Westlaw.

Not Reported in F.Supp.                                                                              Page 1
Not Reported in F.Supp., 1998 WL 88391 (E.D.Pa.)
**(Cite as: 1998 WL 88391 (E.D.Pa.))**

▷

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
HORIZON UNLIMITED, INC. & John Hare
v.
RICHARD SILVA & SNA, INC.
**No. CIV. A. 97-7430.**

Feb. 26, 1998.

*MEMORANDUM AND ORDER*

SHAPIRO, J.

**\*1** Plaintiffs Horizon Unlimited, Inc. ("Horizon") and John Hare ("Hare") (collectively the "plaintiffs"), alleging violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, Pa. Stat. Ann. tit. 73, § 201-1, *et seq.,* negligent misrepresentation, fraud and deceit, and breach of warranty, filed this action against defendants Richard Silva ("Silva") and SNA, Inc. ("SNA") (collectively the "defendants"). Defendants have filed a motion to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, defendants' motion will be granted in part and denied in part.

*BACKGROUND*

Horizon is incorporated under the laws of Delaware,[FN1] and Hare is a citizen of Canada. (Cmplt.¶¶ 6-7). Silva is the president of SNA and resides in Pennsylvania; SNA is incorporated in and has its principal place of business in Pennsylvania. (*Id.* ¶¶ 8-9). Plaintiffs propose to represent a class of all persons who purchased a Seawind aircraft kit manufactured, marketed and sold by defendants. (*Id.* ¶ 1).

FN1. The caption to plaintiffs' Complaint and response to defendants' motion to dismiss describes Horizon as a Florida corporation. However, in the body of their Complaint, plaintiffs aver Horizon is a Delaware corporation; they do not state Horizon's principal place of business. For the purposes of this motion, the court will assume Horizon is incorporated and has its principal place of business in a state other than Pennsylvania.

The Seawind kit contains a variety of fiberglass and machine parts, but the purchaser must provide certain aircraft parts, such as an engine and propeller. The purchaser is required to construct at least 51% of the aircraft under Federal Aviation Administration ("FAA") regulations. (*Id.* ¶ 21). The purchaser may obtain outside help to assist in building the airplane, but defendants cannot construct the airplane for the buyer. (*Id.*).

In order to market and sell the Seawind airplane kit, defendants printed a brochure and placed advertisements in national trade publications. (*Id.* ¶ 22). The advertising materials described the design of the Seawind, its specifications,[FN2] and stated the building time should be "under 2,000 hours." Seawind Brochure at 6. However, plaintiffs claim "[s]ome of the customers purchased the aircraft based upon the 1,000 build time" allegedly represented by defendants in earlier promotional materials. (Cmplt.¶ 24). It is not clear whether plaintiffs, who purchased their airplane in November, 1991, were among those "customers" who believed the build time was under 1,000 hours.

FN2. According to plaintiffs, the relevant specifications are as follows:

| Weight- | Max Takeoff | Land 3400, Water 3400 lbs. |
|---------|-------------|----------------------------|
|         | Empty       | 2300 lbs.                  |

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 88391 (E.D.Pa.)
(Cite as: 1998 WL 88391 (E.D.Pa.))

| | Useful | 1100 lbs. |
|---|---|---|
| | Level Speed 100% Power | |
| | Cruise 75% Power (8000 feet) | |
| | Maximum Range (no reserve) | |
| Rate of Climb | | 1250 fpm |
| Stall Speed- | Clean | 72 mph |
| | Flaps and wheels | 59 mph |
| Take Off Distance- | Land | 820 ft-1175 ft |
| | Water | 1100 ft-1450 ft |
| Landing Distance- | Land | 770 ft-1300 ft |
| | Water | 620 ft-1150 ft |

*See* Seawind Brochure at 1, attached as Ex. to Pltffs.'Cmplt. ["Seawind Brochure"].

Plaintiffs claim they purchased the Seawind airplane kit based on the specifications listed in the brochure. After completing construction, their airplane did not perform as represented in the brochure. Plaintiffs do not state how their airplane was deficient or what specifications they are challenging; plaintiffs only allege the airplane did not "perform according to the specifications and building times" printed in the promotional materials. (*Id.* ¶ 28, 37, 47, 55, 57).

Plaintiffs initiated this action to seek redress for the alleged discrepancies between the specifications and building time in the promotional materials and the airplane's actual performance. They assert four counts: 1) violation of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"); 2) negligence/negligent misrepresentation; 3) fraud and deceit; and 4) breach of warranty. Defendants move to dismiss plaintiffs' Complaint.

## DISCUSSION

I. Standard of Review

**\*2** In considering a motion to dismiss under Rule 12(b)(6), the court "must take all the well pleaded alleg-

ations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." *Colburn v. Upper Darby Township,* 838 F.2d 663, 665-66 (3d Cir.1988) (citations omitted), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989); *see Rocks v. City of Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989). The court must decide whether "relief could be granted on any set of facts which could be proved." *Random v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988). A motion to dismiss may be granted only if the court finds the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Conley v. Gibson,* 335 U.S. 41, 45-46 (1957).

When deciding a motion to dismiss, the court properly may consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 n. 2 (3d Cir.1994); *see Williams v. Stone,* 923 F.Supp. 689, 690 (E.D.Pa.1996), *aff'd,* 109 F.3d 890 (3d Cir.), *cert. denied,* 522 U.S. 956, 118 S.Ct. 383, 139 L.Ed.2d 299 (1997). When the plaintiff attaches an exhibit to the Complaint and incorporates it therein, he is bound by the contents of the exhibit. *See Chester County Intermediate Unit v. Pennsylvania Blue Shield,* 896 F.2d 808, 812 (3d Cir.1990). The court need not convert the motion to dismiss into a motion for summary judgment in order to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 88391 (E.D.Pa.)
(Cite as: 1998 WL 88391 (E.D.Pa.))

Page 3

consider the contents of an attached exhibit. *See id.; Kolimaga v. Bartle,* 871 F.2d 331, 340 n. 3 (3d Cir.1989).

## II. Breach of Warranty

In Count IV, plaintiffs claim a breach of warranty regarding the Seawind's specifications and building time made by defendants in their promotional materials. (Cmplt.¶ 54). Plaintiffs claim these statements created express warranties which they relied upon in purchasing the airplane kit. (Cmplt.¶¶ 54-57). When the Seawind did not perform according to plaintiffs' expectations, defendants allegedly breached these express warranties.

The Purchase Agreement between plaintiffs and defendants contains the following warranty:

SNA, Inc. warrants that the contents of the Kit at the time of shipment will be free of defects in material and workmanship according to current standards of the experimental aircraft industry. SNA, Inc.'s sole obligation under such warranty shall be limited to replacing, correcting or repairing any part of said property, which, within six months after date of shipment and prior to assembly, is shown to be defective and is returned by Purchaser to SNA, Inc.'s plant with all transportation charges, duties and excises paid by seller.

*3 ...

SNA, Inc.'s warranty (a) does not apply to any defect caused by accident, misuse, neglect, improper repair or modifications; (b) does not apply to any part or component not manufactured by SNA, Inc.; and (c) does not apply to any part after it has been assembled in the Aircraft.

Purchase Agreement ¶ 5, at 2, attached as Ex. to Pltffs.' Cmplt. ["Purchase Agreement"].

The Purchase Agreement also contains an integration clause stating:

SNA, Inc. hereby gives notice that it carries NO LIAB-

ILITY INSURANCE and Purchaser and SNA, Inc. agree that THE FOREGOING WARRANTY IS EXPRESSLY IN LIEU OF ANY AND ALL OTHER REPRESENTATIONS, WARRANTIES OR CONDITIONS EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND IS IN LIEU OF ANY AND ALL OBLIGATIONS OR LIABILITIES OF SNA, INC. TO PURCHASER, WHETHER FOR PROPERTY LOSSES OR PERSONAL INJURY LOSSES OR LOSS OF USE OF THE AIRCRAFT, LOSS OF TIME, INCONVENIENCE, COMMERCIAL LOSS, OR FOR INDIRECT, DIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, OR OTHERWISE, ARISING OUT OF THE USE OF THE KIT OR THE FINISHED AIRCRAFT. THE PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT THE FOREGOING SHALL SURVIVE FUNDAMENTAL BREACH OF THIS AGREEMENT.

*Id.* ¶ 5, at 3. The parties initialed the Purchase Agreement directly beneath this clause.

The Purchase Agreement continued with the following language:

The entire understanding and agreement between SNA, Inc. and Purchaser regarding the subject matter hereof is set forth in this document and the Exhibits A, B & C herein. All prior or contemporaneous agreements, understandings, negotiations, discussions, conditions, covenants, warranties and representations, whether written or oral, not incorporated herein are superseded except for the Release and Indemnity signed currently with this Agreement.

Purchase Agreement ¶ 14, at 5.

The Purchase Agreement further contains a choice of law clause stating the agreement "shall be construed and enforced in accordance with, and the rights of the parties hereto shall be governed by, the laws of the Commonwealth of Pennsylvania." Purchase Agreement ¶ 9, at 4.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 88391 (E.D.Pa.)
(Cite as: 1998 WL 88391 (E.D.Pa.))

Page 4

Plaintiffs, claiming the earlier representations in the brochure formed part of the "basis of the bargain," argue defendants cannot "hide behind" the integration clause. (Cmplt.¶¶ 21-22). Plaintiffs, citing no Pennsylvania case law to support their position, assert that a subsequent, written contractual provision cannot contradict earlier express representations.

In Pennsylvania, "the intent of the parties to a written contract is to be regarded as being embodied in the writing itself." *Steuart v. McChesney,* 498 Pa. 45, 444 A.2d 659, 661 (Pa.1982). "[T]he law declares the writing to be not only the best, but the only evidence" of the parties' agreement. *Gianni v. Russell & Co., Inc.,* 281 Pa. 320, 126 A. 791, 792 (Pa.1924); *see Lenihan v. Howe,* 449 Pa.Super. 426, 674 A.2d 273, 275 (Pa.Super.1996). "All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract...." *Union Storage Co. v. Speck,* 194 Pa. 126, 45 A. 48, 49 (Pa.1899); *see HCB Contractors v. Liberty Place Hotel Assoc.,* 539 Pa. 395, 652 A.2d 1278, 1279 (Pa.1995).

*4 The integration clause in the Purchase Agreement purports to supplant "any and all other representations" made prior to formation of the contract. Purchase Agreement ¶ 5, at 3. Where the contractual language is not vague or ambiguous, the court cannot rewrite the terms of the agreement to conform to a party's preferred state of affairs. The waiver of all other express or implied warranties contained in the Purchase Agreement bars an action for breach of warranty based on any representations defendants made prior to the date of the contract.

In certain, limited situations, a party can avoid a waiver of warranties and rely on evidence of prior representations. The party must allege fraud, accident or mistake. *See Bardwell v. Willis Co.,* 375 Pa. 503, 100 A.2d 102, 104 (Pa.1953). However, it is not sufficient for a plaintiff to allege that defendants made fraudulent misrepresentations; the plaintiff must allege fraud in the inducement, that is, "the representations were fraudulently or by accident or mistake omitted from the integrated written contract." *HCB Contractors,* 652 A.2d at 1279. " '[I]f it were otherwise, the parole evidence rule

would become a mockery, because all a party to a written contract would have to do to avoid, modify or nullify it would be to aver (and prove) that the false representations were fraudulently made.' " *Nicolella v. Palmer,* 432 Pa. 502, 248 A.2d 20, 23 (Pa.1968) (quoting *Bardwell,* 100 A.2d at 104).

Plaintiffs have made no allegation that defendants fraudulently induced them to sign the Purchase Agreement. The parties initialed the contract immediately underneath the integration clause, so plaintiffs were not unaware of that provision. An allegation that defendants' brochure made fraudulent representations of the Seawind's specifications or building time is not sufficient to avoid the waiver contained in the integration clause. The waiver in the Purchase Agreement bars plaintiffs' breach of warranty claim; the court will dismiss Count IV of plaintiffs' Complaint.

### III. Negligent Misrepresentation

Plaintiffs' Count II alleges negligent misrepresentation. To establish a prima facie case of negligent misrepresentation, the plaintiff must show: 1) a misrepresentation of a material fact; 2) the representor either knew of the misrepresentation, made the misrepresentation without knowledge as to its truth or falsity or made the misrepresentation under circumstances in which he should have known of its falsity; 3) the representor intended the misrepresentation to induce the plaintiff to act on it; 4) the plaintiff acted in justifiable reliance on the misrepresentation; and 5) injury resulted to the plaintiff. *See Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882, 890 (Pa.1994).

Plaintiffs allege defendants made unidentified misrepresentations concerning the specifications of the Seawind airplane and that defendants knew or should have known of the falsity of their statements. (Cmplt.¶ 35). Plaintiffs also claim defendants intended for them to rely on the allegedly false statements in the brochure. (Cmplt.¶ 39). But plaintiffs cannot claim to have relied on the brochure specifications and figures when the subsequent contract, incorporated in their Complaint, specifically disclaimed any prior representations. Plaintiffs

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 88391 (E.D.Pa.)
(Cite as: 1998 WL 88391 (E.D.Pa.))

Page 5

cannot show reliance. On the face of the Complaint, in light of the incorporated contract, plaintiffs have not established a prima facie case of negligent misrepresentation.

**\*5** Plaintiffs' further difficulty arises from the relationship between their breach of warranty claim and their claim for negligent misrepresentation. Under Pennsylvania law, when the tort involves actions arising from a contractual relationship, the plaintiff is limited to an action under the contract. *See, e.g., Damian v. Hernon,* 102 Pa.Super. 539, 157 A. 520, 521 (Pa.Super.1931). Only in limited circumstances may a plaintiff proceed under a tort theory for alleged wrongs arising from a contractual relationship.

"Breach of contract, without more, is not a tort." *Windsor Securities Co. v. Hartford Life Ins. Co.,* 986 F.2d 655, 664 (3d Cir.1993). "[T]he important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus." *Phico Ins. Co. v. Presbyterian Medical Servs.,* 444 Pa.Super. 221, 663 A.2d 753, 757 (Pa.Super.1995).

To maintain a tort action, " 'the wrong ascribed to defendant must be the gist of the action with the contract being collateral.' " *Bash v. Bell Tele. Co.,* 411 Pa.Super. 347, 601 A.2d 825, 829 (Pa.Super.1992) (citation omitted). "A claim ex contractu cannot be converted to one in tort simply by alleging that the conduct in question was wantonly done." *Closed Circuit Corp. v. Jerrold Electronics Corp.,* 426 F.Supp. 361, 364 (E.D.Pa.1977); *Nirdlinger v. American Dist. Telegraph Co.,* 245 Pa. 453, 91 A. 883, 886 (Pa.1914).

The negligent misrepresentation claim is premised on defendants' statements in promotional literature. Plaintiffs have argued that those statements were part of the "basis of the bargain" that formed the contract between the parties. Plaintiffs claim those statements created express warranties breached by defendants. Plaintiffs' negligent misrepresentation claim is fundamentally intertwined with its breach of warranty claim; the contract is not collateral to the tort claim. Plaintiffs'

mere allegation of negligence is not sufficient to create a distinct tort remedy. *See Phico,* 663 A.2d at 758.

The claim for negligent misrepresentation is "an impermissible attempt to convert a contract claim into a tort claim." *USX Corp. v. Prime Leasing, Inc.,* 988 F.2d 433, 440 (3d Cir.1993). Plaintiffs' attempt to plead a negligence claim cannot survive a motion to dismiss under Rule 12(b)(6). *See Kimberton Chase Realty Corp. v. Mainline Bank,* No. 97-2767, 1997 WL 698487, at \*10 (E.D.Pa. Nov.3, 1997) (Shapiro, J.). Count II will be dismissed.

## IV. Fraud & Deceit

Plaintiffs' Count III asserts a fraud and deceit claim. A plaintiff claiming fraud and deceit must establish the following elements: 1) a representation; 2) which is material to the transaction at hand; 3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; 4) with the intent of misleading another into relying on it; 5) justifiable reliance on the misrepresentation; and 6) injury proximately caused by the reliance. *See Gibbs,* 647 A.2d at 889; *Wilson v. Donegal Mut. Ins. Co.,* 410 Pa.Super. 31, 598 A.2d 1310, 1315 (Pa.Super.1991). In addition, a plaintiff must establish fraud through "clear, precise and convincing" evidence. *Yoo Hoo Bottling Co. of Pennsylvania, Inc. v. Leibowitz,* 432 Pa. 117, 247 A.2d 469, 470 (Pa.1968); *see Gerfin v. Colonial Smelting and Refining Co., Inc.,* 374 Pa. 66, 97 A.2d 71, 74 (Pa.1953) ("clear, precise and indubitable" evidence); *New York Life Ins. Co. v. Brandwene,* 316 Pa. 218, 172 A. 669, 669 (Pa.1934) ("clear and satisfactory" evidence).

**\*6** Plaintiffs base their fraud and deceit claim on defendants' list of the Seawind's specifications and building time in the brochure. Plaintiffs aver that defendants intended for plaintiffs to rely on the statements and knew or should have known the representations were false. (Cmplt.¶ 48). Plaintiffs also claim they reasonably relied on the statements and were injured thereby. (Cmplt.¶¶ 49-51). There is a serious question whether statements in promotional literature are actionable as representations. *See, e.g., Rodio v. Smith,* 123 N.J. 345,

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 88391 (E.D.Pa.)
(Cite as: 1998 WL 88391 (E.D.Pa.))

Page 6

587 A.2d 621, 624 (N.J.1991) (promotional materials were mere puffery, not representations). But the contract attached to plaintiffs' Complaint expressly disclaims any prior statements or representations; plaintiffs cannot claim they relied on prior statements in the brochure to their detriment. By signing the Purchase Agreement, plaintiffs acknowledged that all prior representations were superseded by the contract terms. Plaintiffs have not stated a prima facie case of fraud and deceit.

Plaintiffs' fraud and deceit claim also suffers from the same infirmity as their claim for negligent misrepresentation. Plaintiffs are attempting to recover under a tort theory for an alleged wrong properly characterized as a breach of contract. The same misrepresentations forming the basis of plaintiffs' fraud and deceit claim underlie their claim for breach of warranty. There is no allegation of fraud in the inducement.

A plaintiff cannot "remove the transactions from the ambit of the Commercial Code to the area of tortious conduct simply by making general allegations of fraud." *Closed Circuit Corp.*, 426 F.Supp. at 364. " 'If a party could simply, by alleging that a contracting party never intended to fulfill his promise, create a tortious action in fraud, there would be no effective way of preventing almost every contract case from being converted to a tort for jurisdictional purposes.' " *Id.* at 365 (citation omitted). Because this Purchase Agreement is integral, not collateral, to the alleged fraud and deceit, plaintiffs could only claim a breach of the contract's warranty. *See USX Corp.*, 988 F.2d at 440. Count III will be dismissed.

