UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF OHIO
Eastern Division

| | | |
|---|---|---|
| HODELL-NATCO INDUSTRIES, INC. | ) | CASE NO. 1:08 CV 2755 |
| | ) | |
| Plaintiff, | ) | JUDGE:  LESLEY WELLS |
| | ) | MAGISTRATE JUDGE:  GREG WHITE |
| | ) | |
| -vs.- | ) | |
| | ) | |
| | ) | |
| SAP AMERICA, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

---

PLAINTIFF HODELL-NATCO INDUSTRIES, INC.'S BRIEF IN OPPOSITION TO THE SAP
DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

---

Plaintiff Hodell-Natco Industries, Inc. ("Hodell"), by and through undersigned counsel and pursuant to Fed. R. Civ. P. 12(b)(6), submits the following Brief in Opposition to the Motion to Dismiss filed by defendants SAP America, Inc. ("SAP") and SAP AG (collectively, "SAP" or the "SAP defendants")(ECF #36) directed to Hodell's First Amended Complaint ("FAC").

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iv

STATEMENT OF ISSUES TO BE DECIDED ...................................................... vii

I.    INTRODUCTION ....................................................................................... 1

II.   STATEMENT OF FACTS ........................................................................... 2

      A.    The Parties .................................................................................... 2

      B.    The Defendants' Marketing Efforts Directed Towards Hodell ............................. 3

      C.    Hodell's Initial Purchase of 80 User Licenses Pursuant to the Development
            Agreement .................................................................................... 5

      D.    Hodell's Purchase of 40 Additional Licenses Pursuant to the Software
            Agreement .................................................................................... 7

      E.    SAP and its "Expert Channel Partners" Fail to Successfully Install or
            Implement the Software into Hodell's Operations, Resulting in Total Failure ...... 8

III.  LEGAL ARGUMENT................................................................................... 9

      A.    Standard of Review......................................................................... 9

      B.    Applicable Law............................................................................ 10

            1.    Ohio Law is Applicable to the 2004 Purchase & 2005 Purchase ............ 10

            2.    Ohio Law Applies to Hodell's Tort Claims............................................. 12

      C.    The Parol Evidence Rule Does Not Bar Hodell's Fraudulent Inducement,
            Fraud, or Negligent Misrepresentation Claims ...................................... 14

            1.    Plaintiff's Reliance Upon the License Agreement is Inapplicable
                  to the First 80 User Licenses Purchased by Hodell in the 2004
                  Purchase ................................................................................. 15

            2.    The Parol Evidence Rule is Inapplicable Hodell's Claims Relating
                  to Both the 2004 Purchase and Subsequent 2005 Purchase.................... 15

      D.    Hodell's Claims are Not Barred by the "Gist of the Action" Doctrine ............... 18

1.    Hodell's Fraud Claims are Not Usurped by its Breach of Contract Claim .......................................................................................... 18

E.    The "Economic Loss Rule" is Inapplicable Because, Under Ohio Law, the  SAP Defendants Had an Affirmative Duty to Refrain From Making Fraudulent or Negligent Representations.  The Nature of Hodell's Damages is an Issue of Fact Inappropriate for Adjudication on a Motion to Dismiss ......... 20

F.    Hodell's Third Cause of Action for Breach of Contract Alleges Claims Against Both SAP and SAP AG ...................................................................... 23

1.    The SAP Defendants Are Liable Either as Parties to, or Third-Party Beneficiaries of the Development Agreement .......................................... 23

2.    SAP Did Not Disclaim Any Warranties in the Development Agreement, and the License Agreement's Warranty Disclaimers Were Fraudulently Induced ............................................................... 25

3.    SAP AG is a Party to, and Liable Under, the License Agreement ........... 26

G.    Hodell Did Not Waive its Right to Pursue Damages in the Development Agreement, and Was Fraudulently Induced Into Executing the License Agreement, Barring Application of Any Damage Waivers Therein .................. 26

1.    The Development Agreement Does Not Contain Any Waiver of Damages ............................................................................... 26

2.    The SAP Defendants' Reliance on the Damage Disclaimers is Barred by their Fraudulent Inducement of the License Agreement ......... 27

H.    Hodell's Complaint Complies with Civil Rule 9(b), and SAP Has Not Sought a More Definite Statement of the First Amended Complaint.................. 28

IV.    CONCLUSION.................................................................................... 29

CERTIFICATE OF SERVICE ................................................................. 31

## TABLE OF AUTHORITIES

**Cases**

*Academy Plaza LLC1 v. Bryant Asset Mgmt.*, 2006 WL 1652687 (Pa. Com. Pl. 2006) ........ 18, 19

*Advocacy Org. for Patients and Providers v. Auto Club Ins. Assn.*, 176 F.3d 315
    (6th Cir. 1999).................................................................................................... 29

*Air Products and Chemicals, Inc. v. Eaton Metal Products Co.*, 256 F.Supp.2d 329
    (E.D. Pa. 2003)................................................................................................ 19, 23

*Bartholet v. Reishaver A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992)................................. 9

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) ... 9

*Bilt-Rite Contractors, Inc. v. The Architectural Studio*,581 Pa. 454, 866 A.2d 270 (2005)......... 21

*Burns v. Prudential Secs., Inc.*, 167 Ohio App.3d 809, 841 (2006) .............................................. 13

*Chemtrol Adhesives, Inc. v. Am. Mfrs. Ins. Co.*, 42 Ohio St.3d 40, 46,
    537 N.E.2d 624 (1989)................................................................................... 21, 22

*Clemente v. Gardner*, 2004-Ohio-2254, ¶39 ............................................................................. 17

*Combs v. Crown Life Ins.*, 2008 WL 641557, *7 (S.D. Ohio 2008)............................................. 21

*Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 106 Ohio St.3d 412, 415, 835 N.E.2d 701
    (2005)............................................................................................................... 21

*Cox v. True N. Entergy, LLC*, 524 F.Supp.2d 927, 933-34 (N.D. Ohio 2007) .............................. 9

*Detrick v. 84 Lumber Co.*, 2007 WL 1467070, *2 (N.D. Ohio 2007)........................................... 14

*Drew v. Christopher Constr. Co., Inc.* (1942), 140 Ohio St. 1, 23 O.O. 185, 41 N.E.2d 1018,... 16

*Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) ............................... 9

*Ferro Corp. v. Blaw Knox Food & Chem. Equip. Co.*, 121 Ohio App.3d 434, 440,
    700 N.E.2d 94 (1997)........................................................................................ 22

*Finley v. Schuett*, 8 Ohio App.3d 38, 39, 455 N.E.2d 1324 (1982)............................................. 15

*First Federal Sav. and Loan Ass'n of Toledo v. Fidelity and Deposit Co.*  895 F.2d 254, 258
    (6th Cir. 1990).................................................................................................. 11

*Galmish v. Cicchini*, 90 Ohio St.3d 22, 734 N.E.2d 782 (2000) ..................................... 15, 16, 17

iv

*Gries Sports Enterprises, Inc. v. Modell*, 15 Ohio St.3d 284, 473 N.E.2d 807 (1984) ............... 11

*Hagberg v. Delphi Auto Sys.*, 268 F.Supp.2d 855, 860 (N.D. Ohio 2002) .................................. 12

*Hoddon View Inv. Co. v. Coopers and Lybrand*, 436 N.E.2d 212 (1982) .................................... 21

*In re Cincinnati Gas & Electric Securities Litigation*, 594 F.Supp. 233 (S.D. Ohio1984) .... 20, 29

*In re Commercial Money Center, Inc., Equipment Lease Litigation*, 603 F.Supp.2d 1095
        (N.D.Ohio 2009) ........................................................................................................ 12

*Kreamer Sports, Inc. v. Rocky Brands, Inc.*, 2007 WL 1144865, *7 (S.D. Ohio 2007) ............... 17

*Legge v. Wagner*, 7 F.3d 234 (6th Cir. 1993) ............................................................................. 28

*Link v. Leadworks Corp.*, 79 Ohio App.3d 735, 742-43, 607 N.E.2d 1140 (1992)...................... 19

*Macurdy v. Sikov & Love, P.A.*, 894 F.2d 818 (6th Cir. 1990)................................................. 12, 14

*Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674 (6th Cir. 1988) ........................................... 29

*Morgan v. Biro Mfg. Co.*, 15 Ohio St.3d 339, 341 (1984)............................................................ 13

*Moses v. Bus. Card Express*, 929 F.2d 1131, 1138 (6th Cir.1991).......................................... 12, 13

*Niehaus v. Haven Park West* (1981), 2 Ohio App.3d 24, 25, 440 N.E.2d 584............................ 25

*Ohio Match Co. v. Elm Grove Min. Co.*, 5 Ohio Law Abs. 151 (1927) ....................................... 24

*Parmlee v. Adolph,* 28 Ohio St. 10 (1875)................................................................................... 19

