# UNREPORTED CASES

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1652687 (Pa.Com.Pl.)
(Cite as: 2006 WL 1652687 (Pa.Com.Pl.))

Page 1

**H**
Only the Westlaw citation is currently available.

Court of Common Pleas of Pennsylvania, Philadelphia County,
First Judicial District, Civil Trial Division.
ACADEMY PLAZA L.L.C.1, Port Richmond
L.L.C.1 and Washington Center L.L.C.1,
v.
BRYANT ASSET MANAGEMENT, Washington
Centre Shops, L.P. a Delaware limited partnership,
Port Richmond Associates, LLC a New York limited partnership and Academy Stores, L.P. A
Delaware limited partnership.
**May Term, 2002 No. 2774.**

June 9, 2006.

*FINDING OF FACT, DISCUSSION AND CONCLUSIONS OF LAW SUR BENCH TRIAL*

SHEPPARD, J.

*FINDINGS OF FACT*

*The Parties and Their Representatives*

**\*1** 1. Plaintiffs are Academy Plaza L.L.C.1., Port Richmond L.L.C.1. and Washington Center L.L.C.1. D-21; N.T. 12/9/2005 at 88.

2. Plaintiffs are special purpose entities created and wholly owned by Cedar Income Fund Partnership, L.P., now known as Cedar Shopping Centers, Inc. ("Cedar"). N.T. 12/8/2005 at 90-91, 180; Plaintiffs' FF, ¶ 2.

3. The court will refer to Cedar and plaintiffs interchangeably because for our purposes plaintiffs may be considered the same as Cedar.[FN1]

FN1. N.T. 12/8/2005 at 90-91, 180-181.

4. Cedar is a publicly traded real estate investment trust ("REIT"). N.T. 12/8/2005 at 90.

5. Leo Ullman ("Ullman") is the Chairman, Chief Operating Officer, and President of Cedar. N.T. 12/9/2005 at 12; Plaintiffs' FF, ¶ 5.

6. Ullman testified that Academy Plaza L.L.C.1., Port Richmond L.L.C.1., Washington Center L.L.C.1 were created by Cedar to own each of the three shopping centers: Academy Plaza, Port Richmond Village and Washington Center. N.T. 12/8/2005 at 90; Plaintiffs' FF, ¶ 7.

7. Andrew Hascoe ("Hascoe") is the sole owner of defendant Bryant Management ("Bryant") and was the principal owner of the corporate general partner for the three shopping center defendants. N.T. 1/11/2006 at 177, 181-186.

8. Cedar and Bryant executed an Agreement of Sale for the three shopping centers on or about May 16, 2001. Exh. P-2.

9. Brenda Walker ("Walker") is the Vice President and a Director of Cedar. N.T. 12/14/2005 at 5.

10. At all relevant times, John Fasciano ("Fasciano") was the director of retail leasing for Cedar. N.T. 12/9/2005 at 5.

11. Stuart Widowski ("Widowski") is general counsel for Cedar Shopping Centers, Inc. N.T. 1/12/2006 at 167.

12. Denis Brauchle ("Brauchle") was the property manager of Bryant at all relevant times. N.T. 1/12/2006 at 79.

13. Shelia DuPell ("DuPell") was Bryant's vice president of marketing and administration at all relevant times. N.T. 1/4/2006 at 61.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                  Page 2
Not Reported in A.2d, 2006 WL 1652687 (Pa.Com.Pl.)
**(Cite as: 2006 WL 1652687 (Pa.Com.Pl.))**

14. Samuel Becchofer ("Becchofer"), a partner at the law firm of Pryor, Cashman, Sherman and Flynn, specializing in the practice of real estate, [FN2] drafted and negotiated (on behalf of Bryant) the transaction between Bryant and Cedar. N.T. 1/5/2006 at 13.

FN2. N.T. 1/5/2006 at 11.

*The Claims*

15. Cedar was a small REIT that was in the market to buy shopping centers. 12/9/2005 at 7-8; N.T. 1/11/2006 at 133.

16. Fasciano testified that he learned that Bryant was interested in selling properties that fit the description of what Cedar was looking for. N.T. 12/9/2005 at 8. Fasciano, on behalf of Cedar, contacted Bryant. *Id.* at 10.

17. Fasciano forwarded Bryant Development's "East Coast Portfolio" to Ullman. N.T. 12/9/2005 at 12.

18. The brochure was comprised of an overview of the properties, rent rolls, income, expenses and statements of cash operations and cash projections. Exh. P-111.

19. Cash operations for the purposes of this case, are otherwise known as net operating income ("NOI"). N.T. 12/8/2005 at 111-112, 188.

*2 20. Ullman testified that NOI is the end result of rental income minus property specific deductions. 12/8/2005 at 112.

21. Rent rolls setout the square footage of the properties, lease expiration dates, rental amounts, rent increases under the leases, and expenses. Exh. P-111.

22. There was much debate whether rent rolls should set out tenant defaults and early termination

options. Walker testified that if she had tenant issues such as early terminations or defaults on the part of tenants, she would note these by hand on the rent roll. N.T. 12/14/2005 at 138.

23. She further testified that if a tenant in material default is, nonetheless, listed on the rent roll, the rent roll is inaccurate. N.T. 12/15/2005 at 16.

24. Douglas Nickel, plaintiffs' expert on the valuation of commercial property, testified that he had seen rent rolls that showed tenant delinquencies. N.T. 12/13/2005 at 124.

25. Ullman testified that he believes that it is an industry-wide practice that if a tenant is not in possession and not paying rent, it is false to list them on the rent roll. If a tenant is not in possession and they are substantially delinquent with no likelihood of payment, they should not be on the rent roll. N.T. 1/10/2006 at 19.

26. DuPell testified that a rent roll does not show tenant defaults. N.T. 1/4/2006 at 43.

27. Walker testified that she typically evaluates the purchase of a property based on a revenue stream that is based upon rent rolls. N.T. 12/14/2005 at 10.

28. Plaintiffs advised defendants that they relied upon defendants' 2001 projections of net income of the three properties [FN3] in determining their offer. Exh. P-132.

FN3. These projections can be found in the rent rolls attached to the Bryant Portfolio. Exh. P-111.

29. On February 16, 2001, Warren Vogel, attorney for MaST Charter School, a tenant of Academy Plaza, in a memo to his file, wrote that he had spoken with DuPell about MaST's intent to exercise their early termination option. Exh. P-92, last page.

30. Walker testified that Ullman learned through

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1652687 (Pa.Com.Pl.)
(Cite as: 2006 WL 1652687 (Pa.Com.Pl.))

the "rumor mill" that MaST was building at another location and was planning on moving. N.T. 1/11/2006 at 15.

31. Ullman wrote to Brauchle with his concerns about MaST. Exh. P-10.

32. Ullman testified that he went to Hascoe and addressed this concern, among others, and that Hascoe "unequivocally" said that MaST would not exercise their early termination option. N.T. 12/8/2005 at 119.

33. Subsequently, Walker wrote to Brauchle asking if Hascoe's opinion regarding MaST's early termination opinion was correct. Exh. P-39.

34. Hascoe denies that he ever told Ullman that MaST would not exercise its right to early termination. N.T. 1/11/2006 at 151.

35. Walker testified that Bryant was not forthcoming with documents that Cedar requested prior to the execution of the Agreement of Sale. N.T. 12/14/2005 at 45; Exh. P-46.

36. However, Walker and Widowski reviewed certain documents at Becchofer's offices prior to the execution of the Agreement. Exh. D-251; Exh. P-46; N.T. 12/14/2005 at 11; 11/22/2005 at 272.

**\*3** 37. Brauchle testified that court documents "were typically kept in the tenant file along with any correspondence and billings and reconciliations ..." N.T. 1/12/2006 at 143-144.

38. Walker testified that when she reviewed the files, she was only privy to leases, title information and surveys for the three properties. N.T. 12/14/2005 at 11. Widowski testified similarly. N.T. 1/12/2006 at 272.

39. At least one meeting took place between Brauchle, DuPell, Fasciano and Walker. N.T. 1/11/2006 at 12.

40. There was divergent testimony regarding what was discussed, how many meetings took place, when the meeting (meetings) were held and the format of the meeting (meetings). N.T. 12/9/2005 at 38; N.T. 1/4/2006 at 18-26; N.T. 1/12/2006 at 110-112. However, there was a general consensus that tenants of the three shopping centers were discussed. N.T. 12/9/2005 at 38; N.T.12/14/2005 at 36-39; N.T. 1/4/2006 at 18.

41. Brauchle testified that he could not recall if he gave plaintiffs delinquency information and that very little time was spent on those tenants that were discussed. N.T. 1/12/2006 at 112-113

42. Walker testified that she was not told about the tenants that were in default at the time of the meeting. N.T. 12/14/2005 at 39.

43. Walker testified that Cedar would have lowered their offer had they had the information regarding MaST's early departure and the tenants that were in default. N.T. 12/14/2005 at 86.

44. Douglas Nickel, plaintiffs' expert on the valuation of commercial real estate,[FN4] performed two appraisals. The first appraisal was dated June 2001 (prior to closing). N.T. 12/13/2005 at 17. The date of the second appraisal report is July 29, 2004. The second appraisal takes into account "the alleged misrepresentations ." N.T. 12/13/2005 at 13. He compared the evaluations and concluded that plaintiffs overpaid $1.7 million. *Id.*

FN4. N.T. 12/13/2005 at 8-11.

45. An Agreement of Sale ("Agreement") was entered into between defendants, Washington Centre Shops, L.P., Port Richmond Associates, LLC and Academy Stores L.P., and Cedar Income Fund Partnership, L.P. on May 16, 2001. Exh. P-2.

46. The Agreement contains an integration clause and representations and warranties related to the status of tenants. *Id.*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

47. After the Agreement was executed and before the closing, plaintiffs learned that there had been misrepresentations by defendants. For example, plaintiffs were told definitively that MaST had not missed their right to early termination. Exh. P-33. Further, plaintiffs learned that tenants American Furniture, Triple Play and A Formal Celebration were in arrears. Exh. P-29.

48. According to Ullman, Hascoe promised Cedar a price reduction. N.T. 12/14/2005 at 83.

49. Hascoe admitted that the topic of a price reduction came up during a meeting between himself and Ullman. N.T.1/11/2006. However, Hascoe flatly denied that he promised Cedar a reduction in price. *Id.*

50. Brauchle, a witness to this meeting, testified that he "kind of" remembered hearing something about a request for a price reduction, but that he did not recall having a discussion with Ullman about a price reduction. Exh. P-39.

*4 51. Plaintiffs issued two press releases announcing that they were buying the properties. P-106; N.T. 12/8/2005 at 79.

52. Ullman testified that the press announcements had to be released prior to closing "because under SEC guidelines and NASDAQ requirements at that time, any material transaction involving the company which might have a meaningful effect on the value or its shares had to be disclosed as promptly as 48 hours."N.T. 12/8/2005 at 165.

53. Hascoe testified that he received drafts of a press release and forwarded them to Becchofer. N.T. 1/11/2006 at 155. Hascoe testified that he objected to the press release on account of confidentiality and that consequently, Cedar did not mention the properties by name or Bryant in the final version. *Id.*

## Declaratory Judgment

54. After closing on the properties, plaintiffs received notice from tenant Pep Boys of Port Richmond Village, that Pep Boys had not received a statement of common area maintenance ("CAM") expenses for 4 years. N.T. 12/14/2005 at 108; N.T. 12/13/2005 at 6; Exh. P-50.

55. The lease between Pep Boys and Bryant called for reconciliations to be provided to Pep Boys every year. N.T. 12/13/2005 at 20.

56. Pep Boys alleges that they overpaid CAM expenses during the time that defendants owned Port Richmond Village. N.T. 12/13/2005 at 21.

57. The Assignment and Assumption of Lease and Contracts provides that defendants:

... hereby agree[ ] to indemnify, hold harmless and defend [Cedar] from and against any and all damages, liabilities, loss, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) resulting by reason of any failure by [defendants] to perform or discharge any of [defendants'] duties or obligations under the Leases and/or Contracts during the period of [defendants'] ownership ...

Exh. P-2 (attached Exhibit K); Plaintiffs' FF, ¶ 98.

58. Hascoe testified that "anything that happened before their (plaintiffs) ownership is my responsibility or the properties' responsibility. And we committed to indemnify them ... against any claims from tenants prior to the sale."N.T. 1/11/2006 at 175-176.

59. However, counsel for defendants wrote to Widowski:

... it is the position of Port Richmond Associates LLC ... that it has absolutely no liability whatsoever to Port Richmond LLC.1 and/or Pep Boys

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2006 WL 1652687 (Pa.Com.Pl.)
(Cite as: 2006 WL 1652687 (Pa.Com.Pl.))

pursuant to Pep Boys' lease, the Contract of Sale, the Assignment and Assumption of Leases and Contracts and/or any other documents.

Exh. P-114.

## DISCUSSION

Academy Plaza L.L.C.1, Port Richmond L.L.C.1 and Washington Center L.L.C.1 ("plaintiffs") brought the following causes of action: (1) fraudulent inducement (Count I), (2) negligent misrepresentation (Count II), (3) unjust enrichment (Count III), (4) breach of contract (Count IV) and (5) conspiracy (Count V). Plaintiffs also seek a declaratory judgment (Count VI) requiring defendants to defend and indemnify Cedar against claims brought by a tenant (Pep Boys). Previously, the court sustained preliminary objections to plaintiffs' claims of negligent misrepresentation and breach of contract as to defendant Bryant only.

## I. FRAUDULENT INDUCEMENT

**\*5** Plaintiffs argue that defendants "fraudulently induced plaintiffs to sign the Agreement ... at an inflated price by intentionally overstating the net operating income ("NOI") for the shopping centers."Plaintiffs' CL, ¶ 106. Plaintiffs claim that they would not have paid the price they ultimately paid had they known the net operating income ("NOI") was inaccurate. *Id.*

Defendants deny that they committed fraud. Instead, they insist that plaintiffs "had all the relevant existing facts before the Agreement ..." Defendants FFCL, p. 49.

The elements of fraudulent inducement are: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into

relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury that was proximately caused by the reliance." *Eigen v. Textron Lycoming Reciprocating Engine Division,* 2005 PA Super 141, 874 A.2d 1179, 1185 (Pa. Super 2005) (citing *Skurnowicz v. Lucci,* 2002 PA Super 140, 798 A.2d 788, 795 (Pa.Super.2002)) (quoting *Bortz v. Noon,* 556 Pa. 489, 729 A.2d 555, 560 (Pa.1999)).

Plaintiffs complain that the NOI's and the rent rolls contained misrepresentations that caused them to offer a purchase price that was substantially higher than the value of the properties. Specifically, plaintiffs argue that the rent rolls were false because: (1) they did not contain information regarding the weaknesses, including the litigation history, of certain tenants and (2) despite the fact that rent rolls provide the terms of leases, defendants did not note MaST Charter School's early termination option on the Academy Plaza rent roll.

### A. Representation

Plaintiffs were supplied with a marketing brochure, Bryant Development's "East Cost Portfolio". This brochure had as its subject the six properties that were initially for sale. Exh. P-111. The brochure was first received by John Fasciano, a former employee of Brentway Management [FN5] and subsequently passed on to Leo Ullman ("Ullman"), the chairman, CEO and president of Cedar Shopping Centers Partnership, L.P. N.T. 12/8/2005 at p. 88; N.T. 12/9/2005 at p. 12.This brochure was comprised of an overview of the properties, rent rolls, income expenses and statement of cash operations (otherwise known as "NOI") and cash projections. Exh. P-111.

> FN5. Brentway Management was the company that handled property management for Cedar. N.T. 12/9/2005 at 6.

According to Ullman, NOI embodies the concept of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

income flowing from operations, as opposed to miscellaneous income.[FN6]N.T. 12/8/2005 at p. 111.Ullman testified that "net operating income .... is a function of primarily rental income with property-specific deductions."N.T. 12/8/2005 at 113. Ullman explained the connection between NOI and rent rolls:

> FN6. Counsel for defendants objected numerous times to plaintiffs' claims regarding NOI. He argued that these claims should not be addressed at trial because they were not alleged "in the complaint and never asserted or mentioned in discovery."N.T. 12/14/2005 at p. 13.The court, finding that NOI and rent rolls are inextricably woven, overruled these objections. *Id.* However, the court allowed defense counsel a continuing objection on this issue. N.T. 12/14/2005 at p. 16.

The concept of net income, whether operating net income, other net income, funds from operations, adjusted funds from operations, cash flow, et cetera, all come at the outset from the rental income from the tenants in the shopping center. So the net income figure, if that's the relevant measure, is purely and critically related to the predictable revenue stream that's set forth in the rent roll.
*6 *Id.*

Ullman explained further:

The determination of net operating income on a-on an estimated basis, which is what we go on, for the current or the subsequent year, when you buy a property, is based on the rent roll and those rents are projected out for the term of the lease. And then the income and expenses and the recovery of those income expenses also come out of the rent roll, where you're told how much the tenants will pay [for] the common area charges ..."

N.T. 12/8/2005 at 269.

Brenda Walker ("Walker"), Vice President and a director of Cedar Shopping Centers, Inc.,[FN7] testified that she typically evaluates the purchase of an income producing asset by putting together "a stream of revenues based upon the rent roll that's given to [her] by the sellers."N.T. 12/14/2005 at 10.

> FN7. N.T. 12/14/05 at p. 5.

The court finds that defendants made the requisite representation to plaintiffs by providing, among other information, NOI and rent rolls.

### B. *Materiality and Reliance*

The elements of materiality and reliance go hand in glove in this case. If the representations in the form of rent rolls, NOI and NOI projections constituted the bases of plaintiffs' purchase offer, than the representations were relied upon and basic to plaintiffs deciding whether to enter into an agreement of sale. Therefore, the court will address these two elements together.

Plaintiffs aver that had they known the NOI was lower than what they were told, their offer would have been lower. N.T. 12/14/2005 at 86. In fact, plaintiffs put defendants on notice that they were relying on their numbers. In a letter dated March 5, 2001 from Ullman to Denis Brauchle ("Brauchle"),[FN8] Ullman writes, "Please note that in submitting the offer described above, we have used your 2001 projections for net income of the respective properties ..." Exh. P-132.

> FN8. Brauchle was the property manager for defendants at all relevant times. N.T. 1/12/2006 at 79.

Thus, the information at issue was material and relied upon.

### C. *Justifiable Reliance*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1652687 (Pa.Com.Pl.)
(Cite as: 2006 WL 1652687 (Pa.Com.Pl.))

As to whether reliance was justifiable, defendants argue that "plaintiff here was given ample opportunity to inspect the property and to gather information that would have led any reasonable purchaser in its position to the conclusion that some tenants were in arrears on their rent."Defendants' FFCL, p. 53. The defendants urge that because plaintiffs did not avail themselves of this opportunity, their reliance on defendants' numbers was unjustifiable. Consequently, what information the plaintiffs were privy to prior to the execution of the Agreement determines whether plaintiffs' reliance was justifiable.

Defendants were on notice at least one month before the Agreement was executed that MaST charter school, a large tenant in Academy Plaza, intended to exercise their early termination option. In a February 16, 2001 memo to his file, Warren Vogel, attorney for MaST, wrote:

I spoke with Sheila DuPell, of the Bryant Development Corp., the owner of the Academy Plaza Shopping Center, and the person designated as property manager of the Academy Plaza Shopping Center. I had previously spoken to Sheila with regard to MaST's intent to exercise its right of early termination as set forth in the lease. In my discussion with Ms. DuPell, we discussed the ambiguity of the notice provision in the lease. In our discussion, Sheila made clear that she was amenable to accept a notice of termination which will be effective as of the end of the year (or such other date as we may specify) so long as the termination date is set forth in notice given under the lease.

*7 My recommendation to the school is to give that notice only after the agreement of sale for the property is executed.

Exh. P-92, last page. (Emphasis added.)

Walker testified that Ullman had heard that MaST was building at another location through the "rumor

mill" and that "[MaST] would ultimately move out of the property."N.T. 1/11/2006 at 15 Ullman writes in an April 27, 2001 memorandum to Brauchle: "Specifically, I think it important that we deal with certain essential differences as to price to wit ... certain serious concerns on tenancies, such as ... the impending departure of the charter school at the Academy property...." Exh. P-10.

Ullman testified that he went to Andrew Hascoe ("Hascoe") and addressed this issue along with other concerns. N.T. 12/8/2005 at 118. Ullman testified that Hascoe "unequivocally said to me that they would not exercise that right to leave."*Id.* at 119.Included in a June 4, 2001 series of questions prepared by Walker sent to Brauchle, Walker asks: "... [MaST charter] has until the end of August 2001 to terminate the lease ... Hascoe told Leo that the time for such termination to be exercised had passed ... Are we wrong?"Exh. P-39. Hascoe refutes Ullman's testimony. N.T. 1/11/2006 at 149.

There is also evidence that Bryant representatives thwarted attempts to collect information prior to the Agreement. In a May 8, 2001 letter from Cedar's counsel, Stuart Widowski ("Widowski"), to Bryant's counsel, Samuel Becchofer ("Becchofer"), Widowski writes: "I am concerned that not all promised documentation has been made available in a timely fashion...." A May 24, 2001 letter from Walker to Brauchle reiterates Cedar's growing frustration:

I have been communicating with you since the week of the May 7th... regarding certain information that we require to complete our due diligence.... As of this writing we have not received the information requested on May 10th and May 16 ....."

Exh. P-48.

A review of certain documents took place at Becchofer's offices prior to the execution of the Agree-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ment.[FN9] The key question remains: What documents were available for review?

> FN9. Exh. D-251; Exh. P-46; N.T. 12/14/2005 at 11.

Walker testified that she and Widowski reviewed all of the existing leases, title information and surveys for the three properties. N.T. 12/14/2005 at 11. Widowski's testimony mirrored that of Walker's:

... we [Walker and Widowski] were given access to copies of leases and previous title information and surveys only at the offices of [Becchofer] where Brenda Walker and I spent several days going through these boxes of photocopies.

N.T. 1/12/2006 at 272. (Emphasis added.) Brauchle, defendants' witness, testified that court documents "were typically kept in the tenant file along with any correspondence and billings and reconciliations ..." N.T. 1/12/2006 at 143-144.

The court found Walker and Widowski credible. As a result, the court infers that that correspondence which would have demonstrated past litigation and other collection efforts was not in the tenant files. This court further finds that this missing historical information was material to an assessment of the financial performance of the shopping centers.

*8 Prior to the execution of the Agreement, a second meeting took place among Brauchle, DuPell, Fasciano and Walker in late April, 2001. N.T. 12/9/2005 at 16; N.T. 1/4/2006 at 8; N.T. 1/11/2006 at 137. Controversy swirls around this meeting (or meetings), as DuPell and Walker have dueling versions of how many meetings took place, what was discussed and the format of the meeting(s). Walker testified that she met with Brauchle while Fasciano met with DuPell. N.T. 12/14/2005 at 37. She recalled discussing issues related to the properties. *Id.* She was not involved with the leasing discussion with DuPell and Fasciano. *Id.* Walker testified that she was not told about the tenants

that were in default at the time. *Id.* at 39.

DuPell testified that there were two meetings. One of the meetings took place in either April or early May, before the Agreement of Sale was executed. N.T. 1/4/2006 at 18. According to DuPell, the first meeting included Walker, Fasciano, a third gentleman from Cedar, Brauchle and DuPell. She further testified that she attended this meeting for approximately two hours. N.T. 1/4/2006 at 17. DuPell testified that a second meeting took place in June and that the attendees reviewed a site plan for each shopping center, discussed availability of space, square footage and unit numbers, and that Bryant was quietly looking for a replacement for Triple Play because they were "weak and having trouble paying their rent."*Id.* at 18-26.DuPell further testified that MaST was discussed inasmuch as Bryant was not sure about their early termination option. She also testified that she was talking to a buffet restaurant to replace American Furniture. *Id.* at 54.

John Fasciano testified to being involved in a meeting that "most likely" took place at Bryant's offices. N.T. 12/9/2005 at 16, 37. Overall, Mr. Fasciano's memory of what took place at the meeting was sketchy. He testified that he had no "recollection that tenants were discussed. I don't know if they [sic ] were delinquencies or not."*Id.* He did not recall Walker asking about delinquencies. *Id.*

Denis Brauchle, an individual who was intimately involved in this deal, testified that he generally recalled what was discussed and that they "pretty much" went through "the majority of the tenants".[FN10] He testified that he did not recall what he said about any specific tenant. N.T. 1/12/2006 at 110. He also admitted that he did not recall if he gave the buyers delinquency information [FN11] and that he spent very little time on the tenants that were discussed. *Id.* at 112.

> FN10. N.T. 1/12/2006 at 84, 111.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1652687 (Pa.Com.Pl.)
(Cite as: 2006 WL 1652687 (Pa.Com.Pl.))

FN11.*Id.* at 113

The court finds that Bryant's representatives did not share material information with Walker and Fasciano concerning tenants that were in material default and tenants with litigation histories. Therefore, defendants' argument that all relevant information was available to sellers for the asking fails. This court finds that plaintiffs justifiably relied on the information they were given.

### D. *Knowledge and Intent*

**\*9** Despite the fact that MaST charter school's lease was listed on the rent roll as having an expiration date of July 31, 2004,[FN12] defendants had knowledge one month before the execution of the Agreement that MaST was planning to exercise their early termination option.[FN13]

FN12. Exh. P-111.

FN13. Exh. P-92.

In addition, Denis Brauchle testified that court documents "were typically kept in the tenant file along with any correspondence and billings and reconciliations ..." N.T. 1/12/2006 at 143-144. As noted, Walker and Widowski both testified that the tenant files that were available for their review at Becchofer's office did not include court documents, correspondence or reconciliations. N.T. 12/14/2005 at 11; N.T. 1/12/2006 at 272.

Potential buyers interested in purchasing real estate must determine whether a property has steady income or income potential. If potential buyers are not given relevant information with which they can predict future income, they are buying their real estate blind. Here, the defendants, with their experience buying and selling commercial real estate, knew that this missing information was crucial to the plaintiffs. Accordingly, the elements of knowledge and intent were met.

### E. *Injury Proximately Caused by Reliance*

Walker testified that if she had the relevant information described, they would have reduced the expected revenues and adjusted their offer. N.T 12/14/2005 at 86. Ullman testified that among the factors that were of interest to him in purchasing the three shopping centers were "prospects for future income growth" and "value over a period of time."N.T. 12/8/2005 at 105. He described his process for determining how much he was willing to pay:

The normal process is that you determine the estimated income for the properties, for the current or the next following year, depending on what period of the year it's in and you apply to that a capitalization rate, which will vary, depending on the quality of the tenants, the predictability of the cash flow, location, et cetera, et cetera.

N.T. 12/8/2005 at 108.

Furthermore, it bears repeating that in a letter dated March 5, 2001 from Ullman to Denis Brauchle,[FN14] Ullman was explicit on this issue: "Please note that in submitting the offer described above, we have used your 2001 projections for net income of the respective properties ..." See Exh. P-132.

FN14. Brauchle was the property manager for defendants at all relevant times. N.T. 1/12/2006 at 79.

To reiterate, the plaintiffs bear the burden to prove they suffered an injury as a result of their justifiable reliance on the fraudulent misrepresentations. *Eigen supra* at 1185.Douglas Nickel, plaintiffs' expert on the valuation of commercial real estate,[FN15] prepared appraisals both prior to and subsequent to the closing. N.T. 12/13/2005 at 15. Nickel's July 1, 2001 evaluation was based on information he had at that time. *Id.* at 42.His second evaluation of July 29, 2004 was based on actual post-closing

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1652687 (Pa.Com.Pl.)
(Cite as: 2006 WL 1652687 (Pa.Com.Pl.))

*Id.* at 48-49.He concluded that a well informed purchaser aware of the misrepresentations would have paid 1.7 million less than what plaintiff paid.*Id.* at 17.

FN15. N.T. 12/13/05 at 8-11.

**\*10** Defendants' expert, opined that he did not agree with the techniques used by Nickel but that "he doesn't know if [Nickel's figures] are the right answer."N.T. 1/5/2006 at 163.

The court finds that plaintiffs' have proven the elements of fraudulent misrepresentation,[FN16] and finds that plaintiffs were injured in the amount of 1.7 million dollars.[FN17]

FN16. Plaintiffs also request punitive damages. This court believes that taking into account the totality of circumstances surrounding this case, punitive damages are not warranted.

FN17. Although neither party addressed this issue, this court is aware that the Pennsylvania Superior Court stated:

... a party may introduce evidence of factual misrepresentations allegedly made prior to the execution of a written agreement by misrepresentation provided ... the party may not thereby achieve a reformation of the agreement but rather may obtain total rescission only."

*1776 Cherry Street v. Bell Atlantic,* 439 Pa.Super. 141, 149, 653 A.2d 663 (Pa.Super.1995).

The court believes that, in this case, a rescission of the contract is not only impractical, it would be unjust. This court has company. In *Scaife v. Rockwell-Standard Corporation,* 446 Pa. 280; 285 A.2d 451 (1970), the Superior Court of Pennsylvania upheld a jury verdict of $1,200,000.28 in a fraudulent misrepresentation case. See, also (*Restatement of Torts* ) § 549(1)(a).

### 1. *Gist of the Action Doctrine*

Defendants' assert that the gist of the action doctrine bars plaintiffs' claim of fraudulent inducement. Defendants' FFCL, p. 39. Plaintiffs maintain that "the gist of the action doctrine does not bar a claim of fraud in the inducement because fraud to induce a person to enter a contract is collateral to the terms of the contract itself and implicates society's desire to avoid the fraudulent inducement of contracts."Plaintiffs' CL, ¶ 120. The court agrees.

The gist of the action doctrine "is designed to maintain the conceptual distinction between breach of contract claims and tort claims." *Bash v. Bell Telephone Co. of Pennsylvania,* 411 Pa.Super. 347, 601 A.2d 825, 829 (Pa.Super.1992). The doctrine prevents plaintiffs from recasting ordinary breach of contract claims into tort claims. *Id.* Relying on *Bash,* the Court in *eToll, Inc. v. Elias/Savon Advertising, Inc.,* 2002 PA Super 347, 811 A.2d 10 (Pa.Super.2002), reasoned that: [g]enerally the doctrine is designed to maintain the conceptual distinction between breach of contract claims and tort.[FN18]*eToll* cited the *Bash* Court's delineation of contract claims and tort claims thusly:

FN18.*Bash* supra at 829

[a]lthough they derive from a common origin, distinct differences between civil action of tort and contract breach have developed at common law. Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals ...
*Id.* at 14.(Emphasis added.)

Similarly, in *Redevelopment Auth. v. International*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1652687 (Pa.Com.Pl.)
(Cite as: 2006 WL 1652687 (Pa.Com.Pl.))

*Ins. Co.*, 454 PA Super 374, 685 A.2d 581, 590 (Pa.Super.1996) the court noted that "[t]he important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus."

In *Sullivan v. Chartwell Investment Partners, L.P.,* 2005 PA Super 124, 873 A.2d 710 (Pa.Super.2005), plaintiff employee appealed the trial court's sustaining defendant's Preliminary Objections and dismissing plaintiff's Complaint. The trial court found that the gist of the action doctrine barred prosecution of all of plaintiff's fraud and negligent misrepresentation claims. Appellee argued that Appellant "fraudulently and/or negligently agreed to perform obligations that it never intended to perform in order to induce Appellant to agree to the proposed changes to his compensation package and to forgo an immediate resignation." *Id.* at 719.The Appellate court concluded that because "Appellant's tort claims related to the inducement to contract, they were collateral to the performance of the contracts and therefore, are not barred by the gist-of-the-action doctrine."*Id.* (citing *eToll, supra* at 17).

*11 This court submits that the fraudulent misrepresentations that induced plaintiffs to enter into the Agreement implicate society's interest in preventing the formation of contracts based on fraud and that the tort claim is the gist of the action. Accordingly, the court finds that the gist of the action doctrine does not bar plaintiffs' claim for fraudulent inducement.

### 2. Parol Evidence

Defendants' second line of defense is a claim that the parol evidence rule bars plaintiffs' reliance on pre-contractual misrepresentations. Defendants FFCL, p. 40.

The parol evidence rule has been described as follows:

Where the parties to an agreement adopt a writing as the final and complete expression of their agreement, ... evidence of negotiations leading to the formation of the agreement is inadmissible to show an intent at variance with the language of the written agreement....

*McGuire v. Schneider, Inc.,* 368 PA Super 344, 534 A.2d 115, 117 (Pa.Super.1995).

Defendants list a number of cases that they claim "hold that parol evidence may not be considered in a case alleging fraud in the inducement of an integrated commercial contract".[19] Defendants' FFCL, p. 41.

> FN19. The Agreement's integration clause provides:
>
> > This Agreement embodies and constitutes the entire understanding between the parties hereto with respect to the transactions contemplated herein, and all prior or contemporaneous agreements, understandings, representations and statements, oral or written, are merged into this Agreement....
>
> Exh. P-111.

In *Nicolella v. Palmer,* 432 Pa. 502; 248 A.2d 20 (1968), the Court held that appellant was barred from "seeking to vary the terms of an integrated written agreement by prior or contemporaneous oral agreements." *Id.* at 22. (Emphasis added.) The *Nicolella* court, in coming to their decision relied on another of defendants' cases, *Bardwell v. The Willis Company.*[20]

> FN20. 375 Pa. 503, 100 A.2d 102 (1953)

*Bardwell* provides:

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2006 WL 1652687 (Pa.Com.Pl.)
(Cite as: 2006 WL 1652687 (Pa.Com.Pl.))

[T]he law is now clearly and well settled that in the absence of fraud, accident or mistake the alleged oral representations or agreements are merged in or superseded by the subsequent written contract, and parol evidence to vary, modify or supersede the written contract is inadmissible in evidence.

*Id.* at 506.(Internal citations omitted and emphasis added.)

In another case cited to by defendants, *HCB Contractors v. Liberty Place Hotel Assoc.,* 539 Pa. 395, 652 A.2d 1278 (1995), the Court simply acknowledged that the Superior Court was correct in ruling that *HCB* was controlled by *Nicolella.*

*Youndt v. First National Bank of Port Allegheny,* 2005 PA. Super 42, 868 A.2d 539 (2005) quotes the rationale supporting the *Blumenstock* decision: [t]he case law clearly holds that a party cannot justifiably rely upon prior oral representations yet sign a contract denying the existence of those representations." *Id.* (Emphasis added.)

The court finds that the parol evidence rule is not activated in this case because the fraudulent misrepresentations were consistent with the terms of the agreement.

### 3. *Waiver*

Defendants' argue that because plaintiffs ultimately closed this sale, they have waived their rights to seek damages. Defendants write: "What plaintiffs do not have a right to do is to have their cake and eat it too...." Defendants' FFCL, p. 34. Plaintiffs counter with *Scaife Co. v. Rockwell-Standard Corp.,* 446 Pa. 280, 285 A.2d 451, which held that "the affirmance of a contract induced by fraud of the seller does not extinguish the right of the purchaser, and it is not a waiver of the fraud, nor does it bar the right of the purchaser to recover damages for the fraud."(Internal citation omitted.)

**\*12** Defendants urge that the facts of *Scaife* are distinguishable from the present case because the plaintiff in *Scaife* did not learn about a defect in the product until after they purchased the manufacturer. In the case at bar, the plaintiffs closed on the properties after they learned of the majority of the tenant issues.

Plaintiffs argue that although they had knowledge of some significant tenant issues before the closing,[FN21] if they did not close the deal "it would have been the end of the real estate investment trust", it would have been "the demise of Cedar Income Fund."N.T. 12/14/2005 at 102-103.

> FN21. For instance, between the signing of the Agreement of Sale and the closing, plaintiffs' learned that MaST was going to exercise their early termination option. See Exh. P-33. On June 13, 2001, Walker received the Activity Reconciliation Reports for all three centers. These reports showed the Triple Play, A Formal Celebration and American Furniture delinquencies. Exh. P-161.

Plaintiffs assert that they had to close because they issued two press releases informing their investors and other interested parties that they were purchasing the three shopping centers as the first step in the process of transforming their small REIT into a much larger REIT. Exh. P-106. According to plaintiffs, these press items had to be released "because under SEC guidelines and NASDAQ requirements at the time, any material transaction the company which might have a meaningful effect on the value or its shares had to be disclosed as promptly as 48 hours."N.T. 12/8/2005 at 165.[FN22]

> FN22. Hascoe testified that he received drafts of a press release and forwarded them to Becchofer. N.T. 1/11/2006 at 155. Hascoe further testified that he objected to the press release on account of confidenti-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1652687 (Pa.Com.Pl.)
**(Cite as: 2006 WL 1652687 (Pa.Com.Pl.))**

ality and that consequently, Bryant did not mention the properties by name or Bryant in the final version. *Id.*

Plaintiffs also contend that they closed the deal because they were told that they would receive a price reduction to compensate for the delinquencies that were uncovered during due diligence. Plaintiffs' FF, ¶ 75. This is a promise that defendants flatly deny. A meeting took place at the Bryant offices between Hascoe and Ullman.[FN23] According to Hascoe the topic of a price reduction came up and "Ullman walked out of the office knowing that he was not going to get a price reduction."N.T. 1/11/2006 at 149, 154. Hascoe also testified that he had a witness to this meeting, Denis Brauchle. *Id.* at 154.

FN23. N.T. 1/10/2006 at 67.

Brauchle's testimony was opaque on this issue and on the meeting itself. He testified that he "kind of" remembered hearing something about a request for a reduction of price and that he did not recall having a conversation with Ullman about a price reduction. N.T. 1/12/2006 at 95.

The court believes that had this meeting proceeded consistent with Hascoe's testimony, Brauchle, in this multi-million dollar deal, would have had more than a "kind of" remembrance about a reduction in price. Further, Walker testified that plaintiffs were required to raise more equity for closing because they did not get the price reduction they were relying on. N.T. 12/14/2005 at 91.

This court found Walker and Ullman to be credible. Thus, the court finds that a promise for a price reduction was given and that a failure to close would have resulted in greater damage to plaintiffs than to close and face the uncertainty that underlies all lawsuits. The court finds that plaintiffs did not waive their right to bring this action.

## II. *BREACH OF CONTRACT*

Plaintiffs contend that defendants, with the exception of Byrant Asset Management,[FN24] are liable for breach of contract. According to plaintiffs, "[d]efendants breached the Agreement by representing and warranting that there were no material tenant defaults and that the information on the rent rolls was true ... when there were, in fact multiple material tenant defaults and the information on the rent rolls was not true."Plaintiffs' CL, ¶ 140.

FN24. This court previously held, in response to defendants' Preliminary Objections, that the breach of contract claim was dismissed as to defendant Bryant only.

**\*13** The pertinent provisions of the Agreement provide that the seller represents "the information set forth in the [rent rolls] is true correct and complete in all material respects. To Seller's knowledge, there is no material default of either the landlord or any Tenant under any of the Tenant Leases ..." Exh P-2, 3.3(c)

The following is plaintiffs' own characterization of this case:

... while the underlying complaint contains allegations that the Agreement was breached, the action as a whole clearly sounds in tort, as the action is grounded in the general duty to refrain from deceit and fraud. The contract allegations are merely collateral to conduct that is primarily.

Plaintiffs' Opposition to Defendants' Second Motion for Summary Judgment, p. 21. (Emphasis added.)

If this case is grounded in fraud, and this court agrees that it is, can plaintiffs maintain a breach of contract claim after the court has found that the tort claim is the gist of the action?

The gist of the action doctrine maintains the "conceptual distinction between breach of contract claims and tort claims." *Bash v. Bell Telephone Co.*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1652687 (Pa.Com.Pl.)
(Cite as: 2006 WL 1652687 (Pa.Com.Pl.))

*of Pennsylvania*, 411 Pa.Super. 347, 601 A.2d 825, 829 (Pa.Super.1992). The doctrine prevents plaintiffs from recasting ordinary breach of contract claims into tort claims. *Id.* The gist of the action doctrine must also prevent tort claims from being molded into breach of contract claims. *Bash,* the first Pennsylvania Superior Court case to recognize the gist of the action doctrine, cites to the Corpus Juris Secundum for the key proposition that the conduct of the defendant will be ascribed as a tort if it is "the gist of the action, the contract being collateral."CJS Actions § 136. That section also provides:

... if the complaint states a cause of action in tort and it appears that this is the gravaman of the complaint, the nature of the action as ex delicto is not affected or changed by allegations in regard to the existence of breach of a contract, which may be disregarded as surplusage ...

This court agrees and finds that plaintiffs' breach of contract claim is barred by the gist of the action doctrine.[FN25]

> FN25. The court finds that plaintiffs' claim for unjust enrichment fails because of the presence of a contract. "By its nature, the doctrine of quasi-contract, or unjust enrichment, is inapplicable where a written or express contract exists." *Mitchell v. Moore, 1999 PA Super 77, 729 A.2d 1200, 1203 (Pa.Super.1999).*

## III. *CONSPIRACY*

Plaintiffs allege that the "defendants agreed to act in concert to mislead and defraud Cedar to overpay for the Bryant Portfolio, defendants agreed to act in concert to mislead and defraud Cedar regarding the financial performance of the shopping centers, the NOI, the rent rolls, and the promise of a purchase price reduction."Plaintiffs' CL, ¶ 146.

The elements of civil conspiracy are: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for a lawful purpose, (2) with an intent to injure without justification, (3) an overt act "done in pursuance of the common purpose or design", and resultant actual legal damage. *Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 412 A.2d 466, 472 (1979). Moreover, the *Thompson* court stated, "[a] single entity cannot conspire with itself and, similarly, agents of a single entity cannot conspire among themselves."*Id.* This court submits that plaintiffs have failed to satisfy the first element.

***14** Hascoe, the sole owner of defendant Bryant Asset Management, and the principal owner of the corporate general partner for the three shopping center defendants, testified that he owned 100% of the stock in Bryant Development Company. N.T. 1/11/2006 at 167, 177. He explained that Bryant Asset Management was used for day-to-day management of the three shopping centers. *Id.* at 178.The shopping centers were limited partnership bankruptcy remote entities which were controlled by general partners. *Id.* at 181-182.There were management agreements between the general partners and Bryant Asset Management. *Id.* at 186.Finally, Hascoe testified that he had ultimate decision making authority for all four defendants. N.T. 1/11/2006 at 178-180.

The case that plaintiffs cite in support of their proposition that "there is no rule that a corporation and its wholly owned subsidiaries are immune from civil conspiracy claims",[FN26] also states that "a corporate parent may have varying degrees of involvement with its corporate subsidiary".[FN27] The Superior Court concluded that the closer the relationship between corporate parent and subsidiaries, the more likely it is that they cannot be capable of conspiracy.[FN28]

> FN26. *Shared Communications Services of*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1652687 (Pa.Com.Pl.)
(Cite as: 2006 WL 1652687 (Pa.Com.Pl.))

*1800-80 JFK Blvd. Inc. v. Bell Atlantic Properties, Inc.,* 692 A.2d 570 (Pa.Super.1997).

FN27. *Id.* at 574.

FN28.*Id.*

The court finds that Bryant Asset Management was so involved with the three remaining defendants that they were not able to conspire. The court finds that plaintiffs' claim for conspiracy fails.

### DECLARATORY JUDGMENT

The court has been asked to enter a declaratory judgment in favor of Cedar and against the defendants with respect to claims by tenant Pep Boys of alleged overpayments of Common Area Maintenance ("CAM") charges during the time that Bryant owned the properties.

After closing on the properties, plaintiffs received notice from Pep Boys, a tenant at Port Richmond Village, that Pep Boys had not received a statement of common area maintenance ("CAM") expenses for 4 years. Exh. P-50. The lease between Pep Boys and Bryant called for reconciliations to be provided to Pep Boys every year. N.T. 12/13/2005 at 20. Pep Boys alleges that they overpaid CAM expenses during the time that defendants owned Port Richmond Village. N.T. 12/13/2005 at 21.

The Assignment and Assumption of Lease and Contracts provides that defendants:

... hereby agree[ ] to indemnify, hold harmless and defend [Cedar] from and against any and all damages, liabilities, loss, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) resulting by reason of any failure by [defendants] to perform or discharge any of [defendants'] duties or obligations under the Leases and/or Contracts during the

period of [defendants'] ownership ...

Exh. P-2 (attached Exhibit K); Plaintiffs' FF, ¶ 98.

Hascoe testified that "anything that happened before their (plaintiffs) ownership is my responsibility or the properties' responsibility. And we committed to indemnify them ... against any claims from tenants prior to the sale."N.T. 1/11/2006 at 175-176. However, counsel for defendants wrote to Widowski:

*15 ... it is the position of Port Richmond Associates LLC ... that it has absolutely no liability whatsoever to Port Richmond LLC.1 and/or Pep Boys pursuant to Pep Boys' lease, the Contract of Sale, the Assignment and Assumption of Leases and Contracts and/or any other documents.

Exh. P-114.

The court accepts the testimony of Hascoe and finds that defendants did commit to indemnify and defend plaintiffs against claims made by tenants for that period of time Bryant owned the shopping centers. Therefore, this court enters a declaratory judgment in favor of plaintiffs and against defendants ordering defendants to indemnify and defend plaintiffs against claims related to Pep Boys allegedly overpaid CAM charges.

As to plaintiffs' claim for attorneys' fees, the relevant provision in the Agreement provides:

If either party hereto fails to perform any of its obligations under this Agreement or if a dispute arises between the parties hereto concerning the meaning or interpretation of any provision of this Agreement, then the defaulting party or the party not prevailing in such dispute shall pay any and all costs and expenses incurred by the other party on account of such default and/or enforcing or establishing or enforcing or establishing its rights hereunder, including without limitation court costs and reasonable attorneys' fees and disburse-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1652687 (Pa.Com.Pl.)
(Cite as: 2006 WL 1652687 (Pa.Com.Pl.))

ments.

Exh. P-2, § 10.20.

This court has found that defendants breached the Assumption and Assignment of Leases and Contracts provision set out in the Agreement. Accordingly, the court finds that plaintiffs' are due attorneys' fees specifically related to the Declaratory Judgment action. Therefore, the court will schedule a hearing on the issue of the amount of attorneys' fees.

*CONCLUSIONS OF LAW*

1. Plaintiffs were fraudulently induced to enter into the Agreement of Sale.

2. The plaintiffs are entitled to a judgment in the amount of $1.7 million, which amount represents the damages testified to by plaintiffs' expert (Nichol) and which amount defendants' expert testified he could not dispute.

3. Plaintiffs' Breach of Contract claim is barred by the gist of the action doctrine.

4. Plaintiffs did not satisfy the first element of civil conspiracy, that is, a combination of two or more persons acted with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose.[FN29] Thus, plaintiffs' claim of Civil Conspiracy fails.

> FN29. *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 472 (1979).

5. Plaintiffs' claim for unjust enrichment fails because of the presence of a contract. "By its nature, the doctrine of quasi-contract, or unjust enrichment, is inapplicable where a written or express contract exists." *Mitchell v. Moore, 1999 PA Super 77, 729 A.2d 1200, 1203 (Pa.Super.1999).*

6. Under the contract, defendants must indemnify and defend plaintiffs against claims brought by Pep Boys relative to that period of time that defendants owned the shopping centers.

7. Plaintiffs are entitled to attorneys' fees under the contract because defendants breached the Assumption and Assignment of Leases and Contracts provision.

**16* The court will enter an Order consistent with these Findings and Conclusions.

*ORDER*

AND NOW, this 9th day of June 2006, upon consideration of the evidence presented at a bench trial, the respective proposed findings of fact and conclusions of law and responses of the parties, the respective briefs and memoranda, all matters of record, and in accord with the Findings of Fact, Discussion and Conclusions of Law being filed contemporaneously with this Order, it is ORDERED that:

1. Judgment is entered in favor of plaintiffs, Academy Plaza L.L.C.1, Port Richmond L.L.C.1 and Washington Center L.L.C.1 ("plaintiffs"), and against defendants, Byrant Asset Management, Washington Centre Shops, L.P., Port Richmond Associates, LLC and Academy Stores, L.P. ("defendants"), in the amount of $1.7 million on plaintiffs' claim of fraudulent inducement.

2. The court finds in favor of defendants and against plaintiffs on the breach of contract claim.

3. The court finds in favor of defendants and against plaintiffs on the conspiracy claim.

4. The court finds in favor of defendants and against plaintiffs on the unjust enrichment claim.

5. A declaratory judgment is entered in favor of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2006 WL 1652687 (Pa.Com.Pl.)
**(Cite as: 2006 WL 1652687 (Pa.Com.Pl.))**

plaintiffs and against defendants, ordering that defendants indemnify and defend plaintiffs against claims related to Pep Boys allegedly overpaid CAM charges.

6. The court grants plaintiffs' request for attorneys' fees in an amount to be determined at a hearing to be scheduled.

Pa.Com.Pl.,2006.
Academy Plaza L.L.C.1 v. Bryant Asset Management
Not Reported in A.2d, 2006 WL 1652687 (Pa.Com.Pl.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2004 WL 953700 (Ohio App. 5 Dist.), 2004 -Ohio- 2254
**(Cite as: 2004 WL 953700 (Ohio App. 5 Dist.))**

Page 1

☞
CHECK OHIO SUPREME COURT RULES FOR
REPORTING OF OPINIONS AND WEIGHT OF
LEGAL AUTHORITY.


Court of Appeals of Ohio,
Fifth District, Licking County.
Marc CLEMENTE, et al, Plaintiffs-Ap-
pellees-Cross-Appellants
v.
William GARDNER, et al., Defendant-Appel-
lant-Cross Appellee.
**No. 2002CA00120.**

Decided April 26, 2004.

**Background:** Purchasers brought actions against
vendor, vendor's wife, and real estate agency for
fraudulent and negligent misrepresentation, unjust
enrichment, and fraudulent and negligent conceal-
ment of solid waste landfill, and brought claims for
negligence and breach of fiduciary duty against real
estate agency. After purchasers' actions were con-
solidated, the Court of Common Pleas, Licking
County, No. 01CV330, granted real estate agency's
summary judgment motion and granted motion for
directed verdict to vendor's wife, but denied
vendor's motion for directed verdict. Following jury
verdict, the court entered judgment on jury verdict
for purchasers. Vendor appealed, and purchasers
cross-appealed.

**Holdings:** The Court of Appeals, Edwards, J., held
that:
(1) court did not abuse discretion in consolidating
actions;
(2) statements were not notice sufficient to trigger
statute of limitations;
(3) real estate contract did not contain "as is" con-
dition clause;
(4) caveat emptor did not bar claims;

(5) parol evidence rule did not prohibit purchasers
from introducing evidence that vendor fraudulently
induced them into entering into contracts;
(6) evidence of damages was sufficient to submit
issue to jury; and
(7) vendor was not agent of his wife, and thus wife
was not liable as principal.

Affirmed.

West Headnotes

**[1] Action 13 ☞57(3)**

13 Action
   13III Joinder, Splitting, Consolidation, and Sev-
erance
     13k54 Consolidation of Actions
       13k57 Actions Which May Be Consolid-
ated
         13k57(3) k. Common Questions of
Law or Fact; Same Transaction or Series of Trans-
actions. Most Cited Cases
Trial court did not abuse discretion in consolidating
purchasers' actions against vendor for fraudulent
and negligent misrepresentation, unjust enrichment,
and fraudulent and negligent concealment of solid
waste landfill, as actions shared common question
of fact; purchasers claimed vendors failed to dis-
close same, closed public landfill on same piece of
property divided into two parcels, and many of the
same witnesses, documents, and evidence were
presented in both cases. Rules Civ.Proc., Rule 42(A).

**[2] Limitation of Actions 241 ☞100(12)**

241 Limitation of Actions
   241II Computation of Period of Limitation
     241II(F) Ignorance, Mistake, Trust, Fraud,
and Concealment or Discovery of Cause of Action
      241k98 Fraud as Ground for Relief
       241k100 Discovery of Fraud

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2004 WL 953700 (Ohio App. 5 Dist.), 2004 -Ohio- 2254
**(Cite as: 2004 WL 953700 (Ohio App. 5 Dist.))**

241k100(12)   k.   What   Constitutes
Discovery of Fraud. Most Cited Cases
Vendor's statement to purchasers that there was a
30-square-foot area where a farmer had dumped
some equipment, property disclosure sheet stating
that there was an area that was at one time used to
bury stuff, and purchaser's statement that he was
aware it was not uncommon to find dumping on
rural property was not notice of buried landfill on
property sufficient to trigger statute of limitations
on purchasers' fraud and negligent misrepresenta-
tion claims against vendor. R.C. § 2305.09.

**[3] Fraud 184 ☞36**

184 Fraud
    184II Actions
        184II(A) Rights of Action and Defenses
            184k36 k. Defenses. Most Cited Cases
Clause in real estate purchase contract stating that
purchaser was relying on purchaser's examination
of property "with reference to the condition, char-
acter, and size of land" was not an "as is" condition
clause precluding purchasers' fraud and negligence
claims against vendor due to concealed landfill on
property, but rather was a form of integration
clause concerning representations that may or may
not have been made.

**[4] Fraud 184 ☞22(1)**

184 Fraud
    184I Deception Constituting Fraud, and Liabil-
ity Therefor
        184k19 Reliance on Representations and In-
ducement to Act
            184k22 Duty to Investigate
                184k22(1) k. In General. Most Cited
Cases
Doctrine of caveat emptor did not bar purchasers'
claims against vendor for fraud and negligence
stemming from concealed landfill on purchased
land, where landfill was neither readily observable
nor discoverable upon reasonable inspection, and

there was evidence that vendor knew land had been
part of landfill and that vendor prohibited environ-
mental testing of and around landfill.

**[5] Evidence 157 ☞434(11)**

157 Evidence
    157XI Parol or Extrinsic Evidence Affecting
Writings
        157XI(B) Invalidating Written Instrument
            157k434 Fraud
                157k434(11) k. In Contracts of Sale or
Exchange. Most Cited Cases
Parol evidence rule did not prohibit purchasers
from introducing evidence that vendor fraudulently
induced them into entering into real estate purchase
contracts to purchase land containing concealed
landfill.

**[6] Fraud 184 ☞64(5)**

184 Fraud
    184II Actions
        184II(F) Trial
            184k64 Questions for Jury
                184k64(5) k. Reliance on Representa-
tions and Inducement to Act. Most Cited Cases
Issue of whether purchasers of land containing con-
cealed landfill relied on vendor's false assertions of
failure to disclose landfill was for jury in action
against vendor for fraud and negligent misrepres-
entation. Rules Civ.Proc., Rule 50(A), (B).

**[7] Fraud 184 ☞64(1)**

184 Fraud
    184II Actions
        184II(F) Trial
            184k64 Questions for Jury
                184k64(1) k. In General. Most Cited
Cases
Evidence of damages from vendor's alleged fraudu-
lent inducement and negligent misrepresentation
concerning concealed landfill on property was suf-
ficient to submit damages issue to jury; vendor test-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2004 WL 953700 (Ohio App. 5 Dist.), 2004 -Ohio- 2254
(Cite as: 2004 WL 953700 (Ohio App. 5 Dist.))

Page 3

ified he would not have purchased property if he knew of landfill, vendor testified that location of structures on property violated environmental regulations and virtually prohibited resale of property, and purchaser testified as to actual expenses incurred and potential cost to remove landfill.

**[8] Appeal and Error 30 €⟶1062.2**

30 Appeal and Error
  30XVI Review
    30XVI(J) Harmless Error
      30XVI(J)17 Submission of Issues or Questions to Jury
        30k1062.2 k. Failure or Refusal to Submit Issues. Most Cited Cases
Trial court's failure to give vendor's requested interrogatories to jury asking for particularized findings was not reversible error in purchasers' fraud and negligent misrepresentation action against vendor, where 22 interrogatories submitted to jury asked separate questions as to whether vendor committed fraud or negligent misrepresentation in regards to purchasers, and included separate, specific questions concerning damages. Rules Civ.Proc., Rule 49(B).

**[9] Husband and Wife 205 €⟶25(1)**

205 Husband and Wife
  205I Mutual Rights, Duties, and Liabilities
    205k25 Agency of Husband for Wife
      205k25(1) k. In General. Most Cited Cases
Vendor was not agent of his wife and thus wife was not liable as principal for vendor's fraud and negligent misrepresentations regarding landfill on property sold to purchasers; wife testified that she allowed vendor to make decisions concerning property "because he was more knowledgeable about these kinds of things" and because that's "what you do as husband and wife," and testified that she agreed he would take care of the matters.

Civil Appeal from Licking County Court of Common Pleas, Case 01CV330.Mark A. Losey, Columbus, OH, for plaintiffs-appellees-cross-appellants.

Charles W. Gayton, Columbus, OH, for defendant-appellant-cross appellee.

*OPINION NUNC PRO TUNC*

EDWARDS, J.

**\*1** {¶ 1} Defendant-appellant William Gardner [hereinafter appellant] appeals from the judgment of the Licking County Court of Common Pleas which awarded plaintiffs-appellees Marc and Ginny Clemente [hereinafter appellees] damages for fraudulent inducement and negligent misrepresentation in regards to the sale of real property. Appellees presented a cross appeal from the judgment of the Licking County Court of Common Pleas which granted a directed verdict in favor of defendant-cross appellee Anita Gardner.

*STATEMENT OF THE FACTS AND CASE*

{¶ 2} On April 18, 2001, appellees filed a complaint in the Licking County Court of Common Pleas against appellant, Anita Gardner (appellant's wife) and King Thompson, Holzer-Wollam, Inc. [hereinafter King Thompson], appellant's real estate agency. In the Complaint, appellees alleged fraudulent and negligent misrepresentation, unjust enrichment and fraudulent and negligent concealment of a solid waste landfill located on the real estate sold to appellees by appellant and his wife. Appellees also alleged negligence and breach of fiduciary duty against King Thompson, Inc. An amended complaint was filed on December 26, 2001, containing additional claims against King Thompson, Holzer-Wollam, Inc.

{¶ 3} On the same day that appellees filed their

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2004 WL 953700 (Ohio App. 5 Dist.), 2004 -Ohio- 2254
(Cite as: 2004 WL 953700 (Ohio App. 5 Dist.))

Page 4

Complaint, Kurt and Heather Kluth filed a Complaint against appellant, Anita Gardner and King Thompson, Holzer-Wollam, Inc. In the Complaint, the Kluths alleged unjust enrichment and fraudulent and negligent concealment of a solid waste landfill located on the real estate sold to the Kluths by appellant and his wife. The Kluths also alleged negligence and breach of fiduciary duty against King Thompson, Inc. An amended complaint was filed on December 26, 2001, also contained an additional three claims against King Thompson, Holzer-Wollam, Inc. The Kluth case was assigned case number 01CV0331GLF.

{¶ 4} Appellees filed a motion to consolidate their case with the Kluth case for purposes of trial. Appellant, Anita Gardner and King Thompson, Inc, opposed the consolidation. On September 14, 2001, the trial court granted the motion to consolidate.

{¶ 5} On June 19, 2002, the trial court granted a motion for summary judgment in favor of King Thompson. Upon denial of all other pending motions for summary judgment, the matter went to trial on the claims of fraudulent inducement and negligent misrepresentation. At the end of the third day of trial, the trial court granted Anita Gardner's motion for a directed verdict and denied appellant's motion for directed verdict. At the end of the case, appellant again renewed his motion for directed verdict but the trial court denied the motion.

{¶ 6} The jury returned a verdict for appellees. The jury concluded that appellant had committed fraudulent inducement and negligent misrepresentation against both appellees and the Kluths. The jury awarded appellees $625,000 in compensatory damages for fraudulent inducement, $25,000 for mental suffering and $53,766 in compensatory damages for negligent misrepresentation, for a total of $703,766.[FN1] However, the jury did not award any punitive damages or attorney fees. On November 12, 2002, the trial court journalized the verdict.

FN1. The jury awarded the Kluths $262,000 in compensatory damages for fraudulent inducement, $25,000 for mental suffering and $42,000 in compensatory damages for negligent misrepresentation, for a total of $329,000.

*2 {¶ 7} It is from the November 12, 2002, Judgment Entry that appellant appeals, raising the following assignments of error:

{¶ 8} "I. THE TRIAL COURT ERRED IN CONSOLIDATING THE CASE OF *KLUTH V. GARDNER,* CASE NO. 01CV0331GLF, WITH THE INSTANT CASE, AND THE COURT ABUSED ITS DISCRETION WHEN GRANTING CONSOLIDATION BECAUSE THERE WAS NO COMMONALITY OF ISSUES, AND TRYING BOTH CASES TO A JURY CAUSED JURY CONFUSION AND PREJUDICE.

{¶ 9} "II. THE TRIAL COURT ERRED BY FAILING TO GRANT DEFENDANT-APPELLANT'S MOTION FOR SUMMARY JUDGMENT SINCE THE PLAINTIFF-APPELLES' CLAIMS WERE BARRED BY OHIO REVISED CODE [SEC.] 2305.09(C) AND [SEC.] 2305.07, AS WELL AS THE DOCTRINE OF CAVEAT EMPTOR AND THE PAROL EVIDENCE RULE.

{¶ 10} "III. THE TRIAL COURT ERRED BY NOT DIRECTING A VERDICT FOR THE DEFENDANT-APPELLANT AT THE END OF THE PLAINTIFF-APELLEES' CASE AND AT THE END OF ALL THE EVIDENCE BECAUSE THE PLAINTIFF-APPELLEES' CLAIMS WERE BARRED BY [SEC.] 2305.09, LACK OF JUSTIFIABLE RELIANCE AND THE DOCTRINE OF CAVEAT EMPTOR.

{¶ 11} "IV. THE COURT ERRED IN NOT DIRECTING A VERDICT AGAINST PLAINTIFF-APPELLEES AT THE END OF THE PLAINTIFF-APPELLEES' CASE AND AT THE END OF ALL

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 5
Not Reported in N.E.2d
Not Reported in N.E.2d, 2004 WL 953700 (Ohio App. 5 Dist.), 2004 -Ohio- 2254
(Cite as: 2004 WL 953700 (Ohio App. 5 Dist.))

THE EVIDENCE BECAUSE PLAINTIFF-AP-PELLEES FAILED TO PROVE ANY DAMAGES AS A MATTER OF LAW.

{¶ 12} "V. THE TRIAL COURT ERRED BY RE-FUSING TO SUBMIT TO THE JURY DEFEND-ANT-APPELLANTS' REQUESTED INTERROG-ATORIES WHICH WOULD REQUIRE THE JURY TO DESCRIBE THE CONDUCT OF WHICH THE DEFENDANT WAS GUILTY SHOULD THEY FIND FOR THE PLAINTIFF-APPELLEES ON THE ISSUES OF FRAUDU-LENT INDUCEMENT AND NEGLIGENT MIS-REPRESENTATION. THE JURY'S VERDICT WAS NOT PROPERLY TESTED BY MEANS OF INTERROGATORIES REQUESTED BY DE-FENDANT-APPELLANT, AND ACCORDINGLY THE JURY'S VERDICT CANNOT BE PERMIT-TED TO STAND."

{¶ 13} Marc and Ginny Clemente filed a cross ap-peal. The following sole assignment of error was raised on cross appeal:

{¶ 14}"THE TRIAL COURT ERRED IN DIRECT-ING A VERDICT THAT CROSS-APPELLEE AN-ITA GARDNER WAS NOT VICARIOUSLY LI-ABLE FOR APPELLANT WILLIAM GARD-NER'S FRAUD AND NEGLIGENT MISREPRES-ENTATION."

I

[1]{¶ 15} In the first assignment of error, appellant argues that the trial court abused its discretion when it consolidated the *Clemete* case with the *Kluth* case. We disagree.

{¶ 16} A consolidation of cases lies within the sound discretion of the trial court. *Director of Highways v. Kleines* (1974), 38 Ohio St.2d 317, 313 N.E.2d 370. The Supreme Court has defined abuse of discretion as implying that the court's atti-tude is unreasonable, arbitrary or unconscionable,

see, e.g., *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.

{¶ 17} Consolidation of cases is controlled by Civ.R. 42(A).Civ.R. 42(A) states as follows: "When actions involving a common question of law or fact are pending before a court, that court after a hearing may order a joint hearing or trial of any or all the matters in issue in the actions; it may order some or all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay."

*3 {¶ 18} Thus, the issue is whether the trial court abused its discretion when it found that the actions shared a common question of law or fact. In this case, both the Kluths and the Clementes claimed that the Gardners failed to disclose the same closed, public landfill on the same piece of property that the Gardners had divided into two parcels. The Kluths and the Clementes each purchased one of those parcels. Many of the same witnesses, docu-ments and evidence were presented in both cases. This court is cognizant that there were questions of law and fact that were not common between the cases. However, not all questions of law and fact must be identical to be consolidated pursuant to Civ.R. 42. Under the circumstances herein, we find that the trial court did not abuse its discretion in consolidating the cases.

{¶ 19} Appellant's first assignment of error is over-ruled.

II

{¶ 20} In the second assignment of error, appellant contends that the trial court erred when it denied appellant's motion for summary judgment. We dis-agree.

{¶ 21} In his motion for summary judgment, appel-lant argued that appellees' claims were barred by the statute of limitations as well as the doctrine of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2004 WL 953700 (Ohio App. 5 Dist.), 2004 -Ohio- 2254
(Cite as: 2004 WL 953700 (Ohio App. 5 Dist.))

caveat emptor and the parole evidence rule.

{¶ 22} Summary judgment proceedings present the appellate court with the unique opportunity of reviewing the evidence in the same manner as the trial court. *Smiddy v. The Wedding Party, Inc.* (1987), 30 Ohio St.3d 35, 36, 506 N.E.2d 212. Civ.R. 56 concerns summary judgment and provides the following, in pertinent part:

{¶ 23}"Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * * A summary judgment shall not be rendered unless it appears from such evidence or stipulation, and only from the evidence, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor."

{¶ 24} It is based upon this standard that we review appellant's assignments of error.

[2]{¶ 25} We will first address appellant's statute of limitations issue.Revised Code 2305.09 provides that a cause of action for fraud or negligent misrepresentation shall be brought within four years after the cause thereof accrued. See *Washington v. Spitzer Management, Inc.,* Cuyahoga App. No. 81612, *2003-Ohio-1735.* The Ohio Supreme Court in interpreting R.C. 2305.09 has held that the four-year limitation period does not commence to run on claims presented in fraud until the victim of the fraud has discovered, or should have discovered, the fraud. *Investors REIT One v. Jacobs* (1989), 46 Ohio St.3d 176, 546 N.E.2d 206, paragraph 2b of the syllabus; *Venham v. Astrolite Alloys* (1991), 73

Ohio App.3d 90, 596 N.E.2d 585,motion to certify overruled (1991), 62 Ohio St.3d 1422, 577 N.E.2d 1105. No more than a reasonable opportunity to discover the misrepresentation is required to start the period of limitations. Information sufficient to alert a reasonable person to the possibility of wrongdoing gives rise to a party's duty to inquire into the matter with due diligence. *Id.;* see *Flowers v. Walker* (1992), 63 Ohio St.3d 546, 589 N.E.2d 1284. Appellant essentially limits his arguments to whether appellees had notice of the dumping on the property, thereby triggering the running of the four year statute of limitations.

*4 {¶ 26} Appellant maintains that appellees were given notice of the dumping, both orally and in a written form, and conducted their own investigation of the site.[FN2]Specifically, appellant told appellees that "[t]here's about a 30-square-foot area or so that a farmer had dumped some equipment, some fencing in that spot."Marc Clemente Sept. 18, 2001, Deposition, pg. 15. In addition, the residential property disclosure sheet associated with the sale of the land and signed by appellant included the following disclosure: "L) Other Known Material Defects: The following are other known material defects currently in or on the property: An area close to the spot marked with an X with a box around it was at one time (perhaps over 40 years ago) used to bury stuff. This has been covered over and grassed for many years. There are no known problems with this area. It is in the low dipped area."Appellant also points out that appellee Marc Clemente admitted that he was aware that it was not uncommon to find dumping on rural property.

> FN2. Evidence showed that appellees had appellant's realtor, Juanita Furuta, contact the Licking County Health Department to inquire whether the land was suitable for building. Appellees also had the Ohio State University Extension Service walk the land to see if it was suitable for horses. In each case, no information concerning the land's

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2004 WL 953700 (Ohio App. 5 Dist.), 2004 -Ohio- 2254
(Cite as: 2004 WL 953700 (Ohio App. 5 Dist.))

prior use as a landfill was discovered.

{¶ 27} We find that there was no notice given to appellees by appellant sufficient to trigger the running of the statute of limitations. See *Hamilton v. Ohio Savings Bank* (1994), 70 Ohio St.3d 137, 637 N.E.2d 887. The notice provided by appellant that there was "dumping" at the site by a farmer or that the property was used to "bury stuff" is insufficient to put appellees on notice that the site was used as a landfill in the past. Therefore, appellant's arguments fail.

{¶ 28} Appellant also argues that summary judgment should have been granted based upon application of the caveat emptor doctrine. We disagree.

[3]{¶ 29} First, appellant claims, in essence, that appellees purchased the land in an "as is" condition pursuant to the language of the purchase contract. Appellant cites the following portion of the contract as an "as is" clause:

{¶ 30}"12. Miscellaneous: Buyer has examined all property involved and, in making this offer, is relying solely upon such examination with reference to the condition, character and size of land and improvements and fixtures, if any. This contract constitutes the entire agreement and there are no representations, oral or written, which have not been incorporated herein."

{¶ 31} In Ohio, a seller may be liable for nondisclosure of a latent defect where the seller is under a duty to disclose facts and fails to do so.[FN3] *Brewer v. Brothers* (1992), 82 Ohio App.3d 148, 151-152, 611 N.E.2d 492, 611 N.E.2d 492 (citing *Miles v. McSwegin* (1979), 58 Ohio St.2d 97, 100-101, 388 N.E.2d 1367, 1369-1370). Generally, an "as is" clause in a real estate contract places the risk upon the purchaser as to the existence of defects. It relieves the seller of any duty to disclose. *Id.* However, an "as is" clause does not bar a claim for "positive" fraud, a fraud of commission rather than

omission. An "as is" clause cannot be relied upon to bar a claim for fraudulent misrepresentation or fraudulent concealment. *Id.* Thus, an "as is" clause bars claims for passive non-disclosure. *Traverse v. Long* (1956), 165 Ohio St. 249, 135 N.E.2d 256; *Kaye v. Buehrle* (1983), 8 Ohio App.3d 381, 383, 457 N.E.2d 373.

> FN3. A seller has a duty to disclose material facts which are not "readily observable or discoverable through a purchaser's reasonable inspection." *Layman v. Binns* (1988), 35 Ohio St.3d 176, 178, 519 N.E.2d 642, 644; *Davis v. Sun Refining & Marketing Co.* (1996), 109 Ohio App.3d 42, 55, 671 N.E.2d 1049; See, also, *Miles v. McSwegin* (1979), 58 Ohio St.2d 97, 388 N.E.2d 1367. In determining whether a fact is material, the court must determine if the fact would be likely, "under the circumstances, to affect the conduct of a reasonable person with reference to the transaction in question."*Davis v. Sun Refining & Marketing Company,* supra; *Van Camp v. Bradford* (1993), 63 Ohio Misc.2d 245, 255, 623 N.E.2d 731, 737-738.

*5 {¶ 32} However, the clause relied upon by appellant is not an "as is" clause. The clause does not state that the buyer is purchasing the property in an "as is" condition. Rather, the clause concerns any representations that may or may not have been made and acts as a form of integration clause. Therefore, we find that there is no "as is" clause.

[4]{¶ 33} Appellant also contends that the doctrine of caveat emptor bars appellees' claims. In *Layman v. Binns* (1988), 35 Ohio St.3d 176, 519 N.E.2d 642, syllabus, the Ohio Supreme Court stated:

{¶ 34}"The doctrine of caveat emptor precludes recovery in an action by the purchaser for a structural defect in real estate where (1) the condition complained of is open to observation or discoverable

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2004 WL 953700 (Ohio App. 5 Dist.), 2004 -Ohio- 2254
(Cite as: 2004 WL 953700 (Ohio App. 5 Dist.))

upon reasonable inspection, (2) the purchaser had the unimpeded opportunity to examine the premises, and (3) there is no fraud on the part of the vendor. ( *Traverse v. Long* [1956], 165 Ohio St. 249, 135 N.E.2d 256, approved and followed.)"

{¶ 35} In this case, the landfill was not readily observable nor discoverable upon reasonable inspection. Further, there was a question of material fact as to whether appellant committed a fraudulent act when he made the statements concerning dumping by a farmer and/or the burying of "stuff." Evidence was presented that appellant knew the land had been part of the Lima Township Landfill, that the Ohio EPA [hereinafter OEPA] had attempted to investigate and discussed their concerns about the landfill with appellant and appellant prohibited testing of and around the landfill. Therefore, we find summary judgment was not appropriate on this issue.

[5]{¶ 36} Lastly, appellant claims that summary judgment was appropriate under the parole evidence rule. Appellant asserts that the law of Ohio is clear that when a written instrument is clear as to the specific language, that instrument cannot be contradicted by an alleged prior representation, citing *Blosser v. Enderline* (1925), 113 Ohio St. 121, 134, 148 N.E. 393. Thus, appellant contends that the parole evidence rule excludes all prior and contemporaneous representations and negotiations that either contradict or add to the terms of the formal written contract in which the parties have adopted a provision that states the agreement is the exclusive memorial of their agreement.

{¶ 37} Appellant concludes that because the residential property disclosure sheet made a specific disclosure, supra [FN4], appellant is prohibited from presenting evidence that appellant made a different statement concerning the use of the property.[FN5]Further, appellant claims that the language in the purchase agreement executed by the parties which states that "this contract constitutes

the entire agreement and there are no representations, oral or written, which have not been incorporated herein" prevents appellees from even claiming that appellant made any false representations or concealments to them.

FN4."L) Other Known Material Defects: The following are other known material defects currently in or on the property: An area close to the spot marked with an X with a box around it was at one time (perhaps over 40 years ago) used to bury stuff. This has been covered over and grassed for many years. There are no known problems with this area. It is in the low dipped area."

FN5. Namely, that appellant claimed that dumping was done by a farmer or that the areas was limited to 30 feet in diameter.

*6 {¶ 38} The parole evidence rule is designed to protect the integrity of final, written agreements. *Charles A. Burton, Inc. v.. Durkee* (1952), 158 Ohio St. 313, 109 N.E.2d 265. In general, the parole evidence rule states that "absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements." *Galmish v. Cicchini,* 90 Ohio St.3d 22, 27, *2000-Ohio-7,* 734 N.E.2d 782(quoting 11 Williston on Contracts (4 Ed.1999) 569-570, Section 33:4). The parole evidence rule excludes extrinsic evidence "because it cannot serve to prove what the agreement was, this being determined as a matter of law to be the writing itself."*Id.*"If contracting parties integrate their negotiations and promises into an unambiguous, final, written agreement, then evidence of prior or contemporaneous negotiations, understandings, promises, representations, or the like pertaining to the terms of the final agreement are generally excluded from consideration by the court." *Bollinger v. Mayerson* (1996),

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2004 WL 953700 (Ohio App. 5 Dist.), 2004 -Ohio- 2254
(Cite as: 2004 WL 953700 (Ohio App. 5 Dist.))

Page 9

116 Ohio App.3d 702, 712, 689 N.E.2d 62 (citing *Durkee,* 158 Ohio St. 313, 109 N.E.2d 265, at paragraph two of the syllabus).

{¶ 39} However, even if we assume arguendo that the parole evidence rule is applicable as appellant argues, the parole evidence rule cannot prevent a party from introducing extrinsic evidence for the purpose of proving fraudulent inducement. See *Galmish v. Cicchini,* supra.It "was never intended that the parole evidence rule could be used as a shield to prevent the proof of fraud, or that a person could arrange to have an agreement which was obtained by him through fraud exercised upon the other contracting party reduced to writing and formally executed, and thereby deprive the courts of the power to prevent him from reaping the benefits of his deception or chicanery."*Galmish v. Cicchini,* supra.(citing 37 American Jurisprudence 2d [1968] 621-622, Fraud and Deceit, Section 451). We find this logic applicable to issues of fraudulent inducement and negligent misrepresentation. This court finds that there was a genuine issue of material fact as to whether appellant committed fraudulent inducement or negligent misrepresentation. As such, appellant was not entitled to a grant of summary judgment.

{¶ 40} Appellant's second assignment of error is overruled.

### III

{¶ 41} In the third assignment of error, appellant claims that the trial court erred by not directing a verdict for appellant at the end of appellees' case and at the end of all of the evidence because appellees' claims were barred by R.C. 2305.09, lack of justifiable reliance and the doctrine of caveat emptor. We disagree.

[6]{¶ 42} Appellant again argues that the statute of limitations began to run when appellees were given notice of the prior dumping and conducted their own investigation.[FN6]Appellant also argues that the evidence showed that the purchase agreement included the following "as is" clause: "14. Miscellaneous: Buyer has examined all property involved and, in making this offer, is relying solely upon such examination with reference to the condition, character and size of land and improvements and fixtures, if any. This contract constitutes the entire agreement and there are no representations, oral or written, which have not been incorporated herein."Lastly, appellant asserts that the evidence showed that appellees did not rely upon appellant's alleged false assertions and thus, one of the elements of fraudulent inducement and negligent concealment was not met.[FN7]

> FN6. Evidence showed that appellees had appellant's realtor, Juanita Furuta, contact the Licking County Health Department to inquire whether the land was suitable for building. Appellees also had the Ohio State University Extension Service walk the land to see if it was suitable for horses. In each case, no information concerning the land's prior use as a landfill was discovered.

> FN7. The tort of fraudulent inducement has the following elements: (1) an actual or implied false representation concerning a fact or, where there is a duty to disclose, concealment of a fact, material to the transaction, (2) knowledge of the falsity of the representation or such recklessness or utter disregard for its truthfulness that knowledge may be inferred, (3) intent to induce reliance on the representation, (4) justifiable reliance, and (5) injury proximately caused by the reliance. *Yo-Can, Inc. v. The Yogurt Exchange, Inc.,* 149 Ohio App.3d 513, *2002-Ohio-5194,* 778 N.E.2d 80. The elements of negligent misrepresentation are as follows: "One who, in the course of his business, profession or employment, or in any other transaction in

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2004 WL 953700 (Ohio App. 5 Dist.), 2004 -Ohio- 2254
(Cite as: 2004 WL 953700 (Ohio App. 5 Dist.))

which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Delman v. Cleveland Hts.* (1989), 41 Ohio St.3d 1, 4, 534 N.E.2d 835.

*7 {¶ 43} Under Civ.R. 50(A) and (B), the standard of review of a ruling on a motion for a directed verdict is as follows: "The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions." *Posin v. A.B.C. Motor Court Hotel, Inc.* (1976), 45 Ohio St.2d 271, 344 N.E.2d 334, This "reasonable minds" test calls upon a court to determine only whether there exists any evidence of substantial probative value in support of the claims of the non-moving party. *Wagner v. Roche Laboratories* (1996), 77 Ohio St.3d 116, 119-120, 671 N.E.2d 252. Our review of the trial court's disposition of these motions is de novo.

{¶ 44} First, we find that at the conclusion of appellees' case and all of the evidence, especially when construed in favor of the non-moving party (appellees) reasonable minds could conclude that the "notice" given by appellant to appellees was insufficient to trigger the statute of limitations. Second, as stated previously, the so called "as is" clause relied upon by appellant is not an "as is" clause. Third, we find that reasonable minds could disagree as to whether appellees relied upon appellant's false assertions or failure to disclose. There-

fore, we find that the trial court did not err in denying appellant's motion.

IV

{¶ 45} In the fourth assignment of error, appellant asserts that the trial court erred in not directing a verdict against appellee at the end of appellees' case and at the end of the evidence because appellees failed to prove damages as a matter of law. Appellant concludes that the jury had to speculate as to damages. We disagree.

{¶ 46} As stated in assignment of error three, the standard of review on a motion for a directed verdict is as follows: "The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions." *Posin,* supra.This "reasonable minds" test calls upon a court to determine only whether there exists any evidence of substantial probative value in support of the claims of the non-moving party. *Wagner v. Roche Laboratories,* supra.Our review of the trial court's disposition of such a motion is de novo.

*8 {¶ 47} A party injured by fraud or negligent misrepresentation is entitled to recover "the damages sustained by reason of the fraud or deceit, and which have naturally and proximately resulted therefrom." *Foust v. Valleybrook Realty Co.* (Wood Cty.1981), 4 Ohio App.3d 164, 166, 446 N.E.2d 1122. To prove damages, the owner of the real property is fully competent to testify about the market value of his or her real property. *Smith v. Padgett* (1987), 32 Ohio St.3d 344, 348, 513 N.E.2d

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2004 WL 953700 (Ohio App. 5 Dist.), 2004 -Ohio- 2254
(Cite as: 2004 WL 953700 (Ohio App. 5 Dist.))

737. ("Ohio law has long recognized that an owner of either real or personal property is, by virtue of such ownership, competent to testify as to the market value of the property.")

[7]{¶ 48} Appellee Marc Clemente testified that if he had known of the landfill, he would not have purchased the property. After learning of the landfill and the attendant concerns, Marc Clemente felt that the value of the land was nothing to him. Further, Clemente testified that because the house, barn and water well are within 300 feet of the actual landfill site when any such structures are required to be at least 1000 feet away by EPA regulations, no one is ever going to buy the property. As to actual expenses incurred by Marc Clemente, he testified as follows: the land and buildings on the property cost $540,000; the fencing around the property cost $20,000 to $25,000; testing of the water cost $1,300. Last, Clemente testified that it would cost a minimum of $500,000 to possibly $1.5 million to remove the landfill.

{¶ 49} Upon review, while we may not find the testimony at trial ideal, we find that it was sufficient to survive a motion for directed verdict.

{¶ 50} Appellant's fourth assignment of error is overruled.

V

{¶ 51} In the fifth assignment of error, appellant argues that the trial court erred when it refused to submit to the jury interrogatories which were requested by appellant. Appellant sought to submit interrogatories that would require the jury to describe the conduct by which appellant committed fraudulent inducement and negligent misrepresentation in regards to both appellees and the Kluths. Appellant asserts that: the verdict was not properly tested by the interrogatories submitted to the jury.

{¶ 52}Civil Rule 49(B) concerns interrogatories

and state as follows:

[8]{¶ 53}"The court shall submit written interrogatories to the jury, together with appropriate forms for a general verdict, upon request of any party prior to the commencement of argument. Counsel shall submit the proposed interrogatories to the court and to opposing counsel at such time. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the interrogatories shall be submitted to the jury in the form that the court approves. The interrogatories may be directed to one or more determinative issues whether issues of fact or mixed issues of fact and law."

{¶ 54} Under Rule 49(B), a trial court "retains limited discretion to reject submission of the interrogatories where the request is untimely or the proposed interrogatories are ambiguous, confusing, redundant, or otherwise legally objectionable. Proper jury interrogatories must address determinative issues and must be based upon the evidence presented." *Ramage v. Cent. Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 592 N.E.2d 828, paragraph 3 of the syllabus. The trial court retains full discretion to determine the substance and form of the questions. *Id.* at 107, 592 N.E.2d 828.

*9 {¶ 55} The record contains the following request for an interrogatory: "Yes, I simply ask that for each of the find-if there-in the interrogatories, when there was a question on each of the claims for there to be a question to each of the-to the jury to describe what acts constituted that particular act, such as the fraudulent act and misrepresentation."Transcript of Proceedings, November 6, 2002, pg. 275.

{¶ 56} We find that the trial court did not commit reversible error when it failed to give the requested interrogatories. To support reversal of a judgment, any error in refusing to give an interrogatory must be prejudicial. See *Smith v. Flesher* (1967), 12 Ohio

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2004 WL 953700 (Ohio App. 5 Dist.), 2004 -Ohio- 2254
(Cite as: 2004 WL 953700 (Ohio App. 5 Dist.))

St.2d 107, 233 N.E.2d 137.

{¶ 57} In this case, the trial court issued 22 interrogatories to the jury. These interrogatories asked separate questions as to whether appellant committed fraud or negligent misrepresentation in regards to the Clementes and the Kluths. Further, the interrogatories included separate, specific questions concerning damages incurred by the Clementes and the Kluths.

{¶ 58} We also note that the record presents these requested interrogatories in terms which are confusing and somewhat unfinished. In this case, we find that the trial court did not commit reversible error in failing to submit the requested interrogatories.

{¶ 59} Appellant's fifth assignment of error is overruled.

Cross-Appeal

[9]{¶ 60} In their cross-appeal, cross appellants, Marc and Ginny Clemente, argue that the trial court erred in directing a verdict in favor of cross-appellee Anita Gardner. We disagree.

{¶ 61} As has been stated previously, the standard of review of a ruling on a motion for a directed verdict is as follows: "The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions."*Posin,* supra.This "reasonable minds" test calls upon a court to determine only whether there exists any evidence of substantial probative value in support of the claims of the non-moving party. *Wagner v. Roche Labor-*

*atories,* supra.Our review of the trial court's disposition of such a motion is de novo.

{¶ 62} Specifically, cross appellants argue that cross appellee, Anita Gardner (appellant's wife) admitted in her testimony that she authorized appellant to negotiate and make representations for her in regard to the sale of the property to the Clementes. Thus, accordingly to cross appellants, Anita Gardner shared joint and several liability for appellant's conduct. In essence, cross appellants argue that Anita Gardner was the principal and appellant was the agent of Anita.

*10 {¶ 63} No presumption of agency between a husband and wife arises based merely upon their marital relationship. *McSweeney v. Jackson* (1996), 117 Ohio App.3d 623, 630, 691 N.E.2d 303; *Sowers v. Birkhead* (1958), 108 Ohio App. 507, 512, 157 N.E.2d 459. Although marriage in itself does not create an agency relationship between a husband and wife, an agency can exist within the context of a marriage. See, e.g., *Ameritech Publishing, Inc. v. Jenkins* (Aug. 25, 1993), Montgomery App. No. 13698.

{¶ 64} We find appellant was not Anita Gardner's agent. "Under Ohio law an agency relationship is a consensual relationship (between two persons) where the agent has the power to bind the principal, and the principal has the right to control the agent. The existence of an agency relationship depends primarily upon the right of the principal to control the agent." *Tiefenthalter v. Tiefenthaler,* Fairfield App. No. 02 CA 29, *2002-Ohio-6438* (citing *Amson v. Gen. Motors Corp.*[N.D.Ohio, 1974], 377 F.Supp. 209).

{¶ 65} In the case sub judice, Anita Gardner testified that she allowed appellant to make decisions concerning the property in question "because he was more knowledgeable about these kinds of things" and because "that's generally what you do as husband and wife...." Anita Gardner basically

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2004 WL 953700 (Ohio App. 5 Dist.), 2004 -Ohio- 2254
**(Cite as: 2004 WL 953700 (Ohio App. 5 Dist.))**

testified that "I just agreed that he would take care of those matters."

{¶ 66} Upon review, we find the trial court did not err in granting a directed verdict in favor of Anita Gardner. Her testimony revealed that she permitted her husband to deal with the sale of the property in the context of their relationship as husband and wife. There is no indication that Anita Gardner had any ability to control appellant as her agent.

{¶ 67} Cross appellants' sole assignment of error is overruled.

{¶ 68} The judgment of the Licking County Court of Common Pleas is affirmed.

Judgment affirmed.

HOFFMAN, P.J., and BOGGINS, J., concur.
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Licking County Court of Common Pleas is affirmed. Costs assessed to appellant William Gardner.

Ohio App. 5 Dist.,2004.
Clemente v. Gardner
Not Reported in N.E.2d, 2004 WL 953700 (Ohio App. 5 Dist.), 2004 -Ohio- 2254

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 641557 (S.D.Ohio)
(Cite as: 2008 WL 641557 (S.D.Ohio))

Page 1

C

Only the Westlaw citation is currently available.

United States District Court,
S.D. Ohio,
Western Division.
H. Keith COMBS, Individually and on behalf of all
others similarly situated, Plaintiffs,
v.
CROWN LIFE INSURANCE, et al., Defendants.
No. 1:07-CV-00151.

March 4, 2008.

Gregory Kent Pratt, The Pratt Law Practice LLC,
Middletown, OH, John Michael Levy, Nicole Marie
Lundrigan, Richard Stuart Wayne, Thomas P.
Glass, Strauss & Troy, Cincinnati, OH, for Plaintiffs.

Michael Wesley Hawkins, Michael Jay Newman,
Dinsmore & Shohl, Cincinnati, OH, Raul A.
Cuervo, Waldemar J. Pflepsen, Jr., Jorden Burt
LLP, Washington, DC, for Defendants.

**OPINION AND ORDER**

S. ARTHUR SPIEGEL, Senior District Judge.

**\*1** This matter is before the Court on Defendants'
Motion to Dismiss Amended Class Action Com-
plaint (doc. 44), Plaintiff's Memorandum in Oppos-
ition (doc. 50), and Defendants' Reply (doc. 54).
The Court held a hearing on this matter on February
28, 2008. For the reasons indicated herein, the
Court DENIES Defendants' Motion in all respects.

**I. Background**

This case involves a dispute over the life insurance
coverage of a policy Defendant Crown Life Insur-

ance Company ("Crown") [FN1] sold to Plaintiff in
1986 (doc. 44). After Defendant life insurance com-
pany issued the policy, it sent Plaintiff annual re-
ports listing coverage termination dates based on
projected future values (*Id.*). For fourteen years the
reports were accurate, but starting in 2001 Crown
allegedly sent five annual reports with inaccurate
projected coverage termination dates as it did not
take into consideration the cost of additional cover-
age attached to the policy in the form of "riders"
(*Id.*). Defendants blame the inaccurate numbers on
a computer glitch, while Plaintiff argues Defend-
ants knew about the problem and kept sending out
the wrong numbers nonetheless, thus misleading
him and inducing him to maintain Defendants' life
insurance products (docs.37, 44). In 2005, Defend-
ants informed policyholders that the coverage date
it had reported was inaccurate, and that policyhold-
ers would have to pay additional premiums to main-
tain coverage through such date (doc. 37). Plaintiff
brings claims on behalf of himself and other simil-
arly-situated policyholders for 1) breach of con-
tract, 2) fraud, 3) negligent misrepresentation, 4)
breach of fiduciary duties, and 5) declaratory and
injunctive relief (*Id.*). Defendants bring their Mo-
tion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6)
and 9(b), arguing that Plaintiff has failed to state a
claim upon which relief can be granted as to all of
his claims, and has failed to plead his claim for
fraud with particularity (doc. 44). Defendants fur-
ther argue that Plaintiff's claims for fraud, negligent
misrepresentation, and breach of fiduciary duty are
barred by the economic loss doctrine (*Id.*).

> FN1. Defendants Canada Life Assurance
> Company and Canada Life Insurance Com-
> pany of America purchased Crown in
> 1999, thus succeeding to Crown's contracts
> and liabilities. The Court will refer to De-
> fendants collectively as "Crown." The
> Court will also refer to "Plaintiff" in the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 641557 (S.D.Ohio)
(Cite as: 2008 WL 641557 (S.D.Ohio))

Page 2

singular, because as of yet, no class has been certified in this matter.

## II. Defendants' Motion to Dismiss

### A. The Applicable Standards

A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) requires the Court to determine whether a cognizable claim has been pleaded in the complaint. The basic federal pleading requirement is contained in Fed.R.Civ.P. 8(a), which requires that a pleading "contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." *Westlake v. Lucas,* 537 F.2d 857, 858 (6th Cir.1976). In its scrutiny of the complaint, the Court must construe all well-pleaded facts liberally in favor of the party opposing the motion. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).Rule 8(a)(2) operates to provide the defendant with "fair notice of what plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). A court examines a complaint in light of the objectives of Rule 8 using the standard articulated in *Jones v. Sherrill,* 827 F.2d 1102, 1103 (6th Cir.1987):

**\*2** In reviewing a dismissal under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint. *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir.1983), *cert. denied,* 469 U.S. 826, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984). The motion to dismiss must be denied unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle her to relief. *Id.* at 158; *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

*Jones,* 824 F.2d at 1103.

The admonishment to construe the plaintiff's claim liberally when evaluating a motion to dismiss does not relieve a plaintiff of his obligation to satisfy federal notice pleading requirements and allege more than bare assertions of legal conclusions. Wright, Miller & Cooper, Federal Practice and Procedure: § 1357 at 596 (1969)."In practice, a complaint ... must contain either direct or inferential allegations respecting all of the material elements [in order] to sustain a recovery under some viable legal theory." *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir.1984), *quoting In Re: Plywood Antitrust Litigation,* 655 F.2d 627, 641 (5th Cir.1981); Wright, Miller & Cooper, Federal Practice and Procedure, § 1216 at 121-23 (1969). The United States Court of Appeals for the Sixth Circuit clarified the threshold set for a Rule 12(b)(6) dismissal:

[W]e are not holding the pleader to an impossibly high standard; we recognize the policies behind Rule 8 and the concept of notice pleading. A plaintiff will not be thrown out of court for failing to plead facts in support of every arcane element of his claim. But when a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist.

*Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 437 (6th Cir.1988).

A motion to dismiss for failure to plead fraud with particularity is governed by Fed.R.Civ.P. 9(b), which requires that averments of fraud must be stated with particularity. The Sixth Circuit reads this rule liberally, however, requiring a plaintiff, at a minimum, to "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey v. Foamex L.P.,* 2 F.3d 157, 161-62 (6th Cir.1993) (*quoting Ballan v. Upjohn Co.,* 814 F.Supp. 1375, 1385 (W.D.Mich.1992)). However, "allegations of fraudulent misrepresentation must be made with sufficient particularlity and with suf-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 641557 (S.D.Ohio)
(Cite as: 2008 WL 641557 (S.D.Ohio))

ficient factual basis to support an inference that they were knowingly made."*Id.* The threshold test is whether the Complaint places the defendant on "sufficient notice of the misrepresentation," allowing the defendants to "answer, addressing in an informed way plaintiff's claim of fraud." *Brewer v. Monsanto Corp.*, 644 F.Supp. 1267, 1273 (M.D.Tenn.1986).

## B. Plaintiff's Contract Claims

### 1. Defendants' Motion

*3 Defendants argued at the hearing and in their motion that Plaintiff has failed to allege the existence of a binding contract to provide coverage termination dates contained in the inaccurate reports because 1) according to terms of the policy, the inaccurate reports cannot be considered part of the insurance contract that states on its face that the policy and attached application papers constitutes the entire contract, 2) the inaccurate reports are not incorporated by reference into the insurance contract, which merely requires the company to send an annual report, but which does not make the contents of such reports part of the contract, 3) the inaccurate reports cannot otherwise be used to supplement or alter the contract of insurance (doc. 44). Second, Defendants argue that Plaintiff has failed to allege the terms of a contract to provide coverage through a guaranteed date, and such failure to allege such terms with specificity is fatal to the contract claims (*Id.*). Defendants argue third that Plaintiff's claim for breach of the Annual Report Provision of the policy is nothing more than a reiteration of his claims for misrepresentation (*Id.*).

### 2. Plaintiff's Response

Plaintiff argues in Response that his Complaint need only provide Defendants with fair notice of his claim, and as such, should not be dismissed under Rule 12(b)(6) (doc. 50). Plaintiff argues he

states a claim for breach of contract because Crown failed to provide the coverage it promised and failed to provide accurate annual reports (*Id.*). Plaintiff argues even if the annual reports are not considered part of the contract, Defendants failed to provide true and accurate annual reports, which in Plaintiff's view is a breach of the duty to provide annual reports (*Id.*). Plaintiff further argues that the question of which documents constitute the contract cannot be resolved in a motion to dismiss, as this is a question of fact to be resolved by a jury (*Id.*).

Plaintiff next argues that the insurance policy is ambiguous, and the ambiguity cannot be resolved in a motion to dismiss (*Id.*). Plaintiff argues the ambiguity is that policy requires an examination of annual reports and refers to "guaranteed policy values" (*Id.*). In Plaintiff's view, the annual report is the only document where Defendants provide "guaranteed policy values" referred to in the policy (*Id.*). As such, the contract is missing an essential term-the duration of the obligation, and Plaintiff argues parol evidence is admissible so the Court can construe the ambiguity or missing term (*Id.*). Plaintiff argues the Court should follow its holding in *Gallenstein Bros. Inc. v. General Accident Insurance Company*, 178 F.Supp.2d 907 (S.D.Ohio, 2001) in which the Court looked outside the four corners of the policy to determine coverage, and do the same here in interpreting the contract (*Id.*).

### 3. Defendants' Reply

Defendants argued at the hearing and in their Reply that Plaintiff has continued to receive the benefits of the policy through the present day, and that Defendants worked to correct the computer error and notified Plaintiff of it (doc. 54). Defendants argue that Plaintiff therefore suffered no injury, and that Defendants acted in good faith (*Id.*). Defendants argue the policy contains an unambiguous termination provision stating that the policy will terminate 1) upon the insured's written request, 2) at the end

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 641557 (S.D.Ohio)
(Cite as: 2008 WL 641557 (S.D.Ohio))

of the grace period, 3) on the death of the insured, or 4) on the maturity date (*Id.*). The "grace period" provision states that coverage under the Policy will terminate without value, following a grace period, if the policy's net cash value will not cover the monthly deduction for the following month (*Id.*). Defendants argue there is no ambiguity to such provision (*Id.*).

**\*4** Defendants next argue that *Gallenstein* is inapplicable, because in that case the Court relied on parole evidence created during the creation of the policy, as opposed to the annual reports in this case, sent years after the parties signed the contract (*Id.*). Defendants also argue that Plaintiff's alleged failure to specify the dates relating to the guarantees begs the question as to whether his claim is ripe for judicial review (*Id.*).

**4. Plaintiff's Complaint in Contract Survives**

Having reviewed this matter, the Court finds Plaintiff has sufficiently pleaded a claim for breach of contract. Defendants admit that Crown provided Plaintiff with inaccurate reports for some five years, and the reports are clearly a material term required by the contract. In the Court's view, the contract required Crown to provide accurate annual reports, and Crown did not. The Court further finds it premature to rule on whether the annual reports constitute a part of the contract, as the contract terms requiring an examination of annual reports and referring to "guaranteed policy values" can be viewed in conflict with other terms relating to termination of the contract. As such, the Court finds adequate ambiguity such that the factual question of whether the annual reports are part of the contract is appropriate for a jury. *Dick Sherman Disposal Co., Inc. v. Village Square Apartments,* No. CA-3195, 1986 Ohio App. LEXIS 8937, \*1, \*6 (Ct.App.Ohio, October 30, 1986). For these reasons, Plaintiff's contract claims survive Defendants' motion to dismiss.

**C. Plaintiff's Fraud and Negligent Representation Claims**

**1. Defendants' Motion**

As for Plaintiff's fraud and negligent representation claims, Defendants argue Plaintiff fails to plead the essential elements (doc. 44)). Under Ohio law, the essential elements for a fraud claim are 1) a false representation concerning a fact material to the transaction, 2) knowledge of the falsity, or such utter disregard as to warrant an inference of knowledge, 3) intent to induce reliance, 4) justifiable reliance, and 5) injury proximately caused by the reliance (*Id.* citing *Russ v. TRW, Inc.,* 59 Ohio St.3d 42, 570 N.E.2d 1076, 1083 (Ohio 1991)). Defendants argue the essential elements for negligent misrepresentation are sufficiently similar under the Restatement to warrant discussing them alongside the elements of fraud (*Id.*). Specifically, Defendants argue Plaintiff cannot allege the requisite "justifiable reliance" on the inaccurate reports so as to state a claim for either fraud or negligent misrepresentation (*Id.*). Defendants contend that because Plaintiff received accurate termination dates in the annual reports from 1997 when he initiated a material change in the amount of the planned premium, until March 31, 2001, the date on which the first of the inaccurate reports was issued, Plaintiff had more than sufficient reason to doubt and question the accuracy of the substantially different projected coverage termination dates contained in the inaccurate reports (*Id.*).

**\*5** Defendants further argue that Plaintiff fails to plead fraud with particularity under Fed.R.Civ.P. 9(b), because Plaintiff failed to allege justifiable reliance, and fails to allege with particularity the content of the representations, that is, what the dates through which coverage was guaranteed (*Id.*).

**2. Plaintiff's Response**

Plaintiff argues he properly alleges justifiable reli-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case: 1:08-cv-02755-DCN  Doc #: 40-7  Filed: 07/30/09  36 of 119.  PageID #: 630

Page 5
Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 641557 (S.D.Ohio)
(Cite as: 2008 WL 641557 (S.D.Ohio))

ance and therefore has pled the essential elements of fraud and negligent misrepresentation (doc. 50). Plaintiff argues Defendants' position is that Plaintiff should have doubted the accuracy of Defendants' own statements, and that in any event, whether a party's reliance is justifiable is a question of fact for the jury (*Id.*).

Plaintiff further argues the Complaint satisfies the particularity requirements of Rule 9(b) as it alleges the time and place of the misrepresentation (in the annual report), the content of the misrepresentation (the guaranteed coverage that would be provided and also the accounting for the riders), that Defendants knew of the falsity of their representations, and that Plaintiff suffered an injury (*Id.*). Plaintiff argues he does not need to aver a specific date through which coverage was falsely guaranteed, as he alleged specifically that the annual reports omitted or falsely represented that Defendants were deducting the cost of the riders from the accumulation value of Plaintiff's policy (*Id.*). Moreover, he argues that the exact time period of coverage varies for each member of the class, but that he did allege that Defendants shortened the coverage it had previously guaranteed by several months or even years (*Id.*).

### 3. Defendants' Reply

In their Reply Defendants reiterate their position that Plaintiff was unjustified to rely on the inaccurate reports based on the fact that he had received accurate reports and should have doubted and questioned the inconsistent fifteenth report (doc. 54). Defendants also reiterate in their view that Plaintiff has failed to plead fraud with particularity as he had not specified the precise date through which Crown had indicated Plaintiff had insurance coverage in the inaccurate report (*Id.*).

### 4. Plaintiff's Fraud and Misrepresentation Claims Survive

Having reviewed the question of the viability of Plaintiff's fraud and misrepresentation claims, the Court concludes he has adequately pleaded such claims. The Amended Complaint alleges that as early as June 2003 Crown knew that the figures it provided in the "Continuation of Insurance" section contained in its annual reports was incorrect, but that it failed to disclose such information for almost two years (doc. 37). Such allegation is sufficient, in the Court's view, to show Defendants made a false representation of a material fact so as to induce the Plaintiff and other similarly-situated policy holders to maintain their coverage with Crown. Plaintiff alleges he relied on the representations in the annual reports as the only source of information as to when the policy would expire (doc. 37). The Court finds that an insured should be able to justifiably rely on reports an insurance company provides as to the duration of his policy with the company. As a result of his reliance in this instance, the Complaint alleges, Plaintiff must spend over $5,000 above the planned premiums to maintain the coverage through the dates originally reported by Defendants (*Id.*). Under these circumstances, the Court finds no basis to dismiss Plaintiff's fraud and misrepresentation claims for failure to state a claim.

**\*6** The Court further finds well-taken Plaintiff's position that he stated his claim with adequate particularity to withstand Defendants' Rule 9(b) challenge. Plaintiff clearly pleaded that Crown made a false representation at the time it issued the annual reports, over a five year period, and has pleaded the nature of the representation, that Crown knew of the falsity of the representation, and that he suffered economic loss.

### D. Plaintiff's Claim for Breach of Fiduciary Duty

### 1. Defendants' Motion

As for Plaintiff's claim for breach of fiduciary duty,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Defendants argue the following essential elements must be plead, 1) the existence of a duty arising from a fiduciary relationship, 2) a failure to observe the duty, and 3) an injury resulting proximately therefrom. Defendants argue that under Ohio law, an insurance company does not have a fiduciary relationship with its customers (doc. 44).*citing Wodrich v. Farmers Ins. Of Columbus, Inc.,* No. 98 CA 103, 1999 WL 317448, at *26 (Ohio Ct.App. May 21, 1999)). Even if it can be alleged that such a relationship exists, Defendants argue Plaintiff has failed to allege the existence of a contract that obligated it to provide Plaintiff with guaranteed coverage until one of the unspecified projected coverage termination dates contained in the inaccurate reports (*Id.*). Moreover, argue Defendants, because its issuance of inaccurate reports was neither intentional nor related to the handling or payment of claims, Crown's actions cannot constitute a breach of fiduciary duty (*Id.*).

**2. Plaintiff's Response**

Plaintiff argues that *Wodrich* is inapplicable to the facts of this case and to the question of fiduciary duty, as it held that an insurance company does not have a duty to advance the political interests of its customers (doc. 50). Plaintiff argues that it is well-settled that an insurance company has a fiduciary duty toward an insured in carrying out its duties under the contract. (*Id. citing Red Head Brass, Inc. v. Buckeye Union Ins. Co.,* 135 Ohio App.3d 616, 632, 735 N.E.2d 48 (Ct.App.Ohio, 1999). Plaintiff argues he has adequately alleged Defendants breached their fiduciary duties by failing to perform in accordance with their contractual obligations and representation, and by engaging in dishonest and deceitful conduct with respect to its inclusion of rider premiums in the premium calculation and guarantees of coverage (*Id.*). Plaintiff argues Defendants' own documents show they knew of the calculation problem for at least two years and did nothing to fix it (*Id.*).

**3. Defendants' Reply**

Defendants argue that the authorities supporting the theory of a fiduciary duty between the insurer and insured go to the duty to act in good faith to accept reasonable settlements and in handling claims (doc. 54). Defendants argue there are no other extra-contractual duties, and as this case does not involve the settlement of a claim, fiduciary theory is inapplicable (*Id.*).

**4. Plaintiff's Claim for Breach of Fiduciary Duty Survives**

*7 The existence of a de facto fiduciary relationship is a question of fact and depends on the circumstances of the case. *Prudential Ins. Co. v. Eslick,* 586 F.Supp. 763, 766 (S.D.Ohio, 1984). The Court finds it premature to rule on the existence of such a relationship in this case, absent further development of the evidence of the dealings between the parties. Inasmuch as Crown possessed knowledge for two years that it withheld from Plaintiff, it is not difficult to conclude it stood in an unequal position in relation to its policy holder. Plaintiff's allegations based on fiduciary theory are broad enough, therefore, to survive Defendants' preliminary challenge.

**E. Defendants' Invocation of the Economic Loss Doctrine**

Defendants further attack Plaintiff's claims for fraud, negligent misrepresentation, and breach of fiduciary duty under the theory that such claims are barred by the economic loss doctrine (doc. 44). Under such doctrine, a party cannot recover in tort for purely economic damages (*Id.*). Defendants argue that because Plaintiff has not alleged any non-economic harm, the claims should be dismissed as duplicative of Plaintiff's breach of contract claim (*Id.*). Finally, Defendants argue that Plaintiff's claims for declaratory and injunctive relief should be dismissed as they are remedies and not causes of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 641557 (S.D.Ohio)
**(Cite as: 2008 WL 641557 (S.D.Ohio))**

action (*Id.*).

Plaintiff contends that Defendants misapprehended the application of the economic loss doctrine because such doctrine applies to commercial settings, and not to a setting where consumers are presented with an adhesion boilerplate form contract (doc. 50). Plaintiff argues the doctrine normally bars negligence claims, but is inapplicable to negligent misrepresentation and fraud claims (*Id. citing Corporex Dev. & Constr. Mgmt v. Shook, Inc.,* 106 Ohio St.3d 412, 825 N.E.2d 701 (2005)(recognizing exception to the economic loss rule for negligent representation), and *Onyx Environmental Services, LLC v. Maison,* 407 F.Supp.2d 874, 879 (N.D.Ohio 2005)). Moreover, argues Plaintiff, the doctrine cannot bar his fiduciary duty claim, because such duty arises from the relationship between the parties and the common law, not from a contractual duty. In Reply, Defendants argue the economic loss doctrine does apply here because the exceptions Plaintiff cites only apply to those not in contractual privity with the party against whom the claim is brought (doc. 54).

The Court finds Defendants' contention mistaken that Plaintiffs have only requested relief that is duplicative of damages in contract. The Amended Complaint seeks "Judgment against Defendants for punitive damages" (doc. 37). The fact that Plaintiff has pleaded punitive damages, in the Court's view, precludes Defendants' invocation of the economic loss doctrine.

**F. Final Matters.**

As a final matter, Defendants argue Plaintiff has failed to state a claim for declaratory and injunctive relief, because these claims are remedies and not causes of action (doc. 44, *citing Weiner v. Klais & Co., Inc.,* 108 F.3d 86, 92 (6th Cir.1997). Plaintiff argues in response that Defendants' form over substance argument should be rejected, and that noth-

ing precludes the application of such remedies to the other causes of action he has pled (doc. 50). In the alternative, Plaintiff argues the Complaint states claims for declaratory and injunctive relief, because such actions are permitted with respect to the construction and interpretation of contracts (*Id. citing* Ohio Rev.Code § 2721.04).

**\*8** The Court finds Plaintiff's position well-taken that should he prevail on any of his causes of action, he may very well be entitled to declaratory and/or injunctive relief. Therefore, though the Court "notes the technical accuracy of the distinction identified" by the Defendants, the dismissal of such claims would "elevate form over substance." *Ripple Junction Design Co. v. Olaes Enterprises, Inc.,* No. 05-CV-0043, 2005 U.S. Dist. LEXIS 32866 \*1, \*14, 2005 WL 2206220 (S.D.Ohio, September 8, 2005)(J. Beckwith).

As a final matter, the Court also notes that Defendants argue that Plaintiff has misstated the standard for dismissal under Rule 12(b)(6), in relying heavily on the "no set of facts" language employed in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (doc. 54). Defendants invoke the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly,* ---U.S. ----, ----, 127 S.Ct. 1955, 1969, 167 L.Ed.2d 929 (2007), in which it stated the phrase "no set of facts," is "best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."Defendants argue Plaintiff's Complaint fails to rise above the speculative level, and thus runs afoul of *Bell Atlantic v. Twombly*(*Id.*).

The Court is unconvinced that even if such a heightened standard is applicable to the facts of this case, Plaintiff's Complaint fails to rise above the level of speculation. Moreover, the Court notes that after the Supreme Court issued the *Bell Atlantic* decision, it reaffirmed that Rule 8(a)"requires only a

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

short and plain statement of the claim showing that the pleader is entitled to relief."*Erikson v. Pardus,* 127 S.Ct. at 2200 (2007). Plaintiff has met such requirement.

**III. Conclusion**

For the reasons indicated herein, the Court concludes that Plaintiff's claims survive Defendants' various challenges as presented in their Motion to Dismiss. Accordingly, the Court DENIES Defendants' Motion to Dismiss Amended Class Action Complaint (doc. 44).

SO ORDERED.

S.D.Ohio,2008.
Combs v. Crown Life Ins.
Not Reported in F.Supp.2d, 2008 WL 641557 (S.D.Ohio)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1467070 (N.D.Ohio)
(Cite as: 2007 WL 1467070 (N.D.Ohio))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. Ohio,
Eastern Division.
Norman DETRICK, et al., Plaintiffs,
v.
84 LUMBER COMPANY, Defendant.
No. 5:06CV2732.

May 10, 2007.

Darlene E. White, Larry C. Greathouse, Gallagher
Sharp, Dennis R. Fogarty, Richard M. Garner, Dav-
is & Young, Cleveland, OH, for Plaintiffs.

Audra J. Zarlenga, Frank R. Desantis, Thompson
Hine, Cleveland, OH, for Defendant.

**OPINION AND ORDER**

SARA LIOI, United States District Judge.

*1 Defendant 84 Lumber Company filed its Motion
to Dismiss Counts Three, Five and Six (Doc. 7) on
December 11, 2006. Plaintiffs Norman and Judy
Detrick filed a Brief in Opposition (Doc. 20), and
84 Lumber filed a reply brief (attached to its Mo-
tion to Strike, upon which this Court has ruled sep-
arately) (Doc. 31). The Motion to Dismiss is
**DENIED.**

**Standard of Decision**

In considering a motion to dismiss under Rule
12(b)(6) of the Federal Rules of Civil Procedure, "a
complaint should not be dismissed for failure to
state a claim unless it appears beyond doubt that the
plaintiff can prove no set of facts in support of his
claim which would entitle him to relief." *Conley v.*

*Gibson,* 355 U.S. 41, 45-46 (citations omitted). A
plaintiff is not required to detail all facts on which
he bases his claims; rather, "all the Rules require is
'a short and plain statement of the claim' that will
give the defendant fair notice of what the plaintiff's
claim is and the grounds upon which it rests." *Id.* at
47 (citation omitted).*See also Columbia Natural
Resources, Inc., v. Tatum,* 58 F.3d 1101, 1109 (6th
Cir.1995) ("The district court must construe the
complaint in a light most favorable to the plaintiff,
accept all of the factual allegations as true, and de-
termine whether the plaintiff undoubtedly can
prove no set of facts in support of his claim that
would entitle him to relief.").

The Detricks allege breach of contract, quantum
meruit, negligent construction and defective work-
manship, fraud and misrepresentation and violation
of the Ohio Consumer Sales Practice Act, all
arising out of their negotiations in Macedonia, Ohio
with 84 Lumber and the events following the
parties' agreement concerning the construction of a
residential dwelling on property located in western
Pennsylvania. Defendant 84 Lumber has moved to
dismiss three of the Detricks' claims: Count Three
(Quantum Meruit); Count Five (Fraud and Misrep-
resentation) and Count Six (Violation of the Ohio
Consumer Sales Practices Act).

**Choice of Law**

The parties dispute which state's law-Ohio or
Pennsylvania-governs the Detricks' claims against
84 Lumber.

A federal court sitting in diversity applies the law
of the forum state; this includes the choice of law
rules of that state. *See Miller v. State Farm Mut.
Automobile Ins. Co.,* 87 F.3d 822, 824 (6th
Cir.1996) (citation omitted). This Court therefore
applies Ohio's choice of law rules in considering

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1467070 (N.D.Ohio)
(Cite as: 2007 WL 1467070 (N.D.Ohio))

Page 2

what state's law to apply to the claims at issue in 84 Lumber's motion to dismiss.

Ohio refers to the Restatement (Second) of the Law of Conflicts to resolve conflict of laws issues. *See, e.g., Gries Sports Ent., Inc., v. Modell,* 15 Ohio St.3d 284, 473 N.E.2d 807, syllabus (1984). The calculus for each claim differs depending on the nature of that claim and the Restatement's evaluation of the proper balancing to be done on each claim.

### Quantum Meruit

The Restatement identifies the contacts to be taken into account in determining the law applicable to a claim such as the Detricks' claim for quantum meruit:

*2 (a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship,

(b) the place where the benefit or enrichment was received,

(c) the place where the act conferring the benefit or enrichment was done,

(d) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(e) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 221(2) (1971).

The Detricks' relationship with 84 Lumber began in Ohio, with negotiations between the Detricks and the employees of the Macedonia, Ohio 84 Lumber store. That relationship grew through the negotiation process, also carried out in Ohio, until the Detricks paid the sum at issue in their quantum meruit claim-$108,300-to 84 Lumber in Ohio. The Detricks are domiciled in Ohio; 84 Lumber is a Pennsylvania limited partnership doing business in both Ohio and Pennsylvania. The only physical thing related to the alleged enrichment-the residential dwelling at issue-was located in western Pennsylvania, but now appears to have been destroyed.

Because Ohio has the more substantial relationship to the Detricks' quantum meruit claim, Ohio law governs that claim.

### Fraud and Misrepresentation

The Restatement likewise addresses the factors to consider in addressing the law to apply to the Detricks' fraud and misrepresentation claim:

When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

Restatement (Second) of Conflict of Laws § 148(1) (1971).

In the Fraud and Misrepresentation count of their complaint, the Detricks allege that 84 Lumber made various misrepresentations to induce the Detricks to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1467070 (N.D.Ohio)
(Cite as: 2007 WL 1467070 (N.D.Ohio))

enter into a contract between the parties, and that 84 Lumber made additional misrepresentations to induce the Detricks to continue the contractual relationship and to cause delay in the construction project. Complaint at 9-10. As discussed above, the negotiation of the agreement between the parties took place in Ohio and Ohio therefore has a greater interest in this issue than Pennsylvania. Ohio law should govern here unless "some other state has a more significant relationship ... to the occurrence and the parties." See Restatement (Second) of Conflict of Laws § 148(1) (1971). The formation of the agreement between the parties in Ohio and the effect on the continuation of the agreement is more central to the Detricks' fraud and misrepresentation claim than the construction of the now-defunct residential dwelling in Pennsylvania. Ohio law therefore applies to this claim.

### Ohio Consumer Sales Practices Act

**\*3** The Detricks framed their claim concerning 84 Lumber's alleged unconscionable acts regarding their consumer transaction specifically as a claim arising under the Ohio Consumer Sales Practices Act, Ohio Rev.Code Ann. § 1345.01 *et seq.* The acts complained of in this count relate chiefly to the negotiation of the agreement between the parties in Ohio, rather than to the performance of that agreement by 84 Lumber in Pennsylvania. Because these acts relate to the formation of an agreement or contract, Restatement § 188 applies to such issues:

In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 188(2) (1971).

As discussed above with respect to the Detricks' quantum meruit claim, the place of contracting (to the extent a contract is found) is Ohio; the contract was negotiated between the Detricks and the employees of the Macedonia, Ohio 84 Lumber store. The contract was performed in Pennsylvania; the subject matter appears to have been partly in Pennsylvania (the real property on which the residential dwelling was to be constructed) and partly in Ohio (the building materials to be incorporated into the residential dwelling). The Detricks are domiciled in Ohio; 84 Lumber is a Pennsylvania limited partnership doing business in both Ohio and Pennsylvania. As noted above, the residential dwelling was located in western Pennsylvania, but now appears to have been destroyed.

Ohio law governs the Detricks' consumer sales practices claim, both because of the relationship of the claim to the agreement negotiated in Ohio and because of Ohio's strong interest in protecting consumers from conduct undertaken in Ohio in violation of the Act.

### The Detricks' other claims

This Court does not express any opinion as to which state's law is applicable to the remaining counts in the Detricks' complaint.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2007 WL 1467070 (N.D.Ohio)
(Cite as: 2007 WL 1467070 (N.D.Ohio))

**Merits of the Motion to Dismiss**

*Count Three-Quantum Meruit*

Eighty-four Lumber argues that the Detricks' quantum meruit claim must be dismissed because it is pre-empted by the existence of an express contract; the Detricks contend that this count of their complaint is presented in the alternative to their contract-based claims and therefore should be allowed to stand at this stage of the proceedings.

There is some support for the argument that the existence of a contract precludes the argument of quasi-contractual claims, but the better-reasoned decisions follow the mandate of *Columbia Natural Resources, supra,* to construe the complaint in a light most favorable to the plaintiff, at least at this stage of the proceedings. *See, e.g., Teknol, Inc. v. Buechel,* Case No. C-3-98-416, 1999 U.S. Dist. LEXIS 22017 at *10-*11 (S.D.Ohio, Aug. 9, 1999). In *Teknol,* the defendant's counterclaim asserting contract and unjust enrichment claims was not dismissed on plaintiff's motion: first, because the allegation of the existence of a contract could not on its own support a ruling that such a contract existed; and second, because the court could not conclude that defendant's counterclaim necessarily was governed by the alleged contract so as to justify dismissal of his unjust enrichment claim.

*4 Here, a careful review of the complaint leads to the conclusion that it was the Detricks' intent to argue in the alternative: first, that there existed a contract between the parties and 84 Lumber breached it; and second, in the absence of a finding of a contract, that 84 Lumber had received money from the Detricks without the Detricks receiving a corresponding benefit, such that the Detricks were entitled to an equitable remedy pursuant to quantum meruit.Rule 8(a) of the Federal Rules of Civil Procedure specifically permits pleading in the alternative. As in *Teknol,* the parties each have alleged the existence of an agreement, but at this stage of the

proceedings, this Court is not prepared definitively to call it a contract, especially in light of 84 Lumber's equivocation relative to the validity, enforceability and completeness of the alleged contract.

*Count Five-Fraud and Misrepresentation*

Eighty-four Lumber contends that the Detricks' fraud and misrepresentation claim should be dismissed because it is duplicative of their breach of contract claim and because it is not stated with the required degree of particularity. The Detricks do not address the duplication argument, and contend that any lack of particularity in their fraud averments should be addressed through requiring a more definite statement, rather than through dismissal of their claim.

Initially, as with the Detricks' quantum meruit claim, the contention that their fraud and misrepresentation claim should be dismissed because it is in some way duplicative of their breach of contract claim must fail. Alternative pleading is permitted and provides a basis for the Detricks' decision to include both a breach of contract claim and a fraud and misrepresentation claim. Further, the fact that the Detricks will not ultimately be able to prevail on both claims does not provide a basis for dismissal at this stage of the proceedings. *See DeNune v. Consol. Capital of N. America, Inc .,* 288 F.Supp.2d 844, 854-55 (N.D.Ohio 2003).

Rule 9(b) of the Federal Rules of Civil Procedure requires a complaint alleging fraud or mistake to state with particularity the circumstances constituting fraud or mistake. This rule must be read in conjunction with Rule 8(a), however, which requires "a short and plain statement of the claim" that is sufficient to put the other parties and the court on notice of the claim. *See DeNune, supra,* 288 F.Supp.2d at 855.

A careful review of the complaint reveals that the Detricks have pled that portion of their fraud and

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case: 1:08-cv-02755-DCN  Doc #: 40-7  Filed: 07/30/09  44 of 119.  PageID #: 638

Page 5
Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1467070 (N.D.Ohio)
(Cite as: 2007 WL 1467070 (N.D.Ohio))

misrepresentation claim relating to events following the formation of the agreement with more clarity than that portion relating to the time before the formation of the agreement. That said, after balancing the competing requirements of notice pleading and particularity concerns against the deference to be shown a complaint on a motion to dismiss, the Detricks' allegations are sufficient to survive 84 Lumber's motion to dismiss.

*5 To the extent that 84 Lumber needs additional information concerning the Detricks' fraud and misrepresentation claim, 84 Lumber may file its motion for more definite statement on that claim on or before May 24, 2007, with the Detricks' opposition, if any, to be filed within ten (10) days thereafter.

### Count Six-Violation of the Consumer Sales Practices Act

Eighty-four Lumber argues that the Detricks' claim of violation of the Ohio Consumer Sales Practices Act ("OCSPA") must be dismissed because the actions complained of-characterized by 84 Lumber as the rough framing of the residential dwelling in Pennsylvania-occurred in Pennsylvania rather than Ohio, and they therefore do not form a proper basis for resolution by operation of Ohio law. The Detricks' complaint is not limited in this fashion, however; it alleges that the actions of 84 Lumber referenced in the complaint (which include actions both before and after the formation of the agreement, as well as the rough framing work) form the basis for their claim.

The crux of the Detricks' OCSPA claim is the agreement entered into between the Detricks and 84 Lumber. That agreement was negotiated and entered into at 84 Lumber's Macedonia, Ohio store. It is fruitless, in the face of these facts, for 84 Lumber to contend that framing the residential dwelling that was the subject of that agreement in Pennsylvania deprives the Ohio statute of its reach.

The OCSPA applies to the actions of suppliers in Ohio, even if the ultimate subject of the transaction is located outside the state and even if the supplier itself is based outside the state. *See, e.g., Shorter v. Champion Home Builders Co.,* 776 F.Supp. 333, 339 (N.D.Ohio 1991); *Arnold v. Volkswagen of America, Inc.,* 2005-Ohio-1710 ¶ 30, 2005 Ohio App. LEXIS 1644 (Ohio Ct.App. Apr. 8, 2005); *Brown v. Market Development, Inc.,* 41 Ohio Misc. 57, 60, 322 N.E.2d 367, 369 (Ohio Com.Pl.1974). By acting in Ohio to engage in a consumer transaction, 84 Lumber has placed itself within the reach of this statute.

### Summary Judgment

This ruling on 84 Lumber's motion to dismiss should not be construed as having any preclusive effect on any later motion for summary judgment by either party, on the issues addressed herein or on any other issues that may arise in the course of litigation of this matter.

### Conclusion

The motion to dismiss counts three, five and six of the complaint hereby is **DENIED.**If 84 Lumber wishes to move for a more definite statement on count five, it may do so on or before May 24, 2007 and the Detricks may oppose that motion, if they wish, within ten (10) days thereafter.

**IT IS SO ORDERED.**

N.D.Ohio,2007.
Detrick v. 84 Lumber Co.
Not Reported in F.Supp.2d, 2007 WL 1467070 (N.D.Ohio)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                         Page 1
Not Reported in F.Supp.2d, 2007 WL 1144865 (S.D.Ohio)
(Cite as: 2007 WL 1144865 (S.D.Ohio))

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. Ohio,
Eastern Division.
KREAMER SPORTS, INC., et al., Plaintiffs,
v.
ROCKY BRANDS, INC., Defendant.
No. 2:06cv576.

April 16, 2007.

Adam J. Baker, Adam Baker and Associates, Athens, OH, for Plaintiffs.

Kreamer Sports, Inc., Shreveport, LA, pro se.

David S. Bloomfield, Jr., Molly S. Crabtree, Columbus, OH, for Defendant.

*OPINION AND ORDER*

GEORGE C. SMITH, United States District Judge.

*1 Plaintiffs Kreamer Sports, Inc. ("Kreamer Sports"), David Kreamer, and Janine Kreamer initiated this action on July 10, 2006, seeking damages in excess of $347,866.20 for breach of contract, promissory estoppel, unjust enrichment, fraud, Ohio Uniform Trade Secrets Act, and accounting. Defendant Rocky Brands, Inc. ("Rocky Brands") counterclaimed asserting a breach of contract claim against Kreamer Sports and fraud claims against Kreamer Sports and David Kreamer ("Kreamer") personally.

This case is before the Court on Defendant Rocky Brands Motion for Judgment on the Pleadings (Doc. 16), and Counterclaim Defendant David Kreamer's Motion to Dismiss the Counterclaim against him personally (Doc. 21). For the reasons

that follow, the Court **GRANTS** Defendant Rocky Brand's Motion for Judgment on the Pleadings and **DENIES** Plaintiff David Kreamer's Motion to Dismiss.

**I. FACTS**

Plaintiff, Kreamer Sports, is a Louisiana corporation with its principal place of business in Shreveport, Louisiana. (Countercl.¶ 3). Plaintiffs David and Janine Kreamer are shareholders of Kreamer Sports and residents of Louisiana. (Countercl. ¶ 4; Am. Compl. ¶ 4). Defendant Rocky Brands is an Ohio corporation with its principal place of business in Nelsonville, Ohio. (Countercl.¶ 2).

On March 6, 2003, Kreamer Sports and Rocky Brands signed a binding letter of intent ("Letter of Intent") whereby Rocky Brands would have the first right of refusal to the use of certain commercial technologies, including heated apparel and footwear, developed by Kreamer Sports. (Am. Compl. ¶¶ 7-8; Exhibit A to Am. Compl.). Kreamer Sports also agreed to assign to Rocky Brands existing business orders with Cabela's, Inc. and other vendors, and to deal exclusively with Rocky Brands for future business. (*Id.*). Defendant Rocky Brands agreed to pay Kreamer Sports a certain percentage of the sales involving Kreamer Sports technology, with a minimum payment established in the agreement. (Am.Compl.¶ 9).

In April 2005, the parties entered into another agreement ("Consulting Agreement"). (Countercl. ¶ 5; Am. Compl. ¶ 11). Under this consulting agreement, Defendant Rocky Brands agreed to incorporate into their heating products existing and future heating technology developed by Plaintiff Kreamer Sports. (Am.Compl.¶ 12). Rocky Brands agreed to compensate Kreamer Sports by either a minimum payment or a percentage of the net sales of heated

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1144865 (S.D.Ohio)
**(Cite as: 2007 WL 1144865 (S.D.Ohio))**

products incorporating Kreamer Sports' technology. (Am.Compl.¶ 12).

On October 11, 2005, Rocky Brands notified Kreamer Sports that Rocky Brands was terminating the Consulting Agreement, citing breaches of the Consulting Agreement by Kreamer Sports. (Countercl.¶ 19-20).

Plaintiff Kreamer Sports alleges Defendant Rocky Brands has failed to account or compensate Kreamer Sports for money due under the Letter of Intent or the Consulting Agreement. (Am.Compl.¶¶ 14-18). Rocky Brands counterclaimed alleging that Kreamer Sports had "repeatedly failed to provide services and products to [Rocky Brands] in a timely manner."(Countercl.¶ 10). In addition, Rocky Brands alleges that Kreamer Sports had violated the agreement by providing services and products to other entities rather than exclusively to Rocky Brands. (Countercl.¶ 11).

*2 Rocky Brands also alleges that Kreamer Sports and Mr. Kreamer made misrepresentations of fact and failed to disclose material facts. (Countercl.¶ 23). In particular, Rocky Brands alleges that "David Kreamer represented that he and [Kreamer Sports] had technology and proprietary rights to a butane heated vest."(Countercl.¶ 24). Mr. Kreamer promised that Rocky Brands could use and market the butane-heated vest to Rocky Brand's customers. (Countercl.¶ 25). From March 2003 to June 2005, Mr. Kreamer continued to assure Rocky Brands "that the butane-heated vest was in development and that [Rocky Brands] would be able to market the vest for commercial use."(Countercl.¶ 27). In June 2005, Mr. Kreamer and Kreamer Sports admitted that neither "had the intellectual property rights to the butane-heated vest technologies."(Countercl.¶ 28).

Rocky Brands alleges that the representations were material in deciding to do business with Kreamer Sports. (Countercl.¶ 29). Further, Rocky Brands al-

leges that Mr. Kreamer and Kreamer Sports knew the material representations were false or reckless, and they intended for Rocky Brands to rely on the representations. (Countercl.¶¶ 30-31). Finally, Rocky Brands alleges that it relied on the misrepresentations and was injured as a direct and proximate result of such reliance. (Countercl.¶¶ 32-33).

## II. STANDARD OF REVIEW FOR A MOTION FOR JUDGMENT ON THE PLEADINGS AND A MOTION TO DISMISS

The standard of review for a motion for judgment on the pleadings under Fed.R.Civ.P. 12(c) is the same as that used to address a motion to dismiss under Fed.R.Civ.P. 12(b)(6). A motion to dismiss for failure to state a claim "should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). All well-pleaded allegations must be taken as true and be construed most favorably toward the non-movant. *Schuer v. Rhodes,* 416 U.S. 232, 236 (1974). A 12(b)(6) motion to dismiss is directed solely to the complaint and any exhibits attached to it. *Roth Steel Products v. Sharon Steel Corp.,* 705 F.2d 134, 155 (6th Cir.1983). The merits of the claims set forth in the complaint are not at issue on a motion to dismiss for failure to state a claim. Consequently, a complaint will be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) only if there is no law to support the claims made, or if the facts alleged are insufficient to state a claim, or if on the face of the complaint there is an insurmountable bar to relief. *See Rauch v. Day & Night Mfg. Corp.,* 576 F.2d 857, 858 (6th Cir.1976).Rule 12(b)(6) must be read in conjunction with Fed.R.Civ.P. 8(a) which provides that a pleading for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief."5A Wright & Miller, *Federal Practice and Procedure* § 1356 (1990). The moving party is entitled to relief only when the complaint fails to meet this liberal stand-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2007 WL 1144865 (S.D.Ohio)
(Cite as: 2007 WL 1144865 (S.D.Ohio))

ard. *Id.*

*3 On the other hand, more than bare assertions of legal conclusions are required to satisfy the notice pleading standard. *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988)."In practice, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory."*Id.* (emphasis in original, quotes omitted).

We are not holding the pleader to an impossibly high standard; we recognize the policies behind rule 8 and the concept of notice pleading. A plaintiff will not be thrown out of court for failing to plead facts in support of every arcane element of his claim. But when a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist.

*Id.*

### III. MOTION FOR JUDGMENT ON THE PLEADINGS

Defendant Rocky Brands moved for judgment on the pleadings under Fed.R.Civ.P. 12(c), arguing that David and Janine Kreamer should be dismissed as Plaintiffs because they have not alleged any injury apart from that of the corporation and therefore their claims are merely derivative. This Court agrees that David and Janine Kreamer's claims arose out of their status as shareholders, and they do not have claims distinct from those of the corporation. Therefore, the Court **GRANTS** Defendant Rocky Brand's Motion for Judgment on the Pleadings pursuant to Fed.R.Civ.P. 12(c).

In general, "only a corporation and not its shareholders can complain of an injury sustained by, or a wrong done to, the corporation." *Adair v. Wozniak,* 23 Ohio St.3d 174, 176 (1986); *see also NBD Bank,*

*N.A. v. Fulner,* 109 F.3d 299 (6th Cir.1997). An exception to this general rule is where the defendant owes a duty directly to the shareholder. *Id.* at 176;*see also Quarels v. City of E. Cleveland,* 1999 U.S.App. LEXIS 34061, *7-*8 (6th Cir.1999) ("[w]here the shareholder suffers an injury separate and distinct from that suffered by other shareholders, ... the shareholder may maintain an individual action in his own right."). If the actions of the defendant merely lead to a loss of corporate assets, "liability runs to the corporation and not [the corporation's] individual shareholders."*Id.* at 177.

In the Complaint, although David and Janine Kreamer are included as separate Plaintiffs, the claims only allege injuries to Kreamer Sports and the shareholders of Kreamer Sports. The claims do not allege any violation of a duty owed by Rocky Brands to either David or Janine Kreamer personally. In particular, David and Janine Kreamer were not parties to either of the contracts in their individual capacity, but rather as shareholders of Kreamer Sports. (*See* Am. Compl. Ex. A; Am. Compl. Ex. B). In addition, the Kreamers have not alleged that any promises or fraudulent statements were made to them on which they relied. The Kreamers are merely alleging injuries to the corporation, and they cannot maintain the action in their own right. Therefore, Rocky Brands' Motion for Judgment on the Pleadings is **GRANTED.**

### IV. MOTION TO DISMISS

*4 Defendant Rocky Brands' Counterclaim asserts a cause of action for fraud against Plaintiff David Kreamer. Mr. Kreamer argues that the Counterclaim should be dismissed under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. Mr. Kreamer argues that the fraud claim arises out of actions committed by Mr. Kreamer while acting in his capacity as President of Kreamer Sports. In addition, Mr. Kreamer contends that Rocky Brands has failed to establish sufficient

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1144865 (S.D.Ohio)
(Cite as: 2007 WL 1144865 (S.D.Ohio))

facts to pierce the corporate veil under Ohio law. Rocky Brands argues that an employee can be held liable for actions taken in the course of his or her employment, or alternatively, that Rocky Brands has alleged facts sufficient to pierce the corporate veil. (Def.'s Mem. in Opp. to Mot. to Dismiss at 5). This Court agrees with Rocky Brands that an employee acting in the scope of his or her employment is an agent of the corporation and can be held liable for misrepresentations made by the employee.

### 1. Capacity of Mr. Kreamer to be sued

Although not addressed by either party, an initial issue is whether Mr. Kreamer, a Plaintiff in his capacity as a shareholder, could be a counterclaim-defendant in his individual capacity. This Court holds that Mr. Kreamer can be a counterclaim-defendant in his individual capacity.

When a counterclaim is brought pursuant to Rule 13, the counterclaim can only be brought against an "opposing party." Fed.R.Civ.P. 13. Although not addressed by the Sixth Circuit, other circuits have held that "opposing party" requires that "when a plaintiff has brought suit in one capacity, the defendant may not counterclaim against him in another capacity." *Banco Nacional de Cuba v. Chase Manhattan Bank,* 658 F.2d 875, 885 (2d Cir.1981); *see also* 3-13 Moore's Federal Practice-Civil § 13.90(2)(D). However, there are two recognizable exceptions. *Rhodes, Inc. v. Morrow,* 937 F.Supp. 1202, 1207 (M.D.N.C.1996). First, "a counterclaim in an individual capacity will be allowed when 'plaintiff has sued in a representative capacity but will benefit individually from any recovery.' " *Id.* (quoting *Blanchard v. Katz,* 117 F.R.D. 527, 529 (S.D.N.Y.1987)). Second, the counterclaim can be allowed where "the principles of equity and judicial economy support such a counterclaim." *Id.*

In this case, both exceptions are applicable. First, although Mr. Kreamer attempted to sue in a repres-

entative capacity as shareholder on behalf of Kreamer Sports, had the law permitted Mr. Kreamer to sue as a representative and/or personally, any recovery by the corporation would have benefitted him personally.

Second, the principles of equity and judicial economy would support this counterclaim.[FN1] Counterclaims in a different capacity have not been allowed where the counterclaims "would neither bring about resolution of all controversies between the parties, nor have any effect on the possibility of multiple suits." *Banco Nacional de Cuba v. Chase Manhattan Bank,* 658 F.2d 875, 866 (1981).[FN2] In the case at bar, the Court would be able to completely resolve the entire dispute between the parties in one suit, whereas if the Court dismissed the counterclaim, Rocky Brands would have to bring a second suit against Mr. Kreamer personally. This would not serve the interests of equity and judicial economy.

> FN1."To allow counterclaims to be asserted in appropriate cases against a plaintiff in a capacity different than that in which he brought suit ... is consistent with the goals of Fed.R.Civ.P. 13 to conserve judicial resources and to resolve all controversies between the parties in a single suit. Claims should be tried together to avoid delay and waste of judicial resources." *Blanchard v. Katz,* 117 F.R.D. 527 (S.D.N.Y.1987) (citations omitted).

> FN2. It should be noted that *Banco Nacional de Cuba v. Chase Manhattan Bank* deals with the slightly different though analogous situation of a defendant, sued in one capacity, attempting to counterclaim in a separate capacity.

*5 Therefore, although Mr. Kreamer sued in a representative capacity as shareholder of Kreamer Sports, the counterclaim of Rocky Brands against

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1144865 (S.D.Ohio)
(Cite as: 2007 WL 1144865 (S.D.Ohio))

Mr. Kreamer personally is permissible.

## 2. Mr. Kreamer's Affidavit

As an initial matter, Defendant Rocky Brands argues that in deciding the Motion to Dismiss, the Court should not consider Mr. Kreamer's Affidavit attached to the Motion to Dismiss. The Court agrees that it cannot consider the Affidavit.

In deciding a motion to dismiss, the Court cannot consider matters outside the pleadings. *Weiner v. Klais & Co.,* 108 F.3d 86, 88 (6th Cir.1997); *see also Amini v. Oberlin College,* 259 F.3d 493, 502 (6th Cir.2001) ("In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account."). For the purposes of determining whether to grant a Rule 12(b)(6) motion, pleadings can include "documents that a defendant attaches to a motion to dismiss ... if they are referred to in the plaintiff's complaint and are central to her claim." *Amini,* 259 F.3d at 502. The purpose of this rule is to prevent a plaintiff from surviving a motion to dismiss by not attaching a dispositive document. *Weiner v. Klais & Co.,* 108 F.3d 86, 89 (6th Cir.1997); *see also Levenstein v. Salafsky,* 164 F.3d 345, 347 (7th Cir.1998) ("this is a narrow exception aimed at cases interpreting, for example, a contract.").

In the case at bar, Mr. Kreamer attached an affidavit to the Motion to Dismiss. The Affidavit sets forth statements that support Mr. Kreamer's argument that Kreamer Sports is a bona fide corporation, that Mr. Kreamer was an officer of Kreamer Sports, and that Mr. Kreamer did not represent that there was a finished butane-heated vest. However, the Affidavit was not referred to in Plaintiff Rocky Brand's Counterclaim, nor is the Affidavit central to the Counterclaim. Therefore, the Affidavit is not part of the pleadings and cannot be considered by this Court in determining whether to grant the Motion to Dismiss.

## 3. Personal Liability of Mr. Kreamer

Mr. Kreamer argues that he is not personally liable for fraud against Defendant Rocky Brands because he was acting in his capacity as President of Kreamer Sports and the fraud counterclaim is insufficient to pierce the corporate veil. (Mot. to Dismiss at 1). Rocky Brands argues that regardless of whether the corporate veil can be pierced, Mr. Kreamer, as an employee, can be held personally "liable for actions taken in the course and scope of his employment ."(Mem. in Opp. to Mot. to Dismiss at 5). This Court agrees with Rocky Brands that the corporate veil need not be pierced to hold Mr. Kreamer personally liable.

Under Ohio law, "a corporate officer can be held personally liable for a tort committed while acting within the scope of his employment." *Atram v. Star Tool & Die Corp.,* 64 Ohio App.3d 388, 393 (8th App.Dist.1989). This follows from the general rule of agency that although a principal may be liable for torts committed by an agent, this does not relieve the agent of liability. (Restatement (Second) of Agency, § 343 (1958); *see also* Restatement (Second) of Agency, § 348 (1958) ("[a]n agent who fraudulently makes representations ... is subject to liability in tort to the injured person although the fraud or duress occurs in a transaction on behalf of the principal.")).

*6 For example, in *Atram,* the officer of a corporation made representations to an employee of another company that if the employee left his current employment and worked for the officer's corporation, the officer would train the employee. *Atram,* 64 Ohio App.3d at 390. The employee quit his job and began work at the officer's corporation. *Id.* The officer then discharged the employee after one day,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1144865 (S.D.Ohio)
**(Cite as: 2007 WL 1144865 (S.D.Ohio))**

saying he did not have time to train the employee.*Id.* The Court of Appeals held that although the statements were made in his corporate capacity, the officer was personally liable for his intentional misrepresentations. *Id.* at 393.

In the case at bar, although Mr. Kreamer was acting on behalf of Kreamer Sports, Mr. Kreamer can still be held personally liable for fraud. It appears undisputed that Mr. Kreamer was at all relevant times President of Kreamer Sports. (Mem. in Supp. of Mot. to Dismiss at 3). Rocky Brands alleges that acting in this capacity, Mr. Kreamer "represented that he and his company, [Kreamer Sports], had technology and propriety rights to a butane-heated vest."(Countercl.¶ 24). Further, Rocky Brands alleges that between March 2003 and June 2005, on several occasions, Mr. Kreamer was asked about the status of the butane-heated vest, and "[he] assured [Rocky Brands] employees that the butane-heated vest was in development and that [Rocky Brands] would be able to market the vest for commercial use."(Countercl.¶ 27). Although these alleged statements were made by Mr. Kreamer on behalf of Kreamer Sports, Mr. Kreamer was acting as an agent of the principal, Kreamer Sports. Therefore, Mr. Kreamer can potentially be held personally liable if the statements he made are ultimately considered fraudulent.

### 4. Cause of Action for Fraud

Mr. Kreamer also argues that Rocky Brands has failed to adequately allege fraud. He argues that any representation or omission was not made with the intent to deceive. (Mot. to Dismiss at 6). Mr. Kreamer also argues that the contracts do not offer support for Rocky Brands' allegations of fraud and the parol evidence rule should prohibit the introduction of extrinsic evidence. (Reply to Mem. in Opp. to Mot. to Dismiss at 5). This Court holds that the parol evidence rule does not prohibit the introduction of extrinsic evidence to prove fraud. Fur-

ther, Rocky Brands has sufficiently alleged a valid cause of action for fraud against Mr. Kreamer meeting both the heightened pleading under Fed.R.Civ.P. 9(b) and the elements of fraud under Ohio law.

#### a. Parol Evidence Rule

First, Mr. Kreamer argues that the terms of the contractual documents do not support Rocky Brands' allegations of fraud. (Reply to Mem. in Opp. of Mot. to Dismiss at 5). Mr. Kreamer argues that the contracts are fully integrated and clear an unambiguous; therefore, the parol evidence rule applies. (*Id.*)

The parol evidence rule provides that when a contract is integrated, the written agreement cannot be "varied, contradicted, or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements." *Galmish v. Cicchini,* 90 Ohio St.3d 22, 27 (2000) (*quoting*11 Williston on Contracts 569-570 (4 Ed.1999)). One exception to this rule is fraud. *Id.* at 28.The parol evidence rule does not prohibit extrinsic evidence used to prove fraudulent inducement. *Id.* This exception is particularly applicable when a "contract is induced by promises fraudulently made, with no intention of keeping them."*Id.* at 29-30.

*7 For example, in *Galmish v. Cicchini,* Galmish acquired property (land and an office building) pursuant to a divorce settlement with Cicchini. *Galmish,* 90 Ohio St.3d at 23. Cicchini told Galmish that Cicchini could sell the property to Developers for $1,700,000. *Id.* at 24.Galmish and Cicchini made an agreement where Cicchini would purchase the property from Galmish for $765,000. *Id.* at 23.If the property was sold within one year of the agreement, Cicchini would pay Galmish one-half of the proceeds in excess of $765,000. *Id.* Galmish argued that from the time the contract was signed Cicchini intended to delay the sale until one

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1144865 (S.D.Ohio)
(Cite as: 2007 WL 1144865 (S.D.Ohio))

year after the agreement, thereby depriving Galmish of her share of the excess proceeds. *Id.* The court held that the parol evidence rule did not keep Galmish from introducing extrinsic evidence, because the evidence was not offered to change the terms of the contract. Rather, the evidence was introduced to show that the agreement was fraudulently induced.

In this case, Rocky Brands is alleging that Mr. Kreamer's fraudulent statements induced the contract. Therefore, the parol evidence rule does not prohibit the introduction of statements made by Mr. Kreamer prior to the contract.

### b. Heightened Pleading for Fraud

Defendant Rocky Brands has sufficiently pled fraud under Fed.R.Civ.P. 9(b) in its counterclaim against Mr. Kreamer. Under the Federal Rules of Civil Procedure, fraud must be alleged with particularity. Fed.R.Civ.P. 9(b). The purpose of this requirement is to ensure that the defendant has sufficient notice of the misrepresentation and has enough information to be able to respond to the claim of fraud. *See Coffey v. Foamex L.P.,* 2 F.3d 157, 162 (6th Cir.1993). The Sixth Circuit requires a plaintiff to "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Power & Tel. Supply Co. v. SunTrust Banks, Inc.,* 447 F.3d 923, 931 (6th Cir.2006).

In this case, Rocky Brands has met the heightened pleading requirement of Fed.R.Civ.P. 9(b). First, Rocky Brands adequately alleged the time, place, and content of the alleged misrepresentation. Rocky Brands alleges that around February 13-16, 2003 at the Shot Show in Orlando, Florida, Mr. Kreamer represented that Kreamer Sports had proprietary rights to a butane-heated vest. (Countercl.¶ 24). Rocky Brands also alleges that between March

2003 and June 2005, when asked about the status of the butane-heated vest, Mr. Kreamer "assured [Rocky Brands] employees that the butane-heated vest was in development and that [Rocky Brands] would be able to market the vest for commercial use."(Countercl.¶ 27).

Next, Rocky Brands has alleged a fraudulent scheme and the fraudulent intent of the Defendants. Rocky Brands alleges that Mr. Kreamer and Kreamer Sports told Rocky Brands that Kreamer Sports had the property rights to the butane-heated vest when Mr. Kreamer and Kreamer Sports knew that they did not, in fact, have those property rights. (Countercl.¶ 28). Further, Kreamer Sports was attempting to negotiate a license for the technologies. (*Id.*). The representations by Mr. Kreamer and Kreamer Sports that they held the property rights to the butane-heated vest technologies were the reason that Rocky Brands entered into the agreements with Kreamer Sports. (Countercl.¶ 29). Therefore, the scheme was to induce Rocky Brands to enter into the agreement with Kreamer Sports. (Countercl. Exhibit B).[FN3]

> FN3. Countercl. Exhibit B is a letter by Rocky Brands to Kreamer Sports indicating Rocky Brands intent to terminate the contract. On a motion to dismiss, the court can only consider matters within the pleadings. *Weiner v. Klais & Co.,* 108 F.3d 86, 88 (6th Cir.1997). However, Fed.R.Civ.P. 10(c) provides that "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."The letter was an exhibit to the counterclaim; therefore, the court can consider the letter for the motion to dismiss.

*8 Finally, Rocky Brands has alleged the injury resulting from the fraud. Rocky Brands states that the representations that Kreamer Sports had the property rights to the butane-heated vest "were material to [Rocky Brand's] decision to do business with

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 8
Not Reported in F.Supp.2d, 2007 WL 1144865 (S.D.Ohio)
(Cite as: 2007 WL 1144865 (S.D.Ohio))

[Kreamer Sports]." (Countercl.¶ 29). In addition, Rocky Brands had prepared to use the heating technology in its Fall 2006 product line. (Countercl. Exhibit B). Since Kreamer Sports was unable to obtain the licenses to the heating technology, Rocky Brands was unable to introduce the products in the Fall of 2006 as planned. (*Id.*).

Rocky Brands has adequately "allege[d] the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Power & Tel. Supply Co.,* 447 F.3d at 931. Therefore, Rocky Brands has sufficiently met the heightened pleading requirement of Fed.R.Civ.P. 9(b).

### c. Elements of Fraud

Mr. Kreamer argues that Rocky Brands has not adequately alleged fraud. This Court disagrees. Rocky Brands has adequately alleged all the elements of fraud under Ohio law.

In addition to the heightened pleading requirement of Fed.R.Civ.P. 9(b), Rocky Brands must also "state a claim upon which relief can be granted."Fed.R.Civ.P. 12(b)(6). In Ohio, the elements of fraud are: "(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." *Groob v. Keybank,* 108 Ohio St.3d 348, 357 (2006) (*quoting Gaines v. Preterm-Cleveland, Inc.,* 33 Ohio St.3d 54, 55 (1987)).

Rocky Brands alleges that Mr. Kreamer made several misrepresentations.[FN4] (Countercl.¶ 23). In

particular, Rocky Brands alleges that on multiple occasions between 2003 and 2005, Mr. Kreamer "represented that he and [Kreamer Sports] had technology and proprietary rights to a butane-heated vest" and the butane-heated vest was currently in development. (Countercl.¶¶ 24, 27). In June of 2005, Mr. Kreamer disclosed that neither he nor Kreamer Sports "had the intellectual property rights to the butane-heated vest technologies."(Countercl.¶ 28).

> FN4. Rocky Brands also alleges that Mr. Kreamer omitted material facts. However, to state a cause of action for fraud based on omission of a material fact there must exist a duty to disclose. *Steinfels v. Ohio Dep't of Commerce, Div. of Sec.,* 129 Ohio App.3d 800, 807 (10th App.1998). This "duty to disclose arises when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them."*Id.* In this case, Rocky Brands has not alleged that a fiduciary or other special relationship existed between Mr. Kreamer and Rocky Brands that would create the duty to disclose. Therefore, the Court reads the Complaint as alleging fraud based on affirmative misrepresentations made by Mr. Kreamer.

In addition, Rocky Brands has alleged the misrepresentations were material. Rocky Brands alleges that it entered into the transaction because it "believed that the butane-heated vest technology was on the cutting-edge and that its customers would be very interested in purchasing such a vest."(Countercl.¶¶ 26, 29).

Rocky Brands alleges that Mr. Kreamer knew that the misrepresentations were false, and that he intended for Rocky Brands to rely on these misrepresentations. (Countercl.¶¶ 30-31). Mr. Kreamer represented on multiple occasions that Kreamer Sports

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                      Page 9
Not Reported in F.Supp.2d, 2007 WL 1144865 (S.D.Ohio)
(Cite as: 2007 WL 1144865 (S.D.Ohio))

owned the property rights to heating technology.
(Countercl.¶¶ 24, 27). At the same time, Kreamer
Sports was negotiating licenses to the heating tech-
nologies from the owner. (Countercl.¶ 28). There-
fore, Rocky Brands has sufficiently alleged that the
statements were made with knowledge of their fals-
ity and intent for Rocky Brands to rely on the mis-
representations to sustain a motion to dismiss.

*9 Finally, Rocky Brands alleges that they did rely
on the misrepresentations, and they were proxim-
ately injured. (Countercl.¶¶ 32-34). Rocky Brands
decided to do business with Kreamer Sports based
on the representations that they had the property
rights to the heating technology. (Countercl.¶ 29).
In addition, Rocky Brands had prepared to use the
heating technology in its Fall 2006 product line, but
was unable to do so when it was discovered that
Kreamer Sports did not have property rights to the
heating technology. (Countercl. Exhibit B).

## V. CONCLUSION

Rocky Brands moved for a Judgment on the Plead-
ings pursuant to Rule 12(c), seeking to dismiss
David and Janine Kreamer from the suit. For the
reasons stated in Part III of this opinion, Defendant
Rocky Brands Motion for Judgment on the Plead-
ings is **GRANTED.**

Mr. Kreamer moved for dismissal of the second
count of the counterclaim, which alleged fraud
against him personally, pursuant to Rule 12(b)(6) of
the Federal Rules of Civil Procedure for failure to
state a claim upon which relief can be granted. For
the reasons stated in Part IV of this opinion, the
Court **DENIES** Mr. Kreamer's Motion to Dismiss.

The Clerk shall remove Documents 16 and 21 from
the Court's pending motions list.

**IT IS SO ORDERED.**

S.D.Ohio,2007.

Kreamer Sports, Inc. v. Rocky Brands, Inc.
Not Reported in F.Supp.2d, 2007 WL 1144865
(S.D.Ohio)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

7 F.3d 234                                                                              Page 1
7 F.3d 234, 1993 WL 410414 (C.A.6 (Ohio)), RICO Bus.Disp.Guide 8404
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 7 F.3d 234, 1993 WL 410414 (C.A.6 (Ohio)))**

**C**
NOTICE: THIS IS AN UNPUBLISHED OPIN-
ION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing
in the Federal Reporter. Use FI CTA6 Rule 28 and
FI CTA6 IOP 206 for rules regarding the citation of
unpublished opinions.)

United States Court of Appeals, Sixth Circuit.
Sharon LEGGE; David Legge (92-4155), Plaintiffs-
Appellants,
v.
Fredericka WAGNER; Robert Wagner; Flying W
Farms, Inc., Defendants-Appellees,
Denise VISSER (92-4156), Plaintiff-Appellant,
v.
Fredericka WAGNER; Robert Wagner; Flying W
Farms, Inc., Defendants-Appellees,
Constance BERGENDOFF (92-4233), Plaintiff-
Appellant,
v.
Fredericka WAGNER; Robert Wagner; Flying W
Farms, Inc., Defendants-Appellees.
**Nos. 92-4155, 92-4156 and 92-4233.**

Oct. 14, 1993.

On Appeal from the United States District Court for
the Southern District of Ohio, Nos. 91-00611,
91-00614 and 91-00612; Graham, J.
S.D.Ohio

REVERSED AND REMANDED.

Before: MILBURN and GUY, Circuit Judges; and
KRUPANSKY, Senior Circuit Judge.

PER CURIAM.

**\*1** Plaintiffs appeal the district court's grant of sum-

mary judgment in favor of the defendants in these
consolidated actions for damages under The Rack-
eteer Influenced and Corrupt Organizations Act
("RICO"), 18 U.S.C. § 1961-1964. On appeal, the
issue is whether the district court could properly
grant summary judgment on the basis that the
plaintiffs' complaints did not comply with Federal
Rule of Civil Procedure 9(b) when that ground was
not raised by any party at any stage of the proceed-
ings. For the reasons that follow, we reverse and re-
mand.

I.

The defendants, Fredericka Wagner, Robert Wagn-
er, and Flying W Farms, Inc., are exotic animal
dealers, who sold Vietnamese Pot Bellied Pigs to
each of the plaintiffs. Each plaintiff filed a com-
plaint against defendants for violations of RICO
and pendent state law claims for breach of war-
ranty, misrepresentation, and fraud. The complaints
alleged that defendants perpetuated a scheme to de-
fraud plaintiffs by making misrepresentations about
the Vietnamese Pot Bellied Pigs in the following
manner:

a. Advertising animals as the "very very best qual-
ity and receive the finest care,""the very best in
Vietnamese Pot Bellied pigs" and "direct Connel
pedigrees" when, in fact, the pigs did not meet
the standard of fitness represented;

b. Representing the pigs breeding and pedigree as
high quality when, in fact, no such breeding or
pedigree have been substantiated or given to
[plaintiffs] when requested even though pedigree
was advertised;

c. Representing the pigs as healthy when, in fact,
the pigs were not; and

d. Representing the pigs as bred, breed stock or

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

7 F.3d 234, 1993 WL 410414 (C.A.6 (Ohio)), RICO Bus.Disp.Guide 8404
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 7 F.3d 234, 1993 WL 410414 (C.A.6 (Ohio)))**

stud stock, when in fact, the animals were sterile, not bred or unable to breed.

J.A. at 181. The complaints further alleged that defendants engaged in a pattern of racketeering activity by repeatedly committing mail fraud, violations of 18 U.S.C. § 1341, and wire fraud, violations of 18 U.S.C. § 1343, in furtherance of their scheme to defraud.

Defendants answered the complaints by denying the substantive paragraphs and stating that plaintiffs failed to state a claim upon which relief could be granted and that plaintiffs had failed to state a claim sufficient to establish jurisdiction under RICO. Defendants then filed a motion for judgment on the pleadings in which their sole argument was that the complaints were deficient because they alleged damages for projected lost profits from breeding animals, damages that were too speculative. Plaintiffs responded by arguing that based upon the current case law of Ohio, plaintiffs were entitled to collect loss of profits. Defendants then filed a supplemental memorandum which restated their position that the damages were too speculative. The district court never ruled on the motion for judgment on the pleadings.

Defendants Fredericka and George Wagner filed a motion for summary judgment in which their sole argument was that they should not be liable in their individual capacities because the defendant corporation, Flying W Farms, Inc., was the entity that entered the contracts with plaintiffs. Plaintiffs responded by arguing that the fact that defendants were employees of the corporation does not preclude a RICO action against them individually. Defendants filed a supplemental memorandum which restated their position that they could not be held individually liable.

**\*2** On September 29, 1992, the district court entered summary judgment for all defendants on the RICO claims and dismissed the pendent state law claims without prejudice. However, the district court did not base its decision on, or even mention, the grounds urged by the defendants in their motion for summary judgment; viz., that the Wagners were not acting in their individual capacity and could not be held liable under RICO. Instead, the district court based summary judgment entirely on plaintiffs' failure to plead the acts of fraud in their complaints with the particularity required by Federal Rule of Civil Procedure 9(b). This timely appeal followed.

II.

This court reviews the district court's grant of summary judgment de novo. *Brooks v. American Broadcasting Cos., Inc.,* 932 F.2d 495, 500 (6th Cir.1991). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

A district court may not grant summary judgment on grounds not urged by the moving party without giving adequate notice to the nonmoving party, unless there is no prejudice to the nonmoving party. *See Routman v. Automatic Data Processing, Inc.,* 873 F.2d 970 (6th Cir.1989); *Beaty v. United States,* 937 F.2d 288, 291 (6th Cir.1991). The reason for this rule is that Rule 56(c)"mandates that the party opposing summary judgment be afforded notice and a reasonable opportunity to respond to all issues to be considered by the court." *Routman,* 873 F.2d at 971; *see also Yashon v. Gregory,* 737 F.2d 547 (6th Cir.1984); *Kistner v. Califano,* 579 F.2d 1004 (6th Cir.1978) (per curiam).

In this case, the district court granted summary judgment on a ground that had never been raised by defendants and which the parties could not reasonably anticipate. As earlier stated, defendants' motion for summary judgment was based solely on the argument that the Wagners could not be held indi-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 3

7 F.3d 234, 1993 WL 410414 (C.A.6 (Ohio)), RICO Bus.Disp.Guide 8404
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 7 F.3d 234, 1993 WL 410414 (C.A.6 (Ohio)))**

vidually liable under RICO, but the district court did not even mention this argument in its opinion. Instead, the district court based its decision to grant summary judgment on its determination that plaintiffs failed to plead the fraud, upon which they based their RICO claims, with the particularity required by Federal Rule of Civil Procedure 9(b).

Plaintiffs did not have notice that the district court was considering granting summary judgment on this basis, and this lack of notice was prejudicial to plaintiffs. Defendants had never raised the issue of noncompliance with Rule 9(b). Nor did the district court advise plaintiffs of this problem. If plaintiffs had been given notice of the district court's intent, they could have responded in several ways. They could have argued that summary judgment should not be granted on the sole basis of Rule 9(b). This court has noted that in the absence of a defendant's motion for a more definite statement under Rule 12(e), dismissal on the sole basis of a plaintiff's failure to comply with Rule 9(b) is inappropriate. *Coffey v. Foamex L.P.,* No. 92-5990, slip op. at 8 (6th Cir. Aug. 6, 1993) (citing *Hayduk v. Lanna,* 775 F.2d 441, 445 (1st Cir.1985)). Plaintiffs also could have argued that their complaints actually met the requirements of Rule 9(b). Furthermore, if the complaints did not satisfy Rule 9(b), plaintiffs could have sought leave of the court to amend their complaints to cure the deficiency. Fed.R.Civ.P. 15(a). Because plaintiffs were not given notice that the district court was considering granting summary judgment on the basis of Rule 9(b), they were prejudiced by being denied the opportunity to respond in opposition. *See Kistner,* 579 F.2d at 1006 (holding that plaintiff "was prejudiced by not having an opportunity to respond in opposition" before the district court's *sua sponte* grant of summary judgment). Therefore, the district court erred in granting summary judgment to the defendants.

**\*3** Since we have decided that it was inappropriate for the district court to grant summary judgment on grounds not raised by the parties, we do not need to address the other issues raised by plaintiffs; *viz.,* whether defendants met their initial summary judgment burden, and whether the issue of Rule 9(b) was waived by the failure of the defendants to address it through a proper Rule 12(e) motion.

III.

For the reasons stated, the judgment of the district court is REVERSED, and this case is REMANDED for further action consistent with this opinion.

C.A.6 (Ohio),1993.
Legge v. Wagner
7 F.3d 234, 1993 WL 410414 (C.A.6 (Ohio)), RICO Bus.Disp.Guide 8404

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

1927 WL 3041
1927 WL 3041, 5 Ohio Law Abs. 151
**(Cite as: 1927 WL 3041 (Ohio App. 8 Dist.), 5 Ohio Law Abs. 151)**



Page 1

C

Court of Appeals of Ohio, Eighth District,
Cuyahoga County.
OHIO MATCH CO
v.
ELM GROVE MIN CO
**No 7106.**

Decided Jan. 24, 1927.

West Headnotes

**Contracts 95 ⚖187(5)**

95 Contracts
    95II Construction and Operation
        95II(B) Parties
            95k185 Rights Acquired by Third Persons
                95k187 Agreement for Benefit of
Third Person
                    95k187(5) k. Acceptance by Third
Person. Most Cited Cases
Where a coal company, which was indebted to the
defendant company, was sold to the plaintiff com-
pany for a cash payment, together with notes run-
ning directly to defendant, it being agreed that the
indebtedness to defendant was to be paid by ship-
ments of coal at a specified price per ton, one-half
of the price to be paid in cash and the other half to
be applied to the notes, defendant, when it accepted
the shipments of coal under the agreement made for
its benefit, obligated itself to pay the price stipu-
lated therein, though not a party to the agreement.

**Contracts 95 ⚖202(1)**

95 Contracts
    95II Construction and Operation
        95II(C) Subject-Matter
            95k202 Trade and Business
                95k202(1) k. In General. Most Cited
Cases

Where the plaintiff company in August, 1920,
agreed to purchase the interest of a coal company
and to pay the coal company's indebtedness to de-
fendant by shipments of coal, it being agreed that,
if the miners' wage scale should on April 1, 1922,
or thereafter be increased or decreased, then the
price of coal delivered after such change should be
increased or decreased at a specified rate, a wage
increase which went into effect about two weeks
after the contract did not, by express provision of
the contract, affect the price of coal until April 1,
1922.

**Sales 343 ⚖71(3)**

343 Sales
    343II Construction of Contract
        343k67 Subject-Matter
            343k71 Quantity, and Ascertainment
Thereof
                343k71(3) k. Quantity Not Known or
Definitely Stated. Most Cited Cases
A contract whereby coal mining company agreed to
furnish a certain number of tons of coal per day, did
not require the purchaser to take amount of coal
specified in excess of an amount that it needed in
its business.

**Sales 343 ⚖77(1)**

343 Sales
    343II Construction of Contract
        343k74 Price, Expenses, and Costs of Trans-
portation
            343k77 Ascertainment Under Provisions
of Contract
                343k77(1) k. In General. Most Cited
Cases
A contract for sale of coal providing for an increase
in wages which might become effective April 1,
1922, could not be construed to cover an increase in
wages which went into effect on August 16, 1920.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1927 WL 3041, 5 Ohio Law Abs. 151
(Cite as: 1927 WL 3041 (Ohio App. 8 Dist.), 5 Ohio Law Abs. 151)

Sales 343 &#8451;150(1)

343 Sales
   343IV Performance of Contract
      343IV(C) Delivery and Acceptance of Goods
         343k150 Obligation to Deliver in General
            343k150(1) k. In General. Most Cited
Cases
Seller of coal under contract providing for the furnishing of a certain number of tons of coal per day, in case it wanted to hold purchaser for damages for failure to take all of coal specified, should have tendered and probably have delivered coal to purchasers and sued them for goods sold and delivered.

LEVINE, PJ.

*1 The Elm Grove Mining Co. brought an action against the Ohio Match Co., alleging four causes of action, but the decision of the court, based upon the third cause of action, is the only matter pertinent to the consideration of the Court of Appeals on error proceedings.

It seems that the Oco Coal Co. furnished coal to the Match Co. and was indebted to it in the sum of $550,000. On Aug. 2, 1920, the Oco Co. and the Mining Co. agreed that the latter purchase the interest of the Oco Coal Co. for $600,000, $50,000 of which was payable in cash; and the balance of $550,000, evidenced by notes secured by mortgage on the mine, which notes ran directly to the Match Co.

It was agreed that the indebtedness to the Match Co. was to be paid by shipments of coal at $3.50 per ton, one-half of the price to be in cash and the other half to be applied to the notes. The agreement between the Oco Co. and the Mining Co. provided "that if miners' scale of prices for mining coal in Ohio shall on April 1, 1922, or thereafter, be increased or decreased, then * * * the price of coal delivered after the date of such change in miners' scale of prices shall be increased or decreased, at

the rate of two cents per ton for each one percent of increase or decrease in the miners' scale."

In the middle of August, 1920, a wage increase went into effect and the Mining Co. contended that it was entitled to two cents per ton for each one per cent of the increase in the wage scale from Aug. 16, 1920, through the balance of the life of the contract. The court below construed the increase to take effect from April 1, 1922, only, and gave judgment accordingly. The Court of Appeals held:

1. Although the Ohio Match Co. does not appear as a signatory to the agreement, it accepted the mortgage and notes, caused the mortgage to be recorded, gave orders for coal and otherwise complied with the provision in regard to the price and payments.

2. The one question raised upon the record is as to the right of the Mining Co. to sue the Match Co. and to recover judgment against it. It is not necessary to hold that the Oco Coal Co. acted as agent of the Match Co. when it entered the agreement with the Mining Co. to entitle the Mining Co. to recover upon the third cause of action.

3. Assuming that the Match Co. was not a party to the contract, it was made for the benefit of the Match Co., and when it accepted the shipments of coal under the agreement made for its benefit, it obligated itself to pay the price stipulated in said agreement.

4. The provision in the contract upon which the Mining Co. bases its claim, regulates the price to be paid per ton for all coal delivered.

5. The Match Co. by accepting the benefits of the contract also accepted the burdens, and the acceptance by it of the coal delivered to it, raises an implied obligation on part of the Match Co. to comply with the burdens, namely, payment in accordance with the provisions of the contract made for its benefit.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1927 WL 3041
1927 WL 3041, 5 Ohio Law Abs. 151
**(Cite as: 1927 WL 3041 (Ohio App. 8 Dist.), 5 Ohio Law Abs. 151)**

*2 6. By express provision of the contract, the increase or decrease did not become effective until Apr. 1, 1922.

Judgment therefore affirmed.

Sullivan, J, concurs.Attorneys--Walter D. Meals, for Match Co.; C. F. Taplin, for Mining Co.; all of Cleveland.

Ohio App. 8 Dist. Cuyahoga Co. 1927.
Ohio Match Co. v. Elm Grove Min. Co.
1927 WL 3041, 5 Ohio Law Abs. 151

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

H

United States District Court,
S.D. Ohio,
Western Division.
Wayne E. PULLINS, et al., Plaintiffs,
v.
Laura KLIMLEY, et al., Defendants.
No. 3:05-CV-082.

Jan. 7, 2008.

Richard B. Reiling, Richard Reiling, Esq., Love-
land, OH, for Plaintiffs.

Stephen M. Kindseth, Zeisler & Zeisler PC, Bridge-
port, CT, James Eugene Burke, Jennifer J. Morales,
Michael L. Scheier, Keating Muething & Klekamp,
PLL, Jean R. Robertson, McDonald Hopkins, Cin-
cinnati, OH, Vincent James Nardone, McDonald
Hopkins CO LPA, Columbus, OH, for Defendants.

**ENTRY AND ORDER GRANTING IN PART
AND OVERRULING IN PART BROOKS
KLIMLEY'S MOTION FOR SUMMARY
JUDGMENT (Doc. # 106); GRANTING IN
PART AND OVERRULING IN PART LAURA
KLIMLEY'S MOTION FOR SUMMARY
JUDGMENT (Doc. # 108); AND OVERRULING
PLAINTIFFS' MOTION FOR ORAL ARGU-
MENT (Doc. # 154)**

THOMAS M. ROSE, District Judge.

*1 The Plaintiffs in this matter are Wayne E.
Pullins ("Ed"), his wife Dianne H. Pullins
("Dianne") and their son David E. Pullins
("David"). Robert Howard is also a named Plaintiff.
The Defendants are Laura Klimley ("Laura") and
her husband Brooks Klimley ("Brooks").

Plaintiffs' original Complaint was filed in the Court

of Common Pleas for Clark County, Ohio on Janu-
ary 26, 2005, and was subsequently removed to this
Court by Laura. Erma A. Houser was a named
Plaintiff in the original Complaint and Alicia
Eimicke ("Alicia"), Maxine Eimicke ("Maxine"),
and John Palmero were named Defendants in addi-
tion to Laura. Brooks was not identified as a De-
fendant in the original Complaint. The original
Complaint included causes of action for engaging
in a pattern of corrupt activity under Ohio law,
fraud, civil conspiracy, and violation of Ohio's Blue
Sky laws.

On July 22, 2005, the Plaintiffs filed an Amended
Complaint which added claims of violation of Sec-
tions 12(a)(1) and 12(a)(2) of the Securities Act of
1933 and violation of Section 10b of the Securities
Exchange Act of 1934. The Amended Complaint
also brought the claim of engaging in a pattern of
corrupt activity under federal law instead of state law.

On November 2, 2005, the Plaintiffs again amended
their Complaint. The Second Amended Complaint
includes the same Parties and causes of action as
the First Amended Complaint and indicates that it
was filed pursuant to the instructions of the United
States Bankruptcy Court for the Southern District
of New York.

Following and pursuant to this Court's ruling on
Defendants' Motion To Dismiss the Second
Amended Complaint, the Third Amended Com-
plaint (the "TAC") was filed on April 6, 2006. The
TAC does not include Erma A. Houser as a
Plaintiff. The TAC also adds Brooks as a Defendant
and does not name Alicia, Maxine, and John
Palmero as Defendants. Finally, the TAC includes
the particulars of the allegations of fraud. It is the
TAC that is now before the Court.

Plaintiffs' First Cause of Action in the TAC is a

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
**(Cite as: 2008 WL 85871 (S.D.Ohio))**

claim brought pursuant to Section 12(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(1), which prohibits selling unregistered securities. The First Cause of Action also includes a claim brought pursuant to Section 12(a)(2) of the Securities Act of 1933 which prohibits the offer or sale of securities through a "prospectus or oral communication" that contains misrepresentations or omissions. 15 U . S.C. § 77l(a)(2).

Plaintiffs' Second Cause of Action is a claim brought pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. This claim is brought specifically pursuant to 15 U.S.C. § 78j and the associated regulation, 17 C.F.R. § 240.10b-5 (the "10b-5 claim"). Together, this code and regulation prohibit making material misstatements in connection with the purchase or sale of securities.

Plaintiffs' Third Cause of Action is for violation of Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o, and Plaintiffs' Fourth Cause of Action is for violation of Section 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78t. In these Causes of Action, Plaintiffs claim that Laura and Brooks were control persons and therefore secondarily liable for any misrepresentations and/or omissions.

**\*2** Plaintiffs' Fifth Cause of Action is an common law fraud claim and the Sixth Cause of Action is a common law civil conspiracy claim. Finally, Plaintiffs' Seventh Cause of Action is for violation of the Ohio Securities Act, Ohio Rev.Code § 1707.44(B), (C)(1), (D), (F) and (G).

Now before the Court are Motions for Summary Judgment filed by Laura (doc. # 108) and Brooks (doc. # 106). Both of these Motions are now fully briefed and ripe for decision. A factual background will first be set forth followed by the standard of review for motions for summary judgment and an analysis of the Motions.

**I. FACTUAL SUMMARY**[FN1]

FN1. When contested, the facts herein are presented, as they must be, in a light most favorable to the Plaintiffs who are the non-moving parties.

This matter arises from the purchase of Debenture Notes by the Plaintiffs. The Debenture Notes were issued by VWE Group, Inc. dba V .W. Eimicke Associates, Inc. (hereinafter "VWE").

**A. The Company**

VWE was a New York company founded by Victor W. Eimicke ("Victor") in 1958. (TAC ¶ 16.)Initially VWE produced and sold forms and other materials used by companies in the hiring, firing and motivation of employees (the "HR Business").(*Id.*) Several years ago VWE began selling holiday greeting cards (the "Greeting Card Business") in addition to its HR Business. (*Id.*¶ 17.)

Victor served as VWE's President and managed all of its operations until he passed away on September 4, 2000. (TAC ¶ 14; Deposition of Loretta Buscarino ("Buscarino Dep.") 9-10 May 22, 2007.) Victor and his wife Maxine had two daughters, Alicia and Laura. (Affidavit of Laura E. Klimley ("Laura Aff.") ¶ 4 Sept. 3, 2007.) At some point during the 1990s, Victor gifted all of his stock in VWE to Laura and Alicia, giving them each a 50% share of the company.(*Id.*¶ 5.)

By 2003, the Greeting Card Business surpassed the HR Business and accounted for 75% of VWE's revenues. (TAC ¶ 17.)In December of 2003, VWE sold its Greeting Card Business to an entity known as the Taylor Group. (*Id.*)

Following the sale of the Greeting Card Business, VWE filed for relief pursuant to Chapter 11 of the United States Bankruptcy Code. (TAC ¶ 18.)VWE's bankruptcy petition was filed on June 1, 2004, and is currently pending in the United States Bankruptcy Court for the Southern District of New York,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

Page 3

case number 04-20308. (*Id.*) VWE ceased opera-
tions as a company in July of 2006. (Deposition of
Elizabeth Longinetti ("Longinetti Dep.") 8 May 22,
2007.) During its operation, VWE had an official
policy of not giving out any financial information
to its investors or to anyone else. (Deposition of
Brooks J. Klimley ("Brooks Dep.") 97 Mar. 9, 2007.)

**B. The Debenture Notes**[FN2]

> FN2. A debenture is a debt secured only by
> the debtor's earning power and not by a li-
> en on specific assets. *Black's Law Diction-
> ary* (8th ed.2004). A debenture note is an
> instrument acknowledging such a debt. *Id.*

From its inception, VWE offered Debenture Notes
with terms from 90 days to 5 years, interim matur-
ity periods of between 1 and 3 years and interest
rates from 10 to 23%. (TAC ¶ 19.)At first the
Debenture Notes were issued to "very close friends
and family" of the Eimickes. (Deposition of Bar-
bara DeMuth ("DeMuth Dep.") 55 May 22, 2007.)
Over the years, the Debenture Notes program was
expanded as VWE began to issue Debenture Notes
to individuals and entities "all over the country." (*Id.*)

**\*3** There is no evidence that the Debenture Notes
issued by VWE were registered with the Securities
and Exchange Commission or any state in which
they were offered. When VWE filed for bank-
ruptcy, the outstanding principal amount of the
Debenture Notes issued by VWE was more than
$26 million. (TAC ¶ 20.)

Ed originally invested in VWE Debenture Notes
when he received a call at his home in Ohio from
Victor in 1988. (Deposition of Wayne E. Pullins
("Ed Dep.") 19-20, 26 Feb. 22 and 23, 2007.) At
that time, Victor stated that, as a "favor" to Ed, he
would permit Ed to invest in the family business
which he had specifically designed to make money

for the family. (*Id.* 20.)Ed acknowledges that he
never saw a financial statement prior to purchasing
a Debenture Note. (*Id.* 201.)

Following this initial investment, Ed and his family
continued to invest throughout the nineties in re-
sponse to telephone calls and written solicitations
from VWE. (*Id.* 56-60.)In addition to investing new
money, Ed and his family reinvested interest that
they received on the Debenture Notes and reinves-
ted principal when a Debenture Note became due.
(Affidavit of Wayne E. Pullins ("Ed Aff .") ¶¶ 2-6
Sept. 26, 2007.)

For 15 years from 1989 until just prior to VWE's
bankruptcy, the Plaintiffs have presented evidence
that they made investments totaling $1,389,982 in
VWE's Debenture Notes [FN3] and were paid or ac-
crued 15% per year interest. (See Ed Dep. 208-13;
Ed Aff. ¶ 2-6 .) Over 100 other individuals or entit-
ies also invested in VWE's Debenture Notes.
(Brooks Klimley Mem. In Supp. of Mot. Summ. J.
1.) These investors cannot recover their investments
from VWE which filed bankruptcy, from Victor
who is deceased or from Maxine or Alicia who
have either filed for personal bankruptcy or have no
assets from which to collect.(*Id.*)

> FN3. VWE admitted in its bankruptcy fil-
> ing that it owed this amount or something
> close to this amount to the Pullins.

**C. Laura Klimley**

Laura Eimicke married Brooks in 1981 and cur-
rently resides in Bronxville, New York. (Deposition
of Laura E. Klimley ("Laura Dep.") 6-7 Mar. 8,
2007.) Laura studied dance in college and graduate
school and, after marrying Brooks in 1981, took a
job teaching dance at a preparatory school. (Laura
Aff. ¶ 6.) At some point, Laura was appointed a
Vice-President of VWE and a member of VWE's
Board of Directors. (*Id.*)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

Page 4

When she became tired of teaching dance in 1985, Laura went to work for VWE.(*Id.* ¶ 7.) Her responsibilities at the time included writing copy for the catalogs and brochures, working in the direct mail customer list rental division and dealing with personnel issues at the plant. (*Id.* ¶ 8.)

Laura was employed full-time at VWE until 1996 when she gave birth to triplets. (*Id.* ¶ 7.) She then began working part-time. (*Id.*) After 1999, Laura no longer worked at VWE as an employee of VWE and stayed home with her children. (*Id.* ¶ 9 .)

Laura held the title of Vice-President and was a director of VWE up to the date of the bankruptcy in 2004. (Laura Dep. 38-40.) In addition to 50% of the voting shares in VWE, Laura held 1046.5 of a total of 2093 Common B non-voting shares of VWE, 111 of 189 Preferred A non-voting shares of VWE and 814 of 15978 Preferred B non-voting shares of VWE. (*Id.* 74-75.)Laura testified that she does not know how much she received in salary for VWE and does not recall receiving a dividend. (*Id.* 121-22.)

**D. Brooks Klimley**

*4 Brooks Klimley met Laura Eimicke in 1977 during his sophomore year at Columbia University. (Affidavit of Brooks Klimley ("Brooks Aff.") ¶ 3 Sept. 3, 2007.) At the time, Laura was a freshman at Barnard College studying dance.(*Id.*)

Brooks graduated magna cum laude from Columbia University in New York with a degree in economics. (Brooks Dep. 18-19.) He then went on to obtain a degree in jurisprudence from Oxford University in Oxford, England. (*Id.* 19.)

After marrying Laura in 1981, Brooks worked full time as an investment banker for Chemical Bank (1981-1984), Kidder Peabody (1984-1994), Bear Stearns (1998-2001) and Citigroup (2001-2004) and, at the time of his deposition, was the President of CIT Energy. (Brooks Aff ¶ 4; Brooks Dep. 22.) Brooks holds series 7, series 24 and series 63 certifications from the National Association of Security Dealers. (Answers To Requests for Admissions of B. Klimley .) In a recent deposition in another lawsuit against Brooks, he testified that, at Bear Stearns, he was known as "Dr. Value" for his creativity in complex investment banking transactions. (Deposition of Brooks Klimley ("Brooks Dec. Dep.") 241-42 Dec. 7, 2007.) There is no evidence that Brooks was ever an officer, director, shareholder or employee of VWE.

Beginning in the 1990s, Brooks purchased VWE Debenture Notes for himself and his children and continued to do so until 2004. (Brooks Aff. ¶ 7.) Brooks claims that he did not ask to see any financial records in connection with VWE when he purchased the Debenture Notes and relied upon the representations of Victor that he would be repaid. (Brooks Dep. 60-61.) When VWE declared bankruptcy, the company owed Brooks, Laura, their children and The Klimley Foundation $2,085,003.05. (Brooks Aff. ¶ 7.)

**E. Alicia Eimicke**

Alicia consistently played an active role in VWE's business activities. She joined VWE after graduating from Harvard University. (Laura Aff. ¶ 10.) Alicia worked with Victor to manage VWE's day-to-day operation. (Longinetti Dep. 17; DeMuth Dep. 13-15.) After Victor's death in 2000, Alicia became President of VWE and managed the day-to-day operation of the business. (Longinetti Dep. 13-15.)

**F. Plaintiffs' Familial Relationships**

Ed is a resident of the State of Ohio. (TAC ¶ 6.) Dianne is Ed's wife and David is Ed's son. (Ed Dep. 6.) Victor was Ed's uncle. (*Id.* 26.)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

Plaintiff Robert Howard is also Ed's uncle. (*Id.* 7.) Ed has testified that Robert Howard is no longer interested in proceeding in this litigation (*id.*) but Robert Howard remains a named Plaintiff. Finally, Ed's mother, now deceased, was Maxine's sister. (Ed Dep. 26.)

## II. SPOILATION OF EVIDENCE

Brooks and Laura argue that Plaintiffs claims should be dismissed because they have intentionally "spoiled" evidence. Specifically, according to the Defendants, Ed admits that he destroyed a tape recording of a meeting, destroyed notes that he took regarding telephone conversations with potential witnesses and destroyed executed affidavits and statements that would either corroborate or undermine the potential testimony of these witnesses.

*5 In addition, the Plaintiffs argue that VWE engaged in the spoilation of evidence and the Court should infer that each document that was destroyed contained concrete evidence that Brooks and Laura were heavily involved in the operations of VWE and the sale of Debenture Notes. Brooks and Laura respond that there is no evidence that they were involved in the shredding or that the shredding was improper.

### A. Relevant Law Regarding Spoilation of Evidence

"Spoliation is the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for the destruction." *In re Smartalk Teleservices, Inc. Securities Litigation,* 487 F.Supp.2d 947, 949 (S.D.Ohio 2007)(quoting *Beck v. Haik,* 377 F.3d 624, 641 (6th Cir.2004). Further, "the rules that apply to an alleged spoilation of evidence and the appropriate sanctions are defined by state law."*Id.*

In this case, this Court sits in Ohio, the Defendants

provide legal argument based upon Ohio law and the Plaintiffs do not argue otherwise. Therefore, Ohio spoilation law will be used.

Ohio recognizes the spoilation of evidence as an independent cause of action.*Id.* However, spoilation may also be raised as an affirmative defense, in a motion for summary judgment, in a motion to dismiss or in a Rule 37 motion for sanctions. *Loukinas v. Roto-Rooter Services Co.,* 167 Ohio App.3d 559, 855 N.E.2d 1272, 1278 (Ohio Ct.App.2006). If not pursued as a independent cause of action, which is the case here, the elements of a spoilation claim are nonetheless instructive in considering whether the imposition of sanctions is proper. *In re Smartalk,* 487 F.Supp.2d at 949.

The elements of a spoilation claim, as they would be applied to this case, are: (1) there is a pending or probable litigation involving the non-offending party; (2) knowledge on the part of the offending party that the litigation exists or is probable; (3) wilful destruction of the evidence by the offending party designed to disrupt the non-offending party's case; (4) disruption of the non-offending party's case; and (5) damages proximately caused by the offending party's actions. *In re Smartalk,* 487 F.Supp.2d at 949;*see also Herlik v. Continental Airlines, Inc.,* No. 04-3790, 2005 WL 2445947 at *6 (6th Cir. Oct.4, 2005). Finally, even if the evidence was not deliberately destroyed, negligent or inadvertent destruction of evidence is sufficient to trigger sanctions.*In re Smartalk,* 487 F.Supp.2d 950.

If relevant evidence was indeed destroyed, a court has the power to fashion a just remedy. *Id.* In fashioning a just remedy, the court must balance the intent of the offending party, the level of prejudice, and the reasonableness of the offending party's action. *Id.*"The test for prejudice is where there is a reasonable possibility, based on concrete evidence, that access to the evidence which was destroyed or altered, and which was not otherwise obtainable,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

would produce evidence favorable to the objecting [non-offending] party." *Loukinas,* 855 N.E.2d at 1278.

**\*6** The least severe sanction should be imposed-a sanction that is proportionate to the seriousness of the infraction under the facts of the particular case. *In re Smartalk,* 487 F.Supp.2d 950.Said another way, the sanction imposed must be commensurate with the degree of prejudice. *Loukinas,* 855 N.E.2d at 1278.

## B. Spoliation By Ed

In this case, Ed testifies that he invited creditors to attend two meetings in December of 2005. (Ed Dep. 220.) Only one of the meetings was held. (*Id.* 223, 855 N.E.2d 1272.) He tape recorded the meeting and threw the tape away afterwards because "there wasn't any information on it" and it was useless to him. (*Id.* 224-25, 855 N.E.2d 1272.) Further, when Ed sent out the invitation to the meetings, he invited those who could not attend to send a letter relating their experiences with VWE. (*Id.* 229, 855 N.E.2d 1272.) The written statements that he received were read at the meeting and later thrown away by Ed because they were repetitive of what was being said at the meeting. (*Id.* 229-30, 855 N.E.2d 1272.)

Ed also testifies that he contacted potential witnesses by telephone. (*Id.* 243, 855 N.E.2d 1272.) He would ask the potential witness if it was okay to prepare an affidavit for them to sign. (*Id.*) If so, Ed would prepare and forward an affidavit for signature. (*Id.* 244, 855 N.E.2d 1272.) Ed remembers sending "two or three" affidavits for signature. (*Id.* 243, 855 N.E.2d 1272.) Ed took notes of the telephone conversations and testifies that he later threw the notes away. (*Id.* 244, 855 N.E.2d 1272.) He also destroyed draft affidavits that were not sent to potential witnesses. (*Id.* 246, 855 N.E.2d 1272.)

The Plaintiffs first argue that Ed did not destroy his personal notes. (Pullins Sur-Reply to Mots, for Summ. J 15.) According to the Plaintiffs, Ed kept his notes on VWE's Schedule F to VWE's bankruptcy filing and these notes have been provided to the Defendants. (*Id.*)

Plaintiffs also argue that, while Ed did not keep the tape of the December 2005 meeting, he did provide Defendants with a list of those in attendance.(*Id.*) And, since the list was provided, the Defendants have deposed some of the individuals in attendance. (*Id.*) Further, the Defendants have a copy of one of the unsigned affidavits sent out by Ed and have taken the deposition of the individual who received and refused to sign this affidavit. (Deposition of Michelle Bronski ("Bronski Dep.") Ex. 1 May 2, 2007 .)

Based upon the information presented to the Court, some, but not all of the elements of a spoliation claim exist in this case. Ed knew that there was pending or probable litigation against the Defendants. He also testified that he destroyed personal notes, a tape recording and draft affidavits that were not forwarded for signature. However, the Defendants cannot be said to have been harmed. They allegedly have copies of Ed's notes, they have a list of attendees at the meeting and presumably have deposed at least some of those individuals and they have deposed at least one individual who received and refused to sign an affidavit drafted by Ed. Further, there is not a reasonable probability, based on concrete evidence, that access to the evidence which was destroyed or altered, and which was not otherwise obtainable, would produce evidence favorable to Brooks and Laura, particularly since Brooks and Laura have access to most, if not all of the evidence destroyed by Ed. Therefore, since the Defendants cannot be said to have been prejudiced, sanctions are not appropriate.

## C. Spoliation By Brooks and Laura

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

**\*7** Laura Pignone was VWE's Telemarketing Manager from 1997 until she voluntarily left in 2004. (Deposition of Laura Pignone ("Pignone Dep.") 8 June 26, 2007.) She reported directly to Alicia and was located in VWE's main office on Grassy Spring Road. (*Id.* 10-11, 855 N.E.2d 1272.)

Between the filing of VWE's Bankruptcy in June of 2004 and September of 2004, Laura Pignone observed a "tremendous amount of shredding being done" off site by a contractor. (*Id.* 53-55, 855 N.E.2d 1272.) VWE had always shredded unneeded documents but the shredding took place in house prior to the Bankruptcy filing. (*Id.*) Also, the volume of documents being shredded increased after the Bankruptcy filing. (*Id.*) Laura Pignone, however, does not know what was being shredded. (*Id.*)

Laura Pignone's observations, alone, are not enough to satisfy a spoliation claim. She does not know what documents were being shredded, who was responsible for shredding them or why. The analysis next turns to the standard of review for motions for summary judgment.

### III. STANDARD OF REVIEW

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and the associated caselaw. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.RCiv.P. 56(c).

Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374

(6th Cir.1992)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323.The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed.R.Civ.P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).Rule 56"requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

**\*8** In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the non-moving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 8
Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

credibility determinations must be left to the fact-finder. *Id.*

However, the mere existence of a scintilla of evidence in support of the non-moving party is not sufficient to avoid summary judgment. *Anderson,* 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff."*Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the non-moving party is entitled to a verdict. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed.R.Civ.P. 56(c).

The Plaintiffs' causes of action in this case include claims brought pursuant to Ohio law and issues interpreted under Ohio law. In reviewing an Ohio claim or an issue under Ohio law, this Court must apply the law of Ohio, as interpreted by the Supreme Court of Ohio. *Northland Ins. Co. v. Guardsman Prods. Inc.,* 141 F.3d 612, 617 (6th Cir.1998). Specifically, this Court must apply the substantive law of Ohio " 'in accordance with the then-controlling decision of the highest court of the state.'" *Imperial Hotels Corp. v. Dore,* 257 F.3d 615, 620 (6th Cir.2001)(quoting *Pedigo v. UNUM Life Ins. Co.,* 145 F.3d 804, 808 (6th Cir.1998)). Also, to the extent that the highest court in Ohio has not addressed the issue presented, this Court must anticipate how Ohio's highest court would

rule. *Id.* (quoting *Bailey Farms. Inc. v. NOR-AM Chem. Co. .,* 27 F.3d 188, 191 (6th Cir.1994)).

In this case, Brooks and Laura seek summary judgment on each of Plaintiffs' claims and seek a ruling that the Plaintiffs are not entitled to punitive damages. Brooks' and Laura's arguments regarding each of Plaintiffs' claims will be addressed followed by an analysis of the availability of punitive damages.

## IV. FIRST CAUSE OF ACTION: SECTION 12(a)(1) AND 12(a)(2) CLAIMS

Plaintiffs first assert that Brooks and Laura sold unregistered securities. Plaintiffs also assert that Brooks and Laura sold those securities through a prospectus or oral communication that contained misrepresentations or omissions.

**\*9** Under Section 12(a)(1) of the Securities Act of 1933, the seller of a security is liable to a purchaser if the sale violates the registration provisions of the Securities Act of 1933 unless exempted. *Cook v. Avien, Inc.,* 573 F.2d 685, 691 (1st Cir.1978). Further, if securities are sold without full disclosure or effective access to significant information, there is no exemption to the registration requirement. *Id.*

Liability attaches under Section 12(a)(2) if: (1) the defendant made a false or misleading statement of material fact or failed to state a material fact necessary in order to make the statement not misleading; (2) the plaintiff did not know of the untruth or omission; and (3) the defendant knew, or in the exercise of reasonable diligence, could have known of the untruth or omission.*Id.* (citing *Alton Box Board Co. v. Goldman, Sachs & Co.,* 560 F.2d 916 (8th Cir.1977).

Brooks and Laura argue that these claims are time-barred, that neither of them solicited or sold securities and that the statements they allegedly made are not material. The Plaintiffs respond that their claims are not time-barred, that both Brooks and

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

Laura are "sellers" for purposes of the Section 12(a)(1) and 12(a)(2) claims and that the statements made were material.

**A. Timeliness of Section 12(a)(1) and 12(a)(2) Claims**

The law regarding the timeliness of Plaintiffs' Section 12(a)(1) and 12(a)(2) claims will first be set forth. This is followed by a determination of the relevant dates and an analysis of the timeliness of Plaintiffs' Section 12(a)(1) and 12(a)(2) Claims.

**1. Applicable Statues of Limitation and Repose**

Section 13 of the Securities Act of 1933 provides that no action shall be maintained under Section 12(a)(1) "unless brought within one year after the violation upon which it is based."15 U.S.C. § 77m. It further provides that no action shall be maintained under Section 12(a)(2) "unless brought within one year after discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."*Id.*

Section 13 also provides a period of repose. A Section 12(a)(1) claim cannot be brought "more than three years after the security was bona fide offered to the public."*Id.* A Section 12(a)(2) claim cannot be brought "more than three years after the sale."*Id.*

The Plaintiffs have the burden of pleading facts that show compliance with Section 13's limitation periods. *In re National Mortgage Equity Corp. Mortgage Pool Certificates Securities Litigation,* 636 F.Supp. 1138, 1166 (C.D.Cal.1986)(citing *Toombs v. Leone,* 777 F.2d 465, 468 (9th Cir.1985)). The Plaintiffs must demonstrate compliance with both the statute of limitations and the statute of repose. *Id.* (citing *Morley v. Cohen,* 610 F.Supp. 798, 815 (D.Md.1985)).

The Plaintiffs urge the Court to apply a different statute of limitations and statute of repose to their Section 12(b)(1) and 12(b)(2) claims. They urge the Court to apply the statute of limitations and statue of repose found in the Sarbanes-Oxley Act (the "SOA").

*10 Enacted on July 30, 2002, the SOA provides a two-year statute of limitations and a five year statute of repose to "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws ..." *Lieberman v. Cambridge Partners, L.L .C.,* 432 F.3d 482, 486 (3d Cir.2005) (citing SOA, Pub.L. No. 107-204 § 804, 116 Stat. 745, 801, codified in part at 28 U.S.C. § 1658(b)). However, while the caselaw is limited, those courts that have considered the issue have determined that the SOA time limitations do not apply to claims that are based upon negligence or strict liability and do not require a showing of fraudulent intent. *See In re Enron Corporation Securities, Derivative and "ERISA" Litigation,* No. H-01-3624, 2004 U.S. Dist. Lexis 8158 at * 51, 2004 WL 405886 (S.D .Tex. Feb. 25, 2004)(SOA time limitations do not apply to Section 12(a)(2) claims); *In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation,* 289 F.Supp.2d 416, 423 (S.D.N.Y.2003)(15 U.S.C. § 77m applies to Section 12(a)(2) claims and the SOA applies to 10-b5 claims); *Friedman v. Rayovac Corp.,* 295 F.Supp.2d 957, 974-75 (W.D.Wis.2003)(SOA does not apply to claims brought under the Securities Act of 1933).

While Plaintiffs may have alleged fraud in connection with their Section 12(a)(1) and 12(a)(2) claims, these two alleged violations of the Securities Act of 1933 do not require a showing of fraud. Therefore, the one-year statute of limitations and three-year statute of repose found in 15 U.S.C. § 77m will be applied to Plaintiffs' Section 12(a)(1) and 12(a)(2) claims.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 10
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

**2. Relevant Dates**

To apply the one-year statute of limitations to the Section 12(a)(1) claims, the date the claim was filed and date of the violation must be determined. To apply the one-year statute of limitations to the Section 12(a)(2) claims, the date the claim was filed and the date when the untrue statement was discovered or should have been discovered by the exercise of reasonable diligence must be determined.

To apply the three-year statute of repose to the Section 12(a)(1) claims, the date the claim was filed and the date the security was first bona fide offered to the public must be determined. To apply the three-year statute of repose to the Section 12(a)(2) claims, the date the action was filed and the date the security was sold must be determined.

**a. Date When the Claim Was Filed**

Plaintiffs' original Complaint was filed in the Court of Common Pleas for Clark County, Ohio on January 26, 2005, and was subsequently removed to this Court. The original Complaint included causes of action for engaging in a pattern of corrupt activity under Ohio law, fraud, civil conspiracy, and violation of Ohio's Blue Sky laws.

On July 22, 2005, the Plaintiffs filed an Amended Complaint which added claims of violation of Sections 12(a)(1) and 12(a)(2) of the Securities Act of 1933 and violation of Rule 10b of the Security Exchange Act of 1934. The Amended Complaint also brought the action of engaging in a pattern of corrupt activity under federal law instead of state law.

**\*11** On November 2, 2005, the Plaintiffs again amended their Complaint. The Second Amended Complaint includes the same Parties and causes of action as the First Amended Complaint and indicates that it was filed pursuant to the instructions of the United States Bankruptcy Court for the South-

ern District of New York.

Following and pursuant to this Court's ruling on Defendants' Motion To Dismiss the Second Amended Complaint, the TAC was filed on April 6, 2006. The TAC adds Brooks Klimley as a Defendant and includes the particulars of the allegations of fraud.

The Defendants argue that the Plaintiffs did not file any claim against Laura until January 26, 2005 and did not file the Section 12(a)(1) and 12(a)(2) claims, or any federal securities claims, against Laura until July 22, 2005. They also argue that the first claim against Brooks was filed on January 18, 2006. The Plaintiffs respond that their first claim was filed on January 26, 2005, and that the subsequent claims against both Laura and Brooks relate back to that claim. The Defendants do not dispute that the claims against Laura relate back to the filing of the original complaint on January 26, 2005, but argue that the TAC against Brooks does not relate back .[FN4]

> FN4. Brooks Klimley was first named as a defendant in the TAC which was filed on April 6, 2006.

**i. Relevant "Relate Back" Law**

The Plaintiffs ground their argument that the claim set forth in the TAC relates back to the filing of the original complaint on Fed.R.Civ.P. 15(c)(3). However, Fed.R.Civ.P. 15(c)(3) no longer exists. Fed.R.Civ.P. 15 was amended effective December 1, 2007, as part of the "general restyling of the civil rules to make them more easily understood" and these 2007 "changes are intended to be stylistic only."(2007 Amendment Note to Fed.R.Civ.P. 15.) Since the 2007 changes are intended to be stylistic only and the caselaw refers to and interprets the prior Rule 15(c)(3), the prior Rule 15(c)(3) will be used herein.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

When a complaint is amended to add a defendant, Rule 15(c)(3) controls whether the amended complaint may relate back to the filing of the original complaint for purposes of the running of a statute of limitations. *Pompey v. Lumpkin,* 321 F.Supp.2d 1254, 1258 (M.D.Ala.2004)(citing *Powers v. Graf,* 148 F.3d 1223, 1225 (11th Cir.1998)), *aff'd* 127 F. App'x 473 (11th Cir.2005). Further, Rule 15(c) is liberally construed by federal courts. *Snoqualmie Tribe of Indians v. United States,* 178 Ct.Cl. 570, 372 F.2d 951 n. 5 (Cl.Ct.1967). It assures that the rights of the parties to a transaction or occurrence can be determined on the merits rather than on procedural difficulties. *Id.*

Pursuant to Rule 15(c)(3), an amendment that adds a party relates back when (1) the claim or defense asserted in the amended complaint arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading; (2) when the party being added has received notice of the complaint within the period provided by Rule 4(m) for service of the summons and complaint; and (3) when the party being added knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party. *Pompey,* 321 F.Supp.2d at 1258 (citing Rule 15(c)(3)). A mistake occurs where the wrong party is blamed while the real culprit remains unknown and also where the plaintiff has full knowledge of all relevant actors but lists the technically incorrect parties. *Kinnally v. Bell of Pennsylvania,* 748 F.Supp. 1136, 1142 (E.D.Pa.1990).

**\*12** Courts impute the notice of a lawsuit, termed "constructive notice," when there is sufficient "identity of interests" between the original and new parties. *Id.* at 1263 (citing *Jacobsen v. Osborne,* 133 F.3d 315, 320 (5th Cir.1998). Constructive notice can exist when the original and added parties are a parent corporation and its wholly owned subsidiary, when the original party and the added party are co-executors of an estate and when the original party and new party share counsel. *Id.* Further, constructive notice may exist when the original and added parties are so closely related in business or other activities that it is fair to presume the added parties learned of the institution of the action shortly after it was commenced. *Wine v. EMSA Limited Partnership,* 167 F.R.D. 34, 38 (E.D.Pa.996)(citing *Advanced Power Systems, Inc. v. Hi-Tech Systems, Inc.,* 801 F.Supp. 1450, 1456 (E.D.Pa.1992)); *In re Integrated Resources Real Estate Limited Partnerships Securities Litigation,* 815 F.Supp. 620, 647 (S.D.N.Y.1993)(a growing number of courts and commentators have concluded that sufficient notice exists when a party who has some reason to expect his potential involvement as a defendant hears of the commencement of litigation through some informal means). Finally, the plaintiff has the burden of showing that the added party received constructive notice.*Id.*

### ii. "Relate Back" Analysis

In this case, the claims asserted in the TAC arose out of the conduct, transactions and occurrences set forth in the original complaint. Further, Brooks received constructive notice of the original complaint when it was filed against Laura and should have expected that, while his involvement may have been unknown by others at the time, he might ultimately be included as a Defendant.

Brooks had constructive knowledge of the original complaint because it was brought against his spouse with whom he presumably had an informal relationship. Also, based upon Plaintiffs' factual allegations, Brooks had reason to believe that he would be named as a party because he was involved in VWE. (Deposition of Dianne Pullins ("Dianne Dep.") 16-17, 77, 107-08 Mar. 22, 2007); Deposition of David Pullins ("David Dep.) 82-83, 102-04 Mar. 23, 2007); Affidavit of Thomas Romo ("Romo Aff.") ¶¶ 1-3 Feb. 26, 2007.) Finally, both Brooks and Laura have been jointly represented by Mr.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case: 1:08-cv-02755-DCN  Doc #: 40-7  Filed: 07/30/09  71 of 119.  PageID #: 665

Not Reported in F.Supp.2d                                                                                                              Page 12
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

Kindseth's office in connection with matters concerning VWE.[FN5]

> FN5. The record in VWE's bankruptcy case indicates that Mr. Kindseth and his partners have represented Brooks and Laura in connection with the VWE bankruptcy and the various claims asserted against them by the Creditors Committee since at least December of 2004.

Therefore, for purposes of the Section 12(a)(1) and 12(a)(2) claims against both Brooks and Laura, January 26, 2005, the date the Plaintiffs original complaint was filed, is the date the claims were filed for purposes of statute-of-limitation analysis. Laura was a named Defendant in the original Complaint and the Amended Complaint arose out of the same conduct, transactions and occurrences set forth in the original Complaint. Brooks had constructive notice of the original Complaint and the claims set forth in the TAC, which first named Brooks as a Defendant, arose out of the conduct, transactions and occurrences set forth in the original Complaint. The analysis next turns to the date of the alleged Section 12(a)(1) violations.

**b. Date of the Alleged Section 12(a)(1) Violations**

**\*13** Section 13 provides that a 12(a)(1) claim must be brought within one year after the sale upon which it is based. 17 U.S.C. § 77m. In this case, Brooks and Laura argue and the Plaintiffs agree that the Plaintiffs last purchased debenture notes from VWE on January 1, 2004.

**c. Date When the Alleged Section 12(a)(2) Untrue Statement Was Or Should Have Been Discovered**

Brooks and Laura argue that the Plaintiffs were on inquiry notice about the alleged true state of affairs by at least June 2, 2004, when VWE filed for Bank-

ruptcy. The Plaintiffs agree that they were on inquiry notice when the Bankruptcy was filed on June 2, 2004.

**d. Date When the Security Was First Bona Fide Offered To the Public for Purposes of the Section 12(a)(1) Claims**

Brooks and Laura argue that the Plaintiffs, as they allege, were first offered Debenture Notes in 1989. The Plaintiffs respond that Ed purchased securities from VWE's I-1, I-4, I-7, I-13 and I-15 offerings, that Dianne purchased securities from VWE's I-7, I-9 and I-13 offerings and that David purchased securities from VWE's I-9, I-12, I-13 and I-15 offerings and that, based upon VWE's records, each offer is separate and distinct and each was made available at a different time.

The Plaintiffs further argue that Brooks and Laura have failed to identify the date that each of these offerings was first offered to the public and cannot prove their statute of limitations defense without this information. Brooks and Laura reply by identifying evidence that offering I1 was first sold to Plaintiffs on January 1, 1989, I-4 on September 22, 1992, I-7 on November 12, 1998, I-9 on February 17, 1998, I-12 on December 12, 2000, I-13 on October 1, 2001, and I-15 on October 1, 2003. (Laura Mem. Ex. G.)

A stock, even if unregistered, is bone fide offered when it is genuinely offered to the public. *P. Stolz Family Partnership L.P. v. Daum,* 355 F.3d 92 (2d Cir.2004)(citing *Kubic v. Goldfield,* 479 F.2d 472, 475 (3d Cir.1973)). Further, the majority of courts have found that the three-year period begins when the security is first bona fide offered and not when last bona fide offered. *Id.* at 100;*but see In re National Mortgage,* 636 F.Supp. at 1166 (the statute begins to run from that date of defendant's last sales-related activity, i.e., offer, sale or delivery of the security).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 13
Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

In this case, there were several offerings of debenture notes. Each offering was made at a different time, the offerings had different term periods, the offerings had different interim maturity periods, the offerings had different interest rates, and each offering became due at a different date. Therefore, each of the offerings will be considered to be a bona fide offering and the dates that each offering was sold will be when each of the Debenture Notes was first bona fide offered.

**e. Date the Security Was Sold for Purposes of the Section 12(a)(2) Claims**

Courts generally consider the date of sale relating to Section 12(a)(2) claims as the last of three occurrences: the date the security was first offered for sale, the date it was sold or the date it was delivered. *In re Enron,* 2004 U.S. Dist. LEXIS 8158 at *77, 2004 WL 405886.In this case, since each of the offerings will be considered as a sale of a security, the date each of the offerings was sold will be the date of sale.

**3. Timeliness Analysis**

**\*14** The statute of limitations that applies to Plaintiffs' 12(a)(1) claims requires that Plaintiffs' Complaint be brought within one year after the violation upon which it is based *and* not later than three years after the security was bona fide offered to the public. 15 U.S.C. § 77m. In this case, Plaintiffs' 12(a)(1) claims were brought on January 26, 2005 and the most recent alleged violation occurred on January 1, 2004 when the I-19 offering was purchased.

The Plaintiffs suggest that their Section 12(a)(1) claim is timely because of equitable tolling. Some courts have found that equitable tolling does not apply to Section 12(a)(1) claims. *In re Colonial Ltd. Partnership Litigation,* 854 F.Supp. 64, 86 (D.Conn.1994). Those courts that have considered equitable tolling have either considered it with regard to the service requirement found in Rule 4(m), *Pompey,* 321 F.Supp.2d at 1265, or with regard to cases where there was concealment of the fact that the securities were not registered. *Katz v. Amos Treat & Co.,* 411 F.2d 1046, 1055 (2d Cir.1969); *In re Colonial,* 854 F.Supp. at 86; *Jones v. Lewis,* No. 86-1547-T, 1988 WL 163026 at *2 (D.Kan. June 13, 1988); *In re Gas Reclamation, Inc. Securities Litigation,* 659 F.Supp. 493, 507 (S.D.N.Y.1987); *In re National Mortgage,* 636 F.Supp. at 1166-67.

In this case, the Plaintiffs make no allegations regarding service of their Complaint or no allegations that Brooks and Laura made fraudulent misrepresentations about the registration of the Debenture Notes. Therefore, the doctrine of equitable estoppel does not apply to Plaintiffs' 12(a)(1) claims.

The one-year requirement is not satisfied by any of Plaintiffs' 12(a)(1) claims. Since both the one-year and three-year requirements must be satisfied, Plaintiffs' 12(a)(1) claims against both Laura and Brooks are barred and must be dismissed.

The statute of limitations that applies to Plaintiffs' 12(a)(2) claims requires that Plaintiffs' Complaint be brought within one year after the discovery of the untrue statement or omission *and* not later than three years after the sale. In this case, Plaintiffs' 12(a)(2) claims were brought on January 26, 2005, and the untrue statements or omissions were discovered on June 2, 2004. Therefore, Plaintiffs' 12(a)(2) claims are not barred by the one-year limit.

One of Plaintiffs' 12(a)(2) claims is also not barred by the three-year limit. Plaintiffs' 12(a)(2) claims were brought on January 26, 2005, and the sale of the I-15 offering occurred on October 1, 2003. The sale of the other offerings about which Plaintiffs complain occurred outside of the three year limit and causes of action regarding these sales are barred by the three-year limit.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case: 1:08-cv-02755-DCN  Doc #: 40-7  Filed: 07/30/09  73 of 119.  PageID #: 667

Not Reported in F.Supp.2d                                                                 Page 14
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
**(Cite as: 2008 WL 85871 (S.D.Ohio))**

Plaintiffs' 12(a)(2) claim regarding the purchase of the I-15 offering is not time barred. Further, the doctrine of equitable estoppel does not apply to the other offerings. *In re Enron,* 2004 U.S. Dist. LEXIS 8158 at *77, 2004 WL 405886 (courts have almost uniformly agreed that the three-year time limit is absolute and thus equitable tolling principles are not applied to further extend the three years). In this case, the Plaintiffs do not argue otherwise regarding equitable tolling.

**B. Sale of Securities**

**\*15** The elements of a Section 12(a)(2) claim [FN6] are: (1) the defendants offered and sold a security; (2) by the use of any means of communication in interstate commerce; (3) through a prospectus or oral communication; (4) by making a false or misleading statement of material fact or by omitting to state a material fact; (5) plaintiff did not know of the untruth or omission; and (6) defendants knew, or in the exercise of reasonable care, should have known of the untruth or omission. *Wright v. National Warranty Company,* L.P., 953 F.2d 256, n. 3 (6th Cir.1992); *Wuliger v. Mann,* No. 3:03 CV 1531, 2005 WL 1566751 at *5 (N.D.Ohio July 1, 2005).

> FN6. Since Plaintiffs' Section 12(a)(1) claims are time-barred, only the remaining Section 12(a)(2) claim will be considered.

Therefore, to make a Section 12(a)(2) claim, the Plaintiffs must show that Brooks and Laura offered and sold them the debenture notes that are not barred by the statute of limitations through an oral communication.[FN7] Where the defendant is not a direct seller, direct and active participation in the solicitation of the sale must be shown. *Maker v. Durango Metals, Inc.,* 144 F.3d 1302, 1307 (10th cir.1998). Liability extends "to the person [non owner] who successfully solicits the purchase, motivated at least in part by a desire to serve his own

financial interests or those of the securities owner."[FN8] *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1214-15 (1st Cir.1996); *Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.,* 940 F.Supp. 1101, 1132 (W.D.Mich.1996)(quoting, *Pinter v. Dahl,* 486 U.S. 622, 647, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988)).

> FN7. There is no evidence that a prospectus was involved in the sale of the Debenture Notes.

> FN8. The definition of seller set forth in *Pinter* was in the context of a Section 12(a)(1) claim but it is well established that this same definition applies to a Section 12(a)(2) claim. *Shaw,* 82 F.3d at 1214; *Picard,* 940 F.Supp. at 1132.

To establish liability as a seller, a plaintiff must demonstrate direct and active participation in the solicitation of the immediate sale. *Picard,* 940 F.Supp. at 1132-33;*see also Shaw,* 82 F.3d at 1215. In other words, a statutory seller must engage in activity which could be considered an offer.[FN9]*Id.* (citing *PPM America, Inc. v. Marriott Corp.,* 853 F.Supp. 860, 873 (D.Md.1994)). A non-owner seller must urge a prospective purchaser to buy. *Smith v. American National Bank and Trust Co.,* 982 F.2d 936, 941 (6th Cir.1992). However, participation in activities relating to the sale of securities, standing alone, does not demonstrate statutory seller status nor does the fact that statements by a defendant were a substantial factor in the purchase demonstrate seller status. *Shaw,* 82 F.3d at 1216.

> FN9. An offer is "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value." *Picard,* 940 F.Supp. at 1132-33 (quoting 15 U.S.C. § 77b(3)).

**1. Sales By Brooks for Purposes of Section 12(a)(2) Claims**

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

Turning then to this case, Brooks testifies that he has "never solicited or sold any investments in VWE to Plaintiffs or to anyone else. (Brooks Aff. ¶ 11.) Also, Laura testified that she "did not authorize or participate in, and have no knowledge of my father's, mother's and sister's solicitations of Plaintiffs' investments in VWE."(Laura Aff. ¶ 12.) Brooks and Laura also point to Ed's testimony that Victor, Maxine and Alicia solicited him and David to purchase the debenture notes. (Ed. Dep.15, 39, 59.) This was confirmed by Dianne. (Dianne Dep. 21, 58, 90.)

*16 The Plaintiffs respond by arguing that Brooks made numerous false statements in connection with the financial status of VWE. For example, Brooks allegedly said that the company had plenty of assets to cover the notes outstanding. (Ed Dep. 118.) In another example, Brooks was part of a group sitting around a table who agreed that VWE was doing very well and everyone should do all they can to relieve the anxiety of the shareholders. (*Id.* 122-25.)At another time, Brooks indicated that Alicia was doing a great job at VWE and "launched" into a dialogue about VWE's financials. (*Id.* 160, 169-70.)

Dianne testified that Brooks was indirectly involved in the solicitations by Victor because Victor always said that, if anything happened to him [Victor] that Brooks was going to take over and that "Brooks had his eye on everything."(Dianne Dep. 16-17.) She further testified that, on many social occasions, she was told by Brooks and Victor "what a great company it is and we should invest."(*Id.*) Finally, David testified that, on one occasion, Brooks "had no problem rattling off numbers, saying "I've seen the numbers. They're good. They're strong and profitable. Don't worry ."(David Dep. 102-03.)

The Plaintiffs also direct attention to a conflict in Brooks' testimony between what he testified in this lawsuit and what he testified at a recent deposition taken in another lawsuit brought against him. Here, he said he never solicited or sold VWE Debenture Notes to anyone. In the other lawsuit, he testified that Alicia asked him to talk to other potential investors and he specifically remembers talking to at least one. (Brooks Dec. Dep. 166-68) He said, however, that he does not remember talking to Ed. (*Id.*)

While Brooks may have made statements regarding the financial status of VWE, none of the statements identified demonstrate direct and active participation in the solicitation of the immediate sale of any Debenture Note to the Plaintiffs. Therefore, Brooks was not a "seller" of the Debenture Notes to the Plaintiffs.

**2. Sales By Laura for Purposes of Section 12(a)(2) Claim**

The Plaintiffs do not identify any specific statements that Laura made regarding sale of the Debenture Notes and, instead argue that she is liable as a senior officer of VWE, as a director of VWE and as one who held 50% of the voting shares of VWE. In support of this argument, the Plaintiffs cite *Maywalt v. Parker & Parsley Petroleum Co.,* 808 F.Supp. 1037, 1053 (S.D.N.Y.1992). In *Maywalt,* a group of managers who published a proxy solicitation for a merger and ended up as directors of the resulting company and a group of officers and directors of one of the entities being merged that provided a written recommendation of approval of the merger were found to be sellers for Section 12(a)(2) purposes. 808 F.Supp. at 1053.

However, the situation in *Maywalt* is considerably different from the situation here. In *Maywalt,* there were written publications and here there are no written publications. Here, the only misstatement allegations regarding the sale of Debenture Notes are oral representations by Maxine and Alicia.[FN10] Since there can be no inference that oral statements

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

of one officer represent the "collective action" of others, Laura can hardly be held liable for the oral statements made by the others. *See In re Smartalk Teleservices, Inc. Securities Litigation,* 124 F.Supp.2d 527, (S.D.Ohio 2000)(there can be no inference that an oral statement of one officer represents the "collective action" of others).

> FN10. Victor was deceased at the time of the sale of the Debenture Notes actionable under Section 12(a)(2) and there is no evidence of written communications after that time.

*17 The Plaintiffs have not presented evidence that Laura directly and actively participated in the solicitation of the immediate sale of any debenture notes. Therefore, Laura was not a "seller" of the Debenture Notes.

**C. Conclusion On Section 12(a)(1) and Section 12(a)(2) Claims**

There are no genuine issues of material fact and both Brooks and Laura are entitled to judgment as a matter of law on Plaintiffs' Section 12(a)(1) and Section 12(a)(2) claims against them. Action on all of Plaintiffs' Section 12(a)(1) claims is time-barred. Action on all but one of Plaintiffs' Section 12(a)(2) claims is time-barred. Finally, the Plaintiffs have presented no evidence that either Brooks or Laura sold or solicited the sale of the Debenture Note to them upon which action is not time-barred.

Since summary judgment has been granted based upon the statute of limitations and the requirement that the defendant be a seller of the actionable security to the purchaser, the materiality of the alleged statements need not be addressed for purposes of the Section 12(a)(1) and 12(a)(2) claims. The analysis next turns to Plaintiffs' Second Cause of Action.

**V. SECOND CAUSE OF ACTION: 10b-5 CLAIMS**

Plaintiffs' Second Cause of Action asserts that Brooks and Laura violated Section 10b of the Securities Exchange Act of 1934 and Rule 10b-5 which prohibit making material misstatements in connection with the purchase or sale of securities. To be actionable, the conduct giving rise to the 10b-5 claim must be more than negligent. *Cook,* 573 F.2d at 692.

Section 10(b) of the Securities Exchange Act of 1934 was designed as a "catchall clause to prevent fraudulent practices." *Picard,* 940 F.Supp. at 1119 (quoting *Chiarella v. United States,* 445 U.S. 222, 226, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)). Section 10(b) makes it unlawful to employ, in connection with the purchase or sale of securities, any "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe ..."*Id.*(quoting *Chiarella,* 455 U.S. at 226). Rule 10b-5 promulgated by the Securities and Exchange Commission makes it unlawful in connection with the purchase or sale of any security "(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."*Id.* (quoting 17 C.F.R. 240, 10b-5). Section 10(b) and Rule 10b-5 reach beyond statements and omissions that are made in registration statements and that are actionable under Sections 12(a)(1) and 12(a)(2) to create liability for false or misleading statements or omissions of material fact in connection with trading in the secondary market. *Shaw,* 82 F.3d at 1216-17.

*18 The elements of a 10b-5 claim are: (1) scienter

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                         Page 17
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

on the part of the defendant; (2) materiality of the alleged misrepresentations or omissions by the defendant; (3) actual reliance by plaintiff upon the defendant's misstatements or omissions; and (4) justifiable reliance. *Wright,* 953 F.2d at n. 1 (citing *Cavalier Carpets, Inc. v. Caylor,* 746 F.2d 749, n. 16 (11th Cir.1984)).

The alleged violator need not directly communicate with the plaintiff for primary liability for a 10b-5 claim to attach. *Picard,* 940 F.Supp. at 1120. A third-party defendant may be liable as a primary violator where the third-party defendant controlled the content of the misleading statement.[FN11]*Id.*

> FN11. The control over a specific third-party statement needed to establish primary 10b-5 liability is not the equivalent of the degree of control over an actor needed to establish a "control person" liability under Section 15 of the Securities Act of 1933 or Section 20(a) of the Securities Exchange Act of 1934. *Picard,* 940 F.Supp. at n. 13.

Brooks and Laura argue that Plaintiffs' 10b-5 claims are time-barred, that the statements allegedly made by them are not actionable and that there is no evidence that either of them acted with scienter. The Plaintiffs respond that their claims are not time-barred, that both Brooks and Laura are "sellers" for purposes of the 10b-5 claims and that the statements made were actionable.

## A. Timeliness of 10b-5 Claims

The Sarbanes-Oxley Act of 2002 extended the statute of limitations on 10b-5 claims from a one-year/three-year scheme to a two-year/five year scheme. *Taylor v. Prudential Insurance Company of America,* No. 1:02-cv-1462, 2003 WL 21314254 at *4 (S.D.Ind. May 7, 2003). The two-year/five-year scheme currently in effect is found at 28 U.S.C. § 1658. *Id.*

Section 1658 provides that "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws ... may be brought not later than the earlier of: (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation."*Id.* (citing 28 U.S.C. § 1658). The limitations period is not subject to equitable tolling and the statute of limitations begins to run on either actual or inquiry notice of the facts constituting the fraud. *Id.*

To apply the two-year limitation, the date the complaint was filed and the date that the facts constituting the violation was or should have been discovered must be determined. To apply the five-year limitation, the date of the violation must be determined.

## 1. Date When the 10b-5 Claim Was Filed

Plaintiffs' original Complaint was filed in the Court of Common Pleas for Clark County, Ohio on January 26, 2005, and was subsequently removed to this Court. On July 22, 2005, the Plaintiffs filed an Amended Complaint which added claims of violation of Sections 12(a)(1) and 12(a)(2) of the Securities Act of 1933 and violation of Rule 10b-5 of the Securities Exchange Act of 1934. On November 2, 2005, the Plaintiffs again amended their Complaint. Following and pursuant to this Court's ruling on Defendants' Motion To Dismiss the Second Amended Complaint, the TAC was filed on April 6, 2006. The TAC adds Brooks as a Defendant and includes the particulars of the allegations of fraud.

*19 Brooks and Laura now argue that the 10b-5 claim was first filed against Laura on July 22, 2005 when this claim was amended to the original Complaint. They also argue that the 10b-5 claim against Brooks was brought on January 18, 2006, when Plaintiffs filed their motion to file the TAC.[FN12]The Plaintiffs respond that the 10b-5

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

claim filed against Laura on July 22, 2005, and the TAC which first named Brooks relate back to the original claim filed on January 26, 2005.

> FN12. The TAC first added Brooks as a Defendant.

The law regarding an amendment relating back to an original claim is as set forth above. In this case, Laura was named in the original Complaint and the Amended Complaint adding the 10b-5 claim against Laura arose out of the conduct, transaction and occurrences set forth in the original Complaint. Therefore, the Amended Complaint that adds a 10b-5 claim against Laura relates back to the original Complaint filed on January 26, 2005. Also, for the reasons stated above regarding the Section 12(a)(1) and 12(a)(2) claims, the 10b-5 claim against Brooks relates back to the original Complaint.

Therefore, for purposes of the 10b-5 claims against both Brooks and Laura, January 26, 2005, the date the Plaintiffs original Complaint was filed, is the date the claims were filed for purposes of 10b-5 statute-of-limitation analysis. Laura was a named Defendant in the original Complaint and the Amended Complaint which first includes a 10b-5 claim against Laura relates back to the original Complaint. Also, Brooks had constructive notice of the original Complaint and the TAC which first named Brooks as a Defendant arose out of the conduct, transactions and occurrences set forth in the original Complaint. The analysis next turns to the date that the facts constituting the 10b-5 violation were or should have been discovered.

**2. Date When the Alleged 10b-5 Untrue Statements Were Or Should Have Been Discovered**

As with the Section 12(a)(1) and 12(a)(2) claims, Brooks and Laura argue that the Plaintiffs were on inquiry notice about the alleged true state of affairs by at least June 2, 2004, when VWE filed for bank-

ruptcy. The Plaintiffs agree that they were on in-quiry notice when the Bankruptcy was filed on June 2, 2004. The analysis next turns to when the alleged 10b-5 violations occurred.

**3. Date When the Alleged 10b-5 Violations Occurred**

The alleged 10b-5 violations are misstatements allegedly made by Brooks and Laura in connection with the purchase of Debenture Notes by the Plaintiffs. There are factual allegations that the alleged misstatements by Brooks and/or Laura were made as early as "during the 90s" and continued until VWE filed bankruptcy. (Ed Dep. 41, 61-62, 125-26, 154, 168-70, 190-96; Dianne Dep. 17-18, 75-77, 143; David Dep. 82-85.) There are also factual allegations that the sales to the Plaintiffs that resulted from alleged misrepresentations were made on January 1, 1989, September 22, 1992, November 12, 1998, February 17, 1998, December 12, 2000, October 1, 2001 and October 1, 2003. Therefore, the alleged sales were made after the alleged misrepresentations and, as determined above, each of the sales is an alleged violation.

**4. Analysis of Timeliness of 10b-5 Claims**

*20 In this case, the discovery of the facts consti-tuting the alleged violations was made on June 2, 2004. Two years after this date is June 2, 2006 and the Complaint was filed on January 26, 2005. Therefore, the Complaint was filed within two years of when the facts constituting the alleged vi-olations were discovered and the two-year limita-tion is satisfied.

The five-year limitation must also be considered. The dates of the alleged violations range from Janu-ary 1, 1989, to October 1, 2003. Five years after the alleged violations is a range from January 1, 2004, to October 1, 2008.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

The claim was filed on January 26, 2005. There-fore, any sales that occurred on or after January 26, 2000, are not subject to the five-year limitation. This includes sales made on December 12, 2000, October 1, 2001 and October 1, 2003. The five-year limitation bars claims for sales made prior to January 26, 2000. This includes the sales made on January 1, 1989, September 22, 1992, November 12, 1998, and February 17, 1998. The analysis next turns to the actionability of the alleged statements made by Brooks and Laura.

**B. Actionability as 10b-5 Claims**

To be actionable as 10b-5 claims, the Plaintiffs must show that the statements made by Brooks and/ or Laura Klimley were material. *City of Monroe Employees Retirement System v. Bridgestone Corp.,* 399 F.3d 651, 669 (6th Cir.2005), *cert. denied,* 546 U.S. 936 (2005). Plaintiffs must also show that Brooks and/or Laura had a duty to disclose. *Id.*

The analysis next turns to a determination of whether the alleged statements or omissions were material. This is followed by an analysis of whether Brooks and/or Laura had a duty to disclose.

**1. Relevant Law On Materiality**

A *statement* is material only if there is a substantial likelihood that "a reasonable investor would have viewed the misrepresentation as 'having signific-antly altered the total mix of information made available.' " *In re Ford Motor Company Securities Litigation,* 381 F.3d 563, 570 (6th Cir.2004)(quoting *In re Sofamor Danek Group, Inc.,* 123 F.3d 394, 400 (6th Cir.1997), *cert. denied,* 523 U.S. 1106, 118 S.Ct. 1675, 140 L.Ed.2d 813 (1998)). Likewise, an *omission* is material if there is "a substantial likelihood that the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of in-formation available." *Stavroff v. Meyo,* No.

95-4118, 1997 WL 720475 at *4 (6th Cir. Nov.12, 1997).

Alleged misrepresentations are immaterial "only if they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *In re Ford Motor Company,* 381 F.3d at 570 (citing *Helwig v. Ven-cor, Inc.,* 251 F.3d 540, 563 (6th Cir.2001)). Mis-representations are also immaterial if the investors have knowledge of the truth. *Picard,* 940 F.Supp. at 1123 (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)).

*21 The materiality requirement does not require proof of a substantial likelihood that proper disclos-ure would have caused an investor to change a de-cision. *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Proof that the proper disclosure would have significantly altered the "total mix" of available in-formation is all that is necessary. *Id.*

Whether or not a statement is material turns upon a "fact-intensive test." *City of Monroe,* 399 F.3d at 669 (citing *Helwig,* 251 F.3d at 555). Therefore, materiality is a mixed question of law and fact and is decided as a matter of law only if reasonable minds could not differ on the issue. *Picard,* 940 F.Supp. at 1122. However, in most instances, dis-putes over the materiality of allegedly false or mis-leading statements are determined by the trier of fact. *Shaw,* 82 F.3d at 1217.

Regarding materiality, the Sixth Circuit has distin-guished between "hard" and "soft" information. *Pi-card,* 940 F.Supp. at 1122. Hard information is usu-ally historical information or other factual informa-tion that is objectively verifiable. *Id.* Publicly-dis-closed hard information is actionable if false and material. *Id.*

Soft information includes predictions and matter of opinions. *Id.* Soft information that is not actionable

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

Case: 1:08-cv-02755-DCN  Doc #: 40-7  Filed: 07/30/09  79 of 119.  PageID #: 673   Page 20

includes vague, puffing statements or obvious hy-
perbole upon which a reasonable investor would
not rely. *In re Ford Motor,* 381 F.3d at 570. State-
ments that are "mere puffing" or "corporate optim-
ism" may be forward-looking or generalized state-
ments of optimism that are not capable of objective
verification. *Id.*

Soft information is actionable only if it is virtually
as certain as hard facts. *City of Monroe,* 399 F.3d at
669. Opinions may be deemed false or misleading
under the securities laws if proof of their falsity can
be established "through the orthodox evidentiary
process." *Id.* (citing *Virginia Bankshares, Inc. v.
Sandberg,* 501 U.S. 1083, 1090-93, 111 S.Ct. 2749,
115 L.Ed.2d 929 (1991)).

## 2. Relevant Law On Duty To Disclose

In addition to being material, to be actionable, a
misrepresentation or omission must pertain to in-
formation that the defendant had a duty to disclose.
*City of Monroe,* 399 F.3d at 669. A duty to disclose
may arise where there is an incomplete or mislead-
ing prior disclosure. *Id.* Also, a duty to disclose
may arise from a relationship of trust and confid-
ence between the parties to a transaction. *Chiarella,*
445 U.S. at 230; *State v. Warner,* 55 Ohio St.3d 31,
564 N.E.2d 18, 40 (Ohio 1990), *cert. denied,* 499
U.S. 961, 111 S.Ct. 1584, 113 L.Ed.2d 649 (1991).

For example, "[a] duty to disclose and correspond-
ing liability for failure to disclose arises when the
party fails to exercise reasonable care to disclose a
material fact which may justifiably induce another
party to act or refrain from acting, and the non-
disclosing party knows that the failure to disclose
such information to the other party will render a
prior statement or representation untrue or mislead-
ing. *Glassner v. R.J. Reynolds Tobacco Company,*
223 F.3d 343, 352 (6th Cir.2000). In another ex-
ample, a duty to disclose arises when one party has
information that the other party is entitled to know

because of a fiduciary or other similar relation of
trust and confidence between them. *Warner,* 564
N.E.2d at 40.

**\*22** As an example of a fiduciary duty, the officers
and directors of a corporation that is insolvent or is
on the brink of insolvency owe a fiduciary duty to
the corporation itself and to its creditors not to
waste corporate assets which otherwise could be
used to pay corporate debts. *DeNune v. Consolid-
ated Capital of North America, Inc.,* 288 F.Supp.2d
844, 859 (N.D.Ohio 2003). In another example, dir-
ectors of a corporation owe a fiduciary duty to the
corporation and its shareholders to perform their
duties in good faith and in a manner not opposed to
the best interests of the corporation. *Thomas v.
Matthews,* 94 Ohio St. 32, 113 N.E. 669, 671 (Ohio
1916); *Geygan v. Queen City Grain Co.,* 71 Ohio
App.3d 185, 593 N.E.2d 328, 331 (Ohio
Ct.App.1991).

Directors are held strictly accountable and liable if
corporate funds or property are wasted or misman-
aged due to the director's inattention. *Biggins v.
Garvey,* 90 Ohio App.3d 584, 630 N.E.2d 44, 52
(Ohio Ct.App.1993); *Geygan,* 593 N.E.2d at 333.
However, a fiduciary duty does not exist when a
bank and a prospective borrower are dealing at
arm's length unless special circumstances are
present. *Groob v. Keybank,* 108 Ohio St.3d 348,
843 N.E.2d 1170, 1176 (Ohio 2006).

## 3. Alleged Fraudulent Statements

The allegedly fraudulent statements or omissions
attributed to Brooks and Laura in the TAC are:

¶ 35.In October of 2000 at the Dutch Reformed
Church in Bronxville, New York, after the funer-
al service of Victor Eimicke, Alicia and Maxine
Eimicke and Laura Klimley assured Wayne, Di-
anne and David Pullins that Alicia Eimicke
would run the Company and that the Company
was strong financially. At the time that said state-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Page 21
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

ments were made, Alicia, Maxine Eimicke and Laura Klimley knew these statements to be false. (See also Ed's deposition where he remembers that a group, including Brooks, discussed that VWE was doing well and he remembers this conversation being at a dinner following Victor's funeral. (Ed. Dep.122-25.); In her deposition, Dianne remembers that on many social occasions "we" were told by Victor and Brooks "what a great company it is and we should invest."(Dianne Dep. 16-18; David Dep. 82-83.))

¶ 43.On Thursday-Sunday, October 11-14, 2001 at Baker Field, Columbia University, New York City, Brooks and Laura Klimley took Wayne, Dianne and David Pullins to a Columbia University football game. Brooks and Laura Klimley told the Pullins Family that all was well with the company and everything was running as usual although they knew that said representations were false. (See also Ed Dep. 137-39; Dianne Dep. 16-18, 76-78; David Dep. 100-03.)

¶ 61.On Friday, July 4, 2003, at the Siwanoy Country Club in Bronxville, New York, Laura and Brooks Klimley, along with Maxine Eimicke, indicated to Wayne Pullins that the Company was doing better than ever before and Alicia was doing a great job although they knew this not to be the case. (See also Ed Dep. 164; Dianne Dep. 16-18.)

¶ 68.On Tuesday-Friday, April 20-23, 2004, Wayne Pullins was in Columbus, Ohio at Riverside Methodist Hospital for a heart operation. He received separate calls from both Maxine Eimicke and Laura Klimley, wishing him well and not to worry about the money with them, it was safe for his wife and son although they knew that this was not true and in fact that Company was preparing a bankruptcy filing. (See also Dianne Dep. 16-18.)

*23 ¶ 70.On Saturday, May 29, 2004, at 5 Oakledge

Road (Klimley family residence), Bronxville, New York, the Klimleys held a barbeque at their home, attended by Brooks and Laura Klimley, their three children (Zoe, Spencer, Graham), Beth Duval and Wayne, Dianne and David Pullins. Wayne Pullins asked about the company (because they were behind in payment to the Pullins family for about $17,000). Laura Klimley referred questions to Brooks who said things were "going on as usual." Wayne Pullins asked where Alicia Eimicke was and was told by Laura that she was unable to attend because of conflicting weekend plans. The guests were shown in detail their $8 million home, acting as if they (Maxine Eimicke and Brooks and Laura Klimley) were entirely secure. In front of Brooks and Laura Klimley, Maxine Eimicke advised the Pullins family to reserve rooms at the Plaza Hotel for David Pullins' upcoming graduation from Columbia University, suggesting money issues were secure. At the time that these representations were made Brooks Klimley, Laura Klimley and Maxine Eimicke knew that the Company was insolvent and had authorized the filing of a bankruptcy petition. (See also Ed. Dep. 168-70; Dianne Dep. 16-18.)

¶ 71.On Sunday, May 30, 2004, in the Bronxville area, to see the Klimley's two sons play baseball, Wayne Pullins asked again about Alicia and the Company. Again, Brooks spoke for Laura Klimley and himself saying, "Alicia runs the company for us and she plays her cards close to the vest."This statement was made although Brooks Klimley was actively involved in the note program and had knowledge of the Company's insolvency and bankruptcy filing. (See also Dianne Dep. 16-18.)

¶ 79.Defendants knew or in the alternative recklessly disregarded the adverse information in connection with the Company's losses, excessive officers salaries and compensation; failure to register the subject Notes and make the required disclosures; inability to service the Notes and the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

insolvency of the Company as described above and purposely failed to disclose this information to Plaintiffs and the other investors in the Note Program although Defendants had a clear duty to do so.

In addition to the specific instances identified in the TAC, Ed remembers that, during the time prior to Victor's death, Brooks represented to him that VWE was doing well. (Ed Dep. 62.) Ed does not identify when this particular statement may have been made.

Ed also testified that Brooks confirmed with Maxine that there were $4 million in notes outstanding and VWE had plenty of assets to cover that. (*Id.* 118, 843 N.E.2d 1170.) Ed does not testify as to when this particular statement was made. (*Id.*)

### 4. Analysis of Actionability of Fraudulent Statements

As an initial matter, the alleged general representations made by Brooks and identified in Ed's deposition at pages 62 and 118 will not be considered to be material because Ed does not identify the statements with specificity. Remaining to be considered are the specific statements and omissions alleged in the TAC and confirmed in the Depositions of Ed, Dianne and David.

**\*24** This analysis is undertaken based upon factual allegations that both Laura and Brooks knew or should have know the true financial status of VWE. Laura was a 50% owner, a Vice President of VWE, a Director of VWE and worked in the business every day for a period of time. (See Dianne Dep. 107-08.)

Leo Kirby, a VWE employee from May of 1993 to July of 2000, testifies that, as part of his job duties, he delivered business items, including interoffice envelopes and mail messages, to Laura's home and that he saw an office in her home in which she did

VWE business-related work. (Deposition of Leo Kirby ("Leo Kirby Dep.") 64 May 1, 2007.) He, however, does not know the contents of the materials that he delivered. (*Id.* 42, 843 N.E.2d 1170.) He also recalls occasionally discussing business matters with Laura in VWE's office after she ceased working full time there. (*Id.* 34-35, 843 N.E.2d 1170) Dianne also recalls seeing the office in Laura's home and financial documents on Laura's desk. (Dianne Dep. 73-74.) Finally, David recalls seeing the office that Laura had in her home and describes it as a "business-like" office with a fax machine and computer and as "not an office for writing thank you notes."(David Dep. 117.)

Further, in a recent deposition in a different lawsuit, Laura acknowledges that she was consulted by Alicia in connection with issues involving VWE's business affairs in the 1998 to 2004 time period. (Deposition of Laura Klimley ("Laura Dec. Dep.") 34 Dec. 5, 2007.) She also admits that she had signatory power on VWE accounts after Victor's death and that, in October of 2000, she actually signed checks to holders of the Debenture Notes. (*Id.* 223-25, 843 N.E.2d 1170.) Laura also admits that, in mid-2003 she attended at least one meeting regarding the sale of VWE's Holiday Greeting Card business. (*Id.* 205, 276, 843 N.E.2d 1170.) Finally, Laura admits that, up until VWE's bankruptcy was filed, she was receiving a weekly check from VWE for $600. (*Id.* 41, 843 N.E.2d 1170.) She does not think this money was a salary but was money VWE owed her for something other than a Debenture Note. (*Id.* 41-42, 843 N.E.2d 1170)

Further, regarding Laura, there is evidence that she was told by lawyers in the firm of Hall Dickler Kent Goldstein & Wood that, as of August 27, 2001, VWE had significant net operating losses of approximately $8.6 million, a book value of approximately $11 million and outstanding liabilities of approximately $24 million.. (Affidavit of Michael Meyers ("Meyers Aff.") ¶¶ 3-4, Ex.1 Nov. 9, 2007). This information was presented as part of a

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

response to a request from VWE, half-owned at the time by Laura, to present the most tax efficient business structure under which VWE could achieve certain goals in the event it became profitable and/ or was later sold at a substantial gain.(*Id.*)

There are also factual allegations that Brooks was knowledgeable in general about financial matters and heavily involved in and knowledgeable of VWE financial matters. (Dianne Dep. 16-17, 77, 107-08; David Dep. 82-83, 102-04; Romo Aff. ¶¶ 3-4.)

**\*25** Because Laura and Brooks knew or should have known about VWE's poor financial conditions, their statements identified in paragraphs 35, 43, 61, 68, 70 and 71 of the TAC are misrepresentations. While in one context, these statements may be mere "rosy affirmations," in the context of a family business where no financial information is officially disclosed and where the alleged misstatements are made by those close to the family who knew or should have known the actual financial conditions, there are not mere "rosy affirmations." Also, while the majority of the alleged misrepresentations were made by Victor, Maxine and Alicia, there are factual allegations that Laura and Brooks knew or should have known that they were misrepresentations and either supported or failed to correct them. Finally, proper disclosure of the financial status of VWE would have significantly altered the total mix of information available to Ed, Dianne and David upon which to base their decisions regarding purchase and/or renewal of the Debenture Notes. Finally, failure to disclose the true financial picture when given many opportunities to do so is a material omission.

Regarding duty, both Brooks and Laura had a duty to disclose VWE's true financial status to the Plaintiffs because they had made alleged misleading prior disclosures regarding the financial status of VWE. Both Brooks and Laura also had a duty to disclose arising from the relationship of trust that they created due to their close family relationship with the Plaintiffs, Plaintiffs continuing purchase of Debenture Notes and Brooks' and Laura's prior affirmations of VWE's financial well-being. Further, both Brooks and Laura, as control persons of a insolvent company, had a fiduciary relationship with Plaintiffs as creditors and, therefore, had a duty to disclose. Finally, Laura had a duty to disclose that arose from the positions that she held at VWE and the fact that the Plaintiffs were both investors and close family members.

## 5. Conclusion On Actionability

There are genuine issues of material fact as to whether the alleged misstatements and omissions made by Brooks and Laura are actionable. There are genuine issues of material fact as to whether the statements were material and genuine issues of material fact as to whether Brooks and/or Laura had a duty to disclose the true financial status of VWE.

## C. Scienter Regarding the 10b-5 Claims

To prove their 10b-5 claim, Plaintiffs must show that Brooks and/or Laura acted with the requisite scienter. Scienter is defined as "a mental state embracing intent to deceive, manipulate or defraud." *Brown v. Earthboard Sports USA, Inc.,* 481 F.3d 901, 917 (6th Cir.2007); *Picard,* 940 F.Supp. at 1125. For 10b-5 claims based on statements of present or historical fact, scienter consists of knowledge or recklessness. *PR Diamonds v. Chandler,* 364 F.3d 671, 681 (6th Cir.2004). Recklessness is akin to conscious disregard and is defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Id.* at 684.While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." *Id.* at 681 (quoting *Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1025 (6th Cir.1979)). For forward-looking statements that are not accompanied by meaningful cau-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

tionary language, the required state of mind is actu-
al knowledge of the statement's false or misleading
nature. *Id.* at n. 3.

**\*26** A "totality of the circumstances" test is used to
determine whether scienter is adequately shown.
*Brown,* 481 F.3d at 917. Among the factors that
have been considered to determine if scienter was
present are: divergence between internal reports
and external statements on the same subject; close-
ness in time of an allegedly fraudulent statement or
omission and the later disclosure of inconsistent in-
formation; disregard of the most current factual in-
formation before making statements; and the self-
interested motivation of the defendants in the form
of saving their salaries or jobs. *Id.* at 917.

Scienter must be shown for each of the statements
allegedly made by Brooks and Laura. *City of Mon-
roe,* 399 F.3d at 682. The Plaintiffs must allege
facts that, if true, form the basis for a strong infer-
ence that Brooks and/or Laura knew a statement
was false or misleading.

In this case, the Plaintiffs have alleged facts that
both Laura and Brooks knew or should have known
that their statements regarding the financial health
of VWE were false and that both Brooks and Laura
may have been motivated to make the false state-
ments. This same reasoning applies to the alleged
omissions.

First, there is evidence that Brooks knew or should
have known about the actual financial condition of
VWE. There is evidence that, in 1994 at a party at
Maxine's home, the group present "toasted" to the
"handing of the guard over to Brooks and the
girls."[FN13] (Dianne Dep. 107-08.) The Eimickes,
the Pullins and Brooks Klimley were in attendance.
(*Id.*)

> FN13. The Defendants argue that this testi-
> mony should not be considered because it
> is hearsay. However, it is not hearsay be-

cause Dianne Pullins did not identify who,
if anyone, made a statement.

Dianne testified that, on social occasions, Brooks
and Victor discussed the financial aspects of VWE
and said what a great company it was. (Dianne Dep.
16-17.) Dianne also testified that, after Victor's
death, Brooks told her and others not to worry that
he would take care of the family's money and that
he had it right under his thumb. (Dianne Dep. 108;
David Dep. 82-83.)

Ed testified that, on one occasion, Brooks told him
that VWE was "running fine." (Ed Dep. 41.) On
other occasions, Brooks told Ed that VWE was a
great business and highly profitable. (*Id.* 62.)On
other occasions, Brooks launched into a dialogue
about VWE's financials. (Ed Dep. 160-61, 170; Di-
anne Dep. 77; David Dep. 102-04 .) In addition to
evidence recalled by Ed, Dianne and David, Brooks
allegedly told Terence Cyran that VWE was a
"pioneer" in the direct mail industry with "huge"
margins and had been highly and consistently prof-
itable for many years. (Verified Comp. of Terence
Cyran ¶ 12.) Brooks also told Terence Cyran that
the lack of financial disclosure regarding VWE
should not be a concern given the long profitable
history of the business. (*Id.* ¶ 21.)In addition,
Brooks told Thomas Romo that VWE had been
highly and consistently profitable for many years.
(Verified Compl. of Thomas Romo ¶ 7.)

Laura also knew or should have known about the
financial condition of VWE. There is evidence that
she owned 50% of VWE, she was a Director of
VWE, she was a Vice President of VWE and, for a
period of time, she worked at VWE on a daily
basis. There is also evidence that, after Laura
ceased working full-time, she continued to be in-
volved in the operation of VWE.

**\*27** There is also evidence that both Brooks and
Laura had financial motivation to make misrepres-
entations or fail to provide material information.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

Laura was half-owner of VWE and received a regular payment and other benefits from VWE. Both Brooks and Laura owned several of the Debenture Notes and benefitted from continuing to receive interest payments on the notes. (Plts.' Mem. In Opposition To Brooks Klimley Mot. for Summ. J. Exs. A, B.) Finally, as Laura's spouse, Brooks would indirectly benefit from the income and profits she received from VWE.

## D. Conclusion Regarding 10b-5 Claims

The five-year statute of limitations bars Plaintiffs' 10b-5 claims for Debenture Notes purchased prior to January 26, 2000. However, action on the Debenture Notes purchased by the Plaintiffs on or after January 26, 2000, is not barred by the statute of limitations. This includes purchases made on December 12, 2000, October 1, 2001 and October 1, 2003.

With regard to the Debenture Notes purchased on or after January 26, 2000, the Plaintiffs have presented evidence the misrepresentations and/or omissions made by both Brooks and Laura are material and that Brooks and Laura owed them a duty to disclose the actual financial condition of VWE. The Plaintiffs have also presented evidence that both Brooks and Laura may have acted with a mental state embracing an intent to deceive, manipulate or defraud with regard to these misrepresentations and/or omissions and that Brooks and Laura had the financial incentive to do so. Therefore, there are genuine issues of material facts and Brooks and Laura are not entitled to judgment as a matter of law on Plaintiffs' Second Cause of Action for violation of Section 10b of the Securities Exchange Act of 1934 and Rule 10b-5.

## VI. THIRD CAUSE OF ACTION: VIOLATION OF SECTION 15 OF THE SECURITIES ACT OF 1933

In Plaintiffs' Third Cause of Action, they allege that Brooks and Laura were control persons of VWE and therefore secondarily liable for any misrepresentations made by Victor, Maxine or Alicia. The Defendants argue that neither Brooks nor Laura were control persons.

Section 15 applies to violations of Section 12 of the Securities Act of 1933.*Herm v. Stafford,* 663 F.3d 669, 679 (6th Cir.1981). In this case, Brooks and Laura Klimley have been granted summary judgment on the Section 12 claims brought directly against them. However, Brooks and Laura may be liable as control persons for the Section 12 claim that is not time-barred.

Courts analyze control-person-liability claims brought under Section 15 of the Securities Act of 1933 and control-person-liability claims brought under Section 20(a) of the Securities Exchange Act of 1934 using the same legal standards. *See Maker,* 144 F.3d at 1304-05; *In re Enron Corporation Securities, Derivative & "ERISA" Litigation,* Nos. MDL-1446 and Civ.A. H-01-3624, 2003 WL 230688 at * 12 (S.D.Tex. Jan.28, 2003)(the Fifth Circuit has held that Section 15 and Section 20(a) are analogous and should be interpreted in the same manner); *Picard,* 940 F.Supp. at 1133-34; *Maywalt,* 808 F.Supp. at 1053-54. Also, the Parties in this case have not argued otherwise. Therefore the law regarding Section 15 and Section 20(a) claims will be set forth and applied to both Plaintiffs' Section 15 and Section 20(a) claims.

## A. Relevant Law On Control Person Liability

**\*28** Under Section 15 of the Securities Act of 1933 and Section 20(a) of the Securities Exchange Act of 1934, a person who controls a party that commits a violation of the securities laws may be held jointly and severally liable with the primary violator. *Maher,* 144 F.3d at 1304-05.[FN14]To state a prima facie case of control person liability, the plaintiff must

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case: 1:08-cv-02755-DCN  Doc #: 40-7  Filed: 07/30/09  85 of 119.  PageID #: 679

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

Page 26

establish (1) a primary violation of the securities laws and (2) "control" over the primary violator by the alleged controlling person. *Id.* (citing *First Interstate Bank v. Pring,* 969 F.2d 891, 897 (10th Cir.1992)); *see also PR Diamonds v. Chandler,* 364 F.3d 671, 696-97 (6th Cir.2004).

> FN14. Section 15 and Section 20(a) are remedial and thus construed liberally. *Maher,* 144 F.3d at 1305.

A plaintiff is not required to show that the defendant "acted or culpably participated in the primary violation." *Maher,* 144 F.3d at 1305. Only some indirect means of discipline or influence short of actual direction is required to hold a controlling person liable. *Id.* Further, status as a control person is normally a question of fact unless the allegations are unusually explicit and the court can determine that the plaintiff could not plead or prove sufficient facts to support control-person liability. *Sanders Confectionery Products v. Heller Financial, Inc.,* 973 F.2d 474, 485-86 (6th Cir.1992).

Having set forth the standard for control person liability, the analysis turns a determination of who is liable as a control person. "Control" has been defined by the Securities and Exchange Commission as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. *PR Diamonds,* 364 F.3d at 696-97 (citing 17 C.F.R. § 230.405). "Control," therefore, is the practical ability to direct the actions of the individuals who committed the primary violation. *In re National Century Financial Enterprises, Inc. Investment Litigation,* 504 F.Supp.2d 287, 30 (S.D.Ohio 2007)(citing *Stavrof,* 1997 WL 720475 at n. 5.)

The Sixth Circuit has not adopted a test for control-person liability but has applied the test set forth in *Metge v. Baehler,* 762 F.2d 621 (8th Cir.1987) be-

cause it was the least rigorous standard used at that time. *Sanders,* 973 F.3d at 486.*Metge* established a two-pronged test for control person liability. *Id.* The plaintiff must show that the defendant "actually participated in (i.e. exercised control over) the operations" in general and "that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated."*Id.* (quoting *Metge,* 762 F.2d at 631.)

"To establish the first prong of the test, the plaintiff must show that the defendant had some indirect means of discipline or influence, even if short of actual directions, over the corporation."FN15 *Picard,* 940 F.Supp. at 1134 (citing *Myzel v. Fields,* 386 F.2d 718, 738 (8th Cir.1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968)). In short, there must be some showing of actual participation or some influence before control may be imposed. *Id.*

> FN15. The Defendants cite *Herm v. Stafford,* 663 F.2d 669 (6th Cir.1981) for the proposition that allegations of an actual exercise of control are necessary to survive a motion for summary judgment. However, in *Herm,* the court granted a motion for summary judgment against a Section 20(a) claim because the plaintiff failed to present evidence of the defendant's "influence" or "actual participation in the corporation's operations."*Id.* at 684.

*29 The Plaintiffs cite *In re National Century,* 504 F.Supp.2d 287,FN16 for the proposition that it is not necessary to show actual participation or the exercise of actual power to prove control person liability. However, this particular argument is not persuasive. The *National Century* court was identifying a pleading standard relative to a motion to dismiss. *Id.* at 303.The *National Century* court did, however, acknowledge that *Herm* required evidence of "influence or actual participation in the corporation's operation" in order to survive a motion for

Case: 1:08-cv-02755-DCN  Doc #: 40-7  Filed: 07/30/09  86 of 119.  PageID #: 680

Not Reported in F.Supp.2d                                                                                    Page 27
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

summary judgment. *Id.* at n. 3.

> FN16. The Plaintiffs actually cite *In Re National Century Financial Enterprise, Inc.,* 2006 U.S. Dist. LEXIS 72154 (S.D.Ohio 2006) but this case says nothing about control person liability and it appears that Plaintiffs may have intended to cite *In re National Century Financial Enterprises, Inc.,* 504 F.Supp.2d 287 (S.D.Ohio 2007).

**B. Primary Violation**

The Plaintiffs have presented factual allegations that Victor, Maxine and Alicia violated Section 12(a)(2) of the Securities Act of 1933 by making material misstatements or omissions regarding the sale of the Debenture Notes. These allegations are not disputed by the Defendants. Therefore, for purposes of the Defendants' Motions for Summary Judgment, a primary violation of Section 12(a)(2) will be assumed to have occurred. The analysis next turns to whether Brooks and/or Laura had control over Victor, Maxine and Alicia Eimicke.

To survive a motion for summary judgment regarding control person liability, the Plaintiffs must present evidence that Brooks and/or Laura actually participated in or had some involvement in the operations of VWE in general and that Brooks and/or Laura possessed the power to control Victor, Maxine and Alicia's misstatements and/or omissions regarding sale of the Debenture Notes.

**C. Brooks as a Control Person**

Brooks argues that he did not act in any capacity for VWE, and that his only relationship to VWE was by being married to Laura. The Plaintiffs respond that Brooks was in charge of overseeing VWE's financial affairs and represented to the Plaintiffs and others that he was doing so.

First, there is evidence that Brooks was involved in the financial affairs of VWE. There is evidence that, in 1994 at a party at Maxine's home, the group present "toasted" to the "handing of the guard over to Brooks and the girls." (Dianne Dep. 107-08.) The Eimickes, the Pullins and Brooks Klimley were in attendance. (*Id.*) In addition, Dianne testifies that, on social occasions, Brooks and Victor discussed the financial aspects of VWE and said what a great company it was. (Dianne Dep. 16-17.) Dianne Pullins also testifies that, after Victor's death, Brooks told her and others not to worry that he would take care of the family's money and that he had it right under his thumb. (Dianne Dep. 108; David Dep. 82-83.)

Ed testifies that, on one occasion, Brooks told him that VWE was "running fine." (Ed Dep. 41.) On other occasions, Brooks told Ed that VWE was a great business and highly profitable. (*Id.* 62.) On other occasions, Brooks launched into a dialogue about VWE's financials. (Ed Dep. 160-61, 170; Dianne Dep. 77; David Dep. 102-04 .)

In addition to evidence recalled by Ed, Dianne and David, Brooks allegedly told Terence Cyran that VWE was a "pioneer" in the direct mail industry with "huge" margins and had been highly and consistently profitable for many years. (Verified Comp. of Terence Cyran ¶ 12.) Brooks also told Terence Cyran that the lack of financial disclosure regarding VWE should not be a concern given the long profitable history of the business. (*Id.* ¶ 21.) In addition, Brooks told Thomas Romo that VWE had been highly and consistently profitable for many years. (Verified Compl. of Thomas Romo ¶ 7.) Finally, Brooks has testified that, on at least one occasion, he, at Alicia's request, discussed VWE with a potential buyer of VWE's Debenture Notes. (Brooks Dec. Dep. 166-68.)

**\*30** In addition to the above deposition testimony, the Plaintiffs have identified evidence that Brooks was involved in the operation of VWE in the form

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

of nineteen VWE quarterly interest checks written to various debenture holders that are allegedly signed by Brooks. (Affidavit of Barbara DeMuth ("DeMuth Aff.") Ex. 14 Oct. 11, 2007; Ed Aff.") ¶ 7.) Brooks' signature on the checks is identified by Ed. (Ed. Aff.¶ 7.) Barbara DeMuth also attests that she recognizes the signatures on the checks in Ex. 14 to her Affidavit as the signatures of Alicia Eimicke, John Palmero, Laura Klimley and that these checks were signed at a time when Brooks Klimley, "who likewise appears to have signed these checks," was in VWE's offices. (DeMuth Aff. ¶ 18.)

Brooks testified that he did not sign the checks attached to DeMuth's Affidavit and Laura affirms that she did. (Supplemental Affidavit of Brooks Klimley ("Brooks Supp. Aff.") ¶ 7 Nov. 13, 2007; Supplemental Affidavit of Laura Klimley ("Laura Supp. Aff.") ¶ 3 Nov. 13, 2007.) In addition to arguing that he did not sign the checks, Brooks argues to disregard Ed's Affidavit wherein he identifies Brooks' signature. This Affidavit should be disregarded according to Brooks, because it was untimely, it is not signed or notarized and because Ed Pullins did not establish the foundation necessary for him to conclude that the signature belonged to Brooks.

As to timeliness, signature and notarization, the first page of Ed's Affidavit was filed on October 22, 2007, along with Plaintiffs' responses to Defendants' Motions for Summary Judgment. (Doc. # 132.) A complete Affidavit was then filed on November 5, 2007, but included typed rather than original affiant and notary signatures. (Doc. # 139.) On November 21, 2007, a complete Affidavit was filed that was notarized and included an original signature. (Doc. # 155.) The manner in which Ed's Affidavit was filed is not necessarily acceptable to this Court. However, the Defendants are obviously aware of, and therefore, not prejudiced by the late filing of the complete Affidavit and the interests of justice demand that the Affidavit not be disregarded based upon the manner in which is was filed.

As to the foundation for Ed's Affidavit, a nonexpert may be permitted to state an opinion as to the authenticity of handwriting with which he or she is familiar provided that the familiarity is not acquired for the purpose of litigation. *United States v. Binzel,* 907 F.2d 746, 749 (7th Cir.1990). The extent of the witnesses' familiarity generally goes to the weight to be given to the testimony but there must be a minimal factual basis from which the familiarity might reasonably have been obtained. *Id.* Finally, the nonexpert witness must identify with particularity any documents that are relied upon to establish familiarity. *Hall v. United Insurance Company of America,* 367 F.3d 1255, 1261 (11th Cir.2004).

In his Affidavit, Ed affirms that Laura is his niece and Brooks her husband and that he is familiar with their signatures because he has received correspondence from both for many years prior to filing this lawsuit. This is enough foundation. Ed indicates that he is familiar with Brooks' and Laura's signatures and identifies the documents that he relied upon to establish the familiarity. Any further familiarity issues go to the weight to be given to Ed's testimony and are not properly determined at summary judgment.

*31 Brooks argues that former VWE employees who were actually present at VWE testified that they almost never saw Brooks at VWE and that they had no knowledge of Brooks having involvement in or responsibility for VWE. However, this, of course, is not conclusive proof that Brooks was not a control person, particularly when faced with evidence to the contrary.

The Plaintiffs have presented evidence that Brooks participated in or had some involvement in the operation of VWE in general and that Brooks had the power to control Victor, Maxine and Alicia's misstatements and/or omissions regarding sale of the Debenture Notes. There is evidence that "Brooks

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

Page 29

and the girls" were running VWE and that Brooks held himself out to others as knowledgeable about the financial status of VWE. Further, there is evidence that, on at least one occasion, Brooks discussed VWE with a potential buyer of VWE Debenture Notes. Finally, there is evidence that Brooks signed checks on VWE accounts issued to holders of VWE Debenture Notes. Therefore, there are genuine issues of material facts and Brooks is not entitled to judgment as a matter of law on Plaintiffs' claim that he was a control person pursuant to Section 15.

### D. Laura as a Control Person

Laura argues that she is not a control person of VWE because, at all relevant times, she did not participate in the management and operations of VWE. However, the Plaintiffs have presented evidence otherwise.

Laura owned half of VWE. She also was a Director of VWE until she resigned in a letter dated September 9, 2004 (Laura Dep. Ex. 1.) and a Vice President of VWE until she resigned in a letter date September 28, 2004 (*Id.*Ex. 2.).

Laura affirms that she worked full-time at VWE from 1985 until 1996 and worked part time thereafter until 1999. (Laura Aff. ¶ 7.) She recalls very little regarding her involvement in VWE after 1999. She admits that she was a Vice President of VWE but doesn't recall who appointed her, why she was appointed or what her duties were. (Laura Dep. 39.) She also admits that she was a director of VWE but she claims that she did not know what her duties were and had no idea how VWE's Directors were appointed. (*Id.* 78, 122.)Finally, she acknowledged that she was the owner of VWE common and preferred stock but does not know how she acquired the stock. (*Id.* 74-75.)

Documents submitted by the Plaintiffs describe more involvement in VWE by Laura after 1999

than she remembers. She allegedly received business correspondence at an office that she had at her home, she allegedly signed checks to Debenture Note holders, she allegedly participated in the sale of the Greeting Card Business and she allegedly received a weekly check from VWE after 1999.

In addition, Minutes of Annual Meetings of Stockholders for the years 2000, 2001, 2002 and 2003 indicate that Laura was present for each, that Laura was an officer and employee of VWE, that Laura was elected a director for the next year and that she reviewed and approved the Financial Report for the preceding fiscal year. (DeMuth Aff. Ex. 16.) Minutes of the Annual Meeting of Directors for the years 2000, 2001, 2002 and 2003 indicate that Laura was present, that she was elected as Vice President for the following year, that she reported on "list management and organizational structure/personnel" and that she reviewed and approved VWE's Financial Statements for the previous fiscal year. (*Id.*) The Minutes of the Shareholder and Director annual meetings are signed by Alicia (Barbieri) Klimley and Maxine Klimley. (*Id.*) Included in the records submitted by the Plaintiffs are "Waiver of Notice" forms waiving notice of the 2000, 2001, 2002, and 2003 Stockholders and Directors annual meetings. (*Id.*) Each of the waivers is signed by Laura.[FN17](*Id.; see also* Laura Supp. Aff. 6 Nov. 13, 2007.)

> FN17. The signature on the waiver for the 43rd Annual Meeting of the Directors appears to be different from the signature on the other waivers.

**\*32** In addition to the documents regarding VWE annual shareholder and director meetings, the Plaintiffs have submitted VWE's Federal Income Tax Returns for the years 2002 and 2003. (Demuth Aff. Ex. 12, 13.) These tax returns are signed by Alicia Eimicke as President of VWE and report to the Government that Laura was an officer of VWE and devoted 100% of her time to the business.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

## 1. Objection To Barbara DeMuth's Affidavit

The meeting minutes and waivers and the tax returns were submitted as attachments to Barbara DeMuth's Affidavit. The Defendants object to Barbara DeMuth's Affidavit arguing that it fails to establish her competency to attest to the elements of the business-records exception and because she does not affirm that the minutes were created by a person with knowledge of the transaction or from information transmitted by a person with knowledge.

Records prepared in the course of regularly conducted business are particularly reliable because the person preparing the record has an incentive to be accurate. *United States v. Weinstock,* 153 F.3d 272, 276 (6th Cir.1998). Therefore, the Federal Rules of Evidence provide an exception to the inadmissibility of hearsay for business records.

The business record exception sets forth the following four requirements for admissibility of documents that are otherwise hearsay: (1) the document must have been made in the course of a regularly conducted business activity; (2) the document must have been kept in the regular course of that business; (3) the regular practice of that business must have been to have made the document; and (4) the document must have been made by a person with knowledge of the transaction or from information transmitted by a person with knowledge. *United States v. Jenkins,* 345 F.3d 928, 935 (6th Cir.2004)(citing Fed.R.Evid. 803(b)). Also, the document must be presented through "the testimony of the custodian or other qualified witness[.]"*Id.*(quoting Fed.R.Evid. 803(6)). The "other qualified witness," if applicable, is not required to have control of the record or personal knowledge of the preparation of the record but is required to be familiar with the record keeping procedures of the organization. *Id.* (citing *Dyno Construction Co. v. McWane, Inc.,* 198 F.3d 567, 575-76 (6th Cir.1999)); *Weinstock,* 153 F.3d at 276.

Business records meeting the criteria set forth in Fed.R.Evid. 803(6) are admissible "unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness."*Id.* (quoting Fed.R.Evid. 803(6)). The trial court is given "great latitude" on evidentiary rulings regarding trustworthiness and federal law favors the admission of evidence which has any probative value. *United States v. Hathaway,* 798 F.2d 902, 906 (6th Cir.1986).

## 2. Analysis of the Admissibility of Barbara DeMuth's Affidavit

A review of the Affidavit of Barbara DeMuth indicates a sufficient basis to qualify the meeting minutes, waivers and income tax returns as business records. Barbara DeMuth affirms that she was employed by VWE from 1979 until 2004 as the accounts receivable supervisor and that she worked with John Palmero and Alicia Eimicke on a daily basis. (DeMuth Aff. ¶ 2.) She affirms that she became "intimately" familiar and has extensive knowledge of the creation and maintenance of VWE's banking records, accounts receivable records, records in connection with VWE's sale of unregistered debentures, sales reports and other like general business records. (*Id.* ¶ 3.) She affirms that she viewed numerous documents hand-written and/or signed by John Palmero, Maxine Eimicke, Alicia Eimicke and Laura Klimley and "is very familiar with and recognizes on sight, their handwriting and signature."*Id.* ¶ 4. She then identifies the 2003 and 2004 VWE tax returns as documents prepared by John Palmero in the regular performance of his job duties. (*Id.* ¶¶ 16, 17.)She also identifies the signatures on the 2000, 2001, 2002 and 2003 Shareholders and Directors Meeting Minutes and waivers as those of John Palmero, Maxine Eimicke, Alicia Eimicke and Laura Klimley. (*Id.* ¶ 20.)She further affirms that these records were prepared by Loretta Buscarino, VWE's secretary, in the regular performance of her job duties at or near the dates set

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 31
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
**(Cite as: 2008 WL 85871 (S.D.Ohio))**

forth and were kept in the course of the regularly conducted activity of VWE.(*Id.*) Loretta Buscarino confirms that, although she did not attend the meetings, she typed the minutes based upon notes given to her by those who did attend. (Buscarino Dep. 33-39, 74-75.)

**\*33** As an "other qualified witness," Barbara De-Muth presents evidence that she is familiar with the record keeping procedures of VWE. Further, she affirms that the documents in question were made in the course of a regularly conducted business activity and were kept in the regular course of that business. Further, Barbara DeMuth's recognition of the signatures on the documents is but one indication that the regular practice of VWE must have been to have made the documents. The signatures on the documents and the affirmation that VWE's secretary prepared the documents indicate that the documents were made by a person with knowledge of the transaction or from information transmitted by a person with knowledge.

The Defendants attempt to discredit DeMuth's Affidavit by identifying testimony that she gave at an examination conducted by the Official Committee of Unsecured Creditors in *In re VWE Group, Inc.,* (DeMuth Dep. Ex. C 37.) In response to the question, "Do you know if the company kept corporate books and minutes," DeMuth responded, "I don't know." She was then asked, "You don't know," to which she responded, "Not that I know of." (*Id.*) This general line of questions without any signed documents to view is far different from the specific documents that DeMuth identifies in her Affidavit and does not serve to discredit DeMuth's identification of the meeting minutes, waivers and tax returns.

The Defendants continue to attempt to discredit De-Muth's Affidavit by discussing what DeMuth actually did for VWE, who actually typed minutes, and DeMuth's alleged recantation of allegations that she had made in another affidavit. However, rather than going to the trustworthiness of the Affidavit in question, these arguments go to the weight to be given the evidence and can be made, if appropriate, in cross examination.

### 3. Analysis of Laura's Control Person Liability

Minutes of the Shareholders and Directors Meetings from 2000 to 2003, waivers for these meetings from 2000 to 2003, and the federal income tax returns for 2002 and 2003 will be considered. These documents along with Laura's 50% ownership, Directorship, Vice-Presidency and participation in VWE's business affairs during this same time period are evidence that Laura participated in the operations of VWE and possessed the power to control what was said or unsaid with regard to sale of the Debenture Notes. There is, therefore, evidence that Laura is subject to control person liability.

In moving for summary judgment, the Defendants present evidence that Laura did not actively participate in the operation of VWE at times relevant to the actionable Section 12(a)(2) claims. Resolving this dispute of fact is for the trier of fact. Therefore, there are genuine issues of material fact and Laura is not entitled to judgment as a matter of law on Plaintiffs claim that she was a control person pursuant to Section 15.

### E. Conclusion On Section 15 Control Person Claim

**\*34** There are genuine issues of material fact as to whether Brooks and/or Laura were control persons pursuant to Section 15. Therefore, Brooks' and Laura's Motions for Summary Judgment on Plaintiffs' Third Cause of Action for violation of Section 15 of the Securities Act of 1933 is OVER-RULED.

### VII. FOURTH CAUSE OF ACTION: VIOLA-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

## TION OF SECTION 20(a) OF THE SECURIT-IES EXCHANGE ACT OF 1934

In Plaintiffs' Fourth Cause of Action, they allege that Brooks and Laura were control persons of VWE and therefore secondarily liable for any mis-representations made by Victor, Maxine or Alicia with regard to their 10b-5 Claims. The Defendants argue that neither Brooks nor Laura were control persons and the Plaintiffs respond that they were.

Section 20(a) applies to claims brought under the Securities Exchange Act of 1934 such as Plaintiffs' 10b-5 claims. *Herm,* 663 F.2d at 679. Plaintiffs' 10b-5 claims against both Brooks and Laura have survived summary judgment and the Sixth Circuit has observed without deciding that there is some authority that a plaintiff may not be able to simul-taneously assert both 10b-5 claims and Section 20(a) claims. *PR Diamonds,* 364 F.3d at n. 4. However, since this is a summary judgment pro-ceeding and not a trial, whether Brooks and Laura are liable, if at all, directly under Section 10b-5 or as control persons under Section 20(a) will be left for a jury to decide.

As set forth above, courts analyze control-per-son-liability claims brought under Section 15 of the Securities Act of 1933 and control-person-liability claims brought under Section 20(a) of the Securities Exchange Act of 1934 using the same legal stand-ards and the Parties in this case have not argued otherwise. Therefore, the law and conclusions set forth above with regard to Plaintiffs' Section 15 claims apply to Plaintiffs' Section 20(a) claims.

There are genuine issues of material fact as to whether Brooks and/or Laura were control persons under Section 20(a) of the Securities Exchange Act of 1934. Therefore, Brooks' and Laura's Motions for Summary Judgment on Plaintiffs' Fourth Cause of Action for violation of Section 20(a) of the Se-curities Exchange Act of 1934 is OVERRULED.

## VIII. FIFTH CAUSE OF ACTION: FRAUD

In Plaintiffs' Fifth Cause of Action, they allege that Brooks and Laura made material misrepresentations and/or omissions in an attempt to induce them to in-vest in VWE in violation of common law. The De-fendants argue that neither Brooks nor Laura had a duty to disclose, that the statements attributed to Brooks and Laura were not material and that there is no evidence that either Brooks or Laura acted with the required scienter. The Plaintiffs respond that both Brooks and Laura had a duty to disclose, that the statements by both Brooks and Laura were material and that they both acted with the required scienter.

The elements of a common law fraud claim are:

(1) a representation or, where there is a duty to dis-close, concealment of a fact,

*35 (2) which is material to the transaction at hand,

(3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

(4) with the intent of misleading another into rely-ing upon it,

(5) justifiable reliance upon the representation or concealment, and

(6) a resulting injury proximately caused by the re-liance.

*Glassner,* 223 F.3d at 352; *Russ v. TRW, Inc.,* 59 Ohio St.3d 42, 570 N.E.2d 1076, 1083 (Ohio 1991). Further, a representation which may serve as a basis for common-law fraud includes spoken or written words and conduct that amounts to an assertion not in accordance with the truth. *Russ,* 570 N.E.2d at 1084.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

Page 33

As determined above, there are questions of fact regarding whether the oral statements and omissions attributed to Brooks and Laura were material. Also, as determined above, there are questions of fact as to whether Brooks and Laura had a duty to disclose VWE's true financial condition to the Plaintiffs. Also, as determined above, there are questions of fact as to whether Brooks and Laura acted with the requisite scienter. Finally, Brooks and Laura do not dispute, for purposes of their Motions for Summary Judgment, that the remaining elements of a common law fraud claim are satisfied. Therefore, there are genuine issues of material fact and Brooks and Laura are not entitled to judgment as a matter of law on Plaintiffs' common law fraud claim.

## IX. SIXTH CAUSE OF ACTION: CIVIL CONSPIRACY

In Plaintiffs' Sixth Cause of Action, they allege that Brooks and Laura engaged in a conspiracy to illegally deprive them of their property through a pattern of fraud and corrupt activity. Brooks and Laura argue that the Plaintiffs cannot establish their conspiracy claims.

### A. Relevant Law Regarding Civil Conspiracy

A civil conspiracy claim serves to enlarge the pool of potential defendants from whom a plaintiff may recover. *Gosden v. Louis,* 116 Ohio App.3d 195, 687 N.E.2d 481, 497-98 (Ohio Ct.App.1996). Also, a civil conspiracy claim may constitute an aggravation which may tend to increase the amount of damages available to the plaintiff. *Id.*

A civil conspiracy is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Aetna Casualty and Surety Company v. Leahey Construction Company, Inc.,* 219 F.3d 519, 534 (6th Cir.2000)(quoting *Kenty v. Transamerica Premium Insurance Com-*

*pany,* 72 Ohio St.3d 415, 650 N.E.2d 863, 866 (Ohio 1995)). Thus, the elements of a civil conspiracy claim are: (1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Id.* (quoting *Universal Coach, Inc. v. New York City Transit Authority, Inc.,* 90 Ohio App.3d 284, 629 N.E.2d 28, 33 (Ohio Ct.App.1993)). Finally, knowledge of a wrongful purpose is a crucial element in conspiracy cases. *Id.*

**\*36** To satisfy the "malicious combination" element, actual knowledge must be shown and may be shown by circumstantial evidence. *Aetna,* 219 F.3d at 536. As a result, evidence showing that a defendant should have known is not enough. *Id.* However, only a common understanding or design or shared conspiratorial objective need be shown. *Aetna,* 219 F.3d at 538. Finally, the malice may be imputed to a common design by two or more persons to harm another and need not be proved separately. *Gosden,* 687 N.E.2d at 496.

The fourth element, "[i]n a way not competent for one alone" means that, if one person could lawfully commit an act, then that act, if committed by two or more persons cannot support a conspiracy claim. *Gosden,* 687 N.E.2d at 497. Said another way, if the claim regarding the underlying unlawful act fails, the conspiracy claim must also fail. *Wolfer Enterprises, Inc. v. Overbrook Development Corp.,* 132 Ohio App.3d 353, 724 N.E.2d 1251, 1255 (Ohio App.Ct.1999).

### B. Analysis of Conspiracy Claim

In this case, the Plaintiffs have presented evidence that satisfies the second, third and fourth elements of a conspiracy claim. Brooks and Laura do not argue otherwise regarding second and third elements for purposes of their Motions for Summary Judgment.

Brooks and Laura do, however, argue that the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Plaintiffs have no evidence that Brooks and Laura participated in a "malicious combination" to defraud the Plaintiffs However, there is evidence to the contrary.

As determined above, there are questions of material fact as to whether Brooks and Laura are primarily liable for alleged securities fraud and there are questions of material fact as to whether Brooks and Laura are liable for the alleged securities fraud as control persons. Further, there is evidence that Brooks and Laura were spouses and that they both had financial interests in the success of VWE. From these alleged facts, a reasonable juror could conclude that Brooks and Laura had a common understanding or design or shared conspiratorial objective to defraud the Plaintiffs. Therefore, there are questions of fact as to whether the Plaintiffs can satisfy the "malicious combination" element of a civil conspiracy claim.

Brooks and Laura also argue that they are entitled to summary judgment on the civil conspiracy claim because they are entitled to summary judgment on the underlying claims. Yet, as determined above, Brooks and Laura are not entitled to summary judgment on Plaintiffs' 10b-5 and fraud claims. Therefore, there are genuine issues of material fact and Brooks and Laura are not entitled to judgment as a matter of law on Plaintiffs' Sixth Cause of Action for civil conspiracy.

## X. SEVENTH CAUSE OF ACTION: VIOLATION OF OHIO SECURITIES ACT

In Plaintiffs' Seventh Cause of Action, they alleged that Brooks and Laura violated the Ohio Securities Act, Ohio Rev.Code § 1707.44(B), (C)(1), (D), (F) and (G). Ohio securities laws are evidence of Ohio's interest in protecting its citizens by making certain requirements of investment arrangements before and when they are distributed in Ohio. *Bernie v. Waterfront Limited Dividend Housing As-*sociation,* 614 F.Supp. 651, 655 (S.D.Ohio 1985).

*37 The relevant portions of Ohio securities law prohibit making or causing to be made any false representation concerning a material and relevant fact in any oral statement for the purpose of selling any securities in Ohio. Ohio Rev.Code § 1707.44(B). This law also prohibits knowingly selling or causing to be sold any security which has not been registered and is not exempt from registration. Ohio Rev.Code § 1707.44(C)(1). In addition, Ohio securities law prohibits a person who is an officer, director or trustee of an issuer and who knows the issuer to be insolvent from selling any of the issuer's securities without disclosing the fact that the issuer is insolvent. Ohio Rev.Code § 1707.44(D). Finally, this law prohibits a person from selling the securities of an insolvent issuer with knowledge that the issuer is insolvent and with intent to deceive. Ohio Rev.Code § 1707.44(F).

Brooks and Laura argue that Plaintiffs' Ohio securities claims cannot be applied to them and, in the alternative, that these claims are time-barred. The Plaintiffs respond that this Court has personal jurisdiction over both Brooks and Laura and that Plaintiffs' Ohio securities claims are not time-barred. The existence of personal jurisdiction must first be determined.

### A. Relevant Law On Personal Jurisdiction

Federal courts apply the law of the forum state when determining whether personal jurisdiction exists. *Burnshire Development, LLC v. Cliffs Reduced Iron Corp.,* 198 F. App'x 425, 429 (6th Cir.2006). The federal court must first determine if the law of the forum state, Ohio in this case, provides personal jurisdiction. *Id.* If so, the federal court must then determine if exercising personal jurisdiction comports with the Due Process Clause of the U.S. Constitution. *Id.*

When there is no evidentiary hearing, as is the case

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

here, the plaintiff must make only a prima facie showing. *Id.* The evidence, when in conflict, is viewed in a light most favorable to the plaintiff. *Id.*

Brooks and Laura do not dispute whether Ohio law provides for personal jurisdiction over them. The analysis, therefore, becomes whether personal jurisdiction over Brooks and Laura on Ohio securities claims comports with the Due Process Clause.

For purposes of the Due Process analysis, there is a distinction between general and specific jurisdiction. *Youn v. Track, Inc.,* 324 F.3d 409, 417 (6th Cir.2003). However, either one is an adequate basis for personal jurisdiction. *Id.*

General jurisdiction exists where the defendant's contacts with the forum state are "substantial" and "continuous and systematic" so that the state may exercise personal jurisdiction even if the action does not relate to the defendant's contacts with the state. *Id.* at 418.Specific jurisdiction exists when the contacts giving rise to the jurisdiction relate to the claim that is before the court. *Id.*

The constitutional touchstone for specific jurisdiction is whether the non resident defendant purposefully established minimum contacts in the forum state such that he or she should reasonably anticipate being haled into court there. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Jurisdiction comports with the Due Process Clause where the contacts proximately result from actions by the defendant himself or herself that create a substantial connection with the forum. *Id.* Jurisdiction does not comport with the Due Process Clause when the contacts are random, fortuitous or attenuated or where they result from the unilateral activity of a third party. *Id.*

**\*38** The Sixth Circuit has established a three part test for determining whether specific personal jurisdiction exists. *Id.* For specific personal jurisdiction to exist: (1) a defendant must purposefully avail it-

self of the privilege of acting in the forum state; (2) the cause of action must arise from the defendant's activities in the forum state; and (3) the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of personal jurisdiction over the defendant reasonable. *Morel Acoustics, LTD. v. Morel Acoustics USA, Inc.,* No. 3:04-CV-348, 2005 WL 2211306 at \*5 (S.D.Ohio Sept.7, 2005)(citing *Southern Machine Co. v. Mohasco Industries, Inc.,* 401 F.2d 374, 381 (6th Cir.1968)).

The first prong of the *Southern Machine* test, termed the "purposeful availment requirement," ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous" or "attenuated" contacts. *Burger King,* 471 U.S. at 475. However, physical contacts are not necessary so long as a commercial actor's efforts are "purposely directed" toward a resident of the forum state. *Ricker v. Fraza/Forklifts of Detroit,* 160 Ohio App.3d 634, 828 N.E.2d 205, 211 (Ohio Ct.App.2005). For example, the soliciting of insurance by mail, the transmission of radio broadcasts into the forum state and the sending of magazines and newspapers into the forum state to be sold there have all been considered to be an availment of the privilege to do business in the forum state. *Southern Machine,* 401 F.2d at 382. Yet, the existence of a contract, such as a debenture note, is not purposeful availment. *Healthcare Capital, LLC v. Healthmed, Inc.,* 213 F.Supp.2d 850, 860 (S.D.Ohio 2002.)Prior negotiations and contemplated future consequences along with the terms of the contract and the parties' actual course of dealing must be evaluated. *Healthcare Capital,* 213 F.Supp.2d at 860 (citing *Nationwide Mutual Insurance Co. v. Tryg International Insurance Co., Ltd.,* 91 F.3d 790, 795 (6th Cir.1996)).

The second prong of the *Southern Machine* test is satisfied when the defendant's contacts are related to the operative facts of the case. *Bird v. Parsons,*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

289 F.3d 865, 875 (6th Cir.2002). Further, contacts include only those activities purposefully sought or initiated by the defendant. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297-98, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

The third prong of the *Southern Machine* test is satisfied when the defendants have sufficient contacts with the forum state and the wrongs of which the plaintiff complains arise out of those contacts. *See Cole v. Mileti,* 133 F.3d 433, 436 (6th Cir.1998), *cert. denied,* 525 U.S. 810, 119 S.Ct. 42, 142 L.Ed.2d 32 (1998); *CompuServe, Inc. v. Patterson,* 89 F.3d 1257, 1268 (6th Cir.1996). In other words, a court may infer that the third prong of the *Southern Machine* test has been satisfied and the exercise of personal jurisdiction over the defendant is reasonable if the first two prongs are satisfied. *Id.*

*39 The Parties here cite several cases in support of their arguments. In one example, Due Process was not offended when jurisdiction was found to exist over a non resident defendant who was conducting a mail order business in the forum state and had issued insurance to a resident of the forum state. *Travelers Health Association v. Commonwealth of Virginia,* 339 U.S. 643, 649, 70 S.Ct. 927, 94 L.Ed. 1154 (1950). In another example, Due Process was not offended when jurisdiction was found to exist over claims brought by non resident plaintiffs pursuant to Ohio security laws against a non resident securities underwriting firm that sold securities of an Ohio company and had visited the Ohio company several times in the process. *Corporate Partners, L.P. v. National Westminster Bank PLC,* 126 Ohio App.3d 516, 710 N.E.2d 1144, 1150 (Ohio Ct.App.1998). In another example, Due Process was not offended when jurisdiction was found to exist in a securities case over a non resident defendant who had contacted the Ohio plaintiff several times by phone and mail. *Bernie,* 614 F.Supp. at 654-55.[FN18] In yet another example, subjecting a non resident seller of securities to Ohio securities law did not offend Due Process where the only con-

tacts with Ohio were the mailing of two letters and a subscription agreement to an Ohio resident. *Martin v. Steubner,* 485 F.Supp. 88, 100 (S.D.Ohio 1979), *aff'd* 652 F.2d 652 (6th Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1013, 71 L.Ed.2d 302 (1982). However, Due Process was offended and jurisdiction not permitted over a non resident bank whose only contact with Ohio was the mailing of loan documentation to an Ohio resident. *First National Bank of Mt. Prospect v. Shenk,* Nos. 91 C 5736 and 91 C 5753, 1993 U.S. Dist. LEXIS 1172 at *13 (N.D.Ill. Feb. 2, 1993). While these cases are instructive, none are on point and the course of dealing and contemplated future consequences in this case must be analyzed.

> FN18. The *Bernie* court based its decision upon how the securities were marketed to an Ohio resident and on Ohio's interest in protecting its citizens with regard to the sale of securities in Ohio. *Bernie,* 614 F.Supp. at 654-55.

## B. Analysis of Personal Jurisdiction

In this case, Brooks and Laura argue that they did not have contacts with Ohio and did not purposefully avail themselves of the benefits of Ohio and are, therefore, not subject to Ohio securities laws. The Plaintiffs respond that Brooks and Laura knew that Ohio residents were solicited to buy the debenture notes and that they both actively assisted VWE in selling the debenture notes to residents of Ohio.

As for general jurisdiction, the Plaintiffs identify various social visits to Ohio made by Brooks and Laura. However, social visits do not rise to the level of business contacts necessary to invoke general jurisdiction.[FN19] The analysis, therefore, turns to specific personal jurisdiction.

> FN19. Ohio does not recognize general jurisdiction over non residents. *Signom v. Schenck Fuels, Inc.,* No. C-3-07-037, 2007

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

WL 1726492 at *3 (S.D.Ohio June 13, 2007).

In this case, the Plaintiffs are residents of Ohio and Brooks and Laura are residents of New York. Further, the Plaintiffs were contacted in Ohio at various times by Victor, Maxine and Alicia via telephone and written communications, and there is no evidence that either Brooks or Laura visited Ohio with regard to the sale of the Debenture Notes to the Plaintiffs. (Ed. Dep.19-20, 26, 56-57.)

*40 The contacts with Brooks and Laura identified by the Plaintiffs took place outside of Ohio. However, there are factual allegations that these contacts regarding the Debenture Notes were directed toward Plaintiffs and are part of alleged course of dealing involving Brooks, Laura and the Plaintiffs and the Debenture Notes.

Also, Brooks and Laura were aware that the Plaintiffs owned Debenture Notes and were residents of Ohio. They should have anticipated that making the alleged misrepresentations and/or omissions regarding the Debenture Notes might cause them to be haled into court in Ohio. The first prong of the *Southern Machine* test is satisfied.

The contacts with Brooks and Laura identified by the Plaintiffs are related to Plaintiffs' Ohio securities claim. While these contacts may have been initiated by the Plaintiffs, the responses allegedly given were not. Therefore, the second prong of the *Southern Machine* test is satisfied.

Plaintiffs have presented evidence that Brooks and Laura had sufficient contacts with Ohio and the wrongs of which the Plaintiffs complain arise out of those contacts. Further, Ohio has a significant interest in protecting its citizens by making certain requirements of investment arrangements before and when they are distributed in Ohio. Therefore, the third prong of the *Southern Machine* test has been satisfied and the exercise of personal jurisdic-

tion over Brooks and Laura in this case is reasonable. Since Plaintiffs have made a prima facie showing regarding all three prongs of the *Southern Machine* test, the exercise of personal jurisdiction over Brooks and Laura on Plaintiffs' Ohio securities claims does not offend the Due Process Clause of the U.S. Constitution.

**C. Time Limitations Under Ohio Securities Law**

Brooks and Laura next argue that Plaintiffs' Ohio securities claims are time barred. The Plaintiffs respond that they are not.

Ohio securities laws provide that no action based upon or arising out of a sale may be brought more than two years after the plaintiff knew, or had reason to know, of the facts by reason of which the actions of the defendants were unlawful or more than five years from the date of such sale, whichever is the shorter period. Ohio Rev.Code § 1707.43. "The two-year provision is based on notice and is an actual statute of limitations while the five-year provision is a statute of repose. *Cain v. Mid-Ohio Securities, Inc.,* Nos. 06CA008933 and 06CA008932, 2007 WL 2080553 at *2 (Ohio Ct.App. July 23, 2007). Ohio courts have interpreted the phrase "whichever is the shorter period" to mean whichever period expires first. *Cain,* 2007 WL 2080553 at *3; *Goldberg v. Cohen,* No. 01 CA 49, 2002 WL 1371031 at *6 (Ohio Ct.App. June 13, 2002); *Kondrat v. Morris,* 118 Ohio App.3d 198, 692 N.E.2d 246, 250 (Ohio Ct.App.1997).

**1. Statute of Limitations**

The discovery of the facts constituting the alleged violations in this case was made on June 2, 2004 and the Complaint was filed on January 26, 2005. Therefore, the complaint was filed within two years after Plaintiffs knew, or had reason to know, of the facts by reason of which the actions of Brooks and Laura were allegedly unlawful. The two-year stat-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                 Page 38
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

ute of limitations is satisfied for Plaintiffs' Ohio securities claims.

## 2. Statute of Repose

**\*41** The dates of the alleged sales in this case range from January 1, 1989, to October 1, 2003. The claim was filed on January 26, 2005. Therefore, any sales that occurred on or after January 26, 2000, are not subject to the statute of repose. This includes sales made on December 12, 2000, October 1, 2001 and October 1, 2003. The five-year statute of repose bars claims for sales made prior to January 26, 2000. This includes the sales made on January 1, 1989, September 22, 1992, November 12, 1998, and February 17, 1998.

## 3. Statute of Limitations Conclusion

None of Plaintiffs' Ohio securities claims against Brooks and Laura are barred by Ohio's two-year statute of limitations for bringing such claims. However, the claims regarding several of the sales of Debenture Notes are barred by Ohio's statute of repose for securities claims.

Sales of Debenture Notes that occurred on or after January 26, 2000, are not time-barred. These include sales made on December 12, 2000, October 1, 2001 and October 1, 2003. Having determined that some of Plaintiffs' Ohio securities claims are not time-barred, the analysis turns to whether Plaintiffs have presented evidence that Brooks and/or Laura are liable under Ohio security laws.

## D. Liability Under Ohio Security Laws

Brooks' and Laura's final argument regarding Plaintiffs' Ohio securities claims is that they were not "sellers" of the Debenture Notes and are, therefore, not liable. Ohio securities law makes directors of a corporation liable for violations of the corpora-

tion unless the director had just and reasonable grounds to believe that the alleged statements to be true or the omissions of facts to not be material. *In re National Century Financial Enterprises, Inc.,* 504 F.Supp.2d 287, (S.D.Ohio 2007)(citing Ohio Rev.Code § 1707.41(B)(1)). Further, Ohio securities law makes liable every person that has participated in or aided the seller in any way in making a sale. *Id.* (citing Ohio Rev.Code § 1707.43(A)). Liability extends to any person who participates or aids the sale of a security in any way, including "inducing the purchaser to invest." *Id.* (citing *Federated Management Co. v. Coopers & Lybrand,* 137 Ohio App.3d 366, 738 N.E.2d 842, 860 (Ohio Ct.App.2000)).

The arguments presented and discussed above regarding Brooks and/or Laura as sellers are based upon the Securities Act of 1933. However, the determination of who is a seller for purposes of Ohio securities law is different.

The Plaintiffs have presented evidence from which a reasonable juror could conclude that Brooks and Laura aided in the sale of the Debenture Notes, including inducing the Plaintiffs to continue to invest in the Debenture Notes. The Plaintiffs have presented evidence that Brooks and Laura aided the sale of the Debenture Notes by making the alleged misstatements and/or material omissions regarding the financial health of VWE which induced the Plaintiffs to continue to hold the Debenture Notes. In addition, Laura was a Director of VWE who allegedly knew that the statements and/or omissions were allegedly material and misleading.

## E. Conclusion Regarding Plaintiffs' Ohio Securities Law Claims

**\*42** Applying Ohio securities laws to Brooks and Laura does not offend the Due Process Clause of the U.S. Constitution. Further, the Debenture Notes sold after January 26, 2000, including the Deben-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case: 1:08-sv-02755-DCN  Doc #: 40-7  Filed: 07/30/09  98 of 119.  PageID #: 692

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

Page 39

ture Notes sold on December 12, 2000, October 1, 2001 and October 1, 2003, are not time barred by the statute of limitations or the statute of repose set forth in Ohio securities law. Finally, there are genuine issues of material fact as to whether Brooks and/or Laura were sellers under Ohio securities law. Therefore, Brooks and Laura are not entitled to summary judgment on Plaintiffs Seventh Cause of Action for violation of Ohio securities law.

## XI. PUNITIVE DAMAGES

The relief prayed for in the TAC includes punitive damages. However, punitive damages are not available for the alleged violations of the Security Act of 1933 (Section 12(a)(1) and 12(a)(2) and Section 15 claims), the Security Exchange Act of 1934 (10b-5 and Section 20 claims) and Ohio securities law. *Burkhart v. Alison Realty Trust,* 363 F.Supp. 1286, 1290 (N.D.Ill.1973); *Byrley v. Nationwide Life Insurance Co.,* 94 Ohio App.3d 1, 640 N.E.2d 187, 200 (Ohio Ct.App.1994).

Punitive damages are, however, available for common law tort claims such as fraud and conspiracy. *Motorists Mutual Insurance Co. v. Said,* 63 Ohio St.3d 690, 590 N.E.2d 1228, 1234(Ohio 1992); *Preston v. Murty,* 32 Ohio St.3d 334, 512 N.E.2d 1174, 1175 (Ohio 1987). Plaintiffs' fraud and conspiracy claims have survived summary judgment so further consideration is necessary.

To establish a claim for punitive damages, the plaintiff must show, in addition to proving the elements of the tort itself, that the tort was aggravated by the existence of malice or ill will or must show that the wrongdoing is particularly gross or egregious. *Davis v. Sun Refining and Marketing Co.,* 109 Ohio App.3d 42, 671 N.E.2d 1049, 1060 (Ohio Ct.App.1996). The Ohio Supreme Court has defined actual malice as:

(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit

of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

*Motorists Mutual,* 590 N.E.2d at 1234. To obtain punitive damages, the probability of harm occurring must be great and the possible harm must be substantial. *Id.*

The amount of punitive damages to be awarded, if any, rests largely within the determination of the trier of fact. *Zoppo v. Homestead Insurance Co.,* 71 Ohio St.3d 552, 644 N.E.2d 397, 401 (Ohio 1994); *Roar v. Rydell,* Nos. C-061090 and C-070032, 2007 WL 4463965 at *9 (Ohio Ct.App. Dec.21, 2007). The Ohio Supreme Court has also noted that "it is rarely possible to prove actual malice otherwise than by conduct and surrounding circumstances." *Villella v. Waikem Motors, Inc.,* 45 Ohio St.3d 36, 543 N.E.2d 464, 466-67 (Ohio 1989) (citing *Davis v. Tunison,* 168 Ohio St. 471, 155 N.E.2d 904, 907 (Ohio 1959), overruled on other grounds in *Moskovitz v. Mt. Sinai Medical Center,* 69 Ohio St.3d 638, 635 N.E.2d 331 (Ohio 1994))

**43** "[A]ctual malice may be inferred from conduct and surrounding circumstances which may be characterized as reckless, wanton, willful or gross." *Id.* at 467, 635 N.E.2d 331. Even if actual malice is not shown, actions that are particularly gross or egregious, such as intentionally made misrepresentations, may support an award of punitive damages. *Smith v. General Motors Corp.,* 168 Ohio App.3d 336, 859 N.E.2d 1035, 1042 (Ohio Ct.App.2006).

For example, an insured may maintain an action for punitive damages if the insured shows that the insurer's bad faith was accompanied by a dishonest purpose, actual intent to mislead or deceive the insured, or a calculated scheme to defeat the insured's action. *Motorists Mutual,* 590 N.E.2d at 1235. In another example, punitive damages may be awarded where evidence established that the non removal of potentially contaminated piping displayed a

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

Page 40

conscious disregard for the safety of others. *Davis,* 671 N.E.2d at 1060.

In this case, Brooks and Laura argue that there is no basis for a recovery of punitive damages. The Plaintiffs do not offer legal argument otherwise but do offer facts from which a juror could reasonably conclude that Brooks and/or Laura consciously disregarded Plaintiffs' rights to know the actual financial status of VWE and actually intended to mislead or deceive the Plaintiffs with regard to the actual financial status of VWE.

Plaintiffs are not entitled to punitive damages on their alleged violations of the Security Act of 1933 (Section 12(a)(1) and 12(a)(2) and Section 15 claims), the Security Exchange Act of 1934 (10b-5 and Section 20 claims) and Ohio securities law as a matter of law. However, the factual allegations set forth by the Plaintiffs combined with the axiom that it is generally for the finder of fact to determine the amount, if any, of a punitive damage award leads to the conclusion that there are genuine issues of material fact with regard to whether Plaintiffs are entitled to damages on their fraud and conspiracy claims.

## XII SUMMARY

Brooks' and Laura's Motions for Summary Judgment on Plaintiffs' First Claim for Relief for violation of Sections 12(a)(1) and 12(a)(2) of the Securities Act of 1933 is GRANTED. Plaintiffs' Section 12(a)(1) claims and all but one of Plaintiffs' Section 12(a)(2) claims are time barred. Also, there are no genuine issues of material fact and Plaintiffs have not shown that either Brooks or Laura were "sellers" in accordance with the law regarding Section 12(a)(1) and 12(a)(2) claims.

Brooks' and Laura's Motions for Summary Judgment on Plaintiffs' Second Claim for Relief for violation of Section 10b of the Securities Exchange Act of 1934 and Rule 10b-5 is GRANTED IN

PART and OVERRULED IN PART. Sales made before January 26, 2000, are timed barred and sales that occurred on or after January 26, 2000, are not. Further, there are genuine issues of material fact as to whether the statements made by Brooks and/or Laura are actionable and as to whether Brooks and/or Laura acted with the requisite scienter.

*44 Brooks' and Laura's Motions for Summary Judgment on Plaintiffs Third and Fourth Claims for Relief for violation of Section 15 of the Securities Act of 1933 and Section 20(a) of the Securities Exchange Act of 1934 are OVERRULED. There are genuine issues of material facts as to whether Brooks and/or Laura were control persons under the applicable law.

Brooks' and Laura's Motions for Summary Judgment on Plaintiffs' Fifth Cause of Action for fraud are OVERRULED. There are genuine issues of material fact as to whether the oral statements and omissions attributed to Brooks and Laura were material, as to whether Brooks and/or Laura had a duty to disclose and as to whether Brooks and/or Laura acted with the requisite scienter.

Brooks' and Laura's Motions for Summary Judgment on Plaintiffs' Sixth Cause of Action for civil conspiracy are OVERRULED. There are genuine issues of material fact as to whether the Plaintiffs can satisfy the "malicious combination" element of a civil conspiracy claim and Brooks and Laura are not entitled to summary judgment on the remaining underlying claims.

Brooks' and Laura's Motions for Summary Judgment on Plaintiffs' Seventh Cause of Action for violation of Ohio securities laws is OVERRULED. Application of Ohio securities law to Brooks and Laura in this case is not offended by the Due Process Clause of the U.S. Constitution. Further, Debenture Notes sold after January 26, 2000, including those sold on December 12, 2000, October 1, 2001 and October 1, 2003, are not time barred.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
**(Cite as: 2008 WL 85871 (S.D.Ohio))**

Finally, there are genuine issues of material fact as to whether Brooks and/or Laura were sellers under Ohio securities law.

Finally, Brooks' and Laura's Motion for Summary Judgment on Plaintiffs' prayer for punitive damages is GRANTED IN PART and OVERRULED IN PART. Plaintiffs are not entitled to punitive damages on their alleged violations of the Security Act of 1933 (Section 12(a)(1) and 12(a)(2) and Section 15 claims), the Security Exchange Act of 1934 (10b-5 and Section 20 claims) and Ohio securities law as a matter of law. However, there are genuine issues of material fact as to whether Plaintiffs are entitled to punitive damages on the remaining fraud and civil conspiracy claims.

Plaintiffs' 10b-5, control person liability and Ohio securities law claims on sales of Debenture Notes that occurred on or after January 26, 2000 remain to be adjudicated. Plaintiffs common law fraud and civil conspiracy claims also remain to be adjudicated.

Finally, Plaintiffs have moved for oral argument on Brooks' and Laura's Motions for Summary Judgment. (Doc. # 154.) However, the Court has been able to review the thousands of pages of argument and evidence submitted by the Parties and can fairly resolve the Motions based upon these submissions without oral argument. Therefore, Plaintiffs' Motion for Oral Argument is OVERRULED.

**DONE and ORDERED.**

S.D.Ohio,2008.
Pullins v. Klimley
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Westlaw.**

Slip Copy                                                                                      Page 1
Slip Copy, 2009 WL 185950 (N.D.Ohio)
**(Cite as: 2009 WL 185950 (N.D.Ohio))**

**c**
Only the Westlaw citation is currently available.

United States District Court,
N.D. Ohio,
Eastern Division.
Hugh P. RUFFING, Plaintiff,
v.
MASTERBUILT TOOL & DIE, LLC, et al., Defendants.
**No. 1:08-CV-01264.**

Jan. 23, 2009.

West KeySummary
**Labor and Employment 231H ☞217**

231H Labor and Employment
   231HIV Compensation and Benefits
      231HIV(A) In General
         231Hk217 k. Severance Pay. Most Cited
Cases
Former employee was entitled to $200,000 by the express obligations of an employment agreement under Ohio law. The former employer had argued that the clause awarding severance pay did not extend to the nonrenewal of the employment agreement, while the former employee argued that the clause governed any termination not for cause. The former employer's reading of the contract would have rendered multiple clauses of the employment agreement wholly illusory. The former employee's reading of the agreement was consistent with the plain language and gave effect to all terms.

Harold E. Farling, Thomas G. Kovach, Kovach & Farling, Cleveland, OH, for Plaintiff.

Ann E. Knuth, L. Jason Blake, Benesch, Friedlander, Coplan & Aronoff, Cleveland, OH, for Defendants.

*MEMORANDUM & ORDER*

KATHLEEN McDONALD O'MALLEY, District Judge.

*1 On May 22, 2008, Plaintiff Hugh P. Ruffing filed a seven-count complaint against Defendants Masterbuilt Tool & Die, LLC ("Masterbuilt"), Red Rock Stamping, LLC ("Red Rock"), and Hawthorn Manufacturing Corporation ("Hawthorn") asserting breach of an employment agreement and related claims. (Doc. 1.) Shortly thereafter, Masterbuilt, Red Rock, and Hawthorn (collectively, "Defendants") filed a motion to dismiss four of these seven counts as to Hawthorn and Red Rock (Doc. 13) and the parties filed cross-motions for judgment on the pleadings with respect to another (Docs.19, 24). For the following reasons, this Court *GRANTS* Ruffing's motion for judgment on the pleadings with respect to Count I, *DENIES* Masterbuilt's cross-motion on the same, *GRANTS* Red Rock and Hawthorn's motion to dismiss Count III, and *DENIES* Red Rock and Hawthorn's motion to dismiss Counts II, IV and VI.

*BACKGROUND*

Although this case is primarily an employment dispute, the relationship of the parties to each other is both complicated and vital to the resolution of the instant litigation. The events giving rise to this litigation seem to have begun in August 2006, when Hawthorn entered into a Letter of Intent ("LOI") to purchase Red Rock, the company by which Ruffing was employed at the time. (Compl. at ¶ 8.) Ruffing alleges that this LOI expressly identified Ruffing as a third-party beneficiary of the promises therein. (*Id.* at ¶ 9.) In support of this contention, he points to the first paragraph of the LOI, which provided that Hawthorn:

will enter into an employment agreement with Mr.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 185950 (N.D.Ohio)
(Cite as: 2009 WL 185950 (N.D.Ohio))

Hugh Ruffing.... the agreement will include a minimum salary of $200,000 for one year and a severance provision of one year salary for Mr. Ruffing.

(*Id.*) It is undisputed that Hawthorn itself never offered Ruffing any type of employment agreement.[FN1] On the other hand, Defendants contend that Hawthorn was under no obligation to do so, because they assert that the LOI did not create any binding obligations on the part of its signatories. In particular, they argue that the LOI, by its own terms, did not "create any ... obligations." (Doc. 13 at 6) (quoting the LOI).

> FN1. As explained below, however, Ruffing does allege that Masterbuilt was the alter ego of Hawthorn. Should Ruffing succeed in prosecuting this claim, any claims against Hawthorn would be dismissed to the extent that Masterbuilt fulfilled obligations undertaken by Hawthorn.

Seven months after signing the LOI, on March 5, 2007, Hawthorn purchased Red Rock. (Compl. at ¶ 11.) This was accomplished through an Asset Purchase Agreement ("APA") by which a Hawthorn subsidiary acquired Red Rock. (Compl.Ex. 2.)[FN2] The APA, like the LOI, referrers specifically to Ruffing. In particular, it obligates Red Rock to offer employment to Ruffing, but also provides that nothing within the APA limits Red Rock's ability to terminate Ruffing after offering him employment. In pertinent part, the APA states:

> FN2. As the APA is apparently "four phone books thick," this Court has not seen a full copy of the APA. Nevertheless, both parties concede that the APA is a binding contract and that the provisions before the Court are the provisions that the parties anticipate will be relevant to this litigation.

[Red Rock] shall offer employment to [Ruffing]....

[The] offer of employment [to Ruffing] shall be for at least the substantially similar rate of pay (including salary and bonus), benefits and position as in effect immediately prior to the [execution of the APA]....

*2 Nothing contained in this ... Agreement shall be construed to prevent the termination of employment of [Ruffing] by [Red Rock] or any change in the rate of pay or employee benefits available to [Ruffing] following Closing....

(Compl. Ex. 2 at ¶ 9.) Ruffing contends that these provisions compelled Red Rock to at least offer employment to Ruffing, while the Defendants contend that this provision does not create any enforceable obligation on their part-that "Red Rock [had] complete discretion in its decision to employ [the] Plaintiff."(Doc. 13 at 7.)

Although Red Rock itself did not offer employment to Ruffing, on March 6, 2007, Ruffing was offered a contract with a different Hawthorn subsidiary, Masterbuilt. (Compl. at ¶ 13, 18.) Masterbuilt seems to be a peculiar entity, as it "was not capitalized, had no banking or checking account, had no assets, and had no employees other than Ruffing."(*Id.* at ¶ 16.)Although Ruffing's contract was with Masterbuilt, it is Red Rock that paid Ruffing's salary and reimbursed Ruffing for his expenses. (Compl. at ¶ 28.) Furthermore, Ruffing did not perform any work for Masterbuilt, but rather was instructed to generate business for other companies owned by Hawthorn, including Red Rock. (*Id.* ¶ 27.)It seems that Masterbuilt "never conducted any business ... generated no revenues and had no liabilities (other than Ruffing's Employment Agreement.)"(*Id.* ¶ 17.)

Ruffing asserts that these unusual features obtain because Masterbuilt was nothing but the alter ego of both Hawthorn and Red Rock. (*Id.* ¶¶ 78,79.)("[Masterbuilt was] a mere shell of a company ... [that] did not observe corporate formalities

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

... [and] was used by Hawthorn and Red Rock to ... commit self-dealing and acts of deception."). It is for this reason that Ruffing argues that both Hawthorn and Red Rock should be held liable for any of Masterbuilt's obligations. The Defendants respond by asserting that it is never appropriate to "pierce" an Ohio LLC such as Masterbuilt, regardless of any underlying fraud. (Doc. 13 at 12-13.)[FN3] They argue, further, that even if an LLC can be pierced, it is never appropriate to impute liability from one "sister" corporation to another. Consequently, Defendants maintain that any claim for piercing must be dismissed as to Masterbuilt's "sister," Red Rock.

> FN3. This Court is confused by the degree to which the Defendants' moving papers appear to use the phrase "Michigan law" as a synonym for "bad law." While this Court is mindful that the law of different jurisdictions may vary substantially, in the absence of binding precedent, the Court will carefully consider well-reasoned opinions from another jurisdiction, even when that jurisdiction is in Michigan.

Notwithstanding any other obligations between or among these parties, it is unquestioned that Ruffing signed a binding contract with Masterbuilt (the "Employment Agreement.") (*See* Doc. 1 Ex. C.) Under the terms of the Employment Agreement, Ruffing was paid a base salary of $200,000 each year to serve as President of Masterbuilt. The Employment Agreement ran for one year and automatically renewed each year if neither party expressly terminated the contract. In particular, it provided:

## [§ 2 Term of Employment and Automatic Renewal]

The term of Executive's employment under this Employment Agreement will commence on the date of this Employment Agreement and will continue until the first (1st) anniversary of the date of this Employment Agreement (the "Initial Employment Period"). The Initial Employment Period and any renewal employment period (as defined herein) shall automatically be renewed and extended on the same terms and conditions contained herein for consecutive one-year periods (each, a "Renewal Employment Period"), unless not later than sixty (60) days prior to the end of the Initial Employment Period or any Renewal Employment Period, as the case may be, either party shall give written notice to the other party of its election to terminate this Employment Agreement. The Initial Employment Period and the Renewal Employment Periods are hereinafter referred to as the "Employment Period." Notwithstanding anything to the contrary contained herein, the Employment Period is subject to earlier termination pursuant to Section 12 below.

## [§ 12(d) Termination by the Company without Due Cause]

*3 The Company may terminate the Employment Period without Due Cause upon providing the Executive with written notice of such termination. If the Employment Period is terminated pursuant to this Section 12(d), then Executive will be entitled to receive as severance pay the continuation of his Base Salary at the annual rate then in effect for (i) a period of twelve (12) months following the termination of his employment, to the extent Executive's employment is terminated within the Initial Employment Period, (ii) a period of nine (9) months following the termination of his employment, to the extent Executive's employment is terminated after the expiration of the Initial Employment Period but prior to the twenty-four (24) month anniversary of the date hereof.... Notwithstanding anything to the contrary set forth in this Section 12(d), in *no event* will the Executive receive less than twenty-four (24) months in the aggregate of Base Salary and/

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 185950 (N.D.Ohio)
**(Cite as: 2009 WL 185950 (N.D.Ohio))**

or severance pay, as the case may be, under this Agreement. Notwithstanding the above, Executive shall receive the amounts set forth in this Section 12(d) only if Executive is not in material breach of any of the provisions of Section 10 of this Employment Agreement, and has complied with Section 12(g) of this Employment Agreement.

*Id.* at § § 2,12(d)) (emphasis added). As Masterbuilt accurately paraphrases the first paragraph, § 2 provides that the contract "will automatically renew if Masterbuilt does not inform Plaintiff of its election to not renew, *i.e., terminate,* the Employment Agreement."(Doc. 24 at 2.) (second emphasis added). The second paragraph appears under the contract heading "Termination."

On December 17, 2007 (approximately 10 months after the commencement of the Employment Agreement), Masterbuilt informed Ruffing that his employment was "not being renewed." Masterbuilt did not contend that Ruffing was in any way in violation of his Employment Agreement (i.e., did not claim that there was any "cause" for their decision), but did assert that Ruffing was not entitled to any severance because, under § 2, it asserted that either party may elect to "non-renew" the agreement. (*See id.*Ex. D.) In pertinent part, Masterbuilt stated

Pursuant to Section 2 of the March 5, 2007 Employment Agreement ... notice is given that the Agreement is not being renewed at the end of the initial term, March 5, 2008.... Note, however, that because your employment will cease due to the nonrenewal of the Agreement, the severance described in Section 12(d) when the employment period is terminated ... is not triggered.

(*Id.*) (emphasis added). This letter was signed "Greggory A. Notestine, Group President."

As Notestine's letter indicates, Masterbuilt contends that § 2 and § 12 of the Employment agreement refer to fundamentally different circumstances.

Masterbuilt argues that § 2 permits unconditional termination of the contract itself (the "Employment Agreement"), whereas § 12 discusses only the consequences flowing from termination of an "Employment Period," i.e., a termination occurring during (but apparently not within sixty (60 days of the end of) the contract term. Conversely, Ruffing contends that § 2 refers to the manner in which the Employment Agreement can be terminated, whereas § 12 refers to the consequences flowing from such termination. Ruffing, consequently, argues that he is entitled to severance under § 12 of the Employment Agreement.

*4 Finally, Ruffing, a resident of Arizona, seeks damages under Arizona labor law for what he characterizes as Masterbuilt's wrongful withholding of his final paycheck. (Compl. at ¶ 43.) Ruffing also seeks these damages from Hawthorn and Red Rock under the theory of alter ego liability. Defendants do not contest that Ruffing has pled a valid cause of action against Masterbuilt, but argue that Ruffing cannot sustain a suit against Hawthorn or Red Rock because the relevant Arizona law defines employee to mean "any person who performs services for an employer under a contract of employment" and Ruffing did not have a contract with Hawthorn or Red Rock. (Doc. 20 at 2.)

The Court generally finds Ruffing's arguments to be well-taken at this stage of the litigation. First, the appropriate reading of the Employment Agreement is not a close question-Ruffing was terminated pursuant to the Employment Agreement, which expressly provides for a minimum payment upon such termination. Similarly, the APA expressly provides that Red Rock is to employ Ruffing; the mere fact that the APA does not restrict Red Rock's ability to terminate Ruffing does not modify this obligation. Ruffing is also permitted to pursue his claims asserting that Hawthorn and Red Rock are liable for Masterbuilt's contractual breach because an LLC is not immune from the general law of corporations.[FN4]Ruffing, similarly, may pursue re-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

covery for violation of Arizona labor law under an alter ego theory of liability. On the other hand, Count III is dismissed in its entirety, because the LOI does not create any binding obligations whatsoever.

> FN4. As explained more fully below, the Court also does not accept Defendants' contention that piercing is always inappropriate between sister corporations.

### STANDARD OF REVIEW

The Court may dismiss all or part of a complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). Fed.R.Civ.P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) is directed solely at the complaint itself. *Roth Steel Products v. Sharon Steel Corp.,* 705 F.2d 134, 155 (6th Cir.1983) (citing *Sims v. Mercy Hospital of Monroe,* 451 F.2d 171, 173 (6th Cir.1971).) When evaluating a complaint in light of a motion to dismiss, the Court must accept all of the plaintiff's allegations as true and resolve every doubt in the plaintiff's favor. *Zaluski v. United Am. Healthcare Corp.,* 527 F.3d 564, 570 (6th Cir.2008) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)). That said, a complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level;" it must contain facts that support a claim for relief that is "plausible on its face." *Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)).

A claim will be dismissed when it does not "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory ...." *Id.* at 1969 (internal citations and quotations omitted, emphasis in original). While the federal rules contain a liberal standard against which pleadings should be measured, "more than bare assertions of legal conclu-

sions are ordinarily required to satisfy the federal notice pleading requirements." *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988).

*5 Finally, "[t]he standard of review applicable to a Rule 12(b) (6) motion to dismiss for failure to state a claim is also applicable to a Rule 12(c) motion for judgment on the pleadings." *Trs. of the Bldg. Laborers' Local 310 Pension Fund v. Able Contr. Group,* Inc., No. 1:06-CV-1925, 2008 U.S. Dist. LEXIS 64426, at *15, 2008 WL 3889997 (N.D.Ohio Aug. 19, 2008) (citing *JP Morgan Chase Bank N.A. v. Winget,* 510 F.3d 577, 581 (6th Cir.2007).) In other words, "[a] Rule 12(c) motion is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Id.* (citations omitted). As with a Rule 12(b)(6) motion to dismiss, the complaint is construed "in the light most favorable to the non-moving party." *Commer. Money Ctr., Inc. v. Ill. Union Ins. Co.,* 508 F.3d 327, 336 (6th Cir.Ohio 2007). Still, this Court "need not accept the plaintiff's legal conclusions or unwarranted factual inferences as true." *Id.* Documents attached to the pleadings as exhibits are considered incorporated therein and may be considered in evaluating a Rule 12(c) motion. *See* Fed.R.Civ.P. 10(c). "The Court may consider such exhibits, however, only where the authenticity of such exhibits is not contested." *In re Commercial Money Ctr.,* No.1:02-CV-16000, 2005 U.S. Dist. LEXIS 45488, at *34-35 *aff'd Commer. Money Ctr., Inc.,* 508 F.3d at 344.

### CHOICE OF LAW

Although these parties do not brief the issue, any federal court sitting in diversity must conduct a choice of law analysis to ensure that it is applying the proper substantive law to the dispute before it. In undertaking this function, a court applies the conflict-of-laws rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

S.Ct. 1020, 85 L.Ed. 1477 (1941). Thus, "here, it is apparent that it is Ohio's conflict of laws rules that must normally determine which substantive state law should govern the rights of the parties." *Ranpak Corp. v. Lopez,* 1:08-CV-0042, 2008 U.S. Dist. LEXIS 90025, at *6, 2008 WL 3822129 (N.D.Ohio Aug. 12, 2008) (citation omitted). When a plaintiff asserts multiple claims, it is not necessary for a single jurisdiction's laws to apply to all claims. *See Moses v. Business Card Express, Inc.,* 929 F.2d 1131, 1139-1140 (6th Cir.1991) (citing *Caton v. Leach Corp.,* 896 F.2d 939 (5th Cir.1990)).[FN5] Indeed, both Arizona and Ohio law apply to the instant litigation.

> FN5. It appears that the courts of Ohio have never squarely considered whether it is appropriate to apply the law of different jurisdictions to differing claims. After a careful review of relevant Ohio law, however, this Court believes that the courts of Ohio would reach the same conclusion as those reached in *Moses* and *Caton*-that fundamentally different claims should each be the subject of a careful choice of law analysis. *See Ohayon v. Safeco Ins. Co.,* 91 Ohio St.3d 474, 747 N.E.2d 206, 213 (Ohio 2001) (discussing the different considerations when analyzing the choice of law to apply to a contract claim as opposed to a tort claim); *Am. Trim, L.L.C. v. Oracle Corp.,* No. 3:99CV-7265, 2001 U.S. Dist. LEXIS 11027, at *3, 2001 WL 873073 (N.D.Ohio 2001) ("Controlling Sixth Circuit precedent determines the issues of whether the forum selection clause applies to both the contract and tort claims."); *Globe Metallurgical v. Hewlett-Packard Co.,* 953 F.Supp. 876, 886 (S.D.Ohio 1994) (citing *Moses* with approval when analyzing a case under Ohio law).

> To the extent that *Am. Trim* or *Globe* can be read as applying *Moses,* which con-

sidered Michigan law, to an Ohio choice of law analysis, this would be incorrect. *Globe* and *Am. Trim* are thus properly understood as implicitly assuming what this Court explicitly concludes today, that Ohio courts would likely employ the same analysis as Michigan courts-not because they must, but because the decisions reached in that jurisdiction are persuasive-and apply a different choice of law analysis to fundamentally different claims.

The Court first considers issues of contract interpretation. In the instant litigation, all relevant contracts contain facially valid choice of law provisions indicating that Ohio law should apply. In particular, the Employment Agreement states that it is "governed by the laws of the State of Ohio" (Doc. 1 Ex. A. at § 17) and the APA contains a similar clause, which states that it will be "governed by and construed in accordance with the laws of the State of Ohio applicable to contracts made and performed in such State."(Doc. 32 at § 13.5). Generally speaking, courts defer to the parties' bargained-for intentions with respect to choice of law and courts applying Ohio law are no exception-"where the parties to a contract have made an effective choice of forum law to be applied," an Ohio court will not "contravene [that] choice." *Jarvis v. Ashland Oil Co.,* 17 Ohio St.3d 189, 478 N.E.2d 786 (Ohio 1985). Indeed, the Sixth Circuit has commented that "Ohio choice-of-law principles strongly favor upholding the chosen law of the contracting parties." *Ranpak Corp,* 2008 U.S. Dist. LEXIS 90025, at *6, 2008 WL 3822129 (citing *In Tele-Save Merchandising Co. v. Consumers Distributing Co., Ltd.,* 814 F.2d 1120, 1122 (6th Cir.1987).)

*6 The parties appear to agree that the contractual choice of law clauses are valid and this Court is not aware of any aspect of Arizona public policy that might compel a different result. Consequently, this Court will apply Ohio law to all questions of con-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 185950 (N.D.Ohio)
(Cite as: 2009 WL 185950 (N.D.Ohio))

tract interpretation. *See id.* at *6-7 ("[W]here the law of the chosen state sought to be applied is concededly repugnant to and in violation of the public policy of this state, the law of Ohio will only be applied when it can be shown that this state has a materially greater interest than the chosen state in the determination of the particular issue.") (citation omitted).[FN6]

> FN6. The LOI, which is not a contract, does not contain a choice of law provision. It was, however, a letter from one party in Ohio to another party in Ohio discussing actions to be undertaken entirely in Ohio that is now being evaluated by a district court located within Ohio. The LOI is, consequently, interpreted under Ohio law.

On the other hand, two claims currently before the Court do not involve written documents at all. First, Ruffing asserts statutory claims under Arizona employment law. The Defendants do not dispute that Arizona law indeed governs these claims and the choice of law clause at issue in the Employment Agreement does not compel further analysis.[FN7] Second, Ruffing seeks to pierce Masterbuilt's corporate veil. The parties agree that Ohio law governs this claim. *Cf. Harlamert v. World Finer Foods, Inc.,* 494 F.Supp.2d 681, 686 (S.D.Ohio 2006) (applying the law of the jurisdiction in which a corporation has been incorporated to claims against that corporation for wrongfully restricting the manner in which its stock could be transferred).

> FN7. That clause is quite narrow and impacts only the choice of law analysis when interpreting the Employment Agreement itself. *Compare* (Doc. 1 at Ex. A § 17) ("[This Employment Agreement] will be governed by the laws of the State of Ohio.") *with Moses,* 929 F.2d at 1140 (noting that a choice of law clause stating that it "shall be construed under the laws

of the State of California" did not impact the choice of law for issues other than contract interpretation) (citing *Caton,* 896 F.2d 939).

In summary, then, this Court will apply Ohio law to all questions of contract interpretation, apply Arizona law when considering employment disputes between two parties that do not have a written contract, and will look to Ohio law when determining if it is appropriate to pierce Masterbuilt's corporate veil.

## ANALYSIS

### A. Ruffing is Entitled to Judgment on the Pleadings with Respect to Count I

Both parties agree that Judgment on the Pleadings is appropriate with respect to Count I, which asks this Court to interpret the Employment Agreement between Ruffing and Masterbuilt. Neither party disputes that the Employment Agreement attached to Ruffing's complaint governs the parties contractual relationship, nor does either party contend that this Court should look outside the four corners of the Employment Agreement to divine its meaning. The parties do, however, differ on their interpretations of the relevant contractual provisions. Ruffing argues that the contract contains a clause governing any termination under the agreement, whereas the Defendants argue that this clause does not extend to the particular type of termination to which Ruffing was subjected.

### 1. Governing Law

Count I asserts that Masterbuilt is in breach of its contractual obligations to Ruffing. In Ohio, the elements of a common law breach of contract claim such as the one asserted by Ruffing are: "(1) that a contract existed, (2) that the plaintiff fulfilled his obligations, (3) that the defendant unlawfully failed to fulfill his obligations, and (4) that damages resul-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ted from this failure." *Mikulski v. Centerior Energy Corp.,* 501 F.3d 555, 563 (6th Cir.Ohio 2007) (citing *Lawrence v. Lorain County Cmty. Coll.,* 127 Ohio App.3d 546, 713 N.E.2d 478, 480 (Ohio App.1998)). In the instant case, neither party contests the first two elements of this claim. The question is whether Masterbuilt breached the contract by declining to pay Ruffing after March 5, 2008 and, if so, what damages resulted from this breach.

*7 When examining a contract governed by Ohio law such as the Employment Agreement, this Court must "presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement."*Seals v. GMC,* No.07-4415, 2008 U.S.App. LEXIS 23949, at *11 (6th Cir. Sept. 7, 2008) (citing *Shifrin v. Forest City Enters., Inc.,* 64 Ohio St.3d 635, 597 N.E.2d 499, 501 (Ohio 1992)). If the terms of a contract are unambiguous, this Court "will not in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Holdeman v. Epperson,* 111 Ohio St.3d 551, 857 N.E.2d 583, 586 (Ohio 2006); *see also Dugan & Meyers Constr. Co. v. Ohio Dep't of Admin. Servs.,* 113 Ohio St.3d 226, 864 N.E.2d 68, 73 (Ohio 2007) ("[W]here a contract is plain and unambiguous, it does not become ambiguous by reason of the fact that in its operation it will work a hardship upon one of the parties thereto and a corresponding advantage to the other, [and] that it is not the province of courts to relieve parties of improvident contracts.") (citation omitted). Indeed, this Court is particularly mindful that "[b]y enforcing contractual language rather than molding it until the outcome looks more fair ex post, courts in the end serve all contracting parties' interests." *PSI Energy v. Exxon Coal USA,* 17 F.3d 969, 974 (7th Cir.1994) (Easterbrook, J.).

Finally, and of particular relevance to the instant dispute, "[a]n interpretation derived from a reading of the contract as a whole is preferred to an interpretation taken from a reading of a single provision in isolation." *Reardon v. Kelly Servs.,* 210 Fed. Ap-

px. 456, 459 (6th Cir.2006) (citation omitted); *see also Nilavar v. Mercy Health Sys.,* 142 F.Supp.2d 859, 892 (S.D.Ohio 2000) ("[A] court must read the contract as a whole and must attempt to give effect to each and every part of it; the court should avoid any interpretation of one part that will annul another part.") (citation omitted); *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.,* 78 Ohio St.3d 353, 678 N.E.2d 519 (Ohio 1997) ("In the construction of a contract courts should give effect, if possible, to every provision therein contained, and if one construction of a doubtful condition written in a contract would make that condition meaningless, and it is possible to give it another construction that would give it meaning and purpose, then the latter construction must obtain.").

**2. Interpretation of the Employment Agreement**

Masterbuilt contends that the Court need look to only one clause of the Employment Agreement to resolve the instant dispute. It asserts that § 2, entitled "Term of Employment and Automatic Renewal," contemplates precisely the situation before the Court today. § 2 provides that Ruffing's contract will automatically renew every year, unless one of the parties elects to terminate the Employment Agreement sooner than 60 days prior to the date on which the contract is to renew. (Doc. 24 at 2.) Masterbuilt argues that because § 2 "contains no requirement that Masterbuilt compensate Plaintiff for its election to not renew the Employment Agreement," Masterbuilt was not obligated to provide Ruffing with any type of severance.

*8 Masterbuilt does concede that the employment agreement contains a termination clause (§ 12), but contends that this clause, entitled "Termination," is intended to apply exclusively to situations in which § 2 does not. This clause begins by noting that, irrespective of § 2's automatic renewal clause, Ruffing's "services shall terminate upon the first to oc-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 185950 (N.D.Ohio)
(Cite as: 2009 WL 185950 (N.D.Ohio))

cur of the following events:" (Doc. 1 Ex. A § 12.) The clause then lists six situations under which Ruffing's Employment Agreement will immediately terminate, in apparent contrast to § 2. (*See id.*)

Masterbuilt seizes on this distinction and argue that:

• § 2 addresses the end of a given employment period, whereas § 12 addresses termination *during* an employment period.

• the last sentence of § 2, which states that "the Employment Period is subject to earlier termination pursuant to [§ 12]," illustrates that termination under § 12 is fundamentally different than termination under § 2.

• § 2 and § 12 contain fundamentally different notice provisions

• § 12(d) contains a penalty that is not intended to apply to § 2.

• § 2 concerns nonrenewal of the "Employment Agreement," which is fundamentally different than § 12(d), which concerns termination of the "Employment Period."

(*See* Doc. 24 at 7; Doc. 28 at 2.) These "five" arguments are all part of the overarching argument advanced by Masterbuilt that § 2 addresses one type of situation, whereas § 12 addresses another. (*See id.*)

Masterbuilt's premise is mistaken. Rather, § 2 of the Employment Agreement defines the normal contract term and addresses the manner in which the Employment Agreement can be prevented from automatically renewing by a timely notice of termination, whereas § 12 governs the consequences of any termination, including one effectuated by non-renewal. Despite Masterbuilt's aggressive efforts to characterize § 2 as a "non-renewal" provision that is somehow distinct from "termination," §

12 very clearly defines the mechanism for "non-renewal" as a termination. Masterbuilt's proposed distinction is without merit: the parties agreed that the Employment Agreement would not renew when either party provided "written notice to the other party of its election to *terminate* the contract" (Doc. 1 Ex. A § 2) (emphasis added), and could do so without cause, or even an explanation therefore. They further agreed, however, that this kind of termination might obligate Masterbuilt to pay Ruffing severance. The Employment Agreement states:

**[§ 12(d) Termination by the Company without Due Cause]**

The Company may terminate the Employment Period without Due Cause upon providing the Executive with written notice of such termination. If the Employment Period is terminated pursuant to this Section 12(d).... Notwithstanding anything to the contrary set forth in [§ 12(d) ], *in no event* will the Executive receive less than twenty-four (24) months in the aggregate of Base Salary and/or severance pay, as the case may be, under this Agreement.... if the Executive is not in material breach of any of the provisions of [§ 10] ... and has complied with [§ 12(g) ] of this Employment Agreement."

*\*9 (Doc. 1 Ex. A § 12(d)) (emphasis added). This contractual provisions is straight-forward; there is *"no event"* in which Ruffing should receive "less than twenty-four (24) months" of total compensation.

While the parties *did* explicitly exclude certain forms of termination from § 12(d)'s reach, they did *not* exclude termination under § 2. For example, § 12(d) states that it does not apply if Ruffing "breach[es] any of the provisions of [§ 10]" and § 12(e) explains that Ruffing is not entitled to severance if he voluntarily resigns (*Id.* at 12, 678 N.E.2d 519(d & e).) That the parties explicitly choose to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

indicate that § 10 and § 12(e) were immune from § 12(d) further supports the Court's conclusion that § 2 is not.[FN8]

> FN8. Masterbuilt's argument that § 12(d) only contemplates termination of an "Employment Period" and not the entire "Employment Agreement" is unavailing. Even if the remainder of § 12 were read not to apply to termination of the Employment Agreement under § 2 (a conclusion this Court does not reach, for reasons more fully explained below), this particular sentence of § 12(d) makes clear that it applies to any termination or departure that is not specifically excluded-breach of § 10 or voluntary resignation under § 12(e). This sentence states that "[n]otwithstanding anything to the contrary [regarding termination without Due Cause]" there is *"no event"* in which Ruffing should receive less than 24 months pay. This is an exceptionally straightforward contractual provision that applies to any termination of or departure by Ruffing that is not specifically excluded.

> Similarly, Masterbuilt's argument that Ruffing's proposed interpretation would somehow have prevented Masterbuilt from terminating Ruffing for cause is unavailing. (*See* Doc. 28 n. 1.) The contract makes a clear distinction between the requirements for termination *with cause* and the requirements for termination *without cause.*

Even if § 12(d) did not include the above provision, the Court would still reject Masterbuilt's proposed reading of the Employment Agreement because it has the impact of rendering two of § 12(d)'s clauses wholly illusory. § 12(d) provides for termination "by the Company without Due Cause" and addresses the consequences if Masterbuilt terminates

Ruffing: (i) within the first 12 months of employment; (ii) after 12 months of employment, but within the first 24 months of employment; and (iii) after the first 24 months of employment. Each of these provisions requires some payment to Ruffing if he is terminated without Due Cause-payments that could be wholly avoided under Masterbuilt's reading of the contract.[FN9] On the other hand, Ruffing has suggested an interpretation of § 2 and § 12(d) that is not only consistent with the plain language of the contract, but that also gives effect to all terms. This is the better interpretation of the contract-this Court will not presume that the parties went to the trouble of spelling out the very detailed provisions of § 12(d) without intending them to govern their relationship.[FN10]

> FN9. Under Masterbuilt's reading of the contract, termination under § 2 will always be less expensive for Masterbuilt than termination under § 12(d) (i or ii) and could occur *any* time during the employment period except during the last 60 days of the Employment Period. The Court does not believe that the parties intended to allow Masterbuilt to escape its severance obligations by characterizing a termination under § 2 as a mere non-renewal.

> FN10. § 2 does contain language that is ambiguous when read in isolation. It states that "[n]otwithstanding anything to the contrary contained [in § 2], the Employment Period is subject to earlier termination pursuant to [§ 12]." (*Id.* at § 2.) Read without reference to other provisions within the Employment Agreement, this language might well mean that § 12 is some entirely different provision of the contract. As explained above, however, such a reading would have the effect of eliminating § 12(d) from the contract and should be rejected in light of an equally plausible alternative reading that gives effect to all of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 185950 (N.D.Ohio)
(Cite as: 2009 WL 185950 (N.D.Ohio))

the contract's provisions.

**3. Damages**

Given that Ruffing's reading of the Employment Agreement is correct, this Court must still determine the damages to which he is entitled. That determination turns on the meaning of a letter sent to Ruffing on December 17, 2007-in particular, whether this letter effectively terminated Ruffing pursuant to § 2 of the Employment Agreement.[FN11] In pertinent part, the letter states:

> FN11. This letter was attached to Ruffing's complaint and neither party disputes its authenticity. Consequently, it is appropriate for the Court to consider the letter under Rule 12(c). *In re Commercial Money Ctr.,* 2005 U.S. Dist. LEXIS 45488, at *34-35.

Pursuant to [§ 2] of the March 5, 2007 Employment Agreement ... notice is given that the Agreement is not being renewed at the end of the initial term, March 5, 2008.... Note, however, that because your employment will cease due to the nonrenewal of the Agreement, the severance described in Section 12(d) when the employment period is terminated without due cause is not triggered.

(Doc. 1 Ex. C.) The question is whether this complies with § 2 of the Employment Agreement, which states:

[The Employment Agreement] will be "automatically ... renewed and extended ... unless ... either party shall give written notice to the other party of its election to *terminate* this Employment Agreement."

*10 (*Id.* at Ex. A § 2.) (emphasis added).

Ruffing contends that he was never truly terminated by Masterbuilt as required by § 2, because the letter to Ruffing explicitly stated that Ruffing was *not* "terminated without due cause," but rather that the

Employment Agreement was "not being renewed." (*Id.* at Ex. C.) In a not-so-subtle reversal of the arguments made when interpreting the impact of a non-renewal under § 2, Masterbuilt counters that the plain reading of the sentence that "[your contract] is not being renewed" is that Ruffing's contract was indeed terminated, notwithstanding Masterbuilt's disclaimer of a specific form of termination.

Were it this Court's job to enforce some general notion of fairness, Ruffing's argument would certainly merit consideration. It seems clear that the Defendants were attempting to sidestep the express intention of the parties and deny Ruffing that to which he was entitled. It is, however, this Court's job to enforce the contract as written, and interpret the parties communications in light of that writing, not to punish wordsmithing. *Accord. PSI Energy,* 17 F.3d at 974. Taken as a whole, the letter served as effective "written notice" of Masterbuilt's "election to terminate" the Employment Agreement, which is all that the Employment Agreement required. (*Id.* Ex. A § 2.) Consequently, Ruffing is entitled to damages in the amount of *$200,000,* in accordance with the express obligations under § 12(d) of the Employment Agreement. Judgment in that amount shall be entered against Masterbuilt as to Claim I. Whether any other defendant is also liable for that obligation will be addressed below in connection with the Court's discussion of Count VI.

**B. Red Rock and Hawthorn's Motion to Dismiss Count II is Denied**

Ruffing asserts that Hawthorn and Red Rock violated Arizona labor law § 23-353. This statute provides for triple damages when an "employer" fails to pay an "employee" all wages due to that employee within three working days or the end of the next regular pay period, whichever is sooner. *See* ARS § 23-355. For purposes of Red Rock and Hawthorn's motion to dismiss, the Court accepts as

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

true Ruffing's well-pled allegation that the Defendants did not even inform Ruffing that they were withholding Ruffing's final paycheck until Ruffing contacted the Comptroller of Red Rock. (Doc. 1 at ¶ 54.) The Court further assumes that Red Rock did not release Ruffing's final check until months after Ruffing's final pay check would have been due, when Ruffing's counsel notified Red Rock that it was in violation of Arizona labor law. (Id. at ¶ 43.)

Red Rock and Hawthorn cannot dispute any of Ruffing's facts at this stage of the litigation, but they do assert that § 23-355 applies only to individuals working under a contract of employment. They correctly note that § 23-355 only extends to the situation "[w]hen an employee is discharged from the service of an employer."ARS § 23-355. Red Rock and Hawthorn then cite to Arizona's statutory definition of employee to demonstrate that Ruffing would not fit this definition with respect to them. For purposes of ARS § 23-355, " 'Employee' means any person who performs services for an employer *under a contract of employment.*"ARS § 23-350 (emphasis added).FN12 Red Rock and Hawthorn argue that because Ruffing had no contract with either of them, Ruffing does not state a valid claim against either of these entities.

> FN12. Unfortunately, the Arizona courts do not seem to have had the opportunity to interpret the meaning of "employee" within § 23-355.

*11 Ruffing concedes that he did not have a contract of employment with either Hawthorn or Red Rock, but mounts two arguments in opposition their motion. Ruffing first argues that "because Plaintiff performed services for [Hawthorn and Red Rock] pursuant to his employment agreement, Plaintiff fits the definition of a [Hawthorn and Red Rock] 'employee' under Arizona labor law."(Doc. 17 at 5.) Although this argument is not without its appeal, this Court concludes that it is not an accurate statement of Arizona law. There is simply no basis

upon which this Court could appropriately depart from the plain language of ARS § 23-355, which creates a cause of action only when an employee is "under a contract of employment" with a particular employer.

Ruffing also asserts, however, that it is inappropriate to dismiss this cause of action so long as it may be appropriate to pierce Masterbuilt's corporate veil. Simply put, Ruffing contends that "[Hawthorn] and [Red Rock] are liable as the alter egos of Masterbuilt."(Doc. 17 at 5.) Ruffing asks this Court to extend the case law that indicates a court should not dismiss a breach of contract claim against a party who, although not a party to the contract, would be liable under an alter ego theory. See Ypsilanti Cmty. Utils. Auth. v. MeadWestvaco Air Sys., LLC, No.07-CV-15280, 2008 U.S. Dist. LEXIS 50470, 2008 WL 2610273 (E.D. Mich. June 30, 2008); cf. Dombroski v. Wellpoint, Inc., 119 Ohio St.3d 506, 514, 895 N.E.2d 538 (2008) (dismissing a similar claim when piercing would be inappropriate).

The Court agrees that it is appropriate to apply this line of cases to Ruffing's claim. Indeed, Red Rock and Hawthorn do not contest Ruffing's assertion that these cases provide the controlling legal standard.FN13 This claim is inextricably tied to Plaintiff's assertion that it is appropriate to pierce Masterbuilt's corporate veil-Count II can only be sustained against Hawthorn or Red Rock to the extent that Masterbuilt is the alter ego of Hawthorn or Red Rock.FN14 In other words, should the Defendants at some point succeed in defeating either or both of the piercing claims, this Count would also be dismissed with respect to the successful Defendant(s). At this stage of the litigation, however, Red Rock and Hawthorn's motion to dismiss Count II with respect to Hawthorn and Red Rock is **DENIED.**

> FN13. The Defendants do, of course, contest that it is appropriate to pierce the cor-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

porate veil in this case. As discussed below, however, this contention is unfounded at this stage of the litigation.

FN14. And, of course, to the extent that Ruffing can sustain a claim against Master-built, which did not move to dismiss Count II.

## C. Count III is Dismissed

Count III alleges that Hawthorn is a signatory to a Letter of Intent ("LOI") that names Ruffing as a third-party beneficiary. Ruffing asserts that the LOI creates the binding obligation on the part of Hawthorn to pay Ruffing an additional year of severance. (Doc. 1 ¶¶ 8-11, 63-66.) Ruffing acknowledges that the LOI is not a traditional contract, but cites to Ohio law indicating that "letters of intent or 'agreements to agree' are enforceable *when the parties have manifested an intention to be bound by the terms.*"(Doc. 17 at 6.) (emphasis added) (citing *Oglebay Norton Co. v. Armco, Inc.,* 52 Ohio St.3d 232, 556 N.E.2d 515 (1990). Defendants note that *Oglebay Norton* does not involve a letter of intent and argue that Ohio law does not necessarily recognize agreements to agree.

*12 This Court need not reach the question of whether Ohio law would recognize an agreement to agree, because the LOI attached to Ruffing's complaint states clearly that it does not impose any obligations on Hawthorn.[FN15] They correctly point to Ruffing's own cases that note that the myriad cases finding that letters of intent can create binding obligations apply only when the parties actually intend to be bound by a letter of intent. This LOI contains the opposite directive. It states:

> FN15. The Court does note briefly the general principle that two parties create a contract when an agreement between the parties contains all elements necessary to form an enforceable contract (intent to be

bound, consideration, definite terms, etc.) and do not create a contract when they do not. This Court is generally skeptical of distinctions based on what parties may choose to call a document rather than distinctions based on the substance of a document itself.

> This [LOI] is a statement of present intentions ... and *shall not create any right or obligations on the part of the parties.*

(Doc. 1 Ex. A) (emphasis added). It is clear, therefore, that this particular letter of intent does not create binding obligations on the part of its signatories because, contrary to expressing an intention to be bound by the LOI, the signatories explicitly disclaimed any such obligation. If the parties have no rights or obligations under the LOI, no rights could flow to any third-party beneficiary, even one expressly identified.

Ruffing responds only by noting that he does not have a copy of the final LOI between the parties and has no way of knowing if this provision survived to the final draft. (Doc. 17 at 7.) What Ruffing does not plead, however, is that he has any particular reason to suspect that this language is not in the final LOI between the parties. Although this Court does accept all well-pled allegations as true, the Court will not presume that a critical provision in the LOI Ruffing attached to his complaint does not represent the final agreement between the parties absent some specific well-pled allegation from Ruffing that this provision was absent from the final agreement. Defendants' motion to dismiss Count III is *GRANTED.*

## C. Red Rock and Hawthorn's Motion to Dismiss Count IV is Denied

Count IV alleges that Red Rock breached its obligations under the APA.[FN16] Ruffing contends that the APA compelled Red Rock to offer him employ-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 185950 (N.D.Ohio)
(Cite as: 2009 WL 185950 (N.D.Ohio))

ment, because it contained a clause that stated "[Red Rock] shall offer employment to [Ruffing]." (Doc. 1 Ex. B ¶ 9.1(a).) It is undisputed at this stage of litigation that Red Rock did not offer Ruffing employment and that the APA is a binding contract.[FN17]

> FN16. As previously discussed, interpretation of the APA is governed by Ohio law. Consequently, this Court will apply the same legal standard to Count III as it applied to Count I.

> FN17. Of course, Defendants may later argue that Masterbuilt's offer of employment fulfilled Red Rock's obligations. Such an argument would appear to concede the piercing claim asserted in Count IV (and Count V). The flip side of this coin, of course, is that Ruffing may ultimately prevail on his claim that Red Rock and Hawthorn are really the alter egos of Masterbuilt such that their actions could conceivably relieve Masterbuilt of some of its obligations.

Red Rock and Hawthorn counter that ¶ 9.1(a) contains an illusory promise and that they were under no obligation to offer Ruffing employment. In support of this contention, they cite ¶ 9.1(c), which provides that "[n]othing contained in [the APA] ... shall be construed to prevent the termination of employment of [Ruffing] ... or any change in the rate of pay or employee benefits available to [Ruffing]." (Id. at 9.1, 556 N.E.2d 515(c).) They assert that "Red Rock's decision to not 'offer' employment to [Ruffing] was nothing more than Red Rock exercising its contractually authorized right to terminate Plaintiff's employment at its discretion."(Doc. 20 at 7.)

The problem with Red Rock and Hawthorn's argument at this stage of the litigation is that courts are hesitant to render any contractual provision illusory

when considering a motion to dismiss. While it is possible that the Defendants may bring forth evidence that indicates that their reading of the contract is the most reasonable, the four corners of the document certainly do not compel the conclusion they seek. The Court is hard pressed to think of a clearer contractual obligation than the one at issue here, which clearly states that "[Red Rock] *shall offer* employment to [Ruffing]." (Doc. 1. Ex. B ¶ 9.1(a)) (emphasis added). It seems at this point that Ruffing's interpretation of the contract, which gives effect to all of its terms, is the more reasonable one-¶ 9.1(c) is intended to apply only to termination "under circumstances that justified a termination, such as ... due cause or a change in economic circumstances."(Doc. 17 at 9.) [FN18] Additional evidence, of course, may show otherwise.

> FN18. The parties do not brief, and the Court does not find it necessary to reach, what role the implied duty of good faith and fair dealing may ultimately play in a proper interpretation of the APA. The Court does note, however, that "[m]any cases ... place 'good faith' limitations upon the reasons for which an express power to terminate a contract 'at will' can be exercised." *Tymshare, Inc. v. Covell,* 727 F.2d 1145, 1154 (D.C.Cir.1984) (Scalia, J.). Indeed, even some contracts far less subject to competing interpretations than the APA-those that expressly provide one party "sole discretion"-do not necessarily allow exercise of that discretion "for any reason whatsoever, no matter how arbitrary or unreasonable."*Id.* (citation omitted). The Court is, of course, aware that then-Judge Scalia was not considering Ohio employment law.

**\*13** The Court also notes that, no matter the ultimate interpretation of the contract, Defendants could *never* have terminated Ruffing by referencing ¶ 9.1(c) of the APA. This is because ¶ 9.1(c) itself

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

does not independently grant Red Rock any power to fire Ruffing. Rather, ¶ 9. 1(c) simply indicates that ¶ 9.1(a) does not restrict whatever right Red Rock would *otherwise* have to terminate Ruffing absent ¶ 9.1(a). At this stage, there is no evidence before the Court that could lead it to determine what this power would otherwise have been. For that reason, the Court cannot dismiss Count IV based on Red Rock and Hawthorn's assertion that Ruffing would not be entitled to damages. The Court does note, however, that Ruffing must climb a steep hill on this prong to survive summary judgment.

Finally, Red Rock argues that Ruffing waived any rights under the APA by accepting the Employment Agreement with Masterbuilt. Ruffing characterizes this argument as "insulting," which is not entirely unfair. It is well-established that waiver is the voluntary relinquishment of a known right. *Glidden Co. v. Lumbermens Mut. Cas. Co.,* 112 Ohio St.3d 470, 861 N.E.2d 109 (Ohio 2006). According to the well-pled allegations in Ruffing's complaint, there was no voluntary relinquishment or similar "choice" exercised by Ruffing. Ruffing alleges the opposite, that the Defendants orchestrated the deal between Ruffing and Masterbuilt in part to avoid Red Rock's obligation to employ Ruffing. [FN19]

> FN19. Of course, even if Ruffing's complaint did not include the well-pled allegation that he did not voluntarily enter into the Employment Agreement with Masterbuilt as opposed to Red Rock, Red Rock would still have been obligated to offer Ruffing employment. Ruffing would then have been able to choose between employment with Red Rock and employment with Masterbuilt.

Red Rock and Hawthorn's motion to dismiss Count IV is *DENIED.*

**D. Red Rock and Hawthorn's Motion to Dismiss Count VI is Denied**

Count VI alleges that Masterbuilt is a mere shell of a company that was never adequately capitalized, did not observe corporate formalities, and was used by Hawthorn and Red Rock to improperly shift their liabilities and to practice acts of deception on others, including Plaintiff. The Court notes that Count VI does not allege an independent cause of action-rather, it seeks recovery from Hawthorn and Red Rock for causes of action that would otherwise only obtain against Masterbuilt. *See Dombroski v. Wellpoint, Inc.,* 173 Ohio App.3d 508, 879 N.E.2d 225 (Ohio Ct.App.2007) (rev'd on other grounds). It appears from the complaint, however, that Count VI plays a major role in this litigation, because it requires the Court to determine the precise relationship between the various parties.

**1. Governing Law**

In Ohio, as in most jurisdictions, the corporate form is accorded a great deal of respect. *See, e.g., Music Express Broad. Corp. v. Aloha Sports, Inc.,* 161 Ohio App.3d 737, 831 N.E.2d 1087, 1092 (Ohio Ct.App., 2005) ("[Ohio] [c]ourts have been reluctant to disregard the corporate entity.") (quoting *E.S. Preston Associates, Inc. v. Preston,* 24 Ohio St.3d 7, 492 N.E.2d 441, 446 (Ohio 1986)). Courts recognize that "[l]imited liability is the rule, not the exception; and on that assumption large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted." *Transition Healthcare Assocs. v. Tri-State Health Investors, LLC,* No. 3:06-CV-2859, 2008 U.S. Dist. LEXIS 23416, at *5, 2008 WL 820456 (N.D.Ohio Mar. 25, 2008) (quoting *Anderson v. Abbott,* 321 U.S. 349, 64 S.Ct. 531, 88 L.Ed. 793 (1944)). That said, "[a] court may pierce the veil separating corporations and their shareholders, but will do so only rarely on a case-by-case basis."*Id.* (quoting *Dole Food Co. v. Patrickson,* 538 U.S. 468, 475, 123 S.Ct. 1655, 155

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 185950 (N.D.Ohio)
(Cite as: 2009 WL 185950 (N.D.Ohio))

L.Ed.2d 643 (2003)). The Sixth Circuit has wisely held that "[w]hen a corporation exists solely for the purpose of serving as an alter ego for its owners, the courts will not permit themselves to be blinded or deceived by mere forms or law," instead, the courts should "deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require." *Flynn v. Greg Anthony Constr. Co.,* 95 Fed. Appx. 726, 733-734 (6th Cir.2003) (citation omitted).

*14 Ohio uses a three-prong test to determine whether a plaintiff may disregard the corporate form and hold individual shareholders liable for corporate misdeeds. The plaintiff must establish: (1) the individual shareholders, or any other legal entity exercised such complete control that the corporation had "no separate mind, will, or existence of its own"; (2) this control was used "to commit fraud, an illegal act, or a similarly unlawful act;" (3) the "control and wrong" resulted in "injury or unjust loss ... to the plaintiff." *Sanderson Farms, Inc. v. Gasbarro,* No. 07-4252, 2008 U.S.App. LEXIS 22652, at *13-15, 2008 WL 4764118 (6th Cir. October 24, 2008) (citing *Belvedere Condo. Unit Owners' Ass'n v. R.E. Roark Cos., Inc., et al.,* 67 Ohio St.3d 274, 617 N.E.2d 1075 (Ohio 1993); *Dombroski,* 119 Ohio St.3d 506, 514-15, 895 N.E.2d 538 (2008)).[FN20]

> FN20. The second prong of this test was recently modified to be less "limited" than the previous test set forth by the Ohio Supreme Court, but more restrictive than the test that was in use by various Ohio intermediate appellate courts. *Compare Dombroski,* 119 Ohio St.3d at 513, 895 N.E.2d 538 ("[H]aving reviewed the various tests for piercing the corporate veil developed by other authorities, we are convinced that [the second prong of the test we announced in *Belvedere* is] too limited."); *with id.* at 513-14, 895 N.E.2d 538 (veil piercing should not proceed if it alleges only "a

straightforward tort" rather than "an exceptional wrong."). This Court will refer to the three elements necessary to pierce the corporate veil as the *Dombroski-Belvedere* test.

A plaintiff who seeks to satisfy the *Dombroski-Belvedere* test by alleging fraud must meet the heightened pleading requirements imposed by Rule 9(b). *Southeast Tex. Inns, Inc. v. Prime Hospitality Corp.,* 462 F.3d 666, 672 (6th Cir.2006) ("When a cause of action seeks to pierce the corporate veil on the basis of fraud, it is subject to [Rule 9(b) ].."). Rule 9(b) explains that fraud claims must be plead "with particularity." *United States ex rel. Snapp, Inc. v. Ford Motor Co.,* 532 F.3d 496, 503 (6th Cir.2008) (citing Fed.R.Civ.P. 9(b)). Claims of fraud within the Sixth Circuit require that a plaintiff such as Ruffing "allege the time, place, and content of the alleged misrepresentations on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Lifelink Pharms., Inc. v. NDA Consulting, Inc.,* No. 5:07-CV-785, 2007 U.S. Dist. LEXIS 57342, at *5, 2007 WL 2292461 (N.D.Ohio Aug. 7, 2007) (citing *Sanderson v. HCA-The Healthcare Co.,* 447 F.3d 873, 877 (6th Cir.2006)).

**2. Ruffing's Complaint Satisfies the First Prong of *Dombroski-Belvedere***

The first prong of the *Dombroski-Belevedere* test requires Ruffing to properly allege that Hawthorn and Red Rock exercised such complete control over Masterbilt that Masterbuilt had "no separate mind, will, or existence of its own." *Sanderson Farms, Inc.,* 2008 U.S.App. LEXIS 22652, at *13, 2008 WL 4764118 (citation omitted). Defendants do not contest this element with respect to Hawthorn, but argue that it is "impossible" for Ruffing to meet this prong with respect to Red Rock because "Ohio law has long recognized that it is *impossible* for ... a corporation, to exercise any control over [its sister

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 185950 (N.D.Ohio)
(Cite as: 2009 WL 185950 (N.D.Ohio))

corporation]." (Doc 13 at 12) (emphasis in original) (citing *Enwotwen Indus., Inc. v. Brookstone Ltd. Partnership,* 157 B.R. 374, 377 (Bankr.S.D.Ohio 1993)).

Red Rock and Hawthorn overstate the holding of *Enwotwen,* which itself contains somewhat problematic language.[FN21] The court in *Enwotwen* confronted a situation in which "the only common element" between the sister corporations was the identity of the shareholders. That court explained:

> FN21. That court wrote that "it is impossible [for one sister] corporation ... to exercise any control over [the other]." *Enwotwen,* 157 B.R. at 377. To the extent that this can be read as stating that merely calling a company a sister corporation on a piece of paper renders control impossible, that is simply incorrect. True control will not necessarily follow formal ownership. *See Labadie Coal Co. v. Black,* 672 F.2d 92, 97 (D.C.Cir.1982) ("In many instances, the person 'controlling' a corporation is also the sole, or at least a dominant, shareholder. In other cases the controlling person may seek to avoid personal liability by not formally becoming a shareholder in the corporation. The question is one of control, not merely paper ownership.").

*15 [Plaintiff] asserts that '[Defendant A] clearly possessed domination and control over [Defendant B].' However, there is no evidence to support this bare assertion or even to raise a factual issue....*The only common element* between [Defendant A and Defendant B] is the identity of the shareholders of each corporation. The control asserted by [Plaintiff] simply cannot exist under the existing structural relationship of [Defendant A] and [Defendant B].
*Enwotwen Indus., Inc.,* 157 B.R. at 377-78 (emphasis added). It is clear, in other words, that Enwotwen considered two genuinely separate en-

tities who simply had the same owners.[FN22] In stark contrast, Ruffing has alleged that Masterbuilt was merely an instrumentality of Red Rock and that Masterbuilt never had assets, liabilities, products, employees, or even a checking account.

> FN22. Moreover, the *Enwotwen* court pointed out that plaintiff's alter ego claim did not even make sense, as the plaintiff sought to pierce through the company that was allegedly dominating the subservient company, rather than the other way around. *See Enwotwen,* 157 B.R. at 378. Ruffing, conversely, seeks to pierce the company allegedly being dominated.

Ruffing supports his position with a recent case from an Ohio court of appeals. In that case, the court squarely held that ostensible corporate structure is irrelevant and that the dispositive issue is control:

> Whether one is attempting to pierce the corporate veil by holding individual shareholders liable or by holding a related company liable under alterego principles is a distinction without a difference. In either case, the question [is control, not ownership].

*Minno v. Pro-Fab,* 2007 Ohio 6565, P44 (Ohio Ct.App.2007). Ruffing argues that this court should not allow Red Rock to perpetrate a fraud though Masterbuilt simply because Red Rock is not listed on paper as the owner of Masterbuilt.

The Court believes that Ruffing is correct. Although it will be in only the rarest and most extreme cases that one sister corporation can truly be said to control another, Ruffing has alleged sufficient facts to proceed to discovery. The Court notes, however, that the Supreme Court of Ohio is currently reviewing *Minno* and may ultimately conclude that ownership, rather than control, is the defining question. *See Minno v. Pro-Fab,* 117 Ohio

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

St.3d 1496, 885 N.E.2d 954 (Ohio 2008). It is, of course, the exclusive province of that court to determine Ohio law. Consequently, irrespective of the Court's ruling today, this Court will dismiss this count against Red Rock if the Supreme Court of Ohio determines that *Dombroski-Belvedere* applies only to cases of actual ownership.

### 3. Ruffing's Complaint Satisfies the Second and Third Prongs of *Dombroski-Belvedere*

Red Rock and Hawthorn do not contest that Ruffing has properly pled the second and third prongs of *Dombroski-Belvedere.*The second prong requires Ruffing to allege that Hawthorn and Red Rock used their control over Masterbuilt "to commit fraud, an illegal act, or a similarly unlawful act" and the third prong requires Ruffing to allege that he suffered an "injury or unjust loss" as a result of the "control and wrong." *Sanderson Farms,* 2008 U.S.App. LEXIS 22652, at *13-15, 2008 WL 4764118.

Nevertheless, because neither party had the opportunity to brief the potential impact of *Dombroski,* this Court considers it important to note that Ruffing has properly pled this element of his claim. The Court takes note of Ruffing's specific allegations that despite having a contract that was ostensibly with Masterbuilt, Ruffing was always paid by Red Rock, that Masterbuilt (the company with whom he signed a contract) was not "real," and that various aspects of the contract appear to be fraudulent to the extent that Masterbuilt was a company with no assets, liabilities, products, or employees (other than Ruffing). This is more than enough particularity to satisfy the heightened pleading requirements for a claim of fraud.

### 4. The *Dombroski-Belvedere* Analysis Applies to Limited Liability Companies

*16 Without any case law to support them, Red Rock and Hawthorn argue that piercing law does not apply to limited liability companies. Their argument stems solely from the limited liability statute, which, according to them, states that the members of a limited liability company are not liable for the debts of the company. Red Rock and Hawthorn, however, miss the key word in the statute. The relevant provision states that the members and managers of an LLC are not personally liable for the debts of the company "**solely** by reason of being a member or manager of the limited liability company."Ohio Rev.Code § 1705.48(B) (emphasis added). Thus, contrary to their suggestion, the statute does not state that no one other than the LLC can be held liable for the LLC's debts; it merely states that members and managers are not personally liable just because they happen to be a member or manager.

This concept is not unique to LLCs. Indeed, the officers and shareholders of a corporation are not ordinarily liable for the debts of the corporation just because they work for or own shares of the corporation. *See, e.g., Sanderson Farms,* 2008 U.S.App. LEXIS 22652, 2008 WL 4764118.Yet, under the proper circumstances, they can be held liable if the limited liability of the corporation is pierced. The same is true for LLCs. While the LLC is a relatively new type of entity under the law, many courts have already recognized that they are subject to the same analysis as corporations. *See, e.g., Ypsilanti County Utils. Auth. v. MeadWestvaco Air Systems, LLC,* 2008 U.S. Dist. LEXIS 50470, n. 3, 2008 WL 2610273 (E.D. Mich. June 30, 2008) (recognizing that case law in both the district and Michigan have applied piercing claims against limited liability companies); *Meccatech, Inc. v. Kiser,* 2008 U.S. Dist. LEXIS 30829, 2008 WL 1774992 (D.Neb. Apr. 15, 2008) (assuming that an LLC's corporate veil can be pierced in Nebraska); *BLD Prods., LTC v. Tech. Plastics of Or., LLC,* 2006 U.S. Dist. LEXIS 89874, at *7-8, 2006 WL 3628062 (D.Or. Dec. 11, 2006) ("[T]he piercing doctrine may be applied to LLCs under the same circumstances in which it

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 185950 (N.D.Ohio)
**(Cite as: 2009 WL 185950 (N.D.Ohio))**

Page 19

is applied to corporations."); *Filo Am., Inc. v. Olhoss Trading Co., L.L.C.,* 321 F.Supp.2d 1266, 1270 (M.D.Ala.2004) (allowing a claim to pierce an LLC in Alabama); *Teasck v. Gilbert,* 2007 BNH 11 (Bankr.D.N.H.2007) (same result in New Hampshire). Indeed, Red Rock and Hawthorn do not cite a single case that has ever differentiated an LLC from a corporation for purposes of veil piercing and there is no reason to believe that Ohio would reach such a unique result. Accordingly, Red Rock and Hawthorn's motion to dismiss Count VI is *DENIED.*

### CONCLUSION

For the foregoing reasons, the Court *GRANTS* Ruffing's motion for judgment on the pleadings with respect to Count I, *DENIES* Masterbuilt's cross-motion for judgment on the pleadings with respect to Count I, *GRANTS* Red Rock and Hawthorn's motion to dismiss Count III, and *DENIES* Red Rock and Hawthorn's motion to dismiss Counts II, IV, and VI.

**\*17 IT IS SO ORDERED.**

N.D.Ohio,2009.
Ruffing v. Masterbuilt Tool & Die, LLC
Slip Copy, 2009 WL 185950 (N.D.Ohio)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.