**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| HODELL-NATCO INDUSTRIES, INC., | ) | CASE NO. 1:08-cv-02755 |
| | ) | |
| Plaintiff, | ) | JUDGE LESLEY WELLS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| SAP AMERICA, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

**I.  Procedural Background**

After initiating this action on November 21, 2008, Plaintiff Hodell-Natco Industries, Inc.

(hereinafter "Hodell"), an Ohio corporation with its principal place of business in Valley View,

Ohio, filed an Amended Complaint on April 22, 2009 setting out five causes of action against

LSi-Lowery Systems, Inc. (hereinafter "LSi"), The IBIS Group, Inc. (hereinafter "IBIS"), SAP

America, Inc., and SAP AG.  (Doc. No. 26.)  Hodell's claims revolve around two contracts and

the negotiations and representations made prior to their consummation.  (*See generally* Amended

Compl.)  Specifically, Hodell alleges the following causes of action against all Defendants: (1)

fraudulent inducement; (2) fraud; (3) breach of contract; (4) negligence; and (5) negligent

misrepresentation.  (Doc. No. 26.)

On May 18, 2009, Defendants LSi and IBIS filed a joint Answer.[1]  (Doc. No. 30.)

On June 21, 2009, Defendants SAP America, Inc. and SAP AG (collectively "SAP ")

filed a Motion to Dismiss the Amended Complaint.[2]  (Doc. No. 36.)  Hodell filed a brief in

opposition on July 30, 2009.  (Doc. No. 40.)  On August 17, 2009, the SAP defendants filed a

reply brief.  (Doc. No. 41.)

On July 8, 2010, a referral was made to this Court under Local Rule 72.1, seeking a report

and recommendation regarding  SAP's Motion to Dismiss.  (Doc. No. 46.)  On August 16, 2010,

the Court heard oral arguments.

## II. Civil Rule 12(b)(6) Standard

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil

Procedure 12(b)(6) "should not be granted unless it appears beyond a doubt that the plaintiff can

prove no set of facts in support of his claim that would entitle him to relief."  *Conley v. Gibson*,

355 U.S. 41, 45-46 (1957).  Well-pleaded allegations must be taken as true and construed most

favorably toward the non-moving party.  *See, e.g., Mayer v. Mylod*, 988 F.2d 635, 637 (6th Cir.

1993).  Although a court may not grant a Rule 12(b)(6) motion based on its disbelief of the

factual allegations contained in the complaint, *Lawler v. Marshall*, 898 F.2d 1196, 1199 (6th Cir.

1990), a court "need not accept as true legal conclusions or unwarranted factual inferences."

*Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).  Consequently, a claim

---

[1]  According to the Answer, IBIS, an Illinois corporation, became a wholly owned
subsidiary of LSi, a Missouri corporation, in April of 2004.  (Doc. No. 30 at ¶¶4-5.)

[2]  According to Plaintiff's allegations in the Amended Complaint, SAP America, Inc. is a
Delaware corporation with its principal place of business in Pennsylvania, and is a
wholly owned subsidiary of SAP AG, a corporation organized under the laws of the
Federal Republic of Germany.  (Amended Compl. at ¶¶3-4.)

should not be dismissed unless it is unsupported by the law or the facts alleged are insufficient.

When ruling on motions to dismiss, a Court should normally look no further than the complaint, but "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [plaintiff's] claim." *Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 89 (6th Cir.1997) (citations omitted). "Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied." *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3rd Cir. 1993). Also, [a] court that is ruling on a Rule 12(b)(6) motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice." *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir.2003) (*citing Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir.1999)).

### III. Factual Allegations

The Complaint contains the following factual allegations.[3]  Hodell is a full-service fastener and chain product wholesaler.  (Compl. ¶9.)  In 2003, Hodell commenced a search for a software product that would provide the necessary integrated financial and sales management capabilities for its growing business.  (Compl. ¶¶16-17.)  Hodell required software capabilities to accommodate approximately eighty then-existing users plus the growth Hodell estimated achieving over the software's useful life.  *Id.*  Hodell's user capacity needs were expressly communicated to all potential software vendors.  *Id.*  Hodell also required a software vendor

---

[3]  The Amended Complaint will simply be referred to as the Complaint in the remainder of this report and recommendation, and all citations to the Complaint refer to the Amended Complaint.

with a high level of expertise, and a proven product supported by expert partners.  *Id*.

During its search in 2003, Hodell met with representatives of SAP and/or an SAP "partner."  (Compl. ¶18.)  SAP had recently purchased an Israeli application developer and branded its application "SAP Business One" (hereinafter, the "Software").  (Compl. ¶¶12.)  SAP marketed the Software through "a network of highly qualified channel partners" that resell, build, implement or provide services for SAP products.  (Compl. ¶13.)  The qualifications and expertise of SAP's "channel partners" was touted in a publication titled "SAP Solution Brief, Qualified SAP All-in-One Partner Solutions" published in July of 2002.  *Id*.  Due to the representations made by SAP, Hodell avers that LSi, IBIS, and American Express Business and Tax Services (hereinafter "Amex") were duly authorized agents of SAP.  (Compl. ¶¶13-15, 20.) LSi and IBIS were authorized to make representations concerning the Software's suitability and functionality on SAP's behalf and did, in fact, make various representations to Hodell.[4]  *Id*.

In 2003, Hodell was contacted either by SAP directly or by one of its partners, and provided with a copy of the "SAP Business One Brief" extolling the Software's virtues, and expressly representing that it would provide a "robust and fully integrated" solution suitable for businesses "with 10 to several hundred employees."  (Compl. ¶18, Exh. A.)  In addition, an "SAP Solution Brief" provided to Hodell touted the virtues of SAP's "highly qualified channel partners" that are "supported by SAP's global resources."  *Id*.  On October 16, 2003, an email and an "SAP Business One Whitepaper" sent by an Amex employee stated that the Software had

---

[4] In their joint Answer, LSi and IBIS admitted that they were "SAP Partners authorized to market and service the SAP Business One product and were agents of SAP for purposes of the SAP products ... [and that they] were SAP partners and agents of SAP for the SAP products."  (Doc. No. 30 at ¶¶11-12.)

