1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
2                         EASTERN DIVISION

3    HODELL-NATCO INDUSTRIES,       Case No. 1:08CV2755
     INC.,                          Cleveland, Ohio
4                    Plaintiff,     Monday, August 16, 2010
                                    9:30 a.m.
5              -vs-

6    SAP AMERICA, INC., et al.

7                    Defendants.

8                 TRANSCRIPT OF ORAL ARGUMENT
               BEFORE THE HONORABLE GREG WHITE
9               UNITED STATES MAGISTRATE JUDGE

10
     APPEARANCES:
11
     For the Plaintiff:       James F. Koehler
12                            P. Wesley Lambert
                              Buckley King - Cleveland
13                            **1400 Fifth Third Center**
                              Cleveland, Ohio  44114
14                            (216) 363-1400

15

16   For the Defendant:       Michael J. Miller
                              Drinker, Biddle & Reath
17                            One Logan Square
                              Philadelphia, Pennsylvania
18                            (215) 988-2700

19                            **Charles W. Zepp**
                              **Porter, Wright**
20                            **1700 Huntington Building**
                              **Cleveland, Ohio  44115**
21                            **(216) 443-9000**

22   Also Present:           Rafael P. McLaughlin

23   Court Reporter:         Judith A. Gage, RMR-CRR
                             7-189 U.S. Court House
24                           Cleveland, Ohio  44113

25   Proceedings recorded electronically.
     Transcript produced by computer-aided transcription.

1                    P R O C E E D I N G S

2

3              THE CLERK:  Your Honor, the case before the

4    Court carries case 1:CV2755, Hodell-Natco Industries

5    versus SAP America, et al.

6              THE COURT:  Could we have counsel for the

7    plaintiff enter an appearance on the record, please?

8              MR. KOEHLER:  Wes Lambert and Jim Koehler for

9    Hodell-Natco.

10              THE COURT:  And for the Defendants?

11              MR. MILLER:  Good morning, Your Honor.

12    Michael Miller for SAP America and SAPAG, and I'm

13    joined by my colleague.

14              MR. ZEPP:  Charles Zepp from Porter, Wright.

15              THE COURT:  Mr. Zepp, welcome.  And I

16    understand we have Mr. McLaughlin here for LSI-Lowery

17    Systems?

18              MR. McLAUGHLIN:  That's correct.

19              THE COURT:  We had some discussion in

20    chambers on how to proceed here this morning, and I'm

21    going to turn it over to counsel for defendant.  They

22    have a Power Point presentation, I understand.

23              MR. MILLER:  Thank you, Your Honor.  First, a

24    couple preliminary points.  I understand from our

25    conversation that you have read the briefs, you are up

1    to date on the background and the allegations, I'll

2    skip over that, although we may circle back to it, and

3    I made the point in chambers that although we believe

4    Pennsylvania law applies for purposes of today's

5    argument and this motion, we're going to assume that

6    Ohio law applies.  We think it is very similar to

7    Pennsylvania, about the same result.

8             THE COURT:  Thank you.

9             MR. MILLER:  Also, a point about the

10   complexity and confusion.

11            I do think this case is a straight-up breach

12   of contract case.  It is Hodell-Natco versus SAP

13   America on the license agreement, not SAPAG, and no

14   tort claims.  But there are provisions in the contract

15   that are a real issue for Hodell, and to get around

16   those, they have sought to expand the contractual

17   relationship and inject these tort claims into the

18   case, and it has added complexity.

19            I'll come back to this, Your Honor, but what

20   we are effectively trying to do -- what they are trying

21   to effectively do here is a put a square peg in a round

22   hole, and the complexity and confusion that we're

23   seeing is what results when you try to do that.

24            As we mentioned, I am going to proceed with

25   an argument that tracks Your Honor's questions.  Your

1    Honor's first question was ostensibly can the SAP

2    defendants be liable under the 2004 development

3    agreement, and the short answer to that, Your Honor, is

4    no, and there is a simple reason, and a bit of a more

5    complex reason.

6          I'm going to start with the simple reason.

7    Neither of the SAP entities are parties to the 2004

8    development agreement.  This is it here.  It is the

9    front page of it, anyway.  There are the parties.  It

10   is Hodell and IBIS and LSI, and I typically refer to

11   IBIS and LSI as just LSI.

12         THE COURT:  I will do the same.

13         MR. MILLER:  And there was discussion in

14   chambers here, shouldn't there be discovery?  You don't

15   need discovery on this.  These are the parties to the

16   contract.  Let's see who signed it.  Hodell and LSI.

17   There is no SAP America and no SAPAG, and that's the

18   simple reason.

19         Then here in bullet two is the more complex

20   reason.  Hodell argues that number one, SAP America and

21   SAPAG are intended third parties under the 2004

22   development agreement.  They are not.  This case cited

23   here is the *Hill versus Sonitrol* case, it is Ohio

24   Supreme Court.  It sets forth the standard under Ohio

25   law for an intended third party beneficiary.  It adopts

1    Section 302 of the restated section of contracts, which

2    kind of goes on and on, it has various subsections, but

3    here is the key:  You cannot proceed, you cannot be an

4    intended third party beneficiary unless you have

5    enforceable rights under the agreement.  In other

6    words, you have a right to sue.

7              And if you look, Your Honor, at the

8    development agreement, there is nothing in this

9    development agreement that even hints at the idea that

10   maybe SAP could sue.  If Hodell breached the

11   development agreement, the idea that SAP could sue

12   Hodell for Hodell's breach of its contract with LSI

13   doesn't make any sense.  If we tried that, we would get

14   bounced right out of Court.

15             THE COURT:  You could not enforce the 80

16   licenses, the agreement to buy 80 license in Business

17   One?

18             MR. MILLER:  Right.  If they didn't buy 80

19   licenses, then tough luck for us.  We might have a

20   claim against LSI, we have a contract with them, but if

21   Hodell -- whatever obligations it had to LSI in this

22   contract that I just had up there, if they breached it,

23   SAP had no, no right to sue.  They just stand by and

24   hope that it works out.

25             THE COURT:  I don't want to get ahead of you,

1    but doesn't the contract contemplate some performance

2    by SAP?

3              MR. MILLER:  It has one line in it, Your

4    Honor, towards the end, about if LSI becomes insolvent

5    then SAP will sell certain licenses to the parties, and

6    call that what you want.  Confirmation of a verbal

7    agreement; call it a one sentence contract.  But it

8    doesn't make SAP a party to all of what you see here.

9    It just --

10              THE COURT:  But agency would.

11              MR. MILLER:  Well, let's talk about agency,

12    if I don't get too bollixed up here.

13              THE COURT:  I just think that that clause

14    about SAP's responsibilities, potential performance

15    under that contract kind of plays into the agency

16    argument, so I would like to hear your response to

17    that.

18              MR. MILLER:  Okay.  For purposes of agency,

19    let's assume all their allegations are correct, and I

20    have that -- let me just, so we don't miss this, this

21    last item, they cite the *Resource Title* case that not

22    only is an SAP an intended third party beneficiary, but

23    third party beneficiaries can be sued; I'm prepared to

24    come back to that, but it is highly distinguishable.

25              Agency.  Right.  Number one, Your Honor,

1    there are no cases that stand for the proposition that

2    if one party is an agent of the other, it changes the

3    identity of the contract.

4              Think about an insurance policy, all right?

5    I buy an insurance policy from whoever, Nationwide

6    Insurance, that's where I have my car insurance.

7              I don't sue my agent for breach -- it is a

8    little bit in the reverse, you know what I mean, but I

9    don't sue my agent for breach of my insurance contract.

10   He is not a party to that.  I might have a claim

11   against him of some sort, and there are various types

12   of agency-related claims, but number one, the fact --

13   and let's assume for purposes of argument that LSI was

14   SAP's agent.  That does not change the identity of the

15   parties to the 2004 development agreement.  It LSI and

16   Hodell.  The rest of the agency argument, they have

17   no -- there is no real actual authority, allegations in

18   the complaint.  There are some, what I call parent

19   authority allegations in the complaint.  They are very

20   conclusory, and they never get around, Your Honor,

21   this -- forgive me for going back and forth with my

22   glasses, but you I cannot see the screen without the

23   glasses, and it drives me nuts to have to wear them --

24   but, not the agent.  No authority to bind or make

25   representations or warranties.  So, for me --

```
 1                   THE COURT:  That's the licensing agreement.

 2                   MR. MILLER:  That's right.  That they

 3      executed.  That's our contract with them.  And you

 4      asked, Your Honor, what effect should the license

 5      agreement have on the 2004 development agreement.

 6                   I don't know if I have a copy on the Power

 7      Point of the license agreement, but it is very simple.

 8      It is all the way at the end.  Entire agreement.  It

 9      would be easier to read it from here.  It might be up

10      here.

11                   "This agreement and each schedule and

12      appendix hereto constitute the complete and exclusive

13      statement of the agreement between SAP and licensee,"

14      that's Hodell, "and all previous representations,

15      discussions and writings" -- that would be the

16      development agreement -- "are merged in and

17      superseded" --

18                   THE COURT:  Why would that be the development

19      agreement?  I don't understand why you can't have two

20      contracts.

21                   MR. MILLER:  My point is -- well, we might

22      have.  If the development agreement was drafted

23      differently, and it was between Hodell on the one hand

24      and LSI and SAP on the other hand and we all signed it,

25      then that might be, but we didn't do that.
```

```
 1              I'm assuming just for the purposes of
 2    argument, even if we had -- first, we didn't do that,
 3    but even if we had done that and then we executed the
 4    license agreement with Hodell --
 5              THE COURT:  You think, then, the license
 6    agreement is going to swallow up the development
 7    agreement?
 8              MR. MILLER:  Parties do that all the time,
 9    Your Honor.  They can have a series of contracts going
10    back years, going back generations.  The contract that
11    exists at the moment is the one they consciously and
12    intentionally entered into, and if they put in there
13    that this is their sole agreement, forget what happened
14    before, here is our deal going forward, then they have
15    one contract, and that's it, and that's what happened
16    here.
17              THE COURT:  Well, you know, okay.  I hear
18    you.  I don't know.
19              MR. MILLER:  I appreciate that.  I don't mind
20    spending time on it.  For me --
21              THE COURT:  That's the crux of your argument.
22    I mean, if the licensing agreement doesn't control the
23    development agreement, if they are not considered two
24    separate and enforceable contracts, that is your
25    argument, in essence.
```

1              MR. MILLER:  Your Honor, I find myself --

2     some of this, to me, you're never going to find cases

3     for, because the propositions are, to me, very obvious

4     and very simple.  We were not a party to the

5     development agreement.  You can't find our name on it.

6     The agency allegations don't change the identity of the

7     parties, and that disclosed principal issue is also a

8     complete red herring.  Disclosed principal is when an

9     agent wants to absolve itself for liability in a

10     contract, and it is basically arguing, oh, I'm not the

11     party to this contract, my principal is.

12              In this case, LSI is the party to the

13     contract.  We saw its name right up there on the

14     signature line, and Hodell acknowledges that when they

15     sue LSI on the contract.  We're not a party to --

16              THE COURT:  And once again, we have to accept

17     the allegation in the complaint as true, right?  They

18     have alleged agency; LSI has admitted that they were

19     your agent in the development agreement --

20              MR. MILLER:  And if, for example, that

21     contract -- Your Honor, we have an interpretive

22     contract.  The first thing we look at is the language.

