Not Reported in F.Supp.2d, 2008 WL 3843530 (S.D.Ohio)
(Cite as: 2008 WL 3843530 (S.D.Ohio))

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. Ohio,
Western Division.
The ATM EXCHANGE, INC., Plaintiff,
v.
VISA INTERNATIONAL SERVICE ASSOCI-
ATION, et al., Defendants.
No. 1:05-CV-00732.

Aug. 14, 2008.

Joseph Lee Dilts, Kimberly A. Pramaggiore,
Kohnen & Patton, LLP, Cincinnati, OH, for Plaintiff.

Frederick Michael Erny, Cincinnati, OH, George
M. Haley, Holmes Roberts & Owen LLP, Salt Lake
City, UT, Jeffrey G. Wilhelm, John Charles Hans-
berry, Pepper Hamilton, LLP, Pittsburgh, PA, Dav-
id Alan Tonini, Holme Roberts & Owen LLP, Den-
ver, CO, for Defendants.

## OPINION AND ORDER

S. ARTHUR SPIEGEL, Senior District Judge.

*1 This matter is before the Court on Defendants'
Motion for Summary Judgment Regarding Liability
(doc. 149), Plaintiff's Response in Opposition (doc.
169), and Defendants' Reply in Support (doc. 192).
For the reasons stated herein, the Court DENIES
Defendants' Motion.

## I. Background

The following facts, drawn from the pleadings and
motions, are summarized as follows. Plaintiff ATM
Exchange, Inc. ("ATME" or "Plaintiff") is a busi-
ness that has traditionally bought, refurbished, and
resold older model ATMs (doc. 149). Defendants

Visa USA, Inc. and Visa International Service As-
sociation, Inc. ("Defendants" or "Visa") are
privately held "membership corporations" which
are owned by member financial institutions
("Members") (doc. 169).

As part of the "payment card industry", Visa is con-
cerned with the security of ATM transactions, in-
cluding the protection of the four digit personal
identification numbers ("PINs") associated with
each individual's Visa or other payment card
through encryption, as well as the physical security
of the PIN entry device ("PED") (docs.149, 169).

Prior to 1999, throughout the payment card in-
dustry, PIN security was maintained by use of an
encryption algorithm known as Data Encryption
Standard or "DES" (doc. 169). After that time, the
payment card industry began to migrate towards us-
ing a new encryption algorithm called Triple DES
("TDES"). In January 2001, MasterCard took the
lead in publishing new PIN and TDES require-
ments, instructing its members as follows:

• April 1, 2002-All newly installed ATMs, in-
cluding replacements, must be "Triple DES"
compliant.

• April 1, 2003-All member and processor host
systems must support "Triple DES."

• April 1, 2005-All ATMs must be "Triple DES"
Compliant (doc. 149).

In response to the change in the industry standards,
Plaintiff began developing a TDES product that
would upgrade existing ATMs to TDES capabilities
and comply with the MasterCard security require-
ments (*Id.*). Plaintiff worked for several years to de-
velop a TDES product which met the MasterCard
standards, and in October, 2003, entered into a pur-
chase agreement with Thales, an electronics manu-
facturing company, for the purchase of 2000 TDES
products for $800,000 (*Id.*). However, in late 2003,
Plaintiff abandoned this effort, in part because Mas-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3843530 (S.D.Ohio)
(Cite as: 2008 WL 3843530 (S.D.Ohio))

terCard did not establish a certification process (docs.149, 169). Defendants state that the product developed during that period is essentially the same product at issue in this case (doc. 149). To the contrary, Plaintiff states that while ATME worked on a concept, it "never produced a product, not even a prototype, in connection with developing this concept to deal with the MasterCard TDES requirements" (doc. 169).

Visa also published updated security requirements for its Members. On May 8, 2002, Visa announced the dates by which all ATMs and other PIN entry devices ("PEDs") must be capable of supporting TDES encryption of customer PINs:

**\*2** • Effective 1 January 2003, all newly deployed ATMs (including replacement devices) must support TDES

• Effective 1 January 2004, all newly deployed PEDs (including replacement devices) must support TDES (*Id.*).

Then, on August 19, 2003, Visa announced that, effective July 1, 2004, all Members must only deploy ATMs and cash dispensing machines which had been tested in a Visa-approved laboratory and approved by Visa as complying with its new ATM security requirements, or face penalties (*Id.*). On October 2, 2003, Visa published their new ATM requirements to the ATM vendor community through a Visa vendor website, stating for the first time that all vendors must submit their PIN entry devices to be tested against Visa's enhanced security requirements by one of three independent testing labs selected by Visa (*Id.*). The announcement stated:

New: Effective 01 July 2004, all newly deployed ATMs, and Cash Dispensing PIN acceptance device models (including replacement devices and encrypting PIN pads) must have passed laboratory testing by a Visa-recognized laboratory and be approved by Visa (doc. 146).

Thereafter, in mid-November, 2003, Visa released the technical specifications against which the

devices would be tested in the lab (*Id.*). Plaintiff describes those requirements necessary to get Visa's ATM-specific security approval known as the "Class B" rating, pertinent to this action, as:

1. *Encrypting PIN pad (EPP).* This is a PIN pad into which a cardholder enters his/her PIN number and other transaction-related information. An EPP must encrypt PINs using the TDES algorithm to meet Visa's requirement;

2. *Secure and effective (cryptographic) control of the ATM display.* This required secure control of the ATM video display so that it was not possible to fraudulently change the screen displays so as to trick a customer into entering his or her PIN when the EPP was in a non-encrypting state (The so-called A2 requirement); and

3. *A physical shield.* This was intended to limit the viewing angle of the EPP so as to limit the ability of persons to observe the keys which a customer is pressing when entering his or her PIN on an EPP. (The so-called A6 requirement) (doc. 169).

Plaintiff states that while the requirement that an approved product have TDES encryption at the PIN pad was common to the MasterCard and Visa mandates, the cryptographically secure control of display (A2) and the privacy shield (A6) requirements were unique to Visa (*Id.*).

On December 18, 2003, Plaintiff's representatives Craig Payne, Kelly Horton, and Doug Grote, an employee of Thales, met with Visa personnel Robert Tang, Marc Cleven, Leon Fell, and Min Tran, employees of Visa International, and Stoddard Lambertson, Director of Enterprise Risk and Compliance, Visa USA, Inc., to discuss Plaintiff's development of a product, which Plaintiff called 3DES Plus®, that could meet Visa's Class B approval (doc. 149). At the conclusion of this meeting, Defendants suggested that Plaintiff submit its product for a "security review," or a test run of 3DES Plus®, by one of the approved testing laboratories (doc. 169). On January 22, 2004, Plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

submitted 3DES Plus® for a detailed security review in a Visa approved testing laboratory, T Systems, located in Germany (*Id.*). To meet Visa Class B approval, Plaintiff needed to add the cryptographically secure control of display (A2) and the privacy shield (A6) to the 3DES Plus® product (doc. 149).

*3 Also in January, 2004, Visa employee Robert Tang sent an email to Doug Grote, an employee of Thales, which stated:

> ... I am constantly fielding inquiries about whether/when this company's TDES upgrade is approved by Visa. There is serious interest in our marketplace for a cost effective upgrade solution that passed Visa testing program. We certainly would like to see your product get a favorable evaluation as soon as possible. Do not hesitate to contact me again should you have further questions (doc. 149).

Plaintiff states that there were numerous conversations with Defendants about the progress of 3DES Plus® during the approval process, as reflected in several of Defendants' internal emails (doc. 169) [FN1].

> FN1. For example, Plaintiff cites an email date March 15, 2004 reporting the progress of vendor testing from Mark Cleven, stating "[w]e have had a number of conversations with [Plaintiff] because they are the first to take their product to the lab."

On March 31, 2004, Plaintiff and Thales executed a Change of Scope to the ATME-Thales Contract, to account for the modifications needed to make 3DES Plus® meet the Visa Class B approval specifications (doc. 149). These changes added $40,100 to the charge contemplated in the original contract between Plaintiff and Thales (*Id.*). Thales agreed, in this new agreement, that it would produce a Visa-only approved product, that it would hold off on production of 3DES Plus® until Visa approved the product, and that Plaintiff was not obligated to pay Thales for producing 3DES Plus® until Visa approved it (doc. 169).

On May 12, 2004, Robert Tang wrote to the President of ATME:

> My colleagues, Marc Cleven, Leon Fell, and I would like to arrange for a conference call with ATM Exchange this Friday so that we can exchange some thoughts and questions regarding Class B and Class C approvals. This is to help ensure that your needs are fully met during the evaluation process (doc. 169).

On May 13, 2004, Defendant Visa International asked Plaintiff to provide the testing center, T Systems, with written authorization that would permit direct communication between Visa International and T Systems regarding 3DES Plus® during the testing process (*Id.*).

Other ATM vendors, including Diebold, Triton, and NCR, also worked to develop a product that would meet Visa's requirements (doc. 169). However, these companies were unable to meet the July 1, 2004 Visa deadline, and by March, 2004, began expressing their concerns to Visa, particularly over the A2 and A6 requirements (doc. 149). In March, 2004, Marc Cleven told Diebold, Triton, and NCR, that they were considering deferring the A2 and A6 ATM security requirements for at least two years (*Id.*). From March, 2004, to May, 2004, Marc Cleven and Robert Tang exchanged a series of emails with Diebold, confirming that the A2 and A6 requirements would be deferred (*Id.*). Defendants state that by May, 2004, "Visa became acutely aware that the large ATM manufacturers, relied on by many member banks and financial institutions, had not successfully completed Visa certification" (*Id.*). In May, 2004, Visa employee Leon Fell wrote to his colleagues that "NCR and Triton were close to getting ATMs approved, but since they were informed of the plan to defer, they aren't trying ... anymore" (doc. 169). Plaintiff states that it was unaware of any plan to defer the Visa deadline (*Id.*). However, Plaintiff was aware that the other vendors

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3843530 (S.D.Ohio)
(Cite as: 2008 WL 3843530 (S.D.Ohio))

had not secured Visa approval (doc. 169).

*4 On June 24, 2004, Plaintiff received formal written Class B approval of 3DES Plus® from Visa, and was the only vendor to do so (*Id.*). Plaintiff was thereafter listed on the visa.com website under the Visa Pin Entry Device Approved List for 3DES Plus® (doc. 149). On June 25, 2004, Defendants announced that they were deferring the July 1, 2004 deadline and the associated security requirements for ATMs (*Id.*). In press releases and other marketing efforts after June 25, 2004, Plaintiff advertised their Visa approval (doc. 149). After Visa deferred the July 1, 2004 deadline, Plaintiff states that it was given repeated assurances that the deferral was temporary, and in November, 2004, was told that the requirements would be implemented in early 2006 (doc. 169). Eventually, Visa abandoned the Class B requirements completely (*Id.*).

On November 14, 2005, Plaintiff filed a complaint, making claims for (1) Promissory Estoppel; (2) Fraudulent Misrepresentation; and (3) Negligent Misrepresentation (doc. 1). Thereafter, Defendants filed the instant motion for summary judgment regarding liability on each of Plaintiff's claims (doc. 149).

## II. Applicable Legal Standard

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56; *see also, e.g., Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *LaPointe v. United Autoworkers Local 600,* 8 F.3d 376, 378 (6th Cir.1993); *Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs.,* 979 F.2d 1131, 1133 (6th Cir.1992)(per curiam). In reviewing the instant motion, "this Court must determine whether the evid-

ence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir.1993), *quoting in part Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(internal quotation marks omitted).

The process of moving for and evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well settled. First, "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact[.]" *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also LaPointe,* 8 F.3d at 378; *Guarino v. Brookfield Township Trustees,* 980 F.2d 399, 405 (6th Cir.1992); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989). The movant may do so by merely identifying that the non-moving party lacks evidence to support an essential element of its case. *See Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.,* 12 F.3d 1382, 1389 (6th Cir.1993).

*5 Faced with such a motion, the non-movant, after completion of sufficient discovery, must submit evidence in support of any material element of a claim or defense at issue in the motion on which it would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. *See Celotex,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As the "requirement [of the Rule] is that there be no genuine issue of *material* fact," an "alleged factual dispute between the parties" as to some ancillary matter "will not defeat an otherwise properly supported motion for summary judgment." *Anderson,* 477 U.S. at 247-48 (emphasis added); *see generally Booker v. Brown & Williamson Tobacco Co., Inc.,* 879 F.2d 1304, 1310

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3843530 (S.D.Ohio)
(Cite as: 2008 WL 3843530 (S.D.Ohio))

(6th Cir.1989). Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252; *see also Gregory v. Hunt,* 24 F.3d 781, 784 (6th Cir.1994). Accordingly, the non-movant must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339-40 (6th Cir.1993); *see also Celotex,* 477 U.S. at 324; *Guarino,* 980 F.2d at 405.

Although the non-movant need not cite specific page numbers of the record in support of its claims or defenses, "the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies." *Guarino,* 980 F.2d at 405, *quoting Inter-Royal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989)(internal quotation marks omitted). In contrast, mere conclusory allegations are patently insufficient to defeat a motion for summary judgment. *See McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1162 (6th Cir.1990). The Court must view all submitted evidence, facts, and reasonable inferences in a light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Furthermore, the district court may not weigh evidence or assess the credibility of witnesses in deciding the motion. *See Adams v. Metiva,* 31 F.3d 375, 378 (6th Cir.1994).

Ultimately, the movant bears the burden of demonstrating that no material facts are in dispute. *See Matsushita,* 475 U.S. at 587. The fact that the non-moving party fails to respond to the motion does not lessen the burden on either the moving party or

the Court to demonstrate that summary judgment is appropriate. *See Guarino,* 980 F.2d at 410; *Carver v. Bunch,* 946 F.2d 451, 454-55 (6th Cir.1991).

## II. Defendants' Motion for Summary Judgment Regarding Liability

*6 In their motion for summary judgment regarding liability, Defendants contend that summary judgment is proper on each of Plaintiff's claims for promissory estoppel, fraudulent concealment, and negligent misrepresentation (doc. 149). The Court will address each argument *seriatum.*

### A. Plaintiff's Promissory Estoppel Claim

Under Ohio's promissory estoppel doctrine, a promise that the promisor "should reasonably expect to induce action or forbearance on the part of the promisee or a third person and ... [that] does induce such action or forbearance is binding" if one can avoid injustice only by enforcing the promise. *The Andersons, Inc. v. Consol, Inc.,* 348 F.3d 496, 503 (6th Cir.) (citing *McCroskey v. Ohio,* 8 Ohio St.3d 29, 456 N.E.2d 1204, 1205 (1983); Restatement (Second) of Contracts § 90 (1973)). To establish a claim of promissory estoppel, a plaintiff must prove: "[1] a promise, clear and unambiguous in its terms; [2] reliance [on the promise] by the party to whom the promise is made; [3] that the reliance was reasonable and foreseeable; and [4] that the party claiming estoppel was injured by the reliance." *Id.* (quoting *Rigby v. Fallsway Equip. Co., Inc.,* 150 Ohio App.3d 155, 779 N.E.2d 1056, 1061 (2002); *Connolly v. Malkamaki,* No.2001-L-124, 2002 WL 31813040, at *3 (Ohio App. Dec. 13, 2002)).

Defendants argue that Plaintiff has failed to establish each of the four elements necessary to sustain a claim for promissory estoppel (doc. 149).

#### 1. Clear and unambiguous promise

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3843530 (S.D.Ohio)
(Cite as: 2008 WL 3843530 (S.D.Ohio))

Defendants contend that Plaintiff is unable to prove that Defendants made Plaintiff a "clear and unambiguous" promise (*Id.*). Defendants argue that "[t]his case presents, at most, a statement of future intentions, and not any specific manifestation of commitment" (*Id.*, citing *McCroskey,* 456 N.E.2d at 1205; and *Brown v. American Ecology Corp.* 1997 U.S.App. LEXIS 15518, *2, 1997 WL 362217 (6th Cir. June 24, 1997), for the propositions that specific manifestations of commitment are necessary to establish a promise, and that announcements of future intentions do not constitute a "clear and unambiguous" promise). Defendants set forth four arguments in support of the contention that Visa's announcement of a deadline for members to deploy only lab-tested and Visa approved ATMS, and any communications encouraging Plaintiff to develop 3DES Plus®, cannot constitute a "clear and ambiguous" promise necessary to establish a promissory estoppel claim (*Id.*).

First, Defendants argue that Visa's announcement contained no promise at all, much less a "clear and unambiguous" one (*Id.*). Defendants note that Visa did not state that the deadline would never be delayed, modified, or even canceled, thus making the Visa's announcement merely a statement of its intention to implement a change in requirements regarding member deployment of ATMs in the future (*Id.*, citing *Brown,* 1997 U.S.App. LEXIS 15518, at *7, 1997 WL 362217; *McCroskey,* 456 N.E.2d at 1205).

*7 Second, Defendants contend that Visa's announcement was not directed to ATM vendors like Plaintiff, but instead was plainly directed to "Members and their Agents" (*Id.*). Next, Defendants argue that Plaintiff cannot predicate its claim on any words of encouragement that Visa offered as Plaintiff proceeded with submitting its product for lab testing because these were not promises of anything (*Id.*).

Finally, Defendants contend that Plaintiff's promissory estoppel claim is erroneously based on implicit promises (*Id.*). Defendants state that "implicit promises are far too attenuated to establish the clear and unambiguous promise required to prove liability for promissory estoppel" (*Id.*, citing *The Andersons, Inc.,* 348 F.3d at 503-04; *Brown,* 1997 U.S.App. LEXIS 15518, at *7, 1997 WL 362217).

In response, Plaintiff argues that to the contrary, the record demonstrates that, at the very least, there exist genuine issues of material fact as to whether a clear and unambiguous promise was made (doc. 169). First, Plaintiff contends that Visa's ATM security requirements and testing deadline were directed to and intended for vendors like Plaintiff, as evidenced by Visa's vendor website which published the deadline, and the requirement that vendors, not members, submit their devices for Visa approval (*Id.*). Regardless, Plaintiff states that this argument is inapposite because under Ohio law, a third party who reasonably relies on a promise, not made directly to them, can bring a promissory estoppel claim (*Id.*, citing *Green v. Jackson National Life Ins. Co.,* 2006 U.S.App. LEXIS 21239, 195 Fed. Appx. 398 (6th Cir.2006)).

Second, Plaintiff challenges Defendants' contention that their statements "simply [announced] an intention to act or refrain from acting" and therefore do not constitute a promise (*Id.*). Plaintiff argues that the *Brown* and *McCroskey* cases relied on by Defendants are distinguishable from the circumstances in this case, and that more closely on point is *Bluegrass Center, LLC v. U .S. Intec, Inc.,* 2002 U.S.App. LEXIS 21277, 2002 WL 31269650 (6th Cir.2002) (doc. 169). Plaintiff contends that the Sixth Circuit in *Bluegrass Center* found a promise established through actions and statements, similar to the encouragement and information Defendants provided to Plaintiff over a period of time regarding 3DES Plus® (*Id.*).

Further, Plaintiff argues that Defendants' statements and representations regarding the deadline and the new ATM security requirements easily constitute the requirement that a promise be "clear and unambiguous" (*Id.*, citing *Karnes v. Doctors Hosp.,* 51 Ohio St.3d 139, 142, 555 N.E.2d 280 (1990)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3843530 (S.D.Ohio)
(Cite as: 2008 WL 3843530 (S.D.Ohio))

Plaintiff first points to the statements posted on the Visa vendors website in October 2003, which outlined the July 1, 2004 deadline, and the new ATM security requirements, as proof of the clear and unambiguous representation made by Defendants (*Id.*). Likewise, Plaintiff details the communications and interactions with Defendants about 3DES Plus® and the deadline, which Plaintiff argues, together with Visa's security requirements "constituted a sufficiently 'clear and unambiguous' representation or 'promise' which is legally cognizable under Ohio law to support a claim based upon promissory estoppel" (*Id.*).

*8 Thus, it is for the Court to determine whether Defendants made a promise "clear and unambiguous" on its face, a promise which Defendants should have reasonably expected to induce action or forbearance on the part of a promisee or a third person and ... [that] did induce such action or forbearance. *The Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 503 (6th Cir.) (citing *McCroskey v. Ohio*, 8 Ohio St.3d 29, 456 N.E.2d 1204, 1205 (1983); Restatement (Second) of Contracts § 90 (1973)). A promise is defined in Restatement of the Law 2d, Contracts (1981) 8, Section 2(1), as " * * * a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." *Stull v. Combustion Engineering, Inc.*, 72 Ohio App.3d 553, 595 N.E.2d 504, 507 (Ohio App. 3 Dist.,1991). A "representation" is a presentation of fact made to induce someone to act. *Shoshone Indian Tribe of Wind River v. United States*, 58 Fed. Cl. 542, 546 (2003). The Court finds, under this standard, that a reasonable jury could find that such a promise was made.

The October 2, 2003 announcement on Visa's vendor website stated in part:

Effective 01 July 2004, all newly deployed ATMs, and Cash Dispensing PIN acceptance device models (including replacement devices and encrypting PIN pads) must have passed laboratory testing by a Visa-recognized laborat-

ory and be approved by Visa (doc. 169).

Defendants likewise published the specific security requirements necessary for obtaining Visa approval. Until the deferral, Visa's message remained consistent. The Court finds that a reasonable jury could conclude that these statements were intended to and did, in fact, induce Visa vendors to develop Visa approved products by July 1, 2004. Therefore, the Court finds summary judgment inappropriate on this basis.

**2. Reliance on the promise**

Defendants also contend that Plaintiff is unable to prove reliance on a promise for two reasons (doc. 149). First Defendants argue that ATME's President, David Parlin, admitted that Plaintiff would have developed 3DES Plus even without the Visa member deadline (*Id.*). Second, Defendants contend that the historic development of 3DES Plus shows that Plaintiff had effectively already developed this product before the complained of deadline even existed (*Id.*). Defendants claim that Plaintiff's pre-January 2004 actions could not be in reliance of the July 1, 2004 deadline because "as ATME management, technical, and marketing personnel admit, ATME did not take any action pursuant of Visa approval before that first meeting at T-Systems in January 2004" (*Id.*).

In response, Plaintiff argues that there is substantial evidence which contradicts Defendants' position (doc. 169). Plaintiff refutes Defendants' contention that Plaintiff had already developed and decided to make 3DES Plus®, pointing to the cryptographically secure control of display (A2) and privacy shield (A6) requirements which were unique to Visa, and which were included in the approved 3DES Plus® product (*Id.*). Plaintiffs likewise state that the agreement Plaintiff entered into with Thales in October 2003 is distinct from the agreement entered into in March, 2004 to manufacture 3DES Plus® (*Id.*).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8
Not Reported in F.Supp.2d, 2008 WL 3843530 (S.D.Ohio)
(Cite as: 2008 WL 3843530 (S.D.Ohio))

*9 Further, Plaintiff argues that Defendants mischaracterize David Parlin's testimony that Plaintiff would have inevitably developed a Triple DES product as proof that there was no reliance (*Id.*). Plaintiff contends that even if Plaintiff had developed a product that included a Triple DES encryption without Defendants' deadline, it still would not have included the A6 requirement and or the A2 feature, which Visa employee Marc Cleven characterized as "one of the most 'technically difficult challenges' presented by Visa's new ATM security requirements" (*Id.*).

Finally, Plaintiff contends that the communication between Plaintiff and Visa representatives throughout the Spring of 2004 about the development and testing of 3DES Plus® demonstrates that "[n]ot only did the Plaintiff reasonably rely on the Defendants' new ATM security requirements, Visa took an active role in encouraging the Plaintiff to do so" (*Id.*).

Plaintiff's argument is well taken. Particularly persuasive is that Plaintiff developed 3DES Plus® to include Defendants' specifications, namely the A6 and A2 features. Even if, as Defendants argue, Plaintiff had already developed, or would have inevitably developed, a Triple DES product, these features were unique to the Visa requirements. The Court finds that a reasonable jury could conclude that Plaintiff relied on the announcement of Defendants' deadline and security requirements and the communication between the parties in developing 3DES Plus®.

### 3. Reliance must be objectively reasonable

Defendants further argue that Plaintiff's promissory estoppel claim fails because any purported reliance was objectively unreasonable as a matter of law because Plaintiff knew the risks of deferral (doc. 149, citing *Miami Packaging, Inc. v. Processing Sys. ., Inc.*, 792 F.Supp. 560, 565 (S.D.Ohio 1991)). Defendants point to several facts as evidence that Plaintiff was aware that the July 1, 2004 deadline might not be feasible (doc. 149). First, Defendants state that Plaintiff knew that Defendants were concerned with compliance with the deadline when Plaintiff wrote in December 2003 "[i]t sounds like Visa is getting worried that no ATMs have yet passed the testing requirements and they obviously have need to have solutions they can certify for their members" (doc. 149). As further evidence, Defendants state that Plaintiff knew in the Spring of 2004 that Visa and MasterCard agreed to align their ATM security testing and approval processes (*Id.*). Likewise, Defendants argue reliance was objectively unreasonable because deferral and modification of payment card association deadlines was not uncommon, and therefore "ATME knew or should have known that, as a general matter, there existed an [sic] historical risk that any payment card association's ATM security deadlines, including those Visa, may be delayed, deferred or modified to allow member financial institutions additional time to comply" (*Id.*). Defendants state that Plaintiff was aware that immediately preceding the deadline that leading ATM manufacturers had not received Visa approval for their ATMs (*Id.*). Defendants argue that "in this complete context ... reliance on the intended compliance deadline was not objectively reasonable," but that Plaintiff took an opportunistic risk that should not bind Visa (*Id.*).

*10 In response, in addition to the arguments made in support of reliance, Plaintiff contends that it was Defendants' intention that Plaintiff rely on the Visa requirements, so that Visa Members could purchase and deploy them (doc. 169). Plaintiff argues that Defendants benefitted in several ways from vendors developing products that met the ATM security requirements (*Id.*).[FN2]

> FN2. Plaintiff contends that Defendants benefitted in that: 1) Plaintiff vetted the testing process for Defendants, 2) Plaintiff's product provided an inexpensive upgrade for Visa Members, 3) Plaintiff's product addressed member's objections to the upgrades about cost, 4) Plaintiff argues

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3843530 (S.D.Ohio)
(Cite as: 2008 WL 3843530 (S.D.Ohio))

that Defendants could use the success of Plaintiff's development of the product as leverage with other vendors, and 5) with Plaintiff's product available to upgrade older non-compliant ATMs, there would be more ATMs available to generate fees for Defendants (doc. 169).

Having reviewed the parties' arguments, the Court finds summary judgment is not warranted on this basis. Defendants cite the Court's previous order in *Miami Packaging, Inc.*, 92 F.Supp. at 565, for the proposition that "[w]hen the beneficiary of a promise knows or reasonably should know that the promise might not come to fruition, reliance in spite of that known risk is unreasonable as a matter of law" (doc. 149). Absent the communication between the parties, the Court might agree that Plaintiff should have known that Visa's deadline could be deferred. However, here, Defendants were in communication with Plaintiff during the development and testing process, with Plaintiff pointing to several emails between the parties, which Plaintiff argues show Defendants encouraging Plaintiff's development of 3DES Plus® (doc. 169). When viewed in complete context, the Court finds a reasonable jury could find that Plaintiff's reliance on the compliance deadline is objectively reasonable.

**4. Injury due to reliance**

Defendants next argue that far from proving injury, Plaintiff's witnesses and documents show that Plaintiff obtained a clear benefit from submitting 3DES Plus® for testing in a Visa-approved lab and obtaining Visa's official approval for the product (doc. 149). First, Defendants argue that because in the Spring of 2004, MasterCard agreed to "grandfather" Visa-approved ATM products, any reliance Plaintiff placed on Visa's announcement of the July 1, 2004 deadline ultimately enabled Plaintiff to sell 3DES Plus® to MasterCard members (*Id.*). Second, Defendants contend that the benefit of obtaining Visa certification is evident from

Plaintiff's press releases and marketing materials that touted this achievement, and from the acknowledgment of ATME's President, Dan Parlin, as early as January 15, 2004, that Visa approval would be valuable (*Id.*). Defendants argue that from these facts, the Court can conclude, as a matter of law, that enforcement of any promise made by Visa is not "required to prevent injustice" (*Id.*, citing *Telxon Corp.*, 2005 Ohio App. LEXIS 4475, at *68, 2005 WL 385964).

In response, Plaintiff argues that it incurred expenses in excess of $4.8 million in its pursuit of Visa approval for 3DES Plus®, including items such as the costs associated with the T Systems security review in January 2004, formal testing in May and June 2004, and expenses incurred with vendors who supplied services, components and parts necessary to manufacture 3DES Plus® in quantity (doc. 169). Plaintiff states that its obligations to its suppliers and vendors were tied to the most part to Visa's approval of 3DES Plus®, which happened just one day before Defendants announced the deadline deferment on June 25, 2005 (*Id.*). Plaintiff further argues that the expenses incurred after Defendants dropped the deadline and requirements were done so because Defendants continued to assure Plaintiff that the deferral was temporary, and that Class B requirements could be the standard for ATM security (*Id.*).

*11 The Court finds Plaintiff's position well taken. If a jury concludes that Plaintiff reasonably relied on Defendants' compliance deadline and security requirements, then at minimum, the costs of developing the A2 and A6 features can be attributed to this reliance. Therefore, the Court finds that summary judgment is not appropriate on this basis.

**B. Plaintiff's Fraudulent Concealment Claim**

To establish a claim for fraudulent concealment [FN] under Ohio law, a plaintiff must establish each of six elements:(1) a representation or, where there is a duty to disclose, concealment of a fact, (2)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3843530 (S.D.Ohio)
(Cite as: 2008 WL 3843530 (S.D.Ohio))

which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance. *Micrel, Inc. v. TRW, Inc.,* 486 F.3d 866 (6th Cir.2007); *Scotts Co. v. Central Garden & Pet Co.,* 403 F.3d 781 (6th Cir.2005).

> FN3. While there is some confusion as to whether Plaintiff's claim is for Fraudulent Misrepresentation or Fraudulent Concealment, Defendants make arguments against both claims, and Plaintiff argues solely on the grounds of Fraudulent Concealment, and therefore the Court will construe this claim as one alleging Fraudulent Concealment.

**A. Duty to Disclose**

Defendants first argue that Plaintiff's fraudulent concealment claim must fail because it cannot prove that there was a fiduciary or similar relationship of trust between the parties that would give rise to a duty to disclose (doc. 149). Under Ohio law, concealment of a fact does not constitute fraud unless there was a duty to disclose the concealed fact to the plaintiff. *Federated Mgmt. Co. v. Coopers & Lybrand,* 137 Ohio App.3d 366, 738 N.E.2d 842, 854-55 (Ohio Ct.App.2000). The Supreme Court of Ohio in *Blon v. Bank One, Akron, N.A.,* 35 Ohio St.3d 98, 519 N.E.2d 363, 367-68 (Ohio 1988) stated that a duty to disclose may arise in a situation where:

> a party to a business transaction in a fiduciary relationship with another is bound to make a full disclosure of material facts known to him but not to the other. Such a duty may also arise out of an informal relationship where both parties to a transaction understand that a special trust or confidence has been reposed. Full disclosure may also be required of a party to a business transaction 'where such disclosure is necessary to dispel misleading impressions that are or might have been created by partial revelation of facts.'

Defendants cite to the Ohio Supreme Court's decision in *Umbaugh Pole Bldg. Co. v. Scott,* 58 Ohio St.2d 282, 390 N.E.2d 320 (Ohio 1979), where the defendant negotiated a mortgage with the plaintiffs, and then later gave plaintiffs advice when the mortgage became delinquent (doc. 169). In *Umbaugh,* the Ohio Supreme Court found that under those circumstances "the offering and giving of advice was insufficient to create a fiduciary relationship." 390 N.E.2d at 323. Defendants contend that Plaintiff is in an even weaker position than the plaintiff in *Umbaugh,* because there the parties had entered into an actual business transaction, whereas in this matter there was no such relationship (doc. 149).

*12 Likewise, Defendants argue that because Plaintiff was not in a business relationship with Defendants, Plaintiff cannot prove fraudulent concealment by alleging that Defendants had an obligation and, then failed, to dispel "misleading impressions" (*Id.,* citing *Blon,* 519 N.E.2d at 367). In support, Defendants quote *Moore v. Fenex, Inc.,* 809 F.2d 297, 303 n. 2 (6th Cir.1987), which stated "[w]e are aware of no case, nor has any been cited, where a party has been held liable for fraudulent nondisclosure that had no direct dealings with the plaintiff" (*Id.,* also citing *Chrysler Credit Corp. v. First Nat'l Bank & Trust Co.,* 582 F.Supp. 1436, 1442-43 (W.D.Pa.1984); *In re.: TMJ Implants,* 880 F.Supp. 1311, 1317-18 (D.Minn.1995)). Defendants again contend that because Visa does not buy or deploy ATMs, there existed no business transaction between the parties, and thus a fraudulent concealment claim must fail as a matter of law (*Id.*).

In response, Plaintiff argues that they can establish the necessary elements for a fraudulent concealment claim, including that Defendants had a duty to disclose (doc. 169). Plaintiff concedes there was no fiduciary relationship between the parties, but ar-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

gues that Defendants did partially reveal facts during a business transaction, information that "was necessary to dispel misleading impressions that were or might have been created by partial revelation of facts" (*Id.*, citing *Interim Healthcare of Northeast Ohio, Inc.*, 12 F.Supp.2d 703, 712 (N.D.Ohio 1998)). To show there were partially revealed facts, Plaintiff states that before the deferment of Visa's deadline, at the same time Defendants were encouraging Plaintiff's development of 3DES Plus® and representing to Plaintiff that the deadline was firm, Defendants were telling other vendors that deferment of the deadline was imminent (*Id.*). Likewise, Plaintiff argues that a business relationship did exist between the parties (ld.). Plaintiff contends the cases cited by Defendants are distinguishable, because unlike the circumstances here, in *Moore*, 809 F.2d 297, *Chrysler Credit Corp.*, 582 F.Supp. 1436, and *In re.: TMJ Implants*, 880 F.Supp. 1311, there was little to no direct dealings between the plaintiff and defendants (*Id.*). Here, Plaintiff argues the parties had an ongoing and lengthy business relationship concerning the development of Plaintiff's product and the July 1, 2004 deadline (*Id.*). Plaintiff cites to cases where, Plaintiff contends, the parties had much less of a business connection, and yet a "business transaction" was found to exist (*Id.* citing *Central States Stamping Co. v. Terminal Equipment Co., Inc.*, 727 F.2d 1405, 1408 (6th Cir.1984); *Sallee v. Fort Know National Bank, N.A.*, 286 F.3d 876 (6th Cir.2002); *General Acquisition Corp. v. Gencorp, Inc.*, 766 F.Supp. 1460 (S.D.Ohio 1990)).

In reply Defendants argue that under Ohio law, a duty of full disclosure only arises between parties engaged in a business transaction, not merely a business relationship (doc. 192). Defendants aver that even in the cases relied on by Plaintiff there were actual business transactions, and "not some lesser business relationship or 'back and forth communication' standard" (ld., stating that in *Interim Healthcare* there was a franchise agreement between the parties, in *Sallee*, plaintiff and defendant bank were parties to a loan agreement, and in

*General Acquisition Corp.* the defendant was plaintiff's investment and financial advisor). Defendants reiterate that they never negotiated or entered into a business transaction with Plaintiff, and therefore did not have a duty to disclose (*Id.*).

**\*13** Defendants also dispute that information about Visa's deadline was withheld from Plaintiff while at the same time being shared with other vendors (*Id.*). Defendants argue that Plaintiff mischaracterizes the emails sent to other vendors, stating that those communications instead are evidence that Visa had not reached a conclusion about the deadline, and that neither of the emails' authors had authority to defer the deadline (*Id.*). Further, Defendants state that the emails were sent by Visa in response to specific inquiries by a vendor during the testing process, and that when Plaintiff similarly asked when the deadline would be deferred, Defendants told Plaintiff what it had told other vendors (*Id.*).

In considering whether Defendants had a duty to disclose the Court must determine, first, whether the parties were engaged in a business transaction, and second, whether full disclosure was necessary to dispel misleading impressions that were or might have been created by partial revelation of facts. *Blon v. Bank One, Akron, N.A.*, 35 Ohio St.3d 98, 519 N.E.2d 363, 367-68 (Ohio 1988).

First, the Court finds that there exists a genuine issue of material fact as to whether Defendants derived benefit from their relationship with Plaintiff during the development and testing of 3DES Plus®. The situation here is distinct from the cases cited by both parties. While there was no direct financial component to the parties' relationship, as Visa was not in the market to buy or sell Plaintiff's product, according to Plaintiff, the parties worked together closely during the development and testing of 3DES Plus® at a Visa approved testing facility, and Visa benefitted from this relationship (doc. 169, see footnote two above). The Court therefore finds summary judgment is not appropriate on the question of whether the parties were engaged in a business transaction.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3843530 (S.D.Ohio)
(Cite as: 2008 WL 3843530 (S.D.Ohio))

Second, having reviewed the parties' arguments and the evidence submitted, the Court finds there exists genuine issues of material fact as to whether Defendants concealed information about the deadline deferral from Plaintiff, while informing other vendors that a deferral was planned. Also, the Court finds that there is a question as to when Defendants made the decision to defer the compliance deadline. For these reasons, it is not appropriate to grant summary judgment on the question of whether Defendants failed to disclose information "necessary to dispel misleading impressions that were or might have been created by partial revelation of facts." *Interim Healthcare of Northeast Ohio, Inc.,* 12 F.Supp.2d at 712.

### C. Plaintiff's Negligent Misrepresentation Claim

Defendants argue that Plaintiff's claim for negligent misrepresentation must fail because the claim is specifically barred by Ohio's economic loss doctrine, and because the evidence demonstrates that Plaintiff cannot establish the required elements of the claim (doc. 149).

### 1. Economic Loss Rule

Defendants first claim that Plaintiff cannot sustain the claim for negligent misrepresentation because under Ohio law, tort liability may not be imposed for purely economic damages (doc. 149, citing among others *Floor Craft Floor Covering, Inc. v. Parma Comm. Gen. Hosp. Ass' n.* 54 Ohio St.3d 1, 560 N.E.2d 206, 208 (Ohio 1990)). Defendants argue that Plaintiff has not alleged, and cannot prove "injury to persons or damages to property" and therefore cannot recover under a claim of negligent misrepresentation (*Id.,* quoting *Picker Int'l v. May Found.,* 6 F.Supp.2d 685, 688-89 (N.D.Ohio, 1998) ).

*14 In response, Plaintiff cites *National Mulch & Seed, Inc. v. Rexius Forest By-Products, Inc.,* 2007 U.S. Dist. LEXIS 24904, 2007 WL 894833 (S.D.Ohio Mar. 22, 2007), in which the district

court addressed the economic loss rule and negligent misrepresentation, stating:

> The Supreme Court of Ohio had yet to specifically address the economic loss rule in the context of a claim for negligent misrepresentation claim directly contradicts the express wording of the cause of action of negligent misrepresentation as stated by the Supreme Court of Ohio in *Haddon View. McCarthy, Lebit,* 87 Ohio App.3d at 632, 622 N.E.2d 1093. Under the tort of negligent misrepresentation, a person who supplies false information to others in breach of the common law duty not to do so is liable for "pecuniary loss" to them. *Id.* Because "pecuniary loss" is by its very definition 'ecomonic loss,' " the economic loss rule cannot logically be applied to a negligent misrepresentation claim.

Plaintiff contends that the cases relied on by Defendants, *Floor Craft* and *Picker,* were specifically addressed and distinguished by the district court in *National Mulch* (doc. 169).

As Defendants note, under *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1933), when deciding a diversity case, a federal court must apply the substantive law of the state's highest court. Thus, Defendants argue that the Court must follow the Ohio Supreme Court's decision in *Floor Craft* (doc. 192).

While the Court agrees with Defendants that the Court must apply Ohio law in determining whether the economic loss rule bars Plaintiff's claim of negligent misrepresentation, the Court finds Plaintiff's position well-taken. The Court is persuaded by the district court's reasoning in *National Mulch* in concluding that under Ohio law, a negligent misrepresentation claim is not barred by the economic loss rule. 2007 U.S. Dist. LEXIS 24904 at *9, 2007 WL 894833. Defendants are correct that the economic loss rule generally prevents recovery of damages for purely economic loss in connection with a tort claim. *Corporex,* 106 Ohio St.3d at 414, 835 N.E.2d 701; *Floor Craft,* 54 Ohio St.3d at 3, 560

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3843530 (S.D.Ohio)
(Cite as: 2008 WL 3843530 (S.D.Ohio))

N.E.2d 206. However, as the court in *National Mulch* noted, the Supreme Court of Ohio has yet to specifically address the economic loss rule in the context of a claim for negligent misrepresentation, but several Ohio appellate courts have done so, and a majority of these courts have recognized that a claim for negligent misrepresentation is actionable even when the plaintiff's damages consist only of economic loss. *Id.* at *6 (citing *E.g. Universal Contracting Corp. V. Aug.*, 2004 WL 3015325, at *3 (Ohio App. 1st Dist., Dec. 30, 2004), *Ferro Corp. V. Blaw Knox Food & Chem. Equp. Co.*, 121 Ohio App.3d 434, 440-41, 700 N.E.2d 94 (1997); *McCarthy, Lebit, Crystal & Haiman Co. v. First Union Mgmt., Inc.*, 87 Ohio App.3d 613, 631-32, 622 N.E.2d 1093 (1993)). As the Ohio Court of Appeals reasoned in *McCarthy, Lebit*, "the application of the economic loss rule to a negligent misrepresentation claim directly contradicts the express wording of the cause of action of negligent misrepresentation as stated by the Supreme Court of Ohio in *Haddon View." National Mulch*, 2007 U.S. Dist. LEXIS 24904, 2007 WL 894833 (citing *McCarthy, Lebit*, 87 Ohio App.3d at 632, 622 N.E.2d 1093). Therefore, the Court adopts the reasoning of the court in *National Mulch*, and finds that the economic loss rule does not preclude Plaintiff's claim of negligent misrepresentation.

### 2. Negligent Misrepresentation Elements

*15 Second, Defendants argue that Plaintiff is unable to establish the elements required for a negligent misrepresentation claim. To establish a claim for negligent misrepresentation, a plaintiff must prove that the defendant supplied false information for the guidance of others in their business transactions, causing pecuniary loss to the plaintiff, while the plaintiff justifiably relied upon the information, and defendant failed to exercise reasonable care or competence in obtaining or communicating the information. *Picker*, 6 F.Supp.2d at 689; *Gutter v. Dow Jones*, 22 Ohio St.3d 286, 490 N.E.2d 898, 899-900 (Ohio 1986).

### A. Representations

In addition to arguments previously addressed by the Court [FN4], Defendants first contend that Plaintiff cannot establish their claim of negligent misrepresentation because Plaintiff's claim is based on alleged omitted or concealed facts, which cannot sustain a negligent misrepresentation claim (doc. 149, citing *The Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 506 (6th Cir.2003)).

> FN4. Defendants cite to previous portions of their brief to support their arguments that there is no evidence that Visa supplied any false information, that Plaintiff suffered no pecuniary loss, that Plaintiff did not rely on Defendants statements and any reliance would be unreasonable, and that Defendants did not fail to exercise reasonable care when communicating information about the deadline (doc. 149).

In response, Plaintiff first contends that their negligent misrepresentation claim is not based on omitted or concealed facts, but instead on representations about the deadline made directly to Plaintiff (doc. 169). Plaintiff points to the notice on the Visa Vendors website, the registration and non-disclosure agreement needed to register for the website, the instruction for Vendors to submit their products to a Visa approved testing facility, and finally to the repeated contact between Plaintiff and Defendants, as evidence of direct representations ( *Id.*).

The Court finds Plaintiff's position well-taken. Construing the above evidence in a light most favorable to the Plaintiff, as the Court must do at this stage in the proceedings, the Court finds that a reasonable jury could agree that Defendants made representations about the deadline and security requirements directly to Plaintiff.

### B. Special Relationship

Defendants further argue that Plaintiff cannot estab-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3843530 (S.D.Ohio)
(Cite as: 2008 WL 3843530 (S.D.Ohio))

lish its claim of negligent misrepresentation because Defendants did not owe Plaintiff a duty of care. Defendants contend that under Ohio law, Plaintiff must show that there existed a "special relationship" between the parties under which Defendants supplied information to the Plaintiff for guidance in the Plaintiff's business transactions, and that this special relationship does not exist in normal business transactions (*Id.*, citing among others *Picker*, 6 F.Supp.2d at 689). Defendants contend that Ohio courts have narrowly construed the types of business relationships sufficient to give rise to such a duty, as one who renders opinions to others for their use in guiding their own business transactions, such as accountants or attorneys (*Id.*, citing among others *Ziegler v. Findlay Indus., Inc.*, 464 F.Supp.2d 733, 738 (N.D.Ohio 2006)) Defendants argue that no such special relationship existed, and that they owed Plaintiff no duty that could be breached by alleged negligence (*Id.*).

*16 In response, Plaintiff cites *National Mulch and Seed, Inc.*, which recently held that a "special relationship" is not required to succeed in a negligent misrepresentation claim (doc. 169, citing 2007 U.S. Dist. LEXIS 24904 at *30-31, 2007 WL 894833).

The district court in *National Mulch and Seed, Inc.* stated:

This Court agrees that a special relationship is not a formal element of a negligent misrepresentation claim under Ohio law.

...

To the extent Ohio courts discuss a special relationship in connection with a negligent misrepresentation claim, the discussion appears to be related to the requirement that a defendant supply false information for the guidance of the plaintiff in its business transactions. The "for the guidance of" language directs the court's attention to the duty owed and serves to limit the class of potential plaintiffs. As explained by the Supreme Court of Ohio, liability for negligent misrepresentation is limited to "the person or one of a limited group of persons for whose benefit and guidance [ the defendant] intends to supply the information or knows that the recipient intends to supply it." *Gutter v. Dow Jones, Inc.*, 22 Ohio St.3d 286, 288, 490 N.E.2d 898 (1986); *accord Haddon View*, 70 Ohio St.2d at 157, 436 N.E.2d 212 (not requiring any special relationship but limiting liability to misrepresentations made to a foreseeable class of persons).

2007 U.S. Dist. LEXIS 24904 at *30-31, 2007 WL 894833. In a footnote, the district court further reasoned:

[S]imilar to Ohio Courts in addressing a "special relationship," the court in *Picker* specifically defined the "special relationship" as "the defendant suppl[ying] information to the plaintiff for the latter's guidance in its business transactions." *Picker*, 6 F.Supp.2d at 689. This is merely a reiteration of one of the elements of the cause of action for negligent misrepresentation.

*Id.* at F.N.8.

Having reviewed the relevant case law, the Court adopts the reasoning in *National Mulch and Seed, Inc.*, and therefore finds summary judgment inappropriate on this basis.

**I. Conclusion**

For the foregoing reasons, the Court DENIES Defendants' Motion Summary Judgment Regarding Liability (doc. 192).

SO ORDERED.

S.D.Ohio,2008.
ATM Exchange, Inc. v. Visa Intern. Service Ass'n
Not Reported in F.Supp.2d, 2008 WL 3843530 (S.D.Ohio)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

--- N.E.2d ----, 2010 WL 2680330 (Ohio App. 1 Dist.), 2010 -Ohio- 3142
(Cite as: 2010 WL 2680330 (Ohio App. 1 Dist.))

C

Court of Appeals of Ohio,
First District, Hamilton County.
BURLINGTON INSURANCE CO.
v.
ARTISAN MECHANICAL, INC., Third-Party Appellant;
Wells Fargo Insurance Services of Ohio, L.L.C., et al., Third-Party Appellees.
**No. C-081280.**

No. C-081280.
Decided July 7, 2010.

**Background:** Insured filed claim for negligent misrepresentation against its insurance broker, and a wholesale-insurance broker, who secured commercial general-liability policy for insured. The Court of Common Pleas, Hamilton County, No. A-0703795, granted defendants summary judgment. Insured appealed.

**Holdings:** The Court of Appeals, J. Howard Sundermann, J., held that:
(1) economic loss doctrine barred insured's claim against wholesale-insurance broker, but not against its insurance broker;
(2) expert testimony was not required to establish standard of care that insured's broker owed to insured;
(3) insured's claims against its broker were not barred by insured's failure to read the policy;
(4) broker's alleged statements did not constitute opinion on how term "sales" might be interpreted, such as to bar action; and
(5) factual issue remained as to whether insured failed to provide insurer with necessary documentation that would have reduced the premium.

Affirmed in part, reversed in part, and remanded.

Cunningham, J., concurred in part, dissented in part, and filed opinion.

West Headnotes

**[1] Insurance 217 ☞1672**

217 Insurance
   217XI Agents and Agency
      217XI(D) Agents for Applicants or Insureds
         217k1668 Duties and Liabilities to Insureds or Others
            217k1672 k. Fraud or Misrepresentation. Most Cited Cases
Economic loss doctrine barred insured's claim for negligent misrepresentation against wholesale-insurance broker, but not against its insurance broker, who together secured commercial general-liability policy for insured, because insured had no contractual privity with wholesale-insurance broker, but instead dealt strictly with its insurance broker.

**[2] Insurance 217 ☞1673**

217 Insurance
   217XI Agents and Agency
      217XI(D) Agents for Applicants or Insureds
         217k1668 Duties and Liabilities to Insureds or Others
            217k1673 k. Actions. Most Cited Cases
Expert testimony was not required to establish standard of care that insurance broker owed to insured in action for negligent-misrepresentation based on broker's communications with insurer about facts of premium calculation to secure commercial general-liability policy for insured; insured's claim did not present a difficult or complex allegation of wrong-doing, but alleged that its insurance broker owed it an easily understood duty to use reasonable care when communicating the facts, which was not dependent on any special standard applicable to the insurance industry.

**[3] Insurance 217 ☞1673**

217 Insurance
   217XI Agents and Agency

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- N.E.2d ----, 2010 WL 2680330 (Ohio App. 1 Dist.), 2010 -Ohio- 3142
(Cite as: 2010 WL 2680330 (Ohio App. 1 Dist.))

217XI(D) Agents for Applicants or Insureds
217k1668 Duties and Liabilities to Insureds or Others
217k1673 k. Actions. Most Cited Cases
There is no blanket rule requiring expert testimony against an insurance broker in a negligent misrepresentation case.

**[4] Insurance 217 €===1672**

217 Insurance
217XI Agents and Agency
217XI(D) Agents for Applicants or Insureds
217k1668 Duties and Liabilities to Insureds or Others
217k1672 k. Fraud or Misrepresentation. Most Cited Cases
Insured's negligent-misrepresentation claims against its insurance broker were not barred by insured's failure to read the commercial general-liability policy, where claim was based on broker's alleged representation that insurer had agreed to label the policy as one rated on "sales," with the understanding that insurer was using a method of calculating "sales" such that the final cost would be the amount that insured desired to pay, but nothing in policy addressed the word "sales" or contradicted the alleged agreement that insured claimed broker had negligently misrepresented to have existed.

**[5] Insurance 217 €===1672**

217 Insurance
217XI Agents and Agency
217XI(D) Agents for Applicants or Insureds
217k1668 Duties and Liabilities to Insureds or Others
217k1672 k. Fraud or Misrepresentation. Most Cited Cases
Insurance broker's alleged statements concerning how the term "sales" was to be defined by commercial general-liability policy it secured for insured, as basis for determining cost of premiums, did not constitute opinion on how term might be interpreted, such as to bar action for negligent misrep-

resentation; rather, broker's statement represented a clear, affirmative statement that a present agreement existed at time that the statement was made.

**[6] Judgment 228 €===181(23)**

228 Judgment
228V On Motion or Summary Proceeding
228k181 Grounds for Summary Judgment
228k181(15) Particular Cases
228k181(23) k. Insurance Cases. Most Cited Cases
Genuine issue of material fact remained as to whether insured had failed to provide insurer with the necessary documentation that would have reduced the audited premium for its commercial general-liability policy, thus precluding summary judgment in action against insurance broker for negligent misrepresentation in communicating to insured definition of "sales" allegedly relied upon by insurer, upon which agreed-upon price of audited premium was based.

Taft Stettinius & Hollister L.L.P., and Timothy Pepper, Dayton, for Third-Party appellant.

Katz Teller Brant & Hild, L.P.A., and James M. McCarthy, Cincinnati, for Third-Party appellee Wells Fargo Insurance Services of Ohio, L.L.C.

Frost Brown Todd L.L.C., and David W. Walulik, Cincinnati, for Third-Party appellee CRC Insurance Services, Inc.

Taft Stettinius & Hollister L.L.P., and Timothy Pepper, for Third-Party appellant.Katz Teller Brant & Hild, L.P.A., and James M. McCarthy, for Third-Party appellee Wells Fargo Insurance Services of Ohio, L.L.C.Frost Brown Todd L.L.C., and David W. Walulik, for Third-Party appellee CRC Insurance Services, Inc.

J. HOWARD SUNDERMANN, Judge.

*1 {¶ 1} Defendant/third-party plaintiff-appellant Artisan Mechanical, Inc., appeals from the trial court's entry granting summary judgment to third-party defendants-appellees, Wells Fargo Insurance

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- N.E.2d ----, 2010 WL 2680330 (Ohio App. 1 Dist.), 2010 -Ohio- 3142
(Cite as: 2010 WL 2680330 (Ohio App. 1 Dist.))

Services of Ohio, L.L.C., and CRC Insurance Service, Inc., on its claim for negligent misrepresentation. For the reasons that follow, we affirm the summary judgment entered for CRC Insurance Services, but we reverse the summary judgment entered for Wells Fargo Insurance Services.

## I. The Lawsuit

{¶ 2} The underlying lawsuit between the parties stemmed from a complaint Burlington Insurance Company had filed against Artisan for the insurance premiums due under two separate insurance policies. Artisan filed an answer and counterclaims against Burlington. It then filed a third-party complaint against its insurance broker, Wells Fargo, and wholesale-insurance broker CRC. Artisan asserted claims for negligence, breach of fiduciary duty, fraudulent misrepresentation, negligent misrepresentation, and indemnification against Wells Fargo and claims for fraudulent and negligent misrepresentation against CRC.

{¶ 3} After discovery was completed, Wells Fargo and CRC moved for summary judgment against Artisan. Artisan filed a combined memorandum opposing the motions for summary judgment. Both Wells Fargo and CRC filed a reply memorandum. The trial court subsequently granted Wells Fargo's and CRC's motions without any analysis. Shortly thereafter, the trial court also granted Burlington's motion for summary judgment against Artisan. On appeal, Artisan challenges only the trial court's entry of summary judgment on its negligent-misrepresentation claims against Wells Fargo and CRC.

## II. Events Giving Rise to Artisan's Negligent-Misrepresentation Claims

{¶ 4} Viewed in a light most favorable to Artisan, as the nonmoving party, the facts for purposes of summary judgment are as follows: In the summer of 2004, Artisan sought to obtain a commercial general-liability policy to replace a policy that was set to expire on September 1, 2004. As a result, it contacted its long-time agent, Gloria Davis, an account executive at Wells Fargo, for assistance. Artisan told Davis that it wanted a policy with a price structure rated on its payroll instead of its sales, because of the variable costs of goods passed through to its customers. Davis understood that Artisan did not care how the price structure was labeled as long as it did not pay an inflated premium due to the cost of the goods it sold.

{¶ 5} Davis and her colleague Bob Grigas, also of Wells Fargo, contacted wholesale-insurance broker CRC for assistance in finding such a policy. Davis and Grigas told CRC that they were working on Artisan's behalf. All of Davis and Grigas's communications about Artisan took place with Terry McCann, a senior vice president at CRC. At some point, Wells Fargo and CRC focused their efforts on Burlington Insurance. CRC had a direct relationship with Burlington. Burlington communicated with CRC. CRC then communicated with Wells Fargo. And Wells Fargo then communicated with Artisan.

*2 {¶ 6} According to Davis, she and Grigas told Artisan that Burlington had agreed to label the policy as one rated on "sales," with the understanding that Burlington was using a method of calculating "sales" such that the final cost would be the amount that Artisan desired to pay. Because Artisan's previous policy had been a "payroll-rated" policy, Burlington had purportedly agreed to calculate the price of its policy by subtracting four categories of goods expenses from Artisan's gross sales for the purpose of substantially replicating the price of Artisan's previous "payroll-rated" policy.

{¶ 7} More specifically, Davis testified that she and Grigas had defined the term "sales" in connection with the premium to Artisan because that was where the four price points had come from. Davis testified, "We all-Terry McCann, Bob Grigas, and I discussed what the definition of sales is. We then communicated that to Artisan who said, well the concern I have is that I'm going to get double billed. The cost of the pipe, I do something to it, I

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

sell it again, I'm going to get hit for duplicate sales. So, that would then have been communicated back to Terry who supposedly communicated it back to Burlington."

{¶ 8} Davis further testified about a copy of an email that Bob Grigas had sent to Artisan's owner, Abbe Sexton, which stated that the premium of $30,000 was "in concrete." Davis testified that the statement was Grigas's "assurance to Abbe that the thirty thousand dollar number which is what Artisan had paid historically was going to continue to be the number she paid for general liability insurance." Sexton additionally testified that based upon this email and her prior conversations with Davis and Grigas, Artisan had believed that it was entering into an agreement with Burlington to purchase the commercial general-liability policy at an agreed-upon price, subject to an audit that would confirm the numbers used to determine that price, based upon the definition of "sales" that had been communicated to Artisan. It was not until Burlington performed the audit that Artisan discovered that there was allegedly no agreement with Burlington similar to what Wells Fargo and CRC had represented.

### III. Artisan's Negligent-Misrepresentation Claims

{¶ 9} In its sole assignment of error, Artisan argues that the trial court erred by granting summary judgment to Wells Fargo and CRC on its claims for negligent misrepresentation.

{¶ 10} We review the trial court's decision on a summary-judgment motion de novo. Summary judgment is appropriate when "(1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party." [FN1]

### A. Economic-Loss Doctrine

*3 {¶ 11} Artisan first argues that Wells Fargo and CRC were not entitled to summary judgment on the basis that its negligent-misrepresentation claims were barred by the economic-loss doctrine.

[1] {¶ 12} The parties agree that Artisan's premium payments represented economic losses. This court has held that the absence of privity of contract requires dismissal of a negligent-misrepresentation claim for economic loss. [FN2] Because CRC had no contractual privity with Artisan, but instead dealt strictly with Wells Fargo, CRC was entitled to summary judgment on Artisan's negligent-misrepresentation claim against it. But because the record demonstrates that Wells Fargo had a special relationship with Artisan akin to privity, the economic-loss doctrine did not bar the negligent-misrepresentation claim against it.

### B. Expert Testimony

[2] {¶ 13} Artisan next argues that expert testimony was not required to establish the standard of care that Wells Fargo owed to Artisan because its negligent-misrepresentation claim did not present a difficult or complex allegation of wrong-doing. We agree.

[3] {¶ 14} There is no blanket rule requiring expert testimony against an insurance broker in all cases. [FN3] While Wells Fargo has cited a number of cases that have held that expert testimony is required in cases involving insurance agents, those cases are distinguishable from the case before us. For example, in *Associated Visual Communications v. Erie Ins. Group,*[FN4] the plaintiff's negligence claims rested on a very specific allegation about "whether $75,000 in coverage was sufficient to establish a duty and whether any such duty was breached." [FN5] This question was not a simple one, and its resolution depended on matters that were not within the knowledge of laypersons.

{¶ 15} And in *Nichols v. Schwendeman,*[FN6] there

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

was an allegation that the agent had "breached a duty by failing to procure replacement UIM coverage and/or by failing to advise appellants about such coverage." [FN7] Although the court in *Nichols* acknowledged that the parties had raised an issue regarding the need for expert testimony, it did not address the matter further and decided the case on other grounds.[FN8]

{¶ 16} In this case, Artisan alleged that Wells Fargo, an insurance broker, had owed it an easily understood duty to use reasonable care when communicating about the facts of the premium calculation. That duty was not dependent on any special standard applicable to the insurance industry; it was a generally recognized duty inherent in the tort of negligent misrepresentation. Whether Wells Fargo exercised reasonable care in the context of the negligent-misrepresentation claim against it posed a question of fact that a jury was fully capable of deciding on its own, without the need for expert assistance. [FN9] As a result, we agree with Artisan that Wells Fargo was not entitled to summary judgment due to a lack of expert testimony.

### C. Failure to Read Insurance Policy

*4 [4] {¶ 17} Artisan next argues that its negligent-misrepresentation claims were not barred by its failure to read the insurance policy. We agree.

{¶ 18} While Ohio courts have held that insureds have a duty to read their insurance policies and that their failure to do so bars any claims regarding coverage or the contents of the policies,[FN10] we hold those cases to be factually distinguishable from the matter before us. Here, the entire basis for Artisan's negligent-misrepresentation claim against Wells Fargo was that Wells Fargo had told Artisan that there was an agreement with Burlington regarding the definition of "sales." Nothing in the policy addressed the word "sales" or contradicted the alleged agreement that Artisan claimed Wells Fargo had negligently misrepresented to have existed. Thus, we agree with Artisan that summary judgment on

this basis was inappropriate.

### D. Factual Representations

{¶ 19} Finally, we agree with Artisan that Wells Fargo was not entitled to summary judgment on the negligent-misrepresentation claim against it on the basis that Wells Fargo's representations were not actionable because (1) they were not representations of fact, but opinions on how to construe an insurance policy,[FN11] and (2) they were related to future events.[FN12]

[5] {¶ 20} Based upon our review of the record, we conclude that Artisan produced evidence showing that Wells Fargo had made very clear misrepresentations regarding whether an agreement existed with Burlington on how the term "sales" was to be defined. That was not an opinion on how a term might be interpreted, but was rather a clear, affirmative statement that an agreement existed at the time that the statement was made. Artisan did not allege that the misrepresentation by Wells Fargo related to whether Burlington would audit it. Because Artisan's negligent-misrepresentation claim was based on statements regarding the present existence of an agreement and the definition of the material term "sales," summary judgment for Wells Fargo was inappropriate on the grounds that it had only expressed opinions related to future events.

### IV. Well Fargo's Cross-Assignment of Error

[6] {¶ 21} Wells Fargo has raised one assignment of error that we address pursuant to App.R. 3(C)(2) and R.C. 2505.22.[FN13] Wells Fargo argues that it was not liable for Artisan's payment of the audited premium because Artisan had failed to provide Burlington with the necessary documentation that would have reduced the audited premium.[FN14] Wells Fargo contends that repeated requests were made to Artisan's agent of record, Neace Lukens, to provide an explanation for any dispute that Artisan had with the audit.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

{¶ 22} But based upon our review of the record, we are convinced that genuine issues of material fact remain on this issue. Artisan's agent, Gloria Davis, who had moved from Wells Fargo to Neace Lukens, testified that she had repeatedly requested information from both Wells Fargo, her former employer, and from CRC as to the four price points to be included within the definition of sales, that the requests were appropriate because she had been permitted to bring the Artisan file to Neace Lukens after leaving Wells Fargo's employ, but that both CRC and Wells Fargo had refused to cooperate with her efforts to obtain the information for Artisan. As a result, we overrule Wells Fargo's cross-assignment of error.

### V. Conclusion

*5 {¶ 23} In conclusion, we sustain Artisan's assignment of error regarding the trial court's entry of summary judgment for Wells Fargo on the claim of negligent misrepresentation, but we affirm the trial court's entry of summary judgment to CRC on Artisan's negligent-misrepresentation claim against it. This case is remanded to the trial court for further proceedings on the negligent-misrepresentation claim against Wells Fargo consistent with this decision and the law.

Judgment affirmed in part and reversed in part, and cause remanded.
JUDGMENT AFFIRMED IN PART AND REVERSED IN PART, AND CAUSE REMANDED.
HENDON, P.J., concurs.
CUNNINGHAM, J., concurs in part and dissents in part.
HENDON, P.J., CONCURS.CUNNINGHAM, J., CONCURS IN PART AND DISSENTS IN PART.
CUNNINGHAM, Judge, concurring in part and dissenting in part.
{¶ 24} I agree with my colleagues that CRC was entitled to summary judgment on Artisan's negligent-misrepresentation claim, but for a different reason than the one advanced by the majority. And I would affirm the trial court's entry of summary

judgment for both Wells Fargo and CRC on the basis that Artisan failed to show that there was a genuine issue of material fact for a jury to consider on the existence of the necessary elements of its negligent-misrepresentation claim against each of them.

{¶ 25} Artisan's negligent-misrepresentation claim was based upon 3 Restatement of the Law 2d, Torts (1965), Section 552, which the Ohio Supreme Court adopted in *Haddon View Invest. Co. v. Coopers & Lybrand.*[FN15] That section provides the following:

{¶ 26} "One who in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." [FN16]

{¶ 27} The majority holds that CRC was entitled to summary judgment on Artisan's negligent-misrepresentation claim because it was not in privity of contract with Artisan, based upon this court's holding in *Trustcorp. Mtge. Co. v. Zajac.*[FN17] But privity of contract is not a prerequisite to liability under Section 552. In *Corporex Dev. & Constr. Mgt. Inc. v. Shook, Inc.,* the Ohio Supreme Court clarified that liability imposed under this section is "based exclusively upon the pre-existing duty in tort and not upon any terms of a contract or rights accompanying privity." [FN18] Thus, " *Corporex* makes clear that although tort claims are generally barred by the economic-loss doctrine, the discrete tort generally referred to as negligent misrepresentation is not." [FN19] And while a number of courts have held that negligence claims by insureds against their insurance brokers for failure to produce coverage were barred by the economic-loss doctrine, they have also held that negligent-misrepresentations claims against the brokers were not. [FN20]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*6 {¶ 28} Here, Artisan asserted negligent-misrepresentation claims against insurance brokers CRC and Wells Fargo. Since the Ohio Supreme Court has recognized that the economic-loss doctrine does not apply to such claims, I cannot agree with that part of the majority opinion that upholds the summary judgment entered for CRC on the basis that Artisan's claim for negligent misrepresentation was barred by the economic-loss doctrine.

{¶ 29} I also disagree with the majority's conclusion that Artisan presented sufficient evidence to withstand Wells Fargo's motion for summary judgment. As I have stated earlier, I would affirm the trial court's entry of summary judgment to both Wells Fargo and CRC on the basis that Artisan failed to show that there were genuine issues of material fact for a jury to consider on the existence of the necessary elements of its negligent-misrepresentation claim asserted against each of them.

{¶ 30} One of those elements is a misrepresentation of a material fact. Artisan failed to produce evidence that the claimed misrepresentations by Wells Fargo and CRC concerned a past or present fact. Ohio courts, including this one, have held that a promise of future conduct is not a statement of fact capable of supporting a claim for fraudulent or negligent misrepresentation. FN21

{¶ 31} Here, Artisan only identified misrepresentations that were made by Wells Fargo and CRC concerning how Burlington was to calculate the premium in a future audit. Under the express terms of Artisan's insurance policy with Burlington, the audit would not occur until the expiration of the policy. Thus, any agreement or understanding regarding how sales would be defined in that future audit necessarily related to a future event, not to an existing or past fact.

{¶ 32} Finally, Artisan failed to present any evidence that it justifiably relied on any misrepresentations that were made about the definition of the term "sales" in the insurance policy.FN22 Abbe

Sexton, Artisan's owner, admitted during her deposition that she had received the insurance policy, read the contract, and expressly noted to Wells Fargo that the policy did not contain the limitation on the definition of sales that had been previously discussed. She asked Wells Fargo to obtain a letter from Burlington that clarified the definition. When no letter was forthcoming, she nonetheless bound the insurance and accepted the policy without that written commitment.

{¶ 33} Furthermore, when Wells Fargo delivered the insurance policy to Artisan, it provided a cover letter to Artisan that described an adjustable rate for the policy. The policy itself contained a deposit-rate endorsement that clearly stated that the $30,000 premium was a "deposit only premium" and that, "[u]pon expiration of the policy, we will compute the earned premium by applying to the composite rate shown above the actual amount of the exposure units as developed by final audit divided by the number shown in the Exposure Description." Despite this language, Artisan accepted the policy and did not cancel.

*7 {¶ 34} Because Artisan failed to identify a genuine issue of material fact as to the essential elements of its negligent-misrepresentation claims, I would affirm the trial court's entry of summary judgment to CRC and Wells Fargo on this basis.

FN1. *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 364 N.E.2d 267.

FN2. *Trustcorp Mtge. Co. v. Zajac,* 1st Dist. No. C-060119, 2006-Ohio-6621, 2006 WL 3690299, at ¶ 36; see also *Caruso v. Natl. City Mtge. Co.,* 1st Dist. No. C-090433, 187 Ohio App.3d 329, 2010-Ohio-1878, 931 N.E.2d 1167, at ¶ 12 .

FN3. See *Thompson v. Ohio Fuel Gas Co.* (1967), 9 Ohio St.2d 116, 118, 38 O.O.2d 294, 224 N.E.2d 131, quoting 2 Harper &

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

James, Law of Torts (1986) 966, Section 17.1.

FN4. 5th Dist. No. 2006 CA 00092, 2007-Ohio-708, 2007 WL 520316.

FN5. Id. at ¶ 63.

FN6. 10th Dist. No. 07AP-433, 2007-Ohio-6602, 2007 WL 4305718.

FN7. Id. at ¶ 23.

FN8. Id.

FN9. *C & R, Inc. v. Liberty Mut. Fire Ins. Co.*, 10th Dist. No. 07AP-633, 2008-Ohio-947, 2008 WL 600147, at ¶ 20.

FN10. See, e.g., *Roberts v. Maichl*, 1st Dist. No. C-040002, 2004-Ohio-4665, 2004 WL 1948718, at ¶ 18; *Rose v. Landen*, 12th Dist. No. CA2004-06-066, 2005-Ohio-1623, 2005 WL 752431, at ¶ 16.

FN11. *Indiana Ins. Co. v. Midwest Maintenance* (S.D.Ohio 2001), 174 F.Supp.2d 678, 681.

FN12. *Kondrat v. Morris* (1997), 118 Ohio App.3d 198, 207, 692 N.E.2d 246.

FN13. See *Cincinnati Gas & Elec. Co. v. Joseph Chevrolet*, 153 Ohio App.3d 95, 2003-Ohio-1367, 791 N.E.2d 1016, at ¶ 12.

FN14. See *Craggett v. Adell Ins. Agency* (1993), 92 Ohio App.3d 443, 453, 635 N.E.2d 1326.

FN15. (1982), 70 Ohio St.2d 154, 24 O.O.3d 268, 436 N.E.2d 212.

FN16. See id. at 214, fn. 3.

FN17. *Trustcorp*, 2006-Ohio-6621, 2006

WL 3690299, at ¶ 1 and 6.

FN18. 106 Ohio St.3d 412, 2005-Ohio-5409, 835 N.E.2d 701, at ¶ 9; see also *McCarthy, Lebit, Crystal & Haiman Co. L.P.A. v. First Union Mgt., Inc.* (1993), 87 Ohio App.3d 613, 631, 622 N.E.2d 1093 (holding that "[a]doption of the 'economic loss' rule in *Floor Craft [ Floor Covering, Inc. v. Parma Community Gen. Hosp. Assn.* (1990), 54 Ohio St.3d 1, 3, 560 N.E.2d 206,] does not necessarily preclude recovery in the instant case since Section 552 specifically provides that damages are recoverable for negligent misrepresentation made by those who have a pecuniary interest in a transaction").

FN19. See *J.F. Meskill Ent., L.L.C. v. Acuity* (2006), N.D.Ohio No. 05-CV-2955, 2006 WL 903207; see also *HDM Flugservice v. Parker Hannifin Corp.* (C.A.6, 2003), 332 F.3d 1025, 1032; *Long v. Time Ins. Co.* (S.D.Ohio 2008), 572 F.Supp.2d 907, 912; *Potts v. Safeco Ins. Co.*, 5th Dist. No. 2009 CA 0083, 2010-Ohio-2042, 2010 WL 1839738, at ¶ 21.

FN20. *Potts* at ¶ 25.

FN21. See *Schuster Elec. Co. v. Hamilton Cty. Stores, Inc.* (1939), 61 Ohio App. 331, 334-335, 15 O.O. 222, 22 N.E.2d 582; *Tibbs v. Natl. Homes Constr. Corp.* (1977), 52 Ohio App.2d 281, 287, 6 O.O.3d 300, 369 N.E.2d 1218; *Williams v. Edwards* (1998), 129 Ohio App.3d 116, 124, 717 N.E.2d 368; *Telxon Corp. v. Smart Media of Delaware*, 9th Dist. Nos. 22098 and 22099, 2005-Ohio-4931, 2005 WL 2292800, at ¶ 33; *Isaac v. Alabanza Corp.*, 7th Dist. No. 05 JE 55, 2007-Ohio-1396, 2007 WL 901596, at ¶ 55.

FN22. See, e.g., *Trepp L.L.C. v. Lighthouse Commercial Mtge., Inc.*, 10th Dist.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- N.E.2d ----, 2010 WL 2680330 (Ohio App. 1 Dist.), 2010 -Ohio- 3142
(Cite as: 2010 WL 2680330 (Ohio App. 1 Dist.))

Nos. 09AP-597 and 09AP-850, 2010-Ohio-1820, 2010 WL 1664901, at ¶ 19-23.

Ohio App. 1 Dist.,2010.
Burlington Ins. Co. v. Artisan Mechanical, Inc.
--- N.E.2d ----, 2010 WL 2680330 (Ohio App. 1 Dist.), 2010 -Ohio- 3142

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw. Case: 1:08-cv-02755-DCN Doc #: 54-1 Filed: 09/30/10 24 of 126. PageID #: 931

Page 1

Not Reported in F.Supp.2d, 2008 WL 641557 (S.D.Ohio)
(Cite as: 2008 WL 641557 (S.D.Ohio))

C

Only the Westlaw citation is currently available.

United States District Court,
S.D. Ohio,
Western Division.
H. Keith COMBS, Individually and on behalf of all
others similarly situated, Plaintiffs,
v.
CROWN LIFE INSURANCE, et al., Defendants.
No. 1:07-CV-00151.

March 4, 2008.

Gregory Kent Pratt, The Pratt Law Practice LLC,
Middletown, OH, John Michael Levy, Nicole Marie
Lundrigan, Richard Stuart Wayne, Thomas P. Glass
, Strauss & Troy, Cincinnati, OH, for Plaintiffs.

Michael Wesley Hawkins, Michael Jay Newman,
Dinsmore & Shohl, Cincinnati, OH, Raul A.
Cuervo, Waldemar J. Pflepsen, Jr., Jorden Burt
LLP, Washington, DC, for Defendants.

## OPINION AND ORDER

S. ARTHUR SPIEGEL, Senior District Judge.

*1 This matter is before the Court on Defendants'
Motion to Dismiss Amended Class Action Com-
plaint (doc. 44), Plaintiff's Memorandum in Oppos-
ition (doc. 50), and Defendants' Reply (doc. 54).
The Court held a hearing on this matter on February
28, 2008. For the reasons indicated herein, the
Court DENIES Defendants' Motion in all respects.

## I. Background

This case involves a dispute over the life insurance
coverage of a policy Defendant Crown Life Insur-
ance Company ("Crown") [FN1] sold to Plaintiff in
1986 (doc. 44). After Defendant life insurance com-
pany issued the policy, it sent Plaintiff annual re-
ports listing coverage termination dates based on
projected future values (Id.). For fourteen years the
reports were accurate, but starting in 2001 Crown
allegedly sent five annual reports with inaccurate
projected coverage termination dates as it did not
take into consideration the cost of additional cover-
age attached to the policy in the form of "riders" (
Id.). Defendants blame the inaccurate numbers on a
computer glitch, while Plaintiff argues Defendants
knew about the problem and kept sending out the
wrong numbers nonetheless, thus misleading him
and inducing him to maintain Defendants' life in-
surance products (docs.37, 44). In 2005, Defend-
ants informed policyholders that the coverage date
it had reported was inaccurate, and that policyhold-
ers would have to pay additional premiums to main-
tain coverage through such date (doc. 37). Plaintiff
brings claims on behalf of himself and other simil-
arly-situated policyholders for 1) breach of con-
tract, 2) fraud, 3) negligent misrepresentation, 4)
breach of fiduciary duties, and 5) declaratory and
injunctive relief (Id.). Defendants bring their Mo-
tion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6)
and 9(b), arguing that Plaintiff has failed to state a
claim upon which relief can be granted as to all of
his claims, and has failed to plead his claim for
fraud with particularity (doc. 44). Defendants fur-
ther argue that Plaintiff's claims for fraud, negligent
misrepresentation, and breach of fiduciary duty are
barred by the economic loss doctrine (Id.).

> FN1. Defendants Canada Life Assurance
> Company and Canada Life Insurance Com-
> pany of America purchased Crown in
> 1999, thus succeeding to Crown's contracts
> and liabilities. The Court will refer to De-
> fendants collectively as "Crown." The
> Court will also refer to "Plaintiff" in the
> singular, because as of yet, no class has
> been certified in this matter.

## II. Defendants' Motion to Dismiss

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 641557 (S.D.Ohio)
(Cite as: 2008 WL 641557 (S.D.Ohio))

## A. The Applicable Standards

A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) requires the Court to determine whether a cognizable claim has been pleaded in the complaint. The basic federal pleading requirement is contained in Fed.R.Civ.P. 8(a), which requires that a pleading "contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." *Westlake v. Lucas,* 537 F.2d 857, 858 (6th Cir.1976). In its scrutiny of the complaint, the Court must construe all well-pleaded facts liberally in favor of the party opposing the motion. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Rule 8(a)(2) operates to provide the defendant with "fair notice of what plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). A court examines a complaint in light of the objectives of Rule 8 using the standard articulated in *Jones v. Sherrill,* 827 F.2d 1102, 1103 (6th Cir.1987):

> *2 In reviewing a dismissal under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint. *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir.1983), *cert. denied,* 469 U.S. 826, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984). The motion to dismiss must be denied unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle her to relief. *Id.* at 158; *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

*Jones,* 824 F.2d at 1103.

The admonishment to construe the plaintiff's claim liberally when evaluating a motion to dismiss does not relieve a plaintiff of his obligation to satisfy federal notice pleading requirements and allege more than bare assertions of legal conclusions. Wright, Miller & Cooper, Federal Practice and Procedure: § 1357 at 596 (1969). "In practice, a complaint ... must contain either direct or inferential allegations respecting all of the material elements [in

order] to sustain a recovery under some viable legal theory." *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir.1984), *quoting In Re: Plywood Antitrust Litigation,* 655 F.2d 627, 641 (5th Cir.1981); Wright, Miller & Cooper, Federal Practice and Procedure, § 1216 at 121-23 (1969). The United States Court of Appeals for the Sixth Circuit clarified the threshold set for a Rule 12(b)(6) dismissal:

> [W]e are not holding the pleader to an impossibly high standard; we recognize the policies behind Rule 8 and the concept of notice pleading. A plaintiff will not be thrown out of court for failing to plead facts in support of every arcane element of his claim. But when a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist.

*Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 437 (6th Cir.1988).

A motion to dismiss for failure to plead fraud with particularity is governed by Fed.R.Civ.P. 9(b), which requires that averments of fraud must be stated with particularity. The Sixth Circuit reads this rule liberally, however, requiring a plaintiff, at a minimum, to "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey v. Foamex L.P.,* 2 F.3d 157, 161-62 (6th Cir.1993) (*quoting Ballan v. Upjohn Co.,* 814 F.Supp. 1375, 1385 (W.D.Mich.1992)). However, "allegations of fraudulent misrepresentation must be made with sufficient particularlity and with sufficient factual basis to support an inference that they were knowingly made." *Id.* The threshold test is whether the Complaint places the defendant on "sufficient notice of the misrepresentation," allowing the defendants to "answer, addressing in an informed way plaintiff's claim of fraud." *Brewer v. Monsanto Corp.,* 644 F.Supp. 1267, 1273 (M.D.Tenn.1986).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 641557 (S.D.Ohio)
(Cite as: 2008 WL 641557 (S.D.Ohio))

**B. Plaintiff's Contract Claims**

**1. Defendants' Motion**

**\*3** Defendants argued at the hearing and in their motion that Plaintiff has failed to allege the existence of a binding contract to provide coverage termination dates contained in the inaccurate reports because 1) according to terms of the policy, the inaccurate reports cannot be considered part of the insurance contract that states on its face that the policy and attached application papers constitutes the entire contract, 2) the inaccurate reports are not incorporated by reference into the insurance contract, which merely requires the company to send an annual report, but which does not make the contents of such reports part of the contract, 3) the inaccurate reports cannot otherwise be used to supplement or alter the contract of insurance (doc. 44). Second, Defendants argue that Plaintiff has failed to allege the terms of a contract to provide coverage through a guaranteed date, and such failure to allege such terms with specificity is fatal to the contract claims (*Id.*). Defendants argue third that Plaintiff's claim for breach of the Annual Report Provision of the policy is nothing more than a reiteration of his claims for misrepresentation (*Id.*).

**2. Plaintiff's Response**

Plaintiff argues in Response that his Complaint need only provide Defendants with fair notice of his claim, and as such, should not be dismissed under Rule 12(b)(6) (doc. 50). Plaintiff argues he states a claim for breach of contract because Crown failed to provide the coverage it promised and failed to provide accurate annual reports (*Id.*). Plaintiff argues even if the annual reports are not considered part of the contract, Defendants failed to provide true and accurate annual reports, which in Plaintiff's view is a breach of the duty to provide annual reports (*Id.*). Plaintiff further argues that the question of which documents constitute the contract cannot be resolved in a motion to dismiss, as this is a question of fact to be resolved by a jury (*Id.*).

Plaintiff next argues that the insurance policy is ambiguous, and the ambiguity cannot be resolved in a motion to dismiss (*Id.*). Plaintiff argues the ambiguity is that policy requires an examination of annual reports and refers to "guaranteed policy values" (*Id.*). In Plaintiff's view, the annual report is the only document where Defendants provide "guaranteed policy values" referred to in the policy (*Id.*). As such, the contract is missing an essential term-the duration of the obligation, and Plaintiff argues parol evidence is admissible so the Court can construe the ambiguity or missing term (*Id.*). Plaintiff argues the Court should follow its holding in *Gallenstein Bros. Inc. v. General Accident Insurance Company,* 178 F.Supp.2d 907 (S.D.Ohio, 2001) in which the Court looked outside the four corners of the policy to determine coverage, and do the same here in interpreting the contract (*Id.*).

**3. Defendants' Reply**

Defendants argued at the hearing and in their Reply that Plaintiff has continued to receive the benefits of the policy through the present day, and that Defendants worked to correct the computer error and notified Plaintiff of it (doc. 54). Defendants argue that Plaintiff therefore suffered no injury, and that Defendants acted in good faith (*Id.*). Defendants argue the policy contains an unambiguous termination provision stating that the policy will terminate 1) upon the insured's written request, 2) at the end of the grace period, 3) on the death of the insured, or 4) on the maturity date (*Id.*). The "grace period" provision states that coverage under the Policy will terminate without value, following a grace period, if the policy's net cash value will not cover the monthly deduction for the following month (*Id.*). Defendants argue there is no ambiguity to such provision (*Id.*).

**\*4** Defendants next argue that *Gallenstein* is inapplicable, because in that case the Court relied on parole evidence created during the creation of the policy, as opposed to the annual reports in this case, sent years after the parties signed the contract (*Id.*).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 641557 (S.D.Ohio)
(Cite as: 2008 WL 641557 (S.D.Ohio))

Defendants also argue that Plaintiff's alleged failure to specify the dates relating to the guarantees begs the question as to whether his claim is ripe for judicial review (*Id.*).

### 4. Plaintiff's Complaint in Contract Survives

Having reviewed this matter, the Court finds Plaintiff has sufficiently pleaded a claim for breach of contract. Defendants admit that Crown provided Plaintiff with inaccurate reports for some five years, and the reports are clearly a material term required by the contract. In the Court's view, the contract required Crown to provide accurate annual reports, and Crown did not. The Court further finds it premature to rule on whether the annual reports constitute a part of the contract, as the contract terms requiring an examination of annual reports and referring to "guaranteed policy values" can be viewed in conflict with other terms relating to termination of the contract. As such, the Court finds adequate ambiguity such that the factual question of whether the annual reports are part of the contract is appropriate for a jury. *Dick Sherman Disposal Co., Inc. v. Village Square Apartments,* No. CA-3195, 1986 Ohio App. LEXIS 8937, *1, *6 (Ct.App.Ohio, October 30, 1986). For these reasons, Plaintiff's contract claims survive Defendants' motion to dismiss.

### C. Plaintiff's Fraud and Negligent Representation Claims

### 1. Defendants' Motion

As for Plaintiff's fraud and negligent representation claims, Defendants argue Plaintiff fails to plead the essential elements (doc. 44). Under Ohio law, the essential elements for a fraud claim are 1) a false representation concerning a fact material to the transaction, 2) knowledge of the falsity, or such utter disregard as to warrant an inference of knowledge, 3) intent to induce reliance, 4) justifiable reliance, and 5) injury proximately caused by the reliance (*Id. citing Russ v. TRW, Inc.,* 59 Ohio St.3d 42, 570 N.E.2d 1076, 1083 (Ohio 1991)). Defendants argue the essential elements for negligent misrepresentation are sufficiently similar under the Restatement to warrant discussing them alongside the elements of fraud (*Id.*). Specifically, Defendants argue Plaintiff cannot allege the requisite "justifiable reliance" on the inaccurate reports so as to state a claim for either fraud or negligent misrepresentation (*Id.*). Defendants contend that because Plaintiff received accurate termination dates in the annual reports from 1997 when he initiated a material change in the amount of the planned premium, until March 31, 2001, the date on which the first of the inaccurate reports was issued, Plaintiff had more than sufficient reason to doubt and question the accuracy of the substantially different projected coverage termination dates contained in the inaccurate reports (*Id.*).

**\*5** Defendants further argue that Plaintiff fails to plead fraud with particularity under Fed.R.Civ.P. 9(b), because Plaintiff failed to allege justifiable reliance, and fails to allege with particularity the content of the representations, that is, what the dates through which coverage was guaranteed (*Id.*).

### 2. Plaintiff's Response

Plaintiff argues he properly alleges justifiable reliance and therefore has pled the essential elements of fraud and negligent misrepresentation (doc. 50). Plaintiff argues Defendants' position is that Plaintiff should have doubted the accuracy of Defendants' own statements, and that in any event, whether a party's reliance is justifiable is a question of fact for the jury (*Id.*).

Plaintiff further argues the Complaint satisfies the particularity requirements of Rule 9(b) as it alleges the time and place of the misrepresentation (in the annual report), the content of the misrepresentation (the guaranteed coverage that would be provided and also the accounting for the riders), that Defendants knew of the falsity of their representations, and that Plaintiff suffered an injury (*Id.*). Plaintiff ar-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

gues he does not need to aver a specific date through which coverage was falsely guaranteed, as he alleged specifically that the annual reports omitted or falsely represented that Defendants were deducting the cost of the riders from the accumulation value of Plaintiff's policy (Id.). Moreover, he argues that the exact time period of coverage varies for each member of the class, but that he did allege that Defendants shortened the coverage it had previously guaranteed by several months or even years (Id.).

**3. Defendants' Reply**

In their Reply Defendants reiterate their position that Plaintiff was unjustified to rely on the inaccurate reports based on the fact that he had received accurate reports and should have doubted and questioned the inconsistent fifteenth report (doc. 54). Defendants also reiterate in their view that Plaintiff has failed to plead fraud with particularity as he had not specified the precise date through which Crown had indicated Plaintiff had insurance coverage in the inaccurate report (Id.).

**4. Plaintiff's Fraud and Misrepresentation Claims Survive**

Having reviewed the question of the viability of Plaintiff's fraud and misrepresentation claims, the Court concludes he has adequately pleaded such claims. The Amended Complaint alleges that as early as June 2003 Crown knew that the figures it provided in the "Continuation of Insurance" section contained in its annual reports was incorrect, but that it failed to disclose such information for almost two years (doc. 37). Such allegation is sufficient, in the Court's view, to show Defendants made a false representation of a material fact so as to induce the Plaintiff and other similarly-situated policy holders to maintain their coverage with Crown. Plaintiff alleges he relied on the representations in the annual reports as the only source of information as to when the policy would expire (doc. 37). The Court finds

that an insured should be able to justifiably rely on reports an insurance company provides as to the duration of his policy with the company. As a result of his reliance in this instance, the Complaint alleges, Plaintiff must spend over $5,000 above the planned premiums to maintain the coverage through the dates originally reported by Defendants (Id.). Under these circumstances, the Court finds no basis to dismiss Plaintiff's fraud and misrepresentation claims for failure to state a claim.

*6 The Court further finds well-taken Plaintiff's position that he stated his claim with adequate particularity to withstand Defendants' Rule 9(b) challenge. Plaintiff clearly pleaded that Crown made a false representation at the time it issued the annual reports, over a five year period, and has pleaded the nature of the representation, that Crown knew of the falsity of the representation, and that he suffered economic loss.

**D. Plaintiff's Claim for Breach of Fiduciary Duty**

**1. Defendants' Motion**

As for Plaintiff's claim for breach of fiduciary duty, Defendants argue the following essential elements must be plead, 1) the existence of a duty arising from a fiduciary relationship, 2) a failure to observe the duty, and 3) an injury resulting proximately therefrom. Defendants argue that under Ohio law, an insurance company does not have a fiduciary relationship with its customers (doc. 44). *citing Wodrich v. Farmers Ins. Of Columbus, Inc.,* No. 98 CA 103, 1999 WL 317448, at *26 (Ohio Ct.App. May 21, 1999)). Even if it can be alleged that such a relationship exists, Defendants argue Plaintiff has failed to allege the existence of a contract that obligated it to provide Plaintiff with guaranteed coverage until one of the unspecified projected coverage termination dates contained in the inaccurate reports (Id.). Moreover, argue Defendants, because its issuance of inaccurate reports was neither intentional nor related to the handling or payment of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

claims, Crown's actions cannot constitute a breach of fiduciary duty (*Id.*).

**2. Plaintiff's Response**

Plaintiff argues that *Wodrich* is inapplicable to the facts of this case and to the question of fiduciary duty, as it held that an insurance company does not have a duty to advance the political interests of its customers (doc. 50). Plaintiff argues that it is well-settled that an insurance company has a fiduciary duty toward an insured in carrying out its duties under the contract. (*Id. citing Red Head Brass, Inc. v. Buckeye Union Ins. Co.,* 135 Ohio App.3d 616, 632, 735 N.E.2d 48 (Ct.App.Ohio, 1999). Plaintiff argues he has adequately alleged Defendants breached their fiduciary duties by failing to perform in accordance with their contractual obligations and representation, and by engaging in dishonest and deceitful conduct with respect to its inclusion of rider premiums in the premium calculation and guarantees of coverage (*Id.*). Plaintiff argues Defendants' own documents show they knew of the calculation problem for at least two years and did nothing to fix it (*Id.*).

**3. Defendants' Reply**

Defendants argue that the authorities supporting the theory of a fiduciary duty between the insurer and insured go to the duty to act in good faith to accept reasonable settlements and in handling claims (doc. 54). Defendants argue there are no other extra-contractual duties, and as this case does not involve the settlement of a claim, fiduciary theory is inapplicable (*Id.*).

**4. Plaintiff's Claim for Breach of Fiduciary Duty Survives**

*7 The existence of a de facto fiduciary relationship is a question of fact and depends on the circumstances of the case. *Prudential Ins. Co. v. Eslick,* 586 F.Supp. 763, 766 (S.D.Ohio, 1984). The Court

finds it premature to rule on the existence of such a relationship in this case, absent further development of the evidence of the dealings between the parties. Inasmuch as Crown possessed knowledge for two years that it withheld from Plaintiff, it is not difficult to conclude it stood in an unequal position in relation to its policy holder. Plaintiff's allegations based on fiduciary theory are broad enough, therefore, to survive Defendants' preliminary challenge.

**E. Defendants' Invocation of the Economic Loss Doctrine**

Defendants further attack Plaintiff's claims for fraud, negligent misrepresentation, and breach of fiduciary duty under the theory that such claims are barred by the economic loss doctrine (doc. 44). Under such doctrine, a party cannot recover in tort for purely economic damages (*Id.*). Defendants argue that because Plaintiff has not alleged any non-economic harm, the claims should be dismissed as duplicative of Plaintiff's breach of contract claim ( *Id.*). Finally, Defendants argue that Plaintiff's claims for declaratory and injunctive relief should be dismissed as they are remedies and not causes of action (*Id.*).

Plaintiff contends that Defendants misapprehended the application of the economic loss doctrine because such doctrine applies to commercial settings, and not to a setting where consumers are presented with an adhesion boilerplate form contract (doc. 50). Plaintiff argues the doctrine normally bars negligence claims, but is inapplicable to negligent misrepresentation and fraud claims (*Id. citing Corporex Dev. & Constr. Mgmt v. Shook, Inc.,* 106 Ohio St.3d 412, 825 N.E.2d 701 (2005)(recognizing exception to the economic loss rule for negligent representation), and *Onyx Environmental Services, LLC v. Maison,* 407 F.Supp.2d 874, 879 (N.D.Ohio 2005)). Moreover, argues Plaintiff, the doctrine cannot bar his fiduciary duty claim, because such duty arises from the relationship between the parties and the common law, not from a contractual duty. In Reply, Defendants argue the economic loss

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 641557 (S.D.Ohio)
(Cite as: 2008 WL 641557 (S.D.Ohio))

doctrine does apply here because the exceptions Plaintiff cites only apply to those not in contractual privity with the party against whom the claim is brought (doc. 54).

The Court finds Defendants' contention mistaken that Plaintiffs have only requested relief that is duplicative of damages in contract. The Amended Complaint seeks "Judgment against Defendants for punitive damages" (doc. 37). The fact that Plaintiff has pleaded punitive damages, in the Court's view, precludes Defendants' invocation of the economic loss doctrine.

**F. Final Matters.**

As a final matter, Defendants argue Plaintiff has failed to state a claim for declaratory and injunctive relief, because these claims are remedies and not causes of action (doc. 44, *citing Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 92 (6th Cir.1997). Plaintiff argues in response that Defendants' form over substance argument should be rejected, and that nothing precludes the application of such remedies to the other causes of action he has pled (doc. 50). In the alternative, Plaintiff argues the Complaint states claims for declaratory and injunctive relief, because such actions are permitted with respect to the construction and interpretation of contracts (*Id.* citing Ohio Rev.Code § 2721.04).

*8 The Court finds Plaintiff's position well-taken that should he prevail on any of his causes of action, he may very well be entitled to declaratory and/or injunctive relief. Therefore, though the Court "notes the technical accuracy of the distinction identified" by the Defendants, the dismissal of such claims would "elevate form over substance." *Ripple Junction Design Co. v. Olaes Enterprises, Inc.*, No. 05-CV-0043, 2005 U.S. Dist. LEXIS 32866 *1, *14, 2005 WL 2206220 (S.D.Ohio, September 8, 2005)(J. Beckwith).

As a final matter, the Court also notes that Defendants argue that Plaintiff has misstated the standard for dismissal under Rule 12(b)(6), in relying heavily on the "no set of facts" language employed in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (doc. 54). Defendants invoke the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly,* ---U.S. ----, ----, 127 S.Ct. 1955, 1969, 167 L.Ed.2d 929 (2007), in which it stated the phrase "no set of facts," is "best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Defendants argue Plaintiff's Complaint fails to rise above the speculative level, and thus runs afoul of *Bell Atlantic v. Twombly (Id.).*

The Court is unconvinced that even if such a heightened standard is applicable to the facts of this case, Plaintiff's Complaint fails to rise above the level of speculation. Moreover, the Court notes that after the Supreme Court issued the *Bell Atlantic* decision, it reaffirmed that Rule 8(a) "requires only a short and plain statement of the claim showing that the pleader is entitled to relief." *Erikson v. Pardus,* 127 S.Ct. at 2200 (2007). Plaintiff has met such requirement.

**III. Conclusion**

For the reasons indicated herein, the Court concludes that Plaintiff's claims survive Defendants' various challenges as presented in their Motion to Dismiss. Accordingly, the Court DENIES Defendants' Motion to Dismiss Amended Class Action Complaint (doc. 44).

SO ORDERED.

S.D.Ohio,2008.
Combs v. Crown Life Ins.
Not Reported in F.Supp.2d, 2008 WL 641557 (S.D.Ohio)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw. Case: 1:08-cv-02755-DCN Doc #: 54-1 Filed: 09/30/10 31 of 126. PageID #: 938

Page 1

Not Reported in F.Supp.2d, 2007 WL 894833 (S.D.Ohio), 62 UCC Rep.Serv.2d 371
(Cite as: 2007 WL 894833 (S.D.Ohio))

▷

United States District Court,
S.D. Ohio,
Eastern Division.
NATIONAL MULCH AND SEED, INC., et al.,
Plaintiffs,
v.
REXIUS FOREST BY-PRODUCTS INC., d/b/a Rexius
Express Blowers, Defendant.
No. 2:02-cv-1288.

March 22, 2007.

Marion H. Little, Zeiger Tigges & Little LLP, Columbus, OH, for Plaintiff.

Frederick A. Batson, Tanya C. O'Neil, Gleaves Swearingen Potter & Scott LLP, Eugene, OR, Michael Roy Szolosi, Sr., McNamara and McNamara, Columbus, OH, for Defendant.

### MEMORANDUM OPINION AND ORDER

JOHN D. HOLSCHUH, United States District Judge.

*1 Plaintiff, National Mulch and Seed, Inc., ("National Mulch"),[FN1] brought this action alleging that certain trucks purchased from Defendant Rexius Forest By-Products, Inc., ("Rexius"), failed to perform as promised. Specifically, National Mulch asserts claims of breach of express warranty, negligent misrepresentation, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular purpose. This matter is before the Court on Rexius's three motions for partial summary judgment (R. at 73, 75, 88), on National Mulch's motion for partial summary judgment (R. at 87), and on Rexius's objection to certain evidence submitted by National Mulch. (R. at 92.)

> FN1. On December 8, 2004, Central Ohio Topsoil and Mulch, Inc., voluntarily dismissed its

claims against Defendant with prejudice. (R. at 61.)

### I. Background

In the middle to late part of 1999, Richard Fischer and Montford Will began discussing the possibility of starting a mulching and landscaping business. (Fischer Decl. ¶ 4, Feb. 13, 2006; Fischer Dep. 13-16.) After obtaining information regarding a similar business operated by Fischer's brother in Florida, Fischer and Will developed a business plan for the creation and operation of National Mulch in Ohio. (Fischer Dep. 13-30; Will Dep. 18-37.) Pursuant to this business plan, National Mulch contacted Rexius in November 1999 regarding the possibility of purchasing mulch-blowing trucks to be used in its mulching and landscaping business. (Fischer Decl. ¶ 5, Feb. 13, 2006.)

National Mulch contends that during negotiations regarding the purchase of Rexius's Express Blower 60 mulch-blowing trucks ("Express Blower," "EB-60," or "truck"), Rexius made various oral and written representations regarding the trucks' productivity, capability, and reliability. In particular, National Mulch alleges that Rexius made the following representations:

1. An Express Blower, using only one person, can blow 55 cubic yards per hour.

2. The Rexius Express Blower can be used effectively by only one person.

3. The Express Blower is trouble-free, of superior craftsmanship, economical to operate, and built and manufactured with high-quality material and workmanship.

4. The maintenance cost for the Rexius Express Blower is minimal.

5. As to National Mulch, the Rexius Express Blower would effectively die [sic] mulch.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894833 (S.D.Ohio), 62 UCC Rep.Serv.2d 37
(Cite as: 2007 WL 894833 (S.D.Ohio))

(Fischer Decl. ¶ 6, Feb. 13, 2006; Compl. ¶ 7.)

National Mulch contends that the representations made by Rexius induced it to purchase the mulch-blowing trucks from Rexius. (Fischer Decl. ¶¶ 4-7, Feb. 13, 2006.) National Mulch personnel, including Fischer, traveled to Oregon in late March 2000 to observe Rexius's plant and receive training on the operation of the trucks. (Fax from Rick Fischer to Denny Drennan (Mar. 19, 2000), Def.'s Mot. Part. Summ. J. Certain Claimed Damages Ex. 9.) On April 3, 2000, National Mulch agreed to purchase its first EB-60 truck. (*See* Fischer Dep. 152-53.) While in Oregon, Fischer, on behalf of National Mulch, and Denny Drennan, on behalf of Rexius, signed a "Sales Quote" setting forth various terms and conditions of the sale. (Fischer Dep. 137-38; Sales Quote, Apr. 3, 2000, O'Neil Decl. Ex. 4, Mar. 16, 2006.) The Sales Quote is two pages in length with the second page appearing on the reverse side of the first. (Fischer Dep. 137; Sales Quote, Apr. 3, 2000.) The first page includes the quantity, description, and price of the goods sold; the names and addresses of the parties; the signatures of Fischer and Drennan; and an indication at the bottom noting that there are terms and conditions of the agreement contained on the reverse side. (Sales Quote, Apr. 3, 2000.) The reverse side lists thirteen "ADDITIONAL TERMS AND CONDITIONS OF SALE." (*Id.*)

*2 Later, National Mulch agreed to purchase a second EB-60 truck. (Fischer Decl. ¶ 3, Feb. 13, 2006.) Rexius faxed a Sales Quote for this second truck, signed by Drennan, to National Mulch on May 20, 2000. (Fax from Denny Drennan to Rick Fischer (May 20, 2000), Def.'s Mot. Part. Summ. J. Certain Claimed Damages Ex. 59.) Although a copy of a Sales Quote signed by both parties with respect to the second purchase does not appear in the record, Fischer understood that the terms of the second sale and the forms used therewith were identical as National Mulch's first purchase. (Fischer Dep. 152-53.) Rexius appears to concur that the terms of the second sale were the same as the first. FN2

> FN2. The Court notes that National Mulch has repeatedly stated that it purchased its first EB-

60 truck "on or about Jan. 11, 2000, and a second vehicle on April 4, 2000." (*E.g.,* Pl.'s Mem. Contra Def.'s Mot. Partial Summ. J. Certain Claimed Damages 2 (citing Fischer Decl. ¶ 3, Feb. 13, 2006); Fischer Decl. ¶¶ 38-39, Feb. 13, 2006.) Even viewing the evidence before the Court in a light most favorable to National Mulch, the record cannot support this purported time line. National Mulch initially considered purchasing a model EB-90 truck. (Fischer Decl. ¶ 10, Feb. 13, 2006.) On January 11, 2000, Rexius faxed a Sales Quote for a model EB-90 truck to National Mulch. (Sales Quote, Jan. 11, 2000, Def.'s Mot. Partial Summ. J. Certain Claimed Damages Ex. 14.) This Sales Quote was signed by Rick Fischer (*see id.*), but the record does not reflect whether or not it was returned to Rexius. Regardless, as the January Sales Quote pertains to an EB-90, and neither party has ever claimed that National Mulch purchased this model, it does not appear that National Mulch purchased a truck from Rexius in January 2000.

> Instead, subsequent to receiving the Sales Quote for the EB-90, National Mulch decided to purchase a model EB-60 truck. Rexius says that it prepared the April 3, 2000 Sales Quote in conjunction with National Mulch's first EB-60 purchase and that both parties signed this Sales Quote the same day. Fischer admits that he signed this Sales Quote in Oregon. (Fischer Dep. 137-38.) Additionally, Fischer's testimony shows that the April purchase was National Mulch's first EB-60 purchase and that the second purchase came later that spring. During his deposition, Fischer agreed that National Mulch had owned its first truck for "a month, month and a half" at the time that it received the May 20, 2000 Sale Quote. (*Id.* at 152-53.)

National Mulch claims that the EB-60 trucks failed to meet the representations made by Rexius. Specifically, National Mulch contends that the EB-60 trucks could

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894833 (S.D.Ohio), 62 UCC Rep.Serv.2d 371
(Cite as: 2007 WL 894833 (S.D.Ohio))

not blow 55 cubic yards of mulch per hour on most jobs, that it could not effectively operate an EB-60 truck with only one person, that the EB-60 trucks could not effectively dye mulch, and that the EB-60 trucks suffered various mechanical problems. (Fischer Decl. ¶ 14, Feb. 13, 2000.) National Mulch contends that this lack of productivity and reliability caused a loss of profits and ultimately caused it to go out of business. ( *Id.* at ¶ 15-23.)

## II. Rexius's Objections to Evidence

Rexius has objected to certain evidence submitted by National Mulch. In support of its motion for partial summary judgment, National Mulch submitted the declarations of several other purchasers of mulch-blowing trucks from Rexius. Rexius argues that this evidence is not relevant at this stage of the litigation and, alternatively, that the probative value of such evidence is substantially outweighed by the risk of unfair prejudice.

National Mulch contends that the purpose of the disputed evidence is to support its claim that certain representations made by Rexius constitute express warranties. Rexius, however, does not deny that certain representations were made in connection with the sale of the EB-60 trucks to National Mulch and, as will be made clear *infra,* this Court has not relied upon this disputed evidence in resolving National Mulch's motion for partial summary judgment, nor any other dispositive motion. Rexius's objection is therefore moot.

## III. Motions for Partial Summary Judgment

### A. Standard

The parties have filed multiple motions for partial summary judgment. Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1). The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

[Summary judgment] ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

*3 Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is ... [and where] no genuine issue remains for trial, ... [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broad. Sys.,* 368 U.S. 464, 467 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.,* 321 U.S. 620, 627 (1944); *see also Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1347 (6th Cir.1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner,* 570 F.2d 107, 111 (6th Cir.1978). The court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986); *Weaver v. Shadoan,* 340 F.3d 398, 405 (6th Cir.2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law. *Leary v. Daeschner,* 349 F.3d 888, 897 (6th Cir.2003). All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986); *Wade v. Knoxville Util. Bd.,* 259 F.3d 452, 460 (6th Cir.2001). Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of *some* alleged factual dispute

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247-48. A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties." *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984); *see also Anderson,* 477 U.S. at 248. An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see also Leary,* 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322. The nonmoving party must demonstrate that "there is a genuine issue for trial," and it "cannot rest on her pleadings." *Hall v. Tollett,* 128 F.3d 418, 422 (6th Cir.1997).

*4 When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Anderson,* 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than]

some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Cos.,* 8 F.3d 335, 340 (6th Cir.1993). The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. *Anderson,* 477 U.S. at 251-52; *Lansing Dairy,* 39 F.3d at 1347.

## B. Choice of Law

A federal court exercising diversity jurisdiction is required to apply the choice of law rules of the state in which it sits. *Int'l Ins. Co. v. Stonewall Ins. Co.,* 86 F.3d 601, 604 (6th Cir.1996). Accordingly, Ohio's choice of law rules apply in this diversity case. In Ohio, the rights and duties of parties to a contract are determined by the law of the state that has "the most significant relationship to the transaction and the parties." *Ohayon v. Safeco Ins. Co. of Ill.,* 91 Ohio St.3d 474, 477 (2001) (quoting Restatement (Second) of Conflict of Laws § 188(1)).

National Mulch is a corporation organized under the laws of Ohio with its principal place of business in Ohio. (Compl.¶ 2.) Rexius is an Oregon corporation with its principal place of business in Oregon. (Notice Removal ¶ 2.) Although a conflict between Ohio law and the law of Oregon could possibly exist, neither party has identified any relevant conflict. Moreover, both National Mulch and Rexius have consistently relied upon Ohio law in their memoranda since this action's inception. Consequently, the Court need not engage in a choice of law analysis at this point, but will simply apply Ohio law. *See Wilkes Assocs. v. Hollander Indus. Corp.,* 144 F.Supp.2d 944, 949 n. 4 (S.D.Ohio 2001) (citing *ECHO, Inc. v.. Whitson Co.,* 52 F.3d 702, 707 (7th Cir.1995) ("Where neither party argues that the forum state's choice of law rules require the court to apply the substantive law of another state, the court should apply the forum state's substantive law.")). In any event, the parties appear to agree that Ohio law applies to the claims asserted in this case.

## C. Negligent Misrepresentation Claim

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894833 (S.D.Ohio), 62 UCC Rep.Serv.2d 371
(Cite as: 2007 WL 894833 (S.D.Ohio))

In Count II of the Complaint, National Mulch asserts a claim for negligent misrepresentation. The Supreme Court of Ohio first recognized this cause of action in *Haddon View Investment Co. v. Coopers & Lybrand,* 70 Ohio St.2d 154, 156 & n. 1 (1988). Adopting the Restatement (Second) of Torts § 552, the Supreme Court of Ohio has defined a claim for negligent misrepresentation as follows:

**\*5** One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Delman v. City of Cleveland Heights,* 41 Ohio St.3d 1, 4 (1989) (quotations, citations and emphasis omitted).

As a basis for its claim, National Mulch alleges that Rexius made the following representations:

a. The Rexius Express Blower, using only one person, can blow 55 cubic yards per hour.

b. The Rexius Express Blower could be used effectively by only one person.

c. The Rexius Express Blower was trouble-free, of superior craftsmanship, economical to operate, and built and manufactured with high quality material and workmanship.

d. The maintenance cost for the Rexius Express Blower was minimal.

e. As to National Mulch, the die [sic] feature of the Rexius Express Blower would effectively die [sic] mulch.

(Compl.¶ 14.) Rexius has moved for summary judgment arguing that National Mulch's negligent misrepresentation claim is without merit because: (1) it is barred by the economic loss rule, (2) National Mulch has failed to establish the existence of a special relationship between

itself and Rexius, and (3) National Mulch's claim is impermissibly based, at least in part, on omissions of fact.

**1. Economic Loss Rule**

The economic loss rule generally prevents recovery of damages for purely economic loss in connection with a tort claim. *Corporex Dev. & Constr. Mgmt., Inc. v. Shook, Inc.,* 106 Ohio St.3d 412, 414 (2005); *Floor Craft Floor Coverings, Inc. v. Parma Cmty. Gen. Hosp. Ass'n,* 54 Ohio St.3d 1, 3 (1990). The Supreme Court of Ohio explained the reasoning behind the economic loss rule:

The reason for denying recovery in negligence for purely economic loss lies not in a failure to find "negligent" conduct by the manufacturer, nor in a lack of proximate relationship between that conduct and the consumer's injury. Rather, the key factor is the extent, and more important, the source, of the duty owed by the manufacturer to the consumer. In negligence, the law imposes upon the manufacturer of a product the duty of reasonable care. That duty protects the consumer from physical injury, whether to person or property. However the law of negligence does not extend the manufacturer's duty so far as to protect the consumer's economic expectations, for such protection would arise not under the law but rather solely by agreement between the parties.

*Chemtrol Adhesives, Inc. v. Am. Mfgs. Mut. Ins. Co.,* 42 Ohio St.3d 40, 45 (1989). The court later expounded upon this rationale by explaining that "[t]ort law is not designed ... to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement." *Floor Craft,* 54 Ohio St.3d at 7. Rexius argues that, under the economic loss rule, National Mulch cannot maintain a negligent representation action because economic losses are not recoverable in tort between commercial entities that have contracted with each other.

**\*6** Before deciding whether the economic loss rule applies, the Court must first determine the nature of the alleged losses resulting from Rexius's alleged negligent

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 1:08-cv-02755-DCN Doc #: 54-1 Filed: 09/30/10 36 of 126. PageID #: 943

Page 6
Not Reported in F.Supp.2d, 2007 WL 894833 (S.D.Ohio), 62 UCC Rep.Serv.2d 371
(Cite as: 2007 WL 894833 (S.D.Ohio))

misrepresentation. Damages are generally characterized as either personal injury, property damage, or economic loss. *E.g., HDM Flugservice GMBH v. Parker Hannifin Corp.*, 332 F.3d 1025, 1028 (6th Cir.2003); *Chemtrol,* 42 Ohio St.3d at 434. "Personal injury" involves, quite obviously, injury done to one's person. In an action involving the sale of goods, "property damage" includes damages to both the goods sold to the plaintiff and other property of the plaintiff. *E.g., Chemtrol,* 42 Ohio St.3d at 43. "Economic loss" includes both direct and indirect loss. *Id.* "Direct" economic loss includes the loss attributable to the decreased value of the product itself.[FN3] "Indirect" economic loss includes the consequential losses sustained by the purchaser and can include items such as loss of time and profits. *Id.* at 44.

> FN3. Direct loss is normally measured by the difference in value of a defective product and that product's value had it not been defective. *E.g., Chemtrol,* 42 Ohio St.3d at 43.

National Mulch alleges that reliance upon misrepresentations made by Rexius caused the complete failure of its business. Precisely, National Mulch claims that it incurred damages in the form of substantial additional costs because the Rexius trucks did not perform as represented. These costs included, *inter alia,* expenses for repairs, tools, labor, interest, insurance, general maintenance, and the expense of purchasing the trucks themselves. (*See* Def.'s Mot. Partial Summ. J. Certain Claimed Damages Ex. 3; *see also* Fischer Decl. ¶¶ 27-32, Feb. 13, 2006.) All of the damages claimed by National Mulch are properly characterized as economic losses because they either relate to the value of the trucks or additional expenses, i.e., lost profits, incurred as a consequence of relying upon Rexius's alleged misrepresentations. As such, National Mulch's claim is without merit if the economic loss rule applies to the tort of negligent misrepresentation.

The Supreme Court of Ohio has yet to specifically address the economic loss rule in the context of a claim for negligent misrepresentation; however, several Ohio appellate courts have done so.[FN4] A majority of these courts have recognized that a claim for negligent misrepresentation is actionable even when the plaintiff's damages consist only of economic loss. *E.g., Universal Contracting Corp. v. Aug,* No. C-030719, 2004 WL 3015325, at *3 (Ohio App. 1st Dist. Dec. 30, 2004); *Ferro Corp. v. Blaw Knox Food & Chem. Equip. Co.,* 121 Ohio App.3d 434, 440-41 (1997); *McCarthy, Lebit, Crystal & Haiman Co. v. First Union Mgmt., Inc.,* 87 Ohio App.3d 613, 631-32 (1993). In *McCarthy, Lebit,* the court reasoned that application of the economic loss rule to a negligent misrepresentation claim directly contradicts the express wording of the cause of action of negligent misrepresentation as stated by the Supreme Court of Ohio in *Haddon View. McCarthy, Lebit,* 87 Ohio App.3d at 632. Under the tort of negligent misrepresentation, a person who supplies false information to others in breach of the common law duty not to do so is liable for "pecuniary loss" to them. *Id.* Because " 'pecuniary loss' is by its very definition 'economic loss,' " the economic loss rule cannot logically be applied to a negligent misrepresentation claim. *Id.*

> FN4. In diversity cases, federal courts must apply state law in accordance with controlling decisions of the highest state court, or, if the state's highest court has not spoken on a precise issue, on decisions of the state's lower courts. *E.g., Ziegler v. IBP Hog Mkt., Inc.,* 249 F.3d 509, 517 (6th Cir.2001); *see generally Erie R.R. v. Tompkins,* 304 U.S. 64 (1938).

*7 The Supreme Court of Ohio, although not directly addressing the issue, did provide some clarity regarding an action for negligent misrepresentation in *Corporex.* There, the plaintiff's negligence action was barred by the economic loss rule. *Corporex,* 106 Ohio St.3d at 415-16. In rejecting the plaintiff's argument that *Haddon View* applied to its case, the court stated that liability for negligent misrepresentation is based upon a duty in tort that preexists any contractual terms or rights accompanying privity. *See id.* at 415. "When a duty in tort exists, a party may recover in tort. When a duty is premised entirely upon the terms of a contract, a party may recover based upon breach of contract." *Id.* Thus, the critical determination is the source of the defendant's duty.

The Sixth Circuit, relying on *McCarthy, Lebit,* has spe-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894833 (S.D.Ohio), 62 UCC Rep.Serv.2d 371
(Cite as: 2007 WL 894833 (S.D.Ohio))

cifically stated that the economic loss rule does not apply to a claim of negligent misrepresentation. *HDM,* 332 F.3d at 1032. In *HDM,* an owner of a helicopter brought a claim, *inter alia,* of negligent misrepresentation against the manufacturer of the helicopter's landing gear after an accident. *Id.* at 1027. The court first discussed Ohio's economic loss rule at length and then applied the rule to the plaintiff's tort claims of strict liability and implied warranty, following "cautionary dicta" in *Chemtrol. Id.* at 1029-30. The court thereafter noted that it is incorrect to apply the economic loss rule to a negligent misrepresentation claim. *Id.* at 1032.

Rexius argues that the statement in *HDM* regarding negligent misrepresentation claims and the economic loss rule was dictum and should not control the decision in this case. Although the defendant in *HDM* may have ultimately agreed that the economic loss rule would not bar a negligent misrepresentation claim under Ohio law, the court initially noted that the defendant had originally sought summary judgment on the negligent misrepresentation claim because of a *mistaken* belief that the economic loss rule prohibits recovery for any type of tort claim. *Id.* The court then concluded that the plaintiff had *correctly responded* that the economic loss rule does not apply to claims for negligent misrepresentation. *Id.*

Rexius also argues that, in any event, *McCarthy, Lebit,* which was cited in *HDM* and relied upon by National Mulch, is not consistent with the Supreme Court of Ohio's holding in *Floor Craft* or subsequent decisions by the United States District Court for the Northern District of Ohio in *Trgo v. Chrysler Corp.,* 34 F.Supp.2d 581, 595 (N.D.Ohio 1998), and *Picker International, Inc. v. Mayo Foundation,* 6 F.Supp.2d 685, 688-89 (N.D.Ohio 1998).

This Court cannot conclude that *McCarthy, Lebit* is inconsistent with *Floor Craft.* In *Floor Craft,* the plaintiff flooring installation contractor asserted a claim against an architectural firm for negligence in its design specifications. *Floor Craft,* 54 Ohio St.3d at 2. It does not appear that the *Floor Craft* court directly addressed the application of the economic loss rule to a claim of negligent misrepresentation. Instead, the court held that in

the absence of privity, a party could not recover economic damages in tort. *Id.* at 8. Although the claim in *Floor Craft* against the architectural firm was for negligence, the court did briefly entertain the argument that *Haddon View* applied to the firm's design flaws. However, it settled the issue quickly and decided that the plaintiff could not rely upon *Haddon View* because the architects' services were extended to an unlimited number of persons who could possibly rely upon them. *Id.* at 7. The court never directly addressed whether the economic loss rule applied to a claim of negligent misrepresentation. Thus, *Floor Craft* stands for the general proposition that in the absence of privity between the parties, the economic loss rule bars recovery of economic losses in tort. *Id.* at 8.

**\*8** Consistent with this approach, *McCarthy, Lebit* recognizes that "[t]ort law is not designed ... to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement." *McCarthy, Lebit,* 87 Ohio App.3d at 630 (quoting *Floor Craft,* 54 Ohio St.3d at 7). The court in *McCarthy, Lebit,* however, also found that adoption of the economic loss rule in *Floor Craft* does not necessarily preclude recovery under a negligent misrepresentation claim. *Id.* at 631. The *McCarthy, Lebit* court decided that a plaintiff claiming only economic damages was not barred from asserting an action for negligent misrepresentation. This holding is not inconsistent with *Floor Craft;* the *McCarthy, Lebit* court recognized that an exception to the general rule from *Floor Craft* must logically exist based upon the elements of the tort of negligent misrepresentation as articulated in *Haddon View.*

Moreover, since *Floor Craft* and *McCarthy, Lebit,* the Ohio appellate courts have routinely allowed a negligent misrepresentation cause of action when damages are exclusively economic in nature. *See Universal Contracting; Three-C Body Shops, Inc. v. Welsh Ohio, LLC,* No. 02AP-523, 2003 WL 360958, 2003-Ohio-756 (Ohio App. 10th Dist. Feb. 20, 2003); *Ferro; Bowling Trans., Inc. v. Gregg,* 103 Ohio App.3d 539 (1995); *Lippy v. Society Nat'l Bank,* 100 Ohio App.3d 37 (1995) ; *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.,* 88 Ohio App.3d 73 (1993).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 1:08-cv-02755-DCN  Doc #: 54-1  Filed: 09/30/10  38 of 126.  PageID #: 945

This Court also finds Rexius's citations to *Picker* and *Trgo* unpersuasive. In *Picker,* the court stated that "[i]n Ohio it is well established that a party cannot bring a cause of action in tort (such as negligent misrepresentation) for economic losses." *Picker,* 6 F.Supp.2d at 688-89. This proposition was supported by citations to *Queen City Terminals, Inc. v. General American Transportation Corp.,* 73 Ohio St.3d 609, 614 (1995), and *Floor Craft.* However, neither of these decisions discussed negligent misrepresentation in their analysis of the economic loss rule. In any event, the court in *Picker* ultimately dismissed the negligent misrepresentation claim on other grounds.

Although *Trgo* involves facts that are somewhat similar to this case, the court's reasoning is unpersuasive. In *Trgo,* purchasers of a truck brought a diversity action against the manufacturer alleging *inter alia* negligent misrepresentation. The court concluded that the plaintiffs were "barred from pursuing the negligent misrepresentation claim by the economic loss doctrine." *Trgo,* 34 F.Supp.2d at 595. The authorities relied upon by the *Trgo* court, however, do not support this conclusion. The court first referred to *Chemtrol* and *Midwest Ford, Inc. v. C.T. Taylor Co.,* 118 Ohio App.3d 798, 801-05 (1997), in its discussion of the application of the economic loss rule to the plaintiffs' claim of tortious breach of warranty. *Trgo,* 34 F.Supp.2d at 594. Neither *Chemtrol* nor *Midwest Ford,* however, specifically addressed the application of the economic loss rule to claims of negligent misrepresentation.[FN5] *Trgo* also cited *Picker* in support of its conclusion. *Id.* at 595. However, as was discussed *supra, Picker* is unpersuasive on this issue. In addition, the Court notes that both *Picker* and *Trgo* were decided prior to HDM and *Corporex* and appear to be contrary to those decisions.[FN6]

> FN5. Rexius relies on both *Midwest Ford* and *Sun Refining & Marketing Co. v. Crosby Valve & Gage Co.,* 68 Ohio St.3d 397, 398 (1994), in support of its claim that commercial parties cannot recover for solely economic loss under Ohio law. Both *Midwest Ford* and *Sun Refining* are distinguishable from the present case because in those cases the economic loss rule was

applied to claims resulting from a defective product, not negligent misrepresentation claims.

> FN6. Rexius also directs the Court's attention to *Bailey Farms, Inc. v. Nor-Am Chemical Co.,* 27 F.3d 188 (6th Cir.1994), and asks the Court to follow that decision. In addition to being decided nearly ten years before *HDM, Bailey Farms* is predicated on Michigan's interpretation of the economic loss rule, not Ohio's.

*9 Finally, Rexius attempts to distinguish cases cited by National Mulch as not involving commercial entities engaged in the sale of goods. Ohio courts, as Rexius notes, have stated that the economic loss rule denies recovery of purely economic damages when a commercial buyer has remedies available under article 2 of the U.C.C. *See Sun Refining & Marketing Co. v. Crosby Valve & Gage Co.,* 68 Ohio St.3d 397, 398 (1994) (citing *Chemtrol); Chemtrol,* 42 Ohio St.3d at 51; *Graphic Enters., Inc. v. TAS Int'l, Inc.,* No.1999CA00085, 2000 Ohio App. LEXIS 961, at * 15 (5th Dist. Mar. 13, 2000) (citing *Chemtrol* ). However, each case stating this proposition involved a buyer claiming that the goods were either defective or nonconforming; none confronted the issue of whether the U.C.C. precluded a claim for negligent misrepresentation.[FN7]

> FN7. But, *See Universal Contracting,* 2004 WL 3015325, at *5, 2004-Ohio-7133 at ¶ 20, where the court stated that when parties have contracted with each other, "contract principles override the tort principles in Section 552, and economic damages are not recoverable except as provided in the contract or by the rules of contract interpretation." This proposition was supported by a Washington state case and one Ohio case, *Textron Financial Corp. v. Nationwide Mutual Insurance Co.,* 115 Ohio App.3d 137, 151 (1996). *Textron,* however, does not support barring recovery whenever the parties are related by privity. Consistent with *Corporex,* that case states that negligent representation will not lie for breaches of duties that are

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894833 (S.D.Ohio), 62 UCC Rep.Serv.2d 371
(Cite as: 2007 WL 894833 (S.D.Ohio))

created by contract. *Id.* The defendant's duty to supply accurate information to the plaintiff in *Universal Contracting* was a specific contractual term, and therefore did not arise in tort. *Universal Contracting,* 2004 WL 3015325, at *6, 2004-Ohio-7133 at ¶ 22. In light of *Corporex,* this Court does not believe that *Universal Contracting's* general rule prohibiting contracting parties from maintaining a claim for negligent misrepresentation accurately reflects the law of Ohio.

The primary concern of the economic loss rule is the source of the duty, i.e., whether the duty arises under tort law or from an agreement between the parties. *See Chemtrol,* 42 Ohio St.3d at 45. The U.C.C. provides remedies for breaches of contractual duties; but, as was discussed *supra,* a cause of action for negligent misrepresentation is based upon a duty arising under the common law of torts. Ohio law does not support Rexius's contention that National Mulch cannot assert a negligent misrepresentation claim simply because it also has remedies available under the U.C.C.

Thus, for the reasons stated, the Court does not believe that under Ohio law a negligent misrepresentation claim is barred by the economic loss rule. Summary judgment on this ground is therefore denied.

## 2. Special Relationship

Next, Rexius argues that National Mulch's negligent misrepresentation claim lacks merit because National Mulch has failed to establish a "special relationship" between itself and Rexius. National Mulch argues in response that it is not required to establish a special relationship to succeed on its negligent misrepresentation claim. This Court agrees that a special relationship is not a formal element of a negligent misrepresentation claim under Ohio law. Instead, as stated *supra,* in order to assert a negligent misrepresentation claim under Ohio law, a plaintiff must establish that the defendant supplied false information for the guidance of the plaintiff in its business transactions, that the plaintiff was justified in relying on the information, and that the

defendant failed to exercise reasonable care or competence in obtaining and/or communicating the information. *Delman,* 41 Ohio St.3d at 4.

To the extent Ohio courts discuss a special relationship in connection with a negligent misrepresentation claim, the discussion appears to be related to the requirement that a defendant supply false information for the guidance of the plaintiff in its business transactions.[FN8] The "for the guidance of" language directs the court's attention to the duty owed and serves to limit the class of potential plaintiffs. As explained by the Supreme Court of Ohio, liability for negligent misrepresentation is limited to "the person or one of a limited group of persons for whose benefit and guidance [the defendant] intends to supply the information or knows that the recipient intends to supply it." *Gutter v. Dow Jones, Inc.,* 22 Ohio St.3d 286, 288 (1986); *accord Haddon View,* 70 Ohio St.2d at 157 (not requiring any special relationship but limiting liability to misrepresentations made to a foreseeable class of persons). "A contrary result would in effect extend liability to all the world and not a *limited* class...." *Gutter,* 22 Ohio St.3d at 289.

> FN8. Rexius relies on *Picker* in support of its assertion that a special relationship is required. However, similar to Ohio courts addressing a "special relationship," the court in *Picker* specifically defined the "special relationship" as "the defendant suppl[ying] information to the plaintiff for the latter's guidance in its business transactions." *Picker,* 6 F.Supp.2d at 689. This is merely a reiteration of one of the elements of the cause of action for negligent misrepresentation.

*10 Understanding this, a person may not maintain an action for negligent misrepresentation when the alleged misrepresentation is intended to reach an extensive, unresolved class of persons. Representations made to the public-at-large cannot result in liability. *E.g., id.* (newspaper reader not a member of a limited group of persons intended to benefit from representation in newspaper); *Amann v. Clear Channel Commc'ns, Inc.,* 165 Ohio App.3d 291, 298-99 (2006) (radio station's general audience not a limited group); *Federated Mgmt. Co. v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 1:08-cv-02755-DCN Doc #: 54-1 Filed: 09/30/10 40 of 126. PageID #: 947

Page 10
Not Reported in F.Supp.2d, 2007 WL 894833 (S.D.Ohio), 62 UCC Rep.Serv.2d 371
(Cite as: 2007 WL 894833 (S.D.Ohio))

*Coopers & Lybrand*, 137 Ohio App.3d 366, 384-85 (2000) (investing public is an unlimited class of persons that cannot hold company's auditor liable for alleged negligent misrepresentations).

Conversely, liability may exist when the plaintiff is a person or member of a limited class of persons whom the defendant intends to benefit or guide with the information supplied. *See, e.g., Haddon View*, 70 Ohio St.2d at 157 (representation made to small group of limited partners); *Merrill v. William E. Ward Ins.*, 87 Ohio App.3d 583, 590-91 (1993) (beneficiaries of a life insurance policy were a foreseeable limited class intended to benefit from information supplied by insurance agent); *Sindel v. Toledo Edison Co.*, 87 Ohio App.3d 525, 528 (1993) (representation made to single customer of defendant electric company). All that is necessary is for " 'the maker of the representation [to] intend[ ] to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information.' " *Amann*, 165 Ohio App.3d at 299 (quoting Restatement (Second) of Torts § 552 cmt. h (1977)). Thus, National Mulch can prevail on its negligent misrepresentation claim only if the alleged misrepresentations were intended to benefit or guide a group of persons with a definable limit, and National Mulch was a member of that group.

The determination of whether the plaintiff is a member of a limited class of foreseeable persons is dependent upon the factual circumstances of the representations made and the relationship between the parties. *See id.* at 298. In this case, the alleged misrepresentations appear in marketing materials produced by Rexius. Certainly, the potential exists for these materials to be seen by a large, limitless group of people. However, it is undisputed that Rexius sent the materials directly to National Mulch via mail in response to the latter party's interest in the Rexius trucks. (Will Dep. 53-55; Def.'s Mem. Supp. Mot. Partial Summ. J. 3, R. at 88-2; *see* Pl.'s Mem. Contra Def.'s Mot. Partial Summ. J. Neg. Misrep. Exs. 3-4.) Further, National Mulch has put forth evidence that the alleged misrepresentations were made to it

orally as well. (Fischer Decl. ¶ 4, Dec. 30, 2005.)

Viewing the facts in a light most favorable to National Mulch, it cannot be said that as a matter of law National Mulch was a member of a faceless or unresolved class of persons. Instead, reasonable minds could conclude that National Mulch was a member of a limited class of foreseeable persons that might rely upon the representations made. The marketing materials and oral representations were specifically directed to National Mulch. Although the marketing materials could eventually be disseminated to an indefinite number of persons, these representations were intended to reach and influence particular persons: National Mulch and its principals.

*11 Rexius also argues, in essence, that under Ohio law a party to an "ordinary business transaction" cannot provide information to the other party for guidance in that transaction. In support, Rexius points to language in *Picker* that states that the "special circumstances" where a person supplies information to another for guidance in a business transactions does not exist when the relationship between the parties is nothing more than an ordinary business transaction.[FN9] *Picker*, 6 F.Supp.2d at 689 (citing *Haddon View*, 70 Ohio St.2d at 157; *Gutter*, 22 Ohio St.3d at 288-89). The Court does not believe that Ohio law supports this limitation. First, neither *Haddon View* nor *Gutter* announces such an exclusion either expressly or implicitly, and neither case involved a business transaction between the plaintiff and the defendant. Second, a broad rule like this seemingly contradicts the inclusion of liability for negligent misrepresentation when a person supplies false information "in *any* ... transaction in which he has a pecuniary interest." *Delman*, 41 Ohio St.3d at 4 (emphasis ad- ded).

> FN9. Other federal cases state the same proposition. *See Cuyahoga Metro. Hous. Auth. v. 10-8 Sys., Inc.*, No. 1:05-cv-0980, 2006 WL 543103, at *5 (N.D.Ohio Mar. 2, 2006) (relying exclusively on *Picker); Hayes v. Computer Assocs. Intern, Inc.*, No. 3:02-cv-7452, 2003 WL 21478930, at *6-7 (N.D. Ohio June 24, 2003) (relying exclusively on *Picker; Bank One v. Fin. Ventures, LLC*, No. C2-01-0049, 2002 WL

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11
Not Reported in F.Supp.2d, 2007 WL 894833 (S.D.Ohio), 62 UCC Rep.Serv.2d 371
(Cite as: 2007 WL 894833 (S.D.Ohio))

484394, at *4-5 (S.D.Ohio Mar. 26, 2002) (rule stated identically to *Picker* ).

A number of Ohio courts have been confronted with a claim for negligent misrepresentation where the information was supplied to the opposite party in a business transaction. The majority of these cases do not support a determination that information supplied to a person in the course of a business transaction cannot be supplied for that person's guidance. *See, e.g., Lippy,* 100 Ohio App. 3 d at 45-46 (finding negligent misrepresentation made in the context of a business transaction with a bank actionable even in absence of a fiduciary relationship); *McCarthy, Lebit,* 87 Ohio App.3d at 634 (noting that nothing supports prohibiting a claim for negligent misrepresentation when parties are "directly related to each other pursuant to contract negotiations"); *see also Leal v. Holtvogt,* 123 Ohio App.3d 51, 61-64 (1998). But *see* discussion of *Universal Contracting supra* note 7. Admittedly, these Ohio cases do not involve transactions for the sale of goods. However, Rexius does not offer and this Court cannot ascertain any principled reason why the subject matter of the transaction should be relevant to determining whether a person supplies information to the opposite party in a business transaction for the latter party's guidance. Thus, the Court concludes that Ohio law does not support barring a cause of action for negligent misrepresentation because the defendant supplied information to guide the plaintiff in a business transaction with the defendant.

Therefore, as discussed *supra,* a "special relationship" is not a formal element of a claim for negligent misrepresentation under the law of Ohio. Rather, the "special relationship" is a characterization of the requirements that for liability to exist: (1) the defendant must provide false information for the guidance of the plaintiff in its business transactions and (2) the plaintiff must be the person or one of a limited group of persons for whose benefit and guidance the defendant intends to supply the information or knows that the recipient intends to supply it. The Court concludes that summary judgment should be denied as to the second requirement stated above because reasonable minds could conclude that National Mulch was a member of a limited class of

foreseeable persons that might rely upon the representations made.

**\*12** As to the first requirement stated above, the Court notes that in its motion Rexius did not raise the issue of whether it intended to provide guidance to National Mulch with the alleged misrepresentations. Furthermore, Rexius did not contest the alleged falsity of the statements at issue. Recognizing this, National Mulch did not address these issues in its Memorandum Contra. The Court will not consider these issues because the parties have not moved the Court for summary judgment on them.

### 3. Omissions

Finally, Rexius argues that National Mulch's negligent misrepresentation is impermissibly based, in part, on alleged omissions. In its complaint, National Mulch alleges:

In addition to the misrepresentations, Defendant failed to disclose the following:

a. That the PTO was not sufficient and durable enough for the Rexius Express Blower's use, with the result being significant maintenance problems.

b. That there would be significant bridging of the product, as a result of the problems with the conveyor, which results in significant delay.

c. That the moisture content causes the product to colligate, thus further diminishing productivity.

(Compl.¶ 16.) Rexius asks the Court to grant summary judgment in its favor to the extent that National Mulch's claim of negligent misrepresentation is based upon these alleged omissions.

Rexius correctly states that " 'negligent misrepresentation does not lie for omissions; there must be some affirmative false statement.' " *Leal,* 123 Ohio App.3d at 62 (quoting *Zuber v. Ohio Dep't of Ins.,* 34 Ohio App.3d 42, 45-46 (1986)); *accord, e .g., Manno v. St. Felicitas Elementary Sch.,* 161 Ohio App.3d 715, 724 (2005);

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Gentile v. Ristas*, 160 Ohio App.3d 765, 789 (2005). The defendant must *supply* information for a negligent misrepresentation to occur.

National Mulch does not dispute that a negligent misrepresentation claim requires affirmative false statements. It acknowledges that paragraph 16 the complaint alleges that Rexius failed to disclose certain information to National Mulch, but explains that these allegations go to the falsity of the affirmative representations made by Rexius, alleged in paragraph 14 of the complaint. Also, the allegations of Rexius's failure to disclose are immediately preceded in paragraph 16 by an allegation that Rexius did not exercise reasonable care in making affirmative statements.

Rexius has not disputed that the allegations contained in paragraph 16 do not allege facts relevant to the falsity of the affirmative statements or Rexius's exercise of care. Its argument is instead limited to its assertion that a failure to disclose information cannot support a claim for negligent misrepresentation. Because Rexius is correct in this regard, its motion is granted to the extent, if any, that National Mulch's claim of negligent misrepresentation is based upon omissions of fact.

## D. Warranty Claims

National Mulch has also asserted three warranty claims in this case: (1) breach of express warranties, (2) breach of implied warranty of merchantability, and (3) breach of implied warranty of fitness for a particular purpose. The parties have filed cross-motions for partial summary judgment with respect to National Mulch's warranty claims. In its motion for partial summary judgment, National Mulch seeks to establish that the representations made by Rexius constitute express warranties as a matter of law. Rexius, on the other hand, argues that the representations at issue, as alleged by National Mulch, do not constitute express warranties, that the parties effectively disclaimed all warranties in the Sales Quote, and that National Mulch is barred by the parol evidence rule from introducing evidence of any representations that contradict the terms of the Sales Quote. National Mulch responds that the disclaimer on the back

of the Sales Quote did not become part of the parties' agreement and that the parol evidence rule has no application in this case. Finally, Rexius contends that summary judgment is appropriate regarding two of the representations at issue because, even if the representations are express warranties, Rexius did not breach them.

## 1. Express Warranties

*13 In Count I of the Complaint, National Mulch alleges that

> Defendant breached each express warranty in that the Rexius Express Blower (a) is not trouble-free, is not free from defects in material and workmanship, is not economical to operate, was not manufactured with high quality material and workmanship; (b) cannot be effectively operated with only one person; (c) cannot blow 55 cubic yards per hour with only one operator; (d) has significant maintenance costs; and (e) as to National Mulch, the dye feature does not effectively dye mulch.

(Compl.¶ 11.) In resolving the parties' cross-motions for partial summary judgment on National Mulch's express warranty claim, this Court must answer four questions: (1) does the parol evidence rule bar evidence of alleged express warranties extrinsic to the Sales Quote; (2) were any such express warranties actually created; (3) if so, were express warranties effectively disclaimed by the Sales Quote; and (4) if the agreement did include warranties that, with only one person, the Rexius trucks can blow 55 cubic yards per hour, were these warranties breached.

## a. Parol Evidence Rule

As noted by Rexius, National Mulch's express warranty claim is based on alleged warranties that are extrinsic to the Sales Quote. Rexius argues that National Mulch's express warranty claim must fail because the parol evidence rule bars evidence of any prior representations that are inconsistent with the Sales Quote. National Mulch, on the other hand, argues that the parol evidence rule

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894833 (S.D.Ohio), 62 UCC Rep.Serv.2d 371
(Cite as: 2007 WL 894833 (S.D.Ohio))

does not apply under the facts of this case.

In this case involving the sale of commercial mulch-blowing trucks, there is no dispute that the Uniform Commercial Code as adopted by Ohio applies to the warranty claims asserted by National Mulch.[FN10] Ohio Revised Code § 1302.05 provides the relevant statutory language in connection with the parol evidence rule:

> FN10. Again, this Court notes that the parties appear to agree that Ohio law applies. Moreover, this Court also notes that the U.C.C. sections applicable to this case are identical in all relevant respects under both Ohio law and Oregon law. *Compare* Ohio Rev.Code §§ 1302.01-.98 *with* Or.Rev.Stat. §§ 72.1010- .7250.

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:

(A) by course of dealing or usage of trade as provided in section 1301.11 of the Revised Code or by a course of performance as provided in section 1302.11 of the Revised Code; and

(B) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Ohio Rev.Code § 1302.05. As recognized by the Supreme Court of Ohio, the parol evidence rule is a rule of substantive law that prohibits a party who has entered into a written contract from contradicting the terms of the contract with evidence of other alleged agreements. *Ed Schory & Sons, Inc. v. Soc'y Nat'l Bank,* 75 Ohio St.3d 433, 440 (1996). "When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing." *Id.* (internal quotation and citation omitted).

*14 As was noted *supra,* the representations at issue in this case, as alleged by National Mulch, were made prior to the Sales Quote and are not referenced by that agreement. Such representations are therefore extrinsic to the Sales Quote. In order to determine whether the parol evidence rule bars evidence of such representations, this Court must first determine whether the Sales Quote represents the final agreement of the parties. If the parties did not intend for the Sales Quote to be a final expression of their agreement, then the parol evidence rule does not apply. If the Sales Quote does represent the parties' final agreement, then application of the parol evidence rule will depend upon whether the Sales Quote is a "complete and exclusive statement of the terms of the agreement between the parties."

Whether a document represents the final expression of the parties' agreement and, if so, whether it is "complete and exclusive" of other terms are questions of law to be resolved by the court. *Camargo Cadillac Co. v. Garfield Enters., Inc.,* 3 Ohio App.3d 435, 437-38 (1982). The court makes this determination by looking at the document itself and also considering all relevant evidence "presented by the parties about their intentions." *Id.*

The language of the Sales Quote is ambiguous with respect to whether it is the final agreement between the parties. Although not conclusive, the Sales Quote does not contain a traditional "merger" or "integration" clause.[FN11] *See Burke v. Manfroni,* No. 83231, 2004 WL 397276, at *3 (Ohio App. 8th Dist. Mar. 4, 2004). In fact, the Sales Quote does not contain any statement that clearly indicates that the parties intended for the Sales Quote to represent their final agreement. On the contrary, the Sales Quote appears to anticipate the possibility, at least, for additional agreements. It specifically provides that "any additional or different terms proposed by Buyer are hereby rejected *unless* expressly assented to in writing by Seller." (Sales Quote ¶ 9, Apr. 3,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2000.)

> FN11. Rexius's reliance on *Paragon Networks International v. Macola, Inc.*, No. 9-99-2, 1999 Ohio App. LEXIS 2091, at *9-10, 14 (Ohio App.3d Dist. Apr. 28, 1999), for its assertion that the Sales Quote contains an integration clause is not well-taken. Integration clauses are "[r]ecitations to the effect that a written contract is integrated, that all conditions, promises, or representations are contained in the writing [or] that the parties are not to be bound except by the writing." 11 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 33:21, at 661 (4th ed.1993). The license agreement in *Paragon* contained an integration clause that stated that "unless specifically covered by another license agreement, ... [this Agreement] is the complete agreement between us and it supersedes any prior purchase order, communications, advertising or representations." *Paragon*, 1999 Ohio App. LEXIS 2091, at *8 (alteration in original). This language clearly shows the parties' intent to not be bound in any way other than the writing. The Sales Quote in this case contains no similar language.

It is clear, based on the evidence and arguments made by National Mulch, that it did not consider the Sales Quote to be the final, complete, and exclusive statement of the terms of the agreement. The evidence also reflects that even Rexius did not consider the Sales Quote to represent the final, complete, and exclusive statement of the terms of the agreement. In connection with its argument earlier in this litigation regarding venue, Rexius submitted an "Express Blower Limited Warranty," which disclaimed other express warranties, and argued that this document was part of the parties' agreement.[FN12] Rexius Co-President Arlen Rexius testified that the Limited Warranty was routinely given in connection with the sale of its mulch-blowing trucks. (Rexius Aff. ¶ 9; *accord* Drennan Aff. ¶¶ 5, 14.) Drennan testified that National Mulch would have received this Limited Warranty during training, before the April 3, 2000 Sales Quote was signed. (Drennan Aff. ¶¶ 5-6.) The Limited Warranty is extrinsic to the Sales Quote and directly contradicts the latter document's clause disclaiming all warranties. Under these facts, the parol evidence rule prescribes that the Limited Warranty could only be a part of the agreement if the Sales Quote was not a final expression of the parties' agreement. As Rexius has continuously asserted that the Limited Warranty was part of the parties' agreement, it could not have intended for the Sales Quote to represent the final statement of the terms of the agreement.

> FN12. Rexius makes the same argument now in its response to National Mulch's motion for partial summary judgment.

**\*15** In any event, this Court must construe any ambiguity contained in the Sales Quote against Rexius, the party responsible for preparing that agreement. *See Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 314 (1996) (citing *Central Realty Co. v. Clutter*, 62 Ohio St.2d 411, 413 (1980)). Rexius has failed to demonstrate that the Sales Quote represents the final expression of the terms of the parties' agreement. Therefore, the parol evidence rule, as set forth in Ohio Revised Code § 1302.05, will not preclude National Mulch from introducing evidence of extrinsic representations made by Rexius.

**b. Creation of Express Warranties**

Next, Rexius argues that any representations made regarding the EB-60 do not amount to express warranties, and that it is therefore entitled to partial summary judgment. National Mulch argues that partial summary judgment should be granted in its favor on this issue because several statements made by Rexius concerning the productivity and reliability of the EB-60 created express warranties.

As was noted *supra*, this case is governed by the U.C.C. as adopted by Ohio. The Ohio Revised Code makes it clear that formal words such as "warrant" or "guarantee" are not necessary to create an express warranty. Ohio Rev.Code § 1302.26(B). Instead, an express

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

warranty is created by:

(1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain....

(2) Any description of the goods which is made part of the basis of the bargain....

(3) Any sample or model which is made part of the basis of the bargain ....

§ 1302.26(A). A seller's advertisement of its product may constitute an express warranty so long as the statement in the advertisement fulfills the requirements of § 1302.26(A). *See, e.g ., Jones v. Kellner,* 5 Ohio App.3d 242, 242-43 (1982). However, an affirmation of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create an express warranty. § 1302.26(B).

### i. Statements Regarding the Trucks' Productivity

With respect to productivity, National Mulch alleges that Rexius warranted that the EB-60 trucks, using only one person, could blow 55 cubic yards per hour and that they could be used effectively by only one person.[FN13] (Compl.¶ 7.) Rexius does not dispute that its sales materials indicated that, "[w]ith most material, the EB-60 can blow nearly a full cubic yard per minute, making even the biggest jobs manageable," that the "Express Blower, using only one person, can blow 55 cubic yards per hour," and that the Express Blower could be operated by one person.[FN14] (Rexius Marketing Lit., Exs. 3-4 to Pl.'s Mem. Contra Def.'s Mot. Partial Summ. J. Neg. Misrep.)

> FN13. These statements will be referred to as the productivity statements.

> FN14. Although the Complaint alleges that Rexius breached an express warranty that the "Express Blower, using only one person, can blow 55 cubic yards per hour," (Compl.¶ 7) National Mulch moves the Court for summary

judgment on the issue of whether an express warranty was created warranting that the Express Blowers "can blow 55 cubic yards per hour using 'most material.' " (Pl.'s Mem. in Opp'n 1 n. 1; *accord* Pl.'s Mot. Partial Summ. J. Creation Express Warr. & Failure to Disclaim Warr. 5.)

As an initial matter, Rexius asserts that its statement that the trucks could blow 55 cubic yards per hour with most material cannot be an express warranty because, as a matter of law, "statements of maximum performance do not create a warranty of guaranteed daily output." The Court does not find this contention supported by Ohio law. First, National Mulch has not alleged that Rexius made an express warranty about the guaranteed daily output of the trucks. By its plain meaning, the statement that the trucks "can blow 55 cubic yards per hour" does not make a guarantee of what the buyer's actual daily output will be with the trucks. The statement only concerns the trucks' maximum performance.

*16 Second, under § 1302.26(A), *any* affirmation of fact relating to the goods can create an express warranty. There is no logical reason to exclude statements of a product's maximum performance. Moreover, other courts have specifically found that statements of maximum performance can create express warranties. *E.g., Abele v. Bayliner Marine Corp.* 11 F.Supp.2d 955, 964 (N.D.Ohio 1997) (rejecting the argument that a representation that a boat could go at least 40 mph could not create an express warranty under § 1302.26(A)). [FN15]

> FN15. Contrary to Rexius's assertion, neither *Chic Promotion, Inc. v. Middletown Security Systems, Inc.,* 116 Ohio App.3d 363 (1996), nor *HDM Flugservice GMBH v. Parker Hannifin Corp.,* 332 F.3d 1025 (6th Cir.2003), holds otherwise as neither case involved statements of a product's maximum performance. In *Chic Promotion,* the statements included in an alarm systems manufacturer's brochure did not create express warranties because the brochure did not make statements concerning the specific alarm system configuration purchased by the plaintiff. *Chic Promotion,* 116 Ohio App.3d at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

369. Instead, the brochure provided general descriptions of what the security system could do depending on how the system was customized. *Id.* The court in *HDM* held that a statement by a manufacturer that an aircraft part had a maximum "service life" of 3,500 hours did not create an express warranty that the part would properly perform for a minimum of 3,500 hours. *HDM,* 332 F.3d at 1033, 1035.

Rexius also argues that the productivity statements cannot be express warranties because they were not part of the basis of the parties' bargain. An affirmation of fact is part of the basis of the parties bargain if it induces the buyer to purchase the product. *Wagner v. Roche Labs.,* 85 Ohio St.3d 457, 459 (1999). To determine whether a representation is an affirmation of fact that became a part of the basis of the bargain, the Court must consider the surrounding circumstances of the sale, including: (1) the reasonableness of the buyer in believing the seller, (2) the reliance placed on the seller's statement by the buyer,[FN16] and (3) whether the seller assumes to assert a fact of which the buyer is ignorant, or whether he merely states an opinion or expresses a judgment about a thing. *Abele,* 11 F.Supp.2d at 963; *Norcold, Inc. v. Gateway Supply Co.,* 154 Ohio App.3d 594, 600 (2003); *Slyman v. Pickwick Farms,* 15 Ohio App.3d 25, 28 (1984).

> FN16. Under Ohio law, reliance is not a formal element of a claim for breach of an express warranty. *See Norcold, Inc. v. Gateway Supply Co.,* 154 Ohio App.3d 594, 596 (2003).

Construing the facts in the light most favorable to Rexius, this Court determines that reasonable minds could only conclude that these representations constitute affirmations of fact and/or descriptions of the goods as set forth in Ohio Revised Code § 1302.26(A). This conclusion is supported by a number of cases decided under Ohio law where statements of a similar nature were deemed to be affirmations of fact or descriptions of the goods. *See, e.g., Abele,* 11 F.Supp.2d at 964; *Ohio Savings Bank v. H.L. Vokes Co.,* 54 Ohio App.3d 68, 71-72 (1989). A question remains, however, whether the representations regarding the EB-60's productivity became

part of the basis of the bargain.

Rexius submits that the affirmations regarding the EB-60's productivity could not have become part of the basis of the bargain because National Mulch did not rely upon the statements when agreeing to the bargain. [FN17] In support, Rexius first argues that the Court must consider the warranty disclaimer contained on the reverse side of the Sales Quote in determining whether the productivity statements were part of the basis of the parties' bargain.

> FN17. National Mulch responds to this argument by contending that facts that show no reliance on the statements should be ignored by this Court because they are irrelevant to the issue of whether express warranties were created and are therefore non-responsive to National Mulch's motion. This contention is incorrect for two reasons. First, National Mulch has moved for partial summary judgment on the issue of "creation of express warranties by Defendant." (Pl.'s Mot. Partial Summ. J. Creation Express Warr. & Failure to Disclaim Warr. 1.) As discussed *supra,* the creation of an express warranty is dependent upon whether the statement was part of the basis of the bargain, and the buyer's reliance is a factor in making this determination. Second, Rexius has moved for partial summary judgment on the same issue, arguing the absence of reliance. (*See* Def.'s Mot. Partial Summ. J. Breach Warr. Claims 2.) Thus, whether National Mulch relied upon the statements about the trucks' productivity is relevant to the disposition of both parties' mo- tions.

Certainly the existence of a disclaimer in a written contract is a factor in deciding whether a warranty was part of the parties' agreement. However, creation of an express warranty and that warranty's negation are distinct issues under the U.C.C. Ohio Revised Code § 1302.26 governs the creation of express warranties while § 1302.29 controls the determination of whether warranties were negated or disclaimed. Words in a warranty disclaimer are evidence of an already existing warranty

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

being negated or limited, not of a warranty's creation. *See* Ohio Rev.Code § 1302.29(A) (In deciding whether a warranty was disclaimed, "[w]ords or conduct relevant to the creation of an express warranty *and* words or conduct tending to negate or limit warranty shall be construed ... *with each other.* " (emphasis added)). Thus, any fact showing the existence of a warranty disclaimer in the written agreement is not relevant to the issue of whether an affirmation of fact or description of the goods became a part of the basis of the bargain. Rather, such evidence is properly applied to the determination of whether an express warranty created earlier was negated or limited.[FN18]

> FN18. Whether the parties effectively disclaimed express warranties is discussed *infra.*

*17 Other evidence, however, does suggest that National Mulch did not rely upon the statements concerning the EB-60's productivity. Will testified that National Mulch's business plan did not reflect operating the Rexius trucks with only one person. (Will Dep. 41-42.) National Mulch did not anticipate that its trucks would put out 55 cubic yards per hour during its jobs, and its business plan was not based on this output. (*Id.* at 56-57, 65.) Instead, National Mulch used more conservative numbers in its business plan. (Fischer Dep. 34-35; Fischer Decl. ¶ 12, Feb. 13, 2006; Fischer Decl. ¶ 3, Apr. 24, 2006; Will Dep. 52, 65.)

The marketing material containing the productivity statements also contains other information about the Rexius Express Blowers' productivity. Notably, the literature sent to National Mulch included an "Operating Cost Analysis" sheet that depicts costs estimates for a hypothetical mulch delivery job. (Rexius Marketing Lit.) Rexius argues, in essence, that this analysis shows that National Mulch, in making its decision to purchase, could not have reasonably relied on the statement that the trucks can blow 55 cubic yards per hour. The analysis is based upon an assumption that a job requiring delivery of 45 cubic yards of mulch will take five hours to complete, including time spent for "loading, [40 miles of] travel, customer service, cleanup and blower time." (*Id.*) At the bottom of the sheet appears a note which states that "Rexius makes no claim, expressed or

implied, as to what your actual costs might be" and that the analysis "should be used for general understanding only and not for the use in making financial commitments." (*Id.*)

Rexius states that the "Operating Cost Analysis" sheet shows "a real world application of 9 cubic yards an hour." This statement appears to be accurate so long as "application" is understood to mean the total time required to complete a job. However, as the sheet contains no statement of how long it takes to actually blow 45 cubic yards,[FN19] the analysis provides no discernable rate at which the trucks blow mulch in the "real world." Irrespective of what the hypothetical truck's actual productivity is, the analysis seems to suggest that the rate is something less than 55 cubic yards per hour. This and the note at the bottom of the sheet are relevant to show a lack of reliance by National Mulch upon the statements that the trucks can blow 55 cubic yards with most material.

> FN19. Presumably, the actually blowing time in Rexius's hypothetical would be five hours minus the time spent loading, traveling 40 miles, providing customer service, and clean- ing.

Additionally, there is evidence that shows that National Mulch was not completely ignorant regarding the trucks' productivity. Prior to entering into an agreement with Rexius, Fischer and Will had been in contact with Fischer's brother in Florida who had been operating Rexius trucks. (Fischer Dep. 13-15; Will Dep. 18-37.) In connection therewith, National Mulch received and considered information about Fischer's brother's business, Florida Mulch Express, Inc. ("Florida Mulch"), including its business plan. (Fischer Dep. 23-25.) Florida Mulch's business plan was based on an average throughput of 100 cubic yards per day per truck with each truck staffed by two employees. (Florida Mulch's Bus. Plan 9, 23, Def.'s Mot. Partial Summ. J. Certain Claimed Damages Ex. 54.)

*18 National Mulch also had an opportunity to view how Rexius trucks operated under normal conditions when Fischer and Will visited Fischer's brother in Flor-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ida. (Fischer Dep. 18-19; Will Dep. 23-24.) While there, Fischer and Will observed Florida Mulch's trucks on jobs. (Fischer Dep. 19-20; Will Dep. 26-32.) Both Fischer and Will testified that Florida Mulch had multiple workers assigned to a single Rexius truck. (Fischer Dep. 19; Will Dep. 29-30.) Fischer's and Will's testimony shows that National Mulch had independent knowledge of the trucks' productivity. This knowledge tends to diminish the reasonableness of its belief in the productivity statements made by Rexius.

In summary, there is considerable evidence to show that the productivity statements were not a part of the basis of the bargain between National Mulch and Rexius. However, the record also contains evidence supporting the opposite conclusion. Although Fischer and Will were able to learn much about the Rexius trucks in Florida, the information that they received was possibly not replete with enough facts for them to objectively determine the validity of Rexius's statements. Will testified that Florida Mulch provided its financial projections to National Mulch, but did not disclose any information about its actual profitability other than that it "had been very busy." (Will Dep. 31-32.) Florida Mulch did not give Fischer information about its actual profitability or its actual production, and Fischer did not review any Florida Mulch records other than its business plan. (Fischer Dep. 21-22.) Regarding throughput, Fischer stated that he could not tell how much mulch the Rexius trucks were putting out while he was observing them, (*id.* at 20), and that he did not recall discussing the actual throughput that Florida Mulch was receiving from its Rexius trucks. (*Id.* at 34-36.) These portions of Fischer's and Will's testimonies depict National Mulch as lacking pertinent knowledge about the Rexius trucks' productivity. This evidence helps to support a finding that the productivity statements asserted facts of which National Mulch was not aware on its own and that National Mulch acted reasonably in believing them.

Other testimony by Will and Fischer reflects that National Mulch relied on the productivity statements. Will stated that National Mulch used the Rexius productivity statements as a guide for determining a conservative business plan.[FN20] (Will Dep. 37-38, 40.) Fischer testi-

fied that he believed, based on Rexius's representation of what the trucks could blow, that National Mulch would be able to have significantly greater throughput than the 100 cubic yards per day assumption in Florida Mulch's business plan. (Fischer Dep. 34-35.) According to Fischer, National Mulch "formulated its plan based in part on representations by Rexius that the EB-60 model Express blower could be operated effectively by only one person and apply 55 cubic yards per hour, using most materials." (Fischer Decl. ¶ 2, Apr. 24, 2006.)

> FN20. Will testified,
>
> > [W]e used the literature from Rexius as a guide, and based on the conversations I had had with Rexius and information I had received from Rexius, and then [sic] we attempted to make [National Mulch's business plan] more conservative than the basic numbers that Rexius provided us with.... We saw that the Rexius equipment was being warranted as being able to put down 55 cubic yards of mulch with one person. We felt that was not conservative enough....
>
> (Will Dep. 37-38, 40.)

*19 The Court is mindful that whether an affirmation becomes a part of the basis of the bargain and thereby becomes an express warranty is a question of fact normally left to the province of the jury. *See Lees v. Turek,* No. 87 C.A. 6, 1987 WL 15351, at *2 (Ohio App. 8th Dist. Aug. 6, 1987). Both parties have moved for partial summary judgment on this issue. As such, the Court must view the facts and reasonable inferences drawn thereon in favor of Rexius when deciding National Mulch's motion and in favor of National Mulch when deciding Rexius's motion. However, with the aforementioned facts viewed in a light most favorable to either party, it cannot be said that reasonable minds could come to only one conclusion as to whether the statements regarding the Rexius trucks' productivity became a part of the basis of the bargain between the parties. Instead, the record displays that, at this point in the litigation, whether the productivity statements were part of the basis of the bargain is a disputed issue of fact. Thus,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894833 (S.D.Ohio), 62 UCC Rep.Serv.2d 371
(Cite as: 2007 WL 894833 (S.D.Ohio))

Page 19

the Court concludes that neither party is entitled to partial summary judgment on the issue of whether an express warranty was created by the statements that (1) the Rexius Express Blower could be used effectively by only one person or that (2) the Rexius Express Blower, using only one person, can blow 55 cubic yards per hour with most materials.

**ii. Statement Regarding the Trucks' Capability to Effectively Dye Mulch**

National Mulch also alleges that Rexius made a representation that the EB-60 could effectively dye mulch. (Compl.¶ 7.) Fischer states that Rexius made this representation both orally and in writing. (Fischer Decl. ¶ 6, Feb. 13, 2006.) The Court notes that the Rexius marketing literature submitted to the Court does not include statements about the truck's mulch-dying capability; however, Rexius has put forth no evidence showing that it did not make this representation, either in writing or orally.

There is no dispute that the EB-60 trucks could dye mulch. (Fischer Dep. 222.) The dispute in this case is over the word "effectively." Fischer testified that when dyed mulch was applied, it would come out of the trucks wet. (*Id.*) Fischer contends that application of wet dye created clean-up and liability issues, and he therefore concluded that the EB-60 could not "effectively" dye mulch and discontinued use of they dye function. (*Id.*)

Rexius argues that use of the word "effectively" is merely a seller "puffing" its goods and does not create an express warranty. As was noted *supra,* if use of the word "effectively" merely represents Rexius's opinion, then no express warranty was created. *See* Ohio Rev.Code § 1302.26(B). However, if the word "effectively" was an affirmation of fact, then the Court must determine whether it became part of the basis for the bargain.

A seller's affirmations go beyond puffing when they express an objective fact. In *Barksdale v. Van's Auto Sales, Inc.,* 62 Ohio App.3d 724, 726 (1989), a pur-

chaser of an automobile specifically inquired about the condition of the transmission and was told that it was in good working order and that nothing was wrong with it. The court held that this representation went beyond puffing and was an affirmation of fact that became part of the "essence of the bargain." *Id.* at 728. Similarly, a seller's affirmation that a truck would be "just right for the purpose of commercial snow plowing" was held to be more than puffery in *Society National Bank v. Pemberton,* 63 Ohio Misc. 26, 28, 409 N.E.2d 1073, 1076 (Ohio Mun.Ct.1979).

*20 Subjective commendations of goods by the seller do not create warranties because the statements are merely the seller puffing its goods. Hence, in *Jordan v. Paccar, Inc.,* 37 F.3d 1181, 1185 (6th Cir.1994), "rock-solid" and "strong" were subjective statements about a truck's fiberglass roof. Statements that a car was "good on gas" and "performed fine" were likewise deemed to be puffery in *Jackson v. Krieger Ford, Inc.,* No. 88AP-1030, 1989 Ohio App. LEXIS 1201, at * 17 (10th Dist. Mar. 28, 1989) (noting that the terms "good" and "fine" were expressions of the seller's opinion).

"Effective" means "adequate to accomplish a purpose; producing the intended or expected result." Dictionary.com Unabridged (v 1.0 .1), http:// dictionary.reference.com/browse/ effective (last visited Oct. 20, 2006) (based on the Random House Unabridged Dictionary). Understanding this, it is apparent that Rexius's statement concerning the trucks' dying feature asserts that the Express Blower trucks can dye mulch adequately and in the manner expected. The Court determines that reasonable minds could only conclude that "effectively dye mulch" is an objective affirmation of fact, not sales puffery.

In this case, it appears that National Mulch was specifically interested in whether the EB-60 could dye mulch. In response, Rexius allegedly told National Mulch that the EB-60 could effectively dye mulch. Rexius clearly had superior knowledge in this regard, and National Mulch was justified in believing relying upon its representations. Under these circumstances, this Court concludes that this representation became part of the basis of the bargain. The statement that the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 1:08-cv-02755-DCN Doc #: 54-1 Filed: 09/30/10 50 of 126. PageID #: 957

Page 20
Not Reported in F.Supp.2d, 2007 WL 894833 (S.D.Ohio), 62 UCC Rep.Serv.2d 371
(Cite as: 2007 WL 894833 (S.D.Ohio))

EB-60 can "effectively dye mulch" therefore created an express warranty.

### iii. Statements Regarding the Trucks' Quality

Finally, National Mulch alleges that Rexius made representations regarding the quality and reliability of the EB-60 trucks. In particular, National Mulch alleges that Rexius represented, both in writing and orally, that the EB-60 was trouble-free, of superior craftsmanship, economical to operate, and built and manufactured with high-quality material and workmanship. (Compl. ¶ 7; Fischer Decl. ¶ 6, Feb. 13, 2006.) Additionally, National Mulch alleges that Rexius represented that the maintenance cost for the EB-60 was minimal. (Compl. ¶ 7; Fischer Decl. ¶ 6, Feb. 13, 2006.)

As with the alleged representation that the trucks could effectively dye mulch, Rexius has not argued that it did not make these statements to National Mulch, either in writing or orally. To the contrary, Rexius concedes that its brochures contain these representations of quality. (Def.'s Mem. Supp. Mot. Partial Summ. J. Warr. Claims 11.) Despite Rexius's concession, the Court notes that most of the statements allegedly made by Rexius regarding the trucks' quality do not appear in its marketing literature submitted to the Court. The material does describe the Express Blower's feed system as "trouble-free." (Rexius Marketing Lit. 1.) However, nowhere in the brochures is any part of the Express Blowers expressly described as "of superior craftsmanship," "economical to operate," "built and manufactured with high-quality material and workmanship," or having "minimal maintenance cost." The only reference to the Express Blower's quality comes in the Operating Cost Analysis sheet discussed *supra.* There, Rexius provides estimated per cubic yard costs for "General maintenance" ($0.27/cu .yd.), "Tires" ($0.02/cu.yd.), and "Fuel" ($0.42/cu.yd.) based upon its actual experience.

*21 Of course, an affirmation of fact that relates to the goods or a description of the goods does not need to be written to create an express warranty. National Mulch has asserted that these representations were made orally as well as in writing. (Fischer Decl. ¶ 6, Feb. 13, 2006.)

Although there is an absence of evidence on the record to show that the quality statements, other than "trouble-free," were made in writing, Fischer's averment that these representations were made orally has not been contradicted by Rexius with any evidence.

Rexius argues that these statements of the Express Blowers' quality are puffery and therefore cannot form express warranties. Unlike *Barksdale,* there is no indication that the representations regarding quality were made in response to a specific inquiry by National Mulch or with knowledge of special needs on the part of National Mulch.

Nevertheless, Ohio courts have often found that representations of quality can create express warranties. For instance, in *Jones,* the court upheld the trial court's finding that a representation that an automobile was mechanically in "A-1 condition" created an express warranty. *Jones,* 5 Ohio App.3d at 243. Similarly, in *Abele,* the court found that a representation that a boat was "unsurpassed for trouble-free operation" could create an express warranty. *Abele,* 11 F.Supp.2d at 964 (denying summary judgment in favor of the defendant). Neither court, however, found that these statements created express warranties as a matter of law.

Again, the determination depends on whether the representation is an objective affirmation of fact or merely the seller's opinion. Similar to the statements regarding quality in *Jones* and *Abele,* "trouble-free," "economical to operate," and "minimal maintenance cost" seem to be objective statements of the Express Blowers' level of reliability and cost of operation. However, the Court concludes that neither party is entitled to summary judgment regarding these three alleged statements. Viewing the facts most favorably to Rexius, a reasonable jury could conclude that these statements are nothing more than Rexius's opinion of the goods. Thus, National Mulch is not entitled to summary judgment on the issue of whether these three statements created an express warranty. Likewise, with the facts viewed in favor of National Mulch, reasonable minds could determine that these three statements were either affirmations of fact relating to the goods or descriptions of the goods. As such, summary judgment on this issue in favor of Rexi-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 1:08-cv-02755-DCN Doc #: 54-1 Filed: 09/30/10 51 of 126. PageID #: 958

Page 21
Not Reported in F.Supp.2d, 2007 WL 894833 (S.D.Ohio), 62 UCC Rep.Serv.2d 371
(Cite as: 2007 WL 894833 (S.D.Ohio))

us would be inappropriate.

On the other hand, "superior craftsmanship" and "high-quality material and workmanship" cannot form express warranties under Ohio Revised Code § 1302.26. Neither statement is a description of the goods or an affirmation of fact that relates to the Express Blowers. Like the statements at issue in *Jordan* and *Jackson,* these two statements are Rexius's commendation of its goods. Both "superior" and "high-quality" are value judgments based upon the seller's opinion. No reasonable jury, viewing the facts in the light most favorable to National Mulch, could conclude otherwise. Therefore, Rexius is entitled to summary judgment on National Mulch's express warranty claims arising from these two statements.

### c. Disclaimer

*22 Rexius argues that, even if express warranties were created, those warranties were effectively disclaimed in the Sales Quote. National Mulch argues that it cannot be bound by a disclaimer on the back of the Sales Quote that was not read by Fischer, who signed the Sales Quote on behalf of National Mulch. National Mulch argues alternatively that the disclaimer found on the back of the Sales Quote was not adequate to disclaim the prior express warranties made by Rexius.

### i. Validity of Disclaimer

National Mulch contends that it cannot be bound by language contained on the back of the Sales Quote because the record reflects that, while Fischer signed the front of the Sales Quote, he did not see the language referring to the back of the Sales Quote and, in any event, did not read the back of the Sales Quote. (Fischer Decl. ¶ 40, Feb. 13, 2006.) National Mulch therefore argues that the disclaimer did not become part of the parties' agree- ment.

Initially, this Court notes that National Mulch does not argue that Fischer lacked an opportunity to review the entire agreement prior to signing. In support of its opposition to Rexius's motion for partial summary judg-

ment, National Mulch cites *Dyno Construction Co. v. McWane, Inc.,* 198 F.3d 567 (6th Cir.1999). In *Dyno,* a purchaser of ductile iron pipe signed an agreement that was sent by fax. *Id.* at 570-71. However, the seller failed to fax the back side of the form, which contained a limited liability clause. *Id.* Thus, a genuine issue of material fact existed regarding whether the buyer had an opportunity to review the limited liability clause. *Id.* at 570-75.

In this case, Fischer was present in Oregon on behalf of National Mulch and was given the complete Sales Quote. The following language appears directly beneath the signature line on the Sales Quote:

THIS AGREEMENT IS SUBJECT TO ALL TERMS AND CONDITIONS ON THE REVERSE SIDE IN- CLUDING THOSE WHICH **LIMIT WAR- RANTIES** AND THOSE WHICH AGREE TO A **GRANT OF SECURITY INTEREST.** *NOTE ALSO THE GEOGRAPHICAL USE LIMITATION DE- SCRIBED IN SECTION 13 ON THE REVERSE SIDE.*

(Sales Quote, Apr. 3, 2000.) This language conspicuously notifies National Mulch that there are additional terms and conditions on the reverse side and that warranties are limited.[FN21] The back of the Sales Quote provides a disclaimer which specifically states, in all capital letters,

> FN21. Ohio Revised Code § 1301.01(J) states that:
>
> > a term or clause is "conspicuous" when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NON- NEGOTIABLE BILL OF LADING) is "conspicuous." Language in the body of a form is "conspicuous" if it is in larger or oth- er contrasting type or color.... Whether a term or clause is "conspicuous" is for de- cision by the court.

THERE ARE NO UNDERSTANDINGS, AGREE- MENTS, REPRESENTATIONS OR WARRANTIES,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 1:08-cv-02755-DCN Doc #: 54-1 Filed: 09/30/10 52 of 126. PageID #: 959

Page 22
Not Reported in F.Supp.2d, 2007 WL 894833 (S.D.Ohio), 62 UCC Rep.Serv.2d 371
(Cite as: 2007 WL 894833 (S.D.Ohio))

EXPRESS OR IMPLIED OR STATUTORY, IN-
CLUDING ANY OF MERCHANTABILITY OR
FITNESS FOR A PARTICULAR PURPOSE OR
OTHERWISE (EXCEPT AS TO TITLE).
(*Id.* at ¶ 7.)

As was recognized by the Supreme Court of Ohio,

> [a] person of ordinary mind cannot say that he was
> misled into signing a paper which was different from
> what he intended to sign when he could have known
> the truth by merely looking when he signed.... I[f] this
> were permitted, contracts could not be worth the pa-
> per on which they are written. If a person can read
> and is not prevented from reading what he signs, he
> alone is responsible for his omission to read what he
> signs.

**\*23** *Dice v. Akron, Canton & Youngstown R.R.,* 155
Ohio St. 185, 191 (1952), *rev'd on other grounds,* 342
U.S. 359 (1952); *see also Provident Bank v. Adriatic,
Inc.,* No. CA2004-12-108, 2005 WL 2840741, at \*3
(Ohio App. 12th Dist. Oct. 31, 2005).

National Mulch notes that it did not initial the back of
the Sales Quote. It suggests that this indicates that it did
not assent to the terms and conditions contained on the
back of the Sales Quote. However, upon review, it ap-
pears that the box for initialing found on the back of the
Sales Quote pertains exclusively to paragraph 13, the
geographical use limitation. Thus, this Court cannot
conclude that the absence of initials on the back of the
Sales Quote has any effect on the terms and conditions
of the agreement.[FN22]

> FN22. Except of course paragraph 13, which is
> not relevant to this case.

Even with all of the facts viewed in favor of National
Mulch, a reasonable jury could only conclude that when
Fischer signed the Sales Quote, National Mulch assen-
ted to all of the terms of the document, including those
on the reverse side. The Court therefore determines that
the disclaimer contained on the back of the Sales Quote
became part of the parties' agreement.

## ii. Adequacy of Disclaimer

National Mulch argues that, even if the disclaimer be-
came part of the parties' agreement, the disclaimer is not
adequate to disclaim the express warranties created by
Rexius. The U.C.C. specifically provides for the exclu-
sion of warranties under certain circumstances:

> Words or conduct relevant to the creation of an ex-
> press warranty and words or conduct tending to neg-
> ate or limit warranty shall be construed wherever
> reasonable as consistent with each other; but subject
> to the provisions of section 1302.05 of the Revised
> Code on parol or extrinsic evidence, negation or lim-
> itation is inoperative to the extent that such construc-
> tion is unreasonable.

Ohio Rev.Code § 1302.29(A).

As has been recognized, "express warranties are diffi-
cult to disclaim since they usually go to the essence of
the bargain and form the basis of the agreement
between the parties." *Ohio Savings Bank,* 54 Ohio
App.3d at 72 (citations omitted); *see also* Ohio
Rev.Code § 1302.26 off. cmts. 1, 4. Disclaimers of ex-
press warranties are valid only to the extent that they
are reasonably consistent with the warranties expressed.
Thus, where the conflict is between a written disclaimer
and other assertions which are part of the contract, the
disclaimer is typically ineffective.

Ohio courts have addressed similar cases in which a
pre-contractual oral representation conflicted with a dis-
claimer found in a subsequent written agreement. For
example, in *Barksdale,* the seller of an automobile made
pre-contractual oral representations that the transmis-
sion was in good working order. The parties then signed
a written agreement stating that the automobile was sold
"as is-no warranty." The court concluded that

> [w]hen a written contract for the sale of goods
> provides that the goods are sold "as is" and also dis-
> claims all express and/or implied warranties and such
> provisions cannot be reasonably construed as consist-
> ent with the seller's oral express warranty, the express
> warranty will prevail and the inconsistent provisions

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

deemed inoperative to the extent they are unreasonable.

*24 Barksdale, 62 Ohio App.3d at 729. A similar result was reached by the court in Pemberton, 63 Ohio Misc. at 29, 409 N.E.2d at 1076.

Rexius argues that although an unreasonable disclaimer is inoperative to negate express warranties contained in the same document as the disclaimer, such a disclaimer can still operate to disclaim warranties expressed in prior advertisements. In support of its position, Rexius cites Burton v. Elsea, Inc., No. 97CA2556, 1999 WL 1285874 (Ohio App. 4th Dist. Dec. 27, 1999). In Burton, the court found that "negation language found within a[n] unambiguous written contract intended as the final expression of the parties' agreement, to the extent consistent with the rest of the written agreement, will operate even if the parties reached a prior oral agreement that included an express warranty." Id. at *6. However, in this case, as was discussed supra, the evidence does not support a conclusion that the Sales Quote constitutes the final statement of the terms of the parties' agreement and, therefore, the parol evidence rule does not apply.

Rexius next argues that cases cited by National Mulch invalidating disclaimers are distinguishable on their facts as they involve consumers and "extreme facts." According to Rexius, enforcement of the disclaimer in this case would not be unreasonable because, unlike the cases cited by National Mulch, this case involves sophisticated business entities and there is no evidence of the seller taking advantage of the buyer. Alternatively, Rexius argues that summary judgment in favor of National Mulch on this issue would be inappropriate because there are no facts indicating that enforcement of the disclaimer would be unreasonable.

Rexius's argument misses the point. The question to be answered under § 1302.29(A) is not whether enforcement of the disclaimer would be reasonable. Section 1302.29(A) clearly states that disclaimers are inoperative when their construction with express warranties is unreasonable. Thus, whether the parties to the contract are consumers or commercial entities is not determinat-

ive of whether a disclaimer is reasonable. Instead, the focus is on the "[w]ords or conduct relevant to the creation of an express warranty and the words or conduct tending to negate or limit [that] warranty." Ohio Rev.Code § 1302.29(A).

In this case, the statements alleged to create express warranties are directly contradicted by the language of the disclaimer on the back of the Sales Quote. No reasonable person could construe the two as consistent with each other. The Court concludes that allowing the written disclaimer of express warranties contained on the back of the Sales Quote to effect a waiver of the alleged express warranties made by Rexius prior thereto would be unreasonable. Therefore, the disclaimer of express warranties found in the Sales Quote is ineffective to disclaim express warranties related to the EB-60's productivity, reliability, and ability to effectively dye mulch.

d. Breach of Warranty

*25 Finally, Rexius argues that it is entitled to summary judgment on National Mulch's express warranty claims based on the productivity statements because the facts show that Rexius did not breach those warranties. Specifically, Rexius states that the Express Blowers are able to be operated by just one person and can blow mulch at the rate represented to National Mulch.

Rexius finds support for its contention that the Express Blowers could be operated by one person from the testimony of Renn Beal, a former employee of National Mulch. During his deposition, Beal indicated that he was able to operate the truck by himself. (Beal Dep. 44.) National Mulch does not refute Beal's testimony; instead, it argues that the pertinent question is whether one person could be effectively operated by one person and apply most material at 55 cubic yards per hour.

In its Complaint, National Mulch alleges that Rexius breached two separate express warranties concerning the Express Blowers' productivity. The first is that the trucks could blow 55 cubic yards per hour using only one person. The second is that the trucks could be used

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

effectively by only one person. Beal's testimony is directly relevant to the second of these alleged express warranties.[FN23]

> FN23. Beal did not state the throughput rate at which he was able to operate the Express Blower by himself.

Viewing the evidence in favor of National Mulch, the Court cannot say that reasonable minds could come to only one conclusion as to whether Rexius breached the alleged warranty that the trucks could be effectively used by only one person. The small excerpt of Beal's deposition on the record does not show that, as a matter of law, the trucks could be used effectively by only one person.[FN24] Other evidence shows that effective one-person operation might not have been possible. For instance, Fischer testified that he observed an operator being "totally worn out" after operating the blower by himself for about fifteen minutes. (Fischer Dep. 147.) Rexius is not entitled to summary judgment on the issue of whether it breached the alleged express warranty that the Express Blowers could be effectively operated by one person.

> FN24. The Rexius marketing literature on the record does not actually use the term "effectively" in describing how the trucks can be used by only one person. Nonetheless, it seems that the brochure affirms that one person can effectively operate the trucks. It states that "the entire truck/blowing system is operated by just one person with remote control! When the operator is ready to begin blowing, he simply picks up the end of the hose, turns the system on by remote control, and adjusts the flow of material to meet his needs as he moves from area to area." (Rexius Marketing Lit. 3.) Later, the brochure states that a "one-person crew can get large jobs done quickly." (*Id.* at 4.)

Rexius also argues that there is no genuine issue as to whether it breached the alleged warranty regarding the Express Blowers' throughput rate. It again relies upon Beal's testimony to support this assertion. Beal testified that he could blow a payload of 60 cubic yards of play-

ground chips in "an hour, an hour and 15 minutes ." (Beal Dep. 35.) Rexius also argues that it is entitled to summary judgment on this claim because National Mulch admitted that the Express Blowers "were able to meet the represented production levels where the nature of the materials and the layout of the job made material application easy." (Fischer Decl. ¶ 19, Feb. 13, 2006.)

The Court agrees with Rexius that there is no genuine issue of fact regarding the question of whether the Express Blowers could blow 55 cubic yards per hour. However, National Mulch has specifically argued that the express warranty created by Rexius in regards to throughput is that the Express Blowers, operated by one person, can blow 55 cubic yards per hour with *most material*. Rexius's marketing literature clearly makes this statement. (Rexius Marketing Lit. 2.) Thus, Rexius is only entitled to summary judgment on the issue of breach of this alleged express warranty if there is no genuine issue of fact as to whether the Express Blowers could perform as National Mulch alleges that they were represented.

*26 The evidence advanced by Rexius does not show that it is entitled to summary judgment on this issue. First, the Court notes that Beal's testimony is ambiguous as to whether he was able to blow mulch at 55 cubic yards per hour. His testimony was that it took him about an hour to an hour and fifteen minutes to blow 60 cubic yards. This equates to a throughput of somewhere between 48 and 60 cubic yards per hour. Thus, contrary to Rexius's assertion, Beal's testimony does not definitely show that the Express Blowers could achieve 55 cubic yards per hour.

More importantly, Beal did not testify about his experience with "most material." His testimony concerned only one material-playground chips. Even if Beal's testimony did indicate unequivocally that he was able to get 55 cubic yards or more per hour blowing playground chips, it does not show that the Express Blowers could blow 55 cubic yards per hour with most material.

Additionally, National Mulch has put forth evidence to show that one person could not blow most material at 55 cubic yards per hour. Fischer states that achieving

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

the 55 cubic yard per hour throughput was the "exception," possible only with limited materials. (Fischer Decl. ¶ 19, Feb. 13, 2006.) He also testified that one person could not physically operate the Express Blower for an extended time with the throughput increased to its maximum. (Fischer Dep. 147-48.)

Given the evidence on the record, Rexius has not met its burden of showing that there is no genuine issue of fact regarding whether it breached the alleged warranty that the Express Blowers could, with one person, blow 55 cubic yards per hour with most material. Therefore, Rexius is not entitled to summary judgment.

**2. Implied Warranties**

In Counts III and IV of the Complaint, National Mulch alleges that Rexius breached an implied warranty of merchantability and an implied warranty of fitness for a particular purpose, respectively. In moving for partial summary judgment, Rexius argues that the Sales Quote disclaims all implied warranties. National Mulch generally challenges the validity of the Sales Quote.

As was discussed *supra,* this Court concludes that the disclaimer found on the back of the Sales Quote became part of the agreement between the parties. Therefore, the only question is whether the disclaimer effectively disclaimed all implied warranties.

With respect to the disclaimer of implied warranties, the Ohio Revised Code provides that:

Subject to division (C) of this section, to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states for example, that "There are no warranties which extend beyond the description on the face hereof."

**\*27** Ohio Rev.Code § 1302.29(B). Courts generally uphold a disclaimer of an implied warranty that complies

with § 1302.29 between parties who have equal bargaining power. *See Ressallat v. Burglar & Fire Alarms, Inc.,* 79 Ohio App.3d 43, 51 (1992).

As was noted *supra,* the front page of the Sales Quote, directly below the signature line, contains a clause indicating that there are additional terms and conditions, including terms limiting warranties, contained on the back of the Sales Quote. The disclaimer on the reverse side conspicuously states that no implied warranties, including any implied warranties of merchantability and fitness for a particular purpose, have been made.[FN25] National Mulch offers no argument as to why this language would be ineffective to disclaim all implied warranties. This Court concludes that Rexius effectively disclaimed any implied warranty of merchantability or fitness for a particular purpose. Rexius, therefore, is granted summary judgment on Counts III and IV of the Complaint.

> FN25. As was noted *supra,* note 21, a printed heading in capitals is conspicuous.

**E. Damages**

Finally, Rexius has filed a motion for partial summary judgment with respect to National Mulch's request for damages. In particular, Rexius argues that the Sales Quote excludes all consequential and incidental damages and that, under the U.C.C., National Mulch is limited to the difference in value between the EB-60 trucks that they received, and the value of those trucks as warranted. Rexius also moves for summary judgment as to certain damages that National Mulch indicated in its initial disclosure.

The Court begins with the general position that the remedies provided under Chapter 1302 of the Ohio Revised Code are to be liberally administered for the purpose of putting a party aggrieved by a breach of contract or warranty in as good a position as if the other party had fully performed. Ohio Rev.Code § 1301.06(A); *see also St. Henry Tile Co. v. Cain,* No. 1371, 1995 WL 783603, at \* 2 (Ohio App.2d Dist. Dec. 20, 1995). The Ohio Revised Code provides the following measure of damages

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

for accepted goods:

(A) Where the buyer has accepted goods and given notification as provided in division (C) of section 1302.65 of the Revised Code, he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(B) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(C) In a proper case any incidental and consequential damages under section 1302.89 of the Revised Code may also be recovered.

§ 1302.88. Subsections (A) and (B) are used to determine direct damages, while subsection (C) makes clear that separate, indirect damages are recoverable under § 1302.89. That section dictates what damages the buyer can recover as incidental and consequential damages. It states:

*28 (A) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation, and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses, or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(B) Consequential damages resulting from the seller's breach include:

(1) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(2) injury to person or property proximately resulting from any breach of warranty.

§ 1302.89.

A buyer's consequential damages frequently include profits lost as a result of the seller's breach. E.g., Cyclops Corp. v. Home Ins. Co., 389 F.Supp. 476, 478-79 (W.D.Pa.1975) (applying Ohio law); Chemtrol, 42 Ohio St.3d at 44. Additional expenses incurred by the buyer resulting from the seller's breach, such as increased costs of repairs and labor, are also recoverable as consequential damages under § 1302.89. E.g., World Metals, Inc. v.. AGA Gas, Inc., 142 Ohio App.3d 283, 289 (2001).

1. Limitation of Remedy for Breach of Contract

While the U.C.C. provides a remedy for consequential damages, it also allows the parties to agree to limit the buyer's remedy. Section 1302.93(A)(1) states that "[t]he agreement may provide for remedies in addition to or in substitution for those provided [under the Code] and may limit or alter the measure of damages recoverable." Under this section, parties to a contract may agree to exclude incidental and consequential damages from the amount recoverable flowing from a breach.

This Court concluded supra that the parties' agreement included the first twelve of the thirteen terms on the reverse side of the Sales Quote. Paragraph 2 of the Sales Quote states: "Seller shall not be liable for ... any incidental or consequential damages caused by or related to the goods sold...." By its plain language, this term limits the buyer's ability to recover incidental or consequential damages resulting from the seller's breach of the contract. Unless unenforceable as a matter of law, the parties' agreement excludes incidental and consequential damages from any amount National Mulch may recover for any breach of warranty by Rexius.

A term of an agreement to limit or exclude consequential damages will not limit a party's recovery if enforcement of the term is unconscionable. § 1302.93(C). However, "limitation of damages where the loss is commercial is not" prima facie unconscionable. Id.; accord Stevens v. Protecto Auto Care, Inc., No CA-8607, 1991 Ohio App. LEXIS 6353, at *8 (5th Dist. Dec. 30, 1991);

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894833 (S.D.Ohio), 62 UCC Rep.Serv.2d 371
(Cite as: 2007 WL 894833 (S.D.Ohio))

Page 27

*Slemmons v. Ciba-Geigy Corp.,* 57 Ohio App.2d 43, 57 (1978). All of the losses that National Mulch alleges resulted from Rexius's breach of warranty are economic, i.e., commercial losses. In certain cases, enforcing the parties' agreement to exclude lost profits and increased business expenses from any recovery of damages could be unconscionable. However, there are no circumstances in this case to support such a conclusion. If the sellers of goods were not permitted to routinely exclude lost profits and increased expenses in their contracts, they would be forced to face nearly endless liability with each sale. Such a result is contrary to the rationale behind § 1302.93. Therefore, the Court determines that the term in the Sales Quote limiting recovery by excluding consequential damages is not unconscionable.

**\*29** National Mulch contends that the limited remedy available to it under the terms of paragraph 2 fails of its essential purpose and that, as a result, it is not precluded from recovering incidental and consequential damages. This argument lacks merit.

"Where circumstances cause an exclusive or limited remedy to fail of its essential purpose" damages that are normally available to the non-breaching party may be recovered. § 1302.93(B). A limited remedy fails of its essential purpose when the aggrieved party cannot obtain the intended benefit of the remedy for which it bargained. *See Abele,* 11 F.Supp.2d at 960-61; *Cyclops,* 389 F.Supp. at 482-83. This frequently occurs in the situation where the parties agree that the buyer's only remedy for the seller's breach of warranty is repair or replacement of the goods sold. The purpose of these limited remedies is "to give the seller an opportunity to cure the defect" and to limit the seller's risk "by excluding direct and consequential damages." *Abele,* 11 F.Supp.2d at 960. This type of limited remedy typically fails when evidence shows that the seller either refuses to repair or replace the goods or, despite attempting repair, the seller was not able to cure its breach. *See, e.g., id.* at 960-61.

Unlike the buyers in the cases cited in support of its argument, National Mulch's remedy is not limited to repair or replacement of the goods sold. Instead, paragraph 2 of the Sales Quote provides that National Mulch may not recover incidental or consequential damages, but this term leaves available to National Mulch damages directly caused by any breach of warranty by Rexius. These direct damages are recoverable under § 1302.88(B). National Mulch has put forth no evidence to show that it cannot receive the benefit of this limited remedy for which it bargained. Therefore, the Court cannot conclude that the limited remedy of the parties' agreement fails of its essential purpose.

Because it is neither unconscionable nor fails of its essential purpose, paragraph 2 of the Sales Quote operates to exclude incidental and consequential damages from National Mulch's remedy for any breach of warranty by Rexius. Rexius is entitled to summary judgment on National Mulch's claims for incidental and consequential damages under Count 1 of the Complaint.[FN26]

> FN26. Rexius argues in the alternative that National Mulch cannot recover startup and overhead costs that National Mulch claims as consequential damages because it would have incurred these costs irrespective of any breach of warranty by Rexius. Because the Court concludes that the parties agreed to exclude consequential damages from any recovery for breach of warranty, there is no need to address this argument.

**2. Measure of Direct Damages for Breach of Warranty**

Rexius has also moved for summary judgment on National Mulch's claim for lease payments that it made on the Rexius trucks and the remaining balance owed on the leases. In support, Rexius argues that the proper measure of direct damages for breach of warranty in this case is the difference between the value of the trucks when accepted and the value that they would have had if they had been delivered as warranted. According to Rexius, National Mulch's claim for all of its lease payments would allow it to recover an amount much greater than this difference. National Mulch replies that it is not limited to the difference in value measure because the alleged breach of warranties by

Rexius caused National Mulch to suffer a complete business failure.

*30 In a letter to Rexius dated April 28, 2005, National Mulch claimed as damages $370,567.02 in lease payments that it had made on the Rexius trucks and the $454.259.41 balance that it owes on the lease. (Damages Analysis Letter 2, Batson Decl. Ex. 3, R. at 75-2.) These amounts include both the principal and interest on the loan that National Mulch took to finance the trucks.[FN27] (See Fischer Dep. 185-87.) The combined price that National Mulch paid for the two Rexius trucks was $580,628.[FN28] National Mulch sold the two trucks in December 2005 for approximately $320,000. (Fischer Decl. ¶ 25, Feb. 13, 2006.)

> FN27. National Mulch is correct in its assertion that a buyer can recover interest payments used to finance the purchase the goods that are the subject of the seller's alleged breach of warranty. See, e.g., Bobb Forest Prods., Inc. v. Morbark Indus., Inc., 181 Ohio App.3d 63, 87-88 (2002). However, financing costs are consequential damages, id.; Architectural Identification, Inc. v. Am. Bus. Equip., No. 85 AP-1048, 1986 WL 309, at * 4 (Ohio App. 10th Dist. Sept. 16, 1986), and are therefore not available as damages for any breach of warranty in this case because the parties excluded consequential damages from any recovery. See supra.

> FN28. According to the April 3, 2000 Sales Quote, the first truck was sold to National Mulch for $291,933. The April 28, 2000 Sales Quote indicates that the second truck was sold for $288,695.

Section 1302.88(B)'s difference in value measure for damages resulting from a breach of warranty is the "usual, standard and reasonable method of ascertaining damages." Simons Cadillac, Inc. v. Roddy, No. 9970, 1987 WL 6242, at *4 (Ohio App. 2nd Dist. Feb. 3, 1987). However, a different measure is proper when "special circumstances show proximate damages of a different amount." § 1302 .88(B); accord, e.g., Simons

Cadillac, 1987 WL 6242, at *4; Gen. Motors Acceptance Corp. v. Grady, 27 Ohio App.3d 321, 325 (1985). In Simons Cadillac, special circumstances existed because the difference in market value measure would not have resulted in an accurate determination of the buyer's proximate damages. Simons Cadillac, 1987 WL 6242, at *4 ($9700 difference in market value was not the proper measure of damages where buyer only incurred actual costs of $6,836 to remedy the seller's breach of title warranty. The difference in market value measure would have put the buyer in a better position then if there had been no breach). In Grady, the difference in market value measure was not used to determine damages because, although the buyer had accepted delivery of a car that she had purchased, the car was later repossessed. Grady, 27 Ohio App.3d at 325.

National Mulch asserts that its business failure is a special circumstance that allows it to recover the entire price of the trucks and the cost of financing them. It argues that, like the buyers in Simons Cadillac and Grady, the difference in market value measure for damages will not make it whole. The Court disagrees. There is no evidence to suggest that the difference in market value measure for damages in § 1302.88(B) will not result in an accurate determination of National Mulch's proximate damages from any breach of warranty by Rexius. To the contrary, allowing National Mulch to recover the entire purchase price of the trucks plus financing costs ($824,826.43 according to National Mulch) as direct damages would put it in a better position than if the alleged breach of warranty never occurred.[FN29]

> FN29. With a recovery of the $824,826.43 in damages claimed as the price of the trucks and financing charges, National Mulch would receive in damages $244,198.43 more than it paid for the trucks. Together with the $320,000 that it received upon the sale of the trucks, National Mulch's total windfall would be $564,198.43 plus the value of possessing the trucks between spring 2000 and the end of 2005.

National Mulch argues at length that Dynamic Recycling Services, Inc. v. Shred Pax Corp., 210 Ill.App.3d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

602 (1991), supports a damages award of the entire purchase price of the trucks. Like National Mulch, the buyer in that case argued that the seller's breach of warranty resulted in the failure of its business. *Id.* at 607. The court in *Dynamic* relied upon the special circumstances exception in the Illinois equivalent to § 1302.88(B) when it affirmed the trial court's damage award of the entire amount paid for the goods. *Id.* at 615-16. Although the goods as accepted had value at the time of acceptance, the buyer went out of business due in part to the seller's breach, making the goods worthless. *Id.* at 615. The court stated that the difference in market value at the time of acceptance between the goods accepted and the value they would have had if they had been as warranted would not make the buyer whole in these special circumstances. *Id.*

*31 The Court does not find *Dynamic* persuasive. First, the buyer in that case attempted to revoke its acceptance within two months of delivery of the goods.[FN10] *Id.* at 606. By contrast, National Mulch never revoked, or even attempted to revoke, its acceptance of the trucks. Instead, it used the trucks for several years. More importantly, unlike the goods in *Dynamic* that were worthless after the buyer's business failed, it is indisputable that the Rexius trucks retained immense value even after National Mulch closed its doors. Thus, this case is distinguishable from *Dynamic* and cases where the full price of the goods are awarded as damages because the goods as accepted by the buyer had no value. *E.g., Vitek v. Baker,* No. 86AP-865, 1987 Ohio App. LEXIS 7794, at *6-7 (10th Dist. June 30, 1987) (difference between value of goods accepted and value that they would have had if they had been as warranted was the contract price

because the goods as accepted were worthless).

> FN30. Under Ohio Revised Code § 1302.85, a buyer who justifiably revokes acceptance may recover the entire price that it has paid for the goods.

Viewing the evidence most favorably to National Mulch, the Court concludes there is no genuine issue for trial regarding the existence of special circumstances that would dictate a measure of damages other than that called for in § 1302.88(B). Instead, reasonable minds could only conclude that National Mulch's direct damages for any breach of warranty by Rexius are appropriately measured by the difference at the time of acceptance between the value of the trucks as accepted and the value they would have had if they had been as warranted. Therefore, the Court determines that direct damages for breach of warranty in excess of § 1302.88(B)'s difference in value measure are unavailable to National Mulch as a matter of law.

**3. Damages Claimed in National Mulch's Initial Disclosure**

Last, Rexius moves the Court for summary judgment on certain categories of damages included in National Mulch's initial computation of damages. In its initial disclosures, National Mulch listed the following as direct and consequential damages:

| a. | Outstanding line of credit (including expenditure for parts and labor and lost utility) | $397,129.00 |
|---|---|---|
| b. | Balance of leases for vehicles | $550,000.00 |
| c. | Outstanding Shareholder loans to company | $232,429.75 |
| d. | Twenty percent margin of total sales lost profit | $430,931.68 |
| e. | Outstanding salary obligations to Rick Fisher [sic] | $336,000.00 |

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

| f. | Outstanding salary obligations to Monte Will | $ 42,000.00 |
| g. | Outstanding office rent | $ 25,200.00 |
| h. | Outstanding bookkeeping/office support | $ 38,472.00 |
| i. | Outstanding office equipment liability | $ 12,600.00 |
| Total Losses to Date | | $2,064,767.00 |

(Pl.'s Initial Disclosures 7, Batson Decl. Ex. 1.) Rexius asserts that it is entitled to summary judgment to the extent that National Mulch seeks damages on all of the above items, except for the balance of the leases on the trucks, because National Mulch has abandoned them. Alternatively, Rexius argues that no genuine issue of fact exists as to whether these items are recoverable in this case.

*32 National Mulch has twice updated its damages computation (See Batson Decl. Exs. 2-3.) While both updates include the balance that National Mulch owes on its leases for the trucks, neither includes as damages any of the other categories of damages included in National Mulch's initial disclosures. (See id.) Based upon this, Rexius argues that National Mulch has abandoned its claims for these categories of damages. In response, National Mulch concedes that it abandoned certain claims for damages after discovery commenced and that this is reflected in its updated damages analysis.

Whether the categories of damages for which Rexius seeks summary judgment are recoverable is no longer at issue in this case because National Mulch concedes that it has abandoned its claims for these categories. As such, Rexius's motion for summary judgment on these damages is denied as moot.

## IV. Conclusion

WHEREUPON, Rexius's motion for partial summary judgment on National Mulch's negligent misrepresentation claim (R. at 73) is **GRANTED** in part and **DENIED** in part. Rexius's motion for partial summary judgment on National Mulch's negligent misrepresentation claim is **GRANTED** to the extent that the claim is based upon omissions of fact. Rexius's motion for par-

tial summary judgment on National Mulch's negligent misrepresentation claim is otherwise **DENIED**.

National Mulch's motion for partial summary judgment on the issues of creation of express warranties and the disclaiming of warranties (R. at 87) is **GRANTED** in part and **DENIED** in part. National Mulch's motion for partial summary judgment on the issue of the creation of an express warranty that the Rexius Express Blowers could effectively dye mulch is **GRANTED**. National Mulch's motion for partial summary judgment on the issue of the creation of all other express warranties is **DENIED**. National Mulch's motion for partial summary judgment on the issue of whether Rexius effectively disclaimed express warranties is **GRANTED**.

Rexius's motion for partial summary judgment on National Mulch's warranty claims (R. at 88) is **GRANTED** in part and **DENIED** in part. Rexius's motion for partial summary judgment on National Mulch's claim of breach of express warranty is **GRANTED** to the extent that the claim is based on statements that the Rexius Express Blowers are "of superior craftsmanship" and "built and manufactured with high quality material and workmanship." Rexius's motion for partial summary judgment on National Mulch's claim of breach of express warranties is otherwise **DENIED**. Rexius's motion for partial summary judgment on National Mulch's claims of breach of implied warranty of merchantability and breach of implied warranty of fitness for a particular purpose is **GRANTED**.

Rexius's motion for partial summary judgment on certain damages claimed by National Mulch (R. at 75) is **GRANTED** in part and **DENIED** in part. Rexius's motion for partial summary judgment on incidental and consequential damages resulting from any breach of warranty by Rexius is **GRANTED**. Rexius's motion for partial summary judgment on the measure of direct

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894833 (S.D.Ohio), 62 UCC Rep.Serv.2d 371
(Cite as: 2007 WL 894833 (S.D.Ohio))

damages resulting from any breach of warranty by Rexius is **GRANTED.** Rexius's motion for partial summary judgment on certain categories of damages claimed by National Mulch in its initial disclosure is moot and is therefore **DENIED.**

**\*33** Finally, Rexius's objection to certain evidence submitted by National Mulch (R. at 92) is moot and is therefore **OVERRULED.**

**IT IS SO ORDERED.**

S.D.Ohio,2007.
National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc.
Not Reported in F.Supp.2d, 2007 WL 894833 (S.D.Ohio), 62 UCC Rep.Serv.2d 371

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4557712 (E.D.Mich.)
(Cite as: 2007 WL 4557712 (E.D.Mich.))

C
Only the Westlaw citation is currently available.

United States District Court,
E.D. Michigan,
Southern Division.
PRATHAM DESIGN INNOVATION PVT. LTD.,
Plaintiff,
v.
INFOVISION 21, INC., Defendant.
No. 07-CV-13282.

Dec. 21, 2007.

Stephen M. Ryan, Stephen M. Ryan Assoc., Bing-
ham Farms, MI, for Plaintiff.

Karen J. Wensink, Eastman & Smith, Toledo, OH,
for Defendant.

*ORDER GRANTING IN PART AND DENYING IN
PART DEFENDANT'S MOTION TO DISMISS*

GEORGE CARAM STEEH, District Judge.

*1 This breach of contract action arises out of the
parties' agreement that defendant Infovision 21, Inc.
(InfoVision) would provide a technology consultant
to plaintiff Pratham Design Innovation PVT, LTD
(PDI). A hearing was held on December 18, 2007.
Now before the court is InfoVision's for PDI's fail-
ure to state a claim.[FN1] For the reasons stated on
the record and below, InfoVision's motion will be
granted in part and denied in part.

> FN1. Plaintiff also had moved to dismiss
> for lack of jurisdiction for defendant's fail-
> ure to register as a foreign corporation, but
> defendant obtained a certificate of author-
> ity prior to the court's hearing; thus, the ar-
> gument is moot.

*BACKGROUND*

On November 28, 2006, InfoVision and PDI
entered into a professional services agreement in
which InfoVision promised to provide consulting
via Satya Krishna Ganni to PDI in return for pay-
ment. The contract was to be performed in Detroit,
Michigan and Hartford, Connecticut. On July 26,
2007, PDI filed its two-count complaint alleging
that InfoVision had billed it for consulting services
that were never rendered. Count I alleges breach of
contract for InfoVision's misconduct in submitting
fraudulent invoices for services which were inflated
or non-existent and for providing a consultant who
was unwilling to perform. Count II alleges fraud for
the same alleged misconduct and further alleges
that time sheets were forged.

PDI avers that the amount in controversy exceeds
$500,000. InfoVision claims that the amount in
controversy does not meet the $75,000 jurisdiction-
al amount needed for diversity jurisdiction to exist.
PDI responds that the amount in controversy in-
cludes $50,000 to $60,000 for faulty invoices, addi-
tional damages caused by a three month delay in
connection with its contract with Nissan Motors,
lost confidence of its customer Nissan, lost profits
and increased overhead which may exceed an addi-
tional $100,000 in losses, as well as losses for attor-
ney fees, costs, and punitive damages.

PDI is a foreign corporation incorporated under the
laws of India and doing business in Oakland
County, Michigan. PDI conducted business in
Michigan via its wholly owned subsidiary, Pratham
Design Innovation, Inc. (Pratham). Pratham is a
West Virginia corporation which qualified to do
business in Michigan on December 6, 2006. InfoVi-
sion is an Ohio corporation doing business in
Michigan. The contract contains a forum selection
clause by which the parties agreed that the laws of
Ohio would govern any disputes under the agree-
ment.

In its response brief, plaintiff states that it plans to
file an amended complaint as a matter of right pur-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4557712 (E.D.Mich.)
(Cite as: 2007 WL 4557712 (E.D.Mich.))

suant to Federal Rule of Civil Procedure 15(a) since InfoVision has not yet filed a responsive pleading. [FN2] The amended complaint will ask for punitive damages, attorney fees under the written contract, allege a separate common law duty not to deceive, and ask for a declaratory judgment that PDI owes no money to InfoVision under the contract.

> FN2. A motion to dismiss is not a "responsive pleading" within the meaning of Federal Rule of Civil Procedure 15(a). *Young v. Track, Inc.,* 324 F.3d 409, 416 fn. 6 (6th Cir.2003).

### *ANALYSIS*

### I. JURISDICTIONAL AMOUNT

InfoVision argues that the complaint must be dismissed for PDI's failure to meet the $75,000 jurisdictional amount. As to the alleged amount in controversy, "[i]n a federal diversity action, the amount alleged in the complaint will suffice unless it appears to a legal certainty that the plaintiff cannot claim the jurisdictional amount." *Klepper v. First Amer. Bank,* 916 F.2d 337, 340 (6th Cir.1990) (citing *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 288-89, 58 S.Ct. 586, 82 L.Ed. 845 (1938)).

*2 In this case, PDI has satisfied this threshold amount in its complaint by alleging $500,000 in damages. PDI alleges breach of contract and fraud damages, including attorney fees and costs. In support of the jurisdictional amount, PDI submitted the affidavit of its chairman who states that damages include payments on fraudulent invoices from December 2006 through April 2007; payments to InfoVision's consultant, Mr. Ganni, for travel, an apartment, a car, a laptop computer and clothing, and cash advances; as well as damages for lost time, overhead and profits caused by a three-month delay on a project with Nissan Motors which may, by itself, exceed $100,000.

InfoVision argues that this court may not consider the affidavit in considering whether or not the amount in controversy has been met. InfoVision contends that this court's review is limited to the face of the complaint itself under a motion to dismiss pursuant to Rule 12(b)(6). InfoVision cites the wrong rule. A motion to dismiss for lack of jurisdiction is found at Federal Rule of Civil Procedure 12(b)(1). The Sixth Circuit has made it clear that courts are authorized to find facts to the extent necessary to determine whether jurisdiction exists. *Rice v. Baltimore & O.R. Co.,* 42 F.2d 387 (6th Cir.1930). Plaintiff bears the burden of proving that the amount in controversy has been made. *See McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). In determining whether or not jurisdiction exists, the court may consider affidavits and other proofs outside the pleadings so long as the court's determination of jurisdiction does not turn into a ruling on the merits of the case. *Fireman's Fund Ins. Co., v. Railway Express Agency,* 253 F.2d 780, 784 (6th Cir.1958). Although the complaint normally determines the amount in controversy to determine jurisdiction, the court may consider matters outside the pleadings. *Kennard v. Harris,* 728 F.Supp. 453 (E.D.Mich.1989). Although the $500,000 pled in the complaint appears exaggerated, assuming as true the affidavit of PDI's chairman, the jurisdictional amount is satisfied.

### II. FAILURE TO STATE A CLAIM

InfoVision also argues that it is entitled to dismissal for plaintiff's failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Rule 12(b)(6) authorizes a court to dismiss a claim on an issue of law. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In considering a Rule 12(b)(6) motion, a court must "accept all of plaintiff's factual allegations as true and determine

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 1:08-cv-02755-DCN  Doc #: 54-1  Filed: 09/30/10  64 of 126.  PageID #: 971 Page 3

Not Reported in F.Supp.2d, 2007 WL 4557712 (E.D.Mich.)
(Cite as: 2007 WL 4557712 (E.D.Mich.))

whether any set of facts consistent with the allegations would entitle the plaintiff to relief." *G.M. Eng'r and Assoc., Inc. v. West Bloomfield Tp.*, 922 F.2d 328, 330 (6th Cir.1990).

As to the breach of contract claim, InfoVision argues that the complaint is deficient because PDI rests on a legal conclusion. This court disagrees. PDI has sufficiently pled its breach of contract claim in conformity with Federal Rule of Civil Procedure 8(a) which requires "a short and plain statement of the claim." PDI attached the three-page professional services agreement in dispute to the complaint. Count I alleges that InfoVision was to provide the services of a consultant named Satya Krishna Ganni, and that InfoVision submitted invoices for services never rendered. Given that only five invoices are in dispute in this lawsuit, namely monthly invoices from December 2006 to April 2007, InfoVision is on sufficient notice as to the breach of contract claim against it.

*3 InfoVision also complains that the allegations of the complaint lack the specificity required under Federal Rule of Civil Procedure 9(b). Rule 9(b) provides: "[i]n all averments of fraud ... the circumstances constituting fraud or mistake shall be stated with particularity." In reviewing the complaint to see if it meets the particularity required for a fraud claim, the court is mindful of the Sixth Circuit's admonition that Rule 9(b) must be read in conformity with the notice pleading requirement of Rule 8(a). *American Town Ctr. v. Hall, 83 Assoc.*, 912 F.2d 104, 109 (6th Cir.1990).

As to the fraud claim, the complaint alleges that fraudulent invoices were submitted because they "contained not only hours which were inflated or nonexistent and/or for which the consultant did not perform any services, but related time sheets requiring a signature of someone at PDI were forged." (Complaint, Par. 13). PDI explains that the duration of the contract was from December 2006 to April 2007, and during that time InfoVision submitted just five monthly invoices. Given this scenario, PDI asserts that InfoVision is on notice as to the time,

place and content of the alleged misrepresentations. The court agrees that the complaint, as pled, is sufficient to state a claim.

III. ECONOMIC LOSS DOCTRINE

Finally, InfoVision argues that PDI's fraud claim must be dismissed under Ohio's economic loss doctrine which bars a party from recovering in tort the same damages available under a breach of contract theory. Under the economic loss doctrine, the Ohio Supreme Court has held that a party cannot recover in tort for purely economic damages. *Corporex Dev. & Constr. Man. v. Shook Inc.*, 106 Ohio St.3d 412, 413, 835 N.E.2d 701 (2005); *Floor Craft Floor Covering, Inc. v. Parma Cmty. Gen. Hosp., Ass'n*, 54 Ohio St.3d 1, 8, 560 N.E.2d 206 (1990). Put another way, "the economic loss doctrine prevents a party from recovering economic losses in tort that result from 'a breach of duties assumed only by agreement.' " *Onyx Envir. Serv., LLC v. Maison*, 407 F.Supp.2d 874, 879 (N.D.Ohio 2005) (citing *Corporex*, 106 Ohio St.3d at 414, 835 N.E.2d 701). The Ohio Supreme Court has explained the purpose of the rule "stems from the recognition of a balance between tort law, designed to redress losses suffered by a breach of a duty imposed by law to protect societal interests, and contract law, which holds that 'parties to a commercial transaction should remain free to govern their own affairs.' " *Corporex*, 106 Ohio St.3d at 414, 835 N.E.2d 701 (citing *Chemtrol Adhesives Inc. v. American Mfrs. Mut. Ins. Co.*, 42 Ohio St.3d 40, 537 N.E.2d 624 (1989)).

There is no dispute that Ohio recognizes a common-law fraud claim. The issue is whether under the facts of this case PDI's fraud claim is precluded by the economic loss rule. The court's decision will impact which damages may be recovered as PDI plans to amend the complaint to add a claim for punitive damages which are permissible under a fraud claim, but not under the breach of contract claim. *Battista v. Lebanon Trotting Assn.*, 538 F.2d 111, 118 (6th Cir.1976) (citing Ohio law).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4557712 (E.D.Mich.)
(Cite as: 2007 WL 4557712 (E.D.Mich.))

**\*4** Both parties cite to *Onyx Envtl. Serv. v. Maison,* 407 F.Supp.2d 874 (N.D.Ohio 2005) in support of their competing positions. PDI correctly relies on that case to support the proposition that fraudulent inducement may be an exception to the economic loss doctrine. In that case, the plaintiff Onyx, operated as a waste management servicer. *Id.* at 876. Customers would deposit left over household paint at central locations and Onyx then shipped the waste for recycling to an environmental services firm by the name of EPI. *Id.* Plaintiff sued the president and another officer of EPI for fraud and for fraudulent inducement based on misrepresentations the president made. *Id.* The president assured plaintiff that it was "processing" the waste, when in point of fact, it was merely storing drums of waste at its facility. *Id.* at 878.

The court held that since Onyx had no breach of contract claim against officers of EPI, the fraud claims against those individuals were not redundant. *Id.* at 876. The court also found that the fraudulent inducement claim was not barred by Ohio's economic loss rule since the president of EPI breached duties outside of the contract. *Id.* at 877. The court found that EPI had separate contracts with Onyx for each shipment of waste and that each time the defendants told Onyx that the waste was being "processed" a fraud was perpetrated which falsely induced Onyx to enter into other transactions. *Id.* at 878. This case, by contrast, does not involve a fraud in the inducement claim nor does it involve suit against individuals not named in the contract.

PDI claims that *Bowman v. Goldsmith Bros. Co.,* 109 N.E.2d 556, 63 Ohio Law Abs. 428 (1952) supports its fraud claim here. That case is inapposite. In *Bowman,* a slip and fall action, the court ruled that although there is a common law duty whereby landlords are responsible for maintaining common areas, plaintiff was injured on steps leading only to her own apartment, thus, no common law duty arose. *Id.* at 558-59. Thus, the trial court erred in submitting the case to the jury on the theory of im-

plied contract. *Id.* In our case, there is no common law duty at stake. What is in dispute is InfoVision's failure to comply under the terms of the contract. Namely, the issue is whether PDI was billed for work that was never completed in violation of the contract. PDI contends a common law duty exists not to deceive that exists independently of the contract. The court disagrees.

In *Battista v. Lebanon Trotting Ass'n,* 538 F.2d 111, 117 (6th Cir.1976), the Sixth Circuit explained that a plaintiff has no tort claim where he has merely lost the benefit of the bargain because the duty arises through the contract alone. The Sixth Circuit explained that a common law duty in tort arises in the insurance context where a disparity in bargaining power exists between the insurer and the insured who has nothing to do with the drafting of the policy. *Id.* at 118. No such special duty arises between businesses entering into ordinary contracts and in those cases, the economic loss rule prevents recovery in tort. *Id.* In determining whether the economic loss rule applies, the question is whether the tort claim can exist independent of the contract claim such that a duty is owed even if no contract existed. *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.,* 115 Ohio App.3d 137, 684 N.E.2d 1261 (1996).

**\*5** Unlike the landlord-tenant, doctor-patient, lawyer-client, insurer-insured relationships which give rise to common law duties of care, there is no common law duty that arises between PDI and InfoVision. Their relationship is strictly contractual. Assuming as true that InfoVision submitted false invoices and charged for consulting work that was never performed, that is a breach of InfoVision's contractual duty to perform under their professional services agreement.

InfoVision relies on *Med. Billing, Inc. v. Med. Mgmt. Sciences, Inc.,* 212 F.3d 332 (6th Cir.2000), *cert. denied,* 531 U.S. 1051, 121 S.Ct. 655, 148 L.Ed.2d 558 (2000), where defendants promised plaintiffs they would use a particular formula to calculate compensation to induce them to enter into

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4557712 (E.D.Mich.)
(Cite as: 2007 WL 4557712 (E.D.Mich.))

the contract. *Id.* at 334. When defendants failed to use the contractual formula, plaintiff sued for fraud and breach of contract. *Id.* at 335. The Sixth Circuit, relying on the Ohio economic loss doctrine, struck down the jury's award of fraud and breach of contract damages as redundant. In reaching this conclusion, the Sixth Circuit noted that the injury claimed in the breach of contract claim and the fraud claim were identical. *Id.* at 337-39. In our case, the situation is the same. PDI alleges that timesheets were forged and bills were submitted for work that was never performed. The injury alleged under tort and contract law is the same. Therefore, PDI's fraud claim shall be dismissed under the economic loss rule.

In conclusion, InfoVision's motion to dismiss for failing to plead the jurisdictional amount is DENIED.

InfoVision's motion to dismiss for failure to state a claim is DENIED as to PDI's breach of contract claim pled in Count I of the complaint, but is GRANTED as to PDI's fraud claim pled in Count II of the complaint.

Count II is hereby DISMISSED WITH PREJUDICE.

PDI has stated that it plans to file an amended complaint as of right pursuant to Rule 15(a) since InfoVision has not yet filed a responsive pleading. Based on the court's order herein, plaintiff is prohibited from asking for punitive damages, from pleading a separate common law duty not to deceive, and from pleading a fraud claim, in its amended complaint.

IT IS FURTHER ORDERED that plaintiff file its amended complaint on or before January 8, 2008.

SO ORDERED.

E.D.Mich.,2007.
Pratham Design Innovation Pvt. Ltd. v. Infovision 21, Inc.
Not Reported in F.Supp.2d, 2007 WL 4557712

(E.D.Mich.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 113058 (S.D.Ohio)
(Cite as: 2009 WL 113058 (S.D.Ohio))

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. Ohio,
Eastern Division.
REENGINEERING CONSULTANTS, LTD., d/b/a
Results Engineering, Plaintiff,
v.
EMC CORP. f/k/a Captiva Software Corp., Defendant.
**No. 2:08-cv-47.**

Jan. 14, 2009.

West KeySummary
Torts 379 ⟬⟬⟭⟭241

379 Torts
   379III Tortious Interference
      379III(B) Business or Contractual Relations
         379III(B)2 Particular Cases
            379k241 k. Business relations or economic advantage, in general. Most Cited Cases
Under Ohio law, an engineering corporation's claim of tortious interference with business relations against a software corporation was dismissed. The engineering corporation did not allege that the software corporation had an ulterior motive to interfere with its business. The engineering corporation could only bring a breach of contract claim without the motive to interfere with business relations. Furthermore, without the evidence of motive, the engineering company would have been allowed to present a breach of contract claim as a tort claim.

John Edward Haller, Shumaker Loop & Kendrick, Anthony M. Sharett, Ohio Department of Commerce, Columbus, OH, for Plaintiff.

John F. Marsh, April L. Opper, Hahn Loeser & Parks LLP, Columbus, OH, for Defendant.

*MEMORANDUM OPINION & ORDER*

JOHN D. HOLSCHUH, District Judge.

**\*1** Plaintiff Results Engineering, an Ohio corporation, sues Defendant EMC Corp. ("EMC") alleging claims for breach of contract and tortious interference with business relations. The claims arise from a contract that Plaintiff entered into with Captiva Software Corporation ("Captiva"), a California corporation, which has since been acquired by EMC. Plaintiff alleges that EMC, by soliciting business from Plaintiff's prospective customers, not only breached the contract, but also tortiously interfered with Plaintiff's business opportunities. The matter is before the Court on EMC's motion for partial judgment on the pleadings under Rule 12(c) or, alternatively, for partial summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Doc. # 15). According to EMC, Plaintiff's tortious interference with business relations claim is barred by statute of limitations, or, alternatively, by the existence of a contract between the parties. For the following reasons, the Court **GRANTS** EMC's motion to dismiss Plaintiff's tortious interference with business relations claim.

**I. Background**[FN1]

> FN1. The following factual information is taken from Plaintiff's complaint and is assumed to be true for the purposes of this motion. *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).

On October 1, 2004, Plaintiff entered into a contract with Captiva. (Am.Compl. ¶ 3.) The contract, a Reseller Agreement, authorized Plaintiff to market software solutions it created with Captiva to Plaintiff's end users or prospects. (Am.Compl.Ex.A.) Section 8(d) of that contract prohibits Captiva from knowingly soliciting business from Plaintiff's end users or prospects. The provision requires Captiva to make reasonable ef-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2009 WL 113058 (S.D.Ohio)
(Cite as: 2009 WL 113058 (S.D.Ohio))

forts to refer inquiries it knowingly receives from Plaintiff's current or prospective customers to Plaintiff. Finally, the provision contains notification requirements to be met by Captiva in the event one of Plaintiff's end users or prospects insists on doing business directly with Captiva.

Plaintiff claims that Captiva breached § 8(d) of the contract. (Am.Compl.¶¶ 30-40.) According to Plaintiff, Captiva knowingly solicited orders for its software from four of Plaintiff's prospective customers-three Ohio corporations and one Ohio state agency. With respect to one of these prospective customers, Plaintiff alleges, if Captiva did not directly solicit the business, then Captiva failed to notify Plaintiff that it had been approached by one of Plaintiff's prospects as required under the contract. Plaintiff also alleges that Captiva, by knowingly soliciting the business of these four prospective customers, and through its contacts with another of Plaintiff's prospects, tortiously interfered with Plaintiff's business relations. (Am.Compl.¶ 41-48 .) Plaintiff asserts that Captiva's breach of contract and tortious interference with its business relations caused Plaintiff to lose at least $1.5 million in profits, future license sales, professional services, and maintenance revenue.

EMC responds that Plaintiff's tortious interference with business relations claim is barred by statute of limitations, or, alternatively, by the existence of a contract between the parties. (Def.'s Mot. for Partial J. on Pleadings 1-2.) According to EMC, California law applies in this diversity action, subjecting Plaintiff's tort claim to California's two year statute of limitations. EMC asserts that Plaintiff brought this suit more than two years after learning of Captiva's alleged wrongdoing. (Def.'s Mot. for Partial J. on Pleadings 5-8.)

*2 EMC argues alternatively that if Ohio law governs, making California's statute of limitations inapplicable, Plaintiff's tort claim is still precluded, under Ohio's economic loss doctrine, by the existence of a valid contract between the parties. (Def.'s Mot. for Partial J. on Pleadings 8-11.) EMC's motion to dismiss this claim under Rule 12(c) or, alternatively, for summary judgment on the claim under Rule 56, is now before the Court.

## II. Choice of Law

A federal court sitting in diversity applies the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Therefore, Ohio's choice of law rules govern this case.

In tort actions, to determine which state's law governs, Ohio courts apply the balancing test set forth in the Restatement (Second) of Conflicts of Laws ("Restatement"). *Muncie Power Prod., Inc. v. United Techs. Auto., Inc.,* 328 F.3d 870, 873-74 (6th Cir.2003); *Morgan v. Biro Mfg. Co., Inc.,* 15 Ohio St.3d 339, 342, 474 N.E.2d 286, 289 (Ohio 1984). According to § 145 of the Restatement, "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties ...." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971). To determine which state has the most significant relationship to the occurrence and the parties, § 145 provides four factors to be considered by courts:

  (a) the place where the injury occurred,

  (b) the place where the conduct causing the injury occurred,

  (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

  (d) the place where the relationship, if any, between the parties is centered.

*Id.* The factors above "are to be evaluated according to their relative importance with respect to the particular issue." *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff argues that, applying the four factors above, Ohio has the most significant relationship to the alleged tortious conduct and the parties in this case. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Partial J. on Pleadings 5-7.) The Court agrees. First, and most important, Plaintiff's alleged injury occurred in Ohio. *See* RESTATEMENT § 145. Plaintiff alleges that Captiva's intentional disruption of Plaintiff's prospective business opportunities caused Plaintiff to lose profits it would have earned in Ohio. Second, Plaintiff alleges that Captiva's tortious interference occurred in Ohio. *See id.* The customers Captiva allegedly lured away from Plaintiff were all Ohio corporations or state agencies. Third, Plaintiff is an Ohio corporation. *See id.* Finally, Plaintiff's allegation that it "and EMC worked together to develop business solutions in Ohio for end users in Ohio" suggests that the relationship between Plaintiff and Captiva was centered in Ohio. (Pl .'s Mem. in Opp'n to Def.'s Mot. for Partial J. on Pleadings 6.)

*3 These factors, taken together, show that Ohio has the most significant relationship with the alleged tortious conduct and the parties in this case. The fact that Captiva was a California corporation before it merged with EMC does not sufficiently outweigh Ohio's interest in Plaintiff's tort claim. Moreover, the existence of a choice of law provision in the contract between Plaintiff and Captiva electing California law to govern the contract does not mean, as EMC seems to suggest, that the parties' relationship was centered in California.[FN2] (Def.'s Mot. for Partial J. on Pleadings 7.) EMC's failure to dispute Plaintiff's contention that both its injuries and the tortious conduct that allegedly caused those injuries occurred in Ohio lends further support to the conclusion that the § 145 factors weigh in favor of applying Ohio law. Therefore, the Court finds that Ohio law governs Plaintiff's tortious interference with business relations claim.

> FN2. While the choice of law provision in the contract may require the Court to apply California law to Plaintiff's breach of con-

tract claim, the provision is irrelevant to the question of which state's law governs Plaintiff's tort claim.

### III. Rule 12(c) Standard

Motions for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure are evaluated in much the same way as Rule 12(b)(6) motions to dismiss for failure to state a claim upon which relief may be granted. *See Grindstaff v. Green,* 133 F.3d 416, 421 (6th Cir.1998); *Ziegler v. IBP Hog Market, Inc.,* 249 F.3d 509, 511-12 (6th Cir.2001); *Mixon v. Ohio,* 193 F.3d 389, 399-400 (6th Cir.1999). The purpose of a motion under either rule is to test the sufficiency of the complaint. A complaint need not set down in detail all the particularities of a plaintiff's claim. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." But the complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988) (emphasis in original).

When considering a motion for judgment on the pleadings, a court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. *See Grindstaff,* 133 F.3d at 421. The Court will indulge all reasonable inferences that might be drawn from the pleading. *See Fitzke v. Shappell,* 468 F.2d 1072, 1076-77 n. 6 (6th Cir.1972). It will not, however, accept conclusions of law or unwarranted inferences cast in the form of factual allegations. *See Grindstaff,* 133 F.3d at 421.

The Court will grant a motion for dismissal under Rule 12(b)(6) in the absence of law to support a claim of the type made, or of facts sufficient to make a valid claim, or if on the face of the complaint, an insurmountable bar to relief indicates that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 113058 (S.D.Ohio)
(Cite as: 2009 WL 113058 (S.D.Ohio))

the plaintiff does not have a claim. *Little v. UNUM Provident Corp.*, 196 F.Supp.2d 659, 662 (S.D.Ohio 2002) (citing *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697 (6th Cir.1978)).

## IV. Discussion

**\*4** EMC asserts two alternative grounds for dismissing Plaintiff's tortious interference with business relations claim. EMC first argues that Plaintiff's tort claim is barred by California's two year statute of limitations. (Def.'s Mot. for Partial J. on Pleadings 5-8.) EMC argues alternatively that, under Ohio's economic loss doctrine, the existence of an undisputedly valid contract between Plaintiff and Captiva precludes Plaintiff's tortious interference with business relations claim. (Def.'s Mot. for Partial J. on Pleadings 8-11.) The Court will take each argument in turn.

## A. Statute of Limitations

EMC argues that Plaintiff failed to file this suit within California's two year statute of limitations period for tortious interference with business relations. As explained above, however, Ohio law, not California law, governs this diversity action. Therefore, California's statute of limitations is inapplicable to Plaintiff's tort claim.

EMC recognizes that this Court must apply the factors from § 145 of the Restatement to determine the substantive law governing Plaintiff's tort claim. (Def.'s Mot. for Partial J. on Pleadings 6-7 .) But EMC makes little effort to dispute Plaintiff's arguments and persuade this Court that a balancing of the factors in § 145 militates in favor of applying California law. Instead, EMC asserts two reasons why, regardless of the outcome of the § 145 balancing test, this Court should apply California's statute of limitations to Plaintiff's tort claim. Both arguments are meritless.

EMC first argues that Plaintiff should be estopped from reversing its position on which state's law

governs its tort claim. (Def.'s Mot. for Partial J. on Pleadings 7.) EMC asserts, and Plaintiff does not dispute, that until Plaintiff amended its complaint, Plaintiff argued its tortious interference with business relations claim under California law. According to EMC, Plaintiff only reversed its position, and amended its complaint to allege its tort claim under Ohio law, after learning from EMC at a status conference that the tort claim may be barred by California's statute of limitations. (Def.'s Mot. for Partial J. on Pleadings 4, 7.) EMC argues, therefore, that Plaintiff should be prevented from changing its choice of law position.

Any allegations Plaintiff previously made regarding the law governing its tort claim were superseded when Plaintiff amended its complaint. EMC does not allege any procedural or substantive defects with the amended complaint that would require the Court to exclude the pleading. Moreover, EMC cites no authority to support the application of the estoppel doctrine to this situation. The Court is unpersuaded by EMC's estoppel argument.

EMC next argues that the Court should treat Plaintiff's previous choice of law position as a judicial admission. (Def.'s Mot. for Partial J. on Pleadings 7.) Judicial admissions " 'go to questions of fact,' thereby 'dispensing with proof of formal matters and of facts about which there is no real dispute.' " *Passa v. City of Columbus*, 2007 WL 3125130, \*4 (S.D.Ohio Oct.24, 2007) (quoting *New Amsterdam Casualty Co. v. Waller*, 323 F.2d 20, 24 (4th Cir.1963)). The Sixth Circuit is reluctant to treat legal conclusions reached by counsel as judicial admissions. *MacDonald v. General Motors Corp.*, 110 F.3d 337, 341 (6th Cir.1997).

**\*5** In this case, the question of which state's law governs Plaintiff's tort claim is not a question of fact; it is a question of law, governed in Ohio by the balancing test in § 145 of the Restatement. *See Passa*, 2007 WL 3125130 at \*4; *New Amsterdam*, 323 F.2d at 24. Furthermore, Plaintiff's original choice of law position-that California law governs Plaintiff's tort claim-was an incorrect legal conclu-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

sion that should not be treated as a judicial admission. *See MacDonald,* 110 F.3d at 341. To treat Plaintiff's original choice of law position as a judicial admission, and deprive Plaintiff of the opportunity to correct an erroneous legal conclusion made by counsel through an amended complaint, would turn "a valuable time-saving device, the voluntary use of which should be encouraged, into a trap for the unwary." *Id.* Therefore, the Court will not treat Plaintiff's previous choice of law position as a judicial admission. Ohio law governs Plaintiff's tortious interference with business relations claim, and California's statute of limitations is inapplicable.[FN3]

> FN3. EMC cites *Wilton Corp. v. Ashland Castings Corp.* for the proposition that when parties agree on the applicable substantive law, courts need not inquire into choice of law issues. 188 F.3d 670, 673 n. 2 (6th Cir.1999). While that is true, the parties in this case obviously disagree on which state's law governs Plaintiff's tort claim. The parties may have agreed at one point. But as explained above, Plaintiff was free to change its position, and bring the choice of law question into dispute through an amended complaint. Because the parties disagree on whether California or Ohio law governs Plaintiff's tort claim, a choice of law analysis is necessary.

## B. The Existence of the Contract

EMC next argues that under Ohio law, the existence of an undisputedly valid contract between Plaintiff and Captiva precludes Plaintiff's tortious interference with business relations claim. EMC frames this argument under Ohio's economic loss doctrine. (Def.'s Mot. for Partial J. on Pleadings 8.) According to EMC, under the economic loss doctrine, when a plaintiff has a claim governed by a contract, tort liability cannot be imposed for purely economic damages. Therefore, EMC argues, "where a plaintiff bases its claim on breach of con-

tract, the economic loss rule bars the plaintiff from using the same set of facts as the basis for a tort claim." (Def.'s Mot. for Partial J. on Pleadings 8.) In response, Plaintiff does not dispute EMC's contention that its tort claim is barred by the existence of the contract. Plaintiff instead argues that it should be permitted to plead its tortious interference claim as an alternative theory of recovery to its breach of contract claim. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Partial J. on Pleadings 8-9.) While EMC is misguided when it relies on the economic loss rule, the Court agrees with EMC's underlying argument that Plaintiff's tort claim is barred by the existence of a valid contract between the parties.

The economic loss rule prevents the recovery in negligence of purely economic loss. *Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.,* 42 Ohio St.3d 40, 44-46, 537 N.E.2d 624, 630-31 (Ohio 1989); *Corporex Dev. & Constr. Mgmt., Inc. v. Shook, Inc.,* 106 Ohio St.3d 412, 414-16, 835 N.E.2d 701, 704-05 (Ohio 2005); *Cincinnati Gas & Elec. Co. v. General Electric Co.,* 656 F.Supp. 49, 60-61 (S.D.Ohio 1986). The prohibition on the recovery in negligence of purely economic loss arises from the inevitable absence of a duty on the defendant to protect purely economic loss suffered by the plaintiff. *Chemtrol,* 42 Ohio St.3d at 45, 537 N.E.2d at 630-31. According to the Ohio Supreme Court:

*6 the law of negligence does not extend ... [a] duty so far as to protect ... economic expectations, for such protection would arise not under the law but rather solely by agreement between the parties. "[W]hen the promisee's injury consists merely of the loss of his bargain, no tort claim arises because the duty of the promisor to fulfill the term of the bargain arises only from the contract."

*Id.* (quoting *Battista v. Lebanon Trotting Ass'n,* 538 F.2d 111, 117 (6th Cir.1976)). Negligence law "is not designed ... to compensate parties for losses suffered as a result of a breach of duties assumed

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

only by agreement." *Floor Craft Floor Covering, Inc. v. Parma Cmty. Gen. Hosp. Ass'n,* 54 Ohio St.3d 1, 6-7, 560 N.E.2d 206, 211 (Ohio 1990).

Relying on the economic loss rule, EMC points to the undisputed fact that Plaintiff, through its tortious interference claim, seeks to recover only economic losses-lost profits, future license sales, professional services, and maintenance revenue. (Def.'s Mot. for Partial J. on Pleadings 8.) EMC further argues that Plaintiff has alleged no breach of duty distinct from the alleged breach of contract. (Def.'s Reply Mem. in Support of Mot. for Partial J. on Pleadings 5.) But EMC fails to recognize that Plaintiff's tort claim does not sound in negligence; it is an intentional tort claim for interference with business relations. The economic loss rule prevents recovery in negligence of purely economic loss, not recovery under an intentional tort theory for economic loss. *See Chemtrol,* 42 Ohio St.3d at 45, 537 N.E.2d at 630-31.

It makes sense that the economic loss rule would be limited to negligence actions. In a tortious interference with business relations action, for example, any recovery will always be for purely economic loss. The tort is designed to redress economic losses when a defendent has unfairly and intentionally disrupted a plaintiff's business. A negligence cause of action, on the other hand, is designed to redress personal injury or injury to property. *See Floor Craft,* 54 Ohio St.3d at 7, 560 N.E.2d at 211. Moreover, the fundamental policy consideration underlying the economic loss rule-the inevitable absence of a duty independent of that created by a contract in a negligence action for purely economic loss-is missing in the intentional tort context, where duty is not an element of the claim.[FN4] Therefore, because Plaintiff's claim is for tortious interference with business relations, and does not sound in negligence, the economic loss rule is inapplicable in this case.

> FN4. In Ohio, the elements of a tortious interference with business relations claim are:

(1) a business relationship;

(2) the wrongdoer's knowledge thereof;

(3) an intentional interference causing a breach or termination of the relationship; and;

(4) damages resulting therefrom.

*Harris v. Bornhorst,* 513 F.3d 503, 523 (6th Cir.2008).

While EMC is misguided in its application of the economic loss rule to this case, EMC's underlying proposition that the existence of the contract between Plaintiff and Captiva precludes Plaintiff's tortious interference with business relations claim (even if mislabeled the economic loss doctrine) has merit. According to the Ohio Supreme Court:

> it is well established that "though a breach of a duty under a contract or lease necessarily interferes with the injured party's business relations with third parties, the injured party is limited to an action for breach of contract and may not recover in tort for business interference." An exception exists, and a tort action may lie, only where the breaching party indicates, by his breach, a motive to interfere with the adverse party's business relations rather than an interference with business resulting as a mere consequence of such breach.

*7 Digital & Analog Design Corp. v. North Supply Co.,* 44 Ohio St.3d 36, 46-47, 540 N.E.2d 1358, 1368 (Ohio 1989) (quoting *Cherberg v. Peoples Natl. Bank of Washington,* 88 Wash.2d 595, 564 P.2d 1137, 1143 (Wash.1977)).

In this case, Plaintiff does not allege that Captiva's alleged solicitation of Plaintiff's customers was the result of some ulterior motive of Captiva to interfere with Plaintiff's business. *See Digital & Analog,* 44 Ohio St.3d at 46-47, 540 N.E.2d at 1368. Furthermore, construing the complaint in Plaintiff's favor, the Court finds no evidence of such a motive

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 1:08-cv-02755-DCN Doc #: 54-1 Filed: 09/30/10 73 of 126. PageID #: 980

Not Reported in F.Supp.2d, 2009 WL 113058 (S.D.Ohio)
(Cite as: 2009 WL 113058 (S.D.Ohio))

that would give rise to a tortious interference claim. *See id.* Allowing Plaintiff's tortious interference claim to proceed, without any allegation by Plaintiff of any illegal motive on Captiva's part, would allow Plaintiff to present his breach of contract claim again as a tort claim. *See Cincinnati Gas,* 656 F.Supp. 49 at 61 ("Under Ohio law, the existence of a contract action generally excludes the opportunity to present the same case as a tort claim."). And as EMC points out, Plaintiff cannot circumvent the terms of its contract with Captiva simply by alleging its breach of contract claim as a tortious interference claim. *See Floor Craft,* 54 Ohio St.3d at 7, 560 N.E.2d at 211-12. Therefore, the existence of the contract between Plaintiff and Captiva, and the absence of any allegation that Captiva's alleged breach was motivated by a wrongful desire to interfere with Plaintiff's business, precludes Plaintiff's tortious interference with business relations claim.

Plaintiff does not dispute that its tort claim is barred by the existence of the contract. Plaintiff instead argues that it should be permitted to assert its tortious interference claim in the alternative to its breach of contract claim. As explained above, however, because of the contract between Plaintiff and Captiva, and the absence of any evidence of an illegal motive behind Captiva's alleged solicitation of Plaintiff's customers and prospects, Ohio law does not recognize Plaintiff's tortious interference with business relations claim. *See Digital & Analog,* 44 Ohio St.3d at 46-47, 540 N.E.2d at 1368. Moreover, EMC admits that the Reseller Agreement between Plaintiff and Captiva is a valid contract. (Def.'s Reply Mem. in Support of Mot. for Partial J. on Pleadings 3.) Therefore, under Ohio law, Plaintiff cannot state, in the alternative or otherwise, a tortious interference with business relations claim. Because Plaintiff faces an insurmountable bar to relief on its tortious interference with business relations claim, the Court **GRANTS** EMC's motion to dismiss. *Little,* 196 F.Supp.2d at 662.

**V. Conclusion**

For the reasons above, the Court **GRANTS** EMC's motion to dismiss Plaintiff's tortious interference with business relations claim. (Doc. # 15). That claim is **DISMISSED WITH PREJUDICE.** Plaintiff's breach of contract claim remains.

**IT IS SO ORDERED.**

S.D.Ohio,2009.
Reengineering Consultants, Ltd. v. EMC Corp.
Not Reported in F.Supp.2d, 2009 WL 113058 (S.D.Ohio)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

H

United States District Court,
S.D. Ohio,
Western Division.
Wayne E. PULLINS, et al., Plaintiffs,
v.
Laura KLIMLEY, et al., Defendants.
No. 3:05-CV-082.

Jan. 7, 2008.

Richard B. Reiling, Richard Reiling, Esq., Loveland, OH, for Plaintiffs.

Stephen M. Kindseth, Zeisler & Zeisler PC, Bridgeport, CT, James Eugene Burke, Jennifer J. Morales, Michael L. Scheier, Keating Muething & Klekamp, PLL, Jean R. Robertson, McDonald Hopkins, Cincinnati, OH, Vincent James Nardone, McDonald Hopkins CO LPA, Columbus, OH, for Defendants.

**ENTRY AND ORDER GRANTING IN PART AND OVERRULING IN PART BROOKS KLIMLEY'S MOTION FOR SUMMARY JUDGMENT (Doc. # 106); GRANTING IN PART AND OVERRULING IN PART LAURA KLIMLEY'S MOTION FOR SUMMARY JUDGMENT (Doc. # 108); AND OVERRULING PLAINTIFFS' MOTION FOR ORAL ARGUMENT (Doc. # 154)**

THOMAS M. ROSE, District Judge.

*1 The Plaintiffs in this matter are Wayne E. Pullins ("Ed"), his wife Dianne H. Pullins ("Dianne") and their son David E. Pullins ("David"). Robert Howard is also a named Plaintiff. The Defendants are Laura Klimley ("Laura") and her husband Brooks Klimley ("Brooks").

Plaintiffs' original Complaint was filed in the Court of Common Pleas for Clark County, Ohio on January 26, 2005, and was subsequently removed to this Court by Laura. Erma A. Houser was a named Plaintiff in the original Complaint and Alicia Eimicke ("Alicia"), Maxine Eimicke ("Maxine"), and John Palmero were named Defendants in addition to Laura. Brooks was not identified as a Defendant in the original Complaint. The original Complaint included causes of action for engaging in a pattern of corrupt activity under Ohio law, fraud, civil conspiracy, and violation of Ohio's Blue Sky laws.

On July 22, 2005, the Plaintiffs filed an Amended Complaint which added claims of violation of Sections 12(a)(1) and 12(a)(2) of the Securities Act of 1933 and violation of Section 10b of the Securities Exchange Act of 1934. The Amended Complaint also brought the claim of engaging in a pattern of corrupt activity under federal law instead of state law.

On November 2, 2005, the Plaintiffs again amended their Complaint. The Second Amended Complaint includes the same Parties and causes of action as the First Amended Complaint and indicates that it was filed pursuant to the instructions of the United States Bankruptcy Court for the Southern District of New York.

Following and pursuant to this Court's ruling on Defendants' Motion To Dismiss the Second Amended Complaint, the Third Amended Complaint (the "TAC") was filed on April 6, 2006. The TAC does not include Erma A. Houser as a Plaintiff. The TAC also adds Brooks as a Defendant and does not name Alicia, Maxine, and John Palmero as Defendants. Finally, the TAC includes the particulars of the allegations of fraud. It is the TAC that is now before the Court.

Plaintiffs' First Cause of Action in the TAC is a claim brought pursuant to Section 12(a)(1) of the Securities Act of 1933, 15 U.S.C. § 771(a)(1), which prohibits selling unregistered securities. The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,575
(Cite as: 2008 WL 85871 (S.D.Ohio))

First Cause of Action also includes a claim brought pursuant to Section 12(a)(2) of the Securities Act of 1933 which prohibits the offer or sale of securities through a "prospectus or oral communication" that contains misrepresentations or omissions. 15 U.S.C. § 77l(a)(2).

Plaintiffs' Second Cause of Action is a claim brought pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. This claim is brought specifically pursuant to 15 U.S.C. § 78j and the associated regulation, 17 C.F.R. § 240.10b-5 (the "10b-5 claim"). Together, this code and regulation prohibit making material misstatements in connection with the purchase or sale of securities.

Plaintiffs' Third Cause of Action is for violation of Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o, and Plaintiffs' Fourth Cause of Action is for violation of Section 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78t. In these Causes of Action, Plaintiffs claim that Laura and Brooks were control persons and therefore secondarily liable for any misrepresentations and/or omissions.

**\*2** Plaintiffs' Fifth Cause of Action is an common law fraud claim and the Sixth Cause of Action is a common law civil conspiracy claim. Finally, Plaintiffs' Seventh Cause of Action is for violation of the Ohio Securities Act, Ohio Rev.Code § 1707.44(B), (C)(1), (D), (F) and (G).

Now before the Court are Motions for Summary Judgment filed by Laura (doc. # 108) and Brooks (doc. # 106). Both of these Motions are now fully briefed and ripe for decision. A factual background will first be set forth followed by the standard of review for motions for summary judgment and an analysis of the Motions.

## I. FACTUAL SUMMARY[FN1]

> FN1. When contested, the facts herein are presented, as they must be, in a light most favorable to the Plaintiffs who are the non-moving parties.

This matter arises from the purchase of Debenture Notes by the Plaintiffs. The Debenture Notes were issued by VWE Group, Inc. dba V.W. Eimicke Associates, Inc. (hereinafter "VWE").

## A. The Company

VWE was a New York company founded by Victor W. Eimicke ("Victor") in 1958. (TAC ¶ 16.) Initially VWE produced and sold forms and other materials used by companies in the hiring, firing and motivation of employees (the "HR Business"). (Id.) Several years ago VWE began selling holiday greeting cards (the "Greeting Card Business") in addition to its HR Business. (Id.¶ 17.)

Victor served as VWE's President and managed all of its operations until he passed away on September 4, 2000. (TAC ¶ 14; Deposition of Loretta Buscarino ("Buscarino Dep.") 9-10 May 22, 2007.) Victor and his wife Maxine had two daughters, Alicia and Laura. (Affidavit of Laura E. Klimley ("Laura Aff.") ¶ 4 Sept. 3, 2007.) At some point during the 1990s, Victor gifted all of his stock in VWE to Laura and Alicia, giving them each a 50% share of the company. (Id.¶ 5.)

By 2003, the Greeting Card Business surpassed the HR Business and accounted for 75% of VWE's revenues. (TAC ¶ 17.) In December of 2003, VWE sold its Greeting Card Business to an entity known as the Taylor Group. (Id.)

Following the sale of the Greeting Card Business, VWE filed for relief pursuant to Chapter 11 of the United States Bankruptcy Code. (TAC ¶ 18.) VWE's bankruptcy petition was filed on June 1, 2004, and is currently pending in the United States Bankruptcy Court for the Southern District of New York, case number 04-20308. (Id.) VWE ceased operations as a company in July of 2006. (Deposition of Elizabeth Longinetti ("Longinetti Dep.") 8 May 22, 2007.) During its operation, VWE had an official policy of not giving out any financial information to its investors or to anyone

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

else. (Deposition of Brooks J. Klimley ("Brooks Dep.") 97 Mar. 9, 2007.)

**B. The Debenture Notes**[FN2]

> FN2. A debenture is a debt secured only by the debtor's earning power and not by a lien on specific assets. *Black's Law Dictionary* (8th ed.2004). A debenture note is an instrument acknowledging such a debt. *Id.*

From its inception, VWE offered Debenture Notes with terms from 90 days to 5 years, interim maturity periods of between 1 and 3 years and interest rates from 10 to 23%. (TAC ¶ 19.) At first the Debenture Notes were issued to "very close friends and family" of the Eimickes. (Deposition of Barbara DeMuth ("DeMuth Dep.") 55 May 22, 2007.) Over the years, the Debenture Notes program was expanded as VWE began to issue Debenture Notes to individuals and entities "all over the country." ( *Id.*)

**\*3** There is no evidence that the Debenture Notes issued by VWE were registered with the Securities and Exchange Commission or any state in which they were offered. When VWE filed for bankruptcy, the outstanding principal amount of the Debenture Notes issued by VWE was more than $26 million. (TAC ¶ 20.)

Ed originally invested in VWE Debenture Notes when he received a call at his home in Ohio from Victor in 1988. (Deposition of Wayne E. Pullins ("Ed Dep.") 19-20, 26 Feb. 22 and 23, 2007.) At that time, Victor stated that, as a "favor" to Ed, he would permit Ed to invest in the family business which he had specifically designed to make money for the family. (*Id.* 20.) Ed acknowledges that he never saw a financial statement prior to purchasing a Debenture Note. (*Id.* 201.)

Following this initial investment, Ed and his family continued to invest throughout the nineties in response to telephone calls and written solicitations from VWE. (*Id.* 56-60.) In addition to investing

new money, Ed and his family reinvested interest that they received on the Debenture Notes and reinvested principal when a Debenture Note became due. (Affidavit of Wayne E. Pullins ("Ed Aff .") ¶¶ 2-6 Sept. 26, 2007.)

For 15 years from 1989 until just prior to VWE's bankruptcy, the Plaintiffs have presented evidence that they made investments totaling $1,389,982 in VWE's Debenture Notes [FN3] and were paid or accrued 15% per year interest. (See Ed Dep. 208-13; Ed Aff. ¶ 2-6 .) Over 100 other individuals or entities also invested in VWE's Debenture Notes. (Brooks Klimley Mem. In Supp. of Mot. Summ. J. 1.) These investors cannot recover their investments from VWE which filed bankruptcy, from Victor who is deceased or from Maxine or Alicia who have either filed for personal bankruptcy or have no assets from which to collect. (*Id.*)

> FN3. VWE admitted in its bankruptcy filing that it owed this amount or something close to this amount to the Pullins.

**C. Laura Klimley**

Laura Eimicke married Brooks in 1981 and currently resides in Bronxville, New York. (Deposition of Laura E. Klimley ("Laura Dep.") 6-7 Mar. 8, 2007.) Laura studied dance in college and graduate school and, after marrying Brooks in 1981, took a job teaching dance at a preparatory school. (Laura Aff. ¶ 6.) At some point, Laura was appointed a Vice-President of VWE and a member of VWE's Board of Directors. (*Id.*)

When she became tired of teaching dance in 1985, Laura went to work for VWE. (*Id.* ¶ 7.) Her responsibilities at the time included writing copy for the catalogs and brochures, working in the direct mail customer list rental division and dealing with personnel issues at the plant. (*Id.* ¶ 8.)

Laura was employed full-time at VWE until 1996 when she gave birth to triplets. (*Id.* ¶ 7.) She then began working part-time. (*Id.*) After 1999, Laura no

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

longer worked at VWE as an employee of VWE and stayed home with her children. (*Id.* ¶ 9 .)

Laura held the title of Vice-President and was a director of VWE up to the date of the bankruptcy in 2004. (Laura Dep. 38-40.) In addition to 50% of the voting shares in VWE, Laura held 1046.5 of a total of 2093 Common B non-voting shares of VWE, 111 of 189 Preferred A non-voting shares of VWE and 814 of 15978 Preferred B non-voting shares of VWE. (*Id.* 74-75.) Laura testified that she does not know how much she received in salary for VWE and does not recall receiving a dividend. (*Id.* 121-22.)

### D. Brooks Klimley

*4 Brooks Klimley met Laura Eimicke in 1977 during his sophomore year at Columbia University. (Affidavit of Brooks Klimley ("Brooks Aff.") ¶ 3 Sept. 3, 2007). At the time, Laura was a freshman at Barnard College studying dance. (*Id.*)

Brooks graduated magna cum laude from Columbia University in New York with a degree in economics. (Brooks Dep. 18-19.) He then went on to obtain a degree in jurisprudence from Oxford University in Oxford, England. (*Id.* 19.)

After marrying Laura in 1981, Brooks worked full time as an investment banker for Chemical Bank (1981-1984), Kidder Peabody (1984-1994), Bear Stearns (1998-2001) and Citigroup (2001-2004) and, at the time of his deposition, was the President of CIT Energy. (Brooks Aff ¶ 4; Brooks Dep. 22.) Brooks holds series 7, series 24 and series 63 certifications from the National Association of Security Dealers. (Answers To Requests for Admissions of B. Klimley .) In a recent deposition in another lawsuit against Brooks, he testified that, at Bear Stearns, he was known as "Dr. Value" for his creativity in complex investment banking transactions. (Deposition of Brooks Klimley ("Brooks Dec. Dep.") 241-42 Dec. 7, 2007.) There is no evidence that Brooks was ever an officer, director, share-

holder or employee of VWE.

Beginning in the 1990s, Brooks purchased VWE Debenture Notes for himself and his children and continued to do so until 2004. (Brooks Aff. ¶ 7.) Brooks claims that he did not ask to see any financial records in connection with VWE when he purchased the Debenture Notes and relied upon the representations of Victor that he would be repaid. (Brooks Dep. 60-61.) When VWE declared bankruptcy, the company owed Brooks, Laura, their children and The Klimley Foundation $2,085,003.05. (Brooks Aff. ¶ 7.)

### E. Alicia Eimicke

Alicia consistently played an active role in VWE's business activities. She joined VWE after graduating from Harvard University. (Laura Aff. ¶ 10.) Alicia worked with Victor to manage VWE's day-to-day operation. (Longinetti Dep. 17; DeMuth Dep. 13-15.) After Victor's death in 2000, Alicia became President of VWE and managed the day-to-day operation of the business. (Longinetti Dep. 13-15.)

### F. Plaintiffs' Familial Relationships

Ed is a resident of the State of Ohio. (TAC ¶ 6.) Dianne is Ed's wife and David is Ed's son. (Ed Dep. 6.) Victor was Ed's uncle. (*Id.* 26.)

Plaintiff Robert Howard is also Ed's uncle. (*Id.* 7.) Ed has testified that Robert Howard is no longer interested in proceeding in this litigation (*id.*) but Robert Howard remains a named Plaintiff. Finally, Ed's mother, now deceased, was Maxine's sister. (Ed Dep. 26.)

## II. SPOILATION OF EVIDENCE

Brooks and Laura argue that Plaintiffs claims should be dismissed because they have intentionally "spoiled" evidence. Specifically, according to the Defendants, Ed admits that he destroyed a tape

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

recording of a meeting, destroyed notes that he took regarding telephone conversations with potential witnesses and destroyed executed affidavits and statements that would either corroborate or undermine the potential testimony of these witnesses.

**\*5** In addition, the Plaintiffs argue that VWE engaged in the spoliation of evidence and the Court should infer that each document that was destroyed contained concrete evidence that Brooks and Laura were heavily involved in the operations of VWE and the sale of Debenture Notes. Brooks and Laura respond that there is no evidence that they were involved in the shredding or that the shredding was improper.

## A. Relevant Law Regarding Spoliation of Evidence

"Spoliation is the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for the destruction." *In re Smartalk Teleservices, Inc. Securities Litigation,* 487 F.Supp.2d 947, 949 (S.D.Ohio 2007)(quoting *Beck v. Haik,* 377 F.3d 624, 641 (6th Cir.2004). Further, "the rules that apply to an alleged spoliation of evidence and the appropriate sanctions are defined by state law." *Id.*

In this case, this Court sits in Ohio, the Defendants provide legal argument based upon Ohio law and the Plaintiffs do not argue otherwise. Therefore, Ohio spoilation law will be used.

Ohio recognizes the spoliation of evidence as an independent cause of action. *Id.* However, spoilation may also be raised as an affirmative defense, in a motion for summary judgment, in a motion to dismiss or in a Rule 37 motion for sanctions. *Loukinas v. Roto-Rooter Services Co.,* 167 Ohio App.3d 559, 855 N.E.2d 1272, 1278 (Ohio Ct.App.2006). If not pursued as a independent cause of action, which is the case here, the elements of a spoliation claim are nonetheless instructive in considering whether the imposition of sanctions is proper. *In re Smartalk,*

487 F.Supp.2d at 949.

The elements of a spoliation claim, as they would be applied to this case, are: (1) there is a pending or probable litigation involving the non-offending party; (2) knowledge on the part of the offending party that the litigation exists or is probable; (3) wilful destruction of the evidence by the offending party designed to disrupt the non-offending party's case; (4) disruption of the non-offending party's case; and (5) damages proximately caused by the offending party's actions. *In re Smartalk,* 487 F.Supp.2d at 949; *see also Herlik v. Continental Airlines, Inc.,* No. 04-3790, 2005 WL 2445947 at \*6 (6th Cir. Oct.4, 2005). Finally, even if the evidence was not deliberately destroyed, negligent or inadvertent destruction of evidence is sufficient to trigger sanctions. *In re Smartalk,* 487 F.Supp.2d 950.

If relevant evidence was indeed destroyed, a court has the power to fashion a just remedy. *Id.* In fashioning a just remedy, the court must balance the intent of the offending party, the level of prejudice, and the reasonableness of the offending party's action. *Id.* "The test for prejudice is where there is a reasonable possibility, based on concrete evidence, that access to the evidence which was destroyed or altered, and which was not otherwise obtainable, would produce evidence favorable to the objecting [non-offending] party." *Loukinas,* 855 N.E.2d at 1278.

**\*6** The least severe sanction should be imposed-a sanction that is proportionate to the seriousness of the infraction under the facts of the particular case. *In re Smartalk,* 487 F.Supp.2d 950. Said another way, the sanction imposed must be commensurate with the degree of prejudice. *Loukinas,* 855 N.E.2d at 1278.

## B. Spoliation By Ed

In this case, Ed testifies that he invited creditors to attend two meetings in December of 2005. (Ed Dep.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

Case: 1:08-cv-02755-DCN Doc #: 54-1 Filed: 09/30/10 79 of 126. PageID #: 986

220.) Only one of the meetings was held. (*Id.* 223, 855 N.E.2d 1272.) He tape recorded the meeting and threw the tape away afterwards because "there wasn't any information on it" and it was useless to him. (*Id.* 224-25, 855 N.E.2d 1272.) Further, when Ed sent out the invitation to the meetings, he invited those who could not attend to send a letter relating their experiences with VWE. (*Id.* 229, 855 N.E.2d 1272.) The written statements that he received were read at the meeting and later thrown away by Ed because they were repetitive of what was being said at the meeting. (*Id.* 229-30, 855 N.E.2d 1272.)

Ed also testifies that he contacted potential witnesses by telephone. (*Id.* 243, 855 N.E.2d 1272.) He would ask the potential witness if it was okay to prepare an affidavit for them to sign. (*Id.*) If so, Ed would prepare and forward an affidavit for signature. (*Id.* 244, 855 N.E.2d 1272.) Ed remembers sending "two or three" affidavits for signature. (*Id.* 243, 855 N.E.2d 1272.) Ed took notes of the telephone conversations and testifies that he later threw the notes away. (*Id.* 244, 855 N.E.2d 1272.) He also destroyed draft affidavits that were not sent to potential witnesses. (*Id.* 246, 855 N.E.2d 1272.)

The Plaintiffs first argue that Ed did not destroy his personal notes. (Pullins Sur-Reply to Mots, for Summ. J 15.) According to the Plaintiffs, Ed kept his notes on VWE's Schedule F to VWE's bankruptcy filing and these notes have been provided to the Defendants. (*Id.*)

Plaintiffs also argue that, while Ed did not keep the tape of the December 2005 meeting, he did provide Defendants with a list of those in attendance. (*Id.*) And, since the list was provided, the Defendants have deposed some of the individuals in attendance. (*Id.*) Further, the Defendants have a copy of one of the unsigned affidavits sent out by Ed and have taken the deposition of the individual who received and refused to sign this affidavit. (Deposition of Michelle Bronski ("Bronski Dep.") Ex. 1 May 2, 2007 .)

Based upon the information presented to the Court, some, but not all of the elements of a spoliation claim exist in this case. Ed knew that there was pending or probable litigation against the Defendants. He also testified that he destroyed personal notes, a tape recording and draft affidavits that were not forwarded for signature. However, the Defendants cannot be said to have been harmed. They allegedly have copies of Ed's notes, they have a list of attendees at the meeting and presumably have deposed at least some of those individuals and they have deposed at least one individual who received and refused to sign an affidavit drafted by Ed. Further, there is not a reasonable probability, based on concrete evidence, that access to the evidence which was destroyed or altered, and which was not otherwise obtainable, would produce evidence favorable to Brooks and Laura, particularly since Brooks and Laura have access to most, if not all of the evidence destroyed by Ed. Therefore, since the Defendants cannot be said to have been prejudiced, sanctions are not appropriate.

**C. Spoliation By Brooks and Laura**

*7 Laura Pignone was VWE's Telemarketing Manager from 1997 until she voluntarily left in 2004. (Deposition of Laura Pignone ("Pignone Dep.") 8 June 26, 2007.) She reported directly to Alicia and was located in VWE's main office on Grassy Spring Road. (*Id.* 10-11, 855 N.E.2d 1272.)

Between the filing of VWE's Bankruptcy in June of 2004 and September of 2004, Laura Pignone observed a "tremendous amount of shredding being done" off site by a contractor. (*Id.* 53-55, 855 N.E.2d 1272.) VWE had always shredded unneeded documents but the shredding took place in house prior to the Bankruptcy filing. (*Id.*) Also, the volume of documents being shredded increased after the Bankruptcy filing. (*Id.*) Laura Pignone, however, does not know what was being shredded. (*Id.*)

Laura Pignone's observations, alone, are not enough

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,531
(Cite as: 2008 WL 85871 (S.D.Ohio))

to satisfy a spoliation claim. She does not know what documents were being shredded, who was responsible for shredding them or why. The analysis next turns to the standard of review for motions for summary judgment.

## III. STANDARD OF REVIEW

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and the associated caselaw. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.RCiv.P. 56(c).

Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir.1992)(quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250 (quoting Fed.R.Civ.P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324.

*8 In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the non-moving party and draw all reasonable inferences in the favor of that party. *Anderson,* 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure,* § 2726. Rather, credibility determinations must be left to the factfinder. *Id.*

However, the mere existence of a scintilla of evidence in support of the non-moving party is not sufficient to avoid summary judgment. *Anderson,* 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the non-moving party is entitled to a verdict. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depos-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

itions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed.R.Civ.P. 56(c).

The Plaintiffs' causes of action in this case include claims brought pursuant to Ohio law and issues interpreted under Ohio law. In reviewing an Ohio claim or an issue under Ohio law, this Court must apply the law of Ohio, as interpreted by the Supreme Court of Ohio. *Northland Ins. Co. v. Guardsman Prods. Inc.,* 141 F.3d 612, 617 (6th Cir.1998). Specifically, this Court must apply the substantive law of Ohio " 'in accordance with the then-controlling decision of the highest court of the state.' " *Imperial Hotels Corp. v. Dore,* 257 F.3d 615, 620 (6th Cir.2001)(quoting *Pedigo v. UNUM Life Ins. Co.,* 145 F.3d 804, 808 (6th Cir.1998). Also, to the extent that the highest court in Ohio has not addressed the issue presented, this Court must anticipate how Ohio's highest court would rule. *Id.* (quoting *Bailey Farms. Inc. v. NOR-AM Chem. Co. .,* 27 F.3d 188, 191 (6th Cir.1994)).

In this case, Brooks and Laura seek summary judgment on each of Plaintiffs' claims and seek a ruling that the Plaintiffs are not entitled to punitive damages. Brooks' and Laura's arguments regarding each of Plaintiffs' claims will be addressed followed by an analysis of the availability of punitive damages.

## IV. FIRST CAUSE OF ACTION: SECTION 12(a)(1) AND 12(a)(2) CLAIMS

Plaintiffs first assert that Brooks and Laura sold unregistered securities. Plaintiffs also assert that Brooks and Laura sold those securities through a prospectus or oral communication that contained misrepresentations or omissions.

*9 Under Section 12(a)(1) of the Securities Act of 1933, the seller of a security is liable to a purchaser if the sale violates the registration provisions of the Securities Act of 1933 unless exempted. *Cook v. Avien, Inc.,* 573 F.2d 685, 691 (1st Cir.1978). Further, if securities are sold without full disclosure or

effective access to significant information, there is no exemption to the registration requirement. *Id.*

Liability attaches under Section 12(a)(2) if: (1) the defendant made a false or misleading statement of material fact or failed to state a material fact necessary in order to make the statement not misleading; (2) the plaintiff did not know of the untruth or omission; and (3) the defendant knew, or in the exercise of reasonable diligence, could have known of the untruth or omission. *Id.* (citing *Alton Box Board Co. v. Goldman, Sachs & Co.,* 560 F.2d 916 (8th Cir.1977).

Brooks and Laura argue that these claims are time-barred, that neither of them solicited or sold securities and that the statements they allegedly made are not material. The Plaintiffs respond that their claims are not time-barred, that both Brooks and Laura are "sellers" for purposes of the Section 12(a)(1) and 12(a)(2) claims and that the statements made were material.

### A. Timeliness of Section 12(a)(1) and 12(a)(2) Claims

The law regarding the timeliness of Plaintiffs' Section 12(a)(1) and 12(a)(2) claims will first be set forth. This is followed by a determination of the relevant dates and an analysis of the timeliness of Plaintiffs' Section 12(a)(1) and 12(a)(2) Claims.

### 1. Applicable Statues of Limitation and Repose

Section 13 of the Securities Act of 1933 provides that no action shall be maintained under Section 12(a)(1) "unless brought within one year after the violation upon which it is based." 15 U.S.C. § 77m. It further provides that no action shall be maintained under Section 12(a)(2) "unless brought within one year after discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Section 13 also provides a period of repose. A Section 12(a)(1) claim cannot be brought "more than three years after the security was bona fide offered to the public." *Id.* A Section 12(a)(2) claim cannot be brought "more than three years after the sale." *Id.*

The Plaintiffs have the burden of pleading facts that show compliance with Section 13's limitation periods. *In re National Mortgage Equity Corp. Mortgage Pool Certificates Securities Litigation,* 636 F.Supp. 1138, 1166 (C.D.Cal.1986)(citing *Toombs v. Leone,* 777 F.2d 465, 468 (9th Cir.1985)). The Plaintiffs must demonstrate compliance with both the statute of limitations and the statute of repose. *Id.* (citing *Morley v. Cohen,* 610 F.Supp. 798, 815 (D.Md.1985)).

The Plaintiffs urge the Court to apply a different statute of limitations and statute of repose to their Section 12(b)(1) and 12(b)(2) claims. They urge the Court to apply the statute of limitations and statue of repose found in the Sarbanes-Oxley Act (the "SOA").

*10 Enacted on July 30, 2002, the SOA provides a two-year statute of limitations and a five year statute of repose to "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws ..." *Lieberman v. Cambridge Partners, L.L.C.,* 432 F.3d 482, 486 (3d Cir.2005) (citing SOA, Pub.L. No. 107-204 § 804, 116 Stat. 745, 801, codified in part at 28 U.S.C. § 1658(b)). However, while the caselaw is limited, those courts that have considered the issue have determined that the SOA time limitations do not apply to claims that are based upon negligence or strict liability and do not require a showing of fraudulent intent. *See In re Enron Corporation Securities, Derivative and "ERISA" Litigation,* No. H-01-3624, 2004 U.S. Dist. Lexis 8158 at * 51, 2004 WL 405886 (S.D .Tex. Feb. 25, 2004)(SOA time limitations do not apply to Section 12(a)(2) claims); *In re Merrill Lynch & Co., Inc. Research Reports Securities Lit-*

*igation,* 289 F.Supp.2d 416, 423 (S.D.N.Y.2003)( 15 U.S.C. § 77m applies to Section 12(a)(2) claims and the SOA applies to 10-b5 claims); *Friedman v. Rayovac Corp.,* 295 F.Supp.2d 957, 974-75 (W.D.Wis.2003)(SOA does not apply to claims brought under the Securities Act of 1933).

While Plaintiffs may have alleged fraud in connection with their Section 12(a)(1) and 12(a)(2) claims, these two alleged violations of the Securities Act of 1933 do not require a showing of fraud. Therefore, the one-year statute of limitations and three-year statute of repose found in 15 U.S.C. § 77m will be applied to Plaintiffs' Section 12(a)(1) and 12(a)(2) claims.

**2. Relevant Dates**

To apply the one-year statute of limitations to the Section 12(a)(1) claims, the date the claim was filed and date of the violation must be determined. To apply the one-year statute of limitations to the Section 12(a)(2) claims, the date the claim was filed and the date when the untrue statement was discovered or should have been discovered by the exercise of reasonable diligence must be determined.

To apply the three-year statute of repose to the Section 12(a)(1) claims, the date the claim was filed and the date the security was first bona fide offered to the public must be determined. To apply the three-year statute of repose to the Section 12(a)(2) claims, the date the action was filed and the date the security was sold must be determined.

**a. Date When the Claim Was Filed**

Plaintiffs' original Complaint was filed in the Court of Common Pleas for Clark County, Ohio on January 26, 2005, and was subsequently removed to this Court. The original Complaint included causes of action for engaging in a pattern of corrupt activity under Ohio law, fraud, civil conspiracy, and violation of Ohio's Blue Sky laws.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

On July 22, 2005, the Plaintiffs filed an Amended Complaint which added claims of violation of Sections 12(a)(1) and 12(a)(2) of the Securities Act of 1933 and violation of Rule 10b of the Security Exchange Act of 1934. The Amended Complaint also brought the action of engaging in a pattern of corrupt activity under federal law instead of state law.

*11 On November 2, 2005, the Plaintiffs again amended their Complaint. The Second Amended Complaint includes the same Parties and causes of action as the First Amended Complaint and indicates that it was filed pursuant to the instructions of the United States Bankruptcy Court for the Southern District of New York.

Following and pursuant to this Court's ruling on Defendants' Motion To Dismiss the Second Amended Complaint, the TAC was filed on April 6, 2006. The TAC adds Brooks Klimley as a Defendant and includes the particulars of the allegations of fraud.

The Defendants argue that the Plaintiffs did not file any claim against Laura until January 26, 2005 and did not file the Section 12(a)(1) and 12(a)(2) claims, or any federal securities claims, against Laura until July 22, 2005. They also argue that the first claim against Brooks was filed on January 18, 2006. The Plaintiffs respond that their first claim was filed on January 26, 2005, and that the subsequent claims against both Laura and Brooks relate back to that claim. The Defendants do not dispute that the claims against Laura relate back to the filing of the original complaint on January 26, 2005, but argue that the TAC against Brooks does not relate back .[FN4]

> FN4. Brooks Klimley was first named as a defendant in the TAC which was filed on April 6, 2006.

### i. Relevant "Relate Back" Law

The Plaintiffs ground their argument that the claim set forth in the TAC relates back to the filing of the original complaint on Fed.R.Civ.P. 15(c)(3). However, Fed.R.Civ.P. 15(c)(3) no longer exists. Fed.R.Civ.P. 15 was amended effective December 1, 2007, as part of the "general restyling of the civil rules to make them more easily understood" and these 2007 "changes are intended to be stylistic only." (2007 Amendment Note to Fed.R.Civ.P. 15.) Since the 2007 changes are intended to be stylistic only and the caselaw refers to and interprets the prior Rule 15(c)(3), the prior Rule 15(c)(3) will be used herein.

When a complaint is amended to add a defendant, Rule 15(c)(3) controls whether the amended complaint may relate back to the filing of the original complaint for purposes of the running of a statute of limitations. *Pompey v. Lumpkin,* 321 F.Supp.2d 1254, 1258 (M.D.Ala.2004)(citing *Powers v. Graf,* 148 F.3d 1223, 1225 (11th Cir.1998)), *aff'd* 127 F. App'x 473 (11th Cir.2005). Further, Rule 15(c) is liberally construed by federal courts. *Snoqualmie Tribe of Indians v. United States,* 178 Ct.Cl. 570, 372 F.2d 951 n. 5 (Cl.Ct.1967). It assures that the rights of the parties to a transaction or occurrence can be determined on the merits rather than on procedural difficulties. *Id.*

Pursuant to Rule 15(c)(3), an amendment that adds a party relates back when (1) the claim or defense asserted in the amended complaint arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading; (2) when the party being added has received notice of the complaint within the period provided by Rule 4(m) for service of the summons and complaint; and (3) when the party being added knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party. *Pompey,* 321 F.Supp.2d at 1258 (citing Rule 15(c)(3)). A mistake occurs where the wrong party is blamed while the real culprit remains unknown and also where the plaintiff has full knowledge of all relevant actors but lists the technically incorrect parties. *Kinnally v. Bell of Pennsylvania,* 748 F.Supp. 1136, 1142

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(E.D.Pa.1990).

**\*12** Courts impute the notice of a lawsuit, termed "constructive notice," when there is sufficient "identity of interests" between the original and new parties. *Id.* at 1263 (citing *Jacobsen v. Osborne*, 133 F.3d 315, 320 (5th Cir.1998). Constructive notice can exist when the original and added parties are a parent corporation and its wholly owned subsidiary, when the original party and the added party are co-executors of an estate and when the original party and new party share counsel. *Id.* Further, constructive notice may exist when the original and added parties are so closely related in business or other activities that it is fair to presume the added parties learned of the institution of the action shortly after it was commenced. *Wine v. EMSA Limited Partnership*, 167 F.R.D. 34, 38 (E.D.Pa.996)(citing *Advanced Power Systems, Inc. v. Hi-Tech Systems, Inc.*, 801 F.Supp. 1450, 1456 (E.D.Pa.1992)); *In re Integrated Resources Real Estate Limited Partnerships Securities Litigation*, 815 F.Supp. 620, 647 (S.D.N.Y.1993)(a growing number of courts and commentators have concluded that sufficient notice exists where a party who has some reason to expect his potential involvement as a defendant hears of the commencement of litigation through some informal means). Finally, the plaintiff has the burden of showing that the added party received constructive notice. *Id.*

**ii. "Relate Back" Analysis**

In this case, the claims asserted in the TAC arose out of the conduct, transactions and occurrences set forth in the original complaint. Further, Brooks received constructive notice of the original complaint when it was filed against Laura and should have expected that, while his involvement may have been unknown by others at the time, he might ultimately be included as a Defendant.

Brooks had constructive knowledge of the original complaint because it was brought against his spouse with whom he presumably had an informal relationship. Also, based upon Plaintiffs' factual allegations, Brooks had reason to believe that he would be named as a party because he was involved in VWE. (Deposition of Dianne Pullins ("Dianne Dep.") 16-17, 77, 107-08 Mar. 22, 2007); Deposition of David Pullins ("David Dep.) 82-83, 102-04 Mar. 23, 2007); Affidavit of Thomas Romo ("Romo Aff.") ¶¶ 1-3 Feb. 26, 2007.) Finally, both Brooks and Laura have been jointly represented by Mr. Kindseth's office in connection with matters concerning VWE.[FN5]

> FN5. The record in VWE's bankruptcy case indicates that Mr. Kindseth and his partners have represented Brooks and Laura in connection with the VWE bankruptcy and the various claims asserted against them by the Creditors Committee since at least December of 2004.

Therefore, for purposes of the Section 12(a)(1) and 12(a)(2) claims against both Brooks and Laura, January 26, 2005, the date the Plaintiffs original complaint was filed, is the date the claims were filed for purposes of statute-of-limitation analysis. Laura was a named Defendant in the original Complaint and the Amended Complaint arose out of the same conduct, transactions and occurrences set forth in the original Complaint. Brooks had constructive notice of the original Complaint and the claims set forth in the TAC, which first named Brooks as a Defendant, arose out of the conduct, transactions and occurrences set forth in the original Complaint. The analysis next turns to the date of the alleged Section 12(a)(1) violations.

**b. Date of the Alleged Section 12(a)(1) Violations**

**\*13** Section 13 provides that a 12(a)(1) claim must be brought within one year after the sale upon which it is based. 17 U.S.C. § 77m. In this case, Brooks and Laura argue and the Plaintiffs agree that the Plaintiffs last purchased debenture notes from VWE on January 1, 2004.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**c. Date When the Alleged Section 12(a)(2) Untrue Statement Was Or Should Have Been Discovered**

Brooks and Laura argue that the Plaintiffs were on inquiry notice about the alleged true state of affairs by at least June 2, 2004, when VWE filed for Bankruptcy. The Plaintiffs agree that they were on inquiry notice when the Bankruptcy was filed on June 2, 2004.

**d. Date When the Security Was First Bona Fide Offered To the Public for Purposes of the Section 12(a)(1) Claims**

Brooks and Laura argue that the Plaintiffs, as they allege, were first offered Debenture Notes in 1989. The Plaintiffs respond that Ed purchased securities from VWE's I-1, I-4, I-7, I-13 and I-15 offerings, that Dianne purchased securities from VWE's I-7, I-9 and I-13 offerings and that David purchased securities from VWE's I-9, I-12, I-13 and I-15 offerings and that, based upon VWE's records, each offer is separate and distinct and each was made available at a different time.

The Plaintiffs further argue that Brooks and Laura have failed to identify the date that each of these offerings was first offered to the public and cannot prove their statute of limitations defense without this information. Brooks and Laura reply by identifying evidence that offering I1 was first sold to Plaintiffs on January 1, 1989, I-4 on September 22, 1992, I-7 on November 12, 1998, I-9 on February 17, 1998, I-12 on December 12, 2000, I-13 on October 1, 2001, and I-15 on October 1, 2003. (Laura Mem. Ex. G.)

A stock, even if unregistered, is bone fide offered when it is genuinely offered to the public. *P. Stolz Family Partnership L.P. v. Daum,* 355 F.3d 92 (2d Cir.2004)(citing *Kubic v. Goldfield,* 479 F.2d 472, 475 (3d Cir.1973)). Further, the majority of courts have found that the three-year period begins when the security is first bona fide offered and not when

last bona fide offered. *Id.* at 100; *but see In re National Mortgage,* 636 F.Supp. at 1166 (the statute begins to run from that date of defendant's last sales-related activity, i.e., offer, sale or delivery of the security).

In this case, there were several offerings of debenture notes. Each offering was made at a different time, the offerings had different term periods, the offerings had different interim maturity periods, the offerings had different interest rates, and each offering became due at a different date. Therefore, each of the offerings will be considered to be a bona fide offering and the dates that each offering was sold will be when each of the Debenture Notes was first bona fide offered.

**e. Date the Security Was Sold for Purposes of the Section 12(a)(2) Claims**

Courts generally consider the date of sale relating to Section 12(a)(2) claims as the last of three occurrences: the date the security was first offered for sale, the date it was sold or the date it was delivered. *In re Enron,* 2004 U.S. Dist. LEXIS 8158 at *77, 2004 WL 405886. In this case, since each of the offerings will be considered as a sale of a security, the date each of the offerings was sold will be the date of sale.

**3. Timeliness Analysis**

*14 The statute of limitations that applies to Plaintiffs' 12(a)(1) claims requires that Plaintiffs' Complaint be brought within one year after the violation upon which it is based *and* not later than three years after the security was bona fide offered to the public. 15 U.S.C. § 77m. In this case, Plaintiffs' 12(a)(1) claims were brought on January 26, 2005 and the most recent alleged violation occurred on January 1, 2004 when the I-19 offering was purchased.

The Plaintiffs suggest that their Section 12(a)(1) claim is timely because of equitable tolling. Some

Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

courts have found that equitable tolling does not apply to Section 12(a)(1) claims. *In re Colonial Ltd. Partnership Litigation,* 854 F.Supp. 64, 86 (D.Conn.1994). Those courts that have considered equitable tolling have either considered it with regard to the service requirement found in Rule 4(m), *Pompey,* 321 F.Supp.2d at 1265, or with regard to cases where there was concealment of the fact that the securities were not registered. *Katz v. Amos Treat & Co.,* 411 F.2d 1046, 1055 (2d Cir.1969); *In re Colonial,* 854 F.Supp. at 86; *Jones v. Lewis,* No. 86-1547-T, 1988 WL 163026 at *2 (D.Kan. June 13, 1988); *In re Gas Reclamation, Inc. Securities Litigation,* 659 F.Supp. 493, 507 (S.D.N.Y.1987); *In re National Mortgage,* 636 F.Supp. at 1166-67.

In this case, the Plaintiffs make no allegations regarding service of their Complaint or no allegations that Brooks and Laura made fraudulent misrepresentations about the registration of the Debenture Notes. Therefore, the doctrine of equitable estoppel does not apply to Plaintiffs' 12(a)(1) claims.

The one-year requirement is not satisfied by any of Plaintiffs' 12(a)(1) claims. Since both the one-year and three-year requirements must be satisfied, Plaintiffs' 12(a)(1) claims against both Laura and Brooks are barred and must be dismissed.

The statute of limitations that applies to Plaintiffs' 12(a)(2) claims requires that Plaintiffs' Complaint be brought within one year after the discovery of the untrue statement or omission *and* not later than three years after the sale. In this case, Plaintiffs' 12(a)(2) claims were brought on January 26, 2005, and the untrue statements or omissions were discovered on June 2, 2004. Therefore, Plaintiffs' 12(a)(2) claims are not barred by the one-year limit.

One of Plaintiffs' 12(a)(2) claims is also not barred by the three-year limit. Plaintiffs' 12(a)(2) claims were brought on January 26, 2005, and the sale of the I-15 offering occurred on October 1, 2003. The sale of the other offerings about which Plaintiffs complain occurred outside of the three year limit and causes of action regarding these sales are

barred by the three-year limit.

Plaintiffs' 12(a)(2) claim regarding the purchase of the I-15 offering is not time barred. Further, the doctrine of equitable estoppel does not apply to the other offerings. *In re Enron,* 2004 U.S. Dist. LEXIS 8158 at *77, 2004 WL 405886 (courts have almost uniformly agreed that the three-year time limit is absolute and thus equitable tolling principles are not applied to further extend the three years). In this case, the Plaintiffs do not argue otherwise regarding equitable tolling.

**B. Sale of Securities**

**\*15** The elements of a Section 12(a)(2) claim [FN6] are: (1) the defendants offered and sold a security; (2) by the use of any means of communication in interstate commerce; (3) through a prospectus or oral communication; (4) by making a false or misleading statement of material fact or by omitting to state a material fact; (5) plaintiff did not know of the untruth or omission; and (6) defendants knew, or in the exercise of reasonable care, should have known of the untruth or omission. *Wright v. National Warranty Company,* L.P., 953 F.2d 256, n. 3 (6th Cir.1992); *Wuliger v. Mann,* No. 3:03 CV 1531, 2005 WL 1566751 at *5 (N.D.Ohio July 1, 2005).

> FN6. Since Plaintiffs' Section 12(a)(1) claims are time-barred, only the remaining Section 12(a)(2) claim will be considered.

Therefore, to make a Section 12(a)(2) claim, the Plaintiffs must show that Brooks and Laura offered and sold them the debenture notes that are not barred by the statute of limitations through an oral communication.[FN7] Where the defendant is not a direct seller, direct and active participation in the solicitation of the sale must be shown. *Maker v. Durango Metals, Inc.,* 144 F.3d 1302, 1307 (10th cir.1998). Liability extends "to the person [non owner] who successfully solicits the purchase, motivated at least in part by a desire to serve his own

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 1:08-cv-02755-DCN Doc #: 54-1 Filed: 09/30/10 87 of 126. PageID #: 994

Page 14
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,531
(Cite as: 2008 WL 85871 (S.D.Ohio))

financial interests or those of the securities owner." [FN8] *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1214-15 (1st Cir.1996); *Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F.Supp. 1101, 1132 (W.D.Mich.1996)(quoting, *Pinter v. Dahl*, 486 U.S. 622, 647, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988)).

> FN7. There is no evidence that a prospectus was involved in the sale of the Debenture Notes.

> FN8. The definition of seller set forth in *Pinter* was in the context of a Section 12(a)(1) claim but it is well established that this same definition applies to a Section 12(a)(2) claim. *Shaw*, 82 F.3d at 1214; *Picard*, 940 F.Supp. at 1132.

To establish liability as a seller, a plaintiff must demonstrate direct and active participation in the solicitation of the immediate sale. *Picard*, 940 F.Supp. at 1132-33; *see also Shaw*, 82 F.3d at 1215. In other words, a statutory seller must engage in activity which could be considered an offer. [FN9] *Id.* (citing *PPM America, Inc. v. Marriott Corp.*, 853 F.Supp. 860, 873 (D.Md.1994)). A non-owner seller must urge a prospective purchaser to buy. *Smith v. American National Bank and Trust Co.*, 982 F.2d 936, 941 (6th Cir.1992). However, participation in activities relating to the sale of securities, standing alone, does not demonstrate statutory seller status nor does the fact that statements by a defendant were a substantial factor in the purchase demonstrate seller status. *Shaw*, 82 F.3d at 1216.

> FN9. An offer is "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value." *Picard*, 940 F.Supp. at 1132-33 (quoting 15 U.S.C. § 77b(3)).

## 1. Sales By Brooks for Purposes of Section 12(a)(2) Claims

Turning then to this case, Brooks testifies that he has "never solicited or sold any investments in VWE to Plaintiffs or to anyone else. (Brooks Aff. ¶ 11.) Also, Laura testified that she "did not authorize or participate in, and have no knowledge of my father's, mother's and sister's solicitations of Plaintiffs' investments in VWE." (Laura Aff. ¶ 12.) Brooks and Laura also point to Ed's testimony that Victor, Maxine and Alicia solicited him and David to purchase the debenture notes. (Ed. Dep.15, 39, 59.) This was confirmed by Dianne. (Dianne Dep. 21, 58, 90.)

*16 The Plaintiffs respond by arguing that Brooks made numerous false statements in connection with the financial status of VWE. For example, Brooks allegedly said that the company had plenty of assets to cover the notes outstanding. (Ed Dep. 118.) In another example, Brooks was part of a group sitting around a table who agreed that VWE was doing very well and everyone should do all they can to relieve the anxiety of the shareholders. (*Id.* 122-25.) At another time, Brooks indicated that Alicia was doing a great job at VWE and "launched" into a dialogue about VWE's financials. (*Id.* 160, 169-70.)

Dianne testified that Brooks was indirectly involved in the solicitations by Victor because Victor always said that, if anything happened to him [Victor] that Brooks was going to take over and that "Brooks had his eye on everything." (Dianne Dep. 16-17.) She further testified that, on many social occasions, she was told by Brooks and Victor "what a great company it is and we should invest." (*Id.*) Finally, David testified that, on one occasion, Brooks "had no problem rattling off numbers, saying "I've seen the numbers. They're good. They're strong and profitable. Don't worry ." (David Dep. 102-03.)

The Plaintiffs also direct attention to a conflict in Brooks' testimony between what he testified in this lawsuit and what he testified at a recent deposition taken in another lawsuit brought against him. Here, he said he never solicited or sold VWE Debenture Notes to anyone. In the other lawsuit, he testified that Alicia asked him to talk to other potential in-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 1:08-cv-02755-DCN Doc #: 54-1 Filed: 09/30/10 88 of 126. PageID #: 995

vestors and he specifically remembers talking to at least one. (Brooks Dec. Dep. 166-68) He said, however, that he does not remember talking to Ed. ( *Id.*)

While Brooks may have made statements regarding the financial status of VWE, none of the statements identified demonstrate direct and active participation in the solicitation of the immediate sale of any Debenture Note to the Plaintiffs. Therefore, Brooks was not a "seller" of the Debenture Notes to the Plaintiffs.

## 2. Sales By Laura for Purposes of Section 12(a)(2) Claim

The Plaintiffs do not identify any specific statements that Laura made regarding sale of the Debenture Notes, and, instead argue that she is liable as a senior officer of VWE, as a director of VWE and as one who held 50% of the voting shares of VWE. In support of this argument, the Plaintiffs cite *Maywalt v. Parker & Parsley Petroleum Co.,* 808 F.Supp. 1037, 1053 (S.D.N.Y.1992). In *Maywalt,* a group of managers who published a proxy solicitation for a merger and ended up as directors of the resulting company and a group of officers and directors of one of the entities being merged that provided a written recommendation of approval of the merger were found to be sellers for Section 12(a)(2) purposes. 808 F.Supp. at 1053.

However, the situation in *Maywalt* is considerably different from the situation here. In *Maywalt,* there were written publications and here there are no written publications. Here, the only misstatement allegations regarding the sale of Debenture Notes are oral representations by Maxine and Alicia. [FN10] Since there can be no inference that oral statements of one officer represent the "collective action" of others, Laura can hardly be held liable for the oral statements made by the others. *See In re Smartalk Teleservices, Inc. Securities Litigation,* 124 F.Supp.2d 527, (S.D.Ohio 2000)(there can be no inference that an oral statement of one officer

represents the "collective action" of others).

> FN10. Victor was deceased at the time of the sale of the Debenture Notes actionable under Section 12(a)(2) and there is no evidence of written communications after that time.

*17 The Plaintiffs have not presented evidence that Laura directly and actively participated in the solicitation of the immediate sale of any debenture notes. Therefore, Laura was not a "seller" of the Debenture Notes.

## C. Conclusion On Section 12(a)(1) and Section 12(a)(2) Claims

There are no genuine issues of material fact and both Brooks and Laura are entitled to judgment as a matter of law on Plaintiffs' Section 12(a)(1) and Section 12(a)(2) claims against them. Action on all of Plaintiffs' Section 12(a)(1) claims is time-barred. Action on all but one of Plaintiffs' Section 12(a)(2) claims is time-barred. Finally, the Plaintiffs have presented no evidence that either Brooks or Laura sold or solicited the sale of the Debenture Note to them upon which action is not time-barred.

Since summary judgment has been granted based upon the statute of limitations and the requirement that the defendant be a seller of the actionable security to the purchaser, the materiality of the alleged statements need not be addressed for purposes of the Section 12(a)(1) and 12(a)(2) claims. The analysis next turns to Plaintiffs' Second Cause of Action.

## V. SECOND CAUSE OF ACTION: 10b-5 CLAIMS

Plaintiffs' Second Cause of Action asserts that Brooks and Laura violated Section 10b of the Securities Exchange Act of 1934 and Rule 10b-5 which prohibit making material misstatements in connection with the purchase or sale of securities.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,537
(Cite as: 2008 WL 85871 (S.D.Ohio))

To be actionable, the conduct giving rise to the 10b-5 claim must be more than negligent. *Cook,* 573 F.2d at 692.

Section 10(b) of the Securities Exchange Act of 1934 was designed as a "catchall clause to prevent fraudulent practices." *Picard,* 940 F.Supp. at 1119 (quoting *Chiarella v. United States,* 445 U.S. 222, 226, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)). Section 10(b) makes it unlawful to employ, in connection with the purchase or sale of securities, any "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe ..." *Id.* (quoting *Chiarella,* 455 U.S. at 226). Rule 10b-5 promulgated by the Securities and Exchange Commission makes it unlawful in connection with the purchase or sale of any security "(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." *Id.* (quoting 17 C.F.R. 240, 10b-5). Section 10(b) and Rule 10b-5 reach beyond statements and omissions that are made in registration statements and that are actionable under Sections 12(a)(1) and 12(a)(2) to create liability for false or misleading statements or omissions of material fact in connection with trading in the secondary market. *Shaw,* 82 F.3d at 1216-17.

**\*18** The elements of a 10b-5 claim are: (1) scienter on the part of the defendant; (2) materiality of the alleged misrepresentations or omissions by the defendant; (3) actual reliance by plaintiff upon the defendant's misstatements or omissions; and (4) justifiable reliance. *Wright,* 953 F.2d at n. 1 (citing *Cavalier Carpets, Inc. v. Caylor,* 746 F.2d 749, n. 16 (11th Cir.1984)).

The alleged violator need not directly communicate with the plaintiff for primary liability for a 10b-5 claim to attach. *Picard,* 940 F.Supp. at 1120. A third-party defendant may be liable as a primary violator where the third-party defendant controlled the content of the misleading statement.[FN11] *Id.*

> FN11. The control over a specific third-party statement needed to establish primary 10b-5 liability is not the equivalent of the degree of control over an actor needed to establish a "control person" liability under Section 15 of the Securities Act of 1933 or Section 20(a) of the Securities Exchange Act of 1934. *Picard,* 940 F.Supp. at n. 13.

Brooks and Laura argue that Plaintiffs' 10b-5 claims are time-barred, that the statements allegedly made by them are not actionable and that there is no evidence that either of them acted with scienter. The Plaintiffs respond that their claims are not time-barred, that both Brooks and Laura are "sellers" for purposes of the 10b-5 claims and that the statements made were actionable.

## A. Timeliness of 10b-5 Claims

The Sarbanes-Oxley Act of 2002 extended the statute of limitations on 10b-5 claims from a one-year/three-year scheme to a two-year/five year scheme. *Taylor v. Prudential Insurance Company of America,* No. 1:02-cv-1462, 2003 WL 21314254 at *4 (S.D.Ind. May 7, 2003). The two-year/five-year scheme currently in effect is found at 28 U.S.C. § 1658. *Id.*

Section 1658 provides that "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws ... may be brought not later than the earlier of: (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." *Id.* (citing 28 U.S.C. § 1658). The limitations period is not subject to equitable tolling and the statute of limitations begins to run on either actual or inquiry notice

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

of the facts constituting the fraud. *Id.*

To apply the two-year limitation, the date the complaint was filed and the date that the facts constituting the violation was or should have been discovered must be determined. To apply the five-year limitation, the date of the violation must be determined.

## 1. Date When the 10b-5 Claim Was Filed

Plaintiffs' original Complaint was filed in the Court of Common Pleas for Clark County, Ohio on January 26, 2005, and was subsequently removed to this Court. On July 22, 2005, the Plaintiffs filed an Amended Complaint which added claims of violation of Sections 12(a)(1) and 12(a)(2) of the Securities Act of 1933 and violation of Rule 10b-5 of the Securities Exchange Act of 1934. On November 2, 2005, the Plaintiffs again amended their Complaint. Following and pursuant to this Court's ruling on Defendants' Motion To Dismiss the Second Amended Complaint, the TAC was filed on April 6, 2006. The TAC adds Brooks as a Defendant and includes the particulars of the allegations of fraud.

*19 Brooks and Laura now argue that the 10b-5 claim was first filed against Laura on July 22, 2005 when this claim was amended to the original Complaint. They also argue that the 10b-5 claim against Brooks was brought on January 18, 2006, when Plaintiffs filed their motion to file the TAC.[FN12] The Plaintiffs respond that the 10b-5 claim filed against Laura on July 22, 2005, and the TAC which first named Brooks relate back to the original claim filed on January 26, 2005.

> FN12. The TAC first added Brooks as a Defendant.

The law regarding an amendment relating back to an original claim is as set forth above. In this case, Laura was named in the original Complaint and the Amended Complaint adding the 10b-5 claim against Laura arose out of the conduct, transaction and occurrences set forth in the original Complaint.

Therefore, the Amended Complaint that adds a 10b-5 claim against Laura relates back to the original Complaint filed on January 26, 2005. Also, for the reasons stated above regarding the Section 12(a)(1) and 12(a)(2) claims, the 10b-5 claim against Brooks relates back to the original Complaint.

Therefore, for purposes of the 10b-5 claims against both Brooks and Laura, January 26, 2005, the date the Plaintiffs original Complaint was filed, is the date the claims were filed for purposes of 10b-5 statute-of-limitation analysis. Laura was a named Defendant in the original Complaint and the Amended Complaint which first includes a 10b-5 claim against Laura relates back to the original Complaint. Also, Brooks had constructive notice of the original Complaint and the TAC which first named Brooks as a Defendant arose out of the conduct, transactions and occurrences set forth in the original Complaint. The analysis next turns to the date that the facts constituting the 10b-5 violation were or should have been discovered.

## 2. Date When the Alleged 10b-5 Untrue Statements Were Or Should Have Been Discovered

As with the Section 12(a)(1) and 12(a)(2) claims, Brooks and Laura argue that the Plaintiffs were on inquiry notice about the alleged true state of affairs by at least June 2, 2004, when VWE filed for bankruptcy. The Plaintiffs agree that they were on inquiry notice when the Bankruptcy was filed on June 2, 2004. The analysis next turns to when the alleged 10b-5 violations occurred.

## 3. Date When the Alleged 10b-5 Violations Occurred

The alleged 10b-5 violations are misstatements allegedly made by Brooks and Laura in connection with the purchase of Debenture Notes by the Plaintiffs. There are factual allegations that the alleged misstatements by Brooks and/or Laura were made as early as "during the 90s" and continued

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,531
(Cite as: 2008 WL 85871 (S.D.Ohio))

until VWE filed bankruptcy. (Ed Dep. 41, 61-62, 125-26, 154, 168-70, 190-96; Dianne Dep. 17-18, 75-77, 143; David Dep. 82-85.) There are also factual allegations that the sales to the Plaintiffs that resulted from alleged misrepresentations were made on January 1, 1989, September 22, 1992, November 12, 1998, February 17, 1998, December 12, 2000, October 1, 2001 and October 1, 2003. Therefore, the alleged sales were made after the alleged misrepresentations and, as determined above, each of the sales is an alleged violation.

### 4. Analysis of Timeliness of 10b-5 Claims

**\*20** In this case, the discovery of the facts constituting the alleged violations was made on June 2, 2004. Two years after this date is June 2, 2006 and the Complaint was filed on January 26, 2005. Therefore, the Complaint was filed within two years of when the facts constituting the alleged violations were discovered and the two-year limitation is satisfied.

The five-year limitation must also be considered. The dates of the alleged violations range from January 1, 1989, to October 1, 2003. Five years after the alleged violations is a range from January 1, 2004, to October 1, 2008.

The claim was filed on January 26, 2005. Therefore, any sales that occurred on or after January 26, 2000, are not subject to the five-year limitation. This includes sales made on December 12, 2000, October 1, 2001 and October 1, 2003. The five-year limitation bars claims for sales made prior to January 26, 2000. This includes the sales made on January 1, 1989, September 22, 1992, November 12, 1998, and February 17, 1998. The analysis next turns to the actionability of the alleged statements made by Brooks and Laura.

### B. Actionability as 10b-5 Claims

To be actionable as 10b-5 claims, the Plaintiffs must show that the statements made by Brooks and/

or Laura Klimley were material. *City of Monroe Employees Retirement System v. Bridgestone Corp.,* 399 F.3d 651, 669 (6th Cir.2005), *cert. denied,* 546 U.S. 936 (2005). Plaintiffs must also show that Brooks and/or Laura had a duty to disclose. *Id.*

The analysis next turns to a determination of whether the alleged statements or omissions were material. This is followed by an analysis of whether Brooks and/or Laura had a duty to disclose.

### 1. Relevant Law On Materiality

A *statement* is material only if there is a substantial likelihood that "a reasonable investor would have viewed the misrepresentation as 'having significantly altered the total mix of information made available.' " *In re Ford Motor Company Securities Litigation,* 381 F.3d 563, 570 (6th Cir.2004) (quoting *In re Sofamor Danek Group, Inc.,* 123 F.3d 394, 400 (6th Cir.1997), *cert. denied,* 523 U.S. 1106, 118 S.Ct. 1675, 140 L.Ed.2d 813 (1998)). Likewise, an *omission* is material if there is "a substantial likelihood that the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *Stavroff v. Meyo,* No. 95-4118, 1997 WL 720475 at \*4 (6th Cir. Nov.12, 1997).

Alleged misrepresentations are immaterial "only if they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *In re Ford Motor Company,* 381 F.3d at 570 (citing *Helwig v. Vencor, Inc.,* 251 F.3d 540, 563 (6th Cir.2001)). Misrepresentations are also immaterial if the investors have knowledge of the truth. *Picard,* 940 F.Supp. at 1123 (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)).

**\*21** The materiality requirement does not require proof of a substantial likelihood that proper disclosure would have caused an investor to change a decision. *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,534
(Cite as: 2008 WL 85871 (S.D.Ohio))

(1976). Proof that the proper disclosure would have significantly altered the "total mix" of available information is all that is necessary. *Id.*

Whether or not a statement is material turns upon a "fact-intensive test." *City of Monroe,* 399 F.3d at 669 (citing *Helwig,* 251 F.3d at 555). Therefore, materiality is a mixed question of law and fact and is decided as a matter of law only if reasonable minds could not differ on the issue. *Picard,* 940 F.Supp. at 1122. However, in most instances, disputes over the materiality of allegedly false or misleading statements are determined by the trier of fact. *Shaw,* 82 F.3d at 1217.

Regarding materiality, the Sixth Circuit has distinguished between "hard" and "soft" information. *Picard,* 940 F.Supp. at 1122. Hard information is usually historical information or other factual information that is objectively verifiable. *Id.* Publicly-disclosed hard information is actionable if false and material. *Id.*

Soft information includes predictions and matter of opinions. *Id.* Soft information that is not actionable includes vague, puffing statements or obvious hyperbole upon which a reasonable investor would not rely. *In re Ford Motor,* 381 F.3d at 570. Statements that are "mere puffing" or "corporate optimism" may be forward-looking or generalized statements of optimism that are not capable of objective verification. *Id.*

Soft information is actionable only if it is virtually as certain as hard facts. *City of Monroe,* 399 F.3d at 669. Opinions may be deemed false or misleading under the securities laws if proof of their falsity can be established "through the orthodox evidentiary process." *Id.* (citing *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1090-93, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991)).

## 2. Relevant Law On Duty To Disclose

In addition to being material, to be actionable, a misrepresentation or omission must pertain to information that the defendant had a duty to disclose. *City of Monroe,* 399 F.3d at 669. A duty to disclose may arise where there is an incomplete or misleading prior disclosure. *Id.* Also, a duty to disclose may arise from a relationship of trust and confidence between the parties to a transaction. *Chiarella,* 445 U.S. at 230; *State v. Warner,* 55 Ohio St.3d 31, 564 N.E.2d 18, 40 (Ohio 1990), *cert. denied,* 499 U.S. 961, 111 S.Ct. 1584, 113 L.Ed.2d 649 (1991).

For example, "[a] duty to disclose and corresponding liability for failure to disclose arises when the party fails to exercise reasonable care to disclose a material fact which may justifiably induce another party to act or refrain from acting, and the non-disclosing party knows that the failure to disclose such information to the other party will render a prior statement or representation untrue or misleading. *Glassner v. R.J. Reynolds Tobacco Company,* 223 F.3d 343, 352 (6th Cir.2000). In another example, a duty to disclose arises when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them. *Warner,* 564 N.E.2d at 40.

*22 As an example of a fiduciary duty, the officers and directors of a corporation that is insolvent or is on the brink of insolvency owe a fiduciary duty to the corporation itself and to its creditors not to waste corporate assets which otherwise could be used to pay corporate debts. *DeNune v. Consolidated Capital of North America, Inc.,* 288 F.Supp.2d 844, 859 (N.D.Ohio 2003). In another example, directors of a corporation owe a fiduciary duty to the corporation and its shareholders to perform their duties in good faith and in a manner not opposed to the best interests of the corporation. *Thomas v. Matthews,* 94 Ohio St. 32, 113 N.E. 669, 671 (Ohio 1916); *Geygan v. Queen City Grain Co.,* 71 Ohio App.3d 185, 593 N.E.2d 328, 331 (Ohio Ct.App.1991).

Directors are held strictly accountable and liable if corporate funds or property are wasted or mismanaged due to the director's inattention. *Biggins v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Garvey,* 90 Ohio App.3d 584, 630 N.E.2d 44, 52 (Ohio Ct.App.1993); *Geygan,* 593 N.E.2d at 333. However, a fiduciary duty does not exist when a bank and a prospective borrower are dealing at arm's length unless special circumstances are present. *Groob v. Keybank,* 108 Ohio St.3d 348, 843 N.E.2d 1170, 1176 (Ohio 2006).

## 3. Alleged Fraudulent Statements

The allegedly fraudulent statements or omissions attributed to Brooks and Laura in the TAC are:

¶ 35. In October of 2000 at the Dutch Reformed Church in Bronxville, New York, after the funeral service of Victor Eimicke, Alicia and Maxine Eimicke and Laura Klimley assured Wayne, Dianne and David Pullins that Alicia Eimicke would run the Company and that the Company was strong financially. At the time that said statements were made, Alicia, Maxine Eimicke and Laura Klimley knew these statements to be false. (See also Ed's deposition where he remembers that a group, including Brooks, discussed that VWE was doing well and he remembers this conversation being at a dinner following Victor's funeral. (Ed. Dep.122-25.); In her deposition, Dianne remembers that on many social occasions "we" were told by Victor and Brooks "what a great company it is and we should invest." (Dianne Dep. 16-18; David Dep. 82-83.))

¶ 43. On Thursday-Sunday, October 11-14, 2001 at Baker Field, Columbia University, New York City, Brooks and Laura Klimley took Wayne, Dianne and David Pullins to a Columbia University football game. Brooks and Laura Klimley told the Pullins Family that all was well with the company and everything was running as usual although they knew that said representations were false. (See also Ed Dep. 137-39; Dianne Dep. 16-18, 76-78; David Dep. 100-03.)

¶ 61. On Friday, July 4, 2003, at the Siwanoy Country Club in Bronxville, New York, Laura and Brooks Klimley, along with Maxine Eimicke, indicated to Wayne Pullins that the Company was doing better than ever before and Alicia was doing a great job although they knew this not to be the case. (See also Ed Dep. 164; Dianne Dep. 16-18.)

¶ 68. On Tuesday-Friday, April 20-23, 2004, Wayne Pullins was in Columbus, Ohio at Riverside Methodist Hospital for a heart operation. He received separate calls from both Maxine Eimicke and Laura Klimley, wishing him well and not to worry about the money with them, it was safe for his wife and son although they knew that this was not true and in fact that Company was preparing a bankruptcy filing. (See also Dianne Dep. 16-18.)

*23 ¶ 70. On Saturday, May 29, 2004, at 5 Oakledge Road (Klimley family residence), Bronxville, New York, the Klimleys held a barbeque at their home, attended by Brooks and Laura Klimley, their three children (Zoe, Spencer, Graham), Beth Duval and Wayne, Dianne and David Pullins. Wayne Pullins asked about the company (because they were behind in payment to the Pullins family for about $17,000). Laura Klimley referred questions to Brooks who said things were "going on as usual." Wayne Pullins asked where Alicia Eimicke was and was told by Laura that she was unable to attend because of conflicting weekend plans. The guests were shown in detail their $8 million home, acting as if they (Maxine Eimicke and Brooks and Laura Klimley) were entirely secure. In front of Brooks and Laura Klimley, Maxine Eimicke advised the Pullins family to reserve rooms at the Plaza Hotel for David Pullins' upcoming graduation from Columbia University, suggesting money issues were secure. At the time that these representations were made Brooks Klimley, Laura Klimley and Maxine Eimicke knew that the Company was insolvent and had authorized the filing of a bankruptcy petition. (See also Ed. Dep. 168-70; Dianne Dep. 16-18.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 21

Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,554 of 126. PageID #: 1001
(Cite as: 2008 WL 85871 (S.D.Ohio))

¶ 71. On Sunday, May 30, 2004, in the Bronxville area, to see the Klimley's two sons play baseball, Wayne Pullins asked again about Alicia and the Company. Again, Brooks spoke for Laura Klimley and himself saying, "Alicia runs the company for us and she plays her cards close to the vest." This statement was made although Brooks Klimley was actively involved in the note program and had knowledge of the Company's insolvency and bankruptcy filing. (See also Dianne Dep. 16-18.)

¶ 79. Defendants knew or in the alternative recklessly disregarded the adverse information in connection with the Company's losses, excessive officers salaries and compensation; failure to register the subject Notes and make the required disclosures; inability to service the Notes and the insolvency of the Company as described above and purposely failed to disclose this information to Plaintiffs and the other investors in the Note Program although Defendants had a clear duty to do so.

In addition to the specific instances identified in the TAC, Ed remembers that, during the time prior to Victor's death, Brooks represented to him that VWE was doing well. (Ed Dep. 62.) Ed does not identify when this particular statement may have been made.

Ed also testified that Brooks confirmed with Maxine that there were $4 million in notes outstanding and VWE had plenty of assets to cover that. (*Id.* 118, 843 N.E.2d 1170.) Ed does not testify as to when this particular statement was made. (*Id.*)

### 4. Analysis of Actionability of Fraudulent Statements

As an initial matter, the alleged general representations made by Brooks and identified in Ed's deposition at pages 62 and 118 will not be considered to be material because Ed does not identify the statements with specificity. Remaining to be considered are the specific statements and omissions alleged in the TAC and confirmed in the Depositions of Ed, Dianne and David.

*24 This analysis is undertaken based upon factual allegations that both Laura and Brooks knew or should have know the true financial status of VWE. Laura was a 50% owner, a Vice President of VWE, a Director of VWE and worked in the business every day for a period of time. (See Dianne Dep. 107-08.)

Leo Kirby, a VWE employee from May of 1993 to July of 2000, testifies that, as part of his job duties, he delivered business items, including interoffice envelopes and mail messages, to Laura's home and that he saw an office in her home in which she did VWE business-related work. (Deposition of Leo Kirby ("Leo Kirby Dep.") 64 May 1, 2007.) He, however, does not know the contents of the materials that he delivered. (*Id.* 42, 843 N.E.2d 1170.) He also recalls occasionally discussing business matters with Laura in VWE's office after she ceased working full time there. (*Id.* 34-35, 843 N.E.2d 1170) Dianne also recalls seeing the office in Laura's home and financial documents on Laura's desk. (Dianne Dep. 73-74.) Finally, David recalls seeing the office that Laura had in her home and describes it as a "business-like" office with a fax machine and computer and as "not an office for writing thank you notes." (David Dep. 117.)

Further, in a recent deposition in an different lawsuit, Laura acknowledges that she was consulted by Alicia in connection with issues involving VWE's business affairs in the 1998 to 2004 time period. (Deposition of Laura Klimley ("Laura Dec. Dep.") 34 Dec. 5, 2007.) She also admits that she had signatory power on VWE accounts after Victor's death and that, in October of 2000, she actually signed checks to holders of the Debenture Notes. (*Id.* 223-25, 843 N.E.2d 1170.) Laura also admits that, in mid-2003 she attended at least one meeting regarding the sale of VWE's Holiday Greeting Card business. (*Id.* 205, 276, 843 N.E.2d 1170.) Finally, Laura admits that, up until VWE's bankruptcy was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

filed, she was receiving a weekly check from VWE for $600. (*Id.* 41, 843 N.E.2d 1170.) She does not think this money was a salary but was money VWE owed her for something other than a Debenture Note. (*Id.* 41-42, 843 N.E.2d 1170)

Further, regarding Laura, there is evidence that she was told by lawyers in the firm of Hall Dickler Kent Goldstein & Wood that, as of August 27, 2001, VWE had significant net operating losses of approximately $8.6 million, a book value of approximately $11 million and outstanding liabilities of approximately $24 million.. (Affidavit of Michael Meyers ("Meyers Aff.") ¶¶ 3-4, Ex.1 Nov. 9, 2007). This information was presented as part of a response to a request from VWE, half-owned at the time by Laura, to present the most tax efficient business structure under which VWE could achieve certain goals in the event it became profitable and/ or was later sold at a substantial gain. (*Id.*)

There are also factual allegations that Brooks was knowledgeable in general about financial matters and heavily involved in and knowledgeable of VWE financial matters. (Dianne Dep. 16-17, 77, 107-08; David Dep. 82-83, 102-04; Romo Aff. ¶¶ 3-4.)

**\*25** Because Laura and Brooks knew or should have known about VWE's poor financial conditions, their statements identified in paragraphs 35, 43, 61, 68, 70 and 71 of the TAC are misrepresentations. While in one context, these statements may be mere "rosy affirmations," in the context of a family business where no financial information is officially disclosed and where the alleged misstatements are made by those close to the family who knew or should have known the actual financial conditions, there are not mere "rosy affirmations." Also, while the majority of the alleged misrepresentations were made by Victor, Maxine and Alicia, there are factual allegations that Laura and Brooks knew or should have known that they were misrepresentations and either supported or failed to correct them. Finally, proper disclosure of the financial status of VWE would have significantly altered the

total mix of information available to Ed, Dianne and David upon which to base their decisions regarding purchase and/or renewal of the Debenture Notes. Finally, failure to disclose the true financial picture when given many opportunities to do so is a material omission.

Regarding duty, both Brooks and Laura had a duty to disclose VWE's true financial status to the Plaintiffs because they had made alleged misleading prior disclosures regarding the financial status of VWE. Both Brooks and Laura also had a duty to disclose arising from the relationship of trust that they created due to their close family relationship with the Plaintiffs, Plaintiffs continuing purchase of Debenture Notes and Brooks' and Laura's prior affirmations of VWE's financial well-being. Further, both Brooks and Laura, as control persons of a insolvent company, had a fiduciary relationship with Plaintiffs as creditors and, therefore, had a duty to disclose. Finally, Laura had a duty to disclose that arose from the positions that she held at VWE and the fact that the Plaintiffs were both investors and close family members.

### 5. Conclusion On Actionability

There are genuine issues of material fact as to whether the alleged misstatements and omissions made by Brooks and Laura are actionable. There are genuine issues of material fact as to whether the statements were material and genuine issues of material fact as to whether Brooks and/or Laura had a duty to disclose the true financial status of VWE.

### C. Scienter Regarding the 10b-5 Claims

To prove their 10b-5 claim, Plaintiffs must show that Brooks and/or Laura acted with the requisite scienter. Scienter is defined as "a mental state embracing intent to deceive, manipulate or defraud." *Brown v. Earthboard Sports USA, Inc.,* 481 F.3d 901, 917 (6th Cir.2007); *Picard,* 940 F.Supp. at 1125. For 10b-5 claims based on statements of present or historical fact, scienter consists of know-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ledge or recklessness. *PR Diamonds v. Chandler,* 364 F.3d 671, 681 (6th Cir.2004). Recklessness is akin to conscious disregard and is defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Id.* at 684. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." *Id.* at 681 (quoting *Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1025 (6th Cir.1979)). For forward-looking statements that are not accompanied by meaningful cautionary language, the required state of mind is actual knowledge of the statement's false or misleading nature. *Id.* at n. 3.

*26 A "totality of the circumstances" test is used to determine whether scienter is adequately shown. *Brown,* 481 F.3d at 917. Among the factors that have been considered to determine if scienter was present are: divergence between internal reports and external statements on the same subject; closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; disregard of the most current factual information before making statements; and the self-interested motivation of the defendants in the form of saving their salaries or jobs. *Id.* at 917.

Scienter must be shown for each of the statements allegedly made by Brooks and Laura. *City of Monroe,* 399 F.3d at 682. The Plaintiffs must allege facts that, if true, form the basis for a strong inference that Brooks and/or Laura knew a statement was false or misleading.

In this case, the Plaintiffs have alleged facts that both Laura and Brooks knew or should have known that their statements regarding the financial health of VWE were false and that both Brooks and Laura may have been motivated to make the false statements. This same reasoning applies to the alleged omissions.

First, there is evidence that Brooks knew or should have known about the actual financial condition of VWE. There is evidence that, in 1994 at a party at

Maxine's home, the group present "toasted" to the "handing of the guard over to Brooks and the girls." [FN13] (Dianne Dep. 107-08.) The Eimickes, the Pullins and Brooks Klimley were in attendance. (*Id.*)

> FN13. The Defendants argue that this testimony should not be considered because it is hearsay. However, it is not hearsay because Dianne Pullins did not identify who, if anyone, made a statement.

Dianne testified that, on social occasions, Brooks and Victor discussed the financial aspects of VWE and said what a great company it was. (Dianne Dep. 16-17.) Dianne also testified that, after Victor's death, Brooks told her and others not to worry that he would take care of the family's money and that he had it right under his thumb. (Dianne Dep. 108; David Dep. 82-83.)

Ed testified that, on one occasion, Brooks told him that VWE was "running fine." (Ed Dep. 41.) On other occasions, Brooks told Ed that VWE was a great business and highly profitable. (*Id.* 62.) On other occasions, Brooks launched into a dialogue about VWE's financials. (Ed Dep. 160-61, 170; Dianne Dep. 77; David Dep. 102-04 .) In addition to evidence recalled by Ed, Dianne and David, Brooks allegedly told Terence Cyran that VWE was a "pioneer" in the direct mail industry with "huge" margins and had been highly and consistently profitable for many years. (Verified Comp. of Terence Cyran ¶ 12.) Brooks also told Terence Cyran that the lack of financial disclosure regarding VWE should not be a concern given the long profitable history of the business. (*Id.* ¶ 21.) In addition, Brooks told Thomas Romo that VWE had been highly and consistently profitable for many years. (Verified Compl. of Thomas Romo ¶ 7.)

Laura also knew or should have known about the financial condition of VWE. There is evidence that she owned 50% of VWE, she was a Director of VWE, she was a Vice President of VWE and, for a period of time, she worked at VWE on a daily

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

basis. There is also evidence that, after Laura ceased working full-time, she continued to be involved in the operation of VWE.

**\*27** There is also evidence that both Brooks and Laura had financial motivation to make misrepresentations or fail to provide material information. Laura was half-owner of VWE and received a regular payment and other benefits from VWE. Both Brooks and Laura owned several of the Debenture Notes and benefitted from continuing to receive interest payments on the notes. (Plts.' Mem. In Opposition To Brooks Klimley Mot. for Summ. J. Exs. A, B.) Finally, as Laura's spouse, Brooks would indirectly benefit from the income and profits she received from VWE.

**D. Conclusion Regarding 10b-5 Claims**

The five-year statute of limitations bars Plaintiffs' 10b-5 claims for Debenture Notes purchased prior to January 26, 2000. However, action on the Debenture Notes purchased by the Plaintiffs on or after January 26, 2000, is not barred by the statute of limitations. This includes purchases made on December 12, 2000, October 1, 2001 and October 1, 2003.

With regard to the Debenture Notes purchased on or after January 26, 2000, the Plaintiffs have presented evidence the misrepresentations and/or omissions made by both Brooks and Laura are material and that Brooks and Laura owed them a duty to disclose the actual financial condition of VWE. The Plaintiffs have also presented evidence that both Brooks and Laura may have acted with a mental state embracing an intent to deceive, manipulate or defraud with regard to these misrepresentations and/or omissions and that Brooks and Laura had the financial incentive to do so. Therefore, there are genuine issues of material facts and Brooks and Laura are not entitled to judgment as a matter of law on Plaintiffs' Second Cause of Action for violation of Section 10b of the Securities Exchange Act of 1934 and Rule 10b-5.

**VI. THIRD CAUSE OF ACTION: VIOLATION OF SECTION 15 OF THE SECURITIES ACT OF 1933**

In Plaintiffs' Third Cause of Action, they allege that Brooks and Laura were control persons of VWE and therefore secondarily liable for any misrepresentations made by Victor, Maxine or Alicia. The Defendants argue that neither Brooks nor Laura were control persons.

Section 15 applies to violations of Section 12 of the Securities Act of 1933. *Herm v. Stafford,* 663 F.3d 669, 679 (6th Cir.1981). In this case, Brooks and Laura Klimley have been granted summary judgment on the Section 12 claims brought directly against them. However, Brooks and Laura may be liable as control persons for the Section 12 claim that is not time-barred.

Courts analyze control-person-liability claims brought under Section 15 of the Securities Act of 1933 and control-person-liability claims brought under Section 20(a) of the Securities Exchange Act of 1934 using the same legal standards. *See Maker,* 144 F.3d at 1304-05; *In re Enron Corporation Securities, Derivative & "ERISA" Litigation,* Nos. MDL-1446 and Civ.A. H-01-3624, 2003 WL 230688 at * 12 (S.D.Tex. Jan.28, 2003)(the Fifth Circuit has held that Section 15 and Section 20(a) are analogous and should be interpreted in the same manner); *Picard,* 940 F.Supp. at 1133-34; *Maywalt,* 808 F.Supp. at 1053-54. Also, the Parties in this case have not argued otherwise. Therefore the law regarding Section 15 and Section 20(a) claims will be set forth and applied to both Plaintiffs' Section 15 and Section 20(a) claims.

**A. Relevant Law On Control Person Liability**

**\*28** Under Section 15 of the Securities Act of 1933 and Section 20(a) of the Securities Exchange Act of 1934, a person who controls a party that commits a violation of the securities laws may be held jointly and severally liable with the primary violator. *Mah-*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

er, 144 F.3d at 1304-05.[FN14] To state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) "control" over the primary violator by the alleged controlling person. *Id.* (citing *First Interstate Bank v. Pring,* 969 F.2d 891, 897 (10th Cir.1992)); *see also PR Diamonds v. Chandler,* 364 F.3d 671, 696-97 (6th Cir.2004).

> FN14. Section 15 and Section 20(a) are remedial and thus construed liberally. *Maher,* 144 F.3d at 1305.

A plaintiff is not required to show that the defendant "acted or culpably participated in the primary violation." *Maher,* 144 F.3d at 1305. Only some indirect means of discipline or influence short of actual direction is required to hold a controlling person liable. *Id.* Further, status as a control person is normally a question of fact unless the allegations are unusually explicit and the court can determine that the plaintiff could not plead or prove sufficient facts to support control-person liability. *Sanders Confectionery Products v. Heller Financial, Inc.,* 973 F.2d 474, 485-86 (6th Cir.1992).

Having set forth the standard for control person liability, the analysis turns a determination of who is liable as a control person. "Control" has been defined by the Securities and Exchange Commission as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. *PR Diamonds,* 364 F.3d at 696-97 (citing 17 C.F.R. § 230.405). "Control," therefore, is the practical ability to direct the actions of the individuals who committed the primary violation. *In re National Century Financial Enterprises, Inc. Investment Litigation,* 504 F.Supp.2d 287, 30 (S.D.Ohio 2007)(citing *Stavrof,* 1997 WL 720475 at n. 5.)

The Sixth Circuit has not adopted a test for control-person liability but has applied the test set forth in *Metge v. Baehler,* 762 F.2d 621 (8th Cir.1987) be-

cause it was the least rigorous standard used at that time. *Sanders,* 973 F.3d at 486. *Metge* established a two-pronged test for control person liability. *Id.* The plaintiff must show that the defendant "actually participated in (i.e. exercised control over) the operations" in general and "that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated." *Id.* (quoting *Metge,* 762 F.2d at 631.)

"To establish the first prong of the test, the plaintiff must show that the defendant had some indirect means of discipline or influence, even if short of actual directions, over the corporation." [FN15] *Picard,* 940 F.Supp. at 1134 (citing *Myzel v. Fields,* 386 F.2d 718, 738 (8th Cir.1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968)). In short, there must be some showing of actual participation or some influence before control may be imposed. *Id.*

> FN15. The Defendants cite *Herm v. Stafford,* 663 F.2d 669 (6th Cir.1981) for the proposition that allegations of an actual exercise of control are necessary to survive a motion for summary judgment. However, in *Herm,* the court granted a motion for summary judgment against a Section 20(a) claim because the plaintiff failed to present evidence of the defendant's "influence" or "actual participation in the corporation's operations." *Id.* at 684.

**\*29** The Plaintiffs cite *In re National Century,* 504 F.Supp.2d 287, [FN16] for the proposition that it is not necessary to show actual participation or the exercise of actual power to prove control person liability. However, this particular argument is not persuasive. The *National Century* court was identifying a pleading standard relative to a motion to dismiss. *Id.* at 303. The *National Century* court did, however, acknowledge that *Herm* required evidence of "influence or actual participation in the corporation's operation" in order to survive a motion for summary judgment. *Id.* at n. 3.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,531
(Cite as: 2008 WL 85871 (S.D.Ohio))

FN16. The Plaintiffs actually cite *In Re National Century Financial Enterprise, Inc.,* 2006 U.S. Dist. LEXIS 72154 (S.D.Ohio 2006) but this case says nothing about control person liability and it appears that Plaintiffs may have intended to cite *In re National Century Financial Enterprises, Inc.,* 504 F.Supp.2d 287 (S.D.Ohio 2007).

**B. Primary Violation**

The Plaintiffs have presented factual allegations that Victor, Maxine and Alicia violated Section 12(a)(2) of the Securities Act of 1933 by making material misstatements or omissions regarding the sale of the Debenture Notes. These allegations are not disputed by the Defendants. Therefore, for purposes of the Defendants' Motions for Summary Judgment, a primary violation of Section 12(a)(2) will be assumed to have occurred. The analysis next turns to whether Brooks and/or Laura had control over Victor, Maxine and Alicia Eimicke.

To survive a motion for summary judgment regarding control person liability, the Plaintiffs must present evidence that Brooks and/or Laura actually participated in or had some involvement in the operations of VWE in general and that Brooks and/or Laura possessed the power to control Victor, Maxine and Alicia's misstatements and/or omissions regarding sale of the Debenture Notes.

**C. Brooks as a Control Person**

Brooks argues that he did not act in any capacity for VWE, and that his only relationship to VWE was by being married to Laura. The Plaintiffs respond that Brooks was in charge of overseeing VWE's financial affairs and represented to the Plaintiffs and others that he was doing so.

First, there is evidence that Brooks was involved in the financial affairs of VWE. There is evidence that, in 1994 at a party at Maxine's home, the group

present "toasted" to the "handing of the guard over to Brooks and the girls." (Dianne Dep. 107-08.) The Eimickes, the Pullins and Brooks Klimley were in attendance. (*Id.*) In addition, Dianne testifies that, on social occasions, Brooks and Victor discussed the financial aspects of VWE and said what a great company it was. (Dianne Dep. 16-17.) Dianne Pullins also testifies that, after Victor's death, Brooks told her and others not to worry that he would take care of the family's money and that he had it right under his thumb. (Dianne Dep. 108; David Dep. 82-83.)

Ed testifies that, on one occasion, Brooks told him that VWE was "running fine." (Ed Dep. 41.) On other occasions, Brooks told Ed that VWE was a great business and highly profitable. (*Id.* 62.) On other occasions, Brooks launched into a dialogue about VWE's financials. (Ed Dep. 160-61, 170; Dianne Dep. 77; David Dep. 102-04 .)

In addition to evidence recalled by Ed, Dianne and David, Brooks allegedly told Terence Cyran that VWE was a "pioneer" in the direct mail industry with "huge" margins and had been highly and consistently profitable for many years. (Verified Comp. of Terence Cyran ¶ 12.) Brooks also told Terence Cyran that the lack of financial disclosure regarding VWE should not be a concern given the long profitable history of the business. (*Id.* ¶ 21.) In addition, Brooks told Thomas Romo that VWE had been highly and consistently profitable for many years. (Verified Compl. of Thomas Romo ¶ 7.) Finally, Brooks has testified that, on at least one occasion, he, at Alicia's request, discussed VWE with a potential buyer of VWE's Debenture Notes. (Brooks Dec. Dep. 166-68.)

**\*30** In addition to the above deposition testimony, the Plaintiffs have identified evidence that Brooks was involved in the operation of VWE in the form of nineteen VWE quarterly interest checks written to various debenture holders that are allegedly signed by Brooks. (Affidavit of Barbara DeMuth ("DeMuth Aff.") Ex. 14 Oct. 11, 2007; Ed Aff.") ¶ 7.) Brooks' signature on the checks is identified by

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,351
(Cite as: 2008 WL 85871 (S.D.Ohio))

Ed. (Ed. Aff.¶ 7.) Barbara DeMuth also attests that she recognizes the signatures on the checks in Ex. 14 to her Affidavit as the signatures of Alicia Eimicke, John Palmero, Laura Klimley and that these checks were signed at a time when Brooks Klimley, "who likewise appears to have signed these checks," was in VWE's offices. (DeMuth Aff. ¶ 18.)

Brooks testified that he did not sign the checks attached to DeMuth's Affidavit and Laura affirms that she did. (Supplemental Affidavit of Brooks Klimley ("Brooks Supp. Aff.") ¶ 7 Nov. 13, 2007; Supplemental Affidavit of Laura Klimley ("Laura Supp. Aff.") ¶ 3 Nov. 13, 2007.) In addition to arguing that he did not sign the checks, Brooks argues to disregard Ed's Affidavit wherein he identifies Brooks' signature. This Affidavit should be disregarded according to Brooks, because it was untimely, it is not signed or notarized and because Ed Pullins did not establish the foundation necessary for him to conclude that the signature belonged to Brooks.

As to timeliness, signature and notarization, the first page of Ed's Affidavit was filed on October 22, 2007, along with Plaintiffs' responses to Defendants' Motions for Summary Judgment. (Doc. # 132.) A complete Affidavit was then filed on November 5, 2007, but included typed rather than original affiant and notary signatures. (Doc. # 139.) On November 21, 2007, a complete Affidavit was filed that was notarized and included an original signature. (Doc. # 155.) The manner in which Ed's Affidavit was filed is not necessarily acceptable to this Court. However, the Defendants are obviously aware of, and therefore, not prejudiced by the late filing of the complete Affidavit and the interests of justice demand that the Affidavit not be disregarded based upon the manner in which is was filed.

As to the foundation for Ed's Affidavit, a nonexpert may be permitted to state an opinion as to the authenticity of handwriting with which he or she is familiar provided that the familiarity is not acquired for the purpose of litigation. *United States v. Binzel,*

907 F.2d 746, 749 (7th Cir.1990). The extent of the witnesses' familiarity generally goes to the weight to be given to the testimony but there must be a minimal factual basis from which the familiarity might reasonably have been obtained. *Id.* Finally, the nonexpert witness must identify with particularity any documents that are relied upon to establish familiarity. *Hall v. United Insurance Company of America,* 367 F.3d 1255, 1261 (11th Cir.2004).

In his Affidavit, Ed affirms that Laura is his niece and Brooks her husband and that he is familiar with their signatures because he has received correspondence from both for many years prior to filing this lawsuit. This is enough foundation. Ed indicates that he is familiar with Brooks' and Laura's signatures and identifies the documents that he relied upon to establish the familiarity. Any further familiarity issues go to the weight to be given to Ed's testimony and are not properly determined at summary judgment.

*31 Brooks argues that former VWE employees who were actually present at VWE testified that they almost never saw Brooks at VWE and that they had no knowledge of Brooks having involvement in or responsibility for VWE. However, this, of course, is not conclusive proof that Brooks was not a control person, particularly when faced with evidence to the contrary.

The Plaintiffs have presented evidence that Brooks participated in or had some involvement in the operation of VWE in general and that Brooks had the power to control Victor, Maxine and Alicia's misstatements and/or omissions regarding sale of the Debenture Notes. There is evidence that "Brooks and the girls" were running VWE and that Brooks held himself out to others as knowledgeable about the financial status of VWE. Further, there is evidence that, on at least one occasion, Brooks discussed VWE with a potential buyer of VWE Debenture Notes. Finally, there is evidence that Brooks signed checks on VWE accounts issued to holders of VWE Debenture Notes. Therefore, there are genuine issues of material facts and Brooks is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

not entitled to judgment as a matter of law on Plaintiffs' claim that he was a control person pursuant to Section 15.

### D. Laura as a Control Person

Laura argues that she is not a control person of VWE because, at all relevant times, she did not participate in the management and operations of VWE. However, the Plaintiffs have presented evidence otherwise.

Laura owned half of VWE. She also was a Director of VWE until she resigned in a letter dated September 9, 2004 (Laura Dep. Ex. 1.) and a Vice President of VWE until she resigned in a letter date September 28, 2004 (*Id.* Ex. 2.).

Laura affirms that she worked full-time at VWE from 1985 until 1996 and worked part time thereafter until 1999. (Laura Aff. ¶ 7.) She recalls very little regarding her involvement in VWE after 1999. She admits that she was a Vice President of VWE but doesn't recall who appointed her, why she was appointed or what her duties were. (Laura Dep. 39.) She also admits that she was a director of VWE but she claims that she did not know what her duties were and had no idea how VWE's Directors were appointed. (*Id.* 78, 122.) Finally, she acknowledged that she was the owner of VWE common and preferred stock but does not know how she acquired the stock. (*Id.* 74-75.)

Documents submitted by the Plaintiffs describe more involvement in VWE by Laura after 1999 than she remembers. She allegedly received business correspondence at an office that she had at her home, she allegedly signed checks to Debenture Note holders, she allegedly participated in the sale of the Greeting Card Business and she allegedly received a weekly check from VWE after 1999.

In addition, Minutes of Annual Meetings of Stockholders for the years 2000, 2001, 2002 and 2003 indicate that Laura was present for each, that Laura was an officer and employee of VWE, that Laura

was elected a director for the next year and that she reviewed and approved the Financial Report for the preceding fiscal year. (DeMuth Aff. Ex. 16.) Minutes of the Annual Meeting of Directors for the years 2000, 2001, 2002 and 2003 indicate that Laura was present, that she was elected as Vice President for the following year, that she reported on "list management and organizational structure/ personnel" and that she reviewed and approved VWE's Financial Statements for the previous fiscal year. (*Id.*) The Minutes of the Shareholder and Director annual meetings are signed by Alicia (Barbieri) Klimley and Maxine Klimley. (*Id.*) Included in the records submitted by the Plaintiffs are "Waiver of Notice" forms waiving notice of the 2000, 2001, 2002, and 2003 Stockholders and Directors annual meetings. (*Id.*) Each of the waivers is signed by Laura.[FN17] (*Id.;* see also Laura Supp. Aff. 6 Nov. 13, 2007.)

> FN17. The signature on the waiver for the 43rd Annual Meeting of the Directors appears to be different from the signature on the other waivers.

**\*32** In addition to the documents regarding VWE annual shareholder and director meetings, the Plaintiffs have submitted VWE's Federal Income Tax Returns for the years 2002 and 2003. (Demuth Aff. Ex. 12, 13.) These tax returns are signed by Alicia Eimicke as President of VWE and report to the Government that Laura was an officer of VWE and devoted 100% of her time to the business.

### 1. Objection To Barbara DeMuth's Affidavit

The meeting minutes and waivers and the tax returns were submitted as attachments to Barbara DeMuth's Affidavit. The Defendants object to Barbara DeMuth's Affidavit arguing that it fails to establish her competency to attest to the elements of the business-records exception and because she does not affirm that the minutes were created by a person with knowledge of the transaction or from information transmitted by a person with knowledge.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

Records prepared in the course of regularly conducted business are particularly reliable because the person preparing the record has an incentive to be accurate. *United States v. Weinstock,* 153 F.3d 272, 276 (6th Cir.1998). Therefore, the Federal Rules of Evidence provide an exception to the inadmissibility of hearsay for business records.

The business record exception sets forth the following four requirements for admissibility of documents that are otherwise hearsay: (1) the document must have been made in the course of a regularly conducted business activity; (2) the document must have been kept in the regular course of that business; (3) the regular practice of that business must have been to have made the document; and (4) the document must have been made by a person with knowledge of the transaction or from information transmitted by a person with knowledge. *United States v. Jenkins,* 345 F.3d 928, 935 (6th Cir.2004) (citing Fed.R.Evid. 803(b)). Also, the document must be presented through "the testimony of the custodian or other qualified witness[.]" *Id.* (quoting Fed.R.Evid. 803(6)). The "other qualified witness," if applicable, is not required to have control of the record or personal knowledge of the preparation of the record but is required to be familiar with the record keeping procedures of the organization. *Id.* (citing *Dyno Construction Co. v. McWane, Inc.,* 198 F.3d 567, 575-76 (6th Cir.1999)); *Weinstock,* 153 F.3d at 276.

Business records meeting the criteria set forth in Fed.R.Evid. 803(6) are admissible "unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." *Id.* (quoting Fed.R.Evid. 803(6)). The trial court is given "great latitude" on evidentiary rulings regarding trustworthiness and federal law favors the admission of evidence which has any probative value. *United States v. Hathaway,* 798 F.2d 902, 906 (6th Cir.1986).

**2. Analysis of the Admissibility of Barbara De-Muth's Affidavit**

A review of the Affidavit of Barbara DeMuth indicates a sufficient basis to qualify the meeting minutes, waivers and income tax returns as business records. Barbara DeMuth affirms that she was employed by VWE from 1979 until 2004 as the accounts receivable supervisor and that she worked with John Palmero and Alicia Eimicke on a daily basis. (DeMuth Aff. ¶ 2.) She affirms that she became "intimately" familiar and has extensive knowledge of the creation and maintenance of VWE's banking records, accounts receivable records, records in connection with VWE's sale of unregistered debentures, sales reports and other like general business records. (*Id.* ¶ 3.) She affirms that she viewed numerous documents hand-written and/or signed by John Palmero, Maxine Eimicke, Alicia Eimicke and Laura Klimley and "is very familiar with and recognizes on sight, their handwriting and signature." *Id.* ¶ 4. She then identifies the 2003 and 2004 VWE tax returns as documents prepared by John Palmero in the regular performance of his job duties. (*Id.* ¶¶ 16, 17.) She also identifies the signatures on the 2000, 2001, 2002 and 2003 Shareholders and Directors Meeting Minutes and waivers as those of John Palmero, Maxine Eimicke, Alicia Eimicke and Laura Klimley. (*Id.* ¶ 20.) She further affirms that these records were prepared by Loretta Buscarino, VWE's secretary, in the regular performance of her job duties at or near the dates set forth and were kept in the course of the regularly conducted activity of VWE.(*Id.*) Loretta Buscarino confirms that, although she did not attend the meetings, she typed the minutes based upon notes given to her by those who did attend. (Buscarino Dep. 33-39, 74-75.)

**\*33** As an "other qualified witness," Barbara De-Muth presents evidence that she is familiar with the record keeping procedures of VWE. Further, she affirms that the documents in question were made in the course of a regularly conducted business activity and were kept in the regular course of that business. Further, Barbara DeMuth's recognition of the signatures on the documents is but one indication that the regular practice of VWE must have been to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

have made the documents. The signatures on the documents and the affirmation that VWE's secretary prepared the documents indicate that the documents were made by a person with knowledge of the transaction or from information transmitted by a person with knowledge.

The Defendants attempt to discredit DeMuth's Affidavit by identifying testimony that she gave at an examination conducted by the Official Committee of Unsecured Creditors in *In re VWE Group, Inc.,* (DeMuth Dep. Ex. C 37.) In response to the question, "Do you know if the company kept corporate books and minutes," DeMuth responded, "I don't know." She was then asked, "You don't know," to which she responded, "Not that I know of." (*Id.*) This general line of questions without any signed documents to view is far different from the specific documents that DeMuth identifies in her Affidavit and does not serve to discredit DeMuth's identification of the meeting minutes, waivers and tax returns.

The Defendants continue to attempt to discredit DeMuth's Affidavit by discussing what DeMuth actually did for VWE, who actually typed minutes, and DeMuth's alleged recantation of allegations that she had made in another affidavit. However, rather than going to the trustworthiness of the Affidavit in question, these arguments go to the weight to be given the evidence and can be made, if appropriate, in cross examination.

### 3. Analysis of Laura's Control Person Liability

Minutes of the Shareholders and Directors Meetings from 2000 to 2003, waivers for these meetings from 2000 to 2003, and the federal income tax returns for 2002 and 2003 will be considered. These documents along with Laura's 50% ownership, Directorship, Vice-Presidency and participation in VWE's business affairs during this same time period are evidence that Laura participated in the operations of VWE and possessed the power to control what was said or unsaid with regard to sale of the

Debenture Notes. There is, therefore, evidence that Laura is subject to control person liability.

In moving for summary judgment, the Defendants present evidence that Laura did not actively participate in the operation of VWE at times relevant to the actionable Section 12(a)(2) claims. Resolving this dispute of fact is for the trier of fact. Therefore, there are genuine issues of material fact and Laura is not entitled to judgment as a matter of law on Plaintiffs claim that she was a control person pursuant to Section 15.

### E. Conclusion On Section 15 Control Person Claim

*34 There are genuine issues of material fact as to whether Brooks and/or Laura were control persons pursuant to Section 15. Therefore, Brooks' and Laura's Motions for Summary Judgment on Plaintiffs' Third Cause of Action for violation of Section 15 of the Securities Act of 1933 is OVERRULED.

### VII. FOURTH CAUSE OF ACTION: VIOLATION OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934

In Plaintiffs' Fourth Cause of Action, they allege that Brooks and Laura were control persons of VWE and therefore secondarily liable for any misrepresentations made by Victor, Maxine or Alicia with regard to their 10b-5 Claims. The Defendants argue that neither Brooks nor Laura were control persons and the Plaintiffs respond that they were.

Section 20(a) applies to claims brought under the Securities Exchange Act of 1934 such as Plaintiffs 10b-5 claims. *Herm,* 663 F.2d at 679. Plaintiffs' 10b-5 claims against both Brooks and Laura have survived summary judgment and the Sixth Circuit has observed without deciding that there is some authority that a plaintiff may not be able to simultaneously assert both 10b-5 claims and Section 20(a) claims. *PR Diamonds,* 364 F.3d at n. 4.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

However, since this is a summary judgment proceeding and not a trial, whether Brooks and Laura are liable, if at all, directly under Section 10b-5 or as control persons under Section 20(a) will be left for a jury to decide.

As set forth above, courts analyze control-person-liability claims brought under Section 15 of the Securities Act of 1933 and control-person-liability claims brought under Section 20(a) of the Securities Exchange Act of 1934 using the same legal standards and the Parties in this case have not argued otherwise. Therefore, the law and conclusions set forth above with regard to Plaintiffs' Section 15 claims apply to Plaintiffs' Section 20(a) claims.

There are genuine issues of material fact as to whether Brooks and/or Laura were control persons under Section 20(a) of the Securities Exchange Act of 1934. Therefore, Brooks' and Laura's Motions for Summary Judgment on Plaintiffs' Fourth Cause of Action for violation of Section 20(a) of the Securities Exchange Act of 1934 is OVERRULED.

## VIII. FIFTH CAUSE OF ACTION: FRAUD

In Plaintiffs' Fifth Cause of Action, they allege that Brooks and Laura made material misrepresentations and/or omissions in an attempt to induce them to invest in VWE in violation of common law. The Defendants argue that neither Brooks nor Laura had a duty to disclose, that the statements attributed to Brooks and Laura were not material and that there is no evidence that either Brooks or Laura acted with the required scienter. The Plaintiffs respond that both Brooks and Laura had a duty to disclose, that the statements by both Brooks and Laura were material and that they both acted with the required scienter.

The elements of a common law fraud claim are:

(1) a representation or, where there is a duty to disclose, concealment of a fact,

**\*35** (2) which is material to the transaction at

hand,

(3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

(4) with the intent of misleading another into relying upon it,

(5) justifiable reliance upon the representation or concealment, and

(6) a resulting injury proximately caused by the reliance.

*Glassner*, 223 F.3d at 352; *Russ v. TRW, Inc.*, 59 Ohio St.3d 42, 570 N.E.2d 1076, 1083 (Ohio 1991). Further, a representation which may serve as a basis for common-law fraud includes spoken or written words and conduct that amounts to an assertion not in accordance with the truth. *Russ*, 570 N.E.2d at 1084.

As determined above, there are questions of fact regarding whether the oral statements and omissions attributed to Brooks and Laura were material. Also, as determined above, there are questions of fact as to whether Brooks and Laura had a duty to disclose VWE's true financial condition to the Plaintiffs. Also, as determined above, there are questions of fact as to whether Brooks and Laura acted with the requisite scienter. Finally, Brooks and Laura do not dispute, for purposes of their Motions for Summary Judgment, that the remaining elements of a common law fraud claim are satisfied. Therefore, there are genuine issues of material fact and Brooks and Laura are not entitled to judgment as a matter of law on Plaintiffs' common law fraud claim.

## IX. SIXTH CAUSE OF ACTION: CIVIL CONSPIRACY

In Plaintiffs' Sixth Cause of Action, they allege that Brooks and Laura engaged in a conspiracy to illegally deprive them of their property through a pat-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

tern of fraud and corrupt activity. Brooks and Laura argue that the Plaintiffs cannot establish their conspiracy claims.

## A. Relevant Law Regarding Civil Conspiracy

A civil conspiracy claim serves to enlarge the pool of potential defendants from whom a plaintiff may recover. *Gosden v. Louis,* 116 Ohio App.3d 195, 687 N.E.2d 481, 497-98 (Ohio Ct.App.1996). Also, a civil conspiracy claim may constitute an aggravation which may tend to increase the amount of damages available to the plaintiff. *Id.*

A civil conspiracy is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Aetna Casualty and Surety Company v. Leahey Construction Company, Inc.,* 219 F.3d 519, 534 (6th Cir.2000)(quoting *Kenty v. Transamerica Premium Insurance Company,* 72 Ohio St.3d 415, 650 N.E.2d 863, 866 (Ohio 1995)). Thus, the elements of a civil conspiracy claim are: (1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Id.* (quoting *Universal Coach, Inc. v. New York City Transit Authority, Inc.,* 90 Ohio App.3d 284, 629 N.E.2d 28, 33 (Ohio Ct.App.1993)). Finally, knowledge of a wrongful purpose is a crucial element in conspiracy cases. *Id.*

**\*36** To satisfy the "malicious combination" element, actual knowledge must be shown and may be shown by circumstantial evidence. *Aetna,* 219 F.3d at 536. As a result, evidence showing that a defendant should have known is not enough. *Id.* However, only a common understanding or design or shared conspiratorial objective need be shown. *Aetna,* 219 F.3d at 538. Finally, the malice may be imputed to a common design by two or more persons to harm another and need not be proved separately. *Gosden,* 687 N.E.2d at 496.

The fourth element, "[i]n a way not competent for one alone" means that, if one person could lawfully commit an act, then that act, if committed by two or more persons cannot support a conspiracy claim. *Gosden,* 687 N.E.2d at 497. Said another way, if the claim regarding the underlying unlawful act fails, the conspiracy claim must also fail. *Wolfer Enterprises, Inc. v. Overbrook Development Corp.,* 132 Ohio App.3d 353, 724 N.E.2d 1251, 1255 (Ohio App.Ct.1999).

## B. Analysis of Conspiracy Claim

In this case, the Plaintiffs have presented evidence that satisfies the second, third and fourth elements of a conspiracy claim. Brooks and Laura do not argue otherwise regarding second and third elements for purposes of their Motions for Summary Judgment.

Brooks and Laura do, however, argue that the Plaintiffs have no evidence that Brooks and Laura participated in a "malicious combination" to defraud the Plaintiffs However, there is evidence to the contrary.

As determined above, there are questions of material fact as to whether Brooks and Laura are primarily liable for alleged securities fraud and there are questions of material fact as to whether Brooks and Laura are liable for the alleged securities fraud as control persons. Further, there is evidence that Brooks and Laura were spouses and that they both had financial interests in the success of VWE. From these alleged facts, a reasonable juror could conclude that Brooks and Laura had a common understanding or design or shared conspirational objective to defraud the Plaintiffs. Therefore, there are questions of fact as to whether the Plaintiffs can satisfy the "malicious combination" element of a civil conspiracy claim.

Brooks and Laura also argue that they are entitled to summary judgment on the civil conspiracy claim because they are entitled to summary judgment on the underlying claims. Yet, as determined above,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

Brooks and Laura are not entitled to summary judgment on Plaintiffs' 10b-5 and fraud claims. Therefore, there are genuine issues of material fact and Brooks and Laura are not entitled to judgment as a matter of law on Plaintiffs' Sixth Cause of Action for civil conspiracy.

## X. SEVENTH CAUSE OF ACTION: VIOLATION OF OHIO SECURITIES ACT

In Plaintiffs' Seventh Cause of Action, they alleged that Brooks and Laura violated the Ohio Securities Act, Ohio Rev.Code § 1707.44(B), (C)(1), (D), (F) and (G). Ohio securities laws are evidence of Ohio's interest in protecting its citizens by making certain requirements of investment arrangements before and when they are distributed in Ohio. *Bernie v. Waterfront Limited Dividend Housing Association,* 614 F.Supp. 651, 655 (S.D.Ohio 1985).

**\*37** The relevant portions of Ohio securities law prohibit making or causing to be made any false representation concerning a material and relevant fact in any oral statement for the purpose of selling any securities in Ohio. Ohio Rev.Code § 1707.44(B). This law also prohibits knowingly selling or causing to be sold any security which has not been registered and is not exempt from registration. Ohio Rev.Code § 1707.44(C)(1). In addition, Ohio securities law prohibits a person who is an officer, director or trustee of an issuer and who knows the issuer to be insolvent from selling any of the issuer's securities without disclosing the fact that the issuer is insolvent. Ohio Rev.Code § 1707.44(D). Finally, this law prohibits a person from selling the securities of an insolvent issuer with knowledge that the issuer is insolvent and with intent to deceive. Ohio Rev.Code § 1707.44(F).

Brooks and Laura argue that Plaintiffs' Ohio securities claims cannot be applied to them and, in the alternative, that these claims are time-barred. The Plaintiffs respond that this Court has personal jurisdiction over both Brooks and Laura and that Plaintiffs' Ohio securities claims are not time-barred. The existence of personal jurisdiction must first be determined.

### A. Relevant Law On Personal Jurisdiction

Federal courts apply the law of the forum state when determining whether personal jurisdiction exists. *Burnshire Development, LLC v. Cliffs Reduced Iron Corp.,* 198 F. App'x 425, 429 (6th Cir.2006). The federal court must first determine if the law of the forum state, Ohio in this case, provides personal jurisdiction. *Id.* If so, the federal court must then determine if exercising personal jurisdiction comports with the Due Process Clause of the U.S. Constitution. *Id.*

When there is no evidentiary hearing, as is the case here, the plaintiff must make only a prima facie showing. *Id.* The evidence, when in conflict, is viewed in a light most favorable to the plaintiff. *Id.*

Brooks and Laura do not dispute whether Ohio law provides for personal jurisdiction over them. The analysis, therefore, becomes whether personal jurisdiction over Brooks and Laura on Ohio securities claims comports with the Due Process Clause.

For purposes of the Due Process analysis, there is a distinction between general and specific jurisdiction. *Youn v. Track, Inc.,* 324 F.3d 409, 417 (6th Cir.2003). However, either one is an adequate basis for personal jurisdiction. *Id.*

General jurisdiction exists where the defendant's contacts with the forum state are "substantial" and "continuous and systematic" so that the state may exercise personal jurisdiction even if the action does not relate to the defendant's contacts with the state. *Id.* at 418. Specific jurisdiction exists when the contacts giving rise to the jurisdiction relate to the claim that is before the court. *Id.*

The constitutional touchstone for specific jurisdiction is whether the non resident defendant purposefully established minimum contacts in the forum state such that he or she should reasonably anticip-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

ate being haled into court there. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Jurisdiction comports with the Due Process Clause where the contacts proximately result from actions by the defendant himself or herself that create a substantial connection with the forum. *Id.* Jurisdiction does not comport with the Due Process Clause when the contacts are random, fortuitous or attenuated or where they result from the unilateral activity of a third party. *Id.*

**\*38** The Sixth Circuit has established a three part test for determining whether specific personal jurisdiction exists. *Id.* For specific personal jurisdiction to exist: (1) a defendant must purposefully avail itself of the privilege of acting in the forum state; (2) the cause of action must arise from the defendant's activities in the forum state; and (3) the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of personal jurisdiction over the defendant reasonable. *Morel Acoustics, LTD. v. Morel Acoustics USA, Inc.,* No. 3:04-CV-348, 2005 WL 2211306 at \*5 (S.D.Ohio Sept.7, 2005)(citing *Southern Machine Co. v. Mohasco Industries, Inc.,* 401 F.2d 374, 381 (6th Cir.1968)).

The first prong of the *Southern Machine* test, termed the "purposeful availment requirement," ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous" or "attenuated" contacts. *Burger King,* 471 U.S. at 475. However, physical contacts are not necessary so long as a commercial actor's efforts are "purposely directed" toward a resident of the forum state. *Ricker v. Fraza/Forklifts of Detroit,* 160 Ohio App.3d 634, 828 N.E.2d 205, 211 (Ohio Ct.App.2005). For example, the soliciting of insurance by mail, the transmission of radio broadcasts into the forum state and the sending of magazines and newspapers into the forum state to be sold there have all been considered to be an availment of the privilege to do business in the forum state. *South-*

*ern Machine,* 401 F.2d at 382. Yet, the existence of a contract, such as a debenture note, is not purposeful availment. *Healthcare Capital, LLC v. Healthmed, Inc.,* 213 F.Supp.2d 850, 860 (S.D.Ohio 2002.) Prior negotiations and contemplated future consequences along with the terms of the contract and the parties' actual course of dealing must be evaluated. *Healthcare Capital,* 213 F.Supp.2d at 860 (citing *Nationwide Mutual Insurance Co. v. Tryg International Insurance Co., Ltd.,* 91 F.3d 790, 795 (6th Cir.1996)).

The second prong of the *Southern Machine* test is satisfied when the defendant's contacts are related to the operative facts of the case. *Bird v. Parsons,* 289 F.3d 865, 875 (6th Cir.2002). Further, contacts include only those activities purposefully sought or initiated by the defendant. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297-98, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

The third prong of the *Southern Machine* test is satisfied when the defendants have sufficient contacts with the forum state and the wrongs of which the plaintiff complains arise out of those contacts. *See Cole v. Mileti,* 133 F.3d 433, 436 (6th Cir.1998), *cert. denied,* 525 U.S. 810, 119 S.Ct. 42, 142 L.Ed.2d 32 (1998); *CompuServe, Inc. v. Patterson,* 89 F.3d 1257, 1268 (6th Cir.1996). In other words, a court may infer that the third prong of the *Southern Machine* test has been satisfied and the exercise of personal jurisdiction over the defendant is reasonable if the first two prongs are satisfied. *Id.*

**\*39** The Parties here cite several cases in support of their arguments. In one example, Due Process was not offended when jurisdiction was found to exist over a non resident defendant who was conducting a mail order business in the forum state and had issued insurance to a resident of the forum state. *Travelers Health Association v. Commonwealth of Virginia,* 339 U.S. 643, 649, 70 S.Ct. 927, 94 L.Ed. 1154 (1950). In another example, Due Process was not offended when jurisdiction was found to exist over claims brought by non resident plaintiffs pursuant to Ohio security laws against a non resident

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

securities underwriting firm that sold securities of an Ohio company and had visited the Ohio company several times in the process. *Corporate Partners, L.P. v. National Westminster Bank PLC,* 126 Ohio App.3d 516, 710 N.E.2d 1144, 1150 (Ohio Ct.App.1998). In another example, Due Process was not offended when jurisdiction was found to exist in a securities case over a non resident defendant who had contacted the Ohio plaintiff several times by phone and mail. *Bernie,* 614 F.Supp. at 654-55.[FN18] In yet another example, subjecting a non resident seller of securities to Ohio securities law did not offend Due Process where the only contacts with Ohio were the mailing of two letters and a subscription agreement to an Ohio resident. *Martin v. Steubner,* 485 F.Supp. 88, 100 (S.D.Ohio 1979), *aff'd* 652 F.2d 652 (6th Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1013, 71 L.Ed.2d 302 (1982). However, Due Process was offended and jurisdiction not permitted over a non resident bank whose only contact with Ohio was the mailing of loan documentation to an Ohio resident. *First National Bank of Mt. Prospect v. Shenk,* Nos. 91 C 5736 and 91 C 5753, 1993 U.S. Dist. LEXIS 1172 at *13 (N.D.Ill. Feb. 2, 1993). While these cases are instructive, none are on point and the course of dealing and contemplated future consequences in this case must be analyzed.

> FN18. The *Bernie* court based its decision upon how the securities were marketed to an Ohio resident and on Ohio's interest in protecting its citizens with regard to the sale of securities in Ohio. *Bernie,* 614 F.Supp. at 654-55.

## B. Analysis of Personal Jurisdiction

In this case, Brooks and Laura argue that they did not have contacts with Ohio and did not purposefully avail themselves of the benefits of Ohio and are, therefore, not subject to Ohio securities laws. The Plaintiffs respond that Brooks and Laura knew that Ohio residents were solicited to buy the debenture notes and that they both actively assisted VWE in selling the debenture notes to residents of Ohio.

As for general jurisdiction, the Plaintiffs identify various social visits to Ohio made by Brooks and Laura. However, social visits do not rise to the level of business contacts necessary to invoke general jurisdiction.[FN19] The analysis, therefore, turns to specific personal jurisdiction.

> FN19. Ohio does not recognize general jurisdiction over non residents. *Signom v. Schenck Fuels, Inc.,* No. C-3-07-037, 2007 WL 1726492 at *3 (S.D.Ohio June 13, 2007).

In this case, the Plaintiffs are residents of Ohio and Brooks and Laura are residents of New York. Further, the Plaintiffs were contacted in Ohio at various times by Victor, Maxine and Alicia via telephone and written communications, and there is no evidence that either Brooks or Laura visited Ohio with regard to the sale of the Debenture Notes to the Plaintiffs. (Ed. Dep.19-20, 26, 56-57.)

*40 The contacts with Brooks and Laura identified by the Plaintiffs took place outside of Ohio. However, there are factual allegations that these contacts regarding the Debenture Notes were directed toward Plaintiffs and are part of alleged course of dealing involving Brooks, Laura and the Plaintiffs and the Debenture Notes.

Also, Brooks and Laura were aware that the Plaintiffs owned Debenture Notes and were residents of Ohio. They should have anticipated that making the alleged misrepresentations and/or omissions regarding the Debenture Notes might cause them to be haled into court in Ohio. The first prong of the *Southern Machine* test is satisfied.

The contacts with Brooks and Laura identified by the Plaintiffs are related to Plaintiffs' Ohio securities claim. While these contacts may have been initiated by the Plaintiffs, the responses allegedly given were not. Therefore, the second prong of the *Southern Machine* test is satisfied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiffs have presented evidence that Brooks and Laura had sufficient contacts with Ohio and the wrongs of which the Plaintiffs complain arise out of those contacts. Further, Ohio has a significant interest in protecting its citizens by making certain requirements of investment arrangements before and when they are distributed in Ohio. Therefore, the third prong of the *Southern Machine* test has been satisfied and the exercise of personal jurisdiction over Brooks and Laura in this case is reasonable. Since Plaintiffs have made a prima facie showing regarding all three prongs of the *Southern Machine* test, the exercise of personal jurisdiction over Brooks and Laura on Plaintiffs' Ohio securities claims does not offend the Due Process Clause of the U.S. Constitution.

### C. Time Limitations Under Ohio Securities Law

Brooks and Laura next argue that Plaintiffs' Ohio securities claims are time barred. The Plaintiffs respond that they are not.

Ohio securities laws provide that no action based upon or arising out of a sale may be brought more than two years after the plaintiff knew, or had reason to know, of the facts by reason of which the actions of the defendants were unlawful or more than five years from the date of such sale, whichever is the shorter period. Ohio Rev.Code § 1707.43. "The two-year provision is based on notice and is an actual statute of limitations while the five-year provision is a statute of repose. *Cain v. Mid-Ohio Securities, Inc.,* Nos. 06CA008933 and 06CA008932, 2007 WL 2080553 at *2 (Ohio Ct.App. July 23, 2007). Ohio courts have interpreted the phrase "whichever is the shorter period" to mean whichever period expires first. *Cain,* 2007 WL 2080553 at *3; *Goldberg v. Cohen,* No. 01 CA 49, 2002 WL 1371031 at *6 (Ohio Ct.App. June 13, 2002); *Kondrat v. Morris,* 118 Ohio App.3d 198, 692 N.E.2d 246, 250 (Ohio Ct.App.1997).

### 1. Statute of Limitations

The discovery of the facts constituting the alleged violations in this case was made on June 2, 2004 and the Complaint was filed on January 26, 2005. Therefore, the complaint was filed within two years after Plaintiffs knew, or had reason to know, of the facts by reason of which the actions of Brooks and Laura were allegedly unlawful. The two-year statute of limitations is satisfied for Plaintiffs' Ohio securities claims.

### 2. Statute of Repose

*41 The dates of the alleged sales in this case range from January 1, 1989, to October 1, 2003. The claim was filed on January 26, 2005. Therefore, any sales that occurred on or after January 26, 2000, are not subject to the statute of repose. This includes sales made on December 12, 2000, October 1, 2001 and October 1, 2003. The five-year statute of repose bars claims for sales made prior to January 26, 2000. This includes the sales made on January 1, 1989, September 22, 1992, November 12, 1998, and February 17, 1998.

### 3. Statute of Limitations Conclusion

None of Plaintiffs' Ohio securities claims against Brooks and Laura are barred by Ohio's two-year statute of limitations for bringing such claims. However, the claims regarding several of the sales of Debenture Notes are barred by Ohio's statute of repose for securities claims.

Sales of Debenture Notes that occurred on or after January 26, 2000, are not time-barred. These include sales made on December 12, 2000, October 1, 2001 and October 1, 2003. Having determined that some of Plaintiffs' Ohio securities claims are not time barred, the analysis turns to whether Plaintiffs have presented evidence that Brooks and/or Laura are liable under Ohio security laws.

### D. Liability Under Ohio Security Laws

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Brooks' and Laura's final argument regarding Plaintiffs' Ohio securities claims is that they were not "sellers" of the Debenture Notes and are, therefore, not liable. Ohio securities law makes directors of a corporation liable for violations of the corporation unless the director had just and reasonable grounds to believe that the alleged statements to be true or the omissions of facts to not be material. *In re National Century Finanical Enterprises, Inc.,* 504 F.Supp.2d 287, (S.D.Ohio 2007)(citing Ohio Rev.Code § 1707.41(B)(1)). Further, Ohio securities law makes liable every person that has participated in or aided the seller in any way in making a sale. *Id.* (citing Ohio Rev.Code § 1707.43(A)). Liability extends to any person who participates or aids the sale of a security in any way, including "inducing the purchaser to invest." *Id.* (citing *Federated Management Co. v. Coopers & Lybrand,* 137 Ohio App.3d 366, 738 N.E.2d 842, 860 (Ohio Ct.App.2000)).

The arguments presented and discussed above regarding Brooks and/or Laura as sellers are based upon the Securities Act of 1933. However, the determination of who is a seller for purposes of Ohio securities law is different.

The Plaintiffs have presented evidence from which a reasonable juror could conclude that Brooks and Laura aided in the sale of the Debenture Notes, including inducing the Plaintiffs to continue to invest in the Debenture Notes. The Plaintiffs have presented evidence that Brooks and Laura aided the sale of the Debenture Notes by making the alleged misstatements and/or material omissions regarding the financial health of VWE which induced the Plaintiffs to continue to hold the Debenture Notes. In addition, Laura was a Director of VWE who allegedly knew that the statements and/or omissions were allegedly material and misleading.

### E. Conclusion Regarding Plaintiffs' Ohio Securities Law Claims

**\*42** Applying Ohio securities laws to Brooks and

Laura does not offend the Due Process Clause of the U.S. Constitution. Further, the Debenture Notes sold after January 26, 2000, including the Debenture Notes sold on December 12, 2000, October 1, 2001 and October 1, 2003, are not time barred by the statute of limitations or the statute of repose set forth in Ohio securities law. Finally, there are genuine issues of material fact as to whether Brooks and/or Laura were sellers under Ohio securities law. Therefore, Brooks and Laura are not entitled to summary judgment on Plaintiffs Seventh Cause of Action for violation of Ohio securities law.

## XI. PUNITIVE DAMAGES

The relief prayed for in the TAC includes punitive damages. However, punitive damages are not available for the alleged violations of the Security Act of 1933 (Section 12(a)(1) and 12(a)(2) and Section 15 claims), the Security Exchange Act of 1934 (10b-5 and Section 20 claims) and Ohio securities law. *Burkhart v. Alison Realty Trust,* 363 F.Supp. 1286, 1290 (N.D.Ill.1973); *Byrley v. Nationwide Life Insurance Co.,* 94 Ohio App.3d 1, 640 N.E.2d 187, 200 (Ohio Ct.App.1994).

Punitive damages are, however, available for common law tort claims such as fraud and conspiracy. *Motorists Mutual Insurance Co. v. Said,* 63 Ohio St.3d 690, 590 N.E.2d 1228, 1234(Ohio 1992); *Preston v. Murty,* 32 Ohio St.3d 334, 512 N.E.2d 1174, 1175 (Ohio 1987). Plaintiffs' fraud and conspiracy claims have survived summary judgment so further consideration is necessary.

To establish a claim for punitive damages, the plaintiff must show, in addition to proving the elements of the tort itself, that the tort was aggravated by the existence of malice or ill will or must show that the wrongdoing is particularly gross or egregious. *Davis v. Sun Refining and Marketing Co.,* 109 Ohio App.3d 42, 671 N.E.2d 1049, 1060 (Ohio Ct.App.1996). The Ohio Supreme Court has defined actual malice as:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

*Motorists Mutual,* 590 N.E.2d at 1234. To obtain punitive damages, the probability of harm occurring must be great and the possible harm must be substantial. *Id.*

The amount of punitive damages to be awarded, if any, rests largely within the determination of the trier of fact. *Zoppo v. Homestead Insurance Co.,* 71 Ohio St.3d 552, 644 N.E.2d 397, 401 (Ohio 1994); *Roar v. Rydell,* Nos. C-061090 and C-070032, 2007 WL 4463965 at *9 (Ohio Ct.App. Dec.21, 2007). The Ohio Supreme Court has also noted that "it is rarely possible to prove actual malice otherwise than by conduct and surrounding circumstances." *Villella v. Waikem Motors, Inc.,* 45 Ohio St.3d 36, 543 N.E.2d 464, 466-67 (Ohio 1989) (citing *Davis v. Tunison,* 168 Ohio St. 471, 155 N.E.2d 904, 907 (Ohio 1959), overruled on other grounds in *Moskovitz v. Mt. Sinai Medical Center,* 69 Ohio St.3d 638, 635 N.E.2d 331 (Ohio 1994))

*43 "[A]ctual malice may be inferred from conduct and surrounding circumstances which may be characterized as reckless, wanton, willful or gross." *Id.* at 467, 635 N.E.2d 331. Even if actual malice is not shown, actions that are particularly gross or egregious, such as intentionally made misrepresentations, may support an award of punitive damages. *Smith v. General Motors Corp.,* 168 Ohio App.3d 336, 859 N.E.2d 1035, 1042 (Ohio Ct.App.2006).

For example, an insured may maintain an action for punitive damages if the insured shows that the insurer's bad faith was accompanied by a dishonest purpose, actual intent to mislead or deceive the insured, or a calculated scheme to defeat the insured's action. *Motorists Mutual,* 590 N.E.2d at 1235. In another example, punitive damages may be awarded where evidence established that the non removal of potentially contaminated piping displayed a conscious disregard for the safety of others. *Davis,* 671 N.E.2d at 1060.

In this case, Brooks and Laura argue that there is no basis for a recovery of punitive damages. The Plaintiffs do not offer legal argument otherwise but do offer facts from which a juror could reasonably conclude that Brooks and/or Laura consciously disregarded Plaintiffs' rights to know the actual financial status of VWE and actually intended to mislead or deceive the Plaintiffs with regard to the actual financial status of VWE.

Plaintiffs are not entitled to punitive damages on their alleged violations of the Security Act of 1933 (Section 12(a)(1) and 12(a)(2) and Section 15 claims), the Security Exchange Act of 1934 (10b-5 and Section 20 claims) and Ohio securities law as a matter of law. However, the factual allegations set forth by the Plaintiffs combined with the axiom that it is generally for the finder of fact to determine the amount, if any, of a punitive damage award leads to the conclusion that there are genuine issues of material fact with regard to whether Plaintiffs are entitled to damages on their fraud and conspiracy claims.

## XII SUMMARY

Brooks' and Laura's Motions for Summary Judgment on Plaintiffs' First Claim for Relief for violation of Sections 12(a)(1) and 12(a)(2) of the Securities Act of 1933 is GRANTED. Plaintiffs' Section 12(a)(1) claims and all but one of Plaintiffs' Section 12(a)(2) claims are time barred. Also, there are no genuine issues of material fact and Plaintiffs have not shown that either Brooks or Laura were "sellers" in accordance with the law regarding Section 12(a)(1) and 12(a)(2) claims.

Brooks' and Laura's Motions for Summary Judgment on Plaintiffs' Second Claim for Relief for violation of Section 10b of the Securities Exchange Act of 1934 and Rule 10b-5 is GRANTED IN PART and OVERRULED IN PART. Sales made

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551
(Cite as: 2008 WL 85871 (S.D.Ohio))

before January 26, 2000, are timed barred and sales that occurred on or after January 26, 2000, are not. Further, there are genuine issues of material fact as to whether the statements made by Brooks and/or Laura are actionable and as to whether Brooks and/or Laura acted with the requisite scienter.

*44 Brooks' and Laura's Motions for Summary Judgment on Plaintiffs Third and Fourth Claims for Relief for violation of Section 15 of the Securities Act of 1933 and Section 20(a) of the Securities Exchange Act of 1934 are OVERRULED. There are genuine issues of material facts as to whether Brooks and/or Laura were control persons under the applicable law.

Brooks' and Laura's Motions for Summary Judgment on Plaintiffs' Fifth Cause of Action for fraud are OVERRULED. There are genuine issues of material fact as to whether the oral statements and omissions attributed to Brooks and Laura were material, as to whether Brooks and/or Laura had a duty to disclose and as to whether Brooks and/or Laura acted with the requisite scienter.

Brooks' and Laura's Motions for Summary Judgment on Plaintiffs' Sixth Cause of Action for civil conspiracy are OVERRULED. There are genuine issues of material fact as to whether the Plaintiffs can satisfy the "malicious combination" element of a civil conspiracy claim and Brooks and Laura are not entitled to summary judgment on the remaining underlying claims.

Brooks' and Laura's Motions for Summary Judgment on Plaintiffs' Seventh Cause of Action for violation of Ohio securities laws is OVERRULED. Application of Ohio securities law to Brooks and Laura in this case is not offended by the Due Process Clause of the U.S. Constitution. Further, Debenture Notes sold after January 26, 2000, including those sold on December 12, 2000, October 1, 2001 and October 1, 2003, are not time barred. Finally, there are genuine issues of material fact as to whether Brooks and/or Laura were sellers under Ohio securities law.

Finally, Brooks' and Laura's Motion for Summary Judgment on Plaintiffs' prayer for punitive damages is GRANTED IN PART and OVERRULED IN PART. Plaintiffs are not entitled to punitive damages on their alleged violations of the Security Act of 1933 (Section 12(a)(1) and 12(a)(2) and Section 15 claims), the Security Exchange Act of 1934 (10b-5 and Section 20 claims) and Ohio securities law as a matter of law. However, there are genuine issues of material fact as to whether Plaintiffs are entitled to punitive damages on the remaining fraud and civil conspiracy claims.

Plaintiffs' 10b-5, control person liability and Ohio securities law claims on sales of Debenture Notes that occurred on or after January 26, 2000 remain to be adjudicated. Plaintiffs common law fraud and civil conspiracy claims also remain to be adjudicated.

Finally, Plaintiffs have moved for oral argument on Brooks' and Laura's Motions for Summary Judgment. (Doc. # 154.) However, the Court has been able to review the thousands of pages of argument and evidence submitted by the Parties and can fairly resolve the Motions based upon these submissions without oral argument. Therefore, Plaintiffs' Motion for Oral Argument is OVERRULED.

**DONE and ORDERED.**

S.D.Ohio,2008.
Pullins v. Klimley
Not Reported in F.Supp.2d, 2008 WL 85871 (S.D.Ohio), Fed. Sec. L. Rep. P 94,551

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1266835 (Ohio App. 3 Dist.), 2010 -Ohio- 1492
**(Cite as: 2010 WL 1266835 (Ohio App. 3 Dist.))**

CHECK OHIO SUPREME COURT RULES FOR
REPORTING OF OPINIONS AND WEIGHT OF
LEGAL AUTHORITY.

Court of Appeals of Ohio,
Third District, Allen County.
SIMON PROPERTY GROUP, LP, Plaintiff-Appellant,
v.
Derek KILL, dba D & D Sports Cards & Collectibles, Defendant-Appellee.
No. 1-09-30.

Decided April 5, 2010.

**Background:** Mall landlord filed forcible entry and detainer complaint against tenant in Municipal Court, and following transfer of case, landlord amended complaint to add claim for unpaid rent. Following a bench trial, the Court of Common Pleas, Allen County, No. CV 2007-1292, ruled that landlord fraudulently induced tenant to enter new, long-term lease agreement, had failed to pay tenant a $20,000 tenant's allowance, and had breached lease's exclusivity clause, and awarded landlord unpaid rent, but after off-setting various judgments, ordered landlord to pay tenant $28,673.63. Landlord appealed.

**Holdings:** The Court of Appeals, Willamowski, P.J., held that:
(1) parol evidence was admissible to show reasons why tenant was fraudulently induced into signing new lease agreement with landlord;
(2) sufficient evidence supported conclusion that landlord made false representations to tenant;
(3) sufficient evidence supported conclusion that tenant justifiably relied on landlord's misrepresentations;
(4) tenant suffered damages by relying on landlord's misrepresentations;
(5) there was sufficient evidence to support conclu-

sion that landlord was barred by promissory estoppel from claiming that it had no obligation to pay tenant reimbursement allowance set forth in lease;
(6) evidence supported conclusion that landlord breached exclusivity clause in lease; and
(7) appropriate remedy for landlord's breach of exclusivity clause in lease was to award tenant damages for profits he lost as a direct result of landlord's leases to stores selling competing products.

Affirmed.

Rogers, J., dissented.

West Headnotes

[1] Evidence 157 ⬤⇒434(6)

157 Evidence
  157XI Parol or Extrinsic Evidence Affecting Writings
    157XI(B) Invalidating Written Instrument
      157k434 Fraud
        157k434(6) k. In Leases. Most Cited Cases
Parol evidence was admissible to show reasons why tenant was fraudulently induced into signing new lease agreement with mall landlord, as landlord's alleged representations to tenant concerning the coming of retail store to mall and the reasons why tenant had to vacate his former location in mall were not matters that were embodied in contract, but were issues extrinsic to contract.

[2] Fraud 184 ⬤⇒58(1)

184 Fraud
  184II Actions
    184II(D) Evidence
      184k58 Weight and Sufficiency
        184k58(1) k. In General. Most Cited Cases

Landlord and Tenant 233 ⬤⇒28(1)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1266835 (Ohio App. 3 Dist.), 2010 -Ohio- 1492
(Cite as: 2010 WL 1266835 (Ohio App. 3 Dist.))

233 Landlord and Tenant
    233II Leases and Agreements in General
        233II(A) Requisites and Validity
            233k28 Fraud
                233k28(1) k. In General. Most Cited
Cases
Sufficient evidence supported conclusion that mall landlord falsely represented to tenant who operated sports merchandise and memorabilia store that large sporting merchandise retailer was taking tenant's temporarily leased space, in order to induce tenant to execute new, permanent lease, as element of tenant's claim against landlord for fraudulent inducement; tenant very clearly remembered that he was told by landlord that he was going to have to "go permanent" because retailer was taking tenant's space, tenant submitted mall floor plan that landlord presented to him with name of retailer printed in space that tenant formerly leased, and another mall tenant testified concerning her experiences with landlord and his attempts to change her temporary lease to a permanent one.

**[3] Fraud 184 ☞58(4)**

184 Fraud
    184II Actions
        184II(D) Evidence
            184k58 Weight and Sufficiency
                184k58(4) k. Reliance on Representations and Inducement to Act. Most Cited Cases

**Landlord and Tenant 233 ☞28(1)**

233 Landlord and Tenant
    233II Leases and Agreements in General
        233II(A) Requisites and Validity
            233k28 Fraud
                233k28(1) k. In General. Most Cited
Cases
Sufficient evidence supported conclusion that tenant, who operated sports merchandise and memorabilia store in mall, justifiably relied on misrepresentations mall landlord made to him that large sporting merchandise retailer was taking tenant's temporarily leased space, in order to induce tenant to execute new, permanent lease, as element of tenant's claim against landlord for fraudulent inducement; tenant signed permanent lease only because he was told he had no other chose and that he had to vacate his temporary lease location to provide space for retailer, and tenant testified that he never would have signed permanent lease if not under the impression that retailer was coming to mall.

**[4] Fraud 184 ☞25**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k25 k. Injury and Causation. Most Cited Cases

**Landlord and Tenant 233 ☞28(1)**

233 Landlord and Tenant
    233II Leases and Agreements in General
        233II(A) Requisites and Validity
            233k28 Fraud
                233k28(1) k. In General. Most Cited
Cases
Tenant, who operated sports merchandise and memorabilia store in mall, suffered injury by relying on mall landlord's misrepresentations that large sporting merchandise retailer was taking tenant's temporarily leased space, in order to induce tenant to execute new, permanent lease, as element of tenant's claim against landlord for fraudulent inducement; tenant, by moving, gave up approximately 1,000 square feet of floor space and increased his rent $3,888.34 per month, tenant had counted on being able to recoup the additional costs because he expected an increase in traffic from young consumers drawn to the area by retailer, and tenant's increase in rent constituted the damages tenant sustained as a direct and proximate result of landlord's fraudulent inducement.

**[5] Evidence 157 ☞467**

157 Evidence
    157XI Parol or Extrinsic Evidence Affecting

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Writings
157XI(E) Showing Discharge or Performance of Obligation
157k467 k. Estoppel or Waiver. Most Cited Cases
Evidence of oral communications between mall landlord and tenant in connection with tenant allowance set forth in lease was not barred by parol evidence rule, and, thus, was admissible in determining whether promissory estoppel barred landlord from refusing to pay tenant allowance, as evidence did not contradict written contract, but went to the post-contract actions of landlord and tenant relative to the tenant allowance.

[6] Estoppel 156 ⊂⟶85

156 Estoppel
156III Equitable Estoppel
156III(B) Grounds of Estoppel
156k82 Representations
156k85 k. Future Events; Promissory Estoppel. Most Cited Cases
There was sufficient evidence to support conclusion that mall landlord was barred by promissory estoppel from claiming that it had no obligation to pay tenant reimbursement allowance set forth in lease; tenant proceeded with remodeling, relying on promissory statements, assurances, and representations of landlord and its representatives, but when tenant attempted to obtain reimbursement for improvements from landlord, he was constantly told different things that he needed to do by at least four or five different people within landlord's organization.

[7] Landlord and Tenant 233 ⊂⟶44(1)

233 Landlord and Tenant
233II Leases and Agreements in General
233II(B) Construction and Operation
233k44 Express Covenants in General
233k44(1) k. In General. Most Cited Cases
Evidence supported conclusion that mall landlord breached exclusivity clause in lease prohibiting it

from leasing space to another tenant whose "primary use" was retail sale of sports and celebrity memorabilia and sports collectibles, which was tenant's business; at least two other mall tenants were selling products in direct competition with tenant's merchandise.

[8] Landlord and Tenant 233 ⊂⟶44(1)

233 Landlord and Tenant
233II Leases and Agreements in General
233II(B) Construction and Operation
233k44 Express Covenants in General
233k44(1) k. In General. Most Cited Cases
Remedies provision of exclusivity clause in mall lease, permitting tenant, who operated sports merchandise and memorabilia store, to terminate lease on 60 days' written notice to landlord if landlord leased space to another tenant whose "primary use" was retail sale of sports and celebrity memorabilia and sports collectibles, failed of its essential purpose, and, thus, was unenforceable, as terminating lease and giving up business location and investment tenant had made in improvements would provide no benefit or remedy to tenant, and landlord retained ability to determine whether its actions constituted a breach, such that clause provided vehicle for landlord to for a termination of lease, if it chose to do so.

[9] Landlord and Tenant 233 ⊂⟶48(2)

233 Landlord and Tenant
233II Leases and Agreements in General
233II(B) Construction and Operation
233k48 Liability of Lessor for Breach of Contract
233k48(2) k. Damages. Most Cited Cases
Appropriate remedy for mall landlord's breach of exclusivity clause in lease, which prohibited it from leasing space to another tenant whose "primary use" was retail sale of sports and celebrity memorabilia and sports collectibles, which was tenant's business, was to award tenant damages for profits

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

he lost as a direct result of landlord's leases to stores selling competing products.

**[10] Fraud 184 ⬤61**

184 Fraud
   184II Actions
      184II(E) Damages
         184k61 k. Exemplary. Most Cited Cases
Trial court had authority to award one dollar in punitive damages to tenant who prevailed on his claim, in landlord's action for unpaid rent and forcible entry and detainer, that landlord had fraudulent induced him to enter into permanent lease, despite absence of charge of actual malice on part of landlord; actual malice was only one of several elements that could give rise to punitive damages award, and tort claim of fraudulent inducement could lead to both compensatory and punitive damages.

Appeal from Allen County Common Pleas Court, Trial Court No. CV 2007-1292.Dale E. Bricker, Appellant.

Michael A. Rumer, for Appellee.

WILLAMOWSKI, P.J.

*1 {¶ 1} Plaintiff-Appellant, Simon Property Group, L.P. ("Simon Property" or "Simon") appeals the decision of the Allen County Court of Common Pleas in favor of Defendant-Appellee, Derek Kill dba D & D Sports Cards & Collectibles ("Derek"). Appellant contends that the trial court erred when it found that Simon Property had fraudulently induced Derek into executing a permanent lease at the Lima Mall and had otherwise violated the terms of the lease agreement. For the reasons set forth below, the judgment is affirmed.

{¶ 2} This case involves a landlord and tenant dispute between Derek, who was the sole proprietor of a sports merchandise and memorabilia store, and Simon Property, the landlord who operated the Lima Mall (or, "the mall") and leased retail space

to Derek. From January 15 through December 31, 2006, Derek leased Room 926 at the mall under a "temporary lease." This lease was considered a temporary lease because, pursuant to its terms, Simon Property could elect to terminate it at any time upon thirty days notice. Derek's monthly rent was $1,400 for this 4,228 square foot space.

{¶ 3} In the fall of 2006, Simon Property told Derek that it was attempting to negotiate leases with some national tenants, including Champs Sporting Goods ("Champs"), in the section of the mall which included Room 926. Derek testified that he was told that his temporary lease in Room 926 would not be renewed because Champs would be utilizing that space.

{¶ 4} Simon Property's senior leasing representative, Paul Katz ("Katz"), and Derek commenced talks regarding a permanent lease. Katz explained that rents for a permanent lease were higher because the tenant pays for the right to remain in the mall for a fixed term. On November 30, 2006, Derek entered into a five-year lease for Room 704, just diagonally across the hall from his former location. The lease was to commence in early 2007, after renovations were completed, and run for five years. Derek's monthly rent would be $5,288.37 for this 3,000 [FN1] square foot retail space. Although the rent for this lease was much higher than the temporary lease, Derek believed that his business would greatly benefit from the increased traffic of young, sports-minded customers likely to be generated by the coming of Champs.

> FN1. Simon maintained that Derek's business's ideal space was 2,200 square feet, and that Derek's previous location in room 926, with over 4,000 square feet, was too big. Although Room 704 contained 3,000 square feet of floor area, Simon stated that, as a concession, it would only charge Derek at the rate for 2,500 square feet.

{¶ 5} The terms of the thirty-three page lease also provided for Simon Property to pay Derek up to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

$20,000 for "Permanent Improvements," such as alterations, renovations, improvements, and fixtures specified in lease section 24.21 ("tenant's allowance" or "TA".) Derek also specifically requested the inclusion of an exclusivity clause that would preclude Simon Property from leasing space to any competing business selling similar merchandise.

{¶ 6} Soon thereafter, the parties began to have disputes over their respective rights and obligations under the lease. Derek claimed he made approximately $40,000 in improvements and renovations to the leased space prior to re-opening his business at the new location on March 9, 2007, but that Simon Property never paid him the tenant's allowance. Simon Property contended that Derek never provided the necessary paperwork in order to receive the reimbursement. Derek wanted Simon Property to apply the tenant's allowance to the rent he owed, and, therefore, except for one $2,000 payment in November of 2007, Derek did not make any rent payments. Derek believed that he had been fraudulently induced into signing the new contract based upon the representation that Champs was definitely coming to the mall. Simon Property never finalized an agreement with Champs but insisted that no one had ever affirmatively represented that Champs was anything more than a prospective tenant. Simon Property maintained that the entire agreement between the parties was stated within the four corners of the lease agreement and that it was Derek who was in breach of the lease.

*2 {¶ 7} Derek also complained that Simon Property leased space to two businesses that were in direct competition with him in violation of the exclusivity clause and that caused his holiday sales to fall drastically. Derek provided sales records that showed that his 2007 November and December holiday sales, which accounted for 80% of his annual business, decreased by over $68,990 as compared to the previous year's 2006 November and December sales. Simon maintained that the two stores' primary business was not in competition with Derek and that Simon had not violated the terms of the exclusivity clause.

{¶ 8} On November 2, 2007, Simon Property served Derek with a notice to vacate and subsequently filed a forcible entry and detainer complaint against him in the Lima Municipal Court on November 27, 2007. Derek filed an answer and counterclaim in excess of the jurisdictional limits of the Lima Municipal Court. The case was transferred to the Allen County Court of Common Pleas and Simon Property amended its complaint to include a claim for unpaid rent, which amounted to $65,881.47 for the period from March 2007 through March 2008. [FN2]

> FN2. Derek vacated the premises some time in early February 2008.

{¶ 9} On April 30, 2009, a bench trial was held and the trial court heard conflicting testimony from the parties and their witnesses concerning the disputed claims and counterclaims. On May 18, 2009, the trial court entered its judgment finding that Simon Property had fraudulently induced Derek to enter into a new long-term lease agreement; that Simon Property failed to properly pay Derek the $20,000 tenant's allowance; and that Simon Property had breached the exclusivity agreement, thereby entitling Derek to damages.

{¶ 10} The trial court awarded Simon Property $13,400 in unpaid rent that it would have been entitled to receive from Derek from March 8, 2007 to February 4, 2008, at the rental rate that had been in effect under the terms of the original temporary lease prior to Simon Property fraudulently inducing Derek to enter into the permanent lease agreement. The trial court found that Simon Property owed Derek $20,000 for the tenant allowance, from which Simon Property was to deduct $11,000 to pay directly to Varsity Contracting for the remodeling work it did for Derek. Finally, the trial court awarded $33,163.63 [FN3] in damages to Derek for lost income due to Simon Property's breach of the exclusivity agreement, and one dollar for punitive damages. After off-setting the various judgments

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

and awards, the trial court ordered Simon Property to pay Derek the sum of $28,673.63. It is from this judgment that Simon Property appeals, presenting the following six assignments of error for our review.

> FN3. This was based upon evidence that Derek's gross income was $68,990 less during November and December in 2007 than during the previous November and December in 2006, and that Derek's net profits were approximately 48%.

### First Assignment of Error

**The trial court erred when it found that [Simon Property] fraudulently induced [Derek] into executing a permanent lease on November 30, 2006 by falsely representing that Champs was not only coming in as a tenant at Lima Mall, but that it was a done deal.**

### Second Assignment of Error

**\*3 The trial court erred when it found Simon Property was estopped, under the doctrine of promissory estoppel, from claiming by the Lease that it had no obligation to pay for the Landlord Contribution towards the cost of Tenant's Work (Tenant Allowance) set forth in Section 24.21 of the Lease and finding that Simon Property owes $20,000.00 to Derek for the Tenant Allowance less $11,000.00 due Derek's contractor, Varsity Contracting.**

### Third Assignment of Error

**The trial court erred when it found that Simon Property had violated the exclusive use set forth in Section 24.22 of the Lease.**

### Fourth Assignment of Error

**The trial court erred when it awarded dam-** ages for violation of the exclusive [sic].

### Fifth Assignment of Error

**The trial court erred when it awarded Simon Property $13,400.00 for unpaid rent, based on the rent payable under a prior temporary lease, instead of the $68,881.47 claimed by Simon Property as rent due under the [new lease].**

### Sixth Assignment of Error

**The trial court erred when it awarded Derek $1.00 in punitive damages.**
Because several of the assignments of error address related issues, we shall review those issues together and out of order.

### First and Fifth Assignments of Error

{¶ 11} In its first assignment of error, Simon Property maintains that the trial court erred in finding that Simon Property fraudulently induced Derek to enter into the permanent lease. Simon Property insists that it never told Derek that Champs was definitely going to be a tenant at the mall. Therefore, Derek should have been held responsible for the full $68,881.47 rent due under the new, permanent lease. Simon contends that there is no competent, credible evidence of any false representation being made by Simon regarding Champs.

{¶ 12} Essentially, Simon is arguing that the trial court's decision finding fraudulent inducement was against the manifest weight of the evidence. In *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578, at the syllabus, the Ohio Supreme Court set forth the standard of review for civil manifest weight of the evidence cases, stating, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evid-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 1:08-cv-02755-DCN Doc #: 54-1 Filed: 09/30/10 119 of 126. PageID #: 1026

ence." See, also, *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, at ¶ 24 (reaffirming the standard set forth in C.E. Morris). An appellate court must "presume that the findings of the trier of fact are correct" since "the trial judge had an opportunity 'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Wilson,* at ¶ 24, quoting *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80-81, 461 N.E.2d 1273. Reversal based on an error of law is legitimate; however, the trial court's decision should not be reversed based on a "difference of opinion on credibility of witnesses and evidence * * *." *Id.,* quoting *Seasons Coal,* at 81, 461 N.E.2d 1273; *Knipp v. Sadler,* 3d Dist. No. 6-09-04, 2009-Ohio-4444, ¶ 7.

*4 {¶ 13} In order to prove fraud in the inducement, a plaintiff must prove that the defendant made a knowing, material misrepresentation with the intent of inducing the plaintiff's reliance, and that the plaintiff relied upon that misrepresentation to his or her detriment. *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co.,* 148 Ohio App.3d 596, 601, 2002-Ohio-3932, 774 N.E.2d 775, ¶ 15, citing *ABM Farms, Inc. v. Woods.,* 81 Ohio St.3d 498, 1998-Ohio-612, 692 N.E.2d 574.

[1] {¶ 14} First however, before we discuss the evidence concerning the elements of fraudulent inducement, we must address a preliminary issue that Simon raises. Simon contends that because the lease contained an integration clause and the terms of the lease were clear and unambiguous, evidence of antecedent understandings and negotiations should not be admitted because of the parol evidence rule.

{¶ 15} An integration clause is essentially a contract's embodiment of the parol evidence rule, i.e., that matters occurring prior to or contemporaneous with the signing of a contract are merged into and superseded by the contract. *Galmish v. Cicchini,* 90 Ohio St.3d 22, 27-28, 2000-Ohio-7, 734 N.E.2d 782. "The parol evidence rule states that 'absent

fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements.' " *Rylee Ltd. v. Izzard Family Partnership,* 178 Ohio App.3d 172, 2008-Ohio-4506, 897 N.E.2d 208, ¶ 6, quoting *Galmish v. Cicchini.* However, the parol evidence rule does not prohibit a party from introducing parol or extrinsic evidence for the purpose of proving fraudulent inducement. *Galmish v. Cicchini,* 90 Ohio St.3d at 28, 734 N.E.2d 782. That is because the parol evidence rule does not bar evidence of fraudulent inducement where the extrinsic evidence goes to the *making* of the contract, not to a provision of that contract.

" [W]here one party to a contract has been induced to enter into it through fraud, deceit, and misrepresentation of the other party as to material matters, the defrauded party does not become bound by its terms, notwithstanding the contract contains a provision that there are no agreements or statements binding upon the parties except those contained therein. Fraud which enters into the actual making of a contract cannot be excluded from the reach of the law by any formal phrase inserted in the contract itself."

*Niehaus v. Haven Park West, Inc.* (1981), 2 Ohio App.3d 24, 25, 440 N.E.2d 584, citing *Sparhawk v. Gorham* (1956), 101 Ohio App. 362, 139 N.E.2d 652.

{¶ 16} In this case, the representations concerning the coming of Champs and the reasons why Derek had to vacate his location were not matters that were embodied in the contract. These were issues that were extrinsic to the contract and parol evidence was admissible to show the reasons why Derek was fraudulently induced into signing the new agreement.

*5 [2][3][4] {¶ 17} Specifically, the elements of fraudulent inducement are: (1) an actual or implied

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

false representation concerning a fact or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction; (3) knowledge of the falsity of the representation or such recklessness or utter disregard for its truthfulness that knowledge may be inferred; (4) intent to induce reliance on the representation; (5) justifiable reliance; and (6) injury proximately caused by the reliance. See *Info. Leasing Corp. v. Chambers,* 152 Ohio App.3d 715, 2003-Ohio-2670, 789 N.E.2d 1155. See, also, *Gaines v. Preterm-Cleveland, Inc.* (1987), 33 Ohio St.3d 54, 55, 514 N.E.2d 709. Fraudulent inducement must be proven by clear and convincing evidence. *Mid-America Tire, Inc. v. PTZ Trading Ltd.,* 95 Ohio St.3d 367, 2002-Ohio-2427, 768 N.E.2d 619, ¶ 62.

{¶ 18} Simon argues that there was no fraudulent inducement because: (A) Simon did not make any false representations; (B) there was no reliance by Derek; and, (C) there was no resulting injury or damages.

{¶ 19} First, Simon argues that it never made any false representations. Katz testified that he would never have told anyone that the Champs lease was a "done deal" unless they had a signed contract. However, Katz also testified repeatedly that his "recollection" was unsure because "it was so long ago," and acknowledged that Simon did "thousands of leases" every year. Derek, on the other hand, testified that he very clearly remembered that he was told " ' * * * you're going to have to go permanent because * * * Champs is taking your space.' " (Trial Tr. p. 96.) Further testimony by Derek stated:

**Q: When did you first think about changing from a temporary lease to a permanent lease?**

**A: It would have been sometime during the summer of '06 when I was approached being told that I could no longer stay at the current space I'm at because it was being filled by Champs."**

(Trial Tr. p. 95.) Derek testified that he was told this on more than one occasion by both the mall manager and Katz. He also submitted a floor plan of the mall with the names of the stores listed in each location (Exhibit E). The wording "PROPOSED CHAMPS" is listed in space 926. However, the word "proposed" appears to be crossed out. Derek testified that he specifically remembered the blueprint being laid in front of him many times and that Katz crossed out the word "proposed" when explaining what was going to happen at the mall.[FN4] (Trial Tr. pp. 164-69.) Katz testified that he didn't specifically recall the meeting with the floorplans, and believed that the word was not actually crossed out, but that it was just a "sloppy circle" drawn around the store's name.

> FN4. On appeal, Simon raises the issue for the first time that Derek's testimony was not credible because the date on the floorplan exhibit had a revision date of "January 9, 2007"-several months after the lease was signed. However, Simon did not question Derek or Katz about this at trial when Simon would have had the opportunity to try to impeach Derek's testimony. Furthermore, Derek specifically testified that he remembered conversations with Katz and the blueprint "many times," so it is entirely possible that the same scenario took place with an earlier version of the floorplan prior to the lease being signed. And finally, even without the floorplan, there was sufficient evidence for the trial court to find that there was fraudulent inducement.

{¶ 20} Another tenant at the mall, Cheryl Walters ("Walters"), owner of the Amish Merchant, also testified concerning her experiences with Katz and his attempts to change her temporary lease to a permanent lease. In the summer of 2006, Ms. Walters had been leasing space 736 under a temporary lease. Katz told her that Borders Book Store would be taking over several of the lease spaces, including

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

736, and that she would have to relocate to room 914 and sign a permanent lease. She refused to sign a new lease until such time as she was actually going to be "bumped" for Borders. She requested that Katz provide her with a document in writing stating Borders was coming and she would have to leave. Katz never did, so she remained in room 736 with her temporary lease. Ms. Walters also testified that Katz and the mall manager mentioned other national stores might be coming in, but Katz said "that was years down the road." She did not recall him ever mentioning Champs.

*6 {¶ 21} About a year later, Walters was again requested to move across the hall and sign a permanent lease, this time was because Old Navy was going to move to her location from the other end of the mall. Once again, she asked for something in writing that she was going to be bumped out of her present location but Katz never produced anything. At the time of the trial, Ms. Walters' business still remained in room 736, operating for more than eight years with a temporary lease.

{¶ 22} Simon also argues that fraud cannot be predicated upon promises or representations relating to future actions or conduct because such representations are regarded as predictions and are not fraudulent. See, e.g., *Tibbs V. national Homes Constr. Corp.* (1977), 52 Ohio App.2d 281, 369 N.E.2d 1218. Although Katz was very careful to testify he never stated directly to Derek that Simon had an officially signed lease agreement with Champs, Katz did admit that he "would say they were in negotiations or that it might be looking good." (Trial Tr. p. 200.) Derek testified that "I was told specifically that [Champs] was taking my space." (*Id.*, at p. 149, 369 N.E.2d 1218.) These are not future events as argued by Simon, but rather misrepresentations of present events that Simon made directly to Derek in order to induce Derek to execute the new lease.

{¶ 23} After weighing all of the testimony and evidence before it, the trial court made the following conclusions and holdings:

The Court finds that [Derek] was assured by [Katz] that CHAMPS was not only coming in, but that it was a done deal. This was not a future event, it was a present event. The Court finds credible [Derek's] testimony that Katz had marked out the word "proposed" on Exhibit E. This was important to [Derek]. Katz testified that he did not remember marking out "proposed" but [Derek] specifically remembers. The court deems [Derek's] testimony credible, taken in light of similar representations made to Cheryl Walters at Amish Merchant.

(Judgment Entry, p. 9.)

{¶ 24} The trial court found Derek's and Ms. Walters's testimony to be more credible than Katz's, and it is not for a reviewing court to weigh the credibility of the witnesses. There was sufficient competent and credible evidence presented at trial to support the finding that Simon Property had falsely represented material facts to Derek.

{¶ 25} Next, Simon Property claims that there was no justifiable reliance upon any representation regarding Champs. Simon asserts Derek signed the permanent lease because his temporary lease was about to expire. Simon also argues Derek should have requested a provision in the lease that Champs would be a co-tenant if Champ's presence was so important.

{¶ 26} Whether or not the reliance was justified under the facts of the case is a question for the trier of fact. *Rucker v. Everen Securities, Inc.*, 102 Ohio St.3d 1247, 2004-Ohio-3719, 811 N.E.2d 1141, at paragraph 7. The trial court made the following findings of fact:

*7 A major instrumental reason for [Derek] entering a Permanent Agreement was that CHAMPS, a major tenant selling youth sports shoes and clothing, would be moving in across the hall from him which would assist in his business * * *.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

{¶ 27} Again, the record demonstrates that there was considerable evidence before the trial court indicating that Derek only signed the permanent lease because he was told he had no other choice and that he had to vacate his temporary lease location to provide space for Champs. As the testimony of Ms. Walters demonstrated, there was apparently no reason why he could not have renewed his temporary lease and remained in his old location. We agree that it might have been prudent for Derek to have asked Katz to put the representations concerning Champs in writing, as Ms. Walters did. Unfortunately, Derek was young and had considerably less business experience than Ms. Walters. That does not in any way change the fact that Derek relied upon the many verbal representations of the official representatives of Simon Property. Derek testified that "if Champs didn't come I would never have signed the lease." (Trial Tr. p. 112.)

{¶ 28} And finally, Simon argues that Derek was not damaged by relying upon Simon's representation. There is considerable testimony in the record that refutes this contention. Derek testified that he was operating a profitable business at his old location. By moving, he was giving up approximately one thousand square feet of floor space and increasing his rent $3,888.34 per month. These are negative factors for a retail business. He had counted on being able to recoup the additional costs because he expected an increase in traffic from young consumers drawn to the area by Champs. Ms. Walters also testified how she would have expected increased business if the representations concerning the coming of Borders and Old Navy had been true.

{¶ 29} The trial court ruled that this increase in rent was a damage Derek sustained as a direct and proximate result of Simon's fraudulent inducement. In other words, but for the fraudulent inducement, Derek would have continued to operate his business in room 926 and would not have become indebted to Simon for the amount set forth in the new lease. The trial court, therefore, ordered Derek to pay back rent to Simon, but under the rate of the prior

temporary lease, rather than the new lease. The trial court's decision placed Derek in the same position he would have been if Simon had not fraudulently induced him into signing the new lease agreement.

{¶ 30} A party who has been fraudulently induced to enter into a contract has the option of rescinding the contract or seeking damages based upon the tort of fraudulent inducement. *Mid-America Acceptance Co. v. Lightle* (1989), 63 Ohio App.3d 590, 599-600, 579 N.E.2d 721. In this case, the trial court did not err when it ruled that Derek was not obligated to pay the increased rent owing under the new lease.

*8 {¶ 31} There was sufficient competent and credible evidence in the record for the trial court to have found that Simon fraudulently induced Derek to sign the new lease, and the trial court did not err when it ruled that Derek was not responsible for the higher lease payments due under that lease. Simon's first and fifth assignments of error are overruled

### Second Assignment of Error

[5][6] {¶ 32} In the second assignment of error, Simon contends that the trial court erred when it ruled that Simon must pay the $20,000 tenant's allowance. Simon argues that it was not obligated to pay the TA because Derek failed to submit the proper paperwork and comply with the conditions specified in the lease. Specifically, Simon argues that Derek did not pay all of his contractor bills; he did not furnish the requested Tenant's Affidavit of Payment; and he failed to obtain the required lien waivers.

{¶ 33} While the evidence confirmed that Derek did not comply with all of the specific conditions set forth in section 24.21 of the lease, the trial court found that Derek was entitled to reimbursement under the doctrine of promissory estoppel. The trial court made the following conclusions and holding:

    **The Court further finds that as to the "tenant reimbursement allowance" that there were or-**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

al communications and clear and unambiguous promises and reliance by [Derek] to whom the promises were made. All of the elements of promissory estoppel have been met by clear and convincing evidence and Simon is estopped from claiming by the contract that it has no obligation to pay for the tenant reimbursement allowance. In this instance, promissory estoppel does not contravene the parol evidence rule. [Derek] proceeded with the remodeling and right to the tenant reimbursement allowance, relying upon the promissory statements, assurances and representations by Simon, its agents, managers and employees that show sufficient commitment to induce reasonable reliance by [Derek.] This is a question of fact and the Court finds that the reliance by [Derek] was objectively reasonable and foreseeable.

(Judgment Entry, p. 10.)

{¶ 34} Promissory estoppel is a quasi-contractual or equitable doctrine. *Dailey v. Craigmyle & Son Farms, L.L.C.,* 177 Ohio App.3d 439, 2008-Ohio-4034, 894 N.E.2d 1301, ¶ 14. Promissory estoppel encompasses a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee, does induce such action or forbearance and is binding if injuries can be avoided only by enforcement of the promise. *McCroskey v. State* (1983), 8 Ohio St.3d 29, 30, 456 N.E.2d 1204. Whether a clear and unambiguous promise is made is a question of fact. *Dailey v. Craigmyle & Son Farms,* 2008-Ohio-4034, at ¶ 14, 177 Ohio App.3d 439, 894 N.E.2d 1301.

{¶ 35} First, Simon again argues that even if the elements of promissory estoppel can be proven by oral testimony at trial, that evidence should not be admissible because of the parol evidence rule. However, this is another instance in which the parol evidence rule is not applicable because a claim based on promissory estoppel does not necessarily contravene the parol evidence rule. Promissory es-

toppel is an equitable doctrine for enforcing the right to rely on promises. See *Karnes v. Doctors Hosp.* (1990), 51 Ohio St.3d 139, 142, 555 N.E.2d 280. It is based on the principles of good faith, equity, and conscience. *Rucker v. Everen Securities, Inc.,* 102 Ohio St.3d 1247, 811 N.E.2d 11412004-Ohio-3719, ¶ 6, (Francis E. Sweeney, Sr., J., dissenting), citing Eric Mills Holmes, *The Four Phases of Promissory Estoppel* (1996), 20 Seattle U.L.Rev. 45, 64. The issue presented herein is not a contradiction of the written contract but goes to the post-contract actions of Simon and Varsity relative to the tenant allowance.

*9 {¶ 36} Derek testified that he contracted with Varsity Contractors ("Varsity") to do $11,000 of remodeling, and he also contracted with additional contractors and vendors for total improvements in excess of $20,000. When Derek attempted to obtain reimbursement, he was constantly told different things that he needed to do by at least four or five different people within the Simon Property organization. Each time he attempted to comply with the reimbursement requirements, he was passed along to another person or the requirements changed. He testified that he provided receipts to Simon but he was not able to obtain lien waivers because they were inapplicable to most of the expenses and Varsity testified that it did not provide lien waivers for its work. Derek testified that he paid all of his contractors except Varsity, but that he had an agreement with Varsity to pay them after he received the TA. Therefore, couldn't submit an affidavit of payment, a condition of being paid, until he was paid-a "catch-22" situation.

{¶ 37} Brian Tierney ("Tierney") was Operations Manager for Varsity, but he had previously been a Simon employee and was again directly working for Simon at the time of trial. Tierney testified that Varsity did a lot of work for Simon, including compliance inspections. Tierney could hold up payment of a TA until he gave his approval and had done so with Derek for a period of time. When the trial court questioned Tierney to clarify the relationship

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

between Simon Property and Varsity, the court asked, "They're in bed together?" and Tierney acknowledged, "Yes." (Trial Tr. p. 86.)

{¶ 38} Derek also testified to accidently receiving an email forwarded by Katz stating that "I'm just trying to keep this tenant from getting evicted here. Anita, this tenant has gotten misinformation from Third Works, the mall staff, and even Bryan Zupan for months and the delays in his tenant allowance has contributed to his delinquency." (Trial Tr. p. 140-141; Def.'s Ex. M.) Katz was also confronted on cross examination with his prior deposition testimony where he had stated "this is crazy evicting you for sort of a sequence of circumstances where our own Varsity people sort of screwed up getting the lien waivers done." (Trial Tr. p. 232.)

{¶ 39} We find that there was sufficient clear and convincing evidence to support the trial court's finding that Simon was obligated to pay the $20,000 tenant allowance. Simon Property's second assignment of error is overruled.

### Third and Fourth Assignments of Error

[7][8][9] {¶ 40} Simon Property contends that it did not violate the terms of the exclusive use clause of the lease and that the trial court erred when it awarded Derek damages. Simon acknowledges that it temporarily leased space to Artistic Creations (room 926, Derek's former location) and an unnamed holiday kiosk near Derek's store, from October through December during the 2007 Christmas season. However, Simon maintains that the "primary use" of those businesses did not involve selling items similar to Derek's merchandise. And, even if the exclusive use clause was violated, Simon insists that Derek's sole remedy was termination of the lease, not monetary damages.

*10 {¶ 41} It was extremely important to Derek that he had the exclusive right to sell sports memorabilia and collectibles and he insisted that Simon include an exclusivity clause in the lease agree-

ment. Simon agreed and its attorneys drafted Lease Section 24.22, Exclusive, which stated in part:

> **Except for Excluded Tenants * * *, provided Tenant is not in default under this Lease and is operating for business in the Premises for the Permitted Use, landlord shall not during the Lease Term lease any other space in the enclosed mall portion of the Center to another tenant whose primary use is the retail sale of sports and celebrity memorabilia and sports collectibles ("Competing Use"). Subject to the foregoing, if Landlord does lease other space in the enclosed mall portion of the Center for the Competing Use and fails to cure such violation within thirty (30) days after written notice from Tenant, then Tenant shall have the right to terminate this Lease on sixty 60) days written notice to Landlord. * * * Tenant acknowledges and agrees that the foregoing remedy is Tenant's sole and exclusive remedy arising out of or as a result of Landlord's violation of this Section.* * ***

{¶ 42} Katz testified that Derek notified him "a couple of times" that the exclusivity clause was being violated, and he acknowledged that Artistic Creations was selling "some Ohio State clocks and posters," like Derek was. However, Katz and the mall manager did not believe that there was a direct infringement of the exclusivity clause because they felt that the sale of this type of merchandise was not the stores' "primary use." The term "primary use" was not defined anywhere in the lease agreement, but Katz testified that he believed it meant somewhere in the range of "seventy-five, eighty, eighty-five percent" of the business.[FN5]

> FN5. There was also testimony demonstrating that the two parties had a very different idea as to what type of merchandise constituted "sports and celebrity memorabilia and sports collectibles."

{¶ 43} It is a long-standing rule of contract construction that any ambiguity in a contract shall be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 1:08-cv-02755-DCN Doc #: 54-1 Filed: 09/30/10 125 of 126. PageID #: 1032

construed against the drafter. See, e.g., *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 49. This is especially true in cases such as this when the parties do not have equal bargaining power or experience. See *Cline v. Rose* (1994), 96 Ohio App.3d 611, 614, 645 N.E.2d 806. The terms and purpose of this contract clause clearly meant something different to each party and the term "primary use" was unquestionably ambiguous.

{¶ 44} The uncontroverted testimony and exhibits presented by Derek established that at least two mall tenants were selling products in direct competition with his merchandise. One exhibit was a photograph showing a holiday kiosk selling the same signs and clocks that Derek sold and another photo showed the Artistic Creations store's front window full of competing products.

{¶ 45} The trial court noted in its judgment entry that there was no specified percentage defining "primary use" anywhere in the lease agreement and it stated that Katz appeared to be making up numbers as he testified. The trial court found that "[b]y common sense and the exhibits, it is clear that [Simon] had violated the exclusive clause." (Judgment Entry p. 11.) The totality of the evidence supports the trial court's ruling that Simon breached the exclusivity clause of the lease.

\*11 {¶ 46} We also do not find any merit in Simon's argument that the trial court should not have enforced the exclusivity clause because Derek was delinquent in his rent payments. The record shows Derek and Simon were in constant negotiations regarding payment of the tenant allowance and using that money as a set off to the back rent owed. The trial court did not err in finding that Simon violated the exclusivity clause.

{¶ 47} As to the issue of damages, Simon argues that Derek was not entitled to monetary damages because the exclusivity clause specified the only remedy available. The trial court found that the remedy provided for in the lease was "essentially irrelevant" in that Derek's sole option was to terminate the lease and vacate the premises. Terminating the lease and giving up his business location and the investment he made in improvements would not provide any benefit or remedy to Derek. Derek argues that the remedies clause is unenforceable because it fails of its essential purpose.

{¶ 48} Furthermore, Derek did not have even *that* option available because Simon made the determination that no breach had occurred. And, if Simon would have acknowledged violating the exclusivity agreement, Derek would have had to wait a minimum of ninety days after giving notice of the breach to vacate, during which time he would have continued to lose revenue during the critical holiday season which represented eighty percent of his annual income. Or, if Simon would have asked the competitors to leave, by the time the issue was resolved, the holiday season would have been over and Derek would still have suffered a loss of business. The trial court found that the remedy available to Derek under the lease provided no remedy at all.

{¶ 49} We agree that the exclusivity clause and the remedies provided were illusory and provided no benefit or remedy to Derek. This clause was drafted by Simon's attorney, and therefore, must be construed against the drafter and in favor of Derek. An agreement is illusory where "by its terms the promisor retains an unlimited right to determine the nature or extent of his performance; the unlimited right, in effect, destroys his promise and thus makes it merely illusory." *Imbrogno v. Mimrx.com, Inc.*, 10th Dist. No. 03AP-345, 2003-Ohio-6108, ¶ 8, citing *Century 21 v. McIntyre* (1980), 68 Ohio App.2d 126, 427 N.E.2d 534. See, also, *MedCorp, Inc. v. Mercy Health Partners*, 6th Dist. No. L-08-1227, 2009-Ohio-988, ¶ 18. As noted above, Simon retained the ability to determine whether or not its actions constituted a violation of the exclusivity clause, and, even if it would have acknowledged a breach, the remedies in the clause did not provide any benefit to Derek. In fact, the clause provided a vehicle for Simon to force a termination of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

lease, if it chose to do so.

{¶ 50} The trial court determined that Simon had breached the exclusivity clause. The trial court then provided a remedy that served to make Derek whole. There was sufficient competent and credible evidence in the record that Derek's gross sales decreased by approximately $70,000 from 2006 to 2007 when Simon breached the exclusivity clause. The trial court stated:

**\*12 Further, the Court finds that [Derek's] income and profits and losses for October, November and December were way off from previous years and that this, the court finds, was not speculation. [Derek] had been in the business. He had other businesses in other malls in Ohio and had the records to prove the loss.**

(Judgment Entry, p. 11.)

{¶ 51} The trial court did not err when it ordered Simon to pay damages to Derek to compensate him for the profits he lost as a direct result of the two stores selling competing products in violation of the exclusivity clause. Based on all of the above, Simon's third and fourth assignments error are overruled.

### Sixth Assignment of Error

[10] {¶ 52} In the final assignment of error, Simon Property asserts that the trial court erred in awarding one dollar in punitive damages. Simon claims that a charge of actual malice is essential to the allowance of punitive damages and no charge of actual malice was made in this case.

{¶ 53} Simon cites *Pickle v. Swinehart* (1960), 170 Ohio St. 441, 443, 166 N.E.2d 227, for the proposition that "actual malice" is an essential element to an award of punitive damages. However, that is an inaccurate representation of the law. In the section Simon quotes from *Pickle v. Swinehart*, the Ohio Supreme Court was merely examining the differ-

ence between "actual malice" and "legal malice." Actual malice is only one of several elements that may give rise to an award of punitive damages.

> **In an action to recover damages for a tort which involves the ingredients of *fraud, malice, or insult*, a jury may go beyond the rule of mere compensation to the party aggrieved, and award exemplary or punitive damages \* \* \*. (Emphasis added.)**

*Zappitelli v. Miller*, 114 Ohio St.3d 102, 2007-Ohio-3251, 868 N.E.2d 968, ¶ 4, quoting *Roberts v. Mason* (1859), 10 Ohio St. 277, paragraph one of the syllabus. See, also, *Mabry-Wright v. Zlotnik*, 165 Ohio App.3d 1, 2005-Ohio-5619, 844 N.E.2d 858, ¶ 19; *Manyard v. Eaton Corp.*, 3d Dist. No. No. 9-03-48, 2004-Ohio3025, ¶ 16.

{¶ 54} Fraudulent or negligent misrepresentations and fraudulent inducements are all valid tort claims and can lead to both compensatory damages and punitive damages. *Curran v. Vincent*, 175 Ohio App.3d 146, 2007-Ohio-3680, 885 N.E.2d 964, ¶ 20. In this case, there was a clear claim of fraud against Simon for the fraudulent representations made to induce Derek to enter into the new lease. The trial court did not err in awarding punitive damages. Simon's sixth and final assignment of error is overruled.

{¶ 55} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

### Judgment Affirmed

SHAW, J., concurs.
ROGERS, J., dissents.
Ohio App. 3 Dist.,2010.
Simon Property Group, L.P. v. Kill
Slip Copy, 2010 WL 1266835 (Ohio App. 3 Dist.), 2010 -Ohio- 1492

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.