IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

------------------------------------------------------ :
                                                       : CASE NO.  1:08 CV 02755
HODELL-NATCO INDUSTRIES, INC,                          :
                                                       :
                                          Plaintiff,   : MEMORANDUM OPINION AND
                                                       : ORDER ADOPTING THE
                  -vs-                                 : MAGISTRATE JUDGE'S REPORT
                                                       : AND RECOMMENDATION AND
                                                       : GRANTING IN PART AND DENYING
SAP AMERICA, INC, et al,                               : IN PART THE DEFENDANTS' MOTION
                                          Defendants.  : TO DISMISS
------------------------------------------------------

UNITED STATES DISTRICT JUDGE LESLEY WELLS

On 8 July 2010, this matter was referred to United States Magistrate Judge Greg White for a report and recommendation ("R&R") on a motion to dismiss filed by defendants SAP America and SAP AG (collectively "the SAP defendants" or "SAP"). (Doc. 46).  After hearing oral arguments, the magistrate judge recommended granting in part and denying in part the SAP defendants' motion. (Doc. 50).  The plaintiff Hodell-Natco and the SAP defendants have respectively filed timely objections and responses.  (Doc. 53; Doc. 52; Doc. 54; Doc. 55).  For the following reasons, the parties' objections are overruled, and the Court will adopt the magistrate judge's R&R.

**I. Background**

The plaintiff Hodell-Natco ("Hodell") filed suit on 21 November 2008 against LSi-Lowery Systems, Inc. ("LSi"), the IBIS Group, Inc., ("IBIS"), SAP America, Inc., and SAP AG.  Hodell filed an amended complaint on 22 April 2009, alleging the following

-1-

causes of action: (1) fraudulent inducement; (2) fraud; (3) breach of contract; (4) negligence; and (5) negligent misrepresentation.  On 21 June 2009, defendants SAP America and SAP AG filed a motion to dismiss the amended complaint.  The motion was referred for Report and Recommendation on 8 July 2010.

The Report and Recommendation summarizes the factual allegations in the complaint as follows.

> Hodell is a full-service fastener and chain product wholesaler. (Compl. ¶9.) In 2003, Hodell commenced a search for a software product that would provide the necessary integrated financial and sales management capabilities for its growing business. (Compl. ¶¶16-17.) Hodell required software capabilities to accommodate approximately eighty then-existing users plus the growth Hodell estimated achieving over the software's useful life. Id. Hodell's user capacity needs were expressly communicated to all potential software vendors. Id. Hodell also required a software vendor with a high level of expertise, and a proven product supported by expert partners. Id.
>
> During its search in 2003, Hodell met with representatives of SAP and/or an SAP "partner." (Compl. ¶18.) SAP had recently purchased an Israeli application developer and branded its application "SAP Business One" (hereinafter, the "Software"). (Compl. ¶¶12.) SAP marketed the Software through "a network of highly qualified channel partners" that resell, build, implement or provide services for SAP products. (Compl. ¶13.) The qualifications and expertise of SAP's "channel partners" was touted in a publication titled "SAP Solution Brief, Qualified SAP All-in-One Partner Solutions" published in July of 2002. Id. Due to the representations made by SAP, Hodell avers that LSi, IBIS, and American Express Business and Tax Services (hereinafter "Amex") were duly authorized agents of SAP. (Compl. ¶¶13-15, 20.) LSi and IBIS were authorized to make representations concerning the Software's suitability and functionality on SAP's behalf and did, in fact, make various representations to Hodell.  Id.
>
> In 2003, Hodell was contacted either by SAP directly or by one of its partners, and provided with a copy of the "SAP Business One Brief" extolling the Software's virtues, and expressly representing that it would provide a "robust and fully integrated" solution suitable for businesses "with 10 to several hundred employees." (Compl. ¶18, Exh. A.)  In addition, an "SAP Solution Brief" provided to Hodell touted the virtues of SAP's "highly qualified channel partners" that are "supported by SAP's global resources." Id. On October 16, 2003, an email and an "SAP Business One Whitepaper" sent by an Amex employee stated that the Software had been "successfully installed in 800 businesses globally, with the

