**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HODELL-NATCO INDUSTRIES, INC. | ) | CASE NO.: 1:08 CV 2755 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE WELLS |
| vs. | ) | |
| | ) | |
| SAP AMERICA, INC., et al., | ) | **MOTION FOR SUMMARY JUDGMENT** |
| | ) | **OF DEFENDANTS, LSi-LOWERY** |
| Defendants. | ) | **SYSTEMS, INC.  AND THE IBIS GROUP,** |
| | ) | **INC** |
| | ) | |
| | ) | |

Now come Defendants, LSi Lowery Systems, Inc. and The IBIS Group, Inc. (together hereinafter referred to as LSi/IBIS), pursuant to Fed. R. Civ. P. 56, to move this Court for Summary Judgment dismissing Plaintiff's claims against them.  There is no genuine issue of material fact to support allegations against them and therefore, they are entitled to judgment as a matter of law.  In general, to be discussed more fully in the attached Memorandum,

1)      As to the two fraud claims, LSi made no representation known by it to be false that was relied upon by Plaintiff.

2)      As to the breach of contract claim, LSi performed the terms of the contract required of it, notwithstanding the fact Plaintiff claims to be unhappy with the result.

3)      The negligence claim should be dismissed for the same reason this court dismissed the same claim against SAP, in that Ohio law does not

recognize a negligence claim for economic loss when there is a contract creating the duties between the parties. In addition, there is no evidence that LSi was negligent in any respect, including the claim that it negligently misrepresented any fact upon which Plaintiff relied to its detriment in this case.

The reasons for this Motion are more fully set forth in the Memorandum in Support attached hereto and incorporated herein by reference.

Respectfully submitted,

/s/  Roy A. Hulme
ROY A. HULME (0001090)
REMINGER CO., L.P.A.
101 West Prospect Avenue, Suite 1400
Cleveland, Ohio  44115
Phone: 216/430-2135 Fax: 216/430-2250
E-Mail: rhulme@reminger.com
Attorney for LSi Lowery Systems, Inc. and
The IBIS Group, Inc.

## MEMORANDUM IN SUPPORT

### I.    INTRODUCTION

This case arises out of a business relation that the parties entered for purpose of developing software for Plaintiff's business.  (Am. Compl., ECF No. 26; Ex. "D-G", ECF Nos. 26-4 to 26-7.) Plaintiff brought five claims against LSi/IBIS: (1) Fraudulent Inducement; (2) Fraud; (3) Breach of Contract; (4) Negligence; and (5) Negligent Misrepresentation. (ECF No. 26.)  The same claims were made against the two SAP entities. For reasons that apply equally to LSi/IBIS, this court dismissed the Negligence claims upon SAP's Motion to dismiss. (Sept. 2, 2010 Report and Recommendation of Magistrate Judge Greg White, ECF No. 50 at 21, adopted in June 2, 2011 Mem. Op. and Order, ECF No. 61 at 9-10.)

The evidence is undisputed that Plaintiff was at all times aware that the representations to which Plaintiff now points as forming the basis of its fraud claims were all based upon information supplied by SAP or upon information supplied by another agent of SAP. Thus, Plaintiff was aware that they were not relying upon any independent representations of LSi/IBIS. In addition, it is undisputed that both Hodell and LSi/IBIS were being told the same things by SAP so even if those statements were false and were relied upon by Plaintiff, there is no evidence those representations were known by LSi/IBIS to be false. Based upon information supplied by SAP, Plaintiff and LSi/IBIS entered into a joint development agreement wherein together they would create an add-on to the SAP program.  The add-on would enhance and adapt the SAP program to the functionality desired by Plaintiff. If successful, Plaintiff would use the program and Plaintiff and LSi/IBIS would share in the revenues from sales or licensing of the software solution to others in the fastener industry. Pursuant to the development agreement,

3

LSi/IBIS agreed to provide the service of both developing the add-on and facilitating purchase of the license for the SAP software by Plaintiff, and did so.

It is important to note that during the discovery stage of this litigation, no one with any of the requisite qualifications, including experts retained by Plaintiff and SAP, has expressed any opinions that anything LSi/IBIS did or did not do as part of the contract negotiations deviated from the standard of ordinary care for a software developer, or that LSi/IBIS was negligent in its pre-contract actions.  Finally, this court has already ruled that in a commercial setting such as this, with only economic damages claimed, Plaintiff cannot bring a negligence claim. Accordingly, Defendants are not liable to Plaintiff on any of the causes of action asserted against them in the Amended Complaint.

## II.    STATEMENT OF FACTS

Plaintiff is a Cleveland-based company involved in the business of wholesale distribution of fasteners and chain products. (Am. Compl. ¶ 9.) Prior to any events underlying this litigation, Defendant IBIS (originally owned by Dale Van Leeuwen), was supporting Plaintiff's computer software system. The system, a product named FACTS assisted Plaintiff in keeping track of invoicing, billing, and providing accounting functions. In order to make FACTS more useful for Hodell and the fastener industry for inventory management, Mr. Van Leeuwen had developed an "add-on" inventory management system named In-Flight for FACTS. (Lowery Dep. 28:11[1].) A second add-on, Radio Beacon, improved the warehouse management functions of FACTS. (Dale Van Leeuwen Dep. 14-20; Ross Elliot Dep. 10:23-12:23.)  Those programs had worked successfully for years.  The current lawsuit concerns a

---

[1] Due to a large number of depositions in this case, for purpose of brevity, repeated citations to depositions have been abbreviated as "deponent's last name [space] page number."

4

system that was intended to replace FACTS in 2007.  The new system is an SAP product, called Business One.

Hodell began looking for a software package to replace FACTS well before letting Mr. Van Leeuwen of IBIS know about Business One. In particular, Otto Reidl, who, along with his son Kevin Reidl, owned and operated Hodell, had researched various software solutions on their own.  For example, in 1998 one of Hodell's IT people and Otto Reidl visited Prophet 21 headquarters in Pennsylvania. In 1998, they visited the Software Solution headquarters in Georgia to look at their program. In 2000, they visited Computer Insight's headquarters in Chicago to see their software. In 2002, they spent three days at IBIS looking again at the Software Solution product. In 2002, they had another session with Prophet 21. In 2002, they looked at another product, and by 2003 they had narrowed their choices. (Otto Reidl Dep. 79-83.)

