# In The Matter Of:

*Hodell-Natco Industries, Inc. v.*
*SAP America, Inc., et al.*

*Daniel J. Lowery*
*Vol. 2*
*February 9, 2012*

## NEXTGEN|REPORTING

Making Litigation Easier.  NextGenReporting.com

PHILADELPHIA | 215.944.5800   NEW YORK CITY | 646.470.3376   PHOENIX | 623.224.2760   SILICON VALLEY | 650.799.8020

*Original File Lowery, Daniel J. - Vol. 2.txt*
*Min-U-Script® with Word Index*

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Daniel J. Lowery - Vol. 2
February 9, 2012

**Page 190**

1 case. And Exhibit D to that document is the
2 development agreement between -- between
3 Hodell and IBiS, correct?
4 A. Correct.
5 Q. Dated November 30, 2004?
6 A. Correct.
7 Q. Actually signed December 20,
8 2004, and December 24, 2004, correct?
9 A. Correct.
10 Q. What was the purpose of this
11 document?
12 A. Gain agreement on what Hodell was
13 ordering, price they were to pay, when they
14 were to pay it, couple of checkpoints with
15 dates that said at this point they need to
16 agree to proceed, or get their money back.
17 And basically it was a general document that
18 described the -- the financing of and some
19 time limits for the milestones to be
20 completed.
21 Q. Among other things, this document
22 concerned the purchase of 80 user licenses of
23 SAP Business One by Hodell, correct?
24 A. Correct.
25     MR. STAR: Objection, form.

**Page 191**

1     BY MR. LAMBERT:
2 Q. What kind of licenses was Hodell
3 buying?
4 A. I believe it was professional
5 level licenses for SAP Business One.
6 Q. What is the difference between a
7 professional license and a CRM license?
8 A. Professional licenses have more
9 functionality at the user level.
10 Q. What does a CRM license do?
11 A. It's a -- it's more basic. If a
12 user needs to get into report creation, I
13 believe is one of the areas, but again, that's
14 -- that's an area I'm not knowledgeable of.
15 CRM users are less expensive. Pros are more
16 expensive.
17 Q. Do you know who drafted the
18 development agreement, who wrote it up?
19 A. Who wrote this? Well, I guess
20 LSi.
21 Q. Do you recall having an attorney
22 review it or involved with it at all?
23 A. No.
24 Q. What is the purchase price stated
25 for the 80 user licenses of SAP Business One?

**Page 192**

1 A. 300,000.
2 Q. And Hodell was going to make
3 payments on those licenses in installments of
4 $60,000, correct?
5 A. Correct.
6 Q. Did Hodell make all the payments?
7 A. They did. Yeah. Except the
8 final -- there is 60,000 that is still open,
9 so I guess the --
10 Q. There is a final 60,000 due upon
11 successful implementation, correct?
12 A. Right. Correct.
13 Q. When was the -- strike that.
14 There is a section there, says, the
15 intellectual property to the In-Flight code would
16 be given to Hodell in case of default by IBiS or
17 LSi.
18 A. Correct.
19 Q. Do you recall that?
20 A. Yes.
21 Q. Was the In-Flight code ever
22 provided to Hodell?
23 A. Yes.
24 Q. It was?
25 A. Yes, I believe so. When I closed

**Page 193**

1 the practice, they had to have the code.
2 Q. Did LSi -- strike that.
3 Did SAP review this agreement --
4 A. No.
5 Q. -- before it was signed?
6 A. No.
7 Q. But they were aware of the
8 development of In-Flight at this time,
9 correct?
10 A. Yes.
11 Q. As of December 2004?
12 A. Yes.
13 Q. Do you recall Hodell signing any
14 other documents, contemporaneous with the
15 development agreement, regarding the purchase
16 of 80 user -- 80 Business One user licenses?
17 A. Well, they signed the SAP
18 documents for licenses. Is that what you're
19 asking?
20 Q. Did they sign any documents
21 contemporaneous with this document?
22 A. I think this was it. We gave you
23 -- I mean, unless we gave you another
24 document. Did I give you --
25 Q. I have not seen one, but I just

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Daniel J. Lowery - Vol. 2
February 9, 2012

