**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **HODELL-NATCO INDUSTRIES, INC.** ) <br><br> **Plaintiff,** ) <br><br> **v.** ) <br><br> **SAP AMERICA, INC., et al.** ) <br><br> **Defendants.** ) | **CASE NO. 1:08 CV 2755** <br><br> **JUDGE WELLS** <br><br> <u>**MEMORANDUM OF LAW IN SUPPORT OF**</u> <u>**MOTION FOR SUMMARY JUDGMENT**</u> <u>**AS TO PLAINTIFF'S CLAIMS BY SAP**</u> <u>**AMERICA, INC. AND SAP AG**</u> |

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................. 1

II.    UNDISPUTED MATERIAL FACTS ............................................................... 2

     A.     Hodell was introduced to SAP Business One in 2003, but had no contact with SAP until 2007 .......................................................................... 2

     B.     Hodell knew Business One alone was insufficient for its needs and that it required the development of new software by LSi and IBIS, which Hodell knew could impact the success of any future software implementation ............... 3

     C.     Hodell entered the Development Agreement with LSi for the development of In-Flight, the integration of that new software with Business One, and the implementation of the overall software solution at Hodell ............................ 5

     D.     Hodell had, or had access to, information that contradicted its belief that the software could accommodate 300 users, yet Hodell nonetheless entered into a Business One License Agreement with SAP America on December 23, 2005 ........................................................................ 7

     E.     Hodell's testing of the overall software solution revealed "unacceptable" performance issues which caused Hodell's IT director to recommend against "going live," yet Hodell ignored that advice and now complains it was defrauded because it later experienced the same performance issues it was aware of before going live, and even though it ran the software for two years ...................................................................................... 10

III.   ARGUMENT .................................................................................................. 11

     A.     The License Agreement controls the relationship between SAP and Hodell, and precludes Hodell's tort claims ........................................... 11

     B.     Because Hodell is unable to establish the existence of a duty owed by SAP America or SAP AG outside of the License Agreement, Hodell's tort claims are barred as a matter of law ........................................................ 14

     C.     Even if Hodell could establish that SAP owed a duty outside of the License Agreement, Hodell's misrepresentation claims fail because Hodell cannot establish the other elements of its claims ............................... 19

         1.     Hodell has no evidence that Business One was incapable of handling up to 300 users, and thus has no evidence of a false representation, and further has no evidence that SAP knew Business One would have slow performance for Hodell ........................ 20

         2.     Because Hodell admits it had information contradicting the alleged misrepresentations, Hodell cannot prove that such representations were material to its decision to enter the Development Agreement or the License Agreement ....................................................... 24

3.  Hodell cannot establish that it reasonably relied on any alleged misrepresentation about Business One ...................................................... 26

4.  Hodell has no evidence that SAP intended to mislead it ......................... 30

5.  Hodell admits that any harm it suffered was proximately caused by its own decision to "go-live" on the software despite its knowledge of "unacceptable" performance issues ...................................................... 31

6.  Hodell's negligent misrepresentation claim fails for the additional reason that SAP is not in the business of supplying information, and cannot be subject to such a claim ...................................................... 34

D.  Count Three of Hodell's Amended Complaint (breach of contract) is precluded by the License Agreement because Hodell disclaimed all implied warranties, and because Hodell has no evidence that SAP America breached the limited express warranty that was provided ................................... 35

IV.  CONCLUSION ............................................................................................ 40

## STATEMENT OF ISSUES

In deciding SAP's motion, the Court need only deal with three central issues:

    **1.  The parties' contract bars all tort claims.**  Under Ohio law, tort claims are precluded unless a plaintiff proves a breach of duty independent of the parties' contract.  Here, Hodell and SAP entered a fully integrated License Agreement in 2005, which gave Hodell the right to use SAP's software, provided an express performance warranty, and disclaimed all prior representations.  Yet, Hodell claims it relied upon pre-contractual representations about the performance capabilities of SAP's software.  Is SAP entitled to summary judgment on Hodell's tort claims where Hodell has no evidence that SAP owed or violated a non-contractual duty?  Yes.

    **2.  Hodell has no evidence of an actionable misrepresentation.**  To maintain a misrepresentation claim, Hodell must prove it reasonably relied on a false statement of existing, material fact.  Hodell concedes it had no contact with SAP until 2007, that it did not receive or rely upon information provided by SAP, and that it had information prior to signing the License Agreement with SAP in 2005 that contradicted what it now claims were false representations.  Is SAP entitled to summary judgment on Hodell's tort claims, each of which is based on alleged pre-License Agreement misrepresentations?  Yes.

    **3.  Hodell disclaimed all implied warranties and has no proof of the breach of an express warranty.**  The licensing of software is the purchase of a good controlled by the Ohio UCC.  Hodell claims it received pre-License Agreement misrepresentations as to the abilities of SAP's software to handle Hodell's particular needs, and that the software, when installed and integrated with other software products, did not meet those needs.  However, consistent with the UCC, the License Agreement disclaimed all implied warranties of merchantability and fitness for a particular purpose, and Hodell has no evidence of a breach of any express warranty.  Is SAP entitled to summary judgment on Hodell's warranty claims?  Yes.

## SUMMARY OF ARGUMENTS

Hodell's claims against SAP should be dismissed for the following reasons:

- The License Agreement controls the relationship between SAP and Hodell. Because Hodell is unable to establish the existence of a duty owed by SAP America or SAP AG outside of the License Agreement, Hodell's tort claims are barred as a matter of law.

- Even if Hodell could establish that SAP owed a duty outside of the License Agreement, Hodell's misrepresentation claims fail because Hodell cannot establish the other elements of its claims.

    - Hodell has no evidence that Business One was incapable of handling up to 300 users, and thus has no evidence of a false representation.

    - Because Hodell admits it had information contradicting the alleged misrepresentations, Hodell cannot prove that such representations were material to its decision to enter the Development Agreement or the License Agreement.

    - Hodell cannot establish that it reasonably relied on any alleged misrepresentation about Business One.

    - Hodell has no evidence that SAP intended to mislead it.

    - Hodell admits that any harm it suffered was proximately caused by its own decision to "go-live" on the software despite its knowledge of "unacceptable" performance issues.

    - Hodell's negligent misrepresentation claim fails for the additional reason that SAP is not in the business of supplying information, and cannot be subject to such a claim.

- Count Three of Hodell's Amended Complaint (breach of contract) is precluded by the License Agreement because Hodell disclaimed all implied warranties, and because Hodell has no evidence that SAP America breached the limited express warranty that was provided.

# TABLE OF AUTHORITIES

**CASES**                                                                          **PAGE(S)**

*425 Beecher, LLC v. Unizan Bank*,
    186 Ohio App. 3d 214 (Ohio Ct. App., Franklin County 2010) ...............................14

*425 Beecher, LLC v. Unizan Bank*,
    927 N.E.2d 46 (Ohio Ct. App. 2010) ....................................................................19

*ABM Farms, Inc. v. Woods*,
    81 Ohio St. 3d 498 (Ohio 1998).....................................................................15, 30

*Andersons, Inc. v. Consol, Inc.*,
    221 F. Supp. 2d 810 (N.D. Ohio 2002).................................................................24

*Arlington Elec. Const. v. Schindler Elevator Corp.*,
    No. L-91-102, 1992 Ohio App. LEXIS 953 (Ohio App. March 6, 1992) ...............36

*Cohen v. Lamko, Inc.*,
    10 Ohio St. 3d 167 (Ohio 1984)..........................................................................19

*Diemert v. Lincoln Wood Prods.*,
    No. 1 11 CV 358, 2012 U.S. Dist. LEXIS 3505 (N.D. Ohio Jan. 11, 2012) ...................28, 29

*EverStaff, LLC v. Sansai Envtl. Techs.*,
    LLC, 2011 Ohio 4824 (Ohio Ct. App., Cuyahoga County Sept. 22, 2011)............................14

*Haddon View Inv. Co. v. Coopers & Lybrand*,
    70 Ohio St.2d 154, 436 N.E.2d 212 (1982) ...........................................................34

*Hamilton v. Sysco Food Servs. of Cleveland, Inc.*,
    170 Ohio App. 3d 203 (Ohio Ct. App., Cuyahoga County 2006) ...........................34

*Hayes v. Computer Assocs. Int'l, Inc.*,
    No. 3:02CV7452, 2003 U.S. Dist. LEXIS 10712 (N.D. Ohio June 24, 2003) .......................30

*Hitachi Med. Sys. Am. v. Horizon Med. Group*,
    No. 5:07CV02035, 2008 U.S. Dist. LEXIS 123313 (N.D. Ohio Oct. 13, 2008).........30, 31, 33

*Household Fin. Corp. v. Altenberg*,
    5 Ohio St. 2d 190, 214 N.E.2d 667 (Ohio 1966) ..................................................19

*Infocision Mgmt. Corp. v. Found. for Moral Law Inc.*,
    No. 5:08CV1412, 2009 U.S. Dist. LEXIS 65867 (N.D. Ohio July 27, 2009)..................12, 15

*Issac v. Ebix, Inc.*,
    No. 2:11-cv-00450, 2012 U.S. Dist. LEXIS 40720 (S.D. Ohio Mar. 26, 2012)......................18

*Kott v. Gleneagles Prof'l Builders & Remodelers, Inc.*,
    197 Ohio App. 3d 699 (Ohio Ct. App., Lucas County 2012) ...................................................14

*Lucas Ford, LLC v. Ford Motor Credit Co.*,
    No. 3:09CV451, 2011 U.S. Dist. LEXIS 51141 (N.D. Ohio May 12, 2011) ...................27, 28

*M. L. Simmons v. Bellman Plumbing*,
    NO. 67832, 1995 Ohio App. LEXIS 2831 (Ohio Ct. App., Cuyahoga County July 6,
    1995) ...........................................................................................................................................39

*McCarthy, Lebit, Crystal & Haiman Co., L.P.A. v. First Union Mgmt.*,
    87 Ohio App. 3d 613, 622 N.E.2d 1093 (Ohio Ct. App., Cuyahoga County 1993)...............35

*McLeod Addicitve Disease Cnt., Inc. v. Wildata Sytems Group, Inc.*,
    No. 2:08-CV-570, 2010 U.S. Dist. Lexis 20643 (S.D. Ohio Mar. 8, 2010) ..........18, 35, 36, 39

*Micrel, Inc. v. TRW, Inc.*,
    486 F.3d 866 (6th Cir. 2007) ....................................................................................................19

