**EXHIBIT B**

# In The Matter Of:

*Hodell-Natco Industries, Inc. v.*
*SAP America, Inc., et al.*

*Otto Reidl*
*Vol. 1*
*February 7, 2012*



NEXT GEN | REPORTING

Making Litigation Easier.  NextGenReporting.com

PHILADELPHIA | 215.944.5800   NEW YORK CITY | 646.470.3376   PHOENIX | 623.224.3760   SILICON VALLEY | 650.799.8020

*Original File Reidl, Otto - Vol. 1.txt*

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Otto Reidl - Vol. 1
February 7, 2012

Page 1

1       UNITED STATES DISTRICT COURT
2    FOR THE NORTHERN DISTRICT OF OHIO
         EASTERN DIVISION
3
HODELL-NATCO          )  Case No. 1:08 CV 2755
4  INDUSTRIES, INC.,   )
                       )  Judge:  Lesley Wells
5      Plaintiff,      )  Magistrate Judge:
                       )       Greg White
6  vs.                 )
                       )  VOLUME I
7  SAP AMERICA, INC., et )
8  al.,                )
                       )
9      Defendants.     )

10

11     THE VIDEOCONFERENCE DEPOSITION OF OTTO REIDL
12
13
      DATE:    Tuesday, February 7, 2012
14
      TIME:    9:57 a.m.
15
      PLACE:   Reminger & Reminger
16             1400 Midland Building
               101 Prospect Avenue, West
17             Cleveland, Ohio  44115
18
19
20
21
22
23  NEXTGEN
    REPORTING
24
25  Registered Professional Reporters

Page 2

1  APPEARANCES:
2
3  ON BEHALF OF THE PLAINTIFF:
4      MR. P. WESLEY LAMBERT, ESQ.
       Koehler, Neal, LLC
5      3330 Erieview Tower
       1301 East Ninth Street
6      Cleveland, Ohio 44114
       (216) 539-9370
7      wlambert@koehlerneal.com
8  ON BEHALF OF THE DEFENDANT SAP AMERICA, SAP AG:
9      MR. GREGORY J. STAR, ESQ.
       Drinker, Biddle, Reath
10     One Logan Square
       Suite 2000
11     Philadelphia, Pennsylvania 19103
       (215) 988-2734
12     Gregory.Star@dbr.com
13
14  ON BEHALF OF THE DEFENDANT LSI:
15     MR. ROY A. HULME, ESQ.
       Reminger & Reminger
16     1400 Midland Building
       101 Prospect Avenue, West
17     Cleveland, Ohio 44115
       (216) 687-1311
18     rhulme@reminger.com
19
20  ALSO PRESENT:  Kevin Reidl
21               Daniel Lowery
22
23
24
25

Page 3

1           W I T N E S S   I N D E X
2
3                                            PAGE
4  DIRECT EXAMINATION
   OTTO REIDL
5  BY MR. STAR ...................................   4
6
7           E X H I B I T   I N D E X
8  Exhibit 1   Revised Notice of Deposition of     9
               Hodell-Natco
9  Exhibit 2   Emails from Amy Poidomani to        17
               Kevin Reidl
10
11  Exhibit 3  First Amended Complaint with        22
               Exhibits, Jury Trial Demand
12
13  Exhibit 4  Pages off the Hodell website        54
14  Exhibit 5  ERP Software printout from Internet  125
15
16
17
18
19
20
21
22
23
24
25

Page 4

1      OTTO REIDL,
2  called as a witness herein, having been first duly
3  sworn, as hereinafter certified, was examined and
4      testified as follows:
5      DIRECT EXAMINATION OF OTTO REIDL
6      BY MR. STAR:
7  Q.  Good morning, Mr. Reidl.  I
8  apologize in advance if I continually
9  mispronounce your name today.  Feel free to
10  correct me.  I'm Greg Star.  I'm an attorney
11  on behalf of SAP America and SAP AG, and we're
12  here today for your deposition as the
13  corporate designee on behalf of Hodell-Natco.
14  Have you ever been deposed before, sir?
15 A.  Yes.
16 Q.  How many times?
17 A.  Once.
18 Q.  When was that?
19 A.  Approximately 15 years ago.
20 Q.  All right.  Let me go through the
21  rules for you then, since it's been a while.
22  I'll be asking you questions.  The court
23  reporter will be taking down what I say and
24  your answers.  It's important that we don't
25  speak over each other.  Is that fair?

Page 5

1   A.  Right.
2   Q.  Your -- your answers need to be
3   in verbal form.  The nod of the head is not
4   going --
5   A.  I understand.
6   Q.  -- to be sufficient.  Okay.
7   Thank you.  If you don't understand a question
8   that I ask, because my questions are not
9   always perfect, please let me know, and I'll
10  be happy to rephrase the question or -- or
11  clear up any confusion.  Is that fair?
12  A.  I will do that.
13  Q.  Okay.  The case that you were
14  deposed in 15 years ago, what was the subject
15  matter of that case?
16  A.  It was a fatality in an accident.
17  Q.  Okay.  Not a business dispute
18  involving Hodell?
19  A.  No.
20  Q.  Okay.  Other than this case,
21  where Hodell has sued SAP America, SAP AG and
22  LSi, has -- has Hodell had any other
23  litigation matters where it's been a
24  Plaintiff?
25  A.  No.

Page 6

1   Q.  Are there any other present
2   lawsuits involving Hodell?
3   A.  No.
4   Q.  Either as a Plaintiff or a
5   Defendant?
6   A.  Correct.
7   Q.  Okay.  What is your position with
8   Hodell, sir?
9   A.  I'm the CEO.
10  Q.  Okay.  And can you run for me,
11  through for me the -- the brief history of
12  Hodell, when the company was formed, what its
13  general business is?
14  A.  Yes.  In 1983, the Rife
15  Corporation acquired Hodell Chain from
16  Monogram Industries.
17  Q.  And I'll just interrupt, if you
18  don't mind.  Where -- what was your position
19  back in 1983 with the organization?
20  A.  I was president of the Rife
21  Corporation.
22  Q.  What -- what is the name of it?
23  A.  Rife, R-I-F-E.
24  Q.  Okay.  And what was the business
25  of the Rife Corporation?

Page 7

1   A.  It was a family-held organization
2   to diversify the assets of that family and
3   mine.
4   Q.  Was there a particular line of
5   business that that Rife Corporation was in?
6   A.  That was -- Hodell was the first
7   acquisition.
8   Q.  Okay.  And back in 1983, what was
9   Hodell's business?
10  A.  A manufacturer and distributor of
11  chain products.
12  Q.  Does Hodell still today
13  manufacture products, or is it just a
14  distributor?
15  A.  We do some light assembly.  We do
16  not manufacture the core chain.
17  Q.  And back in 1983, did you have a
18  position with Hodell, once it was acquired by
19  the Rife Corporation?
20  A.  Yes.
21  Q.  What was your --
22  A.  I was president of Hodell
23  Corporation.
24  Q.  When Hodell was acquired in 1983,
25  was Hodell running any kind of business

Page 8

1   software application to -- to manage its
2   manufacturing or distribution processes?
3   A.  Not when I took over, but I
4   introduced Radio Shack TRS-80 and advised the
5   people about modern technology.
6   Q.  What year was that?
7   A.  1983.
8   Q.  What -- following that
9   acquisition in 1983 of this Radio Shack
10  computer, what was the next step in
11  development of the business software
12  application for Hodell's purposes?
13  A.  We used a program similar to
14  Excel, I don't remember the exact software, to
15  record data.
16  Q.  Okay.  When was that?
17  A.  In 1983.
18  Q.  At some point in time Hodell
19  makes a switch to sort of a companywide
20  software solution; is that true?
21  A.  Yes.
22  Q.  When did that first happen?
23  A.  It happened either late in eighty
24  -- 1983 or '84 with Microdata system.
25  Q.  And what did the Microdata system

Page 41

1  A.  We had numerous documents,
2  marketing brochures, and press releases.
3  Q.  Are you able to identify any of
4  those documents for me today?
5  A.  I don't have them with me.  I
6  have no documents here.
7  Q.  You didn't bring any documents
8  with you today?
9  A.  None.
10  Q.  Prior to December 23rd, 2005, did
11  Hodell meet or speak with anybody that was
12  actually employed by either SAP America or SAP
13  AG in connection with its decision to license
14  Business One?
15  A.  At all times we considered the
16  business partner as being one in the same.
17  Q.  Okay.  I understand that you'll
18  have a -- that you -- you take the position
19  here that LSi and Mr. Lowery's company were
20  working on behalf of SAP America and SAP AG,
21  correct?
22  A.  Correct.
23  Q.  Okay.  But what I'm going to ask
24  you today, sir, and I'm entitled to get an
25  answer to, is whether there were any

Page 42

1  communications, whether they were written, or
2  whether they were verbal discussions between
3  Hodell, and anybody who is actually an SAP
4  America or SAP AG employee.  And I understand
5  the distinction that you want to raise, and so
6  if we can have that understanding, I'm
7  entitled to get the information.
8  Going back to my question, at any time
9  prior to December 23rd, 2005, did Hodell have
10  any communications, written or verbal, with
11  anybody from SAP America, or SAP AG concerning
12  the licensing of Business One?
13  A.  Not to my recollection.
14  Q.  Prior to December 23rd, 2005, is
15  there any particular person who was actually
16  employed by SAP America, or SAP AG, who -- who
17  Hodell considers to have been involved in
18  marketing or selling Business One to Hodell?
19  A.  Could you please repeat that
20  question?
21  Q.  Sure.  Prior to December 23rd,
22  2005, is there any particular person that was
23  an actual employee of SAP America or SAP AG
24  that was involved in the sales or marketing
25  process of Business One to Hodell?

Page 43

1  A.  Yes.
2  MR. LAMBERT: Object, but you can
3  answer.
4  BY MR. STAR:
5  Q.  Who was involved, sir?
6  A.  Dan Kraus.  We had an email from
7  Dan Lowery, indicating that he had
8  communication with Dan Kraus of SAP America
9  in beginning of November of '03.  I'm sorry,
10  '04.
11  Q.  Okay.  Is that the only piece of
12  evidence that you have that anybody from SAP
13  or SAP AG, was involved in the
14  process of marketing or selling Business One
15  to Hodell prior to December 23rd, 2005?
16  MR. LAMBERT: Objection.  Other than
17  LSi and -- and IBiS guys.
18  MR. STAR: Well, look.  We need to get
19  that clear.  I understand that he has -- as I
20  explained, I understand that you take this
21  position that LSi and Mr. Lowery were
22  operating as our agents, and that's a legal
23  issue.
24  MR. LAMBERT: Right.
25  MR. STAR: But what I'm entitled to

Page 44

1  find out today is whether there was anybody
2  from SAP directly, if we can understand that
3  distinction.
4  BY MR. STAR:
5  Q.  And you mentioned Mr. Kraus, and
6  you understood that he was an SAP employee,
7  correct?
8  A.  Correct.
9  Q.  Okay.  So you have an
10  understanding of what I'm talking about here.
11  I'm trying to find out from you, sir, whether
12  there were any SAP America, or SAP AG, actual
13  employees, that Hodell communicated with prior
14  to December 23rd, 2005, okay?  With that in
15  mind, let me just ask the question.
16  Other than this one communication that you
17  mentioned, which was an email, I think you said
18  was forwarded from Mr. Lowery to Hodell,
19  indicating that Mr. Lowery had spoken with
20  Mr. Kraus of SAP, is there any person from SAP
21  America, or SAP AG, that Hodell had direct contact
22  with about the process of marketing or -- or
23  purchasing Business One prior to December 23rd,
24  2005?
25  A.  No, because at all times, we were

Page 45

1  aware that SAP Business One was marketed
2  exclusively through its business partners.
3  Q.  Okay.  So to be clear, prior to
4  December 23rd, 2005, no one from Hodell
5  actually spoke with an SAP America or SAP AG
6  employee about Business One, correct?
7  A.  As far as I know --
8  Q.  Okay.
9  A.  -- that is correct.
10 Q.  And prior to December 23rd, 2005,
11 no one from Hodell actually had a direct
12 written communication with any person who was
13 actually employed by SAP America or SAP AG,
14 correct?
15 A.  I don't know that as a fact.
16 Q.  Referring back to this sentence
17 in the end of paragraph 12 of the complaint,
18 concerning efforts by SAP AG and SAP America
19 to market and sell Business One, what does
20 Hodell contend that either of those two
21 entities did directly to market Business One
22 to Hodell, if anything?
23      MR. LAMBERT: I just want to clarify --
24      THE WITNESS: Define directly.
25      MR. LAMBERT: Yeah.

Page 46

1      THE WITNESS: Define directly.
2      BY MR. STAR:
3  Q.  I'll rephrase the question.
4  What, if anything, does Hodell contend that SAP
5  America and SAP AG did to market or sell Business
6  One to Hodell?
7  A.  They provided literature.
8  Q.  To whom?
9  A.  To the business partner, who
10 provided it to us.
11 Q.  At any time did SAP America or
12 SAP AG provide literature about Business One
13 directly to Hodell?
14 A.  No.
15 Q.  In paragraph 13 of the complaint,
16 sir, you reference a publication called the
17 SAP Solution Brief Qualified SAP All-in-One
18 Partner Solutions.  Do you see that?
19 A.  Yes.
20 Q.  Okay.  You quote a piece of that
21 document, but you do not attach that to your
22 complaint, do you?
23 A.  Pardon me?
24 Q.  You do not attach that document
25 to your complaint, do you?

