**EXHIBIT P**

# In The Matter Of:

*Hodell-Natco Industries, et al. v.*
*SAP America, Inc., et al.*

*Marcia Weissman*
*July 19, 2012*



PHILADELPHIA | 215.944.5800   NEW YORK CITY | 646.470.3376   PHOENIX | 623.224.2760   SILICON VALLEY | 650.799.8020

*Original File 07.19.12 Hodell-Natco Industries_et al. v. SAP America_Inc._ et al. Witness Marcia Weissman.txt*

Hodell-Natco Industries, et al. v.  
SAP America, Inc., et al.

Marcia Weissman  
July 19, 2012

Page 1

```
IN THE UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF OHIO
          EASTERN DIVISION

HODELL-NATCO INDUSTRIES,     )
INC.,                        )
                             )
          Plaintiff,         )
                             )
     vs.                     ) No. 1:08-cv-02755
                             )
SAP AMERICA, INC., SAP AG,   )
LSI-LOWERY SYSTEMS, INC.,    )
THE IBiS GROUP, INC.,        )
                             )
          Defendants.        )

STATE OF ILLINOIS    )
                     ) SS.
COUNTY OF COOK       )
```

        The videotaped deposition of MARCIA WEISSMAN taken before April M. Metzler, Certified Shorthand Reporter and Certified Realtime Reporter, at 191 North Wacker Drive, Suite 3700, Chicago, Illinois, commencing at 9:09 a.m. on the 19th day of July, A.D., 2012.

Page 2

```
APPEARANCES:

     KOEHLER NEAL
     MR. P. WESLEY LAMBERT
     3330 Erieview Tower
     1301 East Ninth Street
     Cleveland, Ohio 44114
     Phone:  (216) 539-9375
     E-Mail: wlambert@koehlerneal.com

          On behalf of the Plaintiff;

     DRINKER BIDDLE & REATH LLP
     MR. GREGORY J. STAR
     One Logan Square
     18th and Cherry Streets
     Philadelphia, Pennsylvania 19103
     Phone:  (215) 988-2734
     E-Mail: gregory.star@dbr.com

          On behalf of the Defendants,
          SAP America, Inc. and SAP AG;

     REMINGER & REMINGER
     MR. ROY A. HULME
     1400 Midland Building
     101 Prospect Avenue, West
     Cleveland, Ohio 44115
     Phone:  (216) 687-1311
     E-Mail: rhulme@reminger.com

          On behalf of the Defendants,
          LSi-Lowery Systems, Inc. and
          The IBiS Group, Inc.;

              *  *  *  *  *  *
```

Page 3

                    I N D E X

WITNESS                                       PAGE

MARCIA WEISSMAN

     Direct Examination.......................  4
     By Mr. Star

     Cross-Examination ....................... 70
     By Mr. Lambert

     Cross-Examination .......................134
     By Mr. Hulme


                    E X H I B I T S

NO. DESCRIPTION                      MARKED/REFERRED TO

     No. 298 (E-mails most recently dated .....  65
     10/30/2007)

     No. 299 (E-mails most recently dated ..... 105
     1/2/2007)

     No. 300 (E-mails most recently dated ..... 108
     1/5/2007)

     No. 301 (E-mail dated 1/5/2007) .......... 120

     No. 302 (E-mail dated 4/23/2007) ......... 123

Page 4

1      MR. STAR: Swear the witness.
2      (Witness sworn.)
3      WHEREUPON:
4      MARCIA WEISSMAN,
5  called as a witness herein, having been first duly
6  sworn, was examined and testified as follows:
7      DIRECT EXAMINATION
8      BY MR. STAR:
9  Q.  Good morning, Ms. Weissman. I'm Greg Star.
10     I'm the attorney for SAP America and SAP AG. We're here
11     today to take your deposition in connection with a
12     lawsuit that was filed by Hodell-Natco against SAP
13     America, SAP AG, and LSi-Lowery Systems.
14         Have you ever had your deposition taken
15     before?
16 A.  A very long time ago once.
17 Q.  Let me just give you some of the general
18     ground rules.
19         Obviously, I'll be asking you questions.
20     You'll be answering questions that you understand. The
21     court reporter will be taking down what we say. Let's
22     try not to speak over each other. I doubt we'll have an
23     issue with that, but if you'll let me finish my
24     question, and I let you finish your answer, it's easier
25     for everybody involved.

