**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**


| | | |
|---|---|---|
| HODELL-NATCO INDUSTRIES, INC., | ) | CASE NO. 1:08-cv-02755 |
| | ) | |
| Plaintiff, | ) | JUDGE LESLEY WELLS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| SAP AMERICA, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

On November 16, 2012, this matter was referred to the Court to address three pending

motions for summary judgment.  (ECF No. 170.)  This Report and Recommendation addresses

the motion for summary judgment filed on September 7, 2012 by Defendant SAP America and

SAP AG (collectively "SAP").  (ECF No. 110.)  Plaintiff Hodell-Natco Industries, Inc.

(hereinafter "Hodell") filed a brief in opposition (ECF Nos. 155, 162), to which SAP replied.

(ECF No. 163.)  On February 28, 2013, the Court heard oral arguments.[1]  (ECF No. 178.)

---

[1]  Previously, on February 1, 2013, the Court held a settlement conference.  (ECF No.
175.)  At the time, Defendant SAP requested the opportunity to present oral arguments
before the Court.  Subsequently, on or about March 18, 2013, the parties contacted the
Court indicating that additional information not produced during discovery had come to
light, which delayed consideration of the pending motions.  At that time, it was indicated
additional briefing might be requested.  After the additional information was produced,
the parties notified the Court that they would not seek to supplement their briefs.

## I.  Procedural and Factual Background

Plaintiff Hodell, an Ohio corporation with its principal place of business in Valley View, Ohio, filed an Amended Complaint on April 22, 2009 setting out five causes of action against LSi-Lowery Systems, Inc. (hereinafter "LSi"), The IBIS Group, Inc. (hereinafter "IBIS"), SAP America, Inc., and SAP AG.  (ECF No. 26.)  Hodell's claims involve two contracts and the negotiations and representations made prior to their consummation.  (*See generally* Amended Compl.)  Specifically, Hodell alleged the following causes of action against all Defendants: (1) fraudulent inducement; (2) fraud; (3) breach of contract; (4) negligence; and (5) negligent misrepresentation.  (ECF No. 26.)

On May 18, 2009, Defendants LSi and IBIS filed a joint Answer.[2]  (ECF No. 30.)

On June 21, 2009, the SAP defendants filed a motion to dismiss.  (ECF No. 36.)  On September 2, 2010, after hearing oral arguments, this Court issued a Report and Recommendation providing that SAP's motion to dismiss should be granted in part and denied in part.  (ECF No. 50.)  Specifically, it was recommended that Hodell's claim for breach of contract, as it related to the Development Agreement entered into on or about December 20, 2004, as well as the simple negligence action, be dismissed as to both SAP defendants.  *Id*.  In addition, it was recommended that Hodell's claim for breach of the License Agreement should be dismissed as to Defendant SAP AG only, and that the motion to dismiss be denied with respect to counts one, two and five (fraud, fraud in the inducement, and negligent misrepresentation).  *Id*.

---

[2]  According to the Answer, IBIS, an Illinois corporation, became a wholly owned subsidiary of LSi, a Missouri corporation, in April of 2004.  (ECF No. 30 at ¶¶4-5.)

2

On June 2, 2011, Judge Lesley Wells adopted the Report and Recommendation in its entirety.  (ECF No. 61.)

On June 24, 2011, SAP filed an Answer.  (ECF No. 69.)

Though many of the facts in this matter are contested, the following are either uncontested or are now law of the case.

On or about December 20, 2004, Hodell and LSi executed a Development Agreement, attached to the Amended Complaint as Exhibit D (hereinafter the "Development Agreement"). (ECF No. 26 at ¶¶30-32; ECF No. 30 at ¶15.)  The Court has found that the SAP defendants were not parties to the Development Agreement.  (ECF Nos. 50, 61.)  The Development Agreement called for Hodell to order 80 user licenses for SAP's Business One ("B1") software at a cost of $300,000.00.   (ECF No. 26 at ¶¶30-32; ECF No. 30 at ¶15.)  SAP denies that it received a $300,000 license fee from Hodell for 80 user licenses of B1 software.  (ECF No. 69 at ¶31.)  On December 20, 2004, LSi issued an invoice to Hodell-Natco for 80 user software licenses for SAP B1, a copy of which is attached to the Amended Complaint as Exhibit F.[3] (ECF No. 26 at ¶¶30-32; ECF No. 30 at ¶15.)

On or about December 23, 2005, Hodell alleges it purchased 40 user licenses from IBIS and, in connection with this purchase, signed a License Agreement attached to the Amended Complaint as Exhibit G.  (ECF No. 26 at ¶46.)  In its Answer, SAP admitted only that Hodell executed a maintenance schedule to the License Agreement in December 2005.  (ECF No. 69 at ¶46.)  However, SAP's motion for  summary judgment argument is based almost entirely on the

_____

[3]  SAP denies this statement based on lack of knowledge and information sufficient to form a belief as to the truth of the averment that LSi issued an invoice or that the referenced exhibit is authentic.  (ECF No. 69 at ¶32.)

existence of the License Agreement as a binding contract between Hodell and SAP.  (ECF No. 110-1 at iii, iv, 1, 14-19.)

While the total number of licenses purchased should be straightforward, SAP maintains that it sold only 80 licenses to Hodell.  (ECF No. 110-1 at 9, 12; Oral Arguments Tr. 29.) However, because the Court must make all reasonable inferences in favor of the non-moving party, the Court will presume that Hodell purchased a total of 120 B1 user licenses from SAP. The following, though not inclusive of all the evidence on the issue, is sufficient to give rise to the inference in Hodell's favor.  The aforementioned invoice from IBIS to Hodell, dated December 24, 2004, referencing the purchase of 80 SAP B1 user licenses for $300,000.  (ECF No. 26 at ¶¶31-32, Exh. F; ECF No. 30 at ¶15.)  Hodell alleges that it purchased 40 more licenses on or about December 25, 2005, when it signed the License Agreement.[4]  (ECF No. 26 at ¶46.)  The License Agreement attached to the Amended Complaint is silent as to the number of users being purchased.  (ECF No. 26, Exh. G.)  However, evidence has been presented that Hodell had installed and was operating 120 B1 licenses in total, which reasonably supports the inference that SAP actually sold that number of licenses to Hodell.  This includes:

- In a January 24, 2006 email, Avery Myrick, Vice President of Tech Services for LSi, wrote an email to Manfred Weis of SAP.  (ECF No. 155-38, Exh. 141.)  Mr. Myrick indicated that "We need some help in sizing Hardware for a large SAP install to make sure we get it right.  They will have *120 users*.  80 professional and 40 CRM."[5]  *Id*. (emphasis added).

---

[4]  The dates these licenses were delivered are in dispute.  For the purposes of this report and recommendation, the delivery dates are not important.

