**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HODELL-NATCO INDUSTRIES, INC., | ) | CASE NO. 1:08-cv-02755 |
| | ) | |
| Plaintiff, | ) | JUDGE LESLEY WELLS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| SAP AMERICA, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

On November 16, 2012, this matter was referred to the Court to address three pending

motions for summary judgment.  (ECF No. 170.)  This Report and Recommendation addresses

the summary judgment motion filed by Defendants LSi-Lowery Systems, Inc. ("LSi") and The

IBIS Group, Inc. ("IBIS"), as well as the Motion for Judgment on the Pleadings/Motion for

Summary Judgment filed by Plaintiff Hodell-Natco Industries, Inc. ("Hodell").[1]  (ECF Nos. 105,

109.)  The summary judgment motion filed by Defendants SAP America, Inc. and SAP AG was

addressed in a separate report and recommendation.  (ECF No. 182.)  On February 28, 2013, the

---

[1]   According to the Answer, IBIS, an Illinois corporation, became a wholly owned
subsidiary of LSi, a Missouri corporation, in April of 2004.  (ECF No. 30 at ¶¶4-5.)

Court heard oral arguments concerning the fully briefed motions.[2]  (ECF No. 178.)

## I.  Procedural and Factual Background

Plaintiff Hodell, an Ohio corporation with its principal place of business in Valley View, Ohio, filed an Amended Complaint on April 22, 2009 setting out five causes of action against LSi-Lowery Systems, Inc. (hereinafter "LSi"), The IBIS Group, Inc. (hereinafter "IBIS"), SAP America, Inc., and SAP AG.  (ECF No. 26.)  The claims involve two contracts and the negotiations and representations made prior to their consummation.  (*See generally* Amended Compl.)  Specifically, Hodell alleged the following causes of action against all Defendants: (1) fraudulent inducement; (2) fraud; (3) breach of contract; (4) negligence; and (5) negligent misrepresentation.  (ECF No. 26.)

On May 18, 2009, Defendants LSi and IBIS filed a joint Answer.  (ECF No. 30.)

On June 21, 2009, the SAP defendants filed a motion to dismiss.  (ECF No. 36.)  On September 2, 2010, this Court issued a Report and Recommendation providing that Hodell's claim for breach of contract, as it related to the Development Agreement entered into on or about December 20, 2004, as well as the simple negligence action, should be dismissed as to both SAP defendants.  (ECF No. 50.)  In addition, it was recommended that Hodell's claim for breach of the License Agreement should be dismissed as to Defendant SAP AG only.  *Id.*

On June 2, 2011, Judge Lesley Wells adopted the Report and Recommendation in its entirety.  (ECF No. 61.)

---

[2]  Previously, on February 1, 2013, the Court held a settlement conference that did not result in a settlement.  (ECF No. 175.)  At the time, another set of defendants,  SAP America, Inc. and SAP AG (collectively "SAP ") requested the opportunity to present oral arguments before the Court.

On June 24, 2011, SAP filed an Answer.  (ECF No. 69.)

Though many of the facts in this matter are contested, the following are either uncontested or are now law of the case.

On or about December 20, 2004, Hodell and LSi executed a Development Agreement, attached to the Amended Complaint as Exhibit D (hereinafter the "Development Agreement"). (ECF No. 26 at ¶¶30-32; ECF No. 30 at ¶15.)  The Court has found that the SAP defendants were not party to the Development Agreement.  (ECF Nos. 50, 61.)  The Development Agreement called for Hodell to order 80 user licenses for SAP's Business One ("B1") software at a cost of $300,000.00.   (ECF No. 26 at ¶¶30-32; ECF No. 30 at ¶15.)  On December 20, 2004, LSi issued an invoice to Hodell-Natco for 80 user software licenses for SAP B1, a copy of which is attached to the Amended Complaint as Exhibit F.[3]  (ECF No. 26 at ¶¶30-32; ECF No. 30 at ¶15.)

On or about December 23, 2005, Hodell alleges it purchased 40 user licenses from IBIS and, in connection with this purchase, signed a License Agreement attached to the Amended Complaint as Exhibit G.  (ECF No. 26 at ¶46.)

While the total number is disputed between Hodell and SAP (ECF No. 110-1 at 9, 12; Oral Arguments Tr. 29), Hodell and LSi/IBIS seem to agree that 120 B1 licenses were purchased.[4]  LSi/IBIS have admitted that on December 24, 2004, Hodell issued a purchase order

---

[3]  SAP denies this statement based on lack of knowledge and information sufficient to form a belief as to the truth of the averment that LSi issued an invoice or that the referenced exhibit is authentic.  (ECF No. 69 at ¶32.)

