2014 WL 117315
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Judith A. HENDRIAN, Individually and
as Personal Representative of the Estate of
Howard G. Hendrian, Deceased, Plaintiff,
v.
SAFETY–KLEEN SYSTEMS, INC., Defendant.

No. 08–14371.  |  Jan. 13, 2014.

**Attorneys and Law Firms**

Donald A. Krispin, Duane C. Marsden, Timothy A. Swafford, The Jaques Admiralty Law Firm, PC, Detroit, MI, Raphael Metzger, Metzger Law Group, Long Beach, CA, for Plaintiff.

Cynthia M. Filipovich, Daniel J. Scully, Jr., Clark Hill, Duane C. Marsden, Jaques Admiralty Law Firm, Detroit, MI, Wesley S. Alost, Jones Carr McGoldrick LLP, Dallas, TX, for Defendant.

***ORDER***

JULIAN ABELE COOK, JR., District Judge.

**\*1** On October 15, 2008, the Plaintiff, Judith Hendrian, acting individually and as the personal representative of the estate of her deceased husband, Howard G. Hendrian ("Hendrian"), filed this products liability action against the Defendant, Safety–Kleen Systems, Inc. ("Safety–Kleen"). [1] The facts and the procedural history of this case have been described in detail by this Court in a previously entered Order denying Safety–Kleen's motion for summary judgment. (ECF No. 57 at 2–3).

To summarize, the Plaintiff alleges that her husband was exposed to a cleaning solvent while working at Ford Motor Company. This cleaning solvent (to wit, "105 Solvent") which had been produced by Safety–Kleen contained the chemical "benzene" that was allegedly carcinogenic to humans. The Plaintiff maintains that Hendrian's exposure to the 105 Solvent caused him to incur serious medical problems including an acute form of myelogenous leukemia, which ultimately led to his death in 2007. (Compl.¶ 12). In making her claims, the Plaintiff has advanced four basic theories of

liability against Safety–Kleen; namely, (1) failure to warn, (2) strict liability, [2] (3) negligence, and (4) loss of consortium.

Currently before the Court are the parties' motions which address a variety of subjects that range from (1) boiler plate objections to hypothetical matters, [3] (2) requests for the Court to take judicial notice of certain facts and publications, and (3) issues that are dispositive in nature, rendering them improperly lodged for disposition at this stage of the case. [4]

**I.**

According to the Federal Rules of Evidence, relevant evidence is admissible unless the United States Constitution, a federal statute, the Rules of Evidence, or other rules prescribed by the Supreme Court provide otherwise. Fed.R.Evid. 402. Irrelevant evidence is not admissible. *Id.* Evidence is "relevant" if it tends to make a material fact more or less probable. Fed.R.Evid. 401. Even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed.R.Evid. 403.

Although neither the Federal Rules of Civil Procedure nor the Federal Rules of Evidence expressly provide for the exclusion of evidence in limine before trial, "[i]n general, federal district courts have the power to exclude evidence *in limine* pursuant to their inherent authority to manage trials." *Luce v. United States,* 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). A court will generally reject a proffered motion in limine unless the moving party can satisfy "its burden of showing that the [targeted] evidence in question is clearly inadmissible." *Corporate Commc'n Servs. of Dayton, LLC v. MCI Commc'ns Servs., Inc.,* 2010 WL 1445169, \* 1 (S.D.Ohio Apr.12, 2010) (citing *Indiana Insurance Co. v. General Electric Co.,* 326 F.Supp.2d 844, 846 (N.D.Ohio 2004)). "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Id.*

**\*2** If the Court denies such a motion in limine, the evidence sought to be excluded by the motion will not necessarily be admitted at trial. *Id.* Indeed, the Court will consider any objections raised at trial, "even if the objection falls within the scope of a motion in limine that has been [previously]

denied." *Watts v. United Parcel Serv.,* 2013 WL 4776976, *1 (S.D.Ohio Sept.5, 2013).

Finally, "even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling." *Luce,* 469 U.S. at 41–42.

## II.

As a preliminary matter, the Court has grouped several of the parties' motions together for purposes of eliminating duplicative analyses.

### A. ECF Nos: 78, 79, 81–87, 95, 96, 100–102, 106, 107, 110, and 111.

With respect to the above-listed motions, the parties' seek to preclude the entry of a wide variety of broad categories of evidence. As an example, the Plaintiff seeks, *inter alia,* to exclude the following from being admitted into the record of this case: (1) expert opinions that have not been previously disclosed by the Defendant (ECF Nos. 78–79); (2) allegedly improper hypothetical questions (ECF No. 82); (3) evidence of an assumption of risk (ECF No. 85); (4) arguments for jury nullification of non-economic damages (ECF No. 86); (5) evidence of the non-taxability of a personal injury award (ECF No. 87); (6) evidence of the effect of a verdict on the community (ECF No. 95); and, (7) evidence regarding the Defendant's good corporate conduct (ECF No. 96). In a similar vein, the Defendant seeks, *inter alia,* to preclude the entry of (1) media reports regarding Defendant or its witnesses (ECF No. 100); (2) evidence of unrelated diseases and medical conditions (ECF No. 101); (3) evidence of other suits or claims against the Defendant (ECF No. 102); (4) reference to irrelevant corporate conduct (ECF No. 106); reference to certain irrelevant or inflammatory matters (ECF No. 107); (5) evidence of unreliable or irrelevant studies (ECF No. 110); and (6) evidence of witness testimony to infer corporate knowledge (ECF No. 111).

All of the motions grouped under Section II–A of this Order (enumerated above), share characteristics which allow for summary treatment: namely, they are overly broad, contain little if any reference to specific evidence, and lack the requisite context necessary for the Court to make a well-reasoned decision at this juncture of the case. The courts have been clear that "[a] motion in limine that seeks to exclude broad categories of evidence should rarely be granted." *Watts,*

2013 WL 4776976, *1 (citing *Sperberg v. Goodyear Tire & Rubber Co.,* 519 F.2d 708, 712 (6th Cir.1975). Indeed, "[t]he better practice is to deal with questions of admissibility of evidence as they arise." *Id.* As such, the Court must, and will, deny the parties' motions in limine as they relate to ECF Nos: 78, 79, 81–87, 95, 96, 100–102, 106, 107, 110, and 111.

### B. ECF Nos: 88, 97, 99, 109

\*3 Both parties seek to preclude the entry of certain evidence that is, under most circumstances, categorically barred at trial. Each of the motions grouped under this section, with the exception of ECF No. 109, fit this general description. Starting with ECF No. 88, the Plaintiff seeks to exclude evidence of any collateral source payments. The law in Michigan is clear that, in a personal injury action, any evidence suggesting that the loss in question was paid by a collateral source "shall be admissible to the court in which the action was brought *after* a verdict for the plaintiff and before a judgment is entered on the verdict." Mich. Comp. Laws. 600.6303(1) (emphasis added). As such, the Defendant is prohibited from introducing any evidence of collateral source payments during the course of trial.

Moving to ECF Nos. 97 and 109, both of which address the Defendant's financial condition, the Court is mindful that "[s]tatements relating to the poverty of one of the parties or the wealth of the other calculated to direct the jury's attention to the need of an injured party for compensation rather than the real issues in the case are not relevant." *VSI Holdings, Inc. v. SPX Corp.,* 2005 WL 5980804, *7 (E.D.Mich. Apr.12, 2005). Here, the Plaintiff seeks to preclude the presentation of evidence pertaining to the filing of bankruptcy by the Defendant in 2000. (ECF No. 97). The Defendant counterargues that this information is relevant to show that "the Safety–Kleen entity that existed and operated at the time of [Hendrian's] alleged exposures no longer exists." (ECF No. 158 at 6). The Court, finding that the probative value, if any, in the Defendant's bankruptcy filing is far outweighed by the danger of unfair prejudice, grants the Plaintiff's motion to preclude any evidence of this fact.

With respect to ECF No. 109, however, the Defendant seeks to preclude the admission of all evidence concerning its corporate size and financial condition. In its response to this argument, the Plaintiff maintains that the Defendant's financial viability is relevant to its design defect claim in order to satisfy Michigan's "risk utility" test which requires the movant to show, inter alia, that (1) a safer alternative existed at all of the relevant times in question, and (2) the alternative

was feasible under the circumstances. *See Prentis v. Yale Mfg. Co.*, 421 Mich. 670, 365 N.W.2d 176, 184 (Mich.1984). The Plaintiff contends that Safety–Kleen's financial viability (or lack thereof) is relevant to the issue of whether an alternative design was practicable under the circumstances. In light of the Plaintiff's burden in this case, the Court finds that both parties must be permitted to offer evidence that is tied exclusively to the time period in question regarding the feasibility of an alternative design. Accordingly, the Court grants the Defendant's motion with respect to evidence of SafetyKleen's corporate size and current financial well-beingneither of which are relevant to the claims at issue-while leaving open the prospect of considering evidence tied to Safety–Kleen's financial position during the time that Hendrian was actually exposed to 105 Solvent.

**\*4** Finally, with respect to ECF No. 99, the Defendant seeks to exclude all evidence of its insurance coverage. In response, the Plaintiff appears to concur with the Defendant's request as long as the "preclusion of insurance is mutual and equally applies to preclude evidence of ... any type of insurance that might cover Plaintiff's injuries...." (ECF No. 129 at 2). Having previously determined that all evidence of collateral source payments are precluded at trial, the Court agrees with the Plaintiff's caveat and grants the Defendant's motion with this understanding.

### C. *Motions in limine Requiring Individualized Review*
For those motions in limine which do not share a common threadsubstantive or otherwisewith the group at large, the Court has endeavored to analyze the merits of each request for relief on an individual basis in the following manner:

### 1. *Plaintiff's Motion in limine No. 5 (ECF No: 90)*
The Plaintiff moves to exclude all evidence "that this case is lawyer driven, or that Plaintiff's counsel regularly advertise[s] for and litigate[s] toxic tort cases." (ECF No. 90). The Defendant does not oppose this request, as long as the Plaintiff is prohibited from offering evidence regarding other lawsuits involving Safety–Kleen for any purpose. The Court finds that there is no probative value in the type or volume of litigation pursued by the Plaintiff's counsel. As such, the Court will grant Hendrian's request to exclude this evidence. For reasons that will be discussed below, the Court reserves any ruling on the admissibility of prior *similar* litigation against SafetyKleen.

### 2. *Plaintiff's Motion in limine No. 6 (ECF No: 89)*
The Plaintiff seeks to prohibit the Defendant from proffering evidence of the "allegations of cases litigated by Plaintiff's counsel that do not involve benzene or leukemia." (ECF No. 89 at 1). This particular request appears to be motivated by a belief that the Defendant intends to prejudice the jury by delving into the factual nature of previous cases in which the Plaintiff's experts have testified. Thus, it appears that this motion encompasses two different subjects, namely (1) the extent to which either party should be permitted to introduce evidence concerning unrelated cases previously litigated by counsel in this action, and (2) the permissible scope of inquiry of the parties experts' testimonial history on cross examination. Although the Defendant has essentially stipulated to the Plaintiff's first request as long as it is given reciprocal treatment, it has vigorously challenged the notion that any restriction should be placed on the parties' ability to cross-examine the testifying experts.

With respect to the first issue, the Court agrees that the mere existence of allegations in entirely unrelated and *dissimilar* matters is of no probative value and should, therefore, be excluded from evidence. To the extent that either party seeks to proffer evidence of similar matters previously litigated against Safety–Kleen, such as those cases involving benzene exposure, the Court finds that such evidence could, depending upon the circumstances, satisfy the relevance test under Fed.R.Evid. 403, and reserves ruling on the admissibility of such evidence until trial.

**\*5** As to the scope of permissible cross-examination, Fed.R.Evid. 611(b) allows a party conducting cross-examination to inquire on matters touching "the subject matter of the direct examination and matters affecting the witness's credibility." Several years ago, the Eighth Circuit declared that "cross examination may embrace any matter germane to direct examination, qualifying or destroying it, or tending to elucidate, modify, explain, contradict or rebut testimony given by the witness." *Villanueva v. Leininger*, 707 F.2d 1007, 1010 (8th Cir.1983). Indeed, an expert witness' qualifications are critical to the jury's ability to assess credibility relating to the subject matter at issue. *See Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir.1998) (noting that, because "opposing counsel was provided, and took full advantage of, the opportunity to challenge the expert's qualifications to testify in the area in question ... the trial court did not err in allowing the expert to testify.") Accordingly, notwithstanding the parties' right to object to specific matters pursued on cross examination

during trial, the Court declines to grant any prophylactic measures at this time. The Plaintiff's motion is therefore partially granted.

### 3. *Plaintiff's Motion in limine No. 14 and 20 (ECF Nos: 94 and 91)*

The Plaintiff contends that, throughout the pretrial phase of this case, the Defendant's two primary experts have failed to (1) render risk assessment opinions, and (2) identify any causes or risk factors that are unrelated to benzene, obesity, or idiopathic origin. As a result of the Defendant's claimed shortcomings, the Plaintiff now seeks to obtain an order from the Court that will preclude any line of expert testimony on subjects that were not previously disclosed. In making this motion, the Plaintiff seeks to limit the Defendant's rebuttal to her causation theory in this case. In its opposition papers, the Defendant submits that there is no rule of procedure or case law that requires a proponent-as a prerequisite to admissibility-to establish through its experts that there was correlation between a risk factor and the claimed disease. Moreover, even assuming that such authority did exist, the Defendant argues that its experts made the proper disclosures and, in fact, discussed and evaluated these very issues during their respective depositions.

