Case: 1:08-cv-02755-DCN Doc #: 243-1 Filed: 10/08/14 1 of 5. PageID #: 13875

Hodell-Natco Industries, Inc. v.　　　　　　　　　　　　　　　　　　　　　　　　　　Otto Reidl - Vol. 1
SAP America, Inc., et al.　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　February 7, 2012

## Page 1

```
               UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
                      EASTERN DIVISION

HODELL-NATCO                )  Case No. 1:08 CV 2755
INDUSTRIES, INC.,           )
                            )  Judge: Lesley Wells
         Plaintiff,         )  Magistrate Judge:
                            )       Greg White
   vs.                      )
                            )  VOLUME I
SAP AMERICA, INC., et       )
al.,                        )
                            )
         Defendants.        )
_____


       THE VIDEOCONFERENCE DEPOSITION OF OTTO REIDL


     DATE:    Tuesday, February 7, 2012

     TIME:    9:57 a.m.

     PLACE:   Reminger & Reminger
              1400 Midland Building
              101 Prospect Avenue, West
              Cleveland, Ohio  44115




_____

NEXTGEN
REPORTING

Registered Professional Reporters
```

## Page 3

```
                    W I T N E S S   I N D E X

                                                          PAGE

DIRECT EXAMINATION
OTTO REIDL
BY MR. STAR .................................       4


                    E X H I B I T   I N D E X

Exhibit 1    Revised Notice of Deposition of         9
             Hodell-Natco

Exhibit 2    Emails from Amy Poidomani to           17
             Kevin Reidl

Exhibit 3    First Amended Complaint with           22
             Exhibits, Jury Trial Demand

Exhibit 4    Pages off the Hodell website           54

Exhibit 5    ERP Software printout from Internet   125
```

## Page 2

```
APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

     MR. P. WESLEY LAMBERT, ESQ.
     Koehler, Neal, LLC
     3330 Erieview Tower
     1301 East Ninth Street
     Cleveland, Ohio 44114
     (216) 539-9370
     wlambert@koehlerneal.com

ON BEHALF OF THE DEFENDANT SAP AMERICA, SAP AG:

     MR. GREGORY J. STAR, ESQ.
     Drinker, Biddle, Reath
     One Logan Square
     Suite 2000
     Philadelphia, Pennsylvania 19103
     (215) 988-2734
     Gregory.Star@dbr.com

ON BEHALF OF THE DEFENDANT LSI:

     MR. ROY A. HULME, ESQ.
     Reminger & Reminger
     1400 Midland Building
     101 Prospect Avenue, West
     Cleveland, Ohio 44115
     (216) 687-1311
     rhulme@reminger.com


ALSO PRESENT:  Kevin Reidl
               Daniel Lowery
```

## Page 4

1  OTTO REIDL,
2  called as a witness herein, having been first duly
3  sworn, as hereinafter certified, was examined and
4  testified as follows:
5  DIRECT EXAMINATION OF OTTO REIDL
6  BY MR. STAR:
7  Q. Good morning, Mr. Reidl. I
8  apologize in advance if I continually
9  mispronounce your name today. Feel free to
10 correct me. I'm Greg Star. I'm an attorney
11 on behalf of SAP America and SAP AG, and we're
12 here today for your deposition as the
13 corporate designee on behalf of Hodell-Natco.
14 Have you ever been deposed before, sir?
15 A. Yes.
16 Q. How many times?
17 A. Once.
18 Q. When was that?
19 A. Approximately 15 years ago.
20 Q. All right. Let me go through the
21 rules for you then, since it's been a while.
22 I'll be asking you questions. The court
23 reporter will be taking down what I say and
24 your answers. It's important that we don't
25 speak over each other. Is that fair?

Page 109

1    BY MR. STAR:
2  Q. Is that right?
3  A. Correct.
4  Q. Besides this communication with
5   Mr. Van Leeuwen, did you have any other
6   information that caused you to believe that
7   signing the license agreement was simply to
8   license or lock in the price for the
9   additional 40 CRM users?
10      MR. LAMBERT: Objection. This is to
11  Otto individually.
12      BY MR. STAR:
13 Q. Sure.
14 A. It's my belief that by this time,
15   SAP knew that this would not handle the number
16   of users, and it was a -- a way for them to
17   limit their liability. That's my personal
18   impression.
19      MR. STAR: Can you read back my
20   question?
21   (Whereupon, the court reporter read
22   back the requested testimony.)
23      BY MR. STAR:
24 Q. Can you answer that question,
25   sir?

Page 110

1  A. I thought I did.
2      THE WITNESS: Could you please read it
3   again?
4      THE REPORTER: How do you -- is it
5   Mr. Van -- how do you pronounce --
6      THE WITNESS: Van Leeuwen.
7      THE REPORTER: Okay.
8   (Whereupon, the court reporter read
9   back the requested testimony.)
10      MR. LAMBERT: Is my objection noted on
11   there?
12      THE REPORTER: (Nods head.)
13      MR. LAMBERT: Okay.
14      THE WITNESS: Am I answering as an
15   individual?
16      BY MR. STAR:
17 Q. Yes.
18 A. We had gone on the internet and
19   seen some indication that the number of users
20   being -- the limit on the number of users was
21   declining, the number of users.
22 Q. When was this?
23 A. Sometime during '05 or '04.
24 Q. Prior to December 23rd of 2005,
25   right?

