Case: 1:08-cv-02755-DCN  Doc #: 247-1  Filed:  10/10/14  1 of 6.  PageID #: 13932

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.
Gilbert W. Kennedy
July 16, 2014

**Page 1**

```
                                VOLUME:   I
                                PAGES:    1-114
                                EXHIBITS: See Index
            UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF OHIO
                  EASTERN DIVISION
              CASE NO. 1:08 CV 2755
            JUDGE:   LESLEY WELLS
        MAGISTRATE JUDGE:  GREG WHITE


HODELL-NATCO INDUSTRIES, INC.

         Plaintiff

V.

SAP AMERICA, INC., ET AL.,

         Defendants



           DEPOSITION OF GILBERT W. KENNEDY

             July 16, 2014 - 10:20 a.m.

                    REGUS CENTER

                 8 Hall Marketplace

            Boston, Massachusetts 02109


                    * * * * *
            ---- Lisa Marie Phipps, RPR/CSR ----


                  NextGenReporting
             999 Old Eagle School Road
             Wayne, Pennsylvania 19087
                    215.494.7650
```

**Page 2**

APPEARANCES OF COUNSEL:

For the Plaintiff:

KOEHLER NEAL LLC
(BY: P. Wesley Lambert, Esquire)
3330 Erieview Tower
1301 East Ninth Street
Cleveland, Ohio 44114
216.539.9379
wlambert@koehlerneal.com


For the Defendants(Via Video Stream):

DRINKER BIDDLE & REATH LLP
(BY: Gregory J. Star, Esquire)
One Logan Square - Suite 2000
Philadelphia, Pennsylvania 19103
215.998.2734
gregory.star@dbr.com


ALSO PRESENT:

Jenna LaBrecque, Streaming Video Technician

Steve Silverberg (Via Video Stream)

**Page 3**

I N D E X

Testimony of                                    Page

Gilbert W. Kennedy

Examination by Mr. Star                            5


E X H I B I T S

No.         Description                          Page

1  Expert Report and Disclosure of
   G. William Kennedy, PhD, CPA/ABV
   Managing Director FTI Consulting, Inc.     4

2  Declaration of G. William Kennedy,
   PhD, CPA/ABV                                4

3  Hodell-Natco Statements of Income          71

4  Summary of Financial Information           80

**Page 4**

1  P R O C E E D I N G S
2  (Exhibit Nos. 1-2 premarked.)
3  STREAMING VIDEO TECHNICIAN: My name
4  is Jenna LaBrecque. I am here on behalf of
5  NextGen Reporting located at 999 Old Eagle
6  School Road, Wayne, Pennsylvania, 19087.
7  This deposition is being taken on
8  7/16/2014 at Regus, 8 Faneuil Hall
9  Marketplace, third floor, Boston, Mass, 02109.
10  It is being taken in the matter of
11  Hodell-Natco Industries, Incorporated, versus
12  SAP America, Incorporated.
13  Present for taking of this video
14  deposition is the witness, G. William Kennedy.
15  Would counsel please introduce themselves for
16  the record.
17  MR. LAMBERT: Wes Lambert here in
18  Boston representing Hodell-Natco.
19  MR. STAR: Greg Star from Drinker
20  Biddle & Reath, Philadelphia representing SAP
21  America and SAP AG.
22  And I would just put on the record
23  that counsel for the other co-defendant,
24  LSI/IBIS, has filed a petition for withdrawal
25  and neither I nor anybody else received any

Page 37

1  Q.  What do you mean by "regression analysis"?
2     Break that down in layman's terms.
3  A.  They were looking at relationships of various
4     purchasing manager indices and other
5     government statistics such as that.  That's as
6     specific that I recall.  I think there were
7     some other analysis that I was challenging the
8     staff on their direction.
9  Q.  Was there ever any consideration of making a
10    calculation of damages based on increased
11    operational costs or calculation of lost
12    savings?
13 A.  Not the lost savings that I can recall.  I
14    mean, in my view the operational cost is a
15    component of the lost profits calculations
16    that I've done.
17 Q.  And other than the regression analysis is
18    there anything else specifically that you can
19    recall that was considered as a methodology or
20    possible theory that was worked on by FTI and
21    then rejected, unfavorable, to being the
22    actual report?
23 A.  I didn't catch the last part of the question,
24    I'm sorry.
25 Q.  Sure.  I'll say it again.  Other than the

