2002 WL 34354482
Only the Westlaw citation is currently available.
United States District Court,
District of Columbia.

SIGMA TOOL & MACHINE, Plaintiff,
v.
NAGAYAMA ELECTRONIC INDUSTRY
COMPANY, LTD., Defendant.

Civil Action No. 00–
2936(RWR). | Dec. 18, 2002.

Named Expert: Dr. Robert Buzzell

**Attorneys and Law Firms**

Eugene M. Paige, Keker & Van Nest, LLP, San Francisco,
CA, Kenneth Christy Todd, Kellogg, Huber, Hansen, Todd,
Evans & Figel, PLLC, Washington, DC, for Plaintiff.

Daniel Bucca, McDermott, Will & Emery, Washington, DC,
Thomas Peter Steindler, Abbott Laboratories, Abbott Park,
IL, for Defendant.

David Charles Masselli, David Charles Masselli, PC,
Arlington, VA, for Counter Defendant.

H. Jay Spiegel, Mount Vernon, VA, Richard H. Stern,
Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC,
Washington, DC, for Plaintiff/Counter Defendant.

### *MEMORANDUM OPINION AND ORDER*

RICHARD W. ROBERTS, District Judge.

**\*1** Nagayama Electronic Industry Company, Ltd.
("Nagayama") is the owner of U.S. Patent No. 5,348,432 (the
#432 Patent). Plaintiff Sigma Tool and Machine ("Sigma")
filed this lawsuit seeking a declaration that Nagayama's patent
is invalid or that Sigma's products do not infringe the #432
Patent. Nagayama then filed an infringement counterclaim
against Sigma. Plaintiff has now filed a Motion *In Limine* to
Exclude Evidence of Damages From Before the Time that
Statutory Notice of Infringement Was Given, a Motion for
Partial Summary Judgment on Lost Profits, and a Motion *In
Limine* to Strike the Expert Report of, and Exclude Testimony
by, Dr. Robert Buzzell. Because Nagayama has presented
evidence that it has consistently marked substantially all
packages of its product sold to the public and that it gave

actual notice to Sigma in 1996, Sigma's motion to limit
evidence of damages will be denied. Because Nagayama has
presented evidence that raises a genuine issue of material fact
regarding its lost profits, Sigma's motion for partial summary
judgment will be denied. Because Dr. Robert Buzzell's expert
report satisfies the requirements of Federal Rule of Evidence
702, the motion to strike his report will be denied.

### *BACKGROUND*

The background of this case is set forth fully in the Court's
Memorandum Opinion on Claim Construction. Briefly,
Nagayama's #432 patent covers a rivet-type tee nut used in
furniture manufacturing and sold in the United States by
Nagayama's exclusive distributor, Stafast. Nagayama claims
that a number of Sigma's tee nuts infringe the #432 Patent.

### *DISCUSSION*

### I. *Motion in Limine Regarding Damages*
Plaintiff has filed a Motion *In Limine* to Exclude Evidence
of Damages From Before the Time that Statutory Notice of
Infringement Was Given ("Section 287 Motion").Title 35,
United States Code, section 287(a) provides:

> Patentees and persons making,
> offering for sale, or selling within
> the United States any patented article
> for or under them, or importing any
> patented article into the United States,
> may give notice to the public that
> the same is patented, either by fixing
> thereon the word "patent" or the
> abbreviation "pat.", together with the
> number of the patent, or when, from
> the character of the article, this can
> not be done, by fixing to it, or to
> the package wherein one or more of
> them is contained, a label containing
> a like notice. In the event of failure
> so to mark, no damages shall be
> recovered by the patentee in any
> action for infringement, except on
> proof that the infringer was notified
> of the infringement and continued to
> infringe thereafter, in which event
> damages may be recovered only

> for infringement occurring after such
> notice. Filing of an action for
> infringement shall constitute such
> notice.

35 U.S.C. § 287(a) (2000).

Sigma claims that Nagayama first complied with this statutory notice provision on August 11, 1998 when Nagayama's attorney sent a letter to Sigma advising that Nagayama believed that Sigma's "line of tee-nuts, such as parts number A142010RV and A14208RV AUTO STA–RIVET NUTS," infringe the #432 Patent. Nagayama counters that it satisfied the notice requirement of § 287 before 1998 in more than one way. Nagayama claims, with supporting evidence, that its representative gave actual notice to Sigma at a trade show in Atlanta, Georgia in August 1996. *See* Declaration of Steve Selle, Exh. A to Nagayama's Response to Section 287 Motion ("Steve Selle Declaration"), ¶ 6. Nagayama also has presented evidence that it began marking its packages of patented tee-nuts soon after the #432 Patent was issued by the United States Patent Office in September 1994 and that it has consistently and continuously marked substantially all boxes of its patented tee-nuts since it first began marking the boxes in 1994. *Id.,* ¶ 5. In addition, Nagayama has presented evidence that Stafast, Nagayama's sole distributor of its patented tee-nuts in the United States, "does not repackage the counterbore tee nuts it receives from Nagayama [and] sells counterbore tee nuts to its customers in the same boxes it receives from Nagayama."*See* Second Declaration of Daniel Selle, Exh. A to Nagayama's Sur–Reply to Section 287 Motion, ¶ 4. Nagayama's evidence presents a fact question regarding when Nagayama gave actual notice to Sigma and whether it used package markings that satisfy § 287's notice requirement.

*2 Whether a patentee has complied fully with the statutory notice provision is a fact question. *See Gart v. Logitech, Inc.,* 254 F.3d 1334, 1339 (Fed.Cir.2001), *cert. denied,*534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002); *Maxwell v. J. Baker, Inc.,* 86 F.3d 1098, 1111 (Fed.Cir.1996), *cert. denied,*520 U.S. 1115, 117 S.Ct. 1244, 137 L.Ed.2d 327 (1997). In this case, Sigma is attempting through a motion in limine to resolve the fact disputes raised by Nagayama's evidence. "A motion in limine is designed to narrow evidentiary issues for trial, not resolve factual disputes or weigh evidence."*Johnson v. Inland Steel Co.,* 140 F.R.D. 367, 371 (N.D.Ill.1992) (citing *Bradley v. Pittsburgh Bd. of Educ.,* 913 F.2d 1064, 1069 (3rd Cir.1990)). Factual disputes cannot be resolved "without the appropriate procedures provided by

Fed.R.Civ.P. 56."*Id.* (citing *Bradley,* 913 F.2d at 1070);*see also Schuster v. Shepard Chevrolet,* 2002 WL 507130 at *11 (N.D.Ill. Apr.3, 2002). Because genuine issues of material fact exist regarding when and how Nagayama complied with the notice requirements of § 287, Sigma's motion *in limine* regarding damages will be denied. [1]

**II.** *Motion for Partial Summary Judgment on Lost Profits*
Sigma has moved for summary judgment on Nagayama's claim for lost profits as damages in this case, arguing that Nagayama has not established each of the four factors set forth in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152 (6th Cir.1978).

**A.** *Summary Judgment Standards*
In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *America's Community Bankers v. Federal Deposit Insurance Corp.,* 200 F.3d 822, 831 (D.C.Cir.2000). The facts are to be reviewed with all inferences drawn in favor of the party opposing the motion. *See Matsushita Electric Industrial Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *United States v. Spicer,* 57 F.3d 1152, 1159–60 (D.C.Cir.1995), *cert. denied,*516 U.S. 1043, 116 S.Ct. 701, 133 L.Ed.2d 658 (1996).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. *See Greene v. Dalton,* 164 F.3d 671, 675 (D.C.Cir.1999). If the movant meets this initial burden, the burden shifts to the nonmovant to demonstrate with affirmative evidence that there is a genuine issue of material fact for trial. *See Carney v. American Univ.,* 151 F.3d 1090, 1093 (D.C.Cir.1998).

"Summary judgment is a marvelous tool when used correctly. It can cut to the heart of disputed legal issues and resolve them, so long as the underlying material facts are undisputed. However, summary judgment is completely inappropriate when a law suit turns on a disputed question of material

fact."*Equal Employment Opportunity Comm. v. Brown & Root, Inc.,* 688 F.2d 338, 339 (5th Cir.1982).

### B. *Lost Profits Damages*

**\*3** A patent owner who prevails in a claim of patent infringement is entitled to recover damages adequate to compensate the patentee for the injury proximately caused by the infringement. 35 U.S.C. § 284. One measure of damages for infringement is the patentee's lost profits. *Crystal Semiconductor Corp. v. Tritech Microelectronics International, Inc.,* 246 F.3d 1336, 1353 (Fed.Cir.2001)."The measurement of patent damages is a question of fact."*Id.* at 1346.

"To recover lost profits, 'a patent owner must prove a causal relation between the infringement and its loss of profits.' " *Id .* (quoting *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.,* 1 F.3d 1214, 1218 (Fed.Cir.1993)). The patentee must show "a reasonable probability that 'but for' the infringing activity, the patentee would have made the infringer's sales." *Id.*

### 1. TWO–SUPPLIER MARKET

When there is a two-supplier market occupied by the patentee and the infringer and the patentee has the manufacturing and marketing capacity to handle the increased sales, it is reasonable to infer that the patentee would have made the infringer's sales, absent proof to the contrary. *See State Industries, Inc. v. Mor–Flo Industries, Inc.,* 883 F.2d 1573, 1578 (Fed.Cir.1989), *cert. denied,*493 U.S. 1022, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990); *see also Read Corp. v. Freiday,* 66 F.3d 345 at \*2 (Fed.Cir. August 30, 1995) (citing *Lam, Inc. v. Johns–Manville Corp.,* 718 F.2d 1056, 1065 (Fed.Cir.1983); *State Industries,* 883 F.2d at 1578; and *Water Technologies Corp. v. Calco, Ltd.,* 850 F.2d 660, 672 (Fed.Cir.), *cert. denied,*488 U.S. 968, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988). Here, Nagayama may be entitled to invoke that inference since it has presented evidence that it and Sigma are the only suppliers of the rivet-type counterbored tee-nut at issue in this case, *see* Declaration of Daniel Selle, ¶ 3, and that it has the manufacturing capacity to handle the increased sales it alleges were made by Sigma. *See* Steve Selle Declaration, ¶ 4. Consequently, assuming Sigma and Nagayama a re the only suppliers in the market, "lost profits are a particularly appropriate measure of damages" and Sigma would not be entitled to summary judgment on Nagayama's claim for lost profits. *See Kalman v. Berlyn Corp.,* 914 F.2d 1473, 1484 (Fed.Cir.1990).

### 2. *PANDUIT* TEST

Sigma argues, nevertheless, that Nagayama must—and cannot—satisfy the "*Panduit* test." A patentee can "prove entitlement to lost profits ... by the four-factor *Panduit* test, which requires the patentee to establish: (1) a demand for the patented product; (2) the absence of acceptable non-infringing substitutes; (3) the manufacturing and marketing capability to meet the demand; and (4) the amount of the profit it would have made."*Tate Access Floors, Inc. v. Maxcess Technologies, Inc.,* 222 F.3d 958, 971 (Fed.Cir.2000) (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1156 (6th Cir.1978)). If the patentee makes the required showing under *Panduit,* the trier of fact may infer that the lost profits were caused by the infringing sales. *Id.*

**\*4** Even were Sigma and Nagayama not the only two suppliers of the counterbored tee-nuts at issue in this case, Nagayama has presented evidence which either establishes or raises a genuine issue of material fact as to each element of the *Panduit* test. It is undisputed that there is a demand for the patented tee-nuts in the furniture manufacturing industry.[2] Regarding the second element of the test, Nagayama asserts that there are no acceptable, non-infringing substitutes for its tee nuts. " '[T]he mere existence of a competing device does not necessarily make the device an acceptable substitute' and ... a 'product on the market which lacks the advantages of the patented product can hardly be termed a[n] [acceptable] substitute.' " *Stryker Corp. v. Intermedics Orthopedics, Inc.,* 96 F.3d 1409, 1418 (Fed.Cir.1996) (quoting *Standard Havens Products, Inc. v. Gencor Industries, Inc.,* 953 F.2d 1360, 1373 (Fed.Cir.1991)). "The critical question [is] not whether there were competing devices, but whether there were acceptable substitutes." *Id.* at 1418.

Nagayama claims that the non-infringing alternative suggested by Sigma—purchasing non-infringing tee-nuts and modifying them by using an anvil pin to flare the tee-nuts—compromised speed and quality when used. *See* Deposition of Gene Robinson, Exh. D. to Motion for Partial Summary Judgment, p. 16 (original attempts at modifying non-infringing tee-nuts "slowed us down so much that ... it wasn't very efficient"), p. 38 ("the pin would become worn a little bit and/or sometimes we would have an operator that would be rough and he might try to force the board off of the pin and snap it off"); *see also Fonar Corp. v. General Electric Co.,* 107 F.3d 1543, 1553 (Fed.Cir.), *cert. denied,*522 U.S. 908, 118 S.Ct. 266, 139 L.Ed.2d 192 (1997)

(no acceptable substitute because available alternatives would have compromised speed and quality).

Nagayama also has presented evidence that the regular tee-nut described by Sigma as an acceptable alternative is not counterbored and does not have the linear edges of the flange that are present in the Nagayama patented tee-nut. These two features solve the problems of shingling (where the tee-nuts overlap in the insertion machine and cause the machine to jam) and push-out (where the tee-nut pushes out of the wood). As a result, these two features are important to customers who want to eliminate these problems. *See* Steve Selle Declaration, ¶ 8. Nagayama's evidence raises a genuine issue of material fact regarding the acceptability of non-infringing substitutes.

Additionally, as is noted above, Nagayama has presented evidence that it has the manufacturing capacity to handle the increased sales, *see* Steve Selle Declaration, ¶ 4, and Nagayama's financial information can be used to calculate its lost profits. To the extent the amount of lost profits cannot be determined precisely, "any doubts regarding the amount must be resolved against the infringer."*Lam,* 718 F.3d at 1065;*see also Kalman,* 914 F.2d at 1482.

**\*5** Finally, although "the patent owner must establish a causation between his lost profits and the infringement" to recover lost profits as damages, "causation may be inferred" in a two-supplier market. *Lam,* 718 F.2d at 1065.Since Nagayama has presented evidence to establish or raise a genuine issue of material fact as to each of the four *Panduit* factors, Sigma is not entitled to summary judgment on Nagayama's claim for lost profits.

### III. *Motion in Limine Regarding Expert Witness*

Sigma has moved to exclude the expert testimony of Dr. Robert Buzzell on the issue of Nagayama's lost profits. "[A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify ... in the form of an opinion or otherwise."Fed.R.Evid. 702. The trial judge must determine as an initial matter whether the proffered witness is qualified to give the expert opinion he seeks to express. *Kuhmo Tire Co. v. Carmichael,* 526 U.S. 137, 156, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The district court must also determine whether the reasoning or methodology underlying the proffered testimony is valid and whether the reasoning or methodology can be applied in the case. *Id.* at 592–93.This

so-called "gate-keeping" obligation applies to all types of expert testimony, not just scientific testimony. *Kumho,* 526 U.S. at 147.The *Daubert* analysis is a fact-specific inquiry and depends on the nature of the issue at hand, the witness's particular expertise, and the subject of the testimony. *Id.* at 147–151.The district court's responsibility "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."*Id.* at 151.

### A. *Expert Qualifications*

The trial judge first must determine that the witness is qualified as an expert in the relevant field. To do so, the Court must assess whether the proffered expert has "sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case."*See id.* at 156.

Sigma challenges Dr. Buzzell's qualifications to serve as an expert witness in this case because his background is primarily in marketing and not specifically in lost profit damages in patent cases. Dr. Buzzell has a strong and varied background, measured by both education and experience, that qualifies him to express an opinion on lost profits as damages in this case. Dr. Buzzell received a Ph.D. in Business Administration from Ohio State University. He is currently a visiting professor of marketing in the Graduate School of Business at Georgetown University and is also a professor emeritus of business administration in the Graduate School of Business Administration at Harvard University. He has taught at Ohio State University and at the European Institute of Business Administration in France. He has served as a director of large corporations, as the Executive Director of the Marketing Science Institute, and as a Research Director of a major research project aimed at identifying and measuring the determinants of profits in individual businesses. Dr. Buzzell has authored or co-authored a variety of books and articles on marketing, product profitability, productivity, product innovation, advertising, market share, retail and wholesale distribution of goods, strategic planning, and statistical methods. He has performed at least 48 case studies, and has served as an expert witness on patent infringement damages in at least four other cases. Dr. Buzzell has adequate specialized training and experience to enable him to assist the jury on the issue of lost profits.

### B. *Reliability and Relevance*

**Sigma Tool & Mach. v. Nagayama Electronic Industry Co., Ltd., Not Reported in...**

2002 WL 34354482

*6 The judge must pre-screen the expert witness's proffered opinions to ensure that the expert testimony (1) qualifies as scientific, technical or other specialized knowledge and (2) will assist the trier of fact to understand the evidence or resolve a disputed factual issue. *Daubert,* 509 U.S. at 589.The first inquiry focuses on whether the proffered evidence is scientifically valid and thus sufficiently reliable; the second inquiry is essentially a relevance inquiry. *See id.* at 590–91.

Reliability and validity do not require certainty, but must be demonstrated by evidence that the knowledge is more than speculation. *Id.* at 590.The inquiry is flexible and a district court has broad latitude regarding how to determine reliability. *Kumho,* 526 U.S. at 142."The inquiry must focus on principles and methodology rather than on the conclusions they generate."*Groobert v. Georgetown College,* 219 F.Supp.2d 1, 6 (D.D.C.2002) (citing *Daubert,* 509 U.S. at 595; *Ambrosini v. Labarraque,* 101 F.3d 129, 140 (D.C.Cir.1996); *Raynor v. Merrell Pharmaceutical Inc.,* 104 F.3d 1371, 1375 (D.C.Cir.1997)).

Sigma argues that Dr. Buzzell did not use the incremental approach when calculating Nagayama's lost profits.[3] Nagayama has presented evidence that any applicable incremental costs such as marketing and shipping are paid by Stafast and, as a result, Nagayama does not incur any incremental costs that could be considered by Dr. Buzzell.

Sigma also argues that Dr. Buzzell used average pricing, failed to account for price elasticity, and did not consider other market factors in reaching his opinion on price erosion and lost profits. Sigma's concerns go more to the weight of Dr. Buzzell's anticipated testimony than to its admissibility. The Court's role is not to determine whether an expert's testimony is correct, but only whether it falls "outside the range where experts might reasonably differ."*Kumho,* 526 U.S. at 153 (citing *Daubert,* 509 U.S. at 596)."In *Daubert,* the Supreme Court held that 'vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'"*Groobert v. Georgetown College,* 219 F.Supp.2d 1, 6 (D.D.C.2002) (quoting *Daubert,* 509 U.S. at 596).

Sigma also complains that Dr. Buzzell obtained information from Nagayama's fact witnesses on which he relied in reaching his opinion on lost profits instead of conducting his own investigation of the relevant facts.[4] Federal Rule of Evidence 703 permits an expert to base his opinions on facts or data made known to the expert. Fed.R.Evid. 703. Indeed, the evidence on which the expert bases his opinion need not be admissible for the opinion itself to be admissible if the evidence is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."*Id.* At trial, Nagayama can lay an evidentiary basis through its fact witnesses and other admissible evidence to support Dr. Buzzell's testimony.

*7 Dr. Buzzell is qualified to present expert testimony in this case on the issue of lost profits, including price erosion. The opinions expressed in his expert report are adequately reliable and relevant. Dr. Buzzell's expert report satisfies the requirements of Federal Rules of Evidence 702 and 703 and the Supreme Court decisions in *Daubert* and *Kumho.*As a result, Sigma's motion in limine to strike Dr. Buzzell's expert report and exclude his testimony will be denied.

### CONCLUSION AND ORDER

Nagayama has presented evidence that it complied with the notice requirements of § 287 as early as 1994. Nagayama has also presented evidence creating factual disputes regarding its lost profits, making summary judgment on that issue inappropriate. Dr. Buzzell's expert report satisfies the requirements of Rule 702 and the Supreme Court's *Daubert* and *Kumho* decisions. Accordingly, it is hereby

ORDERED that Sigma's Motion *In Limine* to Exclude Evidence of Damages From Before the Time that Statutory Notice of Infringement Was Given [# 99], Motion for Partial Summary Judgment on Lost Profits [# 101], and Motion *In Limine* to Strike the Expert Report of, and Exclude Testimony by, Dr. Robert Buzzell [# 102] be, and hereby are, **DENIED.**It is further

ORDERED that Nagayama's request for a scheduling conference [121] be, and hereby is, GRANTED. Counsel shall appear before the Court on January 23, 2003 at 9:30 a.m. for a status and pretrial scheduling conference.

Footnotes

**Sigma Tool & Mach. v. Nagayama Electronic Industry Co., Ltd., Not Reported in...**

2002 WL 34354482

1    Because there are genuine issues of material fact which must be decided by the trier of fact, the result would be the same if Sigma had styled its motion as one for partial summary judgment. *See*Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

2    Sigma argues that customers consider its tee-nuts equivalent to those manufactured by Nagayama, but Sigma's evidence does not show as a matter of law that there is little demand for Nagayama's patented tee-nuts.

3    "The incremental income approach to the computation of lost profits is well established in the law relating to patent damages."*Paper Converting Machine Co. v. Magna–Graphics Corp.,* 745 F.2d 11, 22 (Fed.Cir.1984)."The approach recognizes that it does not cost as much to produce unit N + 1 if the first N (or fewer) units produced already have paid the fixed costs. Thus fixed costs—those costs which do not vary with increases in production, such as management salaries, property taxes, and insurance—are excluded when determining profits."*Id.*

4    Dr. Buzzell's report sets forth his opinion regarding Nagayama's past lost profits. Dr. Buzzell does not express an opinion regarding future lost profits. *Cf. Shockley v. Arcan, Inc. .,* 248 F.3d 1349, 1362–64 (Fed.Cir.2001).

---

**End of Document**                                                 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**IGT v. Alliance Gaming Corp., Not Reported in F.Supp.2d (2008)**

2008 WL 7084605

2008 WL 7084605
Only the Westlaw citation is currently available.
United States District Court,
D. Nevada.

IGT, a Nevada Corporation, Plaintiff,
v.

ALLIANCE GAMING CORPORATION, a Nevada
Corporation; Bally Gaming International,
Inc., a Delaware Corporation; and Bally
Gaming, Inc., a Nevada Corporation d/
b/a Bally Gaming & Systems, Defendants.
And Related Counterclaims.

No. 2:04–CV–1676–RCJ–RJJ.  |  Oct. 21, 2008.

Named Expert: J.R. Kearl, Richard Troxel

**Attorneys and Law Firms**

Darin J. Glasser, Nathaniel L. Dilger, Brett J. Williamson, David B. Murphy, Polaphat Veravanich, O'Melveny & Myers LLP, Newport Beach, CA, David P. Enzminger, Mark Samuels, O'Melveny & Myers LLP, Los Angeles, CA, James B. Fairbanks, Steve L. Morris, Rex Garner, Morris Pickering & Peterson, Las Vegas, NV, Darren Tucker, Ian Simmons, O'Melveny & Myers, Washington, DC, for Plaintiff.

Amy H. Candido, Charles K. Verhoeven, Eric E. Wall, Jennifer A. Kash, Rodham Tulloss Delk, Kevin Alexander Smith, Todd Kennedy, Quinn Emanuel Urquhart Oliver & Hedges LLP, San Francisco, CA, J. Stephen Peek, Matthew J. Kreutzer, Holland & Hart, LLP, Steve L. Morris, Morris Peterson, Las Vegas, NV, for Defendants.

**ORDER**

ROBERT C. JONES, District Judge.

**\*1** Before the Court are IGT's Motion *In Limine* No. 1 to Exclude Testimony of Professor J.R. Kearl (# 848) and Bally's Motion *In Limine* No. 1 to Exclude Opinions and Testimony of Richard Troxel Regarding Lost Profits (# 844). The Court has considered the motions, briefs, pleadings, and oral argument on behalf of all parties and issues the following order. IT IS HEREBY ORDERED that IGT's Motion *In Limine* No. 1 to Exclude Testimony of Professor J .R. Kearl (# 848) and Bally's Motion *In Limine* No. 1 to Exclude Opinions

and Testimony of Richard Troxel Regarding Lost Profits (# 844) are *denied.*

**I. BACKGROUND**

IGT is a global company specializing in the design, development, manufacturing, distribution, and sale of computerized gaming machines and system products. Bally, one of IGT's chief competitors, is a diversified, worldwide gaming company that designs, manufactures, operates, and distributes gaming machines and computerized monitoring systems for gaming machines; owns and operates a significant installed base of gaming machines; and owns and operates a casino.

