1                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF OHIO
2                         EASTERN DIVISION

3

   HODELL-NATCO INDUSTRIES, INC.,
4                                   Case No. 1:08-cv-2755
              Plaintiff,            Cleveland, Ohio
5
          vs.                       WEDNESDAY, OCTOBER 15, 2014
6
   SAP AMERICA, INC., et al.,
7
              Defendants.
8

9          TRANSCRIPT OF *PRETRIAL CONFERENCE* PROCEEDINGS
              BEFORE THE HONORABLE LESLEY WELLS
10               UNITED STATES DISTRICT JUDGE

11

12  **APPEARANCES**

13  For Plaintiff:          P. Wesley Lambert, Esquire
                            Timothy J. Fitzgerald, Esquire
14

15  For Defendant SAP:      Gregory J. Star, Esquire
                            Michael J. Miller, Esquire
16                          John Hickey, Esquire

17

18

19

   Official Court Reporter: Sarah E. Nageotte, RDR, CRR, CBC
20                           United States District Court
                             801 West Superior Avenue
21                           Court Reporters 7-189
                             Cleveland, Ohio 44113
22                           (216) 357-7186

23

24

25  Proceedings recorded by mechanical stenography, transcript
   produced by computer-aided transcription.

```
 1              (Proceedings commenced at 10:44 a.m.)

 2                          - - -

 3              THE COURT:  So there are some issues that

 4    maybe we can resolve, and there are some other parts of this

10:44:23  5    that maybe you want to talk about.

 6          And this is a good time for me to hear from you, to

 7    the extent that there are things that are confusing or you

 8    have an understanding about how we want to go forward with

 9    this case.

10:44:36 10          The planning for how we actually get to trial is what

11    I would like to start with and see how that fits with what

12    your expectations are.

13          And the reason for that is that our calendar is one in

14    which it will help if we all know in advance when we're

10:45:01 15    really available for a trial, because this looks like this

16    case is going to trial.

17          I'm disappointed in that, because a huge percentage of

18    our cases we're able to see get resolved, and that may still

19    happen in this case, but from the way I look at the case

10:45:16 20    right now, and I'm an old judge, I've been on the bench a

21    lot of years, this case does not look to me like it's likely

22    to settle.

23          And I'm sorry about that, because it's expensive for

24    people to go to trial, on both sides.  We would like to find

10:45:33 25    ways to assist, if there's anything we can do to help and
```

1   try to get these issues resolved, but let's go forward and

2   build what will happen in case you aren't able to resolve

3   it.

4       And looking at our calendar and where we are with

10:45:49 5   cases, it would probably be a good thing to start with a new

6   trial date, because it would not be until February that we

7   could take this case to trial.  So it would be in the middle

8   of the winter in Cleveland, Ohio, but it's -- you know, it's

9   a nice city to be in, even in the winter.

10:46:15 10      We can give you a trial date of the 23rd of February,

11  and we scheduled you at 9:00 in the morning.  And we conduct

12  the trial in this courtroom.  This is a beautiful place to

13  hold a trial, as you can see.  Any of you have any questions

14  about the courtroom and the surroundings, we'll give you a

10:46:42 15  tour.

16      In any event, that's what we have it set for.

17      Anyone have any immediate problems with that, because

18  I don't want to bump it once we set it?

19          MR. LAMBERT:  Your Honor, the only thing that

10:46:54 20  I would raise -- and this is Wes Lambert for the

21  plaintiff --

22          THE COURT:  Uh-huh.

23          MR. LAMBERT:  -- is there's a number of

24  witnesses that are involved, including an expert that we're

10:47:04 25  flying in from Germany.

1               THE COURT:  Uh-huh.

2               MR. LAMBERT:  So I'll need to confirm with him

3     that he can be available that week.  I don't expect there to

4     be a problem.

10:47:13  5               THE COURT:  Okay.

6               MR. LAMBERT:  But that's the only -- looking

7     at my calendar and -- I appear to be open that month.

8               THE COURT:  Okay.  Everyone else?

9               MR. FITZGERALD:  Your Honor, this is Tim

10:47:26 10    Fitzgerald for the plaintiff.

11          The only other question I would have is it would be

12    our expectation that this would take more than a week to

13    try, probably closer to two weeks.

14               THE COURT:  Yeah.  We expected that, too.

10:47:35 15               MR. FITZGERALD:  Okay.  So you blocked off

16    that time --

17               THE COURT:  Right.

18               MR. FITZGERALD:  -- for this trial?

19          Very good.  Thank you.

10:47:40 20               THE COURT:  It doesn't have to take two weeks.

21               MR. FITZGERALD:  I know.

22          Well --

23               THE COURT:  But in terms of our scheduling,

24    that's what it looked like it might take, so -- maybe it can

10:47:49 25    be done in less time, maybe the case can be settled.  I

1    mean, that's what we try to do here to save everybody time

2    and money, but this one so far hasn't had anything going

3    with it.

4              MR. STAR:  Your Honor, this is Greg Star.

10:48:03  5              THE COURT:  Uh-huh.

6              MR. STAR:  Mike Miller as well, and John

7    Hickey.

8         We have just the same concerns.  Our calendars

9    individually look okay for that date.  We just need to check

10:48:14  10   with the number of witnesses and a number of experts that we

11   have.

12              THE COURT:  Okay.  Okay.  That's good.

13        So just be in touch with us, if there's some

14   adjustment, but it shouldn't be a big adjustment.  We're

10:48:26  15   blocking some time for this case, if it has to go to trial,

16   and a huge percentage of our cases end up being able to

17   settle, and I still hope that will be able to happen.

18        There should be some filings for defaults on Hodell.

19              MR. STAR:  IBIS?

10:48:54  20              THE COURT:  Yeah.  IBIS.

21              MR. STAR:  I know that question came up in a

22   call to Josh yesterday.

23        On behalf of SAP, I did some looking.  The issue is

24   the claims made by plaintiffs against all of the defendants

10:49:10  25   are -- are very intertwined.

1         When you have allegations of fraud and

2    misrepresentations have been made by IBIS and LSi which are

3    attributable to us, and what I saw under 55, there are

4    situations and plenty of cases out there where, what they

10:49:31  5    said, it's generally not advisable to have a default taken

6    against one of the defendants.

7         Because we're entitled to a trial on the merits, and

8    that is where we come out at this point, a default against

9    IBIS and LSi tends to be very prejudicial to us I think.

10:49:50  10         THE COURT:  That's interesting.

11    Explain that to me.

12         MR. STAR:  Well, because of the inter -- the

13    intertwining of the claims, if the jury is told there's a

14    default entered on a fraud claim against IBIS and LSi where,

10:50:06  15    frankly, there are a number of disputed factual issues --

16         THE COURT:  Uh-huh.

17         MR. STAR:  This is a situation where IBIS and

18    LSi did appear in this case, they were represented by very

19    competent counsel for a very long time until just recently,

10:50:19  20    they answered the pleadings, they filed their own

21    dispositive motions and so on, and it's only recently that

22    they've essentially failed to appear.

23         So this is not a situation where they never defended

24    themselves.  Certainly, they defended themselves against the

10:50:34  25    allegations of fraud and other misrepresentations, and even

1   the standalone claim against those entities for breach of

2   contract, there's a development agreement that is strictly

3   between IBIS and LSi and Hodell.

4           THE COURT:  Uh-huh.

10:50:49 5           MR. STAR:  There's a claim that that contract

6   was breached.

7       But I think that any finding, whether it's on the tort

8   claims, on that standalone contract claim, necessarily, it

9   almost inadvertently tells the jury, look, there's been

10:51:09 10  fraud here, and all you have to get to a finding against SAP

11  is have to find that these guys were SAP's agents, and we

12  have a lot of defense -- we think there was no

13  misrepresentation by anybody.

14      You know, we have defended that all along.  In our --

10:51:23 15  in the joint trial brief, we set forth a lot of reasons why

16  we think at the close of the plaintiff's case we'll be

17  entitled to judgment under Rule 50, and as we stated there,

18  it wouldn't just be judgment as to SAP, we think as to all

19  the defendants in some of these claims.

10:51:41 20          MR. MILLER:  And just to be clear, Your

21  Honor -- this is Michael Miller, I think we met a couple

22  years ago -- IBIS and LSi have taken the position in this

23  case that they are our agents.

