# In The Matter Of:

*Hodell-Natco Industries, Inc. v.*
*SAP America, Inc., et al.*

*Geoffrey Ashley*
*March 16, 2012*

**NEXTGEN REPORTING**

Making Litigation Easier.  NextGenReporting.com

PHILADELPHIA | 215.944.5800  NEW YORK CITY | 646.470.3376  PHOENIX | 623.224.2760  SILICON VALLEY | 650.799.8020

*Original File 2012-01663.TXT*
*Min-U-Script® with Word Index*

Page 3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

HODELL-NATCO           )  Case No. 1:08 CV 2755
INDUSTRIES, INC.,      )
                       )  Judge:  Lesley Wells
        Plaintiff,     )  Magistrate Judge:
                       )     Greg White
    vs.                )
                       )  VOLUME I
SAP AMERICA, INC., et  )
al.,                   )
                       )
        Defendants.    )
_____

AUDIOVISUAL DEPOSITION OF GEOFFREY ASHLEY

DATE:   Friday, March 16, 2012
TIME:   9:24 a.m.
PLACE:  Residence Inn
        91 Hall Street
        Concord, New Hampshire

_____

NEXTGEN REPORTING

Registered Professional Reporters

---

**Page 2**

1  APPEARANCES:
2
3  ON BEHALF OF THE PLAINTIFF:
        MR. P. WESLEY LAMBERT, ESQ.
4       Koehler, Neal, LLC
        3330 Erieview Tower
5       1301 East Ninth Street
        Cleveland, Ohio 44114
6       (216) 539-9370
        wlambert@koehlerneal.com
7  ON BEHALF OF THE DEFENDANT, SAP AMERICA, SAP AG:
        MR. GREGORY J. STAR, ESQ.
8       Drinker, Biddle, Reath
        One Logan Square
9       Suite 2000
        Philadelphia, Pennsylvania 19103
10      (215) 988-2734
        Gregory.Star@dbr.com
11
   ON BEHALF OF THE DEFENDANT, LSi:
12
        MR. ROY A. HULME, ESQ.
13      Reminger & Reminger
        1400 Midland Building
14      101 Prospect Avenue, West
        Cleveland, Ohio 44115
15      (216) 687-1311
        rhulme@reminger.com
16
17
18  ALSO PRESENT:  Kevin Reidl
                   J.T. McGinn, Videographer
19
20
21
22
23
24
25

---

**Page 3 (Index)**

1            I N D E X
2
  EXAMINATION                            PAGE
3  BY MR. STAR............................  4-247
4
   BY MR. LAMBERT.........................  14-254
5
   BY MR. HULME...........................  228
6
7            E X H I B I T  I N D E X
8  NO.              EXHIBIT              PAGE
9  Exhibit 172  E-mail string dated January 19,   21
10              2009
11 Exhibit 173  E-mail string dated December 29,  27
               2011
12 Exhibit 174  E-mail string dated January 3,    37
13              2012
14 Exhibit 175  Excerpt of a PowerPoint           57
               Presentation
15 Exhibit 176  E-mail dated December 22,         100
16              2005
17 Exhibit 177  E-mail dated January 2, 2007      112
18 Exhibit 178  E-mail dated February 10,         133
               2006
19 Exhibit 179  Outlook Calendar                  146
20 Exhibit 180  E-mail                            190
21 Exhibit 181  E-mail                            198
22
23
24
25

---

**Page 4**

1        P R O C E E D I N G S
2        GEOFFREY ASHLEY,
3  having first been duly sworn, testified as
4  follows:
5        EXAMINATION BY MR. STAR:
6  Q.  Good morning.  Mr. Ashley, I want to cover a
7  few topics with you quickly, sir.  You're a
8  former SAP employee, correct?
9  A.  That's correct.
10 Q.  Can you run through your employment history
11 with SAP and tell me what job positions you
12 held and how long you were in them?
13 A.  Yes, starting with SAP in roughly the
14 beginning of November, '05, I was hired as
15 the director of channel sales for
16 North America, and the product was the SAP
17 Business One Solution.
18     So my responsibilities were the
19 management of all the partners, the partner
20 community, through all of the resources
21 internally, so I had sales, pre-sales,
22 channel managers, pre-sales recruiters, that
23 kind of stuff.  So that was how I started
24 with SAP.
25     I was in that role until 2008, I think,

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 5

1  if I remember correctly, and then I moved to
2  the All-In-One product, which is the next
3  level up for SAP.  And I was in that role for
4  maybe a couple of years.
5     And then when they rolled out the SAP
6  Business By Design, which is their newest
7  product, I was appointed the director of
8  sales for that product until of 2000 -- of
9  this year -- I'm sorry -- of '11, and August
10  of '11, I left SAP and went to my current
11  employer.
12  Q.  When you were working in 2008 with the
13  All-In-One product, what was your title?
14  A.  I was director of business development, I
15  think is what we ended up calling it.
16  Q.  Was it a national portion or covering a
17  region?
18  A.  It was regional.  It was the Americas.
19  Q.  Is that North and South and Central America
20  as well?
21  A.  Yes, correct.
22  Q.  And when you were working on the Business By
23  Design product up until August of 2011, the
24  title was director of sales.  Did you have a
25  particular territory that you covered?

---

Page 6

1  A.  It was also the Americas again.  I worked for
2  SAP America, so all those positions were the
3  Americas.  I had global reporting and global
4  communication, because it was a global
5  company, but I was paid based on the
6  Americas.
7  Q.  So you left SAP in 2011, and you went to a
8  company called SugarCRM; is that correct?
9  A.  That's correct.
10  Q.  What was the reason that you left SAP?
11  A.  Essentially, the global market strategy for
12  SAP and this new product at this point in
13  this evolution was somewhat contrary to my
14  personal aspirations and goals.
15  Q.  You're talking about Business By Design?
16  A.  Business By Design specifically, correct.
17  Q.  Tell me just a general overview of your
18  experience in the software industry until
19  that time period.
20  A.  Well, I started my professional career in
21  1982.  The reason that that would be
22  important to this is that my first job was
23  working for a VAR, a value added reseller.
24  That is what LSI is.  So I spent nine years
25  either working for or actually running the

---

Page 7

1  entire organization before I left.
2     So I understand not only the VAR
3  business model, but ERP, VAR business model,
4  which is what the company was.  I sold
5  various software.
6     Another point of my career, I was an MIS
7  manager for the Johns Hopkins University, and
8  in that role -- again, what's applicable to
9  this is in that role I was responsible for
10  the MIS or the technical aspects of an
11  extremely large organization.  Therefore,
12  again, I understand what is involved in these
13  very large projects and getting them up and
14  running, and what I did at the Johns Hopkins
15  University was a edge the entire time I was
16  there.
17     And then everything I've done since --
18  and I've got about 30 years in it -- has been
19  working for the publishers in a VAR
20  environment, a value added resource
21  environment, so my job has always been to
22  grow the partners.
23  Q.  In 1982, at the VAR, what was the name of the
24  VAR you worked for?
25  A.  It was called Entre Computer Center.  They

---

Page 8

1  don't exist anymore.  It was privately owned,
2  but the name was Entre.  The corporate name
3  was Hannah Anna. [sic]
4  Q.  Did you go to Johns Hopkins directly from
5  that position?
6  A.  From there, I was a vice president of sales
7  for a distribution organization, but it was
8  computer technology distribution.
9  Q.  What was the name of that company?
10  A.  Micro Wholesalers.  Those are in Maryland.
11  Q.  And when did you go to Johns Hopkins?
12  A.  I'm going to say early '90s, maybe '92.
13  Q.  And how long were you there?
14  A.  About two years.
15  Q.  And where did you go after that before
16  joining SAP?
17  A.  A company called -- well, at the time it was
18  called Platinum Software.  It's now called
19  Epicor.  They do manufacturing of ERP
20  software.
21  Q.  What was your job at Platinum or Epicor?
22  A.  I was the channel manager, so my job was to
23  manage the partners in a territory.
24  Q.  Any other positions between that one and
25  going to SAP in 2005?

---

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 9

1  A.  I was the director of sales for a company
2  called Best Software, B-e-s-t, located in
3  Florida.  They were acquired by Sage, which
4  is a huge ERP software publisher.  So I lost
5  that job, because they were acquired.
6      So I went to a company called Avision.
7  That was in Atlanta, Georgia, and Avision was
8  acquired by Microsoft.  So I went to a
9  company called Aperum, A-p-e-r-u-m.  I was
10  vice president of sales there.  They were
11  acquired by Infor, and so I got sick of that.
12      That's why I went to SAP, because I
13  figured they weren't getting acquired.
14  Q.  It's a long list.  Thank you for going
15  through it.
16      Obviously, you know you're here today in
17  connection with a lawsuit that's brought
18  against SAP America and SAP AG by
19  Hodell-Natco.  LSi, Dan Lowery's company, is
20  also a defendant in the case.
21      You recall having some involvement while
22  you worked for SAP with Hodell-Natco and
23  their project to implement SAP?
24  A.  Yes.
25  Q.  What general -- strike that.

Page 10

1      Run through for me in general terms what
2  you recall about your involvement with
3  Hodell.
4  A.  In general terms, my role at SAP as basically
5  the channel leader was overall
6  responsibility for the partner relationship,
7  so because we had a partner who had a
8  relationship with a valued customer, my role
9  and responsibility was essentially to
10  understand our partner and their role and our
11  customer and their role.
12      So, you know, I had overall
13  responsibility for sales and revenue, and
14  Hodell-Natco represented a very large
15  opportunity for SAP.
16  Q.  Did you have any technical role?
17  A.  No, strictly sales.
18  Q.  Did you have any involvement in helping LSi
19  to develop code or write code for Hodell?
20  A.  None whatsoever.
21  Q.  Did you have any involvement in analyzing the
22  structure either of Hodell's hardware
23  infrastructure or Hodell's needs for a
24  software system?
25  A.  No.

---

Page 11

1  Q.  Would that be something that you would ever
2  do in the role that you served at that time
3  in 2005, 2006 for SAP?
4  A.  It would have been rare.  Partners might have
5  called me into meet with prospects prior to
6  buying, but it was normally as a
7  relationship, our close relationship,
8  publisher to partner, so in support of that.
9  Very seldom --
10      I had a background -- I have a
11  background in distribution, so there would be
12  on occasion where I might speak to a
13  potential customer on how they might utilize
14  our solutions in a distribution environment.
15  I also spoke or I speak at distribution
16  events and things like that, so I might be
17  utilized by the partner community in that
18  regard.  But not technical.
19  Q.  At any time in 2005, do you recall having any
20  direct communications with anybody at Hodell?
21  A.  No, I wasn't hired until November of --
22  Q.  Right.  What about in 2006, do you recall any
23  direct communications between yourself -- and
24  when I say direct communications, I mean
25  either an e-mail, a letter, phone call,

Page 12

1  face-to-face meeting, anything like that
2  between yourself and anybody from Hodell in
3  2006?
4  A.  All I can say is I know I had spoken with
5  someone at Hodell.  I can't remember the time
6  frame, I mean, not that specific.
7  Q.  Fine.  You're aware that in this case Hodell
8  alleges that its implementation of the
9  Business One software did not work to its
10  satisfaction?
11  A.  Yes.
12  Q.  Okay.  You're also aware that in this
13  litigation Hodell alleges that SAP committed
14  fraud, in that SAP, according to Hodell, made
15  misrepresentations or failed to disclose
16  information to Hodell before Hodell purchased
17  licenses for the Business One software?
18  A.  Yes, I'm aware that's what they are claiming.
19  Q.  Are you also aware that Hodell alleges that
20  after it went live with the software SAP
21  misled Hodell by suggesting to Hodell --
22  these were allegations, of course --
23  suggesting to Hodell that the problems it was
24  experiencing with its software limitation
25  could be fixed or remedied in some way?

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 13

1  A.  Sorry?
2  Q.  It was a long question.  Are you also aware
3  that Hodell alleges in this case that after
4  it went live on the Business One software
5  that it believes SAP continued to mislead
6  Hodell by suggesting that problems with the
7  software could be fixed, for instance, with
8  things like patches or upgrades to different
9  versions of the software?
10  A.  Yes, I'm aware.
11  Q.  Okay.  With your knowledge now of what the
12  basic claims were by Hodell, do you have an
13  opinion as to whether SAP misrepresented
14  anything to Hodell or committed fraud either
15  before the licenses were sold to Hodell in
16  2005 or after Hodell went live in 2007?
17      MR. HULME: Objection to form and
18  foundation.
19      MR. LAMBERT: Join.
20  Q.  Please go ahead and answer.
21  A.  My opinion is that there was never any intent
22  to defraud anyone, and my opinion was that
23  there were many instances in which a large
24  number of resources at SAP tried to do
25  everything they could to mitigate the

---

Page 14

1  situation.  We didn't, but the effort was
2  made to try to do that.
3      MR. STAR: I have no other questions.  I
4  turn witness over to Wes.
5      MR. LAMBERT: Okay.
6      EXAMINATION BY MR. LAMBERT:
7  Q.  Wasn't there a brief time when there was a
8  break in your employment with SAP?
9  A.  There was a time when the product was
10  recalled.
11  Q.  What product?
12  A.  Business By Design.
13  Q.  Sorry.
14  A.  A product was recalled.  During that time,
15  the entire organization that I worked for was
16  disbanded and then brought back together, so
17  yes.
18  Q.  So you went to work for someone else for the
19  short period of time, correct?
20  A.  Correct.
21  Q.  Okay.  Did you have any kind of severance
22  agreement or anything with SAP as a result of
23  that termination of your employment?
24  A.  No.
25  Q.  Do you have any kind of agreement with SAP

---

Page 15

1  currently?
2  A.  I have a basically non-disclosure for one
3  year.
4  Q.  So you're subject to a non-disclosure
5  currently?
6  A.  Correct.  I cannot use anything that would
7  be -- I cannot use any trade secrets or
8  disclose any trade secrets.
9  Q.  Have you been instructed to not disclose
10  anything to me or other counsel in this
11  litigation?
12  A.  Absolutely not.
13  Q.  What did you do to prepare to come testify
14  here today?
15  A.  Had dinner last night.
16  Q.  With who?
17  A.  With Greg.
18  Q.  What did you guys talk about?
19      MR. STAR: Objection.
20  Q.  You can answer.
21      MR. STAR: It calls for attorney-client
22  privilege.  We're representing him as a
23  former employee, and what we discussed is
24  subject to attorney-client privilege.  You
25  can ask him documents that he reviewed and

---

Page 16

1  those sorts of things, but you can't ask what
2  discussions that we had.  I'll instruct him
3  not to answer that.
4      MR. LAMBERT: I'm going to note for the
5  record I don't agree that the attorney-client
6  privilege applies to your conversations with
7  Geoff.  If you're going to instruct him not
8  to answer, we'll take that up at later a
9  later date, but I disagree with the assertion
10  of that privilege.
11      MR. STAR: I won't argue it here, but I
12  don't know how you can possibly disagree with
13  it.
14      BY MR. LAMBERT:
15  Q.  Are you paying Mr. Star's firm for
16  representing you?
17  A.  No.
18  Q.  Are you here pursuant to a subpoena?
19  A.  Yes.
20  Q.  Did you agree to appear voluntarily, or did
21  you require that subpoena be served on you?
22  A.  It showed up.  So I never had the need.  Does
23  that make sense?
24  Q.  Well, were you contacted prior to receiving a
25  subpoena?

---

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 17

1  A.  Yes.
2  Q.  And asked to testify at a deposition?
3  A.  Yes.
4  Q.  And what did you say?
5  A.  I had not refused.  We had not come up with a
6  date, and then I got a subpoena.  But I had
7  not refused.  I had not said I won't show up.
8  Q.  Okay.  But you hadn't agreed on a date or
9  anything?
10  A.  That's correct.
11  Q.  Were any dates discussed?
12  A.  Yes.
13      MR. STAR: Objection.
14      THE WITNESS: Oh, sorry.
15      MR. STAR: You can go ahead and answer.
16  A.  Yes, it was my schedule that was causing the
17  issue.  I travel a lot, and I had to have an
18  operation, so I tried to schedule around a
19  lot of that stuff.
20  Q.  And the next thing you know, you received a
21  subpoena, correct?
22      MR. STAR: Objection.  Lack of
23  foundation.  Assumes facts not in evidence.
24  Q.  Is that correct?
25  A.  Yes.

---

Page 18

1  Q.  Okay.  Who was the subpoena served on behalf
2  of?
3  A.  I don't know.  I had said I would show up by
4  then, so I didn't read it that closely.  So I
5  don't know.
6      MR. STAR: You know, we served the
7  subpoena to secure the witness, because he's
8  a former employee, and everybody was
9  traveling at the time making and making a big
10  deal out of it, so I object.  I think it's
11  entirely irrelevant.
12      MR. LAMBERT: Well, you're asserting a
13  privilege over someone you're claiming to be
14  your client.
15      MR. STAR: The serving of a subpoena to
16  make sure that somebody shows up and to
17  formalize a deposition has absolutely nothing
18  to do with whether we have an attorney-client
19  relationship.
20      He's a former employee that served in a
21  management position, and I think you would
22  represent your former employees or at least
23  offer it to them.  And if they accepted it,
24  it certainly serves their counsel for the
25  purposes of a deposition, and the things you

---

Page 19

1  discuss with them would be privileged.
2      I'm sure Roy will be doing that when we
3  take the depositions of people like Jon
4  Woodrum and other former employees of LSi.
5  All of this is asking for things that are
6  subject to attorney-client privilege, and
7  it's a total waste of time.  But go ahead.
8      MR. LAMBERT: I'll represent to you that
9  I don't believe that that's an accurate
10  statement of the law, but it is what it is
11  for purposes of today.
12      MR. STAR: Okay.
13      BY MR. LAMBERT:
14  Q.  Do you have a retainer agreement or anything
15  with Mr. Star's firm?
16  A.  No.
17  Q.  Have you talked -- other than with SAP's
18  lawyer, Mr. Star, have you spoken with anyone
19  else currently employed by SAP regarding this
20  lawsuit?
21  A.  No.
22  Q.  Have you spoken with anyone formerly employed
23  by SAP regarding this lawsuit?
24  A.  No.
25  Q.  Have you spoken with anyone currently

---

Page 20

1  employed with LSi regarding this lawsuit?
2  A.  I'm not actually sure how to answer that.  I
3  have a relationship with Dan Lowery that goes
4  back a long way.  So there's been
5  conversations, but they haven't been specific
6  to a legal matter.  Is that how --
7  Q.  You sent him some e-mails at the end of 2011
8  related to the Hodell implementation?
9      MR. STAR: You asked him if he spoke
10  with anybody, not if he sent an e-mail.
11  Q.  Have you communicated with anybody?
12  A.  Again, if Dan said a comment, I would
13  respond, but it wasn't -- I mean -- so I
14  guess it depends on what you're considering a
15  conversation to be.
16      So it wasn't specific to a lawsuit.  It
17  was specific to a situation that we were both
18  involved in at one time.
19  Q.  Which is the Hodell-Natco/SAP Business One
20  implementation, correct?
21  A.  Yes.  Honestly, I didn't know there was a
22  lawsuit up until all this came up.
23  Q.  How do you know -- how are you aware of the
24  specific legal causes of action that Hodell
25  is alleging in the case?

---

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

**Page 21**

1  A.  How do I know that --
2  Q.  How are you aware of the fact that Hodell is
3  alleging fraud in this litigation?
4  A.  Discussions with Greg.
5  Q.  Okay.  Have you read the complaint?
6  A.  No.
7  Q.  Do you have any legal training?
8  A.  None.
9  Q.  Do you know about legal elements of a cause
10  of action for fraud in the Sixth District?
11     MR. STAR: Objection.
12  A.  No.
13     THE WITNESS: Sorry.
14     MR. STAR: That's okay.
15     (Document marked Exhibit No. 172.)
16     BY MR. LAMBERT:
17  Q.  Mr. Ashley, I'm going to hand you what has
18  been marked as Exhibit 172.  Can you review
19  that document, and let me know when you're
20  finished.
21  A.  (Witness complies.)
22     Okay.
23  Q.  Have you seen Exhibit 172 before?
24  A.  Yes.
25  Q.  Is this an e-mail you sent to Dan Lowery

---

**Page 22**

1  dated November 19 -- I'm sorry -- January 19,
2  2009?
3  A.  Yes.
4  Q.  Were you employed by SAP at this time?
5  A.  I don't think so.
6  Q.  Who were you working for?
7  A.  I believe I was just doing independent
8  consulting.
9  Q.  Okay.  Why were you not with SAP as of
10  January, 2009?
11  A.  This was the time frame when they pulled the
12  SAP Business By Design product back, and so
13  there was nothing to sell.
14  Q.  How did you come into possession of the
15  e-mail you're forwarding to Mr. Lowery which
16  has the header stating "internal use only"?
17  A.  I don't know.  Either that somebody had
18  forwarded it to me because of my past --
19  somebody had forwarded it to me because of my
20  past work because of work I was doing with
21  the partner at the time.
22  Q.  Okay.  Having read this, do you recall making
23  the statement to Dan Lowery in January of
24  2009 that you had little communication with
25  any of the partners anymore, and "It is the

---

**Page 23**

1  one thing that hurts more than anything else
2  when I think of what Dan Kraus has cost us
3  all"?
4  A.  Um-hum.
5  Q.  What were you referring to there?
6  A.  I was referring to the opportunities that we
7  had all hoped for in building the Business
8  One practice within SAP and our belief that
9  decisions were made to make that opportunity
10  less than it could have possibly been.
11  Q.  In what respect?
12  A.  I think we could have dominated the market
13  with that product, and we didn't.
14  Q.  Why not?
15  A.  Because of decisions that were made by some
16  of the executive management that I disagreed
17  with.
18  Q.  Was Dan Kraus part of the executive
19  management?
20  A.  For Business One, correct.
21  Q.  What decisions did he make that you disagree
22  about?
23  A.  In this particular case and specific to me,
24  he felt that my leadership of SAP Business
25  One channel was not in conflict with but not

---

**Page 24**

1  supportive of where he wanted to take it.  So
2  that's why he moved me out of the Business
3  One team, and I moved into the All-In-One
4  team.
5  Q.  What was the conflict there?
6  A.  I was -- literally, from the first quarter I
7  began managing the Business One channel up
8  until the very quarter I left, we exceeded
9  our numbers every single quarter.  The
10  quarter after I left, they missed their
11  numbers.  They have never made them since.
12     So it was a -- it was all about how we
13  went to market, how I managed the channel,
14  and how successful those partners were.  I
15  think Dan needed to feel he had a little more
16  involvement in it, and with me in the role, I
17  was probably a little too strong.
18  Q.  So is it your testimony that Dan Kraus was
19  willing to sacrifice the success of the
20  Business One product line in order to get rid
21  of you?
22  A.  Yes.
23  Q.  Do you find Dan Kraus to be an honest person?
24  A.  Yeah, I don't think he -- I'm going to say
25  yes.

---

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 25

1  Q.  Well, were his actions with regard to having
2  you removed from the Business One channel
3  honest in your opinion?
4  A.  They were not dishonest.  They were a
5  difference in style.
6  Q.  Is Dan Kraus currently employed by SAP?
7  A.  No.
8  Q.  Why not?
9  A.  I don't know actually.
10  Q.  Do you know when his employment with SAP
11  ended?
12  A.  Not for certain.  I'm going to estimate in
13  2010 maybe, but I can't swear to that.  Well,
14  I did I guess, but I'm not for sure.
15  Q.  Did he leave voluntarily?
16  A.  I don't know.
17  Q.  You made a statement to Mr. Lowery in this
18  e-mail, forwarding him a confidential
19  document and then stating, "It would not
20  require you to work with any of the SAP
21  resources that let you down in the past."
22  A.  Um-hum.
23  Q.  What did you mean by that?
24  A.  Dan was, and as far as I know still is, an
25  IBM partner, and so this whole communication

---

Page 26

1  was that there was an opportunity through IBM
2  that Dan Lowery might be able to use to his
3  advantage as a business person to grow his
4  business and he wouldn't have to work with
5  SAP, because at that time, as you would
6  expect, he had some -- wasn't pro SAP.
7  Q.  Okay.  Well, what resources in your opinion
8  had let Mr. Lowery down?
9  A.  I think all of us had let -- I mean, because
10  it didn't grow the way I had hoped it had --
11  my entire career has been built building
12  channels and helping business partners
13  succeed, and I believe that that could have
14  happened with Business One.  But it didn't.
15      There are very few partners that made
16  commitments to SAP and put their businesses
17  on the line.  That could have done much
18  better, and I take that personally.  It's a
19  character issue with me.  I think that this
20  is what it related to.  I think we let him
21  down.
22  Q.  Is there anything specific that you can point
23  to as far as an SAP resource that you felt
24  let Mr. Lowery down?
25  A.  No, I mean, it could cover everything from

---

Page 27

1  senior management and decisions they make,
2  all the way through product, through
3  marketing, through sales.  I mean, basically,
4  I believe we had a huge potential, and we
5  didn't live up to that.  It was an opinion,
6  but that's what I believe.
7  Q.  What do you think was the potential for the
8  market for SAP Business One?
9  A.  I think it could have dominated.  I think
10  against the competitors in that marketplace,
11  given the resources of that company, we
12  should have been able to dominate, at least
13  in the Americas' marketplace, which is where
14  I --
15  Q.  Well, can you define the marketplace that
16  you're referring to?
17  A.  What would be traditionally called small to
18  medium enterprises or SME.  In the small to
19  medium enterprise market, you're looking at
20  companies with revenues of anywhere from
21  probably 5 million up to, you could argue, up
22  to 1 billion.
23      (Document marked Exhibit No. 173.)
24  Q.  You're looking what's been marked as
25  Exhibit 173.  Have you seen that document

---

Page 28

1  before?
2  A.  Yes, I have.
3  Q.  Is this one of the documents you reviewed in
4  preparation for testifying today?
5  A.  Not at the time.  I didn't know I'd be
6  testifying.
7  Q.  No, have you reviewed this document --
8  A.  Oh, sorry.  No.  This is the first time I've
9  seen it since I sent it.
10  Q.  Okay.  You recall sending this e-mail to Dan
11  Lowery, December 29, 2011?
12  A.  I do.
13  Q.  And forwarding him an e-mail exchange you had
14  with Paul Killingsworth?
15  A.  Yes.
16  Q.  Who is Mr. Killingsworth?
17  A.  Who is Mr. Killingsworth?
18  Q.  Yes.
19  A.  He handles -- well, I don't know exactly what
20  he does today.  At this time or at the time
21  of this, of the Hodell-Natco event, he was
22  in -- I guess you call it a customer
23  satisfaction role.  I'm not sure what he does
24  today actually.
25  Q.  Okay.  You made the statement here on the

---

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 29

1 first page, "They were asking me for online
2 e-mails related to Hodell.  I told them I did
3 not have a single e-mail from those days.
4 They were all in my SAP computer, and they
5 have that."  Correct?
6 A.   That is correct.
7 Q.   Is this the first time -- strike that.
8      When you were contacted by
9 Mr. Killingsworth, was that the first time
10 you had been contacted by anyone at SAP
11 relating to the Hodell lawsuit?
12 A.   That is correct.
13 Q.   Is that the first time that anyone had asked
14 you to search for any documents or e-mails
15 you had relating to the case?
16 A.   That is correct.  I mean, other than -- no,
17 that's correct.  It's the first time for this
18 case specifically, yes.
19 Q.   You made the statement, "I let them know that
20 SAP pushed the partner to take the deal, and
21 then SAP (Dan Kraus through me) threw the
22 partner under the bus."
23      Do you see that statement?
24 A.   No.
25 Q.   It's on the first page.

---

Page 30

1 A.   On the first page?
2 Q.   Second paragraph, first sentence.
3 A.   Oh, okay.  Okay.
4 Q.   Do you recall making that statement to Dan
5 Lowery?
6 A.   Yes.
7 Q.   What did you mean by "SAP pushed the partner
8 to take the deal"?
9 A.   Meaning at the --
10 Q.   The partner is LSi?
11 A.   The partner would be LSi, correct.  The issue
12 that I have and that Dan Lowery at LSi would
13 also agree with is -- the issue I had was
14 with Dan Kraus specifically and in his role
15 as the VP of sales and in his tendency to
16 make decisions for arbitrary reasons.
17      So this was not directed at SAP, the
18 company.  It was directed at Dan Kraus, the
19 representative, and he had made several
20 decisions favoring certain partners over
21 other partners for activities or events or
22 situations.  And I felt that LSi was not
23 given the same treatment that other partners
24 might have been given.
25 Q.   Well, it seems to me though when you make the

---

Page 31

1 statement, "SAP pushed the partner to take
2 the deal," aren't you referring to
3 Hodell-Natco there?
4      MR. STAR: Objection to form.  You can
5 answer.
6 A.   I would have been referring to the fact that
7 once everything starts to go south, SAP's --
8 Dan Kraus in this case position was you sold
9 it; you own it.
10 Q.   Okay.  But I'm referring specifically to the
11 statement, "Push the partner to take the
12 deal," which my understanding means that on
13 the front end of the transaction --
14 A.   No.
15 Q.   -- during the sales process?
16 A.   No, I could have probably or should have
17 probably said in hindsight stuck with the
18 deal.
19 Q.   What was do you mean by that?
20 A.   Meaning he sold it; he has to deal with it.
21 Q.   Did you agree with that position?
22 A.   No, I think we sold it, and we had to deal
23 with it.
24 Q.   We meaning SAP, correct?
25 A.   (No response.)

---

Page 32

1 Q.   What do you mean by "deal with it"?
2 A.   Meaning that if there are issues that need to
3 be resolved, then we, SAP, the partner and
4 the customer would have to work together to
5 try to resolve them.
6 Q.   And it was your opinion that as soon as
7 issues with the Hodell implementation arose,
8 SAP withdrew from the problem or Mr. Kraus
9 withdrew from the problem and made it
10 strictly Dan Lowery's problem?
11      MR. STAR: Objection to form.
12 A.   And the answer would be no.  I mean, we did a
13 lot to try to work through the issue.  This
14 was more a -- personality and style issue than
15 it was a -- there were options that could
16 have possibly been discussed that weren't
17 discussed, because essentially, we had
18 personality conflicts.
19 Q.   Why did you make this statement at the end of
20 the first paragraph on there that, "SAP did
21 not want me as any kind of witness as I would
22 tell the truth.  SAP screwed this up"?
23 A.   Again, because of my -- because Dan Lowery
24 and I share a similar position with regards
25 to our relationship with Dan Kraus.

---

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 33

1  Q.   Do you feel that Dan Kraus misled Mr. Lowery?
2  A.   No, I don't think he misled him.  I think he
3  just -- there are lots of ways that you can
4  deal with conflict, and I think the way he
5  chose to deal with the conflict was just not
6  the way I would have done it.  I don't think
7  he was partner-centric or partner friendly.
8  Q.   What did Dan Kraus do in dealing with --
9  well, strike that.
10     What was the conflict first of all?
11  A.   Basically, Dan Kraus and Dan Lowery are both
12  very strong personalities, and when those two
13  strong personalities got together, they were
14  like two positives.  And you know, they
15  pushed each other apart, rather than a
16  positive and a negative trying to attract
17  them together.  So I think they were too
18  strong, and they irritated each other.
19  Q.   Well, can you agree with me that the
20  conflict -- it centered around a tardy
21  implementation of SAP Business One at
22  Hodell-Natco?
23     MR. STAR: Objection to form.
24  A.   No, it didn't.  There were a lot --Dan Lowery
25  had issues regarding we could have given him

---

Page 34

1  more money towards marketing.  He might have
2  had issues of how we trained him.  He might
3  have had issues with a lot of things related
4  to a partnership in general.
5     And Dan Kraus would have had issues with
6  his issues and what he perceived the way we
7  treated him and the way we enabled him and
8  the way we trained him and the way we
9  whatever.
10     So it was more related to the
11  relationship.
12  Q.   Can you turn to the second page of that
13  document referencing your reply to Paul
14  Killingsworth on December 22nd, 2011?
15  A.   Yes.
16  Q.   The first full paragraph, the last sentence,
17  you make the statement, "That there were
18  numerous cries for help from the partner, and
19  SAP either blew them off, gave them wrong
20  information or took sides and made the
21  partner look bad."
22  A.   Um-hum.
23  Q.   Do you remember making that statement?
24  A.   I do.
25  Q.   What did you mean by it?

---

Page 35

1  A.   I mean that, again, I think we could have
2  handled it -- one of the things I had said
3  early on to a lot of people was I think Dan
4  Kraus could have got on a plane and could
5  have flown to Ohio and could have met with
6  Hodell, and I think that would have went a
7  long way.
8     And he never did, and he never
9  volunteered to do so and never offered to do
10  so.  And I think that was specifically
11  because he had -- it wasn't important enough
12  to him specifically to do that, and I think
13  that would have been a good thing.  So it's
14  things like that.
15     I think we could have done a lot of
16  things.  We could have said a lot of things.
17  We could have worked together a little better
18  to try to mitigate what ended up being a bad
19  situation.
20  Q.   Dan Kraus wasn't a technical guy, was he?
21  A.   No, but Dan Kraus had authority.
22  Q.   Okay.  Well, what could he have done in
23  meeting with Hodell personally to fix the
24  problem?
25     MR. STAR: Objection to form.  You can

---

Page 36

1  answer it.
2  A.   If Hodell believes that SAP was acting in any
3  way other than in its best interests, having
4  the top VP for the entire business unit meet
5  with them and help them understand that was
6  not the case, I think is an important thing
7  to do.  The failure to do that I think sends
8  a message as well.
9  Q.   What is the, in all caps, wrong information
10  that you felt SAP had given to Dan Lowery?
11  A.   I think in hindsight, I think everybody could
12  have done a lot better at communicating what
13  the capabilities of the product might have
14  been or not been, what was the capabilities
15  of the future were or weren't, and so I think
16  the wrong information --
17     We probably -- we collectively all
18  together probably should have said very early
19  on right away that this is not going to work,
20  and we should all have just stopped.
21  Q.   We collectively meaning SAP and LSi?
22  A.   And Hodell.
23  Q.   Would you agree with me that Hodell was
24  relying upon information provided to it by
25  SAP and LSi in making such a decision?

---

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 37

1     MR. STAR: Objection to form.
2 A.  No, not completely.
3 Q.  Why not?
4 A.  Because I believe that everybody has a
5 responsibility -- that's why my background as
6 an MIS manager is important, because I
7 believe everybody has a responsibility in
8 this situation, and I believe that Hodell
9 went too fast. I think Hodell did not due
10 diligence in a lot of areas when they could
11 have. They went live when they should have
12 run parallel. There were a lot of things
13 that happened.
14     There were a lot of deadlines that got
15 missed, and then that pushed requirements
16 forward to go live too quickly. So I believe
17 there were a lot of things that were within
18 the power and scope of Hodell that weren't
19 done.
20     But in hindsight, it's easy to make all
21 these comments. At the time everybody was
22 excited and wanted this to work, so that's
23 the wrong information I'm talking about.
24     (Document marked Exhibit No. 174.)
25 Q.  Have you seen Exhibit 174 before?

---

Page 38

1 A.  Yes.
2 Q.  Have you seen this e-mail exchange since you
3 sent it?
4 A.  No.
5 Q.  Okay. Do you recall sending an e-mail to Dan
6 Lowery on January 3, 2012?
7 A.  Yes.
8 Q.  Okay. You're replying to an e-mail from him,
9 correct?
10 A.  Correct.
11 Q.  And I guess this was precipitated by the
12 previous exhibit we were just discussing,
13 correct?
14 A.  Correct.
15 Q.  If you turn to Dan Lowery's e-mail on the
16 second page, about three-fourths of the way
17 down, he makes the statement, "I often wonder
18 what could have been if the SAP software
19 simply worked as promised for large user
20 accounts like Hodell," correct?
21 A.  Um-hum.
22 Q.  Do you know what he was talking about there?
23     MR. STAR: Objection to form.
24 A.  I would assume that what he's talking about
25 is the fact that he had created an add-on and

---

Page 39

1 if he had been able to attack lots of
2 customers with that add-on, he would have
3 made a lot of money and have been very
4 successful.
5 Q.  Customers like Hodell who had a need for a
6 significant amount of users for the software,
7 correct?
8     MR. STAR: Objection to form.
9 A.  And I wouldn't have know back -- I mean, what
10 he would have liked to have done is gone
11 after the fastener industry. So companies
12 like Hodell would have been companies in the
13 fastener industry. He had a vertical
14 solution.
15 Q.  Well, he made the statement specifically
16 "large user accounts like Hodell".
17     MR. STAR: Is there a question?
18 Q.  Yeah, my question is: Do you know what he
19 meant by that? What was your understanding?
20 A.  I would have assumed he meant so that he
21 could have attacked the marketplace. I
22 didn't read anything else into it and don't
23 read anything else into it unless he's trying
24 to form it, because he knows --
25     When this was all going on, I did not

---

Page 40

1 know there was a lawsuit pending. I had just
2 been contacted by Paul, I think, the day
3 before, but I didn't know it was going to
4 lead to anything. So he might have been
5 preparing, and I didn't realize it and
6 probably shouldn't have said anything in that
7 case.
8 Q.  Okay. Well, you did reply?
9 A.  Yes.
10 Q.  Okay. And in the second sentence in your
11 reply stated, "Always told SAP, Dan, lawyers,
12 et cetera, that this was a case we had a
13 product not ready for prime time. Partner
14 relying on documentation that SAP put
15 together; a prospect/customer relying on SAP
16 to back their commitments; and frankly, a
17 solution that could have worked if anyone at
18 SAP would have wanted to take time to help
19 them get there," correct?
20 A.  Um-hum.
21 Q.  Who had you told that statement to?
22 A.  Oh, we all had conversations for long periods
23 of time saying that this was a product that,
24 if evolved correctly, could dominate in the
25 market as I said earlier.

---

---

**Page 41**

1  And so the frustration for everybody on
2  the team was give us more resources, give us
3  more time, give us more money, give us more
4  marketing, give us more whatever, and we can
5  go out there and win.  So that was the
6  discussion we were having internally all the
7  time.
8  Q.  Well, could you tell me who specifically?
9  A.  It could have been somebody in marketing or
10  entire marketing departments, entire
11  development teams, entire resale teams.  I
12  mean, basically everybody responsible or
13  working within the Business One community
14  within SAP.
15  Q.  Is the "Dan" you referred to here Kraus?
16  A.  I would assume so.  Where are you looking at?
17  Yes, yes, sorry.  Correct.
18  Q.  What lawyers are you referring to?
19  A.  Once this got to the point where it was --
20  where people were talking to lawyers, it
21  would have been SAP lawyers or SAP legal, I
22  should say.  I don't know if it was SAP
23  lawyers but SAP legal.
24  Q.  You were interviewed by SAP legal with
25  respect to Hodell?

---

**Page 42**

1  MR. STAR: Objection.  You can answer.
2  A.  And I can't actually say that I would have
3  spoken to them specifically about Hodell or
4  not.  I don't remember if I had spoken to
5  them specifically about Hodell or not.
6  Q.  But you spoke to them about Business One?
7  A.  Business One or issues that SAP would have
8  had with other customers or -- yeah, they
9  would have been related to Business One.
10  Q.  Why did you feel the product was not ready
11  for prime time, the product being SAP
12  Business One, I presume?
13  A.  Because this was extremely early on in its
14  evolution, and it had a lot of -- it needed
15  to grow up.  There was a lot of things that
16  they went to market doing that they over time
17  corrected and fixed.  It's a very good
18  product today, for example.
19  Q.  Well, when you say this was an early time in
20  Business One's evolution, what time period
21  are you speaking of?
22  A.  2005, 2006, when all of this would have
23  happened.
24  Q.  And what specifically was still evolving with
25  respect to the product?

---

**Page 43**

1  A.  The product's architecture, the data sets,
2  the databases, the feature set.  I mean, a
3  lot of it was still evolving.  Again, it's
4  the difference between version 1 of a product
5  and version 4, 5, 6, 7 of a product.  It gets
6  better over time.  It's the nature of
7  software.
8  Q.  Have you seen anything in any SAP marketing
9  literature that states that Business One was
10  still evolving?
11  A.  No.
12  Q.  Why not?
13  MR. STAR: Objection to form.
14  A.  Because it's the nature of the industry.
15  Software is always evolving.  It's the nature
16  of software.
17  Q.  Have you seen anything in SAP marketing
18  literature that stated that SAP Business One
19  as of 2005 was not ready for prime time?
20  A.  No, not in SAP marketing literature.
21  Q.  Have you seen it anywhere else?
22  A.  No.
23  Q.  Is it fair to say that nowhere in Exhibit 174
24  do you lay any blame upon Hoddell-Natco for
25  not conducting due diligence or preparing for

---

**Page 44**

1  the implementation appropriately?
2  A.  That's correct.  I didn't.
3  Q.  Okay.  This was as recently as three months
4  ago, correct?
5  A.  Um-hum.
6  THE COURT REPORTER: You have to
7  answer --
8  THE WITNESS: That's correct.  Sorry.
9  Q.  In fact, you make the statement that Hodell
10  was a prospect/customer relying on SAP to
11  back its commitments, correct?
12  A.  That's correct.
13  MR. STAR: Objection to form.  Where do
14  you see that?  That's not what it says at
15  all.
16  MR. LAMBERT: That's exactly what it
17  says.
18  MR. STAR: It doesn't say Hodell.
19  BY MR. LAMBERT:
20  Q.  Are you not referring to Hodell in that
21  statement?
22  A.  Hodell would be implied in the statement.
23  You could also argue I was talking about
24  everybody, but Hodell would be implied since
25  Dan was specifically.

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 45

1 Q.  And you would agree with me that SAP did not
2 back its commitments, did they?
3     MR. STAR: Objection to form.  What
4 commitments, to whom?
5     MR. LAMBERT: It's not -- I didn't write
6 it.
7     MR. STAR: You have to ask a question
8 about a specific case agenda.  You can answer
9 it if you understand it.
10     BY MR. LAMBERT:
11 Q.  If you understand what your own words were
12 and you can answer, please do.
13 A.  Well, to clarify again, not understanding
14 that I would be writing a document that would
15 get used as evidence, I was talking to Dan
16 Lowery about a shared situation in which we
17 were both frustrated by a lot that went on
18 within SAP.
19     But it wasn't specific in just to
20 Hodell, and it wasn't specific to anything
21 that would be related to fraudulent behavior.
22 It was things didn't happen as quickly as we
23 wanted in the way that we wanted.
24 Q.  Referring to a statement about three-fourths
25 of the way down, almost at the bottom, "I'm

---

Page 46

1 really sorry I was not more up front with you
2 regarding my position.  You should have been
3 made aware of this by me."
4 A.  Um-hum.
5 Q.  What did you mean by that?
6 A.  I mean, if you refer to Dan's e-mail to me,
7 he felt like he was alone out there and that
8 nobody cared and that nobody was listening
9 and that nobody wanted to work with him, and
10 I was saying that if I ever gave him that
11 impression or idea, I apologize, because that
12 was not the case.
13 Q.  What should you have been more up front with
14 him about?
15 A.  Just the partnership in general.  Again,
16 remember, the conversations that I had with
17 Dan Lowery are not specific to any one thing.
18 It's specific to the entire evolution.  He
19 and I had worked together with other
20 publishers in the past and had worked
21 together for a long time.
22     So this didn't go the way either one of
23 us had wanted it to go, and I felt about bad
24 about that, still do.
25 Q.  Can you describe for me how the SAP channel

---

Page 47

1 partner system is organized?
2 A.  The first thing -- the first thing is SAP has
3 three distinct product types.  There is
4 something called Business One.  That's folks
5 that's on the small end of the small to
6 medium enterprise marketplace.  That would be
7 in SAP's language probably between again 5
8 million and 500 million in revenue.
9     Then there is Business All-In-One, and
10 that product would be from probably about
11 give or take a hundred million to a billion
12 in revenue.
13     And then there's SAP -- I don't even
14 know what they call it now.  What they used
15 to call R3.  They renamed it, but I don't
16 remember what they call it now.  And R3 is
17 the big SAP that goes to companies -- the
18 biggest companies in the world.
19     So the partner community is broken down
20 by those three product classifications.  So
21 there are channels for each.  Each of those
22 channels then have different partner
23 communities within them.  Some do resell.
24 Some just provide services.  Some do
25 customizations.  Those are called ISVs,

---

Page 48

1 independent software vendors, and they write
2 code and do things like that.
3     So Dan Lowery, for example, would have
4 been a multiple-partner type.  He resold the
5 software.  He also developed ISV solutions or
6 add-on solutions for the product, and each of
7 the product classifications has those kind of
8 partner types associated with it.
9     The partners sell the software.  They
10 get margin for that.  They also support the
11 customer, and they get paid services for
12 that.  I think -- I mean is that --
13 Q.  I'm talking about, I guess, the corporate
14 organization on the SAP side with respect to
15 the channel partner system.
16 A.  Okay.
17 Q.  Let's start with Michael Sotnick.  Is he at
18 the top of the food chain there?
19 A.  No.
20 Q.  Okay.
21 A.  SAP is broken down by regions.  So there's
22 something called SAP Americas.  At this time,
23 with SAP Americas, there was somebody by the
24 name of Rodney Seligmann.  He would have been
25 the top person that was responsible for the

---

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 49

1  small and medium enterprise business.
2     Under Rodney Seligmann was somebody by
3  the name of the Michael Sotnick.  He was a
4  senior vice president, and he was responsible
5  for all of the SAP Business One and SAP
6  All-In-One revenues.
7     And then under Michael Sotnick was
8  somebody by the name of Dan Kraus.  Dan Kraus
9  was the vice president of the Business One
10  product, and he had not only the sales but he
11  had other components of the go-to market.
12     Under Dan Kraus was me, so Geoff Ashley,
13  and I had all of the responsibility for
14  revenue through partners, which is the only
15  revenue available through Business One.  It
16  was sold exclusively through partners.
17     And then under me were channel managers,
18  and those were by territory within the
19  United States or in the Americas.
20  Q.  Is that people like Shane Corr?
21  A.  That is correct.  Shane Corr would have
22  reported to me.
23  Q.  Was Ted Steffner a channel manager?
24  A.  Yes, he -- I can't remember time frames.  I
25  guess since you have his name, he would have

---

Page 50

1  been at that time.  I can't remember the time
2  frames of when one was and one wasn't.  The
3  one that would be there today and was there
4  when I left was Shane in that Midwest region.
5  Q.  Was Ted Steffner the channel manager that was
6  overseeing, for lack of a better term, the
7  sale of Business One to Hodell?
8  A.  I think so, but I can't remember for sure.
9  Q.  Okay.  SAP has information relating to
10  Business One that it wants to get out to a
11  partner.  How does it accomplish that?
12  A.  There are a lot of different ways.  We had
13  partner newsletters.  We had monthly partner
14  calls.  We had --
15     Every employee is empowered to e-mail to
16  partners.  We broke down by domain, so in
17  other words, I had sales.  For sales-specific
18  messaging, I could send it to partners.  If
19  it was support, them the support could send
20  it to partners, and if it was marketing,
21  marketing could send it to partners.
22     So there were many different vehicles to
23  get information out to the partners, in fact,
24  too many vehicles to get information to
25  partners.

---

Page 51

1  Q.  Why do you say that?
2  A.  Partners could get ten e-mails a day from
3  SAP.
4  Q.  Have you ever seen something called a Partner
5  Co-op Marketing Guide?
6  A.  Yes.
7  Q.  What's that document?
8  A.  When a partner sells -- for Business One,
9  when a partner sales SAP Business One, they
10  make a percentage on the invoice price, and
11  that goes into what's called a marketing
12  development fund or MDF.
13     The marketing development fund is then
14  available to the partner as they do
15  advertising.  They can apply those funds
16  towards covering their advertising.  So it's
17  additional margin, but it's used specifically
18  to generate leads.
19  Q.  So let's say SAP carves off a portion of the
20  partner's commission on a sale and puts it in
21  a fund earmarked specifically for
22  advertising?
23  A.  It doesn't cut it off.  It actually adds to
24  it, but yes.
25  Q.  Okay.  And partners are given the SAP logo,

---

Page 52

1  correct, to use on their literature?
2  A.  That is correct.
3  Q.  And on their letterhead?
4  A.  There's guidelines, so depending on how
5  they're using it, that's correct.  They can't
6  just say they're SAP, but there is an SAP
7  authorized business partner logo that they
8  can use in their letterhead.
9  Q.  Did SAP review announcements by partners
10  relating to Business One before they were
11  distributed?
12  A.  No, if they were advertising and wanted to
13  use co-op funds, then they had to have them
14  pre-approved as a marketing vehicle, but if
15  they were making an announcement specific to
16  them and how they go to market, the answer
17  would be no.
18  Q.  Did SAP provide partners with a template for
19  announcements?
20  A.  There were -- within the marketing portal, so
21  SAP had what's called a partner portal.
22  Within the partner portal, there is a
23  marketing section.  There would be samples
24  and templates of different things, like a
25  generic press release template or a generic

---

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 53

1 something template.  So I guess, not
2 understanding for sure what specifically you
3 might mean, the answer could be yes.
4 Q.  Let's get specific.
5 A.  Okay.
6 Q.  Show him 73.
7      Exhibit 73 is something we've already
8 marked.  Is this an example of a press
9 release template you were referring to?
10 A.  That is correct, and this would have been
11 reviewed before it went out.
12 Q.  Okay.  Is this a template that is written up
13 by SAP and then the partner just kind of
14 fills in the blanks where it's highlighted
15 there?
16 A.  It's not that templatized, but it's pretty
17 close.  Every partner has different
18 capabilities, and every partner has different
19 specialties.  So they would --
20      What it usually is, we usually ask the
21 partner to write it, and then SAP approves
22 the language and makes sure there's nothing
23 that would not meet with the marketing
24 guidelines.
25 Q.  Have you ever heard of a document called an

---

Page 54

1 SAP blueprint document?
2 A.  Yes.
3 Q.  What is that?
4 A.  I can't remember the timing again, so I
5 apologize.  I'm going to say in the 2006 or
6 '7 time frame -- actually, Dan Kraus probably
7 drove this more than anybody.  There was a
8 marketing asset created that was quite
9 literally the size of a blueprint.  So it was
10 an oversized document.
11      And basically, what it did was it broke
12 SAP down by process, so order to cash or
13 inventory to management or whatever, broke it
14 down by process and then flowcharted it.
15 Q.  Okay.  Was it a sales document?
16 A.  Yes.
17 Q.  Okay.  Do you know who would have prepared
18 it?
19 A.  It was prepared by an outside organization,
20 but again, it was Dan Kraus working with our
21 internal Business One marketing team that
22 created it.
23 Q.  Do you know the time period during which it
24 was used?
25 A.  Again, I'm going to guess.  It was after I

---

Page 55

1 came on board, so it would have had to have
2 been in the 2006, 2007 time frame.
3 Q.  Do you have reason to believe it wasn't being
4 used as early as 2005?
5 A.  I know it wasn't used before that, because it
6 wasn't in existence yet.
7 Q.  Turn to Exhibit 39.
8 A.  Okay.
9 Q.  I'll represent to you you've never seen this
10 before, but there's an e-mail down the bottom
11 from a gentleman by the name of Tim Lowe?
12 A.  I remember Tim Lowe.  Okay.
13 Q.  To Dan Kraus, July 21, 2005, and he starts
14 off, "Hello, Dan, today I had an opportunity
15 to use the blueprint document with a
16 prospect."  Would that be a different
17 document?
18 A.  Yeah, a little conjecture, there might have
19 been something that predated what I am
20 referring to, and I would not be aware of it,
21 because it was before my time.
22 Q.  Do you have Exhibit 74 in there?  While
23 you're looking, do you know who would have
24 the blueprint document at SAP?
25 A.  Oh, man, I doubt anybody -- no, I have no

---

Page 56

1 idea at this point.  You could talk to Dan
2 and see if Dan Kraus might still have some
3 electronic copies of it, because he was so
4 closely involved in creating it.  So he
5 might.
6      But it was oversized.  It wasn't
7 something that was meant to be delivered
8 electronically.  It was meant to be delivered
9 hard copy.  I guarantee it doesn't exist
10 anymore that I can think of.
11 Q.  Is there anything with regards to user counts
12 or data count or anything?
13 A.  In the blueprint?
14 Q.  Yes.
15 A.  Not that I can recall.
16 Q.  Have you seen Exhibit 74 before?
17 A.  Yes.
18 Q.  What is that?
19 A.  This is a copy of a script that would have
20 been on the marketing portal that partners
21 could utilize if they were trying to enter --
22 either have their own telemarketing firm or
23 enter into working with a telemarketing firm
24 to help them generate leads.
25 Q.  Put that away.

---

Page 57

1    (Document marked Exhibit No. 175.)
2    Mr. Ashley, have you seen Exhibit 175
3  before?
4    MR. STAR: Just for the record, is this
5  kind of a compendium exhibit, or is this just
6  one document?
7    MR. LAMBERT: It was produced as a
8  series.  The Bates numbers are sequential.  I
9  have no way of knowing.
10 A.  I'm going to guess, but I think it's a good
11 guess.  This probably came from a PowerPoint
12 presentation.  It was probably used in a,
13 what we call a QBR, quarterly business
14 review.
15    A general manager would put up the names
16 of their various partners and highlight who
17 they were and what they do.  I'm guessing
18 that that might be what this is.
19 Q.  Do you know who would have compiled the
20 information in Exhibit 175?
21 A.  Most likely, the channel managers in the
22 various territories.  They would get the
23 information.  Who put it all together, I
24 don't know.
25 Q.  Okay.  Do you know where it would have been

Page 58

1  kept?
2  A.  If this was from a quarterly business review,
3  it would have been kept -- it would have been
4  given to everybody during those reviews and
5  could have been kept on everybody's computer
6  at that point.
7  Q.  Have you ever seen any of the information
8  that is contained within Exhibit 175?
9  A.  Probably, but I mean, I can't say I remember
10 this exactly.  But again, this is obviously
11 from some meeting where we all got together
12 and talked about all the situations going --
13 I would assume it was a quarterly business
14 review.  I mean, that's what it looks like.
15 Q.  Who would be the best person at SAP to ask
16 about Exhibit 175?
17 A.  Probably me.  Sorry.
18 Q.  Well, someone has to have seen it before, but
19 you just can't specify who?
20 A.  I have probably seen this before being
21 honest, but I couldn't tell you exactly when
22 and under what context.  Again, I think
23 probably a quarterly business review.  That
24 would make sense to me, or it could have been
25 because we had a regional meeting with all of

Page 59

1  our partners in a room and then put something
2  together from that.  But this is some kind of
3  a meeting to say the state of the partner
4  channel, the state of our partners.
5  Q.  Do you know who Forrest Koch is on the second
6  page?
7  A.  I do.
8  Q.  Who is he?
9  A.  Forrest Koch at that time was the owner of
10 the company called Omega.  They were in
11 Portland, Oregon.  He has since sold his
12 business and retired.
13 Q.  Do you know what he's referring to down in
14 the last bullet point?
15 A.  No, actually, I don't.  I mean, specifically,
16 no, I don't.
17 Q.  Do you know who his channel manager was at
18 the time?
19 A.  At that time it was probably Gary Hager.
20 Q.  Spelled like Sammy, H-a-j-e-r?
21 A.  H-a-g-e-r, but that's okay.
22 Q.  Do you know who Ross Unger is?
23 A.  Yes, I do.  Sorry.
24 Q.  That's all right.  We're going to take a
25 break here in a second so -- who is

Page 60

1  Mr. Unger's channel manager?
2  A.  Business First was in Minneapolis and Chicago
3  area, so that would have probably been Ted
4  Steffner and/or Shane Corr.  Timing, it just
5  depends on -- I can't remember when one ended
6  and one started.
7  Q.  He makes the statement, "Good.  He is finally
8  realizing that he is not alone having
9  problems with support and product after
10 hearing from Forrest and Dan."
11    Do you know what he's referring to
12 there?
13 A.  I could only assume.
14 Q.  What's your understanding having been
15 involved with overseeing business partners
16 for SAP Business One 2004?
17 A.  Part of why the frustration in the partner
18 community and myself was that, for example,
19 SAP did not have support personnel in the
20 States.  So if you wanted support, you had to
21 go either to Germany or to Israel, and that
22 was a frustrating experience for partners
23 because of time zones and because of response
24 times.
25    When you see partners referring to a

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

Page 61

1  lack of support, what they're talking about
2  is they have a question; they call SAP; how
3  long before SAP responds back.
4  Q.  Was lack of support an issue for Business One
5  from the beginning of your involvement with
6  the product?
7     MR. STAR: Objection to form.
8  A.  Lack of support's a problem with every
9  publisher and every product.
10  Q.  Well, I'm asking about SAP Business One here
11  today.  Was that an issue with SAP Business
12  One from the time you were hired?
13  A.  Yes.
14  Q.  Who is Bertus Jacobs?
15  A.  I don't know actually.  I apologize, but I
16  don't know Bertus Jacobs.  He's an employee
17  for Illumiti.
18  Q.  Do you know who Illumiti is?
19  A.  Yes.
20  Q.  Do you know who their channel manager was?
21  A.  Where were they located?  I can't remember
22  without looking.  I apologize.  They were on
23  the East Coast.  It might have been -- timing
24  again.  It might have been Dell Ross if they
25  were East Coast depending on the time.  I

Page 62

1  can't remember when Dell was the channel
2  manager.
3  Q.  Do you have any frame of reference looking
4  through this document as to when it might
5  have been prepared?
6     MR. STAR: If you know.  Don't
7  speculate.
8  A.  Well, with the product for 18 months.  So if
9  he's talking about Business One, that would
10  be a year and a half at least, so that would
11  have put it, give or take, 2006 maybe.
12     MR. STAR: Again, don't speculate.  If
13  you know.
14     THE WITNESS: Then I don't know.  Then I
15  don't know.  I can't say for sure or with
16  certainty.
17     BY MR. LAMBERT:
18  Q.  Okay.  And I'll take you -- that
19  qualification that you're making an educated
20  guess, but can you give me an educated guess
21  on when that would be?
22  A.  The only thing that gives me any indication
23  of time frame is Scott McMahon with Apollo
24  with the product for 18 months.
25  Q.  And that's on the page that has SAP 12412 at

Page 63

1  the bottom right-hand corner?
2  A.  Correct.
3  Q.  Looking back to Bertus Jacobs' slide, he
4  makes a statement on the second to last
5  bullet point that, "The market is good and
6  demand is out there.  Product will meet them
7  but is not stable enough."
8  A.  Um-hum.
9  Q.  Do you have an understanding of what was
10  meant by that?
11  A.  I can't, not that I could swear to it at this
12  point.  I'd have to know.  I mean, Illumiti
13  was also a vertical reseller, so it could
14  mean any one of a lot of different things.
15  So I'm don't know for sure.
16  Q.  Okay.  In the final bullet point there, he
17  makes a statement, "Product functionality has
18  gotten better, not quality."
19  A.  Um-hum.
20  Q.  Do you have an understanding of what he meant
21  there?
22  A.  Yeah, the company was improving the feature
23  function capability of the product.  They had
24  not rearchitected the product, which did come
25  later.

Page 64

1  Q.  How much later was this?  When did SAP
2  rearchitect SAP Business One?
3  A.  Again, it's the nature of software.  It's
4  always being improved and upgraded and
5  enhanced and rearchitected.  So the first
6  significant rearchitecture would have
7  probably been maybe '08.
8  Q.  Do you have an understanding of what the
9  architecture of SAP Business One is?  I guess
10  the technical term for it.
11  A.  Well, I mean, I don't know that there is a
12  one -- I guess not unless you can be more
13  specific.
14  Q.  Well, is it a two-tier architecture?
15  A.  Okay.  In that case, yes.
16  Q.  Does SAP have any other products that are
17  two-tier architecture?
18  A.  Well, I don't know exactly how to answer
19  that.
20     Two-tier architecture could be created
21  based on the way you implement a product.  So
22  the answer is you could have a product to be
23  multi-tier or it could be two-tier depending
24  on how you utilize it -- what you put it on
25  and how you utilize it, what database you run

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 65

1 on it. So the answer is, yes, it could.
2     SAP does have other products that could
3 be considered two-tier depending how they're
4 using it.
5 Q.  Well, two-tier was the standard architecture
6 for Business One, correct?
7 A.  Correct.
8 Q.  Was two-tier the standard architecture for
9 any of SAP's products in 2005?
10 A.  Probably. They had so many. I don't know.
11 Q.  Okay. Who's Coastal Range?
12 A.  I think they're Canadian if I remember
13 correctly.
14 Q.  Do you know who Peter vanLeeuwen is?
15 A.  I know who Peter vanLeeuwen is. I don't have
16 a strong relationship with him.
17 Q.  Okay. Turn to the page of SAP 12416. Are
18 you there?
19 A.  I'm there.
20 Q.  "Meeting Summary" is the heading, and there
21 is a bullet point. The first one is Diane?
22 A.  Yes.
23 Q.  Do you know who Diane is?
24 A.  Palmquist, I think. She was with Soft Brands
25 maybe. Maybe I did not see that.

---

Page 66

1 Q.  Good memory.
2 A.  Yes.
3 Q.  Okay. Who was her channel manager?
4 A.  They were in Minneapolis. They would have
5 been Midwest, so Ted and/or Shane.
6 Q.  She makes the statement in her second bullet
7 point, "Issues with DI API is causing them to
8 have to go around API as they need to get
9 things to work. They have to either go
10 through the back door or fix it themselves."
11 A.  Um-hum.
12 Q.  Do you have an understanding of what is being
13 talked about there?
14 A.  I do. Soft Brands was an ISV. They had
15 called -- I just lost it out of my head, but
16 anyway a manufacturing software product. So
17 they were selling their product and having
18 Business One as the accounting engine behind
19 it. So they did all of the manufacturing;
20 Business One did all the accounting.
21     Because of the way they had architected
22 their product, they could not use SAP the way
23 it was originally architected. They had to
24 use some of their own engines. So in other
25 words, they would take -- instead of using

---

Page 67

1 the SAP order screen, they would take their
2 own order screen, and run things through
3 their engine instead of SAP's engine.
4 Q.  So it's your understanding she's not
5 talking about an issue with the Business One
6 DI API itself; she's talking about the way
7 her add-on interacted with the DI API?
8 A.  Well, because of the way our application
9 interface -- sorry. I said "our". The way
10 SAP's application program interface was
11 written did not work in the way their product
12 was written. So they had to use their own.
13 Does that --
14 Q.  Right  What about Peter? Who is Peter?
15 That's Peter vanLeeuwen, isn't it?
16 A.  Yes, it is.
17 Q.  His last bullet point, "The DI API needs to
18 be fixed."
19 A.  Um-hum.
20 Q.  Do you know what he meant by that?
21 A.  From that far back, I'm not sure.
22 Q.  Do you ever recall internal discussions about
23 the DI API needing to be fixed internal to
24 SAP?
25 A.  Well, we had discussions at that time about

---

Page 68

1 how it might be continually enhanced. I
2 don't know whether that means fixed. In
3 other words, it worked as originally
4 developed, and it just needed to be enhanced
5 and improved.
6 Q.  In what respects?
7 A.  Again, the same way that all software has to
8 evolve over time. So as you have new
9 equipment and new capabilities and new
10 hardware and you have to interface with other
11 things, you have to grow over time.
12 Q.  When were those discussions taking place?
13 A.  They always are taking place. I'm not trying
14 to be funny. They are always taking place
15 within a publisher.
16 Q.  Were they taking place in 2004?
17 A.  I wasn't there.
18 Q.  Were they taking place when you joined in
19 2005?
20 A.  In the 30 days in 2005 maybe, but I wasn't
21 involved. I didn't come in until the very
22 end of 2005.
23 Q.  What about 2006?
24 A.  Sure.
25     MR. LAMBERT: Off the record.

---

---

Page 69

1    (A brief recess was held.)
2    BY MR. LAMBERT:
3  Q.  Mr. Ashley, when you joined SAP in November
4  of 2005, what was the marketing strategy for
5  Business One?
6  A.  You know, you'd think I'd be able to answer
7  that easily, but SAP is so specific.  And I'm
8  trying to recall.
9    The marketing strategy was again small
10  to medium enterprises.  It was what you would
11  call horizontal, meaning it wasn't a vertical
12  application because it was so young, so new
13  in its development cycle.  So it was
14  horizontal, meaning not focused on any
15  specific type of an industry, more broad
16  based but small to medium enterprises.
17  Q.  Has the definition of small to medium
18  enterprises within SAP changed over time?
19  A.  I can't answer for today.  While I was there,
20  the definition remained pretty consistent.
21  It was basically whatever the analysts used,
22  like Forrester or IDC, what they had
23  classified it as SAP One with that.
24  Q.  And what was the definition of small to
25  medium enterprises in 2005?

---

Page 70

1  A.  Again, give or take, probably 10 million in
2  revenues up to -- 50 million would be the
3  small, the small to medium enterprise, and
4  then up to about 500 million meaning the
5  medium enterprise.
6    And then SAP internally had a billion as
7  the cutoff for what they called the large
8  enterprise, which were direct deals.  They
9  didn't sell through the partners.
10  Q.  What was the target market for SAP
11  Business One in 2005?
12  A.  The small to medium enterprise, but again,
13  realistically, again, 10 to -- the small to
14  medium enterprise, 10 to 500 million, I can't
15  tell you in '05 what the customer spread
16  looked like, but at that time we were gaining
17  customers very rapidly.  So they were pretty
18  much in all industries by that point, across
19  industries.
20  Q.  Dan Lowery testified that he was told by Dan
21  Kraus that there were -- Dan Kraus used the
22  phrase, no theoretical maximum, in regard to
23  the size of a customer that could be sold SAP
24  Business One.
25    MR. STAR: Objection to form.

---

Page 71

1  Q.  Have you ever heard that phrase used before?
2  A.  I can't testify to what Dan said.  I have not
3  heard him use that.  I would find it hard to
4  believe that he would have.
5  Q.  Okay.
6  A.  I mean, we would never have tried to sell
7  Business One to Coca-Cola, for example.  It
8  just would have never happened.
9  Q.  Why not?
10  A.  Because it wasn't designed for that use, that
11  environment.
12  Q.  In what respect?
13  A.  It wasn't ready for global, for example, if
14  you're an organization that's a global
15  organization.  It wasn't ready for an
16  organization that had a combination of lot of
17  different go-to market strategies.  So they
18  had internal, as well as divisional, as well
19  as departmental, as well as field.
20    They had the need for mobile.  They had
21  requirements and needs that the product
22  wasn't designed to meet at that time.  So
23  that's why saying no theoretical limits, to
24  me, just didn't make sense.  I'm not saying
25  he didn't say it.  I'm just saying I can't

---

Page 72

1  understand why he would have.
2  Q.  With respect to SAP's marketing literature
3  for Business One, do you recall SAP making a
4  distinction between the number of employees
5  and the number of users a potential customer
6  had?
7  A.  I'm sorry.  For Business One specifically or
8  across its portfolio?
9  Q.  Marketing literature for SAP Business One
10  specifically in defining the target market
11  for the product, do you recall SAP making a
12  distinction between the number of employees
13  that the target had versus the number of
14  users the target was anticipating?
15  A.  SAP definitely defined or gave a range for
16  employees.  I don't recall seeing anything
17  saying how many users, because it's almost
18  impossible to know.
19  Q.  Okay.  Have you ever heard the term, sweet
20  spot, used with respect to Business One?
21  A.  Sure.
22  Q.  What was your understanding of what the term,
23  sweet spot, was intended to mean?
24  A.  If you analyzed the number of customers using
25  your product, what industries they're in, how

---

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

**Page 73**

1  they used it, et cetera, et cetera, you could
2  say of the 10,000 customers using SAP
3  Business One, of which there probably were at
4  that period of time, globally, the large
5  percentage of them fall into this area, so
6  that becomes your sweet spot.
7  Q.   Do you recall when the term, sweet spot,
8  first began to be used by SAP with respect to
9  Business One?
10  A.   Well, it's a term that's always used.  As you
11  gain more and more customers, your sweet spot
12  continues to evolve and grow.  By the way,
13  sweet spot refers to many different things.
14  You could have sweet spots within a vertical
15  industry.  You know, the product happens to
16  work well in not-for-profit, for example, or
17  you could have a sweet spot in a certain
18  size.  You could have a sweet spot in a
19  region.
20      So there were many sweet spots, and
21  those sweet spots continue to grow and evolve
22  as you get more and more customers.
23  Basically, it's just data.  As you get more
24  and more data, you can segment your product
25  better.

---

**Page 74**

1  Q.   Do you recall the -- strike that.
2      Do you recall the term, sweet spot,
3  being used by SAP when you joined the company
4  in 2005 with regard to Business One
5  specifically?
6  A.   Again, the term, sweet spot, probably was
7  used.  It would not surprise me.  I probably
8  would have used it.  If someone said where do
9  you work best, we would probably say "our
10  sweet spot is".  So I'm going to say I'm sure
11  we had those discussions.
12  Q.   When you joined SAP in November, 2005, what
13  was the sweet spot for Business One?
14  A.   I would -- I can't say with certainty.  If I
15  remember correctly, I would say the sweet
16  spot would probably have been companies of
17  between -- it would have been broad, because
18  we didn't have as much data as we would have
19  had later.  So it would have been broader by
20  definition.
21      So you would have or I would have
22  probably said the sweet spot is companies of
23  between 50 and 500 employees.  They would
24  have required general accounting
25  functionality, not vertical-specific

---

**Page 75**

1  functionality, because the product did not
2  have it at the time.
3      It would have been companies that would
4  have been more attracted to certain ways of
5  work.  For example, we had something called
6  drill down and around.  So if companies would
7  benefit from the ability to be able to drill
8  down and around, they would have been in the
9  sweet spot.  So a lot of it had to do with
10  their culture and what they perceive as
11  competitive advantage in a technology or
12  product.
13  Q.   Is sweet spot ever defined or in part by the
14  number of users for the software?
15  A.   No, there is no way to do that.  The example
16  would be I could sell a million erasers, but
17  I could sell them at 10,000 a pop, or I could
18  sell five yachts, but sell them at 5 million
19  a pop.  You can't --
20      You know, the number of users or the
21  number of transactions or the number of
22  whatever, those are things that are very
23  independent and very specific to a use case.
24  So it's hard to say.
25      I could have a million employees but

---

**Page 76**

1  only five accounting users.  So it's really
2  hard to say how many people or how many users
3  would be in a sweet spot.
4      I don't know if that -- does that make
5  sense?
6  Q.   Well, I'm a little confused, because I have
7  seen a lot of SAP marketing literature that
8  does define a target market in terms of
9  number of users.  So I'm just trying to
10  understand where the disconnect is.
11  A.   Well, speaking for me and how I would have
12  answered the questions, that's how I would do
13  it.  I don't recall seeing -- again, maybe,
14  and I don't remember.  But I don't remember
15  seeing user-specific marketing materials.
16      There might have been technical
17  documents that said we have tested in these
18  environments, but I don't remember marketing
19  materials.
20  Q.   Were you aware of product testing that was
21  done on SAP Business One during your tenure
22  with the company?
23  A.   Sure.
24  Q.   How so?
25  A.   The products are tested -- you have to test

---

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 77

1  the product every time you make a change.
2  Every time there is a version or a revision,
3  the product has to be tested to make sure you
4  haven't broken something before you deliver
5  it to the market.
6  Q.  Well, how are you as the channel director
7  made aware of what tests were being done and
8  what the results of those tests were?
9  A.  I wasn't.  I was made aware of the fact that
10 the product had been tested, was found to be
11 ready and was released.  So SAP had a process
12 by which the product was released.  When the
13 product went through that process, an
14 announcement was made, so my assumption at
15 that point is it went through that process.
16 It was ready.  We'd sent it out, and we were
17 ready and good to go.
18 Q.  Did you ever have to make a judgment call as
19 to whether Business One was an appropriate
20 product for a customer?
21 A.  I can't remember a specific case.  I might
22 have.  I don't remember a specific case.
23 Partners will ask on occasion what do you
24 think; what should we do.  But I can't
25 remember a specific case.

---

Page 78

1  Q.  Are you aware of Field Kickoff meetings held
2  by SAP?
3  A.  Oh, absolutely.
4  Q.  What are those?
5  A.  The Field Kickoff is a yearly event, normally
6  held in January, and it is where SAP brings
7  everybody together and lists what are our
8  priorities for the year, what are we hoping
9  to accomplish.  We have break-out sessions,
10 skill-building sessions and things like that.
11 Q.  Is it your testimony that SAP did not have a
12 target market for SAP Business One that was
13 based upon company size in terms of employees
14 and/or user count?
15 A.  That would be my testimony and contention,
16 yes.
17 Q.  Is there a process by which a customer places
18 an order for SAP Business One software?
19 A.  Customer meaning like an Hodell?
20 Q.  If Hodell decided it wants to buy 80
21 licenses, how is that order placed?
22 A.  The SAP for Business One at that time -- and
23 I think it's still the case.  SAP does not
24 sell direct, so all orders were placed by
25 partners on behalf of a customer.

---

Page 79

1  Q.  They fill out a form and mail it in or --
2  A.  Electronic.
3  Q.  Okay.
4  A.  By the way, but it was a process.  It was not
5  a Microsoft where you can go online and
6  download it and just click yes.  There was no
7  click through.  So the partner did have to
8  submit an order.
9  Q.  Okay.  What information is provided with the
10 order?
11 A.  Obviously, a company name, address.  There
12 were demographic information, so we would
13 know -- well, what they're ordering, so the
14 product.  They had the number of licenses
15 that they were ordering or seats they were
16 ordering, what industry they were in, their
17 size, revenue size, so demographic
18 information, things that we could track to
19 your earlier point to then figure out what
20 your sweet spot is going to be over time.  So
21 basic customer information.
22 Q.  Was that information also used to determine
23 whether the customer ordering Business One
24 was a fit for the software?
25 A.  No.

---

Page 80

1  Q.  During the order process, is there any kind
2  of analysis conducted by SAP as to whether
3  the customer isn't fit for the software?
4  A.  During the order process?
5  Q.  Right.
6  A.  No.  Then, no.  I don't know today.
7  Q.  Is such an analysis undertaken at all by SAP
8  during the time you were there?
9  A.  No.
10 Q.  Why not?
11 A.  The model that SAP goes to market with -- by
12 the way, which is the same model that
13 everyone in that space goes to market with,
14 so whether you're talking Microsoft or Sage
15 or Infor or any of the competitors.
16     The indirect model, which is selling
17 through a partner, the partner's role and
18 responsibility is to assess whether or not
19 this is a good opportunity.  They place the
20 order.  The publishers then submit that
21 software, normally directly to the end user
22 because of the way the license agreements
23 work.
24     So because these are more volume-based
25 models, it would not be practical to evaluate

---

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 81

1  every single order as to fit and finish.  You
2  just couldn't do it.
3  Q.   That's done by SAP's business partner, in
4  this case, LSi, correct?
5  A.   That's correct.
6  Q.   SAP is, in essence, outsourcing that to its
7  business partner?
8     MR. STAR: Objection.  Form.
9  A.   As I was going to say, it's not outsourcing.
10  It's their role and responsibility.
11  Contractually, it's their role and
12  responsibility.
13  Q.   Hodell ended up executing a licensing
14  agreement with SAP.  Are you aware of that?
15  A.   That's correct.
16  Q.   Did you have any role in communicating with
17  anyone at Hodell about that license
18  agreement?
19  A.   No.
20  Q.   Do you have any knowledge personally about
21  what was represented to Hodell about what
22  that license agreement covered?
23  A.   No.
24  Q.   When is a license agreement typically
25  executed by an end user?

---

Page 82

1  A.   There is no typical, and I don't mean that to
2  be cute.  A lot of partners when they close
3  the deal, they'll place the order with SAP,
4  but the partner will retain the software as
5  they do implementation and setup and things
6  like that.
7     So you could have a customer get the
8  software the day they order it.  You could
9  have a customer get the software a week
10  later.  You could have a customer get the
11  software four months later.  It's really a
12  function of how that partner is delivering
13  that solution.  Remember, that solution is
14  not only just the software, but it's services
15  and a lot of other things.
16  Q.   Would you expect that at the time the
17  customer and the business partner enter into
18  an agreement for the customer to buy
19  Business One software that the signing of a
20  license agreement needs to be raised at that
21  point?
22     MR. STAR: Objection to the form.  He's
23  not a lawyer.  You may answer if you
24  understand.
25  A.   And I didn't understand.

---

Page 83

1  Q.   As the director of the channel for SAP
2  Business One, what was your expectation as to
3  when the existence or the need to sign a
4  license agreement would be raised with the
5  customer, at what point in the sales process?
6  A.   I mean, sales 101, when you meet with the
7  customer, you do sales qualification.  If the
8  customer is qualified and you present a
9  solution and the customer says I like what
10  you're doing and you present a proposal, at
11  that point you're basically saying this is
12  what your license is going to look like.
13     Is that what you're --
14  Q.   Well, SAP had a very specific license
15  agreement form that it used, correct?
16  A.   That is correct.
17  Q.   When in the sales process would you expect
18  that licence agreement or the need for the
19  customer to sign that license agreement would
20  be introduced?
21     MR. STAR: Objection to form.  You can
22  answer.
23  A.   Okay.  When it is done, I have no idea.  When
24  it should be done is very early on.  If I
25  were a partner, I would want to give every

---

Page 84

1  one of my legal documents and Ts and Cs to my
2  prospect then as quickly as I can, so they
3  can review them and look them over and decide
4  because otherwise, you extend your sales
5  cycle.
6     So from a sales 101 standpoint, they
7  should get it day one.  When they do it, I
8  have no -- as a publisher, I have no idea.
9  Q.   Well, would it be unusual for a customer to
10  enter into an agreement to buy SAP Business
11  One that doesn't contain any reference to a
12  license agreement?
13  A.   It's impossible.
14     MR. STAR: Let me finish the question.
15     THE WITNESS: I'm sorry.
16     MR. STAR: I think you should show him
17  the documents, because you're going to end up
18  with a bunch of confused testimony here, but
19  go ahead.
20     BY MR. LAMBERT:
21  Q.   Have you ever seen a development agreement
22  between LSi and Hodell?
23  A.   No.
24  Q.   Okay.  Do you know at what point Hodell
25  executed a license agreement?

---

Page 85

1  A.  You mean the date?
2  Q.  Yeah, around what time.
3  A.  If I remember correctly, December.
4  Q.  Of 2005?
5  A.  2005, I think.
6  Q.  Do you recall how much money Hodell had paid
7  for SAP Business One licenses at the time
8  they were presented the license agreement?
9  A.  I apologize.  I don't.  I know it was --
10      MR. STAR: Don't speculate.
11      THE WITNESS: Okay.  Sorry.  I won't
12  speculate.  I don't remember.
13      BY MR. LAMBERT:
14  Q.  Do you recall how many user licenses Hodell
15  purchased?
16  A.  No, sorry.  I don't remember.
17  Q.  If a partner wanted to educate itself on
18  Business One capabilities, things like that,
19  where would it go?
20  A.  Well, the partner actually doesn't educate
21  themselves.  There was a formal program in
22  process.  So when a partner signed an
23  agreement with SAP, they went through
24  training and had to be authorized.
25  Q.  I saw a reference to something called a notes

Page 86

1  database.  Do you know what that is?
2  A.  (Witness nods.)
3  Q.  What is it?
4  A.  It's a knowledge base.  What the knowledge
5  basis is it's an ongoing growing repository
6  of questions.  FAQ, you know, frequently
7  asked questions?  It's basically a
8  frequently-asked-questions environment.
9  Q.  How was it accessed?
10  A.  It was accessed through the SAP partner
11  portal.  It was open to all partners.
12  Q.  They logged onto a website portal, provided a
13  password and played around in there?
14  A.  Correct.
15  Q.  I've seen something called a Business One
16  discussion forum.  Do you know what that is?
17  A.  In today's terms, a blog.
18  Q.  Was that maintained by SAP?
19  A.  I think I'm correct in saying it was housed
20  by SAP, but I think it's self-maintaining.
21  Q.  What was the discussion forum used for?
22  A.  Same -- kind of like an FAQ.  So partners
23  would go in and put a question out to the
24  world, the partner community, and the partner
25  community would respond back.

Page 87

1  Q.  I've seen something called a Business One
2  knowledge base.
3  A.  These are all the same kinds of things.
4  Q.  Same kinds of things but different entities,
5  right?
6  A.  They could have been.  Some are specific to
7  domain.  So if you're a developer, you might
8  go to one versus a consultant might go to
9  another.  Some were specific to the
10  environments.  Like the ISVs would have their
11  own forums.
12      Because Dan Lowery and LSi was a
13  combination of a VAR and an integrator and a
14  consulting-type firm, they might have gone to
15  several.
16  Q.  What was the knowledge base used for?
17  A.  Knowledge base is the same thing.  It's --
18  essentially, a knowledge base is a learning
19  database.  So as you enter more and more
20  information into it, the knowledge base
21  supposedly gets smarter and smarter.
22  Q.  What about the online qualification tool?
23  A.  Online qualification tool was a template
24  again, and it was put out on the partner
25  portal for partners to use as a training tool

Page 88

1  for their salespeople.
2  Q.  When?
3  A.  When would they use it?
4  Q.  When was it put out?
5  A.  Oh, geesh, again, it was an evolving
6  document.  When it first got put out, I don't
7  know.  Early on.
8  Q.  Was it published when you started with SAP?
9  A.  I don't know.  I don't remember.  It could
10  have been.  I don't remember.
11  Q.  What specifically did this online
12  qualification tool accomplish?
13  A.  It was again as a learning and evolving
14  document.  As we got more and more data as to
15  where the product is best sold or where it
16  fit best or what industries or what kinds of
17  companies, we would go into these documents,
18  and we would improve them and make them
19  available to the partners to shorten their
20  training cycles for their people.
21  Q.  Okay.  Well, let me simplify it.  My
22  understanding of what it is -- I could be
23  wrong -- it's a website where they could go
24  to and enter in data with respect to a
25  respective customer and the website would

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 89

1  spit out whether SAP Business One would be
2  fit or not.  Am I wrong?
3  A.   That's a little bit of an oversimplification.
4  What it could do is it could give you an idea
5  of where you might have issues that you need
6  to address and, therefore, come back with a
7  better idea.  So it would say --
8      Think of a stoplight, green, yellow,
9  red.  So there would be areas where it would
10  be green, no problem whatsoever.  There's
11  areas where it might be yellow, where it
12  would say these are issues where you might be
13  exceeding or on the fringes of what the
14  product was designed to do.  And then there
15  are red saying you're selling into real
16  estate, and it was never designed to go
17  there.  That's how the tool would be used.
18  Q.   Well, what data was entered into the
19  qualification tool to allow it to make that
20  assessment?
21  A.   Hundreds of data points.  I mean, it was a
22  pretty comprehensive document.
23  Q.   Was user count entered?
24  A.   I would assume, yes.  Not even assume.  Yes,
25  yes.

---

Page 90

1  Q.   Was transaction volume entered?
2  A.   I don't -- again, that would be time frame.
3  So it would be tough to answer.  Not knowing
4  the time frame, and then I'd have to see the
5  document at that point in its evolution.
6  Early on, probably not.  Later on,
7  definitely.
8  Q.   Why do you say definitely with respect to
9  later on?
10  A.   Because of more data.  As you get more data,
11  you get more knowledge about where it does
12  well and where it doesn't do well and in what
13  categories.
14  Q.   What about prior Hodell to going live on SAP
15  Business One, was the transaction volume at
16  that point that would have been entered into
17  the online qualification tool?
18  A.   I forgot.  When did he -- I forgot.
19  Q.   March, 2007.
20  A.   Probably.
21  Q.   What about December, 2005?
22  A.   Definitely not.
23  Q.   Do you know what happened between December,
24  2005 and March, 2007, that led to a revision
25  of the qualification tool?

---

Page 91

1  A.   About 10,000 customers, literally.
2  Q.   At some point SAP decided that transaction
3  volume needed to be taken into account in
4  determining whether SAP Business One was a
5  fit for a potential customer?
6  A.   No, it would never have been the case where
7  it was a fit for a specific customer.  It
8  would have been a case where it would have
9  said this is a transaction volume that is
10  towards the higher end; we need to understand
11  more about that before you make this final
12  decision.
13      Go back to the whole Soft Brands thing.
14  Transaction volume may have been an issue,
15  except that Soft Brands had their own engine.
16  So what you would have done is used this
17  document to say we've got an area where we
18  need to do a little bit more exploration and
19  it could be an issue but maybe not.
20  Q.   Isn't it fair to say that transaction volume
21  would be an issue from -- relating to
22  performance of the software from the
23  inception of SAP Business One?
24  A.   Not necessarily.
25  Q.   Why not?

---

Page 92

1  A.   Well, maybe I did a hundred thousand
2  transactions, but I only had three customers.
3  They all did a lot of transactions.  Maybe I
4  only had three inventory items.  So I could
5  have had lots of transactions, but over one
6  or two inventory items.
7      The number, 5,000, in quantity ordered
8  doesn't make the software -- the software
9  doesn't care as much.  If I had to do 5,000
10  individual line items on a single invoice,
11  because I have 200,000 inventory items, for
12  example, in the case of Hodell, if I have
13  very long invoices, which are a lot of
14  transactions on one invoice, that could have
15  an issue.  We wouldn't have known that.
16      That's why the document can only be used
17  as a guideline, and then the partner has to
18  say how is it going to get used in this
19  specific customer's situation.
20  Q.   Wouldn't you agree with me that the
21  transaction volume, the product it handled,
22  was set by the way that SAP Business One was
23  designed?  Correct?  It's not established by
24  the customer?
25  A.   The environment that SAP worked with, meaning

---

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

**Page 93**

1  the database it used, the hardware it ran on,
2  and the way it transacted, the way it opened
3  itself up -- I don't know a better way to say
4  this -- the open architecture of the product,
5  but because it was on an Intel platform meant
6  that there were going to be limits.
7      But those limits were a combination of
8  many factors, and you had to take them all
9  into consideration.
10      So again, you could have had a customer
11  with lot of transactions but not very
12  complicated, lots of individual line item
13  invoices. Maybe they didn't have the need to
14  track history. There are a lot of things
15  that come into play that lead to that. The
16  only thing that the tool can do is suggest
17  where there might be an issue, and you need
18  to do more research.
19  Q. Right. But my question is: Wasn't that
20  issue, which was caused by inherent
21  limitations of the software itself, in
22  existence prior to December of 2005?
23  A. It's the nature again of every piece of
24  software, so yes.
25  Q. So that inherent limitation was there. It

**Page 94**

1  just was not taken into account in this
2  online qualification tool until later on?
3  A. The limitation was there. It took until
4  later on to determine what the numbers really
5  were.
6  Q. And that is through field experience or
7  through internal testing?
8  A. A combination of the above, both.
9  Q. So part of it is SAP installs the product,
10  and a customer, they have problems because of
11  transaction volume. SAP comes back and
12  revises its sweet spot because of it; is that
13  correct?
14  A. That could happen, yes.
15  Q. In other words, SAP hasn't predetermined
16  whether a customer is going to be a fit or
17  successful in implementing the software
18  necessarily before the customer buys it; is
19  that fair?
20  A. SAP hasn't predetermined the fit before the
21  customer buys it?
22  Q. They're relying upon field experience to
23  whittle down its sweet spot. Is it fair to
24  say there's instances when they sell SAP
25  Business One to a customer and SAP is not

**Page 95**

1  sure whether it's actually going to be a
2  successful implementation?
3  A. Since SAP doesn't have that data prior to the
4  sale, that would be a correct statement. The
5  other thing to remember is that the software
6  is being sold with a combination of other
7  things attached to it. So all of those
8  things impact it. SAP wouldn't know what
9  else is being attached to it, for example.
10  Q. Well, they knew that In-Flight was being
11  attached to Business One prior to Hodell
12  implementing the software. Did SAP know
13  that?
14  A. No, we would have no way to know that.
15  Q. Do you know if the license agreement that SAP
16  has an end user sign is negotiable?
17      MR. STAR: Objection to form. He's not
18  a lawyer. You haven't established a
19  foundation that he was involved in it.
20  Q. You are familiar with the form license
21  agreement that end users signed, correct?
22      MR. STAR: Objection to form. You can
23  answer.
24  A. Had I seen the license agreement?
25  Q. Right.

**Page 96**

1  A. Yes.
2  Q. Did SAP allow end users to negotiate the
3  terms of that agreement?
4      MR. STAR: Objection to form. You can
5  answer.
6  A. SAP rarely in Business One, not in big SAP,
7  in Business One, SAP rarely talked to the end
8  user before the purchase. So we might
9  negotiate with a partner. Is that --
10  Q. Yes. Okay. So there are instances that
11  you're aware of where a partner was able to
12  change the terms of whatever form license
13  agreement SAP had proposed?
14  A. Depending on the terms, yes.
15  Q. Do you recall when you first heard of
16  Hodell-Natco?
17  A. Yes.
18  Q. When?
19  A. It would have been late November, early
20  December of 2005. Excuse me.
21  Q. Right when you began with SAP?
22  A. Correct.
23  Q. Under what circumstances did you learn of
24  Hodell?
25  A. Pipeline and forecast meetings.

Page 97

1  Q.  From who?
2  A.  My channel managers.
3  Q.  Okay.  Would that be Ted Snucker at the time?
4  A.  Yes.
5  Q.  What did he tell you?
6  A.  He would have -- for every partner in the
7  region, I would have known what their
8  pipeline was.  For an opportunity of the size
9  of the Hodell-Natco opportunity, I would have
10  known the name of the company.  In other
11  words, if he had 50 deals, I wouldn't know
12  all 50 names.  I would probably known the top
13  10 or 15 names.
14      So I would have known the name, Hodell.
15  I may not have known who they were or what
16  exactly it was, but I certainly would have
17  known we have this opportunity; it's expected
18  to close by this date for approximately this
19  amount, this partner and what are the next
20  steps.
21      And then by the way, we had three
22  criteria.  So it was best case, worst case --
23  or best case, probable case, worst case.
24  Q.  What's the pipeline?  I think I know what it
25  is, but I just want to make sure we're on the

Page 98

1  same page.
2  A.  It's the channel manager's report on what
3  they think they're going to bring in in that
4  month or quarter.
5  Q.  Okay.  Is it fair to say that Hodell was a
6  high profile account in November of 2005?
7  A.  Yes.
8  Q.  Why is that?
9  A.  Two reasons, at least two reasons.  One is
10  because of the size of the opportunity.  The
11  second would have been because of the brand
12  recognition of Hodell in their market.
13  Q.  Isn't the third that LSi was developing this
14  add-on that would allow SAP to get into a
15  different --
16  A.  That would be the brand.  That would be the
17  brand piece that I referred to, yes.  It
18  would give us the ability to get into a
19  market segment.
20  Q.  And that was In-Flight Enterprise, right?
21  A.  Correct.
22  Q.  Did you play any part of the sales process to
23  Hodell?
24  A.  No, none whatsoever.  I came in so late.
25  Q.  Was it essentially sold before you started at

Page 99

1  Business One --
2  A.  Essentially.
3  Q.  -- or SAP?
4  A.  Yeah, essentially.
5  Q.  In what respect?
6  A.  Well, given the nature of sales cycles, if a
7  customer is going to buy within 30 days of
8  this large of a deal and especially with
9  vertical software added on to it, if you're
10  making a decision within one month of when I
11  came on board, that decision has already been
12  made.  All you're really doing is waiting for
13  all the POs and the legal and all that stuff
14  to be done.
15      The decision to buy is pretty much done
16  by then.
17  Q.  Were you aware that Hodell had signed a
18  document called a development agreement?
19  A.  I had no idea.
20  Q.  Did you ever become aware of such an
21  agreement?
22  A.  No.  Let me rephrase.  Dan Lowery may have
23  said to me at one point in time we're
24  developing something specific, because it's a
25  vertical add-on.  So he may have said it.  I

Page 100

1  don't recall ever being made aware of that
2  document.
3  Q.  Can you show him Exhibit 40?
4  A.  Don't read it?
5  Q.  You're free to read it if you want.
6  A.  I pass.
7      MR. STAR: Is that on your leisure
8  reading list today?
9      THE WITNESS: Yeah, that's correct.
10      (Document marked Exhibit No. 176.)
11      BY MR. LAMBERT:
12  Q.  I give you 176.  Please review it and let me
13  know when you're ready.
14  A.  Okay.
15      Okay.
16  Q.  Do you recall sending the e-mail that's
17  marked Exhibit 176 on or about December 22nd,
18  2005?
19  A.  Sure.
20  Q.  Do you know what the purpose of this e-mail
21  was?
22  A.  Yeah, it was to fire up the team to close out
23  the year strong, sales.
24  Q.  You guys were a little behind at that time?
25  A.  It says we were.  We made our number though.

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

Page 101

1  Q.   What was the goal, the goal you reference in
2  that first sentence?
3  A.   It would be revenue.
4  Q.   What was the number?
5  A.   Oh, honestly, I can't remember.  It was a
6  quarterly goal.  I would be guessing.  5
7  million.  I don't know.  I honestly don't
8  remember.
9  Q.   Is this an e-mail you sent out frequently?
10  A.   Well, it wasn't a template, but I would
11  communicate with my team all the time, sure.
12  Q.   Did you send out like a periodic e-mail that
13  you would send out, or is there something
14  specific that precipitated this particular
15  communication?
16  A.   Well, I was brand new at that time, still
17  getting to know the team, tying to pull
18  everybody together, trying to send out
19  messages, trying to get everybody to work as
20  a team, all that kind of stuff.  I hate to
21  say it, but kind of a rah-rah communication.
22  Q.   You make the statement -- if Mr. Star doesn't
23  object, I'm going to point it out.  Right
24  here.
25  A.   Okay.

Page 102

1  Q.   "We have kept our eyes focused on the goal
2  though product-related issues have distracted
3  us and derailed our plans."
4  A.   Um-hum.
5  Q.   What were you referring to there?
6  A.   I have no idea.  It could have been delays.
7  I mean, remember, again, I'm on board 30 days
8  when this went out, maybe a little more than
9  that, 45 days.  So it would have been
10  whatever I had learned up to that time.  I
11  don't remember.
12  Q.   That's what I am interested in knowing.
13  You had only been with SAP for maybe two
14  months, right?
15  A.   Um-hum.
16  Q.   And you're aware already of product-related
17  issues with respect to Business One, correct?
18  A.   I was beginning to learn of whatever issues
19  might have been around, yes.
20  Q.   Were you briefed on those issues upon
21  becoming employed by SAP?
22  A.   No, not at all.
23  Q.   How did they come to your attention?
24  A.   Talking to my people, talking to our
25  partners, you know, coming on board and due

Page 103

1  diligence, just getting on the phone and
2  getting out there and meeting.
3  Q.   Do you recall any specific issues you are
4  referring to in that sentence?
5  A.   I don't.  I don't recall specific issues.
6  Q.   Do you recall any issues at all around
7  December of 2005 that you remember
8  discussing?
9  A.   I don't.  If I had another e-mail that could
10  help me remember, I might, but I don't
11  remember exactly.  I mean, floods and natural
12  disasters, obviously, that's a hurricane, but
13  I don't remember what the product issues
14  were.
15  Q.   Up in that first paragraph, you make a
16  statement that you need to drive each of the
17  partners to meet their commitments."
18  A.   Um-hum.
19  Q.   What kind of commitments are you talking
20  about?
21  A.   Forecast.  So if they say I'm going to do $3
22  million this quarter, they need to do $3
23  million this quarter.
24  Q.   How often did partners communicate with you
25  or your team about their forecasts?

Page 104

1  A.   Weekly at least.  I mean, specific deals
2  could be daily, but we would get weekly
3  updates.
4  Q.   Do you recall how often your team was updated
5  on the Hodell sale?
6  A.   I have no idea.  Again, weekly.  I mean, that
7  would be the normal cadence.  So Ted should
8  have been talking to -- I don't know if it's
9  Dan, but Dan's VP of sales or whoever it
10  would have been on a regular basis.
11  Q.   Who was in your job before you?
12  A.   Actually, Dan Kraus, I guess, would have been
13  in my job before me.
14  Q.   Okay.
15  A.   The position as I took it didn't exist, but
16  Dan would have been the closest thing to it.
17  Q.   He was handling your responsibilities and
18  then they brought you in to promote him?
19  A.   Pretty much.  Pretty much.
20  Q.   Turn to the next page.  At the end of that
21  top paragraph, you make this statement, "Make
22  no mistake.  This was not the culture one
23  year ago.  Our partners wouldn't have allowed
24  these opportunities to slip into the next
25  calendar year, but it now as a matter of

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 105

```
 1  pride they are driven to bring these deals
 2  home."
 3  A.  Um-hum.
 4  Q.  What did you mean by that?
 5  A.  As I mentioned, we had a cadence that was a
 6  worst-case/best-case scenario, and the
 7  partners -- we were holding the partners to
 8  that, and they were -- the culture that we
 9  were establishing was that if you say you're
10  going to close a thousand dollars and you
11  lose an opportunity during the month, you
12  still have to meet the thousand dollars if
13  you committed to it; go find something to
14  replace it.
15      So again, this is all sales related.  So
16  we were establishing the culture
17  accountability, and of course, that was
18  establishing the culture of growth.
19  Q.  How did you know what the culture at SAP was
20  one year before you joined the company?
21  A.  Because I had spent the last 45 days or so
22  talking to everybody I could talk to.
23  Q.  You make the statement in the next paragraph,
24  starting with "Ted" -- is that Ted Steffner?
25  A.  Ted Steffner, yeah.
```

Page 106

```
 1  Q.  "He has a large number of charter members on
 2  his team, and they have paid the price for
 3  some of the issues that we haven't covered in
 4  our journey towards relevance."
 5  A.  Um-hum.
 6  Q.  What did you mean by that?
 7  A.  The Midwest, for whatever the reason, if you
 8  looked at the founding partners, the first,
 9  you know, one through ten partners, for
10  example, I think six of them of were in the
11  Midwest.  So the Midwest had --
12      Well, Dan Carr was No. 1.  Lowery was
13  very early on, and so when they came on
14  board, we didn't have channel managers.  We
15  didn't have regions.  We didn't have a lot of
16  stuff ready to go.  So the partners who came
17  on board to begin with came on board without
18  a lot of system in place to support them,
19  didn't have a lot of resources to support
20  them.
21      So as SAP was growing and as the
22  marketing engine was getting going and as the
23  leads were starting to come in, it was
24  getting easier and easier.  The first group
25  had it the hardest, because they were the
```

Page 107

```
 1  first group.
 2  Q.  Doesn't that also mean that they had to bear
 3  the burden of the fact that the product was,
 4  as you stated, not ready for prime time?
 5      MR. STAR: Objection to form.  You can
 6  answer.
 7      THE WITNESS: I can't answer?
 8      MR. STAR: You can.  Okay.  Sure.
 9  A.  Well, yeah, I mean at that point in the --
10  yeah, absolutely.
11  Q.  What happens to a business partner if they
12  sell SAP Business One to a customer and the
13  implementation fails?
14      MR. STAR: Objection to form.
15  A.  I don't know how to -- I don't know how to
16  answer.  I'm not sure I understand.
17  Q.  Does the business partner lose all of the
18  revenue that's received as part of the sale,
19  or do they have to give it back?
20  A.  I don't know.  It would depend on that
21  situation.  If that customer demands a refund
22  and that partner provides the refund, then
23  the answer would be yes.  If the partner
24  doesn't, the answer would be, no.  I don't
25  know.
```

Page 108

```
 1  Q.  Who decides whether a refund is provided?
 2  A.  The partner.
 3  Q.  Does SAP?
 4  A.  Decides the partner has to refund?
 5  Q.  Yes.
 6  A.  No, you can't do that.
 7  Q.  You make the statement at the end of that
 8  paragraph, "LSi should be sending in the
 9  Hodell-Natco order today, which will be the
10  largest deal closed this quarter and possibly
11  this year.  Way to go, Ted, and way to go
12  LSi," correct?
13  A.  Correct.
14  Q.  What did you know about the Hodell-Natco
15  deal at that time?
16  A.  What did I know?
17  Q.  Yes.
18  A.  I knew Hodell-Natco.  I knew LSi.  I knew the
19  size of the deal.  I knew the expected close
20  date, and I knew the probability that it
21  would close.
22  Q.  What was the size of the deal as you
23  understood it?
24  A.  Oh, don't remember.  What was reported to me
25  was dollars to SAP, but I don't remember what
```

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

**Page 109**

1  they were.
2  Q.  What is the -- when you say largest deal
3  closed this quarter and possibly this year,
4  what are you referring to in terms of
5  largest?
6  A.  Meaning if I looked at every one of the
7  license agreements submitted over the course
8  of a year, it would have probably been the
9  one for the most revenue to SAP.
10  Q.  How is the revenue to SAP determined?  Is
11  that based upon users?
12  A.  Yes, price per user, list price minus the
13  margin.
14  Q.  So that was the largest user order for SAP
15  that quarter and possibly that year?
16      MR. STAR: Objection to form.  You can
17  answer.
18  A.  Okay.  I mean, I wrote it, so it could have
19  been.  I mean, I said possibly, so possibly.
20  When I said possibly, it means I probably
21  didn't do a lot of research first, but it
22  could have been.
23  Q.  How would you have determined that?
24  A.  I would have gone into our internal systems
25  and listed all the orders for the year and

---

**Page 110**

1  seen if there were any larger.
2  Q.  What internal system are you talking about?
3  A.  SAP.  I mean, our own internal SAP system.
4  Q.  Well, was there a file folder labeled orders
5  for 2005 in it or --
6  A.  Sure.
7  Q.  Okay.
8  A.  I mean, it wasn't that simple, but sure, I
9  mean, I'd go in and say all orders for
10  Business One from January 1st through
11  December 31st.  And it would list all the
12  orders.
13  Q.  And you could sort them by number of users or
14  licenses ordered or --
15  A.  I can't remember if I could do that.  I could
16  certainly by revenue, and then I could divide
17  and get an idea of number of licenses.
18  Q.  You make a statement in the next paragraph,
19  and I'll help you out here.  "We are truly
20  standing at the precipice.  When you close
21  these multi-site opportunities, it will send
22  yet another message to the industry and the
23  channel."
24  A.  Um-hum.
25  Q.  What do you mean by multi-site opportunities?

---

**Page 111**

1  A.  Meaning we are closing customers that have
2  more than one location.
3  Q.  Was that something that was new to the
4  Business One market at the time?
5  A.  It was new to the Business One history at the
6  time.  So in other words, when you first
7  start in a marketplace and nobody knows you
8  exist, you don't start with the very large
9  complex deals.  You have to get known.  So we
10  were becoming known.
11  Q.  Okay.  Was Hodell the first or one of the
12  first multi-site customers for SAP Business
13  One, to your knowledge?
14  A.  Maybe.  It could have been.
15      (Discussion held off the record.)
16      BY MR. LAMBERT:
17  Q.  Can you think of any other multi-site
18  business opportunities for Business One in
19  and around December of 2005, other than
20  Hodell?
21  A.  It would be -- I would be guessing.  I mean,
22  I don't know for sure.  I couldn't say for
23  sure.  Actually, I don't even remember Hodell
24  to be multi-site.  I am not saying it wasn't.
25  I'm saying I don't even remember that it was

---

**Page 112**

1  or is.
2  Q.  Okay.
3  A.  By point of clarification, this paragraph is
4  specifically to the Southeast, which Hodell
5  wasn't.  So I can tell you that RonJon, who
6  we sold to, and Welbourne who we sold to,
7  both of those were multi-site.  So they
8  wouldn't have been the only, and they
9  wouldn't have been unique.
10      And RonJon, if you know anything about
11  RonJon, here is a good example of a very high
12  transaction volume organization.
13  Q.  How many user licenses did RonJon purchase?
14  A.  It was a lot, because they had again many
15  locations.  I can't remember, but they had
16  stores.  So they not only had their corporate
17  offices but all their store locations, so I
18  can't remember how many, but it was a very
19  large opportunity.  And because they were
20  retail, huge number of transactions.
21  Q.  Okay.  Did they purchase as many licenses as
22  Hodell purchased?
23  A.  I don't know.  Honestly, I don't remember.
24      (Document marked Exhibit No. 177.)
25  Q.  Can you review 177 and let me know when

---

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 113

1  you're finished?
2  A.   Okay.
3       Okay.
4  Q.   Exhibit 177 is an e-mail from yourself to
5  Michael Sotnick dated January 2nd, 2006.
6  A.   Yes.
7  Q.   Do you recall sending that?
8  A.   Not really, but I'm looking at it.  It came
9  from me.
10 Q.   Sotnick was senior VP overseeing Business One
11 and A1 at this time?
12 A.   That is correct.
13 Q.   He reported to a guy named Rodney Seligmann?
14 A.   That is correct.
15 Q.   By the way, who did Rodney Seligmann report
16 to?
17 A.   I can't remember who.  It was a rotating
18 door.  I can't remember who it was at that
19 time, but he reported to essentially the CEO
20 of the Americas.
21 Q.   Was that Bill McDermott?
22 A.   No, it would have been whoever he was right
23 under.  No, I'm sorry.  He reported to the
24 president of the Americas, and Bill McDermott
25 was the CEO.  Rodney reported to somebody who

---

Page 114

1  reported to Bill.  I can't remember who the
2  somebody was at that time.  We went through
3  too many.
4  Q.   Niels Stenfeldt, do you know who he is?
5  A.   Yes, he was Germany though.  He was not in
6  the Americas.
7  Q.   Manfred Weis?
8  A.   No, definitely not him.  Manfred was a peer
9  to me.
10 Q.   You start out Exhibit 177 -- what is this,
11 recapping your first few months on the job
12 really?  Right?
13 A.   Exactly, yes.
14 Q.   The very first item of discussion is
15 Hodell-Natco, correct?
16 A.   Yes.
17 Q.   And you state, "We were able to close our
18 first six-figure opportunity"?
19 A.   Yes.
20 Q.   Does that mean that Hodell at the time was
21 the largest order ever placed for SAP
22 Business One, to your knowledge?
23 A.   In North America.
24 Q.   From product inception until the time you
25 sent this e-mail, Hodell was the largest,

---

Page 115

1  correct?
2  A.   That is correct.  In North America from what
3  I knew at that time, correct, so if there was
4  somebody bigger, it was a mistake by me.  But
5  to my knowledge at that time, they were the
6  largest.
7  Q.   In terms of revenue and by virtue of what we
8  talked about before, user order too, correct?
9  A.   You can infer that, correct.  I mean, it
10 could be possible -- it's possible that it
11 could be a fewer number of users and a lot of
12 different SAP products, like ten users but a
13 whole bunch of different products.  So it's
14 possible.
15      So this doesn't necessarily say how many
16 users it is, but it was probably quite a few
17 users.  I mean, it implies that.
18 Q.   You know that Hodell didn't buy anything
19 other than SAP Business One licenses, right?
20 A.   I don't remember.  If you're saying that, but
21 I don't remember.
22 Q.   Well, if I represent to you that they didn't,
23 then this would be the largest in terms of
24 revenue, end users, correct?
25      MR. HULME: Objection to form.

---

Page 116

1  Q.   Eliminating the possibility they could have
2  purchased other products?
3  A.   If they hadn't purchased anything else and
4  this is strictly a user count at $105,000,
5  then from what I would have known at the
6  time, it was the largest, correct.
7  Q.   In fact, you make this statement.  "This was
8  an important win, not only for its size, but
9  also for the fact it is the first of what we
10 hope to be many new customers in the fastener
11 micro-vertical."
12 A.   Um-hum.
13 Q.   So you'd recognize that this was an important
14 sale, because it was a big, a large number of
15 users, correct?
16      MR. STAR: Objection to form.
17 A.   No, not because of the large number of users,
18 but because Hodell-Natco was very well-known
19 within their industry.
20 Q.   You are simply reference size?
21 A.   Sure.  I'm a sales guy.
22 Q.   What's the size you're referring to?
23 A.   The dollars.  It's important to us, because
24 it's a lot of money, and it's important to us
25 because Hodell-Natco is a really well-known

---

Page 117

1  customer in an industry that we want to
2  target.
3  Q.  What's a micro-vertical?
4  A.  That would be, in addition to going into
5  distribution, which is a vertical, we're
6  going into fastener distribution, which is a
7  micro-vertical.
8  Q.  In fact, you reference, "LSi's creation of a
9  vertical solution specific to Hodell's
10  industry," correct?
11  A.  Correct.
12  Q.  So is it fair to say that at least by
13  January, 2006, you were aware of the
14  development of In-Flight Enterprise?
15      MR. STAR: Objection.
16  A.  I was aware that LSi had a vertical for the
17  fastener industry absolutely.
18  Q.  You're hoping that selling Business One to
19  Hodell, in combination with In-Flight
20  Enterprise, would allow Hodell to serve as a
21  referencable customer that would allow SAP to
22  penetrate the fastener industry marketplace,
23  correct?
24      MR. STAR: Objection to form.  SAP did
25  not sell to Hodell.  You can answer if you

Page 118

1  understand it.
2  A.  My hope was that we would have a happy
3  customer that would be referencable that we
4  could use to drive additional sales into the
5  fastener industry.
6  Q.  An industry into which you had not, you
7  meaning SAP, had not sold Business One
8  previously, correct?
9  A.  Might have, but not as a part of a formalized
10  marketing campaign or program.
11  Q.  Do you have any data points that you could
12  reference with respect to fastener industry
13  implementations of Business One at the time?
14  A.  Didn't track it to that level, no.
15  Q.  Under Q4 challenges --
16  A.  Yes.
17  Q.  -- you state -- and you can read it.  "The
18  first and most obvious challenge we faced in
19  Q4 was the issue surrounding a product.  We
20  were forced to deliver a series of conference
21  calls to our entire channel, in which we
22  notified our partners of significant issues
23  with the product.
24      "This could have been disastrous for the
25  team if the business partners were allowed to

Page 119

1  get distracted by the negative noise
2  surrounding failed Business One
3  implementations."
4  A.  Um-hum.
5  Q.  What were you talking about in that
6  paragraph?
7  A.  Again, I can't say exactly.  I can assume,
8  but it could be anything from we delayed
9  release of the product.  It could have been
10  we released a product that had an issue.  It
11  could have been something very specific.  It
12  could have been something very general.  I
13  actually don't know.
14      But I know we did something that caused
15  some failed implementations.
16  Q.  The plain reading of that paragraph is that
17  this was the single largest issue that you
18  dealt with in your first few months on the
19  job at SAP.  You don't recall what any of the
20  issues were?
21  A.  I don't recall.  I can't say exactly -- I
22  mean, again, there were issues with the
23  product.  So the issue could have been --
24  well, for example, one of the issues with the
25  product was that we couldn't print a check

Page 120

1  register.  It didn't work, so we had to fix
2  that.
3      There is lots of little things that you
4  have to do to fix a product when you first
5  release it to the marketplace, and again, it
6  could have been that in order to fix all of
7  that kind of stuff that we had on the list,
8  we were late getting it out.  And so there
9  were people that couldn't wait any longer.  I
10  can't say exactly, because there were issues.
11  Q.  Were troubles printing checks something you
12  would qualify as significant issues with the
13  product?
14  A.  Sure.  If you couldn't print checks and you
15  were a business, that would be an issue.
16  That would be a big issue.
17  Q.  Something that would cause you to have a
18  conference call with the entire channel?
19  A.  Yeah.
20  Q.  Is that something that would cause a failed
21  implementation of Business One?
22  A.  Again, it could be a failed implementation if
23  somebody had as a requirement the need to cut
24  checks; they couldn't cut checks; and the fix
25  was late in getting released or whatever the

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

Page 121

1  issue might have been, then, yeah, it could
2  have failed the implementation.
3      I'm telling you something did happen,
4  and something caused a failed implementation
5  or I wouldn't have written it.  I don't
6  remember exactly what it was.
7  Q.  Do you recall any specific failed
8  implementations in fourth quarter 2005?
9  A.  I don't recall specifically, no.  Again,
10  there probably was, but I don't recall.
11  Q.  Do you recall Ted Steffner or Dan Lowery
12  telling you that they had informed
13  Hodell-Natco that there was significant
14  issues with the product in the fourth quarter
15  2005?
16  A.  No.
17  Q.  Is that something you would have expected to
18  be conveyed to a potential customer?
19  A.  No.
20  Q.  Why not?
21  A.  It depends on what the issue was, and it
22  would depend upon when the issue was going to
23  be resolved.  It depended on when they're
24  going to buy it, and it depended on when they
25  were going to go live with it.

Page 122

1      I mean, think about if Hodell-Natco --
2  it was 2007 before they went live, and this
3  is in 2005.  Then would I assume those issues
4  to be resolved by the time they needed the
5  product to do what it needed to do?  The
6  answer would be, yeah, absolutely.
7      So what would need to be communicated
8  was if we knew of something that was very
9  specific to what they had to have done and we
10  knew that it couldn't do it, but I'm telling
11  you that was probably not the case here.
12  Q.  What if I told you that as of the fourth
13  quarter 2005 Hodell-Natco had paid in excess
14  of $180,000 towards Business One licenses,
15  would you have expected the fact that there
16  was significant issues with the product to be
17  communicated to them at that time?
18      MR. STAR: Objection to form.  Assumes
19  facts not in evidence.  Go ahead.
20  A.  Again, the significant issue has to be the
21  significant issue.  I don't know.  It would
22  have depended on what the issue was and
23  whether or not it would have impacted what
24  they needed to get done.
25      Remember, In-Flight could have taken --

Page 123

1  could have done what a lot of the issues were
2  in our product anyway.  Maybe we could have
3  never seen them.  Again, there is no way to
4  know.  I have no way to know.  There might
5  not have been any issue whatsoever that
6  impacted them.
7  Q.  If you were in-house and you had purchased
8  software for your company and had paid in
9  excess of $180,000 to that point and the
10  entity from which you were purchasing it had
11  such significant issues with the software you
12  were buying that it was getting at its
13  channel partners on the phone to discuss it
14  with, would you have expected that that would
15  have been -- that you would have been made
16  aware of that fact?
17      MR. STAR: Objection to form.
18  A.  Only if that -- only if the issue was going
19  to be able to impact my being able to use the
20  software.  Again not knowing if it would or
21  not, no.
22  Q.  You made the statement if it's something that
23  you would assume would be fixed by the time a
24  company went live, you wouldn't think it
25  would be necessary to inform a company like

Page 124

1  Hodell that there's an issue like that?
2  A.  Well, two years in software is forever.  So I
3  would say that the assumption would be it
4  wouldn't be an issue.
5  Q.  Well, we know that there are issues that just
6  can't be fixed, right?
7      MR. STAR: Objection to form.
8  A.  I don't know.  It would depend on the issue.
9  Q.  What about the issues that Hodell encountered
10  in its implementation of Business One?
11  A.  I haven't seen Business One for a couple of
12  years now, but it's possible that works fine
13  today.  I don't know.
14  Q.  You don't know that, right?
15  A.  I don't know that.
16  Q.  So if you don't know something is going to be
17  fixed or not, shouldn't you tell the customer
18  about the existence of that issue and let the
19  customer make an educated decision about
20  whether to go forward or not?
21      MR. STAR: Objection to form.
22  A.  Only if you knew it was going to be an issue.
23  Again, I have to go back to my point and say
24  I don't know that there were any issues with
25  what Hodell wanted or needed to do that this

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

Page 125

1  is referring to, that this paragraph is
2  referring to. I don't know if any of these
3  are issues that they would have had.
4  Q. But if there was an issue and you weren't
5  sure whether it would be resolved by the time
6  they went live or soon thereafter, wouldn't
7  you agree with me that that is something that
8  should be disclosed to the customer?
9      MR. STAR: Objection to the form.
10 A. Any issue?
11 Q. Any issue that was going to impact their use
12 of the software.
13 A. If there was an issue that would impact their
14 ability to use the software as sold, then,
15 yes, if you knew that it could not be
16 overcome.
17 Q. What about if you knew that there was a doubt
18 as to --
19 A. No, that's fine. Sure.
20 Q. Right?
21 A. Sure.
22 Q. I mean, Hodell doesn't buy software hoping
23 it's going to work, right?
24 A. Sure.
25    (The luncheon brief recess was held.)

Page 126

1  A F T E R N O O N  S E S S I O N
2    BY MR. LAMBERT:
3  Q. Mr. Ashley, we're back on the record. I've
4  asked you to take a look at Exhibit 118. If
5  you could review that and let me know when
6  you're finished.
7  A. (Witness complies.)
8    Okay.
9  Q. Do you recall what's being discussed in
10 Exhibit 118?
11 A. Yes, I mean in general, yes.
12 Q. What was the issue between Dan Kraus and Dan
13 Lowery as you recall it?
14 A. There was an award program in place for
15 partners that was in place before I got
16 there, but it was a part of the -- I can't
17 remember if it was fiscal year or just fourth
18 quarter. But the idea is that the partner
19 that had the most customer adds and the
20 highest revenue would go on a trip, and SAP
21 would pay.
22 Q. And Dan Lowery contended that he had been
23 promised by Kraus that if he brought in
24 Hodell that he would get to go on that trip?
25 A. That's what's this is informing, yes.

Page 127

1  Q. Okay. Dan Kraus said -- well, in one reply,
2  Dan Kraus said, "The comment was 'You,'"
3  meaning Lowery, "don't get the trip without
4  Hodell," but there also was some other
5  criteria involved, correct, or an additional,
6  in addition to bringing in Hodell, correct?
7  A. Yeah, Dan Kraus is suggesting that, in
8  addition to the revenue from bringing in
9  Hodell, it was also how many other customers.
10 So new customer adds.
11 Q. Do you recall why he made Lowery's award of
12 the top ten trip conditional upon Hodell
13 specifically?
14 A. I don't know that he did make it on Hodell
15 specifically. It was on revenue, and Hodell
16 was large enough that that made him qualify.
17 Q. So that the Hodell sale alone was going to
18 qualify him for the revenue aspect of it, but
19 not the customer adds?
20 A. That's what I'm inferring from this, yes.
21 Q. Were you personally involved with this
22 discussion between Dan Kraus and Dan Lowery?
23 A. I mean, I'm cc'd on it so -- it would be
24 appropriate that I were to be cc'd on this,
25 given my role.

Page 128

1    I don't remember it exactly. Again, I
2  remember sales competitions, and this is
3  consistent with what we would have done. But
4  I don't remember this exact interchange.
5  Q. Do you have any reason to doubt Dan Lowery's
6  contention that he was promised the trip
7  based solely upon the Hodell sale?
8  A. I mean, I don't have any reason to doubt it.
9  I don't have any reason to -- I can see both
10 sides on this one. I can see Dan hearing,
11 "Bring in Hodell you get the deal" -- Dan
12 Lowery -- excuse me -- hearing it, "Bring in
13 Hodell, you get to the deal." I can
14 certainly understand Dan Kraus saying there
15 are two criteria, new customer adds and
16 revenue.
17 Q. Okay. Would you go to Exhibit 72?
18 A. 72?
19 Q. Have you ever seen Exhibit 72 before?
20 A. Not that I know of. Hold on a second.
21 I have not seen this before, no.
22 Q. Do you have any understanding based upon your
23 several years of employment with SAP what
24 Exhibit 72 is?
25 A. Yeah, I'm assuming that under the SAP ISV

Page 129

1  program, of which Dan was a member, that they
2  also had some kind of -- it would be the ISV
3  equivalent, apparently, of a transaction
4  record, so we know how many things are being
5  sold as a result of our ISV partnerships.
6  Q.  What's an ISV partnership?
7  A.  I'm sorry.  Independent software vendor, so
8  somebody that creates an add-on product for
9  SAP.
10  Q.  Okay.  Is he reporting this information to
11  somebody else?
12  A.  My assumption would be -- the person that
13  would in my opinion do this is Ralf
14  Mehnert-Meland.  He ran that organization.
15  Q.  In 2005, when you went into SAP's computer
16  system and sorted the orders to date by
17  revenue size, what was the next closest sale
18  to Hodell that you recall?
19  A.  I mean, I can't recall exactly.  I mean, oNE
20  of the things that my summary e-mail to
21  Michael Sotnick reminded me of were a couple
22  that were of very large deals that would have
23  been really close.  For example, the RonJon
24  deal would have been very similar.
25     Haywood, I can't remember the name of

Page 130

1  it.  Anyway there were a couple of other ones
2  on here that that reminded me of.  There were
3  other transactions at or about that time that
4  would have been similar.
5  Q.  Well, none of those deals are referenced in
6  your e-mail as being similar, are they?
7  A.  Let's see.  I mentioned -- wait a minute.  It
8  might have been my -- I apologize.
9     Here we go.  It was Exhibit 176, if you
10  go to the second page, second to last
11  paragraph, where it talks about the
12  southeast, I talk about multiple companies.
13  So you got RonJon, Welbourne, Aaron's, to
14  name just a few.  These are -- those both
15  were large opportunities.
16     RonJon was very large, with lot of
17  users, lots of locations.  Welbourne was a
18  cabinet manufacturer that wanted their copy
19  and then copies for users, if you will, in
20  all of their dealers around the country.  So
21  those were very big.
22     Aaron's, I think, is the furniture
23  rental, I think, if I remember correctly.  I
24  don't remember how large it was, but again,
25  lots of locations, therefore, lots of

Page 131

1  locations at those locations.
2  Q.  Those were opportunities at the time?
3  A.  That were -- yeah, that were slated to close
4  by the end of the quarter.  I know RonJon's
5  closed, because they were at Sapphire, which
6  is the following May.
7  Q.  How come you don't reference the RonJon sale
8  in your e-mail to Michael Sotnick?
9  A.  It's possible it didn't close by December 31.
10  It might have moved into January or February.
11  Again, I don't remember the exact timing on
12  it.
13  Q.  Did Welbourne end up purchasing Business One?
14  A.  They ended up purchasing Business One I think
15  as well, yes.  It took longer.  It was much
16  more complicated.  They had catalogs, by the
17  way, which is similar to Hodell.  They had
18  many hundreds of thousands of SKUs in their
19  catalogs that users had to order from, and
20  you had the need to have catalogs
21  automatically updated.  So they were some
22  very unique things, so it took a little bit
23  longer.
24  Q.  Did they end up going live on Business One
25  successfully?

Page 132

1  A.  I don't know.  I don't remember.  I don't
2  recall.
3  Q.  Do you recall the number of users?
4  A.  No, not that I can say for sure.
5  Q.  What about Aaron's?
6  A.  I'm pretty sure Aaron's closed.  Again, I
7  don't remember for what size.  Another thing
8  is a lot of these things are very large.
9  They don't necessarily buy a hundred users
10  day one.  They might buy ten and then grow
11  them over phases.
12  Q.  So while RonJon could have been a very large
13  company, it might have actually only been
14  buying ten licenses at the time you wrote
15  this e-mail?
16  A.  That's correct.
17  Q.  Okay.
18  A.  That's correct.  It is possible.
19  Q.  So again, at the time that you wrote your
20  January 2nd, 2006, e-mail, do you have any
21  understanding as to the largest number of
22  user licenses bought by an entity other than
23  Hodell?
24  A.  Not that I can say, and also, I had no idea
25  outside of the U.S. or outside of

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 133

1  North America.  So there could have been.  I
2  don't remember.
3      (Document marked Exhibit No. 178.)
4  Q.  Please review Exhibit 178 and let me know
5  when you're finished.
6  A.  (Witness complies.)
7      Okay.
8  Q.  Do you recall sending the e-mail marked
9  Exhibit 178, on or about in February 10,
10  2006?
11  A.  Well, sure.  I don't remember.  I mean, yes,
12  I remember looking at it.  It's me.
13  Q.  You have no reason to doubt that this is --
14  A.  Correct.
15  Q.  Who is Volney Spalding?
16  A.  I don't remember.  I apologize.  I don't
17  remember.  Based on what I'm reading here,
18  I'm assuming he's collecting information
19  for --
20      This is an assumption.  I'm assuming
21  he's collecting information for, like, a book
22  of customers that we would publish, and
23  people could get access to, because SAP does
24  that.  So it's possible that it was for a --
25  I don't know what technical them.

---

Page 134

1  Q.  Look at the subject line.  It references a
2  presentation from the week prior.  Do you
3  know what that would be in reference to?
4  A.  Well, it's references.  So again, I'm
5  assuming that this is putting together a
6  profile of Hodell-Natco to go into a
7  reference program or book.  So I'm assuming
8  that Volney is probably an SAP person
9  responsible for reference, customers and
10  reference sales.
11  Q.  Yeah, well, this is your e-mail.  Do you
12  recall why you were forwarding on this
13  information?
14  A.  I don't.  I apologize.  I don't.  Apparently,
15  I got an e-mail from Michael saying, "Send
16  this information to Volney."  So I did.
17  Q.  What was Michael Sotnick's position at the
18  time?
19  A.  He was Dan Kraus' boss.  So I reported
20  To Dan.  Dan reported to Mike.
21  Michael had responsibility for all of the
22  Business One and All-In-One through partners.
23  Q.  And based upon your interaction with Michael
24  Sotnick, it was his position that Hodell was
25  a very high profile account?

---

Page 135

1  A.  I'd have to assume.  Well, I would have to
2  assume, because I wouldn't know for sure, but
3  it may be that Michael either assumed Hodell
4  to be a high profile account or assumed
5  Hodell to be a happy customer.
6  Q.  Well, your words here are, "Here is a very
7  high profile account.  We are working very
8  wide on the Midwest."
9  A.  Right.
10  Q.  My question to you is:  What caused you to
11  refer to Hodell as a high profile account?
12  A.  Because of their brand recognition within the
13  fastener industry.
14  Q.  Okay.  You also reference the In-Flight
15  Enterprise add-on being developed by LSi,
16  correct?
17  A.  Correct.
18  Q.  Turn to the next page.
19  A.  Yes.
20  Q.  There's a quote underneath the Hodell-Natco
21  logo.  Do you know where that came from?
22  A.  My assumption is Hodell-Natco.
23  Q.  Do you know where the information -- first of
24  all, is this a template supplied by SAP.
25  A.  Correct.

---

Page 136

1  Q.  And do you know where the information in this
2  template came from?
3  A.  You mean who supplied it or who gave us the
4  data?
5  Q.  Who gave you the data?
6  A.  Hodell-Natco and/or LSi would have supplied
7  the data.  The person to bring it to me would
8  have been Ted Steffner.
9  Q.  It references 120 Business One users under
10  organization size and industry information?
11  A.  Yes.
12  Q.  Under the heading, "Why SAP," it refers to
13  the reputation, financial resources of SAP,
14  combined with industry-specific expertise,
15  LSi/ISV and its In-Flight add-on made the
16  solution a strategic fit?
17  A.  Um-hum.
18  Q.  You're aware of that understanding in January
19  of 2006?
20  A.  Yes.  What --
21  Q.  February, 2006?
22  A.  This would have been why was SAP chosen by
23  Hodell-Natco.  This would have been their
24  response to that question.
25  Q.  Do you recall whether this was actually used,

---

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

Page 137

1  this document was actually used in a
2  presentation by Michael Sotnick?
3  A.  I don't know if it was, no.
4  Q.  Did anybody at or around this time express
5  any concern about the 120 Business One users
6  referenced in this document?
7  A.  Not to my knowledge.
8  Q.  Do you know what the "sweet spot" was for
9  Business One as of February, 2006?
10  A.  No.  I mean, again, sweet spot is a relative
11  term.  I mean, I could tell you industries.
12  I could tell you things like that.  So if you
13  mean specific to numbers of users, it depends
14  on how it's used by the customer.
15  Q.  Turn to Exhibit 52.
16  A.  Okay.
17  Q.  Do you recall receiving an e-mail from Dan
18  Lowery on or about October 25th, 2006,
19  announcing the rollout of In-Flight
20  Enterprise?
21  A.  Yes.
22  Q.  Okay.  He references Hodell-Natco as being a
23  150 CP1 user, correct?
24  A.  He does.
25  Q.  Did that raise any red flags within SAP about

Page 138

1  the number of users that Hodell was going to
2  be utilizing?
3  A.  No, not to my knowledge.
4  Q.  Cc'd on that e-mail are Ted Steffner,
5  correct?
6  A.  Yes.
7  Q.  He was general manager at the time?
8  A.  Yes.
9  Q.  What was Bill McDermott's position with SAP
10  at that time?
11  A.  He was the CEO.
12  Q.  Do you know why he was copied?
13  A.  Because this was a -- because Dan Lowery
14  considered this to be a very significant
15  announcement and wanted it to go as high as
16  it could go.
17  Q.  Did you consider it to be a significant
18  announcement?
19  A.  Yes.
20  Q.  He goes on at the end to thank everyone at
21  SAP B1 in helping bringing the product to
22  life, the product In-Flight?
23  A.  Um-hum.
24  Q.  What was your understanding of what SAP's
25  role was in bringing Business One -- or

Page 139

1  In-Flight Enterprise to life?
2      MR. STAR: Objection to form.  You can
3  answer.
4  A.  Sorry.  What was my --
5      MR. STAR: Objection.
6  Q.  What was your understanding of what he meant
7  by that?
8  A.  My understanding -- but, of course, it has to
9  be an assumption -- is that he was saying,
10  you know, we started at X; we are now at a
11  finished product; and we got there together.
12      So it would have been -- the people that
13  would have helped him would have been
14  everybody involved in training, everybody
15  involved in marketing, everybody involved in
16  sales, everything.
17      So my assumption is he's saying thank
18  you to everybody for working together to get
19  a product to market.
20  Q.  And is that based upon your involvement in
21  that process?
22  A.  Well, it's based on our involvement in
23  creating a partnership.  So I don't know
24  what -- define process.
25  Q.  Well, the process you just explained to me is

Page 140

1  going through development and marketing and
2  all that.
3  A.  Um-hum.
4  Q.  Is that why you're making that assumption, is
5  that you were personally involved?
6  A.  Sure.  I mean, I got involved in -- I did
7  lots of things.  I covered for Dan Lowery's
8  people at a fastener conference, actually.  I
9  spoke for them and on their behalf.  So we
10  did lots of things together and for each
11  other.
12  Q.  What kind of conference are you talking
13  about?
14  A.  A fastener conference, because they were
15  very -- LSi was very active in the fastener
16  industry, and they had made a commitment to
17  do a presentation.  And Dale van Leeuwen had
18  a disease.
19      MR. STAR: Leukemia. Thank you.  I
20  couldn't remember it.  He had leukemia and
21  had to go through treatments, and he was very
22  ill.  And they asked me if I could present on
23  his behalf, and I said sure.
24      I didn't do as a good a job as he did,
25  but I at least was able to help them cover

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 141

1  their commitment.  We tried to cover each
2  other in commitments.  So those are the kinds
3  of things we tried to do together and for
4  each other.
5  Q.  Turn to 53.
6  A.  Okay.
7  Q.  Do you recall receiving Exhibit 53 on or
8  about June 8, 2006?
9  A.  Yes.
10  Q.  What's being discussed in this document?
11  A.  It's actually not an unusual situation and/or
12  request.  A sale was made for a customer.
13  There's a lot of work, services, training,
14  other things that have to be done.
15     In many cases, for whatever the reason,
16  there are delays, and the software's not
17  completely up and live, and so the customers
18  have a tough time paying for maintenance on
19  software they never received or haven't used
20  yet.
21     So partners will come back on occasion
22  and request us to negotiate with them the
23  payment or an extension of the grade pricing
24  or maintenance pricing.
25  Q.  Okay.  He makes the statement, "Both SAP and

---

Page 142

1  LSi will need this customer for references as
2  we sell into the fastener industry vertical.
3  Upsetting them at this point is not a good
4  business decision."
5     Do you see that understand why I'm
6  asking?
7  A.  Um-hum.
8  Q.  Do you agree with that statement?
9  A.  Yes, it's a fair statement.
10  Q.  He references two losses he sustained in
11  excess of $100,000 at RSI and DRI.  Do you
12  have any knowledge of those two
13  installations?
14  A.  I remember the initials.  I don't remember
15  the situation itself.  I don't remember
16  exactly what these were or apparently why
17  they went south.  I don't remember.
18  Q.  Is the statement in the last full paragraph,
19  "Michael, the bottom line on this
20  transaction is we have opportunity to make
21  the customer part of our team.  We will need
22  this as we face the upcoming performance
23  issues SAP B1 has and whatever else we run
24  into during implementation."
25     Do you know what he was referring to as

---

Page 143

1  the upcoming performance issues?
2  A.  I don't.  I mean, I would assume he's
3  referring to everything that's been referred
4  to up to this point, but I don't know
5  specifically.
6  Q.  Well, what issues had been unearthed up to
7  that point?
8  A.  Well, since this was in what, June of 2006?
9  I would assume that they had begun to
10  determine that -- that because of the number
11  of customers, numbers of transactions, number
12  of SKUs, number of users, et cetera, et
13  cetera, that there were some performance
14  issues with the software that we needed to
15  figure out.
16  Q.  Okay.  Do you know if Hodell had been made
17  aware of those issues?
18  A.  I don't know.  I would assume they were aware
19  of it.  I would assume they experienced it,
20  which is why everybody was aware of it.
21  Q.  But you don't know personally whether Hodell
22  was told that transaction volume and things
23  like that were causing performance issues
24  with Business One?
25  A.  I don't know if they had been told, correct.

---

Page 144

1  Q.  Is that something that if SAP or Mr. Lowery
2  knew, you would have expect them to have told
3  Hodell?
4  A.  I mean, your question was specific:  Did I
5  know?  My answer is, no, I didn't know.
6     My assumption would be that we did know
7  and we did say, because my assumption would
8  be that someone had complained about the
9  performance and said, "Well, we're having
10  performance issues because of these things."
11  So my assumption would be that we did say
12  something.
13  Q.  What if nothing was said?  Do you think that
14  would be appropriate or not?
15  A.  I'm not sure that could have happened.
16  Q.  What if I represent to you that it did
17  happen?
18     MR. STAR: Objection to form.
19     MR. HULME: And foundation.
20     MR. STAR: You can ask him a
21  hypothetical.  We can have a hypothetical,
22  but I think we have to have some of the facts
23  in there to make an understanding.
24     You can answer it, if you do understand.
25  A.  Again, I'm not sure I do.  I mean, I know

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

Page 145

1  what I'm thinking and where I'm headed.  I'm
2  not sure what you're thinking or where you're
3  headed, so --
4  Q.  Well, my question is you said you have to
5  assume that it did happen, and I'm saying,
6  no, you don't have to assume that it
7  happened.
8     I want you to assume that it didn't, and
9  it wasn't told to Hodell.
10  A.  Well, my 30 years says to me that if I'm a
11  customer and I've spent money and I'm getting
12  ready to try to go live and things are not
13  working out right and I'm asking why and
14  somebody is giving me an answer.  Otherwise,
15  I'm done; I've stopped.
16     And I know that's not the case because
17  of the other documents that we just talked
18  about.
19  Q.  Okay.  Mr. Lowery makes the statement at the
20  end of this e-mail, "Hodell's the largest
21  single customer order ever taken by SAP
22  Business One."
23     Do you know how he knew that?
24  A.  I would assume he knew that based on -- well,
25  first of all, I don't know that it is true at

Page 146

1  this point in time.  It was true when the
2  order was taken, and he would have known that
3  because we would have told him.
4     (Document was marked Exhibit 179.)
5  Q.  Exhibit 179 is a document that was produced
6  by SAP.  It appears to be an Outlook calendar
7  of events for you to travel to St. Louis to
8  meet with LSi in February of 2007.
9  A.  Yeah.
10  Q.  Do you recall meeting with LSi --
11     THE WITNESS: Sorry.  I should have
12  turned it off.  I apologize.  I will now.
13  Oh, this is my wife.
14     MR. STAR: Can we go off the record?
15     MR. LAMBERT: Yes.
16     (Discussion off the record.)
17     BY MR. LAMBERT:
18  Q.  Do you recall traveling to St. Louis in
19  February of 2007 to meet with LSi?
20  A.  No, but it doesn't -- I met with lots of
21  partners all the time, so it's not an unusual
22  thing for me to do this.
23  Q.  There wasn't any specific event that
24  precipitated your visit with them in February
25  of '07?

Page 147

1  A.  My assumption is I was invited.  Again, I'm
2  not try to be flippant.  My statement to
3  partners was always I never show up
4  uninvited, and I always show up when I'm
5  invited, so I would assume that I was
6  invited.
7  Q.  Are you aware of what testing was done of the
8  Business One and In-Flight implementation at
9  Hodell prior to Hodell going live?
10  A.  Not at all.  I have no idea.  Let me
11  rephrase it.  Sorry.  That is not true.  I
12  know that testing was being done, because I
13  know that SAP at some point even got involved
14  in helping with testing, but I don't know
15  exactly when, and I didn't know any of the
16  particulars.
17  Q.  Okay.  You made a comment earlier on today
18  that to me seemed to lay blame on Hodell for
19  its participation in the pre-live testing.
20  Did I mishear you?
21  A.  No, I don't think you misheard.  I don't
22  think I meant it as blame.  I meant it as
23  responsibility.
24     SAP has responsibilities.  The partner
25  has responsibilities, and the customer has

Page 148

1  responsibilities.  And I think everybody had
2  them, and I think everybody can share in
3  anything that was a success and everybody can
4  share in anything that might not have been
5  successful.
6  Q.  What was Hodell's responsibility with regard
7  to pre-live testing?
8  A.  A lot of things.  They would have been
9  responsible for making people and resources
10  available; they would have been responsible
11  for making environments available, general
12  environments.  They would have been
13  responsible for ensuring that they tested the
14  software and provided for the load.
15     For example, if it were 80 people, 80
16  people would have to get on the system and do
17  it.  The partner can't do that, because they
18  don't have 80 people.
19     So there are rules and responsibilities
20  in every engagement for all of the parties,
21  and there should have been a project plan,
22  and it should have laid all that out.  And
23  everybody should have been following it.
24     And then other things that have to
25  happen is, you know, they have to meet

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 149

1   their -- and I'm not saying they didn't, but
2   they have to meet commitments around making
3   data available for conversion, making
4   customers available for conversion, all that
5   kind of stuff.
6       I don't know if it happened or it
7   didn't, but I can tell you that in a lot of
8   cases they don't.  And that's what makes
9   people get way behind schedule.  That's what
10  makes for cost overruns and other things, and
11  those things lead to shortcuts.
12  Q.  Did you ever hear anyone at SAP or LSi claim
13  that Hodell did not do everything required of
14  it as part of the pre-live testing procedure?
15  A.  I never asked him.  It wasn't part of a
16  conversation where it might have come up.  So
17  I don't know if it did or not.
18  Q.  Okay.  You personally have no knowledge of
19  anyone at SAP or LSi making any claim that
20  Hodell did anything or Hodell failed to do
21  anything that it was expected to do as part
22  of pre-live testing; is that fair?
23  A.  That is fair.
24  Q.  Eddy Neveux testified yesterday that there
25  was a method for a partner to test 80

---

Page 150

1   simultaneous users without actually having
2   the customer have 80 people use the software
3   at one time.
4   A.  There are store procedures that can be
5   written to simulate, but there's two issues
6   with that.  Number one is it's not -- you
7   can't simulate it identically how it can be
8   used, and number two, there's a huge
9   difference between having a system running at
10  night on a standalone versus having 80 users
11  in a production environment using a system.
12      So you can simulate, and you should
13  simulate.  But at the end of the day, the
14  user has to test the system in an environment
15  before they go live with it, before they shut
16  down their current system, production system.
17  Q.  Whose responsibility is it to establish the
18  appropriate test environment for SAP Business
19  One?
20      MR. STAR: Objection to form.
21      You can answer it.
22  A.  Well, I think it's a joint environment
23  between the customer and the solution
24  provider.  Again, everything is subject to
25  culture.  I have sold to many companies who

---

Page 151

1   have this as an actual department.  They have
2   their own tools that they own, and they do it
3   internally themselves.
4       A lot of customers would pay their
5   partner to do it.  So it could be either.  It
6   could be joint, or it could be standalone.
7   Q.  Isn't it fair to say that SAP is the expert
8   of its own product?  Correct?
9   A.  No.
10  Q.  It's not?
11  A.  No.
12  Q.  Why not?
13  A.  Because SAP doesn't use its own product in a
14  distribution solution format.  We don't sell
15  fasteners in this particular case.  We don't
16  do manufacturing in a different case.  We
17  don't do pharmaceuticals in a different case.
18      There are thousands and thousands of
19  different unique environments, and SAP
20  doesn't do them.
21  Q.  My question is: SAP is most knowledgeable
22  about SAP Business One, correct?
23  A.  Again, no.  I think SAP -- SAP has the
24  advantage of being in a position to collect a
25  lot of data from a lot of different sources.

---

Page 152

1   So if there's 10,000 customers, then there
2   are 10,000 potential data points that we
3   could collect, put together and then get
4   back.
5       But again, remember, SAP is only selling
6   accounting software.  It gets implemented by
7   somebody else to do a certain function, and
8   the partner always knows better the function
9   that has to be done than SAP, because we
10  don't do manufacturing or distribution,
11  whatever it might be.
12  Q.  Right.  But SAP was the only entity in the
13  world that had access to the SAP Business One
14  code, correct?
15  A.  At some point the answer would be yes.  There
16  was a tool kit, so partners could do things
17  within the software and to the software.
18  Down to the code level or main level -- I'm
19  sorry.  I don't want to get too technical,
20  but down to the code level or line level,
21  yes, on the SAP.
22  Q.  Eddy Neveux testified yesterday that nobody
23  outside of SAP could touch the SAP Business
24  One core and code.  Do you agree with that?
25  A.  No, I don't.  The core engine is IP,

---

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

Page 153

1  Intellectual Property, and it is owned and
2  controlled by SAP.
3  Q.  So wouldn't you agree with me that SAP is the
4  expert of its own product of which it
5  controlled sole access to the code?
6  A.  No, I can't agree with you.  I'm not trying
7  to fight with you, but no, I can't agree with
8  you.
9  Q.  What's your understanding of the issues
10  encountered by Hodell-Natco with the
11  implementation of Business One and In-Flight
12  Enterprise after going live in March of 2007?
13  A.  My understanding was that, once the software
14  was implemented and fully populated, the
15  day-to-day use of the system was -- did not
16  meet the expectations or requirements of
17  Hodell and that the reasoning was due to the
18  sheer size of the application in total.
19      So the number of customers, the number
20  of SKUs, the number of transactions, the
21  number of lines per invoice, all that in
22  total, when it came together, made the system
23  not suitable for the application.
24  Q.  Those were the result -- that was the result
25  of inherent limitations in the SAP Business

Page 154

1  One core software itself, correct?
2      MR. STAR: Objection to form, but you
3  can answer.
4  A.  That was certainly part of the reason.  I
5  can't say that it was the reason, because
6  there were so many other pieces to it.  It's
7  certainly a part of it.
8  Q.  Did anyone ever isolate a single reason why
9  the implementation was unsuccessful?
10  A.  Not to my knowledge.
11  Q.  Do you agree with me that the implementation
12  at Hodell-Natco was not successful?
13  A.  I do.
14  Q.  Turn to Exhibit 78.
15  A.  (Witness complies.)
16      Okay.
17  Q.  Exhibit 78 is an e-mail string --
18  A.  Yes.
19  Q.  -- dated April -- between April 13 and
20  April 15, 2007?
21  A.  That's correct.
22  Q.  You're not copied on all of the e-mails on
23  there, but you were forwarded that last
24  e-mail, which looks like to me would have
25  included all of the other ones, correct?

Page 155

1  A.  From what I can tell, it did, yes.
2  Q.  Do you recall being involved in this
3  discussion in April, 2007?
4  A.  Yes.
5  Q.  Okay.  Do you know who Udi Ziv is?
6  A.  Yes.
7  Q.  Who is he?
8  A.  He worked for SAP in the development area out
9  of Israel.
10  Q.  Is he one of the inventors of the software?
11  A.  Well, he worked for the company that was
12  acquired that originally developed the
13  software, correct.
14      I don't know if he literally was one of
15  the original developers or not.
16  Q.  Do you know how high up in development he
17  was?
18  A.  As far as I know, he was the development team
19  lead.  So he wasn't that high up in the SAP
20  environment, but he was a team lead in the
21  development of the Business One product.
22  Q.  Okay.  Was he a pretty significant authority
23  on the Business One product in your opinion?
24  A.  Yes.
25  Q.  Why is that?

Page 156

1  A.  Why is he an authority?
2  Q.  Yes.  In your opinion, why is he an authority
3  on the product?
4  A.  Because he was one of those most specifically
5  involved in the development, the creation and
6  development and ongoing maintenance of the
7  product.
8  Q.  Do you see Dan Kraus' e-mail there at the
9  top?  He's e-mailing Dan Lowery and others,
10  correct?  He's really addressing it to
11  Mr. Lowery.
12  A.  That is correct.
13  Q.  Okay.  It states, "Your development team and
14  others have been told that this is outside
15  the sweet spot a number of times," correct?
16  A.  Yes.
17  Q.  Do you know what he meant by that?
18  A.  Yeah.  I mean, he meant that by 2007 -- by
19  2007, we had determined or SAP had figured
20  out that this product used in this type of an
21  environment, given its configuration, was not
22  going to -- well, was probably not going to
23  work.
24  Q.  Did they determine that based upon the Hodell
25  implementation or based upon some other data

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

Page 157

1  that they had acquired?
2  A.  My assumption would be it's based on any and
3  all of the data that we could acquire at that
4  point in time or we had acquire at that
5  point in time.
6  Q.  Do you recall either yourself or Dan Kraus
7  specifically telling Dan Lowery or his team
8  that Hodell is outside of the sweet spot?
9  A.  By this time, yes.
10  Q.  Prior to this day, prior to this e-mail?
11  A.  Yes.
12  Q.  When?
13  A.  I mean, again, I can't tell you exactly by
14  dates when all that started to happen, but I
15  would -- I mean, do you want me to hazard a
16  guess as to when?
17  Q.  I want you to -- as someone that seems to be
18  pretty closely involved with the
19  implementation and development, what's your
20  understanding of when LSi was aware that
21  Hodell was outside the Business One sweet
22  spot?
23  A.  I would assume it would have been in the
24  mid-2006 time frame, most likely.
25  Q.  Did you personally communicate that to anyone

Page 158

1  at LSi?
2  A.  That they were outside the scope?
3  Q.  That Business One -- that Hodell was outside
4  of the scope or sweet spot for Business One.
5      MR. STAR: Objection to form.
6      MR. HULME: Objection to form.  For the
7  first time you just inserted a second word in
8  this, sweet spot or scope.
9      MR. LAMBERT: I understand.
10      BY MR. LAMBERT:
11  Q.  Are scope and sweet spot different?
12  A.  Scope and sweet spot could be very different,
13  yes.
14  Q.  Okay.  In what respect?
15  A.  A scope is a much more specific and technical
16  description, and sweet spot is a much broader
17  and marketing-specific description.
18  Q.  Sweet spot is kind of where ideally you'd
19  like to be, right?
20  A.  Yeah.
21  Q.  But you can kind of dance around the outside
22  edges of it, right?
23  A.  Well --
24      MR. HULME: Objection to form.
25  A.  Yeah, sweet spot -- the data suggests where a

Page 159

1  sweet spot is.  It just isn't what it is.  So
2  if the data says we do better in these areas
3  than other areas, that's a sweet spot.
4  Q.  What about the scope?
5  A.  Scope is very specific, but a scope is this
6  organization using this product in this way
7  for this purpose.  That would be a scope.
8  Q.  Well, is Hodell outside the scope of Business
9  One?
10  A.  Hodell by this time was definitely defined as
11  being outside the scope, and we could have
12  communicated that.  By this time, we
13  definitely would have.
14  Q.  And Hodell was also outside the sweet spot,
15  correct?
16  A.  Most likely.
17      MR. HULME: By "this time," we're
18  talking April 13, 2007?
19      THE WITNESS: Yes.
20      BY MR. LAMBERT:
21  Q.  And it's your understanding that someone had
22  communicated that to Dan Lowery or his team?
23  A.  We had had numerous discussions as soon as
24  the red flag -- everybody understands -- I
25  don't have to define red flag?

Page 160

1      MR. HULME: Define it.
2      THE WITNESS: A red flag would be as
3  soon as an issue has been made aware to
4  someone, whether it's the customer to the
5  partner or the partner to SAP, a red flag is
6  raised.  By this point in time, we would have
7  had enough of those raised that we would
8  have --
9      We've already been through some testing.
10  We had already been through some upgrades.
11  We had already been through some
12  enhancements.  We had already been in touch
13  with Israel itself.
14      So, yes, there would have been multiple
15  situations in which we would have said, "This
16  is a tough one.  This is going to be
17  outside," by this time definitely, just by
18  virtue of who was included.
19  Q.  Did you do anything to ensure that that
20  information was communicated to Hodell?
21  A.  Did I do anything?  No.
22  Q.  Do you have personal knowledge of anyone at
23  SAP doing so?
24      MR. STAR: What time frame are we
25  talking about?

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 161

1    MR. LAMBERT: Whatever time frame he was
2  talking about.
3  A.  By 2007, my assumption is that we'd actually
4  had some phone calls with them by then.  So
5  I'm going to say yes.  It's an assumption.
6  It wasn't me personally.
7  Q.  Okay.  You have no personal knowledge of that
8  taking place, correct?
9  A.  I might have.  I don't remember --
10  Q.  Okay.
11  A.  -- by date.
12  Q.  Turn to the next page.  Udi Ziv is e-mailing
13  Dan Lowery in April 13th, 2007, correct?
14  A.  Yes.
15  Q.  Were you included on that?
16  A.  I don't --
17  Q.  Well, this is part of the e-mail string that
18  was forwarded to you.
19  A.  I wasn't on this one, but I was on the final.
20  Q.  You ultimately were, right?
21  A.  Yes, correct.
22  Q.  Do you see how Udi Ziv defines the sweet spot
23  of Business One?
24  A.  I don't see that he does define the sweet
25  spot, but he says, "This customer's

---

Page 162

1  environment is far outside the sweet spot."
2  Q.  What does he use to determine -- to make that
3  conclusion?
4    MR. STAR: Objection to form.
5  A.  I don't know.
6  Q.  Well, he reference 120 users?
7  A.  Correct.  But I don't know what he uses -- I
8  don't know what data he has to support.  I
9  don't know.  I'm not saying he's wrong.  I'm
10  saying I don't know.
11  Q.  Turn to 69.
12    While you're looking, is there anyone at
13  SAP that you think would be more qualified
14  than Udi Ziv to make a determination of
15  whether Business One would be appropriate for
16  a customer?
17    MR. HULME: Objection to form.
18  A.  To make sure I understand your question, are
19  you asking who else had more technical
20  knowledge of the product capabilities?
21  Q.  Right.  Can you read the question back just
22  to make sure?
23    (Reporter read question as recorded.)
24    Why don't I just rephrase it.  At the
25  time you were employed by SAP, was there

---

Page 163

1  anyone, in your opinion, more qualified than
2  Udi Ziv to make a determination as to whether
3  Business One would be an appropriate software
4  for a particular customer?
5    MR. STAR: Same objection.
6  A.  I'm not sure that there is someone more
7  qualified.  There were other qualified people
8  certainly.  He was one of the lead, if not
9  the lead developer, of the solution.  So he
10  was very qualified to at least understand the
11  issues that were being experienced.
12  Q.  Let's take a look at Exhibit 69.
13    You haven't seen Exhibit 69 before, have
14  you?
15  A.  I have not.
16  Q.  Towards the end of Exhibit 69 is the initial
17  e-mail from Dan Lowery to Udi Ziv requesting
18  some assistance with Hodell, correct?
19  A.  Correct.
20  Q.  And Dan Kraus asked Udi Ziv to assist, right?
21  A.  Correct.
22  Q.  Udi Ziv, on Page 5572, replies to Dan Kraus?
23  A.  I'm sorry?
24  Q.  On Page 5572, do you see Udi Ziv's reply to
25  Dan Kraus?

---

Page 164

1  A.  Yes.
2  Q.  All those people copied on that e-mail are
3  internal SAP employees, correct?
4  A.  Yes.
5  Q.  Udi Ziv's reply is, "Someone has sold to the
6  wrong customer, which is way above any same
7  B1 sweet spot, 120 users," three exclamation
8  points, "And obviously, they are experiencing
9  severe performance issues.  Cannot commit to
10  resolving this issue, and although the IBE
11  team is looking into the matter, you should
12  probably direct them to move away from this
13  issue and concentrate on their volume of
14  regular customers."
15    Do you recall being aware of Mr. Ziv's
16  opinion on the Hodell implementation at this
17  time?
18  A.  I was aware of his opinion.  I don't know if
19  it was at this time or not.  Given the date,
20  it's possible.
21  Q.  You're aware that he was of the opinion that
22  there was no way that SAP Business One would
23  work for Hodell?
24  A.  Not worded that way.  I was definitely aware
25  of the feeling within Israel that this

---

Case: 1:08-cv-02755-DCN   Doc #: 289-1   Filed: 02/20/15   43 of 92.   PageID #: 14855

Hodell-Natco Industries, Inc. v.                                                    Geoffrey Ashley
SAP America, Inc., et al.                                                           March 16, 2012

Page 165

1    environment -- that Business One was not
2    appropriate for this environment, correct.
3    Q.   When did you first become aware of the
4    feeling in Israel that Business One was not
5    appropriate for Hodell's environment?
6    A.   It would have somewhere between mid-'06 and
7    mid-'07, because it wasn't until they
8    actually implemented the software and they
9    started the use in a production environment
10   that we would have figured it out.  So that
11   would have been the appropriate -- this is
12   the appropriate time frame.  So right around
13   this time frame.
14        MR. STAR: Right around April or May?
15        THE WITNESS: Yeah.  I mean, it could
16   have been, you know, four or five months
17   prior to this, but it would have been -- I
18   mean, whenever they put the product in and
19   finally started populating and finally
20   started using on a production level, then
21   they would have said, "Whoa, this is slow.
22   What's going on?"  That's when we would have
23   first started to know and be aware.
24        BY MR. LAMBERT:
25   Q.   You, meaning SAP America?

Page 166

1    A.   SAP Americas, correct -- well, LSi first and
2    then us immediately thereafter, yes.
3    Q.   After go-live, is that your testimony?
4    A.   I don't know, because I don't know because I
5    don't know the -- I don't know how the
6    implementation plan worked.  I don't know to
7    what extent it went in and was tested and all
8    that prior to go-live or just went in and
9    they populated it and went live.
10   Q.   You said mid-2006, and Hodell hadn't gone
11   live by mid-2006.
12   A.   What I'm suggesting is that I don't know when
13   the product went from done with development,
14   ready to go into production, being
15   implemented in the customer, getting
16   populated and then the attempt to go-live.
17        So whenever that happened within that
18   time frame -- and I'm just guessing on the
19   time frame -- that's when we would have been
20   aware, or I would have been aware that this
21   was all happening and that was our position.
22   Q.   Was this consistent, Mr. Ziv's e-mail
23   consistent, with the conversations you were
24   having with Dan Lowery at or around this
25   time?

Page 167

1         MR. STAR: Objection to form.
2    You can answer it, if you understand.
3    A.   Yeah, I understand.  I just don't know how to
4    answer.
5         There's an internal discussion, and
6    there's an external discussion.  Internally,
7    I take issue with the way Udi was wording it,
8    but he was having an internal discussion with
9    people, so he was just making a comment.
10        So part of what we're dealing with is an
11   Israeli culture versus an American culture
12   and just the way we communicate.
13        Part of this was somebody saying, "Not
14   my job," and "I want to focus on something
15   else," rather than saying, "I'm going to put
16   all my efforts on this and maybe resolve
17   this."  And then somebody saying, "But we're
18   going to resolve this at some point anyway."
19        So you could take all of that and say,
20   "How would I respond to our partner," and I
21   would say, you know, "We are working to
22   resolve this issue," and we were so.
23   Q.   Udi Ziv wasn't very ambiguous about his
24   thoughts on this, was he?  In fact, he ends
25   his e-mail saying, "I recommend that we go

Page 168

1    for a reimbursement and debrief the whole
2    process that got us to having this customer
3    in the first place."
4    A.   Correct.  And the problem with that is that
5    the problem got us to this customer would
6    have got us to lots of other customers, which
7    is even alluded to in this e-mail string.
8         So Udi was running from an issue that he
9    couldn't run from.  We had to resolve the
10   issue anyway.
11   Q.   When I showed him this e-mail to Dan Lowery, he
12   was furious that no one imparted this
13   information to him at or around the time that
14   Mr. Ziv sent this e-mail.
15        MR. STAR: There's no question there.
16   Q.   Do you have any understanding of why he would
17   have been angry?
18        MR. STAR: Objection to the form.
19   A.   I can understand why he probably could have
20   been angry, but that doesn't negate the fact
21   that 120 users could mean nothing in this
22   case.  It could also happen at 50 users or 60
23   users or even 10 users, depending on the
24   environment.
25        So Udi's comments to this were meant for

Page 169

1  internal use, never meant for external use
2  and not factually correct in that it's not --
3  the one thing that's important in this string
4  is the locking thing that they refer to
5  several times, the Sql locking thing.
6      The issue has to do not only with the
7  number of transactions or the size of the
8  database or whatever.  It literally has to do
9  with the way the product is architected.
10     And some users, even the small number --
11 some customers, even with small numbers of
12 users, might have the same issue, depending
13 on how they did things within their business,
14 how many fields they had to view at any point
15 in time, because the product did lookups.
16     The reason it would take an hour to
17 place an order is because it had to do a
18 lookup through a huge database every time you
19 hit the tab key.  That could have happened
20 for a ten-user system.
21     So Udi's comment, the reason it doesn't
22 apply here is because it could have been a
23 ten-user system, and you could have still had
24 the same issue.  You've got to fix it.
25     Does that make sense?

Page 170

1  Q.  The problem is that I've seen countless
2  e-mails of internal SAP employees opining
3  that there is no fix to the issue that Hodell
4  is experiencing.
5      Do you take issue to that?
6      MR. STAR: Objection to form.
7  A.  But I would submit that if you looked at the
8  product today, it doesn't have that issue,
9  and so obviously, there was a fix.
10 Q.  Do you see on the previous page, SAP 5571,
11 Udi Ziv stating, "Too bad we didn't stop the
12 implementation of B1 before it started"?
13 A.  Yes.
14 Q.  Are you qualified to disagree with Udi Ziv's
15 assessment of the capabilities of SAP
16 Business One?
17 A.  Am I qualified to take -- I'm qualified to
18 take issue with the way in which he
19 responded.
20 Q.  How so?
21 A.  As I just stated, because his comments were
22 definitive as to a number that was arbitrary.
23 Basically, what he says is, "Hindsight being
24 what it is, we should have never sold to them
25 in the first place," but you could also say,

Page 171

1  "We should never have sold to a ten-user
2  system or a 12-user system or a 1,000-user
3  system."
4      It's not the number of users
5  necessarily.  It's the environment in which
6  it was used and the way it which was
7  architected that caused the problem.
8  Q.  You don't disagree with his conclusion that
9  this product should never have been sold to
10 Hodell-Natco?
11 A.  In hindsight, yeah, I agree with him.
12 Q.  Okay.  Well, Udi Ziv -- it didn't take Udi
13 Ziv very long to reach that conclusion, did
14 he -- did it?
15 A.  I have no idea.
16 Q.  Okay.  On the first page of that document,
17 Dan Kraus makes the statement down at the
18 bottom, "There is no incentive on my team to
19 take a $100,000 return.  We never put a
20 reimbursement program in place.  That would
21 have made sense, for us to do anything other
22 than insist the partner test this completely
23 before go-live, which is what we did do."
24     What is he talking about there?
25 A.  Well, since Udi was suggesting a refund, I

Page 172

1  guess what he's saying here is that we don't
2  have a process in place with which to do a
3  refund.
4  Q.  So he's essentially saying that Hodell either
5  has to live with it or they have to seek
6  reimbursement from LSi?
7      MR. STAR: Objection to form.
8  A.  Yeah, and I have to --- I don't know.
9      MR. STAR: Don't speculate on what LSi
10 is saying.
11     THE WITNESS: Yeah, I don't know.  I
12 don't know.
13     BY MR. LAMBERT:
14 Q.  Do you understand what Michael Sotnick is
15 talking about at the end of his e-mail there,
16 "I suggest you close in a way that leaves the
17 door open for Udi to elect to reimburse this
18 customer if he believes that is the only
19 successful path"?
20     MR. STAR: Objection to form.
21 A.  I know -- yes, what he is suggesting is that
22 the way that SAP is structured, the
23 Americas -- well, the way SAP was structured
24 at that time -- I assume still is -- the
25 Americas were set up basically as a sales and

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 173

1  marketing arm.
2      Anything dealing with development,
3  programming, you know, those types of things,
4  was done, depending on the product, either in
5  Germany or in Israel in this case.
6      So what Michael is suggesting is that if
7  Udi suggests that we refund it, then Udi
8  should get it out of his budget.
9  Q.  Is it fair to say that as of April, 2007, SAP
10  was aware that the Business One software was
11  not appropriate for Hodell, yet in this
12  document they're debating internally who's
13  going to bear the cost of it?
14      MR. HULME: Objection to form.
15  A.  Yeah, I don't know.  I don't know how to
16  answer that.
17      MR. HULME: It's two questions.
18      MR. STAR: Yes, it's compound issues.
19      BY MR. LAMBERT:
20  Q.  Have you been threatened with any lawsuit by
21  anyone at SAP for indemnification --
22  A.  No.
23  Q.  -- if SAP is found liable on this case?
24  A.  No.
25  Q.  Do you have agreements or anything requiring

---

Page 174

1  you to indemnify SAP?
2  A.  No.  And actually, as you saw in one of my
3  earlier e-mails, I actually stated that I
4  don't think SAP would even view me as a very
5  good witness.
6  Q.  Turn to 156.
7      MR. STAR: Is that one that we marked
8  the other day?
9      MR. LAMBERT: Yeah, that's what it is.
10      THE WITNESS: Okay.
11      BY MR. LAMBERT:
12  Q.  Do you recall reading Exhibit 156 in and
13  around April 16, 2007?
14  A.  Yes.
15  Q.  Do you recall what was being discussed?
16  A.  Do I recall what was being discussed?
17  Q.  Right.
18  A.  Yes.
19  Q.  What is it?
20  A.  Essentially, it's a continuation of the last
21  exhibit we were looking at, which is we have
22  identified what -- we had identified a fix
23  that might help to resolve some of the
24  performance issues.
25      And what everybody is trying to figure

---

Page 175

1  out now is when will it be ready; what do we
2  think it might do for Hodell; when can we get
3  it in there; and will it break something else
4  while fixing one thing, which is part of the
5  issue with, of course, product fixes and
6  product updates.
7  Q.  Who is Dirk Boessmann?
8  A.  I don't know him myself personally, but he
9  was on the -- I think he was on the
10  product -- there's a development team that
11  develops, and then there is a team that does
12  enhancements and versions and upgrades.  And
13  I think he was on that team.
14  Q.  Okay.  He makes the statement, "To my
15  knowledge, the environment has 120 user using
16  add-on, which also produces a network trap,"
17  correct?
18  A.  Yes, he said that.
19  Q.  So do you have any reason to disagree with
20  Dirk Boessmann's assessment that the 120
21  users of SAP Business One was contributing to
22  the performance problems they were having?
23  A.  I don't know what else he knew.  Just the 120
24  users, not necessarily.  He may have known
25  other information.

---

Page 176

1      By the way, just so you know, because we
2  keep going back to the same comment, Hodell
3  could have had 100 of their 120 users that
4  did nothing but look up, and if all they did
5  was look up, there would have been no
6  performance issues.
7      So that's why I keep going back to an
8  SAP internal person making the comment that
9  is specific like this, without knowing what
10  the users were and how they used the system,
11  they can't make that comment.
12      So that's why these being internal
13  discussions, not knowing how it's going to
14  end up eventually being scanned or used or
15  after the fact, it's impossible to know.
16  So 120 users doesn't really mean anything if
17  100 of the 120 are just looking up
18  information.
19  Q.  Are you saying that the guy that invented the
20  software --
21      MR. STAR: Objection.
22  Q.  -- isn't qualified to make the determination
23  as to what the software's capabilities are in
24  a particular environment, that you are more
25  qualified to do so?

---

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

Page 177

1 　MR. STAR: Objection to form.
2 　Actually, that's a question that's
3 harassment, and I'm going to instruct him not
4 to answer, because it directly contradicts
5 his testimony.
6 　He doesn't know if Udi is the guy who
7 invented the software. You asked him that,
8 and he said he had no clue.
9 　You can rephrase the question. But like
10 that, it's just trying to get a sound byte
11 that doesn't matter much.
12 　BY MR. LAMBERT:
13 Q. Eddy Neveux makes a comment here at the
14 bottom of 156, "It doesn't mean the database
15 is on the high end of the data that was
16 tested for SAP Business One."
17 A. I'm sorry. I apologize. Where are you
18 reading?
19 Q. The bottom of 156.
20 A. Okay. Yes.
21 Q. Do you know what he's referring to there?
22 A. Well, he's referring to a comment by Dirk, I
23 guess.
24 Q. What test is he referring to?
25 A. Oh, I don't know. I think that's what he's

Page 178

1 saying. I think he's asking. I think he's
2 asking Dirk, "When you make this comment,
3 what tests did you run?"
4 　I think that's exactly what he's asking.
5 By the way, he's kind of saying what I'm
6 saying.
7 Q. Which is what?
8 A. How can you say there is an issue if you
9 don't know how the software is being used?
10 If 100 people are just doing a lookup, there
11 is not going to be an issue. So you can't
12 make a definitive comment just in one
13 sentence.
14 Q. Why were people at SAP addressing questions
15 to Udi Ziv and Dirk Boessmann if you're now
16 telling me that they weren't qualified to
17 make an assessment of what was going on?
18 　MR. STAR: Objection to form.
19 A. They would have been the ones that we spoke
20 with, because they were the ones that we were
21 told to speak with.
22 Q. But you ended up not wanting to listen to
23 them? I guess I'm confused here.
24 　It seems to me like Dirk Boessmann and
25 Udi Ziv were the two people that were the

Page 179

1 most qualified to make an assessment of what
2 was going on. Now, you're telling me that
3 what they were telling you was incorrect.
4 A. Well, first of all --
5 　MR. STAR: Wait, wait, wait. There is
6 no question, okay? He's only made a
7 statement.
8 Q. Well, is that what you're telling me?
9 A. No. What I am telling you is that there is a
10 difference between -- I can't hold a candle
11 to either of those two people in my knowledge
12 of software development, but what I can hold
13 a candle to them on would be my background
14 and experience around how to maybe analyze
15 the situation or an issue. They're very
16 mono-focused. I'm very broad focused.
17 　So I don't think there is any problem or
18 issue with their competence in an environment
19 and in developing and in creating product.
20 What I think is their communication and their
21 communication style and what they're stating
22 internally to a group of people that is now
23 being taken as gospel was not meant to be
24 taken that way and was not appropriately
25 stated.

Page 180

1 Q. I haven't seen any e-mail communication from
2 you or anyone else questioning any of the
3 information provided by Udi Ziv or Dirk
4 Boessmann.
5 　Can you point me to anything?
6 A. No, there was no need. At the time we were
7 expecting a patch to be released within a
8 matter of a couple of days from this e-mail.
9 So there wouldn't have been a reason to do
10 it.
11 　We were still hoping for a patch that
12 was going to fix everything, and everybody'd
13 be happy and we'd move on. There was no
14 reason to do that.
15 Q. Is it your testimony that in April of 2007
16 you were still expecting Hodell to be a
17 successful implementation of SAP
18 Business One?
19 A. Yeah.
20 Q. Turn to Exhibit 158.
21 A. Yes, okay.
22 Q. Exhibit 158 is two e-mails, one from you to
23 several internal SAP employees and a response
24 from Ralf Mehnert-Meland, correct?
25 A. That is correct.

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 181

1  Q.  Who is Ralf Mehnert-Meland?
2  A.  He was my counterpart.  He was in charge of
3  the ISV solutions group.
4  Q.  And on April 17, 2007, he sends you and many
5  other people an e-mail saying, "There is no
6  way SAP Business One will work for this
7  customer.  We need to find a way to move them
8  up.  Plus, Lowery needs to take
9  responsibility for the miss sell," correct?
10  A.  Correct.  He said that, correct.
11  Q.  Is it still your testimony that you were
12  expecting Business One to be a successful
13  implementation at Hodell in April, 2007?
14  A.  It is my testimony that my hope was that we
15  would be able to have a successful
16  implementation of Hodell.  Correct.
17  Q.  That's what you were telling LSi and Hodell,
18  correct?
19      MR. STAR: Objection.
20  A.  Yeah.
21  Q.  Isn't that completely inconsistent with what
22  the last few e-mails we were reviewing?
23  A.  I think what -- I'll say yes.  I'll say yes.
24  Q.  Thank you.  Did anyone, to your knowledge,
25  ever pick up the phone and call Hodell and

---

Page 182

1  say, in April of 2007, "There is no way SAP
2  Business One will work for you"?
3  A.  I have no idea.
4  Q.  Do you have any personal knowledge of that
5  occurring?
6  A.  No.
7  Q.  Is it fair to say that LSi alleged that it
8  had told Hodell-Natco that Business One was
9  capable of supporting up to 500 users?
10      MR. STAR: Objection to form.
11  A.  I have -- yeah, I have no idea.  I know what
12  was suggested.  I don't know if they did.
13  Q.  Well, it looks like your e-mail on the second
14  half of Exhibit 158.
15  A.  Yes.
16  Q.  You're summarizing a phone call that had
17  occurred?
18  A.  Yes.
19  Q.  "LSi commented that they originally sold this
20  solution to Hodell as something that was
21  designed for companies of 250 million in
22  revenue with up to 500 users," correct?
23  A.  Yes.
24  Q.  You recall that statement being made?
25  A.  Yes.

---

Page 183

1  Q.  And you commented, "There was stunned silence
2  on the phone from the SAP team as Hodell
3  confirmed this was their understanding"?
4  A.  Correct.
5  Q.  Why did you write that part?
6  A.  Because that's not something that I recall
7  ever being told.  This is the first time that
8  I or, to my knowledge, anybody from SAP had
9  heard this.
10  Q.  The 500-user count?
11  A.  Correct, correct.
12  Q.  Do you know where they got that number from?
13  A.  That was my original comment.  I have no
14  idea.  I don't.
15      I'm not suggesting they didn't say it,
16  because they said it, but I don't know where
17  it came from.  I don't know when it was
18  originally stated.  I have no idea.
19  Q.  Item 4, what did you mean by, "He said the
20  expectations of this environment is much
21  larger than we were led to believe"?
22  A.  It's 500 users.  To my knowledge, again, we
23  were never led to believe it was going to be
24  that large of an organization or of an
25  environment and, again, especially with all

---

Page 184

1  of the other environmental issues that they
2  had.
3  Q.  Well, Hodell wasn't running with 500 users.
4  I'll represent to you that.
5      Does that help you or does that refresh
6  your recollection as to something else you
7  might have been referring to?
8  A.  I mean, my recollection after this number of
9  years is that Dirk was letting them know that
10  this product, meaning Business One, in this
11  environment, especially if it's going to be
12  growing at a 70-percent compound in growth
13  with 300 users in the short-term, that this
14  was much larger than we were led to believe.
15  I'm not sure what we were going to be able to
16  do to fix this.
17      If you look at No. 6, one of the
18  things -- and I wasn't detailed enough in my
19  explanation here.  One of the things I also
20  suggested in that meeting was using Business
21  All-In-One -- oh, I did mention it, yeah,
22  using Business All-In-One.
23      This is where we first started saying,
24  "Look" -- and I said in this meeting.  "We
25  will get it to you for free," so the idea

---

Page 185

1  being, "Look, this is going to be outside the
2  scope."
3      So again, when you say why would I think
4  we could still make this work, because my
5  intent was still to make this work. We had
6  made the offer of Business All-In-One for
7  free, but that would have required LSi, of
8  course, to have to recode their product to
9  work with the All-In-One product. But that
10 environment would have worked.
11 Q.  What would have worked?
12 A.  Business All-In-One with an LSi fastener
13 add-on would have certainly worked for 500
14 users.
15 Q.  When would that have been available to be
16 installed?
17 A.  It never got that far. I have no idea.
18 Those discussions never happened. I mean,
19 this was the only discussion to my knowledge
20 where that ever came up.
21 Q.  It's my understanding Dan Lowery testified
22 that the first time anyone ever told him
23 something to the effect of what Ralf
24 Mehnert-Meland is saying in Exhibit 158, that
25 there is no way this product will work for

Page 186

1  Hodell, was sometime in the latter half of
2  2007.
3      Do you have any reason to disagree with
4  that?
5      MR. STAR: Objection to form.
6      If you don't recall, you don't recall.
7  If there are documents you need to see, you
8  can see documents.
9  A.  I can tell you that in this phone call that
10 we're talking about, we were telling him that
11 in its current form it wasn't going to work.
12 You can -- it's even in here.
13 Q.  Where?
14 A.  Dirk said it. I said it. I know that Eddy
15 Neveux had made comments. I don't know if
16 they were made by this date. I can't tell
17 you specifically to the date, but I can tell
18 you that I said it and that Dirk had said it
19 just in this phone call.
20 Q.  But there was no way SAP Business One will
21 work for Hodell?
22 A.  If they are going to grow at the rate they're
23 growing and if they're going to be at 500
24 users, that Business One was not going to be
25 the appropriate product for them. That's

Page 187

1  correct.
2  Q.  I'll tell you that I don't know of any
3  conversation occurring where Hodell was
4  saying that they were going to grow to 500
5  users.
6  A.  Well --
7      MR. STAR: There's no question. He made
8  a statement.
9  Q.  Do you ever recall anyone discussing a
10 proposal to roll Hodell back to their old
11 system?
12 A.  No, I don't know that. I mean, it may have
13 happened. I don't remember.
14 Q.  Check out 157.
15 A.  (Witness complies.)
16     Okay.
17 Q.  We were talking earlier about an April patch
18 that you hoped might resolve Hodell's issue,
19 right?
20 A.  Right.
21 Q.  What's Ralf Mehnert-Meland's opinion as to
22 whether that April patch is going to fix the
23 issue?
24     MR. STAR: Objection to form.
25 A.  His stated position in the e-mail is that it

Page 188

1  may resolve add-on performance issues, but
2  that the size of the data, just the sheer
3  volume of the data, may still present a
4  problem.
5  Q.  Okay. And he's not saying that that's a new
6  problem, is it? In fact, he says, "This is
7  an issue that has been known for years,"
8  correct?
9      MR. STAR: Objection to form.
10 A.  Yes.
11 Q.  Do you know how many years that issue had
12 been known by SAP?
13 A.  It's the same as I told you before. Whenever
14 between that 2006, 2007 time frame when the
15 product finally got implemented and we
16 started rolling out the system, I don't know
17 the exact date.
18 Q.  Again, Ralf Mehnert-Meland concludes, "Hodell
19 just has too much data. SAP Business One
20 cannot handle it. There is no fix in sight.
21 I believe we need to find a way to get the
22 customer off SAP Business One," correct?
23 A.  Correct.
24     MR. STAR: Correct, that's what he said?
25     THE WITNESS: Correct, that's what he

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

Page 189

1 says. Sorry.
2     MR. STAR: That's okay.
3     BY MR. LAMBERT:
4 Q.  Isn't it true that no one told Hodell in
5 April -- as of April 16, 2007, that SAP
6 needed to find a way to get them off the SAP
7 Business One's system?
8     MR. STAR: Objection to form.
9 A.  I don't know.
10 Q.  Do you have any personal knowledge of anyone
11 at SAP making that suggestion to Hodell?
12 A.  Not up to 4/16.  I did on 4/17.
13 Q.  Would you agree with me that if Ralf
14 Mehnert-Meland's statement is true, that that
15 was an issue that had been known for years,
16 such a recommendation could have been made
17 well before April, 2007?
18     MR. STAR: Objection to form.
19 A.  Essentially, no.  Again, I have to go back to
20 what I said.  It depends on when the software
21 was finally implemented and when the customer
22 was finally beginning to use it in a
23 production form.  We would not have known
24 prior to that.  No way to know prior to that.
25 Q.  He's saying they knew.  Do you have any

Page 190

1 reason to disagree with him?
2     MR. STAR: Objection to form.
3 A.  What I'm saying is we knew at a time when we
4 knew.  You can't know until the software is
5 installed.  So Hodell knows when that was.  I
6 don't know when that was.
7     That would be like suggesting that
8 Toyota knew that their car was going to
9 accelerate before the car accelerated.  You
10 can't know until it does.
11     MR. HULME: Plus, it didn't.
12     THE WITNESS: Plus, it didn't.
13     (Document marked Exhibit No. 180.)
14     THE WITNESS: Okay.
15     BY MR. LAMBERT:
16 Q.  Do you recall the purpose of Exhibit 180?
17 A.  I'm sorry?
18 Q.  Do you recall the purpose of your e-mail
19 reflected in Exhibit 180?
20 A.  My e-mail was in reference to a request from
21 Michael Sotnick.  He was getting ready to
22 meet with his boss, Rodney Seligmann, and he
23 wanted to bring Rodney up to speed, because
24 by this point we were talking about the need
25 to have to possibly bail out of this, you

Page 191

1 know, a refund, whatever was going to happen,
2 he needed to make sure his boss was aware.
3 Q.  Why did you accuse LSi of playing dumb?
4 A.  The issue -- the "play dumb" would refer to
5 ongoing comments about not knowing that the
6 product was not going to work or not going
7 that the environment is too big or not
8 knowing that it's outside the sweet spot or
9 not knowing that the whatever.  They're just
10 always saying, "We didn't know.  We didn't
11 know.  We didn't know."  That's the
12 definition of playing dumb.
13 Q.  Okay.  And you disagreed with their
14 statements?
15 A.  No, it's just somebody's statement.  They
16 will do that.  As I think Dan will tell you,
17 he and I are friends, but Dan has a very
18 specific kind of a personality, and he will
19 assume a play-dumb attitude.  And then he'll
20 get aggressive, and he has a reputation as a
21 squeaky wheel.  Just a style issue.
22 Q.  Well, that ended up being correct, right?
23 LSi has denied that they were told that
24 Hodell was outside the sweet spot, correct?
25 A.  It's correct they have said that.

Page 192

1 Q.  And your e-mail here says, "There were many
2 discussions, as well as written e-mails, with
3 Dan Lowery and others within his organization
4 stressing that this opportunity was suspect
5 from day one," correct?
6 A.  Yeah.  I mean, I don't know if the letter was
7 from day one, it was an internal e-mail or it
8 was just something I knew was going to end up
9 in a deposition some day, but early on.  I
10 mean, it wasn't something that was going to
11 be in a deposition some day, but early on.
12 Q.  What did you mean?  Why did you put
13 "opportunity" in quotes?
14 A.  Well, because obviously by this point in time
15 it wasn't an opportunity anymore; it was a
16 liability.
17 Q.  And is it fair to say that you did not have
18 any conversations with anyone at Hodell to
19 inform them that their implementation of
20 Business One was suspect?  Correct?
21 A.  By this point?
22 Q.  Correct.
23 A.  It was the next day.
24 Q.  Prior to Hodell going live, you had no
25 communication with anyone at Hodell to let

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

Page 193

1  them know that their implementation of
2  Business One was suspect, correct?
3  A.   When did they go live?
4  Q.   March of 2007.
5  A.   Yes, I did.
6  Q.   When?
7  A.   The next day.  This is on 4/16, and my
8  conversation and call with Hodell was on
9  4/17.
10  Q.   That's after March.
11  A.   You said 2007.  This is -- oh, I'm sorry.
12  Correct.  I'm sorry.  My dates are wrong.
13  Q.   You had conversations with Dan Lowery from
14  day one telling him the opportunity was
15  suspect, correct?  Is that your intention?
16  A.   I'm saying that --
17        MR. HULME: Objection to form and
18  foundation.
19        THE WITNESS: I'm saying that early on.
20  I'm not going to say from day one.  Like I
21  said, that was an internal e-mail.  I
22  shouldn't have said that.
23        From early on, there was -- there were
24  discussions that this was going to be a
25  difficult implementation.

Page 194

1  Q.   How come no one from SAP ever picked up the
2  phone to tell Hodell that this implementation
3  was going to be suspect?
4        MR. STAR: Objection to form and
5  foundation.
6  A.   Because there were at least two other
7  add-ons, and there were at least -- which
8  means two other ways in which the issues that
9  he might find could be addressed.
10        He could know absolutely what he's
11  doing.  He could have had an absolutely great
12  answer for any of that.
13  Q.   Who?
14  A.   Dan Lowery.
15  Q.   I'm saying if you were of the opinion from
16  very early on that this implementation was
17  going to be suspect, how come you never
18  communicated that to Hodell?
19  A.   Because SAP does not communicate directly to
20  their customers.  That's the partner's
21  responsibility.  If SAP communicated with
22  every single customer, we could be doing so
23  in contradiction of what the partner has in
24  mind for that customer.
25        We can't.  We simply cannot understand

Page 195

1  or know because there are other add-ons.
2  There are other products.  There are other
3  services.  There are a lot of other things
4  going on in that sale that we don't know.
5  That would actually be more irresponsible.
6  Q.   There was one thing you did know, right, that
7  this was a suspect implementation?
8  A.   No, we knew that this customer's -- by this
9  time, this customer was large enough that
10  there could be some significant issues with
11  SAP Business One.
12        And again, not knowing for
13  sure how he was going to resolve those or
14  what his product might do --
15        My example to you earlier with Soft
16  Brands, they got around it.  They got around
17  it by putting a lot of their -- a lot of the
18  issues that were caused by SAP in their own
19  engine.
20  Q.   Well, good for them.  Did Hodell get around
21  it?
22        MR. STAR: Objection to form.
23  Q.   Hodell's implementation failed, didn't it?
24        MR. STAR: Objection to form.
25  A.   Not due to Business One necessarily.

Page 196

1  Q.   What's your opinion of why Hodell's
2  implementation failed?
3        MR. STAR: Objection to form.  Go ahead.
4  A.   I believe that there were -- I believe that
5  there were a lot of issues leading up to why
6  this implementation failed.  Part of it was
7  there was not enough due diligence done and
8  testing done up front with this solution in
9  that production environment, production
10  environment of that size.
11        There was not enough testing done in the
12  way those users were going to use that
13  software, and there was not enough testing
14  done of all of the applications running in
15  concert, so, in other words, LSi's, plus
16  Radio Beacon's, plus SAP's, plus any other
17  add-ons.  I don't know if they had other
18  add-ons in there or not, all running
19  together.
20        And again, those are the responsibility
21  of the organization that ultimately delivers
22  a total solution.  SAP is just one small
23  component of a total solution.
24  Q.   What would the testing have revealed in your
25  opinion?

Page 197

1     MR. STAR: Objection to the form.
2  A.  Yeah, I don't know.  I mean, again, I don't
3  know LSi's product itself.  I've never even
4  seen it.  I have no idea what it would have
5  shown.
6     Hindsight, now knowing what we know now,
7  I guess what it would have shown is that it
8  wouldn't have worked.
9  Q.  That Business One could not process the
10  amount of data that Hodell was working with,
11  correct?
12     MR. STAR: Objection.
13  A.  No.  Business One in the environment that it
14  was being asked to perform and the add-ons in
15  addition.  Again, Soft Brands had companies
16  much bigger than Hodell-Natco running fine.
17  The reason was because they overcame some of
18  the Business One issues by doing some things
19  different in their software.
20  Q.  Was Hodell sold SAP Business One on the
21  concept that it was going to have to overcome
22  deficiencies in the software through other
23  products?
24     MR. STAR: Objection to form.
25  A.  They wouldn't have been deficiencies.  They

Page 198

1  would have never seen them.
2  Q.  So you're agreeing with me that there are
3  inherent deficiencies in SAP Business One?
4     MR. STAR: Objection to form.
5  A.  No, I'm not at all.  If Hodell-Natco, that
6  company specifically -- if Hodell-Natco had
7  only used SAP Business One for general
8  financials, it would have worked perfect.
9  Q.  That's not what it was sold to them for,
10  correct?
11  A.  Correct, because there was an add-on.
12     (Document marked Exhibit No. 181.)
13  Q.  Turn to Exhibit 181.
14  A.  Okay.
15  Q.  Have you seen Exhibit 181 before?
16  A.  Yes.
17  Q.  What's being discussed in 181?
18  A.  By me?
19  Q.  Yes.
20  A.  My e-mail is referring to the summary of the
21  call.
22  Q.  The call we were just talking about?
23  A.  Correct.
24  Q.  Okay.
25     MR. HULME: I'm sorry.  What call you

Page 199

1  were just talking about?
2     MR. STAR: He's looking here at the top
3  of this e-mail, which is April 17th, and this
4  document summarized the telephone call that's
5  in --
6     THE WITNESS: Number 158.
7     MR. HULME: Okay.  Thanks.
8     BY MR. LAMBERT:
9  Q.  Look down at the bottom of the second page of
10  that document.  This is an e-mail from Ralf
11  Mehnert-Meland you were copied on, correct?
12  A.  Correct.
13  Q.  He's opining is that the April patch that
14  we've been talking about, in his opinion, was
15  not going to fix the issues, correct?
16     MR. STAR: Objection to form.
17  A.  Correct.
18  Q.  Dan Kraus replies to him, correct?
19  A.  He does.
20  Q.  And you're included on that e-mail?
21  A.  Yes.
22  Q.  And his reply is, "I think the conversation
23  needs to be believed that the performance
24  issue due to the integration of multiple
25  add-ons will be resolved at month end,"

Page 200

1  correct?
2  A.  Correct.
3  Q.  Isn't that inconsistent with what Ralf
4  Mehnert-Meland had just said?
5     MR. STAR: Objection to form.
6  A.  Yes.
7  Q.  Who prevailed?  Given that those two are in
8  conflict, whose message prevailed, and which
9  one was ultimately conveyed to Hodell?
10     MR. STAR: There's at least two
11  questions there.
12     THE VIDEOGRAPHER: Can we pause for one
13  second?  I've got to reboot myself now.  My
14  super Mac just --
15     MR. STAR: I'd say let's keep going.  We
16  don't have a lot of time.
17     THE VIDEOGRAPHER: I'll catch up to it.
18     MR. STAR: Fine.
19     BY MR. LAMBERT:
20  Q.  Given that those two opinions were
21  inconsistent, whose opinion was communicated
22  to Hodell?
23     MR. STAR: Objection to form.
24     You can answer.
25     THE WITNESS: I'm thinking how to

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

Page 201

1 answer.
2 MR. STAR: If you know.
3 A. Well, I communicated it. So I know, but I'm
4 trying -- I would say that the response
5 communicated was more inclined to support
6 Ralf's position.
7 Q. Can you show me or can you point to any
8 communication that supports what Ralf was
9 telling you?
10 A. It was the phone call in my summary.
11 Basically, the fact that I was trying to find
12 other options for Hodell that might work was
13 because I had communicated to them that there
14 was a possibility that --
15 Well, when we found out how quickly they
16 were going to grow, I can tell you in no
17 uncertain terms with complete and total
18 certainty that I stated that Business One was
19 not going to be the appropriate solution if
20 they grew at the numbers they had given us on
21 that call.
22 Q. I've seen you say that internally. I haven't
23 seen anything that indicates that you
24 communicated that to Hodell.
25 MR. STAR: He just testified that he

Page 202

1 did.
2 A. This indicates that I did. What this is is a
3 summary of what was said in the call. I
4 don't know what else I could document.
5 Q. Why is Dan Kraus suggesting that a different
6 message be communicated to the customer?
7 MR. STAR: Objection to form. He's not
8 Dan Kraus.
9 A. I have no idea. I have no idea.
10 Q. He was your boss at the time, correct?
11 A. Yeah, I don't know why he would say it.
12 Q. Well, Michael Sotnick was Dan Kraus' boss,
13 correct?
14 A. Correct.
15 Q. And he agreed with Dan Kraus' position,
16 correct?
17 A. No.
18 MR. STAR: Objection to form.
19 THE WITNESS: And, no, he didn't.
20 Basically, he's said "team," which is all of
21 us. Just basically, he's saying, "Tell me
22 what you're doing, and I will communicate."
23 His style was such that he empowered us
24 to make our decisions, and we did. This is
25 very consistent of Michael, right here.

Page 203

1 (Indicating.)
2 Q. What was your understanding of what he was --
3 what Michael Sotnick was saying on the first
4 page, "So I would agree with the order of the
5 four options below but not necessarily agree
6 with the exact language. I know you know
7 what I mean here"?
8 MR. STAR: Objection to form.
9 Don't speculate.
10 A. All I can -- the only way I can answer this
11 is what I did. I drove the phone call the
12 next day, and I told what I believed to be
13 appropriate and truthful answers and
14 suggestions.
15 Q. Turn to 159.
16 A. (Witness complies.)
17 Okay. Where?
18 Q. Do you recall sending the e-mail that is
19 reflected in Exhibit 159?
20 A. I do.
21 Q. What was the purpose of that e-mail?
22 A. What I was trying to do -- and again, going
23 back to why I was not willing to just say we
24 just have to bail and run away and this won't
25 work, is the suggestion that we might be able

Page 204

1 to use the Business One solution as a front
2 end to an All-In-One engine on the back end,
3 and that might give us the horsepower we
4 needed in order to give Hodell-Natco the
5 performance they required but still give them
6 the In-Flight add-on that they liked.
7 Q. I thought you just testified that you told
8 Hodell on that phone call that they needed to
9 get off of Business One?
10 A. Because on the phone, I did.
11 Q. Did you end up taking that statement back?
12 A. No, no, no. What this is suggesting is not
13 using Business One as the solution. Using
14 Business One -- this was using the
15 In-Flight/Business One solution as a front
16 end to an overall All-In-One solution on the
17 back end.
18 Q. So under that scenario, they would keep
19 running Business One as it had been installed
20 but you would be incorporating other software
21 into it?
22 A. That's it, yes.
23 Q. Is it fair to say that in April, 2007, no one
24 told Hodell to start looking for a completely
25 different software package to replace SAP

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

**Page 205**

1 Business One?
2    MR. HULME: Objection to form.
3 A.  No, because there were still plenty of
4 options.
5 Q.  With SAP Business One?
6 A.  No, with SAP.  If they were going to look for
7 a new solution, they might as well look for
8 an SAP solution.
9 Q.  Well, couldn't they have looked for other
10 solutions as well?
11 A.  Sure.
12 Q.  No one told them to do that, did they?
13 A.  Why would we?  They had options within SAP.
14 We were trying to help them solve their
15 issues and keep them as a customer.
16 Q.  What options did they have with SAP?
17 A.  Well, the one I proposed was again seeing if
18 we could find a way to use Business One as a
19 front end and All-In-One as a back end.
20    They wouldn't care.  They would never
21 see All-In-One.  It would be just be the
22 engine running in the back to make this thing
23 work.
24 Q.  Every SAP employee which -- that I've seen
25 that addressed that issue said that

---

**Page 206**

1 All-In-One would not work for Hodell.
2    MR. STAR: There's no question.
3 Q.  Are you suggesting that All-In-One would work
4 for Hodell?
5 A.  I wasn't suggesting All-In-One for Hodell.  I
6 was suggesting All-In-One as a platform under
7 the Business One solution.
8 Q.  Did anyone ever agree with you that that
9 would work?
10 A.  It never got that far.
11 Q.  Why not?
12 A.  Because if you read my e-mail on 158, LSi
13 said no.
14 Q.  Why was it up to LSi to say yes or no?
15 A.  Because they own In-Flight.
16 Q.  Okay.  Well, if LSi said they wouldn't
17 develop -- what specifically did LSi say no
18 to?
19 A.  To interfacing their solution.  It would have
20 taken time and effort to integrate their
21 solution into an All-In-One platform.
22 Q.  Okay.  Well, what other SAP path was
23 available to Hodell after LSi said no to
24 agreeing to add In-Flight to All-In-One?
25    MR. STAR: Objection to form.

---

**Page 207**

1 A.  If Hodell had determined that they were
2 willing to throw out Business One and start
3 doing an all new software search, then they
4 could have done an all new software search
5 with SAP All-In-One solutions for
6 distribution.
7 Q.  Did you ever hear anyone opine that
8 All-In-One would be appropriate us -- for
9 Hodell?
10 A.  I did in the call, in this call.
11 Q.  Anyone other than yourself?
12 A.  I don't know.
13 Q.  Is it fair to say that Hodell could have --
14 strike that.
15    Is it fair to say that your
16 communications with Hodell around this time
17 were designed to keep Hodell as an SAP
18 customer and to not go look for other
19 software vendors to replace Business One?
20 A.  Yes, if possible, most definitely.
21 Q.  Dan Kraus makes a statement down at the
22 bottom of 159, "There is no go-forward path
23 here with Business One.  The partner clearly
24 has misrepresented the solution."
25 A.  Yeah.

---

**Page 208**

1 Q.  Do you agree with that statement?
2 A.  I can't answer.  I don't know that the
3 partner misstated that.  I don't know that
4 the partner misstated it.  There's no way to
5 know.
6 Q.  Had it been included on this e-mail, you're
7 aware that Dan Kraus was of the opinion that
8 LSi-Lowery had misrepresented Business One to
9 Hodell?
10 A.  That is correct.
11 Q.  Did you ever have a conversation with Dan
12 Kraus about that?
13 A.  I mean, I don't know that I did specific
14 about that comment.  We talked about Hodell
15 and Dan Lowery and LSi many times because of
16 this situation obviously.
17 Q.  You don't have an understanding of what that
18 opinion is based upon -- or strike that.
19    You don't have an understanding of what
20 that conclusion is based upon; is that your
21 testimony?
22    MR. STAR: Objection to form.
23 A.  Um-hum, that would be my testimony.
24 Q.  Turn to 160.
25    MR. STAR: Here it is.

---

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 209

1  A.  Okay.
2  Q.  Do you recall seeing the e-mails that are
3  reflected on Exhibit 160 in and around
4  April 18, 2007?
5  A.  Yes.
6  Q.  Down at the bottom of the first page, Ralf
7  Mehnert-Meland comes to the conclusion that
8  the multiple SAP Business One installation
9  scenario was not feasible, correct?
10  A.  His opinion is it's not feasible, correct.
11  Q.  Is that the solution that you were proposing?
12  A.  It was a solution.  Correct.
13  Q.  Okay.  And it's not -- "It doesn't look to me
14  like it's related to the In-Flight software
15  but that it would be too complex and wouldn't
16  resolve issues anyway."
17  A.  It never went anywhere, so there's no way to
18  know.
19  Q.  He also makes the statement that Lowery
20  completely oversold SAP Business One.  Do you
21  know what he meant by that?
22  A.  Well, again, hindsight -- and what are we
23  now, three years into it or four years into
24  it?  I think it was a conclusion that was
25  drawn.

---

Page 210

1      What happened when it was being sold,
2  no, I don't think anybody can make that
3  claim.  That was an internal comment made to
4  other SAP people.  I don't think anybody knew
5  at the time.
6  Q.  Well, he's not even making that claim to
7  Lowery.  He's stating that internally, right?
8  A.  That's what I'm saying.  Correct.  He's
9  making the claim internally, and he may
10  not -- I mean, it may just be pure emotion
11  coming out.  Who knows what his background --
12  and I don't know what his frame of mind was.
13  Q.  Seeing the top e-mail, does that refresh your
14  recollection as to whether rolling Hodell
15  back to its old system was discussed?
16  A.  Yes, it was discussed.
17  Q.  Do you know why that didn't happen?
18  A.  I have no idea why it didn't happen, no.
19  Q.  Do you ever recall it being proposed to
20  Hodell?
21      MR. STAR: By who?
22      MR. LAMBERT: By SAP.
23  A.  It would be an assumption on my part if I
24  said it.
25      MR. STAR: Only if you know.

---

Page 211

1  Q.  Do you have any personal knowledge of that
2  recommendation being communicated to Hodell
3  by anyone at SAP or LSi?
4  A.  I don't have personal knowledge of it.  I've
5  only got assumptions.
6  Q.  Who is Manfred Weis?
7  A.  He would be my counterpart.  He was in charge
8  of customer satisfaction.
9  Q.  Turn to Exhibit 88.
10  A.  (Witness complies.)
11      Okay.
12  Q.  The bottom e-mail on Exhibit 88 --
13  A.  Um-hum.
14  Q.  -- Dan Kraus makes the comment, "We talked at
15  a high level on the financial impacts of
16  these decisions and what SAP is willing to
17  do, so that should be no surprise as well."
18  A.  You said at the bottom of the e-mail?
19  Q.  The bottom e-mail on Exhibit 88, yeah.
20      MR. HULME: On 2723?
21  A.  On 2723?  Sorry.  Okay.  Sorry.
22  Q.  It's an e-mail from Dan Kraus to Lowery,
23  others.  You're included.
24  A.  Okay.  So now, once again, where are you?
25  Q.  The very last sentence.

---

Page 212

1      MR. STAR: You can read the whole thing
2  if you need to.
3  A.  Okay.
4  Q.  Do you know what Dan Kraus meant by that
5  statement?
6  A.  No.
7  Q.  Were you involved in those discussions?
8  A.  I was probably cc'd.  I was probably, you
9  know, in training meetings and things like
10  that, but if Dan Kraus was having specific
11  conversations with Dan Lowery about what SAP
12  might do, I was not included in those.
13  Q.  Turn to Exhibit 86.
14  A.  (Witness complies.)
15  Q.  You're free to read the whole thing.  I'm
16  just going to ask you about the e-mail on SAP
17  11793.
18  A.  Okay.  Go ahead.  I have read that.
19  Q.  If Dan Lowery makes the statement that he
20  feels that SAP was keeping in touch with his
21  company or Hodell on the installation
22  problems, would you agree with that
23  statement?
24  A.  I don't know.
25  Q.  Well, as someone who was --

---

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 213

1  A.  I would agree that he said it.
2  Q.  No.  Do you agree with his opinion on that?
3  A.  No, I don't know.  I mean, there were a lot
4  of people involved.  I have no idea of who
5  was communicating with whom.
6  Q.  Would you agree with his statement that there
7  was no sense of urgency for SAP to fix the
8  implementation problem at Hodell?
9  A.  I would suggest that there was something
10  coming and that development was working on
11  it, and there was a time frame that was
12  communicated.  Whether that fell into the
13  sense of what somebody's sense of urgency is,
14  I don't know, but I know that we had
15  communicated the date.
16  Q.  Turn to 89.
17  A.  (Witness complies.)
18     Okay.
19  Q.  Exhibit 89 is an e-mail from Paul
20  Killingsworth to some folks at Hodell, but
21  you're cc'd on that, correct?
22  A.  Yes, I am.
23  Q.  It's in June of 2007?
24  A.  Yes, it is.
25  Q.  He makes the statement, "Nonetheless, it is

---

Page 214

1  reasonable to believe that you will
2  experience significant performance
3  improvements in many areas with SAP Business
4  One 2007A when it is implemented at
5  Hodell-Natco."
6  A.  Yes, he did say that.
7  Q.  Based upon your involvement with the
8  implementation up to this point, was this an
9  attempt by Mr. Killingsworth to prevent
10  Hodell-Natco from going out and looking for
11  an alternative software vendor to replace
12  Business One?
13  A.  To prevent them, no.  I don't think so at
14  all.
15  Q.  What was the purpose of Exhibit 89?
16  A.  I think it was to communicate to a customer
17  that we're working on their problems and that
18  we take it very seriously and that we're
19  hoping still to resolve it, the same as my
20  comments all along.
21     I think this is proof that SAP was
22  continuing to try to work on the product and
23  improve it.
24  Q.  Would you agree with me that a customer
25  receiving the e-mail of Exhibit 89 could

---

Page 215

1  reasonably interpret it to mean that they
2  should stick with the product longer rather
3  than going out and trying to replace it?
4     MR. STAR: Objection to form.
5  A.  The answer would be no.
6  Q.  Why?
7  A.  I think it's an attempt to communicate with
8  the customer.  The customer will make up
9  their own mind and their own decision.  They
10  do it all the time.
11  Q.  Well, Exhibit 89 is part of the basic
12  information that the customer would be making
13  its decision based upon, correct?
14  A.  Yes, that is correct.
15  Q.  Dan Lowery testified about a conversation he
16  had with Dan Kraus at a cocktail hour where
17  Dan Kraus -- or Dan Lowery was attempting to
18  talk to Kraus about the In-Flight
19  development, and Dan Kraus said something to
20  the effect of, "I don't want to hear anything
21  about it, because I don't want to know how
22  much code you're going to have to rewrite
23  eventually."
24     Did Lowery ever mention anything about
25  that conversation to you?

---

Page 216

1  A.  If he did, I don't remember.
2  Q.  Turn to Exhibit 61.
3  A.  (Witness complies.)
4     Okay.
5  Q.  Have you seen Exhibit 61 before?
6  A.  Yes -- well, not in this form, but I've seen
7  all of these messages before.
8  Q.  Okay.  Do you know when they first began to
9  be circulated by SAP?
10  A.  Well, By Design is mentioned.  It would be
11  right around September, give or take, of
12  2007, maybe October.
13  Q.  Turn to 171.
14  A.  (Witness complies.)
15     Okay.
16  Q.  Have you seen Exhibit 171 before?
17  A.  Yes.
18  Q.  Did you see it -- well, you wouldn't have
19  seen it in February, 2005, correct?
20  A.  Correct.
21  Q.  Do you recall when you saw it?
22  A.  It was probably -- my assumption is in
23  November of 2005, but it would have been part
24  of my overall packets of SAP information.
25  Q.  Turn to the second page of that document.

---

Page 217

1 A.  Okay.
2 Q.  It's referencing SAP Business One 2005,
3 correct?
4 A.  It is.
5 Q.  There's a bullet point, "Improved qualities
6 of the product to deal with a higher volume."
7 Do you see that?
8 A.  Um-hum.  Wait a minute.
9 Oh, that one.  Yes.
10 Q.  What did that mean?
11 MR. STAR: Objection to form.
12 A.  Yeah, I'm not sure honestly.
13 Q.  You never asked any questions about what it
14 meant?
15 A.  No.
16 Q.  Would that be one of the product issues that
17 we discussed earlier on today?
18 MR. STAR: Don't speculate.
19 A.  Yeah.  Honestly, I don't know.  I also don't
20 know how many versions were released between
21 when this came out and the end of the year.
22 Q.  Do you know what it means, a higher volume of
23 what?  Do you have any idea?
24 A.  I have no idea.  I don't know.
25 Q.  Is there any point in this document that

Page 218

1 people that are reading it don't know what
2 SAP is talking about?
3 MR. STAR: Objection to form.
4 A.  I'm not sure.  Again, I don't understand it.
5 Q.  Are you familiar with the Business One sizing
6 guide?
7 A.  Yes.
8 Q.  What is it?
9 A.  It's the -- it is a -- I think it's an Excel
10 spreadsheet, but anyway, it's a document that
11 a partner -- it asks a partner a series of
12 questions.  They fill in a bunch of
13 information, and then it gives them an idea
14 of what they would need in order for the
15 system -- how to configure a system.
16 Q.  Well, could you turn to Exhibit 122?
17 A.  Yes.  I haven't seen this.  I don't know if I
18 have to read the whole thing.  I guess I
19 could go through it as you ask the question.
20 Q.  Well, what does it reference here as a large
21 business in terms of --
22 A.  150 users.
23 Q.  Okay.  This is in 2004, right?
24 A.  This is correct.
25 Q.  Do you have any idea what the test results

Page 219

1 indicated on there mean?
2 MR. STAR: Where are you looking?
3 A.  Appendix A is where -- I don't think you have
4 Appendix A in here, do you?  I'm not sure.
5 You'd have to go to Appendix A if you've got
6 it.
7 Oh, wait a minute.  The end field test
8 results.  Hold on.  I can't find the page.  I
9 don't have a large -- this one doesn't have a
10 large test result.  I've got a meeting paper.
11 MR. STAR: What page are you on?
12 Q.  It would be the last column.  Are you
13 familiar with statements of direction that
14 were put out by SAP with regard to Business
15 One, annual statements of direction?
16 A.  Well, there were -- there were two events in
17 the year.  There is something called a Field
18 Kickoff and something called a Summer Sales
19 Meeting.  During those events, I mean, SAP
20 would normally put out statements of
21 direction.
22 Is that what you're asking?
23 Q.  Yeah, well, turn to Exhibit 124.
24 A.  (Witness complies.)
25 Okay.

Page 220

1 Q.  Is that a document you're familiar with?
2 A.  Yes.
3 Q.  This one appears to be dated April 25, 2005,
4 correct?
5 A.  Correct.
6 Q.  Turn to Page 5 of 22.
7 A.  Okay.
8 Q.  There's a statement, "In future releases, SAP
9 Business One will focus on the needs of
10 businesses with 10 to 100 employees."
11 Do you see that statement about halfway
12 down?
13 A.  I do.
14 Q.  Was that your understanding of the focus of
15 SAP Business One when you joined SAP?
16 A.  No.  I mean, actually, the next sentence kind
17 of even says it, but no, not necessarily.
18 Q.  Okay.  Is it fair to say that no one
19 communicated to Hodell that SAP was going to
20 focus Business One on the needs of businesses
21 with 10 to 100 employees?
22 A.  That would be safe to say, I think.
23 Q.  Turn to 129.
24 A.  Okay.
25 Q.  Are you familiar with this document?

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 221

1   A.   Yes.
2   Q.   What's the purpose of a statement of
3   direction?
4   A.   Again, it's a way of -- in a company that has
5   multiple solutions or multiple organizations,
6   industries and everything else, it's to give
7   people an idea of where we are going to be
8   taking any given solution or vertical
9   component of a solution.
10  Q.   Turn to Page 7.
11  A.   Okay.
12  Q.   This is titled "Summary," correct?
13  A.   It is.
14  Q.   I'm looking at about halfway down on the
15  left-hand side, that paragraph that ends,
16  "SAP Business One is optimized for
17  performance with up to 50 concurrent users."
18       Do you see that statement?
19  A.   I do.
20  Q.   Was that your understanding of the optimized
21  performance of Business One in 2006?
22  A.   Sure.
23  Q.   Is it fair to say that no one communicated to
24  Hodell, in and around 2006, that Business One
25  was optimized for up to 50 concurrent users?

---

Page 222

1        MR. STAR: Objection to form.
2        You can answer if you know.
3   A.   I don't know that they were anywhere.  I
4   mean, this was a document that was readily
5   available to the general public.
6   Q.   Actually, I don't think it was.
7   A.   I'm pretty sure.  It was on the website.
8   Q.   If you look at Page 6, under the preface, it
9   says, "Please note, as a rule this document
10  should not be shared with customers."
11  A.   Okay.  Then that would be the answer, and it
12  probably was not communicated.
13       MR. STAR: Wait.  You mean this document
14  itself was not communicated or the
15  information?
16       THE WITNESS: No, the document itself
17  was probably not communicated.
18       BY MR. LAMBERT:
19  Q.   Do you have any personal knowledge of anyone
20  informing Hodell that Business One, as of
21  2006, was optimized for performance of up to
22  50 concurrent users?
23  A.   No, I have no knowledge of that.
24  Q.   There is also a similar statement in the
25  bottom right-hand corner, correct, under the

---

Page 223

1   summary page, Page 7?
2   A.   Okay.  I'm sorry.  What's the question?
3   Q.   There is a statement, "Our experience shows
4   that SAP Business One implementations are
5   significantly more successful when we target
6   prospects that fit the profile we used while
7   designing the product as follows."  The first
8   point is, "10 to 100 employees, possibly half
9   of them using SAP Business One concurrently,"
10  correct?
11  A.   Correct.
12  Q.   You have no knowledge of that being
13  communicated to Hodell?
14  A.   I have no knowledge that that was
15  communicated to Hodell.  That part is
16  correct.
17       MR. LAMBERT: Can we go off the record?
18  I think I might be done.
19       (Discussion held off the record.)
20       BY MR. LAMBERT:
21  Q.   Turn to Exhibit 119.
22  A.   (Witness complies.)
23       Okay.
24  Q.   Have you seen Exhibit 119 before?
25  A.   Yes.

---

Page 224

1   Q.   Is this a presentation that you would have
2   attended in July of 2006?
3   A.   Is this a presentation?  Yeah, I guess it
4   was.  Oh, Summer Sales Meeting, I may not
5   have.  I saw this document or this
6   PowerPoint.  I was not in this presentation.
7   I was doing my own presentations.
8   Q.   Turn to one, two, three, the third page.
9   A.   Okay.
10  Q.   "History of Business One Deal Sizes."
11  A.   Okay.
12  Q.   "Average deal size and number of users:  15,"
13  correct?
14  A.   Correct.
15  Q.   Is that consistent with your understanding of
16  the average deal size for SAP Business One in
17  2000 -- as of 2006?
18  A.   That's an indicator of what the average deal
19  size was, yes.
20  Q.   If you flip a few pages back, there is a page
21  that, if you don't mind, looks like that,
22  customer profiles.
23  A.   Okay.
24  Q.   There's a reference to a typical profile and
25  then a high-end profile, right?

---

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

Page 225

1 A. Yes.
2 Q. And on the next page, it has simulated users,
3 correct?
4 A. Correct.
5 Q. And on the high end is 30?
6 A. Yes.
7 Q. That is well below the number of users for
8 Hodell, correct?
9 A. That is correct.
10 Q. Do you know if Dan Lowery attended this
11 meeting?
12 A. I have no idea.
13 Q. The number of items for the high end is
14 60,000, correct?
15 A. Oh, yes, okay. Correct.
16 Q. Isn't it true that that's well below the
17 number of items that Hodell had?
18 A. Yes.
19 Q. Do you have any personal knowledge of anyone
20 at SAP communicating the high-end information
21 in this document to anyone at Hodell in 2006?
22 A. Well, first of all, this is not data. These
23 are results.
24    I go back to my point. These sessions
25 that were presented were giving people an

Page 226

1 idea of what's been sold to date. So all it
2 really is is an indication of what partners
3 have sold. It's not an indication of
4 anything that the product specifically does.
5    So what we try to do is we try to give
6 everybody an idea of KPIs, key performance
7 indicators, and best practices. That's what
8 these sessions were.
9 Q. Can you turn to the previous page? Doesn't
10 this reference a test conducted by SAP
11 Business One or SAP?
12 A. That's correct.
13 Q. So these aren't implementation results; these
14 are internal test numbers, right?
15 A. These are -- they ran tests using these
16 numbers, but what these sessions were was a
17 compilation of data that was to give the
18 partners and IBD of where the partners are
19 playing and succeeding in general.
20    It's just context around this.
21 Q. Okay. Turn to the page that's called
22 "Disclaimers".
23 A. Okay.
24 Q. Like that. (Indicating.)
25 A. All right.

Page 227

1 Q. There is a statement, "Combinations of large
2 number of warehouse, large amount of items
3 and large number of price lists result in
4 performance degradation," correct?
5 A. Correct.
6 Q. To your knowledge, was that information
7 provided to Hodell in 2006?
8 A. I don't know.
9 Q. You have no personal knowledge of that being
10 stated to Hodell; is that correct?
11 A. That's correct.
12 Q. To your knowledge, a slide that looks like
13 this, titled, "How to profit when an
14 opportunity is too large, too complex for SAP
15 Business One."
16 A. Does it have the slide number on it?
17 A. Unfortunately, it doesn't.
18 A. There, we go. Okay.
19 Q. Who is Peter Stoddaker?
20 A. He was -- I think he was from Germany. I
21 think he was from Alameda. Anyway, he was
22 somebody that was participating in our Summer
23 Sales Meeting, doing a presentation.
24 Q. Do you recall seeing these slides?
25 A. I do not.

Page 228

1 Q. Can you turn to the next slide --
2 A. Okay.
3 Q. -- entitled, "When might an opportunity be
4 too large for Business One."
5 A. Okay.
6 Q. And then the next slide.
7 A. Okay.
8 Q. Red flags, correct?
9 A. Yeah.
10 Q. What's the last one?
11 A. "When the number of users exceeds 30."
12 Q. And well below the number of users being
13 purchased by Hodell, correct?
14 A. Correct.
15 Q. Do you recall anyone at SAP communicating to
16 Hodell that number of users exceeding 30 was
17 a red flag with regard to implementation of
18 Business One?
19 A. No, I have no idea.
20    MR. LAMBERT: I have no further
21 questions.
22    EXAMINATION BY MR. HULME:
23 Q. I want to talk about the sweet spot for a
24 second.
25 A. Um-hum.

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 229

1 Q.   The way the sweet spot has been used by SAP
2 as it related to Hodell-Natco, that has to do
3 with the target market for the SAP B1
4 system -- I'm sorry.  Strike that back.  Take
5 that all back.  I'm doing that for the
6 record.
7      I'm trying to paraphrase what you said
8 this morning.  A sweet spot is as you develop
9 a history where the -- most of the sales are
10 being made?
11 A.   That is correct.
12 Q.   Okay.  So by definition, because
13 Hodell-Natco's sale was the largest of the
14 B1, at least here in the United States at
15 that time, they were always going to be
16 outside the sweet spot?
17 A.   That's correct.
18 Q.   Until enough others were sold of the same
19 similar or larger size?
20 A.   That is correct.
21 Q.   Okay.  So that didn't mean it was outside the
22 performance parameters of SAP B1, Business
23 One; it just meant that it was the largest
24 sold?
25 A.   That is correct.

---

Page 230

1 Q.   The Business One software package, as I
2 understand it, was throughout 2005, 2006 and
3 actually even into 2007, targeted on the
4 small to medium-sized companies; is that
5 correct?
6 A.   That's correct.
7 Q.   And by definition, again, that SAP uses for
8 the small to mid-size or medium size is 10
9 million, 50 million is generally considered
10 small business; is that correct?
11 A.   That's correct.
12 Q.   And then 50 million to 500 million is
13 generally considered a medium-sized business?
14 A.   Correct.
15 Q.   Do you know one way or the other where
16 Hodell-Natco fits in either of those two
17 ranges?  Where they fit when they were sold?
18 A.   Well, it's impossible to say, because it
19 includes too many variables.
20 Q.   No, I just said:  Do they fit in small or
21 medium, or do you know?
22      MR. STAR: He's talking about the
23 revenue side.
24 A.   Oh, yeah.  From a marketing standpoint, they
25 would fit in a medium size.

---

Page 231

1 Q.   Okay.  That's what I'm saying.  So this --
2 from a marketing standpoint, the Business One
3 product was targeted for the Hodell-Natco
4 size company?
5 A.   From a marketing standpoint, correct.
6 Q.   Right.  Okay.  Would you go to Exhibit 81,
7 please, at the top of the first page?
8      THE COURT REPORTER: Could I just have
9 one minute?
10      MR. HULME: Sure.
11 A.   Um-hum.
12 Q.   It's an e-mail from Dan Lowery to you, Dirk
13 and Ralf, right?
14 A.   Correct.
15 Q.   In that Mr. Lowery states, "Here is the
16 decision criteria used when they made the
17 decision to buy SAP."  They're referring to
18 Hodell's experience.
19 A.   Right.
20 Q.   "First, Hodell is viewed as one of the best
21 ranked companies in the industry, well
22 respected by all."
23      Do you have any reason to disagree with
24 that statement?
25 A.   I do not.

---

Page 232

1 Q.   "Second, they were looking for a scalable
2 product to grow with them."  Would you
3 consider Business One a scalable product?
4 A.   Yes.
5 Q.   And what do you understand the words,
6 scalable product, to mean?
7 A.   Well, it could mean -- again, there are so
8 many variables.  It could mean anything from
9 taking it from one million to whatever,
10 depending on how you use the product and what
11 is your environment.
12 Q.   It will grow with the company?  It's designed
13 to grow with the company?
14 A.   It's designed to grow with the company, yes.
15 Q.   As the company grows?
16 A.   Yes.
17 Q.   And would you agree that, when sold, SAP
18 Business One was targeted to companies of 250
19 million with 500 users, up to 500 users?
20      MR. STAR: Objection.
21 Q.   From a marketing standpoint.
22 A.   Well --
23 Q.   You either agree, disagree or have no
24 opinion.
25      MR. STAR: If you know, you know.  If

---

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

Page 233

1  you don't, you don't.
2  A.  It was marketed to the small to medium
3  enterprise.
4  Q.  Okay.  And those numbers fit with the small
5  to medium enterprise definition that SAP
6  used, correct?
7     MR. STAR: Objection to form.
8  A.  Yes.
9     MR. STAR: You're talking about the
10 millions of dollars or the numbers of users?
11 Q.  "They like the Sql platform and the
12 scalability of it."
13    Do you know what the Sql platform is?
14 A.  Sql, Microsoft Sql server.
15 Q.  And SB1 was designed to work with the Sql
16 Server platform, correct?
17 A.  That is correct.
18 Q.  And in the same sense that Business One was
19 scalable, so was the Sql Server platform,
20 correct?
21 A.  Correct.
22 Q.  Do you know one way or the other whether LSi
23 developed In-Flight to SAP's SDK standards?
24 Do you know?
25 A.  I can't know.

Page 234

1  Q.  Still on that exhibit, the April 16th e-mail
2  from Dirk to Dan, which is the next one
3  down --
4  A.  Yes.
5  Q.  -- Point No. 2, Dirk states, "What we have
6  found out about Hodell would be, one, namely
7  the transaction volumes of Hodell are pushing
8  the upper limits of B1, which were not
9  thought to be a problem when Hodell purchased
10 B1."
11    Would you agree with that statement
12 based on your knowledge?
13 A.  Because I was so new in the company, I don't
14 know.
15 Q.  Go to Exhibit 83, please.  Simple question.
16 Do you know who Benton, M. Andrew is?
17 A.  Sorry?
18 Q.  On the very top, very first one.  Who are the
19 e-mails addressed to?
20 A.  I don't remember.  He might be somebody at
21 SAP legal, but I don't remember.
22 Q.  And in that e-mail, the one from Dan Lowery
23 to Dirk Boessmann, second paragraph, Dan
24 Lowery says, "Hodell is hanging with us only
25 because they expect a fix from SAP at the end

Page 235

1  of April."
2     And that is because, to your knowledge,
3  that that's what SAP told Hodell and LSi
4  then, to expect a fix by the end of April,
5  correct?
6  A.  To expect a patch by the end of April,
7  correct.
8  Q.  Okay.  A patch which SAP expected to fix
9  their performance problem; is that fair?
10 A.  I believe the way it was communicated is it
11 is a fix or a patch that we expected to
12 improve performance.  We wouldn't know until
13 it was put in.
14 Q.  Go to Exhibit 17, please.
15 A.  Okay.
16 Q.  And go to the Page 12366.
17 A.  Okay.
18 Q.  That contains an e-mail from Udi to Dan,
19 correct?
20 A.  From Udi to -- yes, it does.
21 Q.  April 13th, 2007?
22 A.  That's correct.
23 Q.  And in that e-mail, Udi says to Dan, "As you
24 know, this customer's environment is far
25 outside the sweet spot of Business One, (with

Page 236

1  120 users), et cetera. " close parenthesis.
2     Again, sweet spot in this case is bigger
3  than any others sold, correct?
4  A.  That is correct, but, again, therefore, we
5  anticipate similar performance and --
6  Q.  Okay.  Go ahead.
7  A.  Then again, that's my answer.  I don't know
8  what Udi was saying.  Sweet spot is a term
9  that could mean anything to anybody.  That is
10 how I would define sweet spot.
11 Q.  That's how you use it when you communicate
12 with business partners?
13 A.  That is correct.
14 Q.  Okay.  And then Udi goes on and says, "And
15 therefore, we anticipate that such
16 performance issues will come up."
17    He continues, "Having said that, we
18 believe we have identified the issue that may
19 be causing the specific performance problem,
20 but there is no way to verify this until we
21 use it for real in the customer's
22 environment," correct?
23 A.  That's correct.
24 Q.  And he goes on and states, "The fix will be
25 included in the April patch scheduled for the

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 237

1  end of the month," correct?
2  A.  Correct.
3  Q.  So that's consistent -- that's consistent
4  with Exhibit 83, Dan Lowery's confirmation
5  with Dirk?
6  A.  That is correct.  Yes, it is.
7  Q.  When did you first become aware of the
8  specific size, volumes, et cetera, at
9  Hodell-Natco?
10  A.  I don't know for sure.
11  Q.  Did you ever become aware of the specifics of
12  the volume transactions?
13  A.  Oh, yeah.  I mean, once we got into this --
14  and again, I'm sorry.  I don't mean to be
15  vague to anybody, but it all goes down to
16  sometime between when the product finally got
17  delivered, was put in-house and was starting
18  to be used in a production environment.
19  That's when this would have all come up.
20      I don't know what that time frame was
21  specifically, but that's when we would have
22  started having these discussions.
23  Q.  Is there any literature or database or
24  warnings of any type of SAP available to
25  channel partners that says, "Do not use this

---

Page 238

1  product for this particular application or
2  size customer"?
3  A.  No, there would be no way to do that.
4  Q.  Are you familiar with the online
5  qualification rule?
6  A.  Yes.
7  Q.  And in that you insert certain
8  performance--- I'm sorry.  What do you insert
9  into that tool online?
10  A.  It asks questions.
11  Q.  Okay.
12  A.  And based on your answers to those questions,
13  it tries to help you determine if this
14  prospect would qualify.
15  Q.  Qualify for what?
16  A.  For an SAP solution.
17  Q.  And have you ever run the information for
18  Hodell?
19  A.  I personally have not.
20  Q.  Do you know of anybody who has?
21  A.  Not personally.
22  Q.  Have you heard of anybody having done it?
23  A.  No.
24  Q.  Do you know what testing was done before the
25  go-live date for Hodell?

---

Page 239

1  A.  No.
2  Q.  Is the Business One product always marketed
3  as able to grow with the company?
4  A.  The easiest way to answer that is SAP from a
5  marketing standpoint doesn't market a
6  specific product.  It markets SAP, and SAP
7  has the ability -- allows a company to grow
8  from wherever they are to wherever they want
9  to be, period.
10      So SAP has the ability to take you to
11  wherever you need to go.  That's the way we
12  had always marketed Business One.
13  Q.  Didn't you also market the Business One
14  product to growing companies?
15  A.  We marketed to growing companies, yes.
16  Q.  Okay.  With the representation that they can
17  grow with Business One?
18  A.  In marketing, yes.
19  Q.  Would you agree that SAP marketed the
20  Business One product, "Whether you have five
21  employees or 500, SAP Business One helps
22  emerging businesses streamline their
23  operational and managerial processes"?
24  A.  Yes, yes, that's how it was marketed.
25  Q.  Monday, November 22nd, 2004, does that ring a

---

Page 240

1  bell as to when you started with SAP?
2  A.  November 22nd?
3  Q.  2004.
4  A.  2004?  I don't think so.  It was November.
5  Q.  LSi 1928071, it looks like it's an e-mail
6  announcing your --
7  A.  Let me see.  It's November 22nd.  That's the
8  date.  Then the answer is yes.  I apologize.
9  Q.  That's all right.  I just wanted to make sure
10  I understood.  That's when I understood when
11  you joined.
12  A.  I wish you would have helped me up there.
13  Sorry.  Honestly.
14  Q.  Were you involved in consulting with
15  Hodell-LSi on the hardware to use in the
16  implementation of Business One?
17  A.  I'm sorry?
18  Q.  Were you involved at all involved in the
19  consultation decision of what hardware to use
20  at Hodell?
21  A.  No.
22  Q.  So as I understand it, in April of 2007, both
23  Ralf and Udi were of the opinion that
24  Business One would not work for Hodell?
25  A.  Yes.

---

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

Page 241

1 Q. Based on e-mails you've read?
2 A. Based on e-mails, yes.
3 Q. Based on internal e-mails you read?
4 A. Yes.
5 Q. Okay. And we can agree that what was
6 communicated to LSi was, at least by e-mail
7 was, "We understand there was a performance
8 problem, but we expect to be able to fix that
9 through our patch that's coming out at the
10 end of April"?
11     MR. STAR: Objection to form.
12 Q. I'll go back to the e-mail if you want.
13     MR. STAR: There's a bunch of them.
14 Q. I'm looking at the one from Udi, Exhibit 78,
15 to Dan that states, "We believe we have
16 identified the issue that may be causing the
17 specific performance problem. The fix will
18 be included in the April patch scheduled for
19 the end of the month."
20     Can we agree that that's what was
21 communicated to LSi in April, 2007?
22 A. I can agree that that's what was
23 communicated.
24     MR. STAR: Objection to form.
25 Q. Would you look at Exhibit 69? The very first

Page 242

1 e-mail page of that is from Michael Sotnick
2 to Dan Kraus.
3     MR. STAR: Objection.
4 Q. And it says, "Since Udi is communicating just
5 with you, it is you that should respond."
6     "The 'cheeky' part of me wants to
7 respond as follows: 'Too bad it didn't know
8 the limitations of the product in 2004.'"
9     What do you understand that to mean?
10 A. I think it means exactly -- and I'm not being
11 funny. I think it means exactly what it
12 says. In 2004, I don't think anybody within
13 the SAP Americas organization knew that the
14 product limitations were what they were.
15 Q. And was it your conclusion from these
16 discussions in April of 2007 that Israel knew
17 of the product limitations in 2004?
18 A. No, I don't believe they knew of them either.
19 Q. What does the phrase, the cheeky part of me,
20 indicate to you?
21 A. What he's saying -- I think what Michael is
22 saying is, "We want to go back and say 'Gee.
23 Too bad that we didn't know in 2004,'" but
24 that would be cheeky; that would
25 be inappropriate; so don't say that.

Page 243

1     So what he's saying is, "I'd really like
2 to go and just say in 2004 we knew, but we
3 didn't." And you can't really say that.
4 Q. Do you have any idea when Udi Ziv would have
5 first formulated the opinion that somebody
6 with the configuration of Hodell shouldn't
7 use B1?
8 A. No, I have no way to know. That's kind of
9 what I was alluding to in our discussions
10 earlier, when I said I wasn't trying to
11 suggest Udi doesn't know what he's talking
12 about from a development standpoint.
13     But I don't know how he would have made
14 those claims from an office in Tel Aviv for
15 products being sold all around the world.
16 Q. What do you know about the configuration and
17 performance of B1 at the last time you worked
18 for SAP? Would it in your opinion fit with
19 Hodell?
20 A. Actually, I can't honestly say. I can say
21 that it had continued to improve, and I can
22 say that it continues to improve, probably
23 not at a rate that the partners would like.
24 But it does continue to improve.
25     So, for example, would it work today? I

Page 244

1 don't know. It might, but the issue is the
2 product does continue to advance and improve.
3 I'm still in contact with lots of the
4 partners, and they like the product.
5 Q. I was just wondering if you had knowledge
6 about -- you seemed to suggest a couple of
7 times today or at least when you were last
8 there, if Hodell had only waited, they might
9 have a system that worked.
10     Was that just theoretical on your part,
11 or did you have knowledge of the B1 product
12 and you knew enough about Hodell that you
13 would say it will work now; it's been changed
14 significantly?
15 A. No, what I am alluding to is the nature of
16 software. It continues to grow and continues
17 to evolve, it's quite possible that it would
18 work today. But this is six years later.
19 Q. From your experience in selling software or
20 marketing software, is revenue of a business
21 one of the factors you consider in
22 determining complexity of a software
23 solution? In other words, a company with
24 more revenue is likely to have more
25 complicated software issues than one with

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

Page 245

1 less revenue?
2 A.   Not necessarily.  And again, my example is,
3 you know, I could sell yachts.  So I could be
4 a hundred-million-dollar company but only
5 have a few transactions a year, and they're
6 not complex.  I buy a yacht; versus I sell
7 erasers, and if I sell $100 million worth of
8 erasers, that's going to be a whole lot of
9 transactions and a whole lot of -- not
10 complexity but transactional volume, you
11 know, things like that.
12     So it's an indicator, but it's not --
13 you can't determine just based on revenue.
14 All it is is an indication of a company's
15 potential for not complexity but volume or
16 are they successful; are they growing, et
17 cetera, et cetera.  But it's not an indicator
18 necessarily that the product will work or
19 won't work.
20 Q.   Well, then why is there a target to small to
21 mid-sized companies based on revenues?
22 A.   Because that's what -- the only reason you
23 target anything is because you have to be
24 able to go a marketing department, who sends
25 out either a mailing or sends out their -- or

Page 246

1 does phone calls, and they hire telemarketing
2 companies.  And they say, "Get me a list."
3     The reason you do it is for the list.
4 The whole reason these numbers exist is
5 because I want to buy a list.
6     So you say, "Well, what list do I buy?"
7 Well, I buy a list of companies of between 15
8 and 150 million or 15 and 300 million or
9 whatever, because I believe that those
10 companies with that revenue will be the
11 appropriate candidate.
12     The other reason is because --
13 Q.   You're not answering my question.
14     Why are companies between 10 million and
15 500 million the target audience for Business
16 One?
17 A.   Got it.  Because the revenue size is an
18 indication of the budget.  At the end of the
19 day, if I'm a billion-dollar company and I
20 have a big budget, I can afford R3.  If I'm a
21 billion-dollar company, I'll probably need
22 R3, but it doesn't mean I do need R3.
23     If I'm a $30-million company, I might
24 need R3, but I can't afford R3.  So the $30
25 billion is an indication of what my budget

Page 247

1 will be.  It will be give or take about, you
2 know, five percent or two percent, or
3 whatever, and I don't remember.  I knew at
4 the time, but I don't remember what they are
5 now.  They will invest X percent of their
6 annual revenues into this project.
7 Q.   Do you have any idea of what investigation
8 either what Hodell did or LSi did to
9 determine whether the Business One
10 application was suitable for Hodell?
11 A.   No, I don't know for sure.
12 Q.   Being a lawyer, since you say for sure, the
13 question is:  Do you have a suspicion?  Do
14 you have an indication?  Do you have any --
15 even secondhand knowledge?
16 A.   I don't.  I mean, I was inexperienced in
17 these matters.  Sorry.
18     MR. HULME: That's okay.  I don't have
19 any other questions.
20     MR. STAR: A couple of follow ups.
21     EXAMINATION BY MR. STAR:
22 Q.   Given your experience in the software field
23 since 1982, what is your view of the role of
24 testing as it relates to a software
25 implementation?

Page 248

1 A.   Well, it's huge.  I mean, the only time a
2 company doesn't need to test is when that
3 company can afford to be down.  So if a
4 company cannot place an order, afford not to
5 place an order, afford not to be able to
6 work, afford not to be able to track or
7 whatever, then no need to test.
8     But if you can't afford to -- if you
9 have to be up, then you have to test.
10 Q.   Is there some standard in the industry for
11 how testing is done?  And let's focus on the
12 small to mid-size market of companies and the
13 various software providers.
14     In that marketplace, is there any kind
15 of standard as to how testing is done?
16 A.   The best way to answer would be that there
17 are methodologies for testing, and there are
18 even products that you can buy that fit into
19 an environment to help you to test.  And
20 they're sold by companies that go out and buy
21 them.
22     There is not a standard, but Deloitte
23 would have their standard.  Someone else
24 would have their standard.
25 Q.   Is testing for a particular client, that is,

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

---

Page 249

1  the licensee, the end user -- is testing for
2  that particular client typically done on that
3  client's hardware environment?
4  A.  Well, it's going to be done on an environment
5  that mirrors what they're going to be
6  running.  Ideally, it would be on their
7  environment.
8  Q.  So would it be your opinion that you'd either
9  want to test on the client's environment or
10  on a hardware environment that very closely
11  mimics the client's environment?
12  A.  Absolutely, yes.  That would be ideal.
13  Q.  Are you familiar with the concept of a
14  parallel legacy system in connection with
15  going live on a new software system?
16  A.  Yes.
17  Q.  What does that phrase, parallel legacy
18  system, mean to you?
19  A.  Well, a legacy system is, by definition,
20  whatever the customer has already in place.
21  So running parallel with their legacy system
22  means put the new system in and run parallel
23  with the existing system.
24    So if you add one plus one on the legacy
25  system and then you do the exact same

---

Page 250

1  transactions, one plus one, you're still at
2  two on the new system.  So it's just
3  validating each of the business processes
4  work the same way.
5  Q.  Eddy Neveux testified yesterday that there's
6  a couple of reasons for having a parallel
7  legacy system running when you make a switch
8  to a new system.  One was you could revert to
9  that system if the new system didn't perform.
10    Would you agree with that?
11  A.  Yes.
12  Q.  Okay.  The other piece that he identified was
13  that you would be able to go back to the
14  legacy system and verify that the transaction
15  data that you were getting from the old
16  system matches up with the new system, so you
17  would be able to check the accuracy of the
18  new system.  Would you go agree with that?
19  A.  Yes.
20  Q.  Okay.  Any other benefits for running a
21  parallel system?
22  A.  Oh, huge.  The other different -- the other
23  issue is what if the legacy system and the
24  parallel system are wrong, it's because the
25  legacy system is wrong.  So another reason to

---

Page 251

1  use it is to validate that the new system is
2  actually bringing you value that you bought
3  it for in the first place.
4  Q.  In your view, is it standard industry
5  practice in a software implementation to run
6  a parallel legacy system?
7    MR. HULME: Objection.  Foundation.
8  A.  Yes.
9  Q.  If an implementer of a software product like
10  Business One suggested to a client not to run
11  a parallel legacy system, would you agree
12  with that suggestion or would you think that
13  that would be a wrong piece of advice to give
14  to a client?
15    MR. HULME: Objection.  Foundation.
16  A.  I've never actually had a partner do that,
17  but I would say to them -- I would have to
18  understand why they would say that.
19  Q.  You were shown Exhibit 81, and it was an
20  e-mail from Dan Lowery where he was talking
21  about what Hodell was looking for since
22  April 17th, 2007.  He writes, "They were
23  looking for a scalable product to grow with
24  them."
25    At the time SAP B1 was targeted

---

Page 252

1  companies of $250 million with 500 users.
2  You were asked about those numbers just a few
3  minutes ago by Mr. Hulme.  I take it from
4  your testimony today you agree that Business
5  One was targeted to companies with revenues
6  of 250 million, right, up to 250 million,
7  correct?
8  A.  I would agree with that.
9  Q.  Okay.  Are you aware of any situation prior
10  to April 17, 2007, where SAP was actually
11  targeting companies with up to 500 users to
12  Business One?
13  A.  No, I'm not.  I'm -- we don't talk users that
14  often, because, again -- you're talking
15  employees, an employee count, because, again,
16  that gives you a concept of revenue.
17  Q.  And employees and users are two different
18  things?
19  A.  Employees and users are two very different
20  things.  So users, no idea.  500 users is a
21  monster.
22  Q.  Is it your opinion, based on your personal
23  involvement with working for SAP and becoming
24  aware of the Hodell situation, is it your
25  opinion that the SAP Business One system with

---

Page 253

1  the In-Flight and Radio Beacon add-ons
2  actually worked for Hodell, or was this a
3  complete failure?
4  A.  Actually, I don't know that I could say it
5  worked or it was a complete failure.  I
6  believe from conversations that the business
7  processes worked, but that the performance
8  was unacceptable.
9  Q.  Unacceptable to who, Hodell?
10  A.  To Hodell.
11  Q.  That's a subjective thing, typically, whether
12  the client will accept the performance
13  levels?
14  A.  Well, I mean, I have to be fair.  The answer
15  is, yes, it's subjective, but they are going
16  to compare it to what they have already, back
17  to your legacy.  So if it's worse than their
18  legacy system, then they would say it's
19  unacceptable.
20  Q.  All right.  To your knowledge -- you saw a
21  lot of e-mails today that were from the time
22  frame of April of 2007.
23     To your knowledge, from April of 2007
24  on, were there any performance improvements
25  in the Business One software for Hodell?

Page 254

1  A.  I left Business One in August of 2007.  So
2  from April to August, there might have been
3  one upgrade.  I can't remember exactly, but
4  in August, I moved to All-In-One.  And I did
5  not have any interaction with Business One.
6  Q.  After August of '07, were you done with your
7  involvement with Hodell?
8  A.  I was, not because I wanted to be, but it was
9  not in my scope anymore.
10     MR. STAR: That's it.  Thank you.
11     MR. LAMBERT: A couple of follow-ups.
12     EXAMINATION BY MR. LAMBERT:
13  Q.  Do you ever recall anyone at SAP just
14  agreeing with Hodell's conclusion that
15  Business One performance was unacceptable?
16  A.  No, I don't recall anybody disagreeing that
17  it was unacceptable.
18  Q.  I just want to ask a quick question about
19  Exhibit 180 since you said that you started
20  in 2004.
21  A.  Yeah.  My apologies.
22  Q.  That's fine.
23  A.  180?  Do I need to be looking at or can
24  you -- oh, here it is.
25  Q.  Do you recall us discussing a statement you

Page 255

1  made about discussions with Dan Lowery that
2  this opportunity was suspect from day one?
3  A.  Yes.
4  Q.  And we were talking about the belief that you
5  had started in 2005?
6  A.  Yes.
7  Q.  You actually started in 2004?
8  A.  Yes.
9  Q.  So would you have been having conversations
10  with Dan Lowery that Hodell's opportunity was
11  suspect throughout 2005?
12  A.  Not that I remember.  I could have.  I mean,
13  I honestly -- if I had been made aware of the
14  2004, I would have had to really seriously
15  rethink this whole thing, but I don't
16  remember ever having a conversation with Dan
17  Lowery saying, "Are you sure this is going to
18  work," ever.  I don't recall that at all.
19  Q.  Well, then why did you make the statement
20  that you did?
21  A.  Did I say that I did?
22  Q.  Well, you made the statement that there were
23  many discussions as well as e-mails with Dan
24  Lowery and others within his organization
25  stressing that this opportunity was suspect

Page 256

1  from day one.
2  A.  And again, as I said earlier, the day one
3  piece was probably just bad writing on my
4  part, because it was for internal consumption
5  and was probably a dumb thing to say.
6     But there was definitely conversations
7  internally.  I mean, we've got them
8  documented all over.  So I am sure that I am
9  supporting the fact that the perception was
10  out there that this was a bad solution.
11  Q.  But you don't know how far back?
12  A.  I don't.
13  Q.  You can't reference by saying the date?
14  A.  Correct.  I don't know how far back, and I
15  honestly don't know how far back they go.
16     MR. LAMBERT: I don't have anything
17  further.
18     MR. STAR: We're done.  Thank you.
19     (The deposition concluded at 4:32 p.m.)
20
21
22
23
24
25

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

Page 257

1              CERTIFICATE

2        I, GEOFFREY ASHLEY, do hereby certify

3   that I have read the foregoing transcript of

4   my testimony, taken on Friday, March 16,

5   2012, and further certify it is a true and

6   accurate record of my testimony (with the

7   exception of the corrections listed below):

8   Page        Line            Correction

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17      Signed under the pains and penalties of

18  perjury this _____ day of _____,

19  2012.

20

21          _____

22                  GEOFFREY ASHLEY

23

24

25

Page 258

1          C E R T I F I C A T E

2          STATE OF NEW HAMPSHIRE

3   DEPOSITION OF:   GEOFFREY ASHLEY

4          FRIDAY, MARCH 16, 2012

5   RE:   HODELL-NATCO V. SAP AMERICA, ET AL.

6          DOCKET NO. 1:08 CV 2755

7        I, PATRICIA M. McLAUGHLIN, a Certified
    Shorthand Reporter and Notary Public in and for the
8   State of New Hampshire, do hereby certify as
    follows:
9        1.   That GEOFFREY ASHLEY, the witness
    whose testimony is hereinbefore set forth, was duly
10  recorded by me on Friday, March 16, 2012;
         2.   That such testimony was transcribed by me
11  and is a true and accurate record of the testimony
    given by the said witness, to the best of my
12  knowledge, skill and ability;
         3.   I further certify that I am neither
13  attorney for, nor related to or employed by any of
    the parties, nor financially interested in this
14  matter; and
         4.   That a dash as used through this
15  transcript is meant to represent an interruption in
    thought or between a question and answer.
16       IN WITNESS THEREOF, I hereunto set my hand
    and Notarial seal this 31st day of March, 2012.
17

18

19          _Patricia M. McLaughlin_

20          _____
                    Patricia M. McLaughlin
                    Notary Public
21                  My Commission Expires:
                    May 4, 2012
22

23

24

25

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

**$**

**$100 (1)**
245:7
**$100,000 (2)**
142:11;171:19
**$105,000 (1)**
116:4
**$180,000 (2)**
122:14;123:9
**$250 (1)**
252:1
**$3 (2)**
103:21,22
**$30 (1)**
246:24
**$30-million (1)**
246:23

**[**

**[sic] (1)**
8:3

**A**

**A1 (1)**
113:11
**Aaron's (4)**
130:13,22;132:5,6
**ability (5)**
75:7;98:18;125:14;
239:7,10
**able (20)**
26:2;27:12;39:1;
69:6;75:7;96:11;
114:17;123:19,19;
140:25;181:15;184:15;
203:25;239:3;241:8;
245:24;248:5,6;
250:13,17
**above (2)**
94:8;164:6
**Absolutely (9)**
15:12;18:17;78:3;
107:10;117:17;122:6;
194:10,11;249:12
**accelerate (1)**
190:9
**accelerated (1)**
190:9
**accept (1)**
253:12
**accepted (1)**
18:23
**access (3)**
133:23;152:13;153:5
**accessed (2)**
86:9,10
**accomplish (3)**
50:11;78:9;88:12
**according (1)**

12:14
**account (7)**
91:3;94:1;98:6;
134:25;135:4,7,11
**accountability (1)**
105:17
**accounting (5)**
66:18,20;74:24;76:1;
152:6
**accounts (2)**
38:20;39:16
**accuracy (1)**
250:17
**accurate (1)**
19:9
**accuse (1)**
191:3
**acquire (1)**
157:3
**acquired (8)**
9:3,5,8,11,13;
155:12;157:1,4
**across (2)**
70:18;72:8
**acting (1)**
36:2
**action (2)**
20:24;21:10
**actions (1)**
25:1
**active (1)**
140:15
**activities (1)**
30:21
**actual (1)**
151:1
**actually (36)**
6:25;20:2;25:9;
28:24;42:2;51:23;54:6;
59:15;61:15;85:20;
95:1;104:12;111:23;
119:13;132:13;136:25;
137:1;140:8;141:11;
150:1;161:3;165:8;
174:2,3;177:2;195:5;
220:16;222:6;230:3;
243:20;251:2,16;
252:10;253:2,4;255:7
**add (2)**
206:24;249:24
**added (3)**
6:23;7:20;99:9
**addition (4)**
117:4;127:6,8;
197:15
**additional (3)**
51:17;118:4;127:5
**add-on (14)**
38:25;39:2;48:6;
67:7;98:14;99:25;
129:8;135:15;136:15;
175:16;185:13;188:1;
198:11;204:6

**add-ons (7)**
194:7;195:1;196:17,
18;197:14;199:25;
253:1
**address (2)**
79:11;89:6
**addressed (3)**
194:9;205:25;234:19
**addressing (2)**
156:10;178:14
**adds (5)**
51:23;126:19;
127:10,19;128:15
**advance (1)**
244:2
**advantage (3)**
26:3;75:11;151:24
**advertising (4)**
51:15,16,22;52:12
**advice (1)**
251:13
**afford (7)**
246:20,24;248:3,4,5,
6,8
**AG (1)**
9:18
**again (82)**
6:1;7:8,12;20:12;
32:23;35:1;43:3;45:13;
46:15;47:7;54:4,20,25;
58:10,22;61:24;62:12;
64:3;68:7;69:9;70:1,
12,13;74:6;76:13;
87:24;88:5,13;90:2;
93:10,23;102:7;104:6;
105:15;112:14;119:7,
22;120:5,22;121:9;
122:20;123:3,20;
124:23;128:1;130:24;
131:11;132:6,19;
134:4;137:10;144:25;
147:1;150:24;151:23;
152:5;157:13;183:22,
25;185:3;188:18;
189:19;195:12;196:20;
197:2,15;203:22;
205:17;209:22;211:24;
218:4;221:4;230:7;
232:7;236:2,4,7;
237:14;245:2;252:14,
15;256:2
**against (2)**
9:18;27:10
**agenda (2)**
45:8
**aggressive (1)**
191:20
**ago (3)**
44:4;104:23;252:3
**agree (38)**
16:5,20;30:13;31:21;
33:19;36:23;45:1;
92:20;125:7;142:8;

152:24;153:3,6,7;
154:11;171:11;189:13;
203:4,5;206:8;208:1;
212:22;213:1,2,6;
214:24;232:17,23;
234:11;239:19;241:5,
20,22;250:10,18;
251:11;252:4,8
**agreed (2)**
17:8;202:15
**agreeing (3)**
198:2;206:24;254:14
**agreement (26)**
14:22,25;19:14;
81:14,18,22,24;82:18,
20;83:4,15,18,19;
84:10,12,21,25;85:8,
23;95:15,21,24;96:3,
13;99:18,21
**agreements (3)**
80:22;109:7;173:25
**ahead (8)**
13:20;17:15;19:7;
84:19;122:19;196:3;
212:18;236:6
**Alameda (1)**
227:21
**allegations (1)**
12:22
**alleged (1)**
182:7
**alleges (4)**
12:8,13,19;13:3
**alleging (2)**
20:25;21:3
**All-In-One (24)**
5:2,13;24:3;47:9;
49:6;134:22;184:21,
22;185:6,9,12;204:2,
16;205:19,21;206:1,3,
5,6,21,24;207:5,8;
254:4
**allow (5)**
89:19;96:2;98:14;
117:20,21
**allowed (2)**
104:23;118:25
**allows (1)**
239:7
**alluded (1)**
168:7
**alluding (2)**
243:9;244:15
**almost (2)**
45:25;72:17
**alone (3)**
46:7;60:8;127:17
**along (1)**
214:20
**alternative (1)**
214:11
**although (1)**
164:10

**always (14)**
7:21;40:11;43:15;
64:4;68:13,14;73:10;
147:3,4;152:8;191:10;
229:15;239:2,12
**ambiguous (1)**
167:23
**America (8)**
4:16;5:19;6:2;9:18;
114:23;115:2;133:1;
165:25
**American (1)**
167:11
**Americas (14)**
5:18;6:1,3,6;48:22,
23;49:19;113:20,24;
114:6;166:1;172:23,
25;242:13
**Americas' (1)**
27:13
**amount (4)**
39:6;97:19;197:10;
227:2
**analysis (2)**
80:2,7
**analysts (1)**
69:21
**analyze (1)**
179:14
**analyzed (1)**
72:24
**analyzing (1)**
10:21
**and/or (5)**
60:4;66:5;78:14;
136:6;141:11
**Andrew (1)**
234:16
**angry (2)**
168:17,20
**Anna (2)**
8:3
**announcement (4)**
52:15;77:14;138:15,
18
**announcements (2)**
52:9,19
**announcing (2)**
137:19;240:6
**annual (2)**
219:15;247:6
**answered (1)**
76:12
**anticipate (2)**
236:5,15
**anticipating (1)**
72:14
**anymore (5)**
8:1;22:25;56:10;
192:15;254:9
**apart (1)**
33:15
**Aperum (1)**

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

9:9

**A-p-e-r-u-m (1)**
9:9
**API (6)**
66:7,8;67:6,7,17,23
**Apollo (1)**
62:23
**apologies (1)**
254:21
**apologize (11)**
46:11;54:5;61:15,22;
85:9;130:8;133:16;
134:14;146:12;177:17;
240:8
**apparently (3)**
129:3;134:14;142:16
**appear (1)**
16:20
**appears (2)**
146:6;220:3
**Appendix (3)**
219:3,4,5
**applicable (1)**
7:8
**application (7)**
67:8,10;69:12;
153:18,23;238:1;
247:10
**applications (1)**
196:14
**applies (1)**
16:6
**apply (2)**
51:15;169:22
**appointed (1)**
5:7
**appropriate (16)**
77:19;127:24;
144:14;150:18;162:15;
163:3;165:2,5,11,12;
173:11;186:25;201:19;
203:13;207:8;246:11
**appropriately (2)**
44:1;179:24
**approves (1)**
53:21
**approximately (1)**
97:18
**April (39)**
154:19,19,20;155:3;
159:18;161:13;165:14;
173:9;174:13;180:15;
181:4,13;182:1;
187:17,22;189:5,5,17;
199:3,13;204:23;
209:4;220:3;234:1;
235:1,4,6,21;236:25;
240:22;241:10,18,21;
242:16;251:22;252:10;
253:22,23;254:2
**arbitrary (2)**
30:16;170:22
**architected (4)**

66:21,23;169:9;
171:7
**architecture (8)**
43:1;64:9,14,17,20;
65:5,8;93:4
**area (4)**
60:3;73:5;91:17;
155:8
**areas (6)**
37:10;89:9,11;159:2,
3;214:3
**argue (3)**
16:11;27:21;44:23
**arm (1)**
173:1
**arose (1)**
32:7
**around (29)**
17:18;33:20;66:8;
75:6,8;85:2;86:13;
102:19;103:6;111:19;
130:20;137:4;149:2;
158:21;165:12,14;
166:24;168:13;174:13;
179:14;195:16,16,20;
207:16;209:3;216:11;
221:24;226:20;243:15
**ASHLEY (7)**
4:2,6;21:17;49:12;
57:2;69:3;126:3
**aspect (1)**
127:18
**aspects (1)**
7:10
**aspirations (1)**
6:14
**asserting (1)**
18:12
**assertion (1)**
16:9
**assess (1)**
80:18
**assessment (23)**
89:20;170:15;
175:20;178:17;179:1
**asset (1)**
54:8
**assist (1)**
163:20
**assistance (1)**
163:18
**associated (1)**
48:8
**assume (23)**
38:24;41:16;58:13;
60:13;89:24;119:7;
122:3;123:23;135:1,2;
143:2,9,18,19;145:5,6,
8,24;147:5;157:23;
172:24;191:19
**assumed (3)**
39:20;135:3,4
**Assumes (2)**

17:23;122:18
**assuming (5)**
128:25;133:18,20;
134:5,7
**assumption (17)**
77:14;124:3;129:12;
133:20;135:22;139:9,
17;140:4;144:6,7,11;
147:1;157:2;161:3,5;
210:23;216:22
**assumptions (1)**
211:5
**Atlanta (1)**
9:7
**attached (3)**
95:7,9,11
**attack (1)**
39:1
**attacked (1)**
39:21
**attempt (3)**
166:16;214:9;215:7
**attempting (1)**
215:17
**attended (2)**
224:2;225:10
**attention (1)**
102:23
**attitude (1)**
191:19
**attorney-client (5)**
15:21,24;16:5;18:18;
19:6
**attract (1)**
33:16
**attracted (1)**
75:4
**audience (1)**
246:15
**August (6)**
5:9,23;254:1,2,4,6
**authority (4)**
35:21;155:22;156:1,
2
**authorized (2)**
52:7;85:24
**automatically (1)**
131:21
**available (11)**
49:15;51:14;88:19;
148:10,11;149:3,4;
185:15;206:23;222:5;
237:24
**Average (3)**
224:12,16,18
**Avision (2)**
9:6,7
**Aviv (1)**
243:14
**award (2)**
126:14;127:11
**aware (46)**
12:7,12,18,19;13:2,

10;20:23;21:2;46:3;
55:20;76:20;77:7,9;
78:1;81:14;96:11;
99:17,20;100:1;
102:16;117:13,16;
123:16;136:18;143:17,
18,20;147:7;157:20;
160:3;164:15,18,21,24;
165:3,23;166:20,20;
173:10;191:2;208:7;
237:7,11;252:9,24;
255:13
**away (4)**
36:19;56:25;164:12;
203:24

**B**

**B1 (13)**
138:21;142:23;
164:7;170:12;229:3,
14,22;234:8,10;243:7,
17;244:11;251:25
**back (43)**
14:16;20:4;22:12;
39:9;40:16;44:11;45:2;
61:3;63:3;66:10;67:21;
86:25;89:6;91:13;
94:11;107:19;124:23;
126:3;141:21;152:4;
162:21;176:2,7;
187:10;189:19;203:23;
204:2,11,17;205:19,22;
210:15;224:20;225:24;
229:4,5;241:12;
242:22;250:13;253:16;
256:11,14,15
**background (5)**
11:10,11;37:5;
179:13;210:11
**bad (8)**
34:21;35:18;46:23;
170:11;242:7,23;
256:3,10
**bail (2)**
190:25;203:24
**base (6)**
86:4;87:2,16,17,18,
20
**based (27)**
6:5;64:21;69:16;
78:13;109:11;128:7,
22;133:17;134:23;
139:20,22;145:24;
156:24,25;157:2;
208:18,20;214:7;
215:13;234:12;238:12;
241:1,2,3;245:13,21;
252:22
**basic (3)**
13:12;79:21;215:11
**basically (15)**
10:4;15:2;27:3;

33:11;41:12;54:11;
69:21;73:23;83:11;
86:7;170:23;172:25;
201:11;202:20,21
**basis (2)**
86:5;104:10
**Bates (1)**
57:8
**Beacon (1)**
253:1
**Beacon's (1)**
196:16
**bear (2)**
107:2;173:13
**become (4)**
99:20;165:3;237:7,
11
**becomes (1)**
73:6
**becoming (3)**
102:21;111:10;
252:23
**began (4)**
24:7;73:8;96:21;
216:8
**begin (1)**
106:17
**beginning (4)**
4:14;61:5;102:18;
189:22
**begun (1)**
143:9
**behalf (4)**
18:1;78:25;140:9,23
**behavior (1)**
45:21
**behind (3)**
66:18;100:24;149:9
**belief (2)**
23:8;255:4
**believes (1)**
13:5;36:2;172:18
**bell (1)**
240:1
**below (4)**
203:5;225:7,16;
228:12
**benefit (1)**
75:7
**benefits (1)**
250:20
**Benton (1)**
234:16
**Bertus (3)**
61:14,16;63:3
**Best (5)**
9:2;36:3;58:15;74:9;
88:15,16;97:22,23;
96:7;231:20;248:16
**B-e-s-t (1)**
9:2
**better (11)**
26:18;35:17;36:12;

43:6;50:6;63:18;73:25;
89:7;93:3;152:8;159:2
**big (8)**
18:9;47:17;96:6;
116:14;120:16;130:21;
191:7;246:20
**bigger (3)**
115:4;197:16;236:2
**biggest (1)**
47:18
**Bill (4)**
113:21,24;114:1;
138:9
**billion (4)**
27:22;47:11;70:6;
246:25
**billion-dollar (2)**
246:19,21
**bit (3)**
89:3;91:18;131:22
**blame (3)**
43:24;147:18,22
**blanks (1)**
53:14
**blew (1)**
34:19
**blog (1)**
86:17
**blueprint (5)**
54:1;9;55:15,24;
56:13
**board (7)**
55:1;99:11;102:7,25;
106:14,17,17
**Boessmann (5)**
175:7;178:15,24;
180:4;234:23
**Boessmann's (1)**
175:20
**book (2)**
133:21;134:7
**boss (5)**
134:19;190:22;
191:2;202:10,12
**both (9)**
20:17;33:11;45:17;
94:8;112:7;128:9;
130:14;141:25;240:22
**bottom (14)**
45:25;55:10;63:1;
142:19;171:18;177:14,
19;199:9;207:22;
209:6;211:12,18,19;
222:25
**bought (2)**
132:22;251:2
**brand (5)**
98:11,16,17;101:16;
135:12
**Brands (6)**
65:24;66:14;91:13,
15;195:16;197:15
**break (3)**

14:8;59:25;175:3
**break-out (1)**
78:9
**brief (3)**
14:7;69:1;125:25
**briefed (1)**
102:20
**bring (6)**
98:3;105:1;128:11,
12;136:7;190:23
**bringing (5)**
127:6,8;138:21,25;
251:2
**brings (1)**
78:6
**broad (3)**
69:15;74:17;179:16
**broader (2)**
74:19;158:16
**broke (3)**
50:16;54:11,13
**broken (3)**
47:19;48:21;77:4
**brought (4)**
9:17;14:16;104:18;
126:23
**budget (4)**
173:8;246:18,20,25
**building (2)**
23:7;26:11
**built (1)**
26:11
**bullet (7)**
59:14;63:5,16;65:21;
66:6;67:17;217:5
**bunch (4)**
84:18;115:13;
218:12;241:13
**burden (1)**
107:3
**bus (1)**
29:22
**Business (256)**
4:17;5:6,14,22;6:15,
16;7:3,3;12:9,17;13:4;
14:12;20:19;22:12;
23:7,20,24;24:2,7,20;
25:2;26:3,4,12,14;
27:8;33:21;36:4;41:13;
42:6,7,9,12,20;43:9,18;
47:4,9;49:1,5,9,15;
50:7,10;51:8,9;52:7,
10;54:21;57:13;58:2,
13,23;59:12;60:2,15,
16;61:4,10,11;62:9;
64:2,9;65:6;66:18,20;
67:5;69:5;70:11,24;
71:7;72:3,7,9,20;73:3,
9;74:4,13;76:21;77:19;
78:12,18,22;79:23;
81:3,7;82:17,19;83:2;
84:10;85:7,18;86:15;
87:1;89:1;90:15;91:4,

23;92:22;94:25;95:11;
96:6,7;99:1;102:17;
107:11,12,17;110:10;
111:4,5,12,18,18;
113:10;114:22;115:19;
117:18;118:7,13,25;
119:2;120:15,21;
122:14;124:10,11;
131:13,14,24;134:22;
136:9;137:5,9;138:25;
142:4;143:24;145:22;
147:8;150:18;151:22;
152:13,23;153:11,25;
155:21,23;157:21;
158:3,4;159:8;161:23;
162:15;163:3;164:22;
165:1,4;169:13;
170:16;173:10;175:21;
177:16;180:18;181:6,
12;182:2,8;184:10,20,
22;185:6,12;186:20,
24;188:19,22;189:7;
192:20;193:2;195:11,
25;197:9,13,18,20;
198:3,7;201:18;204:1,
9,13,14,19;205:1,5,18;
206:7;207:2,19,23;
208:8;209:8,20;214:3,
12;217:2;218:5,21;
219:14;220:9,15,20;
221:16,21,24;222:20;
223:4,9;224:10,16;
226:11;227:15;228:4,
18;229:22;230:1,10,
13;231:2;232:3,18;
233:18;235:25;236:12;
239:2,12,13,17,20,21;
240:16,24;244:20;
246:15;247:9;250:3;
251:10;252:4,12,25;
253:6,25;254:1,5,15
**businesses (4)**
26:16;220:10,20;
239:22
**buy (17)**
78:20;82:18;84:10;
99:7,15;115:18;
121:24;125:22;132:9,
10;231:17;245:6;
246:5,6,7;248:18,20
**buying (3)**
11:6;123:12;132:14
**buys (2)**
94:18,21
**byte (1)**
177:10

**C**

**cabinet (1)**
130:18
**cadence (2)**
104:7;105:5

**calendar (2)**
104:25;146:6
**call (26)**
11:25;28:22;47:14,
15,16;57:13;61:2;
69:11;77:18;120:18;
181:25;182:16;186:9,
19;193:8;198:21,22,
25;199:4;201:10,21;
202:3;203:11;204:8;
207:10,10
**called (28)**
6:8;7:25;8:17,18,18;
9:2,6,9;11:5;27:17;
47:4,25;48:22;51:4,11;
52:21;53:25;59:10;
66:15;70:7;75:5;85:25;
86:15;87:1;99:18;
219:17,18;226:21
**calling (1)**
5:15
**calls (5)**
15:21;50:14;118:21;
161:4;246:1
**came (15)**
20:22;55:1;57:11;
98:24;99:11;106:13,
16,17;113:8;135:21;
136:2;153:22;183:17;
185:20;217:21
**campaign (1)**
118:10
**Can (100)**
4:10;12:4;15:20,25;
16:12;17:15;21:18;
26:22;27:15;31:4;33:3,
19;34:12;35:25;41:4;
42:1;45:8,12;46:25;
51:15;52:8;56:10,15;
62:20;64:12;73:24;
79:5;83:21;84:2,3;
92:16;93:16;95:22;
96:4;100:3;107:5,8;
109:16;111:17;112:5,
25;115:9;117:25;
118:17;119:7;128:9,
10,13;132:4,24;139:2;
144:20,21,24;146:14;
148:2,3;149:7;150:4,7,
12,21;154:3;155:1;
158:21;162:21;167:2;
168:19;175:2;177:9;
178:8;179:12;180:5;
186:8,9,12,17;200:12,
24;201:7,7,16;203:10,
10;210:2;212:1;222:2;
223:17;226:9;228:1;
239:16;241:5,20,22;
243:20,21;246:20;
248:3,18;254:23
**Canadian (1)**
65:12
**candidate (1)**

246:11
**candle (2)**
179:10,13
**capabilities (8)**
36:13,14;53:18;68:9;
85:18;162:20;170:15;
176:23
**capability (1)**
63:23
**capable (1)**
182:9
**caps (1)**
36:9
**car (2)**
190:8,9
**care (2)**
92:9;205:20
**cared (1)**
46:8
**career (3)**
6:20;7:6;26:11
**Carr (1)**
106:12
**carves (1)**
51:19
**case (37)**
9:20;12:7;13:3;
20:25;23:23;29:15,18;
31:8;36:6;40:7,12;
45:8;46:12;64:15;
75:23;77:21,22,25;
78:23;81:4;91:6,8;
92:12;97:22,22,23,23,
23;122:11;145:16;
151:15,16,17;168:22;
173:5,23;236:2
**cases (2)**
141:15;149:8
**cash (1)**
54:12
**catalogs (3)**
131:16,19,20
**catch (1)**
200:17
**categories (1)**
90:13
**cause (3)**
21:9;120:17,20
**caused (6)**
93:20;119:14;121:4;
135:10;171:7;195:18
**causes (1)**
20:24
**causing (5)**
17:16;66:7;143:23;
236:19;241:16
**cc'd (5)**
127:23,24;138:4;
212:8;213:21
**Center (1)**
7:25
**centered (1)**
33:20

**Central (1)**
5:19
**CEO (3)**
113:19,25;138:11
**certain (6)**
25:12;30:20;73:17;
75:4;152:7;238:7
**certainly (8)**
18:24;97:16;110:16;
128:14;154:4,7;163:8;
185:13
**certainty (3)**
62:16;74:14;201:18
**cetera (9)**
40:12;73:1,1;143:12,
13;236:1;237:8;
245:17,17
**chain (1)**
48:18
**challenge (1)**
118:18
**challenges (1)**
118:15
**change (2)**
77:1;96:12
**changed (2)**
69:18;244:13
**channel (30)**
4:15,22;8:22;10:5;
23:25;24:7,13;25:2;
46:25;48:15;49:17,23;
50:5;57:21;59:4,17;
60:1;61:20;62:1;66:3;
77:6;83:1;97:2;98:2;
106:14;110:23;118:21;
120:18;123:13;237:25
**channels (3)**
26:12;47:21,22
**character (1)**
26:19
**charge (2)**
181:2;211:7
**charter (1)**
106:1
**check (3)**
119:25;187:14;
250:17
**checks (4)**
120:11,14,24,24
**cheeky (2)**
242:19,24
**cheeky' (1)**
242:6
**Chicago (1)**
60:2
**chose (1)**
33:5
**chosen (1)**
136:22
**circulated (1)**
216:9
**circumstances (1)**
96:23

**claim (5)**
149:12,19;210:3,6,9
**claiming (2)**
12:18;18:13
**claims (2)**
13:12;243:14
**clarification (1)**
112:3
**clarify (1)**
45:13
**classifications (2)**
47:20;48:7
**classified (1)**
69:23
**clearly (1)**
207:23
**click (2)**
79:6,7
**client (6)**
18:14;248:25;249:2;
251:10,14;253:12
**client's (3)**
249:3,9,11
**close (15)**
11:7;53:17;82:2;
97:18;100:22;105:10;
108:19,21;110:20;
114:17;129:23;131:3,
9;172:16;236:1
**closed (4)**
108:10;109:3;131:5;
132:6
**closely (4)**
18:4;56:4;157:18;
249:10
**closest (2)**
104:16;129:17
**closing (1)**
111:1
**clue (1)**
177:8
**Coast (2)**
61:23,25
**Coastal (1)**
65:11
**Coca-Cola (1)**
71:7
**cocktail (1)**
215:16
**code (9)**
10:19,19;48:2;
152:14,18,20,24;153:5;
215:22
**collect (2)**
151:24;152:3
**collecting (2)**
133:18,21
**collectively (2)**
36:17,21
**column (1)**
219:12
**combination (6)**
71:16;87:13;93:7;

94:8;95:6;117:19
**Combinations (1)**
227:1
**combined (1)**
136:14
**coming (4)**
102:25;210:11;
213:10;241:9
**comment (16)**
20:12;127:2;147:17;
167:9;169:21;176:2,8,
11;177:13,22;178:2,
12;183:13;208:14;
210:3;211:14
**commented (2)**
182:19;183:1
**comments (6)**
37:21;168:25;
170:21;186:15;191:5;
214:20
**commission (1)**
51:20
**commit (1)**
164:9
**commitment (2)**
140:16;141:1
**commitments (9)**
26:16;40:16;44:11;
45:2,4;103:17,19;
141:2;149:2
**committed (3)**
12:13;13:14;105:13
**communicate (9)**
101:11;103:24;
157:25;167:12;194:19;
202:22;214:16;215:7;
236:11
**communicated (28)**
20:11;122:7,17;
159:12,22;160:20;
194:18,21;200:21;
201:3,5,13,24;202:6;
211:2;213:12,15;
220:19;221:23;222:12,
14,17;223:13,15;
235:10;241:6,21,23
**communicating (6)**
36:12;81:16;213:5;
225:20;228:15;242:4
**communication (10)**
6:4;22:24;25:25;
101:15,21;179:20,21;
180:1;192:25;201:8
**communications (4)**
11:20,23,24;207:16
**communities (1)**
47:23
**community (7)**
4:20;11:17;41:13;
47:19;60:18;86:24,25
**companies (29)**
27:20;39:11,12;
47:17,18;74:16,22;

75:3,6;88:17;130:12;
150:25;182:21;197:15;
230:4;231:21;232:18;
239:14,15;245:21;
246:2,7,10,14;248:12,
20;252:1,5,11
**company (43)**
6:5,8;7:4;8:9,17;9:1,
6,9,19;27:11;30:18;
59:10;63:22;74:3;
76:22;78:13;79:11;
97:10;105:20;123:8,
24,25;132:13;155:11;
198:6;212:21;221:4;
231:4;232:12,13,14,15;
234:13;239:3,7;
244:23;245:4;246:19,
21,23;248:2,3,4
**company's (1)**
245:14
**compare (1)**
253:16
**compendium (1)**
57:5
**competence (1)**
179:18
**competitions (1)**
128:2
**competitive (1)**
75:11
**competitors (2)**
27:10;80:15
**compilation (1)**
226:17
**compiled (1)**
57:19
**complained (1)**
144:8
**complaint (1)**
21:5
**complete (3)**
201:17;253:3,5
**completely (6)**
37:2;141:17;171:22;
181:21;204:24;209:20
**complex (4)**
111:9;209:15;
227:14;245:6
**complexity (3)**
244:22;245:10,15
**complicated (3)**
93:12;131:16;244:25
**complies (13)**
21:21;126:7;133:6;
154:15;187:15;203:16;
211:10;212:14;213:17;
216:3,14;219:24;
223:22
**component (2)**
196:23;221:9
**components (1)**
49:11
**compound (2)**

173:18;184:12
**comprehensive (1)**
89:22
**Computer (5)**
7:25;8:8;29:4;58:5;
129:15
**concentrate (1)**
164:13
**concept (3)**
197:21;249:13;
252:16
**concern (1)**
137:5
**concert (1)**
196:15
**concluded (1)**
256:19
**concludes (1)**
188:18
**conclusion (8)**
162:3;171:8,13;
208:20;209:7,24;
242:15;254:14
**concurrent (3)**
221:17,25;222:22
**concurrently (1)**
223:9
**conditional (1)**
127:12
**conducted (2)**
80:2;226:10
**conducting (1)**
43:25
**conference (5)**
118:20;120:18;
140:8,12,14
**confidential (1)**
25:18
**configuration (3)**
156:21;243:6,16
**configure (1)**
218:15
**confirmation (1)**
237:4
**confirmed (1)**
183:3
**conflict (7)**
23:25;24:5;33:4,5,
10,20;200:8
**conflicts (1)**
32:18
**confused (3)**
76:6;84:18;178:23
**conjecture (1)**
55:18
**connection (2)**
9:17;249:14
**consider (3)**
138:17;232:3;244:21
**consideration (1)**
93:9
**considered (4)**
65:3;138:14;230:9,

13
considering (1)
    20:14
consistent (8)
    69:20;128:3;166:22,
    23;202:25;224:15;
    237:3,3
consultant (1)
    87:8
consultation (1)
    240:19
consulting (2)
    22:8;240:14
consulting-type (1)
    87:14
consumption (1)
    256:4
contact (1)
    244:3
contacted (4)
    16:24;29:8,10;40:2
contain (1)
    84:11
contained (1)
    58:8
contains (1)
    235:18
contended (1)
    126:22
contention (2)
    78:15;128:6
context (2)
    58:22;226:20
continually (1)
    68:1
continuation (1)
    174:20
continue (3)
    73:21;243:24;244:2
continued (2)
    13:5;243:21
continues (5)
    73:12;236:17;
    243:22;244:16,16
continuing (1)
    214:22
Contractually (1)
    81:11
contradiction (1)
    194:23
contradicts (1)
    177:4
contrary (1)
    6:13
contributing (1)
    175:21
controlled (2)
    153:2,5
conversation (9)
    20:15;149:16;187:3;
    193:8;199:22;208:11;
    215:15,25;255:16
conversations (11)

16:6;20:5;40:22;
    46:16;166:23;192:18;
    193:13;212:11;253:6;
    255:9;256:6
conversion (2)
    149:3,4
conveyed (2)
    121:18;200:9
Co-op (2)
    51:5;52:13
copied (4)
    138:12;154:22;
    164:2;199:11
copies (2)
    56:3;130:19
copy (3)
    56:9,19;130:18
core (3)
    152:24,25;154:1
corner (2)
    63:1;222:25
corporate (3)
    8:2;48:13;112:16
Corr (3)
    49:20,21;60:4
corrected (1)
    42:17
correctly (6)
    5:1;40:24;65:13;
    74:15;85:3;130:23
cost (3)
    23:2;149:10;173:13
counsel (2)
    15:10;18:24
count (6)
    56:12;78:14;89:23;
    116:4;183:10;252:15
counterpart (2)
    181:2;211:7
countless (1)
    170:1
country (1)
    130:20
counts (1)
    56:11
couple (9)
    5:4;124:11;129:21;
    130:1;180:8;244:6;
    247:20;250:6;254:11
course (6)
    12:22;105:17;109:7;
    139:8;175:5;185:8
COURT (2)
    44:6;231:8
cover (4)
    4:6;26:25;140:25;
    141:1
covered (4)
    5:25;81:22;106:3;
    140:7
covering (2)
    5:16;51:16
CP1 (1)

137:23
created (4)
    38:25;54:8,22;64:20
creates (1)
    129:8
creating (3)
    56:4;139:23;179:19
creation (2)
    117:8;156:5
cries (1)
    34:18
criteria (4)
    97:22;127:5;128:15;
    231:16
Cs (1)
    84:1
culture (9)
    75:10;104:22;105:8,
    16,18,19;150:25;
    167:11,11
current (3)
    5:10;150:16;186:11
currently (5)
    15:1,5;19:19,25;25:6
customer (87)
    10:8,11;11:13;28:22;
    32:4;48:11;70:15,23;
    72:5;77:20;78:17,19,
    25;79:21,23;80:3;82:7,
    9,10,17,18;83:5,7,8,9,
    19;84:9;88:25;91:5,7;
    92:24;93:10;94:10,16,
    18,21,25;99:7;107:12,
    21;117:1,21;118:3;
    121:18;124:17,19;
    125:8;126:19;127:10,
    19;128:15;135:5;
    137:14;141:12;142:1,
    21;145:11,21;147:25;
    150:2,23;160:4;
    162:16;163:4;164:6;
    166:15;168:2,5;
    172:18;181:7;188:22;
    189:21;194:22,24;
    195:9;202:6;205:15;
    207:18;211:8;214:16,
    24;215:8,8,12;224:22;
    238:2;249:20
customers (27)
    39:2,5;42:8;70:17;
    72:24;73:2,11,22;91:1;
    92:2;111:1,12;116:10;
    127:9;133:22;134:9;
    141:17;143:11;149:4;
    151:4;152:1;153:19;
    164:14;168:6;169:11;
    194:20;222:10
customer's (5)
    92:19;161:25;195:8;
    235:24;236:21
customizations (1)
    47:25
cut (3)

51:23;120:23,24
cute (1)
    82:2
cutoff (1)
    70:7
cycle (2)
    69:13;84:5
cycles (2)
    88:20;99:6

D

daily (1)
    104:2
Dale (1)
    140:17
Dan (135)
    9:19;20:3,12;21:25;
    22:23;23:2,18;24:15,
    18,23;25:6,24;26:2;
    28:10;29:21;30:4,12,
    14,18;31:8;32:10,23,
    25;33:1,8,11,11,24;
    34:5;35:3,20,21;36:10;
    38:5,15;40:11;41:15;
    44:25;45:15;46:17;
    48:3;49:8,8,12;54:6,
    20;55:13,14;56:1,2;
    60:10;70:20,20,21;
    71:2;87:12;99:22;
    104:9,12,16;106:12;
    121:11;126:12,12,22;
    127:1,2,7,22,22;128:5,
    10,11,14;129:1;134:19,
    20,20;137:17;138:13;
    140:7;156:8,9;157:6,7;
    159:22;161:13;163:17,
    20,22,25;166:24;
    168:11;171:17;185:21;
    191:16,17;192:3;
    193:13;194:14;199:18;
    202:5,8,12,15;207:21;
    208:7,11,15;211:14,22;
    212:4,10,11;215:15,
    16,17,17,19;225:10;
    231:12;234:2,22,23;
    235:18,23;237:4;
    241:15;242:2;251:20;
    255:1,10,16,23
dance (1)
    158:21
Dan's (2)
    46:6;104:9
data (32)
    43:1;56:12;73:23,24;
    74:18;88:14,24;89:18,
    21;90:10,10;95:3;
    118:11;136:4,5,7;
    149:3;151:25;152:2;
    156:25;157:3;158:25;
    159:2;162:8;177:15;
    188:2,3,19;197:10;
    225:22;226:17;250:15

51:23;120:23,24
database (8)
    64:25;86:1;87:19;
    93:1;169:8,18;177:14;
    237:23
databases (1)
    43:2
date (17)
    16:9;17:6,8;85:1;
    97:18;108:20;129:16;
    161:11;164:19;186:16,
    17;188:17;213:15;
    226:1;238:25;240:8;
    256:13
dated (4)
    22:1;113:5;154:19;
    220:3
dates (3)
    17:11;157:14;193:12
day (21)
    40:2;51:2;82:8;84:7;
    132:10;150:13;157:10;
    174:8;192:5,7,9,11,23;
    193:7,14,20;203:12;
    216:19;255:2;256:1,2
days (7)
    29:3;68:20;99:7;
    102:7,9;105:21;180:8
day-to-day (1)
    153:15
deadlines (1)
    37:14
deal (26)
    18:10;29:20;30:8;
    31:2,12,18,20,22;32:1;
    33:4,5;82:3;99:8;
    108:10,15,19,22;109:2;
    128:11,13;129:24;
    217:6;224:10,12,16,18
dealers (1)
    130:20
dealing (3)
    33:8;167:10;173:2
deals (7)
    70:8;97:11;104:1;
    105:1;111:9;129:22;
    130:5
dealt (1)
    119:18
debating (1)
    173:12
debrief (1)
    168:1
December (12)
    28:11;34:14;85:3;
    90:21,23;93:22;96:20;
    100:17;103:7;110:11;
    111:19;131:9
decide (1)
    84:3
decided (2)
    78:20;91:2
decides (1)
    108:1,4

**Hodell-Natco Industries, Inc. v.**
**SAP America, Inc., et al.**

**Geoffrey Ashley**
**March 16, 2012**

**decision (12)**
36:25;91:12;99:10,
11,15;124:19;142:4;
215:9,13;231:16,17;
240:19

**decisions (8)**
23:9,15,21;27:1;
30:16,20;202:24;
211:16

**defendant (1)**
9:20

**deficiencies (3)**
197:22,25;198:3

**define (7)**
27:15;76:8;139:24;
159:25;160:1;161:24;
236:10

**defined (3)**
72:15;75:13;159:10

**defines (1)**
161:22

**defining (1)**
72:10

**definitely (11)**
72:15;90:7,8,22;
114:8;159:10,13;
160:17;164:24;207:20;
256:6

**definition (9)**
69:17,20,24;74:20;
191:12;229:12;230:7;
233:5;249:19

**definitive (2)**
170:22;178:12

**defraud (1)**
13:22

**degradation (1)**
227:4

**delayed (1)**
119:8

**delays (2)**
102:6;141:16

**deliver (2)**
77:4;118:20

**delivered (3)**
56:7,8;237:17

**delivering (1)**
82:12

**delivers (1)**
196:21

**Dell (2)**
61:24;62:1

**Deloitte (1)**
248:22

**demand (1)**
63:6

**demands (1)**
107:21

**demographic (2)**
79:12,17

**denied (1)**
191:23

**department (2)**

**decision - drove**

**151:1;245:24**

**departmental (1)**
71:19

**departments (1)**
41:10

**depend (3)**
107:20;121:22;124:8

**depended (3)**
121:23,24;122:22

**depending (9)**
52:4;61:25;64:23;
65:3;96:14;168:23;
169:12;173:4;232:10

**depends (5)**
20:14;60:5;121:21;
137:13;189:20

**deposition (6)**
17:2;18:17,25;192:9,
11;256:19

**depositions (1)**
19:3

**derailed (1)**
102:3

**describe (1)**
46:25

**description (2)**
158:16,17

**Design (7)**
5:6,23;6:15,16;
14:12;22:12;216:10

**designed (10)**
71:10,22;89:14,16;
92:23;182:21;207:17;
232:12,14;233:15

**designing (1)**
223:7

**detailed (1)**
184:18

**determination (3)**
162:14;163:2;176:22

**determine (7)**
79:22;94:4;143:10;
156:24;162:2;238:13;
245:13;247:9

**determined (4)**
109:10,23;156:19;
207:1

**determining (2)**
91:4;244:22

**develop (3)**
10:19;206:17;229:8

**developed (5)**
48:5;68:4;135:15;
155:12;233:23

**developer (2)**
87:7;163:9

**developers (1)**
155:15

**developing (3)**
98:13;99:24;179:19

**development (24)**
5:14;41:11;51:12,13;
69:13;84:21;99:18;

**117:14;140:1;155:8,**
16,18,21;156:5,6,13;
157:19;166:13;173:2;
175:10;179:12;213:10;
215:19;243:12

**develops (1)**
175:11

**DI (5)**
66:7;67:6,7,17,23

**Diane (2)**
65:21,23

**difference (4)**
25:5;43:4;150:9;
179:10

**different (27)**
13:8;47:22;50:12,22;
52:24;53:17,18;55:16;
63:14;71:17;73:13;
87:4;98:15;115:12,13;
151:16,17,19,25;
158:11,12;197:19;
202:5;204:25;250:22;
252:17,19

**difficult (1)**
193:25

**diligence (4)**
37:10;43:25;103:1;
196:7

**dinner (1)**
15:15

**direct (6)**
11:20,23,24;70:8;
78:24;164:12

**directed (2)**
30:17,18

**direction (4)**
219:13,15,21;221:3

**directly (4)**
8:4;80:21;177:4;
194:19

**director (7)**
4:15;5:7,14,24;9:1;
77:6;83:1

**Dirk (15)**
175:7,20;177:22;
178:2,15,24;180:3;
184:9;186:14,18;
231:12;234:2,5,23;
237:5

**disagree (10)**
16:9,12;23:21;
170:14;171:8;175:19;
186:3;190:1;231:23;
232:23

**disagreed (2)**
23:16;191:13

**disagreeing (1)**
254:16

**disasters (1)**
103:12

**disastrous (1)**
118:24

**disbanded (1)**

**14:16**

**Disclaimers (1)**
226:22

**disclose (3)**
12:15;15:8,9

**disclosed (1)**
125:8

**disconnect (1)**
76:10

**discuss (2)**
19:1;123:13

**discussed (12)**
15:23;17:11;32:16,
17;126:9;141:10;
174:15,16;198:17;
210:15,16;217:17

**discussing (4)**
38:12;103:8;187:9;
254:25

**discussion (13)**
41:6;86:16,21;
111:15;114:14;127:22;
146:16;155:3;167:5,6,
8;185:19;223:19

**discussions (17)**
16:2;21:4;67:22,25;
68:12;74:11;159:23;
176:13;185:18;192:2;
193:24;212:7;237:22;
242:16;243:9;255:1,23

**disease (1)**
140:18

**dishonest (1)**
25:4

**distinct (1)**
47:3

**distinction (2)**
72:4,12

**distracted (2)**
102:2;119:1

**distributed (1)**
52:11

**distribution (10)**
8:7,8;11:11,14,15;
117:5,6;151:14;
152:10;207:6

**District (1)**
21:10

**divide (1)**
110:16

**divisional (1)**
71:18

**Document (54)**
21:15,19;25:19;
27:23,25;28:7;34:13;
37:24;45:14;51:7;
53:25;54:1,10,15;
55:15,17,24;57:1,6;
62:4;88:6,14;89:22;
90:5;91:17;92:16;
99:18;100:2,10;
112:24;133:3;137:1,6;
141:10;146:4,5;

**171:16;173:12;190:13;**
198:12;199:4,10;
202:4;216:25;217:25;
218:10;220:1,25;
222:4,9,13,16;224:5;
225:21

**documentation (1)**
40:14

**documented (1)**
256:8

**documents (10)**
15:25;28:3;29:14;
76:17;84:1,17;88:17;
145:17;186:7,8

**dollars (5)**
105:10,12;108:25;
116:23;233:10

**domain (2)**
50:16;87:7

**dominate (2)**
27:12;40:24

**dominated (2)**
23:12;27:9

**done (41)**
7:17;26:17;33:6;
35:15,22;36:12;37:19;
39:10;76:21;77:7;81:3;
83:23,24;91:16;99:14,
15;122:9,24;123:1;
128:3;141:14;145:15;
147:7,12;152:9;
166:13;173:4;196:7,8,
11,14;207:4;223:18;
238:22,24;248:11,15;
249:2,4;254:6;256:18

**door (3)**
66:10;113:18;172:17

**doubt (5)**
55:25;125:17;128:5,
8;133:13

**down (28)**
25:21;26:8,21,24;
38:17;45:25;47:19;
48:21;50:16;54:12,14;
55:10;59:13;75:6,8;
94:23;150:16;152:18,
20;171:17;199:9;
207:21;209:6;220:12;
221:14;234:3;237:15;
248:3

**download (1)**
79:6

**drawn (1)**
209:25

**DRI (1)**
142:11

**drill (2)**
75:6,7

**drive (2)**
103:16;118:4

**driven (1)**
105:1

**drove (2)**

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

54:7;203:11
**due (7)**
  37:9;43:25;102:25;
  153:17;195:25;196:7;
  199:24
**duly (1)**
  4:3
**dumb (4)**
  191:3,4,12;256:5
**During (11)**
  14:14;31:15;54:23;
  58:4;76:21;80:1,4,8;
  105:11;142:24;219:19

# E

**earlier (9)**
  40:25;79:19;147:17;
  174:3;187:17;195:15;
  217:17;243:10;256:2
**early (16)**
  8:12;35:3;36:18;
  42:13,19;55:4;83:24;
  88:7;90:6;96:19;
  106:13;192:9,11;
  193:19,23;194:16
**earmarked (1)**
  51:21
**easier (2)**
  106:24,24
**easiest (1)**
  239:4
**easily (1)**
  69:7
**East (2)**
  61:23,25
**easy (1)**
  37:20
**Eddy (5)**
  149:24;152:22;
  177:13;186:14;250:5
**edge (1)**
  7:15
**edges (1)**
  158:22
**educate (2)**
  85:17,20
**educated (3)**
  62:19,20;124:19
**effect (2)**
  185:23;215:20
**effort (2)**
  14:1;206:20
**efforts (1)**
  167:16
**either (22)**
  6:25;10:22;11:25;
  13:14;22:17;34:19;
  46:22;56:22;60:21;
  66:9;135:3;151:5;
  157:6;172:4;173:4;
  179:11;230:16;232:23;
  242:18;245:25;247:8;

249:8
**elect (1)**
  172:17
**electronic (2)**
  56:3;79:2
**electronically (1)**
  56:8
**elements (1)**
  21:9
**Eliminating (1)**
  116:1
**else (20)**
  14:18;19:19;23:1;
  39:22,23;43:21;95:9;
  116:3;129:11;142:23;
  152:7;162:19;167:15;
  175:3,23;180:2;184:6;
  202:4;221:6;248:23
**e-mail (82)**
  11:25;20:10;21:25;
  22:15;25:18;28:10,13;
  29:3;38:2,5,8,15;46:6;
  50:15;55:10;100:16,
  20;101:9,12;103:9;
  113:4;114:25;129:20;
  130:6;131:8;132:15,
  20;133:8;134:11,15;
  137:17;138:4;145:20;
  154:17,24;156:8;
  157:10;161:17;163:17;
  164:2;166:22;167:25;
  168:7,11,14;172:15;
  180:1,8;181:5;182:13;
  187:25;190:18,20;
  192:1,7;193:21;
  198:20;199:3,10,20;
  203:18,21;206:12;
  18,19,22;212:16;
  213:19;214:25;231:12;
  234:1,22;235:18,23;
  240:5;241:6,12;242:1;
  251:20
**e-mailing (2)**
  156:9;161:12
**e-mails (17)**
  20:7;29:2,14;51:2;
  154:22;170:2;174:3;
  180:22;181:22;192:2;
  209:2;234:19;241:1,2,
  3;253:21;255:23
**emerging (1)**
  239:22
**emotion (1)**
  210:10
**employed (7)**
  19:19,22;20:1;22:4;
  25:6;102:21;162:25
**employee (8)**
  4:8;15:23;18:8,20;
  50:15;61:16;205:24;
  252:15
**employees (18)**

18:22;19:4;72:4,12,
  16;74:23;75:25;78:13;
  164:3;170:2;180:23;
  220:10,21;223:8;
  239:21;252:15,17,19
**employer (1)**
  5:11
**employment (5)**
  4:10;14:8,23;25:10;
  128:23
**empowered (2)**
  50:15;202:23
**enabled (1)**
  34:7
**encountered (2)**
  124:9;153:10
**end (47)**
  20:7;31:13;32:19;
  47:5;68:22;80:21;
  81:25;84:17;91:10;
  95:16,21;96:2,7;
  104:20;108:7;115:24;
  131:4,13,24;138:20;
  145:20;150:13;163:16;
  172:15;176:14;177:15;
  192:8;199:25;204:2,2,
  11,16,17;205:19,19;
  217:21;219:7;225:5,
  13;234:25;235:4,6;
  237:1;241:10,19;
  246:18;249:1
**ended (8)**
  5:15;25:11;35:18;
  60:5;81:13;131:14;
  178:22;191:22
**ends (2)**
  167:24;221:15
**engagement (1)**
  148:20
**engine (9)**
  66:18;67:3,3;91:15;
  106:22;152:25;195:19;
  204:2;205:22
**engines (1)**
  66:24
**enhanced (3)**
  64:5;68:1,4
**enhancements (2)**
  160:12;175:12
**enough (11)**
  35:11;63:7;127:16;
  160:7;184:18;195:9;
  196:7,11,13;229:18;
  244:12
**ensure (1)**
  160:19
**ensuring (1)**
  148:13
**enter (6)**
  56:21,23;82:17;
  84:10;87:19;88:24
**entered (4)**
  89:18,23;90:1,16

**enterprise (17)**
  27:19;47:6;49:1;
  70:3,5,8,12,14;98:20;
  117:14,20;135:15;
  137:20;139:1;153:12;
  233:3,5
**enterprises (5)**
  27:18;69:10,16,18,
  25
**entire (11)**
  7:1,15;14:15;26:11;
  36:4;41:10,10,11;
  46:18;118:21;120:18
**entirely (1)**
  18:11
**entities (1)**
  87:4
**entitled (1)**
  228:3
**entity (3)**
  123:10;132:22;
  152:12
**Entre (2)**
  7:25;8:2
**environment (41)**
  7:20,21;11:14;71:11;
  86:8;92:25;150:11,14,
  18,22;155:20;156:21;
  162:1;165:1,2,5,9;
  168:24;171:5;175:15;
  176:24;179:18;183:20,
  25;184:11;185:10;
  191:7;196:9,10;
  197:13;232:11;235:24;
  236:22;237:18;248:19;
  249:3,4,7,9,10,11
**environmental (1)**
  184:1
**environments (5)**
  76:18;87:10;148:11,
  12;151:19
**Epicor (2)**
  8:19,21
**equipment (1)**
  68:9
**equivalent (1)**
  129:3
**erasers (3)**
  75:16;245:7,8
**ERP (3)**
  7:3;8:19;9:4
**especially (3)**
  99:8;183:25;184:11
**essence (1)**
  81:6
**Essentially (11)**
  6:11;10:9;32:17;
  87:18;98:25;99:2,4;
  113:19;172:4;174:20;
  189:19
**establish (1)**
  150:17
**established (2)**

92:23;95:18
**establishing (3)**
  105:9,16,18
**estate (1)**
  89:16
**estimate (1)**
  25:12
**et (9)**
  40:12;73:1,1;143:12,
  12;236:1;237:8;
  245:16,17
**evaluate (1)**
  80:25
**even (17)**
  47:13;89:24;111:23,
  25;147:13;168:7,23;
  169:10,11;174:4;
  186:12;197:3;210:6;
  220:17;230:3;247:15;
  248:18
**event (3)**
  28:21;78:5;146:23
**events (5)**
  11:16;30:21;146:7;
  219:16,19
**eventually (2)**
  176:14;215:23
**everybody (25)**
  18:8;36:11;37:4,7,
  21;41:1,12;44:24;58:4;
  78:7;101:18,19;
  105:22;139:14,14,15,
  18;143:20;148:1,2,3,
  23;159:24;174:25;
  226:6
**everybody'd (1)**
  180:12
**everybody's (1)**
  58:5
**everyone (2)**
  80:13;138:20
**evidence (3)**
  17:23;45:15;122:19
**evolution (5)**
  6:13;42:14,20;46:18;
  90:5
**evolve (4)**
  68:8;73:12,21;
  244:17
**evolved (1)**
  40:24
**evolving (6)**
  42:24;43:3,10,15;
  88:5,13
**exact (5)**
  128:4;131:11;
  188:17;203:6;249:25
**exactly (21)**
  28:19;44:16;58:10,
  21;64:18;97:16;
  103:11;114:13;119:7,
  21;120:10;121:6;
  128:1;129:19;142:16;

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

147:15;157:13;178:4;
242:10,11;254:3
**EXAMINATION (5)**
4:5;14:6;228:22;
247:21;254:12
**example (19)**
42:18;48:3;53:8;
60:18;71:7,13;73:16;
75:5,15;92:12;95:9;
106:10;112:11;119:24;
129:23;148:15;195:15;
243:25;245:2
**exceeded (1)**
24:8
**exceeding (2)**
89:13;228:16
**exceeds (1)**
228:11
**Excel (1)**
218:9
**except (1)**
91:15
**excess (2)**
122:13;123:9;142:11
**exchange (2)**
28:13;38:2
**excited (1)**
37:22
**exclamation (1)**
164:7
**exclusively (1)**
49:16
**Excuse (2)**
96:20;128:12
**executed (2)**
81:25;84:25
**executing (1)**
81:13
**executive (2)**
23:16,18
**Exhibit (81)**
21:15,18,23;27:23,
25;37:24,25;38:12;
43:23;53:7;55:7,22;
56:16;57:1,2,5,20;58:8,
16;100:3,10,17;
112:24;113:4;114:10;
126:4,10;128:17,19,24;
130:9;133:3,4,9;
137:15;141:7;146:4,5;
154:14,17;163:12,13,
16;174:12,21;180:20,
22;182:14;185:24;
190:13,16,19;198:12,
13,15;203:19;209:3;
211:9,12,19;212:13;
213:19;214:15,25;
215:11;216:2,5,16;
218:16;219:23;223:21,
24;231:6;234:1,15;
235:14;237:4;241:14,
25;251:19;254:19
**exist (5)**

8:1;56:9;104:15;
111:8;246:4
**existence (4)**
55:6;83:3;93:22;
124:18
**existing (1)**
249:23
**expect (8)**
26:6;82:16;83:17;
144:2;234:25;235:4,6;
241:8
**expectation (1)**
83:2
**expectations (2)**
153:16;183:20
**expected (8)**
97:17;108:19;
121:17;122:15;123:14;
149:21;235:8,11
**expecting (3)**
180:7,16;181:12
**experience (10)**
6:18;60:22;94:6,22;
179:14;214:2;223:3;
231:18;244:19;247:22
**experienced (2)**
143:19;163:11
**experiencing (3)**
12:24;164:8;170:4
**expert (2)**
151:7;153:4
**expertise (1)**
136:14
**explained (1)**
139:25
**explanation (1)**
184:19
**exploration (1)**
91:18
**express (1)**
137:4
**extend (1)**
84:4
**extension (1)**
141:23
**extent (1)**
166:7
**external (1)**
167:6;169:1
**extremely (2)**
7:11;42:13
**eyes (1)**
102:1

**F**

**face (1)**
142:22
**faced (1)**
118:18
**face-to-face (1)**
12:1
**fact (18)**

21:2;31:6;38:25;
44:9;50:23;77:9;107:3;
116:7,9;117:8;122:15;
123:16;167:24;168:20;
176:15;188:6;201:11;
256:9
**factors (2)**
93:8;244:21
**facts (3)**
17:23;122:19;144:22
**factually (1)**
169:2
**failed (13)**
12:15;33:20;119:2,
15;120:20,22;121:2,4,
7;149:20;195:23;
196:2,6
**fails (1)**
107:13
**failure (3)**
36:7;253:3,5
**fair (20)**
43:23;91:20;94:19,
23;98:5;117:12;142:9;
149:22,23;151:7;
173:9;182:7;192:17;
204:23;207:13,15;
220:18;221:23;235:9;
253:14
**fall (1)**
73:5
**familiar (7)**
95:20;218:5;219:13;
220:1,25;238:4;249:13
**FAQ (2)**
86:6,22
**far (11)**
25:24;26:23;67:21;
155:18;162:1;185:17;
206:10;235:24;256:11,
14,15
**fast (1)**
37:9
**fastener (14)**
39:11,13;116:10;
117:6,17,22;118:5,12;
135:13;140:8,14,15;
142:2;185:12
**fasteners (1)**
151:15
**favoring (1)**
30:20
**feasible (2)**
209:9,10
**feature (2)**
43:2;63:22
**February (8)**
131:10;133:9;
136:21;137:9;146:8,
19,24;216:19
**feel (3)**
24:15;33:1;42:10
**feeling (2)**

164:25;165:4
**feels (1)**
212:20
**fell (1)**
213:12
**felt (6)**
23:24;26:23;30:22;
36:10;46:7,23
**few (10)**
4:7;26:15;114:11;
115:16;119:18;130:14;
181:22;224:20;245:5;
252:2
**fewer (1)**
115:11
**field (8)**
71:19;78:1,5;94:6,
22;219:7,17;247:22
**fields (1)**
169:14
**fight (1)**
153:7
**figure (3)**
79:19;143:15;174:25
**figured (3)**
9:13;156:19;165:10
**file (1)**
110:4
**fill (2)**
79:1;218:12
**fills (1)**
53:14
**final (3)**
63:16;91:11;161:19
**finally (7)**
60:7;165:19,19;
188:15;189:21,22;
237:16
**financial (2)**
136:13;211:15
**financials (1)**
198:8
**find (10)**
24:23;71:3;105:13;
181:7;188:21;189:6;
194:9;201:11;205:18;
219:8
**Fine (6)**
12:7;124:12;125:19;
197:16;200:18;254:22
**finish (2)**
81:1;84:14
**finished (5)**
21:20;113:1;126:6;
133:5;139:11
**fire (1)**
100:22
**firm (5)**
16:15;19:15;56:22,
23;87:14
**first (64)**
4:3;6:22;24:6;28:8;
29:1,7,9,13,17,25;30:1,

164:25;165:4
2;32:20;33:10;34:16;
47:2,2;60:2;64:5;
65:21;73:8;88:6;96:15;
101:2;103:15;106:8,
24;107:1;109:21;
111:6,11,12;114:11,14,
18;116:9;118:18;
119:18;120:4;135:23;
145:25;158:7;165:3,
23;166:1;168:3;
170:25;171:16;179:4;
183:7;184:23;185:22;
203:3;209:6;216:8;
223:7;225:22;231:7,
20;234:18;237:7;
241:25;243:5;251:3
**fiscal (1)**
126:17
**fit (17)**
79:24;80:3;81:1;
88:16;89:2;91:5,7;
94:16,20;136:16;
223:6;230:17,20,25;
233:4;243:18;248:18
**fits (1)**
230:16
**five (5)**
75:18;76:1;165:16;
239:20;247:2
**fix (23)**
35:23;66:10;120:1,4,
6,24;169:24;170:3,9;
174:21;180:12;184:16;
187:22;188:20;199:15;
213:7;234:25;235:4,8,
11;236:24;241:8,17
**fixed (9)**
12:25;13:7;42:17;
67:18,23;68:2;123:23;
124:6,17
**fixes (1)**
175:5
**fixing (1)**
175:4
**flag (5)**
159:24,25;160:2,5;
228:17
**flags (2)**
137:25;228:8
**flip (1)**
224:20
**flippant (1)**
147:2
**floods (1)**
103:11
**Florida (1)**
9:3
**flowcharted (1)**
54:14
**flown (1)**
35:5
**focus (5)**
167:14;220:9,14,20;

248:11
**focused (3)**
  69:14;102:1;179:16
**folder (1)**
  110:4
**folks (2)**
  47:4;213:20
**follow (1)**
  247:20
**following (2)**
  131:6;148:23
**follows (3)**
  4:4;223:7;242:7
**follow-ups (1)**
  254:11
**food (1)**
  48:18
**forced (1)**
  118:20
**forecast (2)**
  96:25;103:21
**forecasts (1)**
  103:25
**forever (1)**
  124:2
**forgot (2)**
  90:18,18
**form (86)**
  13:17;31:4;32:11;
  33:23;35:25;37:1;
  38:23;39:8,24;43:13;
  44:13;45:3;61:7;70:25;
  79:1;81:8;82:22;83:15,
  21;95:17,20,22;96:4,
  12;107:5,14;109:16;
  115:25;116:16;117:24;
  122:18;123:17;124:7,
  21;125:9;139:2;
  144:18;150:20;154:2;
  158:5,6,24;162:4,17;
  167:1;168:18;170:6;
  172:7,20;173:14;
  177:1;178:18;182:10;
  186:5,11;187:24;
  188:9;189:8,18,23;
  190:2;193:17;194:4;
  195:22,24;196:3;
  197:1,24;198:4;
  199:16;200:5,23;
  202:7,18;203:8;205:2;
  206:25;208:22;215:4;
  216:6;217:11;218:3;
  222:1;233:7;241:11,24
**formal (1)**
  85:21
**formalize (1)**
  18:17
**formalized (1)**
  118:9
**format (1)**
  151:14
**former (6)**
  4:8;15:23;18:8,20,

22;19:4
**formerly (1)**
  19:22
**formulated (1)**
  243:5
**Forrest (3)**
  59:5,9;60:10
**Forrester (1)**
  69:22
**forum (2)**
  86:16,21
**forums (1)**
  87:11
**forward (2)**
  37:16;124:20
**forwarded (2)**
  22:18,19;154:23;
  161:18
**forwarding (4)**
  22:15;25:18;28:13;
  134:12
**found (4)**
  77:10;173:23;
  201:15;234:6
**foundation (6)**
  13:18;17:23;95:19;
  144:19;193:18;194:5;
  251:7,15
**founding (1)**
  106:8
**four (4)**
  82:11;165:16;203:5;
  209:23
**fourth (4)**
  121:8,14;122:12;
  126:17
**frame (20)**
  12:6;22:11;54:6;
  55:2;62:3,23;90:2,4;
  157:24;160:24;161:1;
  165:12,13;166:18,19;
  188:14;210:12;213:11;
  237:20;253:22
**frames (2)**
  49:24;50:2
**frankly (1)**
  40:16
**fraud (4)**
  12:14;13:14;21:3,10
**fraudulent (1)**
  45:21
**free (4)**
  100:5;184:25;185:7;
  212:15
**frequently (2)**
  86:6;101:9
**frequently-asked-questions (1)**
  86:8
**friendly (1)**
  33:7
**friends (1)**
  191:17
**fringes (1)**

89:13
**front (7)**
  31:13;46:1,13;196:8;
  204:1,15;205:19
**frustrated (1)**
  45:17
**frustrating (1)**
  60:22
**frustration (2)**
  41:1;60:17
**full (2)**
  34:16;142:18
**fully (1)**
  153:14
**function (4)**
  63:23;82:12;152:7,8
**functionality (3)**
  63:17;74:25;75:1
**fund (3)**
  51:12,13,21
**funds (2)**
  51:15;52:13
**funny (2)**
  68:14;242:11
**furious (1)**
  168:12
**furniture (1)**
  130:22
**further (2)**
  228:20;256:17
**future (2)**
  36:15;220:8

## G

**gain (1)**
  73:11
**gaining (1)**
  70:16
**Gary (1)**
  59:19
**gave (5)**
  34:19;46:10;72:15;
  136:3,5
**Gee (1)**
  242:22
**geesh (1)**
  88:5
**general (15)**
  6:17;9:25;10:1,4;
  34:4;46:15;57:15;
  74:24;119:12;126:11;
  138:7;148:11;198:7;
  222:5;226:19
**generally (2)**
  230:9,13
**generate (2)**
  51:18;56:24
**generic (2)**
  52:25,25
**gentleman (1)**
  55:11
**Geoff (2)**

16:7;49:12
**GEOFFREY (1)**
  4:2
**Georgia (1)**
  9:7
**Germany (4)**
  60:21;114:5;173:5;
  227:20
**gets (3)**
  43:5;87:21;152:6
**given (16)**
  27:11;30:23,24;
  33:25;36:10;51:25;
  58:4;99:6;127:25;
  156:21;164:19;200:7,
  20;201:20;221:8;
  247:22
**gives (3)**
  62:22;218:13;252:16
**giving (2)**
  145:14;225:25
**global (6)**
  6:3,3,4,11;71:13,14
**globally (1)**
  73:4
**goal (4)**
  101:1,1,6;102:1
**goals (1)**
  6:14
**goes (9)**
  20:3;47:17;51:11;
  80:11,13;138:20;
  236:14,24;237:15
**go-forward (1)**
  207:22
**go-live (5)**
  166:3,8,16;171:23;
  238:25
**Good (14)**
  4:6;35:13;42:17;
  57:10;60:7;63:5;66:1;
  77:17;80:19;112:11;
  140:24;142:3;174:5;
  195:20
**gospel (1)**
  179:23
**go-to (2)**
  49:11;71:17
**grade (1)**
  141:23
**great (1)**
  194:11
**green (2)**
  89:8,10
**Greg (2)**
  15:17;21:4
**grew (1)**
  201:20
**group (4)**
  106:24;107:1;
  179:22;181:3
**grow (20)**
  7:22;26:3,10;42:15;

68:11;73:12,21;
  132:10;186:22;187:4;
  201:16;232:2,12,13,14;
  239:3,7,17;244:16;
  251:23
**growing (7)**
  86:5;106:21;184:12;
  186:23;239:14,15;
  245:16
**grows (1)**
  232:15
**growth (2)**
  105:18;184:12
**guarantee (1)**
  56:9
**guess (22)**
  20:14;25:14;28:22;
  38:11;48:13;49:25;
  53:1;54:25;57:10,11;
  62:20,20;64:9,12;
  104:12;115:16;172:1;
  177:23;178:23;197:7;
  218:18;224:3
**guessing (4)**
  57:17;101:6;111:21;
  166:18
**Guide (2)**
  51:5;218:6
**guideline (1)**
  92:17
**guidelines (2)**
  52:4;53:24
**guy (5)**
  35:20;113:13;
  116:21;176:19;177:6
**guys (2)**
  15:18;100:24

## H

**Hager (1)**
  59:19
**H-a-g-e-r (1)**
  59:21
**H-a-j-e-r (1)**
  59:20
**half (4)**
  62:10;182:14;186:1;
  223:8
**halfway (2)**
  220:11;221:14
**hand (1)**
  21:17
**handle (1)**
  188:20
**handled (2)**
  35:2;92:21
**handles (1)**
  28:19
**handling (1)**
  104:17
**hanging (1)**
  234:24

Case: 1:08-cv-02755-DCN   Doc #: 289-1   Filed:  02/20/15   76 of 92.   PageID #: 14888

Hodell-Natco Industries, Inc. v.                                                                    Geoffrey Ashley
SAP America, Inc., et al.                                                                            March 16, 2012

**Hannah (1)**
  8:3
**happen (11)**
  45:22;94:14;121:3;
  144:17;145:5;148:25;
  157:14;168:22;191:1;
  210:17,18
**happened (13)**
  26:14;37:13;42:23;
  71:8;90:23;144:15;
  145:7;149:6;166:17;
  169:19;185:18;187:13;
  210:1
**happening (1)**
  166:21
**happens (2)**
  73:15;107:11
**happy (3)**
  118:2;135:5;180:13
**harassment (1)**
  177:3
**hard (4)**
  56:9;71:3;75:24;
  76:2
**hardest (1)**
  106:25
**hardware (7)**
  10:22;68:10;93:1;
  240:15,19;249:3,10
**hate (1)**
  101:20
**Haywood (1)**
  129:25
**hazard (1)**
  157:15
**head (1)**
  66:15
**headed (2)**
  145:1,3
**header (1)**
  22:16
**heading (2)**
  65:20;136:12
**hear (3)**
  149:12;207:7;215:20
**heard (7)**
  53:25;71:1,3;72:19;
  96:15;183:9;238:22
**hearing (3)**
  60:10;128:10,12
**held (7)**
  4:12;69:1;78:1,6;
  111:15;125:25;223:19
**Hello (1)**
  55:14
**help (12)**
  34:18;36:5;40:18;
  56:24;103:10;110:19;
  140:25;174:23;184:5;
  205:14;238:13;248:19
**helped (2)**
  139:13;240:12
**helping (4)**

**helps (1)**
  239:21
**high (13)**
  98:6;112:11;134:25;
  135:4,7,11;138:15;
  155:16,19;177:15;
  211:15;225:5,13
**high-end (2)**
  224:25;225:20
**higher (3)**
  91:10;217:6,22
**highest (1)**
  126:20
**highlight (1)**
  57:16
**highlighted (1)**
  53:14
**hindsight (7)**
  31:17;36:11;37:20;
  170:23;171:11;197:6;
  209:22
**hire (1)**
  246:1
**hired (3)**
  4:14;11:21;61:12
**history (5)**
  4:10;93:14;111:5;
  224:10;229:9
**hit (1)**
  169:19
**Hodell (213)**
  10:3;19:11;20:12:2,
  5,7,13,14,16,16,19,21,
  21,23;13:3,6,12,14,15,
  16;20:8,24;21:2;29:2,
  11;32:7;35:6,23;36:2,
  22,23;37:8,9,18;38:20;
  39:5,12,16;41:25;42:3,
  5;44:9,18,20,22,24;
  45:20;50:7;78:19,20;
  81:13,17,21;84:22,24;
  85:6,14;90:14;92:12;
  95:11;96:24;97:14;
  98:5,12,23;99:17;
  104:5;111:11,20,23;
  112:4,22;114:20,25;
  115:18;117:19,20,25;
  124:1,9,25;125:22;
  126:24;127:4,6,9,12,
  14,15,17;128:7,11,13;
  129:18;131:17;132:23;
  134:24;135:3,5,11;
  138:1;143:16,21;
  144:3;145:9;147:9,9,
  18;149:13,20,20;
  153:17;156:24;157:8,
  21;158:3;159:8,10,14;
  160:20;163:18;164:16,
  23;166:10;170:3;
  172:4;173:11;175:2;
  176:2;180:16;181:13,

  16,17,25;182:20;
  183:2;184:3;186:1,21;
  187:3,10;188:18;
  189:4,11;190:5;
  191:24;192:18,24,25;
  193:8;194:2,18;
  195:20;197:10,20;
  200:9,22;201:12,24;
  204:8,24;206:1,4,5,23;
  207:1,9,13,16,17;
  208:9,14;210:14,20;
  211:2;212:21;213:8,
  20;220:19;221:24;
  222:20;223:13,15;
  225:8,17,21;227:7,10;
  228:13,16;231:20;
  234:6,7,9,24;235:3;
  238:18,25;240:20,24;
  243:6,19;244:8,12;
  247:8,10;251:21;
  252:24;253:2,9,10,25;
  254:7
**Hodell-LSi (1)**
  240:15
**Hodell-Natco (37)**
  9:19,22;10:14;28:21;
  31:3;33:22;96:16;97:9;
  108:9,14,18;114:15;
  116:18,25;121:13;
  122:1,13;134:6;
  135:20,22;136:6,23;
  137:22;153:10;154:12;
  171:10;182:8;197:16;
  198:5,6;204:4;214:5,
  10;229:2;230:16;
  231:3;237:9
**Hodell-Natco/SAP (1)**
  20:19
**Hodell-Natco's (1)**
  229:13
**Hodell's (12)**
  10:22,23;117:9;
  145:20;148:6;165:5;
  187:18;195:23;196:1;
  231:18;254:14;255:10
**Hold (4)**
  128:20;179:10,12;
  219:8
**Holdell-Natco (1)**
  43:24
**holding (1)**
  105:7
**home (1)**
  105:2
**honest (3)**
  24:23;25:3;58:21
**Honestly (10)**
  20:21;101:5,7;
  112:23;217:12,19;
  240:13;243:20;255:13;
  256:15
**hope (3)**
  116:10;118:2;181:14

**hoped (3)**
  23:7;26:10;187:18
**hoping (5)**
  78:8;117:18;125:22;
  180:11;214:19
**Hopkins (4)**
  7:7,14;8:4,11
**horizontal (2)**
  69:11,14
**horsepower (1)**
  204:3
**hour (2)**
  169:16;215:16
**housed (1)**
  86:19
**huge (7)**
  9:4;27:4;112:20;
  150:8;169:18;248:1;
  250:22
**HULME (22)**
  13:17;115:25;
  144:19;158:6,24;
  159:17;160:1;162:17;
  173:14,17;190:11;
  193:17;198:25;199:7;
  205:2;211:20;228:22;
  231:10;247:18;251:7,
  15;252:3
**hundred (3)**
  47:11;92:1;132:9
**hundred-million-dollar (1)**
  245:4
**Hundreds (2)**
  89:21;131:18
**hurricane (1)**
  103:12
**hurts (1)**
  23:1
**hypothetical (2)**
  144:21,21

# I

**IBD (1)**
  226:18
**IBE (1)**
  164:10
**IBM (2)**
  25:25;26:1
**IDC (1)**
  69:22
**idea (37)**
  46:11;56:1;83:23;
  84:8;89:4,7;99:19;
  102:6;104:6;110:17;
  126:18;132:24;147:10;
  171:15;182:3,11;
  183:14,18;184:25;
  185:17;197:4;202:9,9;
  210:18;213:4;217:23,
  24;218:13,25;221:7;
  225:12;226:1,6;
  228:19;243:4;247:7;

  252:20
**ideal (1)**
  249:12
**ideally (2)**
  158:18;249:6
**identically (1)**
  150:7
**identified (5)**
  174:22,22;236:18;
  241:16;250:12
**ill (1)**
  140:22
**Illumiti (3)**
  61:17,18;63:12
**immediately (1)**
  166:2
**impact (4)**
  95:8;123:19;125:11,
  13
**impacted (2)**
  122:23;123:6
**impacts (1)**
  211:15
**imparted (1)**
  168:12
**implement (2)**
  9:23;64:21
**implementation (43)**
  12:8;20:8,20;32:7;
  33:21;44:1;82:5;95:2;
  107:13;120:21,22;
  121:2,4;124:10;
  142:24;147:8;153:11;
  154:9,11;156:25;
  157:19;164:16;166:6;
  170:12;180:17;181:13,
  16;192:19;193:1,25;
  194:2,16;195:7,23;
  196:2,6;213:8;214:8;
  226:13;228:17;240:16;
  247:25;251:5
**implementations (5)**
  118:13;119:3,15;
  121:8;223:4
**implemented (7)**
  152:6;153:14;165:8;
  166:15;188:15;189:21;
  214:4
**implementer (1)**
  251:9
**implementing (2)**
  94:17;95:12
**implied (2)**
  44:22,24
**implies (1)**
  115:17
**important (9)**
  6:22;35:11;36:6;
  37:6;116:8,13,23,24;
  169:3
**impossible (4)**
  72:18;84:13;176:15;
  230:18

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

impression (1)
46:11
improve (7)
88:18;214:23;
235:12;243:21,22,24;
244:2
improved (3)
64:4;68:5;217:5
improvements (2)
214:3;253:24
improving (1)
63:22
inappropriate (1)
242:25
incentive (1)
171:18
inception (2)
91:23;114:24
inclined (1)
201:5
included (9)
154:25;160:18;
161:15;199:20;208:6;
211:23;212:12;236:25;
241:18
includes (1)
230:19
inconsistent (1)
181:21;200:3,21
incorporating (1)
204:20
incorrect (1)
179:3
indemnification (1)
173:21
indemnify (1)
174:1
independent (4)
22:7;48:1;75:23;
129:7
indicate (1)
242:20
indicated (1)
219:1
indicates (2)
201:23;202:2
Indicating (1)
203:1;226:24
indication (7)
62:22;226:2,3;
245:14;246:18,25;
247:14
indicator (3)
224:18;245:12,17
indicators (1)
226:7
indirect (1)
80:16
individual (2)
92:10;93:12
industries (6)
70:18,19;72:25;
88:16;137:11;221:6

industry (23)
6:18;39:11,13;43:14;
69:15;73:15;79:16;
110:22;116:19;117:1,
10,17,22;118:5,6,12;
135:13;136:10;140:16;
142:2;231:21;248:10;
251:4
industry-specific (1)
136:14
inexperienced (1)
247:16
infer (1)
115:9
inferring (1)
127:20
In-Flight (19)
95:10;98:20;117:14,
19;122:25;135:14;
136:15;137:19;138:22;
139:1;147:8;153:11;
204:6;206:15,24;
209:14;215:18;233:23;
253:1
In-Flight/Business (1)
204:15
Infor (2)
9:11;80:15
inform (2)
123:25;192:19
information (38)
12:16;34:20;36:9,16,
24;37:23;50:9,23,24;
57:20,23;58:7;79:9,12,
18,21,22;87:20;
129:10;133:18,21;
134:13,16;135:23;
136:1,10;160:20;
168:13;175:25;176:18;
180:3;215:12;216:24;
218:13;222:15;225:20;
227:6;238:17
informed (1)
121:12
informing (2)
126:25;222:20
infrastructure (1)
10:23
inherent (4)
93:20,25;153:25;
198:3
in-house (2)
123:7;237:17
initial (1)
163:16
initials (1)
142:14
insert (2)
238:7,8
inserted (1)
158:7
insist (1)
171:22

installation (2)
209:8;212:21
installations (1)
142:13
installed (3)
185:16;190:5;204:19
installs (1)
94:9
instance (1)
13:7
instances (3)
13:23;94:24;96:10
instead (2)
66:25;67:3
instruct (3)
16:2,7;177:3
instructed (1)
15:9
integrate (1)
206:20
integration (1)
199:24
integrator (1)
87:13
Intel (1)
93:5
Intellectual (1)
153:1
intended (1)
72:23
intent (2)
13:21;185:5
intention (1)
193:15
interacted (1)
67:7
interaction (2)
134:23;254:5
interchange (1)
128:4
interested (1)
102:12
interests (1)
36:3
interface (3)
67:9,10;68:10
interfacing (1)
206:19
internal (23)
22:16;54:21;67:22,
23;71:18;94:7;109:24;
110:2,3;164:3;167:5,8;
169:1;170:2;176:8,12;
180:23;192:7;193:21;
210:3;226:14;241:3;
256:4
internally (11)
4:21;41:6;70:6;
151:3;167:6;173:12;
179:22;201:22;210:7,
9;256:7
interpret (1)
215:1

interviewed (1)
41:24
into (44)
11:5;22:14;24:3;
39:22,23;51:11;56:23;
73:5;82:17;84:10;
87:20;88:17;89:15,18;
90:16;91:3;93:9,15;
94:1;98:14,18;104:24;
109:24;117:4,6;118:4,
6;129:15;131:10;
134:6;142:2,24;
164:11;166:14;204:21;
206:21;209:23,23;
213:12;230:3;237:13;
238:9;247:6;248:18
introduced (1)
83:20
invented (2)
176:19;177:7
inventors (1)
155:10
inventory (2)
54:13;92:4,6,11
invest (1)
247:5
investigation (1)
247:7
invited (3)
147:1,5,6
invoice (4)
51:10;92:10,14;
153:21
invoices (2)
92:13;93:13
involved (22)
7:12;20:18;56:4;
60:15;68:21;95:19;
127:5,21;139:14,15,15;
140:5,6;147:13;155:2;
156:5;157:18;212:7;
213:4;240:14,18,18
involvement (11)
9:21;10:2,18,21;
24:16;61:5;139:20,22;
214:7;252:23;254:7
IP (1)
152:25
irrelevant (1)
18:11
irresponsible (1)
195:5
irritated (1)
33:18
isolate (1)
154:8
Israel (7)
60:21;155:9;160:13;
164:25;165:4;173:5;
242:16
Israeli (1)
167:11
issue (71)

17:17;26:19;30:11,
13;32:13,14;61:4,11;
67:5;91:14,19,21;
92:15;93:17,20;
118:19;119:10,17,23;
120:15,16;121:1,21,22;
122:20,21,22;123:5,18;
124:1,4,8,18,22;125:4,
10,11,13;126:12;
160:3;164:10,13;
167:7,22;168:8,10;
169:6,12,24;170:3,5,8,
18;175:5;178:8,11;
179:15,18;187:18,23;
188:7,11;189:15;
191:4,21;199:24;
205:25;236:18;241:16;
244:1;250:23
issues (62)
32:2,7;33:25;34:2,3,
5,6;42:7;66:7;89:5,12;
102:2,17,18,20;103:3,
5,6,13;106:3;118:22;
119:20,22,24;120:10,
12;121:14;122:3,16;
123:1,11;124:5,9,24;
125:3;142:23;143:1,6,
14,17,23;144:10;
150:5;153:9;163:11;
164:9;173:18;174:24;
176:6;184:1;188:1;
194:8;195:10,18;
196:5;197:18;199:15;
205:15;209:16;217:16;
236:16;244:25
ISV (7)
48:5;66:14;128:25;
129:2,5,6;181:3
ISVs (2)
47:25;87:10
item (3)
93:12;114:14;183:19
items (7)
92:4,6,10,11;225:13,
17;227:2

J

Jacobs (2)
61:14,16
Jacobs' (1)
63:3
January (11)
22:1,10,23;38:6;
78:6;110:10;113:5;
117:13;131:10;132:20;
136:18
job (12)
4:11;6:22;7:21;8:21,
22;9:5;104:11,13;
114:11;119:19;140:24;
167:14
Johns (4)

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

7:7,14;8:4,11
**Join (1)**
13:19
**joined (7)**
68:18;69:3;74:3,12;
105:20;220:15;240:11
**joining (1)**
8:16
**joint (2)**
150:22;151:6
**Jon (1)**
19:3
**journey (1)**
106:4
**judgment (1)**
77:18
**July (2)**
55:13;224:2
**June (3)**
141:8;143:8;213:23

## K

**keep (6)**
176:2,7;200:15;
204:18;205:15;207:17
**keeping (1)**
212:20
**kept (4)**
58:1,3,5;102:1
**key (2)**
169:19;226:6
**Kickoff (3)**
78:1,5;219:18
**Killingsworth (7)**
28:14,16,17;29:9;
34:14;213:20;214:9
**kind (24)**
4:23;14:21,25;32:21;
48:7;53:13;57:5;59:2;
80:1;86:22;101:20,21;
103:19;120:7;129:2;
140:12;149:5;158:18,
21;178:5;191:18;
220:16;243:8;248:14
**kinds (4)**
87:3,4;88:16;141:2
**kit (1)**
152:16
**knew (29)**
95:10;108:18,18,18,
19,20;115:3;122:8,10;
124:22;125:15,17;
144:2;145:23,24;
175:23;189:25;190:3,
4,8;192:8;195:8;210:4;
242:13,16,18;243:2;
244:12;247:3
**knowing (11)**
57:9;90:3;102:12;
123:20;176:9,13;
191:5,8,9;195:12;
197:6

**knowledge (46)**
13:11;81:20;86:4,4;
87:2,16,17,18,20;
90:11;111:13;114:22;
115:5;137:7;138:3;
142:12;149:18;154:10;
160:22;161:7;162:20;
175:15;179:11;181:24;
182:4;183:8,22;
185:19;189:10;211:1,
4;222:19,23;223:12,
14;225:19;227:6,9,12;
234:12;235:2;244:5,
11;247:15;253:20,23
**knowledgeable (1)**
151:21
**known (16)**
92:15;97:7,10,12,14,
15,17;111:9,10;116:5;
146:2;175:24;188:7,
12;189:15,23
**knows (5)**
39:24;111:7;152:8;
190:5;210:11
**Koch (2)**
59:5,9
**KPIs (1)**
226:6
**Kraus (56)**
23:2,18;24:18,23;
25:6;29:21;30:14,18;
31:8;32:8,25;33:1,8,
11;34:5;35:4,20,21;
41:15;49:8,8,12;54:6,
20;55:13;56:2;70:21,
21;104:12;126:12,23;
127:1,2,7,22;128:14;
157:6;163:20,22,25;
171:17;199:18;202:5,
8;207:21;208:7,12;
211:14,22;214:2,10;
215:16,17,18,19;242:2
**Kraus' (4)**
134:19;156:8;
202:12,15

## L

**labeled (1)**
110:4
**Lack (5)**
17:22;50:6;61:1,4,8
**laid (1)**
148:22
**LAMBERT (46)**
13:19;14:5,6;16:4,
14;18:12;19:8,13;
21:16;44:16,19;45:5,
10;57:7;62:17;68:25;
69:2;84:20;85:13;
100:11;111:16;126:2;
146:15,17;158:9,10;
159:20;161:1;165:24;

172:13;173:19;174:9,
11;177:12;189:3;
190:15;199:8;200:19;
210:22;222:18;223:17,
20;228:20;254:11,12;
256:16
**language (3)**
47:7;53:22;203:6
**large (31)**
7:11,13;10:14;13:23;
38:19;39:16;70:7;73:4;
99:8;106:1;111:8;
112:19;116:14,17;
127:16;129:22;130:15,
16,24;132:8,12;
183:24;195:9;218:20;
219:9,10;227:1,2,3,14;
228:4
**larger (4)**
110:1;183:21;
184:14;229:19
**largest (14)**
108:10;109:2,5,14;
114:21,25;115:6,23;
116:6;119:17;132:21;
145:20;229:13,23
**last (16)**
15:15;34:16;59:14;
63:4;67:17;105:21;
130:10;142:18;154:23;
174:20;181:22;211:25;
219:12;228:10;243:17;
244:7
**late (4)**
96:19;98:24;120:8,
25
**later (12)**
16:8,9;63:25;64:1;
74:19;82:10,11;90:6,9;
94:2,4;244:18
**latter (1)**
186:1
**law (1)**
19:10
**lawsuit (9)**
9:17;19:20,23;20:1,
16,22;29:11;40:1;
173:20
**lawyer (4)**
19:18;82:23;95:18;
247:12
**lawyers (5)**
40:11;41:18,20,21,
23;44:1
**lay (2)**
43:24;147:18
**lead (7)**
40:4;93:15;149:11;
155:19,20;163:8,9
**leader (1)**
10:5
**leadership (1)**
23:24

**leading (1)**
196:5
**leads (3)**
51:18;56:24;106:23
**learn (2)**
96:23;102:18
**learned (1)**
102:10
**learning (2)**
87:18;88:13
**least (14)**
18:22;27:12;62:10;
98:9;104:1;117:12;
140:25;163:10;194:6,
7;200:10;229:14;
241:6;244:7
**leave (1)**
25:15
**leaves (1)**
172:16
**led (4)**
90:24;183:21,23;
184:14
**Leeuwen (1)**
140:17
**left (8)**
5:10;6:7,10;7:1;24:8,
10;50:4;254:1
**left-hand (1)**
221:15
**legacy (13)**
249:14,17,19,21,24;
250:7,14,23,25;251:6,
11;253:17,18
**legal (10)**
20:6,24;21:7,9;
41:21,23,24;84:1;
99:13;234:21
**leisure (1)**
100:7
**less (2)**
23:10;245:1
**letter (2)**
11:25;192:6
**letterhead (2)**
52:3,8
**letting (1)**
184:9
**Leukemia (2)**
140:19,20
**level (8)**
5:3;118:14;152:18,
18,20,20;165:20;
211:15
**levels (1)**
253:13
**liability (1)**
192:16
**liable (1)**
173:23
**licence (1)**
83:18
**license (17)**

80:22;81:17,22,24;
82:20;83:4,12,14,19;
84:12,25;85:8;95:15,
20,24;96:12;109:7
**licensee (1)**
249:1
**licenses (14)**
12:17;13:15;78:21;
79:14;85:7,14;110:14,
17;112:13,21;115:19;
122:14;132:14,22
**licensing (1)**
81:13
**life (2)**
138:22;139:1
**liked (2)**
39:10;204:6
**likely (4)**
57:21;157:24;
159:16;244:24
**limitation (3)**
12:24;93:25;94:3
**limitations (5)**
93:21;153:25;242:8,
14,17
**limits (4)**
71:23;93:6,7;234:8
**line (7)**
14:20;26:17;92:10;
93:12;134:1;142:19;
152:20
**lines (1)**
153:21
**list (10)**
9:14;100:8;109:12;
110:11;120:7;246:2,3,
5,6,7
**listed (1)**
109:25
**listen (1)**
178:22
**listening (1)**
46:8
**lists (2)**
78:7;227:3
**literally (5)**
24:6;54:9;91:1;
155:14;169:8
**literature (8)**
43:9,18,20;52:1;
72:2,9;76:7;237:23
**litigation (3)**
12:13;15:11;21:3
**little (8)**
22:24;24:15,17;
35:17;55:18;76:6;89:3;
91:18;100:24;102:8;
120:3;131:22
**live (23)**
12:20;13:4,16;27:5;
37:11,16;90:14;
121:25;122:2;123:24;
125:6;131:24;141:17;

145:12;147:9;150:15;
153:12;166:9,11;
172:5;192:24;193:3;
249:15
**load (1)**
148:14
**located (2)**
9:2;61:21
**location (1)**
111:2
**locations (6)**
112:15,17;130:17,
25;131:1,1
**locking (2)**
169:4,5
**logged (1)**
86:12
**logo (3)**
51:25;52:7;135:21
**long (11)**
4:12;8:13;9:14;13:2;
20:4;35:7;40:22;46:21;
61:3;92:13;171:13
**longer (4)**
120:9;131:15,23;
215:2
**look (18)**
34:21;83:12;84:3;
126:4;134:1;163:12;
176:4,5;184:17,24;
185:1;199:9;205:6,7;
207:18;209:13;222:8;
241:25
**looked (5)**
70:16;106:8;109:6;
170:7;205:9
**looking (23)**
27:19,24;41:16;
55:23;61:22;62:3;63:3;
113:8;133:12;162:12;
164:11;174:21;176:17;
199:2;204:24;214:10;
219:2;221:14;232:1;
241:14;251:21,23;
254:23
**looks (6)**
58:14;154:24;
182:13;224:21;227:12;
240:5
**lookup (2)**
169:18;178:10
**lookups (1)**
169:15
**lose (2)**
105:11;107:17
**losses (1)**
142:10
**lost (2)**
9:4;66:15
**lot (54)**
17:17,19;32:13;
33:24;34:3;35:3,15,16;
36:12;37:10,12,14,17;

39:3;42:14,15;43:3;
45:17;50:12;63:14;
71:16;75:9;76:7;82:2,
15;92:3,13;93:11,14;
106:15,18,19;109:21;
112:14;115:11;116:24;
123:1;130:16;132:8;
141:13;148:8;149:7;
151:4,25,25;195:3,17,
17;196:5;200:16;
213:3;245:8,9;253:21
**lots (13)**
33:3;39:1;92:5;
93:12;120:3;130:17,
25,25;140:7,10;
146:20;168:6;244:3
**Louis (2)**
146:7,18
**Lowe (2)**
55:11,12
**Lowery (66)**
20:3;21:25;22:15,23;
25:17;26:2,8,24;28:11;
30:5,12;32:23;33:1,11,
24;36:10;38:6;45:16;
46:17;48:3;70:20;
87:12;99:22;106:12;
121:11;126:13,22;
127:3,22;128:12;
137:18;138:13;144:1;
145:19;156:9,11;
157:7;159:22;161:13;
163:17;166:24;168:11;
181:8;185:21;192:3;
193:13;194:14;208:15;
209:19;210:7;211:22;
212:11,19;215:15,17,
24;225:10;231:12,15;
234:22,24;251:20;
255:1,10,17,24
**Lowery's (7)**
9:19;32:10;38:15;
127:11;128:5;140:7;
237:4
**LSi (53)**
6:24;9:19;10:18;
19:4;20:1;30:10,11,12,
22;36:21,25;81:4;
84:22;87:12;98:13;
108:8,12,18;117:16;
135:15;136:6;140:15;
142:1;146:8,10,19;
149:12,19;157:20;
158:1;166:1;172:6,9;
181:17;182:7,19;
185:7,12;191:3,23;
206:12,14,16,17,23;
208:15;211:3;233:22;
235:3;240:5;241:6,21;
247:8
**LSi/ISV (1)**
136:15
**LSi-Lowery (1)**

208:8
**LSi's (3)**
117:8;196:15;197:3
**luncheon (1)**
125:25

## M

**Mac (1)**
200:14
**mail (1)**
79:1
**mailing (1)**
245:25
**main (1)**
152:18
**maintained (1)**
86:18
**maintenance (3)**
141:18,24;156:6
**makes (18)**
38:17;53:22;60:7;
63:4,17;66:6;141:25;
145:19;149:8,10;
171:17;175:14;177:13;
207:21;209:19;211:14;
212:19;213:25
**making (23)**
18:9,9;22:22;30:4;
34:23;36:25;52:15;
62:19;72:3,11;99:10;
140:4;148:9,11;149:2,
3,19;167:9;176:8;
189:11;210:6,9;215:12
**man (1)**
55:25
**manage (1)**
8:23
**managed (1)**
24:13
**management (6)**
4:19;18:21;23:16,19;
27:1;54:13
**manager (12)**
7:7;8:22;37:6;49:23;
50:5;57:15;59:17;60:1;
61:20;62:2;66:3;138:7
**managerial (1)**
239:23
**managers (5)**
4:22;49:17;57:21;
97:2;106:14
**manager's (1)**
98:2
**managing (1)**
24:7
**Manfred (3)**
114:7,8;211:6
**manufacturer (1)**
130:18
**manufacturing (5)**
8:19;66:16,19;
151:16;152:10

**many (34)**
13:23;50:22,24;
65:10;72:17;73:13,20;
76:2,2;85:14;93:8;
112:13,14,18,21;114:3;
115:15;116:10;127:9;
129:4;131:18;141:15;
150:25;154:6;169:14;
181:4;188:11;192:1;
208:15;214:3;217:20;
230:19;232:8;255:23
**March (5)**
90:19,24;153:12;
193:4,10
**margin (3)**
48:10;51:17;109:13
**marked (16)**
21:15,18;27:23,24;
37:24;53:8;57:1;
100:10,17;112:24;
133:3,8;146:4;174:7;
190:13;198:12
**market (26)**
6:11;23:12;24:13;
27:8,19;40:25;42:16;
49:11;52:16;63:5;
70:10;71:17;72:10;
76:8;77:5;78:12;80:11,
13;98:12,19;111:4;
139:19;229:3;239:5,
13;248:12
**marketed (6)**
233:2;239:2,12,15,
19,24
**marketing (40)**
27:3;34:1;41:4,9,10;
43:8,17,20;50:20,21;
51:5,11,13;52:14,20,
23;53:23;54:8,21;
56:20;69:4,9;72:2,9;
76:7,15,18;106:22;
118:10;139:15;140:1;
173:1;230:24;231:2,5;
232:21;239:5,18;
244:20;245:24
**marketing-specific (1)**
158:17
**marketplace (9)**
27:10,13,15;39:21;
47:6;111:7;117:22;
120:5;248:14
**markets (1)**
239:6
**Maryland (1)**
8:10
**matches (1)**
250:16
**materials (2)**
76:15,19
**matter (5)**
20:6;104:25;164:11;
177:11;180:8
**matters (1)**

247:17
**maximum (1)**
70:22
**may (17)**
82:23;91:14;97:15;
99:22,25;131:6;135:3;
165:14;175:24;187:12;
188:1,3;210:9,10;
224:4;236:18;241:16
**maybe (20)**
5:4;8:12;25:13;
62:11;64:7;65:25,25;
68:20;76:13;91:19;
92:1,3;93:13;102:8,13;
111:14;123:2;167:16;
179:14;216:12
**McDermott (2)**
113:21,24
**McDermott's (1)**
138:9
**McMahon (1)**
62:23
**MDF (1)**
51:12
**mean (110)**
11:24;12:6;20:13;
25:23;26:9,25;27:3;
29:16;30:7;31:19;32:1,
12;34:25;35:1;39:9;
41:12;43:2;46:5,6;
48:12;53:3;58:9,14;
59:15;63:12,14;64:11;
71:6;72:23;82:1;83:6;
85:1;89:21;102:7;
103:11;104:1,6;105:4;
106:6;107:2,9;109:18,
19;110:3,8,9,25;
111:21;114:20;115:9,
17;119:22;122:1;
125:22;126:11;127:23;
128:8;129:19,19;
133:11;136:3;137:10,
11,13;140:6;143:2;
144:4,25;156:18;
157:13,15;165:15,18;
168:21;176:16;177:14;
183:19;184:8;185:18;
187:12;192:6,10,12;
197:2;203:7;208:13;
210:10;213:3;215:1;
217:10;219:1,19;
220:16;222:4,13;
229:21;232:6,7,8;
236:9;237:13,14;
242:9;246:22;247:16;
248:1;249:18;253:14;
255:12;256:7
**Meaning (16)**
30:9;31:20,24;32:2;
36:21;69:11,14;70:4;
78:19;92:25;109:6;
111:1;118:7;127:3;
165:25;184:10

**Hodell-Natco Industries, Inc. v.**
**SAP America, Inc., et al.**

**Geoffrey Ashley**
**March 16, 2012**

**means (8)**
31:12;68:2;109:20;
194:8;217:22;242:10,
11;249:22
**meant (20)**
39:19,20;56:7,8;
63:10,20;67:20;93:5;
139:6;147:22,22;
156:17,18;168:25;
169:1;179:23;209:21;
212:4;217:14;229:23
**medium (17)**
27:18,19;47:6;49:1;
69:10,16,17,25;70:3,5,
12,14;230:8,21,25;
233:2,5
**medium-sized (2)**
230:4,13
**meet (14)**
11:5;36:4;53:23;
63:6;71:22;83:6;
103:17;105:12;146:8,
19;148:25;149:2;
153:16;190:22
**meeting (15)**
12:1;35:23;58:11,25;
59:3;65:20;103:2;
146:10;184:20,24;
219:10,19;224:4;
225:11;227:23
**meetings (3)**
78:1;96:25;212:9
**Mehnert-Meland (8)**
129:14;180:24;
181:1;185:24;188:18;
199:11;200:4;209:7
**Mehnert-Meland's (2)**
187:21;189:14
**member (1)**
129:1
**members (1)**
106:1
**memory (1)**
66:1
**mention (2)**
184:21;215:24
**mentioned (3)**
105:5;130:7;216:10
**message (4)**
36:8;110:22;200:8;
202:6
**messages (2)**
101:19;216:7
**messaging (1)**
50:18
**met (2)**
35:5;146:20
**method (1)**
149:25
**methodologies (1)**
248:17
**Michael (21)**
48:17;49:3,7;113:5;

**129:21;131:8;134:15,**
17,21,23;135:3;137:2;
142:19;172:14;173:6;
190:21;202:12,25;
203:3;242:1,21
**Micro (1)**
8:10
**Microsoft (4)**
9:8;79:5;80:14;
233:14
**micro-vertical (3)**
116:11;117:3,7
**mid-'06 (1)**
165:6
**mid-'07 (1)**
165:7
**mid-2006 (3)**
157:24;166:10,11
**mid-size (2)**
230:8;248:12
**mid-sized (1)**
245:21
**Midwest (6)**
50:4;66:5;106:7,11,
11;135:8
**might (61)**
11:4,12,13,16;26:2;
30:24;34:1,2;36:13;
40:4;53:3;55:18;56:2,
5;57:18;61:23,24;62:4;
68:1;76:16;77:21;87:7,
8,14;89:5,11,12;93:17;
96:8;102:19;103:10;
118:9;121:1;123:4;
130:8;131:10;132:10,
13;148:4;149:16;
152:11;161:9;169:12;
174:23;175:2;184:7;
187:18;194:9;195:14;
201:12;203:25;204:3;
205:7;212:12;223:18;
228:3;234:20;244:1,8;
246:23;254:2
**Mike (1)**
134:20
**million (29)**
27:21;47:8,8,11;
70:1,2,4,14;75:16,18,
25;101:7;103:22,23;
182:21;230:9,9,12,12;
232:9,19;245:7;246:8,
8,14,15;252:1,6,6
**millions (1)**
233:10
**mimics (1)**
249:11
**mind (4)**
194:24;210:12;
215:9;224:21
**Minneapolis (2)**
60:2;66:4
**minus (1)**
109:12

**minute (4)**
130:7;217:8;219:7;
231:9
**minutes (1)**
252:3
**mirrors (1)**
249:5
**MIS (3)**
7:6,10;37:6
**mishear (1)**
147:20
**misheard (1)**
147:21
**mislead (1)**
13:5
**misled (3)**
12:21;33:1,2
**misrepresentations (1)**
12:15
**misrepresented (3)**
13:13;207:24;208:8
**miss (1)**
181:9
**missed (2)**
24:10;37:15
**misstated (2)**
208:3,4
**mistake (2)**
104:22;115:4
**mitigate (2)**
13:25;35:18
**mobile (1)**
71:20
**model (5)**
7:3,3;80:11,12,16
**models (1)**
80:25
**Monday (1)**
239:25
**money (6)**
34:1;39:3;41:3;85:6;
116:24;145:11
**mono-focused (1)**
179:16
**monster (1)**
252:21
**month (6)**
98:4;99:10;105:11;
199:25;237:1;241:19
**monthly (1)**
50:13
**months (8)**
44:3;62:8,24;82:11;
102:14;114:11;119:18;
165:16
**more (47)**
23:1;24:15;32:14;
34:1,10;41:2,3,3,3,4;
46:1,13;54:7;64:12;
69:15;73:11,11,22,22,
23,24;75:4;80:24;
87:19,19;88:14,14;
90:10,10,11;91:11,18;

**93:18;102:8;111:2;**
131:16;158:15;162:13,
19;163:1,6;176:24;
195:5;201:5;223:5;
244:24,24
**morning (2)**
4:6;229:8
**Most (17)**
57:21;109:9;118:18;
126:19;151:21;156:4;
157:24;159:16;179:1;
207:20;229:9
**move (3)**
164:12;180:13;181:7
**moved (5)**
5:1;24:2,3;131:10;
254:4
**much (18)**
26:17;64:1;70:18;
74:18;85:6;92:9;99:15;
104:19,19;131:15;
158:15,16;177:11;
183:20;184:14;188:19;
197:16;215:22
**multiple (6)**
130:12;160:14;
199:24;209:8;221:5,5
**multiple-partner (1)**
48:4
**multi-site (6)**
110:21,25;111:12,
17,24;112:7
**multi-tier (1)**
64:23
**myself (3)**
60:18;175:8;200:13

## N

**name (14)**
7:23;8:2,2,9;48:24;
49:3,8,25;55:11;79:11;
97:10,14;129:25;
130:14
**named (1)**
113:13
**namely (1)**
234:6
**names (3)**
57:15;97:12,13
**national (1)**
5:16
**natural (1)**
103:11
**nature (7)**
43:6,14,15;64:3;
93:23;99:6;244:15
**necessarily (11)**
91:24;94:18;115:15;
132:9;171:5;175:24;
195:25;203:5;220:17;
245:2,18
**necessary (1)**

**123:25**
**need (33)**
16:22;32:2;39:5;
66:8;71:20;83:3,18;
89:5;91:10,18;93:13,
17;103:16,22;120:23;
122:7;131:20;142:1,
21;180:6;181:7;186:7;
188:21;190:24;212:2;
218:14;239:11;246:21,
22,24;248:2,7;254:23
**needed (13)**
24:15;42:14;68:4;
91:3;122:4,5,24;
124:25;143:14;189:6;
191:2;204:4,8
**needing (1)**
67:23
**needs (8)**
10:23;67:17;71:21;
82:20;181:8;199:23;
220:9,20
**negate (1)**
168:20
**negative (2)**
33:16;119:1
**negotiable (1)**
95:16
**negotiate (3)**
96:2,9;141:22
**network (1)**
175:16
**Neveux (5)**
149:24;152:22;
177:13;186:15;250:5
**new (24)**
6:12;68:8,9,9;69:12;
101:16;111:3,5;
116:10;127:10;128:15;
188:5;205:7;207:3,4;
234:13;249:15,22;
250:2,8,9,16,18;251:1
**newest (1)**
5:6
**newsletters (1)**
50:13
**next (18)**
5:2;17:20;97:19;
104:20,24;105:23;
110:18;129:17;135:18;
161:12;192:23;193:7;
203:12;220:16;225:2;
228:1,6;234:2
**Niels (1)**
114:4
**night (2)**
15:15;150:10
**nine (1)**
6:24
**nobody (5)**
46:8,8,9;111:7;
152:22
**nods (1)**

86:2
**noise (1)**
119:1
**non-disclosure (2)**
15:2,4
**None (4)**
10:20;21:8;98:24;
130:5
**Nonetheless (1)**
213:25
**normal (1)**
104:7
**normally (4)**
11:6;78:5;80:21;
219:20
**North (5)**
4:16;5:19;114:23;
115:2;133:1
**note (2)**
16:4;222:9
**notes (1)**
85:25
**not-for-profit (1)**
73:16
**notified (1)**
118:22
**November (12)**
4:14;11:21;22:1;
69:3;74:12;96:19;98:6;
216:23;239:25;240:2,
4,7
**nowhere (1)**
43:23
**number (52)**
13:24;72:4,5,12,13,
24;75:14,20,21,21;
76:9;79:14;92:7;
100:25;101:4;106:1;
110:13,17;112:20;
115:11;116:14,17;
132:3,21;138:1;
143:10,11,12;150:6,8;
153:19,19,20,21;
156:15;169:7,10;
170:22;171:4;183:12;
184:8;199:6;224:12;
225:7,13,17;227:2,3,
16;228:11,12,16
**numbers (14)**
24:9,11;57:8;94:4;
137:13;143:11;169:11;
201:20;226:14,16;
233:4,10;246:4;252:2
**numerous (2)**
34:18;159:23

## O

**object (2)**
18:10;101:23
**Objection (93)**
13:17;15:19;17:13,
22;21:11;31:4;32:11;

33:23;35:25;37:1;
38:23;39:8;42:1;43:13;
44:13;45:3;61:7;70:25;
81:8;82:22;83:21;
95:17,22;96:4;107:5,
14;109:16;115:25;
116:16;117:15,24;
122:18;123:17;124:7,
21;125:9;139:2,5;
144:18;150:20;154:2;
158:5,6,24;162:4,17;
163:5;167:1;168:18;
170:6;172:7,20;
173:14;176:21;177:1;
178:18;181:19;182:10;
186:5;187:24;188:9;
189:8,18;190:2;
193:17;194:4;195:22,
24;196:3;197:1,12,24;
198:4;199:16;200:5,
23;202:7,18;203:8;
205:2;206:25;208:22;
215:4;217:11;218:3;
222:1;232:20;233:7;
241:11,24;242:3;
251:7,15
**obvious (1)**
118:18
**Obviously (8)**
9:16;58:10;79:11;
103:12;164:8;170:9;
192:14;208:16
**occasion (3)**
11:12;77:23;141:21
**occurred (1)**
182:17
**occurring (2)**
182:5;187:3
**October (2)**
137:18;216:12
**off (14)**
34:19;51:19,23;
55:14;68:25;111:15;
146:12,14,16;188:22;
189:6;204:9;223:17,19
**offer (2)**
18:23;185:6
**offered (1)**
35:9
**office (1)**
243:14
**offices (1)**
112:17
**often (4)**
38:17;103:24;104:4;
252:14
**Ohio (1)**
35:5
**old (5)**
187:10;210:15;
250:15
**Omega (1)**
59:10

**once (5)**
31:7;41:19;153:13;
211:24;237:13
**One (308)**
4:17;8:24;12:9,17;
13:4;15:2;20:18,19;
23:1,8,20,25;24:3,7,20;
25:2;26:14;27:8;28:3;
33:21;35:2;41:13;42:6,
7,9,12;43:9,18;46:17,
22;47:4;49:5,9,15;
50:2,2,3,7,10;51:8,9;
52:10;54:21;57:6;60:5,
6,16;61:4,10,12;62:9;
63:14;64:2,9,12;65:6,
21;66:18,20;67:5;69:5,
23;70:11,24;71:7;72:3,
7,9,20;73:3,9;74:4,13;
76:21;77:19;78:12,18,
22;79:23;82:19;83:2;
84:1,7,11;85:7,18;
86:15;87:1,8;89:1;
90:15;91:4,23;92:5,14,
22;94:25;95:11;96:6,7;
98:9;99:1,10,23;
102:17;104:22;105:20;
106:9;107:12;109:6,9;
110:10;111:2,4,5,11,
13,18;113:10;114:22;
115:19;117:18;118:7,
13;119:2,24;120:21;
122:14;124:10,11;
127:1;128:10;129:19;
131:13,14,24;132:10;
134:22;136:9;137:5,9;
138:25;143:24;145:22;
147:8;150:3,6,19;
151:22;152:13,24;
153:11;154:1;155:10,
14,21,23;156:4;
157:21;158:3,4;159:9;
160:16;161:19,23;
162:15;163:3,8;
164:22;165:1,4;
168:12;169:3;170:16;
173:10;174:2,7;175:4,
21;177:16;178:12;
180:18,22;181:6,12;
182:2,8;184:10,17,19;
186:20,24;188:19,22;
189:4;192:5,7,20;
193:2,14,20;194:1;
195:6,11,25;196:22;
197:9,13,18,20;198:3,
7;200:9,12;201:18;
204:1,9,13,14,15,19,
23;205:1,5,12,17,18;
206:7;207:2,19,23;
208:8;209:8,20;214:4,
12;217:2,9,16;218:5;
219:9,15;220:3,9,15,
18,20;221:16,21,23,24;
222:20;223:4,9;224:8,

10,16;226:11;227:15;
228:4,10,18;229:23;
230:1,15;231:3,9,20;
232:3,9,18;233:18,22;
234:2,6,18,22;235:25;
239:2,12,13,17,20,21;
240:16,24;241:14;
244:21,25;246:16;
247:9;249:24,24;
250:1,1,8;251:10;
252:5,12,25;253:25;
254:1,3,5,15;255:2;
256:1,2
**ones (4)**
130:1;154:25;
178:19,20
**One's (2)**
42:20;189:7
**ongoing (3)**
86:5;156:6;191:5
**online (9)**
29:1;79:5;87:22,23;
88:11;90:17;94:2;
238:4,9
**only (35)**
7:2;22:16;49:10,14;
60:13;62:22;76:1;
82:14;92:2,4,16;93:16;
102:13;112:8,16;
116:8;123:18,18;
124:22;132:13;152:5,
12;169:6;172:18;
179:6;185:19;198:7;
203:10;210:25;211:5;
234:24;244:8;245:4,
22;248:1
**onto (1)**
86:12
**open (3)**
86:11;93:4;172:17
**opened (1)**
93:2
**operation (1)**
17:18
**operational (1)**
239:23
**opine (1)**
207:7
**opining (2)**
170:2;199:13
**opinion (31)**
13:13,21,22;25:3;
26:7;27:5;32:6;129:13;
155:23;156:2;163:1;
164:16,18,21;187:21;
194:15;196:1,25;
199:14;200:21;208:7,
18;209:10;213:2;
232:24;240:23;243:5,
18;249:8;252:22,25
**opinions (1)**
200:20
**opportunities (7)**

23:6;104:24;110:21,
25;111:18;130:15;
131:2
**opportunity (22)**
10:15;23:9;26:1;
55:14;80:19;97:8,9,17;
98:10;105:11;112:19;
114:18;142:20;192:4,
13,15;193:14;227:14;
228:3;255:2,10,25
**optimized (1)**
221:16,20,25;222:21
**options (6)**
32:15;201:12;203:5;
205:4,13,16
**order (28)**
24:20;54:12;67:1,2;
78:18,21;79:8,10;80:1,
4,20;81:1;82:3,8;
108:9;109:14;114:21;
115:8;120:6;131:19;
145:21;146:2;169:17;
203:4;204:4;218:14;
248:4,5
**ordered (2)**
92:7;110:14
**ordering (4)**
79:13,15,16,23
**orders (6)**
78:24;109:25;110:4,
9,12;129:16
**Oregon (1)**
59:11
**organization (18)**
7:1,11;8:7;14:15;
48:14;54:19;71:14,15,
16;112:12;129:14;
136:10;159:6;183:24;
192:3;196:21;242:13;
255:24
**organizations (1)**
221:5
**organized (1)**
47:1
**original (2)**
155:15;183:13
**originally (5)**
66:23;68:3;155:12;
182:19;183:18
**others (7)**
156:9,14;192:3;
211:23;229:18;236:3;
255:24
**otherwise (2)**
84:4;145:14
**out (54)**
5:5;18:10;24:2;41:5;
46:7;50:10,23;53:11;
63:6;66:15;77:16;79:1,
19;86:23;87:24;88:4,6;
89:1;100:22;101:9,12,
13,18,23;102:8;103:2;
110:19;114:10;120:8;

143:15;145:13;148:22;
155:8;156:20;165:10;
173:8;175:1;187:14;
188:16;190:25;201:15;
207:2;210:11;214:10;
215:3;217:21;219:14,
20;234:6;241:9;
245:25,25;248:20;
256:10
**Outlook (1)**
146:6
**outside (21)**
54:19;132:25,25;
152:23;156:14;157:8,
21;158:2,3,21;159:8,
11,14;160:17;162:1;
185:1;191:8,24;
229:16,21;235:25
**outsourcing (2)**
81:6,9
**over (14)**
14:4;18:13;30:20;
42:16;43:6;68:8,11;
69:18;79:20;84:3;92:5;
109:7;132:11;256:8
**overall (4)**
10:5,12;204:16;
216:24
**overcame (1)**
197:17
**overcome (2)**
125:16;197:21
**overruns (1)**
149:10
**overseeing (3)**
50:6;60:15;113:10
**oversimplification (1)**
89:3
**oversized (2)**
54:10;56:6
**oversold (1)**
209:20
**overview (1)**
6:17
**own (19)**
31:9;45:11;56:22;
66:24;67:2,12;87:11;
91:15;110:3;151:2,2,8,
13;153:4;195:18;
206:15;215:9,9;224:7
**owned (2)**
8:1;153:1
**owner (1)**
59:9

**P**

**package (2)**
204:25;230:1
**packets (1)**
216:24
**page (36)**
29:1,25;30:1;34:12;

38:16;59:6;62:25;
65:17;98:1;104:20;
130:10;135:18;161:12;
163:22,24;170:10;
171:16;199:9;203:4;
209:6;216:25;219:8,
11;220:6;221:10;
222:8;223:1,1;224:8,
20;225:2;226:9,21;
231:7;235:16;242:1
**pages (1)**
224:20
**paid (6)**
6:5;48:11;85:6;
106:2;122:13;123:8
**Palmquist (1)**
65:24
**paper (1)**
219:10
**paragraph (16)**
30:2;32:20;34:16;
103:15;104:21;105:23;
108:8;110:18;112:3;
119:6,16;125:1;
130:11;142:18;221:15;
234:23
**parallel (10)**
37:12;249:14,17,21,
22;250:6,21,24;251:6,
11
**parameters (1)**
229:22
**paraphrase (1)**
229:7
**parenthesis (1)**
236:1
**part (28)**
23:18;60:17;75:13;
94:9;98:22;107:18;
118:9;126:16;142:21;
149:14,15,21;154:4,7;
161:17;167:10,13;
175:4;183:5;196:6;
210:23;211:11;216:23;
223:15;242:6,19;
244:10;256:4
**participating (1)**
227:22
**participation (1)**
147:19
**particular (9)**
5:25;23:23;101:14;
151:15;163:4;176:24;
238:1;248:25;249:2
**particulars (1)**
147:16
**parties (1)**
148:20
**partner (84)**
4:19;10:6,7,10;11:8,
17;22:21;25:25;29:20,
22;30:7,10,11;31:1,11;
32:3;33:7;34:18,21;

40:13;47:1,19,22;48:8,
15;50:11,13,13;51:4,8,
9,14;52:7,21,22;53:13,
17,18,21;59:3;60:17;
79:7;80:17;81:3,7;
82:4,12,17;83:25;
85:17,20,22;86:10,24,
24;87:24;92:17;96:9,
11;97:6,19;107:11,17,
22,23;108:2,4;126:18;
147:24;148:17;149:25;
151:5;152:8;160:5,5;
167:20;171:22;194:23;
207:23;208:3,4;
218:11,11;251:16
**partner-centric (1)**
33:7
**partners (64)**
4:19;7:22;8:23;11:4;
22:25;24:14;26:12,15;
30:20,21,23;48:9;
49:14,16;50:16,18,20,
21,23,25;51:2,25;52:9,
18;56:20;57:16;59:1,4;
60:15,22,25;70:9;
77:23;78:25;82:2;
86:11,22;87:25;88:19;
102:25;103:17,24;
104:23;105:7,7;106:8,
9,16;118:22,25;
123:13;126:15;134:22;
141:21;146:21;147:3;
152:16;226:2,18,18;
236:12;237:25;243:23;
244:4
**partner's (3)**
51:20;80:17;194:20
**partnership (4)**
34:4;46:15;129:6;
139:23
**partnerships (1)**
129:5
**pass (1)**
100:6
**password (1)**
86:13
**past (4)**
22:18,20;25:21;
46:20
**patch (11)**
180:7,11;187:17,22;
199:13;235:6,8,11;
236:25;241:9,18
**patches (1)**
13:8
**path (3)**
172:19;206:22;
207:22
**Paul (4)**
28:14;34:13;40:2;
213:19
**pause (1)**
200:12

**pay (2)**
126:21;151:4
**paying (2)**
16:15;141:18
**payment (1)**
141:23
**peer (1)**
114:8
**pending (1)**
40:1
**penetrate (1)**
117:22
**people (31)**
19:3;35:3;41:20;
49:20;76:2;88:20;
102:24;120:9;133:23;
139:12;140:8;148:9,
15,16,18;149:9;150:2;
163:7;164:2;167:9;
178:10,14,25;179:11,
22;181:5;210:4;213:4;
218:1;221:7;225:25
**per (2)**
109:12;153:21
**perceive (1)**
75:10
**perceived (1)**
34:6
**percent (3)**
247:2,2,5
**percentage (2)**
51:10;73:5
**perception (1)**
256:9
**perfect (1)**
198:8
**perform (2)**
197:14;250:9
**performance (33)**
91:22;142:22;143:1,
13,23;144:9,10;164:9;
174:24;175:22;176:6;
188:1;199:23;204:5;
214:2;221:17,21;
222:21;226:6;227:4;
229:22;235:9,12;
236:5,16,19;241:7,17;
243:17;253:7,12,24;
254:15
**performance- (1)**
238:8
**period (6)**
6:19;14:19;42:20;
54:23;73:4;239:9
**periodic (1)**
101:12
**periods (1)**
40:22
**person (8)**
24:23;26:3;48:25;
58:15;129:12;134:8;
136:7;176:8
**personal (11)**

6:14;160:22;161:7;
182:4;189:10;211:1,4;
222:19;225:19;227:9;
252:22
**personalities (2)**
33:12,13
**personality (3)**
32:14,18;191:18
**personally (12)**
26:18;35:23;81:20;
127:21;140:5;143:21;
149:18;157:25;161:6;
175:8;238:19,21
**personnel (1)**
60:19
**Peter (6)**
65:14,15;67:14,14,
15;227:19
**pharmaceuticals (1)**
151:17
**phases (1)**
132:11
**phone (15)**
11:25;103:1;123:13;
161:4;181:25;182:16;
183:2;186:9,19;194:2;
201:10;203:11;204:8,
10;246:1
**phrase (4)**
70:22;71:1;242:19;
249:17
**pick (1)**
181:25
**picked (1)**
194:1
**piece (5)**
93:23;98:17;250:12;
251:13;256:3
**pieces (1)**
154:6
**Pipeline (3)**
96:25;97:8,24
**place (20)**
68:12,13,14,16,18;
80:19;82:3;106:18;
126:14,15;161:8;
168:3;169:17;170:25;
171:20;172:2;248:4,5;
249:20;251:3
**placed (3)**
78:21,24;114:21
**places (1)**
78:17
**plain (1)**
119:16
**plan (2)**
148:21;166:6
**plane (1)**
35:4
**plans (1)**
102:3
**platform (7)**
93:5;206:6,21;

233:11,13,16,19
**Platinum (2)**
   8:18,21
**play (3)**
   93:15;98:22;191:4
**play-dumb (1)**
   191:19
**played (1)**
   86:13
**playing (3)**
   191:3,12;226:19
**Please (8)**
   13:20;45:12;100:12;
   133:4;222:9;231:7;
   234:15;235:14
**plenty (1)**
   205:3
**Plus (8)**
   181:8;190:11,12;
   196:15,16,16;249:24;
   250:1
**pm (1)**
   256:19
**point (51)**
   6:12;7:6;26:22;
   41:19;56:1;58:6;59:14;
   63:5,12,16;65:21;66:7;
   67:17;70:18;77:15;
   79:19;82:21;83:5,11;
   84:24;90:5,16;91:2;
   99:23;101:23;107:9;
   112:3;123:9;124:23;
   142:3;143:4,7;146:1;
   147:13;152:15;157:4,
   5;160:6;167:18;
   169:14;180:5;190:24;
   192:14,21;201:7;
   214:8;217:5,25;223:8;
   225:24;234:5
**points (4)**
   89:21;118:11;152:2;
   164:8
**pop (2)**
   75:17,19
**populated (3)**
   153:14;166:9,16
**populating (1)**
   165:19
**portal (7)**
   52:20,21,22;56:20;
   86:11,12;87:25
**portfolio (1)**
   72:8
**portion (2)**
   5:16;51:19
**Portland (1)**
   59:11
**POs (1)**
   99:13
**position (15)**
   8:5;18:21;31:8,21;
   32:24;46:2;104:15;
   134:17,24;138:9;

151:24;166:21;187:25;
   201:6;202:15
**positions (3)**
   4:11;6:2;8:24
**positive (1)**
   33:16
**positives (1)**
   33:14
**possession (1)**
   22:14
**possibility (2)**
   116:1;201:14
**possible (10)**
   115:10,10,14;
   124:12;131:9;132:18;
   133:24;164:20;207:20;
   244:17
**possibly (11)**
   16:12;23:10;32:16;
   108:10;109:3,15,19,19,
   20;190:25;223:8
**potential (8)**
   11:13;27:4,7;72:5;
   91:5;121:18;152:2;
   245:15
**power (1)**
   37:18
**PowerPoint (2)**
   57:11;224:6
**practical (1)**
   80:25
**practice (2)**
   23:8;251:5
**practices (1)**
   226:7
**pre-approved (1)**
   52:14
**precipice (1)**
   110:20
**precipitated (3)**
   38:11;101:14;146:24
**predated (1)**
   55:19
**predetermined (2)**
   94:15,20
**preface (1)**
   222:8
**pre-live (4)**
   147:19;148:7;
   149:14,22
**preparation (1)**
   28:4
**prepare (1)**
   15:13
**prepared (3)**
   54:17,19;62:5
**preparing (2)**
   40:5;43:25
**pre-sales (2)**
   4:21,22
**present (4)**
   83:8,10;140:22;
   188:3

**presentation (8)**
   57:12;134:2;137:2;
   140:17;224:1,3,6;
   227:23
**presentations (1)**
   224:7
**presented (2)**
   85:8;225:25
**president (5)**
   8:6;9:10;49:4,9;
   113:24
**press (2)**
   52:25;53:8
**presume (1)**
   42:12
**pretty (11)**
   53:16;69:20;70:17;
   89:22;99:15;104:19,
   19;132:6;155:22;
   157:18;222:7
**prevailed (2)**
   200:7,8
**prevent (2)**
   214:9,13
**previous (3)**
   38:12;170:10;226:9
**previously (1)**
   118:8
**price (5)**
   51:10;106:2;109:12,
   12;227:3
**pricing (2)**
   141:23,24
**pride (1)**
   105:1
**prime (4)**
   40:13;42:11;43:19;
   107:4
**print (2)**
   119:25;120:14
**printing (1)**
   120:11
**prior (16)**
   11:5;16:24;90:14;
   93:22;95:3,11;134:2;
   147:9;157:10,10;
   165:17;166:8;189:24,
   24;192:24;252:9
**priorities (1)**
   78:8
**privately (1)**
   8:1
**privilege (6)**
   15:22,24;16:6,10;
   18:13;19:6
**privileged (1)**
   19:1
**pro (1)**
   26:6
**probability (1)**
   108:20
**probable (1)**
   97:23

**probably (48)**
   24:17;27:21;31:16,
   17;36:17,18;40:6;47:7,
   10;54:6;57:11,12;58:9,
   17,20,23;59:19;60:3;
   64:7;65:10;70:1;73:3;
   74:6,7,9,16,22;90:6,20;
   97:12;109:8,20;
   115:16;121:10;122:11;
   134:8;156:22;164:12;
   168:19;212:8,8;
   216:22;222:12,17;
   243:22;246:21;256:3,5
**problem (19)**
   32:8,9,10;35:24;
   61:8;89:10;168:4,5;
   170:1;171:7;179:17;
   188:4,6;213:8;234:9;
   235:9;236:19;241:8,17
**problems (7)**
   12:23;13:6;60:9;
   94:10;175:22;212:22;
   214:17
**procedure (1)**
   149:14
**procedures (1)**
   150:4
**process (20)**
   31:15;54:12,14;
   77:11,13,15;78:17;
   79:4;80:1,4;83:5,17;
   85:22;98:22;139:21,
   24,25;168:2;172:2;
   197:9
**processes (3)**
   239:23;250:3;253:7
**produced (2)**
   57:7;146:5
**produces (1)**
   175:16
**product (140)**
   4:16;5:2,7,8,13,23;
   6:12;14:9,11,14;22:12;
   23:13;24:20;27:2;
   36:13;40:13,23;42:10,
   11,18,25;43:4,5;47:3,
   10,20;48:6,7;49:10;
   60:9;61:6,9;62:8,24;
   63:6,17,23,24;64:21,
   22;66:16,17,22;67:11;
   71:21;72:11,25;73:15,
   24;75:1,12;76:20;77:1,
   3,10,12,13,20;79:14;
   88:15;89:14;92:21;
   93:4;94:9;103:13;
   107:3;114:24;118:19,
   23;119:9,10,23,25;
   120:4,13;121:14;
   122:5,16;123:2;129:8;
   138:21,22;139:11,19;
   151:8,13;153:4;
   155:21,23;156:3,7,20;
   159:6;162:20;165:18;

166:13;169:9,15;
   170:8;171:9;173:4;
   175:5,6,10;179:19;
   184:10;185:8,9,25;
   195:14;197:3;214:22;
   215:2;217:6,16;223:7;
   226:4;231:3;232:2,3,6,
   10;237:16;238:1;
   239:2,6,14,20;242:8,
   14,17;244:2,4,11;
   245:18;251:9,23
**production (9)**
   150:11,16;165:9,20;
   166:14;189:23;196:9,
   9;237:18
**product-related (2)**
   102:2,16
**products (11)**
   64:16;65:2,9;76:25;
   115:12,13;116:2;
   195:2;197:23;243:15;
   248:18
**product's (1)**
   43:1
**professional (1)**
   6:20
**profile (9)**
   98:6;134:6,25;135:4,
   7,11;223:6;224:24,25
**profiles (1)**
   224:22
**profit (1)**
   227:13
**program (7)**
   67:10;85:21;118:10;
   126:14;129:1;134:7;
   171:20
**programming (1)**
   173:3
**project (3)**
   9:23;148:21;247:6
**projects (1)**
   7:13
**promised (3)**
   38:19;126:23;128:6
**promote (1)**
   104:18
**proof (1)**
   214:21
**Property (1)**
   153:1
**proposal (2)**
   83:10;187:10
**proposed (3)**
   96:13;205:17;210:19
**proposing (1)**
   209:11
**prospect (3)**
   55:16;84:2;238:14
**prospect/customer (2)**
   40:15;44:10
**prospects (2)**

11:5;223:6
**provide (2)**
47:24;52:18
**provided (7)**
36:24;79:9;86:12;
108:1;148:14;180:3;
227:7
**provider (1)**
150:24
**providers (1)**
248:13
**provides (1)**
107:22
**public (1)**
222:5
**publish (1)**
133:22
**published (1)**
88:8
**publisher (5)**
9:4;11:8;61:9;68:15;
84:8
**publishers (3)**
7:19;46:20;80:20
**pull (1)**
101:17
**pulled (1)**
22:11
**purchase (3)**
96:8;112:13,21
**purchased (8)**
12:16;85:15;112:22;
116:2,3;123:7;228:13;
234:9
**purchasing (3)**
123:10;131:13,14
**pure (1)**
210:10
**purpose (7)**
100:20;159:7;
190:16,18;203:21;
214:15;221:2
**purposes (2)**
18:25;19:11
**pursuant (1)**
16:18
**Push (1)**
31:11
**pushed (5)**
29:20;30:7;31:1;
33:15;37:15
**pushing (1)**
234:7
**put (22)**
26:16;40:14;56:25;
57:15,23;59:1;62:11;
64:24;86:23;87:24;
88:4,6;152:3;165:18;
167:15;171:19;192:12;
219:14,20;235:13;
237:17;249:22
**puts (1)**
51:20

**putting (2)**
134:5;195:17

## Q

**Q4 (2)**
118:15,19
**QBR (1)**
57:13
**qualification (10)**
62:19;83:7;87:22,23;
88:12;89:19;90:17,25;
94:2;238:5
**qualified (13)**
83:8;162:13;163:1,7,
7,10;170:14,17,17;
176:22,25;178:16;
179:1
**qualify (5)**
120:12;127:16,18;
238:14,15
**qualities (1)**
217:5
**quality (1)**
63:18
**quantity (1)**
92:7
**quarter (15)**
24:6,8,9,10;98:4;
103:22,23;108:10;
109:3,15;121:8,14;
122:13;126:18;131:4
**quarterly (5)**
57:13;58:2,13,23;
101:6
**quick (1)**
254:18
**quickly (5)**
4:7;37:16;45:22;
84:2;201:15
**quite (3)**
54:8;115:16;244:17
**quote (1)**
135:20
**quotes (1)**
192:13

## R

**R3 (7)**
47:15,16;246:20,22,
22,24,24
**Radio (2)**
196:16;253:1
**rah-rah (1)**
101:21
**raise (1)**
137:25
**raised (4)**
82:20;83:4;160:6,7
**Ralf (13)**
129:13;180:24;
181:1;185:23;187:21;

188:18;189:13;199:10;
200:3;201:8;209:6;
231:13;240:23
**Ralf's (1)**
201:6
**ran (3)**
93:1;129:14;226:15
**Range (2)**
65:11;72:15
**ranges (1)**
230:17
**ranked (1)**
231:21
**rapidly (1)**
70:17
**rare (1)**
11:4
**rarely (2)**
96:6,7
**rate (2)**
186:22;243:23
**rather (3)**
33:15;167:15;215:2
**reach (1)**
171:13
**read (17)**
18:4;21:5;22:22;
39:22,23;100:4,5;
118:17;162:21,23;
206:12;212:1,15,18;
218:18;241:1,3
**readily (1)**
222:4
**reading (6)**
100:8;119:16;
133:17;174:12;177:18;
218:1
**ready (15)**
40:13;42:10;43:19;
71:13,15;77:11,16,17;
100:13;106:16;107:4;
145:12;166:14;175:1;
190:21
**real (2)**
89:15;236:21
**realistically (1)**
70:13
**realize (1)**
40:5
**realizing (1)**
60:8
**really (15)**
46:1;76:1;82:11;
94:4;99:12;113:8;
114:12;116:25;129:23;
156:10;176:16;226:2;
243:1,3;255:14
**rearchitect (1)**
64:2
**rearchitected (2)**
63:24;64:5
**rearchitecture (1)**
64:6

**reason (26)**
6:10,21;55:3;106:7;
128:5,8,9;133:13;
141:15;154:4,5,8;
169:16,21;175:19;
180:9,14;186:3;190:1;
197:17;231:23;245:22;
246:3,4,12;250:25
**reasonable (1)**
214:1
**reasonably (1)**
215:1
**reasoning (1)**
153:17
**reasons (4)**
30:16;98:9,9;250:6
**reboot (1)**
200:13
**recall (71)**
9:21;10:2;11:19,22;
22:22;28:10;30:4;38:5;
56:15;67:22;69:8;72:3,
11,16;73:7;74:1,2;
76:13;85:6,14;96:15;
100:1,16;103:3,5,6;
104:4;113:7;119:19,
21;121:7,9,10,11;
126:9,13;127:11;
129:18,19;132:2,3;
133:8;134:12;136:25;
137:17;141:7;146:10,
18;155:2;157:6;
164:15;174:12,15,16;
182:24;183:6;186:6,6;
187:9;190:16,18;
203:18;209:2;210:19;
216:21;227:24;228:15;
254:13,16,25;255:18
**recalled (2)**
14:10,14
**recapping (1)**
114:11
**received (4)**
17:20;107:18;141:19
**receiving (4)**
16:24;137:17;141:7;
214:25
**recently (1)**
44:3
**recess (2)**
69:1;125:25
**recode (1)**
185:8
**recognition (2)**
98:12;135:12
**recognize (1)**
116:13
**recollection (3)**
184:6,8;210:14
**recommend (1)**
167:25
**recommendation (2)**
189:16;211:2

**record (11)**
16:5;57:4;68:25;
111:15;126:3;129:4;
146:14,16;223:17,19;
229:6
**recorded (1)**
162:23
**recruiters (1)**
4:22
**red (9)**
89:9,15;137:25;
159:24,25;160:2,5;
228:8,17
**refer (4)**
46:6;135:11;169:4;
191:4
**referencable (2)**
117:21;118:3
**reference (19)**
62:3;84:11;85:25;
101:1;116:20;117:8;
118:12;131:7;134:3,7,
9,10;135:14;162:6;
190:20;218:20;224:24;
226:10;256:13
**referenced (2)**
130:5;137:6
**references (6)**
134:1,4;136:9;
137:22;142:1,10
**referencing (2)**
34:13;217:2
**referred (3)**
41:15;98:17;143:3
**referring (28)**
23:5,6;27:16;31:2,6,
10;41:18;44:20;45:24;
53:9;55:20;59:13;
60:11,25;102:5;103:4;
109:4;116:22;125:1,2;
142:25;143:3;177:21,
22,24;184:7;198:20;
231:17
**refers (2)**
73:13;136:12
**reflected (3)**
190:19;203:19;209:3
**refresh (2)**
184:5;210:13
**refund (8)**
107:21,22;108:1,4;
171:25;172:3;173:7;
191:1
**refused (2)**
17:5,7
**regard (7)**
11:18;25:1;70:22;
74:4;148:6;219:14;
228:17
**regarding (5)**
19:19,23;20:1;33:25;
46:2
**regards (2)**

32:24;56:11
**region (4)**
　5:17;50:4;73:19;
　97:7
**regional (2)**
　5:18;58:25
**regions (2)**
　48:21;106:15
**register (1)**
　120:1
**regular (2)**
　104:10;164:14
**reimburse (1)**
　172:17
**reimbursement (3)**
　168:1;171:20;172:6
**related (10)**
　20:8;26:20;29:2;
　34:3;10;42:9;45:21;
　105:15;209:14;229:2
**relates (1)**
　247:24
**relating (5)**
　29:11,15;50:9;52:10;
　91:21
**relationship (9)**
　10:6,8;11:7,7;18:19;
　20:3;32:25;34:11;
　65:16
**relative (1)**
　137:10
**release (4)**
　52:25;53:9;119:9;
　120:5
**released (6)**
　77:11,12;119:10;
　120:25;180:7;217:20
**releases (1)**
　220:8
**relevance (1)**
　106:4
**relying (5)**
　36:24;40:14,15;
　44:10;94:22
**remained (1)**
　69:20
**remedied (1)**
　12:25
**remember (84)**
　5:1;12:5;34:23;42:4;
　46:16;47:16;49:24;
　50:1,8;54:4;55:12;
　58:9;60:5;61:21;62:1;
　65:12;74:15;76:14,14,
　18;77:21,22,25;82:13;
　85:3,12,16;88:9,10;
　95:5;101:5,8;102:7,11;
　103:7,10,11,13;108:24,
　25;110:15;111:23,25;
　112:15,18,23;113:17,
　18;114:1;115:20,21;
　121:6;122:25;126:17;
　128:1,2,4;129:25;

130:23,24;131:11;
132:1,7;133:2,11,12,
16,17;140:20;142:14,
14,15,17;152:5;161:9;
187:13;216:1;234:20,
21;247:3,4;254:3;
255:12,16
**reminded (2)**
　129:21;130:2
**removed (1)**
　25:2
**renamed (1)**
　47:15
**rental (1)**
　130:23
**rephrase (4)**
　99:22;147:11;
　162:24;177:9
**replace (5)**
　105:14;204:25;
　207:19;214:11;215:3
**replies (2)**
　163:22;199:18
**reply (7)**
　34:13;40:8,11;127:1;
　163:24;164:5;199:22
**replying (1)**
　38:8
**report (2)**
　98:2;113:15
**reported (9)**
　49:22;108:24;
　113:13,19,23,25;114:1;
　134:19,20
**REPORTER (3)**
　44:6;162:23;231:8
**reporting (2)**
　6:3;129:10
**repository (1)**
　86:5
**represent (6)**
　18:22;19:8;55:9;
　115:22;144:16;184:4
**representation (1)**
　239:16
**representative (1)**
　30:19
**represented (2)**
　10:14;81:21
**representing (2)**
　15:22;162:16
**reputation (2)**
　136:13;191:20
**request (3)**
　141:12,22;190:20
**requesting (1)**
　163:17
**require (2)**
　16:21;25:20
**required (4)**
　74:24;149:13;185:7;
　204:5
**requirement (1)**

120:23
**requirements (3)**
　37:15;71:21;153:16
**requiring (1)**
　173:25
**resale (1)**
　41:11
**research (2)**
　93:18;109:21
**resell (1)**
　47:23
**reseller (2)**
　6:23;63:13
**resold (1)**
　48:4
**resolve (11)**
　32:5;167:16,18,22;
　168:9;174:23;187:18;
　188:1;195:13;209:16;
　214:19
**resolved (5)**
　32:3;121:23;122:4;
　125:5;199:25
**resolving (1)**
　164:10
**resource (2)**
　7:20;26:23
**resources (9)**
　4:20;13:24;25:21;
　26:7;27:11;41:2;
　106:19;136:13;148:9
**respect (14)**
　23:11;41:25;42:25;
　48:14;71:12;72:2,20;
　73:8;88:24;90:8;99:5;
　102:17;118:12;158:14
**respected (1)**
　231:22
**respective (1)**
　88:25
**respects (1)**
　68:6
**respond (5)**
　20:13;86:25;167:20;
　242:5,7
**responded (1)**
　170:19
**responds (1)**
　61:3
**response (5)**
　31:25;60:23;136:24;
　180:23;201:4
**responsibilities (6)**
　4:18;104:17;147:24,
　25;148:1,19
**responsibility (16)**
　10:6,9,13;37:5,7;
　49:13;80:18;81:10,12;
　134:21;147:23;148:6;
　150:17;181:9;194:21;
　196:20
**responsible (8)**
　7:9;41:12;48:25;

49:4;134:9;148:9,10,
13
**result (6)**
　14:22;129:5;153:24,
　24;219:10;227:3
**results (5)**
　77:8;218:25;219:8;
　225:23;226:13
**retail (1)**
　112:20
**retain (1)**
　82:4
**retainer (1)**
　19:14
**rethink (1)**
　255:15
**retired (1)**
　59:12
**return (1)**
　171:19
**revealed (1)**
　196:24
**revenue (28)**
　10:13;47:8,12;49:14,
　15;79:17;101:3;
　107:18;109:9,10;
　110:16;115:7,24;
　126:20;127:8,15,18;
　128:16;129:17;182:22;
　230:23;244:20,24;
　245:1,13;246:10,17;
　252:16
**revenues (6)**
　27:20;49:6;70:2;
　245:21;247:6;252:5
**revert (1)**
　250:8
**review (11)**
　21:18;52:9;57:14;
　58:2,14,23;84:3;
　100:12;112:25;126:5;
　133:4
**reviewed (4)**
　15:25;28:3,7;53:11
**reviewing (1)**
　181:22
**reviews (1)**
　58:4
**revises (1)**
　94:12
**revision (2)**
　77:2;90:24
**rewrite (1)**
　215:22
**rid (1)**
　24:20
**Right (47)**
　11:22;36:19;59:24;
　67:14;80:5;87:5;93:19;
　95:25;96:21;98:20;
　101:23;102:14;113:22;
　114:12;115:19;124:6,
　14;125:20,23;135:9;

145:13;152:12;158:19,
22;161:20;162:21;
163:20;165:12,14;
174:17;187:19,20;
191:22;195:6;202:25;
210:7;216:11;218:23;
224:25;226:14,25;
231:6,13,19;240:9;
252:6;253:20
**right-hand (2)**
　63:1;222:25
**ring (1)**
　239:25
**Rodney (7)**
　48:24;49:2;113:13,
　15,25;190:22,23
**role (20)**
　4:25;5:3;7:8,9;10:4,
　8,10,11,16;11:2;24:16;
　28:23;30:14;80:17;
　81:10,11,16;127:25;
　138:25;247:23
**roll (1)**
　187:10
**rolled (1)**
　5:5
**rolling (2)**
　188:16;210:14
**rollout (1)**
　137:19
**RonJon (9)**
　112:5,10,11,13;
　129:23;130:13,16;
　131:7;132:12
**RonJon's (1)**
　131:4
**room (1)**
　59:1
**Ross (2)**
　59:22;61:24
**rotating (1)**
　113:17
**roughly (1)**
　4:13
**Roy (1)**
　19:2
**RSI (1)**
　142:11
**rule (2)**
　222:9;238:5
**rules (1)**
　148:19
**run (13)**
　4:10;10:1;37:12;
　64:25;67:2;142:23;
　168:9;178:3;203:24;
　238:17;249:22;251:5,
　10
**running (14)**
　6:25;7:14;150:9;
　168:8;184:3;196:14,
　18;197:16;204:19;
　205:22;249:6,21;

250:7,20

**S**

**sacrifice (1)**
24:19
**safe (1)**
220:22
**Sage (2)**
9:3;80:14
**sale (13)**
50:7;51:20;95:4;
104:5;107:18;116:14;
127:17;128:7;129:17;
131:7;141:12;195:4;
229:13
**sales (37)**
4:15,21;5:8,24;8:6;
9:1,10;10:13,17;27:3;
30:15;31:15;49:10;
50:17;51:9;54:15;83:5,
6,7,17;84:4,6;98:22;
99:6;100:23;104:9;
105:15;116:21;118:4;
128:2;134:10;139:16;
172:25;219:18;224:4;
227:23;229:9
**salespeople (1)**
88:1
**sales-specific (1)**
50:17
**same (19)**
30:23;68:7;80:12;
86:22;87:3,4,17;98:1;
163:5;164:6;169:12,
24;176:2;188:13;
214:19;229:18;233:18;
249:25;250:4
**Sammy (1)**
59:20
**samples (1)**
52:23
**SAP (366)**
4:8,11,13,16,24;5:3,
5,10;6:2,7,10,12;8:16,
25;9:12,18,18,22,23;
10:4,15;11:3;12:13,14,
20;13:5,13,24;14:8,22,
25;19:19,23;22:4,9,12;
23:8,24;25:6,10,20;
26:5,6,16,23;27:8;29:4,
10,20,21;30:7,17;31:1,
24;32:3,8,20,22;33:21;
34:19;36:2,10,21,25;
38:18;40:11,14,15,18;
41:14,21,21,22,23,24;
42:7,11;43:8,17,18,20;
44:10;45:1,18;46:25;
47:2,13,17;48:14,21,
22,23;49:5,5;50:9;
51:3,9,19,25;52:6,6,9,
18,21;53:13,21;54:1,
12;55:24;58:15;60:16,

19;61:2,3,10,11;62:25;
64:1,2,9,16;65:2,17;
66:22;67:1,24;69:3,7,
18,23;70:6,10,23;72:3,
9,11,15;73:2,8;74:3,12;
76:7,21;77:11;78:2,6,
11,12,18,22,23;80:2,7,
11;81:6,14;82:3;83:1,
14;84:10;85:7,23;
86:10,18,20;88:8;89:1;
90:14;91:2,4,23;92:22,
25;94:9,11,15,20,24,
25;95:3,8,12,15;96:2,6,
6,7,13,21;98:14;99:3;
102:13,21;105:19;
106:21;107:12;108:3,
25;109:9,10,14;110:3,
3;111:12;114:21;
115:12,19;117:21,24;
118:7;119:19;126:20;
128:23,25;129:9;
133:23;134:8;135:24;
136:12,13,22;137:25;
138:9,21;141:25;
142:23;144:1;145:21;
146:6;147:13,24;
149:12,19;150:18;
151:7,13,19,21,22,23,
23;152:5,9,12,13,21,
23,23;153:2,3,25;
155:8,19;156:19;
160:5,23;162:13,25;
164:3,22;165:25;
166:1;170:2,10,15;
172:22,23;173:9,21,23;
174:1,4;175:21;176:8;
177:16;178:14;180:17,
23;181:6;182:1;183:2,
8;186:20;188:12,19,
22;189:5,6,11;194:1,
19,21;195:11,18;
196:22;197:20;198:3,
7;204:25;205:5,6,8,13,
16,24;206:22;207:5,
17;209:8,20;210:4,22;
211:3,16;212:11,16,20;
213:7;214:3,21;216:9,
24;217:2;218:2;
219:14,19;220:8,15,15,
19;221:16;223:4,9;
224:16;225:20;226:10,
11;227:14;228:15;
229:1,3,22;230:7;
231:17;232:17;233:5;
234:21,25;235:3,8;
237:24;238:16;239:4,
6,6,10,19,21;240:1;
242:13;243:18;251:25;
252:10,23,25;254:13
**Sapphire (1)**
131:5
**SAP's (12)**
19:17;31:7;47:7;

65:9;67:3,10;72:2;
81:3;129:15;138:24;
196:16;233:23
**satisfaction (3)**
12:10;28:23;211:8
**saw (5)**
85:25;174:2;216:21;
224:5;253:20
**saying (52)**
40:23;46:10;71:23,
24,25;72:17;83:11;
86:19;89:15;111:24,
25;115:20;128:14;
134:15;139:9,17;
145:5;149:1;162:9,10;
167:13,15,17,25;172:1,
4,10;176:19;178:1,5,6;
181:5;184:23;185:24;
187:4;188:5;189:25;
190:3;191:10;193:16,
19;194:15;202:21;
203:3;210:8;231:1;
236:8;242:21,22;
243:1;255:17;256:13
**SB1 (1)**
233:15
**scalability (1)**
233:12
**scalable (5)**
232:1,3,6;233:19;
251:23
**scanned (1)**
176:14
**scenario (3)**
105:6;204:18;209:9
**schedule (3)**
17:16,18;149:9
**scheduled (2)**
236:25;241:18
**scope (15)**
37:18;158:2,4,8,11,
12,15;159:4,5,5,7,8,11;
185:2;254:9
**Scott (1)**
62:23
**screen (2)**
67:1,2
**screwed (1)**
32:22
**script (1)**
56:19
**SDK (1)**
233:23
**search (3)**
29:14;207:3,4
**seats (1)**
79:15
**Second (20)**
30:2;34:12;38:16;
40:10;59:5,25;63:4;
66:6;98:11;128:20;
130:10,10;158:7;
182:13;199:9;200:13;

216:25;228:24;232:1;
234:23
**secondhand (1)**
247:15
**secrets (2)**
15:7,8
**section (1)**
52:23
**secure (1)**
18:7
**seeing (7)**
72:16;76:13,15;
205:17;209:2;210:13;
227:24
**seek (1)**
172:5
**seemed (2)**
147:18;244:6
**seems (3)**
30:25;157:17;178:24
**segment (2)**
73:24;98:19
**seldom (1)**
11:9
**self-maintaining (1)**
86:20
**Seligmann (5)**
48:24;49:2;113:13,
15;190:22
**sell (18)**
22:13;48:9;70:9;
71:6;75:16,17,18,18;
78:24;94:24;107:12;
117:25;142:2;151:14;
181:9;245:3,6,7
**selling (6)**
66:17;80:16;89:15;
117:18;152:5;244:19
**sells (1)**
51:8
**send (8)**
50:18,19,21;101:12,
13,18;110:21;134:15
**sending (7)**
28:10;38:5;100:16;
108:8;113:7;133:8;
203:18
**sends (4)**
36:7;181:4;245:24,
25
**senior (3)**
27:1;49:4;113:10
**sense (10)**
16:23;58:24;71:24;
76:5;169:25;171:21;
213:7,13,13;233:18
**sent (9)**
20:7,10;21:25;28:9;
38:3;77:16;101:9;
114:25;168:14
**sentence (8)**
30:2;34:16;40:10;
101:2;103:4;178:13;

211:25;220:16
**September (1)**
216:11
**sequential (1)**
57:8
**series (3)**
57:8;118:20;218:11
**seriously (2)**
214:18;255:14
**serve (1)**
117:20
**served (5)**
11:2;16:21;18:1,6,20
**server (3)**
233:14,16,19
**serves (1)**
18:24
**services (5)**
47:24;48:11;82:14;
141:13;195:3
**serving (1)**
18:15
**sessions (5)**
78:9,10;225:24;
226:8,16
**set (3)**
43:2;92:22;172:25
**sets (1)**
43:1
**setup (1)**
82:5
**several (5)**
30:19;87:15;128:23;
169:5;180:23
**severance (1)**
14:21
**severe (1)**
164:9
**Shane (5)**
49:20,21;50:4;60:4;
66:5
**share (3)**
32:24;148:2,4
**shared (2)**
45:16;222:10
**sheer (1)**
153:18;188:2
**short (1)**
14:19
**shortcuts (1)**
149:11
**shorten (1)**
88:19
**short-term (1)**
184:13
**show (8)**
17:7;18:3;53:6;
84:16;100:3;147:3,4;
201:7
**showed (2)**
16:22;168:11
**shown (3)**
197:5,7;251:19

shows (2)
18:16;223:3
shut (1)
150:15
sick (1)
9:11
side (3)
48:14;221:15;230:23
sides (2)
34:20;128:10
sight (1)
188:20
sign (3)
83:3,19;95:16
signed (3)
85:22;95:21;99:17
significant (14)
39:6;64:6;118:22;
120:12;121:13;122:16,
20,21;123:11;138:14,
17;155:22;195:10;
214:2
significantly (2)
223:5;244:14
signing (1)
82:19
silence (1)
183:1
similar (8)
32:24;129:24;130:4,
6;131:17;222:24;
229:19;236:5
simple (2)
110:8;234:15
simplify (1)
88:21
simply (3)
38:19;116:20;194:25
simulate (4)
150:5,7,12,13
simulated (1)
225:2
simultaneous (1)
150:1
single (8)
24:9;29:3;81:1;
92:10;119:17;145:21;
154:8;194:22
situation (13)
14:1;20:17;35:19;
37:8;45:16;92:19;
107:21;141:11;142:15;
179:15;208:16;252:9,
24
situations (3)
30:22;58:12;160:15
six (2)
106:10;244:18
six-figure (1)
114:18
Sixth (1)
21:10
size (30)

54:9;70:23;73:18;
78:13;79:17,17;97:8;
98:10;108:19,22;
116:8,20,22;129:17;
132:7;136:10;153:18;
169:7;188:2;196:10;
224:12,16,19;229:19;
230:8,25;231:4;237:8;
238:2;246:17
Sizes (1)
224:10
sizing (1)
218:5
skill-building (1)
78:10
SKUs (3)
131:18;143:12;
153:20
slated (1)
131:3
slide (5)
63:3;227:12,16;
228:1,6
slides (1)
227:24
slip (1)
104:24
slow (1)
165:21
small (24)
27:17,18;47:5,5;
49:1;69:9,16,17,24;
70:3,3,12,13;169:10,
11;196:22;230:4,8,10,
20;233:2,4;245:20;
248:12
smarter (2)
87:21,21
SME (1)
27:18
Snucker (1)
97:3
Soft (6)
65:24;66:14;91:13,
15;195:15;197:15
software (96)
6:18;7:5;8:18,20;9:2,
4;10:24;12:9,17,20,24;
13:4,7,9;38:18;39:6;
43:7,15,16;48:1,5,9;
64:3;66:16;68:7;75:14;
78:18;79:24;80:3,21;
82:4,8,9,11,14,19;
91:22;92:8,8;93:21,24;
94:17;95:5,12;99:9;
123:8,11,20;124:2;
125:12,14,22;129:7;
141:19;143:14;148:14;
150:2;152:6,17,17;
153:13;154:1;155:10,
13;163:3;165:8;
173:10;176:20;177:7;
178:9;179:12;189:20;

190:4;196:13;197:19,
22;204:20,25;207:3,4,
19;209:14;214:11;
230:1;244:16,19,20,22,
25;247:22,24;248:13;
249:15;251:5,9;253:25
software's (2)
141:16;176:23
sold (34)
7:4;13:15;31:8,20,
22;49:16;59:11;70:23;
88:15;95:6;98:25;
112:6,6;118:7;125:14;
129:5;150:25;164:5;
170:24;171:1,9;
182:19;197:20;198:9;
210:1;226:1,3;229:18,
24;230:17;232:17;
236:3;243:15;248:20
sole (1)
153:5
solely (1)
128:7
Solution (33)
4:17;39:14;40:17;
82:13,13;83:9;117:9;
136:16;150:23;151:14;
163:9;182:20;196:8,
22,23;201:19;204:1,13,
15,16;205:7,8;206:7,
19,21;207:24;209:11,
12;221:8,9;238:16;
244:23;256:10
solutions (7)
11:14;48:5,6;181:3;
205:10;207:5;221:5
solve (1)
205:14
somebody (20)
18:16;22:17,19;41:9;
48:23;49:2,8;113:25;
114:2;115:4;120:23;
129:8,11;145:14;
152:7;167:13,17;
227:22;234:20;243:5
somebody's (2)
191:15;213:13
someone (13)
12:5;14:18;18:13;
58:18;74:8;144:8;
157:17;159:21;160:4;
163:6;164:5;212:25;
248:23
sometime (2)
186:1;237:16
somewhat (1)
6:13
somewhere (1)
165:6
soon (4)
32:6;125:6;159:23;
160:3
sorry (40)

5:9;13:1;14:13;
17:14;21:13;22:1;28:8;
41:17;44:8;46:1;58:17;
59:23;67:9;72:7;84:15;
85:11,16;113:23;
129:7;139:4;146:11;
147:11;152:19;163:23;
177:17;189:1;190:17;
193:11,12;198:25;
211:21,21;223:2;
229:4;234:17;237:14;
238:8;240:13,17;
247:17
sort (1)
110:13
sorted (1)
129:16
sorts (1)
16:1
Sotnick (14)
48:17;49:3,7;113:5,
10;129:21;131:8;
134:24;137:2;172:14;
190:21;202:12;203:3;
242:1
Sotnick's (1)
134:17
sound (1)
177:10
sources (1)
151:25
South (3)
5:19;31:7;142:17
Southeast (2)
112:4;130:12
space (1)
80:13
Spalding (1)
133:15
speak (3)
11:12,15;178:21
speaking (2)
42:21;76:11
specialties (1)
53:19
specific (48)
12:6;20:5,16,17,24;
23:23;26:22;45:8,19,
20;46:17,18;52:15;
53:4;64:13;69:7,15;
75:23;77:21,22,25;
83:14;87:6,9;91:7;
92:19;99:24;101:14;
103:3,5;104:1;117:9;
119:11;121:7;122:9;
137:13;144:4;146:23;
158:15;159:5;176:9;
191:18;208:13;212:10;
236:19;237:8;239:6;
241:17
specifically (32)
6:16;29:18;30:14;
31:10;35:10,12;39:15;

41:8;42:3,5,24;44:25;
51:17,21;53:2;59:15;
72:7,10;74:5;88:11;
112:4;121:9;127:13,
15;143:5;156:4;157:7;
186:17;198:6;206:17;
226:4;237:21
specifics (1)
237:11
specify (1)
58:19
speculate (7)
62:7,12;85:10,12;
172:9;203:9;217:18
speed (1)
190:23
Spelled (1)
59:20
spent (3)
6:24;105:21;145:11
spit (1)
89:1
spoke (5)
11:15;20:9;42:6;
140:9;178:19
spoken (6)
12:4;19:18,22,25;
42:3,4
spot (49)
72:20,23;73:6,7,11,
13,17,18;74:2,6,10,13,
16,22;75:9,13;76:3;
79:20;94:12,23;137:8,
10;156:15;157:8,22;
158:4,8,11,12,16,18,
25;159:1,3,14;161:22,
25;162:1;164:7;191:8,
24;228:23;229:1,8,16;
235:25;236:2,8,10
spots (3)
73:14,20,21
spread (1)
70:15
spreadsheet (1)
218:10
Sql (7)
169:5;233:11,13,14,
14,15,19
squeaky (1)
191:21
St (2)
146:7,18
stable (1)
63:7
standalone (2)
150:10;151:6
standard (8)
65:5,8;248:10,15,22,
23,24;251:4
standards (1)
233:23
standing (1)
110:20

Hodell-Natco Industries, Inc. v.
SAP America, Inc., et al.

Geoffrey Ashley
March 16, 2012

standpoint (7)
84:6;230:24;231:2,5;
232:21;239:5;243:12
STAR (142)
4:5;14:3;15:19,21;
16:11;17:13,15,22;
18:6,15;19:12,18;20:9;
21:11,14;31:4;32:11;
33:23;35:25;37:1;
38:23;39:8,17;42:1;
43:13;44:13,18;45:3,7;
57:4;61:7;62:6,12;
70:25;81:8;82:22;
83:21;84:14,16;85:10;
95:17,22;96:4;100:7;
101:22;107:5,8,14;
109:16;116:16;117:15,
24;122:18;123:17;
124:7,21;125:9;139:2,
5;140:19;144:18,20;
146:14;150:20;154:2;
158:5;160:24;162:4;
163:5;165:14;167:1;
168:15,18;170:6;
172:7,9,20;173:18;
174:7;176:21;177:1;
178:18;179:5;181:19;
182:10;186:5;187:7,
24;188:9,24;189:2,8,
18;190:2;194:4;
195:22,24;196:3;
197:1,12,24;198:4;
199:2,16;200:5,10,15,
18,23;201:2,25;202:7,
18;203:8;206:2,25;
208:22,25;210:21,25;
212:1;215:4;217:11,
18;218:3;219:2,11;
222:1,13;230:22;
232:20,25;233:7,9;
241:11,13,24;242:3;
247:20,21;254:10;
256:18
Star's (2)
16:15;19:15
start (6)
48:17;111:7,8;
114:10;204:24;207:2
started (19)
4:23;6:20;60:6;88:8;
98:25;139:10;157:14;
165:9,19,20,23;170:12;
184:23;188:16;237:22;
240:1;254:19;255:5,7
starting (4)
4:13;105:24;106:23;
237:17
starts (2)
31:7;55:13
state (4)
59:3,4;114:17;
118:17
stated (10)

40:11;43:18;107:4;
170:21;174:3;179:25;
183:18;187:25;201:18;
227:10
statement (66)
19:10;22:23;25:17;
28:25;29:19,23;30:4;
31:1,11;32:19;34:17,
23;38:17;39:15;40:21;
44:9,21,22;45:24;60:7;
63:4,17;66:6;95:4;
101:22;103:16;104:21;
105:23;108:7;110:18;
116:7;123:22;141:25;
142:8,9,18;145:19;
147:2;171:17;175:14;
179:7;182:24;187:8;
189:14;191:15;204:11;
207:21;208:1;209:19;
212:5,19,23;213:6,25;
220:8,11;221:2,18;
222:24;223:3;227:1;
231:24;234:11;254:25;
255:19,22
statements (4)
191:14;219:13,15,20
states (9)
43:9;49:19;60:20;
156:13;229:14;231:15;
234:5;236:24;241:15
stating (5)
22:16;25:19;170:11;
179:21;210:7
Steffner (8)
49:23;50:5;60:4;
105:24,25;121:11;
136:8;138:4
Stenfeldt (1)
114:4
steps (1)
97:20
stick (1)
215:2
still (23)
25:24;42:24;43:3,10;
46:24;56:2;78:23;
101:16;105:12;169:23;
172:24;180:11,16;
181:11;185:4,5;188:3;
204:5;205:3;214:19;
234:1;244:3;250:1
Stoddaker (1)
227:19
stop (1)
170:11
stoplight (1)
89:8
stopped (2)
36:20;145:15
store (2)
112:17;150:4
stores (1)
112:16

strategic (1)
136:16
strategies (1)
71:17
strategy (3)
6:11;69:4,9
streamline (1)
239:22
stressing (2)
192:4;255:25
strictly (3)
10:17;32:10;116:4
strike (7)
9:25;29:7;33:9;74:1;
207:14;208:18;229:4
string (4)
154:17;161:17;
168:7;169:3
strong (6)
24:17;33:12,13,18;
65:16;100:23
structure (1)
10:22
structured (2)
172:22,23
stuck (1)
31:17
stuff (7)
4:23;17:19;99:13;
101:20;106:16;120:7;
149:5
stunned (1)
183:1
style (5)
25:5;32:14;179:21;
191:21;202:23
subject (5)
15:4,24;19:6;134:1;
150:24
subjective (2)
253:11,15
submit (3)
79:8;80:20;170:7
submitted (1)
109:7
subpoena (8)
16:18,21,25;17:6,21;
18:1,7,15
succeed (1)
26:13
succeeding (1)
226:19
success (2)
24:19;148:3
successful (12)
24:14;39:4;94:17;
95:2;148:5;154:12;
172:19;180:17;181:12,
15;223:5;245:16
successfully (1)
131:25
SugarCRM (1)
6:8

suggest (5)
93:16;172:16;213:9;
243:11;244:6
suggested (3)
182:12;184:20;
251:10
suggesting (15)
12:21,23;13:6;127:7;
166:12;171:25;172:21;
173:6;183:15;190:7;
202:5;204:12;206:3,5,
6
suggestion (3)
189:11;203:25;
251:12
suggestions (1)
203:14
suggests (2)
158:25;173:7
suitable (2)
153:23;247:10
summarized (1)
199:4
summarizing (1)
182:16
Summary (7)
65:20;129:20;
198:20;201:10;202:3;
221:12;223:1
Summer (3)
219:18;224:4;227:22
super (1)
200:14
supplied (3)
135:24;136:3,6
support (13)
11:8;48:10;50:19,19;
60:9,19,20;61:1,4;
106:18,19;162:8;201:5
supporting (2)
182:9;256:9
supportive (1)
24:1
supports (1)
201:8
support's (1)
61:8
supposedly (1)
87:21
sure (60)
18:16;19:2;20:2;
25:14;28:23;50:8;53:2,
22;62:15;63:15;67:21;
68:24;72:21;74:10;
76:23;77:3;95:1;97:25;
100:19;101:11;107:8,
16;110:6,8;111:22,23;
116:21;120:14;125:5,
19,21,24;132:4,6;
133:11;135:2;140:6,
23;144:15,25;145:2;
162:18,22;163:6;
184:15;191:2;195:13;

205:11;217:12;218:4;
219:4;221:22;222:7;
231:10;237:10;240:9;
247:11,12;255:17;
256:8
surprise (2)
74:7;211:17
surrounding (2)
118:19;119:2
suspect (10)
192:4;20;193:2,15;
194:3,17;195:7;255:2,
11,25
suspicion (1)
247:13
sustained (1)
142:10
swear (2)
25:13;63:11
sweet (52)
72:19,23;73:6,7,11,
13,14,17,18,20,21;
74:2,6,10,13,15,22;
75:9,13;76:3;79:20;
94:12,23;137:8,10;
156:15;157:8,21;
158:4,8,11,12,16,18,
25;159:1,3,14;161:22,
24;162:1;164:7;191:8,
24;228:23;229:1,8,16;
235:25;236:2,8,10
switch (1)
250:7
sworn (1)
4:3
system (55)
10:24;47:1;48:15;
106:18;110:2,3;
129:16;148:16;150:9,
11,14,16,16;153:15,22;
169:20,23;171:2,2,3;
176:10;187:11;188:16;
189:7;210:15;218:15,
15;229:4;244:9;
249:14,15,18,19,21,22,
23,25;250:2,7,8,9,9,14,
16,16,18,21,23,24,25;
251:1,6,11;252:25;
253:18
systems (1)
109:24

**T**

tab (1)
169:19
talk (7)
15:18;56:1;105:22;
130:12;215:18;228:23;
252:13
talked (8)
19:17;58:12;66:13;
96:7;115:8;145:17;

208:14;211:14

**talking (39)**
6:15;37:23;38:22,24;
41:20;44:23;45:15;
48:13;61:1;62:9;67:5,
6;80:14;102:24,24;
103:19;104:8;105:22;
110:2;119:5;140:12;
159:18;160:25;161:2;
171:24;172:15;186:10;
187:17;190:24;198:22;
199:1,14;218:2;
230:22;233:9;243:11;
251:20;252:14;255:4

**talks (1)**
130:11

**target (12)**
70:10;72:10,13,14;
76:8;78:12;117:2;
223:5;229:3;245:20,
23;246:15

**targeted (5)**
230:3;231:3;232:18;
251:25;252:5

**targeting (1)**
252:11

**team (25)**
24:3,4;41:2;54:21;
100:22;101:11,17,20;
103:25;104:4;106:2;
118:25;142:21;155:18,
20;156:13;157:7;
159:22;164:11;171:18;
175:10,11,13;183:2;
202:20

**teams (2)**
41:11,11

**technical (10)**
7:10;10:16;11:18;
35:20;64:10;76:16;
133:25;152:19;158:15;
162:19

**technology (2)**
8:8;75:11

**Ted (13)**
49:23;50:5;60:3;
66:5;97:3;104:7;
105:24,24,25;108:11;
121:11;136:8;138:4

**Tel (1)**
243:14

**telemarketing (3)**
56:22,23;246:1

**telephone (1)**
199:4

**telling (13)**
121:3,12;122:10;
157:7;178:16;179:2,3,
8,9;181:17;186:10;
193:14;201:9

**template (9)**
52:18,25;53:1,9,12;
87:23;101:10;135:24;

136:2

**templates (1)**
52:24

**templatized (1)**
53:16

**ten (6)**
51:2;106:9;115:12;
127:12;132:10,14

**tendency (1)**
30:15

**tenure (1)**
76:21

**ten-user (1)**
169:20,23;171:1

**term (10)**
50:6;64:10;72:19,22;
73:7,10;74:2,6;137:11;
236:8

**termination (1)**
14:23

**terms (13)**
10:1,4;76:8;78:13;
86:17;96:3,12,14;
109:4;115:7,23;
201:17;218:21

**territories (1)**
57:22

**territory (3)**
5:25;8:23;49:18

**test (16)**
76:25;149:25;
150:14,18;171:22;
177:24;218:25;219:7,
10;226:10,14;248:2,7,
9,19;249:9

**tested (7)**
76:17,25;77:3,10;
148:13;166:7;177:16

**testified (9)**
4:3;70:20;149:24;
152:22;185:21;201:25;
204:7;215:15;250:5

**testify (3)**
15:13;17:2;71:2

**testifying (2)**
28:4,6

**testimony (12)**
24:18;78:11,15;
84:18;166:3;177:5;
180:15;181:11,14;
208:21,23;252:4

**testing (21)**
76:20;94:7;147:7,12,
14,19;148:7;149:14,
22;160:9;196:8,11,13,
24;238:24;247:24;
248:11,15,17,25;249:1

**tests (4)**
77:7,8;178:3;226:15

**Thanks (1)**
199:7

**theoretical (3)**
70:22;71:23;244:10

**thereafter (2)**
125:6;166:2

**Therefore (2)**
7:11;89:6;130:25;
236:4,15

**thinking (3)**
145:1,2;200:25

**third (2)**
98:13;224:8

**though (4)**
30:25;100:25;102:2;
114:5

**thought (2)**
204:7;234:9

**thoughts (1)**
167:24

**thousand (3)**
92:1;105:10,12

**thousands (3)**
131:18;151:18,18

**threatened (1)**
173:20

**three (9)**
44:3;47:3,20;92:2,4;
97:21;164:7;209:23;
224:8

**three-fourths (2)**
38:16;45:24

**threw (1)**
29:21

**throughout (2)**
230:2;255:11

**throw (1)**
207:2

**Tim (2)**
55:11,12

**times (5)**
60:24;156:15;169:5;
208:15;244:7

**timing (4)**
54:4;60:4;61:23;
131:11

**title (2)**
5:13,24

**titled (2)**
221:12;227:13

**today (23)**
9:16;15:14;19:11;
28:4,20,24;42:18;50:3;
55:14;61:11;69:19;
80:6;100:8;108:9;
124:13;147:17;170:8;
217:17;243:25;244:7,
18;252:4;253:21

**today's (1)**
86:17

**together (22)**
14:16;32:4;33:13,17;
35:17;36:18;40:15;
46:19,21;57:23;58:11;
59:2;78:7;101:18;
134:5;139:11,18;
140:10;141:3;152:3;

153:22;196:19

**told (23)**
29:2;40:11,21;70:20;
122:12;143:22,25;
144:2;145:9;146:3;
156:14;178:21;182:8;
183:7;185:22;188:13;
189:4;191:23;203:12;
204:7,24;205:12;235:3

**took (5)**
34:20;94:3;104:15;
131:15,22

**tool (5)**
87:22,23,25;88:12;
89:17,19;90:17,25;
93:16;94:2;152:16;
238:9

**tools (1)**
151:2

**top (11)**
36:4;48:18,25;97:12;
104:21;127:12;156:9;
199:2;210:13;231:7;
234:18

**topics (1)**
4:7

**total (6)**
19:7;153:18,22;
196:22,23;201:17

**touch (3)**
152:23;160:12;
212:20

**tough (3)**
90:3;141:18;160:16

**towards (6)**
34:1;51:16;91:10;
106:4;122:14;163:16

**Toyota (1)**
190:8

**track (4)**
79:18;93:14;118:14;
248:6

**trade (2)**
15:7,8

**traditionally (1)**
27:17

**trained (2)**
34:2,8

**training (7)**
21:7;85:24;87:25;
88:20;139:14;141:13;
212:9

**transacted (1)**
93:2

**transaction (15)**
31:13;90:1,15;91:2,
9,14,20;92:21;94:11;
112:12;129:3;142:20;
143:22;234:7;250:14

**transactional (1)**
245:10

**transactions (15)**
75:21;92:2,3,5,14;

93:11;112:20;130:3;
143:11;153:20;169:7;
237:12;245:5,9;250:1

**trap (1)**
175:16

**travel (2)**
17:17;146:7

**traveling (2)**
18:9;146:18

**treated (1)**
34:7

**treatment (1)**
30:23

**treatments (1)**
140:21

**tried (5)**
13:24;17:18;71:6;
141:1,3

**tries (1)**
238:13

**trip (5)**
126:20,24;127:3,12;
128:6

**troubles (1)**
120:11

**true (6)**
145:25;146:1;
147:11;189:4,14;
225:16

**truly (1)**
110:19

**truth (1)**
32:22

**truthful (1)**
203:13

**try (9)**
14:2;32:5,13;35:18;
145:12;147:2;214:22;
226:5,5

**trying (18)**
33:16;39:23;56:21;
68:13;69:8;76:9;
101:18,19;153:6;
174:25;177:10;201:4,
11;203:22;205:14;
215:3;229:7;243:10

**Ts (1)**
84:1

**turn (33)**
14:4;34:12;38:15;
55:7;65:17;104:20;
135:18;137:15;141:5;
154:14;161:12;162:11;
174:6;180:20;198:13;
203:15;208:24;211:9;
212:13;213:16;216:2,
13,25;218:16;219:23;
220:6,23;221:10;
223:21;224:8;226:9,
21;228:1

**turned (1)**
146:12

**two (29)**

8:14;33:12,14;92:6;
98:9,9;102:13;124:2;
128:15;142:10,12;
150:5,8;173:17;
178:25;179:11;180:22;
194:6,8;200:7,10,20;
219:16;224:8;230:16;
247:2;250:2;252:17,19
**two-tier (7)**
64:14,17,20,23;65:3,
5,8
**tying (1)**
101:17
**type (4)**
48:4;69:15;156:20;
237:24
**types (3)**
47:3;48:8;173:3
**typical (2)**
82:1;224:24
**typically (3)**
81:24;249:2;253:11

## U

**Udi (35)**
155:5;161:12,22;
162:14;163:2,17,20,22,
24;164:5;167:7,23;
168:8;170:11,14;
171:12,12,25;172:17;
173:7,7;177:6;178:15,
25;180:3;235:18,20,
23;236:8,14;240:23;
241:14;242:4;243:4,11
**Udi's (2)**
168:25;169:21
**ultimately (3)**
161:20;196:21;200:9
**Um-hum (28)**
23:4;25:22;34:22;
38:21;40:20;44:5;46:4;
63:8,19;66:11;67:19;
102:4,15;103:18;
105:3;106:5;110:24;
116:12;119:4;136:17;
138:23;140:3;142:7;
208:23;211:13;217:8;
228:25;231:11
**unacceptable (5)**
253:8,9,19;254:15,
17
**uncertain (1)**
201:17
**under (16)**
29:22;49:2,7,12,17;
58:22;96:23;113:23;
118:15;128:25;136:9,
12;204:18;206:6;
222:8,25
**underneath (1)**
135:20
**understands (1)**

159:24
**understood (3)**
108:23;240:10,10
**undertaken (1)**
80:7
**unearthed (1)**
143:6
**Unfortunately (1)**
227:17
**Unger (1)**
59:22
**Unger's (1)**
60:1
**uninvited (1)**
147:4
**unique (3)**
112:9;131:22;151:19
**unit (1)**
36:4
**United (2)**
49:19;229:14
**University (2)**
7:7,15
**unless (2)**
39:23;64:12
**unsuccessful (1)**
154:9
**unusual (3)**
84:9;141:11;146:21
**up (76)**
5:3,15,23;7:13;16:8,
22;17:5,7;18:3,16;
20:22,22;24:7;27:5,21,
21;32:22;35:18;42:15;
46:1,13;53:12;57:15;
70:2,4;81:13;84:17;
93:3;100:22;102:10;
103:15;131:13,14,24;
141:17;143:4,6;147:3,
4;149:16;155:16,19;
172:25;176:4,5,14,17;
178:22;181:8,25;
182:9,22;185:20;
189:12;190:23;191:22;
192:8;194:1;196:5,8;
200:17;204:11;206:14;
214:8;215:8;221:17,
25;222:21;232:19;
236:16;237:19;240:12;
248:9;250:16;252:6,11
**upcoming (2)**
142:22;143:1
**updated (2)**
104:4;131:21
**updates (2)**
104:3;175:6
**upgrade (1)**
254:3
**upgraded (1)**
64:4
**upgrades (3)**
13:8;160:10;175:12
**upon (18)**

36:24;43:24;78:13;
94:22;102:20;109:11;
121:22;127:12;128:7,
22;134:23;139:20;
156:24,25;208:18,20;
214:7;215:13
**upper (1)**
234:8
**ups (1)**
247:20
**Upsetting (1)**
142:3
**urgency (2)**
213:7,13
**use (39)**
15:6,7;22:16;26:2;
52:1,8,13;55:15;66:22,
24;67:12;71:3,10;
75:23;87:25;88:3;
118:4;123:19;125:11,
14;150:2;151:13;
153:15;162:2;165:9;
169:1,1;189:22;
196:12;204:1;205:18;
232:10;236:11,21;
237:25;240:15,19;
243:7;251:1
**used (42)**
45:15;47:14;51:17;
54:24;55:4,5;57:12;
69:21;70:21;71:1;
72:20;73:1,8,10;74:3,7,
8;79:22;83:15;86:21;
87:16;89:17;91:16;
92:16,18;93:1;136:25;
137:1,14;141:19;
150:8;156:20;171:6;
176:10,14;178:9;
198:7;223:6;229:1;
231:16;233:6;237:18
**user (20)**
38:19;39:16;56:11;
78:14;80:21;81:25;
85:14;89:23;95:16;
96:8;109:12,14;
112:13;115:8;116:4;
132:22;137:23;150:14;
175:15;249:1
**users (76)**
39:6;72:5,14,17;
75:14,20;76:1,2,9;
95:21;96:2;109:11;
110:13;115:11,12,16,
17,24;116:15,17;
130:17,19;131:19;
132:3,9;136:9;137:5,
13;138:1;143:12;
150:1,10;162:6;164:7;
168:21,22,23,23;
169:10,12;171:4;
175:21,24;176:3,10,16;
182:9,22;183:22;
184:3,13;185:14;

186:24;187:5;196:12;
218:22;221:17,25;
222:22;224:12;225:2,
7;228:11,12,16;232:19,
19;233:10;236:1;
252:1,11,13,17,19,20,
20
**user-specific (1)**
76:15
**uses (2)**
162:7;230:7
**using (16)**
52:5;65:4;66:25;
72:24;73:2;150:11;
159:6;165:20;175:15;
184:20,22;204:13,13,
14;223:9;226:15
**usually (2)**
53:20,20
**utilize (4)**
11:13;56:21;64:24,
25
**utilized (1)**
11:17
**utilizing (1)**
138:2

## V

**vague (1)**
237:15
**validate (1)**
251:1
**validating (1)**
250:3
**value (3)**
6:23;7:20;251:2
**valued (1)**
10:8
**van (1)**
140:17
**vanLeeuwen (3)**
65:14,15;67:15
**VAR (7)**
6:23;7:2,3,19,23,24;
87:13
**variables (2)**
230:19;232:8
**various (4)**
7:5;57:16,22;248:13
**vehicle (1)**
52:14
**vehicles (2)**
50:22,24
**vendor (2)**
129:7;214:11
**vendors (2)**
48:1;207:19
**verify (2)**
236:20;250:14
**version (3)**
43:4,5;77:2
**versions (3)**

13:15;172:15;217:20
**versus (5)**
72:13;87:8;150:10;
167:11;245:6
**vertical (11)**
39:13;63:13;69:11;
73:14;99:9,25;117:5,9,
16;142:2;221:8
**vertical-specific (1)**
74:25
**vice (4)**
8:6;9:10;49:4,9
**VIDEOGRAPHER (2)**
200:12,17
**view (4)**
169:14;174:4;
247:23;251:4
**viewed (1)**
231:20
**virtue (2)**
115:7;160:18
**visit (1)**
146:24
**Volney (3)**
133:15;134:8,16
**volume (17)**
90:1,15;91:3,9,14,
20;92:21;94:11;
112:12;143:22;164:13;
188:3;217:6,22;
237:12;245:10,15
**volume-based (1)**
80:24
**volumes (2)**
234:7;237:8
**voluntarily (2)**
16:20;25:15
**volunteered (1)**
35:9
**VP (4)**
30:15;36:4;104:9;
113:10

## W

**wait (8)**
120:9;130:7;179:5,5,
5;217:8;219:7;222:13
**waited (1)**
244:8
**waiting (1)**
99:12
**wants (3)**
50:10;78:20;242:6
**warehouse (1)**
227:2
**warnings (1)**
237:24
**waste (1)**
19:7
**way (83)**
12:25;20:4;26:10;
27:2;33:4,6;34:6,7,8,8;

35:7;36:3;38:16;45:23,
25;46:22;57:9;64:21;
66:21,22;67:6,8,9,11;
68:7;73:12;75:15;79:4;
80:12,22;92:22;93:2,2,
3;95:14;97:21;108:11,
11;113:15;123:3,4;
131:17;149:9;159:6;
164:6,22,24;167:7,12;
169:9;170:18;171:6;
172:16,22,23;176:1;
178:5;179:24;181:6,7;
182:1;185:25;186:20;
188:21;189:6,24;
196:12;203:10;205:18;
208:4;209:17;221:4;
229:1;230:15;233:22;
235:10;236:20;238:3;
239:4,11;243:8;
248:16;250:4
**ways (4)**
33:3;50:12;75:4;
194:8
**website (4)**
86:12;88:23,25;
222:7
**week (2)**
82:9;134:2
**Weekly (3)**
104:1,2,6
**Weis (2)**
114:7;211:6
**Welbourne (4)**
112:6;130:13,17;
131:13
**well-known (2)**
116:18,25
**weren't (6)**
9:13;32:16;36:15;
37:18;125:4;178:16
**Wes (1)**
14:4
**what's (23)**
7:8;27:24;51:7,11;
52:21;60:14;97:24;
116:22;117:3;126:9,
25;129:6;141:10;
153:9;157:19;165:22;
187:21;196:1;198:17;
221:2;223:2;226:1;
228:10
**whatsoever (4)**
10:20;89:10;98:24;
123:5
**wheel (1)**
191:21
**whenever (3)**
165:18;166:17;
188:13
**wherever (3)**
239:8,8,11
**whittle (1)**
94:23

**Whoa (1)**
165:21
**whole (11)**
25:25;91:13;115:13;
168:1;212:1,15;
218:18;245:8,9;246:4;
255:15
**Wholesalers (1)**
8:10
**Who's (2)**
65:11;173:12
**Whose (3)**
150:17;200:8,21
**wide (1)**
135:8
**wife (1)**
146:13
**willing (4)**
24:19;203:23;207:2;
211:16
**win (2)**
41:5;116:8
**wish (1)**
240:12
**withdrew (2)**
32:8,9
**within (27)**
23:8;37:17;41:13,14;
45:18;47:23;49:18;
52:20,22;58:8;68:15;
69:18;73:14;99:7,10;
116:19;135:12;137:25;
152:17;164:25;166:17;
169:13;180:7;192:3;
205:13;242:12;255:24
**without (5)**
61:22;106:17;127:3;
150:1;176:9
**witness (40)**
14:4;17:14;18:7;
21:13,21;32:21;44:8;
62:14;84:15;85:11;
86:2;100:9;107:7;
126:7;133:6;146:11;
154:15;159:19;160:2;
165:15;172:11;174:5,
10;187:15;188:25;
190:12,14;193:19;
199:6;200:25;202:19;
203:16;211:10;212:14;
213:17;216:3,14;
219:24;222:16;223:22
**wonder (1)**
38:17
**wondering (1)**
244:5
**Woodrum (1)**
19:4
**word (1)**
158:7
**worded (1)**
164:24
**wording (1)**

167:7
**words (11)**
45:11;50:17;66:25;
68:3;94:15;97:11;
111:6;135:6;196:15;
232:5;244:23
**work (49)**
12:9;14:18;22:20,20;
25:20;26:4;32:4,13;
36:19;37:22;46:9;66:9;
67:11;73:16;74:9;75:5;
80:23;101:19;120:1;
125:23;141:13;156:23;
164:23;181:6;182:2;
185:4,5,9,25;186:11,
21;191:6;201:12;
203:25;205:23;206:1,
3,9;214:22;233:15;
240:24;243:25;244:13,
18;245:18,19;248:6;
250:4;255:18
**worked (24)**
6:1;7:24;9:22;14:15;
35:17;38:19;40:17;
46:19,20;68:3;92:25;
155:8,11;166:6;
185:10,11,13;197:8;
198:8;243:17;244:9;
253:2,5,7
**working (17)**
5:12,22;6:23,25;
7:19;22:6;41:13;54:20;
56:23;135:7;139:18;
145:13;167:21;197:10;
213:10;214:17;252:23
**works (1)**
124:12
**world (4)**
47:18;86:24;152:13;
243:15
**worse (1)**
253:17
**worst (2)**
97:22,23
**worst-case/best-case (1)**
105:6
**worth (1)**
245:7
**write (5)**
10:19;45:5;48:1;
53:21;183:5
**writes (1)**
251:22
**writing (2)**
45:14;256:3
**written (7)**
53:12;67:11,12;
121:5;150:5;192:2
**wrong (12)**
34:19;36:9,16;37:23;
88:23;89:2;162:9;
164:6;193:12;250:24,
25;251:13

wrote (3)
109:18;132:14,19

**Y**

**yacht (1)**
245:6
**yachts (2)**
75:18;245:3
**year (17)**
5:9;15:3;62:10;78:8;
100:23;104:23,25;
105:20;108:11;109:3,
8,15,25;126:17;
217:21;219:17;245:5
**yearly (1)**
78:5
**years (15)**
5:4;6:24;7:18;8:14;
124:2,12;128:23;
145:10;184:9;188:7,
11;189:15;209:23,23;
244:18
**yellow (2)**
89:8,11
**yesterday (3)**
149:24;152:22;250:5
**You' (1)**
127:2
**young (1)**
69:12

**Z**

**Ziv (17)**
155:5;161:12,22;
162:14;163:2,17,20,22;
167:23;168:14;170:11;
171:12,13;178:15,25;
180:3;243:4
**Ziv's (5)**
163:24;164:5,15;
166:22;170:14
**zones (1)**
60:23

**0**

**05 (2)**
4:14;70:15
**07 (2)**
146:25;254:6
**08 (1)**
64:7

**1**

**1 (3)**
27:22;43:4;106:12
**1,000-user (1)**
171:2
**10 (11)**
70:1,13,14;97:13;

133:9;168:23;220:10,
21;223:8;230:8;246:14
**10,000 (5)**
73:2;75:17;91:1;
152:1,2
**100 (6)**
176:3,17;178:10;
220:10,21;223:8
**101 (2)**
83:6;84:6
**11 (2)**
5:9,10
**11793 (1)**
212:17
**118 (2)**
126:4,10
**119 (2)**
223:21,24
**120 (12)**
136:9;137:5;162:6;
164:7;168:21;175:15,
20,23;176:3,16,17;
236:1
**122 (1)**
218:16
**12366 (1)**
235:16
**124 (1)**
219:23
**12412 (1)**
62:25
**12416 (1)**
65:17
**129 (1)**
220:23
**12-user (1)**
171:2
**13 (2)**
154:19;159:18
**13th (2)**
161:13;235:21
**15 (5)**
97:13;154:20;
224:12;246:7,8
**150 (3)**
137:23;218:22;246:8
**156 (4)**
174:6,12;177:14,19
**157 (1)**
187:14
**158 (6)**
180:20,22;182:14;
185:24;199:6;206:12
**159 (3)**
203:15,19;207:22
**16 (2)**
174:13;189:5
**160 (2)**
208:24;209:3
**16th (1)**
234:1
**17 (3)**
181:4;235:14;252:10

**171** (2)
  216:13,16
**172** (3)
  21:15,18,23
**173** (2)
  27:23,25
**174** (3)
  37:24,25;43:23
**175** (5)
  57:1,2,20;58:8,16
**176** (4)
  100:10,12,17;130:9
**177** (4)
  112:24,25;113:4;
  114:10
**178** (3)
  133:3,4,9
**179** (2)
  146:4,5
**17th** (2)
  199:3;251:22
**18** (3)
  62:8,24;209:4
**180** (5)
  190:13,16,19;
  254:19,23
**181** (4)
  198:12,13,15,17
**19** (2)
  22:1,1
**1928071** (1)
  240:5
**1982** (3)
  6:21;7:23;247:23
**1st** (1)
  110:10

---

**2**

**2** (1)
  234:5
**200,000** (1)
  92:11
**2000** (2)
  5:8;224:17
**2004** (12)
  60:16;68:16;218:23;
  239:25;240:3,4;
  242:12,17;243:2;
  254:20;255:7,14
**2004'** (2)
  242:8,23
**2005** (40)
  8:25;11:3,19;13:16;
  42:22;43:19;55:4,13;
  65:9;68:19,20,22;69:4,
  25;70:11;74:4,12;85:4,
  5;90:21,24;93:22;
  96:20;98:6;100:18;
  103:7;110:5;111:19;
  121:8,15;122:3,13;
  129:15;216:19,23;
  217:2;220:3;230:2;

**255**:5,11
**2006** (27)
  11:3,22;12:3;42:22;
  54:5;55:2;62:11;68:23;
  113:5;117:13;132:20;
  133:10;136:19,21;
  137:9,18;141:8;143:8;
  188:14;221:21,24;
  222:21;224:2,17;
  225:21;227:7;230:2
**2007** (41)
  13:16;55:2;90:19,24;
  122:2;146:8,19;
  153:12;154:20;155:3;
  156:18,19;159:18;
  161:3,13;173:9;
  174:13;180:15;181:4,
  13;182:1;186:2;
  188:14;189:5,17;
  193:4,11;204:23;
  209:4;213:23;216:12;
  230:3;235:21;240:22;
  241:21;242:16;251:22;
  252:10;253:22,23;
  254:1
**2007A** (1)
  214:4
**2008** (2)
  4:25;5:12
**2009** (3)
  22:2,10,24
**2010** (1)
  25:13
**2011** (5)
  5:23;6:7;20:7;28:11;
  34:14
**2012** (1)
  38:6
**21** (1)
  55:13
**22** (1)
  220:6
**22nd** (5)
  34:14;100:17;
  239:25;240:2,7
**25** (1)
  220:3
**250** (4)
  182:21;232:18;
  252:6,6
**25th** (1)
  137:18
**2723** (2)
  211:20,21
**29** (1)
  28:11
**2nd** (2)
  113:5;132:20

---

**3**

**3** (1)
  38:6

**30** (8)
  7:18;68:20;99:7;
  102:7;145:10;225:5;
  228:11,16
**300** (2)
  184:13;246:8
**31** (1)
  131:9
**31st** (1)
  110:11
**39** (1)
  55:7

---

**4**

**4** (2)
  43:5;183:19
**4/16** (2)
  189:12;193:7
**4/17** (2)
  189:12;193:9
**4:32** (1)
  256:19
**40** (1)
  100:3
**45** (2)
  102:9;105:21

---

**5**

**5** (6)
  27:21;43:5;47:7;
  75:18;101:6;220:6
**5,000** (2)
  92:7,9
**50** (10)
  70:2;74:23;97:11,12;
  168:22;221:17,25;
  222:22;230:9,12
**500** (19)
  47:8;70:4,14;74:23;
  182:9,22;183:22;
  184:3;185:13;186:23;
  187:4;230:12;232:19,
  19;239:21;246:15;
  252:1,11,20
**500-user** (1)
  183:10
**52** (1)
  137:15
**53** (2)
  141:5,7
**5571** (1)
  170:10
**5572** (2)
  163:22,24

---

**6**

**6** (3)
  43:5;184:17;222:8
**60** (1)
  168:22

**60,000** (1)
  225:14
**61** (2)
  216:2,5
**69** (5)
  162:11;163:12,13,
  16;241:25

---

**7**

**7** (4)
  43:5;54:6;221:10;
  223:1
**70-percent** (1)
  184:12
**72** (4)
  128:17,18,19,24
**73** (2)
  53:6,7
**74** (2)
  55:22;56:16
**78** (3)
  154:14,17;241:14

---

**8**

**8** (1)
  141:8
**80** (7)
  78:20;148:15,15,18;
  149:25;150:2,10
**81** (2)
  231:6;251:19
**83** (2)
  234:15;237:4
**86** (1)
  212:13
**88** (3)
  211:9,12,19
**89** (5)
  213:16,19;214:15,
  25;215:11

---

**9**

**90s** (1)
  8:12
**92** (1)
  8:12

---