UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

– – – – –

HODELL-NATCO INDUSTRIES, INC, )
                              )
            Plaintiff,        )  Case No. 1:08CV2755
                              )
        vs.                   )
                              )
SAP AMERICA, INC.,            )
                              )
            Defendant.        )

– – – – –

TRANSCRIPT OF PROCEEDINGS HAD BEFORE THE HONORABLE

SENIOR JUDGE LESLEY WELLS, JUDGE OF SAID COURT,

ON WEDNESDAY, FEBRUARY 18TH, 2015

COMMENCING AT 10:30 O'CLOCK A.M.

– – – – –

Court Reporter:            GEORGE J. STAIDUHAR
                           801 W. SUPERIOR AVE.,
                           SUITE 7-184
                           CLEVELAND, OHIO 44113
                           (216) 357-7128

– – – – –

 1      APPEARANCES:

 2         On behalf of the Plaintiff:

 3            BROUSE McDOWELL – Akron
              BY:  P. WESLEY LAMBERT, ESQ.
 4            388 South Main Street, Suite 500
              Akron, OH 44311
 5

 6                  and

 7            BROUSE McDOWELL – Cleveland
              BY:   SHARON A. LAURDE, ESQ.
 8                  CHRISTOPHER J. CARNEY, ESQ.
              600 Superior Avenue, E, Suite 600
 9            Cleveland, OH 44114

10

11         On behalf of the Defendant:

12            DRINKER BIDDLE & REATH – Philadelphia
              BY:   GREGORY J. STAR, ESQ.
13                  MICHAEL J. MILLER, ESQ.
                    ALEX H. HAYDEN, ESQ.
14            One Logan Square
              18th & Cherry Streets
15            Philadelphia, PA 19103

16

17                     – – – – –

18

19

20

21

22

23

24

25

1          <u>P R O C E E D I N G S</u>

2          THE COURT:  We have been communicating back

3     and forth, but at this point, we are trying to see

4     whether there is any resolution of this case that might

5     be possible, that would prevent everyone from taking it

6     all the way through trial, although we are ready to go to

7     trial.

8          As you know, we have been through lots of

9     things presented by the parties, and so the case is a

10    familiar one now.  This is a courtroom where we would try

11    it, and we have a request for the top half of Ohio to

12    draw upon for our jurors.  What I found over the many

13    years, both as a Common Pleas Court and as a Federal

14    Judge here, we have jurors who come, but they are leaving

15    behind very important things.

16         They will stay here and be accommodated here

17    throughout the trial, but still I am always conscious of

18    the fact that they are performing their duties but doing

19    it at some cost that never can really be measured.  But

20    we get great juries out of the top half, and they come

21    from the whole top half.  And so it is an interesting way

22    to go forward.

23         I want to go over some things now, which I

24    think will be helpful to us, and I have some questions to

25    ask.  And we are always looking to see whether or not it

1   is possible for people to work out some, if not all, of

2   the issues in the case so that not everything has to go

3   through trial.  So that's what we are here to do.

4                   And you are familiar with my clerk, so I

5   think we will just go over some things now to prepare for

6   the trial.  In terms of the length of the trial, I am

7   really not at all clear about how long this trial might

8   go, and so I am looking to see whether or not you have

9   got some idea how long.

10                  We have given you a big space, but we don't

11  know how you are looking at the case and how much time

12  you think it would take.

13                  So can you give me some information about

14  that?

15                  MS. LAURDE:  Yes, your Honor.  I am

16  Sharon Laurde.  We have in our case in chief fifteen

17  witnesses.

18                  THE COURT:  Okay.

19                  MS. LAURDE:  I anticipate that we will be

20  able to get in on average two per day.  So we are looking

21  at, at least, two weeks in our case in chief.  I don't

22  know about opposing counsel, but we are looking at about

23  two weeks.

24                  THE COURT:  And they can speak for

25  themselves.

1            MR. STAR:  Good morning, your Honor.

2    Greg Star.

3            THE COURT:  Yes.

4            MR. STAR:  Well, I think when we were back

5    here in October of last year we had discussed that this

6    was maybe a two-week trial, probably less than that.  I

7    am not sure of the fifteen witnesses.  That number is

8    bigger than I understand, so I am not quite sure, and

9    maybe we can go through that.

10            THE COURT:  That's something to find out

11    now.

12            MR. STAR:  And we had discussed yesterday

13    this would come up, based on the witnesses we thought,

14    that all of the testimony from both sides would probably

15    come in a little over one week and wouldn't necessarily

16    be a two-week trial.

17            THE COURT:  Okay.  We need final witness

18    lists.  We don't have that.  Have you got them today?

19    You should.

20            MR. STAR:  Sorry to interrupt.

21            THE COURT:  Sure.

22            MR. STAR:  We did put in per your pretrial

23    order late spring-early summer last year, we did submit

24    witness lists and did objections to those.  So we do know

25    who the witnesses are.

1        THE COURT:  Right.  And we have seen that,

2   but I am looking for the final one.  I want to really

3   know now who you need.

4        MR. STAR:  Your Honor, we did file our final

5   witness list back in October.

6        Is that correct?

7        MS. LAURDE:  It has not changed since that

8   time.  I can identify the names.

9        THE COURT:  If you already sent it to us, we

10   don't need to see it again, right?

11        MR. LAMBERT:  I think, your Honor, there are

12   a couple on our witness list that we would more than

13   likely not call.

14        THE COURT:  Uh-huh.

15        MS. LAURDE:  So it would be smaller than the

16   one we filed.

17        THE COURT:  Okay.  Then give us a correct

18   witness list.

19        Can you do that today?

20        MR. LAMBERT:  Yes.  And I think we are close

21   to having the order worked out.

22        THE COURT:  Okay.

23        MR. LAMBERT:  Logistically speaking,

24   depending on how long things go, but I think it can be

25   filed in the order to be presented.

1          THE COURT:  Okay.

2          MR. STAR:  Your Honor, I think if we can

3     just pause, if Ms. Laurde actually has the names of

4     the fifteen right now, it would help us to know who they

5     are.

6          THE COURT:  Yeah.

7          MS. LAURDE:  Absolutely.

8          THE COURT:  Okay.

9          MS. LAURDE:  We will be calling Kevin Reidl,

10    Mr. Lowery, Mr. VanLeuwen would appear by videotape, our

11    expert, Mr. Grumble, Mr. Meland.  We do have a question

12    about Mr. Ashley, but he would certainly be a witness,

13    Mr. DeVoe —

14          THE COURT:  So you have a question, but

15    he would be a witness.  We want to know who the witness

16    is.

17          MS. LAURDE:  Mr. Ashley, there is an issue

18    with regard to Mr. Ashley that we would need to raise

19    with you, your Honor.  Up until last week, we had been

20    advised that Mr. Ashley would appear live.  SAP's counsel

21    told us he would appear live up until last week.

22          THE COURT:  Okay.

23          MS. LAURDE:  At this point, your Honor, we

24    had prepared designations with regard to his testimony

25    and received counter designations, but because he was

1   going to appear live, no objections were prepared by

2   either side.

