# EXHIBIT 1

Neutral
As of: May 15, 2015 9:39 AM EDT

# United States v. Kerley

United States Court of Appeals for the Sixth Circuit

October 7, 2014, Argued; April 23, 2015, Decided; April 23, 2015, Filed

File Name: 15a0077p.06

Nos. 13-5821/5931

**Reporter**
2015 U.S. App. LEXIS 6723; 2015 FED App. 0077P (6th Cir.)

UNITED STATES OF AMERICA

**Prior History:** [*1] Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville. No. 3:10-cr-00169--Thomas W. Phillips, District Judge.
United States v. Whaley, 2012 U.S. Dist. LEXIS 160222 (E.D. Tenn., Nov. 8, 2012)

## Core Terms

district court, lenders, funds, money laundering, buyers, loans, sentence, deposit, mortgage, transactions, underwriting, disbursement, convictions, wire fraud, lending, cashier's check, summaries, exhibits, argues, financial institution, lay opinion testimony, particularized, restitution, collateral, guidelines, borrowers, witnesses, straw, reliability, fraudulent

## Case Summary

### Overview

HOLDINGS: [1]-Bank employees were properly allowed to offer lay opinions concerning the effect that knowledge of defendants' mortgage fraud scheme would have on lending decisions since their experience and knowledge of lending guidelines, policies, and procedures were properly applied to loan documents, and the employees were not required to be personally involved in the underlying loan transactions; [2]-A defendant's statement implicating a co-defendant was properly excluded since the statement was inadmissible hearsay, did not comply with the rule of completeness, and did not prevent the defendant from presenting a defense; [3]-The calculation of loss for sentencing purposes was properly based on the difference between the amount of loans and the amount eventually recovered by sales of properties, with no credit for the banks' credit bids at foreclosure sales.

### Outcome

Convictions and sentence affirmed.

## LexisNexis® Headnotes

Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > Evidence

Evidence > Admissibility > Procedural Matters > Rulings on Evidence

*HN1* An appellate court reviews a district court's evidentiary rulings for abuse of discretion, and will reverse only where the district court's erroneous admission of evidence affects a substantial right of the party.

Evidence > Admissibility > Expert Witnesses

Evidence > ... > Testimony > Expert Witnesses > General Overview

*HN2* See Fed. R. Evid. 702.

Evidence > ... > Lay Witnesses > Opinion Testimony > General Overview

*HN3* A witness may offer a lay opinion that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Fed. R. Evid. 702. Fed. R. Evid. 701.

Evidence > Types of Evidence > Documentary Evidence > Summaries

Case: 1:08-cv-02755-DCN Doc #: 314-1 Filed: 05/15/15 3 of 16. PageID #: 15997

Page 2 of 15
2015 U.S. App. LEXIS 6723, *1; 2015 FED App. 0077P (6th Cir.), **Cir.)

**HN4** Secondary-evidence summaries are a hybrid of summaries admitted under *Fed. R. Evid. 1006* and pedagogical-device summaries. They are not prepared entirely in accordance with *Rule 1006* but are more than mere pedagogical devices. In other words, secondary-evidence summaries are admitted in evidence not in lieu of the evidence they summarize but in addition thereto, because in the judgment of the trial court such summaries so accurately and reliably summarize complex or difficult evidence that is received in the case as to materially assist the jurors in better understanding the evidence.

Criminal Law & Procedure > ... > Standards of Review > De Novo Review > Conclusions of Law

Constitutional Law > ... > Case or Controversy > Constitutional Questions > General Overview

**HN5** Where a defendant frames an issue as a violation of a constitutional right, an appellate court's review is de novo.

Constitutional Law > ... > Fundamental Rights > Criminal Process > General Overview

Criminal Law & Procedure > Defenses > Right to Present

**HN6** Whether rooted directly in the *Due Process Clause of the Fourteenth Amendment* or in the Compulsory Process or *Confrontation Clauses of the Sixth Amendment*, the U.S. Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. Even so, a defendant does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence. Unless the particular rule of evidence serves no legitimate purpose or is disproportionate to the ends that it is asserted to promote, a trial court's application of the rule to exclude defense evidence will not offend the Constitution. Exclusion of evidence is unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused. Thus, erroneous evidentiary rulings rarely constitute a violation of a defendant's right to present a defense.

Criminal Law & Procedure > Trials > Motions for Acquittal

Criminal Law & Procedure > ... > Standards of Review > De Novo Review > Sufficiency of Evidence

**HN7** An appellate court reviews de novo a district court's denial of a motion for judgment of acquittal.

Criminal Law & Procedure > ... > Standards of Review > De Novo Review > Sufficiency of Evidence

**HN8** In reviewing the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The defendant's burden is a very heavy one. The reviewing court must draw all available inferences and resolve all issues of credibility in favor of the jury's verdict.

Criminal Law & Procedure > ... > Fraud > Wire Fraud > Elements

**HN9** A conviction for wire fraud under *18 U.S.C.S. § 1343* requires the government to prove three elements beyond a reasonable doubt: (1) the defendant devised or willfully participated in a scheme to defraud; (2) the defendant used or caused to be used an interstate wire communication in furtherance of the scheme; and (3) the defendant intended to deprive a victim of money or property.

Criminal Law & Procedure > ... > Fraud > Fraud Against the Government > General Overview

**HN10** The elements of bank fraud under *18 U.S.C.S. § 1344* are: (1) the defendant knowingly executed or attempted to execute a scheme to defraud a financial institution; (2) the defendant had an intent to defraud; and (3) the financial institution was insured by the Federal Deposit Insurance Corporation. Intent to defraud means to act with intent to deceive or cheat for the purpose of causing a financial loss to another or bringing about a financial gain to oneself.

Criminal Law & Procedure > ... > Racketeering > Money Laundering > Elements

**HN11** *18 U.S.C.S. § 1957* defines money laundering as a monetary transaction in criminally derived property derived from specified unlawful activity. *18 U.S.C.S. § 1957(a)*. The term criminally derived property is defined as any property constituting, or derived from, proceeds obtained from a criminal offense. *18 U.S.C.S. § 1957(f)(2)*. Because money laundering is a separate offense from the underlying predicate offense, the primary issue in a money laundering charge involves determining when the predicate crime becomes a completed offense after which money laundering can occur. The government must show that the criminally derived funds are derived from an already completed

Case: 1:08-cv-02755-DCN Doc #: 314-1 Filed: 05/15/15 4 of 16. PageID #: 15998

Page 3 of 15
2015 U.S. App. LEXIS 6723, *1; 2015 FED App. 0077P (6th Cir.), **Cir.)

offense, or a completed phase on an ongoing offense. In determining whether the government has proven a distinct predicate offense, a court should consider the government's theory of the case, as alleged in the indictment.

Criminal Law & Procedure > ... > Racketeering > Money Laundering > Elements

Criminal Law & Procedure > Accessories > Aiding & Abetting

*HN12* To convict a defendant of aiding and abetting money laundering, the government is required to show beyond a reasonable doubt that he acted with the specific intent to facilitate the money laundering.

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

*HN13* An appellate court affirms if the evidence, viewed in a light most favorable to the government, permits a rational juror to find the crime's essential elements beyond a reasonable doubt.

