## _Wedgewood L.P. v. Twp. of Liberty_

United States District Court for the Southern District of Ohio, Eastern Division

November 24, 2010, Decided; November 24, 2010, Filed

Case No. C2-04-1069

**Reporter**

2010 U.S. Dist. LEXIS 124657; 2010 WL 4918783

WEDGEWOOD LIMITED PARTNERSHIP I, Plaintiff, v. TOWNSHIP OF LIBERTY, OHIO, et. al., Defendants.

**Subsequent History:** Motion denied by _Wedgewood L.P. I v. Twp. of Liberty, 2010 U.S. Dist. LEXIS 138891 (S.D. Ohio, Dec. 29, 2010)_

**Prior History:** _Wedgewood Ltd. P'ship v. Twp. of Liberty, 2010 U.S. Dist. LEXIS 121050 (S.D. Ohio, Nov. 16, 2010)_

**Counsel:** [*1] For The Leslie Group, Interested Party: Stephen Douglas Jones, Roetzel & Andress - 2, Columbus, OH.

For Wedgewood Limited Partnership I, Plaintiff: Bruce Leroy Ingram, LEAD ATTORNEY, Joseph R Miller, Vorys Sater Seymour & Pease - 2, Columbus, OH; Kenneth J Rubin, Vorys Sater Seymour & Pease, Columbus, OH; Tyler B Pensyl, Vorys Sater Seymour & Pease LLP, Columbus, OH.

For Township of Liberty, Ohio, Board of Trustees of Liberty Township, Holly C. Foust, Liberty Township Zoning Inspector, in her official capacity, Liberty Township/Powell Neighborhood Community Watch Foundation, Peggy Guzzo, Liberty Township Trustee in his official capacity, Curt Sybert, Liberty Township Trustee, in his official capacity, Defendants: Lawrence Edward Barbiere, LEAD ATTORNEY, Michael Edward Maundrell, Schroeder Mundrell Barbiere & Powers - 1, Mason, OH; Joseph R Miller, Vorys Sater Seymour & Pease - 2, Columbus, OH; Michael Wall Currie, O Judson Scheaf, III, Scott

A Campbell, Thompson Hine LLP, Columbus, OH; Michele L Noble, Thompson Hine LLP - 2, Columbus, OH; William Lyle Loveland, Loveland & Brosius - 2, Columbus, OH.

For Robert E. Cape, Liberty Township Trustee in his official capacity, Kim Cellar, Liberty [*2] Township Trustee in his official capacity, John C. Werner, Liberty Township Trustee, in his official capacity, Defendants: Joseph R Miller, Vorys Sater Seymour & Pease - 2, Columbus, OH; Michael Wall Currie, O Judson Scheaf, III, Scott A Campbell, Thompson Hine LLP, Columbus, OH; Michele L Noble, Thompson Hine LLP - 2, Columbus, OH; William Lyle Loveland, Loveland & Brosius - 2, Columbus, OH.

**Judges:** JUDGE ALGENON L. MARBLEY, UNITED STATES DISTRICT JUDGE. Magistrate Judge Deavers.

**Opinion by:** ALGENON L. MARBLEY

# Opinion

## ORDER

## I. INTRODUCTION

This matter comes before the Court on the Parties' cross-motions in anticipation of the trial on the Plaintiff's claim for damages arising out of the violation of its procedural due process rights.

The Defendants have moved: (1) to exclude any evidence related to the Court's determination as to liability, _Motion_, Doc. No. 206; and (2) to exclude

the testimony of Dr. Robert J. Weiler, the Plaintiff's damages expert, *Motion*, Doc. No. 208. The Plaintiff has moved: (1) to exclude witness Mike Delhendorf and any testimony regarding threats made by Charles Ruma, *Motion*, Doc. No. 220; (2) to exclude evidence related to offers of purchase the Plaintiff has received for the property at issue [*3] in this litigation, *Motion*, Doc. No. 221; (3) to exclude evidence regarding payment by Wal-Mart of the Plaintiff's attorneys' fees, *Motion*, Doc. No. 222; and (4) to exclude the testimony of Kim Koenig, the Defendants' damages expert, *Motion*, Doc. No. 225. The Defendants have filed a Motion to Strike the Plaintiff's three motions, Docs. No. 220-222, 225, for being filed after the court-imposed deadline for filing motions in limine. *Motion*, Doc. No. 232.

The Defendants have moved to quash a subpoena issued to the Defendant's expert, Kim Koenig. *Motion*, Doc. No. 230.

Intervening Defendant Community Oversight Foundation has moved to be dismissed because there are no claims for compensatory damages against it. *Motion*, Doc. No. 214.

The Plaintiff has moved to have its proposed stipulations read to the jury at trial. *Motion*, Doc. No. 205.

The Court will address each motion in turn.

# I. MOTIONS IN LIMINE

## A. Standard of Review

Motions in limine allow the Court to rule on the admissibility of evidence in advance of trial in order to expedite proceedings and give the parties advance notice of the evidence upon which they may not rely to prove their case. *See Jonasson v. Lutheran Child & Family Servs ., 115 F.3d. 436, 440 (7th Cir. 1997)*. [*4] To prevail on a motion in limine, the moving party must show that the

evidence is clearly inadmissible. *Ind. Ins. Co. v. Gen. Elec. Co ., 326 F. Supp. 2d 844, 846 (N.D. Oh. 2004)*. Courts are typically "reluctant to grant broad exclusions of evidence in limine because a court is almost always better situated during the actual trial to assess the value and utility of evidence." *Black v. Columbus Pub. Sch ., No. 2:96-CV-326, 2007 U.S. Dist. LEXIS 68672, at *2 (S.D. Oh. Sept. 17, 2007)*; *accord Sperberg v. Goodyear Tire & Rubber Co., 519 F. 2d, 708, 712 (6th Cir. 1975)*. If the Court does deny a motion in limine, however, the Court can reconsider the admissibility of the evidence as the proceedings give context to the pretrial objections. *Black, 2007 U.S. Dist. LEXIS 68672, at *2*.

## B. Evidence Relating to Liability Determination

The Defendants essentially request that the scope of the background information, concerning the imposition of the unconstitutional Instructions and the resulting litigation, provided to the jury be restricted. They identify five specific subject areas in which they allege the evidence is irrelevant or unfairly prejudicial or both. The Plaintiff opposes the motion, *Opposition*, [*5] Doc. No. 228, on the ground that this information is necessary to provide context for the jury.

First, the Defendants request that the events of 1991 and 1992 surrounding zoning decisions be excluded as irrelevant. They contend that the only relevant zoning facts are those concerning the current zoning on the Plaintiff's property and the reasons for the denial of the Plaintiff's June 29, 2004 zoning permit application. The Plaintiff counters that the 1991 and 1992 zoning history is necessary to lay the foundation for its expert's testimony, which relies on the possible uses of the Plaintiff's property in 2004. The Court concludes that this evidence is not irrelevant as it may be required to lay a contextual foundation for the jury and to establish the zoning status of the Plaintiff's property before the imposition of the Instructions. In other words, in order for the

Plaintiff to prove damages resulting from a diminished capacity for commercial development as set forth in the Instructions, it is necessary to have evidence of the commercial development capacity of the property under the zoning regulations as they existed before the Instructions. These regulations come from the 1991 and [*6] 1992 zoning decisions. This portion of the Defendants' motion is accordingly **DENIED**.

Second, the Defendants request that the events leading up to the issuance of the January 19, 2004 Instructions imposing restrictions in the amount of permissible commercial development on the Plaintiff's property be excluded as irrelevant. They propose that the jury only be allowed to learn that commercial building restrictions were in place, that the Plaintiff's zoning application was denied because of those restrictions, that the Court has determined that those restrictions shouldn't have been imposed, that the Court ordered the restrictions lifted, and that multiple courts have determined that the application was properly lifted for other reasons. The Court agrees in part with the Defendants. The motivations behind the Instructions are not relevant to this claim for compensatory damages, and evidence on this point shall be excluded. _Howard v. Grinage, 82 F.3d 1343, 1352 (6th Cir. 1996)_ (holding that defendants' motivation is "simply irrelevant in a post-deprivation procedural due process case"). The history of the zoning applicable to the Plaintiff's property, however, including the adoption and [*7] subsequent overruling of the Instructions, is relevant to the extent and duration of the unlawful restrictions on the commercial development of the Plaintiff's property. This history is also relevant to the Plaintiff's ability to rebut the Defendants' mitigation defense since the status of the Instructions affected the Plaintiff's ability to sell its property. The Court accordingly concludes that this portion of the Defendants' motion is **DENIED** in part and **GRANTED** in part.

Third, the Defendants move to exclude any evidence relating to anti-Wal-Mart sentiment on the part of local residents and Defendant Liberty Township Trustees as irrelevant. The Plaintiff argues that the anti-Wal-Mart bias is relevant to explain why the Instructions were instituted and why its zoning application was denied. The Court finds the Plaintiff's arguments unpersuasive. As stated above, the motivations behind the Instructions do not illuminate the existence or extent of the damages suffered by the Plaintiff as a result of their imposition, _Howard, 82 F.3d at 1352_, nor do they provide useful background information. The Court accordingly **GRANTS** this portion of the Defendant's motion.

Fourth, the Defendants request [*8] that any pejorative references to the Instructions, such as "illegal," "unconstitutional," or "pretextual," be prohibited. They argue that these words serve only to inflame the jury and are not relevant to the determination of damages. The Plaintiff retorts that the Instructions are, as a matter of law, unconstitutional, and that there is no basis for the Defendants' request. This Court agrees. The reason the Defendants were enjoined from enforcing the Instructions is that this Court has concluded that they are unconstitutional. "Unconstitutional," "illegal," and similar words are merely accurate descriptors, and their use may provide useful contextual background for the jury. The Court therefore **DENIES** this portion of the Defendant's motion.

Fifth, the Defendants move to exclude evidence of the state court litigation, arguing that these issues should not be re-litigated and are irrelevant; the Plaintiff does not specifically address this request. The Court finds that evidence of the state court litigation cannot be excluded in its entirety at this time and will reserve ruling on this objection until trial. Although wary of the introduction of copious details about this litigation, [*9] this Court ultimately finds that this subject may relevant to provide contextual information for the

jury and to establish the status of the Plaintiff's zoning application at any particular moment in time. Accordingly, the Court **DENIES** this portion of the Defendants' motion.

## C. Testimony of Plaintiff's Damages Expert

The Defendants argue that Dr. Weiler's testimony should be excluded because his opinions are unreliable, speculative, irrelevant, and beyond his expertise.

The Defendants argue that Dr. Weiler's testimony is unreliable for two reasons. First, because Dr. Weiler assumed that the damages flowed from the unfulfilled Wal-Mart contract, which was unfulfilled because of the unconstitutional Instructions. They contend that the project failed for reasons unrelated to the Instructions; hence, Dr. Weiler's opinion is based on a false assumptions and is unreliable. *See Rose v. Truck Centers, Inc., 388 Fed. Appx. 528, 2010 U.S. App. LEXIS 16396, at *19-20 (6th Cir. 2010)* (affirming exclusion of expert testimony where expert assumed that position of bolts was identical at the time of his report and at the time of the accident). Rose is distinguishable from this case because the faulty assumptions alleged **[*10]** by the Defendants are matters of fact for the jury. The relationship between the Instructions and the Plaintiff's damages is the question of causation at the heart of this damages trial, *Vill. of Milford v. K-H Holding Corp., 390 F.3d 926, 936 (6th Cir. 2004)* (noting that "causation is a question of fact"), and the Court declines to grant such a broad exclusion of evidence at this time.

Second, the Defendants argue that Dr. Weiler's testimony is unreliable because he improperly ignored half of the land as valueless. *Greenbriar, Ltd. v. Alabaster, 881 F.2d 1570, 1576 n.11 (11th Cir. 1989)* (relevance of alternate uses); *Craftsmen Limousine, Inc. v. Ford Motor Co., 363 F.3d 761 (8th Cir. 2004)* (excluding expert testimony as unreliable when antitrust expert "failed 'to

incorporate all aspects of the economic reality'") (citations omitted). The Defendants contend that Dr. Weiler's second theory, in which he calculated the value to the loss of temporary deprivation of the total use of land, is based on the value of the 16.874 out of 34.02 acres available for commercial development; this analysis ignores the alternate uses or value of the other 17.2 acres. The Plaintiff retorts that Dr. Weiler **[*11]** did not assume that the 34.02 acres would be split into two parcels but instead valued the entire parcel with 16.874 acres available for commercial development. These arguments and the bases for Dr. Weiler's opinions are factual disputes which are appropriately to be decided by a jury; the Court concludes that the Defendants' motion on this point is without merit. Hence the Defendants' motion that Dr. Weiler's testimony should be excluded as unreliable is **DENIED**.

The Defendants next argue that Dr. Weiler's testimony is speculative because he assumes without support that the proceeds from the Wal-Mart sale would have gone into real property earning a 9% annual rate of return. For support of their position, the Defendants rely on **Joy v. Bell Helicopter Textron, 999 F.2d 549, 569, 303 U.S. App. D.C. 1 (D.C. Cir. 1993)** for support. In **Joy**, the plaintiff's expert, Dr. Glennie, testified in a products liability action to the value of the real estate investments of the deceased husband of the plaintiff over his estimated lifetime. *Id. at 568*. The appellate court concluded that the district court should have excluded this testimony on the ground that it was improper speculation. *Id. at 569*. Dr. Glennie based his **[*12]** estimate of the appreciation of a single piece of land in the Virgin Islands on the assumption that the deceased would have built a house on it and that the house would appreciate at 11% per year for the remainder of the deceased's projected life. *Id. at 568*. He arrived at 11% appreciation based on the value of the house the deceased has recently sold in the District of Columbia and on inflation. *Id.* Dr. Glennie did not research the experience of

investors in the Virgin Islands housing market, and the circuit court concluded that his testimony was too speculative to have been admitted. *Id.*

Unlike in *Joy*, Dr. Weiler has stated that he arrived at the value of the property without the restrictions, the value of the property with restrictions, and the 9% rate of return after researching local market conditions and based upon his decades of experience in real estate. These calculations are not speculative, and the Defendants have not shown that Dr. Weiler's testimony is clearly admissible. Although they may raise some of these arguments at trial to contest the weight the jury should give to Dr. Weiler, the Defendants' motion in limine on this ground is **DENIED**.

