IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| HODELL-NATCO INDUSTRIES, INC. | ) | CASE NO. 1:08 CV 2755 |
|---|---|---|
| | ) | |
| Plaintiff, | ) | JUDGE NUGENT |
| | ) | |
| v. | ) | |
| | ) | |
| SAP AMERICA, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## APPENDIX OF UNPUBLISHED CASES

CASES

*B&P Co. v. TLK Fusion Entm't, LLC*, No.
  3:11-cv-276, 2013 U.S. Dist. LEXIS 26131  (S.D. Ohio Feb. 26, 2013) ...................................1

*Bush Truck Leasing, Inc. v. Dynamex, Inc.*,
  No. 1:09-cv-354, 2011 U.S. Dist. LEXIS 1720 (S.D. Ohio Jan. 7, 2011) ...............................2

*Cuyahoga Metro. Hous. Auth. v. 10-8 Sys.*,
  No. 1:05-cv-0980, 2006 U.S. Dist. LEXIS 8340 (N.D. Ohio Mar. 2, 2006) ............................3

*Dawes v. BAC Home Loans Servicing LP*,
  No. 1:10-cv-02637, 2011 U.S. Dist. LEXIS 66507 (N.D. Ohio Apr. 27, 2011) ......................4

*Infocision Mgmt. Corp. v. Found. for Moral Law Inc.*,
  No. 5:08-cv-1342, 2009 U.S. Dist. LEXIS 65867 (N.D. Ohio July 27, 2009) ........................5

*Loyd v. Huntington Nat'l Bank*,
  No. 1:08-cv-2301, 2009 U.S. Dist. LEXIS 51858 (N.D. Ohio June 18, 2009) .......................6

*Marine Direct v. Dougherty Marine, Inc*.,
  No. 2:06-cv-0100, 2007 U.S. Dist. LEXIS 1414 (S.D. Ohio Jan. 8, 2007) .............................7

*Parma Cmty. Gen. Hosp. v. Premier Anesthesia of Parma*,
  No. 1:09-cv-325, 2011 U.S. Dist. LEXIS 11035 (N.D. Ohio Feb. 4, 2011) ...........................8

*Phelps v. MacConnell*,
  No. 3:12-cv-344, 2014 U.S. Dist. LEXIS 105472 (S.D. Ohio Aug. 1, 2014) .........................9

*Sherrod v. Enigma Software Grp. USA, LLC*,
  No. 2:13-cv-36, 2014 U.S. Dist. LEXIS 137329 (S.D. Ohio Sept. 29, 2014) ........................10

# Tab 1



**B&P COMPANY, INC., Plaintiff, -vs- TLK FUSION ENTERTAINMENT, LLC., et al., Defendants.**

**Case No. 3:11-cv-276**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION**

*2013 U.S. Dist. LEXIS 26131*

**February 26, 2013, Decided**
**February 26, 2013, Filed**

**PRIOR HISTORY:** *B&P Co. v. TLK Fusion Entm't, LLC, 2012 U.S. Dist. LEXIS 36229 (S.D. Ohio, Mar. 19, 2012)*

**COUNSEL:** [*1] For B&P Company, Plaintiff: Kathryn Mack, LEAD ATTORNEY, Dayton, OH; Toby K Henderson, LEAD ATTORNEY, Sebaly Shillito & Dyer - 3, Dayton, OH; Paul Michael Monzione, PRO HAC VICE, Law Offices of Paul M. Monizone, P.C., Wolfeboro, NH.

For TLK Fusion Entertainment, LLC, Defendant: Susan D Solle, LEAD ATTORNEY, Chernesky Heyman & Kress, Dayton, OH; Thomas Patrick Whelley, II, LEAD ATTORNEY, Dinsmore and Shohl, Dayton, OH.

For Jenner Communications, Inc., Kristen Jenner, also known as Kris Jenner, Kristen Jenner, Defendants: David Carr Greer, LEAD ATTORNEY, Bieser, Greer & Landis - 3, Dayton, OH; Carla J Morman, Bieser, Greer & Landis, LLP, Dayton, OH.

For B&P Company, Counter Defendant: Kathryn Mack, LEAD ATTORNEY, Dayton, OH; Toby K Henderson, LEAD ATTORNEY, Sebaly Shillito & Dyer - 3, Dayton, OH; Paul Michael Monzione, PRO HAC VICE, Law Offices of Paul M. Monizone, P.C., Wolfeboro, NH.

For Jenner Communications, Inc., Kristen Jenner,

Counter Claimants: David Carr Greer, LEAD ATTORNEY, Bieser, Greer & Landis - 3, Dayton, OH; Carla J Morman, Bieser, Greer & Landis, LLP, Dayton, OH.

For B&P Company, Counter Defendant: Kathryn Mack, LEAD ATTORNEY, Dayton, OH; Toby K Henderson, LEAD ATTORNEY, [*2] Sebaly Shillito & Dyer - 3, Dayton, OH; Paul Michael Monzione, Law Offices of Paul M. Monizone, P.C., Wolfeboro, NH.

**JUDGES:** Michael R. Merz, United States Magistrate Judge. District Judge Thomas M. Rose.

**OPINION BY:** Michael R. Merz

**OPINION**

**REPORT AND RECOMMENDATIONS RECOMMENDING PLAINTIFF B&P'S MOTION TO DISMISS COUNTS III AND IV OF JENNER DEFENDANTS' AMENDED COUNTERCLAIM BE GRANTED; ORDER DENYING JENNER DEFENDANTS' MOTION FOR LEAVE TO FILE A SECOND AMENDED COUNTERCLAIM**

This case is before the Court on Plaintiff and Counterclaim Defendant B&P Company, Inc.'s (B&P)

2013 U.S. Dist. LEXIS 26131, *2

Motion to dismiss Counts III and IV of Jenner Defendants' Amended Counterclaim. Doc. 46. The parties have fully briefed the issues, *Id.*; Doc. 50[1]; Doc. 52, and the matter is ripe for Report and Recommendations.

> 1    The Jenner Defendants filed their Memorandum in Opposition under seal pursuant to District Judge Rose's Order granting their unopposed motion to that effect. (Doc. 49 and Notation Order).

Plaintiff B&P Company ("B&P") filed a complaint against Defendants TLK Fusion Entertainment, LLC ("TLK"), Jenner Communications, Inc. ("Jenner Communications")[2] Kristen Jenner a/k/a Kris Jenner ("Ms. Jenner"), and Does 1-100 alleging claims for fraud and deceit, [*3] breach of contract, breach of covenant of good faith and fair dealing, and unjust enrichment, and seeking rescission of a contract pursuant to *California Civil Code § 1689.* Subsequently, Jenner Communications and Ms. Jenner filed an Amended Counterclaim against B&P Company. Currently before the Court is B&P's Motion to Dismiss pursuant to *Fed.R.Civ.P. 12(b)(6)* Counts III (fraudulent misrepresentation) and IV (negligent misrepresentation) of the Amended Counterclaim[3].

> 2    Jenner Communications is owned by Bruce Jenner and Ms. Jenner and is a production company that exists primarily for the purpose of entering into agreements on behalf of and for the benefit of Bruce Jenner and Ms. Jenner. Bruce Jenner is Ms. Jenner's spouse.
> 3    The Jenner Defendants have pled Counts III and IV in the alternative. PageID 687.

As noted, B&P brought its Motion to Dismiss Counts III and IV of the Jenner Defendants' Amended Counterclaim pursuant to *Fed.R.Civ.P. 12(b)(6)* whose purpose is to allow a party to test whether, as a matter of law, the opposing party is entitled to legal relief even if everything alleged in the [counterclaim] is true. *Mayer v. Mylod, 988 F.2d 635, 638 (6th Cir. 1993)*, citing *Nishiyama v. Dickson County, Tennessee, 814 F.2d 277, 279 (6th Cir. 1987).*

The [*4] Supreme Court recently raised the bar for pleading requirements beyond the old "no-set-of-facts" standard of *Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).*

Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004)("[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact) ....

> ...

[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, "'this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court.'" 5 Wright & Miller § 1216, at 223-234 (quoting *Daves v. Hawaiian Dredging Co., 114 F.Supp 643, 645 (D. Hawaii 1953)*); see also *Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 346 (2005)*; *Asahi Glass Co. v. Pentech Pharmaceuticals, Inc., 289 F.Supp.2d 986, 995 (N.D.Ill. 2003)* ....

*Bell Atlantic Corp, v. Twombly, 550 U.S. 544, 555, 558, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*(citations omitted).

In *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*, [*5] the Court made it clear that *Twombly* applies in all areas of federal law and not only in the antitrust context in which it was announced. Following *Iqbal*, district courts faced with motions to dismiss must first accept as true all of the factual allegations contained in a complaint. However, this requirement "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Twombly, 550 U.S. at 555.* Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id. at 556.* Determining whether a counterclaim states a plausible claim for relief will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. *Iqbal, 556 U.S. at 678.* Under *Iqbal*, a civil complaint will only survive a motion to dismiss if it "contain[s] sufficient

factual matter, accepted as true, to state a claim for relief that is plausible on its face. ... Exactly how implausible is "implausible" remains to be seen, as a malleable standard will have to be worked out in practice." *Courie v. Alcoa Wheel & Forged Products, 577 F.3d 625, 629-30 (6th Cir. 2009)*.

> [O]n [*6] the plausibility issue, the factual allegations in the complaint need to be sufficient "to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." *Fritz v. Charter Twp. Of Comstock, 592 F.3d 718, 722 (6th Cir. 2010)*(quoting *Iqbal, 129 S.Ct. at 1949-50*). Further, "a legal conclusion [may not be] couched as a factual allegation" and mere "recitations of the elements of a cause of action" are insufficient to withstand a motion to dismiss. *Id.*(quoting *Hensley Mfg. v. ProPride, Inc., 579 F.3d 603, 609 (6th Cir. 2009)*).

*White v. Chase Bank USA, NA, No. 3:10cv021, 2010 U.S. Dist. LEXIS 102908, 2010 WL 3782399 (S.D. Ohio Sept. 28, 2010)*(Rice, J.). In deciding a *Rule 12(b)(6)* motion, a court must construe the complaint in the light most favorable to the plaintiff and treat all well-pleaded allegations in the complaint as true. *Twombly, 550 U.S. at 555-56*.

The Sixth Circuit recently held that to survive a *Rule 12(b)(6)* motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face" and all well-pled facts in the complaint must be accepted as true. [*7] *Savoie v. Martin, 673 F.3d 488, 492 (6th Cir. 2012)*(citations omitted).

The court turns to the allegations contained in the Jenner Defendants' Amended Counterclaim which, for purposes of this Motion, the Court accepts as true.

On or about February 7, 2011, B&P entered into an agreement [with TLK Fusion Entertainment LLC ("TLK")] which was made, in part, for the benefit of Ms. Jenner ("the Agreement"). Doc. 41, PageID 681. The Agreement provided that B&P wished to engage the marketing and public relations services of TLK to align Ms. Jenner with its Frownies brand and designated product line known as "Beautiful Eyes in a Bag", PageID 682. The Agreement also provided that as consideration for TLK's and Ms. Jenner's performance of all obligations identified in the Agreement, B&P would pay TLK the sum of $305,000.00 as well as two percent (2%) of the net sales of the designated Frownies in excess of $4,500,000.00 for the term of the Agreement. *Id*. The Agreement provided further that Ms. Jenner would appear for a single photo shoot of not more than five hours and be available for a single promotional event in Los Angeles to last no more than five hours. *Id*. Ms. Jenner agreed to approve and [*8] license five photographs for use by B&P in promoting and advertising its Frownies products. PageID 683.

In the discussions which led to the execution of the Agreement, B&P represented that it was a legitimate company, made millions on just "Beautiful Eyes in a Bag" product, and had the financial strength and ability to qualify and participate in third party marketing programs such as QVC television presentations and mass marketing relationships with Sears and other large retail organizations. *Id*. Such financial strength, marketing programs, and relationships were essential to achieving the 2% commission which was a key inducement for Ms. Jenner to endorse the Frownies products. *Id*. Those representations were material to the transaction in that Ms. Jenner would not have entered into the Agreement if she had known that B&P would be unable to finance the mass marketing programs, the inventory production, and the retail relationships that were essential to the generation of the commission. PageID 684.

Starting in about March 1, 2011, Ms. Jenner performed all of the acts required under the Agreement. *Id*. On or about May 12, 2011, B&P issued a press release describing a Mother's Day interview [*9] in which Ms. Jenner endorsed the Frownies' product "Beautiful Eyes in a Bag". *Id*. In or about mid-July, 2011, reports were published on the Internet claiming that Ms. Jenner had undergone a "facelift". PageID 685. Subsequently, B&P commenced this action against Ms. Jenner alleging, *inter alia*, she had breached the Agreement by undergoing a surgical facelift. *Id*.

With respect to damages, the Jenner Defendants allege that:

> 1. as a result of B&P's alleged breach of

contract (Count I), "[Ms.] Jenner has suffered and will continue to suffer general and special damages. [Ms.] Jenner seeks compensation for all damages and losses proximately caused by the breaches and wrongful conduct of B&P in an amount to be proved at trial, as well as the recovery of [her] reasonable attorney's fees." PageID 686.

2. as a result of B&P's breach of implied covenant of good faith and fair dealing (Count II), "[Ms.] Jenner has suffered, and will continue to suffer, general and special damages. [Ms.] Jenner seeks compensation for all damages and losses proximately caused by the breaches and wrongful conduct of B&P in an amount to be proved at trial, as well as the recovery of [her] reasonable attorney's fees." [*10] PageID 686-86.

3. as a result of B&P's fraudulent representations and her justifiable reliance on those representations (Count III), "[Ms.] Jenner has suffered and will continue to suffer, general and special damages. [Ms.] Jenner seeks compensation for all damages and losses proximately caused by her reliance on B&P's fraudulent representations in an amount to be proved at trial, as well as the recovery of [her] reasonable attorney's fees." PageID 687.

4. as a result of Ms. Jenner's reliance on B&P's negligent representations (Count IV), "[Ms.] Jenner has suffered and will continue to suffer, general and special damages. [Ms.] Jenner seeks compensation for damages and losses proximately by B&P's negligent representations in an amount to be proved at trial, as well as the recovery of [her] reasonable attorney's fees." PageID 688.

First, the Court notes that perhaps with the exception of *Textron Fin. Corp. v. Nationwide Mut. Ins. Co, 115 Ohio App.3d 137, 684 N.E.2d 1261 (9th Dist. 1996)*, see *infra*, the parties generally do not disagree as to the legal standards applicable to the present dispute.

In support of its *Rule 12(b)(6)* motion to dismiss, B&P argues that the Jenner Defendants' claims for fraudulent [*11] misrepresentation (Count III) and negligent misrepresentation (Count IV) fail for several reasons:

1. The claims "fall woefully short" of the heightened pleading standard prescribed by *Fed.R.Civ.P. 9(b)*;

2. The claim for negligent misrepresentation fails further because it arises out of the Jenner Defendants' claim for breach of contract and Ohio courts have held that the existence of a contract action excludes the opportunity to present the same case as a tort claim; and

3. The Jenner Defendants were admittedly not involved in the negotiations of the agreement and as such, cannot establish liability for any comments purportedly made by B&P during those negotiations.

(Doc. 46).

In support of its first argument (the "heightened pleading" argument), B&P alleges that while state law governs the burden of proving fraud at trial in a diversity action in federal court, the procedure for pleading fraud in a diversity suit in federal court is governed by the special pleading requirements of *Fed.R.Civ.P. 9(b)* which requires that a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud of mistake." Doc. 46, PageID 722. B&P argues that the pleading requirements [*12] of *Rule 9(b)* apply to claims of fraudulent misrepresentation, that whether a state law claim sounds in fraud and triggers *Rule 9(b)*'s heightened standard is a matter of substantive state law, and that Ohio courts have held that *Rule 9(b)*'s heightened pleading requirements apply to claims of negligent misrepresentation. PageID 722-23. B&P's position is that the allegations in the Amended Counterclaim: (1) fail to allege the time, place, or content of the alleged misrepresentations but just vaguely refer to "discussions which led to the execution of the contracts" and "B&P's representations as to the fact of its financial strength and ability"; (2) fail to identify the specific source of the

alleged misrepresentations but simply state that "B&P represented"; (3) fail to allege with any specificity where the alleged "discussions" or "representation" took place; and (4) fail to allege any specific content or quotation from the alleged misrepresentation. PageID 723. The thrust of B&P's arguments is that the Jenner Defendants have failed to plead "the who, what, when, where, and how" of the alleged misrepresentation. PageID 724.

In support of its argument that the claim for negligent misrepresentation [*13] fails because it arises out of the Jenner Defendants' claim for breach of contract, B&P claims that in Ohio breach of contract does not create a tort claim and that a tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract only if the breaching party also breaches a duty owed separately from that created by the contract (that is, a duty owed even if no contract existed). PageID 724-25. B&P's position is that the Jenner Defendants have failed to plead a duty independent of the agreement and have failed to allege actual damages in addition to those attributable to the alleged breach of the agreement. PageID 725. B&P points out that the Jenner Defendants' claim for negligent misrepresentation alleges "general and special damages ... [and] compensation for damages and losses proximately caused by B&P's negligent representations in an amount to be proved at trial, as well as the recovery of Jenner's reasonable attorney's fees", [Doc. 41, ¶ 40, PageID 688], and that their claim for breach of contract alleges identical damages, "general and special damages ... [and] compensation for all damages and losses proximately [*14] caused by the breaches and wrongful conduct of B&P in an amount to be proved at trial, as well as the recovery of Jenner's reasonable attorney's fees." [Doc. 41, ¶29, PageID 686]. Doc. 46, PageID 725.

In support of its final argument that the Jenner Defendants cannot establish liability for any comments purportedly made by B&P during the negotiations because they were admittedly not involved in the negotiations of the agreement and as such, B&P argues that under Ohio law a person is liable for negligent misrepresentation when: (1) he supplies false information; (2) for the guidance of others in their business transactions; (3) causing pecuniary loss to plaintiff; (4) who justifiably relies upon the information; (5) if he fails to exercise reasonable care or competence in obtaining or communicating the information. PageID

726. B&P's position is that the Jenner Defendants allege that the misrepresentation occurred "[i]n the discussion which led to the execution of the contracts", but they admit that they had no involvement in the negotiations of the agreement with B&P. Id. B&P argues that because the Jenner Defendants were not involved in the negotiations, B&P did not intend to supply [*15] the alleged misrepresentation to the Jenner Defendants of influence them with its alleged misstatement and that B&P could not have known that TLK intended to use this information to induce reliance from the Jenner Defendants as B&P was aware of the Jenner Defendants absence from the negotiations. Id.

In support of their opposition to B&P's motion, the Jenner Defendants have submitted several documents they represent they obtained during discovery. Doc. 50, Ex. A. Attached thereto and Attachments thereto, PageID 762-814. The Jenner Defendants filed their memorandum in opposition under seal on the basis these documents are subject to an agreed protective order entered on August 17, 2012. Doc. 49, PageID 740.

In opposition to B&P's motion to dismiss, the Jenner Defendants argue first that their claims for fraudulent and negligent misrepresentation were pled with sufficient particularity to satisfy Rule 9(b) and provide B&P with sufficient notice to prepare an informed response. Doc. 50, PageID 750-51. The Jenner Defendants argue in the alternative that should the Court find that the allegations lack in some respect, the Court should grant them leave to amend and file a Second Amended Counterclaim [*16] curing any alleged deficiency. PageID 749; 753; 759-60.

The Jenner Defendants' position is that the content is "undeniably clear" as "B&P represented that it was a legitimate company, made millions on just 'Beautiful Eyes in a Bag' products, and had the financial strength and ability to qualify and participate in third party marketing programs such as QVC television presentations and mass marketing relationships with Sears and other large retail organizations. (Doc. 41, ¶ 13)." Doc. 50, PageID 751. The Jenner Defendants claim that the Amended Counterclaim is clear that the misrepresentations intending to induce Ms. Jenner to enter the contract took place during discussions which let to execution of the contract. Id. The Jenner Defendants' also claim that B&P had sufficient notice of the claims "through the Amended Counterclaims, the initial

disclosures, the Motion for Leave to Amend, and this Memorandum in Opposition." PageID 752-53.

The Jenner Defendants argue further that B&P's financial strength was essential to Ms. Jenner earning the 2% commission and they claim that Ms. Jenner would not have entered into the contracts if she knew that B&P could not finance the inventory production [*17] and retail relationships essential to generate her commission. PageID 751. The Jenner Defendants further argue that the misrepresentations were made to induce Ms. Jenner to enter the contracts to promote "Beautiful Eyes in a Bag" products and that she was justified in relying on the representations, was given no reason to doubt them, and relied upon them in entering the contract. *Id.* As for damages, the Jenner Defendants allege they have "suffered lost profits as well as general and special damages and attorney fees" and that Ms. Jenner, in reliance on the misrepresentations and omissions, lost substantial time including the approval of photographs, participation in a satellite medial tour, and a Mother's Day interview. PageID 751-52. Finally, the Jenner Defendants argue that "the *Rule 9(b)* specificity threshold--for which B&P argues *Rule 12(b)(6)* dismissal--is not a threshold its own fraud allegations would satisfy." *Id.*

With respect to B&P's argument that the claim for negligent misrepresentation fails because it arises out of the Jenner Defendants' claim for breach of contract and is therefore barred by Ohio law, the Jenner Defendants argue that their negligent misrepresentation claim [*18] is not based upon the same factual circumstances as their breach of contract claim. PageID 753. Essentially, the Jenner Defendants' position is that their negligent misrepresentation claim is based upon actions prior to the execution of the agreement while the breach of contract claim is based on an alleged breach of the agreement after it was executed. PageID 753-56. They claim that with respect to the negligent misrepresentation claim, B&P provided false information in the course of its business, the information was provided to Ms. Jenner, and that she justifiably relied on it, and that she suffered damages. *Id.* They distinguish the breach of contract claim by arguing that it is "based upon the existence of the B&P agreement and commission agreement, Ms. Jenner's performance of her obligations, B&P's improper rescission based on rumors published on the internet regarding face-lifts, and B&P's refusal to use Ms. Jenner's endorsement to promote its products, Ms. Jenner's willingness to continue

to perform, and loss of the ability to earn her commission." PageID 755.

Finally, the Jenner Defendants address B&P's argument that the Jenner Defendants were admittedly not involved in the negotiations [*19] of the agreement and as such, cannot establish liability for any comments purportedly made by B&P during those negotiations. PageID 756. Relying heavily on documents which they attached to their memo in opposition, the Jenner Defendant's argue that TLK was B&P's agent. PageID 756. The Jenner Defendants argue further that they were supplied negligent misrepresentations by B&P through its agent TLK who conducted the negotiations for B&P and therefore B&P is liable for those negligent misrepresentations because a party can be held liable for the negligent misrepresentations of its agents. PageID 756-57.

In its reply, the first argument that B&P makes is that a *Rule 12(b)(6)* motion is directed solely to the counterclaim and any exhibits attached to it and the merits of the claims set forth in the complaint are not at issue on a motion to dismiss for failure to state a claim. Doc. 52, PageID 820-21. B&P notes that *Rule 12(b)(6)* requires that "if matters outside the pleadings are presented to and not excluded by the court," that motion shall be treated as one for summary judgment. PageID 821. B&P also notes that a court may consider attachments to a motion to dismiss as part of the pleadings [*20] if such attachments are referred to in the complaint and are a central part of the claim, and only to fill in the contours and details of the complaint and it may not base its rationale on the additional information contained in matters outside the pleading. *Id.* The essence of B&P's position is that the documents that the Jenner Defendants attached to their memo in opposition do not merely fill in the contours and details of their Amended Counterclaim but rather attempt to argue the merits of their claims and B&P's position is that the Court should not consider the documents unless converting the *Rule 12(b)(6)* motion to one for summary judgment.[4] *Id.*

> 4 Should the Court convert its motion to dismiss to one for summary judgment, B&P requests an opportunity to respond to the Jenner Defendants' memo in opposition as such. *Id.*

As to their position that the Jenner Defendants' claims for fraudulent misrepresentation and negligent misrepresentation are not pled with the requisite

particularity, B&P argues that the Jenner Defendants alleged in their amended counterclaim that the purported misrepresentations were made "[i]n the discussions which led to the execution of the contracts", and they [*21] admit that the subject negotiations that ultimately ended with the executed agreement were on-going from January to February, 2011. PageID 822, citing Doc. 41, ¶ 13, Page ID 683 and Doc. 50, PageID 746-47. B&P argues that the Jenner Defendants' admission supports B&P's argument that it is therefore unable to glean from the Amended Counterclaim the date and time of the alleged misrepresentations. Doc. 52, PageID 822. B&P also argues that for the same reasons, the Amended Counterclaim fails to identify the place and manner of the alleged misrepresentations since the Jenner Defendants simply allege that the purported misrepresentations occurred "in discussions". Doc. 52, PageID 822-23.

B&P argues next that while the Amended Counterclaim alleges that "B&P represented..." and "B&P's representations as to the facts of its financial strength and ability were made...", the Jenner Defendants now argue that the source of the misrepresentations and omissions was TLK. PageID 823. B&P notes that nowhere in the Amended Counterclaim do the Jenner Defendants claim that the purported misrepresentations were made by TLK on behalf of B&P. *Id.* B&P also argues that the Amended Counterclaim does not allege [*22] that the fraud took place on a specific date and time, or that there was an agency relationship between B&P and TLK. *Id.* B&P points out that, contrary to the Jenner Defendants' position that B&P had sufficient notice of the claims "through the Amended Counterclaims, the initial disclosures, the Motion for Leave to Amend, and this Memorandum in Opposition", the threshold test is whether the [counterclaim] placed the defendant on sufficient notice of the misrepresentation. PageID 824.

B&P argues next that the Jenner Defendants' attempt to distinguish their claim for negligent misrepresentation from their claim for breach of contract fails because both claims arise out of B&P's alleged misrepresentations regarding its financial condition and Ms. Jenner's alleged missed opportunity to earn commissions. PageID 824-25. B&P argues that the Jenner Defendants' breach of contract claim alleges that B&P decided, because of poor sales and its inability to provide the financial and other commitments to enter into third party marketing programs, to terminate the agreement thereby depriving

Ms. Jenner of her opportunity to earn commissions pursuant to the agreement. PageID 825. B&P argues further [*23] that the negligent misrepresentation claim is based on B&P's alleged misrepresentations regarding its status as a legitimate company, its profits on the Beautiful Eyes product, and its financial strength and ability to participate in third party marketing programs. *Id.* Finally, B&P points out that the Jenner Defendants have failed to allege a duty, independent of the contract, and have alleged identical damages for both claims and that their claim for negligent misrepresentation fails. PageID 825-26. Finally, B&P argues that it cannot be liable to the Jenner Defendants for negligent misrepresentation based on a theory of agency as no agency relationship is alleged in the Amended Counterclaim. PageID 826-27.

The Court will first address that branch of B&P's present motion that addresses Count III, the claim for fraudulent misrepresentation.

While state law governs the burden of proving fraud at trail in a diversity action in federal court, the procedure for pleading fraud in a diversity action in federal court is governed by the special pleading requirements of *Fed.R.Civ.P. 9(b)*. *Minger v. Green, 239 F.3d 793, 800 (6th Cir. 2001)*(citations omitted). The heightened pleading standard of [*24] *Rule 9(b)* applies to claims of fraudulent misrepresentation. See *Coffey v. Foamex L.P.., 2 F.3d 157, 162 (6th Cir. 1993)*(citation omitted). In other words, because the Jenner Defendants' claim in Count III of their Amended Complaint is based on fraud, in addition to the *Rule 12(b)(6)* standards, they must also meet the more rigorous pleading standards of *Rule 9(b)* with respect to that claim. See *Heinrich v. Waiting Angels Adoption Services, Inc., 668 F.3d 393, 403 (6th Cir. 2012)*. *Rule 9(b)* states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *Heinrich, supra*, citing *Rule 9(b)*; *Minger, supra*, citing *Rule 9(b)*. In order to satisfy the pleading requirements of *Rule 9(b)*, the Jenner Defendants, at a minimum, must allege the time, place, and content of the alleged misrepresentation on which they relied, the fraudulent scheme, the fraudulent intent of the Defendants, and the injury resulting from the fraud. *Cataldo v. U.S. Steel Corp., 676 F.3d 542, 551 (6th Cir. 2012)*. In other words, the Jenner Defendants must plead "the who, what, when, where, and how" of the alleged fraud. *Sanderson v. HCA-The Healthcare Co., 447 F.3d 873, 877 (6th Cir. 2006)*

(citation [*25] omitted). A complaint's failure to comply with *Rule 9(b)*'s pleading requirements is treated as a failure to state a claim under *Rule 12(b)(6)*. *United States ex rel. Howard v. Lockheed Martin Corp., 499 F.Supp.2d 972, 976 (S.D Ohio 2007)*.

Based on its review of the Amended Counterclaim, this Court concludes that the Jenner Defendants have failed to satisfy the heightened pleading requirement of *Rule 9(b)*. The Amended Counterclaim arguably states with specificity what the Jenner Defendants claim were the fraudulent misrepresentations: "[T]hat B&P fraudulently represented that it was a legitimate company, made millions on just 'Beautiful Eyes in a Bag' products, and had the financial strength and ability to qualify and participate in third party marketing programs such as QVC television presentations and mass marketing relationships with Sears and other large retail organizations." Doc. 41, PageID 683. Assuming that those allegations satisfy the pleading requirement of *Rule 9(b)*, the Amended Counterclaim fails satisfy *Rule 9(b)* because it does not specify the "who, when, where" of the alleged fraud.

First, the Jenner Defendants fail to identify in the Amended Counterclaim who made the allegedly [*26] fraudulent representations. Additionally, while the Jenner Defendants argue in their memorandum in opposition that the sources of the representations were TLK and Ken Collis, Doc. 50, Page ID 751, the Amended Counterclaim is silent as to whom the allegedly fraudulent representations were made. Second, the Amended Counterclaim does not specify when B&P made the allegedly fraudulent representations. The most the Amended Complaint does is to refer to "in the discussions which led to the execution of the contracts". Doc. 41, PageID 683. Indeed, in their memorandum in opposition, the Jenner Defendants acknowledge that those discussions were on-going for a period of one month from January to February, 2011. Doc. 50, PageID 746. Yet, the Amended Complaint is silent as to when, during that month-long period, the allegedly fraudulent misrepresentations were made. Moreover, the Amended Counterclaim is silent as to where or how the misrepresentations were made.

The Jenner Defendants contend that B&P has sufficient notice of the fraud claims "through the Amended Counterclaim, the initial disclosures, the Motion for Leave to Amend, and this Memorandum in

Opposition". Doc. 50, PageID 752. Indeed, [*27] they have based their arguments in opposition to B&P's present motion almost entirely on facts that they have gleaned from the documents which they attached to their memorandum. However, the test is whether the *Amended Counterclaim* placed B&P on sufficient notice of the time, place, and content of the alleged misrepresentations, *Cataldo, 676 F.3d at 551*; in other words, the "who, what, when, where, and how" of the alleged fraud. *Sanderson, 447 F.3d at 877*. This Court concludes that the allegations in Count III of the Amended Complaint do not meet the heightened pleading requirements of *Fed.R.Civ.P. 9(b)* and B&P's *Rule 12(b)(6)* motion to dismiss Count III should be granted. See *Lockheed Martin, 499 F.Supp.2d at 976*.

The Court turns to Count IV of the Amended Complaint, the claim for negligent misrepresentation. First, the Court will assume that *Rule 9(b)*'s heightened pleading requirements apply to a claim for negligent misrepresentation. See *Republic Bank & Trust Co. v. Bear Stearns & Co., Inc., 683 F.3d 239, 247 (6th Cir. 2012)*. With that assumption in mind, for the same reasons that Count III of the Amended Complaint does not satisfy *Rule 9(b)*, Count IV also fails. However, even if [*28] a claim for negligent misrepresentation is not subject to *Rule 9(b)*'s requirement, there are additional reasons why Count IV fails.

Under Ohio law, the existence of a contract action generally excludes a cause of action based upon the same conduct sounding in tort. *Hanlin v. Ohio Builders and Remodelers, Inc., 196 F.Supp.2d 572, 579 (S.D. Ohio 2001)*(citation omitted). "A tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed." *Textron, 115 Ohio App.3d at 151* (citation omitted). Further, there must be actual damages in addition to those attributable to the breach of contract claim. *Id.* (citations omitted).

In their Amended Counterclaim, the Jenner Defendants have not pled that B&P owed them a duty independent of the contract at issue. The entire Amended Counterclaim is based on the Jenner Defendants' allegations of breach of contract. The Jenner Defendants' tort claim in Count IV is based on the same actions as their breach of contract claim. In other [*29] words, the

Jenner Defendants' allegation of negligent misrepresentation arises out of the contract and it does not stand on its own. Further, a comparison of the Jenner Defendants' claim for damages for each of the four Counts in the Amended Counterclaim reveals that their claims for damages for breach of contract (Count I), breach of implied covenant of good faith and fair dealing (Count II), fraudulent misrepresentation (Count III), and negligent misrepresentation (Count IV), are virtually identical. Doc. 41, PageID 686-88. Accordingly, the Amended Counterclaim fails to allege actual damages for a claim sounding in tort in addition to those attributable to the breach of contract. *Textron, 115 Ohio App.3d at 151.*

The Jenner Defendants attempt to distinguish *Textron* on the basis it concerned an appeal alleging failure to direct a verdict after trial "not a premature attempt to dismiss appropriately states claims via *Rule 12(b)(6)* before a single deposition has been taken." Doc. 50, PageID 754. However, the Jenner Defendants have read *Textron* too narrowly, particularly in light of *Twombly* and *Iqbal*. Further, in the recent case of *Toledo Mack Sales & Service, Inc., v. Mack Trucks, Inc., 437 Fed.Appx. 381 (6th Cir. 2011)*, [*30] the Sixth Circuit affirmed the district court's granting of a *Rule 12(b)(6)* motion, and in doing so, quoted *Textron. Id. at 151* ("Under Ohio law, 'the existence of a contract action ... excludes the opportunity to present the same case as a tort claim. A tort claim based upon the same actions [as the contract claim] ... will exist ... only if the breaching party also breaches a duty owed separately from that created by the contract.'"). *Toledo Mack* directly opposes the Jenner Defendants' position.

For the foregoing reasons, this Court concludes that Count IV of the Jenner Defendants Amended Counterclaim fails and B&P's *Rule 12(b)(6)* motion should be granted.

The Jenner Defendants seek leave to file a second amended counterclaim in the event that the Court finds the allegations in Courts III and IV of their Amended Complaint insufficient to withstand B&P's *Rule 12(b)(6)* motion. Doc. 50, PageID 759-60. The extent of their "alternative motion" is, "Nonetheless, should this Court find a more definite statement is required to cure any purported ambiguity, it is requested that leave be granted to file a Second Amended Counterclaim", PageID 753, and "In the alternative, should this Court find [*31] the

pleadings lacking, the Jenner Defendants respectfully request that this Court grant them leave to file a Second Amended Counterclaim including the factual matters cited herein to cure any deficiency ...." PageID 759-60.

*Rule 15 of the Federal Rules of Civil Procedure* instructs courts to freely grant a party leave to amend its pleadings when justice so requires.

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason -- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of any allowance of the amendment, futility of amendment, etc.--the leave sought should, as the rules require, be "freely given."

*Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962).*

"A bare request in an opposition to a motion to dismiss--without any indication of the particular grounds on which amendment is sought--does not constitute a motion within the contemplation of *Rule 15(a)*." *Louisiana School Employees' Retirement System v. Ernst & Young, LLP, 622 F.3d 471, 486 (6th Cir. 2010)*(citation [*32] omitted). A request for leave to amend "almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss is ... not a motion to amend." *Id.*, quoting *Begala v. PVC Bank, Ohio, Nat'l Ass'n, 214 F.3d 776, 784 (6th Cir. 2000), cert. denied, 531 U.S. 1145, 121 S. Ct. 1082, 148 L. Ed. 2d 958 (2001)*. In the absence of a motion under *Rule 15*, the court, in its discretion, may deny leave to amend because defendants are "entitled to a review of the complaint as filed pursuant to *Rule 12(b)(6)*" and plaintiffs are "not entitled to an advisory opinion from the court informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies." *Louisiana School Employees' Retirement System, 622 F.3d at 486*, quoting, *Begala, 214 F.3d at 784*.

The Jenner Defendants' alternative motion falls

squarely within *Louisiana School Employees' Retirement System and Begala*. They have requested leave to amend "almost as an aside ... in a memorandum in opposition ..." to B&P's *Rule 12(b)(6)* motion to dismiss Counts III and IV of the Amended Counterclaim. Other than alleging that they would include in a second amended counterclaim the factual matters that they cited in their memorandum [*33] in opposition, the Jenner Defendants do not provide any particular grounds on which they seek to amend. Indeed, they have not provided any proposed second amended counterclaim.

As an aside, the Court notes that Judge Rose entered the Preliminary Pretrial Conference Order in this matter on July 24, 2012, in which he set October 12, 2012, as the cut-off date to amend the pleadings. Doc. 36, PageID 638. The Jenner Defendants filed their Motion for Leave to Amend Counterclaim on that date and attached to the Motion their proposed amended counterclaim. *Id.*, Ex. A thereto. In support of that Motion, the Jenner Defendants stated that, "[o]n August 17, 2012, the parties exchanged initial disclosures in discovery" and that as a result they had learned of the facts which allegedly provided the basis for Counts III and IV in the Amended Counterclaim. Doc. 39, PageID 653. The Court granted the motion on amend on October 22, 2012, Doc. 36, Notation Order thereon, and the Amended Counterclaim was filed on that date. Doc. 41.

The Jenner Defendants' acknowledge that they have had in their possession since at least August 17, 2012, the documents which apparently provided the bases for the claims contained [*34] in Counts III and IV of the Amended Counterclaim. They have amended their counterclaim once within the time allowed by Judge Rose in his Preliminary Pretrial Conference Order. The deadline for amending pleadings has passed and the Jenner Defendants have not shown any cause let alone good cause for failure to seek leave earlier. See *Leary v. Daeschner, 349 F.3d 888, 909 (6th Cir. 2003)*, citing *Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1419 (11th Cir. 1998)*("Once the scheduling order's deadline [for amending pleadings] passes, a plaintiff first must show good cause under *Rule 16(b)* for failure to earlier to seek leave to amend before a court will consider whether amendment is proper under *Rule 15(a)*").

For the foregoing reasons, the Jenner Defendant's Alternative Motion is denied.

It is therefore recommended that Plaintiff B&P's Motion to Dismiss Counts III and IV of Jenner Defendants' Amended Counterclaim, (Doc. 46), be granted.

It is ordered that the Jenner Defendants' Motion for Leave to File a Second Amended Counterclaim, (Doc. 50), is denied.

February 26, 2013.

/s/ Michael R. Merz

United States Magistrate Judge

# Tab 2



**Bush Truck Leasing, Inc., Plaintiff, v. Dynamex, Inc., et al., Defendants.**

**Case No. 1:09-cv-354**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION**

*2011 U.S. Dist. LEXIS 1720*

**January 7, 2011, Filed**

**COUNSEL:** [*1] For Bush Truck Leasing, Inc., Plaintiff: Brian A. Riddell, LEAD ATTORNEY, Brenna Lynn Kelly Penrose, Keating Muething & Klekamp PLL, Cincinnati, OH; Daniel E Izenson, LEAD ATTORNEY, Keating Muething & Klekamp - 1, Cincinnati, OH; William Keith Noel, LEAD ATTORNEY, Keating Muething & Klekamp, Cincinnati, OH.

For Dynamex, Inc., Defendant: Glenn Virgil Whitaker, LEAD ATTORNEY, Anthony L Osterlund, Eric Wade Richardson, Vorys Sater Seymour & Pease - 1, Cincinnati, OH.

For Office Depot, Inc., Defendant: Joseph S Simms, LEAD ATTORNEY, Ulmer & Berne, Cleveland, OH; Daniel F Katz, Jennifer L Gibbons, Paul T Hourihan, PRO HAC VICE, Washington, DC.

**JUDGES:** Chief Judge Susan J. Dlott.

**OPINION BY:** Susan J. Dlott

**OPINION**

ORDER GRANTING IN PART MOTION TO DISMISS AND GRANTING MOTION TO TRANSFER

This matter is before the Court on Defendant Office Depot, Inc.'s Motion to Dismiss (doc. 39) and Motion to Sever Claims and Transfer Venue (doc. 40). This case arises from a set of business relationships between Plaintiff Bush Truck Leasing, Inc., Defendant Dynamex, Inc., and Defendant Office Depot, Inc. At least between 2006-2008 the parties had a relationship in which Bush purchased Office Depot-branded delivery vehicles from Office Depot, [*2] Bush then leased the delivery vehicles to Dynamex, and Dynamex's independent contractor drivers used the vehicles to service delivery routes for Office Depot.

Bush alleges in the Amended Complaint (doc. 24) that Dynamex and Office Depot made representations that in the event Dynamex terminated its contract with Bush: (1) Office Depot promised to buy back the Office Depot-branded delivery vehicles from Bush and (2) Dynamex promised to return the leased vehicles to Bush and to assist Office Depot in buying back the Office Depot-branded vehicles. Bush has sued both Office Depot and Dynamex alleging that they breached their obligations to Bush. Bush has settled its dispute with and dismissed all claims against Dynamex. Office Depot is the only remaining Defendant.

Office Depot now has moved to dismiss for failure to state a claim upon which relief can be granted. Office Depot also seeks to transfer any remaining claims to the United States District Court for the Southern District of Florida. [1] For the reasons that follow, the Court will **GRANT IN PART** the Motion to Dismiss and **GRANT** the Motion to Transfer.

1  Office Depot originally requested that the Court sever the claims against Dynamex from [*3] the claims against Office Depot. That part of the Motion to Sever Claims and Transfer Venue is moot.

## I. BACKGROUND

The Court will set forth the facts alleged in the Amended Complaint by providing a timeline of the key events and allegations. [2]

2  The Court has considered the allegations in the Amended Complaint and the contractual documents referenced therein or related to the allegations therein in ruling upon the Motion to Dismiss. The Court has not considered materials extraneous to the pleading such as declarations and emails submitted by the parties.

## A.  Master Transportation Agreement ("MTA") between Dynamex and Office Depot

On September 23, 2003, Dynamex and Office Depot entered into a Master Transportation Agreement ("MTA") (doc. 26) whereby Dynamex agreed to provide transportation-related services to Office Depot. The MTA was amended on multiple occasions: Amendment 1 in May 2005; Amendment 2 on December 15, 2005; Amendment 3 on July 31, 2006; Amendment 4 on March 5, 2007; Amendment 5 on June 6, 2008; Amendment 6 effective April 29, 2008; and Amendment 7 in March 2009. Bush alleges in the Amended Complaint that it is an intended third-party beneficiary of the MTA.

The MTA provided [*4] that any litigation arising from the MTA must be brought in the Southern District of Florida and that disputes would be governed by Florida law. Consecutively-numbered Schedule A(s) were incorporated into the MTA for each separate Office Depot location or region. Bush alleges upon information and belief that many of the Schedule A(s) contained a buy-back clause which required Office Depot to buy back from Bush certain vehicles at book value if the Schedule A(s) were terminated without cause. These Schedule A(s) contained the following language:

Vehicle Assets: Carrier [Dynamex] agrees to facilitate the required purchase of Office-Depot Sprinters through a third party company who will in turn lease the

vehicles to the independent contractors serving the contract. In the event this Schedule A is terminated without cause, carrier will facilitate the sale of Office Depot-branded Sprinter and bulk trucks from the independent contractors or leasing company back to Office Depot. To that end, the third party company will include a mandatory truck buy back clause in its agreements with the independent contractors hired to service the Office Depot account. That buy back agreement will state that  [*5] Office Depot will buy the trucks back at book value.

(Doc. 46-4.) Bush asserts that it is the third-party company discussed in the Schedule A(s).

## B. Program Agreement between Bush and Dynamex

On December 1, 2005, Bush and Dynamex entered into a Program Agreement. (Doc. 24-2.) Pursuant to the Program Agreement, Bush extended financing and/or leasing of delivery vehicles to Dynamex drivers. Dynamex agreed to facilitate the financing and/or leasing by its drivers of Bush's delivery vehicles. The Program Agreement ran for a three-year term with automatic successive one-year renewals. Dynamex was permitted to cancel the Program Agreement at any time with ninety days notice.

The Program Agreement was amended on March 22, 2006 to provide that if Dynamex terminated the Program Agreement, the terms of the Program Agreement continued for each vehicle financed prior to the effective date of the termination. (Doc. 24-3.) The Program Agreement was modified again on March 28, 2006. The so-called Office Depot Amendment to the Program Agreement provided as follows:

Bush Transportation Systems agrees to lease vehicles to Independent Contractor's [sic] servicing the Dynamex-Office Depot contract. In the  [*6] event that the agreement is terminated with or without cause, Bush [] will sell the Office Depot branded Sprinter and bulk trucks back to Office Depot. To that end, Bush [] will include mandatory truck buy back clause [sic] in its agreements with the

Independent Contractors hired to service the Dynamex-Office Depot account. That buy-back agreement will state that Office Depot will buy the trucks back at book value.

(Doc. 24-4.)

Bush alleges that Office Depot was aware of and participated in negotiations between Bush and Dynamex leading up to the Office Depot Amendment to the Program Agreement. Bush further alleges that Office Depot wanted to be able to retain and purchase the Sprinter and bulk trucks which were subject to the Program Agreement. Bush alleges that Office Depot agreed to buy back the vehicles from Bush at book value and to include the buy-back provision in its Schedule A(s) with Dynamex. Bush alleges that it agreed to enter into the Office Depot Amendment to the Program Agreement in reliance upon Office Depot's promises and representations.

## C. Used Vehicle Purchase Agreement ("VPA") between Office Depot and Bush

On June 14, 2006, Office Depot and Bush entered into a Used [*7] Vehicle Purchase Agreement ("VPA"). (Doc. 39-1 at 23.) Pursuant to the VPA, Bush purchased used delivery vehicles from Office Depot. Bush did not expressly discuss the VPA in the Amended Complaint. However, Office Depot provided a copy of the VPA to the Court. The Court will consider the VPA without converting the pending motion to a motion for summary judgment because the VPA is indirectly mentioned in the Amended Complaint and it is central to the dispute between the parties. [3] *See Greenberg v. Life Ins. Co. of Va., 177 F.3d 507, 514 (6th Cir. 1999).*

    3 For example, the VPA is indirectly mentioned when Bush alleges that Office Depot had an obligation to "buy back" vehicles from Bush. The VPA is the agreement by which Office Depot sold the vehicles that Bush now alleges that Office Depot must buy back.

The VPA provided that it would be governed and construed pursuant to the laws of Florida. The VPA also contained an integration clause which provided that the VPA was intended by the parties to the VPA "as the final expression of their agreement and was further intended as the complete and exclusive statement of all the terms of

their agreement." (Doc. 39-1 at 23, 26.) The VPA does not [*8] contain a buy-back provision requiring Office Depot to repurchase the vehicles it sold to Bush.

## D. Termination of the Program Agreement

On May 2, 2008, Dynamex provide written notice to Bush of its intention to terminate the Program Agreement effective August 2, 2008. Three hundred vehicles subject to the Program Agreement were returned to Bush. Bush alleges that Dynamex drivers abandoned, took parts from, or damaged the vehicles before the vehicles were returned to Bush. Bush alleges that it has approximately $8 million dollars in idle inventory. Office Depot has not bought back Office Depot-branded vehicles from Bush since the termination of the Program Agreement.

## E. MTA is Amended to Delete "Vehicle Asset" Provisions from Schedule A(s)

At some unspecified date on or after June 6, 2008, [4] Dynamex and Office Depot amended the MTA by agreeing to delete the "Vehicle Asset" provision from applicable Schedule A(s). This Amendment 6 to the MTA was given an effective date of April 29, 2008. Bush alleges that Dynamex and Office Depot signed this Amendment 6 to the MTA after Dynamex gave Bush notice to terminate the Program Agreement, but purported to back-date Amendment 6 to be effective before [*9] Dynamex gave Bush notice of its intention to terminate the Program Agreement.

    4 Amendment 5 to the MTA was dated June 6, 2008. Bush asserts that Amendment 6 must have been agreed to on or after June 6, 2008.

## F. Relevant Procedural Posture

Bush filed an Amended Complaint against Office Depot and Dynamex on December 1, 2009. Office Depot is the only remaining defendant. Bush asserts the following claims against Office Depot: (1) breach of the MTA, (2) promissory estoppel, (3) unjust enrichment, (4) tortious interference with contractual and business relationships, (5) fraud, (6) fraudulent inducement, and (7) civil conspiracy. Office Depot moves to dismiss each claim stated against it and to transfer any remaining claims to the United States District Court for the Southern District of Florida. The Court held oral argument on the pending motions on December 16, 2010.

2011 U.S. Dist. LEXIS 1720, *9

## II. MOTION TO DISMISS

Office Depot moves to dismiss the claims stated against it in the Amended Complaint pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. *Rule 12(b)(6)* allows a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6)*. A district court "must [*10] read all well-pleaded allegations of the complaint as true." *Weiner v. Klais and Co., Inc., 108 F.3d 86, 88 (6th Cir. 1997)*. However, this tenet is inapplicable to legal conclusions, or legal conclusions couched as factual allegations. *Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50, 173 L. Ed. 2d 868 (2009)*.

To withstand a dismissal motion, a complaint "does not need detailed factual allegations," but it must contain "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. "Factual allegations must be enough to raise a right to relief above the speculative level." *Id*. The Court does not require "heightened fact pleading of specifics, but only enough facts to state a claim for relief that is plausible on its face." *Id. at 570*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, 129 S. C t. at 1949*. "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly, 550 U.S. at 563*.

The [*11] Supreme Court gave the following additional guidance in *Iqbal*:

> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than [legal] conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*129 S. Ct. at 1950*.

## A. Breach of MTA

Bush asserts in this claim that it is a third-party beneficiary of the MTA between Office Depot and Dynamex. Reading the allegations in the Amended Complaint and the supporting documentation as a whole, the Court understands Bush to allege that it is a third-party beneficiary of the Vehicle Asset provisions in certain Schedule A(s) to the MTA. Bush alleges that Office Depot had a duty pursuant to the Vehicle Asset provisions to buy back from Bush the Office Depot-branded vehicles that Bush had purchased from Office Depot and leased to Dynamex.

The Court has considered the dismissal arguments made by [*12] the parties in their briefs and at the hearing. Florida law is controlling on this claim because the MTA contains a Florida choice-of-law provision. Under Florida law, a third-party beneficiary need not be specifically named in a contract to assert rights thereunder. *See Shaffer v. Wells Fargo Guard Servs., 528 So. 2d 389, 390 (Fla. App. 1988)*; *Technicable Video Sys., Inc. v. Americable of Greater Miami, Ltd., 479 So. 2d 810, 812* (Fla. App. 1985.) A person is a third-party beneficiary if "the parties to the contract clearly express . . . an intent to primarily and directly benefit the third party or a class of persons to which that party claims to belong." *Caretta Trucking, Inc. v. Cheoy Lee Shipyards, Ltd., 647 So. 2d 1028, 1031 (Fla. App. 1994)*. Here Bush has alleged sufficient facts to state a plausible claim that it was the intended third-party beneficiary of the MTA. Likewise, it has pleaded that Office Depot breached the MTA and that Bush was damaged thereby. The Court concludes that Bush has stated this claim adequately to withstand a *Rule 12(b)(6)* motion.

## B. Promissory Estoppel, Unjust Enrichment, and Fraudulent Inducement

Bush pleads the promissory estoppel and unjust enrichment [*13] claims in the alternative to the breach of contract claims. Bush alleges that Office Depot made promises and representations to Bush to buy back the Office Depot-branded vehicles, that it relied on Office Depot's promises and representations by entering into the Office Depot Amendment to the Program Agreement, and that it was damaged by Office Depot's failure to buy back the vehicles. Office Depot moves for dismissal primarily on the basis that Bush cannot establish

reasonable reliance as a matter of law.

The VPA between Bush and Office Depot is a fully-integrated contract by its terms and it contains the only obligations of the parties to each other. The VPA set forth the terms of the sale of vehicles from Office Depot to Bush. The VPA did not contain a buy-back provision obligating Office Depot to re-purchase the vehicles from Bush in any circumstances. Because of the absence of a buy-back provision in the VPA, Office Depot asserts that Bush's reliance upon Office Depot's alleged non-contractual promises and representations was unreasonable as a matter of law.

Bush's promissory estoppel and unjust enrichment claims are sufficiently pleaded to meet the *Rule 12(b)(6)* standard. Office [*14] Depot's argument predicated upon the VPA requires the Court to make determinations of fact not appropriate for resolution at the pleading stage. Issues of reasonable reliance are not readily determined prior to discovery. The Court will not dismiss Bush's promissory estoppel and unjust enrichment claims at this time.

A similar analysis applies to Bush's fraudulent inducement claim. Bush alleges that Office Depot misled (fraudulently induced) Bush into entering into the Office Depot Amendment to the Program Agreement by representing that it would abide by the terms therein. Stated differently, and taking as a whole the allegations in the Amended Complaint and the relevant documents, Bush alleges that Office Depot induced it into entering into the Office Depot Amendment to the Program Agreement by representing that Office Depot would buy back the Office Depot-branded vehicles in the event that the Program Agreement was terminated. Bush has stated this claim with particularity as required by *Rule 9(b) of the Federal Rules of Civil Procedure*. Additionally, for the reason set forth above, the fraudulent inducement claim does not fail at the pleading stage on the basis that Bush could not [*15] have reasonably relied upon Office Depot's alleged representations.

## C. Fraud

Bush alleges a fraud claim in addition to the fraudulent inducement claim. To the extent that Bush intended to assert a fraud claim based on facts independent of and separate from the fraudulent inducement claim, the fraud claim is not pleaded with the particularity required by *Rule 9(b)*. Additionally, the fraud claim is barred under Florida and Ohio law. Under Florida law, "where parties freely enter a contract and the promisor fails to perform an obligation 'interwoven with the breach of contract,' the promisee's claim arises only in contract." *Gen. Elec. Co. v. Latin Am. Imports, S.A., 126 Fed. Appx. 209, 212 (6th Cir. 2005)* (applying Florida law and quoting *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A., 685 So. 2d 1238, 1240 (Fla. 1996))*. Bush's contention that Office Depot misrepresented or concealed its obligations necessarily is interwoven with Bush's contention that Office Depot assumed the duty to buy back vehicles from Bush in the MTA. Therefore, Bush's claim for fraud fails under Florida law.

In Ohio, "[t]he economic-loss rule generally prevents recovery in tort of damages for purely economic loss." [*16] *Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc., 106 Ohio St. 3d 412, 414, 2005 Ohio 5409, 835 N.E.2d 701, 704 (2005)*. The rule "prevents a party from recovering economic losses in tort that result from 'a breach of duties assumed only by agreement.'" *Onyx Envtl. Servs., LLC v. Maison, 407 F. Supp. 2d 874, 879 (N.D. Ohio 2005)* (quoting *Corporex Dev. & Constr. Mgmt., 106 Ohio St. 3d at 414*). The injury or damages caused by the tortious conduct must be separate and distinct from the injury or damages caused by the breach of contract. *Med. Billing, Inc. v. Med. Mgmt. Sciences, Inc., 212 F.3d 332, 338 (6th Cir. 2000)*. To the extent that Bush alleges fraud separate from the fraudulent inducement, the damages it seeks for the fraud are purely economic. The claim therefore fails under Ohio law as well. For these reasons, the Court will **DISMISS** Bush's fraud claim. [5]

> 5   As to a fraudulent inducement claim, Florida law provides that "when the promisor makes a false promise 'extraneous to the contract,' which, rather than forming a term of performance, induces the promisee to enter the contract, then the [economic loss] rule does not bar his claim." *Gen. Elec. Co., 126 F. App'x at 213* (quoting *HTP, Ltd., 685 So. 2d at 1240*); [*17] *see also Becherer v. Merrill Lynch, Pierce, Fenner, and Smith, Inc., 193 F.3d 415, 439 (6th Cir. 1999)* (Kennedy, J., dissenting) (applying Florida law and stating that the economic loss rule bars fraud claims, but not true fraudulent inducement claims). Similarly, in Ohio, courts have held that claims for fraudulent inducement are not barred by the economic loss rule. *See Marine Direct v.*

*Doughtery Marine, Inc.*, No. 2:06-cv-0100, 2007 U.S. Dist. LEXIS 1414, 2007 WL 81842, at *2 (S.D. Ohio Jan. 8, 2007); Onyx Envir. Servs., 407 F. Supp. 2d at 879.* Therefore, Bush's claim that Office Depot fraudulently induced it into entering the Office Depot Amendment to the Program Agreement survives.

**D. Tortious Interference**

Bush alleges in the tortious interference claim that Office Depot interfered with or caused a breach of the contracts between Bush and Dynamex and between Bush and Dynamex drivers. It is not clear from the allegations in the Amended Complaint which facts support this claim. The only contract between Bush and Dynamex is the Program Agreement. Bush does not explain by what acts or in what manner Office Depot interfered with or caused a breach of that agreement.

Moreover, both Bush and Dynamex had the right to [*18] terminate the Program Agreement at any time with ninety days notice. Some cases have held that there can be no tortious interference with a contract that is terminable at will. *See Mitchell v. Mid-Ohio Emer. Servs., LLC, No. 03-AP-981, 2004 Ohio 5264, 2004 WL 2803419, at *9 (Ohio App. Sept. 30, 2004); Hoyt, Inc. v. Gordon & Assoc., Inc., 104 Ohio App. 3d 598, 612-13, 662 N.E.2d 1088 (1995).* Office Depot's conduct could not be considered wrongful if it encouraged or solicited Dynamex to terminate an agreement it had the right to terminate at any time. Applied here, these cases instruct that Office Depot could not tortiously interfere with or cause the breach of a contract which Dynamex had the right to terminate at any time. For these reasons, Bush has failed to state a facially plausible claim for relief under *Iqbal. See 129 S. Ct. at 1949.* The Court will **DISMISS** the tortious interference claim as well.

**E. Civil Conspiracy**

Finally, Bush alleges that Office Depot conspired with Dynamex to deprive Bush of the expected benefits of the Program Agreement and the MTA. "Under Ohio law, a civil conspiracy consists of four elements: (1) a malicious combination; (2) two or more persons; (3) injury to person or [*19] property; and (4) existence of an unlawful act independent from the actual conspiracy."

*Hicks v. Bryan Med. Group, Inc., 287 F. Supp. 2d 795, 813 (N.D. Ohio 2003).* Office Depot moved for

dismissal of this claim on the sole ground that the predicate tort claims failed. However, the Court has held that Bush's fraudulent inducement, promissory estoppel, and unjust enrichment claims survive the *Rule 12(b)(6)* motion. Accordingly, the Court holds that the civil conspiracy claim survives as well.

**III. MOTION TO TRANSFER**

The Court next must determine whether to transfer the remaining claims to the Southern District of Florida pursuant to *28 U.S.C. § 1404(a).* The transfer statute provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." *28 U.S.C. § 1404(a).* According to the notes following *§ 1404, subsection (a)* "was drafted in accordance with the doctrine of forum non conveniens, permitting transfer to a more convenient forum, even though the venue is proper." *Id.* note. *"Section 1404(a)* provides for transfer to a more convenient forum, not to a forum likely [*20] to prove equally convenient or inconvenient." *Van Dusen v. Barrack, 376 U.S. 612, 645-46, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964).*

The moving party usually bears the burden of proving why a court should grant a transfer. *Kay v. Nat'l City Mortg. Co., 494 F. Supp. 2d 845, 849-50 (S.D. Ohio 2007); Jamhour v. Scottsdale Ins. Co., 211 F. Supp. 2d 941, 945 (S.D. Ohio 2002).* Office Depot moves for the transfer primarily on the basis of the forum-selection and the choice-of-law provisions in the MTA. Bush claims to be a third-party beneficiary of the MTA. "The presence of a forum-selection clause such as the parties entered into in this case will be a significant factor that figures centrally in the district court's [transfer] calculus." *Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29, 108 S. Ct. 2239, 101 L. Ed. 2d 22 (1988).* A forum-selection provision is relevant to the parties' choice of forum, the convenience of the parties, the public's interest in local adjudication. "[A] forum selection clause negates the presumption given to the plaintiff's choice of forum and requires the plaintiff to prove why enforcement and transfer is unreasonable under the circumstances." *Travelers Prop. Cas. Co. of Am. v. Centimark, Corp., No. 2:04-cv-0916, 2005 U.S. Dist. LEXIS 35611, 2005 WL 1038842, at *4 (S.D. Ohio 2005).*

Bush [*21] does not dispute that the MTA includes a forum-selection clause. Instead, it argues that it would be unjust to enforce the clause against it because, as a

third-party beneficiary, it did not bargain for inclusion of the forum-selection provision. The Court cannot agree. Forum-selection provisions can be enforced against third-party beneficiaries. *See Woods v. Christensen Shipyards, Ltd., No. 04-61432-CIV, 2005 U.S. Dist. LEXIS 42994, 2005 WL 5654643, at \*4 (S.D. Fla. 2005)*; *Bohl v. Hauke, 180 Ohio App. 3d 526, 533-34, 2009 Ohio 150, 906 N.E.2d 450 (2009)*. Accordingly, the presence of the Southern District of Florida forum-selection provision weighs strongly in favor of transfer. Bush bears the burden of establishing that the other transfer factors weigh against transfer, but it cannot meet that burden here. The Florida choice-of-law provisions in the MTA and in the VPA also weigh in favor of transfer. Bush argues that Ohio is a more convenient forum for it and its witnesses, but its contention is balanced out by Office Depot's assertion that Florida is more convenient for it and its witnesses. [6] In sum, Bush cannot establish that this is the more convenient forum. Accordingly, the Court will transfer this action to the Southern [*22] District of Florida.

[6] Neither party submitted any evidence to support their assertions as to convenience of the respective forums.

## IV. CONCLUSION

For the foregoing reasons, Defendant Office Depot, Inc.'s Motion to Dismiss (doc. 39) is **GRANTED IN PART**. The Court dismisses Bush's claims for fraud and tortious interference pursuant *Rule 12(b)(6) of the Federal Rules of Civil Procedure*.

Defendant Office Depot, Inc.'s Motion to Sever Claims and Transfer Venue (doc. 40) is **GRANTED**. This case is **TRANSFERRED TO THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA**.

IT IS SO ORDERED.

/s/ Susan J. Dlott

Chief Judge Susan J. Dlott

United States District Court

# Tab 3



CUYAHOGA METROPOLITAN HOUSING AUTHORITY, Plaintiff, v. 10-8 SYSTEMS, INC., et al., Defendants.

CASE NO. 1:05 CV 0980

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

*2006 U.S. Dist. LEXIS 8340*

**March 2, 2006, Decided**

**COUNSEL:** [*1] For Cuyahoga Metropolitan Housing Authority, Plaintiff: Harold C. Reeder, Jr., Cleveland, OH.

For Enforcement Technology, Inc., Defendant: Anthony J. O'Malley, Lori L. Fauvie, Vorys, Sater, Seymour & Pease, Cleveland, OH.

**JUDGES:** DONALD C. NUGENT, United States District Judge.

**OPINION BY:** DONALD C. NUGENT

**OPINION**

MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon Defendant Enforcement Technology Inc.'s ("ETEC's") Motion To Dismiss pursuant to *Federal Rule of Civil Procedure ("Rule") 12(b)(6)* Against Cuyahoga Metropolitan Housing Authority ("CMHA"). (ECF # 3.)

**I. BACKGROUND**

1

---

1  The Court's recitation and use of these facts in resolving the instant Motion to Dismiss is based upon the parties' statements of fact as set forth in the respective pleadings.

Plaintiff CMHA is a metropolitan housing authority and political subdivision. (Am. Compl. at P1.) In 1999, CMHA entered into a contract with Public Safety Management ("Public Safety"), under which Public Safety [*2] was to provide CMHA with law enforcement software including, *inter alia,* the LEADS/NCIC interface (the "1999 contract"). (*Id.* at PP4-5.) Public Safety was also to provide maintenance services to CMHA, pursuant to the terms of a maintenance agreement. (*Id.* at P11.) Although the reason for the change is unclear, Public Safety later became known as 10-8 Systems. Inc. ("10-8 Systems"). (*Id.* at P7.)

In August 2003. CMHA received a letter from Gary Ward, the President and CEO at ETEC. (*Id.* at P8, Ex. C.) The letter stated, in pertinent part, the following:

By now you should have received an email announcing the Business Partner relationship between 10-8 Systems and Enforcement Technology, Inc. (ETEC). We are very excited about this opportunity to expand our law enforcement offerings to include the Public Safety Software from 10-8 Systems.

All of us at ETEC are very pleased to have Mr. Timothy Fenlon join us as our Regional Director in Florida. Mr. Fenlon will have oversight responsibility to work

with our national marketing staff for the expansion of the 10-8 Systems Public Safety Software across the country. Additionally he will have total responsibility for the [*3] promotion and support of our AutoCITE Systems in Florida.

Our first priority will be to integrate support for the 10-8 Systems customers into the ETEC Technical Support Call Center to handle all first line support calls and route them to the appropriate resource for response and resolution. One of our engineers will be assigned as the Project Manager to oversee staff members from 10-8 System [sic]; George Oaks, Jeff Shelby and Donn Githens. A toll free number will be established at the Call Center, for 10-8 Systems' customers, to make certain inquiries, reported problems and questions are routed to the appropriate resource for resolution. You will get a staff person when you call and you will also have email access to the Call Center and staff.

ETEC is now the Distributor for all of the 10-8 Systems products. ETEC/10-8 will be actively marketing these software solutions to their existing Customer base and potential new Customers. ETEC/10-8 will continue to market and sell the product and provide installation, implementation and training services to Customers. Additionally, ETEC/10-8 will also develop all of the new software products and provide these Enhancements/Releases for distribution [*4] on a timetable to be announced.

(*Id.,* Ex. C. at 1.)

In January 2004. CMHA's Board of Commissioners passed a resolution approving renewal of the maintenance agreement with ETEC. (*Id.* at P11.) The "Procurement Department Board Package" described the transaction with ETEC as, "Renewal of the Police Division annual computer maintenance agreement, which includes various reports, records operating systems, emergency 24 hour

telephone support, and product/program enhancements." (*Id.,* Ex D, at 2.) Thereafter, CMHA issued a purchase order to ETEC. (*Id.* at P12.) In that document, CMHA described the transaction, in relevant part, as:

RENEWAL OF THE ANNUAL MAINTENANCE AGREEMENT WHICH MAINTAINS THE CMHA POLICE COMPUTER REPORT AND RECORDS OPERATING SYSTEM IN A CURRENT OPERATIONAL STATE AND RELEASE LEVEL AGREEMENT IS TO PROVIDE EMERGENCY 24 HOUR TELEPHONE SUPPORT AND PRODUCT ENHANCEMENTS. RELEASE TO INCLUDE BUT NOT LIMITED TO LERS/CAD/MAPPING AND LEADS/NCIC INTERFACE. COVERAGE OF THIS MAINTENANCE AGREEMENT WOULD BE FROM NOVEMBER 1, 2003 THROUGH OCTOBER 31, 2004.

(*Id.,* Ex E.)

On April 15, 2005, CMHA filed an Amended Complaint against 10-8 Systems and ETEC [*5] in the Court of Common Pleas for Cuyahoga County. In Count I of the Amended Complaint, CMHA attempts to bring a claim for "Failure to Perform" under a contract. (*Id.* at PP20-23.) More specifically, CMHA alleges that "10-8 Systems/ETEC's failure to provide the LEADS/NCIC interface as required under their contract with CMHA was a material breach of contract entitling CMHA to damages." (*Id.* at P22.) CMHA also contends that "10-8 Systems/ETEC's failure to provide the contracted for service upgrades, customer support and maintenance as required under their contract" was a material breach of contract entitling CMHA to damages. (*Id.* at P23.)

In Count II of the Amended Complaint, CMHA asserts a claim for "Recovery of Payment." (*Id.* at PP24-26.) CMHA alleges that it "paid 10-8 Systems/ETEC $ 19,000.00 for the LEADS/NCIC interface," which it is entitled to recover, "on the ground of failure of consideration." (*Id.* at PP25-26.)

In Count III of the Amended Complaint, CMHA alleges fraud by ETEC. (*Id.* at PP27-32.) In particular, CMHA asserts that ETEC knowingly made false

statements in the August 2003 letter from Gary Ward to CMHA. (*Id.* at PP28-29.) CMHA also claims [*6] that ETEC "failed to disclose the fact that 10-8 Systems was apparently having trouble meeting its obligations to its customers." (*Id.* at P29.) CMHA alleges that it "relied on ETEC's representations by, among other things: (i) continuing the contractual relationship with ETEC (not 10-8 Systems), (ii) paying $ 44,200.00 in 2004 for the 10-8 Systems products and services and (iii) failing to immediately file suit against 10-8 Systems when it might have some assets that could be reached." (*Id.* at P30.)

In Count IV of the Amended Complaint, CMHA attempts to bring a claim of negligent misrepresentation against ETEC. (*Id.* at PP33-36.) CMHA states, "Even assuming *arguendo* that ETEC was not guilty of intentional misrepresentation or fraud, it negligently supplied false information for the guidance of CMHA who justifiably relied on said information." (*Id.* at P35.) Based on the allegations in Counts I through IV, CMHA seeks compensatory damages in excess of $ 300,000.00 and interest, costs and attorneys' fees. (*Id.* at 8.)

In April 2005. ETEC removed the case to this Court. ETEC subsequently filed a motion to dismiss CMHA's Amended Complaint. (ECF # 3.) CMHA has filed [*7] Briefs in Opposition to ETEC's Motion (ECF # 18, 21, 23), and ETEC has filed a Reply. (ECF # 19). Thus, ETEC's Motion has been briefed fully and is now properly before the Court for consideration.

## II. STANDARD OF REVIEW

On a motion to dismiss brought pursuant to *Rule 12(b)(6)*, the court's inquiry is essentially limited to the content of the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint may also be taken into account. *See Chester County Intermediate Unit v. Pennsylvania Blue Shield, 896 F.2d 808 (6th Cir. 1990)*. The court "must construe the complaint in a light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *Columbia Natural Resources, Inc. v. Tatum, 58 F.3d 1101, 1109 (6th Cir. 1995), cert. denied, 516 U.S. 1158, 116 S. Ct. 1041, 134 L. Ed. 2d 189 (1996)*. However, while construing the complaint in favor of the non-moving party, a trial court will not accept conclusions of law or unwarranted inferences cast in the [*8] form of factual allegations. *See City of Heath*

*v. Ashland Oil, Inc., 834 F. Supp. 971, 975 (S.D. Ohio 1993)*. Thus, a plaintiff must plead more than bare legal conclusions. "A complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Lillard v. Shelby County Bd. of Educ., 76 F.3d 716, 726 (6th Cir. 1996) (quoting In re DeLorean Motor Co., 991 F.2d 1236, 1238 (6th Cir. 1993))*. It is with these standards in mind that the instant Motion must be decided.

## III. DISCUSSION

In resolving ETEC's Motion to Dismiss, the Court first examines Counts I and II of the Amended Complaint, and then separately considers Counts III and IV.

## A. Counts I And II

Count I of the Amended Complaint involves ETEC's alleged breach of contract due to its failure to provide (1) the LEADS/NCIC interface and (2) services upgrades, customer support and maintenance. (Am. Compl. at PP22-23.) Count II of the Amended Complaint seeks recovery of the $ 19,000.00 that CMHA claims to have paid "for the LEADS/NCIC interface." (*Id.* at P25.)

ETEC [*9] claims that the "only contract attached to the Complaint for the software" was the 1999 contract between 10-8 Systems and CMHA, and, because it was not a party to that contract, it cannot, as a matter of law, be liable under Counts I and II. (ECF # 3 at 5.) In opposing ETEC's Motion, CMHA makes clear that Counts I and II indeed involve the 1999 contract between it and 10-8 Systems. (ECF # 18 at 11.) CMHA does not contend that ETEC was a party to the contract; rather, it asserts that "ETEC *assumed* the obligations of 10-8 Systems under the contract. . . ." (*Id.* (emphasis in original).) Such allegations are present in the Amended Complaint, wherein CMHA asserts that ETEC took "over for 10-8 Systems in the contractual relationship." (Am. Compl. at P10.)

"Under the liberal federal system of notice pleading, all that a plaintiff must do in a complaint is give a defendant 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Vector Research, Inc. v. Howard & Howard Attorneys P.C., 76 F.3d 692, 697 (6th Cir. 1996) (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957))*. Applying the

liberal notice pleading standards to CMHA's [*10] breach of contract claims, the Court finds that, although the allegations in the Amended Complaint were perhaps inartful and not as particular as they could have been. CMHA has plead facts sufficient to state a claim in Counts I and II of the Amended Complaint. The Amended Complaint puts ETEC on notice that CMHA intends to pursue claims for breach of contract based on its position that ETEC assumed the responsibilities of 10-8 Systems under the 1999 Agreement. As such, CMHA has pleaded the elements of breach of contract sufficient to overcome ETEC's Motion to Dismiss as it relates to Counts I and II of the Amended Complaint. Based on the foregoing, the Court DENIES ETEC's Motion to Dismiss as it relates to Counts I and II of the Amended Complaint.

## B. Count III

In Count III of the Amended Complaint, CMHA attempts to set forth a claim of fraud against ETEC. (Am. Compl. at PP27-32.) The allegedly false statements at issue in CMHA's claim arise from the August 2003 letter to CMHA from Mr. Ward. (*Id.* at P28 (citing P8, Ex. C).) CMHA likewise brings the claim based on a purported concealment of a fact; namely, ETEC's failure to "disclose the fact that 10-8 Systems was apparently [*11] having trouble meeting its obligations to its customers." (*Id.* at P29.)

ETEC argues that Count III should be dismissed for several reasons. First, ETEC asserts that the fraud claim should be dismissed because it constitutes an improper attempt by CMHA to recast its contract claims in tort. (ECF # 3 at 8-9.) The economic loss doctrine prohibits a plaintiff from recovering economic losses in tort that arise due to "a breach of duties assumed only by agreement." *Corporex Dev. & Constr. Mgmt., Inc. v. Shook, Inc., 106 Ohio St. 3d 412, 414, 2005 Ohio 5409, 835 N.E.2d 701 (2005)*. The doctrine applies only if the claimant fails to allege a "separate and unique duty not created by contract which would exist even in the absence of a contract." *Ohio Bell Tel. Co. v. Corecomm Newco, Inc., 214 F. Supp. 2d 810, 819 (N.D. Ohio 2002)*.

In this case, the allegations in Count III arise independent of any duty arising in contract. CMHA asserts that ETEC breached its common law duty not to deceive by making false statements in the August 2003 letter to CMHA from Mr. Ward, and in failing to disclose that 10-8 Systems having trouble meeting its obligations.

Thus, CMHA's allegations do not relate [*12] to the 1999 contract, nor does CMHA allege that the August 2003 letter created a contractual obligation. Accordingly, the allegations in Count III are not barred by the economic loss doctrine.

Next, ETEC asserts that the Court should dismiss CMHA's fraud claim because the August 2003 letter does not contain "actionable statements of fact, but opinions, and to the extent the Plaintiff alleges statements of fact, it cannot tie any reliance or damages to those statements." (ECF # 3 at 9.) With respect to the allegedly false statements in the August 2003 letter, ETEC's arguments are more appropriately made in a motion for summary judgment, rather than in its Motion to Dismiss. In order to prevail on its fraud claim, CMHA is required to produce evidence sufficient to establish all of the elements of that claim. It need not do so at this stage of the litigation. Therefore. ETEC's Motion to Dismiss Count III on this basis is DENIED.

To the extent that CMHA's claim is based on ETEC's alleged failure to disclose that 10-8 Systems was having trouble meeting its obligations, however, the Motion to Dismiss is GRANTED. When a fraud claim is based upon a purported concealment of fact, the plaintiff [*13] must allege that the defendant had a duty to disclose the information at issue. *See Federated Management Co. v. Coopers & Lybrand, 137 Ohio App. 3d 366, 383-85, 738 N.E.2d 842 (Ohio Ct. App. 10th Dist. 2000)*. "[A] duty to disclose arises primarily in a situation involving a fiduciary or other similar relationship of trust and confidence." *Id. at 384*. In this case. CMHA's Amended Complaint fails to allege that a special relationship existed between it and ETEC. CMHA does not cure this defect by arguing in opposition to the Motion to Dismiss that a special relationship existed because "CMHA desperately needed 10-8 Systems or ETEC to maintain [CMHA's] system." (ECF # 18 at 20.) Because CMHA's Amended Complaint fails to allege that ETEC had a duty to disclose the information at issue, its fraud claim based on the purported concealment of fact fails.

## C. Count IV

In Count IV. CMHA makes the general assertion that, even if ETEC did not intentionally supply the allegedly false information at issue in Count III, it did so negligently. (Am. Compl. at P35.) As noted above. CMHA's Amended Complaint fails to allege that a special relationship existed between it and [*14] ETEC.

As such, its claim for negligent misrepresentation must be dismissed. *See Picker Int'l, Inc. v. Mayo Found., 6 F. Supp. 2d 685, 689 (N.D. Ohio 1998)* (noting that a "core requirement" of negligent misrepresentation under Ohio law is that a special relationship exist between the parties). Thus, ETEC's Motion to Dismiss Count IV of the Amended Complaint is GRANTED.

### IV. CONCLUSION

Based upon the foregoing. ETEC's Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART.** (ECF # 3.) More specifically, ETEC's Motion is GRANTED to the extent that it seeks to dismiss the portion of Count III relating to ETEC's purported concealment of fact. The Motion is likewise granted as it applies to Count IV of the Amended Complaint. To the contrary, ETEC's Motion to Dismiss is DENIED as it relates to Counts I and II of the Amended Complaint. The Motion is further DENIED as to the portion of Count III based on the allegedly false statements contained in the August 2003 letter.

This case shall proceed to trial at **8:30 a.m. on Monday, April 3, 2006.**

IT IS SO ORDERED.

DONALD C. NUGENT

United States District Judge

DATED: March 2, 2006

# Tab 4



**MICHAEL DAWES, individually and as a class representative, Plaintiff, v. BAC HOME LOANS SERVICING LP, et al., Defendants.**

**CASE NO. 1:10-cv-02637**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION**

*2011 U.S. Dist. LEXIS 66507*

**April 27, 2011, Decided**
**April 27, 2011, Filed**

**SUBSEQUENT HISTORY:** Adopted by, Complaint dismissed at *Dawes v. BAC Home Loans Servicing LP, 2011 U.S. Dist. LEXIS 66356 (N.D. Ohio, June 22, 2011)*

**COUNSEL:** [*1] For Michael Dawes, Plaintiff: Brendan E. Delay, LEAD ATTORNEY, Rocky River, OH.

For BAC Home Loans Servicing LP, Bank of America, N.A., Countrywide Home Loans, Inc., Defendants: James L. DeFeo, LEAD ATTORNEY, Thompson Hine, Cleveland, OH; Scott A. King, LEAD ATTORNEY, Thompson Hine - Dayton, Dayton, OH; Bradley R. Kutrow, McGuire Woods - Charlotte, Charlotte, NC; Brian E. Pumphrey, J. William Boland, Richard Cullen, McGuire Woods - Richmond, Richmond, VA; David L. Hartsell, Tammy L. Adkins, McGuire Woods - Chicago, Chicago, IL; Kip T. Bollin, Thompson Hine - Cleveland, Cleveland, OH.

**JUDGES:** Greg White, United States Magistrate Judge. JUDGE DONALD C. NUGENT.

**OPINION BY:** Greg White

**OPINION**

**REPORT AND RECOMMENDATION**

On January 20, 2011, this matter was referred pursuant to *Local Rule 72.1*, seeking a report and recommendation. [1] (ECF No. 25.)

> 1    This matter was also referred for general pretrial supervision and to enter and enforce pretrial orders including, but not limited to, orders pertaining to discovery. (ECF No. 25.)

**I. Procedural Background**

**A. The Complaint**

On October 8, 2010, Plaintiff Michael Dawes ("Dawes"), on behalf of himself and all others similarly situated, filed a complaint in Cuyahoga County Court of Common [*2] Pleas against Defendants BAC Home Loans Servicing LP, Bank of America, Countrywide Home Loans, Inc., Countrywide Home Loans LP, and America's Wholesale Lender (collectively "Defendants"). (ECF No. 1-2.) On November 18, 2010, Defendants filed a Notice of Removal, claiming diversity jurisdiction. (ECF No. 1.)

The Complaint asserts the following causes of action: (1) slander of title; (2) fraud; (3) negligent misrepresentation; (4) breach of contract; (5) false oaths; (6) unjust enrichment; (7) conversion; (8) abuse of process; and, (9) malicious prosecution. (ECF No. 1-2.)

Dawes asserts that this action may be maintained as a class action pursuant to *Civil Rule 23(B)(3)*. *Id.* at ¶49.

## B. Motion To Dismiss

On November 26, 2010, Defendants filed a Motion To Dismiss with prejudice pursuant to *Federal Rules of Civil Procedure 8(a)*, *9(b)*, and *12(b)(6)*. (ECF No. 6.) Generally, Defendants argue that Dawes failed to plead cognizable damages aside from attorney fees, which are not recoverable. (ECF No. 6-1 at 4-5.) On January 13, 2011, Dawes filed a Brief in Opposition, as well as motions seeking to exclude certain evidence and additional time to obtain responsive documents. [2] (ECF No. 22.) Defendants [*3] filed their Reply Memorandum on January 27, 2011. (ECF No. 27.)

> 2   On February 17, 2011, this Court held a telephone conference with counsel. (ECF No. 29.) The Court stayed discovery until resolution of Defendants' Motion To Dismiss. *Id.* As such, Dawes's Motion For Additional Time To Obtain Responsive Evidence (ECF No. 22) is DENIED. Dawes also requested until February 22, 2011, to file supplemental authority. *Id.* To date, Plaintiff has not done so.

## II. Applicable Law

### A. Civil *Rule 12(b)(6)* Standard

A motion to dismiss for failure to state a claim pursuant to *Federal Rule of Civil Procedure 12(b)(6)* "should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*. Well-pleaded allegations must be taken as true and construed most favorably toward the non-moving party. *See, e.g., Mayer v. Mylod, 988 F.2d 635, 637 (6th Cir. 1993)*. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[, as] [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [*4] do not suffice." *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. Although a court may not grant a *Rule 12(b)(6)* motion based on its disbelief of the factual allegations contained in the complaint, *Lawler v. Marshall, 898 F.2d 1196,*

*1199 (6th Cir. 1990)*, a court "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987)*. Consequently, a claim should not be dismissed unless it is unsupported by the law or the facts alleged are insufficient.

When ruling on motions to dismiss, a Court should normally look no further than the complaint, but "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [plaintiff's] claim." *Weiner v. Klais and Co., Inc., 108 F.3d 86, 89 (6th Cir.1997)* (citations omitted). "Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied." *Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3rd Cir. 1993)*. [*5] Also, [a] court that is ruling on a *Rule 12(b)(6)* motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice." *New England Health Care Employees Pension Fund v. Ernst & Young, LLP, 336 F.3d 495, 501 (6th Cir.2003) (citing Jackson v. City of Columbus, 194 F.3d 737, 745 (6th Cir.1999))*. "Federal courts may take judicial notice of proceedings in other courts of record." *Rodic v. Thistledown Racing Club, Inc., 615 F.2d 736, 738 (6th Cir. Ohio 1980) (quoting Granader v. Public Bank, 417 F.2d 75, 82-83 (6th Cir. 1969) (citing cases), cert. denied, 397 U.S. 1065, 90 S. Ct. 1503, 25 L. Ed. 2d 686 (1970))*.

Defendants argue that, in addressing their motion to dismiss, the Court should only consider damages allegedly incurred by Dawes and not other putative class members. (ECF No. 6-1 at 6, *citing Lewis v. Casey, 518 U.S. 343, 357, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996)* ("That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and [*6] which they purport to represent.'") (*quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 40, n. 20, 96 S. Ct. 1917, 48 L. Ed. 2d 450 (1976); Warth v. Seldin, 422 U.S. 490, 502, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)); accord Courtney v. Smith, 297 F.3d 455, 467 (6th Cir. 2002)*. "In addition, in a class action, the named plaintiffs may not

rely upon the purported injuries of unidentified members of the class they represent, but must allege and show that they have personally been injured." *Hale v. Enerco Group, Inc., 2011 U.S. Dist. LEXIS 781 (N.D. Ohio Jan. 5, 2011)* (Polster, J.). A court "must dismiss a case if the named plaintiff does not have standing regardless of whether members of the putative class have suffered injuries." *Key v. DSW, Inc., 454 F. Supp. 2d 684, 687 (S.D. Ohio 2006)*. The law appears to be clear that Dawes cannot rely on injuries or damages sustained by other members of the putative class to avoid dismissal. Furthermore, Dawes has not addressed this issue or drawn this Court's attention to contrary authority. Therefore, the Court will not consider allegations relating solely to purported plaintiffs in deciding whether the present motion to dismiss should be granted.

### III. Factual Allegations

On June 26, 2003, Dawes executed [*7] a Borrower's Note (the "Note") in the amount of $90,000.00 to purchase a house at 18309 Holland Road, Brook Park, Ohio, 44142 (the "Property"). (Compl. ¶2, Exh. A.) The payee on the original Note was America's Wholesale Lender. (Compl. ¶¶1-3.)

On December 24, 2008, Countrywide Home Loans Servicing LP ("Countrywide") filed a foreclosure action in state court against Dawes. (Compl. ¶9; *see also Docket for Countrywide Home Loans Servicing LP v. Dawes*, No. CV-08-680110 (Ohio Ct. Com. Pl., Cuyahoga County Dec. 24, 2008); ECF No. 1-2 at 48; ECF No. 6-4, Exh. C.) On March 26, 2009, the court found that an allonge and mortgage, submitted by Countrywide on March 16, 2009, failed to demonstrate ownership of the Note, and ordered Countrywide to show cause within thirty days why its complaint should not be dismissed without prejudice for lack of standing. (ECF No. 6-4, Exh. C.) On April 30, 2009, the court, after converting Dawes's motion to dismiss into a motion for summary judgment, dismissed the action without prejudice when Countrywide failed to supplement its filing to demonstrate ownership of the Note. *Id.*; Compl. at ¶11.

On June 10, 2009, a second foreclosure action was brought against Dawes, [*8] this time initiated by BAC-Home Loans Servicing LP ("BAC-HLS"). [3] (Compl. ¶13; *see also Docket for BAC Home Loans Servicing LP v. Dawes*, No. CV-09-695425 (Ohio Ct. Com. Pl., Cuyahoga County Oct. 8, 2009); ECF No. 1-2 at 49-53; ECF No. 6-5, Exh. D.) On August 12, 2009,

Dawes filed a motion to dismiss, alleging that BAC-HLS lacked standing to bring the action. (ECF No. 6-5, Exh. D.) On August 20, 2009, BAC-HLS responded by asserting the following:

> America's Wholesale Lender is the original payee to the Note. America's Wholesale Lender was doing business as Countrywide Home Loans, as evidenced by Exhibit 'A'. Countrywide Home Loans, Inc., fka, Countrywide Funding Corp., dba, America's Wholesale Lender executed and delivered to Countrywide Home Loans Servicing LP., an Allonge to the Note making the Note payable to Countrywide Home Loans Servicing, LP. Mortgage Electronic Registration Systems, Inc. assigned the mortgage to BAC Home Loans Servicing, LP.

(*See* Brief in Opp'n to Mot. to Dismiss, ECF No. 6-6, Exh. E.) On September 8, 2009, the state court denied Dawes's Motion to Dismiss, stating as follows: "Plaintiff has provided sufficient evidence that it owned both the subject promissory [*9] note and mortgage prior to the date of the filing of the complaint in this case, and, therefore, has standing to bring this case." (ECF No. 6-6, Exh. D; ECF No. 6-7, Exh. F.)

3  Dawes's opposition brief was also styled as a Motion to Exclude Evidence Presented. (ECF No. 22.) In his brief, Dawes asks the Court to exclude the statement contained in footnote four of Defendants' motion to dismiss, wherein Defendants state that:

> On July 31, 2008, Countrywide Financial Corporation completed its merger with Red Oak Merger Corporation, a Delaware corporation and wholly owned subsidiary of Bank of America Corporation. Countrywide Financial Corporation was the survivor of the merger, and thereby became a wholly-owned subsidiary of Bank of America Corporation. As a result of the merger, Countrywide became an indirect subsidiary of Bank of America

Corporation.

(ECF No. 6-1 at 2, n. 4) The Court need not determine, for purposes of this motion, whether Countrywide or BAC-HLS actually owned the Note or had standing to bring the foreclosure action. As the Court is considering only the documents attached to the Complaint and the relevant proceedings in state court, Dawes's motion to exclude evidence (ECF [*10] No. 22) is DENIED as moot.

On October 8, 2009, BAC-HLS filed a Motion for Summary Judgment and Motion for Default Judgment. (ECF No. 6-5, Exh. D.) On November 10, 2009, the state court ordered BAC-HLS to submit an endorsement within ten days "deleting the conditions, exclusions, and stipulations from the preliminary judicial report filed," warning that failure to do so would result in a dismissal without prejudice. *Id.* BAC-HLS failed to file said endorsement. *Id.* On November 25, 2009, the state court dismissed the action without prejudice, and, in the process, denied BAC-HLS's motions for default and summary judgment. *Id.*

Dawes has not alleged that his payments on the Note were current when the state court actions were initiated, nor has he alleged that, at the time his Complaint was filed, he had actually been evicted from the Property.

**IV. Analysis**

**A. Slander of Title**

Dawes alleges slander of title stemming from the filing of the two foreclosure actions initiated by Defendants. "To prove slander of title in Ohio, a plaintiff must show that the defendant (1) made a defamatory statement against the property of another, (2) which was false and malicious, and (3) caused actual or special [*11] damages." *Specialty Minerals, Inc. v. Dunbar Mech., Inc.,* 164 Fed. Appx. 539, 542 (6th Cir. 2005) (*citing Green v. Lemarr,* 744 N.E.2d 212, 224, 139 Ohio App. 3d 414 (Ohio App. Ct. 2000)); *accord Marinelli v. Prete,* 2010-Ohio-2257, 2010 Ohio App. LEXIS 1855 (Ohio Ct. App., May 21, 2010).

"A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Restatement 2d of*

*Torts, § 559.* Dawes has not actually identified a defamatory statement in his Complaint. The statement that an individual is in default on their home could arguably constitute a defamatory statement if false. That, however, is not the allegation in the case at bar. A careful reading of Dawes's complaint reveals that he has not alleged that Defendants falsely stated that he was in default. Instead, he alleges that Defendants either did not own the Note and/or submitted a "robo-signed affidavit" without any personal knowledge of whether Defendant Countrywide was the holder of the Note. (Compl. at ¶¶1, 5, 7, 9-10, 12, 14, 16.) This, however, does not constitute a false *and* defamatory statement. [*12] Defendants' allegedly false statement that they owned the Note is not the kind that would tend to harm Dawes's reputation.

Furthermore, even if the Court were to construe Defendants' statement that they owned the Note as defamatory in substance, such statements were made in the course of judicial proceedings and, therefore, cannot serve as the basis of Davis's claim. *See, e.g., Buehrer v. Provident Mut. Life Ins. Co.,* 175 N.E. 25, 123 Ohio St. 264, 274, 9 Ohio Law Abs. 285 (Ohio 1931); *accord Michaels Bldg. Co. v. Cardinal Fed. Sav. & Loan Bank,* 561 N.E.2d 1015, 1019, 54 Ohio App. 3d 180 (Ohio Ct. App., 1988) ("[A] party is absolutely privileged or immune from suit for defamatory statements set forth in judicial pleadings, which concern a mortgage debt."); *see also Surace v. Wuliger,* 495 N.E.2d 939, 25 Ohio St. 3d 229, 233, 25 Ohio B. 288 (Ohio 1986) (holding that "as a matter of public policy, under the doctrine of absolute privilege in a judicial proceeding, a claim alleging that a defamatory statement was made in a written pleading does not state a cause of action where the allegedly defamatory statement bears some reasonable relation to the judicial proceeding in which it appears."); *accord Swinson v. Fedex Nat'l LTL, Inc.,* 2008 U.S. Dist. LEXIS 90026 (N.D. Ohio Aug. 12, 2008) [*13] ("[S]tatements given under oath are absolutely privileged if they are related to the subject matter of the judicial proceeding.")

Finally, assuming *arguendo* that the Defendants' statement that they owned the note is both defamatory *and* unprivileged, Dawes's action would, nonetheless, be barred by the statute of limitations. "The wrongful filing for the record of a document which casts a cloud upon another's title to or interest in realty is considered to be an act of publication which gives rise to an action for slander of title." *Smith Elec. v. Rehs,* 1998 Ohio App. LEXIS 537 at *4 (Ohio Ct. App., Feb. 18, 1998) (*citing Karpanty v.*

*Kaplan, 1986 Ohio App. LEXIS 8378, at *11 (Ohio Ct. App., Sept. 12, 1986)*). "An action for libel, slander, malicious prosecution ... shall be commenced within one year after the cause of action accrued ...." *Ohio Revised Code ("O.R.C.") § 2305.11(A);*" *Smith Elec., 1998 Ohio App. LEXIS 537 at *5* (finding that *O.R.C. § 2305.11(A)* applies to all actions for slander, including slander of title). The cause of action for slander of title accrues "when the right to prosecute begins, i.e., at the time the public notice was filed" and not when the offended party discovers [*14] the publication. *Smith Elec., supra; see also Wendover Rd. Prop. Owners Ass'n v. Kornicks, 502 N.E.2d 226, 28 Ohio App. 3d 101, 103, 28 Ohio B. 198 (Ohio Ct. App., 1985)* (declining to apply the "discovery rule" of medical and legal malpractice actions to slander of title claims); *cf. Talwar v. Kattan, 1998 Ohio App. LEXIS 1517 at *9 (Ohio Ct. App., Mar. 31, 1998)* ("For slander, a cause of action accrues from the time the slanderous remarks were spoken, whether the defamed person had knowledge of the fact or not.")

This action was instituted on October 8, 2010 in the Cuyahoga County Court of Common Pleas. (ECF No. 1-2.) The first foreclosure complaint was filed in state court in December of 2008, and dismissed on April 30, 2009. Therefore, the statute of limitations would have expired as to all statements made during the course of the first foreclosure action. The second foreclosure complaint was filed on June 10, 2009. Therefore, an action for slander of title accrued on that date. Thus, Dawes had until June 11, 2010, to file a timely slander of title action. This action, however, was not commenced until almost four months later.

For the foregoing reasons, it is recommended that Dawes's slander of title  [*15] claim be dismissed.

**B. Fraud and Negligent Misrepresentation**

Dawes alleges that Defendants engaged in fraud by "pretending to have a valid foreclosure with threat of eviction." (Compl. at ¶18.) Dawes further avers that the assignments and affidavits submitted to support the foreclosure actions were false documents, and that Defendants did not own the Note. *Id.* at ¶¶17-21.

According to Ohio law, in order to maintain a cause of action for fraud, a plaintiff must demonstrate the following:

(a) a representation or, where there is a

duty to disclose, concealment of a fact; (b) which is material to the transaction at hand; (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (d) with the intent of misleading another into relying upon it; (e) justifiable reliance upon the representation or concealment; and (f) a resulting injury proximately caused by the reliance.

*Cohen v. Lamko, Inc., 462 N.E.2d 407, 10 Ohio St. 3d 167, 169, 10 Ohio B. 500 (Ohio 1984)* (citations omitted); *accord Magical Farms, Inc. v. Land O'Lakes, Inc., 356 Fed. Appx. 795 (6th Cir. 2009); David A. Flynn, Inc. v. GMAC, 2008 U.S. Dist. LEXIS 41597 (N.D. Ohio May 23, 2008).* [*16] "The elements of the claim are conjunctive, and accordingly all of them must be shown." *Graham v. Am. Cyanamid Co., 350 F.3d 496, 507 (6th Cir. 2003).*

Under a claim for negligent misrepresentation in Ohio, a defendant who, "in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions . . . is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *David A. Flynn, Inc. v. GMAC, 345 Fed. Appx. 974, 977 (6th Cir. 2009)* (*citing Andersons, Inc. v. Consol, Inc., 348 F.3d 496, 505-06 (6th Cir. 2003)*); *Delman v. City of Cleveland Heights, 534 N.E.2d 835, 41 Ohio St. 3d 1, 4 (Ohio 1989).*

Defendants argue that Dawes has failed to allege a false representation, as Dawes's allegation that Defendants did not own the Note is foreclosed by the state court's ruling. (ECF No. 61- at 10.) Specifically, Defendants point to the denial of Dawes's motion to dismiss, wherein the state court found that: "Plaintiff [*17] has provided sufficient evidence that it owned both the subject promissory note and mortgage prior to the date of the filing of the complaint in this case, and, therefore, has standing to bring this case." (ECF No. 6-6, Exh. D; ECF No. 6-7, Exh. F). The Court disagrees that this finding precludes a claim for fraud or negligent misrepresentation, as neither collateral estoppel ("issue

preclusion") or *res judicata* [4] ("claim preclusion") are applicable. The state court's opinion does not constitute a final decision on the merits. The order denying Dawes's motion to dismiss should only be construed as a finding that there was sufficient evidence BAC-HLS owned the Note to withstand such a motion. It was not a conclusive finding that BAC-HLS did indeed own the Note.

> [4] "*Res judicata* is established by four elements: 1) a final decision on the merits in an earlier action by a court of competent jurisdiction; 2) the later action involves the same parties or their privies; 3) the later action raises issues that were or could have been asserted in the earlier action; and 4) there is an identity of the causes of action." *Temple v. United States Air Force*, 2000 U.S. App. LEXIS 1466 (6th Cir., Jan. 31, 2000).  [*18] "The modern view of *res judicata* embraces the doctrine of collateral estoppel, which basically states that if an issue of fact or law actually is litigated and determined by a valid and final judgment, such determination being essential to that judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *Hicks v. De La Cruz*, 369 N.E.2d 776, 52 Ohio St. 2d 71, 74 (Ohio 1977).

However, Defendants' other argument ? that Dawes has failed to plead justifiable reliance on an alleged fraudulent representation -- is well taken. Dawes's brief in opposition offers no response to this argument. (ECF. No. 22.) *Fed. R. Civ. P. 9(b)* requires that averments of fraud must be plead with particularity. "The Sixth Circuit reads this rule liberally, however, requiring a plaintiff, at a minimum, to 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" *Coffey v. Foamex L.P.*, 2 F.3d 157, 162 (6th Cir. 1993) (quoting *Ballan v. Upjohn Co.*, 814 F. Supp. 1375, 1385 (W.D. Mich. 1992) (citing *Michaels Bldg. Co. v. Ameritrust Co. N.A.*, 848 F.2d 674, 679 (6th Cir. 1988)).

The  [*19] Complaint cannot be reasonably read to include an allegation that Dawes justifiably relied upon the allegedly false representation that Defendants owned the Note to his mortgage. Based on Dawes's repeated attempts to have the state foreclosures actions against him

dismissed by challenging whether Defendants owned the Note, it can fairly be said that rather than relying on the alleged misrepresentation, Dawes adamantly contested it. As such, Dawes's claim for fraud should be dismissed because he has failed to plead any facts establishing the element of justifiable reliance.

Dawes's claim for negligent misrepresentation also fails, as it too requires justifiable reliance. Furthermore, a core requirement of a negligent misrepresentation claim is a "special relationship" under which the defendant supplied information to the plaintiff for the latter's guidance in business transactions. *See, e.g., Premier Bus. Group, LLC v. Red Bull of N. Am., Inc.*, 2009 U.S. Dist. LEXIS 91647 at *31 (N.D. Ohio, Sept. 30, 2009). This relationship occurs only in 'special' circumstances. Usually the defendant is a professional (*e.g.*, an accountant) who is in the business of rendering opinions to others for  [*20] their use in guiding their business, and the plaintiff is a member of a limited class. *Picker Int'l v. Mayo Found.*, 6 F. Supp. 2d 685, 689 (N.D. Ohio 1998) (citing *Haddon View Inv. Co. v. Coopers & Lybrand*, 70 Ohio St. 2d 154, 157, 436 N.E.2d 212 (1982); *Gutter v. Dow Jones, Inc.*, 22 Ohio St. 3d 286, 288-89, 22 Ohio B. 457, 490 N.E.2d 898 (1986). The *Picker* court emphasized the "special relationship" does not exist in all ordinary business transactions. *Id.* Here, Dawes does not allege a business relationship between himself and the Defendants. To the contrary, he alleges that there is no relationship between the parties, and that Defendants' statements to the contrary are misrepresentations. Furthermore, in the event that Dawes's allegation -- that the Defendants do not actually own the Note -- turns out to be inaccurate, his negligent misrepresentation claim would fail because the Defendants' assertion of ownership would be true. Dawes's claim for negligent misrepresentation should be dismissed. [5]

> [5] Although the Complaint appears to raise a claim of "False Oaths" (Compl. at ¶¶28-29), Dawes makes clear in his brief in opposition to the motion to dismiss that, "[t]he false oaths allegations are not made  [*21] as a separate sounding cause of action," but simply constitute a component of his other claims for fraud and negligent misrepresentation. (ECF No. 22 at 4.) Therefore, the Court will not construe the Complaint as attempting to raise such a claim.

**C. Breach of Contract**

Dawes alleges that "Defendants violated the contractual rights enjoyed by [him] with the true note holder." (Compl. at ¶27.) This allegation amounts to little more than a legal conclusion. However, if Dawes's factual allegations are taken as true, none of the named Defendants would have had standing to sue Dawes in state court, as they would not be the true holders of the Note. (Compl. at ¶1.)

To prove a breach of contract under Ohio law, the following elements must be established: 1) the existence of a valid contract; 2) performance by the plaintiff; 3) breach by the defendant; and 4) damage or loss to the plaintiff. *Samadder v. DMF of Ohio, Inc., 154 Ohio App. 3d 770, 778, 2003 Ohio 5340, 798 N.E.2d 1141 (2003)*; *Doner v. Snapp, 98 Ohio App. 3d 597, 600, 649 N.E.2d 42 (1994)*; *Thomas v. Publishers Clearing House, Inc., 29 Fed. Appx. 319, 322 (6th Cir. 2002)*.

*Res. Title Agency, Inc. v. Morreale Real Estate Servs., 314 F. Supp. 2d 763, 769 (N.D. Ohio 2004)*; [*22] *accord Faurecia Auto. Seating v. Toledo Tool & Die Co., 579 F. Supp. 2d 967, 971 (N.D. Ohio 2008)*; *Younglove Constr., LLC v. PSD Dev., LLC, 2011 U.S. Dist. LEXIS 15689 (N.D. Ohio Feb. 16, 2011)* ("A contract is binding only on parties to a contract and those in privity with them.")

The very crux of Dawes's allegations is that Defendants were not parties to the mortgage and Note he signed. This would seem fatal to the breach of contract claim as Defendants could not have breached a contract where they were neither a party nor in privity with a party. In his brief in opposition, Dawes concedes that the Defendants are not in privity with him. (ECF No. 22 at 7.) Conversely, in the event one of the Defendants actually owns the Note and Mortgage, Dawes has not alleged that he performed his obligation to make timely payments or that the filing of a foreclosure action by that Defendant -- the real party in interest -- violated the terms of any contract.

Therefore, it is recommended that Dawes's claim for breach of contract be dismissed.

**D. Unjust Enrichment**

Defendants contend that Dawes cannot maintain an unjust enrichment claim because he has not conferred any benefit on them. Relying on *Johnson v. Microsoft Corp., 834 N.E.2d 791, 799, 106 Ohio St.3d 278, 2005 Ohio 4985 (Ohio 2005)*, [*23] Defendants assert that "the purpose of such claims 'is not to compensate the plaintiff for any loss or damage suffered by him but to compensate him for the benefit he has conferred on the defendant.'" (ECF No. 6-1 at 15.) Dawes's brief is unresponsive to this argument. (ECF No. 22.)

To recover for unjust enrichment under Ohio law, a plaintiff must prove that: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant knew of such benefit; and (3) the defendant retained the benefit "under circumstances where it would be unjust to do so without payment." *Brown-Graves Co. v. Obert, 98 Ohio App. 3d 517, 648 N.E.2d 1379, 1383 (Ohio Ct. App. 1994)*. The plaintiff must show that the substantial benefit to the defendant is "causally related" to the substantial detriment to the plaintiff. *Gaier v. Midwestern Group, 76 Ohio App. 3d 334, 601 N.E.2d 624, 627 (Ohio Ct. App. 1991)*. In determining whether a defendant received an unjust or unconscionable benefit, we must consider whether "the defendant was the party responsible for the plaintiff's detrimental position." *U.S. Health Practices, Inc. v. Blake, 2001 Ohio App. LEXIS 1291, No. 00AP-1002, 2001 WL 277291, at *2 (Ohio Ct. App. March 22, 2001)* [*24] (holding that the plaintiff's responsibility for his detrimental position breaks the requisite causal connection between the defendant's benefit and the plaintiff's loss). "The doctrine of unjust enrichment provides an equitable remedy imposed to prevent injustice." *Giles v. Hanning, 2002 Ohio 2817, 2001 WL 1173512, at *2 (Ohio Ct. App. 2002)*. Thus, the plaintiff must show enrichment that is unjust. *Id.* It is insufficient for the plaintiff to prove merely that he conferred a benefit upon the defendant. *Katz v. Banning, 84 Ohio App. 3d 543, 617 N.E.2d 729, 735 (Ohio Ct. App. 1992)*. Rather, the plaintiff must prove that, under the circumstances, the

plaintiff has a "superior equity so that, as against . . . [the plaintiff], it would be unconscionable for the . . . [defendant] to retain the benefit." *Id.* (internal quotation marks omitted).

*Andersons, Inc. v. Consol, Inc., 348 F.3d 496, 501-502 (6th Cir. 2003)*

Defendants' argument is well taken. Allowing the most generous construction to Dawes's Complaint, he fails to state a claim. [6] Dawes has not identified a benefit conferred upon Defendants, and only argues that he has incurred attorney fees and other costs associated with defending [*25] the allegedly groundless foreclosure actions. (Compl. at ¶33.) Though the costs associated with defending these actions undoubtedly resulted in a detriment to Dawes, he must show a corresponding benefit to Defendants that is "causally related" to the substantial detriment. Dawes has failed to set out any such allegation. As such, it is recommended that Dawes's unjust enrichment claim be dismissed.

> 6   Dawes cannot rely on injuries or damages sustained by other members of the putative class to avoid dismissal. Even the assertion that Defendants have been unjustly enriched by other class members constitutes nothing more than a vague legal conclusion, as there is no allegation that Defendants received and retained a benefit from any of the putative members without any payment or return benefit.

**E. Conversion**

Dawes alleges that Defendants have wrongfully converted the property of others by seizing their homes. (Compl. at ¶¶34-36.)

Under Ohio law, a cause of action for conversion arises where a defendant: (1) wrongfully exercises dominion or control; (2) over the property of the plaintiff; and, (3) in a manner inconsistent with plaintiff's rights of ownership. *See Zacchini v. Scripps-Howard Broad. Co., 351 N.E.2d 454, 456, 47 Ohio St.2d 224, 226 (Ohio 1976)* [*26] (observing that even some intangible rights may be converted) *rev'd on other grounds 433 U.S. 562, 97 S. Ct. 2849, 53 L. Ed. 2d 965 (1977); accord Joyce v. Gen. Motors Corp., 551 N.E.2d 172, 175, 49 Ohio St.3d 93 (Ohio 1990); Am. Chem. Soc'y v. Leadscope, Inc.,*

*2005 Ohio App. LEXIS 2428, 2005-Ohio-2557 at ¶24 (Ohio Ct. App. 2005)*. To prove conversion, a plaintiff "need not demonstrate intent or wrongful purpose or an assertion of ownership by defendant." *Taylor v. First Nat'l Bank of Cincinnati, 508 N.E.2d 1006, 31 Ohio App.3d 49, 31 Ohio B. 88 (Ohio Ct. App. 1986)*. A plaintiff can maintain a claim for conversion of money if the funds are specifically identified, are held in trust, or are withheld by a person owing a fiduciary duty to the plaintiff. In the absence of these factors, as the Ohio Supreme Court noted in *Staley v. Kreinbihl, 89 N.E.2d 593, 597, 152 Ohio St. 315, 321-322 (Ohio 1949)*, the plaintiff is merely a general creditor. *See also Haul Transp. of Va., Inc. v. Morgan, 1995 Ohio App. LEXIS 2240 at **11-12 (Ohio Ct. App. 1995)* (Haul would have been entitled to bring a conversion claim against Morgan had the latter been required to hold shipping fees in trust or in some fiduciary capacity, but in the absence [*27] of such an agreement, the relationship of the parties was merely that of creditor and debtor and no conversion claim was possible).

Dawes does not allege the conversion of his own property, but only the potential conversion of the property of putative plaintiffs. (Compl. at ¶¶34-36.) Dawes cannot rely on injuries or damages sustained by other members of the putative class to avoid dismissal. There is also no allegation that Dawes was ever dispossessed of property. In his brief in opposition, Dawes maintains that the mere act of filing foreclosure actions without standing constitutes a conversion, because it creates a cloud on his title, though he concedes that his house and land were not converted. (ECF No. 22 at 8-9.) Allegations made in Dawes's responsive brief do not cure deficiencies in his Complaint.

Dawes's conversion claim suffers from more than pleading deficiencies. He concedes that there is no case law determining whether a cause of action may be maintained for conversion, where the allegation stems from "robo-signing foreclosure cases." *Id.* Nonetheless, the general rule in Ohio is that "[c]onversion is a [*28] tort applicable to personal property; it only applies to personal property." 18 Ohio Jurisprudence, Conversion and Replevin §6; *see also Baker v. Chevron USA, Inc., 2009 U.S. Dist. LEXIS 110524 at n. 4 (S.D. Ohio, Nov. 4, 2009)* ("Real property is not the proper subject of a conversion claim"); *Portage Cty. Bd. of Comm'rs v. City of Akron, 808 N.E.2d 444, 156 Ohio. 3d 657, 691, 2004 Ohio 1665 (Ohio Ct. App. 2004)* (finding that

conversion applies to personal property and, therefore, inapplicable to riparian rights); *Sandy v. Rataiczak, 2008-Ohio-6212 at ¶9 (Ohio Ct. App., Nov. 25, 2008)* ("conversion claim is not justiciable because conversion only applies to personal property"); *Fed. Land Bank Ass'n v. Walton, 1995 Ohio App. LEXIS 2532, at \*4 n.1 (Ohio Ct. App. June 16, 1995)*).

It is recommended that the conversion claim be dismissed.

### F. Abuse of Process and Malicious Prosecution

Abuse of process and malicious prosecution, although similar, constitute two distinct causes of action. *See, e.g., Clermont Environmental Reclamation Co. v. Hancock, 474 N.E.2d 357, 16 Ohio App. 3d 9, 11, 16 Ohio B. 9 (Ohio Ct. App., 1984)* ("'[A]buse of process' differs from 'malicious prosecution' in that the former connotes the use of [*29] process properly initiated for improper purposes, while the latter relates to the malicious initiation of a lawsuit which one has no reasonable chance of winning."); *accord Robb v. Chagrin Lagoons Yacht Club, 662 N.E.2d 9, 75 Ohio St. 3d 264, 271, 1996 Ohio 189 (Ohio 1996)*.

### 1. Abuse of Process

The tort known as "abuse of process" developed to offer plaintiffs redress in "cases in which legal procedure has been set in motion in proper form, with probable cause, and even with ultimate success, but nevertheless has been perverted to accomplish an ulterior purpose for which it was not designed." *Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A., 626 N.E.2d 115, 118, 68 Ohio St. 3d 294, 1994 Ohio 503 (Ohio 1994)* (citations omitted). The elements of an abuse of process claim are as follows: (1) commencement of a legal proceeding set in motion in proper form and with probable cause; (2) the perversion of the proceeding into an attempt to accomplish an ulterior purpose for which it was not designed; and (3) damage resulting directly from the wrongful use of process. *Id.; accord Hahn v. Star Bank, 190 F.3d 708, 718 (6th Cir. 1999)*. The Ohio Supreme Court further noted that "there is no liability [for abuse of process] where [*30] the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Id. at n. 2* (citations omitted).

Dawes has not alleged any ulterior purpose to the

foreclosure actions beyond what is permitted (*i.e.* the recovery of the collateral on the loan, namely the Property). Indeed, that is exactly what was sought by the Defendants in state court. As explained by the Ohio Supreme Court, "abuse of process occurs where someone attempts to achieve through use of the court that which the court is itself powerless to order." *Robb, 662 N.E.2d at 14*. Because no collateral or ulterior purpose has been alleged, an abuse of process claim is untenable. As such, it is recommended that Dawes's abuse of process claim be dismissed.

### 2. Malicious Prosecution

"[I]n order to state a cause of action for malicious prosecution in Ohio, four essential elements must be alleged by the plaintiff: (1) malicious institution of prior proceedings against the plaintiff by defendant; (2) lack of probable cause for the filing of the prior lawsuit; (3) termination of the prior proceedings in plaintiff's favor; and (4) seizure of plaintiff's person or property during the [*31] course of the prior proceedings." *Crawford v. Euclid Nat'l Bank, 483 N.E.2d 1168, 19 Ohio St. 3d 135, 139, 19 Ohio B. 341 (Ohio 1985)* (citations omitted); [7] *accord Powell v. Squire, Sanders & Dempsey, 1999 U.S. App. LEXIS 16854 (6th Cir., July 16, 1999)*.

> 7 The *Crawford* court explained that "the requirement of an arrest of the person or seizure of property in malicious prosecution actions is necessary, as a matter of public policy, to dissuade the multiplicity of counter-suits that could occur in the absence of such a requirement." *483 N.E.2d at 1171*.

The Complaint merely avers that Defendant BAC-HLS filed the second state foreclosure action with "no reasonable chance of winning since it was not the real party interest." (Compl. at ¶¶40-41.) Dawes arguably has sufficiently alleged that the prior proceeding terminated in his favor, and, reading the Complaint as a whole, it may be possible to find that Dawes has also sufficiently alleged that BAC-HLS filed the action maliciously and without probable cause. Nonetheless, the Court cannot find, based on these allegations, that any of the Defendants seized Dawes's person or property during the course of the proceedings. In *Crawford*, the Ohio Supreme Court found [*32] that damage to the plaintiffs' credit rating and the placement of funds in escrow did not constitute a seizure, either actual or constructive. *483 N.E.2d at 1170*. Similarly, the attorney fees and costs

incurred by Dawes would not satisfy the requirement that there has been a seizure. *See also, Pheils v. Garber-Lawrence Publishing Group, 1993 Ohio App. LEXIS 5914 (Ohio Ct. App., Dec. 10, 1993)* ("[T]he payment of legal fees does not establish a seizure of property in a claim for civil malicious prosecution."); *Jacob v. Fadel, 2006 Ohio App. LEXIS 4949, 2006-Ohio-5003 at ¶P11 (Ohio Ct. App., Sept. 28, 2006)* (finding no error in the trial court's grant of summary judgment dismissing malicious prosecution claim where the plaintiffs remained in possession of the real property in question both during and after the eviction proceedings.)

Because Dawes has failed to allege a necessary element of malicious prosecution, it is recommended that his claim be dismissed.

**V. Conclusion**

For the foregoing reasons, it is recommended that the Defendants' Motion to Dismiss (ECF No. 6) be GRANTED and the Complaint be dismissed with prejudice in its entirety. [8]

> 8  Dawes has not sought to amend his complaint to [*33] cure the deficiencies, nor does it appear that Dawes could reasonably do so without completely altering the substance of his factual allegations. As such, an amended complaint based on the same general facts would likely be futile. *See, e.g., Frank v. Dana Corp., 649 F. Supp. 2d 729, 2009 U.S. Dist. LEXIS 77030 at *43 (N.D.*

*Ohio Aug. 25, 2009)* (where the amendment would be futile, there is no reason to allow it). "A dismissal for failure to state a claim under *Federal Rule of Civil Procedure 12(b)(6)* is a judgment on the merits, and is therefore done with prejudice." *Pratt v. Ventas, Inc., 365 F.3d 514, 522 (6th Cir. 2004)* (internal quotation marks omitted) (*quoting Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 399 n.3, 101 S. Ct. 2424, 69 L. Ed. 2d 103 (1981)); accord Kachaylo v. Brookfield Twp. Bd. of Trs., 778 F. Supp. 2d 814, 2011 U.S. Dist. LEXIS 23598 (N.D. Ohio Mar. 9, 2011)* (Lioi, J.).

/s/ Greg White

U.S. Magistrate Judge

Date: April 27, 2011

**OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation. *28 U.S.C. § 636(b)(1)(C)*. Failure to file objections within the specified time may waive the right to appeal the District** [*34] **Court's order. *See United States v. Walters, 638 F.2d 947 (6th Cir. 1981)*. See also Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S. Ct. 899, 88 L. Ed. 2d 933 (1986).**

# Tab 5



**INFOCISION MANAGEMENT CORP., Plaintiff, vs. FOUNDATION FOR
MORAL LAW INC., Defendants.**

**CASE NO.: 5:08CV1342,RELATED CASE NO.: 5:08CV1412**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
OHIO, EASTERN DIVISION**

*2009 U.S. Dist. LEXIS 65867*

**July 27, 2009, Decided
July 27, 2009, Filed**

**SUBSEQUENT HISTORY:** Motion granted by, Motion
denied by *Infocision Mgmt. Corp. v. Found. for Moral
Law, Inc., 2009 U.S. Dist. LEXIS 77033 (N.D. Ohio, Aug.
28, 2009)*

**PRIOR HISTORY:** *Infocision Mgmt. Corp. v. Found.
for Moral Law, Inc., 2009 U.S. Dist. LEXIS 55023 (N.D.
Ohio, June 15, 2009)*

**COUNSEL:**  [*1]  For Infocision Management
Corporation, Plaintiff, Counter-Defendant: David P.
Bertsch, LEAD ATTORNEY, Buckingham, Doolittle &
Burroughs - Akron, Akron, OH.

For Foundation for Moral Law, Inc., Defendant,
Counter-Claimant: Percy Squire, LEAD ATTORNEY,
Columbus, OH; Brett K. Bacon, Carl H. Gluek, Frantz
Ward, Cleveland, OH.

For Forrest D. Thompson, Defendant in Member Case
8-1412, Defendant: David P. Bertsch, LEAD
ATTORNEY, Buckingham, Doolittle & Burroughs -
Akron, Akron, OH.

For Curtis Stern, Defendant in Member Case 8-1412 and
9-951, Defendant: James M. McHugh, Tzangas, Plakas,
Mannos & Raies, Canton, OH; Lee E. Plakas, Tzangas,
Plakas & Mannos, Canton, OH.

**JUDGES:** HONORABLE SARA LIOI, UNITED
STATES DISTRICT JUDGE.

**OPINION BY:** SARA LIOI

**OPINION**

MEMORANDUM OPINION AND ORDER

This matter is before the Court on the motion for
partial summary judgment (Doc. No. 49) filed by
Infocision Management Corporation ("Infocision"). The
motion is fully briefed and ripe for decision.

**I. Factual and Procedural Background**

This case concerns a failed business relationship
between Infocision and the Foundation for Moral Law
("FML"). FML is a charitable religious organization that
solicits donations from the general public to support its
[*2]  activities. (FML Compl., P 10.) [1] On March 31,
2004, FML entered into a one-year contract for
telemarketing services with Infocision (the "Agreement").
(*Id*., PP 10-11.) Infocision agreed to make calls in FML's
name to prospective donors and to compile a donor list
for FML. (*Id*., P 11.) The Agreement was extended for an
additional year on November 8, 2004, and later was
revised on December 2, 2004. (*Id*., P 10.) The Agreement
included a "Breakeven Agreement" regarding payment by

2009 U.S. Dist. LEXIS 65867, *2

FML for Infocision's services. (*Id.*, P 11.) If (because the amount of donations received during the compilation of the donor list did not exceed the costs of performing the work) Infocision incurred a deficit on FML's account, the Breakeven Agreement provided FML with two options for paying the deficit. (*Id.*, P 11.) Specifically, FML "ha[d] the option to pay the deficit, or allow Infocision to make up to two recalls per donor acquired during the next rolling 18 month period to make up the deficit." (*Id.*, P 11.) FML selected the latter payment option, and the meaning of that provision gives rise to the core dispute in this case.

    1   Citations to the FML Complaint refer to the complaint filed by FML in Case No. 5:08CV1412 [*3] (Doc. No. 1).

It was important to FML that its donors were not recalled more than twice. FML wanted "to avoid 'donor burnout' or otherwise annoying or overzealous 'spoiling' of [FML]'s donor base." (*Id.*, P 13.) FML asserts that during the negotiations leading up to the Agreement, and in negotiations of the subsequent renewal, Infocision assured FML's officers that the contractual phrase "two recalls per donor acquired" limited Infocision to no more than two recalls to each donor. (*Id.*, P 12.) On October 12, 2005, FML President, Dr. Richard Hobson, discovered from FML's records that Infocision had recalled one donor at least four times. (*Id.*, P 14.) Further examination of the calling records disclosed that, from a total of 63,725 donors, Infocision called 9,602 of those donors more than twice. (*Id.*, P 15.) In fact, according to FML, Infocision recalled 5,372 donors three times, 3,642 donors were called four times, and 588 donors were called five times. (*Id.*) Based on Infocision's final report of amounts pledged and received, FML contends that Infocision received, in FML's name, pledges totaling $ 3,627,477 and actually collected $ 2,333,063 of that amount. (*Id.*) Infocision raised $ 239,031.85 [*4] from the recalls exceeding two per donor. (*Id.*)

In October of 2007, FML filed suit against Infocision (5:07CV3121), asserting claims for breach of contract, misrepresentation, fraud, breach of fiduciary duty, federal RICO, Ohio RICO, and nuisance. (Original Compl., PP 19-59.) [2] Infocision moved under *Rule 12(b)(6)* to dismiss each of the claims set forth in the complaint, with the lone exception being the breach of contract claim. (Motion to Dismiss; Doc. No. 10.) Infocision particularly sought dismissal of FML's intentional misrepresentation

and fraud claims because they could not be brought concurrently with an action for breach of contract. (Motion to Dismiss, pp. 6-10.)

    2   Citations to the Original Complaint refer to the complaint filed by FML in the Original Action, Case No. 5:07CV3121 (Doc. No. 1).

After requesting and receiving an extension of time to respond, FML filed an amended complaint in lieu of a response. (Am. Compl.; Doc. No. 13.) The amended complaint set forth FML's account of the alleged inducement in greater detail. (*Id.*, P 25.) On February 19, 2008, Defendants filed a motion to strike the amended complaint and renewed the motion for partial dismissal under *Rule 12(b)(6)*. [*5] (Doc. No. 15; Doc. No. 16.) The Court denied Infocision's motion to strike. On April 4, 2008, the Court conducted a case management conference. At the conference, FML's counsel requested further opportunity to respond to Infocision's motion to dismiss. As an explanation for failing to respond timely to the motion, FML's counsel expressed his belief that filing the amended complaint rendered the motion moot. The Court granted FML's request for additional time, providing it with leave until April 24, 2008 to file opposition to the renewed motion to dismiss. The time later was extended, at FML's request, until May 8, 2008. On May 7, 2008, FML filed a two-page opposition to the motion for partial dismissal. (Doc. No. 32.) FML's opposition again did not address the issue of whether it could bring concurrent tort and contract claims. (*Id.*) Instead, it reiterated that filing the amended complaint made the renewed motion moot. (*Id.*)

On May 27, 2008, the Court granted the 12(b)(6) motion in part and denied it in part, dismissing all but two claims:  intentional misrepresentation/fraudulent inducement and breach of contract. (Order on Motion to Dismiss, pp. 25-26.) The Court held that the fraudulent [*6] inducement claim met the minimum requirements for adequate pleading necessary to survive a motion to dismiss. (*Id.* at 12.) Shortly thereafter, on June 2, 2008, FML filed a notice of voluntary dismissal without prejudice, (Doc. No. 35,) which the Court approved that same day. (Doc. No. 36.)

On June 3, 2008, Infocision filed suit (5:08CV1342) against FML alleging breach of contract and seeking damages in excess of $ 500,000. (Infocision Compl.; Doc. No. 1.) FML responded by filing a separate suit (5:08CV1412), reasserting nearly the same claims set

forth in its original action. (FML Compl.) Infocision filed a motion under *Rule 12(b)(6)* seeking dismissal of Counts III through VII on the same bases that led to their dismissal in FML's original action. (Doc. No. 6) and it followed with a motion for partial summary judgment. (Doc. No. 10.) On December 8, 2008, FML filed an answer and counterclaim in Infocision's suit. (Doc. No. 18.) Its counterclaim was in all respects identical to the complaint in its own action. (*Id.*) The Court consolidated both actions by order dated December 23, 2008. (Doc. No. 23.) On January 14, 2009, the Court granted Infocision's motion to dismiss Counts III through [*7] VII in their entirety, along with the corresponding counts in FML's counterclaim. (Doc. No. 24.)

Of FML's claims, only those for fraudulent inducement and breach of contract remained. On April 30, 2009, Infocision filed this motion and a memorandum in support of partial summary judgment dismissing the fraudulent inducement claim. (Doc. No. 49.) Infocision again argues that "FML cannot convert its breach of contract claim into a tort claim by simply alleging that InfoCision intentionally misrepresented its interpretation of [the recall provision] to fraudulently induce Plaintiff to enter into the Agreement." (Mot., p. 2.) FML filed a response on June 1. (Doc. No. 62.) It also moved for additional discovery under *Federal Rule of Civil Procedure 26(f)*, arguing that "there are deponents available who will support the Foundation's claims, as well as data and information from Infocision, and the Foundation requests reasonable time to take those depositions and discover the available information." (Opp., p. 11.)

## II. Law and Analysis

### A. Summary Judgment

*Federal Rule of Civil Procedure 56* governs summary judgment and provides:

> The judgment sought should be rendered if the pleadings, the discovery [*8] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)(2)*.

The movant is not required to file affidavits or other similar materials negating a claim on which its opponent

bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).*

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970).* A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled [*9] to a verdict . . . ." *Id. at 252.*

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex, 477 U.S. at 322.* The party opposing a motion for summary judgment:

> may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party. *Fed. R. Civ. P. 56(e)(2).*

Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989)* (citing *Frito-Lay, Inc. v. Willoughby, 863 F.2d 1029, 1034, 274 U.S. App. D.C. 340 (D.C. Cir. 1988)).* Instead, the non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. Columbus, 801 F. Supp. 1, 4 (S.D. Ohio 1992).* [*10] The non-movant must show more than a scintilla of evidence to overcome summary judgment. It is not enough for the non-moving

party to show that there is some metaphysical doubt as to material facts. *Id*. Nevertheless, if that party shows that it cannot present essential facts to justify its opposition, the court may order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken. *Fed. R. Civ. P. 56(f)(2)*.

### 1. Intent

FML alleges that Infocision "with wanton disregard for Plaintiff's interests and malice intentionally misled Plaintiff's officials and thereby have caused damage to Plaintiff [. . .] ." (FML Compl., P 27.) But FML's evidence that Infocision's representation may have been intentional or malicious is not enough to support its fraudulent inducement claim.

"[U]nder Ohio law, the existence of a contract action generally excludes the opportunity to present the same case as a tort claim." *Wolfe v. Cont'l Cas. Co., 647 F.2d 705, 710 (6th Cir. 1981)*. The rationale is clear: "[i]f a party could simply, by alleging that a contracting party never intended to fulfill his promise, create a tortious action in fraud, there would be no effective [*11] way of preventing almost every contract case from being converted to a tort for jurisdictional purposes." *Hertz Commercial Leasing Corp. v. LMC Data, Inc., 73 Misc. 2d 1009, 1013, 343 N.Y.S.2d 689, 694 (Civ. Ct. 1973)* (holding that a cause of action sounded in contract despite additional allegations of fraud and misrepresentation). Therefore, "[i]t is not a tort to breach a contract, no matter how willful or malicious the breach." *Salvation Army, 92 Ohio App. 3d at 578*. If the gravamen of the complaint is for breach of contract, the cause of action will not be transformed into one sounding in tort by the charge of tortious conduct or the addition of the adverbs "intentionally," "willfully," and "fraudulently." Characterizing the alleged wrongful action in that way only emphasizes that it was done "in utter disregard of the rights of the defendants in error and with an evil and wicked purpose." *See, e.g., Ketcham v. Miller, 104 Ohio St. 372, 377, 136 N.E. 145 (1922)*; *Schwartz v. Bank One, Portsmouth, N.A., 84 Ohio App. 3d 806, 810, 619 N.E.2d 10 (Ohio Ct. App. 4th Dist. 1992)*; *Tibbs v. Nat'l. Homes Constr. Corp., 52 Ohio App. 2d 281, 290, 369 N.E.2d 1218 (Ohio Ct. App. 1st Dist. 1977)*.

FML's inclusion of "wanton," "malice," and "intentionally" [*12] implies the tortious nature of the alleged misrepresentation, but it does not create a separate tort. Furthermore, though Dr. Hobson's affidavit suggests that Infocision "intentionally misled [FML]" with "wanton disregard . . . and malice" (Hobson Aff. A, PP 2, 4) that does not change the contractual nature of the claim. Finally, further testimony corroborating the malicious nature of Infocision's actions (see Hobson Aff. B, P 3) would not establish a tort. Thus, the Court must look beyond Infocision's intent to determine whether FML has demonstrated genuine issues with respect to material facts supporting an independent fraud. [3]

3  It is worth noting at this point that both parties repeatedly discussed Infocision's intent throughout the litigation of this case. That discussion concerned whether FML alleged an actionable fraud, since fraud ordinarily must be premised upon misrepresentations of past or existing fact, not promises relating to future actions or conduct. *See Williams v. Edwards, 129 Ohio App. 3d 116, 124, 717 N.E.2d 368 (1st Dist. 1998)*. In an order denying Infocision's 12(b)(6) motion, the Court cited *Williams* for an exception to that rule: where an individual makes a promise concerning [*13] the future, but does not *intend* to keep it. (Memorandum Opinion and Order, May 27, 2008, pp. 11-12.) The Court noted that the claim did not fit within that exception because it was alleged that Infocision intended to perform pursuant to its own interpretation, rather than to enter the contract with intention not to perform. *Id*. Nevertheless, the Court denied Infocision's motion to dismiss. *Id*. Both parties still dispute the nature of the fraud. Infocision argues that FML does not allege an actionable fraud because the Court found that its claim did not fit within the exception to the *Williams* rule. (Mot., p. 3.) FML ignores that argument (and misconstrues the Court's finding), insisting that "the Foundation has demonstrated that, at the time Infocision made its representations that it would perform and treat the call back provision as if it restricted Infocision to two call backs per acquired donor. Infocision then had no intention of doing so . . . ." (Opp., p. 8.) The entire debate reflects the lack of clarity in FML's claim, since the exact nature of Infocision's alleged "misrepresentation" is unclear. FML continues to characterize Infocision's misrepresentation as a promise [*14] not to recall donors more than twice without intention of fulfilling that promise.

Perhaps FML ignores the Court's finding because it fears that its claim would not fit within the exception to the *Williams* rule. That fear, however, would be unfounded. FML's fraud claim, properly characterized, is still viable because it *no longer alleges a promise of future conduct*. Instead, the Court has found that Infocision allegedly misrepresented a *present* fact -- the manner in which it intended to carry out the contract's terms at that time. Thus, the debate over Infocision's intent is immaterial and should finally be put to rest.

**2. Separate Duty**

FML's claims merge because it has not presented evidence suggesting that Infocision breached a duty independent of their contract. "A tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed." *See, e.g., Textron Fin. Corp.*, 115 Ohio App. 3d 137, 151, 684 N.E.2d 1261 (Ohio Ct. App. 9th Dist. 1996); *Battista v. Leb. Trotting Ass'n*, 538 F.2d 111, 117 (6th Cir. 1976); [*15] *Wolfe*, 647 F.2d at 710. Thus, "[t]he tort liability of parties to a contract arises from the breach of some positive legal duty of good faith imposed by law because of the relationship of the parties, rather than from a mere omission to perform a contractual obligation." *Wolfe, 647 F.2d at 710*. Such a rule makes sense because, otherwise, every breach of contract would give rise to a tort.

In *Creative Hardwood Floors, Inc. v. Schafer, Ohio App., 1998 Ohio App. LEXIS 1959, 1998 WL 515783 (Ohio Ct. App. 5th Dist. 1998)*, appellants entered into a construction loan agreement with Bank One Mortgage Corporation. *1998 Ohio App. LEXIS 1959, [WL] at *2-3*. Under the agreement, draws on the loan would only be made for completed work. *Id.* After a draw went toward uncompleted work, appellants filed for breach of contract and fraudulent inducement. *Id.* The Fifth District held that the claims merged because they arose solely out of the loan agreement. *1998 Ohio App. LEXIS 1959, [WL] at *4*. Because the contract created Bank One Mortgage Company's only duty (to disburse after work was complete), the tort claim was dismissed.

FML tries to distinguish its case from *Schafer*, arguing that it alleges false misrepresentations *in addition*

to the breach:

> While the Foundation's fraud and breach [*16] of contract claims both initially arise from Infocision's failure to abide by its agreement, the fraud claim is based on Infocision's intention not to perform the Agreement at the time it was entered into, while the breach of contract claim is based on Infocision's purported nonperformance regardless of its intention at the outset or indeed at the time of the breach.

(Opp., p. 8.) Thus, FML argues that its tort claim is not identical in form to its contract claim. Nevertheless, its claims are essentially the same. Infocision's duty lay within the terms of its contract. Its failure to perform pursuant to FML's interpretation of the recall provision gave rise to both claims. Therefore, FML cannot bring both.

In examining Infocision's duty, *Graphic Enterprises, Inc. v. Tas International, Inc., Ohio App., 2000 Ohio App. LEXIS 961, 2000 WL 330059 (Ohio Ct. App. 5th Dist. 2000)* is particularly instructive. Graphic Enterprises was to supply "remanufactured" fax machines to Tas International, though the written contract did not specify whether they were to be "remanufactured," new, or used. *2000 Ohio App. LEXIS 961, [WL] at *4*. Graphic Enterprises represented that the fax machines would merely have converted power supplies rather than come completely [*17] used. *2000 Ohio App. LEXIS 961, [WL] at *2*. After Tas learned that the machines were "used," it brought suit for breach of contract and fraud. The Fifth District held that "[a]ny alleged failure by GEI to supply conforming goods is purely an issue of whether GEI breached the contract." *2000 Ohio App. LEXIS 961, [WL] at *5*. Though the court did not explicitly state that Graphic Enterprises failed to breach a separate duty, its holding falls after its citation of the rule that a separate duty must exist. *Id.* That suggests that Graphic Enterprises' duty was to supply the proper machines, rather than to ensure that Tas correctly understood their agreement. [4]

> 4  There are other examples of fraudulent inducement claims merging with breach of contract claims when the duties in question arise solely from the contract. *See, e.g., Homewood Homes, Inc. v. Helwig, Ohio App., 2009 Ohio*

*1699, 2009 WL 960775, at \*4 (Ohio Ct. App. 10th Dist. 2009)* (holding that a letter assuring that windows were installed properly gave rise only to a contractual duty); *Textron, 115 Ohio App. 3d at 152-54* (holding that a duty to consent to a sublease was uniquely contractual). In each, a party made an alleged "misrepresentation," but the action was predicated on its failure [*18] to perform the contract according to the opposing party's expectations.

Like in *Graphic Enterprises*, this case concerns a disagreement over how a party represented its interpretation of an agreement. The agreement's terms arguably were unclear, and one party relied on the other's interpretation for guidance. Yet, like Graphic Enterprises, Infocision's duty lay not in representing its interpretation accurately, but rather in complying with the contract's terms. That duty sounds in contract rather than tort.

Though FML might argue that Infocision breached a separate *duty of good faith* when it misrepresented its interpretation of the recall provision, there is no such duty under Ohio law. In certain limited contexts, there is a positive duty of good faith giving rise to tort rather than breach of contract. *See, e.g., Ruggles v. Bulkmatic Transp. Co., 2004 U.S. Dist. LEXIS 30588, 2004 WL 5376213, n. 12 (S.D. Ohio 2004)* (noting that a cause of action for the tort of bad faith may exist where there is a special relationship between an insurer and the insured); *Velotta v. Leo Petronzio Landscaping, Inc., 69 Ohio St. 2d 376, 378, n.2, 433 N.E.2d 147 (1982)* (finding a duty of ordinary care when constructing a residence in a workmanlike [*19] manner, but expressing no opinion as to whether there is such a duty when building a residence in the future); *Schrock Road Markets, Inc. v. HODCO Food System, Inc., Ohio App., 2001 Ohio App. LEXIS 2848, 2001 WL 722078, at \*2-3 (Ohio Ct. App. 10th Dist. 2001)* (finding that the sole servicer of a gas deep fryer had a duty of good faith to a purchaser to disclose unknowable potential hazards); *Offenbeher v. Lomax Soful & Foster, Inc., Ohio App., 1996 Ohio App. LEXIS 4152, 1996 WL 539134, at \*6 (Ohio Ct. App. 9th Dist. 1996)* (holding that accountants have a duty of ordinary care not to be negligent in preparing income tax returns) [5]; *Burnside v. Leimbach, 71 Ohio App. 3d 399, 403-04, 594 N.E.2d 60 (Ohio Ct. App. 10th Dist. 1991)* (holding that there is a tort duty of good faith in the "unique" physician-patient relationship). But outside of those unique contexts, Ohio does not recognize a general tort of

bad faith. *See, e.g., Highway Equip. Co. v. Caterpillar, Inc., 707 F. Supp. 954, 958 (S.D. Ohio 1989)* ("care must be taken to prevent the transmutation of every breach of contract into an independent tort action through the bootstrapping of the general principle of good faith and fair dealing." (citation omitted)) "There is no separate cause of action for [*20] breach of good faith separate from a breach of contract claim. . . . Rather, 'good faith is part of a contract claim and does not stand alone.'" *See Ne. Ohio Coll. Of Massotherapy v. Burek, 144 Ohio App. 3d 196, 204, 2001 Ohio 3293, 759 N.E.2d 869 (Ohio Ct. App. 7th Dist. 2001)* (citations omitted); *see also Littlejohn v. Parrish, 163 Ohio App. 3d 456, 462, 2005 Ohio 4850, 839 N.E.2d 49 (Ohio Ct. App. 1st Dist. 2005)* ("If the finder of fact determine[d] that the . . . refusal to consent . . . resulted in a restraint on alienation . . . then the refusal may be assumed to have been unreasonable, and [defendants] . . . breached the contract."); *Eggert Agency, Inc. v. NA Mgmt. Corp., Case No. C2-07-1011, 2008 U.S. Dist. LEXIS 90830, 2008 WL 3474148, at \*4 (S.D. Ohio 2008)* (noting that *Littlejohn* demonstrates that the good-faith requirement is part of a contract--not part of a separate tort claim). No special duty of good faith arises between businesses entering into ordinary contracts.

[5] Though the Ninth District in *Offenbeher* found "a duty recognized in every contract that each party will fulfill his obligations with care, skill, and faithfulness, and that the breach of such a duty will give rise to a cause of action in *tort*[,]" that does not apply here. *Offenbeher* [*21] concerned an accountant's purported negligence in filing returns. Similarly, *Offenbeher* cited *Wagenheim v. Alexander Grant & Company, 19 Ohio App. 3d 7, 19 Ohio B. 71, 482 N.E.2d 955 (Ohio Ct. App. 10th Dist. 1983)* and *Muir v. Hadler Real Estate Management Company, 4 Ohio App. 3d 89, 4 Ohio B. 170, 446 N.E.2d 820 (Ohio Ct. App. 10th Dist. 1982)*, which concerned client actions for negligence against an accountant and attorney. But while *Offenbeher, Wagenheim*, and *Muir* considered negligent breaches of good faith *after* contracts were clearly established, this dispute concerns good faith *during contractual negotiations*. FML argues that Infocision's fraud occurred prior to performance, when Infocision misrepresented how it interpreted the Recall Provision to induce agreement. If *Offenbeher* were to apply, however, FML would have had to

allege that Infocision accidentally recalled donors more than twice without intention of breaching a clearly understood contractual provision. That is not the case here. It is also unclear whether *Offenbeher, Wagenheim*, and *Muir* were even intended to apply to arms-length negotiations in the business context. In the end, the duty cited in *Offenbeher* does not support FML's fraudulent inducement claim.

FML has offered no [*22] evidence supporting the existence of an independent duty, instead assuming a duty to refrain from misrepresentations. Analogous cases universally suggest that misrepresentations give rise to claims for breach of contract. Therefore, FML has failed to establish a genuine issue with respect to the separate duty necessary to bring a tort.

### 3. Separate Damages

FML's tort and contract claims also merge because FML has not established separate damages resulting from Infocision's representation. An action based upon tortious conduct must include actual damages attributable to the wrongful acts of the tortfeasor *in addition* to those attributable to the breach. *See Textron, 115 Ohio App. 3d at 152* (citing *Cincinnati Gas & Elec. Co. v. Gen. Elec. Co., 656 F. Supp. 49, 63 (S.D. Ohio 1986)*). In other words, "[t]he tort injury must be unique and separate from any injury resulting from a breach of contract." *See Med. Billing, Inc. v. Med. Mgmt. Sci., Inc., 212 F.3d 332, 338 (6th Cir. 2000).* Such a rule prevents plaintiffs from asking "for 'basically the same damages but two different ways to get there.'" *See Homewood Homes, 2009 Ohio 1699, 2009 WL 960775 at *4.*

In *Medical Billing, Inc. v. Medical Management Sciences,* [*23] *Inc.*, plaintiff sought to terminate a contract after accusing defendant of failing to use the correct formula for calculating compensation. To avoid termination, defendant promised plaintiff that it would use the correct formula. *See Med. Billing, 212 F.3d at 334.* Plaintiff withdrew termination. *Id.* When defendant then still used an incorrect formula, plaintiff sued for fraud and breach of contract. The Sixth Circuit held that awarding damages for both claims would be redundant, noting that the damages sought (loss in compensation) flowed from the breach. *Id. at 339.* Ultimately, though defendant's manipulation of the formula seemed "fraudulent," that did not entail separate damages. [6]

6  Other cases also illustrate how fraud claims are subsumed by concurrent contract claims unless supported by independent damages. *See Polen Implement, Inc. v. Toth, Ohio App., 2008 Ohio 3211, 2008 WL 2582927, at *4-5 (Ohio Ct. App. 9th Dist. 2008)* (holding that, because defendant sought the same compensation for equipment repairs on his breach of contract and negligence claims, plaintiff could not bring them separately); *Graphic Enterprises, 2000 Ohio App. LEXIS 961, 2000 WL 330059 at *5* (holding that the only possible damages [*24] were identical to those underlying the breach of contract claim because they stemmed from Graphic Enterprises' failure to send the expected machines); *Textron, 115 Ohio App. 3d at 143, 153* (holding that, though there was an independent duty to disclose the computer's relocation, any damages stemmed from breach of agreement).

FML offers no evidence supporting actual damages resulting from the misrepresentation. FML only argues that it is entitled to damages stemming from its spoiled donor base, but it seeks the same damages in its contract claim. Dr. Hobson's affidavits are silent with regard to the damages resulting specifically from fraud, and neither he nor FML suggests how other depositions or affidavits would shed light on the issue. Like in *Medical Billing*, where defendant's representation led only to damages stemming from the breach, the only damages FML seeks resulted from Infocision's purported role in causing donor burnout. Thus, summary judgment on FML's fraudulent inducement claim is also appropriate because FML has failed to establish a genuine issue with respect to separate damages.

### B. Motion for Extension

FML's motion for extension under *Federal Rule of Civil Procedure 56(f)(2)* [*25] should be denied because further discovery would not result in evidence establishing an independent tort. Federal *Rule 56(f)* provides:

> If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> . . . .

(2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken . . . . *Fed. R. Civ. P. 56(f)(2)*.

Citing 56(f), FML argues that "the testimony of Rebecca Backus, Forrest Thompson, Kevin Johnson, Ken Dawson, and others, is helpful and relevant, as well as confirmation of data and information from Infocision Management Corp." (Hobson Affidavit B, P 3.) It also argues that "[t]estimony and information from Infocision personnel and third parties will support the Foundation's claims and assist its opposition to the pending motion for partial summary judgment." (*Id*. P 4.)

The 56(f) discovery FML seeks would add nothing to the summary judgment debate because it would establish *neither* a separate duty *nor* separate damages. Testimony as to what was said during contractual negotiations would not support an independent tort. Whether there is a duty [*26] to refrain from misrepresenting contractual interpretations or a general tort duty of good faith is a question of law, rather than of fact, so further discovery would not support their existence. In addition, FML does not claim that Infocision breached *any* specific duty in either its complaint or its memoranda to the Court. It is highly unlikely then that the testimony it seeks would lay the factual groundwork for such a duty when it has not even been identified. Furthermore, FML has never suggested that evidence establishing separate damages exists. Its entire discussion of damages to this point has centered around the spoiling of its donor base.

A review of the record reveals that, over the course of two years of litigation, neither party has even raised the question of separate duties or damages. Instead, FML's only argument at this point is a vague request for "helpful and relevant" testimony and "confirmation of data," with no explanation of how they would do anything but corroborate the facts set forth in its complaint. Therefore, further discovery is unnecessary for ruling on summary judgment.

**III. Conclusion**

For the foregoing reasons, Infocision's motion for partial summary judgment [*27] (Doc. No. 49) is **GRANTED**, and FML's motion for extension (Doc. No. 62) is **DENIED**. The Court finds that FML has failed to establish a genuine issue both with respect to a separate duty and with respect to separate damages. Moreover, further discovery would establish neither. Therefore, FML's tort claim (Case No. 5:08CV1412) and the corresponding count in its counterclaim (Case No. 5:08CV1342) are **DISMISSED**. In these consolidated cases, FML shall proceed against Infocision solely based solely upon the claim set forth in Count I of the complaint in Case No. 5:08CV1412 and the corresponding breach of contract counterclaim in Case No. 5:081342.

**IT IS SO ORDERED**.

Dated: July 27, 2009

/s/ Sara Lioi

**HONORABLE SARA LIOI**

**UNITED STATES DISTRICT JUDGE**

# Tab 6



JAMES LOYD, et al., Plaintiffs, v. HUNTINGTON NATIONAL BANK, et al., Defendants.

CASE NO.: 1:08 CV 2301

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

*2009 U.S. Dist. LEXIS 51858*; *69 U.C.C. Rep. Serv. 2d (Callaghan) 295*

June 18, 2009, Decided
June 18, 2009, Filed

**PRIOR HISTORY:** *Loyd v. Huntington Nat'l Bank, 2009 U.S. Dist. LEXIS 42392 (N.D. Ohio, May 18, 2009)*

**COUNSEL:** [*1] For James Loyd, Margaret Loyd, Daniel L. Luebbehusen, Robert J. Lueken, George Matthews, Virginia Matthews, Patrick McCafferty, Kim McCafferty, Jacqueline L. Mattison, Glenn A. Newton, Alice Beck, Ray Shuss, Roberta Shuss, Debbie Loyd, Helen Alpanalp, Iris Ammerman, Lucille Arnold, Alfred Ballentine, Bruce Bandy, Thomas Bandy, Barbara Bezzeg, Edgar Boberg, Nancy Brown, Charles Burger, Leon Cox, Maybelline Dell, Ken Don, William Golden, Cherly Hawkins, Georgianna Holly, Zachary Horgan, Emma Jochum, Nancy Kitay, Clarence Knust, Donald Kready, Paul Lawrence, Joretta Nichols, Anna Powers, Charles Sankey, Philip Sillia, Donna Sillia, Horst Uebel, Anna Uebel, Joseph Vanek, Harlam Warren, Plaintiffs: Daniel G. Morris, Cleveland, OH.

For Huntingon National Bank, N.A., itself, and as corporate successor by merger to other First National Bank of Zanesville other County Savings Bank other Unizan Bank, National City Bank, itself and as corporate successor by merger to other Provident Bank, Defendants: Frances F. Goins, Reem Shalodi, Thomas L. Anastos, Ulmer & Berne - Cleveland, Cleveland, OH.

For Fifth Third Bank, itself, and as Corporate successor by merger to other Citizens Bank other Strongsville [*2]

Savings Bank, Third Federal Bank, Defendants: Brett A. Wall, Katie M. McVoy, Michael E. Mumford, Baker & Hostetler - Cleveland, Cleveland, OH.

For Suntrust Bank, N.A., Defendant: T. Thomas Cottingham, III, LEAD ATTORNEY, Hunton & Williams - Charlotte, Charlotte, NC; Patrick M. McLaughlin, McLaughlin & McCaffrey, Cleveland, OH.

For Wachovia Bank, N.A., itself, and as corporate successor by merger to other First United Bank other First United Bancorp other First Union, Defendant: Dana C. Lumsden, K. Stacie Corbett, T. Thomas Cottingham, III, LEAD ATTORNEYS, Hunton & Williams - Charlotte, Charlotte, NC; Patrick M. McLaughlin, McLaughlin & McCaffrey, Cleveland, OH.

For Andover Bank, The Covington Savings and Loan Association, First Indiana Bank, itself, and as corporate successor to other Mid-West Federal Credit Union, The Killbuck Savings Bank, Mechanics Savings Bank, Monroe County Bank, Spencer County Bank, U.S. Bank, as successor by merger to other Firstar Bank, N.A. other Star Bank, N.A., U.S. Bank National Association, Defendants: Joseph P. Rodgers, Martha S. Sullivan, Squire, Sanders & Dempsey - Cleveland, Cleveland, OH.

For Aurgroup Financial Credit Union, corporate successor to other [*3] Hambuco Credit Union, Day Air

2009 U.S. Dist. LEXIS 51858, *3; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

Credit Union, Defendants: Stephen D. Miles, Dayton, OH.

For Belmont National Bank, J.P. Morgan Chase Bank, N.A., as corporate successor by merger to other Bank One other First National Bank of Chicago, Key Bank, itself, and as corporate successor to other Society Bank, PNC Bank National, itself and as corporate successor to other National City Bank other First Bank of Huntington, IN, Sky Bank, as corporate successor by merger of other Metropolitan Bank and Trust Co. other Americom Bank other Citizens Banking Co., Defendants: Frances F. Goins, Joseph A. Castrodale, Reem Shalodi, Thomas L. Anastos, Ulmer & Berne - Cleveland, Cleveland, OH.

For Charter One Bank, Defendant: Karen L. Giffen, Kathleen A. Nitschke, Melissa A. Laubenthal, Giffen & Kaminski, Cleveland, OH.

For Dollar Bank, Defendant: David M. Dvorin, Jonathon M. Yarger, Steven L. Wasserman, Victor D. Radel, Chernett, Wasserman, Yarger & Pasternak, Cleveland, OH.

For Dover-Phila Federal Credit Union, Defendant: Frances F. Goins, Joseph A. Castrodale, Thomas L. Anastos, Ulmer & Berne - Cleveland, Cleveland, OH.

For Farmers National Bank Corp., as corporate parent of other Farmers National Bank of Canfield, [*4] Ohio Valley National Bank, Republic Savings Bank, Sunflower Bank, Farmers & Merchants Bank of Colby, Defendants: Martha S. Sullivan, Squire, Sanders & Dempsey - Cleveland, Cleveland, OH.

For First Merit Corporation, itself and as corporate successor to other Signal Bank, Defendant: Elizabeth A. Ratliff, Marcel C. Duhamel, Natalia Steele, Vorys, Sater, Seymour & Pease - Cleveland, Cleveland, OH; John W. Solomon, Vorys, Sater, Seymour & Pease - Akron, Akron, OH.

For Old National Bancorp, as corporate successor by merger to, and as parent of other Farmers Bank & Trust Co. other Dubois County Bank, Defendant: Fritz E. Berckmueller, Kevin R. Carter, Calfee, Mitchell G. Blair, Halter & Griswold - Cleveland, Cleveland, OH.

For Springs Valley Bank & Trust, Defendant: Rosemary Taft Milby, Weltman, Weinberg & Reis, Cleveland, OH.

For State Street Corp., parent of other State Street Bank

& Trust Co., Defendant: Kathleen J. Goldman, LEAD ATTORNEY, Christopher P. Schueller, Stanley J. Parker, PRO HAC VICE, Buchanan Ingersoll - Pittsburgh, Pittsburgh, PA.

For Wright-Patt Credit Union, Century Federal Credit Union, Defendants: Jay C. Rice, Mark M. Turner, Gallagher Sharp - Cleveland, Cleveland, OH.

For [*5] Terre Haute Savings, Defendant: Kari B. Coniglio, Tamara L. Karel, Benesch, Friedlander, Coplan & Aronoff - Cleveland, Cleveland, OH.

For Wells Fargo Bank, Defendant: Matthew T. Fitzsimmons, R. Christopher Yingling, Nicola, Gudbranson & Cooper, Cleveland, OH.

For Wilson & Muir Bank & Trust Co., Defendant: Bonnie L. Wolf, Frost Brown Todd - Columbus, Columbus, OH.

For SunTrust Bank, NA, Defendant: Dana C. Lumsden, K. Stacie Corbett, LEAD ATTORNEYS, Hunton & Williams - Charlotte, Charlotte, NC; Anthony R. Petruzzi, Patrick M. McLaughlin, McLaughlin & McCaffrey, Cleveland, OH.

For Wachovia Bank, National Association, Defendant: Anthony R. Petruzzi, Patrick M. McLaughlin, McLaughlin & McCaffrey, Cleveland, OH.

For Citizens Bank, f/k/a Republic Bank, Farmers National Bank of Canfield, M&I Bank, f/k/a First Indiana Bank, Town & Country Bank and Trust Co., Successor to Farmer's Bank & Trust, Defendants: Joseph P. Rodgers, Squire, Sanders & Dempsey - Cleveland, Cleveland, OH.

For Bank of America, as corporate successor to other Bank of Boston, Defendant: David A. Wallace, Carpenter, Lipps & Leland - Columbus, Columbus, OH.

For First National Bank of Pennsylvania, as corporate successor to other Bucktail [*6] Bank & Trust Co., Defendant: Amanda J. Banner, Henderson Covington Messenger Newman Thomas, Youngstown, OH.

For German American Bancorp, as corporate successor to other Community Trust, Defendant: Beau D. Hollowell, James P. Sammon, Reminger & Reminger - Cleveland, Cleveland, OH; Erik C. Johnson, Philip A. Whistler, Ice Miller, Indianapolis, IN.

2009 U.S. Dist. LEXIS 51858, *6; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

**JUDGES:** DONALD C. NUGENT, United States District Judge.

**OPINION BY:** DONALD C. NUGENT

**OPINION**

MEMORANDUM OPINION AND ORDER

This case is before the Court on the Defendants' Motions to Dismiss Plaintiffs' First Amended Complaint. The Defendants have filed numerous Motions to Dismiss, some filed jointly by multiple defendants and some filed on behalf of individual defendants. The Defendants raise various arguments for the dismissal of Plaintiffs' claims. Having fully considered all of the facts and law relevant to the motions, the Court finds as follows.

**PROCEDURAL HISTORY**

Plaintiffs filed their original Complaint on September 29, 2008. (ECF # 1). An Amended Complaint was filed on January 9, 2009. [1] (ECF # 80). The Defendants have filed a myriad of briefs requesting dismissal of Plaintiffs' claims. Common to all of the motions to dismiss is the question of whether the claims brought [*7] under the Uniform Commercial Code ("UCC") are barred by the applicable statutes of limitation. Statute of limitations issues have also been raised in connection with the common law claims. Further, several Defendants have provided substantive arguments as to why Plaintiffs' claims fail to state claims upon which relief may be granted.

> 1  The Amended Complaint is styled (though not captioned) as a purported class action suit. Multiple classes have been defined based on which bank negotiated and/or deposited the checks at issue in this case.

Motions to dismiss the Plaintiffs' Amended Complaint remain pending under the following ECF numbers: # 84 (Terre Haute Savings); # 87 (Old National Bancorp); # 89 (Wilson & Muir Bank & Trust Co.); # 90 (Springs Valley Bank & Trust); [2] # 95 (First Merit Corp.); # 96 (U.S. Bank National Association and The Killbuck Savings Bank); # 97 (Sunflower Bank); # 98 (Fifth Third Bank); [3] # 99 (Third Federal Bank); # 101 (Walls Fargo Bank); # 103 (Dollar Bank); # 107 (Charter One Bank); # 108 (Belmont National Bank, J.P. Morgan Chase Bank, N.A., Key Bank, PNC Bank National, and Sky Bank); # 118 (Century Federal Credit Union); # 120 (Huntington National Bank, N.A.); [*8] # 121 (Sun Trust Bank, N.A. and Wachovia Bank, N.A.); # 124 (Farmers & Merchants Bank of Colby); [4] # 136 (First National Bank of Pennsylvania); # 137 (Bank of America); and, # 156 (German American Bancorp). [5] Plaintiff also named John Doe Banks one through ten (additional drawee banks) and John Doe Banks eleven through fifteen (additional depositary banks) in the caption of the Amended Complaint.

> 2  Springs Valley Bank & Trust was named in the original Complaint, but was not named in the First Amended Complaint. It is, therefore, dismissed, for want of prosecution.
>
> 3  This motion was mis-captioned as a Motion to Dismiss Second Amended Class Action Complaint.
>
> 4  Farmers & Merchants Bank of Colby was identified as "Bank of Colby" in the Amended Complaint.
>
> 5  The Amended Complaint also names "First National Bank" and "First National Bank of Odon" as Defendants. No responsive pleading has been filed by either entity, and there is no indication on the docket that either of these entities were ever served with a complaint (or that service was even attempted) in this action. Pursuant to *Fed. R. Civ. P. 4(m)*, if a Defendant has not been served within 120 days of the filing of a Complaint against them, [*9] the Court must dismiss the action without prejudice against that Defendant. Generally a Court will provide prior notice to the Plaintiffs of its intent to dismiss for failure of service. However, because the claims against these parties would otherwise be dismissed as untimely under the applicable statute of limitations, the Court finds that the interests of the parties and principles of judicial economy dictate that it is more appropriate under these circumstances to dismiss these parties without prejudice. If Plaintiffs believe that they can properly serve these Defendants and they wish to pursue an action against them, they may file a motion to reinstate the action as against these Defendants only.

Plaintiffs filed a global Response to Defendants' Motion to Dismiss on April 28, 2009. (ECF # 157). [6]

Case: 1:08-cv-02755-DCN Doc #: 322-7 Filed: 06/01/15 51 of 99. PageID #: 16358

Page 4

2009 U.S. Dist. LEXIS 51858, *9; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

Several Defendants filed replies to the Plaintiffs' Opposition. (ECF # 166, 168-170, 172-184, 187). Oral arguments were heard on the motions on May 28, 2009. The pending motions to dismiss have now been fully briefed and are ready for consideration.

> 6  Plaintiffs filed their response a day after it was due along with a request for leave to file the response instanter. The Court granted leave [*10] on May 11, 2009. (ECF non-doc.)

## PARTIES

The Plaintiffs are individuals who, between 1998 and 1999, wrote checks to Serengeti Diamonds U.S.A., Inc. ("Serengeti") and/or Lomas De La Barra ("Lomas"), thinking that they were purchasing promissory notes in those companies. These "notes" were being sold by James Carpenter directly and/or through agents or brokers. Mr. Carpenter allegedly failed to use the funds provided by the investors to purchase promissory notes in these companies, and instead "commingled" them into bank accounts he controlled. Plaintiffs claim they were injured when the Defendant Drawee Banks improperly paid checks "made to Defendant depositary [banks], which had wrongly negotiated the check[s] into an account it opened" in the name of Serengeti and/or Lomas.

There are two main categories of Defendants in this action. The first are the Drawee Banks. Drawee Banks are the banks that paid off on the checks written by the Plaintiffs (i.e., the banks at which the Plaintiffs had accounts). The Drawee Banks are: Huntington National Bank; Fifth Third (in its own name and as corporate successor by merger to Citizens Bank and The Strongsville Savings Bank); Sun Trust (through merger/acquisition [*11] of Firstar Bank and Star Bank); Wachovia Bank (as corporate successor to First United Bank, First United Bancorp and First Union Bank); Bank of America (through merger with Bank of Boston); Bank of Colby; Belmont National Bank; Century Federal Credit Union; Charter One Bank; Dollar Bank; Firstmerit Corporation (in its own name and as corporate successor to Signal Bank); First National Bank; First National Bank of Odon; First National Bank of Pennsylvania; German American Bancorp (as corporate successor to Community Bank); JP Morgan/Chase Bank (as corporate successor to Bank One and First National Bank of Chicago); Key Bank; Killbuck Savings Bank; Old National Bancorp (in its own name and as corporate successor to the Dubois

County Bank); PNC Bank (in its own name and as corporate successor to National City Bank); Sky Bank (as corporate successor to Citizens Bank); Sunflower Bank; Third Federal Savings Bank; Terre Haute Savings; US Bank (as corporate successor to Star Bank); Wells Fargo; and, Wilson & Muir Bank. Plaintiffs assert one claim against the drawee banks for violations of the Uniform Commercial Code ("UCC") *Section 4-401*(Count I).

The Second group of Defendants are the Depositary [*12] Banks. The Depository Banks are accused of wrongly opening and maintaining bank accounts for James Carpenter in the names of Serengeti and Lomas. The Depository Banks are: Huntington National Bank (as corporate successor to First National Bank of Zanesville, Bank First National of Zanesville, and Unizan Bank); Fifth Third; Sun Trust; and, Wachovia Bank. Plaintiffs' claims against the Depositary Banks include the following: fraud, fraudulent concealment, and conspiracy to commit fraud (Count II - against Huntington National; Count III - against Fifth Third; Count IV - against Wachovia; and, Count V [7] - against Sun Trust); failure to act with ordinary care (Count VI - against all Depositary Banks); breach of fiduciary duty (Count VII - against all Depositary Banks); money had and received (Count VIII-against all Depositary Banks); and, aiding and abetting Carpenter's tortious acts (Count IX - against all Depositary Banks).

> 7  The Amended Complaint mistakenly labels Count V, as "Count IV." This opinion will refer to the Fraud count against Sun Trust as "Count V."

## STANDARD OF REVIEW

On a motion brought under *Fed. R. Civ. P. 12(b)(6)*, this Court's inquiry is limited to the content of the complaint, [*13] although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint may also be taken into account. See *Chester County Intermediate Unit v. Pennsylvania Blue Shield, 896 F.2d 808, 812 (3rd Cir. 1990).*

In evaluating a motion for dismissal under *Rule 12(b)(6)*, the district court must "consider the pleadings and affidavits in a light most favorable to the [non-moving party]." *Jones v. City of Carlisle, Ky., 3 F.3d. 945, 947 (6th Cir. 1993)* (quoting *Welsh v. Gibbs, 631 F.2d 436, 439 (6th Cir. 1980))*. However, though construing the complaint in favor of the non-moving

Case: 1:08-cv-02755-DCN Doc #: 322-7 Filed: 06/01/15 52 of 99. PageID #: 16359

Page 5

2009 U.S. Dist. LEXIS 51858, *13; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

party, a trial court will not accept conclusions of law or unwarranted inferences cast in the form of factual allegations. See *City of Heath, Ohio v. Ashland Oil, Inc., 834 F.Supp. 971, 975 (S.D. Ohio 1993)*. "A plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*(quoting *Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986))*. "Factual allegations [*14] must be enough to raise a right to relief above the speculative level." *Twombly at 555.* In deciding a *Rule 12(b)(6)* motion, this Court must determine not whether the complaining party will prevail in the matter but whether it is entitled to offer evidence to support the claims made in its complaint. See *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)*.

## ANALYSIS

### I. Personal Jurisdiction

Several of the out-of-state Banks have challenged whether this Court has personal jurisdiction to hear the claims against them. These include: Terre Haute Savings, Wilson & Muir Bank & Trust Co., Sunflower Bank, Farmers & Merchants Bank of Colby, and German American Bancorp. [8] In order to exercise personal jurisdiction over an out-of-state party, two requirements must be met. First, the Complaint must allege sufficient jurisdictional facts to bring the action within the purview of Ohio's long-arm statute (*O.R.C. §2307.382*). See *Calphalon Corp. v. Rowlette, 228 F.3d 718, 721 (6th Cir. 2000)*. Second, the exercise of personal jurisdiction must comport with the due process requirements of the U.S. Constitution. See *Nationwide Mut. Ins. Co. v. TRYG Inter. Ins. Co. Ltd., 91 F.3d 790, 793 (6th Cir. 1996)*. Plaintiffs [*15] bear the burden of demonstrating the exercise of personal jurisdiction is proper. See *American Greetings Corp. v. Cohn, 839 F.2d 1164, 1168 (6th Cir. 1987)*.

[8] Personal jurisdiction requirements are waivable rights. See *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, n.14, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)*. Those Defendants who did not challenge personal jurisdiction in their first responsive pleading have waived this issue. *Fed. R. Civ. P. 12(h)(1)*; see, e.g., *Taubman Co. v. Webfeats, 319 F.3d 770, 773 (6th Cir.*

*2003)*; *Reynolds v. Int'l Amateur Athletic Fed'n, 23 F.3d 1110, 1120 (6th Cir. 1994)*; *In Re Wolverine Radio Co., 930 F.2d 1132, 1137 n.5 (6th Cir. 1991)*.

Each [*16] Bank challenging personal jurisdiction asserts that it is an out-of-state Bank that does not conduct business in Ohio and that the Plaintiffs making claims against it are not citizens of Ohio. They also each allege that they have insufficient contacts, ties, or relations with Ohio to justify personal jurisdiction in the state. The allegations in the Amended Complaint do not conflict with these assertions, and Plaintiffs have provided no other basis upon which this Court could find that the exercise of personal jurisdiction is proper over these Defendants.

Plaintiffs have not identified which section of Ohio's Long Arm Statute would form a basis for the exercise of personal jurisdiction; they have not made any allegations that would demonstrate that their claims arose out of any acts or omissions that occurred in Ohio; they have not provided any allegations or evidence that these Defendants have substantial and continuous contacts with Ohio; they have not shown that these Defendants have any customers, offices, subsidiaries, employees, assets, or real property in Ohio; and, they have not established that these Defendants are registered or licensed to do business in Ohio, pay Ohio taxes, [*17] or maintain any business address, phone number or other contacts in Ohio. [9]

[9] Plaintiffs do not respond to the personal jurisdiction argument in their Response to Defendants' motions to dismiss, and have, therefore, effectively conceded to the dismissal of these Defendants. They do superficially address a challenge to subject matter jurisdiction based on a lack of diversity in the last two pages of their Response brief, but they have made no attempt to counter these Defendants' arguments against the exercise of personal jurisdiction.

Based on the information currently before the Court, these Defendants do not appear to have sufficient contacts to satisfy the statutory or due process requirements that would allow this Court to exercise personal jurisdiction over them. The claims against Terre Haute Savings, Wilson & Muir Bank & Trust Co., Sunflower Bank, Farmers & Merchants Bank of Colby, and German American Bancorp must, therefore, be dismissed. [10]

Case: 1:08-cv-02755-DCN  Doc #: 322-7  Filed:  06/01/15  53 of 99.  PageID #: 16360

Page 6

2009 U.S. Dist. LEXIS 51858, *17; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

10    Even if this Court could exercise personal jurisdiction over the non-Ohio Drawee Banks listed above, for the reasons set forth below, all of the claims against those Banks would be dismissed along with the claims against all of the other  [*18] Drawee Banks, based on the statute of limitations.

## II. UCC Displacement of Tort Claim For "Money Had and Received"

The Depositary Banks argue that the common law claim of "money had and received" (Count Eight) has been displaced by Ohio's codification of the UCC. This Court explored this argument in detail in *Metz v. Unizan Bank, 416 F. Supp. 2d 568 (2006)* [11] and found that this common law claim (when raised in the commercial context involving negotiable instruments) has, indeed, been supplanted by the UCC. See *Olympic Title Ins. Co. v. Fifth Third Bank of Western Ohio, 2004 Ohio 4795, 2004 WL 2009285 at *6 (2nd Dist. Ohio Ct. App. 2004)*; *Amzee Corp. v. Comerica Bank-Midwest, 2002 Ohio 3084, 2002 WL 1012998, at *9-10 (Ohio App. 2002)*(holding that claims for conversion, money had and received, money paid by mistake, and unjust enrichment were displaced by the UCC). Plaintiffs do not challenge the Defendants' contention that the common law cause of action for "money had and received" has been supplanted by Ohio's codification of the UCC. Rather, Plaintiffs now characterize their cause of action for "money had and received" (Count VIII) as a UCC  [*19] claim. (Response, at 4, 40).

11    Please note, when reviewing the Docket in the Metz case, the ECF (Docket) Numbers are not necessarily in chronological order by date of entry.

The UCC has created a statutory scheme to assess liability and otherwise allocate losses arising in the commercial context. However, Plaintiffs have cited no specific provision that would give them a cause of action against the Depositary Banks under the facts set forth in Count Eight of the Amended Complaint. The claim, therefore, is dismissed for failure to state a claim upon which relief may be given. [12]

12    Even if Count Eight actually did state a claim under the common law, or the UCC, it is undisputed that the three year statute of limitations set forth in *O.R.C. § 1303.16(G)(1)*

would apply. As set forth below, this statute of limitations would have run long before this action was filed, and the claim, therefore, must be dismissed.

## III. Statute of Limitations

A. Applying the Statutes of Limitation to the UCC Claims

The parties agree that the Plaintiffs' claims are based on events which occurred in 1998 and 1999, and that the original Complaint was not filed until September 29, 2008. The parties also agree that Plaintiffs'  [*20] UCC claims [13] are subject to the three-year statute of limitations set forth in Articles 3 and 4 of the Uniform Commercial Code ("UCC"), codified at *O.R.C. § 1303.16* and *O.R.C. § 1304.09*. [14] Both of these provisions provide that an action shall be brought within three years of when the cause of action "accrues."

13    The UCC based claims include Count I (violation of *O.R.C. §1304.30 - U.C.C. 4-401*), Count VI (failure to exercise ordinary care), and Count VII (bad faith in violation of *O.R.C. §1304.03*).

14    Claims brought pursuant to *O.R.C. §1304.30* (2005)(*UCC 4-401*) are subject to the statute of limitations set forth in *O.R.C. § 1304.09* (2005).

Article 3 provides that:

Unless governed by other law regarding claims for indemnity or contribution, any of the following actions shall be brought within three years from when the action accrues:

(1) An action for conversion of an instrument, money had and received, or a similar action based on conversion;

(2) An action for breach of warranty;

(3) An action to enforce an obligation, duty or right arising under this chapter and not governed by this section.

*O.R.C. § 1303.16. Article 4 of Section 1304.09* provides that:

An action to enforce an obligation, duty

Case: 1:08-cv-02755-DCN  Doc #: 322-7  Filed:  06/01/15  54 of 99.  PageID #: 16361

Page 7

2009 U.S. Dist. LEXIS 51858, *21; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

[*21] or right arising under *Sections 1304.01 to 1304.04* of the Revised Code shall be brought within three years after the cause of action accrues.

The dispute between the parties centers on how to determine when the Plaintiffs' causes of action accrued. Neither of the applicable statutes of limitation defines the word "accrues." The current syllabus law in Ohio is that "[a]bsent legislative definition, it is left to the judiciary to determine when a cause "arose" for purposes of statutes of limitations." *O'Stricker v. Jim Walter Corp., 4 Ohio St.3d 84, 4 Ohio B. 335, 447 N.E.2d 727*, syllabus P 1, *4 Ohio St. 3d 84, 4 Ohio B. 335, 447 N.E.2d 727 (1983)*. The Defendants argue that, for purposes of applying a statute of limitations, unless otherwise specified, a cause of action accrues at the time the wrongful act is committed. Further, they contend that Ohio courts have found that this general rule applies to the UCC claims at issue in this case. Plaintiffs, on the other hand, claim that under Ohio law, "accrual" occurs only after the wrongful acts have been discovered.

The Defendants cite several Ohio cases in support of their contention that the UCC claims in this case accrued at the time of the wrongdoing. As seen in *Palmer v. Mfg. and Supply, Inc. v. BancOhio Nat'l Bank, 93 Ohio App. 3d 17, 637 N.E.2d 386, 390 (1994)*, [*22] cert. denied *69 Ohio St. 3d 1488, 635 N.E.2d 43 (1994)*, and *Brentar v. Rupert, No. 73903, 1998 Ohio App. LEXIS 6111, 1998 WL 895285 (Ohio App. 8th Dist. Dec. 17, 1998)*, Ohio courts have found that the "great bulk of authority runs very strongly against" the application of the discovery rule for claims involving the theft or conversion of negotiable instruments. In addition, the Ohio General Assembly, in enacting the UCC, specifically chose to toll the running of the statute of limitations until after the injury was discovered in some instances but not in others. The legislature did not specifically add a discovery rule to the statutes of limitation applicable in this case. The Ohio Supreme Court has held that the fact that the General Assembly included language establishing a discovery rule under some UCC sections but not in others "argues strongly that it was not the legislature's intent to apply the discovery rule to [the later] claims." *Investors Reit One v. Jacobs, 46 Ohio St.3d at 181, 546 N.E.2d at 211*, citing *Kirsheman v. Paulin, 155 Ohio St. 137, 146, 98 N.E.2d 26, 31 (1951)*. "The legislature's express inclusion of a discovery rule for certain [claims] . . .

implies the exclusion of other torts arising [*23] under the statute . . . ." Id.

Plaintiffs cite no case law to the contrary, rather they argue that the Ohio cases cited by the Defendants are irrelevant because a statutory "discovery rule" applies to these claims. Plaintiffs point to *O.R.C. § 2305.09* -- the four year statute of limitations for "certain torts" -- as the statutory "discovery rule" that should be applied to the statute of limitations set forth in *O.R.C. §1303.16* and *O.R.C. §1304.09*. *Ohio Revised Code § 2305.09* sets forth the statute of limitations for the following causes of action: (A) trespassing upon real property; (B) the recovery of personal property, or for taking and detaining it; (C) for relief on the ground of fraud; and (D) for an injury to the rights of plaintiff not arising on contract nor enumerated in *sections 2305.10 to 2305.12, 2305.14*, and *1304.35* of the Revised Code. It further states:

> If the action is for trespassing under ground or injury to mines, or for the wrongful taking of personal property, the causes thereof shall not accrue until the wrongdoer is discovered; nor, if it is fraud, until the fraud is discovered.

The discovery rule established in this section is clearly limited in its application. [*24] It applies only to the four year statute of limitations for certain actions set forth in sub-sections *(A)-(C) of O.R.C. § 2305.09*.

Plaintiffs spend a great deal of their Response brief outlining the legislative history of this provision and of various statutes of limitation established through Ohio's codification of the UCC. None of this information is relevant, however, because *O.R.C. § 2305.09* has no application to claims which are given their own specific statute of limitations in the UCC. This statute creates a four year statute of limitations for tort actions that are not otherwise specifically governed by their own statutes of limitations. The parties, however, agree that a three year period of limitations, specifically assigned by *O.R.C. § 1303.16* and *§ 1304.09*, apply to the UCC claims at issue in this case. *Ohio Revised Code § 2305.09*, therefore, does not apply, and the definition of accrual specifically aimed at certain sections of that particular statute is not applicable to the Plaintiffs' claims.

Plaintiffs contend that because the Amended Complaint alleges that James Carpenter was guilty of

Case: 1:08-cv-02755-DCN  Doc #: 322-7  Filed:  06/01/15  55 of 99.  PageID #: 16362

Page 8

2009 U.S. Dist. LEXIS 51858, *24; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

conversion and fraud, all of the claims in their complaint "were caused by the wrongful [*25] taking of their personal property and from fraud." Consequently, they argue that the discovery rule in *O.R.C. § 2305.09* should apply to all of their claims, including those brought under various UCC provisions. However, any claims they may have had (but did not assert in this action) against Mr. Carpenter are irrelevant in determining what statute of limitations applies to the actual claims Plaintiffs brought against the banks. The statutory claims under the UCC are not legally equivalent to an action for wrongful taking of personal property, fraud, or any other common law cause of action, [15] and whether or not there is some connection between these claims and the allegations made against Mr. Carpenter, they are certainly not interchangeable with potential common law tort claims Plaintiffs may have had against Mr. Carpenter, a legally independent entity.

> 15  The banks are not alleged to have taken any personal property of the Plaintiffs. Rather, they are accused of honoring checks made out by the Plaintiffs; cashing checks and depositing the money into accounts named for the companies the checks had been written out to. Checks are not personal property. They are an obligation on behalf [*26] of the drawer of the check to the drawee.

Further, Plaintiffs do not accuse the Drawee Banks of any fraud or other wrongful taking. In fact, they have as much as admitted that the Drawee Banks did not "wrongfully" take any personal property from the Plaintiffs. In Plaintiffs' Introduction on page one of their Response brief, they characterize the actions of the drawee banks as "innocent," claiming only that the UCC transfers the losses of its customers to the bank, and allows the "innocent" bank to then recover the loss from other sources. There is no way to extrapolate a UCC charge under *4-401* (*O.R.C. § 1304.30*), which the Plaintiffs themselves characterize as a requirement to "refund their victims the face value of stolen checks, **without liability**," into the equivalent of a "wrongful taking" claim against these banks. [16]

> 16  Plaintiffs reiterated this position during oral arguments, emphasizing that the Drawee Banks were allegedly legally bound to re-credit the Plaintiffs for their losses even though they were without fault. During the same portion of the

argument, Plaintiffs argued that *O.R.C. § 2305.09(D)* would apply to these claims. However, the language adding a discovery rule to [*27] the definition of accrual does not apply to *subsection (D)*.

The UCC claims against the Depositary Banks are for breach of duty to act with ordinary care and failure to act in good faith. Even if these UCC claims could be equated to some common law cause of action, they would sound in negligence or bad faith, not in conversion or the wrongful taking of property. [17] Therefore, the discovery rule imposed by *O.R.C. § 2305.09* would still not apply to such claims. [18]

> 17  Plaintiffs did bring separate and independent claims for fraud and aiding and abetting in tortious behavior against the Depositary Banks. The legal analysis of the statute of limitations and discovery rule issues differs with regard to those tort claims and will be addressed later in the opinion.
>
> 18  Plaintiffs spent some time during oral argument explaining why they believed the UCC claims made in this case would fall under *subsection (D) of O.R.C. § 2305.09*. However, even if this were true, the discovery rule contained in that statute does not apply to claims described in *sub-section (D)*. The plain language of the discovery rule clause limits its application to only certain types of claims set forth in *sub-sections (A)-(C)*.

This [*28] Court is bound to apply state law in accordance with the currently controlling decisions of the state's highest court. *Bailey Farms, Inc. v. NOR-AM Chemical Co., 27 F.3d 188, 191 (6th Cir. 1994)*. Where the state supreme court has not specifically addressed a particular issue, this Court is charged with anticipating how that court would rule. Id. The Court conducted an exhaustive review of all of case law on both sides of this issue in the case of Metz v. Unizan Bank, Case No. 5:05 CV 1510, Docket Numbers 376 and 600 (Feb. 28, 2006 and Sept. 16, 2008), and found that Ohio law does not support grafting a discovery rule onto the determination of the accrual date for the UCC claims at issue in this case. There has been no change in the law that would alter the reasoning behind that decision. In fact, although there was no Ohio law directly addressing the two statutes of limitation at issue in this case when the Metz

Case: 1:08-cv-02755-DCN  Doc #: 322-7  Filed:  06/01/15  56 of 99.  PageID #: 16363

Page 9

2009 U.S. Dist. LEXIS 51858, *28; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

case was decided, two Ohio courts have since specifically applied the general definition of accrual (without a discovery rule) to those statutes of limitations. See *Western Ohio Colt Racing Assoc. v. Fast, Mercer App. No. 10-08-15, 2009-Ohio-1303* (finding that, consistent with [*29] the general rule in Ohio, cause of action subject to statute of limitations contained in *O.R.C. § 1303.16(G)(1)* accrued when the wrongful act was committed); *Connors v. U.S. Bank, Franklin App. No. 07 AP-649, 2008-Ohio-1838* (holding that for purposes of *O.R.C. § 1303.16(G)* and *O.R.C. §1304.09*, a cause of action accrues at time of wrongdoing).

The general and longstanding rule in Ohio is that a cause of action accrues at the time the harm is committed and not when it is discovered. The discovery rule is an exception, either statutorily or judicially imposed. There is no applicable statutory exception, and the Ohio Courts have not found any other compelling justification for applying the discovery rule under these circumstances. Therefore, this Court finds that Ohio law does not support the application of the discovery rule to toll the running of the limitations period contained in *O.R.C. § 1303.16(G)* or *O.R.C. § 1304.09*.

The parties agree that the alleged UCC violations occurred in 1998 and 1999, and that the statutes of limitations for each of the corresponding UCC claims was three years. Thus, the Plaintiffs cause of action on the UCC claims would have expired no later than the end of 2002. [*30] This lawsuit was not filed until September of 2008. All of the Plaintiffs UCC claims are, therefore, barred by the statutes of limitations set forth in *O.R.C. § 1303.16(G)* or *O.R.C. § 1304.09*, and Counts One, Six, Seven, and Eight must, therefore, be dismissed.

B.  Applying the Statute of Limitations to the Fraud-Based Claims

Counts Two through Five (Fraud, Fraudulent Concealment, and Conspiracy to Commit Fraud), and Count Nine (Aiding and Abetting) of the Amended Complaint are common law claims against the Depositary Banks (Huntington National, Fifth Third, Sun Trust, and Wachovia). Defendants argue that these claims are governed by the statute of limitations in *O.R.C. § 1707.43(B)*. Ohio Revised Code § 1707.43(B) applies to causes of actions arising from the sale of securities. It states that actions "for any recovery based upon or arising out of a sale or contract for sale" of securities must be brought within "two years after the plaintiff knew, or had

reason to know, of the facts by reason of which the actions of the person . . . were unlawful, or [within] five years from the date of such sale or contract for sale, whichever is the shorter period." Id.

Plaintiffs' Response to Defendants' [*31] Motion to Dismiss is somewhat confusing on this issue. Although it is clear that Plaintiffs don't believe *O.R.C. § 1707.43(B)* is the appropriate statute of limitations to apply, they don't specify what other statute would be applicable to the fraud-based claims. Although it would potentially result in a shorter statute of limitations, they seem, at times, to be arguing that all of their claims should be subject to the statute of limitations in the UCC. Their own arguments even seem to discount the validity of any claims of actual fraud against the banks. [19] During oral argument, Plaintiffs argued that the statute of limitations for securities fraud shouldn't apply to the fraud-based claims because the UCC governs "banking torts," and the UCC is the sole means by which the Plaintiffs can recover their money. There was also a strong implication in this argument that the Plaintiffs were not actually injured by the alleged fraud, but only by the eventual cashing of the checks they wrote to Lomas and Serengeti. Nonetheless, Plaintiffs have brought non-UCC, fraud-based common law claims against the banks, alleging (however conclusory those allegations may be) knowledge, complicity, and conspiracy [*32] in the underlying fraud allegedly committed by James Carpenter. Setting aside those arguments that seem somewhat incompatible with the fraud-based claims set forth in the Amended Complaint, the Court will assume that Plaintiffs meant to argue that the general statute of limitations for fraud set forth in *O.R.C. § 2305.09(D)*(a four year statute of limitations, with a discovery rule) should apply.

> 19  Plaintiffs' argument reads as follows: "The Defendants at bar are all banks. They are either liable without fault pursuant to *R.C. 1303.03*, as part of the loss-allocation rules of the Ohio UCC, or their liability is for fault plead [sic]EXCLUSIVELY in the manner in which they opened and maintained checking accounts, and negotiated checks (or for Huntington, in the way it negotiated with a criminal)." (Response at 38)(emphasis in the original).

Addressing the question of whether *O.R.C. § 1707.43* or *O.R.C. § 2305.09* would be the appropriate

2009 U.S. Dist. LEXIS 51858, *32; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

statute of limitations, in a case with identical facts and nearly identical claims, this Court has previously held that under these circumstances Ohio law dictates that *O.R.C. §1707.43(B)*, the statute of limitations for securities fraud, is the proper statute [*33] to apply.

> The facts underlying the fraud claims are inextricably intertwined with allegations that the Defendants conspired with Mr. Carpenter to engage in securities fraud . . . The fact that the Amended Complaint does not specifically state a claim for securities violations is not dispositive . . . . "The Supreme Court of Ohio directs that when courts are faced with determining the statute of limitations that governs a claim, they 'must look to the actual nature or subject matter of the case, rather than to the form in which the action is pleaded.'" ([Metz Feb. 8, 2008 Rep. And Recom.], citing *Lawyer's Coop. Pub. Co. v. Muething*, 65 Ohio St. 3d 273, 603 N.E.2d 969, 973 (Ohio 1992)). In this case, there are allegations of securities fraud even though no actual claims under the state or federal securities laws have been made.

> Further, even if no actual sale of securities occurred, the Plaintiffs had attempted to buy securities, and it was only by operation of the alleged fraud that an actual sale was prevented. Under the plain language of the statute, an actual sale is not necessary to trigger the statute of limitations in *O.R.C. § 1707.43(B)*. Whether or not an actual security was purchased, there can be [*34] no doubt that the allegations in the Amended Complaint establish that the Plaintiffs contracted for the sale of securities . . . The Court, therefore, finds that the statute of limitations set forth in *O.R.C. § 1707.43(B)* applies to the fraud claims in this action.

(Metz v. Unizan Bank, Case No. 5:05 CV 1510, 2008 U.S. Dist. LEXIS 37270, Docket Number 555, at 3-4 (May 7, 2008)). Plaintiffs have offered no argument why this reasoning would not apply equally in this case, nor have they shown any change in the law that would justify

a different holding. Therefore,

> *Ohio Revised Code § 1707.43(B)* will be applied to Counts Two through Five, and Count Nine of this action.

In the Metz opinion, this Court held that, although *O.R.C. § 1707.43(B)* was the appropriate statute of limitations, the absolute five year period of limitations contained in the statute is not enforceable because it would violate the right-to-remedy clause of the Ohio Constitution. [20] Under Ohio law, an unenforceable provision in a statute may be severed, leaving the constitutionally valid sections of the statute in force. *O.R.C. § 1.50*; *State, ex rel. Doersam v. Industrial Commission of Ohio*, 45 Ohio St.3d 115, 121, 543 N.E.2d 1169, 1175 (1989)*. Therefore, [*35] the two year period of limitations, statutorily tolled until after the Plaintiffs knew or had reason to know of the "facts by reason of which the actions of the person . . . were unlawful" is the governing language in that statute.

> [20]  A detailed analysis of the law and history leading to this conclusion is provided in the Metz opinion (Order dated May 7, 2008, ECF # 555). As the parties have offered no new law or argument challenging this holding, there is no need to repeat that analysis here.

As set forth above, the parties agree that the Plaintiffs' claims are based on events which occurred in 1998 and 1999, and that the original Complaint was not filed until September 29, 2008. The Plaintiffs claims survive only if they were brought within "two years after the plaintiff knew, or had reason to know, of the facts by reason of which the actions of the person. . . were unlawful." In this case, that means that if they knew or had reason to know of any such facts prior to September 29, 2006, their claims are untimely and must be dismissed.

"[C]onstructive notice is . . . sufficient to start the two-year period" running under *O.R.C. § 1707.43(B)*. *Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553, 561 (6th Cir. 2005). [*36] Tolling of the statute of limitations by exercise of the discovery rule ends when Plaintiffs are deemed to be on "notice to investigate the facts and circumstances relevant to [their] claim in order to pursue [a] remedy." *Flowers v. Walker*, 63 Ohio St.3d 546, 549, 589 N.E.2d 1284 (Ohio 1992). The discovery of "suspicious facts," triggers a potential plaintiff's duty to investigate. See *Wyser-Pratte Mgmt. Co.*, 413 F.3d at

2009 U.S. Dist. LEXIS 51858, *36; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

*561*. The limitations period then begins to run, when through the exercise of reasonable diligence, a plaintiff discovers the facts underlying his or her alleged claim(s). Id. In other words, when applying the discovery rule, a cause of action accrues when Plaintiffs become aware of facts that should alert them that they may have claims to pursue. They need not be aware of the actual causes of action, or legal theories underpinning their eventual claims in order to trigger the running of the limitations period. See *Flowers, 63 Ohio St.3d at 548-49*.

In this case, there were a series of events that should have raised the Plaintiffs' suspicions that something illegal had occurred. While taken alone, each of these events may not have been sufficient to trigger the running of the statute [*37] of limitations, together they certainly should have spurred a reasonable investor to investigate further and pursue a potential remedy. The first indication that something may have been seriously amiss with the Lomas and Serengeti investments is outlined in the Amended Complaint. Paragraph Three of that Complaint states that sometime after the Plaintiffs stopped receiving interest payments and were unable to redeem their debentures upon maturity, Carpenter "organized the victims to present their claims to the corporate guarantor of the notes: The New England International Surety Corp. . . . (hereinafter "NEISC") . . . [T]he purported owner of NEISC apparently responded that Lomas and Serengeti were frauds, and their claims could not be honored, in 2000 or 2001."

In addition to their early knowledge that they were no longer receiving payments, could not redeem their debentures, and that the guarantor was refusing to honor their claims based on alleged fraud by the investment companies, the Plaintiffs had access to public information from various sources that would have put them on notice of Carpenter's alleged fraud more than two years before this action was filed. Included among these [*38] sources were James Carpenter's past criminal history and disbarment, [21] James Carpenter's indictment for illegal activities directly related to the claims in this case, [22] the issuance of Cease and Desist orders to Carpenter and several other brokers by the Securities Division of the Ohio Department of Commerce, [23] and the filing of the *Metz* case. [24]

and should have denied him the ability to open accounts on that basis. By the same reasoning, Plaintiffs could have discovered Mr. Carpenter's past history (a matter of public record) prior to buying investments from him, or at least upon a cursory investigation after those investments stopped paying interest, were dishonored, and were labeled as "fraud" by the guarantor in 2000 or 2001. (See, Amended Complaint at 38-39) (alleging Carpenter's disbarment in 1993 and guilty plea to felony Bank Fraud, Aggravated Theft, Grand Theft, and Theft in Office in or about 1991 were matters of public record). An investor is in the best position to investigate the background and legitimacy of his own investments (and [*39] the brokers he is buying from).

22  James Carpenter was indicted in 2005 for his role in creating the fraud alleged in the Amended Complaint. His indictment was unsealed on January 4, 2006 and he was publically arraigned in connection with the alleged Serengeti and Lomas frauds on that day. See United States v. Carpenter, Case No. 1:05 CR 586 (N.D. Ohio 2005).

23  The Complaint in the Posen case (a class action whose class definition included the Plaintiffs in this action) admitted that from 1999 to 2000, the Securities division of the Ohio Department of Commerce issued cease and desist orders to Carpenter and several brokers selling Serengeti and Lomas notes on his behalf. These orders are public records.

24  The Plaintiffs in the Metz case brought claims nearly identical to those raised in this action. This shows that information sufficient to support the Plaintiffs claims must have been available prior to March of 2005 because other supposed victims of the same alleged fraud filed a complaint nearly identical to this one at that time. See *Gumbus v. United Food and Commercial Workers Int'l Union, Nos. 93-5113, 93-5235, 1995 U.S. App. LEXIS 523 (6th Cir. Jan. 6, 1995)*("We believe that reasonably [*40] diligent plaintiff should have known about and monitored the progress of [a class action lawsuit]" which raised similar claims against the defendants.) Further, although we do not directly impute counsel's knowledge to his clients in this case, it also bears noting that Plaintiffs' counsel was well aware of all of the

21  Plaintiffs repeatedly argue that the Depositary banks should have been aware of James Carpenter's past criminal history and disbarment,

Case: 1:08-cv-02755-DCN  Doc #: 322-7  Filed:  06/01/15  59 of 99.  PageID #: 16366

Page 12

2009 U.S. Dist. LEXIS 51858, *40; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

facts and legal theories behind the claims in this action at least as early as 2004, having worked on the Posen class action and having helped draft the original Metz Complaint. (Huntington Mot. to Dismiss, Ex. 1: Morris Aff. PP 9, 12-14). Later in October of 2005, Mr. Morris filed a motion to intervene in Metz on behalf of two additional named Plaintiffs.

The clearest evidence that the Plaintiffs were on notice that they had possible claims, however, is the filing of the Posen action. In 2000, a suit captioned Posen, et al. v. New England Surety, Inc., et al., No. 2000-06-2623 was filed as a putative class action in Summit County Ohio. This suit alleged fraud against James Carpenter, NEISC, and others in connection with the Lomas and Serengeti investments. (Huntington Mot. to Dismiss, Ex. A: Posen I Compl.). The Plaintiffs in the instant case all fell within the class [*41] definition of the putative class in Posen. [25] (Id.) The Summit County Court certified the class in an Order dated May 6, 2004, and a Notice and Opportunity to Opt Out was approved by the Court on December 30, 2004. (Posen, et al. v. New England Surety, Inc., et al., No. 2000-06-2623). Assuming the notice was served or published in accordance with the court's order, each of the Plaintiffs in this case would have had notice of the alleged fraud well in advance of two years before the filing of the instant action. [26]

[25]   The Posen complaint defines the proposed class as "all individuals who, during the time period between and including 1997 and 1999, purchased promisory notes from Defendant Carpenter or the Carpenter Corporations, in either Serengeti or Lomas, and who were injured when both Serengeti and Lomas defaulted on the notes and New England failed to make payments on the guarantees." (Fifth Third Mot. to Dismiss, Ex. A: Posen I Complaint, at 7).

[26]   The proposed Notice of Class Settlement filed by the Posen class attorneys later in the litigation noted that over 400 class members had been identified. Of those eight opted out, and just over twenty had not been identified or contacted. [*42] The order approving the notice of class certification was issued three years and almost eight months before this action was filed, well outside the two year statute of limitations.

Although this Court accepted in Metz that this series of events (without the benefit of any discussion relating to the Posen case) may have been sufficient to create notice of the Plaintiffs injuries and of Carpenter's wrongdoings, it could not determine from the pleadings in Metz that the Plaintiffs should have discovered the involvement of the specific Depositary Banks more than two years before the Metz case was filed (March of 2005). There is additional information in instant Complaint, however, that suggests even before the alleged fraud came to light, these Plaintiffs knew that their checks had been cashed and deposited in the Serengeti and Lomas accounts at the Depositary Banks, and knew that they had received interest checks from Depositary bank accounts bearing the name of Serengeti and Lomas. (Amended Complaint at 14, 15). If, as Plaintiffs allege, these accounts were fraudulent, and if, as Plaintiffs allege, the banks had some duty to discover and prevent the use of these fraudulent accounts, then [*43] Plaintiffs should have investigated the banks' involvement in the alleged fraud as soon as they were alerted to suspicious facts involving these accounts. [27] There is an argument, therefore, that once the Plaintiffs were aware of the alleged fraud by Carpenter (or even an alleged fraud by Lomas and/or Serengeti), the statute of limitations would have begun to run against the banks as well because the Plaintiffs had knowledge that the Banks had opened accounts for these allegedly fraudulent businesses and allowed James Carpenter to cash checks and deposit the funds into these accounts, and to write checks from these accounts. This should have triggered the Plaintiffs to further investigate the banks' role in opening and managing the accounts.

[27]   Further, under the Plaintiffs' theory in this case, it would be obvious that Carpenter's fraud could not have occurred with the participation of the Depositary banks because in Plaintiffs words "[w]ithout the ability to cash and write checks in the names of non-existent companies, [the alleged fraud] would have been impossible." (Response at 41). According to Plaintiffs' oral argument no injury occurred until the banks funded and deposited the [*44] checks in the Serengeti and Lomas accounts.

If that is not enough to determine that sufficient facts were or should have been discovered by the Plaintiffs before September of 2006, there is another significant difference between this and the Metz case on this issue.

2009 U.S. Dist. LEXIS 51858, *44; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

Each of the Depositary Banks in this action had been the subject of extensive discovery in the Posen case, and each had been identified as having accounts related to the Lomas and Serengeti investments prior to September of 2006 (two years before the instant case was filed). (See Posen docket, Summit County Court - multiple entries). Although this information was not discussed in Metz, [28] the information was known to all Plaintiffs (as members of the Posen class) in this action more than four years prior to the filing of their original Complaint.

> 28  The information would have been irrelevant to the statute of limitations issues in Metz because Metz was filed less than two years after the class certification in Posen was granted, and the bank related discovery took place.

In addition, the Posen Complaint identified Ashley Carpenter, her employment with First National Bank of Zanesville (the predecessor to Huntington National [*45] Bank), and her involvement in the alleged fraud. This occurred far more than two years before the instant case was filed. Therefore, Plaintiffs specifically knew or had reason to know of the facts by reason of which the Depositary Bank First National Bank of Zanesville's (succeeded in interest by Huntington National Bank) actions were allegedly unlawful more than two years before this action was filed. As set forth above, whether or not a legal theory for recovery had been identified or pursued against the banks is irrelevant to the running of the statute of limitations on those potential causes of action. Only the facts underlying the cause of action need be known to trigger the running of the statute of limitations; it does not matter whether the Plaintiffs understood the legal significance of those facts. See *Flowers, 63 Ohio St.3d at 548-49.*

Plaintiffs argue that even if the statute of limitations would otherwise have run, their action was timely filed because it was tolled by Metz. According to Plaintiffs, Metz was filed as a proposed class action and they fell under the stated class definition, therefore the statute of limitations on their claims in this case should be tolled [*46] from the date of the Metz filing until the class certification request was denied in March of 2009. This would effectively toll the running of the statute of limitations for nearly four years, and would save the claims from a summary dismissal on statute of limitations grounds. Generally, the filing of a class action does toll the statute of limitations as to all putative class members.

See *Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538, 554, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974)*; *Crown Cork & Seal Co. v. Parker, 462 U.S. 345, 349, 103 S. Ct. 2392, 76 L. Ed. 2d 628 (1983)*. There are, however, exceptions to this general rule that prevent its application in this case. Primarily, the general rule does not apply when a plaintiff chooses to file an independent action without waiting for a determination on class certification in the previously filed suit. See *Wyser-Pratte Mgmt. Co. v. Telxon Corp., 413 F.3d 553, 568 (6th Cir. 2005)*. The instant action was filed in September of 2008, nearly six months prior to the March 2009 class certification determination in Metz. Therefore, the exception applies, and the filing of the Metz case did not toll the applicable statute of limitations for these Plaintiffs in this action. For these reasons, Counts Two through [*47] Five, and Count Nine of the Amended Complaint, were filed after the expiration of the applicable statute of limitations, and they are dismissed as untimely.

## IV. Substantive Arguments for Dismissal of the Common Law Claims

A. Counts Two through Five - Fraud, Fraudulent Concealment, and Conspiracy to Commit Fraud (Depositary Banks)

1. Fraud

Under Ohio law, the elements of fraud are: (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying on it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance. See *Cohen v. Lamko, Inc., 10 Ohio St. 3d 167, 10 Ohio B. 500, 462 N.E.2d 407, 409 (Ohio 1984)*. Under *Federal Rule of Civil Procedure 9(b)*, an allegation of fraud must be stated with particularity. At a minimum a party must allege "the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the [*48] defendants; and the injury resulting from the fraud." *Michaels Bldg. Co. v. Ameritrust Co. N.A., 848 F.2d 674, 679 (6th Cir. 1988)*.

The allegations underlying the fraud-based claims against the Depositary Banks stem from the fact that

2009 U.S. Dist. LEXIS 51858, *48; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

these Defendants accepted checks written by the Plaintiffs for deposit in accounts opened by Carpenter in the name of Serengeti and Lomas, and in some cases from the fact that interest checks, redemptions and refunds were paid to some Plaintiffs from those accounts. Plaintiffs basically contend that simply allowing these accounts to exist and operate was tantamount to a representation to the Plaintiffs that Serengeti and Lomas were legitimate companies that were "performing substantial economic activity." Plaintiffs further allege that this "representation" was false. As a matter of law, however, a depositary bank makes no representation to the drawer of a check simply by accepting that check for deposit. See *G.F.D. Enterprises, Inc., 37 Ohio St.3d at syl. P5, 525 N.E.2d at 12 (1988)*("the presentment and transfer warranties made by a depositary bank in obtaining or transferring an instrument pursuant to *Ohio Revised Code § 1304.13* (*UCC § 4-207*) do not run [*49] to the drawer of such instrument."). Further, the mere existence of a bank account, without more, is not a representation by a bank to the general public that the name on the account accurately indicates the true owner of the account, or that the owner of the account is a legitimate, trustworthy, economically sound entity.

There are no allegations that employees of the Depositary Banks had any actual contact or communication with any of the Plaintiffs (in their role as a Depositary Bank) or that they made any actual statement or other representation (false or otherwise) to any of the Plaintiffs. [29] Consequently, there are also no allegations as to the identity of the person(s) allegedly making a misrepresentation, or the time or place of the alleged misrepresentation as required under the pleading standards for fraud. [30]

> [29] The only allegations of a supposed misrepresentation don't even extend to all of the Plaintiffs. The Amended Complaint states: "Still other Plaintiffs received clearly marked bank stamps on the back of their returned investment checks that made it appear that their checks had been deposited into a bank account entitled Lomas or Serengeti." (Amended Complaint at 15-16) [*50] (emphasis added). Further, although it later alleges "these indicia of legitimate economic activity [were] ... supplied by the Defendant depositary banks," this statement does not clearly allege which banks, if any, returned checks to which Plaintiffs, which banks, if any,

stamped the checks, or what information the stamps actually conveyed.

> [30] As to Huntington Bank, the Amended Complaint alleges only that "representations originated at the branches where the accounts were opened and were directed to the victims at their residences or places of business." (Amended Complaint at 54). This allegation is far too vague to satisfy the pleading requirements for fraud. It does not provide the Defendants with adequate information upon which to base a defense as there is no identification of a person making the alleged representation or receiving the alleged representation, or any information that would allow the Defendants to determine how the alleged representation was communicated or where each Plaintiff received the alleged representation.

As to Fifth Third, Wachovia, and Sun Trust, Plaintiffs allege that misrepresentations were communicated through bank statements sent by the Plaintiffs' Drawee [*51] Banks to the Plaintiffs. The Depository Banks cannot be liable for a representation or communication made by a wholly independent entity (the Plaintiffs' Drawee Bank) to the Plaintiffs, whether or not the statement was false. Further, there is no allegation that the bank statements sent by the Drawee Banks actually contained any false information whatsoever.

Plaintiffs have also failed to plead any facts that would support the allegation that they "justifiably relied" on the Depositary Banks' alleged misrepresentations. By the time the checks were cashed and deposited into the suspect accounts, and certainly before Plaintiffs received cancelled checks or bank statements showing that this had been accomplished, the Plaintiffs had already written the checks to Serengeti and/or Lomas, and had already given those checks to James Carpenter (either directly or through a broker/agent), thereby entering into and memorializing an obligation to those entities. Plaintiffs allege no further act (or failure to act) that they entered into in reliance on the Bank's alleged "misrepresentations." The Amended Complaint, therefore, fails not only to plead a cause of action for fraud with the specificity [*52] required by *Fed. R. Civ. P. 9(b)*, [31] but also, because there are no allegations of an actual representation by the Depositary Banks to the

2009 U.S. Dist. LEXIS 51858, *52; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

Plaintiffs, and no factual allegations supporting the element of justifiable reliance, it fails to state a claim upon which relief can be granted. See generally, *Bender v. Southland Corp., 749 F.2d 1205 (6th Cir. 1984).*

> 31  The only argument Plaintiffs put forth in their Response to the Defendants' Motion to Dismiss to counter this finding is that their "amended complaint is 67 pages long" and "shorter books have won Nobel prizes for literature." (Response at 42). This is an inane argument: it should go without saying that the length of a Complaint bears no relation to its legal sufficiency.

### 2. Fraudulent Concealment

Fraudulent concealment requires more than mere non-disclosure. See *Arbor Village Condominium Assoc. v. Arbor Village, Ltd., 95 Ohio App.3d 499, 510, 642 N.E.2d 1124 (Ohio App. 1994).* In order to plead fraudulent concealment, a plaintiff must allege both a wrongful failure to disclose certain information, and a duty to disclose that information. See *Birkett Williams Ford, Inc. v. East Woodworking Co., 8 Ohio App.3d 231, 234, 8 Ohio B. 304, 456 N.E.2d 1304 (8th Dist. 1982)*; *Federated Mgmt. Co. v. Coopers & Lybrand, 137 Ohio App. 3d 366, 383, 738 N.E.2d 842, 854 (Franklin App. 2000)*; [*53] see also, *Steinfels v. Ohio Dept. Of Commerce, 129 Ohio App. 3d 800, 807, 719 N.E.2d 76, 82 (Franklin App. 1998).* The duty to disclose arises only when one party has information "that the other [party] is entitled to know because of a fiduciary or other similar relationship of trust and confidence." *State v. Warner, 55 Ohio St.3d 31, 59, 564 N.E.2d 18, 39 (1990)*(citing *Chiarella v. United States, 445 U.S. 222, 224-225, 100 S. Ct. 1108, 63 L. Ed. 2d 348)(1980))*; see also, *Federated, 137 Ohio App.3d at 384.* Nowhere in the Amended Complaint do the Plaintiffs allege a fiduciary or other trust relationship that would give rise to a duty to disclose by the Depositary Banks, and nowhere in their Response to the motions to dismiss do Plaintiffs cite any law that would indicate that such a duty exists based on the facts and circumstances alleged in this case. [*52] Plaintiffs claim for fraudulent concealment, must, therefore, be dismissed.

> 32  Generally courts have held that a depository bank does not owe any duty to a non-customer. See, e.g., *Conder v. Union Planters Bank, N.A.., 384 F.3d 397, 399-400 (7th Cir. 2004).*

### 3. Conspiracy to Commit Fraud

Ohio law defines civil conspiracy as "a malicious combination of two or more persons to [*54] injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins. Co., 72 Ohio St. 3d 415, 1995 Ohio 61, 650 N.E.2d 863, 866 (1995)*(citations omitted). The elements of this claim include: (1) a malicious combination; (2) involving two or more persons; (3) injury to person or property; and, (4) the existence of an unlawful act independent from the actual conspiracy." *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.., 219 F.3d 519, 534 (6th Cir. 2000)*(quoting *Universal Coach, Inc. v. New York City Trans. Auth. Inc., 90 Ohio App. 3d 284, 629 N.E.2d 28, 33 (Ohio Ct. App. 1993).*

The alleged fraud perpetrated by James Carpenter is the unlawful act upon which the conspiracy claim is based. The Amended Complaint, however, does not allege any facts that would even imply that the Depositary Banks, Fifth Third, Wachovia or Sun Trust "shared in the conspiratorial objective" of James Carpenter's fraud. [33] Even if the Amended Complaint sufficiently alleged knowledge of the alleged fraud, or recklessness in failing to discover the fraud, this does not equate to a shared objective to commit the fraud. As the first element of a conspiracy charge has not been properly alleged, the Plaintiffs [*55] have failed to state a claim for civil conspiracy in Counts Three through Five of the Amended Complaint.

> 33  Plaintiffs allegation that "unknown employees. . . maliciously conspired with Carpenter. . ." is insufficient to satisfy the pleading requirements for conspiracy to commit fraud. The information states no actual facts, and is far too vague to allow the Defendants to investigate and defend themselves against the charge.

Because additional facts were alleged against Huntington Bank, the element of "malicious combination" may, however, have been sufficiently asserted against that Defendant. Nonetheless, Plaintiffs claim fails as against this Bank, as well. The allegations supporting the element of "malicious combination" in Count Two against Huntington Bank are based on the fact that James Carpenter's daughter, Ashley Carpenter, opened the accounts at issue in that Count. The Amended

Case: 1:08-cv-02755-DCN  Doc #: 322-7  Filed:  06/01/15  63 of 99.  PageID #: 16370

Page 16

2009 U.S. Dist. LEXIS 51858, *55; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

Complaint alleges that she knew of her father's prior convictions and that she was aware of his intent to use these accounts to perpetrate a fraud. The Amended Complaint also alleges that Ashley Carpenter performed these actions in her capacity as an employee of FNB (the predecessor to Huntington). Ashley [*56] Carpenter's alleged involvement in the fraud, in fact, was so prominent that she was personally sued for her involvement in the earlier Posen case. That case settled, and the settlement was approved as a class settlement. [34] Because the current Plaintiffs were all included under the definition of the class in Posen, any claims they may have had against Ashley Carpenter were settled and released in that action.

[34]   The release language applicable to Ashley Carpenter reads as follows: "Plaintiffs, on behalf of themselves and their devisees, heirs, executors, administrators, insurers and insureds, do hereby forever release, acquit and discharge Defendants form any and all claims, liens, demands, obligations, judgments, actions, causes of action and liabilities whatsoever (except as specified herein)... arising from the Investments or the Dispute. Plaintiffs agree to cease and desist from further prosecution of any claims and defenses against Defendants in connection with the Investments or Dispute." (Posen Journal Entry at 7). The "Investments" were defined as the promissory notes plaintiffs had purchased in Serengeti and Lomas from 1997 to 1999, and the "Dispute" was defined as the dispute [*57] relating to those investments. (Id. at 2).

Under Ohio law the release of Ashley Carpenter in the Posen case also extinguishes any claim against Huntington Bank that arises under a theory of (successor) vicarious liability. "[T]he release of a party who is primarily liable operates also as a release of any party who was only secondarily liable." *Niemann v. Post Industries, Inc., 68 Ohio App. 3d 392, 396, 588 N.E.2d 301, 303 (Ohio Ct. App. 1991)*(citing *Bello v. Cleveland, 106 Ohio St. 94, 1 Ohio Law Abs. 10, 1 Ohio Law Abs. 311, 138 N.E. 526 (Ohio 1922)*); see also, *Losito v. Kruse (1940), 136 Ohio St. 183, 188, 24 N.E.2d 705*, headnote 18("A settlement with and release of the servant will exonerate the master."); *Divine Tower Int'l Corp. v. Kegler, Brown, Hill & Ritter Co., L.P.A., 2007 U.S. Dist. LEXIS 65078, at **22-24; Munson v. United States, 380 F.2d 976, 977-980 (6th Cir. 1967)*; *Mickowski v.*

*Visi-Trak Worldwide, LLC, 321 F.Supp.2d 885, 897 (N.D. Ohio 2004)*("[T]he release of the primary tortfeasor releases the secondary tortfeasor, where the theory against the secondary tortfeasor is vicarious liability."); *Radcliffe v. Mercy Hosp. Anderson, 1997 Ohio App. LEXIS 1997, at *3-5* (release of the primary tortfeasor "necessarily [*58] extinguished" any secondary liability); *Wells v. Spirit Fabricating Ltd., 113 Ohio App. 3d 282, 291-294, 680 N.E.2d 1046 (1996)*(where liability is based on *respondeat superior*, release of the primary tortfeasor releases the secondary liability); *Havens-Tobias v. Eagle, 2003 Ohio 1561, 2003 Ohio App. LEXIS 1512 (2nd Dist. Ohio 2003)*.

Plaintiffs argue that this common law rule was superceded by *Ohio Revised Code § 2307.28*. The argument is without merit. *Ohio Revised Code § 2307.28* applies only when there are joint or multiple tortfeasors, each contributing to the harm incurred. It has no application to employer or secondary liability where the only theory of liability is vicarious liability or *respondeat superior*, and the employer is alleged to be acting through the employee rather than in concert with her.

Plaintiffs further argue that Huntington's liability is based not only on *respondeat superior*, but, because a corporation can only act through its employees, officers, and agents, Ashley's knowledge and intent is imputed to her employer and they are directly liable as well. Plaintiffs also argue in their Response to the Defendants' Motions to Dismiss that after Ashley Carpenter assisted her father in setting up the allegedly [*59] fraudulent accounts, her employer ratified that fraud. The Amended Complaint makes no allegation or suggestion of ratification. Plaintiffs offer no facts or other explanation of what acts FNB or its successors took to ratify the alleged fraud. [35] To the contrary, the facts alleged in the Amended Complaint show that once notified of irregularities in the accounts, FNB took action to close the accounts and discontinue doing business with Mr. Carpenter. (Amended Complaint at 54-55). Plaintiffs, therefore, have failed to allege any facts that would support the claim that FNB (or Huntington) ratified the actions of Ashley Carpenter. The Amended Complaint appears to allege no basis for liability against Huntington, except through vicarious liability for the actions of its predecessor's employee, Ashley Carpenter. As these claims are barred by the settlement and release in Posen, they must be dismissed.

Case: 1:08-cv-02755-DCN  Doc #: 322-7  Filed:  06/01/15  64 of 99.  PageID #: 16371

Page 17

2009 U.S. Dist. LEXIS 51858, *59; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

35  They do allege that "Huntington earned fees and interests" from the accounts, however there is no allegation that these alleged fees stemmed from anything other than the banks's ordinary course of business. There is no allegation that they shared in proceeds from the alleged fraud or otherwise  [*60] received higher or additional fees because of the alleged fraud. (Amended Complaint at 19).

B. Count Eight - Money Had and Received (Depositary Banks)

Even if the common law claim for money had and received had not been supplanted by the UCC, and wasn't barred by the applicable statute of limitations, this Count of the Amended Complaint would have to be dismissed for failure to state a claim upon which relief could be granted. The common law claim for money had and received is a quasi-contractual claim akin to unjust enrichment. It is an equitable action based on a moral obligation to make restitution where a retention of benefits bestowed would result in injury and injustice. See *National City Bank, Norwalk v. Stang, 84 Ohio App. 3d 764, 766, 618 N.E.2d 241 (Huron Cty. 1992)*. The Amended Complaint, however, makes no allegation that Plaintiffs bestowed a benefit on the Depositary Banks. There are no allegations of a quasi-contractual relationship between Plaintiffs and the Depositary Banks, nor is there any allegation that the Banks retained any money given to them by the Plaintiffs.

C. Count Nine - Aiding and Abetting in James Carpenter's Tortious Activity (Depositary Banks)

Contrary to the arguments  [*61] of the Depositary Banks, the Sixth Circuit has recognized "aiding and abetting" as a common law claim under Ohio law. *Aetna, 219 F.3d at 533-34*. In Aetna, the court held that "the Supreme Court of Ohio would recognize aiding and abetting liability if squarely faced with the issue." Id. As this Court is bound by Sixth Circuit precedent, aiding and abetting is presumed to be a valid cause of action.

Aiding and abetting has two main elements: (1) knowledge that the primary party's conduct is a breach of duty and, (2) substantial assistance or encouragement to the primary party in carrying out the tortious act. *Id. at 533*. The knowledge element for aiding and abetting can only be satisfied by actual knowledge; constructive knowledge does not suffice. *Id. at 536*. Circumstantial

evidence of knowledge, however, is sufficient to allow an inference of knowledge on the part of the defendant. *Id. at 535*.

The Sixth Circuit has adopted the position that atypical banking transactions may be sufficient to imply the level of knowledge necessary to support an aiding and abetting claim. *Id. at 536* (citing *Camp v. Dema, 948 F.2d 455, 459 (8th Cir. 1991); Woodward v. Metro Bank of Dallas, 522 F.2d 84, 97 (5th Cir. 1975)).  [*62] Because the Amended Complaint alleges that the Banks' failed to follow their own policies or industry standards in setting up the Serengeti and Lomas accounts for James Carpenter, they have arguably pled enough to infer knowledge of Mr. Carpenter's alleged wrongdoings, and to avoid dismissal on this basis, at this stage of the litigation. 36

36  The Amended Complaint charges that "all four (4) of the depositary banks that are defendants in this case had internal security measures designed to prevent such activity. On the belief or knowledge of the Plaintiffs, all of them negligently, recklessly and or knowingly violated their internal security measures while laundering money for Carpenter. On the belief and knowledge of the Plaintiffs, these internal security measures had become the industry standard by the years 1998 and 1999. . . ." (Amended Complaint at 12). However, it is disputable whether or not Plaintiffs even believed that any of the Depositary Banks besides Huntington is actually liable for "knowingly" participating in the fraud. (See Amended Complaint at 14)("The Plaintiffs never knew that the actual cause of their loss was that the depositary banks had negligently, recklessly  [*63] and in at least one case knowingly turned their money over to Carpenter. . . .").

To prove substantial assistance, Plaintiffs must show that "the secondary party proximately caused the violation, or, in other words, that the encouragement or assistance was a substantial factor in causing the tort." *Aetna at 537* (quoting *K&S Partnership v. Continental Bank, N.A., 952 F.2d 971, 979 (8th Cir. 1991)).* The following factors are relevant in determining whether the assistance was substantial enough to justify imposing liability: (1) the nature of the act encouraged; (2) the amount of assistance given by the defendant; (3) his

Case: 1:08-cv-02755-DCN Doc #: 322-7 Filed: 06/01/15 65 of 99. PageID #: 16372

Page 18

2009 U.S. Dist. LEXIS 51858, *63; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

presence or absence at the time of the tort; (4) his relation to the other; and, (5) his state of mind. *Restatement (Second) of Torts §876(b), comment d.* The first factor certainly weighs in favor of an aiding and abetting charge. The allegations of fraud against the Plaintiffs involved a premeditated, long standing, and well organized fraud that inflicted substantial harm on a large number of victims.

With regard to the remaining factors, the allegations against Fifth Third, Wachovia, and Sun Trust are that these banks opened accounts for James Carpenter in the name of [*64] Serengeti and Lomas, that they processed checks written by Plaintiffs, depositing their proceeds in the above accounts, and that they allowed checks to be written from those same accounts. No other participation or assistance is alleged. Other courts have found that merely allowing a tortfeasor to use a bank account as part of the means of perpetrating a fraud is insufficient to support the element of substantial assistance for an aiding and abetting charge against the bank. See *Williams v. Nank Leumi Trust Co., 96 Civ. 6695, 1997 U.S. Dist. LEXIS 7538. *14 (S.D.N.Y. May 30, 1997)*(finding no substantial assistance where principal opened several accounts at depository bank and used accounts to further the principal's fraud).

The Amended Complaint alleges no special relationship between these Depositary Banks and James Carpenter; makes no allegation that any agent of the bank was present when the underlying fraud was perpetrated; and, does not allege any intent on the part of the bank to assist in the alleged fraud perpetrated by Mr. Carpenter, to harm the plaintiffs, or to profit from the alleged fraud. [37] Thus, four out of the five factors to be considered in determining whether there [*65] is substantial assistance weigh against such a finding as against Fifth Third, Wachovia, and Sun Trust. Without a finding of substantial assistance, there can be no liability for aiding and abetting. Therefore, even if it were not barred by the applicable statute of limitations, Count Nine would be dismissed as against Defendants Fifth Third, Wachovia, and Sun Trust. [38]

> 37 There is an allegation that they profited by opening and maintaining the accounts at issue, but these profits stemmed only from the banks's ordinary course of business. There is no allegation that they shared in proceeds from the alleged fraud or otherwise received higher or additional

fees because of the alleged fraud. (Amended Complaint at 19).

38 The allegations against Huntington Bank also include additional facts that would show a special relationship between the employee who opened the accounts at their predecessor in interest, and James Carpenter. The employee, Ashley Carpenter is James Carpenter's daughter. This relationship alters the balance of the factors considered in determining whether there was substantial assistance. The Court need not decide whether this would otherwise save the aiding and abetting [*66] claim from dismissal because, as set forth above, the claim is untimely, and those claims based solely on vicarious liability for the acts of Ashley Carpenter are barred by the settlement and release in Posen.

There are additional factual allegations against Huntington (as successor to FNB). The Amended Complaint alleges that after discovering that the accounts opened by James Carpenter were suspect, FNB nevertheless allowed Mr. Carpenter to "withdraw the remaining stolen money." In doing so, Plaintiffs argue that FNB violated a duty to report their findings to various agencies, and facilitated the alleged fraud. It is possible that, if this claim had been timely filed, these additional allegations of "substantial assistance" could have saved this claim against Huntington from summary dismissal at this stage of the litigation. [39]

> 39 Indeed, this was the result in Metz. Based on the additional allegations against Unizan Bank (the successor to FNB, and predecessor to Huntington), the aiding and abetting claim was allowed to go to trial.

**CONCLUSION**

For all of the reasons set forth above, the following motions are disposed of as indicated:

* Defendant Springs Valley Bank & Trust's Motion to [*67] Dismiss (**ECF # 90**) is **GRANTED**. All claims against Springs Valley Bank & Trust are dismissed for want of prosecution.

* Defendant Huntington National Bank's Motion to Dismiss Amended Complaint is **GRANTED**. (ECF # 120). Counts One, Two, Six, Seven, Eight, and Nine are dismissed against Huntington National Bank. There are

Case: 1:08-cv-02755-DCN  Doc #: 322-7  Filed:  06/01/15  66 of 99.  PageID #: 16373

Page 19

2009 U.S. Dist. LEXIS 51858, *67; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

no remaining claims against Huntington National Bank.

* Fifth Third Bank's Motion to Dismiss Second [sic] Amended Complaint is **GRANTED**. (ECF # 98). Counts One, Three, Six, Seven, Eight, and Nine are dismissed against Fifth Third Bank. There are no remaining claims against Fifth Third.

* Sun Trust Bank and Wachovia Bank's Motion to Dismiss is **GRANTED** in part and **DENIED** in part. (ECF # 121). Counts One, Four, Five, Six, Seven, Eight, and Nine are dismissed against Sun Trust Bank and Wachovia Bank. There are no remaining claims against Sun Trust and Wachovia.

* Bank of America's Motion to Dismiss is **GRANTED**. (ECF # 137). There are no remaining claims against Bank of America.

* Farmers & Merchants Bank of Colby's (named as Bank of Colby in the caption of the Amended Complaint) Motion to Dismiss is **GRANTED**. (ECF # 124). Farmers & Merchants Bank of Colby's (Bank of Colby) is dismissed [*68] from this action for lack of personal jurisdiction.

* Belmont National Bank, J.P. Morgan Chase Bank, N.A., Key Bank, PNC Bank National, and Sky Bank's Motion to Dismiss Amended Complaint is **GRANTED**. (ECF # 108). There are no remaining claims against Belmont National Bank, J.P. Morgan Chase Bank, N.A., Key Bank, PNC Bank National, or Sky Bank.

* Century Federal Credit Union's Motion to Dismiss Plaintiffs' Amended Complaint is **GRANTED**. (ECF # 118). There are no remaining claims against Century Federal Credit Union.

* Charter One Bank's Motion to Dismiss Amended Complaint is **GRANTED**. (ECF # 107). There are no remaining claims against Charter One Bank.

* Dollar Bank's Motion to Dismiss Plaintiff's First Amended Complaint is **GRANTED**. (ECF # 103). There are no remaining claims against Dollar Bank.

* First Merit Corporation's Motion to Dismiss is GRANTED. (ECF # 95). There are no remaining claims against First Merit Corporation.

* First National Bank of Pennsylvania's Motion is **GRANTED**. (ECF # 136). There are no remaining claims against First National Bank of Pennsylvania.

* German American Bancorp's Motion to Dismiss Amended Complaint is **GRANTED**. (ECF # 156). German American Bancorp is dismissed [*69] from this action for lack of personal jurisdiction.

* Killbuck Savings Bank and U.S. Bank National Association's Motion to Dismiss is **GRANTED**. (ECF # 96). There are no remaining claims against Killbuck Savings Bank or U.S. Bank National Association.

* Old National Bancorp's Motion to Dismiss Plaintiffs' First Amended Complaint is **GRANTED**. (ECF # 87). There are no remaining claims against Old National Bancorp.

* Sunflower Bank's Motion to Dismiss the Amended Complaint is **GRANTED**. (ECF # 97). Sunflower Bank is dismissed from this action for lack of personal jurisdiction.

* Third Federal Savings Bank's Motion to Dismiss Amended Complaint is **GRANTED**. (ECF # 99). There are no remaining claims against Third Federal Savings Bank.

* Terre Haute Savings' Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim is **GRANTED**. (ECF # 84). Terre Haute Savings is dismissed from this action for lack of personal jurisdiction.

* Wells Fargo Bank's Motion to Dismiss Plaintiffs' Amended Complaint is **GRANTED**. (ECF # 101). There are no remaining claims against Wells Fargo Bank.

* Wilson & Muir Bank's Amended Motion to Dismiss Plaintiffs' Amended Complaint is **GRANTED**. (ECF # 89). Wilson & Muir Bank [*70] is dismissed from this action for lack of personal jurisdiction.

Defendants Terre Haute Savings, Wilson & Muir Bank & Trust Co., Sunflower Bank, Farmers & Merchants Bank of Colby, and German American Bancorp are dismissed for lack of personal jurisdiction. As against the remaining banks (except First National Bank and First National Bank of Odon), Counts One, Six, Seven, and Eight are dismissed as time-barred under the three year UCC statutes of limitations. Counts Two through Five, and Count Nine are dismissed as time-barred under *O.R.C. § 1707.43(B)*. In addition,

2009 U.S. Dist. LEXIS 51858, *70; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

Counts Two through Five fail to state a claim upon which relief can be granted. Count Nine also fails to state a claim as against Defendants Fifth Third, Wachovia, and Sun Trust banks. Finally, because Defendants First National Bank and First National Bank of Odon were never served, they are dismissed from this action without prejudice. If the Plaintiffs believe that they can properly serve these Defendants, they may move the Court to reinstate this case as against these Defendants. **IT IS SO ORDERED**.

/s/ Donald C. Nugent

DONALD C. NUGENT

United States District Judge

DATED: June 18, 2009

# Tab 7



**Marine Direct, Plaintiff, v. Dougherty Marine, Inc. d/b/a Everglades by Dougherty, Defendant.**

**Case No. 2:06-cv-0100**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION**

*2007 U.S. Dist. LEXIS 1414*

**January 8, 2007, Filed**

**COUNSEL:** [*1] For Marine Direct, Plaintiff: Michael Wall Currie, LEAD ATTORNEY, Gabriel J Roehrenbeck, Thompson Hine LLP, Columbus, OH.

For R J Dougherty Associates, Inc, Defendant: Timothy Craig Sullivan, LEAD ATTORNEY, Taft Stettinius & Hollister - 1, Cincinnati, OH; Thomas J Leek, Thomas J. Leek, Attorney at Law, Daytona Beach, FL US.

**JUDGES:** Terence P. Kemp, United States Magistrate Judge.

**OPINION BY:** Terence P. Kemp

**OPINION**

OPINION AND ORDER

This diversity action is before the Court on a motion for judgment on the pleadings filed by defendant, Dougherty Marine. This case has been referred to the Magistrate Judge for full disposition under *28 U.S.C. § 636(c)*. The motion is fully briefed and ripe for consideration. For the following reasons, the motion for judgment on the pleadings will be denied.

I.

Plaintiff, Marine Direct, filed suit against Dougherty Marine alleging, *inter alia,* breach of contract, promissory estoppel, unjust enrichment, fraud, and violations of the Ohio Revised Code. Marine Direct seeks compensatory and punitive damages. On November 14, 2006, Dougherty Marine filed a motion for judgment on the pleadings arguing that under Ohio's economic-loss rule, [*2]

> [t]he damages alleged by MARINE DIRECT in its fraud claim are based on R.J. Dougherty's failure to pay MARINE DIRECT 3% commission on all orders secured by MARINE DIRECT. These damages are based on the identically alleged obligation of R.J. DOUGHERTY to pay 3% commission as part of the contract between the parties. Because these damages arise as a result of one party's alleged failure to perform a duty created in contract, such damages are purely economic loss.

> Because the damages alleged by MARINE DIRECT for the tort of fraud are ceonomic losses arising from a duty in contract and not a duty extraneous to the contract, MARINE DIRECT is prevented from recovering such economic losses under the fraud cause of action as a matter of law.

(Motion for Judgment on the Pleadings at PP7-8 (emphasis in original).) In response, Marine Direct claims that fraud is an exception to the economic-loss rule.

II.

A motion for judgment on the pleadings attacks the sufficiency of the pleadings and is evaluated under the same standard as a motion to dismiss. *Amersbach v. City of Cleveland, 598 F.2d 1033, 1038 (6th Cir.1979)*. In ruling upon such motion, the Court [*3] must accept as true all well-pleaded material allegations of the pleadings of the opposing party, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment. *Southern Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 479 F.2d 478, 480 (6th Cir.1973)*. It is with these standards in mind that the motion for judgment on the pleadings must be decided.

III.

Generally, the economic-loss rule prevents recovery in tort of damages for purely economic loss. *Corporex Dev. & Constr. Mgmt. Inc. v. Shook, 106 Ohio St.3d 412, 414, 2005 Ohio 5409, 835 N.E.2d 701 (2005)*. The rule was crafted as a balance between tort law, which was "designed to redress losses suffered by breach of duty imposed by law to protect societal interest, and contract law, which holds that 'parties to a commercial transaction should remain free to govern their own affairs.'" Id. (citing *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co., 42 Ohio St.3d 40, 42, 537 N.E.2d 624 (1989)*).

However, Ohio recognizes some exceptions to the economic-loss rule. For example, in *Haddon View Invest. Co. v. Coopers & Lybrand, 70 Ohio St.2d 154, 436 N.E.2d 212 (1982)*, the Court held [*4] that an accountant may be liable for purely economic damages based upon a theory of negligent misrepresentation, which is a tort. The Ohio Supreme Court has been careful not to expand unduly such situations, noting that the Haddon View decision allowed such recovery when there is a tort duty owed by the defendant, such as the duty not to commit accounting malpractice, that arises independently from any contractual relationship between the parties. See *Corporex Dev. & Constr. Mgmt., 106 Ohio St.3d at 415*.

Here, the parties are in privity of contract, and there is no other relationship between them which would give rise to an independent duty for Dougherty Marine to pay commissions to Marine Direct. If the claim which Dougherty Marine seeks to have dismissed were merely a tort claim for such commissions, it would indeed be barred under the economic-loss rule. However, the Court construes the claim made by Marine Direct as based upon the doctrine of fraudulent inducement.

In Ohio, in order to prove fraudulent inducement, a plaintiff must prove (a) a representation, or where there is a duty to disclose, concealment of fact, (b) which is material to the transaction [*5] at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance. *Gaines v. Preterm-Cleveland, Inc., 33 Ohio St.3d 54, 55, 514 N.E.2d 709 (1987)*. In the instant case, the complaint states:

In or about 2004, Dougherty promised and represented that Marine Direct would be Dougherty's exclusive manufacturer's representative in the Midwest and Northeast territories of the U.S.[] and that Marine Direct would receive a commission of 3% on all orders that Marine Direct secured for Dougherty boats within those territories.

When Dougherty made those promises and representations, it had absolutely no intention to fully fulfill them: Dougherty malicious scheme was to steal Marine Direct's lucrative and well-established boat dealer network.

Dougherty made its promises and representations with knowledge or utter disregard and recklessness about their falsity.

Dougherty's promises [*6] and representations were material to the parties' transaction, and they were made with the malicious intent of misleading Marine Direct into relying upon them.

Marine Direct was justified in relying

upon Dougherty's promises and representations, and did, so rely to its detriment.

(Am. Complaint PP51-55.)

Claims of fraudulent inducement appear to be sufficient to allow a party to recover purely economic loss. See, e.g., *Onyx Environmental Services, LLC v. Maison, 407 F.Supp.2d 874, 879 (N.D. Ohio 2005)*; *Miami Valley Paper, LLC v. Lebbing Engineering & Consulting GMBH, No. 1:05-CV-00702, 2006 U.S. Dist. LEXIS 76748, 2006 WL 2924779, at *4 (S.D. Ohio Oct. 10, 2006)* (unpublished) ("However, as this Court previously held in its opinion in *Cincinnati Gas & Electric Company, et al. v. General Electric Company, et al.,* the economic loss rule does not preclude a claim of fraudulent inducement") (citation omitted). Indeed, in most cases where fraudulent inducement is claimed, the alleged losses are purely economic. See, e.g., *Noth v. Wynn, 59 Ohio App. 3d 65, 571 N.E.2d 446 (1st. Dist. 1988)* (discussing claim for fraudulent inducement to purchase real property). In such [*7] a case, the plaintiff is seeking to recover damages apart from the mere loss of the bargain reached for a specified payment. Thus, the rule that "when the promisee's injury consists merely of the loss of his bargain, no tort claim arises because the duty of the promisor to fulfill the term of the bargain arises only from the contract" is inapplicable, and the duty breached is one which is owed to the plaintiff "independently of the contract." *Battista v. Lebanon Trotting Ass'n, 538 F.2d 111, 117 (6th Cir.1976).* Although Marine Direct may not directly recover the unpaid commissions based upon a tort theory, if it can prove fraud in the inducement of the contract, it would be entitled to whatever amount of damages were proximately caused by that fraud, even if the damages were purely economic.

IV.

Based on the foregoing reasons, R.J. Dougherty's motion for partial judgment on the pleadings (doc. # 17) is DENIED.

/s/ Terence P. Kemp

United States Magistrate Judge

# Tab 8



**PARMA COMMUNITY GENERAL HOSPITAL, Plaintiff, v. PREMIER ANESTHESIA OF PARMA, et al., Defendants.**

**CASE NO. 1:09 CV 325**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION**

*2011 U.S. Dist. LEXIS 11035*

**February 4, 2011, Decided**
**February 4, 2011, Filed**

**PRIOR HISTORY:** *Parma Cmty. Gen. Hosp. v. Premier Anesthesia of Parma, 2011 U.S. Dist. LEXIS 3006 (N.D. Ohio, Jan. 12, 2011)*

**COUNSEL:** [*1] For Parma Community General Hospital, Plaintiff, Counter-Defendant: Amanda J. Martinsek, Marquettes D. Robinson, Thacker Martinsek - Cleveland, Cleveland, OH.

For Premier Anesthesia of Parma, Defendant: Daniel G. Schulof, James F. Bogan, III, LEAD ATTORNEYS, Kilpatrick Stockton - Atlanta, Atlanta, GA; David R. Mayo, L. Jason Blake, Tamara L. Karel, Benesch, Friedlander, Coplan & Aronoff - Cleveland, Cleveland, OH.

For Premier Anesthesia Associates LLC, Premier Anesthesia Consultants, Locumtenens.com LLC, Defendants: David R. Mayo, L. Jason Blake, Benesch, Friedlander, Coplan & Aronoff - Cleveland, Cleveland, OH; James F. Bogan, III, Kilpatrick Stockton - Atlanta, Atlanta, GA.

For Premier Anesthesia of Parma, Counter-Claimant: David R. Mayo, L. Jason Blake, Tamara L. Karel, Benesch, Friedlander, Coplan & Aronoff - Cleveland, Cleveland, OH; James F. Bogan, III, Kilpatrick Stockton - Atlanta, Atlanta, GA.

**JUDGES:** DONALD C. NUGENT, United States District Judge.

**OPINION BY:** DONALD C. NUGENT

**OPINION**

MEMORANDUM OPINION AND ORDER

This matter is before the Court on *Defendant's Motion for Partial Summary Judgment On the Enforceability And Meaning of Settlement Agreement, and Supporting Memorandum of Points and Authority (ECF* [*2] *#76); Defendant's Motion For Summary Judgment On Plaintiff's Unjust Enrichment and Fraud Claims, and Supporting Memorandum of Points and Authorities (ECF # 75); and, Plaintiff Parma Community General Hospital's Motion for Summary Judgment on Defendant's Counterclaim.* (ECF # 72). There has been a Response to each motion, and each party has filed a Reply in support of its own motion(s). (ECF # 92, 91, 93, 97, 96, 95). The issues have been fully briefed and are now ripe for consideration.

**STANDARD OF REVIEW**

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material

2011 U.S. Dist. LEXIS 11035, *2

fact and that the moving party is entitled to a judgment as a matter of law." *FED. R. CIV. P. 56(c)*. The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)* [*3] (citing *FED. R. CIV. P. 56(c)*). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc., 48 F.3d 937, 941 (6th Cir. 1995)* (citing *Celotex, 477 U.S. at 322*). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis, 57 F.3d 476, 479 (6th Cir. 1995)* (citing *Anderson, 477 U.S. at 252*). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson, 477 U.S. at 249-50* [*4] (citations omitted). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id. at 252*.

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmover. The nonmoving party may not simply rely on its pleadings,

but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp., 53 F.3d 146, 149 (6th Cir. 1995)*. *FED. R. CIV. P. 56(e)* states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the [*5] need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson, 477 U.S. at 250*.

## FACTUAL BACKGROUND[1]

> 1   The factual summary is based upon agreed or unchallenged facts set forth in the parties' statements of facts. Those material facts that are controverted and have support on both sides, as established by deposition testimony, affidavit, or other appropriate evidence are stated in a light most favorable to the non-moving party.

The Complaint alleges that on April 5, 2005, Parma Community General Hospital ("Parma") and Premier Anesthesia of Parma ("Premier") entered into an agreement by which Premier would be the exclusive provider of anesthesia services at Parma for two years ("the Agreement"). The parties subsequently agreed to extend the term of the Agreement through the end of December in 2007. (ECF #11, ¶¶ 4, 5).

Article IV of the Agreement sets forth the parties' rights and obligations with respect to the final profits or losses that would result from a reconciliation of the practice-related expenses and revenues incurred by or

collected [*6] by Premier. Specifically, section 4.5. sets forth the procedures for a final accounting at the termination of the Agreement. [2] The Agreement also gave Premier non-compete rights that prohibited its health care providers from working at Parma for two years after Parma's termination of the Agreement. On November 12, 2007, Parma informed Premier that it was terminating the Agreement, effective December 31, 2007. (ECF # 77, Ex. B). As of December 3, 2007, there remained outstanding invoices from August, September, and October, which Premier considered to be in default. In order to resolve the default and avoid any issues stemming from an early termination of the contract, Premier proposed a settlement that would resolve the default issues and address the non-compete restricting Parma's ability to hire the current anesthesia staff following the termination of the agreement. [3] The proposed settlement agreement contained the following terms:

> 1. Parma immediately pays [Premier's] invoices for August, September, and October;

> 2. [Premier's] invoices for November and December, 2007, will be part of a final settlement;

> 3. In February 2008, [Premier] will give Parma [Premier's] calculation of all [*7] collections received and costs incurred by [Premier] since contract inception (April 1, 2005) through and ending December 31, 2007. The $590,500 deposit will be treated as a [Premier] collection in this calculation. After Parma's review of [Premier's] calculation, we will settle with a payment to or from Parma per the calculation. This procedure will supercede the procedure in our contract.

> 4. [Premier] will release the providers noted above from their contract restrictions from working for Parma.

2    This section applies if the contract is terminated after the first year. The contract was in effect for more than two years.

3    These two issues, the handling of the November and December invoices, and the procedures for settlement at termination are the only issues specifically resolved or altered by the settlement agreement. As there was no general waiver or release included in the agreement, the right to pursue alleged breaches of the original contract not related to the August 2007 through December 2007 invoices, the non-compete, or the procedures for settlement at termination are not affected by this settlement.

On the very next day, Parma's General Counsel responded to the proposal stating: [*8] "Your December 3rd proposal is accepted," and indicating that a check for outstanding invoices would be sent by December 7, 2008. Pursuant to the agreement [4] Premier sent its calculation to Parma, concluding that Parma owed Premier approximately $360,141. [5] Parma spent several months reviewing the calculation and concluded that Premier owed Parma $339,326.96.

4    Parma argues that the calculation was not sent until May of 2009, three months after the agreed submission date from the December 3, 2008 letter

5    This is reduction in the amount originally claimed by Premier. Premier's expert witness determined that this was the appropriate amount, and Premier modified its demand to correspond to the amount determined by its expert.

Premier's final calculation contained previously un-billed charges of approximately $290,000 for temporary staff costs, known by the parties as "locum tenens" expenses. Parma's expert concluded that these expenses appeared to be for bona-fide expenses actually incurred. The parties do not dispute that they were incurred in 2006, or that they were not billed or otherwise revealed to Parma until 2008. Because the parties could not reach an agreement on the final reconciliation, [*9] Parma filed its Complaint in the Cuyahoga County Court of Common Pleas. Premier timely removed the action to this Court. (ECF #1). The Complaint alleges three counts: (1) breach of contract, (2) unjust enrichment, and (3) fraud. Premier then filed a counterclaim for breach of contract, based on an alleged breach of the terms set forth in the December 3, 2008 letter.

## ANALYSIS

A. Defendant's Motion for Summary Judgment on

Case: 1:08-cv-02755-DCN  Doc #: 322-7  Filed:  06/01/15  76 of 99.  PageID #: 16383

Page 4
2011 U.S. Dist. LEXIS 11035, *9

Plaintiff's Claims for Unjust Enrichment and Fraud

Premier seeks to have this Court dismiss Plaintiff's Unjust Enrichment and Fraud claims as a matter of law, arguing that the claims in this case stem from a dispute over contractual terms, and therefore cannot give rise to claims for unjust enrichment or fraud. Under Ohio law claims for unjust enrichment are not allowed where an express contract governs the transactions at issue, and claims for fraud are not permitted when the damages resulting from the alleged fraud are not distinct from the damages available under a breach of contract claim. *See generally Ullmann v. May, 72 N.E.2d 63, 63, 147 Ohio St. 468, 468 (1947); Corporex Dev. & Constr. Mgt., Inc. V. Shook, Inc., 835 N.E.2d 701, 704, 106 Ohio St. 3d 412, 414, 2005 Ohio 5409 (Ohio 2005).*

The [*10] Amended Complaint bases the unjust enrichment claim on allegations that Premier charged unreasonable fees for locum tenens expenses, and engaged in self-dealing by retaining profits from the excess fees for itself or its affiliates. However, the Agreement specifically includes terms that require fees be reasonable and competitive. Therefore, the reasonableness of the fees is an issue that can be raised under the terms of the contract, and unjust enrichment is not an appropriate cause of action to address this allegation. As to the charge of self-dealing, this allegation, even if true, does not give rise to a claim absent a relationship that would create a duty against it. There are no allegations that the parties had a fiduciary relationship, or any other relationship involving a heightened level of trust. Their relationship was defined solely by the terms of the contract. Therefore, if any duty against self-dealing were imposed, it would be created by the contract, and would properly be addressed through a breach of contract claim, and not by way of an unjust enrichment claim.

In so far as Parma's unjust enrichment claim may be based on specific representations made during the negotiation [*11] of the Agreement, and included in the Agreement, those claims parallel the breach of contract claim, and cannot be the basis for a claim of unjust enrichment. "Ohio law does not recognize an equitable claim for unjust enrichment, as a matter of law, when an express contract covers the same subject matter." *Davidson v. Davidson, No. 17-05-12, 2005 Ohio 6414, 2005 WL 3274853, *5 (Ohio Ct. App. 2005)*(citing *Ullman v. May, 72 N.E.2d 63, 147 Ohio St. 468 1947).*

Consequently, any unjust enrichment claim for the use of locum tenens providers after the first year, allegedly in violation of representations made in negotiations and in Section 4.4.2 of the Agreement are dismissed as a matter of law. Any breach of contract claims based on an alleged violation of this section, however, remain viable causes of action.

Further, Parma's claim that Premier concealed more than $290,000 in order to induce Parma into continuing its contract with Premier and to enter into a settlement agreement with regard to other disputes, does not satisfy the elements of an unjust enrichment claim. There is no allegation that expenses were paid for services not rendered. Therefore, the allegations do not support an [*12] unjust enrichment claim. Further, as there is no dispute that services were rendered, the only challenge to the legitimacy of the charges that could arise would have to come from the contractual terms addressing when locum tenens staff were allowed to be used, or what procedures had been agreed to with regard to how the charges would be calculated, when they would be disclosed or reported, and how they were to be allocated between the parties. Therefore, Defendant's Motion for Summary Judgment on the Plaintiff's unjust enrichment claims is granted.

With regard to the fraud claim, Parma contends in the Amended Complaint that Premier committed fraud by promising to obtain required staffing when it had no intention of doing so, and by engaging in self-dealing by upcharging provided services and pocketing the profit. Parma's fraud claims all stem from Premier's alleged failure to satisfy the terms of the contract, [6] and the damages stemming from the fraud allegations would mirror those damages sought under Parma's breach of contract claims. Further, with regard to the allegations of self-dealing, as set forth above, Parma has provided no basis for a duty that would prohibit such activity, [*13] outside of the duty allegedly created by the contract itself, and has admitted as much in its Opposition. (ECF # 91, pg. 5). Therefore, the "economic loss" doctrine bars Parma from pursuing damages through a cause of action for fraud. *See, e.g., Ketcham v. Miller, 104 Ohio St. 372, 136 N.E. 145 (1922); Wolfe v. Continental Casualty, 647 F.2d 705, 710 (6th Cir. 1981)*(Ohio law forbids parties from converting contract actions into tort actions by attacking the intentions or motives of the breaching party); *Telxon Corp. v. Smart Media of Delaware, Inc., Nos. 22098 & 22099, 2005 Ohio 4931, 05 WL 2292800*

*(Ohio Ct. App. 2005); Textron Fin. Corp. v. Nationwide Mut. Ins. Co., 684 N.E.2d 1261, 115 Ohio App.3d 137 (Ohio Ct. App. 1996).*

> 6    In fact, in its Opposition to the Motion for Summary Judgment, Parma clarifies that its allegation as to when and where the fraud took place was "under the contract". (ECF #91, pg. 6).

Aside from the allegations in the Complaint, Parma provides a new basis for its fraud claim in its Opposition to Defendant's Motion for Summary Judgment. In its Opposition, Parma raises the allegation that Premier fraudulently induced Parma into agreeing to the December settlement by [*14] failing to disclose un-billed locum tenens expenses. The remedy for the alleged fraud inducing Parma into agreeing to the December settlement would be rescission. Parma has asserted rescission as a defense to Premier's counterclaim for breach of the settlement agreement, and the validity of this defense is addressed in detail below. To the extent Parma is allowed to pursue its defense of rescission, it is also allowed to maintain an affirmative claim for fraudulent inducement of the December settlement.

To the extent that Parma may seek to assert a general claim for fraudulent misrepresentation based on the non-disclosure of the locum tenens expenses, however, that claim would be barred under the Ohio law. The contract appears to addresses when expenses must be disclosed. (ECF #91, Ex. A, Section 4.5.1.2.1. "Quarterly Reconciliation"). Therefore, any damages relating to the late disclosure of these charges would mirror the damages available for allegedly failing to report the expenses as required under the contract. This claim, therefore, would also be barred under the economic loss doctrine. If the contract does not determine when charges must be submitted, Parma has pointed to no [*15] basis giving rise to a duty of disclosure relating to those charges. Premier's request for Summary Judgment on Parma's fraud claims is, therefore, granted in part and denied in part.

**B.** Defendant's Motion for Summary Judgment on the Enforceability and Meaning of the Settlement Agreement

There is no dispute that Parma, through its General Counsel, accepted the settlement terms in the December 3, 2007 letter, or that Parma has benefitted to some degree from the agreement. [7] However, the parties dispute the meaning of the terms included in that

agreement. Premier argues that the December 3, 2007 letter setting forth proposed terms for a settlement between the parties is clear and unambiguous. The proposal requires Premier provide a calculation of monies allegedly owed based on "all collections received and costs incurred by [Premier] since contract inception (April 1, 2005) through and ending December 31, 2007." Premier contends that this language, on its face, clearly establishes that the calculation is to exclude any collections received after December 31, 2007, and is to include all costs incurred by Premier since April 1, 2005.

> 7    Specifically by the elimination of any non-compete restrictions [*16] placed on the anesthesia staff, and by avoiding the possibility of an early termination of the contract based on their alleged default

Parma contends that this language could be interpreted to include collections anticipated, or payable based on services performed through December 31, 2007, but not actually received by that date; and, that it should only include costs incurred by Premier over the last twelve months. Parma bases its arguments, in part, on the language and original formulas for calculation set forth in the original agreement.

The Court agrees with Premier that this language is unambiguous. The agreed basis for the calculation includes "collections received" between April 1, 2005 and December 31, 2007. There is nothing in the agreement that would suggest that "**collections received**" would include collections billed, incurred, or anticipated but NOT received. "[A] court may not delete or add words to a contract when determining the parties' rights and obligations under it." *Merz v. Motorists Mut. Ins. Co., No. CA2006-08-203, 2007 Ohio 2293, 07 WL 1394560, *6 (Ohio App. May 14, 2007); see also Kellie Auto Sales, Inc. v. Rahbars & Ritters, Ents., L.L.C., 172 Ohio App. 3d 675, 876 N.E.2d 1014, 1024, 2007 Ohio 4312 (Ohio App. 2007)* [*17] . [8] Similarly, there is absolutely nothing in the terms of this agreement to suggest that the parties did not mean to include "costs incurred" prior to December 31, 2007. The language specifically includes "costs incurred" between April 5, 2005 and December 31, 2007. Further, the agreement specifically states that the terms of the calculation are to supercede the procedures set forth in the original agreement. [9] Therefore, the Court cannot look to the language contained in procedures from the original agreement to determine the meaning of a

settlement proposal that specifically superceded those terms.

    8 Parma's argument that the word "collections" is ambiguous and could include collections anticipated but not received, even if taken as true, does not resolve the question. If the agreement had said that "collections from before December 31, 2007" were to be included in the final calculation, this argument may have held some weight. But, the clear language of the agreement states that only collections "received" by the December date are to be included. The word "received" modifies "collections" and is not ambiguous. Therefore, even if we accepted that "collections" [*18] could included "collections anticipated," the agreement would still clearly include only those anticipated collections that were actually received by December 31, 2007.

    9 A fair reading of the original contract reveals that the procedures that were superceded are those procedures relating to settlement at termination. These procedures are set forth at paragraph 4.5.2 of the original agreement.

It may very well be that Parma did not intend to agree to the terms as written. However, that is irrelevant to the enforcement of those terms. The language used is clear and unambiguous, and Parma is bound to abide by the plain language of the terms it agreed to. Although the overriding concern when interpreting a contract is to ascertain and effectuate the intention of the parties, that intent "is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med. Life Ins. Co., 509 N.E.2d 411, 413, 31 Ohio St. 3d 130, 132, 31 Ohio B. 289 (Ohio 1987).* Therefore, "evidence cannot be introduced to show an agreement between the parties is materially different from that expressed by clear and unambiguous language of the instrument." *Blosser v. Enderlin, 148 N.E. 393, 396, 113 Ohio St. 121, 134, 2 Ohio Law Abs. 499, 3 Ohio Law Abs. 389 (Ohio 1925)).* [*19] Therefore, this Court finds, as a matter of law, that the language included in the terms of the settlement agreement from December of 2007, provides that the settlement at termination shall include collections actually received between April 5, 2005 and December 31, 2007, and includes "costs incurred" by Premier between April 5, 2005 and December 31, 2007.

However, although the terms of the agreement are

unambiguous, this does not necessarily mean that the agreement is enforceable as a matter of law. Parma argues that even if the Court agrees with Premier with regard to the meaning of the December agreement, that agreement is rescindable based on Premier's alleged fraud or Parma's unilateral mistake relating to un-billed costs that were not disclosed to Parma prior to entering into the December agreement. Rescission is available to undo a contract if the contract was entered into on the basis of fraud, duress, undue influence, or mistake. *See generally Wannemacher v. Cavalier, 2004 Ohio 4020, 2004 WL 1718080, *9 (Ohio App. 3 Dist., 2004).* "The primary purpose of rescission is to return the parties to their original positions before the contract was formed." *Trajcevski v. Bell, 115 Ohio App. 3d 289, 292, 685 N.E.2d 289, 291 (1996).*

Parma [*20] alleges that Premier knew there were outstanding undisclosed charges when it made the settlement offer, and knew that Parma was unaware that these charges were outstanding when it agreed to the offer. (ECF #92). Premier argues that even if this were true, Parma has received a tremendous benefit under the agreement, and did not take timely steps to initiate rescission after learning of the allegedly concealed charges in May of 2008. Under Ohio law, a party cannot rescind a contract unless it is willing and able to return the consideration or benefit it obtained from the agreement. *See, e.g., Id., Mid-America Acceptance Co. v. Lightle, 63 Ohio App. 3d 590, 599, 579 N.E.2d 721, 727 (1989).* Further, "[t]he right to rescind a contract must be exercised with great promptness. . . . Accordingly, unreasonable delay in manifesting an election to rescind a contract may constitute a waiver of the right to rescind." *Meyers v. Hoops, 74 Ohio Law Abs. 280, 140 N.E.2d 65, 68 (Ohio App. 1955); see also Hanes v. Giambrone, 14 Ohio App. 3d 400, 405, 14 Ohio B. 518, 471 N.E. 2d 801, 807 (1984).*

There remains several questions of material fact that will need to be resolved in order to determine whether rescission is a viable defense to the [*21] enforcement of the settlement in this case. These include, but are not limited to whether Parma is willing to return the benefit of the agreement in order to effectuate a rescission; what the value of that bargain actually was; whether the existence of the undisclosed locum tenens charges was material to the settlement agreement; whether the non-disclosure of the charges was known to Premier at the time the settlement was entered into; whether Premier

intended to mislead Parma by concealing the existence of these charges; whether Parma was reasonably justified in assuming that no such charges remained un-billed; and, whether Parma timely sought rescission upon discovering the alleged fraud or mistake that led it to agree to the December settlement. Therefore, Defendant's Motion for Partial Summary Judgment On the Enforceability and Meaning of Settlement Agreement is granted with regard to the meaning of the terms included in the December 2007 agreement, and denied with regard to the enforceability of the agreement. [10] The issue of enforceability will need to be resolved at trial.

> 10  Assuming that rescission is not an available option, there would also remain a question of fact as to [*22] what the proper final reconciliation would be employing the changes to section 4.5.2 contained in paragraph three of the December settlement.

C.  Plaintiff's Motion for Summary Judgment on Defendant's Counterclaim

Parma argues that the December settlement is not enforceable because the parties agreed that they did not intend to alter the contract or effectuate a change in the value of the contract. (ECF #72, pg. 10). However, as set forth above, extrinsic evidence as to the parties' intent cannot be considered when the language of the agreement is clear and unambiguous.

Parma also argues that the December settlement cannot alter the terms of the original Agreement because the original Agreement contained specific requirements for any amendments to the Agreement. The "Amendment and Agreement Execution" and "Entire Agreement" provisions, contained in 6.13 and 6.16 respectively, provide that the Agreement could not be amended except by an agreement

> in writing and executed in multiple copies on behalf of [Parma] by any official of [Parma] specifically authorized by [Parma's] Board with respect to such execution and on behalf of [Premier] by Richard L. Jackson, CEO or his designee. Each multiple [*23] copy shall be deemed an original, but all multiple copies together shall constitute one and the same instrument.

(ECF #91, Ex. A, Section 6.13).

They also provided that "no changes in or additions to this Agreement shall be recognized unless incorporated herein by amendment as provided herein." (ECF #91, Ex. A, Section 6.16). Premier asserts that there is at least a factual question as to whether the modification requirements were met. However, whether or not specifics of the amendment requirements were met, the December settlement can be enforced. A settlement agreement resolving a contractual dispute is not bound by the terms of the contract that is in dispute. The settlement agreement is not an amendment of the original Agreement. Rather, it is a binding contract in its own right, and constitutes a written waiver of any contrary terms in the original Agreement. The parties who executed the settlement were the legal counsel of the parties, with actual authority to enter into the agreement, [11] and new consideration was provided as a basis for the agreement. Therefore, whether or not the writings containing the settlement agreement satisfied the technical requirements of sections 6.13 [*24] or 6.16 of the original Agreement, it is a binding and enforceable agreement. [12]

> 11  There is a dispute as to whether counsel had the abstract authority to change the terms of the contract, but the parties do not dispute that counsel had the authority to agree to the proposal as it was submitted. Whether the parties fully understood the consequences of the agreement is not relevant here, so long as they gave counsel the authority to enter into the agreement as written.
> 12  The enforceability of the agreement may be compromised by other defenses, but it is not unenforceable for failure to satisfy the requirements of the amendment provisions in the original Agreement.

Finally, Parma argues that even if the December settlement does supercede the requirements of the original Agreement, Parma should be allowed to rescind the settlement based on fraudulent inducement or unilateral mistake. As set forth above, there are many unresolved questions of fact that could affect whether rescission is a viable remedy in this case. Therefore, the Court cannot determine as a matter of law that rescission is an available option or that the December settlement is otherwise unenforceable based on fraudulent inducement [*25] or unilateral mistake.

## CONCLUSION

For the reasons set forth above, *Defendant's Motion For Summary Judgment On Plaintiff's Unjust Enrichment and Fraud Claims, and Supporting Memorandum of Points and Authorities* (ECF # 75) and *Defendant's Motion for Partial Summary Judgment On the Enforceability And Meaning of Settlement Agreement, and Supporting Memorandum of Points and Authority* (ECF #76) are GRANTED in part and DENIED in part. *Plaintiff Parma Community General Hospital's Motion for Summary Judgment on Defendant's Counterclaim*, (ECF # 72), is DENIED. Trial remains set for March 15, 2011 at 8:30 a.m. Trial will address Plaintiff's claim for breach of contract; Defendant's claim for breach of the December settlement agreement; and, Plaintiff's claim of fraudulent inducement (and/or defense of rescission) with regard to the December settlement. IT IS SO ORDERED.

/s/ Donald C. Nugent

DONALD C. NUGENT

United States District Judge

DATED: February 4, 2011

# Tab 9



COY PHELPS, Plaintiff, vs. RION MACCONNELL, et al., Defendants.

Case No. 3:12cv00344

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION

*2014 U.S. Dist. LEXIS 105472*

August 1, 2014, Decided
August 1, 2014, Filed

**SUBSEQUENT HISTORY:** Adopted by, Objection overruled by, Summary judgment denied by, Partial summary judgment granted by, Dismissed by, in part *Phelps v. MacConnell, 2014 U.S. Dist. LEXIS 125164 (S.D. Ohio, Sept. 8, 2014)*

**PRIOR HISTORY:** *Phelps v. Macconnell, 2013 U.S. Dist. LEXIS 110785 (S.D. Ohio, Aug. 6, 2013)*

**COUNSEL:** [*1] Coy Phelps, Plaintiff, Pro se, SPRINGFIELD, MO.

For Rion Macconnell, also known as Ryan Macconnell, Heather F Green, U.S Mint Green LTD, Defendants: Edward T Kathman, LEAD ATTORNEY, Loveland, OH; John K Limoli, LEAD ATTORNEY, PRO HAC VICE, Fairborn, Oh.

For Heather F Green, Counter Claimant: Edward T Kathman, LEAD ATTORNEY, Loveland, OH.

**JUDGES:** Sharon L. Ovington, Chief United States Magistrate Judge. District Judge Thomas M. Rose.

**OPINION BY:** Sharon L. Ovington

**OPINION**

**REPORT AND RECOMMENDATIONS**[1]

1   Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

**I. Introduction**

Plaintiff Coy Phelps is an inmate at the Springfield Federal Medical Center in Missouri.[2] He brings this case *pro se* against a company -- Defendant U.S. Mint Green, Ltd. -- that provides publishing and marketing services to inmates who have authored their autobiographies or other materials. Additional Defendants are Rion MacConnell and Heather F. Green, allegedly "members" of Defendant U.S. Mint Green.

2   In 2005, the United States Court of Appeals for the Ninth Circuit explained, "Coy Phelps [is] an insanity acquitee committed to hospitalization under *18 U.S.C. § 4243 ....*" *Phelps v. United States, 120 Fed. Appx. 744, 2005 WL 332765 (9th Cir. 2005).* [*2] For more information, see *United States v. Phelps, 283 F.3d 1176 (9th Cir. 2002).*

Plaintiff's Complaint asserts several federal claims including, for example, violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), conspiracy to violate RICO, "Copyright Infringement/False Authorship," and conspiracy to interfere with civil rights in violation of *42 U.S.C. §*

*1985(3)*. The Complaint also asserts many claims under Ohio law including, in part, breach of contract, fraudulent inducement, and conversion. Among the relief Plaintiff seeks is an award of "restitution damages" in the amount of $2,100.00 and "punitive damages in the amount of ten million tax free dollars." (Doc. #1, PageID at 58).

The case is presently pending upon Plaintiff's Motion for Summary Judgment or Judgment as a Matter of Law, which Defendant Rion MacConnell opposes, and Plaintiff's Motion to Strike Defendant Rion MacConnell's response in opposition. (Doc. #s 48, 49, 53). The case is also pending upon Defendant MacConnell's ("Defendant's") Motion for Partial Summary Judgment or Motion for Partial Judgment on the Pleadings, which Plaintiff opposes (Doc. # 51, 55), and the record as a whole.[3]

> 3  Plaintiff's [*3] Complaint was not subject to the preliminary screening mandated by *28 U.S.C. §1915(e)* because he is not proceeding *in forma pauperis*. See *Brown v. Bargery, 207 F.3d 863, 865-66 (6th Cir. 2000)*.

**II. Plaintiff's Complaint and Motion for Summary Judgment**

To place the parties' present motions in context, it suffices to incorporate the Court's present review of Plaintiff's Complaint plus a few brief observations.[4] (Doc. #s 26, 28).

> 4  Plaintiff's lengthy Complaint is approximately 40 pages with approximately 120 pages of attached exhibits.

Plaintiff's factual allegations largely concern his unsuccessful efforts to secure Defendants' help in publishing and publicizing a manuscript he wrote. He titled his manuscript "LORD NAZI" and subtitled it, "His Writings and Teachings for Racist White Supremists and True Christian Warriors of God." (Doc. #1, PageID at 95). Plaintiff alleges that pursuant to his contract with Defendants, he paid them $2,100 to perform publishing and related services, but Defendants did nothing and kept the $2,100.

In his Motion for Summary Judgment, Plaintiff restates certain allegations raised in his Complaint and supports the allegations with citations to his Complaint. (Doc. [*4] #48, PageID at 515). He then identifies the following six services he paid Defendants to perform, supported by citations to the Complaint.

> 1.  Register Domain names on the internet and get copyrights on the domain names;
>
> 2.  Send mass e-mail to radio talk show hosts and producers;
>
> 3.  Get a book, written by the plaintiff, published on amazon.com and distribute [the] books;
>
> 4.  Publish a political campaign website on the internet;
>
> 5.  Make copies of the political campaign writings and the book on computer disks and mail to plaintiff's sister in law; [and]
>
> 6.  Search for publicity agents and send them mass e-mail.

(Doc. #48, PageID at 514) (internal citations omitted). Plaintiff states that although Defendants notified him they had received his payment and performed all requested services, "defendants lied and did not provide any service that they were paid to do ...." *Id.*, PageID at 514-15.

Plaintiff's Motion for Summary Judgment next lists "OTHER FACTS." *Id.*, PageID at 515 (capitalization in original). This is a misnomer to the extent that his list contains a mixture of factual allegations and references to violations of law. Regardless, Plaintiff emphasizes that he alleges in pages two and three [*5] of his Complaint that Defendants:

> 1.  In violation of Ohio's Unfair and Deceptive Business Practices Act (*O.R.C. 3901.19 et seq.*) and
>
> 2.  In violation of Ohio State's Constitution Statement of Rights
>
> 3.  And in violation of Federal, State, Civil, and Common law
>
> 4.  Obstructed justice and onstructed [sic] an official investigation and

5. Acted in a conspiracy, and in an agreement, to aid and abet one another,

6. To operate a Criminal Racketeering Enterprise and business,

7. Utilizing criminal mail and wire fraud, misappropriation,

8. That affected intrastate and interstate commerce ....

* * *

19. To falsely induce the plaintiff to send them money

Which caused the plaintiff to

20. Suffer a loss of property and money

21. Suffer a loss of a[n] opportunity and chance to hold public office

22. Suffer a loss of revenue from a book publication

23. Suffer a loss of expected revenue from the political campaign

And the defendants substantially contributed to the plaintiff

24. Suffering a stroke

25. By the negligent and intentional infliction of emotional distress ....

(Doc. #48, PageID at 515-16).

Plaintiff argues that summary judgment in his favor is warranted because "the facts are so one sided for the plaintiff that [*6] there is no defense for the defendants." *Id.*, PageID at 513).

Under *Rule 56* a party is entitled to summary judgment when there is no genuine dispute over any material fact and when the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*; *see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *see also Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 247, 106 S. Ct. 2505,*

*91 L. Ed. 2d 202 (1986)*. When resolving whether a genuine issue of material fact exists, all reasonable inferences are drawn in the light most favorable to the non-moving party. *Richland Bookmart, Inc. v. Knox County, Tenn., 555 F.3d 512, 520 (6th Cir. 2009)* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986))*. "The function of the court in assessing a summary judgment motion is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008)* (quoting, in part, *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))*.

"Summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential [*7] to that party's case, and on which that party will bear the burden of proof at trial.'" *Seeger v. Cincinnati Bell Tel. Co., LLC, 681 F.3d 274, 281 (6th Cir. 2012)* (quoting *Daugherty, 544 F.3d at 702*); *see Celotex, 477 U.S. at 322*.

Plaintiff is not entitled to summary judgment because he has not met his initial burden to show there is no genuine dispute over an issue of material fact and that he is entitled to judgment as a matter of law. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Taft Broadcasting Co. v. United States, 929 F.2d 240, 247 (6th Cir. 1991)* (quoting *Celotex, 477 U.S. at 323*); *see Alexander v. CareSource, 576 F.3d 551, 558 (6th Cir. 2009)*. Plaintiff's Motion for Summary Judgment does not satisfy his initial responsibility. Instead, he merely restates some of his allegations, such as the services Defendants were allegedly supposed to, but failed to, provide [*8] under the terms of their contract. Neither those allegations nor his lengthy list of "OTHER FACTS" demonstrate that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law on any of his claims.

Plaintiff's Motion also fails to show that the evidence is so one-sided that a reasonable jury could only rule one way: in his favor on one or more of his claims. Where, as in the present case, "the moving party has the burden of

proof at trial -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- *his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986)* (emphasis in original) (citation omitted). "This means that, if the moving party has the burden of proof at trial, that party must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in that party's favor." *Vasquez v. City of Bell Gardens, 938 F.Supp. 1487, 1494 (C.D. Cal. 1996)* (emphasis in original) (citation omitted). Plaintiff's Motion for Summary Judgment does not connect evidence of record [*9] with the particular elements of his claims. This shortcoming fails to show that a jury could only find in his favor on one or more of his claims. He is not, therefore, entitled to summary judgment in his favor.

Plaintiff disagrees. He contends that his Motion for Summary Judgment requires Defendant "to come forward with more than a scintilla of evidence showing specific and particular arguable proof, facts, and evidence, in opposition to the issues and facts in the plaintiff's motion for summary judgment showing there are specific genuine issues of material fact in dispute." (Doc. #53, PageID at 545). This argument, however, overlooks that Plaintiff carries the ultimate burden of proving his claims. In light of this burden, his showing in support of his Motion for Summary Judgment "must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone, 799 F.2d at 259* (emphasis omitted); *see Vasquez, 938 F.Supp. at 1494*. Because his Motion does not do so, he is not entitled to summary judgment on his claims.

Accordingly, Plaintiff's Motion for Summary Judgment lacks merit.

### III. Defendant MacConnell's Motion for Partial Summary [*10] Judgment or Motion for Partial Judgment on the Pleadings

#### A. *The Parties' Contentions*[5]

> [5] Although the presently pending Partial Motions are captioned as brought by Defendant MacConnell, all remaining Defendants seek relief. (Doc. #56, PageID at 575). The remaining discussion thus refers to all remaining "Defendants" rather than Defendant MacConnell

only and considers whether they are entitled to relief.

Defendants view Plaintiff's Complaint as mainly raising a breach of contract claim. *See, e.g.*, Doc. #51, PageID at 534, 539 ("At its heart this is a contract case"; "This is a contract case and nothing more." (Doc. #51, PageID at 534, 539). Defendant MacConnel's alternative Motion for Partial Judgment on the Pleadings "respectfully ask[s] that this Honorable Court grant partial judgment on the pleadings and dismiss plaintiff's cause of action asking for punitive damages." *Id.*, PageID at 541.

Plaintiff argues that Defendants ignore pages 15 though 26 of his Complaint, "listing the torts ... the defendants committed ..." and asserting "that the defendants are liable for the torts they committed. (Doc. #55, PageID at 558). Plaintiff further argues that Defendants fail to raise, and have therefore [*11] waived, challenges to many of his claims.

Defendants' Reply asks for much more than his Motion: "Defendants respectfully ask that all causes of action other than breach of contract be dismissed." (Doc. #56, PageID at 575) (emphasis in original).

In light of Defendants' broad request for dismissal of all Plaintiff's claims (except his breach of contract claim), and given the parties' respective arguments, the discussion that follows describes the applicable standards, then applies those standards to Plaintiff's Complaint in several stages by considering: (1) Plaintiff's federal claims; (2) his state-law claims; and (3) his requests for punitive damages in connection with his breach of contract claim. As will be explained, review of the Complaint leaves only Plaintiff's breach of contract claim for last and for *sua sponte* consideration of subject matter jurisdiction.

#### B. Applicable Standards

Two main cases -- *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* and *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* -- apply to resolving a motion for judgment on the pleadings. *See HDC, LLC v. City of Ann Arbor, 675 F.3d 608, 611 (6th Cir. 2012)*; *see also Fritz v. Charter Twp. of Comstock, 592 F.3d 718, 722 (6th Cir. 2010)*. [*12] Under *Twombly and Iqbal*, the "Court construes the complaint in a light most favorable to the

plaintiff, accepts all factual allegations as true, and determines whether the complaint states a plausible claim for relief." *HDC, 675 F.3d at 611* (citations omitted); *see Iqbal, 556 U.S. at 678*. "*Pro se* complaints are to be held 'to less stringent standards than formal pleadings drafted by lawyers,' and should therefore be liberally construed." *Williams v. Curtin, 631 F.3d 380, 383 (6th Cir. 2011)* (citation omitted).

A complaint's factual allegations "need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible.... However, 'a legal conclusion couched as a factual allegation' need not be accepted as true on a motion to dismiss [or a Rule 12(c) motion], nor are recitations of the elements of a cause of action sufficient." *Fritz, 592 F.3d at 722* (quoting, in part, *Iqbal, 556 U.S. at 678-79*; other citations omitted).

> In keeping with these principles a court considering a motion to dismiss [or motion for judgment on the pleadings] can choose to begin [*13] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Iqbal, 556 U.S. at 679*.

"'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Jasinski v. Tyler, 729 F.3d 531, 538 (6th Cir. 2013)* (quoting *Iqbal, 556 U.S. at 678*). Factual allegations need not be detailed, and "[t]hreadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal, 556 U.S. at 678* (citing *Twombly, 550 U.S. at 555*). The plaintiff must allege enough facts "to raise a right to relief above the speculative level ...." *Twombly, 550 U.S. at 555*. "Where complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the

line between possibility and plausibility of entitlement to [*14] relief." *Iqbal, 556 U.S. at 678* (citation and internal quotations omitted).

In the end, "[d]etermining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'" *Id., 556 U.S. at 679* (citations omitted).

## C. Plaintiff's Federal Claims

### 1.

A violation of RICO, *18 U.S.C. § 1962(c)*, "requires '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Heinrich v. Waiting Angels Adoption Servs., Inc., 668 F.3d 393, 404 (6th Cir. 2012)* (quoting *Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985))*. A plaintiff must allege sufficiently specific facts on each RICO element to state a plausible RICO claim. *See id.*

Plaintiff's Complaint asserts:

> [D]efendants formed a criminal racketeering enterprise under the name U.S. Mint Green Ltd., and as members of the corporation, operated the enterprise to commit violations of federal, State, Civil, and Common [*15] law that caused the plaintiff irreparable physical, mental, emotional, and economic harm, injury, pain and suffering.

(Doc. #1, PageID at 35).

Plaintiff's RICO claim makes no attempt to connect the Complaint's allegations with any RICO element. The Complaint provides many facts about his personal and legal history. Yet, these background facts, when accepted as true and construed in Plaintiff's favor, do not point towards any element of a RICO claim, let alone a RICO violation by Defendants. *See* Doc. #1, PageID at 23-34. Next, the Complaint identifies Plaintiff's RICO claim but only advances conclusory assertions containing RICO terms without factual support. For instance, this section of the Complaint states the following unsupported

conclusory allegations:

> The plaintiff alleges that the defendants operated a continuing criminal enterprise with criminal patterns, schemes, designs and plans that posed a real threat of being a future criminal racketeering enterprise and the defendants injured the plaintiff in his business and property, and because of, and but for, that criminal activity the plaintiff would not have suffered irreparable physical, mental, emotion, spiritual and economic loss, [*16] harm ... and would not have suffered a deprivation of his constitutional, statutory, civil, and common law guarantees, freedoms, liberties, rights, privileges, immuni[t]ies, protections, and safeguards.

(Doc. #1, PageID at 35-36). Such "threadbare recitals of elements...," lacking support with something more than "mere conclusory statements," fail to raise a plausible RICO claim. *Iqbal, 556 U.S. at 678* (discussing *Twombly, 550 U.S. at 555*).

Searching the Complaint for more specific RICO allegations leads next to the pages identifying Plaintiff's other claims and requests for damages under various headings with only minimal or conclusory supporting allegations. (Doc. #1, PageID at 36-45). The Complaint then turns to Plaintiff's "Statement of Facts" and "Statement of Claims." *Id.*, PageID at 46-58. The Statements consist of a bit more than 12 pages of factual allegations related to the parties' communications, the details of Plaintiff's numerous requests and payments (amounting to $2,100) to Defendants for their services, and Defendants' acts and omissions. *Id.*, PageID at 46-56. But, these Statements are conclusory and make no attempt to connect particular facts to a RICO violation committed [*17] by Defendants or to the elements of a RICO claim.

Perhaps the RICO claim's most obvious omission is allegations pointing to the key RICO element of "racketeering activity." To satisfy the element of racketeering activity, Plaintiff's Complaint must contain sufficiently specific facts (when taken as true) to raise a reasonable inference that Defendants committed "acts which are indictable under a number of federal statutes listed in *18 U.S.C. §1961(1)(B)*." *Heinrich, 668 F.3d at*

*404*. The Complaint does not do so. Instead, it sets forth a laundry list -- or in Twombly /Iqbal terms, mere "labels and conclusions," *556 U.S. at 678* -- referring to some of the predicate racketeering acts identified in *18 U.S.C. §1961*. Without further factual illumination, the list simply mentions mail fraud, wire fraud, obstruction of justice, and "fraud and misuse of government forms and documents." (Doc. #1, PageID at 35). Neither this list nor any other allegations in the Complaint are adequate to support a reasonable conclusion that Defendants engaged in conduct indictable under the federal statutes listed in *§1961(1)(B)*. As a result, Plaintiff's right to relief under RICO is speculative rather than plausible. [*18] And the Complaint therefore fails to plead factual content that allows the Court to draw a reasonable inference that Defendants are liable to him for a RICO violation. *See Iqbal, 556 U.S. at 678*.

Accordingly, Defendants are entitled to judgment on the pleadings in their favor on Plaintiff's RICO claim.

**2.**

In support of his claim of copyright infringement/false authorship, the Complaint alleges, "The plaintiff sent the defendants a book manuscript to get published and they declared themselves to be the original author of he [sic] book in the copyright form ... just as they had done to over eighteen other authors." (Doc. #1, PageID at 42). He further alleges that he paid Defendants to obtain copyrights and the defendants promised to obtain a copyright in the name of the plaintiff but, instead, the defendants obtaibed [sic: presumably, "obtained"] copyrights under their own names thereby depriving the plaintiff of copyright protection." *Id.*, PageID at 57.

Plaintiff's Complaint does not contain sufficiently specific facts to support a claim of copyright infringement or false authorship. Accepting the Complaint's allegations as true, the copyrights Plaintiff wanted to obtain concerned his manuscript [*19] titled, "LORD NAZI, His Writings and Teachings for Racist White Supremists and True Christian Warriors of God." (Doc. #1, PageID at 95). The Complaint fails to identify where, when, or to whom Defendants published LORD NAZI using their name as author or their name as the copyright claimant, instead of identifying Plaintiff as the author and copyright claimant. The Complaint does not identify a work that Defendants passed off as their own that was substantially similar to LORD NAZI. He merely

raises a conclusory and speculative claim that Defendants engaged in copyright infringement or false authorship without providing any meaningful supporting facts. His copyright infringement/false authorship claims therefore lack facial plausibility. *See Iqbal, 556 U.S. at 678*; *see also Ellis v. Diffie, 177 F.3d 503, 506 (6th Cir. 1999)* ("To establish copyright infringement, a plaintiff must show: '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'")(citation omitted).

It is also worth pausing to note that Plaintiff's allegations are not consistent with the public records of the U.S. Copyright Office, which the Court may take judicial notice [*20] of under *Fed. R. Evid. 201*. Those public records reveal that as of 2008, Plaintiff -- not any Defendant -- has been the copyright claimant in Plaintiff's LORD NAZI book manuscript and title page.[6] Given this, Plaintiff's copyright infringement claim fails as a matter of law for lack of copyright ownership. *See Ellis, 177 F.3d at 506*.

> [6]  *See* http://www.copyright.gov (search Public Catalog for "LORD NAZI").

Each of Plaintiff's remaining federal claims likewise suffers from insufficient factual pleading. Plaintiff's RICO conspiracy claim is conclusory and suffers from the same lack of facts identifying predicate racketeering activities that is missing from his RICO claim. Plaintiff's conspiracy claim under *42 U.S.C. §1985(3)* is likewise conclusory and speculative, rather than plausible.

Accordingly, Defendants are entitled to judgment on the pleading in their favor on Plaintiff's federal claims.

**D. Plaintiff's State-Law Tort Claims**

Plaintiff's Complaint advances tort claims based on Ohio law under the following headings: joint venture enterprise; breach of implied covenant of good faith, fair dealings, and honest services; breach of duty [sic]; fraudulent inducement; false and misleading advertising; [*21] deceit; negligent - intentional misrepresentation; conversion; negligent - intentional infliction of emotional; loss of opportunity or chance/right to publicity/right to hold office; and unjust enrichment. The Complaint provides few, if any, specific factual allegations under each heading and instead provides only conclusory comments with citations to the various Restatements of Law and case law. This is seen, for

example, under the heading "Conversion," where the Complaint states:

> Ohio Revised Code *222A, 229*, and *235* and *Restatement (Second) of Torts 224* recognizes two types of conversion (1) when the possessor of property has acquired the property but refuses to return the property upon demand of the owner of the property and refuses to pay the owner for the property, (2) when the possessor has acquired the property wrongfully or unlawfully and, without authorization of the owner, exercises control of the property (*Zacchini v. Scripps-Howard, 1976, 47 Ohio St. 2d 224, 351 N.E.2d 454, 456-457*). Conversion is the malicious, wrongful, and illegal privation of ownership rights to property.

> Under the Restatement, liability will lie against the defendants even when the owner has lost the [*22] property or even when the defendants have mistakenly appropriated the property, and even if the defendants have not received the benefits from the conversion.

(Doc. #1, PageID at 39-40). The Complaint contains no other information or factual allegations under this heading. Assuming in Plaintiff's favor that his ownership rights concerned his LORD NAZI manuscript, the Complaint does not allege sufficiently specific facts, rather than mere conclusions, to raise a reasonable inference that Defendant committed conversion "by a wrongful act or disposition of plaintiff's property rights ..." in LORD NAZI. *Jack F. Neff Sand & Gravel, Inc. v. Great Lakes Crushing, Ltd*., 2014-Ohio-2875, 2014 WL 2958279 at *7 (Oh. Ct. App., 2014). Other than appearing to allege that Defendants took LORD NAZI for their own use, the Complaint sheds no factual light on what that use was, when it occurred, or how Defendants disposed of Plaintiff's property rights in LORD NAZI. The Complaint therefore fails to raise a plausible conversion claim.

The Complaint is similarly deficient in its lack of facts sufficient to support the plausibility of his other state-law tort claims. Accepting Plaintiff's allegations [*23] as true and liberally construing the Complaint in his favor, the most the Complaint accomplishes is to "plead

facts that are 'merely consistent with' [Defendants'] liability ...." *Iqbal, 556 U.S. at 678*. The Complaint therefore "stops short of the line between possibility and plausibility of [Plaintiff's] 'entitlement to relief,'" *id*., on his state-law tort claims.

Turning to an even more intractable problem for Plaintiff, his state-law claims arise from the same factual allegations that give rise to his breach of contract claim.

In Ohio, "generally, the existence of a contract action excludes the opportunity to present the same case as a tort claim." *Textron Fin. Corp. v. Nationwide Mut. Ins. Co., 115 Ohio App.3d 137, 684 N.E.2d 1261, 1270 (Ohio Ct. App. 1996)* (quoting *Wolfe v. Continental Cas. Co., 647 F.2d 705, 710 (6th Cir. 1981))*. This is because where parties have reached an agreement "protection for economic losses should arise under the bargained-for contract." *Middleton v. Rogers Ltd., Inc. 804 F. Supp.2d 632, 639 (S.D. Ohio 2011)* (citing *Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co., 42 Ohio St.3d 40, 537 N.E.2d 624, 630--31 (1989))*; (*see also Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc., 106 Ohio St. 3d 412, 2005 Ohio 5409, 835 N.E.2d 701, 704 (2005)* [*24] ("When a duty in tort exists, a party may recover in tort. When a duty is premised entirely upon the terms of a contract, a party may recover based upon breach of contract")). Further, a party may not transform a breach of contract claim into a tort claim by simply additionally alleging that the opposing party intentionally, wantonly, or maliciously failed to perform its contractual duties. *Ketcham v. Miller, 104 Ohio St. 372, 136 N.E. 145, 146--147 (1922)*; *see also Wolfe v. Continental Cas. Co., 647 F.2d 705, 710 (6th Cir.1981)*.

Nevertheless, a plaintiff may state a tort claim in addition to a breach of contract claim if the plaintiff is able to demonstrate that tortious conduct by the defendant that breached "a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed." *Textron, 684 N.E.2d at 1270*. In addition, a tort claim arising out of a breach of contract "must include actual damages attributable to the wrongful acts of the alleged tortfeasor which are *in addition* to those attributable to the breach of the contract." *Id. at 1271*; *see also Cincinnati Gas & Elec. Co. v. General Elec. Co., 656 F.Supp. 49, 62--63 (S.D. Ohio 1986)* (emphasis [*25] original).

*Wells Fargo Bank, N.A. v. Fifth Third Bank, 931 F. Supp. 2d 834, 838-39, 2013 WL 1064829 (S.D. Ohio 2013)*. Under this aspect of Ohio law, Plaintiff faces two problems: First, his tort claims are based on the same facts that give rise to his breach of contract claim. His factual allegations do not point to a duty Defendant owed Plaintiff that arose separately from the parties' contract. The Complaint thus fails to raise a plausible state-tort claim separate from his breach of contract claim. *See id*. (and cases cited therein).

Second, the Complaint does not allege that Plaintiff suffered actual damages attributable to Defendants beyond the $2,100 in financial harm he allegedly incurred from Defendants' alleged breach of contract. The closest the Complaint comes to alleging that Plaintiff suffered actual damages beyond those attributable to the purported breach of contract appears in his allegation that he suffered "a stroke by [Defendants'] negligent and intentional infliction of emotional distress." (Doc. #1, PageID at 58). Yet, the Compliant contains only conclusory references to Plaintiff's stroke. He alleges, for instance, that he suffered a stroke "because of [Defendants'] [*26] reckless disregard for ... [his] rights...." *Id*., PageID at 40 (citing *Restatement (Second) of Tort 908*, *909*). Plaintiff's allegations about his stroke are mere "'naked assertion[s]' devoid of 'further factual enhancement," *Iqbal, 556 U.S. at 678*, and are thus insufficient to support a plausible conclusion that he suffered actual damages beyond the financial harm arising from Defendants' alleged breach of contract.

Plaintiff's Complaint raises other allegations concerning the harm he allegedly suffered due to Defendants' misconduct or omissions. He alleges, in part, "The defendants cheated the plaintiff out of campaigning for public office and the right to hold public office and

the right to publicity ...."; "The defendants cheated the plaintiff out of revenue expected from the political campaign website when they failed to publish the website"; and "The defendant cheated the plaintiff out of liberty and freedom in that the political campaign website and the book was designed not only for financial gain and religious awakening but also to gain public attention to his false imprisonment in a federal prison for almost thirty years without being accused or convicted of any criminal acts [*27] and to motivate the general public to take political action against the injustice." (Doc. #1, PageID at 57). "Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal, 556 U.S. at 679*. Drawing on judicial experience and common sense, these and other similar allegations in the Complaint wholly fail to permit a reasonable inference that Defendants were factually or legally responsible for Plaintiff's inability to mount a campaign for political office or to gain financially in any significant way from a book titled, "LORD NAZI His Writings and Teachings for Racist White Supremists and True Christian Warriors of God." Even if LORD NAZI was published and became widely available to the public, it is fantasy bordering on delusion to conclude that Plaintiff would have earned enough money, and would have gained enough public support to run a competitive campaign for public office -- especially any national public office -- or to obtain a release from his present federal incarceration. The latter is especially so when Plaintiff has fully and repeatedly tested [*28] the validity of his incarceration in the courts without success. *See, e.g., Coy Phelps v. United States, 120 F. App'x 744 (9th Cir. 2005); United States v. Coy Phelps, 955 F.2d 1258 (9th Cir. 1992); Coy Phelps v. Grondolsky, CIV.A. 11-10083, 2011 U.S. Dist. LEXIS 18665, 2011 WL 761509 (D. Mass. Feb. 24, 2011); Coy Phelps v. United States, No. C 13-5627, 2014 U.S. Dist. LEXIS 48497, 2014 WL 1369219 (N.D. Cal., April 7, 2014).* Plaintiff's allegations therefore fail to create a reasonable inference that Defendants caused him the harm he alleges. As a result, his state-law tort claims lack facial plausibility. *See Iqbal, 556 U.S. at 678.*

Accordingly, for the above reasons, Defendants are entitled to judgment on the pleadings in their favor on Plaintiff's state-law tort claims.

**E. Analysis: Breach of Contract and Punitive Damages**

Defendants contend that Plaintiff cannot recover punitive damages on his contract claim. Defendants further contend that if Plaintiff prevails with his contract claim, the most he could recover is $2,100, equaling the amount he paid Defendants for their services.

> The law is quite clear in Ohio that: "As a general rule exemplary damages are not recoverable in actions for the breach of contracts, irrespective of the motive [*29] on the part of defendant which prompted the breach. No more can be recovered as damages than will fully compensate the party injured." This has been the nearly universal rule for some time: see, *e.g., Hadley v. Baxendale* (1854), 9 Ex. 341, 156 Eng. Rep. 145 .... No matter how willful the breach,' [p]unitive damages are not recoverable in an action for breach of contract.'"

*Digital & Analog Design Corp. v. N. Supply Co., 44 Ohio St.3d 36, 46, 540 N.E.2d 1358 (1989)* (quoting *Saberton v. Greenwald, 146 Ohio St. 414, 426, 66 N.E.2d 224 (1946)* and *Ketcham v. Miller, 104 Ohio St. 372, 136 N.E. 145*, paragraph two of the syllabus (1922)). Punitive damages are only awarded in cases involving a breach of contract where a plaintiff has established both the breach of contract and an "independent tort involving fraud, malice or oppression ...." *Dominion Liquid Technologies, LLC v. GT Beverage Co., LLC, 1:11-CV-444, 2014 U.S. Dist. LEXIS 33841, 2014 WL 1045913 at *7 (S.D. Ohio Mar. 14, 2014)* (Litkovitz, M.J.) (consent jurisdiction) (citing *Goldfarb v. The Robb Report, Inc., 101 Ohio App. 3d 134, 141, 655 N.E.2d 211, 1995 WL 488145 (Ohio Ct. App. 1995); see In re Graham Square, Inc., 126 F.3d 823, 828 (6th Cir. 1997)* ("Because the sole purpose of contract damages is to compensate [*30] the nonbreaching party for losses suffered as a result of a breach, '[p]unitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable.'" (quoting, in part, *Lake Ridge Academy v. Carney, 66 Ohio St.3d 376, 613 N.E.2d 183, 187 (1993)).*

For the reasons stated previously, Plaintiff's Complaint fails to state a plausible tort claim under Ohio law. His Complaint thus also fails to raise a reasonable inference, and plausible claim, that Defendants committed a tort independent of his breach of contract

claim that involved fraud, malice, or oppression. Defendants are therefore entitled to judgment on the pleadings in their favor to the extent Plaintiff seeks punitive damages in connection with his breach of contract claim. *See In re Graham Square, 126 F.3d at 828; see also Digital & Analog Design Corp, 44 Ohio St.3d at 46* (and cases cited therein); *Dominion Liquid Technologies, 1:11-CV-444, PageID at 3743, 2014 U.S. Dist. LEXIS 33841, 2014 WL 1045913 at *7* (and cases cited therein).

This leaves only Plaintiff's claim for breach of contract under which he seeks to recover $2,100, equaling the amount he allegedly paid Defendants [*31] for their services. This relatively low amount of damages brings subject matter jurisdiction into question, which the Court may consider *sua sponte. Answers in Genesis of Ky., Inc. v. Creation Ministries Int'l, Ltd., 556 F.3d 459, 465 (6th Cir. 2009)* ("[F]ederal courts have a duty to consider their subject matter jurisdiction in regard to every case and may raise the issue *sua sponte.*").

Considering, first, federal question jurisdiction under *28 U.S.C. §1331*, when a plaintiff's federal claims are dismissed, the frequent course of action would be for the Court to decline to exercise supplemental jurisdiction over the plaintiff's state-law claims. *See 28 U.S.C. §1367(c)(3); see also Musson Theatrical, Inc. v. Fed. Exp. Corp., 89 F.3d 1244, 1254-55 (6th Cir. 1996)*. At first glance, this procedural scenario seems to play out in the present case, once Plaintiff's federal claims are dismissed. The parties' diverse citizenship, however, also raises the possibility that subject matter jurisdiction exists under *28 U.S.C. §1332(a)*. If diversity jurisdiction exists, then Plaintiff's state-law claims are properly before this Court without regard to the absence of supplemental jurisdiction. *See Charvat v. NMP, LLC, 656 F.3d 440, 446 (6th Cir. 2011)*.

To [*32] establish diversity jurisdiction, the matter in controversy must exceed "the sum or value of $75,000 ...." *28 U.S.C. § 1332(a); see Charvat, 656 F.3d at 446*. "Diversity jurisdiction is defeated when it appear[s] to a legal certainty that the claim is really for less than the jurisdictional amount." *Charvat, 656 F.3d at 447*

(citations and internal quotations omitted). Because Plaintiff is not entitled to punitive damages in connection with his breach of contract claim, *supra*, §III(E), his breach of contract claim if fully vindicated result in $2,100 damages to Plaintiff. Obviously this amount is far less than the minimum jurisdictional requirement of more than $75,000. It thus appears to a legal certainty that Plaintiff cannot claim the minimal jurisdictional amount in support of his breach of contract claim. And, consequently, his breach of contract claim is subject to dismissal for lack of jurisdiction.

**IT IS THEREFORE RECOMMENDED THAT:**

1. Plaintiff's Motion for Summary Judgment or Judgment as a Matter of Law (Doc. #48) and Plaintiff's Motion to Strike (Doc. #53) be DENIED;

2. Rion MacConnell's Motion for Partial Summary Judgment or Motion for Partial Judgment on the Pleadings (Doc. [*33] #51) be GRANTED;

3. Plaintiff's sole remaining breach of contract claim be dismissed for lack of subject matter jurisdiction;

4. Plaintiff's Motion for Certificate of Interlocutory Appeal and Motion for Reconsideration and Motion for Stay in Proceedings (Doc. #54) be DENIED as moot; and

5. The case be terminated on the docket of this Court.

August 1, 2014

/s/ Sharon L. Ovington

Sharon L. Ovington

Chief United States Magistrate Judge

# Tab 10



**Nicole A. Sherrod, Plaintiff, v. Enigma Software Group USA, LLC, Defendant.**

**Case No. 2:13-cv-36**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION**

*2014 U.S. Dist. LEXIS 137329*

**September 29, 2014, Decided**
**September 29, 2014, Filed**

**PRIOR HISTORY:** *Sherrod v. Enigma Software Group, USA, Magistrate Judge Kemp LLC, 2013 U.S. Dist. LEXIS 178068 (S.D. Ohio, Dec. 19, 2013)*

**COUNSEL:** [*1] For Nicole A. Sherrod, Plaintiff: Brian J Laliberte, LEAD ATTORNEY, Ulmer & Berne LLP, Columbus, OH; John Peter Sherrod, Mills, Mills, Fiely & Lucas, Columbus, OH.

For Enigma Software Group USA, LLC, Defendant: Mark Alan VanderLaan, LEAD ATTORNEY, Dinsmore & Shohl - 1, Cincinnati, OH; Andrew C Glass, Roger L Smerage, PRO HAC VICE, K&L Gates LLP, Boston, MA; R Bruce Allensworth, PRO HAC VICE, K&L Gates, Boston, MA.

**JUDGES:** JAMES L. GRAHAM, United States District Judge. Magistrate Judge Kemp.

**OPINION BY:** JAMES L. GRAHAM

**OPINION**

**OPINION AND ORDER**

This matter is before the Court on the Defendant's Motion for Summary Judgment (doc. 11) filed on June 18, 2013. For the following reasons, the Court will GRANT IN PART AND DENY IN PART the

Defendant's Motion for Summary Judgment (doc. 11).

**I. Background**

The Defendant, Enigma Software Group, LLC, is a developer of PC security software. The Defendant produces a software security program, SpyHunter, which detects and removes viruses and malware from personal computers. Malaspina Aff. at ¶ 4, doc. 13. The Defendant also produces a software security program, RegHunter, which cleans personal computer registries. Id. at ¶ 5. A customer may purchase SpyHunter and RegHunter as a package. [*2] Id. at ¶ 6.

Upon purchase and installation of SpyHunter, together with or apart from RegHunter, a customer agrees to the terms of the SpyHunter End User License Agreement (SpyHunter EULA). Id. at ¶ 7. Before completing the purchase of SpyHunter, the Defendant's webpage notifies the customer that their subscription will automatically renew every six months. Id. at ¶ 8. Further, the Defendant's webpage informs the customer that they will receive an e-mail notification that will allow them to cancel their subscription prior to the renewal date. Id.

In regards to cancelling a subscription, the EULA explains:

> When you purchase SpyHunter, your account will be configured for six month

semi-annual automatic billing. If you choose to cancel the automatic billing option, you can accomplish this by either: (a) opening a ticket with technical support (on the following URL: http://www.enigmasoftware.com/support/) and request to opt-out of the automatic billing option, (b) contact our payment processor Esellerate.net at 1-800-999-273 . . . (c) or email Esellerate.net at shopper@esellerate.net. If you cancel automatic billing, we will not bill you for continued service when your account expires. If you desire continued service, it will be your responsibility [*3] to renew your account. If you remain on automatic billing, your account will automatically renew at the end of your subscription and your credit card will be billed accordingly.

EULA at 4, doc. 13. The EULA is governed by the laws of the State of New York. Id. at 7.

A third party, Digital River, Inc., provides customer billing, account renewal, and account cancellation services for the Defendant in conjunction with the sale of the Defendant's software products. Beidle Aff. at ¶ 3, doc. 12. Digital River is responsible for notifying customers of upcoming subscription renewals, processing customer payments for software purchases and renewal, and processing customer subscription cancellations. Id. Digital River makes and processes payments on behalf of the Defendant. Malaspina Aff. at ¶ 20. The Defendant does not directly charge customers credit cards. Id.

A. *The Plaintiff's Purchase of the Two Subscriptions*

On April 10, 2012, the Plaintiff purchased a SpyHunter and RegHunter subscription (the First Subscription) for her personal laptop. Sherrod Aff. at ¶ 5, doc. 35-1. The Plaintiff used a computer with an IP address ending in the digits 160. Malaspina Aff. at ¶ 9. The Plaintiff purchased the First Subscription [*4] with a Mastercard credit card ending in the digits 8617. Beidle Aff. at ¶ 6. The First Subscription cost $69.98. Id. After installing the SpyHunter and RegHunter software on her personal laptop, the Plaintiff activated the software and ran a software scan on her computer. Malaspina Aff. at ¶ 11.

Shortly after purchasing the First Subscription, on

April 15, 2012, the Plaintiff purchased a second SpyHunter and RegHunter subscription (the Second Subscription) for her husband's laptop.[1] Sherrod Aff. at ¶ 6. The IP address for the Plaintiff's husband's computer also ended in the digits 160. Malaspina Aff. at ¶ 13. The Plaintiff purchased the Second Subscription with a MasterCard credit card ending in the digits 5709. Beidle Aff. at ¶ 9. After installing the SpyHunter and RegHunter software on her husband's laptop, the Plaintiff activated the software and ran a software scan on the computer. Malaspina Aff. at ¶ 15.

> 1    As the Defendant correctly notes, the Plaintiff's Second Subscription was purchased on April 15, 2012, rather than April 17, 2012. Def.'s Reply at 2 n.1, doc. 36 (citing Sherrod Aff. at ¶ 6).

The Plaintiff used her personal e-mail address, nicoleasherrod@yahoo.com, to complete both [*5] purchases. Sherrod Aff. at ¶¶ 5-6. After purchasing both subscriptions, the Plaintiff installed the software on her laptop and her husband's laptop. Id. at 7.

B. *The Cancellation of the Plaintiff's Subscriptions*

The parties offer conflicting accounts regarding the Plaintiff's alleged cancellation of both subscriptions.

1. The Plaintiff's Account

According to the Plaintiff, on October 8, 2012, she requested the cancellation of both subscriptions. Sherrod Aff. at ¶ 9. The Plaintiff did so using the Defendant's on-line cancellation process. Id. at ¶ 10. After completing the cancellation process, the website notified the Plaintiff that she would receive an e-mail confirmation at nicoleasherrod@yahoo.com. Id. at ¶ 11. Although she did not immediately receive e-mail confirmation of her cancellation, screen messages indicated that the Plaintiff's subscriptions had been canceled. Id. The Plaintiff received an e-mail confirming her cancellation of both subscriptions on October 15, 2012. Id. at ¶ 12.

Two days after canceling both subscriptions, on October 10, 2012, the Plaintiff received a notice of renewal for one of the subscriptions. Sherrod Aff. at ¶ 13. In response, the Plaintiff sent the Defendant [*6] the following e-mail:

On Monday, October 8, 2012 both

subscriptions associated with my username: nicoleasherrod were cancelled. However, today I received an invoice for a renewal. I did not authorize a renewal and request an immediate credit for this renewal. I took all required steps to cancel both subscriptions and will dispute this charge if necessary.

Exhibit 1-g, doc. 35-2 at 26. That same day, the Plaintiff again e-mailed the Defendant to confirm cancellation of both subscriptions and "to revoke authorizations for charges" to her credit card. Sherrod Aff. at ¶ 14. The Defendant charged the Plaintiff's credit card for one of the subscriptions and that charge has not been refunded. Id. at 15.

2. The Defendant's Account

On October 3, 2012, Digital River sent the Plaintiff an e-mail notifying her that the First Subscription would automatically renew on October 10, 2012. Beidle Aff. at ¶ 11. Digital River sent the e-mail to the account used by the Plaintiff in purchasing the First Subscription, nicoleasherrod@yahoo.com. Id. The e-mail included a link to contact Digital River Online Support and explained that, if the Plaintiff wished to cancel her subscription, she should click on that link. Id [*7] . at ¶ 13. After receiving the e-mail, the Plaintiff did not take any action prior to renewal of the First Subscription on October 10, 2012. Id. at ¶ 14. A week later, on October 10, 2012, Digital River renewed the Plaintiff's First Subscription and charged her MasterCard ending in the digits 6817 for $69.98. Id. at ¶ 15.

On October 8, 2012, Digital River sent the Plaintiff an e-mail notifying her that the Second Subscription would automatically renew on October 15, 2012. Id. at ¶ 16. Digital River sent the e-mail to the account used by the Plaintiff in purchasing the Second Subscription, nicoleasherrod@yahoo.com. Beidle Aff. at ¶ 16. The e-mail included a link to contact Digital River Online Support and explained that, if the Plaintiff wished to cancel her subscription, she should click on that link. Id. at ¶ 18. Upon receipt of the October 8 e-mail, the Plaintiff clicked the link therein to access Digital River's Online Support. Id. at ¶ 19. The Plaintiff then entered her e-mail address and the order number associated with her Second Subscription and clicked the "Cancel" link for the Second Subscription. Id. A week later, on October 15, 2012,

Digital River processed the Plaintiff's [*8] cancellation of her Second Subscription and did not renew the Second Subscription. Id. After processing her cancellation, Digital River sent the Plaintiff an e-mail notifying her that her Subscription had been canceled. Id. at ¶ 20.

Several months later, on January 16, 2013, the Defendant contacted Digital River and requested that it cancel the automatic renewal of the Plaintiff's First Subscription prior to its next scheduled renewal. Beidle Aff. at ¶ 21. Digital River processed the Defendant's request and did not renew the Plaintiff's First Subscription on April 10, 2013. Id.

In early 2013, the Plaintiff filed a class-action Complaint (doc. 2) against the Defendant alleging: (1) breach of contract; (2) promissory estoppel; (3) fraud; and (4) misrepresentation. The Defendant subsequently filed a Motion for Summary Judgment (doc. 11). This matter is fully briefed and ripe for resolution.

## II. Standard of Review

Under *Federal Rule of Civil Procedure 56*, summary judgment is proper if the evidentiary material in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; see *Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009)*. The moving party bears the burden of proving the absence of genuine issues [*9] of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005)*.

The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; see also *Longaberger, 586 F.3d at 465*. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008)* (quoting *Anderson, 477 U.S. at 248*). Accordingly, the nonmoving party must present

"significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993)*.

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty, 544 F.3d at 702*; *Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994)*. Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson, 477 U.S. at 251-52*. The evidence, all facts, [*10] and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992)*. However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson, 477 U.S. at 252*; see *Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009)*.

### III. Discussion

The Defendant moves for summary judgment on all counts of the Plaintiff's Complaint. According to the Defendant, its business records "unequivocally demonstrate that plaintiff purchased *two* software subscriptions from Enigma at *two* separate times for *two* different computers using *two* different credit cards, but only cancelled one of those subscriptions and allowed the other to renew under the terms of the applicable license agreement." Def.'s Mot. for Summ. J. at 1, doc. 11. The Defendant asserts that it complied with the EULA and that all of its representations to the Plaintiff were truthful.

In response, the Plaintiff maintains that material facts are in dispute. The Plaintiff argues that she followed the Defendant's on-line cancellation process and canceled both of her subscriptions prior to the automatic renewal, but that the Defendant [*11] only canceled one of her subscriptions and renewed the other subscription.

In reply, the Defendant emphasizes that the documentary evidence submitted by the Plaintiff does not create a material issue of genuine fact. In the Defendant's

view, the only evidence that could potentially create a genuine issue of material fact is the Plaintiff's affidavit in which she offers conclusory assertions that she canceled both subscriptions but that the Defendant nonetheless renewed one of the subscriptions and charged her for that renewal. The Defendant notes that while "'courts generally may not weigh evidence in resolving summary judgment motions, the quantity and quality of the evidence submitted to create an issue of material fact must be sufficient to support a jury verdict.'" Def.'s Reply at 8, doc. 36 (quoting *Ridenour v. Collins, 692 F. Supp. 2d 827, 834 (S.D. Ohio 2010)*). Consequently, the Defendant insists that "'some weighing of the evidence in order to determine the existence of material facts is unavoidable,'" Def.'s Reply at 8 (quoting *Ridenour, 692 F. Supp. 2d at 834*), and argues that the "Plaintiff's submissions . . . are not even colorable, let alone sufficient 'to show that there is more than some metaphysical doubt as to the material facts,'" Def.'s Reply at 9 (quoting [*12] *Ridenour, 692 F. Supp. 2d at 834*).

### A. *Breach of Contract*

Under New York law,[2] to recover damages for a breach of contract, a plaintiff must prove: "(1) the existence of a contract, (2) the plaintiff's performance under the contract, (3) the defendant's breach of the contract, and (4) resulting damages." *Palmetto Partners, L.P. v. AJW Qualified Partners, LLC, 83 A.D.3d 804, 921 N.Y.S.2d 260, 264 (N.Y. App. Div. 2011)* (citing *JP Morgan Chase v. J.H. Electric of New York, Inc., 69 A.D.3d 802, 893 N.Y.S.2d 237, 239 (N.Y. App. Div. 2010); Furia v. Furia, 116 A.D.2d 694, 498 N.Y.S.2d 12, 13 (N.Y. App. Div. 1986)*). Here, the parties do not dispute the existence of the contract or that the Plaintiff performed pursuant to the terms of the EULA. Instead, the parties dispute whether the Defendant breached the terms of the EULA.

> 2  Under the EULA's choice of law provision, New York law governs the Plaintiff's contract claims. EULA at 7.

In the Defendant's view, its business records and affidavits demonstrate conclusively that the Plaintiff canceled the Second Subscription but allowed the First Subscription to automatically renew. The Defendant maintains that Digital River charged the Plaintiff's credit card for the First Subscription pursuant to the renewal terms set forth in the EULA and canceled the Second Subscription in accordance with the Plaintiff's

cancellation of that subscription.

In contrast, the Plaintiff insists that she canceled both subscriptions, but that the Defendant, through Digital River, nonetheless charged her for [*13] the renewal of the First Subscription. In support of this argument, the Plaintiff submits a sworn affidavit with attached documents that the affidavit describes as follows: "screen messages indicating that her subscriptions has been canceled," Exhibits 1-a, 1-b, 1-c, doc. 35-2; an October 10, 2012 e-mail to the Defendant notifying the Defendant of her cancellation of both subscriptions, Exhibit 1-g, doc. 35-2; e-mails confirming the cancellation of her subscriptions, Exhibits 1-d, 1-e, 1-f, doc. 35-2; and a credit card bill indicating that the Defendant charged her credit card for the renewal of the First Subscription, Exhibit 1-h, doc. 35-2.

In her affidavit, the Plaintiff states that, on October 8, 2012, she requested cancellation of both subscriptions through the Defendant's on-line cancellation process. Sherrod Aff. at ¶¶ 9-10. According to the Plaintiff, she "chose the online options available for cancelling each of the subscriptions associated with [her] user name (nicoleasherrod) and/or email address (nicoleasherrod)." Id. at ¶ 10 (citing Exhibits 1-a, 1-b, and 1-c). Upon completing the cancellation process, the website informed the Plaintiff that she would receive a cancellation [*14] e-confirmation at her personal e-mail account. Sherrod Aff. at ¶ 11. The Plaintiff viewed screen messages that showed both subscriptions had been canceled and she received an e-mail confirming her cancellation on October 15, 2012. Id. at ¶ 12 (citing Exhibits 1-a through 1-f).

Later in her affidavit, the Plaintiff reiterates that she "followed Enigma's [cancellation] process, but one of [her] subscriptions was not canceled as provided for in the EULA." Sherrod Aff. at ¶ 17. The Plaintiff states that she "followed the process reflected on Exhibit E, Beidle Declaration . . . and canceled all of my subscriptions using the process made available to me." Id. at ¶ 18. Further, the Plaintiff asserts that she "was not confused about [her] purchases, or [her] subscriptions, or [her] cancellations when [she] used the process required by Enigma to cancel them. [She] followed that process as directed." Id. at ¶ 24. Despite following the Defendant's cancellation policy when canceling both subscriptions, the Plaintiff's credit card was nonetheless charged for the renewal of the First Subscription. Id. at ¶¶ 15, 21, 25.

The Defendant argues that the documents attached to the affidavit do not show what [*15] the affidavit claims that they show. In fact, the Defendant contends that "there is no conflict between [the Plaintiff's] documentary evidence and Enigma's--both sets of evidence are entirely consistent with Enigma's recitation of the facts." Def.'s Reply at 1. The Defendant's Reply brief is devoted to argument that illustrates the factual deficiencies in the Plaintiff's documentary evidence. Def.'s Reply at 2-7.

Generally, the Court agrees with much of the Defendant's characterization of the Plaintiff's exhibits. Most, if not all, of the Plaintiff's exhibits are ambiguous or unsupportive of the Plaintiff's assertion that she canceled both subscriptions prior to October 8, 2012. For example, the screen messages submitted by the Plaintiff are undated and offer no indication of whether they were created before or after October 8, 2012. When viewed in the light most favorable to the Plaintiff, these documents indicate that the Plaintiff canceled both of her subscriptions at some undetermined time. But they do not support the conclusion that she canceled both subscriptions *prior to October 8, 2012*. The e-mails from the Defendant submitted by the Plaintiff, Exhibits 1-d, 1-e, 1-f, doc. 35-2, [*16] suffer from similar flaws. Two of the e-mails concern the cancellation of the Second Subscription but not the First Subscription. See Exhibits 1-d and 1-e, doc. 35-2 (discussing the cancellation of subscription order number ST78823932, the order number associated with the Plaintiff's Second Subscription). The third e-mail provides the Plaintiff's order history for both subscriptions, but merely shows that they were both "fulfilled" and makes no reference to the cancellation of either subscription. See Exhibit 1-f, doc. 35-2.[3]

> 3   Significantly, even though these exhibits are generally unsupportive of the Plaintiff's factual assertions, neither do they disprove or contradict them.

In contrast, the Defendant's documentary evidence is generally consistent with its account of the Plaintiff's failure to cancel the First Subscription. See Beidle Aff., Exhibits D, F, G, and H. However, the Plaintiff's documentary evidence does not definitively answer the ultimate question in this case: Did the Plaintiff actually cancel the First Subscription on October 8, 2012?

The parties have presented the Court with dueling affidavits that address this question. The Defendant

points to the affidavit of Thomas [*17] Beidle, Digital River's Group Vice President for MyCommerce Operations, to support its position. In his affidavit, Beidle avers that, on October 3, 2012, the Plaintiff was informed that the First Subscription would renew on October 10, 2012 if she took no action. Beidle Aff. at ¶¶ 11-12. According to Beidle, "Sherrod took no action in connection with the October 3, 2012 notification. Further, Digital River's records do not reflect that Sherrod took any action to cancel her First Subscription prior to its renewal on October 10, 2012." Id. at ¶ 14.

In response, the Plaintiff cites her affidavit in which she swears that, on October 8, 2012, she canceled both subscriptions online using the cancellation process outlined by Beidle in his affidavit. Despite canceling both subscriptions prior to their renewal, the Plaintiff maintains that the Defendant canceled the Second Subscription but renewed the First Subscription.

This is a close case. But, in the Court's view, the Plaintiff's affidavit is sufficient to create a genuine issue of material fact as to whether the Defendant breached the EULA. In her affidavit, the Plaintiff swears that she canceled both subscriptions following Digital River's [*18] cancellation process, but that the Defendant nonetheless renewed the First Subscription. Drawing all inferences and considering the evidence in the light most favorable to the Plaintiff, Beidle's affidavit and the Defendant's documentary evidence contradict, but do not conclusively disprove, the Plaintiff's sworn statements. A jury, and not the Court, must resolve this conflict.

According to the Defendant, the "Plaintiff's submissions in no way constitutes [sic] the 'significant probative evidence' necessary to sustain her claims." Def.'s Reply at 8. The Defendant argues that the Plaintiff's self-serving statements that she "followed the process" for cancellation as set forth in the SpyHunter EULA and as instructed on Digital River's website "are not even colorable, let alone sufficient 'to show that there is more than some metaphysical doubt as to the materials facts.'" Id. at 9 (quoting Ridenour, 692 F. Supp. 2d at 834). Further, the Defendant contends that the Plaintiff's statements in her affidavit are "utterly conclusory and not evidentiary in nature, such that the Court should properly disregard [them]." Def.'s Reply at 10 (citing F.R.C. Int'l, Inc. v. United States, 278 F.3d 641, 643-44 (6th Cir. 2002)).

The Defendant's arguments are unpersuasive. A party's affidavit alone may be sufficient [*19] to defeat summary judgment, Harris v. J.B. Robinson Jewelers, 627 F.3d 235, 239 (6th Cir. 2010), and the Defendant does not explain why self-serving statements in the Plaintiff's affidavit are insufficient to support the denial of summary judgment here. "A court may not disregard evidence merely because it serves the interests of the party introducing it." Harris, 627 F.3d at 239 (citing Niemi v. NHK Spring Co., 543 F.3d 294, 300 (6th Cir. 2008)); Rushing v. Kan. City S. Ry. Co., 185 F.3d 496, 513 (5th Cir.1999) (reversed on other grounds)). See also Payne v. Pauley, 337 F.3d 767, 773 (7th Cir. 2003) ("Provided that the evidence meets the usual requirements for evidence presented on summary judgment--including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there is a genuine issue for trial--a self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed material facts."); Cadle Co. v. Hayes, 116 F.3d 957, 961 n.5 (1st Cir. 1997) ("A party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment.")

Nor does the Defendant explain why the Plaintiff's statements are "conclusory" and therefore not properly considered by the Court at this stage. It is true that an affidavit that contains no "specific facts" and merely "restat[es] the requirement of the law . . . cannot create a genuine issue of material [*20] fact sufficient to defeat summary judgment," Doren v. Battle Creek Health Sys., 187 F.3d 595, 598-99 (6th Cir. 1999). But in her affidavit, the Plaintiff swears that: (1) she purchased two software subscriptions from the Defendant; (2) her credit cards were charged for the purchase of both subscriptions; (3) prior to the subscriptions' renewal dates, she canceled both subscriptions online using the cancellation process outlined by Digital River's Vice President, Thomas Beidle; and (4) despite canceling both subscriptions, the Defendant renewed the First Subscription and charged her credit card. These specific facts are not conclusory and therefore support the denial of the Defendant's Motion for Summary Judgment on the Plaintiff's breach of contract claim.

B. *Count Two - Promissory Estoppel*

In her Response in Opposition, "[the Plaintiff] concedes that her promissory estoppel claim is not viable

given Enigma's admission that the EULA is a valid, binding and enforceable contract. She therefore consents to the entry of a judgment of dismissal on Count Two of her Complaint." Pl.'s Resp. in Opp. at 7 n.6. The Court will enter judgment dismissing Count Two of the Plaintiff's Complaint accordingly.

C. *Counts Threes and Four -- Fraud and Misrepresentation*

The Defendant [*21] argues that it is entitled to summary judgment on the Plaintiff's fraud and misrepresentation claims. First, the Defendant contends that the Plaintiff's fraud and misrepresentation claims are barred by the economic-loss rule. Second, the Defendant asserts that the Plaintiff cannot demonstrate that it made any false representations to the Plaintiff. Third, the Defendant argues that the Plaintiff cannot demonstrate any injury. The Plaintiff challenges each of these assertions in turn.

Here, even assuming that the Plaintiff's tort claims are not barred by the economic-loss rule, they fail as a matter of law. "[A] tort claim arising out of a breach of contract 'must include actual damages attributable to the wrongful acts of the alleged tortfeasor which are in addition to those attributable to the breach of the contract.'" *Wells Fargo Bank, N.A. v. Fifth Third Bank, 931 F. Supp. 2d 834, 839 (S.D. Ohio 2013)* (quoting *Textron Fin. Corp. v. Nationwide Mut. Ins. Co., 115 Ohio App. 3d 137, 684 N.E.2d 1261 (Ohio 1996)).* Although the Plaintiff repeatedly refers to the $70.00 that she lost

due to the Defendant's fraud (or negligent misrepresentation), that $70.00 is the same damages underlying her breach of contract claim. The Plaintiff does not identify any evidence of "actual damages attributable to the wrongful acts of the [Defendant] which are *in addition* to those attributable [*22] to the breach of contract," *Textron Fin. Corp., 684 N.E.2d at 1271* (emphasis added). The Defendant is therefore entitled to summary judgment as to the Plaintiff's tort claims.

**IV. Conclusion**

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART the Defendant's Motion for Summary Judgment (doc. 11). The Plaintiff may proceed with its breach of contract claim against the Defendant. The Court ORDERS the Plaintiff to file a motion to certify the proposed class within 30 days of this Opinion and Order being issued. The Court also GRANTS the Defendant's Motion for Leave to File a Sur-Reply (doc. 43).

IT IS SO ORDERED.

/s/ James L. Graham

JAMES L. GRAHAM

United States District Judge

DATE: September 29, 2014