# EXHIBIT B

# In The Matter Of:

*Hodell-Natco Industries, Inc. v.*
*SAP America, Inc., et al.*

*Otto Reidl*
*Vol. 1*
*February 7, 2012*

**NEXTGEN|REPORTING**
Making Litigation Easier.    NextGenReporting.com
PHILADELPHIA | 215.944.5800   NEW YORK CITY | 646.470.3376   PHOENIX | 623.224.2760   SILICON VALLEY | 650.799.8020

*Original File Reidl, Otto - Vol. I.txt*
*Min-U-Script® with Word Index*

## Page 1

```
  1              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
  2                    EASTERN DIVISION

  3
     HODELL-NATCO            )  Case No. 1:08 CV 2755
  4  INDUSTRIES, INC.,       )
                             )  Judge: Lesley Wells
  5           Plaintiff,     )  Magistrate Judge:
                             )        Greg White
  6     vs.                  )
                             )  VOLUME I
  7  SAP AMERICA, INC., et   )
     al.,                    )
  8                          )
              Defendants.    )
  9  _____)

 10

 11
          THE VIDEOCONFERENCE DEPOSITION OF OTTO REIDL
 12

 13
          DATE:     Tuesday, February 7, 2012
 14
          TIME:     9:57 a.m.
 15
          PLACE:    Reminger & Reminger
 16                 1400 Midland Building
                    101 Prospect Avenue, West
 17                 Cleveland, Ohio  44115

 18

 19

 20

 21

 22  _____

 23  NEXTGEN
     REPORTING
 24

 25  Registered Professional Reporters
```

## Page 2

```
  1  APPEARANCES:

  2
     ON BEHALF OF THE PLAINTIFF:
  3
         MR. P. WESLEY LAMBERT, ESQ.
  4       Koehler, Neal, LLC
          3330 Erieview Tower
  5       1301 East Ninth Street
          Cleveland, Ohio 44114
  6       (216) 539-9370
          wlambert@koehlerneal.com
  7
  8  ON BEHALF OF THE DEFENDANT SAP AMERICA, SAP AG:

  9       MR. GREGORY J. STAR, ESQ.
          Drinker, Biddle, Reath
 10       One Logan Square
          Suite 2000
 11       Philadelphia, Pennsylvania 19103
          (215) 988-2734
 12       Gregory.Star@dbr.com

 13
     ON BEHALF OF THE DEFENDANT LSI:
 14
          MR. ROY A. HULME, ESQ.
 15       Reminger & Reminger
          1400 Midland Building
 16       101 Prospect Avenue, West
          Cleveland, Ohio 44115
 17       (216) 687-1311
          rhulme@reminger.com
 18

 19

 20
     ALSO PRESENT:  Kevin Reidl
 21                 Daniel Lowery

 22

 23

 24

 25
```

## Page 3

```
  1              W I T N E S S   I N D E X

  2
                                                    PAGE
  3
  4  DIRECT EXAMINATION
     OTTO REIDL
  5  BY MR. STAR .................................    4

  6
                   E X H I B I T   I N D E X
  7
  8  Exhibit 1   Revised Notice of Deposition of      9
                 Hodell-Natco
  9
     Exhibit 2   Emails from Amy Poidomani to        17
 10              Kevin Reidl

 11  Exhibit 3   First Amended Complaint with        22
                 Exhibits, Jury Trial Demand
 12
     Exhibit 4   Pages off the Hodell website        54
 13
     Exhibit 5   ERP Software printout from Internet 125
 14
```

## Page 4

1  OTTO REIDL,
2  called as a witness herein, having been first duly
3  sworn, as hereinafter certified, was examined and
4  testified as follows:
5  DIRECT EXAMINATION OF OTTO REIDL
6  BY MR. STAR:
7  Q. Good morning, Mr. Reidl. I
8  apologize in advance if I continually
9  mispronounce your name today. Feel free to
10 correct me. I'm Greg Star. I'm an attorney
11 on behalf of SAP America and SAP AG, and we're
12 here today for your deposition as the
13 corporate designee on behalf of Hodell-Natco.
14 Have you ever been deposed before, sir?
15 A. Yes.
16 Q. How many times?
17 A. Once.
18 Q. When was that?
19 A. Approximately 15 years ago.
20 Q. All right. Let me go through the
21 rules for you then, since it's been a while.
22 I'll be asking you questions. The court
23 reporter will be taking down what I say and
24 your answers. It's important that we don't
25 speak over each other. Is that fair?

