IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HODELL-NATCO INDUSTRIES, INC. | ) | CASE NO. 1:08 CV 2755 |
| | ) | |
| Plaintiff, | ) | JUDGE NUGENT |
| | ) | |
| v. | ) | |
| | ) | |
| SAP AMERICA, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## APPENDIX OF UNPUBLISHED CASES

### CASES

*Loyd v. Huntington Nat'l Bank*,
 No. 1:08-cv-2301, 2009 U.S. Dist. LEXIS 51858 (N.D. Ohio June 18, 2009) ........................1

*Parma Cmty. Gen. Hosp. v. Premier Anesthesia of Parma*,
 No. 1:09-cv-325, 2011 U.S. Dist. LEXIS 11035 (N.D. Ohio Feb. 4, 2011)..............................2

# Tab 1



**JAMES LOYD, et al., Plaintiffs, v. HUNTINGTON NATIONAL BANK, et al., Defendants.**

**CASE NO.: 1:08 CV 2301**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION**

*2009 U.S. Dist. LEXIS 51858*; *69 U.C.C. Rep. Serv. 2d (Callaghan) 295*

**June 18, 2009, Decided
June 18, 2009, Filed**

**PRIOR HISTORY:** *Loyd v. Huntington Nat'l Bank, 2009 U.S. Dist. LEXIS 42392 (N.D. Ohio, May 18, 2009)*

**COUNSEL:** [*1] For James Loyd, Margaret Loyd, Daniel L. Luebbehusen, Robert J. Lueken, George Matthews, Virginia Matthews, Patrick McCafferty, Kim McCafferty, Jacqueline L. Mattison, Glenn A. Newton, Alice Beck, Ray Shuss, Roberta Shuss, Debbie Loyd, Helen Alpanalp, Iris Ammerman, Lucille Arnold, Alfred Ballentine, Bruce Bandy, Thomas Bandy, Barbara Bezzeg, Edgar Boberg, Nancy Brown, Charles Burger, Leon Cox, Maybelline Dell, Ken Don, William Golden, Cherly Hawkins, Georgianna Holly, Zachary Horgan, Emma Jochum, Nancy Kitay, Clarence Knust, Donald Kready, Paul Lawrence, Joretta Nichols, Anna Powers, Charles Sankey, Philip Sillia, Donna Sillia, Horst Uebel, Anna Uebel, Joseph Vanek, Harlam Warren, Plaintiffs: Daniel G. Morris, Cleveland, OH.

For Huntingon National Bank, N.A., itself, and as corporate successor by merger to other First National Bank of Zanesville other County Savings Bank other Unizan Bank, National City Bank, itself and as corporate successor by merger to other Provident Bank, Defendants: Frances F. Goins, Reem Shalodi, Thomas L. Anastos, Ulmer & Berne - Cleveland, Cleveland, OH.

For Fifth Third Bank, itself, and as Corporate successor by merger to other Citizens Bank other Strongsville [*2]

Savings Bank, Third Federal Bank, Defendants: Brett A. Wall, Katie M. McVoy, Michael E. Mumford, Baker & Hostetler - Cleveland, Cleveland, OH.

For Suntrust Bank, N.A., Defendant: T. Thomas Cottingham, III, LEAD ATTORNEY, Hunton & Williams - Charlotte, Charlotte, NC; Patrick M. McLaughlin, McLaughlin & McCaffrey, Cleveland, OH.

For Wachovia Bank, N.A., itself, and as corporate successor by merger to other First United Bank other First United Bancorp other First Union, Defendant: Dana C. Lumsden, K. Stacie Corbett, T. Thomas Cottingham, III, LEAD ATTORNEYS, Hunton & Williams - Charlotte, Charlotte, NC; Patrick M. McLaughlin, McLaughlin & McCaffrey, Cleveland, OH.

For Andover Bank, The Covington Savings and Loan Association, First Indiana Bank, itself, and as corporate successor to other Mid-West Federal Credit Union, The Killbuck Savings Bank, Mechanics Savings Bank, Monroe County Bank, Spencer County Bank, U.S. Bank, as successor by merger to other Firstar Bank, N.A. other Star Bank, N.A., U.S. Bank National Association, Defendants: Joseph P. Rodgers, Martha S. Sullivan, Squire, Sanders & Dempsey - Cleveland, Cleveland, OH.

For Aurgroup Financial Credit Union, corporate successor to other [*3] Hambuco Credit Union, Day Air

Case: 1:08-cv-02755-DCN  Doc #: 324-4  Filed:  06/01/15  4 of 31.  PageID #: 16536

Page 2

2009 U.S. Dist. LEXIS 51858, *3; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

Credit Union, Defendants: Stephen D. Miles, Dayton, OH.

For Belmont National Bank, J.P. Morgan Chase Bank, N.A., as corporate successor by merger to other Bank One other First National Bank of Chicago, Key Bank, itself, and as corporate successor to other Society Bank, PNC Bank National, itself and as corporate successor to other National City Bank other First Bank of Huntington, IN, Sky Bank, as corporate successor by merger of other Metropolitan Bank and Trust Co. other Americom Bank other Citizens Banking Co., Defendants: Frances F. Goins, Joseph A. Castrodale, Reem Shalodi, Thomas L. Anastos, Ulmer & Berne - Cleveland, Cleveland, OH.

For Charter One Bank, Defendant: Karen L. Giffen, Kathleen A. Nitschke, Melissa A. Laubenthal, Giffen & Kaminski, Cleveland, OH.

For Dollar Bank, Defendant: David M. Dvorin, Jonathon M. Yarger, Steven L. Wasserman, Victor D. Radel, Chernett, Wasserman, Yarger & Pasternak, Cleveland, OH.

For Dover-Phila Federal Credit Union, Defendant: Frances F. Goins, Joseph A. Castrodale, Thomas L. Anastos, Ulmer & Berne - Cleveland, Cleveland, OH.

For Farmers National Bank Corp., as corporate parent of other Farmers National Bank of Canfield, [*4] Ohio Valley National Bank, Republic Savings Bank, Sunflower Bank, Farmers & Merchants Bank of Colby, Defendants: Martha S. Sullivan, Squire, Sanders & Dempsey - Cleveland, Cleveland, OH.

For First Merit Corporation, itself and as corporate successor to other Signal Bank, Defendant: Elizabeth A. Ratliff, Marcel C. Duhamel, Natalia Steele, Vorys, Sater, Seymour & Pease - Cleveland, Cleveland, OH; John W. Solomon, Vorys, Sater, Seymour & Pease - Akron, Akron, OH.

For Old National Bancorp, as corporate successor by merger to, and as parent of other Farmers Bank & Trust Co. other Dubois County Bank, Defendant: Fritz E. Berckmueller, Kevin R. Carter, Calfee, Mitchell G. Blair, Halter & Griswold - Cleveland, Cleveland, OH.

For Springs Valley Bank & Trust, Defendant: Rosemary Taft Milby, Weltman, Weinberg & Reis, Cleveland, OH.

For State Street Corp., parent of other State Street Bank

& Trust Co., Defendant: Kathleen J. Goldman, LEAD ATTORNEY, Christopher P. Schueller, Stanley J. Parker, PRO HAC VICE, Buchanan Ingersoll - Pittsburgh, Pittsburgh, PA.

For Wright-Patt Credit Union, Century Federal Credit Union, Defendants: Jay C. Rice, Mark M. Turner, Gallagher Sharp - Cleveland, Cleveland, OH.

For [*5] Terre Haute Savings, Defendant: Kari B. Coniglio, Tamara L. Karel, Benesch, Friedlander, Coplan & Aronoff - Cleveland, Cleveland, OH.

For Wells Fargo Bank, Defendant: Matthew T. Fitzsimmons, R. Christopher Yingling, Nicola, Gudbranson & Cooper, Cleveland, OH.

For Wilson & Muir Bank & Trust Co., Defendant: Bonnie L. Wolf, Frost Brown Todd - Columbus, Columbus, OH.

For SunTrust Bank, NA, Defendant: Dana C. Lumsden, K. Stacie Corbett, LEAD ATTORNEYS, Hunton & Williams - Charlotte, Charlotte, NC; Anthony R. Petruzzi, Patrick M. McLaughlin, McLaughlin & McCaffrey, Cleveland, OH.

For Wachovia Bank, National Association, Defendant: Anthony R. Petruzzi, Patrick M. McLaughlin, McLaughlin & McCaffrey, Cleveland, OH.

For Citizens Bank, f/k/a Republic Bank, Farmers National Bank of Canfield, M&I Bank, f/k/a First Indiana Bank, Town & Country Bank and Trust Co., Successor to Farmer's Bank & Trust, Defendants: Joseph P. Rodgers, Squire, Sanders & Dempsey - Cleveland, Cleveland, OH.

For Bank of America, as corporate successor to other Bank of Boston, Defendant: David A. Wallace, Carpenter, Lipps & Leland - Columbus, Columbus, OH.

For First National Bank of Pennsylvania, as corporate successor to other Bucktail [*6] Bank & Trust Co., Defendant: Amanda J. Banner, Henderson Covington Messenger Newman Thomas, Youngstown, OH.

For German American Bancorp, as corporate successor to other Community Trust, Defendant: Beau D. Hollowell, James P. Sammon, Reminger & Reminger - Cleveland, Cleveland, OH; Erik C. Johnson, Philip A. Whistler, Ice Miller, Indianapolis, IN.

2009 U.S. Dist. LEXIS 51858, *6; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

**JUDGES:** DONALD C. NUGENT, United States District Judge.

**OPINION BY:** DONALD C. NUGENT

**OPINION**

MEMORANDUM OPINION AND ORDER

This case is before the Court on the Defendants' Motions to Dismiss Plaintiffs' First Amended Complaint. The Defendants have filed numerous Motions to Dismiss, some filed jointly by multiple defendants and some filed on behalf of individual defendants. The Defendants raise various arguments for the dismissal of Plaintiffs' claims. Having fully considered all of the facts and law relevant to the motions, the Court finds as follows.

**PROCEDURAL HISTORY**

Plaintiffs filed their original Complaint on September 29, 2008. (ECF # 1). An Amended Complaint was filed on January 9, 2009. [1] (ECF # 80). The Defendants have filed a myriad of briefs requesting dismissal of Plaintiffs' claims. Common to all of the motions to dismiss is the question of whether the claims brought [*7] under the Uniform Commercial Code ("UCC") are barred by the applicable statutes of limitation. Statute of limitations issues have also been raised in connection with the common law claims. Further, several Defendants have provided substantive arguments as to why Plaintiffs' claims fail to state claims upon which relief may be granted.

> 1 The Amended Complaint is styled (though not captioned) as a purported class action suit. Multiple classes have been defined based on which bank negotiated and/or deposited the checks at issue in this case.

Motions to dismiss the Plaintiffs' Amended Complaint remain pending under the following ECF numbers: # 84 (Terre Haute Savings); # 87 (Old National Bancorp); # 89 (Wilson & Muir Bank & Trust Co.); # 90 (Springs Valley Bank & Trust); [2] # 95 (First Merit Corp.); # 96 (U.S. Bank National Association and The Killbuck Savings Bank); # 97 (Sunflower Bank); # 98 (Fifth Third Bank); [3] # 99 (Third Federal Bank); # 101 (Walls Fargo Bank); # 103 (Dollar Bank); # 107 (Charter One Bank); # 108 (Belmont National Bank, J.P. Morgan

Chase Bank, N.A., Key Bank, PNC Bank National, and Sky Bank); # 118 (Century Federal Credit Union); # 120 (Huntington National Bank, N.A.); [*8] # 121 (Sun Trust Bank, N.A. and Wachovia Bank, N.A.); # 124 (Farmers & Merchants Bank of Colby); [4] # 136 (First National Bank of Pennsylvania); # 137 (Bank of America); and, # 156 (German American Bancorp). [5] Plaintiff also named John Doe Banks one through ten (additional drawee banks) and John Doe Banks eleven through fifteen (additional depositary banks) in the caption of the Amended Complaint.

> 2 Springs Valley Bank & Trust was named in the original Complaint, but was not named in the First Amended Complaint. It is, therefore, dismissed, for want of prosecution.
> 3 This motion was mis-captioned as a Motion to Dismiss Second Amended Class Action Complaint.
> 4 Farmers & Merchants Bank of Colby was identified as "Bank of Colby" in the Amended Complaint.
> 5 The Amended Complaint also names "First National Bank" and "First National Bank of Odon" as Defendants. No responsive pleading has been filed by either entity, and there is no indication on the docket that either of these entities were ever served with a complaint (or that service was even attempted) in this action. Pursuant to *Fed. R. Civ. P. 4(m)*, if a Defendant has not been served within 120 days of the filing of a Complaint against them, [*9] the Court must dismiss the action without prejudice against that Defendant. Generally a Court will provide prior notice to the Plaintiffs of its intent to dismiss for failure of service. However, because the claims against these parties would otherwise be dismissed as untimely under the applicable statute of limitations, the Court finds that the interests of the parties and principles of judicial economy dictate that it is more appropriate under these circumstances to dismiss these parties without prejudice. If Plaintiffs believe that they can properly serve these Defendants and they wish to pursue an action against them, they may file a motion to reinstate the action as against these Defendants only.

