**APPENDIX**

Unpublished Opinions Cited in Brief

**A** Neutral

As of: June 12, 2015 5:09 PM EDT

## *Infocision Mgmt. Corp. v. Found. for Moral Law, Inc.*

United States District Court for the Northern District of Ohio, Eastern Division

July 22, 2011, Decided; July 22, 2011, Filed

CASE NO.5:08cv1342

**Reporter**

2011 U.S. Dist. LEXIS 80266; 2011 WL 3022002

INFOCISION MANAGEMENT CORP., PLAINTIFF, vs. FOUNDATION FOR MORAL LAW INC., DEFENDANT.

**Subsequent History:** Costs and fees proceeding at *Infocision Mgmt. Corp. v. Found for Moral Law, Inc., 2012 U.S. Dist. LEXIS 13552 (N.D. Ohio, Feb. 3, 2012)*

**Prior History:** *Infocision Mgmt. Corp. v. Found. for Moral Law, 2011 U.S. Dist. LEXIS 28570 (N.D. Ohio, Mar. 7, 2011)*

## Core Terms

donor, damages, mitigate, parties', motion in limine, recalls, habit, affirmative defense, offering, admissible, argues, issues, limine, twice, set forth, cease, summary judgment, discovery, notice, contract provision, discovery dispute, routine practice, responsive, employees, breached, campaign, repeated, waived

## Case Summary

### Overview

The foundation offered no evidence, beyond its unsupported contention, that the isolated act of the corporation's employee amounted to a routine practice such that it represented the corporation's regular response to a repeated specific situation. Consequently, such evidence was the type of character evidence contemplated under *Fed. R. Evid. 404(b)*, and was not admissible to show habit. Therefore, the corporation's motion to exclude such evidence was granted.

### Outcome

Corporation's motion in limine granted in full.

## LexisNexis® Headnotes

Civil Procedure > Pretrial Matters > Motions in Limine > Exclusion of Evidence

***HN1*** Although not explicitly authorized by the Federal Rules of Evidence or the Federal Rules of Civil Procedure, the practice of ruling on motions in limine has developed pursuant to the district court's inherent authority to manage the course of trials. Motions in limine allow the court to rule on evidentiary issues prior to trial in order to avoid delay and focus pertinent issues for the jury's consideration. Courts should exclude evidence on a motion in limine only when it is clearly inadmissible. If the court is unable to determine whether or not certain evidence is clearly inadmissible, it should defer ruling until trial so that questions of foundation, relevancy, and potential prejudice can be evaluated in proper context. Ultimately, the determination whether to grant or deny a motion in limine is within the sound discretion of the trial court. In limine rulings are preliminary, and the district court may change its ruling at trial for any reason it deems appropriate.

Evidence > Relevance > Exclusion of Relevant Evidence > Confusion, Prejudice & Waste of Time

Evidence > Relevance > Relevant Evidence

***HN2*** All relevant evidence is admissible and evidence that is not relevant is not admissible. *Fed. R. Evid. 402*. Relevant evidence is defined as evidence having any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence. *Fed. R. Evid. 401*. The relevancy standard is liberal. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of the evidence. *Fed. R. Evid. 403*.

Evidence > Admissibility > Conduct Evidence > Habit & Routine Practices

*HN3* See *Fed. R. Evid. 406*.

Evidence > Admissibility > Conduct Evidence > Habit & Routine Practices

*HN4* According to the *Fed. R. Evid. 406*, advisory committee's notes, "habit" refers to one's regular response to repeated specific situation. When habit refers to a group, it references the routine practice of an organization. Courts have generally proceeded cautiously in permitting the admission of a pattern of conduct as habit, because it necessarily engenders the very possibility that such evidence will be used to establish a party's propensity to act in conformity with its general character, thereby thwarting *Fed. R. Evid. 404*'s prohibition against the use of character evidence except for narrowly prescribed purposes.

Evidence > Admissibility > Conduct Evidence > Prior Acts, Crimes & Wrongs

Evidence > Admissibility > Conduct Evidence > Habit & Routine Practices

*HN5* Given the concern that such character evidence will amount to improper *Fed. R. Evid. 404* other acts evidence, before a court may admit evidence of habit, the offering party must establish the degree of specificity and frequency of uniform response that ensures more than a mere tendency to act in a given manner, but rather, conduct that is semiautomatic in nature. That requires a showing that the behavior at issue occurred with sufficient regularity making it more probable than not that it would be carried out in every instance or in most instances. As such, admissible *Fed. R. Evid. 406* evidence must rest on an analysis of instances numerous enough to support an inference of systematic conduct and to establish one's regular response to a repeated specific situation. Such an analysis may require some comparison of the number of instances in which any such conduct occurs with the number in which no such conduct took place.

Evidence > Admissibility > Statements as Evidence > Compromise & Settlement Negotiations

*HN6* *Fed. R. Evid. 408(a)* prohibits the use of evidence of offers to compromise a claim, and compromises need not be limited to those made after a lawsuit is filed.

Evidence > Admissibility > Statements as Evidence > Compromise & Settlement Negotiations

*HN7* *Fed. R. Evid. 408* prohibits the admission of statements made for the purpose of: (1) furnishing or accepting a valuable consideration in compromising or attempting to compromise the claim; and (2) conduct or statements made in compromise negotiations regarding the claim. *Fed. R. Evid. 408(a)*. While *Fed. R. Evid. 408(a)* prohibits the admission of such evidence for the purposes of establishing liability or the quantum of damages, *Fed. R. Evid. 408(b)* permits such evidence to be admitted for other purposes. For *Fed. R. Evid. 408*'s prohibition to apply, there must be an actual dispute, or at least an apparent difference of opinion between the parties, as to the validity of a claim. It is clear that litigation need not have actually commenced for *Fed. R. Evid. 408* to apply. The term "claim," as set forth in *Fed. R. Evid. 408*, contemplates legal claims for or against liability of the parties. Courts have observed that the trigger for application of *Fed. R. Evid. 408*, the existence of an actual dispute as to existing claims, appears to be whether the parties have rejected each other's claims for performance, or, to put it another way, whether the parties have reached a clear difference of opinion as to what performance is required.

Evidence > Admissibility > Statements as Evidence > Compromise & Settlement Negotiations

*HN8* The United States Court of Appeals for the Sixth Circuit has previously ruled that evidence of failure to mitigate is not admissible as serving another purpose under *Fed. R. Evid. 408*.

Civil Procedure > Discovery & Disclosure > Disclosure > Motions to Compel

*HN9* N.D. Ohio Civ. R. 37.1 outlines the procedure for handling discovery disputes, and requires the parties to refer any discovery dispute to a judicial officer only after counsel have certified to the court the making of a sincere, good faith effort to resolve the dispute. N.D. Ohio Civ. R. 37.1(a)(1). The rule further provides that no discovery dispute shall be brought to the attention of the court more than 10 days after the discovery cut-off deadline. N.D. Ohio Civ. R. 37.1(b).

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Avoidable Consequences

*HN10* Under Ohio law, an injured party is under a duty to mitigate its damages and may not recover those damages which it could have reasonably avoided. While a failure to mitigate is an affirmative defense which limits the amount of damages a plaintiff can recover, it is not a defense to liability. Further, the failure to mitigate damages only

2011 U.S. Dist. LEXIS 80266, *80266

reduces the amount recoverable; it does not bar recovery. When the plaintiff failures to mitigate, the plaintiff is only precluded from recovering damages that could have been avoided by mitigation.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

*HN11* *Fed. R. Civ. P. 8(c)* provides that all affirmative defenses, except those specifically set forth in *Fed. R. Civ. P. 12*, must be set forth in an answer or some other responsive pleading. Nonetheless, the failure to raise an affirmative defense does not always result in a waiver of that defense. The United States Supreme Court has held that such a defense may be litigated so long as the party against whom the defense received notice and had an opportunity to rebut it.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > Waiver

*HN12* Ohio R. Civ. P. 8(C) requires a party to set forth affirmatively any matter constituting an avoidance or affirmative defense. The failure to raise an affirmative waives that defense.

**Counsel:**  [*1] For Infocision Management Corporation, Plaintiff: David P. Bertsch, LEAD ATTORNEY, Buckingham, Doolittle & Burroughs - Akron, Akron, OH.

For Foundation for Moral Law, Inc., Defendant: John A. Eidsmoe, LEAD ATTORNEY, Foundation for Moral Law, Montgomery, AL; Percy Squire, LEAD ATTORNEY, Columbus, OH; Benjamin D. DuPre, Montgomery, AL.

For Forrest D. Thompson, Defendant in Member Case 8-1412, Defendant: David P. Bertsch, LEAD ATTORNEY, Buckingham, Doolittle & Burroughs - Akron, Akron, OH; Percy Squire, Columbus, OH.

For Curtis Stern, Defendant in Member Case 5:08cv1412, Curtis Stern, Defendant in Member Case 5:09cv951, Defendants: James M. McHugh, Tzangas, Plakas, Mannos & Raies, Canton, OH; John D. Ramsey, Canton, OH; Lee E. Plakas, Tzangas, Plakas & Mannos, Canton, OH; Percy Squire, Columbus, OH.

For Steven H. Steinglass, Mediator, Mediator: Percy Squire, Columbus, OH.

For Foundation for Moral Law, Inc., Counter-Claimant: Percy Squire, LEAD ATTORNEY, Columbus, OH; Benjamin D. DuPre, Montgomery, AL.

For  Infocision  Management  Corporation, Counter-Defendant: David P. Bertsch, LEAD ATTORNEY, Buckingham, Doolittle & Burroughs - Akron, Akron, OH; Percy Squire, Columbus, OH.

**Judges:**  HONORABLE  SARA  LIOI,  [*2]  UNITED STATES DISTRICT JUDGE.

**Opinion by:** SARA LIOI

# Opinion

OPINION AND ORDER

Before the Court are the motions in limine of Plaintiff Infocision Management Corp. (Infocision) (Doc. No. 167) and the amended motion in limine of Defendant Foundation for Moral Law Inc. (FML) (Doc. No. 169.) Both motions are fully briefed and ripe for decision.

**Factual and Procedural Background**

The facts surrounding these contract actions have been set forth in numerous Memorandum Opinions, familiarity with which is presumed. Suffice it to say, the present dispute arises out of a contractual relationship wherein Infocision agreed to provide telemarketing services designed to raise money to support the charitable and political work of FML. The focal point of the litigation was the disagreement over the interpretation of a provision in the contract that permitted FML to address any deficit in the contract by allowing Infocision to make up to "two [re]calls per donor acquired" during the next rolling 18 month period.

A brief review of the parties' interpretation of the relevant contract provision, and the actions they took based upon their respective interpretations, is necessary to place the present in limine motions in context. Infocision  [*3] believed that the "two call" contract provision permitted it to make a total number of calls that was not to exceed two times the number of donors on the donor list cultivated during the initial telemarketing campaign. Relying on this interpretation, Infocision admittedly placed more than two calls each to some of FML's more generous donors, but less than 2 times the total number of donors. FML, in contrast, believed that the provision was merely a prohibition on calling any individual donor more than twice during the recall campaign. Thus, when FML learned that Infocision had placed more than two recalls to certain donors, its representative, Dr. Richard Hopson, initially instructed Infocision to stop making any further calls. He later revised FML's position,

and told Infocision to simply refrain from recalling individual donors more than twice. (Doc. No. 147 at 5, Ex. A, letter dated November 15, 2005 to Rebecca Backus.) Infocision ultimately stopped all recalls "after determining that Hobson's restrictions made it impossible to generate any net revenues from further calls." (Doc. No. 145 at 4.)

On October 27, 2010, the Court issued its ruling granting Infocision's motion for summary  [*4] judgment, and denying FML's motion for summary judgment. Specifically, the Court held that the term "two calls per donor acquired" established a ratio to be used in determining the maximum number of calls Infocision could make during the second campaign. In so ruling, the Court rejected FML's interpretation that Infocision was not permitted to make more than two calls to each individual donor. The Court concluded that its ruling resolved the question of whether Infocision breached the agreement by recalling certain donors more than twice, and whether FML was entitled to instruct Infocision to stop making recalls. Both issues were resolved in favor of Infocision. In light of this ruling, the Court dismissed FML's case (Case No. 5:08CV1412), and set Infocision's case (Case No. 5:08CV1342) for trial.

Several issues, including the determination of damages, Infocision's right to an accounting, and the proper disposition of the $14,644.79 that was held in the parties' joint back account, remained for trial. Notwithstanding the existence of these remaining issues, FML filed a notice of appeal from the Court's ruling on summary judgment. In light of the notice, the Court was forced to abandon  [*5] the November 8, 2010 trial date.

Infocision's case was returned to this docket on January 20, 2011 when the Sixth Circuit granted Infocision's motion to dismiss the appeal as to Infocision's case, and held the appeal from the dismissal of FML's case in abeyance until after the trial on damages in the Infocision case. (*See* Doc. No. 164.)

The Court is now, once again, on the eve of trial, and the parties have filed motions in limine.

**Law and Analysis**

**A.** Motion in Limine Standard

*HN1* Although not explicitly authorized by the Federal Rules of Evidence or the Federal Rules of Civil Procedure, the practice of ruling on motions in limine "has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States, 469 U.S. 38, 41*

*n.4, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984)*. Motions in limine allow the court to rule on evidentiary issues prior to trial in order to avoid delay and focus pertinent issues for the jury's consideration. *See United States v. Brawner, 173 F.3d 966, 970 (6th Cir. 1999)*; *Jonasson v. Lutheran Child & Family Servs., 115 F.3d 436, 440 (7th Cir. 1997)*.

Courts should exclude evidence on a motion in limine only when it is clearly inadmissible. *Indiana Ins. Co. v. Gen. Elec. Co., 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004)*.  [*6] If the court is unable to determine whether or not certain evidence is clearly inadmissible, it should defer ruling until trial so that questions of foundation, relevancy, and potential prejudice can be evaluated in proper context. *Id.* Ultimately, the determination whether to grant or deny a motion in limine is within the sound discretion of the trial court. *Goldman v. Healthcare Mgmt. Sys., Inc., 559 F. Supp. 2d 853, 858 (W.D. Mich. 2008)* (citing *United States v. Certain Land Situated in the City of Detroit, 547 F. Supp. 680, 681 (E.D. Mich. 1982))*. In limine rulings are preliminary, and the district court may change its ruling at trial for any reason it deems appropriate. *United States v. Yannott, 42 F.3d 999, 1007 (6th Cir. 1994)*.

*HN2* All relevant evidence is admissible and evidence that is not relevant is not admissible. *Fed. R. Evid. 402*. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Fed. R. Evid. 401*. The relevancy standard is liberal. *Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 587, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*. However, relevant  [*7] evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of the evidence." *Fed. R. Evid. 403*.

**B.** The Motions in Limine

*i) Infocision's Motions in Limine (Doc. No. 167.)*

By its motion, Infocision seeks to prevent FML from introducing evidence: (1) involving statements made regarding the interpretation of the contract; (2) regarding an unsuccessful attempt by an Infocision employee to withdraw the funds from the parties' joint bank account; and (3) regarding Infocision's settlement offers. The Court will address each category of evidence in turn.

Infocision argues that FML should be precluded from mentioning any statements allegedly made by Infocision's

2011 U.S. Dist. LEXIS 80266, *7

former employee, Curtis Stern (or any other Infocision employee), as to the meaning of the contractual language limiting the number of recalls. In support of its position, Infocision notes that the Court has already resolved the issue of the interpretation of this contract provision, and, as such, any further testimony on this subject would be irrelevant and prejudicial.

FML [*8] posits that the question of why Infocision ceased to make any calls will undoubtedly give rise to testimony regarding the parties' respective interpretations of the "two call" provision. It insists that it would be unfair and prejudicial to permit Infocision to explain that it did not make all of the required calls, and then prohibit FML from explaining why it gave instructions to Infocision concerning the recall question. According to FML, the fact that the Court has now ruled on the interpretation of the "two call" provision should not prohibit FML from presenting evidence of its contemporaneous understanding of the contract provision.

Liability has been determined in this matter. The Court had already ruled that the contract was unambiguous, and that FML's interpretation was unreasonable. The only questions left for trial relate to the damages to which Infocision is entitled. At this point, the question of why FML instructed Infocision to stop making calls is not relevant. With respect to the parties' communications, the only question left is whether it was reasonable for Infocision to discontinue making all calls when FML ultimately gave it permission to continue making calls to [*9] certain donors. What motivated FML to so instruct Infocision is simply not relevant to the question of damages. [1] As such, this portion of Infocision's motion in limine is GRANTED.

Infocision also seeks to prohibit FML from offering any evidence of an unauthorized attempt by an Infocision employee to withdraw the funds held in the parties' joint bank account. It is undisputed that the attempt was unsuccessful. In an order ruling on motions in limine filed prior to the aborted November 2010 trial, the Court ruled that such evidence was not relevant because it did not make it any more or less probable that Infocision was entitled to the funds in question. (Doc. No. 136 at 4.) Finding that the only conceivable purpose for offering this evidence would be to cast Infocision in an unfavorable light, showing that its employees act with improper or fraudulent motives, the Court ruled that its admission would be unduly prejudicial under *Rule 403 of the Federal Rules of Evidence.* [*10] (*Id.*)

FML now asks the Court to revisit that ruling, arguing that such evidence would be admissible to demonstrate habit or routine practice of an organization. Without support, FML argues that "Infocision's internal procedures were configured to enable them to act unilaterally in the event a client refused to release the funds upon request." (Doc. No. 173 at 4.) It offers its "contention" that this was not the first time that Infocision had acted in this manner, and that FML should be permitted to bring this out at trial.