V. Unfair Trade Practices & Consumer Protection Law

In Count I of their Complaint, plaintiffs allege a violation of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), Pa. Stat. Ann. tit. 73, § 201-1, *et seq.*,[FN3] based on defendants' representations in their promotional literature. "The general purpose of the UTPCPL is to protect the public from fraud and unfair or deceptive business practices." *Burke v. Yingling*, 446 Pa.Super. 16, 666 A.2d 288, 291 (Pa.Super.1995). Be-

cause UTPCPL is an anti-fraud, consumer protection statute, it should be "liberally construed to effect the purpose." *Pennsylvania v. Monumental Prop., Inc.*, 459 Pa. 450, 329 A.2d 812, 816 (Pa.1974).

*7 A private right of action under UTPCPL exists for "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes[FN4] and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by ... this act." Pa. Stat. Ann. tit. 73, § 201-9.2(a). Plaintiffs claim the "aircraft does not perform according to the specifications" in the brochure, (Cmplt.¶ 28), and defendants' omissions and false representations amount to deceptive acts prohibited by UTPCPL.[FN5]

A claim under UTPCPL is separate and distinct from a claim for breach of contract, even though both claims may be based on the same facts. *See Fink v. Delaware Valley HMO*, 417 Pa.Super. 287, 612 A.2d 485, 488 (Pa.Super.1992); *Bash v. Bell Tele. Co. of Pa.*, 411 Pa.Super. 347, 601 A.2d 825, 828 (Pa.Super.1992). The UTPCPL claim is not precluded because plaintiffs' breach of warranty claim is barred by an integration clause. The UTPCPL claim is also distinct from plaintiffs' common law tort actions for negligent misrepresentation and fraud and deceit; the fact that those claims are barred does not preclude plaintiffs' UTPCPL claim.

A. Limitation of Liability Clause

Defendants argue the Purchase Agreement contains provisions restricting liability. One clause limits defendants' liability for defective parts to "replacing, correcting or repairing any part" prior to assembly. Purchase Agreement ¶ 5, at 2.

A limitation of liability clause does not eliminate a contracting party's liability, but it restricts it to a certain amount or form of corrective action. "Limitation of liability clauses are routinely enforced under the Uniform Commercial Code when contained in sales contracts ne-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                              Page 7
Not Reported in F.Supp., 1998 WL 88391 (E.D.Pa.)
**(Cite as: 1998 WL 88391 (E.D.Pa.))**

gotiated between sophisticated parties and when no personal injury or property damage is involved. This is true whether the damages are pled in contract or tort." *Valhal Corp. v. Sullivan Assoc., Inc.,* 44 F.3d 195, 203 (3d Cir.1995) (citing cases). Limitation of liability clauses are not disfavored under Pennsylvania law; Pennsylvania courts generally enforce them, finding the parties "[a]re at liberty to fashion the terms of their bargain." *Vasilis v. Bell of Pa.,* 409 Pa.Super. 396, 598 A.2d 52, 54 (Pa.Super.1991).

The Purchase Agreement states, "Purchaser represents that he is an educated and/or sophisticated purchaser of aircraft and purchases this kit as such." Purchase Agreement ¶ 3, at 1. But the limitation of liability clause pertains only to contractual remedies. It warrants the contents of the Seawind kit will be free of defective parts; if defects exist, defendants agree to repair, correct or replace them. Plaintiffs are not alleging any of the airplane's parts are defective; they claim under the UTP-CPL that defendants engaged in deceptive acts prior to formation of the contract. The clause limiting defendants' duty to repairing defective parts does not apply to this action.

B. Exculpatory Clause

*8 The Purchase Agreement contains a provision purporting to release defendants from any and all liability. A valid exculpatory clause "deprives one contracting party of a right to recover for damages suffered through the negligence of the other contracting party." *Fidelity Bank v. Tiernan,* 249 Pa.Super. 216, 375 A.2d 1320, 1325 (Pa.Super.1977); *see Ellwood Consolidated Water Co. v. Johnson,* 420 F.2d 787, 788 (3d Cir.1970).

Three conditions must be met for an exculpatory clause to be valid: 1) the clause cannot contravene public policy; 2) the contract must involve only the private affairs of the parties and not a public matter; and 3) the contract cannot be one of adhesion. *See Topp Copy Products, Inc. v. Singletary,* 533 Pa. 468, 626 A.2d 98, 99 (Pa.1993). Even if the exculpatory clause is valid, it is unenforceable "unless the language of the parties is clear that a person is being relieved of liability for his

own acts of negligence." *Id.* The contract language is strictly construed and must state the parties' intentions with particularity. Any ambiguities must be resolved against the party seeking immunity from liability. *See, e.g., Dilks v. Flohr Chevrolet, Inc.,* 411 Pa. 425, 192 A.2d 682, 687 (Pa.1963).

In the Purchase Agreement's exculpatory clause, plaintiffs agreed to assume "the entire responsibility and liability for, any and all damages or injuries of any kind or nature whatsoever, including property damage, personal injury or death, ... caused by, resulting from, arising out of, or occurring in connection with the supply to purchaser, or the use by purchaser or other persons, of the kit or finished aircraft." Plaintiffs also "generally release [d] SNA, Inc. from any and all liabilities above described, either occurring now and/or at any time in the future." Purchase Agreement at 6.

Plaintiffs also agreed that defendants' agreement to repair any defective parts was "IN LIEU OF ANY OBLIGATIONS OR LIABILITIES OF SNA, INC. TO PURCHASER, WHETHER FOR PROPERTY LOSSES OR PERSONAL INJURY LOSSES OR LOSS OF USE OF THE AIRCRAFT, LOSS OF TIME, INCONVENIENCE, COMMERCIAL LOSS, OR FOR INDIRECT, DIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, OR OTHERWISE, ARISING OUT OF THE USE OF THE KIT OR THE FINISHED AIRCRAFT." *Id.* ¶ 5, at 3.

If plaintiffs are claiming only their loss of time or the inconvenience of flying an airplane that does not conform to the specification in the brochure, the exculpatory clause would apply and preclude their recovery. However, plaintiffs appear to claim violation of UTP-CPL based on defendants' alleged deceptive activity leading plaintiffs to enter into a commercial transaction. It is not clear from the language of the exculpatory clause whether the parties intended to bar actions based on a separate statutory remedy for illegal activity inducing the formation of the contract as opposed to an action for damages incurred after the making of the contract. The nature of the damages claimed and their cause or causes are also very unclear at this time.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                           Page 8
Not Reported in F.Supp., 1998 WL 88391 (E.D.Pa.)
**(Cite as: 1998 WL 88391 (E.D.Pa.))**

**\*9** "[W]hen a contract does not provide for a contingency, it is not ambiguous; rather, it is silent, and the court may not 'read[ ] into the contract something it does not contain and thus make a new contract for the parties.' " *Banks Engineering Co. v. Polons,* 697 A.2d 1020, 1023 (Pa.Super.1997) (citing *Snellenberg Clothing Co. v. Levitt,* 282 Pa. 65, 127 A. 309, 310 (Pa.1925)). Because this matter is raised on a motion to dismiss, the court will not read into the exculpatory clause language barring an action under UTPCPL when the parties not did expressly contract for such a provision. The court will deny the motion to dismiss Count I of plaintiffs' Complaint without prejudice to a motion for summary judgment after the individual circumstances are revealed by discovery.

## VI. Damages

### A. Punitive Damages Under UTPCPL

Defendants move to dismiss any claims for punitive damages. Under UTPCPL, a successful plaintiff may "recover actual damages or one hundred dollars ($100), whichever is greater." Pa. Stat. Ann. tit. 73, § 201-9.2(a). "The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper ... [including] costs and reasonable attorney fees." *Id.*

"It is undisputed that the imposition of exemplary or treble damages is essentially punitive in nature." *Johnson v. Hyundai Motor of Am.,* 698 A.2d 631, 639 (Pa.Super.1997). " '[Courts] will be guided by the well-established, general principles of law governing punitive damages when exercising discretion under the UTP-CPL.' " *Kimberton Chase Realty Corp.,* 1997 WL 698487, at \*11 (citation omitted). The statute authorizes an award of treble damages, ultimately serving the same purpose as an award of punitive damages. Plaintiffs may be awarded statutory damages rather than punitive damages if successful at trial.

### B. Punitive Damages in a Class Action

Defendants also argue punitive damages are unavailable because, "to the extent this is ever going to amount to a class action, no punitive damages are usually available to a common plaintiff and said claims must be dismissed." Defs.' Mem. Supp. Mot. Dismiss at 5. However, "each member of the putative class holds a separate and distinct interest in a punitive damages award." *Pierson v. Source Perrier,* 848 F.Supp. 1186, 1189 (E.D.Pa.1994); *see also Johnson v. Gerber Products. Co.,* 949 F.Supp. 327, 329 (E.D.Pa.1996) (listing cases involving punitive damages in class actions).

In support of their argument, defendants rely on *Bishop v. General Motors Corp.,* 925 F.Supp. 294 (D.N.J.1996). *Bishop* simply holds that a class plaintiff cannot aggregate punitive damage claims for all class members to satisfy the jurisdictional amount in controversy requirement, *see id.* at 297, a proposition established by *Snyder v. Harris,* 394 U.S. 332, 335, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). *See e.g., Hamel v. All-state Indemnity Co.,* No. 95-6554, 1996 WL 106120, at (E.D.Pa., Mar. 5, 1996). No class has yet been certified. However, only the UTPCPL claim remains, so plaintiffs are restricted to statutory damages, not punitive damages.

## VII. Specificity

**\*10** Defendants move to dismiss the Complaint for failure to plead fraud with specificity. "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). The court will dismiss plaintiffs' claim for fraud and deceit; therefore, defendants' Rule 9(b) argument is moot as to Count III. In Count I, plaintiffs rely on alleged fraudulent practices made illegal by UTPCPL. Viewing the Complaint in the light most favorable to plaintiffs, they have put defendants on sufficient notice that their claim is premised on the specifications listed in the Seawind promotional materials. Through discovery, defendants will be able to learn the specifications plaintiffs claim their Seawind fails to meet and the statutory provisions claimed to have been violated.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 88391 (E.D.Pa.)
**(Cite as: 1998 WL 88391 (E.D.Pa.))**

Page 9

*CONCLUSION*

The court will dismiss plaintiffs' claims for breach of warranty, negligent misrepresentation and fraud and deceit. The court will deny defendants' motion to dismiss plaintiffs' claim for violation of UTPCPL.

An appropriate Order follows.

*ORDER*

AND NOW, this 26th day of February, 1998, upon consideration of defendants' motion to dismiss the Complaint, plaintiffs' response thereto, and in accordance with the attached Memorandum, it is hereby ORDERED that:

1. Defendants' motion to dismiss is GRANTED IN PART AND DENIED IN PART.

2. Defendants' motion to dismiss is GRANTED as to Count II (Negligence/Negligent Misrepresentation), Count III (Fraud and Deceit) and Count IV (Breach of Warranty).

3. Defendants' motion to dismiss is DENIED as to Count I (Unfair Trade Practices and Consumer Protection Law) without prejudice to a subsequent motion for summary judgment.

4. Plaintiffs' request for punitive damages is amended to a request for statutory damages under UTPCPL.

5. Defendants shall file an Answer within ten (10) days of the date of this Order.

6. Plaintiffs shall move for class certification within twenty (20) days of the date of this Order. Defendants shall respond within ten (10) days thereafter; plaintiffs may reply to defendants' response within an additional ten (10) days.

7. A Rule 16 conference and oral argument on the motion for class certification will be scheduled by separate Order.

Norma L. Shapiro, J.

FN3. The relevant provision of UTPCPL states: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce ... are hereby declared unlawful." Pa. Stat. Ann. tit. 73, § 201-3. Actions that qualify as "unfair methods of competition" or "unfair or deceptive acts or practices" are listed in Pa. Stat. Ann. tit. 73, § 201-2.

FN4. The Seawind aircraft is designated as "experimental" by the FAA. *See* Purchase Agreement at 6, 14. Under FAA regulations, "[n]o person may operate an aircraft that has an experimental certificate-... (2) Carrying persons or property for compensation or hire." 14 C.F.R. § 91.319. Plaintiffs were not permitted to use the Seawind for commercial purposes; therefore, the court assumes without deciding now that they purchased the kit for "personal" use.

FN5. Plaintiffs do not identify which statutory definition of "unfair methods of competition" or "unfair or deceptive acts or practices" they are relying upon. Conceivably, defendants' alleged actions might fall within the following definitions:

"Representing that goods or services have ... ingredients, uses, benefits or quantities that they do not have,"73 Pa. Stat. Ann. tit. 73, § 201-2(4)(v);

"Representing that goods or services are of a particular standard, quality or grade, or that the goods are of a particular style or model, if they are of another,"73 Pa. Stat. Ann. tit. 73, § 201-2(4)(vii);

"Advertising goods or services with intent not to sell them as advertised,"73 Pa. Stat. Ann. tit. 73, § 201-2(4)(ix);

"Failing to comply with the terms of any written guarantee or warranty given to the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                  Page 10
Not Reported in F.Supp., 1998 WL 88391 (E.D.Pa.)
**(Cite as: 1998 WL 88391 (E.D.Pa.))**

        buyer at, *prior to* or after a contract for the
        purchase of goods or services is made,"73
        Pa. Stat. Ann. tit. 73, § 201-2(4)(xiv)
        (emphasis added); or

        "Engaging in any other fraudulent or decept-
        ive conduct which creates a likelihood of
        confusion or of misunderstanding,"73 Pa.
        Stat. Ann. tit. 73, § 201-2(4)(xxi).

E.D.Pa.,1998.
Horizon Unlimited, Inc. v. Silva
Not Reported in F.Supp., 1998 WL 88391 (E.D.Pa.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3605272 (E.D.Pa.)
**(Cite as: 2005 WL 3605272 (E.D.Pa.))**

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
INTERWAVE TECHNOLOGY INC., et al
Plaintiffs,
v.
ROCKWELL AUTOMATION, INC. and Richard
Ryan, Defendants.
**No. Civ.A.05-398.**

Dec. 30, 2005.

Andrew L. Noble, David Glenn Oberdick, Meyer,
Unkovic & Scott, LLP, Pittsburgh, PA, Philip A.
Tordella, Tordella & Kane PC, Paoli, PA, for
Plaintiffs.

David P. Muth, Robert H. Duffy, Quarles & Brady
LLP, Milwaukee, WI, Gregory J. Hauck, Mont-
gomery McRacken Walker & Rhoads, Philadelphia,
PA, for Defendants.

*MEMORANDUM AND ORDER*

PRATTER, J.

**\*1** Defendants Rockwell Automation, Inc.
("Rockwell") and Richard Ryan ("Ryan") move to
dismiss the claims of Plaintiffs Interwave Techno-
logy Inc. ("Interwave") and Jonathan Kall as the as-
signee of Interwave ("Kall") in this commercial dis-
pute. Rockwell and Ryan argue that the Complaint
should be dismissed because (1) the Amended
Complaint does not properly allege breaches of
either express or implied contract obligations, (2)
the "gist of the action" doctrine prohibits Plaintiffs'
fraud claims, (3) the operation of the integration
clause in the operative contract in conjunction with
the parol evidence rule prohibit the fraud claims,
(4) this Court has no subject matter jurisdiction,
and (5) Interwave lacks standing to pursue the as-

serted claims.

Interwave and Kall respond by positing that (1)
they plead several specific instances of both im-
plied and express breaches of contract, (2) liberal
pleading rules allow alternate pleading and the "gist
of the action" doctrine does not require dismissal of
the fraudulent inducement claims at this stage, (3)
the reach of the parol evidence rule in connection
with the integration clause is not so broad as to pre-
clude the fraud allegations here, (4) the Court has
already determined that subject matter jurisdiction
exists and the contract itself establishes jurisdiction
for this Court, and, finally, (5) even though Inter-
wave assigned its rights under the relevant contract,
not all of the claims in this action arise under that
contract, and Interwave has preserved its independ-
ent standing to pursue certain unassigned claims.

For the reasons discussed below, the Court denies
in part and grants in part Rockwell and Ryan's Mo-
tion to Dismiss. While many of the arguments
presented during the oral argument on the Motion
likely are precursors for hotly contested factual dis-
putes that will no doubt prompt good faith discov-
ery disagreements and possibly other motions in
this case, at this point in the litigation, the simple
fact of the matter is that the Complaint, on its face,
sufficiently states a claim to place Rockwell and
Ryan on notice of claims for express and implied
contract breaches. The Complaint also successfully
establishes the subject matter jurisdiction of this
Court. However, because the claims of fraudulent
inducement against Rockwell are precluded by the
operation of the parol evidence rule under
Pennsylvania law, Count II will be dismissed. Fi-
nally, because Interwave would have standing to
the degree that there are claims outside of the as-
signed contract in dispute, Interwave remains a
party in this case because Count III asserts fraudu-
lent inducement claims against Ryan who was not a
party to the assigned contract.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3605272 (E.D.Pa.)
(Cite as: 2005 WL 3605272 (E.D.Pa.))

## I. PROCEDURAL HISTORY AND FACTUAL BACKGROUND

The following recitation of the facts is based on the allegations found in the Complaint and will be viewed with all reasonable inferences in the Plaintiffs' favor. *See Jordan v. Fox, Rothschild. O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994).

**\*2** Interwave, a manufacturing execution systems integrator located in Exton, Pennsylvania, adopted a Plan of Liquidation, and in the process of winding up its business, assigned to Kall its assets, including the rights of Interwave under a January 28, 2003, Asset Purchase Agreement ("APA") with Rockwell. Am. Compl. ¶¶ 1-3.

Rockwell is a Delaware corporation, and Ryan was President of Rockwell Software Inc., a business unit of Rockwell, *id.* ¶¶ 3-4, who also was Rockwell's chief negotiator and conduit of information between Rockwell and Interwave regarding the transaction between the parties that is the focal point of the litigation. *Id.* ¶¶ 12-14.

### A. Procedural History

Interwave and Kall filed their original Complaint in this action on January 28, 2005. Very shortly thereafter they filed a Motion to Stay Proceedings Pending Non-Binding Mediation Process. In response, Rockwell and Ryan filed a Motion to Dismiss the Complaint and Opposition to Plaintiffs' Motion to Stay. On March 2, 2005, the Court granted the Motion to Stay, and denied the Motion to Dismiss, without prejudice, and ordered the parties to provide a jointly written status report by May 3, 2005 or within one week of the conclusion or abandonment of the mediation process, whichever occurred sooner.