*Proctor & Gamble Co. v. Bankers Trust Co.*, 925 F.Supp. 1270 (S.D. Ohio 1996) ................... 12

*Pullins v. Klimley*, 2008 WL 85871, *43 (S.D.Ohio 2008) ......................................................... 28

*Pumphrey v. Quillen*, 165 Ohio St. 343, 59 O.O. 460, 135 N.E.2d 328 (1956), ......................... 19

*Resource Title Agency, Inc. v. Morreale Real Estate Servs., Inc.*, 314 F.Supp.2d 763, 773
        (N.D. Ohio 2004) ................................................................................................... passim

*Rogers v. Hill*, 124 Ohio App.3d 468, 706 N.E.2d 438 (1998) ................................................... 25

*Ruffing v. Masterbuilt Tool & Die, LLC*, 2009 WL 185950, *6 (N.D. Ohio 2009) .................... 12

*Sarmiento v. Grange Mut. Cas. Co.*, 106 Ohio St.3d 403 (2005)................................................. 13

*Saum v. Moenter*, 101 Ohio App.3d 48, 53, 654 N.E.2d 1333 (1995) ......................................... 24

*Sky Tech. Partners, LLC v. Midwest Research Inst.*, 125 F.Supp.2d 286, 297 (S.D. Ohio 2000) 13

*Smith v. General Motors Corp.,* 168 Ohio App.3d 336, 859 N.E.2d 1035, 1042 (2006)............. 28

*Sullivan v. Chartwell Investment Partners, LP*, 873 A.2d 710 (Pa. Sup. Ct. 2005) ..................... 19

*Union Mut. Ins. Co. of Maine v. Wilkinson* (1871), 80 U.S. (13 Wall.) 222, 231-232, 20 L.Ed. 617, 622.............................................................................................................................. 16

*Zoppo v. Homestead Insurance Co.*, 71 Ohio St.3d 552, 644 N.E.2d 397, 401 (1994)................ 28

**Rules**
Civil Rule 12(e)........................................................................................................................... 28

Fed. R. Civ. P. 12(b)(6)................................................................................................................. 9

Fed. R. Civ. P. 8(a)(2).................................................................................................................. 9

Fed. R. Civ. P. 8(d)(2).................................................................................................................. 9

Fed. R. Civ. P. 9(b) ............................................................................................................... 28, 29

**Treatises**
37 American Jurisprudence 2d (1968) 621-622, Fraud and Deceit, Section 451 ......................... 16

Annotation, Parol-Evidence Rule; Right to Show Fraud in Inducement or Execution of Written Contract (1928), 56 A.L.R. 13, 34-36:............................................................................... 16

Restatement (2d) Conflict of Laws, §§ 145, 146 and 6 ................................................................ 13

Restatement (2d) Conflict of Laws, §188 ............................................................................... 10, 11

Restatement (2d) Conflict of Laws, §188, Comment (e) on Subsection 2 .................................... 11

Restatement (2d) Conflict of Laws, §188, Comment on Subsection 1, d..................................... 11

Restatement of Torts 2d, 126-127 § 552 ..................................................................................... 21

Restatement Section § 552.......................................................................................................... 21

<u>STATEMENT OF ISSUES TO BE DECIDED</u>

Plaintiff Hodell-Natco Industries, Inc. submits that the Motion to Dismiss filed by Defendants SAP America, Inc. and SAP AG pursuant to Fed. R. Civ. P. 12(b)(6) is without merit.  Plaintiff has plead all required elements in support of its claims, and the legal defenses raised by the SAP Defendants fail to demonstrate, as a matter of law, that Plaintiff has failed to state a claim upon which relief can be granted.

I.      INTRODUCTION

On April 22, 2009, Hodell filed a First Amended Complaint (ECF #26) intended to clarify and augment the allegations contained within its original Complaint.   Hodell's First Amended Complaint asserts claims as follows:   Count I:   Fraudulent Inducement; Count II:  Fraud; Count III:   Breach of Contract; Count IV:   Negligence; and Count V:   Negligent Misrepresentation.   Hodell's claims arise out of a series of transactions involving Hodell, as purchaser of a business management software, and the SAP defendants, LSI-Lowery Systems, Inc. ("LSI") and The IBIS Group, Inc. ("IBIS") as the marketers and sellers of that software known as SAP Business One.

As detailed below, Hodell entered into two separate and distinct transactions for the purchase of software from the SAP defendants based upon representations made by SAP and its representatives regarding the qualities and characteristics of the SAP Business One software, and further based upon SAP's representations and statements regarding its own, and its channel partners' abilities.   The first transaction occurred in December 2004 pursuant to a "Development Agreement."   The Development Agreement contains no choice of law clause, no limitation on liability and no warranty disclaimers.

The second transaction was one year later, in December 2005, pursuant to a "License Agreement."   The License Agreement purports to require application of Pennsylvania law, limit SAP's liability, and disclaim all warranties.   Hodell alleges it was fraudulently induced into agreeing to these terms.

The purchase of SAP's Business One software was a debacle.   Contrary to express representations made to Hodell during the Business One marketing phase, the SAP Business One software was utterly incapable of supporting the number of users required by Hodell.   Further,

1

the Business One software was incapable of being installed or implemented into Hodell's operations, and when used, resulted in multiple server errors in communications between Hodell personnel and its customers.  Hodell eventually abandoned the entire software platform, incurring damages in excess of $1.3 million.  SAP, through its Motion to Dismiss, attempts to escape all responsibility for the blatant misrepresentations made to Hodell, and the abject failure of its software.

II.     STATEMENT OF FACTS

        A.      The Parties

        Plaintiff Hodell is a full-service fastener and chain product wholesale distributor headquartered in Valley View, Ohio.  FAC, ¶9.  Due to the vast number of products sold and distributed by Hodell, and its multiple locations throughout the country, Hodell requires software that provides real time access to vital data such as customer information, parts numbers, quantities of inventory, and locations of inventory.  FAC, ¶11.

        In 2003, Hodell commenced a search for a software product that would provide the necessary integrated financial and sales management capabilities for its growing business.  FAC, ¶16.  Hodell required software capabilities to accommodate its then-existing users, numbering approximately 80, and the growth Hodell estimated achieving over the software's useful life.  *Id.* Hodell also required a software vendor with a high level of expertise, and a proven product supported by expert channel partners.  *Id.*  Hodell's user capacity needs were expressly communicated to all potential software vendors, including the defendants named herein.  FAC, ¶17.

During the course of its search, Hodell met and spoke with representatives of SAP.  SAP America is a wholly-owned subsidiary of SAP AG, a German software company.  FAC, ¶4.[1] SAP AG had recently purchased an Israeli application developer and branded its application "SAP Business One" (hereinafter, the "Software") FAC, ¶12.  SAP began marketing the Software through "a network of highly qualified channel partners" that resell, build, implement or provide services for SAP products.  FAC, ¶13.    The qualifications and expertise of SAP's "channel partners" was touted in a publication titled "SAP Solution Brief, Qualified SAP All-in-One Partner Solutions" published in July 2002.  FAC, ¶13.

Due to the representations made by SAP directly, and in copious publications, the SAP channel partners were viewed by the marketplace, and Hodell specifically, as authorized agents of SAP, having assented to act on its behalf, and subject to its control. FAC, ¶13.  These agents, or "channel partners," were authorized to, and did in fact make representations concerning the Software's suitability and functionality on SAP's behalf.  FAC, ¶13-15.  Three such authorized agents were two software companies known as LSi-Lowery Systems, Inc. ("LSi") and The IBIS Group, Inc. ("IBIS") (collectively referred to herein as the "LSi defendants"), and American Express Business and Tax Services ("Amex"). FAC, ¶¶14-15, 20.[2]  The LSi defendants acted on behalf of SAP as authorized agents for the express purpose of making representations to potential clients about the suitability and functionality of the Software.  FAC, ¶15.

B.    The Defendants' Marketing Efforts Directed Towards Hodell

In 2003, Hodell was contacted either by SAP directly, or by one of its "channel partners," and provided with a copy of the "SAP Business One Brief" extolling the Software's virtues, and

---

[1]  At all times relevant to the allegations in Hodell's First Amended Complaint, SAP America and SAP AG were commonly controlled and acted in concert with one another.  FAC, ¶4.

[2]  At all times relevant to Hodell's First Amended Complaint, LSi and IBIS were commonly controlled and acted in concert with one another.  FAC, ¶6.