4

been "successfully installed in 800 businesses globally, with the maximum implementation time being four weeks."  (Compl. ¶21.)  The "SAP Business One Whitepaper" also represented the Software would support "an unlimited number of simultaneous user transactions." (Compl. ¶21, Exh. C.)  On October 20, 2003, Hodell participated in an "Online Webinar and Demonstration" presented jointly by SAP, Amex, and IBM.  (Compl. ¶22.)  During the course of the Webinar, the suitability of the Software for small and mid-sized wholesale distributors was specifically represented to the attendees, including Hodell's President.  *Id.*  In November of 2003, a representative of Amex orally informed Hodell that IBIS would be partnering with Amex, and postponed a scheduled meeting between Hodell and Amex.  (Compl. ¶23.)  Hodell was then contacted by IBIS, which represented that it was an expert in providing IT solutions to the fastener industry and that "SAP had chosen to partner with The IBIS Group to develop the specific requirements of this vertical market space and bring to market a turn key solution (sic) to this industry."  (Compl. ¶24.)  On or about December 19, 2003, Hodell was contacted by Amex representatives, who provided assurances that the Software had sufficient capability to serve a business of Hodell's size.  (Compl. ¶26.)

During 2004, IBIS continued its marketing efforts for the Software.  (Compl. ¶27.)  After LSi acquired IBIS in June of 2004, Dan Lowery of LSi joined in the efforts to market the Software to Hodell.  *Id.*  Though meetings and conversations continued throughout 2004, none of the Defendants ever informed Hodell that the Software: (1) was unsuitable for mid-sized businesses; (2) could only support a limited number of users; (3) could not be installed in a reasonably functioning form; (4) existed with only mediocre or poor support; or (5) would require months of installation lead time.  *Id.*

5

On December 20, 2004, Hodell executed a "Development Agreement" with LSi and issued a Purchase Order for 80 user licenses.  (Compl. ¶¶30-32, Exhs. D, E, and F.)   Hodell alleges that SAP was a third party beneficiary under the development agreement.  (Compl. ¶33.) According to Hodell, the representations of SAP and its "channel partner" agents – that the Software could be used to support the number of users Hodell required – was essential to the agreement.  (Compl. ¶34.)  All defendants knew at the time the Development Agreement was executed that Hodell intended to purchase additional licenses to accommodate as many as 300 users.  (Compl. ¶34.)  Hodell would not have made its initial purchase without assurances that the Software could support the initial 80 users, as well as up to 300 users after expected growth. (Compl. ¶35.)  Hodell further relied upon SAP, LSi, and IBIS's assurances that it would receive "high-level" customer support tailored to Hodell's specific needs.  (Compl. ¶39.)

At the time the 2004 Development Agreement was executed, Hodell asserts that the Defendants' statements regarding the Software – including their statements regarding its user capacity, the attendant customer support, and the number of successful installations – were false, misleading, and made with the intent to induce Hodell to enter into the 2004 Development Agreement.  (Compl. ¶¶41-45.)  Notably, at the time Defendants sold Hodell the initial 80 user licenses in December 2004, SAP knew, or was reckless in not knowing, that the Software could not reasonably support more than 30 total users.  (Compl. ¶45.)

In December 2005, Hodell purchased an additional 40 user licenses and signed a "License Agreement."  (Compl. ¶46, Exh. G.)  The License Agreement contains limitations of liability, a choice of law, and warranty waiver provisions relied upon in SAP's Motion.  Hodell alleges that it was fraudulently induced into agreeing to these terms.  (Compl. ¶62.)  By the time Hodell

6

purchased the additional 40 user licenses in December 2005, SAP knew or should have known

that the Software could not reasonably support more than 30 users, and, therefore, could not

support the 80 user licenses initially purchased by Hodell, let alone the additional 40.  (Compl.

¶47.)

Beginning in 2004, Hodell worked diligently with SAP and its "expert channel partner"

LSi to implement the Software.  (Compl. ¶48.)  Efforts to make the Software minimally

functional continued until 2008, when Hodell abandoned the effort after reaching the conclusion

that the Software had been a complete failure.  *Id.*

On April 25, 2007, Dan Lowery of LSi sent an email to Hodell demonstrating Defendants'

knowledge that the Software was unsuitable for its purposes: "Yes, at the early stages we all

started with [the Software], the number most often quoted for users was 250+.  On the call, you

correctly heard Hodell was pushing the upper limit with 120."  (Comp. ¶50.)  On September 6,

2007, Hodell received a call from an LSi representative, who admitted that the Software had

initially been represented as capable of supporting up to 300 users, but that by May 2006, SAP

had reduced that number to 50 users.  (Comp. ¶51.)

Due to Defendants' alleged misrepresentations inducing Hodell to enter into the 2004

Development Agreement and the 2005 License Agreement, Hodell asserts it has suffered over

$1.3 million in damages.  (Compl. ¶¶53-54.)

### IV.  Law and Analysis

### A.  Governing Law

Although SAP, in its brief, argued for the application of Pennsylvania law to all counts,

SAP's counsel conceded at oral argument that Ohio law should be applied when ruling upon the

Motion to Dismiss.  (Tr. 3, 67.)

**A.    Breach of Contract**

     **1.        Development Agreement**

SAP asserts that Hodell's breach of contract claim should be dismissed with respect to the Development Agreement.  Specifically, SAP argues that SAP America, Inc. and SAP AG are neither signatories nor otherwise bound by that agreement.  (Doc. No. 36 at 18-21.)  Hodell asserts that SAP is liable for breach of the Development Agreement because LSi was SAP's agent and because SAP was an intended third party beneficiary.  The initial provisions of the Development Agreement declare that it is a "Development Agreement Between Hodell-Natco Industries, Inc., The IBIS Group Inc., a wholly owned subsidiary of LSi-Lowery Systems Inc. and LSi-Lowery Systems Inc. (LSi)."  (Compl., Exh. D.)  The Development Agreement clearly contemplates that LSi, IBIS, and Hodell are the actual parties to the agreement, and that IBIS would work on integrating its In-Flight Enterprise software with SAP's Business One Software.[5] *Id*.  There is no recitation that SAP is a party to the contract.  *Id*.  The contract was executed by Otto Reidl, president of Hodell, and Daniel Lowery, president of IBIS and LSi.  *Id*.