23     We are looking at the parties' intent.  If it was the

24     intention of the parties that SAP was going to be a

25     party because its agent, LSI, made it a party, that

1    intention would be clearly and plainly expressed in the

2    very first sentence, when it says here is who the

3    parties are, and it would be at the end, too, because

4    someone would sign on behalf of SAP.  It might even be

5    LSI.

6              THE COURT:  So you don't think any of the

7    representations that SAP made in regard to the

8    capabilities of their Business One software had

9    anything to do with the execution of the development

10   agreement?

11             MR. MILLER:  They may or may not have.  To

12   me, it is not relevant for purposes of whether they can

13   proceed on a breach of contract claim on the

14   development agreement.

15             THE COURT:  I get the breach of contract, and

16   we are kind of mixing those up --

17             MR. MILLER:  I understand.  That's a great

18   point.  Could SAP have made some representations that

19   induced, right, Hodell to enter into the development

20   agreement, and they have some of the flavor of that

21   allegation in the complaint, and my response to that is

22   it doesn't change the result in this case, because you

23   get to the license agreement next, because there is a

24   contract, a very sophisticated commercial contract

25   between SAP and Hodell.  It was entered into in

1    December of 2005.  Even if we had been a party to the

2    2004 development agreement, all of that is wiped clean,

3    and now you --

4              THE COURT:  Well, that's a central question

5    to me.  And I guess -- I hear you say it, but --

6              MR. MILLER:  But, Your Honor, that is

7    business.  If Your Honor and I had some sort of

8    contractual relationship, I was your tenant, you know,

9    and we had an agreement one year, an agreement another

10   year, you know, and then --

11             THE COURT:  Well, let's try to stick to the

12   facts here.  I mean, they are alleging in their

13   complaint -- again, this is a 12(b)(6) motion to

14   dismiss, they are alleging in the complaint that the

15   only reason they entered into the development agreement

16   was because of the representations that SAP made

17   regarding the capabilities of their software.

18             MR. MILLER:  Understood, and the question is

19   might they have a tort claim, right?

20             Let's leave aside the whole breach of

21   contract claim, and that's why I go straight to the

22   license agreement, Your Honor, is because the facts of

23   this case are that in December of 2005, not long after

24   they entered into that development agreement and prior

25   to when these claims developed, they entered into a

1    contract with SAP that said, number one, we're not

2    going to ever seek certain damages for you, and number

3    two, under the Ohio economic loss rule, it precludes

4    them from bringing tort claims.

5              THE COURT:  And I hear you saying that -- I

6    get your argument, that the licensing agreement is the

7    total agreement between you and Hodell.  I get that.

8              MR. MILLER:  Is it Hodell?

9              MR. LAMBERT:  Hodell, yes.

10             MR. MILLER:  I have been going with Hodell.

11   But that is very significant commercial reality, and it

12   ends up, Your Honor, if you'll permit me -- breach of

13   contract, right?  Just to spare us coming back to this.

14   This is the license agreement, that's who the parties

15   were, and this is a very important point.  It relates

16   to what Your Honor is raising.  What kind of claims do

17   we have here, and what we really have, Your Honor, are

18   breach of contract claims.

19             The second bullet, okay, what they

20   effectively claim is that oh, the software didn't work.

21   It failed to function.  It didn't conform to the

22   functional specifications contained in the

23   documentation.

24             This is their complaint right here --

25             THE COURT:  Well, you're not arguing, are

1    you, and I didn't read in any of your briefs that you

2    are disputing that the Business One software can handle

3    no more than 30 users.

4              MR. MILLER:  We're not conceding anything,

5    Your Honor --

6              THE COURT:  You have not argued against that.

7              MR. MILLER:  Correct.  They have a breach of

8    contract claim that they can proceed with against SAP

9    America --

10             THE COURT:  So your current position, as I

11   understand it, is that it cannot handle more than 30

12   users?

13             MR. MILLER:  That it cannot?

14             THE COURT:  Yes.

15             MR. MILLER:  No.  I understand it is actually

16   not the users that matter so much, it is the number of

17   transactions.

18             You could have -- I don't know the technical

19   pieces, so I don't want to get too far ahead, but you

20   can have many users, you can have 200 users with the

21   Business One software.  It depends how many

22   transactions each one of those people are doing.

23             Now, I understand in the Hodell context, they

24   had like 160,000 products, and it sounds like that

25   might at the end of the day be one of the significant

1     issues in this case, you know --

2               THE COURT:  The complaint phrases it in --

3               MR. MILLER:  It's a combination of how many

4     users you have, how many transactions you have.  We

5     have not contested any of that for the purposes of

6     today's motion.  I'm not conceding any of it; I have to

7     learn some of the technical issues, frankly, and

8     address them then, but we don't --

9               THE COURT:  But that's the context of the

10    complaint.  We are dealing with, again, a 12(b)(6)

11    motion.

12              MR. MILLER:  Absolutely, but in the 12(b)(6)

13    context, the economic loss rule gets applied, and there

14    are cases dismissing fraudulent inducement claims in

15    the 12(b)(6) context.

16              In the software context, where it is

17    fraudulent inducement, and one of the keys is exactly,

18    Your Honor, what I'm showing here, which is, okay, what

19    is this case all about?  Is this really a contract

20    case, or is this really a tort case?

21              And under Ohio law, it is very confusing, I

22    know, there are lots of cases and they go all over the

23    place, but when the parties are in contract together,

24    when they are in privity, Ohio law is distilled down to

25    basically having two requirements if you want to try

1    and have tort claims in addition to your breach of

2    contract claims.  You have to show that there is a

3    contractual duty -- pardon me --

4              THE COURT:  A duty outside the contract.

5              MR. MILLER:  Right.  Separate and distinct

6    from what's in the contract, and damages that are

7    separate and distinct from breach of contract damages,

8    and the reason, Your Honor this --

9              THE COURT:  Well, I thought the fraudulent

10   inducement law in Ohio was that if they can establish

11   that, they get all the proximate damages.

12             MR. MILLER:  No.  Look at *Medical Billing*,

13   for example.  Sixth Circuit, I think it is 2007 or

14   2005, it's a fraudulent inducement count.  It actually

15   went to trial, and when they realized that the damages

16   for fraudulent inducement were no different than the

17   breach of contract damages, they cut the fraudulent

18   inducement piece out of the case all together.

19             And that is -- and the analysis, Your Honor,

20   in *Medical Billing*, Sixth Circuit, applying Ohio law,

21   was this:  What's their case about?  Is it about tort

22   stuff, or is it really tort stuff recast, or breach of

23   contract recast as tort?

24             Look at the first paragraph of the complaint.

25   "Injuries sustained from the sale."  When you go

17

 1    through their complaint, all of it -- this is just that
 2    it didn't work, right -- all of it is really breach of
 3    contract in disguise, and the piece of the contract
 4    that they are saying was breached is right here.  7.1.
 5    What they say is SAP breached its warranty.  We
 6    warranted that it would work for you.
 7            THE COURT:  You kind of conceded that in a
 8    footnote, didn't you?
 9            MR. MILLER:  Yes.  And I did two minutes ago,
10    that they can proceed with a breach of contract claim
11    against SAP America, and it is --
12            THE COURT:  Under the licensing agreement.
13            MR. MILLER:  Based on the licensing
14    agreement, and it is based on this promise that we made
15    to them, that the software would work for them, and
16    when you read their complaint, even in their tort claim
17    contexts, what they are effectively saying is you
18    didn't do that.
19            And the reason that's a problem -- I'll skip
20    ahead, this is just, you know, there are not other
21    warranties, there are not implied warranties, SAPAG is
22    not liable for warranties -- I'll come back to damages.
23            Economic loss rule, right?  The duty and the
24    damages.  And there is the duty, all the duty -- I'm
25    going to skip over there and go right to damages --

1          THE COURT:  You are saying they have alleged

2   no duty outside the contract in any count in the

3   complaint?

4          MR. MILLER:  I think that of two

5   requirements, that was the tougher one for SAP to get

6   over.  I think there is some confusion in the cases.

7          Occasionally, for example, in the *Forum* case,

8   Your Honor, that you pulled out today, it was a great

9   read for me, and I'm sure for counsel.

10         What is in here, right?  Well, number one, I

11  notice right away there is no privity.  Number two, no

12  one raised economic loss rule in that case.  And that

13  happens.  We have cases where, you know, each one

14  proceeds in a different procedural sequence --

15         THE COURT:  I think we gave you some case law

16  for fraudulent inducement and economic loss in Ohio.

17         MR. MILLER:   *Onyx*, no privity; *Marine Direct*

18  supports our position.  And *Marine Direct*, the only

19  reason the parties were allowed to proceed with the

20  fraudulent inducement count is, and it is right in the

21  last sentence of the case, they say the damages look

22  like they are different.

23         THE COURT:  Well, I read that as saying where

24  fraud and contract duties are distinct from one

25  another, the economic loss doctrine is not a bar to the

1    fraud claim.

2              MR. MILLER:  Pardon, Your Honor?

3              THE COURT:  *Marine Direct*.  Where a fraud --

4              MR. MILLER:  I could not hear you.

5              THE COURT:  I said where fraud and contract

6    duties are distinct from one other, the economic loss

7    doctrine is not a bar to the fraud claim.

8              MR. MILLER:  In *Marine Direct* -- there are

9    two requirements.  That is one of them.  That was the

10   duty requirement, but if you go back to this, right,

11   that is number one.  And *Marine Direct* does have

12   language in there about that, and as I pointed out to

13   Your Honor, I think of the two separate and distinct

14   requirements, duty is tougher for SAP to deal with, and

15   that's why I made that point.  Sometimes it come up,

16   sometimes it doesn't.

17             There are some cases in there where

18   fraudulent inducement -- take *Galmish*, for example.

19   *Galmish* is one of the cases we argued over in the parol

20   evidence context.  It is a fraudulent inducement count.

21   You look at it and you go, "Huh?  Where is the economic

22   loss analysis?"  And it is not in there.  And from that

23   you must being to go, well maybe there is a duty

24   exception for fraudulent inducement, but is there a

25   damages exception, and when you read the cases, they

1    say no, and *Marine Direct*, Your Honor, is one of them,

2    and *Marine Direct* says two things, right at the end of

3    the opinion.

4            Actually, the last sentence is probably the

5    best summary.  Although *Marine Direct* may not directly

6    recover the unpaid commissions based on a tort theory,

7    if it can prove fraudulent inducement of the contract,

8    it can be entitled to whatever amount of damages is

9    proximately caused.  They have to prove separate and

10   distinct damages, and when you look, Your Honor, at the

11   damages in this case, here is what they say:  They are

12   all from the sale, all the injuries are from the sale.

13   These are the sentences they have right at the end of

14   every one of their counts.  They are basically

15   identical -- oh, I messed it up.

16           There are two paragraphs.  They seek direct

17   damages and they seek indirect damages.  Their

18   breach -- the case is basically a breach of contract

19   action.  The damages that they seek are basically

20   breach of contract damages, and you can -- I'll give

21   Your Honor a copy of this and you can see, every time

22   they ask for damages, it is basically the same as the

23   breach of contract damages, and -- and this is

24   important -- when you look at the kinds of damages that

25   you are entitled to under Ohio law, it is very broad.