maximum implementation time being four weeks." (Compl. ¶21.) The "SAP Business One Whitepaper" also represented the Software would support "an unlimited number of simultaneous user transactions." (Compl. ¶21, Exh. C.) On October 20, 2003, Hodell participated in an "Online Webinar and Demonstration" presented jointly by SAP, Amex, and IBM. (Compl. ¶22.) During the course of the Webinar, the suitability of the Software for small and mid-sized wholesale distributors was specifically represented to the attendees, including Hodell's President. Id. In November of 2003, a representative of Amex orally informed Hodell that IBIS would be partnering with Amex, and postponed a scheduled meeting between Hodell and Amex. (Compl. ¶23.) Hodell was then contacted by IBIS, which represented that it was an expert in providing IT solutions to the fastener industry and that "SAP had chosen to partner with The IBIS Group to develop the specific requirements of this vertical market space and bring to market a turn key solution (sic) to this industry." (Compl. ¶24.) On or about December 19, 2003, Hodell was contacted by Amex representatives, who provided assurances that the Software had sufficient capability to serve a business of Hodell's size. (Compl. ¶26.)

During 2004, IBIS continued its marketing efforts for the Software. (Compl. ¶27.) After LSi acquired IBIS in June of 2004, Dan Lowery of LSi joined in the efforts to market the Software to Hodell. Id. Though meetings and conversations continued throughout 2004, none of the Defendants ever informed Hodell that the Software: (1) was unsuitable for mid-sized businesses; (2) could only support a limited number of users; (3) could not be installed in a reasonably functioning form; (4) existed with only mediocre or poor support; or (5) would require months of installation lead time.

On December 20, 2004, Hodell executed a "Development Agreement" with LSi and issued a Purchase Order for 80 user licenses. (Compl. ¶¶30-32, Exhs. D, E, and F.) Hodell alleges that SAP was a third party beneficiary under the development agreement. (Compl. ¶33.) According to Hodell, the representations of SAP and its "channel partner" agents -- that the Software could be used to support the number of users Hodell required -- was essential to the agreement. (Compl. ¶34.) All defendants knew at the time the Development Agreement was executed that Hodell intended to purchase additional licenses to accommodate as many as 300 users. (Compl. ¶34.) Hodell would not have made its initial purchase without assurances that the Software could support the initial 80 users, as well as up to 300 users after expected growth. (Compl. ¶35.) Hodell further relied upon SAP, LSi, and IBIS's assurances that it would receive "high-level" customer support tailored to Hodell's specific needs. (Compl. ¶39.)

At the time the 2004 Development Agreement was executed, Hodell asserts that the Defendants' statements regarding the Software -- including their statements regarding its user capacity, the attendant customer support, and the

number of successful installations -- were false, misleading, and made with the intent to induce Hodell to enter into the 2004 Development Agreement. (Compl. ¶¶41-45.) Notably, at the time Defendants sold Hodell the initial 80 user licenses in December 2004, SAP knew, or was reckless in not knowing, that the Software could not reasonably support more than 30 total users. (Compl. ¶45.)

In December 2005, Hodell purchased an additional 40 user licenses and signed a "License Agreement." (Compl. ¶46, Exh. G.) The License Agreement contains limitations of liability, a choice of law, and warranty waiver provisions relied upon in SAP's Motion. Hodell alleges that it was fraudulently induced into agreeing to these terms. (Compl. ¶62.) By the time Hodell purchased the additional 40 user licenses in December 2005, SAP knew or should have known that the Software could not reasonably support more than 30 users, and, therefore, could not support the 80 user licenses initially purchased by Hodell, let alone the additional 40. (Compl. ¶47.)

Beginning in 2004, Hodell worked diligently with SAP and its "expert channel partner" LSi to implement the Software. (Compl. ¶48.) Efforts to make the Software minimally functional continued until 2008, when Hodell abandoned the effort after reaching the conclusion that the Software had been a complete failure. Id.

On April 25, 2007, Dan Lowery of LSi sent an email to Hodell demonstrating Defendants' knowledge that the Software was unsuitable for its purposes: "Yes, at the early stages we all started with [the Software], the number most often quoted for users was 250+. On the call, you correctly heard Hodell was pushing the upper limit with 120." (Comp. ¶50.) On September 6, 2007, Hodell received a call from an LSi representative, who admitted that the Software had initially been represented as capable of supporting up to 300 users, but that by May 2006, SAP had reduced that number to 50 users. (Comp. ¶51.)