At some point, Hodell started looking at the Business One program. (O. Reidl 51:7.) They first encountered Business One in early 2003, at a Microsoft-sponsored conference in Cleveland where American Express Business Tax Service had a booth marketing SAP. American Express was then a "Channel Partner", also known as a "value added reseller" of SAP. Shortly after the conference, American Express contacted Hodell with an offer to sell SAP Business One. (O. Reidl, 83:16.)

As a background, there is no dispute that Business One had been originally developed by an Israeli company, Top Manage. Some time in the early 2000's, SAP purchased Top Manage and rolled its product out as Business One in the United States. (Lowery 34:5-13; Udi Ziv Dep. 14:1-5.)  According to SAP's marketing literature at the time it was introduced in the United States, "Thousands of businesses in 15 countries were already running Business

One…". (Am. Compl. Ex. A, at 1 & 3.) SAP was well known for its Enterprise Resource Planning (ERP) software. It marketed itself as a worldwide leader in ERP software. SAP brought Business One to the United States in 2003, desiring to enter the small to midsize market for ERP software. (Kraus Dep. 13.)  For the purpose of expansion, in March 2003, Mr. Daniel Kraus was hired by SAP, as one of the three original employees hired to build the distribution system and take the product to market in the United States. (Kraus 13:13-14:5.)

After being introduced to Business one at the Microsoft trade show and by American Express, Mr. Reidl familiarized himself with the product. He became excited about it. He obtained literature on it, and began working with American Express to evaluate the appropriateness of Business One for Hodell. The following are examples of the research done by Hodell, *independent of any involvement by LSi/IBIS*:

1)      Amended Complaint Exhibit A referenced at paragraph 18 of Complaint is the SAP Business One brief given to Hodell probably by American Express in 2003. (O. Reidl 129:7 – 130:12). That document represents that Business One helps emerging businesses, those with 10 to several hundred employees. (O. Reidl 130:14 – 132:15).

2)      Amended Complaint Exhibit B is a document received from American Express. It represents that Business One is specifically designed for the small and midsized businesses (SMB). (O. Reidl 135-36.)

3)      Amended Complaint Exhibit C is a white paper received from American Express on October 16, 2003. (O. Reidl 140.)  It represented that SAP Business One was for small and medium-sized businesses. (O. Reidl 142.) That document represents that "an unlimited number of simultaneous user transactions" is supported. (Ex. C, at p. 18 of 30.)  This document is one of a series Hodell relied upon in purchasing the product. (O. Reidl 143.)

4)     On October 20, 2003, Hodell participated in an online Webinar that was presented jointly by SAP and American Express. (O. Reidl 152.)

After consulting with American Express and doing some research on his own, Otto Reidl contacted Dale Van Leeuwen of IBIS and expressed his excitement about this new SAP product.  (Dale Van Leeuwen Dep. 27:25-28). At that point, Mr. Van Leeuwen contacted Dan Lowery, owner of LSi-Lowery.  Mr. Van Leeuwen and Dan Lowery were both supporters of the FACTS programs and knew each other from the trade. Both were looking for the next new technology beyond FACTS. (Van Leeuwen 25:19-29:14; 30.) Prompted by the call from Hodell, they both became excited about the possibility of representing the world-renowned heavyweight in the ERP world, SAP. They had conversations with and reviewed SAP information, and were especially intrigued by the fact that Business One was targeting the small to medium-sized market, as that was also the market of both IBIS and LSI. Mr. Van Leeuwen and Mr. Lowery also began discussing the possible combination of their two complementary companies, IBIS who was strong in the fastener industry, having developed the In-Flight add-on for FACTS and LSI Lowery who was strong in the equipment rental business. (Van Leeuwen 28:18-29:14.)

As part of his due diligence in becoming a Channel Partner for SAP, Mr. Van Leeuwen traveled to Atlanta, Georgia to meet with SAP personnel. Mr. Van Leeuwen went to that meeting armed with specific information on the needs of Hodell to evaluate whether Business One might be a fit for Hodell and therefore, a good fit for IBIS and LSi Lowery. (Van Leeuwen 29:15-30:24; 35:16-37:14; 204:11-206:9.)   He was assured at that meeting that it was, confirming what Otto Reidl had concluded from his independent investigation and work with American Express. (Van Leeuwen 53:10-25.) Accordingly, both IBIS and LSi became Channel

Partners of SAP to both sell and develop add-ons to Business One. LSi then purchased IBIS from Mr. Van Leeuwen as a wholly-owned subsidiary and employed Mr. Van Leeuwen and his employees. (Lowery 30-32.)

Of importance to this case, SAP considered a small business to be $10-50 million in revenue and midsized businesses to be $50-500 million. (Geoffrey Ashley 230). SAP marketing literature told both potential customers *and SAP's partners* that "…the general target market for Business One is any small and medium size business between 5 and 500 users." (Ex. 14; Ex. 36.[2]) This SAP literature and the information passed along by American Express to Hodell demonstrated that Business One was a good fit for Hodell. Between 2002 and 2007 Hodell's sales ranged from $25 million up to as high as $40; this number increased to $43 million in the year after installation of the software that is the subject of this lawsuit. (Ex. 24.) Hodell had 137-186 employees during this same time. (Ex. 25.) As such, Hodell's numbers of employees and revenues fit well within the target market and representations of SAP as to who could use Business One. Mr. Ashley, who was Director of Channel Sales for Business One in the U.S. agrees and testified that Hodell-size companies were the target for Business One. (Ashley 231.) Dan Kraus, of Hodell, confirmed this to Dale Van Leeuwen in January 2004 at an SAP conference in Las Vegas. (Van Leeuwen 197:20-203:23.) Nothing in the record suggests that either Hodell or LSi/IBIS had any reason to think otherwise.