Page 250

1  (Whereupon, Exhibit 57 was marked for
2  identification.)
3  BY MR. LAMBERT:
4  Q. Review Exhibit 57, and let me
5  know when you're finished.
6  A. (Doing as indicated.) Okay.
7  Q. Exhibit 57 is Mr. Woodrum's reply
8  to Kevin Reidl, correct?
9  A. Jon Woodrum, Kevin Reidl,
10  correct.
11  Q. You're copied on that?
12  A. I am.
13  Q. And discussing the go live date,
14  correct?
15  A. Yes.
16  Q. In this email, Mr. Woodrum is
17  expressing his belief that Hodell may be
18  unnecessarily delaying the go live date,
19  correct?
20  A. Okay. Where do you see that?
21  Q. The very first part of the email.
22  A. Okay. So he was giving his
23  opinion, addressing Kevin's last email, but he
24  said no arm twisting, we will do everything we
25  can to satisfy your comfort level and go live

Page 251

1  preference. Our goals are the same.
2  Q. As of January 12, 2007, having
3  been copied on this email, did you agree or
4  disagree that Hodell may be unnecessarily
5  prolonging the go live?
6  MR. HULME: Objection, form.
7  THE WITNESS: Yeah, I had no opinion on
8  it. I was waiting for -- this thing wasn't
9  going live until the customer felt comfortable
10  with what we had done, so to me, this is all
11  back and forth, back and forth. And then when
12  I hear that Hodell was saying, hey, it looks
13  good, let's go, then I'm -- then I start to
14  realize we're going to go live.
15  (Whereupon, Exhibit 58 was marked for
16  identification.)
17  THE WITNESS: Dan to Jon, carbon, okay,
18  to Kevin. Jon, here's some questions. Okay.
19  So this is me saying where are we. Okay.
20  BY MR. LAMBERT:
21  Q. Exhibit 58 is an email from you
22  to Jon and Kevin, dated January 16, 2007,
23  right?
24  A. Correct.
25  Q. What is the purpose of this

Page 252

1  email?
2  A. Jon, where are we? I had -- here
3  are some questions. Jon, here are some
4  questions I asked and his answers. Here are
5  some questions I asked and his answers. Who
6  did I ask? Okay. It must have been Kevin, so
7  I must have asked Kevin these questions. That
8  would be my guess. And then what Kevin's
9  responses were.
10  Q. Okay. There is a reference to
11  the second Q&A.
12  A. Okay.
13  Q. How is performance, response
14  time? And the last sentence of the answer --
15  A. I think it is okay. We're
16  running good in most areas that used to run
17  slow, but there are spots that drag down. I'm
18  not sure if those are big issues to resolve or
19  not. We have not tested on the big database
20  yet, so that will be important.
21  Q. What is the reference to the big
22  database?
23  A. I really don't know.
24  THE WITNESS: Are they supposed to be
25  in order?

Page 253

1  MR. HULME: Yeah, eventually. I'll
2  take care of them.
3  THE WITNESS: No. No.
4  MR. HULME: Numbered.
5  MR. LAMBERT: Go off the record for a
6  second.
7  (Whereupon, a break was taken from
8  12:14 until 12:47.)
9  MR. LAMBERT: Back on.
10  BY MR. LAMBERT:
11  Q. Mr. Lowery, do you recall --
12  strike that.
13  Hodell went live around March 8th,
14  2007, correct?
15  A. Correct.
16  Q. Did issues with the performance
17  of Business One arise immediately upon going
18  live?
19  A. Yes. Yes.
20  Q. Do you know what those issues
21  were?
22  A. Well, there was -- again, I'm not
23  the technical guy, but in my mind, there were
24  three issues. One was system freezes, another
25  was memory leaks, and the last was the DI API

Page 254

1  slow.  You couldn't get in and out of.  So to
2  process a long order, a Hodell long order,
3  would take, you know, a long time,
4  unacceptably long.
5  Q.  What would happen when the system
6  froze?  Let's talk about the first one.
7  A.  What would happen what?
8  Q.  When the system would freeze?
9  A.  Well, again, I'm assuming it's
10  like your PC locking up, it just -- you got to
11  reboot and go from there.
12  Q.  Is it a systemwide issue, or was
13  it an individual user issue?
14  A.  I don't know.
15  Q.  You don't know?  Was there --
16  A.  I know it was a big enough issue
17  where all the lights went on, up into SAP, and
18  you know, we were sending off problem reports
19  and all this kind of things, and it was a big
20  deal.
21  Q.  So you would agree with me that
22  that was an example of unacceptable
23  performance by the software, correct?
24  A.  That was a -- ended up being a
25  Business One problem, yeah.  You cannot have