*Middlefield Banking Co. v. Deeb*,
    2012 Ohio 3191 (Ohio Ct. App., Geauga County July 16, 2012)................................19, 34, 35

*Premier Bus. Group, LLC v. Red Bull of N. Am., Inc.*,
    No. 08-CV-01453, 2009 U.S. Dist. LEXIS 91647 (N.D. Ohio Sept. 30, 2009)....29, 30, 34, 35

*Roshong v. Fitness Brands Inc.*,
    No. 3:10cv2656, 2012 U.S. Dist. LEXIS 74730 (N.D. Ohio May 30, 2012).........................37

*Stein v. Brown*,
    18 Ohio St. 3d 305, 18 Ohio B. 352, 480 N.E.2d 1121 (1985) ...............................................31

*Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*,
    115 Ohio App. 3d 137 (Ohio Ct. App. 1996) ...........................................................................14

*Thornton v. Cangialosi*,
    No. 2:09-CV-585, 2010 U.S. Dist. LEXIS 51818 (S.D. Ohio May 26, 2010) ........................14

*Thornton v. State Farm Mut. Auto Ins. Co.*,
    No. 1:06-cv-00018, 2006 U.S. Dist. LEXIS 83968 (N.D.Ohio, Nov. 17, 2006)....................34

*Wall v. Planet Ford, Inc.*,
    159 Ohio App.3d 840, 2005 Ohio 1207, 825 N.E.2d 686 (Ohio Ct. App. 2005) ...................14

**STATUTES, RULES & REGULATIONS**

O.R.C. § 1302.29(B) ............................................................................................................36, 37

**OTHER AUTHORITIES**

50 Ohio Jurisprudence 3D, What is Material § 101 (1984)..........................................................24

## I.     __INTRODUCTION__

Hodell admits it executed a written software license agreement with SAP in December 2005, through which it: (a) acquired the right to use SAP's Business One software; (b) was granted a warranty as to the performance of that software; (c) disclaimed all prior representations and implied warranties; and (d) agreed to limit SAP's liability in the event the software did not meet the performance warranty.  In its Amended Complaint, Hodell told a story of an allegedly failed implementation of business software which consisted of three applications: SAP's Business One software; a brand-new application developed by LSi for Hodell called In-Flight; and a warehouse management application called Radio Beacon.  At bottom, Hodell complains this software solution had performance issues and was too slow for Hodell's needs.

Realizing that its contract with SAP precluded any claim other than one for breach of express warranty, Hodell contrived a series of tort claims based on alleged pre-contractual misrepresentations.  When SAP moved to dismiss Hodell's tort claims, there were compelling reasons for granting SAP's motion and limiting Hodell to a breach of warranty claim even then. This included the fact that *every* duty or promise Hodell claims SAP violated arose solely from the parties' license agreement.  However, based mainly on Hodell's complaint allegations that SAP itself had made pre-contractual promises to Hodell, this Court permitted most of Hodell's tort claims to proceed.

Now, after nearly four years of litigation, Hodell still has *no* evidence that SAP made a pre-contractual misrepresentation or that SAP owed or violated a duty arising outside of the parties' contract.  The simple reality is that Hodell's relationship with SAP and its co-defendants is controlled by contracts Hodell willingly signed, and which preclude Hodell's tort claims. Beyond this, discovery has exposed the hyperbole contained in Hodell's pleadings, and Hodell's original allegations of fraud and misrepresentation crumble under its admissions and utter lack of

- 1 -

proof.  Moreover, Hodell is unable to carry its burden in proving that SAP breached any

warranty, and that claim fails as well.

## II.    UNDISPUTED MATERIAL FACTS

### A.    Hodell was introduced to SAP Business One in 2003, but had no contact with SAP until 2007.

Hodell is a wholesaler of fastener and chain products.  *See* Ex. A, Am. Cmplt., ¶9.[1]  Otto

Reidl is the CEO of Hodell, and his son, Kevin Reidl, is the company's president.  *See* Ex. B, Tr.

of Otto Reidl Dep. at 6:7-9; Ex. C, Tr. of Kevin Reidl Dep. at 5:25.

In 2003, Hodell began looking for new business software to run its business and

warehouse operations.  Am. Cmplt. ¶¶16, 34.  According to Hodell, the new software needed to

accommodate up to 300 users.  *Id.*

SAP AG is a developer of business software.  SAP America distributes and licenses such

software, including a software product called Business One.  Hodell first became aware of

Business One in "early 2003" during a conference Otto Reidl attended in Cleveland.  O. Reidl at

83.  Hodell contends that throughout 2003, it received a number of "marketing piece[s]" which

generally described Business One as a software solution for small and midsize businesses.  Am.

Cmplt., ¶18, *see also*, Ex. A to Am. Cmplt.  The information Hodell received in 2003 included

marketing materials which described generally that Business One "help[ed] emerging businesses,

from those with ten to several hundred employees" and that "whether you have 5 employees or

500, the solution helps emerging businesses streamline their operational and managerial

processes."  Am. Cmplt., ¶18.

---

[1] Certain of the relevant facts come from Hodell's amended complaint.  While SAP may dispute those facts should this case proceed to trial, it assumes the cited facts as true for purposes of this motion only.

Although Hodell alleged that this information and other oral representations about Business One were provided by "SAP and/or an SAP 'partner,'" Hodell testified that all of the information it received and considered concerning Business One in 2003 came from Dale Van Leeuwen of defendant IBIS (which had no relationship with SAP), and from individuals at non-party American Express (which promoted its own Business One package different from that at issue in this case). O. Reidl at 101:25-102:3, 115:12-117:5; K. Reidl at 90:18-91:22. In fact, Hodell admits that it had *no* contact whatsoever with SAP until early 2007. O. Reidl at 44:9-45:9.

**B.      Hodell knew Business One alone was insufficient for its needs and that it required the development of new software by LSi and IBIS, which Hodell knew could impact the success of any future software implementation.**

Hodell admits that even as early as 2003, it understood Business One alone could *not* provide all of the functions Hodell needed and that it required other software products, in addition to Business One, to meet its particular needs. O. Reidl at 160:15-24. Specifically, Hodell testified that "Business One was not sufficient for [its] needs . . . [b]ecause it didn't have a warehouse management system, and it did not have the idiosyncrasies of the fastener distribution industry in the base package." *Id*. To make Business One "suitable" for Hodell, it needed to hire LSi and IBIS to develop additional software that would be tailored for Hodell and the fastener industry, and which would then be integrated with the base Business One software. *Id*. at 160:25-161:9. The new product to be developed by LSi and IBIS was called an add-on, and was given the name In-Flight. *Id*.; Am. Cmplt., ¶24.

Hodell contends that during a December 3, 2003 meeting, Dale Van Leeuwen – who was then CEO of IBIS and not affiliated with SAP – represented that "the system" Hodell was contemplating – which would eventually consist of Business One *plus* the yet-to-be-developed

In-Flight add-on and other software – "would be capable of handling 300 users over the next decade." O. Reidl at 215:2-9. Hodell understood, however, that the In-Flight add-on had *not* been developed and, of course, that "no company anywhere in the world had actually implemented SAP Business One with the In-Flight add-on." *Id*. at 164:6-15. In fact, Hodell admits it knew that if the In-Flight software was not properly developed by LSi and IBIS, it could materially impact the ability to later integrate that software with Business One and to implement the overall software solution for Hodell. *Id*. at 169:2-8.

Hodell understood the risks involved with a new software development that essentially had to be built from scratch by LSi and IBIS. *Id*. at 164:16-166:7. To offset this risk, Hodell would profit if the In-Flight application was later resold to other companies in the chain and fastener industry. *Id*. Specifically, Hodell contemplated that if In-Flight was a success and could be resold, Hodell would recover the money it paid to LSi and IBIS to develop In-Flight because Hodell was "taking the risk up front." *Id*. at 165:2.

Additionally, Hodell was to receive "unlimited user licenses for In-Flight . . . at no charge" from LSi and IBIS. Ex. D at 2. Such licenses were being provided to Hodell for free because of a prior dispute Hodell had with IBIS, which did not involve SAP or SAP software. O. Reidl, at 260:2-23, 265:1-18. More specifically, Hodell had previously worked with IBIS and Mr. Van Leeuwan to implement warehouse management software, and Hodell believed it was entitled to "restitution" from IBIS for failures related to that prior software. *Id*. While during discovery Hodell refused to quantify the restitution, or to admit what amount was actually received, Otto Reidl conceded it was in excess of $200,000. *Id*. at 267:1-268:13.

**C.      Hodell entered the Development Agreement with LSi for the development of In-Flight, the integration of that new software with Business One, and the implementation of the overall software solution at Hodell.**

It is undisputed that at the time of Mr. Van Leeuwan's alleged representations on December 3, 2003, SAP had no relationship with IBIS.  On December 31, 2003, IBIS executed a "Limited Term SAP Business One Software Development Kit License" with SAP America.  Ex. E.  Through that agreement, IBIS acquired the right to create separate, stand-alone applications that could be used along with Business One.  *Id*.  It is undisputed that IBIS had no other contractual or business relationship with SAP, and that IBIS was not authorized to license or sell Business One software itself.  *Id*.  In or around June 2004, IBIS merged with LSi.  Am. Cmplt., ¶27.

Prior to that merger, LSi executed an "SAP Business One Software Marketing and Distribution Agreement" with SAP America on December 19, 2003.  Ex. F.  Through this agreement, LSi became a "reseller" of Business One with authority to market and distribute SAP Business One software.  *Id*., ¶2.1.  This agreement further provided that LSi was "an independent contractor and [was] not an agent, employee, or legal representative of SAP . . . [with] no power or authority to . . . make any guarantees or warranties concerning [Business One] or the delivery thereof, or to make any commitments for SAP or to obligate SAP in any respect whatsoever." *Id*., ¶17.8.

Following the merger of IBIS and LSi, Hodell contends that Dan Lowery, LSi's president, "joined in the efforts to sell SAP Business One" to Hodell.  Am. Cmplt., ¶27.  Hodell claims that throughout 2004, it had various communications with Messrs. Lowery and Van Leeuwan, as well as individuals from American Express, and that such communications left

Hodell with the impression that the software was suitable for Hodell.[2] *Id*.; O. Reidl at 215:2-9; K. Reidl at 101:10-103:22, 119:6-120:20.