Page 47

1  A.  I don't know for sure.
2  Q.  Okay.  You go on in this
3  paragraph 13 to conclude, thus, SAP's
4  "partners" are agents of SAP, having assented
5  to act on behalf of and subject to the control
6  of SAP.
7  Is it correct that Hodell presently takes
8  the view that SAP business partners were the
9  actual agents of SAP?
10     MR. LAMBERT: Objection.
11     BY MR. STAR:
12 Q.  You can answer.
13     MR. LAMBERT: It's a legal -- agents is
14 a legal term that was inserted in the
15 complaint.  Obviously if you can testify as to
16 your layman's understanding of the
17 relationship between SAP and its business
18 partners, then you can do so.
19     THE WITNESS: Could you repeat that
20 question again, please?
21     BY MR. STAR:
22 Q.  Sure.
23 A.  I'm sorry.
24 Q.  You agree with me that Hodell
25 contends in this litigation that LSi was

Page 48

1  acting as the "agent" of SAP America and SAP
2  AG when it was marketing Business One to
3  Hodell, correct?
4  A.  Correct.
5  Q.  Okay.  And what you say here is
6  that, in paragraph 13, that they're acting --
7  LSi is acting on behalf of and subject to the
8  control of the SAP Defendants.  Do you see
9  that?
10 A.  Yes.
11 Q.  What evidence do you have that
12 LSi was acting on behalf and subject to the
13 control of SAP?
14 A.  The literature that I mentioned
15 earlier, that they are one in the same.
16 They're a team.
17 Q.  And by the literature, you're
18 talking about the SAP Solution Brief that's
19 mentioned in this paragraph 13?
20 A.  No, because this references
21 All-in-One, instead of Business One.
22 Q.  Okay.  So what literature are you
23 referring to?
24 A.  Some of the other exhibits that
25 we have provided.

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Otto Reidl - Vol. 1
February 7, 2012

Page 69

1   Business One software?
2   A.  Emails from LSi and IBiS on their
3   business partner relationship.
4   Q.  Anything other than that?
5   A.  No.
6   Q.  Okay.  Off the record.
7       (Whereupon, a break was taken from
8       11:15 to 11:23.)
9       MR. STAR: All right.  Let's go back on
10  the record.
11      BY MR. STAR:
12  Q.  Sir, can you flip to the license
13  agreement, which is Exhibit G?
14  A.  (Doing as indicated.)
15      MR. STAR: My understanding, and Wes,
16  correct me if I'm wrong, is that Kevin will be
17  the designee to testify as to the details of
18  entering into the license agreement, but I
19  just have some general questions here for --
20  for Otto about the license agreement.
21      BY MR. STAR:
22  Q.  Sir, if you flip to page 2 of the
23  license agreement, in Section 4.1.  Do you
24  agree with me that under this agreement, the
25  licensee is Hodell?

Page 70

1   A.  Is that the definition on the
2   front page?  Yes.
3   Q.  Okay.  And you agree with me that
4   at the time, December 23rd, 2005, that Hodell
5   signed the license agreement, the reseller for
6   Business One was LSi, correct?
7   A.  Correct.
8   Q.  Okay.  Paragraph 4.1 then, you
9   would agree with me, that -- that this says
10  that Hodell acknowledges and agrees that the
11  SAP reseller, being LSi, through which Hodell
12  has arranged for the procurement of this
13  agreement, or from which Hodell receives any
14  services related to the software, is not the
15  agent of SAP.  Do you see that?
16  A.  Yes, I see that.
17  Q.  Okay.  And you agree that this
18  language was contained in the license
19  agreement at the time your son signed it on
20  December 23rd, 2005, correct?
21  A.  Correct.
22  Q.  It goes on to say, the SAP
23  reseller is an independent company, person or
24  entity with no authority to bind SAP or to
25  make representations or warranties on behalf

Page 71

1   of SAP.  Do you see that?
2   A.  Yes.
3   Q.  And that language was also
4   included in this document when it was signed
5   on December 23rd, 2005, correct?
6   A.  Correct.
7   Q.  So going back to paragraphs 14
8   and 15 of the first amended complaint, where
9   it alleges that LSi was an authorized agent
10  and reseller of SAP Business One, and that LSi
11  was the duly authorized agent of SAP for the
12  express purpose of making representations
13  concerning the suitability and functionality
14  of SAP Business One, you would agree with me
15  that the language out of Section 4.1 of the
16  license agreement that we just reviewed
17  actually contradicts your allegations in
18  paragraph 14 and 15 of the complaint, correct?
19      MR. LAMBERT: Objection.
20      THE WITNESS: No.
21      BY MR. STAR:
22  Q.  What -- what do you think is --
23  strike that.
24  In what way do you think that those
25  allegations are not contradictory to the

Page 72

1   language in paragraph 4.1 of the license
2   agreement?
3   A.  We had actually a document in
4   February '04 from IBiS, in which there was --
5   contained their logo and the SAP business
6   partner logo.
7   Q.  Anything else?
8   A.  That we had documents, marketing
9   documents, that stated that SAP and SAP
10  America were part of a team with the business
11  partner in support and marketing of this
12  product.
13  Q.  When did you have those
14  documents?
15  A.  At various stages in '03 and '04.
16  Q.  Yet on December 23rd, 2005, your
17  son, as the executive vice president of
18  Hodell, signed the license agreement which
19  contained this language in Section 4.1,
20  stating, among other things, that LSi is not
21  the agent of SAP --
22      MR. LAMBERT: Objection.
23      BY MR. STAR:
24  Q.  -- correct?
25  A.  Correct.

Page 73

1  Q.  If as of December 23rd, 2005,
2  Hodell believed that LSi was the authorized
3  agent of SAP, why would Hodell sign a license
4  agreement on December 23rd, 2005, with
5  language indicating that LSi is not the agent
6  of SAP?
7      MR. LAMBERT: I'm going to object.  You
8  can ask that of Kevin, because we're getting
9  into a little more of the details surrounding
10  the execution of this agreement, and we'll let
11  you ask Kevin all about that.
12      BY MR. STAR:
13  Q.  Okay.  Sir, did you personally
14  have any involvement with reviewing and
15  executing the -- the license agreement with
16  SAP?
17  A.  I read it, along with Kevin.
18  Q.  Prior to Kevin signing it?
19  A.  Correct.
20  Q.  Okay.  When do you recall reading
21  it prior to his signing?
22  A.  Either the day he signed it or
23  shortly before.
24  Q.  Okay.  So you recall being aware,
25  before Kevin signed this document on behalf of

Page 74

1  Hodell, that it contained the language in
2  Section 4.1, correct?
3  A.  I'm not certain that the full
4  brunt of that entered my mind.
5  Q.  Okay.  My question is a little
6  bit different.  Let me ask it in a -- in a
7  different way though.  Prior to Kevin signing
8  this document, did you read the language in
9  Section 4.1?
10  A.  I read the document.
11  Q.  Okay.  And that would have
12  included 4.1?
13  A.  Correct.
14      MR. LAMBERT: Objection.
15      BY MR. STAR:
16  Q.  Yes?  Yes?
17  A.  Yes.
18  Q.  Okay.  Did -- did reading Section
19  4.1 give you or Hodell any cause for concern?
20      MR. LAMBERT: I'm going to object.
21  Outside the scope.
22      MR. STAR: Well, let me be clear.  I
23  thought what we had discussed before the
24  deposition is that he'd also be testifying to
25  things that are within his personal knowledge.

Page 75

1      MR. LAMBERT: I was going to go off the
2  record to discuss that.  That's fine.  I think if
3  there is a way that we can -- I don't have a
4  problem with you asking Otto that as an individual
5  testifying on his own behalf, as long as it's
6  clear somehow that it's not -- he's not the
7  designee of the Plaintiff to testify on that
8  subject, that you can ask him that.
9      MR. STAR: Okay.
10      MR. LAMBERT: I don't know how we can
11  logistically accomplish that, if there is a way.
12      MR. STAR: I think practically speaking,
13  it makes little difference, because he's the CEO,
14  and we're talking about his personal knowledge,
15  but let's -- let's go through it.
16      BY MR. STAR:
17  Q.  Let me just go back to where we
18  were.  Your testimony was that prior to
19  Kevin's signing of this document of
20  December 23rd, 2005, you personally read the
21  entire license agreement, correct?
22  A.  Correct.
23  Q.  And then you would have also read
24  Section 4.1 that we have been through here?
25  A.  That is correct.

Page 76

1  Q.  Okay.  My question then was, did
2  the language in Section 4.1 give you any cause
3  for concern when you read it, before -- before
4  Kevin signed it, signed the license agreement?
5  A.  Yes.
6  Q.  What concerns did it give you?
7  A.  Am I asking -- answering as an
8  individual or CEO?
9      MR. LAMBERT: As an individual.  Well,
10  and as a CEO.
11      THE WITNESS: This was a way for SAP to
12  limit their liability in a situation that
13  wasn't a good one possibly.
14      BY MR. STAR:
15  Q.  Okay.  Any other concerns that
16  were raised when you read Section 4.1 before
17  Kevin signed the document?
18  A.  Yes.  All of a sudden, out of the
19  blue, comes a license agreement, when three
20  years, two years, or a year earlier, we were
21  in the process of acquiring 80 licenses.
22  Q.  What do you mean out of the blue?
23  A.  We were never told that -- that
24  we had to sign this agreement.
25  Q.  Never told by whom?

Page 77

1 A.  By your business partner.
2 Q.  You mean LSi?
3 A.  SAP -- SAP's business partner,
4 correct.
5 Q.  Okay.  So when you got this
6 document and you read through it, did you
7 contact anybody who was actually employed by
8 SAP to discuss the license agreement or its
9 terms?
10 A.  I did not.
11 Q.  Okay.  Do you know if anybody
12 else did that on behalf of Hodell before this
13 document was signed?
14 A.  No.
15 Q.  Okay.  So you had concerns about
16 the language in Section 4.1, yet your son went
17 ahead and signed this document with your
18 approval, correct?
19 A.  Correct.
20 Q.  Okay.  Did you make any efforts
21 to negotiate the language in Section 4.1 with
22 SAP directly?
23 A.  No.  We were dealing with the
24 business partner --
25 Q.  Okay.

Page 78

1 A.  -- on this license agreement.
2 Q.  Did you make any efforts with LSi
3 to attempt to negotiate the language in
4 Section 4.1 of the license agreement?
5    MR. LAMBERT: Again, this is Otto
6 individually, right?
7    BY MR. STAR:
8 Q.  Individually.
9 A.  I did not.
10 Q.  Do you know if anybody else did
11 that on behalf of Hodell?
12 A.  I do not know.
13 Q.  Let's move on to paragraph 16 of
14 the complaint, sir.  In substance, that
15 paragraph states that in 2003, Hodell
16 commenced a search for a new software solution
17 to provide integrated financial and sales
18 management capabilities.  Do you see that?
19 A.  Yes.
20 Q.  Okay.  Describe for me in general
21 what -- and we touched on this in the
22 beginning of the deposition -- what were
23 Hodell's goals in acquiring new software in
24 2003?
25 A.  To improve productivity, both in

Page 79

1 the office and in the warehouse, to streamline
2 the warehouse management and accounting
3 system, synchronization, to provide some of
4 the other ancillary capabilities, EDI, faxing
5 of invoices, emailing of invoices, and
6 generally linking to an office cap --
7 Microsoft capability.
8 Q.  What efforts did Hodell undertake
9 in 2003 to search for a new software product?
10 A.  It actually started well before
11 that.  In 1998, one of our IT people and I
12 visited Prophet 21 headquarters in
13 Pennsylvania.
14 Q.  Where in Pennsylvania are they?
15 A.  I want to say Yardley.
16 Q.  Okay.
17 A.  We spent a day and a half
18 reviewing the software.  In '99, that same
19 individual and I visited the Software Solution
20 headquarters in Georgia to take a look at
21 TakeStock, their Windows version.
22 Q.  Take, T-A-K-E?
23 A.  T-A-K-E.
24 Q.  Okay.
25 A.  S-T-O-C-K.

Page 80

1 Q.  TakeStock.  Okay.
2 A.  At that time, the company that
3 owned it was called Software Solutions.  It's
4 now called Infor, I-N-F-O-R.
5 In 2000, that same individual and I
6 visited Computer Insights' headquarters in
7 Chicago owned by Denny Cowhey.  We spent a day
8 and a half reviewing that software.
9 In 2002, we -- Kevin, Mark and I, spent
10 -- Mark Betts, the individual who had traveled
11 with me to the other locations -- spent three
12 days at IBiS facilities in Illinois, suburb of
13 Chicago, reviewing TakeStock again.
14 Q.  At that point in time, IBiS was a
15 distributor of TakeStock?
16 A.  Yes.
17 Q.  Did you review Business One
18 during that meeting with IBiS in 2002?
19 A.  Not at that time.  And then in
20 2002, we also had another session with P21.
21 Q.  Also in Yardley?
22 A.  In -- no.  In -- in our offices.
23 Q.  Who from P21 came to your office
24 in 2002?
25 A.  Krentz, I believe is his name.