| Hodell-Natco Industries, et al. v. | Marcia Weissman |
| SAP America, Inc., et al. | July 19, 2012 |

Page 49

1 because I wasn't his supervisor, but, you know, we
2 talked about it.
3 Q. Okay. Did he tell you orally what he found?
4 A. Yes.
5 Q. This was after the go-live?
6 A. Yes.
7 Q. Okay. Do you remember any of the specifics of
8 what Joe told you he had found, as far as the cause of
9 the problems at Hodell?
10 A. As I mentioned, he was particularly concerned
11 about some of the wiring issues, and --
12 Q. And this was after go-live?
13 A. Yes.
14 And some of the -- I think there was something
15 with the CPU, it needed to be faster or something like
16 that.
17 Q. That was also after go-live?
18 A. Yes.
19 Q. Anything else that he reported on?
20 A. I can't recall at this point.
21 Q. Do you recall Joe Guagenti communicating to
22 you any problems that he felt were in the Business One
23 core code itself?
24 A. I don't recall him saying that --
25 Q. Did you personally ever come to a conclusion

Page 50

1 as to what was causing issues at Hodell?
2 A. I think it was a number of different factors
3 that all kind of came together. One certainly was the
4 volume of data input, which was very, very large. And
5 possibly we had not understood initially how -- how
6 large that was.
7 Partially, it was certainly the hardware and
8 the communication. The networking communication with
9 the remote offices was definitely a problem.
10 I was not personally at any of the remote
11 offices at any time, but I was told that in some of
12 those offices the wiring and the hardware was even worse
13 than at the main office, and that was an issue as well.
14 There were also issues with -- you know, there
15 certainly were some issues where some of the programs
16 needed to be rewritten in some way, so that they worked
17 more efficiently.
18 Q. As a percentage of the overall speed and
19 performance problems that Hodell was experiencing, are
20 you able to tell me what percentage you think were
21 attributed to the hardware and network issues of Hodell
22 itself?
23 MR. HULME: Objection, foundation.
24 BY THE WITNESS:
25 A. Yeah, I can't give you a quantitative answer

Page 51

1 on that.
2 Q. You mentioned the volume of data input was a
3 problem and that LSi might not have fully understood the
4 magnitude of the data. What did you mean by that?
5 A. I don't think we were aware of, you know, the
6 fact that you had -- I don't recall how many people --
7 but there were multiple people who for eight hours solid
8 every day were entering these really, really long
9 documents, sales orders, purchase orders, and so on,
10 sales orders were the biggest element that were the
11 problem. I don't think we realized how much of that was
12 going on.
13 MR. HULME: Let me just object to the foundation.
14 Move to strike.
15 MR. LAMBERT: Same objection.
16 MR. STAR: Move to strike?
17 MR. HULME: Yeah.
18 MR. STAR: On what basis?
19 MR. HULME: What I just said, based on her
20 testimony to date and what she just said, she doesn't
21 have a foundation --
22 MR. STAR: Yeah.
23 MR. HULME: -- for saying we.
24 MR. STAR: Yeah.
25 THE WITNESS: Okay.

Page 52

1 BY MR. STAR:
2 Q. Your job, you had been on site with L- --
3 strike that.
4 For LSi you had been on site at Hodell many
5 times before go-live, right?
6 A. Yes, yes.
7 Q. Part of what you were doing was assessing
8 functionality that Hodell needed --
9 A. Yes.
10 Q. -- for its solution?
11 A. Yes.
12 Q. In your visits to Hodell, is part of what you
13 did also to analyze how Hodell would be using the
14 system?
15 A. From a functional standpoint, yes.
16 Q. When you mentioned a moment ago that LSi might
17 not have understood that -- the volume in the way that
18 Hodell will be using the system, was it your job to
19 collect information about that, or was that somebody
20 else at LSi, prior to go-live?
21 A. I don't think we ever specifically discussed
22 the volume issue. My job was to assess the needs, but
23 that was understood to be primarily in a procedural way.
24 What steps do they need to go through? What
25 forms do they need to fill out? You know, that type of

Hodell-Natco Industries, et al. v.  
SAP America, Inc., et al.