[5]  During his deposition, Mr. Lowery of LSi identified the email as one it produced during discovery.  (ECF No. 151, Lowery Dep. at 613-14.)  From the email chain, it is apparent that the referenced customer is Hodell.  (ECF No. 155-38, Exh. 141.)

- In an email sent from Dan Lowery, President of LSi, to Udi Ziv, general manager for Small Business Solutions for SAP at that time, Mr. Lowery stated that "We have **installed** a **120 user B1 deal** at Hodell Natco in Cleveland with an add-on we developed called In-Flight Enterprise."  (ECF No. 155-11, Exh. 69) (emphasis added).  Mr. Lowery confirmed he sent such a message during his deposition. (ECF No. 149, Lowery Dep. at 296.)

- In his deposition, Kevin Reidl of Hodell stated that Hodell had purchased 120 B1 user licenses from SAP: " I know we had purchased 120.  I know we had purchased 80, and then 40 separately."  (ECF Nos. 142, K. Reidl Dep. at 274-76.)

- Geoffrey Ashley, is a former employee of SAP who was hired in November 2005 as the director of channel sales for SAP's B1 software in North America.  (ECF No. 143, Ashley Dep. at 4.)  In an email he sent on April 17, 2007, Mr. Ashley wrote that "Hodell **currently has 120 users**.  They expect to grow at 17% compounded growth per year.  They expect to be at 300 users in the short-term (next couple of years)."  (ECF No. 155-42, Exh. 159) (emphasis added).

Nevertheless, for the purpose of the motion under consideration, the Court need not resolve whether Hodell purchased 120 licenses or only 80, as that is a factual issue reserved for the trier of fact.[6]

## II.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) governs summary judgment motions and states:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense  – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

In considering summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact

---

[6]  It is also debatable whether the difference between 80 users and 120 users is significant, as there is some evidence, discussed below, that B1 could not accommodate the lower number.

exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989)(*citing Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).  The non-moving party is under an affirmative duty to point out specific facts in the record which create a genuine issue of material fact.  *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992).  The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts.  *Id*.  "[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery."  *Anderson*, 477 U.S. at 257.

In other words, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007).  When ruling on a motion for summary judgment, "a judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict – 'whether there is [evidence] upon which a

jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" *Anderson*, 477 U.S. at 252 (citations omitted); *accord Fuller v. Landmark 4 LLC*, 2012 WL 1941792 (N.D. Ohio May 29, 2012). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter ...." *Anderson*, 477 U.S. at 249. "It is an error for the district court to resolve credibility issues against the nonmovant." *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008) ("In effect, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. The district court errs by granting summary judgment for the defendant where issues of credibility are determinative of the case.") (citations omitted).

### III. Law and Analysis

**A. Fraud/Fraud-in-the-Inducement**

Hodell maintains that SAP is liable for fraud and fraud-in-the-inducement regarding both the License Agreement *and* the Development Agreement. (ECF No. 162 at 27.) SAP asserts that it is entitled to summary judgment with respect to Hodell's fraud and fraud-in-the-inducement claims because there is insufficient evidence to satisfy all the necessary elements.

According to Ohio law, in order to maintain a cause of action for fraud, a plaintiff must demonstrate the following:

> (a) a representation or, where there is a duty to disclose, concealment of a fact; (b) which is material to the transaction at hand; (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (d) with the intent of misleading another into relying upon it; (e) justifiable reliance upon the representation or concealment; and (f) a resulting injury proximately caused by the reliance.

*Cohen v. Lamko, Inc.*, 462 N.E.2d 407, 10 Ohio St. 3d 167, 169 (Ohio 1984) (citations omitted); *accord Magical Farms, Inc. v. Land O'Lakes, Inc.*, 356 Fed. Appx. 795 (6th Cir. 2009); *David A.*

*Flynn, Inc. v. GMAC*, 2008 U.S. Dist. LEXIS 41597 (N.D. Ohio May 23, 2008).  "The elements of the claim are conjunctive, and accordingly all of them must be shown."  *Graham v. Am. Cyanamid Co.*, 350 F.3d 496, 507 (6th Cir. 2003).  Likewise, under Ohio law, "a claim of fraud in the inducement arises when a party is induced to enter into an agreement through fraud or misrepresentation. . . . A classic claim of fraudulent inducement asserts that a misrepresentation of facts outside the [agreement] or other wrongful conduct induced a party to enter into the [agreement]."  *Am. Coal Sales Co. v. N.S. Power Inc.*, 2009 U.S. Dist. LEXIS 13550 (S.D. Ohio, Feb. 23, 2009) (*citing ABM Farms, Inc. v. Woods*, 81 Ohio St. 3d 498, 502-3, 1998 Ohio 612, 692 N.E.2d 574 (Ohio 1998)).  To prove fraudulent inducement, a plaintiff must demonstrate the same elements necessary to prove an action for fraud.  *See, e.g., Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 874 (6th Cir. 2007); *Scotts Co. LLC v. Liberty Mut. Ins. Co.*, 606 F. Supp. 2d 722, 741 (S.D. Ohio 2009).

First, it is asserted that Hodell cannot show that SAP made a false representation regarding B1's capabilities that was material to the execution of the December 2005 License Agreement.  Specifically, SAP argues that Hodell cannot show SAP's B1 software was incapable of handling up to 300 users.  (ECF No. 110-1 at 20-24.)  Hodell was sold 120 user licenses.  The material issue is whether Hodell was told that the B1 software could accommodate at least that many users.  Hodell has pointed to the following representations it received from SAP, directly or through its alleged partners, concerning the capabilities of B1 software:[7]

---

[7]  The parties disagree whether LSi and IBIS were partners and/or agents of SAP.  In their joint Answer, LSi and IBIS admitted that they were "SAP Partners authorized to market and service the SAP Business One product and were agents of SAP for purposes of the SAP products ... [and that they] were SAP partners and agents of SAP for the SAP products."  (ECF No. 30 at ¶¶11-12.)  SAP points to its agreements with LSi and IBIS

- On December 31, 2003, Hodell's president, Otto Reidl, met with representatives from American Express and LSi, he believed to be authorized agents and representatives of SAP.  (ECF No. 155-82, Exh. F, O. Reidl Dep. at 138-39.)  At that meeting Reidl was told that B1 can handle 300 or 500 users.[8]  *Id*. at 112, 139.

- A report on what appears to be SAP letterhead states that "[w]hether you have 5 employees or 500, SAP [B1] helps emerging businesses streamline their operational and managerial processes." (ECF No. 155-5, Dep. Exh. 38.)