[4]  The dates these licenses were delivered are also in dispute.  For the purposes of this report and recommendation, the delivery dates are not important.

in the amount of $300,000 for 80 user licenses; that Hodell issued a check for $60,000 as a down payment; and, that LSi, in turn, issued an invoice for 80 B1 user licenses.  (ECF No. 26 at ¶¶31-32, Exh. F; ECF No. 30 at ¶15.)  While LSi/IBIS's Answer omits an admission or denial with respect to Hodell's claim that it purchased 40 more licenses on or about December 23, 2005, when it signed the License Agreement, there are repeated references made by LSi's president or employees in the record to Hodell using or having installed 120 B1 licenses.[5]  (ECF No. 26 at ¶46.)

## II.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) governs summary judgment motions and states:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

In considering summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

---

[5] These references are expressly noted in this Court's report and recommendation with concerning SAP's motion for summary judgment.  (ECF No. 182 at 4-5.)

4

322 (1986).  Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989)(*citing Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).  The non-moving party is under an affirmative duty to point out specific facts in the record which create a genuine issue of material fact.  *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992).  The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts.  *Id.*  "[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Anderson*, 477 U.S. at 257.

In other words, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007).  When ruling on a motion for summary judgment, "a judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict – 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" *Anderson*, 477 U.S. at 252 (citations omitted); *accord Fuller v. Landmark 4 LLC*, 2012 WL 1941792 (N.D. Ohio May 29, 2012).  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter ...." *Anderson*, 477 U.S. at 249.  "It is an error for the district court to resolve credibility issues against the nonmovant." *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008) ("In effect,

any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true.  The district court errs by granting summary judgment for the defendant where issues of credibility are determinative of the case.") (citations omitted).

## III.  Law and Analysis

### A.  Fraud/Fraud-in-the-Inducement

LSi asserts that it is entitled to summary judgment with respect to Hodell's fraud and fraud-in-the-inducement claims.  According to Ohio law, in order to maintain a cause of action for fraud, a plaintiff must demonstrate the following:

> (a) a representation or, where there is a duty to disclose, concealment of a fact; (b) which is material to the transaction at hand; (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (d) with the intent of misleading another into relying upon it; (e) justifiable reliance upon the representation or concealment; and (f) a resulting injury proximately caused by the reliance.

*Cohen v. Lamko, Inc.*, 462 N.E.2d 407, 10 Ohio St. 3d 167, 169 (Ohio 1984) (citations omitted); *accord Magical Farms, Inc. v. Land O'Lakes, Inc.*, 356 Fed. Appx. 795 (6th Cir. 2009); *David A. Flynn, Inc. v. GMAC*, 2008 U.S. Dist. LEXIS 41597 (N.D. Ohio May 23, 2008).  "The elements of the claim are conjunctive, and accordingly all of them must be shown."  *Graham v. Am. Cyanamid Co.*, 350 F.3d 496, 507 (6th Cir. 2003).  Likewise, under Ohio law, "a claim of fraud in the inducement arises when a party is induced to enter into an agreement through fraud or misrepresentation. . . . A classic claim of fraudulent inducement asserts that a misrepresentation of facts outside the [agreement] or other wrongful conduct induced a party to enter into the [agreement]."  *Am. Coal Sales Co. v. N.S. Power Inc.*, 2009 U.S. Dist. LEXIS 13550 (S.D. Ohio, Feb. 23, 2009) (*citing ABM Farms, Inc. v. Woods*, 81 Ohio St. 3d 498, 502-3, 1998 Ohio 612, 692 N.E.2d 574 (Ohio 1998)).  To prove fraudulent inducement, a plaintiff must demonstrate the

6

same elements necessary to prove an action for fraud.  *See, e.g., Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 874 (6th Cir. 2007); *Scotts Co. LLC v. Liberty Mut. Ins. Co.*, 606 F. Supp. 2d 722, 741 (S.D. Ohio 2009).