In support of her argument for exclusion, the Plaintiff relies exclusively upon Fed.R.Civ.P. 26(a)(2)(B) and Fed.R.Evid. 702. Starting with the former, Rule 26 requires, *inter alia,* the proponent to disclose the identity of all testifying expert witnesses along with a written report detailing "all opinions the witness will express and the basis and reasons for them." Fed.R.Civ.P. 26(a)(2)(B)(i). If a party fails to comply with Rule 26, "the party is not allowed to use that information or witness to supply evidence...." Fed.R.Civ.P. 37(c)(1). Contrary to the Plaintiff's assertion, the Defendant has complied with the spirit and the letter of Rule 26. Indeed, in its Rule 26(a) disclosures, the Defendant specifically identified its testifying experts (namely, Drs. Peter Shields and David Pyatt) both of whom provided a general overview of the topical nature of their testimony. *See* (ECF No. 151 at Ex. A–B).

*\*6* With respect to the experts' reporting obligations, each of them disclosed several risk factors,[5] and stated more generally that "Like AML, the underlying cause of the majority of MDS cases is unknown. It has been estimated that 80% (or more) of all MDS cases are de novo or idiopathic...." *Id.* at Ex. D. The Plaintiff essentially suggests that the Court

should limit the experts' testimony because of their failure or inability to identify each and every possible cause of Hendrian's MDS. This argument fails where, as here, the experts have been clear from the beginning that the root cause of MDS is often idiopathic in nature. Indeed, the Plaintiff has failed to direct the Court to any authority which suggests that Rule 26 requires an expert to definitively identify all possible causes of Hendrian's condition.

Finally, and without further elaboration, the Plaintiff summarily states that "if any expert or other witness at trial attempts to relay information to the jury that there is any other or additional risk factors ... such statements or purported evidence would be based on pure speculation and would be barred by Rule 702(b)...." (ECF No. 91). This argument is unavailing for a number of reasons. First, as mentioned earlier, the Defendant's experts opined that the root cause of Hendrian's MDS could have been idiopathic in nature. In fact, in coming to this conclusion, Dr. Shields' report contains a work cited page providing reference to over 400 individual sources while Dr. Pyatt's report contains nearly 100. Thus, it appears that these expert witnesses considered a whole host of risk factors which ultimately culminated in their collective opinion that the cause could have been idiopathic. Second and perhaps most telling of all, the Plaintiff, in failing to analyze any of the factors under Fed.R.Evid. 702, has not expressed any objections to any of the sources cited in the experts' reports. Without more, the Court must, and does, deny the Plaintiff's motions to limit the Defendant's expert testimony.

### 4. *Defendant's Motion in limine ECF No. 103*

Turning now to the Defendant's motions in limine, the first of the lot seeks to exclude "reference to proposition 65 warnings as evidence of benzene content, carcinogenicity, or causation." Proposition 65 is a California state law which requires a business to disclose the presence of certain chemical constituents contained in products distributed in the state. Cal. Health & Safety Code § 25249.5. The Defendant concedes that while this information may be evidence that such a warning was provided, it is neither relevant nor sufficient for purposes of establishing causation or the actual benzene content of 105 Solvent. In support of its position, the Defendant directs the Court to the attention of *Mitchell v. Gencorp,* holding that a government agencies' "threshold of proof is reasonably lower than that appropriate in tort law, which traditionally requires ... a plaintiff to prove that it is more likely than not that another individual has caused him or her harm." 165 F.3d 778, 783 (10th Cir.1999). It should be noted that the Plaintiff's response does not make any reference

of her intention to use the Proposition 65 warnings to establish causation or the chemical content of 105 Solvent. (ECF No. 139).

\*7 The Court agrees with the Defendant, but only as it pertains to the exclusion of the Proposition 65 warnings for purposes of establishing causation or the benzene content of 105 Solvent. Certainly, the Plaintiff is entitled to introduce these warnings to establish the fact that they may have differed in substance and form from those issued in Michigan. As such, the Court grants the Defendant's motion in part and defers any remaining objections to trial.

### 5. *Defendant's Motion in limineECF No. 104*

The Defendant seeks to prohibit the Plaintiff from introducing evidence of the so-called "Dittmar Memorandum"; a memo written by Paul Dittmar, Safety-Kleen's manager of product and process development, to Hyman Bielsky, Safety-Kleen's general counsel. According to the Defendant, the Dittmar Memorandum was written in 1991 and describes a process for potentially removing all benzene from Safety-Kleen's products. (ECF No. 104 at 7). While the Defendant makes no claim of privilege with respect to this document, it contends that it should be withheld from evidence for all purposes because it is irrelevant to Hendrian's exposure and has no bearing on the Plaintiff's design defect claim. The Plaintiff submits that the Dittmar Memorandum is relevant for a number of purposes including, *inter alia,* (1) the presence of benzene in 105 Solvent, (2) Safety-Kleen's knowledge that "[a] properly designed fractionation system [would] ... totally remove benzene ....", and (3) the economic feasibility of implementing a system capable of removing the benzene. (ECF No. 140 at 3).

At this juncture, the Court is not persuaded that the Dittmar Memorandum should be excluded from evidence for all purposes at trial. Indeed, it clearly concerns the crux of the claims at issue: namely, exposure to benzene and the practicality of safer alternatives to the chemical composition of 105 Solvent. Moreover, the Dittmar Memorandum makes clear that, in as early as 1991, Safey-Kleen was on notice that some level of benzene-arguably or not-was present in the parts washer solvent. *See* (ECF No. 140 at Ex. A). While it is conceivable that this document could be offered for some purpose contrary to the Rules of Evidence, the Defendant is free to object to those issues at trial at the appropriate time. For the reasons thus stated, the Defendant's motion is denied.

### 6. *Defendant's Motion in limineECF No. 105*

The Defendant seeks to exclude the depositions of several former Safety-Kleen executives that were taken in a different, albeit substantively related, action. According to the Plaintiff, each of the depositions was taken in connection with a case that was pending in the Los Angeles (California) Superior Court; namely, *Talley v. Safety-Kleen,* Case No; 784605. In *Talley,* the plaintiff alleged that his occupational exposure to the 105 Solventthe same product used by Hendriancaused him to develop Acute Myelogenous Leukemia ("AML"). The plaintiff's counsel in *Talley* deposed most of Safety-Kleen's officers and managing agents, eighteen of which Hendrian seeks to use at the trial in the case at bar. In addition to the factual similarity between *Talley* and this case, the Plaintiff maintains that (1) the identified deponents are former employees of Safety-Kleen, all of whom reside outside the subpoena power of this Court, (2) the depositions were noticed as trial depositions and videotaped as such, and (3) Safety-Kleen's then counsel exercised his client's right to vigorously defend the depositions. (ECF No. 141 at 5–6).

\*8 Federal Rule of Evidence 804 provides for the admission of former testimony that was taken during a different proceeding that "is now offered against a party who had-or, in a civil case, whose predecessor in interest had-an opportunity and similar motive to develop it by direct, cross-, or redirect examination." Fed.R.Evid. 804(b)(1)(B). The Advisory Committee Notes indicate that modern decisions require the substantial "identity of issues as a means of insuring that the former handling of the witness was the equivalent of what would now be done if the opportunity were presented." *Id.* at Advisory Committee Notes. Indeed, "[t]he opportunity to develop testimony offered at another proceeding is not established by presence alone." *United States v. Taplin,* 954 F.2d 1256, 1258 (6th Cir.1992). Thus, the gravity and the totality of the issues must substantially align in order to show that the party-in-interest had a similar motive to develop the testimony at issue. Finally, the moving party must also show that each of the declarants meet the criteria for being unavailable established under Fed.R.Evid. 804(a). [6]

An examination of the Defendant's primary argument appears to be that Safety-Kleen had no motive to spend the additional time or resources to develop the testimony in the *Talley* matter. The Court disagrees. First, the mere fact that the plaintiff in *Talley* deposed at least eighteen management level executives from Safety-Kleen is indicative of the potential

seriousness of the matter. Moreover, although the Defendant maintains that many of the prior cases involved "different facts, different solvents, and different parts washers", the Court is only concerned with the *Talley* matterwhich, interestingly, the Defendant has elected not to address with any level of specificity. As such, the Court is left only with the Plaintiff's uncontested assertion that the plaintiff in *Talley* allegedly developed AML following his occupational exposure to the 105 Solvent. Surely there is no reasonable basis to suggest that the case at bar is any different.

Finally, with respect to Safety–Kleen's motive to vigorously defend the *Talley* action, it seems reasonable to suggest that, when faced with a products liability action involving a heavily marketed substance, the prospect of derivative actions would be enough to inspire a vigorous defense. [7]

As such, the Court denies the Defendant's motion, but only with respect to the eighteen depositions that have been identified in the Plaintiff's response. *See* (ECF No. 141 at 3–4).

### 7. *Defendant's Motion in limineECF No. 108*
The Defendant seeks an order that, if granted, would prohibit the Plaintiff from referring to 105 Solvent as "hazardous waste." According to the Defendant, "hazardous waste", as defined by the Resource Conservation and Recovery Act ("RCRA"), [8] is a term of art that pertains to the "tracking, transportation and disposal of a substance as it flows through various streams of commerce." (ECF No. 108 at 7). The Defendant maintains that, even if 105 Solvent had been properly classified as "hazardous waste" under the RCRA, this characterization has no bearing on the Plaintiff's allegations and creates a substantial danger of unfair prejudice against Safety–Kleen. In her response, the Plaintiff contends that this evidence is necessary to rebut the testimony of Safety–Kleen's experts and, more fundamentally, to inform the jury "of the true nature of SafetyKleen 105 Solvent." (ECF No. 128 at 3).

**\*9** According to the RCRA, "hazardous waste" means "a *solid waste,* or combination of solid wastes...." 42 U.S.C. § 6903(5) (emphasis added). Solid waste is in turn defined as "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant or air pollution control facility, and other *discarded* material, including solid, liquid, or semisolid, or contained gaseous material ...." § 6903(27) (emphasis added). In other words, under the RCRA, a

material or product is not classified as "waste" until *after* it is discarded by the end-user. As such, the Defendant's argument fails from a substantive perspective. At no time during Hendrian's exposure to 105 Solvent was it properly classified as "waste" under the RCRA.

Moreover, even assuming, *arguendo,* that the Defendant's argument was (1) substantively valid, and (2) relevant under Fed.R.Evid. 401, any probative value of attaching this highly prejudicial descriptor to the product is "substantially outweighed by a danger of ... unfair prejudice, confusing the issues, [or] misleading the jury...." Fed.R.Evid. 403. This is especially true where, as here, there are a number of ways to prove the underlying implication that is associated with "hazardous waste": namely, by identifying the chemical constituents of 105 Solvent and demonstrating their propensity to be harmful to one's health. As such, the Defendant's motion to prohibit the Plaintiff from characterizing 105 Solvent as "hazardous waste" under the RCRA is granted.

### 8. *Defendant's Motion in limineECF No. 112*
The Defendant seeks to exclude all evidence of material data safety sheets ("MSDS"), warnings, labels, and safe use instructions for (1) Safety–Kleen 105 Solvent unrelated to benzene; and (2) products, solvents or machines not alleged to have been used by the Plaintiff.

With respect to its first request, the Defendant maintains that because the "Plaintiff pled and proceeded with this manner as a benzene case, any evidence regarding inadequacies or insufficiencies of MSDS, warnings, labels, and safe use instructions for [ 105 Solvent] unrelated to benzene" are irrelevant. (ECF No. 190 at 6). The Plaintiff disagrees, arguing that although benzene was ultimately responsible for Hendrian's death, there is evidence to suggest that some of the other harmful constituents within the solvent may have played a contributing role.

Even assuming, *arguendo,* that the Plaintiff is correct in contending that some of the identified constituents in the 105 Solvent aggravated or enhanced the benzene's toxicity, the Court notes that the Plaintiff has not claimed that anything other than benzene was *independently* capable of causing her husband's demise. [9] Under these circumstances, the Court concludes that the warnings, the MSDS, the labels, as well as the "safe use" instructions that are unrelated to benzene have no direct bearing on the underlying claim and, as a

consequence, are not relevant under Fed.R.Evid. 401. Indeed, benzene is the only chemical mentioned by name in the complaint, which appears to be consistent with the Plaintiff's theory of the case.

**\*10** Moving to the second issue, the Defendant maintains that the Plaintiff should not be permitted to expand the universe of parts washers or solvents to those outside the scope of the Plaintiff's complaint, and, further that, all evidence of the warnings and instructions related to same are likewise irrelevant. According to the Plaintiff, Safety–Kleen manufacturers two products that are safer than 105 Solvent; namely, a highly refined solvent known as "Premium Gold Solvent" and "150 Solvent", both of which contain virtually no benzene. (ECF No. 143 at 2). Likewise, the Plaintiff maintains that Safety–Kleen has two safer machines available for use, "which suck toxic solvent vapors away from operators' breathing zones...." *Id.* The Plaintiff contends that she should be permitted to offer evidence of "safer feasible alternatives" in support of her design defect claim under Michigan law. The Court agrees in part.