Page 111

1  A. Correct.
2  Q. What information did you uncover
3   prior to December 23rd, 2005 about declining
4   information on the number of users?
5  A. I think that's the first time I
6   saw a reference where there was a distinction
7   made between number of employees and maximum
8   users.
9  Q. And what specifically did you
10   see?
11 A. I don't recall the exact
12   information.
13 Q. Okay. Prior to seeing this
14   information on the internet before
15   December 23rd, 2005, what was Hodell's belief
16   about the number of users that Business One
17   could support?
18 A. Five hundred.
19 Q. Five hundred users or employees?
20 A. Employees have nothing to do with
21   it. It's users.
22 Q. Number of users --
23 A. Yeah.
24 Q. -- in the organization?
25 A. I don't understand why number of

Page 112

1   employees limits a system, if they're not
2   users.
3  Q. Okay. So prior to you looking
4   for and finding information on the internet,
5   which also occurred before December 23rd,
6   2005, you're telling me it was Hodell's belief
7   that Business One could support up to 500
8   users?
9  A. We were told that.
10 Q. By whom?
11 A. By LSi and by American Express.
12 Q. Who at LSi told you that -- that
13   Business One could support up to 500 users?
14 A. Dale Van Leeuwen.
15 Q. When did he tell you that?
16 A. December 3rd, 2003.
17 Q. How do you remember that date so
18   specifically?
19 A. At that point -- at that meeting,
20   I stated to American Express and Dale Van
21   Leeuwen, who was on a teleconference with us,
22   the other -- the American Express people were
23   in our facility. We had a ten-year compounded
24   growth rate at that point that was in excess
25   of ten percent per year. We were -- if we

Page 113

1  continued that pace, in the next ten years, we
2  would exceed 300 users, with productivity
3  improvements promised, and all the literature
4  that we had and efficiencies, 300 users would
5  carry us. We did not want to be doing an
6  implementation of software that would not be
7  viable for the next decade. And I was assured
8  by both parties that 300 users is -- the
9  system is capable of supporting 300 users.
10 Q. Which --
11 A. I said I would not proceed unless
12    that was -- assurance was made.
13 Q. Well, which was it, that
14    Mr. Van Leeuwen told you it was 500 users or
15    300 users?
16 A. He said he had information that
17    indicated 500.
18 Q. Okay. What specific information
19    did he tell you he had?
20 A. A SAP document.
21 Q. What SAP document?
22 A. I don't --
23 Q. Did you ask for that document?
24 A. We subsequent -- we had documents
25    of our own that indicated that, 500 employees.

Page 114

1  Q. Okay. We're referring right now
2     to a conversation that you had with
3     Mr. Van Leeuwen on December 3rd, 2003, that
4     also involved American Express, who you said
5     was at your actual office?
6  A. Yes.
7  Q. Mr. Van Leeuwen was on a
8     conference --
9  A. Yes.
10 Q. -- right?
11 A. Correct.
12 Q. Okay. Your testimony is that
13    Van Leeuwen says during that conversation that
14    Business One can support up to 500 users, and
15    you also said, I believe, that Van Leeuwen
16    referenced a document from SAP that had that
17    information, right?
18 A. Correct.
19 Q. Okay. My question to you is, did
20    you obtain that document from Mr. Van Leeuwen
21    at any time prior to December 23rd, 2005?
22 A. I believe we already had such a
23    document.
24 Q. You had a document that actually
25    said Business One can support 500 users?

Page 115

1  A. It said 500 employees.
2  Q. Five hundred employees. Well,
3     you just said earlier, sir, that you don't
4     understand what the number of employees has to
5     do with the number of users. What did you
6     mean by that?
7  A. No. What I said was, nonuser
8     employees have nothing to do with capacity,
9     therefore, a logical assumption would be that
10    the number of employees specified that define
11    capacity of the system is users.
12 Q. I see. So when you would read in
13    a document that Business One could support an
14    organization up to 500 employees, you just
15    assumed that that meant 500 users; is that
16    right?
17 A. Correct.
18 Q. Okay. That's an awful big
19    assumption to make without further
20    investigating; wouldn't you agree?
21 A. I did investigate it.
22 Q. With whom?
23 A. I confronted SA -- American
24    Express and IBiS, and asked for specific
25    confirmation that it could handle 300 users.