Page 38

1     regression analysis, is there any other
2     methodology or theory of damages that you
3     recall being considered at FTI and then not
4     being included in the final report?
5  A.  I am not recalling anything specific, but I
6     can tell you I was pretty tough on the staff
7     in terms of really making sure that the
8     analysis was a tight one.
9  Q.  So when you say that Hodell suffered actual
10    lost profits because it should have been able
11    to ship 4.2 million additional pounds of
12    product during the damages period than what it
13    actually shipped, what you are actually saying
14    is, or at least assuming, is that Hodell lost
15    opportunities to ship that additional amount
16    of product, correct?
17 A.  It's a way to quantify using the
18    before-and-after method, which is the standard
19    acceptable method in my profession for
20    calculating lost profits.
21        Based on actual data, and not
22    conjecture, a comparison of the productivity
23    in a five-year period prior to the
24    installation of the package and during the
25    two-year period when the package was

Page 39

1     functioning.
2  Q.  I don't mean to be disrespectful, but I don't
3     think that that responded to my question.
4  A.  I apologize if it didn't.
5  Q.  In lieu of having the -- it is all right.  In
6     lieu of having the court reporter read it
7     back, I will try again.
8         We can agree that you are saying
9     that Hodell had the capacity and, therefore,
10    should have been able during the damages
11    period to ship 4.2 million pounds of
12    additional product than what it actually
13    shipped, correct?
14 A.  Correct.
15 Q.  Okay.  And to go from that calculation of what
16    their capacity was or should have been and
17    translate that into an actual lost profits
18    calculation, there's an assumption in between
19    it, right, and the assumption has to be that
20    Hodell had customers that would have ordered
21    that additional product, right?
22 A.  The before-and-after method, before-and-after
23    approach, that I have taken was looking at the
24    difference in the productivities in
25    quantifying the financial impact of lost

Page 40

1     profits of that difference in productivity.
2         I wouldn't agree with you that I
3     could specifically point out another
4     $4.2 million worth of orders that were
5     cancelled.
6         And I apologize if I'm not answering
7     your question, but that is how I understand
8     it.
9  Q.  Well, my question, to be very fair, sir, did
10    not use the word cancel.  I didn't say
11    anything about cancelled orders.
12        I asked you whether there was an
13    assumption that was made by you that allows
14    you to take yourself from the calculation,
15    say, that, hey, Hodell on the one hand had the
16    capacity during the damages period to ship out
17    another 4.2 million pounds of product and it
18    should have shipped that out; and had it
19    shipped it out it would have translated into
20    the lost profits figure that you came up with.
21        My question to you, sir, is in
22    between those two calculations you would agree
23    with me that there is an assumption that in
24    order to translate the lost profits there must
25    have been customers out there at least willing

Case: 1:08-cv-02755-DCN Doc #: 247-1 Filed: 10/10/14 3 of 6. PageID #: 13934

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.
Gilbert W. Kennedy
July 16, 2014

### Page 49

1  assumption; that there is a customer ready,
2  willing, and able to pay for this product,
3  doesn't that render your opinion completely
4  speculative?
5  A.  Not at all.  My opinion was based on the
6  actual facts during the pre-damage period and
7  during the damage period both.
8      It was very robust and supported by
9  information the company maintained in the
10 ordinary course of business.
11 Q.  Well, let's look on your specific opinion.  Go
12 to Page 12 for me and the last full paragraph.
13     You say, quote -- you calculated,
14 quote, an incremental 4.2 million pounds of
15 product would have been shipped, which, if
16 shipped, would have resulted in a lost revenue
17 of around $9 million and lost profits of
18 3.2 million during the damages period.
19     Sir, from your own statement, from
20 your own report, where you say -- where you
21 talk about product which, if shipped, you are
22 necessarily assuming that there were customers
23 who had placed orders and were going to have
24 product shipped to them during that damages
25 period, correct?