Among IGT's most successful products is its "Wheel of Fortune" slot machine, which includes a bonus wheel feature located in the gaming machine top-box. According to IGT, the "Wheel of Fortune" game has been on the market for over a decade. IGT asserts that beginning in 2002, Bally began selling wheel games that compete with the "Wheel of Fortune," "Wheel of Gold," and other IGT products. These competing games include "Monte Carlo," "Lucky Wheel," "Frenzy Games," "Cash Wheel," "Playboy Get Lucky," "Fortune Finder," "Party Spin," "Diamond Sevens," and "Dragon Wheel." Because IGT claims that these competing games infringe upon IGT's patents, it commenced this patent infringement suit in December 2004 to stop what it calls "Bally's willful disregard for IGT's intellectual property rights."(# 172 at 4).

On December 7, 2004, IGT filed with this Court its Complaint (# 1) for patent infringement against Bally. In its Complaint, IGT alleges six separate infringement counts for six different patents: Patent No. 6,827,646 (the "#646 patent"); Patent No. 5,848,932 (the "#932 patent"); Patent No. 5,788,573 (the "#573 patent"); Patent No. 5,722,891 (the "#891 patent"); Patent No. 6,712,698 (the "#698 patent"); and Patent No. 6,722,985 (the "#985 patent"). On January 21, 2005, Bally filed its Answer and fourteen counterclaims.

In support of its claims for damages, IGT has proffered the expert testimony of Mr. Richard Troxel. Mr. Troxel opines that IGT is entitled to recover damages from Bally for its alleged infringement of IGT's wheel patents in the form of lost sales. Mr. Troxel estimates IGT's purported lost sales by assuming that, absent infringement, every placement of an accused Bally wheel game would have instead been a placement of an IGT wheel game. Relying on this one-for-one substitution assumption, Mr. Troxel uses Bally's data to

estimate the number of "lost machine days" that IGT has allegedly suffered. Mr. Troxel then assumes that each alleged IGT lost sale would have earned the average daily profit per unit earned by IGT's wheel games historically in that jurisdiction. Mr. Troxel also concludes that IGT is entitled to recover damages in the form of price erosion damages. Mr. Troxel concludes that Bally's introduction of its allegedly infringing wheel games into the market has injured IGT by causing IGT to drop its prices to compete with Bally. Mr. Troxel's price erosion calculations are based upon the machines that IGT leased at discounted rates to two of its largest customers—MGM/Mirage and Harrah's.

**\*2** To rebut Mr. Troxel's damages opinions, Bally has proffered the expert testimony of Dr. James Kearl. Dr. Kearl does not agree that each casino that bought a Bally wheel game would have instead leased from IGT. According to Dr. Kearl, a casino could have based its decision to purchase a Bally wheel game on a number of factors, such as a Bally game's unique design, trademarks, play mechanics, or pricing structure. Dr. Kearl believes that under these circumstances, economic theory does not lead to the conclusion that but for infringement, each Bally wheel game placement would have instead been an IGT wheel game placement.

Dr. Kearl also concludes that Mr. Troxel's assumption that each substituted IGT wheel game would have earned the historic average profit per unit of other IGT games in that jurisdiction is erroneous. According to Dr. Kearl, Mr. Troxel does not take into account that Bally's games are not necessarily the same denomination as IGT's. Dr. Kearl also notes that Mr. Troxel assumes that as a casino increases the number of IGT wheel games on its floor, these additional games do not diminish any of the play on the IGT wheel games already on the floor. According to Dr. Kearl, economic theory would predict that IGT wheel games would enjoy a diminishing marginal return to casinos as they approach a saturation point. Dr. Kearl tested that theory and found that the average profitability of IGT wheel games was negatively correlated with the number on a casino floor.

## II. MOTIONS IN LIMINE
A motion *in limine* is a procedural device to obtain an early and preliminary ruling on the admissibility of evidence. Black's Law Dictionary defines it as "[a] pretrial request that certain inadmissible evidence not be referred to or offered at trial. Typically, a party makes this motion when it believes that mere mention of the evidence during trial would be highly prejudicial and could not be remedied by an instruction to

disregard...."BLACK'S LAW DICTIONARY, 1038–39 (8th ed.2004). Although the Federal Rules of Evidence do not explicitly authorize a motion *in limine,* the Supreme Court has held that trial judges are authorized to rule on motions *in limine* pursuant to their authority to manage trials. *Luce v. United States,* 469 U.S. 38, 41 n. 4 (1984)

A motion *in limine* is a request for the court's guidance concerning an evidentiary question. *See Wilson v. Williams,* 182 F.3d 562, 570 (7th Cir.1999). Judges have broad discretion when ruling on motions *in limine. See Jenkins v. Chrysler Motors Corp.,* 316 F.3d 663, 664 (7th Cir.2002). However, a motion *in limine* should not be used to resolve factual disputes or weigh evidence. *See C & E Services, Inc., v. Ashland Inc.,* 539 F.Supp .2d 316, 323 (D.D.C.2008). To exclude evidence on a motion *in limine*"the evidence must be inadmissible on all potential grounds."*Ind. Ins. Co. v. Gen. Elec. Co.,* 326 F.Supp.2d 844, 846 (N.D.Ohio 2004); *Kiswani v. Phoenix Sec. Agency, Inc.,* 247 F .R.D. 554 (N.D.Ill.2008); *Wilkins v. K–Mart Corp.,* 487 F.Supp.2d 1216, 1218–19 (D.Kan.2007); *Allen v. City of N.Y.,* 466 F.Supp.2d 545, 548 (S.D.N.Y.2006)."Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context."*Hawthorne Partners v. AT & T Tech, Inc.,* 831 F.Supp. 1398, 1400 (N.D.Ill.1993). This is because although rulings on motions *in limine* may save "time, costs, effort and preparation, a court is almost always better situated during the actual trial to assess the value and utility of evidence."*Wilkins,* 487 F.Supp.2d at 1219.

**\*3** It is settled law that *in limine* rulings are provisional. Such "rulings are not binding on the trial judge [who] may always change his mind during the course of a trial."*Ohler v. United States,* 529 U.S. 753, 758 n. 3 (2000); *accord Luce v. United States,* 469 U.S. 38, 41 (1984) (noting that *in limine* rulings are always subject to change, especially if the evidence unfolds in an unanticipated manner)."Denial of a motion in limine does not necessarily mean that all evidence contemplated by the motion will be admitted to trial. Denial merely means that without the context of trial, the court is unable to determine whether the evidence in question should be excluded."*Ind. Ins. Co. v. Gen. Elec. Co.,* 326 F.Supp.2d at 846.

## III. DAUBERT STANDARD
The trial court acts as a "gatekeeper" to exclude expert testimony that does not meet the relevancy and reliability threshold requirements. *Elsayed Mukhtar v. California State*

*University, Hayward,* 299 F.3d 1053, 1063 (9th Cir.2002)."A trial court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability."*Id.* at 1064(citations omitted)."It is the proponent of the expert who has the burden of proving admissibility."*Lust v. Merrell Dow Pharms., Inc.,* 89 F.3d 594, 598 (9th Cir.1996).

As to the first prong of *Daubert,*"relevance means that the evidence will assist the trier of fact to understand or determine a fact in issue."*Cooper v. Brown,* 510 F.3d 870, 942 (9th Cir.2007) (citing *Daubert,* 509 U.S. at 591–92)."The evidence must logically advance a material aspect of the party's case."*Id.* (citation omitted)."Encompassed in the determination of whether expert testimony is relevant is whether it is helpful to the jury, which is the 'central concern' of Rule 702."*Elsayed Mukhtar,* 299 F.3d at 1063 n. 7 (citation omitted)."*Daubert* [also] adds that the gatekeeping inquiry must be 'tied to the facts' of a particular 'case.' " *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 150 (1999) (quoting *Daubert,* 509 U.S. at 591).

Expert testimony "must satisfy a second hurdle, reliability, before it can be admitted."*Cooper,* 510 F.3d at 942."The trial court must [also] act as a 'gatekeeper' to exclude 'junk science' that does not meet Rule 702's reliability standards by making a preliminary determination that the expert's testimony is reliable. *Elsayed Mukhtar,* 299 F.3d at 1063."Rule 702 demands that expert testimony relate to scientific, technical or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs."*Diviero v. Uniroyal Goodrich Tire Co.,* 114 F.3d 851, 853 (9th Cir.1997) (citing *Daubert,* 509 U.S. at 590).

*Daubert* provides the following non-exclusive list of factors to guide the assessment of the reliability of scientific evidence: (1) whether a scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the technique is generally accepted. *See Daubert,* 509 U.S. at 593–94. The Court's analysis of the relevance and reliability of expert testimony is "vital to ensure accurate and unbiased decision-making by the trier of fact."*Elsayed Mukhtar,* 299 F.3d at 1063.In response to *Daubert,* Rule 702 was amended to better aid trial judges in assessing reliable expert testimony. That rule now provides that an expert witness with "scientific, technical, or other specialized

knowledge" may testify in the form of an opinion "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."Fed.R.Evid. 702.

**\*4** In *Micro Chemical, Inc. v. Lextron, Inc.,* 317 F.3d 1387 (Fed.Cir.2003), the defendants filed a motion *in limine* to exclude the plaintiff's expert testimony regarding damages, alleging that the expert relied on "insufficient facts or data" and "unreliable methodology." *Id.* at 1392–93.As to the argument that the expert relied on insufficient facts, the court concluded that "it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."*Id.* at 1392.As such, the court held that, when the parties' experts rely on conflicting sets of facts, an expert may testify on his party's version of the disputed facts. The proper way for a party to challenge an expert in such a situation, reasoned the court, is through cross-examination of the expert. *Id.* Therefore, the court ruled that the trial court properly rejected defendant's argument. *Id. See Pipitone v. Biomatrix, Inc.,* 288 F.3d 239 (5th Cir.2002) (observing that "the trial court's role as gatekeeper [under *Daubert* ] is not intended to serve as a replacement for the adversary system" and that under *Daubert,*"[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") (citations omitted).

In contrast, the Court's discussion of whether the expert relied on "unreliable methodology" involved an analysis of the underlying legal principles of patent damages law. *Id.* at 1393.In the context of computing reasonable royalty damages, the Court noted that it had "endorsed the conceptual framework of a hypothetical negotiation between patentee and infringer ..."*Id.* at 1393 (citations omitted). Thus, the Court reviewed the expert's testimony to determine whether he had "properly applied the accepted [factors]" outlined in the framework to the disputed facts. *Id.* The Court held that, in applying those factors, the expert was not legally erroneous in his methodology to compute reasonable royalty damages. *Id.* at 1394.Thus, *Micro Chemical* distinguishes between the trial court's factual review, which is generally outside the role of the trial court, and review of the legal methodology underlying an expert's opinion which is within the role of the trial court.

**IV. DR. KEARL'S EXPERT REPORT**

**IGT v. Alliance Gaming Corp., Not Reported in F.Supp.2d (2008)**

2008 WL 7084605

## A. Two–Supplier Market

IGT argues that Dr. Kearl's analysis and testimony are unreliable and inadmissible because he failed to apply the legally required methodology in reaching his conclusions regarding lost profits. IGT argues that under Federal Circuit precedent, because the evidence demonstrates that IGT and Bally are the only two suppliers of wheel games, Dr. Kearl is required to assume that "but for" Bally's infringing activities, IGT would have made the sales of wheel games that Bally captured.

"To recover lost profits, the patent owner must show 'causation in fact,' establishing that 'but for' the infringement, he would have made additional profits."*Grain Processing Corp. v. American Maize–Products Co.,* 185 F.3d 1341, 1349 (Fed.Cir.1999) (citation omitted)."When basing an alleged lost profits on lost sales, the patent owner has an *initial burden* to show a reasonable probability that he would have made the asserted sales 'but for' the infringement."*Id.* (citation omitted) (emphasis added). Once the patentee successfully carries this burden, "the burden then shifts to the accused infringer to show that [the patent owner's 'but for' causation claim] is unreasonable for some or all of the lost sales."*Id.* (citation omitted).

\*5  To assist the patentee with this burden, the Federal Circuit has approved of the specific test articulated in *Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.,* 575 F.2d 1152 (6th Cir.1978).*See Kaufman v. Lantech, Inc.,* 926 F.2d 1136, 1140 (Fed.Cir.1991). The *Panduit* test has four requirements. To obtain damages for lost profits, the patentee must prove (1) a demand for the patented product, (2) the marketing and manufacturing capability to exploit demand, (3) an absence of acceptable noninfringing substitutes, and (4) the amount of profit the patentee would have made. *Id.* at 1140–41.By satisfying this test, a patentee creates an inference that it probably would have made all the sales but for the occurrence of the infringing sales. *See id.* at 1143.The Federal Circuit has also recognized that "[t]he same inference can be compelled by another course. When the patentee and the infringer are the only suppliers present in the market, it is reasonable to infer that the infringement probably caused the loss of profits."*Id.* at 1141 (citing *Lam, Inc. v.. Johns–Manville Corp.,* 718 F.2d 1056, 1065 (Fed.Cir.1983)). Under the two-supplier test, a patentee must show 1) the relevant market contains only two suppliers; 2) its own manufacturing and marketing capability to make the sales that were diverted to the infringer; and 3) the amount of profit it would have made from these diverted sales. *Micro Chemical,*

*Inc.,* 318 F.3d at 1124 (citing *Lam,* 718 F.2d at 1064)."In essence, the two-supplier market test collapses the first two *Panduit* factors into one 'two suppliers in the relevant market' factor."*Id.*

IGT argues that once a patentee satisfies the *Panduit* test or the *Lam* two-supplier market test, the patentee has provided conclusive evidence as to its entitlement and the amount of damages. Such a proposition runs counter to Federal Circuit precedent and would lead to a grossly unjust result. Satisfaction of both the *Panduit* and *Lam* tests creates a strong inference in favor of the patentee. In fact, the Federal Circuit has noted that when both tests are satisfied, "the inference approaches conclusiveness." *Id.* at 1141.

Nonetheless, they are still mere inferences. The patentee shifts the burden to the alleged infringer "to show that it is unreasonable to infer that some or all of the infringing sales probably caused the patentee to suffer the loss of profits."*Id.* at 1141–42.The alleged infringer must be allowed to produce evidence to rebut these inferences. In *Micro Chemical, Inc. v. Lextron, Inc.,* the Federal Circuit stated that if the patentee satisfies the two-supplier test, the alleged infringer "may rebut the presumption by showing that the patentee reasonably would not have made some or all of the diverted sales 'but for' the infringement."*Id.* at 1125.In fact, the Federal Circuit gave an example of how a two-supplier market could prevail, but an accused infringer could still successfully rebut the inference. The Federal Circuit described the situation where "there are two suppliers in the market, but the infringing supplier had two available alternatives: one infringing and the other noninfringing" and noted that "[i]n that situation, even absent the infringement, customers may have selected the infringer's available, noninfringing alternative over the patented invention."*Id.* IGT's position would rob Bally of the right to rebut the inference triggered by IGT and its expert Mr. Troxel.

\*6  In *Grain Processing Corp.,* the Federal Circuit observed that to prove what a patentee would have made absent the infringing activities, the patentee is entitled to reconstruct the market "as it would have developed absent the infringing product, to determine what the patentee 'would ... have made.' " *Id.* at 1350.(citation omitted). Nonetheless, "a fair and accurate reconstruction of the 'but for' market also *must* take into account, where relevant, alternative actions the infringer foreseeably would have undertaken had he not infringed." *Id.* at 1350–51 (emphasis added). Therefore, the alleged infringer must have a right to produce evidence as

to what it would have done absent the infringement, namely in the form of offering noninfringing alternatives. In fact, "if the defendant is not permitted to present evidence of this ilk, the analysis is quite skewed: only the patentee's 'best case' scenario is presented, rather than a more realistic scenario." *Id.* at 1351 (quoting Robert P. Merges, Patent Law 1080 (2d Ed.1997)).*See also,* John W. Schlicher, Patent Law: Legal and Economic Principles § 9.05[2][l] (1997) ( "unless the law wishes to systematically overreward patented inventions, it is necessary to inquire about the nature and value of the product that the infringer could have made had he not infringed."). If IGT's argument were to prevail, it would only allow IGT to present its case of the reconstructed world, but this reconstruction would be incomplete as there must be an opportunity to consider noninfringing alternatives or other factors that would impact the patentee's recoverable damages.

In *Grain Processing Corp.,* the district court adopted the plaintiff Grain Processing's initial premise that, because Grain Processing and the defendant American Maize competed head-to-head as the only significant suppliers of a type of product, consumers logically would purchase Grain Processing's patented product if American Maize's allegedly infringing product were not available. *See id.* at 1349.Yet, American Maize was not precluded from presenting evidence to rebut this initial inference simply because there was a two-supplier market. In fact, the district court found that American Maize proved that a different American Maize product was available and that it was an acceptable substitute for the claimed invention. *See id.* at 1349.In the face of this noninfringing substitute, American Maize argued that Grain Processing could not prove lost profits. *See id.* at 1349.The district court and the Federal Circuit agreed.

Therefore, Dr. Kearl's analysis is not legally precluded by the *Lam* two-supplier test. Dr. Kearl is still entitled to provide his expert report and testimony.

**B. Panduit Test**

IGT also argues that Dr. Kearl's analysis is improper because he failed to conduct an analysis under the *Panduit* four-factor test. IGT argues that Dr. Kearl relies upon factors that are irrelevant to the *Panduit* test, which renders such testimony unreliable.

**\*7** The *Panduit* test is a tool that the patentee uses to carry its initial burden of showing causation in fact, establishing that "but for" the infringement, the patentee would have made additional profits. The accused infringer can then rebut that

inference. IGT's argument that Dr. Kearl's analysis is not credible on this ground has no merit. Bally is not restricted to producing rebuttal evidence that would only apply to one of the four *Panduit* factors, and IGT has produced no authority to suggest otherwise. Furthermore, Dr. Kearl includes a section in his report that addresses Mr. Troxel's *Panduit* analysis, namely treating the second factor on noninfringing substitutes.

**C. Noninfringing Substitutes**

IGT also argues that Dr. Kearl's testimony is inadmissible because he claims that non-wheel games are acceptable substitutes for wheel games with the patented features. IGT claims that Dr. Kearl's testimony that non-wheel games are adequate substitutes for gaming machines with the patented features is based on a misunderstanding of the law.

"A product lacking the advantages of that patented can hardly be termed a substitute acceptable to the customer who wants those advantages."*TWM Mfg. Co., Inc. v. Dura Corp.,* 789 F.2d 895, 901 (Fed.Cir.1986) (quoting *Panduit,* 575 F.2d at 1162). In *Kaufman Co., Inc.,* the district court denied a patentee lost profits on the ground that the patentee failed to present evidence indicating that every infringing purchaser would not have accepted a noninfringing substitute. 926 F.2d at 1140.The Federal Circuit reversed, holding that neither of the alleged substitutes that the district court deemed to be noninfringing substitutes "possessed all the beneficial characteristics of the patented device" and therefore could not be treated as acceptable noninfringing substitutes. *Id.* at 1143.

Nonetheless, two products can have different features yet still qualify as noninfringing substitutes. The Federal Circuit has noted that courts should consider "the commercial realities of the marketplace."*SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.,* 926 F.2d 1161, 1166 (Fed.Cir.1991). In *SmithKline Diagnostics, Inc.,* the patentee argued that certain allegedly noninfringing products lacked one or more features of the patented invention and, therefore, would not be deemed part of the market. *See id.*The Federal Circuit countered by stating that "by definition, noninfringing products do not represent an embodiment of the invention" and that a court should consider "the realities of the marketplace in connection with an assertion that 'but for' the infringing activities, the patent owner would have made the sales."*Id.* The Federal Circuit concluded that "if the realities of the market are that others would likely have captured sales made by the infringer, despite a difference in the products, it follows that the 'but for' test is not met."*Id.*

*8 Bally has produced evidence that the realities of the marketplace may make some non-wheel gaming machines acceptable substitutes. In his expert report, Dr. Kearl noted that IGT's own reports show that casinos regularly replace IGT wheel games with its competitors' non-wheel games when it is profitable to do so. (# 864, Ex. 1 at 29, ¶ 94). Dr. Kearl noted that IGT testimony reveals that profitability drives which machines a casinos puts on its floor. (*See id.* at 28–31). In fact, in a separate motion *in limine,* IGT argues that wheel games cannot constitute a relevant market for antitrust purposes because the record clearly shows that wheel games and non-wheel games are in the same relevant market, which argument significantly weakens IGT's present argument that non-wheel games cannot constitute acceptable non-infringing substitutes. (# 857).

Nonetheless, "[c]onsumer demand defines the relevant market and relative substitutability among products therein."*Grain Processing Corp.,* 185 F.3d at 1355.Numerous factors shape consumer demand, including "consumers' intended use for the patentee's product, similarity of physical and functional attributes of the patentee's product to alleged competing products, and price."*Id.* (citation omitted)."Where the alleged substitute differs from the patentee's product in one or more of these respects, the patentee often must adduce economic data supporting its theory of the relevant market in order to show 'but for' causation."*Id.* (citation omitted). Bally has pointed to evidence that the realities of the gaming marketplace and the various factors that shape consumer demand for a gaming machine may allow for a finding that certain non-wheel games are acceptable substitutes for IGT's wheel games.

In sum, both parties have essentially highlighted an issue of fact as to what is the essential feature of IGT's patented wheel games that drives their sales and demand, as well as what machines could serve as a noninfringing substitute for IGT's patented products. However, the existence of a noninfringing substitute is a question of fact. *See Minnesota Min. and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,* 976 F.2d 1559, 1577 (Fed.Cir.1992). Although this dispute may be excellent fodder for consideration on summary judgment, it is not appropriately resolved through a motion *in limine.*As *Micro Chemical* demonstrates, *Daubert* does not allow a court to resolve a factual dispute underlying the expert's analysis. A trial court is not permitted under *Daubert* to "transform a *Daubert* hearing into a trial on the merits."*Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 250 (5th Cir.2002). To this end,

a *motion in limine* is not the appropriate vehicle for resolving a question of fact. *See NRDC v. Rodgers,* No. Civ–S–88–1658, 2005 WL 1388671 at *1 n. 2 (E.D. Cal. June 9, 2005) ("motions in limine address evidentiary questions and are inappropriate devices for resolving substantive issues" (citing 75 Am.Jur.2d Trial § 99 (2004))).*See also, Voohries–Larson v. Cessna Aircraft Co.,* 177 F.R.D. 462, 472 (D.Ariz.1998) (stating that "in the context of a motion in limine, rather than a motion for summary judgment, the Court's inquiry is limited to reliability and relevance, not whether there exists a genuine issue of material fact with respect to causation.").

*9 IGT also argues that Dr. Kearl's testimony is unreliable because it directly contradicts Bally's admissions. Dr. Kearl claims that an acceptable noninfringing substitute existed because Bally offered the "Triple Spin" game for sale during a small portion of the damages period. Yet, Bally admitted that the "Tripe Spin" game was unprofitable. As a result, IGT argues that Dr. Kearl cannot factor this game in as part of his analysis that there was a noninfringing substitute.

For similar reasons, this is an issue inappropriate for a motion *in limine.*If IGT wishes the Court to rule that Bally's "Triple Spin," or certain non-wheel gaming machines, are not acceptable non-infringing substitutes, IGT should have asked the Court to do so through a motion for summary judgment. Because it did not, these are questions of fact left for the jury's determination. Furthermore, even though Bally may have admitted that the "Triple Spin" was not that profitable, the "Triple Spin" was still on sale and available to the public for purchase in place of one of IGT's machines. As a result, Dr. Kearl should be allowed to factor in the "Triple Spin" into his analysis.