24      We don't agree with that.  I mean, we have a written

10:51:54 25  agreement with them that says they're not.  But essentially,

1    what Mr. Star is explaining, if there's a finding of default

2    and there's therefore a determination by the Court in front

3    of the jury that, yeah, LSi and IBIS have perpetrated a

4    fraud, and then our adversaries read into evidence testimony

10:52:11  5    where Dan Lowery of LSi and Dale Van Leeuwen of IBIS say,

6    well, we're SAP's agents, we're right there, we're right

7    there, it says to the jury, a finding against SAP.

8         And I think Mr. Star is correct, in a contest like

9    this where it's multi-party, multi-defendant, where someone

10:52:31  10   doesn't show up, this can be dealt with afterwards.  It's

11   not much different if they had settled out of the case.

12   This is a case where we try, there's an empty chair, and

13   we're able to make our arguments, and all arguments can be

14   made.

10:52:43  15        But there's not some determination that's made by the

16   Court that can get read in the wrong way by the jury, or the

17   right way, but in a way that's unfairly prejudicial to us.

18        We -- it's interesting when this first came up, we had

19   -- our immediate reaction was, well, that makes sense, and

10:52:59  20   then, as soon as we thought of it, we realized, no,

21   actually, that's -- that's very unfair to us.

22             THE COURT:  That's interesting.

23        Do you want to respond?

24             MR. STAR:  If I may just add a little bit to

10:53:09  25   that.  I'm sorry.

1          There's a case that I can give you a cite to, and we

2     can brief this very, very quickly, Your Honor.

3                    THE COURT:  I don't think you'll need to brief

4     it.

10:53:17  5                    MR. STAR:  A case called *Northland Insurance*,

6     cite is 204 F.R.D. 327.  That's a case from 2000, the year

7     2000.  And it does talk exactly to this issue, multi-party

8     defendants where you have intertwined issues.

9                    THE COURT:  Uh-huh.

10:53:37 10                    MR. STAR:  The other thing I would add quickly

11    is that this is not a situation where, for instance, Hodell

12    could ask the clerk I think to just enter a default, because

13    this is not a claim for a sum certain.

14         And then, we get to the second prong under Rule 55,

10:53:52 15    it's (b)(2) I think, there are disputed issues of fact, so

16    that's where -- all right -- that's where we sort of butt up

17    against this.

18         The other piece to this, however, is that -- I mean,

19    this is in the joint trial brief we submitted along with

10:54:07 20    Hodell, IBIS and LSi have submitted their own asserted

21    claims, they have a counterclaim against Hodell and a

22    cross-claim against us, I don't see any reasons why these

23    claims necessarily stay around.  They're certainly not

24    prosecuting those at this point.

10:54:23 25                    THE COURT:  Okay.

1              MR. FITZGERALD:  Your Honor, we have not come

2       to a final conclusion as to how best to deal with this.

3       Unlike Mr. Star, we have not yet done any research on it,

4       and whether we have to, I'm not sure it's going to come to

10:54:34 5      that.

6              Our view is, and I tend to agree with Mr. Star, that

7       the evidence is going to come in whether there's a default

8       against LSi or IBIS in the same matter.

9              To say it another way, if this were to result in a

10:54:48 10     trial being shortened, that might be something that would

11      be, you know, desirable.  But from our perspective, the case

12      is going to get tried the same way regardless of whether

13      there's a default entered before trial against LSi or IBIS

14      or not.

10:55:03 15            Not to mention, the fact that it would seem to me that

16      perhaps it could be something that could be addressed at

17      some point during the course of the trial, perhaps at the

18      end of the plaintiff's case there would be a default

19      judgment that would be entered, because at that point in

10:55:17 20     time, LSi would certainly and IBIS certainly would not have

21      been here to defend those claims.

22             So I guess our thought would be to -- to table this

23      issue and -- and raise it perhaps down the road, either at

24      trial or shortly before the February trial date.

10:55:36 25                   THE COURT:  All right.  All right.  What other

1          kinds of things do you want to talk about today?

2              I mean, there may be some things I can tell you about,

3          the way we run the court and so forth, but --

4                    MR. LAMBERT:  Is there going to be another

10:55:52 5  final pretrial like we're having today before the

6          February 23rd date or should we get all these issues out

7          now?

8                    THE COURT:  I think we should deal with

9          whatever we can now.  People have come here, let's do it.

10:56:03 10                   MR. LAMBERT:  Okay.

11                   MR. STAR:  So, certainly, I think we can all

12         agree that a couple of the big issues that will help us to

13         streamline the trial and figure out what evidence is

14         actually coming in are the deposition designations.  There's

10:56:17 15  quite a lot of it in this case.  And then, objections to

16         exhibits, which these things tend to be, again, I'll use the

17         word, intertwined.

18             We have a significant amount of testimony, deposition

19         testimony of witnesses who were out of state that are no

10:56:34 20  longer employed by any of the parties.  I think if we add up

21         the total number of potential witnesses that will come in by

22         video deposition, luckily almost all but one was done by

23         video, we're coming close to probably, potentially a dozen

24         witnesses that way.

10:56:52 25                   THE COURT:  We'll need popcorn for the jurors.

```
 1              MR. STAR:  It's hard for the jury.

 2         And as Your Honor can imagine, many of the questions

 3    asked of these witnesses were -- were not really styled in

 4    the manner in which you would do it in trial.

 5              THE COURT:  Would do it in court.

 6              MR. STAR:  And so, there are a lot of

 7    objections, there are instances where witnesses just

 8    pontificate, they're speaking without having a question, and

 9    so on and so forth.  So it's been a big job for both sides

10    to go through and try to designate what we want.

11         We've at this point limited it to those witnesses who

12    we're pretty sure will not actually be here.  There's some

13    other witnesses that we're trying to get to secure here,

14    even though we can't force them to do that.

15         But, certainly, those objections need to be dealt

16    with, and then, we also need to deal with objections to the

17    exhibits.

18              MR. FITZGERALD:  I don't, I guess, necessarily

19    disagree in principle.

20         I think one of the issues we're going to confront, I

21    guess, what Mr. Star was -- was discussing, we took -- the

22    next point I wanted to bring up here is my understanding is

23    that there's I think six witnesses that we think are pretty

24    sure that have to be presented by deposition testimony.

25              THE COURT:  Oh, boy.  The jurors just go to
```

1    sleep, you know.

2              MR. FITZGERALD:  Well -- and there is another

3    interesting option that I have raised, and it's kind of a

4    new procedure that's available under the civil rules, and

10:58:25  5    it's up to Your Honor's discretion, but my -- my

6    understanding is that the Court can take live testimony by

7    videoconference.

8         In other words, the Court can subpoena an out-of-state

9    witness to a location where that witness lives and that

10:58:48 10    witness can then be videoconferenced into the courtroom and

11    testify live as if they were here.

12         It's not something that I think is used all the time,

13    but I think it's an avenue that's available, if the Court

14    does want -- there's two ways it's helpful.  One is you --

10:59:06 15    is you don't have to issue a significant amount of pretrial

16    rulings on dep designations.  And the other is that the jury

17    isn't watching cutups of videos for hours on end.  So that

18    is an option that's available to the Court if -- if that's

19    the Court's concerns.

10:59:28 20         But the -- the other thing is, and I just wanted to be

21    clear because I know Mr. Star and I have discussed it as to

22    which witnesses we think are going to be here live, I think

23    that's important for us to have an understanding of so that

24    we can prepare our case.

10:59:43 25         Right now, I think there's, what, I think I said six

1    that we don't think will be here live.  The remainder I

2    believe will be.  My understanding is that they will be

3    available, even though SAP is securing their attendance,

4    they will be available to testify in the plaintiff's case,

11:00:06  5    and if that's the case, I would like to know.

6            THE COURT:  Does that work out?

7            MR. STAR:  A couple of things.

8        The suggestion of taking a witness's trial testimony

9    live by video link, Mr. Lambert and I have discussed that.

11:00:23  10   I think he's meaning for that to apply to one particular

11   witness.  He -- this witness's name is Ross Elliot.  He is

12   the only deponent that was not videotaped.