3            So at this point, the Court would need to

4   rule on the objections that would be proffered, but we do

5   have an alternative to that, which I think might be a

6   better option, and that is, under Rules 43 and 45,

7   we could actually subpoena Mr. Ashley to appear in

8   the District Court in which he resides and take his

9   testimony live via video feed, and that would save the

10  Court ruling on objections.  He would be presented live,

11  and I think that would be a more acceptable option to

12  both parties.

13           THE COURT:  That's something you should

14  discuss right now and see what their response is.

15           MR. STAR:  Thank you, your Honor.  The issue

16  with Mr. Ashley, if you go back to our submission, back

17  in October of our trial list, we had indicated and has

18  been known all along Mr. Ashley has been a former SAP

19  employee living in New Hampshire, and we had said that we

20  would anticipate him to come, and he had been willing to.

21           Up until just the last couple of weeks,

22  where he informed us that he wanted what we thought was

23  too much money to actually come, he told us he wanted

24  $2,400 a day, $300 an hour, a minimum of $2,400 a day

25  to come — and we communicated that to the other side —

1    we are not willing to do that for lots of reasons.

2              As far as having a witness like that appear

3    by video conference, we can certainly discuss it.

4    Mr. Lambert and I had discussions about that topic with

5    other witnesses, and we didn't think that actually works,

6    and I had the understanding — maybe I am wrong — that

7    the technology in this particular building didn't allow

8    for it anyway.

9              MS. LAURDE:  As far as the technology is

10   concerned, it is easy in this time period to come up with

11   the technology in order to accommodate that.  We have

12   reached out to a vendor to ensure that they could bring

13   in the equipment needed here and ensure the District

14   Court he would have the technology in order to transmit

15   the witness.

16             And frankly, having a live witness is much

17   more compelling than having a witness read from a

18   deposition transcript or just showing video clips.

19   Mr. Ashley is, in fact, a pretty critical witness for

20   us.

21             There are a couple of e-mails that

22   Mr. Ashley had written with his employment after SAP

23   where he made statements such as "you know, this was a

24   case where we had a product not ready for prime time, a

25   partner relying on documentation that SAP put together,

1    we were relying on those commitments, and SAP, frankly,

2    messed up."

3            So Ashley is important as far as proving

4    material facts in our case, and having him live would

5    serve the interest of justice more than just reading

6    deposition transcripts.

7            MR. STAR:  So again, Mr. Ashley lives in

8    New Hampshire.  It was known at the time, and his

9    deposition was videoed.  We have the video.  The quality

10   is pretty good, so like other witnesses, designations and

11   portions of his videotape could be played.

12           Ms. Laurde wrote e-mails — Mr. Ashley wrote

13   e-mails, and indeed, he wrote them, but those e-mails

14   were written, and he was questioned about those e-mails

15   at his deposition, and counsel had them.  So our view of

16   this, your Honor, we don't think it is necessary or

17   appropriate to try to — and I don't know if Mr. Ashley

18   — I would have to look at the rule — I don't know if he

19   could be compelled to suggest to appear at a different

20   courthouse and not in this courtroom.

21           THE COURT:  Actually, we do that frequently.

22           MR. STAR:  But here I don't think it is

23   necessary because he was deposed on all those issues, and

24   there is a videotape, and like other witnesses who appear

25   here and available, we can just have his designations

1    come in.  And Ms. Laurde is right, we would need to get

2    those designations in front of your Honor and have those

3    ruled on.

4              MS. LAURDE:  Your Honor, I certainly

5    understand SAP's not wanting him here live.  I think

6    Mr. Ashley is going to be a tremendous witness for us.  I

7    think that he will be able to present himself much more

8    fully to the jury via video.  This happens frequently,

9    and the rules allow for it.  I think it would give the

10   jury a better appreciation for Mr. Ashley and his

11   credibility and his testimony.  He is a very important

12   witness for us.

13             And frankly, up until last week, SAP told us

14   he was going to be here.  I mean, we had one week notice

15   that he wasn't going to appear, and we can arrange for

16   him to appear.  And SAP, frankly, you know, Mr. Star is

17   saying he is not necessary, but he is necessary, and we

18   can arrange for him to appear through Veritex or some

19   other vendor.

20             So the best option is to have him appear at

21   the District Court in which he resides, and Mr. Star can

22   cross-examine him on his exhibits.

23             MR. STAR:  So the last thing I would say,

24   your Honor, I obviously haven't said that Mr. Ashley is

25   not perhaps a necessary witness; all I said, it is not

1    necessary to do a live video link of this man because we

2    do have a very, a thorough video recorded deposition of

3    him that can easily be ruled on and brought in.

4           The parties have already done the

5    designations and exchanged those with each other as I

6    recall going back to last year.  We just hadn't bothered

7    to lodge objections because we had believed that he was

8    willing to come, but now he told us he wants the

9    ridiculous amount of money just to appear as a fact

10   witness, and even having him appear by this video link as

11   he communicated to me, he would still want all this

12   money.

13          And then the question is:  Who is going to

14   pay that?

15          So I think the short answer is, we ought to

16   get his deposition designations in front of your Honor,

17   get them ruled upon, and that's what his testimony ought

18   to be.

19          MS. LAURDE:  Your Honor, I can only

20   reiterate that Mr. Ashley is an important witness for us,

21   and if we are willing to bear the cost of the video

22   transmission, I don't understand Mr. Star's concern.

23          Why does it matter to him if he

24   cross-examines him live versus have the deposition read

25   in?  I mean, the reality is, we are entitled to have this

1   witness here live.  We were told he would be live up

2   until a week ago.  If we bear the cost of ensuring the

3   video transmission works, Mr. Star can cross-examine him

4   all he wants.

5                   THE COURT:  Isn't that so?

6                   MR. STAR:  Certainly, I could cross-examine

7   him if he is through the video conferencing.

8                   THE COURT:  Right.

9                   MR. STAR:  The big issue with Mr. Ashley —

10  first off, I want the record to be clear we never made

11  any promise about the man.  It was always known he was a

12  former employee and had no control on him.  It was only

13  recently he sprung on us he wants all this money, and we

14  communicated that.

15                  Yes, we can cross-examine by video.  I just

16  think that isn't necessary because all they want to ask

17  him has been asked, and he has given the answers he

18  wants.

19                  THE COURT:  Well, I think you have the right

20  to have him go forward.

21                  MS. LAURDE:  Thank you, your Honor.

22                  THE COURT:  Okay.  So what else have we gone

23  through?