Criminal Law & Procedure > ... > Appeals > Standards of Review > De Novo Review

Criminal Law & Procedure > ... > Appeals > Standards of Review > Abuse of Discretion

Criminal Law & Procedure > Sentencing > Appeals > Proportionality & Reasonableness Review

Criminal Law & Procedure > Sentencing > Restitution

Criminal Law & Procedure > Sentencing > Sentencing Guidelines > General Overview

*HN14* An appellate court reviews criminal sentences for both procedural and substantive reasonableness. The appellate court reviews for procedural reasonableness to ensure that the district court did not commit significant procedural error such as failing to calculate (or improperly calculating) the U.S> Sentencing Guidelines Manual range, treating the Guidelines as mandatory, failing to consider the *18 U.S.C.S. § 3553(a)* factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence. The district court's interpretation of the advisory Guidelines is reviewed de novo, and its findings of fact are reviewed for clear error. As for substantive reasonableness, the appellate court reviews the amount of restitution for abuse of discretion. An abuse of discretion occurs when a ruling is based on an error of law or a clearly erroneous finding of fact, or when the reviewing court is otherwise left with the definite and firm conviction that the district court committed a clear error of judgment.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

*HN15* In mortgage fraud cases, the court follows a two-step approach in determining loss. First, under *U.S. Sentencing Guidelines Manual § 2B1.1*, the court must use the greater of actual or intended loss. Actual loss will usually be the appropriate measure in mortgage fraud cases involving straw buyers. Default by a woefully unqualified home-loan borrower is so likely that the pecuniary harm will almost invariably include the full amount of unpaid principal on the fraudulently obtained loan. In the second step, the district court must reduce the loss by the amount of money the victim recovered by selling the collateral, or the fair market value of the property at the time of sentencing if the victim has not disposed of the collateral.

Criminal Law & Procedure > Sentencing > Sentencing Guidelines > General Overview

*HN16* See *U.S. Sentencing Guidelines Manual § 2B1.1*, cmt., application n. 3(E)(ii).

**Counsel:** ARGUED: James R. Stovall, RITCHIE, DILLARD, DAVIES & JOHNSON, P.C., Knoxville, Tennessee, for Appellant in 13-5821. Andrew B. Greenlee, BROWNSTONE, P.A., Winter Park, Florida, for Appellant in 13-5931. Francis M. Hamilton III, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

ON BRIEF: James R. Stovall, Wade V. Davies, RITCHIE, DILLARD, DAVIES & JOHNSON, P.C., Knoxville, Tennessee, for Appellant in 13-5821. Andrew B. Greenlee, Patrick Michael Megaro, BROWNSTONE, P.A., Winter Park, Florida, for Appellant in 13-5931. Francis M. Hamilton III, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

**Judges:** Before: BOGGS and COOK, Circuit Judges; and QUIST, District Judge.*

**Opinion by:** QUIST

---

* Honorable Gordon J. Quist, Senior United States District Judge for the Western District of Michigan, sitting by designation.

Case: 1:08-cv-02755-DCN Doc #: 314-1 Filed: 05/15/15 5 of 16. PageID #: 15999

Page 4 of 15
2015 U.S. App. LEXIS 6723, *1; 2015 FED App. 0077P (6th Cir.), **Cir.)

# Opinion

[**2] QUIST, District Judge. Defendants-Appellants Jerry D. *Kerley* and Jeffrey Whaley were convicted following a jury trial in the Eastern District of Tennessee of conspiracy to commit wire fraud affecting a financial [*2] institution and bank fraud, wire fraud affecting a financial institution, bank fraud, making a false statement to a financial institution, and money laundering, all arising out of a mortgage fraud scheme. *Kerley* and Whaley appeal their convictions, arguing that the district court committed evidentiary errors. *Kerley* separately argues that there was insufficient evidence to support his money laundering conviction and that his sentence was procedurally and substantively unreasonable. Whaley separately argues that the district court's refusal to sever his trial resulted in a denial of his constitutional right to present a defense and that there was insufficient evidence of his intent to defraud. For the following reasons, we affirm the convictions and *Kerley*'s sentence.

## I. FACTS AND PROCEDURAL HISTORY

In August 2005, Kenneth Lee, a contractor who built houses in the Sevierville, Tennessee area, owed a substantial debt to Jeff Whaley, a contractor and real estate developer who also did business in the Sevierville area, for loans that Whaley had made to Lee to finance houses that Lee was building. Whaley proposed a scheme to Lee that would allow Lee to repay Whaley and other investors in [*3] Lee's projects and to obtain funds to operate his business. Whaley told Lee that they could "milk[] down" the equity in high-priced cabins that Whaley and his sister, Joyce Whaley, had built in the Black Bear Ridge Resort by recruiting individuals to act as straw buyers in sham purchases of the properties.

Pursuant to this arrangement, Lee recruited straw buyers for eight transactions occurring over several months in late 2005 and early 2006. At Whaley's suggestion, Lee referred the straw buyers to Mary Bevins, a mortgage broker at Gateway Mortgage, with whom Whaley and his sister had dealt in previous real estate transactions. For each transaction, the Whaleys prepared the purchase agreement and set the purchase price without input from or negotiation by the straw [**3] buyer. Bevins used this information to prepare loan applications that falsely inflated the buyers' incomes and assets and falsely stated that they would be bringing their own funds to closing, and submitted the papers to SunTrust Mortgage and Citizens Bank.[1]

At Whaley's direction, Bevins arranged for all of the closings to be conducted by *Kerley*'s title company, Guaranty Land Title (GLT), which the Whaleys had used for many of their previous real estate transactions. GLT employees prepared the closing documents, including the HUD-1[2] settlement statements, pursuant to SunTrust's and Citizens's closing instructions, and sent the documents to the lenders for approval. Although none of the buyers brought their own funds to the closings, *Kerley* signed the final HUD-1 forms that GLT returned to SunTrust and Citizens. Each HUD-1 form indicated on Line 303 that the purchaser had brought his or her own funds to the closing and confirmed that the representations therein were "a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction."

In each transaction, *Kerley* determined or approved how the HUD-1 Line 303 [*5] cash-from-borrower amount would be satisfied. For the transactions involving 1230 Bird Nest Way, 1437 Eagle Cloud Way, 1518 Firefly Trail Way, and 1234 Bird Nest Way, *Kerley* instructed his employee, Gina Hurst, to reduce the actual disbursement of the amount shown on the HUD-1 as going to Whaley's company, GBO Enterprises (GBO), by the cash-from-borrower amount stated on Line 303.

The cash-from-borrower requirement for the 1016 Black Bear Cub Way transaction was handled in a different manner. In that transaction, the buyer, Rodney Parton, brought a check from Lee's company, Regency Development, LLC, that Lee had given to him to take to the [**4] closing.[3] *Kerley* was present at the time Parton provided the Regency check, and had previously

---

[1] Lee persuaded his employees and their relatives, a family friend, and his grandmother to serve as buyers in the transactions by lending their credit, even though none [*4] of them had the financial wherewithal to make the mortgage payments.

[2] "The Housing and Urban Development-1 ('HUD-1') statement is a settlement form used in closing a property sale; it details the costs and fees associated with a mortgage loan." *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1319 n.2 (11th Cir. 2008).