Finally, the Defendants contend [*13] that Dr. Weiler's testimony should be excluded because it exceeds the scope of his expertise. Dr. Weiler has conceded that he is not an expert on the time value of money, and the Defendants argue that he is therefore unqualified to testify on the rate of return the Plaintiff would achieve. The Plaintiffs argue in opposition that Dr. Weiler has opined on the rate of return on an investment in real estate, and that the depth of his training and experience in real estate development make him more than qualified to give such an opinion. The Court finds that the Defendants' objections go to the weight to be accorded Dr. Weiler's testimony, but not to the admissibility of such testimony. The Defendants' motion on this ground is also **DENIED**.

## D. Motion to Strike

The Defendants have moved to strike all four of the Plaintiff's motions in limine for the tardiness of their filing. The Court ordered on October 15, 2010 that the Parties submit any motions in limine by November 8, 2010. *Order*, Doc. No. 189. Responses to any such motions were to be filed by November 15, 2010. All four of the Plaintiff's motions were filed on November 15, one week after the expiration of the motions deadline, with no [*14] explanation for their tardiness. The

Defendants contend that none of the issues raised by the Plaintiff in its motion is a matter that could not have been anticipated by the November 8th deadline and that the motions should therefore be stricken. Having reviewed the Plaintiff's motions and the Defendants' arguments, the Court concludes that the Defendants' motion is **GRANTED** in part. The Plaintiff's motions regarding offers of purchase, *Motion*, Doc. No. 221, and the testimony of Kim Koenig, *Motion*, Doc. No. 225, shall be stricken from the record. The Court notes, however, that the grant of the Defendants' motion does not preclude the Plaintiff from renewing its objections to this — or any other evidence — it considers inadmissible at trial.

The Court found that the explanations for the late-filing of the Plaintiff's motions regarding witness Mike Delhendorf, *Motion*, Doc. No. 220, and payment by Wal-Mart of the Plaintiff's attorneys' fees, *Motion*, Doc. No. 222, to be sufficient. It will therefore consider these motions on their merits.

## E. Mike Delhendorf and Testimony Regarding Alleged Threats Made by Charles Ruma

The Court indicated at the final pretrial conference that it would only consider [*15] this motion to the extent that it sought to exclude the testimony of Mike Delhendorf, identified as a witness for the Defendants on November 8, 2010.

Ibex Development and Wedgewood Limited Partnership I were in negotiations for Ibex to purchase Wedgewood's property. Charles Ruma, the principal of Wedgewood Limited Partnership I, and Jim Coker of Ibex, had a phone conversation in 2008 in which Ruma allegedly made a threat to Coker. This threat is alleged by the Defendants to be the cause of the termination of the purchase agreement between the two companies. At the 2009 annual shareholders meeting of Wedgewood, Inc., Ruma allegedly lied to the shareholders

about the reason the Ibex deal fell apart. Mike Delhendorf has been offered as a witness to testify as to the substance of Ruma's comments at the shareholders meeting.

The Defendants argue that Ruma's threats and statements to the shareholders are relevant because they go to his efforts at selling the property — i.e. mitigation of damages — and that Delhendorf's testimony is relevant because it goes to Ruma's credibility. Delhendorf will testify that Ruma misrepresented having threatened Coker and that he misrepresented the reasons [*16] the Ibex deal fell through. The Plaintiff argues that Delhendorf's testimony is irrelevant because it goes to comments made at a shareholder meeting of a company not a party to this case.

The Court finds the Defendants' arguments persuasive. The truthfulness of Ruma's remarks to the shareholders goes to his credibility on the demise of the Ibex deal, which goes towards the Defendants' mitigation defense. Where the remarks occurred is of no import. The Plaintiff's Motion is accordingly **DENIED**, and the Defendants may introduce Mike Delhendorf's testimony on matters relevant to their mitigation defense and to the credibility of Charles Ruma.

## F. Payment by Wal-Mart of Plaintiff's Attorneys' Fees

Wal-Mart's payment of attorney fees to the Plaintiff comes from the testimony of Ron Belnap. Belnap has stated in deposition testimony that Wal-Mart contributed to the cost of litigation in furtherance of the Plaintiff's attempt to obtain the requisite zoning permissions for the Wal-Mart plan to move forward. Plaintiff contends that any payments made by Wal-Mart towards the Plaintiff's attorneys' fees are irrelevant and should be excluded at trial. The Defendants argue that the payment of fees is [*17] relevant to demonstrate that on an ongoing basis, consideration was conveyed to Wedgewood for the right to acquire the property. In other words, Defendants argue that Wal-Mart's continued pursuit of the litigation after the imposition of the Instructions shows that the property was worth at least $155,000 per acre, or the price per acre in the original Wal-Mart contract, after the Instructions.

The Court is not persuaded by the Defendants' argument. The payment of fees goes to the apportionment of the fees between the Plaintiff and Wal-Mart for the litigation to secure a zoning permit for the project. It does not go towards the value of the property or any other issue relevant in this trial. The Plaintiff's Motion is **GRANTED**.

## II. MOTION TO QUASH

The Defendants have moved to quash the subpoena issued by the Plaintiff to Kim Koenig for a deposition and to produce documents on November 19, 2010 at 9 a.m. At the final pretrial conference held on November 17, 2010, the Court orally **DENIED** the motion. The Court allowed the deposition to go forward on what additional information Mr. Koenig has reviewed or in what manner his opinions have changed.

## III. MOTION TO DISMISS

Intervening Defendant Liberty [*18] Township/ Powell Neighborhood Community Watch Foundation moves to be dismissed from the action because there are no claims for damages against it. The Intervenor states that its only connection to the case is the Plaintiff's Interim Motion for Attorneys' Fees and Costs, *Motion*, Doc. No. 188, and that the Plaintiff may not as a matter of law recover attorneys' fees from the Intervenor, *see Response*, Doc. No. 213. In its Reply, the Intervenor modified its request. Conceding that it would remain a party to the case for the purpose of the motion for fees, the Intervenor now moves only that it be dismissed for the purposes of the damages portion of the litigation and that the Court declare that the Intervenor is not subject to any damages award that may be issued at trial.

*Reply*, Doc. No. 250. The Plaintiff has filed a notice that it does not oppose the Intervenor's amended request. *Notice*, Doc. No. 252.

The Court finds the Intervenor's amended arguments to be meritorious. The Intervenor's Motion to Dismiss for the purposes of the damages portion of the litigation is **GRANTED**. The Intervenor is still a party for purposes of determining whether Intervenor can be held responsible for Plaintiff's [*19] attorneys' fees and costs.

## IV. MOTION TO READ STIPULATION

The Plaintiff has moved to read its proposed Stipulations 1 through 38 to the jury to provide necessary background information to the jury without the need for live testimony. *Motion*, Doc. No. 205. The Defendants object that Stipulations 2 through 38 are irrelevant to the issues at trial and prejudicial to the Defendants. *Response*, Doc. No. 224.

As discussed above in reference to the motions in limine, the Court finds that some information relating to the zoning history and liability determination is relevant to provide useful context for the jury on the claim for compensatory damages. With that in mind, the Court concludes that Stipulations 1-7, 25, 30, 31, 32, and 34 are relevant to provide context and are not prejudicial to the Defendants. Those Stipulations may be read to the jury.

Stipulations 8, 9, 11, 16, 17, 22, 24, 28, 29, 33, 35, 37 and 38 are not relevant or confuse the issues for the jury. Those Stipulations may not be read to the jury.

Stipulations 10, 12, 13, 14, 15, 18, 19, 23 are motivation evidence that the Court has ruled inadmissible. These Stipulations may not be read to the jury.

Stipulations 20 and 21 are relevant. [*20] The statement in Stipulation 20, however, that "the

Trustees responded to the public's demands by issuing what they called″ is impermissible motivation evidence and may not be read to the jury. Similarly, the statement ″that prevented Wedgewood from developing a Wal-Mart SuperCenter″ is a conclusory statement not supported by the record. The Stipulation may instead read as follows: ″On January 19, 2004, the Trustees issued the 'Public Statement and Instructions to Zoning Department Regarding Future Administration of Wedgewood Commerce Center Development Plain' (the 'January 19 Instructions').″ Stipulation 21 may be read to the jury as-is.

Stipulation 26 is partially relevant. The Stipulation may be read to the jury up to the word ″certificate.″

Stipulation 27 is partially relevant. Only its first sentence may be read to the jury.

Stipulation 36 is relevant but misleading. The Stipulation may read as follows: ″On October 21, 2008, the BZA upheld the September 30, 2004 denial of Wedgewood's zoning application.″

The Motion is therefore **GRANTED** in part and **DENIED** in part.

## V. CONCLUSION

For the foregoing reasons, the Court concludes

That the Motion in Limine of Defendants Concerning Facts Related [*21] to Court's Liability Determination, *Motion*, Doc. No. 206, is **GRANTED in part** and **DENIED in part**. The motion is granted only with respect to evidence of the motivation of the Township or its residents that led to the adoption of the Instructions, which may not be introduced at trial;

That the Defendants' Motion to Exclude the Testimony of Plaintiff's Damages Expert Witness, Robert J. Weiler, *Motion*, Doc. No. 208, is **DENIED**;

That the Motion of Defendants to Strike, *Motion*, Doc. No. 232, is **GRANTED in part**. Accordingly, the following motions are stricken: Plaintiff's Motion to Exclude Evidence Related to Offers Wedgewood has Received to Purchase the Property at Issue and Mary Bresnahan, David Ruma, Paul Lukeman, and Tom Burrows, *Motion*, Doc. No. 221; and Plaintiff's Motion to Exclude Kim Koenig, Motion, Doc. No. 225;

That Plaintiff Wedgewood Limited Partnership I's Motion to Exclude Mike Delhendorf and Testimony Regarding Alleged Threats Made by Charles Ruma, *Motion*, Doc. No. 220, is **DENIED**;

That Plaintiff Wedgewood Limited Partnership I's Motion to Exclude Evidence Regarding Any Payment by Wal-Mart of Plaintiff's Attorneys' Fees, *Motion*, Doc. No. 222, is **GRANTED**;

That the Motion of Defendants [*22] to Quash Subpoena, Motion, Doc. No. 230, is **DENIED**;

That the Intervening Defendant Community Oversight Foundation's Motion to Dismiss, *Motion*, Doc. No. 214, is **GRANTED**. It is further **DECLARED** that the Intervenor is still a party for purposes of determining whether Intervenor can be held responsible for Plaintiff's attorneys' fees and costs; and

That the Motion of Plaintiff Wedgewood Limited Partnership I To Have Its Proposed Stipulations Read to the Jury at Trial, *Motion*, Doc. No. 205, is **GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED**. [1]

**Dated: November 24, 2010**

**/s/Algenon L. Marbley**

**ALGENON L. MARBLEY**

**UNITED STATES DISTRICT COURT**

---

[1]  Remaining for trial are the Parties' cross-objections to the designations of deposition portions. *Defendants' Designation*, Doc. No. 200; *Plaintiff's Objection*, Doc. No. 219; Plaintiff's Designation, Doc. No. 204; *Defendants' Objection*, Doc. No. 224. The Court will issue a ruling on these objections on Monday, November 29, 2010.

## *Lativafter Liquidating Trust v. Clear Channel Communs., Inc.*

United States Court of Appeals for the Sixth Circuit

August 18, 2009, Filed

File Name: 09a0578n.06

Case No. 08-5959

**Reporter**

345 Fed. Appx. 46; 2009 U.S. App. LEXIS 18767; 2009 FED App. 0578N (6th Cir.)

LATIVAFTER LIQUIDATING TRUST, Plaintiff-Appellee, v. CLEAR CHANNEL COMMUNICATIONS, INC., Defendant-Appellant.

**Notice:** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**Prior History:** [**1] ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE.

*Lativafter Liquidating Trust v. Clear Channel Communs., Inc., 2008 U.S. Dist. LEXIS 50846 (E.D. Tenn., July 1, 2008)*

**Counsel:** For LATIVAFTER LIQUIDATING TRUST, Plaintiff - Appellee: Martin Blair Bailey, Herbert S. Sanger, Jr., Attorney, Wagner, Myers & Sanger, Knoxville, TN.

For CLEAR CHANNEL COMMUNICATIONS, INC., Defendant - Appellant: James C. Martin, Donna Marie Doblick, Attorney, Colin E. Wrabley, Reed Smith, Pittsburgh, PA; Patricia A. Foster,

Attorney, Richard M. Goehler, Frost Brown Todd, Cincinnati, OH.

**Judges:** BEFORE: BATCHELDER, Chief Judge, CLAY, Circuit Judge; and COX [*]

**Opinion by:** ALICE M. BATCHELDER

## Opinion

**[*47] ALICE M. BATCHELDER, Chief Judge.** In this contract dispute, Defendant-Appellant Clear Channel Communications, Inc. ("Clear Channel") appeals a jury award of compensatory damages and the district court's award of pre-judgment interest to Plaintiff-Appellee Eon Streams, Inc. ("Eon"). [1] For the reasons that follow, we AFFIRM.

**I.**

Clear Channel operates a network of approximately [**2] 1200 radio stations. Prior to going out of business, Eon provided internet streaming services, which allow radio stations to broadcast live programming on their websites. In January 2004, Eon and Clear Channel entered into a one-year, automatically renewable Service Agreement, under which Eon would provide internet streaming for some of Clear Channel's stations.

Later that year, Stephen Newman, Eon's chief executive officer, approached Brian Parsons, Clear

---

[*]  The Honorable Sean F. Cox, United States District Judge for the Eastern District of Michigan, sitting by designation.

[1]  On July 23, 2007, the district court granted Eon's motion to substitute "Lativafter Liquidating Trust" as the real party in interest.