Page 41

1  A.  We had numerous documents,
2  marketing brochures, and press releases.
3  Q.  Are you able to identify any of
4  those documents for me today?
5  A.  I don't have them with me.  I
6  have no documents here.
7  Q.  You didn't bring any documents
8  with you today?
9  A.  None.
10 Q.  Prior to December 23rd, 2005, did
11 Hodell meet or speak with anybody that was
12 actually employed by either SAP America or SAP
13 AG in connection with its decision to license
14 Business One?
15 A.  At all times we considered the
16 business partner as being one in the same.
17 Q.  Okay.  I understand that you'll
18 have a -- that you -- you take the position
19 here that LSi and Mr. Lowery's company were
20 working on behalf of SAP America and SAP AG,
21 correct?
22 A.  Correct.
23 Q.  Okay.  But what I'm going to ask
24 you today, sir, and I'm entitled to get an
25 answer to, is whether there were any

Page 42

1  communications, whether they were written, or
2  whether they were verbal discussions between
3  Hodell, and anybody who is actually an SAP
4  America or SAP AG employee.  And I understand
5  the distinction that you want to raise, and so
6  if we can have that understanding, I'm
7  entitled to get the information.
8  Going back to my question, at any time
9  prior to December 23rd, 2005, did Hodell have
10 any communications, written or verbal, with
11 anybody from SAP America, or SAP AG concerning
12 the licensing of Business One?
13 A.  Not to my recollection.
14 Q.  Prior to December 23rd, 2005, is
15 there any particular person who was actually
16 employed by SAP America, or SAP AG, who -- who
17 Hodell considers to have been involved in
18 marketing or selling Business One to Hodell?
19 A.  Could you please repeat that
20 question?
21 Q.  Sure.  Prior to December 23rd,
22 2005, is there any particular person that was
23 an actual employee of SAP America or SAP AG
24 that was involved in the sales or marketing
25 process of Business One to Hodell?

Page 43

1  A.  Yes.
2      MR. LAMBERT: Object, but you can
3  answer.
4      BY MR. STAR:
5  Q.  Who was involved, sir?
6  A.  Dan Kraus.  We had an email from
7  Dan Lowery, indicating that he had
8  communication with Dan Kraus of SAP America
9  in beginning of November of '03.  I'm sorry,
10 '04.
11 Q.  Okay.  Is that the only piece of
12 evidence that you have that anybody from SAP
13 America, or SAP AG, was involved in the
14 process of marketing or selling Business One
15 to Hodell prior to December 23rd, 2005?
16     MR. LAMBERT: Objection.  Other than
17 LSi and -- and IBiS guys.
18     MR. STAR: Well, look.  We need to get
19 that clear.  I understand that he has -- as I
20 explained, I understand that you take this
21 position that LSi and Mr. Lowery were
22 operating as our agents, and that's a legal
23 issue.
24     MR. LAMBERT: Right.
25     MR. STAR: But what I'm entitled to

Page 44

1  find out today is whether there was anybody
2  from SAP directly, if we can understand that
3  distinction.
4      BY MR. STAR:
5  Q.  And you mentioned Mr. Kraus, and
6  you understood that he was an SAP employee,
7  correct?
8  A.  Correct.
9  Q.  Okay.  So you have an
10 understanding of what I'm talking about here.
11 I'm trying to find out from you, sir, whether
12 there were any SAP America, or SAP AG, actual
13 employees, that Hodell communicated with prior
14 to December 23rd, 2005, okay?  With that in
15 mind, let me just ask the question.
16 Other than this one communication that you
17 mentioned, which was an email, I think you said
18 was forwarded from Mr. Lowery to Hodell,
19 indicating that Mr. Lowery had spoken with
20 Mr. Kraus of SAP, is there any person from SAP
21 America, or SAP AG, that Hodell had direct contact
22 with about the process of marketing or -- or
23 purchasing Business One prior to December 23rd,
24 2005?
25 A.  No, because at all times, we were