Plaintiffs filed a global Response to Defendants' Motion to Dismiss on April 28, 2009. (ECF # 157). [6]

2009 U.S. Dist. LEXIS 51858, *9; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

Several Defendants filed replies to the Plaintiffs' Opposition. (ECF # 166, 168-170, 172-184, 187). Oral arguments were heard on the motions on May 28, 2009. The pending motions to dismiss have now been fully briefed and are ready for consideration.

> 6   Plaintiffs filed their response a day after it was due along with a request for leave to file the response instanter. The Court granted leave  [*10] on May 11, 2009. (ECF non-doc.)

## PARTIES

The Plaintiffs are individuals who, between 1998 and 1999, wrote checks to Serengeti Diamonds U.S.A., Inc. ("Serengeti") and/or Lomas De La Barra ("Lomas"), thinking that they were purchasing promissory notes in those companies. These "notes" were being sold by James Carpenter directly and/or through agents or brokers. Mr. Carpenter allegedly failed to use the funds provided by the investors to purchase promissory notes in these companies, and instead "commingled" them into bank accounts he controlled. Plaintiffs claim they were injured when the Defendant Drawee Banks improperly paid checks "made to Defendant depositary [banks], which had wrongly negotiated the check[s] into an account it opened" in the name of Serengeti and/or Lomas.

There are two main categories of Defendants in this action. The first are the Drawee Banks. Drawee Banks are the banks that paid off on the checks written by the Plaintiffs (i.e., the banks at which the Plaintiffs had accounts). The Drawee Banks are: Huntington National Bank; Fifth Third (in its own name and as corporate successor by merger to Citizens Bank and The Strongsville Savings Bank); Sun Trust (through merger/acquisition  [*11] of Firstar Bank and Star Bank); Wachovia Bank (as corporate successor to First United Bank, First United Bancorp and First Union Bank); Bank of America (through merger with Bank of Boston); Bank of Colby; Belmont National Bank; Century Federal Credit Union; Charter One Bank; Dollar Bank; Firstmerit Corporation (in its own name and as corporate successor to Signal Bank); First National Bank; First National Bank of Odon; First National Bank of Pennsylvania; German American Bancorp (as corporate successor to Community Bank); JP Morgan/Chase Bank (as corporate successor to Bank One and First National Bank of Chicago); Key Bank; Killbuck Savings Bank; Old National Bancorp (in its own name and as corporate successor to the Dubois County Bank); PNC Bank (in its own name and as corporate successor to National City Bank); Sky Bank (as corporate successor to Citizens Bank); Sunflower Bank; Third Federal Savings Bank; Terre Haute Savings; US Bank (as corporate successor to Star Bank); Wells Fargo; and, Wilson & Muir Bank. Plaintiffs assert one claim against the drawee banks for violations of the Uniform Commercial Code ("UCC") *Section 4-401*(Count I).

The Second group of Defendants are the Depositary  [*12] Banks. The Depositary Banks are accused of wrongly opening and maintaining bank accounts for James Carpenter in the names of Serengeti and Lomas. The Depositary Banks are: Huntington National Bank (as corporate successor to First National Bank of Zanesville, Bank First National of Zanesville, and Unizan Bank); Fifth Third; Sun Trust; and, Wachovia Bank. Plaintiffs' claims against the Depositary Banks include the following: fraud, fraudulent concealment, and conspiracy to commit fraud (Count II - against Huntington National; Count III - against Fifth Third; Count IV - against Wachovia; and, Count V [7] - against Sun Trust); failure to act with ordinary care (Count VI - against all Depositary Banks); breach of fiduciary duty (Count VII - against all Depositary Banks); money had and received (Count VIII- against all Depositary Banks); and, aiding and abetting Carpenter's tortious acts (Count IX - against all Depositary Banks).

> 7   The Amended Complaint mistakenly labels Count V, as "Count IV." This opinion will refer to the Fraud count against Sun Trust as "Count V."

## STANDARD OF REVIEW

On a motion brought under *Fed. R. Civ. P. 12(b)(6)*, this Court's inquiry is limited to the content of the complaint,  [*13] although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint may also be taken into account. See *Chester County Intermediate Unit v. Pennsylvania Blue Shield, 896 F.2d 808, 812 (3rd Cir. 1990).*

In evaluating a motion for dismissal under *Rule 12(b)(6)*, the district court must "consider the pleadings and affidavits in a light most favorable to the [non-moving party]." *Jones v. City of Carlisle, Ky., 3 F.3d. 945, 947 (6th Cir. 1993)* (quoting *Welsh v. Gibbs, 631 F.2d 436, 439 (6th Cir. 1980)).* However, though construing the complaint in favor of the non-moving

2009 U.S. Dist. LEXIS 51858, *13; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

party, a trial court will not accept conclusions of law or unwarranted inferences cast in the form of factual allegations. See *City of Heath, Ohio v. Ashland Oil, Inc., 834 F.Supp. 971, 975 (S.D. Ohio 1993)*. "A plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*(quoting *Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986))*. "Factual allegations [*14] must be enough to raise a right to relief above the speculative level." *Twombly at 555*. In deciding a *Rule 12(b)(6)* motion, this Court must determine not whether the complaining party will prevail in the matter but whether it is entitled to offer evidence to support the claims made in its complaint. See *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)*.

## ANALYSIS

### I. Personal Jurisdiction

Several of the out-of-state Banks have challenged whether this Court has personal jurisdiction to hear the claims against them. These include: Terre Haute Savings, Wilson & Muir Bank & Trust Co., Sunflower Bank, Farmers & Merchants Bank of Colby, and German American Bancorp. [8] In order to exercise personal jurisdiction over an out-of-state party, two requirements must be met. First, the Complaint must allege sufficient jurisdictional facts to bring the action within the purview of Ohio's long-arm statute (*O.R.C. §2307.382*). See *Calphalon Corp. v. Rowlette, 228 F.3d 718, 721 (6th Cir. 2000)*. Second, the exercise of personal jurisdiction must comport with the due process requirements of the U.S. Constitution. See *Nationwide Mut. Ins. Co. v. TRYG Inter. Ins. Co. Ltd., 91 F.3d 790, 793 (6th Cir. 1996)*. Plaintiffs [*15] bear the burden of demonstrating the exercise of personal jurisdiction is proper. See *American Greetings Corp. v. Cohn, 839 F.2d 1164, 1168 (6th Cir. 1987)*.

[8]    Personal jurisdiction requirements are waivable rights. See *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, n.14, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)*. Those Defendants who did not challenge personal jurisdiction in their first responsive pleading have waived this issue. *Fed. R. Civ. P. 12(h)(1)*; see, e.g., *Taubman Co. v. Webfeats, 319 F.3d 770, 773 (6th Cir.*

*2003)*; *Reynolds v. Int'l Amateur Athletic Fed'n, 23 F.3d 1110, 1120 (6th Cir. 1994)*; *In Re Wolverine Radio Co., 930 F.2d 1132, 1137 n.5 (6th Cir. 1991)*.

Each [*16] Bank challenging personal jurisdiction asserts that it is an out-of-state Bank that does not conduct business in Ohio and that the Plaintiffs making claims against it are not citizens of Ohio. They also each allege that they have insufficient contacts, ties, or relations with Ohio to justify personal jurisdiction in the state. The allegations in the Amended Complaint do not conflict with these assertions, and Plaintiffs have provided no other basis upon which this Court could find that the exercise of personal jurisdiction is proper over these Defendants.

Plaintiffs have not identified which section of Ohio's Long Arm Statute would form a basis for the exercise of personal jurisdiction; they have not made any allegations that would demonstrate that their claims arose out of any acts or omissions that occurred in Ohio; they have not provided any allegations or evidence that these Defendants have substantial and continuous contacts with Ohio; they have not shown that these Defendants have any customers, offices, subsidiaries, employees, assets, or real property in Ohio; and, they have not established that these Defendants are registered or licensed to do business in Ohio, pay Ohio taxes, [*17] or maintain any business address, phone number or other contacts in Ohio. [9]

[9]    Plaintiffs do not respond to the personal jurisdiction argument in their Response to Defendants' motions to dismiss, and have, therefore, effectively conceded to the dismissal of these Defendants. They do superficially address a challenge to subject matter jurisdiction based on a lack of diversity in the last two pages of their Response brief, but they have made no attempt to counter these Defendants' arguments against the exercise of personal jurisdiction.

Based on the information currently before the Court, these Defendants do not appear to have sufficient contacts to satisfy the statutory or due process requirements that would allow this Court to exercise personal jurisdiction over them. The claims against Terre Haute Savings, Wilson & Muir Bank & Trust Co., Sunflower Bank, Farmers & Merchants Bank of Colby, and German American Bancorp must, therefore, be dismissed. [10]

Case: 1:08-cv-02755-DCN  Doc #: 324-4  Filed: 06/01/15  8 of 31.  PageID #: 16540

Page 6

2009 U.S. Dist. LEXIS 51858, *17; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

10    Even if this Court could exercise personal jurisdiction over the non-Ohio Drawee Banks listed above, for the reasons set forth below, all of the claims against those Banks would be dismissed along with the claims against all of the other  [*18] Drawee Banks, based on the statute of limitations.

## II. UCC Displacement of Tort Claim For "Money Had and Received"

The Depository Banks argue that the common law claim of "money had and received" (Count Eight) has been displaced by Ohio's codification of the UCC. This Court explored this argument in detail in *Metz v. Unizan Bank, 416 F. Supp. 2d 568 (2006)* [11] and found that this common law claim (when raised in the commercial context involving negotiable instruments) has, indeed, been supplanted by the UCC. See *Olympic Title Ins. Co. v. Fifth Third Bank of Western Ohio, 2004 Ohio 4795, 2004 WL 2009285 at *6 (2nd Dist. Ohio Ct. App. 2004)*; *Amzee Corp. v. Comerica Bank-Midwest, 2002 Ohio 3084, 2002 WL 1012998, at *9-10 (Ohio App. 2002)*(holding that claims for conversion, money had and received, money paid by mistake, and unjust enrichment were displaced by the UCC). Plaintiffs do not challenge the Defendants' contention that the common law cause of action for "money had and received" has been supplanted by Ohio's codification of the UCC. Rather, Plaintiffs now characterize their cause of action for "money had and received" (Count VIII) as a UCC  [*19] claim. (Response, at 4, 40).

11    Please note, when reviewing the Docket in the Metz case, the ECF (Docket) Numbers are not necessarily in chronological order by date of entry.

The UCC has created a statutory scheme to assess liability and otherwise allocate losses arising in the commercial context. However, Plaintiffs have cited no specific provision that would give them a cause of action against the Depository Banks under the facts set forth in Count Eight of the Amended Complaint. The claim, therefore, is dismissed for failure to state a claim upon which relief may be given. [12]

12    Even if Count Eight actually did state a claim under the common law, or the UCC, it is undisputed that the three year statute of limitations set forth in *O.R.C. § 1303.16(G)(1)*

would apply. As set forth below, this statute of limitations would have run long before this action was filed, and the claim, therefore, must be dismissed.

## III. Statute of Limitations

### A. Applying the Statutes of Limitation to the UCC Claims

The parties agree that the Plaintiffs' claims are based on events which occurred in 1998 and 1999, and that the original Complaint was not filed until September 29, 2008. The parties also agree that Plaintiffs'  [*20] UCC claims [13] are subject to the three-year statute of limitations set forth in Articles 3 and 4 of the Uniform Commercial Code ("UCC"), codified at *O.R.C. § 1303.16* and *O.R.C. § 1304.09*. [14] Both of these provisions provide that an action shall be brought within three years of when the cause of action "accrues."

13    The UCC based claims include Count I (violation of *O.R.C. §1304.30 - U.C.C. 4-401*), Count VI (failure to exercise ordinary care), and Count VII (bad faith in violation of *O.R.C. §1304.03*).

14    Claims brought pursuant to *O.R.C. §1304.30* (2005)(*UCC 4-401*) are subject to the statute of limitations set forth in *O.R.C. § 1304.09* (2005).

Article 3 provides that:

Unless governed by other law regarding claims for indemnity or contribution, any of the following actions shall be brought within three years from when the action accrues:

(1) An action for conversion of an instrument, money had and received, or a similar action based on conversion;

(2) An action for breach of warranty;

(3) An action to enforce an obligation, duty or right arising under this chapter and not governed by this section.

*O.R.C. § 1303.16*. *Article 4 of Section 1304.09* provides that:

An action to enforce an obligation, duty

Case: 1:08-cv-02755-DCN Doc #: 324-4 Filed: 06/01/15 9 of 31. PageID #: 16541

Page 7

2009 U.S. Dist. LEXIS 51858, *21; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

[*21] or right arising under *Sections 1304.01 to 1304.04* of the Revised Code shall be brought within three years after the cause of action accrues.

The dispute between the parties centers on how to determine when the Plaintiffs' causes of action accrued. Neither of the applicable statutes of limitation defines the word "accrues." The current syllabus law in Ohio is that "[a]bsent legislative definition, it is left to the judiciary to determine when a cause "arose" for purposes of statutes of limitations." *O'Stricker v. Jim Walter Corp., 4 Ohio St.3d 84, 4 Ohio B. 335, 447 N.E.2d 727,* syllabus P 1, *4 Ohio St. 3d 84, 4 Ohio B. 335, 447 N.E.2d 727 (1983).* The Defendants argue that, for purposes of applying a statute of limitations, unless otherwise specified, a cause of action accrues at the time the wrongful act is committed. Further, they contend that Ohio courts have found that this general rule applies to the UCC claims at issue in this case. Plaintiffs, on the other hand, claim that under Ohio law, "accrual" occurs only after the wrongful acts have been discovered.