*Federal Rule of Evidence 406* [2] provides:

> HN3 Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

*Fed. R. Evid. 406*.

HN4 According to the Notes to *Rule 406*, "habit" refers to "one's regular response to repeated specific situation." When "habit" refers to a group, it references the "routine practice of [*11] an organization." Courts have generally proceeded cautiously in "permitting the admission of a pattern of conduct as habit, because it necessarily engenders the very possibility that such evidence will be used to establish a party's propensity to act in conformity with its general character, thereby thwarting *Rule 404*'s prohibition against the use of character evidence except for narrowly prescribed purposes." *Simplex, Inc. v. Diversified Energy Systems, Inc., 847 F.2d 1290, 1293 (7th Cir. 1988)* (citing *Wilson v. Volkswagen of America, Inc., 561 F.2d 494 (4th Cir. 1977))*.

HN5 Given the concern that such evidence will amount to improper *Rule 404* other acts evidence, "before a court may admit evidence of habit, the offering party must establish the degree of specificity and frequency of uniform response that ensures more than a mere 'tendency' to act in a given manner, but rather, conduct that is 'semiautomatic' in nature." *Simplex, Inc., 847 F.2d at 1293* (citing *Fed. R. Evid. 406* (Notes of Advisory Committee)). This requires a showing that "the behavior at issue occurred with sufficient regularity making it more probable than not that it would be carried out in every instance or in most [*12] instances." *United States v. Newman, 982 F.2d 665, 668 (1st Cir. 1992)*

---

[1]  FML also argues that this evidence would be admissible to demonstrate FML's good faith defense to the breach of contract. "Good faith" is an affirmative defense which was never pled nor litigated by FML. As such, it is waived.

[2]  FML erroneously cites *Fed. R. Evid. 407*, which relates to the admissibility of subsequent remedial measures, instead of *Rule 406*.

(internal citations omitted). *See Bell v. CONRAIL, 299 F. Supp. 2d 795, 800-801 (N.D. Ohio 2004)* (disallowing *Rule 406* habit evidence where evidence from employees failed to show that it was not uncommon or unusual for defrosters on trains to be non-functioning). As such, admissible *Rule 406* evidence must "rest on an analysis of instances 'numerous enough to [support] an inference of systematic conduct' and to establish one's regular response to a repeated specific situation." *Newman, 982 F.2d at 668* (internal citation omitted); s*ee Osborne v. Pinsonneault, 2009 U.S. Dist. LEXIS 33957, at *8 (W.D. Ky. Apr. 20, 2009)* (citing *Bell, 299 F. Supp. 2d at 800*)). Such an analysis "may require 'some comparison of the number of instances in which any such conduct occurs with the number in which no such conduct took place.'" *Bell, 299 F. Supp. 2d at 800* (quoting *Strauss v. Douglas Aircraft Co., 404 F.2d 1152, 1158 (2d Cir. 1968)); see also Weil v. Seltzer, 873 F.2d 1453, 1460-61, 277 U.S. App. D.C. 196 (D.C. Cir. 1985)* (burden of establishing the habitual nature of the evidence rests with the proponent); *Fed. R. Evid. 406* (Advisory Committee's Note: In [*13] deciding whether conduct amounts to "habit" significant factors include the "adequacy of sampling and uniformity of responses.")

Here, FML offers no evidence, beyond its unsupported "contention," that the isolated act of Infocision's employee amounted to a routine practice such that it represented Infocision's "regular response to a repeated specific situation." Consequently, such evidence is the type of character evidence contemplated under *Rule 404(b)*, and is not admissible to show habit. *See, e.g., Weil, 873 F.2d at 1460-61* (evidence relating to the treatment of five former patients did not establish the existence of a habit). Of course, even if FML would have met its burden of establishing the existence of a habit, evidence that Infocision had a habit of having its employees withdraw contested monies would not be relevant to the question of who is entitled to the money in the parties' joint account. Infocision's motion to exclude such evidence is GRANTED.

Finally, Infocision argues that FML should not be permitted to mention anything about Infocision's settlement offers. While FML acknowledges that *HN6 Fed. R. Evid. 408(a)* prohibits the use of evidence of offers to compromise a claim, [*14] and further concedes that compromises need not be limited to those made after a lawsuit is filed, it maintains, without support, that *Rule 408* does not include

"statements made before a dispute has heated up and the possibility of a lawsuit is looming." (Doc. No. 173.) According to FML, Infocision's Rebecca Backus's August 28, 2006 email to Richard Hobson, suggesting that the existing balance should be excused in exchange for the balance of the parties' joint bank account, is admissible because it came almost two years before Infocision filed suit. [3]

*HN7 Rule 408* prohibits the admission of statements made for the purpose of: [1] "furnishing [...]—or accepting [...]—a valuable consideration in compromising or attempting to compromise the claim; and [2] conduct or statements made [*15] in compromise negotiations regarding the claim [...]." *Fed. R. Evid. 408(a)*. While *subsection (a)* prohibits the admission of such evidence for the purposes of establishing liability or the quantum of damages, *subsection (b)* permits such evidence to be admitted for other purposes. *See id.* FML argues that there was no claim as contemplated by *Rule 408(a)*, and submits that it should be permitted to offer evidence that Infocision was willing in 2006 and early 2007 to walk away from the deficit to demonstrate that it had already determined that it would not vigorously pursue its recall campaign as another purpose under *Rule 408(b)*.

For *Rule 408*'s prohibition to apply, "there must be an actual dispute, or at least an apparent difference of opinion between the parties, as to the validity of a claim." *Dallis v. Aetna Life Ins. Co., 768 F.2d 1303, 1307 (11th Cir. 1985)*. "It is clear that litigation need not have actually commenced for *Rule 408* to apply." *Alpex Computer Corp. v. Nintendo Co., 770 F. Supp. 161, 164 (S.D.N.Y. 1991)* (construing *Big O Tire Dealers v. Goodyear Tire & Rubber Co., 561 F.2d 1365 (10th Cir. 1977))*. The term "claim," as set forth in *Rule 408*, contemplates "legal claims [*16] for or against liability of the parties." *Nat'l Presort v. Bowe Bell + Howell Co., 663 F. Supp. 2d 505, 508 n.4 (N.D. Tex. 2009)* (statements in letters sent prior to litigation were not admissible to prove liability for or the amount of the claim). Courts have observed that:

> The "trigger" for application of *Rule 408*, the existence of an actual dispute as to existing claims, appears to be whether the parties have rejected each other's claims for performance or, to put it another way, whether the parties have reached a clear difference of opinion as to what performance is required.

---

[3]  FML also seeks to introduce evidence that on January 30, 3007, Forrest Thompson of Infocision allegedly indicated that he did not care about the escrow account so long as the state did not get the money, and that, on February 9, 2007, Ken Dawson and Rebecca Backus informed FML that Infocision had decided to forgive the alleged deficit and that FML could also have the monies held in the parties' joint bank account.

2011 U.S. Dist. LEXIS 80266, *16

*Johnson v. Land O' Lakes*, 181 F.R.D. 388, 392 (N.D. Iowa 1998).

The evidence offered by FML in support of its own motion in limine demonstrates quite clearly that there was an actual dispute as to an existing claim, as well as a clear difference of opinion as to what performance was required under the contract when various Infocision employees, in 2006 and 2007, made offers to FML that were designed to resolve all issues between the two parties. In a November 29, 2005 email to Rich Hobson, Rebecca Backus advised Hobson that "we have suspended the recalls per your request until we can sort through the questions  **[*17]** you had on the contract." That same morning, November 29, 2005, Rich Hobson responded in an email that "Infocision may still make up to 2 recalls to each donor, but we do not believe the contract allows for more than 2 to any donor. We ask that Infocision refrain from making more than 2 recalls. (*See* Doc. No. 169 at 6.) Because there was an actual dispute when Infocision employees made the offers of resolution, they cannot be offered to refute FML's liability or to establish the value of the claim.

Nor can this evidence be offered for some other purpose under *Rule 408(b)*. To the extent that FML wishes to offer such evidence as proof of Infocision's failure to mitigate its damages, *HN8* the Sixth Circuit has previously ruled that evidence of failure to mitigate is not admissible as serving "another purpose" under *Rule 408*. See *Stockman v. Oakcrest Dental Ctr., 480 F.3d 791, 797-98 (6th Cir. 2007)* (quoting *Pierce v. F.R. Tripler & Co., 955 F.2d 820, 826-27 (2d Cir. 1992)* ("[e]vidence that demonstrates a failure to mitigate goes to the 'amount' of the claim and thus, if the offer was made in the course of compromise negotiations, it is barred under the plain language of *Rule 408.*"))

For all  **[*18]** of the reasons set forth above, Infocision's motion in limine is GRANTED in full.

*ii) FML's Motion in Limine*

By its motion, FML seeks to preclude Infocision from offering any evidence as to damages because: (1) Infocision has failed to furnish evidence of damages during discovery; (2) FML permitted Infocision to recall donors; (3) FML did not breach the contract; (4) Infocision failed to mitigate damages; and (5) Infocision breached the contract.

As to its first contention, FML complains that Infocision failed to respond to repeated requests for evidence of damages included in interrogatories, requests for production of documents, and various letters and emails. *HN9* *Local*

*Rule 37.1* outlines the procedure for handling discovery disputes, and requires the parties to refer any discovery dispute to a Judicial Officer only after counsel have certified to the Court the making of a sincere, good faith effort to resolve the dispute. *Local Rule 37.1(a)(1)*. The rule further provides that no discovery dispute shall be brought to the attention of the Court more than 10 days after the discovery cut-off deadline. *L.R. 37.1(b)*. The discovery deadline in this case was August 31, 2009 (*see* Doc. No. 65), yet  **[*19]** this is the first time that FML has raised this particular complaint regarding discovery. Moreover, in its second status report, filed September 22, 2009, FML reported that the parties had completed fact discovery. (*See* Doc. No. 88.) No mention of any discovery dispute was made. Having failed to bring this discovery dispute to the Court's attention in a timely fashion in accordance with the local rules, FML cannot now complain that Infocision failed to comply with discovery requests. This portion of FML's motion in limine is DENIED.

FML also argues that it is not responsible for any alleged deficit because FML "chose to allow Infocision to recall donors." (Doc. No. 169 at 4.) But it is undisputed that FML instructed Infocision to stop recalling donors more than twice, contrary to the terms of the Breakeven Agreement. FML now suggests, however, that Dr. Hobson merely aired his concerns regarding the potential for burning out the donor pool, and that Hobson did nothing more than suggest a possible course of conduct. Of course, FML has alleged from the beginning that "Dr. Hobson [] told Infocision by telephone and in subsequent letters to cease recalling any donor more than twice." (Case  **[*20]** No. 5:08CV1412, Compl. at ¶ 16.) Ultimately, whether Infocision should have ceased all recall efforts in response to the limitations Dr. Hobson placed on the recall campaign is a question properly left for the jury.

In a related vein, FML argues that Infocision should be precluded from offering any evidence of damages because Infocision failed to mitigate its damages. Specifically, FML points to the fact that, in response to FML's concerns regarding the calling of individual donors more than twice, Infocision made the unilateral decision to cease all calls. *HN10* Under Ohio law, "an injured party is under a duty to mitigate its damages and may not recover those damages which it could have reasonably avoided." *Wilson v. Kreusch, 111 Ohio App. 3d 47, 52, 675 N.E.2d 571 (Ohio Ct. App. 2d Dist. 1996)*. While a failure to mitigate is an affirmative defense which limits the amount of damages a plaintiff can recover, it is not a defense to liability. *A.B. & B, Inc. v. Banfi Products, Inc., 71 Ohio App. 3d 650, 594 N.E.2d 1151 (Ohio Ct. App. 1991)*. Further, the failure to mitigate damages only

reduces the amount recoverable; it does not bar recovery. *Van Beusecum v. Continental Builders, 2008 Ohio 2141, 2008 Ohio App. LEXIS 1837, at *27 (Ohio Ct. App. 5th Dist. May 1, 2008)* [*21] (citing *A.B. & B, 71 Ohio App. 3d at 657*. When the plaintiff failures to mitigate, the plaintiff is only precluded from recovering damages that could have been avoided by mitigation. *Id.* As such, Infocision's failure to mitigate, should FML establish it at trial, will go to the amount of damages; and not, its entitlement to them. To the extent FML's motion seeks to bar damages evidence on grounds of failure to mitigate it is DENIED.

Infocision argues, however, that FML should be precluded from raising the issue of mitigation because it failed to raise the defense in a responsive pleading. There is no question that FML failed to raise this affirmative defense in any responsive pleading. Further, *HN11 Fed. R. Civ. P. 8(c)* provides that all affirmative defenses, except those specifically set forth in *Fed. R. Civ. P. 12*, must be set forth in an answer or some other responsive pleading. [4] Nonetheless, the failure to raise an affirmative defense does not always result in a waiver of that defense. The United States Supreme Court has held that such a defense may be litigated so long as the party against whom the defense received notice and had an opportunity to rebut it. *Blonder-Tongue Labs., Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S. Ct. 1434, 28 L. Ed. 2d 788 (1971)*; [*22] s*ee Moore, Owen, Thomas & Co. v. Coffey, 992 F.2d 1439, 1445 (6th Cir. 1993)*; *see, e.g., R.H. Cochran & Assocs. v. Sheet Metal Workers Int'l Ass'n, 335 Fed. Appx. 516, 519 (6th Cir. 2009)* (affirmative defense not waived where raised in summary judgment); *Stupak-Thrall v. Glickman, 346 F.3d 579, 585 (6th Cir. 2003)* (same).

The Court finds that FML has sufficiently raised the issue of mitigation in various pleadings, motions and responsive briefs such that Infocision was put on notice that this was an affirmative defense that FML intended to pursue at trial. Specifically, FML has made repeated reference to the fact that Rich Hobson ultimately indicated to Infocision that it was permitted to make some call (i.e. up two additional [*23] calls) to each individual donor), and that Infocision made a unilateral decision to cease making any calls. These allegations sufficiently placed Infocision on notice that FML believed that Infocision failed to mitigate its damages by making calls to certain donors. *See, e.g., Moore, 992 F.2d 1445* (affirmative defense not waived where raised during

summary judgment.) The Court, therefore, concludes that the affirmative defense of mitigation has not been waived.

Finally, FML argues that its own lack of breach, combined with Infocision's breach of the agreement, should preclude Infocision from offering any evidence of damages. Specifically, FML maintains that it did not breach the contract because Rich Hobson merely expressed his concerns regarding donor burnout, and encouraged Infocision to continue making up to two calls to each donor. It notes that FML had no authority to stop Infocision from making any calls authorized by the contract, and that Infocision had a duty to honor the contract "notwithstanding Dr. Hobson's concerns." (Doc. No. 169 at 4.) It further argues that Infocision breached its duty under the Breakeven Agreement when it unilaterally decided to cease making all calls. [*24] (*Id.* at 5.)

The Court rejects this argument for several reasons. First and foremost, this argument is not properly raised in an in limine motion. As set forth above, the purpose of the in limine motion is to "ensure evenhanded and expeditious management of trials by eliminating evidence that is clearly inadmissible for any purpose." *Indiana Ins. Co., 326 F. Supp. 2d at 846*; s*ee Harris v. City of Circleville, 2010 U.S. Dist. LEXIS 29386, at *6 (S.D. Ohio Mar. 5, 2010)* (citing *Jonasson, 115 F.3d at 440*) ("The purpose of a motion in limine is to allow the court to rule on issues pertaining to evidence in advance of trial in order to both avoid delay and ensure an evenhanded and expeditious trial.")) While couched in terms of an evidentiary issue, FML's motion truly represents an attempt to relitigate the issue of liability. Liability has been determined and the deadline for filing dispositive motions has long since passed. Thus, FML's untimely attempt to pass off a dispositive motion as one in limine shall not be tolerated.

Second, even if the Court were inclined to revisit the issue liability, FML's arguments represent a new theory that was neither plead nor litigated. Throughout this [*25] litigation, FML has argued that Infocision breached the agreement by calling certain individual donors more than twice; thereby, burning out the donor pool. (*See* Case No. 5:08CV1412, Doc. No. 1, FML Compl. at ¶ 20, "By placing recalls to Plaintiff's donors three (3), four (4), and five (5) times in an eighteen (18) month period, Infocision materially breached the two-recall provision of the contract between Plaintiff

---

[4]   The same is true under Ohio law.*HN12* Ohio R. Civ. P. 8(C) requires a party to "set forth affirmatively [...] any [...] matter constituting an avoidance or affirmative defense." "The failure to raise an affirmative waives that defense." *Oliver v. C.M.H.A., 2002 Ohio 5830, 2002 Ohio App. LEXIS 5663, at ¶ 11 (Ohio Ct. App. 8th Dist.)*. Under Ohio law, the failure to mitigate damages is an affirmative defense. *Young v. Frank's Nursery & Crafts, Inc., 58 Ohio St.3d 242, 244, 569 N.E.2d 1034 (1991)*.