The mediation took place in Pittsburgh, Pennsylvania on May 23, 2005, and immediately thereafter counsel for both parties advised the Court that the case remained unresolved and requested that the Court lift the stay. With the stay lifted Rockwell and Ryan then filed a Motion to Stay Proceedings Pending the Outcome of Arbitration to which Interwave and Kall replied. However, the parties, with leave of Court, also stipulated to the filing of an Amended Complaint, which Plaintiffs proceeded to do. Rockwell and Ryan's Motion to Stay Proceedings was denied, and Rockwell and Ryan then filed this Motion to Dismiss Plaintiffs' Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

### B. Factual Background

### 1. The Asset Purchase Agreement

Early in 2003, Rockwell purchased substantially all of Interwave's assets pursuant to an Asset Purchase Agreement ("APA")(the "Transaction"). Kall was Interwave's president and sole shareholder at the time of sale. *Id.* ¶ 10.Under the APA, the purchase price for the assets was a combination of $12 million payable at closing and an Earn Out amount of up to an additional $12 million (to be calculated and paid in accordance with Article XIII of the APA). Essentially, the Earn Out consists of a Year One Earn Out payment to Interwave of up to $2 million dollars and a Year Three Earn Out payment to Interwave of up to $10 million dollars, based on revenues calculated pursuant to definitions contained in the APA and recorded by Rockwell for the period from May 1, 2003 to April 30, 2004 (Year One Earn Out Revenue) and from May 1, 2005 to April 30, 2006 (Year Three Earn Out Revenue), (collectively, the "Earn Out").*Id.* ¶ 16.

**\*3** As part of the Transaction, Kall entered into a 39-month employment contract (the "Employment Agreement"), by which Rockwell hired Kall to serve as Rockwell's Director of Manufacturing Business Solutions division ("MBS"). Subsequently, this division was renamed Information Systems ("IS") and included Interwave's Manufacturing Execution Solutions ("MES"). The 39-month employment term was intentionally consistent with

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3605272 (E.D.Pa.)
(Cite as: 2005 WL 3605272 (E.D.Pa.))

Page 3

the length of the total Earn Out measurement period under the APA, which period is due to expire on April 30, 2006. *Id.* ¶¶ 18-19.

2. Defendants' Alleged Conduct

a. Coordinator Software and MES Solutions

Prior to closing on the Transaction, Interwave was in the process of filing a patent application with the U.S. Patent and Trademark Office for its "Coordinator" software, which was sold to Rockwell as part of the Transaction. Post closing sales were critical to Interwave in order to achieve the Earn Out revenues and subsequent Earn Out Payments, especially with regard to the Year Three Earn Out. The Coordinator software was designed to be used in combination with MES or related software products to provide more "out of the box" MES solutions to potential MES customers. *Id.* ¶ 26-29.Ryan knew the Coordinator software needed to be paired with an existing comprehensive MES software product or layered/developed over a plant floor software suite of products to derive any beneficial commercial application. *Id.* ¶¶ 34, 52.

In early August 2002, at meetings at the Best Western Motel in Exton, Pennsylvania, Ryan allegedly represented to Interwave that subsequent to closing on the Transaction, Rockwell would put a "team" on the development of Coordinator software. *Id.* ¶¶ 27-30, 33.Prior to closing on the Transaction, Rockwell represented it would also enter into partnerships with existing vendors which possessed comprehensive MES software products in order to develop a capability to deliver comprehensive MES solutions and integration services while Rockwell was developing its own competitive MES software products (via Coordinator development) to deliver comprehensive and/or partial MES solutions and integration services to achieve MES sales and revenue post closing in fulfillment of the Earn Out obligations contained in Article XIII of the APA.*Id.* ¶ 35.

However, according to the Complaint, after closing on the Transaction, Rockwell failed to approve fully negotiated partnerships with third party vendors possessing comprehensive MES "third party products" necessary for comprehensive MES solutions, and failed to accept offered contracts. Plaintiffs allege that this resulted in the loss of at least two multi-million dollar comprehensive MES solution projects that would have generated substantial revenue to the IS Division and at least between $20 million and $25 million in additional revenue toward the calculation of Year One and Year Three Revenue.*Id.* ¶ 54.

*4 Additionally, Rockwell allegedly removed key IS Division software development personnel from the development of Coordinator initiative to work on other Rockwell projects. Rockwell also failed to devote any meaningful resources or effort toward development of a comprehensive MES software product, which, in combination with Rockwell's failure to approve fully negotiated partnerships with existing comprehensive third party vendors, and its failure to accept offered contracts, allegedly crippled the ability of Interwave/IS to offer comprehensive MES solutions which represented virtually all of Interwave's entire pre-closing business. As a result, Plaintiffs did not attain the negotiated revenue targets for the Year One Earn-Out. *Id.* ¶ 55.

b. Alleged Sales Leads

On July 8, 2002, Ryan met with Kall to discuss the terms and conditions of the proposed transaction between the parties. At that meeting, which took place at the Philadelphia Airport Marriott, Ryan represented to Interwave that, subsequent to Rockwell's purchase of Interwave as proposed, the new Interwave/Rockwell would have access to "more leads than Interwave/Rockwell could handle," it would have access to existing Rockwell customers, and Rockwell had more "Scheduling" software business than the new Interwave/Rockwell could perform. *Id.* ¶ 31.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                Page 4
Not Reported in F.Supp.2d, 2005 WL 3605272 (E.D.Pa.)
**(Cite as: 2005 WL 3605272 (E.D.Pa.))**

After the Transaction closing, however, Interwave discovered that Rockwell was not aligned, and had never been aligned, to provide substantive leads or customers to the new Interwave/Rockwell and Rockwell had very little "Scheduling" software business as had been represented. *Id.* ¶ 32.Thus, Interwave claims that Rockwell failed to provide Interwave/IS access to qualitative leads from Rockwell's sales channel and, instead, raised impediments to the ability of Interwave/IS to sell to its existing customers through this sales channel. *Id.* ¶ 51.

c. Calculation of Earn Out Provisions

In late December 2002, Ryan represented to Interwave's agents, including Kall, that in Ryan's view, the definition of "Implementation Services" set forth in the APA to be executed by the parties included all revenue for hardware and software sold as part of a solution, including Rockwell hardware and software. Ryan also represented at this time that for purposes of calculating the Earn Out, again as Ryan interpreted the contract definitions, all services provided or performed by Rockwell's existing MBS business group and by Interwave's existing MES business were to be included in the definition of "Implementation Services." Furthermore, prior to closing on the Transaction, Plaintiffs contend that Ryan consistently represented to Interwave that all revenue from consulting and/or services performed by any MBS/Interwave employees would be included in the calculation of revenue applicable to the Earn Out. *Id.* ¶¶ 40, 42-43.

According to Plaintiffs, however, Rockwell has refused and continues to refuse to include as revenue the total price for hardware and software sold as part of solutions sold and/or for services by Rockwell's IS division (a combination of Rockwell's former MBS business and Interwave's pre-closing MES business) or as part of its calculation of the Earn Out and specifically in its calculation of Year One Revenue as that term is defined in Article XIII of the APA as represented by Ryan. Rockwell

denies that it ever intended to do so. *Id.* ¶ 39.

*5 Rockwell continues to refuse to include in the calculation of revenue applicable to the Earn Out, and specifically in its calculation of Year One Revenue, all revenue from consulting and/services performed by MBS/Interwave employees, performed by a previous Interwave employee or performed by a Rockwell employee as represented by Ryan, and denies that it ever intended to do so. *Id .* ¶¶ 41, 44.

d. Tracking revenues

Interwave also claims that prior to closing on the Transaction, Ryan also represented to Interwave that Rockwell's structure, processes and infrastructure were aligned and its sales channel, structure and processes were configured so as to enable Interwave to achieve, and Rockwell to track, the revenues subject to the Earn Out. However, in actuality, according to Plaintiffs, at the time of the closing and during the measuring period of the Earn Out, including the Year One Revenue measuring period, Rockwell's structure, processes and infrastructure were not aligned, and its sales channel, structure and processes were not configured, so as to enable Interwave to achieve, and Rockwell to track, the revenues subject to the Earn Out. *Id.* ¶¶ 45-46.

e. Jonathon Kall's Role After the Transaction

Rockwell represented to Interwave and Kall that post closing Kall was to be put in charge of the combined Rockwell existing MBS Business and the former    Interwave    MES    Business ("MBS/Interwave"), and would be responsible for the sales and revenue to be included in the Year-One and Year-Three Earn Out revenue provided for in Article XIII of the APA. *Id.* ¶ 47.

However, subsequent to closing, Rockwell refused and failed to put Kall in charge of the combined MBS/Interwave business or its sales, technical and service employees as represented. Therefore, Kall

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2005 WL 3605272 (E.D.Pa.)
**(Cite as: 2005 WL 3605272 (E.D.Pa.))**

was not, as represented to Interwave, in charge of sales and revenue referred to in Article XIII of the APA. This, too, according to Interwave, had a direct negative impact on Interwave's ability to achieve the Earn Out. *Id.* ¶¶ 47-48.

f. Reorganization of Rockwell

Kall's employment was terminated by Rockwell on June 22, 2004, and Rockwell immediately reorganized, transferred key IS personnel to other divisions, fired or transferred the entire IS sales force and eventually eliminated completely the former Rockwell IS division, making it structurally impossible for Interwave to achieve, or for Rockwell to appropriately track and record, revenue applicable to Interwave's Year Three Earn Out. *Id.* ¶ 57.

g. Retention Bonuses Under the APA

Section 10.2 (b) of the APA provides for the payment of Retention Bonuses to certain key employees who were in the employ of Interwave at the time of closing on the Transaction. Pursuant to the terms of the APA, the Retention Bonuses were to create an incentive for the listed employees to remain in Rockwell's employ and to provide an incentive for those employees to "meet financial objectives." *Id*. ¶ 63-64.

*6 Beginning in 2003, various listed employees allegedly indicated to Rockwell their concerns as to the inability to achieve the Year One Earn Out target revenues set out in their Retention Agreements (and matched in the APA), and thus the Retention Bonuses, all due to Rockwell's actions and/or omissions. In response to these concerns, Rockwell compensated the listed employees with retroactive pay increases, stock grants, and, with respect to most of the listed employees, lump sum payments in an amount equal to what they would have received if the Year One Earn Out revenue goals were achieved. Plaintiffs assert that by making these payments outside of the structure provided for in the APA, Rockwell destroyed the incentive,

provided for in Section 10.2 of the APA, of the employees to meet the financial objectives necessary for Interwave to achieve the Earn Out revenues and thereby undermined Interwave's ability to achieve Earn Out targets. *Id.* ¶ 65-69.

h. Reporting Revenue Under the APA

In early July, 2004, Interwave and Kall received from Rockwell a Year One Earn-Out Statement dated June 29, 2004 and signed by John McDermott Senior Vice President of Rockwell, indicating a calculation of Year One Earn Out revenue of $4,513,815.00, resulting in no earn out payment to Interwave. Kall requested access by "Seller's Representatives" to Rockwell "personnel, properties, books and records" necessary to prepare a Notice of Disagreement with the Year One Earn-Out Statement and to conduct an audit and inspection in accordance with Section 13.1(f) and (g) of the APA. Rockwell denied access to all but one of the requested personnel and provided only very limited access to the books and records requested by Interwave in order to properly prepare its Notice of Disagreement. *Id.* ¶¶ 70-75.

i. Summary of Plaintiffs' Claims

In summary, Plaintiffs allege that Rockwell has breached Sections 4.1, 7.2, 9.3, 10.2, 13.1(f) and (g), and Article XIII of the APA, as well as the implied covenants and obligations of good faith and fair dealing. (Counts I and IV). Plaintiffs also assert actions in deceit and fraudulent inducement claims against both Rockwell and Ryan (Counts II and III).

II. DISCUSSION

A. The Legal Standard

A Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted tests the legal sufficiency of the complaint. *Winterberg v. CNA Ins. Co.,* 868 F.Supp. 713, 718

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3605272 (E.D.Pa.)
**(Cite as: 2005 WL 3605272 (E.D.Pa.))**

(E.D.Pa.2004). When considering such a motion to dismiss, the Court must accept the complainant's allegations as true, *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), and must consider "all reasonable inferences that can be drawn from them after construing them in the light most favorable to the non-movant." *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). A complaint may be dismissed "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon,* 467 U.S. at 73. *See also Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) ("a complaint should not be dismissed for failure to state a claim unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief").

*7 The pleading standards against which this Complaint is to be measured are those set out in the Federal Rules of Civil Procedure, most notably Fed.R.Civ.P. 8(a) and (e), which call upon the pleader to present "a short and plain statement of the claim" where "each averment ... shall be simple, concise, and direct."The Supreme Court described the simplified pleading permitted by the Federal Rules as that which "will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley,* 355 U.S. at 47. Indeed, the Supreme Court has reaffirmed these liberal notice-pleading requirements by noting that a *prima facie* case is "an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

B. Subject Matter Jurisdiction

Rockwell and Ryan argue that mediation is a condition precedent that must be fulfilled in order for this Court to have subject matter jurisdiction under § 14.16 of the APA. Rockwell contends that because Interwave and Kall filed suit before the mediation process was complete, there was no subject matter

jurisdiction for the original Complaint, and therefore any fraud claims in the Amended Complaint are now untimely and should be dismissed pursuant to the statute of limitations.

Interwave and Kall counter this argument by posing that, by denying Defendants' initial motion to dismiss without prejudice and granting the Plaintiffs' Motion to Stay, the Court already rejected Defendants' argument that there is no subject matter jurisdiction prior to the conclusion of mediation. Interwave and Kall also contend that § 14.13 of the APA which "submits [disputes] to the exclusive jurisdiction of the United States District Court for the Eastern District of Pennsylvania" gives this Court jurisdiction, and even if it had not, the non-binding arbitration requirements of the contract have already been satisfied.

When Interwave and Kall initiated suit and sought to stay proceedings pending the mediation they acted consistently with § 14.16. As drafted, the dispute resolution section of the APA does not prohibit filing suit and staying the suit pending the mediation. Rather, § 14.16 states "the parties will attempt in good faith to resolve such Dispute by mediation ... [i]f such mediation is unsuccessful within ninety days after commencement thereof, either party may pursue any other remedies available to it."

Under Rockwell's theory, under this particular contract, Interwave's failure to engage exclusively and exhaustively in mediation in accordance with § 14.16 could operate to extinguish Plaintiffs' claims by operation of the statute of limitations because this Court would not have jurisdiction of claims brought prior to mediation, and claims filed subsequent to the completion of the mediation would risk being untimely inasmuch as the APA has no timing mechanism for compelling the *start* of mediation, although it does allow for the parties to pursue other avenues if mediation is not successful within 90 days of commencing mediation. At best, the APA is ambiguous on this point, and Plaintiffs correctly point out that the Court declined to accept

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3605272 (E.D.Pa.)

**(Cite as: 2005 WL 3605272 (E.D.Pa.))**

the challenge made by the Defendants in their initial Motion to Dismiss and Opposition to Plaintiffs' Motion to Stay. Further, as Interwave and Kall argue, none of the cases cited by Rockwell dealt with subject matter jurisdiction during the pendency of a non-binding mediation process already commenced by the plaintiff at the time of the suit.[FN1] Here, Plaintiffs sought mediation, and by staying this suit during that mediation, waited to pursue "other remedies available to it" until after the attempt at mediation failed. Therefore, Defendants' argument that this Court lacks subject matter jurisdiction fails due to its overly preclusive, unwarranted, and erroneous interpretation of § 14.16.

> FN1. *See e.g., Ziarno v. Gardner Carton & Douglas, LLP,* No. 03-3880, 2004 WL 838131, at *3 (E.D.Pa. April 8, 2004)(the court held it lacked subject matter jurisdiction because the parties failed to submit their dispute to contractually mandated mediation/arbitration); *Darling's v. Nissan North America, Inc.* 117 F.Supp.2d 54, 61 (D.Me.2000)(the court held plaintiff was required to make written demand for non-binding mediation as a prerequisite to filing its lawsuit); *Bill Call Ford, Inc. v. Ford Motor Co.,* 48 F.3d 201, 208 (6th Cir.1995) (claim that franchisor did not adequately reimburse franchisee for warranty repairs was barred by franchisee's failure to seek mediation); *De Valk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 336 (7th Cir.1987) (substantial compliance with dispute resolution provisions did not excuse the plaintiff's failure to present claim to defendant's policy board as condition precedent to suit); *HIM Portland, LLC v. DeVito Builders, Inc.,* 317 F.3d 41, 44 (1st Cir.2003)(the court held that owner could not compel arbitration where neither party had requested mediation because the contracting parties conditioned an arbitration agreement upon the request by either party for mediation);

> *Kemiron Atlantic, Inc. v. Aguakem Intern., Inc.,* 290 F.3d 1287, 1291 (11th Cir.2002) (under the contract, to invoke the arbitration provision, either party had to request mediation and provide notice of the request to the other party, where neither condition was met, arbitration was precluded); *Mortimer v. First Mount Vernon Indus. Loan Ass'n,* No. 03-1051, 2003 WL 23305155, at *2 (D.Md. May 19, 2003) (court dismissed plaintiff's claim when plaintiff failed first to submit to mediation in accordance with the contract); *Ponce Roofing, Inc. v. Roumel Corp.,* 190 F.Supp.2d 264, 267 (D.P.R.2002)(court dismissed suit where parties failed to first mediate as required by the contract); *Ventre v. Ventreu,* No. 377184S, 2001 WL 100326, at *1 (Conn.Super.Ct. Jan.9, 2001) (court dismissed case where it found mediation was a condition precedent for bringing suit); *Coburn v. Grabowski,* No. 960134935, 1997 WL 309572, at *3 (Conn.Super.Ct. May 29, 1997) (without addressing whether or not the plaintiff even sought mediation or filed for a stay, the court held "[t]he language of the instant contract indicates the clear intention of the parties that mediation should be a condition precedent to bringing a court action. Since that condition precedent was not satisfied prior to the filing of this court action, the court finds that it does not have subject matter jurisdiction and thereby grants the defendants' Motion to Dismiss."); *Gould v. Gould,* 240 Ga.App. 481, 523 S.E.2d 106, 108 (Ga.App.1999) (court determined relief was precluded by mother's failure to comply with provision in divorce decree requiring parties to submit disputes concerning their minor children to mediator or family counselor before litigating); *Absher Const. Co. v. Kent School Dist. No. 415,* 77 Wash.App. 137, 890 P.2d 1071, 1076 (Wash. Ct.App. Div. 1 1995) (court found

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3605272 (E.D.Pa.)
(Cite as: 2005 WL 3605272 (E.D.Pa.))

the contract provided a mandatory procedure to resolve claims for extra work caused by deficient plans and specifications and found the plaintiff waived the claim by failing to follow those procedures).