3

expressly representing that the Software would provide a "robust and fully integrated" software suitable for businesses "with 10 to several hundred employees."  FAC, ¶18.[3]  The Brief also asserted that the Software had been successful in "[t]housands of business in 15 countries."  *Id.* A contemporaneous marketing piece provided to Hodell, the "SAP Solution Brief," touted the virtues of SAP's "highly qualified channel partners" that are "supported by SAP's global resources."[4]  *Id.*

On October 16, 2003, Hodell received an email from Penelope A. Vitantonio, an Amex employee, and an authorized agent and representative of SAP.  FAC, ¶20-21.[5]  Attached to the email was "a technical whitepaper and a collateral piece" regarding SAP Business One – The American Express Edition.  FAC, ¶21.  The "SAP Business One Whitepaper" represented that the Software had been "successfully installed in 800 businesses globally, with the maximum implementation time being four weeks."  FAC, ¶21.  The "SAP Business One Whitepaper" also represented the Software as supporting "an unlimited number of simultaneous user transactions."[6]  *Id.*

On October 20, 2003, Hodell participated in an "Online Webinar and Demonstration" presented jointly by SAP, Amex, and IBM.  FAC, ¶22.  During the course of the Webinar, the suitability of the Software for small and mid-sized wholesale distributors was specifically represented to the attendees, including Otto Reidl, Hodell's President.  FAC, ¶22.  In November 2003, a representative of Amex orally informed Mr. Reidl that IBIS would be partnering with Amex, and postponed a scheduled meeting between Hodell and Amex.  FAC, ¶23.

---

[3] A true and accurate copy of this publication is attached as Exhibit A.
[4] A true and accurate copy of this publication is attached as Exhibit B.
[5]  At all times referenced in Hodell's First Amended Complaint, Amex acted as the authorized agent and representative of its disclosed principal, SAP.  Amex's role as agent and representative for SAP was later transitioned to the LSi defendants.  FAC, ¶20.
[6] A true and accurate copy of this publication is attached as Exhibit C.

4

Soon thereafter, Hodell was contacted by IBIS, which represented to Hodell that it was an expert in providing IT solutions to the fastener industry and that "SAP had chosen to partner with The IBIS Group to develop the specific requirements of this vertical market space and bring to market a turn key (sic) solution to this industry."  FAC, ¶24.  Development of the "vertical market space" advertised by IBIS included the integration of other applications with the Software, including an "In-Flight Enterprise" application and "Radio Beacon" synchronization. FAC, ¶24.  On or about December 19, 2003, Mr. Reidl was contacted by Amex representatives who provided Mr. Reidl with assurances that the Software had sufficient capability to serve a business the size of Hodell.  FAC, ¶26.

During 2004, IBIS continued its marketing efforts for the Software.  FAC, ¶27.  After LSi acquired IBIS in June 2004, Dan Lowery of LSi joined in the efforts to market the Software to Hodell.  *Id.*  Meetings and/or telephone conversations between Hodell and the LSi defendants continued from February 2004 through November 2004. [7]  *Id.*  However, not once during any of these meetings and/or conversations did the LSi defendants or SAP inform Hodell that the Software:  (1) was unsuitable for mid-sized businesses; (2) could only support a limited number of users; (3) could not be installed in a reasonably functioning form; (4) existed with only mediocre or poor support; or (5) would require months of installation lead time.  *Id.*

C.     Hodell's Initial Purchase of 80 User Licenses Pursuant to the Development Agreement

Based upon representations by the defendants, Hodell began negotiating with LSi to purchase licenses for the Software.  On December 17, 2004, LSi forwarded a draft "final agreement" to be executed by Hodell and the LSi defendants as representatives of SAP.  FAC,

---

[7] As alleged in the First Amended Complaint, meetings and/or conversations occurred on at least the following dates:  February 2, 2004; February 6, 2004; September 10, 2004; October 13, 2004; November 3, 2004; November 8, 2004; and November 23, 2004.  FAC, ¶27.

¶29.  On December 20, 2004, Hodell executed the Development Agreement.[8]  Also on December 20, 2004, Hodell issued a Purchase Order for an 80-user software license for the Software, at a purchase price for the licenses alone of $300,000.[9]  LSi issued an invoice to Hodell for the 80-user license on the same day.  FAC, ¶32.  These documents comprise the entire and complete agreement pursuant to which Hodell purchased the initial 80 licenses (hereinafter, the "2004 Purchase").  FAC, ¶33.

Importantly, the Development Agreement does not contain a choice of law provision, nor does it contain any provisions purporting to limit any warranties or remedies available to Hodell for breach of the Agreement.  In fact, the Development Agreement expressly preserves Hodell's remedies.  Exh. D:  Devt. Agreement, Section 5.

The Purchase Order issued in connection with the Development Agreement indicates that the goods ordered are to be shipped to Hodell's warehouse in Cleveland, Ohio.  FAC, Exh. D.  The Invoice issued by LSi was sent to Hodell's headquarters in Valley View, Ohio.  FAC, Exh. E.  Payment was remitted from Hodell's headquarters in Valley View, Ohio.  *Id.*

Essential to the 2004 Purchase were the representations by SAP and its "channel partner" agents that the Software could be used to support the many Hodell users.  FAC, ¶34.  The defendants understood that Hodell might later purchase an additional 220 licenses, and that Hodell anticipated a potential need of 300 licenses during the expected 10-year useful life.  *Id.*  Hodell would not have made its initial purchase without the assurances that the Software could support the initial 80 users, and subsequently be expanded to the anticipated 300 total users.  FAC, ¶35.  Hodell also relied upon SAP and the LSi defendants' assurances that it would receive "high-level" customer support tailored to Hodell's specific needs.  FAC, ¶39.

---

[8] A true and accurate copy of the Development Agreement is attached as Exhibit D.
[9] A true and accurate copy of the Purchase Order is attached as Exhibit E.

6

As Hodell later learned, the defendants' statements regarding the software, including their statements regarding its user capacity, the attendant customer support, and the number of successful installations, turned out to be false, misleading, and made with the intent to induce Hodell to enter into the 2004 Purchase.  By the time the defendants sold Hodell the initial 80 user licenses in December 2004, SAP knew, or was reckless in not knowing, that the Software could not reasonably support more than 30 total users.  FAC, ¶45.[10]

D.    Hodell's Purchase of 40 Additional Licenses Pursuant to the License Agreement

In December 2005, as a result of the defendants' prior false statements, and  additional representations made subsequent to the 2004 Purchase, Hodell purchased an additional "40 CRM" user licenses from IBIS.  FAC, ¶46 (the "2005 Purchase").  In the course of the 2005 Purchase, Hodell was presented with a Maintenance Schedule and SAP Business One Software License Agreement (the "License Agreement").[11]  *Id.*  Hodell signed the License Agreement but never received a signed counterpart from SAP.  *Id.*  The License Agreement contains the purported limitation of liability, choice of law, and warranty waiver provisions relied upon in SAP's Motion.  Hodell alleges that it was fraudulently induced into agreeing to these terms.  FAC, ¶62.

By the time the additional 40 user licenses were sold to Hodell in December 2005, the SAP knew or should have known that the Software could not reasonably support more than 30 users, and thus, could not support the 80 user licenses initially purchased by Hodell, let alone the 40 user licenses sold to Hodell in December 2005.

---

[10] A timeline demonstrating the amount of users SAP knew, or should have known, SAP Business One could reasonably support during its marketing of the software from 2003 to 2007 is included within Paragraph 42 of the First Amended Complaint.

[11] A true and accurate copy of the License Agreement is attached as Exhibit F.

E.     SAP and its "Expert Channel Partners" Fail to Successfully Install or Implement
the Software into Hodell's Operations, Resulting in Total Failure

Hodell worked diligently with SAP and its "expert channel partner" LSi to implement the Software.  FAC, ¶48.  However, installation of the Software was an abject failure.  Hodell continued efforts to make the Software even minimally functional until 2008, when the project had to be abandoned after reaching the conclusion that the Software had completely failed. FAC, ¶48.[12]

On April 25, 2007, Dan Lowery of LSi wrote an email to Kevin Reidl of Hodell demonstrating defendants' knowledge that the Software was unsuitable for Hodell:  "Yes, at the early stages we all started with [Business One], the number most often quoted for *users* was 250+.  On the call, you correctly heard Hodell was pushing the upper limit with 120."  FAC, ¶50. (Emphasis in original).  On September 6, 2007, Hodell received a call from LSi representative Dale Van Leeuwen, who admitted that the Software had initially been represented as capable of supporting up to 300 users, but that by May 2006, SAP had reduced that number to 50 users. FAC, ¶51.

As a result of the defendants' misrepresentations inducing Hodell to enter into the 2004 and 2005 transactions, and forego other business opportunities, Hodell has suffered over $1.3 million in damages.  FAC, ¶¶53-54.