Construing as true Hodell's allegation that IBIS and LSi were agents of SAP for the purpose of marketing the Software (Compl. ¶¶13-18), such allegation, without more, does not render SAP a party to the Development Agreement.  The Complaint is devoid of any specific allegation that LSi, with either actual or apparent authority, executed the agreement as the agent

---

[5]  The Development Agreement also contemplated that Hodell, after assisting with the integration of the In-Flight Enterprise software with SAP's Business One Software, would receive up to $100,000 if the resulting product was sold to other users.  (Compl., Exh. D.)

of SAP and on SAP's behalf.  (Compl. ¶¶30-32.)  The agreement cannot reasonably be construed as binding SAP as an undisclosed principal, since Hodell's own allegation that LSi was a partner or agent of SAP throughout the course of the negotiations is inconsistent with such an allegation.[6]  Even when considering that LSi may have been an agent for a disclosed principal, SAP, Hodell's allegations still fail to state a claim for breach of contract.  There is no ambiguity in the Development Agreement as to the identity of the contracting parties – Hodell and LSi/IBIS.  "[W]here a third party contracts with an agent alone, the party cannot maintain an action against the agent's principal.  Even if the agent's principal is disclosed, if the agent does not enter into the contract as agent, but as the sole contracting party, the principal is not bound."  *Brown -vs- NAEP, Inc.*, 1983 Ohio App. LEXIS 12800 (Ohio Ct. App., Nov. 17, 1983) (*citing Depositors Sav. & Loan Co. v. Gross*, 1928 Ohio Misc. LEXIS 904 (Ohio Ct. App., July 24, 1928)).  "Generally speaking, the real parties to a simple contract should be determined from the intention of the parties as expressed ***by the instrument itself***.  If the terms of the instrument show an intention to bind the principal, the agent is not liable, since intention gathered from the terms of the instrument must control."  3 Ohio Jur.  § 158, *Agency and Independent Contractors*

---

[6]  Restatement 3d of Agency, § 1.04(2) - Terminology:

(a) Disclosed principal.  A principal is disclosed if, when an agent and a third party interact, the third party has notice that the agent is acting for a principal and has notice of the principal's identity.

(b) Undisclosed principal.  A principal is undisclosed if, when an agent and a third party interact, the third party has no notice that the agent is acting for a principal.

(c) Unidentified principal.  A principal is unidentified if, when an agent and a third party interact, the third party has notice that the agent is acting for a principal but does not have notice of the principal's identity.

9

(emphasis added); *see also Soberay Mach. & Equip. Co. v. MRF Ltd.*, 181 F.3d 759 (6th Cir. 1999).

In the case at bar, the instrument itself clearly identifies Hodell, LSi, and IBIS as the contracting parties.  Generally, agents are not bound by an agreement executed on behalf of a disclosed principal.[7]  Here, IBIS and LSi are bound by the terms of the agreement, as it clearly contemplates performance by them in developing and integrating other programs with SAP's Business One Software.  While the agreement does call for Hodell to purchase eighty user licenses for SAP's Software, it also specifies that  IBIS must "order" the Software from SAP. (Compl., Exh. D.)  Also, though the Development Agreement provides that SAP agreed to sell eighty user licenses for the Software to Hodell in the event IBIS and LSi defaulted, such provision is inconsequential as Hodell was not explicitly bound to purchase the licenses under such circumstances and, in any event, there is no allegation this provision was breached.  *See Int'l Customs Assocs. v. Ford Motor Co.*, 893 F. Supp. 1251, 1256 (S.D.N.Y. 1995) (finding that Ford, a non-signatory to the agreement, was entitled to a Rule 12(b)(6) dismissal despite the plaintiff's allegation that the contract gave Ford express rights and imposed corresponding obligations in one provision, because there was no allegation that Ford breached that provision).

---

[7]  Restatement 3d of Agency, § 6.01 - Agent for Disclosed Principal:

When an agent acting with actual or apparent authority makes a contract on behalf of a disclosed principal,

(1) the principal and the third party are parties to the contract; and

(2) the agent is not a party to the contract unless the agent and third party agree otherwise.

10

*Id.*

Hodell also argues that the Development Agreement is enforceable against SAP, because SAP was a third party beneficiary of the agreement.  (Compl. ¶33.)  "Only a party to a contract or an intended third-party beneficiary of a contract may bring an action on a contract in Ohio." *Thornton v. Windsor House, Inc.*, 566 N.E.2d 1220, 57 Ohio St. 3d 158, 161 (Ohio 1991). Potential benefits to a third party that are merely incidental to the contract are insufficient to support a breach of contract cause of action by the third party.  *Id.*

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either.
>
> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>
> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
>
> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.
>
> [Comment e to Section 302 states]:
>
> Performance of a contract will often benefit a third person. But unless the third person is an intended beneficiary as here defined, no duty to him is created. * * *

*Hill v. Sonitrol of Southwestern Ohio, Inc.*, 521 N.E.2d 780,  36 Ohio St. 3d 36, 40 (Ohio 1988) (*quoting and adopting* Section 302 of the Restatement of the Law 2d, Contracts (1981)); *see also Bell v. City of Cleveland*, 2007 U.S. Dist. LEXIS 62566 at **12-13 (N.D. Ohio Aug. 24, 2007) ("A mere incidental or indirect benefit of a contract flowing to a non-party is not sufficient to give such party a cause of action in breach.") (citations omitted).