1    This is damages limitations, right?  But this case

2    right here, *National Mulch and Seed*, okay, this is a

3    UCC case.  And if you look in the UCC, they are

4    entitled to be made whole.  If their breach of contract

5    claim under the license agreement against SAP America

6    turns out to have merit, they can collect a lot of

7    significant -- the UCC provides them with a very broad

8    range of damages and this case, *National Mulch and*

9    *Seed*, does a pretty good job of describing what they

10   are, and those damages include consequential damages

11   and incidental damages, which are the same as the

12   indirect damages, the direct and indirect damages they

13   are seeking in the complaint.

14        So when you go through this analysis, you

15   have a situation where this is fundamentally a breach

16   of contract case.  They are saying it doesn't work.

17   Okay.  But are they alleging any separate damages?

18   Because, you know, if they do that, then maybe they can

19   proceed with this economic -- you know, despite the

20   existence of the economic loss, or maybe they can

21   proceed with the fraudulent inducement count, but when

22   you read their complaint, in all fairness, they don't

23   allege any different damages claims.  They just are

24   seeking to be made whole under the breach of contract

25   claim, and they are entitled to be made whole under the

1    UCC, which Ohio's version gives them all sorts of

2    damages, including consequential damages, including

3    incidental damages, but there is nothing in the

4    complaint that says "Oh, and this is different."  The

5    only exception is one line where they say punitive

6    damages, right?  But punitive damages -- I mean, if

7    that was the rule, that's how you get around economic

8    loss every time.  You always ask for punitive damages.

9    And there is no kind of reasoning that supports that.

10            The point is, under Ohio -- and this string,

11   Your Honor, of cases, every one of these is Ohio law,

12   where the Court is talking about the damages

13   requirement.  The separate and distinct damages

14   requirement.  They are in chronological order.  Supreme

15   Court, Sixth Circuit, and recent district cases,

16   including fraud and including fraudulent inducement

17   cases, and there have been, Your Honor, I cited right

18   at the end of this, this *Irwin Seating* case, that is a

19   motion to dismiss granted, it's Sixth Circuit, it is

20   Michigan law, which is comparable to Ohio.  It is a

21   software case.  Motion to dismiss, fraudulent

22   inducement, dismissed on economic loss rule grounds

23   because of exactly what I'm saying.

24            They are basically alleging damages -- they

25   are trying to get damages for their tort claims that

 1    are basically breach of contract, and they are already

 2    entitled to those.

 3              The last piece, and this is why --

 4              THE COURT:  Was that a summary judgment or a

 5    12(b)(6)?

 6              MR. MILLER:  12(b)(6).  Sixth Circuit.

 7              The reason that we're trying to put -- we're

 8    in this square peg in a round hole situation is this:

 9    Contract damages under the UCC would be great for them,

10    but they signed a contract that said they are going to

11    limit those damages, and they are trying to avoid it.

12    They don't argue in their brief that this doesn't

13    apply.  There is very little commentary.  This is very

14    broad.  Sole and exclusive remedy, damages or losses in

15    any way, due to negligence or breach of any duty, which

16    can't be stated any more broadly than that.  It is

17    impossible to say it more broadly.  And there are two

18    of them.  There is 9.1 and 9.2.

19              THE COURT:  I understand what the licensing

20    agreement says, and that takes us back to our other

21    questions about the impact that has on the development

22    agreement, but there is no question here from a

23    12(b)(6) standpoint, and without, again, getting into

24    the issues that you just raised in terms of fraudulent

25    inducement, but there is no question that the parties

1    to the licensing agreement at least contemplated that

2    your Business One software could handle 120 users.

3              MR. MILLER:  Absolutely.

4              THE COURT:  And the contemplation in the

5    development agreement that it could handle at least 80

6    users.  You may not have been -- you are claiming you

7    are not a party to that, but there is no question that

8    the development agreement contemplated that Business

9    One software could handle 80 users, and for the

10   purposes of this motion, we have to believe that it

11   can't.

12             MR. MILLER:  That sounds true.

13             THE COURT:  Okay.

14             MR. MILLER:  I will confess to you standing

15   here, I don't remember where that is in the development

16   agreement.

17             THE COURT:  Well, there were 80 licenses

18   being sold in the development agreement.

19             MR. MILLER:  That may be some implied piece

20   of that, I understand, you know.  This is a case that

21   has --

22             THE COURT:  And we have to accept for this

23   purpose that it couldn't handle 80, let alone 120.

24             MR. MILLER:  Well, we have to accept, Your

25   Honor --

```
1            THE COURT:  For the 12(b)(6).
2            MR. MILLER:  That they have alleged that,
3   agreed, and for purposes of this motion, that is
4   assumed to be true.
5            THE COURT:  Right.
6            MR. MILLER:  Exactly.  I think I'll close,
7   because I know we have a lot more to do.
8            This is a case that is complex standing here
9   right now, and can get more complex, but it is a
10  case --
11           THE COURT:  Do you think I'm making it more
12  complex?
13           MR. MILLER:  Not at all.
14           THE COURT:  I just want to know the answer to
15  that.
16           MR. MILLER:  Your Honor, these are really
17  interesting cases.  This is, you know, sometimes I go
18  down to the library, get the remedies book out --
19           THE COURT:  This is law school stuff.
20           MR. MILLER:  A little bit like that.  And
21  Your Honor, two or three times standing here, I bit my
22  tongue, but I will proceed.
23           To me, when you come to the breach of
24  contract stuff, it is law school.  And if you write
25  down in your answer that SAP is a party to this
```

1   development agreement or that SAP is a third party

2   beneficiary or that SAP is a --

3           THE COURT:  Do you have to be a party to

4   fraudulently induce it?

5           MR. MILLER:  No, you do not.  I understand

6   that point.  And Your Honor raised that question, and I

7   conceded that in the beginning.

8           THE COURT:  Right.  So wouldn't you be

9   responsible for fraudulent inducement, even though you

10  are not a party?  Set aside the licensing agreement for

11  a second.

12          MR. MILLER:  Understood.

13          THE COURT:  So for purposes of the 12(b)(6),

14  if we didn't have the licensing agreement, you would

15  be -- you would be responsible for conceding all these

16  points, that your Business One can't handle that number

17  of users, that you would be responsible for the

18  fraudulent inducement of that contract.

19          MR. MILLER:  I think that if we never had the

20  license agreement, I think they made agency allegations

21  that LSI is acting on our behalf and made all these

22  representations, and we were induced in there.

23          THE COURT:  So we get past the 12(b)(6).

24          MR. MILLER:  And I can see that we go to here

25  is a licensing agreement, and this is what it said,

1  that you are not our agent, and here are the terms and

2  everything else is wiped clear, and you won't sue us

3  for damages, and the economic loss rule applies because

4  we're now in privity.  And that's how we get to where

5  we are.

6          THE COURT:  Okay.

7          MR. MILLER:  Thank you, Your Honor.

8          THE COURT:  All right.  Mr. Lambert.

9          MR. LAMBERT:  Your Honor, I'm going to use

10  the podium, because I have a variety of stuff I have to

11  refer to.

12          I think from Hodell's standpoint, we have to

13  at least understand my perspective on the contractual

14  arrangement and the transactional structure, at least

15  as far as I'm aware of it at the pre-discovery stage.

16          The software that SAP sold Hodell-Natco to my

17  understanding wasn't -- and I think it is contained in

18  the license agreement, wasn't independently functional,

19  it had to be integrated with other software, and

20  because of that fact, you have the development

21  agreement, which contemplates the development of other

22  software to be used along with --

23          THE COURT:  From LSI, and you were going to

24  get a benefit from doing that as well, right?

25          MR. LAMBERT:  Correct, which we never did,

```
 1    but that's beside the point.
 2              So when we're talking about whether we have
 3    just a straight-up breach of contract action for the
 4    sale of SAP Business One licenses --
 5              THE COURT:  And I want to talk about the
 6    timing of the sale of the licenses a little bit,
 7    because I had some questions of you about that --
 8              MR. LAMBERT:  Sure.
 9              THE COURT:  Because the development
10    contemplates -- here is my global assessment of what
11    was happening in the development agreement.
12              You guys hired LSI to come in, take a look at
13    the software you were using, bring in some software
14    they had outside of Business One, look at your business
15    model, go around and talk to all your people, you know,
16    what would work for you, what would make your job
17    easier, what would make us integrate all of our parts
18    and pieces, and they were going to work on that for a
19    while before they attempted to integrate Business One
20    into that system.
21              Am I wrong about that?
22              MR. LAMBERT:  I don't think that is exactly
23    how it worked.  I think how it worked was --
24              MR. KOEHLER:  I think you are pretty close.
25              THE COURT:  Because the development agreement
```

1    contemplates that you were not even going to get the

2    Business One software for 300 days after you signed the

3    development agreement, right, and because the first --

4    the last $120,000 of the money paid under the

5    development agreement was actually going to be

6    purchasing Business One software.

7              MR. LAMBERT:  Correct.

8              THE COURT:  And the first $180,000 was

9    basically the fees for LSI to come in there and figure

10   out what they needed to do to make your software and

11   their software and Business One work together, so you

12   really were not getting Business One for almost a year,

13   which would be about the time you signed the licensing

14   agreement, after you signed the development agreement.

15             Isn't that what the contract says?

16             MR. LAMBERT:  Yes.  The contract says that

17   SAP, Business One, is being purchased in the context of

18   this overall transaction --

19             THE COURT:  I get that, but you were not

20   going to get Business One itself, the product, Business

21   One, for a year after you signed that contract.

22             MR. LAMBERT:  I don't think it is relevant

23   when I got it.  It is when I committed myself to buy

24   it.

25             THE COURT:  Well, it is relevant when you got

1    it, because when you get it, you have to sign the

2    licensing agreement.

3                MR. LAMBERT:  I didn't sign the licensing

4    agreement with respect to what was recommended to me to

5    be --

6                THE COURT:  I understand the representations.

7    I'm talking about when you actually got Business One on

8    your system.

9                MR. LAMBERT:  I think that's a fact that has

10   to be developed through discovery.  I think we had it

11   in our possession before this license agreement came

12   into play.

13               THE COURT:  I wondered about that, just

14   because of the terms of the contract, you know.  It is

15   clear that when LSI sells something under their

16   agreement with SAP, they may sell a Business One, they

17   have to make you sign this license agreement.

18               Now, you're saying they didn't when they gave

19   you the first 80 copies --

20               MR. LAMBERT:  That's correct.

21               THE COURT:  User licenses, but your own

22   contract says 300 days before we are even going to buy

23   Business One, so I'm curious about how that plays into

24   your saying that you already had 80 copies, 80 licenses

25   before you signed the licensing agreement, and they

1    would not give you the other 40 until you signed the

2    licensing agreement, so, you know, I wonder about that.

3            MR. LAMBERT:  Well, I'll tell you what to me

4    seems kind of odd about the whole transaction is that

5    it is my understanding the second 40 were actually

6    offered, I could be wrong -- well, no.  As we allege,

7    it was offered pursuant to a one-time limited offer --

8            THE COURT:  In the development agreement.

9            MR. LAMBERT:  I think you might find through

10   discovery that maybe they realized there was an error

11   in not having us sign the license agreement with regard

12   to the first 80, and then say, oh, you know, we have to

13   pitch this one-time limited offer, and get the other 40

14   in 2005, have them execute the license agreement, and

15   that way we roped them in, maybe we can have it apply

16   retroactively, but when you talk about the license

17   agreement specifically, it can't apply retroactively.

18   So, again --

19           THE COURT:  So I guess I would like you to

20   address the point that Mr. Miller was making about the

21   relationship the licensing agreement has to the

22   development agreement.