Due to Defendants' alleged misrepresentations inducing Hodell to enter into the 2004 Development Agreement and the 2005 License Agreement, Hodell asserts it has suffered over $1.3 million in damages. (Compl. ¶¶53-54.)

**II. The Magistrate Judge's Recommendations**

The magistrate judge made the following recommendations: (a) that Hodell's breach of contract claim against the SAP defendants be dismissed; (b) that Hodell's breach of the License Agreement claim be dismissed with respect to defendant SAP AG only; (c) that Hodell's negligence claim be dismissed; and (d) that SAP's motion to

dismiss be denied with respect to Hodell's fraud, fraud in the inducement, and negligent misrepresentation claims.

## III. Standard of Review

When ruling on a 12(b)(6) motion, the Court must construe the complaint in a light most favorable to the plaintiff, accept all the plaintiff's factual allegations as true, and draw all reasonable inferences in her or his favor. Dubay v. Wells, 506 F.3d 422, 427 (6th Cir. 2007). The Court need not accept as true the legal assertions of the plaintiff. Tackett v. M & G Polymers, USA, LLC, 561 F.3d 478, 488 (6th Cir. 2009). "[T]o survive a motion to dismiss a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" Id. (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 569 (2007)). "In considering a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated into the complaint by reference." Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir.1991).

When reviewing the magistrate judge's report and recommendation, this Court must make a de novo determination of the portions of the R&R to which the parties have objected. See 28 U.S.C. § 636(b)(1)(C). "[T]he court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

**IV. Discussion**

    **A. Breach of the Development Agreement**

The magistrate judge recommended dismissal of Hodell's breach of contract claim relating to the Development Agreement. After reviewing the document, he determined that the direct contracting parties to this agreement were Hodell, IBIS, and LSi. The magistrate judge concluded that Hodell did not sufficiently allege that IBIS or LSi were acting as the SAP defendant's agents when they entered into the agreement. The magistrate judge also concluded that the complaint did not sufficiently allege facts to support the novel theory that the SAP defendants assumed liability as third party beneficiaries to the Development Agreement.

In its objections, Hodell acknowledges that LSi, IBIS, and Hodell are the signatories to the Development Agreement. However, it maintains that the magistrate judge erred because he failed to recognize that a provision in the Development Agreement allowed for the formation of a purchase contract for 80 user licenses of SAP Business One between Hodell and the SAP defendants through their agents. (Doc. 26; 26-4; 26-5). Accepting arguendo that such a contract for purchase was formed and breached, and there are no allegations that it was, it is not evident how this would bind the SAP defendants to the Development Agreement as a whole. In any event, the magistrate judge correctly concluded that this contract provision is irrelevant because there was no allegation that it was breached. (Doc. 50, at 10-11).

Hodell also argues that the magistrate judge erred when he concluded that Hodell did not sufficiently allege an agency relationship between the SAP defendants

-6-

and the signatories to the Development Agreement.  Hodell states that the complaint alleges that LSi and IBIS were authorized to enter into the Development Agreement transactions in their own right, and were authorized to bind SAP as well.  (Doc. 26, ¶¶13-15, 77-78).  Hodell further notes that both LSi and IBIS admitted this allegation in their answer, and contends that LSi and IBIS's admission should be part of the Court's analysis.

The magistrate judge correctly concluded that the complaint is devoid of any specific factual allegation that LSi or IBIS had actual or apparent authority to enter into the Development Agreement on behalf of SAP.  "[A] claimant must plead facts that would support a finding that the alleged agents had actual or apparent authority to act on behalf of another. . . ."  In re Commercial Money Center, Inc., 2005 WL 2233233, at *18 (N.D. Ohio 2005) (quoting Gunderson v. ADM Investor Servs., Inc., 85 F.Supp.2d 892, 905 (N.D. Iowa 2000).  Hodell's allegations of agency in paragraphs 13-18 of the complaint relate to IBIS and LSi's authority to market the software, not the authority to enter into a contract.   Further, its conclusory allegation in paragraph 77 that "SAP was a disclosed principal for whose benefit LSi contracted with Hodell-Natco" is unsupported by the facts alleged.  These allegations, even in light of LSi and IBIS's answer, do not satisfy the pleading standard set forth in Federal Rule 8(a).