Based upon the representations of SAP as to the capabilities of Business One, Hodell decided to purchase Business One to replace its FACTS system. As part of that package, Hodell also wanted the warehousing capabilities provided by Radio Beacon, and the inventory

---

[2] All of the numbered Exhibits used herein have been previously identified and used during the depositions in this case. For purposes of this Motion, this Exhibit numbering system will continue. Relevant pages of the cited Exhibits are attached to this Motion. Lettered exhibits are from the Amended Complaint, with copies also attached to this Motion.

management capabilities of In-Flight—the two systems previously used with FACTS. It is also undisputed that SAP authorized and encouraged its Channel Partners to develop extensions or add-ons for Business One. (Lowery 64:9-66:9, 78:11-81:18.)

To memorialize Hodell's decision to install Business One with In-Flight, Hodell and LSi/IBIS entered into a contract, the Development Agreement attached to the Amended Complaint as Exhibit D. (O. Reidl 160:5-161:19.) Although there was an In-Flight add-on for FACTS, LSi/IBIS had to write the code from scratch for Business One. (Lowery 29:15-30:15.) President of Hodell, Mr. Reidl, understood that In-Flight for Business One did not yet exist and would be developed specifically for their installation. (O. Reidl 161:21-162:25.)

The Development Agreement between Hodell and LSi/IBIS called for three things: (1) the delivery of 80 SAP Business One software licenses to Hodell; (2) the development of the software add-on, eventually known as In-Flight Enterprise, for Business One; and (3) unlimited licenses for In-Flight. (Am. Compl. ¶ 75.) Otto Reidl both read and understood the terms of this agreement before he signed it. (O. Reidl 93:5-23; 101:13.) There was no performance guarantee written into the contract; there were no warranties and no promises other than for (1) the In-Flight development; (2) delivery of the SAP licenses; and (3) unlimited licenses for In-Flight. (As there has never been a complaint that Hodell did not or would not have received unlimited licenses for In-Flight this third requirement will be ignored for the rest of this Motion.) LSi/IBIS and Hodell further agreed that Hodell would fund the development by, essentially, pre-paying for the Business One licenses in stages as the development progressed, but only so long as Hodell was satisfied with the progress of the development and implementation. (Ex. 10.) When completed, it was the intent of both Hodell and LSi that LSi would market the In-Flight/Business One package to others in the fastener industry and that Hodell would share in

the software licenses sold for the In-Flight/Business One package to others. (O. Reidl 164:16 - 166:7.)

Mr. Van Leeuwen's role was to design In-Flight and, along with Hodell, develop the workflow processes that In-Flight was to have. (Joseph Guagenti Dep. 12.) Mr. Guagenti and another individual, Eric Johnson, were the two LSi programmers primarily responsible for "coding" i.e.: the actual writing of the code to create the In-Flight program and integrate it with Business One. (Guagenti 10-11, 12; Johnson 10 – 12)   Marcia Weissman, LSi/IBIS's Implementation Consultant, worked with Hodell (1) to determine its specific business needs and (2) to determine how the program package was to meet those needs, and (3) to write up specifications for the programmers to code to meet those needs. She also provided training before implementation of the program at Hodell and assisted with implementation, troubleshooting and training after implementation. (Weissman 11:16-12:16; 23:20-25:22.)

The development stage lasted for over two years, from the date the Development Agreement was signed in December 2004 and the "go live" implementation at Hodell in early March 2007.  This phase included software testing by LSi in-house, interaction between LSi and Hodell regarding functionality and the desired functions, and on-site load testing by Hodell. (Weissman 25:7-27:6.)  Hodell was to perform multiple "live stress tests "on the software as it was being developed.  These tests were done at the direction of LSi/IBIS, but they were actually performed by Hodell employees, on Hodell computers, using Hodell's data, exactly as Hodell would run the day-to-day business. (Weissman 27:14-28:18, 36:11-40:12; Guagenti 68:22- 71:7; Kevin Reidl 281:2-285:27; 299:12- 300:8.) The purpose was to make sure Hodell was satisfied that the system being developed had reached the functional point that it could be used effectively at Hodell, before switching the Hodell operations from FACTS to

Business One. (Jon Woodrum Dep. 202:19-203:21; Ex. 55; Terry Phillips Dep. 26:5-28:1, 94:12-95:24; Ex. 57, Jan. 12, 2007 Woodrum email; Ex. 58, Jan. 16, 2007 Lowery email.) By March of 2007, Hodell and LSi/IBIS agreed that the program was functioning sufficiently well in the load testing done by Hodell at Hodell, that it was time to "go live". (O. Reidl 434:4; Terry Phillips 26:15-28:1.)  The program went live in March 2007 and was in operation for two years, until Prophet 21 went live. (K. Reidl 131:17-132:9; 147:22-24; Jay Shelton 23:20-24:18)

The primary complaint that gave rise to this lawsuit is the slow speed with which Business One works and processes orders at Hodell—a problem that occurred immediately upon the program going live. (Am. Compl. ¶49 (a); Lowery 4/11/07 email to Udi Ziv, Ex. 69; Ex. 91.)  Hodell began complaining of the performance, alleging the system operated slowly, particularly with larger orders. Ultimately, in part through this litigation, LSi and Hodell have discovered that the performance problems complained of by Hodell result from two particular limitations of Business One.

The first problem is that the portal through which SAP requires the add-on to access Business One was "too small" to handle the amount of information and users at Hodell. (Neveux 97-99; 94:18-96:5.) As explained by Eddie Neveux—SAP's Business One Solution Architect, LSi/IBIS was required to use this portal, technically known as the DI API (Data Interface- Application Programing Interface) and UI API (User Application Interface). (Neveux 125:9-126:12.) SAP expressly confirmed that this access point was a problem to Ross Elliott of Radio Beacon.  Radio Beacon, who also had performance issues during development, was then given permission to access Business One by bypassing the DI API. Confirming that this aspect of the SAP program was one of the problems, performance improved when Radio Beacon worked around the bottleneck of the DI API. (Ross Elliott Dep. 35; 48-49; 165-166.)

Second, unbeknownst to LSi/IBIS and contrary to the representations of SAP, the Business One core product was not robust enough to handle the number of users, transactions, documents and other usage criteria of Hodell, and was outside the range of any testing or other installation by SAP. (Neveux 61, 103; Eric Johnson 52-59:15; Ex. 69; Ex. 159; Ex. 161; Ex. 162.) None of this was ever disclosed to either LSi or Hodell prior to this litigation. (Johnson 52-59.) While Mr. Guagenti testified that during development In-Flight initially caused slowdowns because of the way they had programmed it to communicate through the DI API, they were able to improve performance by implementing different techniques, essentially working around the characteristics of the DI API. (Guagenti 57-58.)