Page 255

1  system freezes and run a business, if that is
2  what you're asking.
3  Q.  It was -- what is a memory leak?
4  A.  Memory leaks, I think that was
5  basically the same result, the system locked
6  up.  I mean, Kevin probably can answer these
7  better than I do, because he was living it.
8  But the memory leaks issue, again, were
9  identified, went to Germany, SAP wrote
10  releases and eventually those were resolved.
11  Same for the freezes.  But that was a very
12  frustrating, and it complicated, you know,
13  because then at the same time we're battling
14  the DI API, so you're ....
15  Q.  Is it your testimony that the
16  system lockups or freezes were completely
17  solved?
18  A.  My testimony is what?
19  Q.  Is it your testimony that the --
20  that the system lockups or freezes that Hodell
21  experienced were solved?
22  A.  Yes, eventually.
23  Q.  One hundred percent?
24  A.  Yes.
25  Q.  Okay.  Explain to me what you

Page 256

1  mean by the DI API was slow?
2  A.  Well, again, going back to the
3  pipe analogy, it's the data interface and
4  application program interface.  And it simply
5  wasn't a big enough pipe to allow the data
6  from In-Flight to update the database within
7  SAP Business One.
8  Q.  What kind of problems was that
9  creating?
10  A.  When you hit enter, you sat there
11  and waited.
12  Q.  Okay.  Would you -- would you
13  agree that was an example of unacceptable
14  performance by the software, meaning that
15  Hodell should not have been expected to
16  tolerate that performance --
17  A.  Yes.
18  Q.  -- correct?
19  A.  I agree to that.
20  (Whereupon, Exhibit 59 was marked for
21  identification.)
22      BY MR. LAMBERT:
23  Q.  Okay.  What attempts were made to
24  resolve those issues?
25  A.  What?

Page 257

1  Q.  What attempts were made to
2  resolve those issues you just -- you just
3  explained to me?
4  A.  Oh, it was all hands on deck.  I
5  mean, it's a very lengthy answer, but we threw
6  out the, request SAP, several different
7  approaches were taken to it.  Ralph, or
8  Dirk Boessmann, was one of the people
9  coordinating it through the programming labs
10  over in Germany, I believe, so they were
11  working on it.  Dan Kraus was approaching it
12  from -- he was pointing the finger at
13  In-Flight and was trying to prove In-Flight
14  was at fault.  And he brought in another
15  partner to review our code, company called
16  Apollo, so he and I structured up an agreement
17  that if they found something, I would pay for
18  Apollo's time.  And if they didn't, he would
19  pay for Apollo's time.  They found nothing.
20  Actually ended up complimenting us on our
21  programming.
22  Another complication at that point,
23  Dan Kraus was not satisfied.  Now he wanted
24  all of our code to go to Apollo, and I started
25  smelling something wrong there, and I said no.

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Daniel J. Lowery - Vol. 2
February 9, 2012

Page 266

1 Q. What was discussed on that call?
2 A. The implementation it seems.
3 Well, if Radio Beacon was on there, I'm sure
4 it was about Radio Beacon. Paul Killingsworth
5 was on there. Paula Hendley, whoever that is.
6 I don't know who that is. And at LSi, we had
7 everybody. Avery will send you a recap with
8 the plan, so we must have been -- I don't know
9 specifically. Everyone's in the boat. Radio
10 Beacon and SAP are anxious to resolve and are
11 supplying great people.
12 Q. You don't recall who Paula
13 Hendley was?
14 A. I don't.
15 Q. So your testimony, or would you
16 agree with me that the installation and
17 operation of the SAP Business One software at
18 Hodell was a failure, correct?
19    MR. STAR: Objection to form.
20    THE WITNESS: No. I mean, they ran
21 their business on it for two years.
22    BY MR. LAMBERT:
23 Q. You would agree with me it did
24 not work as it was supposed to work, correct?
25    MR. HULME: You mean at -- what point