On December 30, 2004, Hodell entered into the "Inflight Enterprise Development Agreement" with LSi . Ex. D. Pursuant to this Development Agreement, Hodell hired LSi to develop the In-Flight application, integrate that application into Business One, and implement the overall software solution for Hodell. *Id*. According to Hodell, it entered the Development Agreement in reliance on the above-mentioned representations that the software would accommodate Hodell's 300 users. Am. Cmplt., ¶34.

Contrary to the allegations in its Amended Complaint, Hodell now concedes that SAP was *not* a party to the Development Agreement. O. Reidl, at 94. Moreover, this Court has already held that SAP was not a party to the Development Agreement, and that no SAP software was purchased or licensed under that agreement. D.E. 61, pp. 6-7; D.E. 50, p. 10. Among other things, that agreement makes clear that the SAP Business One software would not be purchased from SAP until Hodell acknowledged sufficient progress in development of In-Flight, and that Hodell could be released from its obligations under the Development Agreement. *See* Ex. D. In fact, the Development Agreement called for three installment payments of $60,000 each from Hodell to LSi: one at the time of contracting; one at 150 days after contracting; and one 300 days after contracting. *Id*. at 1. At the 150-day mark, Hodell had the option of requesting a refund of its initial payment and a release from the agreement. *Id*. However, Hodell did not exercise those

---

[2] Hodell contends that American Express was an SAP reseller and that it received certain information concerning the so-called American Express Edition of Business One. However, Hodell admits it did not further consider this software, and does not now contend that misrepresentations were made to it through the materials concerning this software. O. Reidl, at 297:8-298:19.

rights.  Instead, it is undisputed that on May 19, 2005, Hodell made the 150-day installment

payment to LSi.  Ex. G

> **D.**    **Hodell had, or had access to, information that contradicted its belief that the
> software could accommodate 300 users, yet Hodell nonetheless entered into a
> Business One License Agreement with SAP America on December 23, 2005.**

Hodell admits that it became aware of information suggesting that Business One might

not be suitable for its need of having 300 users.  Specifically, "[s]ometime during" 2004 or 2005,

Hodell had "gone on the internet and seen some indication that the number of users [for Business

One] was declining . . . ." O. Reidl, at 110:18-25.  Mr. Reidl is certain this occurred prior to

December 23, 2005, but is unsure whether and Hodell had this information before signing the

Development Agreement in December 2004 or before making the 150-day installment payment

to LSi in May 2005.  *Id*., at 110:24-111:8, 120:6-12.

However, Hodell has produced in this litigation at least two articles that pre-date the

Development Agreement and which state: "Business One targets companies with 50 or fewer

employees," and that "Business One was developed specifically for companies with less than

250 employees, according to [ ] SAP."  Exs. H and I.

Additionally, Hodell admits it also obtained through an internet search a November 1,

2005 document which stated Business One was "[a]imed at companies who are looking for 10-

100 users."  Am. Cmplt., ¶42; O. Reidl, at 205:10-206:13; Ex. J.  While Hodell contends it found

this particular article in connection with preparing its complaint in this case, it does not dispute

the fact that this information was available to it in November 2005.  *Id*. at 206:15-208:13.

On December 23, 2005, Hodell signed a contract with SAP America called the "SAP

Business One Software License Agreement."  Ex. K.  That License Agreement granted Hodell

the right to use SAP's Business One software, and set forth the rights and obligations between

- 7 -

the parties.  *Id.*  Among other things, the License Agreement disclaims any warranty of merchantability or warranty for a particular purpose; provides Hodell with a limited performance warranty; excludes any warranty related to add-on products like In-Flight; limits Hodell's damages; and provides that all previous representations "are merged in, and superseded."  *Id.*, at 3-4.

The License Agreement was signed on Hodell's behalf by Kevin Reidl, who at the time was Hodell's executive vice-president.  *Id.*, at 4. Otto and Kevin Reidl both read the entire License Agreement before Kevin signed.  O. Reidl, at 75:18-25; K. Reidl, at 253:4-6.  Otto Reidl (who was still Hodell's president in 2005), testified that he was aware, for instance, that Article 4.1 of the License Agreement provided that LSi was *not* SAP's agent and had no authority to make representations or warranties on SAP's behalf.  O. Reidl, at 70:8-72:6.

Otto Reidl testified that the License Agreement gave him cause for concern because, in his words, "[t]his was a way for SAP to limit their liability in a situation that wasn't a good one possibly."  *Id.*, at 76:1-13.  He elaborated on this, further testifying that it was his "belief by this time [*i.e.*, December 23, 2005], SAP knew that this [*i.e.*, Business One] would not handle the number of users, and it was a – a way for them to limit their liability."  *Id.*, at 109:14-17.

Moreover, concerning Article 11.9, which provides that the License Agreement is the "Entire Agreement" between SAP and Hodell and supersedes "all previous representations, discussion, and writings," Mr. Reidl had this to say:

> Q: You see paragraph 11.9 headed Entire Agreement? Do you see that paragraph, sir?
> A: Oh, yes.
> * * *
> Q: Did you have any particular understanding of what that meant at the time your son signed this agreement in December 2005?

> A: It is my impression at this point, we're at a point of no return, and *this is SAP's way of getting it, shunting off liability*.

*Id*., at 218:1-219:9 (emphasis added).

He further testified that he and his son "agonized" over signing the Licensing Agreement because they were well aware of its provisions, which he agrees were written in plain English that he understood. *Id*., at 218:8-221:12; 229:17-230:7. The Licensing Agreement was so clear that the Reidls did not bother to show it to Hodell's lawyer, who had been providing Hodell with legal advice for approximately 20 years. *Id*., at 224:25-225:11. In Kevin Reidl's words, the License Agreement "appeared to be pretty standard software licensing stuff, where no one's accountable for anything." K. Reidl, p. 253:10-12. Hodell did not communicate with SAP, nor did it attempt to negotiate the terms of the License Agreement. O. Reidl, at 77:5-78:12. Instead, the undisputed evidence is that Hodell simply executed the License Agreement as written. Ex. K.

While Hodell's Amended Complaint tells a different story, Hodell now admits that any and all rights it had to use SAP's software arose exclusively through the December 23, 2005 License Agreement. O. Reidl, at 224:6-13. Hodell also admits that it did not receive delivery of any software from SAP until after signing the License Agreement, and that it "had nothing more than a business-to-business, or arms' length relationship [with] SAP." *Id*., at 104:14-18, 236:19-24. And the undisputed evidence is that contemporaneously with the License Agreement, LSi placed an order with SAP, on Hodell's behalf, for 80 licenses of Business One software. Ex. L. Hodell thereafter took delivery of Business One, and worked along with LSi to implement that software with the newly-developed In-Flight application.

     **E.**     **Hodell's testing of the overall software solution revealed "unacceptable"**
          **performance issues which caused Hodell's IT director to recommend against**
          **"going live," yet Hodell ignored that advice and now complains it was**
          **defrauded because it later experienced the same performance issues it was**
          **aware of before going live, and even though it ran the software for two years.**

LSi's and Hodell's efforts to implement Business One, along with In-Flight and other add-on software at Hodell, took until March 2007, at which time Hodell decided to "go-live" on this software solution.  K. Reidl, at 131:17-132:9.  Prior to going live, Hodell was responsible for testing the software in its own environment.  *Id*., at 282:3-284:7.  According to Hodell's IT director, Terry Phillips, Hodell's pre-go-live testing revealed that the overall solution had "unacceptable" issues, including performance problems and missing functionality from the In-Flight add-on.  Ex. M, Tr. of T. Phillips Dep. at 24:4-18.  Concerning performance, Mr. Phillips testified that the speed of the overall solution was too slow for Hodell's purposes, and he thus recommended to Kevin Reidl, who had become Hodell's president, that Hodell *not* go-live on the solution unless and until these issues were resolved.  *Id*., at 24:13-27:17.

Mr. Phillips was the *only* Hodell employee with formal computer science training.  *Id*., at 29:11-15.  However, despite his advice, Hodell nonetheless decided to go-live with the solution in early March 2007.  *Id*., at 27:23-28:1; 28:21-25  Mr. Phillips was thus not surprised to find that the same performance issues existed in the solution after Hodell went live over his advice.  *Id.,* at 27:23-30:25.  Indeed, he knew the issues had not been resolved, and that they would exist after go-live.  *Id*., at 30:12-21.

Quite remarkably, and in sharp contrast to the allegations of Hodell's Amended Complaint, Hodell now admits that it ran its business and warehouse operations using the software solution for two years, from March 2007 until April 2009.  K. Riedl, at 146:24-147:15.  In fact, at the time Hodell commenced this action in November 2008, alleging its software

implementation was a complete failure, Hodell was actually running its business using that very same allegedly failed software. *Id*. at 146:24-147:15, 454:19-455:3.

While Hodell now contends that it continued to experience performance issues during the two years it ran the software solution – which consisted of Business One, In-Flight, and another add-on product called Radio Beacon – it admits that these same issues existed prior to go-live, that it was aware of these issues prior to go-live, and that it decided to go-live anyway against the advice of its IT director.  T. Phillips, at 24:4-30:18.

## III.  ARGUMENT

Hodell initially alleged claims of fraudulent inducement (count one), fraud (count two), breach of contract concerning the Development Agreement and the License Agreement (count three), negligence (count four), and negligent misrepresentation (count five).  Following SAP's motion to dismiss, the Court dismissed: (a) Hodell's negligence claim against both SAP defendants; (b) Hodell's breach of contract claim concerning the Development Agreement against both SAP defendants; and (c) Hodell's breach of contract claim concerning the License Agreement as to SAP AG.  The remaining claims against the SAP defendants are for fraudulent inducement, fraud, and negligent misrepresentation against SAP America and SAP AG. Hodell's breach of contract claim, concerning the License Agreement, remains against SAP America only.  As set forth below, each of Hodell's remaining claims against SAP (and, in fact, against all defendants) fail as a matter of law for a variety of independent reasons.

### A.  The License Agreement controls the relationship between SAP and Hodell, and precludes Hodell's tort claims.

Ohio law is clear:  "the existence of a contract action generally excludes the opportunity to present the same case as a tort claim [and] [i]f the gravamen of the complaint is for breach of contract, the cause of action will not be transformed into one sounding in tort by the charge of

tortious conduct or the addition of the adverbs 'intentionally,' 'willfully,' and 'fraudulently.'"
*Infocision Mgmt. Corp. v. Found. for Moral Law Inc.*, No. 5:08CV1412, 2009 U.S. Dist. LEXIS
65867, *10-11 (N.D. Ohio July 27, 2009).