Page 93

1  were contracting with SAP in the development
2  agreement?
3  A.  Because we were dealing with the
4  business partner.
5  Q.  Okay.  Well, let's look at the
6  development agreement.  It's Exhibit D to the
7  complaint, sir.
8  A.  Which is it again?
9  Q.  D.
10  A.  D?
11  Q.  David.
12  A.  Got it.
13  Q.  This is the development
14  agreement.  It's a two-page document that
15  makes up Exhibit D; is that correct?
16  A.  Correct.
17  Q.  You signed this document on
18  December 20th, 2004 as the president of
19  Hodell?
20  A.  Correct.
21  Q.  Okay.  You read this document
22  before you signed it?
23  A.  Correct.
24  Q.  Okay.  Do you see anywhere in
25  here that indicates that either SAP America or

Page 94

1  SAP AG was a party to this agreement?
2      MR. LAMBERT: Objection.
3      THE WITNESS: Purchasing the SAP
4  Business One software certainly is.
5      BY MR. STAR:
6  Q.  Well, let me ask the question
7  again, because I don't think that's
8  responsive.  Do you see anything in here that
9  makes SAP America or SAP AG a party to this
10  development agreement?
11      MR. LAMBERT: Objection.
12      THE WITNESS: No.
13      BY MR. STAR:
14  Q.  Okay.  And your testimony earlier
15  today was that even as of the time that you
16  signed the license agreement on December 23rd,
17  2005, when your son signed it, that even as of
18  that date, Hodell had no direct communications
19  with anybody who was actually employed by SAP
20  America or SAP AG, correct?
21  A.  Correct.
22  Q.  So necessarily at the time that
23  you signed the license, or that you signed the
24  distributor agreement -- pardon me.
25      At necessarily the time that you signed

Page 95

1  the development agreement in December of 2004,
2  you also hadn't spoken with anybody at SAP
3  America or SAP AG, correct?
4  A.  I spoke with their business
5  partners, AmEx and IBiS.
6  Q.  But you hadn't actually spoken
7  with an employee of SAP America or SAP AG,
8  correct?
9  A.  That's correct.
10  Q.  You've been in business for many
11  years now, right?
12  A.  Correct.
13  Q.  Okay.  You have signed contracts
14  with many different kinds of companies I
15  imagine, correct?
16  A.  Correct.
17  Q.  Okay.  You understand when you're
18  signing a contract that typically the parties
19  to that contract are going to be named in the
20  contract itself, correct?
21  A.  Correct.
22  Q.  Okay.  And you wouldn't normally
23  expect that a party could -- could be made
24  subject to a contract, if you hadn't even
25  mentioned them by name in the contract, or

Page 96

1  even spoken to any of their employees about
2  that contract, correct?
3  A.  Please rephrase that question.
4  Q.  Sure.  Do you have any reason to
5  believe that in any of your business dealings
6  that you could make a part -- you could make
7  some entity a party to a contract, if you
8  hadn't even spoken with an employee or
9  representative of that entity to make them a
10  party to the contract?
11  A.  Yes --
12      MR. LAMBERT: Objection.
13      THE WITNESS: -- if the indication is
14  that they are a team.
15      BY MR. STAR:
16  Q.  So your belief is that SAP is a
17  party to this development agreement; is that
18  right?
19  A.  On the purchase of the 80
20  licenses, yes.
21  Q.  Now, you mention the purchase of
22  the 80 licenses, and then you mentioned a
23  purchase order, right?  That's the document
24  that you have attached as Exhibit E; is that
25  correct?

Page 101

1   here for SAP America or SAP AG, correct?
2   A.   Correct.
3   Q.   Yet you understood at the time
4   you signed this agreement, December 20, 2004,
5   that Business One was a product owned by SAP,
6   correct?
7   A.   Correct.
8   Q.   Why didn't you insist then that
9   somebody from SAP -- strike that.
10   Why didn't you insist then that SAP
11   America or -- and/or SAP AG actually be made a
12   party to this agreement in December 2004?
13   A.   Item 4 indicates that SAP has
14   agreed that Hodell-Natco will receive 80 user
15   licenses of SAP Business One for the balance
16   of the payment.
17   Q.   Okay.  What led you to believe
18   that SAP had actually made any agreement with
19   Hodell?
20   A.   This agreement.
21   Q.   This -- this item in -- number 4,
22   on page 2 of the development agreement, that's
23   what you're referring to?
24   A.   Correct.
25   Q.   Okay.  But, again, at this point

Page 102

1   in time, you hadn't actually spoken with an
2   employee of SAP America or SAP AG, correct?
3   A.   Correct.  I didn't see a need to.
4   Q.   And your understanding of this
5   supposed agreement by SAP was based on what?
6   A.   It's based on this statement.
7   Q.   And it's a statement --
8   A.   I believe when --
9   Q.   -- by whom?
10   A.   -- when people tell me this, when
11   I have dealt with them before, that that is
12   the case.
13   Q.   It was a statement by whom, sir?
14   A.   Mr. Lowery and LSi and
15   Dale Van Leeuwen.
16   Q.   Okay.  You agree it was not a
17   statement by SAP America, correct?
18       MR. LAMBERT: Objection.
19       THE WITNESS: I treat SAP America
20   under, in this situation, the same as the
21   business partner.
22       BY MR. STAR:
23   Q.   Okay.  That's not my question.
24   You agree there is no statement in this
25   development agreement by SAP America, correct?

Page 103

1       MR. LAMBERT: Objection.
2       THE WITNESS: Correct.
3       BY MR. STAR:
4   Q.   Okay.  You also agree that there
5   is no statement in this development agreement
6   by SAP AG, correct?
7       MR. LAMBERT: Objection.
8       THE WITNESS: Correct.
9       BY MR. STAR:
10   Q.   Okay.  And actually, had you
11   thought that either SAP America or SAP AG were
12   intended to and actually became parties to
13   this development agreement, you would have had
14   no reason to sign the license agreement in
15   December 2005, right?
16       MR. LAMBERT: Objection.
17       THE WITNESS: That's not correct.
18       BY MR. STAR:
19   Q.   Okay.  What is not correct about
20   that?
21       MR. LAMBERT: I'm going to object this
22   is outside the scope of Mr. -- of Otto's
23   designation.  If you want to ask him
24   individually, you can ask him individually.
25       BY MR. STAR:

Page 104

1   Q.   I'll ask him -- that question is
2   asked to you individually, sir.  What was not
3   correct about that?
4   A.   At the time we needed additional
5   licenses, and it was the only way we could
6   lock in the price for those additional
7   licenses.  That was generally my
8   understanding.
9   Q.   What time are you talking about,
10   December 2005 or '04?
11   A.   2005.
12   Q.   Okay.
13   A.   At the signing of the agreement.
14   Q.   Prior to December 23rd, 2005, had
15   LS -- had Hodell actually taken delivery of
16   Business One software?  Had it received the
17   software?
18   A.   No, but we had purchased it.
19   Q.   When did you first receive the
20   SAP Business One software?
21   A.   I don't recall the specific day
22   that it was first put on one of our servers.
23   Q.   Do you know how it came to
24   Hodell?  Was it shipped?
25   A.   I don't know.

Page 109

1    BY MR. STAR:
2  Q.  Is that right?
3  A.  Correct.
4  Q.  Besides this communication with
5  Mr. Van Leeuwen, did you have any other
6  information that caused you to believe that
7  signing the license agreement was simply to
8  license or lock in the price for the
9  additional 40 CRM users?
10    MR. LAMBERT: Objection. This is to
11  Otto individually.
12    BY MR. STAR:
13  Q.  Sure.
14  A.  It's my belief that by this time,
15  SAP knew that this would not handle the number
16  of users, and it was a -- way for them to
17  limit their liability. That's my personal
18  impression.
19    MR. STAR: Can you read back my
20  question?
21  (Whereupon, the court reporter read
22  back the requested testimony.)
23    BY MR. STAR:
24  Q.  Can you answer that question,
25  sir?

Page 110

1  A.  I thought I did.
2    THE WITNESS: Could you please read it
3  again?
4    THE REPORTER: How do you -- is it
5  Mr. Van -- how do you pronounce --
6    THE WITNESS: Van Leeuwen.
7    THE REPORTER: Okay.
8  (Whereupon, the court reporter read
9  back the requested testimony.)
10    MR. LAMBERT: Is my objection noted on
11  there?
12    THE REPORTER: (Nods head.)
13    MR. LAMBERT: Okay.
14    THE WITNESS: Am I answering as an
15  individual?
16    BY MR. STAR:
17  Q.  Yes.
18  A.  We had gone on the internet and
19  seen some indication that the number of users
20  being -- the limit on the number of users was
21  declining, the number of users.
22  Q.  When was this?
23  A.  Sometime during '05 or '04.
24  Q.  Prior to December 23rd of 2005,
25  right?

Page 111

1  A.  Correct.
2  Q.  What information did you uncover
3  prior to December 23rd, 2005 about declining
4  information on the number of users?
5  A.  I think that's the first time I
6  saw a reference where there was a distinction
7  made between number of employees and maximum
8  users.
9  Q.  And what specifically did you
10  see?
11  A.  I don't recall the exact
12  information.
13  Q.  Okay. Prior to seeing this
14  information on the internet before
15  December 23rd, 2005, what was Hodell's belief
16  about the number of users that Business One
17  could support?
18  A.  Five hundred.
19  Q.  Five hundred users or employees?
20  A.  Employees have nothing to do with
21  it. It's users.
22  Q.  Number of users --
23  A.  Yeah.
24  Q.  -- in the organization?
25  A.  I don't understand why number of

Page 112

1  employees limits a system, if they're not
2  users.
3  Q.  Okay. So prior to you looking
4  for and finding information on the internet,
5  which also occurred before December 23rd,
6  2005, you're telling me it was Hodell's belief
7  that Business One could support up to 500
8  users?
9  A.  We were told that.
10  Q.  By whom?
11  A.  By LSi and by American Express.
12  Q.  Who at LSi told you that -- that
13  Business One could support up to 500 users?
14  A.  Dale Van Leeuwen.
15  Q.  When did he tell you that?
16  A.  December 3rd, 2003.
17  Q.  How do you remember that date so
18  specifically?
19  A.  At that point -- at that meeting,
20  I stated to American Express and Dale Van
21  Leeuwen, who was on a teleconference with us,
22  the other -- the American Express people were
23  in our facility. We had a ten-year compounded
24  growth rate at that point that was in excess
25  of ten percent per year. We were -- if we

Page 113

1  continued that pace, in the next ten years, we
2  would exceed 300 users, with productivity
3  improvements promised, and all the literature
4  that we had and efficiencies, 300 users would
5  carry us. We did not want to be doing an
6  implementation of software that would not be
7  viable for the next decade. And I was assured
8  by both parties that 300 users is -- the
9  system is capable of supporting 300 users.
10 Q.  Which --
11 A.  I said I would not proceed unless
12  that was -- assurance was made.
13 Q.  Well, which was it, that
14  Mr. Van Leeuwen told you it was 500 users or
15  300 users?
16 A.  He said he had information that
17  indicated 500.
18 Q.  Okay. What specific information
19  did he tell you he had?
20 A.  A SAP document.
21 Q.  What SAP document?
22 A.  I don't --
23 Q.  Did you ask for that document?
24 A.  We subsequent -- we had documents
25  of our own that indicated that, 500 employees.

Page 114

1  Q.  Okay. We're referring right now
2  to a conversation that you had with
3  Mr. Van Leeuwen on December 3rd, 2003, that
4  also involved American Express, who you said
5  was at your actual office?
6  A.  Yes.
7  Q.  Mr. Van Leeuwen was on a
8  conference --
9  A.  Yes.
10 Q.  -- right?
11 A.  Correct.
12 Q.  Okay. Your testimony is that
13  Van Leeuwen says during that conversation that
14  Business One can support up to 500 users, and
15  you also said, I believe, that Van Leeuwen
16  referenced a document from SAP that had that
17  information, right?
18 A.  Correct.
19 Q.  Okay. My question to you is, did
20  you obtain that document from Mr. Van Leeuwen
21  at any time prior to December 23rd, 2005?
22 A.  I believe we already had such a
23  document.
24 Q.  You had a document that actually
25  said Business One can support 500 users?

Page 115

1  A.  It said 500 employees.
2  Q.  Five hundred employees. Well,
3  you just said earlier, sir, that you don't
4  understand what the number of employees has to
5  do with the number of users. What did you
6  mean by that?
7  A.  No. What I said was, nonuser
8  employees have nothing to do with capacity,
9  therefore, a logical assumption would be that
10  the number of employees specified that define
11  capacity of the system is users.
12 Q.  I see. So when you would read in
13  a document that Business One could support an
14  organization up to 500 employees, you just
15  assumed that that meant 500 users; is that
16  right?
17 A.  Correct.
18 Q.  Okay. That's an awful big
19  assumption to make without further
20  investigating; wouldn't you agree?
21 A.  I did investigate it.
22 Q.  With whom?
23 A.  I confronted SA -- American
24  Express and IBiS, and asked for specific
25  confirmation that it could handle 300 users.