Marcia Weissman  
July 19, 2012

Page 53

1   thing. What does the program need to do? In terms of
2   the data that it needs to keep and how it needs to be
3   presented and those kinds of things.
4       I don't recall discussions, prior to go-live,
5   that specifically related to the volume of data that was
6   being entered.
7   Q. Was there somebody at LSi who was -- who had,
8   as part of their job, to sit with Hodell's users and
9   figure out how they would be using the system before
10  Hodell went live?
11      MR. HULME: Objection, foundation.
12      BY THE WITNESS:
13  A. Not specifically.
14  Q. Do you know if anybody did that?
15  A. No. I mean, we -- I, and some of the other
16  implementation consultants who were also involved, did
17  on occasion sit with users. But, again, it was more,
18  you know, what steps do you go through, the procedure
19  aspect of it.
20  Q. Prior to go-live, did you personally have some
21  conception, some understanding of how the various Hodell
22  users would be using the SAP solution?
23  A. I knew, again, procedurally, yes.
24  Q. Well, you mentioned that after go-live LSi
25  became aware that some of the Hodell users were spending

Page 54

1   a full day on the system entering very large orders. Am
2   I understanding that you personally only became aware of
3   how those users would be behaving after go-live?
4       MR. HULME: Objection, form.
5       BY THE WITNESS:
6   A. I certainly knew that they spent their time
7   entering sales orders, because that's what their job
8   was. I was not aware of the time pressure that they
9   were under, which was considerable, that they were told
10  that they had to turn these things around very, very
11  quickly. And I was not aware, as I said, of the
12  quantities of data that were involved.
13  Q. Is that something that you typically would be
14  aware of in an implementation like this, you personally,
15  given your role?
16  A. It varies. Usually in a smaller
17  implementation where there are fewer individuals
18  involved, I would be more interacting with each of them.
19  But in a company like Hodell, which had a large number
20  of users and also was very well organized by departments
21  and branches, I spent most of my time with the branch
22  managers and the department heads, rather than the
23  individual users.
24  Q. How did you personally come to find out that
25  some of these users were on the system all day entering

Page 55

1   these very large orders?
2   A. By being there during go-live and, you know,
3   there were complaints. And I would go and sit with them
4   and try to work out what the problems were. And I saw
5   the pressures that they were under to -- you know, to do
6   these and to do them quickly.
7   Q. And that's the first time that you learned of
8   that sort of pressure?
9   A. To that degree, yes.
10  Q. Did that come as a surprise to you?
11  A. Somewhat.
12  Q. Why?
13  A. Because it hadn't been mentioned. It hadn't
14  been brought up that that was a need to be able to enter
15  that quantity of data.
16  Q. It hadn't been mentioned to you?
17  A. Correct.
18  Q. Did that spawn internal discussions that you
19  were a part of at LSi about the topic of Hodell's volume
20  and volume -- transactions --
21  A. We talked about it, yes.
22  Q. Who did you have conversations with about
23  that?
24  A. I had conversations with Jon Woodrum and with
25  Joe and Eric, the programmers, and the other

Page 56

1   implementation people that were involved.
2   Q. And what was the substance of those
3   conversations?
4   A. Just what I said, that it was a very high
5   volume that needed to be done at considerable speed, and
6   that they were having difficulties with it.
7   Q. Did any of those individuals express to you
8   that they had already, before go-live, been aware of
9   those kinds of pressures --
10  A. No.
11  Q. -- and data volumes?
12  A. No.
13  Q. To -- did you develop an understanding that
14  none of them had been aware of that fact before go-live?
15  A. Yes.
16  Q. Is it your testimony today that based on what
17  you know, personally and through your conversations with
18  others at LSi, that Hodell had not fully informed LSi of
19  the way in which it was going to be using the system and
20  the volume of the transactions before go-live?
21  A. I -- I would say that's true.
22  Q. And you believe that the volume of
23  transactions that was actually, in fact, taking place
24  caused performance problems on the system after go-live,
25  true?