---

that specifically disclaim agency or partnership relationships.  (ECF No. 110-1; 163.) However, there is no indication that Hodell was aware of these agreements or the terms contained therein.  As such, even if LSi and IBIS were not authorized agents, factual issues remain whether SAP could be found liable through a theory of apparent agency or agency by estoppel.  As stated in 3 Ohio Jur. 3d Agency and Independent Contractors § 79: "A principal's liability for an agent's acts and contracts is not limited to those which are expressly authorized, necessarily implied from express authority granted, or otherwise actually conferred by the principal.  The agent's acts within the apparent scope of the authority conferred upon the agent, even though no actual authority to do such acts or to make such contracts has in fact been conferred, are also binding on the principal. As to third persons, the power of an agent is not only that conferred upon the agent by his or her commission, but that which the agent is held out as possessing.  When an agent acts within the scope of the agent's apparent authority, unless the third person has notice that the agent is exceeding the agent's actual authority, the principal is liable.  The term 'apparent authority' is used to describe or label what is treated as the equivalent of actual authority." (Citations omitted); *see also Sinclair Ref. Co. v. Lecrone Motor Transp. Line*, 34 N.E.2d 822, 824 (Ohio Ct. App. 1940) (noting that agency by estoppel is well recognized in Ohio law); *In re Atl. Fin. Mgmt., Inc.*, 784 F.2d 29, 31-32 (1st Cir. 1986) ("[A] corporation's liability for an agent's misrepresentations may rest upon a theory of 'apparent authority.'  The agent's tortious action, while not actually authorized by the corporation, appears so to those adversely affected.  Vicarious '[l]iability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business provided to him.") (*quoting* Restatement (Second) of Agency § 8).  Hodell has cited sufficient evidence in its brief (ECF No. 162 at 9-10) to at least create a genuine issue of material fact as to whether SAP clothed LSi or IBIS with apparent authority.  Furthermore, there is evidence, if credited, that the representations were actually made by SAP and simply relayed by LSi/IBIS.

[8]  At one point during his deposition, Otto Reidl stated he was told at a December 3, 2003 meeting that B1 could handle 500 users.  (ECF No. 155-82, Exh. F, O. Reidl Dep. at 112-13.)  Later during his deposition, he indicated American Express told him B1 could handle 300 users.  *Id*. at 139.

9

- An SAP Business One Brief states that B1 "helps emerging businesses, from those with 10 to several hundred employees, to streamline their operational and managerial processes."  (ECF No. 155-59, Dep. Exh. 314.)

- In Requests for Admissions, Dan Lowery, President of LSi, admitted that he "was authorized to, and did in fact, make representations regarding the [B1] Software's qualities, characteristics and suitability for [Hodell's] business."  (ECF No. 158-3, Admiss. 12.)  During his deposition, Mr. Lowery stated that SAP both authorized and encouraged LSi to refer to itself as an SAP business partner, and permitted LSi to use SAP's logo on its letterhead.  (ECF Nos. 148-151, Lowery Dep. at 56-68.)  Lowery stated that B1 was marketed for 250 users, and in some instances as many as 500 users.  *Id.* at 362.

- Dale Van Leeuwen, sole owner of IBIS, stated during his deposition that "[i]n 2004 it was clearly advertised, presented to partners, including myself, that the SAP [B1] Suite was for those customers with three to 500 users, and for not just the small market but also mid-sized market." (ECF No. 138, Van Leeuwen Dep. at 14-15, 166.)

- Mr. Van Leeuwen of IBIS stated that he flew to Atlanta to meet with SAP representatives, including Ralf Mehnert-Meland, Chris Robinson, and Daniel Kraus. (ECF No. 111-1, Van Leeuwen Dep. at 29.)  He stated that he was told that B1 was appropriate for three to 500 users.  *Id.* at 54-55, 197-98.

- In an email to SAP, Mr. Lowery wrote that "[a]t the time, SAP B1 was targeted to companies of $250 million, with 500 users." (ECF No. 158-19, Exh. 81.)

- In his deposition, Kevin Reidl of Hodell stated that he was told by Mr. Lowery in 2004 that B1 could support up to 300 or 500 users.  (ECF Nos. 141-142, K. Reidl Dep. at 101-103.)

- In an email to Mr. Lowery, Mr. Ashley, formerly of SAP, wrote that "I have always told SAP, Dan, lawyers, etc. that this was a case where we had a product not ready for prime time, *a partner relying on documentation that SAP put together*, a prospect/customer relying on SAP to back their commitments...." (ECF No. 155-48, Exh. 174) (emphasis added).[9]

---

[9]  In its motion for summary judgment, Lsi/IBIS cites an undated document that purports to identify "SAP's Market Strategy" for its B1 software.  (ECF No. 105-13, Exh. 14.)  The documents states that "As to customers, the general target market for Business One is any small and medium size business with between 5 and 500 *users*."  *Id.* (emphasis added.)

The above cited evidence is not intended to be all inclusive. However, the evidence is sufficient to support a finding by reasonable jurors that SAP, directly and/or through third parties that it held out as agents and/or partners, represented to Hodell that its B1 Software could handle at least 250 users and, by implication, the 120 user licenses that Hodell purchased.

The following evidence of record[10] could allow reasonable jurors to find that the above representations were made with knowledge of their falsity or with such utter disregard and recklessness as to whether the statements were true or false that knowledge could be inferred:

- During his deposition, Ralf Mehnert-Meland, the former director of business development for SAP America, stated that "[n]o way [SAP B1 software] would have ever worked for this – for 500 users" and that he agreed B1 was "mis-sold" to Hodell. (ECF No. 152, Mehnert-Meland Dep. at 13-14, 101-103.)

- In an email, Dan Kraus, Director of the Business One channel for SAP America, wrote that "[w]e very simply need to figure out if there is a solution in A1 for this customer or if we [just] refund our license fees. There is no go-forward path here with Business One. The partner clearly has misrepresented the solution." (ECF No. 158-44, Exh. 159; ECF No. 128, Kraus Dep. at 13.)

- In an email, Mr. Mehnert-Meland, stated that "Hodell asked the right question today: 'Did we buy the wrong solution with SAP Business One.' Based on what we know now, the answer is 'yes' as Lowery completely oversold SAP Business One.... SAP Business One was never advertised for companies with up to $250mm in revenues and 500 users." (ECF No. 158-45, Exh. 160.)

- An SAP pamphlet from a summer sales meeting dated July 17, 2006, warned that the following were "red flags" that an opportunity was too large for SAP's B1 software: revenue and growth both larger than $50 million and 10% and the ***number of users exceeds 30***. (ECF No. 155-31 at 24) (emphasis added).

- On April 12, 2007, Udi Ziv, then general manager for Small Business Solutions for SAP, wrote an email with a subject line of "RE: Dan Lowery - Hodell Natco." (ECF

_____

[10] This material is not intended to be exhaustive of the exhibits and depositions cited by the parties, but rather illustrates that evidence exists in the record that could allow a reasonable juror to find in favor of the non-moving party on those issues where it bears the burden of proof.