### 1.    Federal Rule of Civil Procedure 9(B)

In its motion for summary judgment, LSi/IBIS raises an argument that SAP had raised in its motion to dismiss.  Specifically, LSi/IBIS alleges that Hodell's fraud and fraud in the inducement claims should be dismissed for failure to plead with the particularity required by Federal Rule of Civil Procedure 9(b) ("Rule 9(b)).  (ECF No. 105 at 14-15.)  As the Court noted in its prior Report and Recommendation, the Sixth Circuit has found that "despite [a] plaintiffs' failure to satisfy the requirements of Rule 9(b), in the absence of defendants' motion for more definite statement under Rule 12(e), dismissal on this basis alone would not be appropriate." *Coffey v. Foamex L.P.*, 2 F.3d 157, 162 (6th Cir. 1993) (*citing Hayduk v. Lanna*, 775 F.2d 441, 445 (1st Cir. 1985)); *accord Legge v. Wagner*, 1993 U.S. App. LEXIS 27050 at *6 (6th Cir., Oct. 14, 1993); *Yatooma v. JPMorgan Chase Bank, N.A.*, 2010 U.S. Dist. LEXIS 86341 ( E.D. Mich. July 23, 2010); *Resource Title Agency, Inc. v. Morreale Real Estate Servs.*, 314 F. Supp. 2d 763, 776 (N.D. Ohio 2004) (Wells, J.)  Given the late stage of proceedings, LSi/IBIS's argument that the case should be dismissed for failure to comply with Rule 9(b) is not well taken.

### 2.    Elements of Fraud and Fraud In The Inducement

It does not appear that LSi/IBIS challenges the first element of fraud: that it made representations to Hodell concerning SAP's B1 software, particularly with respect to the number

of users it could accommodate.[6]  While LSi/IBIS avers that it did not make any "independent" representations of its own, LSi/IBIS fails to identify any law indicating such a requirement exists.  (ECF No. 106 at 16-20.)

Instead, LSi/IBIS's motion for summary judgment focuses on another requisite element of fraud: that the representation be made with either knowledge of its falsity or with such utter disregard and recklessness that knowledge may be inferred.  (ECF No. 105 at 1, 12, 16-18.) LSi/IBIS asserts that any and all representations that it made to Hodell concerning SAP's B1 Software were based entirely on information it received from SAP.  *Id.*

Hodell asserts that summary judgment is not appropriate because SAP contends that LSi/IBIS had no authority to make representations on behalf of SAP and factual questions remain whether the information LSi/IBIS passed on to Hodell was contrived.[7]  (ECF No. 158 at 6.)  Hodell avers that SAP denies making repeated representations to LSi/IBIS that its B1

---

[6]  To the extent that the Court misconstrues LSi/IBIS's motion in that the first element of fraud is being contested, there is evidence of record sufficient to allow the trier of fact to find that representations were made by LSi/IBIS.  Specifically, during the deposition of Kevin Reidl of Hodell, he stated that, in 2004, Dan Lowery, President of LSi, told him B1 could support up to 300 or 500 users.  (ECF Nos. 141-142, K. Reidl Dep. at 101-103.) According to Otto Reidl of Hodell, Dale Van Leeuwen, sole owner of IBIS, made similar representations to him during a December 3, 2003 conference call.  (ECF No. 129-1, O. Reidl Dep. at 1115-16.)

[7]  The parties disagree whether LSi and IBIS were partners and/or agents of SAP.  In their joint Answer, LSi and IBIS admitted that they were "SAP Partners authorized to market and service the SAP Business One product and were agents of SAP for purposes of the SAP products ... [and that they] were SAP partners and agents of SAP for the SAP products."  (ECF No. 30 at ¶¶11-12.)  SAP points to its agreements with LSi and IBIS that specifically disclaim agency or partnership relationships.  (ECF No. 110-1; 163.) However, there is no indication that Hodell was aware of these agreements or the terms contained therein.  As such, even if LSi and IBIS were not authorized agents, factual issues remain whether SAP could be found liable through a theory of apparent agency or agency by estoppel.

8

software could support up to 300 users.  *Id*.  In support, Hodell points to the following evidence

of record:

- During his deposition, Dan Kraus, Director of the Business One channel for SAP America, stated that in 2003 and 2004, SAP did not market B1 in terms of users.  To his knowledge, B1 has never been marketed in terms of the number of users it could handle.  (ECF No. 128-1, Kraus Dep. at 42-43.)

- During a partner meeting held on September 13-14, 2004, prior to the signing of the Development Agreement, according to the notes taken by a Jon Woodrum, at Mr. Lowery's direction, Mr. Kraus stated that the ideal B1 customer has "simple business processes" and "10 users."  (ECF No. 150 at 469-472; ECF No. 158-35, Exh. 127.)