As discussed, the Court has construed the Plaintiff's strict liability claim as a design defect claim under Michigan law. Recognizing that it is the Plaintiff's initial burden to establish a prima facie case of liability against the Defendant, the Court finds that evidence of feasible safer alternatives to the allegedly defective product (i.e., 105 Solvent) are relevant to the issues in play. However, the Court also notes that the Plaintiff has not made any reference in the complaint to the mechanism utilized by her husband during the course of his employment at the Ford Motor Company; namely, the "sink-on-a-drum parts washer." As such, evidence of safer alternative equipment is not relevant for purposes of trial. Finally, with respect to the relevant time period, the Plaintiff maintains that Hendrian's exposure to the 105 Solvent was limited to "1990 and continuing through [to] 1993." (ECF No. 1–3 at 4). This time period likewise controls the universe of safer alternatives available to Safety–Kleen. As such, the Court (1) grants the Defendant's motion with respect to the MSDS, the warnings, the labels, and those safe use instructions that are unrelated to benzene, (2) grants the Defendant's motion relating to the admissibility of evidence as it pertains to safer alternative equipment, and (3) denies the Defendant's motion with regard to safer alternatives to the use of 105 Solvent within the time period thus described.

**9.** *Defendant's Motion in limineECF No. 113*

Consistent with the Defendant's motion to exclude the MSDS, the warnings, the labels, and the safe use instructions unrelated to benzene, it now seeks a much broader order that will prohibit the Plaintiff from making reference to any other chemicals in the 105 Solvent. In making this motion, the Defendant submits that the Plaintiff has purposefully chosen to litigate this matter as a benzene exposure case. In its view, she should be prohibited from ambushing her adversary with new and otherwise independent theories of causation at trial. The Plaintiff, while agreeing that the complaint is focused on benzene, maintains that "[s]ince the complaint identified the product[,] and since Safety–Kleen was aware of the product's constituents from its own testing ... [it] cannot be prejudiced...." (ECF No. 135 at 3).

**\*11** The Court disagrees with the Plaintiff's position. First and foremost, nowhere in the complaint does the Plaintiff specifically identify the product at issue; i.e., the 105 Solvent. Indeed, the only specificity that is contained within the complaint is the repeated reference to benzene which appears at least fifteen times over eight pages. Moreover, the Court notes that the Plaintiff has not responded to the Defendant's accusation that its "experts have calculated Hendrian's exposure to and formulated opinions regarding benzene, no other chemical or constituent." (ECF No. 191 at 3). The Plaintiff's failure to respond to this assertion is telling.

To the extent that the Plaintiff maintains that the presence of the other chemicals caused an increase in the absorption rate of benzene or otherwise aggravated Hendrian's injury *stemming from the benzene,* counsel is permitted to explore this line of argument. For purposes of clarity, however, the Plaintiff is prohibited from introducing any evidence for the purpose of suggesting that Hendrian's death was the result of some independent factor unrelated to benzene. As such, the Court grants the Defendant's motion in part with the limitation thus described.

**10.** *Defendant's Motion in limineECF No. 114*

With respect to this last motion in limine, the Defendant seeks to exclude any reference to "annual waste recharacterization reports." According to the Defendant, Safety–Kleen annually performs testing on the waste streams of a number of its customers nationwide. The purpose of this testing is to determine the appropriate waste codes that should be applied pursuant to various regulations. (ECF No. 114 at 8). The Defendant anticipates that the Plaintiff will attempt to offer these reports as evidence of the benzene content of 105 Solvent, which, it contends, is improper because

(1) the reports characterize numerous *waste* streams (i.e. spent solvent) none of which originated from Hendrian's employer during the relevant time period, and (2) the reports and underlying data do not focus on the 105 Solvent, but rather the chemical analysis of dozens of waste streams considered together. The Plaintiff's response, while failing to address either of the Defendant's primary arguments, is essentially that because the 105 Solvent may have been included in a given report which contains some evidence of benzene, they should be permitted at trial. The Court disagrees. There is simply no foundational basis upon which to admit the seemingly randomly generated reports of various *spent* product taken from a multitude of sites, none of which appear to be the location where Hendrian actually worked. The Defendant's motion is granted.

**D. *Miscellaneous Matters***

In addition to the thirty three motions in limine that have already been evaluated and resolved, the Plaintiff has filed a motion concerning a dispositive matter (ECF No. 76), and both parties request the Court to take judicial notice of certain evidence in advance of trial. (ECF Nos. 117 and 168). The Court will address each in turn.

**1. *Plaintiff's Motion For An Order that Non–Economic Damages Are Not Limited By Michigan Compiled Laws § 600.2946***

**\*12** On October 25, 2013, the Plaintiff filed a motion seeking the entry of an order that would confirm that Hendrian's damages in this case are not limited by Mich. Comp. Laws § 600.2946. This pleading is based upon an allegation that Safety–Kleen had actual knowledge that the 105 Solvent was defective and likely to cause leukemia.

Setting aside the merits of the Plaintiff's request, this so-called motion in limine is procedurally deficient for at least two reasons. First, the Plaintiff is seeking relief that (1) requires the Court to weigh the totality of the evidence, and (2) seeks relief that is dispositive in nature. Indeed, while the Plaintiff has premised her request under the cloak of a motion in limine, the Sixth Circuit has been clear that "[i]n light of their limited purpose, motions in limine should not be used to resolve factual disputes...." *Louzon v. Ford Motor Co.,* 718 F.3d 556, 561 (6th Cir.2013) (internal citations omitted). Indeed, "a mechanism already exists in civil actions to resolve non-evidentiary matters prior to trial-the summary judgment motion." *Id.* To conclude otherwise, "not only allows those dissatisfied with the court's initial ruling a

chance to relitigate, but also deprives their opponents of the procedural protections that attach at summary judgment." *Id.*

Here, the true nature of the Plaintiff's request is evident from the first page of her motion, where she argues that, as a matter of law, "Safety–Kleen had actual knowledge its product, SafetyKleen 105 Solvent was defective and substantially likely to cause leukemia. Not only did SafetyKleen have this knowledge, but Safety–Kleen then willfully disregarded that knowledge ... thereby satisfying the exception to the statutory cap on non-economic damages...." (ECF No. 76 at 5). Resolution of this issuewhether the Plaintiff's evidence is sufficient as a matter of lawrequires a summary judgment analysis. Fed.R.Civ.P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). More importantly, however, the Plaintiff's motion "does not require any rulings relating to the admissibility of evidence at trial." *Louzon,* 718 F.3d at 561.

Finally, notwithstanding the guidance by the Sixth Circuit in *Louzon,* the Scheduling Order from the Court which governs this matter mandates that all dispositive motions must be filed on or before January 27, 2012. (Text only Order, December 15, 2011). In short, nearly two years has passed and the Plaintiff has failed to offer any explanation as to why the Court should accept her grossly tardy filing. *See Leary v. Daeschner,* 349 F.3d 888, 906 (6th Cir.2003) (quoting Fed.R.Civ.P. 16, 1983 committee's notes) ("[A] court choosing to modify the schedule upon a showing of good cause, may do so only 'if it cannot reasonably be met despite the diligence of the party seeking the extension.' ") As such, the Court denies the Plaintiff's motion.

**2. *Motions Seeking Judicial Notice of Certain Records***

**\*13** Both parties have requested the Court to take judicial notice of certain statutes, regulations, and publications. More specifically, the Plaintiff has asked the Court to take judicial notice of certain passages within (1) 40 C.F.R 61; (2) a U.S. Department of Labor's Occupational Safety and Health Administration publication, "Cancer in the Rubber Industry"; (3) a California Department of Health Services publication," Health Effects of Benzene: Part B; and (4) the transcript from a United States Senate hearing on April 6–7, 1971.

On the other hand, the Defendant's numerous requests can be grouped into the following general categories: (1) federal statutes and regulations; (2) Michigan statutes; (3) *Industrial*

*Union Department, AGL–CIO v. American Petroleum Institute, et al.,* 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980); (4) publications from the Environmental Protection Agency, U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry, and the National Institute for Occupational Safety and Health; and (5) publications from the following institutions: World Health Organization, International Agency for Research on Cancer, American Conference of Industrial Hygienists, and the American National Standard for Hazardous Industrial Chemicals. [10]

Under Federal Rule of Evidence 201(b), "[t]he Court may judicially notice a fact that is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Public records and government documents are generally considered "not to be subject to reasonable dispute." *U.S. ex rel. Dingle v. BioPort Corp.,* 270 F.Supp.2d 968, 971 (W.D.Mich.2003) *aff'd sub nom. Dingle v. Bioport Corp.,* 388 F.3d 209 (6th Cir.2004) (citations omitted). This includes public records and government documents available from reliable sources on the Internet. *See, e.g., Grimes v. Navigant Consulting, Inc.,* 185 F.Supp.2d 906, 913 (N.D.Ill.2002) (taking judicial notice of stock prices posted on website).

In her motion, the Plaintiff has asked the Court to take judicial notice of four isolated comments from the EPA, OSHA, California Department of Health Services, and the U.S. Senate. The Court notes that the Plaintiff's approach limiting her request to four specific passages without regard to the broader surrounding context is, on its face, highly suspect. Indeed, even assuming, *arguendo,* that the sources in question were of the type and quality typically endorsed by Rule 201, taking judicial notice of only selected excerpts requires the Court to ignore other provisions which may have a bearing on the facts. *See United States v. Judge,* 846 F.2d 274, 276 (5th Cir.1988) (denying request to take judicial notice of select portions of DEA manual). The Court will thus consider the entirety of the source material from which the proffered statements originated, taking judicial notice of the entire publication or nothing at all.

*14 Pursuant to 44 U.S.C. § 1507, "[t]he contents of the Federal Register shall be judicially noticed...." As such, the Court grants the Plaintiff's request with respect to the entirety of 40 C.F.R 61. *See* (ECF No. 117 at Exhibit B). Likewise, the

Court agrees that "OSHA regulations are subject to judicial notice" *City of Wichita, Kan. v. U.S. Gypsum Co.,* 72 F.3d 1491, 1496 (10th Cir.1996), and thus accepts the publication appended to the Plaintiff's motion at Exhibit C: namely, "Cancer in the Rubber Industry: The Risks and What You Can Do About Them." As for the epidemiological study undertaken by the California Department of Health Services, however, the Plaintiff offers nothing beyond the blanket assertion that "[i]t is not uncommon for Courts to take judicial notice of such items as official reports ...." in support of her assertion that the accuracy of this particular study cannot reasonably be questioned. (ECF No. 117 at 11). Moreover, the Plaintiff has failed to provide the Court with a copy of the entire report, attaching thereto only "Part B" to her motion. Finding that the Plaintiff has not provided the Court with any confidence in the credibility or the reliability of this publication, the Court declines to take judicial notice of Exhibit D to her motion. Finally, the Court is likewise not obliged to take judicial notice of the U.S. Senate hearing, which as noted above, has been attached as Exhibit E to the Plaintiff's motion. Although the fact that the hearing took place may not be open to dispute, "the contents of [the] testimony, particularly when offered for the truth of the matters asserted, evince considerable dispute." *Ridenour v. Collins,* 692 F.Supp.2d 827, 830 (S.D.Ohio 2010) (refusing to take judicial notice of testimony elicited during Ohio Senate committee hearing).

Prior to addressing the six broad categories of evidence tendered by the Defendant, the Court notes that while this motion includes nearly seventy individual offerings-totaling well over two thousand pages of records-there is less than a single page of briefing dedicated to an analysis of the underlying subject matter. *See* (ECF No. 168 at 7). As stated, "[i]n order for a court to take judicial notice of a fact, a party must supply a reliable source of verification for the fact." *Pearce v. Faurecia Exhaust Sys., Inc.,* WL 2884748. *6 (S.D.Ohio July 13, 2012) *aff'd,* 529 F. App'x 454 (6th Cir.2013). In light of the Defendant's utter failure to provide the Court with an ample discussion-let alone any authority in support of its voluminous request, the Court must and will refuse to take judicial notice of all forms of evidence that cannot "be accurately and readily determined." Fed.R.Evid. 201. Operating under this understanding, the Court holds as follows:

**a. *Group 1–Federal statutes and regulations***
Pursuant to 44 U.S.C. § 1507, the Court grants the Defendant's request to take judicial notice of the federal regulations in

Exhibits 9–14, 16–21 and 23. With respect to the various federal statutes in the Defendant's request, the Court notes that "in recent years the terminology of 'judicial notice' has shifted.' " *United States v. Dedman,* 527 F.3d 577, 587 (6th Cir.2008). Indeed, in several modern opinions the Sixth Circuit has cabined the concept of judicial notice to facts alone. *Id.* "The effect of such a semantic move is largely minimal because judges are still entitled-and indeed required-to determine the applicable law, even if that law is the law of other states." *Id.* Thus, "judicial notice is generally not the appropriate means to establish the legal principles governing the case." *Toth v. Grand Trunk R.R.,* 306 F.3d 335, 349 (6th Cir.2002). As such, the Court denies the Defendant's request with respect to exhibits 1–8 and 22.

**b. *Group 2–Michigan statutes***

\*15 For the same reasons identified above, the Court also declines to take judicial notice of all Michigan statutes encompassed within the Defendant's request, namely: Exhibits 55–68.

**c. *Group 3–Industrial Union Department, AGL–CIO v. American Petroleum Institute, et al***

The Defendant requests the Court to take judicial notice of a Supreme Court case decided in 1980. "[I]t has been held that federal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.,* 605 F.2d 1169, 1172 (10th Cir.1979). Finding no direct relationship between the case proffered by the Defendant and the proceedings currently before the Court, this request is denied as it relates to Exhibit 15.