Page 116

1  Q. And what did they give you as
2     specific confirmation, sir?
3  A. It will handle 300 users.
4  Q. That's all they said?
5  A. Correct.
6  Q. Who said it?
7  A. I -- Dale Van Leeuwen said he had
8     a document that talked about 500 users, but
9     300 users was within the system capability.
10 Q. Well, I think you just said
11    that Dale Van Leeuwen was referencing a
12    document that said that it could handle up to
13    500 employees, not users, correct?
14 A. At that time, he said users, but
15    we had a document that said employees.
16 Q. But you just assumed that
17    employees meant users, right?
18 A. That's a very logical assumption.
19 Q. You didn't actually contact
20    anybody at SAP?
21 A. Yes, I did.
22 Q. An employee --
23 A. The SAP business partner.
24 Q. Let me finish the question. You
25    did not actually contact any person employed

Page 137

1  Q. Is there any representation in
2  that document that you believe was false when
3  it was made?
4  A. I don't know.
5  Q. Sorry?
6  A. I don't know.
7  Q. You don't know?
8  A. No.
9  Q. Okay. As we sit here today, is
10  there anything in this document that you
11  believe was false at the time that you
12  received it?
13  A. Not at the time I received it.
14  Q. Okay. Is it your contention, or
15  Hodell's contention, that there's any
16  information in this document that you believe
17  constitutes a misrepresentation by SAP about
18  the Business One software?
19      MR. LAMBERT: Objection.
20      THE WITNESS: Don't know. I answered.
21      BY MR. STAR:
22  Q. Oh, I'm sorry. I didn't hear
23  you.
24  A. I don't know.
25  Q. Okay. Paragraph 20, Hodell

Page 138

1  alleges that at all times relevant to this
2  action, American Express Tax and Business
3  Services, Inc. acted as the authorized agent
4  and representative of its disclosed
5  principals, the SAP Defendants.
6  What evidence do you have, sir, that
7  American Express was acting as an authorized
8  agent of the SAP Defendants?
9  A. We supplied documents that had
10  showed them as a business partner of SAP.
11  Q. Showed American Express as a
12  business partner?
13  A. Correct.
14  Q. Okay. Is it presently Hodell's
15  contention that it received false information
16  that constitutes a misrepresentation through
17  American Express?
18  A. On the number of users?
19  Q. That you believe --
20  A. Yes.
21  Q. -- there was a false rep --
22  A. Yes.
23  Q. Let's be clear. You -- Hodell
24  presently believes there was a false
25  representation by American Express as to the

Page 139

1  number of users that could be supported under
2  Business One; is that right?
3  A. Yes.
4  Q. Okay.
5  A. As a business partner.
6  Q. What is the basis for your belief
7  that American Express supplied false
8  information about the number of users?
9  A. We were told at that meeting 300
10  users, and when we started with 120 users, the
11  system would not handle it.
12  Q. Okay. You're referring to the
13  December 3rd, 2003 meeting?
14  A. Correct.
15  Q. Okay. Was there any literature
16  or any -- any writing given to you by American
17  Express that Hodell presently contends
18  constitutes a misrepresentation?
19      MR. LAMBERT: Objection.
20      THE WITNESS: I don't know.
21      BY MR. STAR:
22  Q. Paragraph 21, you reference the
23  document attached as Exhibit C to the
24  complaint, which you described as the Business
25  One white paper. And in that same paragraph,

Page 140

1  you contend that Ms. Vitantonio,
2  V-I-T-A-N-T-O-N-I-O, of American Express sent
3  you that document on October 16, 2003.
4  If you flip to Exhibit C of the complaint,
5  is that the document you recall receiving on
6  October 16th, 2003?
7  A. Which exhibit is that?
8  Q. C.
9  A. C. Correct.
10  Q. Okay. Is there any
11  representation or statement in this document,
12  this is the SAP Business One white paper
13  attached as Exhibit C, that Hodell currently
14  contends constitutes a misrepresentation
15  either by American Express or SAP concerning
16  the Business One software?
17      MR. LAMBERT: Objection.
18      THE WITNESS: Since we never
19  implemented their software, I have no way of
20  telling you.
21      BY MR. STAR:
22  Q. So to be clear, as we sit here
23  today, Hodell does not believe that there is
24  any information that was represented to it
25  through Exhibit C to the complaint, that it --

Page 237

1  second.
2  (Whereupon, an off-the-record discussion
3  was held at 4:13.)
4  (Whereupon, the deposition was continued
5  until the following day.)

Page 238

1              CERTIFICATE OF THE REPORTER
2       I, Angela A. O'Neill, a Registered Professional
3  Reporter and Notary Public, authorized to administer oaths and to
4  take and certify depositions, do hereby certify that the
5  above-named witness was by me, before the giving of their
6  deposition, first duly sworn to testify the truth, the whole
7  truth, and nothing but the truth to questions propounded at the
8  taking of the foregoing deposition in a cause now pending and
9  undetermined in said court.
10       I further certify that the deposition above-set forth
11  was reduced to writing by me by means of machine shorthand and was
12  later transcribed from my original shorthand notes; that this is a
13  true record of the testimony given by the witness; and that said
14  deposition was taken at the aforementioned time, date, and place,
15  pursuant to notice or stipulations of counsel.
16       IN WITNESS WHEREOF, I have set my hand and seal this
17  14th day of February, 2012.
18       _____
19       Angela A. O'Neill, RPR
20       My Commission Expires:  Aug. 10, 2012
21
22
23
24
25