### Page 50

1     MR. LAMBERT: Objection.
2  A.  That's not correct.  This is a way to
3  phrase --
4  Q.  You are assuming that those products -- you
5  are assuming that those products would have
6  been shipped?
7  A.  This, for the fifth or sixth time is a way to
8  quantify the impact of the drop in
9  efficiencies.
10     And I phrased it the way I've
11 phrased it to try to summarize and explain
12 what is in the details of the calculations;
13 that there was a material decline in the
14 productivity during the period we are calling
15 the damage period and this is a method of
16 quantifying the impact on profitability of the
17 business as a result of that.
18 Q.  And I'll tell you again that I think your
19 answer is not responsive, and I'm not
20 questioning you on -- right now on the
21 methodology itself.  I'm not looking at your
22 equation that you have put together, okay.
23     I am asking you about the factual
24 assumptions that leads you to believe that
25 your calculation of lost profits is reliable

### Page 51

1  based on the facts of this case.
2      What I am trying to get at is
3  whether you made any assumption.  I take it
4  from your testimony repeatedly here that you
5  made no assumption; you think none is
6  necessary.
7      But I point you now to this language
8  in your report, the "which is shipped" phrase
9  on Page 12.
10     And let me just get your
11 understanding.  Your testimony to the jury in
12 this case would be that you are making no
13 assumption that there were customers to whom
14 that product would be shipped that were ready
15 to place orders and pay Hodell to receive
16 those products, right?
17 A.  I can't answer that any differently than I've
18 answered it for, you know, probably
19 approaching a dozen times now.
20 Q.  Okay.  So you can't tell me to whom exactly
21 the 4.2 million pounds of products would have
22 been shipped and which customers would have
23 paid Hodell for that product, right?
24 A.  That would never, ever be a part of a
25 before-and-after and a but-for world of

### Page 52

1  quantification of lost profit damages.  That's
2  never been the standard for accounting experts
3  to point to a customer that hung up the phone
4  or the customer that didn't call.
5  Q.  Now, you can't even tell me which of Hodell's
6  specific products you believe would have been
7  shipped that would have made up this 4.2
8  million additional pounds of product, correct?
9  A.  It wasn't something that I have any reason to
10 try to parse out.
11 Q.  Okay.  You are aware that Hodell has over
12 40,000 inventory items in its stock?
13 A.  I believe I say that in my report.  Yes, I am.
14 Q.  Okay.  You are aware that some products weigh
15 a lot but don't cost much while other products
16 don't weigh very much at all and cost more
17 than heavier products, correct?
18 A.  I am.
19 Q.  Okay.  I mean, just so we are clear, we've got
20 this from folks at Hodell in prior testimony,
21 but, you know, Hodell stocks products that are
22 made of different types of metals; some metals
23 cost more but weigh less than others, right,
24 you aware of that through your site visit with
25 Kevin?

Page 57

1  the sentence in terms of what I was intending
2  to communicate or in describing the
3  calculations that I performed.
4      And, again, I am not sure where this
5  leaves me in terms of what to do next so...
6      MR. LAMBERT: Well, if he has a
7  question that you can answer, then he can ask
8  a question.
9  Q.  Sir, you agreed with me that the more
10 appropriate word choice there should be could
11 have been shipped, correct, you agree with
12 that?
13 A.  If I think that better communicates to you
14 what -- it's very clear to me what I have done
15 and what I have said in my report.
16     I am not hearing a difference in the
17 two as it relates to the work that I have done
18 or what I'm trying to communicate here.
19 Q.  Well, as I understand your testimony, you've
20 actually just ignored completely the issue of
21 whether there were customers willing and able
22 to place orders, take shipment, and make
23 payment and, therefore, made no analysis
24 whether, in fact, 4.2 additional pounds of
25 product would have been shipped over the

Page 58

1  damages period, correct?
2  A.  That's right. I didn't try to identify the
3  customer that didn't call or the customer that
4  hung up, which is not part of a lost profits
5  calculation.
6  Q.  You simply opined that Hodell had the capacity
7  to make more shipment, correct?
8  A.  Correct. This is the impact of the
9  profitability -- wait. The capacity is
10 measured by the work force, labor, and the
11 efficiency and the decrement in deficiency in
12 that work force.
13 Q.  And, therefore, you calculated that Hodell
14 could have shipped 4.2 million additional
15 pounds of product and not offered any
16 testimony that Hodell, in fact, would have had
17 opportunities to make those shipments,
18 correct?
19 A.  Yeah, I don't disagree with that.
20 Q.  So given that, just given what we've just gone
21 over, and I will ask you again, are you still
22 unwilling to right now take a pen and amend
23 your report and change the word "would" to
24 "could" so that it reads could have been
25 shipped?