For the foregoing reasons, IGT's Motion *In Limine* No. 1 To Exclude Testimony Of Professor J.R. Kearl (# 848) *is denied.*

## V. MR. TROXEL' S EXPERT REPORT

Under 35 U.S.C. § 284, a patentee is entitled to at least a reasonable royalty for infringement of its patent: "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."(emphasis added). Beyond reasonable royalty, a patentee may seek lost profit damages for infringement. To recover lost profits, "a patent owner must prove a causal relation between the infringement and its loss of profits."*BIC Leisure Prods., Inc. v. Windsurfing*

**IGT v. Alliance Gaming Corp., Not Reported in F.Supp.2d (2008)**

2008 WL 7084605

*Int'l, Inc.,* 1 F.3d 1214, 1218 (Fed.Cir.1993). Lost profits can be sought in the form of "diverted sales, price erosion, and increased expenditures caused by infringement."*Atmel Corp. v. Silicon Storage Technology, Inc.,* 76 Fed.Appx. 298, 311 (Fed.Cir.2003). For price erosion damages, the patentee must show that "but for" infringement, it would have sold its product at higher prices. *See BIC Leisure,* 1 F.3d at 1220.

Bally argues that Mr. Troxel's damages opinions are unreliable and inadmissible on several different grounds. First, Bally argues that Mr. Troxel's lost sales and price erosion opinions conflict with the economic principle of elasticity of demand. Second, Bally argues that Mr. Troxel's lost sales opinions are contrary to the economic principle of the law of diminishing marginal returns. Third, Bally argues that Mr. Troxel's lost sales and price erosion conclusions are based upon mutually exclusive assumptions.

**A. Elasticity of Demand**

\*10 Bally argues that Mr. Troxel's opinion is flawed for assuming that IGT would have sold or leased one of its products for the sale of every one of Bally's allegedly infringing products. Bally claims that such a conclusion conflicts with the economic principle of elasticity of demand, which states that consumers will typically purchase fewer units of a product at a higher price than at a lower price.

Bally makes the same argument for excluding Mr. Troxel's opinion on price erosion damages. Mr. Troxel concludes that IGT has suffered price erosion damages as a result of competition from Bally's allegedly infringing wheel games. Specifically, Mr. Troxel claims that because IGT discounted the price of the wheel games it sold to two of its clients —MGM/Mirage and Harrah's—to compete with Bally's allegedly infringing wheel games, IGT can recover price erosion damages for each one of the discounted machines that it leased to these two clients. Bally asserts that this conclusion also ignores elasticity of demand because IGT cannot claim that IGT would have leased one of its wheel games at the non-discounted price for every one of the allegedly infringing wheel games that Bally sold to MGM/Mirage and Harrah's.

For both the lost sales and price erosion conclusions, Bally's argument lives and dies on its assumption that IGT's patented products cost more than Bally's allegedly infringing products. Bally sells its wheel games for approximately $19,000 a machine. Instead of an outright sale, IGT leases its wheel games on a participation basis. IGT places its games in the casinos for free and then takes a percentage of the machine's

profits. As a result, one cannot determine upfront the actual cost of one of IGT's wheel games. Because of the participation model employed by IGT, the ultimate cost of one of IGT's wheel machines varies from machine to machine. In light of the contrasting cost structures of the Parties' respective gaming machines, the Court cannot determine at this stage the cost equivalency of the machines. *Daubert* does not allow a court to resolve a factual dispute underlying the expert's analysis. There is a genuine issue of material fact regarding the costs of the Parties' respective wheel games. "[A] motion *in limine* should not be used to resolve factual disputes or weigh evidence."*Hays v. Clark County Nev.,* No. 2:07–cv–01395, 2008 WL 2372295, at \*7 (D.Nev. June 6, 2008) (citation omitted). The Court's resolution of this issue of fact is not appropriate at this stage and on a motion *in limine.*

Moreover, a damages expert's damages calculations are not *per se* unreliable simply because the expert's figures are based on an inelastic market. The Federal Circuit denied this proposition in *Ericsson, Inc. v. Harris Corp.,* 352 F.3d 1369, 1379 (Fed.Cir.2003). In *Ericsson,* the Federal Circuit highlighted that the plaintiff had sufficiently explained how "the unique market conditions in th[e] case would not have resulted in decreased sales at an increased price."*Id.* Similarly, IGT has explained that the elasticity of demand is not applicable in the present case because of the circumstances unique to the gaming industry and how casinos choose which machines to purchase. IGT has stressed the importance of the "net win" or profitability of a gaming machine in driving a casino's choice to purchase a machine. (# 892 at 4). Dr. Kearl's own opinions provide some support for this explanation. In his expert report, Dr. Kearl relied upon evidence that casinos regularly replace IGT wheel games with its competitors' non-wheel games when it is profitable to do so. (# 864, Ex. 1 at 29, ¶ 94). Dr. Kearl also relied upon IGT testimony that profitability drives which machines a casinos puts on its floor. (*See id.* at 28–31). In *Ericsson,* the Federal Circuit "recognized that an inelastic market may be 'rare,' " but that "it was for the jury to determine whether this was such a case based on the evidence before it." 352 F.3d at 1379.Once again, there appears to be a genuine issue of material fact as to the ultimate factor or factors driving the purchase of the Parties' respective gaming machines, adding another issue of fact inappropriate for resolution on a motion *in limine.*The jury should have the opportunity to address this issue and its impact on the elasticity of the market.

**B. Law of Diminishing Returns**

*11 Bally argues that Mr. Troxel's opinion disregards the law of diminishing returns in calculating the average profitability of the machines that IGT would have leased had it made the sales that Bally did on its allegedly infringing products. Because IGT places most of its wheel games on a participation basis, Bally argues that if IGT claims that it would have made all of the sales that Bally did and placed those machines on the casino floor, such a result would diminish the average profitability for each machine.

Mr. Troxel bases his calculations on his finding that IGT's wheel games would sustain their average profitability even with the addition of more wheel games. Bally's expert Dr. Kearl concludes that IGT's wheel games could not sustain the same average profitability. Both experts have arrived at different conclusions, but this does not allow the Court to exclude either expert. IGT cites no law that holds that a damages expert's calculations are unreliable if his or her average profitability figures do not entirely square up with the law of marginal diminishing returns.

Furthermore, Bally's own argument relies upon unfounded assumptions. For example, Bally assumes that the additional wheel games that IGT would have allegedly made but for Bally's allegedly infringing sales would have all ended up on the same casino floor. Bally has no support for this assumption.

In the end, both damages experts offer reasoned opinions based on differing views of fundamental economics to reach different conclusions. Rather than exclude either expert, the Court should hold that both approaches are worthy of a presentation to a jury for a decision. In case of conflicting expert testimony, it is for jury to decide which expert to believe. *See Knapp v. Leonardo,* 46 F.3d 170, 179 (2d Cir.1995)."It is not for the Court to decide which expert opinion is more persuasive. The conflicting opinions 'merely create[ ] a credibility question for the jury to resolve ... and plaintiff is entitled to the benefit of every favorable inference.' " *Zabel v. Olsen,* 895 F.Supp. 44, 47 (N.D.N.Y.1995) (citation omitted).

**C. Relationship Between Lost Sales and Price Erosion**
Bally argues that Mr. Troxel's damages opinions must be excluded because they rest on mutually inconsistent assumptions. In others words, a patentee cannot seek to recover all of the accused infringer's lost sales and simultaneously seek to recover price erosion damages for those same sales. Bally's only legal authority for this proposition is *Crystal Semiconductor Corp. v. TriTech Microelectronics Intern., Inc.,* 246 F.3d 1336 (Fed.Cir.2001).

In *Crystal Semiconductor Corp.,* the Federal Circuit recognized that in seeking price erosion damages, the patentee must account for the reduced sales of its products due to the higher prices. The court affirmed the denial of price erosion damages in *Crystal Semiconductor Corp.* because the patentee used an improper benchmark by attempting to compare the pricing history in a market that was substantially different from the competitive market in which the infringing product was sold and failed to account for the reduced sales it would suffer as a result of the higher prices. Applying this principle, the court held that because the patentee competed in a competitive market, its failure to make any estimates as to the number of sales it would have lost or kept had it increased its prices by the amount it alleged was eroded amounted to a failure of showing "but for" causation sufficient to obtain damages for price erosion. *See id.* at 1360–61.

*12 The *Crystal Semiconductor Corp.* facts are significantly different from those in the present case, which precludes the type of wholesale application of the Federal Circuit's holding and reasoning that Bally is seeking. In fact, in *Crystal Semiconductor Corp.,* the Federal Circuit highlighted the essential difference between operating in a market where there are only two suppliers of a product and a competitive market with multiple players. *See id.* at 1358–59.The Federal Circuit's holding applies to the latter type of market. The Federal Circuit held that in the latter competitive market, a patentee needs to present detailed economic evidence of the resulting market for a higher priced product. The Parties do not dispute that they are the two suppliers for wheel games. As a result, the Federal Circuit's reasoning and holding on price erosion damages does not control the same issue between IGT and Bally. Bally has presented no other legal authority to persuade the Court to hold that a patentee cannot simultaneously seek to recover the accused infringer's lost sales and price erosion damages. As a result, Bally's Motion *In Limine* No. 1 to Exclude Opinions and Testimony of Richard Troxel Regarding Lost Profits *is denied.*

**CONCLUSION**

IT IS HEREBY ORDERED that IGT's Motion *In Limine* No. 1 to Exclude Testimony of Professor J.R. Kearl (# 848) and Bally's Motion *In Limine* No. 1 to Exclude Opinions and

**IGT v. Alliance Gaming Corp., Not Reported in F.Supp.2d (2008)**

2008 WL 7084605

Testimony of Richard Troxel Regarding Lost Profits (# 844)
are *denied.*

---

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:08-cv-02755-DCN Doc #: 247-2 Filed: 10/10/14 16 of 47. PageID #: 13953

Storage Technology Corp. v. Custom Hardware Engineering..., Not Reported in...
2006 WL 1766434, 2006-2 Trade Cases P 75,434

2006 WL 1766434
United States District Court,
D. Massachusetts.

STORAGE TECHNOLOGY CORPORATION
v.
CUSTOM HARDWARE ENGINEERING
& CONSULTING, LTD., David
York, and PD Properties, LLC.

Civil Action No. 02-12102-
RWZ. | June 28, 2006.

**Attorneys and Law Firms**

Allan H. Norman, Edwin G. Harvey, Dean L. Franklin,
Nicholas B. Clifford, Thompson Coburn LLP, Anthony G.
Simon, Simon-Passanante, PC, St.Louis, MO, Marjorie S.
Cooke, Barbara Gruenthal, Cooke, Clancy & Gruenthal,
David E. Plotkin, Joseph D. Steinfield, Prince, Lobel,
Glovsky & Tye, LLP, Boston, MA, for Custom Hardware
Engineering & Consulting, Ltd., David York, and PD
Properties, LLC.

Bobbee J. Musgrave, Perkins Coie, LLP, Charles W. Steese,
Heather Beller, Steese and Evans P.C., Tracy L. Ashmore,
Musgrave & Theis LLP, Denver, CO, Brian E. Whiteley,
Scibelli, Whiteley and Stanganelli, LLP, Boston, MA, Jerry
A. Riedinger, Michael D. Broaddus, Perkins Coie LLP,
Seattle, WA, for Storage Technology Corporation.

Joseph L. Stanganelli, Scibelli, Whiteley and Stanganelli,
LLP, Boston, MA, Anthony Mirenda, Foley Hoag LLP,
Boston, MA.

## MEMORANDUM OF DECISION

ZOBEL, District Judge.

**\*1** In October 2002, plaintiff Storage Technology
Corporation ("STK") filed suit against defendants Custom
Hardware Engineering & Consulting, Inc. ("CHE"),
PD Properties, LLC ("PDP"), and David York. STK
manufactures automated libraries ("silos") that store large
quantities of data on tape cartridges. Each silo houses
numerous cartridges and is connected to a Library Control
Unit ("LCU") that monitors and controls operation of the
silo; each LCU is, in turn, connected via local area network
("LAN") to a Library Management Unit ("LMU"), which

directs and controls multiple LCUs and silos. "To access
data from the library, a user sends a request for the data
to the [LMU]," which then "transmits commands to the
appropriate [LCU]," which finds and reads the data, and then
"sends the data over the network back to the [LMU]."*Storage
Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.,*
421 F.3d 1307, 1309 (Fed.Cir.2005) ("*Storage Tech. II*"),
*reh'g denied*431 F.3d 1374 (Fed.Cir.2005). The computer
code controlling these units is referred to as LMU Code
(or "9330 Code") and LCU Code (or "9311 Code"), and
it is copyrighted. Both LMU and LCU Code consist of
two distinct but intertwined groups: Functional Code, which
"cause[s] the [LMU and LCU] to run," and Maintenance
Code, which "diagnose[s] malfunctions and maintain[s] ...
performance."*Id.* at 1310.

CHE repairs STK libraries. In order to diagnose problems,
CHE intercepts and interprets error messages, which are
generated by the LCU and transmitted to the LMU. These
numeric error messages, known as Fault Symptom Codes
("FSCs"), are packaged within an "Event Message." FSCs
are generated all the time, but they are only sent only if the
LCU is set at an enhanced maintenance level; they are not set
at maintenance level zero. STK tries to prevent others from
using FSCs by setting the maintenance level of its silos to zero
and requiring a password to change the maintenance level.
The password protection scheme is known as "GetKey." To
intercept and interpret FSCs, CHE must therefore bypass
GetKey and change the maintenance level. CHE first used a
device known as the Library Event Manager ("LEM") and
a program called reverse.exe. Eventually, it switched to the
Enhanced Library Event Manager ("ELEM"). Both devices
allow CHE to overcome GetKey, change the maintenance
level, and access FSCs and other STK diagnostic tools.

In 2002, STK filed suit. Its complaint, as subsequently
amended, alleged copyright infringement, violation of the
Digital Millenium Copyright Act ("DMCA"), 17 U.S.C. §
1201(a), trade secret misappropriation, patent infringement,
false advertising, and various state law claims. CHE
counterclaimed, alleging that STK had committed antitrust
and state law violations. In January 2003, STK moved for a
preliminary injunction, which I granted upon finding that it
had shown a substantial likelihood of success on its copyright,
DMCA, and trade secret claims, and that CHE's antitrust
counterclaims would likely fail. *See Storage Tech Corp. v.
Custom Hardware Eng'g & Consulting, Inc.,* No. 02-12102-
RWZ, 2004 WL 1497688, at \*5 (D.Mass. July 2, 2004)
("*Storage Tech. I* "). CHE appealed, and in August 2005,

the Federal Circuit vacated the preliminary injunction, upon finding that CHE was likely to prevail on all three of the claims at issue. *See Storage Tech. II,* 421 F.3d at 1321.

*\*2 Currently before me are the parties' numerous pending motions. Before deciding them, I note once again the extreme excesses to which these parties have been prone. Not only have they asserted a total of thirty-eight counts against one another, in this most recent round they have filed no fewer than ten motions to dismiss and fifteen motions for summary judgment. To illustrate the overlapping, unwieldy nature of the litigation, consider one example. Count 9 of STK's Third Amended Complaint ("Compl.") alleges patent infringement. It is addressed in: PDP's Motion for Partial Summary Judgment (Docket # 609) as well as a supplemental motion (# 764). These filings have brought forth STK's oppositions (679, 779), PDP's reply (# 730), and the usual memoranda, statements of fact, and multi-volume sets of exhibits (611-13, 680, 690-91, 780, 783-86). Count 9 is also addressed by CHE in two separately filed Motions for Partial Summary Judgment (616 and 617), which are joined by York (# 614), and accompanied by two appendices (620-21), three separately filed oppositions from STK (681, 683, 687), supporting papers and exhibits (682, 684, 695, 699), and two replies (724, 725). Finally, STK has filed two motions to dismiss directed toward CHE's affirmative defenses to Count 9 and related counterclaims (338 and 622), which motions CHE has opposed (361 and 659), thereby eliciting STK's reply (# 731).

As the above example makes clear, deciding the motions seriatim would make little sense as multiple motions often address any one count. I therefore address the parties' submissions as they pertain to each count. First, however, I address a preliminary issue of personal jurisdiction.

### PDP's Motion to Dismiss for Lack of Personal Jurisdiction (# 310)

PDP is a wholly owned subsidiary of CHE, which was allegedly established by CHE and York as a holding company for CHE's intellectual property rights. It moves to dismiss for lack of personal jurisdiction, contesting STK's ability to meet the requirements of either the Massachusetts long-arm statute, M.G.L. c. 223A, § 3, or the Fourteenth Amendment Due Process Clause. STK bears the burden of proving personal jurisdiction, *see Boit v. Gar-Tec Prods., Inc.,* 967 F.2d 671, 675 (1st Cir.1992), which the parties agree must in this case be specific. (# 310, at 2 n. 1; # 354, at 5). In relevant part, the Massachusetts long-arm statute provides

courts with jurisdiction over persons or entities who (1) cause tortious injury by an act or omission inside the Commonwealth, or (2) cause tortious injury by an act or omission outside the Commonwealth, "if [the person or entity] regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth."M.G.L. c. 223A, § 3(c), (d).

STK has asserted facts and submitted evidence giving rise to personal jurisdiction over PDP under any of the standards courts apply to a personal jurisdiction analysis. *See Boit,* 967 F.2d at 675-78 (describing prima facie, preponderance of the evidence, and likelihood standards). PDP, which until the filing of suit was the holding company for CHE's intellectual property rights, is headed by York, who is also the head of CHE. In 2000, PDP contracted with a third party to create LEM and ELEM, which devices it then licensed to CHE. CHE, in turn, used LEM and ELEM to provide maintenance services to customers throughout the country, including Allmerica, a business located in Worcester, Massachusetts. In the course of providing these services, the record indicates that CHE accessed STK's Maintenance Code, Event Messages, and FSC Dictionaries, and additionally caused STK's silos to perform calibration operations. STK has alleged that CHE thereby misappropriated its trade secrets and infringed its patents and that PDP was both directly and indirectly involved in such wrongdoing. In relation to the Allmerica account, PDP's conduct occurred both outside and within the state, as is evidenced by the purchase order and invoice naming PDP, and not CHE, as the party that sold the LEM device and licensed the LEM technology to Allmerica. This evidence is sufficient to meet the requirements of both subsections of § 3 of the long-arm statute.

*\*3 Furthermore, as discussed in greater detail below, STK is entitled to proceed to trial against both CHE and PDP on its trade secret and one of its patent infringement claims. In other words, STK has offered sufficient evidence of tortious injury within Massachusetts caused in part by PDP's conduct to proceed to trial. To the extent that "factual issues are common to both the jurisdictional question and the claim on the merits," Boit, 976 F.2d 671, STK's ability to withstand summary judgment scrutiny on these claims indicates it is entitled to prevail on the jurisdictional question as well.

Finally, the Allmerica documents establish this court's jurisdiction under federal due process requirements. *See United Elec. Radio & Mach. Workers of Am. v. 163*

*Pleasant St. Corp.,* 960 F.2d 1080, 1089 (1st Cir.1992). First, STK's trade secret misappropriation and patent infringement claims arise, in part, out of PDP's contacts with Allmerica, both directly and derivatively through CHE. Second, PDP's transactions with Allmerica demonstrate that it purposefully availed itself of the privilege of conducting activities within the Commonwealth and should therefore reasonably have foreseen that it was subject to the jurisdiction of the state's courts. And third, under the relevant "gestalt" factors, jurisdiction is reasonable.

Accordingly, the motion is denied.

**Motions Concerning STK's Third Amended Complaint**

**Counts 1 and 8: Direct and Indirect/Vicarious Copyright Infringement**

In Counts 1 and 8, STK alleges direct and indirect copyright infringement against CHE and PDP, and York, respectively. Specifically, STK alleges that devices developed by defendants and used by CHE in servicing STK libraries infringe STK's copyrighted microcode. The motions addressing this claim are: PDP's Motion for Partial Summary Judgment (# 609), PDP's and York's Supplemental Motion for Summary Judgment (# 764), CHE's Supplemental Motion for Summary Judgment as to Count 1 (# 772), and STK's Motion for Summary Judgment on Count 1 (# 623).

Although the Federal Circuit held that CHE was "likely to prevail on the issue of copyright infringement,"*Storage Tech. II,* 421 F.3d at 1317, STK still asserts that it is entitled to pursue Count 1, albeit on narrower grounds. CHE and PDP disagree, arguing that the Federal Circuit's decision disposed of STK's entire copyright claim, that STK is trying to expand Count 1 to encompass unpled claims, and that in any event its infringement claims fail. At issue are three allegedly infringing copies: [1] (1) reverse.exe, (2) Run Time Diagnostics, and (3) English translations of FSCs.

**I.** *reverse.exe*

According to STK, the reverse.exe program is a "copy of STK's LMU Code," or the 9330 code, which allows CHE to "create unauthorized GetKey passwords." (STK's Response, # 679, at 3). As noted above, GetKey is a password protection scheme with which STK tries to control the maintenance level, and thereby access to the fruits of the Maintenance Code. CHE uses reverse.exe to create passwords that satisfy GetKey. STK claims that reverse.exe is an "unauthorized

copy of STK's LMU code."(# 679, at 3). Defendants respond that STK is impermissibly asserting an entirely new claim, and I agree.

**\*4** STK's copyright claim has always been premised upon the copying of Maintenance Code. The complaint states that the action "arises out of CHE's blatant copying ... of ... STK's original computer Maintenance Code" (Compl.¶ 1), and Count 1 specifically asserts that defendants have "copied and reproduced and used the Maintenance Code."(*Id.* ¶ 36). Indeed, STK has consistently focused upon infringement of the Maintenance Code, not only in its motion for preliminary injunction (# 39), but also in its motion for summary judgment on Count 1 (# 623, at 1 (characterizing claim as one to protect "copyrights in the Maintenance Code")).

The term "Maintenance Code" has been defined repeatedly throughout the litigation. Maintenance Code is a portion of 9330 and 9311 Code, distinct from Functional Code, and has three defining features. First, it detects, diagnoses, and analyzes equipment malfunctions. *See Storage Tech. II,* 421 F.3d at 1310, 1313. Second, it is anything that is enabled or disabled by GetKey. (*See* PDP's Reply, # 730, at 4). And third, it is any portion of STK's computer code that is only used to support maintenance functionality above maintenance level zero. (*Id.* at 5).

The reverse.exe program does not fit within any of these definitions. First, STK nowhere alleges that reverse.exe detects, diagnoses, displays, or analyzes equipment failures or otherwise falls within the Federal Circuit's definition of Maintenance Code. Second, reverse.exe is not enabled or disabled by GetKey, quite the opposite: reverse.exe allows users to bypass GetKey. Finally, reverse.exe does not support maintenance functionality above maintenance level zero. The program assists CHE in generating passwords, which in turn allows CHE to alter the maintenance level, but the record nowhere suggests that reverse.exe supports functionality once the maintenance level has been changed. Instead, reverse.exe simply allows users to create passwords. By the time STK's machines are set to an enhanced maintenance level, however, reverse.exe has fulfilled its role and, from the record, apparently has no further function. Because no reasonable jury could find that reverse.exe is a copy of Maintenance Code, and because Count 1 is limited to infringement of Maintenance Code, the claim thus falls beyond the scope of Count 1. [2]

STK argues in the alternative that it should be allowed to amend its complaint to pursue its reverse.exe claim, in part, because it did not learn of reverse.exe until the parties had engaged in substantial discovery. Yet STK's summary judgment motion-filed after the close of discovery in July 2005-did not mention reverse.exe. (623, 640). Nor did STK seek leave to amend its complaint at any time after learning of reverse.exe. Its belated request comes nine months after the close of discovery, not to mention following two amendments to the complaint, a preliminary injunction motion that was amended, decided, and then appealed, as well as numerous dispositive motions. Although leave to amend is "ordinarily freely given," in this instance the request can only be described as "unduly delayed," and is therefore denied. *Saunders v. R.D. Werner Co.,* No. 04-10782, 1995 WL 598959, at *3 (D.Mass.1995) (citing *Hayes v. New England Millwork Distributors, Inc.,* 602 F.2d 15, 19 (1st Cir.1979)).