13       I've looked at that rule.  I've not seen anything that

14   actually suggests that we can or should do that, but we can

11:00:43  15   continue to have that discussion, and if that's something

16   that Your Honor wants to do, then we can cross that bridge.

17       I don't really think it's necessary.  That's a --

18   that's a single witness whose testimony turned out to be not

19   that extensive.  There are other witnesses who have three or

11:01:01  20   four volumes of transcript.  This was a witness who didn't

21   have anything close to that.

22       As to -- and maybe at some point it's useful for us to

23   go through each of the witnesses today that are on our

24   respective witness lists and have an understanding of what

11:01:20  25   the witnesses look like.

```
                              1              THE COURT:  That would be helpful.

                              2              MR. STAR:  Would you like to do that?

                              3              THE COURT:  Yeah.  I think that would be

                              4    helpful, don't you think, to both sides?

11:01:29           5              MR. LAMBERT:  I'm glad I brought my binder of

                              6    witnesses then.

                              7              MR. MILLER:  Can I just add a layer into this,

                              8    and I think this is kind of useful to what we're all saying.

                              9         I think there would be value in setting time aside in

11:01:42         10    advance of this trial to argue whatever the evidentiary

                            11    issues are with respect to these designations so when we get

                            12    to February 23rd, we've minimized the -- the -- the board of

                            13    chores and reduced this to the absolute important testimony

                            14    that they'll want to hear, and resolve all of those

11:02:02         15    pontifications that Mr. Star is referencing and questions

                            16    that need dealt with.

                            17         And also, that help resolve some of these other issues

                            18    about whether we might consider video link, because it -- if

                            19    there's nothing left of a particular witness's testimony

11:02:16         20    because the questions were all objections --

                            21              MR. LAMBERT:  Right.

                            22         And I guess that's my point is there's some of these

                            23    depositions -- I wasn't specifically referring to Mr.

                            24    Elliot's deposition, which was not videotaped, everybody

11:02:31         25    else was, and so, there's two ways I guess that we could
```

1    conduct ourselves leading up to trial.

2         We can rule on pages and pages and pages of objections

3    to deposition testimony designations, which is what it looks

4    like would happen, or we can figure out, you know, where

5    there is significant disagreements as to the admissibility

6    of testimony and agree to take those witnesses live by video

7    link.

8         And that way we're conducting ourselves just as we

9    would be in a trial and we're not issuing out-of-court

10   evidentiary rulings on the admissibility of testimony --

11              THE COURT:  Uh-huh.

12              MR. LAMBERT:  -- outside the context of trial.

13        And I think -- I don't know that there would be a

14   significant amount of witnesses that we would want to do

15   that for because, like I said, there's probably less than a

16   half dozen of witnesses whose testimony actually would be

17   played by video at trial, it's my understanding.  I could be

18   wrong.

19              MR. STAR:  Well, now that I have a deeper

20   understanding of what Mr. Lambert was considering, I think

21   we would strenuously object to that.

22        These witnesses -- I say these witnesses, referring to

23   everybody in the case -- were known.  We traveled around the

24   country to take depositions.  We took depositions of people

25   in Virginia, New Hampshire, all over the place.  We even

1     took some international depositions.

2         It was known to us, it was known to Hodell that these

3     folks were not current employees of any of the parties, that

4     these folks were outside of the Court's subpoena power to

11:04:12  5     bring them here to trial.

6         If you look at the way in which SAP asked questions of

7     witnesses that we knew were likely not going to be here

8     because of those circumstances, we did ask very focused,

9     very direct, unobjectionable questions, because we figured

11:04:30 10    we would be putting them in that way.

11        My understanding of the proposal before you just now

12    of doing some kind of video link, again, I don't even know

13    that there's a rule that provides for that, I have not seen

14    it --

11:04:44 15                THE COURT:  I haven't either.

16                MR. STAR:  -- that it related to perhaps one

17    witness, but now we're hearing it might be a lot, and my

18    personal experience with videoconference has been a pretty

19    good one, but there are always technical difficulties, and I

11:05:00 20    don't know that that's a way to try to fix a problem.

21        And they don't get a second bite of the apple.  They

22    had a chance to depose these folks.  This case has been

23    around for a very long time.  The deposition testimony has

24    been out there for a very long time.  If they didn't ask the

11:05:18 25    questions they wanted to ask to get the answers that they

1    wanted, they didn't lay a proper foundation for personal

2    knowledge or testimony or for personal knowledge about

3    documents that they now want to bring into the record,

4    that -- they don't get a second chance at that.

11:05:35  5                MR. LAMBERT:  Your Honor, if I just may

6    respond.

7          There's a significant difference in -- actually, the

8    law recognizes the difference between a discovery deposition

9    and even the taking of a trial deposition.  I think that the

11:05:47 10   Court could authorize us, if it were so inclined, and

11   particularly given that the trial date is being moved, to

12   take trial deposition testimony, even though a witness has

13   already been deposed, and I think there's Sixth Circuit law

14   on that.

11:06:01 15        But even absent that, the fact of the matter is when

16   we're deposing a witness very early on in the case,

17   conducting discovery as to what this witness may know, what

18   the source of their knowledge is, is far different than

19   questioning that witness at trial.

11:06:17 20        And the other issue that we have is the issue of what

21   I confronted as rolling productions of documents.  So there

22   is -- I would question a witness in March of 2012, take his

23   deposition, documents were produced many months later that I

24   would have loved to have had to question that witness about,

11:06:40 25   in some cases e-mails that that witness was copied on that I

1    didn't have available to me at the time, that I didn't have

2    an opportunity to question him about.

3        And so, I think it's unfair to say that we had our

4    opportunity to depose these people at one point and we're

11:06:55 5   locked into whatever that person had to say when I didn't

6    even have all the information produced to me when that

7    person was deposed.

8        And that can go both ways.  I realize that Hodell

9    produced documents throughout 2012 as well, so I can't say

11:07:12 10  that that didn't happen on our end as well.  That I guess is

11   my point, that it's 2014, it will be 2015 when this case is

12   tried, and technology is there to accomplish this.  There's

13   no inconvenience to the jury.  In fact, it's probably

14   preferable to the jury.

11:07:29 15      We're not talking about a significant amount of

16   witnesses.  I would anticipate maybe two or three at the

17   most.  And it -- and I've done the research.  I know it's an

18   avenue that's available to the Court, and I understand it's

19   the Court's discretion to do that.

11:07:45 20      That's -- that's my point, Your Honor.

21          MR. STAR:  A couple points on that, Your

22   Honor.

23       I'm not prepared to respond to Mr. Lambert's assertion

24   that there were rolling production of documents that he

11:08:04 25  didn't have a chance to question witnesses on.  I don't

1    think that that was a significant factor.

2        And the argument that he makes begs a couple of

3    questions.  One, if that were an issue, that issue expired

4    two years ago.  The discovery deadline in this case closed

11:08:23  5    in December of 2012.  And if there were an issue there that

6    Mr. Lambert felt we needed to do additional depositions,

7    again, of all folks who were outside of the Court's subpoena

8    power that we knew, we all knew were -- weren't going to be

9    there at trial unless they somehow voluntarily were going to

11:08:42  10   agree to appear, so what effectively is being requested here

11   is a redo of a significant number of -- of the testimony

12   from a significant number of witnesses.

13       We spent a lot of money in discovery of this case.

14   There were millions, literally millions of pieces of paper

11:09:02  15   that were produced.  We had -- we had discovery battles

16   where -- where, you know, we ended up producing everything

17   that the plaintiff wanted.  We arranged for

18   videoconferencing of witnesses overseas.  We traveled around

19   the country.

11:09:18  20       And I don't mean to oversimplify things, but -- and I

21   haven't totaled up the costs associated with all of that

22   work that we did to travel and so on with respect to just

23   depositions, but it is out of line with -- with the amounts

24   that are legitimately at issue in this case at this point.

11:09:38  25       What we're being presented here with is a request to

1    do it all over again, and if that request had any

2    legitimacy, I think it should have been raised a couple

3    years back.  We would have battled over it at that point.

4         But the record is what the record is.  We all knew

11:09:55 5    what it was going to be.  We all had a really good

6    understanding of who was likely to be here live and who

7    wasn't.