24                  MR. MILLER:  We were going through witness

25  list.

```
1            THE COURT:  We have to have a final witness
2    list because we have lots of witnesses written down, and
3    we need to know.
4            What's next?
5            MS. LAURDE:  Next is Mr. DeBoe, Mr. Krause,
6    Mr. Killingsworth, we have videotape depositions of
7    Andy Ziv and Mr. Woodrun.  We also have Mr. Vislocky,
8    Mr. Clarke, Otto Reidl, and then we have our expert,
9    Mr. Kennedy, who we would need to proffer his testimony
10   for your Honor to ensure that we have that available to
11   us, if necessary, on appeal.
12           THE COURT:  Okay.
13           MS. LAURDE:  I believe, your Honor, the one
14   issue with regard to some of these witnesses, four of the
15   witnesses, that we would like to call in our case in
16   chief are either current or former employees of SAP, and
17   certainly, I am assuming that they will be testifying in
18   SAP's case in chief as well, and I simply don't know how
19   you would like to handle that.  We would be calling them
20   and having our examination.
21           I don't know if you want to have the
22   witness complete in one day or if we would call them and
23   then SAP would then recall them later in their case in
24   chief.
25           THE COURT:  A little bit depends on where
```

1    they are.  I mean, if they are local around here, it

2    isn't — you know, if they aren't, okay.  So then I think

3    we need to do them.

4                MS. LAURDE:  In one day.

5                THE COURT:  One day, that, yeah.

6                MR. STAR:  And if I may, so we have it

7    clear, it is Mehnert-Meland.  He is a former employee.

8    He is in North Dakota or South Dakota, and the other

9    employee is a former employee, Dan Krause, and we are

10   planning to bring them as part of our case, and this is

11   an issue that came up in October about witnesses coming

12   from out of town, how that would go, recognizing, of

13   course, the Plaintiff has the ability to call our

14   witnesses as part of their case.

15                For the orderly presentation of evidence, we

16   do think the jury is best served by hearing from these

17   witnesses in the order it should happen in our case that

18   the Plaintiff would have an opportunity to cross-examine

19   these witnesses on a variety of topics.

20                MR. MILLER:  Your Honor, Mike Miller.

21                And we have been here multiple times, and in

22   an attempt to avoid some confusion, we should be

23   considering these witnesses in two different categories.

24   There are the current SAP employees and the former SAP

25   employees.  Dan Krause and Ralph Mehnert are former SAP

1    employees, so we would not imagine that they would be

2    part of the Plaintiff's case in chief unless they were

3    able to subpoena them, which I am not aware that they are

4    going to.

5            We will likely call them in our case and

6    will bring them in from wherever they are, North Dakota

7    or wherever it is, and the Plaintiff will be permitted to

8    cross-examine them.  So I didn't want there to be

9    confusion.  Those are former employees.  They have been

10   deposed, and they are going to testify live, and they

11   will be witnesses of ours.

12           Then there are the current employees, and I

13   think they are Ed DeBoe, Paul Killingsworth.

14           MR. STAR:  Just those two.

15           MR. MILLER:  Okay.  Then, there are only two

16   employees, Ed DeBoe and Paul Killingsworth, and if

17   Plaintiff is going to call them in their case in chief,

18   if that's going to happen, then it will happen, and we

19   would reserve the right to either conduct our cross as

20   part of the Plaintiff's case in chief to avoid multiple

21   trips —

22           THE COURT:  That's a good way to do it.

23           MR. MILLER:  It can be efficient and may

24   be confusing, and we will have to decide at that time,

25   depending on their schedules and availability, also.

```
 1              MS. LAURDE:  Your Honor, we have always
 2    discussed with SAP's counsel that we would, in fact, be
 3    calling both the former and current employees that were
 4    identified in our case in chief.  It is a bit of a
 5    surprise now they are saying they were not aware we were
 6    planning to call them in our case in chief.
 7              We were advised they would be available, and
 8    frankly, this is not what we had discussed with counsel.
 9    But we are entitled to put on our case in chief as we see
10    fit.
11              THE COURT:  That's true.
12              MS. LAURDE:  And so we want
13    Mr. Mehnert-Meland and Mr. Krause available to us.  If
14    SAP is saying they will not be here for the time period
15    during our case in chief, then I would suggest we arrange
16    to have them available live during our case in chief
17    because we want our case to go in in an orderly fashion
18    and the testimony of e-mail traffic they have is very
19    critical in our case against SAP.
20              So I would suggest that we treat the former
21    employees who are voluntarily coming, that we treat the
22    current employees who will be available, we put on our
23    case and SAP put on their case and do the cross.  I don't
24    see any reason why we shouldn't have access to them
25    during our case in chief when that's always what we
```

1    discussed.

2              MR. LAMBERT:  Your Honor, if I may add, if

3    you recall the process for submitting the deposition

4    designations was such that neither side submitted

5    deposition designations for our case in chief.

6              Based on representations of opposing

7    counsel, we did not submit designations for Mr. Krause or

8    Mr. Mehnert, and we were told they would be available,

9    that they would be live witnesses and wouldn't need to be

10   presented by deposition.

11             MR. STAR:  So let me just set the record

12   straight again on a couple issues.

13             THE COURT:  I don't know about setting the

14   record straight.  This is unusual to have so much

15   difference in memory.

16             MR. STAR:  It has been said there were

17   discussions that we would have these particular witnesses

18   here for Plaintiff's case in chief.  Those discussions

19   have never actually happened.  That's not true.  When we

20   were back here in October, I raised the issue that we had

21   these witnesses who were out of the jurisdiction and

22   would need to travel.

23             THE COURT:  Right.

24             MR. STAR:  And your Honor said the parties

25   should discuss that.  There has never been a discussion.

1    The only thing we had was a short e-mail exchange last

2    week where Mr. Lambert told me he would give a list of

3    witnesses during his case and never got that back.  So

4    for these former witnesses, it is a big inconvenience

5    for them.  They have been good enough to be willing to

6    come.

7              THE COURT:  Okay.  Before you go into that

8    part of what you want to tell me about, I am really

9    surprised that we are sitting here today on the edge of a

10   trial, and this is where you guys are with witnesses.  I

11   mean, it doesn't — it is very unusual and kind of

12   baffling to me.

13             This case doesn't involve a whole lot of

14   witnesses, but most of the people involved in the case

15   who the jury needs to hear from are people who each of

16   you has a reason to want to be able to have in front of

17   the jury with you asking the questions and you deciding

18   what should be said.  So you have got to pull this

19   together yourselves, and we will just wait until you do

20   it.  This is really unusual, your having difficulty with

21   this.

22             MR. LAMBERT:  Your Honor, the entire reason

23   — and I will go back and check the transcript of the

24   final pretrial we had in October — but I think when I

25   read it, we will find this was covered in pretrial, and

1    we were told the witnesses would be available in our

2    case.  I could be wrong and haven't read it for a while.

3    Obviously, we would like to have Mr. Mehnert and Krause's

4    testimony presented in our case in chief.

5              THE COURT:  Is this the first time you have

6    ever heard this?  You never knew they wanted them

7    available?

8              MR. STAR:  They never specifically said to

9    us "we need to the have you bring these gentlemen here

10   available for our case."  They have them on the witness

11   list but never came to have us to arrange to have these

12   gentlemen.  It has been known all along where these

13   individuals live and did the depositions scattered all

14   around the country.  No one has broached this.  That's

15   why I broached it back in October.