[3] Lee began doing business as Regency Development, LLC, after running into financial trouble with lenders. Lee concealed [*6] his involvement with Regency from banks and others by listing his employee, Ed Walker, as the owner.

told Whaley that Lee could bring a business check to closing. When it turned out that the Regency account did not have sufficient funds to cover the check, Lee stopped payment and Whaley replaced the Regency check with a cashier's check drawn on his GBO business account at Tennessee State Bank, payable to GLT and showing Parton as the remitter.

The cash-from-borrower requirement for two other transactions, 1531 Trappers Ridge Lane and 954 Black Bear Cub Way, was satisfied in yet another manner—from pre-closing disbursements of SunTrust escrow funds. The HUD-1 for the 1531 Trappers Ridge Lane sale, which was Whaley's own property, required the buyer to bring $38,755.11 of his own funds to closing and showed that $99,350 was to be disbursed to Regency. Prior to the closing, GLT issued a check to Regency in the amount of $99,350. Whaley picked up the check from GLT, had Lee's employee, Ed Walker, endorse it, and deposited it into his GBO bank account. Whaley then obtained two cashier's checks from his GBO account, one payable to GLT in the amount of $38,755.11, showing Ed Walker as the remitter, and the other payable to Regency in the amount of $60,594.89. Whaley delivered the $38,755.11 cashier's check to GLT. The 954 Black Bear Cub Way transaction had a more complicated structure, but employed a similar method of satisfying the Line 303 cash-from-buyer requirement.

The final transaction, involving 3515 Peggy Lane, was structured [*7] as a property "flip" consisting of two simultaneous sales. In the first sale, Diane Koch sold the property to Lee's employee, Ed Walker, for $280,000. In the second sale, Walker sold the property to William Hasket, another employee of Lee, for $385,000. The Koch-Walker sale was not disclosed to SunTrust Mortgage. Prior to the closing, a warranty deed that *Kerley* drafted, conveying the property from Koch to Walker for $280,000, was filed with the Sevier County Register of Deeds. At the time, no money had been exchanged between Koch and Walker because the funds from the second sale, which had not closed, were to be used to fund the first sale. Two weeks later, *Kerley* conducted the closing for the Walker-Haskett sale. The cash-from-borrower requirement was purportedly satisfied by a cashier's check for $4,544.46 drawn on Whaley's GBO account. [**5] Whaley personally requested the cashier's check and requested that Haskett be shown as the remitter. At the closing, Walker received a GLT check payable to Walker in the amount of $92,389.40. Walker later endorsed the check and gave it to Whaley, who deposited the $92,389.40 check into his GBO account.

Following the "sales," the properties went into [*8] foreclosure, and SunTrust and Citizens incurred substantial losses on the loans. Whaley, *Kerley*, Lee, and Bevins were charged with various offenses relating to the eight real estate transactions. Lee and Bevins pled guilty and agreed to cooperate with the government. Prior to trial, *Kerley* moved to sever his trial, arguing that introduction of a pre-indictment statement that Whaley made to law enforcement implicating *Kerley* would violate *Kerley*'s *Confrontation Clause* rights as set forth in *Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968)*. Whaley joined in with his own motion, arguing that severance was justified on a so-called "reverse *Bruton*" ground. That is, Whaley argued that limiting him to presenting a redacted version of his statement at a joint trial that excluded all references to *Kerley* would violate both his right to present a defense and the rule of completeness under *Federal Rule of Evidence 106*. The magistrate judge denied *Kerley*'s motion to sever after concluding that the government's proposed redactions to Whaley's statement remedied any potential violation of *Kerley*'s *Confrontation Clause* rights. He also denied Whaley's motion on the grounds that Whaley was not entitled to introduce his own hearsay statements and that the rule of completeness did not provide an avenue for the admission [*9] of such statements.

Over Defendants' objections, the district court permitted the government to call SunTrust representative Barbara DeMichele and Citizens representative Ronalda Owens to testify about the materiality of the misrepresentations at issue to their respective employers' loan approval decisions. DeMichele, a Vice President and Underwriting Manager, had worked as an underwriting supervisor at SunTrust since November 2005 and was familiar with, and had applied, SunTrust's underwriting guidelines in 2005 and 2006. Although she was not involved with the underwriting review or any other aspect of the loans at issue, DeMichele testified about the loan approval and underwriting process and about the documents contained in SunTrust's files for each of the loans in question. She confirmed that, had SunTrust known that the borrowers were not providing their own funds at closing, or that the buyers were being paid for [**6] use of their credit and had no intention of repaying the loans, SunTrust would not have approved the loans or the wiring and disbursement of the funds. Owens, a

Senior Vice President of Lending for Citizens, testified about the two loans Citizens had made. Owens explained [*10] Citizens's Correspondent Loan Purchase Agreement with SunTrust to the jury, pursuant to which SunTrust agreed to purchase loans from Citizens that met SunTrust's guidelines. Owens also noted that SunTrust could demand that Citizens repurchase a loan if SunTrust subsequently discovered a misrepresentation by the borrower in the file after the loan was sold. Although Owens was not involved in SunTrust's underwriting review process for the two loans that Citizens funded and later sold to SunTrust, she supervised Citizens's own approval process for the loans. Owens echoed DiMichele's testimony that the buyer's use of his or her own funds for the down payment is an important consideration in a loan transaction because it makes the borrower less likely to default, and she confirmed that Citizens would not have approved or funded the loans in question had it known that straw buyers were involved or that the buyers were not using their own funds.

Whaley and *Kerley* were convicted of conspiracy to commit wire fraud affecting a financial institution and bank fraud, eight counts of wire fraud affecting a financial institution, two counts of bank fraud, and two counts of making a false statement [*11] to a financial institution. In addition, Whaley was convicted of two counts of money laundering and *Kerley* was convicted of one count of money laundering. They were sentenced to 60 months and 48 months imprisonment, respectively, and ordered to pay $1,901,980.31 in restitution.

## II. ANALYSIS

### A. EVIDENTIARY ISSUES

Defendants argue that the district court erred in admitting certain testimony as lay opinion testimony and in admitting the government's secondary-evidence summaries and its summary witness's testimony regarding those exhibits. *HN1* This court reviews a district court's evidentiary rulings for abuse of discretion, and will "reverse only where the district court's erroneous admission of evidence affects a substantial right of the party." *United States v. White, 492 F.3d 380, 398 (6th Cir. 2007)*.

[**7] **1. Lay Opinion Testimony**

a.

Defendants contend that the district court abused its discretion in allowing DeMichele and Owens to opine about what SunTrust and Citizens would have done had they known that the borrowers were not satisfying the cash-from-borrower requirement themselves. They argue that neither witness was personally involved in underwriting the loans at issue, and their opinions were based on technical or specialized knowledge that should [*12] have been subjected to *Federal Rule of Evidence 702*'s reliability requirements.[4] Prior to trial, Defendants filed a motion *in limine* to exclude the testimony of the lender-representative witnesses as improper lay opinion.[5] The magistrate judge denied the motion, concluding that the witnesses' proposed testimony comported with *Rule 701* because it was based on their particularized knowledge of SunTrust's and Citizens's underwriting processes and policies that

---

[4] *Federal Rule of Evidence 702* provides:

> *HN2* A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable [*13] principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

[5] The government initially identified Kimberly Blankenship, a SunTrust employee who had personal knowledge of SunTrust's underwriting requirements but was not employed by SunTrust during the relevant period, to testify as SunTrust's representative.

they had obtained through their employment with those lenders. The district court agreed with the magistrate judge, concluding that the lender representatives could testify about their investigations of the loan files and approvals and could offer opinions about how knowledge that the buyers were not using their own funds would have affected the lending decision.