345 Fed. Appx. 46. *47; 2009 U.S. App. LEXIS 18767, **2

Channel's Vice President of Technology, with a proposal for Eon to provide ad-insertion technology [2] for Clear Channel's internet broadcasts. On October 13, 2004, Newman e-mailed Parsons a "Letter of Agreement" ("LOA") that would amend the Service Agreement between Clear Channel and Eon. Under the proposed LOA, Eon would, among other things, develop and implement internet ad-insertion technology for Clear Channel. In return, Clear Channel was to extend the Service Agreement for a minimum three-year term and move all streaming radio stations within its network to Eon.

On October 19, 2004, Parsons sent an e-mail to Newman and Emma Woods of Eon, and to Kim Johnson, Clear Channel's Vice President of Sales and Marketing. Parsons began the e-mail by stating: "I am going to have to start from scratch on this but wanted to make sure the deal points were put into and verified via email first." Parsons then listed the deal points as including: (1) a three-year term under which Eon would be Clear Channel's preferred streaming partner; (2) Eon's maintaining competitive pricing, quality, and features; (3) Clear Channel's maintaining editorial control of network and branding; and (4) a 15% commission for Eon on any internet advertisement sale within Clear [*48] Channel's network. The same day, Johnson "replied to all" to note that the 15% commission would be on advertisement sales initiated by Eon, not on all sales.

After another round of revisions between Eon and Clear Channel, Woods e-mailed Parsons what she referred to as "hopefully the final version" of the LOA on October 21, 2004. The next day, Parsons e-mailed Newman an "updated draft" of the LOA. Parsons wrote: "[A]s a reminder, I won't be able to get an answer on a three-year commitment until [**4] I confirm with my cohort VPs." The attached "updated draft" included all the deal points Parsons had listed in his October 19 e-mail, including the three-year term.

Parsons attended Eon's January 2005 board meeting and informed the board that the contract was "in legal" but assured them: "[W]e have a deal, so nobody has to worry about anything here; we do have a deal." At some point after that board meeting, Newman met with Jeffrey Littlejohn, a Clear Channel Senior Vice President. Newman testified that Littlejohn told him: "We've absolutely got a deal."

Over the next several months, Eon sought to secure a written expression of that deal so it could show potential investors that Eon had a solid commitment from Clear Channel. In an effort to get a signed LOA, Newman presented Parsons with several new proposals suggesting changing the term from three years to a one-year or two-year renewable term, and even expressing a willingness to eliminate Eon's commission on advertisement sales it initiated. Meanwhile, Eon began developing the ad-insertion technology. Parsons regularly met with Eon during this time. Representatives of Eon and Clear Channel together met with potential advertising customers. [**5] Clear Channel's internal communications referred to Eon's responsibilities to develop the ad-insertion technology and expressed an objective of moving all streaming stations over to Eon.

Parsons even joined Eon's board of directors. The minutes of Eon's April 2005 board meeting reflect that Parsons announced that Clear Channel was "committed to executing the written contract . . . ." At Eon's July 2005 board meeting, Parsons assured the directors that a signed contract would be sent that day. That contract, however, never arrived.

In September 2005, Clear Channel signed an agreement with Akamai Technologies, Inc., one of Eon's competitors, to serve as Clear Channel's streaming provider. In November 2005, Clear Channel notified Eon of its intent to let its Service

---

[2]  Ad-insertion technology allows a station to insert advertisements into its "streamed" internet broadcasts to replace the advertisements that air on the station's local [**3] radio broadcasts.

Agreement with Eon expire. In May 2006, Eon sold substantially all of its assets to a third party for $ 17 million.

Eon filed suit against Clear Channel, alleging breach of contract, promissory estoppel, and negligent misrepresentation. Both parties unsuccessfully moved for summary judgment, and the case proceeded to a jury trial. Following Eon's evidence and again at the close of all evidence, Clear Channel unsuccessfully moved [**6] for judgment as a matter of law under *Rule 50(a)*. A jury found for Clear Channel on Eon's promissory estoppel and negligent misrepresentation claims, but found for Eon on the breach of contract claim and awarded Eon $ 40 million in damages. Clear Channel filed a post-verdict *Rule 50(b)* motion for judgment as a matter of law, or, in the alternative, a new trial; and Eon moved to alter the judgment to include pre-judgment interest. The district court denied Clear Channel's motion and granted Eon's, bringing the total award to approximately $ 44.2 million. Clear Channel timely filed its Notice of Appeal.

**[*49] II.**

Clear Channel makes several arguments on appeal. First, it argues it was entitled to judgment as a matter of law because there was no "meeting of the minds" regarding Eon's proposed LOA, and thus no contract for it to breach. Next, Clear Channel contends that the district court erred in allowing Grady Vanderhoofen, an Eon board member, to testify regarding Eon's diminished value and that Vanderhoofen's testimony was, in any event, insufficient evidence of Eon's damages. Finally, Clear Channel argues that the district court erred in awarding Eon pre-judgment interest.

**A. Was [**7] there a contract?**

We review a district court's denial of a Rule 50(b) motion *de novo*. *Radvansky v. City of Olmsted Falls, 496 F.3d 609, 614 (2007)*. "[I]n a diversity

case, when a Rule 50 motion for judgment as a matter of law is based on the sufficiency of the evidence, this court applies the standard of review of the state whose substantive law governs the matter." *American Trim, L.L.C. v. Oracle Corp., 383 F.3d 462, 471 (6th Cir. 2004)* (citing *Morales v. Am. Honda Motor Co., 151 F.3d 500, 506 (6th Cir.1998))*. In Tennessee,

> The standards governing trial courts in ruling on motions for directed verdict or JNOV . . . are well established. In ruling on the motion, the court must take the strongest legitimate view of the evidence in favor of the non-moving party. In other words, the court must remove any conflict in the evidence by construing it in the light most favorable to the non-movant and discarding all countervailing evidence. The court may grant the motion only if, after assessing the evidence according to the foregoing standards, it determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence. If there is any doubt as to the proper conclusions [**8] to be drawn from the evidence, the motion must be denied.

*Potter v. Ford Motor Co., 213 S.W.3d 264, 267-68 (Tenn. Ct. App. 2006)* (quoting *Eaton v. McLain, 891 S.W.2d 587, 590 (Tenn. 1994))* (internal citations omitted).

Clear Channel argues that the LOA regarding Eon's ad-insertion technology was not a contract because Clear Channel never accepted the terms of any of Eon's various offers. It contends that there was no meeting of the minds between it and Eon and that their volleys of e-mails and draft proposals were simply ongoing negotiations that never culminated in a mutual agreement.

Eon, on the other hand, argues that Parsons's October 22 e-mail with the attached "updated draft" of the LOA set forth an express contract between the parties. Eon contends that "[t]he jury

could legitimately have concluded that the only open item in November 2004 was whether Clear Channel would confirm a three-year term for the Letter of Agreement." Eon submits that "[t]he jury could have concluded that any doubt on this point was removed when Parsons attended the Eon board meeting in January 2005 and manifested Clear Channel's unqualified and unconditional acceptance by stating 'we have a deal.'" In other [**9] words, Eon argues that the evidence was sufficient for the jury to find that an express contract existed as of October 22, 2004, the date of the final LOA draft, or at least by January 2005, the date of Parsons's appearance before the Eon board.

"[A]n enforceable contract must, among other elements, result from a meeting of the minds and must be sufficiently definite to be enforced." *Rice v. N.N. Inc., Ball & Roller Div., 210 S.W.3d 536, 542 (Tenn. Ct. App. 2006)* (quoting *Jamestowne on Signal, [*50] Inc. v. First Federal Sav. & Loan Ass'n., 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990))*. Taking "the strongest legitimate view of the evidence in favor of" Eon, and "discarding all countervailing evidence" in favor of Clear Channel, *Potter, 213 S.W.3d at 267*, the jury reasonably could have concluded that the parties reached an agreement on the LOA's material terms. In replying to Emma Wood's October 21, 2004, e-mail containing the "hopefully [] final version" of the LOA, Parsons attached an "updated draft" containing all the "deal points" listed by Woods in her version. True, Parsons cautioned that he would have to get approval for a three-year term from his fellow Clear Channel Vice Presidents. This [**10] approval, however, was manifested by Parsons's and Littlejohns's subsequent assurances to Eon CEO Stephen Newman that they "had a deal." Moreover, the conduct of the parties also served as evidence that the deal was sealed: Eon and Clear Channel even made joint sales calls to potential advertising customers. Even if we were inclined to reach an opposite determination, we cannot say "that

reasonable minds could not differ as to the conclusions to be drawn from the evidence." *Potter, 213 S.W.3d at 267*.

## B. Should the district court have allowed Vanderhoofven to testify, and was his testimony sufficient evidence of Eon's damages?

Grady Vanderhoofven is a venture capitalist, the Executive Vice-President of Southern Appalachian Fund (which invested in Eon), and was a member of Eon's board. Vanderhoofven testified that Eon's value would have been $ 57 million with the Clear Channel contract, instead of the $ 17 million it sold for in 2006. As an investor in Eon, Vanderhoofven in 2005 investigated Eon's financials, retaining a market research firm to verify Eon's market potential. When he became a member of Eon's board in March 2005, he received Eon's monthly financial reports, including income [**11] statements, balance sheets, and cash flow statements. Vanderhoofven testified that between June 2004 and June 2005, the number of stations Eon was streaming increased by over 500%. After June 2005, however, the revenue from Clear Channel began to dwindle, and Vanderhoofven determined that Clear Channel was moving its streaming business to another company. Vanderhoofven based his $ 57 million valuation on the revenue Clear Channel had been generating for Eon prior to the discontinuation of their business, and the projection for the 12-month period prior to Eon's sale.

Clear Channel argues, as an initial matter, that Eon cannot recover damages for its diminished value because Tennessee does not recognize diminished-value damages outside the context of commercial real estate, and because a potential loss in Eon's value was not contemplated by the parties when they entered into the contract.

In *BVT Lebanon Shopping Center, Ltd. v. Wal-Mart Stores, Inc., 48 S.W.3d 132, 136 (Tenn. 2001)*, the Tennessee Supreme Court upheld a diminished-value award to a shopping center

whose value had decreased when its anchor tenant breached a covenant of continuous occupancy. The court held that its conclusion [**12] was in line with general contract remedies: "The purpose of assessing damages in breach of contract cases is to place the plaintiff as nearly as possible in the same position she would have been in had the contract been performed[.]" *Id.* (quoting *Lamons v. Chamberlain, 909 S.W.2d 795, 801 (Tenn. Ct. App.1993)*). "Generally speaking," the court recognized, "damages for breach of contract include only such as are incidental [*51] to or directly caused by the breach and may be reasonably supposed to have entered into the contemplation of the parties." *Id.* (quoting *Simmons v. O'Charley's, Inc., 914 S.W.2d 895, 903 (Tenn. Ct. App.1995)*). The court in *BVT Lebanon* did not limit its holding to the commercial real estate context; indeed, it relied on basic principles of contract law to place the plaintiff in the position it would have enjoyed had the contract been kept.

Here, had Clear Channel not breached the contract, Eon would have had a fixed-term agreement to stream internet broadcasts for hundreds of radio stations, obviously increasing its attractiveness to potential investors and buyers. And by the time Clear Channel executives assured Stephen Newman and the Eon board that a deal was in place, [**13] Clear Channel knew that Eon was seeking assurances to mollify investors; Clear Channel knew that the amended Service Agreement was integral to Eon's financial health. Diminished-value damages were in order here and were not outside the contemplation of the contracting parties.

Clear Channel contends that even if diminished-value damages are allowed in this setting, they cannot be proven without expert testimony, and that Vanderhoofven's testimony as a lay opinion witness under *Federal Rule of Evidence 701* was improper. "'We review for abuse of discretion a district court's evidentiary

rulings, including rulings on witness testimony under *Rule[] 701 . . . of the Federal Rules of Evidence*.'" *United States v. White,* 492 F.3d 380, 398 (2007) (quoting *JGR, Inc. v. Thomasville Furniture Indus., Inc., 370 F.3d 519, 524 (6th Cir.2004)*). That Rule provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on [**14] scientific, technical, or other specialized knowledge within the scope of Rule 702.

*Fed. R. Evid. 701.* The advisory commission notes to the 2000 amendments to *Rule 701* provide:

> [M]ost courts have permitted the owner *or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. See, e.g., Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153 (3d Cir. 1993)* (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business). Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

*Id.* (emphasis added).

As an investor who researched Eon's financial condition, and later as a member of Eon's board, Vanderhoofven had personal, particularized knowledge of Eon's value. The district court did not abuse its discretion in permitting him to testify

about Eon's projected value [**15] if it had retained Clear Channel's business. Moreover, contrary to Clear Channel's assertions, Vanderhoofven's testimony rested on a sufficient foundation -- his personal research into Eon's financial reports. [3]

**[*52] C. Should the district [**16] court have awarded Eon pre-judgment interest?**

We review for an abuse of discretion a district court's prejudgment-interest award. *Gentek Bldg Products, Inc. v. Sherwin-Williams Co., 491 F.3d 320, 333 (2007)* (quoting *Anderson v. Whittaker Corp., 894 F.2d 804, 809 (6th Cir.1990))*. "There is no dispute that in a diversity action the question of prejudgment interest must be determined under state law." *Daily v. Gusto Records, Inc., 14 F. App'x 579, 591 (6th Cir. 2001)* (citing *Mass. Benefit Ass'n v. Miles, 137 U.S. 689, 11 S. Ct. 234, 34 L. Ed. 834 (1891))*. Tennessee law favors "awarding prejudgment interest whenever doing

so will more fully compensate plaintiffs for the loss of use of their funds. Fairness will, in almost all cases, require that a successful plaintiff be fully compensated by the defendant for all losses caused by the defendant, including the loss of use of money the plaintiff should have received." *Scholz v. S.B. Intern., Inc., 40 S.W.3d 78, 83 (Tenn. Ct. App. 2000)*. The court determined that "Eon's demise was assured when Clear Channel breached the parties' contract on September 9, 2005." The court then calculated interest as accruing from that date at a rate equal to 4.666%, the average rate [**17] from September 9, 2005 to December 14, 2007. The district court did not abuse its discretion in awarding Eon prejudgment interest.