Page 45

1  aware that SAP Business One was marketed
2  exclusively through its business partners.
3  Q.  Okay.  So to be clear, prior to
4  December 23rd, 2005, no one from Hodell
5  actually spoke with an SAP America or SAP AG
6  employee about Business One, correct?
7  A.  As far as I know --
8  Q.  Okay.
9  A.  -- that is correct.
10 Q.  And prior to December 23rd, 2005,
11 no one from Hodell actually had a direct
12 written communication with any person who was
13 actually employed by SAP America or SAP AG,
14 correct?
15 A.  I don't know that as a fact.
16 Q.  Referring back to this sentence
17 in the end of paragraph 12 of the complaint,
18 concerning efforts by SAP AG and SAP America
19 to market and sell Business One, what does
20 Hodell contend that either of those two
21 entities did directly to market Business One
22 to Hodell, if anything?
23     MR. LAMBERT: I just want to clarify --
24     THE WITNESS: Define directly.
25     MR. LAMBERT: Yeah.

Page 46

1      THE WITNESS: Define directly.
2      BY MR. STAR:
3  Q.  I'll rephrase the question.
4  What, if anything, does Hodell contend that SAP
5  America and SAP AG did to market or sell Business
6  One to Hodell?
7  A.  They provided literature.
8  Q.  To whom?
9  A.  To the business partner, who
10 provided it to us.
11 Q.  At any time did SAP America or
12 SAP AG provide literature about Business One
13 directly to Hodell?
14 A.  No.
15 Q.  In paragraph 13 of the complaint,
16 sir, you reference a publication called the
17 SAP Solution Brief Qualified SAP All-in-One
18 Partner Solutions.  Do you see that?
19 A.  Yes.
20 Q.  Okay.  You quote a piece of that
21 document, but you do not attach that to your
22 complaint, do you?
23 A.  Pardon me?
24 Q.  You do not attach that document
25 to your complaint, do you?

Page 47

1  A.  I don't know for sure.
2  Q.  Okay.  You go on in this
3  paragraph 13 to conclude, thus, SAP's
4  "partners" are agents of SAP, having assented
5  to act on behalf of and subject to the control
6  of SAP.
7  Is it correct that Hodell presently takes
8  the view that SAP business partners were the
9  actual agents of SAP?
10     MR. LAMBERT: Objection.
11     BY MR. STAR:
12 Q.  You can answer.
13     MR. LAMBERT: It's a legal -- agents is
14 a legal term that was inserted in the
15 complaint.  Obviously if you can testify as to
16 your layman's understanding of the
17 relationship between SAP and its business
18 partners, then you can do so.
19     THE WITNESS: Could you repeat that
20 question again, please?
21     BY MR. STAR:
22 Q.  Sure.
23 A.  I'm sorry.
24 Q.  You agree with me that Hodell
25 contends in this litigation that LSi was

Page 48

1  acting as the "agent" of SAP America and SAP
2  AG when it was marketing Business One to
3  Hodell, correct?
4  A.  Correct.
5  Q.  Okay.  And what you say here is
6  that, in paragraph 13, that they're acting --
7  LSi is acting on behalf of and subject to the
8  control of the SAP Defendants.  Do you see
9  that?
10 A.  Yes.
11 Q.  What evidence do you have that
12 LSi was acting on behalf and subject to the
13 control of SAP?
14 A.  The literature that I mentioned
15 earlier, that they are one in the same.
16 They're a team.
17 Q.  And by the literature, you're
18 talking about the SAP Solution Brief that's
19 mentioned in this paragraph 13?
20 A.  No, because this references
21 All-in-One, instead of Business One.
22 Q.  Okay.  So what literature are you
23 referring to?
24 A.  Some of the other exhibits that
25 we have provided.