The Defendants cite several Ohio cases in support of their contention that the UCC claims in this case accrued at the time of the wrongdoing. As seen in *Palmer v. Mfg. and Supply, Inc. v. BancOhio Nat'l Bank, 93 Ohio App. 3d 17, 637 N.E.2d 386, 390 (1994),* [*22] cert. denied *69 Ohio St. 3d 1488, 635 N.E.2d 43 (1994),* and *Brentar v. Rupert, No. 73903, 1998 Ohio App. LEXIS 6111, 1998 WL 895285 (Ohio App. 8th Dist. Dec. 17, 1998),* Ohio courts have found that the "great bulk of authority runs very strongly against" the application of the discovery rule for claims involving the theft or conversion of negotiable instruments. In addition, the Ohio General Assembly, in enacting the UCC, specifically chose to toll the running of the statute of limitations until after the injury was discovered in some instances but not in others. The legislature did not specifically add a discovery rule to the statutes of limitation applicable in this case. The Ohio Supreme Court has held that the fact that the General Assembly included language establishing a discovery rule under some UCC sections but not in others "argues strongly that it was not the legislature's intent to apply the discovery rule to [the later] claims." *Investors Reit One v. Jacobs, 46 Ohio St.3d at 181, 546 N.E.2d at 211,* citing *Kirsheman v. Paulin, 155 Ohio St. 137, 146, 98 N.E.2d 26, 31 (1951).* "The legislature's express inclusion of a discovery rule for certain [claims] . . .

implies the exclusion of other torts arising [*23] under the statute . . . ." Id.

Plaintiffs cite no case law to the contrary, rather they argue that the Ohio cases cited by the Defendants are irrelevant because a statutory "discovery rule" applies to these cases. Plaintiffs point to *O.R.C. § 2305.09* -- the four year statute of limitations for "certain torts" -- as the statutory "discovery rule" that should be applied to the statute of limitations set forth in *O.R.C. §1303.16* and *O.R.C. §1304.09. Ohio Revised Code § 2305.09* sets forth the statute of limitations for the following causes of action: (A) trespassing upon real property; (B) the recovery of personal property, or for taking and detaining it; (C) for relief on the ground of fraud; and (D) for an injury to the rights of plaintiff not arising on contract nor enumerated in *sections 2305.10 to 2305.12, 2305.14,* and *1304.35* of the Revised Code. It further states:

> If the action is for trespassing under ground or injury to mines, or for the wrongful taking of personal property, the causes thereof shall not accrue until the wrongdoer is discovered; nor, if it is fraud, until the fraud is discovered.

The discovery rule established in this section is clearly limited in its application. [*24] It applies only to the four year statute of limitations for certain actions set forth in sub-sections *(A)-(C) of O.R.C. § 2305.09.*

Plaintiffs spend a great deal of their Response brief outlining the legislative history of this provision and of various statutes of limitation established through Ohio's codification of the UCC. None of this information is relevant, however, because *O.R.C. § 2305.09* has no application to claims which are given their own specific statute of limitations in the UCC. This statute creates a four year statute of limitations for tort actions that are not otherwise specifically governed by their own statutes of limitations. The parties, however, agree that a three year period of limitations, specifically assigned by *O.R.C. § 1303.16* and *§ 1304.09,* apply to the UCC claims at issue in this case. *Ohio Revised Code § 2305.09,* therefore, does not apply, and the definition of accrual specifically aimed at certain sections of that particular statute is not applicable to the Plaintiffs' claims.

Plaintiffs contend that because the Amended Complaint alleges that James Carpenter was guilty of

Case: 1:08-cv-02755-DCN  Doc #: 324-4  Filed:  06/01/15  10 of 31.  PageID #: 16542

Page 8

2009 U.S. Dist. LEXIS 51858, *24; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

conversion and fraud, all of the claims in their complaint "were caused by the wrongful [*25] taking of their personal property and from fraud." Consequently, they argue that the discovery rule in *O.R.C. § 2305.09* should apply to all of their claims, including those brought under various UCC provisions. However, any claims they may have had (but did not assert in this action) against Mr. Carpenter are irrelevant in determining what statute of limitations applies to the actual claims Plaintiffs brought against the banks. The statutory claims under the UCC are not legally equivalent to an action for wrongful taking of personal property, fraud, or any other common law cause of action, [15] and whether or not there is some connection between these claims and the allegations made against Mr. Carpenter, they are certainly not interchangeable with potential common law tort claims Plaintiffs may have had against Mr. Carpenter, a legally independent entity.

> 15  The banks are not alleged to have taken any personal property of the Plaintiffs. Rather, they are accused of honoring checks made out by the Plaintiffs; cashing checks and depositing the money into accounts named for the companies the checks had been written out to. Checks are not personal property. They are an obligation on behalf [*26] of the drawer of the check to the drawee.

Further, Plaintiffs do not accuse the Drawee Banks of any fraud or other wrongful taking. In fact, they have as much as admitted that the Drawee Banks did not "wrongfully" take any personal property from the Plaintiffs. In Plaintiffs' Introduction on page one of their Response brief, they characterize the actions of the drawee banks as "innocent," claiming only that the UCC transfers the losses of its customers to the bank, and allows the "innocent" bank to then recover the loss from other sources. There is no way to extrapolate a UCC charge under *4-401* (*O.R.C. § 1304.30*), which the Plaintiffs themselves characterize as a requirement to "refund their victims the face value of stolen checks, **without liability**," into the equivalent of a "wrongful taking" claim against these banks. [16]

> 16  Plaintiffs reiterated this position during oral arguments, emphasizing that the Drawee Banks were allegedly legally bound to re-credit the Plaintiffs for their losses even though they were without fault. During the same portion of the

argument, Plaintiffs argued that *O.R.C. § 2305.09(D)* would apply to these claims. However, the language adding a discovery rule to [*27] the definition of accrual does not apply to *subsection (D)*.

The UCC claims against the Depositary Banks are for breach of duty to act with ordinary care and failure to act in good faith. Even if these UCC claims could be equated to some common law cause of action, they would sound in negligence or bad faith, not in conversion or the wrongful taking of property. [17] Therefore, the discovery rule imposed by *O.R.C. § 2305.09* would still not apply to such claims. [18]

> 17  Plaintiffs did bring separate and independent claims for fraud and aiding and abetting in tortious behavior against the Depositary Banks. The legal analysis of the statute of limitations and discovery rule issues differs with regard to those tort claims and will be addressed later in the opinion.
>
> 18  Plaintiffs spent some time during oral argument explaining why they believed the UCC claims made in this case would fall under *subsection (D) of O.R.C. § 2305.09*. However, even if this were true, the discovery rule contained in that statute does not apply to claims described in *sub-section (D)*. The plain language of the discovery rule clause limits its application to only certain types of claims set forth in *sub-sections (A)-(C)*.

This [*28] Court is bound to apply state law in accordance with the currently controlling decisions of the state's highest court. *Bailey Farms, Inc. v. NOR-AM Chemical Co., 27 F.3d 188, 191 (6th Cir. 1994)*. Where the state supreme court has not specifically addressed a particular issue, this Court is charged with anticipating how that court would rule. Id. The Court conducted an exhaustive review of all of case law on both sides of this issue in the case of Metz v. Unizan Bank, Case No. 5:05 CV 1510, Docket Numbers 376 and 600 (Feb. 28, 2006 and Sept. 16, 2008), and found that Ohio law does not support grafting a discovery rule onto the determination of the accrual date for the UCC claims at issue in this case. There has been no change in the law that would alter the reasoning behind that decision. In fact, although there was no Ohio law directly addressing the two statutes of limitation at issue in this case when the Metz

2009 U.S. Dist. LEXIS 51858, *28; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

case was decided, two Ohio courts have since specifically applied the general definition of accrual (without a discovery rule) to those statutes of limitations. See *Western Ohio Colt Racing Assoc. v. Fast, Mercer App. No. 10-08-15, 2009-Ohio-1303* (finding that, consistent with [*29] the general rule in Ohio, cause of action subject to statute of limitations contained in *O.R.C. § 1303.16(G)(1)* accrued when the wrongful act was committed); *Connors v. U.S. Bank, Franklin App. No. 07 AP-649, 2008-Ohio-1838* (holding that for purposes of *O.R.C. § 1303.16(G)* and *O.R.C. §1304.09,* a cause of action accrues at time of wrongdoing).

The general and longstanding rule in Ohio is that a cause of action accrues at the time the harm is committed and not when it is discovered. The discovery rule is an exception, either statutorily or judicially imposed. There is no applicable statutory exception, and the Ohio Courts have not found any other compelling justification for applying the discovery rule under these circumstances. Therefore, this Court finds that Ohio law does not support the application of the discovery rule to toll the running of the limitations period contained in *O.R.C. § 1303.16(G)* or *O.R.C. § 1304.09.*

The parties agree that the alleged UCC violations occurred in 1998 and 1999, and that the statutes of limitations for each of the corresponding UCC claims was three years. Thus, the Plaintiffs cause of action on the UCC claims would have expired no later than the end of 2002. [*30] This lawsuit was not filed until September of 2008. All of the Plaintiffs UCC claims are, therefore, barred by the statutes of limitations set forth in *O.R.C. § 1303.16(G)* or *O.R.C. § 1304.09,* and Counts One, Six, Seven, and Eight must, therefore, be dismissed.

B. Applying the Statute of Limitations to the Fraud-Based Claims

Counts Two through Five (Fraud, Fraudulent Concealment, and Conspiracy to Commit Fraud), and Count Nine (Aiding and Abetting) of the Amended Complaint are common law claims against the Depositary Banks (Huntington National, Fifth Third, Sun Trust, and Wachovia). Defendants argue that these claims are governed by the statute of limitations in *O.R.C. § 1707.43(B). Ohio Revised Code § 1707.43(B)* applies to causes of actions arising from the sale of securities. It states that actions "for any recovery based upon or arising out of a sale or contract for sale" of securities must be brought within "two years after the plaintiff knew, or had

reason to know, of the facts by reason of which the actions of the person . . . were unlawful, or [within] five years from the date of such sale or contract for sale, whichever is the shorter period." Id.

Plaintiffs' Response to Defendants' [*31] Motion to Dismiss is somewhat confusing on this issue. Although it is clear that Plaintiffs don't believe *O.R.C. § 1707.43(B)* is the appropriate statute of limitations to apply, they don't specify what other statute would be applicable to the fraud-based claims. Although it would potentially result in a shorter statute of limitations, they seem, at times, to be arguing that all of their claims should be subject to the statute of limitations in the UCC. Their own arguments even seem to discount the validity of any claims of actual fraud against the banks. [19] During oral argument, Plaintiffs argued that the statute of limitations for securities fraud shouldn't apply to the fraud-based claims because the UCC governs "banking torts," and the UCC is the sole means by which the Plaintiffs can recover their money. There was also a strong implication in this argument that the Plaintiffs were not actually injured by the alleged fraud, but only by the eventual cashing of the checks they wrote to Lomas and Serengeti. Nonetheless, Plaintiffs have brought non-UCC, fraud-based common law claims against the banks, alleging (however conclusory those allegations may be) knowledge, complicity, and conspiracy [*32] in the underlying fraud allegedly committed by James Carpenter. Setting aside those arguments that seem somewhat incompatible with the fraud-based claims set forth in the Amended Complaint, the Court will assume that Plaintiffs meant to argue that the general statute of limitations for fraud set forth in *O.R.C. § 2305.09(D)*(a four year statute of limitations, with a discovery rule) should apply.

> 19   Plaintiffs' argument reads as follows: "The Defendants at bar are all banks. They are either liable without fault pursuant to *R.C. 1303.03,* as part of the loss-allocation rules of the Ohio UCC, or their liability is for fault plead [sic]EXCLUSIVELY in the manner in which they opened and maintained checking accounts, and negotiated checks (or for Huntington, in the way it negotiated with a criminal)." (Response at 38)(emphasis in the original).

Addressing the question of whether *O.R.C. § 1707.43* or *O.R.C. § 2305.09* would be the appropriate

Case: 1:08-cv-02755-DCN  Doc #: 324-4  Filed:  06/01/15  12 of 31.  PageID #: 16544

Page 10

2009 U.S. Dist. LEXIS 51858, *32; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

statute of limitations, in a case with identical facts and nearly identical claims, this Court has previously held that under these circumstances Ohio law dictates that *O.R.C. §1707.43(B)*, the statute of limitations for securities fraud, is the proper statute [*33] to apply.

> The facts underlying the fraud claims are inextricably intertwined with allegations that the Defendants conspired with Mr. Carpenter to engage in securities fraud . . . The fact that the Amended Complaint does not specifically state a claim for securities violations is not dispositive . . . . "The Supreme Court of Ohio directs that when courts are faced with determining the statute of limitations that governs a claim, they 'must look to the actual nature or subject matter of the case, rather than to the form in which the action is pleaded.'" ([Metz Feb. 8, 2008 Rep. And Recom.], citing *Lawyer's Coop. Pub. Co. v. Muething, 65 Ohio St. 3d 273, 603 N.E.2d 969, 973 (Ohio 1992))*. In this case, there are allegations of securities fraud even though no actual claims under the state or federal securities laws have been made.