2011 U.S. Dist. LEXIS 80266, *25

and Infocision;" Case No. 5:08CV1342, Doc. No. 18, Answer at ¶ 6, incorporating all allegations of FML's Complaint in Case No. 5:08CV1412; Case No. 5:08CV1342, Doc. No. 147, FML's motion for summary judgment, noting that FML moves for judgment "by reason of Infocision's breach of the two recall provision" at 1, and fn. 2 noting that Infocision was limited to making no more than two additional calls to each individual donor).

Now, on the eve of trial, FML attempts to argue that Infocision owed a duty under the contract to disregard FML"s "concerns" and continue to make any and all calls under the contract. [5] This was never FML's theory, either in pleading or in litigation, and it would be inappropriate to permit FML to raise it at this late juncture where there has

been [*26] no notice and no opportunity for Infocision to respond. [6]

For all of the foregoing reasons, FML's motion in limine is DENIED.

**IT IS SO ORDERED.**

Dated: July 22, 2011

/s/ Sara Lioi

**HONORABLE SARA LIOI**

**UNITED STATES DISTRICT JUDGE**

---

[5]  The Court is not persuaded by FML's attempt to suggest that FML never instructed Infocision to, in any way, curtail its recall efforts. In its complaint in its own breach of contract case, FML alleged that "Dr. Hobson also told Infocision by telephone and in subsequent letters to cease recalling any donor more than twice." (*See* Case No. 5:08CV1412, Compl. at ¶ 16.)

[6]  To the extent that this "theory" represents merely a restatement of its argument that Infocision failed to mitigate its damages by at least making two additional calls to each donor, the Court has already ruled that it will permit FML to offer evidence in support of this affirmative defense at trial.

Ⓐ Neutral

As of: June 12, 2015 5:10 PM EDT

# *Am. Home Assur. Co. v. Greater Omaha Packing Co.*

United States District Court for the District of Nebraska

July 22, 2014, Decided; July 22, 2014, Filed

8:11CV270

**Reporter**

2014 U.S. Dist. LEXIS 99433; 2014 WL 3661485

AMERICAN HOME ASSURANCE COMPANY and CARGILL MEAT SOLUTIONS CORPORATION, Plaintiffs, v. GREATER OMAHA PACKING COMPANY, INC., Defendant.

**Prior History:** *Am. Home Assur. Co. v. Greater Omaha Packing Co., 2012 U.S. Dist. LEXIS 78966 (D. Neb., June 7, 2012)*

## Core Terms

invoices, WARRANTY, summary judgment motion, motion in limine, shipment, legal issue, disclaimers, parties, meat, warranty of merchantability, terms and conditions, affirmative defense, particular purpose, contemporaneous, prejudicial, discovery, effective, argues, beef

**Counsel:** [*1] For American Home Assurance Company, Plaintiff: Thomas A. Grennan, GROSS, WELCH LAW FIRM, Omaha, NE.

For Cargill Meat Solutions, Corporation, Plaintiff: Jacob D. Bylund, Kimberly J. Walker, FAEGRE, BAKER LAW FIRM - IOWA, Des Moines, IA; Kiri Somermeyer, Sarah L. Brew, PRO HAC VICE, FAEGRE, BENSON LAW FIRM - MINNEAPOLIS, Minneapolis, MN; Thomas A. Grennan, GROSS, WELCH LAW FIRM, Omaha, NE.

For Greater Omaha Packing Company, Inc., Defendant: David J. Stubstad, Jordan W. Adam, Michael F. Coyle, Patrick S. Cooper, FRASER, STRYKER LAW FIRM, Omaha, NE.

**Judges:** LYLE E. STROM, Senior United States District Judge.

**Opinion by:** LYLE E. STROM

# Opinion

## MEMORANDUM AND ORDER

This matter is before the Court on plaintiff Cargill Meat Solution's ("Cargill") motion to exclude certain invoice terms and conditions that defendant Greater Omaha Packing Company ("GOPAC") seeks to offer at trial (Filing No. 480).

## I. Background

GOPAC started selling beef to Cargill as part of Cargill's "approved supplier program" in 2007. This program involved a specific contract between the parties that included specific guarantees that the shipments would be — among other things — "not adulterated" and "able to be legally transported or sold." The agreement [*2] also provided for damages "that are a direct and proximate result of [GOPAC]'s actions." In the fall of 2007, a substantial amount of beef traced to Cargill was recalled due to multiple instances of consumers contracting E. coli. Cargill alleges that the tainted meat was supplied to Cargill by GOPAC and has brought suit on the basis of the explicit guarantee in the parties' contract as well as implied warranty of merchantability and implied warranty of fitness for a particular purpose.

The present motion involves invoices that GOPAC claims to have sent to Cargill contemporaneous to every shipment of meat — some 350 up to and including the allegedly contaminated shipment. Said invoices included a page entitled "TERMS AND CONDITIONS OF SALE" that states "THIS WARRANTY IS THE EXCLUSIVE WARRANTY PROVIDED AND IS EXPRESSLY IN LIEU OF ANY OTHER WARRANTIES EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY, CONDITION, OR FITNESS FOR A PARTICULAR PURPOSE or use." The invoice also limits GOPAC's liability to the price of the

2014 U.S. Dist. LEXIS 99433, *3

goods sold and claims to be the exclusive agreement regarding the sale. Cargill claims not to have received any such invoices and produced no  [*3] such invoices in response to discovery requests. Cargill also asserts that discovery served on other GOPAC customers did not yield any invoices. The parties also dispute whether it was GOPAC's policy to send the invoices before, after, or contemporaneously with the shipments of product — an act that would constitute full performance of the contract.

II. Analysis

As a preliminary matter, GOPAC argues that the motion in limine to exclude the invoices should be treated as a late-filed motion for summary judgment because it seeks the resolution of legal issues outside of simple relevance calculations. The substance of the motion will determine whether the Court will construe it as motion for summary judgment or a motion in limine. *See Bliss v. BNSF Rwy. Co., No. 4:12CV3019, 2013 U.S. Dist. LEXIS 146101, 2013 WL 5570231, at *2 (D. Neb. Oct. 9, 2013).* "A motion in limine is 'any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered.'" *Id.* (citing *Louzon v. Ford Motor Co., 718 F.3d 556, 561 (6th Cir. 2013).* "A motion in limine is used 'to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions;' in contrast, a motion  [*4] for summary judgment is a mechanism for resolving non-evidentiary matters prior to trial." *Id.*

Cargill argues that the invoices are non-probative and prejudicial because the disclaimers contained therein are ineffective. However, the sole reason GOPAC intends to submit the invoices is to prove its affirmative defense against the warranty claims. Thus, in order for the Court to determine whether the invoices are relevant, the Court must do more than simply weigh the probative value against the potential for prejudice. Rather, Cargill asks that the Court to resolve a legal issue that is central to the merits of the case: whether the warranties are effective and, in turn, whether GOPAC's affirmative defense is valid. The resolution of such legal issues is the purpose and function of summary judgment, and the deadline for summary judgment motions has passed. Further, whether the disclaimers are fully effective depends on certain facts, some of which are contested and some of which have not been fully developed for the Court. At this point in the proceedings, the effectiveness of the disclaimers is an issue best left for resolution at trial. Accordingly,

IT IS ORDERED that plaintiff's motion  [*5] is denied.

DATED this 22nd day of July, 2014.

BY THE COURT:

/s/ Lyle E. Strom

LYLE E. STROM, Senior Judge

United States District Court

A Neutral

As of: June 12, 2015 5:10 PM EDT

## Hendrian v. Safety-Kleen Sys.

United States District Court for the Eastern District of Michigan, Southern Division

January 13, 2014, Decided; January 13, 2014, Filed

Case No. 08-14371

**Reporter**

2014 U.S. Dist. LEXIS 3638; 2014 WL 117315

JUDITH A. HENDRIAN, Individually and as Personal Representative of the Estate of HOWARD G. HENDRIAN, Deceased, Plaintiff, v. SAFETY-KLEEN SYSTEMS, INC., Defendant.

**Subsequent History:** Objection denied by *Hendrian v. Safety-Kleen Sys., 2014 U.S. Dist. LEXIS 51726 ( E.D. Mich., Apr. 15, 2014)*

**Prior History:** *Hendrian v. Safety-Kleen Sys., 2012 U.S. Dist. LEXIS 123585 ( E.D. Mich., Aug. 30, 2012)*

## Core Terms

Solvent, benzene, judicial notice, warnings, motion in limine, parties, chemical, exposure, matters, limine, unrelated, requires, motions, admissibility, depositions, purposes, issues, cases, safer alternative, proffered, witnesses, contends, statutes, appears, reasons, hazardous waste, circumstances, constituents, instructions, regulations

**Counsel:** [*1] For Judith A Hendrian, Individually and as Personal Representative of the Estate of Howard G Hendrian, Deceased, Plaintiff: Donald A. Krispin, LEAD ATTORNEY, The Jaques Admiralty Law Firm, PC, Detroit, MI; Duane C. Marsden, LEAD ATTORNEY, Timothy A. Swafford, Jaques Admiralty Law Firm, Detroit, MI; Raphael Metzger, Metzger Law Group, Long Beach, CA.

For Safety-Kleen Systems, Inc., Defendant: Cynthia M. Filipovich, Daniel J. Scully, Jr., Clark Hill, Detroit, MI; Duane C. Marsden, Jaques Admiralty Law Firm, Detroit, MI; Wesley S. Alost, Jones Carr McGoldrick LLP, Dallas, TX.

**Judges:** Honorable JULIAN ABELE COOK, JR., U.S. District Judge.

**Opinion by:** JULIAN ABELE COOK, JR.

## Opinion

ORDER

On October 15, 2008, the Plaintiff, Judith Hendrian, acting individually and as the personal representative of the estate of her deceased husband, Howard G. Hendrian ("Hendrian"), filed this products liability action against the Defendant, Safety-Kleen Systems, Inc. ("Safety-Kleen"). [1] The facts and the procedural history of this case have been described in detail by this Court in a previously entered Order denying Safety-Kleen's motion for summary judgment. (ECF No. 57 at 2-3).

To summarize, the Plaintiff alleges that her husband was exposed to a cleaning solvent while working at Ford Motor Company. This cleaning solvent (to wit, "105 Solvent") which had been produced by Safety-Kleen contained the chemical "benzene" that was allegedly carcinogenic to humans. The Plaintiff maintains that Hendrian's exposure to the 105 Solvent caused him to incur serious medical problems including an acute form of myelogenous leukemia, which ultimately led to his death in 2007. (Compl. ¶ 12). In making her claims, the Plaintiff has advanced four basic theories of liability against Safety-Kleen; namely, (1) failure to warn, (2) strict liability, [2] (3) negligence, and (4) loss of consortium.

Currently before the Court are the parties' motions which address a variety of subjects that range from (1) boiler plate

[1] The Court has interchanged "Defendant" and "Safety-Kleen" [*2] without any intention of giving emphasis or significance to the arguments or the positions of either party in this controversy.

[2] The Court has interpreted the Plaintiff's claim for strict liability (which is not recognized as an enforceable tort under Michigan law) as a design defect claim in product liability. (ECF No. 57 at 11).

2014 U.S. Dist. LEXIS 3638, *4

objections to hypothetical matters, [3] (2) [*3] requests for the Court to take judicial notice of certain facts and publications, and (3) issues that are dispositive in nature, rendering them improperly lodged for disposition at this stage of the case.[4]

I.

According to the Federal Rules of Evidence, relevant evidence is admissible unless the United States Constitution, a federal statute, the Rules of Evidence, or other rules prescribed by the Supreme Court provide otherwise. *Fed.R.Evid. 402*. Irrelevant evidence is not admissible. *Id.* Evidence is "relevant" if it tends to make a material fact more or less probable. *Fed.R.Evid. 401*. Even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, misleading the jury, undue delay, wasting time, or needlessly [*4] presenting cumulative evidence. *Fed.R.Evid. 403*.

Although neither the Federal Rules of Civil Procedure nor the Federal Rules of Evidence expressly provide for the exclusion of evidence in limine before trial, "[i]n general, federal district courts have the power to exclude evidence *in limine* pursuant to their inherent authority to manage trials." *Luce v. United States, 469 U.S. 38, 41 n. 4, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984)*. A court will generally reject a proffered motion in limine unless the moving party can satisfy "its burden of showing that the [targeted] evidence in question is clearly inadmissible." *Corporate Commc'n Servs. of Dayton, LLC v. MCI Commc'ns Servs., Inc., 2010 U.S. Dist. LEXIS 45571, 2010 WL 1445169, *1 (S.D. Ohio Apr. 12, 2010)* (citing *Indiana Insurance Co. v. General Electric Co., 326 F.Supp.2d 844, 846 (N.D.Ohio 2004))*. "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Id.*

If the Court denies such a motion in limine, the evidence sought to be excluded by the motion will not necessarily be admitted at trial. *Id.* Indeed, the Court will consider any objections raised at trial, [*5] "even if the objection falls within the scope of a motion in limine that has been [previously] denied." *Watts v. United Parcel Serv., 2013 U.S. Dist. LEXIS 126746, 2013 WL 4776976, *1 (S.D. Ohio Sept. 5, 2013)*.

II.

Finally, "even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling." *Luce, 469 U.S. at 41-42*.

II.

As a preliminary matter, the Court has grouped several of the parties' motions together for purposes of eliminating duplicative analyses.

A. ECF Nos: 78, 79, 81-87, 95, 96, 100-102, 106, 107, 110, and 111.

With respect to the above-listed motions, the parties' seek to preclude the entry of a wide variety of broad categories of evidence. As an example, the Plaintiff seeks, *inter alia,* to exclude the following from being admitted into the record of this case: (1) expert opinions that have not been previously disclosed by the Defendant (ECF Nos. 78-79); (2) allegedly improper hypothetical questions (ECF No. 82); (3) evidence of an assumption of risk (ECF No. 85); (4) arguments for jury nullification of non-economic damages (ECF No. 86); (5) evidence of the non-taxability of a personal injury award (ECF No. 87); (6) evidence [*6] of the effect of a verdict on the community (ECF No. 95); and, (7) evidence regarding the Defendant's good corporate conduct (ECF No. 96). In a similar vein, the Defendant seeks, *inter alia,* to preclude the entry of (1) media reports regarding Defendant or its witnesses (ECF No. 100); (2) evidence of unrelated diseases and medical conditions (ECF No. 101); (3) evidence of other suits or claims against the Defendant (ECF No. 102); (4) reference to irrelevant corporate conduct (ECF No. 106); reference to certain irrelevant or inflammatory matters (ECF No. 107); (5) evidence of unreliable or irrelevant studies (ECF No. 110); and (6) evidence of witness testimony to infer corporate knowledge (ECF No. 111).

All of the motions grouped under Section II-A of this Order (enumerated above), share characteristics which allow for summary treatment: namely, they are overly broad, contain little if any reference to specific evidence, and lack the requisite context necessary for the Court to make a well-reasoned decision at this juncture of the case. The courts have been clear that "[a] motion in limine that seeks to exclude broad categories of evidence should rarely be granted." *Watts, 2013 U.S. Dist. LEXIS 126746, 2013 WL*

---

[3] On November 4, 2013, the Court referred six other motions in limine to Magistrate Judge Mark A. Randon. (ECF No. 123). These motions concerned various *Daubert* challenges and related objections to anticipated expert testimony.

[4] The motions that are currently under consideration are as follows: (1) by the Plaintiff, ECF Nos: 76, 78, 79, 81-92, 94-97, and 117; and (2) by the Defendant, ECF Nos: 99-114, and 168.

2014 U.S. Dist. LEXIS 3638, *6

*4776976, *1* [**7**] (citing *Sperberg v. Goodyear Tire & Rubber Co., 519 F.2d 708, 712 (6th Cir.1975)*. Indeed, "[t]he better practice is to deal with questions of admissibility of evidence as they arise." *Id.* As such, the Court must, and will, deny the parties' motions in limine as they relate to ECF Nos: 78, 79, 81-87, 95, 96, 100-102, 106, 107, 110, and 111.

## B. ECF Nos: 88, 97, 99, 109

Both parties seek to preclude the entry of certain evidence that is, under most circumstances, categorically barred at trial. Each of the motions grouped under this section, with the exception of ECF No. 109, fit this general description. Starting with ECF No. 88, the Plaintiff seeks to exclude evidence of any collateral source payments. The law in Michigan is clear that, in a personal injury action, any evidence suggesting that the loss in question was paid by a collateral source "shall be admissible to the court in which the action was brought *after* a verdict for the plaintiff and before a judgment is entered on the verdict." *Mich. Comp. Laws, 600.6303(1)* (emphasis added). As such, the Defendant is prohibited from introducing any evidence of collateral source payments during the course of trial.