C. Standing

*8 Rockwell argues that Interwave lacks standing because it has assigned its claims under the APA to Kall. Plaintiffs respond by arguing that to the extent Interwave has alleged causes of action not related to the APA, such as Counts II and III's claims of fraudulent inducement and deceit against both Rockwell and Ryan, Interwave should remain a party to the action.

"Under Pennsylvania law, which the parties treat as applicable, a contracting party that has assigned its contract rights to a third party does not have standing to enforce that contract." *Sanford Inv. Co. v. Ahlstrom Mach. Holdings, Inc.,* 198 F.3d 415, 420 (3d Cir.1999) (*citing West Penn Admin., Inc. v. Pittsburgh Nat'l Bank,* 289 Pa.Super. 460, 433 A.2d 896, 902 (Pa.Super.Ct.1981)). But as the Plaintiffs properly state, and Defendants seem to agree,[FN2] to the extent that Interwave has causes of action outside the fair scope of the assignment of its rights to Kall, Interwave shall remain a party to this action. As discussed below, the Court concludes that Interwave may pursue its fraudulent inducement claim against Ryan only.

> FN2. At oral argument, as to the proposition that Interwave had standing if the fraud claims were allowed to continue, counsel for the defendant acknowledged as much: "As to the fraud claim, I believe that is correct."Tr. of Oral Argument at 29, lines 7-8.

D. Breach of Contract

To survive Defendants' motion to dismiss Counts I and IV, Plaintiffs must have properly pleaded the elements of a cause of action for breach of contract, namely (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages. *Contawe v. Crescent Heights of Am., Inc.,* No. 04-2304, 2004 WL 2244538, at *3 (E.D.Pa. Oct.1, 2004).

Rockwell argues that Plaintiffs' breach of contract claim seeks to "expand the provisions of an unambiguous contract," rather than alleging a breach of an express term of the APA. Rockwell also contends that the contract at issue expressly disavows any implied obligations, and that all of the Rockwell's alleged implied breaches were actually expressly authorized conduct under the contract, specifically permitted by § 7.5 (no representation or warranty in regard to future business operations or financial performance), § 13.1(d) (no-minimum earn-out guarantee), and the MBS definition (employee list is subject to change or reorganization at the discretion of the buyer).

Plaintiffs argue that the breach of contract claims survive because there is a basis for each breach claim in the Amended Complaint, including breach of the implied covenant of good faith and fair dealing. Plaintiffs further respond that Rockwell improperly interprets § 7.5, § 13.1(d), and the MBS definition to disavow any good faith obligation and to override obligations created by other provisions in the APA.

1. Breach of Express APA Provisions

In response to Rockwell's invocation of the § 7.5 and § 13.1(d) disclaimers, Plaintiffs argue they have stated a claim for breach of contract under specific sections of the contract based on their allegations concerning actions taken by Rockwell and Ryan. Plaintiffs claim that Rockwell engaged in restructuring, making it impossible to achieve Earn-Outs; failed to approve appropriate business initiatives and fully negotiated contracts and partnerships required to generate the earn-out; and failed to provide access to sales channels. Am. Compl. at ¶¶

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3605272 (E.D.Pa.)
(Cite as: 2005 WL 3605272 (E.D.Pa.))

51-59, 115. Plaintiffs assert these claims allege breaches of specific APA provisions such as § 4.1 ("buyer will ... pay to seller the earnout amounts"), § 7.2 ("buyer has all requisite power and authority ... to perform all of its obligations"), and § 9.3(a)(each "party will ... take, or cause to be taken, all such reasonable actions, as such other party may reasonably deem necessary or desirable to consummate the Transaction").

*9 Plaintiffs also point out that they allege in their Amended Complaint that Rockwell breached § 10.2 (employee bonuses based on Earn-Out revenue) by making payments equivalent to the Earn-Out bonuses, but doing so prior to the measuring period for the Earn-Out bonuses in order to reduce employee incentives to meet the financial objectives under the APA. Am. Compl. at ¶¶ 63-69. Finally, Interwave and Kall allege Rockwell's failure to comply with § 13.1(f) (Earn-Out record keeping requirement) and § 13.1(g) (Earn-Out Statement requirement) in ¶¶ 70-80 and 117-119 of the Amended Complaint because Rockwell never demonstrated its record keeping or properly disclosed its earn-out statements.[FN3]

> FN3. Plaintiffs also argue that Rockwell failed to address Plaintiffs' breach claims under § 10.2, § 13.1(f) (Earn-Out record keeping requirement) and (g) (Earn-Out Statement requirement), Article XIII, and implied covenants in its initial Motion and instead only addressed those claims in its Reply, and, therefore, the claims should survive on this basis alone under Federal Rule of Civil Procedure Rule 12(g). Plaintiffs also argue that Defendants concede in their papers that Plaintiffs have properly plead a breach based on improper calculation of the year one Earn-Outs. While there may be a basis to deny the portions of the motion on the grounds that the arguments were not made until the Reply was submitted, the Court has addressed the substance of these issues and

concludes that denial of these aspects of the Motion based on the merits is appropriate.

When these allegations are viewed with all reasonable inferences in favor of the Plaintiffs, the Court concludes that Plaintiffs have stated a claim of breach of contract upon which relief could be granted. Therefore, it would be premature to dismiss claims for breach of these express provisions of the APA.

2. Breach of the Implied Covenant of Good Faith and Fair Dealing

Pennsylvania has adopted the general duty of good faith and fair dealing in the performance of a contract as set forth in the Restatement (Second) of Contracts § 205. *Creeger Brick & Building Supply Inc. v. Mid-State Bank & Trust Co.,* 385 Pa.Super. 30, 560 A.2d 151, 153 (1989).*Seealso Baker v. Lafayette College,* 350 Pa.Super. 68, 504 A.2d 247, 255 (1986), *aff'd,* 516 Pa. 291, 532 A.2d 399 (1987). A similar requirement has been imposed upon contracts within the Uniform Commercial Code. 13 Pa.C.S. § 1203; *Somers v. Somers,* 418 Pa.Super. 131, 613 A.2d 1211, 1213 (Pa.Super.Ct.1992).

"Good faith" is defined as "[h]onesty in fact in the conduct or transaction concerned."*Id.* (citing 13 Pa.C.S. § 1201). Examples of bad faith can include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance."*Id.* (quoting Restatement 2d of Contracts, § 205 comment(d)).

Rockwell argues that the implied covenant of good faith and fair dealing does not apply in this situation because the Third Circuit Court of Appeals has limited the application of implied covenants. Rockwell cites to *Northeast Jet Center, Ltd. v. Lehigh-Northampton Airport Authority,* No. 90-1262,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 10
Not Reported in F.Supp.2d, 2005 WL 3605272 (E.D.Pa.)
**(Cite as: 2005 WL 3605272 (E.D.Pa.))**

1996 WL 442784, at *18 (E.D.Pa. Aug.1, 1996), for the proposition that an "independent duty of good faith has been recognized only in limited situations. After all, if contracting parties cannot profitably use their contractual powers without fear that a jury will second-guess them under a vague standard of good faith, the law will impair the predictability that an orderly commerce requires."(citing *Duquesne Light Co. v. Westinghouse Elec. Corp.,* 66 F.3d 604, 618 (3d Cir.1995). Rockwell also points out that "courts are not generally available to rewrite agreements or make up special provisions for parties who fail to anticipate foreseeable problems." *In re Estate of Hall,* 517 Pa. 115, 535 A.2d 47, 56 n. 7 (Pa.1987). Moreover "[t]he law will not imply a different contract than that which the parties have expressly adopted. To imply covenants on matters specifically addressed in the contract itself would violate this doctrine." *Hutchison v. Sunbeam Coal Corp.,* 513 Pa. 192, 519 A.2d 385, 388 (Pa.1986).

**\*10** However, Rockwell fails to appreciate a complete understanding of the holding in *Northeast Jet Center* as it is based on the Court of Appeals' application of the implied covenant of good faith in *Duquesne.Duquesne,* as interpreted in *Northeast Jet Center,* was based on application of the implied covenant of good faith "in the absence of a dispute about the parties' reasonable expectations under a particular term of the contract." *Duquesne,* 66 F.3d at 618. In *Duquesne,* the Third Circuit Court of Appeals explained that courts "generally utilize the good faith duty as an interpretive tool to determine the *parties' justifiable expectations,* and do not enforce an independent duty divorced from the specific clauses of the contract."*Id.* at 617 (citations omitted) (emphasis added). It is the permissible use of the "interpretive tool" that Rockwell overlooks.

Wielding this tool, Interwave and Kall construct a claim from their allegations that "[b]y including an Earn Out as part of the purchase price consideration in Section 4.1 of the APA, Plaintiffs could expect that Rockwell would act in good faith to generate

additional purchase price consideration in the form of an earn out and not in frustration of that purpose."Interwave also fastens its breach implied covenant argument directly to multiple provisions of the APA in paragraph 127 of its Amended Complaint.[FN4] Additionally, the Amended Complaint at ¶¶ 113, 127 cites Section 9.3 of the APA as a contractual basis for an implied good faith duty. Section 9.3 states that the parties will take "all such reasonable actions, as such that the other party may reasonably deem necessary or desirable to consummate the Transaction."

> FN4. Paragraph 127 of the Amended Complaint states: "Rockwell's conduct as aforesaid further constitutes a breach of Rockwell's implied covenants, duties and obligations of good faith and fair dealing under Section 4.1, Article XII of the APA, Section 9.3 of the APA, Section 13.1(f) and (g) and Section 10.2 of the APA."

Rockwell counters with the express disclaimers of § 7.5 and § 13.1(d) in the contract which Rockwell claims work to specifically disclaim implied obligations. Section 13.1(d) specifically states: "Buyer makes no express or implied representations with respect to either the One Year Earn-Out Payment or the Three Years Earn-Out Payment."Therefore, Rockwell argues, implied obligations are allowed only when there are no express terms relating to that particular issue. *See U.S. Small Bus. Admin. v. Progress Bank,* No. 03-3461, 2004 WL 2980412 at *4 (E.D.Pa. Dec.22, 2004).

Interwave and Kall claim that Rockwell engaged in a series of actions and omissions that effectively reduced Rockwell's earn-out payments, including Rockwell's refusal to allow Plaintiffs to use Rockwell's sales channels, its refusal to accept contracts that would have generated substantial revenue by the IS division, and diversion of key personnel from the development of the Coordinator initiative. Am. Compl. ¶¶ 51, 54-55.

To support the claim that these actions by Rockwell

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                    Page 11
Not Reported in F.Supp.2d, 2005 WL 3605272 (E.D.Pa.)
(Cite as: 2005 WL 3605272 (E.D.Pa.))

amount to a sufficient allegation of Rockwell's breach of the implied covenant of good faith, Interwave and Kall cite to *T.R. McClure & Co. v. TMG Acquisition Co.,* No. 99-537, 1999 WL 692683 (E.D.Pa. Sept.7, 1999).[FN5] In *McClure,* the plaintiff alleged conduct that "resulted in the determination of lower earn-out payments than would have been granted had the defendants not breached."*Id.* at *2. Denying a defense motion for summary judgment prior to discovery on a claim of breach of the implied duty of good faith and fair dealing, the court held "the Earn-out Agreement's Terms envision that [Defendant] would, if feasible, act so as to generate additional purchase price consideration. It is reasonable to require that, in doing so, [Defendant] act in good faith to make the parties' expectations come to fruition."In particular, the court found that:

> FN5.*McClure* involved the application of New York law, rather than Pennsylvania law. But, just as in *Duquesne,* where the Third Circuit Court of Appeals recognized good faith to include justified expectations, New York courts also see good faith obligations as those "promises that a reasonable promisee would understand to be included."*McClure* at *6 (citations omitted). Thus, the citation to *McClure* is instructive here.

*11 Finding [defendant] liable of a breach of its contractual obligations to plaintiff if it acted in bad faith by setting unreasonable prices and unacceptable schedules, or undercapitalizing [plaintiff's business], even though the Earn-Out Agreement does not set forth any minimal requirements, would not be tantamount to rewriting the contract or adding additional terms. Rather, it would simply be enforcing [defendant's] obligation to act reasonably and in good faith in fulfilling the parties' expectations.
*Id.* at *7.

Interwave and Kall also urge the Court to adopt the approach of the court in *O'Tool and Horizon Hold-*

*ings LLC v. Genmar Holdings, Inc.,* 387 F.3d 1188, 1196-97 (10th Cir.2004), which stated that "[t]he obvious spirit of the [earn-out] was that [Plaintiffs] would be given a fair opportunity to operate the company in such a fashion as to maximize the earn-out consideration available under the agreement."[FN6]

> FN6. Rockwell attempts to distinguish *McClure* and *O'Tool* by arguing there were no express disclaimers like § 13.1(d) of the APA in those cases. However, Rockwell's attempt to distinguish these cases ultimately is unhelpful in the absence of a viable "interpretive tool" to broaden § 13.1(d) to disclaim the duty to act in good faith.

This implied duty had been applied to limit the possibility of self-dealing conduct such as "where the contract grants one party discretion over some aspect of performance, for in these cases the party accorded discretionary power can opportunistically subvert the legitimate expectations of the other party. *Curley v. Allstate Ins. Co.,* 289 F.Supp.2d 614, 617 (E.D.Pa.2003)(citing *Huang v. BP Amoco Corp.,* 271 F.3d 560, 564-65 (3d Cir.2001); *Goldstein v. Johnson & Johnson,* 251 F.3d 433, 444 (3d Cir.2001); *Baker v. Lafayette College,* 350 Pa.Super. 68, 504 A.2d 247, 256 (Pa.Super.Ct.1986). The conduct alleged here arises in connection with the matters over which Rockwell had just such discretionary power, making these cited cases instructive and useful in this case.

Rockwell admits, as it must, that its argument on this issue turns on the scope given to the disclaimers in § 7.5 and § 13.1(d) of the APA. During oral argument, when specifically challenged on the appropriate scope of these disclaimers, Defendants' counsel stated: "Nothing more than what is in here is what we are promising. And there are representations, and there are warranties, and there are promises as to what they are willing to do. Other than that, nothing more implied."Tr. of Oral Argument at 60, lines 2-5.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3605272 (E.D.Pa.)
**(Cite as: 2005 WL 3605272 (E.D.Pa.))**

The Court does not agree that "nothing more" here is implied. The Court of Appeals for the Third Circuit has held:

One of the most important principles of contract law is the implied covenant of good faith. Such a promise is fairly to be implied. The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. Hence where it is clear that an obligation is within the contemplation of the parties at the time of contracting or is necessary to carry out their intentions, the court will imply it ... even where the contract itself is not ambiguous.

*Huang v. BP Amoco Corp.,* 271 F.3d 560, 564-565 (3d Cir.2001) (citations omitted).

While Section 13.1(d) of the APA disclaims "implied representations with respect to either the One Year Earn-Out Payment or the Three Years Earn-Out Payment," of significance to the instant challenge, Section 9.3 of the APA states that the parties will take "all such reasonable actions, as such that the other party may reasonably deem necessary or desirable to consummate the Transaction."When the allegations in the Amended Complaint are evaluated in a light most favorable to the Plaintiff and all reasonable inferences are drawn in their favor, the Amended Complaint does in fact succeed at least in alleging breach of the implied covenant of good faith and fair dealing. Here, as in *McClure,* the Earn-Out payment constituted a bargained for element of the purchase price. While § 13(d) of the APA does state that "Buyer makes no express or implied representations with respect to either the Year One Earn-Out Payment or the Year Three Earn-Out Payment", Plaintiffs have properly alleged that Defendants took actions specifically to reduce the earnout amount under the APA and, therefore, are in violation of the good faith obligation.

**\*12** Therefore, while the doctrine of the implied covenant of good faith and fair dealing may be lim-

ited by implied duties based on reasonable expectations emanating from specific language in the contract, the Court finds that Interwave and Kall have presented enough in their pleading to survive a motion to dismiss. Rockwell's discovery will no doubt be directed strongly at these issues. In the absence of wholly explicit and unambiguous contractual language specifically defining the parties' expectations concerning actions necessary to consummate the Transaction, it would be inappropriately precipitous at this time to dismiss Interwave's and Kall's breach of an implied covenant of good faith claim. *See e.g., Curley v. Allstate Ins. Co.,* 289 F.Supp.2d 614, 619 (E.D.Pa.2003).

E. Gist of the Action Doctrine

The "gist of the action" doctrine, recognized under Pennsylvania law, precludes tort claims based on a party's failure to comply with a contract. Both sides here advance their arguments on this issue by relying on *EToll, Inc. v. Elias/Savion Adver., Inc.,* 811 A.2d 10 (Pa.Super.Ct.2002), in which the Superior Court of Pennsylvania addressed this doctrine and analyzed federal district courts' interpretations of the doctrine in relation to fraud claims. *Id.* at 15-16.The court in *EToll* determined that, as applied by federal courts, the gist of the action doctrine bars tort claims: (1) arising solely from a contract between the parties, (2) where the duties allegedly breached were created and grounded in the contract itself, (3) where the liability stems from a contract, or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract. *Id.* at 19.

Here, Rockwell argues that Plaintiffs' claims for breach of contract and for fraud cover the same activity and are predominantly contract claims, as opposed to fraud claims. Therefore, according to Rockwell, the fraud claims are barred by the gist of the action doctrine because the fraud claims are based on Rockwell's alleged failure to comply with the contract. To bolster its contention on this point,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Page 13
Not Reported in F.Supp.2d, 2005 WL 3605272 (E.D.Pa.)
(Cite as: 2005 WL 3605272 (E.D.Pa.))

Rockwell argues that the damages Interwave and Kall seek as a remedy for their fraud count are based entirely on the earn-out obligations in the contract. Rockwell also argues that Plaintiffs' hope for use of an exception to the gist of the action doctrine for fraudulent inducement is misplaced because all of the allegations of fraud relate to performance rather than inducement. And, further, Defendants claim that the fraud claims that may relate to inducement are still prohibited because they are inextricably intertwined with the breach of contract claim.

Interwave and Kall respond by arguing that at the motion to dismiss stage, alternative pleading allows both claims to proceed. Rule 8(d)(2) of the Federal Rules of Civil Procedure states:

A party may set forth two or more statements of a claim or defense alternatively or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds.

**\*13** This permissive pleading rule has been applied to cases involving both contract claims and other claims related the same facts. In this District courts have held that "even if the gist of action test and economic loss doctrine were to bar [plaintiff] from proceeding simultaneously on breach of contract and conversion claims, [plaintiff] can still plead both claims as alternative theories of liability." *Berger & Montague v. Scott & Scott,* 153 F.Supp.2d 750, 754 (E.D.Pa.2001). Likewise, fraud and contract claims have survived the gist of the action doctrine at the motion to dismiss stage. *See e.g., Little Souls, Inc. v. State Auto Mut. Ins. Co.,* No. 03-5722, 2004 WL 503538, at *2-3 (E.D.Pa. March 15, 2004) (motion to dismiss denied where plaintiff

alleged "misrepresentations occurred both before and after the formation of the contract that, if sufficiently distinct, would not hinge on the outcome of the breach of contract claim.")