---

[12] The many problems encountered by Hodell in attempting to install the Software included, but were not limited to: (1) the system responded so slowly that Hodell's sales force was unable to reasonably respond to customer inquiries; (2) frequent disconnect errors were encountered; (3) data synchronization failures occurred between the Software and Radio Beacon; (4) ongoing discrepancies arose between package onhand and warehouse onhand figures; (5) faxes were sent to incorrect customers; (6) e-mailing failed without any apparent pattern; (7) screens froze when looking up past sales to customers; (8) form settings sporadically changed from one day to the next following no apparent pattern; (9) repeated "Internal error 2038" messages; (10) misapplied costs; (11) item interchanges were not functional; (12) order entry failures with no apparent pattern; and (13) country of origin did not uniformly carry through the system.  FAC, ¶49.

III.  LEGAL ARGUMENT

    A.    Standard of Review

In *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007), the United States Supreme Court reaffirmed that the standard for dismissal under Fed. R. Civ. P. 12(b)(6) cannot be read in isolation from Fed. R. Civ. P. 8(a)(2), which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Erickson*, 127 S.Ct. at 2200 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007). *Twombly* reaffirmed that all allegations in the complaint are presumed to be true and inferences are to be resolved in the plaintiff's favor in resolving a motion to dismiss. *Bell Atlantic Corp.*, 127 S.Ct. at 1965.

While not the case here, in stating the pleading standard, the *Twombly* Court noted that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* at 1965.  Citing both *Twombly* and *Erickson*, this District held in *Cox v. True N. Entergy, LLC*, 524 F.Supp.2d 927, 933-34 (N.D. Ohio 2007) that "**either direct or inferential allegations which comprise all of the essential, material elements** necessary to sustain a claim for relief under some viable legal theory" preclude a dismissal under Fed. R. Civ. P. 12(b)(6).  *Id.* at 934 (emphasis added).

As set forth in Fed. R. Civ. P. 8(d)(2), a party may set forth claims in the alternative.  Nor does the pleader have to specifically identify the legal theory justifying the relief sought.  Identifying no legal theory or even an incorrect legal theory is not fatal to the complaint. *Bartholet v. Reishaver A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992)("A complaint under Rule 8 limns the claim; details of both fact and law come later, in other documents.  Instead of

asking whether the complaint points to the appropriate statute, a court should ask whether relief is possible under any set of facts that could be established consistent with the allegations.").

In the present case, Hodell's Amended Complaint adequately pleads facts which would support the monetary damages sought.

B.    Applicable Law

As discussed in the Statement of Facts above, Hodell's purchase of the Software occurred in two distinct transactions:  the 2004 Purchase and the 2005 Purchase.  None of the documents exchanged in the 2004 Purchase contains a choice of law provision.

In the 2005 Purchase, Hodell purchased additional licenses pursuant to a "one time limited offer," and executed the License Agreement.  FAC, ¶61.  The License Agreement contains the Pennsylvania choice of law clause relied upon by SAP's Motion.  Hodell submits that Ohio law must apply to the 2004 Purchase, and to each of Hodell's tort claims, because Ohio has the most significant relationship to the parties' transaction.  Additionally, Hodell submits that the License Agreement's choice of law provision should not be enforced because Hodell was fraudulently induced into entering the 2005 contract at a time when the Defendants knew the software was unable to support the 80 licenses already sold to Hodell.[13]

1.    Ohio Law is Applicable to the 2004 Purchase & 2005 Purchase

Ohio law applies to the 2004 Purchase, which contains no provisions requiring application of any particular state's law.  The 2004 Purchase must be separately analyzed under Ohio's choice of law rules.[14]  Restatement (2d) Conflict of Laws, §188 applies where the parties

---

[13] The SAP defendants' Motion makes absolutely no effort to undertake a choice of law analysis, assuming that Pennsylvania law applies throughout merely because of the choice of law clause in the 2005 License Agreement, which, if even if enforceable, applies only to that limited transaction concerning 40 licenses.  As discussed below, the law applicable to Hodell's claims must be individually addressed.

[14] "[C]ourts have long recognized that they are not bound to decide all issues under the local law of a single state . . . . Each issue is to receive separate consideration if it is one which would be resolved differently under the local law

do not select any particular law to govern their transaction.  *Gries Sports Enterprises, Inc. v. Modell*, 15 Ohio St.3d 284, 473 N.E.2d 807 (1984).  Under Section 188, "[t]he state where performance is to occur under a contract has an obvious interest in the nature of performance and in the party who is to perform."  Restatement (2d) Conflict of Laws, §188, Comment (e) on Subsection 2.  See also, *First Federal Sav. and Loan Ass'n of Toledo v. Fidelity and Deposit Co.* 895 F.2d 254, 258 (6th Cir. 1990) ("Since the contract was entered into and negotiated in Ohio, conflict of laws authority indicates that Ohio law should control, and the district court in Ohio properly had jurisdiction of the controversy now on appeal.").  In the present case, performance of the 2004 Purchase was to occur in Ohio, Hodell is located in Ohio,[15] and the failed installation of the Software occurred at Hodell's headquarters in Ohio.  Ohio has a strong interest in the validity of contracts entered into, and to be performed, in Ohio, and in protecting the justified business expectations of Ohio's businesses conducting business with out-of-state and foreign entities.

The Purchase Order issued in connection with the Development Agreement indicates that the goods ordered were to be shipped to Hodell's Ohio warehouse.  FAC, Exh. D.  The Invoice issued by LSi was sent to Hodell in Ohio.  FAC, Exh. E.  Payment was remitted from Ohio.  *Id.* Thus, Ohio has the most significant relationship to Hodell's purchase of the initial 80 licenses, and Ohio law should apply to the 2004 Purchase.[16]

The License Agreement's choice of law clause should not be applied either.  A contractual choice-of-law clause is unenforceable where the objecting party alleges that the

---

rule of two or more of the potentially interested states."  Restatement (2d) Conflict of Laws, §188, Comment on Subsection 1, d.  Hodell submits that a separate choice of law analysis must occur with regard to the 2004 Purchase.
[15] Hodell's principal place of business and headquarters are in Valley View, Ohio.  FAC ¶2.
[16] To the extent the precise location of all activities giving rise to Hodell's claims is not ascertainable from the First Amended Complaint, Hodell submits that the Court should defer the choice of law analysis until discovery is conducted and the facts are more fully developed.

choice of law clause itself was fraudulently induced. *Moses v. Bus. Card Express*, 929 F.2d 1131, 1138 (6th Cir.1991). Hodell's First Amended Complaint specifically alleges that Hodell was fraudulently induced into signing the License Agreement for the express purpose of securing Hodell's assent to the agreement's disclaimers and other limitations. FAC, ¶62. Thus, Hodell's allegation that the License Agreement's choice of law clause was fraudulently induced should preclude application of Pennsylvania law to any claims in this case, including claims arising from the 2005 Purchase.

2.  Ohio Law Applies to Hodell's Tort Claims[17]

Courts apply a different choice of law analysis to tort claims than contract claims. *Hagberg v. Delphi Auto Sys.*, 268 F.Supp.2d 855, 860 (N.D. Ohio 2002); *Macurdy v. Sikov & Love, P.A.*, 894 F.2d 818 (6th Cir. 1990)("We think the district court erred in failing to recognize that Macurdy's fraud claim derives from tort law, and that the Restatement of Conflicts mandates a different choice-of-law analysis to determine which state's law applies to a tortious fraud claim."); *In re Commercial Money Center, Inc., Equipment Lease Litigation*, 603 F.Supp.2d 1095 (N.D.Ohio 2009)("Once the claims at issue have been classified appropriately, the Court then can apply the relevant choice of law principles to determine the applicable substantive law."). Ohio has adopted the principles of the Restatement (2d) of Conflicts of Law, sections

---

[17] SAP cites to *Proctor & Gamble Co. v. Bankers Trust Co.*, 925 F.Supp. 1270 (S.D. Ohio 1996) for the proposition that the License Agreement's choice of law clause applies to both Hodell's contract claims and its tort claims. However, the License Agreement's choice of law clause is not as broad as the clause at issue in *Proctor*. Rather, SAP's chosen choice of law provision tracks language identified in *Moses v. Business Card Exp., Inc.*, 929 F.2d 1131, 1140 (6th Cir. 1991) which the Sixth Circuit found would not incorporate tort claims within its breadth. *See also*, *Ruffing v. Masterbuilt Tool & Die, LLC*, 2009 WL 185950, *6 (N.D. Ohio 2009)(finding that choice of law clause providing that agreement "will be governed by the laws of the State of Ohio" was "quite narrow" and applied only to claims based upon that contract, and not to other claims in same lawsuit").

Similarly, the License Agreement merely provides that "This Agreement shall be governed and construed under the Commonwealth of Pennsylvania law . . ." and is virtually identical to the language identified by the *Moses* and *Ruffing* courts which would not preclude application of law other than the choice of law clause. Additionally, the *Moses* court, in applying the broad choice of law clause, found that the plaintiffs were "not asserting a non-contractual claim or one that arose incidentally out of the contractual relationship." *Id.* In contrast, here, Hodell's claims arise out of a series of transactions with SAP and its "channel partners" which involve other transactions manifestly outside the License Agreement's parameters.