Here, however, it is *not* SAP that is claiming it is an intended third party beneficiary and, therefore, entitled to enforce the contract against Hodell.  Rather, it is Hodell, in attempting to

11

enforce the contract against SAP, that claims SAP is a third party beneficiary.  While it is well established that an action for breach of contract can be maintained *by* an intended third party beneficiary, "there is very little authority addressing the question of whether and/or when third-party beneficiaries assume actual liability under a contract."  *Resource Title Agency, Inc. v. Morreale Real Estate Servs.*, 314 F. Supp. 2d 763, 776 (N.D. Ohio 2004).  In *Resource Title*, it was noted that two Ohio decisions provide support for the proposition that an intended third party beneficiary may be held liable pursuant to a contract.  *Id*. (*citing Ohio Match Co. v. Elm Grove Min. Co.*, 5 Ohio Law Abs. 151 (Ohio Ct. App. 1927) and *Saum v. Moenter*, 654 N.E.2d 1333, 101 Ohio App.3d 48 (Ohio Ct. App. 1995)).  However, in *Resource Title* the Court found that those cases were "highly fact-specific and do not stand for the general proposition that intended third-party beneficiaries always assume liabilities under the contract, they illustrate that, in particular cases, a third-party beneficiary may be so held liable."  *Id*. at 771.

The facts of this case are not analogous to either *Ohio Match* or *Saum*.  In *Ohio Match*, the defendant did not sign the relevant purchase agreement but did initially accept shipments of coal and make payments to the Mining Company in accordance with the terms of the agreement.  5 Ohio Law Abs. at *1.  Later, however, it refused to pay the price stipulated in the agreement.  *Id*. Here, there is no allegation that SAP conducted itself as if it was bound by the Development Agreement.  In *Saum*, defendant Moenter was found liable to his former wife's parents for a loan they made to her before the marriage even though he was not a party to the loan and did not negotiate the terms.  101 Ohio App.3d at 52-53.  The *Saum* court explained that Moenter was an intended third-party beneficiary because the loan was made to allow the couple to finance the building of their home.  *Id*.  Moenter became obligated on the loan by accepting its benefits and

12

by making payments on the loan out of the couple's joint checking account while the marriage lasted. *Id*. Accepting as true the facts pled by Hodell, it cannot be said that, by entering into the Development Agreement, the parties intended to benefit SAP. Hodell has not alleged that it intended to confer any sort of benefit upon SAP. The Development Agreement also cannot reasonably be construed as conferring any right of action upon SAP in the event Hodell cancelled or breached the agreement, as it did not obligate Hodell to purchase the Software from SAP.[8] Rather, the agreement contemplated that, for monetary consideration provided by Hodell, IBIS would lead a development effort to integrate its software with SAP's Business One Software, which IBIS, in turn, would procure from SAP. Though the Court is mindful that allegations must be construed in Hodell's favor, the claim that SAP was a third party beneficiary is essentially a legal conclusion unwarranted by the factual allegations in the Complaint.

As such, it is recommended that Hodell's action for breach of contract against the SAP defendants, as it relates to the Development Agreement, be dismissed.

### 2.        License Agreement

Although SAP does not characterize its 12(b)(6) motion as requesting partial judgment on the pleadings, it is clear both through SAP's brief and from oral arguments that there is no challenge to Hodell's action for beach of contract with respect to the License Agreement against SAP America, Inc. (Tr. 14, 17.) The SAP defendants do argue, however, that SAP AG is not party to the License Agreement. Hodell argues that SAP AG was either a direct contracting

---

[8] The Development Agreement seems to provide that the Software would not actually be purchased from SAP until satisfactory progress reviews for the separate development of IBIS's In-Flight application. It also gives Hodell the option to be released from the agreement with a refund after 150 days if the project is substantially behind schedule. (Compl., Exh. D.)

13

party, a third-party beneficiary, or a principal acting in concert with SAP America, Inc.  (Doc.
No. 40 at 26.)  The express language of the License Agreement states that it was between "SAP
America, Inc., a Delaware corporation ... and Hodell-Natco Ind., a Ohio corporation...."
(Compl., Exh. G.)

Hodell's argument that SAP AG is a party to the License Agreement fails for the same
reasons the Court found that SAP was not a party to the Development Agreement.  Hodell has
not sufficiently alleged that SAP America, Inc. was acting as the agent for SAP AG and entered
into the agreement on SAP AG's behalf.  Relying on the instrument itself, it is clear that the
parties to the agreement are SAP America, Inc. and Hodell.  Assuming *arguendo* that SAP
America, Inc. was SAP AG's agent, where an agent enters into a contract as the sole contracting
party, the principal is not bound.  As SAP AG is not a signatory to the contract and nothing in
the agreement can reasonably be interpreted as an intent to bind SAP AG, the Court finds that
SAP AG was not a party to the License Agreement.[9]

Though Hodell alleges that SAP AG is a third-party beneficiary to the License Agreement,
the allegation is no less conclusory than its allegations with respect to the Development
Agreement.  In fact, Hodell's brief contains no real argument with respect to why it believes
SAP AG should be construed as a third party beneficiary to the License Agreement, but merely
refers to its prior arguments relating to SAP AG and the Development Agreement.  (Doc. No. 40
at 26.)  Though SAP AG may indeed derive some benefit from the agreement as the owner of

---

[9]  SAP AG is mentioned twice in the agreement in the "Definitions" section.  (Compl.,
Exh. G. §§ 1.7 and 1.10.) One reference merely states that the SAP Business One
Software was developed by SAP America, Inc. and/or SAP AG.  *Id*.  The other states that
SAP is the licensor of SAP propriety information to SAP America, Inc.  *Id*.