23           MR. LAMBERT:  Okay.  It has absolutely no

24   relationship, according to its own terms.  If you

25   look --

1          THE COURT:  Because that's kind of a critical

2    question here.  Aside from your allegations that you

3    were fraudulently induced to sign the licensing

4    agreement, if the development agreement stands on its

5    own, there is no choice of law, there is no limit of

6    liability, there is no waiver of warranties.  That is

7    your position?

8          MR. LAMBERT:  Theoretically, if I'm wrong on

9    some of these issues, the Court would have to apply

10   Ohio law with regard to the 2004 transaction, and

11   Pennsylvania law with regard to the 2005 transaction.

12         THE COURT:  If they are separate.  If they

13   are separate.

14         MR. LAMBERT:  If they are separate, and if

15   I'm correct that this agreement was fraudulently

16   induced.

17         THE COURT:  But you still think you get your

18   whole damages under the development agreement breach?

19         MR. LAMBERT:  Absolutely.

20         THE COURT:  So you don't even need the

21   licensing agreement breach.

22         MR. LAMBERT:  With regard to the fraudulent

23   inducement allegations, I think it is -- that is for me

24   two separate transactions.  At worse, maybe an

25   integrated transaction --

1          THE COURT:  So how can it be a no-brainer on

2     both sides?  The licensing agreement kind of is a --

3     takes over the whole understanding between you and SAP,

4     and you are saying no-brainer, they are two different

5     contracts, two separate contracts, separately

6     enforceable?  How do I resolve that?

7          MR. LAMBERT:  I think you let us have

8     discovery and hear from representatives of LSI and

9     IBIS.

10          THE COURT:  Well, LSI basically has taken

11     your side on this.

12          MR. LAMBERT:  And they are very wise for

13     doing so.  But whether the license agreement applies to

14     the development agreement, if you look at the -- for

15     example, the definition of the term "software," as used

16     in the license agreement, applies to -- pursuant to the

17     order for the software, including present and future

18     orders placed by the licensee.  It does not apply to

19     prior orders, okay?

20          If you look at the term of the agreement,

21     "this agreement and the license agreement granted

22     hereunder shall become effective as of the date first

23     set forth above," which is December, 2005.  So how

24     could it apply?  It wasn't effective when we purchased

25     the first 80.

1           THE COURT:  But that goes back to my question

2    about when you actually got the first 80 Business One

3    licenses.  But that, I guess that's beside the point

4    for purposes of this argument.

5           MR. LAMBERT:  Correct.  And for purposes of

6    this argument --

7           THE COURT:  And waiving the agency, you're

8    saying, okay, if we waive the agency in the license

9    agreement, saying LSI is not an agent, that has nothing

10   to do -- we're not saying they were not an agent for

11   the development agreement.

12          MR. LAMBERT:  Correct, or if I was

13   fraudulently induced into signing the agreement under

14   the auspices of a one-time limited offer when they

15   realized we hadn't signed it for the first 80, then

16   none of this stuff is applicable.

17          And importantly, especially for purposes of

18   this motion and I think throughout the case, SAP

19   drafted this agreement, it looks to me to be a form

20   agreement, it has to be construed against SAP as the

21   drafter.  If they wanted this to apply to prior

22   transactions, and I realize there is the merger clause

23   in there, but if there are two separate transactions,

24   right, two separate agreements, then --

25          THE COURT:  Well, the development

1    agreement --

2         MR. LAMBERT:  -- it is expressly stated in

3    the license agreement it applied to the first 80.

4         THE COURT:  So I hear your argument being the

5    license agreement at best applies only to the Business

6    One software, and the development agreement is much

7    broader than that because it involves the development

8    and the integration of your existing software with

9    Business One, as well as the software that LSI is

10   bringing to the table.

11        MR. LAMBERT:  Correct.  And if we were to get

12   down to brass tacks, I don't even think that I have to

13   prove that SAP was a party to the development

14   agreement.  I don't think there will be any dispute

15   that they sold Hodell-Natco 80 licenses of Business One

16   software in 2004 through their agent -- maybe the

17   agency aspect will be disputed, but through LSI --

18        THE COURT:  Well, is agency your stronger

19   argument, or third party beneficiary?

20        MR. LAMBERT:  Right now I don't know.  I

21   think they are both on equal footing.

22        THE COURT:  Really.

23        MR. LAMBERT:  In the development agreement --

24   if I have to prove that they are a party to the

25   development agreement, it expressly contemplates the

1    performance by SAP in there.

2            THE COURT:  But they didn't agree to that

3    performance.

4            MR. LAMBERT:  Well, then, they can't cast

5    channel partners out into the business world to act as

6    their agents and have them make representations about

7    their product, enter into the sale of their products

8    with business entities, and then say "Well, I didn't

9    read any of that, you know, those were not my

10   representations" --

11           THE COURT:  So you think that SAP could have

12   forced you to buy the 80 licenses if you chose not to

13   halfway through that deal?

14           MR. LAMBERT:  That's a good question.

15           THE COURT:  Yes.

16           MR. LAMBERT:  I think it is arguable that

17   they could have, yes.

18           THE COURT:  Really.  Okay.

19           MR. LAMBERT:  I think if everything had gone

20   according to plan, Your Honor, and everything had

21   worked --

22           THE COURT:  No question SAP was going to get

23   a benefit out of the development agreement.

24           MR. LAMBERT:  They were going to get the

25   purchase price.

1        THE COURT:  The sale of the 80 licenses.

2        MR. LAMBERT:  Right.

3        THE COURT:  But I guess the question related

4   to what enforceability rights did they have in that

5   context.

6        MR. LAMBERT:  Well, for example --

7        THE COURT:  I see you winning perhaps on the

8   fraudulent inducement question, where for purposes of

9   this 12(b)(6) -- winning, winning the 12(b)(6) because

10  we are conceding that they couldn't handle 80 users

11  when you signed that development agreement --

12       MR. LAMBERT:  Not only that they couldn't

13  handle it, but that they knew they couldn't handle even

14  30, and that they -- and that we were going to be

15  purchasing or needing upwards of 300.  That's why we

16  went down this path in the first place.  We never would

17  have gone down the path --

18       THE COURT:  And that's the allegation in the

19  complaint we're accepting as true, but I question

20  whether or not SAP had any right to enforce your

21  agreement with LSI to buy 80 copies of the Business One

22  software.

23       MR. LAMBERT:  Correct.  And you can

24  contemplate a situation under the development agreement

25  where the SAP Business One software works correctly,

1    the integration with LSI software works; LSI is unable

2    to continue performance under the agreement --

3              THE COURT:  Well, that begs the question,

4    though, doesn't it?  I mean, why would they sell you

5    120 licenses and work for three years to try to make it

6    work if they knew when they sold it to you it wouldn't

7    work?

8              MR. LAMBERT:  I think that they were -- I

9    think they knew -- and again, this is something I'll

10   have to prove through discovery, but I think you could

11   find in discovery that they knew it wasn't capable of

12   working then, but they hoped as they continued to work

13   through the problems with us, maybe something would

14   happen that they would discover, oh, here is what

15   wrong, and they could implement it again.

16             THE COURT:  I'm just questioning, it's a

17   legitimate question, what's the motive for a company

18   like SAP to sell you 120 licenses for something that

19   they knew could only handle 30?

20             MR. LAMBERT:   I think that -- I think that

21   you could find a situation where they know that in its

22   current state it wouldn't work --

23             THE COURT:  Do you have to prove they knew

24   it?

25             MR. LAMBERT:  I think we're going to have to

```
 1   prove intent.  Correct.
 2            THE COURT:  Okay.
 3            MR. KOEHLER:  Can I chime in on your
 4   question?
 5            THE COURT:  Sure.
 6            MR. KOEHLER:  What SAP knew is not
 7   necessarily the same thing as LSI knew.  LSI was the
 8   one that was primarily dealing directly with
 9   Hodell-Natco, and at least the documents that I have
10   seen that they are going to come out and discover --
11            THE COURT:  Well, they are going to say they
12   didn't know, right?
13            MR. KOEHLER:  Exactly.
14            THE COURT:  They already said that.  But
15   that's back to the agency thing again.
16            MR. KOEHLER:  Well, your question was why
17   would these licenses be sold if they didn't know that
18   they couldn't perform; well, it was LSI that was
19   dealing directly --
20            THE COURT:  They signed the licensing
21   agreement --
22            MR. KOEHLER:  Pardon?
23            THE COURT:  They signed the licensing
24   agreement for 120 licenses.  SAP did.
25            MR. KOEHLER:  I don't know why SAP would do
```

1     it, but the point I'm making --

2              THE COURT:  Well, I understand you're saying

3     LSI would do it because they didn't know.

4              MR. KOEHLER:  Right.

5              THE COURT:  But my question is why would SAP

6     do it?

7              MR. KOEHLER:  Who knows.  We'll find out.

8     Maybe it is the right arm not knowing what the left arm

9     is doing.  In an organization the size of SAP, I can

10    tell you, that happens all the time, where marketing is

11    not fully conversant with the products they are

12    selling.

13             THE COURT:  That's why I passed out that

14    *Magical Farms* case.  I'm trying to interpret that, but

15    it seems to me it says you don't have to prove they

16    knew it was false at the time it was made; you have to

17    prove that it was put out with the intention that

18    people would rely upon it, and it turned out to be

19    false.  So, that's why I asked the question.

20             If you think you have to prove that they knew

21    it was false at the time it was -- that the

22    representations were made, then that is a big hurdle.

23    That is an intentional, "I'm going to misrepresent this

24    for the purpose of obtaining a contract," and that's

25    where I trip over their motive.  I mean, if they are

1   putting it out there and wanting you to rely on it and

2   it turns out to be false, that is a different case,

3   right?

4           MR. LAMBERT:  If they were -- if they knew --

5   if they were reckless in not knowing whether the

6   software could support the number of users they were --

7           THE COURT:  And that is your allegation in

8   the complaint.

9           MR. LAMBERT:  Correct. And we pleaded in the

10  alternative.

11          THE COURT:  Okay.

12          MR. LAMBERT:  I also, Your Honor, I don't see

13  a reference in the license agreement to 120 licenses.

14          THE COURT:  You are claiming that was in the

15  documentation?  That is your claim in the complaint.

16          MR. LAMBERT:  Okay.  But with regard to

17  the --

18          THE COURT:  And they are conceding there was

19  an implied warranty of 120 users --

20          MR. MILLER:  Your Honor, what we conceded is

21  that there was an express warranty that this software

22  would work for you.

23          THE COURT:  Right.  For what they were

24  buying.  120 copies.

25          MR. MILLER:  Whatever we sell you, 7.1 says

1    this will work for you.

2            THE COURT:  And then you have your limitation

3    of damages.

4            MR. LAMBERT:  And with regard to the

5    limitation on damages, I don't know that that is even

6    something that should be addressed on the motion to

7    dismiss.  It doesn't entitle them to a dismissal for

8    any of the claims.  If it comes out through discovery

9    that that is an enforceable clause, we'll address what

10   damages Hodell-Natco can recover for breach of the

11   warranties.  I don't think it is enforceable; I don't

12   think it applies to the 2004 transaction, but it's

13   certainly not a basis to dismiss any portion of the

14   complaint.