Hodell also argues that the magistrate judge erred when he concluded that the Development Agreement could not be enforced against SAP as a third party beneficiary.  The R&R notes that "it is well established that an action for breach of contract can be maintained *by* an intended third party beneficiary, 'there is very little authority addressing the question of whether and/or when third-party beneficiaries

assume actual liability under a contract." (R&R, at 12 (quoting Resource Title Agency, Inc. v. Morreale Real Estate Srvcs., 314 F. Supp. 2d 763, 776 (N.D. Ohio 2004)). The R&R correctly determined that the authority that does address this question is inapposite to the facts as alleged in this case. Further, under Ohio law third party beneficiary status depends upon the existence of a promise for the benefit of a third person. See Chitlik v. Allstate Ins. Co., 299 N.E.2d 295, 297 (Ohio App. 1973). As noted by the R&R, no promise exists in this instance because Hodell was under no obligation to purchase the software from SAP. Hodell's objections to the magistrate judge's first recommendation are accordingly overruled.

### B. Breach of the License Agreement

The magistrate judge recommended dismissal of Hodell's claim for breach of the license agreement as to SAP AG only. He noted that the express language of the License Agreement states that it is between SAP America and Hodell. He then concluded that SAG AG is not a party to the license agreement, because the complaint did not sufficiently allege that SAP America was acting as SAP AG's agent. The magistrate judge further concluded that SAP AG is not a third party beneficiary, because there are insufficient allegations that the parties to the agreement intended to benefit SAP AG. The R&R accordingly recommended that the Court dismiss Hodell's claim for breach of the License Agreement as to SAP AG only. (R&R at 13-15).

Hodell contends that the magistrate judge erred by engaging in factfinding and by disregarding the sufficient allegations in the complaint. This objection is without merit and therefore overruled. Hodell has not adequately alleged facts supporting the conclusion that SAP America had actual or apparent authority to enter into the License

-8-

Agreement on behalf of SAP AG. Hodell's contention that SAP AG is an intended third party beneficiary, and therefore somehow liable on the contract, is similarly deficient. As already noted, the authority on this legal theory is sparse at best, and the Court finds it distinguishable in this instance.

### C. Negligence

The magistrate judge recommended dismissal of Hodell's negligence claim on the ground that it is foreclosed by the economic loss rule. "The economic loss rule generally prevents recovery in tort of damages for purely economic loss." Corporex Dev. Constr. Mgmt. v. Shook, Inc., 838 N.E.2d 701, 704 (Ohio 2005). Because Hodell did not plead damages other than economic harm – such as those to person or property – the magistrate judge determined that Hodell failed to state a plausible negligence claim.

Hodell objects, contending that it "is not required to plead the precise amount, or nature, of its damages in its Complaint." Hodell supports this argument by citing Federal Rule 54(c), which provides that, except in the case of default judgment, "[e]very other final judgment should grant the relief to which each party is entitled, even if that party has not demanded that relief in its pleadings." (Doc. 53 at 8).

This objection has no merit. Rule 54(c) provides that the Court may grant relief beyond what a plaintiff initially sought in its complaint, but this does not mean that Hodell need not properly plead negligence damages. Pursuant to Rule 8(a), Hodell must still present a plausible claim for relief. Hodell pleaded economic losses in the complaint but alleged no damage to person or property. As the magistrate judge correctly concluded, a claim for negligence is not cognizable where the recovery sought

is for economic losses.  See Queen City Terminals, Inc. v. Gen. Am. Transp. Corp., 73 Ohio St.3d 609, 653 N.E.2d 661, 667 (1995).  Hodell's objection is therefore overruled.

### E. Fraud, Fraud in the Inducement, and Negligent Misrepresentation

The magistrate judge recommended denying the SAP defendant's motion to dismiss as to Hodell's fraud, fraud in the inducement, and negligent misrepresentation claims.  The magistrate judge rejected the proposition that these claims are foreclosed by the economic loss doctrine.  The magistrate judge interpreted the Ohio Supreme Court's holding in Corporex, as it relates to the economic loss doctrine, as limited to negligence claims.  Doc. 50 at 19; See Corporex Dev. Constr. Management v. Shook, Inc., 835 N.E.2d 701, 704 (Ohio 2005) ("[t]he well-established general rule is that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensible").  That is, Corporex only went so far as to foreclose recovery of economic loss in a negligence case.  The magistrate judge further noted a number of federal court decisions that refused to extend the economic loss rule to other torts under Ohio law, such as negligent misrepresentation.  Doc. 50 at 20; See Long v. Time Ins. Co., 572 F.Supp.2d 907, 912 (S.D. Ohio 2008); Lee v. Dublin Manor Corp., 2007 WL 2259190 (S.D. Ohio Aug. 3, 2007); J.F. Meskill Enters., LLC v. Acuity, 2006 WL 903207 (N.D. Ohio Apr. 7, 2006).