What Mr. Guagenti did not know (because SAP did not give them access to the SAP code), was that *the SAP development team, Ralf Mehnart-Meland, Eddie Neveux, and Udi Ziv knew that it was problems with the DA API and the Business One software package itself that was causing the problem*. (Guagenti. 215 – 216, 217 – 218, 220 – 223, Exhibits 78, 157, 159, 161, 162; Guagenti 199 – 200.)  On April 12, 2007 Udi Ziv, authored an internal SAP email, Exhibit 69 that concluded that Hodell is "WAY above any sane sweet spot (120 users!!!), and are obviously experiencing severe performance issues." (Emphasis in the original). Mr. Ziv was responsible for overseeing the development of the Business One Product. (Ziv 16:21-17:6, 39:16.) He was General Manager of SAP Labs in Israel, which was the development or R & D lab for SAP. He was also the General Manager of Small Business Solutions for SAP. (Ziv 26, 12:21-13:4.) If anyone should know the cause of the performance issue complained of by Hodell in this case, it would be Mr. Ziv. There is no doubt, based upon the undisputed evidence in this case, but that the cause of the problems complained of by Hodell is the Business One product itself.

It is apparent from a review of the facts that LSi only became aware of the inherent limitations of Business One as a result of this litigation, leading to the inevitable conclusion that LSi cannot be found liable for fraud or fraudulent inducement in this case. In addition, reasonable minds could come to no other conclusion but that LSi did, in fact, perform as required by the bare bones Development Agreement, the only contract between LSi IBIS and Plaintiff. Lastly, as to the two negligence claims: (1) the general negligence claim should be dismissed for the reasons that this Court has already dismissed the negligence claim against SAP, and (2) there is no evidence to support either a duty or negligence in any pre-contract negotiations of the Development Agreement.

III.  **LAW AND DISCUSSION**

**Summary Judgment Standard**

The purpose of summary judgment is "to eliminate a trial where it would be unnecessary and merely result in delay and expense." *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319, 1324 (6th Cir. 1983).  "The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Provenzano v. LCI Holdings, Inc.,* 663 F.3d 806, 811 (6th Cir. 2011) (internal quotation marks omitted).  Summary judgment is proper when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 229 (6th Cir. 1990).

In defining the term "material fact" in the summary judgment context, the United State Supreme Court has stated that "the substantive law will identify which facts are material.  Only disputes or facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If

13

the non-moving party fails to prove the existence of an element essential to that party's case, there can be no genuine issue as to any material fact and all other facts are rendered immaterial. *Celotex v. Catrett*, 477 U.S. 317, 322 (1986).

The burden of proving that there is no genuine issue of material fact rests on the moving party. *Provenzano,* 663 F.3d at 811.  In deciding a summary judgment motion, the court will construe the evidence of the nonmoving party as true and will draw all reasonable inferences in favor of the nonmoving party—in this case, Plaintiff.  *Enertech Elec., Inc. v. Mahoning Cnty. Comm'rs,* 85 F.3d 257, 259 (6th Cir. 1996); *Savage v. Gee,* 665 F.3d 732, 737 (6th Cir. 2012).  Therefore, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment is proper.  Fed. R. Civ. P. 56(a).  Such is the case here.

### A. Plaintiff's Fraud Claims Fail Because LSi and IBIS did not Represent any False Material Facts to Plaintiff with Knowledge of their Falsity and it was Representations of SAP and American Express, not LSi upon which Plaintiff Relied in Choosing the Business One Program.

Plaintiff's first and second causes of action are fraudulent inducement and fraud.  (ECF No. 26 ¶¶ 55-73.)  Because the elements for both claims overlap, Defendants will analyze both claims together.  The burden on Plaintiff in proving a fraud claim is high. In *Lincoln Electric v. Technitrol*, 2010 U.S. Dist. Lexis 194010, Judge Gaughan outlined the burden applicable to the claims by Hodell against LSi/IBIS:

> When pleading fraud**,** Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." It is well-settled in the Sixth Circuit that circumstances constituting fraud include "the time, place, and content of the alleged misrepresentation" as well as the identity of the individual making the representation. *United States v. Ford Motor Credit Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (internal quotations omitted); *Sogevalor, SA v. Penn Central Corp.*, 771 F. Supp. 890, 893 (S.D. Ohio 1991) (citing *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988)).

\*          \*          \*

To properly assert a claim for fraudulent inducement, plaintiff must allege (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent to induce reliance on the representation; (5) justifiable reliance on the representation or concealment; and (6) resulting injury proximately caused by such reliance. *Magical Farms, Inc. v. Land O'Lakes, Inc.*, No. 07-3568, 356 Fed. Appx. 795, 2009 U.S. App. LEXIS 26768, at \*19, 21-22 (6th Cir. Dec. 8, 2009) (citing *Burr v. County Comm'r of Stark County*, 23 Ohio St. 3d 69, 23 Ohio B. 200, 491 N.E.2d 1101, 1105 (1986) and *Yo-Can, Inc. v. Yogurt Exch., Inc.*,149 Ohio App. 3d 513, 2002 Ohio 5194, 778 N.E.2d 80, 89 (Ohio Ct. App. 2002)). *See also Onyx Environmental Svcs., LLC, v. Maison*, 407 F. Supp. 2d 874, 878 (N.D. Ohio 2005) (elements of fraudulent inducement are essentially the same as elements of fraud)**.**

First, the specific circumstances claimed to constitute fraud by LSi/IBIS are not pled or alleged with sufficient specificity to meet the burden required. Those claims as alleged against these moving parties should be dismissed for that reason alone. Second, the undisputed facts in the case can lead to no other conclusion but that even under the broad allegations of the Amended Complaint, Plaintiff has no claim of fraud against LSi/IBIS.