Page 267

1 in time are you talking about?
2    THE WITNESS: Yeah.
3    BY MR. LAMBERT:
4 Q. Ever?
5 A. Ever?
6 Q. Right.
7 A. Okay. Are you talking about SBO
8 or In-Flight?
9 Q. I'm talking about SAP Business
10 One.
11 A. I agree that the SAP Business One
12 DI API problems were unacceptable.
13 Q. And they were never fixed, right?
14 A. Not to -- no. No.
15 Q. When did the number of users on
16 the SAP Business One system start being
17 discussed between you and -- and SAP?
18 A. As being a problem?
19 Q. Yes.
20 A. Oh, probably shortly after go
21 live.
22 Q. And why did it come up?
23 A. In my opinion, it was a way for
24 Kraus and Sotnick to run for cover.
25 Q. Well, in what regard?

Page 268

1 A. They weren't going to fix the
2 problem. They had to find something else to
3 blame it on. I mean, we have documentation
4 that SAP is not going to fix the problem.
5 Probably the most legitimate one is from Miki
6 Zilberstein.
7    (Whereupon, Exhibit 61 was marked for
8 identification.)
9    THE WITNESS: Where we at here?
10 September of 2007. Okay. Okay.
11    MR. LAMBERT: What number is that?
12    THE WITNESS: Sixty-one.
13    BY MR. LAMBERT:
14 Q. Have you reviewed Exhibit 61?
15 A. Have I, yeah. I'm on it right
16 now. I have seen it, right here.
17 Q. What is -- what is Exhibit 61?
18 A. It looks like it's a -- a message
19 guide for field sales and partners.
20 Q. Well, on the front, what is it?
21 A. Pardon me?
22 Q. It's an email from you to --
23 A. Oh, it's an email from me to
24 Kevin with an attachment, copying Otto. This
25 was what is announced today, so on

Page 269

1    September 19th, 2007.
2 Q. Why were you sending it to Otto
3 and Kevin?
4 A. Well, let's see. What does it
5 say? Okay. My guess would be to let them
6 know the new typical number of employees that
7 they are recommending SAP Business One be sold
8 into, which would be under 100, 10 to 100
9 employees, fewer than 50 users. And this came
10 out September 2007. So this -- SAP at this
11 point was trying to prevent future Hodells
12 from happening.
13 Q. Okay. My question was, why did
14 you send it to Otto and Kevin in September of
15 2007?
16 A. The kimono is open. I mean, they
17 -- if I felt this was significant to know,
18 they should have felt this was significant to
19 know.
20 Q. Okay.
21 A. I found it interesting. I'm sure
22 they found it interesting.
23 Q. If you turn to the first page of
24 that document, it's called a message guide for
25 field sales partners --

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Daniel J. Lowery - Vol. 2
February 9, 2012

Page 306

1    THE WITNESS: This implies there is a
2  fix on the way coming out of you.
3    Okay. I don't even know what your
4  question was, but -- what was it?
5    BY MR. LAMBERT:
6  Q.   There is no question pending.
7    MR. LAMBERT: Off the record.
8  (Whereupon, at 2:02, an off-the-record
9  discussion was held.)
10    THE REPORTER: Do you want signature?
11    MR. HULME: We'll read it.
12    THE REPORTER: Does everybody still want
13  copies of everything?
14    MR. STAR: Yeah, please.
15    MR. HULME: Yes.
16    MR. LAMBERT: Yes.
17  (Whereupon, at 2:03, the deposition was
18  continued until a later date.)
19
20
21
22
23
24
25

Page 308

1              UNITED STATES DISTRICT COURT
2               NORTHERN DISTRICT OF OHIO
                      EASTERN DIVISION
3  HODELL-NATCO INDUSTRIES,    ) Case No. 1:08 CV 2755
   INC.,                       )
4         Plaintiff,           ) Judge:  Lesley Wells
   vs.                         ) Magistrate Judge:
5                              )      Greg White
   SAP AMERICA, INC., et al.,  )
6         Defendants.          )
7  ─────────────────────────────
8                    SIGNATURE SHEET
9          DEPOSITION OF DANIEL J. LOWERY
10
11     I do hereby acknowledge that the above and foregoing
   deposition has been submitted to me.  I have carefully
12  read the same, and it correctly portrays the answers
   given by me, except as may be otherwise noted on the
   errata sheet(s) attached hereto.
13
14
15  ─────────────────────────────
                 DANIEL J. LOWERY
16  Dated: _____
17
18
19
20
21
22
23
24
25