Here, Hodell admits it signed the License Agreement with SAP on December 23, 2005.
According to Otto Reidl, Hodell read and understood the entire License Agreement and, in fact,
"*agonized*" over signing it because Hodell understood that the agreement: (1) disclaimed all pre-
contractual representations; (2) limited SAP's liability; (3) provided Hodell with an express,
limited performance warranty; and (4) disclaimed any implied warranties. O. Reidl, at 218:13-
25; 219:1-25; 220:21-222:23. In the words of Mr. Reidl, the License Agreement was written in
plain English and he understood what it meant. *Id*., at 229:27-230:7

According to the terms of the License Agreement, the software Hodell would receive
from SAP was "the SAP Business One software product . . . and any new releases. . . ." Ex. K,
¶1.10. The agreement specifies that SAP was obligated to provide such software to Hodell
pursuant to any "order for the Software (including without limitation present and future orders)
placed by [Hodell] or on its behalf by an SAP Reseller [*i.e.*, LSi]. . . ." *Id*. It also defines the
parameters of the licenses purchased by Hodell, the manner in which Hodell could use SAP's
software, and the confidential and proprietary nature of SAP's software, among other things.
Without the License Agreement, SAP had no obligation to provide software to Hodell, a fact
which Hodell now begrudgingly admits. O. Reidl, at 224:6-13.

Moreover, it is undisputed that on December 23, 2005, LSi placed an order with SAP, on
Hodell's behalf, for 80 Business One licenses. Ex. L. And, as Hodell admits, it took delivery of
the Business One software in 2006, only after it signed the License Agreement.

Hodell will attempt to create a factual issue by arguing that it actually acquired 80 licenses from SAP in December 2004 when it signed the Development Agreement with LSi, and that the License Agreement applies only to the alleged subsequent acquisition of 40 additional licenses.  This argument has no logical or factual support, and has already been rejected by the Court.  Specifically, in ruling on SAP's motion to dismiss, the Court held that SAP is not, and was never, a party to the Development Agreement, and therefore Hodell could not have acquired anything from SAP under that contract.  D.E. 50, p. 13; D.E. 61, p. 8.

The Court also correctly ruled that the Development Agreement is a contract between Hodell and LSi/IBIS; neither SAP America nor SAP AG was a party to the Development Agreement; the Development Agreement "did not obligate Hodell to purchase the Software from SAP;" and the Development Agreement called for Business One to be purchased from SAP at a later date, after Hodell approved "satisfactory progress reviews for the separate development of IBIS's In-Flight Application."  D.E. 50, p. 13; D.E. 61, p. 8.  Based on these findings, the Court dismissed any claims against SAP America and SAP AG arising from the Development Agreement.  *Id*.  The Court also flatly rejected Hodell's suggestion that Hodell actually acquired licenses from SAP through the Development Agreement in December 2004.[3]  *Id*.

Thus, it is the law of this case that the only contract between Hodell and any of the SAP defendants is the December 2005 License Agreement between Hodell and SAP America.  It

---

[3] As this Court correctly held, the purpose of the 2004 Development Agreement was to memorialize the terms agreed to by Hodell and LSi, whereby LSi would develop a *new* software application for Hodell that would integrate with SAP's Business One software.  D.E. 50, p. 10.  By the terms of the Development Agreement, Hodell did not purchase software from SAP, which was not a party to that agreement.  Instead, Hodell effectuated the purchase of the Business One software through the License Agreement in December 2005.  Indeed, as the Court recognized, the Development Agreement itself provides that Business One would not actually be purchased from SAP until Hodell gave satisfactory progress reviews for LSi's separate development of the new In-Flight software application.  D.E. 50, p. 13, n. 8.  Unsurprisingly, the undisputed evidence is that Hodell signed-off on the progress of In-Flight on May 19, 2005, and the Business One software was only ordered by LSi from SAP *after* that occurred.  Ex. G.

logically follows from this that any and all rights Hodell had to use SAP's software arose
exclusively from the License Agreement, without which Hodell would not have received any
software at all from SAP.  *See* O. Reidl, at 224:6-13.

> **B.**      **Because Hodell is unable to establish the existence of a duty owed by SAP
> America or SAP AG outside of the License Agreement, Hodell's tort claims
> are barred as a matter of law.**

As this Court already held, Hodell's fraud and negligent misrepresentation claims cannot
succeed unless Hodell establishes that SAP owed a duty independent of that arising from the
License Agreement.  *See* D.E. 61, p. 12, (citing *425 Beecher, LLC v. Unizan Bank*, 186 Ohio
App. 3d 214, 230 (Ohio Ct. App., Franklin County 2010) ("[A] tort claim based upon the same
actions as those upon which a breach of contract claim is based will exist independently of the
contract action 'only if the breaching party also breaches a duty owed separately from that
created by the contract, that is, a duty owed even if no contract resulted.'")).[4]  While Ohio
recognizes a general common law duty to refrain from making fraudulent representations to
induce a party to enter a contract, in order to impose a duty in the context of a fraudulent
inducement claim, a plaintiff must prove a misrepresentation *collateral to* the parties' contract.
*Thornton v. Cangialosi*, No. 2:09-CV-585, 2010 U.S. Dist. LEXIS 51818, *10 (S.D. Ohio May
26, 2010) (citing *Wall v. Planet Ford, Inc*., 159 Ohio App.3d 840, 850-51, 2005 Ohio 1207, 825
N.E.2d 686, 694 (Ohio Ct. App. 2005) (giving an example of a termite inspector falsely

---

[4] It is clear under Ohio law that fraud and negligent misrepresentation claims fail unless a plaintiff establishes the
defendant owed and breached a common law duty.  *See*, *e.g.*, *Kott v. Gleneagles Prof'l Builders & Remodelers, Inc.*,
197 Ohio App. 3d 699, 704 (Ohio Ct. App., Lucas County 2012) (fraud in the inducement claim precluded by
parties' contract and cannot exist unless plaintiff proves a duty owed separate from the contract) (citing *Textron Fin.
Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App. 3d 137, 151-53 (Ohio Ct. App. 1996) (fraudulent inducement and
negligent misrepresentation claims require existence and violation of non-contractual duty)); *EverStaff, LLC v.
Sansai Envtl. Techs*., LLC, 2011 Ohio 4824, P28 (Ohio Ct. App., Cuyahoga County Sept. 22, 2011) (plaintiff must
plead and prove existence of "a duty independent of that created by contract.").

representing that a house is infested with termites in order to induce the homeowner to enter into a pest control contract)); *see also Infocision Mgmt. Corp*., 2009 U.S. Dist. LEXIS 65867, *21-22 (dismissing fraudulent inducement claim on summary judgment where plaintiff "offered no evidence supporting the existence of an independent duty, instead assuming a duty to refrain from misrepresentations.").

As the Ohio Supreme Court explained, fraudulent inducement claims hinge on:

> a misrepresentation of facts outside the contract or other wrongful conduct [inducing] a party to enter into the contract. Examples include a party to a release misrepresenting the economic value of the released claim, or one party employing coercion or duress to cause the other party to sign an agreement.

*ABM Farms, Inc. v. Woods*, 81 Ohio St. 3d 498, 503 (Ohio 1998).

Here, although Hodell alleged to the contrary in its pleadings, it now admits it had *absolutely no contact with SAP until early 2007*.  O. Reidl at 42:8-13; 45:3-9; 94:14-95:9; 116:19-117:5; 185:2-12; 198:18-199:1.  Thus, Hodell's *allegations* in its Complaint and Amended Complaint that SAP itself made pre-contractual promises to induce Hodell to enter into the December 2004 Development Agreement and the December 2005 License Agreement, and that SAP, in the course of its business, supplied Hodell with false information for Hodell's guidance in selecting Business One, are now belied by the undisputed facts of record.  Notably, in deciding SAP's motion to dismiss, the Court accepted these allegations as true and held that Hodell had adequately *alleged* a violation by SAP of a pre-contractual duty collateral to the License Agreement, and thus declined to dismiss Hodell's misrepresentation claims.  *See* D.E. 61, p. 13; D.E. 50, pp. 17-18.  However, Hodell's admissions now conclusively establish that these allegations were unsupported, and that its tort claims fail because Hodell has not, and cannot, establish that SAP owed or violated a duty outside of the License Agreement.

Indeed, the record establishes that Hodell's tort claims are based entirely on the contention that Business One was not suitable for Hodell's particular purpose, which topic is directly covered by the terms of the License Agreement.  Specifically, Hodell contends that Dale Van Leeuwen, then the CEO of IBIS (and with no affiliation to SAP), misrepresented at a December 3, 2003 meeting with Hodell that the "system" would be capable of handling 300 users at Hodell over the next decade, and that substantially the same information was conveyed by Dan Lowery of LSi during a conversation sometime in 2004.  O. Reidl, at 213:25-214:4; 215:1-9; K. Reidl, at 101:5-103:1.  Hodell also claims it was provided literature about Business One, which stated that Business One was suitable for companies with up to 500 "employees," that Hodell understood this to mean that Business One could accommodate 500 *users*, and that this corroborated the statements of Messrs. Van Leeuwan and Lowery.  According to Hodell, Business One did not have such capabilities because when implemented in its environment along with the In-Flight and Radio Beacon add-ons in March 2007, the entire system performed too slowly for Hodell's needs.

However, the License Agreement – which Hodell admits it signed without ever communicating directly with SAP in what Hodell concedes was simply an arms' length business transaction – clearly disclaims reliance on all prior representations.  It also deals *directly* with the capabilities of Business One and the warranties and promises made about that software, and disclaims any responsibility on SAP's part for add-on products or other software not developed or licensed by SAP.

Specifically, the License Agreement provides:

> 11.9    Entire Agreement.  This Agreement and each Schedule and Appendix hereto **constitute the complete and exclusive statement of the agreement between SAP and Licensee, and all previous representations, discussions, and writings are merged in, and superseded by, this Agreement**.  This Agreement may be modified only by a writing signed by both parties.  This Agreement and each Appendix hereto shall prevail over any additional, conflicting, or inconsistent terms and conditions which may appear on any purchase order or other document furnished by Licensee to SAP.