Page 116

1  Q.  And what did they give you as
2  specific confirmation, sir?
3  A.  It will handle 300 users.
4  Q.  That's all they said?
5  A.  Correct.
6  Q.  Who said it?
7  A.  I -- Dale Van Leeuwen said he had
8  a document that talked about 500 users, but
9  300 users was within the system capability.
10 Q.  Well, I think you just said
11  that Dale Van Leeuwen was referencing a
12  document that said that it could handle up to
13  500 employees, not users, correct?
14 A.  At that time, he said users, but
15  we had a document that said employees.
16 Q.  But you just assumed that
17  employees meant users, right?
18 A.  That's a very logical assumption.
19 Q.  You didn't actually contact
20  anybody at SAP?
21 A.  Yes, I did.
22 Q.  An employee --
23 A.  The SAP business partner.
24 Q.  Let me finish the question. You
25  did not actually contact any person employed

Page 117

1  directly by SAP America, or SAP AG, to confirm
2  that Business One could handle 300 or 500
3  users back in December of 2003, correct?
4  MR. LAMBERT: Objection.
5  THE WITNESS: Correct.
6  MR. HULME: Okay. I have a question.
7  Are those cookies for dissemination?
8  THE WITNESS: For you folks. I can't
9  have any.
10  BY MR. STAR:
11  Q.  Now, you said that prior to
12  December 23rd, 2005, Hodell had gone on to the
13  internet and seen information suggesting that
14  the number of users for -- possible on
15  Business One had been decreased, right?
16  A.  I believe so.
17  Q.  When did that happen, and what
18  did you find?
19  A.  I would have to refresh my memory
20  from the documents. I would have to dig them
21  out.
22  Q.  Fair to say, though, that prior
23  to signing the license agreement on
24  December 23rd, 2005, Hodell was aware that
25  there was information publically available,

Page 118

1  indicating that the number of users possible
2  on Business One might be less than 300?
3  A.  Yes.
4  Q.  When did LSi -- strike that.
5  Just going back to the development agreement
6  for a moment, the caption on that document, if
7  you flip back to the first page, mentions it's
8  between Hodell and IBiS, which is a wholly
9  owned company of LSi. If I just would, in
10  connection with the development agreement,
11  refer to LSi, you understand that I'm
12  referring to LSi and IBiS; is that fair?
13  A.  Yes.
14  Q.  Okay. When did LSi commence work
15  under the development agreement?
16  A.  Subsequent to the -- the payment
17  of our down payment.
18  Q.  Okay. Do you know an exact date?
19  A.  I would assume the next day --
20  Q.  Okay.
21  A.  -- after receiving the money.
22  Q.  And the first payment was
23  $60,000, right?
24  A.  Correct.
25  Q.  And the development agreement

Page 119

1  called for that initial $60,000 payment to be
2  the first installment, with another $60,000
3  due 150 days after the signing of the
4  development agreement, and a final payment of
5  another $60,000 due at 300 days after signing,
6  right?
7  A.  Correct.
8  Q.  Okay. And those second and third
9  installments of $60,000 each were based on LSi
10  having made significant progress or suitable
11  progress in the development of the In-Flight
12  application, correct?
13  A.  Correct.
14  Q.  Okay. Between the date that you
15  signed the development agreement, December 20
16  of 2004 and 150 days later, approximately five
17  months later, had Hodell gone on the internet
18  and found information suggesting that the
19  number of users of SAP Business One had been
20  reduced, and that it possibly could not handle
21  up to 300 users?
22  A.  I don't know if it was at that
23  160 day -- 180-day period or the subsequent
24  one.
25  Q.  Okay. Do you recall at which --

Page 120

1  do you recall when Hodell made the second
2  installment payment under the development
3  agreement, the second $60,000 payment?
4  A.  No, but we provided the exhibit
5  that itemizes all the payments.
6  Q.  Do you know if Hodell had found
7  the information that you referenced from the
8  internet, concerning the decreased number of
9  users possible on Business One, before Hodell
10  made the second $60,000 payment under the
11  development agreement?
12  A.  I don't know.
13  Q.  Do you know if Hodell had found
14  the information that you're referring to on
15  the internet about the decreased number of
16  users for Business One before it made the
17  third $60,000 payment under the development
18  agreement?
19  A.  I believe so.
20  Q.  Okay. Do you recall when the
21  third $60,000 payment was made under the
22  development agreement?
23  A.  I would have to check the
24  schedule.
25  Q.  Do you recall if that third

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Otto Reidl - Vol. 1
February 7, 2012

Page 125

1      BY MR. STAR:
2  Q.  Mr. Reidl, before we took our
3  break, we were talking about information that
4  Hodell had obtained from the internet
5  concerning the number of users that were
6  possible in SAP Business One prior to signing
7  the license agreement on December 23rd, 2005.
8      MR. STAR: Can you mark this as the
9  next exhibit, please.
10  (Whereupon, Exhibit 5 was marked for
11  identification.)
12      MR. HULME: Five?
13      THE REPORTER: Five.
14      MR. STAR: Five.
15      BY MR. STAR:
16  Q.  Sir, I marked here as Exhibit 5 a
17  document that was produced by Hodell, with the
18  number down at the bottom right-hand corner of
19  Hodell 494.  And this is a -- appears to be an
20  article that was on the internet.  Is this one
21  of the documents, or pieces of information
22  that you believe Hodell had prior to signing
23  the license agreement in December of 2005?
24  A.  I don't recall.
25  Q.  You agree this is dated

Page 126

1  November 1st, 2005?
2  A.  Yes, I see that.
3  Q.  And it's -- the title of the
4  article is New SAP Business One 2005?  You see
5  that?
6  A.  Yes.
7  Q.  Okay.  And the first line, it
8  says, SAP has just released new functionality
9  for their starter ERP package aimed at
10  companies who are looking for 10 to 100 users.
11  Do you see that?
12  A.  Uh-huh.
13  Q.  Yes?
14  A.  Yes.
15  Q.  Okay.  You just don't recall if
16  you had this actual document back in --
17  A.  The month before we signed.  I --
18  I believe we did, but I don't know.
19  Q.  Okay.  So you -- you don't --
20  strike that.
21  You believe that Hodell did actually
22  have this November 1st, 2005 document in its
23  possession prior to signing the license
24  agreement in December 2005?
25  A.  I don't know.  I don't know.  I

Page 127

1  don't recall.
2  Q.  Okay.  But you do believe that
3  Hodell had information in its possession,
4  prior to signing the license agreement, that
5  indicated that the number of users possible on
6  Business One had been decreased to something
7  less than 300 users, right?
8  A.  Correct.
9  Q.  Are you able to identify any
10  particular document that Hodell had, prior to
11  December 23rd, 2005, that did indicate that
12  the number of users for Business One had been
13  decreased below 300?
14  A.  Not without searching the files.
15  Q.  Do you recall if you personally
16  had searched for internet information -- for
17  information on the internet about Business One
18  and the number of users prior to
19  December 23rd, 2005?
20  A.  I don't recall if I personally
21  did.
22  Q.  Do you know, or have any
23  recollection, as to who might have searched
24  for that information at Hodell?
25  A.  Possibly William Rex.

Page 128

1  Q.  What is the last name?
2  A.  Rex, R-E-X.
3  Q.  What is Mr. Rex's position?
4  A.  He's vice president, treasurer
5  and shareholder.
6  Q.  Was that his position back in
7  2005 as well?
8  A.  Correct.
9  Q.  Off the record for a second.
10  (Whereupon, a brief off-the-record
11  discussion was held at 1:31.)
12      BY MR. STAR:
13  Q.  What was Mr. Rex's role, if any,
14  in connection with Hodell's acquisition of
15  licenses for Business One?
16      MR. LAMBERT: Are we back on the
17  record?
18      MR. STAR: Yes.
19      THE WITNESS: Kevin will answer that.
20      BY MR. STAR:
21  Q.  Okay.  You don't have any
22  personal knowledge as to Mr. --
23  A.  No.
24  Q.  -- Rex's role?
25  A.  No.

Page 157

1  the last few words of the -- of the quotation
2  to put in parens sic, which indicates that
3  there is some typographical error was in the
4  -- in the original, right?
5  A.  What do you have there?
6  Q.  I'm looking at paragraph 24 of
7  your complaint, at the fourth line, at the end
8  of the quote that I just read to you.  Do you
9  see -- do you see in parens the letters S-I-C?
10  A.  Uh-huh.
11  Q.  Yes?
12  A.  Yes.
13  Q.  And you agree with me that --
14  that that designation usually refers to some
15  typographical error that is in the original
16  form of -- of whatever your quoting is from,
17  correct?
18  A.  I don't know that that's what it
19  refers to.
20  Q.  Okay.  Well, what were you
21  referring to when this allegation was made by
22  Hodell?
23  A.  The turnkey solution.
24  Q.  All right.  What document, if
25  any, were you referring to when you made this

Page 158

1  quote in the complaint?
2  A.  IBiS presented, represented that
3  to us verbally as a business partner of SAP
4  America.
5  Q.  To be clear, this quote in
6  paragraph 24 is taken from an oral statement
7  by Mr. Van Leeuwen, and it's not taken from a
8  document, correct?
9  A.  The first sentence or the entire
10  paragraph 24?
11  Q.  The quoted language in paragraph
12  24, sir?
13  A.  That is from a verbal statement.
14  Q.  When did you first meet
15  Dale Van Leeuwen?
16  A.  I believe you asked that earlier,
17  and I thought I had already answered that.
18  Q.  Could you refresh me, sir?
19  A.  It was when we first were
20  involved with FACTS, he was with -- I believe
21  he was an employee of the firm that we
22  conducted the transaction with.  That firm
23  folded, and we worked for a couple of years
24  with one of their other employees, and then
25  Dale approached us about assisting us --

Page 159

1  Q.  And --
2  A.  -- with --
3  Q.  Sorry.
4  A.  -- with developments, upgrades,
5  and conversion of acquisition data and so
6  forth into FACTS.
7  Q.  Okay.  Sorry to ask the question
8  again, if I did.  When do you recall first
9  meeting him though?
10  A.  Perhaps '88, '89, 1989.  I'm --
11  I'm trying to go by recollection.
12  Q.  Paragraph 24, Hodell mentions
13  that IBiS made certain representations about
14  the integration of other software with
15  Business One, including the In-Flight
16  Enterprise application and Radio Beacon
17  synchronization.
18  What, if anything, did that mean to you
19  at the time?
20  A.  I -- could you rephrase that
21  question?
22  Q.  Sure.  I mean, you say here in
23  the last sentence of paragraph 24, concerning
24  representations made to you by the IBiS Group
25  and Mr. Van Leeuwen, that development of the

Page 160

1  vertical market space also included the
2  integration of other software with SAP
3  Business One, including the In-Flight
4  Enterprise application and Radio Beacon
5  synchronization.  My question to you is, what
6  did it mean to you at the time that there was
7  going to be the In-Flight Enterprise
8  application and Radio Beacon synchronization?
9  What did you understand that to mean?
10  A.  That is what makes it a viable
11  product in the fastener distribution industry.
12  Q.  That's -- that is what makes what
13  a viable product, Business One?
14  A.  SAP Business One.
15  Q.  Your view, Hodell's view that --
16  was that Business One by itself was not
17  sufficient for Hodell's needs, correct?
18  A.  Absolutely.
19  Q.  Okay.  And why?
20  A.  Because it didn't have a
21  warehouse management system, and it did not
22  have the idiosyncrasies of the fastener
23  distribution industry inherent in the base
24  package.
25  Q.  So what needed to be done to make

Page 161

1    Business One a suitable product for Hodell?
2    A.   Basically, the adaptations as
3    spelled out in the details of the In-Flight
4    project.
5    Q.   And when you say the In-Flight
6    project, you're referring to the terms of the
7    development agreement; is that right?
8    A.   The development that was inherent
9    that -- in that development agreement.
10   Q.   Well, let's turn to that document
11   again, sir.  Again, that's Exhibit D to the
12   complaint.  It's D.
13   A.   D.
14   Q.   Development agreement shows,
15   under the heading Project Description, that
16   it's going to be the development of the IBiS
17   Group's In-Flight Enterprise application and
18   its integration into SAP Business One software
19   for Hodell-Natco.  Do you see that?
20   A.   Yes.
21   Q.   Okay.  Was it your understanding
22   that as of the date of this development
23   agreement in December 2004, that the In-Flight
24   Enterprise application did not even exist at
25   that time, correct?

Page 162

1    A.   Correct.
2    Q.   Okay.  And this was going to be a
3    brand new application to be developed by
4    IBiS/LSi for Hodell, correct?
5    A.   Not absolutely.
6    Q.   Okay.  What is wrong with that
7    statement?
8    A.   Because IBiS had worked on the
9    enhancements to FACTS to make it a product for
10   use in the fastener industry, so they had
11   extensive experience on the aspects of the
12   fastener industry that needed to be
13   incorporated in this, so it wasn't a complete
14   start from scratch.
15   Q.   Okay.  Understood that your view
16   there then is that IBiS or LSi would -- would
17   already be hitting the ground running, because
18   they had some experience working for Hodell in
19   the past, correct?
20   A.   Compared to somebody else
21   starting from scratch.
22   Q.   Right.  But you would agree that
23   they had to build this application essentially
24   from the start, it didn't exist --
25   A.   Correct.