Hodell-Natco Industries, et al. v.  
SAP America, Inc., et al.

Marcia Weissman  
July 19, 2012

Page 57

1 A. It was one of the factors, yes.
2 Q. Are you able to tell me, as a percentage,
3 what -- what portion of -- strike that.
4   As a percentage, if you're able to tell me,
5 how much did that issue contribute to the performance
6 problems --
7 A. I -- I really can't give you a percentage. I
8 really don't know.
9 Q. Would you consider that to have been a
10 significant issue?
11   MR. HULME: Objection, foundation.
12   BY THE WITNESS:
13 A. It was one of the significant issues.
14 Q. What were the other significant issues?
15 A. What I discussed before, about the hardware,
16 primarily.
17 Q. Did you ever come to some understanding that
18 there were core issues with the Business One software
19 that created problems for Hodell?
20 A. In terms of performance?
21 Q. Yes.
22 A. As a nontechnical person, I wasn't aware of
23 that initially. But over the course of time with
24 investigations that Joe did and, you know,
25 communications that he had with SAP that he talked

Page 58

1 about, it became apparent that there were things within
2 the core program that could be improved, and I believe
3 were subsequently improved.
4 Q. And you acquired that knowledge just through
5 conversations with Joe --
6 A. Yes.
7 Q. -- Guagenti?
8 A. Yes.
9 Q. What about the InFlight code, did you ever
10 become aware that there were issues with the InFlight
11 code itself that were causing any performance problems
12 at Hodell?
13 A. I don't know that I would phrase it exactly
14 that way. We -- we worked to improve performance in the
15 InFlight code on a continuing basis, and that was one of
16 the things that I was testing, in terms of can we make
17 it go faster and can we prevent freeze-ups and other
18 issues that were affecting performance. So, you know,
19 we were constantly trying to improve that aspect.
20 Q. How long did you work on the Hodell project?
21 What was your last involvement?
22 A. Well, my last involvement was when I stopped
23 working for LSi, because, you know, we were supporting
24 them on a continuing basis, you know, for that whole
25 period of time. So I was involved with them to one

Page 59

1 degree or another. They weren't my primary focus after
2 a while, but, you know, they would call for support
3 fairly frequently.
4 Q. When was your last on-site visit to Hodell?
5 A. It would have been probably early 2008. I
6 don't really know for sure.
7 Q. At that point in time what was the status of
8 the Hodell implementation of SAP?
9 A. Well, it was functional. I mean, they were
10 using it. They were getting their work done. They were
11 doing what they needed to do with it, but they were not
12 terribly happy with it.
13 Q. Why weren't they happy with it, as of early
14 2008?
15 A. As far as I know, they were not pleased with
16 the performance and, you know, some of the
17 functionality, but I don't recall specific things at
18 that particular time.
19 Q. When you went there for your final visit, in
20 early 2008, did anybody show you the performance of the
21 system? Did they show you how they were using the
22 system, anything like that?
23 A. I assumed so. I don't really recall exactly
24 what we did.
25 Q. Do you recall having any impression about the

Page 60

1 performance?
2 A. It was -- it had improved considerably since
3 the initial go-live. As I said, it was functional. It
4 may not have been optimal, but it was functional.
5   I really don't remember the specifics of what
6 went on in that particular visit.
7 Q. Do you know how long Hodell ran the SAP
8 solution with InFlight and Radio Beacon?
9 A. No, I don't.
10 Q. Do you know -- they were running this solution
11 in October of 2008 when you left --
12 A. Yes.
13 Q. -- LSi?
14 A. Yes.
15 Q. What do you recall, if anything, was the
16 status of their use of SAP, as of October 2008? Were
17 they still complaining about performance, for instance?
18 A. I don't recall that there were that many
19 complaints about performance at that point. It was more
20 specific issues, which are not unusual, as a company
21 uses the system. You know, various questions come up,
22 and obviously the more people you have doing it, the
23 more questions you're going to get. So I would say it
24 was fairly routine questions at that point.
25 Q. So as of October 2008, Hodell was not