No. 155-11; ECF No. 154, Ziv Dep. at 12-13.)  The email reads as follows: "Someone has sold to the wrong customer, which is WAY above any sane B1 sweet spot (120 users !!!)" (emphasis in original).  *Id.*

The intent to mislead may also be inferred from the above evidence.  As noted by several Ohio courts, "[r]arely is the subjective intent of the party alleged to have committed fraud provable by direct evidence.  Fraud must be measured by objective standards....  The existence of intent to mislead or defraud must be considered under the totality of the circumstances." *Klapchar v. Dunbarton Properties, Ltd.*, CA-8521, 1991 WL 249432 (Ohio Ct. App. Nov. 4, 1991); *accord Arales v. Furs By Weiss, Inc.*, 2003-Ohio-3344, 2003 WL 2146913 (Ohio Ct. App. June 26, 2003); *Davis v. Sun Ref. & Mktg. Co.*, 109 Ohio App. 3d 42, 56, 671 N.E.2d 1049, 1059 (1996) (observing that "as intent is rarely provable by direct evidence, it may be inferred from the 'totality of the circumstances.'")  Reasonable jurors could find that SAP intentionally misled Hodell so that it would purchase the B1 software.  This inference is further buttressed by the statement of SAP's former director of channel sales for the B1 software, Mr. Ashley, who was updated weekly about the Hodell sale.  (ECF No. 114-1, Ashley Dep. at 103-04.)  In an email, Mr. Ashley stated that Hodell was "a very high profile account we are working to bring live" and was SAP's "first customer for a new add-on product specifically created by [LSi] for the Fastener Distribution Industry."  (ECF No. 155-50, Exh. 178.)  In a letter dated January 2, 2006, Mr. Ashley stated that "LSi, was able to close Hodell-Natko Industries for $105,000 to SAP. This was an important win not only for its size, but also for the fact that it is the first of what we hope will be many new customers in the Fastener micro-vertical. LSi has created a Business One vertical solution specific to this industry and we are looking to Hodell-Natko to be our first happy, referenceable customer within this space."  (ECF No. 155-49, Exh. 177.)  Based on the

12

above and the totality of the circumstances, it can be inferred that SAP oversold its B1 product as Hodell was seen as a critical gateway customer to gain a foothold in a whole new industry.

While it may be that the sales team for SAP did not actually know the alleged representations were inaccurate or actively seek to sell Hodell a product that was not suitable for its needs, "Ohio has long recognized '[a] corporation cannot see or know anything except by the eyes and intelligence of its officers.'  A corporation can act only through its officer and agents, and the knowledge of the officers of a corporation is at once the knowledge of the corporation." *Orrenmaa v. CTI Audio, Inc.*, 2008-Ohio-4299 (Ohio Ct. App. Aug. 22, 2008) (*citing Orme v. Baker*, 74 Ohio St. 337, 78 N.E. 439 (Ohio 1906); *Arcanum Nat'l Bank v. Hessler*, 69 Ohio St.2d 549, 557, 433 N.E.2d 204 (Ohio 1982); *The First Nat'l Bank of New Bremen v. Burns*, 88 Ohio St. 434, 103 N.E. 93 (Ohio 1913)).  As such, intent can be imputed to the entire corporation even though none of the individuals allegedly making misrepresentations had knowledge of their falsity.  Furthermore, if there was a disconnect or miscommunication between the sales and technical personnel, recklessness and/or negligence could also be reasonably inferred.

Despite the presence of a genuine issue of material fact as to whether SAP falsely represented the capabilities of its B1 software to Hodell, SAP argues that any representation made as to the number of users B1 could accommodate was not material to the transaction at hand.  (ECF No. 110-1 at 24-26.)  Specifically, SAP asserts that Hodell possessed information that contradicted the above representations that B1 was suitable for Hodell's needs.  *Id*.  SAP points to a news release from October 2004 which states that B1 was developed for companies with less than 250 employees, a news release cited in the Amended Complaint. *Id*. at 25.  While SAP considers this evidence to be critical, the Court disagrees.  Even if SAP only stated that B1

13

could handle as few as 250 users, this representation necessarily implies that the B1 software could accommodate the 120 licenses sold to Hodell.[11]  However, according SAP's manager for Small Business Solutions, 120 users was "WAY above any sane B1 sweet spot."[12]  (ECF No. 155-11; ECF No. 154, Ziv Dep. at 12-13.)  As such, the Court finds that the representations of SAP and/or its agents could reasonably be found to be material by the trier of fact.

SAP also asserts that representations as to the higher number of users were not material because a document dated November 1, 2005, indicated that B1 was aimed at companies who are looking for 10 to 100 users.  (ECF No. 110-1 at 26.)  However, there is no evidence that Hodell had seen this document prior to entering the License Agreement in December of 2005.  The only evidence on this issue cited by the parties is Otto Reidl's testimony that this document was not obtained until an internet search was performed after filing the instant Complaint.  (ECF No. 129-2, O. Reidl Dep. at 205-06.)  SAP asserts that because the information was publicly available prior to the execution of the License Agreement, previous representations were

---

[11]  There is some debate as to whether the number of employees equates to a representation as to the number of users.  The Court believes this issue is best left for the finder of fact, as this Court cannot say that, as a matter of law, the representation as to the number of employees the software could accommodate cannot reasonably be construed as a corresponding representation as to the number of users that can be accommodated. Theoretically, a company with 500 employees may only have 5 employees who regularly utilize the computer system.  On the other hand, there may be several hundred.

[12]  SAP suggests that because Hodell anticipated expanding up to 300 users in the future while arguably knowing that B1 was only suitable for companies with up to 250 users, the representations were not material.  (ECF No. 110-1 at 25-26.)  However, the operative number herein is 120 – the actual number of users purchased.  Nonetheless, during his deposition, Kevin Reidl of Hodell indicated that, even if he was aware that B1 could only accommodate up to 250 users, he would not have ruled it out.  (ECF Nos. 141 & 142, K. Reidl Dep. at 103-04.)  As such, this Court cannot find the representations immaterial.

immaterial.  *Id*.  The Court disagrees that public availability of contrary evidence affects the materiality of the previous representations.  It may, however, go to the issue of whether Hodell's reliance was reasonable.

> SAP cites the following Ohio law on determining the reasonableness of reliance:

>> Factors to be considered in determining whether reliance is reasonable include 'the nature of the transaction, the form and materiality of the representation, the relationship of the parties, the respective intelligence, experience, age and mental and physical condition of the parties, and their respective knowledge and means of knowledge.'  An individual 'has no right to rely on misrepresentations when the true facts are equally open to both parties.'