- During the deposition of Ralf Mehnert-Meland, the former director of business development for SAP America, he stated that Mr. Lowery of LSi "mis-sold" B1 to Hodell.  (ECF No. 152, Mehnert-Meland Dep. at 13-14, 101-103.)  He stated that "we had no idea that ... a customer had been told this would be good for 250 users."  *Id*. at 83.

- A document produced by LSi released by SAP to its B1 partners in March of 2005, prior to the signing of the License Agreement towards the end of December 2005, states as follows: "In future releases, SAP Business One will focus on the needs of businesses with 10 to 100 employees.  While SAP Business One continues to meet the needs of many larger businesses of up to 250 employees, by concentrating on companies with 10-100 employees, we will be able to more rapidly increase penetration of the small and midsize market ..."  (ECF No. 158, Exh. 124 at 5.)

- A document produced by LSi, created by Gadi Samia of SAP in 2005, states as follows: "SAP Business One is an affordable, integrated business management solution designed specifically for small and midsize companies (10-100 employees)." (ECF No. 158-37, Exh. 130 at 4.)  It also indicates that the B1 "sweet spot" is for "very small business" of 1-100 employees.  *Id*. at 6.

- In an email written by Mr. Mehnert-Meland, he stated that "Hodell asked the right question today: 'Did we buy the wrong solution with SAP Business One.'  Based on what we know now, the answer is 'yes' as Lowery completely oversold SAP Business One.... SAP Business One was never advertised for companies with up to $250mm in revenues and 500 users."  (ECF No. 158-45, Exh. 160.)  In another email, he stated that "Lowery needs to take responsibility for the mis-sell."  (ECF No. 158-43, Exh. 158.)

- Mr. Kraus also confirmed that he sent an email, marked as Exhibit 159, which stated that "[t]he partner clearly has misrepresented the [Business One] solution."  (ECF No.

158-44, Exh. 159; ECF No. 128-1, Kraus Dep. at 125.)

- Geoffrey Ashley is a former employee of SAP who was hired in November 2005 as the director of channel sales for North America for SAP's B1 software. (ECF No. 143, Ashley Dep. at 4.)  He stated that while "SAP definitely defined or gave a range for employees.  I don't recall seeing anything saying how many users, because it's almost impossible to know."  *Id*. at 72.

There does exist evidence to the contrary that could support LSi/IBIS's position.  Notably, in his deposition, Mr. Van Leuwen of IBIS stated that he flew to Atlanta to meet with SAP representatives, including Mr. Mehnert-Meland, Chris Robinson, and Mr. Kraus.  (ECF No. 111-1, Van Leuwen Dep. at 29.)  He stated that they told him B1 was appropriate for three to 500 users.  *Id*. at 54-55, 197-98.  The trier of fact, however, would not be obligated to find Mr. Van Leuwen's testimony credible.  The only tangible item of evidence cited by LSi/IBIS as to the number of users (rather than employees) that B1 could accommodate is an undated document that purports to identify "SAP's Market Strategy" for its B1 software.  (ECF No. 105-13, Exh. 14.)  The documents states that "[a]s to customers, the general target market for Business One is any small and medium size business with between 5 and 500 users."[8]  *Id*.

While LSi/IBIS characterizes SAP's statements that it was Mr. Lowery who was

---

[8]  Another document, an SAP Business One Brief with a copyright date of 2003, indicates that B1 "helps emerging businesses, from those with 10 to several hundred *employees*, to streamline their operational and managerial processes."  (ECF No. 158-62, Dep. Exh. 314) (emphasis added).  An undated report (with a handwritten date of 2005) on what appears to be SAP letterhead states that "[w]hether you have 5 employees or 500, SAP [B1] helps emerging businesses streamline their operational and managerial processes."  (ECF No. 155-5, Dep. Exh. 38.)  As the Court has noted, there is some debate as to whether a representation as to the number of employees implies an ability to accommodate a similar number of users.  Theoretically, a company with 500 employees may only have 5 employees who regularly utilize the computer system.  On the other hand, there may be several hundred.  Sorting this issue out is best left for the trier of fact.

responsible for the "mis-sell" as self-serving, at this juncture in the proceedings, it is not for the Court to determine which scenario will prevail.  There is ample evidence from which a reasonable juror could find that LSi/IBIS ignored information that suggested B1 could not accommodate the 120 user licenses eventually purchased and selectively passed on information that was likely to further Hodell's purchase of B1.  Based on the information available to LSi/IBIS, a reasonable juror could further find that the information was transmitted to Hodell with either knowledge of its falsity or with such recklessness that knowledge of the falsity may be inferred.