**d. *Group 4–Government Publications***

The Defendant proffers several reports and publications from a number of different governmental bodies. While courts are generally willing to take judicial notice of data and pronouncements issued by the federal government, such as Environmental Protection Agency research (*Nebraska v. EPA,* 331 F.3d 995, 998 n. 3 (D.C.Cir.2003)); State

Department travel warnings (*Parsons v. United Tech. Corp.,* 243 Conn.66, 700 A.2d 655, 665 n.18 (Conn.1997)); and a federal fisheries management plan approved by formal rule (*City of Charleston v. A Fisherman's Best Inc.,* 310 F.3d 155, 172 (4th Cir.2002), *cert. denied,* 539 U.S. 926, 123 S.Ct. 2573, 156 L.Ed.2d 602 (2003)), the Defendant has failed to proffer any authority to the Court which even suggests that these particular publications satisfy the minimum requirements set forth under Rule 201. Moreover, the Court is unable to determine if it has been provided with full and complete copies of each of the sources grouped under this category. As such, the Court declines to take judicial notice of Exhibits 24–25, 34–37, and 44–47.

**e. *Group 5—International and commercial publications***

The documents in this categoryhailing from international organizations and private agenciesare arguably even less reliable than those identified under Group 4. Once again the Defendant has failed to offer any legitimate argument which suggests that the documents within this group are of the type and character that should be formally recognized by the Court based upon their individual or collective trustworthiness. Accordingly, the Court declines to take judicial notice of Exhibits 26–33, 38–43, and 48–54.

## III.

For the reasons explained above, the Court holds as follows:

1. ECF Nos: 76, 78–79, 81–87, 91, 94–96, 100–102, 104–107, and 110–111 are denied.

2. ECF Nos: 88, 90, 97, 99, 108, 109, and 114 are granted to the extent that this directive is consistent with the opinion of the Court; and

3. ECF Nos: 89, 103, 112–113, 117, and 168 are granted in part and denied in part consistent with the Court's opinion.

\*16 IT IS SO ORDERED.

Footnotes

1    The Court has interchanged "Defendant" and "Safety–Kleen" without any intention of giving emphasis or significance to the arguments or the positions of either party in this controversy.

**Hendrian v. Safety-Kleen Systems, Inc., Slip Copy (2014)**

2     The Court has interpreted the Plaintiff's claim for strict liability (which is not recognized as an enforceable tort under Michigan law) as a design defect claim in product liability. (ECF No. 57 at 11).

3     On November 4, 2013, the Court referred six other motions in limine to Magistrate Judge Mark A. Randon. (ECF No. 123). These motions concerned various *Daubert* challenges and related objections to anticipated expert testimony.

4     The motions that are currently under consideration are as follows: (1) by the Plaintiff, ECF Nos: 76, 78, 79, 81–92, 94–97, and 117; and (2) by the Defendant, ECF Nos: 99–114, and 168.

5     *See* (ECF No. 151 at Ex. C–D).

6     The Plaintiff alleges that all of the witnesses are located outside of the Court's subpoena power. (ECF No. 141 at 4).

7     Note further that the Defendant's attempt to analogize the two actions at issue in *Harville v. Vanderbilt University, Inc.*, 95 Fed. Appx. 719, 725 (6th Cir.2003)one being a child protection proceeding filed by the state and the other a civil tort liability suit against a universityis simply without merit.

8     42 U.S.C. § 6901 et seq.

9     By way of example, the Plaintiff specifically notes that if " Safety–Kleen [had] provided a cancer warning because of the perchloroethylene content of the solvent, the warning would also have served to warn of the cancer hazard of *benzene.* " (ECF No. 143 at 6) (emphasis added). The only warning necessary to provide notice of the alleged carcinogenic effect of benzene is the benzene warning itself.

10     The Court notes that the Defendant's motion is unopposed.

---

**End of Document**              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

American Home Assur. Co. v. Greater Omaha Packing Co., Inc., Not Reported in...

2014 WL 3661485

2014 WL 3661485
Only the Westlaw citation is currently available.
United States District Court,
D. Nebraska.

AMERICAN HOME ASSURANCE COMPANY
and Cargill Meat Solutions Corporation, Plaintiffs,

v.

GREATER OMAHA PACKING
COMPANY, INC., Defendant.

No. 8:11CV270.  |  Signed July 22, 2014.

**Attorneys and Law Firms**

Thomas A. Grennan, Gross, Welch Law Firm, Omaha, NE, for Plaintiff.

David J. Stubstad, Jordan W. Adam, Michael F. Coyle, Patrick S. Cooper, Fraser, Stryker Law Firm, Omaha, NE, for Defendant.

### MEMORANDUM AND ORDER

LYLE E. STROM, Senior District Judge.

*1 This matter is before the Court on plaintiff Cargill Meat Solution's ("Cargill") motion to exclude certain invoice terms and conditions that defendant Greater Omaha Packing Company ("GOPAC") seeks to offer at trial (Filing No. 480).

### I. Background

GOPAC started selling beef to Cargill as part of Cargill's "approved supplier program" in 2007. This program involved a specific contract between the parties that included specific guarantees that the shipments would be—among other things—"not adulterated" and "able to be legally transported or sold." The agreement also provided for damages "that are a direct and proximate result of [GOPAC]'s actions." In the fall of 2007, a substantial amount of beef traced to Cargill was recalled due to multiple instances of consumers contracting E. coli. Cargill alleges that the tainted meat was supplied to Cargill by GOPAC and has brought suit on the basis of the explicit guarantee in the parties' contract as well as implied warranty of merchantability and implied warranty of fitness for a particular purpose.

The present motion involves invoices that GOPAC claims to have sent to Cargill contemporaneous to every shipment of meat—some 350 up to and including the allegedly contaminated shipment. Said invoices included a page entitled "TERMS AND CONDITIONS OF SALE" that states "THIS WARRANTY IS THE EXCLUSIVE WARRANTY PROVIDED AND IS EXPRESSLY IN LIEU OF ANY OTHER WARRANTIES EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY, CONDITION, OR FITNESS FOR A PARTICULAR PURPOSE or use." The invoice also limits GOPAC's liability to the price of the goods sold and claims to be the exclusive agreement regarding the sale. Cargill claims not to have received any such invoices and produced no such invoices in response to discovery requests. Cargill also asserts that discovery served on other GOPAC customers did not yield any invoices. The parties also dispute whether it was GOPAC's policy to send the invoices before, after, or contemporaneously with the shipments of product— an act that would constitute full performance of the contract.

### II. Analysis

As a preliminary matter, GOPAC argues that the motion in limine to exclude the invoices should be treated as a late-filed motion for summary judgment because it seeks the resolution of legal issues outside of simple relevance calculations. The substance of the motion will determine whether the Court will construe it as motion for summary judgment or a motion in limine. *See Bliss v. BNSF Rwy. Co.,* No. 4:12CV3019, 2013 WL 5570231, at *2 (D.Neb. Oct. 9, 2013)."A motion in limine is 'any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered.' " *Id.* (citing *Louzon v. Ford Motor Co.,* 718 F.3d 556, 561 (6th Cir.2013). "A motion in limine is used 'to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions;' in contrast, a motion for summary judgment is a mechanism for resolving non-evidentiary matters prior to trial." *Id.*

*2 Cargill argues that the invoices are non-probative and prejudicial because the disclaimers contained therein are ineffective. However, the sole reason GOPAC intends to submit the invoices is to prove its affirmative defense against the warranty claims. Thus, in order for the Court to determine whether the invoices are relevant, the Court must do more than simply weigh the probative value against the potential for prejudice. Rather, Cargill asks that the Court to resolve a legal issue that is central to the merits of the case: whether the warranties are effective and, in turn, whether GOPAC's

**American Home Assur. Co. v. Greater Omaha Packing Co., Inc., Not Reported in...**

2014 WL 3661485

affirmative defense is valid. The resolution of such legal issues is the purpose and function of summary judgment, and the deadline for summary judgment motions has passed. Further, whether the disclaimers are fully effective depends on certain facts, some of which are contested and some of which have not been fully developed for the Court. At this point in the proceedings, the effectiveness of the disclaimers is an issue best left for resolution at trial. Accordingly,

IT IS ORDERED that plaintiff's motion is denied.

---

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 2112865
Only the Westlaw citation is currently available.
United States District Court,
D. Nebraska.

AMERICAN HOME ASSURANCE COMPANY
and Cargill Meat Solutions Corporation, Plaintiffs,

v.

GREATER OMAHA PACKING
COMPANY, INC., Defendant.

No. 8:11CV270.  |  Signed May 20, 2014.

**Attorneys and Law Firms**

Thomas A. Grennan, Gross, Welch Law Firm, Omaha, NE, for Plaintiffs.

David J. Stubstad, Jordan W. Adam, Michael F. Coyle, Patrick S. Cooper, Fraser, Stryker Law Firm, Omaha, NE, for Defendant.

**MEMORANDUM AND ORDER**

LYLE E. STROM, Senior District Judge.

**\*1** This matter is before the Court on the motion (Filing No. *311* ) of the plaintiff Cargill to exclude evidence that Cargill was a "contributing cause" for the purpose of disclaiming GOPAC's warranties. Plaintiff Cargill has filed an accompanying brief (Filing No. 312) and index of evidence (Filing No. 313). The defendant filed a brief (Filing No. *399* ) in opposition to the motion. Cargill then replied with a brief (Filing No. 409) and index of evidence (Filing No. *410* ) in support of its motion. The Court will deny the motion.

**I. FACTUAL BACKGROUND**

An *E. coli* outbreak occurred in 2007 and gravely injured several people. An investigation traced the *E. coli* back to a ground-beef patty manufacturer, Cargill Meat Solutions, Corp. ("Cargill"), who is the plaintiff in this case along with American Home Assurance Company ("Assurance"). The plaintiffs have brought various contract claims against the defendant, Greater Omaha Packing, Corp. ("GOPAC"). Essentially, the plaintiffs claim that GOPAC sold Cargill meat contaminated with the *E. coli* strain in violation of a contract between GOPAC and Cargill.

Cargill used four sources of beef to produce the ground beef patties in question. Those sources were Lone Star Beef Processors, L.P. ("Lone Star"), Beef Products, Inc. ("BPI"), Frigorifico PUL ("Frigorifico"), and GOPAC. After production, Cargill distributed the patties across the United States. In the Fall of 2007, multiple people became ill due to *E. coli* O157:H7 (Filing Nos. 328, at 1; 278, at 3). The Center for Disease Control ("CDC") began to track the illness. The CDC compiled a "Line List" which comprised 54 people affected by the *E. coli* outbreak. After identifying 54 people affected by the *E. coli* strain, the CDC found that 27 of them reported exposure to Cargill's burgers (Filing No. 278, at 4). Cargill recalled approximately 845,000 pounds of product and has settled numerous claims against it with those injured by the contaminated meat.

At the center of the current motion is a one-page Guarantee between Cargill and GOPAC. Filing No. *313–1,* at 2. It is titled "General and Continuing Pure Food/Hold Harmless Guarantee."GOPAC guaranteed to Cargill that all articles, comprising each shipment or other delivery would not be adulterated, which included being free of *E. coli.*GOPAC further guaranteed that its articles would be legally transportable or sold. The Guarantee also stated it would be "void in the event any act or omission by [Cargill] shall be a **contributing cause** to any loss otherwise covered by the terms of this Guarantee."*Id.* (emphasis added).

In preparation for trial, GOPAC has retained several expert witnesses to testify that Cargill was a contributing cause to the *E. coli* outbreak. Cargill moves under Federal Rules of Evidence Rules 402 and 403 to exclude all evidence of Cargill's acts or omissions after GOPAC delivered its product to Cargill (Filing No. 311, at ¶ 1, ¶ 3). First, the Court addresses the scope of its analysis.

**II. LAW**
**\*2** The Court must evaluate whether Cargill's pending motion is merely a motion *in limine* or a motion for summary judgment. Though Cargill labeled the motion as one "*in limine,*" the substance of the motion will determine whether the Court will construe it as such. *See Bliss v. BNSF Rwy. Co.,* No. 4:12cv3019, 2013 WL 5570231, at \*2 (D.Neb. Oct. 9, 2013). "A motion in limine is 'any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered.'" *Id.* (citing *Louzon v. Ford Motor Co.,* 718 F.3d 556, 561 (6th Cir.2013)."A motion in limine is used 'to narrow the evidentiary issues for trial and to eliminate unnecessary trial

**American Home Assur. Co. v. Greater Omaha Packing Co., Inc., Not Reported in...**

2014 WL 2112865

interruptions;' in contrast, a motion for summary judgment is a mechanism for resolving non-evidentiary matters prior to trial."*Id.* Circuit courts have reversed district courts for granting *in limine* motions to bar the presentation of all evidence in support of the non-moving party's affirmative defenses in contravention of the procedural protections of the federal rules of civil procedure regarding summary judgment. *Id.; Louzon,* 718 F.3d at 562 (citing *Meyer Intellectual Props. Ltd. v. Bodum, Inc.,* 690 F.3d 1354, 1378 (Fed.Cir.2012); *Bradley v. Pittsburgh Bd. of Educ.,* 913 F.2d 1064, 1069–70 (3d Cir.1990); *Mid–Am. Tablewares, Inc. v. Mogi Trading Co.,* 100 F.3d 1353, 1363 (7th Cir.1996)). Therefore, the denial of this motion turns on whether Cargill's motion seeks to exclude all evidence of one of GOPAC's affirmative defenses.