Page 59

1  A.  Again, I don't have a preference as to which
2  of the two words if it better explains what I
3  was trying to communicate. I am not hearing a
4  difference in inserting one versus the other.
5      I'm not sure how the protocols and
6  the process works here. Not being a lawyer I
7  am going to have to --
8  Q.  The protocol and process -- the process is
9  that it is your report. In your report you've
10 indicated that you have reserved the right to
11 amend it.
12     You say that on Page 6. I reserve
13 the right to amend my report accordingly if
14 new or additional information becomes
15 available to you.
16 A.  (Witness reviewing document.)
17 Q.  I am asking you whether you agree based on
18 your testimony that it is now appropriate for
19 you to amend your report.
20     MR. LAMBERT: Greg, you are putting
21 words into his mouth as to what you are asking
22 him to do.
23     I don't understand why this has --
24 what the point of this is. He has testified
25 as to what he has testified about; his report

Page 60

1  says what it says. That is why we are here.
2  What is the point of all of this?
3  Q.  Sir, can you answer my question?
4  A.  As you pointed out on Page 6, my report says
5  my opinion may be modified or supplemented
6  based upon additional information may become
7  available to me up to and during trial.
8      This is just grammar and the
9  difference, maybe, between an attorney's
10 background and an accountant's.
11     Could have been shipped -- it is an
12 impact on the profitability. "Could have been
13 shipped," "would have been shipped," to me are
14 saying the same thing.
15 Q.  Well, we can agree that no product would have
16 been shipped over the damages period by Hodell
17 unless a customer was actually there ready,
18 willing, and able to place an order, take the
19 shipment and make payment, we can agree on
20 that, right?
21 A.  Yes. I think that's back to the business
22 fundamental questions we had earlier this
23 morning.
24 Q.  Okay. So you do agree with me, yes?
25 A.  Yes, to the fundamental --

Page 69

1 but wouldn't you agree that your calculation
2 also then overstates the potential harm that
3 Hodell suffered because unless you can show
4 that Hodell was going to take orders and
5 fulfill them and get paid by customers, there
6 could be no lost profits?
7 A. I disagree with that.
8 Q. So just so we are clear, your lost profits
9 calculation also includes increased overhead
10 costs?
11 A. I am not following that.
12 Q. Well, you say that your lost profits
13 calculation already, in part, as I understand
14 your testimony, covers the harm that Hodell
15 allegedly suffered from having workers who
16 were not working at peak efficiency.
17     In other words, in your view Hodell
18 was paying more workers or paying workers too
19 much to work at less than full capacity and
20 that's part of your lost profits calculation
21 already, right?
22 A. The lost profit calculation uses not
23 speculative but actual costs that were being
24 incurred by the company in each of the
25 period -- each of the months during the damage

Page 70

1 period.
2     I didn't set out to reduce those
3 costs and increase the margin in addition to
4 the calculations that I've made.
5 Q. Lets look at some of Hodell's financial
6 records that I believe you used, listed out in
7 your report, and you used for the basis for
8 the lost profits calculation.
9     MR. STAR: Lisa, we have marked
10 there a document that is deposition
11 Exhibit 24. Can you hand that to Dr. Kennedy,
12 please?
13     MR. LAMBERT: Can I have a copy?
14 Q. Do you have that, Dr. Kennedy?
15 A. I do, deposition Exhibit 24.
16 Q. Okay. This is a document that was marked in,
17 I think, Kevin Reidl's deposition -- pardon
18 me, Otto Reidl's deposition some years back.
19     These are documents produced by
20 Hodell. Could you just set that one to the
21 side for a moment. I want to hand you another
22 exhibit.
23     MR. STAR: Lisa, in one of the
24 folders, I think it is marked No. 5, there is
25 a three-page exhibit. It is Hodell-Natco