### II. *RTD Code and FSCs*

**\*5** Run Time Diagnostics ("RTD Code") is "[t]he portion of the Maintenance Code that actually diagnoses troubles in the hardware."(# 39, at 8). Unlike the rest of the Maintenance Code, it is not automatically loaded upon power-up, but instead is loaded only when utilized. (# 757, at 9). STK asserts that it has "substantial evidence" that CHE has utilized (and therefore copied) RTD Code. STK also asserts infringement of the "exact English language interpretation of what the error code (Fault Symptom Code or FSC) means."(*Id.* at 9). It does not assert infringement of the numeric FSCs themselves or of the Event Messages within which they are contained, but solely infringement of the English-language translations of FSCs. Defendants seek summary judgment on numerous grounds, but their primary objection is that STK abandoned these claims earlier in the litigation.

STK argues that both RTD Code and English versions of FSCs are "portions" of the Maintenance Code and therefore fall within the scope of Count I, which pleads infringement of Maintenance Code. It also notes that RTD Code and English versions of FSCs were, unlike reverse.exe, identified by STK in its preliminary injunction motion as infringing copies. (# 39, at 8). Even accepting these assertions, however, I find nevertheless that STK has waived these claims. Specifically, by April 2004 when it filed its amended motion for preliminary injunction, STK had narrowed its copyright infringement claim to the copy of Maintenance Code created upon power-up (the "IPL copy") and copies of Event Messages. [3] (*See* # 282, at 2 (asking court "to enjoin CHE's

blatant copying and willful use of StorageTek's intellectual property rights in its Maintenance Code and excerpts thereof known as Event Messages"); *see also id.,* Ex. A, at 8-9). Thus, my decision on the motion referred only to those copies. *Storage Tech. I,* 2004 WL 1497688, at *3 & n. 3.

STK argues that it should not be bound by the claims raised at the preliminary injunction stage. Even if STK is correct, however, the fact remains that STK's own summary judgment motion-filed in August 2005, after discovery was complete and long after the ruling on its request for a preliminary injunction-is also devoid of any reference to either RTD Code or FSCs. Instead, the summary judgment motion is focused entirely on the IPL copy. (# 640, at 6, 9, 12). Indeed, although STK took care to note that it was maintaining its Event Messages claim though not seeking summary judgment on it (*id* . at 1 n. 1), it made no similar mention of a claim based on RTD Code or English versions of FSCs, as a subject either for summary judgment or for trial. [4]

In fact, STK has affirmatively sought to benefit by limiting its infringement claim to the IPL copy. In a typical infringement case involving computer code, the alleged infringer must be shown to have copied "constituent, original elements" of the program. *Data Gen. Corp. v. Grumman Sys. Support,* 36 F.3d 1147, 1160 n. 19 (1st Cir.1994). That is, even if a plaintiff has copyrighted the computer program as a whole (as STK has copyrighted the 9330 and 9311 Codes), it must still show that the "particular elements" that the defendant is alleged to have infringed are copyright-protected. *ILOG, Inc. v. Bell Logic, Inc.,* 181 F.Supp.2d 3, 4 (D.Mass.2002). As part of this showing, the plaintiff must-as a threshold matter-identify the particular elements allegedly copied. *E.g., id.* at 8 (plaintiff had responded to defendant's interrogatory by identifying "every line of code" allegedly copied).

**\*6** In this case, however, STK has consistently refused to so identify any particular element of the Code. Its refusal has been premised on the scope of its infringement claim: "Defendants are ... copying each version of the 9330 and 9311 Maintenance Code in its entirety *(thus obviating any need to analyze what portions are 'constituent, original elements')."* (# 282, at 6 (footnote omitted, emphasis in original)). In other words, STK has maintained throughout that its copyright claim was based on the IPL copy of the entire Maintenance Code, thereby obviating any need to identify specific portions of the code, such as RTD Code or FSCs. On that basis, STK steadfastly refused to respond to CHE's repeated requests for analysis of those portions of

the Maintenance Code that it had allegedly infringed, and its refusals were upheld by the court. Having strategically confined its infringement claim to "Maintenance Code in its entirety," and having thereby successfully limited CHE's discovery, STK cannot now seek to press an infringement claim based on precisely the elements of the Maintenance Code that it refused to disclose.

On this record, I find that STK has abandoned any infringement claim it may previously have asserted as to RTD Code and English translations of RTDs. *See Schneider v. Loc. 103 I.B.E.W. Health Plan,* 442 F.3d 1, 2-3 (1st Cir.2006); *Grenier v. Cyanamid Plastics, Inc.,* 70 F.3d 667, 668 (1st Cir.1995). To the extent STK seeks to amend its complaint to include allegations based on RTD Code or English translations of FSCs, the request is denied, for reasons explained above in relation to reverse.exe.

### III. *Conclusion*

Accordingly, STK has waived, withdrawn, or is foreclosed from pursuing any copyright infringement claim except its claim based on the IPL copy. Because it concedes that it cannot prevail on that claim, CHE and PDP are entitled to summary judgment on Count 1 and York is entitled to summary judgment on Count 8.

### *Count 2: DMCA Violation*

The motions addressing Count 2 are PDP's Motion for Partial Summary Judgment (# 609), joined by CHE (# 608) and York (# 614), as well as PDP's and York's Supplemental Motion for Summary Judgment (# 764). STK acknowledges that the Federal Circuit's opinion, which dealt with circumvention in relation to the IPL copy, *see Storage Tech. II,* 421 F.3d at 1318-19,"impairs, as a practical matter, its ability to pursue those claims effectively."(# 757, at 2 n. 2.). Defendants are therefore entitled to summary judgment on Count 2 insofar as it is based on the IPL copy. STK is further "willing to withdraw the remainder of its DMCA claim (i.e., all DMCA claims based on CHE copying other than the IPL copy), *conditioned upon Defendants' agreement not to seek attorney fees.*" [5] (*Id.* at 10 (emphasis in original)). Defendants, however, are unwilling to concede their right to seek attorneys' fees. (# 766, at 3; # 764, at 7 & n. 13). I must therefore address their motions.

*7 The complaint alleges that all three defendants "circumvented STK's technological measures in order to gain access to all o[r] a portion of the Maintenance Code," in violation of 17 U.S.C. § 1201. (Compl.¶ 45). The main thrust of the DMCA claim has always been that defendants circumvented GetKey in order to create the IPL copy. (*Id.* ¶¶ 44-48). However, STK now asserts that its DMCA claim was also based on circumvention of GetKey in order to access and copy (1) RTD Code, and (2) Event Messages. (# 679, at 4-5). Even assuming that such DMCA claims are properly in the case, defendants are still entitled to summary judgment.

In order to prevail on a DMCA claim, STK "must prove that the circumvention of the technological measure [here, the GetKey] 'facilitates infringing *a right protected by the Copyright Act.*' " *Storage Tech. II,* 421 F.3d at 1318 (internal quotation marks omitted, emphasis added); *see also*17 U.S.C. §§ 1201(a)(1)(A), (a)(2)(A), (b)(1)(A) (prohibiting circumvention of measures protecting copyright-protected works). STK has, however, withdrawn its copyright claim as to Event Messages (# 757, at 9) and has therefore failed to establish that Event Messages are copyright-protected works. [6] Thus, STK's claim that defendants circumvented GetKey to access Event Messages fails because it has not shown that Event Messages are "protected by the Copyright Act." *See Storage Tech. II,* 421 F.3d at 1318 ("To the extent that STK's rights under copyright law are not at risk, the DMCA does not create a new source of liability.").

Insofar as STK asserts circumvention of GetKey in order to copy RTD Code, it must show that GetKey "effectively" protects or controls access to RTD Code. For reasons articulated by the Sixth Circuit in *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 387 F.3d 522 (6th Cir.2004), a decision cited with favor by the Federal Circuit in this case, *see Storage Tech. II,* 421 F.3d at 1319, STK cannot prevail. In that case, the plaintiff Lexmark claimed infringement of its Printer Engine Program ("PEP"), which was a copyrighted program that controlled the printer's operation. 387 F.3d at 530. Anyone who owned a Lexmark printer could download the PEP from the printer's microchip. However, Lexmark sought to control access to the PEP, and to printer operation, through use of an "authentication sequence," which was satisfied only when Lexmark-approved toner cartridges were used. *Id.* Without a Lexmark-approved cartridge, the authentication sequence would fail and PEP (and therefore the printer) would not operate properly. The defendant SCC sold a microchip that performed the authentication sequence, thereby allowing customers to use Lexmark printers without using Lexmark-approved toner. *Id.* Lexmark sued, claiming that SCC had circumvented the authentication sequence in violation of the DMCA. *Id.* at 546.The Sixth Circuit

**Storage Technology Corp. v. Custom Hardware Engineering..., Not Reported in...**

2006 WL 1766434, 2006-2 Trade Cases P 75,434

disagreed. It found that the authentication sequence did not effectively control access to the PEP within the meaning of the DMCA because "[a]nyone who buys a Lexmark printer may read the literal code of the Printer Engine Program directly from the printer memory, with or without the benefit of the authentication sequence, ... after which copies may be freely distributed."*Id.* Thus, although the authentication sequence blocked "one form of 'access,' " it did not block "another relevant form of 'access,' " and it therefore did not constitute a "technological measure" that "effectively" controlled access within the meaning of the DMCA. *Id.* at 547.

**\*8** In this case, RTD Code, along with the rest of the LMU Code, is contained either on the hard drive of the LMU or on floppy disks that STK sometimes ships with its products. CHE has asserted and STK has not denied that any customer who owns an STK system can access and copy RTD Code. Like the Lexmark customers who were able to copy PEP directly from the printers, STK's customers can access RTD Code regardless of the existence of GetKey protection. STK disputes the relevance of *Lexmark* and cites instead *Davidson & Assocs. v. Jung,* 422 F.3d 630 (8th Cir.2005). (# 679, at 6-7). In *Davidson,* however, the court found that the technological measure at issue did effectively control access to the copyrighted work; the copyrighted works were, unlike the PEP and unlike RTD Code, "not freely available," even to purchasers of the product. *Id.* at 642. *Davidson* is thus inapposite. Because GetKey does not effectively control access to RTD Code, circumvention of GetKey to access RTD Code cannot violate the DMCA. Therefore, defendants are entitled to summary judgment on Count 2 and may be entitled to attorneys' fees under 17 U.S.C. § 1203(b)(5).

***Counts 3 and 4: Trade Secret Misappropriation***
The relevant motions are (1) CHE's Supplemental Motion for Summary Judgment on Counts 3-6 and 10 (# 767); and (2) York's and PDP's Supplemental Motion for Summary Judgment (# 764). Counts 3 and 4 of the Third Amended Complaint allege trade secret misappropriation. They are identical, except that Count 4 is brought under the Uniform Trade Secrets Act ("UTSA"). (Compl.17). Because Massachusetts has not adopted UTSA, *see Diomed, Inc. v. Vascular Solutions, Inc.,* 417 F.Supp.2d 137 n. 3 (D.Mass.2006), and because the parties have cited only Massachusetts law in relation to STK's trade secret claim, Count 4 is dismissed and STK's trade secret claim is analyzed under Massachusetts trade secret law.

STK asserts that defendants misappropriated its trade secrets in various "data and information related to maintenance of [STK] library systems."(Compl.¶¶ 52, 57). Specifically, STK alleges that defendants misappropriated its trade secrets in Event Messages, FSC Dictionaries,[7] and diagnostic manuals. To establish trade secret misappropriation under Massachusetts law, STK must show (1) that the information in question is a trade secret, (2) that STK took reasonable steps to preserve the secrecy of that information, and (3) that defendants used improper means, in breach of a confidential relationship, to acquire and use the trade secret. *DB Riley, Inc. v. AB Eng'g Corp.,* 977 F.Supp. 84, 89 (D.Mass.1997). The Federal Circuit rejected STK's trade secret claim on two grounds: first, that STK's Event Messages and FSCs were publicly circulated before 1992 and therefore were not protectable trade secrets, and second, that STK had made "no showing that [CHE's] activities breached a confidential relationship."*Storage Tech. II,* 421 F.3d at 1320-21.

**\*9** STK concedes that the Federal Circuit's decision disposes of its claim with respect to Event Messages and FSC Dictionaries that existed prior to 1992, known as the 4400 versions. (# 757, at 8). However, STK maintains that the Federal Circuit's decision did not foreclose its trade secret claim with respect to the later 9300 versions, which were introduced after 1992 and, importantly, after the institution of GetKey protection. As to the 9300 versions, STK argues, the Federal Circuit's decision is inapplicable. On this point, STK is correct. The record indicates that the 9300 versions were introduced at the same time or after the introduction of the GetKey protection mechanism, and that the 9300 versions were different from the 4400 versions. (# 783, Ex. 9, at 94 (111:20-112:17); *id.,* Ex. 4, ¶¶ 23-25; # 790, Ex. 42, ¶ 6). These changes sufficiently distinguish the 9300 versions from the 4400 versions to render the Federal Circuit's decision inapplicable. In addition, STK seeks to pursue a trade secret claim as to its diagnostic manuals, a type of information not considered by the Federal Circuit at the preliminary injunction stage. (*Id.*). Accordingly, STK's trade secret claim is not foreclosed by the Federal Circuit's decision with respect to the 9300 versions and the diagnostic manuals. As to this information, defendants seek summary judgment on the basis of trade secret status and improper means.

**I. *Trade Secret Status***
Trade secret status is based on numerous factors, including "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees

and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."*Jet Spray Cooler, Inc. v. Crampton,* 361 Mass. 835, 840, 282 N.E.2d 921 (1972). Where the evidence conflicts, trade secret status is a question of fact properly left to the jury. *See Curtiss-Wright Corp. v. Edel-Brown Tool & Die, Co.,* 381 Mass. 1, 6-7, 407 N.E.2d 319 (trade secret status properly left to jury given conflicting evidence).

Such disputes exist in this case, precluding summary judgment. In particular, disputes exist as to the reasonableness of STK's security precautions, which is a key factor in trade secret status determination. *E.g., USM Corp. v. Marson Fastener Corp.,* 379 Mass. 90, 98, 393 N.E.2d 895 (1979). Reasonableness itself is determined by looking at multiple factors, including "the existence or absence of an express agreement restricting disclosure," disclosures to employees and the circumstances of such disclosures, and "the degree to which the information has been placed in the public domain or rendered 'readily ascertainable' by the third parties through patent applications or unrestricted product marketing."*Id.* The reasonableness determination is fact-specific and depends largely on the circumstances. *Picker Int'l Corp. v. Imaging Equip. Servs.,* 931 F.Supp. 18, 23 (D.Mass.1995). STK notes that in addition to instituting GetKey protection, it also (1) required employees to sign confidentiality agreements that extended beyond an employee's termination (# 790, Ex. 45, ¶¶ 12-15); (2) required customers to sign license agreements, which expressly asserted the confidentiality of STK's intellectual property and required the customer not to access or use such materials (# 784, Ex. 14, § 4); and (3) required resellers to sign similar agreements (# 790, Ex. 46, §§ 3.6, 6.3). From these facts, a jury could reasonably conclude that STK had taken reasonable security precautions to protect the 9300 versions and diagnostic manuals. *See Picker Int'l Corp.,* 931 F.Supp. at 35-36 (finding "reasonable security precautions" where plaintiff had, *inter alia,* required confidentiality agreements from employees, customers, and resellers); *Harvard Apparatus, Inc. v. Cowen,* 139 F.Supp.2d 161, 176 (D.Mass.2001) (same).

**\*10** CHE notes that STK's security measures have not been entirely successful. For example, STK has on multiple occasions, and as recently as January 2006, left its machines

at an enhanced maintenance level. (# 768, ¶¶ 35-37). At an enhanced maintenance level, Event Messages and FSC Dictionaries may be viewed by anyone who connects a terminal to the LMU. (*Id.* ¶ 37; # 793, ¶ 37). By forgetting to disable Maintenance Code or by failing to do so before CHE took over maintenance, STK has arguably made the disputed information available to third parties. The record also shows that third-party technicians often arrive at sites where machines display FSCs and STK manuals are readily available. (# 770, Ex. 17, at 427-28). Thus, to the extent that STK's information has been rendered available to unauthorized parties, STK's carelessness has played a contributing role.

Under a reasonableness standard, however, STK's carelessness does not entitle defendants to prevail at summary judgment, though it may ultimately militate against a finding of trade secret status. A plaintiff's security precautions must be reasonable, but it need not erect "an impenetrable fortress" or take "heroic measures." *Picker Int'l Corp.,* 931 F.Supp. at 23 (internal quotation marks omitted); *USM Corp.,* 379 Mass. at 101, 393 N.E.2d 895. STK may have inadvertently disclosed certain information, but the various nondisclosure agreements into which it entered with customers and employees could lead a jury to conclude that information was "not placed entirely within the public domain."*Harvard Apparatus, Inc. .,* 130 F.Supp.2d at 176. In any event, its conduct-leaving manuals at customer sites, failing to disable Maintenance Code by setting the maintenance level to zero-falls short of the type of disclosure that has traditionally been found to destroy trade secret status. *See, e.g., CVD, Inc. v. Raytheon Corp.,* 769 F.2d 842, (1st Cir.1985) (information was "well known in the scientific community" and employees had published papers on the technology in scientific journals); *J.T. Healy & Son, Inc. v. James A. Murphy & So, Inc.,* 357 Mass. 728, 737-38, 260 N.E.2d 723 (1970) (information "not guarded at all").

Defendants raise two other arguments as to trade secret status. First, they argue that Event Messages and FSC Dictionaries ("the information") cannot constitute trade secrets because they are "raw data about a malfunction on a customer's machine."(# 767, at 13). But STK has offered evidence indicating that the information contains not only data about machine malfunctions, but also diagnosis and analysis (# 793, ¶¶ 42-44); such diagnostic material can constitute trade secret. *See, e.g., Picker Int'l Corp.,* 931 F.Supp. at 25. Indeed, the Federal Circuit expressly found that "the meaning of the fault symptom codes might have been a trade secret if they

had not been previously made public."*Storage Tech. II,* 421 F.3d at 1320. Second, defendants argue that the information is transient and thus not in "continuous use." However, it is unclear whether Massachusetts courts would still apply the continuous-use requirement. *See*Restatement (Third) of Unfair Competition § 39, cmt. d. In any event, the information is a standardized set of terms that retains the same meanings over time and is therefore susceptible to "continuous use."

**II. *Improper Means***

*11 In rejecting STK's trade secret claim, the Federal Circuit also found that STK had made "no showing" that CHE had "breached a confidential relationship" in obtaining and using Event Messages and FSCs. *Storage Tech. II,* 421 F.3d at 1321. The court noted specifically that CHE had "developed the LEM and ELEM devices *independently* to diagnose problems in the silos," in a manner akin to "reverse engineering." *Id.* (emphasis added). Because independent development was not an "improper means," the court held there could be no misappropriation; defendants argue the same principle applies here. On the summary judgment record, [8] however, material factual disputes on this issue remain.

First, STK has offered evidence indicating that CHE used former STK employees to obtain STK information in breach of their confidentiality agreements. For example, Charles Zagorski, a former STK employee, obtained information for CHE-ostensibly from a "secret helper" at STK [9] -that he thought "might solve our problems ... in getting error codes [without a] way to interpret them."(# 790, Ex. 47). Zagorski believed the information "might give us [CHE] a way to get FSC call outs."(*Id.*). A reasonable jury could find that CHE had employed "improper means" in obtaining this information from Zagorski, a former STK employee, in breach of his confidentiality agreement. In addition, STK maintains that CHE was prohibited, under various customer and resale agreements, from accessing and using Maintenance Code except for purposes of activating the machines. (# 793, ¶¶ 14-16).*See also Storage Tech. II,* 421 F.3d at 1310. And yet the record shows that CHE technicians would access Maintenance Code not only to access the silos, but also to access diagnostic information, which they were able to do as long as the machines were at an enhanced maintenance level. (# 790, Ex. 41, at 153-55). At some point, CHE also downloaded onto its server a 58-page, FSC Dictionary containing 9300 FSCs and English translations. (# 783, Ex. 4, ¶¶ 28-29; *id .,* # 784, Ex. 28). Based on these facts, a jury could reasonably infer that CHE had obtained the diagnostic

information and FSC Dictionary by accessing Maintenance Code in violation of license and resale agreements. Obtaining information in violation of a license agreement may constitute trade secret misappropriation. *See, e.g., Picker Int'l Corp.,* 931 F.Supp. at 42. Accordingly, triable issues of fact persist on the matter of "improper means."

**III. *PDP and York***

PDP and York also move for summary judgment separately. Because the record evidence shows that York corresponded with Zagorski about obtaining STK Code to aid in deciphering FSCs, his request for summary judgment is denied. As for PDP, it argues that it is entitled to summary judgment based on its assignment of interests to CHE, which it erroneously claims took place in 1992; in fact, PDP did not assign its interests to CHE until 2002. (# 764, ¶ 5; # 780, ¶¶ 4-5). Accordingly, it is not entitled to summary judgment on that ground.

**IV. *Conclusion***

*12 Count 4 is dismissed. Defendants' motions for summary judgment on Count 3 are denied.

**Count 5: Chapter 93A Unfair Competition**

The relevant motions are CHE's Motion for Partial Summary Judgment (# 619), and CHE's Supplemental Motion for Summary Judgment (# 767). Count 5 alleges that CHE engages in unfair competition when it deceives STK's former and prospective customers into believing that CHE's copying and/or use of the Maintenance Code is "legal or otherwise approved by, endorsed by, or authorized StorageTek," and when it "induce[s] and knowingly benefit[s] from interference with StorageTek's existing and prospective business relationships and/or contracts."(Compl.¶¶ 63-64). Chapter 93A [10] prohibits parties from bringing actions under § 11 "unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth."Courts applying this requirement "determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth."*Kuwaiti Danish Computer Co. v. Digital Equip. Corp.,* 438 Mass. 459, 472, 781 N.E.2d 787 (2003). CHE disputes that its alleged misconduct occurred "primarily and substantially" in Massachusetts.

In response, STK points to its allegations concerning the Allmerica Insurance account. Allmerica is a former STK customer for whom CHE subsequently provided maintenance services; it is located in Worcester, Massachusetts. STK argues that the Allmerica incident constitutes "a single instance of misconduct" that has "greater significance for [the] case as a whole than a multiplicity of instances of misconduct in another jurisdiction."*Kuwaiti Danish,* 438 Mass. at 473, 781 N.E.2d 787. This assertion is, however, belied by STK's own claim, which in essence accuses CHE of deceiving and then stealing various STK customers. To the extent that the relevant situs is the location of the customers, the Allmerica account alone is insufficient to warrant 93A jurisdiction. To the extent that the relevant situs is the location of CHE's planning and communications, there is no proof that CHE engaged in such planning anywhere except Colorado and Missouri, where it and York are located. (# 619, ¶¶ 32-34). Tellingly, of the forty-seven customers identified by STK's damages expert in her lost profits analysis, only Allmerica is located in Massachusetts. (# 619, Ex. N, at 14). Moreover, the lost profits associated with Allmerica amount to less than 2% of STK's total damages claim. (*Id.*). STK has simply failed to establish that the alleged misconduct occurred "primarily and substantially" within the Commonwealth. *See Straumann Co. v. Lifecore Biomedical Inc.,* 278 F.Supp.2d 130, 140 (D.Mass.2003) (no 93A jurisdiction where only 2.3% of defendant's sales occurred in Massachusetts). Accordingly, summary judgment on Count 5 is allowed.

**Count 6: Tortious Interference with Business Relations**

**\*13** CHE moves for summary judgment on Count 6 (# 767), which alleges tortious interference with business relationships. The parties argue at length about the scope of Count 6. The dispute arises from STK's recent assertion that CHE tortiously interfered not only by stealing STK's maintenance customers, but also by "caus[ing] many existing and prospective customers to breach their license agreements with StorageTek."(# 757, at 7). Specifically, STK asserts (1) that under the license agreements, customers are prohibited from accessing or using Maintenance Code except to activate their machines, and (2) that CHE caused customers to breach their license agreements by accessing and using Maintenance Code on their behalf, for purposes other than activation. Count 6 does not encompass these allegations. STK's tortious interference claim is and has always been about whether CHE improperly took away STK's customers; it has never, until now, included a claim that CHE caused STK customers to breach their license agreements by accessing

and using Maintenance Code on their behalf for non-activation purposes. In any event, by the time CHE accessed Maintenance Code on a customer's behalf, that customer had presumably already ended its maintenance relationship with STK. In sum, I agree with CHE as to the scope of the claim. Its entitlement to summary judgment, however, is another matter.