8         And I think if you -- and I don't mean to belabor the

9    point, but if you compare some of the transcripts of

11:10:08 10    witnesses that we know won't be here, and questions that we

11    asked -- for instance, I'll give you a couple witnesses,

12    Marcia Weissman and Terry Phillips, we asked very direct,

13    very easily admissible questions -- and if you compare that

14    to questions that were asked of other witnesses by plaintiff

11:10:27 15    that we also knew weren't going to be here, they didn't

16    focus like that.

17         They really are looking at the fact that the testimony

18    they're trying to designate for these people is, ultimately

19    big, big, big chunks of it, maybe the large majority of it

11:10:45 20    is -- is absolutely non-admissible at trial.  That's what

21    they're really trying to cure.  And I think it's too late.

22              MR. LAMBERT:  I'm not -- I wholeheartedly

23    disagree with that.

24              THE COURT:  Right.  Right.

11:10:57 25         I haven't bought that.

1          MR. LAMBERT:  I think -- in fact, our

2     deposition designations are right here.  I'm happy to look

3     at the cases on that.  The questions were proper.  Many of

4     them were not objection --

11:11:15   5          THE COURT:  I don't think we need to go back

6     into that.

7          MR. FITZGERALD:  Your Honor, I think what

8     we're talking about here, I think we're talking about is

9     what is most efficient and effective to present this case to

11:11:25  10    the jury.

11         The only truly relevant argument I heard in that

12    regard as to the links is the possibility that there could

13    be some technical glitch during the course of it.

14         This is the only reason this could be a problem --

11:11:40  15         THE COURT:  Well, the jurors would actually --

16         MR. FITZGERALD:  -- I think they --

17         THE COURT:  No.  They prefer having people in

18    front of them, testifying from the stand.  They don't buy

19    all this watching movies, as they call it.

11:11:53  20         MR. FITZGERALD:  Absolutely.

21         It seems to me if this could be accomplished, and it

22    could be done in an efficient way, it benefits both sides.

23         We're not looking at this as more advantageous to

24    Hodell or less advantageous to SAP.  It's -- it's how is the

11:12:08  25    jury best going to grasp what happened here, and I think

1    this is the way that it gets accomplished.

2              THE COURT:  Well, I think the jury will

3    appreciate having human beings here talking to them, so I

4    think you need to bring people in.  I mean, there's some

11:12:25  5    exceptions.  You can present them.

6              MR. LAMBERT:  I guess that's my next point, is

7    who is going to be here so that we know how it's going to

8    go?

9              THE COURT:  Okay.

11:12:38 10              MR. LAMBERT:  I mean, from our end, on

11    plaintiff's witness list, obviously, Otto Reidl, who is

12    sitting across from me, and Kevin Reidl, who is sitting next

13    to me, will be here.

14              THE COURT:  Okay.

11:12:51 15              MR. LAMBERT:  Daniel Lowery, who is a key

16    player in this case, may come.  I don't know for certain.

17              THE COURT:  Let me just get my list here.

18         Reidl.

19              MR. MILLER:  If we're going to take these one

11:13:21 20    at a time, which I think makes perfect sense, I understand

21    very clearly that Otto Reidl will testify live, Kevin Reidl

22    will testify live, and then we get number three, Daniel

23    Lowery, who is the principal of LSi.

24         Could you help us out there.  We're not in contact

11:13:38 25    with him.  It sounds like you might be.

1          MR. LAMBERT:  I've spoken with his lawyer.  I

2    have not spoken with him.  His lawyer was involved with the

3    declaratory judgment action and that's how I --

4          THE COURT:  And you noted in the paper that we

11:13:54  5    have on the plaintiff's witness list that testimony may be

6    presented by videotape deposition if he's unavailable to

7    testify?

8          MR. LAMBERT:  Right.

9          THE COURT:  Okay.

11:14:03  10          MR. LAMBERT:  Our preference is for him to

11    testify live, and we think SAP's preference would be the

12    same, but I don't know.  And I don't know how that's going

13    to play out for certain.

14          MR. MILLER:  And, Your Honor, my point is,

11:14:15  15    we've been under the understanding Mr. Lowery is unlikely to

16    appear and his testimony would be presented by videotape,

17    and I'm hearing that counsel is in contact with Mr. Lowery's

18    counsel, and I'm just trying to get to the bottom of that.

19          It frankly goes to some of the other concerns about

11:14:34  20    the entry of default judgment and how this case is coming

21    together, and I would like to hear the universe of what they

22    know of Mr. Lowery appearing and under what conditions.

23          MR. LAMBERT:  I've asked his attorney to have

24    him appear, and we'll see if he'll appear.

11:14:52  25          THE COURT:  And he said -- and the way they

1    put it to you in the witness list is what he's saying now,

2    it may be.

3                    MR. MILLER:  It sounds like a short

4    conversation --

11:15:03  5                    THE COURT:  He may be presented by videotape

6    if he's unavailable.

7          That's what you're saying, or don't you know?

8                    MR. LAMBERT:  I'm sorry.  What was the

9    question?

11:15:11  10                   THE COURT:  Are you still saying he may be

11   presented by videotape deposition if he's unavailable to

12   appear in person?

13                   MR. LAMBERT:  We have his videotape

14   deposition, and we have been in discussions about whether

11:15:23  15   he's going to appear live, so he is not one -- I have

16   designated testimony in his deposition and provided it to

17   defense counsel, but they have agreed -- we have agreed that

18   they will hold off until we know whether he's going to come

19   live.

11:15:39  20                   THE COURT:  Okay.  Is that right?

21                   MR. MILLER:  Yes, Your Honor.

22         It sounded like the music I was hearing was that there

23   was a longer conversation between counsel and maybe there

24   was more for us to know about the likelihood of Mr. Lowery

11:15:50  25   appearing.

1          And if your conversation was as short as you say,

2     then -- then we all would just wait and see what happens

3     next.

4               MR. LAMBERT:  I don't have a commitment from

11:15:59  5     him to come.  That's all I know.

6               THE COURT:  Okay.  Okay.

7               MR. LAMBERT:  Dale Van Leeuwen, who is number

8     four on our list.

9               THE COURT:  It's V-A-N L-E-E-U-W-E-N.

11:16:19  10               MR. LAMBERT:  I have not been in contact with

11     him.  I would expect him to be presented by videotape or --

12     or by live video link, depending on how the Court wanted to

13     handle it.

14               THE COURT:  Okay.

11:16:34  15               MR. LAMBERT:  Edward Neveux I've been told

16     will be here live.

17          Geoff Ashley.

18               MR. STAR:  Sorry.  I don't mean to interrupt.

19          Wes and I have talked about Mr. Neveux.  Ed Neveux is

11:16:53  20     a current SAP employee who lives in New Hampshire.  He's not

21     a managerial level.  We do -- we have him on our witness

22     list.  We absolutely do intend to have him here at trial.

23          A question to be resolved is when would he be

24     presented and in what way.  Doubtful the jury or the Court

11:17:15  25     would want to have him up on the stand two times.  I think

1    what Hodell is proposing is they would call him on cross in

2    their case, and one way to handle that is the cross --

3    calling him on cross could be done through his video

4    deposition, and then we could call him live as part of

11:17:35  5    our --

6              THE COURT:  You guys can work that out.  It

7    doesn't matter to me.  Even if he has to go home and come

8    back.  You guys work that out.

9         You can do that, right?

11:17:43  10             MR. LAMBERT:  As far as when he appears and

11    how long he stays for?

12             THE COURT:  Well, yeah.

13         And then, Geoff Ashley.

14             MR. STAR:  So Geoff Ashley, a former SAP

11:17:53  15    employee, I've been in contact with him multiple times over

16    the last couple weeks, including this week.  He's confirmed

17    for me he's willing to come here.  He lives -- he also lives

18    in New Hampshire.

19         What he'll -- he'll be a little bit more difficult for

11:18:08  20    -- and Wes and I will have to work that out.  It will be a

21    little more difficult to have him come back on multiple

22    occasions.  I'll discuss that with Wes on that.

23             THE COURT:  Okay.  Should we just keep going?

24             MR. LAMBERT:  Yes.

11:18:25  25         Seven on our list is Paul Killingsworth.  My

1    understanding is he's in the same category as Ed Neveux,

2    unless I'm incorrect.