16             MR. MILLER:  And that's why you raised it

17   last week and never heard —

18             THE COURT:  So it has to be resolved today.

19             MR. LAMBERT:  I think the fair and just way

20   to resolve it, if they are going to call these witnesses

21   live, which they always intended to do and always

22   intended to present them live, and we have always

23   intended to present them live, then they come once, they

24   are presented in our case and presented live.

25             They have agreed to come here and can come

1   here at the Court's discretion as far as how the Court

2   wants to set the schedule.

3                MR. STAR:  Your Honor, we don't agree.  We

4   think these witnesses, Mr. Mehnert-Meland and Mr. Krause

5   will be here to testify live.  We think we should put

6   them up in our case, and if there are questions that go

7   outside the scope of our case, it should be done in

8   reasonable bounds.  It has been known where these

9   gentlemen are, what their status is as former employees,

10  and to throw this at us the last moment is actually not

11  fair.

12               MR. MILLER:  And if we are going to get down

13  to other practical ways, you can subpoena them and take

14  their deposition.  I don't think it is necessary as part

15  of their case, and they are really more important for us,

16  which is why I am calling them.

17               MS. LAURDE:  Your Honor, a couple of points:

18               I think first both of these gentlemen have

19  authored very damaging e-mails for SAP.  There are a lot

20  of internal e-mails with these gentlemen involved,

21  implicating SAP.  They are extremely important for our

22  case in chief.  They have been identified on our witness

23  list from the get-go.  We included them on our witness

24  list.

25               I mean, I have never been in a situation

1   where I had to call up opposing counsel and say "did you

2   read my witness list?"

3             THE COURT:  But is this the first time you

4   wondered how you would get them here?

5             MR. STAR:  We believed they were going to be

6   available to us.

7             THE COURT:  Well, they aren't available to

8   you.

9             MR. MILLER:  Your Honor, with all due

10  respect, that doesn't make sense.  There is their case

11  and our case, and we have made it clear they have been

12  part of our case.

13            THE COURT:  That doesn't mean they can't

14  call them.

15            MR. MILLER:  No, but it doesn't make sense

16  out-of-state witnesses would hang around for however long

17  it is handy for them.

18            THE COURT:  No.  I think you need to do

19  something about it.

20            MS. LAURDE:  I suppose our option then would

21  be to arrange for a similar video feed for them if we

22  want to put them on at that point or —

23            MR. LAMBERT:  Or we will need to submit —

24  indeed, I have submitted prepared designations, although,

25  your Honor, I would like to review the transcript from

1    the last final pretrial to see what was said on the

2    record about this, but we can submit their videotape

3    testimony.

4                    THE COURT:  That sounds like —

5                    MR. LAMBERT:  I don't see why there is a

6    reason, and I am certain I can find e-mail traffic

7    reflecting this, but the entire reason why deposition

8    transcript references for Mr. Mehnert-Meland and Krause

9    were not submitted to this Court to be ruled upon because

10   we were told they would be available to testify live at

11   trial, and so we would need, if we want to play their

12   videos, I suppose we need to go through that process

13   now.

14                   MS. LAURDE:  Or do it by video.

15                   MR. CARNEY:  Or we can cross-examine them in

16   Defendant's case and go outside the direct examination as

17   counsel represented that we could.

18                   THE COURT:  I think maybe that's the better

19   way to go.  You know, juries get tired of watching

20   video.  They like to see a real trial.  I mean, for

21   them, it means a lot.  I think that's the way you need to

22   go.

23                   MS. LAURDE:  We will resolve it.  I think

24   the options we have available to us, including as

25   represented by counsel, may be the approach we land on.

1          THE COURT:  Okay.

2          MR. CARNEY:  Thank you, your Honor.

3          THE COURT:  Let's keep going.

4          MR. STAR:  I know we have fifteen witnesses

5   now.  It was mentioned Mr. VanLeuwen would be by

6   videotape.  I take it that would mean his video

7   deposition would be played.  I wanted to get that

8   confirmed.  This is a critical witness.  He has been a

9   gentleman up in the air whether he would come.

10              The last Mr. Lambert and I discussed sounded

11  like Mr. VanLeuwen was coming live, and I wanted to make

12  sure we had that live so we didn't waste our time

13  preparing for somebody who wouldn't be here.

14          MR. LAMBERT:  He will be by videotape

15  deposition, and the Court ruled on the designations.

16          THE COURT:  Okay.

17          MR. STAR:  So all right.  Fine.

18          THE COURT:  So you know, you have to do

19  something.

20          MR. STAR:  Terrific.  Your Honor has ruled

21  on designations put in front of you.  Since Mr. VanLeuwen

22  will not be here live, there are additional discreet

23  pieces of his deposition we would like to put before you.

24  We can confer with opposing counsel beforehand.  It is

25  limited, not objectionable, supplements what's coming in

1    and something the jury should actually hear about.  So we

2    will share that with counsel, and then we will put it in

3    front of your Honor if that's okay.

4              THE COURT:  That's a good thing.  So let's

5    keep going.

6              MR. LAMBERT:  Dr. Kennedy is the damages

7    expert your Honor excluded pursuant to a motion in limine

8    last year.  Obviously, we need to proffer his testimony

9    to the Court in order to preserve that issue for the

10   appellate record.

11             The question we had for your Honor was when

12   would you like that to occur.  What we had planned on

13   doing is bringing him in last, but if the Court would

14   prefer us to do it at a different time, we would like to

15   know that so we can schedule his travel.

16             THE COURT:  Where is he from?

17             MR. LAMBERT:  He is in Boston.

18             THE COURT:  Well, we should do it sometime

19   around when all of us are here anyway, right?

20             MS. LAURDE:  Yes.

21             MR. LAMBERT:  Yes.  We would prefer —

22   again, our preference is to bring him in after the close

23   of our last fact witness and put him on and proffer his

24   testimony, his expert testimony on damages last, and then

25   unless your Honor has a different point of view, that's

1    what we intend to do.

2                    THE COURT:  That's a good way to do it.

3                    MR. STAR:  If I may, this did come up back

4    in October and consulted the rules.  My understanding of

5    whether a proffer is necessary is simply if it was not

6    clear in the record what the individual's testimony was

7    going to be.

8                    We think it was clear, and without being

9    presumptuous and we thought the Court was clear and

10   that's why we didn't have a Daubert hearing, it is part

11   of the briefing in your ruling.  We had a lengthy

12   affidavit that was submitted by Mr. Kennedy also in the

13   record, and we had his deposition, which also was put in

14   as part of the record because it was submitted as an

15   exhibit to the briefing on the motion in limine.

16                   So our point of view is, we don't think a

17   proffer is necessary.  It is kind of a waste of

18   everybody's time.  If there are things that counsel can

19   point to — and doesn't have to be now — but in addition

20   to what's already put in, then maybe it is necessary.  If

21   it turns out to be necessary, even to some limited

22   extent, we would suggest it happen at a point at the end

23   when we are done and not distracted by this because we

24   don't think it is necessary.