**HN3** A witness may offer a lay opinion that is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of *Rule 702*." *Fed. R. Evid. 701*. Requirement (a) pertains to "first-hand knowledge or observation," and requirement (b) ensures that the proffered opinion is "helpful in resolving [**8] issues" and does not "amount to little more than choosing up sides." *Fed. R. Evid. 701* advisory committee's note (1972 Proposed Rules). Requirement (c), added by the 2000 amendment to *Rule 701*, serves [*14] to "eliminate the risk that the reliability requirements set forth in *Rule 702* will be evaded through the simple expedient of proffering an expert in lay witness clothing." *Fed. R. Evid. 701* advisory committee's note (2000). The asserted error pertains to the requirements in *subsections (a)* and *(c)*.[6]

The fact that neither witness was personally involved in the loan transactions at issue does not preclude their testimony under *Rule 701*.[7] In a number of decisions from other circuits, courts have permitted witnesses to give lay opinion testimony about a business's policies, practices, or procedures, based on an after-the-fact review or analysis of documents or facts, if the witness's testimony derived from personal knowledge gained through participation in the business's day-to-day affairs. For example, in *United States v. Munoz-Franco, 487 F.3d 25 (1st Cir. 2007)*, the First Circuit upheld the admission of testimony by a bank's former vice president of commercial lending about how a loan should have been classified under the bank's loan classification system, [*15] even though he did not remember seeing the specific loan classifications at issue during his employment with the bank, because his testimony was based on the knowledge of the bank's practices that he acquired during his employment there. *Id. at 35-36*. In *United States v. Valencia, 600 F.3d 389 (5th Cir. 2010)*, the Fifth Circuit affirmed the admission of testimony under *Rule 701* by the former chief risk officer of Dynegy regarding his analysis of Dynegy's various natural gas trading positions and how Dynegy stood to benefit from changes in published price indices. The court found a sufficient foundation for the testimony, even though the witness completed his analysis at the request of the government after he left the company, because his "knowledge and analysis were derived from duties he held at Dynegy." *Id. at 416*. Likewise, the Second Circuit has held that a witness chosen to conduct an investigation because [**9] of specialized knowledge she possesses may testify about perceptions she formed during the investigation, consisting of "investigatory findings and conclusions," within the scope of *Rule 701(a)*. *Bank of China, N.Y. Branch v. NBM LLC, 359 F.3d 171, 181 (2d Cir. 2013)*. The Second Circuit followed *Bank of China* in allowing a witness to testify about what Adelphia Communications Company's related-party-receivables balance would have been [*16] absent certain debt reclassifications, based on the witness's employment with the company, during which he was responsible for reviewing its accounting records and correcting its financial statements. See *United States v. Rigas, 490 F.3d 208, 223, 224 (2d Cir. 2007)*; see also *Burlington N. R.R. Co. v. Nebraska, 802 F.2d 994, 1004, 1005 (8th Cir. 1986)* ("Personal knowledge or perception acquired through review of records prepared in the ordinary course of business, or perceptions based on industry experience, is a sufficient foundation for lay opinion testimony.").

Here, DiMichele and Owens both had not only personal knowledge of their respective employers' underwriting and lending guidelines, policies, and procedures that were in place during 2005 and 2006, but also had experience in applying those guidelines and policies to mortgage loans during that time. They simply [*17]

---

Subsequently, the government secured DeMichele, who had been employed in SunTrust's underwriting department during 2005 and 2006 and had actual experience applying SunTrust's underwriting policies to loans during that period.

[6] Defendants apparently concede that the lender-representative witness testimony was helpful to resolving the issue of whether the false representations that the buyers were using their own funds were material to the lenders' lending decisions.

[7] In contrast to DiMichele, who was not involved at all in the SunTrust loans, Owens testified that she supervised Citizens's loan review and approval process for the two loans it made. Although there is no indication that Owens personally reviewed the loan applications and other materials prior to approval, we need not decide whether Owens's supervisory status over the Citizens loans, by itself, independently satisfies the personal knowledge requirement.

applied that experience and knowledge to their review of the loan documents. Citing United States v. Hill, 643 F.3d 807 (11th Cir. 2011), Kerley contends that the district court should not have permitted DiMichele and Owens to testify because they were not personally involved in the loans. Hill involved a mortgage fraud scheme similar to the scheme at issue here. The district court permitted lender representatives, some of whom were personally involved in the loan transactions and others who were not, to testify about whether disclosure of misrepresentations in the loan applications would have affected the decisions to approve the loans. The Eleventh Circuit held that the district court did not abuse its discretion in permitting the lender representatives who personally dealt with the fraudulent loan transactions to give such testimony. Id. at 842. On the other hand, the court stated, "[a]s for the witnesses who were not personally involved with the transactions at issue, any error in admitting their testimony was harmless." Id. The court did not expressly find error in the admission of such testimony, nor does its discussion reveal why it drew the personal-involvement distinction between the two groups of lender witnesses as a prerequisite for [*18] admission under Rule 701. Thus, as the Eighth Circuit has recently observed in a mortgage fraud case involving lender-representative testimony similar to that presented in both the instant case and Hill, "[t]he best [**10] that we can say about Hill is that it sends unclear signals on the propriety under Rule 701 of the challenged lay witness testimony in this case." United States v. Powers, 578 F. App'x 763, 771 (10th Cir. 2014). For this reason, nothing of substance in Hill undermines our conclusion that DiMichele and Owens were not required to have been personally involved in the underlying loan transactions in order to give lay opinion testimony regarding how knowledge that the buyers were not using their own funds would have affected the lending decisions.

Defendants insist that DiMichele's and Owens's testimony ran afoul of Rule 701(c) because it was expert in nature. They point out that mortgage underwriting standards and the process of applying them are subjects not familiar to the average person in everyday life, but instead require specialized training or experience that the average juror does not possess. See White, 492 F.3d at 401 ("[L]ay testimony results from a process of reasoning familiar in everyday life, whereas an expert's testimony results from a process of reasoning which can be mastered [*19] only by specialists in the field." (internal quotation marks omitted)). Defendants also contend that the nature of the testimony—based on after-the-fact investigations and responding to hypothetical "what would have happened" questions—reveals classic features of expert opinion. The government responds that, so long as the lender representatives testified based on particularized knowledge they gained from their employment with the lenders, they were not required to qualify as experts.

The Advisory Committee notes to the 2000 amendment clarify that the drafters intended to preserve the practice of treating certain testimony based on particularized knowledge gained through personal experience as lay opinion:

> For example, most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business. The amendment [*20] does not purport to change this analysis.

Fed. R. Evid. 701 advisory committee's note (2000) (citation omitted); see also United States v. Oriedo, 498 F.3d 593, 603 n.10 (7th Cir. 2007) (explaining that a business owner's knowledge of [**11] the value of his business is not "specialized knowledge" within the purview of Rule 702 because the witness "has knowledge of his own business in the particular" (italics in original)).