## III.

Accordingly, we **AFFIRM** the judgment of the district court.

---

[3]   On March 13, 2009, Clear Channel moved this Court to certify three questions of law to the Supreme Court of Tennessee under Tennessee Supreme Court Rule 23. Specifically, Clear Channel asked us to inquire of that court: "(1) whether Tennessee would permit a corporate plaintiff to recover $ 40 million in diminished value damages for a breach of contract that does not involve either permanent damage to real estate or a covenant of continuous occupancy; (2) whether Tennessee permits a plaintiff to recover diminished value damages for a breach of an implied contract; and (3) whether Tennessee required diminished value damages to be proven by expert testimony." Because we hold that an express contract existed between Eon and Clear Channel, that the Tennessee Supreme Court in *BVT Lebanon* did not limit its holding to the real estate context, and that Federal Rule of Evidence 701 permits Vanderhoofen's testimony, we hereby **DISMISS** Clear Channel's motion to certify.

## *Havard v. Baxter Int'l, Inc.*

United States District Court for the Northern District of Ohio, Eastern Division

July 21, 2000, Filed

Case No. 1:92CV0863

**Reporter**

2000 U.S. Dist. LEXIS 21316

SANDRA LEE HAVARD, Plaintiff, vs. BAXTER INTERNATIONAL INC., et al., Defendants.

**Disposition:** [*1]  Baxter's motion to exclude testimony from Dr. Gary Solemon, Dr. Douglas Shanklin, Dr. Pierre Blais, and Dr. Saul Puszkin regarding the ability of silicone implants to cause systemic and/or atypical connective tissue diseases granted.

**Counsel:** For SANDRA LEE HAVARD, plaintiff: Leonard W. Yelsky, Esq., Fanette Poulos Yelsky, Esq., Yelsky & Lonardo, Cleveland, OH.

For SANDRA LEE HAVARD, plaintiff: Mark S. Colucci, Esq., Youngstown, OH.

For SANDRA LEE HAVARD, plaintiff: Michael R. Hugo, Esq., Samuel M. Pollack, Esq., Hugo & Pollack, Boston, MA.

For SANDRA LEE HAVARD, plaintiff: Alan S. Levin, Esq., White & Meany, Reno, NV.

For BAXTER HEALTHCARE CORPORATION, defendant: Elizabeth B. Wright, Esq., Thompson Hine, Barbara J. Arison, Esq., Frantz Ward, Cleveland, OH.

For BAXTER HEALTHCARE CORPORATION, defendant: Debra E. Pole, Esq., David L. Schrader, Esq., Kathleen A. Waters, Esq., Brobeck, Phleger & Harrison, Los Angeles, CA.

**Judges:** ANN ALDRICH, UNITED STATES DISTRICT JUDGE.

**Opinion by:** ANN ALDRICH

## Opinion

### MEMORANDUM AND ORDER

This is a diversity, product-liability action arising out of the plaintiff's use of silicone breast implants. The defendants, Baxter International Inc. and [*2] Baxter Healthcare Corporation (collectively "Baxter"), have filed a motion to exclude testimony from Sandra Lee Havard's experts regarding the theory that silicone implants cause systemic diseases. In particular, Baxter challenges the reliability and relevance of the expert testimony that Havard purportedly is offering from four experts: Dr. Gary Solomon, Dr. Douglas Shanklin, Dr. Pierre Blais, and Dr. Saul Puszkin. In accordance with the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)*, this Court conducted a hearing on the matter on June 29, 2000. For the reasons that follow, this Court grants Baxter's motion to exclude testimony from all four of those witnesses regarding the ability of silicone to cause systemic diseases (doc. # 44).

### I. Facts and Procedural History

In 1980, Havard underwent breast augmentation surgery for "cosmetic" purposes. Her surgeon implanted her with two silicone breast prostheses that had been manufactured by the Heyer-Schulte Corporation. This company eventually merged into Baxter Travenol Laboratories, Inc.; pursuant to a number of other [*3] mergers, the company's liabilities later were transferred to Baxter International Inc. and its subsidiary, Baxter Healthcare Corporation.

Case: 1:08-cv-02755-DCN  Doc #: 319-2  Filed: 05/26/15  16 of 38.  PageID #: 16142

Page 2 of 8
2000 U.S. Dist. LEXIS 21316, *3

In the early 1990's, after hearing about the possible dangers of silicone breast implants, Havard decided to have her silicone implants removed and replaced with saline-filled prostheses. During the replacement surgery, it was discovered that Havard's right silicone implant had ruptured at some point in time. Soon thereafter, Havard filed this lawsuit, alleging that the silicone implants had caused her to suffer a variety of health problems. In addition to local chest pain and breast deformity, Havard claims that she has experienced muscle and joint pain, short-term memory loss, and chronic fatigue -- a constellation of systemic symptoms that has been labeled "undifferentiated connective tissue disease" and/or fibromyalgia.

This case and numerous other silicone breast implant cases were consolidated into Multi-District Litigation before the Honorable Sam C. Pointer in the Northern District of Alabama. Judge Pointer appointed a Rule 706 National Science Panel "to review and critique the scientific literature pertaining to the possibility of a causal [*4] association between silicone breast implants and connective tissue diseases, related signs and symptoms, and immune system dysfunction." Def. Summary Judgment Motion, Exh. H, at 1. The panel, which consisted of four scientific experts in the fields of immunology, epidemiology, toxicology, and rheumatology, held hearings and reviewed all available information on the subject. The panel concluded, in short, that the scientific evidence failed to demonstrate a causal connection between silicone implants and systemic diseases. In 1997, Congress asked the Department of Health and Human Services to sponsor a study of the safety of silicone breast implants by the Institute of Medicine ("IOM") of the National Academy of Sciences. After an extensive review of the available data, the IOM found that the incidence of connective tissue diseases and other systemic diseases is no higher among women with implants that it is among women without implants. See Def. Summary Judgment Motion, Exh. I, at 11. In January of 1999, Judge Pointer remanded Havard's case back to this Court.

On June 8, 2000, this Court granted Baxter's motion for summary judgment in large part. [1] Baxter also had filed a motion [*5] to exclude testimony from Havard's experts regarding the ability of silicone implants to cause systemic diseases, or what those experts call "atypical" or "undifferentiated" connective tissue disease. In light of the importance of the motion to the length and complexity of the trial -- and in an effort to give Havard a full opportunity to convince this Court of the reliability of the proposed expert testimony -- this Court scheduled a Daubert hearing to assess the admissibility of the testimony. The hearing occurred on June 29, 2000. No live witnesses were presented, but Baxter presented some videotaped testimony from the members of the Rule 706 National Science Panel (hereinafter "Rule 706 panel"). This Court also heard oral argument from both sides.

[*6] II. Daubert Standard

Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 588, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993). It provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702. In the landmark Daubert case,

---

[1]  There are four remaining claims in this case: (1) defective manufacture and design; (2) failure to warn; (3) negligence; and (4) breach of implied warranty of merchantability. Havard has raised a genuine dispute as to whether her silicone implants caused her to suffer localized (as opposed to systemic) injuries.

the Supreme Court, in keeping with the liberal thrust of the Federal Rules of Evidence, created a "flexible inquiry," which was intended to relax the admission standard for expert testimony but prevent unreliable evidence from entering the courtroom. *Daubert, 509 U.S. at 594-95*. This inquiry assigns the trial judge "a gatekeeping role," *id. at 597*, and requires the court to assess: "(1) whether the reasoning or methodology underlying the expert's testimony is scientifically valid; and (2) whether that reasoning or methodology properly [*7] could be applied to the facts at issue to aid the trier of fact." *United States v. Smithers, 212 F.3d 306, 315 (6th Cir. 2000)*.

The first step pertains to the reliability of the proposed testimony. It focuses on the methodologies that the experts use to reach their conclusions; it does not fixate on the conclusions themselves. *Daubert, 509 U.S. at 595*; *see also Wellman v. Norfolk and W. Ry. Co., 98 F. Supp. 2d 919, 2000 WL 728813*, at *2 ("The proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable."). Scientifically valid methodology generally will lead to scientifically valid conclusions for purposes of *Rule 702*. *Greenwell v. Boatwright, 184 F.3d 492, 497 (6th Cir. 1999)* (citing *United States v. Bonds, 12 F.3d 540, 556 (6th Cir. 1993)*). Nonetheless, "conclusions and methodology are not entirely distinct from one another. ... A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered" for the opinion to be admissible. *General Electric Co. v. Joiner, 522 U.S. 136, 146, 139 L. Ed. 2d 508, 118 S. Ct. 512 (1997)*. [*8]

The <u>Daubert</u> Court enumerated four non-exhaustive factors that trial judges may consider when making the reliability determination:

(1) whether the theory has been tested or is capable of being tested;

(2) whether the theory has been subjected to peer review and publication;

(3) the theory's potential rate of error; and

(4) whether the theory has been generally accepted by the relevant scientific community.

*Daubert, 509 U.S. at 593-94*. The Sixth Circuit and other courts have cited another factor that may be pertinent in a particular case:

(5) whether the opinion has been put to any non-judicial uses, or whether the opinion has been developed expressly for the purposes of litigation.

See *Smelser v. Norfolk S. Ry. Co., 105 F.3d 299, 303 (6th Cir.)*, cert. denied, *522 U.S. 817, 139 L. Ed. 2d 29, 118 S. Ct. 67 (1997)*, abrogated on other grounds; *Daubert v. Merrell Dow Pharm., 43 F.3d 1311, 1317 (9th Cir. 1995)* (on remand). These factors neither are meant to comprise a comprehensive list, nor are they all intended to be relevant in every case. *Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999)*. [*9]

The second prong of the <u>Daubert</u> analysis refers to the relevancy or "fit" of the proffered testimony. *Daubert, 509 U.S. at 591*. Generally, testimony fits when it "will assist the trier of fact to understand evidence or to determine a fact in issue." *Cook v. American Steamship Co., 53 F.3d 733, 738 (6th Cir. 1995)*, abrogated on other grounds (citing *Fed. R. Evid. 702*); *see also Smithers, 212 F.3d at 315* (second step requires court to consider whether proposed testimony is "relevant to the task at hand and would aid the trier of fact").

The Sixth Circuit has stated that the district court does not need to hold a hearing when determining the relevance and reliability of an expert's testimony under <u>Daubert</u> and its progeny. *Greenwell, 184 F.3d at 498*. However, the Circuit

has intimated that conducting a hearing on the issue is optimal. See _Smithers, 212 F.3d at 318_ ("district court should have conducted a hearing under _Daubert_" instead of excluding expert testimony without undertaking proper analysis). As a final matter, the trial judge must pay heed to the other rules of evidence in making [*10] his or her determination regarding the admissibility of the proffered testimony. _Daubert, 509 U.S. at 595_ (court must remain mindful of Rule 703, Rule 706, _Rule 403_, and other rules).

## III. Proposed Expert Testimony

Although Baxter purportedly has moved to exclude all testimony regarding the correlation between silicone breast implants and systemic diseases, Baxter really challenges the ability of four of Havard's experts to provide reliable expert testimony on this topic. This Court will consider each of these witnesses in turn.

## A. Gary Solomon, M.D.

Gary Solomon, M.D., is a rheumatologist. According to the report that he submitted in this case, he is willing to opine as follows:

> [Havard] lacks specific findings to allow for the diagnosis of one of the classical connective tissue diseases and specifically does not fulfill criteria for rheumatoid arthritis, hence the most appropriate diagnostic category for her would be undifferentiated connective tissue disease (UCTD). She also appears to fulfill ACR criteria for fibromyalgia. . . . It is my belief to a reasonable degree of medical certainty that exposure to silicone has been a substantial [*11] contributing factor in the etiology of both the local disorders in the breast and of the systemic disorder in the form of UCTD.

Pl. Expert Disclosures, at Exh. 3, p.3. Solomon bases his opinion that silicone implants cause "atypical/undifferentiated connective tissue disease" on his database containing approximately 1,200 patients whom he has encountered (all of whom apparently have, or had, implants). That is, symptomatic, implanted women are referred to him for evaluation, and Solomon attempts to diagnosis and record any rheumatological illnesses from which they might suffer.

In this case, Solomon examined Havard's medical records and used a technique known as "differential diagnosis" to identify the cause of Havard's systemic symptoms. See Pl. Expert Disclosures, at Exh. 3. This technique involves a process of elimination whereby the physician identifies diseases which may be causing the individual's symptoms, and then rules out diseases on the list until the most likely disease is identified. See, e.g., _Glaser v. Thompson Med. Co., Inc., 32 F.3d 969, 978 (6th Cir. 1994)_ (proper use of differential diagnosis involves assigning reliable probabilities [*12] to likely sources of illness). As stated in Solomon's report, he concluded that Havard fails to satisfy the diagnostic criteria for classic connective tissue diseases (such as rheumatoid arthritis, so "the most appropriate diagnostic category for her would be undifferentiated connective tissue disease (UCTD)." Pl. Expert Disclosures, at Exh. 3, p.3.

Upon a thorough review of the evidence, this Court concludes that Solomon's opinion regarding general causation of systemic illness is too unreliable to be admissible. As an initial matter, it is important to highlight the distinction between general causation and specific causation. In mass tort cases, a plaintiff must prove both that the product is capable of causing the alleged injuries in the first place (general causation), and that the product caused his or her particular injuries (specific causation). See _Sterling v. Velsicol Chem. Corp., 855 F.2d 1188, 1200 (6th Cir. 1988)_ (distinguishing between generic and individual causation); _Grant v. Bristol-Myers Squibb, 97 F. Supp. 2d 986, 2000 WL 562311, at *2 (D. Ariz. 2000)_ (plaintiff in breast implant case "must prove

that the allegedly toxic substance [*13] is capable of causing a particular injury in the general population, and that the substance caused this particular individual's injury"); Joseph Sanders, From Science to Evidence: The Testimony on Causation in the Bendectin Cases, 46 Stan. L. Rev. 1, 13-17 (1993) (discussing differences between general and specific causation). Here, Solomon's view that silicone implants generally are capable of causing undifferentiated connective tissue disease is not based on scientifically valid methodology.