Page 181

1  Q.  -- with the add-on?
2  A.  -- with the add-on.
3  Q.  When did that occur?
4  A.  I -- I don't recollect for
5    certain.
6  Q.  Is it your personal belief that
7    there was some issue with the SAP software by
8    itself that caused the implementation to be
9    delayed until March of 2007, or the go live
10   date to be delayed until March of 2007?
11 A.  Please repeat that question.
12 Q.  Sure.  Is it your personal
13   contention that there was some issue with the
14   Business One software by itself, without the
15   In-Flight add-on, that caused a delay in the
16   go live date from the first half of 2006 into
17   the first quarter of 2007?
18 A.  I believe part of the problem was
19   SAP Business One.
20 Q.  Okay.  Do you have any specific
21   information as to what the problem was with
22   Business One?
23 A.  Am I asking that question with
24   what I know now or what I knew then?
25 Q.  What you know now, sir.

Page 182

1      MR. LAMBERT: Just a continuing
2    qualification that this is directed to Otto
3    Reidl personally, and not as a representative
4    of the company.
5      THE WITNESS: Right.
6      MR. LAMBERT: You can answer.
7      THE WITNESS: There were -- we had
8    indication that SAP Business One had problems
9    with other large add-ons, in file lockage and
10   speed.
11     BY MR. STAR:
12 Q.  Okay.  So you're --
13 A.  Through not -- verbal
14   communication from SAP business partner.
15 Q.  Okay.
16 A.  Since confirmed in emails from
17   SAP.
18 Q.  My question is a little bit
19   different though.  Is there any particular
20   aspect of SAP Business One that you believe
21   caused a delay in the go live date?  Or was
22   that only -- did that only, that delay only
23   occur because of the attempted integration
24   with the In-Flight add-on?
25 A.  The In-Flight add-on brought to

Page 183

1    the surface some problems with applets, large
2    applets in SAP Business One, with the DI API,
3    the data interface.
4  Q.  If all that Hodell was going to
5    actually install was just Business One,
6    without any add-ons, how long would that have
7    taken?
8      MR. LAMBERT: Objection.
9      THE WITNESS: We never tested that.  I
10   have no way of confirming.
11     BY MR. STAR:
12 Q.  You don't know if it would have
13   taken a month or taken a year, right?
14 A.  The implementation, meaning the
15   day you first turn on the computer, or when
16   you have it working?
17 Q.  When you have it working.  If all
18   you were going to install was Business One by
19   itself.
20 A.  For 120 users, never, with our
21   database.
22 Q.  Okay.
23 A.  Now, that's what I know now.
24 Q.  Why do you say it would never
25   work with your database?

Page 184

1  A.  Because --
2      MR. LAMBERT: Again, continuing
3    objection -- not objection, just
4    qualification --
5      THE WITNESS: I'm answering as an
6    individual.
7      MR. LAMBERT: -- as to this line of
8    questioning, right.
9      THE WITNESS: Because the developer,
10   Udi Ziv, said this was outside the
11   capabilities of the system, the database and
12   the number of users.
13     BY MR. STAR:
14 Q.  This was after the attempted
15   installation, correct?
16 A.  Yes.  I -- I asked if I -- it's
17   based upon what I know now, versus what I knew
18   then, and I was answering based on what I know
19   now.
20 Q.  Sure.  And so when you -- when
21   Hodell actually did have direct communications
22   with SAP, SAP actually told Hodell that based
23   on its database size, and other factors, that
24   Business One might not function the way Hodell
25   had hoped, correct?