> Further, even if no actual sale of securities occurred, the Plaintiffs had attempted to buy securities, and it was only by operation of the alleged fraud that an actual sale was prevented. Under the plain language of the statute, an actual sale is not necessary to trigger the statute of limitations in *O.R.C. § 1707.43(B)*. Whether or not an actual security was purchased, there can be [*34] no doubt that the allegations in the Amended Complaint establish that the Plaintiffs contracted for the sale of securities . . . The Court, therefore, finds that the statute of limitations set forth in *O.R.C. § 1707.43(B)* applies to the fraud claims in this action.

(Metz v. Unizan Bank, Case No. 5:05 CV 1510, 2008 U.S. Dist. LEXIS 37270, Docket Number 555, at 3-4 (May 7, 2008)). Plaintiffs have offered no argument why this reasoning would not apply equally in this case, nor have they shown any change in the law that would justify

a different holding. Therefore,

> *Ohio Revised Code § 1707.43(B)* will be applied to Counts Two through Five, and Count Nine of this action.

In the Metz opinion, this Court held that, although *O.R.C. § 1707.43(B)* was the appropriate statute of limitations, the absolute five year period of limitations contained in the statute is not enforceable because it would violate the right-to-remedy clause of the Ohio Constitution. [20] Under Ohio law, an unenforceable provision in a statute may be severed, leaving the constitutionally valid sections of the statute in force. *O.R.C. § 1.50*; *State, ex rel. Doersam v. Industrial Commission of Ohio, 45 Ohio St.3d 115, 121, 543 N.E.2d 1169, 1175 (1989)*. Therefore, [*35] the two year period of limitations, statutorily tolled until after the Plaintiffs knew or had reason to know of the "facts by reason of which the actions of the person . . . were unlawful" is the governing language in that statute.

> [20] A detailed analysis of the law and history leading to this conclusion is provided in the Metz opinion (Order dated May 7, 2008, ECF # 555). As the parties have offered no new law or argument challenging this holding, there is no need to repeat that analysis here.

As set forth above, the parties agree that the Plaintiffs' claims are based on events which occurred in 1998 and 1999, and that the original Complaint was not filed until September 29, 2008. The Plaintiffs claims survive only if they were brought within "two years after the plaintiff knew, or had reason to know, of the facts by reason of which the actions of the person. . . were unlawful." In this case, that means that if they knew or had reason to know of any such facts prior to September 29, 2006, their claims are untimely and must be dismissed.

"[C]onstructive notice is . . . sufficient to start the two-year period" running under *O.R.C. § 1707.43(B)*. *Wyser-Pratte Mgmt. Co. v. Telxon Corp., 413 F.3d 553, 561 (6th Cir. 2005)*. [*36] Tolling of the statute of limitations by exercise of the discovery rule ends when Plaintiffs are deemed to be on "notice to investigate the facts and circumstances relevant to [their] claim in order to pursue [a] remedy." *Flowers v. Walker 63 Ohio St.3d 546, 549, 589 N.E.2d 1284 (Ohio 1992)*. The discovery of "suspicious facts," triggers a potential plaintiff's duty to investigate. See *Wyser-Pratte Mgmt. Co., 413 F.3d at*

*561*. The limitations period then begins to run, when through the exercise of reasonable diligence, a plaintiff discovers the facts underlying his or her alleged claim(s). Id. In other words, when applying the discovery rule, a cause of action accrues when Plaintiffs become aware of facts that should alert them that they may have claims to pursue. They need not be aware of the actual causes of action, or legal theories underpinning their eventual claims in order to trigger the running of the limitations period. See *Flowers, 63 Ohio St.3d at 548-49*.

In this case, there were a series of events that should have raised the Plaintiffs' suspicions that something illegal had occurred. While taken alone, each of these events may not have been sufficient to trigger the running of the statute  [*37] of limitations, together they certainly should have spurred a reasonable investor to investigate further and pursue a potential remedy. The first indication that something may have been seriously amiss with the Lomas and Serengeti investments is outlined in the Amended Complaint. Paragraph Three of that Complaint states that sometime after the Plaintiffs stopped receiving interest payments and were unable to redeem their debentures upon maturity, Carpenter "organized the victims to present their claims to the corporate guarantor of the notes: The New England International Surety Corp. . . . (hereinafter "NEISC") . . . [T]he purported owner of NEISC apparently responded that Lomas and Serengeti were frauds, and their claims could not be honored, in 2000 or 2001."

In addition to their early knowledge that they were no longer receiving payments, could not redeem their debentures, and that the guarantor was refusing to honor their claims based on alleged fraud by the investment companies, the Plaintiffs had access to public information from various sources that would have put them on notice of Carpenter's alleged fraud more than two years before this action was filed. Included among these  [*38] sources were James Carpenter's past criminal history and disbarment, [21] James Carpenter's indictment for illegal activities directly related to the claims in this case, [22] the issuance of Cease and Desist orders to Carpenter and several other brokers by the Securities Division of the Ohio Department of Commerce, [23] and the filing of the *Metz* case. [24]

21  Plaintiffs repeatedly argue that the Depositary banks should have been aware of James Carpenter's past criminal history and disbarment,

and should have denied him the ability to open accounts on that basis. By the same reasoning, Plaintiffs could have discovered Mr. Carpenter's past history (a matter of public record) prior to buying investments from him, or at least upon a cursory investigation after those investments stopped paying interest, were dishonored, and were labeled as "fraud" by the guarantor in 2000 or 2001. (See, Amended Complaint at 38-39) (alleging Carpenter's disbarment in 1993 and guilty plea to felony Bank Fraud, Aggravated Theft, Grand Theft, and Theft in Office in or about 1991 were matters of public record). An investor is in the best position to investigate the background and legitimacy of his own investments (and  [*39] the brokers he is buying from).

22  James Carpenter was indicted in 2005 for his role in creating the fraud alleged in the Amended Complaint. His indictment was unsealed on January 4, 2006 and he was publically arraigned in connection with the alleged Serengeti and Lomas frauds on that day. See United States v. Carpenter, Case No. 1:05 CR 586 (N.D. Ohio 2005).

23  The Complaint in the Posen case (a class action whose class definition included the Plaintiffs in this action) admitted that from 1999 to 2000, the Securities division of the Ohio Department of Commerce issued cease and desist orders to Carpenter and several brokers selling Serengeti and Lomas notes on his behalf. These orders are public records.

24  The Plaintiffs in the Metz case brought claims nearly identical to those raised in this action. This shows that information sufficient to support the Plaintiffs claims must have been available prior to March of 2005 because other supposed victims of the same alleged fraud filed a complaint nearly identical to this one at that time. See *Gumbus v. United Food and Commercial Workers Int'l Union, Nos. 93-5113, 93-5235, 1995 U.S. App. LEXIS 523 (6th Cir. Jan. 6, 1995)*("We believe that reasonably  [*40] diligent plaintiff should have known about and monitored the progress of [a class action lawsuit]" which raised similar claims against the defendants.) Further, although we do not directly impute counsel's knowledge to his clients in this case, it also bears noting that Plaintiffs' counsel was well aware of all of the

Case: 1:08-cv-02755-DCN  Doc #: 324-4  Filed:  06/01/15  14 of 31.  PageID #: 16546

Page 12

2009 U.S. Dist. LEXIS 51858, *40; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

facts and legal theories behind the claims in this action at least as early as 2004, having worked on the Posen class action and having helped draft the original Metz Complaint. (Huntington Mot. to Dismiss, Ex. 1: Morris Aff. PP 9, 12-14). Later in October of 2005, Mr. Morris filed a motion to intervene in Metz on behalf of two additional named Plaintiffs.

The clearest evidence that the Plaintiffs were on notice that they had possible claims, however, is the filing of the Posen action. In 2000, a suit captioned Posen, et al. v. New England Surety, Inc., et al., No. 2000-06-2623 was filed as a putative class action in Summit County Ohio. This suit alleged fraud against James Carpenter, NEISC, and others in connection with the Lomas and Serengeti investments. (From Third Mot. to Dismiss, Ex. A: Posen I Compl.). The Plaintiffs in the instant case all fell within the class [*41] definition of the putative class in Posen. [25] (Id.) The Summit County Court certified the class in an Order dated May 6, 2004, and a Notice and Opportunity to Opt Out was approved by the Court on December 30, 2004. (Posen, et al. v. New England Surety, Inc., et al., No. 2000-06-2623). Assuming the notice was served or published in accordance with the court's order, each of the Plaintiffs in this case would have had notice of the alleged fraud well in advance of two years before the filing of the instant action. [26]

25   The Posen complaint defines the proposed class as "all individuals who, during the time period between and including 1997 and 1999, purchased promisory notes from Defendant Carpenter or the Carpenter Corporations, in either Serengeti or Lomas, and who were injured when both Serengeti and Lomas defaulted on the notes and New England failed to make payments on the guarantees." (Fifth Third Mot. to Dismiss, Ex. A: Posen I Complaint, at 7).
26   The proposed Notice of Class Settlement filed by the Posen class attorneys later in the litigation noted that over 400 class members had been identified. Of those eight opted out, and just over twenty had not been identified or contacted. [*42] The order approving the notice of class certification was issued three years and almost eight months before this action was filed, well outside the two year statute of limitations.

Although this Court accepted in Metz that this series of events (without the benefit of any discussion relating to the Posen case) may have been sufficient to create notice of the Plaintiffs injuries and of Carpenter's wrongdoings, it could not determine from the pleadings in Metz that the Plaintiffs should have discovered the involvement of the specific Depositary Banks more than two years before the Metz case was filed (March of 2005). There is additional information in instant Complaint, however, that suggests even before the alleged fraud came to light, these Plaintiffs knew that their checks had been cashed and deposited in the Serengeti and Lomas accounts at the Depositary Banks, and knew that they had received interest checks from Depositary bank accounts bearing the name of Serengeti and Lomas. (Amended Complaint at 14, 15). If, as Plaintiffs allege, these accounts were fraudulent, and if, as Plaintiffs allege, the banks had some duty to discover and prevent the use of these fraudulent accounts, then [*43] Plaintiffs should have investigated the banks' involvement in the alleged fraud as soon as they were alerted to suspicious facts involving these accounts. [27] There is an argument, therefore, that once the Plaintiffs were aware of the alleged fraud by Carpenter (or even an alleged fraud by Lomas and/or Serengeti), the statute of limitations would have begun to run against the banks as well because the Plaintiffs had knowledge that the Banks had opened accounts for these allegedly fraudulent businesses and allowed James Carpenter to cash checks and deposit the funds into these accounts, and to write checks from these accounts. This should have triggered the Plaintiffs to further investigate the banks' role in opening and managing the accounts.

27   Further, under the Plaintiffs' theory in this case, it would be obvious that Carpenter's fraud could not have occurred with the participation of the Depositary banks because in Plaintiffs words "[w]ithout the ability to cash and write checks in the names of non-existent companies, [the alleged fraud] would have been impossible." (Response at 41). According to Plaintiffs' oral argument no injury occurred until the banks funded and deposited the [*44] checks in the Serengeti and Lomas accounts.

If that is not enough to determine that sufficient facts were or should have been discovered by the Plaintiffs before September of 2006, there is another significant difference between this and the Metz case on this issue.

Case: 1:08-cv-02755-DCN  Doc #: 324-4  Filed:  06/01/15  15 of 31.  PageID #: 16547

Page 13

2009 U.S. Dist. LEXIS 51858, *44; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

Each of the Depositary Banks in this action had been the subject of extensive discovery in the Posen case, and each had been identified as having accounts related to the Lomas and Serengeti investments prior to September of 2006 (two years before the instant case was filed). (See Posen docket, Summit County Court - multiple entries). Although this information was not discussed in Metz, [28] the information was known to all Plaintiffs (as members of the Posen class) in this action more than four years prior to the filing of their original Complaint.

> [28]  The information would have been irrelevant to the statute of limitations issues in Metz because Metz was filed less than two years after the class certification in Posen was granted, and the bank related discovery took place.

In addition, the Posen Complaint identified Ashley Carpenter, her employment with First National Bank of Zanesville (the predecessor to Huntington National [*45] Bank), and her involvement in the alleged fraud. This occurred far more than two years before the instant case was filed. Therefore, Plaintiffs specifically knew or had reason to know of the facts by reason of which the Depositary Bank First National Bank of Zanesville's (succeeded in interest by Huntington National Bank) actions were allegedly unlawful more than two years before this action was filed. As set forth above, whether or not a legal theory for recovery had been identified or pursued against the banks is irrelevant to the running of the statute of limitations on those potential causes of action. Only the facts underlying the cause of action need be known to trigger the running of the statute of limitations; it does not matter whether the Plaintiffs understood the legal significance of those facts. See *Flowers, 63 Ohio St.3d at 548-49.*

Plaintiffs argue that even if the statute of limitations would otherwise have run, their action was timely filed because it was tolled by Metz. According to Plaintiffs, Metz was filed as a proposed class action and they fell under the stated class definition, therefore the statute of limitations on their claims in this case should be tolled [*46] from the date of the Metz filing until the class certification request was denied in March of 2009. This would effectively toll the running of the statute of limitations for nearly four years, and would save the claims from a summary dismissal on statute of limitations grounds. Generally, the filing of a class action does toll the statute of limitations as to all putative class members.