Moving to ECF Nos. 97 and [**8**] 109, both of which address the Defendant's financial condition, the Court is mindful that "[s]tatements relating to the poverty of one of the parties or the wealth of the other calculated to direct the jury's attention to the need of an injured party for compensation rather than the real issues in the case are not relevant." *VSI Holdings, Inc. v. SPX Corp., 2005 U.S. Dist. LEXIS 45979, 2005 WL 5980804, *7 (E.D. Mich. Apr. 12, 2005)*. Here, the Plaintiff seeks to preclude the presentation of evidence pertaining to the filing of bankruptcy by the Defendant in 2000. (ECF No. 97). The Defendant counter-argues that this information is relevant to show that "the Safety-Kleen entity that existed and operated at the time of [Hendrian's] alleged exposures no longer exists." (ECF No. 158 at 6). The Court, finding that the probative value, if any, in the Defendant's bankruptcy filing is far outweighed by the danger of unfair prejudice, grants the Plaintiff's motion to preclude any evidence of this fact.

With respect to ECF No. 109, however, the Defendant seeks to preclude the admission of *all* evidence concerning its corporate size and financial condition. In its response to this argument, the Plaintiff maintains that the Defendant's [**9**] financial viability is relevant to its design defect claim in order to satisfy Michigan's "risk utility" test which requires the movant to show, *inter alia,* that (1) a safer alternative existed at all of the relevant times in question,

and (2) the alternative was feasible under the circumstances. *See Prentis v. Yale Mfg. Co., 421 Mich. 670, 365 N.W.2d 176, 184 (Mich. 1984)*. The Plaintiff contends that Safety-Kleen's financial viability (or lack thereof) is relevant to the issue of whether an alternative design was practicable under the circumstances. In light of the Plaintiff's burden in this case, the Court finds that both parties must be permitted to offer evidence that is tied exclusively to the time period in question regarding the feasibility of an alternative design. Accordingly, the Court grants the Defendant's motion with respect to evidence of Safety-Kleen's corporate size and *current* financial well-being–neither of which are relevant to the claims at issue–while leaving open the prospect of considering evidence tied to Safety-Kleen's financial position during the time that Hendrian was actually exposed to 105 Solvent.

Finally, with respect to ECF No. 99, the Defendant seeks to exclude all [**10**] evidence of its insurance coverage. In response, the Plaintiff appears to concur with the Defendant's request as long as the "preclusion of insurance is mutual and equally applies to preclude evidence of . . . any type of insurance that might cover Plaintiff's injuries . . . ." (ECF No. 129 at 2). Having previously determined that all evidence of collateral source payments are precluded at trial, the Court agrees with the Plaintiff's caveat and grants the Defendant's motion with this understanding.

## C. Motions *in limine* Requiring Individualized Review

For those motions in limine which do not share a common thread–substantive or otherwise–with the group at large, the Court has endeavored to analyze the merits of each request for relief on an individual basis in the following manner:

### 1. *Plaintiff's Motion in limine No. 5 (ECF No: 90)*

The Plaintiff moves to exclude all evidence "that this case is lawyer driven, or that Plaintiff's counsel regularly advertise[s] for and litigate[s] toxic tort cases." (ECF No. 90). The Defendant does not oppose this request, as long as the Plaintiff is prohibited from offering evidence regarding other lawsuits involving Safety-Kleen for any purpose. The Court [**11**] finds that there is no probative value in the type or volume of litigation pursued by the Plaintiff's counsel. As such, the Court will grant Hendrian's request to exclude this evidence. For reasons that will be discussed below, the Court reserves any ruling on the admissibility of prior *similar* litigation against Safety-Kleen.

### 2. *Plaintiff's Motion in limine No. 6 (ECF No: 89)*

The Plaintiff seeks to prohibit the Defendant from proffering evidence of the "allegations of cases litigated by Plaintiff's

counsel that do not involve benzene or leukemia." (ECF No. 89 at 1). This particular request appears to be motivated by a belief that the Defendant intends to prejudice the jury by delving into the factual nature of previous cases in which the Plaintiff's experts have testified. Thus, it appears that this motion encompasses two different subjects, namely (1) the extent to which either party should be permitted to introduce evidence concerning unrelated cases previously litigated by counsel in this action, and (2) the permissible scope of inquiry of the parties experts' testimonial history on cross examination. Although the Defendant has essentially stipulated to the Plaintiff's first request [*12] as long as it is given reciprocal treatment, it has vigorously challenged the notion that any restriction should be placed on the parties' ability to cross-examine the testifying experts.

With respect to the first issue, the Court agrees that the mere existence of allegations in entirely unrelated and *dissimilar* matters is of no probative value and should, therefore, be excluded from evidence. To the extent that either party seeks to proffer evidence of similar matters previously litigated against Safety-Kleen, such as those cases involving benzene exposure, the Court finds that such evidence could, depending upon the circumstances, satisfy the relevance test under *Fed. R. Evid. 403*, and reserves ruling on the admissibility of such evidence until trial.

As to the scope of permissible cross-examination, *Fed. R. Evid. 611(b)* allows a party conducting cross-examination to inquire on matters touching "the subject matter of the direct examination and matters affecting the witness's credibility." Several years ago, the Eighth Circuit declared that "cross examination may embrace any matter germane to direct examination, qualifying or destroying it, or tending to elucidate, modify, explain, [*13] contradict or rebut testimony given by the witness." *Villanueva v. Leininger, 707 F.2d 1007, 1010 (8th Cir.1983)*. Indeed, an expert witness' qualifications are critical to the jury's ability to assess credibility relating to the subject matter at issue. *See Morales v. Am. Honda Motor Co., Inc., 151 F.3d 500, 516 (6th Cir. 1998)* (noting that, because "opposing counsel was provided, and took full advantage of, the opportunity to challenge the expert's qualifications to testify in the area in question . . . the trial court did not err in allowing the expert to testify."). Accordingly, notwithstanding the parties' right to object to specific matters pursued on cross examination during trial, the Court declines to grant any prophylactic measures at this time. The Plaintiff's motion is therefore partially granted.

3. *Plaintiff's Motion in limine No. 14 and 20 (ECF Nos: 94 and 91)*

The Plaintiff contends that, throughout the pretrial phase of this case, the Defendant's two primary experts have failed to (1) render risk assessment opinions, and (2) identify any causes or risk factors that are unrelated to benzene, obesity, or idiopathic origin. As a result of the Defendant's claimed shortcomings, [*14] the Plaintiff now seeks to obtain an order from the Court that will preclude any line of expert testimony on subjects that were not previously disclosed. In making this motion, the Plaintiff seeks to limit the Defendant's rebuttal to her causation theory in this case. In its opposition papers, the Defendant submits that there is no rule of procedure or case law that requires a proponent - as a prerequisite to admissibility - to establish through its experts that there was correlation between a risk factor and the claimed disease. Moreover, even assuming that such authority did exist, the Defendant argues that its experts made the proper disclosures and, in fact, discussed and evaluated these very issues during their respective depositions.

In support of her argument for exclusion, the Plaintiff relies exclusively upon *Fed. R. Civ. P. 26(a)(2)(B)* and *Fed. R. Evid. 702*. Starting with the former, *Rule 26* requires, *inter alia*, the proponent to disclose the identity of all testifying expert witnesses along with a written report detailing "all opinions the witness will express and the basis and reasons for them." *Fed. R. Civ. P. 26(a)(2)(B)(i)*. If a party fails to comply with *Rule 26*, "the [*15] party is not allowed to use that information or witness to supply evidence . . . ." *Fed. R. Civ. P. 37(c)(1)*. Contrary to the Plaintiff's assertion, the Defendant has complied with the spirit and the letter of *Rule 26*. Indeed, in its *Rule 26(a)* disclosures, the Defendant specifically identified its testifying experts (namely, Drs. Peter Shields and David Pyatt) both of whom provided a general overview of the topical nature of their testimony. *See* (ECF No. 151 at Ex. A-B).

With respect to the experts' reporting obligations, each of them disclosed several risk factors, [5] and stated more generally that "Like AML, the underlying cause of the majority of MDS cases is unknown. It has been estimated that 80% (or more) of all MDS cases are de novo or idiopathic . . . ." *Id.* at Ex. D. The Plaintiff essentially suggests that the Court should limit the experts' testimony because of their failure or inability to identify each and every possible cause of Hendrian's MDS. This argument fails where, as here, the experts have been clear from the

---

5   *See* (ECF No. 151 at Ex. C-D).

beginning that the root cause of MDS is often idiopathic in nature. Indeed, the Plaintiff has failed to direct the Court to any authority which suggests that **[*16]** *Rule 26* requires an expert to definitively identify all possible causes of Hendrian's condition.

Finally, and without further elaboration, the Plaintiff summarily states that "if any expert or other witness at trial attempts to relay information to the jury that there is any other or additional risk factors . . . such statements or purported evidence would be based on pure speculation and would be barred by *Rule 702(b)* . . . ." (ECF No. 91). This argument is unavailing for a number of reasons. First, as mentioned earlier, the Defendant's experts opined that the root cause of Hendrian's MDS could have been idiopathic in nature. In fact, in coming to this conclusion, Dr. Shields' report contains a work cited page providing reference to over 400 individual sources while Dr. Pyatt's report contains nearly 100. Thus, it appears that these expert witnesses considered a whole host of risk factors which ultimately culminated in their collective opinion that the cause could have been idiopathic. Second and perhaps most telling of all, the Plaintiff, in failing to analyze any of the factors under *Fed. R. Evid. 702*, has not expressed any objections to any of the sources **[*17]** cited in the experts' reports. Without more, the Court must, and does, deny the Plaintiff's motions to limit the Defendant's expert testimony.

### 4. *Defendant's Motion in limine- ECF No. 103*

Turning now to the Defendant's motions in limine, the first of the lot seeks to exclude "reference to proposition 65 warnings as evidence of benzene content, carcinogenicity, or causation." Proposition 65 is a California state law which requires a business to disclose the presence of certain chemical constituents contained in products distributed in the state. Cal. Health & Safety Code § 25249.5.

The Defendant concedes that while this information may be evidence that such a warning was provided, it is neither relevant nor sufficient for purposes of establishing causation or the actual benzene content of 105 Solvent. In support of its position, the Defendant directs the Court to the attention of *Mitchell v. Gencorp,* holding that a government agencies' "threshold of proof is reasonably lower than that appropriate in tort law, which traditionally requires . . . a plaintiff to prove that it is more likely than not that another individual has caused him or her harm." *165 F.3d 778, 783 (10th Cir. 1999).* It **[*18]** should be noted that the Plaintiff's response does not make any reference of her intention to use the Proposition 65 warnings to establish causation or the chemical content of 105 Solvent. (ECF No. 139).

The Court agrees with the Defendant, but only as it pertains to the exclusion of the Proposition 65 warnings for purposes of establishing causation or the benzene content of 105 Solvent. Certainly, the Plaintiff is entitled to introduce these warnings to establish the fact that they may have differed in substance and form from those issued in Michigan. As such, the Court grants the Defendant's motion in part and defers any remaining objections to trial.

### 5. *Defendant's Motion in limine- ECF No. 104*

The Defendant seeks to prohibit the Plaintiff from introducing evidence of the so-called "Dittmar Memorandum"; a memo written by Paul Dittmar, Safety-Kleen's manager of product and process development, to Hyman Bielsky, Safety-Kleen's general counsel. According to the Defendant, the Dittmar Memorandum was written in 1991 and describes a process for potentially removing all benzene from Safety-Kleen's products. (ECF No. 104 at 7). While the Defendant makes no claim of privilege with respect to **[*19]** this document, it contends that it should be withheld from evidence for all purposes because it is irrelevant to Hendrian's exposure and has no bearing on the Plaintiff's design defect claim. The Plaintiff submits that the Dittmar Memorandum is relevant for a number of purposes including, *inter alia,* (1) the presence of benzene in 105 Solvent, (2) Safety-Kleen's knowledge that "[a] properly designed fractionation system [would] . . . totally remove benzene . . . . ", and (3) the economic feasibility of implementing a system capable of removing the benzene. (ECF No. 140 at 3).

At this juncture, the Court is not persuaded that the Dittmar Memorandum should be excluded from evidence for all purposes at trial. Indeed, it clearly concerns the crux of the claims at issue: namely, exposure to benzene and the practicality of safer alternatives to the chemical composition of 105 Solvent. Moreover, the Dittmar Memorandum makes clear that, in as early as 1991, Safey-Kleen was on notice that some level of benzene - arguably or not - was present in the parts washer solvent. *See* (ECF No. 140 at Ex. A). While it is conceivable that this document could be offered for some purpose contrary to the Rules **[*20]** of Evidence, the Defendant is free to object to those issues at trial at the appropriate time. For the reasons thus stated, the Defendant's motion is denied.

### 6. *Defendant's Motion in limine- ECF No. 105*

The Defendant seeks to exclude the depositions of several former Safety-Kleen executives that were taken in a different, albeit substantively related, action. According to the Plaintiff,

each of the depositions was taken in connection with a case that was pending in the Los Angeles (California) Superior Court; namely, *Talley v. Safety-Kleen*, Case No; 784605. In *Talley*, the plaintiff alleged that his occupational exposure to the 105 Solvent-the same product used by Hendrian-caused him to develop Acute Myelogenous Leukemia ("AML"). The plaintiff's counsel in *Talley* deposed most of Safety-Kleen's officers and managing agents, eighteen of which Hendrian seeks to use at the trial in the case at bar. In addition to the factual similarity between *Talley* and this case, the Plaintiff maintains that (1) the identified deponents are former employees of Safety-Kleen, all of whom reside outside the subpoena power of this Court, (2) the depositions were noticed as trial depositions and videotaped as [*21] such, and (3) Safety-Kleen's then counsel exercised his client's right to vigorously defend the depositions. (ECF No. 141 at 5-6).

*Federal Rule of Evidence 804* provides for the admission of former testimony that was taken during a different proceeding that "is now offered against a party who had—or, in a civil case, whose predecessor in interest had—an opportunity and similar motive to develop it by direct, cross-, or redirect examination." *Fed.R.Evid. 804(b)(1)(B)*. The Advisory Committee Notes indicate that modern decisions require the substantial "identity of issues as a means of insuring that the former handling of the witness was the equivalent of what would now be done if the opportunity were presented." *Id.* at Advisory Committee Notes. Indeed, "[t]he opportunity to develop testimony offered at another proceeding is not established by presence alone." *United States v. Taplin, 954 F.2d 1256, 1258 (6th Cir. 1992)*. Thus, the gravity and the totality of the issues must substantially align in order to show that the party-in-interest had a similar motive to develop the testimony at issue. Finally, the moving party must also show that each of the declarants meet the criteria for being [*22] unavailable established under *Fed. R. Evid. 804(a)*.[6]

An examination of the Defendant's primary argument appears to be that Safety-Kleen had no motive to spend the additional time or resources to develop the testimony in the *Talley* matter. The Court disagrees. First, the mere fact that the plaintiff in *Talley* deposed at least eighteen management level executives from Safety-Kleen is indicative of the

potential seriousness of the matter. Moreover, although the Defendant maintains that many of the prior cases involved "different facts, different solvents, and different parts washers", the Court is only concerned with the *Talley* matter-which, interestingly, the Defendant has elected not to address with any level of specificity. As such, the Court is left only with the Plaintiff's uncontested assertion that the plaintiff in *Talley* allegedly developed AML following his occupational exposure to the 105 Solvent. Surely there is no reasonable basis to suggest that the case at bar is any different.

Finally, with respect to Safety-Kleen's motive to vigorously defend the *Talley* [*23] action, it seems reasonable to suggest that, when faced with a products liability action involving a heavily marketed substance, the prospect of derivative actions would be enough to inspire a vigorous defense.[7]

As such, the Court denies the Defendant's motion, but only with respect to the eighteen depositions that have been identified in the Plaintiff's response. *See* (ECF No. 141 at 3-4).

7. *Defendant's Motion in limine- ECF No. 108*

The Defendant seeks an order that, if granted, would prohibit the Plaintiff from referring to 105 Solvent as "hazardous waste." According to the Defendant, "hazardous waste", as defined by the Resource Conservation and Recovery Act ("RCRA"), [8] is a term of art that pertains to the "tracking, transportation and disposal of a substance as it flows through various streams of commerce." (ECF No. 108 at 7). The Defendant maintains that, even if 105 Solvent [*24] had been properly classified as "hazardous waste" under the RCRA, this characterization has no bearing on the Plaintiff's allegations and creates a substantial danger of unfair prejudice against Safety-Kleen. In her response, the Plaintiff contends that this evidence is necessary to rebut the testimony of Safety-Kleen's experts and, more fundamentally, to inform the jury "of the true nature of Safety-Kleen 105 Solvent." (ECF No. 128 at 3).

According to the RCRA, "hazardous waste" means "a *solid waste*, or combination of solid wastes . . . ." *42 U.S.C*

---

[6]   The Plaintiff alleges that all of the witnesses are located outside of the Court's subpoena power. (ECF No. 141 at 4).

[7]   Note further that the Defendant's attempt to analogize the two actions at issue in *Harville v. Vanderbilt University, Inc., 95 Fed. Appx. 719, 725 (6th Cir. 2003)*- one being a child protection proceeding filed by the state and the other a civil tort liability suit against a university-is simply without merit.