By the same token, however, as Defendants have urged, motions to dismiss fraud claims have been granted when the claims relate to the performance of a contract. In *Caudill Seed & Warehouse Co. v. Prophet 21, Inc.,* 123 F.Supp.2d 826, 834 (E.D.Pa.2000), for example, the court dismissed a fraud claim where "the agreement is at the heart of plaintiff's ongoing fraud claim, and therefore the gist of plaintiff's fraud action is unmistakably contractual, not tortious," even though "caution should be exercised in determining the gist of an action at the motion to dismiss stage."*Id.* Judicial caution is appropriate because "[o]ften times, without further evidence presented during discovery, the court cannot determine whether the gist of the claim is in contract or tort."*Weber Display & Packaging v. Providence Wash. Ins. Co.,* No. 02-7792, 2003 WL 239141, at *3-4 (E.D.Pa. Feb. 10, 2003). In *Weber,* the court held that "it would be inappropriate to dismiss [plaintiff's] intentional misrepresentation claim at this stage of the proceeding, before any discovery is conducted which could aid in a determination of the 'gist' of this claim."*Id.*

Interwave and Kall argue that their claims allege fraudulent *inducement* which is not precluded under the gist of the action doctrine. While Rockwell asserts that fraud claims which include damages emanating only from the contract are precluded by the gist of the action doctrine, also citing *Williams v. Hilton Group, PLC,* 261 F.Supp.2d 324, 329 (W.D.Pa.2003), Interwave and Kall counter that they are not seeking the same damages for their contract and fraud claims. To explain, Interwave and Kall argue that they could be awarded as damages the difference between the Cash Consideration to be paid to Interwave at Closing and the reduced Cash Consideration that Rockwell negotiated based on its alleged misrepresentations. *Skurnowicz v. Lucci,* 798 A.2d 788, 795 (Pa.Super.Ct.2002). To

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

this Rockwell points out that if the actionable inducement is intertwined with performance of the contract, then the fraudulent inducement claim may not survive. *Galdieri v. Monsanto Co.,* 245 F.Supp.2d 636, 651 (E.D.Pa.2002) (fraud claims were barred by the gist of the action doctrine because the fraud claims were "intertwined" with breach of contract claims).

**\*14** The endeavor of attempting to reconcile the results among the various trial level courts on this issue is challenging, to say the least. One might justifiably question if the goal of consistency is achievable even though it might well be useful. Ultimately, however, each case merits its own analysis under the requirement that, for the purposes of the motion to dismiss, the plaintiff must allege facts in the complaint that if proven, would amount to fraud in the inducement to enter into the contract, with such facts being analytically separable from allegations of breaches in the performance of the contract. Suffice it to say, Plaintiffs here succeed in doing so. These Plaintiffs allege that Rockwell and Ryan misrepresented information concerning the ability of Interwave to achieve the Earn Out portion of the APA, and Plaintiffs do allege that reliance on those representations induced Interwave to enter into the APA. Am. Compl. ¶ 98. Therefore, Interwave's and Kall's fraud claims ought not be dismissed on the basis of the "gist of the action" doctrine at this time.

Although Plaintiffs have alleged enough to survive a motion to dismiss their fraud claims under the gist of the action doctrine, this does not mean they have cleared the hurdle created by the parol evidence rule.

F. The Integration Clause and the Parol Evidence Rule

Rockwell argues that allegations that contradict the express language of the agreement at issue are prohibited by the parol evidence rule. Specifically, Rockwell contends that if the alleged misrepresent-

ation or reliance on it is foreclosed by an integration clause, then a fraudulent inducement claim based on such misrepresentation(s) is barred.

Rockwell relies on §§ 7.5, 13.1(d), the definition of MBS, and the integration clause at § 14.11 to argue that the APA does indeed cover the statements alleged by Interwave and Kall. Section 7.5 of the APA, entitled *Limitation of Representation and Warranties,* provides:

> Buyer makes no representation or warranty with respect to any financial projections, estimates, budgets of business plans delivered to or made available to Seller concerning Buyer's MBS business (as defined in Section 14 below) or the future business, operations and financial performance thereof.

The MBS definition provides:

> "MBS" means the existing Manufacturing Business Solutions business unit of the Global Manufacturing Solutions group of Rockwell Automation that provides consulting and information systems that enable clients to monitor, analyze, and improve operations. Attached as Schedule 13.1 is a list of the employees as of January 24, 2003 that are part of the MBS Business located in North America. This list is subject to change and/ or reorganization at the discretion of the Buyer.

Section 13.1(d) *Contingent Payment* provides:

> Except for Buyer's obligations to make an earned Year One Earn-Out Payment and the earned Year Three Earn-Out Payment, as adjusted herein, Buyer makes no express or implied representations with respect to either the Year One Earn-Out Payment or the Year Three Earn-Out Payment. There is no minimum earn-out payment expectation by the parties.

**\*15** Perhaps most importantly, Section 14.11, entitled the *Entire Agreement,* states:

> This Agreement and the Confidentiality Agree-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3605272 (E.D.Pa.)
(Cite as: 2005 WL 3605272 (E.D.Pa.))

ment collectively constitute the entire agreement between the parties with respect to the subject matter hereof and thereof and this Agreement and the Confidentiality Agreement supersede all prior negotiations, agreements and understandings of the parties of any nature, whether oral or written, relating thereto.

Interwave and Kall argue, first, that the integration clause does not apply to the fraud claim against Ryan because they had no contract with Ryan. They also contend that because the parol evidence rule does not preclude evidence of issues not dealt with in the contract, it does not bar their fraudulent inducement claims.

The controlling case in the Third Circuit with respect to Pennsylvania law concerning the interplay of a claim of fraudulent inducement and the parol evidence rule is *Dayhoff Inc. v. H.J. Heinz Co.,* 86 F.3d 1287, 1300 (3d Cir.1996), where the court of appeals explained:

The Supreme Court of Pennsylvania found that the parol evidence rule barred consideration of prior representations concerning matters covered in the written contract, even those alleged to have been made fraudulently, unless the representations were fraudulently omitted from the contract. Otherwise, the parol evidence rule 'would become a mockery,' and integrated contracts could be avoided or modified by claims of differing prior representations.

*Dayhoff Inc. v. H.J. Heinz Co.,* 86 F.3d 1287, 1300 (3d Cir.1996) (citing *HCBContractors v. Liberty Place Hotel Assocs.,* 539 Pa. 395, 652 A.2d 1278, 1279 (Pa.1995), (quoting *Nicolella v. Palmer,* 432 Pa. 502, 248 A.2d 20 (Pa.1968)).

The *Dayhoff* plaintiff argued that it was induced to enter into a distribution contract by the false and misleading statements of the defendant's lawyer regarding the scope and purpose of the contract's termination provision. *Dayhoff,* 86 F.3d at 1299. The Third Circuit Court of Appeals recognized that the

claim involved "allegations of oral representations contrary to express terms of the agreement" and, additionally, that the contract had an integration clause, on the strength of which the court upheld the dismissal of the fraud in the inducement claim. *Dayhoff,* at 1300-1301.

To make this determination, the Court of Appeals relied on a series of state court decisions which established the framework for applying the parol evidence rule to bar claims of fraud in the inducement. Rockwell also cites these same cases. For example, *1726 Cherry St. Partnership v. Bell Atlantic Properties.,* 439 Pa.Super. 141, 653 A.2d 663 (Pa.Super.Ct.1995), embraces the proposition that in Pennsylvania, parol evidence cannot be used to prove fraudulent inducement:

Parol evidence of representations concerning a subject dealt with in an integrated written agreement and made prior to or contemporaneous with the execution of the agreement [should be admitted] to modify or avoid the terms of that agreement only where it is alleged that the parties agreed that those representations would be included in the written agreement but were omitted by fraud, accident or mistake.[FN7]

FN7. The *1726 Cherry St.* court continued:

This is commonly referred to as "fraud in the execution" because the party proffering the evidence contends that he or she *executed* the agreement because he or she was defrauded by being led to believe that the document he or she was signing contained terms that were actually omitted therefrom. Such a case is to be distinguished from a "fraud in the inducement" case ... where the party proffering evidence of additional prior representations does not contend that the parties agreed that the additional representations would be in the written agreement, but rather claims that the repres-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

entations were fraudulently made and that but for them, he or she never would have entered into the agreement.

*1726 Cherry St. Partnership v. Bell Atlantic Properties.,* 439 Pa.Super. 141, 653 A.2d 663, 666 (Pa.Super.Ct.1995) (emphasis added).

Interwave's case against Rockwell does not involve fraud in the execution. Plaintiffs' Counts II and III entitled Action in Deceit and Fraudulent Inducement forthrightly allege that Plaintiffs agreed to Article XII of the APA "[a]s a direct and proximate result of [the defendants] fraud, misrepresentations and deceit."Am. Compl. ¶¶ 102, 109.

**\*16** *Id.* at 666.

In *1726 Cherry St.* the appellants claimed they were fraudulently induced to enter into the sales contracts because the appellee orally misrepresented that it did not intend to purchase a parcel of land in the vicinity of appellants' land and that, had the appellants known of the purchase, they would have insisted on a higher price or not sold at all. But the court determined otherwise:

The agreement contains an exclusive list of the parcels as to which a price adjustment might be triggered and the [parcel in dispute] is not one of them. Moreover, the agreement states that it is the parties' entire agreement and that there are no other representations or understandings between them. Under these circumstances what the [appellants] seek to do is exactly what the Pennsylvania parol evidence rule forbids: to admit evidence of a prior representation in a fully integrated written agreement.

*1726 Cherry St. Partnership v. Bell Atlantic Properties.,* 439 Pa.Super. 141, 653 A.2d 663, 670 (Pa.Super.Ct.1995).

The *Dayhoff* court also analyzed the Pennsylvania

Supreme Court's decision in *HCB Contractors v. Liberty Place Hotel Assocs.,* 539 Pa. 395, 652 A.2d 1278 (Pa.1995). In *HCB,* the plaintiff general contractor claimed mechanics' liens even after agreeing to a lien waiver, arguing it was fraudulently induced into agreeing to the waiver. The Supreme Court of Pennsylvania rejected this argument, holding that the plaintiff's claims related to subjects that were specifically addressed in the written contract that included a "Waiver of Liens" provision: "This Agreement waiving the right of lien shall be an independent covenant ... and shall be enforceable by Owner and such Other Owners, or any of them, and their respective successors and assigns."*Id.* at 1280.The integration clause of the contract in *HCB* expressly disclaimed all prior oral representations: "This Contract represents the entire and integrated agreement between the parties hereto and supersedes all prior negotiations, representations, or agreements, whether written or oral."*Id.*

Pennsylvania courts have frequently applied the distinction between fraud in the execution and fraud in the inducement when considering the role of the parol evidence rule. The analysis is straightforward: "[W]here the assertions put forth by one party are specifically contradicted by the written agreement ... parol evidence is admissible only to prove fraud in the execution, not the inducement, of the contract." *Abel v. Miller,* 293 Pa.Super. 6, 437 A.2d 963, 965 (1982). In *1726 Cherry St.,supra,* the court cautioned: "if plaintiffs relied on any understanding, promises, representations or agreements made prior to the execution of the written contract ... they should have protected themselves by incorporating in the written agreement the promises or representations upon which they now rely."*1726 Cherry St. Partnership v. Bell Atlantic Properties.,supra* at 669 (quoting *Bardwell v. Willis Company,* 375 Pa. 503, 100 A.2d 102, 105 (Pa.1953).

**\*17** Interwave and Kall respond by claiming that the conduct and conditions underlying the fraud claims, such as Rockwell's access to sales leads,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3605272 (E.D.Pa.)
(Cite as: 2005 WL 3605272 (E.D.Pa.))

Rockwell's intention to develop complementary software products, Rockwell's organizational structure and ability to track revenues attributable to the earn out calculation, and Rockwell's intention to place Kall in charge of the revenue streams attributable to the earn out calculation, are not matters that are specifically dealt with in the APA or related to matters addressed un the agreement. According to Plaintiffs, because those issues do not concern subjects dealt with in the integrated written agreement, they are not subject to the parol evidence rule. To advance their argument on this point, Plaintiffs cite *In re Estate of Hall,* 517 Pa. 115, 535 A.2d 47, 55 (Pa.1987) ("when the terms of a written agreement are at issue, the parol evidence rule bars admission of oral representations made before or contemporaneously with the subject contract, *only if* those representations concern a matter specifically dealt with in the contract itself.") (emphasis added). Therefore, the question that must be answered to determine whether the fraudulent inducement claims are permitted notwithstanding the parol evidence rule in Pennsylvania is whether or not the APA covers the specific representations alleged by Interwave and Kall.

When does the oral agreement come within the field embraced by the written one? This can be answered by comparing the two, and determining whether parties, situated as were the ones to the contract, would naturally and normally include the one in the other if it were made. If they relate to the same subject-matter and are so interrelated that both would be executed at the same time, and in the same contract, the scope of the subsidiary agreement must be taken to be covered by the writing. This question must be determined by the court.

*Gianni v. R. Russell & Co.,* 281 Pa. 320, 126 A. 791, 792 (Pa.1924).

More recently the Pennsylvania Superior Court has come to a similar conclusion concerning a real estate dispute:

In the instant case, Appellants signed a contract that stated that it was the parties' whole agreement and that there were no representations made by the Appellees regarding the condition of the property. Appellants also agreed that they had either inspected the premises or had waived the right to do so and were not purchasing the property in reliance upon any representations by Appellees. But now Appellants are before this Court asserting a claim for fraud in the inducement in an effort to disavow the terms to which they expressly agreed. Under the facts of this case, the parol evidence rule bars the evidence of [Appellees'] alleged misrepresentation that "there were not problems" with the property.

*Youndt v. First Nat'l Bank,* 868 A.2d 539, 548-49 (Pa.Super.Ct.2005).

The problem for the Plaintiffs here is not unlike that confronting the plaintiff in *Titelman v. Rite Aid Corp.,* No. 00-2865, 2001 U.S. Dist. LEXIS 24049, 15-16 (E.D.Pa. Nov. 13, 2001):

*18 There is no sound reason to allow a fraud in the inducement claim to go forward when the plaintiff alleges that he relied on allegedly fraudulent statements that he did not insist be included in the final written contract. Pennsylvania's parol evidence rule seeks to protect parties from fraudulent inducement claims which could have been prevented by more complete, more thorough contract formation.

Integration clauses and contract terms that specifically cover the subject matter of the alleged fraudulent inducement frequently result in dismissal of fraudulent inducement claims in the Third Circuit pursuant to the *Dayhoff* rubric discussed above. For example, in *Goldstein v. Murland,* No. 02-247, 2002 WL 1371747, at *2 (E.D.Pa. June 24, 2002), the court granted a motion to dismiss claims of fraudulent inducement because "Pennsylvania law prohibits recovery on a claim of fraud in the inducement where the contract represents a fully integrated written agreement."In that case the integra-

tion clause in the relevant agreement is similar to the clause in § 14.11 of the APA here, and the *Murland* court concluded that "[t]he contract contains no provisions relating to the alleged representations made ... Accordingly, the written agreement is fully integrated and dismissal of the fraud/fraud in the inducement claims is appropriate."*Id.* at *3.

Similarly, in *North Am. Roofing & Sheet Metal Co. v. Building & Constr. Trades Council,* No. 99-2050, 2000 WL 230214, at *5 (E.D.Pa. Feb.29, 2000), the court also dismissed fraudulent inducement claims when the plaintiff alleged a failure to disclose key information about the likelihood of being "forced off the project by the unions."The court held that the plaintiffs "should have insisted that the representation be set forth in the integrated written agreements. Failure to do so results in evidence of the representation being barred."*Id.* at *7.*See also Winters v. Inv. Sav. Plan for Employees of Knight-Ridder, Inc.,* 174 F.Supp.2d 259, 263 (E.D.Pa.2001) ("the agreement states that 'this agreement constitutes the entire Agreement between the Parties .'Here, plaintiff's argument that she was fraudulently induced into signing the agreement is barred by the parol evidence rule.") (citations omitted); *Health Mgmt. Publs. v. Warner-Lambert Co.,* No. 98-1557, 1998 WL 784243 (E.D.Pa. Nov.10, 1998); *Peerless Wall & Window Coverings, Inc. v. Synchronics, Inc.,* 85 F.Supp.2d 519, 533 (W.D.Pa.2000) ("that plaintiff's fraud claim, to the extent it is based upon affirmative misrepresentations, is barred by the integration clause as contrary to the express terms of the license agreement, in the same manner as the contract and warranty claims"); *Sunquest Info. Sys. v. Dean Witter Reynolds, Inc.,* 40 F.Supp.2d 644, 656 (W.D.Pa.1999).[FN8]

> FN8. The only case cited in Interwave's and Kall's brief which actually allows parol evidence when the contract included an integration clause is *Brinich v. Jencka,* 757 A.2d 388, 400-01 (Pa.Super.Ct.2000).*Brinich,* however, does not involve a claim of fraudulent induce-

ment, but rather a dispute concerning damages under a oral modification to a contract where the court allowed the plaintiff's claim because, according to the court in *Titelman,*"the parol evidence rule does not apply if the extra-contractual representation or agreement would not 'naturally and normally' be included in the contract at issue."*Titelman v. Rite Aid Corp.,* No. 00-2865, 2001 U.S. Dist. LEXIS 24049, at *16 (E.D.Pa. Nov. 13, 2001).

> Interwave and Kall also rely on *In re Estate of Hall,* 517 Pa. 115, 535 A.2d 47, 55 (Pa.1987), and *Quorum Health Resources, Inc. v. Carbon-Schuylkill Community Hosp., Inc.,* 49 F.Supp.2d 430, 432 (E.D.Pa.1999), for the proposition that the parol evidence rule only applies to fraudulent inducement claims when the alleged misrepresentation involves a subject which is specifically dealt with in the written contract. But in *Hall,* the court held that the lower court's "failure to apply the parole [sic] evidence rule here was clear error."*Hall* at 56.Furthermore, in *Quorum Health,* the court held that the claims in dispute were "based on allegations of fraudulent inducement that require the introduction of pre-contractual representations. Therefore, the parol evidence rule applies to bar them."