145, 146 and 6 for resolving choice of law issues in tort cases.  *Morgan v. Biro Mfg. Co.*, 15 Ohio St.3d 339, 341 (1984).  As a general rule, tort claims are subject to the law of the state where the tort occurred.  *Sarmiento v. Grange Mut. Cas. Co.*, 106 Ohio St.3d 403 (2005), and Section 146 creates a presumption that the law of the place of the injury controls, unless another jurisdiction has a more significant relationship to the lawsuit.  *See Burns v. Prudential Secs., Inc.*, 167 Ohio App.3d 809, 841 (2006).  Hodell's tort claims arose and/or occurred in Ohio, where the loss was suffered.  *Sky Tech. Partners, LLC v. Midwest Research Inst.*, 125 F.Supp.2d 286, 297 (S.D. Ohio 2000)(stating that a tort claim arises "where the loss is suffered . . . . That loss is deemed to be suffered where its economic impact is felt, normally the plaintiff's residence . . .").  Hodell submits that no other state, including Pennsylvania, has a more significant relationship to this lawsuit than Ohio, and thus, Ohio law must govern Hodell's tort claims.

While the place of loss creates a strong presumption that Ohio law applies, Ohio courts also consider the principles established in Restatement §145.  *Burns*, 167 Ohio App.3d at 841. The factors to be considered under section 145 include:  (1) the place of the injury; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; (4) the place where the relationship of the parties, if any, is located; and (5) any factors under [Restatement] section 6 which the court may deem relevant to the litigation.[18]  *Morgan*, 15 Ohio St.3d at 342; Restatement (2d) Conflicts of Law, §145.

---

[18] While Hodell believes the choice of law issue may be decided without reaching the factors discussed in Restatement §6, to the extent it is necessary to address section 6, those factors include:  (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of law to be applied.

Because Hodell is headquartered in Valley View, Ohio, and would therefore suffer injury in Ohio as a result of any tortuous conduct directed at it, the presumption created by Restatement §146 dictates that Ohio law must apply to Hodell's tort claims unless the other factors clearly dictate a different result.  However, the remaining section 145 factors only cement this conclusion:  (1)  the injury occurred in Ohio; (2) the conduct causing the injury occurred in several different locales, including Ohio; (3) the parties' domiciles vary, but include Ohio; and (4) the parties' relationship occurred in Ohio, where SAP's marketing efforts were directed.[19] Thus, the section 145 balancing factors clearly weigh in favor of applying Ohio law, and in any event, there is no indication that these factors clearly weigh in favor of applying Pennsylvania law.

Accordingly, Ohio law should be applied to Hodell's tort claims.  See, *Macurdy*, 894 F.2d at 821 ("The factors delineated in [Restatement] § 6 . . . do not rebut the presumption that Ohio's statute of limitations applies to Macurdy's fraud claim because all of the contacts for purposes of the fraud claim occurred in Ohio, <u>and Pennsylvania has no real interest in protecting Ohio's citizens from frauds committed against them in Ohio</u>.")(emphasis added); *Detrick v. 84 Lumber Co.*, 2007 WL 1467070, *2 (N.D. Ohio 2007)("The formation of the agreement between the parties in Ohio and the effect on the continuation of the agreement is more central to the . . . fraud and misrepresentation claim than the construction of the now-defunct residential dwelling in Pennsylvania. Ohio law therefore applies to this claim.").

C.   <u>The Parol Evidence Rule Does Not Bar Hodell's Fraudulent Inducement, Fraud, or Negligent Misrepresentation Claims</u>

Hodell's tort claims are not barred by the parol evidence rule, as applied by either Ohio or Pennsylvania courts.  SAP asserts that these causes of action, based upon pre-contractual

---

[19] The First Amended Complaint specifically references several marketing communications directed to Hodell's President, Otto Reidl, at Hodell's Valley View, Ohio headquarters. *See* FAC ¶¶18, 20-22, 24, 26-27.

statements, are barred by virtue of the "fully integrated License Agreement."  SAP's argument fails on several independent grounds, each of which is addressed below.

        1.      <u>Plaintiff's Reliance Upon the License Agreement is Inapplicable to the First 80 User Licenses Purchased by Hodell in the 2004 Purchase</u>

The written License Agreement, and "integration clause" therein so heavily relied upon by the SAP defendants applies, if at all, only to the 2005 Purchase.  The License Agreement was not presented to, and was not signed by Hodell, with respect to the 2004 Purchase.  Thus, the SAP defendants' exclusive reliance upon the License Agreement to defeat Hodell's fraudulent inducement, fraud, and negligent misrepresentation claims regarding the 2004 Purchase fails as a matter of fact and law.

As discussed below, Hodell's claims for fraudulence inducement, regarding both the 2004 Purchase and the 2005 Purchase, withstand SAP's attacks under the parol evidence rule.

        2.      <u>The Parol Evidence Rule is Inapplicable Hodell's Claims Relating to Both the 2004 Purchase and Subsequent 2005 Purchase</u>

Hodell has stated a claim for fraudulent inducement with regard to its purchase of both the first 80 licenses in December 2004, and the subsequent 40 licenses in December 2005.  As discussed in Section III.D.1, infra, Hodell has plead all the required elements of its tort claims - - indeed, SAP does not contend otherwise.  SAP's sole argument is that the representations relied upon by Hodell are barred by the parol evidence rule.[20]

SAP's Motion acknowledges that in *Galmish v. Cicchini*, 90 Ohio St.3d 22, 734 N.E.2d 782 (2000), the Ohio Supreme Court recognized an exception to the parol evidence rule for pre-

---

[20] While not specifically addressed in SAP's Motion to Dismiss, any fraudulent statements made by LSi, IBIS, or Amex, as agents for SAP, are attributable to SAP if made in the scope of their employment as agent.  *Finley v. Schuett*, 8 Ohio App.3d 38, 39, 455 N.E.2d 1324 (1982).  SAP does not contend that the misrepresentations attributable to LSi, IBIS or Amex were made outside the scope of their agency, and in any event, this issue could not be decided upon a Motion to Dismiss without introducing evidence outside the pleadings.

contractual statements introduced for the purpose of proving fraudulent inducement.  In *Galmish*,

the Ohio Supreme Court stated:

> **Nevertheless, the parol evidence rule does not prohibit a party from introducing parol or extrinsic evidence for the purpose of proving fraudulent inducement**. *Drew v. Christopher Constr. Co., Inc.* (1942), 140 Ohio St. 1, 23 O.O. 185, 41 N.E.2d 1018, paragraph two of the syllabus. See, also, *Union Mut. Ins. Co. of Maine v. Wilkinson* (1871), 80 U.S. (13 Wall.) 222, 231-232, 20 L.Ed. 617, 622. As explained in Annotation, Parol-Evidence Rule; Right to Show Fraud in Inducement or Execution of Written Contract (1928), 56 A.L.R. 13, 34-36:
>
> > "The principle which prohibits the application of the parol-evidence rule in cases of fraud inducing the execution of a written contract * * * has been regarded as being as important and as resting on as sound a policy as the parol-evidence rule itself. It has been said that if the courts were to hold, in an action on a written contract, that parol evidence should not be received as to false representations of fact made by the plaintiff, which induced the defendant to execute the contract, they would in effect hold that the maxim that fraud vitiates every transaction is no longer the rule; and such a principle would in a short time break down every barrier which the law has erected against fraudulent dealing.
> >
> > **"Fraud cannot be merged; hence the doctrine, which is merely only another form of expression of the parol-evidence rule, that prior negotiations and conversations leading up to the formation of a written contract are merged therein, is not applicable to preclude the admission of parol or extrinsic evidence to prove that a written contract was induced by fraud."** (Footnotes omitted.)
>
> Stated differently, **"[i]t was never intended that the parol evidence rule could be used as a shield to prevent the proof of fraud,** or that a person could arrange to have an agreement which was obtained by him through fraud exercised upon the other contracting party reduced to writing and formally executed, and thereby deprive the courts of the power to prevent him from reaping the benefits of his deception or chicanery." (Footnotes omitted.) 37 American Jurisprudence 2d (1968) 621-622, Fraud and Deceit, Section 451.

*Id.* at 28 (emphasis added).  Thus, where a party relies upon pre-contractual representations

which are independent of, or consistent with, the written instrument as evidence of fraud, the

parol evidence rule is inapplicable.  *Id.* at 29-30.  See also, *Kreamer Sports, Inc. v. Rocky*

*Brands, Inc.*, 2007 WL 1144865, *7 (S.D. Ohio 2007) (parol evidence rule inapplicable to pre-contractual statement which fraudulently induced contract).

This rule of law applies equally to Hodell's claims of negligent misrepresentation, where the alleged representations do not contradict express terms in either the Development Agreement or the License Agreement. See, *Clemente v. Gardner*, 2004-Ohio-2254, ¶39 (finding the *Galmish* decision applicable to issues of fraudulent inducement and negligent misrepresentation.").