14

both the Software and SAP America, Inc., there is no allegation that the parties to the agreement intended to benefit SAP AG or that SAP AG was anything more than an incidental beneficiary. As such, it is recommended that Hodell's cause of action for breach of the License Agreement be dismissed with respect to SAP AG only.[10]

**B.    Tort Claims**

    **1.    Federal Rule of Civil Procedure 9(B)**

SAP alleges that Hodell's fraud and fraud in the inducement claims should be dismissed for failure to plead with the particularity required by Federal Rule of Civil Procedure 9(b) ("Rule 9(b)).  (Doc. No. 36 at 24-25.)  The Sixth Circuit, however, has often noted that even where plaintiff fails to satisfy the requirements of Rule 9(b), "in the absence of defendants' motion for more definite statement under Rule 12(e), dismissal on this basis alone would not be appropriate."  *Coffey v. Foamex L.P.*, 2 F.3d 157, 162 (6th Cir. 1993) (*citing Hayduk v. Lanna*, 775 F.2d 441, 445 (1st Cir. 1985)); *accord Legge v. Wagner*, 1993 U.S. App. LEXIS 27050 at *6 (6th Cir., Oct. 14, 1993); *Resource Title Agency, Inc. v. Morreale Real Estate Servs.*, 314 F. Supp. 2d 763, 776 (N.D. Ohio 2004) (Wells, J.)  As such, SAP's argument that the case should be dismissed for failure to comply with Rule 9(b) is not well taken.

    **2.    Elements of Fraud, Fraud In The Inducement, Negligent Misrepresentation, and Negligence**

According to Ohio law, in order to maintain a cause of action for fraud, a plaintiff must demonstrate the following:

---

[10]  SAP also disputes the type of damages recoverable under the contract based on limitations within the contract.  As discussed below, it is premature to decide at this early stage of the proceedings what sort of damages may be recovered.

15

> (a) a representation or, where there is a duty to disclose, concealment of a fact;
> (b) which is material to the transaction at hand; (c) made falsely, with knowledge
> of its falsity, or with such utter disregard and recklessness as to whether it is true
> or false that knowledge may be inferred; (d) with the intent of misleading another
> into relying upon it; (e) justifiable reliance upon the representation or
> concealment; and (f) a resulting injury proximately caused by the reliance.

*Cohen v. Lamko, Inc.*, 462 N.E.2d 407, 10 Ohio St. 3d 167, 169 (Ohio 1984) (citations omitted);

*accord Magical Farms, Inc. v. Land O'Lakes, Inc.*, 356 Fed. Appx. 795 (6th Cir. 2009); *David A.*

*Flynn, Inc. v. GMAC*, 2008 U.S. Dist. LEXIS 41597 (N.D. Ohio May 23, 2008).  "The elements

of the claim are conjunctive, and accordingly all of them must be shown."  *Graham v. Am.*

*Cyanamid Co.*, 350 F.3d 496, 507 (6th Cir. 2003).

Also, under Ohio law, "a claim of fraud in the inducement arises when a party is induced to

enter into an agreement through fraud or misrepresentation. . . . A classic claim of fraudulent

inducement asserts that a misrepresentation of facts outside the [agreement] or other wrongful

conduct induced a party to enter into the [agreement]."  *Am. Coal Sales Co. v. N.S. Power Inc.*,

2009 U.S. Dist. LEXIS 13550 (S.D. Ohio, Feb. 23, 2009) (*citing ABM Farms, Inc. v. Woods*, 81

Ohio St. 3d 498, 502-3, 1998 Ohio 612, 692 N.E.2d 574 (Ohio 1998)).  To prove fraudulent

inducement, a plaintiff must demonstrate the same above cited elements necessary to prove an

action for fraud.  *See, e.g., Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 874 (6th Cir. 2007); *Scotts*

*Co. LLC v. Liberty Mut. Ins. Co.*, 606 F. Supp. 2d 722, 741 (S.D. Ohio 2009).

Under a claim for negligent misrepresentation in Ohio, a defendant who, "in the course of

his business, profession, or employment, or in any other transaction in which he has a pecuniary

interest, supplies false information for the guidance of others in their business transactions . . . is

subject to liability for pecuniary loss caused to them by their justifiable reliance upon the

information, if he fails to exercise reasonable care or competence in obtaining or communicating

16

the information." *David A. Flynn, Inc. v. GMAC*, 345 Fed. Appx. 974, 977 (6th Cir. 2009) (*citing*

*Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 505-06 (6th Cir. 2003)); *Delman v. City of*

*Cleveland Heights*, 534 N.E.2d 835, 41 Ohio St. 3d 1, 10 (Ohio 1989).

To maintain a cause of action for negligence, "the plaintiff must show (1) the existence of a

duty, (2) a breach of duty, and (3) an injury proximately resulting therefrom." *Armstrong v. Best*

*Buy Co.*, 788 N.E.2d 1088, 99 Ohio St. 3d 79, 81 (Ohio 2003).

**3.   Analysis**

Based upon the Court's review of the Complaint, the briefs, and the oral arguments

presented by the parties, it appears that Hodell's fraud, fraud in the inducement, and negligent

misrepresentation claims revolve around allegations that the SAP defendants, directly and

through their agents, knowingly, recklessly, or negligently misrepresented the capabilities of the

Software, particularly with respect to the number of users that could be accommodated.

Specifically, Hodell has alleged that SAP represented, through its agents and/or marketing

materials, that the Software was capable of handling users well in excess of the 120 licenses

Hodell purchased.  In fact, Hodell states that the Software was unable to accommodate more

than 30 users.  (Compl. ¶¶18-19, 34-36, 42-43, 47, 50-51.)  Further, Hodell has alleged that SAP

knew, or was reckless in not knowing, that the Software was incapable of supporting the 80

licenses purchased in December of 2004 or the 40 additional licenses purchased in December

2005.  *Id.*  Hodell has stated that the representations as to user capabilities was a critical factor in

the decision to purchase the Software.  *Id.*  As such, Hodell has sufficiently alleged that SAP

made a representation that was material to Hodell's decision to enter into both the Development

Agreement and the License Agreement, that the representation was false or made with an utter

17

disregard or recklessness as to whether it was true or false, that the representation was made to induce Hodell to purchase the Software, and that Hodell justifiably relied upon the representation resulting in injuries caused by the reliance.  Hodell has sufficiently alleged claims for fraud and fraud in the inducement.  Furthermore, the same allegations support a cause of action for negligent misrepresentation, as it has been alleged that SAP, in the course of its business, or concerning a transaction in which had a pecuniary interest, supplied false information, without exercising reasonable care or competence, for the guidance of Hodell.  The elements of justifiable reliance and pecuniary loss are indistinguishable from those for fraud.