15           THE COURT:  Okay.  Let me see if I get this.

16           You feel like the licensing agreement is not

17   even really a part of this, because it was fraudulently

18   induced --

19           MR. LAMBERT:  Correct.

20           THE COURT:  -- and that you get your whole

21   damages out of the development agreement, which was

22   also fraudulently induced --

23           THE DEFENDANT:  Correct.

24           THE COURT:  And that they are liable under

25   that on an agency and third party beneficiary theory.

```
 1              MR. LAMBERT:  Correct.

 2              THE COURT:  Okay.

 3              MR. LAMBERT:  As the seller of the SAP --

 4              THE COURT:  And you don't think that we

 5    should address how much the damages are, or whether you

 6    are entitled to punitive damages in a 12(b)(6) motion.

 7              MR. LAMBERT:  There is no pleading standard

 8    for punitive damages.  There are allegation in the

 9    complaint that if proven could give rise to punitive

10    damages.  I don't have to allege that there is malice

11    necessarily, and there is certainly no -- there is

12    certainly no requirement at the pleading stage for

13    Hodell-Natco to have to itemize what damages it

14    suffered, what categories of damages it suffered, and

15    that's what I took SAP's argument to be, is that they

16    have alleged fraudulent inducement, but they have

17    generalized what damages they suffered from that fraud,

18    and they should have had to parse out the category of

19    damages they suffered, how much damages are

20    attributable to the fraud versus what's the breach of

21    contract damages, and that's certainly not an

22    obligation of the pleadings --

23              THE COURT:  Okay.

24              MR. LAMBERT:  Do you want me to move --

25              THE COURT:  I want to try to resolve if we
```

1   can, from Mr. Miller's standpoint, this issue of, you

2   know, don't you think that the development agreement

3   had a life separate and apart from the licensing

4   agreement.

5           MR. MILLER:  It did.

6           THE COURT:  Okay.

7           MR. MILLER:  It was between LSI --

8           THE COURT:  But not with SAP?

9           MR. MILLER:  Think about, Your Honor, the

10  first question asked of Hodell's counsel.  What was the

11  development agreement really about.  It was a business

12  deal.  You look at the end of it, they were looking to

13  make money.  They were going into partnership together

14  to make a solution for the fastener industry.  If it

15  would work for Hodell, they would sell it to the

16  fastener companies in the country and get rich.

17          THE COURT:  So would you.

18          MR. MILLER:  Pardon me?

19          THE COURT:  So would you.

20          MR. MILLER:  There is nothing wrong with it,

21  but that is not my contract.  I'm not in this business.

22  That is what they are doing.  It exists separate and

23  apart, it sure does --

24          THE COURT:  Well, you're in the business of

25  selling Business One, right?

1          MR. MILLER:  There are lots of fastener

2     companies out there that might do that.  There is no

3     express term in the development agreement that makes us

4     an intended third party beneficiary.

5          If you go back and look at *Resource Title*,

6     for example, one of the cases they cite, there are

7     clear benefits that grow directly --

8          THE COURT:  There is case law all over the

9     place on third party beneficiaries.  I'm sticking to

10    the agency thing.

11         MR. MILLER:  And forgive me, but on the

12    agency front, nothing changed.  No agency allegations

13    ever change the identity of the parties to the

14    contract.  One of the things --

15         THE COURT:  But if LSI was acting as your

16    agent, wouldn't you be bound by the contract?

17         MR. MILLER:  And that goes back to the point

18    I made before.

19         The first thing I look at in a contract case

20    is what does the language say, because we need to

21    determine the parties' intentions.

22         Well, the language here, there is -- all of

23    this agency stuff aside, it cannot get past the simple

24    clear fact the parties intentions were expressly

25    stated.  This was a contract between LSI and Hodell.

1   If it doesn't say that it can't be --

2          THE COURT:  But if LSI didn't have your

3   agreement, and I have read that agreement as well, that

4   they can sell Business One software, they wouldn't be

5   executing that contract.

6          MR. MILLER:  But they couldn't have done

7   that.  If the parties wanted to have a triangular

8   contractual relationship like that, that intention

9   would be clearly expressed in the first sentence and in

10  the signature line.  "Look, we're all in this together.

11  Here is what Hodell does, here is what LSI does, here

12  is what SAP does."

13         THE COURT:  I have to accept the allegations

14  in the complaint.  They are alleging that LSI was your

15  agent.  Can I consider LSI's admission to that?

16         MR. MILLER:  It stops there.  You can assume

17  the agency admission, okay, but my point is that

18  doesn't change the identity of the contract, and there

19  is -- like *Twombly* starts to matter at some point,

20  because they can't say that this --

21         THE COURT:  You think *Twombly* changed the law

22  in the Sixth Circuit?

23         MR. MILLER:  I think *Twombley* raised the bar

24  a bit for what you have to set forth, you know --

25         THE COURT:  The circuits are all over the

1   place on that too, right?

2           MR. MILLER:  I know, but my point is either

3   before or after *Twombly*, it has been, is, and probably

4   always will be the case that you can't just say

5   something in the complaint that is contrary to the

6   obvious facts, and they say, "Oh, SAP is a party to

7   this development agreement" --

8           THE COURT:  So they are making a legal

9   conclusion?

10          MR. MILLER:  It is a legal conclusion that

11  flies in the face of the basic facts that, no, they are

12  not.  It is between LSI and Hodell, and they can't do

13  that.  You can't just say today is Friday, so that's

14  assumed to be true for purposes of the complaint.

15  Today is Monday.

16          The parties to that contract are Hodell and

17  LSI.  They can't change that.  And they -- there could

18  be an agency issue, and in this case --

19          THE COURT:  So you think SAP knew nothing

20  about the --

21          MR. MILLER:  We might have.

22          THE COURT:  -- about the clause in that

23  contract that had some performance on your part

24  involved in it, in case LSI folded?

25          MR. MILLER:  I think taking their conclusions

 1   to where they ought to be, assumed to be true, et

 2   cetera, et cetera; they say LSI was our agent.  Well,

 3   our agent said --

 4            THE COURT:  But there is something in the

 5   contract that would kind of support that.

 6            MR. MILLER:  Our agent said that if LSI goes

 7   under, SAP will sell some -- great, fine, we're bound

 8   by that.  We're at least stuck in the case with the

 9   agency allegation.

10            THE COURT:  And that gets you to fraudulent

11   inducement, because your software, we have to presume,

12   could not handle the 80 licenses in the development.

13            MR. MILLER:  I take it one step at a time.

14            The first thing, that sentence doesn't change

15   the identities of the parties to the contract --

16            THE COURT:  But it implies an agency, doesn't

17   it?

18            MR. MILLER:  Pardon me?

19            THE COURT:  It implies that LSI may very well

20   be your agent.

21            MR. MILLER:  That's true.

22            THE COURT:  So it is not just "This is

23   Friday."  There is something in the contract that would

24   support the conclusion that they are acting as your

25   agent.

1          MR. MILLER:  Them acting as our agent doesn't

2     mean we can be sued for breach of contract.  It doesn't

3     make us a party --

4          THE COURT:  Well, that's the question, if it

5     makes you liable under the contract.

6          MR. MILLER:  But it doesn't.  An agency

7     allegation never changes the clear, plain, undeniable

8     identity of the actual parties to the contract.

9          The principal may have problems because his

10    agent is out there in the world doing things he

11    shouldn't do, but it doesn't make the principal liable

12    on contracts if the agent signs in the agent's own

13    name.

14         THE COURT:  On a 12(b)(6), the standard is a

15    little different.

16         MR. MILLER:  Except, Your Honor --

17         THE COURT:  If you had depositions and all

18    those things to go with it --

19         MR. MILLER:  I would respectfully submit that

20    is just not right.  It cannot -- they cannot take a

21    development agreement that says it is between Party A

22    and Party B, very clearly, signed by Party A, signed by

23    Party B, and then come in to Your Honor and say "Oh,

24    12(b)(6), the Court to has to assume everything we say

25    is true."   Either up is down, down is up --

1          THE COURT:  But that's what makes the case so

2    confusing, because then you go right back to the whole

3    issue of fraudulent inducement --

4          MR. MILLER:  And I'm happy to go there.  And

5    I conceded that before, and the answer to that is "And

6    then what?"

7          We entered into -- when we finally got around

8    to selling them the licenses, we entered into a

9    contract that said "Look, wipe it all clean, we're

10   going to" -- here is how -- the damages are limited,

11   and now we're in privity, the economic loss rule

12   applies, and I did check that case, Your Honor, it is a

13   Sixth Circuit case, that *Irwin Seating* case was a

14   motion to dismiss, and it was fraudulent inducement,

15   and it is software --

16         THE COURT:  Okay.  Mr. Lambert, are you going

17   someplace else?

18         MR. LAMBERT:  No.  Did you have any other

19   questions for me?

20         THE COURT:  I guess I want to at least talk

21   about this 9(b) issue versus the 12(e) issue.  You

22   know, you're saying you can't have a 9(b) motion

23   without first filing a 12(e) motion.  You know, I'm not

24   sure, Mr. Miller, where you are at on that.  You made

25   some comment in chambers about that.  Can we not

```
 1    eliminate that, at least, from this process?

 2              MR. MILLER:  Your Honor, forgive me, I'm not

 3    trying to make this case more complex.  I think this

 4    case is more simple.

 5              On the fraud count, it is unclear.  They are

 6    not -- number one, the standard for punitives is very

 7    high.  Number two, when you read the cases, whether

 8    something in a commercial context is a representation

 9    or not is a pretty high standard --

10              THE COURT:  It's a pretty simple question.

11    Do you have to ask for a more definite statement in the

12    Sixth Circuit case law before you can ask for a

13    dismissal under 9(b)?

14              MR. MILLER:  I'm not certain of the answer to

15    that.

16              THE COURT:  Okay.  That is my question.

17              MR. KOEHLER:  I worked on the Resource Title

18    case, I didn't read that.  That was a defense raised to

19    our complaint.  I didn't raise it.  Judge Wells raised

20    it on her own, so I wasn't aware of it before that.

21    But as far as I can tell, that's the standard in the

22    Sixth Circuit, especially in the Northern District.

23              THE COURT:  That's my understanding as well.

24    You didn't read his brief, then?

25              MR. MILLER:  Well --
```

1          MR. LAMBERT:  In response to that part of it.

2          MR. MILLER:  Well, frankly, Your Honor, I

3     don't -- I don't see why, if under 9(b) -- under

4     Rule 9, they have to be specific in the context of a

5     motion to dismiss.  They can't fail to state a claim

6     due to lack of specificity, and that's my point.  They

7     failed to state a claim under 12(b)(6) because they

8     violated Rule 9, and when you read their

9     representations, it is not clear --

10         THE COURT:  I get the merits of what you are

11    saying on the 9(b).  It is a question of procedurally

12    are we there yet.

13         MR. MILLER:  Right.  As I just mentioned,

14    there is not a lot of that in the briefs.  There is --

15    it has actually come up from reading all these cases,

16    preparing for this argument.  There is a real test

17    under Ohio law for whether something, like the Business

18    One profile sheet, and the white paper, a lot of that

19    is puffery.  It doesn't even constitute a

20    representation in a commercial context, and they don't

21    say when you read the complaint who said what, and it

22    is difficult to tell.

23         THE COURT:  One thing I would like you to

24    help me with is in fraudulent inducement, privity

25    versus non-privity.  I'm hearing you say there is such

1    a thing as fraudulent inducement without a contract?

2             MR. MILLER:  Yes.

3             THE COURT:  And that would be the purchase of

4    goods, like we're talking about in the *Magical Farms*

5    case.  There is no contract there.