The magistrate judge then concluded that "it would be inherently inconsistent to find that negligent misrepresentation claims survive the economic loss doctrine while fraud or fraud in the inducement claims do not."  The economic loss rule, he reasoned, prevents tort recovery for breach of a duty assumed under a contract.  Because the claims of fraud and fraudulent inducement relate to a duty that arises outside of the

formation of a contract the economic loss rule should not apply.  This Court agrees with the magistrate judge in this instance and the other courts that have reached the same conclusion.  See R&R at 20-21; Marine Direct v. Doughtery Marine, Inc., No. 2:06-cv-0100, 2007 WL 81842, at *2 (S.D. Ohio Jan.8, 2007); Onyx Envir. Servs., LLC v. Maison, 407 F.Supp.2d 874, 879 (N.D. Ohio 2005).

The SAP defendants do not appear to question the general proposition that claims of negligent misrepresentation, fraud, and fraudulent inducement can survive the economic loss rule.  They contend, however, that in this instance these tort claims must be dismissed because the damages alleged are entirely duplicative of Hodell's alleged contract damages.  SAP relies on Medical Billing, Inc. v. Medical Mgmt. Sciences, Inc, 212 F.3d 332, 338 (6th Cir. 2000), which held that an award of damages "arising from the fraudulent inducement must be separate and distinct from the damages awarded [for breach of contract]."

This argument has no merit.  With entry of the present opinion and order, Hodell's breach of contract claims relating to both the Development and License Agreements against SAP AG will be dismissed.  Its contract claim relating to the Development Agreement against SAP America will also be dismissed.  This forecloses the possibility of any duplicative damages on these claims.  This leaves Hodell's breach of contract claim relating to the License Agreement against SAP America, but, with respect to this claim, Medical Billing is inapposite.  In Medical Billing, after a trial on the merits, the district court was reversed for awarding fraudulent inducement damages that were duplicative of an award of contract damages.  Unlike Medical Billing, this matter has not proceeded beyond the pleading stage.  "[T]he mere existence of a

-11-

plaintiff's inchoate cause of action against one party for breach of contract does not foreclose an action in tort against another party for all damages suffered by reason of the latter's inducement of such a breach." Davison Fuel & Dock Co. v. Pickands Mather & Co., 376 N.E.2d 965, 968 (Ohio Ct. App. 1977).  Of course, should Hodell ultimately prevail on any of its tort claims, its recoverable damages would be limited to those separate and distinct from any awarded on its claim for breach of contract.  See Medical Billing, 212 F.3d at 338.

SAP America also argues that the magistrate judge erred because a negligent misrepresentation claim cannot survive where the litigants are commercial parties in privity.  SAP America argues that in Ohio where there is a written contract between sophisticated parties, and the plaintiffs seek recovery for economic loss alone, their remedies are limited to those available under contract law.  (Doc. 52 at 5).  SAP America relies on 425 Beecher, LLC v. Unizan Bank, which states that "[w]here the parties are sophisticated business entities that have contracted to protect against potential economic loss, contract principles override the tort principles embodied in [Restatement of Torts] Section 552, and economic damages are not recoverable except as provided in the contract or by the rules of contract interpretation."  425 Beecher, LLC v. Unizan Bank, 927 N.E.2d 46, 59 (Ohio Ct. App. 2010).

Despite this language, 425 Beecher also makes clear that a tort claim for economic damages between sophisticated parties in privity is not necessarily foreclosed by the existence of a contract.  Such a tort claim can "exist independently of the contract action 'only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed.'" Id.

-12-

(quoting Textron Fin. Corp. v. Nationwide Mut. Ins. Co., 684 N.E.2d 1261, 1270-71 (Ohio Ct. App. 1996)).