The fraudulent misrepresentations alleged to have been made by "Defendants" are at ¶¶ 56 and 67 of the Amended Complaint. (There are other more specific allegations elsewhere in the Amended Compliant but they are against the SAP defendants only.) Those alleged misrepresentations are:

"SAP Business One was suitable for companies with hundreds of employees, that SAP Business One was suitable for 250 users, that SAP Business One had been successfully installed in hundreds of similar companies, and that SAP could provide industry-specific high level support."

15

(Am. Compl. ¶ 56.)

The record is replete with evidence that supports dismissal of the Fraud claims against LSI/IBIS because there is no evidence from which reasonable minds can conclude:

1)    That LSi/IBIS made any independent representations of its own regarding the quality or capacity of Business One;    (Fraud element #1)

2)    That LSi/IBIS passed on any of the information from SAP with knowledge that the information was false;    (Fraud element #3)

3)    That it was anything other than Hodell's own independent investigation and past experiences with In-Flight for FACTS that lead to Hodell's decision to purchase.    (Fraud element #5]

The figures regarding numbers of users alleged to be misleading all came from SAP, and were known by Hodell to have come from SAP. The communications from LSi/IBIS to Hodell contained the SAP partner logo. The marketing literature was SAP's marketing literature. Everyone in this case knew that the source of all performance information understood the information was from SAP and that LSi/IBIS was learning about Business One right along with Hodell. (Lowery 55:17-59:8; O. Reidl 47:24-49:23.) SAP authorized the use of its name in LSi's letterhead with the intent to communicate the partnership arrangement between LSi and SAP for the marketing and sale of Business One. When statements were made by LSi, Hodell had every reason to know that the statements were coming from SAP. (Lowery. 57-59.) Information regarding the capabilities of Business One came from literature such as Exhibits 35, 36 & 37. (Van Leeuwen Depo. 90-94.) Exhibit 36 evidences the fact LSi was advised that the program was suitable for companies with five employees or 500 employees. (Lowery 117-118.) That Exhibit is an example of SAP literature that led to LSi's confirmation

of the information that had been previously communicated to Hodell by American Express. (Lowery 119.) Exhibit 37 is another example, this one stating that Business One is ideally suited for companies with revenues up to $100 million or with up to 250 employees. (Lowery 121.)  Exhibit 37 also represents that Business One was appropriate for companies 5 to 500 employees. (Lowery 127-128.)

LSi/IBIS had no knowledge that any of the SAP representations were false. SAP told Mr. Van Leeuwen that Business One was appropriate for users of 3 to 500 and that there were customers in Europe running with over 300 users. This was in conformity with a document given to Otto Reidl by American Express and SAP which contained the same information. (Van Leeuwen 43-45.)  There is no evidence that LSi/IBIS had any reason to doubt these representations.

Not until this litigation did the LSi/IBIS defendants have any reason to suspect that the information upon which they entered a large business deal and which they passed along to others was not true.  The revelations contained in the Udi Ziv and Ralf Mehnert-Meland emails of April 12, 2007 (Ex. 69) and April 16, 2007 (Ex. 157), made 2 years into the development cycle and a month after installation, were never before communicated to LSi/IBIS staff. Both of the LSi/IBIS program developers and implementation manager have testified that capacity limitation information was never communicated to them until this litigation. (Guagenti Dep. 124:8 and 232:2-6; Weissman Dep. 127:9-128:4; Johnson Dep. 52:6-54:8.) It is also undisputed that these internally communicated opinions of the head of development, Udi Ziv, were not communicated in that unequivocal and straightforward way to Dan Lowery or LSi/IBIS until during this litigation. (Lowery 292:20-301:2; Ex. 69.)  The evidence unquestionably

demonstrates that to the extent that Hodell may have been misled into entering the deal with SAP, LSi/IBIS was misled to the same extent.  Both parties were expressly misled by SAP.

The actions of LSi/IBIS confirm this lack of knowledge of falsity.  The FACTS program that Mr. Van Leeuwen had been supporting at Hodell prior to Business One was limited from between 5 users to about 45 to 75 users. It would make no sense for Mr. Van Leeuwen to engage himself to SAP if he had not been told Business One could be used at much larger businesses. (Van Leeuwen Dep. 29-30.)  Mr. Leeuwen went to Atlanta with a very specific list of capacity-type questions about which to talk to SAP representatives.  He came back comfortable that Business One was appropriate for the Small to Midsize Business market into which Hodell fell. (Van Leeuwen 29, 35-37.)  Dan Lowery devoted thousands of hours to this project, which logically would not have been done had he known it was doomed to fail. (Lowery 299-301.) Eric Johnson, one of the programmers, testified that he was never told by SAP that the usage anticipated at Hodell was outside the bounds of anything SAP had tested. (Johnson 61; Ex. 94.)  Mr. Johnson testified that had he been told of the deficiencies in the SAP Business One product, he would not have continuously rewritten In-Flight. (Johnson 75.)  Mr. Johnson testified that 100% of his time during 2005, 2006, and 2007 was dedicated to developing the In-Flight program and integrating it with Business One, again something he would not have done had he been told of Business One's limitations. (Johnson 76-77.)  The other LSi programmer, Joe Guagenti would not have spent 100% of his time in 2005, 90% of his time in 2006, and 50% of his time in 2007, had he known of the Business One deficiencies. (Johnson 77.) Mr. Guagenti testified he "would have got a lot more sleep" if he had known Business One was not going to work for Hodell. (Guagenti 218:24-219:5.) There is no evidence

from with knowledge of falsity of any statement made by or passed along by LSi/IBIS can be found.

Finally, Plaintiff fails on its fraud claims because it cannot support the element of justifiable reliance on representations *made by LSi*.  In fact, the evidence shows that Plaintiff did independent research before entering the Development Agreement, even before contacting LSi/IBIS. After consulting with American Express and doing some research on his own, Otto Reidl contacted Dale Van Leeuwen, excited about this new SAP product. (Van Leeuwen 27:25-28.) Some of the investigation done and the results of that investigation are detailed in the Facts section of this Memorandum at pp. 5-7.  Plaintiff has presented no evidence of any representations separate and apart from those known by Plaintiff to have been made either by American Express (that also, presumably, came from SAP) or from SAP. As to In-Flight, Hodell needed no information; it has used the FACTS version for years.