Page 307

1          E R R A T A  S H E E T
2  WITNESS:  DANIEL J. LOWERY
3  DATE:  February 9, 2012
4  CASE:  HODELL-NATCO INDUSTRIES, INC. vs. SAP AMERICA, INC., et
5  al.
6       After you have read your transcript, please note any
   errors in transcription on this page.  Do not mark on the
7  transcript itself.  Please sign and date this sheet as
   indicated below.  If additional lines are required for
8  corrections, attach additional sheets.  If no corrections,
   please indicate "None."
9
10  Page/Line       Correction         Reason
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21
22
23  DATED: _____
24
25  ─────────────────────────────
                 DANIEL J. LOWERY

Page 309

1            CERTIFICATE OF THE REPORTER
2       I, Angela A. O'Neill, a Registered Professional
3  Reporter and Notary Public, authorized to administer oaths and to
4  take and certify depositions, do hereby certify that the
5  above-named witness was by me, before the giving of their
6  deposition, first duly sworn to testify the truth, the whole
7  truth, and nothing but the truth to questions propounded at the
8  taking of the foregoing deposition in a cause now pending and
9  undetermined in said court.
10       I further certify that the deposition above-set forth
11  was reduced to writing by me by means of machine shorthand and was
12  later transcribed from my original shorthand notes; that this is a
13  true record of the testimony given by the witness; and that said
14  deposition was taken at the aforementioned time, date, and place,
15  pursuant to notice or stipulations of counsel.
16       IN WITNESS WHEREOF, I have set my hand and seal this
17  17th day of February, 2012.
18
19  ─────────────────────────────
20      Angela A. O'Neill, RPR
       My Commission Expires:  Aug. 10, 2012
21
22
23
24
25

# In The Matter Of:

*Hodell-Natco Industries, Inc. v.*
*SAP America, Inc., et al.*

---

*Daniel J. Lowery*
*Vol. 3*
*March 7, 2012*

---

# NEXTGEN|REPORTING

Making Litigation Easier.                    NextGenReporting.com

PHILADELPHIA | 215.944.5800   NEW YORK CITY | 646.470.3376   PHOENIX | 623.224.2760   SILICON VALLEY | 650.799.8020

*Original File Lowery, Daniel J. - Vol. 3.txt*
*Min-U-Script® with Word Index*

Page 406

1  discussion today is to be treated as
2  confidential within the partnership agreement?
3  A. I don't -- I don't recall what
4  that refers to.
5     MR. STAR: Objection to form.
6     BY MR. LAMBERT:
7  Q. You don't recall what
8  information --
9  A. What he's -- I don't know what
10  he's talking about there.
11  Q. Okay. And then you reply, that
12  same day, you've never seen a customer try
13  harder to make something work than Hodell had,
14  correct?
15  A. Correct.
16  Q. You would agree with me that
17  Hodell did everything in their power to make
18  the installation of Business One work?
19  A. I do.
20  Q. And yes, I will keep what we
21  discussed today private, correct?
22  A. Correct.
23  Q. But you don't recall what that
24  was?
25  A. I don't. I mean, it must have

Page 407

1  been some general -- later on in that email,
2  I'm referring to -- okay. Must be about -- he
3  must have had the idea of trying to get Hodell
4  to move to All-in-One, and he wanted to
5  present that to Hodell, not me. So my
6  question was, is how is everybody going to get
7  reimbursed, and how am I going to get my 60
8  grand that I was stiffed on, and da, da, da,
9  da, da, da, da, so ....
10  Q. Well, the third paragraph of that
11  email references, or you make the statement,
12  "Hearing the DI API is the problem gives us a
13  personal satisfaction, as we have been saying
14  that for months. But knowing that, and that
15  SAP will not rewrite to fix it, leaves me more
16  confused than ever where we can sell."
17  Correct?
18  A. Correct.
19  Q. Who had told you that the DI API
20  was the problem?
21  A. Apparently Sotnick.
22     MR. STAR: Objection to form.
23     BY MR. LAMBERT:
24  Q. Sotnick had said that?
25  A. Sotnick, yeah. It must have