Ex. K, § 11.9 (emphasis added).  Hodell also agreed to a limited warranty

concerning the performance of Business One, and disclaimed any warranty that

Business One was either merchantable or suitable for Hodell's particular purpose:

> 7.    PERFORMANCE WARRANTY/MAINTENANCE
>
> 7.1    Warranty.  *SAP warrants that the Software will substantially conform to the functional specifications contained in the Documentation for six months following delivery*.  The warranty shall *not* apply:  (i) if the Software is not used in accordance with the Documentation; or (ii) *if the defect is caused by a Modification, Integration Add-On, Licensee, third-party software, or third-party database*.  SAP does not warrant that the Software will operate uninterrupted or that it will be free from minor defects or errors that do not materially affect such performance, or that the applications contained in the Software are designed to meet all of Licensee's business requirements.
>
> 7.2    Express Disclaimer.  SAP AND ITS LICENSORS DISCLAIM ALL OTHER WARRANTIES EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE EXCEPT TO THE EXTENT THAT ANY WARRANTIES IMPLIED BY LAW CANNOT BE VALIDLY WAIVED.

Ex. K, §§ 7.1, 7.2 (emphasis added to § 7.1 only).[5]

---

[5] As discussed in Section III. D, this warranty disclaimer complies in all respects with Ohio's UCC, and is fully enforceable.

Here, the License Agreement is the "complete and exclusive statement of the agreement between SAP and [Hodell]," and it addresses directly – *not* collaterally – any promise concerning the performance of Business One generally or for Hodell specifically.  As a result, and given that Hodell also disclaimed reliance on pre-contractual representations, Hodell cannot establish a tort claim based on any pre-contractual promises about Business One's suitability generally, or for Hodell's particular purposes specifically.  *See McLeod Addictive Disease Cnt., Inc. v. Wildata Systems Group, Inc.*, No. 2:08-CV-570, 2010 U.S. Dist. Lexis 20643, *11 (S.D. Ohio Mar. 8, 2010) (holding promises not reflected in the terms of an integrated software license agreement are precluded by the parol evidence rule).

Moreover, the undisputed facts show that Hodell's fraud and contract claims are based on identical allegations, and its fraudulent inducement claim (count one) therefore fails as a matter of law.  *See*, *e.g.*, *Issac v. Ebix, Inc.*, No. 2:11-cv-00450, 2012 U.S. Dist. LEXIS 40720, *15 (S.D. Ohio Mar. 26, 2012) (granting motion to dismiss fraudulent inducement claim because it is factually intertwined with breach of contract claim and does not arise from a promise collateral to the contract, and because plaintiff used the same allegations to support its fraud and contract claims).  And because Hodell's fraud claim (count two) is indistinguishable from its fraudulent inducement claim, that claim fails for the same reasons as count one.[6]

Hodell's remaining tort claim is for negligent misrepresentation (count four).  While in limited circumstances Ohio law recognizes a common law duty to supply accurate information, a negligent misrepresentation claim can "exist independently of the contract action 'only if the

---

[6] Indeed, this Court did not distinguish the two claims when dealing with them on SAP's motion to dismiss, and when asked at deposition about any differences between the claims, Hodell could offer none.  O. Reidl, at 217:8-18 (admitting Hodell's fraudulent inducement and fraud claims are based on the same allegations of misrepresentations prior to the December 23, 2005 License Agreement).

breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed.'"  D.E. 61, p. 12 (citing *425 Beecher, LLC v. Unizan Bank*, 927 N.E.2d 46, 59 (Ohio Ct. App. 2010)).  Because this claim is predicated on the same alleged representations underlying Hodell's breach of contract claim and its other tort claims, the negligent misrepresentation claim fails as well.  *See* O. Reidl, at 234:12-235:23 (admitting that identical factual allegations of pre-License Agreement misrepresentations form the basis of each of Hodell's tort claims).

> C.   **Even if Hodell could establish that SAP owed a duty outside of the License Agreement, Hodell's misrepresentation claims fail because Hodell cannot establish the other elements of its claims.**

In addition to the fact that Hodell is unable to establishing a duty outside of the parties' contract, Hodell cannot take its case to a jury because it lacks any evidence – let alone the *clear and convincing* evidence required – of: (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance.[7]  *See Cohen v. Lamko, Inc.*, 10 Ohio St. 3d 167 (Ohio 1984); *see also*, *Middlefield Banking Co. v. Deeb*, 2012 Ohio 3191, P30 (Ohio Ct. App., Geauga County July 16, 2012) (defining elements of negligent misrepresentation to require, *inter alia*, evidence

---

[7] In an attempt to avoid the License Agreement's integration clause and limited warranty and damages provisions, Hodell contrived claims of fraudulent and negligent misrepresentation.  However, Hodell must prove each of the elements of such claims with clear and convincing evidence – a burden it cannot met.  *See Household Fin. Corp. v. Altenberg*, 5 Ohio St. 2d 190, 214 N.E.2d 667, 669-70 (Ohio 1966) (Action to "set aside or reform a written contract" requires "clear and convincing evidence of the fraud."); *Micrel, Inc. v. TRW, Inc*., 486 F.3d 866, 873-874 (6th Cir. 2007) ("When a plaintiff seeks to set aside a written document, clear and convincing evidence of fraud is required.").

of false information supplied for the purpose of guiding others which is reasonably relied upon by the plaintiff to its detriment).

      **1.**     **Hodell has no evidence that Business One was incapable of handling up to 300 users, and thus has no evidence of a false representation, and further has no evidence that SAP knew Business One would have slow performance for Hodell.**

For Hodell to establish that Business One was incapable of handling any particular number of users – whether Hodell's actual users or the 300 users Hodell hoped to have in the future – Hodell must offer proof of how Business One actually performed or failed to perform. But Hodell cannot do this because it is undisputed that Hodell never intended to, nor did it, implement only Business One.  Instead, Hodell hired LSi to develop In-Flight – a brand-new, undeveloped, and untested product – and to the integrate both In-Flight and Radio Beacon with Business One.  *See* Ex. D.

Hodell concedes that this is precisely what was done by LSi, and that it went live on this integrated software solution in March 2007.  To be clear, the undisputed evidence is that Hodell *never* ran Business One by itself, and thus is completely unable – whether through its fact witnesses or its expert – to offer *any* evidence that Business One could not, in general, meet the needs of a company with 300 users, or that it was unable to do so for Hodell specifically.

Moreover, Hodell admits it ran its entire business operations on the integrated software solution for two years, but complains that the speed and performance of this system was too slow.  Yet, Hodell has offered not a scintilla of evidence that this was because Business One itself could simply not handle any particular number of users.

Remarkably, the *only* piece of evidence from Hodell concerning how Business One performed – when running by itself at Hodell – comes from a November 14, 2006 Hodell email discussing pre-go-live testing done by Hodell:

> Kevin and I did a little test running SAP without InFlight. *SAP ran very nicely*. We installed InFlight and SAP began to crawl.

Ex. N (emphasis added).  Of course, Hodell tries to distance itself from this email, claiming that the referenced test was perhaps limited to only two users, and that no expansive testing of Business One, by itself, with all of Hodell's users, was ever performed at Hodell.  K. Reidl, at 289:14-292:6.  But whether the testing involved only some or all of Hodell's users is not material, because the only evidence on the issue is that Business One, by itself, "ran very nicely" for Hodell, and Hodell has no evidence that Business One alone did not or could not perform for Hodell, whether it had two users, 80 users, or even 300 users.

Indeed, Hodell's own expert witness, Helmut Gümbel, concludes that Hodell's performance issues on the overall integrated software solution were caused by a confluence of factors, including: (1) Hodell's database size and administration, for which only Hodell was responsible; (2) Hodell's transaction volume, which factor was unique to Hodell; (3) what he believes are some inherent limitations within Business One; (4) issues inherent in the In-Flight code for which SAP made no promise and which had not been developed by LSi at the time of the alleged false statements in 2003 and 2004; and (5) Hodell's own "[h]ardware/network infrastructure."  *See* Ex. O, Gümbel Rpt., pp. 13-14.

Hodell's hope is that the Court will permit it to offer speculative evidence that because, when the integrated software with Business One was eventually installed in its environment the performance was slow, this must mean that Business One could only handle a certain limited

- 21 -

number of users, whether for Hodell or any other potential Business One customer.  But this claim is not based on any evidence, and is instead one of pure speculation and conjecture. Hodell will likely argue that a disputed issue of fact arises because its expert concludes that "Hodell would have experienced unsatisfactory performance even if SAP Business One had been installed as a stand-alone product." *Id*. at 17.  However, there is zero support for this conclusion because Hodell *never* implemented Business One as a stand-alone product, and even its expert is guessing that Hodell *might* have had such issues with Business One alone – an untenable and unsupportable conclusion given Hodell's admission that Business One alone "ran very nicely." Ex. N.

To be sure, whatever issues Hodell experienced were, in its own expert's view, caused by a host of factors – including Hodell's own unique hardware and network environment – and there is no evidence as to how Business One, by itself, performed (or failed to perform) for Hodell.  Thus, Hodell's speculation aside, it has *no* evidence that Business One could not, in fact, handle up to 300 users, and all of its misrepresentation claims thus fail for lack of evidence of any false representation.  Notably, Hodell has failed to offer any concrete, specific evidence of the exact problems it experienced while running Business One with In-Flight and Radio Beacon. Instead, Hodell relies on generalized allegations that the system was "far too slow."  K. Reidl, at 350:13-16.  And Hodell has produce no evidence that it tracked the performance of the system such that it could explain, for example, exactly how long it took to complete certain processes or transactions, and then explain how or why that performance was unacceptable.  Of course, Hodell has no evidence that it had been promised any particular speed, or even that it had an expectation that certain processes and transactions would be completed within a certain time.