Page 163

1    Q.   -- at the time?
2    Okay.  And your view then, and your
3    understanding then, was that the application
4    would be integrated with Business One
5    software, correct?
6    A.   Correct.
7    Q.   So you, of course, understood
8    that no company anywhere in the world had
9    actually done an implementation of SAP
10   business software integrated with the then
11   nonexistent In-Flight application, correct?
12   A.   For the fastener industry or for
13   other industries?
14   Q.   Well, the In-Flight application
15   didn't exist for any industry, correct?
16   A.   Correct.
17   Q.   So necessarily Hodell understood
18   that there was no implementation of SAP
19   Business One anywhere in the world that was
20   going to be exactly like the implementation
21   for Hodell, right?
22   A.   Or for -- for the fastener
23   industry, not just for Hodell.
24   Q.   Well, this wasn't contemplated
25   for the fastener industry in general.  It was

Page 164

1    an implementation for Hodell, correct?
2    A.   It was meant to be a -- a package
3    for the vertical integration component of an
4    add-on for SAP Business One, to give them
5    access to the fastener industry.
6    Q.   Okay.  Let me ask my question
7    again.  Hodell understood that no company
8    anywhere in the world had actually implemented
9    SAP Business One with the In-Flight add-on as
10   of December of 2004, correct?
11   A.   Correct.
12   Q.   And that's necessarily true
13   because the In-Flight add-on simply did not
14   exist at that time, correct?
15   A.   Correct.
16   Q.   And is it your testimony that the
17   purpose -- part of the purpose in entering
18   into the development agreement, was that you
19   were trying to, in cooperation with LSi,
20   develop an application that could be re-sold
21   to other fastener companies like Hodell; is
22   that right?
23   A.   That they could resell.
24   Q.   Well, that -- and Hodell would
25   see some profit from that, correct?

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Otto Reidl - Vol. 1
February 7, 2012

Page 165

1  A.  Yes, because we're the ones
2  taking the risk up front.
3  Q.  Okay.  So in other words, this
4  was a joint venture between Hodell and LSi to
5  develop this add-on, that could then be
6  re-sold by LSi, to both the profit of LSi and
7  Hodell, correct?
8  A.  Not a joint venture.  They were
9  doing the development.  We bought the
10  licenses.  We agreed to pay for those up
11  front, so that they would have money to
12  develop this for their marketing.
13  Q.  And if this application were
14  successful, and it was then sold to other
15  fastener companies, Hodell stood to gain from
16  that, correct?
17  A.  Yes, for the first 100 users, I
18  believe.
19  Q.  Okay.  And --
20  A.  First 500 users.
21  Q.  What did Hodell stand to gain
22  from that?
23  A.  A reduction in the cost of our
24  SAP licenses, by a refund.
25  Q.  How much of a refund?

Page 166

1  A.  Against a -- as a credit, I
2  believe, against maintenance.
3  Q.  How much of a refund?
4  A.  Of $200 per user, up to 500
5  users.
6  Q.  So up to $100,000?
7  A.  Correct.
8  Q.  What about if this was a
9  tremendously successful product, and you sold
10  -- or LSi was able to resell this In-Flight
11  application to numerous different companies
12  around the world, would it -- would Hodell
13  have expected to see some profit from that?
14  A.  No.
15  Q.  Not at all?
16  A.  Not at all.  You -- off the
17  record, may I say something?
18     MR. HULME: Ask your lawyer.
19     THE WITNESS: Oh, okay.
20     MR. LAMBERT: We'll talk about that at
21  a break.
22     THE WITNESS: The comment is we
23  wouldn't benefit from another development, but
24  the more people that use something, the
25  stronger the product becomes, and you

Page 167

1  indirectly benefit from the use of that
2  product.
3     BY MR. STAR:
4  Q.  Okay.
5  A.  That's all I was -- it was no
6  monetary thing, but it ultimately makes it a
7  -- the products keep getting better, because
8  there are more users.
9  Q.  Okay.
10  A.  So I answered financial question.
11  We would not gain from any further.
12  Q.  At the time you signed the
13  development agreement in December of 2004 on
14  behalf of Hodell, did you personally
15  understand that there were some risks in
16  trying to have an implementation of SAP
17  Business One that would be utilizing an add-on
18  product, an application, that hadn't yet been
19  developed?
20  A.  Define -- a risk in what way?
21  Q.  Well, you understood you weren't
22  simply going to be installing SAP Business One
23  out of the box, so to speak, correct?
24  A.  In-Flight was going to be fully
25  functional, and then you would be installing

Page 168

1  it out of the box.
2  Q.  You didn't license In-Flight from
3  SAP, correct?
4  A.  We licensed SAP from In-Flight
5  from an SAP partner.
6  Q.  Okay.  And you actually went into
7  the development agreement for the purpose of
8  having LSi build the In-Flight application,
9  correct?
10  A.  We went into it for the purpose
11  of having a vertical integration package for
12  the fastener industry available to --
13  Q.  And you --
14  A.  -- to be integrated into SAP
15  Business One.
16  Q.  And in your view, to do that, it
17  required the development of this new
18  application called In-Flight, right?
19  A.  Correct.
20  Q.  Okay.  And so you necessarily
21  understood, at the time you signed the
22  development agreement, that the success of the
23  eventual implementation could hinge in part on
24  the successful development of In-Flight,
25  correct?

Page 169

1 A. In part.
2 Q. You would agree with me that if
3 In-Flight was not properly developed to
4 integrate with SAP Business One, that could
5 materially impact the ability to integrate the
6 SAP Business One software, or implement the
7 software, correct?
8 A. Correct.
9 Q. Paragraph 25 of the complaint,
10 you refer to a December 3rd, 2003 meeting,
11 which I think is the one you have been
12 referencing throughout the day today, with
13 Ms. Vitantonio, and a gentleman named
14 Michael Neuendorff, N-E-U-E-N-D-O-R-F-F, both
15 of American Express, right?
16 A. Correct.
17 Q. And that is the same meeting you
18 have been talking about, where Mr. Van Leeuwen
19 was on conference call?
20 A. Correct.
21 Q. And it's at that meeting that you
22 contend that you were given the document that
23 is Exhibit A to the complaint, right? Which
24 again is the SAP Business One Brief.
25 A. Correct.

Page 170

1 Q. In paragraph 26, you say that on
2 December 19th of 2003, at 3:30 p.m., you
3 received a phone call from Vitantonio and
4 Eric Worth. Was Mr. Worth also from American
5 Express?
6 A. Correct.
7 Q. You go on to say here that it was
8 expressly discussed, and left you with the
9 assurance that SAP Business One had sufficient
10 capability to serve a business the size of
11 Hodell. What does -- what exactly was the
12 represented to you during that December 19,
13 2003 phone call?
14 A. That it was scaleable up to our
15 growth requirements for the next ten years.
16 Q. Did you specifically convey to
17 Ms. Vitantonio, or Mr. Worth, the requirements
18 of Hodell over the -- over the next ten years?
19 A. The requirement was spelled out
20 to Ms. Vitantonio on the December 3rd meeting.
21 Q. And what exactly did you tell
22 Ms. Vitantonio on December 3rd, 2003?
23 A. I spelled all that out before.
24 Q. It's the information you already
25 testified to earlier?

Page 171

1 A. Correct.
2 Q. Did you tell her the number of
3 users that Hodell expected to have?
4 A. I would like to know how many
5 more times I'm supposed to answer this
6 question.
7 Q. Did you tell her it, sir?
8 A. Yes.
9 Q. What did you say exactly?
10 A. I told her and Dale Van Leeuwen,
11 who was on the extension, on the conference
12 call, that our company had been growing at a
13 compounded rate of in excess of ten percent
14 per year for the previous ten years.
15 Mr. Van Leeuwen was aware of that growth,
16 because he was with us during that time. And
17 based on our growth and user requirements, and
18 our desire not to have to implement another
19 software in the next decade, other than the
20 one we're trying to choose now, that we would
21 need 300 users. And I needed assurance before
22 I go any further.
23 Q. But you never sent anything in
24 writing to Ms. Vitantonio, or any of her
25 colleagues at American Express, that conveyed

Page 172

1 that thought exactly, did you?
2 A. Correct.
3 Q. You eventually decided not to
4 deal with American Express anymore, correct?
5 A. Because they felt that the SAP
6 partner IBiS was a better route for the
7 vertical integration requirement for the
8 fastener industry. Their own applet was
9 probably not suitable.
10 Q. So if I understand you correctly,
11 is it your testimony that American Express
12 conveyed to you that the idea that the product
13 that they had was not particularly suited for
14 Hodell's needs?
15 A. Not at the get-go, not at the
16 outset. It would require modifications.
17 Q. What kind of modifications did
18 they tell you, did American Express tell you
19 would be needed to make it fit Hodell's needs?
20 A. They didn't specifically identify
21 them. We discussed with them some of our
22 needs, and the intricacies of that were not
23 inherent in their package at the very start.
24 Q. Okay. How did you communicate to
25 American Express that you weren't going to

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Otto Reidl - Vol. I
February 7, 2012

Page 197

1  same.
2  Q.  What is the same, SAP America and
3  SAP AG?
4  A.  SAP owns SAP America.
5  Q.  Fine.  We'll just refer to it
6  collectively as SAP.  Your contention in this
7  lawsuit is that SAP committed fraud on Hodell,
8  correct?
9  A.  Correct.
10 Q.  When did that fraud occur?
11     MR. LAMBERT: Objection.
12     THE WITNESS: When they --
13     MR. LAMBERT: You can answer.
14     THE WITNESS: When their business
15  partner told us about the number of users,
16  that's when it started.
17     BY MR. STAR:
18 Q.  So that was the December 3rd,
19  2003 meeting, correct?
20 A.  It started then, yes.
21 Q.  Okay.  What then happened that
22  you think constituted fraud by SAP?
23 A.  Taking 120 user license, when
24  they were convinced it was outside the sweet
25  spot.

Page 198

1  Q.  Where did SAP take or issue 120
2  user licenses?
3  A.  They knew that we bought 80
4  before, and we were looking to add 40 CRMs
5  when we signed that agreement.
6  Q.  How many licenses did you
7  actually get from SAP?
8  A.  I would have to defer to Kevin,
9  because I believe we added some more.
10 Q.  Do you have a particular
11  understanding of what is meant by fraud?
12 A.  Misrepresentation.
13 Q.  Okay.  You'd agree with me that
14  that would be a statement by somebody of a
15  fact that they knew not to be true at the time
16  that they made the statement?
17 A.  Correct.
18 Q.  Yes.  Can you identify for me any
19  factual statement made by anybody actually
20  employed by SAP to Hodell, prior to
21  December 23rd, 2005, concerning Business One
22  at all?
23 A.  We had no dealings with SAP
24  directly up to that point.  We dealt through
25  their business partner, and in our view, they

Page 199

1  are one in the same.
2     MR. STAR: Off the record for a second.
3  (Whereupon, a break was taken from 3:05
4  until 3:21.)
5     MR. STAR: Back on the record.
6     BY MR. STAR:
7  Q.  So your testimony has been
8  consistent with the allegations in the
9  complaint, that Hodell anticipated a need of a
10  total of 300 licenses for Business One,
11  correct?
12 A.  Correct.
13 Q.  I'm also correct that at no time
14  with respect to Business One, or with respect
15  to the current software solution that Hodell
16  has, has Hodell ever come close to 300 total
17  users, right?
18 A.  Correct.
19 Q.  And that your testimony earlier
20  today was there is 125 current licensees of
21  the software you're using today; is that
22  right?
23 A.  I defer to Kevin on those --
24 Q.  Okay.
25 A.  -- specific number.

Page 200

1  Q.  All right.  Do you know if at any
2  point in time if Hodell has had more than 200
3  licensed users of any particular software
4  solution?
5  A.  No.
6  Q.  No, Hodell has not?
7  A.  No, Hodell has not.
8  Q.  Okay.
9     MR. HULME: Double negatives --
10    MR. STAR: Yeah.
11    MR. HULME: -- are famous on records,
12  famous.
13    MR. STAR: I always try to catch them
14  when I ask them --
15    MR. HULME: Yeah.
16    MR. STAR: -- so ....
17    BY MR. STAR:
18 Q.  Paragraph 37 of the complaint,
19  you say that it was expressly represented to
20  Hodell that Business One could support as many
21  as 250 users.  Why do you mention 250 users
22  there, when it's Hodell's contention that it
23  was anticipating up to 300 users?
24 A.  Because it showed a departure.
25 Q.  What do you mean?

Page 201

1 A. It showed a difference between
2 300 and 250.
3 Q. So is it your contention that --
4 that at some point in time, and I believe
5 you've targeted that as December 3rd, 2003, it
6 was told to you that Business One could
7 support up to 300 users, but at some later
8 point, it was told to you that Business One
9 could only support up to 250 users; is that
10 right?
11 A. That was in a marketing document,
12 not by a specific individual.
13 Q. What marketing document are you
14 referring to?
15 A. I don't know that it's in here.
16 Q. So just so I have this correct,
17 it's your understanding that Hodell received
18 some kind of marketing document, prior to
19 December 23rd, 2005, that indicated that the
20 number of users was only up to 250; is that
21 correct?
22 A. The document talked about number
23 of employees.
24 Q. And how many employees did it
25 say?