*Lucas Ford, LLC v. Ford Motor Credit Co.*, 2011 U.S. Dist. LEXIS 51141 (N.D. Ohio May 12, 2011) (quoting *Freedom Foods, Inc. v. Rose Valley Land Group, Ltd.*, 2006 U.S. Dist. LEXIS 49591 (S.D. Ohio)).  Under the circumstances, it can hardly be said that Hodell and SAP were equals in ascertaining the capabilities of the B1 software.  The Court finds the issue of whether Hodell reasonably relied on the statements catalogued above is best left to the trier of fact.[13]  *See, e.g., Angrisani v. Capital Access Network, Inc*., 175 F. App'x 554, 557 (3d Cir. 2006) (finding the question of whether the plaintiff's reliance on a representation was reasonable presented "a

---

[13]  SAP's argument that the representations as to the number of users B1 could support constituted mere "puffery" on which no reasonable person could rely is wholly without merit.  (ECF No. 110-1 at 29-30.) "Puffery is generally defined as exaggerated blustering or subjective boasting upon which no reasonable consumer would rely."  *Davis v. Byers Volvo*, 2012-Ohio-8822012 WL 691757,  (Ohio Ct. App. Feb. 24, 2012) (internal quotation marks and citations omitted) (citing *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945  (3rd Cir. 1993) (defining puffery as "an exaggeration or overstatement expressed in broad, vague and commendatory language"); *Stiffel Co. v. Westwood Lighting Group*, 658 F.Supp. 1103, 1114 (D.N.J. 1987) (defining puffery as advertising the advantages of a product including claims of general superiority).  Here, Hodell is not complaining that SAP made vague statements that their B1 Software was "quality," or simply better than the competition.  The representations at issue concern *specific* statements as to the number of users the B1 software could accommodate.

15

factual issue that is more properly left to the judgment of the jury"); *Rodi v. S. New England Sch. of Law*, 389 F.3d 5, 16 (1st Cir. 2004) ("[T]he reasonableness of a party's reliance ordinarily constitutes a question of fact for the jury."); *Miller v. Premier Corp.*, 608 F.2d 973, 982 (4th Cir. 1979) ("[I]ssues of reliance and its reasonableness, going as they do to subjective states of mind and applications of objective standards of reasonableness, are preeminently factual issues for the trier of fact.")

Finally, SAP argues that Hodell cannot demonstrate an injury proximately caused by the reliance as a matter of law.  (ECF No. 110-1 at 31-34.)  SAP avers that the harm suffered by Hodell was the result of its own decision to "go-live" after testing in March of 2007.  *Id.*  SAP's argument on this issue is devoid of any citation to law, and is conclusory at best.  Further, it assumes that no damages were incurred by Hodell prior to the "go-live" date.  In this Court's view, this argument goes to the extent of the damages suffered, an issue best left for the trier of fact.

For the foregoing reasons, it is recommended that SAP's motion for summary judgment with respect to the fraud and fraud-in-the-inducement claims be denied.

**B.  Negligent Misrepresentation**

SAP asserts that it is entitled to summary judgment on Hodell's negligent misrepresentation claim because it is not in the business of supplying information.  (ECF No. 110-1 at 34-35.)

Under a claim for negligent misrepresentation in Ohio, a defendant who, "in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions . . . is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the

information, if he fails to exercise reasonable care or competence in obtaining or communicating

the information." *David A. Flynn, Inc. v. GMAC*, 345 Fed. Appx. 974, 977 (6th Cir. 2009) (*citing*

*Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 505-06 (6th Cir. 2003)); *Delman v. City of*

*Cleveland Heights*, 534 N.E.2d 835, 41 Ohio St. 3d 1, 10 (Ohio 1989).

SAP argues that a recent decision of an Ohio appellate court, *Middlefield Banking Co. v.*

*Deeb*, 2012 Ohio 3191 (Ohio Ct. App. July 16, 2012), clarified that negligent misrepresentation

claims are limited to professionals, such as accountants and attorneys, in the business of

supplying information.  (ECF No. 110-1 at 34-35.)  However, in her order adopting the previous

Report and Recommendation, Judge Wells found as follows:

> The question remains, however, whether Hodell's negligent misrepresentation
> claim is otherwise adequately pled.  The SAP defendants' only argument on this
> point is that Hodell did not plead facts to support the existence of the requisite
> "special relationship" between Hodell and the SAP defendants.  (Doc. 52, at 7-8).
> The SAP defendants cite a number of federal court decisions interpreting Ohio
> law, which have concluded that "[a] core requirement in a claim for negligent
> misrepresentation is a special relationship under which the defendant supplied
> information to the plaintiff for the latter's guidance in its business transaction."
> *Hayes v. Computer Associates Intern., Inc.*, 2003 WL 21478930, at *6 (N.D. Ohio
> 2003) (*citing Picker Intern., Inc. v. Mayo Found.*, 6 F.Supp.2d 685, 689 (N.D.
> Ohio 1998). "This relationship occurs only in 'special' circumstances. Usually the
> defendant is a professional (*e.g.*, an accountant) who is in the business of
> rendering opinions to others for their use in guiding their business, and the
> plaintiff is a member of a limited class." *Picker Intern.*, 6 F.Supp.2d at
> 689.
>
> The "special relationship" requirement imposed by these courts does not appear
> to be a formal element of the tort of negligent misrepresentation, as that tort is
> defined in Ohio. The Ohio Supreme Court has spoken on the sort of relationship
> required, explaining that liability for negligent misrepresentation is limited to "the
> person or one of a limited group of persons for whose benefit and guidance [the
> defendant] intends to supply the information or knows that the recipient intends to
> supply it." *Gutter v. Dow Jones, Inc.*, 490 N.E.2d 898, 900 (Ohio 1986); *accord*
> *Haddon View Inv. Co. v. Coopers & Lybrand*, 436 N.E.2d 212 (Ohio 1982).
>
> On this point, Hodell has pleaded sufficient facts to survive a motion to dismiss.

(ECF No. 61 at 13-14.)

First, the *Middlefield Banking* decision – a state appellate court opinion – does not represent an intervening change in controlling Ohio law.  The general proposition therein, that a special relationship is necessary, outside of a business transaction, to maintain a negligent misrepresentation claim, is not new.  While the Court recognizes there are decisions that support such a view, that line of argument was squarely addressed and expressly rejected by the Court in the ruling on the Motion to Dismiss.  Because SAP's argument is: (1) identical the one it made earlier; and, (2) dependent upon its interpretation of the law and not on any new factual developments that came to light during discovery, the Court sees no reason to revisit the issue at the summary judgment stage.