The only additional challenge LSi/IBIS makes with respect to fraud is that Hodell cannot demonstrate its reliance on LSi/IBIS's representations was justifiable.  (ECF No. 105 at 19-20.) This argument is based on the assertion that Otto Reidl, president of Hodell, was relying solely on information he obtained during a telephone conference with American Express and LSi in December of 2003.  *Id*.  However, LSi/IBIS does not deny making representations as to the number of users B1 could accommodate.  LSi/IBIS has even pointed to meetings that Mr. Van Leuwen had with SAP in Atlanta "armed with specific information on the needs of Hodell to evaluate whether [B1] might be a fit for Hodell and therefore, a good fit for IBIS and LSi Lowery."  (ECF No. 105 at 7.)  Given this admitted fact-finding endeavor LSi/IBIS undertook on behalf of Hodell, the Court finds the issue of whether Hodell reasonably relied on the representations made by LSi/IBIS is a factual issue best left to the trier of fact.  *See, e.g., Angrisani v. Capital Access Network, Inc.*, 175 F. App'x 554, 557 (3d Cir. 2006) (finding the question of whether the plaintiff's reliance on a representation was reasonable presented "a factual issue that is more properly left to the judgment of the jury"); *Rodi v. S. New England Sch.*

11

*of Law*, 389 F.3d 5, 16 (1ˢᵗ Cir. 2004) ("[T]he reasonableness of a party's reliance ordinarily constitutes a question of fact for the jury."); *Miller v. Premier Corp.*, 608 F.2d 973, 982 (4ᵗʰ Cir. 1979) ("[I]ssues of reliance and its reasonableness, going as they do to subjective states of mind and applications of objective standards of reasonableness, are preeminently factual issues for the trier of fact.")

For the foregoing reasons, it is recommended that LSi/IBIS's motion for summary judgment with respect to the fraud and fraud-in-the-inducement claims be denied.

**B.    Negligent Misrepresentation**

LSi/IBIS also asserts that it is entitled to summary judgment on Hodell's negligent misrepresentation claim, because it did not make an affirmative false statement and/or the statements that were made originated from SAP.  (ECF No. 105 at 27-29.)

As discussed in the fraud section, there is sufficient evidence of record from which a reasonable juror could find that LSi/IBIS made knowingly false or reckless representations. LSi/IBIS's argument, that it only relayed information to Hodell from SAP, ignores that it is a disputed issue of material fact as to whether SAP actually made the representations as claimed by LSi/IBIS.  Furthermore, if LSi/IBIS supplied information to Hodell regarding the number of users B1 could accommodate despite also possessing information that contradicted those representations, such actions are certainly sufficient to satisfy the standard for negligent misrepresentation.

Therefore, it is recommended that SAP's motion for summary judgment as to the negligent misrepresentation claim be denied.

C.    **Breach of Contract - The Development Agreement**

1.    **LSI/IBIS's Motion for Summary Judgment**

LSi/IBIS seeks summary judgment with respect to Hodell's claim that it breached the

Development Agreement.  (ECF No. 105 at 20-27.)  Specifically, LSi/IBIS asserts that Hodell

cannot establish a breach of the Development Agreement because all the assumed obligations

were fulfilled.  (ECF No. 105 at 20.)

According to LSi/IBIS, the Development Agreement had only two performance

requirements: (1) the delivery of 80 SAP B1 users licenses to Hodell, and (2) the development of

an add-on software known as In-Flight Enterprise (hereinafter "In-Flight").  (ECF No. 105 at 20-

21.)  Hodell's brief in opposition does not argue that LSi/IBIS failed to deliver 80 SAP user

licenses.[9]  (ECF No. 158 at 31-35.)  Hodell takes issue with LSi/IBIS's contention that it

performed its second obligation under the agreement, and also appears to take issue with the

scope of that obligation as portrayed by LSi/IBIS.  *Id.*  Essentially, Hodell argues that LSi/IBIS

breached the Development Agreement because In-Flight implementation was not fully-

functional and, consequently, unsuccessful.  (ECF No. 158 at 31.)  LSi/IBIS asserts the

Development Agreement did not guarantee In-Flight's development and integration would

ultimately be successful. (ECF No. 105 at 24.)  In support, it is argued that the Development

Agreement contemplated full payment only upon "successful implementation."  *Id.*  The full

language of the provision LSi/IBIS quotes from the Development Agreement states as follows:

3.    Hodell-Natco will pay $60,000.00, of the purchase price balance of

_____

[9]  In his deposition, Otto Reidl, president of Hodell, acknowledged that Hodell received
the 80 B1 user licenses called for by the Development Agreement.  (ECF No. 129-1, O.
Reidl Dep. at 123-24.)