## III. DISCUSSION

GOPAC has asserted the affirmative defense that "[t]o the extent that the Guarantee alleged in Plaintiffs' Complaint existed, such Guarantee is void for reasons including, but not limited to, the acts or omissions of Plaintiffs and/or their Affiliates as set forth therein."Filing No. 40, ¶ 14. This affirmative defense references the Guarantee and includes evidence of Cargill's failure to use finished-product testing, [1] Cargill's production and shipment of the burgers, Cargill's use of dated GOPAC product, and Cargill's failure to irradiate its burgers. Filing No. 399, at 9–10. Cargill has moved to exclude "any evidence of Carill's 'acts or omissions' " and is therefore a motion for summary judgment.

The close for motions for summary judgment in this case was March 3, 2014. Filing No. 18, at 2. Cargill filed the instant motion on March 10, 2014—seven days after the deadline for summary judgment. Filing No. 311. Therefore, the motion was improper and untimely. Because the Court cannot exclude all evidence of GOPAC affirmative defense in a motion *in limine,* the Court will deny the motion. *See Bliss v. BNSF Rwy. Co.,* No. 4:12cv3019, 2013 WL 5570231, at *2.

IT IS ORDERED that plaintiff Cargill's motion is denied.

Footnotes

1    Cargill has filed a separate motion *in limine* to exclude specific evidence regarding finished-product testing. Filing No. 301.

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**Ruth v. A.O. Smith Corp., Not Reported in F.Supp.2d (2006)**

2006 WL 530388

2006 WL 530388
Only the Westlaw citation is currently available.
United States District Court,
N.D. Ohio, Eastern Division.

Charles RUTH, III, Plaintiff,
v.
A.O. SMITH CORP., et al., Defendants

No. 1:04–CV–18912. | Feb. 27, 2006.

**Attorneys and Law Firms**

Christina M. Janice, John R. Climaco, Lisa A. Gorshe,
Climaco Lefkowitz Peca Wilcox & Garofoli, Cleveland, OH,
Don Barrett, Barrett Law Office, Lexington, MS, Richard
F. Scruggs, Scruggs Law Firm, Scott O. Nelson, Maples &
Lomax, Pascagoula, MS, for Plaintiff.

John H. Beisner, O'Melveny & Myers, Washington, DC, for
Defendants.

**MEMORANDUM AND ORDER**

OMALLEY, J.

\*1 The Court earlier issued a number of oral rulings on the
record in this case, [1] with the promise that it would later issue
one or more written memoranda confirming those rulings and,
in some cases, providing additional explanation. Thereafter,
the parties settled this case. The parties requested, however,
that the Court issue the promised written rulings anyway,
because the Court's oral rulings had implications for the entire
MDL, as well as related actions filed in state court.

Accordingly, this is one of several memoranda documenting
the Court's earlier rulings. [2] For the reasons and to the extent
stated on the record earlier, and for the additional reasons
stated below, [3] the Court hereby documents the following
rulings. [4]

- Defendants' Motion for Summary Judgment on Ruth's
Failure to Warn Claim (*Ruth* docket no. 66.1).

Defendants move for summary judgment on Ruth's failure to
warn claim, asserting that the warnings they placed on the
welding rods at issue were adequate as a matter of law. For the

reasons stated on the record and the additional reasons stated
below, this motion is DENIED.

The warning labels on the Hobart and ESAB welding rods
that Ruth used do contain warnings regarding welding fumes.
For example, both the Hobart and ESAB warning labels tell
the welder to "keep your head out of the fumes," and to
"use enough ventilation, exhaust at the arc, or both, to keep
fumes and gases from your breathing zone and the general
area."The Hobart label goes further, stating: "the following
chemicals and their oxides may be hazardous during welding:
* * *, manganese, * * *. Lung, nervous system, and allergic
skin reaction may result from overexposure."In contrast, the
ESAB label does not mention manganese, nor does it mention
anything about nervous system injury.

The Hobart and ESAB warning labels also each directed
Ruth to read the Material Safety Data Sheets ("MSDSs") that
accompanied the welding rods which Hobart and ESAB sent
to Ruth's employer, Ingalls Shipyard. Among other things,
the Hobart MSDS warned that "Long-term overexposure
to manganese compounds may affect the central nervous
system. Symptoms may be similar to Parkinson's disease
and can include slowness, changes in handwriting, gait
impairment, muscle spasms and cramps, and less commonly,
tremor and behavioral changes."The ESAB MSDS, again less
thorough, simply warned that "Overexposure to manganese
compounds may affect the central nervous system, symptoms
of which are languor, sleepiness, muscular weakness,
emotional disturbances, and spastic gait."

Under Mississippi law, which applies in this case, a
product warning is legally adequate if it "communicates
sufficient information of the dangers and safe use of the
product."Miss.Code Ann. 11–1–63. Defendants insist the
warnings they provided to Ruth are adequate as a matter
of law, because the warnings: (1) specifically addressed
the danger that manganese can cause neurological damage,
and (2) specifically explained that safe use of welding rods
included avoiding the inhalation of welding fumes.

\*2 The Court concludes, however, that there exist genuine
issues of material fact regarding whether the warnings
provided by both Hobart and ESAB in this case are legally
adequate. [5] These issues of material fact allow a reasonable
jury to find in favor of Ruth on his failure to warn claim.
Among other reasons, the Court reaches this conclusion
because it appears, on the evidence so far adduced, that
a jury could reasonably conclude that: (1) the MSDSs do

not "communicate sufficient information" that the danger of exposure to manganese comes from exposure to welding *fumes,* and not just the welding rod itself; (2) the warnings do not explain that welding fumes contain a substantially higher percentage of manganese than do the welding rods; (3) the warning to "use enough ventilation ... to keep fumes and gases from your breathing zone" does not "communicate sufficient information" to inform a welder how to use the welding rod safely, because "enough ventilation" is not defined; (4) the warnings did not sufficiently communicate the level and extent of the danger of inhaling welding fumes; (5) the warnings' use of a reference to a separate document —the MSDSs—did not serve as a sufficient mechanism to adequately and actually give notice to the intended warning recipient; and/or (5) the warnings given were inadequate in light of the defendants' history of having earlier provided welders with what a jury could conclude were grossly inadequate and possibly even misleading warnings. [6]

Further, the Court cannot conclude that, as a matter of law, Ruth's failure to warn claim is barred by the learned intermediary doctrine. Defendants assert they sufficiently discharged their duty to warn by "relying on intermediaries to warn end-users of the hazards associated with [their] products."Memo in support at 30. Specifically, defendants state they "adequately warned [Ruth's employer, Ingalls Shipyard], through their warning labels and MSDSs, of the potential risks of manganese overexposure, and the precautionary measures to be taken during the welding process to prevent such exposure."*Id.* at 32.Given the present state of the record, however, the Court finds a reasonable jury could conclude that defendants had certain knowledge regarding the extent of welding fume hazards and how to avoid those hazards, but defendants did not *fully* disclose this information to Ingalls Shipyard. Thus, Ingalls may not have been completely "learned" regarding the known hazards of welding, and so could not adequately warn Ruth. *See, e.g., In re: Norplant Contraceptive Prod. Liab. Litig.,* 215 F.Supp.2d 795, 803 (E.D.Tex.2002) ("[w]hen the warning to the intermediary is inadequate or misleading, however, the manufacturer remains liable for injuries sustained by the ultimate user"). Because a reasonable jury could conclude the defendants' warnings did not "communicate[ ] sufficient information of the dangers and safe use of the product" to Ingalls, the motion for summary judgment on Ruth's failure to warn claim, based on the learned intermediary defense, must also be denied.

**\*3** • Defendants' Motion for Summary Judgment on Ruth's Claim for Punitive Damages (*Ruth* docket no. 66.6).

The Court finds that, on the current record, it cannot conclude as a matter of law that no reasonable jury could find Ruth is entitled to punitive damages. Plaintiffs point to evidence that could allow a jury to conclude that, as of the date of Ruth's injury, defendants had access to information indicating that welding fumes posed health hazards for their workers, but defendants failed to take adequate steps to warn of or guard against those hazards, and may have participated in affirmatively hiding or downplaying the extent of those hazards. If accepted by a jury and left unrebutted, such evidence could support an award of punitive damages. Accordingly, this motion is DENIED. This denial, however, is without prejudice, meaning defendants may later move for judgment as a matter of law, pursuant to Fed.R.Civ.P. 50, on Ruth's claim for punitive damages. The Court notes the following aspects of its ruling on this issue: (1) it is generally preferable to wait until after all the evidence is in before addressing the legal sufficiency of a punitive damages claim, where one is authorized by law; accordingly, this Court normally will grant a summary judgment motion on this issue only in compelling circumstances not present in this case; and (2) as explained elsewhere, [7] the Court has determined that much of the evidence that would support a claim for punitive damages is also relevant and admissible for other purposes, so it is appropriate to allow the testimony to proceed and to make a determination later whether there will be a punitive damages charge to the jury.

- Ruth's Motion to Exclude Testimony by Experts Thomas and Schimmel (*Ruth* docket no. 91)

   - Ruth's Motion to Bar Evidence of Lawyer Advertising (*Ruth* docket no. 94).

   - Defendants' Motion to Exclude Evidence of Claims Brought by Other Welders after August 2000 (*Ruth* docket no. 106.1)

These motions are all GRANTED. Ruth stopped welding in August of 2000. Defendants concede that claims similar to Ruth's that were brought by other welders *before* this date may have some limited relevance regarding defendants' notice and knowledge of the health effects of welding; but defendants argue that lawsuits filed *after* this date are irrelevant, because they cannot possibly show defendants' notice or knowledge

as of the time Ruth was doing any welding. The plaintiffs respond that, even if not relevant to defendants' knowledge as of the date warnings were given, the spate of lawsuits now pending against the defendants is relevant to rebut defendants' current and continued assertion that there is simply *no* causal connection between exposure to welding fumes and the onset of neurological injury.

Separately, defendants assert that, if their motion to exclude evidence of lawsuits brought by other welders is overruled, they intend to introduce expert testimony showing that all of the recent welding lawsuits came in the wake of huge lawyer advertising. Defendants offer as experts Randall Thomas, who is a Mississippi psychologist, and Kurt Schimmel, who is a business professor and "advertising expert;" they both opine that the dramatic increase in welders' lawsuits is attributable mostly to advertising by plaintiffs' counsel, and not, for example, because welders generally got poor diagnostic health care before 2000. Plaintiffs respond by moving to exclude this evidence as inadmissible under both *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Fed.R.Evid. 403.

\*4 The Court need not fully reach the *Daubert* issues raised by plaintiffs, because the Court concludes the evidence of lawsuits brought by other welders must be excluded pursuant to both Fed.R.Civ.P. 403 and 611(a)(2). While plaintiffs are correct that a multiplicity of injury claims by welders is inconsistent with the notion that no harm can flow from exposure to welding fumes, defendants are also correct that the spark leading to the great number of recently-filed lawsuits is the combination of the advertising and screening processes used by plaintiffs' counsel to identify potential claimants. As defendants point out, moreover, the validity of the claims asserted in those cases remains untested. Given the complicated issues in this case, a jury's time would not be well-spent sifting through expert opinions regarding the efficacy of lawyer advertising, and debating the viability of thousands of lawsuits that are not before it. The Court, accordingly, finds that it is necessary and appropriate to exclude both types of evidence, as a matter of prudent trial management.

The Court adds the following caveat, however, so that the scope of this ruling is not misunderstood. The Court excludes reference to *lawsuits,* and evidence analyzing the arguable driving force behind those lawsuits having been filed. This ruling does not pertain to claims for disability filed by a welder directly with one of the MDL defendants, or with any employee benefit plan sponsored by or in any way affiliated with an MDL defendant. Those types of claims, and their allowance *vel non,* are generally not the product of lawyer advertising and may, indeed, be relevant to the credibility of a defendants' current disavowal of having reason to know of any connection between welding and neurological injury. Issues relating to these types of claims for benefits are not currently ripe and are not addressed by this ruling.

• Ruth's motion to exclude testimony from expert Krenek (*Ruth* docket no. 92).

In an earlier Order, the Court noted it would apply the same general limitations to defendants' warnings expert, Dr. Richard Krenek, as it would to plaintiffs' warnings expert, Robert Cunitz. *See* docket no. 1353 at 12–17. Thereafter, Krenek filed a supplemental, *Ruth*-specific expert report, and plaintiffs moved to exclude Krenek's testimony. This motion is GRANTED IN PART; as earlier stated, the Court will limit Krenek's testimony in generally the same manner as it will limit Cunitz's testimony, including exclusion of any "ultimate opinion" testimony. The Court cannot be more precise in the abstract, and will rule on any other objections on a question-by-question basis. [8]

• Ruth's Motion to Bar Admission of Lincoln's Warning Labels (*Ruth* docket no. 93).

This motion is CONDITIONALLY DENIED. Ruth asserts he never saw any Lincoln warning labels—he saw only Hobart and/or ESAB warning labels—so defendants should not be allowed to introduce any Lincoln warning labels at trial because they are irrelevant. Among other arguments, defendants respond by noting they have asserted the learned intermediary defense, and any pertinent information received *from any source* by the Ingalls Shipyard is relevant to show what Ingalls knew and what it passed on to Ruth. Indeed, defendants argue that the pertinent information received by Ingalls includes not only Lincoln warning labels but also various Lincoln publications on welding safety. Generally, the Lincoln warnings defendants seek to introduce are stronger than the Hobart and ESAB warnings.

\*5 The Court concludes that these Lincoln materials may be admitted, to the extent, and *only* to the extent, that defendants can first establish through testimony of Ingalls representatives that: (1) the particular warnings were actually received from Lincoln; and (2) the Lincoln warnings educated and informed Ingalls in a particular, meaningful way that

was in addition to any education and information provided by Hobart's and ESAB's warnings. A Lincoln warning would also be admissible if the evidence shows that Ingalls actually took action which was based specifically upon the additional education and information obtained from the Lincoln warning.