Page 71

1 statements of income.
2     (The stenographer hands
3     document to the witness and
4     Attorney Lambert.)
5     MR. STAR: Let's mark that Kennedy
6 3, please.
7     (Exhibit No. 3 marked.)
8 Q. Dr. Kennedy, the document marked Kennedy 3 is
9 -- these are documents that, unfortunately,
10 when they were copied the Bates label on the
11 bottom right-hand corner has gotten cut off.
12     These are documents, I will
13 represent to you, that were produced in this
14 case by Hodell.
15     They were not produced in the order
16 that I have given you. I have made sort of a
17 compendium exhibit here to provide you with
18 the statements of income for 2009, '10, '11,
19 and '12.
20     Are these documents that I have
21 handed you here that has been marked as
22 Exhibit 24 and now Kennedy 3 documents that
23 you have seen in the past and used in
24 preparing your opinions?
25 A. (Witness reviewing document.) I would have to

Page 72

1 look at the Bates stamps compared to what I
2 have indicated in my report I had received and
3 reviewed.
4     I don't have a recollection of the
5 2011, 2012 income statements in the form that
6 they are presented, but I know that we had in
7 our file annual financial statements, the
8 reviewed financial statements for Hodell for a
9 sweep of years that may have encompassed
10 these. I am not sure.
11 Q. Okay. All right. Fair enough. And let's do
12 this --
13     MR. LAMBERT: Greg, your audio is
14 cutting out significantly. I don't know if
15 NextGen is still on the line or not.
16     MR. STAR: All right. Lisa, go off
17 the record, please.
18     (Discussion off the record.)
19 Q. All right. So we had some technical problems
20 there and we lost each other for a few minutes
21 on the video and audio feed, but, Mr. Kennedy,
22 we are looking at Exhibit 24 and the document
23 marked as Kennedy 3.
24     And I understand you don't have a
25 specific recollection of whether you reviewed

Page 113

 1  CERTIFICATE
    COMMONWEALTH OF MASSACHUSETTS
 2  MIDDLESEX, SS.
 3
 4
 5  I, Lisa Marie Phipps, Registered Professional
    Reporter and Notary Public in and for the
 6  Commonwealth of Massachusetts, hereby certify that
    there came before me on the 16th day of July, 2014
 7  the deponent herein, GILBERT W. KENNEDY, who was
    duly sworn by me; that the ensuing examination upon
 8  oath of the said deponent was reduced to
    typewriting under my direction and control; and
 9  that the within transcript is a true record of the
    questions asked and answers given at said
10  deposition.
11
    I FURTHER CERTIFY that I am neither attorney nor
12  counsel for, nor related to or employed by any of
    the parties to the action in which this deposition
13  is taken; and, further, that I am not a relative or
    employee of any attorney or financially interested
14  in the outcome of the action.
15
    IN WITNESS WHEREOF, I have hereunto set my hand and
16  affixed my seal of office this 16th day of July,
    2014.
17
18
19
20         Lisa Marie Phipps, RPR
21         Notary Public
           Commonwealth
22         of Massachusetts
           My Commission Expires:
23         April 17, 2020
24
25

Page 114

 1       DEPONENT'S ERRATA SHEET & SIGNATURE
 2              --- --- ---
 3
 4  The original of the errata sheet has been delivered
 5  to R. Wesley Lambert, Esq.  When the errata sheet
 6  has been completed by the deponent and signed, a
 7  copy thereof should be delivered to each party of
 8  record and the original thereof delivered to
 9  Gregory J. Star, Esq., to whom the original
10  deposition transcript was delivered.
11
12
13
14         INSTRUCTIONS TO DEPONENT
15
16  After reading this volume of your deposition,
17  indicate any corrections or changes on your
18  testimony and the reasons therefor on the errata
19  sheet supplied to you, and sign it.
20  DO NOT make any marks or notations on the
21  transcript volume itself.
22
23
24
25