Under Massachusetts law, [11] a plaintiff claiming tortious interference must show "(1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's interference with the relationship through improper motive or means; and, (4) the plaintiff's loss of advantage as a direct result of the defendant's conduct."*Singh v. Blue Cross/Blue Shield of Mass., Inc.,* 308 F.3d 25, 47 (1st Cir .2002) (internal quotation marks omitted). CHE argues that STK has not shown that CHE employed "improper means" to interfere with STK's maintenance relationships. In *United Truck Leasing Corp. v. Geltman,* 406 Mass. 811, 816, 551 N.E.2d 20 (1990), the Supreme Judicial Court expressly held that a plaintiff was not required to show malice in a tortious interference case. Instead, the court defined "improper means" as conduct that "is wrongful by some measure beyond the fact of interference itself."*Id.* (internal quotation marks omitted). Although the court did not discuss at length what might constitute "improper means," it did cite the Restatement (Second) of Torts, § 767, which sets out a seven-factor test for determining whether conduct is "improper," and which defines such conduct as ranging from "physical violence, fraudulent misrepresentation and threats of illegal conduct," to "[v]iolation of recognized ethical codes" and business customs. *Id.* cmt. c; *see also Ary Jewelers, LLC v. IBJTC Business Credit Corp.,* 414 F.Supp.2d 90, 94 (D.Mass.2006).

In this case, STK has presented sufficient evidence of "improper means." The record indicates that CHE induced former STK employees to breach their confidentiality agreements by disclosing information about STK's intellectual property, which assisted CHE in developing its diagnostic capabilities. *See* discussion of Count 3, *supra.*In addition, STK has submitted evidence that a former STK employee provided CHE with leads on potential customers. (# 790, Ex. 50). It is not clear from the record whether the customers were being serviced at the time by STK, but at least some of the information about the customers came from relationships the employee formed while at STK. (*Id.* at AAI 047759, AAI 047343). From this evidence, a reasonable

Case: 1:08-cv-02755-DCN Doc #: 247-2 Filed: 10/10/14 25 of 47. PageID #: 13962

Storage Technology Corp. v. Custom Hardware Engineering..., Not Reported in...

2006 WL 1766434, 2006-2 Trade Cases P 75,434

jury could find that CHE had developed both its diagnostic capabilities and its business contacts by inducing former STK employees to breach their confidentiality agreements, and thus that it had interfered with STK's business relationships through improper means. Accordingly, summary judgment is denied.

**Count 7: Conversion**

**\*14** STK has unconditionally withdrawn its conversion claim. (# 757, at 10). Accordingly, it is dismissed with prejudice.

**Count 9: Patent Infringement**

The relevant motions are (1) PDP's Motion for Partial Summary Judgment (# 609); (2) two CHE Motions for Partial Summary Judgment (616 and 617), joined by York (# 614); and (3) two STK Motions to Dismiss (338 and 622), concerning CHE's assertions of invalidity and noninfringement, which I address first.

**I. *STK's Motions to Dismiss (338 and 622)***

In its Second Amended Complaint (# 203), STK alleged patent infringement as to three patents, U.S. Patents 4,908,777, 5,850,569, and 6,550,391 ("#777, #569, and #391 patents," respectively). In response, CHE filed several counterclaims for invalidity and noninfringement of the three patents, sham litigation based on improper assertion of the patents, and patent misuse. Although STK amended its complaint to remove any claim as to the #391 Patent (# 253), CHE insisted on pursuing its counterclaims as to all three patents. STK has therefore moved to dismiss CHE's counterclaim for invalidity and noninfringement (Counterclaim Count 27) insofar as it concerns the #391 Patent. The issue has become moot because CHE now characterizes Counterclaim Count 27 as a defense. (# 760, at 2). As a defense, it is relevant only to the extent that STK asserts patent infringement; it does not provide an independent jurisdictional basis for assessing an unasserted patent. Since STK no longer asserts infringement of the #391 Patent, the defense is unnecessary.

A similar issue arises with respect to unasserted claims of the #569 and #777 patents, whose validity CHE seeks to undermine. STK has asserted only Claims 18 and 23 of the #569 Patent, and Claims 5, 12, 14, and 16 of the #777 Patent. Because Counterclaim Count 27 is now interposed only as a defense, it is relevant only with respect to asserted claims. Accordingly, both motions are denied as moot.

**II. *The #569 Patent***

Defendants CHE and York move for summary judgment on the #569 Patent, claiming invalidity (# 617) and non-infringement (# 616). Both issues depend upon interpretation of the term "simulated LMU."

Claim construction presents purely legal questions. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed.Cir.1995), *aff'd* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Claim terms are given their "ordinary and customary meaning," which is the meaning that a "person of ordinary skill in the art" would give the term, "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."*Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed.Cir.2005)*(en banc).* The court's primary resource is intrinsic evidence, including the claim itself, other claims of the patent, "both asserted and unasserted," the patent's specification or written description, and the prosecution history. *Id.* at 1314-15.The specification may "teach and enable those of skill in the art to make and use the invention," but it does not define the scope of the claim terms, and courts therefore "avoid importing limitations from the specification into the claims."*Id.* at 1321.Extrinsic evidence-though "less significant" than intrinsic evidence-may nevertheless "shed useful light" on a claim term. *Id.* at 1317 (internal quotation marks omitted). Such evidence may include dictionaries, treatises, and expert testimony. However, extrinsic evidence is considered "less reliable" than intrinsic evidence; courts assume it is "unlikely to result in a reliable interpretation ... unless considered in the context of the intrinsic evidence."*Id.* at 1318-19.

**\*15** The Patent describes a method for testing the Library Storage Module ("LSM") component of an STK silo system. The LSM stores data cartridges, which are retrieved and read by a robotic arm. Several LSMs are controlled by an LMU, which in turn receives commands from host computers. The method is intended to aid STK library owners when they wish to add additional LSMs to an existing system. (#569 Patent 1:25-27). Before a new LSM is added, it must undergo diagnostic testing. (*Id.* at 1:39). Such testing was previously accomplished after an LSM was assembled and connected to the library, but it required customers to "shut down ... operations." (*Id.* at 1:47-48). The #569 Patent reduces this downtime. Instead of first connecting the new LSM to

the system and thereafter performing diagnostic testing, the patent describes a method for testing a new LSM "prior to its incorporation into the library."(*Id.* at 2:6-7).

Such testing is accomplished by means of a "simulated LMU," a term that appears in each asserted claim. The parties offer divergent definitions of the term and hotly dispute each distinction. One of these disputes, however, is dispositive as to infringement. CHE argues that a simulated LMU must be "capable of being used to perform diagnostic testing on an LSM ... before such LSM is ever connected to an LMU."This assertion is supported by the intrinsic record, though the diagnostic testing is perhaps more accurately described taking place before the LSM is connected to a library, rather than an LMU. As STK concedes (# 683, at 8-9), unasserted Claims 1 and 8 of the #569 Patent both specify that diagnostic testing be conducted via a simulated LMU before the LSM is connected to a library. (#569 Patent, 5:58, 6:37-39). Because Claims 1 and 8 therefore use the term "simulated LMU" to refer to a device that is capable of conducting diagnostic testing before the LSM is attached to a library, and because claim terms are "normally used consistently throughout the patent,"*Phillips*, 415 F.3d at 1314, the same definition applies to the asserted claims. That the purpose of the simulated LMU is to perform such prior testing is further apparent from the rest of the patent. (#569 Patent, Abstract (simulated LMU "test[s] the new LSM prior to its incorporation into the library"); Summary, 2:4-7 (same)). I therefore conclude that term "simulated LMU" refers to a device capable of being used to perform diagnostic testing on an LSM before the LSM is connected to a library.

Having construed the disputed claim term, I now consider "whether the properly construed claim encompasses the accused structure."*See Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed.Cir.1998). CHE argues that neither LEM or ELEM is a simulated LMU, specifically because neither LEM nor ELEM is capable of performing diagnostic testing on an LSM before the LSM is connected to a library. STK apparently agrees. (# 681, at 4 (noting that LEM and ELEM are two devices that do not have this capability)). If both LEM and ELEM lack this required capability, then neither can be a simulated LMU under the court's construction. Defendants are thus entitled to summary judgment on the #569 Patent on the basis of non-infringement, and it is therefore unnecessary to determine invalidity.

**III. *The #777 Patent***

**\*16** STK's tape libraries require the use of a robotic arm that retrieves the appropriate tape cartridge when it is needed. The libraries depend upon the accurate positioning and movement of the robot arms. The #777 Patent claims a method for calibrating a robot arm to ensure accuracy. STK has asserted infringement of independent Claims 5 and 12, as well as dependent Claims 14 and 16. CHE moves for summary judgment on grounds of non-infringement (# 616).

**A. *Implied License***

CHE first claims patent exhaustion and implied license, confusingly equating the two doctrines. (# 616, at 9). They are, however, distinguishable. Under the doctrine of first sale, or patent exhaustion, a patentee abandons its statutory right to exclusivity through the unrestricted sale or license of the patent. *See Hewlett-Packard Co. v. Repeat-O-Type Stencil,* 123 F.3d 1445, 1451 (Fed.Cir.1997). By contrast, an implied license exists where no such unrestricted sale or license has necessarily been given, but where nevertheless "the patentee may, through its own conduct, grant an implied license to practice the patent to certain downstream purchasers."*LG Elecs., Inc. v. Asustek Computer, Inc.,* No. 01-00326, 2002 WL 31996860, at \*3 (N.D.Cal.2002).

To the extent that CHE claims patent exhaustion, the doctrine is inapplicable in this case. The articles sold in this case were STK's libraries, which are "merely embodiments" of the patent at issue. *Glass Equipment Dev., Inc. v. Besten, Inc.,* 174 F.3d 1337, 1341 n. 1 (Fed.Cir.1999). (# 616, ¶ 46-47). The asserted claims, however, are *method* claims. Therefore, the first sale doctrine is inapplicable. *See id.*(doctrine inapplicable where sale concerned equipment but claim involved patented method of using equipment); *see also Bandag, Inc. v. Al Bolser's Tire Stores, Inc.,* 750 F.2d 903, 924 (Fed.Cir.1984).

Insofar as CHE claims an implied license, it has failed to meet its burden. *See Bandag, Inc.,* 750 F.2d at 924 (burden of proving implied license falls on defendant). A defendant seeking to show an implied license must demonstrate (1) that the equipment at issue has no non-infringing uses, and (2) that the patentee's conduct clearly supports the finding of an implied license. *Id.* at 924-25 (internal quotation marks omitted). As to this latter factor, "[a] mere sale does not import a license except where the circumstances plainly indicate that the grant of a license should be inferred."*Id.* at 925.Moreover, an inquiry into the circumstances of the sale is necessarily fact-intensive, though the existence of an implied license is ultimately a question of law, *see Met-Coil*

*Sys. Corp. v. Korners Unlimited, Inc.,* 803 F.2d 684, 687 (Fed.Cir.1986).

STK's storage systems are commercial embodiments of the #777 Patent. (# 682, ¶ 46). CHE argues that by selling the systems, STK has granted its customers an implied license to use the systems and, therefore, to practice the robotic calibration operations covered by the #777 Patent. CHE's argument fails for multiple reasons. As an initial matter, CHE contradicts itself; to prove the existence of an implied license, CHE must show that there are no non-infringing uses of the STK equipment; and yet CHE itself argues that its own use of STK's equipment is non-infringing. *See Lifescan, Inc. v. Polymer Tech. Int'l Corp.,* No. 94-672R, 1995 WL 271599, at *8 (W.D.Wa.1995). Second, because CHE is both the summary judgment movant and the party bearing the ultimate burden of proof, it is entitled to prevail only by producing "conclusive" evidence, which "establish[es] beyond peradventure all of the essential elements of the claim or defense to warrant judgment in [its] favor."*Vargas v. Cummings,* 149 F.3d 29, 35-36 (1st Cir.1998) (internal quotation marks omitted, emphasis in original). CHE, however, has failed to offer any evidence, let alone conclusive evidence, on the issue of non-infringing uses. In addition, the circumstances in this case do not "plainly indicate that the grant of a license should be inferred."*Met-Coil Sys. Corp.,* 803 F.2d at 686. On the contrary, STK expressly declined to license certain aspects of its technology and software to its customers. *See, e.g., Storage Tech. II,* 421 F.3d at 1310. In light of these clear restrictions, CHE's assertion of an implied license is unwarranted.

## B. *Infringement*

**\*17** CHE's non-infringement argument focuses on the claim term "independent calibration operations," which appears in all of the asserted claims. Claim 5 describes a "method of calibrating" a robot arm, including the step of "storing a sequence of independent calibration operations, with each sequential calibration operation having a greater positional accuracy than the preceding operation."(#777 Patent, 11:8-13). Similarly, independent Claim 12 and dependent Claims 14 and 16 describe "a method of calibrating" an end effectuator upon a robot arm by, *inter alia,*"storing a hierarchical sequence of independent calibration operations."(*Id.* 12:21-25). CHE argues that STK's equipment itself does not engage in "independent calibration operations" and therefore CHE's use of the equipment cannot infringe the asserted claims.

## 1. *Claim Construction*

As explained above, claim construction is a matter of law, claims are generally given their ordinary and customary meaning, and intrinsic evidence is generally given greater weight than extrinsic evidence. The central dispute here concerns the word "independent." CHE argues that "independent" must mean "not dependent," "not reliant," or "not determined by." (# 616, at 15). It argues that STK's equipment does not conduct "independent calibration operations" because it "must perform the calibration operations in a particular order"; the operations are not "independent" because the "operations that have greater positional accuracy rely on and are influenced by the calibration operations of lesser positional accuracy."(*Id.* at 16). This interpretation of "independent" is inconsistent with the #777 Patent, not least because it would exclude the preferred embodiment (STK's libraries) from the scope of the claims. An interpretation of a claim term that excludes the preferred embodiment is "rarely, if ever, correct" and requires "highly persuasive evidentiary support," which CHE has failed to offer. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1583 (Fed.Cir.1996).

The patented invention is described at the outset as a "hierarchical calibration arrangement," which is "used to provide ever-increasing levels of accuracy in positioning a robot arm end effectuator."(#777 Patent, Abstract). Thus, from the beginning, the patented calibration operation is envisioned in relational terms, as the words "hierarchy" and "sequence" indicate. The Specification also repeatedly describes the invention as a hierarchical arrangement, consisting of a sequence providing increasing levels of accuracy. (*E.g., id.* at 1:8-10, 1:45-50, 3:20-25). Finally, the asserted claims themselves describe functions that occur in relationship to other functions. For example, Claim 5 describes independent calibration operations that occur in a "sequence," and further specifies that within the sequence, "each sequential calibration operation ha[s] a greater positional accuracy than the preceding operation."(*Id.* at 11:10-14). Similarly, Claim 12 refers to a "hierarchical sequence of independent calibration operations."(*Id.* at 12:24-25). The intrinsic record therefore supports an interpretation of "independent calibration operations" that does not require the operations to be unrelated.*Phillips,* 415 F.3d at 1313 (claim terms should be construed in context of particular claim and of entire patent). I therefore find that "independent calibration operations" are calibration operations that are separate from one another but are not necessarily unrelated.

## 2. *Analysis*

**\*18** CHE's assertion of non-infringement is premised entirely upon its proposed claim construction, which I have rejected. Specifically, CHE argues that because STK's equipment performs calibration operations "in a particular order," in which later calibration operations "have greater positional accuracy" and "rely on and are influenced by the [earlier] calibration operations," they cannot be independent. As explained above, the term "independent calibration operations" does not exclude operations that are related, as long as the operations are performed separately. Because CHE raises no other grounds for finding non-infringement, its motion for summary judgment is denied.

## IV. *PDP's Motion for Summary Judgment (# 609)*

PDP separately moves for summary judgment on Count IX. STK originally alleged direct and indirect patent infringement by PDP as to both the #569 and #777 Patents, but its only remaining claim is active inducement of infringement by PDP as to the #777 Patent. [12] PDP now argues that STK has no evidence that PDP possessed the requisite intent. The parties hotly dispute precisely what level of intent STK is required to establish, and the source of their disagreement is Federal Circuit case law. In several cases, the Federal Circuit has applied a specific intent requirement, which requires the plaintiff to show that the defendant "the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements."*Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 553 (Fed.Cir.1990); *accord Ferguson Beau regard/Log ic Controls, Div. of Dover Resources, Inc. v. Mega Sys., LLC,* 350 F.3d 1327, 1341-42 (Fed.Cir.2003); *Warner-Lambert Co. v. Apotex Corp.,* 316 F.3d 1348, 1363 (Fed.Cir.2003); *Minnesota Mining & Mfg. Co. v. Chemque, Inc.,* 303 F.3d 1294, 1304-05 (Fed.Cir.2002). In a parallel line of cases, however, the Federal Circuit has required something less. Beginning with *Hewlett-Packard Co. v. Bausch & Lomb, Inc.,* 909 F.2d 1464, 1469 1468-69 (Fed.Cir.1990), which was decided in the same year as *Manville Sales,* the Federal Circuit has sometimes held that only "intent to cause the acts which constitute infringement" is required. *See Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings,* 370 F.3d 1354, 1365 (Fed.Cir.2004), *cert. dismissed as improvidently granted sub nom. Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc.,* No. 04-607, --- S.Ct. ----, 2006 WL 1699360 (June 22, 2006); *Moba, B.V. v. Diamond Automation, Inc.,* 325 F.3d 1306, 1318 (Fed.Cir.2003). Thus, in some instances,

the Federal Circuit has applied the *Manville Sales* specific intent standard, while in other cases, it has applied *Hewlett-Packard's* less stringent standard. Indeed, the court has expressly recognized the conflict among its precedents. *See Minnesota Mining & Mfg. Co.,* 303 F.3d at 1305.

Given the unsettled state of the law, I look to recent Federal Circuit precedent. In its most recent case discussing inducement of infringement, the court ruled that a defendant could be held liable for inducement even where the defendant claimed there was "no evidence that it knew that these sales would result in actual infringement."*nCube Corp. v. Seachange Int'l, Inc.,* 436 F.3d 1317, 1324 (Fed.Cir.2006). The court cited the *Hewlett-Packard* intent standard and stated that in a case of indirect infringement, a plaintiff need show "at least that the alleged inducer had knowledge of the infringing acts."*Id.* (internal quotation marks omitted). To the extent that this decision represents the Federal Circuit's current stance on the intent question, it suggests that the *Hewlett-Packard* standard applies.

**\*19** PDP has presented no argument that STK cannot meet this standard. Its summary judgment motion is premised entirely upon its argument that STK must show that PDP had knowledge of the #777 Patent or specifically intended to induce its infringement. The fact that PDP's principals did not learn of the patent until suit was filed is not necessarily dispositive, since the Federal Circuit has previously found that a defendant may be liable for inducement of infringement in precisely such circumstances. *See Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.,* 249 F.3d 1341, 1351, 1355 (Fed.Cir.2001). PDP presents no reasons why it is entitled to summary judgment under the *Hewlett-Packard* standard, instead assuming that the specific intent standard applies. For that reason and because the question of intent is "particularly within the province of the trier of fact,"*Metabolite Labs., Inc.,* 370 F.3d at 1365 (internal quotation marks omitted), the motion is denied.

## *Count 10: False Advertising*

The relevant motions are CHE's Motion for Partial Summary Judgment (# 619) and its Supplemental Motion for Summary Judgment (# 767). Count 10 alleges false advertising in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). [13] Under that section, STK must show, *inter alia,* that CHE "made a false or misleading description of fact or representation of fact in a commercial advertisement about [its] own or another's product."*Cashmere & Camel*

**Storage Technology Corp. v. Custom Hardware Engineering..., Not Reported in...**

*Hair Mfrs. Inst. v. Saks Fifth Ave.,* 284 F.3d 302, 310-11 (1st Cir.2002). However, a "crucial" limitation exists: the statute "prohibits misrepresentations only in 'commercial advertising or promotions.' " *Podiatrist Ass'n, Inc. v. La Cruz Azul de Puerto Rico, Inc.,* 332 F.3d 6, 19 (1st Cir.2003) (quoting 15 U.S.C. § 1125(a)(1)(B)); *see also First Health Group Corp. v. BCE Emergis Corp.,* 269 F.3d 800 (7th Cir.2001) (commercial advertising "an essential ingredient").

Courts apply a multi-part test [14] to determine whether speech falls within the "specific forms of communication" targeted by the Lanham Act. *Podiatrist Ass'n, Inc.,* 332 F.3d at 19. It "must at a bare minimum target a class or category of purchasers or potential purchasers, not merely particular individuals." *Id.* The Act "covers more than classic advertising campaigns," *Podiatrist Ass'n, Inc.,* 332 F.3d at 20, including "more informal types of 'promotion,' " but speech nevertheless "must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Seven-Up Co. v. Coca-Cola Co.,* 86 F.3d 1379, 1384 (5th Cir.1996).

The ten documents that STK disclosed to CHE as the basis for its false advertising claim consist of (1) five emails or letters from a CHE marketing employee to a particular customer or individual, (2) internal CHE communications, and (3) CHE's Capabilities Statements. First, the five emails or letters are more akin to the "isolated, individual statements of opinion by a single sales representative to a single customer,"*Seven-Up Co.,* 86 F.3d at 1386, than they are to an "organized campaign to penetrate the relevant market."*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 314 F.3d 48, 57 (2d Cir.2002). Second, STK has offered no admissible evidence suggesting that the Capabilities Statements were "disseminated ... to the relevant purchasing public," while CHE has offered proof that in fact they were only disseminated to "specific individuals in response to a direct request."(# 619, Ex. A). Finally, CHE's internal communications clearly do not constitute advertising or promotion.

**\*20** STK argues that its proof of false advertising is far more extensive than the ten documents referenced by CHE. But STK apparently chose not to disclose any of these documents to CHE, either in its initial response to CHE's interrogatories, nor in its supplemental response, nor at any time following a final request by CHE in May 2005. STK offers no satisfactory explanation for this failure. It notes that it informed CHE that its interrogatory was "unduly burdensome and premature." But even if the request was premature when first rendered, that condition was presumably resolved by the time CHE

supplemented its request in May 2005. And in light of the fact that STK has identified numerous documents it says are relevant to its false advertising claim, CHE's request does not seem in fact to have been "unduly burdensome." In the absence of any other compelling justification for its failure to identify and disclose to CHE the documents upon which it now relies, STK may not refer to them for summary judgment purposes. Because STK cannot establish that CHE made false representations in "commercial advertising or promotion," summary judgment on Count 10 is allowed.

### *Motions Concerning CHE's Counterclaim*

### *Counts 3, 4, 5, 6, 7, 8, 9 and 10: Section 1 of the Sherman Act*

The relevant motions are STK's Motion for Summary Judgment (# 626), CHE's Motion for Partial Summary Judgment (# 618), and STK's Motion to Strike CHE's Expert Testimony and Reports (# 630). Counterclaim Counts 3 and 4 assert that STK illegally tied its parts to service, in violation of Section 1 of the Sherman Act; Count 3 alleges a per se violation, while Count 4 alleges a violation under the rule of reason. Similarly, Counts 5 and 6 allege illegal tying of functional microcode to service; Counts 7 and 8 allege illegal tying of maintenance microcode to service; and Counts 9 and 10 allege illegal tying of engineering changes to service. STK moves for summary judgment on Counts 3 through 10, and CHE cross-moves for summary judgment on Counts 5, 7, and 9.

### **I.** *Standing: Antitrust Injury*

Federal law confers standing on private citizens who suffer injury "by reason of anything forbidden in the antitrust laws."The class of persons who possess "antitrust standing" has been limited by the courts. *Sullivan v. Tagliabue,* 25 F.3d 43, 45 (1st Cir.1994). The Supreme Court has identified several factors that courts must weigh in determining whether antitrust standing exists. *See Associated Gen. Contractors of Cal. Inc. v. California State Council of Carpenters,* 459 U.S. 519, 537-45, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). One factor is antitrust injury, which is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."*Brunswick Corp. V. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Antitrust injury is a "central factor in the standing calculus," and its absence "weighs heavily against a grant of standing."*Sullivan,* 25 F.3d at 47

**Storage Technology Corp. v. Custom Hardware Engineering..., Not Reported in...**

2006 WL 1766434, 2006-2 Trade Cases P 75,434

& n. 9. STK argues that it is entitled to summary judgment because CHE is unable to show the requisite injury.