3                    MR. STAR:  No.  That is correct.

4           He's a current SAP employee.

11:18:34   5                    MR. LAMBERT:  So based upon that

6    understanding, we'll plan to call him live at trial.

7                    THE COURT:  Okay.

8                    MR. LAMBERT:  Dan Kraus I think is up in the

9    air.

11:18:43  10                    MR. STAR:  Dan Kraus I've been in touch with

11   this week.  He's in the same category as Geoff Ashley,

12   former employee, but he's agreed to come.  Even though he

13   lives in North Carolina, I do expect that he will be here.

14          But these folks --

11:19:01  15                    THE COURT:  That's all right.

16          We'll just say may be.

17                    MR. LAMBERT:  Udi Ziv, my understanding, will

18   not be testifying live, so we have his deposition

19   videotaped.  He's a candidate to be either present by video

11:19:20  20   deposition or by video link.

21                    MR. STAR:  I would say that he's a maybe to be

22   here live, but probably a more questionable may be than

23   Misters Kraus and Ashley.

24                    THE COURT:  Okay.

11:19:42  25                    MR. LAMBERT:  All right.  Joe Vislocky is a

1    former employee.  We expect he will be here live.  He fits

2    under the Court's subpoena power, as far as I know.

3                  THE COURT:  Uh-huh.

4                  MR. LAMBERT:  Ralf Mehnert-Meland, my

11:19:55 5    understanding from talking with Greg is he will be here to

6    testify live, but I'm not certain.

7                  MR. STAR:  He's in the same category, Your

8    Honor, as Mr. Ashley and Mr. Kraus.  He's a former employee.

9    He lives in North Carolina I think.

11:20:10 10                  THE COURT:  Okay.  And he may be here?

11                  MR. STAR:  He may be here.  Likely to be here.

12                  THE COURT:  Jon Woodrum.

13                  MR. LAMBERT:  Jon Woodrum is in St. Louis.

14    He -- neither one of us have been in contact with him, as

11:20:27 15    far as I know.  I think he, again, would be a video

16    deposition or -- or video link of the testimony.

17          And then, Jaime Clark is a Hodell employee.  He will

18    be live.

19                  THE COURT:  Okay.

11:20:45 20                  MR. LAMBERT:  Helmuth Guembel will be live.

21          And then, depending on what happens with Dr. Kennedy,

22    he may or may not be here.

23          On the list of may bes, I'm looking through it now,

24    I -- there's a separate section of witnesses that may be

11:21:08 25    called if the need arises.  I'm not expecting, with the

1    exception of maybe Mr. Elliot, who would be presented by

2    reading a deposition of the transcript or doing the video

3    link or taking a trial depo, he would be the -- the only one

4    in that section there that I really anticipate maybe

11:21:33  5    calling.

6                    THE COURT:  So the rest, Sheldon, Lovelace

7    are --

8                    MR. LAMBERT:  From the plaintiff's

9    perspective, no.

11:21:40 10                    MR. STAR:  We've learned that -- Jay Sheldon

11    would be by video.  We learned that Michael Lovelace is

12    actually within -- he works some place in Ohio, so I believe

13    he's within the subpoena power, so he would be live as a

14    witness called.  He's on our list as well, Your Honor.

11:21:57 15                    THE COURT:  Yeah.

16                    MR. STAR:  So I'll take off some of these that

17    are on our list.

18                    THE COURT:  That's fine.

19                    MR. STAR:  Terry Phillips is on our list.  He

11:22:07 20    would be called live.

21        I don't know who Damon Hacker is.

22        Ellen Daniels would potentially be called live.

23                    MR. LAMBERT:  Greg, just a note, her name is

24    now Flick.  F-L-I-C-K.

11:22:52 25                    MR. STAR:  And then, that brings us to Joseph

```
 1    Guagenti and Eric Johnson, both of whom will be deposition,
 2    videotape deposition.
 3                    THE COURT:  Okay.  The custodian of record?
 4                    MR. STAR:  I don't -- Wes would have to answer
 5    that.  I don't know who that is or why he needs that or
 6    that's --
 7                    THE COURT:  Just in case?
 8                    MR. LAMBERT:  Just in case.
 9        And Damon Hacker is -- he was number five on my list
10    of may be called.  He's the principal of Vestige Limited who
11    did the collection off of the LSi defendants' hard drives
12    that was produced to us in mass.
13        And so, if there are any issues with regard to that
14    production, I put him on the list, just as a --
15                    THE COURT:  Okay.  All right.  We have
16    objections to exhibits that we need to go over here, too, to
17    talk about, so we know what's going on.
18        I mean, there have been numerous ones from both sides,
19    and so, we didn't pull them all together.
20        There were -- I mean, have you looked at the -- at
21    each other's objections to exhibits?  Have you resolved any
22    of it?
23                    MR. STAR:  We have not resolved any of them.
24    There -- we definitely have looked at them.  We've exchanged
25    lists.
```

1      For instance, Hodell have objected to our exhibits.

2   We've given them our response to those objections.

3            THE COURT:  That's right.  That's what we

4   expect you to do.  I don't know whether that's been done.

11:25:28  5            MR. STAR:  That has been done, Your Honor.

6            THE COURT:  Do you have anything left over

7   from that that needs to be taken care of?

8            MR. LAMBERT:  I think there's a fair amount,

9   yes.

11:25:36 10            THE COURT:  Okay.

11            MR. LAMBERT:  There were several that were on

12   both of our lists.  There were several that either one side

13   or the other did not object to.  But there are still many

14   that were objected to.

11:25:47 15      Again, my -- the way that I responded to their

16   objections to plaintiff's exhibits was more general in

17   nature, because many of them were objections on relevance

18   grounds and hearsay grounds and a lot of the resolutions of

19   those objections depends upon how the case is presented at

11:26:08 20   trial.

21      I don't see how many of their objections could be

22   resolved outside the context of a trial.  There was an

23   objection as to whether something was produced or whether it

24   was -- I'm trying to think of another example as to how --

11:26:28 25   how an exhibit could be excluded based upon -- outside the

1    context of a trial, but our response was as brief as

2    possible in presenting the argument of these exhibits, we

3    expect the relevance of which and the admissibility of which

4    will be apparent when they're presented in the context of

11:26:50  5    trial.

6              THE COURT:  Well, we have 68 objections from

7    Hodell and we have 127 objections to exhibits from SAP.

8         So I don't know.  You know, I really haven't seen many

9    cases where it was like this.  And one way to do it might be

11:27:18 10   to just set aside the first day of trial and go through it.

11   That's one way to do it.

12        If you could do it earlier, it would probably help

13   both sides.  But if you want to wait, we can just take the

14   first day of trial and do it.  I've done that once.

11:27:33 15             MR. MILLER:  Your Honor, if I may make a

16   suggestion.

17        I think the review we did of the witnesses was very

18   helpful, and I think we're going to see more live than any

19   of us thought, so it sounds like there's still going to be

11:27:47 20   some designations that need to be reviewed.

21        And while doing the exhibit arguments on the day

22   before trial is a thought, and is probably fine, if there's

23   time in advance, and some time earlier in February or even

24   in January, we can get together and knock this stuff out,

11:28:02 25   that can make the trial much more clean.

1          THE COURT:  That sounds like a good idea.  We

2    can do it in January.  If people are willing to travel to

3    Cleveland in January, we can do it.

4          MR. MILLER:  Test it out.

11:28:16 5          MR. FITZGERALD:  I think that's -- that would

6    be acceptable.

7          THE COURT:  Say a month before?

8          MR. FITZGERALD:  That would be acceptable to

9    the plaintiff, Your Honor.

11:28:22 10         THE COURT:  Okay.  So why don't we choose a

11   day since we're here.

12       Someone must have a calendar.

13         MR. STAR:  And, Your Honor, I'm sorry to step

14   back to the last topic about witnesses.

11:28:32 15         THE COURT:  Okay.

16         MR. STAR:  What I tried to do there, when we

17   went through the plaintiff's list, was to cross -- also deal

18   with the ones that were on our list.

19       There's one other witness on our witness list who we

11:28:45 20   expect to come in by deposition and that would be Marcia

21   Weissman.

22         THE COURT:  Oh, okay.

23         MR. STAR:  So by my count we have, if you

24   include Mr. Lowery and Mr. Van Leeuwen, I think we have

11:28:59 25   seven witnesses that would come in through deposition.