25                   MR. CARNEY:  That's all fine and good, and I

1      understand why he would want it done that way, but the

2      motion to exclude Mr. Kennedy is a preliminary ruling,

3      and once you hear our evidence, your Honor, and in

4      particular the testimony of Mr. Reidl, Otto Reidl, we

5      anticipate asking you to reconsider that preliminary

6      ruling, and we may — and you may agree with us at that

7      time, and we would like to have the opportunity to put

8      him on at the end of our case.  A motion in limine is

9      preliminary.

10             MS. LAURDE:  And were, your Honor, just to

11      buttress what my partner has stated, the deposition that

12      was taken by Mr. Star, the way the testimony would come

13      in would be very different in the flow and the context

14      and the explanation as compared to the examination

15      performed during the deposition.

16             It is simply a different means of getting

17      the information, making it more understandable, and we

18      believe that once you hear that, that you will, in fact,

19      reconsider your preliminary ruling.

20             MR. MILLER:  Your Honor, if I may, I think

21      everything we need to know was in that last phrase, they

22      are hoping that your Honor will reconsider.  It is

23      effectively a motion for reconsideration.  There was

24      Mr. Kennedy's report, his affidavit, and have his

25      testimony.  If it becomes clear during the trial, your

1    Honor's ruling should be revisited, then opposing counsel

2    will raise it.

3             In October when we thought the case would

4    take less than two weeks and now hearing two weeks for

5    just their witnesses and at the end something that is

6    nothing more than an attempt to have your Honor

7    reconsider a motion that has already been dealt with I

8    don't think is necessary.

9             MS. LAURDE:  That's a mischaracterization of

10   what I stated.

11            Frankly, to preserve the issue for appeal,

12   we have to proffer the testimony despite very fine

13   lawyers, despite their review of the rules, I am not

14   going to commit malpractice by not proffering his

15   testimony.  We would like it to occur at the end of our

16   case.

17            The two weeks that I stated at the beginning

18   included Mr. Kennedy's testimony.  So frankly, I think we

19   are entitled to have that proffer occur at that point.

20   It fits.  It flows well, but we need to have the proffer

21   occur.

22            THE COURT:  I think we can have the proffer

23   occur.  I think it is appropriate.

24            MR. CARNEY:  Thank you, your Honor.

25            THE COURT:  You are welcome.  Anything

1    further?

2            MS. LAURDE:  Your Honor, I think there are

3    some logistical issues that we may need some guidance

4    from you on.  One is with regard to voir dire.  I don't

5    know what your practice is with regard to that, if you

6    simply conduct the voir dire yourself or if we also do

7    that as well.

8            THE COURT:  Well, it really depends on what

9    lawyers want to do.  I think if one of you does it, then

10   I think both sides need to do it.

11           MS. LAURDE:  Okay.  I think we would like to

12   if that's acceptable.  I am not certain what opposing

13   counsel says.

14           MR. STAR:  I missed what your preference

15   was.

16           MS. LAURDE:  We would like to conduct voir

17   dire.

18           MR. MILLER:  Of course.  Fine.  So would

19   we.

20           MS. LAURDE:  And my partner, Mr. Lambert,

21   wants to explain some issues with deposition exhibit

22   numbering so there is no confusion during the time of

23   trial.

24           MR. LAMBERT:  I wanted to be clear to the

25   Court there was confusion back and forth between both

1    sides the way exhibits would be marked, and there had

2    been an agreement, and then we learned maybe that

3    agreement couldn't hold.  So the way that our — the

4    Plaintiff's exhibits have been marked is according to

5    deposition number.  If they were marked in a deposition,

6    since Plaintiff uses numbers anyway, we just retained the

7    number given at the deposition just so there wasn't three

8    or four different numbers on these depositions when we

9    submitted them marked.

10              THE COURT:  Is that what you are doing, too?

11   It is important that we get it settled today.

12              MR. STAR:  Yes.

13              MR. LAMBERT:  I don't think there is any

14   disagreement between us.  I just wanted to make it clear

15   to the Court so when you see our exhibit list, there is

16   not a Plaintiff's Exhibit 1, for example, because

17   Deposition Exhibit 1 isn't one that we plan to use.  So I

18   think our exhibit list starts with 3 and jumps around a

19   little bit rather than going sequentially 1, 2, 3, 4.

20              THE COURT:  You will have to explain that to

21   the jurors.  The jurors want to know what happened to 2,

22   where is 1?

23              MR. MILLER:  We understand that, your Honor.

24   We have agreement, there is going to be a lot for this

25   jury to digest, and I think we are in complete agreement

1    it is preferable to continue to use the deposition

2    numbering that we had been using starting from scratch

3    and will have to explain the gaps.

4              THE COURT:  And on exhibits, you know, we

5    need lots of copies.

6              MR. STAR:  So your Honor is clear, this is

7    something we did work out and do see eye to eye, and when

8    we got to the point of submitting the exhibit with the

9    proper labeling, we were told we need proper numbering.

10   So we have letters, but we have the actual original dep

11   numbers, so counsel for both sides understands.

12             THE COURT:  Good.

13             MR. MILLER:  And to be perfectly clear on

14   it, I think in terms of researching exhibits during the

15   trial and handing exhibits to the jury and to the Judge,

16   the numbering that we would use would be the deposition

17   numbering because it is what everyone is familiar with

18   and would be consistent with what would result in the

19   least confusion.

20             MR. LAMBERT:  In the Court's ruling on the

21   admissibility of exhibits, the Court, when they sustained

22   objections to Plaintiff exhibits referred to — and this

23   is my fault — when we filed the original exhibit list,

24   we did, indeed, get it in new numbers, and this is before

25   Mr. Star agreed to the new numbering process.

1           So our original list was 1, 2, 3, 4, 5, 6,

2     and 7, and when the Court ruled and sustained objections,

3     the Court was referring to that numbering process.  We

4     worked it out because I was able to cross reference it,

5     and we are happy to abide by the Court —

6           MR. MILLER:  And we did the same, did some

7     cross referencing, so we know with respect to your

8     Honor's rulings precisely which deposition exhibits will

9     be excluded.

10          THE COURT:  That's good.  That's good you

11    are working on that because that's the only way it will

12    work.  If we have ten jurors, we need ten copies of

13    things.

14          MR. STAR:  Is ten jurors, is that the

15    number?

16          THE COURT:  I don't know.  We can.  We can

17    have ten jurors.

18          MS. LAURDE:  Would it be helpful, your

19    Honor, for us to give you that cross reference for your

20    use as to the accuracy of the exhibit numbers admitted or

21    not based on how we marked the exhibits?

22          THE COURT:  However it is going to be when

23    we are doing the trial is what I need to know.

24          MR. LAMBERT:  We can prepare a chart so that

25    we are all clear as to what's been excluded and what's

1    not because when you say Exhibit 1 has been excluded

2    right now, there is no Exhibit 1, so that should be

3    easy.

4                THE COURT:  The joint statement of the case,

5    are we going to have a joint statement of the case from

6    the two of you?