Although this court has thus far approved the admission of lay opinion based on particularized knowledge only in the realm of lost profits, see Lativafter Liquidating Trust v. Clear Channel Commc'ns, Inc., 345 F. App'x 46, 51 (6th Cir. 2009) (holding that a witness who was familiar with a company's value as an investor and a member of its board could testify under Rule 701 to the diminished value of the company caused by the defendant's breach), other circuits have permitted lay opinion testimony based on particularized knowledge on a variety of topics, when the witness gained such knowledge through employment or involvement in the day-to-day affairs of the business in question. See Valencia, 600 F.3d at 416 ("Because Labhart's knowledge and analysis were derived from duties he

held at Dynegy, his opinions [concerning Dynegy's trading positions] were admissible as testimony based upon personal knowledge and experience gained while employed by Dynegy."); Rigas, 490 F.3d at 225 (lay opinion properly admitted [*21] to show the amount of the company's debt absent accounting fraud); Munoz-Franco, 487 F.3d at 35 (lay testimony admitted regarding the proper classification of a loan under the bank's loan classification system in light of the borrower's insolvent financial condition); Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., 320 F.3d 1213, 1223 (11th Cir. 2003) (holding that the plaintiff's officers and employees involved in making repairs to the defendant's vessel could properly give lay opinion testimony about the reasonableness of those repairs because the testimony was "based upon their particularized knowledge garnered from years of experience within the field" (footnote omitted)).

We can find no persuasive reason for not applying this rationale to DiMichele's and Owens's knowledge of underwriting guidelines and policies they acquired and applied through their respective employment with SunTrust and Citizens. See Valencia, 600 F.3d at 416 ("[The witness] engaged in precisely the kind of analysis he regularly performed as chief risk officer; the fact that he drew particular opinions and projection for the purposes of this case does not make him an 'expert' within the meaning of Federal Rule of Evidence 702."). Moreover, we concur with the Eleventh Circuit's view that "it does not take any specialized or technical knowledge to realize that lending institutions [*22] would be reluctant to approve a loan application if [**12] they knew that it contained false statements about material facts." Hill, 643 F.3d at 842; see also United States v. Cuti, 720 F.3d 453, 460 (2d Cir. 2013) ("When the issue for the fact-finder's determination is reduced to impact—whether a witness would have acted differently if he had been aware of additional information—the witness so testifying is engaged in a process of reasoning familiar in everyday life." (internal quotation marks omitted)). This is especially true given the other, substantial evidence in this case demonstrating the importance the lenders placed on the "own funds" requirement—including closing instructions that stressed the importance of the buyer using his or her own funds to fulfill any deposit requirement, warned that the buyer should not be lending his or her own credit to another, and directed the closing agent to suspend the closing and notify the lenders immediately of any suspected improprieties.

United States v. White, 492 F.3d 380 (6th Cir. 2007), is not to the contrary. In White, we held that the district court did not abuse its discretion in allowing auditors employed by Medicare fiscal intermediaries to testify about their personal involvement in auditing the defendants' cost reports and their interactions with the defendants. [*23] Id. at 403. However, we concluded that the district court should not have permitted the witnesses to testify, in general, about Medicare's structure and procedures without qualifying as expert witnesses because the topic of Medicare reimbursement procedures is beyond the knowledge of the average lay person. Id. at 403-04. Here, DiMichele and Owens limited their testimony specifically to SunTrust's and Citizens's respective underwriting policies and lending programs based on the particularized knowledge they acquired through their employment with SunTrust and Citizens, and did not purport to opine about generally applicable standards in the mortgage lending industry—testimony about a subject, like the Medicare testimony in White, that would be familiar only to one with specialized or technical knowledge under Rule 702.

b.

Whaley separately argues that the district court erred in admitting testimony by Stephen Bledsoe, SunTrust's controller, as lay opinion testimony. Bledsoe testified about the losses SunTrust sustained from the fraudulent mortgage loans at issue. Whaley briefly raises the argument, but fails to develop it in any meaningful way. Therefore, we need not consider the issue because Whaley has forfeited [*24] it. See United States v. Coffman, 574 F. App'x 541, 554 (6th [**13] Cir. 2014) ("Coffman has failed to develop his argument that Government witnesses gave improper lay opinion testimony, simply claiming in summary fashion, with no explanation whatsoever, that four statements contained lay opinions.").

Even if the issue were not forfeited, Whaley's argument lacks merit. In his role as SunTrust's controller from 2007 through 2012, Bledsoe was responsible for the company's financial statements, which required him to be familiar with all of the underlying information that went into those documents, as well as the processes and controls that generated such information. Because Bledsoe's testimony was limited to information within his personal knowledge that he gained as controller, his testimony was strictly that of a fact witness. Moreover, even if Bledsoe's testimony spilled into the realm of

opinion testimony, the district court did not err in admitting it because, as was true with DiMichele and Owens, it was based on particularized knowledge that he acquired through his employment.

## 2. Secondary-Evidence Summaries

Defendants argue that the district court erred by admitting the government's summary exhibits and allowing the government to introduce [*25] such exhibits through its summary witness, Internal Revenue Service Special Agent Kevin McCord. Defendants contend that the admission of this evidence was improper because the summary exhibits simply reiterated the government's interpretation of the evidence and, thus, constituted nothing more than additional argument by the government pointing to Defendants' guilt.

We find no abuse of discretion in the admission of the summary evidence. The district court properly admitted the government's summaries as secondary-evidence summaries. See *United States v Bray, 139 F.3d 1104, 1112 (6th Cir. 1998)*. **HN4** Secondary-evidence summaries are a hybrid of summaries admitted under *Federal Rule of Evidence 1006* and pedagogical-device summaries. *Id.* They are not prepared entirely in accordance with *Rule 1006* but are more than mere pedagogical devices. In other words, secondary-evidence summaries "are admitted in evidence not in lieu of the evidence they summarize but *in addition thereto*, because in the judgment of the trial court such summaries so accurately and reliably summarize complex or difficult evidence that is received in the case as to materially assist the jurors in better understanding the evidence." *Id.*

[**14] The district court properly determined that the government's exhibits were accurate [*26] and reliable depictions of the admitted evidence they sought to synthesize for the jury. The government's summary exhibits accurately summarized thousands of pages of previously-admitted exhibits, conveniently displaying for the jury the details of the eight separate real estate transactions. Defendants have not shown that the information conveyed in any of the exhibits was inaccurate or unreliable. Moreover, the district court properly instructed the jury that the summaries themselves were not evidence of the transactions they summarized, but were only as valid and reliable as the underlying documents. Accordingly, Defendants' challenge to the district court's admission of the summary exhibits is without merit.

For the same reasons, the district court did not abuse its discretion by allowing Agent McCord to testify, because McCord merely explained the summary charts to the jury and was subject to cross-examination about the accuracy of the exhibits, and the district court gave a proper limiting instruction. See *United States v. Vasilakos, 508 F.3d 401, 412 (6th Cir. 2007)*; *United States v. Paulino, 935 F.2d 739, 753 (6th Cir. 1991)*, superseded by statute on other grounds as stated in *United States v. Caseslorente, 220 F.3d 727, 736 (6th Cir. 2000)*.