As all four members of the Rule 706 panel recognized, Solomon's methodology is neither tested nor testable. Solomon bases his theory regarding general causation on his database, which contains only an experimental group of women who have, or have had, breast implants. He has not drawn a representative sample or compared the individuals in his database to a control group. Dr. Tugwell (and other members of the Rule 706 panel) noted that Solomon's theory is incapable of being tested due to incorporation bias:

> Having reviewed both the testimony presented to us, plus the fairly extensive literature, we [the panel] came to the conclusion that we are not, at this time, prepared [*14] to accept systemic silicone-related disease as a disease for the following reasons. Number one, and most importantly, the inclusion of the putative cause, possible cause, silicone exposure as one of the criteria . . . does not allow the criteria set to be tested objectively without knowledge of the presence of implants, thus incurring one of the standardized epidemiological biases that one has to avoid, namely, incorporation bias. That refers to where you incorporate what you're looking for in the definition of what you started with,

what's called a tautology, you're guaranteed that result, and, therefore, you're not asking a testable question. It does not meet the scientific method.

In re: Silicone Gel Breast Implant Litigation, Video Deposition of Dr. Peter Tugwell, at 99-100. Moreover, Solomon uses criteria that "are already part of our accepted diseases, for example, scleroderma, Sjogren's, lupus, fibromyalgia, chronic fatigue, [etc]." Id. at 100-01. Solomon has not assessed whether the criteria he ascribes to undifferentiated connective tissue disease are present in people without implants; he has not published any explanation as to how silicone-related [*15] systemic disease may differ from a variety of diseases marked by similar, if not identical, symptoms. In addition, he fails to account for any pre-existing conditions in the patients in his database, or for the possibility that the patients' medications might be causing some of their symptoms. As such, Solomon's methods are not only untestable, but also are subject to a high rate of error. See Grant, 97 F. Supp. 2d at 990, 2000 WL 562311, at *5 (excluding Dr. Solomon's causation testimony as scientifically unreliable).

Indeed, to the extent Solomon's theory of general causation has been peer-reviewed, it has been resoundingly rejected. The Rule 706 panel, the IOM of the National Academy of Sciences, the Independent Review Group out of the United Kingdom, and major medical associations all have concluded that there is no reliable evidence to support the theory that silicone implants can cause rheumatological, auto-immune, or other systemic diseases. [2]

[*16] Havard evades the evident unreliability of Solomon's methods by misconstruing Daubert and by conflating general and specific causation.

---

[2] Baxter submitted a list of approximately fifteen organizations that have found such evidence to be unreliable. These organizations include the American College of Rheumatology (of which Dr. Solomon is a member), the American Medical Association, the American Cancer Society, and the College of American Pathologists. In contrast, Havard has not identified a single organization that finds Dr. Solomon's theory to be based on sound methodology.

With respect to Daubert and its progeny, she erroneously charges that Baxter, the Rule 706 panel, and the courts expect her experts to establish their theories to "a scientific certainty." That is not correct. Rather, Solomon and the other experts must show that their opinions are based on valid methodology, and that there are no enormous analytical gaps between those opinions and the data generating them. *Joiner, 522 U.S. at 146*. While the judge's gatekeeping role often presents difficult challenges.

> the Supreme Court has obviously deemed [it] less objectionable than dumping a barrage of questionable scientific evidence on a jury, who would likely be even less equipped than the judge to make reliability and relevance determinations and more likely than the judge to be awestruck by the expert's mystique.

*Allison v. McGhan Med. Corp., 184 F.3d 1300, 1310 (11th Cir. 1999)* (upholding exclusion of expert testimony in silicone breast implant case). Havard's complaints regarding the hubris of lawyers [*17] and judges in assessing scientific evidence ring hollow in light of: (1) the fact that Judge Pointer specifically appointed a neutral panel of scientific experts in this case to assess the testimony being offered from Solomon and other witnesses regarding systemic diseases; and (2) Havard did not even bother to produce any of her experts at the Daubert hearing.

Havard also misunderstands the interplay between general causation and specific causation. She seems to argue that Solomon's use of differential diagnosis is sufficiently valid to be admissible to prove either specific or general causation. However, the differential diagnosis testimony would be relevant only to specific causation -- not to general causation. That is, differential diagnosis is premised on the assumption that each of the diseases on the list of possible causes can, in fact, cause the symptoms at issue. Baxter does not dispute that Solomon's use of differential diagnosis would be relevant to the specific causation of Havard's symptoms; rather, Baxter correctly argues that differential diagnosis does not prove that silicone implants are capable of causing systemic diseases in the general population. Thus, Solomon's [*18] testimony regarding specific causation is dependent upon proof of general causation, and it would be probative only if Havard is able to show, in the first place, that silicone implants can cause atypical or undifferentiated connective tissue disease. [3]

[*19] Finally, the unreliability of Solomon's testimony regarding general causation of systemic illnesses must be contrasted with the danger of unfair prejudice to Baxter, the possibility of confusion to the jury, and, in particular, the undue prolonging of the trial that inevitably would result were this Court to admit the testimony. The balancing test contained in *Rule 403 of the Federal Rules of Evidence* only further counsels in favor of excluding Solomon's general causation testimony. In sum, this Court concludes that the methodology underlying Solomon's general causation opinion -- i.e., his opinion that silicone implants can cause systemic or undifferentiated connective tissue diseases -- is far too unreliable to be admissible.

**B. Douglas Shanklin, M.D.**

Douglas Shanklin, M.D., is a pathologist who originally was slated to testify regarding the

---

[3]  Havard relies on Westberry v. Gummi, 178 F.3d 257 (4th Cir. 1999), a case which is distinguishable from Havard's case in an illustrative way. In Westberry, testimony based on a reliable differential diagnosis was admissible because general causation was *not* disputed. See id. at 264 ("there was no dispute that exposure to high concentrations of airborne talc could cause irritation to mucous membranes"). In this case, Baxter strenuously disputes the issue of general causation. In addition, like the Bendectin cases and unlike the Westberry case, Dr. Solomon's maverick theory regarding general causation contradicts the available epidemiological data. See id. at 263 (citing Raynor v. Merrell Pharms., Inc., 323 U.S. App. D.C. 23, 104 F.3d 1371 (D.C. Cir. 1997), regarding impropriety of "ruling in" possible cause in differential diagnosis when that alleged cause conflicts with body of epidemiological evidence).

Case: 1:08-cv-02755-DCN  Doc #: 319-2  Filed: 05/26/15  21 of 38.  PageID #: 16147

Page 7 of 8
2000 U.S. Dist. LEXIS 21316, *19

migratory properties of silicone gel and his interpretation of Havard's pathology samples. Shanklin had been prepared to testify in other breast implant cases that silicone transforms into crystalline silica in vivos; that his "silicone sensitivity test" is able to measure a person's sensitivity to crystalline silica; and that crystalline [*20] silica leads to autoimmune disease. See, e.g., Allison, 184 F.3d at 1317 (upholding exclusion of Shanklin's testimony under Daubert); Grant, 97 F. Supp. 2d at 992, 2000 WL 562311, at *5 (excluding Shanklin's testimony as unreliable). Baxter argues that such testimony from Shanklin must be excluded in this case as well.

At the Daubert hearing, Havard's counsel retracted from arguments that had been made in the plaintiff's briefs and indicated that Shanklin would not testify regarding his silica sensitivity test or his theory that silicone converts into silica in vivos. [4] However, Havard's counsel never specified to what, then, Shanklin would testify (other than an oblique reference to the "slides" he allegedly viewed).

[*21] Havard's decision to withdraw Shanklin's testimony regarding causation of systemic and/or auto-immune diseases is wise, as Shanklin's methods are unreliable and fraught with the possibility of confusion. The record is bereft of any documents or data that would support the theory that silicone gel is capable of spontaneously transforming into silica, or any evidence that would support Shanklin's other poorly-tested hypotheses. In contrast, the Rule 706 panel, the IOM, and the Independent Review Group all have rejected Shanklin's theories. Furthermore, Baxter submitted affidavits from a number of doctors who attest that Shanklin's hypotheses have not gained acceptance in the scientific community. Accordingly, any testimony from Shanklin

regarding silicone disease causation must be excluded as scientifically unreliable.

## C. Pierre Blais, Ph.D.

Havard's counsel also conceded at the Daubert hearing that Pierre Blais, a chemist, would not be offered to testify regarding silicone's effect on the body. This concession is thoroughly appropriate in light of the fact that Blais has not conducted any research on this topic or employed a methodology that passes muster under Daubert [*22] . In addition, Blais keeps no records, does not publish his opinions, and has not developed any relevant opinions independent of litigation. See also Grant, 97 F. Supp. 2d at 991, 2000 WL 562311, at *5 (excluding Blais' testimony in breast implant case). His consulting firm, which he calls Innoval, is based in his home; Blais apparently possesses little equipment, and stores the implants he examines in an annex to his house (which may not be an environment that can preserve the implants adequately).

Due to the weaknesses in Blais' credentials and methodologies, Baxter asks this Court to exclude him from testifying regarding pathology, biology, design and manufacturing defects, and a variety of other areas beyond his expertise. This Court agrees with Baxter that Havard has fallen far short of demonstrating that Blais' purported expert testimony on any of these subjects is sufficiently reliable to be admissible. With regard to implant design and manufacture, for example, there is no credible evidence in the record to show that Blais bases any opinions in this area on scientifically reliable analyses (indeed, Havard has failed to explain what those opinions are). [*23] As previously noted, Blais neither publishes his theories nor espouses opinions that have been accepted by the scientific community. Havard

---

[4] In support of Dr. Shanklin's testimony (and other disputed testimony), Havard's attorneys obviously submitted briefs that are almost identical to briefs they had submitted in a case in which Bristol-Meyers Squibb, and not Baxter, was the defendant (except, perhaps, that in this case, they repeated pages 2-12 again at pages 13-22). This Court will overlook the plaintiff's continuous and erroneous references to the defendant as Bristol-Myers, but cautions plaintiff's counsel to exercise more care in any future briefings before this Court.

relies solely on Blais' curriculum vitae and the claim that Blais once worked for the Canadian government's Department of National Health and Welfare, Radiation and Medical Devices Health Protection Branch. A reference to an individual's resume and prior work experience does not, standing alone, qualify that individual as an expert.

Accordingly, this Court concludes that Blais may not testify regarding systemic diseases, the design or manufacturing of silicone implants, warnings associated with breast implants, or any other subject beyond his qualifications. Blais may testify only regarding his identification and handling of Havard's implant(s), and his observations of the physical condition of her implant(s).

### D. Saul Puszkin, Ph.D.

Finally, Baxter challenges the admissibility of the proposed testimony from Saul Puszkin, who possesses a Ph.D. in biochemistry. Puszkin's main idea seems to be that silicone is an adjuvant that stimulates a response in the body's immune system. He believes that the body creates antibodies in response to [*24] the presence of silicone, and, apparently, that this immune response causes atypical connective tissue disease. Puszkin is prepared to testify about the reaction of tissue to silicone, and the chemical and color changes that silicone gel undergoes while implants are in the body.

At the Daubert hearing -- which, as previously indicated, Puszkin did not attend -- Havard's counsel averred that Puszkin would not testify regarding immunology, but only about his "pathology observations." However, Havard has not produced any credible evidence to show that Puszkin's "pathology" opinions are reliable under Daubert. Baxter, on the other hand, has demonstrated that Puszkin has published only one article regarding his research; that his methods have not been tested; and that his opinions regarding disease causation have not been generally accepted by the relevant scientific community. [5] Moreover, Puszkin has not developed his opinions independent of litigation. As best this Court can discern, Puszkin possesses no opinions regarding silicone implants and pathology that are based on sound science. Therefore, this Court grants Baxter's request to exclude testimony from Puszkin regarding [*25] the causation of systemic and/or other diseases.

### IV. Conclusion

For the foregoing reasons, this Court grants Baxter's motion to exclude testimony from Dr. Gary Solomon, Dr. Douglas Shanklin, Dr. Pierre Blais, and Dr. Saul Puszkin regarding the ability of silicone implants to cause systemic and/or atypical connective tissue diseases.

In addition, the parties are reminded that this case is set for trial on [*26] **September 5, 2000**, at **9:00 a.m.**, in Courtroom 34, Key Tower, 127 Public Square, Cleveland, Ohio.

IT IS SO ORDERED.

ANN ALDRICH

UNITED STATES DISTRICT JUDGE

---

[5] Dr. Puszkin's recent article was published in Argentina, his native country. Havard has not supplied a copy of the article to this Court (in either Spanish or English). It is also worth noting that Puszkin's credibility has been attacked in a number of contexts. For example, he misstated his credentials in numerous cases, and was reprimanded by the Mt. Sinai Medical School for misrepresenting his research and engaging in other unethical practices. Because Puszkin did not appear at the Daubert hearing, this Court was not afforded the opportunity to directly assess Puszkin's credibility.

## _Caterpillar Fin., Servs. Corp. v. Firstmerit Corp._

United States District Court for the Northern District of Ohio, Eastern Division

March 21, 2008, Decided; March 24, 2008, Filed

CASE NO. 5:06 CV 2097

**Reporter**

2008 U.S. Dist. LEXIS 22836

CATERPILLAR FINANCIAL, SERVICES CORPORATION, Plaintiff, v. FIRSTMERIT CORPORATION, et al., Defendants.

**Counsel:** [*1] For Caterpillar Financial Services Corporation, Plaintiff: James S. Wertheim, LEAD ATTORNEY, McGlinchey Stafford, Beachwood, OH.

For FirstMerit Corporation, FirstMerit Bank, N.A., FirstMerit Bank Corp., Defendants: Elia O. Woyt, Jocelyn N. Prewitt-Stanley, LEAD ATTORNEYS, Marcel C. Duhamel, Vorys, Sater, Seymour & Pease - Cleveland, Cleveland, OH; Reginald W. Jackson, LEAD ATTORNEY, Vorys, Sater, Seymour & Pease - Columbus, Columbus, OH.