Page 185

1  A.  When did they tell us?
2  Q.  When you finally communicated
3   with SAP, well after you signed the license
4   agreement, SAP actually told you, correct?
5  A.  Well after we were, started it
6   live, well.
7  Q.  And that's the first time Hodell
8   -- first -- the first time Hodell actually had
9   direct communications with anybody at SAP, was
10  well after you signed the license agreement,
11  correct?
12 A.  Correct.
13 Q.  And it was actually after you
14  went live in -- in March of 2007, correct?
15 A.  I can't say that with certainty,
16  no.
17 Q.  Paragraph 28 of the complaint
18  covers part of page 12 and 13 of your
19  complaint.  It lists certain information that
20  was allegedly provided during -- provided
21  through written materials to Hodell-Natco.  Do
22  you see that, sir?
23 A.  We're going back to 12?
24     MR. LAMBERT: You said paragraph 28?
25     MR. STAR: 28.

Page 186

1      MR. LAMBERT: He said paragraph 28.
2      THE WITNESS: Oh, I thought he
3   said ....
4      BY MR. STAR:
5  Q.  You see that paragraph, sir?
6  A.  Yes.
7  Q.  Okay.  Paragraph 28 b., you claim
8   Business One was jointly represented by the
9   Defendants as providing robust and fully
10  integrated financial and sales management
11  capabilities.  Is it Hodell's belief that that
12  representation was false?
13 A.  Yes.
14 Q.  Why?
15 A.  Because it wasn't easy to
16  implement.
17 Q.  Well, what does this, having
18  robust and fully integrated financial and
19  sales management capabilities, have to do with
20  the ease of implementation?
21 A.  Please rephrase that question.
22 Q.  Sure.  I'm looking at 28 b, sir,
23  where the allegation is that it was
24  represented that Business One would provide
25  robust and fully integrated financial and

Page 187

1   sales management capabilities.  My question to
2   you is, does Hodell presently believe that
3   that representation is false?
4  A.  Yes.  Taken into the -- in the
5   context of the number of users, yes.
6  Q.  You agree with me, though, that
7   SAP -- neither SAP America, nor SAP AG, ever
8   made any direct representation to Hodell about
9   the number of users that could be supported by
10  SAP Business One?
11     MR. LAMBERT: Objection.
12     BY MR. STAR:
13 Q.  Correct?
14 A.  I have asked -- answered that
15  question.
16 Q.  And the answer is nobody from SAP
17  gave a direct representation, right?
18     MR. LAMBERT: Objection.
19     THE WITNESS: SAP business partners are
20  one -- and SAP are one in the same to a
21  customer.
22     BY MR. STAR:
23 Q.  Okay.  Paragraph 28 c, you claim
24  Business One was represented as providing
25  managers on-demand access to critical real

Page 188

1   time information.  Do you believe that was a
2   false representation about the potential
3   capabilities of Business One?
4  A.  Yes.
5  Q.  Why?
6  A.  Because it wasn't real time.
7  Q.  Were these representations --
8  A.  Huge delays.
9  Q.  Were these representations that
10  you're mentioning in paragraph 28 b. and c.
11  specific representations about how Business
12  One would function specifically for Hodell, or
13  were these general representations about how
14  the product works?
15 A.  I can only deal with the issue as
16  represented to Hodell.
17 Q.  So you believe that the
18  representation that Business One could provide
19  on-demand access to critical real time
20  information was false; is that right?
21 A.  Correct.
22 Q.  Why is it that you believe it was
23  false?
24 A.  Because the system would lock up
25  constantly, and it wasn't -- real time to me

Page 233

1  Q. No -- I'm sorry. I'm looking at
2  paragraph 1.2 on the first page of the license
3  agreement.
4  A. Oh, I'm sorry. I thought you
5  said 7.1.
6  Q. Just want to make sure we don't
7  have any confusion there.
8  Just to do that again, you see in
9  paragraph 1.2, it says Documentation, right?
10 It says it means SAP's documentation, which is
11 delivered to licensee, being Hodell, under
12 this agreement, correct?
13 A. Correct.
14 Q. Okay. Do you have that
15 documentation?
16 A. I would have to defer to Kevin.
17 Q. Okay. Do you know if that
18 documentation's actually been produced in this
19 litigation?
20     MR. LAMBERT: Objection.
21     THE WITNESS: I would have to defer to
22 Kevin.
23     BY MR. STAR:
24 Q. Okay. Do you recall personally
25 ever reading the documentation?