See *Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538, 554, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974)*; *Crown Cork & Seal Co. v. Parker, 462 U.S. 345, 349, 103 S. Ct. 2392, 76 L. Ed. 2d 628 (1983)*. There are, however, exceptions to this general rule that prevent its application in this case. Primarily, the general rule does not apply when a plaintiff chooses to file an independent action without waiting for a determination on class certification in the previously filed suit. See *Wyser-Pratte Mgmt. Co. v. Telxon Corp., 413 F.3d 553, 568 (6th Cir. 2005)*. The instant action was filed in September of 2008, nearly six months prior to the March 2009 class certification determination in Metz. Therefore, the exception applies, and the filing of the Metz case did not toll the applicable statute of limitations for these Plaintiffs in this action. For these reasons, Counts Two through [*47] Five, and Count Nine of the Amended Complaint, were filed after the expiration of the applicable statute of limitations, and they are dismissed as untimely.

## IV. Substantive Arguments for Dismissal of the Common Law Claims

A. Counts Two through Five - Fraud, Fraudulent Concealment, and Conspiracy to Commit Fraud (Depositary Banks)

### 1. Fraud

Under Ohio law, the elements of fraud are: (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying on it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance. See *Cohen v. Lamko, Inc., 10 Ohio St. 3d 167, 10 Ohio B. 500, 462 N.E.2d 407, 409 (Ohio 1984)*. Under *Federal Rule of Civil Procedure 9(b)*, an allegation of fraud must be stated with particularity. At a minimum a party must allege "the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the [*48] defendants; and the injury resulting from the fraud." *Michaels Bldg. Co. v. Ameritrust Co. N.A., 848 F.2d 674, 679 (6th Cir. 1988)*.

The allegations underlying the fraud-based claims against the Depositary Banks stem from the fact that

Case: 1:08-cv-02755-DCN   Doc #: 324-4   Filed:  06/01/15   16 of 31.   PageID #: 16548

Page 14

2009 U.S. Dist. LEXIS 51858, *48; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

these Defendants accepted checks written by the Plaintiffs for deposit in accounts opened by Carpenter in the name of Serengeti and Lomas, and in some cases from the fact that interest checks, redemptions and refunds were paid to some Plaintiffs from those accounts. Plaintiffs basically contend that simply allowing these accounts to exist and operate was tantamount to a representation to the Plaintiffs that Serengeti and Lomas were legitimate companies that were "performing substantial economic activity." Plaintiffs further allege that this "representation" was false. As a matter of law, however, a depositary bank makes no representation to the drawer of a check simply by accepting that check for deposit. See *G.F.D. Enterprises, Inc., 37 Ohio St.3d at syl. P5, 525 N.E.2d at 12 (1988)*("the presentment and transfer warranties made by a depositary bank in obtaining or transferring an instrument pursuant to *Ohio Revised Code § 1304.13* (*UCC § 4-207*) do not run [*49] to the drawer of such instrument."). Further, the mere existence of a bank account, without more, is not a representation by a bank to the general public that the name on the account accurately indicates the true owner of the account, or that the owner of the account is a legitimate, trustworthy, economically sound entity.

There are no allegations that employees of the Depositary Banks had any actual contact or communication with any of the Plaintiffs (in their role as a Depositary Bank) or that they made any actual statement or other representation (false or otherwise) to any of the Plaintiffs. [29] Consequently, there are also no allegations as to the identity of the person(s) allegedly making a misrepresentation, or the time or place of the alleged misrepresentation as required under the pleading standards for fraud. [30]

29     The only allegations of a supposed misrepresentation don't even extend to all of the Plaintiffs. The Amended Complaint states: "Still other Plaintiffs received clearly marked bank stamps on the back of their returned investment checks that made it appear that their checks had been deposited into a bank account entitled Lomas or Serengeti." (Amended Complaint at 15-16) [*50] (emphasis added). Further, although it later alleges "these indicia of legitimate economic activity [were] ... supplied by the Defendant depositary banks," this statement does not clearly allege which banks, if any, returned checks to which Plaintiffs, which banks, if any,

stamped the checks, or what information the stamps actually conveyed.

30     As to Huntington Bank, the Amended Complaint alleges only that "representations originated at the branches where the accounts were opened and were directed to the victims at their residences or places of business." (Amended Complaint at 54). This allegation is far too vague to satisfy the pleading requirements for fraud. It does not provide the Defendants with adequate information upon which to base a defense as there is no identification of a person making the alleged representation or receiving the alleged representation, or any information that would allow the Defendants to determine how the alleged representation was communicated or where each Plaintiff received the alleged representation.

As to Fifth Third, Wachovia, and Sun Trust, Plaintiffs allege that misrepresentations were communicated through bank statements sent by the Plaintiffs' Drawee [*51] Banks to the Plaintiffs. The Depository Banks cannot be liable for a representation or communication made by a wholly independent entity (the Plaintiffs' Drawee Bank) to the Plaintiffs, whether or not the statement was false. Further, there is no allegation that the bank statements sent by the Drawee Banks actually contained any false information whatsoever.

Plaintiffs have also failed to plead any facts that would support the allegation that they "justifiably relied" on the Depositary Banks' alleged misrepresentations. By the time the checks were cashed and deposited into the suspect accounts, and certainly before Plaintiffs received cancelled checks or bank statements showing that this had been accomplished, the Plaintiffs had already written the checks to Serengeti and/or Lomas, and had already given those checks to James Carpenter (either directly or through a broker/agent), thereby entering into and memorializing an obligation to those entities. Plaintiffs allege no further act (or failure to act) that they entered into in reliance on the Bank's alleged "misrepresentations." The Amended Complaint, therefore, fails not only to plead a cause of action for fraud with the specificity [*52] required by *Fed. R. Civ. P. 9(b)*, [31] but also, because there are no allegations of an actual representation by the Depositary Banks to the

Case: 1:08-cv-02755-DCN  Doc #: 324-4  Filed: 06/01/15  17 of 31.  PageID #: 16549

Page 15

2009 U.S. Dist. LEXIS 51858, *52; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

Plaintiffs, and no factual allegations supporting the element of justifiable reliance, it fails to state a claim upon which relief can be granted. See generally, *Bender v. Southland Corp., 749 F.2d 1205 (6th Cir. 1984)*.

> 31  The only argument Plaintiffs put forth in their Response to the Defendants' Motion to Dismiss to counter this finding is that their "amended complaint is 67 pages long" and "shorter books have won Nobel prizes for literature." (Response at 42). This is an inane argument: it should go without saying that the length of a Complaint bears no relation to its legal sufficiency.

## 2. Fraudulent Concealment

Fraudulent concealment requires more than mere non-disclosure. See *Arbor Village Condominium Assoc. v. Arbor Village, Ltd., 95 Ohio App.3d 499, 510, 642 N.E.2d 1124 (Ohio App. 1994)*. In order to plead fraudulent concealment, a plaintiff must allege both a wrongful failure to disclose certain information, and a duty to disclose that information. See *Birkett Williams Ford, Inc. v. East Woodworking Co., 8 Ohio App.3d 231, 234, 8 Ohio B. 304, 456 N.E.2d 1304 (8th Dist. 1982)*; *Federated Mgmt. Co. v. Coopers & Lybrand, 137 Ohio App. 3d 366, 383, 738 N.E.2d 842, 854 (Franklin App. 2000)*; [*53] see also, *Steinfels v. Ohio Dept. Of Commerce, 129 Ohio App. 3d 800, 807, 719 N.E.2d 76, 82 (Franklin App. 1998)*. The duty to disclose arises only when one party has information "that the other [party] is entitled to know because of a fiduciary or other similar relationship of trust and confidence." *State v. Warner, 55 Ohio St.3d 31, 59, 564 N.E.2d 18, 39 (1990)*(citing *Chiarella v. United States, 445 U.S. 222, 224-225, 100 S. Ct. 1108, 63 L. Ed. 2d 348)(1980))*; see also, *Federated, 137 Ohio App.3d at 384*. Nowhere in the Amended Complaint do the Plaintiffs allege a fiduciary or other trust relationship that would give rise to a duty to disclose by the Depositary Banks, and nowhere in their Response to the motions to dismiss do Plaintiffs cite any law that would indicate that such a duty exists based on the facts and circumstances alleged in this case. [32] Plaintiffs claim for fraudulent concealment, must, therefore, be dismissed.

> 32  Generally courts have held that a depositary bank does not owe any duty to a non-customer. See, e.g., *Conder v. Union Planters Bank, N.A.., 384 F.3d 397, 399-400 (7th Cir. 2004)*.

## 3. Conspiracy to Commit Fraud

Ohio law defines civil conspiracy as "a malicious combination of two or more persons to [*54] injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins. Co., 72 Ohio St. 3d 415, 1995 Ohio 61, 650 N.E.2d 863, 866 (1995)*(citations omitted). The elements of this claim include: (1) a malicious combination; (2) involving two or more persons; (3) injury to persons or property; and, (4) the existence of an unlawful act independent from the actual conspiracy." *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.., 219 F.3d 519, 534 (6th Cir. 2000)*(quoting *Universal Coach, Inc. v. New York City Trans. Auth. Inc., 90 Ohio App. 3d 284, 629 N.E.2d 28, 33 (Ohio Ct. App. 1993)*.

The alleged fraud perpetrated by James Carpenter is the unlawful act upon which the conspiracy claim is based. The Amended Complaint, however, does not allege any facts that would even imply that the Depositary Banks, Fifth Third, Wachovia or Sun Trust "shared in the conspiratorial objective" of James Carpenter's fraud. [33] Even if the Amended Complaint sufficiently alleged knowledge of the alleged fraud, or recklessness in failing to discover the fraud, this does not equate to a shared objective to commit the fraud. As the first element of a conspiracy charge has not been properly alleged, the Plaintiffs [*55] have failed to state a claim for civil conspiracy in Counts Three through Five of the Amended Complaint.

> 33  Plaintiffs allegation that "unknown employees. . . maliciously conspired with Carpenter. . ." is insufficient to satisfy the pleading requirements for conspiracy to commit fraud. The information states no actual facts, and is far too vague to allow the Defendants to investigate and defend themselves against the charge.

Because additional facts were alleged against Huntington Bank, the element of "malicious combination" may, however, have been sufficiently asserted against that Defendant. Nonetheless, Plaintiffs claim fails as against this Bank, as well. The allegations supporting the element of "malicious combination" in Count Two against Huntington Bank are based on the fact that James Carpenter's daughter, Ashley Carpenter, opened the accounts at issue in that Count. The Amended

Case: 1:08-cv-02755-DCN  Doc #: 324-4  Filed:  06/01/15  18 of 31.  PageID #: 16550

Page 16

2009 U.S. Dist. LEXIS 51858, *55; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

Complaint alleges that she knew of her father's prior convictions and that she was aware of his intent to use these accounts to perpetrate a fraud. The Amended Complaint also alleges that Ashley Carpenter performed these actions in her capacity as an employee of FNB (the predecessor to Huntington). Ashley [*56] Carpenter's alleged involvement in the fraud, in fact, was so prominent that she was personally sued for her involvement in the earlier Posen case. That case settled, and the settlement was approved as a class settlement. [34] Because the current Plaintiffs were all included under the definition of the class in Posen, any claims they may have had against Ashley Carpenter were settled and released in that action.

> [34]  The release language applicable to Ashley Carpenter reads as follows: "Plaintiffs, on behalf of themselves and their devisees, heirs, executors, administrators, insurers and insureds, do hereby forever release, acquit and discharge Defendants form any and all claims, liens, demands, obligations, judgments, actions, causes of action and liabilities whatsoever (except as specified herein)... arising from the Investments or the Dispute. Plaintiffs agree to cease and desist from further prosecution of any claims and defenses against Defendants in connection with the Investments or Dispute." (Posen Journal Entry at 7). The "Investments" were defined as the promissory notes plaintiffs had purchased in Serengeti and Lomas from 1997 to 1999, and the "Dispute" was defined as the dispute [*57] relating to those investments. (Id. at 2).

Under Ohio law the release of Ashley Carpenter in the Posen case also extinguishes any claim against Huntington Bank that arises under a theory of (successor) vicarious liability. "[T]he release of a party who is primarily liable operates also as a release of any party who was only secondarily liable." *Niemann v. Post Industries, Inc., 68 Ohio App. 3d 392, 396, 588 N.E.2d 301, 303 (Ohio Ct. App. 1991)*(citing *Bello v. Cleveland, 106 Ohio St. 94, 1 Ohio Law Abs. 10, 1 Ohio Law Abs. 311, 138 N.E. 526 (Ohio 1922)*); see also, *Losito v. Kruse (1940), 136 Ohio St. 183, 188, 24 N.E.2d 705*, headnote 18("A settlement with and release of the servant will exonerate the master."); *Divine Tower Int'l Corp. v. Kegler, Brown, Hill & Ritter Co., L.P.A., 2007 U.S. Dist. LEXIS 65078, at **22-24*; *Munson v. United States, 380 F.2d 976, 977-980 (6th Cir. 1967)*; *Mickowski v.*

*Visi-Trak Worldwide, LLC, 321 F.Supp.2d 885, 897 (N.D. Ohio 2004)*("[T]he release of the primary tortfeasor releases the secondary tortfeasor, where the theory against the secondary tortfeasor is vicarious liability."); *Radcliffe v. Mercy Hosp. Anderson, 1997 Ohio App. LEXIS 1997, at *3-5* (release of the primary tortfeasor "necessarily [*58] extinguished" any secondary liability); *Wells v. Spirit Fabricating Ltd., 113 Ohio App. 3d 282, 291-294, 680 N.E.2d 1046 (1996)*(where liability is based on *respondeat superior*, release of the primary tortfeasor releases the secondary liability); *Havens-Tobias v. Eagle, 2003 Ohio 1561, 2003 Ohio App. LEXIS 1512 (2nd Dist. Ohio 2003)*.