[8]   *42 U.S.C. §6901 et seq.*

*§6903(5)* (emphasis added). Solid waste is in turn defined as "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant or air pollution control facility, and other *discarded* material, including solid, liquid, or semisolid, or contained gaseous material . . . ." *§6903(27)* (emphasis added). In other words, under the RCRA, a material or product is not classified as "waste" until *after* it is discarded by the end-user. As such, the Defendant's argument fails from a substantive perspective. At no time during Hendrian's exposure to 105 Solvent was it properly classified as "waste" under the  [**25**] RCRA.

Moreover, even assuming, *arguendo,* that the Defendant's argument was (1) substantively valid, and (2) relevant under *Fed. R. Evid. 401*, any probative value of attaching this highly prejudicial descriptor to the product is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ." *Fed. R. Evid. 403*. This is especially true where, as here, there are a number of ways to prove the underlying implication that is associated with "hazardous waste": namely, by identifying the chemical constituents of 105 Solvent and demonstrating their propensity to be harmful to one's health. As such, the Defendant's motion to prohibit the Plaintiff from characterizing 105 Solvent as "hazardous waste" under the RCRA is granted.

### 8. *Defendant's Motion in limine- ECF No. 112*

The Defendant seeks to exclude all evidence of material data safety sheets ("MSDS"), warnings, labels, and safe use instructions for (1) Safety-Kleen 105 Solvent unrelated to benzene; and (2) products, solvents or machines not alleged to have been used by the Plaintiff.

With respect to its first request, the Defendant maintains that because the "Plaintiff pled and proceeded  [**26**] with this manner as a benzene case, any evidence regarding inadequacies or insufficiencies of MSDS, warnings, labels, and safe use instructions for [105 Solvent] unrelated to benzene" are irrelevant. (ECF No. 190 at 6). The Plaintiff disagrees, arguing that although benzene was ultimately responsible for Hendrian's death, there is evidence to suggest that some of the other harmful constituents within the solvent may have played a contributing role.

Even assuming, *arguendo,* that the Plaintiff is correct in contending that some of the identified constituents in the 105 Solvent aggravated or enhanced the benzene's toxicity, the Court notes that the Plaintiff has not claimed that anything other than benzene was *independently* capable of causing her husband's demise. [9] Under these circumstances, the Court concludes that the warnings, the MSDS, the labels, as well as the "safe use" instructions that are unrelated to benzene have no direct bearing on the underlying claim and, as a consequence, are not relevant under *Fed. R. Evid. 401*. Indeed, benzene is the only chemical mentioned by name in the complaint, which appears to be consistent with the Plaintiff's theory of the case.

Moving to the second issue, the Defendant maintains that the Plaintiff should not be permitted to expand the universe of parts washers or solvents to those outside the scope of the Plaintiff's complaint, and, further, that all evidence of the warnings and instructions related to same are likewise irrelevant. According to the Plaintiff, Safety-Kleen manufacturers two products that are safer than 105 Solvent; namely, a highly refined solvent known as "Premium Gold Solvent" and "150 Solvent", both of which contain virtually no benzene. (ECF No. 143 at 2). Likewise, the Plaintiff maintains that Safety-Kleen has two safer machines available for use, "which suck toxic solvent vapors away from operators' breathing zones . . . ." *Id.* The Plaintiff contends that she should be permitted to offer evidence of "safer feasible  [**28**] alternatives" in support of her design defect claim under Michigan law. The Court agrees in part.

As discussed, the Court has construed the Plaintiff's strict liability claim as a design defect claim under Michigan law. Recognizing that it is the Plaintiff's initial burden to establish a prima facie case of liability against the Defendant, the Court finds that evidence of feasible safer alternatives to the allegedly defective product (i.e., 105 Solvent) are relevant to the issues in play. However, the Court also notes that the Plaintiff has not made any reference in the complaint to the mechanism utilized by her husband during the course of his employment at the Ford Motor Company; namely, the "sink-on-a-drum parts washer." As such, evidence of safer alternative equipment is not relevant for purposes of trial. Finally, with respect to the relevant time period, the Plaintiff maintains that Hendrian's exposure to the 105 Solvent was limited to "1990 and continuing through [to] 1993." (ECF No. 1-3 at 4). This time period likewise controls the universe of safer alternatives available to Safety-Kleen. As such, the Court (1) grants the Defendant's motion with

---

[9]  By way of example,  [**27**] the Plaintiff specifically notes that if "Safety-Kleen [had] provided a cancer warning because of the perchloroethylene content of the solvent, the warning would also have served to warn of the cancer hazard of *benzene*." (ECF No. 143 at 6) (emphasis added). The only warning necessary to provide notice of the alleged carcinogenic effect of benzene is the benzene warning itself.

respect to the MSDS, the warnings, [*29] the labels, and those safe use instructions that are unrelated to benzene, (2) grants the Defendant's motion relating to the admissibility of evidence as it pertains to safer alternative argument, and (3) denies the Defendant's motion with regard to safer alternatives to the use of 105 Solvent within the time period thus described.

### 9. *Defendant's Motion in limine- ECF No. 113*

Consistent with the Defendant's motion to exclude the MSDS, the warnings, the labels, and the safe use instructions unrelated to benzene, it now seeks a much broader order that will prohibit the Plaintiff from making reference to any other chemicals in the 105 Solvent. In making this motion, the Defendant submits that the Plaintiff has purposefully chosen to litigate this matter as a benzene exposure case. In its view, she should be prohibited from ambushing her adversary with new and otherwise independent theories of causation at trial. The Plaintiff, while agreeing that the complaint is focused on benzene, maintains that "[s]ince the complaint identified the product[,] and since Safety-Kleen was aware of the product's constituents from its own testing . . . [it] cannot be prejudiced . . . ." [*30] (ECF No. 135 at 3).

The Court disagrees with the Plaintiff's position. First and foremost, nowhere in the complaint does the Plaintiff specifically identify the product at issue; i.e., the 105 Solvent. Indeed, the only specificity that is contained within the complaint is the repeated reference to benzene which appears at least fifteen times over eight pages. Moreover, the Court notes that the Plaintiff has not responded to the Defendant's accusation that its "experts have calculated Hendrian's exposure to and formulated opinions regarding benzene, no other chemical or constituent." (ECF No. 191 at 3). The Plaintiff's failure to respond to this assertion is telling.

To the extent that the Plaintiff maintains that the presence of the other chemicals caused an increase in the absorption rate of benzene or otherwise aggravated Hendrian's injury *stemming from the benzene,* counsel is permitted to explore this line of argument. For purposes of clarity, however, the Plaintiff is prohibited from introducing any evidence for the purpose of suggesting that Hendrian's death was the result of some independent factor unrelated to benzene. As such, the Court grants the Defendant's motion in part with [*31] the limitation thus described.

### 10. *Defendant's Motion in limine- ECF No. 114*

With respect to this last motion in limine, the Defendant seeks to exclude any reference to "annual waste

recharacterization reports." According to the Defendant, Safety-Kleen annually performs testing on the waste streams of a number of its customers nationwide. The purpose of this testing is to determine the appropriate waste codes that should be applied pursuant to various regulations. (ECF No. 114 at 8). The Defendant anticipates that the Plaintiff will attempt to offer these reports as evidence of the benzene content of 105 Solvent, which, it contends, is improper because (1) the reports characterize numerous *waste* streams (i.e. spent solvent) none of which originated from Hendrian's employer during the relevant time period, and (2) the reports and underlying data do not focus on the 105 Solvent, but rather the chemical analysis of dozens of waste streams considered together. The Plaintiff's response, while failing to address either of the Defendant's primary arguments, is essentially that because the 105 Solvent may have been included in a given report which contains some evidence of benzene, they should [*32] be permitted at trial. The Court disagrees. There is simply no foundational basis upon which to admit the seemingly randomly generated reports of various *spent* product taken from a multitude of sites, none of which appear to be the location where Hendrian actually worked. The Defendant's motion is granted.

### D. Miscellaneous Matters

In addition to the thirty three motions in limine that have already been evaluated and resolved, the Plaintiff has filed a motion concerning a dispositive matter (ECF No. 76), and both parties request the Court to take judicial notice of certain evidence in advance of trial. (ECF Nos. 117 and 168). The Court will address each in turn.

### 1. *Plaintiff's Motion For An Order that Non-Economic Damages Are Not Limited By Michigan Compiled Laws § 600.2946*

On October 25, 2013, the Plaintiff filed a motion seeking the entry of an order that would confirm that Hendrian's damages in this case are not limited by *Mich. Comp. Laws § 600.2946*. This pleading is based upon an allegation that Safety-Kleen had actual knowledge that the 105 Solvent was defective and likely to cause leukemia.

Setting aside the merits of the Plaintiff's request, this so-called motion in limine is procedurally [*33] deficient for at least two reasons. First, the Plaintiff is seeking relief that (1) requires the Court to weigh the totality of the evidence, and (2) seeks relief that is dispositive in nature. Indeed, while the Plaintiff has premised her request under the cloak of a motion in limine, the Sixth Circuit has been clear that "[i]n light of their limited purpose, motions in

limine should not be used to resolve factual disputes . . . ." *Louzon v. Ford Motor Co., 718 F.3d 556, 561 (6th Cir. 2013)*(internal citations omitted). Indeed, "a mechanism already exists in civil actions to resolve non-evidentiary matters prior to trial - the summary-judgment motion." *Id.* To conclude otherwise, "not only allows those dissatisfied with the court's initial ruling a chance to relitigate, but also deprives their opponents of the procedural protections that attach at summary judgment." *Id.*

Here, the true nature of the Plaintiff's request is evident from the first page of her motion, where she argues that, as a matter of law, "Safety-Kleen had actual knowledge its product, Safety-Kleen 105 Solvent was defective and substantially likely to cause leukemia. Not only did Safety-Kleen have this knowledge, but [*34] Safety-Kleen then willfully disregarded that knowledge . . . thereby satisfying the exception to the statutory cap on non-economic damages . . . ." (ECF No. 76 at 5). Resolution of this issue-whether the Plaintiff's evidence is sufficient as a matter of law-requires a summary judgment analysis. *Fed.R.Civ.P. 56(a)* ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). More importantly, however, the Plaintiff's motion "does not require any rulings relating to the admissibility of evidence at trial." *Louzon, 718 F.3d at 561.*

Finally, notwithstanding the guidance by the Sixth Circuit in *Louzon,* the Scheduling Order from the Court which governs this matter mandates that all dispositive motions must be filed on or before January 27, 2012. (Text only Order, December 15, 2011). In short, nearly two years has passed and the Plaintiff has failed to offer any explanation as to why the Court should accept her grossly tardy filing. *See Leary v. Daeschner, 349 F.3d 888, 906 (6th Cir. 2003)* (quoting *Fed. R. Civ. P. 16,* 1983 committee's notes) ("[A] court choosing to modify the [*35] schedule upon a showing of good cause, may do so only 'if it cannot reasonably be met despite the diligence of the party seeking the extension.'") As such, the Court denies the Plaintiff's motion.

## 2. *Motions Seeking Judicial Notice of Certain Records*

Both parties have requested the Court to take judicial notice of certain statutes, regulations, and publications. More specifically, the Plaintiff has asked the Court to take judicial notice of certain passages within (1) 40 C.F.R. 61; (2) a U.S. Department of Labor's Occupational Safety and Health

Administration publication, "Cancer in the Rubber Industry"; (3) a California Department of Health Services publication, "Health Effects of Benzene: Part B; and (4) the transcript from a United States Senate hearing on April 6-7, 1971.

On the other hand, the Defendant's numerous requests can be grouped into the following general categories: (1) federal statutes and regulations; (2) Michigan statutes; (3) *Industrial Union Department, AGL-CIO v. American Petroleum Institute, et al., 448 U.S. 607, 100 S. Ct. 2844, 65 L. Ed. 2d 1010 (1980);* (4) publications from the Environmental Protection Agency, U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry, [*36] and the National Institute for Occupational Safety and Health; and (5) publications from the following institutions: World Health Organization, International Agency for Research on Cancer, American Conference of Industrial Hygienists, and the American National Standard for Hazardous Industrial Chemicals.[10]

Under *Federal Rule of Evidence 201(b),* "[t]he Court may judicially notice a fact that is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Public records and government documents are generally considered "not to be subject to reasonable dispute." *U.S. ex rel. Dingle v. BioPort Corp., 270 F. Supp. 2d 968, 971 (W.D. Mich. 2003) aff'd sub nom. Dingle v. Bioport Corp., 388 F.3d 209 (6th Cir. 2004)* (citations omitted). This includes public records and government documents available from reliable sources on the Internet. *See, e.g., Grimes v. Navigant Consulting, Inc., 185 F.Supp.2d 906, 913 (N.D.Ill.2002)* (taking judicial notice of stock prices posted on [*37] website).

In her motion, the Plaintiff has asked the Court to take judicial notice of four isolated comments from the EPA, OSHA, California Department of Health Services, and the U.S. Senate. The Court notes that the Plaintiff's approach-limiting her request to four specific passages without regard to the broader surrounding context-is, on its face, highly suspect. Indeed, even assuming, *arguendo,* that the sources in question were of the type and quality typically endorsed by *Rule 201,* taking judicial notice of only selected excerpts requires the Court to ignore other provisions which may have a bearing on the facts. *See United States v. Judge, 846 F.2d 274, 276 (5th Cir. 1988)* (denying request to take judicial notice of select portions of DEA manual). The Court will thus consider the entirety of

---

[10]  The Court notes that the Defendant's motion is unopposed.

the source material from which the proffered statements originated, taking judicial notice of the entire publication or nothing at all.

Pursuant to *44 U.S.C. § 1507*, "[t]he contents of the Federal Register shall be judicially noticed . . . ." As such, the Court grants the Plaintiff's request with respect to the entirety of 40 C.F.R 61. *See* (ECF No. 117 at Exhibit B). Likewise, the Court agrees **[*38]** that "OSHA regulations are subject to judicial notice" *City of Wichita, Kan. v. U.S. Gypsum Co., 72 F.3d 1491, 1496 (10th Cir. 1996)*, and thus accepts the publication appended to the Plaintiff's motion at Exhibit C: namely, "Cancer in the Rubber Industry: The Risks and What You Can Do About Them." As for the epidemiological study undertaken by the California Department of Health Services, however, the Plaintiff offers nothing beyond the blanket assertion that "[i]t is not uncommon for Courts to take judicial notice of such items as official reports . . . ." in support of her assertion that the accuracy of this particular study cannot reasonably be questioned. (ECF No. 117 at 11). Moreover, the Plaintiff has failed to provide the Court with a copy of the entire report, attaching thereto only "Part B" to her motion. Finding that the Plaintiff has not provided the Court with any confidence in the credibility or the reliability of this publication, the Court declines to take judicial notice of Exhibit D to her motion. Finally, the Court is likewise not obliged to take judicial notice of the U.S. Senate hearing, which as noted above, has been attached as Exhibit E to the Plaintiff's motion. **[*39]** Although the fact that the hearing took place may not be open to dispute, "the contents of [the] testimony, particularly when offered for the truth of the matters asserted, evince considerable dispute." *Ridenour v. Collins*, 692 F. Supp. 2d 827, 830 (S.D. Ohio 2010) (refusing to take judicial notice of testimony elicited during Ohio Senate committee hearing).

Prior to addressing the six broad categories of evidence tendered by the Defendant, the Court notes that while its motion includes nearly seventy individual offerings - totaling well over two thousand pages of records - there is less than a single page of briefing dedicated to an analysis of the underlying subject matter. *See* (ECF No. 168 at 7). As stated, "[i]n order for a court to take judicial notice of a fact, a party must supply a reliable source of verification for the fact." *Pearce v. Faurecia Exhaust Sys., Inc., 2012 U.S. Dist. LEXIS 97423, 2012 WL 2884748, *6 (S.D. Ohio July 13, 2012) aff'd, 529 F. App'x 454 (6th Cir. 2013)*. In light of the Defendant's utter failure to provide the Court with an ample discussion - let alone any authority-in support of its voluminous request, the Court must and will refuse to take judicial notice of all forms of evidence **[*40]** that cannot "be accurately and readily determined." *Fed. R. Evid. 201*.