After repeated review of the contract at issue here, while several sections of the APA can be interpreted to have a broad application, arguably none of these sections cover the subject matter of Interwave's and Kall's allegations with the considerable specificity of the contract provisions the court of appeals analyzed in *Dayhoff,* or that the Pennsylvania Supreme Court reviewed in *HCB,* or that the Pennsylvania Superior Court fastened upon in *1726 Cherry St.,* particularly when these allegations must be taken by the Court with all reasonable

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

inferences in the Plaintiffs' favor. However, subsequent rational applications of *Dayhoff* by the lower courts have recognized the imposition of the parol evidence rule to facts similar to those here, and this Court finds persuasive the numerous opinions that interpreted *Dayhoff* to preclude parol evidence when the plaintiff is making a claim of fraudulent inducement and the contract at issue contains an integration clause. Contract drafting is no task to be undertaken casually, of course. However, among draftsmen even of varying skills and experience, the function and phrasing of integration clauses such as the one set forth in Section 14.11 of the APA are familiar. To require more written discourse on the subject in this contract would be to impose a belt and suspenders style of drafting that would run the risk of creating so much verbiage that the provision could become ambiguous, if not meaningless.

**\*19** Fully integrated contracts preclude fraudulent inducement claims. It is no different here. Therefore, Interwave's and Kall's claim of fraudulent inducement against Rockwell as a party to the APA will be dismissed. However, as alluded to above, Interwave still has standing as a plaintiff because the remaining claims include fraudulent inducement against Ryan (Count III) who is not a party to the APA. *See Sunquest Info. Sys. v. Dean Witter Reynolds, Inc.*, 40 F.Supp.2d 644, 656. n. 7 (W.D.Pa.1999) (holding the integration clause bars whatever fraud in the inducement claims the plaintiff had against the defendant who was party to the contract, but not those claims against the defendant which was not a party to the contract.) The court in *Sunquest* distinguished two cases applying the protection of the integration clause to agents of the party to the contract. *Bowman v. Meadow Ridge, Inc.*, 419 Pa.Super. 511, 615 A.2d 755, 759 (Pa.Super.Ct.1992) and *Iwashyna v. Department of Housing and Urban Dev.*, No. 93-1138, 1993 WL 313702, at \*14 (E.D.Pa. Aug.16, 1993) are both distinguishable here as well, "because the integration clauses, unlike here, specifically referred to the representations of the agents as barred." *Sunquest,*

40 F.Supp.2d at 656 n. 7.

Therefore, Interwave's fraudulent inducement claim against Ryan will be permitted to proceed.

### III. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the Defendants' Motion to Dismiss. An appropriate Order consistent with this Memorandum follows.

### *ORDER*

AND NOW, this 29th day of December, 2005, upon consideration of the Defendants Rockwell Automation, Inc.'s and Richard Ryan's Motion to Dismiss Plaintiffs' Amended Complaint (Docket No. 18), and the responses thereto (Docket Nos. 20, 21, and 22), it is hereby ORDERED that the Motion is GRANTED in part as to Count II (Action in Deceit and Fraudulent Inducement against Rockwell) and DENIED in part as to Counts I, III, and IV. Defendants shall file their answer within twenty (20) days of the date of this Order.

Concerning the schedule for this case, IT IS FURTHER ORDERED:

### A. Discovery

1. Parties shall provide their Initial Disclosures pursuant to Rule 26(a) of the Federal Rules of Civil Procedure within thirty days of the date of this order.

2. Fact discovery (including interrogatories, document requests, requests to admit and depositions) shall be completed by June 16, 2006.

3. On or before May 12, 2006 the parties shall identify subject matters for expert testimony. On or before July 14, 2006, the party who will ultimately bear the burden of proof on any particular issue shall disclose the identity of each person

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3605272 (E.D.Pa.)
**(Cite as: 2005 WL 3605272 (E.D.Pa.))**

Page 20

whom they expect to call as an expert witness to testify at trial as to that issue and produce reports signed by such expert(s), which reports shall contain the facts and opinions to which the expert will testify, a current curriculum vitae, and a list of material consulted and/or relied upon in connection with the preparation of the expert's report. On or before August 11, 2006, the Parties shall disclose the identity of each person whom they expect to call as rebuttal expert at trial, produce report(s) signed by such rebuttal expert(s), which reports shall contain the facts and rebuttal opinions to which the rebuttal expert will testify, a current curriculum vitae, and material consulted and/or relied upon in connection with the preparation of the rebuttal expert's report. Expert witness discovery shall be completed by September 15, 2006.

### B. Dispositive Motions

**\*20** Any motions for summary judgment shall be filed on or before October 13, 2006. Any such motions, and any opposition thereto, shall comply with this Court's policies and procedures regarding the form of such motions.

### C. Protective Order

The Parties will stipulate to a separate Protective Order(s) to address protection of confidential and privileged information. Inadvertent production of material claimed to be privileged shall be addressed in the manner agreed upon by the Parties in the proposed Joint Case Management Order submitted to the Court by letter dated November 29, 2005 (Docket No. 32).

### D. Pretrial Conferences

The Court will schedule such pretrial status conferences as may be necessary at which time a schedule for trial and final pre-trial matters will be discussed. The Parties are advised that they should consider it likely that the Court will set this case for trial no later than December 2006.

E.D.Pa.,2005.
Interwave Technology, Inc. v. Rockwell Automation, Inc.
Not Reported in F.Supp.2d, 2005 WL 3605272 (E.D.Pa.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in N.E.2d          Page 1
Not Reported in N.E.2d, 2002 WL 2030889 (Ohio App. 3 Dist.), 48 UCC Rep.Serv.2d 586, 2002 -Ohio- 4613
**(Cite as: 2002 WL 2030889 (Ohio App. 3 Dist.))**

**C**

CHECK OHIO SUPREME COURT RULES FOR REPORTING OF OPINIONS AND WEIGHT OF LEGAL AUTHORITY.

Court of Appeals of Ohio,
Third District, Paulding County.
Doyle JOHNSON, et al., Plaintiffs-Appellants,
v.
MONSANTO COMPANY, Defendant-Appellee.
**No. 11-02-02.**

Decided Sept. 6, 2002.

Farmers brought breach of implied warranties and breach of express warranty claims against herbicide manufacturer, arising from herbicide's failure to control weeds in farmers' fields. The Common Pleas Court, Paulding County, granted summary judgment for manufacturer. Farmers appealed. The Court of Appeals, Walters, J., held that genuine issue of material fact existed as to whether manufacturer's breach was the proximate cause of the herbicide's failure, thus precluding summary judgment for manufacturer.

Reversed and remanded.

West Headnotes

**[1] Sales 343 ☞255**

343 Sales
    343VI Warranties
        343k255 k. Parties; Privity. Most Cited Cases
In order to maintain an action founded upon the implied warranty of merchantability and implied warranty of fitness for a particular purpose theories of recovery, proof of a sales contract between the parties must be established. R.C. § 1302.27, 1302.28.

**[2] Sales 343 ☞255**

343 Sales
    343VI Warranties
        343k255 k. Parties; Privity. Most Cited Cases
The parties are required to be in privity of contract before the implied warranty of merchantability and implied warranty of fitness for a particular purpose under the Uniform Commercial Code (UCC) will attach to a sales transaction. R.C. § 1302.27, 1302.28.

**[3] Sales 343 ☞255**

343 Sales
    343VI Warranties
        343k255 k. Parties; Privity. Most Cited Cases
Herbicide manufacturer was not liable to farmers for breach of the implied warranty of merchantability and implied warranty of fitness for a particular purpose, even though herbicide failed to control the weeds in the farmers' fields; there was no sales contract between herbicide manufacturer and farmers, as the farmers purchased the herbicide from a third party that had no authority to act on behalf of the manufacturer. R.C. § 1302.27, 1302.28.

**[4] Sales 343 ☞255**

343 Sales
    343VI Warranties
        343k255 k. Parties; Privity. Most Cited Cases
To preclude an action for breach of express warranty under the Uniform Commercial Code (UCC) for a lack of privity when a manufacturer has induced a party, by way of express warranty, to purchase one of its products from an intermediary would be unconscionable; otherwise, a party would be able to make express warranties about its products and then shield itself from liability by selling to a middleman who, in turn, sells it to the other party. R.C. §1302.26(A)(1,2).

**[5] Sales 343 ☞285(.5)**

343 Sales
    343VI Warranties

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d                                                                                      Page 2
Not Reported in N.E.2d, 2002 WL 2030889 (Ohio App. 3 Dist.), 48 UCC Rep.Serv.2d 586, 2002 -Ohio- 4613
(Cite as: 2002 WL 2030889 (Ohio App. 3 Dist.))

343k285 Notice to Seller of Defects
343k285(.5) k. In General. Most Cited
Cases

**Sales 343 ☞286**

343 Sales
    343VI Warranties
        343k286 k. Opportunity to Seller to Remedy
Defects. Most Cited Cases
The notification requirement in the express war-
ranty statute allows the seller or manufacturer time
to correct the problem. R.C. §1302.65.

**[6] Sales 343 ☞285(3)**

343 Sales
    343VI Warranties
        343k285 Notice to Seller of Defects
            343k285(3) k. Mode and Sufficiency of
Notice. Most Cited Cases
The content of the notification, regarding claims for
breach of express warranty, need merely be suffi-
cient to put the party on notice that the transaction
is troublesome and must be watched, and a buyer's
rights are saved if notice is given that a breach may
be involved, thus opening the door for settlement
negotiations; in other words, notice does not have
to include a clear statement of all the objections
that will be relied on, statements of claimed dam-
ages, or threats of litigation. R.C. §1302.65.

**[7] Sales 343 ☞445(5)**

343 Sales
    343VIII Remedies of Buyer
        343VIII(D) Actions and Counterclaims for
Breach of Warranty
            343k443 Trial
                343k445 Questions for Jury
                    343k445(5) k. Notice of Defects
and Return of Property. Most Cited Cases
The determination of whether a buyer, after accept-
ing goods, gave timely notice of an alleged breach
is generally a question for the trier of fact to be de-
termined in consideration of all attendant circum-

stances.

**[8] Judgment 228 ☞181(29)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k181 Grounds for Summary Judgment
            228k181(15) Particular Cases
                228k181(29) k. Sales Cases in Gener-
al. Most Cited Cases
Genuine issue of material fact existed as to whether
farmers gave notice within a reasonable time to
herbicide manufacturer that the herbicide was not
working to control the weeds in the farmers' fields,
thus precluding summary judgment for herbicide
manufacturer in farmers' action for breach of ex-
press warranty. R.C. §1302.65(C).

**[9] Judgment 228 ☞181(29)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k181 Grounds for Summary Judgment
            228k181(15) Particular Cases
                228k181(29) k. Sales Cases in Gener-
al. Most Cited Cases
Genuine issue of material fact existed as to whether
farmers' situation was an emergency that justified
their attempted efforts to rescue their crops prior to
providing notice to herbicide manufacturer that
herbicide was not working, thus precluding sum-
mary judgment for herbicide manufacturer in farm-
ers' action for breach of express warranty. R.C.
§1302.65.

**[10] Sales 343 ☞445(2)**

343 Sales
    343VIII Remedies of Buyer
        343VIII(D) Actions and Counterclaims for
Breach of Warranty
            343k443 Trial
                343k445 Questions for Jury
                    343k445(2) k. Making and Requis-
ites of Express Warranty. Most Cited Cases
The issues of whether any warranties were created,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d                                                    Page 3
Not Reported in N.E.2d, 2002 WL 2030889 (Ohio App. 3 Dist.), 48 UCC Rep.Serv.2d 586, 2002 -Ohio- 4613
**(Cite as: 2002 WL 2030889 (Ohio App. 3 Dist.))**

and, if so, whether they were effectively disclaimed are questions of fact to be determined at trial.

**[11] Judgment 228 ⟜181(29)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k181 Grounds for Summary Judgment
            228k181(15) Particular Cases
                228k181(29) k. Sales Cases in General. Most Cited Cases
Genuine issue of material fact existed as to whether farmers' misuse of herbicide with another product invalidated their warranty claim against herbicide manufacturer and, in turn, whether the manufacturer's breach was the proximate cause of the herbicide's failure, thus precluding summary judgment for herbicide manufacturer in farmers' action for breach of express warranty. R.C. §1302.65.

**[12] Sales 343 ⟜426**

343 Sales
    343VIII Remedies of Buyer
        343VIII(D) Actions and Counterclaims for Breach of Warranty
            343k426 k. Provisions of Contract as to Remedy. Most Cited Cases
Under commercial law, a limitation of remedy fails its essential purpose if it deprives the purchaser of the substantial value of its bargain. R.C. §1302.93.

**[13] Sales 343 ⟜445(3)**

343 Sales
    343VIII Remedies of Buyer
        343VIII(D) Actions and Counterclaims for Breach of Warranty
            343k443 Trial
                343k445 Questions for Jury
                    343k445(3) k. Scope and Extent of Warranty. Most Cited Cases
Determinations of whether a warranty has failed to fulfill its essential purpose is ordinarily a question of fact for the jury. R.C. §1302.93.

**[14] Sales 343 ⟜426**

343 Sales
    343VIII Remedies of Buyer
        343VIII(D) Actions and Counterclaims for Breach of Warranty
            343k426 k. Provisions of Contract as to Remedy. Most Cited Cases
Farmers who brought breach of express warranty claim against herbicide manufacturer were not limited to recover only the replacement cost of the herbicide which failed to kill weeds, but rather could also seek damages for crop loss; the manufacturer attempted to limit its liability in disclaimer to cost of product or replacement thereof, but the remedy failed its essential purpose, in that the manufacturer did not make the goods conforming within a reasonable time, and did not visit the fields until after the crop had been harvested. R.C. §1302.93.

**[15] Sales 343 ⟜427**

343 Sales
    343VIII Remedies of Buyer
        343VIII(D) Actions and Counterclaims for Breach of Warranty
            343k427 k. Right of Action. Most Cited Cases
The right to bring an action for implied warranty in tort does not depend upon the existence of a contractual relationship between the plaintiff and the defendant.

**[16] Sales 343 ⟜425**

343 Sales
    343VIII Remedies of Buyer
        343VIII(D) Actions and Counterclaims for Breach of Warranty
            343k425 k. Nature and Form of Remedy. Most Cited Cases
A breach of implied warranty in tort claim is within an entirely separate body of law from that applied under the Uniform Commercial Code (UCC). R.C. § 1302.27, 1302.28.

**[17] Judgment 228 ⟜181(29)**

Not Reported in N.E.2d                                                    Page 4
Not Reported in N.E.2d, 2002 WL 2030889 (Ohio App. 3 Dist.), 48 UCC Rep.Serv.2d 586, 2002 -Ohio- 4613
**(Cite as: 2002 WL 2030889 (Ohio App. 3 Dist.))**

228 Judgment
   228V On Motion or Summary Proceeding
      228k181 Grounds for Summary Judgment
         228k181(15) Particular Cases
            228k181(29) k. Sales Cases in General. Most Cited Cases
Genuine issue of material fact existed as to whether herbicide manufacturers breached an implied warranty in tort to farmers, regarding herbicide's failure to control weeds in farmers' fields, thus precluding summary judgment for herbicide manufacturer in farmers' action for breach of implied warranty in tort.

Civil Appeal from Common Pleas Court.Steven L. Diller, Attorney at Law, Reg. # 0023320, Van Wert, OH, for Appellants.

Stuart J. Goldberg, Attorney at Law, Reg. # 0029469, Toledo, OH, Wayne K. McNeil, Attorney at Law, New Orleans, LA, for Appellee.

WALTERS, J.

\*1 {¶ 1} Plaintiffs-Appellants, Doyle and Louise Johnson ("Appellants"), appeal a decision of the Paulding County Common Pleas Court granting summary judgment with respect to their claims founded upon implied and express warranty in contract and implied warranty in tort relative to their use of an herbicide manufactured by Defendant-Appellee, Monsanto Company ("Monsanto"). Because Appellants were not in privity of contract with Monsanto, they are precluded from maintaining an action for breach of implied warranty in contract; however, questions of fact remain with respect to their claims for breach of express warranty in contract and breach of implied warranty in tort.

{¶ 2} Facts and procedural history pertinent to the issues raised on appeal are as follows. Appellants have maintained their livelihood through farming operations since the 1970s. In May 1996, Appellants purchased Roundup Ultra, an herbicide manufactured by Monsanto, from Stryker Agricultural Center ("Stryker") in Stryker, Ohio for the purpose of killing weeds in their corn and soybean fields. Appellants applied Roundup Ultra to their fields as part of a tank mixture containing multiple chemicals used for various purposes. Appellants oversee five fields of corn, which were sprayed beginning on May 19, 1996, and completed on June 5, 1996. Likewise, Appellants' six soybean fields were sprayed with a similar mixture, also containing Roundup Ultra, beginning on June 3, 1996, and ending on June 15, 1996.

{¶ 3} Shortly after applying the herbicide, Appellants' noticed that the weeds were not dying. Thereafter, with the assistance of Stryker, Appellants began attempts to rescue the fields from weed infestation, which would cause a reduction in crop yield if not curtailed, by applying different chemicals. In July, Appellants realized that the weeds were not being controlled; therefore, they contacted Stryker and requested that Monsanto be notified of the problem, alleging that the Roundup Ultra was not working to kill the weeds.

{¶ 4} At that time, Monsanto provided no response to the complaint and did not send a representative to view Appellants' fields. Stryker made additional attempts to contact Monsanto in August 1996, with similar results. Subsequently, on September 7, 1996, Appellants personally contacted Monsanto about the weed control problem; however, no representative visited Appellants' fields, despite promises to the contrary, until November. By that time, the fields had been harvested and tilled, leaving nothing for the Monsanto representatives to view.

{¶ 5} Consequently, on April 17, 2000, Appellants filed the subject complaint against Monsanto, alleging that Roundup Ultra was defective as manufactured and failed to conform to the representations made as to its ability to control weeds, resulting in reduced crop yields and added expenditures for rescue attempts. Appellants based their claims upon breach of express and implied warranties in contract and common law implied warranty in tort theories.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d

Not Reported in N.E.2d, 2002 WL 2030889 (Ohio App. 3 Dist.), 48 UCC Rep.Serv.2d 586, 2002 -Ohio- 4613
(Cite as: 2002 WL 2030889 (Ohio App. 3 Dist.))

*2 {¶ 6} On April 4, 2001, Monsanto moved for summary judgment. The trial court denied the motion, finding that genuine issues of material fact existed. Thereafter, on August 30, 2001, Monsanto renewed its motion for summary judgment. Upon review thereof, the court granted summary judgment in favor of Monsanto, finding that Appellants' claims were barred by R.C. 1302.65(C) for failing to provide notice of the alleged breach within a reasonable time. In addition, the court held that, notwithstanding the notice requirements, Appellants were only entitled to the replacement costs of the product in question. From this decision, Appellants appeal, asserting the following two assignments of error for our review:

{¶ 7} "The trial court erred in granting summary judgment in Appellee's favor because Appellee failed to meet its burden to prove that no genuine issue of material fact existed as to whether Appellants failed to give notice was [sic] within a reasonable time."

{¶ 8} "The trial court erred in granting summary judgment in Appellee's favor on the grounds that Appellants could recover no more than their product replacement costs."