In the present case, the alleged fraudulent and/or negligent statements identified by Hodell are both independent and consistent with the Development Agreement and License Agreement. Neither agreement addresses, nor limits, the number of users the Software can support. Additionally, neither agreement addresses the qualifications of SAP itself, nor those of its expert "channel partners." SAP has failed to cite any representations relied upon by Hodell that directly contradict any term within the Development Agreement or License Agreement, and thus, the parol evidence rule is inapplicable.

Hodell's allegations regarding the number of users that could be supported by the Software is entirely consistent with both documents. If SAP contracted to sell Hodell 80 licenses pursuant to the Development Agreement, implied in that transaction is that the software can support, at a minimum, the 80 licenses being sold. Similarly, when SAP sold Hodell an additional 40 licenses pursuant to the License Agreement, implied in that transaction is the assumption that the software can support, at a minimum, the additional 40 licenses being sold. Thus, Hodell's allegations regarding the Software's ability to support the amount of user licenses being sold to it, and SAP's knowledge at the time of sale that its representations were untrue, is

not inconsistent with the written documents.  The parol evidence rule is therefore inapplicable to Hodell's fraud allegations.

Similarly, Hodell's negligent misrepresentation allegations, concerning the capabilities of SAP Business One, SAP itself, and its "channel partners," do not contradict anything in the written instruments.  Accordingly, SAP's parol evidence argument is without merit and its Motion to Dismiss should be denied.[21]

D.    Hodell's Claims are Not Barred by the "Gist of the Action" Doctrine

The "gist of the action" doctrine is inapplicable here, where the gist of Hodell's claims concern a fraud perpetrated on Hodell by SAP directly, and through its "channel partners," resulting in over $1.3 million in damages to Hodell.  The "gist" of Hodell's fraud and negligence claims sound in tort, and arise independent of any contract between Hodell and SAP.

1.    Hodell's Fraud Claims are Not Usurped by its Breach of Contract Claim

The SAP defendants' representations regarding their willingness and ability to design and implement the Software are actionable if, at the time the representations were made, the SAP defendants knew they had no intention of fulfilling their promises.  *Resource Title Agency, Inc. v. Morreale Real Estate Servs., Inc.*, 314 F.Supp.2d 763, 773 (N.D. Ohio 2004).[22]  In *Resource Title*, this Court held that a party may assert a claim for fraud in the inducement by pleading the same elements generally required for fraud.  Such a claim generally involves a misrepresentation of facts outside the contract or other wrongful conduct inducing the party to enter into the

---

[21] Pennsylvania law is in accord, holding that the parole evidence rule is inapplicable to fraud allegations which do not expressly contradict terms in the written agreement.  *Academy Plaza LLC1 v. Bryant Asset Mgmt.*, 2006 WL 1652687 (Pa. Com. Pl. 2006)("The court finds that the parole evidence rule is not activated in this case because the fraudulent misrepresentations were consistent with the terms of the agreement").

[22] SAP's treatment of Ohio law on the "gist of the action" doctrine is non-existent.  Rather, SAP hopes that the Court turns a blind eye to the clear application of Ohio law to Hodell's tort claims, and urges this Court to adopt the apparently more strict application found under Pennsylvania law.  However, even SAP admits that the "gist of the action" doctrine has not been adopted by the Pennsylvania Supreme Court (Mtn. to Dismiss, p. 13, fn 8), and even if it had been adopted, the cases cited below demonstrate that it does not apply to Hodell's fraud or negligent misrepresentation claims here.

contract.  *Id.* at 774.  Ohio courts have held that a fraudulent inducement claim exists separate and apart from a breach of contract claim if based upon a party's intent not to perform at the time of contracting.  *Id.* at 774-75 (citing *Link v. Leadworks Corp.*, 79 Ohio App.3d 735, 742-43, 607 N.E.2d 1140 (1992)).[23]

A party can be held liable for fraud even if it does not know its representation to the plaintiff is false.  *Pumphrey v. Quillen*, 165 Ohio St. 343, 59 O.O. 460, 135 N.E.2d 328 (1956), paragraphs one and two of the syllabus.  Where representations are made "recklessly, and without any knowledge or information on the subject calculated to induce such belief, and they are untrue, then they are fraudulent."  *Id.* (quoting *Parmlee v. Adolph, 28* Ohio St. 10 (1875), paragraph four of syllabus).

In *Resource Title*, this Court expressly held that a fraud claim may proceed beyond the pleadings stage where the plaintiff has plead that, at the time of contracting, the defendant induced the plaintiff's agreement through fraudulent promises it had no intention of performing.  *Resource Title*, 314 F.Supp.2d at 775 ("In this case, the Agencies have specifically pled that, at the time Cendant made its representations that it would pay the Agencies at closing, Cendant had no intention of doing so.  Because the Resource Title Agencies have pled claims for fraudulent inducement separate from their breach of contract claims, their fraud claims should not be dismissed merely because they are asserting the contract claims as well.").

---

[23] Even if Pennsylvania law were applied, the result stands.  In Pennsylvania, the "gist of the action" doctrine does not apply where a party was fraudulently induced into a contract based upon representations made by the defendant when the defendant never intended to perform its contractual duties.  *Sullivan v. Chartwell Investment Partners, LP*, 873 A.2d 710 (Pa. Sup. Ct. 2005); *Academy Plaza LLC1 v. Bryant Asset Mgmt.*, 2006 WL 1652687 (Pa. Com. Pl. 2006)("This court submits that the fraudulent misrepresentations that induced plaintiffs to enter into the Agreement implicate society's interest in preventing the formation of contracts based on fraud and that the tort claim is the gist of the action. Accordingly, the court finds that the gist of the action doctrine does not bar plaintiffs' claim for fraudulent inducement.").  *See also*, *Air Products and Chemicals, Inc. v. Eaton Metal Products Co.*, 256 F.Supp.2d 329 (E.D. Pa. 2003)("Fraud in the inducement claims are much more likely to present cases in which a social policy against the fraud, external to the contractual obligations of the parties, exists.").

In the present case, Hodell's First Amended Complaint satisfies the pleading standard set forth in *Resource Title*.  Hodell specifically sets forth the alleged misrepresentations regarding the Software, the number of successful installations, the installation lead time, SAP's own capabilities, and the capabilities of SAP's expert "channel partners."  FAC, ¶¶56-61.  Hodell also alleges that "[a]t the time the Defendants [including SAP] made their representations regarding the Development Agreement and License Agreement, the Defendants knew that they had no intention and/or ability to perform their contractual obligations."  FAC, ¶64.  Hodell has properly plead a claim for fraudulent inducement aside from its breach of contract claim.

The same analysis applies to Hodell's fraud and negligent misrepresentation claims.[24] Hodell's claims do not arise out of the Development Agreement, but rather, extra contractual statements such as SAP's installation capabilities (FAC, ¶68), the "high-level and industry-specific support" Hodell would receive (FAC, ¶68), and the number of successful installations SAP had experienced (FAC, ¶69).  Each of these statements are extra-contractual, were untrue when made, and were justifiably relied upon by Hodell.

      E.    <u>The "Economic Loss Rule" is Inapplicable Because, Under Ohio Law, the SAP Defendants Had an Affirmative Duty to Refrain From Making Fraudulent or Negligent Representations.  The Nature of Hodell's Damages is an Issue of Fact Inappropriate for Adjudication on a Motion to Dismiss</u>

The SAP defendants fail to cite any authority, from Ohio or Pennsylvania, which requires dismissal of Hodell's fraud claim based upon the economic loss doctrine.  Ohio recognizes an exception to the economic loss doctrine where a duty is imposed by law, independent of a contract, and such a duty is breached by the defendant.  "When a duty in tort exists, a party may

---

[24] Ohio law recognizes a cause of action for negligent misrepresentation where a party has a duty to know whether or not its representations are true, but neglects this duty by making representations it believes are true, but turn out to be false.  *In re Cincinnati Gas & Electric Securities Litigation*, 594 F.Supp. 233 (S.D. Ohio1984)**.**  Similar to SAP's breach of contract argument, the negligent misrepresentations made by SAP, and its agents, fall outside the four corners of the parties' contract, and are not subsumed within Hodell's breach of contract claims.

recover in tort." *Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 106 Ohio St.3d 412, 415, 835 N.E.2d 701 (2005).    The SAP defendants do not dispute that they possessed a duty to Hodell to refrain from making affirmative misrepresentations to Hodell in their marketing and sale of the Software.   The economic loss doctrine is inapplicable to Hodell's fraud claims.   See also, *Combs v. Crown Life Ins.*, 2008 WL 641557, *7 (S.D. Ohio 2008)(holding that economic loss doctrine was inapplicable to plaintiff's negligent misrepresentation and fraud claims).