SAP acknowledges that a defendant may be liable for fraudulent inducement even though that defendant is not a party to the agreement.  (Tr. 26, 52-54.)  As such, SAP's status as a non-party to the Development Agreement does not necessarily bar Hodell's cause of action against SAP for fraudulent inducement.  SAP, however, argues that these tort claims should be dismissed because: (1) "the economic loss" rule bars an action in tort where there is a valid contract; and, (2) the alleged misrepresentations may not be considered under the parol evidence rule, as any pre-contractual representations are negated by the integration and merger clause of the License Agreement.[11]

### a.    Economic Loss Rule

SAP asserts that Hodell cannot maintain a tort claim where the damages sought are purely economic.  (Doc. No. 36 at 15-16.)  Though SAP relied primarily on Pennsylvania law, it also cited several Ohio decisions.  *See Fitzgerald v. Roadway Express, Inc.*, 262 F. Supp. 2d 849, 855

---

[11]  SAP conceded that the "gist of the action" doctrine it advanced as another reason to dismiss Hodell's tort claims is inapplicable under Ohio law.  (Tr. 67.)

(N.D. Ohio 2003); *Telephone Mgmt. Corp. v. Goodyear Tire & Rubber Co.*, 32 F. Supp. 2d 960

(N.D. Ohio 1998) (plaintiff cannot rework a purely contractual relationship into a tort claim);

*Corporex Dev. Constr. Mgmt. v. Shook, Inc.*, 835 N.E.2d 701, 704 (Ohio 2005) (under Ohio law,

the economic loss rule  precludes recovery in tort for purely economic losses); *Pavlovich v.*

*Nat'l City Bank*, 435 F.3d 560 (6th Cir. 2006) (stating same).

The *Fitzgerald* decision does not discuss the economic loss rule and is inapplicable.

*Telephone Mgmt. Corp.* is not controlling as it deals with a plaintiff attempting to maintain an

action for a breach of an implied covenant of good faith and fair dealing.  In *Corporex*, the Ohio

Supreme Court stated that "[t]he economic-loss rule generally prevents recovery in tort of

damages for purely economic loss."  However, read in its proper context, it appears that the

*Corporex* court was discussing simple negligence actions and not intentional torts.  Immediately

after the above statement, the Ohio Supreme Court quoted an earlier decision that specifically

stated as follows: "The well-established general rule is that a plaintiff who has suffered only

economic loss due to another's ***negligence*** has not been injured in a manner which is legally

cognizable or compensable."  *Id.* (*quoting Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins.*

*Co.*,537 N.E.2d 624, 42 Ohio St. 3d 40 (Ohio 1989) (emphasis added)).[12]

Other courts have been critical of the *Corporex* decision to the extent that it suggests that

---

[12]  Though the language from *Corporex* was cited with approval by the Sixth Circuit in
*Pavlovich*, 435 F.3d at 569, that Court was addressing a negligence claim and not an
intentional tort claim.  Similarly, this Court followed the *Corporex* decision in *Integrated
Molding Concepts, Inc. v. Stopol Auctions*, 2007 U.S. Dist. LEXIS 75646 at *11 (N.D.
Ohio Oct. 11, 2007).  Again, however, that case addressed a negligence action and not
fraud, fraud in the inducement, or negligent misrepresentation.  *Id.*; *see also*, *Transcon.
Ins. Co. v. Simplexgrinnell LP*, 2006 U.S. Dist. LEXIS 48654 at *20 (N.D. Ohio July 17,
2006) (granting summary judgment on negligence claim due to economic loss rule).

*all* torts are barred by the economic loss rule where there is a contract.  For example, the Ninth

Circuit Court of Appeals observed that the economic loss doctrine has caused much confusion,

primarily because some courts have mistakenly stated in "overly broad terms that purely

economic losses cannot be recovered in tort."  *Giles v. GMAC*, 494 F.3d 865, 874 (9th Cir. 2007).

The *Giles* court asserted that "[s]uch broad statements are not accurate [as] tort law has

traditionally protected individuals from a host of wrongs that cause only monetary damage" such

as fraud, fraud in the inducement, or conversion actions.  *Id*. at 875 (noting that "[m]ost courts

that have applied the economic loss doctrine beyond product liability cases have done so to bar

recovery of economic loss in negligence and strict liability.")

A prior decision of this Court declined to extend the economic loss doctrine to negligent

misrepresentation claims.  *J.F. Meskill Enters., LLC v. Acuity*, 2006 U.S. Dist. LEXIS 41491

(N.D. Ohio Apr. 7, 2006).  The "*Corporex* [decision] thus makes clear that although tort claims

are generally barred by the economic loss doctrine, the discrete tort generally referred to as

negligent misrepresentation is not."  *Id*. at *12; *accord Long v. Time Ins. Co.*, 572 F. Supp. 2d

907, 912 (S.D. Ohio 2008) ("Negligent misrepresentation claims survive the economic loss

doctrine."); *see also Lee v. Dublin Manor Corp.*, 2007 U.S. Dist. LEXIS 57603 at *19 (S.D.

Ohio, Aug. 3, 2007) (denying a motion for a dismissal under Rule 12(b)(6) because "Ohio courts

generally do not apply the economic loss rule to preclude negligent misrepresentation claims").

It would be inherently inconsistent to find that negligent misrepresentation claims survive

the economic loss doctrine while fraud or fraud in the inducement claims do not.  While the

economic loss doctrine prevents a party from recovering in tort for breach of duties assumed

only by contract, "fraudulent inducement involves a general duty to avoid wrongful conduct that

20

induces a party to enter into a contract."  *Onyx Environmental Services, LLC v. Maison*, 407 F.