6             MR. MILLER:  I think fraudulent inducement,

7    the analogy, Your Honor, that you brought up before is

8    probably pretty good, where I induced -- Party C

9    induces A and B to enter into a contract and says all

10   sorts of things to A and B to induce them to do that,

11   but Party C enjoys some sort of indirect benefit from

12   that contract, so there can be fraudulent inducement --

13            THE COURT:  But Party C was the one making

14   the fraudulent representations.

15            MR. MILLER:  Right.

16            THE COURT:  So, I mean, that's the point of

17   this.  Not only did you get a benefit, but you are the

18   one that put out the paper and made the representations

19   that you could handle this.  So, it is more than just

20   getting a benefit.  You made the representations.

21            MR. MILLER:  That's my analogy.  I'm

22   conceding that.  We're Party C.  A is Hodell; B is LSI,

23   and Party C is making representations that induce them

24   to enter into their contract, and indirectly we get to

25   stand around and wait for licenses to get sold, and

1    maybe they take off --

2              THE COURT:  That's your benefit.

3              MR. MILLER:  Pardon me?

4              THE COURT:  That's your benefit.

5              MR. MILLER:  It is a benefit, and that's

6    where I think you could have a fraudulent inducement

7    count in the absence of a contract.  However, that's

8    not our case.  We have a contract.  It is a license

9    agreement --

10             THE COURT:  But again, that is presuming that

11   the license agreement, you know, is the total agreement

12   between you and --

13             MR. MILLER:  The presumption is based on the

14   language that we included in the contract --

15             THE COURT:  But let's say there wasn't a

16   license agreement.

17             MR. MILLER:  Right.

18             THE COURT:  They never got to the point of

19   actually buying the license.

20             MR. MILLER:  We have a tougher economic loss

21   rule argument, then.

22             THE COURT:  Well, but you have a fraudulent

23   inducement argument as well, don't you?  You had a bad

24   fraudulent inducement argument, right?

25             MR. MILLER:  Well, I think --

 1              THE COURT:  So I'm trying to figure out what

 2    the privity issue is that saves you here.

 3              MR. MILLER:  It goes like this:  Forget --

 4    like Your Honor says, forget the license agreement, act

 5    like it never existed.

 6              THE COURT:  Right.  Yes.  Let's do that for a

 7    second.

 8              MR. MILLER:  Just the development agreement.

 9              We would have a harder time raising the

10    economic loss rule as a basis for their fraudulent

11    inducement claim being dismissed because the fact is

12    under Ohio law, when there is no privity, it is tougher

13    to raise the economic loss rule and get --

14              THE COURT:  So they get the proximate

15    damages.

16              MR. MILLER:  I'm not sure that we lose,

17    because there is still that damages requirement under

18    the Ohio law, and it is very unclear, because some of

19    those are fraudulent inducement cases, but the ones I

20    have cited -- the first thing is *Whirlpool*, and I have

21    a copy of it, it is cited in the brief.  The *Whirlpool*

22    case says when there is privity in a commercial

23    context, the economic loss rule is applied more

24    strictly, and when you read the cases, that's what they

25    do, and they definitely pay close attention to whether

1      there is privity --

2                THE COURT:  So we're right back again -- I'm

3      going to need you guys to help me more on the issue of

4      the relationship between the license agreement and the

5      development agreement, because that's where -- we're

6      right back to then again with what you are saying.

7                MR. MILLER:  And, Your Honor, all I can tell

8      you is --

9                THE COURT:  That's the privity that you're

10     referring to, is the licensing agreement.

11               MR. MILLER:  Yes.  Absolutely.  And to me,

12     fine, 12(b)(6), all their allegations are taken to be

13     true, et cetera, et cetera, but they can't call today

14     Friday, and they can't deny that they have a license

15     agreement with us, and they agree to its terms, and the

16     terms say this is the sole and exclusive agreement

17     between us and you.  Everything else is wiped clean.

18               Okay.  So when I'm doing economic loss rule

19     analysis, first question, privity or no, absolutely

20     privity.  License agreement.  Okay.  Economic loss rule

21     is applied more strictly.  Is it applied so strictly

22     that I can get a fraudulent inducement count kicked on

23     a 12(b) -- at the 12(b)(6) stage, that early?  Answer:

24     Yes, if a fair reading of the complaint is they

25     basically took the preach of contract case and breach

1    of contract damages, and they are trying to make it

2    sound like a tort case.

3            So, you read their complaint carefully.  The

4    first paragraph says we're basically suing because the

5    stuff didn't work.  Everything else they say is the

6    same, and they say they want two things, indirect

7    damages and direct damages, and they want that for

8    contract --

9            THE COURT:  But don't you have a duty outside

10   the contractual duty not to act fraudulently with

11   Hodell?  That's the whole point here, isn't it?

12           MR. MILLER:  The jurisdictions are splat --

13           THE COURT:  You don't need the duty under the

14   contract to prove the fraudulent misrepresentation

15   count.

16           MR. MILLER:  It is unclear.  The

17   jurisdictions are split on it.

18           THE COURT:  But Ohio is not, is it?

19           MR. MILLER:  Ohio is not clear.  There is no

20   Ohio Supreme Court case that says in the fraudulent

21   inducement context that you have a separate duty apart

22   from the contract to do this.

23           And you will remember, I conceded that that's

24   the tougher argument of those two elements, the

25   separate duty.  It's the tougher one for us.

1          THE COURT:  Yes.  I don't want to beat a dead

2     horse --

3          MR. MILLER:  I understand, but this is

4     interesting.  You read *Galmish*, and when I'm reading

5     *Galmish*, I'm expecting that issue to come up.  *Galmish*

6     is about parol evidence, it is a fraudulent inducement

7     case, looks likes they are in privity.  Okay.  Ohio

8     Supreme Court.  They are going to say it.  And they

9     never do, and I find myself scratching my head.

10          Maybe the lawyers never raised economic loss

11     rule.  It doesn't look like they did.  I don't know

12     what the answer is, but it is clear under Ohio law they

13     have to satisfy both requirements, duty and damages,

14     and when you look at the damages here, you read their

15     complaint, it is breach of contract, and you look at

16     the case, that *Irwin Seating* case, Sixth Circuit,

17     motion to dismiss, the Sixth Circuit says "We read the

18     complaint, dismissed.  Fraudulent inducement is out.

19     This complaint is really a breach of contract case, and

20     you can tell because you look at the kind of damages

21     they are looking for," and that is what is happening

22     here.

23          THE COURT:  Okay.  Let me go through the

24     motion to dismiss a little here.

25          Can we treat your two clients the same here?

```
 1    I know you made some distinctions between them in the

 2    motion to dismiss.

 3              MR. MILLER:  You mean between SAP America and

 4    SAPAG?  Absolutely not.

 5              THE COURT:  Tell me the difference, then.

 6              MR. MILLER:  Well, SAP America, first of all,

 7    is a subsidiary of SAPAG, but they are separate and

 8    distinct corporate entities.  SAP America is party to

 9    the license agreement, and SAPAG is not.

10              THE COURT:  But SAPAG is the one that made

11    the representations.

12              MR. MILLER:  They allege, they have

13    effectively an allegation -- it goes back to my

14    definitive --

15              THE COURT:  I know, but for the fraudulent

16    inducement, for accepting what they are saying in the

17    12(b)(6), SAPAG is where the representations came from,

18    right, as to Business One capabilities?

19              MR. MILLER:  I don't think so.

20              THE COURT:  I think that's what the complaint

21    alleges, but maybe -- well, I'll ask --

22              MR. MILLER:  I think have very conclusory

23    allegations, almost like an alter ego statement, that

24    everybody did everything on behalf of everybody else,

25    and ignore the corporate distinctions.
```

1       THE COURT:  Well, I don't know about that,

2  but at least we have to take the allegations in the

3  complaint as true, right?

4       MR. MILLER:  And they never -- and here is

5  what they do.  They say that SAP and SAPAG are

6  basically the same thing, and then they collectively

7  refer to them and they have all these representations,

8  and they never say which one of them did it, and one of

9  my points on a more definitive statement is, "Look, if

10  you are going to try to" --

11       THE COURT:  But Business One belonged to

12  SAPAG, not SAP America.  It belonged to SAPAG.  They

13  are the ones that bought the Israeli company that had

14  the software in the first place.

15       MR. MILLER:  And the right to sell the

16  license was SAP America.  The history of it --

17       THE COURT:  But they marketed it all over the

18  world with the same --

19       MR. MILLER:  They may have been issuing some

20  of those papers, but the license agreement is

21  between us --

22       THE COURT:  Okay.

23       MR. MILLER:  And I'm not --

24       THE COURT:  I understand the license

25  agreement --

```
 1              MR. MILLER:  No, I understand, and I would
 2     like Your Honor to know --
 3              THE COURT:  I'm talking about the tort
 4     claims.
 5              MR. MILLER:  I'm not trying to be too
 6     argumentative --
 7              THE COURT:  No, I understand.  That's what
 8     they are here for.
 9              MR. MILLER:  There is a sentence in the
10     complaint that is early on, they say, "Look, each one
11     is the same," and then you read the rest of the
12     representations and you are cannot tell which one they
13     are saying is making those, and frankly, I don't know,
14     and I would like to --
15              THE COURT:  Okay.
16              MR. MILLER:  If SAPAG is not out of the case,
17     I would like them to be more clear about what they are
18     saying we did.
19              THE COURT:  Mr. Lambert.
20              MR. LAMBERT:  I think the precise reason you
21     cannot specify the distinction between the two is that
22     in our client's mind, the way it was marketed and sold
23     to us, there wasn't one.  So if an employee of the
24     SAPAG or SAP America, if they don't identify who they
25     are speaking on behalf of, how is Hodell-Natco supposed
```

1     to know?  And in turn, how are they supposed to allege

2     it?

3            And there is case law, especially with regard

4     to 9(b), and I think we've been very specific in our

5     complaint, and in some instances more so than we're

6     obligated to be --

7            THE COURT:  Honestly, we believe that the law

8     in this circuit is that you've got to make the 12

9     motion before you can make the 9 motion.

10           MR. MILLER:  Understood.

11           THE COURT:  So we'll be past that.

12           MR. MILLER:  We may be dealing with that

13     later, then.  I understand.

14           THE COURT:  So the question is, from your --

15     for the 2(b) motion to dismiss, set aside the 9 issue,

16     are we still treating your two clients differently,

17     based on the allegations in the complaint?

18           MR. LAMBERT:  I'm sorry.  What was the

19     question, Your Honor?

20           THE COURT:  I put the question back to him.

21     Setting aside the 9(b) issue, and the specificity of

22     the pleadings, the question is if we accept the

23     pleadings as being specific enough, does that eliminate

24     the distinction between SAP and SAPAG -- SAP America

25     and SAPAG on the tort claims?

1      MR. MILLER:  Understood.  I would have to

2  look at the complaint more carefully, but my standing

3  here understanding is that they have allegations in

4  here that these guys are the same, and they all said

5  this, and if that's true, then that's what they have in

6  their complaint.

7      MR. LAMBERT:  And if you look at Exhibit A to

8  our complaint for example, Your Honor, it is an SAPAG

9  document.  Exhibit A --

10      THE COURT:  That was my question.  Weren't

11  they making the representations on a worldwide basis?

12      MR. LAMBERT:  It is the Business One brief

13  that is referred to throughout the complaint.

14      THE COURT:  I'm just looking for concessions.

15      MR. MILLER:  I understand.

16      THE COURT:  Make my job easier.

17      MR. MILLER:  I understand, and I'm being

18  completely honest.