Therefore, the fact that Hodell and SAP America appear to be sophisticated parties in privity of contract is insufficient to warrant dismissal of Hodell's tort claim for economic damages.  As long as Hodell's negligent misrepresentation claim, otherwise properly pleaded, invokes a duty that exists independent of the contract, it can survive a motion to dismiss.  In its complaint, Hodell alleges that "[i]n the course of their business, the defendants supplied false information to Hodell-Natco with respect to the capabilities of SAP Business One which information was supplied to Hodell-Natco for the guidance of Hodell-Natco in its purchase of business software."  (Doc. 26, ¶92).  It is not apparent, and SAP America does not argue, that the duty associated with this claim is one that arises, or could arise, from the parties' contractual relationship.  See Air Prods. and Chemicals, Inc., v. Eaton Metal Prods., 256 F.Supp.2d 329, 336 (E.D. Pa. 2003) ("it is impracticable, if not impossible, for parties to negotiate terms regarding what happens if one of them is intentionally deceiving the other").  Therefore, the existence of a contract does not foreclose Hodell's negligent misrepresentation claim.

The question remains, however, whether Hodell's negligent misrepresentation claim is otherwise adequately pled.  The SAP defendants' only argument on this point is that Hodell did not plead facts to support the existence of the requisite "special relationship" between Hodell and the SAP defendants.  (Doc. 52, at 7-8).  The SAP defendants cite a number of federal court decisions interpreting Ohio law, which have concluded that "[a] core requirement in a claim for negligent misrepresentation is a special relationship under which the defendant supplied information to the plaintiff for

the latter's guidance in its business transaction." Hayes v. Computer Associates Intern., Inc., 2003 WL 21478930, at *6 (N.D. Ohio 2003) (citing Picker Intern., Inc. v. Mayo Found., 6 F.Supp.2d 685, 689 (N.D. Ohio 1998).  "This relationship occurs only in 'special' circumstances.  Usually the defendant is a professional (e.g., an accountant) who is in the business of rendering opinions to others for their use in guiding their business, and the plaintiff is a member of a limited class." Picker Intern., 6 F.Supp.2d at 689.

The "special relationship" requirement imposed by these courts does not appear to be a formal element of the tort of negligent misrepresentation, as that tort is defined in Ohio.  The Ohio Supreme Court has spoken on the sort of relationship required, explaining that liability for negligent misrepresentation is limited to "the person or one of a limited group of persons for whose benefit and guidance [the defendant] intends to supply the information or knows that the recipient intends to supply it." Gutter v. Dow Jones, Inc., 490 N.E.2d 898, 900 (Ohio 1986); accord Haddon View Inv. Co. v. Coopers & Lybrand, 436 N.E.2d 212 (Ohio 1982).

On this point, Hodell has pleaded sufficient facts to survive a motion to dismiss. Drawing all reasonable inferences in favor of Hodell, the complaint contains numerous allegations making it plausible that the SAP defendants intended to supply information for Hodell's benefit and guidance.  Hodell's complaint states that it "expressly communicated its user capacity and other needs to all potential vendors, including the named Defendants."  (Doc. 26, ¶17).  Its needs included dealing with "a major software vendor with a high level of expertise, and a proven product supported with and by expert channel partners."  (Doc. 26, ¶16) (emphasis in original).  In turn, the SAP

-14-

defendants, either directly or through their agents, allegedly provided Hodell with information touting the software's capabilities and SAP and its partners' qualifications and resources.  (See Doc. 26, ¶¶18, 19, 21, 22, 24-26, 28, 36-39). The SAP defendants' objection is therefore overruled.

### E. Punitive Damages

Finally, the SAP defendants object to the magistrate judge's recommendation to deny their request to strike Hodell's prayer for punitive damages.  Under Ohio law, punitive damages may be awarded in tort actions that involve fraud, actual malice, or insult.  Preston v. Murty, 512 N.E.2d 1174, 1175 (Ohio 1987).  As stated by the magistrate judge, "pleading standards are not so onerous as to require a party to prove every element of its prayer for damages before any discovery has been conducted." The SAP defendants' objection is therefore overruled.

### V. Conclusion

The parties' objections are overruled and the report and recommendation is hereby adopted.  The SAP defendants' motion to dismiss the amended complaint is granted in part and denied in part, in accordance with the report and recommendation.


IT IS SO ORDERED.

    /s/ Lesley Wells  
UNITED STATES DISTRICT JUDGE

Date:  2 June 2011