While Mr. Reidl testified that both American Express and LSi told Hodell in a December 3, 2003 telephone conference that Business One would support up to 500 users. He also testified that Mr. Van Leeuwen identified the source of his information as SAP. He also testified that subsequently, Hodell, on their own, had documents indicating 500 employees. (O. Reidl 112:12; 113:13-114-116:18.) On December 19, 2003, representatives of American Express called Hodell and assured Hodell that SAP Business One had sufficient capacity to serve the business of Hodell and it was scalable up to Hodell's growth requirements for the next 10 years. This was a requirement spelled out to American Express during their December 3, 2003 meeting—well before the Development Agreement was signed. (O. Reidl 170:1-

171:1.) LSI's representations consisted of telling Hodell that they had documents from SAP that Business One could support up to 500 users. (O. Reidl 280.)

Plaintiff fails to establish the elements of fraudulent inducement and fraud as they relate to LSi/IBIS. For these reasons, Count I and II of the Amended Complaint fails as a matter of law with respect to these Defendants.

### B. **LSi and IBIS did not Breach the Development Agreement.**

Under Ohio law, the essential elements of a breach of contract claim are (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damage or loss to the plaintiff. *Bellas Co. v. Pabst Brewing Co.*, No. 11-3417, 2012 U.S. App. LEXIS 14422 (6th Cir. 2012) (citing *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 762 (6th Cir. 2008)). Hodell cannot establish the third element of the Breach of Contract claim because LSi/IBIS performed all obligations that they assumed in the Development Agreement.

The contract between Hodell and LSi/IBIS is attached to the Amended Complaint as Exhibit D. It is a two-page Development Agreement signed December 20, 2004 by Otto Reidl and read by him prior to signing. (O. Reidl 93:5-23.) The Development Agreement's Project Description was:

> "The *development* of the IBIS Group's In-Flight Enterprise application and its *integration* into SAP Business One Software for Hodell-Natco Industries, Inc." (*emphasis added*)

(ECF. No. 26-4.)

As is relevant to this case, there were only two things that were required of LSi/IBIS: (1) the delivery of 80 SAP Business One software licenses to Hodell and (2) the

development of the software add-on, eventually known as In-Flight Enterprise, for Business One. (*Id.*; Am. Compl. ¶ 75.)

LSi/IBIS did develop and deliver In-Flight for Business One and did provide Hodell with the requisite Business One licenses. They performed the contract requirements. There are no facts from which a reasonable jury could conclude that any requirement of LSi/IBIS imposed by the Development Agreement was not performed.

Mr. Reidl understood when he signed the Development Agreement that Business One was the product owned by SAP. He agreed that SAP would be providing the licenses for SAP Business One. (O. Reidl 101:13.) Specifically, Hodell would pay LSi and LSi would pay SAP for 80 user licenses of Business One in order to develop add-on to them and thereafter, make sure Hodell received those licenses. Mr. Reidl agrees that Hodell actually did receive the user licenses that it paid for. (O. Reidl 123:16-124:18.) Mr. Reidl also acknowledges that LSi/IBIS did integrate In-Flight into Business One. It was the integration that brought to the surface problems with the SAP Business One, and with the DI API, the data interface. (O. Reidl 182:25-183:3.)

As to the In-Flight add-on, no expert has testified or authored a report that it was in any way not delivered or would not have been appropriate if Business One had been able to  handle Hodell. In fact, the only testimony in the case relating to an evaluation of In-Flight was that SAP hired an outside contractor, one of its other channel partners to work with LSi and look at LSi's code. Apollo reported back to SAP that based upon the portions of the code that they reviewed, the coding was good. (Neveux 161:10.)

Plaintiff's additional allegations in the Amended Complaint of breaches of "implied warranties of merchantability and fitness for a particular purpose," found at ¶¶ 80-81 of the Amended Complaint, create no additional liability to these moving Defendants.

As a preliminary matter, as it relates to the Business One program, Plaintiff entered into a separate agreement with SAP that contains both warranties and limitations of warranties. (Am. Compl. Ex. G, ¶¶ 7 and 9.) It was clearly understood that as to that program, LSi/IBIS was acting in the capacity of a "disclosed principal." Under Ohio law, when an agent acts on behalf of a disclosed principal, that agent, LSi/IBIS in this case, is not personally liable on that contract. *Campbell v. Murdock*, 90 F. Supp. 297 (N.D. Ohio 1950); *Eaton v. Continental General Insurance Co.*, 147 F. Supp. 2d 829 (N.D. Ohio 2001); *Foster v. Lee Motors Inc.*, 102 Ohio App. 10 (6th Dist. Lucas Cty. 1956). In addition, Business One is the program that Plaintiff consciously chose, after performing extensive research and the program that Plaintiff presented to Defendants as the one upon which Defendants were requested to build their In-Flight application.  Their warranty claims as to Business One are with SAP.

As it relates to the development of In-Flight, the implied warranty theories of recovery are only applicate to the "sale of goods" not service contracts. For purposes of this motion only, however, it will be assumed that the development of a piece of software under these circumstances is governed by the UCC, Ohio Rev. Code Chapter 1302. Even if applicable,  Plaintiff cannot maintain the cause of action because (1) No warranty of merchantability is implied  when the goods are one-of-a-kind, new, or for which there is not yet a market to which to compare the good; (2) Even if a warranty of merchantability could be implied, the program was merchantable; (3) Since Plaintiff was not relying upon

LSi/IBIS for determining the appropriateness of the programs, there is no implied warranty of fitness; and (4) even if an implied warranty of fitness existed, there is no evidence that In-Flight was not fit.