Page 408

1  been.
2  Q. Could that have been the
3  information he was asking you to keep
4  confidential?
5  A. Possibly. He wanted the whole
6  conversation kept confidential. I guess that
7  could have been it. Yeah, I guess so.
8  Q. Did Sotnick say where he'd gotten
9  the information from that the DI API was the
10  problem?
11     MR. STAR: Objection to form.
12     THE WITNESS: I don't recall. But when
13  I wrote this letter, someone at SAP told me
14  that they weren't going to rewrite to fix it,
15  and they were admitting the DI API was the
16  problem, and that had to come from that
17  conversation with Sotnick.
18  (Whereupon, Exhibit 106 was marked for
19  identification.)
20     MR. LAMBERT: Greg, 106 is SAP872.
21     MR. STAR: Wes, before you go on to
22  that, I mean, we -- we had this issue the last
23  time when you were questioning Dan, which is
24  that a lot of the documents that you show him
25  are only partial pieces of an email chain.

Page 409

1  And then we're marking multiple exhibits,
2  which are the same emails, with the full
3  chain. And -- and the problem, of course,
4  that we come up with is the testimony that is
5  given on the record, is it unusable, because
6  the witness is -- is speculating, having not
7  had a chance to see the full email chain. So
8  I -- I just throw that out there. If you want
9  to continue in this fashion, you can, but I
10  think it leaves us with a -- a transcript that
11  is not usable in a lot of ways, but go ahead.
12     MR. LAMBERT: Well, I have tried to fix
13  that. Is this -- is the email we just
14  questioned him about not the complete string?
15     MR. STAR: It is not. There is a response
16  from Sotnick that refutes entirely what Mr. Lowery
17  says here, but you -- go ahead.
18     MR. LAMBERT: Okay. The other problem is
19  that there is several long email chains in here,
20  and they're -- and depending who was forwarded
21  what, they differ somewhat, so it's kind of
22  difficult to know which one to use, but you know,
23  we're doing our best.
24     MR. HULME: You didn't ask him any
25  questions about 106, did you?

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Daniel J. Lowery ‑ Vol. 3
March 7, 2012

Page 494

```
 1   (Whereupon, the deposition was
 2   continued until the following morning.)
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 495