Moreover, even if Hodell could prove that Business One could not handle a certain number of users, Hodell has no evidence that SAP knew this with respect to Hodell when Hodell licensed that software in December 2005. This is true because the undisputed evidence is that Hodell's vague performance issues were related (at least in part) to the volume of transactions Hodell ultimately ran on the system, and the evidence is that SAP had *no knowledge* until after go-live of how Hodell intended to use the system.[8]

Specifically, Marcia Weissman of LSi testified (consistent with the conclusions of Hodell's expert) that she believes the issues Hodell experienced came from "the volume of data input, which was very, very large [a]nd possibly [LSi] had not understood initially how – how large that was." Ex. P., Tr. of Marcia Weissman Dep., at 50:25-51:6. She testified, for example, that LSi was not aware that Hodell would be entering "really, really long documents, sales orders, purchase orders, and so on," that Hodell's large "sales orders were the biggest element that were the problem," and that LSi did not "realize how much of that was going on." *Id*. at 51:5-12.[9]

---

[8] Importantly, Hodell appears to concede that by the middle of May 2007, approximately two months after go-live, the only issue which persisted and which it believes might have derived from Business One was related to this same allegedly slow system performance. K. Reidl, at 348:4 -350:16. And it appears that most (or all) of this slowness occurred when Hodell's users would enter very large transactions with hundreds of lines of information. *Id*. But the only measured performance of the system comes from documents produced by LSi and SAP, which show that performance was acceptable. As pointed out in the motion for summary judgment filed by LSi and IBIS, on May 21, 2007, Jon Woodrum, LSi's project manager for the Hodell implementation, visited Hodell's St. Louis location to observe the performance of Business One with the In-Flight add-on. He reported that "[l]arge orders are seeing enter per line improvements to one to two seconds," and that large line items transactions were running well with no limitations or performance issues. Mr. Woodrum found performance of Business One and In-Flight to be acceptable. Other LSi employees who had first-hand knowledge of the Hodell implementation believed that Business One with In-Flight and Radio Beacon was operating at a satisfactory level for Hodell probably 2 to 3 months after go-live. *See* D.E. 105, p. 25 (citing testimony of Jon Woodrum and Eric Johnson). While Hodell will attempt to create a factual issue here, and claim vaguely (without specific evidence of the type needed to take a case to a jury) that performance of the system was unacceptable and too slow, the important undisputed fact is that SAP had no idea until after go-live that Hodell was intending to use the system in the way it did.

[9] Ms. Weissman further testified that she believes Hodell did not fully inform LSi of the way in which Hodell was going to be using the system and the volume of transactions Hodell actually intended to process, and that the volume

(Continued)

- 23 -

It follows as a matter of undisputed fact that if LSi admits it did not know of Hodell's actual transaction volume and the manner in which Hodell was planning to use the system, then neither did SAP, which had no involvement in the implementation of Business One or In-Flight at Hodell.  Hodell has no evidence to the contrary.  Thus, even if Hodell could establish that a false statement was made to it prior to entering the License Agreement, Hodell has no evidence that SAP actually knew that such a statement was false because Hodell cannot prove that SAP knew the details of how Hodell intended to use the system and that SAP, with this knowledge, nonetheless told Hodell that Business One would meet its needs.  That simply did not occur.

> **2.**      **Because Hodell admits it had information contradicting the alleged misrepresentations, Hodell cannot prove that such representations were material to its decision to enter the Development Agreement or the License Agreement.**

If a plaintiff would not have changed its decision had it known the truth of an alleged false statement, such statement cannot as a matter of law be material to the transaction.  *See Andersons, Inc. v. Consol, Inc.*, 221 F. Supp. 2d 810, 812-813 (N.D. Ohio 2002) (Citing 50 Ohio Jurisprudence 3D, What is Material § 101 (1984) ("The representations must have operated as an inducement to the making of the contract in question, that is, must have influenced the mind of the party to whom they are made in making the contract or fixing its terms.")).  Based on the undisputed facts, Hodell cannot establish that any of the statements that purportedly form the basis of its tort claims was material to its decision to license Business One because Hodell admits it had information contradicting those purported statements *before* executing the Development Agreement and the License Agreement.  Yet it signed those contracts anyway.

---

(Continued)

of Hodell's transactions was a significant factor in the performance issues Hodell now complains of.  M. Weissman, at 56:16-57:13.

Hodell alleges that "[e]ssential to [its] decision" to license Business One was the representation by Messrs. Van Leeuwan and Lowery that Business One would support Hodell's anticipated need for 300 users over a ten-year period.  Am. Cmplt, ¶34.  In other words, Hodell contends that it would not have licensed Business One if it had information suggesting that Business One was not capable of handling up to 300 users.

However, even in its Amended Complaint, Hodell admitted that it was in possession – prior to entering the Development Agreement in December 2004 – of an October 2004 SAP news release stating "Business One was developed specifically for companies with less than 250 employees, according to [ ] SAP."  Am. Cmplt., ¶42; Ex. I.  Otto Reidl affirmed this during his deposition, but claimed he "assumed" this meant Business One was capable of handling up to 250 users.  O. Reidl., at 116:7-18; 117:11-118:3; 127:2-8; 201:16-202:25.  Regardless of Hodell's efforts to twist the words of this document as between *employees* and *users* (which is discussed below), it clearly contradicted the information Hodell claims it had been given about Business One.  But Hodell did nothing to investigate this information.  *Id*., at 203:1-10.

When Kevin Reidl was questioned on this issue, he offered confusing testimony that contradicts Hodell's present theory that Business One needed to support 300 users for Hodell.  Instead, he testified that Business One was suitable even if it was meant for companies with only up to 250 employees:

> Q. How many users in 2004 did you expect you might have in the future?
> A. Up to 300 users.
> Q. So if you had information that the software was for companies with up to 250 employees, yet you had expectations of up to 300 users, would that have made Business One a nonstarter for you?
> A. Up to 250 employees, no.  Wouldn't have made it a nonstarter, because we would have considered users.

> Q. Well, you say you were -- had expectations of up to 300 users,
> right?
> A. Right, over the useful lifespan of the product.
> Q. If you were aware of information that said that Business One
> was suitable for companies with up to 250 users, would that have
> made Business One a nonstarter for you?
> A. I don't believe so. I think that was – [end of testimony].

K. Reidl, at 103:20-104:25.  Whatever might be said of Hodell's present confusion in the stories of its witnesses and with its claims, it is clear that Hodell was aware of information that contradicted the *allegedly* false statement that Business One was suitable for companies with up to 300 users.

Indeed, Hodell has also produced another article from October 2004 stating that "Business One targets companies with 50 or fewer employees."  Ex. H.  Additionally, Hodell admits it also obtained through an internet search a November 1, 2005 document which stated Business One was "[a]imed at companies who are looking for 10-100 users."  Am. Cmplt., ¶42; O. Reidl, at 205:21-206:13; Ex. J.  While Hodell claims it does not know when it actually came into possession of this information, it cannot dispute that such information was available to it and other members of the public *before* it even signed the Development Agreement in December 2004, and well before it signed the License Agreement in December 2005.

Yet, this information apparently did not impact Hodell's decision making, as Hodell nonetheless entered the License Agreement in December 2005.  Accordingly, Hodell can hardly be heard to now complain that any of the defendants made a material false representation that induced Hodell to act, and Hodell's tort claims fail as a matter of law against all defendants.

3.     **Hodell cannot establish that it reasonably relied on any alleged misrepresentation about Business One.**

As this Court recently held in granting summary judgment for lack of reasonable reliance:

> the components of justifiable reliance on representations of another in a business context are: A party must prove not only that he acted in reliance on a material misrepresentation, but also that he had a right to do so.  Reliance is "that degree of care which would be exercised in an average transaction between persons under similar circumstances. . . ."  Factors to be considered in determining whether reliance is reasonable include "the nature of the transaction, the form and materiality of the representation, the relationship of the parties, the respective intelligence, experience, age and mental and physical condition of the parties, and their respective knowledge and means of knowledge."  An individual "has no right to rely on misrepresentations when the true facts are equally open to both parties."  As a general rule under Ohio law, an individual "is expected to conduct his or her dealings with proper vigilance."  "Such vigilance imputes a duty upon one to reasonably investigate the truth of representations made prior to reliance thereon."  An individual must avail himself of information that is easily accessible to him.

See *Lucas Ford, LLC v. Ford Motor Credit Co.*, No. 3:09CV451, 2011 U.S. Dist. LEXIS 51141, *10-11 (N.D. Ohio May 12, 2011) (dismissing fraudulent inducement claim where plaintiff "presented no evidence as to its due diligence" and holding "[n]o reasonable businessman relies on the say-so of a third party when acquiring a business – even where that third party can be assumed to know all about the business and its affairs.  It's up to the purchaser to do his own due diligence.").

Here, having admitted its pre-contractual knowledge of information that contradicted the *allegedly* false statement that Business One was suitable for up to 300 users, Hodell cannot establish the element of reasonable reliance.  Indeed, Otto Reidl admitted that information from the articles and news releases described above would have caused Hodell to conclude that

- 27 -

Business One was *not* a proper product for it, as Hodell was envisioning at least 120 initial users, and growing to 300 or more.  O. Reidl, at 202:13-25; 206:23-208:13; K. Reidl, at 103:23-104:25.  And despite Hodell's suspicion *before* signing the License Agreement that SAP knew Business One was not suitable for Hodell and that SAP was "shunting off liability," Hodell did not bother to take any action, conduct any investigation, or ask any questions of SAP.

In fact, Hodell has offered no evidence in this case that it conducted any due diligence or investigation, let alone a reasonable one.  Instead, Hodell's refrain has been that it simply relied, without question or concern, upon the statements of Messrs. Van Leeuwan and Lowery made in 2003 and 2004.  Simply put, Hodell did not, as a matter of law, act with the sort of "vigilance" required, nor did it avail itself of information that was either in its possession or easily accessible.  *See Lucas Ford, LLC*, 2011 U.S. Dist. LEXIS 51141, *10-11.

Moreover, it is clear that Hodell's attempt to create a misrepresentation is unreasonable because the documents it claims corroborate the allegedly false statements of Messrs. Van Leeuwan and Lowery are mere marketing materials upon which Hodell could not rely as a matter of law.  *Diemert v. Lincoln Wood Prods.*, No. 1 11 CV 358, 2012 U.S. Dist. LEXIS 3505, 8-9 (N.D. Ohio Jan. 11, 2012) ("Statements of opinion and sales 'puffery' are insufficient to form the basis of a fraud claim . . . because such statements cannot reasonably be relied upon by the recipient.").

More specifically, Hodell claims that in 2003 it received a document called the SAP Business One Brief which described Business One "as 'robust and fully integrated' software for businesses 'with 10 to several hundred employees.'"  Am. Cmplt., ¶18.  Hodell also claims it had a "contemporaneous marketing piece" called the "SAP Solution Brief" which included statements such as "SAP Business One is easy to use" and "[w]hether you have 5 employees or

- 28 -

500, the solution helps emerging businesses streamline their operational and managerial processes." *Id.*  All told, Hodell contends that the representations made to it about Business One through these documents caused Hodell to believe that Business One: (a)  was "an affordable and easy to implement solution designed from the ground up to address the needs of small and midsize businesses;" (b) provided "robust and fully integrated financial and sales management capabilities;" (c) provided "managers on-demand access to critical real time information;" (d) was "the one solution designed for key decision makers that helped them do it all – make more profitable decisions, grow their businesses, and stay ahead of their competition; (e) was "an affordable, powerful business solution that allowed everyone in the organization to get the information they need – in real time;" and (f) provided "the ability to manage practically all of [Hodell's] core operations." *Id.*, ¶28.