Page 202

1 A. Two hundred fifty.
2 Q. So you would have known right
3 then that Business One might not be suitable
4 for Hodell, if Hodell was expecting up to 300
5 users?
6 A. No. I was told specifically it
7 had 300 users.
8 Q. You were told that prior to
9 receiving this document though, correct?
10 A. Uh-huh.
11 Q. Yes?
12 A. Yes.
13 Q. Okay. So you had been told in
14 December of 2003, 300 users. And then you had
15 been told sometime after, but before
16 December 23rd, 2005, that it could only
17 support up to 250 users, correct?
18 A. Correct.
19 Q. Okay. And so that would have
20 caused Hodell to understand that Business One
21 might not be the correct solution for it,
22 right, if Hodell in fact wanted --
23 A. Possibly.
24 Q. -- 300 users?
25 A. Possibly.

Page 203

1 Q. When you received that
2 information that lowered the number from 300
3 to 250, what, if anything, did you do to
4 further investigate the number of users that
5 were capable on Business One?
6 A. At that point, we were committed
7 to SAP Business One. Our investment had been
8 made, so it would appear that it might not
9 take us 10 years, maybe it would take us 7 or
10 8 years.
11 Q. When you say your investment was
12 made, you're talking about the payments that
13 you had made to LSi under the development
14 agreement, correct?
15 A. Yes.
16 Q. And you agree that under the
17 terms of the development agreement, you could
18 have actually received back all the money that
19 you gave to LSi, correct?
20 MR. LAMBERT: Objection.
21 THE WITNESS: Not at that point
22 anymore.
23 BY MR. STAR:
24 Q. Well, if you turn to the
25 development agreement, you'll -- you'll agree

Page 204

1 with me that under the general terms on the
2 first page, it allowed Hodell to request a
3 refund and release from the agreement, right?
4 A. Under certain conditions.
5 Q. Okay. Would you agree with me
6 that if -- if Hodell had found out that the
7 Business One software product was no longer
8 suitable for its needs, because it wouldn't
9 support the number of users that Hodell
10 anticipated having, that that would be a
11 reason that Hodell could back out of the
12 development agreement?
13 MR. LAMBERT: Objection.
14 THE WITNESS: No, it would not.
15 BY MR. STAR:
16 Q. Why not?
17 A. Because you made an investment,
18 you don't know if you can get it back, and if
19 it carries you seven years, it's better than
20 nothing.
21 Q. And at that point in time, what
22 had the total investment been in terms of
23 dollars by Hodell for the Business One system?
24 A. I would have to defer to the
25 document to look.

Page 205

1  Q.  It would not have been more than
2  $180,000 though, correct?
3  A.  I can't say that specifically.  I
4  would have to look at the document and look at
5  the time frame and the investments.
6  Q.  In paragraph 42 of the complaint,
7  sir, you have a sort of timeline or a chart.
8  Do you see that, paragraph 42?
9  A.  Yes.
10 Q.  Okay.  There is an entry dated
11 November 2005, and it indicates 10 to 100
12 users, and hyphen, article about new SAP news
13 release.  Do you see that?
14 A.  That's the date of the article.
15 Q.  And that's the article that we
16 marked as Exhibit 5, sir, is that correct?  If
17 you refer back to that.  It's in front of you.
18 A.  Okay.
19 Q.  Yes?
20 A.  Yes.
21 Q.  Okay.  So the reference in
22 paragraph 42 to November 2005 and this article
23 about SAP, is in fact a reference to this
24 document that we marked as Exhibit 5, correct?
25 A.  Correct.

Page 206

1  Q.  And based on your earlier
2  testimony, you'd agree that if Business One,
3  as according to this article, was targeted for
4  customers for up to 100 users, that Business
5  One would not have been a proper product for
6  Hodell, because you were envisioning at least
7  120 users, correct?
8  A.  Correct, but the question is at
9  what time did I get this document?
10 Q.  How did you get this document, do
11 you know?
12 A.  I think that was from an internet
13 search.
14 Q.  Prior --
15 A.  After filing the complaint.
16 Q.  After filing the complaint?
17 A.  Yeah.
18 Q.  You testified --
19 A.  No, as -- to enter that
20 information here to try and indicate when SAP
21 knew what, SAP knew what.
22 Q.  Was this an internet search that
23 you did yourself?
24 A.  I think Bill Rex did that, I
25 believe.

Page 207

1  Q.  You talked earlier about another
2  internet search that was done before the
3  license agreement was signed in December 2005.
4  Just to be clear, are -- is it your testimony
5  that there were two different points in time,
6  once before the license agreement was signed,
7  and once afterwards in connection with this
8  lawsuit, that Hodell ran internet searches for
9  information about the number of users that
10 Business One could support?
11 A.  Correct.
12 Q.  Okay.
13 A.  I think what we uncovered was in
14 the range of 250 employees.
15 Q.  At what time did you uncover
16 that?  You're referring to before the license
17 agreement was signed?
18 A.  I believe so.
19 Q.  Do you know what Mr. Rex did to
20 find the document that is marked as Exhibit 5?
21 A.  The only thing I can think of is
22 internet search.
23 Q.  You have no reason to believe
24 that Hodell would have been unable to find
25 this particular document prior to signing the

Page 208

1  license agreement in December of 2005,
2  correct?
3      MR. LAMBERT: Objection.
4      THE WITNESS: We didn't have any reason
5  to try and look for a document at that time.
6      BY MR. STAR:
7  Q.  My question is different though.
8  You don't have any reason to believe that
9  Hodell would have been -- would have been
10 unable to obtain this document prior to
11 signing the license agreement, correct?
12     MR. LAMBERT: Objection.
13     THE WITNESS: I don't know.
14     BY MR. STAR:
15 Q.  In paragraph 42, you refer to an
16 event dated October of 2004, and you reference
17 less than 250 employees -- SAP news release
18 (Ellen O'Brien, SAP.com.)  Was there a
19 particular document that you're referring to?
20 A.  You're back on that exhibit?
21 Q.  Paragraph 42, yes, sir.
22 A.  Okay.
23 Q.  The heading -- the entry under
24 October 2004.
25 A.  Now, could you repeat your

Page 213

1  that question.
2  Q.  Do you have any recollection of
3   that happening in 2006?
4  A.  Ask your question again, of what
5   is it we're looking for in 2006?
6  Q.  Do you have any recollection of
7   any actual SAP employee visiting Hodell's
8   location in 2006?
9  A.  I can't answer that.
10  Q.  Is it because you don't have a
11   recollection?
12  A.  I don't have a recollection.
13      MR. STAR: Off the record.
14   (Whereupon, a brief off-the-record
15   discussion was held at 3:39.)
16      BY MR. STAR:
17  Q.  Paragraph 51, you refer to a
18   September 6th, 2007 phone call you received
19   from Dale Van Leeuwen, where he, according to
20   the complaint, admitted that initially SAP
21   Business One had been represented to Hodell as
22   being capable of supporting up to 300 users.
23   Do you see that?
24  A.  Yes.
25  Q.  Is it your testimony that what

Page 214

1   Mr. Van Leeuwen was referring to was the
2   representation that you said happened on
3   December 3rd, 2003?
4  A.  Correct.
5      MR. HULME: Rephrase that. Could you
6   rephrase the question?
7      BY MR. STAR:
8  Q.  Yeah. Paragraph 51, you're
9   referring to a September '07 telephone call
10   from Dale Van Leeuwen, where he claimed --
11   where you claimed that he admitted that
12   Business One had been represented to Hodell as
13   being capable of supporting up to 300 users.
14   My question to you is, was it your
15   understanding that the representation about
16   the number of users was actually made to
17   Hodell during that December 3rd, 2003 meeting
18   that you've referred to before?
19  A.  Correct.
20  Q.  Getting on paragraph, paragraph
21   55 of the complaint, Hodell has set forth a
22   claim for fraudulent inducement.  What is
23   Hodell's position as to what it was induced to
24   do or not do by any of the Defendants in this
25   case that lead to this claim?

Page 215

1      MR. LAMBERT: Objection.
2      THE WITNESS: We were assured by SAP
3   business partner, therefore SAP, that the
4   system would be capable of handling 300 users
5   over the next decade, that we would experience
6   productivity improvement, that we would
7   experience efficiency improvements, real time
8   access to data, and the support of SAP as a
9   team.
10      BY MR. STAR:
11  Q.  Okay.  And you believe all of
12   those representations were false?
13  A.  Correct.
14  Q.  Okay.  And you also contend that
15   because of those false representations, Hodell
16   was caused to, or induced to enter the
17   development agreement with LSi, correct?
18      THE REPORTER: Can you say that one
19   more time?  Hodell was caused to or --
20      BY MR. STAR:
21  Q.  Caused or induced to enter the
22   development agreement with LSi, correct?
23  A.  Those, among others.
24  Q.  Okay.  You also contend that
25   Hodell, because of what you say were these

Page 216

1   false representations, was caused to enter
2   into the license agreement with SAP, correct?
3  A.  Correct.
4  Q.  Okay.  Besides entering into the
5   development agreement and the license
6   agreement, what else was Hodell induced or
7   caused to do, in your view, because of the
8   misrepresentations that you have alleged?
9  A.  We invested in hardware for the
10   infrastructure to support this software.
11  Q.  What else?
12  A.  We went through training,
13   implementation costs.
14  Q.  You agree with me that each of
15   the representations that you now claim are
16   false were actually made to Hodell prior to
17   Hodell signing the license agreement in
18   December 2005, correct?
19  A.  Correct.
20  Q.  Paragraph -- pardon me, the
21   second claim in your complaint is -- styled
22   as a cause of action for fraud.  Begins on
23   paragraph 66 of the complaint.  Is this claim
24   any different, in your view, from the first
25   claim for fraudulent inducement?

Page 217

```
 1      MR. LAMBERT: Objection.
 2      THE WITNESS: In the one case, the
 3   claim under 64 is the Defendants knew they had
 4   no intention or ability to perform.  And in
 5   this case, it's -- they had the knowledge or
 6   utter disregard or recklessness or falsity.
 7      BY MR. STAR:
 8   Q.  In the second cause of action for
 9   fraud, you agree with me that the allegations
10   all relate to representations that were made
11   to Hodell prior to December 23rd, 2005, right?
12   A.  Correct.
13   Q.  So both the first claim for
14   fraudulent inducement and the second claim for
15   fraud are based on allegation -- based on
16   representations made to Hodell prior to
17   signing the license agreement, correct?
18   A.  Correct.
19   Q.  If you refer, please, to the
20   license agreement, which is Exhibit G to the
21   amended complaint.
22   A.  (Doing as indicated.)
23   Q.  If you'll flip to the signature
24   page, page 4 of the license agreement.
25   A.  (Doing as indicated.)
```

Page 218

```
 1   Q.  You see paragraph 11.9 headed
 2   Entire Agreement?  Do you see that paragraph,
 3   sir?
 4   A.  Oh, yes.
 5   Q.  Okay.  That's a paragraph that
 6   was in the agreement when it was signed?
 7   A.  Correct.
 8   Q.  Okay.  And that would have been a
 9   paragraph that you would have read before your
10   son signed this agreement in December of 2005,
11   correct?
12   A.  Correct.
13   Q.  Okay.  And you agree that it
14   provides that this agreement, referring to the
15   license agreement, and each schedule and
16   appendix hereto constitute the complete and
17   exclusive statement of the agreement between
18   SAP and licensee, which was Hodell, and all
19   previous representations, discussions and
20   writings are merged in, and superseded by,
21   this agreement?  You see that, right?
22   A.  I see that, yes.
23   Q.  Did you have any particular
24   understanding of what that meant at the time
25   your son signed this agreement in
```

Page 219

```
 1   December 2005?
 2      MR. LAMBERT: Objection.  Also with the
 3   qualification his testimony is not on behalf of -- his
 4   testimony is not on behalf of the company.
 5   You can answer.
 6      THE WITNESS: It is my impression at
 7   this point, we're at a point of no return, and
 8   this is SAP's way of getting it, shunting off
 9   liability.
10      BY MR. STAR:
11   Q.  So why would you sign the
12   document, if you believe SAP was shunting off
13   liability?
14      MR. LAMBERT: Objection.
15      THE WITNESS: I'm asking -- answering
16   as an individual.
17      BY MR. STAR:
18   Q.  Fine.
19   A.  We were between a rock and a hard
20   place.
21   Q.  As of December 23rd, 2005?
22   A.  Correct.
23   Q.  Is it your testimony then -- well
24   -- well, what do you mean exactly you were
25   between a rock and a hard place in December of
```