Second, there are decisions that reject the "special relationship" requirement.  *See, e.g., Versatile Helicopters v. City of Columbus*, 879 F. Supp. 2d 775, 783 (S.D. Ohio 2012) (noting that "some persuasive authority rejects the argument that there must be a 'special relationship' between" a plaintiff making a negligent misrepresentation claim and the defendant who made the representation); *Culy Constr. & Excavating, Inc. v. Laney Directional Drilling Co.*, 2012 U.S. Dist. LEXIS 79575 (S.D. Ohio June 8, 2012) ("some persuasive authority rejects Culy's too-narrow 'special relationship' argument.); *Bank of Am. v. Kenwood Towne Place*, 2010 Ohio Misc. LEXIS 528 (Ohio C.P. Aug. 20, 2010) ("The Court finds that Ohio law does not require a special relationship as an element of negligent misrepresentation.")  Perhaps the clearest and most persuasive decision on this matter was cited by Hodell.  In *National Mulch and Seed, Inc. v. Resins Forest Byproducts, Inc*., 2007 U.S. Dist. LEXIS 24904 (S.D. Ohio, Mar. 22, 2007), the United States District Court for Ohio's Southern District explained as follows:

18

This Court agrees that a special relationship is not a formal element of a negligent misrepresentation claim under Ohio law. Instead, as was stated *supra*, in order to assert a negligent misrepresentation claim under Ohio law, a plaintiff must establish that the defendant supplied false information for the guidance of the plaintiff in its business transactions, that the plaintiff was justified in relying on the information, and that the defendant failed to exercise reasonable care or competence in obtaining and/or communicating the information. *Delman*, 41 Ohio St. 3d at 4.

To the extent Ohio courts discuss a special relationship in connection with a negligent misrepresentation claim, the discussion appears to be related to the requirement that a defendant supply false information for the guidance of the plaintiff in its business transactions. The "for the guidance of" language directs the court's attention to the duty owed and serves to limit the class of potential plaintiffs. As explained by the Supreme Court of Ohio, liability for negligent misrepresentation is limited to "the person or one of a limited group of persons for whose benefit and guidance [the defendant] intends to supply the information or knows that the recipient intends to supply it*." Gutter v. Dow Jones, Inc.*, 22 Ohio St. 3d 286, 288, 22 Ohio B. 457, 490 N.E.2d 898 (1986); *accord Haddon View*, 70 Ohio St. 2d at 157 (not requiring any special relationship but limiting liability to misrepresentations made to a foreseeable class of persons). "A contrary result would in effect extend liability to all the world and not a limited class . . . ." *Gutter*, 22 Ohio St. 3d at 289.

Understanding this, a person may not maintain an action for negligent misrepresentation when the alleged misrepresentation is intended to reach an extensive, unresolved class of persons. Representations made to the public-at-large cannot result in liability. *E.g., id.* (newspaper reader not a member of a limited group of persons intended to benefit from representation in newspaper); *Amann v. Clear Channel Commc'ns, Inc.*, 165 Ohio App. 3d 291, 298-99, 2006 Ohio 714, 846 N.E.2d 95 (2006) (radio station's general audience not a limited group); *Federated Mgmt. Co. v. Coopers & Lybrand*, 137 Ohio App. 3d 366, 384-85, 738 N.E.2d 842 (2000) (investing public is an unlimited class of persons that cannot hold company's auditor liable for alleged negligent misrepresentations).

Conversely, liability may exist when the plaintiff is a person or member of a limited class of persons whom the defendant intends to benefit or guide with the information supplied. *See, e.g., Haddon View*, 70 Ohio St. 2d at 157 (representation made to small group of limited partners); *Merrill v. William E. Ward Ins.*, 87 Ohio App. 3d 583, 590-91, 622 N.E.2d 743 (1993) (beneficiaries of a life insurance policy were a foreseeable limited class intended to benefit from information supplied by insurance agent); *Sindel v. Toledo Edison Co.*, 87 Ohio App. 3d 525, 528, 622 N.E.2d 706 (1993) (representation made to single customer

19

of defendant electric company).  All that is necessary is for "'the maker of the representation [to] intend[] to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information.'" *Amann*, 165 Ohio App. 3d at 299 (quoting Restatement (Second) of Torts § 552 cmt. h (1977)).  Thus, National Mulch can prevail on its negligent misrepresentation claim only if the alleged misrepresentations were intended to benefit or guide a group of persons with a definable limit, and National Mulch was a member of that group.

The determination of whether the plaintiff is a member of a limited class of foreseeable persons is dependent upon the factual circumstances of the representations made and the relationship between the parties.  *See id*. at 298. In this case, the alleged misrepresentations appear in marketing materials produced by Rexius.  Certainly, the potential exists for these materials to be seen by a large, limitless group of people.  However, it is undisputed that Rexius sent the materials directly to National Mulch via mail in response to the latter party's interest in the Rexius trucks. *** Further, National Mulch has put forth evidence that the alleged misrepresentations were made to it orally as well. ***

Viewing the facts in a light most favorable to National Mulch, it cannot be said that as a matter of law National Mulch was a member of a faceless or unresolved class of persons.  Instead, reasonable minds could conclude that National Mulch was a member of a limited class of foreseeable persons that might rely upon the representations made.  The marketing materials and oral representations were specifically directed to National Mulch.  Although the marketing materials could eventually be disseminated to an indefinite number of persons, these representations were intended to reach and influence particular persons: National Mulch and its principals.

*Id*. at **30-35 (footnotes omitted).

This Court finds the *National Mulch* decision to be more persuasive than the decisions cited by SAP.  Furthermore, the Court further finds that the *National Mulch* decision is sufficiently analogous to the facts herein to preclude summary judgment.  As discussed above, there is sufficient evidence of record from which a reasonable juror could find that SAP made a knowingly false or reckless representation, both through its marketing literature and through information allegedly supplied through LSi/IBIS.  The evidence is further capable of supporting

20

the conclusion that SAP knew that its representations were being transmitted directly to Hodell, and, therefore, were not made to an extensive, unresolved class of persons. As such, there is sufficient evidence of record to satisfy the requisite lower standard for negligent misrepresentation (*i.e.* that SAP failed to exercise reasonable care or competence in communicating information about its B1 software to Hodell.) Furthermore, there is sufficient evidence that would allow a jury to reasonably find that these communications were made in the course of a transaction in which SAP had a pecuniary interest.