$120,000, when IBIS orders the software from SAP.  This should occur on the date mutually agreed upon and listed in the Inflight Enterprise Development Project Plan (attached as part of our contract).  This $60,000 payment will be for 40 licenses of SAP Business One.  The remaining $60,000.00 purchase price balance for the 41-80[th] license will be due on successful implementation.  Successful implementation will be defined in the Inflight Enterprise Development project plan, and mutually agreed upon.

(ECF No. 26-4, Exh. D.)

First, the "Inflight Enterprise Development project plan" was not attached to the Amended Complaint.  (ECF No. 26.)  Hodell does not reference it in its brief and LSi/IBIS avers that the Development Agreement is two pages long and attached to the Amended Complaint as Exhibit D.  (ECF No. 105 at 20.)  The parties fail to acknowledge this inherent ambiguity.  The Court cannot determine from the four corners of the agreement what constitutes successful implementation.

Under Ohio law, the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court. *Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993) (applying Ohio law); *Potti v. Duramed Pharmaceuticals, Inc.*, 938 F.2d 641, 647 (6th Cir.1991) (applying Ohio law); *see also Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio, Inc.*, 15 Ohio St.3d 321, 474 N.E.2d 271, 272-73 (1984) ("If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined. However, if a term cannot be determined from the four corners of a contract, factual determination of intent or reasonableness may be necessary to supply the missing term."). "The role of courts in examining contracts is to ascertain the intent of the parties." *City of St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 875 N.E.2d 561, 566 (2007).  "The intent of the parties is presumed to reside in the language they choose to use in their agreement." *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 667 N.E.2d 949, 952 (1996); *accord State ex. rel Petro v. R.J. Reynolds Tobacco Co.*, 104 Ohio St.3d 559, 820 N.E.2d 910, 915 (2004). "Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract." *City of St. Marys*, 875 N.E.2d at 566; *accord Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146, 150 (1978) ("[W]here the terms in an existing contract are clear and unambiguous, this court cannot in effect create a new contract by finding an intent

14

not expressed in the clear language employed by the parties."). However, "[e]xtrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning." *Graham*, 667 N.E.2d at 952; *accord R.J. Reynolds*, 820 N.E.2d at 915. Nevertheless, a court "is not permitted to alter a lawful contract by imputing an intent contrary to that expressed by the parties" in the terms of their written contract. *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 797 N.E.2d 1256, 1261-62 (2003).

Contractual language is ambiguous "only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Covington v. Lucia*, 151 Ohio App.3d 409, 784 N.E.2d 186, 190 (2003) (quoting *Potti*, 938 F.2d at 647); *see also King v. Nationwide Ins. Co.*, 35 Ohio St.3d 208, 519 N.E.2d 1380, 1383 (1988); *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 129 Ohio App.3d 45, 716 N.E.2d 1201, 1208 (1998). "[C]ourts may not use extrinsic evidence to create an ambiguity; rather, the ambiguity must be patent, i.e., apparent on the face of the contract." *Covington*, 784 N.E.2d at 190. In determining whether contractual language is ambiguous, the contract "must be construed as a whole," *Tri-State Group, Inc. v. Ohio Edison Co.*, 151 Ohio App.3d 1, 782 N.E.2d 1240, 1246 (2002) (quoting *Equitable Life Ins. Co. of Iowa v. Gerwick*, 50 Ohio App. 277, 197 N.E. 923, 926 (1934)), so as "to give reasonable effect to every provision in the agreement." *Stone v. Nat'l City Bank*, 106 Ohio App.3d 212, 665 N.E.2d 746, 752 (1995); *see also Burris v. Grange Mut. Co.*, 46 Ohio St.3d 84, 545 N.E.2d 83, 88 (1989) ("The meaning of a contract is to be gathered from a consideration of all its parts, and no provision is to be wholly disregarded as inconsistent with other provisions unless no other reasonable construction is possible." (quoting *Karabin v. State Auto. Mut. Ins. Co.*, 10 Ohio St.3d 163, 462 N.E.2d 403, 406 (1984))). "[C]ommon words appearing in the written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." *Alexander*, 374 N.E.2d at 150.

*Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763-64 (6th Cir. 2008).