Thus, defendants may not show to the jury any Lincoln warning unless and until defendants have shown the warning was a substantial and specific basis for Ingalls' understanding of the dangers from welding fumes. In addition, Ruth may still testify (and his counsel may argue) that: (1) Ruth never saw the Lincoln warning labels; (2) the Lincoln warnings also remain inadequate to fully educate Ingalls of the hazards of welding fumes; (3) Ingalls did not pass on to Ruth what the Lincoln warnings said; and/or (4) defendants should have known Ingalls would or could not pass on the information contained in Lincoln's warnings. Any party may request a limiting instruction as to point (1) above, given the limited purpose for which evidence of the Lincoln warnings may be proffered.

• Ruth's Motion to Exclude Reference to Cunitz's Disqualification in Unrelated Cases (*Ruth* docket no. 95).

In at least four other cases, courts have ruled that Ruth's warnings expert, Dr. Cunitz, was not qualified to offer testimony. Ruth asks that evidence of these other disqualifications be excluded as irrelevant. This motion is GRANTED. The only relevant question is whether Cunitz is qualified to opine in *this* case, and the Court has answered that question affirmatively (though with limitations). Especially given the particular bases for the rulings in those other cases, any attempt by defendants to delve into Cunitz's disqualifications in other proceedings would confuse the jury, cause Ruth undue prejudice, and have the effect of undermining the rulings of this Court.

• Ruth's Motion to Bar Certain Psychological Evidence (*Ruth* docket no. 96).

For the reasons stated on the record, this motion is GRANTED IN PART. Given that Ruth claims his exposure to welding fumes caused neuro-psychological harm and emotional distress, the Court will allow introduction of some of the evidence addressed in this motion, to be strictly circumscribed by Fed.R.Civ.P. 403.

• Ruth's Motion to Bar Evidence of Previously Named Defendants (*Ruth* docket no. 97).

Defendants argue that Ruth's originally having named defendants other than Hobart and ESAB, and then dismissing them, is relevant and admissible to show Ruth's awareness of warnings issued by these other welding rod manufacturers. Defendants go so far as to state that Ruth's allegations, in his original complaint, are tantamount to admissions that Ruth had read these other manufacturers' warnings. The Court disagrees, and Ruth's motion is GRANTED. The fact that Ruth named certain defendants and then dismissed them after discovery is not an admission and is not relevant to any issue in this case.

**\*6** • Ruth's Motion to Exclude Evidence of Flying on Private Airplanes (*Ruth* docket no. 98).

Various fact and expert witnesses have used plaintiffs' counsel's private airplanes to attend depositions, hearings, medical appointments, and so on. Ruth seeks to preclude defendants from bringing out this information at trial, while defendants argue it is legitimate evidence of bias, in the same way as is evidence of an expert's hourly rates. The Court concludes the "private airplane" evidence is too attenuated to show bias, so the motion is GRANTED. Any impeachment on the basis of bias due to financial interests may be undertaken sufficiently by adducing evidence of how much a witness got paid, how often they have worked for a particular party (or type of party), and the extent to which their expenses were covered or reimbursed. Federal Rules of Evidence 403 and 611 counsel against delving into greater detail regarding which hotels experts use, in what restaurants they ate, whether they fly first class, and so on. This limitation will be applied equally to all parties.

• Ruth's Motion to Exclude Evidence of Collateral Sources (*Ruth* docket no. 99).

Ruth qualifies as an "employee" under the federal Longshore and Harbor Workers Compensation Act ("LHWCA" or "Act"). Accordingly, Ingalls Shipyard made a workers' compensation claim on Ruth's behalf under the Act.[9] Ruth has not received "compensation" under the Act, but he has received certain medical benefits. Ruth asserts these benefits qualify as collateral sources under Mississippi law and are not admissible as evidence: "[c]ompensation or indemnity for the loss received by the plaintiff from a collateral source, wholly independent of the wrongdoer, as from insurance, can

**Ruth v. A.O. Smith Corp., Not Reported in F.Supp.2d (2006)**

2006 WL 530388

not be set up by the [defendant] in mitigation or reduction of damages."*Busick v. St. John,* 856 So.2d 304, 309 (Miss.2003).

Defendants generally agree they cannot use collateral source evidence to show damage mitigation. But defendants argue that, for other reasons, they should be permitted to make reference to federal or state "health benefit programs" or "collateral sources," so long as these references are not connected with the payment of benefits to Ruth. In particular, defendants note that: (1) Ingalls Shipyard is the largest employer in Mississippi and has employed tens of thousands of welders over the years; and (2) Ingalls' Risk Manager, Steve Pierce, testified at a 30(b)(6) deposition that, other than Ruth, no worker has made a LHWCA or related claim against Ingalls for neurological impairment as a result of welding in the past 64 years. Defendants want to adduce this evidence to show that, despite the exposure of tens of thousands of other welders to welding fumes, none has suffered an injury similar to Ruth's.

The Court concludes the motion must be GRANTED in part, to the extent that no witness may refer to LHWCA or any similar benefits program, or to Ruth's having received LHWCA or similar benefits. However, the Court will allow Pierce to testify that he reviewed "medical claims" made by Ingalls Shipyard welders over the last 64 years and he has no knowledge of any claim ever being made by any welder for neurological impairment. The parties stated they will work out a stipulation that addresses their concerns.

> \*7 • Ruth's Motion to Bar Testimony Regarding PET Scans(*Ruth* docket no. 100).

The Court earlier denied a *Daubert* motion filed by plaintiffs, on the master docket, seeking to strike or limit testimony relating to PET scans (MDL docket no. 964). The question remained, however, whether the defendants would be permitted to ask Ruth himself, at trial, about his reasons for choosing not to undergo a PET scan. The Court concludes that this line of questioning, when directed at a person who is not a learned professional or sufficiently educated regarding the science behind (or risks and benefits of) a PET scan, would be confusing and unfair. Accordingly, this motion is DENIED, pursuant to Rule 403. Defendants may, of course, establish that Ruth has not undergone a PET scan, but they may not address his willingness *vel non* to have one. [10]

> • Ruth's motion to exclude certain testimony of Zimmerman (*Ruth* docket no. 101).

Plaintiffs named Dr. Neil Zimmerman as an "MDL core expert" on industrial hygiene—not on warnings—but they do not intend to call Zimmerman at the *Ruth* trial. When defendants asked Zimmerman at deposition whether "warnings on welding consumables were adequate in the 1990s," Zimmerman opined "they were adequate." Zimmerman also wrote in his declaration that welders were not adequately warned "until the 1990s." Defendants argue this testimony is admissible because it is relevant, qualifies as an admission, and also may come in for "any purpose" under Rule 32(a)(3)(B).

Ruth insists the testimony is irrelevant because Zimmerman was not opining particularly about the Hobart and ESAB warnings at issue in this case. Further, Ruth points to Zimmerman's full testimony, where he: (1) explains that each label has to be examined individually to see when it "is getting to be adequate;" and (2) seems to suggest there is a difference between adequately disclosing a hazard as required by law, and adequately warning a welder of generic or general hazards. Ruth also argues there is no rule or policy that a defendant can introduce testimony of an MDL core expert in a given case, if that particular plaintiff does not intend to call him as a witness. Ruth contends, moreover, that this is especially true where the substance of the testimony to be elicited falls outside the subject area for which the expert was designated.

The Court agrees with defendants' general proposition that an opponent's expert's testimony may be admissible as an admission, even if the opponent does not actually call the expert. And the Court further agrees with defendants that it has the discretion to admit Zimmerman's statements. Finally, the Court agrees that plaintiffs' counsel sufficiently designated Zimmerman as an expert who might be called in *Ruth,* so that his testimony would be admissible in *Ruth,* even if Ruth does not actually call him as a witness.

The Court does not, however, believe Zimmerman made a clear admission that is admissible in *Ruth,* for the following reasons. With regard to the *Ruth* defendants, Zimmerman was not shown any Hobart documents, only ESAB documents, and his "admission" goes only to an ESAB MSDS, not to a warning label. As to this document, he stated that it is generally "adequate," but only after giving lengthy and somewhat complicated testimony defining what this term means to him. Critically, his definition of 'adequate" is different than the legal terminology and standard that would

be included in a jury instruction on when and whether a warning is legally sufficient.

**\*8** Ultimately, for Zimmerman's "admission" to be allowed into evidence at the *Ruth* trial at all, it would have to be accompanied by Zimmerman's explanation, as well. The sum of Zimmerman's testimony, then, would be unduly confusing to a jury, carry very little probative value to the defendants' case, and, in the end, carry no clear "admission." Further, admitting this testimony and any rebuttal would take a fair amount of time. Given that each party has other witnesses to testify about the particular warnings at issue, and pursuant to Fed.R.Civ.P. Rules 611 and 403, the Court concludes the motion *in limine* must be GRANTED.

The Court adds, however, that this ruling applies only to these defendants (Hobart and ESAB). Zimmerman's discussion of warnings issued by other defendants (e.g., Lincoln) goes beyond his discussion of the ESAB MSDS—that is, as to other warnings, he goes beyond merely stating they are "adequate," as he defines that term—so other statements he made *may* be admissible in a different case. [11]

• Ruth's Motion to Bar Evidence of Other Possible Causes of His Injury (*Ruth* docket no. 102).

With this motion, Ruth states he "anticipates that Defendants will attempt to submit evidence of possible other causes of [his neurological injury], specifically evidence regarding poisoned well water, genetics, Gulf War syndrome, and carbon monoxide exposure."Ruth also suggests defendants will point at the primer that was painted on some of the steel he welded, and even to his having repeatedly showered in manganese-containing water, as possible toxins that caused his injury. Ruth argues none of this evidence should be allowed because there is no basis (and no expert opinion) to show any of these agents can cause his particular set of symptoms or disease.

In response to Court questioning, defendants explained they intend only to adduce evidence of "other sources of manganese in [Ruth's] work environment."Tr. at 40–41 (Aug. 30, 2005). [12] Defendants explain that their industrial hygienist, Daniel Chute, can testify regarding various common activities that occur in the Ingalls Shipyard (such as metal-grinding, - cutting, -blasting, and painting) that yield exposure to manganese.

The Court concludes that, based on defendants' representations of what they intend to adduce, the motion must be DENIED; however, the Court adds the following caveats. Chute may testify that a given activity takes place at Ingalls Shipyard and is a source of manganese exposure, but only if the defendants first lay a foundation that, in fact, Ruth could have been exposed to that particular activity or source of manganese. Chute may, if appropriate, also testify that there exist governmental or other regulations regarding manganese exposure limits with respect to these other activities. Finally, Chute may *not* testify or opine that any of these activities did or can cause neurological injury, as he is not qualified to do so; his testimony must be limited to the possibility of manganese exposure from these other sources, and not the possible effects of such exposure. Plaintiffs are also free, of course, to cross-examine Chute regarding his inability to causally link the exposures he identifies to the type of neurological injury claimed.

**\*9** • Ruth's Motion to Exclude Evidence of Negative Economic Impact (*Ruth* docket no. 103).

Ruth moves to exclude evidence that a punitive damages award would cause defendants to suffer certain negative economic impacts, such as higher insurance premiums and having to lay off workers. Beyond the fact that any such effect (or at least the degree) is uncertain and unpredictable, Ruth asserts such evidence is unduly prejudicial and immaterial to an award of punitive damages. Defendants respond that a jury is charged with considering the "economic effects" of an award of punitive damages when determining the proper amount, and that the possibility of higher insurance premiums and lay offs are probative economic effects.

One factor a jury may consider when determining whether and to what extent a punitive damages award is appropriate in a given case is the defendant's ability to fund any such award. Accordingly, the Court concludes the law allows defendants to present witnesses to provide testimony that, if a particular punitive damages award is given, there would be a negative economic effect on the defendants, including the effects to which Ruth objects. Thus, the motion is DENIED. The Court adds, however, that it will limit any such testimony to ensure there are no unnecessary or unsupported appeals to sympathy.

• Ruth's Motion to Exclude Hobart Witness Russ McClellan (*Ruth* docket no. 162).

Pursuant to Fed.R.Civ.P. 30(b)(6), Hobart designated Eugene Sabel as its witness to discuss, among other topics,

"Hobart's communications with Ingalls [Shipyard] re: Hobart welding products and their health effects."When asked at his deposition what Hobart had told Ingalls regarding the health effects of manganese in welding fumes, Sabel answered: "I'm not aware of anything that I told them and I'm not aware of anything that anybody else in our company has told them at this point."Sabel repeatedly confirmed his belief that neither he nor any other Hobart employee communicated anything to Ingalls about the health effects of manganese in welding fumes. Separately, Ingalls' Fed.R.Civ.P. 30(b)(6) designee, Winston Howell, testified that Sabel was Hobart's contact person with Ingalls, and no one else from Hobart would have communicated with Ingalls about Hobart products. Ruth asserts this testimony, taken together, proves Hobart did not give Ingalls at least some of what a learned intermediary needs to be "learned" about the hazards of welding fumes.

In its most recent witness list, however, Hobart did not list Sabel; instead, Hobart listed Russ McClellan as the witness who would testify about "the availability of safety information and communications with Ingalls."While Sabel was Hobart's contact person with Ingalls before 1997, McClellan was Hobart's contact person with Ingalls some time thereafter. Ruth argues this tactic is unfair and inappropriate, and he cites case law where "replacement" or "additional" 30(b)(6) witnesses have been precluded from testifying. Ruth also argues that being forced to impeach McClellan with Sabel's deposition will be confusing to the jury.