**\*21** However, CHE has presented evidence that it and other independent service organizations ("ISOs") suffered injury flowing from STK's allegedly anticompetitive conduct. Specifically, the record indicates that CHE experienced significant growth prior to 2003. CHE entered the private sector market in 2001, and during the spring and summer of 2002, CHE was awarded several significant accounts, including GE Capital, AT & T, and Boeing. (# 671, ¶¶ 27-31). The record further indicates that at some point in late 2002 or early 2003, STK changed several of its policies and that these changes affected ISOs and their ability to provide proper service. (# 700, Ex. 39, at 25; # 703, Ex. 154, at 222-27). These policies contributed to one ISO's decision to exit the service market (# 700, Ex. 39, at 25), and caused a measurable decline in CHE's STK-related revenues. (# 704, Ex. 168). Such evidence supports an inference that STK's allegedly anticompetitive conduct caused injury to CHE.

STK of course disagrees with CHE's calculations and has filed a motion to strike the reports and testimony of CHE's damages expert, Dr. Vincent O'Brien, or for a *Daubert* hearing in the alternative. Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592-93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), courts conduct a "preliminary assessment of whether the reasoning or methodology underlying the [proposed expert] testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."However, "[t]he focus ... must be solely on principles and methodology, not on the conclusions that they generate," and courts should not be "overly pessimistic about the capabilities of the jury," since "[v]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."*Id.* at 595-96.In light of these principles, the motion is denied.

As an initial matter, the "before and after" analysis and regression conducted by Dr. O'Brien are accepted methodologies for demonstrating antitrust lost profits. *Cambridge Plating Co. v. Napco, Inc.,* 85 F.3d 752, 772 (1st Cir.1996) (internal quotation marks omitted); *accord Conwood Co., L.P. v. U.S. Tobacco Co.,* 290 F.3d 768, 793 (6th Cir.2002) (before-and-after and regression analyses are "generally accepted methods for proving antitrust damages"). To the extent that STK attacks the specificity or Dr. O'Brien's

opinions, and, in particular, his failure to look solely at customer-specific data, its arguments are rejected. Lost profits generally need not be proved with "mathematical exactness," but rather with a reasonable degree of certainty. *Cambridge Plating Co.,* 85 F.3d at 771. In antitrust cases, lost profits may have a lesser degree of certainty than in other arenas, since market uncertainties "usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation."*Hasbrouck v. Texaco, Inc.,* 842 F.2d 1034, 1044 (9th Cir.1987) (internal quotation marks omitted). To the extent that STK's expert, Dr. Sharon Oster, criticizes the growth rates or timeline employed by Dr. O'Brien, such questions are more properly decided by the jury, to whom STK may present its theory of damages through presentation of its own expert testimony and evidence, as well as through cross-examination. Thus, while aspects of Dr. O'Brien's analysis certainly appear to be "shaky," the methodologies he employs are valid, and his opinions therefore reach the threshold of admissibility. The motion to strike is denied.

## II. *Substantial Amount of Commerce*

**\*22** STK next argues that it is entitled to summary judgment because CHE has failed to establish that any alleged tying foreclosed a substantial amount of commerce. The amount of commerce foreclosed must be "not insubstantial," or "merely *de minimis.*" *Fortner Enters., Inc. v. U.S. Steel Corp.,* 394 U.S. 495, 501, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (internal quotation marks omitted). The "relevant figure is the total volume of sales tied by the sales policy under challenge, not the portion of this total accounted for by the particular plaintiff who brings suit."*Id.* at 502.There can be no real dispute that in this case, the amount of sales in the tied product-STK maintenance service-is not insubstantial. STK's revenues for service of its tape libraries well exceeds $100 million annually. (# 700, Ex. 10).

## III. *Parts: Counterclaim Counts 3 and 4*

In these counts, CHE alleges that STK ties the sales of its parts to its service. [15] Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."15 U.S.C. § 1. When a seller ties the sale of one product to the purchase of a second product, "thereby avoid[ing] competition on the merits of the 'tied' product," he may violate Section 1. *Data General v. Grumman Sys. Support Corp.,* 36 F.3d 1147, 1178 (1st Cir.1994). CHE has asserted all of its tying claims under both

**Storage Technology Corp. v. Custom Hardware Engineering..., Not Reported in...**

2006 WL 1766434, 2006-2 Trade Cases P 75,434

the per se and rule-of-reason theories; in recent years, these theories have essentially merged, rendering separate analysis unnecessary. *See Lee v. Life Ins. Co. of North Am.,* 23 F.3d 14, 15 (1st Cir.1994); *see also PSI Repair Servs., Inc. v. Honeywell, Inc.,* 104 F.3d 811, 815-16 (6th Cir.1997). To make out a tying claim, an antitrust plaintiff must establish that

(1) the tying and tied products are actually two distinct products; (2) there is an agreement or condition, express or implied, that establishes a tie; (3) the entity accused of tying has sufficient economic power in the market for the tying product to distort consumers' choices with respect to the tied product; and (4) the tie forecloses a substantial amount of commerce in the market for the tied product.

*Id.* at 1178-79.STK has moved for summary judgment on Counts 3 and 4 on numerous grounds. Its principal argument is that STK parts are available from numerous sources other than STK, disproving both STK's market power and the existence of a tie.

"Proof of a tying arrangement generally requires evidence that the supplier's sale of the tying product is conditioned upon the unwilling purchase of the tied product from the supplier or an unwilling promise not to purchase the tied product from any other supplier."*Data General,* 36 F.3d at 1180. Where no explicit tying arrangement exists, a plaintiff may establish the existence of a tie by showing "that the supplier has actually coerced the purchase or non-purchase of another product."*Id.*"Whether the condition is explicit or implicit," however, courts "will not consider the anticompetitive effects of a tie to be unreasonable *per se* unless there is evidence that the supplier of the tying product has actually used its market power to impose the condition."*Id.*

*23 Here, CHE has failed to raise a triable issue of fact as to the existence of a tie. No explicit tie exists, and CHE has adduced no evidence that STK "actually coerced" customers into purchasing its services by leveraging its economic power in the parts market. Ample record evidence shows that customers are able to obtain STK replacement parts from numerous non-STK sources, including CHE itself, without having to purchase STK maintenance service. Such sources include ISOs, authorized distributors, resellers, brokers, used equipment that may be salvaged for parts, and internet auction sites. (# 632, ¶ 42). CHE's service business itself proves that customers may obtain STK parts without having to purchase STK service; instead, they may purchase both from CHE. Indeed, CHE's own materials tell customers that "[o]utside

of STK themselves [sic], CHE probably has the largest inventory of STK parts in the industry."(# 634, Ex. 32).

CHE responds that STK has often disparaged used replacement parts; CHE does not argue that used parts should be excluded from the replacement parts market, but instead complains that it is unfair for STK, in the context of a tying analysis, to rely upon the availability of used parts that it previously characterized as inferior. The record shows, however, that in the relevant market for STK replacement parts, new and refurbished parts are treated interchangeably. Both CHE and STK rely on used parts to maintain STK equipment. (# 738, Exs.2-6). STK does not distinguish between used and new parts (*id.,* Ex. 7), and CHE's expert recognized that "used and/or refurbished parts" may "serve as commercially acceptable substitutes for new parts," that such parts are available from non-STK sources, and that STK therefore faces a "limited degree of competition" in the replacement parts market. (# 704, Ex. 170, ¶ 15; # 702, Ex. 106, ¶ 206).

CHE next points to various STK actions-STK's buy-back program, its refusal to sell parts directly, the higher prices it charges its authorized distributors, and its packaging of parts-that it claims support a tying claim. But none of these allegations proves the existence of a tie. CHE offers no proof that STK has recaptured a significant share of the replacement parts market through its buy-back program. Indeed, it was CHE and other ISOs who first began salvaging used equipment; STK, which also has difficulty sourcing some replacement parts, and which observed the potential cost savings, followed their lead. (# 633, Ex. 6, at 767-70; # 634, Ex. 30, at 29). To the extent that STK marks up parts sold to authorized distributors or bundles parts, rather than selling them individually, CHE has offered no evidence that these actions force customers to obtain parts from STK in conjunction with a service agreement; instead, the evidence indicates that customers may turn to resellers, brokers, or used machines as alternative sources of supply.

Viewing the record in the light most favorable to CHE, it shows unequivocally that STK replacement parts are available from non-STK sources and that CHE therefore cannot prove the existence of a tie. STK is therefore entitled to summary judgment on Counts 3 and 4.

**IV.** *Functional Microcode: Counterclaim Counts 5 and 6*
*24 CHE's counterclaim alleges tying of both Functional Microcode (Counts 5 and 6) and Engineering Changes

(Counts 9 and 10) to STK maintenance service. CHE concedes it has no tying claim with respect to Functional Microcode that is initially provided to customers when they purchase an STK library. (# 667, at 5; # 670, ¶ 52). To the extent that CHE alleges tying of Functional Microcode updates, it concedes that this claim "overlaps" with its claim as to Engineering Changes, which it defines as "upgrades, updates, and [engineering changes]." (# 618, at 1 n. 2). Accordingly, STK is entitled to summary judgment on Counts 5 and 6 insofar as they are based on originally-installed Functional Microcode. To the extent that Counts 5 and 6 are based on updates, upgrades, or engineering changes, those claims are merged with Counts 9 and 10 and are addressed in Section VI, infra.

### V. *Maintenance Code: Counterclaim Counts 7 and 8*

The parties have cross-moved for summary judgment on Counts 7 and 8 of CHE's Counterclaim, which allege an illegal tie between STK's Maintenance Code and its maintenance service. Although this claim was rejected at the preliminary injunction stage, *Storage Tech. I,* 2004 WL 1497688, at *5, the parties' arguments require additional analysis upon the summary judgment record. *See Univ. of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981).

STK moves for summary judgment first on the ground that Maintenance Code and maintenance service are not separate products. To establish the existence of two distinct products, CHE must first identify the products at issue and then demonstrate sufficient demand for the tied product separate from the tying product, such that it is "efficient" to offer the two products separately.*Data General,* 36 F.3d at 1179. Maintenance service (the "tied" product) is the provision of maintenance and repair services to customers who own STK silos. Maintenance Code, which CHE alleges is the "tying" product, "consists of the portions of the [computer] program [i.e., microcode] that diagnose malfunctions and maintain performance of [STK silos]."*Storage Tech. II,* 421 F.3d at 1310. STK does not sell Maintenance Code, nor does it license Maintenance Code to its own maintenance customers; it does, however, license Maintenance Code to customers pursuant to its Customer Self-Maintenance ("CSM") program, under which customers can self-maintain or hire an ISO for maintenance service, while receiving certain service materials. (# 737, at 8, ¶ 21).

The record contains evidence that Maintenance Code is a product separate from maintenance service. As CHE points out, the existence of the Customer Self Maintenance ("CSM") program itself indicates that some customers choose not to obtain maintenance service from STK, but still seek access to STK Maintenance Code. (# 696, ¶ 7).*Cf. Data General,* 36 F.3d at 1179-80 (finding two separate products where some customers wished to license diagnostic software from the seller without purchasing support services from the seller); *Bell Atlantic Bus. Sys. Servs., Inc. v. Hitachi Data Sys., Corp.,* 1995 WL 798935, at *7 (N.D.Cal.1995) (citing *Data General* and noting that not "all products used in the course of service are inseparable from service"). Accordingly, summary judgment on this ground is denied.

**\*25** STK also argues that no tie can exist because STK does not sell its Maintenance Code; if it does not sell the tying product, it cannot have conditioned the sale of the tying product upon the sale of the tied product. Courts have previously agreed with this reasoning. *See id.*(seller did not tie service maintenance to service items it refused to sell). And this was the basis upon which I rejected CHE's tying claim at the preliminary injunction stage. *Storage Tech. I,* 2004 WL 1497688, at *5. But the summary judgment record reveals that STK does license its Maintenance Code, pursuant to the CSM program. (# 737, at 8, ¶ 21). Such licensing constitutes a "commercial transfer" sufficient to allow CHE to argue the existence of a tie. *See Bell Atlantic,* 1995 WL 798935, at *7.

Whether or not such a tie exists presents a thornier question, but one that is ultimately answered in the negative. STK does not sell or license Maintenance Code to its maintenance customers. With respect to its maintenance customers, therefore, no tie between the two products exists. STK does license Maintenance Code to its CSM customers, but those customers-by definition-do not purchase STK maintenance services; they self-maintain or hire ISOs. *Cf. Service & Training, Inc. v. Data General Corp.,* 963 F.2d 680, 686 (4th Cir.1992). Therefore, no tie exists with respect to CSM customers. In short, STK has structured its service offerings in a manner that prevents customers from ever purchasing or licensing both the tied and tying product at the same time: Under an STK maintenance agreement, customers purchase the tied product, but not the tying product; under a CSM agreement, customers license the tying product, but not the tied product. In the absence of any evidence of a tie, STK is entitled to summary judgment on Counts 7 and 8.

### VI. *Engineering Changes/Functional Code Upgrades: Counterclaim Counts 9 and 10*

**Storage Technology Corp. v. Custom Hardware Engineering..., Not Reported in...**

2006 WL 1766434, 2006-2 Trade Cases P 75,434

The parties cross-move for summary judgment on these counts as well, which, as explained above, have been merged with Counts 5 and 6 to cover upgrades, updates, and engineering changes. STK argues it is entitled to summary judgment because CHE cannot establish either the existence of a tie or that any alleged tie would foreclose a substantial amount of commerce. [16] Because material factual disputes persist as to both of these issues, summary judgment is denied.

**A. *Existence of a Tie***

STK contends that it provides engineering changes, or Functional Code upgrades ("upgrades"), to customers through a variety of means-primarily on a "time and materials" basis and through the CSM program-without requiring that they purchase STK maintenance service. It maintains that such upgrade availability defeats the existence of a tie. In support of its claim, STK cites the deposition testimony of CHE's Vice President, CHE customers, STK employees, and STK's written policies.

However, material factual disputes on this point remain. First, it is not entirely clear that STK made upgrades available on a "time and materials" basis. The record contains evidence that STK emphatically told customers that upgrades were only available through STK maintenance agreements or CSM agreements. (*E.g.,* # 700, Ex. 40; # 702, Ex. 120, at 203). Such evidence includes statements of STK employee David Jesuale, who was in charge of upgrade policy and to whom STK employees and customers turned for clarification; Jesuale repeatedly and unequivocally emphasized that upgrades were only available through STK maintenance or CSM. (# 700, Ex. 34; # 702, Ex. 81).*Cf. Datagate, Inc. v. Hewlett-Packard Co.,* 60 F.3d 1421, 1426 (9th Cir.1995) (triable issue remained on tying claim where HP threatened to withhold software service if customer purchased hardware service from ISO, that software service was necessary, and that ISO prices were lower than HP's prices). As for the specific instances upon which STK claims it provided engineering changes on a "time and materials" basis, CHE has presented evidence that these occasions were anomalies concerning newly installed tape drives, not routine upgrades. (# 701, Ex. 44, at 504).

*26 Furthermore, record evidence indicates that in late 2002 or early 2003, shortly after CHE entered the market for servicing private sector STK equipment, STK implemented changes that were intended to make the CSM program expensive and unattractive to customers, and thereby to dissuade customers from choosing ISO service over STK service. (# 701, Ex. 58-59, 62, 64-65). STK imposed a fee equal to fifty percent of the fee charged for its most expensive level of maintenance service. (*Id.,* Ex. 60). The record indicates that both ISOs and customers viewed the fee as prohibitively expensive. (*Id.,* Exs.66, 68-69). Moreover, CSM customers were entitled only to a one-time upgrade; additional upgrades were available only if customers paid the fee again.(*Id.,* Ex. 58). From this evidence, a reasonable jury could conclude that purchasing upgrades through the CSM program was not an economically viable option and that a tie therefore did exist. *See Amerinet, Inc. v. Xerox Corp.,* 972 F.2d 1483, 1500 (8th Cir.1992) (illegal tie may be shown "if the defendant's policy makes the purchasing of the tying and tied products together the only viable economic option" (internal quotation marks omitted)); *Data General,* 36 F.3d at 1180 (implicit tie exists where "facts and circumstances ... as a practical matter forced the buyer into purchasing the tied product" with the tying product (internal quotation marks omitted)). Because this evidence raises material disputes as to microcode availability, summary judgment on basis of lack of a tie is inappropriate.

**B. *Substantial Amount of Commerce***

Any alleged tie must foreclose a "not insubstantial" amount of commerce to be actionable under Section 1. *Fortner Enters.,* 394 U.S. at 501. As noted above, if STK does indeed tie upgrades to service, the total volume of sales of maintenance service for STK equipment exceeds $100 million, which is sufficient to satisfy the requirement. STK, however, additionally argues that upgrades are not needed or generally desired by STK silo owners and thus any alleged tie does not foreclose a substantial amount of commerce. In other words, STK argues that upgrades are not really necessary for or related to the service of STK equipment and thus, even if it did condition the sale of upgrades on the purchase of service, it would not foreclose a substantial enough portion of the service market.

On this point, the record is mixed. STK has presented evidence that upgrades are necessary only "to make some new piece of hardware function," and that there are no other circumstances in which customers need a code upgrade. (# 697, at 431). It has further presented evidence that upgrades generally are not necessary for mature silo systems, such as the 4400 and 9300 series, and that CHE did not believe such upgrades would be needed in the future. (# 696, ¶ 51). To the extent that upgrades are generally not needed by silo owners for maintenance purposes and have "no diagnostic or

repair function," but are needed only to upgrade hardware, its availability may be relevant only in the product market, but not in the service aftermarket. *See Telecom Tech. Servs., Inc. v. Rolm Co.,* 388 F.3d 820, 828 (11th Cir.2004). CHE has, however, presented evidence that upgrades are required for maintaining silo performance, and that it was required to obtain upgrades while servicing STK machines. (# 647, Ex. 39, at 76; # 700, Ex. 37, at 138). Because factual disputes therefore exist as to the link between upgrades and the service market, I reject STK's argument that a substantial amount of commerce in the service market cannot be foreclosed by conditioning sales of upgrades on service.

### C. *Market Power*

**\*27** STK has also filed a supplement (# 765) in which it claims that the Supreme Court's recent decision in *Illinois Tool Works Inc. v. Independent Ink,* 547 U.S. 28, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006), defeats CHE's tying claims. *Illinois Tool Works* held (1) that in all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product, and (2) that no presumption of market power attaches to patent owners. *Id.* at 1293.Summary judgment under *Illinois Tool Works* is denied, since a jury could reasonably conclude that STK-as the sole producer of upgrades-possesses market power.

### D. *Conclusion*

Because STK has raised no other reason why it is entitled to summary judgment on Counts 9 and 10, its motion is denied. CHE's summary judgment motion is denied on the basis of the evidence proffered by STK tending to show that upgrades may have been available to customers on a "time and materials" basis, and that any alleged tie of upgrades to service may not have foreclosed a substantial amount of commerce in the service market because upgrades are not widely necessary to silo owners.

### *Counts 1, 2, 13, and 15: Section 2 of the Sherman Act*

The relevant motion is STK's Motion for Summary Judgment (# 627). Counts 1, 2, 13, and 15 of CHE's counterclaim allege violations of Section 2 of the Sherman Act, 15 U.S.C. § 2. [17] Counts 1 and 2 allege monopolization and attempt to monopolize the market for maintenance service of STK machines. Count 13 alleges monopolization of an essential facility, specifically STK's Functional and Maintenance Code. Count 15 alleges monopolization, based on refusal to deal in microcode.

To prove a Section 2 violation, CHE must establish (1) "that the defendant has monopoly power in a relevant market," and (2) that the defendant has maintained or increased that power through anticompetitive conduct. *SMS Sys. Maintenance Servs., Inc. v. Digital Equip. Corp.,* 188 F.3d 11, 15 (1st Cir.1999). With respect to attempted monopolization, the analysis is similar, *Davric Maine Corp. v. Rancourt,* 216 F.3d 143, 149-50 (1st Cir.2000), except that the plaintiff must show a "dangerous probability" that the defendant will achieve monopoly power, *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993).

### I. *Monopoly Power: Relevant Market*

The parties vigorously dispute the monopoly power question and, specifically, the definition of the relevant market. STK argues that the relevant market is the market for data storage equipment ("the primary market") and that it does not possess monopoly power in that market. CHE contends that the relevant market is the STK service market, which it defines as the market "for the maintenance and repair of STK Silo Systems in the United States," and which is also referred to as the "aftermarket." (Counterclaim ¶¶ 17, 117).

As an initial matter, I disagree with STK's argument that a single-brand aftermarket must be rejected out of hand. As the Supreme Court recognized in *Eastman Kodak Co. v. Image Tech. Servs. .,* 504 U.S. 451, 481-82, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), a service aftermarket may be the relevant market for Section 2 purposes. An aftermarket is by definition a single-brand market. *See id.* at 482 (from equipment owner's perspective, aftermarket is "composed of only those companies that service [STK] machines"). Whether or not the aftermarket is the relevant market thus requires analysis under *Kodak* and its progeny; the answer cannot be based simply upon single-brand status.

**\*28** In *Kodak,* the Supreme Court recognized that a competitive primary equipment market might not adequately protect against anticompetitive conduct in the aftermarket. In that case, a group of ISOs that serviced Kodak copiers alleged that Kodak had monopolized the aftermarket. Kodak argued that competition in the primary equipment market necessarily checked anticompetitive conduct in the aftermarket, since higher service prices in the aftermarket would cause customers to switch brands in the primary market. *Id.* at 466.The Supreme Court disagreed. It found that high information costs prevented customers from

comprehending the cost of services they would eventually need at the time they purchased copying equipment. *Id.* at 472-73.Furthermore, high switching costs could inhibit consumers from changing brands even if Kodak were charging supracompetitive prices in the aftermarket. *Id.* at 476-77.These factors could insulate the aftermarket from competitive pressure in the foremarket.

Kodak does not, however, mean that the aftermarket is always the relevant market. As the First Circuit emphasized in SMS, "a litigant who envisions the aftermarket as the relevant market must advance hard evidence dissociating the competitive situation in the aftermarket from activities occurring in the primary market."188 F.3d at 17. In that case, the First Circuit placed the burden on the plaintiff to bring forth "evidence show[ing] that the manufacturer can exert raw power in the aftermarket without regard for commercial consequences in the foremarket," without which the court declined to deem the aftermarket the relevant market. *Id.* STK argues that CHE has failed to provide such evidence, but material factual disputes exist.

First, supracompetitive pricing in the aftermarket can indicate that the aftermarket is insulated from competition in the foremarket. *See Kodak,* 504 U.S. at 477; SMS, 188 F.3d at 24. CHE has presented evidence that when STK discounted its prices by seventy percent, it was still able to maintain a nearly twenty percent profit margin. (# 700, Ex. 11, at 1336). A jury could reasonably infer from this evidence that STK's usual prices were supracompetitive, thus distinguishing this case from SMS, where the "record [wa]s devoid of any evidence of supracompetitive prices."188 F.3d at 24. STK disputes that it engaged in supracompetitive pricing, citing an internal STK document that instructed employees to "[f]ollow[ ] standard pricing practices," to "negotiate an acceptable pricing scheme" with customers, to be "flexible in pricing," and even to consider "[o]ffering to meet CHE pricing."(# 703, Ex. 138). STK provides no proof that these suggested strategies were followed, but in any event, none of them are necessarily inconsistent with supracompetitive pricing. Supracompetitive prices need not be unilateral or fixed and thus could be consistent with negotiations and flexible pricing. STK also argues that its prices were higher because its services were better. Yet the record contains evidence that CHE's customers thought that it provided high quality, "excellent" service. (*E.g., id.,* # 700, Ex. 6, at 237; *id.,* Ex. 14, at 502501). Thus, the degree to which STK's supracompetitive prices may be attributed to relative quality remains an issue of dispute.