1          THE COURT:  The former implementation

2     consultant, right, Marcia Weissman?

3          MR. STAR:  Marcia Weissman.  Correct.

4          THE COURT:  And that's going to be a

11:29:14  5     deposition testimony?

6          MR. STAR:  Correct.

7          THE COURT:  Okay.  Is there anyone else?

8          MR. STAR:  Sorry.  And maybe eight witnesses

9     that will be called by videotape, be presented by video.

11:29:35 10          THE COURT:  Okay.  Let's go down the list so

11     that we have the list at this point.

12          MR. STAR:  So witnesses I have are Dan Lowery,

13     who is a question mark, but we assume might be presented by

14     video deposition.

11:29:52 15          Dale Van Leeuwen.

16          Udi Ziv.

17          Jon Woodrum.

18          Ross Elliot.

19          Joe Guagenti.

11:30:20 20          Eric Johnson.

21          THE COURT:  Go a little slower.

22          MR. STAR:  Sorry.

23          MR. LAMBERT:  Are you guys calling him?  Is

24     Johnson on your list, because I don't think I designated

11:30:33 25     him?

1                    MR. STAR:  We reserved the right to call him.

2                    MR. LAMBERT:  Huh?

3                    MR. STAR:  We each reserved the right to call

4        anyone else.

11:31:01  5                    MR. LAMBERT:  But no one's designated his

6        testimony.

7                    MR. STAR:  And Marcia Weissman.

8            I think that brings it up to eight.

9                    THE COURT:  Okay.  Gentlemen, anything else

11:32:19 10        you want to talk about?

11                    MR. FITZGERALD:  One -- one other matter, Your

12        Honor.

13            We obviously just received yesterday morning the

14        Court's ruling in regard to our expert, Dr. Kennedy.

11:32:28 15                    THE COURT:  Uh-huh.

16                    MR. FITZGERALD:  We didn't want -- did not

17        want to do anything that would jeopardize the November trial

18        date, but now that the trial date has been moved into

19        February, one thought that we did have, and we have not yet

11:32:39 20        finalized whether this would be something that we would be

21        interested in attempting to do, but I'm interested in

22        knowing what the Court's inclination would be if we were to

23        ask the Court to certify that issue to the Sixth Circuit for

24        an interlocutory appeal and hope that the Sixth Circuit

11:32:55 25        would be able to resolve that --

1          THE COURT:  They'll never get it resolved

2     before then, before February.

3          Yeah.  Yeah.

4          MR. FITZGERALD:  Would the Court entertain a

11:33:04  5     motion for interlocutory appeal on that legal issue as to

6     whether or not Dr. Kennedy, his testimony should be

7     admissible?

8          I mean, we understand the Court's ruling, and I'm not

9     going to argue for -- to the Court as to why we disagree

11:33:18 10     with it, but --

11          THE COURT:  Well, it can bump this case into

12     outer space I think.

13          MR. FITZGERALD:  Well, this is our concern,

14     Your Honor, is that with that being an in limine order,

11:33:33 15     obviously, we're going to have to bring Dr. Kennedy in to at

16     least testify or at least proffer his testimony to the Court

17     in order to preserve that issue for appeal, and I think for

18     both sides, no one wants to try this case twice.

19          And I -- I understand the Court's concern that maybe

11:33:49 20     the Sixth Circuit would not be able to resolve that issue on

21     an expedited basis, but without even asking them to do that

22     would be -- would be inviting the possibility that this case

23     would perhaps have to be tried a -- a second time.

24          And my thought would be that if the -- if Your Honor

11:34:06 25     would entertain a motion to certify the issue, first of all,

1    the Sixth Circuit would have to agree to hear the case, in

2    any event, they may decide that they don't want to hear it,

3    but that if the Sixth Circuit was not going to be able to

4    resolve it, assume they did accept the certified appeal, if

11:34:22  5    it was going to somehow jeopardize the February trial date,

6    I suppose our recourse would be to dismiss that appeal as

7    that February date approached, if it appeared that the issue

8    could not be resolved timely.

9                 THE COURT:  That's too complicated.

11:34:38 10         But I'll listen to you on this.

11         Do you have anything you want to say about this?

12                 MR. STAR:  I -- our position is not going to

13    be a surprise I think to anybody.

14         We've thought since we received Dr. Kennedy's report

11:34:49 15    two years ago, in July of 2012, that it was a gaping hole,

16    and that he had completely speculative testimony.  We raised

17    that issue not that long afterwards, Your Honor.

18         We had an early, it was January 2013, settlement

19    conference with Judge White where I personally raised that

11:35:08 20    issue.  And during that conference, Judge White was

21    interested in seeing the report.  We were there for a

22    settlement.  And for reasons unknown to me, the plaintiff

23    didn't want that to happen.  We turned around and we filed

24    our motion in limine in February of 2013.

11:35:27 25         The issues that existed with Dr. Kennedy's report have

1    been known to Hodell for a very, very long time.  They've

2    done nothing to try to fix any of those issues.  And so, we

3    are where we are, which is where we, frankly, expected that

4    we would be.

11:35:42  5         And I don't quite understand the suggestion that

6    Dr. Kennedy would somehow still come into this court and

7    testify in front of the jury in this case.  I --

8              MR. FITZGERALD:  I wasn't -- I mean, a proffer

9    is a proffer.  It's proffered to the Court for purposes of

11:36:00 10   determining whether or not that testimony -- I mean, the

11   Court can always reconsider an in limine order in any event.

12        But for purposes of the appeal, if it ends up on

13   appeal, we have to proffer his testimony to preserve that

14   issue.  That's what I'm talking about.

11:36:16 15        I'm not talking about Dr. Kennedy, and short of the

16   Court reconsidering that ruling, testifying in front of the

17   jury.  That's not my suggestion.

18              THE COURT:  So you're suggesting that he be

19   given an opportunity with all of you present to come in and

11:36:29 20   testify?

21              MR. FITZGERALD:  He's going to have to do

22   that, Your Honor, at the time of the February trial.  We

23   have to proffer his testimony into the record in order to

24   preserve that issue for appeal.

11:36:38 25              MR. MILLER:  Your Honor, if I may, we have

1    this gentleman's report.

2         He's been deposed in excruciating detail, and over the

3    course of the last 18 months, this issue has been heavily

4    briefed and Your Honor has decided.

11:36:52  5         This issue is resolved.  There's no need for a

6    proffer.  It's a sideshow and I think it's -- I'm glad it's

7    come up now so we can resolve it now.  But it shouldn't

8    happen.

9              MR. FITZGERALD:  All I'm saying, Your Honor,

11:37:06 10    is that according to the appellate rules, in order for us to

11    preserve an issue that's been ruled on in an in limine

12    order, as this one is --

13              THE COURT:  Uh-huh.

14              MR. FITZGERALD:  -- we have to proffer into

11:37:16 15    the record.

16         This was not a *Daubert* hearing in which the Court

17    heard the testimony from Dr. Kennedy from the witness stand

18    and made a ruling on the *Daubert* grounds.

19         I respect the fact that you have a report, a

11:37:27 20    deposition, a deposition that was taken by SAP, not by us,

21    we didn't -- this isn't his testimony that was going to be

22    presented at trial, it was a discovery deposition of an

23    expert.

24         So in any event, he is going to have to come in and

11:37:38 25    testify, albeit it will be outside of the presence of the

1    jury, at a time when the Court is inclined to allow us to

2    proffer that testimony, but that will happen in February

3    with Dr. Kennedy in order to preserve that issue for appeal.

4                MR. MILLER:  Your Honor, maybe this is an

11:37:51  5    issue that needs to be briefed, because I will imagine --

6                THE COURT:  Well --

7                MR. MILLER:  Pardon me?

8        I mean, in advance of bringing this witness in to

9    create what I view is at that point a sideshow, I have a

11:38:05  10   strong --

11               THE COURT:  We need to allow each of you to

12   put this in as part of what's going on in this case, and so,

13   that's what --

14               MR. MILLER:  And my point, Your Honor, only is

11:38:17  15   that I imagine when I read the cases I'll learn that an

16   expert report, coupled with extensive deposition testimony,

17   will qualify as a proffer, could substitute for one.