7                MR. LAMBERT:  We submitted that in October.

8                THE COURT:  We have that.  Sorry.

9                MR. STAR:  I believe — I think it was part

10   of a larger document we put in as a joint statement.  The

11   joint statement itself was fairly brief.

12               THE COURT:  Should be.  We are going to need

13   final witness lists from each side and detail who is

14   going to come in live and some come in some other form.

15   If it is videotape, you need to work with my staff to

16   make sure all the equipment is here.

17               We have all the equipment, and sometimes it

18   is in another building, and we have to get it and bring

19   it over.

20               MR. LAMBERT:  We can file ours today, your

21   Honor.

22               MR. CARNEY:  And certainly, our list is

23   reduced by four since they are going to be called in

24   Defendant's case.  And those individuals, so it is clear

25   on the record — excuse me — I guess it is only two

1    witnesses?

2                    MR. LAMBERT:  Is that correct?

3                    MR. CARNEY:  Mehnert-Meland and Krause will

4    be called in our case.

5                    MS. LAURDE:  You have it in reverse.

6                    MR. CARNEY:  I apologize.

7                    THE COURT:  I have Mr. Mehnert.

8                    MS. LAURDE:  Mr. Mehnert-Meland and

9    Mr. Krause.  We will examine them in the Defendant's

10   case.

11                   MR. LAMBERT:  And my understanding Mr. DeBoe

12   and VanLeuwen will be available in our case.

13                   MR. STAR:  And they are out of towners, so

14   we need to know when you will need them available.

15                   THE COURT:  Okay.  Somebody asked me because

16   there are other cases we have, how long is this case

17   going to be?  How long is your presentation going to

18   take, how many days, do you know?  It doesn't have to be

19   exact.

20                   MR. MILLER:  Can you give us a sense of what

21   hours you would like to keep?

22                   THE COURT:  It says the jury sits from 9:00

23   to 4:00, 9:00 to 4:00, and the courtroom opens to the

24   parties at 8:00, 8:15 in the morning.

25                   MS. LAURDE:  Your Honor, I believe we will

1    require — I believe it will take two weeks for our case.

2    I mean, I am assuming we will have the first day would be

3    jury selection, we would have openings, and perhaps start

4    the first witness on the second day and proceed from

5    there, but I think for us it will take for the witnesses

6    alone probably eight full days.

7                THE COURT:  How about you, what is you

8    thinking?  It is important to do this simply because

9    there are bunches of other trials that we have here.

10               MR. STAR:  Our expectation would be our case

11   would be less than a week.

12               THE COURT:  Okay.  So a three-week trial.

13   Is that right?  I mean not talking about the jury and how

14   long they take.

15               MS. LAURDE:  Right.  I think that's correct,

16   your Honor.

17               MR. MILLER:  Just to be clear, your Honor,

18   obviously no one can predict what's actually going to

19   happen.

20               THE COURT:  That's true.

21               MR. MILLER:  And I hope and expect the

22   Plaintiff's case will go quicker, and it is likewise

23   possible our case could take longer.

24               THE COURT:  That's always true, but it helps

25   if we know.

1          MR. CARNEY:  Yeah.  And a lot of it is

2   based on, we don't know how long your cross-examinations

3   of our witnesses will be and — I mean, that's always an

4   issue.

5          THE COURT:  I am trying to figure this out,

6   and I don't want it to be in the middle of your trial,

7   but we can make it.  Okay.  So maybe a four-week trial

8   at the most.  I know the jury can take a long time,

9   too.

10         MS. LAURDE:  I think that's correct, your

11  Honor.

12         Your Honor, again, this is sort of a

13  logistical question:  Some of our exhibits are pretty

14  voluminous, and I know that we are required to produce a

15  binder set for each juror.  Does it make sense to just

16  have some of those copies available or have them

17  available on disk or in some other way because some of

18  them are fairly lengthy, and I am just not certain how

19  you have dealt with that in the past with regards to

20  large exhibits.

21         THE COURT:  We really leave it up to you.

22  You have to think carefully how much a juror is going to

23  deal with them, what they need, and the fact that they

24  also have another life outside of the courthouse.  So you

25  don't want to overwhelm the them.  So I can't really help

1    you much with that.  We will stack up the binders, and to

2    the extent you are using other equipment, we will make it

3    available to them.

4                  We do allow our jurors to take notes, and

5    they take good notes.  Some of them draw a lot of

6    pictures.  The daily schedule, did I go over that, 9:00

7    to 4:00, one our for lunch?  We have witness rooms on

8    this floor and have a lot of space, and you are able to

9    use some of those witness rooms, so they become

10   accessible at 9:30 in the morning — no, 7:30 in the

11   morning.

12                 MR. MILLER:  Are there more than one of

13   them, your Honor?

14                 THE COURT:  Yes.  We have a bunch of rooms

15   and can give each of you one room.

16                 MR. MILLER:  And we can keep stuff in

17   there?

18                 THE COURT:  Yes.  Well —

19                 MR. MILLER:  Paper?

20                 THE COURT:  Can they leave stuff?  They said

21   no, because the concern is no one can tell you whether it

22   will be there when you come back.

23                 LAW CLERK:  I don't believe we have keys

24   to those rooms, so they may not be secure, not that

25   people are raiding the federal courthouse for lots of

1    documents.

2              THE COURT:  But there are lots of other

3    things that go on that have nothing to do with the

4    courts.  So we really can't keep things locked up for

5    you.  It is tough.  That's the way it is.  We can show

6    you witness rooms before you leave today.  No cellphones

7    in here.  They have to be turned off anyway.  The

8    cellphones have to be turned off when you are in the

9    courtroom.

10             We ask on voir dire, we ask prospective

11   jurors standard questions, and we also permit case

12   specific questions if you want to provide them to me.

13   Sometimes lawyers ask follow-up questions.  It just

14   depends on how it is all going.

15             MR. STAR:  Your Honor, I think we did both

16   provide voir dire questions.

17             THE COURT:  Yeah.  And, you know,

18   prospective jurors can be stricken for cause.  And we use

19   what we call the informed strike method of actually

20   deciding peremptories.

21             MR. MILLER:  Can you explain so we are

22   clear?

23             THE COURT:  We have three peremptory

24   strikes, and you each get three, and they take three,

25   yeah.  So issues arise all the time in trials, and we try

1    to do most of them at the end of the day or when we have

2    a break, and we do have breaks during the day.  But when

3    there is an issue arising, it is important that you do it

4    in the kind of way — you are all seasoned lawyers, and

5    you don't want to disrupt the jury or make them think you

6    are doing secret things on the side.  We don't do bench

7    conferences at all when the jury is in the box, and we

8    allow our jurors to take notes.

9              This is a rule that you need to know about.

10   The parties and lead counsel of record should be advised

11   that the Court, pursuant to one of our rules so we have

12   to follow it, will assess parties or counsel with the

13   cost of one day's attendance of jurors if the case is

14   settled after the jury has been summoned.  The deadline

15   for calling off the jury is 6:00 p.m. on the evening

16   before trial.  So if you settle your case at 6:15,  you

17   are in trouble.