## B. Whaley's Issues

### 1. Constitutional Right to Present a Defense

Whaley argues that the district court violated his right [*27] to present a defense when it denied his so-called "reverse *Bruton*" motion to sever. Whaley contends that the district court's rationale for denying his motion—that the pre-indictment statement he made to law enforcement implicating **Kerley** was hearsay and thus would not be admissible in either a joint or separate trial—effectively precluded him from presenting his advice-of-counsel defense. **HN5** Because Whaley frames the issue as a violation of a constitutional right, our review is de novo. *United States v. Reichert, 747 F.3d 445, 453 (6th Cir. 2014)*; see *United States v. Blackwell, 459 F.3d 739, 752 (6th Cir. 2006)* (noting that the abuse-of-discretion standard generally applicable to a district court's evidentiary rulings is not at odds with de novo review of constitutional questions because district courts do "not have the discretion to rest [their] evidentiary decisions on incorrect interpretations of the Constitution").

[**15] **HN6** "Whether rooted directly in the *Due Process Clause of the Fourteenth Amendment* or in the Compulsory Process or *Confrontation Clauses of the Sixth Amendment*, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina, 547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)* (quoting *Crane v. Kentucky, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986)*). Even so, a defendant "does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Blackwell, 459 F.3d at 753* (internal alterations and quotation [*28] marks omitted). Unless the particular rule of evidence "serve[s] no legitimate purpose" or is "disproportionate to the ends that . . . [it] is asserted to

promote," a trial court's application of the rule to exclude defense evidence will not offend the Constitution. *Holmes, 547 U.S. at 326*; see also *Chambers v. Mississippi, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)* ("In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."). Exclusion of evidence is "unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." *United States v. Scheffer, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998)*. Thus, "erroneous evidentiary rulings rarely constitute a violation of a defendant's right to present a defense." *United States v. Hardy, 586 F.3d 1040, 1044 (6th Cir. 2009)* (citing *Washington v. Schriver, 255 F.3d 45, 56 (2d Cir. 2001)*).

We have no difficulty concluding that the district court's exclusion of Whaley's preindictment statement to law enforcement did not violate Whaley's right to present a defense. To begin, Whaley's own statements inculpating *Kerley* were inadmissible hearsay.[8] See *United States v. Holden, 557 F.3d 698, 706 (6th Cir. 2009)* ("The inculpatory statements against Holden were admissible under *Fed. R. Evid. 801(d)(2)*, the hearsay exclusion for admissions of a party opponent. However, Mike Holden was unable to avail [\*29] himself of this exception because he sought to introduce his own statement. Thus, his statements are inadmissible hearsay and were properly excluded."). The district court also correctly determined that Whaley's statement was [\*\*16] not admissible under the rule of completeness embodied in *Federal Rule of Evidence 106*. See *United States v. Costner, 684 F.2d 370, 373 (6th Cir. 1982)* (noting that *Rule 106* "is not designed to make something admissible that should be excluded"). More importantly, the district court's evidentiary rulings did not cause Whaley constitutional injury, because they did not prevent him from raising an "advice of counsel" defense. A variety of avenues were available to Whaley to present his defense, including his own testimony that he relied on *Kerley*'s advice. See *Reichert, 747 F.3d at 454* ("[O]f course, Reichert had at least one other avenue of putting his own statements and beliefs into evidence: by taking the stand himself."). In fact, Whaley took the stand and testified at trial, but instead of claiming that he relied on the legal advice of his good friend *Kerley*, Whaley chose to point the finger at Lee. Thus, it was Whaley's strategic decision, rather than the district court's evidentiary rulings, that caused Whaley not to present an advice-of-counsel defense.

### 2. Sufficiency of Evidence of Intent to Defraud

Whaley also contends that the district court erred in denying his motion for judgment of acquittal because there was insufficient evidence for the jury to conclude that he participated in a wire or bank fraud scheme with the intent to defraud SunTrust and Citizens. *HN7* We review de novo a district court's denial of a motion for judgment of acquittal. See *United States v. Algee, 599 F.3d 506, 512 (6th Cir. 2010)*.

*HN8* "In reviewing the sufficiency of the evidence, the relevant question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Warshak, 631 F.3d 266, 308 (6th Cir. 2010)* (quoting *Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979))*. The defendant's burden is a very heavy one. *United States v. Jones, 641 F.3d 706, 710 (6th Cir. 2011)*. The reviewing court must draw [\*31] "all available inferences and resolve all issues of credibility in favor of the [jury's] verdict." *United States v. Bakri, 505 F. App'x 462, 466 (6th Cir. 2012)* (internal quotation marks omitted).

*HN9* A conviction for wire fraud under *18 U.S.C. § 1343* requires the government to prove three elements beyond a reasonable doubt: (1) the defendant devised or willfully participated in a scheme to defraud; (2) the defendant used or caused to be used an interstate wire [\*\*17] communication in furtherance of the scheme; and (3) the defendant intended to deprive a victim of money or property. *United States v. Speer, 419 F. App'x 562, 567 (6th Cir. 2011)*. *HN10* The elements of bank fraud under *18 U.S.C. § 1344* are: "(1) the defendant knowingly executed or attempted to execute a scheme to defraud a financial institution; (2) the defendant had

---

[8] At oral argument, Whaley's [\*30] counsel argued that Whaley's statement could have been admitted to show Whaley's state of mind. However, counsel conceded that Whaley's trial counsel did not raise this issue before the district court. Accordingly, we decline to consider it. See *Cleveland Firefighters for Fair Hiring Practices v. City of Cleveland, 669 F.3d 737, 753 (6th Cir. 2012)* (Keith, Circuit J., dissenting) ("Generally, a reviewing court should not consider issues in the first instance when they were not litigated in the trial court except in exceptional circumstances.").

an intent to defraud, and (3) the financial institution was insured by the FDIC." *United States v. Dowlen, 514 Fed. Appx. 559, 563 (6th Cir. 2013)* (citing *United States v. Everett, 270 F.3d 986, 989 (6th Cir. 2001)*). "Intent to defraud means to act with intent to deceive or cheat for the purpose of causing a financial loss to another or bringing about a financial gain to oneself." *United States v. Olds, 309 F. Appx 967, 972 (6th Cir. 2009)*.

Construing the evidence in favor of the verdict, as we must, we conclude that there was ample evidence to support Whaley's fraud convictions. The government's evidence showed that Whaley proposed the idea to [*32] Lee of using straw buyers to "milk" the equity from Whaley's properties in order to generate funds to repay Lee's debt to Whaley. The evidence also showed that Whaley orchestrated the fraudulent scheme by telling Lee to direct the straw buyers to Gateway Mortgage—where Bevins would prepare and submit fraudulent loan applications—and by directing that all of the closings be conducted by *Kerley*'s title company, GLT. Whaley also participated in manufacturing the sham sales to the straw buyers by preparing the purchase agreements that unilaterally set the sale price. Finally, there was also ample evidence to show that Whaley, with *Kerley*'s assistance, acted to conceal from the lenders that the borrowers were not using their own funds, as represented on the HUD-1 settlement statements, by obtaining cashier's checks from his GBO account showing the borrowers as remitters, sometimes using SunTrust's prematurely-disbursed funds.

## C. *Kerley*'s Issues

### 1. Money Laundering Conviction

*Kerley* argues that we should reverse his conviction for money laundering charged in Count 22 of the Fifth Superseding Indictment, which was based on the Peggy Lane transaction. That count alleged that Whaley's deposit [*33] of the $92,389.40 GLT check into his GBO account was an act of money laundering of property derived from a specified unlawful activity. *Kerley* was convicted as an aider or abettor. *Kerley* raises three grounds for reversal: (1) the [**18] government failed to show that the alleged laundered funds were obtained from a distinct, completed predicate offense; (2) the government failed to prove that the monetary transaction involved profits, rather than proceeds, of the predicate offense; and (3) there was insufficient evidence to establish that *Kerley* had the requisite specific intent for aiding and abetting liability. Because all three arguments challenge the sufficiency of the evidence, we review them de novo. *United States v. Gunter, 551 F.3d 472, 482 (6th Cir. 2009)*.