**Judges:** DONALD C. NUGENT, United States District Judge.

**Opinion by:** DONALD C. NUGENT

# Opinion

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motion to Exclude the Report and Testimony of Plaintiff's Expert Witness. (ECF # 55). Defendants FirstMerit Bank, N.A. and FirstMerit Corporation have requested that this Court exclude the report and testimony of Plaintiff's expert, Barkley Clark ("Mr. Clark"), pursuant to _Federal Rules of Evidence 702_ and _704_. Plaintiff, Caterpillar Financial Services Corporation ("Caterpillar") has filed a brief opposing the motion, (ECF # 62), and the Defendants filed a reply. (ECF # 64). Having

reviewed all submissions by the parties, the Court finds that the motion is premature and would be better addressed as a motion in limine [*2] when and if Mr. Clark is called to offer actual testimony in this case.

Defendants object to Mr. Clark's report because they believe that it (1) contains "almost exclusively" an opinion on the interpretation or application of the law; (2) it involves an opinion on the ultimate issue in the case; (3) it is not supported by reliable methodology; and (4) it is not relevant to the facts of this case. A review of the arguments and the relevant law in case reveal that Mr. Clark's report contains some opinions that may overlap with the Court's role in interpreting or applying the law, but that it also contains opinions which may be perfectly appropriate subjects for an expert opinion. The appropriateness of the opinions challenged by the Defendants will depend on the issues and circumstances existing at the time the testimony is offered and cannot be properly evaluated until such a time. Further, in non-scientific fields, experts may base their opinions on their specialized knowledge and experience, and an identifiable scientific methodology may not be strictly required. _See, Hangarter v. Provident Life & Acc. Ins. Co., 373 F.3d 998, 1015 (9th Cir. 2004)_. A challenge to the methodology used [*3] in any particular case is better addressed by a request for a Daubert hearing, than an early motion to exclude an expert's report.

In short, the Court finds that the motion to exclude Mr. Clark's expert report is premature insofar as his testimony has not yet been offered in any

2008 U.S. Dist. LEXIS 22836, *3

formal manner in support of the Plaintiff's case. The Court cannot properly evaluate the appropriateness of Mr. Clark's testimony until it knows the circumstances and issues in place at the time of its proffer. Therefore, the Defendants Motion to Exclude Mr. Clark's testimony is denied at this time. The Court, however, reserves the right to re-visit the Defendants' objections if and when Mr. Clark's report and opinions are actually offered as testimony in this case.

IT IS SO ORDERED.

/s/ Donald C. Nugent

DONALD C. NUGENT

United States District Judge

DATED: March 21, 2008

```
######  ######    ####
  #    #   #    #   #    #
  #  #      #  #     #
  ###       ###      #
  #  #      #  #     #
  #         #        #
  #    #    #    #   #    #
######  ######    ###
```

```
Job : 118
Date: 5/26/2015
Time: 5:26:51 PM
```

## _Lativafter Liquidating Trust v. Clear Channel Communs., Inc._

United States Court of Appeals for the Sixth Circuit

August 18, 2009, Filed

File Name: 09a0578n.06

Case No. 08-5959

**Reporter**

345 Fed. Appx. 46; 2009 U.S. App. LEXIS 18767; 2009 FED App. 0578N (6th Cir.)

LATIVAFTER LIQUIDATING TRUST, Plaintiff-Appellee, v. CLEAR CHANNEL COMMUNICATIONS, INC., Defendant-Appellant.

**Notice:** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**Prior History:** [**1] ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE.

_Lativafter Liquidating Trust v. Clear Channel Communs., Inc., 2008 U.S. Dist. LEXIS 50846 (E.D. Tenn., July 1, 2008)_

**Counsel:** For LATIVAFTER LIQUIDATING TRUST, Plaintiff - Appellee: Martin Blair Bailey, Herbert S. Sanger, Jr., Attorney, Wagner, Myers & Sanger, Knoxville, TN.

For CLEAR CHANNEL COMMUNICATIONS, INC., Defendant - Appellant: James C. Martin, Donna Marie Doblick, Attorney, Colin E. Wrabley, Reed Smith, Pittsburgh, PA; Patricia A. Foster,

Attorney, Richard M. Goehler, Frost Brown Todd, Cincinnati, OH.

**Judges:** BEFORE: BATCHELDER, Chief Judge, CLAY, Circuit Judge; and COX [*]

**Opinion by:** ALICE M. BATCHELDER

# Opinion

**[*47] ALICE M. BATCHELDER, Chief Judge.** In this contract dispute, Defendant-Appellant Clear Channel Communications, Inc. ("Clear Channel") appeals a jury award of compensatory damages and the district court's award of pre-judgment interest to Plaintiff-Appellee Eon Streams, Inc. ("Eon"). [1] For the reasons that follow, we AFFIRM.

I.

Clear Channel operates a network of approximately [**2] 1200 radio stations. Prior to going out of business, Eon provided internet streaming services, which allow radio stations to broadcast live programming on their websites. In January 2004, Eon and Clear Channel entered into a one-year, automatically renewable Service Agreement, under which Eon would provide internet streaming for some of Clear Channel's stations.

Later that year, Stephen Newman, Eon's chief executive officer, approached Brian Parsons, Clear

---

[*] The Honorable Sean F. Cox, United States District Judge for the Eastern District of Michigan, sitting by designation.

[1] On July 23, 2007, the district court granted Eon's motion to substitute "Lativafter Liquidating Trust" as the real party in interest.

Channel's Vice President of Technology, with a proposal for Eon to provide ad-insertion technology [2] for Clear Channel's internet broadcasts. On October 13, 2004, Newman e-mailed Parsons a "Letter of Agreement" ("LOA") that would amend the Service Agreement between Clear Channel and Eon. Under the proposed LOA, Eon would, among other things, develop and implement internet ad-insertion technology for Clear Channel. In return, Clear Channel was to extend the Service Agreement for a minimum three-year term and move all streaming radio stations within its network to Eon.

On October 19, 2004, Parsons sent an e-mail to Newman and Emma Woods of Eon, and to Kim Johnson, Clear Channel's Vice President of Sales and Marketing. Parsons began the e-mail by stating: "I am going to have to start from scratch on this but wanted to make sure the deal points were put into and verified via email first." Parsons then listed the deal points as including: (1) a three-year term under which Eon would be Clear Channel's preferred streaming partner; (2) Eon's maintaining competitive pricing, quality, and features; (3) Clear Channel's maintaining editorial control of network and branding; and (4) a 15% commission for Eon on any internet advertisement sale within Clear [*48] Channel's network. The same day, Johnson "replied to all" to note that the 15% commission would be on advertisement sales initiated by Eon, not on all sales.

After another round of revisions between Eon and Clear Channel, Woods e-mailed Parsons what she referred to as "hopefully the final version" of the LOA on October 21, 2004. The next day, Parsons e-mailed Newman an "updated draft" of the LOA. Parsons wrote: "[A]s a reminder, I won't be able to get an answer on a three-year commitment until [**4] I confirm with my cohort VPs." The attached "updated draft" included all the deal points Parsons had listed in his October 19 e-mail, including the three-year term.

Parsons attended Eon's January 2005 board meeting and informed the board that the contract was "in legal" but assured them: "[W]e have a deal, so nobody has to worry about anything here; we do have a deal." At some point after that board meeting, Newman met with Jeffrey Littlejohn, a Clear Channel Senior Vice President. Newman testified that Littlejohn told him: "We've absolutely got a deal."

Over the next several months, Eon sought to secure a written expression of that deal so it could show potential investors that Eon had a solid commitment from Clear Channel. In an effort to get a signed LOA, Newman presented Parsons with several new proposals suggesting changing the term from three years to a one-year or two-year renewable term, and even expressing a willingness to eliminate Eon's commission on advertisement sales it initiated. Meanwhile, Eon began developing the ad-insertion technology. Parsons regularly met with Eon during this time. Representatives of Eon and Clear Channel together met with potential advertising customers. [**5] Clear Channel's internal communications referred to Eon's responsibilities to develop the ad-insertion technology and expressed an objective of moving all streaming stations over to Eon.

Parsons even joined Eon's board of directors. The minutes of Eon's April 2005 board meeting reflect that Parsons announced that Clear Channel was "committed to executing the written contract . . . ." At Eon's July 2005 board meeting, Parsons assured the directors that a signed contract would be sent that day. That contract, however, never arrived.

In September 2005, Clear Channel signed an agreement with Akamai Technologies, Inc., one of Eon's competitors, to serve as Clear Channel's streaming provider. In November 2005, Clear Channel notified Eon of its intent to let its Service

---

[2]  Ad-insertion technology allows a station to insert advertisements into its "streamed" internet broadcasts to replace the advertisements that air on the station's local [**3] radio broadcasts.

345 Fed. Appx. 46, *48; 2009 U.S. App. LEXIS 18767, **5

Agreement with Eon expire. In May 2006, Eon sold substantially all of its assets to a third party for $ 17 million.

Eon filed suit against Clear Channel, alleging breach of contract, promissory estoppel, and negligent misrepresentation. Both parties unsuccessfully moved for summary judgment, and the case proceeded to a jury trial. Following Eon's evidence and again at the close of all evidence, Clear Channel unsuccessfully moved [**6] for judgment as a matter of law under *Rule 50(a)*. A jury found for Clear Channel on Eon's promissory estoppel and negligent misrepresentation claims, but found for Eon on the breach of contract claim and awarded Eon $ 40 million in damages. Clear Channel filed a post-verdict *Rule 50(b)* motion for judgment as a matter of law, or, in the alternative, a new trial; and Eon moved to alter the judgment to include pre-judgment interest. The district court denied Clear Channel's motion and granted Eon's, bringing the total award to approximately $ 44.2 million. Clear Channel timely filed its Notice of Appeal.

[*49]  **II.**

Clear Channel makes several arguments on appeal. First, it argues it was entitled to judgment as a matter of law because there was no "meeting of the minds" regarding Eon's proposed LOA, and thus no contract for it to breach. Next, Clear Channel contends that the district court erred in allowing Grady Vanderhoofen, an Eon board member, to testify regarding Eon's diminished value and that Vanderhoofen's testimony was, in any event, insufficient evidence of Eon's damages. Finally, Clear Channel argues that the district court erred in awarding Eon pre-judgment interest.

**A. Was  [**7] there a contract?**

We review a district court's denial of a Rule 50(b) motion *de novo*. *Radvansky v. City of Olmsted Falls, 496 F.3d 609, 614 (2007)*. "[I]n a diversity

case, when a Rule 50 motion for judgment as a matter of law is based on the sufficiency of the evidence, this court applies the standard of review of the state whose substantive law governs the matter." *American Trim, L.L.C. v. Oracle Corp., 383 F.3d 462, 471 (6th Cir. 2004)* (citing *Morales v. Am. Honda Motor Co., 151 F.3d 500, 506 (6th Cir.1998))*. In Tennessee,

> The standards governing trial courts in ruling on motions for directed verdict or JNOV . . . are well established. In ruling on the motion, the court must take the strongest legitimate view of the evidence in favor of the non-moving party. In other words, the court must remove any conflict in the evidence by construing it in the light most favorable to the non-movant and discarding all countervailing evidence. The court may grant the motion only if, after assessing the evidence according to the foregoing standards, it determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence. If there is any doubt as to the proper conclusions  [**8] to be drawn from the evidence, the motion must be denied.

*Potter v. Ford Motor Co., 213 S.W.3d 264, 267-68 (Tenn. Ct. App. 2006)* (quoting *Eaton v. McLain, 891 S.W.2d 587, 590 (Tenn. 1994))* (internal citations omitted).

Clear Channel argues that the LOA regarding Eon's ad-insertion technology was not a contract because Clear Channel never accepted the terms of any of Eon's various offers. It contends that there was no meeting of the minds between it and Eon and that their volleys of e-mails and draft proposals were simply ongoing negotiations that never culminated in a mutual agreement.

Eon, on the other hand, argues that Parsons's October 22 e-mail with the attached "updated draft" of the LOA set forth an express contract between the parties. Eon contends that "[t]he jury

could legitimately have concluded that the only open item in November 2004 was whether Clear Channel would confirm a three-year term for the Letter of Agreement." Eon submits that "[t]he jury could have concluded that any doubt on this point was removed when Parsons attended the Eon board meeting in January 2005 and manifested Clear Channel's unqualified and unconditional acceptance by stating 'we have a deal.'" In other [**9] words, Eon argues that the evidence was sufficient for the jury to find that an express contract existed as of October 22, 2004, the date of the final LOA draft, or at least by January 2005, the date of Parsons's appearance before the Eon board.

"[A]n enforceable contract must, among other elements, result from a meeting of the minds and must be sufficiently definite to be enforced." *Rice v. N.N. Inc., Ball & Roller Div., 210 S.W.3d 536, 542 (Tenn. Ct. App. 2006)* (quoting *Jamestowne on Signal, [*50] Inc. v. First Federal Sav. & Loan Ass'n, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990))*. Taking "the strongest legitimate view of the evidence in favor of" Eon, and "discarding all countervailing evidence" in favor of Clear Channel, *Potter, 213 S.W.3d at 267*, the jury reasonably could have concluded that the parties reached an agreement on the LOA's material terms. In replying to Emma Wood's October 21, 2004, e-mail containing the "hopefully [] final version" of the LOA, Parsons attached an "updated draft" containing all the "deal points" listed by Woods in her version. True, Parsons cautioned that he would have to get approval for a three-year term from his fellow Clear Channel Vice Presidents. This [**10] approval, however, was manifested by Parsons's and Littlejohns's subsequent assurances to Eon CEO Stephen Newman that they "had a deal." Moreover, the conduct of the parties also served as evidence that the deal was sealed: Eon and Clear Channel even made joint sales calls to potential advertising customers. Even if we were inclined to reach an opposite determination, we cannot say "that

reasonable minds could not differ as to the conclusions to be drawn from the evidence." *Potter, 213 S.W.3d at 267*.