Page 234

1     MR. LAMBERT: Objection.
2     THE WITNESS: I don't know.
3     BY MR. STAR:
4  Q. So you don't know if the
5  documentation may have representations about
6  productivity gains and those sorts of things
7  that you have described, correct?
8     MR. LAMBERT: I just want to note an
9  objection.
10    THE WITNESS: I don't know.
11    BY MR. STAR:
12 Q. The fifth cause of action in your
13 complaint is for negligent misrepresentation.
14 It begins with paragraph 91. Is it correct
15 that the representations, or
16 misrepresentations that form the basis of this
17 cause of action for negligent
18 misrepresentation, are the same
19 representations that support your claims for
20 fraudulent inducement and fraud?
21    MR. LAMBERT: Objection.
22    THE WITNESS: Please rephrase that
23 question.
24    BY MR. STAR:
25 Q. Sure. Okay. Is it your

Page 235

1  understanding, as the designee on behalf of
2  Hodell, that the alleged misrepresentations
3  that support your fifth cause of action for
4  negligent misrepresentation, are the same
5  alleged misrepresentations that form the basis
6  of your claims for fraud and fraudulent
7  inducement?
8     MR. LAMBERT: Objection, same.
9     THE WITNESS: Sorry, I didn't hear what
10 you said.
11    MR. LAMBERT: I was just objecting.
12 You can answer, if you know.
13    THE WITNESS: I believe so.
14    BY MR. STAR:
15 Q. Okay. And you'd also agree with
16 me that all of the misrepresentations that
17 form the basis of your negligent
18 misrepresentation claim were representations
19 made to Hodell prior to its signing of the
20 license agreement on December 23rd, 2005,
21 right?
22    MR. LAMBERT: Objection.
23    THE WITNESS: I believe that's correct.
24    BY MR. STAR:
25 Q. Okay. At the time Hodell signed

Page 236

1  the license agreement in 2005, was it your
2  personal belief that you had any sort of
3  special relationship with SAP, either SAP
4  America, or SAP AG, or did you feel that you
5  were just dealing with them as a business
6  customer, or -- not the right word -- let me
7  ask the question again.
8  At the time that you signed the license
9  agreement in December of 2005, did Hodell
10 believe that it had any special relationship
11 with SAP America, or SAP AG, such that it was
12 in a position of trust or confidence with SAP?
13    MR. LAMBERT: Objection.
14    THE WITNESS: I don't believe it was a
15 special relationship. I believe a company of
16 SAP's stature requires an up and up
17 relationship with all their clients.
18    BY MR. STAR:
19 Q. So you'd agree that when you
20 signed the license agreement, you had nothing
21 more than a business to business, or arm's
22 length relationship between Hodell and SAP,
23 correct?
24 A. Correct.
25 Q. Let's go off the record for a

Page 237

1  second.
2  (Whereupon, an off-the-record discussion
3  was held at 4:13.)
4  (Whereupon, the deposition was continued
5  until the following day.)

Page 238

1              CERTIFICATE OF THE REPORTER
2        I, Angela A. O'Neill, a Registered Professional
3  Reporter and Notary Public, authorized to administer oaths and to
4  take and certify depositions, do hereby certify that the
5  above-named witness was by me, before the giving of their
6  deposition, first duly sworn to testify the truth, the whole
7  truth, and nothing but the truth to questions propounded at the
8  taking of the foregoing deposition in a cause now pending and
9  undetermined in said court.
10       I further certify that the deposition above-set forth
11 was reduced to writing by me by means of machine shorthand and was
12 later transcribed from my original shorthand notes; that this is a
13 true record of the testimony given by the witness; and that said
14 deposition was taken at the aforementioned time, date, and place,
15 pursuant to notice or stipulations of counsel.
16       IN WITNESS WHEREOF, I have set my hand and seal this
17 14th day of February, 2012.
18                    *Angela A. O'Neill* (signature)
19       _____
         Angela A. O'Neill, RPR
20       My Commission Expires:  Aug. 10, 2012