Plaintiffs argue that this common law rule was superceded by *Ohio Revised Code § 2307.28*. The argument is without merit. *Ohio Revised Code § 2307.28* applies only when there are joint or multiple tortfeasors, each contributing to the harm incurred. It has no application to employer or secondary liability where the only theory of liability is vicarious liability or *respondeat superior*, and the employer is alleged to be acting through the employee rather than in concert with her.

Plaintiffs further argue that Huntington's liability is based not only on *respondeat superior*, but, because a corporation can only act through its employees, officers, and agents, Ashley's knowledge and intent is imputed to her employer and they are directly liable as well. Plaintiffs also argue in their Response to the Defendants' Motions to Dismiss that after Ashley Carpenter assisted her father in setting up the allegedly [*59] fraudulent accounts, her employer ratified that fraud. The Amended Complaint makes no allegation or suggestion of ratification. Plaintiffs offer no facts or other explanation of what acts FNB or its successors took to ratify the alleged fraud. [35] To the contrary, the facts alleged in the Amended Complaint show that once notified of irregularities in the accounts, FNB took action to close the accounts and discontinue doing business with Mr. Carpenter. (Amended Complaint at 54-55). Plaintiffs, therefore, have failed to allege any facts that would support the claim that FNB (or Huntington) ratified the actions of Ashley Carpenter. The Amended Complaint appears to allege no basis for liability against Huntington, except through vicarious liability for the actions of its predecessor's employee, Ashley Carpenter. As these claims are barred by the settlement and release in Posen, they must be dismissed.

Case: 1:08-cv-02755-DCN  Doc #: 324-4  Filed:  06/01/15  19 of 31.  PageID #: 16551

Page 17

2009 U.S. Dist. LEXIS 51858, *59; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

35   They do allege that "Huntington earned fees and interests" from the accounts, however there is no allegation that these alleged fees stemmed from anything other than the banks's ordinary course of business. There is no allegation that they shared in proceeds from the alleged fraud or otherwise [*60] received higher or additional fees because of the alleged fraud. (Amended Complaint at 19).

B. Count Eight - Money Had and Received (Depositary Banks)

Even if the common law claim for money had and received had not been supplanted by the UCC, and wasn't barred by the applicable statute of limitations, this Count of the Amended Complaint would have to be dismissed for failure to state a claim upon which relief could be granted. The common law claim for money had and received is a quasi-contractual claim akin to unjust enrichment. It is an equitable action based on a moral obligation to make restitution where a retention of benefits bestowed would result in injury and injustice. See *National City Bank, Norwalk v. Stang, 84 Ohio App. 3d 764, 766, 618 N.E.2d 241 (Huron Cty. 1992)*. The Amended Complaint, however, makes no allegation that Plaintiffs bestowed a benefit on the Depositary Banks. There are no allegations of a quasi-contractual relationship between Plaintiffs and the Depositary Banks, nor is there any allegation that the Banks retained any money given to them by the Plaintiffs.

C. Count Nine - Aiding and Abetting in James Carpenter's Tortious Activity (Depositary Banks)

Contrary to the arguments [*61] of the Depositary Banks, the Sixth Circuit has recognized "aiding and abetting" as a common law claim under Ohio law. *Aetna, 219 F.3d at 533-34*. In Aetna, the court held that "the Supreme Court of Ohio would recognize aiding and abetting liability if squarely faced with the issue." Id. As this Court is bound by Sixth Circuit precedent, aiding and abetting is presumed to be a valid cause of action.

Aiding and abetting has two main elements: (1) knowledge that the primary party's conduct is a breach of duty and, (2) substantial assistance or encouragement to the primary party in carrying out the tortious act. *Id. at 533*. The knowledge element for aiding and abetting can only be satisfied by actual knowledge; constructive knowledge does not suffice. *Id. at 536*. Circumstantial

evidence of knowledge, however, is sufficient to allow an inference of knowledge on the part of the defendant. *Id. at 535*.

The Sixth Circuit has adopted the position that atypical banking transactions may be sufficient to imply the level of knowledge necessary to support an aiding and abetting claim. *Id. at 536* (citing *Camp v. Dema, 948 F.2d 455, 459 (8th Cir. 1991)*; *Woodward v. Metro Bank of Dallas, 522 F.2d 84, 97 (5th Cir. 1975)*). [*62] Because the Amended Complaint alleges that the Banks' failed to follow their own policies or industry standards in setting up the Serengeti and Lomas accounts for James Carpenter, they have arguably pled enough to infer knowledge of Mr. Carpenter's alleged wrongdoings, and to avoid dismissal on this basis, at this stage of the litigation. [36]

36   The Amended Complaint charges that "all four (4) of the depositary banks that are defendants in this case had internal security measures designed to prevent such activity. On the belief or knowledge of the Plaintiffs, all of them negligently, recklessly and or knowingly violated their internal security measures while laundering money for Carpenter. On the belief and knowledge of the Plaintiffs, these internal security measures had become the industry standard by the years 1998 and 1999. . . ." (Amended Complaint at 12). However, it is disputable whether or not Plaintiffs even believed that any of the Depositary Banks besides Huntington is actually liable for "knowingly" participating in the fraud. (See Amended Complaint at 14)("The Plaintiffs never knew that the actual cause of their loss was that the depositary banks had negligently, recklessly [*63] and in at least one case knowingly turned their money over to Carpenter. . . .").

To prove substantial assistance, Plaintiffs must show that "the secondary party proximately caused the violation, or, in other words, that the encouragement or assistance was a substantial factor in causing the tort." *Aetna at 537* (quoting *K&S Partnership v. Continental Bank, N.A., 952 F.2d 971, 979 (8th Cir. 1991)*). The following factors are relevant in determining whether the assistance was substantial enough to justify imposing liability: (1) the nature of the act encouraged; (2) the amount of assistance given by the defendant; (3) his

Case: 1:08-cv-02755-DCN  Doc #: 324-4  Filed:  06/01/15  20 of 31.  PageID #: 16552

Page 18

2009 U.S. Dist. LEXIS 51858, *63; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

presence or absence at the time of the tort; (4) his relation to the other; and, (5) his state of mind. *Restatement (Second) of Torts §876(b), comment d.* The first factor certainly weighs in favor of an aiding and abetting charge. The allegations of fraud against the Plaintiffs involved a premeditated, long standing, and well organized fraud that inflicted substantial harm on a large number of victims.

With regard to the remaining factors, the allegations against Fifth Third, Wachovia, and Sun Trust are that these banks opened accounts for James Carpenter in the name of [*64] Serengeti and Lomas, that they processed checks written by Plaintiffs, depositing their proceeds in the above accounts, and that they allowed checks to be written from those same accounts. No other participation or assistance is alleged. Other courts have found that merely allowing a tortfeasor to use a bank account as part of the means of perpetrating a fraud is insufficient to support the element of substantial assistance for an aiding and abetting charge against the bank. See *Williams v. Nank Leumi Trust Co., 96 Civ. 6695, 1997 U.S. Dist. LEXIS 7538. *14 (S.D.N.Y. May 30, 1997)*(finding no substantial assistance where principal opened several accounts at depository bank and used accounts to further the principal's fraud).

The Amended Complaint alleges no special relationship between these Depository Banks and James Carpenter; makes no allegation that any agent of the bank was present when the underlying fraud was perpetrated; and, does not allege any intent on the part of the bank to assist in the alleged fraud perpetrated by Mr. Carpenter, to harm the plaintiffs, or to profit from the alleged fraud. [37] Thus, four out of the five factors to be considered in determining whether there [*65] is substantial assistance weigh against such a finding as against Fifth Third, Wachovia, and Sun Trust. Without a finding of substantial assistance, there can be no liability for aiding and abetting. Therefore, even if it were not barred by the applicable statute of limitations, Count Nine would be dismissed as against Defendants Fifth Third, Wachovia, and Sun Trust. [38]

[37] There is an allegation that they profited by opening and maintaining the accounts at issue, but these profits stemmed only from the banks's ordinary course of business. There is no allegation that they shared in proceeds from the alleged fraud or otherwise received higher or additional

fees because of the alleged fraud. (Amended Complaint at 19).

[38] The allegations against Huntington Bank also include additional facts that would show a special relationship between the employee who opened the accounts at their predecessor in interest, and James Carpenter. The employee, Ashley Carpenter is James Carpenter's daughter. This relationship alters the balance of the factors considered in determining whether there was substantial assistance. The Court need not decide whether this would otherwise save the aiding and abetting [*66] claim from dismissal because, as set forth above, the claim is untimely, and those claims based solely on vicarious liability for the acts of Ashley Carpenter are barred by the settlement and release in Posen.

There are additional factual allegations against Huntington (as successor to FNB). The Amended Complaint alleges that after discovering that the accounts opened by James Carpenter were suspect, FNB nevertheless allowed Mr. Carpenter to "withdraw the remaining stolen money." In doing so, Plaintiffs argue that FNB violated a duty to report their findings to various agencies, and facilitated the alleged fraud. It is possible that, if this claim had been timely filed, these additional allegations of "substantial assistance" could have saved this claim against Huntington from summary dismissal at this stage of the litigation. [39]

[39] Indeed, this was the result in Metz. Based on the additional allegations against Unizan Bank (the successor to FNB, and predecessor to Huntington), the aiding and abetting claim was allowed to go to trial.

**CONCLUSION**

For all of the reasons set forth above, the following motions are disposed of as indicated:

* Defendant Springs Valley Bank & Trust's Motion to [*67] Dismiss (**ECF # 90**) is **GRANTED**. All claims against Springs Valley Bank & Trust are dismissed for want of prosecution.

* Defendant Huntington National Bank's Motion to Dismiss Amended Complaint is **GRANTED**. (ECF # 120). Counts One, Two, Six, Seven, Eight, and Nine are dismissed against Huntington National Bank. There are

Case: 1:08-cv-02755-DCN  Doc #: 324-4  Filed:  06/01/15  21 of 31.  PageID #: 16553

Page 19
2009 U.S. Dist. LEXIS 51858, *67; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

no remaining claims against Huntington National Bank.

* Fifth Third Bank's Motion to Dismiss Second [sic] Amended Complaint is **GRANTED**. (ECF # 98). Counts One, Three, Six, Seven, Eight, and Nine are dismissed against Fifth Third Bank. There are no remaining claims against Fifth Third.

* Sun Trust Bank and Wachovia Bank's Motion to Dismiss is **GRANTED** in part and **DENIED** in part. (ECF # 121). Counts One, Four, Five, Six, Seven, Eight, and Nine are dismissed against Sun Trust Bank and Wachovia Bank. There are no remaining claims against Sun Trust and Wachovia.

* Bank of America's Motion to Dismiss is **GRANTED**. (ECF # 137). There are no remaining claims against Bank of America.

* Farmers & Merchants Bank of Colby's (named as Bank of Colby in the caption of the Amended Complaint) Motion to Dismiss is **GRANTED**. (ECF # 124). Farmers & Merchants Bank of Colby's (Bank of Colby) is dismissed [*68] from this action for lack of personal jurisdiction.

* Belmont National Bank, J.P. Morgan Chase Bank, N.A., Key Bank, PNC Bank National, and Sky Bank's Motion to Dismiss Amended Complaint is **GRANTED**. (ECF # 108). There are no remaining claims against Belmont National Bank, J.P. Morgan Chase Bank, N.A., Key Bank, PNC Bank National, or Sky Bank.

* Century Federal Credit Union's Motion to Dismiss Plaintiffs' Amended Complaint is **GRANTED**. (ECF # 118). There are no remaining claims against Century Federal Credit Union.

* Charter One Bank's Motion to Dismiss Amended Complaint is **GRANTED**. (ECF # 107). There are no remaining claims against Charter One Bank.

* Dollar Bank's Motion to Dismiss Plaintiff's First Amended Complaint is **GRANTED**. (ECF # 103). There are no remaining claims against Dollar Bank.

* First Merit Corporation's Motion to Dismiss is GRANTED. (ECF # 95). There are no remaining claims against First Merit Corporation.

* First National Bank of Pennsylvania's Motion is **GRANTED**. (ECF # 136). There are no remaining claims against First National Bank of Pennsylvania.

* German American Bancorp's Motion to Dismiss Amended Complaint is **GRANTED**. (ECF # 156). German American Bancorp is dismissed [*69] from this action for lack of personal jurisdiction.

* Killbuck Savings Bank and U.S. Bank National Association's Motion to Dismiss is **GRANTED**. (ECF # 96). There are no remaining claims against Killbuck Savings Bank or U.S. Bank National Association.

* Old National Bancorp's Motion to Dismiss Plaintiffs' First Amended Complaint is **GRANTED**. (ECF # 87). There are no remaining claims against Old National Bancorp.