Operating under this understanding, the Court holds as follows:

a. *Group 1-Federal statutes and regulations*

Pursuant to *44 U.S.C. § 1507*, the Court grants the Defendant's request to take judicial notice of the federal regulations in Exhibits 9-14, 16-21 and 23. With respect to the various federal statutes in the Defendant's request, the Court notes that "in recent years the terminology of 'judicial notice' has shifted.'" *United States v. Dedman, 527 F.3d 577, 587 (6th Cir. 2008)*. Indeed, in several modern opinions the Sixth Circuit has cabined the concept of judicial notice to facts alone. *Id.* "The effect of such a semantic move is largely minimal because judges are still entitled—and indeed required—to determine the applicable law, even if that law is the law of other states." *Id.* Thus, "judicial notice is generally not the appropriate means to establish the legal principles governing the case." *Toth v. Grand Trunk R.R., 306 F.3d 335, 349 (6th Cir.2002)*. As such, the Court denies the Defendant's request with respect to exhibits 1-8 and 22.

b. *Group 2- Michigan statutes*

For the same reasons identified above, the Court **[*41]** also declines to take judicial notice of all Michigan statutes encompassed within the Defendant's request, namely: Exhibits 55-68.

c. *Group 3- Industrial Union Department, AGL-CIO v. American Petroleum Institute, et al*

The Defendant requests the Court to take judicial notice of a Supreme Court case decided in 1980. "[I]t has been held that federal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp., 605 F.2d 1169, 1172 (10th Cir. 1979)*. Finding no direct relationship between the case proffered by the Defendant and the proceedings currently before the Court, this request is denied as it relates to Exhibit 15.

d. *Group 4- Government Publications*

The Defendant proffers several reports and publications from a number of different governmental bodies. While courts are generally willing to take judicial notice of data and pronouncements issued by the federal government, such as Environmental Protection Agency research (*Nebraska v. EPA, 331 F.3d 995, 998 n.3, 356 U.S. App. D.C. 410 (D.C.*

*Cir. 2003))*; State Department **[\*42]** travel warnings (*Parsons v. United Techs. Corp., 243 Conn. 66, 700 A.2d 655, 665 n.18 (Conn. 1997))*; and a federal fisheries management plan approved by formal rule (*City of Charleston v. A Fisherman's Best Inc.,* 310 F.3d 155, 172 (4th Cir. 2002), *cert. denied, 539 U.S. 926, 123 S. Ct. 2573, 156 L. Ed. 2d 602 (2003))*, the Defendant has failed to proffer any authority to the Court which even suggests that these particular publications satisfy the minimum requirements set forth under *Rule 201*. Moreover, the Court is unable to determine if it has been provided with full and complete copies of each of the sources grouped under this category. As such, the Court declines to take judicial notice of Exhibits 24-25, 34-37, and 44-47.

*e. Group 5 – International and commercial publications*

The documents in this category- hailing from international organizations and private agencies- are arguably even less reliable than those identified under Group 4. Once again the Defendant has failed to offer any legitimate argument which suggests that the documents within this group are of the type and character that should be formally recognized by the Court based upon their individual or collective trustworthiness. Accordingly, the Court declines to take **[\*43]** judicial notice of Exhibits 26-33, 38-43, and 48-54.

III.

For the reasons explained above, the Court holds as follows:

    1. ECF Nos: 76, 78-79, 81-87, 91, 94-96, 100-102, 104-107, and 110-111 are denied.

    2. ECF Nos: 88, 90, 97, 99, 108, 109, and 114 are granted to the extent that this directive is consistent with the opinion of the Court; and

    3. ECF Nos: 89, 103, 112-113, 117, and 168 are granted in part and denied in part consistent with the Court's opinion.

IT IS SO ORDERED.

Date: January 13, 2014

/s/ Julian Abele Cook, Jr.

JULIAN ABELE COOK, JR.

U.S. District Judge

⚠ Caution

As of: June 12, 2015 5:14 PM EDT

## *Escue* **v.** *Sequent, Inc.*

United States District Court for the Southern District of Ohio, Eastern Division

August 24, 2010, Decided; August 24, 2010, Filed

Case No. 2:09-cv-765

### Reporter

2010 U.S. Dist. LEXIS 87043; Fed. Sec. L. Rep. (CCH) P95,844

Michael R. Escue, Plaintiff, v. Sequent, Inc., et al., Defendants.

**Subsequent History:** Motion denied by [Escue v. Sequent, Inc., 2010 U.S. Dist. LEXIS 136249 (S.D. Ohio, Dec. 13, 2010)](#)

## Core Terms

alleges, merger agreement, merger, financial statement, criminal investigation, motion to dismiss, Counterclaim, misleading, individual defendant, fraudulent, securities, first amended complaint, scienter, claim for relief, inferences, disclose, misrepresentation, employees, omissions, services, asserts, employment agreement, requirements, representations, negotiations, shareholders, customers, inflated, premiums, damages

**Counsel:** [*1] For Michael R Escue, Plaintiff: Michael Joseph Canter, LEAD ATTORNEY, Vorys Sater Seymour & Pease - 2, Columbus, OH; Rodney Alan Holaday, Vorys, Sater, Seymour and Pease LLP, Columbus, OH.

For Sequent, Inc., William F Hutter, Michael L Schoonover, John E Boyer, Glenn J Gettman, Steven R Kerber, Thomas A Ewers, Defendants: James Snoffner Savage, III, LEAD ATTORNEY, McFadden, Winner & Savage - 2, Columbus, OH; Holly Wilson Wallinger, McFadden Winner Savage & Segerman, Columbus, OH; Mary Jane McFadden, McFadden, Winner & Savage, Columbus, OH.

For Sequent, Inc., Counter Claimant: James Snoffner Savage, III, LEAD ATTORNEY, McFadden, Winner & Savage - 2, Columbus, OH; Mary Jane McFadden, McFadden, Winner & Savage, Columbus, OH.

**Judges:** James L. Graham, United States District Judge.

**Opinion by:** James L. Graham

## Opinion

### OPINION AND ORDER

This is an action filed by plaintiff Michael R. Escue (hereinafter "Escue"), a resident of Alabama, against Sequent, Inc. (hereinafter "Sequent"), a closely held Ohio corporation with its principal place of business in Dublin, Ohio. Also named as defendants are William F. Hutter, the CEO and majority shareholder of Sequent (hereinafter "Hutter"), and other individual shareholders and directors [*2] of Sequent, including Chairman Michael L. Schoonover, Treasurer John E. Boyer, Glenn J. Gettman, Corporate Secretary Steven R. Kerber, and Thomas A. Ewers. Jurisdiction is based on diversity citizenship, as well as federal question jurisdiction.

According to the first amended complaint filed on November 16, 2009 (Doc. 19), Escue was the sole shareholder of Better Business Solutions of Alabama, Inc. ("BBSA"), a professional employee organization ("PEO") located in Birmingham, Alabama, which provided human resource services to business clients in the Birmingham area. PEOs provide services typically preformed by a human resources department, including payroll, audit, tax management, the administration of employee benefit plans, employment and labor law compliance, workers' compensation claims and risk management.

Sequent is also a PEO which provides human resource services, including health, dental and vision insurance coverages and coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), to its own employees, and to business clients ("Jobsite Employers") and employees ("Jobsite Employees") leased by Sequent to Jobsite Employers. Sequent is the sponsor of the [*3] Sequent, Inc. Flexible Benefits Plan ("the Plan"), an employee benefit plan under the Employee Retirement Income Security Act of 1974 ("ERISA"). Sequent also created the Sequent Welfare Benefits Trust ("the Trust") for the purpose of holding Plan assets, receiving premium

payments received from Jobsite Employers and Employees and Sequent's own employees, and paying those premiums to insurers.

Hutter and the other individual defendants also formed Accompany Benefits, LLC ("ABL"), an Ohio limited liability company currently registered under the trade name SRBG. ABL was formed to offer consulting services in the areas of employee benefits design, life, health and disability insurance, and retirement and nonqualified deferred compensation plans. ABL provides consulting services to Sequent, the Plan and the Trust, and the shareholders and directors of ABL are also shareholders and directors of Sequent.

Escue alleges that beginning in 2005, and continuing into 2006, he engaged in negotiations with Hutter concerning the merger of BBSA with Sequent. In August of 2005, and again in April of 2006, Hutter told Escue that Sequent was the subject of a routine Department of Labor ("DOL") audit; however, [*4] Escue was aware that the DOL routinely audited PEOs, and thought that this information was not significant. During the negotiations, Hutter also described Sequent's business practice of "tiering," which consisted of charging some Jobsite Employers more for insurance premiums in order to subsidize the coverage provided to other Jobsite Employers who were charged lower premiums to attract them as clients. Hutter represented that this practice was the reason for Sequent's success, and that it was legal and had been approved by specialized ERISA counsel. A business valuation expert was employed to value both companies, based on the 2005 financial statements and projections for 2006. BBSA was valued at $1,756,455, and Sequent was valued at $14,973,040.

Escue further alleges that a draft of the proposed merger agreement was exchanged in December of 2006. Section 6.08 of the merger agreement disclosed that Sequent was the subject of a "DOL Investigation into Sequent's Section 125 Plan." Escue assumed that this meant the routine audit which was referred to by Hutter during the negotiations. Hutter and the other individual defendants signed a corporate resolution, effective December 19, 2006, [*5] which approved the merger agreement. Escue then signed the agreement, and Hutter signed the merger agreement and a closing certificate for the merger as CEO and President of Sequent.

It is alleged in the first amended complaint that effective January 1, 2007, Sequent acquired BBSA through a merger transaction. Escue surrendered his BBSA shares, valued at $1,756,455, for 14,000 shares of Sequent common stock

with a negotiated value of $1,871,630. After the merger, Escue became a director of Sequent, and also entered into an employment agreement with Sequent which specified the payment of an annual salary of $160,000 and incentive compensation in the amount of 10% of BBSA's earnings for the fiscal year.

Escue alleges that in order to procure the merger between BBSA and Sequent, Hutter and the other individual defendants made false statements to him and concealed or failed to disclose material facts bearing upon the value of Sequent and the shares acquired by Escue pursuant to the merger agreement. Escue alleges that prior to the merger, Sequent, Hutter, and the other individual defendants engaged in improper and illegal activities which exposed Sequent to potential and actual financial [*6] liability and which adversely impacted the value of the Sequent shares acquired by Escue pursuant to the merger agreement. Escue further alleges that the financial statements provided to the valuation expert were false because Sequent failed to disclose material facts about Sequent, including the fact that Sequent had been the target of a DOL criminal investigation since January of 2006.

Specifically, Escue alleges that prior to the merger, Hutter and the other individual defendants approved a plan for Sequent to make loans in a total amount of $347,918 to the individual defendants. Escue alleges that as a result of these loans, Sequent's financial status failed to meet accounting standards established by the Employer Services Assurance Corporation, an entity which provides accreditation and client assurance programs for the PEO industry. In an effort to rectify this situation, in October of 2005, Hutter and the other individual defendants allegedly approved the sale of the loans to ABL. However, since ABL only had $90,000 in available cash, on January 12, 2006, Hutter and the other individual defendants allegedly caused the Trust, in violation of ERISA, to illegally pay $257,918 to [*7] ABL, which transferred this sum to Sequent. On January 27, 2006, the DOL served written notice on Sequent that it was under criminal investigation. Escue alleges that Hutter and the other individual defendants then reversed the transfer of funds by returning the $257,918 to the Trust as of February 27, 2006. Escue further alleges that later in 2006, Hutter and the other individual defendants arranged to have Sequent forgive the loans made to them, serving no legitimate business purpose.

Escue alleges that at no time before the merger was he informed that Sequent was the subject of a DOL criminal investigation. He claims that he first learned about the criminal investigation at a Sequent board meeting on

David Sporar

September 24, 2007. Escue alleges that he did not learn the full extent of the DOL criminal investigation until early December of 2008, when Sequent's counsel issued a memorandum describing the investigation. Escue alleges that as a result of the criminal investigation, various individuals, including Hutter, have incurred legal fees exceeding $1 million, which have been paid partially or entirely by the Trust, that Sequent has paid overinflated severance packages to or entered into  [*8] unnecessary contracts with Sequent employees as "hush money," and that Sequent paid $230,000 to the DOL as a civil settlement which was really the obligation of ABL, as it reflected the amount of funds which ABL improperly obtained from the Trust.

Escue alleges that in mid-2005, Hutter and the other individual defendants caused ABL to increase the fees it charged to the Plan and Trust, thus doubling the amount of fees charged on an annual basis. Escue further alleges that after being informed by the DOL that a criminal investigation had been commenced, in March of 2006, Hutter instructed Sequent employees to suspend all further payments from the Trust to ABL.

Escue also alleges that beginning prior to the merger, Hutter and the other individual defendants caused Sequent to charge its Jobsite Employer clients an inflated administrative fee for services provided, to misrepresent the amount charged by insurers for insurance premiums, and to overcharge employers for insurance premiums. Sequent allegedly retained the difference between the inflated price and the actual cost of coverage charged by the insurers for its own benefit. Escue alleges that Sequent stopped this practice after being  [*9] informed of the DOL criminal investigation.

Escue further alleges that Sequent's practice of "tiering" by overcharging some Jobsite Employer clients for insurance premiums in order to be able to offer other Jobsite Employer clients a lesser rate and attract more clients was illegal conduct constituting a breach of fiduciary duty under ERISA. Escue alleges that since Sequent has been unable to charge enough in excess fees to support the below cost subsidies, the Trust lacked sufficient funds to make premium payments, and Sequent has loaned money to the Trust in an amount exceeding $1.5 million to cover the cost of those premiums. Escue further alleges that Hutter's previous representations that the practice of "tiering" had been approved by specialized ERISA legal counsel were shown to be false at a director's meeting in June of 2009, where Hutter proposed that Sequent ought to obtain an outside expert opinion and consultant on the issue of "tiering" and compliance with ERISA.

Escue further alleges that since 2005, Sequent has charged its clients and its own employees inflated rates for vision, dental and COBRA coverage above the actual amount of administrative expenses and premium costs  [*10] incurred by Sequent and the Trust. Escue further alleges that since 2005, Sequent has charged its Jobsite Employer clients an administrative fee which included a hidden "risk management fee" which did not reflect any administrative costs to Sequent, but rather was an arbitrary charge imposed solely for the fraudulent purpose of padding Sequent's fees.

In the First Claim for Relief of the first amended complaint, Escue seeks the common law breach of contract remedy of rescission of the merger agreement. In the Second Claim for Relief, Escue asserts, in the alternative, a claim for monetary damages for breach of the merger agreement. In the Third Claim for Relief, Escue seeks rescission of the merger agreement on the grounds of common law fraudulent inducement, and in the Fourth Claim for Relief, in the alternative, Escue seeks monetary damages for fraudulent inducement. In the Fifth and Sixth Claims for Relief, Escue asserts fraud claims under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b) and *Rule 10b-5*, *17 C.F.R. § 240.10b-5(b)*, seeking the remedy of rescission of the merger agreement, and, in the alternative, monetary damages. In the Seventh Claim for Relief,  [*11] Escue asserts a claim against Hutter and the other individual defendants under *Ohio Rev. Code §1701.93(A)(1)* for damages proximately caused by their misrepresentations and omissions. In the Eighth Claim for Relief, Escue asserts a claim for breach of fiduciary duty against Hutter and the other individual defendants. In the Ninth and Tenth Claims for Relief, Escue asserts claims against Sequent, Hutter and the other individual defendants for the unlawful sale of a security under *Ohio Rev. Code §§ 1707.43* and *1707.44*, seeking rescission of the merger agreement and, in the alternative, damages. In the Eleventh Claim for Relief, Escue alleges that Sequent breached the employment agreement entered into between him and Sequent by failing to pay compensation due him under the terms of the agreement. In the Twelfth Claim for Relief, Escue requests declaratory judgment that the non-competition and non-solicitation provisions of the employment agreement are void and unenforceable.

Sequent has asserted counterclaims against Escue. The First Counterclaim asserts a claim for damages for breach of the merger agreement based upon an alleged distribution of $400,000 by BBSA to Escue after the merger  [*12] agreement was executed, the alleged improper receipt of commissions by Escue and BBSA, and Escue's alleged failure to disclose an ownership interest in entities that had

business relationships with BBSA. The Second Counterclaim alleges that Escue breached a fiduciary duty to Sequent in his management of Sequent's Birmingham, Alabama, office through alleged self-dealing and other misconduct. The Third Counterclaim asserts a claim for tortious interference with contractual relationships. Sequent contends that Escue published certain allegedly false statements contained in the complaint to customers of Sequent in order to seek leverage to support his rescission demands, causing several customers to terminate their contractual agreements with Sequent. Sequent's Fourth Counterclaim asserts a claim for breach of the employment agreement.

On October 21, 2009, defendants Schoonover, Boyer, Gettman, Kerber and Ewers (hereinafter referred to as "the defendants") filed a motion to dismiss the Second through Sixth Claims for Relief of the original complaint pursuant to *Fed.R.Civ.P. 12(b)(6)* for failure to state a claim for relief. In the first amended complaint filed on November 16, 2009, the Second [*13] through Sixth Claims were renumbered as the Third through Seventh Claims, and additional claims were added. On November 16, 2009, Escue filed a memorandum contra the motion to dismiss. The defendants filed a reply brief arguing that the Third through Seventh Claims and newly added Ninth and Tenth Claims should be dismissed as to them. By order dated August 13, 2010, this court indicated that it would consider the reply as a renewed motion to dismiss the first amended complaint. On January 28, 2010, Escue filed a motion to dismiss Counterclaims Three and Four pursuant to *Rule 12(b)(6)*. Those motions are now before the court for a ruling.

I. Standards for *Rule 12(b)(6)* Motions

In ruling on a motion to dismiss under *Rule 12(b)(6)*, the court must construe the complaint in a light most favorable to the plaintiff, accept all well-pleaded allegations in the complaint as true, and determine whether plaintiff undoubtedly can prove no set of facts in support of those allegations that would entitle him to relief. *Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007)*; *Bishop v. Lucent Technologies, Inc., 520 F.3d 516, 519 (6th Cir. 2008)*; *Harbin-Bey v. Rutter, 420 F.3d 571, 575 (6th Cir. 2005)*. To survive [*14] a motion to dismiss, the "complaint must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory." *Mezibov v. Allen, 411 F.3d 712, 716 (6th Cir. 2005)*. Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice. Id.