*Standard of Review*

{¶ 9} Because the arguments presented herein all relate to the trial court's finding of summary judgment in favor of Monsanto, we will begin our analysis by outlining the requisite standard of review.

{¶ 10} A court may not grant a motion for summary judgment unless the record demonstrates: 1) that no genuine issue of material fact remains to be litigated; 2) that the moving party is entitled to judgment as a matter of law, and; 3) that, after construing the evidence most strongly in the non-movant's favor, reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made.[FN1] In ruling on a summary

judgment motion, the trial court is not permitted to weigh evidence or choose among reasonable inferences; rather, the court must evaluate evidence, taking all permissible inferences and resolving questions of credibility in favor of the nonmovant.[FN2] Even the inferences to be drawn from the underlying facts contained in evidentiary materials, such as affidavits and depositions, must be construed in a light most favorable to the adverse party.[FN3] Moreover, once the moving party demonstrates that he is entitled to summary judgment, the burden shifts to the nonmoving party to show why summary judgment in favor of the moving party should not be had.[FN4] In addition, appellate review of summary judgment determinations is conducted on a de novo basis;[FN5] therefore, this Court considers the motion independently and without deference to the trial court's findings.[FN6]

FN1.Civ.R. 56(C); *Horton v. Harwick Chemical Corp.* (1995), 73 Ohio St.3d 679, 686-87, 653 N.E.2d 1196.

FN2. *Jacobs v. Racevskis* (1995), 105 Ohio App.3d 1, 7, 663 N.E.2d 653.

FN3. *Hannah v. Dayton Power & Light Co.* (1998), 82 Ohio St.3d 482, 485, 696 N.E.2d 1044.

FN4.Civ.R. 56(E); *Weithman v. Weithman* (June 28, 2002), Crawford App. No. 3-02-08, 2002-Ohio-3400, at ¶ 12.

FN5. *Griner v. Minster Bd. of Education* (1998), 128 Ohio App.3d 425, 430, 715 N.E.2d 226.

FN6. *J.A. Industries, Inc. v. All American Plastics, Inc.* (1999), 133 Ohio App.3d 76, 82, 726 N.E.2d 1066.

*Implied Warranties in Contract*

[1][2] {¶ 11} As part of their action, Appellants have attempted to raise the implied warranties set

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d                                                    Page 6
Not Reported in N.E.2d, 2002 WL 2030889 (Ohio App. 3 Dist.), 48 UCC Rep.Serv.2d 586, 2002 -Ohio- 4613
**(Cite as: 2002 WL 2030889 (Ohio App. 3 Dist.))**

forth in R.C. 1302.27, implied warranty of merchantability, and R.C. 1302.28, implied warranty of fitness for a particular purpose, as basis for relief against Monsanto. As part of Ohio's Uniform Commercial Code ("UCC"), these sections are applicable to "transactions in goods[.]"[FN7] However, in order to maintain an action founded upon these theories of recovery, proof of a sales contract between the parties must be established.[FN8] In other words, the parties are required to be in privity of contract before implied warranties under the UCC will attach to a sales transaction.[FN9]

> FN7.R.C. 1302.02.

> FN8. *Lawyers Cooperative Publishing Co. v. Muething* (1992), 65 Ohio St.3d 273, 277, 603 N.E.2d 969, citing *Lonzrick v. Republic Steel Corp.* (1966), 6 Ohio St.2d 227, 230, 218 N.E.2d 185. See, also, *Diversified Capping Equip., Inc. v. Clinton Pattern Works Inc.* (Apr. 12, 2002), Wood App. No. WD-01-035, 2002-Ohio-2295; *Acme Steak Co., Inc. v. Great Lakes Mechanical Co.* (Sept. 29, 2000), Mahoning App. No. 94 CV 2401, 2000-Ohio-2566;*Brant v. Sreenan's Office Systems/Designs* (July 14, 1993), Van Wert App. No. 15-93-1;*Pagan v. Stroh Brewery Co.* (May 28, 1991), Mahoning App. No. 86 CV 2374.

> FN9.*Id.*

*3 [3] {¶ 12} The undisputed evidence herein reveals that Appellants purchased Roundup Ultra from Stryker, not directly from Monsanto. Additionally, uncontroverted evidence shows that representatives of Stryker are not agents of Monsanto and, concomitantly, have no authority to act on behalf on Monsanto. As such, without the benefit of a sales contract directly with Monsanto, Appellants are precluded from raising claims founded on UCC implied warranty theories for want of privity.

*Express Warranties in Contract*

{¶ 13} As mentioned previously, Appellants also presented claims for breach of express warranty. R.C. 1302.26 defines express warranties, in pertinent part, as "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise" and "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the desprciption."[FN10]

> FN10.R.C. 1302.26(A)(1), (2).

[4] {¶ 14} While seemingly creating an anomalous result when taken in conjunction with our previous discussion of implied warranties in contract, we find that "to preclude [an action for breach of express warranty under the UCC for a lack of privity] when a manufacturer has induced a party, by way of express warranty, to purchase one of its products from an intermediary would be unconscionable."[FN11] Otherwise, a party would be able to make express warranties about its products and then shield itself from liability by selling to a middleman who, in turn, sells it to the other party.[FN12] Consequently, Appellants' claims for breach of express warranty in contract survive despite the absence of privity.

> FN11.*C.W. Zumbiel Co. v. Reichhold Chemicals, Inc.* (June 5, 1996), Hamilton App. No. C-950644, quoting *Reichhold Chem., Inc. v.. Haas* (Nov. 3, 1989), Portage App. No.1983. See, also, *Rogers v. Toni Home Permanent Co.* (1958), 167 Ohio St. 244, 147 N.E.2d 612, paragraph three of the syllabus.

> FN12.*Haas, supra.*

[5][6] {¶ 15} The trial court herein held that summary judgment was proper because Appellants failed to give notice of breach to Monsanto within a

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d                                                                                                    Page 7
Not Reported in N.E.2d, 2002 WL 2030889 (Ohio App. 3 Dist.), 48 UCC Rep.Serv.2d 586, 2002 -Ohio- 4613
**(Cite as: 2002 WL 2030889 (Ohio App. 3 Dist.))**

reasonable time. R.C. 1302.65, which is applicable to express warranty claims,[FN13] states that when goods have been accepted "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy[.]"[FN14] The notification requirement allows the seller or manufacturer time to correct the problem.[FN15] The content of the notification need merely be sufficient to put the party on notice that the "transaction is * * * troublesome and must be watched[,]" and a buyer's rights are saved if notice is given that a breach may be involved, thus opening the door for settlement negotiations.[FN16] In other words, notice does not have to include a clear statement of all the objections that will be relied on, statements of claimed damages, or threats of litigation.[FN17]

> FN13. *AGF, Inc. v. Great Lakes Heat Treating Co.* (1990), 51 Ohio St.3d 177, 179, 555 N.E.2d 634.

> FN14. R.C. 1302.65(C)(1).

> FN15. *Litehouse Products, Inc. v. A.M.I. International, Ltd.* (Mar. 8, 1984), Cuyahoga App. No. 46834.

> FN16. *Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.* (1989), 42 Ohio St.3d 40, 52, 537 N.E.2d 624, quoting R.C. 1302.65, Official Comment.

> FN17. *Id.*

{¶ 16} Within the informational packet accompanying Roundup Ultra, Monsanto makes an express warranty that the product "is generally non-selective and gives broad spectrum control of many annual weeds, perennial weeds, woody brush and trees." In reliance upon this statement, Appellants utilized the product for weed control in their fields. Based on the evidence herein, Appellants sprayed their various fields between May 19 and June 15, 1996. Apparently, within a few days of spraying their first fields, Appellants contacted Stryker and

informed them that the herbicide was not working; however, because such products often take time to activate, Stryker suggested Appellants "give it a few more days." By June 3, Appellants informed Stryker that the product is "absolutely not working," and rescue treatment discussions began. Thereafter, the remaining fields were sprayed and followed by a rainy period, which postponed any rescue attempts until towards the end of June. Then, on an unknown date in July, Appellants requested that Stryker notify Monsanto of the problem and send a representative to view their fields. When Monsanto continually failed to comply with multiple requests from Stryker to view Appellants' fields, Appellants began personally notifying them on September 7, 1996, resulting in a November visit.

*4 {¶ 17} In its renewed motion for summary judgment, Monsanto contends that because Appellants did not personally give notice until September 7, notice was not given within a reasonable time. However, based upon the liberal interpretation for what constitutes notice,[FN18] as discussed above, we find that the information provided by Stryker on behalf of Appellants would be sufficient to put Monsanto on notice that there was a performance problem with the product. Notwithstanding, a question remains as to whether the notice in July was given timely pursuant to R.C. 1302.65(C).

> FN18. *Id.* at 54, 537 N.E.2d 624.

[7][8] {¶ 18} At the outset, we note that the determination of whether a buyer, after accepting goods, gave timely notice of an alleged breach is generally a question for the trier of fact to be determined in consideration of all attendant circumstances.[FN19] In this case, despite Appellants' knowledge in early June that the Roundup Ultra was not working, there is a lack of evidence relating to the extent of the product's nonperformance at that time or the effects resulting therefrom. Moreover, without any reference to a specific date in July for which notice was provided and the fact that Appellants did not spray their last fields with

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d                                                                 Page 8

Not Reported in N.E.2d, 2002 WL 2030889 (Ohio App. 3 Dist.), 48 UCC Rep.Serv.2d 586, 2002 -Ohio- 4613
(Cite as: 2002 WL 2030889 (Ohio App. 3 Dist.))

the product until mid-June, there is a likelihood that reasonable minds could come to differing opinions as to whether notice was timely. Evaluating these facts in a light favorable to Appellants, we find that questions of material fact remain as to whether notice was made within a reasonable time.

> FN19. *Id.* at 51-52, 537 N.E.2d 624; *Diversified Capping Equip., Inc. v. Clinton Pattern Works Inc.* (Apr. 12, 2002), Wood App. No. WD-01-035, 2002-Ohio-2295; *Kabco Equip. Specialists v. Budgetel, Inc.* (1984), 2 Ohio App.3d 58, 61, 440 N.E.2d 611.

[9] {¶ 19} Furthermore, we also note that the Eighth District Appellate Court has held that "[u]nder most circumstances reasonable notice of defect should be made prior to any attempted repairs[.]"[FN20] Evidence in this case reveals that Appellants did initiate rescue efforts prior to providing notice to Monsanto; however, in an emergency situation, resorting to self-help is permissible before notice is given.[FN21] Accordingly, this presents another question of material fact for a jury to decide: the issue of whether or not Appellants' situation was an emergency could foreclose Appellants' claim that notice was timely.

> FN20.*Litehouse Products, Inc. v. A.M.I International, Ltd.* (Mar. 8, 1984), Cuyahoga App. No.46834.

> FN21.*Id.*

[10][11] {¶ 20} Also related to Appellants' claims involving breach of express warranty is Monsanto's argument that Appellants have no valid warranty claims because they misused the product despite the following warranty contained in the informational booklet: "[t]his company warrants that this product conforms to the chemical description on the label and is reasonably fit for the purposes set forth in the Complete Directions for Use label booklet * * * when used in accordance with those Directions under the conditions described therein."We note that

typically "the issues of whether any warranties were created, and, if so, whether they were effectively disclaimed are questions of fact to be determined at trial."[FN22] Appellants admit that when they sprayed their fields Roundup Ultra was mixed with multiple chemicals, namely Frontier, which was not included in Monsanto's label as being a compatible product with Roundup Ultra. However, in light of the evidence produced thus far, a question of material fact remains as to whether Appellants' misuse was inconsequential to the resulting effects or lack thereof.

> FN22.*C.W. Zumbiel Co. v. Reichhold Chemicals, Inc.* (June 5, 1996), Hamilton App. No. C-950644.

*5 {¶ 21} Appellants stated during deposition that they used Roundup Ultra without mixing it with other chemicals to kill weeds in their yard; however, they observed nothing to support that the product worked. Moreover, deposition testimony from Appellants' expert witness reveals that multiple farmers around the country experienced similar problems with the product. In addition, prior to 1996, Monsanto included Frontier as a compatible chemical within its label for Roundup, which, as testimony indicates, contains the same primary ingredients as Roundup Ultra but with a different formulation. Furthermore, Frontier was added to the Roundup Ultra label in 1997. Expert deposition testimony also indicates that Frontier was not included on the Roundup Ultra label because of a marketing conflict with Lasso, a product similar to Frontier but manufactured by Monsanto. Accordingly, a question of material fact exists as to whether Appellants addition of Frontier to their spray mixture was inconsequential in light of the resulting effects and, in turn, whether Monsanto's breach of express warranty was the proximate cause of the weed control failure.[FN23]

> FN23. Cf. *Cincinnati Ins. Co. v. Maytag Co.* (1989), 63 Ohio App.3d 144, 149-52, 578 N.E.2d 478. See, e.g., *Maine Energy Recovery Co. v. United Steel Structures,*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d                                                    Page 9
Not Reported in N.E.2d, 2002 WL 2030889 (Ohio App. 3 Dist.), 48 UCC Rep.Serv.2d 586, 2002 -Ohio- 4613
(Cite as: 2002 WL 2030889 (Ohio App. 3 Dist.))

*Inc.* (1999), 724 A.2d 1248, 1250, at ¶ 7; *Crosbyton Seed Co. v. Mechura Farms* (1994), 875 S.W.2d 353, 361.

{¶ 22} Similar questions of fact are also present with respect to Monsanto's claims that Appellants did not utilize proper screening methods when mixing the chemicals prior to spraying. Appellants' expert witness testified at deposition that their method was a common procedure utilized in farming operations and was not a contributing cause to Appellants' weed control problem. Accordingly, a question of fact remains concerning whether this alleged misuse was the proximate cause of the weed infestation.

{¶ 23} The trial court herein further held that even if Appellants' notice to Monsanto was reasonable pursuant to R.C. 1302.65, they would only be entitled to the replacement value of the product in question based upon the following disclaimer contained in Roundup Ultra's informational booklet: "THE EXCLUSIVE REMEDY OF THE USER OR BUYER, AND THE LIMIT OF THE LIABILITY OF THIS COMPANY OR ANY OTHER SELLER FOR ANY AND ALL LOSSES, INJURIES OR DAMAGES RESULTING FROM THE USE OR HANDLING OF THIS PRODUCT (INCLUDING CLAIMS BASED IN CONTRACT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT OR OTHERWISE) SHALL BE THE PURCHASE PRICE PAID BY THE USER OR BUYER FOR THE QUANTITY OF THIS PRODUCT INVOLVED, OR, AT THE ELECTION OF THIS COMPANY OR ANY OTHER SELLER, THE REPLACEMENT OF SUCH QUANTITY, OR, IF NOT ACQUIRED BY PURCHASE, REPLACEMENT OF SUCH QUANTITY. IN NO EVENT SHALL THIS COMPANY OR ANY OTHER SELLER BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES."

[12][13] {¶ 24} R.C. 1302.93 allows a court to override a limited warranty where the remedy fails of its essential purpose.[FN24] Under commercial law, a limitation of remedy fails its essential pur-

pose if it deprives the purchaser of the substantial value of its bargain.[FN25] Determinations of whether a warranty has failed to fulfill its essential purpose is ordinarily a question of fact for the jury.[FN26]

FN24. R.C. 1302.93(B).

FN25. *Daniel A. Terrieri and Sons, Inc. v. Alliance Wall Corp.* (Mar. 29, 1996), Mahoning App. No. 92 CV 526, citing *Ohio Savings Bank v. H.L. Vokes Co.* (1989), 54 Ohio App.3d 68, 74, 560 N.E.2d 1328.

FN26. *Chemtrol Adhesives, Inc.,* 42 Ohio St.3d at 56, 537 N.E.2d 624, citing *Cayuga Harvester, Inc. v. Allis-Chalmers Corp.* (1983), 95 A.D.2d 5, 465 N.Y.S.2d 606; *Johnson v. John Deere Co.* (S.D.1981), 306 N.W.2d 231.

*6 [14] {¶ 25} In this case, Monsanto has attempted to limit their liability to either the cost of the product or replacement thereof. The Ohio Supreme Court has stated that replacement remedies are designed "to give the seller an opportunity to make the goods conforming while limiting the risks to which he is subject by excluding direct and consequential damages that might otherwise arise."[FN27] Moreover, such limited warranties typically fail when the seller is unable or unwilling to grant such remedy within a reasonable time.[FN28] Herein, there is evidence that Monsanto was unwilling to replace the product within a reasonable time: despite notice in July, Monsanto did not visit Appellants' fields until November, well after the fields had been harvested.

FN27. *Id.,* citing *Beal v. General Motors Corp.* (D.Del.1973), 354 F.Supp. 423, 426.

FN28. Cf. *Id.*

### Implied Warranty in Tort

[15][16][17] {¶ 26} Within their complaint, Appel-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d                                                                 Page 10
Not Reported in N.E.2d, 2002 WL 2030889 (Ohio App. 3 Dist.), 48 UCC Rep.Serv.2d 586, 2002 -Ohio- 4613
**(Cite as: 2002 WL 2030889 (Ohio App. 3 Dist.))**

lants sufficiently pled a claim based upon the theory of implied warranty in tort, which the trial court neglected to discuss. The right to bring such an action does not depend upon the existence of a contractual relationship between the plaintiff and the defendant,[FN29] and because Appellants are claiming economic damages, Ohio's product liability statutes have not preempted their claim.[FN30] Moreover, a breach of implied warranty in tort claim is within an entirely separate body of law from that applied under the UCC.[FN31] This court has previously found that an action for breach of implied warranty in tort requires the following elements: 1) the existence of a defect; 2) the defect was present at the time the product left the hands of the manufacturer; and 3) the plaintiff's injury was directly and proximately caused by the defect.[FN32] Each of these elements raise questions of material fact reserved to the trier of fact.

> FN29. *Avenell v. Westinghouse Elec. Corp.* (1974), 41 Ohio App.2d 150, 156, 324 N.E.2d 583; *Diversified Capping Equip., Inc. v. Clinton Pattern Works, Inc.* (Apr. 12, 2002), Wood App. No. WD-01-035, citing *Chemtrol Adhesives, Inc.,* 42 Ohio St.3d at 49, 537 N.E.2d 624; *Ohio Dept. of Adm. Serv. v. Robert P. Madison Internatl., Inc.* (2000), 138 Ohio App.3d 388, 395-97, 741 N.E.2d 551.

> FN30. *LaPuma v. Collinwood Concrete* (1996), 75 Ohio St.3d 64, 66-67, 661 N.E.2d 714.

> FN31. *Diversified Capping Equip., Inc. v. Clinton Pattern Works Inc.* (Apr. 12, 2002), Wood App. No. WD-01-035.