In *Chemtrol Adhesives, Inc. v. Am. Mfrs. Ins. Co.*, 42 Ohio St.3d 40, 46, 537 N.E.2d 624 (1989), the Ohio Supreme Court held that a plaintiff may not recover in <u>negligence</u> for purely economic losses.   However, Ohio courts recognize an exception to that rule where negligent representations are made by one in the business of supplying such information.   Thus, in *Hoddon View Inv. Co. v. Coopers and Lybrand*, 436 N.E.2d 212 (1982), the Court applied section 552 of the Restatement of Torts to find that a duty lies, independent of contract, to refrain from negligently supplying information to one who justifiably relies upon it.[25]   Thus, SAP, who held itself, and its "channel partners," out as experts in the industry and a leader in providing the software needed by Hodell, and who knew that Hodell was relying upon SAP's representations, and those its representatives, had a clear independent duty to act with due care.[26]   SAP's breach of that duty is actionable in tort by Hodell.[27]

---

[25] The court applied Restatement of Torts 2d, 126-127 Section 552, which provides in relevant part: "(1) One who * * * supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

[26] SAP recognizes in its Motion that Restatement Section 552 has been adopted by both Ohio and Pennsylvania courts, but gives this dispositive rule short shrift, arguing that it applies only in limited cases involving professional negligence.  (SAP Mtn. to Dismiss, p. 16, fn. 10, 11).  There is no language in the decisions cited by SAP limiting application of Section 552 solely to actions against professionals, and in fact, the cases expressly apply to anyone "in the business of supplying information" to others.  See, *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 866 A.2d 270 (2005)("Accordingly, we hereby adopt Section 552 as the law in Pennsylvania in cases **where information is negligently supplied by one in the business of supplying information**, such as an architect or design professional, and where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of information.")(emphasis added). SAP does not contend that it is not in the business of supplying the information relied upon by Hodell in this case.

Additionally, Ohio courts do not apply the economic loss rule where the injured party has alleged non-economic damage, rather than purely economic loss.  It is the nature of the loss claimed that controls whether the allegations sound in contract or in tort.  *Ferro Corp. v. Blaw Knox Food & Chem. Equip. Co.*, 121 Ohio App.3d 434, 440, 700 N.E.2d 94 (1997).  If the allegations claim both damages to property, as well as economic loss, then the economic loss rule is inapplicable.  *Id.* at 440-41.  See also, *Chemtrol Adhesives, Inc.* ("If the defect . . . had caused personal injury or damage to other property . . . Midland-Ross might be found to have breached its duty of care imposed by law, and recovery in negligence would accordingly lie.")(emphasis added).

Courts have defined "property damage" as damage to both the goods sold to the plaintiff and other property belonging to the plaintiff.  *Chemtrol*, supra at 43.  In contrast, "economic losses" are losses attributable to decreased value of the product itself or consequential losses suffered from deficiencies in the product."  Id. at 43-44.

The allegations within Hodell's fraudulent inducement, fraud, and negligence claims, taken as true for purposes of a Motion to Dismiss, set forth damages to which the economic loss rule is inapplicable.  The full extent and scope of those damages are more appropriately addressed in discovery and examined by the trier of fact.  See, *Ferro Corp.*, supra at 443 (finding an issue of fact existed on status of damages as either property or economic, which precluded summary judgment based upon the economic loss doctrine).  The classification of Hodell's damages is not properly addressed in a motion to dismiss.[28]

---

Thus, pursuant to Restatement Section 552, the economic loss doctrine does not preclude Hodell's claims under either Ohio or Pennsylvania law.

[27] The SAP defendants do not argue that Hodell has failed to plead the elements of its fraud claims or claims for negligent misrepresentation—rather, they rely solely upon a misapplication of the parol evidence rule and economic loss doctrine.  Because those defenses are inapplicable here, SAP's Motion must be denied.

[28] Application of Pennsylvania law would not dictate a different outcome.  The Third Circuit has carved out an exception to the economic loss rule for fraudulent inducement and fraud claims where the fraud arises independently

F.    Hodell's Third Cause of Action for Breach of Contract Alleges Claims Against
      Both SAP and SAP AG

SAP asserts three meritless arguments for the dismissal of Hodell's breach of contract claim.  First, the SAP defendants jointly argue that they can not be held liable for any breach of the Development Agreement because they were not parties to that Agreement.   The SAP defendants also jointly argue that all implied warranties of merchantability or fitness for a particular purpose were disclaimed in the License Agreement.  SAP AG further argues that it can not be held liable for any breach of the License Agreement, because only SAP America was a party to License Agreement.  Each of these arguments are independently addressed below.

1.    The SAP Defendants Are Liable Either as Parties to, or Third-Party
      Beneficiaries of the Development Agreement

SAP's argument that it is not liable under the Development Agreement is meritless for the very reason that the Development Agreement itself expressly contemplates performance by SAP.  The Development Agreement itself specifically contemplates that if Hodell's purchase of the licenses through LSi, as SAP's representative, fails due to LSI's bankruptcy or insolvency, "SAP has agreed Hodell-Natco will receive 80 user licenses of SAP Business One from SAP for the balance payment to SAP of $120,000."  Exhibit D:  Development Agreement, section 4.[29]

---

of the contract and is not inextricably intertwined with the contract claims, such as where the fraud does not relate to the quality or characteristics of the goods sold.  *See Air Products and Chemicals, Inc. v. Eaton Metal Products Co.,* 256 F.Supp.2d 329, 337 (defendant liable for fraudulent inducement where it misrepresented its own abilities to produce compliant products, rather than merely the characteristics of the products themselves).  Hodell's Amended Complaint specifically alleges misrepresentations unrelated to the Software's quality or characteristics.  Thus, Hodell's fraud claims arise independently of its breach of contract claims, and the economic loss doctrine is inapplicable under Pennsylvania law.

[29] The Development Agreement does not specify whether SAP America or SAP AG was responsible for completing performance under the Development Agreement.   For purposes of this Motion, however, the Development Agreement is clear that SAP itself undertook obligations pursuant to the Development Agreement, and was not merely a third-party beneficiary.  The specific identity of which SAP entity was intended to assume these obligations is a matter for discovery, and could not be resolved on a Motion to Dismiss.

Because SAP expressly assumed obligations under the Development Agreement, it is bound by that agreement.  Hodell's failure to receive conforming goods under the Development Agreement is a breach of that contract, for which SAP must answer.

Alternatively, if the Court holds that SAP did not expressly assume obligations under the Development Agreement, the First Amended Complaint specifically pleads that the LSi defendants entered into the Development Agreement transactions in their own right, and were authorized to bind SAP to the Agreement as well.  FAC, ¶¶13-15, 77-78.

Further, the First Amended Complaint alleges that SAP was an intended third-party beneficiary of the Development Agreement, in that the Development Agreement was entered on its behalf by the LSi defendants.  FAC, ¶77-78.

As an intended third-party beneficiary, SAP is liable for any breaches of the Development Agreement, just as it intended to reap any benefits from the Development Agreement at the time SAP and its agents fraudulently induced Hodell into signing it.  See *Resource Title*, 314 F.Supp.2d at 771 (holding, in ruling upon a motion to dismiss, that a third-party beneficiary may be held liable under a contract)(citing *Saum v. Moenter*, 101 Ohio App.3d 48, 53, 654 N.E.2d 1333 (1995) (finding third-party beneficiary liable under loan agreement) and *Ohio Match Co. v. Elm Grove Min. Co.*, 5 Ohio Law Abs. 151 (1927) (noting that by accepting the benefits of a contract, a third-party beneficiary also accepts its burdens).  This is especially true here, where SAP expressly assumed the obligation to provide Hodell with the 80 user licenses itself should its agent be unable to consummate the transaction.  It cannot be said, as a matter of law, that SAP did not assume obligations under the Development Agreement transaction either directly, as a disclosed principal, or as a third-party beneficiary of the

transaction. Thus, SAP's Motion to Dismiss any claims against it arising from the Development Agreement should be denied.

      2.     <u>SAP Did Not Disclaim Any Warranties in the Development Agreement, and the License Agreement's Warranty Disclaimers Were Fraudulently Induced</u>

SAP argues that it can not be held liable for the breach of any warranties arising from the failure of the Software to comply with any express warranties, or the implied warranties of merchantability or fitness for a particular purpose.  As with Hodell's other claims, SAP does not assert that Hodell has failed to plead the required elements of those claims.  Rather, SAP argues that an exception to its liability applies—a waiver of warranties in the License Agreement.

SAP's argument fails as a matter of law with regard to the 2004 Purchase.  SAP has not pointed to any waiver of warranties in the Development Agreement, and indeed, none exists.  Thus, all express and implied warranties were in effect regarding the 2004 Purchase.  The Software's failure to comply with the express descriptions presented by SAP, and with the implied warranties accompanying the sale, render SAP liable for any breach of those warranties.