Supp.2d 874, 879 (N.D. Ohio 2005) (finding that because fraud and contract duties are distinct

from one another, the economic loss doctrine does not bar plaintiff's fraud claim).  A decision

from the Southern District for Ohio also supports the proposition that the economic loss rule

does not bar fraud in the inducement claims.  *See Marine Direct v. Dougherty Marine, Inc.*,

2007 U.S. Dist. LEXIS 1414 (S.D. Ohio, Jan. 8, 2007).  In terms similar to the Ninth Circuit's

decision in *Giles*, the *Marine Direct* decision explains that claims of fraudulent inducement

allow for the recovery of purely economic loss, as "in most cases where fraudulent inducement

is claimed, the alleged losses are purely economic."  *Id.* *6; *cf. MyVitanet.com v. Kowalski*, 2008

U.S. Dist. LEXIS 57745 (S.D. Ohio, Jul. 29, 2008) (addressing whether the economic loss rule

in Ohio applies to intentional torts, but not deciding the matter as plaintiff alleged non-economic

losses).

On the other hand, Hodell cannot maintain a simple negligence action.  Hodell has failed to

allege breach of any duty independent of contract and the economic loss rule clearly bars simple

negligence actions where, as here, no non-economic damages have been alleged.[13]  As such, it is

recommended that Hodell's negligence claim contained in Count Four be dismissed.

Undoubtedly, there is some ambiguity in the case law discussed above as it relates to Hodell's

remaining tort claims.  This Court, however, cannot find that Hodell has failed to state a claim

---

[13]  Although Hodell claims it has alleged non-economic damages, counsel, at oral
argument, was unable to point to any specific allegation of non-economic damages in the
Complaint when asked to do so.  (Tr. 73-74.)  Counsel speculated that perhaps there was
some damage to Hodell's information systems and suggested that discovery may reveal
evidence of property damage.  *Id.*  Discovery, however, is unnecessary for Hodell to
ascertain whether its own information systems have been damaged, as such information
would plainly be within Hodell's possession.

upon which relief can be granted.  It does not appear that Ohio courts intended to extend the economic loss rule beyond negligence actions to bar intentional torts as well.  Indeed it is a rare case where fraud or fraud in the inducement results in non-economic damages (*i.e.* damages to person or property).  SAP's all-encompassing construction of the economic loss rule would effectively eviscerate the viability of fraud and fraudulent inducement tort claims in Ohio.  The above cited federal court decisions applying Ohio law have implicitly declined to extend the economic loss rule to the extent advocated by SAP.  As such, the Court finds SAP's argument that Hodell's fraud, fraud in the inducement, and negligent misrepresentation claims are barred by the economic loss rule to be without merit.

**b.**  **Parol Evidence Rule and Integration/Merger Clause**

In a related argument, SAP claims that the parol evidence rule and the integration clause contained within the License Agreement combine to bar Hodell's fraud, fraud in the inducement, and negligent misrepresentation claims.  (Doc. No. 36 at 8-12, 15-16.)  The License Agreement contains the following provision:

> This Agreement and each Schedule and Appendix hereto constitute the complete and exclusive statement of the agreement between SAP and Licensee, and all previous representations, discussions, and writings are merged in, and superseded by, this Agreement.  This Agreement may be modified only by a writing signed by both parties.  This Agreement and each Appendix hereto shall prevail over any additional, conflicting, or inconsistent terms and conditions which may appear on any purchase order or other document furnished by Licensee to SAP.

(Compl., Exh. G § 11.9.)

In *Galmish v. Cicchini*, 734 N.E.2d 782, 90 Ohio St.3d 22 (Ohio 2000), the Ohio Supreme Court conducted a thorough analysis of the relationship between claims of fraud and the parol evidence rule.

22

The parol evidence rule states that "absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements." 11 Williston on Contracts (4 Ed.1999) 569-570, Section 33:4.

***

The principal purpose of the parol evidence rule is to protect the integrity of written contracts. *Ed Schory & Sons, Inc. v. Soc. Natl. Bank* (1996), 75 Ohio St. 3d 433, 440, 662 N.E.2d 1074, 1080.  By prohibiting evidence of parol agreements, the rule seeks to ensure the stability, predictability, and enforceability of finalized written instruments. "It reflects and implements the legal preference, if not the talismanic legal primacy, historically given to writings. It effectuates a presumption that a subsequent written contract is of a higher nature than earlier statements, negotiations, or oral agreements by deeming those earlier expressions  to be merged into or superseded by the written document." (Footnotes omitted.) 11 Williston on Contracts, supra, at 541-548, Section 33:1.

Nevertheless, ***the parol evidence rule does not prohibit a party from introducing parol or extrinsic evidence for the purpose of proving fraudulent inducement***. *Drew v. Christopher Constr. Co., Inc.* (1942), 140 Ohio St. 1, 23 Ohio Op. 185, 41 N.E.2d 1018, paragraph two of the syllabus. *See, also, Union Mut. Ins. Co. of Maine v. Wilkinson* (1871), 80 U.S. (13 Wall.) 222, 231-232, 20 L. Ed. 617, 622. As explained in Annotation, Parol-Evidence Rule; Right to Show Fraud in Inducement or Execution of Written Contract (1928), 56 A.L.R. 13, 34-36:

"The principle which prohibits the application of the parol-evidence rule in cases of fraud inducing the execution of a written contract * * * has been regarded as being as important and as resting on as sound a policy as the parol-evidence rule itself. It has been said that if the courts were to hold, in an action on a written contract, that parol evidence should not be received as to false representations of fact made by the plaintiff, which induced the defendant to execute the contract, they would in effect hold that the maxim that fraud vitiates every transaction is no longer the rule; and such a principle would in a short time break down every barrier which the law has erected against fraudulent dealing.