19      THE COURT:  That's fine.

20      MR. MILLER:  My recollection is they cast a

21  very wide net, and if they are allowed to plead that

22  way --

23      THE COURT:  Well, I don't know, but

24  procedurally, I don't think that we're at the motion to

25  dismiss on the other thing.

1              Ohio law and parol evidence on fraudulent

2      inducement --

3              MR. MILLER:  *Galmish*.  They basically argue

4      under *Galmish* --

5              THE COURT:  You argued the Pennsylvania

6      exceptions, which did not include fraudulent

7      inducement.  Your argument was there was no fraud in

8      the execution and no proof that you ever intended to --

9              MR. MILLER:  Number one --

10             THE COURT:  So now it is a different

11     question.  No fraud in the execution is not the issue.

12             MR. MILLER:  I think that's fair to say.  I

13     don't think there has ever been an allegation that we

14     kind of tricked them and put words in there that nobody

15     saw.

16             THE COURT:  So the question is under Ohio

17     law, parol evidence and fraudulent inducement --

18             MR. MILLER:  And their argument, *Galmish*,

19     there is a phrase in *Galmish* that says if statements

20     are consistent with what is in the contract, then you

21     can have fraudulent inducement, and that is their

22     argument, and I understand it and I have not dwelled on

23     it --

24             THE COURT:  It is all about the number of

25     users, and again, you knew there was going to be 120.

1          MR. MILLER:  Effectively they are saying we

2     said there are -- you can use -- we have lots of

3     conversations with them where we said users is no

4     problem, and in the contract we said users is no

5     problem, and according to *Galmish*, if what you said

6     before was consistent with what is in the agreement,

7     that can support a fraudulent inducement count.

8          If you stop the Ohio Supreme Court and took a

9     poll and ask them, oh, when you dropped the word

10    consistent if there did you mean to blow this all up, I

11    don't know what they would say, but *Galmish* has

12    language in it that Hodell has seized on, and I

13    understand it.

14         THE COURT:  But no question that you knew

15    that they were buying 120 licenses by the time the

16    licensing agreement was signed, right?  We've

17    established that.

18         MR. MILLER:  As I point out, we say it will

19    work for you.  If they bought a thousand, we would be

20    saying it would work for you.

21         THE COURT:  Right.  The gist of the action

22    rule -- do you want to add anything to the issue about

23    SAP/SAP America/SAPAG?

24         MR. LAMBERT:  No.  Only that it is

25    sufficiently alleged in the complaint.  The specificity

1   argument, A, is procedurally improper, but B, I think

2   our complaint is more than -- more than specific.  The

3   exhibits can be referenced as part of the specificity

4   requirement, and if, for example, Exhibit A, which is a

5   SAPAG document --

6              THE COURT:  And what about the parol evidence

7   law and the Ohio rule on fraudulent inducement?

8              MR. LAMBERT:  *Galmish* is obviously directly

9   on point.

10             THE COURT:  You are both arguing *Galmish*?

11             MR. LAMBERT:  He is not arguing it.  I think

12  he is conceding it.

13             MR. MILLER:  I don't really like *Galmish*.  It

14  is interesting, as I pointed out before, why economic

15  loss was never raised in *Galmish* is a mystery to me.

16             THE COURT:  We're talking about parol

17  evidence.  So you're conceding that issue, then, in

18  Ohio law?

19             MR. MILLER:  What?

20             THE COURT:  That they can use parol evidence

21  to prove fraudulent inducement.

22             MR. MILLER:  I'm not prepared to concede it

23  under Ohio law because I don't think it is right, but I

24  do concede that *Galmish* has language in it that is very

25  unfavorable to SAP because it says that you can proceed

1    with a fraudulent inducement claim if what you said in

2    advance of the contract is consistent with what's in

3    the contract.

4              I don't know if you polled the Ohio Supreme

5    Court that they would say, "Oh, that's what we meant,

6    you are allowed to do, you know, what you are doing in

7    the Hodell case."

8              THE COURT:  That's close to a concession.

9              Let's talk about gist of the action a minute

10   here.

11             MR. MILLER:  I may be able to save us some

12   time on that, Your Honor.  That is primarily a

13   Pennsylvania doctrine.  In Ohio, it is basically

14   absorbed in the two step duty on damages piece.

15             THE COURT:  So we're taking the gist of the

16   action argument off the table?

17             MR. MILLER:  When I took Pennsylvania off the

18   table, yes.

19             THE COURT:  Thank you.

20             MR. MILLER:  There you go.

21             THE COURT:  You are my hero now.

22             All right.  Economic loss rule.  As I

23   understand the plaintiff's argument is saying Ohio law,

24   the economic rule, economic loss rule is inapplicable

25   because the defendant had a duty to refrain from making

1     fraudulent or negligent representations --

2              MR. LAMBERT:  Yes.  In fact, I think that's

3     precisely why the economic loss doctrine was not raised

4     in *Galmish* with regard to the fraudulent inducement

5     claim, because it is not a defense to a fraudulent

6     inducement claim.  Fraudulent inducement is an

7     intentional tort.

8              The Supreme Court, when it formulated the

9     economic loss doctrine or adopted it, applied it with

10    regard to negligence claims.  They are claiming

11    negligence with regard to pure economic damages.

12             And before I forget --

13             THE COURT:  We're going to get to the

14    negligence count before we conclude today.

15             MR. LAMBERT:  We might have a problem with

16    the negligence count.  I would submit that I should be

17    allowed be permitted to conduct discovery on it, but I

18    understand where the Court is coming from.

19             THE COURT:  Because if your argument on the

20    economic loss rule regarding your fraud claims, that

21    Ohio has held that a duty lies independent of the

22    contract to refrain from negligently supplying

23    information to one who justifiably relies upon it, you

24    know, I want to talk in a minute about the -- whether

25    there is an independent duty in negligence outside the

 1    contract, as opposed to fraudulent representations or

 2    negligent representations, but I want to ask Mr. Miller

 3    to respond the economic loss rule and Ohio law in

 4    regard to the fraud claims and the negligent

 5    representation claims.

 6            MR. MILLER:  Sure.  Negligence I thought it

 7    might be Mr. Lambert's term to concede.

 8            THE COURT:  I'm going to get back to him on

 9    that.  I'm talking about the negligent representation,

10    not the negligence.

11            MR. MILLER:  Understood.  Very limited types

12    of cases, where there is some sort of -- most of them

13    are not privity cases, and they involve professionals,

14    accountants, right?  The *Hadden* case --

15            THE COURT:  Professional malpractice.

16            MR. MILLER:  Right.  And to me, it is -- it

17    can be simplified.  Because if the economic loss rule

18    applies to fraudulent inducement, the economic loss

19    rule certainly applies to negligent misrepresentation

20    counts.

21            If Your Honor determined that the economic

22    loss rule didn't apply to fraudulent inducement, and

23    you are looking at negligent misrepresentation counts,

24    when you read the complaint, they are essentially same

25    saying the same thing, and all I would argue is that

1    the cases under Ohio law appear to be limiting the

2    application of the economic loss rule -- the decision

3    not to apply the economic loss rule to these cases

4    where there is some sort of professional relationship,

5    and I don't think we had that.

6              THE COURT:  But that is not implicit in the

7    decisions.  That's just the facts of the cases that it

8    ruled on is what you're suggesting.

9              MR. MILLER:  You know, there is some language

10   in there that these were professionals and were in the

11   business --

12             THE COURT:  Why would that be?

13             MR. MILLER:  Pardon me?

14             THE COURT:  Why would that be?  Why?

15             MR. MILLER:  Think about the legal

16   malpractice.  It is a strange animal.

17             I hire a lawyer, the guy screws up my case, I

18   want to sue, it is a tort.  Like medical malpractice.

19             THE COURT:  Yes, but you're just talking

20   about a duty not to act fraudulently, right, and

21   economic loss.

22             MR. MILLER:  But if my plumber puts my water

23   heater in and he screws it up in kind of the same way,

24   both were not paying attention or whatever, I just have

25   a contract against the plumber.  So there is --

1              THE COURT:  But that is negligence, isn't it?

2              MR. MILLER:  Against the plumber?  No.

3              THE COURT:  Your professional standards.

4              MR. MILLER:  That is my point.  You asked

5      isn't that weird, why would that be, and my point is

6      there has been this law in many jurisdictions, going

7      back many, many years, there is an exception where some

8      professional owes you a duty, even though you

9      definitely have a contract with your doctor, you have a

10     contract --

11             THE COURT:  Okay, but here is where my point

12     is.  When your lawyer owes you a duty and is negligent

13     in performing, that is a negligence complaint --

14             MR. MILLER:  True.

15             THE COURT:  -- not a fraud complaint.  So,

16     you know, that goes back to where I'm going to go back

17     to them, with the negligence issue.  That argument, I

18     think, plays very well into it.  But when it is fraud,

19     or, you know, something higher than negligence itself,

20     like a negligent representation, why wouldn't the

21     economic loss rule go away under Ohio law?  Because

22     your professional standards is a negligence issue.

23             MR. MILLER:  It may or may not.

24             THE COURT:  Okay.

25             MR. MILLER:  And on duty, I concede it is a

1    tougher argument for SAP --

2              THE COURT:  You have already done that.

3              MR. MILLER:  Okay.  But however, the economic

4    loss rule under Ohio law has two requirements, and it

5    can be fraudulent inducement or negligent

6    misrepresentation, or any type of tort.  If the damages

7    are the same, that's it.  And you had a contract with

8    the people, and the damages you want for your torts are

9    the same as the contract damages.  Done.

10             THE COURT:  They are not, though.

11             MR. MILLER:  They are.

12             THE COURT:  No.  You wanted limited damages

13   to your licensing agreement.

14             MR. MILLER:  Well, the -- then you could

15   always sue in Court if there is a damages limitation.

16   The point is, in the cases --

17             THE COURT:  If it is fraudulently induced.

18             MR. MILLER:  The cases analysis is what does

19   the law give you for breach of contract, and if the

20   scope of that is the same, you can't get --

21             THE COURT:  Okay.  But the question is you

22   still want to argue economic loss rule on the tort

23   claims other than negligence.

24             MR. MILLER:  Okay.

25             THE COURT:  Thanks.  Negligence.

1              MR. MILLER:  Well, as to negligence also.

2              THE COURT:  Yes, of course.  Right.

3   Including negligence.  Negligence, can we make that one

4   go away?

5              MR. LAMBERT:  For the record, I just want to

6   state that I think that Hodell-Natco is entitled to

7   conduct discovery, because also, the economic loss

8   doctrine doesn't apply to non-economic damages, so to

9   conduct, to proceed in discovery on the nature --

10             THE COURT:  But you have already -- you

11  said -- it would be interesting to see it in the brief.

12  You said that you alleged property damage, and I was

13  kind of going to press you on that.  Show me in the

14  complaint where you have alleged property damages.

15             MR. LAMBERT:  I don't think I can sit up here

16  and prove that we have sustained property damage, and I

17  think it is a tough argument to make.

18             THE COURT:  So you are conceding that you

19  have not alleged property damage, then?

20             MR. LAMBERT:  I think we have alleged --

21             THE COURT:  You say in your brief you did.

22  But I read the complaint twice.  I was trying to figure

23  out where that was at.

24             MR. LAMBERT:  Correct.  You can construe

25  damage to the information systems, if damage was

1    sustained to the information systems, the Hodell

2    internal IT structure.