It has been held that goods are not merchantable when they are "not of an acceptable quality *when compared to that generally acceptable in the trade for goods of the kind.*" *Price Bros. Co. v. Philadelphia Gear Corp.*, 649 F.2d 416, 424 (6th Cir. Ohio 1981) (citing Ohio Rev. Code § 1302.27 (Page) (Official Comment 2)) (emphasis added); *see also Global Shredding Techs., Ltd., L.L.C. v. Aggregates Equip., Inc.*, 2005 U.S. Dist. LEXIS 13428 (N.D. Ohio July 5, 2005) ("The implied warranty of merchantability contained in O.R.C. § 1302.27 requires that goods: '(1) pass without objection in the trade under the contract description; and. . . (3) are fit for the ordinary purposes for which such goods are used.'").[3]

Here the program that was supposed to be developed by Defendants is not comparable to any goods "generally acceptable in the trade of goods of the kind." *See id.* Where a standard of merchantability cannot be determined because the products contracted for are "of a 'new' type in the industry," there can be no claim of implied

---

[3] Full text of Ohio Rev. Code § 1302.27 states:

> Goods to be merchantable must be at least such as:
>
> (1) pass without objection in the trade under the contract description; and
> (2) in the case of fungible goods are of fair average quality within the description; and
> (3) are fit for the ordinary purposes for which such goods are used; and
> (4) run, within the variations permitted by the agreement, of even kind, quality and quantity, within each unit and among all units involved; and
> (5) are adequately contained, packaged, and labeled as the agreement may require; and
> (6) conform to the promises or affirmations of fact made on the container or label if any.

Ohio Rev. Code § 1302.27.

warranty of merchantability. *Price Bros. Co. v. Philadelphia Gear Corp.*, 649 F.2d 416, 424 (6th Cir. Ohio 1981) (quoting A. Squillante & J. Fonseca, Williston On Sales 81, § 1809 (4th ed. 1974) ("Where there is 'no trade for an experimental machine and no proof or evidence pointing to a record of past years on which a determination of its ordinary purpose could be found, there is no implied warranty created in the instance.'"). As in *Price*, it is difficult to image how "standard for" merchantability can be determined when Hodell's version of In-Flight was then the only version.

Hodell was fully aware that there was no finished or even started In-Flight add-on for Business One when Hodell signed the Development Agreement. (Van Leeuwen 50:5-12.) It is undisputed that the sole purpose of the Development Agreement and the relationship between Plaintiff and Defendants was to develop a program that did not exist in the industry. The Development Agreement did not contain any specifications with which the licenses and programs would comply, simply because no such specifications existed for a new, undeveloped program. The Agreement did not even guarantee that the development and implementation would be successful—that is why the Development Agreement contemplated full payment only upon "successful implementation." (*See* ECF No. 26-4.) In light of the foregoing, there can be no claim that the programs were not merchantable where there was no generally acceptable standard for same or similar products in the industry and where the Development Agreement expressly contemplated that the development might be unsuccessful.

Next, even if there is implied a warranty that In-Flight was to be merchantable, there is no reason to believe that when combined with Business One, with the right size customer, it would not be capable of being sold and used as expected. Jon Woodrum

24

personally went to the St. Louis location of Hodell to observe the performance of the Business One with In-Flight Enterprise at Hodell. He saw no limitation or performance issue. (Woodrum 41:24-42:9; 43:18-44:3.)  From what he observed the day he visited, Mr. Woodrum found performance to be acceptable. (Woodrum 44; 252.) Eric Johnson, one of the two LSi programmers who worked on this project had no reason to believe that In-Flight application was not functioning as intended. When he left LSI in September 2008, Hodell was running version 1 of In-Flight, and LSi had already sold version 2 as they were moving on to the next In-Flight installation. (Johnson 24.) As far as he was concerned, the SAP solution with In-Flight and Radio Beacon was operating at a satisfactory level for Hodell probably 2 to 3 months after installation, by May or June of 2007. (Johnson 36:14-21.) Mr. Neveux personally observed the performance and, while he found it less than perfect and something he described as "a bit of a nuisance," he concluded that the installed software package was working on the particular day he visited. (Ex. 167; Neveux 148-150.) Lastly, there is no expert identified in this case who is critical of the In-Flight's coding or functionality.  Thus, in addition to the lack of legal support that a warranty should be implied under the circumstances of this case, there is absolutely no evidence that In-Flight was not merchantable.

In order to recover under an implied warranty of fitness for a particular purpose under Ohio Rev. Code § 1302.28, Plaintiff must prove the following two elements:

> First, the seller must be aware at the time of contracting of a particular purpose for which the buyer intends to use the goods. Second, *the buyer must rely* on the seller's skill or judgment to select or furnish goods suitable for that particular purpose.

*Price Bros. Co. v. Philadelphia Gear Corp.*, 649 F.2d 416, 423 (6th Cir. Ohio 1981) (citing Ohio Rev.Code Ann. § 1302.28).

Plaintiff's claim fails because Hodell did not rely on Defendants' skill or judgment to select either the Business One software or the In-Flight add-on. As to Business One, it conducted independent research, which in reality was to review the same or similar information as LSi/IBIS had access to. Both Plaintiff and LSi/IBIS relied exclusively on SAP information; since the product was new, there was no other source for this information. The fact that LSi/IBIS assisted Hodell in the selection and actually sold the SAP system does not create an implied warranty of fitness for purpose. *Price* at 423-24. As to In-Flight, Hodell had years of favorable experience with the FACTS version and knew that as to the Business One version, it would be a new program to be developed jointly with Hodell and LSi/IBIS.  This is not a situation where Hodell completely deferred to LSi/IBIS to select the programs where such a warranty might be implied.

It is now well-established law that "where a specific item as delivered fits the description called for by the buyer, there is no breach when the contemplated use of the goods proves inappropriate to their inherent capabilities and design." *Price Bros. Co. v. Philadelphia Gear Corp.*, 649 F.2d 416, 423 (6th Cir. Ohio 1981) (citing *Standard Packaging Corp. v. Continental Distilling Corp.*, 378 F.2d 505 (3rd Cir. 1967); *Steel Sanitary Co. v. Pangborn Corp.*, 38 Ohio App. 65, 175 N.E. 615 (1930).  In this case, there is no evidence that In-Flight was other than what it was represented to be, an inventory management add-on to Business One. The contract that called for the In-Flight add-on plus the SAP Business One licenses, is not one that gives rise to an implied warranty of fitness for a particular purpose.

Even if there was to be such a warranty implied, as discussed previously, there is no evidence that In-Flight was not integrated into Business One, and had Business One

been able to handle Hodell operations, everyone would have been happy and satisfied. As discussed at length prior in this Memorandum, all the evidence in this case leads to no other conclusion but that if there is a problem with performance, it is a problem with the inherent limitations of Business One, not In-Flight.