```
 1              CERTIFICATE OF THE REPORTER
 2          I, Angela A. O'Neill, a Registered Professional
 3   Reporter and Notary Public, authorized to administer oaths and to
 4   take and certify depositions, do hereby certify that the
 5   above-named witness was by me, before the giving of their
 6   deposition, first duly sworn to testify the truth, the whole
 7   truth, and nothing but the truth to questions propounded at the
 8   taking of the foregoing deposition in a cause now pending and
 9   undetermined in said court.
10          I further certify that the deposition above-set forth
11   was reduced to writing by me by means of machine shorthand and was
12   later transcribed from my original shorthand notes; that this is a
13   true record of the testimony given by the witness; and that said
14   deposition was taken at the aforementioned time, date, and place,
15   pursuant to notice or stipulations of counsel.
16          IN WITNESS WHEREOF, I have set my hand and seal this
17   18th day of March, 2012.
18                          Angela A. O'Neill
19
20          Angela A. O'Neill, RPR
             My Commission Expires:  Aug. 10, 2012
21
22
23
24
25
```

# In The Matter Of:

*Hodell-Natco Industries, Inc. v.*
*SAP America, Inc., et al.*

*Daniel J. Lowery*
*Vol. 4*
*March 8, 2012*

# NEXTGEN|REPORTING

Making Litigation Easier.                        NextGenReporting.com

PHILADELPHIA | 215.964.5800   NEW YORK CITY | 646.470.3376   PHOENIX | 623.224.2760   SILICON VALLEY | 650.799.8020

*Original File Lowery, Daniel J. - Vol. 4.txt*
*Min-U-Script® with Word Index*

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Daniel J. Lowery - Vol. 4
March 8, 2012

**Page 832**

1  BY MR. LAMBERT:
2  Q.  Did not?
3      MR. HULME: What is the question?
4      THE WITNESS: It's my understanding --
5      BY MR. LAMBERT:
6  Q.  I got it backwards.
7  A.  -- that Hodell did not do what?
8  Q.  You keep making reference to 100
9  licenses, 80 that Hodell purchased and 20 that
10  were given by SAP.  And my question is, are
11  you disregarding the 40 that it referenced on
12  Exhibit 155?
13  A.  All right.  I don't quite
14  understand Exhibit 155, is what I guess I'm
15  saying.
16  Q.  Okay.
17  A.  They got 80, and they paid for
18  80.  And then later on, after go live, they
19  got another 20 from Hodell, or from SAP.
20  Q.  For free?
21  A.  For free.  I guess.  I was not
22  involved in that.
23  Q.  So you don't have any knowledge
24  of the 40 CRM user licenses --
25  A.  I really don't.

**Page 833**

1  Q.  -- referenced in Exhibit 155?
2  A.  I don't.  And that's why I asked,
3  wasn't -- I don't know for sure, but I kind of
4  remember somebody asking me a question about
5  Otto wanting a year-end tax thing or
6  something.
7  Q.  You don't know for sure --
8  A.  I don't know for sure.
9  Q.  -- what that was for?
10  A.  I don't know for sure.
11  Q.  Okay.
12  A.  All I know for sure is they had
13  80 and then 20.
14  Q.  You made several statements today
15  and yesterday that Hodell was running its
16  business on Business One, correct?
17  A.  Correct.
18  Q.  Are you suggesting that in any
19  way it's inappropriate for Hodell to
20  eventually decide to abandon the Business One
21  In-Flight software and move to a different
22  package?
23  A.  Do I feel it's inappropriate for
24  them to abandon it?
25  Q.  Well, is that what you're

**Page 834**

1  suggesting when you say that they were running
2  their business on it?
3  A.  No.  What I was suggesting is is
4  we delivered our part of that contract.
5  Q.  Which was?
6  A.  In-Flight integrated into SAP
7  Business One.
8  Q.  You don't feel any responsibility
9  for the fact that Business One itself didn't
10  work?
11      MR. STAR: Objection to form.
12      THE WITNESS: That was outside of our
13  control.  We had no access to the source code
14  of Business One.  And we tried everything
15  humanly possible to -- to get it resolved.
16      BY MR. LAMBERT:
17  Q.  Well, In-Flight was only useful
18  to the extent that it was incorporated into
19  Business One, correct?
20  A.  In-Flight --
21  Q.  Had no usefulness to Hodell on
22  its own, correct?
23  A.  Without SAP?
24  Q.  Right.
25  A.  Correct.

**Page 835**

1  Q.  So that if Hodell wasn't running
2  its business, could not run its business on
3  Business One, In-Flight, in fact, would not
4  deliver what was promised, correct?
5      MR. STAR: Objection.
6      THE WITNESS: In-Flight -- In-Flight
7  was what?
8      BY MR. LAMBERT:
9  Q.  Hodell -- if you agree with me
10  that Hodell could not run its business on
11  Business One as it functioned, which I think
12  we're in agreement on, correct?
13      MR. HULME: Objection, form.
14      THE WITNESS: I don't understand it.
15      BY MR. LAMBERT:
16  Q.  Do you agree with me that the
17  performance of Business One was unacceptable
18  at Hodell-Natco?
19  A.  I do.
20  Q.  Okay.  Do you agree with me that
21  Hodell-Natco had every right eventually to
22  abandon Business One and move to a different
23  software package?
24  A.  Sure.
25  Q.  Okay.  I don't have anything

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Page 840

```
1              CERTIFICATE OF THE REPORTER
2          I, Angela A. O'Neill, a Registered Professional
3    Reporter and Notary Public, authorized to administer oaths and to
4    take and certify depositions, do hereby certify that the
5    above-named witness was by me, before the giving of their
6    deposition, first duly sworn to testify the truth, the whole
7    truth, and nothing but the truth to questions propounded at the
8    taking of the foregoing deposition in a cause now pending and
9    undetermined in said court.
10         I further certify that the deposition above-set forth
11   was reduced to writing by me by means of machine shorthand and was
12   later transcribed from my original shorthand notes; that this is a
13   true record of the testimony given by the witness; and that said
14   deposition was taken at the aforementioned time, date, and place,
15   pursuant to notice or stipulations of counsel.
16         IN WITNESS WHEREOF, I have set my hand and seal this
17   19th day of March, 2012.
18                          Angela A. O'Neill
19
20          Angela A. O'Neill, RPR
            My Commission Expires:  Aug. 10, 2012
21
22
23
24
25
```