Hodell obviously used its Amended Complaint to throw a lot against the wall to see what would stick.  However, the crux of its claims is that through these general, non-specific "marketing pieces," Business One was misrepresented as being suitable in every way for companies with up to 500 users.[10]  But assuming for the sake of argument that these marketing materials contained false information (and there is no proof they did), Hodell admits these materials were *not* prepared specifically for it, and that they were simply general statements about Business One which are not actionable as misrepresentations.  Indeed, these are nothing more than mere statements of opinion or sales "puffery" upon which no reasonable person can rely as a matter of law.  *See Diemert*, 2012 U.S. Dist. LEXIS 3505, *8-9 (granting summary judgment where plaintiff sought to rely upon statements by a salesman about the "quality and

---

[10] Hodell does not appear to contend at this point that Business One lacked any functionality.  Instead, Hodell's focus is the claim that Business One simply could not handle Hodell's number of users.

performance" of windows he was purchasing; holding "the reasonable reliance element of fraud cannot be established."); *see also Premier Bus. Group, LLC v. Red Bull of N. Am., Inc.*, No. 08-CV-01453, 2009 U.S. Dist. LEXIS 91647 *26-29 (N.D. Ohio Sept. 30, 2009) (granting motion to dismiss because plaintiff could not establish reasonable reliance on statements that defendant was "reliable and trustworthy" as these were merely an opinion of defendant's reputation).

Furthermore, the "marketing pieces" at issue generally state only that Business One is for companies with "several hundred *employees*" or up to "500 *employees*."  Hodell attempts to twist this by claiming this was a representation that Business One was intended for companies with up to 500 *users*.  But whether Hodell may have "assumed" this meant Business One was capable of handling 500 *users* does not make it so.  There is a clear and obvious difference between these two distinct words, and even Hodell admits it understood that a company usually has fewer users than employees.  K. Reidl, at 199:20-200:23.  In fact, this has always been the case for Hodell. *Id*.  Simply put, Hodell cannot establish that it reasonably believed Business One was marketed as a product for companies with up to 500 *users*, when the documents it cites clearly do *not* state this.

### 4.    Hodell has no evidence that SAP intended to mislead it.

It is clear that Hodell must also establish that SAP made a material misrepresentation with the *intent* of inducing Hodell's reliance.  *See ABM Farms*, 81 Ohio St. 3d at 502, 1998 Ohio at 692.  "In order for representations to have the requisite fraudulent intent, it must have been intended that they should be acted on by the party complaining of fraud."  *Hayes v. Computer Assocs. Int'l, Inc.*, No. 3:02CV7452, 2003 U.S. Dist. LEXIS 10712, *16-17 (N.D. Ohio June 24, 2003) (granting summary judgment where "plaintiffs have not produced sufficient evidence of defendants' intent to mislead plaintiffs.").

Because evidence of intent is sometimes difficult to obtain, "courts may infer fraudulent intent from the facts and circumstances surrounding the transaction and the relationship of the parties involved."  *Hitachi Med. Sys. Am. v. Horizon Med. Group*, No. 5:07CV02035, 2008 U.S. Dist. LEXIS 123313, *32-33 (N.D. Ohio Oct. 13, 2008) (citing *Stein v. Brown*, 18 Ohio St. 3d 305, 308-09, 18 Ohio B. 352, 480 N.E.2d 1121 (1985)).  However, it is clearly not enough for a plaintiff to simply allege intent without coming forth with some evidence of this critical factor. *See id.* (granting summary judgment to defendant where plaintiff's only evidence of intent was that promises went unfulfilled; holding this does not support an inference of fraudulent intent as a matter of law).

Here, Hodell has absolutely no evidence that SAP intended to mislead it, and not a scintilla of proof that could lead a jury to infer intent.  Indeed, contrary to the allegations in Hodell's Amended Complaint which suggested that SAP had made direct false statements to Hodell, Hodell now admits it had *no communication with SAP* until 2007 – years after it signed the Development Agreement and the License Agreement, and only after Hodell decided to go-live on the overall software solution.  Simply put, how could SAP have intended to mislead Hodell if SAP had no contact with Hodell?  Hodell cannot explain this, nor does it have proof to overcome this obviously fatal flaw in its case.

     **5.**    **Hodell admits that any harm it suffered was proximately caused by its own decision to "go-live" on the software despite its knowledge of "unacceptable" performance issues.**

In addition to all of the above reasons, Hodell's tort claims fail because Hodell now admits that it was responsible for testing the integrated software solution *before* deciding to go live.  According to Kevin Reidl, Hodell performed pre-go-live "stress" testing whereby its users

accessed the software solution and ran the types of transactions they would run during a normal

day.  K. Reidl, at 287:10-16.

  While there is some dispute as to the scope and extent of testing Hodell performed, one

thing is clear beyond doubt:  according to Hodell's IT director, Terry Phillips, the testing Hodell

did before going live revealed that the performance of the overall solution was "unacceptable" to

Hodell.  T. Phillips, at 25:21.  Mr. Phillips' testimony could not be clearer:

> Q. And what exactly was your opinion at that time just before Go-Live?
> A. That the system was still very slow.
> Q. Did you have an opinion that you  reached just before Go-Live as to whether  Hodell should actually go live or if Hodell should wait?
> A. Yes. I thought that we should wait and try to work out the issues.
> Q. Did you express that opinion to anybody?
> A. Yeah, I expressed it to Kevin and  the LSi side.
> Q. What do you recall telling Kevin Reidl specifically with respect to your opinion  that Hodell should wait and not go live?
> A. Other than that, I don't remember specifically what was said.
> Q. Okay. The decision, though, was made to go live over -- even though you held  the opinion that Hodell should wait; correct?
> A. Yeah.
> Q. And what transpired with respect to the solution right after Go-Live?
> A. What transpired with respect to the solution?
> Q. Better question is what did you personally witness the solution doing right  after Go-Live so far as performance and speed issues?
> A. The same as before we went live, slow.
> Q. Slow. Was it slower, was it faster, was it about the same?
> A. I don't recall, you know, what the difference was right before we went live. I want to say that it was probably the same.

T. Phillips, at 27:4-28:16.

> Q. Okay. Was there anybody else, to  your knowledge, at Hodell that held a computer science degree at the time of the Go-Live in March of 2007?
> A. No.

Q. Do you have an understanding of  why Kevin Reidl didn't take your advice and wait and not go live in March of 2007?
A. No.
Q. You say that right after the Go-Live, you saw the same speed and performance  issues that you had experienced before Go-Live. Was that a surprise to you in any way?
A. No.
Q. Why not?
A. Because nothing was done at LSi or SAP, to my knowledge, to speed it up.
Q. So you personally fully expected  that the problems that you witnessed just before Go-Live would still exist at Hodell when you turn the switch and you went live on the solution; correct?
A. I don't know. I don't recall what LSi was saying that they were going to do about the situation, because at this point it was in  their hands to, you know, find a solution.
Q. Well, what was your expectation? Did you expect that when you went live, when Hodell went live on the system that you would see performance issues, speed issues with the system?
A. Yeah, I thought that that was going to be the case.
Q. And why did you think that?
A. Because we had those issues right before Go-Live when we were testing.
Q. And those were the issues that you made Kevin Reidl and others within Hodell  aware of?
A. Correct.

*Id*. at 29:11-30:25.

Q. And your recommendation at the time was that you should not, that Hodell should not go forward with the Go-Live with that speed and performance issue that you had  seen just before going live; right?
A. Yeah, I recommended that we should wait and have LSi fix some of the issues.

*Id*. at 58:1-8.

As a matter of law, the admission of Hodell's IT director that the performance issues about which Hodell complains existed *before* Hodell went live with the integrated software solution precludes any finding that SAP (or the other defendants) was the proximate cause of Hodell's alleged losses.  Indeed, Hodell offers no evidence that SAP was involved in any way in

- 33 -

Hodell's decision to go-live on the solution, and the only evidence is that Hodell made this decision despite realizing beforehand that the performance of the solution was "unacceptable." For this and the other reasons set forth above, Hodell's fraud, fraudulent inducement, and negligent misrepresentation claims must fail as a matter of law.

> **6.    Hodell's negligent misrepresentation claim fails for the additional reason that SAP is not in the business of supplying information, and cannot be subject to such a claim.**

The Ohio Court of Appeals recently put to rest any question as to the scope of a negligent misrepresentation claim, clarifying that such a claim is circumscribed to professionals in the business of supplying information for others to rely upon and holding this "tort was not intended to have extensive application." *Middlefield Banking Co. v. Deeb*, 2012 Ohio 3191, P31 (Ohio Ct. App., Geauga County July 16, 2012) (citing *Haddon View Inv. Co. v. Coopers & Lybrand*, 70 Ohio St.2d 154, 436 N.E.2d 212 (1982)). Negligent misrepresentation claims are thus recognized "only in those limited circumstances in which a person, in the course of business, negligently supplies false information, knowing that the recipient either intends to rely on it in business, or knowing that the recipient intends to pass the information on to a foreseen third party or limited class of third persons who intend to rely on it in business." *Id*.

Accordingly, negligent misrepresentation claims fail outside of the context of professionals (e.g., accountants) who are in the business of providing opinions to be relied upon by others. Indeed, "a claim of negligent misrepresentation has been characterized as a mere 'business tort related to professional malpractice.'" *Id*. (citing *Thornton v. State Farm Mut. Auto Ins. Co*., No. 1:06-cv-00018, 2006 U.S. Dist. LEXIS 83968, *49 (N.D.Ohio, Nov. 17, 2006) (rejecting claim in context of ordinary consumer and business transaction). And "the class of persons who are in the business of supplying information to others is limited to certain

- 34 -

professionals, such as ''attorneys, surveyors, abstractors of title and banks dealing with no-depositors' checks.'''  *Id.* (citing *Hamilton v. Sysco Food Servs. of Cleveland, Inc.*, 170 Ohio App. 3d 203, 208 (Ohio Ct. App., Cuyahoga County 2006)); *see also Premier Bus. Group, LLC* 2009 U.S. Dist. LEXIS 91647 *31 ("[P]rofessions traditionally fitting the definition include attorneys, surveyors, inspectors of goods, and abstractors of title [and] the mere act of supplying information in itself is not sufficient to give rise to a negligent misrepresentation claim.") (citing *McCarthy, Lebit, Crystal & Haiman Co., L.P.A. v. First Union Mgmt.*, 87 Ohio App. 3d 613, 631, 622 N.E.2d 1093 (Ohio Ct. App., Cuyahoga County 1993)).