Page 220

```
 1   2005?  What does that mean?
 2   A.  We had committed to this product,
 3   we had been assured it would handle 300 users,
 4   it would provide productivity improvements and
 5   integration into a Windows environment, we
 6   would have an add, several add-ons, which
 7   would be at that point state of the art for
 8   our industry.
 9   Q.  Anything else?
10   A.  Spend time, evaluation, training.
11   Q.  And I'm not sure I completely
12   understand your testimony.  You believe that
13   as of December 2005, Hodell was in between a
14   rock and a hard place.  Are you saying you
15   were somehow forced to sign this license
16   agreement?
17      MR. LAMBERT: Objection.
18      THE WITNESS: I'll let Kevin address
19   the signing issue.
20      BY MR. STAR:
21   Q.  Okay.  Well, you testified
22   earlier that you reviewed this document.
23   A.  Yes, I did.
24   Q.  And that he signed with your
25   approval, correct?  He wouldn't have signed
```

Page 221

```
 1  the document if he thought he shouldn't have,
 2  right?
 3  A.  Right.
 4  Q.  Okay.  I'm trying to find out
 5  from you what the Hodell state of mind was at
 6  the time --
 7  A.  We agonized --
 8  Q.  -- you signed this document?
 9  A.  -- over it.  That's the best I
10  can say.
11  Q.  What do you mean agonized over
12  it?
13      MR. LAMBERT: Again, if you're asking
14  what the Hodell state of mind is at the time
15  this document was executed, that's the
16  belief --
17      MR. STAR: Fine.  He can testify in his
18  individual capacity.
19      BY MR. STAR:
20  Q.  What -- what do you mean you
21  agonized over it?  You mean you agonized over
22  signing this license agreement?
23  A.  Yes.
24  Q.  Why?
25  A.  Because of the burden it would
```

Page 222

```
 1  put on us if this failed.
 2  Q.  Okay.  What burden did you think
 3  would be put on you if it failed?
 4  A.  For the 40 licenses that we had
 5  to add in order to -- in order to get those,
 6  we signed this, we would have no protection.
 7  Q.  Where in this document does it
 8  say anything about 40 licenses in this license
 9  agreement, sir?
10  A.  It doesn't, sir.  We have an
11  earlier agreement where we purchased 80
12  licenses.
13  Q.  And you're referring to the
14  development agreement, right?
15  A.  I'm referring to our purchase
16  order and the invoice for the 80 licenses.
17  Q.  Are you aware that the court in
18  this case has already held as a matter of law
19  that neither SAP America, nor SAP AG, was
20  actually a party to the development agreement
21  or your purchase order; you aware of that?
22      MR. LAMBERT: Objection.
23      THE WITNESS: Yes.
24      BY MR. STAR:
25  Q.  You're also aware that the court
```

Page 223

```
 1  in this case has already held as a matter of
 2  law that SAP AG was not a party to the license
 3  agreement signed on December 23rd, 2005,
 4  correct?
 5      MR. LAMBERT: Objection.
 6      THE WITNESS: Yep.
 7      BY MR. STAR:
 8  Q.  Okay.  So you're aware that the
 9  court in this case has already concluded that
10  the only contract, written contract, between
11  an SAP Defendant and Hodell is the license
12  agreement which is between Hodell and SAP
13  America, correct?
14  A.  Correct.
15  Q.  Okay.  And you're also aware that
16  the only way in which Hodell was given the
17  right to use any SAP software, was by signing
18  this license agreement with SAP directly,
19  correct?
20      MR. LAMBERT: Objection.
21      BY MR. STAR:
22  Q.  You can answer the question.
23  A.  Repeat that -- repeat the
24  question.
25      MR. LAMBERT: If it's the same
```

Page 224

```
 1  question, this is Otto testifying --
 2      MR. STAR: Fine.
 3      MR. LAMBERT: -- individually.
 4      MR. STAR: That's fine.
 5      BY MR. STAR:
 6  Q.  Sir, you -- you're personally
 7  aware that the only way in which Hodell had
 8  any right at all to use any -- any SAP
 9  software was by signing this license agreement
10  with SAP America, correct?
11      MR. LAMBERT: Objection.
12      THE WITNESS: I'm not an attorney, but
13  I suspect that answer -- that is correct.
14      BY MR. STAR:
15  Q.  Okay.  In December of 2005, did
16  Hodell have legal representation?  Was there
17  an attorney that you used regularly?
18  A.  Please repeat that question.
19  Q.  In December of 2005, did Hodell
20  have legal representation?
21  A.  On whether we signed this
22  contract or not?
23  Q.  No, in general.
24  A.  Yes, we did.
25  Q.  Who was your attorney in December
```

Page 225

1    of 2005?
2    A.   Eugene Kratus of Spieth, Bell.
3    Q.   Okay.  For how long have you been
4    dealing with Mr. Kratus?
5    A.   Approximately 20 years.
6    Q.   Okay.  Did you, or anybody else
7    on behalf of Hodell, enlist Mr. Kratus'
8    services in reviewing the license agreement
9    before you signed it, before your son signed
10   it?
11   A.   No.
12   Q.   Did you go to any other attorney
13   to review the license agreement before your
14   son signed it on December 23rd, 2005?
15   A.   Not that I recollect.
16   Q.   Okay.  What sort of services did
17   Mr. Kratus provide to Hodell, legal services,
18   did he provide to Hodell prior to December of
19   2005?
20        MR. LAMBERT: Objection, outside the
21   scope, relevance.
22        THE WITNESS: Do I have to answer that?
23        MR. LAMBERT: If you can answer in a
24   general sense that doesn't invade any
25   privileged communications, just go ahead and

Page 226

1    answer it.
2         THE WITNESS: We used him for
3    acquisition, contracts, asset purchase
4    agreements.  We use his firm if we had human
5    relations type of issues.
6         BY MR. STAR:
7    Q.   Okay.  Mr. Kratus is a
8    transactional-type lawyer, use him for --
9    A.   I don't know that term.
10   Q.   Okay.  Well, you used him for
11   the, or his services, and his firm's services,
12   in acquiring some of these different office
13   locations, or warehouse locations that you
14   described before; is that right?
15   A.   Acquisition candidates, not
16   necessarily warehouses.
17   Q.   Did you use him to draft any
18   agreements that Hodell eventually entered
19   into?
20   A.   Yes, the asset purchase
21   agreements.
22   Q.   What was the reason that you
23   didn't go to Mr. Kratus, or to his firm, to
24   have him review the software license agreement
25   before you signed it in December of 2005?

Page 227

1         MR. LAMBERT: I'm going to object and
2    instruct you not to answer, to the extent that
3    your answer would invade any attorney-client
4    privileged communications.
5         BY MR. STAR:
6    Q.   You can answer.
7    A.   Pardon?
8    Q.   You can answer.
9    A.   I thought I heard --
10   Q.   Well, he instructed you not to
11   disclose attorney-client communication.
12        MR. LAMBERT: If you can answer that
13   question without invading or disclosing
14   attorney-client communications, then you can
15   answer it.
16        THE WITNESS: I would like the -- to
17   say something off the record.  I have to.  To
18   a businessman, this is --
19        MR. LAMBERT: Well, are we on the
20   record?
21        MR. STAR: We're on the record.  Anything
22   you say will be on the record.
23        MR. LAMBERT: Okay.
24        BY MR. STAR:
25   Q.   Did you -- did you contact

Page 228

1    Mr. Kratus, or anybody in his firm, prior to
2    signing the license agreement in
3    December 2005, to discuss any of the terms in
4    the license agreement?
5         MR. LAMBERT: I'm going to object.
6         MR. STAR: I'm not asking him for the
7    actual communications.  I'm trying to find out
8    if he went to speak with a lawyer on behalf of
9    Hodell to have him --
10        MR. LAMBERT: He already said he
11   didn't.
12        MR. STAR: -- review the document.
13        MR. LAMBERT: I think he already said
14   he didn't.
15        THE WITNESS: Yeah.  To my
16   recollection, we did not.
17        BY MR. STAR:
18   Q.   Okay.  Why not?
19   A.   Because --
20        MR. LAMBERT: Again, same objection to
21   the extent that your answer --
22        MR. STAR: It can't call for
23   attorney-client privilege.  If he didn't have
24   a communication with his lawyer, it
25   necessarily cannot call for privileged

Page 229

1    information. I mean, he didn't -- he's
2    testified he didn't go to the lawyer that he
3    had for 20 years, and I'm asking -- and yet he
4    agonized over this document, and I'm asking
5    him why he didn't go to his lawyer.
6        MR. LAMBERT: Again, first of all, Otto
7    isn't the one that signed this document.
8    Kevin is. If you want to ask Kevin, that's
9    fine.
10       MR. STAR: Well, I will also ask Kevin
11   the question, and -- but Otto has testified
12   here today that he reviewed this document in
13   detail, and that his son would not have signed
14   this document if he didn't approve it, and
15   that they agonized over the document.
16       BY MR. STAR:
17   Q. Sir, given your testimony that
18   you reviewed this document before it was
19   signed by your son, that you agonized over the
20   document, and you had some concerns, why
21   didn't you go to Mr. Kratus or somebody else
22   in his firm to review it?
23   A. Two reasons. Number one, we both
24   speak English, we can read, and we were
25   dealing with a worldwide organization that, in

Page 230

1    our view, could be trusted at the time.
2    Q. Okay. Is that it?
3    A. Yeah.
4    Q. Okay. So you understood what you
5    were signing then? It was in plain English,
6    as you say, right?
7    A. (Witness nods head.) Yes.
8    Q. Okay. Including paragraph 11.9,
9    which says that this is the entire agreement,
10   and that all previous representations,
11   discussions and writings are merged in and
12   superseded by this agreement, correct?
13   A. I already answered that question.
14   Q. Okay. We'll let you stand by
15   your prior answer.
16   Your third cause of action here, sir, is
17   for breach of contract. And in the complaint, you
18   allege that SAP had breached both the development
19   agreement and the license agreement. As we've
20   already established, the only remaining claim
21   against SAP for breach of contract is a claim that
22   SAP America breached a warranty obligation in the
23   license agreement. You understand that?
24       MR. LAMBERT: Objection.
25       THE WITNESS: I'm not an attorney.

Page 231

1        BY MR. STAR:
2    Q. Okay. But you're aware that the
3    court dismissed any claim against SAP America
4    or SAP AG that it had breached the development
5    agreement, correct?
6    A. Correct.
7    Q. And you're aware that the court
8    dismissed any claim against SAP AG that it
9    breached the license agreement, correct?
10   A. I don't recall.
11   Q. Paragraph 84 of the complaint
12   states that in the event Hodell-Natco should
13   be deemed bound to the terms of the SAP
14   Business One software license agreement for
15   the 2005 purchase of 40 CMR -- pardon me --
16   CRM user license -- licenses -- the Plaintiff
17   alleges that the warranty set forth in
18   paragraph 7.1 was breached, as the software
19   did not substantially conform to the
20   functional specifications contained in the
21   documentation.
22   What specifically does Hodell contend
23   about the SAP Business One software that it did
24   not substantially conform to the functional
25   specifications contained in the documentation?

Page 232

1        MR. LAMBERT: Again, that's going to be
2    Kevin's area of testimony.
3        BY MR. STAR:
4    Q. Okay. Do you have any
5    understanding in your individual capacity as
6    to what is -- what you mean by the
7    "documentation" referenced in paragraph 84 of
8    the complaint?
9    A. Among various documents, the
10   elements that talked about productivity
11   improvement, efficiencies, reduction of
12   cost --
13   Q. Okay.
14   A. -- speed of access to data.
15   Q. If you look at the license
16   agreement for me, sir, again, Exhibit G.
17   Exhibit G, sir. Paragraph 1.2 is titled
18   Documentation. It says it means SAP's
19   documentation, which is delivered to licensee,
20   which is Hodell, under this agreement. Do you
21   see that?
22   A. Yes.
23   Q. Okay. Are you on paragraph 1.2,
24   sir?
25   A. 7.1.

Page 233

1  Q.  No -- I'm sorry.  I'm looking at
2  paragraph 1.2 on the first page of the license
3  agreement.
4  A.  Oh, I'm sorry.  I thought you
5  said 7.1.
6  Q.  Just want to make sure we don't
7  have any confusion there.
8  Just to do that again, you see in
9  paragraph 1.2, it says Documentation, right?
10  It says it means SAP's documentation, which is
11  delivered to licensee, being Hodell, under
12  this agreement, correct?
13  A.  Correct.
14  Q.  Okay.  Do you have that
15  documentation?
16  A.  I would have to defer to Kevin.
17  Q.  Okay.  Do you know if that
18  documentation's actually been produced in this
19  litigation?
20  MR. LAMBERT: Objection.
21  THE WITNESS: I would have to defer to
22  Kevin.
23  BY MR. STAR:
24  Q.  Okay.  Do you recall personally
25  ever reading the documentation?