Therefore, it is recommended that SAP's motion for summary judgment as to the negligent misrepresentation claim be denied.[14]

## C. Parol Evidence Rule and Integration/Merger Clause

SAP asserts that the License Agreement precludes all of Hodell's tort claims. (ECF No. 110-1 at 11-19.) Specifically, SAP asserts that the alleged misrepresentations were not *collateral* to the agreement, and that the agreement's integration/merger clause, contained in Section 11.9 and quoted below, bars Hodell from arguing that contrary representations were made. *Id.* at 14-17. Notably, SAP made a virtually identical argument in its earlier motion to dismiss. (ECF No. 36-1 at 8-11.) In the previous Report and Recommendation, the Court addressed this argument as follows:

_____

[14] During oral arguments, SAP suggested that a negligent misrepresentation cannot set aside a contract, herein the License Agreement. (Oral Arguments Tr. 23-29.) In essence, counsel argues that because the amount of damages recoverable under negligent misrepresentation might be circumscribed by contract, the two actions cannot coexist. *Id.* This argument was not raised in the motion for summary judgment. Nonetheless, SAP has not cited any law suggesting that the two actions cannot coexist. Assuming *arguendo* that damages recoverable for negligent misrepresentation might be limited by the License Agreement, it does not follow that the cause of action cannot be maintained.

In a related argument, SAP claims that the parol evidence rule and the integration clause contained within the License Agreement combine to bar Hodell's fraud, fraud in the inducement, and negligent misrepresentation claims. (Doc. No. 36 at 8-12, 15-16.)  The License Agreement contains the following provision:

> This Agreement and each Schedule and Appendix hereto constitute the complete and exclusive statement of the agreement between SAP and Licensee, and all previous representations, discussions, and writings are merged in, and superseded by, this Agreement.  This Agreement may be modified only by a writing signed by both parties.  This Agreement and each Appendix hereto shall prevail over any additional, conflicting, or inconsistent terms and conditions which may appear on any purchase order or other document furnished by Licensee to SAP.

(Compl., Exh. G § 11.9.)

In *Galmish v. Cicchini*, 734 N.E.2d 782, 90 Ohio St.3d 22 (Ohio 2000), the Ohio Supreme Court conducted a thorough analysis of the relationship between claims of fraud and the parol evidence rule.

> The parol evidence rule states that "absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements." 11 Williston on Contracts (4 Ed.1999) 569-570, Section 33:4.

> \*\*\*

> The principal purpose of the parol evidence rule is to protect the integrity of written contracts. *Ed Schory & Sons, Inc. v. Soc. Natl. Bank* (1996), 75 Ohio St. 3d 433, 440, 662 N.E.2d 1074, 1080.  By prohibiting evidence of parol
> agreements, the rule seeks to ensure the stability, predictability, and enforceability of finalized written instruments. "It reflects and implements the legal preference, if not the talismanic legal primacy, historically given to
> writings.  It effectuates a presumption that a subsequent written contract is of a higher nature than earlier statements, negotiations, or oral agreements by deeming those earlier expressions to be merged into or superseded by the written document." (Footnotes omitted.) 11 Williston on Contracts, *supra*, at 541-548, Section 33:1.

> Nevertheless, ***the parol evidence rule does not prohibit a party from***

22

*introducing parol or extrinsic evidence for the purpose of proving fraudulent inducement*. *Drew v. Christopher Constr. Co., Inc.* (1942), 140 Ohio St. 1, 23 Ohio Op. 185, 41 N.E.2d 1018, paragraph two of the syllabus. *See, also, Union Mut. Ins. Co. of Maine v. Wilkinson* (1871), 80 U.S. (13 Wall.) 222, 231-232, 20 L. Ed. 617, 622.  As explained in Annotation, Parol-Evidence Rule; Right to Show Fraud in Inducement or Execution of Written Contract (1928), 56 A.L.R. 13, 34-36:

"The principle which prohibits the application of the parol-evidence rule in cases of fraud inducing the execution of a written contract * * * has been regarded as being as important and as resting on as sound a policy as the parol-evidence rule itself.  It has been said that if the courts were to hold, in an action on a written contract, that parol evidence should not be received as to false representations of fact made by the plaintiff, which induced the defendant to execute the contract, they would in effect hold that the maxim that fraud vitiates every transaction is no longer the rule; and such a principle would in a short time break down every barrier which the law has erected against fraudulent dealing.

"*Fraud cannot be merged*; hence the doctrine, which is merely only another
form of expression of the parol-evidence rule, that prior negotiations and conversations leading up to the formation of a written contract are merged therein, is not applicable to preclude the admission of parol or extrinsic evidence to prove that a written contract was induced by fraud." (Footnotes omitted.)

Stated differently, "*it was never intended that the parol evidence rule could be used as a shield to prevent the proof of fraud, or that a person could arrange to have an agreement which was obtained by him through fraud exercised upon the other contracting party reduced to writing and formally executed, and thereby deprive the courts of the power to prevent him from reaping the benefits of his deception or chicanery.*" (Footnotes omitted.) 37 American Jurisprudence 2d (1968) 621-622, Fraud and Deceit, Section 451.

Contrary to [defendant's] assertions, this principle does not lose its force merely because the considered written agreement contains an integration clause.  The parol evidence rule applies, in the first instance, only to integrated writings, and an express stipulation to that effect adds nothing to the legal effect of the instrument.  The presence of an integration clause makes the final written agreement no more integrated than does the act of embodying the complete terms into the writing.  Thus, *the presence of an integration provision does not vitiate the principle that parol evidence is*

23

> ***admissible to prove fraud***.  *See Blackledge v. Allison* (1977), 431 U.S. 63, 75, 97 S. Ct. 1621, 1630, 52 L. Ed. 2d 136, 148, fn. 6; *Downs v. Wallace* (Ala.1993), 622 So. 2d 337, 341; Annotation, *supra*, 56 A.L.R. at 56-62; 37 American Jurisprudence 2d, supra, at 622-623, Section 452; 11 Williston on Contracts, supra, at 661-673, Section 33:21.
>
> \*\*\*
>
> Thus, "***the rule excluding parol evidence of collateral promises to vary a written contract does not apply where such contract is induced by promises fraudulently made, with no intention of keeping them* \* \* \*.**" 37 American Jurisprudence 2d, supra, at 623, Section 452.  However, ***the parol evidence rule does apply "to such promissory fraud if the evidence in question is offered to show a promise which contradicts an integrated written agreement.  Unless the false promise is either independent of or consistent with the written instrument, evidence thereof is inadmissible***." *Alling v. Universal Mfg. Corp.* (1992), 5 Cal. App. 4th 1412, 1436, 7 Cal. Rptr. 2d 718, 734. By the same token, "if the written contract provides for the doing of an act on a certain condition, the promisee cannot show that the promise was an absolute one merely by claiming fraud, unless he produces some other evidence of the alleged fraud." Annotation, *supra*, 56 A.L.R. at 47-48.

Id. at 788-790 (emphasis added).