As the contract is not clear and unambiguous as to what constitutes successful implementation, its interpretation is not simply a matter of law for the Court. The contract also does not contain an integration/merger clause, and therefore, the precise contours of this contract are unlikely to be determined based on the four corners of the agreement, especially given the

explicit reference to additional and potentially crucial terms left to be defined elsewhere.  As such, resolution of this issue may rest on extrinsic evidence, the existence and credibility of which would be determined by the trier of fact.

Second, even if the Development Agreement attached to the Amended Complaint would be interpreted based only on the language contained within its four corners, the Court could not find that the provision cited by LSi/IBIS stands for the proposition that the agreement did *not* require the successful development and integration of In-Flight with B1.  The agreement called for IBIS to be paid a total of $180,000 (out of the total contract sum of $300,000) for the development of In-Flight in three $60,000 installments.  *Id.*  Thus, as stated in the Development Agreement, the remaining $120,000 was designated for the B1 user licenses and not the In-Flight add-on.  *Id.*  Of that $120,000, "[t]he remaining $60,000.00 purchase price balance for the 41-80th license will be due on successful implementation."  (ECF No. 26-4, Exh. D.)  In other words, the provision referenced above merely refers to the timing of *when* the final $60,000 is paid for the second batch of the B1 licenses.  Arguably, the language utilized in the Development Agreement does not imply a contingency, but rather affirmatively and unequivocally states that said sum "will be due on successful implementation."  *Id.*  As such, the Court finds that a reasonable interpretation of the agreement is that it *required* "successful implementation" of In-Flight, B1, or possibly both, at which point Hodell's obligation for the final payment towards the B1 licenses would be triggered.

Furthermore, Hodell has cited the following evidence suggesting that In-Flight was not successfully developed and integrated with B1:

- In his deposition, Joseph Guagenti, formerly a lead programmer with LSi, stated that the development of In-Flight was rushed and undermanned.  (ECF No. 117-1,

16

Guagenti Dep. at 9, 170.)  He stated that any coding issues related to In-Flight were LSi's fault as "we built it as quickly and as fast as we possibly could with the resources that we had.  I think we could have done much better in hindsight."  *Id*. at 193.

- Guagenti stated that, when he left LSi in the fall of 2008, he was unsure if B1 with the In-Flight add-on was functioning because "I'm not sure that we ever went to go-live. I
  thought we were still in the state of testing, developing, debugging...."  He believed LSi was "still evaluating some of the slowdown issues that we were having in the InFlight add-on." (ECF No. 117-1, Guagenti Dep. at 63-64.)  He stated that it would be "inappropriate" to suggest that In-Flight had no performance issues.  *Id*. at 65.

- Jon Woodrum, an employee with LSi from 1995 through 2009, stated during his deposition that he did not believe LSi should be "taking milestone payments without better understanding of what we were developing and going to deliver.... [b]ecause I thought it was more than we could  deliver. And it wasn't, and it wasn't being, in my opinion, and I think I'm correct, it was being presented as developed, or being developed, and I didn't think it was a reality.[10]  (ECF No. 145, Woodrum Dep. at 9, 83-87.)

SAP, in asserting that its B1 Product performed well, pointed to an email from a Hodell employee to an LSi employee, to suggest that In-Flight was the cause of the problems Hodell experienced.  (ECF No. 110-1 at 21.)  The email states as follows: "Kevin and I did a little test running SAP without InFlight.  SAP ran very nicely.  We installed InFlight and SAP began to crawl."  (ECF No. 110-15, Exh. N.)

Given the foregoing, genuine issues of material fact remain as to whether LSi/IBIS met its obligations, and, therefore, whether the Development Agreement was breached.  It is therefore recommended that LSi/IBIS's motion for summary judgment as to Hodell's breach of contract

---

[10]  The Development Agreement called for installment payments of $60,000 for the development of the In-Flight software which "require[d] prior progress reviews for In-Flight development according to the development schedule outlined and made part of the contract."  (ECF No. 26-4, Exh. D.)

17

claim be denied.[11]

### 2.    Hodell's Motion for Summary Judgment

Hodell has moved the Court for a judgment on the pleadings pursuant to Fed. R. Civ. 12(c) with respect to LSi/IBIS's counterclaim.  (ECF No. 109 at 4-5.)   Specifically, Hodell asserts that LSi/IBIS has failed to plead the elements of their claim, much less provide any factual allegations in support of that claim.  *Id*.  LSsi/IBIS's counterclaim against Hodell reads as follows:

> There is due and owing by Plaintiff to Defendants the sum of $60,000 for services rendered and expenses advanced by Defendants on behalf of Plaintiff.