**\*10** Hobart agrees with Ruth that it is bound by Sabel's testimony, but Hobart asserts that "being bound" is not tantamount to a judicial admission—Hobart argues it can still call another witness who may testify differently than did Sabel. Hobart also disagrees that a jury will be unduly confused. Because the Court agrees with Hobart, Ruth's motion is DENIED. Generally, testimony from a 30(b)(6) witness can be contradicted or used for impeachment at trial, just like any other deposition testimony; it is only when a party first provides a *non-responsive* 30(b)(6) deponent and later tries to call a more-responsive witness at trial that courts have excluded the witness. Accordingly, Hobart may call McClellan at trial, with the understanding that Ruth may: (1) proffer Sabel's deposition testimony in Ruth's case-in-chief; (2) adduce the fact that McClellan was not designated until after Sabel had testified; and (3) use Sabel's testimony for any other relevant purpose (including impeachment of McClellan).

• Ruth's Motion to Exclude Evidence Re: Employers' HazCom Duties (*Ruth* docket no. 164).

With this motion, Ruth challenges certain testimony defendants seek to elicit from their Industrial Hygiene experts regarding the Hazard Communication Standard ("HazCom"), 29 C.F.R. § 1910.1200, which was promulgated by the Occupational Safety and Health Administration ("OSHA"). Ruth states the defendants' experts intend to discuss the duties, under HazCom, of employers to convey warnings to employees, and will then "opine or insinuate" that Ingalls "complied with the provisions of OSHA or HazCom."Specifically: "Defendants intend to have experts Chute, Boelter, and Krenek read portions of OSHA and HazCom to the jury and then testify to the jury: (1) what *they* think these regulations mean; (2) what *they* think Ingalls' obligations under the regulations are; and (3) whether *they* think Ingalls complied with those regulations."Motion at 3 (emphasis in original). Ruth argues this is inappropriate because: (1) testimony explaining how a statute or regulation works and what it means invades the province of the Court; (2) testimony opining that Ingalls complied with its legal duties under HazCom invades the province of the jury; and (3) such testimony is wholly irrelevant anyway, because the manufacturer's duties to Ruth are separate from Ingalls' duties to its employees.

In response, defendants argue that what the employers' duties are under HazCom, and whether Ingalls met those duties, is highly relevant. Defendants assert that the question of what warnings were required depends on all the circumstances of the product user and his environment, and those circumstances necessarily include what the manufacturer could reasonably expect an employer to tell its employees, as required under HazCom. For example, defendants note their warnings refer employers of welders, as well as welding rod users, to OSHA regulations and the MSDSs required under HazCom, "incorporating them by reference." Defendants also note that the "adequate ventilation" referred to in their warnings is necessarily provided by the employer, not the manufacturer, and the OSHA regulations make this clear.

**\*11** The Court concludes Ruth's motion to exclude evidence of employers' duties under HazCom must be DENIED, but adds certain caveats. Testimony regarding HazCom requirements, and Ingalls' efforts to comply therewith, is relevant to many issues in this case, including the learned intermediary doctrine, what "all the circumstances" were surrounding the product's purchase and use, and (at least

in Mississippi) comparative fault. A central question in this case is whether defendants acted reasonably in determining what warnings they needed to supply to the ultimate users of their welding rod products, knowing that the HazCom regulation existed and that employers also had certain related duties. Accordingly, defendants' experts may testify about *the defendants' understanding* of what HazCom required and how the defendants endeavored to meet those requirements. The Court will be careful, however, to exclude any "ultimate conclusion testimony" opining whether a defendant did meet any given legal requirement. Further, the Court will strictly limit any expert's attempt to explain the meaning of any terms or provisions in any statute or regulation. Ruth will have to object, if appropriate, to any such testimony on a question-by-question basis.

• Plaintiffs' Motion to Exclude the Testimony of Laurence Fechter and Brian Buckley (MDL docket no. 966).

Various experts for both plaintiffs and defendants have addressed the question of whether manganese in welding fumes is "bio-available," meaning whether (and the degree to which) various physiological mechanisms and processes enable the human body to absorb the particular manganese compounds and particle structures contained in welding fumes. The Court discussed some of this science earlier, in the context of deciding the admissibility of testimony from plaintiffs' expert Jerome Roth. *See* MDL docket no. 1353 at 20–23.

Plaintiffs now move to exclude the testimony of two of defendants' core experts, Brian Buckley and Laurence Fechter. To oversimplify somewhat, Buckley's principal opinion is that manganese in welding fumes is not "bio-soluble" in lung fluid; Fechter's principal opinion is that manganese in welding fumes poses no neurotoxicological hazard, because: (1) the various physiological pathways that could allow manganese to reach the brain (including pathways involving lung fluid) do not combine to carry sufficient amounts of manganese to the brain to cause any harm, and (2) the precise form and structure of the manganese compounds that are contained in welding fumes have low bio-availability.

Plaintiffs first argue that these opinions do not survive the *Daubert* standard, because the principles and methods the two experts use are not scientifically reliable. [13] Having read the experts' declarations and the lengthy briefs submitted by both sides, and having heard argument and testimony at

the *Daubert* hearing, the Court disagrees with this particular argument. As to both Buckley and Fechter, their opinions are sufficiently grounded in the scientific method to pass the *Daubert* standard. Certainly, there are substantial weaknesses in their methodologies that cross-examination can and did expose, and there is much about the conclusions they reach which is questionable in light of the compelling scientific testimony proffered at the hearings; but the Court concludes that: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."Fed.R.Evid. 702.

**\*12** For a different reason, however, the Court concludes it is appropriate to exclude the testimony of Buckley. Buckley testified at length during the Court's *Daubert* hearing and explained the scientific basis for his opinion that manganese contained in welding fume is not soluble in lung fluid, which has a pH of about 7.5. Buckley further explained that he did not investigate, and/or had no opinion regarding, other physiological mechanisms that might allow manganese in welding fume to move from the lung to the blood stream (such as the role of macrophages in the lungs, or the role of the mucociliary escalator in moving matter from the lungs to the digestive tract). Buckley also professed no opinion regarding the ultimate bio-availability of manganese contained in welding fumes. The sum and substance of Buckley's opinion, then, was simply and only that manganese contained in welding fumes is not soluble in lung fluid alone.

This contention, however, is not at issue—there is no plaintiffs' expert who has opined that absorption of manganese by lung fluid, alone, is a significant pathway leading to manganese in the brain. [14] Indeed, there appears to be no debate, either in this case or in the relevant scientific field, regarding the correctness of Buckley's ultimate and only conclusion. Given the length of this trial and the multitude of other scientifically complicated issues, the Court concludes Buckley's testimony would take too much valuable trial time without any beneficial purpose. The ultimate touchstone governing admissibility of expert testimony is whether it will assist the trier of fact, and the Court concludes Buckley's testimony will not provide substantial assistance. Buckley's experiments and opinions, though interesting to listen to, are too much ado about nothing that is material, so exclusion is appropriate under Fed.R.Civ.P. 611(a). [15]

The Court further finds, moreover, that Buckley's testimony must also be excluded under Fed.R.Evid. 403. Spending

substantial time analyzing and appearing to debate a non-debatable proposition could mislead the jury into believing that plaintiffs proffer a scientific case which they do not, and which is easily rebutted. In other words, Buckley's testimony would have the effect of putting up what is no more than a straw man which, because of the scientific complexity of the testimony, the jury could be confused into believing is important.

For the same reasons, the Court concludes that those portions of the opinions of defendants' expert Fechter and plaintiffs' expert William Longo that rely upon or refer to Buckley's experiments and opinions must also be excluded. Thus, for example, Longo's testimony about modifying Buckley's experiments by lowering the pH of the synthetic lung fluid is excluded, as it would not be helpful to a jury and does not meaningfully help to resolve any issue in dispute. Similarly, Fechter need not refer to Buckley's studies to show that only about 1–2% of manganese contained in welding fume is soluble in lung fluid alone; Fechter can merely state the fact, which is undisputed. These rulings will greatly streamline the presentation of proofs in this case and yet have no material effect on their substance.

**\*13** For all these reasons, plaintiffs' motion to exclude Buckley is GRANTED, and the motion to exclude Fechter is DENIED.

• Defendants' Motion to Exclude Testimony from Glenn Harrison (MDL docket no. 1373).

Dr. Glenn Harrison is plaintiffs' MDL core expert on lobbying; he is an Economics Professor who specializes in how government regulation and marketplace economics intertwine. Harrison's declaration explains that one way economists analyze government regulation is by using supply and demand concepts: politicians supply workplace regulations, workers demand them, and monopolies can arise where the regulated industry "captures" the regulators, so that regulation is somewhat illusory. This economic theory is decades old and has been applied to many industries, including regulation of the legal bar. [16] Harrison ultimately opines that the welding industry engaged in "unacceptable lobbying activities" by withholding information from regulators and putting industry cost ahead of worker safety. In his declaration, Harrison explicitly refers to and relies upon the opinions of another plaintiffs' expert, Dr. Hoffman, whom this Court previously ruled could not testify about business ethics. *See* MDL docket no. 1353 at 36–42.

Defendants argue that Harrison's testimony must be excluded for two overriding reasons. [17] First, defendants insist that Harrison's conclusion that the industry engaged in "unacceptable practices" is reminiscent of Hoffman's inadmissible, subjective conclusion that the industry engaged in "unethical practices." Defendants state that, like Hoffman's testimony, Harrison's conclusion is not based on the correct legal standard, ignores their First Amendment rights, usurps the jury's role, and is irrelevant to any issue in the case.

While the Court agrees that Harrison cannot opine that the industry did anything "unacceptable," the Court disagrees that *all* of Harrison's testimony must be excluded. In particular, the Court finds that the following opinions, contained in Harrison's declaration, are generally admissible under *Daubert* and the Federal Rules of Evidence: (1) the welding industry had an economic interest in affecting workplace regulation related to manganese exposure, and also in affecting regulations related to defendants' government contractor defense; (2) different health standards for manganese exposure reflect different trade-offs between worker safety and economic feasibility; (3) the welding industry had an economic incentive to discourage decreases in allowed or recommended manganese exposure levels set by regulators; and (4) the information that the industry chose to give to regulators was affected by economic interests. Further, Harrison can testify generally on how the marketplace and government regulation interact.

In sum, the Court concludes that the motion to exclude Harrison's testimony must be DENIED. But Harrison may not rely on the opinions of Hoffman, and may not opine that, in his view, the welding rod industry engaged in "unacceptable" activity.

**\*14** • Defendants' Motion to Exclude Testimony from Dr. Roth (MDL docket no. 972).

Earlier, this Court addressed the question of whether Dr. Roth was qualified to testify about the mechanisms of human absorption of manganese particles found in welding fume, and the subsequent distribution and effects of those particles in the human body. *See* docket no. 1353 at 20–23 (concluding he was qualified). The defendants have also moved to exclude Dr. Roth's opinions under *Daubert* on the basis that they are not scientifically reliable. *See* Omnibus Daubert Motion (docket no. 972.1) at 35*et seq.* In particular, defendants assert there is no reliable scientific evidence to support Dr. Roth's

(or any other expert's) opinions "(1) that manganese contained in welding fume can enter the brain through the olfactory system, (2) that manganese from welding fume is solubilized and made bioavailable by macrophage, (3) that manganese from welding fume is transported across cells that line the lung, and (4) that the Divalent Metal Transporter ("DMT") plays any role in the transport of manganese across the blood-blain barrier."*Id.* at 36.*See*docket no. 1353 at 21 n. 16 (summarizing Dr. Roth's discussion of various physiological mechanisms that allegedly transport manganese particles in welding fumes to the brain).

Having reviewed the parties' arguments and evidence, the Court concludes this motion must be DENIED. With regard to Dr. Roth's opinion that manganese particles contained in welding fumes are solubilized in the lung by macrophage lysosomes, thus becoming bio-available, defendants' own experts conceded that macrophages can solubilize manganese; the true debate is the *extent* to which solubilization occurs, and whether and how any solubilized manganese particles reach the brain. As to this latter question, at least some of defendants' own experts, again, conceded that manganese does pass from the lung to the blood stream somehow, that manganese does cross the blood/brain barrier somehow, and that manganese does deposit in certain areas of the brain somehow—even though defendants insist the *precise* mechanisms proposed by Dr. Roth are not scientifically reliable explanations of how all of these things occur. While defendants' challenges to Dr. Roth's explanations certainly highlight gaps in current medical understanding, the Court concludes that Dr. Roth's opinions are not so untethered from the scientific method and from reliably collected data that his opinions are inadmissible under *Daubert*. [18]

The Court adds that the question of admissibility is closer with respect to certain parts of Dr. Roth's opinions than others. For example, the Court is confident that the dictates of *Daubert* do not call for exclusion of Dr. Roth's opinions and explanations regarding macrophages, DMT, and the mucociliary escalator. As noted above, while defendants can debate the niceties regarding how manganese from welding fumes enters the brain once it is in the lungs, that debate is at the margins —there is substantial scientific support for the proposition that it does so. A closer question is presented regarding Dr. Roth's opinions and explanations related to the "olfactory pathway," where he contends that manganese particles in welding fumes also obtain relatively direct entry to the brain through the nasal cavity and olfactory system. Virtually

all of his opinion testimony on this issue is based on rat and other animal studies, and defendants correctly criticize extrapolation to humans from these animal studies, because the olfactory pathways of rats and humans have dissimilar physiological structures. The Court ultimately concludes, however, that admission of this testimony is appropriate. Defendants' own experts, including Drs. Fechter and Olanow and others, themselves rely on animal studies to test or prove certain theses regarding human physiology. Accordingly, Dr. Roth will be permitted to testify about the olfactory pathway, and defendants will be allowed wide latitude on cross-examination to challenge whether the animal studies and other facts upon which Dr. Roth relies are sufficient to support his opinions.