**\*29** Second, courts also tend to scrutinize retroactive policy changes, since they may indicate a manufacturer's power to engage in anticompetitive conduct in the aftermarket without regard to competition in the foremarket. For example, in *Kodak,* the defendant had retroactively changed its policy regarding its parts. 504 U.S. at 458. This change increased the lack of transparency suffered by consumers who had purchased the equipment without comprehending the service options that would be available to them, or the full life cycle costs of their equipment. In other words, retroactive policy changes can indicate that customers in the "primary market [may not be] in possession of information that sufficiently reveals the anticompetitive tendencies of a manufacturer in its aftermarket."SMS, 188 F.3d at 19 n. 3. This concern was not present in SMS, where the disputed warranty was entirely prospective and was therefore "obvious to any purchaser in the primary market."*Id.* at 19.

CHE alleges that STK implemented a number of retroactive changes, including (1) increasing the price and changing the terms of the CSM, which effectively discouraged customers from choosing ISOs; and (2) changing its Licensed Internal Code ("LIC") process, through which ISOs obtained STK microcode upgrades. Because upgrades are necessary for proper maintenance, these restrictions negatively impacted CHE's ability to provide maintenance service. Sufficient record evidence supports these allegations.

STK denies that it actually implemented changes to the CSM program, but the record contains STK documents referring to major policy changes in the program. (*E.g.,* # 701, Exs. 58, 59 (referring to "a major face lift" in CSM program and "new CSM program")). Indeed, STK's assertion that its pricing policies remained the same are directly contradicted by STK correspondence that "highlights" certain "changes to the [CSM] program," including pricing changes. (*Id.,* Ex. 59). STK's contention that these "changes" were not actually changes, but were merely express statements of previously implicit policies, is entirely unconvincing. Similarly, record evidence shows that STK changed the LIC process to make it harder for CHE and other ISOs to obtain microcode updates. Correspondence and testimony of an employee of Fujitsu, another ISO, indicates that until the fall of 2003, STK provided upgrades through its LIC process to customers being serviced by ISOs for a $50 fee. (# 701, Ex. 46; *id.,* Ex. 47, at 97-98). At some point in the fall of 2003, however, STK altered the LIC order process, thereby preventing ISOs like CHE and Fujitsu from obtaining updates. (*Id.* at 104).

**Storage Technology Corp. v. Custom Hardware Engineering..., Not Reported in...**

2006 WL 1766434, 2006-2 Trade Cases P 75,434

STK does not dispute that it changed the LIC process, but instead argues that upgrades were not necessarily required for maintaining STK silos. This contention is belied by the record, which portrays a dispute between Fujitsu and STK about microcode update availability for Exxon Mobil, an STK customer whose silos were being serviced by Fujitsu. *See also*Section 1 discussion of engineering changes, *supra.*When STK refused to provide the necessary updates, Fujitsu was unable to provide the requisite service, which placed its relationship with Exxon under significant pressure. Eventually, STK provided the needed microcode, but only after Fujitsu agreed to turn over maintenance on the Exxon account to STK. (*Id.* at 105-06). The urgent need that Exxon and Fujitsu expressed in the fall of 2003 for a functional code upgrade undermines STK's efforts to minimize upgrade importance. (*E.g., id.* at 113;*see also* # 700, Ex. 37, at 138). STK also objects to CHE's characterization of the Fujitsu-Exxon incident; but while the Exxon incident was not "the only reason" for Fujitsu's decision to exit the service industry, it was "certainly a factor." (# 701, Ex. 47, at 319). In short, CHE has presented evidence from which a reasonable jury could conclude that STK implemented changes to its LIC process that materially impacted the ability of ISOs to obtain upgrades and thus to compete in the service aftermarket.

**\*30** Market definition is a factual question. *Coastal Fuels of P.R., Inc. v. Carribean Petroleum Corp.,* 79 F.3d 182, 196 (1st Cir .1996). In this case, evidence of supracompetitive pricing and retroactive policy changes raises the possibility that competition in the foremarket may not have provided a sufficient check on anticompetitive conduct in the aftermarket. A reasonable jury might conclude from this evidence that this case falls more within the ambit of *Kodak* rather than SMS, and that the relevant market is properly defined as the service aftermarket rather than the equipment foremarket. Accordingly, the issue of monopoly power remains in dispute.

**II.** *Anticompetitive Conduct*

To make out a Section 2 claim, CHE must also prove that STK engaged in "improper exclusionary conduct." SMS, 188 F.3d at 25. STK moves for summary judgment on this element, arguing that CHE cannot raise a triable issue of fact as to anticompetitive conduct. CHE's asserts numerous types of anticompetitive conduct. (Counterclaim ¶ 100; # 668, at 5). Because a triable issue of fact persists as to at least one alleged type, summary judgment is denied.

A number of CHE's allegations concern STK's refusal to provide access to its microcode. CHE asserts that STK has violated Section 2 by (1) tying the availability of microcode to its maintenance service, in part through changes to the CSM program; (2) eliminating ISO access to microcode through authorized parts distributors; and (3) eliminating ISO access to microcode through the LIC Order Form process. (# 688, at 5, 23). These allegations form a partial basis for Counterclaim Counts 1 and 2, and are the sole basis for Counts 13 and 15.

As a general matter, unilateral conduct by a monopolist may be exclusionary under Section 2, and a monopolist's unilateral refusal to deal with its competitors may be prima facie evidence of exclusionary conduct as long as the refusal harms the competitive process. *Data General,* 36 F.3d at 1182-83. A monopolist may, however, "rebut such evidence by establishing a valid business justification for its conduct."*Id.* at 1183.Relying on *Data General,* STK argues that its refusal to provide microcode is justified because its microcode is copyrighted. In that case, the First Circuit dealt with the tension between an intellectual property owner's right to exclude others from its property, and the potentially anticompetitive effect of unilateral refusal to deal. After analyzing the historical relationship between the intellectual property laws and antitrust liability, the First Circuit held that "while exclusionary conduct can include a monopolist's unilateral refusal to license a copyright, an author's desire to exclude others from use of its copyrighted work is a presumptively valid business justification for any immediate harm to consumers."*Id.* at 1187.The presumption may be rebutted, but only in "rare cases." *Id.* at 1187 n. 64.

**\*31** Under *Data General,* STK argues that its refusal to provide access to copyrighted microcode cannot form the basis of Section 2 liability, and it is correct with respect to Maintenance Code and Functional Code. CHE argues that STK is not entitled to the *Data General* presumption, but it has failed to present evidence that this is one of those cases "in which imposing antitrust liability is unlikely to frustrate the objectives of the Copyright Act."*Id* . CHE has presented no evidence, for example, that STK's copyright was unlawfully acquired. *Cf. id.* at 1186 (noting that patent exception to antitrust laws does not apply where patent unlawfully acquired); *In re Independent Service Organizations Antitrust Litig. CSU, L.L.C.* ("*In re CSU*"), 203 F.3d 1322, 1329 (Fed.Cir.2000) (following *Data General* and noting that "in the absence of any evidence that the copyrights were obtained by unlawful means," defendant's refusal to sell or license copyrighted works was lawful). CHE notes that

Case: 1:08-cv-02755-DCN Doc #: 247-2 Filed: 10/10/14 37 of 47. PageID #: 13974

Storage Technology Corp. v. Custom Hardware Engineering..., Not Reported in...

2006 WL 1766434, 2006-2 Trade Cases P 75,434

the Federal Circuit has indicated that the presumption may be overcome with evidence of an illegal tie. *See id.* at 1327.But I have already rejected CHE's tying claims with respect to Maintenance Code and Functional Code. CHE is, in short, unable to win the "uphill battle" that the *Data General* presumption creates. Accordingly, STK's motion for summary judgment is granted insofar as CHE's Section 2 claims are based upon STK's refusal to license or provide access to Maintenance Code and Functional Code.

Engineering changes, or upgrades, are another matter. First, the copyright status of engineering changes is unclear. STK has repeatedly asserted-with respect to both Sections 1 and 2-that Maintenance Code and Functional Code, or microcode, is copyrighted. Thus, it expressly disputes Section 1 liability with respect to *Maintenance Code* on the basis of its copyright. (# 643, at 13; # 735, at 8). But its Section 1 briefs never raise a copyright argument with respect to upgrades or engineering changes. Similarly, in its response to CHE's Section 1 motion, STK raises a copyright defense only for Maintenance Code, but mentions no such defense in relation to upgrades. (# 689, at 20). Instead, STK's Section 1 defense for upgrades is throughout based upon (1) the availability of upgrades, and (2) the lack of market foreclosure. With respect to CHE's Section 2 claims, the same is true. Its papers do not mention the copyright status of engineering changes or upgrades.

STK documents provide little clarification. For example, CP-8-5-3 is an STK document that describes how customers who are not under an STK service agreement will be treated, specifically, what access they will be given to STK's "support services, spare parts, tools and engineering changes."(# 647, Ex. 33, at STK 242716). The document emphasizes the proprietary status of "Maintenance software," stating that it is "the sole property" of STK and that it may be licensed under the CSM program. (*Id.* at STK 242717). It likewise emphasizes the proprietary status of "Licensed internal code," which it notes is copyrighted. (*Id.*). No proprietary language is used, however, in describing engineering changes. While STK's silence does not mean that engineering changes and code upgrades are not copyrighted, I am hesitant to automatically conclude that they are, especially since STK has repeatedly emphasized the copyright status of Maintenance Code. It is certainly possible that STK has not copyrighted engineering changes, while it has copyrighted its microcode. In *Bell Atlantic,* the defendant Hitachi also produced storage systems. 1995 WL 798935, at *1. It copyrighted its maintenance documentation and diagnostic

software, but did not copyright its microcode or engineering change notices. *Id.* at *1, 7. In the absence of any affirmative evidence that STK's upgrades and engineering changes are copyrighted, I am disinclined to apply the *Data General* presumption at this stage of the case.

**\*32** Even assuming that upgrades are copyrighted, it is still not clear that the Data *General* presumption applies. The presumption, after all, is not irrebuttable. *See*36 F.3d at 1187 n. 64 (expressly declining to adopt irrebuttable presumption). As mentioned earlier, the First Circuit explicitly noted that unilateral refusals to deal in copyrighted material could constitute exclusionary conduct in some circumstances. The Federal Circuit has further elaborated that a copyright holder cannot use its lawful right to exclude "with impunity to extend power in the marketplace beyond what Congress intended."*In re CSU,* 203 F.3d at 1328. Courts have enunciated few principles elucidating the boundary between lawful and unlawful conduct. But, as CHE points out, at least one court has found that the *Data General* presumption may not apply where there is an "indication of illegal tying." *Id.* at 1327.As explained above, CHE has presented evidence supporting a claim of illegal tying between upgrades and service. This evidence is therefore relevant not only because it precludes summary judgment on CHE's tying claim, but also because it raises the possibility that STK extended its statutory power beyond the permissible boundary established by its copyright and thereby relinquished its entitlement to the *Data General* presumption. [18]

To be sure, tension in the case law exists. The Federal Circuit has found that evidence of an illegal tie may rebut the *Data General* presumption. Therefore, if STK illegally tied upgrades to service, it may have exceeded the scope of any copyright it possesses with respect to upgrades. On the other hand, some courts have held that the right to exclude from copyrighted or patented parts or software that are necessary for service may include within its scope the right to exclude from the service aftermarket. *See, e.g., Telecomm Tech. Servs., Inc. v. Siemens Rolm Comms., Inc.,* 150 F.Supp.2d 1365, 1369 (N.D.Ga.2000), *aff'd on different grounds,*388 F.3d 820 (11th Cir.2004) ("[A]s a matter of law the statutory scope of a patent extends beyond the original equipment market into the service market where service requires use of patented parts."). Nevertheless, at this stage in the litigation, I am unwilling to eliminate the possibility that an illegal tie between upgrades and service, if proved, might also be relevant to the validity of STK's business justification, by virtue of its copyright, for engaging in otherwise exclusionary

**Storage Technology Corp. v. Custom Hardware Engineering..., Not Reported in...**

2006 WL 1766434, 2006-2 Trade Cases P 75,434

conduct in the service market. At trial, STK may well disprove the existence of any tie between upgrades and service and thereby foreclose this line of argument. But CHE's proffered evidence is sufficient to avoid summary judgment.

Accordingly, summary judgment on Counts 1, 2, 13, and 15 is denied, except to the extent that such counts are based upon STK's refusal to license or provide access to microcode, summary judgment is allowed. STK's additional arguments under Counts 13 and 15 concerning the trade-secret status of Event Messages are therefore moot, since Event Messages are part of Maintenance Code. In light of these rulings, I need not consider CHE's lengthy catalogue of other anti-competitive conduct.

### Counts 18, 21, 23, and 25: Unfair Competition and Tort Claims

**\*33** STK moves for summary judgment on Counts 18, 21, and 23 of CHE's Counterclaim (# 625), and, somewhat repetitively, for summary judgment on Counts 23 and 25 (# 624). [19]

#### I. *Counts 18 and 23: Unfair Competition*

Count 18 alleges unfair competition based upon harm to competition in the service market. (Counterclaim ¶¶ 212-17). Count 23 alleges common law unfair competition, "under the common law and statutes of the various states where STK and CHE have business relationships including the common law and statutes of Missouri and Massachusetts."(*Id.* ¶ 246). They are based upon STK's allegedly "false, deceptive or misleading and unfair descriptions of fact and/or misleading or deceptive representations of fact in connection with the sale of its goods and/or services about CHE and its services."(*Id.* ¶ 247). STK challenges the sufficiency of CHE's claims on several grounds.

A preliminary matter concerns choice of law. CHE contends that Missouri law governs. STK apparently believes that Massachusetts law applies, but, more importantly, believes that choice of law is irrelevant "because the outcome ... is the same regardless of choice of law."(# 732, at 2). I will therefore apply Missouri law. [20] In *Fred Wehrenberg Circuit of Theatres, Inc. v. Moviefone, Inc.,* 73 F.Supp.2d 1044, 1047-48 (E.D.Mo.1999), the federal court thoroughly canvassed the history of Missouri's common law of unfair competition and found that "[i]n Missouri, common law unfair competition encompasse[s] several categories of

legal claims, including palming or passing off, trademark violations, and misappropriation."Count 18, which alleges unfair competition based upon "monopolistic anticompetitive activity," does not fall within these categories. Notably, Missouri is not one of the states to have adopted Restatement (Third) of Unfair Competition § 1, which ostensibly extends common law unfair competition to include antitrust violations. Indeed, to the extent that Missouri courts have considered the relationship between antitrust violations and common law unfair competition, they have declined to rule that the former may be actionable as the latter. For example, in *Essex v. Getty Oil Co.,* 661 S.W.2d 544, 555 (Mo.App.1983), the court found that a claim concerning anticompetitive price discrimination did not fall within the scope of common law unfair competition. While recognizing that "any scheme that misappropriates the property of another may lie within the protection of the doctrine," the court found that conduct that allegedly "limit[ed] trade or competition" did not. *Id.* at 554-55.Accordingly, STK is entitled to summary judgment on Count 18, which claims common law unfair competition based upon harm to competition.

Count 23 alleges common law unfair competition based upon "false, deceptive or misleading and unfair descriptions ... and/or ... representations of fact ... about CHE and its services."(Counterclaim ¶ 247). CHE has asserted that STK made many deceptive or unfair statements about it to customers, but has not alleged facts falling within the scope of common law unfair competition in Missouri. Deceptive statements are actionable under Missouri law when they are intended to "trade on another's reputation," or misappropriates the property of another while using his own name. CHE has not accused STK of trading on CHE's reputation, either by palming off STK goods as CHE property, or by misappropriating CHE property and associating it with STK's name. Perhaps recognizing this weakness, CHE now claims that STK misappropriated CHE's proprietary tools, namely, LEM and ELEM, and that such misappropriation constitutes unfair competition. (# 661, at 5). This claim is completely different from what was pled in Count 23, and in any event is insufficient. Even if STK misappropriated CHE's property, such misappropriation-while it might theoretically support a trade secret claim-would not constitute common law unfair competition, unless STK passed that property off as its own. Accordingly, STK is entitled to summary judgment on Count 23 as well.

## II. *Counts 21 and 25: Tortious Interference with Prospective Economic Advantage and with Contract*

**\*34** "Tortious interference with a contract or business expectancy requires proof of: (1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages."*Hensen v. Truman Medical Center, Inc.,* 62 S.W.3d 549, 553 (Mo.App.2001). CHE cites five examples where STK allegedly interfered with a contract or valid business expectancy. STK challenges the sufficiency of the evidence in each case.

### A. *El Paso*

CHE had a maintenance agreement with El Paso Corporation and claims that STK tortiously interfered with that contract by (1) sending threatening letters about the preliminary injunction, which was at that time in place, (2) threatening to bring litigation against El Paso litigation, and (3) unreasonably delaying its provision of microcode, thereby causing CHE to fall into disfavor of El Paso. CHE's allegations, however, lack support.

First, CHE has offered no evidence that any allegedly tortious conduct caused El Paso to terminate its relationship with CHE. CHE cites the deposition testimony of Richard Rutkoski, the IBM liaison, but Rutkoski actually testified that he did not know why El Paso terminated its CHE relationship. He specifically denied knowing whether the preliminary injunction contributed to El Paso's decision and even expressed doubt that its decision was based on lack of microcode availability through CHE. (# 734, Ex. 42, at 411-13). CHE also cites the testimony of Chris Carrier, a CHE employee, who states that he heard from someone at IBM, who heard from someone at El Paso, that STK had threatened El Paso with litigation. (# 703, Ex. 151, at 75). This statement, which concerns at least two levels of hearsay, is inadmissible insofar as it is offered for the purpose of proving that STK actually made such statements to El Paso. *Noviello v. City of Boston,* 398 F.3d 76, 85 (1st Cir.2005). In the absence of any evidence of a causal link between STK's conduct and El Paso's termination of its CHE contract, STK is entitled to summary judgment.

### B. *AT & T*

CHE claims that STK harmed a prospective business relationship with AT & T by delaying its provision of microcode. AT & T was a customer serviced by CHE, as a subcontractor for IBM. CHE has proffered evidence, primarily the testimony of Patti Summey, the IBM liaison, that STK refused to provide microcode to either IBM or CHE, and as a result, IBM decided to move the AT & T account back to STK for service. (# 646, Ex. 13, at 185). STK counters with evidence that microcode was available to AT & T directly and that IBM was aware of this option. (# 734, Exs.41-42, 50-51). There is no evidence that AT & T ever made a direct request, and the IBM employees who handled the issue were unaware of such a request.(*Id.,* Exs.50-51). It is thus entirely possible that AT & T never received the necessary microcode because STK never received a request it was willing to honor. In any event, there is no evidence that STK would have refused to provide the microcode to AT & T, even knowing it was under a CHE agreement, had AT & T made a request. CHE cannot sustain a tortious interference claim where it lacks affirmative evidence that STK refused altogether to provide microcode to AT & T.

### C. *Bureau of Public Debt ("BPD")*

**\*35** STK argues that CHE cannot argue tortious interference with its BDP account because CHE never lost that account. CHE concedes that it "managed to hang on to the BDP account," but complains that it suffered "considerable damages," in the amount of $38,000, because it had to buy tape units that STK would not provide. (# 661, at 15; # 662, ¶¶ 160-62). In the absence of any evidence that BDP breached its agreement with CHE as a result of STK's conduct, or that CHE lost the economic advantage of a relationship with BDP, these allegations cannot support a tortious interference claim.

### D. *American Express*

CHE contends that STK tortiously interfered with its American Express account by informing American Express of the preliminary injunction then in effect. The email in question describes this court's preliminary injunction decision and includes certain quoted language. It further encourages customers to ascertain the legality of CHE's maintenance practices and to "avoid participating" in any infringement, "to avoid any liability on the part of your company."(# 703, Ex. 160). This email cannot be the basis of tort liability. Under the *Noerr-Pennington* doctrine, "acts incidental to protected litigation-acts that are 'reasonably and normally attendant upon protected litigation'-are entitled to immunity to the same extent as the related litigation."*Matsushita Elecs. Corp. v. Loral Corp.,* 974 F.Supp. 345, 359 (S.D.N.Y.1997). Such acts include "sending letters threatening court action." *Id.*

As the Fifth Circuit has noted, "[t]he litigator should not be protected only when he strikes without warning."*Coastal States Marketing, Inc. v. Hunt,* 694 F.2d 1358, 1367 (5th Cir.1983). Indeed, "[i]f litigation is in good faith, a token of that sincerity is a warning that it will be commenced and a possible effort to compromise the dispute."*Id.* Therefore, in the absence of any evidence that STK has engaged in sham litigation,[21] *Noerr-Pennington* immunity protects STK from liability on the basis of this communication.

### E. *Allmerica and Huntington National Bank*

Finally, CHE asserts that STK interfered with its contracts with Allmerica and Huntington National Bank by disconnecting ELEM at those sites and by disparaging CHE. Even if STK did so, CHE has failed to adduce any evidence that such conduct caused either Allmerica or Huntington to end their relationships with CHE. On the contrary, the record contains a letter stating that Allmerica decided to terminate its CHE relationship because it "believe[d] that it is in Allmerica's best interest long term to have our equipment serviced by the original manufacturer."(# 734, Ex. 45). CHE has presented no evidence indicating that Allmerica's decision was based on either the temporary disconnection of ELEM, or any disparaging comments STK allegedly made about CHE. Indeed, Allmerica's letter expressly states that "CHE's performance over the past two years has been satisfactory," that the relationship has been "positive," and that CHE consultants have been "responsive, professional and flexible." (*Id.*). As for Huntington, CHE has similarly presented no evidence as to the reasons for its decision. When asked whether the ELEM disconnection had anything to do with Huntington's decision to terminate, David York himself stated that he "would be speculating as to-if that was part of the process or not."(# 703, Ex. 152, at 217-18). In addition, here-as with the El Paso account-the only evidence of STK making disparaging comments are vague, hearsay statements offered by Christopher Carrier. Such evidence cannot support a tortious interference claim.

### F. *Conclusion*

*36 CHE has not supported its allegations as to these five incidents, and has proffered no other evidence to make out a tortious interference claim. Accordingly, STK is entitled to summary judgment on Counts 21 and 25 of CHE's counterclaim.

### Other Motions

### # 461: STK's Motion to Strike

STK has moved to strike the expert opinions of David York, or in the alternative to compel their production. Fed.R.Civ.P. 26(a)(2)(B) requires that an expert report be produced "with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony."There is no dispute that York's duties as an employee of CHE do not include regularly giving testimony. STK, however, contends that York, who will unquestionably be testifying as a fact witness, may also be considered an expert "retained or specially employed to provide expert testimony."As the cases cited by STK explain, to require employee experts to provide written reports "is entirely consistent with the spirit of [the Rule]," since it "will undoubtedly serve to minimize the elements of surprise."*3M v. Signtech USA,* 177 F.R.D. 459, 461 (D.Minn.1998); *accord Kw Plastics v. U.S. Can Co.,* 199 F.R.D. 687, 690 (N.D.Ala.2000). To the extent that York will be testifying as a traditional expert, in matters involving scientific, technical, or specialized knowledge, STK is entitled to a report disclosing his opinions.

CHE notes that the cases cited by STK are distinguishable, since in those cases, the court found that the witnesses should be subject to expert disclosure requirements in part because the witnesses were not hybrid witnesses. However, the principles underlying both these cases as well as the disclosure rules are clearly applicable here. Testimony that is expert testimony should not "evade the expert witness disclosure requirements set forth in Fed.R.Civ.P. 26," simply because the testimony is proffered through a fact witness. Fed.R.Evid.701, Advisory Committee note (2000). Indeed, the Advisory Committee has emphasized that the key distinction in managing expert testimony is not between expert and lay *witnesses,*"but rather between expert and lay testimony."*Id.* Thus, "any part of a witness' testimony that is based upon scientific, technical, or other specialized knowledge ... is governed by ... the corresponding disclosure requirements of the Civil ... Rules."*Id.* CHE also argues that STK cannot be unaware of York's opinions because they have already extensively deposed him and have clearly scoured that testimony in preparing its various motions. I am inclined to agree that the risk of unfair surprise is relatively low in this case, given STK's considerable familiarity with Mr. York. Nevertheless, in an effort to streamline what will inevitably be contentious questioning at trial, I conclude that STK is entitled to an expert report on York's opinions, but only to the limited extent that his testimony will be based upon

**Storage Technology Corp. v. Custom Hardware Engineering..., Not Reported in...**

2006 WL 1766434, 2006-2 Trade Cases P 75,434

"scientific, technical, or other specialized knowledge." CHE shall therefore produce within twenty days a report limited accordingly. The motion is denied to the extent it seeks exclusion of York's testimony, but allowed to the extent that it seeks production of his opinions.