18        But we'll look at the cases.

19               THE COURT:  Okay.  Set a schedule for

11:38:33  20   yourselves and then we'll do what we have to do.

21               MR. FITZGERALD:  Very good, Your Honor.

22        Thank you.

23               MR. STAR:  One issue, Your Honor, that I would

24   raise is just a concern that the new trial date could be

11:38:53  25   seized upon by Hodell as a way to backfill a lack of

1    damages -- damages evidence at this point in time.

2        We fully understand Your Honor's order, it's very,

3    very clear to us, and we think at this point the evidence

4    that Hodell can offer at trial on damages, Mr. Kennedy is

11:39:17  5    not there, tends to be extremely limited.

6        It falls mainly into the category of lay testimony

7    about paid invoices, actual out-of-pocket costs, but it does

8    not at this point go to any more technical matters.  There

9    are -- there's no calculation or computation, other than Mr.

11:39:39 10    Kennedy's report, that's ever been provided to SAP.

11        This is an issue that goes way back to the initial

12    disclosures, where Hodell listed out what they called

13    categories of damages without computation and said that this

14    would be subject to expert testimony.

11:39:56 15        They answered our interrogatories in 2010 where we

16    asked them for actual details of the calculation that were

17    behind the -- the numbers that they listed in their Rule 26

18    disclosures.  Their response at that point was to say that

19    they'll be getting an expert to give the details and the

11:40:18 20    methodology will be in his report.  And they gave us no

21    further information.

22        We served a 30(b)(6) notice asking for two -- two of

23    the topics were about the damages calculation listed in the

24    Rule 26 disclosure.  Hodell objected to that and said that

11:40:38 25    Mr. Otto Reidl would be put up to talk about estimates of

1    damages.  I then deposed Mr. Reidl as the corporate

2    designee.

3         I specifically put before him the Rule 26 disclosure

4    section and he told me a couple things:  He's not an expert

11:40:56  5    on damages, he could just give me some high-level estimates.

6    We went through some of the details of that, but it was

7    clear he didn't have them.  And then, Hodell rode the rails

8    of an expert witness in this case.

9         And so, our view at this point is that Hodell cannot

11:41:11  10   now open the door and try to backfill, come up with new

11   evidence that's it's never put in the record before and

12   never disclosed to us as an actual calculation or

13   computation of damages.

14        And there's a variety of cases out there that -- that

11:41:26  15   speak to this issue, and it's an issue that runs up against

16   both the Rule 26 disclosure obligation, and then Rule 37,

17   and also with respect to Federal Rule of Evidence 701,

18   dealing with allowing a layperson to come in and testify to

19   damages calculations that are outside of that person's

11:41:52  20   knowledge and expertise as a -- as a layperson.

21        And I -- I can give you a citation to a very recent

22   case, for instance, that speaks almost directly on point

23   to -- to the scenario we have presented here in this case.

24        This is from the Southern District of Ohio, November

11:42:10  25   of last year, it's called *Info-Hold versus Muzak*.

1    M-U-Z-A-K.  And the citation for that is 2013 U.S. District

2    Court, Lexis 161684.  And the scenario there was very

3    similar.

4        There are a variety of cases that I have come across

11:42:47  5    just in very, very limited research that go really directly

6    to the same point and are very close in fact pattern to what

7    we have here.

8        So I only raise that because we don't want to have a

9    situation where Hodell suddenly arrives at trial and

11:43:02 10    attempts to bring in a lot of new evidence that we never

11    heard of before and wasn't disclosed to us and really is

12    probably subject of an expert opinion, which they don't have

13    at this point.

14                THE COURT:  Anything you want to say?

11:43:17 15                MR. LAMBERT:  There's a lot we want to say.

16                MR. FITZGERALD:  Only that it -- it sounds

17    like we're --

18                THE COURT:  Make your record.

19        That's why we have someone here.

11:43:24 20                MR. FITZGERALD:  Only it sounds as if we're

21    now hearing other grounds for a motion in limine that was

22    never filed in this case, Your Honor.

23        I don't know what the testimony is going to be from

24    the witness stand.  I'm sure we're going to have plenty of

11:43:36 25    side bars and plenty of objections during trial.  That would

1    be the time for the Court to decide whether or not what Mr.

2    Otto Reidl has to say, or anyone else in this case has to

3    say, is properly before the Court and whether there's a

4    foundation for that testimony.

11:43:49  5        So I -- I -- as Mr. Lambert said, we have a lot to say

6    in response, but I'm not going to belabor that fact, given

7    that it's an issue that's to be addressed at trial.

8            MR. LAMBERT:  I would like to point out, and

9    again, I agree with my co-counsel here, again, we -- we put

11:44:09 10  Mr. Reidl up as a deponent, he was deposed on the issue of

11   damages.

12       Contrary to what Mr. Star just said, he was -- he was

13   questioned at length in specific detail about his

14   calculation of Hodell's losses.  He did say that we were

11:44:30 15  also retaining an expert, which we did.

16       But this is the classic example of gotcha litigation,

17   which they have a ruling in limine on our expert, but

18   they've known for years that even if our expert didn't

19   testify, Otto Reidl had personal knowledge of the damages he

11:44:51 20  believed Hodell had suffered, which were less in some

21   instances than Dr. Kennedy calculated, and they questioned

22   him and they full well understood the basis for his

23   calculations.

24       Mr. Reidl has personal knowledge as CEO of the company

11:45:08 25  as to how he calculated those numbers.  He has personal

1     knowledge of the -- of the records upon which they are

2     based.  So under Rule 701, his testimony is absolutely

3     admissible and there is an abundance of case law.

4          I don't know about -- I haven't read this case.  I've

11:45:24  5     read dozens that -- that would permit the Court to admit

6     testimony of the owner of a business as to the damages

7     suffered by that business.  And it's not expert testimony.

8     It's testimony based upon his personal knowledge as -- of

9     running a business.

11:45:42  10     And the documents supporting his testimony have been

11     in SAP's possession, much like the document they claimed in

12     their motion in limine they didn't have, which they had had

13     for three years.  Those documents have been in their

14     possession for years and they had every opportunity to

11:45:59  15     question whoever they wanted.  They never filed a discovery

16     motion.  And now we're here on a motion in limine that they

17     didn't file.

18                    MR. STAR:  So this is obviously a very, very,

19     very important issue.  In fact, I think it's one that goes

11:46:12  20     to whether this case should even be tried.

21                    THE COURT:  So you would like to brief it

22     or --

23                    MR. STAR:  Pardon?

24                    THE COURT:  You would like to write law about

11:46:22  25     it?

1          MR. STAR:  I am happy to do that.

2      But we can do it very quickly if Your Honor would like

3  us to, and I think it's something that does need to be

4  resolved.

11:46:31  5      You know, I -- I can show you actual pieces of

6  transcripts of their disclosures, their discovery responses.

7  I have them all right here right now.

8      For instance, I asked Mr. Reidl:  What is the amount

9  of your damages that you calculate today?

11:46:47 10      He said, I'm not a damages expert.  From my

11  assessment, it's in excess of $6 million, but I do not have

12  all the components in that estimate.

13      I then went through with him and I showed him, I

14  marked it as Exhibit 23 during the deposition, I had a copy

11:47:04 15  of the Rule 26 initial disclosures of Hodell.  I asked him

16  what he did with that, and he said he basically summarized

17  his estimate of damages.

18      He then was able to give some additional testimony of

19  that, but he was very clear in other places in his

11:47:18 20  deposition that they had already been consulting with an

21  expert, it was an expert that was going to give the ultimate

22  testimony about damages.

23      So this is not gotcha litigation, and it's not that at

24  all.  This is an issue that goes back two years.  You know,

11:47:34 25  look at the history of this case.  They filed this case in

1   November of 2008.  It finally gave us initial -- you know,

2   we had briefing on motions to dismiss, and it wasn't until

3   2010 that we get their initial disclosures, when they're

4   finally telling us what they think their damages might be.

11:47:51  5   But even then they tell us they're going to have an

6   expert.  Fine.  We take the depositions we should take on

7   the damages.  We deposed the witnesses who are designated by

8   the plaintiff on damages.  And we find out very little.