18             Opening statements, you are fine.  One of

19   the most common complaints the jurors give judges is that

20   lawyers ramble on and on in opening statement.  People

21   who come down here, leaving all their work and are

22   sitting in that box, want to get the jury trial going.

23             So I am just telling you that, that they

24   will be happy to listen, but that's one of the complaints

25   we get, is that it just goes on and on.  The lawyer just

1   talked and talked.  We want the trial to start.

2                   MR. STAR:  Does your Honor want to put a

3   limit on that?  We would be okay with that.

4                   THE COURT:  No.  You are all good lawyers.

5                   We can't store anything in the courtroom.

6   You need to keep your home and cellphone numbers

7   available, and we will give you some numbers to call in

8   case something comes up, and we have to notify you

9   quickly.

10                  MR. MILLER:  As long as we can give you our

11  hotel numbers because if the bell rings at my house and

12  one of my kids pick it up —

13                  THE COURT:  It has happened.  Yeah, we have

14  had to chase people down.

15                  It is late to talk about settlement, but it

16  is always an option, and I want to remind you of that,

17  that it is always an option, and sometimes it happens

18  that just after we have gone through all kinds of things

19  and impaneled a jury, suddenly something happens, a fact

20  out there, and you can settle the case.  And if you want

21  to do it, doing worry about it just because we have

22  impaneled a jury or did other things because it stays an

23  option.

24                  If you reach a settlement after 6:00 p.m. on

25  Sunday, you are going to be assessed the cost of one

1    day's attendance of the jury.  So this is not a very

2    complicated case.  It is an interesting case, and it

3    matters a lot to the people in it, and you haven't been

4    able to settle it.

5            You are a very good group of lawyers, and I

6    am still hopeful somewhere along the way you might be

7    able to, but I know once you get geared up to go to trial

8    it is hard, but you can do it even during the

9    presentation of the case.  Just always keep it in the

10   back of your minds.

11           MR. STAR:  Your Honor, I have — I'm sorry.

12           THE COURT:  No.  I am waiting for questions.

13           MR. STAR:  Just a couple of other

14   housekeeping items.  The schedule we have heard about

15   gives us a potential problem with our liability expert,

16   Mr. Hilliard.  He is actually with his wife scheduled to

17   go in the middle of the first week in March to Haiti for

18   a relief effort.  I need to find out when he can come

19   back and could discuss his testimony.

20           THE COURT:  Well, do you understand when

21   he'll be back?

22           MR. MILLER:  When we thought the trial would

23   be two weeks or less, our point was we wanted to fit him

24   in before he left on the 5th.

25           THE COURT:  Right.

1          MR. MILLER:  We never figured out when he

2     was planning on returning, and it might be able we can

3     fit him in after he returns.  If that's not possible, we

4     may have to take a break and wait for Hilliard to return.

5     He leaves on the 5th.

6          THE COURT:  I have to be in Europe at a

7     certain time, so I am going to get that date for you,

8     too.  If we start squeezing it toward a later date, I am

9     going to run into that, but I can't remember the exact

10    day.

11         MR. STAR:  Would you like me to wait for the

12    law clerk to come back?

13         THE COURT:  It doesn't matter.

14         MR. STAR:  A couple of document issues.

15    There are — and I am going to talk with counsel — but I

16    wanted to make your Honor aware, and we can submit these,

17    there are some key conversations that are alleged to have

18    happened back in 2003 between Mr. Reidl and Mr. Antonio,

19    and as far as the document production that goes back

20    years ago, we have handwritten notes from both

21    individuals from those particular meetings.

22         Neither party actually put them in as

23    exhibits, and we think they ought to come in.  They are

24    the notes these people took from those conversations.

25    The jury is going to hear about those conversations.

1          I will talk with opposing counsel whether

2    they have objection to any of them, and then we can

3    deal with that, but I think they are probably

4    unobjectionable.

5                THE COURT:  Okay.

6                MS. LAURDE:  Your Honor, until we see them

7    certainly, but you know, obviously, the deadline for

8    identifying any of these documents has long since passed.

9    But we will take a look at those notes.

10               THE COURT:  Okay.

11               MR. STAR:  Another issue, your Honor,

12   involved documents, e-mails specifically that were

13   generated between Hodell and subsequent ERP providers

14   currently called Activan, a program called Product 21.

15   As it turned out, this issue in these particular

16   documents were part of a motion in limine that Hodell had

17   filed, and we responded to it and your Honor denied that

18   motion in limine.

19               Then, in the course in doing the exhibit

20   lists, we, of course, listed these exhibits.  That was

21   the genesis of their motion in limine, and they put in

22   their objections, and we put in our response.  What we

23   didn't put in our response was that this was subject to a

24   pending motion in limine, which by the time your Honor

25   ruled on the actual exhibit objections, you had already

1     denied their motion in limine.

2            I wanted to get clarification because it

3     seemed inconsistent, and these documents are very

4     important to our case.  They go to a variety of

5     substantive issues, mostly causation with respect

6     specifically to the damages theory that we think Hodell

7     is coming forward with, and I can identify those

8     particular documents.

9            They were deposition exhibits 325, 326, 327,

10    then also Exhibit 275, 277, those were the main five we

11    really were concerned about and Hodell's motion dealt

12    with — pardon me — also dealt with — let me just read

13    them again, pardon me:  Exhibits 273, 274, 275, 276, 277,

14    278, 279, 280 and 325, 326, and 327.

15           MR. MILLER:  Just to be clear, the ones that

16    Mr. Star listed, the five was the five that we would like

17    to introduce notwithstanding your Honor's ruling on the

18    exhibits, so we can proceed consistent with your Honor's

19    ruling of the motion in limine motion.  What Mr. Star was

20    reading from was the entire list that set forth in the

21    motion in limine.

22           MR. STAR:  Let me get that again because we

23    got a little confused there.

24           MR. LAMBERT:  I am confused.

25           THE COURT:  Yeah.

1              MR. STAR:  So Hodell filed a motion in

2    limine based on those exhibits that I just rattled off.

3    They deal with Hodell's subsequent implementation of

4    software through a company called Activan for a program

5    called Product 21.  Your Honor denied their motion in

6    limine, and all of those exhibits were ruled upon on the

7    exhibit list separately.  And after the denial of the

8    motion in limine and your Honor struck all the exhibits

9    when ruling on the exhibit list, and the most important

10   of those exhibits in our view are 325, 326, 327, 275, and

11   277.

12             So we wanted to just get clarification as to

13   whether — as to what actually is the status of these

14   documents and go from there.

15             THE COURT:  I would have to go back from

16   there, and I can't off the top of my head, but I did

17   write down the numbers.  I have the numbers you gave

18   me.

19             MR. LAMBERT:  I don't have the Court's

20   ruling in front of me.  If those were stricken, then our

21   position is that they were — if the objection to those

22   documents were sustained, then my understanding is those

23   documents would not come in.  The reason that we objected

24   to them and separate and apart from the motion in limine,

25   but they are just simply not relevant to the case.