Count 22 charged *Kerley* with aiding and abetting money laundering by Whaley in violation of *18 U.S.C. § 1957*. **HN11** The statute defines money laundering as "a monetary transaction in criminally derived property . . . derived from specified unlawful activity." *18 U.S.C. § 1957(a)*. The term "criminally derived property" is defined as "any property constituting, or derived from, proceeds obtained from a criminal offense." *18 U.S.C. § 1957(f)(2)*. Because money laundering is a separate offense from the underlying predicate offense, "the primary issue [*34] in a money laundering charge involves determining when the predicate crime becomes a completed offense after which money laundering can occur." *United States v. Nolan, 223 F.3d 1311, 1315 (11th Cir. 2000)* (internal quotation marks omitted). The government must show that the criminally derived funds are "derived from an already completed offense, or a completed phase on an ongoing offense." *United States v. Conley, 37 F.3d 970, 980 (3d Cir. 1994)*. In determining whether the government has proven a distinct predicate offense, a court should consider the government's theory of the case, as alleged in the indictment. See *United States v. Crosgrove, 637 F.3d 646, 655 (6th Cir. 2011)*.

*Kerley* contends that the government failed to prove a completed predicate offense because Count 22 alleged that the funds Whaley deposited into his GBO account were derived from the execution of the wire fraud scheme alleged in Count 9. *Kerley* further notes that Count 9 alleged that Whaley's receipt of the $92,389.40 GLT check from the Peggy Lane closing, after Ed Walker had endorsed it, was part of the fraudulent scheme. Thus, *Kerley* argues, the indictment makes clear that the deposit occurred as part of the scheme. However, the indictment did not allege that Whaley's depositing the GLT check was part of the scheme to defraud SunTrust. Rather, it alleged that Whaley's *receipt* of the [*35] check was part of the scheme. Because Whaley's receipt of the GLT check was the last possible act in the alleged scheme, Whaley's [**19] deposit of the check—which occurred subsequent to his receipt—was separate from the completed wire fraud offense. Cf. *United States v. Cefaratti, 221 F.3d 502, 511 (3d Cir. 2000)* ("We agree with the government that, at the latest, the checks became criminally derived property when they were endorsed by the student borrowers and that any subsequent monetary transactions, including

deposits, violated § 1957."). Thus, the wire fraud and money laundering offenses were separate and distinct.

*Kerley*'s next argument—that the government failed to prove that the underlying offense involved profits, as required by *United States v. Santos, 553 U.S. 507, 128 S. Ct. 2020, 170 L. Ed. 2d 912 (2008)*—also lacks merit. In *Santos*, a plurality of the Supreme Court was concerned with a merger problem that arose from the defendant's convictions for running an illegal gambling and lottery operation in violation of *18 U.S.C. § 1955* and money laundering under *18 U.S.C. § 1956*. *553 U.S. at 509-10*. The Court was concerned that "[i]f proceeds' meant 'receipts,' nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the [*36] carrying on of the lottery." *Id. at 515*. Thus, based on the facts of the case and the rule of lenity, the Court held that proceeds under *18 U.S.C. § 1956(a)(1)* meant "profits" and not "receipts." *Id. at 514*. In *United States v. Kratt, 579 F.3d 558 (6th Cir. 2009)*, this Court considered *Santos*' application in the context of a money laundering conviction under *18 U.S.C. § 1957*, and held that proceeds "means profits only when the predicate offense creates a merger problem that leads to a radical increase in the statutory maximum sentence and only when nothing in the legislative history suggests that Congress intended such an increase." *Id. at 562*. In cases where these criteria are not met, proceeds continues to mean receipts. *United States v. Crosgrove, 637 F.3d 646, 654 (6th Cir. 2011)*.

*Kerley*'s money laundering conviction does not fall within the parameters of *Santos*, as delineated in *Kratt*, because, as discussed above, there is no merger problem. *Kerley*'s wire fraud and money laundering convictions do not overlap. In addition, even if the two offenses merged, *Kerley*'s money laundering conviction does not radically increase his statutory maximum sentence because his conviction for wire fraud affecting a financial institution carries [**20] a maximum punishment of 30 years—20 years more than his money laundering conviction under § 1957. See *18 U.S.C. §§ 1343, 1957*.

Finally, *Kerley* argues [*37] that the government failed to present sufficient evidence that *Kerley* aided and abetted Whaley in money laundering. *HN12* To convict *Kerley* of aiding and abetting, the government was required to show beyond a reasonable doubt that he acted with the specific intent to facilitate Whaley's money laundering. See *United States v. Bryant, 461 F.2d 912, 920 (6th Cir. 1972)*. *Kerley* argues that the government failed to present sufficient evidence showing not only that *Kerley* acted with specific intent, but also that Whaley actually engaged in the alleged act of money laundering by depositing the Peggy Lane disbursement check into his GBO account. *Kerley*'s challenges are subject to the *Jackson* standard, which requires that *HN13* we affirm if the evidence, viewed in a light most favorable to the government, permits a rational juror to find the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)*.

*Kerley* concedes that there was sufficient evidence to convict him of wire fraud in connection with the Peggy Lane property transaction, but he contends that such evidence does not show that he intended to assist *Kerley* in money laundering. He contends that there was no evidence showing that he knew the GLT check disbursed to Ed Walker at closing was going to be deposited [*38] in the GBO account or that Whaley was going to deposit it. *Kerley* notes that the HUD-1 statement called for the check to be disbursed to Ed Walker, and *Kerley* had no idea what would happen to the check after closing. *Kerley* also notes that, unlike the other transactions, the Peggy Lane transaction was unique in that it did not involve adjustments to GBO disbursements or early disbursements of loan proceeds that would be used to fund the buyer's cashier's check for closing. In other words, he argues, none of the prior transactions alerted him that Whaley would be depositing the disbursement check paid to Ed Walker.

While *Kerley*'s argument might appeal to a jury, it fails to acknowledge the countervailing evidence that we must consider in resolving his sufficiency challenge. The Peggy Lane sale was not an isolated event. The jury had before it evidence of a series of ever-evolving transactions that were designed to monetize artificially inflated equity in various real properties through sham sales. This evidence demonstrated that, when transactions were closed, *Kerley* [**21] served as the architect of the financial arrangements. For example, in the 1531 Trappers Ridge Lane transaction, the [*39] government introduced *Kerley*'s handwritten note, which the jury could have reasonably construed as a directive to Whaley as to how to convert the early-disbursed $99,350 check from GLT to Regency Development into a cashier's check naming a false remitter. Because the closing check from the buyer, Bill

Barger, was drawn on Whaley's GBO account, the jury could have easily concluded that *Kerley* knew that Whaley was using his GBO account to convert disbursement checks from the transactions into smaller amounts. Similarly, in the 954 Black Bear Cub Way transaction, the jury saw evidence of *Kerley*'s handwritten note on a HUD-1 form that could be interpreted as an instruction for Whaley to convert the $81,350 disbursement check, payable to Ed Walker, into a cashier's check falsely showing Darlene Barger as the remitter. Based on this evidence, the jury could have reasonably concluded that *Kerley* knew that Whaley would deposit the $92,389.40 disbursement check payable to Ed Walker for the Peggy Lane transaction into his GBO account.