**B. Should the district court have allowed Vanderhoofven to testify, and was his testimony sufficient evidence of Eon's damages?**

Grady Vanderhoofven is a venture capitalist, the Executive Vice-President of Southern Appalachian Fund (which invested in Eon), and was a member of Eon's board. Vanderhoofven testified that Eon's value would have been $ 57 million with the Clear Channel contract, instead of the $ 17 million it sold for in 2006. As an investor in Eon, Vanderhoofven in 2005 investigated Eon's financials, retaining a market research firm to verify Eon's market potential. When he became a member of Eon's board in March 2005, he received Eon's monthly financial reports, including income [**11] statements, balance sheets, and cash flow statements. Vanderhoofven testified that between June 2004 and June 2005, the number of stations Eon was streaming increased by over 500%. After June 2005, however, the revenue from Clear Channel began to dwindle, and Vanderhoofven determined that Clear Channel was moving its streaming business to another company. Vanderhoofven based his $ 57 million valuation on the revenue Clear Channel had been generating for Eon prior to the discontinuation of their business, and the projection for the 12-month period prior to Eon's sale.

Clear Channel argues, as an initial matter, that Eon cannot recover damages for its diminished value because Tennessee does not recognize diminished-value damages outside the context of commercial real estate, and because a potential loss in Eon's value was not contemplated by the parties when they entered into the contract.

In *BVT Lebanon Shopping Center, Ltd. v. Wal-Mart Stores, Inc., 48 S.W.3d 132, 136 (Tenn. 2001)*, the Tennessee Supreme Court upheld a diminished-value award to a shopping center

345 Fed. Appx. 46, *50; 2009 U.S. App. LEXIS 18767, **11

whose value had decreased when its anchor tenant breached a covenant of continuous occupancy. The court held that its conclusion [**12] was in line with general contract remedies: "The purpose of assessing damages in breach of contract cases is to place the plaintiff as nearly as possible in the same position she would have been in had the contract been performed[.]" *Id.* (quoting *Lamons v. Chamberlain, 909 S.W.2d 795, 801 (Tenn. Ct. App.1993)).* "Generally speaking," the court recognized, "damages for breach of contract include only such as are incidental [*51] to or directly caused by the breach and may be reasonably supposed to have entered into the contemplation of the parties." *Id.* (quoting *Simmons v. O'Charley's, Inc., 914 S.W.2d 895, 903 (Tenn. Ct. App.1995)).* The court in *BVT Lebanon* did not limit its holding to the commercial real estate context; indeed, it relied on basic principles of contract law to place the plaintiff in the position it would have enjoyed had the contract been kept.

Here, had Clear Channel not breached the contract, Eon would have had a fixed-term agreement to stream internet broadcasts for hundreds of radio stations, obviously increasing its attractiveness to potential investors and buyers. And by the time Clear Channel executives assured Stephen Newman and the Eon board that a deal was in place, [**13] Clear Channel knew that Eon was seeking assurances to mollify investors; Clear Channel knew that the amended Service Agreement was integral to Eon's financial health. Diminished-value damages were in order here and were not outside the contemplation of the contracting parties.

Clear Channel contends that even if diminished-value damages are allowed in this setting, they cannot be proven without expert testimony, and that Vanderhoofven's testimony as a lay opinion witness under *Federal Rule of Evidence 701* was improper. "'We review for abuse of discretion a district court's evidentiary

rulings, including rulings on witness testimony under *Rule[] 701 . . . of the Federal Rules of Evidence*.'" *United States v. White,* 492 F.3d 380, 398 (2007) (quoting *JGR, Inc. v. Thomasville Furniture Indus., Inc., 370 F.3d 519, 524 (6th Cir.2004)).* That Rule provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on [**14] scientific, technical, or other specialized knowledge within the scope of Rule 702.

*Fed. R. Evid. 701.* The advisory commission notes to the 2000 amendments to *Rule 701* provide:

> [M]ost courts have permitted the owner *or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. See, e.g., Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153 (3d Cir. 1993)* (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business). Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

*Id.* (emphasis added).

As an investor who researched Eon's financial condition, and later as a member of Eon's board, Vanderhoofven had personal, particularized knowledge of Eon's value. The district court did not abuse its discretion in permitting him to testify

345 Fed. Appx. 46, *51; 2009 U.S. App. LEXIS 18767, **14

about Eon's projected value [**15] if it had retained Clear Channel's business. Moreover, contrary to Clear Channel's assertions, Vanderhoofven's testimony rested on a sufficient foundation -- his personal research into Eon's financial reports. [3]

**[*52]  C. Should the district [**16] court have awarded Eon pre-judgment interest?**
We review for an abuse of discretion a district court's prejudgment-interest award. *Gentek Bldg Products, Inc. v. Sherwin-Williams Co., 491 F.3d 320, 333 (2007)* (quoting *Anderson v. Whittaker Corp., 894 F.2d 804, 809 (6th Cir.1990)).* "There is no dispute that in a diversity action the question of prejudgment interest must be determined under state law." *Daily v. Gusto Records, Inc., 14 F. App'x 579, 591 (6th Cir. 2001)* (citing *Mass. Benefit Ass'n v. Miles, 137 U.S. 689, 11 S. Ct. 234, 34 L. Ed. 834 (1891)).* Tennessee law favors "awarding prejudgment interest whenever doing

so will more fully compensate plaintiffs for the loss of use of their funds. Fairness will, in almost all cases, require that a successful plaintiff be fully compensated by the defendant for all losses caused by the defendant, including the loss of use of money the plaintiff should have received." *Scholz v. S.B. Intern., Inc., 40 S.W.3d 78, 83 (Tenn. Ct. App. 2000).* The court determined that "Eon's demise was assured when Clear Channel breached the parties' contract on September 9, 2005." The court then calculated interest as accruing from that date at a rate equal to 4.666%, the average rate [**17] from September 9, 2005 to December 14, 2007. The district court did not abuse its discretion in awarding Eon prejudgment interest.

**III.**

Accordingly, we **AFFIRM** the judgment of the district court.

---

[3]  On March 13, 2009, Clear Channel moved this Court to certify three questions of law to the Supreme Court of Tennessee under Tennessee Supreme Court Rule 23. Specifically, Clear Channel asked us to inquire of that court: "(1) whether Tennessee would permit a corporate plaintiff to recover $ 40 million in diminished value damages for a breach of contract that does not involve either permanent damage to real estate or a covenant of continuous occupancy; (2) whether Tennessee permits a plaintiff to recover diminished value damages for a breach of an implied contract; and (3) whether Tennessee required diminished value damages to be proven by expert testimony." Because we hold that an express contract existed between Eon and Clear Channel, that the Tennessee Supreme Court in *BVT Lebanon* did not limit its holding to the real estate context, and that *Federal Rule of Evidence 701* permits Vanderhoofven's testimony, we hereby **DISMISS** Clear Channel's motion to certify.

## B-K Cypress Log Homes Inc. v. Auto-Owners Ins. Co.

United States District Court for the Northern District of Florida, Gainesville Division

May 25, 2012, Decided; May 25, 2012, Filed

Case No. 1:09-cv-211-GRJ

**Reporter**

2012 U.S. Dist. LEXIS 73773; 2012 WL 1933766

B-K CYPRESS LOG HOMES INC, Plaintiff, v. AUTO-OWNERS INSURANCE COMPANY, Defendant.

**Prior History:** _B-K Cypress Log Homes Inc. v. Auto-Owners Ins. Co., 2011 U.S. Dist. LEXIS 142641 (N.D. Fla., Dec. 12, 2011)_

**Counsel:** [*1] For B-K CYPRESS LOG HOMES INC, A FLORIDA CORPORATION, Plaintiff: ROBERT PATRICK MAJOR, LEAD ATTORNEY, WINDERWEEDLE HAINES WARD ETC - ORLANDO FL, ORLANDO, FL; STEPHEN A MARINO, JR, LEAD ATTORNEY, VER PLOEG & LUMPKIN PA, MIAMI, FL; STEVEN MICHAEL BRADY, LEAD ATTORNEY, THE BRADY LAW FIRM PA, ORLANDO, FL; ROCHELLE WILLIS, VER PLOEG & LUMPKIN PA - MIAMI FL, MIAMI, FL.

For AUTO-OWNERS INSURANCE COMPANY, A FOREIGN CORPORATION, Defendant: CARLA MARIA SABBAGH, MICHAEL S RYWANT, RYWANT ALVAREZ JONES ETC - GAINESVILLE FL, GAINESVILLE, FL.

**Judges:** GARY R. JONES, United States Magistrate Judge.

**Opinion by:** GARY R. JONES

## Opinion

## ORDER

This case is before the Court on Doc. 199, Plaintiff B-K Cypress' _Daubert_ Motion to Exclude Testimony of Defendant's Expert Jeffrey Harrison; Doc. 211, Defendant Auto-Owner's _Daubert_ Motion to Exclude Evidence (testimony of Plaintiff's expert Dr. Stanley P. Stephenson); and Doc. 215, Plaintiff B-K Cypress' Motion to Strike Raffa and Harrison Affidavits submitted in support of Defendant's _Daubert_ motion. The parties have responded to the motions and therefore the motions are ripe for decision.

### I. Procedural Background: Expert Disclosures

Pursuant to the Joint Scheduling Report, Doc. 23, and the Court's [*2] Order adopting same, Doc. 24, B-K Cypress' expert disclosure was originally due on June 18, 2010, and Auto- Owners' expert disclosure was originally due on July 19, 2010. B-K Cypress submitted the expert report of Dr. Stanley P. Stephenson on June 18, 2010. Dr. Stephenson's report was limited to the issue of the economic damages sustained by B-K Cypress as a result of Auto-Owners' bad faith.

On September 1, 2010, the Court granted the parties' Joint Motion to Modify Scheduling Deadlines. Doc. 52. The deadline for B-K Cypress' expert disclosure was November 15, 2010, and the deadline for Auto-Owners' expert disclosure was December 15, 2010. The discovery deadline was set as January 14, 2011. _Id._ B-K Cypress received a further extension for its expert disclosure until March 7, 2011, (Doc. 63) and on that date B-K Cypress submitted the report of an insurance expert, Peter Knowe. Knowe's expert opinion is not at issue.

On March 11, 2011, Auto-Owners submitted for the first time the expert report of Jeffrey L.

2012 U.S. Dist. LEXIS 73773, *3

Harrison, which rebuts Dr. Stephenson's June 18, 2010, report but does not independently opine as to B-K Cypress' damages. B-K Cypress moved to strike Auto-Owners' expert disclosure [*3] as untimely. Doc. 86. This motion was stricken as moot when Judge Paul entered judgment for Plaintiff on the issue of liability as a sanction for Defendant's discovery violations. Doc. 106. However, the Court permitted Mr. Harrison's report to be filed. His deposition was taken on October 5, 2011.

On November 2, 2011, the Court entered a new scheduling order which established a discovery deadline, including expert depositions, of December 16, 2011. However, due to Dr. Stephenson's unavailability the parties consented to taking his deposition outside of the discovery deadline and his deposition was taken on March 7, 2012. Docs. 173, 200 (notice of filing deposition of Stephenson).

## II. Discussion

Under *Federal Rule of Evidence 702*, *Daubert v. Merrell Dow Pharm., Inc.*, [1] and *Kumho Tire Company Ltd., et al., v. Carmichael* [2] expert testimony is admissible if (1) the expert is qualified to testify competently, (2) the expert has used sufficiently reliable methodology in reaching a conclusion, and (3) the testimony will assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. [3] While *Daubert* [*4] dealt with scientific evidence, and *Kumho* dealt with technical knowledge, the *Daubert* analysis applies equally as well to the evaluation of the reliability of non-scientific based expert testimony. [4]

Among the factors that courts are to consider under the *Daubert* analysis are: (1) whether the expert's methodology has been tested, (2) whether the theory has been subjected to peer review and publication, (3) whether there are standards to guide the use of the technique, and (4) whether the theory or technique has been generally accepted in the scientific community. [5] These factors are illustrative and the trial court is granted considerable flexibility in adapting its analysis to fit a particular case. [6] The trial court should also be mindful of other rules of evidence such as *Rules 703*, *706*, [*5] and *403*. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." [7]

According to the Eleventh Circuit, a trial court's focus should be on the expert's methodology and its application, not on the expert's conclusions. [8] However, a trial court must "examine the expert's conclusions in order to determine whether the conclusion could reliably flow from the facts

---

[1] 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)

[2] 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

[3] *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)(*citing Daubert*, 509 U.S. at 589.)

[4] *See, e.g. United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004)("The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony.").

[5] *Daubert*, 509 U.S. at 593-94.

[6] *Kumho*, 526 U.S. at 152.

[7] *Daubert*, 509 U.S. at 596.

[8] *See City of Tuscaloosa*, 158 F.3d 548, n.25 (proper inquiry regarding reliability of methodologies of economic experts is not whether other experts reach same conclusions, but whether techniques utilized are reliable in light of the relevant factors).

2012 U.S. Dist. LEXIS 73773, *5

known to the expert and the methodology used." [9] Nothing requires a district court to admit opinion evidence "that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." [10]

With  [*6] these principles in mind, the Court will consider the parties' motions.

### A. Defendant's Motion to Exclude Dr. Stephenson's Testimony and Plaintiff's Motion to Strike Defendant's Affidavits

Auto-Owners moves to strike Dr. Stephenson's opinion regarding the damages sustained by B-K Cypress as a result of Auto-Owners' bad-faith conduct in handling the third-party claim underlying this case. Auto-Owners submits that the methodology applied by Dr. Stephenson in determining Plaintiff's economic losses is not reliable because Dr. Stephenson's techniques are not generally accepted in the economic community and are therefore inadmissible. Doc. 211.