* Sunflower Bank's Motion to Dismiss the Amended Complaint is **GRANTED**. (ECF # 97). Sunflower Bank is dismissed from this action for lack of personal jurisdiction.

* Third Federal Savings Bank's Motion to Dismiss Amended Complaint is **GRANTED**. (ECF # 99). There are no remaining claims against Third Federal Savings Bank.

* Terre Haute Savings' Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim is **GRANTED**. (ECF # 84). Terre Haute Savings is dismissed from this action for lack of personal jurisdiction.

* Wells Fargo Bank's Motion to Dismiss Plaintiffs' Amended Complaint is **GRANTED**. (ECF # 101). There are no remaining claims against Wells Fargo Bank.

* Wilson & Muir Bank's Amended Motion to Dismiss Plaintiffs' Amended Complaint is **GRANTED**. (ECF # 89). Wilson & Muir Bank [*70] is dismissed from this action for lack of personal jurisdiction.

Defendants Terre Haute Savings, Wilson & Muir Bank & Trust Co., Sunflower Bank, Farmers & Merchants Bank of Colby, and German American Bancorp are dismissed for lack of personal jurisdiction. As against the remaining banks (except First National Bank and First National Bank of Odon), Counts One, Six, Seven, and Eight are dismissed as time-barred under the three year UCC statutes of limitations. Counts Two through Five, and Count Nine are dismissed as time-barred under *O.R.C. § 1707.43(B)*. In addition,

2009 U.S. Dist. LEXIS 51858, *70; 69 U.C.C. Rep. Serv. 2d (Callaghan) 295

Counts Two through Five fail to state a claim upon which relief can be granted. Count Nine also fails to state a claim as against Defendants Fifth Third, Wachovia, and Sun Trust banks. Finally, because Defendants First National Bank and First National Bank of Odon were never served, they are dismissed from this action without prejudice. If the Plaintiffs believe that they can properly serve these Defendants, they may move the Court to reinstate this case as against these Defendants. **IT IS SO**

**ORDERED**.

/s/ Donald C. Nugent

DONALD C. NUGENT

United States District Judge

DATED: June 18, 2009

# Tab 2



**PARMA COMMUNITY GENERAL HOSPITAL, Plaintiff, v. PREMIER ANESTHESIA OF PARMA, et al., Defendants.**

**CASE NO. 1:09 CV 325**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION**

*2011 U.S. Dist. LEXIS 11035*

**February 4, 2011, Decided**
**February 4, 2011, Filed**

**PRIOR HISTORY:** *Parma Cmty. Gen. Hosp. v. Premier Anesthesia of Parma, 2011 U.S. Dist. LEXIS 3006 (N.D. Ohio, Jan. 12, 2011)*

**COUNSEL:** [*1] For Parma Community General Hospital, Plaintiff, Counter-Defendant: Amanda J. Martinsek, Marquettes D. Robinson, Thacker Martinsek - Cleveland, Cleveland, OH.

For Premier Anesthesia of Parma, Defendant: Daniel G. Schulof, James F. Bogan, III, LEAD ATTORNEYS, Kilpatrick Stockton - Atlanta, Atlanta, GA; David R. Mayo, L. Jason Blake, Tamara L. Karel, Benesch, Friedlander, Coplan & Aronoff - Cleveland, Cleveland, OH.

For Premier Anesthesia Associates LLC, Premier Anesthesia Consultants, Locumtenens.com LLC, Defendants: David R. Mayo, L. Jason Blake, Benesch, Friedlander, Coplan & Aronoff - Cleveland, Cleveland, OH; James F. Bogan, III, Kilpatrick Stockton - Atlanta, Atlanta, GA.

For Premier Anesthesia of Parma, Counter-Claimant: David R. Mayo, L. Jason Blake, Tamara L. Karel, Benesch, Friedlander, Coplan & Aronoff - Cleveland, Cleveland, OH; James F. Bogan, III, Kilpatrick Stockton - Atlanta, Atlanta, GA.

**JUDGES:** DONALD C. NUGENT, United States District Judge.

**OPINION BY:** DONALD C. NUGENT

**OPINION**

MEMORANDUM OPINION AND ORDER

This matter is before the Court on *Defendant's Motion for Partial Summary Judgment On the Enforceability And Meaning of Settlement Agreement, and Supporting Memorandum of Points and Authority (ECF [*2] #76); Defendant's Motion For Summary Judgment On Plaintiff's Unjust Enrichment and Fraud Claims, and Supporting Memorandum of Points and Authorities (ECF # 75); and, Plaintiff Parma Community General Hospital's Motion for Summary Judgment on Defendant's Counterclaim.* (ECF # 72). There has been a Response to each motion, and each party has filed a Reply in support of its own motion(s). (ECF # 92, 91, 93, 97, 96, 95). The issues have been fully briefed and are now ripe for consideration.

**STANDARD OF REVIEW**

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law." *FED. R. CIV. P. 56(c)*. The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)* [*3] (citing *FED. R. CIV. P. 56(c)*). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc., 48 F.3d 937, 941 (6th Cir. 1995)* (citing *Celotex, 477 U.S. at 322*). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis, 57 F.3d 476, 479 (6th Cir. 1995)* (citing *Anderson, 477 U.S. at 252*). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson, 477 U.S. at 249-50* [*4] (citations omitted). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id. at 252*.

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmover. The nonmoving party may not simply rely on its pleadings,

but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp., 53 F.3d 146, 149 (6th Cir. 1995)*. *FED. R. CIV. P. 56(e)* states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the [*5] need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson, 477 U.S. at 250*.

## FACTUAL BACKGROUND[1]

> 1  The factual summary is based upon agreed or unchallenged facts set forth in the parties' statements of facts. Those material facts that are controverted and have support on both sides, as established by deposition testimony, affidavit, or other appropriate evidence are stated in a light most favorable to the non-moving party.

The Complaint alleges that on April 5, 2005, Parma Community General Hospital ("Parma") and Premier Anesthesia of Parma ("Premier") entered into an agreement by which Premier would be the exclusive provider of anesthesia services at Parma for two years ("the Agreement"). The parties subsequently agreed to extend the term of the Agreement through the end of December in 2007. (ECF #11, ¶¶ 4, 5).

Article IV of the Agreement sets forth the parties' rights and obligations with respect to the final profits or losses that would result from a reconciliation of the practice-related expenses and revenues incurred by or

collected [*6] by Premier. Specifically, section 4.5. sets forth the procedures for a final accounting at the termination of the Agreement. [2] The Agreement also gave Premier non-compete rights that prohibited its health care providers from working at Parma for two years after Parma's termination of the Agreement. On November 12, 2007, Parma informed Premier that it was terminating the Agreement, effective December 31, 2007. (ECF # 77, Ex. B). As of December 3, 2007, there remained outstanding invoices from August, September, and October, which Premier considered to be in default. In order to resolve the default and avoid any issues stemming from an early termination of the contract, Premier proposed a settlement that would resolve the default issues and address the non-compete restricting Parma's ability to hire the current anesthesia staff following the termination of the agreement. [3] The proposed settlement agreement contained the following terms:

1. Parma immediately pays [Premier's] invoices for August, September, and October;

2. [Premier's] invoices for November and December, 2007, will be part of a final settlement;

3. In February 2008, [Premier] will give Parma [Premier's] calculation of all [*7] collections received and costs incurred by [Premier] since contract inception (April 1, 2005) through and ending December 31, 2007. The $590,500 deposit will be treated as a [Premier] collection in this calculation. After Parma's review of [Premier's] calculation, we will settle with a payment to or from Parma per the calculation. This procedure will supercede the procedure in our contract.

4. [Premier] will release the providers noted above from their contract restrictions from working for Parma.

[2] This section applies if the contract is terminated after the first year. The contract was in effect for more than two years.

3 These two issues, the handling of the November and December invoices, and the procedures for settlement at termination are the only issues specifically resolved or altered by the settlement agreement. As there was no general waiver or release included in the agreement, the right to pursue alleged breaches of the original contract not related to the August 2007 through December 2007 invoices, the non-compete, or the procedures for settlement at termination are not affected by this settlement.

On the very next day, Parma's General Counsel responded to the proposal stating: [*8] "Your December 3rd proposal is accepted," and indicating that a check for outstanding invoices would be sent by December 7, 2008. Pursuant to the agreement [4] Premier sent its calculation to Parma, concluding that Parma owed Premier approximately $360,141. [5] Parma spent several months reviewing the calculation and concluded that Premier owed Parma $339,326.96.

4 Parma argues that the calculation was not sent until May of 2009, three months after the agreed submission date from the December 3, 2008 letter
5 This is reduction in the amount originally claimed by Premier. Premier's expert witness determined that this was the appropriate amount, and Premier modified its demand to correspond to the amount determined by its expert.

Premier's final calculation contained previously un-billed charges of approximately $290,000 for temporary staff costs, known by the parties as "locum tenens" expenses. Parma's expert concluded that these expenses appeared to be for bona-fide expenses actually incurred. The parties do not dispute that they were incurred in 2006, or that they were not billed or otherwise revealed to Parma until 2008. Because the parties could not reach an agreement on the final reconciliation, [*9] Parma filed its Complaint in the Cuyahoga County Court of Common Pleas. Premier timely removed the action to this Court. (ECF #1). The Complaint alleges three counts: (1) breach of contract, (2) unjust enrichment, and (3) fraud. Premier then filed a counterclaim for breach of contract, based on an alleged breach of the terms set forth in the December 3, 2008 letter.

## ANALYSIS

A. Defendant's Motion for Summary Judgment on

2011 U.S. Dist. LEXIS 11035, *9

Plaintiff's Claims for Unjust Enrichment and Fraud

Premier seeks to have this Court dismiss Plaintiff's Unjust Enrichment and Fraud claims as a matter of law, arguing that the claims in this case stem from a dispute over contractual terms, and therefore cannot give rise to claims for unjust enrichment or fraud. Under Ohio law claims for unjust enrichment are not allowed where an express contract governs the transactions at issue, and claims for fraud are not permitted when the damages resulting from the alleged fraud are not distinct from the damages available under a breach of contract claim. *See generally Ullmann v. May, 72 N.E.2d 63, 63, 147 Ohio St. 468, 468 (1947); Corporex Dev. & Constr. Mgt., Inc. V. Shook, Inc., 835 N.E.2d 701, 704, 106 Ohio St. 3d 412, 414, 2005 Ohio 5409 (Ohio 2005).*

The [*10] Amended Complaint bases the unjust enrichment claim on allegations that Premier charged unreasonable fees for locum tenens expenses, and engaged in self-dealing by retaining profits from the excess fees for itself or its affiliates. However, the Agreement specifically includes terms that require fees be reasonable and competitive. Therefore, the reasonableness of the fees is an issue that can be raised under the terms of the contract, and unjust enrichment is not an appropriate cause of action to address this allegation. As to the charge of self-dealing, this allegation, even if true, does not give rise to a claim absent a relationship that would create a duty against it. There are no allegations that the parties had a fiduciary relationship, or any other relationship involving a heightened level of trust. Their relationship was defined solely by the terms of the contract. Therefore, if any duty against self-dealing were imposed, it would be created by the contract, and would properly be addressed through a breach of contract claim, and not by way of an unjust enrichment claim.

In so far as Parma's unjust enrichment claim may be based on specific representations made during the negotiation [*11] of the Agreement, and included in the Agreement, those claims parallel the breach of contract claim, and cannot be the basis for a claim of unjust enrichment. "Ohio law does not recognize an equitable claim for unjust enrichment, as a matter of law, when an express contract covers the same subject matter." *Davidson v. Davidson, No. 17-05-12, 2005 Ohio 6414, 2005 WL 3274853, *5 (Ohio Ct. App. 2005)*(citing *Ullman v. May, 72 N.E.2d 63, 147 Ohio St. 468 1947).*

Consequently, any unjust enrichment claim for the use of locum tenens providers after the first year, allegedly in violation of representations made in negotiations and in Section 4.4.2 of the Agreement are dismissed as a matter of law. Any breach of contract claims based on an alleged violation of this section, however, remain viable causes of action.

Further, Parma's claim that Premier concealed more than $290,000 in order to induce Parma into continuing its contract with Premier and to enter into a settlement agreement with regard to other disputes, does not satisfy the elements of an unjust enrichment claim. There is no allegation that expenses were paid for services not rendered. Therefore, the allegations do not support an [*12] unjust enrichment claim. Further, as there is no dispute that services were rendered, the only challenge to the legitimacy of the charges that could arise would have to come from the contractual terms addressing when locum tenens staff were allowed to be used, or what procedures had been agreed to with regard to how the charges would be calculated, when they would be disclosed or reported, and how they were to be allocated between the parties. Therefore, Defendant's Motion for Summary Judgment on the Plaintiff's unjust enrichment claims is granted.