While the complaint need not contain detailed factual allegations, the "[f]actual allegations must be enough to raise the claimed right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*, and must create a reasonable expectation that discovery will reveal evidence to support the claim. *Campbell v. PMI Food Equipment Group, Inc., 509 F.3d 776, 780 (6th Cir. 2007)*. A complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly, 550 U.S. at 570*. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal, __ U.S. __, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)*. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops [*15] short of the line between possibility and plausibility of entitlement to relief. Id. Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id. at 1950*. Where the facts pleaded do not permit the court to infer more than the mere possibility of misconduct, the complaint has not shown that the pleader is entitled to relief as required under *Fed.R.Civ.P. 8(a)(2)*. Ibid.

In evaluating a motion to dismiss, a court generally is limited to the complaint and exhibits attached thereto. *Amini v. Oberlin College, 259 F.3d 493, 502 (6th Cir. 2001)*. However, the court may also consider a document or instrument which is attached to the complaint, or which is referred to in the complaint and is central to the plaintiff's claim. *Fed.R.Civ.P. 10(c)*("[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *Weiner v. Klais & Co., Inc., 108 F.3d 86, 89 (6th Cir. 1997)*.

II. Third and Fourth Claims - Fraudulent Inducement

The Third and Fourth Claims assert claims for fraudulent inducement. Escue alleges that the defendants failed [*16] to inform him of the ongoing DOL criminal investigation and failed to advise him of Sequent's practice of charging inflated rates for vison and dental plans and COBRA coverage. Doc. 19, ¶¶ 126, 128. Escue further alleges that the defendants, "whose numbers include an experienced corporate attorney and multiple certified public accountants, knew, or should have known, that the financial statements were fraudulent and misleading" yet failed to disclose that the financial statements were fraudulent and misleading. Doc. 19, ¶ 129.

The defendants argue that the first amended complaint fails to plead fraud with particularity as required under *Fed. R. Civ. P. 9 (b)*. *Rule 9(b)* states that "a party must state with

David Sporar

particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Rule 9(b)*. *Rule 9(b)* requires a plaintiff to allege the time, place, and content of the alleged misrepresentation on which he or she relied, the fraudulent scheme, the fraudulent intent of the defendants, and the injury resulting from the fraud. *Bennett v. MIS Corporation, 607 F.3d 1076, 1100 (6th Cir. 2010)*.

The requirements of  [**17]** *Rule 9 (b)* are relaxed where information is only within the opposing party's knowledge. *Michaels Building Co. v. Ameritrust Co., N.A., 848 F.2d 674, 680 (6th Cir. 1988)*("Especially in a case in which there has been no discovery, courts have been reluctant to dismiss the action where the facts underlying the claims are within the defendant's control.") "*Rule 9(b)* does not require omniscience; rather, the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as th the nature of the claim." *Id.* However, while fraud may be pled on information and belief where the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge, the plaintiff must still set forth the factual basis for his belief. *United States ex rel. Bledsoe v. Community Health Systems, Inc., 501 F.3d 493, 512 (6th Cir. 2007)*. Escue has noted that after the merger of BBSA with Sequent, his personal calendar was incorporated into the Sequent database, and that he no longer has access to information concerning some exact dates and times.

Under Ohio law, a corporate officer may be held personally liable for corporate contracts if he engages in fraud.  [**18]** *Yo-Can, Inc. v. The Yogurt Exch., Inc., 149 Ohio App.3d 513, 2002 Ohio 5194, 778 N.E.2d 80 (2002)*. An officer can also be "liable for a tort committed by the corporation under his control, or with his participation or cooperation." *Central Benefits Mut. Ins. Co. v. RIS Admin. Agency, Inc., 93 Ohio App.3d 397, 403, 638 N.E.2d 1049 (1994)*.

A claim of fraud in the inducement arises when a party is induced to enter into an agreement through fraud or misrepresentation. *ABM Farms, Inc. v. Woods, 81 Ohio St.3d 498, 502, 1998 Ohio 612, 692 N.E.2d 574 (1998)*. The elements of fraudulent inducement are essentially the same as those for fraudulent misrepresentation, fraudulent concealment, and fraudulent nondisclosure. *Gentile v. Ristas, 160 Ohio App.3d 765, 781, 2005 Ohio 2197, 828 N.E.2d 1021 (2005)*. The elements of fraud under Ohio law are: (1) a representation or, when there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard as to whether it is true or false that

knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance on the representation or concealment, and   [**19]** (6) an injury proximately caused by that reliance. *Williams v. Aetna Fin. Co., 83 Ohio St.3d 464, 475, 1998 Ohio 294, 700 N.E.2d 859 (1998)*.

In arms length business transactions, each party is ordinarily presumed to have the opportunity to ascertain relevant facts available to others similarly situated, and in such instances neither party has a duty to disclose material information to the other. *Blon v. Bank One, Akron, N.A., 35 Ohio St.3d 98, 101, 519 N.E.2d 363 (1988)*. However, full disclosure may be required of a party to a business transaction where such disclosure is necessary to dispel misleading impressions that are or might have been created by partial revelation of the facts. *Id.; Miles v. Perpetual Savings & Loan Co., 58 Ohio St. 2d 93, 97, 388 N.E.2d 1364 (1979)*; see also *Onyx Environmental Services, LLC v. Maison, 407 F. Supp. 2d 874, 879 (N.D.Ohio 2005)* ("An officer can be liable for another officer's misrepresentations where he or she has a duty to speak). A party has a duty to speak and will be liable for nondisclosure:

> if the party fails to exercise reasonable care to disclose a material fact which may justifiably induce another [party] to act or refrain from acting, and the non-disclosing  [**20]** party knows that the failure to disclose such information to the other party will render a prior statement or representation untrue or misleading.

*Miles, 58 Ohio St.2d at 97*.

The defendants argue that they were not involved in the merger negotiations, and therefore made no misrepresentations to Escue. However, Escue argues that the defendants, acting as directors and shareholders of Sequent, affirmed and approved the representations made in the merger agreement by authorizing Sequent to enter into that agreement, and that he reasonably relied on the approval of the merger agreement by the defendants. Escue notes that approval of the merger by the defendants as members of Sequent's board of directors was a mandatory closing condition (Merger Agreement §9.01).

Escue has alleged that the merger agreement included the following representations: (1) that Sequent had not operated in an illegal manner in any way which would have an adverse impact on Sequent (Merger Agreement §6.05); (2) that the audited financial statements for the fiscal years ending in 2003 to 2006 and the unaudited financial statements for the three months ending in September 30,

2006, fairly presented the financial position [*21] of Sequent (Merger Agreement §6.06); (3) that Sequent was not the subject of a continuing investigation by any governmental entity except for a "DOL Investigation into Sequent's Section 125 Plan" which was not specifically described as being a criminal investigation as opposed to a routine audit (Merger Agreement §6.08); (4) that Sequent had operated in compliance with ERISA, Merger Agreement §6.10; and (5) that no representation or warranty in Article VI of the Merger Agreement contained any untrue statements or omissions of material fact (Merger Agreement §6.19). Doc. 19, ¶¶ 67, 70.

In addition, Escue quotes §8.04 (a) of the Merger Agreement, which states:

> Notwithstanding any right of any party to the Agreement to fully investigate the affairs of any other party to the Agreement and notwithstanding any knowledge of facts determined or determinable by any party pursuant to such investigation or right of investigation, each party to the Agreement has the right to rely fully upon the representations and warranties of any other party to the Agreement contained in this Agreement or in any Schedule or Exhibit or Agreement in connection with the Merger[.]

Doc. 19, ¶ 68.

Defendants allege that [*22] the fact that they approved the merger agreement is insufficient to allege an intent to defraud. Under Ohio law,

> directors [of a corporation] are not held as a matter of law to know all its affairs, or all the transactions or business conducted by the corporation, or at all times to know just what its books and papers contain; and it is well settled that such knowledge cannot be imputed to them for the purpose of charging them with liability.

*Goff v. Emde, 32 Ohio App. 216, 221, 6 Ohio Law Abs. 546, 167 N.E. 699, 27 Ohio L. Rep. 276 (1928)*. However, Sequent is a closely held corporation; thus, the defendants presumably have a greater degree of knowledge and control over Sequent's operations than would the outside directors of a large corporation. Defendant Schoonover is chairman of Sequent's board of directors, defendant Boyer is Sequent's treasurer, and defendant Kerber is Sequent's corporate secretary.

Under *Rule 9(b)*, intent may be averred generally. In addition, the first amended complaint specifically alleges

knowledge on the part of the defendants in several respects. Escue alleges that prior to the merger, each of the defendants and Hutter received loans from Sequent, approved the sale of the loans to ABL, illegally caused [*23] the Trust to pay cash to ABL to cover the purchase, reversed the transaction upon learning of the DOL criminal investigation, then caused Sequent to forgive the loans. Doc. 19, ¶¶ 21-28. Escue further alleges that in 2005, Hutter and the defendants caused ABL to charge excessive fees for the services it provided to the Trust; this practice was one of the subjects of the DOL criminal investigation. Doc. 19, ¶¶ 31, 35. Escue alleges that Hutter and the defendants also approved Sequent's illegal practice of charging inflated insurance premiums, another subject of the DOL criminal investigation. Doc. 19, ¶¶ 36-41. Escue also alleges that Sequent's financial statements, which were provided to the outside expert for purposes of determining Sequent's worth, were inflated and inaccurate because they did not disclose that Sequent's income was partly the result of its illegal practices or that Sequent was under criminal investigation by the DOL. Doc. 19, ¶¶ 86-87. Escue alleges that the defendants, whose numbers included an experienced corporate attorney and multiple certified public accounts, knew, or should have known, that the financial statements were fraudulent and misleading. Doc. 19, [*24] ¶ 88. These allegations provide a sufficient factual basis as to why the defendants knew or should have known that the merger agreement contained false and misleading statements and omitted material facts. The Third and Fourth Claims, which incorporate the previous paragraphs of the first amended complaint, comply with *Rule 9(b)*'s requirements of alleging fraud with particularity, and the motion to dismiss those claims is not well taken.

### III. Fifth and Sixth Claims - Federal Securities Law Claims

#### A. Failure to State a Claim

Defendants argue that Escue has failed to plead sufficient facts to state a claim against them under the federal securities laws. Section 10(b) prohibits any person from making "fraudulent, material misstatements or omissions in connection with the sale or purchase of a security." *Morse v. McWhorter, 290 F.3d 795, 798 (6th Cir. 2002)*; 15 U.S.C. §78j (b); *17 C.F.R. §240.10b-5 (b)*. To state a claim under Section 10(b) and *Rule 10b-5(b)*, a plaintiff must allege, in connection with the purchase or sale of securities: (1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) justifiably relied on by plaintiffs, and (5) proximately causing them [*25] injury. *Frank v. Dana Corp., 547 F.3d 564, 569 (6th Cir. 2008)*. "Misrepresented or omitted facts are material only if a reasonable investor would have viewed the misrepresentation

or omission as 'having significantly altered the total mix of information made available.'" *In re Sofamor Danek Group, Inc., 123 F.3d 394, 400 (6th Cir. 1997)*(quoting *Basic Inc. v. Levinson, 485 U.S. 224, 232, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988))*. Before liability for non-disclosure can attach, the defendant must have violated an affirmative duty of disclosure; materiality alone is not sufficient to place a company under a duty of disclosure. *In re Sofamor, 123 F.3d at 400*. However, a duty to affirmatively disclose may arise when there is an inaccurate, incomplete or misleading prior disclosure. *City of Monroe Employees Retirement System v. Bridgestone Corp., 399 F.3d 651, 669 (6th Cir. 2005)*. "When a company chooses to speak, it must 'provide complete and non-misleading information.'" *Indiana State District Council of Laborers and Hod Carriers Pension and Welfare Fund v. Omnicare, Inc., 583 F.3d 935, 943 (6th Cir. 2009)* (quoting *Rubin v. Schottenstein, Zox & Dunn, 143 F.3d 263, 268 (6th Cir. 1998))*.

Fraud claims arising under §10(b) must [*26] satisfy the particularity pleading requirements of *Rule 9(b)*. *Id. at 569-70*. In addition, the Private Securities Litigation Reform Act of 1995 ("PSLRA") "imposes additional and more '[e]xacting pleading requirements' for pleading scienter in a securities fraud case." *Id. at 570* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007))*. Under the PSLRA's heightened pleading requirements, the complaint must:

> (1) ... specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed [and]
>
> (2) ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. §78u-4(b) (1), (2). Thus, the PSLRA "requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate or defraud.'" *Tellabs, 551 U.S. at 321* (quoting *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976))*. [*27] "To qualify as 'strong' ..., an inference of scienter must be more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, 551 U.S. at 314*; *Konkol v. Diebold, Inc., 590 F.3d 390, 396 (6th Cir. 2010)*.

In evaluating a motion to dismiss private securities claims arising under §10(b), this court must accept all factual allegations in the complaint as true. *Tellabs, 551 U.S. at 322*. This court must consider the complaint in its entirety, including any other sources courts ordinarily examine when ruling on a *Rule 12(b)(6)* motion to dismiss, and determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id. at 322-23* (emphasis in original). Finally, this court must take into account plausible opposing inferences and assess any possible competing inferences that could be drawn from the allegations, including "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id. at 323-24*.

A complaint will survive a motion to dismiss [*28] "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id. at 324*. "Thus, where two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation," ... the complaint should be permitted to move forward." *Frank, 547 F.3d at 571*. Although negligence alone on the part of a defendant cannot support a finding of scienter, recklessness is a sufficiently culpable state of mind. *Konkol, 590 F.3d at 396*. Recklessness is "'highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.'" *Id.* (quoting *Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017, 1023 (6th Cir. 1979))*.

The defendants argue that they were not involved in the merger negotiations and therefore made no direct statements to Escue during those negotiations. Escue argues in response that the defendants implicitly affirmed the contents of the merger agreement, including the accuracy of the representations and warranties [*29] contained therein, when they approved the merger. He argues that since the defendants effectively approved the representations made in the warranty agreement by authorizing the merger, a duty arose on the part of defendants to rectify any material misrepresentations or omissions.

Although high-level executives can be presumed to be aware of matters central to their business's operation, fraudulent intent cannot be inferred merely from the defendants' positions as directors and alleged access to information. *PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 688, 91 Fed. Appx. 418 (6th Cir. 2004)*; see also *City of*

*Monroe Employees Retirement System v. Bridgestone Corp.,
399 F.3d 651, 690 (6t Cir. 2005)* (complaint which pleaded
little more than corporate titles of defendant, dates of
employment and attendance at quarterly meetings insufficient
to allege scienter). The complaint must allege specific facts
or circumstances suggestive of the defendants' knowledge.
*Chandler, 364 F.3d at 688*. Likewise, the fact that defendants
as directors approved the merger agreement may not, in
itself, be sufficient to allege scienter for purposes of the
securities fraud claims. Cf. *Ley v. Visteon Corp., 543 F.3d
801, 812 (6th Cir. 2008)* [*30] (fact that chief executive
officer and chief financial officer signed Sarbanes-Oxley
certification of accuracy for periodic financial reports
required under 18 U.S.C. §1350 is only probative of scienter
if the person signing the certification was severely reckless
in certifying the accuracy of the financial statements).

In this case, Escue has alleged more than the mere titles of
the defendants and their signing a resolution approving the
adoption of the merger agreement. Escue alleges that the
defendants had actual knowledge that the DOL was
conducting a criminal investigation of Sequent activities by
virtue of having direct contact with the DOL and understood
the significance of that investigation by virtue of that
contact and discussions with legal counsel for Sequent. Doc.
19, ¶ 136. He also alleges that the defendants had specific
and actual knowledge of Sequent's practice of inflating
premiums charged to clients for vision, dental and COBRA
insurance coverage. Doc. 19, ¶ 138.

As discussed above, Escue has also alleged that defendants
were involved in approving loans to themselves from
Sequent and illegally causing the Trust to pay cash to ABL
to cover the purchase, that they caused [*31] ABL to charge
excessive fees for the services it provided to the Trust, and
that they approved Sequent's illegal practice of charging
inflated insurance premiums. Doc. 19, ¶¶ 21-28 31, 35-41.
Escue also alleges that the defendants, whose numbers
included an experienced corporate attorney and multiple
certified public accounts, knew, or should have known, that
the financial statements provided to the independent
valuation expert were fraudulent and misleading. Doc. 19, ¶
88. Sequent is a private, closely held corporation, and
Escue, Hutter, and the other individual defendants are
Sequent's only shareholders. Doc. 19, ¶ 11.