> FN32. *Crow v. Parker* (June 29, 1999), Allen App. No. 1-99-13, 1999-Ohio-822.

{¶ 27} Based upon the foregoing rationale, we find that the trial court erred in granting summary judgment in favor of Monsanto because questions of material fact remain. Accordingly, Appellants as-

signments of error are sustained.

{¶ 28} Having found error prejudicial to Appellant herein, in the particulars assigned and argued, the judgment of the trial court is reversed and the matter is remanded for further proceedings in accordance with this opinion.

***Judgment reversed and cause remanded.***

SHAW, P.J., and BRYANT, J., concur.
Ohio App. 3 Dist.,2002.
Johnson v. Monsanto Co.
Not Reported in N.E.2d, 2002 WL 2030889 (Ohio App. 3 Dist.), 48 UCC Rep.Serv.2d 586, 2002 -Ohio- 4613

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy                                                                                          Page 1
Slip Copy, 2008 WL 5412490 (Ohio App. 1 Dist.), 2008 -Ohio- 6904
(Cite as: 2008 WL 5412490 (Ohio App. 1 Dist.))

C

CHECK OHIO SUPREME COURT RULES FOR
REPORTING OF OPINIONS AND WEIGHT OF
LEGAL AUTHORITY.

Court of Appeals of Ohio,
First District, Hamilton County.
Brandon J. GEIGER, Michael Geiger, and Ellen
Geiger, Plaintiffs-Appellants,
v.
WESTFIELD NATIONAL INSURANCE COM-
PANY, Defendant-Appellee.
**No. C-080355.**

Decided Dec. 31, 2008.

Civil Appeal from Hamilton County Court of Com-
mon Pleas.
Austin Mehr Law Offices, P.S.C., and Austin Mehr,
and Perry, Deering, Futscher & Sparks, P.S.C., and
Robert Sparks for appellants.

McCaslin, Imbus, & McCaslin, R. Gary Winters,
and Bernard W. Wharton, for appellee.

SYLVIA S. HENDON, Judge.

*1 {¶ 1} Plaintiff-appellants Brandon, Michael, and
Ellen Geiger sued the Westfield National Insurance
Company, claiming bad faith and fraud in West-
field's handling of an underinsured motorist
("UIM") claim. The Geigers also sought punitive
damages. The trial court granted summary judg-
ment in favor of Westfield without comment, but
presumably on the grounds that either (1) the Gei-
gers' case was barred by res judicata, or (2) the Gei-
gers had previously released all claims against
Westfield. The Geigers now appeal. We reverse.

De Novo Review

{¶ 2} We review the trial court's judgment de

FN1 Summary judgment is appropriate if (1) no
genuine issue of any material fact remains, (2) the
moving party is entitled to judgment as a matter of
law, and (3) it appears from the evidence that reas-
onable minds can came to but one conclusion, and
construing the evidence most strongly in favor of
the nonmoving party, that conclusion is adverse to
the party against whom the motion for summary
judgment is made. FN2

> FN1. *Grafton v. Ohio Edison Co.* (1996),
> 77 Ohio St.3d 102, 105, 671 N.E.2d 241.
>
> FN2.Civ.R. 56(C); *Temple v. Wean United,
> Inc.* (1977), 50 Ohio St.2d 317, 327, 364
> N.E.2d 267; see, also, *Dresher v. Burt,* 75
> Ohio St.3d 280, 293, 1996-Ohio-107, 662
> N.E.2d 264.

The UIM Lawsuit

{¶ 3} Fourteen-year old Brandon Geiger was hit by
a car driven by John Sulau. He was seriously in-
jured. Brandon and his parents sued John Sulau and
his father, William, for negligence, negligent en-
trustment, loss of consortium, and emotional dis-
tress. The Geigers' later amended their complaint
and added a claim for UIM coverage, joining West-
field, their insurance company, as a defendant. Fol-
lowing binding arbitration between the Geigers and
Westfield, the Geigers were awarded over $1.4 mil-
lion, and the parties signed a satisfaction of arbitra-
tion award. In the award, the Geigers agreed to dis-
miss with prejudice the underlying lawsuit, "Case
No. A-0404364." The trial court in that case later
journalized a document entitled "stipulation of dis-
missal," which was signed by both parties. The
stipulation stated that "all matters in controversy
between the remaining parties in this case having
been amicably resolved,* * * this matter is hereby
dismissed with prejudice."

The Second Lawsuit

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy

Slip Copy, 2008 WL 5412490 (Ohio App. 1 Dist.), 2008 -Ohio- 6904

(Cite as: 2008 WL 5412490 (Ohio App. 1 Dist.))

Page 2

{¶ 4} After case number A-0404364 had been dismissed, the Geigers filed another lawsuit against Westfield. In their complaint, the Geigers claimed that Westfield had breached its duty of good faith and fair dealing in the way that it had handled the Geigers' UIM claim. The Geigers also alleged fraud, and sought punitive damages. Some of the facts pled included claims that Westfield refused to promptly or fairly assess their claim, and that Westfield had questioned coverage without reasonable justification. The Geigers also took issue with the settlement amounts initially offered by Westfield, and with representations made by Westfield concerning the Geigers' policy.

## Res Judicata

{¶ 5} In their first assignment of error, the Geigers argue that their second lawsuit against Westfield was not barred by the doctrine of res judicata. The Geigers are correct.

{¶ 6} According to the Ohio Supreme Court in *Grava v. Parkman Twp.,*[FN3] under the doctrine of res judicata, "[a] valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action."In *Grava,* the court cited with approval the Restatement of Judgments, defining the same transaction or occurrence as those having a "common nucleus of operative facts."[FN4]

> FN3. 73 Ohio St.3d 379, 1995-Ohio-331, 653 N.E.2d 226, syllabus.

> FN4.*Id.,* at 382-383, 1995-Ohio-331 653 N.E.2d 226.

**\*2** {¶ 7} Although it pre-dates *Grava,* the Ohio Supreme Court case of *Norwood v. McDonald*[FN5] is helpful in determining what a "common nucleus of operative facts" is. The *Norwood* court found that, to determine whether a second action is barred by a first, a court should consider the facts essential to the maintenance of each cause of action.[FN6]If the

same facts or evidence would sustain both, then the second action is barred by res judicata.[FN7]If, however, the two cases rely upon different facts, a judgment in one case is no bar to the maintenance of the other.[FN8]"Different facts" do not include "different shadings of the facts" or an emphasis "of different elements of the facts."[FN9]

> FN5. (1943), 142 Ohio St. 299, 306, 52 N.E.2d 67, overruled, in part, on other grounds as stated in *Grava,* supra.

> FN6.*Id.*

> FN7.*Id.*

> FN8.*Id.*

> FN9. *Grava,* at 383, 1995-Ohio-1995, 653 N.E.2d 226; see, also *Miami Valley Hospital v. Purvis,* 2nd Dist. No. CA 21740, 2007-Ohio-4721.

## The Facts

{¶ 8} Here, in the Geigers' first lawsuit, the facts needed to prove UIM coverage centered on the existence of a UIM policy, the extent of the Sulaus' liability, the amount of damage to the Geigers, and damage in excess of what the Sulaus' insurance policy would pay.[FN10]

> FN10. See, gererally, *Hammock v. Cincinnati Ins. Co.,* 1st Dist. No. C-020783, 2003-Ohio-5090, ¶ 11;R.C. 3937.18.

{¶ 9} By contrast, the facts needed to maintain the second lawsuit revolve around Westfield's actions in processing the Geigers' UIM claim. The tort of bad faith exists when an insurer's refusal to pay a claim is not based on circumstances that would reasonably justify the refusal.[FN11]Likewise, the Geigers' fraud claim focuses on Westfield's actions-namely the representations it made concerning the Geigers' policy and the Geigers' UIM claim.[FN12]Finally, to recover punitive damages,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the Geigers would have to demonstrate that West-field acted with "actual malice," which is character-ized by hatred or ill-will.[FN13] The facts necessary to maintain these claims, while perhaps tangentially related to the first cause of action, are not the same as those needed for the first. The first suit focused on Westfield's contractual liability and the Sulaus' negligence, the second on Westfield's actions in the processing of the Geigers' claims.[FN14] So, res judicata does not bar this cause of action. The Geigers' first assignment of error is sustained.

> FN11. *Zoppo v. Homestead Ins. Co.,* 71 Ohio St.3d 552, 1994-Ohio-461, 644 N.E.2d 397, paragraph one of the syllabus.

> FN12. See *State ex rel. Illuminating Co. v. Cuyahoga Cty. Court of Common Pleas,* 97 Ohio St.3d 69, 2002-Ohio-5312, 776 N.E.2d 92, ¶ 24; *Russ v. TRW, Inc.* (1991), 59 Ohio St.3d 42, 49, 570 N.E.2d 1076.

> FN13. *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus; see, also, *Calmes v. Goodyear Tire & Rubber Co.* (1991), 61 Ohio St.3d 470, 472-473, 575 N.E.2d 416.

> FN14. See *Buckeye Union Ins. Co. v. State Farm Mutual Auto Ins.* (Apr. 16, 1997), 1st Dist. No. C-960282 (An insurer's breach of the duty of good faith gives rise to a cause of action in tort, irrespective of any liability that might arise from a breach of the underlying insurance contract).

### The Dismissal was not a Release

{¶ 10} In their second assignment of error, the Geigers contend that the trial court erred in granting summary judgment on the basis that the Geigers had released all future claims against Westfield in the satisfaction of arbitration award and the stipulation of dismissal. The record is unclear as to whether this was the basis for summary judgment. But, to the extent that it was, the trial court erred.

{¶ 11} Neither the satisfaction of arbitration award nor the stipulation of dismissal purport to do anything other than to dismiss case number A-0404364. There is no release language in either document.[FN15] Viewing these documents in a light most favorable to the Geigers, we interpret them to be nothing other than what they purport to be-an agreement to dismiss case A-0404364, and a dismissal. The Geigers' second assignment of error is sustained.

> FN15. Cf. *Tanker v. North Crest Equestrian Ctr.* (1993), 86 Ohio App.3d 522, 621 N.E.2d 589

*3 {¶ 12} In sum, we reverse the trial court's summary judgment in favor of Westfield, and remand this cause for further proceedings.

Judgment reversed and cause remanded.

PAINTER, P.J., and CUNNINGHAM, J., concur.
Please Note:

The court has recorded its own entry on the date of the release of this decision.

Ohio App. 1 Dist.,2008.
Geiger v. Westfield Natl. Ins. Co.
Slip Copy, 2008 WL 5412490 (Ohio App. 1 Dist.), 2008 -Ohio- 6904

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



LEXSEE 2006 US DIST LEXIS 63783

**LUCAS-COOPER, Plaintiff, vs. PALMETTO GBA et al, Defendant.**

**CASE NO: 1:05-cv-00959**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION**

*2006 U.S. Dist. LEXIS 63783*

**September 7, 2006, Decided**
**September 7, 2006, Filed**

**SUBSEQUENT HISTORY:** Summary judgment granted by, Claim dismissed by *Lucas-Cooper v. Gba, 2006 U.S. Dist. LEXIS 77575 (N.D. Ohio, Oct. 25, 2006)*

**PRIOR HISTORY:** *Lucas-Cooper v. Palmetto GBA, 2006 U.S. Dist. LEXIS 51531 (N.D. Ohio, July 27, 2006)*

**COUNSEL:** [*1] Eva Lucas-Cooper, Plaintiff, Pro se, Pittsburgh, PA.

For Palmetto GBA, Blue Cross & Blue Shield of South, Carolina, Defendants: Kathleen E. Karelis, Victoria H. Jueds, Jenner & Block, Washington, DC; John Czarnecki, Cooper & Walinski, Toledo, OH.

For Vincent B. Johnson, Defendant, Pro se, Akron, OH.

For Charter One Bank, Citizens Financial Group, Defendants: Karen L. Giffen, Kathleen A. Nitschke, Giffen & Kaminski, Cleveland, OH; Ilah M. Adkins, Charter One Bank, Cleveland, OH.

For Royal Bank of Scotland PLC, Defendant: Kathleen A. Nitschke, Giffen & Kaminski, Cleveland, OH.

For Ohio Dept. Job and Family, Services, Defendant: Henry G. Appel, Office of the Attorney General, Columbus, OH.

For Veterans Administration, Defendant: Lori W. Laisure, Office of the U.S. Attorney, Northern District of Ohio, Cleveland, OH.

For Taft, Stettinius & Hollister, LLP, Defendant: Donna M. Flammang, Patricia Fleming Krewson, Peter M. Pou-los, Stephen H. Jett, Taft, Stettinius & Hollister, Cleveland, OH.

For Gibson, Brelo, Ziccarelli &, Martello, Defendant: Mark A. Ziccarelli, Thomas J. Mayernik, Gibson, Brelo, Ziccarelli & Martello, Mentor, OH.

**JUDGES:** Nancy A. Vecchiarelli, [*2] UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** Nancy A. Vecchiarelli

**OPINION**

MEMORANDUM AND OPINION

MAGISTRATE JUDGE

NANCY A. VECCHIARELLI

On August 11, 2006, Defendant Gibson, Brelo, Zicarelli & Martello Co., LPA ("Gibson") filed a motion to dismiss (Doc. No. 183), asserting that Plaintiff's complaint should be dismissed for failure to plead with particularity and failure to state a claim. For the reasons set forth in detail below, the motion is GRANTED. Defendant Gibson is dismissed.

**I. PROCEDURAL BACKGROUND**

On April 13, 2005, Plaintiff Eva Lucas-Cooper filed the instant action. In her complaint, Plaintiff alleged the eleven Defendants, Palmetto GBA ("Palmetto"), Blue Cross & Blue Shield of South Carolina ("Blue Cross"), Vincent B. Johnson ("Johnson"), Cardinal Home Health Care, LTD ("Cardinal"), Charter One Bank ("Charter One"), Citizens Financial Group ("Citizens"), Royal Bank of Scotland PLC ("Royal Bank"), Ohio Dept. Of

Job and Family Services ("ODJFS"), the Veterans Administration ("VA"), Taft, Stettinius & Hollister, LLP ("Taft"), and Gibson, Brelo, Ziccarelli & Martello ("Gibson") unlawfully used her Employer Identification Number ("EIN"). Plaintiff included the following claims [*3] against the Defendants: (I) gross negligence and reckless conduct; (II) violations of *18 U.S.C. § 1028*; (III) fraud and negligent misrepresentation; (IV) violations of *18 U.S.C. § 1962(c)* and *(d)*; (V) violations of *18 U.S.C. § 1962(a)*; (VI) unjust enrichment; (VII) violations of *5 U.S.C. § 552* or *552a*; and (VIII) outrageous conduct or punitive damages.

On August 11, 2006, Defendant Gibson filed a motion to dismiss Plaintiff's complaint. (Doc. No. 30). In an Order dated August 4, 2006, Plaintiff was ordered to file a response to Gibson's motion on or before August 28, 2006. Plaintiff failed to do so.

## II. PLAINTIFF'S CLAIMS AGAINST GIBSON

Plaintiff's claims arise out of alleged unauthorized use of an Employer Identification Number ("EIN"). Specifically, Plaintiff claims that Defendants Johnson, her former business partner, and Cardinal One Healthcare, her former company, used Plaintiff's EIN to receive funds. In May 2004, Johnson and Cardinal filed suit against Plaintiff in the Lake County, Ohio Court of Common Pleas, captioned *Cardinal Home Health Care, Ltd.* [*4] *and Vincent B. Johnson v. Eva Lucas Cooper aka Eva S. Lucas*, Case No. 04CV000904 (the "Lake County Litigation"). Johnson and Cardinal alleged that Plaintiff fraudulently took funds and/or property of Cardinal, in excess of $ 300,000, for personal use and engaged in serious mismanagement of Cardinal. Defendant Taft represented Johnson and Cardinal in this action from its institution until September 16, 2004. Attorney Nicholas Austin represented Plaintiff in the Lake County Litigation.

Taft sought and received, on behalf of its clients Johnson and Cardinal, a temporary restraining order ("TRO"), which the Lake County Court extended numerous times and eventually vacated on February 24, 2005 when the parties submitted a settlement agreement to the Court. The TRO directed Plaintiff to relinquish control of Cardinal and recognized Defendant Johnson as the sole authorized owner and/or representative for all purposes, including billing. It further required Plaintiff to turn over numerous documents connected with the billing, including the EIN.

Plaintiff alleges that after the TRO was issued, she asked all Defendants to cease using the EIN. On June 29, 2004, Attorney Austin sent a letter [*5] to Taft stating that "Cardinal Home Health Care, Ltd. is not entitled, authorized, or permitted to bill with or in any way utilize,

my client's tax identification number (EIN #) as said number is my client's and is non-transferable pursuant to federal law."

On July 23, 2004, the Lake County Court granted Austin's motion to withdraw as counsel. On August 23, 2004, Plaintiff, acting *pro se*, filed a motion for injunctive relief with the Lake County Court moving the court to prohibit Johnson and Cardinal from using the EIN, which was registered to Plaintiff as a sole proprietor.

On August 30, 2004, Taft filed a motion to withdraw as counsel for Johnson and Cardinal. On September 16, 2004, the Lake County Court granted the motion.

On the same day, the Lake County Court granted Plaintiff's motion for injunctive relief only to the extent that Johnson and Cardinal shall cease using the EIN on and after September 1, 2004. This entry by the Lake County Court is apparently the written memorialization of an oral order rendered on August 26, 2004 -- the date on which the court held a hearing on the matter. Plaintiff claims that Johnson and Cardinal continued to use the EIN even after this [*6] order was issued.

Defendant Gibson became counsel of record for Johnson and Cardinal beginning on September 28, 2004. The litigation apparently continued while Gibson represented Johnson and Cardinal, but the complaint does not reveal the details.

The charges Plaintiff levels against Gibson stem primarily from allegations that Gibson: "knew or should have know that its clients had been found in contempt of Court for continuing to fraudulent [sic] use Plaintiff's [EIN]"; "professed innocence while it intentionally perverted the truth for the purpose of inducing Plaintiff to rely upon it to part with her [EIN]"; "continues to receive fees which it knows or has reason to know that the money is from the fraudulent use of Plaintiff's [EIN]"; and engaged in "conduct of aiding, assisting, encouraging, and abetting one or more of the other defendants in the unlawful fraudulent conduct, included [sic], but not limited to a false representation by words, conduct, allegations, suppressions of truth, suggestions, and concealment so that Plaintiff would act upon such falsehood and innuendo, to her legal injury."

## III. STANDARD UNDER *FED. R. CIV. P. 12(b)(6)*

[*7] A motion to dismiss for failure to state a claim pursuant to *Rule 12(b)(6)* "should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*. All well-pleaded allegations must be taken as true and construed most favorably toward the non-movant. *See Mayer v. Mylod, 988 F.2d*