As SAP notes, the License Agreement contains a section 7.2 titled "Express Disclaimer," which purports to disclaim any express or implied warranties.  However, given Hodell's claim that the License Agreement was fraudulently induced, SAP is precluded from avoiding liability pursuant to the warranty disclaimer—a part of the fraudulently induced agreement itself.  See, *Niehaus v. Haven Park West* (1981), 2 Ohio App.3d 24, 25, 440 N.E.2d 584 ("It is a general rule that where one party to a contract has been induced to enter into it through fraud, deceit, and misrepresentation of the other party as to material matters, the defrauded party does not become bound by its terms . . . ."); *Rogers v. Hill*, 124 Ohio App.3d 468, 706 N.E.2d 438 (1998)(finding

that evidence of fraudulent misrepresentations or concealments precluded reliance upon "as is" disclaimer in real estate purchase contract).

The First Amended Complaint expressly alleges that SAP fraudulently induced Hodell into signing the License Agreement, in part, for the purpose of fraudulently obtaining Hodell's assent to the warranty waiver provisions. See, FAC, ¶62 ("The misrepresentations described in Paragraph 61 above not only furthered the Defendants' ongoing fraudulent scheme, **but were also specifically designed to induce Hodell-Natco to sign a License Agreement containing certain disclaimers and other limitations**.")(emphasis added).

Because Hodell has plead that it was fraudulently induced into agreeing to the warranty disclaimers, and that SAP acted with the specific intent of fraudulently securing Hodell's assent to those waivers, Hodell's fraudulent inducement claim bears enforcement of the warranty disclaimers relied upon by SAP.

        3.      <u>SAP AG is a Party to, and Liable Under, the License Agreement</u>

For the reasons discussed above, SAP AG is either a party to, or liable under the License Agreement as either a direct contracting party, a third-party beneficiary of the License Agreement, or a principal acting in concert with SAP America entering into the License Agreement. The exact nature and roles of the contracting parties is more appropriately addressed through discovery, and can not be resolved on a Motion to Dismiss where examination of the facts is confined to the pleadings.

      G.      <u>Hodell Did Not Waive its Right to Pursue Damages in the Development Agreement, and Was Fraudulently Induced Into Executing the License Agreement, Barring Application of Any Damage Waivers Therein</u>

        1.      <u>The Development Agreement Does Not Contain Any Waiver of Damages</u>

As with SAP's prior arguments, SAP ignores that the Development Agreement contains absolutely no limitations on the damages recoverable by Hodell pursuant to that Agreement. Indeed, the Development Agreement expressly preserves all contract damages available to Hodell:

> In case of default by The IBIS Group or LSi, for any reason, <u>in addition to other legal remedies for breach of contract</u>, Hodell-Natco will retain all development programming to date of the In-Flight Enterprise programs, including documentation and any intellectual property.

Exh. D:  Devt. Agreement, Section 5.  Thus, the full array of contract damages are available to Hodell for SAP's breach of the Development Agreement.

        2.      <u>The SAP Defendants' Reliance on the Damage Disclaimers is Barred by their Fraudulent Inducement of the License Agreement</u>

As with SAP's reliance upon its warranty disclaimer provision in the License Agreement, SAP's citation to Section 9 of the License Agreement, titled "Limitations of Liability," is misplaced.  The First Amended Complaint expressly alleges that SAP fraudulently induced Hodell into signing the License Agreement, in part, for the purpose of fraudulently obtaining Hodell's assent to the License Agreement's limitation of liability provisions.  See, FAC, ¶62 ("The misrepresentations described in Paragraph 61 above not only furthered the Defendants' ongoing fraudulent scheme, **but were also specifically designed to induce Hodell-Natco to sign a License Agreement containing certain disclaimers and other limitations**.").  SAP is barred from fraudulently inducing Hodell's assent to certain contractual terms, and then using Hodell's fraudulently obtained agreement to limit its damages in this action.  Accordingly, SAP's reliance upon Section 9 of the License Agreement is meritless and its Motion to Dismiss should be denied.

Finally, SAP's argument regarding Hodell's purported failure to adequately plead its request for punitive damages is a red herring.  The First Amended Complaint contains numerous allegations regarding intentional and knowing misrepresentations and fraud directed towards Hodell.  "Even if actual malice is not shown, actions that are particularly gross or egregious, such as intentionally made misrepresentations, may support an award of punitive damages." *Pullins v. Klimley*, 2008 WL 85871, *43 (S.D.Ohio 2008)(citing *Smith v. General Motors Corp.,* 168 Ohio App.3d 336, 859 N.E.2d 1035, 1042 (2006)).

Additionally, there is no pleading standard regarding punitive damages, and indeed SAP cites to none.  While recovery of punitive damages requires proof of actual malice, the issue of whether the facts developed rise to the level of actual malice are generally issues of fact to be resolved by the jury.  *Zoppo v. Homestead Insurance Co.*, 71 Ohio St.3d 552, 644 N.E.2d 397, 401 (1994).  Thus, the question of whether the facts plead in Hodell's First Amended Complaint, taken as true in this instance, rise to the level of "actual malice" should not be resolved on a Rule 12(b)(6) Motion to Dismiss.

H.  <u>Hodell's Complaint Complies with Civil Rule 9(b), and SAP Has Not Sought a More Definite Statement of the First Amended Complaint</u>

SAP's request to dismiss the First Amended Complaint under Civ. R. 9(b) is fatally flawed from the outset because it has not filed a motion for a more definite statement under Civil Rule 12(e) prior to seeking dismissal.  Sixth Circuit Courts have repeatedly held that a Rule 12(e) motion for a more definite statement must precede a request for dismissal based upon Rule 9(b).  *Legge v. Wagner*, 7 F.3d 234 (6th Cir. 1993)("This court has noted that in the absence of a defendant's motion for a more definite statement under Rule 12(e), dismissal on the sole basis of a plaintiff's failure to comply with Rule 9(b) is inappropriate."); *Resource Title*, 314 F.Supp. 2d at 776 ("However, in the absence of a motion for more definite statement under Rule 12(e),

28

dismissal of a fraud claim, solely on account of a party's failure to satisfy the requirements of Rule 9(b), is inappropriate.").  For this reason alone, SAP's Motion must be denied.

Additionally, SAP's Motion fails to demonstrate that Hodell's First Amended Complaint lacks the particularity required by Rule 9(b).  In ruling on a motion to dismiss for failure to plead fraud with particularity, courts are to factor in the policy embodied in the Federal Rules of Civil Procedure favoring simplicity in pleading, a short and plain statement of the claim, and simple, concise and direct allegations.  *Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674 (6th Cir. 1988).  The particularity rule's purpose is merely to provide fair notice to the defendant so that he may be allowed to prepare an informed pleading which responds to the specific allegations of fraud.  *Advocacy Org. for Patients and Providers v. Auto Club Ins. Assn.*, 176 F.3d 315 (6th Cir. 1999).  Rule 9(b)'s pleading requirements may also be relaxed where information is only within the opposing party's knowledge.  *Michaels*, 848 F.2d at 679.  *See also, In re Cincinnati Gas & Electric Securities Litigation*, 594 F.Supp. at 238 (stating that "Rule 9(b) does not require plaintiffs to allege facts. All that the rule requires is that the pleading state with particularity the circumstances giving rise to the alleged fraud.").

In the present case, Hodell's First Amended Complaint sets forth in great detail the exact misrepresentations made, who made them, and on many occasions, the exact date the misrepresentation occurred.  The First Amended Complaint is sufficient to place SAP on notice of the claims being made against it, and thus, complies with the spirit and intent of Rule 9(b).  Accordingly, even if SAP had previously requested a more definite statement, Hodell's fraud claims comply with Fed. R. Civ. P. 9(b) and should not be dismissed.

IV.    UNDERLINE_CONCLUSION

Based upon the foregoing, plaintiff Hodell-Natco Industries, Inc. submits that each of SAP's arguments are without merit, and that the Motion to Dismiss Hodell's First Amended Complaint should be denied in its entirety.

Respectfully submitted,

*/s/ P. Wesley Lambert*
JAMES F. KOEHLER (0007904)
koehler@buckleyking.com
P. WESLEY LAMBERT (0076961)
lambert@buckleyking.com
OF COUNSEL:                              1400 Fifth Third Center
                                         600 Superior Avenue, East
BUCKLEY KING LPA                         Cleveland, Ohio  44114-2652
                                         (216) 363-1400
                                         (216) 579-1020   (*facsimile*)

Attorneys for plaintiff

30

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of July, 2009, a copy of the foregoing was filed electronically.  Parties may access this filing through the Court's electronic filing system.

*/s/ P. Wesley Lambert*
P. WESLEY LAMBERT (0076961)

219724_1

31