"***Fraud cannot be merged***; hence the doctrine, which is merely only another form of expression of the parol-evidence rule, that prior negotiations and conversations leading up to the formation of a written contract are merged therein, is not applicable to preclude the admission of parol or extrinsic evidence to prove that a written contract was induced by fraud." (Footnotes omitted.)

23

Stated differently, "***it was never intended that the parol evidence rule could be used as a shield to prevent the proof of fraud, or that a person could arrange to have an agreement which was obtained by him through fraud exercised upon the other contracting party reduced to writing and formally executed, and thereby deprive the courts of the power to prevent him from reaping the benefits of his deception or chicanery***." (Footnotes omitted.) 37 American Jurisprudence 2d (1968) 621-622, Fraud and Deceit, Section 451.

Contrary to [defendant's] assertions, this principle does not lose its force merely because the considered written agreement contains an integration clause.  The parol evidence rule applies, in the first instance, only to integrated writings, and an express stipulation to that effect adds nothing to the legal effect of the instrument.  The presence of an integration clause makes the final written agreement no more integrated than does the act of embodying the complete terms into the writing.  Thus, ***the presence of an integration provision does not vitiate the principle that parol evidence is admissible to prove fraud***. *See Blackledge v. Allison* (1977), 431 U.S. 63, 75, 97 S. Ct. 1621, 1630, 52 L. Ed. 2d 136, 148, fn. 6; *Downs v. Wallace* (Ala.1993), 622 So. 2d 337, 341; Annotation, *supra*, 56 A.L.R. at 56-62; 37 American Jurisprudence 2d, *supra*, at 622-623, Section 452; 11 Williston on Contracts, *supra*, at 661-673, Section 33:21.

\*\*\*

Thus, "***the rule excluding parol evidence of collateral promises to vary a written contract does not apply where such contract is induced by promises fraudulently made, with no intention of keeping them * * *.***"  37 American Jurisprudence 2d, supra, at 623, Section 452.  However, ***the parol evidence rule does apply "to such promissory fraud if the evidence in question is offered to show a promise which contradicts an integrated written agreement.***  Unless the false promise is either independent of or consistent with the written instrument, evidence thereof is inadmissible." *Alling v. Universal Mfg. Corp.* (1992), 5 Cal. App. 4th 1412, 1436, 7 Cal. Rptr. 2d 718, 734.  By the same token, "if the written contract provides for the doing of an act on a certain condition, the promisee cannot show that the promise was an absolute one merely by claiming fraud, unless he produces some other evidence   of the alleged fraud." Annotation, supra, 56 A.L.R. at 47-48.

*Id*. at 788-790 (emphasis added).

The Ohio Supreme Court's analysis in *Galmish* is fatal to SAP's position.  Hodell alleges that SAP represented its Software could at least accommodate the 80 licenses contemplated in the Development Agreement and the additional 40 licenses purchased at the time the License

24

Agreement was signed.  This representation is not inconsistent with any provision of the License Agreement.[14]  Hodell has further alleged that SAP knew of the falsity or was, at the very least, reckless in making such representation.  Had the License Agreement stated that the Software could only handle thirty users, or that SAP did not make any representations or guarantees as to the number of users the Software could handle, the parol evidence rule might well bar evidence of contradictory terms.  Here, however, if it is true that SAP falsely represented the number of user licenses the Software could handle – and the Court must construe such allegations as true on a 12(b)(6) motion – then arguably both agreements were induced by promises fraudulently made that SAP had no intention of keeping or, more appropriately, had no ability to keep.

For the foregoing reasons, it is recommended that SAP's motion to dismiss the fraud, fraud in the inducement, and negligent misrepresentation claims in the Amended Complaint be denied.

## C.  Damages

In its motion, SAP argues that all of Hodell's claims are barred due to waivers of certain warranties in the License Agreement.  (Doc. No. 36 at 20-24.)  At oral arguments, SAP conceded that Hodell can maintain a breach of contract claim against SAP America, Inc. with respect to the License Agreement.  (Tr. 14, 17.)  At this stage of the proceedings, it is premature to determine the kind of damages a party may recover except where the damages sought are contrary to statute.  Though SAP may ultimately be correct that all implied warranties were disclaimed in the License Agreement, such an assertion does not defeat Hodell's claim.

---

[14]  The License Agreement states that "SAP warrants that the Software will substantially conform to the functional specifications contained in the Documentation for six months following delivery."  (Compl., Exh. G. § 7.1.)  Neither party has shed any light on what writings consist of "the Documentation" – an issue that may be best left for the discovery process.

Certainly, Hodell would be entitled to some damages in the event it prevails on a breach of contract claim.  Though Hodell's recovery may be limited by the express terms of the agreement, those limitations do not defeat the cause of action itself.  Similarly, SAP's argument that Hodell's prayer for punitive damages should be dismissed is also rejected.  Punitive damages do not constitute a claim.  Furthermore, punitive damages are available in tort actions where a defendant has displayed "a conscious disregard for the plaintiff's rights..." *Magical Farms, Inc. v. Majestic Meadows Alpacas, Inc.*, 356 Fed. Appx. 795, 799-800 (6th Cir. 2009).  Whether Hodell can demonstrate the element of malice necessary to recover punitive damages remains to be seen.  However, pleading standards are certainly not so onerous as to require a party to prove every element of its prayer for damages before any discovery has been conducted.

### V.  Conclusion

It is recommended that the SAP defendants' Motion to Dismiss the Amended Complaint (Doc. No. 36) be GRANTED in part and DENIED in part.  Specifically, Hodell's claim for breach of the Development Agreement should be dismissed as it relates to the SAP defendants.  Hodell's claim for breach of the License Agreement should be dismissed *only* as it relates to Defendant SAP AG, as Hodell can maintain a claim for breach of that contract against Defendant SAP America, Inc. only.  Finally, Hodell's fourth cause of action alleging negligence should also be dismissed.  SAP's Motion to Dismiss should be denied with respect to counts one, two and five (fraud, fraud in the inducement, and negligent misrepresentation).

/s/ Greg White
U.S. Magistrate Judge

Date: September   2, 2010

26

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).