3              THE COURT:  You didn't allege that, I don't

4    think.

5              MR. LAMBERT:  I don't know whether they

6    allege it specifically.  Whether you could prove it

7    through discovery or not is a different animal.

8              THE COURT:  So you are saying the negligence

9    count survives only on the property damage issue?

10             MR. LAMBERT:  If the Court finds we have

11   alleged property damage, then --

12             THE COURT:  Are you conceding that the

13   negligence count survives only on the property damage,

14   and the economic loss rule knocks out the pure

15   negligence count?

16             MR. LAMBERT:  Pure negligence, yes; negligent

17   misrepresentation, no.

18             THE COURT:  What can I take away from what

19   you just said, Mr. Lambert?  I can say to the extent

20   there is property damage, the negligence count has a

21   life; to the extent there is no property damage alleged

22   in the complaint, it has no life?

23             MR. LAMBERT:  Correct.

24             THE COURT:  That's fair.  Okay.

25             Let me look at my breach of contract here.

1              Mr. Miller, is there an implied warranty in

2      the development agreement at all?

3              MR. MILLER:  I'm not sure, Your Honor.

4              THE COURT:  Okay.  Just not yours?

5              MR. MILLER:  Pardon?

6              THE COURT:  Just not yours if there is one?

7              MR. MILLER:  That's right.

8              THE COURT:  Okay.  Any concessions we can

9      make on the damages asked for, the punitives, in regard

10     to 12(b)(6) versus summary judgment?

11             MR. MILLER:  Your Honor, I've read more of

12     the punitive damages cases after the briefing than

13     before, including the case this morning.  It seems to

14     suggest to me that there ought to be a pleadings

15     standard.  Since collecting them is that high, you

16     ought not to be able to just get them by saying you get

17     them.  When you read these complaints, none of it

18     sounds like -- if everything in there is true, it

19     doesn't sound like they get punitive damages.

20             THE COURT:  All right.  Any summation?

21             MR. MILLER:  Your Honor --

22             THE COURT:  You're done?  You've had enough?

23             MR. MILLER:  Well, I will say this.  I have a

24     copy of the Power Point --

25             THE COURT:  I would like that.

1          MR. MILLER:  And this is it.  It has all the

2    cases cited in there.

3          THE COURT:  I guess you guys could help me,

4    as I said, with the relationship between the two

5    contracts -- we'll take that as well.  Sure.

6          MR. MILLER:  Thank you.  My apologies.  I

7    thought it would actually make it easier.

8          THE COURT:  We need a thicker book from you,

9    Mr. Miller.  Is that what you are saying?

10         Is there any additional help you can give us,

11   citing, you know, you say there is no case law on the

12   issue of the relationship between the licensing

13   agreement and the development agreement, yet you are

14   both on opposite sides of whether one exists without

15   the other.

16         Is there some case law you can provide the

17   Court in short order that would help me with it, either

18   side?

19         MR. MILLER:  I will be happy to look, and if

20   we find something, Your Honor, that we believe will

21   assist, I'll submit it.

22         THE COURT:  I want to get this ruling out for

23   you guys as soon as I can.

24         MR. MILLER:  I have some -- what's the

25   word -- disability.  I'm supposed to go on vacation

1   this afternoon, which I think is going to be fine, but

2   the gentleman I work with is also on vacation.  I can

3   get some help from someone, and if we find something

4   that changes this, we would submit it.

5           I would say, Your Honor --

6           THE COURT:  Mr. Zepp, you are going on

7   vacation.

8           MR. ZEPP:  I'm not going on vacation.  I

9   already had mine this summer.

10          THE COURT:  Seems to me it is a pretty basic

11  point, and you both say it is a no-brainer --

12          MR. MILLER:  I get that, and all I can do is

13  hopefully not repeat myself verbatim, but I don't think

14  you're going to find cases, because I think -- two

15  things:  One, these are simple, basic, black letter

16  law.  Like we were talking about, law school

17  propositions.

18          Number two, when applied, there are very

19  complex fact patterns, and you have to look, you have

20  the development agreement between these two parties,

21  they want to kind of get this thing up and running, get

22  this SAP software, go into business together, et

23  cetera, and there is one phrase that jumped out at me

24  when I was listening to counsel for Hodell.  They said

25  -- well, I'll summarize it.  They want discovery to

1      determine that the parties to the development agreement

2      aren't as they appear.  And you don't get discovery to

3      determine if you have a cause of action.  They don't

4      have a breach of contract action because there is

5      nothing on the face of the earth that can controvert

6      the obvious intentions of LSI and Hodell when they

7      entered into the development agreement.

8                  THE COURT:  But if they can make the

9      fraudulent -- you know, I'm not going to go back to the

10     fraudulent --

11                 MR. MILLER:  Then you're into the fraudulent

12     tort claims.

13                 THE COURT:  Then they get their whole damages

14     and they don't need the breach of contract, right?

15                 MR. MILLER:  Well, and then they are going to

16     have to deal with did they have that when they signed

17     the license agreement with us that has its terms.

18                 THE COURT:  Okay.  Look.  Mr. Lambert, is

19     there any help you can give me on the relationship

20     between those contracts, in short order?  Like end of

21     this week?

22                 MR. LAMBERT:  I spent a lot of late nights

23     putting that brief together, and I never found any.  I

24     am not aware of anything that is going to illuminate

25     the relationship between --

```
 1              THE COURT:  But I don't think you guys really
 2    addressed -- you know, I read the briefs.  I'm not sure
 3    we addressed that point in the briefs.  Your complaint
 4    certainly does, and you said if the licensing agreement
 5    is valid, it was fraudulently induced, but the impact
 6    that it might have had on the -- maybe I missed that,
 7    but --
 8              MR. LAMBERT:  Throughout the brief, my point
 9    was that there was two separate transactions in 2004
10    and 2005.  What the license agreement says or limits,
11    even if it is not fraudulently induced, even if it is
12    fully enforceable, can't apply to what occurred in
13    2004, a year earlier, and that is my point.
14              I don't think there is any argument that a
15    contract was formed in 2004 and a contract was formed
16    in 2005.  There is disagreement as to who the parties
17    are.  We have factual and legal arguments as to why SAP
18    is a party to the sale, the purchase and sale of SAP
19    Business One in 2004, okay?
20              They sold licenses to us in 2004 through LSI;
21    we paid a purchase price for those licenses in 2004
22    through LSI through to SAP.  That is sufficient to form
23    a contract with SAP if LSI is their agent.
24              So, with who is a party to the development
25    agreement, SAP is not mentioned as a party; I don't
```

 1   know that you really even need to go there.  But

 2   certainly, the development agreement confers

 3   obligations upon SAP to sell us the software if LSI

 4   can't at some point, to deliver the remainder of the

 5   software.  It would obviously in that circumstance

 6   obligate us to pay for it, so I don't see how SAP can

 7   argue that they have no relationship to this

 8   transaction in 2004 whatsoever.

 9           MR. MILLER:  Your Honor, I am not highly

10   confident that we'll find any cases, but I am going to

11   look.

12           THE COURT:  I appreciate it.

13           MR. MILLER:  If we find something

14   instructive, we'll forward it to Your Honor, and we'll

15   do it within a couple days.

16           THE COURT:  That would be great, and if you

17   could do the same, Mr. Lambert, I appreciate it.

18           I hear what you just said, but I'm not sure

19   that really answered the question of what impact the

20   license agreement, if it wasn't fraudulently induced,

21   had on the development agreement in respect to SAP's

22   liabilities.  So, I'm not sure you just answered that,

23   but --

24           MR. LAMBERT:  Well, it goes back to one of

25   the things I said at the outset.

1          The license agreement but its terms doesn't

2    apply to previous software.  It applies to -- the

3    definition of the term "software" in that agreement, it

4    says it applies to the present and future purchases.

5    And construing that agreement against the drafter, had

6    they wanted it to apply to that prior contract, they

7    should have put that in there, or they should have

8    dated it retroactively.  You don't get just there by

9    throwing in a general merger clause that doesn't make

10   it applicable to a prior purchase and sale.  The

11   integration doctrine is not that broad.

12          THE COURT:  Anything else from counsel?

13          MR. MILLER:  No, Your Honor.

14          MR. LAMBERT:  No.  Thank you, Your Honor.

15          MR. KOEHLER:  I would only add, Your Honor,

16   and I have not done the briefing and so I'm not

17   anywhere near as conversant with the cases, but the

18   issue that you are focused on is a very critical issue

19   in the case.

20          THE COURT:  That's why I'm trying to get an

21   answer.

22          MR. KOEHLER:  I don't see how it could fairly

23   or properly under the law be resolved at this stage.

24   It's a complicated transaction, multiple parties

25   involved; the license agreement does not make any

1   specific reference to that development agreement, so

2   how it can be resolved in a 12(b)(6) stage, a final

3   legal determination made as to the impact of one of

4   those agreements upon the other, I don't think it can

5   be properly done at this stage of the proceedings.

6   That's all I have to add.

7            MR. MILLER:  Your Honor, I'll respond, if you

8   will permit me, very briefly.

9            THE COURT:  This has been an unconventional

10  argument thus far.  We might as well finish it off that

11  way.

12           MR. MILLER:  If we can't resolve stuff like

13  this at 12(b)(6), we'll have a hard time clearing

14  dockets of cases.  There is a contract here.  That

15  development agreement is clear, and what they

16  effectively want to say is throw what is perfectly

17  obvious out the window, unleash us on these folks with

18  discovery -- it was five years ago, six years ago.

19  They have not come up with anything yet.  Turn that

20  upside down and chase us in discovery, because they

21  don't like the terms of the agreement they actually did

22  sign.

23           THE COURT:  Well, there hasn't been any

24  discovery, has thee?  This case has been pending for

25  over a year.

1            MR. MILLER:  You're right.  They waited years

2    to file it, and it has been --

3            THE COURT:  And I'm going to move that.

4            MR. MILLER:  I understand that.  I understand

5    that.  My point is, if the identity of the parties to a

6    contract can't be resolved in a 12(b)(6), then nothing

7    can.

8            THE COURT:  Identity of parties versus

9    liability under is a different issue?

10           MR. MILLER:  Well, then you go to third party

11   beneficiary, and you have to read.  Could we have sued

12   if Hodell didn't do it, and the answer is no.  You read

13   *Resource Title*, and not only that, not only were we not

14   an intended third party beneficiary, but this is not

15   like that coal case, or that husband and wife case, or

16   anything like that.

17           THE COURT:  Mr. McLaughlin, you have been

18   very quiet over there, sir.  Anything you want to --

19           MR. McLAUGHLIN:  No.  Thank you, Your Honor.

20   Thank you very much.  It has been illuminating.

21           MR. MILLER:  Your Honor, if we find

22   additional case law, and I will look --

23           THE COURT:  I appreciate that.

24           MR. MILLER:  I will forward it to you.

25           THE COURT:  Look, I had a lot of questions.

1    I appreciate counsel's tolerance of my questions, and I

2    appreciate how well prepared everyone was to make this

3    argument this morning.  So, we'll try to get this out

4    as soon as possible.  We stand adjourned.

5            (Proceedings adjourned at 11:22 AM.)

6                    -  -  -  -

7            C E R T I F I C A T E

8

9        I, Judith A. Gage, Federal Official Court
    Reporter, certify that the foregoing is a correct
10   transcript from the record of proceedings in the above
    entitled matter.

11

12

13

14   August 18, 2010

15

16

17

18

19

20

21

22

23

24

25