Plaintiff fails to establish breach of contract with respect to the Development Agreement. Defendants performed their obligations under the Agreement and no claim of implied warranty creates grounds for additional claims.

### C.  Plaintiff is Limited to Contract Claims for Economic Loss.

This court has already analyzed Plaintiff's claim of Negligence against SAP in response to SAP's Motion to Dismiss. For the reasons asserted by SAP and upheld in dismissing the negligence claim against SAP, that claim against LSi/IBIS should also be dismissed. In a commercial setting, such as this, where only economic damages are claimed, the contract between the parties, not tort law, establishes the duties owed. *Queen City Terminals v. Gen. Am. Transp. Corp*., 73 Ohio St. 3d 609 (1995); *Sun Refining & Marketing v. Crosby Valve & Gauge Co.,* 68 Ohio St. 3d 397 (1994); *Chemtrol Adhesives v. American Manufacturers*, 42 Ohio St. 3d 40, 44 (1989) and the cases cited therein.; *Bronze Bushing Company, Inc. v. North American Manufacturing Company*, 8th Dist. Ohio No. 68852, 1996 Ohio App. Lexis 1419 (1996).

### D.  Plaintiff's Negligent Misrepresentation Claim Fails as There is No Evidence of Negligence on the Part of LSi/IBIS.

The Fifth Cause of Action in Plaintiff's Amended Complaint, alleges that "defendants supplied false information to Hodell-Natco with respect to the capabilities of SAP Business One . . . for the guidance of Hodell-Natco in its purchase of business software."  (ECF No. 26 ¶ 92.)  In addition to the fact that this claim is not pled with the

required specificity, and should be dismissed (*see Jones v. Petland, Inc.*, No. 2:08-CV-1128, 2010 WL 536894 (S.D. Ohio Feb. 11, 2010); *Pasacic v. Ameriquest Mortg. Co.*, No. 404CV0527, 2005 WL 1200373 (N.D. Ohio May 19, 2005)), Plaintiff fails on this count because LSi/IBIS was not negligent in providing any material representations to Hodell. Moreover, throughout the entire ninety-five counts of the Amended Complaint, Plaintiff does not allege any affirmative misrepresentation made specifically by LSi/IBIS that induced it to purchase the "business software."

Under Ohio law,

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Delman v. Cleveland Heights,* 41 Ohio St. 3d 1, 534 N.E.2d 835, 838 (1989).

There is no evidence that LSi/IBIS did something or failed to do something that the reasonably prudent value added reseller under these circumstances would have done or would not have done in the sales process. The record is replete with the joint investigation done by Hodell and LSi/IBIS into the SAP product. Neither party had any reason to believe the product was other than what SAP marketed it to be, with the capabilities for the companies to whom it marketed that program. Neither Plaintiff's expert nor SAP's expert expressed criticism of the investigatory process that lead to Hodell's purchase of Business One and LSi/IBIS's agreement to undertake development of In-Flight add-on for that program. Accordingly, there is no evidence from which a reasonable jury could conclude that LSi/IBIS was negligent.

28

Furthermore, a claim of negligent misrepresentation requires that Defendants made an affirmative false statement.  It is well established in Ohio that this claim will not stand for omissions. *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 506 (6th Cir. Ohio 2003) (citing *Leal v. Holtvogt*, 123 Ohio App. 3d 51, 702 N.E.2d 1246 (Ohio Ct. App. 1998)); *Picker Int'l, Inc. v. Mayo Found.*, 6 F. Supp. 2d 685, 689 (N.D. Ohio 1998) ("In deciding whether defendants have supplied false information, Ohio courts have held that the alleged negligent misrepresentation must have been an affirmative false statement. An omission or silence will not satisfy this requirement.") (citing *Textron Financial Corp.,* 115 Ohio App.3d at 149, 684 N.E.2d 1261; *Guarantee Co. of North America v. City of Cleveland,* No. 1:95–CV–1936, 1997 WL 614406, at *6 (N.D.Ohio 1997)).  Plaintiff does not allege any affirmative representations made by LSi/IBIS that induced its reliance and its purchase of the business software at issue.  Rather, the representations on which Plaintiff allegedly relied were made either prior to LSi/IBIS's involvement with Business One or did not come from LSi/IBIS but from SAP instead.

Therefore, the claim of negligent misrepresentation fails as a matter of law and should be dismissed from this litigation.

## IV. <u>CONCLUSION</u>

Plaintiff alleged five causes of action against LSi/IBIS in this litigation.  Although the facts alone, as evidenced by statements of multiple witnesses, prove that LSi/IBIS is not liable for Plaintiff's alleged damages, these claims additionally fail because they are not supported by applicable Ohio law.  As to the two fraud claims, it is undisputed that Plaintiff performed independent research rather than relying on these Defendants' representations.  Furthermore, the evidence is clear that LSi/IBIS did not have the

knowledge that any representations made by SAP and communicated further to Hodell were false.  As to the breach of contract claims, the record discloses that LSi/IBIS performed their contractual obligations, both expressed and implied—if any implied warranties even existed.  The software contracted for was delivered to Plaintiff and met all the requirements agreed upon.  As to the two negligence claims, to the extent that they still exist after this Court's decision upon SAP's Motion to Dismiss, Plaintiff cannot maintain the simple negligence claim for purely economic loss and there is no evidence of any negligence in ascertaining accurate information before providing it to Plaintiff.

For all the foregoing reasons, Defendants LSi Lowery Systems, Inc. and The IBIS Group, Inc. pray that this Court grant their Motion for Summary Judgment, therefore eliminating a need for trial in this case, as the evidence is undisputed and leads to no other conclusion but that Defendants are entitled to judgment as a matter of law.

Respectfully submitted,


/s/  Roy A. Hulme
ROY A. HULME (0001090)
REMINGER CO., L.P.A.
Attorney for LSi Lowery Systems, Inc. and
The IBIS Group, Inc.

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing Motion for Summary Judgment was filed electronically this 6th day of September, 2012.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's electronic filing system.

/s/  Roy A. Hulme
ROY A. HULME (0001090)