Here, Hodell admits that SAP is a software company engaged in the business of developing and licensing software.  Hodell does not allege, and offers no proof, that SAP is a professional in the business of selling information upon which others may rely.  Indeed it is not. *See*, *e.g.*, *Premier Bus. Group, LLC*, 2009 U.S. Dist. LEXIS 91647 at *32-22 (dismissing negligent misrepresentation claim because "Red Bull, after all, is in the business of selling energy drinks, not in the business of supplying information.").  Moreover, Hodell admits it had no contact with SAP until 2007, that it did not receive *any* information directly from SAP prior to entering the contracts at issue, and that it engaged in nothing more than an arms-length business transaction with SAP.  O.Reidl, at 236.  Under these circumstances, Hodell's negligent misrepresentation claim fails as a matter of law.  *See Middlefield Banking Co.*, 2012 Ohio 3191, P36 (dismissing claim on summary judgment where defendant bank was not engaged in the business of supplying information and had no "professional duty to provide dependable information; instead, the relationship was limited to an arms-length loan transaction.").

**D.**    **Count Three of Hodell's Amended Complaint (breach of contract) is precluded by the License Agreement because Hodell disclaimed all implied warranties, and because Hodell has no evidence that SAP America breached the limited express warranty that was provided.**

Hodell admits that its licensing of Business One from SAP America was the sale of a good controlled by the Ohio UCC.  *See* Am. Cmplt. , ¶76.; *see also McLeod Addictive Disease Ctr., Inc. v. Wildata Sys. Group, Inc*., No. 2:08-CV-570, 2010 U.S. Dist. LEXIS 20643, n. 4 (S.D. Ohio Mar. 8, 2010) ("Software is considered a 'good' for purposes of Article 2 of the Uniform Commercial Code.") (citing *Arlington Elec. Const. v. Schindler Elevator Corp.*, No. L-91-102, 1992 Ohio App. LEXIS 953 (Ohio App. March 6, 1992)).

Using the same factual allegations that support its failed tort claims, Hodell alleges that SAP America and SAP AG breached implied and express warranties found in the License Agreement.  *See* Am. Cmplt., ¶¶74-86.[11]  More specifically, Hodell apparently contends it received express or implied warranties that Business One was merchantable and/or fit for Hodell's particular purpose such that the software would support Hodell's initial users and allow Hodell to increase to approximately 300 users at some point in the future, while operating at some undefined, non-specific level of performance.  However, Hodell clearly disclaimed any such implied warranties, and is unable to offer any proof that SAP breached its express warranty.

Indeed, as authorized by the UCC, the License Agreement used conspicuous language to disclaim all implied warranties, including that Business One was either merchantable (*i.e.*, that Business One met some ordinary or customary standard) or that it was fit for Hodell's particular purpose (*i.e.*, that Business One was suitable specifically for Hodell's needs).  *See* O.R.C. §

---

[11] Hodell also alleges SAP breached warranties in the Development Agreement, but that implausible theory was rejected when this Court correctly held that SAP is not a party to that contract.

1302.29(B) (permitting exclusion of implied warranties of merchantability and fitness); *McLeod Addictive Disease Ctr., Inc.*, 2010 U.S. Dist. LEXIS 20643, *21-23 (holding language in software license sufficient under Ohio law to disclaim both the implied warranty of merchantability and the implied warranty of fitness for a particular purpose where "[t]he disclaimer is in writing, refers expressly to implied warranty of merchantability and fitness and is made conspicuous by the bold and capital letter print.  Thus, the disclaimer complies with O.R.C. § 1302.29(B).").  Here, Hodell expressly disclaimed any implied warranties:

<u>PERFORMANCE WARRANTY/MAINTENANCE</u>

> 7.2    <u>Express Disclaimer</u>.  SAP AND ITS LICENSORS DISCLAIM ALL OTHER WARRANTIES EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE EXCEPT TO THE EXTENT THAT ANY WARRANTIES IMPLIED BY LAW CANNOT BE VALIDLY WAIVED.

Ex. K, § 7.2 (capitalization in original).

Otto Reidl, Hodell's president at the time the License Agreement was signed in December 2005, testified that he read and understood the entire License Agreement before Hodell signed, and that he and his son Kevin "agonized" over the License Agreement because Hodell understood what its terms and provision meant.  O.Reidl, at 218:8-219:22; 220:21-224:13.  Accordingly, Hodell cannot avoid the fact that, in accordance with the Ohio UCC, it disclaimed any implied warranties, and its claim for breach of implied warranties fails as a matter of law.

Moreover, to proceed on its claim for breach of express warranty, Hodell must offer some proof that: (1) Business One failed to perform as warranted; (2) Hodell provided SAP with reasonable notice of the defect; and (3) Hodell suffered injury as a result of the defect.  *See*

*Roshong v. Fitness Brands Inc.*, No. 3:10cv2656, 2012 U.S. Dist. LEXIS 74730 *6 (N.D. Ohio

May 30, 2012).  Hodell contends that SAP breached the express warranty provided at Section 7.1

of the License Agreement, but has offered no proof to support that claim.

The warranty at issue provides:

> PERFORMANCE WARRANTY/MAINTENANCE
>
> 7.1     Warranty.    SAP warrants that the Software will
> substantially conform to the functional specifications contained in the
> Documentation for six months following delivery.  The warranty shall
> not apply:  (i) if the Software is not used in accordance with the
> Documentation; or (ii) if the defect is caused by a Modification,
> Integration Add-On, Licensee, third-party software, or third-party
> database.  SAP does not warrant that the Software will operate
> uninterrupted or that it will be free from minor defects or errors that do
> not materially affect such performance, or that the applications
> contained in the Software are designed to meet all of Licensee's
> business requirements.

Ex. K, § 7.1.

To prove a breach of this warranty, Hodell must establish that: (1) "the Software [did not]

substantially conform to the functional specifications contained in the Documentation for six

months following delivery;" and (2) the defect alleged was not "caused by a Modification,

Integration Add-On, Licensee, third-party software, or third-party database."

Hodell has failed to offer *any* evidence such that a factfinder could determine, without

rampant speculation, that Business One alone – as opposed to one of the add-on products,

Hodell's own unique circumstances, or any combination of factors – actually caused the

problems Hodell claims it experienced, let alone that Business One failed to conform to the

functional specifications supplied by SAP.  Indeed, as stated in Section III.C.1., Hodell's own

technical expert, Helmut Gümbel, concludes that the problems Hodell experienced were caused

not just by Business One, but by the In-Flight add-on and by problems with Hodell's own

"[h]ardware/network infrastructure."  *See* Gümbel Rpt. pp. 13-14.  Accordingly, because Hodell

has failed to offer any evidence that Business One did to meet the functional specifications

supplied by SAP, and because Hodell is otherwise unable to establish that any issues it

experience were not caused by an add-on or other issues, Hodell's breach of express warranty

claim fails as a matter of law.  *See McLeod Addictive Disease Ctr., Inc*., 2010 U.S. Dist. LEXIS

20643 *19 (S.D. Ohio Mar. 8, 2010) (granting summary judgment where "[p]laintiff has not

articulated how the software fails to conform to published specifications.").

In addition, even if Hodell had evidence of a breach of warranty, the record is devoid of

evidence that Hodell discovered a defect in Business One during the six-month period of the

express warranty found in Section 7.1.  To the contrary, the undisputed evidence is that Hodell

signed the License Agreement in December 2005; took delivery of Business One sometime in

early 2006; never returned the software to SAP; LSi, IBIS, and Hodell thereafter implemented

Business One with In-Flight and Radio Beacon at Hodell's location; Hodell was aware of the

performance issues it now complains of before going-live, yet went live anyway on the

integrated software solution in March 2007; Hodell ran its business operations on this solution

until April 2009; and Hodell still today uses Business One in a limited capacity.  In short, there is

absolutely no evidence that Hodell, within six months of accepting delivery of the software,

notified SAP of any defect, let alone that SAP failed or refused to honor its warranty.

Accordingly, Hodell has failed to come forth with evidence that SAP breached its express

warranty, and this claim fails as a matter of law.  *See M. L. Simmons v. Bellman Plumbing*, NO.

67832, 1995 Ohio App. LEXIS 2831, *8-9 (Ohio Ct. App., Cuyahoga County July 6, 1995)

(holding one can only recover for breach of express warranty if defects discovered within the

warranty period; otherwise a general warranty of fitness would be created).

IV.     **CONCLUSION**

This is an obvious case where a buyer, having entered into a written contract for the sale of a good, is bound to that contract and cannot be permitted to manufacture tort claims as a way of escaping its agreement with the seller.  This is particularly true because, despite Hodell's complaint allegations to the contrary, it now finally admits it had *no* contact with SAP until more than a year *after* it contracted for and received SAP's software.  Given this undisputed fact, it is not surprising that Hodell's nearly four years' worth of litigation has failed to unearth any evidence that SAP committed pre-contractual fraud.

Indeed, how could fraud have occurred if SAP had no involvement whatsoever with Hodell?  And how could SAP be accused of making a negligent misrepresentation – which requires proof that SAP was providing guidance and advice to Hodell – when it never met with Hodell, never spoke with Hodell, and never even had a communication with Hodell?  SAP always knew this case was built upon hyperbole, and that Hodell had filled its pleadings with generalized, non-specific and false allegations of fraud.  For these reasons, and those set forth above, all of Hodell's remaining claims against SAP America and SAP AG must be dismissed as a matter of law.

Respectfully submitted,

/s/ Gregory J. Star
Michael J. Miller (admitted *pro hac vice*)
Gregory J. Star (admitted *pro hac vice*)
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone:  (215) 988-2700
Facsimile:  (215) 988-2757
*Attorneys for SAP America, Inc. and SAP AG*

### CERTIFICATION PURSUANT TO LOCAL RULE 7.1

This is a complex case involving a software implementation. Pursuant to this Court's order, SAP was granted leave to file a brief of not more than forty-five (45) pages.  I, Gregory J. Star, certify that the foregoing Brief adheres to this page limitation.

/s/Gregory J. Star
Gregory J. Star

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of September 2012, a copy of the foregoing Motion for Summary Judgment and Supporting Memorandum of Law was filed electronically.  Parties may access this filing through the Court's electronic filing system.

/s/Gregory J. Star
Gregory J. Star