Page 234

1  MR. LAMBERT: Objection.
2  THE WITNESS: I don't know.
3  BY MR. STAR:
4  Q.  So you don't know if the
5  documentation may have representations about
6  productivity gains and those sorts of things
7  that you have described, correct?
8  MR. LAMBERT: I just want to note an
9  objection.
10  THE WITNESS: I don't know.
11  BY MR. STAR:
12  Q.  The fifth cause of action in your
13  complaint is for negligent misrepresentation.
14  It begins with paragraph 91.  Is it correct
15  that the representations, or
16  misrepresentations that form the basis of this
17  cause of action for negligent
18  misrepresentation, are the same
19  representations that support your claims for
20  fraudulent inducement and fraud?
21  MR. LAMBERT: Objection.
22  THE WITNESS: Please rephrase that
23  question.
24  BY MR. STAR:
25  Q.  Sure.  Okay.  Is it your

Page 235

1  understanding, as the designee on behalf of
2  Hodell, that the alleged misrepresentations
3  that support your fifth cause of action for
4  negligent misrepresentation, are the same
5  alleged misrepresentations that form the basis
6  of your claims for fraud and fraudulent
7  inducement?
8  MR. LAMBERT: Objection, same.
9  THE WITNESS: Sorry, I didn't hear what
10  you said.
11  MR. LAMBERT: I was just objecting.
12  You can answer, if you know.
13  THE WITNESS: I believe so.
14  BY MR. STAR:
15  Q.  Okay.  And you'd also agree with
16  me that all of the misrepresentations that
17  form the basis of your negligent
18  misrepresentation claim were representations
19  made to Hodell prior to its signing of the
20  license agreement on December 23rd, 2005,
21  right?
22  MR. LAMBERT: Objection.
23  THE WITNESS: I believe that's correct.
24  BY MR. STAR:
25  Q.  Okay.  At the time Hodell signed

Page 236

1  the license agreement in 2005, was it your
2  personal belief that you had any sort of
3  special relationship with SAP, either SAP
4  America, or SAP AG, or did you feel that you
5  were just dealing with them as a business
6  customer, or -- not the right word -- let me
7  ask the question again.
8  At the time that you signed the license
9  agreement in December of 2005, did Hodell
10  believe that it had any special relationship
11  with SAP America, or SAP AG, such that it was
12  in a position of trust or confidence with SAP?
13  MR. LAMBERT: Objection.
14  THE WITNESS: I don't believe it was a
15  special relationship.  I believe a company of
16  SAP's stature requires an up and up
17  relationship with all their clients.
18  BY MR. STAR:
19  Q.  So you'd agree that when you
20  signed the license agreement, you had nothing
21  more than a business to business, or arm's
22  length relationship between Hodell and SAP,
23  correct?
24  A.  Correct.
25  Q.  Let's go off the record for a

Page 259

1 Q. Okay. So as of this time,
2 October 14th, 2004, what was your expected
3 timeline for the completion of the In-Flight
4 add-on and the Radio Beacon applications?
5 A. I don't recall what my original
6 expectation was.
7 Q. I'm asking you as of the -- as of
8 October 14th of 2004, did you have an
9 expectation?
10 A. Yes.
11 Q. What was it?
12 A. But I don't have that memorized.
13     MR. STAR: This is the next document,
14 please. 10.
15     (Whereupon, Exhibit 10 was marked for
16 identification.)
17     BY MR. STAR:
18 Q. Sir, we have marked here as
19 Exhibit 10 an email produced by Hodell, which
20 is dated November 1, 2004 from Dan Lowery to
21 yourself and your son. Do you see that?
22 A. Yes.
23 Q. Okay. There is notes,
24 handwritten notes at the bottom. Are those
25 your notes, sir?

Page 260

1 A. Yes.
2 Q. You have written here the
3 In-Flight "pass" was IBiS's restitution for
4 our implementation penalty of Radio Beacon, in
5 conjunction with pass on Radio Beacon. What
6 -- what did you mean by that?
7 A. The number of In-Flight licenses
8 would be provided at no cost to us.
9 Q. Why?
10 A. Because of the time required to
11 implement Radio Beacon on FACTS.
12 Q. You say here, you use the word
13 restitution, IBiS's restitution. What did you
14 mean exactly?
15 A. That was their help to us for the
16 financial cost to us on that implementation.
17 Q. Going into -- strike that. As of
18 November 1st of 2004, was it Hodell's view
19 that it was owed restitution from IBiS
20 concerning the FACTS implementation?
21 A. I think there was a general
22 understanding that it cost us more than was
23 anticipated.
24 Q. How much more?
25 A. I can't recall.

Page 261

1 Q. What did Hodell believe as of
2 November 1st, 2004 would have been fair
3 restitution for the FACTS implementation?
4     MR. LAMBERT: Objection.
5     THE WITNESS: I don't recall.
6     BY MR. STAR:
7 Q. What was wrong with the FACTS
8 implementation that you thought you were
9 entitled to restitution from IBiS?
10 A. It was not a FACTS
11 implementation. It was a Radio Beacon add-on
12 to the FACTS software.
13 Q. Okay. What was wrong with the
14 Radio Beacon add-on to the FACTS software --
15 A. The time it took to --
16 Q. -- that you thought you needed
17 restitution or deserved restitution from IBiS?
18 A. In essence, we helped upgrade the
19 Radio Beacon package, because of the -- the
20 time it took to implement for our industry.
21 Q. Is that it? That's the only
22 reason you thought you were entitled to
23 restitution?
24     MR. LAMBERT: Objection.
25     THE WITNESS: I don't recall.

Page 262

1     BY MR. STAR:
2 Q. You agree with me that if you in
3 general had the belief that you were entitled
4 to restitution from a company with whom you
5 did business, there would be some specific
6 reason why you thought you were owed some
7 money from them, right?
8 A. It took longer than we originally
9 anticipated to get it functional.
10 Q. Did it ever get functional?
11 A. Yes.
12 Q. Okay. And you believe the -- the
13 delay in having the Radio Beacon add-on for
14 FACTS functional warranted restitution for
15 Hodell, right?
16 A. Some recovery of the costs for
17 implementation and helping them develop a
18 package.
19 Q. Helping Radio Beacon develop a
20 package?
21 A. Yes.
22 Q. Okay.
23 A. And the synchronization with
24 IBiS.
25 Q. Did you ever address this issue

Page 263

1  directly with -- with Radio Beacon and ask
2  them for restitution or any monies for the
3  delayed implementation?
4  A.  I don't recall.
5  Q.  Did you ever -- ever initiate any
6  legal proceedings against Radio Beacon in
7  connection with this alleged delay concerning
8  the FACTS software?
9  A.  No.
10     MR. STAR: Mark this as 11, please.
11  (Whereupon, Exhibit 11 was marked for
12  identification.)
13     BY MR. STAR:
14  Q.  Sir, we've marked here as
15  Exhibit 11 is an undated document that was
16  produced by Hodell.  Do you -- do you recall
17  seeing this document sometime in 2004?
18  A.  Yes.
19  Q.  Okay.  When do you think you saw
20  this in 2004?  Was it before you signed the
21  license -- before you signed the development
22  agreement in December of that year?
23  A.  It was prior to the signing.
24  Q.  Okay.  Underneath the heading
25  Costs in the middle of the page, it shows the

Page 264

1  purchase of In-Flight Enterprise.  Below that
2  it says 3,816 hours, then it says no charge.
3  Why was there no charge for the purchase of
4  In-Flight?  Is this what you were referring to
5  earlier that this was going to be restitution?
6  A.  Correct.
7  Q.  Okay.  Did you have some
8  understanding of what dollar figure that
9  equated to that -- that you would be obtaining
10  restitution for?
11  A.  No specific dollar amount was
12  discussed.
13  Q.  Okay.  You see that it lists the
14  purchase of In-Flight and relates that as to
15  number of hours, and below that, it has a per
16  hour charge for different development and
17  implementation items, and it shows $150 an
18  hour.  Was it your understanding that the
19  amount that -- that you would be receiving for
20  restitution was the equivalent of $150 an hour
21  times 3,816 hours?
22  A.  I can't say that for certain,
23  because I don't know if the same individuals
24  would be involved now.
25  Q.  I'm not sure I understand your

Page 265

1  response.  What was your understanding, if you
2  can recall, as to the amount of restitution
3  Hodell would be receiving in connection with
4  the Radio Beacon-FACTS issue?
5     MR. LAMBERT: Objection.
6     THE WITNESS: The free In-Flight
7  licenses.
8     BY MR. STAR:
9  Q.  Okay.  And how much was that
10  worth?
11  A.  I didn't put a number on it.
12  Q.  Had you done any calculation in
13  or around October of 2004, as to what you
14  thought in terms of dollars Hodell was
15  entitled to in terms of restitution concerning
16  the Radio Beacon and FACTS issue?
17  A.  It was my impression that this,
18  plus the royalty, would be sufficient.
19  Q.  By the royalty, what do you mean?
20  A.  We talked about the development
21  agreement yesterday.  In that, was spelled out
22  up to $100,000 of funds credited to our
23  invoices due for user sales above the 500
24  number.
25  Q.  Well, do you agree with me that a

Page 266

1  proper interpretation of the costs associated
2  with the purchase of In-Flight would be to
3  take the 3,816 hours and multiply it by $150
4  per hour, which would come out to a figure of
5  $572,400?
6     MR. LAMBERT: Objection.
7     THE WITNESS: I can't jump to that
8  conclusion.
9     BY MR. STAR:
10  Q.  Because you just had no
11  understanding of how much this was worth at
12  all; is that right?
13  A.  I had some general understanding
14  of the caliber of the people that were working
15  on it.  I don't know what the net charge would
16  be for those.
17  Q.  So you would not agree with the
18  statement that Hodell, in effect, expected to
19  receive total restitution of somewhere around
20  $672,000, which would include $572,000 related
21  to the no charge for the In-Flight licensing,
22  plus $100,000 back as you have described?
23  A.  That is your conclusion.
24  Q.  You don't agree with it?
25  A.  I don't have any direct basis.

Page 267

1  Q.  And your -- your testimony today
2  is that you just have no understanding of the
3  exact amount of restitution Hodell was going
4  to receive for the problems that it had
5  incurred with respect to the Radio Beacon
6  add-on for FACTS; is that right?
7      MR. LAMBERT: Objection.
8      THE WITNESS: That's your summary --
9      BY MR. STAR:
10  Q.  Okay.  Well --
11  A.  -- not mine.
12  Q.  -- if you have an understanding,
13  sir, I'm entitled to know what it was.  If I
14  just haven't asked the question in a way that
15  hits the -- the nail right on the head, I'm
16  still entitled for you to tell me what your
17  understanding was of the total amount of
18  restitution Hodell would be receiving with
19  respect to the -- the problems that it
20  experienced with the Radio Beacon add-on for
21  FACTS.  Would you please tell me that?
22  A.  It's my understanding, based on
23  the development agreement work, that at some
24  point they may be licensing In-Flight.  I
25  don't know specifically what they were going

Page 268

1  to charge for it, but it probably could put a
2  value in -- well in excess of 100,000 on that
3  portion alone in licensing fees.
4  Q.  So it was at least in excess of
5  $100,000 that you would be obtaining in
6  benefits by not having to pay for the
7  In-Flight licenses; is that true?
8  A.  Plus the royalties.
9  Q.  Plus another $100,000 in
10  royalties?
11  A.  Plus, yes.
12  Q.  So at least $200,000?
13  A.  Yes, above that.
14  Q.  How far above that?
15  A.  I wouldn't be able to say.
16      MR. STAR: This is 12, please.
17  (Whereupon, Exhibit 12 was marked for
18  identification.)
19      BY MR. STAR:
20  Q.  Sir, what we have marked as
21  Exhibit 12, is this also another page of your
22  handwritten notes?
23  A.  I'm sorry, could you repeat that?
24  Q.  Is this also a page of your
25  handwritten notes, Exhibit 12?

Page 269

1  A.  Correct.
2  Q.  Okay.  It's dated October 31,
3  2005, correct?
4  A.  Correct.
5  Q.  It indicates at the top, SAP Web
6  Demo.  What were you referring to?
7  A.  I can't say.
8  Q.  At the bottom of your note here,
9  you write, some little concern of server size
10  for sequel database greater than the 120,000
11  SKUs.  Do you see that?
12  A.  Yes.
13  Q.  What were you referring to there?
14  A.  There are two sentences there.
15  Which one are you asking me a question on?
16  Q.  Well, I was asking you a question
17  on the one that I read to you.
18  A.  Could you please --
19  Q.  Sure.
20  A.  -- read it again?
21  Q.  You wrote, some little concern of
22  server size for sequel database greater than
23  120,000 SKUs.  What were you referring to?
24  A.  My recollection at this point is
25  that referred to, since at this time we were

Page 270

1  dealing with LSi, IBiS, SAP business partner,
2  this pertained to a comment that either Dale,
3  or someone from LSi, IBiS made on our number
4  of SKUs and that -- effect that might have on
5  the sizing of the sequel server.
6  Q.  Did this in any way relate to
7  concerns as to whether Business One itself
8  could handle a customer that had greater than
9  120,000 SKUs?
10  A.  Not to me.
11  Q.  Did -- now reviewing this
12  document, does it refresh your recollection as
13  to whether you were actually given a web demo
14  of the SAP Business One software back in
15  October of 2005?
16  A.  That is the implication of this
17  memo.
18  Q.  Okay.  What do you recall about
19  that demo?  How was it done, and who did it?
20  A.  As I pointed out, at this time,
21  we were dealing with LSi, IBiS, the SAP
22  business partner, so it would have been done
23  by them.
24  Q.  Okay.  Do you recall if they came
25  to your location to do it, or did you view it