The Ohio Supreme Court's analysis in *Galmish* is fatal to SAP's position. Hodell alleges that SAP represented its Software could at least accommodate the 80 licenses contemplated in the Development Agreement and the additional 40 licenses purchased at the time the License Agreement was signed.  This representation is not inconsistent with any provision of the License Agreement. Hodell has further alleged that SAP knew of the falsity or was, at the very least, reckless in making such representation.  Had the License Agreement stated that the Software could only handle thirty users, or that SAP did not make any representations or guarantees as to the number of users the Software could handle, the parol evidence rule might well bar evidence of contradictory terms.  Here, however, if it is true that SAP falsely represented the number of user licenses the Software could handle – and the Court must construe such allegations as true on a 12(b)(6) motion – then arguably both agreements were induced by promises fraudulently made that SAP had no intention of keeping or, more appropriately, had no ability to keep.

(ECF No. 50 at 22-25) (footnotes omitted).

Previously, the Court specifically found that the representations as to the number of users

24

the B1 software could accommodate was " not inconsistent with any provision of the License

Agreement."  (ECF No. 50 at 25.)  In other words, the representations were indeed collateral to

the License Agreement and did not represent contrary terms.  Notably, that portion of the report

and recommendation, quoted above, was **not** objected to by SAP.  (ECF No. 52.)  Rather, SAP's

objections focused on the Economic Loss Doctrine – a distinct and separate issue.  *Id*.  The Court

sees no reason to revisit this finding, as it is based on legal rather than factual issues and,

therefore, largely unaffected by discovery.  In its current motion, SAP asserts that discovery has

revealed that it made no false representations to Hodell prior to the 2005 License Agreement.

(ECF No. 110-1 at 15.)  However, the Court has found, based on the evidence discussed above,

that reasonable jurors could decide otherwise.

Finally, even if the Court found that the representation as to the number of users was not

collateral and was rather contrary to the License Agreement, such a finding would only bar the

fraud-in-the-inducement claim as to the License Agreement.  SAP could still be held liable for

fraudulently inducing Hodell into entering into the Development Agreement, notwithstanding

the Court's finding that SAP was not a party to that agreement.  In fact, as noted in the Court's

previous report and recommendation, SAP has conceded that a defendant may be liable for

fraudulent inducement even though it is not a party to the relevant agreement.  (ECF No. 50 at

18; ECF No. 51 at 26, 52-54.)

**D.    Breach of Contract - The License Agreement**

Hodell's claim for breach of the Development Agreement entered into on or about

December 20, 2004 was previously dismissed as to SAP.  (ECF Nos. 50, 61.)  The claim for

breach of the License Agreement was dismissed with respect to Defendant SAP AG only.  *Id*.

25

Defendant SAP America now moves for summary judgment with respect to Hodell's claim for breach of the License Agreement.  (ECF No. 110-1 at 36-39.)

In the Amended Complaint, Hodell alleges the breach of implied warranties and of an express warranty.  (ECF No. 26 at ¶¶72-85.)  Specifically, Hodell asserted that the Development Agreement contained an implied warranty of merchantability and an implied warranty of fitness for a particular purpose.  *Id*. at ¶82.  The breach of that agreement, however, is no longer an issue with respect to SAP.  The Amended Complaint does not allege that the *License Agreement* contains an implied warranty of merchantability and/or an implied warranty of fitness for a particular purpose.  *Id*. at ¶¶72-85.  Hodell's brief in opposition appears to concede this point, as it does not argue that SAP breached an implied warranty.  (ECF No. 162 at 46-49.)  Nonetheless, the Amended Complaint also alleges a violation of an express warranty contained in the License Agreement:

> In the event that Hodell-Natco should be deemed to be bound by the terms of the SAP Business One Software License Agreement for the December 2005 purchase of 40 "CRM" user licenses, then Plaintiff alleges that the warranty set forth in paragraph 7.1 was breached as the software did not substantially conform to the functional specifications contained in the "documentation."

(ECF No. 26 at ¶84.)

In its brief, Hodell argues that it will offer evidence that SAP breached the express warranty, that the warranty "failed its essential purpose," and that SAP breached the covenant of good faith and fair dealing implied in every contract.  (ECF No. 162 at 46-49.)  The express warranty contained in the License Agreement reads as follows:

> 7.1  <u>Warranty</u>. SAP warrants that the Software will substantially conform to the functional specifications contained in the Documentation for six months following delivery.  The warranty shall not apply: (i) if the Software is not used in accordance with the Documentation; or (ii) if the defect is caused by a

26

> Modification, Integration Add-On, Licensee, third-party software, or third-party
> database. SAP does not warrant that the Software will operate uninterrupted or
> that it will be free from minor defects or errors that do not materially affect such
> performance, or that the applications contained in the Software are designed to
> meet all of Licensee's business requirements.

(ECF No. 110-12, Ex. K)

SAP asserts that Hodell cannot offer any evidence that B1 did not conform to the functional

specifications supplied by SAP.  (ECF No. 110-1 at 38.)  Hodell disagrees and relies on the

following evidence:

- Dan Kraus, Director of the B1 channel for SAP America, sent an email on February 18, 2007 – prior to the March 2007 "go-live" date – asking that Hodell receive credit for maintenance expenses incurred in 2006 and to have such credit applied to maintenance expenses for 2007.  (ECF No. 155-52, Exh. 253, ECF No. 128, Kraus Dep. at 89-90.)

- In his deposition, Mr. Kraus testified that Hodell was working on issues it had experienced with the software in 2006.  (ECF No. 128, Kraus Dep. at 89-90.)

- Mr. Kraus's email stated that "[i]f [Hodell] had requested the return of software due to inability to conform to documentation, we likely would have been obligated to honor the request."  (ECF No. 155-52, Exh. 253.)

- When asked what "documentation" he was referring to, Mr. Kraus stated that he meant "[t]he documentation in the software that talks about the functionality in terms of how it performs."  (ECF No. 128, Kraus Dep. at 90.)

The above evidence is sufficient to allow reasonable jurors to conclude that SAP breached

the express warranty of the License Agreement by B1's failure to conform to the functional

specifications contained in the documentation.  Furthermore, Mr. Kraus's deposition testimony

and email could support the inference that these problems arose within the first six months, as he

stated that Hodell began experiencing issues in 2006.  SAP asserts that it was not notified of any

defect within six months of delivery.  (ECF No. 110-1 at 39.)  However, the License Agreement

merely refers to the six month period for which B1 will substantially conform to the functional

27

specifications contained in the documentation.  As such, genuine issues of material fact remain

as to whether SAP breached the License Agreement.[15]

### V.  Conclusion

It is recommended that the SAP defendants' Motion for Summary Judgment (ECF No.

110) be DENIED.

/s/ Greg White
U.S. Magistrate Judge

Date: June 13, 2013


### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

---

[15]  In the interests of judicial economy, the Court will not address at this time whether the the express warranty "failed its essential purpose" or whether SAP breached the covenant of good faith and fair dealing.