(ECF No. 30.)

While LSi/IBIS's counterclaim is admittedly terse, given Hodell's allegations in the Amended Complaint that it entered into an agreement with LSi, on or about December 20, 2004, which called for Hodell to make several payments in $60,000 installments, it cannot credibly be

---

[11]  In the interests of judicial economy, the Court will not address at this time whether the the Development Agreement contained implied warranties.  LSi/IBIS has argued that the agreement does not contain implied warranties because it was not a contract for the "sale of goods" but rather for services.  (ECF No. 105 at 22.)  Without deciding the matter, the Court notes that several other decisions have found that software development is for the sale of good and is covered by the Unform Commercial Code (UCC).  *See, e.g., Dahlmann v. Sulcus Hospitality Technologies, Corp.*, 63 F. Supp. 2d 772, 775 (E.D. Mich. 1999) ("The Court believes that the agreements at issue for software package development and installation were within the scope of the U.C.C.") (citing *Downriver Internists v. Harris Corp.*, 929 F.2d 1147, 1151 (6th Cir.1991) (noting that several courts have held that agreements for software development are considered "goods")); *Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649, 654 (7th Cir. 1998) ("we can think of no reason why the UCC is not suitable to govern disputes arising from the sale of custom software"); *Newcourt Fin. USA, Inc. v. FT Mortgage Companies, Inc.*, 161 F. Supp. 2d 894, 897 (N.D. Ill. 2001) ("Custom software has been considered a good under the UCC."); *contra Systems America, Inc. v. Rockwell Software, Inc.*, 2007 WL 218242 (N.D. Cal. Jan. 26, 2007) (distinguishing the development of new software from transactions where customization of software was only a small part of the agreement).

18

argued that Hodell has not received adequate notice of the claim against it.  As such, it is recommended that Hodell's motion for judgment on the pleadings be denied.

Turning to Hodell's motion for summary judgment, the essence of Hodell's brief argument is that it is undisputed that the implementation of SAP's B1 software was unsuccessful.  (ECF No. 109 at 6-7.)  Hodell's argument is essentially the inverse of LSi/IBIS's argument as to the requirement that the implementation be successful.  As discussed above, due to the inherent ambiguity in the Development Agreement, the Court cannot determine from the four corners of the agreement whether the contract required successful implementation of In-Flight or, for that matter, what constitutes successful implementation.  Moreover, it is unclear whether the agreement required LSi/IBIS to develop software that would have been functional but for the alleged shortcomings in the B1 software or whether the agreement required In-Flight and B1 to function in tandem at certain acceptable performance levels.  Although LSi/IBIS admits that SAP's B1 was an abject failure, due to the unresolved ambiguities in the Development Agreement, the Court does not believe this admission alone entitles to Hodell to summary judgment.

Therefore, it is recommended that Hodell's motion for summary judgment be denied.

**D.  Negligence**

LSi/IBIS also argue that the negligence claim should be dismissed as the Court has already dismissed similar claims made against the SAP defendants.  (ECF No. 105 at 27.)  Hodell's brief in opposition, while addressing the summary judgment motion with respect to the negligent misrepresentation claim, is largely silent on the negligence issue.  (ECF No. 158 at 35-39.)  As mentioned during oral arguments on February 28, 2013, and during the settlement conference,

Hodell agreed to withdraw its simple negligence claims against LSi/IBIS.  (Oral Arguments Tr. 57, 60.)  Furthermore, the Court has previously found that a claim for negligence is not cognizable where the recovery sought is for economic losses.  (ECF No. 61 at 9-10.)

Therefore, it is recommended that summary judgment be granted with respect to Hodell's negligence claim against LSi/IBIS.

## V.  Conclusion

It is recommended that the LSi/IBIS's Motion for Summary Judgment (ECF No. 105) be GRANTED in part and DENIED in part.  Specifically, it is recommended that summary judgment be granted with respect to Hodell's negligence claim against LSi/IBIS and denied with respect to the remaining claims.  It is further recommended that Hodell's Motion for Judgment on the Pleadings/Motion for Summary Judgment (ECF No. 109) be DENIED in its entirety.

/s/ Greg White
U.S. Magistrate Judge

Date: June 13, 2013

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, **638 F.2d 947 (6th Cir. 1981)**.  *See also Thomas v. Arn*, **474 U.S. 140 (1985)**, *reh'g denied*, **474 U.S. 1111 (1986)**.