**\*15** • Defendants' Motion to Exclude Testimony Regarding the "Welding Fume Study" (MDL docket no. 972.2).

Earlier, this Court addressed the question of whether Mr. Ewing and Dr. Zimmerman were qualified to testify about medical causation and toxicology. *See*docket no. 1353 at 18–20 (concluding they were qualified). The defendants have also moved to exclude testimony from these two Industrial Hygienists regarding an experiment they helped to conduct known as the "Welding Fume Study." [19] The Welding Fume Study was designed to, among other things, "quantify personal breathing zone welding fume and manganese exposures for welders and their potential helpers when performing Shielded Metal Arc Welding (SMAW) in confined spaces, with varying amounts of general dilution ventilation."Motion at 75. In particular, a room-sized test chamber of known dimensions was created, inside of which a welder was engaged to practice his trade using different types of welding rods. The ventilation rate to the chamber was manipulated and measured, and air samples were collected from under the welder's mask, near his shoulder outside of his mask, and in various spots throughout the chamber (both upstream and downstream from the ventilation flow around the welder). The samples were then evaluated for welding fume and manganese particle levels. Ultimately, manganese levels in all of these locations were assessed for five different ventilation rates, for each of three different welding rods.

Defendants object to the admissibility of any testimony regarding the Welding Fume Study, arguing that the Study is not scientifically reliable. Defendants point out, for example, that: (1) the Study has not been replicated by Ewing or Zimmerman or anybody else; (2) the measurements taken

in the Study did not involve repeat sampling; (3) the room-size and ventilation conditions chosen in the Study did not duplicate any actual conditions for any known welder; and (4) the Study did not examine or attempt to replicate other known variables that affect airborne manganese levels, such as the voltage of the welding machine, the welder's work position, and so on. Defendants also assert that the Welding Fume Study was funded by plaintiffs' counsel and conducted solely for purposes of this litigation. Defendants argue that all of these criticisms illustrate that the Study is not admissible under *Daubert.*

While defendants certainly expose weaknesses and limitations inherent in the Welding Fume Study, the Court concludes these circumstances do not require the Study to be completely excluded from evidence. Plaintiffs explain they do not intend to suggest that their Welding Fume Study actually mimics the conditions a particular welder experienced, or accurately quantifies the historical exposure to welding fumes or manganese particles that a particular welder sustained. Rather, the Welding Fume Study merely provides a reference point against which a particular welder's circumstances may be compared. Thus, if a welder testifies he welded mostly outside, using low-fume welding rods, there is a reasonable basis for an expert to opine that the manganese levels measured in the air samples in the Welding Fume Study were probably higher than those the welder experienced; conversely, if the welder worked inside of very small, enclosed spaces with little airflow, using a high-fume product, an expert has a basis to opine that the manganese levels measured in the air samples in the Welding Fume Study were probably lower than those the welder experienced.

*16 Plaintiffs explain that the Welding Fume Study is simply one data point, or reference point, that their experts might use to establish historical exposure. Other relevant information to establish historical exposure would include the welder's explanation of his own working conditions, any air sampling done in the welder's workplace, the OSHA welding sample database, other data available from the welder's employer and Workers' Compensation insurance carrier, measurements from other fume studies by NIOSH, and AWS standardized procedures for estimating welding fume exposure levels. Even if all of these data and protocols can serve as a basis only to show that the welder was likely exposed to "more than" a certain level of manganese particles —as opposed to definitely exposed to an exact, known level of manganese particles—this information is normally relevant and admissible. *See Curtis v. M & S Petroleum,*

*Inc. .,* 174 F.3d 661, 671 (5th Cir.1999) (reversing exclusion of expert opinion where the expert witness was able to conclude only that the plaintiffs were "exposed to benzene at levels several hundred times the permissible exposure level," because "the law does not require Plaintiffs to show the precise level of benzene to which they were exposed").

In sum, the methodology of the Welding Fume Study is sufficiently empirical, reliable, and scientific to survive the *Daubert* standard, given the comparative purpose for which plaintiffs seek to offer it. Further, defendants are fully capable of revealing to a jury the limitations which they believe make any referential comparisons to the Welding Fume Study nugatory. Finally, the Court notes that its decision on this issue is also informed by having reviewed other motions and documents in this case which make clear that defendants' own experts (e.g., Drs. Fechter and Olanow) use mechanisms and data to calculate historical estimates of welding fume exposure that are no more precise than the Welding Fume Study. Accordingly, the motion to exclude testimony relating to the Welding Fume Study is DENIED. [20]

- Defendants' Motion to Exclude Causation Testimony (MDL docket no. 972.2).

As have been most of defendants' evidentiary motions, the defendants' motion to exclude testimony of causation ("Causation Motion") was in part a motion *in limine,* and in part a motion for summary judgment. The *in limine* aspects of the Causation Motion were directed mostly at exclusion of testimony from expert witnesses who opined about physiological mechanisms that allegedly allow manganese particles in welding fumes to cause permanent brain damage. Elsewhere in this and other opinions, the Court has addressed these *in limine* contentions.

The summary judgment aspect of the Causation Motion is very similar to issues raised by the defendants earlier in their "PD Motion." As defendants explain:

> Defendants previously-filed [PD Motion] discusses the absence of a causal link between Parkinson's Disease and exposure to *any* form of manganese. [The Causation Motion] is focused on a similar lack of scientific evidence linking any other form of movement disorder and exposure to the manganese contained in low

**Ruth v. A.O. Smith Corp., Not Reported in F.Supp.2d (2006)**

2006 WL 530388

manganese mild and stainless steel welding fume.

**\*17** Causation memorandum at 3 n. 1 (emphasis in original). Given this similarity in focus and the Court's prior rulings, the Causation Motion may now be ruled upon summarily.

Defendants filed their Causation Motion before the Court issued its opinion finding that the PD Motion was not well-taken. *See* docket no. 1353. Obviously, there is an overlap of issues addressed in the PD Motion and the Causation Motion; indeed, many of the same arguments and same citations to cases and medical studies appear in each. The overriding theme of the Causation Motion is that plaintiffs do not have sufficient epidemiological or other evidence to prove general causation.

The Court believes reference to its Order denying the PD Motion, and to its discussion in this opinion of Dr. Roth's testimony, sufficiently answers the questions posed by defendants' summary judgment arguments on this issue. Put simply, for the same reasons stated earlier, and based on a careful assessment of the scientific data submitted by the parties regarding the movement of manganese into and through the human body, the Court concludes the Causation Motion must be DENIED. The evidence so far presented is sufficiently reliable to support the assertion that exposure to low-manganese welding fumes can cause, contribute to, or accelerate a movement disorder, including a parkinsonian syndrome that some doctors will diagnose as PD.

IT IS SO ORDERED.

Footnotes

1   *See, e.g.,* hearing transcript at 42–142 (Aug. 8, 2005); hearing transcript at 33–64 (August 30, 2005). The Court issued rulings on motions pending in both this specific case, and also on motions aimed at all MDL cases pending on the master docket.

2   The Court earlier issued a written memorandum confirming its oral rulings on defendants' motion for summary judgment on Ruth's conspiracy claim and defendants' motion for summary judgment based on the government contractor defense. *See Ruth* docket no. 180. In a future Order, the Court will confirm in writing its rulings regarding Ruth's motion to exclude evidence regarding allocation of alleged fault on the part of Ingalls Shipyard (*Ruth* docket nos. 105 & 115).

3   To the extent the parties intend to rely on these rulings in other MDL cases, the Court notes that this opinion and the hearing transcripts of the Court's oral rulings should be read together; neither, alone, contain all of the reasons behind the Court's rulings.

4   Even though this Order documents rulings issued earlier, and even though the *Ruth* case has now settled, for ease of reading the Court phrases this Order in the present tense instead of the past tense, and as if the *Ruth* case was still going to trial.

5   Of course, given that ESAB's warnings were less specific than Hobart's warnings, this ruling applies even more strongly to ESAB.

6   With regard to this last point, Mississippi law states that "[a]n adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates sufficient information on the dangers and safe use of the product, *taking into account the characteristics of, and the ordinary knowledge common to an ordinary consumer who purchases the product.*" Miss. Code Ann. § 11–I–63(c)(ii) (emphasis added). The "ordinary knowledge common to an ordinary [welder]" regarding the danger of welding fumes must be measured, at least in part, by the information and warnings given by the defendants to welders historically. On the evidence so far adduced, a jury could reasonably conclude that a modern warning by a defendant to a welder was inadequate because it did not sufficiently take into account "ordinary knowledge," where the defendants' historical dissemination of public information underlying that knowledge was, for many years, inadequate or misleading. Put differently, if published in a void, a manufacturer's warning that it is dangerous to use a product in a certain way might be adequate; but a jury could reasonably conclude the same warning is *inadequate,* if published after many years of statements by the manufacturer that using the product in that way is *not* dangerous.

7   *See generally* hearing transcript (Aug. 10, 2005); hearing transcript (Sept. 2, 2005); and *see* hearing transcript (Aug. 8, 2005) at 94–95 ("I'm not guaranteeing that I'm going to charge the jury on punitive damages, but I am going to withhold judgment on the issue at this point. In other words, I'm going to make that decision at the close of all of the evidence. Except in extreme cases, I rarely deal with punitive damages in the summary judgment context, and here because I find that the evidence that would support the punitive damages argument is relevant for other purposes, it makes sense to allow the testimony to proceed and to make a determination before I charge the jury whether there will be a punitive damages charge.").

8   The Court addresses Krenek's opinions about about Ingalls' Hazard Communications Program below, in its discussion of Ruth's motion to exclude evidence re: employers' HazCom duties (*Ruth* docket no. 164).

9   LHWCA is basically a federal workers compensation law that applies to persons working on ships located on or near navigable waters.

**Ruth v. A.O. Smith Corp., Not Reported in F.Supp.2d (2006)**

2006 WL 530388

10    After the Court issued this ruling, Ruth did undergo a PET scan. Nonetheless, the Court intends to apply the same reasoning to other cases in this MDL, absent good reason to reconsider its position.

11    While the Court certainly understands why defendants would want to introduce the statement of an expert hired by *plaintiffs* that a defendant's warning sufficiently apprised a welder of the dangers from welding and welding fumes, the value to defendants of such evidence is only as good as the clarity of the admission. The clarity of Zimmerman's statements regarding various warnings varies substantially.

12    This explanation was somewhat different from the one contained in defendants' response brief, which suggested defendants wanted to point to a broader array of toxins than just other sources of manganese in the workplace. As the Court noted at the hearing, however, defendants had no evidentiary basis (expert opinion or otherwise) upon which to base the assertion that many of these other toxins could cause the symptoms and injury suffered by Ruth.

13    Plaintiffs do not argue that either Buckley or Fechter are not sufficiently qualified.

14    Plaintiffs' expert Roth, for example, opines that manganese inhaled into the lung reaches the brain through two different avenues, neither of which involves direct absorption by lung fluid. *See* MDL docket no. 1353 at 21 n. 16.

15    Rule 611(a) states that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."

16    The Court, accordingly, concludes that Harrison's testimony passes the *Daubert* standard. Both the principles and methods used by Harrison, as well as his application of those principles and methods to the facts of the case, are sufficiently reliable; and Harrison is sufficiently qualified to offer the opinions he sets out in his declaration.

17    In their motion, defendants actually provide "four arguments" why Harrison's testimony should be excluded, but the first three arguments are all closely related.

18    *See Daubert,* 509 U.S. at 590 ("Of course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science."); *In re: Phenylpropanolamine (PPA) Prods. Liab. Litig.,* 289 F.Supp.2d 1230, 1247 (W.D.Wash.2003) ("The fact that the mechanism remains unclear does not call the reliability of the opinion into question: 'Not knowing the mechanism whereby a particular agent causes a particular effect is not always fatal to a plaintiff's claim. Causation can be proved even when we don't know precisely how the damage occurred, if there is sufficiently compelling proof that the agent must have caused the damage somehow.' ") (quoting *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1314 (9th Cir.1995) (*"Daubert II"* )).

19    At the time defendants filed their motion, the Welding Fume Study had not been published, but it since has been. *See* Michael Harris, *et al., Manganese Exposures During Shielded Metal Arc Welding (SMAW) in and Enclosed Space,* J. of Occupational and Environmental Hygiene 375 (Aug.2005).

20    The Court holds here only that the Welding Fume Study is admissible, and that defendants' arguments go to the weight a jury should give the Study, not its admissibility. Whether the Welding Fume Study evidence, combined with any other evidence, satisfies a given plaintiff's required quantum of proof of exposure is, of course, a separate issue.

With regard to proof of exposure levels, defendants identify a number of weaknesses in plaintiffs' experts' explanations of how they intend to quantify a given welder's historical exposure. But the Court cannot conclude, in the abstract, that these explanations are inadmissible in every MDL case as a matter of law. Further, it appears an expert's methodology may be admissible to support an opinion that a welder's exposure must have *exceeded* a certain level (either in total or during certain moments in time), even though the same methodology might not support an opinion that the welder's exposure was a certain, known quantity.

---

**End of Document**                                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.