### # 584: STK's Motion to Strike

*37 STK also moves to strike new expert opinions allegedly espoused in CHE's expert's rebuttal reports. To the extent that the disputed material concerns the #569 Patent, the motion is denied as moot, as I have already granted CHE summary judgment on that patent for unrelated reasons. To the extent that the disputed material concerns the doctrine of implied license in relation to the #777 Patent, the motion is denied as moot because I have rejected CHE's implied license doctrine on the merits.

### Conclusion

Rulings on the parties' pending motions are summarized below. Counsel are requested to forego the customary motions for reconsideration and/or clarification unless there is a sound legal basis for invoking such.

PDP's Motion to Dismiss (# 310) is denied.

STK's Motion to Dismiss (# 338) is denied as moot.

STK's Motion to Strike (# 461) is allowed in part and denied in part.

STK's Motion to Strike (# 584) is denied as moot.

CHE's Motion for Joinder (# 608) is allowed.

PDP's Motion for Partial Summary Judgment (# 609), in which York and CHE join as to Count 2 (608, 614), is allowed as to Counts 1 and 2. With respect to Count 9, it is allowed except as to inducement of infringement of the #777 Patent, as to which it is denied.

CHE's Motion for Partial Summary Judgment (# 616), joined by York (# 614), is allowed as to the #569 Patent and denied as to the #777 Patent.

CHE's Motion for Partial Summary Judgment (# 617), joined by York (# 614), is denied as moot.

CHE's Motion for Partial Summary Judgment (# 618) is denied.

CHE's Motion for Partial Summary Judgment (# 619) is allowed as to Counts 5 and 10.

STK's Motion to Dismiss (# 622) is denied as moot.

STK's Motion for Summary Judgment (# 623) is denied.

STK's Motion for Summary Judgment (# 624) is allowed.

STK's Motion for Summary Judgment (# 625) is allowed.

STK's Motion for Summary Judgment (# 626) is allowed as to Counterclaim Counts 3, 4, 5, 6, 7 and 8, and denied as to Counts 9 and 10.

STK's Motion for Summary Judgment (# 627) is allowed in part and denied in part.

STK's Motion to Strike (# 630) is denied.

York's and PDP's Supplemental Motion for Summary Judgment (# 764) is allowed as to Counts 1, 2, and 8, denied as to Count 3, and denied as moot as to Count 4.

CHE's Supplemental Motion for Summary Judgment (# 767) is allowed as to Counts 5 and 10; denied as to Counts 3 and 6, and denied as moot as to Count 4.

CHE's Supplemental Motion for Summary Judgment (# 772) is allowed.

STK's Request for Oral Argument (# 787) is denied as moot.

### Parallel Citations

2006-2 Trade Cases P 75,434

Footnotes

1    STK concedes that two copies are not in dispute: the Maintenance Code copy created when the LCU and LMU are turned on, which was adjudicated by the Federal Circuit, and the copy of Event Messages, as to which STK has withdrawn its claim.

2   It is telling that STK repeatedly characterizes reverse.exe as a copy of "STK's LMU Code" or "9330 Code," rather than as a copy of Maintenance Code. (*E.g.*, # 679, at 2-3; # 680, ¶ 7). As explained above, LMU Code includes both Functional and Maintenance Code. Even if reverse.exe is a copy of LMU Code, it is not necessarily a copy of Maintenance Code.

3   Although FSCs are a portion of the Event Messages, STK's claim based on Event Messages cannot be construed as preserving a claim based on FSCs or English translations of FSCs. STK has always distinguished between FSCs and Event Messages. (# 39, at 8-9 (listing separately copies of Event Messages and copies of FSCs); # 757, at 9 (same)). Moreover, STK has voluntarily withdrawn its claim as to Event Messages, while seeking to maintain its claim as to English versions of FSCs (# 757), further highlighting the distinction between the two.

4   Similarly, to the extent that STK relies on its proposed order of permanent injunction (filed August 2003), that document preceded its amended preliminary injunction motion (filed in April 2004) as well as its summary judgment motion (filed August 2005), neither of which discusses RTD Code or English translations of FSCs.

5   A party who prevails in an action brought under 17 U.S.C. § 1203(a) may be entitled to attorneys' fees under § 1203(b)(5).

6   Even if Event Messages are a portion of the copyright-protected 9330 or 9311 Codes, STK must still show that the "particular elements" that the defendant is alleged to have infringed are copyright-protected.*ILOG, Inc.*, 181 F.Supp.2d at 4.

7   FSC Dictionaries contain numeric FSCs and their English translations. Technicians use the Dictionaries to translate FSCs generated by the LCU.

8   At the preliminary injunction stage, STK was not required either to prove its case in full or to develop a complete evidentiary record. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). Therefore, the Federal Circuit's factual findings and legal conclusions are "not binding" at this stage, when the record is more fully developed. *Id.*

9   Zagorski later revealed that the "secret helper" was not, as he had previously represented, an African-American woman named "Shelly Gramstaff," but was instead himself; he further revealed that he had "personally derived" the information contained in his emails. (# 790, Ex. 54).

10  STK attempts to characterize Count 5 as pleading unfair competition "under the common law of each state in which CHE has either bid for, or performed service on [STK machines]." (# 757, at 4). Count 5, however, has always been limited to a claim under 93A, as its caption-"Unfair Competition in Violation of Mass. Gen. L. Ch. 93A"-clearly indicates. (Compl.18).

11  Both parties assume for purposes of summary judgment that Massachusetts law applies to STK's tortious interference claim. (# 767, at 19; # 792, at 8-9). CHE, however, asserts that Missouri law applies to its own tortious interference counterclaims, since its principal place of business is in Missouri. (# 661, at 4). STK contends that CHE's counterclaim fails under either state's law. (# 628, at 11 n. 6). Accordingly, STK's tortious interference claim is analyzed under Massachusetts law, while CHE's tortious interference counterclaim is analyzed under Missouri law.

12  STK has withdrawn its claims of direct and contributory infringement, but continues to pursue its claim of inducement of infringement under 35 U.S.C. § 271(b). (# 679, at 16 n. 17). PDP insists upon and is entitled to judgment on the withdrawn claims. (# 730, at 13). In addition, PDP is entitled to summary judgment on all claims as to the # 569 Patent, for the same reasons that CHE is entitled to summary judgment.

13  STK has also belatedly attempted to assert a claim under § 1125(a)(1)(A) for false designation of origin. (# 757, at 5; # 686). However, Count 10 alleges false advertising only under § 1125(a)(1)(B) and nowhere mentions false designation of origin. (Compl.¶¶ 91-92). None of the paragraphs cited by STK assert such a claim, even if broadly construed. (# 792, at 14 (citing Compl. ¶¶ 24, 25, 31, 66, 77)). In other words, STK is yet again attempting to insert new claims into the case.

14  STK claims that the Seventh Circuit has disagreed, but it is clear that the Seventh Circuit, although it has expressed doubts about administering a judicially-developed test, likewise recognizes the need to distinguish "between varieties of commercial speech." *First Health Group Corp.*, 269 F.3d at 803.

15  Although STK's microcode is sometimes treated as a "part," the parties here confine "parts" to non-microcode items.

16  For reasons that will later become apparent, it is significant that STK does not argue-as it does in relation to Maintenance Code-that it cannot be liable for any alleged tie involving engineering changes or upgrades, because upgrades are copyrighted material. *(Compare* # 643, at 14, with *id.* at 15).

17  CHE has withdrawn Count 17, which alleged violation of state antitrust laws. (# 760, at 2).

18  As a general matter, an illegal tie can be evidence of exclusionary conduct under Section 2. *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 981 (5th Cir.1977).

19  These motions also address Counts 22, 26, and 28, which have either been dismissed or withdrawn. (# 760, at 2).

20  *See also* note 11, *supra.*

21  Indeed, the preliminary injunction decision in this court, as well as the split decisions issued by the Federal Circuit on appeal, underscore the seriousness, if not the ultimate success, of STK's claims.

**Storage Technology Corp. v. Custom Hardware Engineering..., Not Reported in...**

2006 WL 1766434, 2006-2 Trade Cases P 75,434

---

**End of Document**                                   © 2014 Thomson Reuters. No claim to original U.S. Government Works.

W.L. Gore & Associates, Inc. v. Garlock, Inc., Not Reported in F.Supp. (1989)

1989 WL 81270, 10 U.S.P.Q.2d 1628

1989 WL 81270
United States District Court,
N.D. Ohio, Eastern Division.

W.L. GORE & ASSOCIATES, INC., Plaintiff,
v.
GARLOCK, INC., Defendant.

Nos. C79–2074, C80–174.  |  Feb. 2, 1989.

**Attorneys and Law Firms**

David Pfeffer, Morgan, Finnegan, Pine, Foley & Lee, New York City, Albert Knopp, Baker & Hostetler, Cleveland, Ohio, for plaintiff.

John J. Mackiewicz, Woodcook, Washburn, Kurtz, Mackiewicz & Norris, Philadelphia, Pa., William D. Ginn, Thompson, Hine & Flory, Cleveland, Ohio, for defendant.

MANOS, District Judge.

### *MEMORANDUM OF OPINION*

**\*1** On November 2, 1979 and February 7, 1980, W.L. Gore & Associates, Inc. ("Gore") filed the above-captioned cases alleging patent infringement by Garlock, Inc. ("Garlock"), defendant. On February 28, 1980, the parties stipulated to consolidation of the cases for trial. From June 23, 1982 to July 22, 1982, they tried the cases to the court. It is established that Gore's patents are valid, *W.L. Gore & Associates, Inc. v. Garlock, Inc.,* 721 F.2d 1540 (Fed.Cir.1983), *cert. denied,*469 U.S. 851 (1984), and infringed by Garlock,[1] *W.L. Gore & Associates, Inc. v. Garlock, Inc.,* 670 F.Supp. 760 (N.D.Ohio 1987), *modified,*842 F.2d 1275 (Fed.Cir.1988). The case is before the court on Gore's motion for entry of judgment for damages. Pursuant to Fed.R.Civ.P. 52(a),[2] the court makes the following findings and conclusions.

### I.

Under 35 U.S.C. § 284,[3] a patent owner is entitled to damages that are adequate to compensate for the infringement. "The appropriate measure of compensatory damages may be (1) lost profits, (2) an established royalty, or (3) a reasonable royalty, depending on the circumstances of the case." 5 D. Chisum, *Patents,* § 20.03, at 20–71

(1988). "To be entitled to damages beyond a reasonable or established royalty, a claimant must prove his actual damages, that is, his entitlement to lost profits." *Water Technologies Corp. v. Calco, Ltd.,* 850 F.2d 660, 671 (Fed.Cir.1988), *cert. denied,*109 S.Ct. 498 (1988). Consequently, a patent owner "must establish a factual basis for causation, i.e. that but for the infringer's improper acts, he would have made greater sales," and a "reasonable approximation of the amount of lost profits." Chisum, § 20.03[1], at 20–72. These two factors, causation and quantum of recovery, are the principal elements of the four-part test set forth in *Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.,* 575 F.2d 1152, 1156 (6th Cir.1978):

To obtain as damages the profits on sales he would have made absent the infringement, i.e., the sales made by the infringer, a patent owner must prove: (1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made.

Proof of the first three elements of the *Panduit* test establishes causation. *Ryco, Inc. v. Ag–Bag Corp.,* 857 F.2d 1418, 1427 (Fed.Cir.1988). Nevertheless, "a patent owner need not demonstrate causation with certainty. A reasonable probability that the patent owner would have made some or all of the sales is sufficient." *Water Technologies Corp.,* 850 F.2d at 671. Likewise, the amount of lost profits, the fourth element of the *Panduit* test, "cannot be speculative but ... [it] need not be proven with unerring precision." *Bio–Rad Laboratories, Inc. v. Nicolet Instrument Corp.,* 739 F.2d 604, 616 (Fed.Cir.1984), *cert. denied,*469 U.S. 1038 (1984). "[W]hen the amount of the damages cannot be ascertained with precision, any doubts regarding the amount must be resolved against the infringer." *Lam, Inc. v. Johns Manville Corp.,* 718 F.2d 1056, 1065 (Fed.Cir.1983).

### II.

**\*2** Gore's patents protect its manufacture and sale of: (1) fabric laminates of PTFE film bonded to fabric for use in rainwear; (2) PTFE film for filters; and (3) PTFE yarn for weaving and braiding into various products.[4] It seeks lost profits on Garlock's sales of PTFE film, known as PLASTOLON, and production of PTFE yarn. Garlock argues Gore should receive reasonable royalties because it failed to prove causation.

**W.L. Gore & Associates, Inc. v. Garlock, Inc., Not Reported in F.Supp. (1989)**

1989 WL 81270, 10 U.S.P.Q.2d 1628

### A.

First, Gore seeks damages for Garlock's sales of PLASTOLON film to Kenyon Piece Dyeworks, Inc. ("Kenyon"), which manufactured a rainwear fabric called KLIMATE. Gore argues "if Garlock had not infringed, [5] ... [it] would have been manufacturing and selling quantities of rainwear fabric corresponding to the amount of film which Garlock sold to Kenyon." Gore's Reply in Support of Its Motion for Entry of Judgment for Damages at 4. Garlock does not dispute that a demand for PTFE rainwear fabric existed, and that it and Gore were the only available sources of PTFE film. Rather, it argues that causation is absent because Gore, which declined to sell PTFE film to Kenyon, actually competed in the rainwear fabric market with another company, Howe & Bainbridge. It argues alternatively that Gore lacked sufficient capacity to produce additional PTFE film. [6]

Garlock, however, ignores that it directly induced the manufacture and sale of KLIMATE rainwear fabric. Absent its development and sale of PLASTOLON film, neither Kenyon nor Howe & Bainbridge would have sold the infringing product. That conclusion is not altered by Gore's decision to manufacture rainwear fabric in-house instead of selling PTFE film to Kenyon. Further, Garlock failed to rebut W.L. Gore's testimony that his company could produce additional PTFE film for use in making rainwear fabric. Accordingly, the court holds it is reasonably probable that but for Garlock's sales of PLASTOLON film to Kenyon, Gore would have sold additional PTFE rainwear fabric.

### B.

Second, Gore seeks damages for Garlock's sales of PLASTOLON film to the Pall Corporation ("Pall") for use in filtration media. It is undisputed that a demand existed for PTFE film suitable for this purpose and that Gore possessed sufficient capacity to produce additional quantities of it. However, Garlock argues Gore failed to prove the absence of an acceptable noninfringing substitute. [7]

This element of causation is easily proven "where there are only two suppliers in the market, the infringer and the patent owner." *Water Technologies Corp.,* 850 F.2d at 672. In the case at bar, Garlock did not rebut W.L. Gore's

testimony that PLASTOLON film was the only material comparable to Gore's PTFE film. Accordingly, the court holds it is reasonably probable that but for Garlock's sales of PLASTOLON film to Pall, Gore would have sold additional quantities of PTFE film.

### C.

Third, Gore seeks damages for Garlock's production and use of PTFE yarn in LATTICE BRAID packing material. [8] W.L. Gore testified that before Garlock infringed, it purchased PTFE yarn from his company. Hence, Gore argues "but for Garlock's own infringing activity, ... [it] would have continued to make sales of porous PTFE ... [yarn] in an amount equal to what Garlock manufactured itself." Gore's Reply at 11. Garlock argues "DuPont" yarn was an adequate noninfringing substitute for Gore's PTFE yarn. It does not dispute the existence of a demand for PTFE yarn and Gore's capacity to increase production.

**\*3** Relying on the testimony of its Senior Vice–President, John Brennan, Garlock argues "DuPont" yarn was "the functional equivalent of Gore's yarn." Garlock's Memorandum in Opposition at 14. Nevertheless, it fails to consider the testimony of Gore's expert, Dr. Carleton Sperati, that "DuPont" yarn was not porous. Since Gore and Garlock were the only two manufacturers of porous PTFE yarn in the market, the absence of an acceptable noninfringing substitute can be inferred. *Water Technologies Corp.,* 850 F.2d at 672. Accordingly, the court holds it is reasonably probable that but for the infringement, Gore would have continued to sell PTFE yarn to Garlock. *See H.K. Porter Co. v. Goodyear Tire and Rubber Co.,* 536 F.2d 1115, 1122–23 (6th Cir.1976) (court held infringer would have probably continued to buy from patent holder absent the infringement).

### D.

The amount of Gore's lost profits is undisputed. The parties stipulated to the amount of Garlock's sales of PLASTOLON film and production of PTFE yarn and to Gore's annual sales, variable costs, average invoice prices and variable costs per unit. [9] Based on those stipulations, Gore's expert, Berton Ely, testified he subtracted Gore's variable cost per unit from its selling price per unit and multiplied the resulting lost profit per unit by the number of units made or sold by Garlock.

**W.L. Gore & Associates, Inc. v. Garlock, Inc., Not Reported in F.Supp. (1989)**

1989 WL 81270, 10 U.S.P.Q.2d 1628

*See Saginaw Products Corp. v. Eastern Airlines, Inc.,* 615 F.2d 1136, 1142 (6th Cir.1980) (approving this formula for calculating amount of lost profits). Accordingly, the court awards Gore damages in the amount of: (1) $362,458 for sales of PLASTOLON film to Kenyon; (2) $45,858 for sales of PLASTOLON film to Pall, and (3) $376,565 for manufacture of PTFE yarn. *See* Plaintiff's Exhibit 107.

### III.

In construing 35 U.S.C. § 284, the Supreme Court has held that "prejudgment interest should ordinarily be awarded absent some justification for withholding" it. *General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 657 (1983). Although it "should be awarded from the date of infringement to the date of judgment[,]"*Nickson Industries, Inc. v. Rol Mfg. Co., Ltd.,* 847 F.2d 795, 800 (Fed.Cir.1988), the court must "determine the rate of interest, ... [and] whether it shall be simple or compounded,"*Fromson v. Western Litho Plate and Supply Co.,* 853 F.2d 1568, 1574 (Fed.Cir.1988). Since the circumstances of this case do not justify withholding such an award, the court holds that Gore may recover interest calculated at the rate of 9%, compounded annually, from the date of infringement to entry of judgment. [10] Gore shall submit an affidavit consistent with this opinion, setting forth the amount of interest to which it is entitled from Garlock.

### IV.

"If infringement is willful, increased damages may be awarded at the discretion of the district court, and the amount of the increase, up to three times, may be set in the exercise of that same discretion." *Ryco, Inc. v. Ag–Bag Corp.,* 857 F.2d 1418, 1429 (Fed.Cir.1988). Willfulness is a question of fact which the patent owner must prove by clear and convincing evidence. *E.I. Du pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1440 (Fed.Cir.1988), *cert. denied,*109 S.Ct. 542 (1988); *Shatterproof Glass Corp. v. Libby–Owens Ford Co.,* 758 F.2d 613, 628 (Fed.Cir.1985), *cert. dismissed,*474 U.S. 976 (1985). It is determined by looking at the totality of the circumstances related to the infringing conduct. *Shiley, Inc. v. Bentley Laboratories, Inc.,* 794 F.2d 1561, 1568 (Fed.Cir.1986). Gore argues the totality of the circumstances reflect that Garlock willfully infringed: (1) its '590 patent by adopting an infringing process for manufacturing PLASTOLON film in contravention of a legal opinion received in 1977, and by altering a noninfringing

process for the manufacture of PTFE yarn into an infringing one without benefit of legal advice; (2) its '390 patent by failing to obtain a legal opinion, and (3) by defending this lawsuit in bad faith.

**\*4** "There ... [are no] hard and fast *per se* rules" for evaluating an infringer's conduct. *Rolls–Royce Ltd. v. GTE Valeron Corp.,* 800 F.2d 1101, 1110 (Fed.Cir.1986). In the case at bar, Garlock presented substantial defenses regarding the validity of Gore's patents. *Cf. Allen Archery, Inc. v. Browning Mfg. Co.,* 819 F.2d 1087, 1099 (Fed.Cir.1987); *Datascope Corp. v. SMEC, Inc.,* 678 F.Supp. 457, 465 (D.N.J.1988). Moreover, it received two opinions of counsel regarding Gore's '566 patent: a preliminary opinion in 1977, and a more complete opinion in August 1978. [11] Accordingly, Gore's motion for increased damages is denied.

### V.

Under 35 U.S.C. § 285, "[t]he court in exceptional [patent] cases may award reasonable attorney fees to the prevailing party." However, "the prevailing party must first establish[ ] the exceptional nature of the case by clear and convincing evidence." *Machinery Corp. of America v. Gullfiber AB,* 774 F.2d 467, 471 (Fed.Cir.1985). Gore argues this case is "exceptional" because Garlock willfully infringed. Since the court holds otherwise, Gore's motion for attorney fees is denied.

### VI.

In conclusion, Gore may recover damages in the amount of $784,881 for Garlock's sales of PLASTOLON film and manufacture of PTFE yarn. It also may recover prejudgment interest at the rate of 9%, compounded annually. Its motions for increased damages and attorney fees are denied.

IT IS SO ORDERED.

### *ORDER*

Pursuant to the Memorandum of Opinion issued in the above-captioned case this date:

**W.L. Gore & Associates, Inc. v. Garlock, Inc., Not Reported in F.Supp. (1989)**

1989 WL 81270, 10 U.S.P.Q.2d 1628

1. Gore shall recover damages in the amount of: (1) $362,458 for sales of PLASTOLON film to Kenyon; (2) $45,858 for sales of PLASTOLON film to Pall; and (3) $376,565 for production of PTFE yarn.

2. Gore shall recover prejudgment interest at the rate of 9%, compounded annually, from the date of infringement to entry of judgment, and it shall submit an affidavit consistent with this opinion, setting forth the amount of interest to which it is entitled from Garlock.

3. Gore's motions for increased damages and attorney fees are denied.

IT IS SO ORDERED.

**Parallel Citations**

10 U.S.P.Q.2d 1628

Footnotes

1    Those patents protect inventions of 1) processes for making porous products of polytretaflouroethylene ("PTFE")—the '566 patent, and 2) porous products of PTFE—the '390 patent. This court enjoined Garlock from making, marketing, or selling PLASTOLON film, PTFE yarn, and LATTICE BRAID packing materials, products which infringed the '390 patent.

2    Fed.R.Civ.P. 52(a) provides:
     In all actions tried upon the facts without a jury ..., the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58....

3    35 U.S.C. § 284 provides:
     Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.
     When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.
     The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances.

4    These PTFE products are sold under the trademark "Gore–Tex."

5    Garlock's production of PLASTOLON film infringed the '566 patent and the '390 patent. Garlock also induced the infringement of the '390 patent by making and selling PLASTOLON for use in KLIMATE rainwear fabric.

6    On January 10, 1989, the court denied Garlock's motion to reopen the record for evidence regarding Gore's capacity and Kenyon's transactions with Howe & Bainbridge.

7    On January 10, 1989, the court denied Garlock's motion to reopen the record for evidence that Pall internally developed a noninfringing substitute and that it considered Gore's PTFE film to be cost-prohibitive.

8    Garlock's production of PTFE yarn infringed the '566 patent. The yarn and LATTICE BRAID packing material, of which the yarn is the essential ingredient, also infringed the '390 patent.

9    Garlock's sales and production information is contained in Stipulated Facts ¶¶ 4.3.2 and 4.4.3. Gore's price and cost calculations for PTFE products are set forth in plaintiff's exhibit 105.

10   Gore seeks interest calculated at the Ohio statutory rate of 10%, compounded daily. Relying on 28 U.S.C. § 1961, Garlock argues interest should be calculated at the 1988 treasury bill rate of 7%, compounded annually. The latter approach is appropriate "in the absence of any showing that the ... [patent owner] would successfully invest the excess wealth elsewhere." Hulbert, *et al., De–Vexing Prejudgment Interest Awards in Patent Cases,* 67 J. Pat. Off. Soc'y 103, 122 (1985). In the case at bar, Gore failed to make such a showing; however, the court adopts an average of 9% to compensate for fluctuation in the treasury bill rate from 1980 through 1988. *See* Gore's Reply at 14.

11   At trial, Garlock refused to produce the 1978 opinion on the ground of attorney-client privilege. However, its failure to offer the opinion cannot be used to infer willfulness since that would undermine the purpose of the privilege.

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.