9   And, in fact, that they're going to be pushing it to an

11:48:09  10   expert, which is not atypical, which is what happens when

11   you get into things that go beyond out-of-pocket costs.

12   Right.  And I'm not saying here that Hodell can't come

13   into this trial and offer up evidence of invoices it

14   received and paid and those sorts of things, but once we go

11:48:27  15   down the line of then trying to redo at this point a lost

16   profits calculation or some other -- I don't even know what

17   it would be, lost productivity calculation that Mr. Kennedy

18   already tried and failed on, that is not a computation that

19   was ever disclosed to us, as would have been required in

11:48:48  20   Rule 26.

21   Rule 37 says they now can't bring it in, and this

22   would be brand new testimony.  It would be expert testimony

23   being offered by a lay witness, which violates 701.

24   So I'm happy to brief that issue.  We'll give you all

11:49:01  25   the details on it.  I think it turns out to be very clear

1    that the amount of damages they could actually put on the

2    board in this case turn out to be measured in the couple

3    hundred thousands of dollars mainly.  It's not going to be

4    some massive number like they've tried to come in through

11:49:21  5    Mr. Kennedy.

6         They had the opportunity, and they chose to ride the

7    rails of that expert, to not have an alternative calculation

8    that we ever had a chance to investigate, and this new break

9    and pushing the trial date back a little bit should not at

11:49:38 10    all give them the opportunity to do that.  They're just

11    going to reload on us when they've had all this time in this

12    case.  2008 is when they filed it.

13              MR. FITZGERALD:  Just very briefly, Your

14    Honor.

11:49:48 15         I've spent probably 90 percent of my 25-plus career

16    doing defense work.  That sounds like a -- a very good

17    outline for cross-examination and impeachment, and I think

18    we just got an insight into Mr. Star's closing argument to

19    the jury.

11:50:04 20         This is all stuff for the jury to decide, whether or

21    not Mr. Reidl has --

22              THE COURT:  That's right.

23              MR. FITZGERALD:  -- familiarity, the personal

24    knowledge, the foundation to testify about what he's going

11:50:14 25    to testify about.

1          They took his deposition, they asked him questions.

2     Of course, if -- if Mr. Reidl or anyone else gets on the

3     witness stand and says something different, the -- I'm sure

4     that deposition will show up and they'll be using it to

11:50:28  5     impeach or they could argue to the Court that that testimony

6     shouldn't come in at that point in time.

7          But we're here on an issue that, to me, goes to the

8     weight, certainly not the admissibility, of any testimony

9     that we would offer on damages.  That's -- that's -- if we

11:50:42 10     end up briefing it, that's fine.  But I think we're -- we're

11     just killing more trees, Your Honor, and -- and I just -- I

12     don't see the advantage to doing any more briefing on this

13     issue.

14               THE COURT:  Well, there's time to brief, so

11:50:55 15     let's brief.

16               MR. STAR:  Thank you, Your Honor.

17               THE COURT:  Anything else?

18          Any questions you have about the way things will

19     operate?

11:51:05 20               MR. LAMBERT:  The only other outstanding

21     motion is the motion in limine on SAP's expert, Mr.

22     Hilliard, I think is outstanding.

23          I wasn't intending to --

24               THE COURT:  We haven't got it yet.

11:51:20 25               MR. LAMBERT:  What was that?

1              THE COURT:  We haven't ruled on it yet.

2              MR. LAMBERT:  Okay.

3              MR. STAR:  The only other thing I have noted

4      from Your Honor's scheduling order was you wanted to know if

11:51:30  5      we were using courtroom technology, and the answer is

6      absolutely, yes.

7          So we can deal with that in any manner the Court would

8      like us to.

9              THE COURT:  Yeah.  You just have to get in

11:51:39 10      contact with our staff here.  We have lots of things, in

11      spite of the fact that this is a beautiful, old building.

12              MR. STAR:  I'm glad to see you haven't hung

13      flat screen TVs on these walls.

14              THE COURT:  No.  It's been very hard to just

11:51:54 15      maintain this, to just allow this building to still stand.

16      I mean, we've had incredible fights to keep this courtroom

17      alive, because people just kind of don't think about

18      everything this means in a courtroom like this.  We've

19      fought for it.

11:52:16 20              MR. FITZGERALD:  You couldn't replicate it

21      today, Your Honor.

22              THE COURT:  Well, I'm the only judge over

23      here, and the only way I got over here was by taking senior

24      status, and then they couldn't keep me from being here, so

11:52:27 25      that's why I came.

1       And I bet you will see our current chief judge come

2   over here and take the back courtroom, and we're doing it

3   now because it's much more beautiful than the new courtroom,

4   but we're doing it to try to prevent the demolition of this

11:52:41  5   building.

6       So --

7               MR. FITZGERALD:  I was never even aware that

8   that was on the table.

9               THE COURT:  Well, it's not openly on the

11:52:47 10   table.  But it's a problem that you can't resolve unless you

11   have live people using it.

12               MR. MILLER:  It's so beautiful.

13       When Greg and I were in here earlier, we were

14   imagining that you might even conduct marriage ceremonies

11:53:02 15   and other --

16               THE COURT:  Oh, yeah.  We do those, too.

17               MR. MILLER:  I'm sure they're fantastic.

18               THE COURT:  And we bring new people to the

19   country here, too.

11:53:10 20               MR. MILLER:  Oh, I bet that's great.

21               THE COURT:  Those are beautiful ceremonies.

22       But there's a lot to be said just for keeping these

23   gorgeous buildings in use.

24       But right now, I'm the only federal judge over here,

11:53:22 25   and I only got here because they can't prevent me from doing

1      it because I have a lifetime appointment.

2           So, anyway, isn't it lovely?

3                MR. FITZGERALD:  It's beautiful.

4                THE COURT:  It's a lovely place.

11:53:35  5      And you'll find when you have a jury in here and you

6      try a case in here, it makes everybody stand tall.  It's a

7      good place to litigate.

8           Okay.

9                MR. STAR:  One other point of clarification.

11:53:46  10      When we come back to argue, I think it was just

11      mentioned, the exhibits, will we also be arguing over

12      deposition designations during that?

13                THE COURT:  I don't know.

14           That might be useful.

11:53:57  15                THE LAW CLERK:  We need to set a date.

16           Get together with me and we'll look at the Court's

17      schedule.  I don't know how many days it will take to do

18      this.

19                MR. STAR:  That's --

11:54:06  20                THE LAW CLERK:  I'm expecting more than one.

21                MR. FITZGERALD:  Probably.

22                MR. MILLER:  Just one point.

23           In my experience, and maybe others of seeing this the

24      same way, sometimes once you get a feel for what the rulings

11:54:18  25      would be like on some of the designations, you can maybe

1    short work some of the other objections.

2         So as long as it's included and we all put a fair and

3    reasonable effort into it, I think we'll be able to get that

4    straightened out.

11:54:35  5              THE COURT:  All right.  Well, my staff is easy

6    to contact, and I guess you all know how to do that.

7         And you know how to find us now.  Sometimes people get

8    lost in this great building.

9         So I think things will move along well.  We'll deal

11:54:49 10   with the few issues we have left.  And the new trial date is

11   on the 23rd of February.

12        Okay.

13              MR. FITZGERALD:  Okay.

14              THE COURT:  It will probably be snowing in

11:54:58 15   Cleveland.  We don't know.  We'll see.

16        We start at 9:00.  Some days we'll go earlier or

17   later, depending on where the lawyers are and where the jury

18   is and so forth.

19        Anything that comes up, just call us, and you'll find

11:55:16 20   that it's easy to contact us.

21        Okay.

22              MR. FITZGERALD:  Very good, Your Honor.

23        Thank you.

24        Thank you for your time.

11:55:22 25              MR. STAR:  Thank you, Your Honor.

1          THE COURT:  I'll leave you here.

2                        - - -

3          (Proceedings concluded at 11:55 a.m.)

4

5

6

7                  **C E R T I F I C A T E**

8          I certify that the foregoing is a correct transcript
   of the record of proceedings in the above-entitled matter
9  prepared from my stenotype notes.

10          */s/ Sarah E. Nageotte*                *12/16/2014*
            SARAH E. NAGEOTTE, RDR, CRR, CBC            DATE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25