1          And I believe that's why the Court excluded

2    them.  They also excluded the testimony — the Court also

3    excluded the testimony of Mr. Sheldon on this same topic.

4    It concerns the implementation of a completely different

5    piece of software after the failure of the software that

6    we are here about today.

7          And if we are going to get into the

8    particulars of that, then we will be trying two cases

9    because then we have to start doing a trial within a

10   trial without subsequent implementation that it is part

11   of this lawsuit, frankly.  So that's why those documents

12   are objected to and more than likely why the Court

13   sustained those objections.

14          MR. STAR:  So all of what Mr. Lambert just

15   said was exactly what Hodell argued in its motion in

16   limine at the time.  The issue is not that we want to go

17   into exploring subsequent ERPs implementation.  We do not

18   intend to do that.

19          The issue of these documents goes directly

20   to the element whether, the issue of whether — Hodell is

21   right when it says that SAP caused it harm and whether as

22   Hodell says SAP caused Hodell to have major productivity

23   losses.

24          One of the documents, your Honor, Exhibit

25   325, is an e-mail from Kevin Reidl, Hodell's president,

1    to Activan, a subsequent provider, and he tells them our

2    business is off — this is September 2009 — our business

3    is off 25 percent, but our headcount is up since we went

4    live on Product 21.  Any efficiency we had has vanished

5    with the implementation of this software.

6              It goes on, and there are other documents

7    that go to the same issue.  Kevin Reidl, again, December

8    19, 2009, so a few months after this, he tells Product 21

9    and Activan, we are now at historical low levels of

10   productivity since going live with this software on April

11   1st, 2009.

12             So all the documents speak to this issue,

13   and they are very important to us as part of our case,

14   and there are documents that we want to be able to

15   discuss and a topic we want to talk about in our opening,

16   and this really was dealt with when your Honor ruled on

17   the motion in limine and denied it.

18             THE COURT:  I think so.

19             MR. LAMBERT:  All this is going to do is

20   confuse the jury.  This is not a separate software

21   implementation.  Even if the jury were to accept SAP's

22   portrayal of those e-mails, it doesn't have any ability

23   to prove or disprove whether SAP's software also caused

24   productivity loss, which is admitted throughout SAP's

25   e-mails.

1          So all SAP is proving is that another

2    software may have also contributed to productivity losses

3    outside the damage period, outside the period we are

4    claiming productivity losses for.  So it is simply not

5    relevant to the case.

6              MR. CARNEY:  And that's why you excluded

7    them.

8              MR. MILLER:  Your Honor, if I may, I won't

9    respond to the last comment, but I will say when the

10   objection was made to the exhibits, it was not confirmed

11   with your Honor that you had already denied the motion in

12   limine, which may have avoided all of this confusion in

13   the first place.

14             But going to the issue that Mr. Lambert

15   addressed, one of the points that we will be making in

16   this case is that business — there is a causation issue

17   fundamentally here, and one of the issues we will be

18   making in the case, notwithstanding all of the protests

19   of the Plaintiff, the business worked and worked for two

20   years, and they could test that.

21             And it will be relevant to show that when

22   they switched off what we say worked, things got much

23   worse because what they had before was actually pretty

24   good, and they can argue all they want, but that's

25   relevant and material evidence.  And it relates to other

1    points that will come up shortly having to do with

2    causation, because our fundamental point was the Business

3    One worked, but even if it didn't, the problems that you

4    did experience when you say you had to limp along for

5    those two years were caused by the add-on, radio beacon,

6    the add-on, the mistakes they made in testing the system,

7    and the mistakes they made when they did go live because

8    they didn't run a parallel system.

9              So all of this is relevant to all the facts

10   and circumstances regarding the fundamental inquiry.  The

11   Business One worked like we say, and if it didn't, what

12   was the problem?  Or if Business One wasn't perfect, is

13   that what was fundamentally causing the problem?

14             THE COURT:  You need to save these remarks

15   for the jury.  So I think you know pretty much where we

16   are and when we are going to start up and how long we

17   will go.  How long can we go?  We have a six-week window,

18   no problem.

19             MS. LAURDE:  We certainly ——

20             THE COURT:  You couldn't keep a jury for six

21   weeks.  Okay.  All right.  We will look forward to having

22   you all in front of us.  You are familiar with the place.

23   We will give you —— my clerk can take you around and show

24   you the various spaces.  You know, there is a wonderful

25   jury room back there for our jurors, and we will look

1    forward to this trial.  It is an interesting case.  It is

2    too bad it couldn't get resolved.  I really thought maybe

3    you would be able to find a resolution.

4              You know better than I do what was the

5    reason why you couldn't have a resolution, but whatever

6    it was, we will go forward and get the trial, and all

7    these folks will come in from the farms and the cities in

8    Northern Ohio, and to the extent you can maintain their

9    attention, you are all good lawyers, I think you will, we

10   will see what they decide.

11             MR. STAR:  Before we close for the day, your

12   Honor, if you would like to speak with the parties

13   separately about the settlement issues, we would be more

14   than happy to do that.

15             THE COURT:  It would be an important thing

16   to do.  I don't want to — I have the time.  I will make

17   the time to work with you.

18             MR. STAR:  We as well.

19             THE COURT:  So I think it would be a good

20   idea.  What I would suggest is my clerk will show you

21   some spaces that are good to work in.  We resolve an

22   awful lot of cases and for good reason that they should

23   be resolved, but sometimes you can't do it until

24   everybody has had a chance to look at everything in the

25   case.  But you have got a lot of sensible people here.

1    You have done a very good job of presenting the sides of

2    the case to me.  I like it.

3              I think you are doing good job, and I think

4    you would have an interesting time with the jury, but

5    remember the jury you will get is in the top half of

6    Ohio.  The lawyers need to think about that hard because

7    this is not the kind of case that is going to fascinate

8    people.  It is very important to those sitting in the

9    room, but if you can work something out today, I will

10   stay here and help you.  But first, you need to decide

11   whether you are really ready to do that.

12             You have certainly given me enough

13   information for the trial to go forward.  Okay?  All

14   right.  So you will find a good place for them to work.

15   You may want to talk with each other before you talk to

16   us.  Talk to your own folks about it.

17             (Adjourned at 12:02 p.m., and further

18   discussion was held off the record.)

19                       - - - - -

20

21

22

23

24

25

1              <u>C E R T I F I C A T E</u>

2              I, George J. Staiduhar, Official Court

3     Reporter in and for the United States District Court,

4     for the Northern District of Ohio, Eastern Division,

5     do hereby certify that the foregoing is a true

6     and correct transcript of the proceedings herein.

7

8

9

10              <u>s/George J. Staiduhar</u>
               George J. Staiduhar,
11             Official Court Reporter

12             U.S. District Court
               801 W. Superior Ave., Suite 7-184
13             Cleveland, Ohio 44113
               (216) 357-7128
14

15

16

17

18

19

20

21

22

23

24

25