As for Whaley's depositing of the check, there was ample evidence that Whaley was involved with every deposit made to his GBO account. Lee testified that every [*40] check from the scheme that was deposited into Whaley's GBO account was deposited at Whaley's direction. In addition, Whaley admitted that if the $92,389.40 was deposited into his account, he would have discussed it with Lee. Finally, Tennessee State Bank employee Sherry Cole testified that Whaley personally requested that the $4,544.46 cashier's check be drawn on his GBO account and that his representative be permitted to pick up the check. Based on this evidence, a rational jury could find beyond a reasonable doubt that Whaley engaged in money laundering under *18 U.S.C. § 1957*.

## 2. Sentencing Issues

*Kerley* contends that his sentence was procedurally unreasonable because the district court misapplied the credits-against-loss Application Note by failing to reduce the loss by the amounts of the lenders' "credit bids" at the foreclosure sales, and substantively unreasonable because the district court should not have imposed joint and several restitution liability on him for the full amount of the loss.

[**22] *HN14* We review criminal sentences for both procedural and substantive reasonableness. *Gall v. United States, 552 U.S. 38, 51, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007)*. We review for procedural reasonableness to "ensure that the district court did not commit significant procedural error such [*41] as: failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [*18 U.S.C.] § 3553(a)* factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *United States v. Brown, 579 F.3d 672, 677 (6th Cir. 2009)* (quoting *Gall, 552 U.S. at 51*) (internal formatting omitted). "The district court's interpretation of the advisory Sentencing Guidelines is reviewed *de novo*, and its findings of fact are reviewed for clear error." *Id. at 677* (citing *United States v. Kosinski, 480 F.3d 769, 774 (6th Cir. 2007))*. As for substantive reasonableness, we review the amount of restitution for abuse of discretion. *United States v. Boring, 557 F.3d 707, 713 (6th Cir. 2009)*. "An abuse of discretion occurs when a ruling is based on an error of law or a clearly erroneous finding of fact, or when the reviewing court is otherwise left with the definite and firm conviction that the district court committed a clear error of judgment." *United States v. Kumar, 750 F.3d 563, 566 (6th Cir. 2014)*.

a.

*HN15* In mortgage fraud cases, this court follows a two-step approach in determining loss. *United States v. Wendlandt, 714 F.3d 388, 393, 394 (6th Cir. 2013)*. First, under *U.S.S.G. § 2B1.1*, the court must use the greater of actual or intended loss. *Id. at 393* (citing *U.S.S.G. § 2B1.1 cmt. n.3(A))*. Actual loss will usually be the appropriate measure in mortgage fraud cases involving straw buyers. "'Default by a woefully unqualified home-loan borrower is so likely that . . . the pecuniary harm [*42] . . . will almost invariably include the full amount of unpaid principal on the fraudulently obtained loan.'" *Id. at 393, 394* (quoting *United States v. Turk, 626 F.3d 743, 750 (2d Cir. 2010))*. In the second step, "the district court must reduce the loss by the amount of money the victim recovered by selling the collateral, or the fair market value of the property at the time of sentencing if the victim has not disposed of the collateral." *Id. at 394* (citing *U.S.S.G. § 2B1.1 cmt. n.3(E)(ii)*).

After the mortgages went into foreclosure, but before *Kerley* was sentenced, the lenders acquired the properties through credit bids at public foreclosure sales, and subsequently resold [**23] them in Real Estate Owned (REO) sales. In *Kerley*'s presentence report, the probation office calculated the loss by crediting the amount the lenders received from the REO sales and determined that the loss exceeded $1,000,000, but was less than $2,500,000, warranting a sixteen-level enhancement. *Kerley* objected to this calculation, arguing that the loss should be calculated by crediting the amount that the lenders bid at the foreclosure sales,

rather than the amounts they received from the subsequent REO sales, for purposes of § 2B1.1. The district court overruled *Kerley*'s objection and determined the loss to be approximately [*43] $1.9 million.

The "credits against loss" provision of U.S.S.G. ' 2B1.1 provides,

**HN16** Loss shall be reduced by the following:

. . . .

> (ii) In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

U.S.S.G. § 2B1.1 cmt. n.3(E)(ii). *Kerley* contends that the district court erred in applying this provision because it failed to credit the "value" the lenders recovered when they acquired the properties at the foreclosure sales. *Kerley* also argues that because, under Tennessee law, the foreclosure sale price constitutes the fair market value of the property, the lenders' foreclosure credit bids represent the proper amount that should be credited against the loss.

*Kerley*'s argument lacks merit. Assuming, *arguendo*, that a lender's acquisition of foreclosed property through a credit bid could constitute a disposition, we must read "disposition" in light of the Sentencing Commission's direction. *Application Note 3(E)(ii) of Guideline 2B1.1* directs the court to credit "the *amount the victim has recovered* at the time of sentencing from the [*44] disposition of the collateral." U.S.S.G. § 2B1.1 cmt. 3(E)(ii) (2012) (emphasis added). While a lender may receive something of *value* from purchasing collateral in a foreclosure sale using a credit bid, the lender does not "recover" any amount of money until the property is ultimately sold to a third party. Under the circumstances, where there is no evidence that the lenders failed to mitigate their losses by unreasonably delaying the ultimate sale of the properties, we cannot fault the district court for basing its § 2B1.1 loss calculation on the [**24] difference between the amount loaned and the amount eventually recovered by selling the properties securing the loan.

United States v. Yeung, 672 F.3d 594 (9th Cir. 2012), and the other cases that *Kerley* cites addressing restitution under the Mandatory Victims Restitution Act of 1996, do not support his argument. *Yeung* does not help *Kerley* for a number of reasons. Most importantly, the Supreme Court recently abrogated *Yeung* in Robers v. United States, U.S. , 134 S. Ct. 1854, 188 L. Ed. 2d 885 (2014). In *Robers*, the Court held that "the statutory phrase 'any part of the property' [in the MVRA] refers only to the specific property lost by a victim, which, in the case of a fraudulently obtained loan, is the money lent." Id. at 1856. Although *Robers* involved restitution and not a sentencing issue, it illustrates [*45] why using a lender's credit bid at a foreclosure sale is not a proper basis for determining a victim's loss. That is, the lender's loss in a fraudulent loan scheme is the amount of money it loaned to the defendant. The final amount of loss cannot be determined based on the lender's credit bid amount because at that point the lender has yet to realize any amount from the collateral.

b.

As for the amount of restitution, we cannot conclude that the district court abused its discretion by imposing joint and several liability against *Kerley* for the full amount of the restitution and declining to apportion the restitution payment under 18 U.S.C. § 3664(h). The district court essentially found that *Kerley* was the lynch-pin in the entire scheme. Had he not disregarded the lenders' closing instructions, the scheme would not have succeeded. This reasoning is supported by the record and provides no basis for reversal.

**III. CONCLUSION**

For the foregoing reasons, we **AFFIRM** *Kerley*'s and Whaley's convictions and *Kerley*'s sentence.