In support of the motion, Auto-Owners submits the affidavits of its expert, Professor Jeffrey Harrison, and of economist Frederick A. Raffa, Ph.D. Dr. Raffa has not previously been identified as an expert witness. B-K Cypress moves to strike the affidavits as improper attempts to elicit new and previously undisclosed expert rebuttal testimony. Doc. 215. A review of the affidavits reflects that they are offered as rebuttal to Dr. Stephenson's Report. Pursuant to *Fed. R. Civ. P. 26(a)(2)(D)(ii)*, "if the evidence is intended solely to contradict or rebut  [*7] evidence on the same subject matter identified by another party," the disclosure of the expert must be made within 30 days after the other party's disclosure. With respect to Professor Harrison's affidavit, the opinions expressed are essentially the same as set forth in

his report that was previously disclosed. However, Dr. Raffa is a new expert, and the Court concludes that his affidavit should be stricken because the disclosure of his rebuttal opinion is untimely.

Dr. Stephenson's curriculum vitae is attached to his "Report on Economic Damages to B-K Cypress Log Homes, Inc.," Doc. 203. To summarize, Dr. Stephenson is the founder and Managing Principal of Litigation Economics, LLC, an economic consulting firm with offices in California, Connecticut, Florida, and Washington, D.C. Dr. Stephenson holds B.A. and Ph.D. degrees in economics, and was an Associate Professor of Economics and an Associate Professor of Business Administration at the Pennsylvania State University and the University of Hartford. He was an Assistant Vice-President of Aetna International Inc., the Managing Director of Management & Strategy Analysis, Inc., and a Regional Commissioner of the Bureau of Labor Statistics.  [*8] In each of these positions, Dr. Stephenson was involved in defining and measuring economic value. He is a member of the National Association of Certified Valuation Analysts, and the National Association of Forensic Economists. Dr. Stephenson has written more than 35 journal articles, technical reports, and book chapters regarding economic valuation issues. He has been retained as an expert in the determination of economic damages in more than 300 cases arising from personal injuries and commercial disputes. He recently published an article in an academic journal entitled "Computing Lost Profits in Business Interruption Litigation: A General Model" (Journal of Business Valuation and Economic Loss Analysis (JBVELA) (Berkeley Electronic Press/UC Berkeley 2011)), a copy of which is included in B-K Cypress' response in opposition to Auto-Owners *Daubert* motion, Doc. 233.

---

[9] *Heller v. Shaw*, 167 F.3d 146, 153 (3d Cir.1999).

[10] *General Elec. Co. v. Joiner*, 522 U.S. 136, 145-46, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997).

In this case Auto-Owners does not challenge the qualifications of Dr. Stephenson as an expert. Therefore, the Court will not discuss the first prong *of Daubert* and concludes, for purposes of the *Daubert* analysis, that Dr. Stephenson is qualified to testify competently regarding the matters identified in his Report. Having [*9] determined that Dr. Stephenson is competent to testify to the matters in his expert report, the Court must review the factors outlined in *Daubert* to determine whether Dr. Stephenson's opinions are reliable and relevant.

As Auto-Owners observes, "Lost profits are generally proven by one of two methods: (1) the before and after theory or (2) the yardstick test." *4 Corners Ins., Inc. v. Sun Pub'lns of Fla., Inc., 5 So. 3d 780, 783 (Fla. 2d DCA 2009)* (citing *G.M. Brod & Co. v. U.S. Home Corp., 759 F.2d 1526, 1538 (11th Cir. 1985)*). There can be little dispute that these methods are generally accepted in the economic community. In his Report, Dr. Stephenson uses both of these methods in a two-part model that reflects alternative lost-profit calculations.

In the first part of his analysis, Dr. Stephenson's Report states that he analyzed B-K Cypress' expenses that vary directly with sales, such as cost of goods sold, direct labor, and sales commissions. Dr. Stephenson used profit/loss statements to determine B-K Cypress' profit margin before and after the damages period, which Dr. Stephenson determined commenced in August 2000 when the first lawsuit connected with Auto-Owners' claims practices [*10] was filed against B-K Cypress (the Connor lawsuit). Dr. Stephenson determined that B-K Cypress' profit margin before August 2000 was 26.1%, and that after August 2000 it was 22.6%, for a difference of 3.6%. The Report states that although B-K Cypress' production and sales rose after 1999, an event which he says would normally create economies of scale, the company instead experienced an increase in variable costs and a reduction in profit margin. Dr. Stephenson

attributes the difference in the profit margin to impacts created by Jim Keeton's participation in dispute-related activities that should have been handled by Auto-Owners, which resulted in operational inefficiencies. Doc. 203-1 at 6. Dr. Stephenson applied the difference in profit margin to B-K Cypress' sales after August 2000 and through 2009, and concluded that the change resulted in a loss of $1,565,247. He explained that "[t]his is a first part of economic loss, one that does not depend on sales loss but focuses on changes in variable costs of production and associated profit margins." *Id.*

The second part of Dr. Stephenson's loss model considered "what B-K sales would have been had the company matched the industry average [*11] sales for the loss period starting in [August 2000]." *Id.* Dr. Stephenson based this part of the model on the premise that Jim Keeton's participation in dispute-related matters prevented him from using his time to generate additional sales. Dr. Stephenson used sales information from a log-home industry publication for the years 1995, 2001, and 2003. Because there was no published industry information after 2003, a "sample survey" was conducted of members of the Log Homes Council that yielded growth rate numbers for six companies. Dr. Stephenson did not conduct the sample survey. Based upon Dr. Stephenson's deposition testimony, it appears that the survey was conducted by Jim Keeton, who provided the results to Dr. Stephenson. Dr. Stephenson could not testify as to the contents of the survey or other details such as how many companies were surveyed, or specifically how the six companies included in the Report compare to B-K Cypress. Based on this information, and applying the B-K profit margin of 26.1% from the 1994-2000 profit and loss statements, Dr. Stephenson concluded that B-K Cypress

2012 U.S. Dist. LEXIS 73773, *11

experienced lost profits of $413,152. Doc. 203-1, Report Exhibit 4. [11]

Lastly, Dr. Stephenson analyzed B-K Cypress' financial statements and interviewed company officials to determine that B-K Cypress had incurred extraordinary expenses, such as legal and travel costs, of $199,244 due to the bad faith of Auto-Owners. Dr. Stephenson posits that damages using the lost profit margin analysis total $1,764,491 (including extraordinary expenses), that damages using the lost revenue analysis totals $612,395 (including extraordinary expenses), and that B-K Cypress' total economic damages are $2,177,643, which includes the damages calculated from each part of the loss model plus the extraordinary expenses. Doc. 203-1 at 7.

With respect to Dr. Stephenson's [*13] "before and after" analysis, Auto-Owners contends that the analysis is not accepted by other experts in the field because it does not control for variables in market conditions but instead assumes that all loss in profitability is attributable to Auto-Owners' bad faith. In support of this argument, Auto-Owners has submitted the report of its own expert, Jeffrey L. Harrison, as well as affidavits from Professor Harrison and from Frederick A. Raffa. Docs. 166, 207, 202. Professor Harrison (whose expert report is the subject of B-K Cypress' *Daubert* motion), contends that Dr. Stephenson's report "lacks economic merit and is inconsistent with any acceptable damage methodology." Doc. 166-1. Professor Harrison criticizes Dr. Stephenson's report for failing to describe the

connection between either component of his loss model and the bad faith of Auto-Owners. Professor Harrison states that the "before and after" model can reflect the damages caused by a Defendant's actions "only if other possible causes are examined and eliminated." *Id.* at 5. Professor Harrison finds particular fault with the lack of data documenting the amount of time Jim Keeton may have expended attending to Auto-Owners [*14] related matters, and the Report's failure to account for time he would have expended on such matters even if Auto-Owners had not acted in bad faith.

The Court concludes that Dr. Stephenson's Report reflects the application of a well-known "before and after" method for measuring lost profits, and that his testimony will assist the jury in determining the amount of damages incurred by B-K Cypress' as a result of Auto-Owners' bad faith. Auto-Owners and its expert have criticized the application of the methodology, but their criticisms are appropriately raised by way of cross-examination of Dr. Stephenson and B-K Cypress' other witnesses regarding the assumptions underlying the damages calculation. It remains within the province of the jury to consider and weigh such evidence and determine whether in fact some or all of the damages determined by Dr. Stephenson are causally connected to Auto-Owners' actions. [12] Accordingly, such testimony will not be excluded.

With respect to Dr. Stephenson's "yardstick" analysis, Auto-Owners also asserts that Dr. Stephenson's technique is not generally accepted

---

[11]  At his deposition in March [*12] 2012, Dr. Stephenson stated that he had prepared a revised Exhibit 4 in response to the Report of Auto-Ow ner's expert, which resulted in an increase of about a million dollars in this damage calculation. *Stephenson Deposition*, Doc. 200-1, at 137-39. It is unclear whether Dr. Stephenson has submitted a revised Report including this exhibit. The copy of his Report submitted with the instant motion is the M ay 2010 version, and the copy of the deposition filed with the Court does not include the deposition exhibits.

[12]  Auto-Owners also contends that Dr. Stephenson's analysis improperly analyzes the "before" time period, as reflected in deposition testimony that he did not analyze B-K Cypress' data outside of the damages period. But a review of the [*15] deposition reflects that the cited testimony pertained to Dr. Stephenson's "yardstick" analysis of sales growth rate, which he admitted did not compute the growth rate for B-K Cypress prior to August 2000. *See Stephenson Deposition*, Doc. 200-1, at 126-29. According to Dr. Stephenson's Report, in determining B-K-Cypress' "before" incremental profit margin, Dr. Stephenson used a weighted average of incremental profit margins from 1994 - July 2000. *See* Doc. 203-1 at 13 (Report Exhibits 5, 6).

2012 U.S. Dist. LEXIS 73773, *14

in the economic community, in view of the fact that B-K Cypress has been in business since 1979. Auto-Owners argues that even if the yardstick approach was a proper method for computing lost profits in this case, the methodology was improperly applied because the Report does not establish that the businesses used to measure B-K Cypress' losses are sufficiently similar to B-K Cypress. In support of this argument, Auto-Owners cites *Devon Medical, Inc. v. Ryvmed Medical, Inc., 60 So.3d 1125 (Fla 4th DCA 2011)* (reversing award of lost anticipated profits based on yardstick [*16] model because experts did not provide evidence that comparison company was closely comparable to plaintiff company in size, location, profits, and position, but made only a blanket statement regarding similarity); *River Bridge Corp. v. American Somax Ventures, 18 So. 3d 648 (Fla. 4th DCA 2009)* (lost profits must be established with reasonable degree of certainty; finding expert testimony lacked reasonable certainty because expert could not establish similarity of comparison companies, noting that comparison companies "might have provided the trappings of a yardstick, it was not enough to simply assume those contractors were comparable and made a profit; it was necessary to prove both.").

In this case, Dr. Stephenson relied on the survey data that were provided to him in performing his analysis. It is not necessary for Dr. Stephenson to have performed the survey himself for purposes of considering whether his testimony is admissible under *Daubert*. However, the reliability of the underlying data is open to question with respect to whether the surveyed companies are sufficiently comparable to B-K Cypress to provide an objective measure of damages. Therefore, while the Court will deny Auto-Owners' [*17] motion to exclude Dr. Stephenson's testimony regarding this part of his analysis, the Court will do so without prejudice to Auto-Owners' right to move to exclude the testimony at trial if Plaintiff is unable to establish the reliability of the survey data through other evidence.

## B. Plaintiff's Motion to Exclude Testimony of Professor Harrison

Plaintiff contends that Professor Harrison's testimony should be excluded because it is not helpful, relevant, or reliable, and is likely to cause confusion of the issues and undue prejudice. Doc. 199.

Professor Harrison holds a Ph.D in Economics and Business Administration, and a J.D. degree. He is a professor at the University of Florida, teaching in the areas of Antitrust, Law and Economics, Economic Regulation, and Contract Law. He has written articles and books in the areas of contracts, law and economics, and antitrust, and has testified as an economic expert in federal and state courts.

B-K Cypress does not challenge the qualifications of Professor Harrison as an expert. Therefore, the Court will not discuss the first prong of *Daubert* and concludes, for purposes of the *Daubert* analysis, that Professor Harrison is qualified to testify competently [*18] regarding the matters identified in his Report. The Court will turn to consideration of the remaining *Daubert* factors.

Professor Harrison observes that "[t]ypically, when an expert is retained on a matter of damages, he or she calculates the damages. In this instance I have declined to do so because the record has not developed to the point that any acceptable damage methodology can be employed to determine even a rough measure of damages. In fact, in my opinion Dr. Stephenson's report lacks economic merit and is inconsistent with any acceptable damage methodology." Doc. 166-1.

In terms of *Daubert*, Professor Harrison does not use any methodology but rather focuses on asserted deficiencies in Dr. Stephenson's application of the "before and after," and "yardstick" models. Inasmuch as Auto-Owners' *Daubert* motion was derived from the flaws identified in Professor Harrison's report, the Court has addressed such

2012 U.S. Dist. LEXIS 73773, *18

arguments in the foregoing discussion of Auto-Owners' motion.

The Court concludes that as a pure rebuttal opinion that does not offer any alternative methodology or analysis, Professor Harrison's testimony would not aid the jury in determining the amount of damages, if any, to award [*19] to B-K Cypress. The criticisms raised in Professor Harrison's report may be explored through cross-examination of Dr. Stephenson and B-K's other witnesses. Under the circumstances of this case, it is unnecessary and unduly prejudicial to present evidence that is directed to the weight and credibility of Dr. Stephenson's testimony by way of a rebuttal expert. Professor Harrison's testimony will be excluded.

Accordingly, it is **ORDERED:**

    1. Auto-Owner's *Daubert* Motion to Exclude Evidence (Doc. 211) is **DENIED** without

prejudice to its right to move to exclude Dr. Stephenson's testimony at trial as detailed herein.

2. B-K Cypress' Motion to Strike Affidavits, Doc. 215, is **GRANTED IN PART** and the affidavit of Frederick A. Raffa is **STRICKEN**.

3. B-K Cypress' *Daubert* Motion to Exclude Testimony, Doc. 199, is **GRANTED.**

**DONE AND ORDERED** this 25th day of May 2012.

/s/ Gary R. Jones

GARY R. JONES

United States Magistrate Judge