With regard to the fraud claim, Parma contends in the Amended Complaint that Premier committed fraud by promising to obtain required staffing when it had no intention of doing so, and by engaging in self-dealing by upcharging provided services and pocketing the profit. Parma's fraud claims all stem from Premier's alleged failure to satisfy the terms of the contract, [6] and the damages stemming from the fraud allegations would mirror those damages sought under Parma's breach of contract claims. Further, with regard to the allegations of self-dealing, as set forth above, Parma has provided no basis for a duty that would prohibit such activity, [*13] outside of the duty allegedly created by the contract itself, and has admitted as much in its Opposition. (ECF # 91, pg. 5). Therefore, the "economic loss" doctrine bars Parma from pursuing damages through a cause of action for fraud. *See, e.g., Ketcham v. Miller, 104 Ohio St. 372, 136 N.E. 145 (1922); Wolfe v. Continental Casualty, 647 F.2d 705, 710 (6th Cir. 1981)*(Ohio law forbids parties from converting contract actions into tort actions by attacking the intentions or motives of the breaching party); *Telxon Corp. v. Smart Media of Delaware, Inc., Nos. 22098 & 22099, 2005 Ohio 4931, 05 WL 2292800*

*(Ohio Ct. App. 2005)*; *Textron Fin. Corp. v. Nationwide Mut. Ins. Co., 684 N.E.2d 1261, 115 Ohio App.3d 137 (Ohio Ct. App. 1996)*.

> 6    In fact, in its Opposition to the Motion for Summary Judgment, Parma clarifies that its allegation as to when and where the fraud took place was "under the contract". (ECF #91, pg. 6).

Aside from the allegations in the Complaint, Parma provides a new basis for its fraud claim in its Opposition to Defendant's Motion for Summary Judgment. In its Opposition, Parma raises the allegation that Premier fraudulently induced Parma into agreeing to the December settlement by [*14] failing to disclose un-billed locum tenens expenses. The remedy for the alleged fraud inducing Parma into agreeing to the December settlement would be rescission. Parma has asserted rescission as a defense to Premier's counterclaim for breach of the settlement agreement, and the validity of this defense is addressed in detail below. To the extent Parma is allowed to pursue its defense of rescission, it is also allowed to maintain an affirmative claim for fraudulent inducement of the December settlement.

To the extent that Parma may seek to assert a general claim for fraudulent misrepresentation based on the non-disclosure of the locum tenens expenses, however, that claim would be barred under the Ohio law. The contract appears to addresses when expenses must be disclosed. (ECF #91, Ex. A, Section 4.5.1.2.1. "Quarterly Reconciliation"). Therefore, any damages relating to the late disclosure of these charges would mirror the damages available for allegedly failing to report the expenses as required under the contract. This claim, therefore, would also be barred under the economic loss doctrine. If the contract does not determine when charges must be submitted, Parma has pointed to no [*15] basis giving rise to a duty of disclosure relating to those charges. Premier's request for Summary Judgment on Parma's fraud claims is, therefore, granted in part and denied in part.

**B. Defendant's Motion for Summary Judgment on the Enforceability and Meaning of the Settlement Agreement**

There is no dispute that Parma, through its General Counsel, accepted the settlement terms in the December 3, 2007 letter, or that Parma has benefitted to some degree from the agreement. [7] However, the parties dispute the meaning of the terms included in that

agreement. Premier argues that the December 3, 2007 letter setting forth proposed terms for a settlement between the parties is clear and unambiguous. The proposal requires Premier provide a calculation of monies allegedly owed based on "all collections received and costs incurred by [Premier] since contract inception (April 1, 2005) through and ending December 31, 2007." Premier contends that this language, on its face, clearly establishes that the calculation is to exclude any collections received after December 31, 2007, and is to include all costs incurred by Premier since April 1, 2005.

> 7    Specifically by the elimination of any non-compete restrictions [*16] placed on the anesthesia staff, and by avoiding the possibility of an early termination of the contract based on their alleged default

Parma contends that this language could be interpreted to include collections anticipated, or payable based on services performed through December 31, 2007, but not actually received by that date; and, that it should only include costs incurred by Premier over the last twelve months. Parma bases its arguments, in part, on the language and original formulas for calculation set forth in the original agreement.

The Court agrees with Premier that this language is unambiguous. The agreed basis for the calculation includes "collections received" between April 1, 2005 and December 31, 2007. There is nothing in the agreement that would suggest that "**collections received**" would include collections billed, incurred, or anticipated but NOT received. "[A] court may not delete or add words to a contract when determining the parties' rights and obligations under it." *Merz v. Motorists Mut. Ins. Co., No. CA2006-08-203, 2007 Ohio 2293, 07 WL 1394560, *6 (Ohio App. May 14, 2007)*; *see also Kellie Auto Sales, Inc. v. Rahbars & Ritters, Ents., L.L.C., 172 Ohio App. 3d 675, 876 N.E.2d 1014, 1024, 2007 Ohio 4312 (Ohio App. 2007)* [*17] . [8] Similarly, there is absolutely nothing in the terms of this agreement to suggest that the parties did not mean to include "costs incurred" prior to December 31, 2007. The language specifically includes "costs incurred" between April 5, 2005 and December 31, 2007. Further, the agreement specifically states that the terms of the calculation are to supercede the procedures set forth in the original agreement. [9] Therefore, the Court cannot look to the language contained in procedures from the original agreement to determine the meaning of a

settlement proposal that specifically superceded those terms.

8   Parma's argument that the word "collections" is ambiguous and could include collections anticipated but not received, even if taken as true, does not resolve the question. If the agreement had said that "collections from before December 31, 2007" were to be included in the final calculation, this argument may have held some weight. But, the clear language of the agreement states that only collections "received" by the December date are to be included. The word "received" modifies "collections" and is not ambiguous. Therefore, even if we accepted that "collections" [*18] could included "collections anticipated," the agreement would still clearly include only those anticipated collections that were actually received by December 31, 2007.

9   A fair reading of the original contract reveals that the procedures that were superceded are those procedures relating to settlement at termination. These procedures are set forth at paragraph 4.5.2 of the original agreement.

It may very well be that Parma did not intend to agree to the terms as written. However, that is irrelevant to the enforcement of those terms. The language used is clear and unambiguous, and Parma is bound to abide by the plain language of the terms it agreed to. Although the overriding concern when interpreting a contract is to ascertain and effectuate the intention of the parties, that intent "is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med. Life Ins. Co., 509 N.E.2d 411, 413, 31 Ohio St. 3d 130, 132, 31 Ohio B. 289 (Ohio 1987).* Therefore, "evidence cannot be introduced to show an agreement between the parties is materially different from that expressed by clear and unambiguous language of the instrument." *Blosser v. Enderlin, 148 N.E. 393, 396, 113 Ohio St. 121, 134, 2 Ohio Law Abs. 499, 3 Ohio Law Abs. 389 (Ohio 1925)).* [*19] Therefore, this Court finds, as a matter of law, that the language included in the terms of the settlement agreement from December of 2007, provides that the settlement at termination shall include collections actually received between April 5, 2005 and December 31, 2007, and includes "costs incurred" by Premier between April 5, 2005 and December 31, 2007.

However, although the terms of the agreement are

unambiguous, this does not necessarily mean that the agreement is enforceable as a matter of law. Parma argues that even if the Court agrees with Premier with regard to the meaning of the December agreement, that agreement is rescindable based on Premier's alleged fraud or Parma's unilateral mistake relating to un-billed costs that were not disclosed to Parma prior to entering into the December agreement. Rescission is available to undo a contract if the contract was entered into on the basis of fraud, duress, undue influence, or mistake. *See generally Wannemacher v. Cavalier, 2004 Ohio 4020, 2004 WL 1718080, *9 (Ohio App. 3 Dist., 2004).* "The primary purpose of rescission is to return the parties to their original positions before the contract was formed." *Trajcevski v. Bell, 115 Ohio App. 3d 289, 292, 685 N.E.2d 289, 291 (1996).*

Parma [*20] alleges that Premier knew there were outstanding undisclosed charges when it made the settlement offer, and knew that Parma was unaware that these charges were outstanding when it agreed to the offer. (ECF #92). Premier argues that even if this were true, Parma has received a tremendous benefit under the agreement, and did not take timely steps to initiate rescission after learning of the allegedly concealed charges in May of 2008. Under Ohio law, a party cannot rescind a contract unless it is willing and able to return the consideration or benefit it obtained from the agreement. *See, e.g., Id., Mid-America Acceptance Co. v. Lightle, 63 Ohio App. 3d 590, 599, 579 N.E.2d 721, 727 (1989).* Further, "[t]he right to rescind a contract must be exercised with great promptness. . . . Accordingly, unreasonable delay in manifesting an election to rescind a contract may constitute a waiver of the right to rescind." *Meyers v. Hoops, 74 Ohio Law Abs. 280, 140 N.E.2d 65, 68 (Ohio App. 1955); see also Hanes v. Giambrone, 14 Ohio App. 3d 400, 405, 14 Ohio B. 518, 471 N.E. 2d 801, 807 (1984).*

There remains several questions of material fact that will need to be resolved in order to determine whether rescission is a viable defense to the [*21] enforcement of the settlement in this case. These include, but are not limited to whether Parma is willing to return the benefit of the agreement in order to effectuate a rescission; what the value of that bargain actually was; whether the existence of the undisclosed locum tenens charges was material to the settlement agreement; whether the non-disclosure of the charges was known to Premier at the time the settlement was entered into; whether Premier

intended to mislead Parma by concealing the existence of these charges; whether Parma was reasonably justified in assuming that no such charges remained un-billed; and, whether Parma timely sought rescission upon discovering the alleged fraud or mistake that led it to agree to the December settlement. Therefore, Defendant's Motion for Partial Summary Judgment On the Enforceability and Meaning of Settlement Agreement is granted with regard to the meaning of the terms included in the December 2007 agreement, and denied with regard to the enforceability of the agreement. [10] The issue of enforceability will need to be resolved at trial.

> 10  Assuming that rescission is not an available option, there would also remain a question of fact as to  [*22] what the proper final reconciliation would be employing the changes to section 4.5.2 contained in paragraph three of the December settlement.

C.  Plaintiff's Motion for Summary Judgment on Defendant's Counterclaim

Parma argues that the December settlement is not enforceable because the parties agreed that they did not intend to alter the contract or effectuate a change in the value of the contract. (ECF #72, pg. 10). However, as set forth above, extrinsic evidence as to the parties' intent cannot be considered when the language of the agreement is clear and unambiguous.

Parma also argues that the December settlement cannot alter the terms of the original Agreement because the original Agreement contained specific requirements for any amendments to the Agreement. The "Amendment and Agreement Execution" and "Entire Agreement" provisions, contained in 6.13 and 6.16 respectively, provide that the Agreement could not be amended except by an agreement

> in writing and executed in multiple copies on behalf of [Parma] by any official of [Parma] specifically authorized by [Parma's] Board with respect to such execution and on behalf of [Premier] by Richard L. Jackson, CEO or his designee. Each multiple [*23] copy shall be deemed an original, but all multiple copies together shall constitute one and the same instrument.

(ECF #91, Ex. A, Section 6.13).

They also provided that "no changes in or additions to this Agreement shall be recognized unless incorporated herein by amendment as provided herein." (ECF #91, Ex. A, Section 6.16). Premier asserts that there is at least a factual question as to whether the modification requirements were met. However, whether or not specifics of the amendment requirements were met, the December settlement can be enforced. A settlement agreement resolving a contractual dispute is not bound by the terms of the contract that is in dispute. The settlement agreement is not an amendment of the original Agreement. Rather, it is a binding contract in its own right, and constitutes a written waiver of any contrary terms in the original Agreement. The parties who executed the settlement were the legal counsel of the parties, with actual authority to enter into the agreement, [11] and new consideration was provided as a basis for the agreement. Therefore, whether or not the writings containing the settlement agreement satisfied the technical requirements of sections 6.13  [*24] or 6.16 of the original Agreement, it is a binding and enforceable agreement. [12]

> 11  There is a dispute as to whether counsel had the abstract authority to change the terms of the contract, but the parties do not dispute that counsel had the authority to agree to the proposal as it was submitted. Whether the parties fully understood the consequences of the agreement is not relevant here, so long as they gave counsel the authority to enter into the agreement as written.
> 12  The enforceability of the agreement may be compromised by other defenses, but it is not unenforceable for failure to satisfy the requirements of the amendment provisions in the original Agreement.

Finally, Parma argues that even if the December settlement does supercede the requirements of the original Agreement, Parma should be allowed to rescind the settlement based on fraudulent inducement or unilateral mistake. As set forth above, there are many unresolved questions of fact that could affect whether rescission is a viable remedy in this case. Therefore, the Court cannot determine as a matter of law that rescission is an available option or that the December settlement is otherwise unenforceable based on fraudulent inducement [*25] or unilateral mistake.

## CONCLUSION

For the reasons set forth above, *Defendant's Motion For Summary Judgment On Plaintiff's Unjust Enrichment and Fraud Claims, and Supporting Memorandum of Points and Authorities* (ECF # 75) and *Defendant's Motion for Partial Summary Judgment On the Enforceability And Meaning of Settlement Agreement, and Supporting Memorandum of Points and Authority* (ECF #76) are GRANTED in part and DENIED in part. *Plaintiff Parma Community General Hospital's Motion for Summary Judgment on Defendant's Counterclaim*, (ECF # 72), is DENIED. Trial remains set for March 15,

2011 at 8:30 a.m. Trial will address Plaintiff's claim for breach of contract; Defendant's claim for breach of the December settlement agreement; and, Plaintiff's claim of fraudulent inducement (and/or defense of rescission) with regard to the December settlement. IT IS SO ORDERED.

/s/ Donald C. Nugent

DONALD C. NUGENT

United States District Judge

DATED: February 4, 2011