Accepting all factual allegations in the complaint as true and
considering the complaint in its entirety, the court concludes
that the facts alleged, taken collectively, give rise to a strong
inference of scienter. The first amended complaint contains
factual allegations sufficient to allege that the defendants
had knowledge of Sequent's business practices, which,

acting as directors, they caused Sequent to adopt, and of the
DOL criminal investigation, and that they knew or should
have known that the representations and warranties made in
the merger agreement approved [*32] by their action and the
omissions therefrom were false and misleading. While it is
plausible to infer from the complaint that the defendants
may not have been aware of some of the matters alleged
therein, such as the details of the in person merger
negotiations engaged in between Escue and Hutter, the
inferences of fraudulent and reckless conduct on the part of
defendants which favor Escue are at least as cogent and
compelling, or even more plausible, than any inferences
favoring the defendants. There are sufficient allegations
supporting scienter, as well as the other elements of a
federal security law claim, to permit the Fifth and Sixth
Claims to proceed to discovery.

## B. Statute of Limitations

Defendants also argue that the federal securities law claims
are barred by the statute of limitations. Prior to the passage
of the Sarbanes-Oxley Act in 2002, parties asserting
violations of §10 (b) and *Rule 10b-5* were required to file
suit within one year after the discovery of the facts
constituting the violation. 15 U.S.C. §78i(e); *Lampf, Pleva,
Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350,
364, 111 S. Ct. 2773, 115 L. Ed. 2d 321 (1991)*. However,
the Sarbanes-Oxley Act extended the statute of limitations
for actions [*33] filed after July 30, 2002, which allege
securities law violations which were not already time-barred
prior to that date, to two years after the discovery of the
facts constituting the violation or five years after the
violation, whichever occurs earlier. *Greenburg v. Hiner, 359
F.Supp.2d 675, 681 (N.D.Ohio 2005)*; 28 U.S.C. §1658(b).

Escue alleges in the first amended complaint that he had no
notice of the pending DOL criminal investigation until a
board of directors meeting held on September 24, 2007.
Doc. 19, ¶ 91. The original complaint in this case was filed
on September 2, 2009, within two years of the date when
Escue was first placed on notice of the criminal investigation.
Escue also alleges that he learned at a board of directors
meeting in June of 2009 that Hutter's previous representation
concerning Sequent's tiering practices being approved by an
outside ERISA expert were false when Hutter proposed that
Sequent obtain an outside expert opinion on that issue. Doc.
19, ¶ 47. Thus, the federal securities law claims were based
on facts which were discovered within two years of the
filing of the complaint, and the motion to dismiss based on
the statute of limitations is not well [*34] taken.

## IV. Seventh Claim - *Ohio Rev. Code §1701.93*

In the Seventh Claim, Escue asserts a claim against Hutter and the other individual defendants under *Ohio Rev. Code §1701.93(A)(1)*. That section provides:

> (A) No officer, director, employee, or agent of a corporation shall, either alone or with another or others, with intent to deceive:
>
> (1) Make, issue, deliver, publish, or send by mail or by any other means of communication any prospectus, report, circular, certificate, statement, balance sheet, exhibit, or document, respecting the shares, assets, liabilities, capital, business, dividends or distributions, earnings, or accounts of a corporation, that is false in any material respect, knowing the statement to be false[.]

*§1701.93(A)(1)*. *Ohio Rev. Code §1701.93(B)* states:

> (B) Whoever violates this section shall be personally liable, jointly and severally, with all other persons participating with the offender in any act of that type, to any person for any damage actually suffered and proximately resulting from the act.

*§1701.93(B)*.

Defendants argue that there are no allegations in the complaint that they delivered any statement, document or report to Escue. However, the statute does not require [*35] that the director or officer personally deliver the document to another person. Rather, it applies to an officer or director acting "either alone or with another or others[.]" *§1701.93(A)*. Escue has alleged that the defendants approved Sequent financial statements at board of directors meetings, knowing or having reason to know that the financial statements were fraudulent and misleading because of their failure to take into account Sequent's illegal business practices or to disclose that Sequent was the subject of a DOL criminal investigation. Doc. 19, ¶¶ 87-89. Escue alleges that Sequent provided fraudulent financial statements to the valuation expert for use in evaluating the proposed merger. Doc. 19, ¶¶ 86, 89.

Escue also alleges that in December of 2006, Sequent and Escue, through counsel, exchanged drafts of the merger agreement, in which Sequent represented that the statements in Article VI and its associated schedules "are correct and complete as of the date of this Agreement and will be correct and complete immediately prior to the" effective date of January 1, 2007. Doc. 19, ¶¶ 65-66. Escue alleges that §6.06 of the merger agreement contained statements

indicating that Sequent's [*36] financial statements accurately reflected Sequent's assets and liabilities. Doc. 19, ¶ 67. Escue alleges that Hutter and the other directors signed a corporate resolution approving the merger agreement, thereby affirming the accuracy of the contents of the merger agreement, and that he relied on the defendants' approval of the merger agreement in agreeing to the merger. Doc. 19, ¶¶ 71-72, 78-79. Escue alleges that approval of the merger by the defendant directors was a mandatory closing condition of the merger. Doc. 19, ¶ 69. Therefore, the final merger agreement would never have been delivered to Escue for his signature if the defendants had not approved the merger.

The allegations in the first amended complaint are sufficient to allege that the defendants, acting together with Hutter and Sequent's counsel, took actions which contributed to the false and misleading financial statements and merger document being delivered to others, and that they acted with the intent to deceive and with knowledge of the falsity of information contained in those documents. The motion to dismiss the Seventh Claim is denied.

V. Ninth and Tenth Claims - *Ohio Rev. Code §§ 1707.44* and *1707.43*

Escue alleges [*37] that the defendants violated *Ohio Rev. Code §1707.44* in the issuance of Sequent shares to him under the merger agreement. In his Ninth Claim, he seeks the remedy of rescission under *Ohio Rev. Code §1707.43*, and in his Tenth Claim, he seeks damages as an alternative remedy.

*Section 1707.44* provides in relevant part:

> (B) No person shall knowingly make or cause to be made any false representation concerning a material and relevant fact, in any oral statement or in any prospectus, circular, description, application, or written statement, for any of the following purposes:
>
> * * *
>
> (4) Selling any securities in this state;
>
> * * *
>
> (J) No person, with purpose to deceive, shall make, issue, publish, or cause to be made, issued, or published any statement or advertisement as to the value of securities, or as to alleged facts affecting the value of securities, or as to the financial condition of any issuer of securities, when the person knows that the statement or advertisement is false in any material respect.

* * *

(N) No person knowingly shall influence, coerce, manipulate, or mislead any person engaged in the preparation, compilation, review, or audit of financial statements to be used in the purchase [*38] or sale of securities for the purpose of rendering the financial statements materially misleading.

*§1707.44(B)(4)*, *(J)* and *(N)*.

*Sections 1707.44(B)(4)* and *1707.44(J)* prohibit only affirmative misrepresentation; they do not apply to fraudulent nondisclosure or the omission of material facts. *State v. Warner, 55 Ohio St.3d 31, 38, 564 N.E.2d 18 (1990)*. For purposes of *§§1707.44(B)(4)* and *(J)*, a person acts "knowingly" if he represents facts to be different than he should have known them to be if he had exercised reasonable diligence to ascertain the facts. *Id., 55 Ohio St.3d at 42-43*.

With respect to *1707.44(B)(4)*, the first amended complaint alleges that the defendants caused false statements to be made in written documents, namely, the Sequent financial statements and the merger agreement, by approving of the financial statements at the board of directors meetings and by the resolution authorizing Sequent to enter into the merger agreement. The defendants arguably "caused" the false statements to be made because absent the resolution approving the merger, the final agreement would not have been submitted to Escue for signature and the merger would not have occurred. While some of the [*39] allegations in the complaint concern omissions, for example, the failure to mention the pending DOL criminal investigation, the complaint also alleges that affirmative misrepresentations were made. For example, it is alleged that the merger agreement contained representations and warranties that the agreement and financial statements accurately reflected Sequent's worth and liabilities, when in fact these statements were allegedly false. Doc. 19, ¶ 67. The allegations in the complaint include facts sufficient to plead that the defendants, at the very least, acted knowingly by representing facts to be different than they should have known them to be if they had exercised reasonable diligence to ascertain the facts. These allegations apply as well to the defendants' liability under *§1707.44(J)*.

There are no Ohio cases which have construed the language of *§1707.44(N)*. This section prohibits any person from influencing, coercing, manipulating or misleading anyone engaged in the preparation, compilation, review or sale of financial statements to be used in the purchase or sale of securities. It was clearly intended to apply to a situation where the person gives false information to the

[*40] individual who is preparing or reviewing the financial statements. It is less clear that it was intended to apply here, where the only allegations are that the defendant directors approved allegedly false financial statements at the board of directors meetings which were then provided by Sequent to the valuation expert, i.e., where the "misleading" was achieved through providing false or incomplete financial statements for review. However, Ohio courts have indicated that the Ohio securities laws are to be liberally construed. See *In re Columbus Skyline Securities, 74 Ohio St.3d 495, 498, 1996 Ohio 151, 660 N.E.2d 427 (1996)*; *Federated Management Co. v. Coopers & Lybrand, 137 Ohio App.3d 366, 392, 738 N.E.2d 842 (2000)*. The court will therefore deny the motion to dismiss the *§1707.44(N)* theory at the pleading stage.

*Section 1707.43(A)* provides:

(A) Subject to divisions (B) and (C) of this section, every sale or contract for sale made in violation of Chapter 1707. of the Revised code, is voidable at the election of the purchaser. The person making such sale or contract for sale, and every person that has participated in or aided the seller in any way in making such sale or contract for sale, are jointly [*41] and severally liable to the purchaser, in an action at law in any court of competent jurisdiction, upon tender to the seller in person or in open court of the securities sold or of the contract made, for the full amount paid by the purchaser and for all taxable court costs, unless the court determines that the violation did not materially affect the protection contemplated by the violated provision.

*§1707.43(A)*.

The language "participated in or aided the seller in any way" is broad in scope and extends beyond the actual seller and issuer of the security. *Federated Management, 137 Ohio App.3d at 391*. *Section 1707.43* does not require that a person induce a purchaser to invest in order to be held liable. Id. This statute does not contain a scienter requirement. *In re National Century Financial Enterprises, Inc., Investment Litigation, 580 F. Supp. 2d 630, 650 (S.D.Ohio 2008)*. In this case, the allegation that the defendants, acting as directors of Sequent, approved the merger agreement, which was a precondition for the merger going forward, is sufficient to allege that the defendants "participated in or aided the seller in any way" for purposes of liability under *§1707.43(A)*.

The defendants' [*42] motion to dismiss the Ninth and Tenth Claims will be denied.

David Sporar

## VI. Motion to Dismiss Third and Fourth Counterclaims

## A. Third Counterclaim - Tortious Interference with Contractual Relationships

Escue has moved to dismiss Sequent's Third Counterclaim for tortious interference with contractual relationships. The elements of a claim for tortious interference with contract under Ohio law are: (1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) the lack of justification; and (5) resulting damages. *Kenty v. Transamerica Premium Ins. Co., 72 Ohio St.3d 415, 1995 Ohio 61, 650 N.E.2d 863 (1995)*.

Only improper interference with a contract is actionable. *Fred Siegel Co., L.P.A. v. Arter & Hadden, 85 Ohio St.3d 171, 176, 1999 Ohio 260, 707 N.E.2d 853 (1999)*. In determining whether an actor has acted improperly in intentionally interfering with a contract, consideration should be given to: (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the other with which the actor's conduct interferes; (4) the interest sought to be advanced by the actor; (5) the social interests in protecting the freedom of [*43] action of the actor and the contractual interests of the other; (6) the proximity or remoteness of the actor's conduct to the interference; and (7) the relations between the parties. *Id. at 178-179*.

Sequent alleges that Escue deliberately published "certain false statements contained in the complaint (and now, the first amended complaint) to customers of Sequent [.]" Answer, ¶ 212. Sequent alleges that as a direct result of Escue's conduct, several customers have terminated their contractual agreements with Sequent. Answer, ¶ 215.

Escue notes that privilege defenses applicable under defamation law also apply to claims for tortious interference with contract. See *Mawaldi v. St. Elizabeth Health Center, 381 F.Supp.2d 675, 690 (N.D.Ohio 2005)*(where a claim such as tortious interference with contract is based on statements that are qualifiedly privileged under defamation law, the protection afforded those statements also apply to the derivative claim."). Escue argues that the alleged conduct of publishing statements contained in his amended complaint is protected by the absolute privilege accorded statements made in a judicial proceeding.

Under Ohio law, "a claim alleging that a defamatory [*44] statement was made in a written pleading does not state a cause of action where the allegedly defamatory statement bears some reasonable relation to the judicial

proceeding in which it appears." *Surace v. Wuliger, 25 Ohio St. 3d 229, 25 Ohio B. 288, 495 N.E.2d 939, 942-43 (1986)*. Statements made in a written pleading or brief, or in an oral statement to a judge or jury, are absolutely privileged if they have some reasonable relation to the judicial proceeding. *Michaels v. Berliner, 119 Ohio App.3d 82, 87, 694 N.E.2d 519 (1997)*.

The privilege has also been extended, with strict limitations, to extrajudicial communications, including communications between attorneys. *Morrison v. Gugle, 142 Ohio App.3d 244, 259, 755 N.E.2d 404 (2001)*. In order for an extrajudicial communication to fall within the scope of the absolute privilege, it must be: (1) made in the regular course of preparing for and conducting a proceeding that is contemplated in good faith and under serious consideration; (2) pertinent to the relief sought; and (3) published only to those directly interested in the proceeding. *Id. at 260*. Thus, the privilege "does not give a person carte blanche to defame another on the mere condition that a [*45] judicial proceeding is mentioned in, or somehow connected to, the defamatory statement." *Michaels, 119 Ohio App.3d at 87-88*. Escue's alleged act of publishing statements contained in his complaint to Sequent's customers constitutes an extrajudicial communication which does not appear to meet the criteria for the privilege applicable to statements made in a judicial proceeding.

The alleged conduct may be otherwise privileged. A qualified privilege is recognized where the publication is fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned. *Hahn v. Kotten, 43 Ohio St.2d 237, 244, 331 N.E.2d 713 (1975)*. "A qualified privilege is recognized in many cases where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it[,] particularly "in the case of those who have entered upon or are considering business dealings with one another." Id. However, whether the claim of tortious interference would be barred by a qualified privilege in the instant case cannot be determined from the pleadings.

Escue [*46] also argues that the claim should not survive a motion to dismiss under *Rule 12(b)(6)* because it is implausible that he would publish false statements to Sequent's clients in light of the fact that he is a substantial shareholder of Sequent and has an interest in Sequent maintaining its customers and operating a successful and profitable business. Sequent alleges that Escue did so "in order to seek leverage to support his demand that the merger transaction be unwound on his terms." Answer, ¶ 212. It is

2010 U.S. Dist. LEXIS 87043, *46

not implausible that Escue would share his concerns about Sequent with his customers in Alabama to gain their support and sympathy in his efforts to regain control of BBSA. However, the court does find that the counterclaim fails to allege sufficient facts to place Escue on notice as to the nature of the claim against him. A complaint must give the defendant "fair notice of what the ... claim is and the grounds upon which it rests." *Twombly, 550 U.S. at 555*. Here, the counterclaim simply alleges that Escue "published certain false statements contained in the complaint ... to customers of Sequent." It fails to notify Escue, even in general terms, of the nature of the statements which  [*47] were allegedly made, or the persons or businesses to whom they were made. The allegations do not permit the court to infer more than the mere possibility of misconduct. On this ground, Escue's motion to dismiss the Third Counterclaim is well taken.

### B. Fourth Counterclaim - Breach of Contract

Sequent alleges in its Fourth Counterclaim that Escue breached his obligations under his employment agreement with Sequent. To prove a breach of contract claim under Ohio law, a plaintiff must show the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff. *Nilavar v. Osborn, 137 Ohio App.3d 469, 483, 738 N.E.2d 1271 (2000)*.

The Fourth Counterclaim simply alleges in general terms that "Plaintiff's conduct was in breach of his obligations under his written Employment Agreement." Answer, ¶ 217. It does not specify the nature of Escue's conduct, nor does it allege which provisions of the agreement were breached. The Fourth Counterclaim incorporates all of the preceding

paragraphs of the answer. However, Sequent's denials of the allegations in Escue's first amended complaint cannot serve as affirmative allegations of fact for purposes of a counterclaim.  [*48] Although Sequent filed a copy of the employment agreement with the record, and although the other counterclaims contain additional allegations concerning Escue's conduct, those paragraphs do not specify which, if any, of Escue's alleged acts relate to the employment agreement. In addition, Escue correctly notes that Sequent has failed to plead, even in general terms, that it performed all of its obligations under the employment agreement. The Fourth Counterclaim fails to allege sufficient facts to state a claim for breach of contract under Ohio law, and this branch of Escue's motion to dismiss is granted.

### VII. Conclusion

In accordance with the foregoing, this court finds that the first amended complaint contains allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory, which are sufficient to state a claim to relief that is plausible on its face. The motion to dismiss the Third through Seventh, Ninth and Tenth Claims for Relief filed by defendants Schoonover, Boyer, Gettman, Kerber and Ewers is denied. The motion to dismiss the Third and Fourth Counterclaims filed by Escue is granted.

Date: August 24, 2010

/s/ James L. Graham

James  [*49] L. Graham

United States District Judge