# APPENDIX

Unpublished Opinions Cited in Brief

**A** Neutral

As of: June 12, 2015 4:58 PM EDT

## ODW Logistics, Inc. v. Karmaloop, Inc.

United States District Court for the Southern District of Ohio, Eastern Division

January 27, 2014, Filed

Case No. 2:12-cv-996; Case No. 2:13-cv-270

**Reporter**

2014 U.S. Dist. LEXIS 9615; 2014 WL 293816

ODW LOGISTICS, INC., Plaintiff, v. KARMALOOP, INC., Defendant.KARMALOOP, INC., Plaintiff, v. ODW LOGISTICS, INC., Defendant.

**Subsequent History:** Later proceeding at *Karmaloop, Inc. v. Odw Logistics, 2014 U.S. Dist. LEXIS 15612 (S.D. Ohio, Feb. 7, 2014)*

**Prior History:** *ODW Logistics, Inc. v. Karmaloop, Inc., 2013 U.S. Dist. LEXIS 96309 (S.D. Ohio, July 10, 2013)*

## Core Terms

counterclaim, Inventory, conversion, summary judgment, intentional torts, asserting, parties, damages, declaratory judgment, conversion claim, breach of contract, Services, good faith, covenant, breach of contract claim, economic loss doctrine, claim for breach, fair dealing, contractual, shortage, bailee, bailor

**Counsel:** [*1] For ODW Logistics, Inc., Plaintiff (2:12-cv-00996-GLF-MRA), Counter Defendant (2:12-cv-00996-GLF-MRA): Marc S Blubaugh, LEAD ATTORNEY, Benesch Friedlander Coplan & Aronoff - 2, Columbus, OH: Steven Andrew Oldham, Benesch, Friedlander, Coplan & Aronoff LLP, Columbus, OH.

For Karmaloop, Inc., Defendant (2:12-cv-00996-GLF-MRA): James Joseph Hughes, III, LEAD ATTORNEY, Bricker & Eckler, olumbus, OH; Erica Mastrangelo, Shepard Davidson, PRO HAC VICE, Burns & Levinson LLP, Boston, MA.

For Karmaloop, Inc., Counter Claimant (2:12-cv-00996-GLF-MRA): James Joseph Hughes, III, LEAD ATTORNEY, Bricker & Eckler, olumbus, OH; Erica Mastrangelo, Shepard Davidson, Burns & Levinson LLP, Boston, MA.

For Karmaloop, Inc., Plaintiff (2:13-cv-00270-GLF-MRA), Counter Defendant (2:13-cv-00270-GLF-MRA): Erica Mastrangelo, Shepard Davidson, PRO HAC VICE, Burns & Levinson LLP, Boston, MA.

For ODW Logistics Inc., Defendant (2:13-cv-00270-GLF-MRA), Counter Claimant (2:13-cv-00270-GLF-MRA): Marc S Blubaugh, LEAD ATTORNEY, Benesch Friedlander Coplan & Aronoff - 2, Columbus, OH.

**Judges:** GREGORY L. FROST, UNITED STATES DISTRICT JUDGE, Magistrate Judge Mark R. Abel.

**Opinion by:** GREGORY L. FROST

## Opinion

### OPINION AND ORDER

This matter is before the Court [*2] for consideration of a motion for partial summary judgment (ECF No. 42) filed by ODW Logistics, Inc., a memorandum in opposition (ECF No. 48) filed by Karmaloop, Inc., and a reply memorandum (ECF No. 49) filed by ODW Logistics, Inc.[1] For the reasons that follow, the Court finds the motion well taken in part.

### I. Background

ODW Logistics, Inc. ("ODW") is a warehousing and logistics company with its primary place of business in Columbus, Ohio. Karmaloop, Inc. ("Karmaloop") is an online clothing retailer and lifestyle brand that buys, markets, and sells streetwear clothing and accessories. In July 2006, Karmaloop and ODW entered into a Warehouse Distribution Services Agreement. Under that agreement, ODW was to provide certain warehouse, distribution, and fulfillment services to Karmaloop. In February 2012, however,

---

[1] Unless otherwise indicated, all citations to filings on the docket are to documents filed in Case No. 2:12-cv-996.

2014 U.S. Dist. LEXIS 9615, *3

Karmaloop notified ODW of its intention to exercise its right to terminate the Distribution Services Agreement.

Consequently, in May 2012, Karmaloop and ODW entered into a new agreement, the Transition Services Agreement ("TSA"), which was to govern the termination [*3] of their business relationship. The TSA modified and then terminated the Warehouse Distribution Services Agreement. The TSA specifically set forth the duties of each party and a general timeline for the relocation of Karmaloop's inventory.

Section IV(c) of the TSA provided when ODW would and when it would not be liable for any damage or variance to the Karmaloop goods that would be relocated from the ODW facilities. For liability to exist, Karmaloop had to conduct a physical inventory of the goods that it received from ODW, which the TSA designated a Confirmation Inventory, no later than 30 days after ODW delivered the goods involved to Karmaloop's replacement facility. Section VI(a) of the TSA then provided that ODW and Karmaloop would execute a final release that would resolve all claims for payments, all liabilities, and all future claims between the parties.

In July 2012, the parties executed a Mutual Release and Hold Harmless ("the Release") in accordance with Section VI(a). That document provides in relevant part:

> Each Releasing Party, on behalf of itself and each of its agents, representatives, predecessors in interest, successor and assigns, employees, subsidiaries, affiliated [*4] entities, insurers and anyone acting on their behalf, hereby releases and forever holds harmless and discharges the other Party, and its heirs, agents or assigns (each, a "Releasee") from any and all claims, demands, proceedings, causes of action, orders, obligations, contracts, unsuspected, both at law and in equity, which each of the Releasing Parties now has, have ever had or may hereafter have against the Releasee arising contemporaneously with or prior to the Effective Date of the Agreement, or on account of or arising out of any matter, cause or event occurring contemporaneously with or prior to the Effective Date, whether pursuant to the Original Contract (referenced and defined in the Agreement), any contract or otherwise arising under law or equity and whether or not relating or not relating to claims pending on, or asserted after, the Effective Date, provided that Karmaloop or ODW, as the case may be, shall fully perform its obligations under the Agreement in order to be entitled to the benefits of this Release as a Releasee.
>
> Each Releasing Party hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim

or demand, or commencing, instituting [*5] or causing to be commenced, any proceeding of any kind against any Releasee, based upon any matter purported to be released hereby. The claims released by Karmaloop shall not apply to claims for loss of Goods caused by ODW in accordance with the Confirmation Inventory provisions of Section IC(C) of the Transition Services Agreement by and between Karmaloop and ODW dated May 16, 2012.

(ECF No. 42-1, at Page ID # 351.) Despite the language of the Release, the parties' involvement with one another did not smoothly conclude.

In June 2013, ODW made its final shipment of goods to Karmaloop. There is an alleged variance of 42,294 units between what ODW returned to Karmaloop and what ODW should have returned to Karmaloop. Karmaloop did not provide a Confirmation Inventory to ODW within 30 days of receipt of this final delivery of its goods. Instead, in October 2012, Karmaloop unsuccessfully attempted to invoke a mediation provision of the TSA and filed a lawsuit against ODW in the United States District Court for the District of Massachusetts, alleging breach of contract and various tort claims. (ECF No. 1 in 2:13-cv-270.) ODW in turn filed a lawsuit in this Court, Case No. 2:12-cv-996, seeking [*6] declaratory judgment of its rights and liabilities under the TSA. (ECF No. 1.) In February 2013, Karmaloop responded by asserting various counterclaims: declaratory judgment that the TSA is not legally binding; conversion; violation of the Massachusetts unfair and deceptive practices act, M.G.L. c. 93A; and breach of contract. (ECF No. 22.) In March 2013, the Massachusetts litigation was then transferred to this Court and assigned Case No. 2:13-cv-270. This Court consolidated the cases in April 2013. (ECF No. 34.)

Prior to that consolidation, ODW had filed a motion to dismiss the counterclaims raised by Karmaloop in Case No. 2:12-cv-996. (ECF No. 28.) Following consolidation, this Court filed a July 2013 Opinion and Order in which the Court dismissed Karmaloop's counterclaims for declaratory judgment and breach of contract. (ECF No. 39.) ODW has now filed a motion for partial summary judgment on its claim for declaratory judgment in Case No. 2:12-cv-996, Karmaloop's counterclaim for conversion in Case No. 2:12-cv-996, Karmaloop's claim for breach of contract in Case No. 2:13-cv-270, and Karmaloop's claim for breach of the implied covenant of good faith and fair dealing in Case No. 2:13-cv-270. [*7] (ECF No. 42.) The parties have completed briefing on the motion, which is ripe for disposition.

2014 U.S. Dist. LEXIS 9615, *7

## II. Discussion

### A. Standard Involved

_Federal Rule of Civil Procedure 56_ provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." _Fed. R. Civ. P. 56(a)._ The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. _See Muncie Power Prods. v. United Techs. Auto., Inc., 328 F.3d 870, 873 (6th Cir. 2003)_ (citing _Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986))._

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. _Id._ (citing _Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)); Hamad v. Woodcrest Condo, Ass'n, 328 F.3d 224, 234 (6th Cir. 2003)._ A genuine issue of material fact exists "if the evidence is such that [*8] a reasonable jury could return a verdict for the nonmoving party." _Muncie, 328 F.3d at 873_ (quoting _Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))._ Consequently, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" _Hamad, 328 F.3d at 234-35_ (quoting _Anderson, 477 U.S. at 251-52)._

### B. Analysis

#### 1. Declaratory Judgement

In Case No. 2:12-cv-996, ODW asserts a single claim for declaratory judgment. ODW seeks a declaration from this Court that Karmaloop cannot pursue inventory shortage claims related to the Confirmation Inventory as a result of Karmaloop's alleged failure to provide ODW with such an inventory and Karmaloop's purported failure to negotiate in good faith. Citing this Court's July 2012 Opinion and Order (ECF No. 39, incorporated herein by reference), ODW seeks summary judgment on the grounds that this Court resolved the issue when it dismissed Karmaloop's counterclaim seeking a declaration that the TSA was unenforceable.

This Court agrees with ODW. In reaching this conclusion, the Court rejects Karmaloop's newfound reliance on a theory [*9] of commercial extortion under the Massachusetts unfair and deceptive practices act, M.G.L. c. 93A, and the debatable remedy of rescission as supporting Karmaloop's attempt at obtaining declaratory judgment. Simply stated, Karmaloop is raising now an argument it should have raised before and cannot resurrect a failed claim or defeat a controlling adverse rationale based on hindsight strategic maneuvering. To conclude otherwise would be to invalidate this Court's prior decision regarding whether the TSA is binding. Karmaloop should have raised its newfound argument previously. Instead, Karmaloop relied only on two narrow grounds, and Karmaloop is stuck with its litigation choices. Those choices lead to the conclusion that because Karmaloop failed to comply with Section IV(c) of the TSA by providing ODW with the Confirmation Inventory within the requisite time period, Karmaloop is barred from asserting inventory-related claims under the TSA. ODW is therefore entitled to a declaratory judgment in this regard.

#### 2. Conversion

In Case No. 2:12-cv-996, Karmaloop asserts a counterclaim for conversion, contending that ODW retained Karmaloop goods. ODW argues that this conversion claim is simply [*10] Karmaloop's attempt to circumvent the effect of the TSA by obtaining recovery under a tort theory for inventory shortage that Karmaloop could not address via breach of contract. ODW seeks summary judgment on this counterclaim on the grounds that the economic loss doctrine and this Court's prior decision that Karmaloop cannot recover for any inventory shortage as a result of its failure to provide ODW with a timely Confirmation Inventory preclude the conversion claim.

The Sixth Circuit has explained that, "[u]nder Ohio law, '[t]he economic-loss rule generally prevents recovery in tort damages for purely economic loss.'" _Pavlovich v. Nat'l City Bank, 435 F.3d 560, 569 (6th Cir. 2006)_ (quoting _Corporex Dev. & Constr. Mgmt., Inc. v. Shook, Inc., 106 Ohio St.3d 412, 414, 2005 Ohio 5409, 835 N.E.2d 701, 704 (2005))._ Karmaloop opposes summary judgment by arguing that the economic loss doctrine cannot bar the intentional tort of conversion.

Karmaloop reaches this conclusion by relying on case law indicating that Ohio's economic loss doctrine "applies only in negligence cases, not in cases involving intentional torts." _Eysoldt v. Proscan Imaging, 194 Ohio App.3d 630, 636, 2011 Ohio 2359, 957 N.E.2d 780, 785 (Ohio App. 1 Dist. 2011)_ [*11] (declining to apply doctrine to bar conversion claim). Such a proposition is replete in the case law; courts have repeatedly rejected application of the doctrine to

intentional torts. *See Medpace, Inc. v. Biothera, Inc., No. 1:12-cv-179, 2013 U.S. Dist. LEXIS 48817, 2013 WL 1386298, at *4 (S.D. Ohio Apr. 4, 2013)* (holding that Ohio's doctrine did not bar conversion claim); *Pride of Hills Mfg. Inc. v. Range Resources-Appalachia, LLC, No. 5:09CV02764, 2011 U.S. Dist. LEXIS 59794, 2011 WL 2116455, at *6-7 (N.D. Ohio May 27, 2011)* (declining to apply the doctrine to intentional torts claims); *Hodell-Natco Indus., Inc. v. SAP America, Inc., No. 1:08-cv-02755, 2010 U.S. Dist. LEXIS 143144, 2010 WL 6765522, at *11 (N.D. Ohio Sept. 2, 2010)* ("It does not appear that Ohio courts intended to extend the economic loss rule beyond negligence actions to bar intentional torts as well."); *Reengineering Consultants, Ltd. v. EMC Corp., No. 2:08-cv-47, 2009 U.S. Dist. LEXIS 2627, 2009 WL 113058, at *6 (S.D. Ohio Jan. 14, 2009)* ("The economic loss rule prevents recovery in negligence of purely economic loss, not recovery under an intentional tort theory for economic loss.").

ODW disagrees with the proposition that Ohio's economic loss doctrine does not extend to intentional torts. To support is position, ODW relies [*12] upon *Academic Imaging, LLC v. Soterion Corp., 352 F. App'x 59 (6th Cir. 2009)*, a case in which the Sixth Circuit addressed whether under Ohio law the existence of a contract action prevented a buyer from asserting a conversion claim against a seller. The court of appeals explained:

> As in all tort actions that are "factually intertwined" with a contract, "[i]n conversion actions, Ohio Courts have held, '[s]uch tort claim lies against a contracting party independent of a breach of contract claim so long as the plaintiff alleges a breach of a duty owed separately from obligations created by the contract.'" *Jean v. Stanley Works, No. 1:04-CV-1904, 2006 U.S. Dist. LEXIS 50027, at *14,2006 WL 1966644, at *5 (N.D. Ohio July 5, 2006)* (quoting *DeNune v. Consol. Capital of N. Am., Inc., 288 F. Supp.2d 844, 854 (N.D. Ohio 2003)*). Here, the "wrongful act" alleged must be wrongful for reasons other than breach of a contract.

*Id. at 67.* The Sixth Circuit also recognized that

> Ohio law requires that "[i]n addition to containing a duty independent of that created by contract, an action arising out of contract which is also based upon tortious conduct must include actual damages attributable to the wrongful [*13] acts of the alleged tortfeasor which are in addition to those attributable to the breach of the contract." [*Textron Fin. Corp. v. Nationwide Mut. Ins. Co., 115 Ohio App.3d 137, 684 N.E.2d 1261, 1271*

*(Ohio App. 9 Dist. 1996)].* The actual damages resulting from the alleged conversion would necessarily be identical to those resulting from the corresponding breach of the Operating Agreement's provision on distributions and/or the ostensible breach of the Purchase Agreement. Thus, insofar as the conversion claim is based on the collection of monies in violation of the Operating and/or Purchase Agreements, it fails as a matter of law.

*Id. at 67-68.* Thus, ODW reasons, there is support for preclusion of the conversion counterclaim.

Karmaloop asserts that ODW had a duty independent of the TSA that supports the counterclaim for conversion. Karmaloop contends that, "as the bailee of Karmaloop's goods, ODW plainly had a duty not to steal, destroy, or withhold Karmaloop's goods that was independent of any contractual obligations ODW may have had under the TSA or the [Warehouse Distribution Services Agreement]." (ECF No. 48, at Page ID # 380.)

The premise that the bailor-bailee relationship can create [*14] a tort claim for relief is grounded in Ohio law. One state court of appeals has explained:

> A bailment exists where one person delivers personal property to another to be held for a specific purpose with a contract, express or implied, that the property shall be returned or accounted for when this special purpose is accomplished or retained until the bailor reclaims the property. The duty of the bailee is to hold the property in accordance with the terms of the bailment. Bailment involves the transfer of a possessory interest only and not an ownership interest in property. A bailment may be for the benefit of only the bailor or bailee, or for the mutual benefit of both. . . . As stated in paragraph two of the syllabus of *Agricultural Ins. Co. v. Constantine (1944), 144 Ohio St. 275, 29 O.O. 426, 58 N.E.2d 658*, the failure of a bailee to redeliver the bailed property to the bailor upon legal demand creates a cause of action either in contract or in tort, either of which may be pursued at the election of the bailor.

*Tomas v. Nationwide Mut. Ins. Co., 79 Ohio App.3d 624, 628-29, 607 N.E.2d 944, 946-47 (Ohio App. 10 Dist. 1992).* Applying this approach here, the parties' dispute is not simply [*15] a disagreement over contractual non-performance. Rather, it is a dispute over the fact that ODW allegedly has kept Karmaloop's property in contravention of the bailor-bailee relationship. This

2014 U.S. Dist. LEXIS 9615, *15

relationship is not purely governed by contract. As this Court previously explained in its decision on the motion to dismiss, Section IV of the TSA does not impose an affirmative duty, it only limits liability under specific circumstances. In other words, ODW had to give back what did not belong to ODW, regardless of any potential contractual caps on damages.

ODW rejects Karmaloop's assertion of an independent basis with fairly straightforward reasoning. According to ODW, Karmaloop's ability to seek relief for inventory shortage necessarily arises only out of the TSA As a result of the TSA and the Release, there is no requisite duty independent of the TSA that is not subsumed by the parties' agreement. Although ODW would normally have had an independent legal duty as a bailee to return all of its bailor's goods, ODW posits that *Ohio Revised Code § 1307.403(A)(6)* qualifies this duty when parties have executed a release such as found here. The TSA and Release therefore control the duty ODW owed  [*16] Karmaloop so that there is no independent duty to support the conversion claim. ODW thus concludes that it is entitled to summary judgment on the conversion counterclaim.

The problem with ODW's analysis is that it bypasses the fact that the argument hinges on an enforceable release of an intentional tort. A release of a future intentional tort is void as against public policy. *See Denlinger v. City of Columbus, No. 00AP-315, 2000 Ohio App. LEXIS 5679, 2000 WL 1803923, at *7-8 (Ohio App. 10 Dist. Dec. 7, 2000).* Thus, the Release involved in this case controlled all prior claims between the parties and all future claims, with two exceptions: a breach of contract claim when the Confirmation Inventory exception applied (which it does not due to Karmaloop's untimeliness) and intentional tort claims (based on public policy qualifying the scope of the release). Therefore, two points are necessary. One, despite the broader characterization ODW affords it, this Court's prior motion to dismiss decision was necessarily and inherently limited to those claims falling within the scope of the parties' contractual agreements. Two, the TSA and the Release therefore permit the conversion counterclaim, which falls outside the contractual [*17] agreements because there is no applicable release under *Ohio Revised Code § 1307.403(A)(6)* or any other lawful excuse under *Ohio Revised Code § 1307.403(A)(7).*

This leads to the final point of contention regarding the conversion counterclaim, specifically, whether the tort damages are the same as what Karmaloop could pursue under a breach of contract claim. Section IV(c) of the TSA provided that ODW would be liable for inventory shortages

that were in excess of a total net inaccuracy of 7.5 percent based on a timely Confirmation Inventory. This was a limitation on damages relevant to a breach of contract claim. The potential actual damages attributable to the tort counterclaim of conversion are not so limited, with the greater amount available via tort constituting damages that would be in addition to those attributable to the breach of the contract. What this means is that, even assuming *arguendo* that the economic loss doctrine could apply to the intentional tort involved here, there is an independent duty and additional actual damages that would remove the conversion claim from that doctrine. ODW is therefore not entitled to summary judgment on the conversion counterclaim.

### 3. Breach  [*18] of Contract

In Case No. 2:13-cv-270, Karmaloop asserts a claim for breach of contract. ODW seeks summary judgment on this claim on the theory that the same rationale that proved dispositive in regard to ODW's declaratory judgment claim discussed above also proves dispositive here. This Court agrees. The enforceable TSA and the Release bar Karmaloop from now asserting its breach of contract claim as a matter of law, which entitles ODW to summary judgment.

### 4. Breach of Implied Covenant of Good Faith and Fair Dealing

In Case No. 2:13-cv-270, Karmaloop asserts a claim for breach of implied covenant of good faith and fair dealing. ODW seeks summary judgment on this claim. In response, Karmaloop states in in memorandum in opposition that it "agrees to refrain from pursuing a separate cause of action for breach of the covenant of good faith and fair dealing." (ECF No. 48, at Page ID # 373 n.1 and Page ID # 378 n.34.) Based on this concession, the Court also enters summary judgment on behalf of ODW on the abandoned claim for breach of implied covenant of good faith and fair dealing.

### III. Conclusion

The Court **GRANTS IN PART** and **DENIES IN PART** ODW's motion for partial summary judgment. (ECF No. 42.) [*19] Karmaloop's second counterclaim for conversion and third counterclaim in Case No. 2:12-cv-996, asserting a violation of M.G.L. c. 93A, remain pending.

**IT IS SO ORDERED.**

/s/ Gregory L. Frost

GREGORY L. FROST

2014 U.S. Dist. LEXIS 9615. *19

UNITED STATES DISTRICT JUDGE

David Sporar

(A) Neutral

As of: June 12, 2015 4:59 PM EDT

## *Medpace, Inc. v. Biothera, Inc.*

United States District Court for the Southern District of Ohio, Western Division

April 4, 2013, Decided; April 4, 2013, Filed

Case No. 1:12-cv-179

**Reporter**

2013 U.S. Dist. LEXIS 48817; 2013 WL 1386298

**Prior History:** *Medpace, Inc. v. Biothera, Inc., 2013 U.S. Dist. LEXIS 28995 (S.D. Ohio, Mar. 4, 2013)*

## Core Terms

damages, conversion, conversion claim, economic loss doctrine, Services, parties', bailment, partial summary judgment, termination, breach of contract, tort claim, contractual, obligations, clinical, bailee, breach of contract claim, refuse to return, responsibilities, documents, materials, provides, replevin, argues, bailed, duties

**Counsel:** [*1] For Medpace, Inc., Plaintiff, Counter Defendant: Heather MacGregor Hawkins, LEAD ATTORNEY, Anthony Joseph Hornbach, Thompson, Hine LLP, Cincinnati, OH.

For Biothera, Inc., Biopolymer Engineering, Inc., doing business as, Biothera, Defendants: Erin Leigh Hoffman, LEAD ATTORNEY, Faegre Baker Daniels LLP, Minneapolis, MN; Jeffrey P Justman, Michael F Cockson, Tyler A Young, PRO HAC VICE, Faegre Baker Daniels LLP, Minneapolis, MN.

For Biopolymer Engineering, Inc., Biothera, Inc., Counter Claimants: Erin Leigh Hoffman, LEAD ATTORNEY, Faegre Baker Daniels LLP, Minneapolis, MN; Jeffrey P Justman, Michael F Cockson, Tyler A Young, PRO HAC VICE, Faegre Baker Daniels LLP, Minneapolis, MN.

**Judges:** Timothy S. Black, United States District Judge.

**Opinion by:** Timothy S. Black

## Opinion

ORDER: (1) GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT **(Doc. 42)**; and (2) DENYING PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT **(Doc. 46)**

This civil action is before the Court on: (1) Biothera's motion for partial summary judgment (Doc. 42) and the parties' responsive memoranda[1] (Docs. 43, 44); and (2) Medpace's cross-motion for partial summary judgment (Doc. 46), and the parties' responsive memoranda (Docs 49, 52).

### I. BACKGROUND FACTS

Biothera[2] maintains that it owns, and has always owned, all case report forms, study files, and other data related to the clinical trials of its cancer drug, Imprime PGG® ("Imprime").

In 2009, Biothera hired Medpace[3] to manage the clinical trials of Imprime. However, Medpace allegedly failed [*3] to live up to its contractual obligations, and in February 2012, Biothera terminated its Master Services Agreement ("MSA") with Medpace and assumed direct responsibility for managing the trials. After terminating the MSA, Biothera

---

[1] Medpace seeks [*2] oral argument on Defendant's motion for partial summary judgment. (Doc. 43). *Local Rule 7.1(b)(2)* provides for oral argument where it "is deemed to be essential to the fair resolution of the case because of its public importance or the complexity of the factual or legal issues presented." Here, the Court finds that the pleadings are clear on their face, and that oral argument is not necessary. *See Whitescarver v. Sabin Robbins Paper Co., Case No. C-1-03-911, 2006 U.S. Dist. LEXIS 51524, at *7 (S.D. Ohio July 27, 2006)* (C.J. Dlott) ("*Local Rule 7.1(b)(2)* leaves the Court with discretion whether to grant a request for oral argument.").

[2] Biothera is a privately held biotechnology company in the business of developing and obtaining regulatory approval for the marketing and sale of pharmaceutical products, biological products, and medical devices. (Doc. 5 at ¶ 2; Doc. 34, Ex. 3 at 16-17).

[3] Medpace is an Ohio corporation and full service global contract research organization that provides services relating to the design and execution of clinical development programs involving drugs, biologics, and medical devices. (Doc. 41, Ex. B at ¶ 3).

2013 U.S. Dist. LEXIS 48817, *4

asked Medpace — and Medpace refused — to turn over all documents and data related to the Imprime trials (hereinafter the "Trial Property").

On November 6, 2012, this Court granted Biothera's motion for preliminary injunction and ordered Medpace to return the Trial Property. (Doc. 36). Biothera now moves for partial summary judgment on its conversion counterclaim. Medpace filed a cross-motion for partial summary judgment on the same conversion claim.

## II. UNDISPUTED FACTS[4]

1. On or about April 29, 2009, Biothera and Medpace entered into a Master Services Agreement ("MSA"). (Doc. 42, Ex. 3 at ¶ 2; Attach. A).

2. Biothera, as sponsor, hired Medpace to provide clinical trial services (the "Services"). (Doc. 42, Ex. [*4] 3 at ¶ 2; Attach. A).

3. Following the execution of the MSA, Biothera and Medpace entered into a Series of Task Orders and Task Order Amendments and a Consulting Agreement, which set forth the parties' responsibilities with respect to performance of the Services and payment for the Services. (Doc. 43, Ex. B at ¶ 4).[5]

4. Medpace and Biothera entered into four Task Orders numbered PGG821 (BT-CLPGG-CRC0821). PGG1AVA (BT-CL-PGG-LCA0821). PGG2ERB (BT-CL-LCA0822). BTCRC31 (BT-CL-PGG-CRC1031). (Doc. 6 at ¶ 7).

5. On February 29, 2012, Biothera provided written notice to Medpace that, pursuant to Section 6 of the MSA, it was terminating the MSA. (Doc. 42, Ex. 3 at ¶ 7; Attach. D).

6. On March 9, 2012, Biothera requested in writing that Medpace comply with its obligations under the MSA to return certain materials and information constituting "Clinical Materials" and "Trial Property" (collectively,

the "Trial Property") to Biothera. (Doc. 42, Ex. 3 at ¶ 8; Attach. E).[6]

7. On March 16, 2012, Biothera made a second written request for the return of the Trial Property. (Doc. 42, Ex. 3 at ¶ 9; Attach. F).

8. On September 10, 2012, Biothera sent Medpace a letter requesting to meet and confer regarding [*5] Medpace's obligation to return the Trial Property. (Doc. 42, Ex. 3 at ¶ 11; Attach. G).

9. On September 12, 2012, counsel for Medpace sent a letter refusing to return the Trial Property to Biothera. (Doc. 42, Ex. 3 at ¶ 12; Attach. H).[7]

## III. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to [*6] the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex, 477 U.S. at 323*. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*.

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson, 477 U.S. at 248 (1986)*.

## IV. ANALYSIS

### A. Conversion

---

[4]   See Doc. 42, Ex. 2; Doc. 43, Ex. 1; Doc. 46, Ex. 2; and Doc. 50.

[5]   Biothera admits that the MSA, Task Orders, Task Order Amendments, and a Consulting Agreement are among the documents that set forth the parties' responsibilities. Biothera denies that these documents are the exclusive source of the parties' responsibilities with respect to each other.

[6]   While Medpace admits that counsel for Biothera sent the March 9, 2012 letter, Medpace denies that it had any obligations under the MSA to return the trial data to Biothera. (Doc. 49, Ex. 1).

[7]   Medpace admits that it sent the September 12, 2012 letter, but denies that the letter "refus[ed] to return the trial property to Biothera," as the letter clearly states that "[a]s we have repeatedly told Biothera, Medpace is more than willing to turn over this trial data as soon as Biothera pays for it." (Doc. 49, Ex. 1).

2013 U.S. Dist. LEXIS 48817, *6

To prevail on a claim for conversion under Ohio law, Biothera must prove: "(1) that it owned or had the right to control the property at the time of conversion, (2) the [opposing party's] wrongful act or disposition of [Biothera's] property rights, and (3) damages." *Pelmar USA, LLC, v. Mach. Exch. Corp., 2012 Ohio 3787, 976 N.E.2d 282, 286 (Ohio App. Aug. 22, 2012).* [*7] Because Medpace came into possession of the property lawfully, Biothera must also establish that it demanded return of the property and that Medpace refused to deliver it. *Alexander v. Motorists Mut. Ins., Co., No. C-110836, 2012 Ohio 3911, 2012 Ohio App. LEXIS 3454, at *3 (Ohio App. Aug. 29, 2012).*

*First*, pursuant to Section 9.1 of the MSA, Biothera maintains that it owns and has the right to possess the Trial Property:

> [a]ll materials, documents, data, software and information of every kind and description supplied to MEDPACE by [Biothera] or any of [Biothera's] clients, or prepared, developed, or generated by MEDPACE pursuant to this Agreement (except for the pre-existing Medpace procedural manuals, personal data, methods, procedures, and policies) are and shall be the sole and exclusive property of [Biothera].

*Second*, Medpace refused to return the Trial Property, despite Biothera's requests.

*Third*, Biothera maintains that Medpace's refusal to return the Trial Property has caused and continues to cause Biothera significant damages, including fees and costs paid to recreate the Trial Property.

Medpace disputes the first and third elements.

**B. Ownership of the Trial Property**

Medpace maintains that Section 6.4 of the MSA,[8] [*8] which governs Biothera's payment obligations for cancelled Task Orders, justifies Medpace's refusal to turn over the Trial Property.

However, even if Biothera breached Section 6.4 by failing to pay Medpace amounts due, the MSA still requires Medpace to turn over the Trial Property. Medpace can and did bring a claim against Biothera for breach of contract, which will be resolved by this litigation. However, the MSA does [*9] not permit Medpace to withhold Biothera's property. The MSA unambiguously provides that, even in the event of Biothera's breach, "MEDPACE shall transfer to [Biothera] all case report forms, study files, and other data and information in any and all forms available, including electronic format and computer files and programs, in MEDPACE's possession." MSA § 6.3.

Therefore, the Court finds that Biothera owns and has a right to possess the Trial Property and that Medpace was obligated to return its Trial Property upon request.

**C. Duty of Care**

Medpace's conduct violated its common law duty as bailee of Biothera's property. *Grand Leasing & Rental v. Cooley, No. 69983, 1996 Ohio App. LEXIS 3656, at *2 (Ohio App. Aug. 29, 1996)* ("A mutual benefit bailment gives rise to common-law duties to exercise ordinary care in protecting and keeping safe bailed goods, and to redeliver the subject of the bailment."). The MSA created a bailment relationship between the parties and Medpace, as a bailee, violated an independent, common-law duty by failing to return the bailed property upon the bailor's request. *Grand Leasing & Rental, 1996 Ohio App. LEXIS 3656 at 2* ("A mutual benefit bailment gives rise to [*10] common-law duties to exercise ordinary care in protecting and keeping safe bailed goods, and to redeliver the subject of the bailment."). When a bailor demands and a bailee refuses to return the bailed property, a cause of action in tort accrues in favor of the bailor. 8 Ohio Jur. 3d Bailments § 20 (2012).[9]

Here, the MSA and Task Orders provided that Biothera, on a continuing basis, would deliver to Medpace — either directly or through its study sites or other third-party agents — documents and other materials (i.e., personal property) related to the Imprime trials, and Medpace would safeguard, organize, and otherwise improve those materials. The MSA

---

[8]  "In the event of any termination of a Task Order before completion, SPONSOR agrees to pay MEDPACE for all Services rendered pursuant to the unfinished Task Order prior to such termination and any non-cancelable expenses incurred in connection with MEDPACE's performance of Services thereunder. As soon as reasonably practicable following receipt of a termination notice, MEDPACE shall submit an itemized accounting of Services performed, expenses incurred pursuant to performance of the Services, non-cancelable expenses incurred by MEDPACE relating to an unfinished Task Order, and payments received in order to determine a balance to be paid by either Party to the other. Such balance shall be paid within 30 days of receipt of such an itemized accounting by SPONSOR." MSA § 6.4.

[9]  Medpace argues that this is a new theory and therefore cannot be plead. However, the Court determines that although not captioned as "breach of bailment," Biothera's claim for "Breach of Contract (Specific Performance)" functionally pleads a claim for breach of bailment.

2013 U.S. Dist. LEXIS 48817, *10

also required Medpace to return the Trial Property to Biothera upon termination of the MSA. MSA §§ 6.2-6.3. Therefore, Medpace became a bailee of Biothera's property pursuant to the MSA. The MSA was not a contract for the sale of goods and did not confer title of the Trial [*11] Property on Biothera. Instead, the MSA simply acknowledged that the Trial Property provided to (and even to the extent improved by) Medpace was and would always remain the exclusive property of Biothera. Biothera would own the Trial Property even absent the MSA. The existence of a contractual duty does not immunize tortious conduct, if the conduct also violates a separate legal duty. *Battista v. Lebanon Trotting Ass'n, 538 F.2d 111, 117 (6th Cir. 1976)* (applying Ohio law).

As a bailee, Medpace had a duty to return the bailed property upon demand, but it refused. By breaching this duty, Medpace became liable to Biothera in tort. *Tomas v. Nationwide Mut. Ins. Co., 79 Ohio App. 3d 624, 607 N.E.2d 944, 947 (Ohio App. 1992)*. "Where a bailor has proven a bailment and a subsequent refusal of the bailee to return the goods on demand, a *prima facie* case of conversion has been created." *Welch v. Smith, 129 Ohio App. 3d 224, 717 N.E.2d 741, 744 (Ohio Ct. App. 1998)*.[10]

**D. The Conversion Claim is Distinct From [*12] the Contract Claim**

Medpace argues that Biothera cannot recast its breach of contract claim (breach of the MSA) as a tort claim (conversion).

Under Ohio law, "the existence of a contract action...[generally] excludes the opportunity to present the same case as a tort case...A tort action will lie only if a party breaches a duty separate and distinct from the duties that arise under the contract." *Ruggles v. Bulkmatic Transp. Co., No. C2-03-617, 2004 U.S. Dist. LEXIS 30588, at *22 (S.D. Ohio June 23, 2004)* (finding that plaintiff's fraud and

negligent misrepresentation claims failed as a matter of law because the duties in question arose under the parties' contract and there were no tort damages that were distinct from the breach of contract damages). Additionally, to recover under a tort theory, "Ohio law requires that the alleged tort damage must be in addition to the alleged damage resulting from the breach of contract." *Id. at *26-27*.

Ohio courts have explicitly and repeatedly applied the rule against double recovery for both breach of contract and for intertwined tort claims to bar conversion claims altogether. *See, e.g., Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc., 437 F. App'x 381, 385 (6th Cir. 2011)* [*13] (affirming the district court's dismissal of the conversion claim and holding that because "the conversion claim is based on the same actions as the contract claim" that the "conversion claim is therefore duplicative of the breach of contract claim and is not permitted under Ohio law.").[11]

Medpace further contends that Biothera's conversion claim is precluded by a separate doctrine barring "intertwined claims" based on this Court's decision in *ITS Fin., LLC v. Advent Fin. Servs., LLC, 823 F. Supp. 2d 772, 781-82 (S.D. Ohio 2011)*. However, Medpace's argument is misplaced. After observing that the economic loss doctrine is traditionally limited to negligence claims, the Court held in *ITS Fin.* that the economic loss doctrine did not bar the fraud claim, because it sought damages distinct from those caused by the breach of [*14] contract. *Id. at 783*.[12] This concept is a core principle of the economic loss doctrine. (*See infra*, Section IV.E). In fact, even the cases Medpace cites acknowledge that this requirement is founded in the economic loss doctrine.[13]

However, "[c]onversion is essentially a tort action[, but] it may arise out of violation of contractual obligations." *Marshall v. Neff, 27 Ohio N.P. (n.s.) 125, 1928 Ohio Misc. LEXIS 1161, *2 (Ohio Mun. Feb. 23, 1928)*. A party's

---

[10]  *See also Foliano v. Dussault Moving, Inc., No. 82562, 2003 Ohio 4408, 2003 Ohio App. LEXIS 3919, at *5 (Ohio App. Aug. 21, 2003)* ("[A] conversion claim, if proven, renders the limitation of liability clause [in a bailment contract] ineffective.").

[11]  *See also Nat'l Strategies, LLC, v. Naphcare, No. 5:10cv974, 2011 U.S. Dist. LEXIS 85841, at 847-48 (N.D. Ohio Aug. 4, 2011)* (granting summary judgment for defendant on plaintiff's conversion claim because "Plaintiff has not advanced evidence on the record from which a reasonable jury could find a conversion claim independent of Plaintiff's breach of contract claim.").

[12]  Moreover, all of the cases cited in *ITS Fin.* regarding factual intertwinement dealt with the specific issue of whether a contract-related fraud claim can be brought together with a breach-of-contract claim, which are not the facts in the instant case.

[13]  *See, e.g., Ebenisterie Beaubois Ltee v. Marous Bros. Constr., Inc., No. 02cv985, 2002 U.S. Dist. LEXIS 26625, at *30 (N.D. Ohio Oct. 17, 2002)* ("Where no independent duty is alleged, the economic loss doctrine prevents a plaintiff from recovering in tort where the only damages alleged are direct or indirect losses arising from the breach of contract...Thus, to sustain a [tort] claim, the plaintiff must allege damages, in addition to those alleged for breach of contract, caused by the alleged [tort].").

Case: 1:08-cv-02755-DCN  Doc #: 341-1  Filed:  06/12/15  12 of 70.  PageID #: 17375

Page 5 of 6
2013 U.S. Dist. LEXIS 48817, *17

intentional [*15] conduct is not sheltered from tort liability simply because it also violates a separate contractual obligation. The existence of a contractual duty does not immunize tortious conduct if the conduct also violates a separate legal duty, as in the instant case.

Here, Biothera's conversion claim is not duplicative of its breach of contract claim and is therefore properly alleged.[14] (*See supra*, Section IV.C.&D.).

## E. Economic Loss Doctrine

Medpace also argues that the conversion claim is barred by the economic loss doctrine.

The economic loss doctrine serves an important purpose: parties should not be permitted to transform a claim of contractual non-performance into a tort claim. *Floor Craft Floor Covering, Inc. v. Parma Cmty. Gen. Hosp. Ass'n, 54 Ohio St. 3d 1, 560 N.E.2d 206, 211 (Ohio 1990)* (observing that negligence law "is not designed...to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement"). However, the [*16] economic loss doctrine does not bar Biothera's conversion claim because the doctrine does not apply to intentional torts. *Eysoldt v. Proscan Imaging, 194 Ohio App. 3d 630, 2011 Ohio 2359, 957 N.E.2d 780, 784-85 (Ohio App. 2011)* (holding that the economic loss doctrine did not bar intentional torts, including conversion). *See also Garry v. C.P., 2012 Ohio 2640, 972 N.E.2d 154, 157-58 (Ohio App. 2012)* (noting that conversion is an intentional tort).

Accordingly, the economic loss doctrine is inapplicable to the instant case.

## F. Damages[15]

Biothera seeks to recover the direct and indirect damages caused as a result of Medpace's nine-month-long refusal to return the Trial Property, including costs incurred, where possible, to recreate portions of the Trial Property. Biothera claims that it incurred costs and fees to recreate portions of the Trial property from third-party sources. (Doc. 42,

[*17] Ex. 3 at ¶ 18). In fact, Biothera maintains that it has incurred invoices from these vendors of approximately $3 million. (Doc. 49, Ex. 1 at ¶ 3).

Medpace argues that consequential damages are not available on a conversion claim. However, the case Medpace cites to support this proposition, *McCaughey v. Garlyn Shelton, Inc., Nos. 1:02cv732, 1:02cv767, 2008 U.S. Dist. LEXIS 2609, at *23 (S.D. Ohio Jan. 14, 2008)*, was explicitly predicated on the fact that the plaintiff "has not demonstrated that Ohio case law...would permit additional consequential damages." *Id.* That is not the case here. *See, R&S Distrib., Inc., v. Hartge Smith Nonwovens, LLC, No. C-090100, 2010 Ohio 3992, 2010 Ohio App. LEXIS 3414, at 8 (Ohio App. Aug. 27, 2010)* (holding that conversion damages can include the loss of capital investment or income caused by the conversion).

Medpace's argument focuses on the technical distinction between replevin and conversion. (Doc. 43 at 10). However, both intentional torts address the wrongful detention of personal property. They differ only in terms of the primary remedy provided: replevin provides for the return of wrongfully detained property, while conversion provides damages in lieu of the property. [*18] 18 Ohio Jur. 3d Conversion & Replevin § 48. Both replevin and conversion allow for other direct and consequential damages caused by the wrongful detention. *See, e.g., R&S Distrib., 2010 Ohio 3992, 2010 Ohio App. LEXIS 3414 at 7* (holding that conversion damages can include the loss of capital investment or income caused by the conversion); *Ace Vending Co. v. Davidson, 8 Ohio App. 3d 328, 8 Ohio B. 438, 457 N.E.2d 341, 343 (Ohio App. 1982)* (observing that damages for lost profits in a replevin action are available if shown with reasonable certainty).

Medpace also suggests that Biothera has not demonstrated that it needed to recreate, where possible, the Trial Property. (Doc. 46 at 5-16).[16] The Court disagrees as the undisputed facts evidence that Biothera required the clinical trial records both to attract potential acquirers and, eventually, obtain regulatory approval of Imprime. (*See* Doc. 36; Doc.

---

[14]   Medpace argues that *Wright v. Bank of America, No. 12-13663, 2013 U.S. App. LEXIS 3301 (6th Cir. 2013)*, is instructive in this matter. But *Wright* simply reaffirmed that a party cannot assert a tort claim which is duplicative of a breach of contract claim.

[15]   For purposes of the motion for summary judgment, it is sufficient for Biothera to establish the existence of some damages, the precise amount of which to be proven at trial. In contrast, for Medpace to prevail on its motion, it would need to establish as a matter of law that Biothera is entitled to no damages, a finding the law does not countenance here.

[16]   While the measure of damages in a conversion case is usually the market-value of the goods at the time of conversion, "the owner must be compensated for the loss sustained by reason of the wrongful conversion of his property." *Rogers v. Standard Steel Castings Co., 16 Ohio App. 474, 480 (Ohio App. June 24, 1922)*.

2013 U.S. Dist. LEXIS 48817, *18

34, Ex. 2 at ¶ 11) ("CROs ordinarily work on behalf of the development-stage pharmaceutical companies to create data that is the property of the development-stage company from the moment of its creation, regardless of the timing of payments ... Furthermore it is well understood that the data is to be provided immediately to the development-stage [*19] pharmaceutical companies when the study has terminated for any reason. This is to ensure protection of the subjects and to enable additional studies. Obtaining the date on termination of the study for any reason is critical because of the need to continue with additional studies and to prepare the FDA submission for product approval.").

While there are disputed issues of fact as to the precise amount of damages incurred as a result of the conversion, there is no support for a finding that Biothera's damages are speculative. *Cf. Ace Hardware Corp. v. Marn, Inc., No. 06cv5335, 2008 U.S. Dist. LEXIS 84709, at *18 (N.D. Ill. Sept. 16, 2008)* ("The problem is not that the damages are 'undetermined,' but rather that Defendants have failed to provide tangible evidence that they suffered any damages 'to a reasonable degree of certainty'...").

Accordingly, the Court finds that Biothera: [*20] (1) owned or had the right to control the Trial Property at the time of conversion; and (2) Medpace's wrongful act or disposition of Biothera's property rights; (3) resulted in damages. Therefore, Biothera prevails as a matter of law on its counterclaim for conversion.

## V. CONCLUSION

Accordingly, for the foregoing reasons, Biothera's motion for partial summary judgment (Doc. 42) is **GRANTED** and Medpace's cross-motion for partial summary judgment (Doc. 46) is **DENIED**.

**IT IS SO ORDERED.**

Date: 4/4/13

*/s/ Timothy S. Black*

Timothy S. Black

United States District Judge

◆ Positive

As of: June 12, 2015 4:59 PM EDT

## Pride of the Hills MFG, Inc v. Resources-Appalachia, LLC

United States District Court for the Northern District of Ohio, Eastern Division

May 27, 2011, Decided; May 27, 2011, Filed

CASE NO. 5:09CV02764

**Reporter**

2011 U.S. Dist. LEXIS 59794; 2011 WL 2116455

PRIDE OF THE HILLS MFG. INC. et al., Plaintiffs, v. RANGE RESOURCES-APPALACHIA, LLC., Defendant.

**Prior History:** *Pride of the Hills Mfg. v. Range Resources-Appalachia, LLC, 2011 U.S. Dist. LEXIS 44905 (N.D. Ohio, Apr. 26, 2011)*

## Core Terms

Heaters, Separators, welds, summary judgment, services, counterclaims, inspected, damages, repair, genuine issue of material fact, partial summary judgment, warranty, argues, matter of law, raw material, manufacture, non-moving, defects, design and manufacture, parties, welders, breach of implied warranty, economic loss rule, particular purpose, summary judgment motion, civil conspiracy, alleged defect, economic loss, Merchantability, representations

## Case Summary

### Overview

The economic loss rule did not bar defendant's counterclaims for civil conspiracy and fraud in the inducement because that rule prohibited recovery in negligence of purely economic loss, not recovery for intentional torts. Under Ohio law, both civil conspiracy and fraud in the inducement were intentional torts. Thus, plaintiffs were not entitled to summary judgment on these counterclaims, as the economic loss rule did not preclude recovery as a matter of law.

### Outcome

Plaintiffs' motion for partial summary judgment denied. Defendant's motion for summary judgment granted in part.

## LexisNexis® Headnotes

Civil Procedure > Pleading & Practice > Pleadings > General Overview

*HN1* See Ohio R. Civ. P. 10(D)(1).

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

*HN2* Defending parties may move for summary judgment as well.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Legal Entitlement

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

*HN3* *Fed. R. Civ. P. 56(c)* governs summary judgment motions, and provides in part that judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Civil Procedure > ... > Summary Judgment > Supporting Materials > Affidavits

*HN4* *Fed. R. Civ. P. 56(e)* specifies the materials properly submitted in connection with a motion for summary judgment. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. A court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the

2011 U.S. Dist. LEXIS 59794, *59794

adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

> Civil Procedure > ... > Summary Judgment > Evidentiary Considerations > Absence of Essential Element

> Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

> Civil Procedure > ... > Summary Judgment > Supporting Materials > Affidavits

*HN5* On a motion for summary judgment, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.

> Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

> Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

*HN6* Upon review of a motion for summary judgment, a court must view the evidence in light most favorable to the non-moving party to determine whether a genuine issue of material facts exists.

> Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

> Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

*HN7* A fact is "material" only if its resolution will affect the outcome of the lawsuit. Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases, a court must decide whether reasonable jurors could find by a preponderance of the evidence that the non-moving party is entitled to a verdict.

> Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

> Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

*HN8* Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's

case and on which that party will bear the burden of proof at trial.

> Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > Cross Motions

> Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

*HN9* Cross-motions for summary judgment are examined under the usual *Fed. R. Civ. P. 56* standards. Each cross-motion must be evaluated on its own merits, with the court viewing all facts and reasonable inferences in the light most favorable to the nonmoving party.

> Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

> Civil Procedure > ... > Summary Judgment > Evidentiary Considerations > Scintilla Rule

*HN10* On a motion for summary judgment, a trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact. The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts.

> Torts > ... > Compensatory Damages > Types of Losses > Economic Losses

*HN11* Under Ohio law, the economic-loss rule generally prevents recovery in tort of damages for purely economic loss. The economic-loss rule applies in a tort action only when economic loss is unaccompanied by personal injury or property damage.

> Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > General Overview

*HN13* *Ohio Rev. Code Ann. § 1302.01(A)(8)* specifies in part that "goods" means all things (including specially manufactured goods) which are movable at the time of identification to a contract for sale other than the money in which the price is to be paid, investment securities, and things in action.

> Commercial Law (UCC) > ... > Contract Provisions > Warranties > Implied Warranty of Fitness

> Commercial Law (UCC) > ... > Contract Provisions > Warranties > Implied Warranty of Merchantability

2011 U.S. Dist. LEXIS 59794, *59794

*HN12* *Ohio Rev. Code Ann. § 1302.27(A)* specifies in part that a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Similarly, *Ohio Rev. Code Ann. § 1302.28* specifies in part that where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is an implied warranty that the goods shall be fit for such purpose.

Civil Procedure > Pleading & Practice > Pleadings > General Overview

*HN14* *Fed. R. Civ. P. 8(e)* requires the courts to construe pleadings liberally.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Legal Entitlement

*HN15* A court must deny a motion for summary judgment when the moving party is not entitled to a judgment as a matter of law.

Torts > ... > Compensatory Damages > Types of Losses > Economic Losses

*HN16* The economic loss rule prevents recovery in negligence of purely economic loss, not recovery under an intentional tort theory for economic loss.

Torts > Intentional Torts > General Overview

Torts > ... > Concerted Action > Civil Conspiracy > General Overview

*HN17* According to Ohio law, civil conspiracy is an intentional tort. The malice involved in the tort of civil conspiracy is that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another.

Torts > ... > Fraud & Misrepresentation > Constructive Fraud > Elements

Torts > Intentional Torts > General Overview

*HN18* Fraud in the inducement is an intentional tort under Ohio law.

Torts > ... > Fraud & Misrepresentation > Actual Fraud > Elements

Torts > ... > Fraud & Misrepresentation > Negligent Misrepresentation > Elements

*HN19* Under Ohio law, the elements of fraud are: (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance. Negligent misrepresentation requires the same essential elements of fraud, except that the defendant need not know that the statement in question is false.

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

*HN21* Evidence, not contentions, avoids summary judgment.

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

*HN20* Upon viewing the facts in the light most favorable to a nonmoving party, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

*HN22* A fact is "material" for purposes of a motion for summary judgment if it might affect the outcome of a case.

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Civil Procedure > ... > Summary Judgment > Supporting Materials > Affidavits

*HN23* To be considered on a motion for summary judgment, an affidavit must be: sworn; based upon personal knowledge; state specific facts admissible in evidence at the time of trial; and, offered by a competent affiant. Personal knowledge may include reasonable inferences and opinions provided that all inferences and opinions are premised on first-hand observations or personal experience.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

2011 U.S. Dist. LEXIS 59794, *59794

*HN24* A "genuine issue" exists when a rational factfinder, considering the evidence in the summary judgment record, could find in favor of the non-moving party.

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Need for Trial

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

*HN25* Evaluating credibility, weighing evidence, and drawing factual inferences are all functions reserved for the jury. A court will not weigh the credibility of witnesses or other evidence in ruling on a motion for summary judgment.

Contracts Law > ... > Readjustments > Statute of Frauds > General Overview

*HN26* The Ohio Statute of Frauds, *Ohio Rev. Code Ann. § 1302.04(A)*, specifies that except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this division beyond the quantity of goods shown in such writing.

Contracts Law > ... > Readjustments > Statute of Frauds > Exceptions

*HN27* See *Ohio Rev. Code Ann. § 1302.04(C)*.

Civil Procedure > ... > Summary Judgment > Evidentiary Considerations > Absence of Essential Element

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

*HN28* A party moving for summary judgment is not required to disprove the opponent's claims or defenses. The

moving party's burden is often satisfied by pointing out for the court an absence of evidence in support of the non-moving party's claims or defenses. The burden of going forward shifts to the non-moving party to show that a genuine issue of material fact remains for the factfinder to resolve.

**Counsel:** [*1] For Pride of the Hills Manufacturing, Inc., Plaintiff, Counter-Defendant: J. Douglas Drushal, John H. Schaeffer, Critchfield, Critchfield & Johnston, Wooster, OH.

For Grace Automation Services, Inc., an Ohio corporations with its principal place of business in Ohio, Plaintiff: Mark M. Turner, LEAD ATTORNEY, Gallagher Sharp - Cleveland, Cleveland, OH; Thomas J. Cabral, LEAD ATTORNEY, Gallagher, Sharp, Fulton & Norman, Cleveland, OH; J. Douglas Drushal, John H. Schaeffer, Critchfield, Critchfield & Johnston, Wooster, OH.

For Range Resources - Appalachia, LLC, Delaware corporation with its principal place of business in a state other than Ohio, Defendant, Counter-Claimant: Jason L. Richey, William D. Wickard, K&L Gates - Pittsburgh, Pittsburgh, PA; Jeremy A. Mercer, Fulbright & Jaworski - Canonsburg, Canonsburg, PA.

For Grace Automation Services, Inc., an Ohio corporations with its principal , place of business in Ohio, Counter-Defendant: Mark M. Turner, LEAD ATTORNEY, Gallagher Sharp - Cleveland, Cleveland, OH; J. Douglas Drushal, John H. Schaeffer, Critchfield, Critchfield & Johnston, Wooster, OH; Thomas J. Cabral, Gallagher, Sharp, Fulton & Norman, Cleveland, OH.

**Judges:** Benita Y. Pearson, United [*2] States District Judge.

**Opinion by:** Benita Y. Pearson

# Opinion

## MEMORANDUM OF OPINION AND ORDER
**(Resolving ECF Nos. 34, 35, & 37)**
### Table of Contents

I. Introduction
II. Background
A. Factual History
B. Procedural History
III. Discussion
A. Plaintiffs' Motions for Partial Summary Judgment

2011 U.S. Dist. LEXIS 59794, *2

1. Counts III, IV, VIII, and X Are Not Barred by the Economic Loss
a. Counts III and IV: Breach of Implied Warranty of Merchantability and Breach of Implied Warranty of Fitness for a Particular Purpose

b. Counts VIII and X: Fraud/Fraud in the Inducement and Civil Conspiracy
2. Counts VII and IX Present Genuine Issues of Material Fact
a. Plaintiffs' Alleged Representations Are Materially at Issue
b. Plaintiffs' Alleged Inspection Is Genuinely at Issue
3. Damages for Defects as to Counts I, II, III, IV, and VI Present Genuine Issues of Material Facts
B. Range's Motion for Partial Summary Judgment
1. Counts II, III, and IV Probe into Whether the Equipment Is Defective, a Function Reserved for the Jury
2. Plaintiffs' Repair Cost Claim Belongs to a Jury
3. Range is Entitled to Summary Judgment As To Plaintiffs' Claim for Cost of Raw Materials
C. Plaintiff Grace Automation Services' Motion for Partial Summary Judgment
IV. Conclusion
APPENDIX

I. Introduction

Plaintiffs [*3] Pride of the Hills Mfg., Inc. and Grace Automation Services, Inc. (collectively "Plaintiffs") filed the present action against Defendant Range Resources-Appalachia, LLC ("Range"), claiming breach of contract, statement of account, and unjust enrichment. ECF No. 1 at 5-10. Range filed an Answer and Counterclaim alleging ten counterclaims, discussed below. ECF No. 5 at 21-32.

Before the Court are cross-motions for summary judgment. Pursuant to *Fed. R. Civ. P. 56(c)*, Plaintiffs seek partial summary judgment on Range's counterclaims; Range seeks partial summary judgment on its own counterclaims; and Plaintiff Grace Automation Services, Inc. seeks partial summary judgment on Range's counterclaims. ECF Nos. 34, 35, and 37.

For the reasons that follow, the Court denies Plaintiffs' Motions for Partial Summary Judgment (ECF Nos. 34 and 37); and grants, in part, Range's Motion for Summary Judgment—barring Plaintiffs from recovering costs of raw materials based on Defendant's alleged oral promise to purchase additional Line Heaters and Separators, pursuant to *Ohio Revised Code § 1302.04* (ECF No. 35).

In accordance with *Fed.R.Civ.P 56(g)*, attached at Appendix A, are material facts not genuinely in [*4] dispute.

II. Background

Plaintiffs are related companies that design and manufacture gas production equipment. ECF Nos. 5 at 10, ¶ 70; 8 at 2, ¶ 7. Range is an independent oil and gas company engaged in the exploration, development, and operation of oil and gas wells throughout the country, including Marcellus Shale wells in the Appalachian basin region. ECF No. 5 at 10, ¶ 67.

A. Factual History

For several years, Plaintiffs have sold and delivered certain goods and provided certain services to Range. ECF Nos. 1-1 at 5, 8; 5 at 12, ¶ 82; 8 at 3, ¶ 14. Specifically, Plaintiff Pride of the Hills "had a long standing business arrangement in which Pride of the Hills agreed to sell and deliver certain goods and provide certain services" to Range, and Plaintiff Grace Automation "entered into an arrangement to sell and deliver certain goods and provide certain services." ECF Nos. 1-1 at 5, 8. Range began using new high volume production techniques to produce gas when its Marcellus Shale operation started to rapidly grow. [1] ECF Nos. 5 at 12, ¶ 83; 8 at 3, ¶ 14.

Plaintiff Grace Automation Services Inc. entered into a Master Service Agreement ("MSA") with Defendant Range Resources-Appalachia, LLC in 2008 to manufacture high capacity Line Heaters and Separators using high volume

---

[1] High volume completion and production techniques are highly technical in nature and requires high quality equipment. ECF Nos. 5 at 12, [*5] ¶ 84; 8 at 3, ¶ 14. For example, Range explained:

Case: 1:08-cv-02755-DCN  Doc #: 341-1  Filed: 06/12/15  19 of 70.  PageID #: 17382

Page 6 of 16
2011 U.S. Dist. LEXIS 59794, *4

production techniques. [2] ECF Nos. 5 at 11, ¶¶ 78, 88; 8 at 2-3, ¶¶ 8-14. Notably, even though Pride of the Hills is not a signator to the MSA, the MSA plainly states "GRACE AUTOMATION SERVICES, INC., AND ITS SUBSIDIARIES AND AFFILIATES," implying that Pride of the Hills—an affiliate of Grace—is bound by the MSA. ECF Nos. 5-1 at 2; 37-1 at 14, fn. 11; 41 at 20.

Range informed Plaintiffs that the Line Heaters and Separators would be critical to Range's operations, and provided Plaintiffs with confidential information so that Plaintiffs could design and manufacture Line Heaters and Separators. ECF Nos. 5 at 11, ¶¶ 89-90; 8 at 3, ¶ 14. Plaintiffs understood Range's desire to purchase such equipment that would operate safely, efficiently, and continuously for a long period of time without failure. ECF Nos. 5 at 11, ¶ 91; 8 at 3, ¶ 14.

In Plaintiffs' Reply to Range's Counterclaim, Plaintiffs admit that they: "represented, among other things, that they were experts in the design and manufacture of this type of equipment and that they could design and manufacture the Line Heaters and Separators that Range needed for Range's particular Wells" (ECF Nos. 5 at 11, ¶ 93; 8 at 3, ¶ 14); "represented to Range that they could design and manufacture Line Heaters and Separators which would allow Range to safely and efficiently operate the Wells using high volume production techniques" [*7] (ECF Nos. 5 at 11, ¶ 94; 8 at 3, ¶ 14); and represented to Range that their welders were properly qualified to perform the work and that they properly inspected the Line Heaters and Separators (ECF Nos. 5 at 15, ¶¶ 111-12; 8 at 4, ¶ 27).

Conversely, in Plaintiffs' Motion for Partial Summary Judgment on Defendant's Economic Loss Claims, Fraud/ Misrepresentation Claims, and Claims for Future Damages, Plaintiffs' deny these same attributes. ECF No. 34 at 6-7.

In February 2009, the Line Heater designed and manufactured by Plaintiffs failed "because one of its factory welds contained a leak." ECF Nos. 5 at 14, ¶ 101; 8 at 3, ¶

19. Range immediately shut down the Well after discovering the leak to avoid an accident. ECF Nos. 5 at 14, ¶ 102; 8 at 3, ¶ 20. Plaintiffs sent a welder to repair the Line Heater, and delivered another Line Heater for a different Well. ECF Nos. 5 at 14, ¶¶ 103, 105; 8 at 3, ¶¶ 21, 23.

Before installing the Line Heater, "Range conducted an x-ray and visual inspection of the Line Heater's welds." ECF Nos. 5 at 14, ¶ 106; 8 at 3, ¶ 23. After conducting the inspection, Range rejected the Line Heater and returned it to Plaintiffs with instructions not to deliver another Line [*8] Heater. ECF Nos. 5 at 14, ¶¶ 108-09; 8 at 4, ¶ 25.

Thereafter, Plaintiffs met with Range and (1) acknowledged that they had serious weld quality problems; (2) admitted that their quality control/quality assurance measures were lacking; (3) represented that they would invest in a new welder; and (4) committed to changing their welding procedures. ECF Nos. 5 at 18, ¶ 132; 8 at 5, ¶ 37. Immediately after the meeting, Plaintiffs began to repair the Separators. ECF Nos. 5 at 18, ¶ 137; 8 at 5, ¶ 39. Range sent Plaintiffs a check in the amount of $548,453.03, and Plaintiffs cashed the check and represented that they were "currently fabricating replacement piping" in order to repair six Separators. ECF Nos. 5 at 18, ¶¶ 137-39; 8 at 5, ¶¶ 40-41. Range sent Plaintiffs another check in the amount of $25,522.20, and upon receipt Plaintiffs cashed the check. ECF Nos. 5 at 19, ¶¶ 140, 142; 8 at 5, ¶¶ 42, 44.

It is undisputed that Plaintiffs did not provide Range with the replacement piping to repair the six Separators. ECF Nos. 5 at 19, ¶ 143; 8 at 6, ¶ 45. Plaintiffs explain that they did not ship the replacement piping because Range refused to pay. ECF No. 8 at 6, ¶ 45. Range's Facility Superintendent [*9] met with Curt Murray, Sr., President and CEO of Plaintiff Pride of the Hills and Vice President of Plaintiff Grace Automation Services, to discuss Plaintiffs' refusal to deliver the allegedly fabricated replacement piping in order to repair six Separators. ECF Nos. 5 at 10, ¶ 71 and 19, ¶ 149; 8 at 6, ¶ 47. Several days later, Range's Facility Engineering Manager spoke with Curt Murray, Sr. *via*

---

[H]igh volume wells produce a mixture of gas, oil and water that is under very high pressures when it initially leaves the Wells. The mixture must first pass through large line heaters ('Line Heaters') which prevent the mixture from freezing as its pressure drops by passing across pressure reduction chokes. After the pressure of the mixture is lowered, the mixture must pass through three phase separators ("Separators") to separate water and oil from the gas. The gas is then processed and the water and oil are sent to storage tanks.

ECF No. 5 at 12, ¶¶ 85-86.

[2]  In reply [*6] to Range's Counterclaim, Plaintiffs' "admit that Grace Automation entered into the Agreement, but deny that Pride of the Hills entered into the Agreement." ECF No. 8 at 2 ¶¶ 8-13.

2011 U.S. Dist. LEXIS 59794, *9

telephone. ECF Nos. 5 at 20, ¶ 151; 8 at 6, ¶ 49. Thereafter, Plaintiffs' counsel sent Range a letter that included a list of allegedly overdue invoices requesting payment amounting to $1,000,582.66. ECF Nos. 5 at 20, ¶ 156; 8 at 6, ¶ 52.

Plaintiffs filed their Complaint against Range in the Common Pleas Court of Holmes County, Ohio alleging the following claims:

## B. Procedural History

| | |
|---|---|
| Pride of the Hills Count I: | Breach of Contract |
| Pride of the Hills Count II: | Statement of Account [3] |
| Pride of the Hills Count III: | Statement of Account [4] |
| Pride of the Hills Count IV: | Unjust Enrichment |
| Grace Automation Count V: | Breach of Contract |
| Grace Automation Count VI: | Statement of Account |
| Grace Automation Count VII: | Statement of Account [5] |
| Grace Automation Count VIII: | Unjust Enrichment |

ECF No. 1-1 at 5-10. Range filed a Notice of [*10] Removal, removing the cause of action from the Common Pleas Court of Holmes County, Ohio pursuant to 28 U.S.C. §§ 1332,

1441, and 1446. ECF No. 1. Range filed an Answer and Counterclaim alleging the following ten counterclaims:

| | |
|---|---|
| Count I: | Breach of Contract |
| Count II: | Breach of Express Warranty |
| Count III: | Breach of the Implied Warranty of Merchantability |
| Count IV: | Breach of the Implied Warranty of Fitness for a Particular Purpose |
| Count V: | Promissory Estoppel |
| Count VI: | Unjust Enrichment |
| Count VII: | Fraud/Fraudulent Inducement |
| Count VIII: | Fraud/Fraudulent Inducement |
| Count IX: | Negligent Misrepresentation |
| Count X: | Civil Conspiracy |

ECF No. 5 at 21-32. Plaintiffs filed a reply to Range's Counterclaim. ECF No. 8.

Subsequently, [*11] Plaintiffs filed Motions for Partial Summary Judgment on Range's Economic Loss Claims (Counts III, IV, VIII, and X), Fraud/Misrepresentation Claims, and Claims for Future Damages. ECF No. 34. Range filed a Motion for Partial Summary Judgment requesting that the Court enter summary judgment in Range's favor on Counts II, III, IV, Plaintiffs' repair costs claim, and Plaintiffs cost of raw material to manufacture goods. [6] ECF No. 35. Plaintiff/Counter-Defendant Grace Automation Services filed a Motion for Partial Summary

Judgment on all claims brought against them by Range. ECF No. 37.

## III.Discussion

HN3 *Federal Rule of Civil Procedure 56(c)* governs summary judgment motions, and provides in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material

---

[3]  *See HN1* Ohio Civil Rule 10(D)(1) Attachments to Pleadings:

(1) Account or written instrument. When any claim or defense is founded on an account or other written instrument, a copy of the account or written instrument must be attached to the pleading. If the account or written instrument is not attached, the reason for the omission must be stated in the pleading.

[4]  Pride of the Hills' Count III is identical to Pride of the Hills' Count II.

[5]  Grace Automation's Count VII is identical to Grace Automation's Count VI.

[6]  *HN2* Defending parties may move for summary judgment as well. *See* Alexander v. CareSource, 576 F.3d 551, 557-58 (6th Cir. 2009).

2011 U.S. Dist. LEXIS 59794, *11

fact and that the moving party is entitled to a judgment as a matter of law . . . .

*HN4* *Rule 56(e)* specifies the materials properly submitted in connection [*12] with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. [...] The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

*HN5* The movant, however, is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex, 477 U.S. at 317.*

*HN6* Upon [*13] review, the Court must view the evidence in light most favorable to the non-moving party to determine whether a genuine issue of material facts exists. *Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598, 26 L. Ed. 2d 142* (1970); *see also White v. Turfway Park Racing Ass'n, 909 F.2d 941, 943-44 (6th Cir. 1990). HN7* A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson, 477 U.S. at 248.* Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases, the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id. at 252.*

*HN8* Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex, 477 U.S. at 322. HN9* Cross-motions for summary judgment are examined under the usual *Rule 56* standards. *Spectrum Health Continuing Care Group v. Anna Marie Bowling Irrevocable Trust, 410 F.3d 304, 309 (6th*

*Cir. 2005).* Each cross-motion must be evaluated on its [*14] own merits, with the court viewing all facts and reasonable inferences in the light most favorable to the nonmoving party. *Appoloni v. U.S., 450 F.3d 185, 189 (6th Cir. 2006).*

Moreover, *HN10* "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989)* (citing *Frito-Lay, Inc. v. Willoughby, 863 F.2d 1029, 1034, 274 U.S. App. D.C. 340 (D.C. Cir. 1988)).* The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. Columbus, 801 F.Supp. 1, 4 (S.D. Ohio 1992).* The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

**A. Plaintiffs' Motions for Partial Summary Judgment**

Plaintiffs move for partial summary judgment on counterclaims: (1) Counts III (breach of implied warranty of merchantability), IV (breach of implied warranty of fitness for particular purpose), VIII (fraud/fraudulent inducement), and X (civil conspiracy); (2) [*15] Counts VII (fraud/fraudulent inducement) and IX (negligent misrepresentation); and (3) Range's attempt to recover in contract, express warranty, implied warranty or tort damages for defects that did not occur. ECF No. 34 at 1.

**1. Counts III, IV, VIII, and X Are Not Barred by the Economic Loss**

Plaintiffs argue that the economic loss rule prevents Range from recovering on Counts III, IV, VIII, and X. ECF No. 34 at 4-6. *HN11* Under Ohio law, "[t]he economic-loss rule generally prevents recovery in tort of damages for purely economic loss." *Pavlovich v. Nat'l City Bank, 435 F.3d 560, 569 (6th Cir. 2006)* (citing *Corporex Dev. & Constr. Mgmt., Inc. v. Shook, Inc., 106 Ohio St. 3d 412, 2005 Ohio 5409, 835 N.E.2d 701, 704 (2005)).* The economic-loss rule applies in a tort action only when economic loss is unaccompanied by personal injury or property damage. *Pavlovich, 435 F.3d at 569* (citing *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co., 42 Ohio St.3d 40, 537 N.E.2d 624, 629-30 (1989)).* Plaintiffs allege that Counts III, IV, VIII, and X are pleaded in tort and barred by the economic loss rule. ECF No. 34 at 5-9.

**a. Counts III and IV: Breach of Implied Warranty of Merchantability and Breach of Implied Warranty of [*16] Fitness for a Particular Purpose**

Case: 1:08-cv-02755-DCN  Doc #: 341-1  Filed:  06/12/15  22 of 70.  PageID #: 17385

Page 9 of 16
2011 U.S. Dist. LEXIS 59794, *16

Plaintiffs allege that Range has asserted a tort claim in Counts III and IV and must resort to contract law to recover on Counts III and IV. ECF No. 34 at 5. Plaintiffs argue that Range must rely upon the Uniform Commercial Code's contractual remedies instead of suing in tort under strict liability or implied warranty for economic damages. ECF No. 34 at 5

In response, Range argues that Counts III and IV have been pleaded in contract, not tort. ECF No. 40 at 15. As support, Range turns to the language in its Counterclaim that references the Uniform Commercial Code provisions:

> 178. Line Heaters and Separators are goods as defined in _R.C. § 1302.01(A)(8)_. [7]

> 179. Pursuant to _R.C. § 1302.27_, Counterclaim-Defendants [Plaintiffs], as sellers of Line Heaters and Separators, impliedly warranted to Range that they would be merchantable.

> 183. Pursuant to _R.C. § 1302.28_, Counterclaim-Defendants [Plaintiffs], as Sellers of Line Heaters and Separators, warranted to Range that they would be fit for a particular purpose.

ECF Nos. 40 at 15; 5 at 23-24, ¶¶ 178, 179, 183. _Ohio Revised Code § 1302.27(A)_ **HN12** specifies in pertinent part: "[A] warranty that the goods shall be merchantable [*17] is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Similarly, _Ohio Revised Code § 1302.28_ specifies in part:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is . . . an implied warranty that the goods shall be fit for such purpose.

Plaintiffs cannot prevail as a matter of law. _See Beard v. Banks, 548 U.S. 521, 529, 126 S. Ct. 2572, 165 L. Ed. 2d 697 (2006)_ (discussing judgment is appropriate "as a matter of law" when the moving party should prevail). Range has set-forth specific facts showing that as a matter of law Counts VIII and X are pleaded in contract pursuant to the Ohio Revised Code and the Uniform Commercial Code. ECF No. 41 at 15. **HN14** _Federal Rule of Civil Procedure 8(e)_ [*18] requires the courts to construe pleadings liberally.

_See Minger v. Green, 239 F.3d 793, 799 (6th Cir. 2001)_ (explaining the "fundamental tenor of the Rules is one of liberality rather than technicality"). Counts III and IV show that Range's claims are grounded in contract, not tort as alleged by Plaintiffs.

**b. Counts VIII and X: Fraud/Fraud in the Inducement and Civil Conspiracy**

Plaintiffs argue that Range has asserted a tort claim in Count VIII alleging that Plaintiffs made certain statements and representations to induce Range to pay a portion of the outstanding invoices due and owing to Plaintiffs. ECF No. 34 at 5. Plaintiffs aver that the economic loss rule prohibits Range from recovering on Count VIII because Range's sought relief—the recoupment of monies spent for the allegedly defective product—is purely economic. Plaintiffs further contend that Count X alleging Civil Conspiracy for acting in concert to produce the alleged fraud described in Count VIII is subject to and barred by the economic loss rule by definition because "those damages are economic." ECF No. 34 at 5.

In response, Range argues that the economic loss rule does not bar Counts VIII and X because the economic loss [*19] rule is "limited in its application," and under Ohio law, the rule does not bar claims for intentional torts. ECF No. 40 at 14. Further, Range argues that it "seeks non-economic punitive damages for both these claims and for this reason alone, the economic loss rule cannot bar either claim." ECF No. 40 at 14-15.

**HN15** The Court must deny a motion for summary judgment when the moving party is not entitled to a judgment as a matter of law. _Beard v. Banks, 548 U.S. 521, 529, 126 S. Ct. 2572, 165 L. Ed. 2d 697 (2006)_. **HN16** "The economic loss rule prevents recovery in negligence of purely economic loss, not recovery under an intentional tort theory for economic loss." _Reengineering Consultants, Ltd. v. EMC Corp., No. 2:08-CV-47, 2009 U.S. Dist. LEXIS 2627, at *16 (S.D. Ohio Jan. 14, 2009)_. Range, the non-moving party, has set-forth specific facts showing that the economic loss rule does not apply because Counts VIII and X are intentional torts. **HN17** According to Ohio law, civil conspiracy is an intentional tort. _Hicks v. Bryan Medical Group, Inc., 287 F.Supp.2d 795, 813 (N.D. Ohio 2003)_ (explaining the malice involved in the tort of civil conspiracy is "that state of mind under which a person does a wrongful act purposely,

---

[7]  **HN13** R.C. § 1302.01(A)(8), described in Title XIII, Commercial Transactions, specifies in pertinent part: "'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities, and things in action."

without a reasonable [*20] or lawful excuse, to the injury of another"). *HN18* Fraud in the inducement is also an intentional tort under Ohio law. *See Hale v. Enerco Group, Inc., Case No. 1:10CV00867, 2011 U.S. Dist. LEXIS 781, 2011 WL 49545, at * 5 (N.D. of Ohio Jan. 5, 2011)* (citing *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St. 3d 54, 514 N.E.2d 709, 712 (Ohio 1987)). Summary judgment is denied as to Counts VIII and X because the economic loss rule does not preclude recovery as a matter of law.

## 2. Counts VII and IX Present Genuine Issues of Material Fact

Plaintiffs argue that they are entitled to judgment as a matter of law as to Counts VII alleging that Plaintiffs made representations regarding Plaintiffs' capabilities and Count IX Negligent Representation. *HN19* Under Ohio law, the elements of fraud are: (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused [*21] by the reliance. *See Hale v. Enerco Group, Inc., Case No. 1:10CV00867, 2011 U.S. Dist. LEXIS 781, 2011 WL 49545, at * 5 (N.D. of Ohio Jan. 5, 2011)* (citing *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St. 3d 54, 514 N.E.2d 709, 712 (Ohio 1987)). Negligent misrepresentation requires the same essential elements of fraud, except that the defendant need not know that the statement in question is false. *Delman v. Cleveland Hts., 41 Ohio St. 3d 1, 534 N.E.2d 835, 837-38 (1989)*.

### a. Plaintiffs' Alleged Representations Are Materially at Issue

Plaintiffs' allege that Range's following counterclaims are unsupported and meritless:

207. Counterclaim-Defendants represented to Range that Counterclaim-Defendants could design and manufacture Line Heaters and Separators so that Range could safely and efficiently operate the Wells using high volume production techniques.

208. Counterclaim-Defendants represented to Range that Counterclaim-Defendants' welders were properly qualified.

209. Counterclaim-Defendants represented to Range that Counterclaim-Defendants were properly inspecting Line Heaters and Separators.

210. Counterclaim-Defendants represented to Range that the Line Heaters and Separators Counterclaim-Defendants had designed and manufactured were [*22] not defective.

ECF Nos. 34 at 6; 5 at 28, ¶¶ 207-210. Plaintiffs argue that "there is no evidence before the Court of the exact statement made by either Pride or Grace regarding Plaintiffs' respective qualifications." ECF No. 34 at 7. Alternatively, even if such evidence did exist, then Range cannot provide evidence showing that Plaintiffs are not considered experts in the design and manufacture of Line Heaters and Separators. ECF No. 34 at 6.

In response, Range avers that the record reflects that Plaintiffs' representations were false based on Plaintiffs' prior admissions. Plaintiffs admitted the following in their Reply to Range's Counterclaim: (1) Plaintiffs "represented, among other things, that they were experts in the design and manufacture of this type of equipment and that they could design and manufacture the Line Heaters and Separators that Range needed for Range's particular Wells" (ECF Nos. 5 at 11, ¶ 93; 8 at 3, ¶ 14); (2) Plaintiffs "represented to Range that they could design and manufacture Line Heaters and Separators which would allow Range to safely and efficiently operate the Wells using high volume production techniques" (ECF Nos. 5 at 11, ¶ 94; 8 at 3, ¶ 14); (3) [*23] Plaintiffs sent a welder to the Well to repair the Line Heater, and delivered another Line Heater for another Well (ECF Nos. 5 at 14, ¶¶ 103, 105; 8 at 3, ¶¶ 21, 23); and, (4) Plaintiffs represented to Range that their welders were properly qualified to perform the work and that they properly inspected the Line Heaters and Separators (ECF Nos. 5 at 15, ¶¶ 111-12; 8 at 4, ¶ 27). ECF No. 40 at 16-17.

Range also highlights Curt Murray, Sr.'s deposition explaining that Pride of the Hill's welders were qualified and that Plaintiffs would properly inspect the equipment:

Q. When Range approached you about doing the line heaters and the separators for the Marcellus shale, did you ever tell the Range employees that the new welders that would be working on this new, larger equipment would be qualified to do the welds?

A. I'm sure that as some point I had told them, you know, that we only used code certified welders to weld this type of equipment. And that's our normal policy, not just for Range, for everyone.

Q. Same question. During the—this time period that they were seeking you to do this larger equipment for the Marcellus shale, did you ever tell Range that you

Case: 1:08-cv-02755-DCN  Doc #: 341-1  Filed:  06/12/15  24 of 70.  PageID #: 17387

Page 11 of 16
2011 U.S. Dist. LEXIS 59794, *23

would make sure that the line [*24] heaters and separators were properly inspected?

A. I'm sure.

ECF Nos. 40 at 12; 42-1 at 43.

**b. Plaintiffs' Alleged Inspection Is Genuinely at Issue**

Plaintiffs further contend that the record shows that Plaintiff Pride of the Hills "complied with its policy to visually inspect every weld." ECF No. 34 at 8. During his deposition, Plaintiff Pride of the Hills employee, Aaron Blaugh, that he was in charge of inspecting the welds on the equipment and witnessing the hydrostatic tests. ECF Nos. 34 at 8; 42-3 at 5. Mr. Blaugh testified that he: (1) inspected the welds on the shop floor and in the hydro department and (2) visually inspected at least 75-80% of the welds on each unit built for Range and observed 75-80% of the hydrostatic tests done on the units build for Range. ECF Nos. 34 at 8; 42-3 at 7-8, 10. Alternatively, Plaintiffs' contend that if Mr. Blaugh "could not visually inspect all the welds," then presumably other Plaintiffs' personnel would inspect the remaining welds. ECF Nos. 34 at 8-9; 42-3 at 39, 40.

Range argues that Plaintiffs' representations are false based on expert testimony demonstrating that the equipment was defective and not properly inspected. ECF No. 40 at 19. Range's [*25] expert, Dr. Geoffrey Egan, concluded that the piping welds on the Heaters and Separators "did not meet the requirements of the applicable oilfield codes and standards," were "not suitable for their intended purpose," "represent[ed] a gross and pervasive breakdown in quality in the fabrication shop," and would have represented an "extreme hazard to personnel" if "left in place." [8] ECF No. 42-9 at 13, ¶¶ 5-8.

As to Counts VII and IX, Plaintiffs, the moving party, have failed to make a *prima facie* showing that no genuine dispute as to material facts exists with respect to Plaintiffs' representations and qualifications. [9] *See Celotex Corp., 477 U.S. at 323-24.* The Supreme Court has explained that *HN20* upon viewing the facts in the light most favorable to the nonmoving party "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by

the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *See Scott, 550 U.S. at 380.*

In the instant matter, despite Plaintiffs' admissions to Range's allegations set forth in its Counterclaim, genuine issues of Plaintiffs' alleged representations are materially at issue. *See Anderson, 477 U.S. at 247-252* (explaining *HN22* a fact is "material" if it might affect the outcome of a case). Thus, summary judgment as to Counts VII and IX is improper.

**3. Damages for Defects as to Counts I, II, III, IV, and VI Present Genuine Issues of Material Facts**

Plaintiffs' claim that they are entitled to summary judgment as a matter of law on the counterclaims seeking damages for defects. [10] ECF No. 34 at 10. Plaintiffs argue that the "only 'defect' ever to manifest itself was a pinhole leak in one weld on one Line Heater . . . [and] [n]o other leaks occurred . . . ." ECF No. 34 at 10. Thus, "Range cannot recover for defects which had not occurred and require Plaintiffs to pay for an upgrade which Range did not order." ECF No. 34 at 11, 12. Plaintiffs' contend that "Range cannot recover until a specific unit or product fails because there is no assurance that any of the individual [*27] welds will fail." ECF No. 34 at 13.

Range clarifies that it is "not claiming any future damages or speculating regarding future injuries[;] . . . [i]nstead, Range has already hired and paid third parties to repair *all* the defective equipment to an approximate cost of $1,000.000 and it is these costs of repairs that Range is seeking to recover." ECF No. 40 at 22 (emphasis in original). Range points out that "[t]o prevent Range from recovering damages until a unit 'fails' and kills someone not only ignores the UCC, it is pure lunacy . . . [because] Range can recover damages to correct known defects before an accident happens." ECF No. 40 at 22-23. Further, Range argues that "[b]ecause the Heaters and Separators were defective, Plaintiffs breached their warranties and are liable to the costs to repair the defective equipment even if it had not yet 'failed.'" ECF No. 40 at 24.

---

[8]  Dr. Geoffrey Egan's experience includes over thirty years of assessing weld quality and determining the existence of weld defects. ECF No. 35 at 1.

[9]  *HN21* Evidence, [*26] not contentions, avoids summary judgment." *Al-Zubaidy v. TEK Industries, Inc., 406 F.3d 1030, 1036 (8th Cir. 2005).*

[10]  "Range has requested [that] the Court award damages for repair and/or replacement of allegedly defective Line Heaters and Separators as part of Counts I, II, III, and VI." ECF No. 34 at 10.

2011 U.S. Dist. LEXIS 59794, *27

Plaintiffs request for summary judgment as to Range's counterclaims seeking damages for defects is two-fold. The Court must first [*28] resolve whether the Line Heaters and Separators were defective, then resolve whether Plaintiffs can avoid liability as to the defects. The two-fold inquiry requires the Court to draw factual inferences of whether the equipment at issue was defective—a function reserved for the jury. *Anderson, 477 U.S. at 255*. Therefore, the alleged defective Line Heaters and Separators present a genuine issue of material fact, and, accordingly, the issue of whether damages were derived from the alleged defective Line Heaters and Separators is for a jury.

**B. Range's Motion for Partial Summary Judgment**

Range moves for summary judgment on the following claims: (1) Count II (Range's claim for breach of express warranty; (2) Count III (Range's claims for breach of warranty of merchantabiltiy); (3) Count IV (Range's claims for breach of warranty of fitness for particular purpose; (4) Plaintiffs' repair cost claim; and, (5) Plaintiffs' claim for costs of raw materials to manufacture goods Range allegedly orally promised to purchase. ECF No. 35.

**1. Counts II, III, and IV Probe into Whether the Equipment Is Defective, a Function Reserved for the Jury**

Range argues that the expert testimony coupled with Sixth Circuit [*29] law entitles them to summary judgment and bars Plaintiffs from recovering their alleged costs to repair the defective equipment. ECF No. 35 at 2. Range relies on Dr. Geoffrey Egan's expert opinion finding that "the heater and separator contained extensive and pervasive welding defects which represented an extreme safety hazard." ECF No. 35 at 1.

Plaintiffs allege that expert William Roach has rebutted Dr. Egan's opinion. ECF No. 43 at 5-6. Plaintiffs highlight that Dr. Egan failed to cite to a standard that was not met, but rather stated that the welds would fail "any standard." ECF

No. 43 at 5. Plaintiffs argue that Dr. Egan's opinion fails to provide evidence that the equipment was defective. ECF No. 43 at 5, fn 3. Expert William Roach found that "due to a lack of specifications given to Pride by Range, the only code that could be applicable was *49 CFR 192*." ECF No. 43 at 6.

Range refutes Plaintiffs' argument by explaining that Plaintiffs cannot withstand summary judgment by offering the opinion of an expert with no firsthand knowledge. [11] ECF No. 46 at 1.

A genuine issue of material fact exists as to whether the Line Heaters and Separators supplied to Range were defective. *HN24* A "genuine issue" exists when a rational factfinder, considering the evidence in the summary judgment record, could find in favor of the non-moving party. [12] *Ricci v. DeStefano, ___ U.S. ___, 129 S.Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) Scott, 550 U.S. at 380*. The conflicting expert testimony presents a genuine issue of material fact for the factfinder, and Range's request for summary judgment on the counterclaims seeking damages for defects is reserved for a jury.

**2. Plaintiffs' Repair Cost Claim Belongs to a Jury**

Range seeks judgment as a matter of law on Plaintiffs' claim for payment on work completed in 2009 at Range's request. ECF No. 35 at 2. Range argues that "because the heaters and separators were defective, as a matter of law, [Plaintiffs] are barred from recovering their alleged costs to repair this defective equipment." ECF No. 35 at 2, ¶ 5. Range further avers that Plaintiffs agreed to repair the alleged defective equipment "without ever requesting payment from Range." ECF No. 35 at 2, ¶ 6. Alternatively, Range argues that if the Court finds that the equipment is not defective, then Range is still entitled to summary judgment based on the doctrine of estoppel. ECF No. 35 at 2, ¶ .6

Plaintiffs allege that a genuine issue of material fact exist regarding Range's contention for summary judgment as a

---

[11] Range misapplies the affidavit standard. *HN23* To be considered on a motion for summary judgment, an affidavit must be: sworn; based [*30] upon personal knowledge; state specific facts admissible in evidence at the time of trial; and offered by a competent affiant. *Briggs v. Potter, 463 F.3d 507, 512 (6th Cir. 2006)*. Personal knowledge may include reasonable inferences and opinions provided that all inferences and opinions are premised on first-hand observations *or* personal experience. *Yeazel v. Baxter Healthcare Crop., Case No. 1:09-hc-60186, 2011 U.S. Dist. LEXIS 23241, 2011 WL 711453, at *2 (N.D. Ohio Feb. 22, 2011); see also Payne v. Pauley, 337 F.3d 767, 772 (7th Cir. 2003)*.

[12] *HN25* Evaluating credibility, weighing evidence, and drawing factual inferences are all functions reserved [*31] for the jury. *Anderson, 477 U.S. at 255; see also Baranski v. Fifteen Unknown Agents of Bureau of Alcohol, Tobacco and Firearms, 452 F.3d 433, 451 (6th Cir. 2006)* (explaining the court will not weigh the credibility of witnesses or other evidence in ruling on a motion for summary judgment).

matter of law on Plaintiffs' claim for payment on [*32] work completed in 2009. ECF No. 43 at 11. Plaintiffs explain that Range's argument is premised on the equipment being defective, and respond that the equipment is not defective or that a genuine issue of material fact precludes summary judgment. Plaintiffs also challenge Range's estoppel argument by alleging that there is "unrebutted documented evidence that Range asked Pride to put together a cost estimate to do the 'repairs.'" creating a genuine issue of material fact as to who should bear the cost of the additional work. ECF No. 43 at 13. Range provides that Plaintiffs are barred from recovering repair costs simply because the piping welds were defective and as a result, Plaintiffs breached their warranties. ECF No. 46 at .7

In accordance with Section B.1., above, the alleged defective Line Heaters and Separators present a genuine issue of material fact, and, accordingly, the issue of whether damages were derived from the alleged defective Line Heaters and Separators is for a jury.

### 3. Range is Entitled to Summary Judgment As To Plaintiffs' Claim for Cost of Raw Materials

Range argues that the Court should enter judgment as a matter of law barring Plaintiffs from recovering their purported [*33] costs of raw materials based on Range's alleged oral promise to purchase additional heaters and separators pursuant to the R.C. 1302.04(A). ECF No. 35 at 2, ¶ 6 . HN26 Ohio Revised Code Statute of Frauds described in 1302.04(A) specifies:

> Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this division beyond the quantity of goods shown in such writing.

Plaintiffs argue that the parties course of dealing prevents Range from judgment on Plaintiffs' claim for payment on materials purchased to build production equipment in 2009 by pointing to the plain language in R.C. § 1302.04(C), which specifies in pertinent part:

> HN27 (C) A [*34] contract which does not satisfy the requirements of division (A) of this section but which is valid in other respects is enforceable:

> (1) if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement;

ECF No. 43 at 13. Plaintiffs summarized its course of dealing with Range by describing the following:

> For years, Range would tell Pride how many wells would be drilled in the coming months. When the well was nearly complete, Range would call Pride and want the production unit delivered within days. Pride needed to order the necessary materials to build the units well in advance of when they would be needed. Range had no problems with this arrangement until the lawsuit was filed.

ECF No. 39 at 1 .4

In reply, Range argues that the exception does not apply because the goods are not specially manufactured-that is, raw materials purchased to manufacture a final product were not [*35] "specially manufactured." ECF No. 46 at 9. Range alleges that the raw materials at issue, shell heads, valves, piping, flanges, and fittings, are not specially manufactured goods. ECF No. 46 at 9. Range points out that the goods are not "specially manufactured" because Plaintiffs have admitted that they "sold some of these raw materials and used some of the raw materials for equipment made for other customers . . . ." ECF No. 46 at 10. Plaintiffs explained that the 2008 wells are "no different than what Pride had been making for GLEP, Range, and other customers for fifteen years now." ECF No. 39 at 3. Range further explained that Plaintiffs have failed to show that they made a "substantial beginning of their manufacture" according to R.C. § 1302.04(C.)

Range has met its burden of showing that Plaintiffs are not entitled to recover their purported costs of raw materials based on Range's alleged oral promise to purchase additional heaters and separators pursuant to the R.C. 1302.04(A). HN28 The party moving for summary judgment is not required to disprove the opponent's claims or defenses. Edwards v. Aguillard, 482 U.S. 578, 595, 107 S. Ct. 2573, 96 L. Ed. 2d 510 (1987;) see also Celotex, 477 U.S. at 323. The moving party's [*36] burden is often satisfied by pointing out for the Court an absence of evidence in support of the non-moving party's claims or defenses. Celotex, 477 U.S. at

2011 U.S. Dist. LEXIS 59794, *36

*317*. The burden of going forward shifts to Plaintiffs, the non-moving party, to show that a genuine issue of material fact remains for the factfinder to resolve. *Beard, 548 U.S. at 529*. In the instant matter, albeit plausible, Plaintiffs' scenario that the raw materials may constitute specially manufactured goods is insufficient to meet its burden because Plaintiffs proffered scenario conflicts with direct, contrary evidence that the materials are not specially manufactured. *Scott, 550 U.S. at 380*. Therefore, summary judgment is appropriate.

| | |
|---|---|
| Count I: | Breach of Contract |
| Count II: | Breach of Express Warranty |
| Count III: | Breach of the Implied Warranty of Merchantability |
| Count IV: | Breach of the Implied Warranty of Fitness for a Particular Purpose |
| Count V: | Promissory Estoppel |
| Count VI: | Unjust Enrichment |
| Count VII: | Fraud/Fraudulent Inducement |
| Count VIII: | Fraud/Fraudulent Inducement |
| Count IX: | Negligent Misrepresentation |
| Count X: | Civil Conspiracy |

ECF. [*37] Nos. 37-1 at 7; 5 at 21-3.2

At the outset, Grace differentiates itself from Pride of the Hills Manufacturing, Inc. by explaining that the entities provide separate and distinct services to companies drilling for natural gas. ECF No. 37-1 at 2. Grace claims that its business consists of "servicing telemetry for natural gas wells throughout the Appalachian Basin." ECF No. 37-1 at 3. Grace argues that it is entitled to summary judgment as a matter of law because "[n]one of the claims articulated by Range have anything to do with telemetry work provided by Grace . . . [and] Grace is not the manufacturer of any of the line heaters or separators purchased by Range." ECF No. 37-1 at .8

Grace attempts to bolster its position and avoid liability by arguing that "Range's breach of contract (Count I), breach of warranty claims (Counts II through IV), its fraud claim (Count VII), as well as its claims alleging 'repair' of the non-defective goods (Counts V, VI, VIII, IX and X) . . . seek to retroactively modify the terms and conditions of the previous sales and future sales by demanding POH (and Grace) upgrade the existing line heaters and separators to a higher standard." ECF No. 37-1 at 10. Relying [*38] on *UCC 2-208(1)* and Ohio law. Grace highlights its course of performance with Range and argues that Range may not recover for allegedly defective equipment because "dozens of units were sold and accepted for over a year without objection" and "Range's sudden demand that the goods be retroactively upgraded to a higher standard is a material alteration of the contract." ECF No. 37-1 at 12-13.

In addition to the parties' course of performance, Range continues to argue that the plain language of the Master

**C. Plaintiff Grace Automation Services' Motion for Partial Summary Judgment**

Plaintiff Grace Automation Services ("Grace") separately moves for summary judgment on Range's counterclaims:

Service Agreement ("MSA") is unambiguously limited to Grace's services and "not the sale of any goods." ECF No. 37-1 at 14. Grace alleges the following:

> Both the first and third 'Whereas' clauses of the MSA speak of the agreement in terms of services provided to Range. The first states that Range is in the oil and gas exploration business and regularly 'enters into contracts with independent contractors for performance of service thereto.' While the third states that the 'Contractor represents that it has adequate equipment in good working order and fully trained personnel capable of efficiently operating such equipment and performing services for Operator (Range) in a safe and workmanlike [*39] manner.' Neither of these speak of the sale of goods, only the performance of service to Range.

ECF No. 37-1 at 15. Grace admits that Section 2.1 of the MSA does discuss "the furnishing of goods," yet those goods are references to "goods not at issue in this suit." ECF No. 37-1 at 15.

Grace further contends that the MSA was "executed between Range Resources and Grace Automation Serives, Inc. *and its subsidiaries and affiliates*," which does not include Pride of the Hills. ECF No. 37-1 at 14 (emphasis in original). Grace points out that the MSA does not define Grace's subsidiaries and affiliates, and Pride of the Hills "is not even a signator to the MSA. . . ." ECF No. 37-1 at 14, fn. 11. Grace and Pride of the Hills "maintain separate corporate forms, IRS filings, state filings, employees, etc." ECF No. 37-1 at 16. Likewise, if the Court finds that Pride of the Hills is not an affiliate of Grace, then Grace argues that it

retains no liability as to all warranties, such that the warranties are those of Pride of the Hills. ECF No. 37-1 at 17. Grace therefore concludes that it should "be dismissed from any breach of warranty claim." ECF No. 37-1 at 18.

In response, Range illustrates genuine [*40] issues of material facts. Range explains that Pride of the Hills and Grace are related companies because (1) Curt Murray Sr. is President and CEO of Pride of the Hills and Vice President of Grace (ECF No. 42-19 at 3); (2) Curt Murray Jr. is Vice President and COO of Pride of the Hills and President of Grace (ECF No. 42-19 at 3); (3) Pride of the Hills and Grace are operated out of the same office (ECF No. 42-1 at 14); and, (4) Pride of the Hills and Grace have the same accounting department (ECF Nos. 42-1 at 14). ECF No. 41 at 6. Range further contends that according to Sixth Circuit case law, Pride of the Hills is an affiliate and a party to the MSA. ECF No. 41 at 20; see *Ohio Valley Coal Co. v. Pleasant Ridge Synfuels, LLC*, 54 Fed. Appx. 610, 614 (6th Cir. 2002) (holding that where one individual served as the CEO of one company and owned and controlled another company, the companies were "affiliates" under an agreement).

As to Grace's allegation that Range's counterclaims is an attempt to circumvent the MSA, Range explains that *UCC 2-208(1)* and related sections are irrelevant because "as soon as Range found out about the defects it objected to the goods." ECF No. 41 at 17. In short, [*41] Range argues that "there is absolutely no support (in the record or the law) for Grace's contention and defense that Range acquiesced to the defective equipment." ECF No. 41 at 19.

Based upon the record before the Court, summary judgment in Grace's favor is improper because genuine issues exists as to various material facts. A rational factfinder considering the evidence and substantive law at issue could find in favor of Range, the non-moving party. *Scott, 550 U.S. at 380*; see also *Anderson, 477 U.S. at 247-52*.

**IV. Conclusion**

For the reasons provided above, the Court denies Plaintiffs' Partial Motion for Summary Judgment (ECF No. 34); Range's Partial Motion for Summary Judgment as to: (1) Count II (Range's claim for breach of express warranty); (2) Count III (Range's claims for breach of warranty of merchantabiltiy); (3) Count IV (Range's claims for breach of warranty of fitness for particular purpose); and, (4) Plaintiffs' repair cost claim (ECF No. 35); and Grace's Partial Motion for Summary Judgement (ECF No. 37).

The Court grants Range's Motion to Summary Judgment as to Plaintiffs' claim for costs of raw materials to manufacture

goods Range allegedly orally promised to purchase. ECF [*42] No. 35.

IT IS SO ORDERED.

May 27, 2011

Date

/s/ Benita Y. Pearson

Benita Y. Pearson

United States District Judge

**APPENDIX A—Undisputed Facts**

1. For several years, Plaintiffs have sold and delivered certain goods and provided certain services to Range. ECF Nos. 1-1 at 5, 8; 5 at 12, ¶ 82; 8 at 3, ¶ 14. Specifically, Plaintiff Pride of the Hills "had a long standing business arrangement in which Pride of the Hills agreed to sell and deliver certain goods and provide certain services" to Range, and Plaintiff Grace Automation "entered into an arrangement to sell and deliver certain goods and provide certain services." ECF Nos. 1-1 at 5, 8.

2. Range began using new high volume production techniques to produce gas when its Marcellus Shale operation started to rapidly grow. ECF No. 5 at 12, ¶ 83; 8 at 3, ¶ 14.

3. Plaintiff Grace Automation Services Inc. entered into a Master Service Agreement ("MSA") with Defendant Range Resources-Appalachia, LLC in 2008 to manufacture high capacity Line Heaters and Separators using high volume production technique.s ECF Nos. 5 at 11, ¶¶ 78, 88; 8 at 2-3, ¶¶ 8-14.

4. Range informed Plaintiffs that the Line Heaters and Separators would be critical to Range's operations, [*43] and provided Plaintiffs with confidential information so that Plaintiffs could design and manufacture Line Heaters and Separators. ECF Nos. 5 at 11, ¶¶ 89-90; 8 at 3, ¶ 14.

5. Plaintiffs understood Range's desire to purchase such equipment that would operate safely, efficiently, and continuously for a long period of time without failure. ECF Nos. 5 at 11, ¶ 91; 8 at 3, ¶ 14.

6. In February 2009, the Line Heater designed and manufactured by Plaintiffs failed "because one of its factory welds contained a leak." ECF Nos. 5 at 14, ¶ 101; 8 at 3, ¶ 19.

2011 U.S. Dist. LEXIS 59794, *43

7. Range immediately shut down the Well after discovering the leak to avoid an accident. ECF Nos. 5 at 14, ¶ 102; 8 at 3, ¶ 20.

8. Plaintiffs sent a welder to repair the Line Heater, and delivered another Line Heater for a different Well. ECF Nos. 5 at 14, ¶¶ 103, 105; 8 at 3, ¶¶ 21, 23.

9. Before installing the Line Heater, "Range conducted an x-ray and visual inspection of the Line Heater's welds." ECF Nos. 5 at 14, ¶ 106; 8 at 3, ¶ 23. After conducting the inspection, Range rejected the Line Heater and returned it to Plaintiffs with instructions not to deliver another Line Heater. ECF Nos. 5 at 14, ¶¶ 108-09; 8 at 4, ¶ 25.

10. Plaintiffs met [*44] with Range and (1) acknowledged that they had serious weld quality problems; (2) admitted that their quality control/quality assurance measures were

lacking; (3) represented that they would invest in a new welder; and (4) committed to changing their welding procedures. ECF Nos. 5 at 18, ¶ 1328 at 5, ¶ 37

11. Immediately after the meeting, Plaintiffs began to repair the Separators. ECF Nos. 5 at 18, ¶ 137; 8 at 5, ¶ 39

12. Range sent Plaintiffs a check in the amount of $548,453.03 and Plaintiffs cashed the check. ECF Nos. 5 at 18, ¶¶ 137-398 at 5, ¶¶ 40-41. Range sent Plaintiffs another check in the amount of $25,522.20, and upon receipt Plaintiffs cashed the check. ECF Nos. 5 at 19, ¶¶ 140, 1428 at 5, ¶¶ 42, 44.

13. Plaintiffs did not provide Range with the replacement piping to repair the six Separators. ECF Nos. 5 at 19, ¶ 1438 at 6, ¶ 45

Caution
As of: June 12, 2015 5:00 PM EDT

# Hodell-Natco Indus. v. SAP Am., Inc.

United States District Court for the Northern District of Ohio, Eastern Division

September 2, 2010, Decided; September 2, 2010, Filed

CASE NO. 1:08-cv-02755

**Reporter**
2010 U.S. Dist. LEXIS 143144; 2010 WL 6765522

HODELL-NATCO INDUSTRIES, INC., Plaintiff, v. SAP AMERICA, INC., et al., Defendants.

**Subsequent History:** Adopted by, Motion granted by, in part, Motion denied by, in part *Hodell-Natco Indus. v. SAP Am., Inc., 2011 U.S. Dist. LEXIS 59276 (N.D. Ohio, June 2, 2011)*
Magistrate's recommendation at *Hodell-Natco Indus. v. SAP Am., Inc., 2013 U.S. Dist. LEXIS 186576 (N.D. Ohio, June 13, 2013)*
Magistrate's recommendation at *Hodell-Natco Indus. v. SAP Am., Inc., 13 F. Supp. 3d 786, 2013 U.S. Dist. LEXIS 186577 (N.D. Ohio, 2013)*
Motion granted by, in part, Motion denied by, in part *Hodell-Natco Indus. v. SAP Am., Inc., 2015 U.S. Dist. LEXIS 8735 (N.D. Ohio, Jan. 26, 2015)*

## Core Terms

Software, License, development agreement, users, damages, allegations, integration, beneficiary, induced, fraud in the inducement, economic loss rule, parol evidence rule, cause of action, third party, parties, fraudulent inducement, motion to dismiss, third party beneficiary, written contract, representations, negligent misrepresentation claim, economic loss doctrine, tort claim, courts, negligent misrepresentation, economic loss, third-party, asserts, partner, contracting parties

**Counsel:** [*1] For Hodell-Natco Industries, Inc., Plaintiff, Counter-Defendant: James F. Koehler, LEAD ATTORNEY, P. Wesley Lambert, Koehler Neal, Cleveland, OH.

For SAP America, Inc., SAP AG, Defendants: Charles W. Zepp, Hugh E. McKay, LEAD ATTORNEYS, Porter, Wright, Morris & Arthur - Cleveland, Cleveland, OH; Gregory J. Star, LEAD ATTORNEY, PRO HAC VICE, Drinker Biddle & Reath - Philadelphia, Philadelphia, PA; Michael John Miller, Thomas S. Downie, LEAD ATTORNEYS, Drinker Biddle & Reath - Philadelphia,

Philadelphia, PA; Leo M. Spellacy, Jr., Porter, Wright, Morris & Arthur, Cleveland, OH.

For LSI-Lowery Systems, Inc., Defendant, Cross-Claimant, Counter-Claimant, Cross-Claimant, Counter-Defendant, Cross Defendant: Rafael P. McLaughlin, Roy A. Hulme, Reminger & Reminger - Cleveland, Cleveland, OH.

For The IBIS Group, Inc., Defendant: Roy A. Hulme, Reminger & Reminger - Cleveland, Cleveland, OH.

For SAP America, Inc., Cross Defendant: Charles W. Zepp, Hugh E. McKay, LEAD ATTORNEYS, Porter, Wright, Morris & Arthur - Cleveland, Cleveland, OH; Gregory J. Star, LEAD ATTORNEY, PRO HAC VICE, Drinker Biddle & Reath - Philadelphia, Philadelphia, PA; Leo M. Spellacy, Jr., Porter, Wright, Morris & Arthur, Cleveland, [*2] OH.

For SAP AG, SAP America, Inc., Counter-Claimants, Cross-Claimants: Gregory J. Star, LEAD ATTORNEY, PRO HAC VICE, Drinker Biddle & Reath - Philadelphia, Philadelphia, PA.

For IBIS Group, Inc., LSI-Lowery Systems, Inc., Counter-Defendants, Cross Defendants: Rafael P. McLaughlin, Reminger & Reminger - Cleveland, Cleveland, OH.

For SAP America, Inc., Cross Defendant: Charles W. Zepp, Hugh E. McKay, LEAD ATTORNEYS, Porter, Wright, Morris & Arthur - Cleveland, Cleveland, OH; Michael John Miller, Thomas S. Downie, LEAD ATTORNEYS, Drinker Biddle & Reath - Philadelphia, Philadelphia, PA; Leo M. Spellacy, Jr., Porter, Wright, Morris & Arthur, Cleveland, OH.

For IBIS Group, Inc. Counter-Defendant, Cross Defendant: Rafael P. McLaughlin, Reminger & Reminger - Cleveland, Cleveland, OH.

**Judges:** Greg White, U.S. Magistrate Judge. JUDGE LESLEY WELLS.

**Opinion by:** Greg White

# Opinion

## REPORT AND RECOMMENDATION

### I. Procedural Background

After initiating this action on November 21, 2008, Plaintiff Hodell-Natco Industries, Inc. (hereinafter "Hodell"), an Ohio corporation with its principal place of business in Valley View, Ohio, filed an Amended Complaint on April 22, 2009 setting out five causes of action against LSi-Lowery Systems, Inc. [*3] (hereinafter "LSi"), The IBIS Group, Inc. (hereinafter "IBIS"), SAP America, Inc., and SAP AG. (Doc. No. 26.) Hodell's claims revolve around two contracts and the negotiations and representations made prior to their consummation. (*See generally* Amended Compl.) Specifically, Hodell alleges the following causes of action against all Defendants: (1) fraudulent inducement; (2) fraud; (3) breach of contract; (4) negligence; and (5) negligent misrepresentation. (Doc. No. 26.)

On May 18, 2009, Defendants LSi and IBIS filed a joint Answer. [1] (Doc. No. 30.)

On June 21, 2009, Defendants SAP America, Inc. and SAP AG (collectively "SAP") filed a Motion to Dismiss the Amended Complaint. [2] (Doc. No. 36.) Hodell filed a brief in opposition on July 30, 2009. (Doc. No. 40.) On August 17, 2009, the SAP defendants filed a reply brief. (Doc. No. 41.)

On July 8, 2010, a referral was made to this Court under *Local Rule 72.1*, seeking a report and recommendation regarding SAP's Motion to Dismiss. (Doc. No. 46.) On August 16, 2010, the Court heard oral arguments.

### II. Civil *Rule 12(b)(6)* Standard

A motion to dismiss for failure to state a claim pursuant to *Federal Rule of Civil Procedure 12(b)(6)* "should not be

granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*. Well-pleaded allegations must be taken as true and construed most favorably toward the non-moving party. See, e.g., *Mayer v. Mylod, 988 F.2d 635, 637 (6th Cir. 1993)*. Although a court may not grant a *Rule 12(b)(6)* motion based on its disbelief of the factual allegations contained in the complaint, *Lawler v. Marshall, 898 F.2d 1196, 1199 (6th Cir. 1990)*, a court "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987)*. Consequently, a claim should not [*5] be dismissed unless it is unsupported by the law or the facts alleged are insufficient.

When ruling on motions to dismiss, a Court should normally look no further than the complaint, but "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [plaintiff's] claim." *Weiner v. Klais and Co., Inc., 108 F.3d 86, 89 (6th Cir.1997)* (citations omitted). "Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied." *Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3rd Cir. 1993)*. Also, [a] court that is ruling on a *Rule 12(b)(6)* motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice." *New England Health Care Employees Pension Fund v. Ernst & Young, LLP, 336 F.3d 495, 501 (6th Cir.2003)* (citing *Jackson v. City of Columbus, 194 F.3d 737, 745 (6th Cir.1999))*.

### III. Factual Allegations

The Complaint contains the following factual allegations. [3] Hodell is a full-service [*6] fastener and chain product wholesaler. (Compl. ¶9.) In 2003, Hodell commenced a search for a software product that would provide the necessary integrated financial and sales management capabilities for its growing business. (Compl. ¶¶16-17.)

---

[1]  According to the Answer, IBIS, an Illinois corporation, became a wholly owned subsidiary of LSi, a Missouri corporation, in April of 2004. (Doc. No. 30 at ¶¶4-5.)

[2]  According to Plaintiff's allegations in the Amended Complaint, SAP America, Inc. is a Delaware corporation with its principal place of business in Pennsylvania, and is a wholly owned subsidiary of [*4] SAP AG, a corporation organized under the laws of the Federal Republic of Germany. (Amended Compl. at ¶¶3-4.)

[3]  The Amended Complaint will simply be referred to as the Complaint in the remainder of this report and recommendation, and all citations to the Complaint refer to the Amended Complaint.

2010 U.S. Dist. LEXIS 143144, *6

Hodell required software capabilities to accommodate approximately eighty then-existing users plus the growth Hodell estimated achieving over the software's useful life. *Id.* Hodell's user capacity needs were expressly communicated to all potential software vendors. *Id.* Hodell also required a software vendor with a high level of expertise, and a proven product supported by expert partners. *Id.*

During its search in 2003, Hodell met with representatives of SAP and/or an SAP "partner." (Compl. ¶18.) SAP had recently purchased an Israeli application developer and branded its application "SAP Business One" (hereinafter, the "Software"). (Compl. ¶¶12.) SAP marketed the Software through "a network of highly qualified channel partners" that resell, build, implement or provide [*7] services for SAP products. (Compl. ¶13.) The qualifications and expertise of SAP's "channel partners" was touted in a publication titled "SAP Solution Brief, Qualified SAP All-in-One Partner Solutions" published in July of 2002. *Id.* Due to the representations made by SAP, Hodell avers that LSi, IBIS, and American Express Business and Tax Services (hereinafter "Amex") were duly authorized agents of SAP. (Compl. ¶¶13-15, 20.) LSi and IBIS were authorized to make representations concerning the Software's suitability and functionality on SAP's behalf and did, in fact, make various representations to Hodell. [4] *Id.*

In 2003, Hodell was contacted either by SAP directly or by one of its partners, and provided with a copy of the "SAP Business One Brief" extolling the Software's virtues, and expressly representing that it would provide a "robust and fully integrated" solution suitable for businesses "with [*8] 10 to several hundred employees." (Compl. ¶18, Exh. A.) In addition, an "SAP Solution Brief" provided to Hodell touted the virtues of SAP's "highly qualified channel partners" that are "supported by SAP's global resources." *Id.* On October 16, 2003, an email and an "SAP Business One Whitepaper" sent by an Amex employee stated that the Software had been "successfully installed in 800 businesses globally, with the maximum implementation time being four weeks." (Compl. ¶21.) The "SAP Business One Whitepaper" also represented the Software would support "an unlimited number of simultaneous user transactions." (Compl. ¶21, Exh. C.) On October 20, 2003, Hodell participated in an "Online Webinar and Demonstration" presented jointly by SAP, Amex, and IBM. (Compl. ¶22.) During the course of the Webinar, the suitability of the Software for small and mid-sized wholesale distributors was specifically represented to the attendees, including Hodell's President. *Id.* In November of 2003, a representative of Amex orally informed Hodell that IBIS would be partnering with Amex, and postponed a scheduled meeting between Hodell and Amex. (Compl. ¶23.) Hodell was then contacted by IBIS, which represented [*9] that it was an expert in providing IT solutions to the fastener industry and that "SAP had chosen to partner with The IBIS Group to develop the specific requirements of this vertical market space and bring to market a turn key solution (sic) to this industry." (Compl. ¶24.) On or about December 19, 2003, Hodell was contacted by Amex representatives, who provided assurances that the Software had sufficient capability to serve a business of Hodell's size. (Compl. ¶26.)

During 2004, IBIS continued its marketing efforts for the Software. (Compl. ¶27.) After LSi acquired IBIS in June of 2004, Dan Lowery of LSi joined in the efforts to market the Software to Hodell. *Id.* Though meetings and conversations continued throughout 2004, none of the Defendants ever informed Hodell that the Software: (1) was unsuitable for mid-sized businesses; (2) could only support a limited number of users; (3) could not be installed in a reasonably functioning form; (4) existed with only mediocre or poor support; or (5) would require months of installation lead time. *Id.*

On December 20, 2004, Hodell executed a "Development Agreement" with LSi and issued a Purchase Order for 80 user licenses. (Compl. ¶¶30-32, Exhs. [*10] D, E, and F.) Hodell alleges that SAP was a third party beneficiary under the development agreement. (Compl. ¶33.) According to Hodell, the representations of SAP and its "channel partner" agents — that the Software could be used to support the number of users Hodell required — was essential to the agreement. (Compl. ¶34.) All defendants knew at the time the Development Agreement was executed that Hodell intended to purchase additional licenses to accommodate as many as 300 users. (Compl. ¶34.) Hodell would not have made its initial purchase without assurances that the Software could support the initial 80 users, as well as up to 300 users after expected growth. (Compl. ¶35.) Hodell further relied upon SAP, LSi, and IBIS's assurances that it would receive "high-level" customer support tailored to Hodell's specific needs. (Compl. ¶39.)

At the time the 2004 Development Agreement was executed, Hodell asserts that the Defendants' statements regarding the

---

[4] In their joint Answer, LSi and IBIS admitted that they were "SAP Partners authorized to market and service the SAP Business One product and were agents of SAP for purposes of the SAP products ... [and that they] were SAP partners and agents of SAP for the SAP products." (Doc. No. 30 at ¶¶11-12.)

2010 U.S. Dist. LEXIS 143144, *10

Software — including their statements regarding its user capacity, the attendant customer support, and the number of successful installations — were false, misleading, and made with the intent to induce Hodell to enter into the 2004 Development [*11] Agreement. (Compl. ¶¶41-45.) Notably, at the time Defendants sold Hodell the initial 80 user licenses in December 2004, SAP knew, or was reckless in not knowing, that the Software could not reasonably support more than 30 total users. (Compl. ¶45.)

In December 2005, Hodell purchased an additional 40 user licenses and signed a "License Agreement." (Compl. ¶46, Exh. G.) The License Agreement contains limitations of liability, a choice of law, and warranty waiver provisions relied upon in SAP's Motion. Hodell alleges that it was fraudulently induced into agreeing to these terms. (Compl. ¶62.) By the time Hodell purchased the additional 40 user licenses in December 2005, SAP knew or should have known that the Software could not reasonably support more than 30 users, and, therefore, could not support the 80 user licenses initially purchased by Hodell, let alone the additional 40. (Compl. ¶47.)

Beginning in 2004, Hodell worked diligently with SAP and its "expert channel partner" LSi to implement the Software. (Compl. ¶48.) Efforts to make the Software minimally functional continued until 2008, when Hodell abandoned the effort after reaching the conclusion that the Software had been a complete [*12] failure. Id.

On April 25, 2007, Dan Lowery of LSi sent an email to Hodell demonstrating Defendants' knowledge that the Software was unsuitable for its purposes: "Yes, at the early stages we all started with [the Software], the number most often quoted for users was 250+. On the call, you correctly heard Hodell was pushing the upper limit with 120." (Comp. ¶50.) On September 6, 2007, Hodell received a call from an LSi representative, who admitted that the Software had initially been represented as capable of supporting up to 300 users, but that by May 2006, SAP had reduced that number to 50 users. (Comp. ¶51.)

Due to Defendants' alleged misrepresentations inducing Hodell to enter into the 2004 Development Agreement and the 2005 License Agreement, Hodell asserts it has suffered over $1.3 million in damages. (Compl. ¶¶53-54.)

## IV. Law and Analysis

### A. Governing Law

Although SAP, in its brief, argued for the application of Pennsylvania law to all counts, SAP's counsel conceded at oral argument that Ohio law should be applied when ruling upon the Motion to Dismiss. (Tr. 3, 67.)

### A. Breach of Contract

#### 1. Development Agreement

SAP asserts that Hodell's breach of contract claim should be dismissed with [*13] respect to the Development Agreement. Specifically, SAP argues that SAP America, Inc. and SAP AG are neither signatories nor otherwise bound by that agreement. (Doc. No. 36 at 18-21.) Hodell asserts that SAP is liable for breach of the Development Agreement because LSi was SAP's agent and because SAP was an intended third party beneficiary. The initial provisions of the Development Agreement declare that it is a "Development Agreement Between Hodell-Natco Industries, Inc., The IBIS Group Inc., a wholly owned subsidiary of LSi-Lowery Systems Inc. and LSi-Lowery Systems Inc. (LSi)." (Compl., Exh. D.) The Development Agreement clearly contemplates that LSi, IBIS, and Hodell are the actual parties to the agreement, and that IBIS would work on integrating its In-Flight Enterprise software with SAP's Business One Software. [5] Id. There is no recitation that SAP is a party to the contract. Id. The contract was executed by Otto Reidl, president of Hodell, and Daniel Lowery, president of IBIS and LSi. Id.

Construing as true Hodell's allegation that IBIS and LSi were agents of SAP for the purpose of marketing the Software (Compl. ¶¶13-18), such allegation, without more, does not render SAP a party to the Development Agreement. The Complaint is devoid of any specific allegation that LSi, with either actual or apparent authority, executed the agreement as the agent of SAP and on SAP's behalf. (Compl. ¶¶30-32.) The agreement cannot reasonably be construed as binding SAP as an undisclosed principal, since Hodell's own allegation that LSi was a partner or agent of SAP throughout the course of the negotiations is inconsistent with such an allegation. [6] Even when considering that LSi

---

[5]  The Development Agreement also contemplated that Hodell, after assisting with the integration of the In-Flight Enterprise software with SAP's Business One Software, would receive up to $100,000 [*14] if the resulting product was sold to other users. (Compl, Exh. D.)

[6]  Restatement 3d of Agency, § 1.04(2) - Terminology:

David Sporar

2010 U.S. Dist. LEXIS 143144, *13

may have been an agent for a disclosed principal, SAP. Hodell's allegations still fail to state a claim for breach of contract. There is no ambiguity in the Development Agreement as to the identity of the contracting parties — Hodell and LSi/IBIS. "[W]here a third party contracts with an agent alone, the party cannot maintain an action against the agent's principal. Even if the agent's principal is disclosed, if the agent does not enter into the [*15] contract as agent, but as the sole contracting party, the principal is not bound." *Brown -vs- NAEP, Inc., 1983 Ohio App. LEXIS 12800 (Ohio Ct. App., Nov. 17, 1983)* (citing *Depositors Sav. & Loan Co. v. Gross,* 6 Ohio Law Abs. 606, 1928 Ohio Misc. LEXIS 904 (Ohio Ct. App., July 24, 1928)). "Generally speaking, the real parties to a simple contract should be determined from the intention of the parties as expressed *by the instrument itself.* If the terms of the instrument show an intention to bind the principal, the agent is not liable, since intention gathered from the terms of the instrument must control." 3 Ohio Jur. § 158, *Agency and Independent Contractors* (emphasis added); *see also Soberay Mach. & Equip. Co. v. MRF Ltd., 181 F.3d 759 (6th Cir. 1999).*

In the case at bar, the instrument itself clearly identifies Hodell, LSi, and IBIS as the contracting parties. Generally, agents are not bound by an agreement executed on behalf of a disclosed principal. [7] Here, IBIS and LSi are bound by the terms of the agreement, as it clearly contemplates performance by them in developing and integrating other programs with SAP's Business One Software. While the agreement does call for Hodell to purchase eighty user licenses for SAP's Software, it also specifies that IBIS must "order" the Software from SAP. (Compl., Exh. D.) Also, though the Development Agreement provides that SAP

agreed to sell eighty user licenses for the Software to Hodell in the event IBIS and LSi defaulted, such provision is inconsequential as Hodell was not explicitly bound to purchase the licenses under such circumstances and, in any event, there is no allegation this provision was breached. *See Int'l Customs Assocs. v. Ford Motor Co., 893 F. Supp. 1251, 1256 (S.D.N.Y. 1995)* (finding [*17] that Ford, a non-signatory to the agreement, was entitled to a *Rule 12(b)(6)* dismissal despite the plaintiff's allegation that the contract gave Ford express rights and imposed corresponding obligations in one provision, because there was no allegation that Ford breached that provision). *Id.*

Hodell also argues that the Development Agreement is enforceable against SAP, because SAP was a third party beneficiary of the agreement. (Compl. ¶33.) "Only a party to a contract or an intended third-party beneficiary of a contract may bring an action on a contract in Ohio." *Thornton v. Windsor House, Inc., 566 N.E.2d 1220, 57 Ohio St. 3d 158, 161 (Ohio 1991).* Potential benefits to a third party that are merely incidental to the contract are insufficient to support a breach of contract cause of action by the third party. *Id.*

> (1) Unless otherwise agreed between promisor [*18] and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either.
>
> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

---

(a) Disclosed principal. A principal is disclosed if, when an agent and a third party interact, the third party has notice that the agent is acting for a principal and has notice of the principal's identity.

(b) Undisclosed principal. A principal is undisclosed if, when an agent and a third party interact, the third party has no notice that the agent is acting for a principal.

(c) Unidentified principal. A [*16] principal is unidentified if, when an agent and a third party interact, the third party has notice that the agent is acting for a principal but does not have notice of the principal's identity.

---

[7]  Restatement 3d of Agency, § 6.01 - Agent for Disclosed Principal:

   When an agent acting with actual or apparent authority makes a contract on behalf of a disclosed principal,

      (1) the principal and the third party are parties to the contract; and

      (2) the agent is not a party to the contract unless the agent and third party agree otherwise.

Case: 1:08-cv-02755-DCN  Doc #: 341-1  Filed: 06/12/15  35 of 70.  PageID #: 17398

Page 6 of 12
2010 U.S. Dist. LEXIS 143144, *18

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

[*Comment c to Section 302* states]:

Performance of a contract will often benefit a third person. But unless the third person is an intended beneficiary as here defined, no duty to him is created. * * *

*Hill v. Sonitrol of Southwestern Ohio, Inc., 521 N.E.2d 780, 36 Ohio St. 3d 36, 40 (Ohio 1988)* (quoting and adopting *Section 302 of the Restatement of the Law 2d, Contracts* (1981)); *see also Bell v. City of Cleveland, 2007 U.S. Dist. LEXIS 62566 at **12-13 (N.D. Ohio Aug. 24, 2007)* ("A mere incidental or indirect benefit of a contract flowing to a non-party is not sufficient to give such party a cause of action in breach.") (citations omitted).

Here, however, it is *not* SAP that is claiming [*19] it is an intended third party beneficiary and, therefore, entitled to enforce the contract against Hodell. Rather, it is Hodell, in attempting to enforce the contract against SAP, that claims SAP is a third party beneficiary. While it is well established that an action for breach of contract can be maintained *by* an intended third party beneficiary, "there is very little authority addressing the question of whether and/or when third-party beneficiaries assume actual liability under a contract." *Resource Title Agency, Inc. v. Morreale Real Estate Servs., 314 F. Supp. 2d 763, 776 (N.D. Ohio 2004)*. In *Resource Title*, it was noted that two Ohio decisions provide support for the proposition that an intended third party beneficiary may be held liable pursuant to a contract. *Id.* (citing *Ohio Match Co. v. Elm Grove Min. Co.*, 5 Ohio Law Abs. 151 (Ohio Ct. App. 1927) and *Saum v. Moenter, 654 N.E.2d 1333, 101 Ohio App.3d 48 (Ohio Ct. App. 1995)*). However, in *Resource Title* the Court found that those cases were "highly fact-specific and do not stand for the general proposition that intended third-party beneficiaries always assume liabilities under the contract, they illustrate that, in particular [*20] cases, a third-party beneficiary may be so held liable." *Id. at 771*.

The facts of this case are not analogous to either *Ohio Match* or *Saum*. In *Ohio Match*, the defendant did not sign the relevant purchase agreement but did initially accept shipments of coal and make payments to the Mining Company in accordance with the terms of the agreement. *5 Ohio Law Abs. at *1*. Later, however, it refused to pay the price stipulated in the agreement. *Id.* Here, there is no allegation that SAP conducted itself as if it was bound by the Development Agreement. In *Saum*, defendant Moenter was found liable to his former wife's parents for a loan they made to her before the marriage even though he was not a party to the loan and did not negotiate the terms. *101 Ohio App.3d at 52-53*. The *Saum* court explained that Moenter was an intended third-party beneficiary because the loan was made to allow the couple to finance the building of their home. *Id.* Moenter became obligated on the loan by accepting its benefits and by making payments on the loan out of the couple's joint checking account while the marriage lasted. *Id.* Accepting as true the facts pled by Hodell, it cannot be said that, by entering into the Development [*21] Agreement, the parties intended to benefit SAP. Hodell has not alleged that it intended to confer any sort of benefit upon SAP. The Development Agreement also cannot reasonably be construed as conferring any right of action upon SAP in the event Hodell cancelled or breached the agreement, as it did not obligate Hodell to purchase the Software from SAP. [8] Rather, the agreement contemplated that, for monetary consideration provided by Hodell, IBIS would lead a development effort to integrate its software with SAP's Business One Software, which IBIS, in turn, would procure from SAP. Though the Court is mindful that allegations must be construed in Hodell's favor, the claim that SAP was a third party beneficiary is essentially a legal conclusion unwarranted by the factual allegations in the Complaint.

As such, it is recommended that [*22] Hodell's action for breach of contract against the SAP defendants, as it relates to the Development Agreement, be dismissed.

## 2. License Agreement

Although SAP does not characterize its 12(b)(6) motion as requesting partial judgment on the pleadings, it is clear both through SAP's brief and from oral arguments that there is no challenge to Hodell's action for breach of contract with respect to the License Agreement against SAP America, Inc. (Tr. 14, 17.) The SAP defendants do argue, however, that SAP AG is not party to the License Agreement. Hodell argues that SAP AG was either a direct contracting party, a third-party beneficiary, or a principal acting in concert with SAP America, Inc. (Doc. No. 40 at 26.) The express

---

[8]  The Development Agreement seems to provide that the Software would not actually be purchased from SAP until satisfactory progress reviews for the separate development of IBIS's In-Flight application. It also gives Hodell the option to be released from the agreement with a refund after 150 days if the project is substantially behind schedule. (Compl., Exh. D.)

Case: 1:08-cv-02755-DCN  Doc #: 341-1  Filed:  06/12/15  36 of 70.  PageID #: 17399

Page 7 of 12
2010 U.S. Dist. LEXIS 143144, *22

language of the License Agreement states that it was between "SAP America, Inc.. a Delaware corporation ... and Hodell-Natco Ind.. a Ohio corporation...." (Compl.. Exh. G.)

Hodell's argument that SAP AG is a party to the License Agreement fails for the same reasons the Court found that SAP was not a party to the Development Agreement. Hodell has not sufficiently alleged that SAP America. Inc. was acting as the agent for SAP AG and entered into the agreement on SAP AG's behalf.  [*23] Relying on the instrument itself, it is clear that the parties to the agreement are SAP America, Inc. and Hodell. Assuming *arguendo* that SAP America, Inc. was SAP AG's agent, where an agent enters into a contract as the sole contracting party, the principal is not bound. As SAP AG is not a signatory to the contract and nothing in the agreement can reasonably be interpreted as an intent to bind SAP AG, the Court finds that SAP AG was not a party to the License Agreement. [9]

Though Hodell alleges that SAP AG is a third-party beneficiary to the License Agreement, the allegation is no less conclusory than its allegations with respect to the Development Agreement. In fact. Hodell's brief contains no real argument with respect to why it believes SAP AG should be construed as a third party beneficiary to the License Agreement, but merely refers to its prior arguments relating  [*24] to SAP AG and the Development Agreement. (Doc. No. 40 at 26.) Though SAP AG may indeed derive some benefit from the agreement as the owner of both the Software and SAP America. Inc.. there is no allegation that the parties to the agreement intended to benefit SAP AG or that SAP AG was anything more than an incidental beneficiary. As such. it is recommended that Hodell's cause of action for breach of the License Agreement be dismissed with respect to SAP AG only. [10]

**B. Tort Claims**

**1. Federal Rule of Civil Procedure 9(B)**

SAP alleges that Hodell's fraud and fraud in the inducement claims should be dismissed for failure to plead with the particularity required by *Federal Rule of Civil Procedure 9(b)* ("*Rule 9(b)*). (Doc. No. 36 at 24-25.) The Sixth Circuit. however. has often noted that even where plaintiff fails to satisfy the requirements of *Rule 9(b).* "in the absence of

defendants' motion for more definite statement under *Rule 12(e).* dismissal on this basis  [*25] alone would not be appropriate." *Coffey v. Foamex L.P.. 2 F.3d 157, 162 (6th Cir. 1993)* (citing *Hayduk v. Lanna, 775 F.2d 441, 445 (1st Cir. 1985)); accord Legge v. Wagner, 1993 U.S. App. LEXIS 27050 at *6 (6th Cir. Oct. 14, 1993); Resource Title Agency. Inc. v. Morreale Real Estate Servs., 314 F. Supp. 2d 763, 776 (N.D. Ohio 2004)* (Wells. J.) As such, SAP's argument that the case should be dismissed for failure to comply with *Rule 9(b)* is not well taken.

**2. Elements of Fraud. Fraud In The Inducement. Negligent Misrepresentation, and Negligence**

According to Ohio law, in order to maintain a cause of action for fraud, a plaintiff must demonstrate the following:

> (a) a representation or, where there is a duty to disclose, concealment of a fact; (b) which is material to the transaction at hand; (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (d) with the intent of misleading another into relying upon it; (e) justifiable reliance upon the representation or concealment; and (f) a resulting injury proximately caused by the reliance.

*Cohen v. Lamko, Inc., 462 N.E.2d 407, 10 Ohio St. 3d 167, 169, 10 Ohio B. 500 (Ohio 1984)* [*26] (citations omitted); *accord Magical Farms, Inc. v. Land O'Lakes, Inc., 356 Fed. Appx. 795 (6th Cir. 2009); David A. Flynn, Inc. v. GMAC, 2008 U.S. Dist. LEXIS 41597 (N.D. Ohio May 23, 2008),* "The elements of the claim are conjunctive, and accordingly all of them must be shown." *Graham v. Am. Cyanamid Co., 350 F.3d 496, 507 (6th Cir. 2003).*

Also, under Ohio law, "a claim of fraud in the inducement arises when a party is induced to enter into an agreement through fraud or misrepresentation. . . . A classic claim of fraudulent inducement asserts that a misrepresentation of facts outside the [agreement] or other wrongful conduct induced a party to enter into the [agreement]." *Am. Coal Sales Co. v. N.S. Power Inc., 2009 U.S. Dist. LEXIS 13550 (S.D. Ohio, Feb. 23, 2009)* (citing *ABM Farms, Inc. v. Woods, 81 Ohio St. 3d 498, 502-3, 1998 Ohio 612, 692 N.E.2d 574 (Ohio 1998)).* To prove fraudulent inducement,

---

[9]  SAP AG is mentioned twice in the agreement in the "Definitions" section. (Compl.. Exh. G. §§ 1.7 and 1.10.) One reference merely states that the SAP Business One Software was developed by SAP America, Inc. and/or SAP AG. *Id.* The other states that SAP is the licensor of SAP propriety information to SAP America. Inc. *Id.*

[10]  SAP also disputes the type of damages recoverable under the contract based on limitations within the contract. As discussed below. it is premature to decide at this early stage of the proceedings what sort of damages may be recovered.

2010 U.S. Dist. LEXIS 143144, *26

a plaintiff must demonstrate the same above cited elements necessary to prove an action for fraud. *See, e.g., Micrel, Inc. v. TRW, Inc., 486 F.3d 866, 874 (6th Cir. 2007); Scotts Co. LLC v. Liberty Mut. Ins. Co., 606 F. Supp. 2d 722, 741 (S.D. Ohio 2009).*

Under a claim for negligent misrepresentation [*27] in Ohio, a defendant who, "in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions . . . is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *David A. Flynn, Inc. v. GMAC, 345 Fed. Appx. 974, 977 (6th Cir. 2009) (citing Andersons, Inc. v. Consol, Inc., 348 F.3d 496, 505-06 (6th Cir. 2003)); Delman v. City of Cleveland Heights, 534 N.E.2d 835, 41 Ohio St. 3d 1, 4 (Ohio 1989).*

To maintain a cause of action for negligence, "the plaintiff must show (1) the existence of a duty, (2) a breach of duty, and (3) an injury proximately resulting therefrom." *Armstrong v. Best Buy Co., 788 N.E.2d 1088, 99 Ohio St. 3d 79, 81, 2003 Ohio 2573 (Ohio 2003).*

### 3. Analysis

Based upon the Court's review of the Complaint, the briefs, and the oral arguments presented by the parties, it appears that Hodell's fraud, fraud in the inducement, and negligent misrepresentation claims revolve around allegations that the SAP defendants, [*28] directly and through their agents, knowingly, recklessly, or negligently misrepresented the capabilities of the Software, particularly with respect to the number of users that could be accommodated.

Specifically, Hodell has alleged that SAP represented, through its agents and/or marketing materials, that the Software was capable of handling users well in excess of the 120 licenses Hodell purchased. In fact, Hodell states that the Software was unable to accommodate more than 30 users. (Compl. ¶¶18-19, 34-36, 42-43, 47, 50-51.) Further, Hodell has alleged that SAP knew, or was reckless in not knowing, that the Software was incapable of supporting the 80 licenses purchased in December of 2004 or the 40 additional licenses purchased in December 2005. *Id.* Hodell has stated that the representations as to user capabilities was a critical factor in the decision to purchase the Software. *Id.* As such,

Hodell has sufficiently alleged that SAP made a representation that was material to Hodell's decision to enter into both the Development Agreement and the License Agreement, that the representation was false or made with an utter disregard or recklessness as to whether it was true or false, that [*29] the representation was made to induce Hodell to purchase the Software, and that Hodell justifiably relied upon the representation resulting in injuries caused by the reliance. Hodell has sufficiently alleged claims for fraud and fraud in the inducement. Furthermore, the same allegations support a cause of action for negligent misrepresentation, as it has been alleged that SAP, in the course of its business, or concerning a transaction in which had a pecuniary interest, supplied false information, without exercising reasonable care or competence, for the guidance of Hodell. The elements of justifiable reliance and pecuniary loss are indistinguishable from those for fraud.

SAP acknowledges that a defendant may be liable for fraudulent inducement even though that defendant is not a party to the agreement. (Tr. 26, 52-54.) As such, SAP's status as a non-party to the Development Agreement does not necessarily bar Hodell's cause of action against SAP for fraudulent inducement. SAP, however, argues that these tort claims should be dismissed because: (1) "the economic loss" rule bars an action in tort where there is a valid contract; and, (2) the alleged misrepresentations may not be considered [*30] under the parol evidence rule, as any pre-contractual representations are negated by the integration and merger clause of the License Agreement. [11]

#### a. Economic Loss Rule

SAP asserts that Hodell cannot maintain a tort claim where the damages sought are purely economic. (Doc. No. 36 at 15-16.) Though SAP relied primarily on Pennsylvania law, it also cited several Ohio decisions. *See Fitzgerald v. Roadway Express, Inc., 262 F. Supp. 2d 849, 855 (N.D. Ohio 2003); Telephone Mgmt. Corp. v. Goodyear Tire & Rubber Co., 32 F. Supp. 2d 960 (N.D. Ohio 1998)* (plaintiff cannot rework a purely contractual relationship into a tort claim); *Corporex Dev. Constr. Mgmt. v. Shook, Inc., 106 Ohio St. 3d 412, 2005 Ohio 5409, 835 N.E.2d 701, 704 (Ohio 2005)* (under Ohio law, the economic loss rule precludes recovery in tort for purely economic losses); *Pavlovich v. Nat'l City Bank, 435 F.3d 560 (6th Cir. 2006)* (stating same).

The *Fitzgerald* decision does not discuss the economic loss rule and is inapplicable. *Telephone Mgmt. Corp.* is not

---

[11]  SAP conceded that the "gist of the action" doctrine it advanced as another reason to dismiss Hodell's tort claims is inapplicable under Ohio law. (Tr. 67.)

David Sporar

2010 U.S. Dist. LEXIS 143144, *30

controlling as it deals with a plaintiff attempting to [*31] maintain an action for a breach of an implied covenant of good faith and fair dealing. In *Corporex*, the Ohio Supreme Court stated that "[t]he economic-loss rule generally prevents recovery in tort of damages for purely economic loss." However, read in its proper context, it appears that the *Corporex* court was discussing simple negligence actions and not intentional torts. Immediately after the above statement, the Ohio Supreme Court quoted an earlier decision that specifically stated as follows: "The well-established general rule is that a plaintiff who has suffered only economic loss due to another's *negligence* has not been injured in a manner which is legally cognizable or compensable." *Id.* (quoting *Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.,*537 N.E.2d 624, 42 Ohio St. 3d 40 (Ohio 1989)* (emphasis added)).  [12]

Other courts have been critical of the *Corporex* decision to the extent that it suggests that *all* torts are barred by the economic loss rule where there is a contract. For example, the Ninth Circuit Court of Appeals observed that the economic loss doctrine has caused much confusion, primarily because some courts have mistakenly stated in "overly broad terms that purely economic losses cannot be recovered in tort." *Giles v. GMAC, 494 F.3d 865, 874 (9th Cir. 2007).* The *Giles* court asserted that "[s]uch broad statements are not accurate [as] tort law has traditionally protected individuals from a host of wrongs that cause only monetary damage" such as fraud, fraud in the inducement, or conversion actions. *Id. at 875* (noting that "[m]ost courts that have applied the economic loss doctrine beyond product liability cases have done so to bar recovery of economic loss in negligence and [*33] strict liability.")

A prior decision of this Court declined to extend the economic loss doctrine to negligent misrepresentation claims. *J.F. Meskill Enters., LLC v. Acuity, 2006 U.S. Dist. LEXIS 41491 (N.D. Ohio Apr. 7, 2006).* The "*Corporex* [decision] thus makes clear that although tort claims are generally barred by the economic loss doctrine, the discrete tort generally referred to as negligent misrepresentation is not." *Id. at *12*; *accord Long v. Time Ins. Co., 572 F. Supp. 2d*

*907, 912 (S.D. Ohio 2008)* ("Negligent misrepresentation claims survive the economic loss doctrine."); *see also Lee v. Dublin Manor Corp., 2007 U.S. Dist. LEXIS 56703 at *19 (S.D. Ohio, Aug. 3, 2007)* (denying a motion for a dismissal under *Rule 12(b)(6)* because "Ohio courts generally do not apply the economic loss rule to preclude negligent misrepresentation claims").

It would be inherently inconsistent to find that negligent misrepresentation claims survive the economic loss doctrine while fraud or fraud in the inducement claims do not. While the economic loss doctrine prevents a party from recovering in tort for breach of duties assumed only by contract, "fraudulent inducement involves a general duty to avoid [*34] wrongful conduct that induces a party to enter into a contract." *Onyx Environmental Services, LLC v. Maison, 407 F. Supp.2d 874, 879 (N.D. Ohio 2005)* (finding that because fraud and contract duties are distinct from one another, the economic loss doctrine does not bar plaintiff's fraud claim). A decision from the Southern District for Ohio also supports the proposition that the economic loss rule does not bar fraud in the inducement claims. *See Marine Direct v. Dougherty Marine, Inc., 2007 U.S. Dist. LEXIS 1414 (S.D. Ohio, Jan. 8, 2007).* In terms similar to the Ninth Circuit's decision in *Giles*, the *Marine Direct* decision explains that claims of fraudulent inducement allow for the recovery of purely economic loss, as "in most cases where fraudulent inducement is claimed, the alleged losses are purely economic." *Id. *6*; *cf. MyVitanet.com v. Kowalski, 2008 U.S. Dist. LEXIS 57745 (S.D. Ohio, Jul. 29, 2008)* (addressing whether the economic loss rule in Ohio applies to intentional torts, but not deciding the matter as plaintiff alleged non-economic losses).

On the other hand, Hodell cannot maintain a simple negligence action. Hodell has failed to allege breach of any duty independent of [*35] contract and the economic loss rule clearly bars simple negligence actions where, as here, no non-economic damages have been alleged.  [13] As such, it is recommended that Hodell's negligence claim contained in Count Four be dismissed. Undoubtedly, there is some ambiguity in the case law discussed above as it relates to

---

[12]  Though the language from *Corporex* was cited with approval by the Sixth Circuit in *Pavlovich, 435 F.3d at 569,* that Court was addressing a negligence claim and not an intentional tort claim. Similarly, this Court followed the *Corporex* decision in *Integrated Molding Concepts, Inc. v. Stopol Auctions, 2007 U.S. Dist. LEXIS 75646 at *11 (N.D. Ohio Oct. 11, 2007).* Again, [*32] however, that case addressed a negligence action and not fraud, fraud in the inducement, or negligent misrepresentation. *Id.; see also, Transcon. Ins. Co. v. Simplexgrinnell LP, 2006 U.S. Dist. LEXIS 48654 at *20 (N.D. Ohio July 17, 2006)* (granting summary judgment on negligence claim due to economic loss rule).

[13]  Although Hodell claims it has alleged non-economic damages, counsel, at oral argument, was unable to point to any specific allegation of non-economic damages in the Complaint when asked to do so. (Tr. 73-74.) Counsel speculated that perhaps there was some damage to Hodell's information systems and suggested that discovery may reveal evidence of property damage. *Id.* Discovery, however,

2010 U.S. Dist. LEXIS 143144, *35

Hodell's remaining tort claims. This Court, however, cannot find that Hodell has failed to state a claim upon which relief can be granted. It does not appear that Ohio courts intended to extend the economic loss rule beyond negligence actions to bar intentional torts as well. Indeed it is a rare case where fraud or fraud in the inducement results in non-economic damages (*i.e.* damages to person or property). SAP's all-encompassing construction of the economic loss rule would effectively eviscerate the viability of fraud and fraudulent inducement tort claims in Ohio. The above cited federal court decisions applying Ohio law have implicitly declined to extend the economic loss rule to the extent advocated by SAP. As such, the Court finds SAP's argument that Hodell's fraud, fraud in the inducement, and negligent misrepresentation claims are barred by the economic loss rule  [*36] to be without merit.

**b. Parol Evidence Rule and Integration/Merger Clause**

In a related argument, SAP claims that the parol evidence rule and the integration clause contained within the License Agreement combine to bar Hodell's fraud, fraud in the inducement, and negligent misrepresentation claims. (Doc. No. 36 at 8-12, 15-16.) The License Agreement contains the following provision:

> This Agreement and each Schedule and Appendix hereto constitute the complete and exclusive statement of the agreement between SAP and Licensee, and all previous representations, discussions, and writings are merged in, and superseded by, this Agreement. This Agreement may  [*37] be modified only by a writing signed by both parties. This Agreement and each Appendix hereto shall prevail over any additional, conflicting, or inconsistent terms and conditions which may appear on any purchase order or other document furnished by Licensee to SAP.

(Compl., Exh. G § 11.9.)

In *Galmish v. Cicchini, 734 N.E.2d 782, 90 Ohio St.3d 22, 2000 Ohio 7 (Ohio 2000)*, the Ohio Supreme Court conducted a thorough analysis of the relationship between claims of fraud and the parol evidence rule.

> The parol evidence rule states that "absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements." 11 Williston on Contracts (4 Ed.1999) 569-570, Section 33:4.

\* \* \*

> The principal purpose of the parol evidence rule is to protect the integrity of written contracts. *Ed Schory & Sons, Inc. v. Soc. Natl. Bank (1996), 75 Ohio St. 3d 433, 440, 662 N.E.2d 1074, 1080, 1996 Ohio 194*. By prohibiting evidence of parol agreements, the rule seeks to ensure the stability, predictability, and enforceability of finalized written instruments. "It reflects and implements  [*38] the legal preference, if not the talismanic legal primacy, historically given to writings. It effectuates a presumption that a subsequent written contract is of a higher nature than earlier statements, negotiations, or oral agreements by deeming those earlier expressions to be merged into or superseded by the written document." (Footnotes omitted.) 11 Williston on Contracts, supra, at 541-548, Section 33:1.

> Nevertheless, *the parol evidence rule does not prohibit a party from introducing parol or extrinsic evidence for the purpose of proving fraudulent inducement. Drew v. Christopher Const. Co., Inc. (1942), 140 Ohio St. 1, 23 Ohio Op. 185, 41 N.E.2d 1018*, paragraph two of the syllabus. *See, also, Union Mut. Ins. Co. of Maine v. Wilkinson (1871), 80 U.S. (13 Wall.) 222, 231-232, 20 L. Ed. 617, 622*. As explained in Annotation, Parol-Evidence Rule; Right to Show Fraud in Inducement or Execution of Written Contract (1928), 56 A.L.R. 13, 34-36:

> "The principle which prohibits the application of the parol-evidence rule in cases of fraud inducing the execution of a written contract \* \* \* has been regarded as being as important and as resting on as sound a policy as the parol-evidence rule itself.  [*39] It has been said that if the courts were to hold, in an action on a written contract, that parol evidence should not be received as to false representations of fact made by the plaintiff, which induced the defendant to execute the contract, they would in effect hold that the maxim that fraud vitiates every transaction is no longer the rule; and such a principle would in a short time break down every barrier which the law has erected against fraudulent dealing.

> "*Fraud cannot be merged*; hence the doctrine, which is merely only another form of expression of the parol-evidence rule, that prior negotiations and

is unnecessary for Hodell to ascertain whether its own information systems have been damaged, as such information would plainly be within Hodell's possession.

conversations leading up to the formation of a written contract are merged therein, is not applicable to preclude the admission of parol or extrinsic evidence to prove that a written contract was induced by fraud." (Footnotes omitted.)

Stated differently, *"it was never intended that the parol evidence rule could be used as a shield to prevent the proof of fraud, or that a person could arrange to have an agreement which was obtained by him through fraud exercised upon the other contracting party reduced to writing and formally executed, and thereby deprive the courts of the power to* [*40] *prevent him from reaping the benefits of his deception or chicanery."* (Footnotes omitted.) 37 American Jurisprudence 2d (1968) 621-622, Fraud and Deceit, Section 451.

Contrary to [defendant's] assertions, this principle does not lose its force merely because the considered written agreement contains an integration clause. The parol evidence rule applies, in the first instance, only to integrated writings, and an express stipulation to that effect adds nothing to the legal effect of the instrument. The presence of an integration clause makes the final written agreement no more integrated than does the act of embodying the complete terms into the writing. Thus, *the presence of an integration provision does not vitiate the principle that parol evidence is admissible to prove fraud. See Blackledge v. Allison (1977), 431 U.S. 63, 75, 97 S. Ct. 1621, 1630, 52 L. Ed. 2d 136, 148, fn. 6; Downs v. Wallace (Ala.1993), 622 So. 2d 337, 341;* Annotation, *supra,* 56 A.L.R. at 56-62; 37 American Jurisprudence 2d, *supra,* at 622-623, Section 452; 11 Williston on Contracts, *supra,* at 661-673, Section 33:21.

\*\*\*

Thus, *"the rule excluding parol evidence of collateral promises to vary a written contract does* [*41] *not apply where such contract is induced by promises fraudulently made, with no intention of keeping them* * * *."* 37 American Jurisprudence 2d, supra, at 623, Section 452. However, *the parol evidence rule does apply "to such promissory fraud if the evidence in question is offered to show a promise which contradicts an integrated written agreement.* Unless the false promise is either independent of or consistent with the written instrument, evidence thereof is inadmissible."

*Alling v. Universal Mfg. Corp. (1992), 5 Cal. App. 4th 1412, 1436, 7 Cal. Rptr. 2d 718, 734.* By the same token, "if the written contract provides for the doing of an act on a certain condition, the promisee cannot show that the promise was an absolute one merely by claiming fraud, unless he produces some other evidence of the alleged fraud." Annotation, supra, 56 A.L.R. at 47-48.

*Id. at 788-790* (emphasis added).

The Ohio Supreme Court's analysis in *Galmish* is fatal to SAP's position. Hodell alleges that SAP represented its Software could at least accommodate the 80 licenses contemplated in the Development Agreement and the additional 40 licenses purchased at the time the License Agreement was signed. This representation  [*42] is not inconsistent with any provision of the License Agreement. [14] Hodell has further alleged that SAP knew of the falsity or was, at the very least, reckless in making such representation. Had the License Agreement stated that the Software could only handle thirty users, or that SAP did not make any representations or guarantees as to the number of users the Software could handle, the parol evidence rule might well bar evidence of contradictory terms. Here, however, if it is true that SAP falsely represented the number of user licenses the Software could handle — and the Court must construe such allegations as true on a 12(b)(6) motion — then arguably both agreements were induced by promises fraudulently made that SAP had no intention of keeping or, more appropriately, had no ability to keep.

For the foregoing reasons, it is recommended  [*43] that SAP's motion to dismiss the fraud, fraud in the inducement, and negligent misrepresentation claims in the Amended Complaint be denied.

## C. Damages

In its motion, SAP argues that all of Hodell's claims are barred due to waivers of certain warranties in the License Agreement. (Doc. No. 36 at 20-24.) At oral arguments, SAP conceded that Hodell can maintain a breach of contract claim against SAP America, Inc. with respect to the License Agreement. (Tr. 14, 17.) At this stage of the proceedings, it is premature to determine the kind of damages a party may recover except where the damages sought are contrary to statute. Though SAP may ultimately be correct that all

---

14   The License Agreement states that "SAP warrants that the Software will substantially conform to the functional specifications contained in the Documentation for six months following delivery." (Compl., Exh. G. § 7.1.) Neither party has shed any light on what writings consist of "the Documentation" — an issue that may be best left for the discovery process.

2010 U.S. Dist. LEXIS 143144, *43

implied warranties were disclaimed in the License Agreement, such an assertion does not defeat Hodell's claim. Certainly, Hodell would be entitled to some damages in the event it prevails on a breach of contract claim. Though Hodell's recovery may be limited by the express terms of the agreement, those limitations do not defeat the cause of action itself. Similarly, SAP's argument that Hodell's prayer for punitive damages should be dismissed is also rejected. Punitive damages do not constitute a claim. Furthermore, punitive [*44] damages are available in tort actions where a defendant has displayed "a conscious disregard for the plaintiff's rights..." *Magical Farms, Inc. v. Majestic Meadows Alpacas, Inc., 356 Fed. Appx. 795, 799-800 (6th Cir. 2009)*. Whether Hodell can demonstrate the element of malice necessary to recover punitive damages remains to be seen. However, pleading standards are certainly not so onerous as to require a party to prove every element of its prayer for damages before any discovery has been conducted.

**V. Conclusion**

It is recommended that the SAP defendants' Motion to Dismiss the Amended Complaint (Doc. No. 36) be GRANTED in part and DENIED in part. Specifically, Hodell's claim for breach of the Development Agreement should be dismissed as it relates to the SAP defendants.

Hodell's claim for breach of the License Agreement should be dismissed *only* as it relates to Defendant SAP AG, as Hodell can maintain a claim for breach of that contract against Defendant SAP America, Inc. only. Finally, Hodell's fourth cause of action alleging negligence should also be dismissed. SAP's Motion to Dismiss should be denied with respect to counts one, two and five (fraud, fraud in the inducement, and negligent [*45] misrepresentation).

/s/ Greg White

U.S. Magistrate Judge

Date: September 2, 2010

**OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.** *28 U.S.C. § 636(b)(1)(C)*. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111, 106 S. Ct. 899, 88 L. Ed. 2d 933 (1986).

◆ Positive
As of: June 12, 2015 5:01 PM EDT

## *Reengineering Consultants, Ltd. v. EMC Corp.*

United States District Court for the Southern District of Ohio, Eastern Division

January 14, 2009, Decided; January 14, 2009, Filed

Case No. 2:08-cv-47

**Reporter**
2009 U.S. Dist. LEXIS 2627; 2009 WL 113058

REENGINEERING CONSULTANTS, LTD., d/b/a RESULTS ENGINEERING, Plaintiff, v. EMC CORP. f/k/a CAPTIVA SOFTWARE CORP., Defendant.

**Subsequent History:** Motion granted by, Summary judgment denied by, As moot *Reengineering Consultants, Ltd. v. EMC Corp., 2010 U.S. Dist. LEXIS 29965 (S.D. Ohio, Mar. 29, 2010)*

## Core Terms

tortious interference, business relationship, tort claim, Pleadings, parties, Partial, argues, statute of limitations, choice of law, alleges, economic loss rule, economic loss, soliciting, customers, factors, breach of contract claim, judicial admission, prospects, existence of the contract, economic loss doctrine, motion to dismiss, valid contract, asserts, motive

**Counsel:** [*1] For Reengineering Consultants, LTD, doing business as Results Engineering, Plaintiff: John Edward Haller, LEAD ATTORNEY, Shumaker Loop & Kendrick, Columbus, OH; Anthony M Sharett, Bricker & Eckler, LLP, Columbus, OH.

For EMC Corporation, formerly known as Captiva Software Corporation, Defendant: John F Marsh, LEAD ATTORNEY, Hahn Loeser & Parks LLP, Columbus, OH; April L Opper, Hahn Loeser & Parks LLP, Columbus, OH.

**Judges:** John D. Holschuh, United States District Judge, Magistrate Judge Abel.

**Opinion by:** John D. Holschuh

## Opinion

### MEMORANDUM OPINION & ORDER

Plaintiff Results Engineering, an Ohio corporation, sues Defendant EMC Corp. ("EMC") alleging claims for breach of contract and tortious interference with business relations. The claims arise from a contract that Plaintiff entered into with Captiva Software Corporation ("Captiva"), a California corporation, which has since been acquired by EMC. Plaintiff alleges that Captiva, by soliciting business from Plaintiff's prospective customers, not only breached the contract, but also tortiously interfered with Plaintiff's business relations. The matter is before the Court on EMC's motion for partial judgment on the pleadings under *Rule 12(c)* or, alternatively, for partial [*2] summary judgment under *Rule 56 of the Federal Rules of Civil Procedure*. (Doc. # 15). According to EMC, Plaintiff's tortious interference with business relations claim is barred by statute of limitations, or, alternatively, by the existence of a contract between the parties. For the following reasons, the Court **GRANTS** EMC's motion to dismiss Plaintiff's tortious interference with business relations claim.

### I. Background [1]

On October 1, 2004, Plaintiff entered into a contract with Captiva. (Am. Compl. P 3.) The contract, a Reseller Agreement, authorized Plaintiff to market software solutions it created with Captiva to Plaintiff's end users or prospects. (Am. Compl. Ex. A.) Section 8(d) of that contract prohibits Captiva from knowingly soliciting business from Plaintiff's end users or prospects. The provision requires Captiva to make reasonable efforts to refer inquiries it knowingly receives from Plaintiff's current or prospective customers to Plaintiff. Finally, the provision contains notification requirements [*3] to be met by Captiva in the event one of Plaintiff's end users or prospects insists on doing business directly with Captiva.

---

[1] The following factual information is taken from Plaintiff's complaint and is assumed to be true for the purposes of this motion. See *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)*.

2009 U.S. Dist. LEXIS 2627, *3

Plaintiff claims that Captiva breached § 8(d) of the contract. (Am. Compl. PP 30-40.) According to Plaintiff, Captiva knowingly solicited orders for its software from four of Plaintiff's prospective customers--three Ohio corporations and one Ohio state agency. With respect to one of these prospective customers, Plaintiff alleges, if Captiva did not directly solicit the business, then Captiva failed to notify Plaintiff that it had been approached by one of Plaintiff's prospects as required under the contract. Plaintiff also alleges that Captiva, by knowingly soliciting the business of these four prospective customers, and through its contacts with another of Plaintiff's prospects, tortiously interfered with Plaintiff's business relations. (Am. Compl. P 41-48.) Plaintiff asserts that Captiva's breach of contract and tortious interference with its business relations caused Plaintiff to lose at least $ 1.5 million in profits, future license sales, professional services, and maintenance revenue.

EMC responds that Plaintiff's tortious interference with business relations [*4] claim is barred by statute of limitations, or, alternatively, by the existence of a contract between the parties. (Def.'s Mot. for Partial J. on Pleadings 1-2.) According to EMC, California law applies in this diversity action, subjecting Plaintiff's tort claim to California's two year statute of limitations.

EMC asserts that Plaintiff brought this suit more than two years after learning of Captiva's alleged wrongdoing. (Def.'s Mot. for Partial J. on Pleadings 5-8.) EMC argues alternatively that if Ohio law governs, making California's statute of limitations inapplicable, Plaintiff's tort claim is still precluded, under Ohio's economic loss doctrine, by the existence of a valid contract between the parties. (Def.'s Mot. for Partial J. on Pleadings 8-11.) EMC's motion to dismiss this claim under _Rule 12(c)_ or, alternatively, for summary judgment on the claim under _Rule 56_, is now before the Court.

**II. Choice of Law**

A federal court sitting in diversity applies the choice of law rules of the state in which it sits. _Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941)_. Therefore, Ohio's choice of law rules govern this case.

In tort actions, to determine which state's law governs, [*5] Ohio courts apply the balancing test set forth in the Restatement (Second) of Conflicts of Laws ("Restatement"). _Muncie Power Prods., Inc. v. United Techs. Auto., Inc., 328 F.3d 870, 873-74 (6th Cir. 2003); Morgan v. Biro Mfg. Co.,_

_Inc., 15 Ohio St.3d 339, 342, 15 Ohio B. 463, 474 N.E.2d 286, 289 (Ohio 1984)_. According to _§ 145 of the Restatement,_ "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties . . . ." _RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145_ (1971). To determine which state has the most significant relationship to the occurrence and the parties, _§ 145_ provides four factors to be considered by courts:

> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>
> (d) the place where the relationship, if any, between the parties is centered.

_Id._ The factors above "are to be evaluated according to their relative importance with respect to the particular issue." _Id._

Plaintiff argues [*6] that, applying the four factors above, Ohio has the most significant relationship to the alleged tortious conduct and the parties in this case. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Partial J. on Pleadings 5-7.) The Court agrees. First, and most important, Plaintiff's alleged injury occurred in Ohio. See _RESTATEMENT § 145_. Plaintiff alleges that Captiva's intentional disruption of Plaintiff's prospective business opportunities caused Plaintiff to lose profits it would have earned in Ohio. Second, Plaintiff alleges that Captiva's tortious interference occurred in Ohio. See id. The customers Captiva allegedly lured away from Plaintiff were all Ohio corporations or state agencies. Third, Plaintiff is an Ohio corporation. See id. Finally, Plaintiff's allegation that it "and EMC worked together to develop business solutions in Ohio for end users in Ohio" suggests that the relationship between Plaintiff and Captiva was centered in Ohio. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Partial J. on Pleadings 6.)

These factors, taken together, show that Ohio has the most significant relationship with the alleged tortious conduct and the parties in this case. The fact that Captiva was a California [*7] corporation before it merged with EMC does not sufficiently outweigh Ohio's interest in Plaintiff's tort claim. Moreover, the existence of a choice of law provision in the contract between Plaintiff and Captiva electing California law to govern the contract does not mean, as EMC seems to suggest, that the parties' relationship was

2009 U.S. Dist. LEXIS 2627, *7

centered in California. [2] (Def.'s Mot. for Partial J. on Pleadings 7.) EMC's failure to dispute Plaintiff's contention that both its injuries and the tortious conduct that allegedly caused those injuries occurred in Ohio lends further support to the conclusion that the *§ 145* factors weigh in favor of applying Ohio law. Therefore, the Court finds that Ohio law governs Plaintiff's tortious interference with business relations claim.

### III. *Rule 12(c)* Standard

Motions for judgment on the pleadings under *Rule 12(c) of the Federal Rules of Civil Procedure* are evaluated in much the same way as *Rule 12(b)(6)* motions to dismiss for failure [*8] to state a claim upon which relief may be granted. See *Grindstaff v. Green, 133 F.3d 416, 421 (6th Cir. 1998); Ziegler v. IBP Hog Market, Inc., 249 F.3d 509, 511-12 (6th Cir. 2001); Mixon v. Ohio, 193 F.3d 389, 399-400 (6th Cir. 1999).* The purpose of a motion under either rule is to test the sufficiency of the complaint. A complaint need not set down in detail all the particularities of a plaintiff's claim. *Rule 8(a)(2) of the Federal Rules of Civil Procedure* requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." But the complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988)* (emphasis in original).

When considering a motion for judgment on the pleadings, a court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. *See Grindstaff, 133 F.3d at 421.* The Court will indulge all reasonable inferences that might be drawn from the pleading. *See Fitzke v. Shappell, 468 F.2d 1072, 1076-77 n.6 (6th Cir. 1972).* [*9] It will not, however, accept conclusions of law or unwarranted inferences cast in the form of factual allegations. *See Grindstaff, 133 F.3d at 421.*

The Court will grant a motion for dismissal under *Rule 12(b)(6)* in the absence of law to support a claim of the type made, or of facts sufficient to make a valid claim, or if on the face of the complaint, an insurmountable bar to relief indicates that the plaintiff does not have a claim. *Little v. UNUM Provident Corp., 196 F. Supp.2d 659, 662 (S.D. Ohio 2002)* (citing *Rauch v. Day & Night Mfg. Corp., 576 F.2d 697 (6th Cir. 1978)).*

### IV. Discussion

EMC asserts two alternative grounds for dismissing Plaintiff's tortious interference with business relations claim. EMC first argues that Plaintiff's tort claim is barred by California's two year statute of limitations. (Def.'s Mot. for Partial J. on Pleadings 5-8.) EMC argues alternatively that, under Ohio's economic loss doctrine, the existence of an undisputedly valid contract between Plaintiff and Captiva precludes Plaintiff's tortious interference with business relations claim. (Def.'s Mot. for Partial J. on Pleadings 8-11.) The Court will take each argument in turn.

### A. Statute of Limitations

EMC [*10] argues that Plaintiff failed to file this suit within California's two year statute of limitations period for tortious interference with business relations. As explained above, however, Ohio law, not California law, governs this diversity action. Therefore, California's statute of limitations is inapplicable to Plaintiff's tort claim.

EMC recognizes that this Court must apply the factors from *§ 145 of the Restatement to* determine the substantive law governing Plaintiff's tort claim. (Def.'s Mot. for Partial J. on Pleadings 6-7.) But EMC makes little effort to dispute Plaintiff's arguments and persuade this Court that a balancing of the factors in *§ 145* militates in favor of applying California law. Instead, EMC asserts two reasons why, regardless of the outcome of the *§ 145* balancing test, this Court should apply California's statute of limitations to Plaintiff's tort claim. Both arguments are meritless.

EMC first argues that Plaintiff should be estopped from reversing its position on which state's law governs its tort claim. (Def.'s Mot. for Partial J. on Pleadings 7.) EMC asserts, and Plaintiff does not dispute, that until Plaintiff amended its complaint, Plaintiff argued its tortious [*11] interference with business relations claim under California law. According to EMC, Plaintiff only reversed its position, and amended its complaint to allege its tort claim under Ohio law, after learning from EMC at a status conference that the tort claim may be barred by California's statute of limitations. (Def.'s Mot. for Partial J. on Pleadings 4, 7.) EMC argues, therefore, that Plaintiff should be prevented from changing its choice of law position.

Any allegations Plaintiff previously made regarding the law governing its tort claim were superseded when Plaintiff

---

[2]  While the choice of law provision in the contract may require the Court to apply California law to Plaintiff's breach of contract claim, the provision is irrelevant to the question of which state's law governs Plaintiff's tort claim.

amended its complaint. EMC does not allege any procedural or substantive defects with the amended complaint that would require the Court to exclude the pleading. Moreover, EMC cites no authority to support the application of the estoppel doctrine to this situation. The Court is unpersuaded by EMC's estoppel argument.

EMC next argues that the Court should treat Plaintiff's previous choice of law position as a judicial admission. (Def.'s Mot. for Partial J. on Pleadings 7.) Judicial admissions "'go to questions of fact,' thereby 'dispensing with proof of formal matters and of facts about which there is no real dispute.'" *Passa v. City of Columbus, 2007 U.S. Dist. LEXIS 78905, 2007 WL 3125130, *4 (S.D. Ohio Oct. 24, 2007)* [*12] (quoting *New Amsterdam Casualty Co. v. Waller, 323 F.2d 20, 24 (4th Cir. 1963))*. The Sixth Circuit is reluctant to treat legal conclusions reached by counsel as judicial admissions. *MacDonald v. General Motors Corp., 110 F.3d 337, 341 (6th Cir. 1997)*.

In this case, the question of which state's law governs Plaintiff's tort claim is not a question of fact; it is a question of law, governed in Ohio by the balancing test in *§ 145 of the Restatement. See Passa, 2007 U.S. Dist. LEXIS 78905, 2007 WL 3125130 at *4; New Amsterdam, 323 F.2d at 24*. Furthermore, Plaintiff's original choice of law conclusion--that California law governs Plaintiff's tort claim--was an incorrect legal conclusion that should not be treated as a judicial admission. See *MacDonald, 110 F.3d at 341*. To treat Plaintiff's original choice of law position as a judicial admission, and deprive Plaintiff of the opportunity to correct an erroneous legal conclusion made by counsel through an amended complaint, would turn "a valuable time-saving device, the voluntary use of which should be encouraged, into a trap for the unwary." *Id.* Therefore, the Court will not treat Plaintiff's previous choice of law position as a judicial admission. Ohio law governs Plaintiff's [*13] tortious interference with business relations claim, and California's statute of limitations is inapplicable. [3]

**B. The Existence of the Contract**

EMC next argues that under Ohio law, the existence of an undisputedly valid contract between Plaintiff and Captiva precludes Plaintiff's tortious interference with business relations claim. EMC frames this argument under Ohio's economic loss doctrine. (Def.'s Mot. for Partial J. on Pleadings 8.) According to EMC, under the economic loss doctrine, when a plaintiff has a claim governed by a contract, [*14] tort liability cannot be imposed for purely economic damages. Therefore, EMC argues, "where a plaintiff bases its claim on breach of contract, the economic loss rule bars the plaintiff from using the same set of facts as the basis for a tort claim." (Def.'s Mot. for Partial J. on Pleadings 8.) In response, Plaintiff does not dispute EMC's contention that its tort claim is barred by the existence of the contract. Plaintiff instead argues that it should be permitted to plead its tortious interference claim as an alternative theory of recovery to its breach of contract claim. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Partial J. on Pleadings 8-9.) While EMC is misguided when it relies on the economic loss rule, the Court agrees with EMC's underlying argument that Plaintiff's tort claim is barred by the existence of a valid contract between the parties.

The economic loss rule prevents the recovery in negligence of purely economic loss. *Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co., 42 Ohio St.3d 40, 44-46, 537 N.E.2d 624, 630-31 (Ohio 1989); Corporex Dev. & Constr. Mgmt., Inc. v. Shook, Inc., 106 Ohio St.3d 412, 414-16, 2005 Ohio 5409, 835 N.E.2d 701, 704-05 (Ohio 2005); Cincinnati Gas & Elec. Co. v. General Electric Co., 656 F. Supp. 49, 60-61 (S.D. Ohio 1986)*. [*15] The prohibition on the recovery in negligence of purely economic loss arises from the inevitable absence of a duty on the defendant to protect purely economic loss suffered by the plaintiff. *Chemtrol, 42 Ohio St.3d at 45, 537 N.E.2d at 630-31*. According to the Ohio Supreme Court:

> the law of negligence does not extend . . . [a] duty so far as to protect . . . economic expectations, for such protection would arise not under the law but rather solely by agreement between the parties. "[W]hen the promisee's injury consists merely of the loss of his bargain, no tort claim arises because the duty of the promisor to fulfill the term of the bargain arises only from the contract."

*Id.* (quoting *Battista v. Lebanon Trotting Ass'n, 538 F.2d 111, 117 (6th Cir. 1976))*. Negligence law "is not designed . . . to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement." *Floor Craft*

---

[3]  EMC cites *Wilton Corp. v. Ashland Castings Corp.* for the proposition that when parties agree on the applicable substantive law, courts need not inquire into choice of law issues. *188 F.3d 670, 673 n.2 (6th Cir. 1999)*. While that is true, the parties in this case obviously disagree on which state's law governs Plaintiff's tort claim. The parties may have agreed at one point. But as explained above, Plaintiff was free to change its position, and bring the choice of law question into dispute through an amended complaint. Because the parties disagree on whether California or Ohio law governs Plaintiff's tort claim, a choice of law analysis is necessary.

2009 U.S. Dist. LEXIS 2627. *15

*Floor Covering, Inc. v. Parma Cmty. Gen. Hosp. Ass'n, 54 Ohio St.3d 1, 6-7, 560 N.E.2d 206, 211 (Ohio 1990).*

Relying on the economic loss rule, EMC points to the undisputed fact that Plaintiff, through its tortious interference claim, seeks to recover only economic losses—lost profits, [*16] future license sales, professional services, and maintenance revenue. (Def.'s Mot. for Partial J. on Pleadings 8.) EMC further argues that Plaintiff has alleged no breach of duty distinct from the alleged breach of contract. (Def.'s Reply Mem. in Support of Mot. for Partial J. on Pleadings 5.) But EMC fails to recognize that Plaintiff's tort claim does not sound in negligence; it is an intentional tort claim for interference with business relations. The economic loss rule prevents recovery in negligence of purely economic loss, not recovery under an intentional tort theory for economic loss. See *Chemtrol, 42 Ohio St.3d at 45, 537 N.E.2d at 630-31.*

It makes sense that the economic loss rule would be limited to negligence actions. In a tortious interference with business relations action, for example, any recovery will always be for purely economic loss. The tort is designed to redress economic losses when a defendent has unfairly and intentionally disrupted a plaintiff's business. A negligence cause of action, on the other hand, is designed to redress personal injury or injury to property. See *Floor Craft, 54 Ohio St.3d at 7, 560 N.E.2d at 211.* Moreover, the fundamental policy consideration [*17] underlying the economic loss rule--the inevitable absence of a duty independent of that created by a contract in a negligence action for purely economic loss--is missing in the intentional tort context, where duty is not an element of the claim. [4] Therefore, because Plaintiff's claim is for tortious interference with business relations, and does not sound in negligence, the economic loss rule is inapplicable in this case.

While EMC is misguided in its application of the economic loss rule to this case, EMC's underlying proposition that the existence of the contract between Plaintiff and Captiva precludes Plaintiff's tortious interference with business relations claim (even if mislabeled the economic loss doctrine) has merit. According to the Ohio Supreme Court:

> it is well established that "though a breach of a duty under a contract or lease necessarily interferes [*18] with the injured party's business relations with third parties, the injured party is limited to an action for breach of contract and may not recover in tort for business interference." An exception exists, and a tort action may lie, only where the breaching party indicates, by his breach, a motive to interfere with the adverse party's business relations rather than an interference with business resulting as a mere consequence of such breach.

*Digital & Analog Design Corp. v. North Supply Co., 44 Ohio St.3d 36, 46-47, 540 N.E.2d 1358, 1368 (Ohio 1989)* (quoting *Cherberg v. Peoples Natl. Bank of Washington, 88 Wn.2d 595, 564 P.2d 1137, 1143 (Wash. 1977)).*

In this case, Plaintiff does not allege that Captiva's alleged solicitation of Plaintiff's customers was the result of some ulterior motive of Captiva to interfere with Plaintiff's business. See *Digital & Analog, 44 Ohio St.3d at 46-47, 540 N.E.2d at 1368.* Furthermore, construing the complaint in Plaintiff's favor, the Court finds no evidence of such a motive that would give rise to a tortious interference claim. See *id.* Allowing Plaintiff's tortious interference claim to proceed, without any allegation by Plaintiff of any illegal motive on Captiva's [*19] part, would allow Plaintiff to present his breach of contract claim again as a tort claim. See *Cincinnati Gas, 656 F. Supp. 49 at 61* ("Under Ohio law, the existence of a contract action generally excludes the opportunity to present the same case as a tort claim."). And as EMC points out, Plaintiff cannot circumvent the terms of its contract with Captiva simply by alleging its breach of contract claim as a tortious interference claim. See *Floor Craft, 54 Ohio St.3d at 7, 560 N.E.2d at 211-12.* Therefore, the existence of the contract between Plaintiff and Captiva,

---

[4]   In Ohio, the elements of a tortious interference with business relations claim are:

   (1) a business relationship;

   (2) the wrongdoer's knowledge thereof;

   (3) an intentional interference causing a breach or termination of the relationship; and;

   (4) damages resulting therefrom.

*Harris v. Bornhorst, 513 F.3d 503, 523 (6th Cir. 2008).*

David Sporar

2009 U.S. Dist. LEXIS 2627, *19

and the absence of any allegation that Captiva's alleged breach was motivated by a wrongful desire to interfere with Plaintiff's business, precludes Plaintiff's tortious interference with business relations claim.

Plaintiff does not dispute that its tort claim is barred by the existence of the contract. Plaintiff instead argues that it should be permitted to assert its tortious interference claim in the alternative to its breach of contract claim. As explained above, however, because of the contract between Plaintiff and Captiva, and the absence of any evidence of an illegal motive behind Captiva's alleged solicitation of Plaintiff's [*20] customers and prospects, Ohio law does not recognize Plaintiff's tortious interference with business relations claim. See *Digital & Analog, 44 Ohio St.3d at 46-47, 540 N.E.2d at 1368*. Moreover, EMC admits that the Reseller Agreement between Plaintiff and Captiva is a valid contract. (Def.'s Reply Mem. in Support of Mot. for Partial J. on Pleadings 3.) Therefore, under Ohio law, Plaintiff cannot state, in the alternative or otherwise, a tortious interference with business relations claim. Because Plaintiff faces an insurmountable bar to relief on its tortious

interference with business relations claim, the Court **GRANTS** EMC's motion to dismiss. *Little, 196 F. Supp.2d at 662*.

**V. Conclusion**

For the reasons above, the Court **GRANTS** EMC's motion to dismiss Plaintiff's tortious interference with business relations claim. (Doc. # 15). That claim is **DISMISSED WITH PREJUDICE.** Plaintiff's breach of contract claim remains.

**IT IS SO ORDERED.**

Date: January 14, 2009

/s/ **John D. Holschuh**

John D. Holschuh, Judge

United States District Court

⬥ Positive

As of: June 12, 2015 5:02 PM EDT

## *J.F. Meskill Enters., LLC v. Acuity*

United States District Court for the Northern District of Ohio, Eastern Division

April 7, 2006, Decided ; April 7, 2006, Filed

CASE NO. 05-cv-2955

**Reporter**

2006 U.S. Dist. LEXIS 41491; 2006 WL 903207

J.F. Meskill Enterprises, LLC Plaintiff, Vs. Acuity, and Acordia of Ohio, LLC, Defendants.

## Core Terms

economic loss doctrine, coverage, insured, parties, contractor, negligent misrepresentation, economic loss, negligent misrepresentation claim, flooring, alleges, intends, courts, advice, broker, lawsuit, cases, negligence claim, economic loss rule, plaintiff's claim, privity, notice, buyer, advertising injury, false information, written notice, third party, recipient, procure

**Counsel:** [*1] For J.F. Meskill Enterprises, LLC, Plaintiff: Keven D. Eiber, Brouse McDowell, Cleveland, OH.

For Acuity, Defendant: D. John Travis, Gallagher, Sharp, Fulton & Norman, Cleveland, OH.

For Acordia of Ohio, LLC, Defendant: Ellyn Mehendale, Janik & Dorman, Cleveland, OH.

**Judges:** PATRICIA A. GAUGHAN, United States District Judge.

**Opinion by:** PATRICIA A. GAUGHAN

## Opinion

### Memorandum of Opinion and Order

### INTRODUCTION

Defendant Acordia of Ohio, LLC ("Acordia") has filed a Motion for Judgment on the Pleadings (Doc. 7). This case arises out of Defendant Acuity's refusal to pay a claim by its insured, Plaintiff J.F. Meskill Enterprises, LLC. Acordia is an insurance broker involved with the policy at issue. For the reasons that follow, Acordia's motion is GRANTED IN PART.

### FACTS

Plaintiff alleges the following. Plaintiff purchased a commercial general liability policy from Acuity. The policy provides $ 1 million in coverage for "those sums that the insured becomes legally obligated to pay as damages because of personal and advertising injury to which this insurance applies" as well as the defense of lawsuits seeking such damages.

Plaintiff was sued for trade dress infringement [*2] by Seville Classics, Inc. ("Seville") on December 10, 2004. Early negotiations led Plaintiff to believe that Seville "did not intend to formally pursue the litigation." On or before March 10, 2005, it became apparent that Seville was moving forward with its lawsuit. James Meskill, Plaintiff's president, contacted Acordia (an insurance broker involved in the procurement of the Acuity policy) seeking advice. Meskill spoke with several Acordia representatives on the phone to report the fact of the lawsuit and to request a defense from Plaintiff's insurer, Acuity. An Acordia employee informed Meskill that the Acuity policy did not cover the Seville lawsuit, but that such coverage could be purchased for future claims. As a result, Plaintiff did not pursue its insurance claim with Acuity.

Plaintiff thereafter settled the Seville lawsuit for approximately $ 70,000, incurring $ 177,000 in defense costs in the process. Plaintiff contacted a third party to reevaluate whether the policy provided coverage for the Seville lawsuit and demanded coverage from Acuity in a letter received on July 1, 2005. Acuity acknowledged that the claim was covered by the policy, but denied coverage on the basis [*3] of late notice.

Plaintiff brings two claims against Acuity for breach of contract and declaratory relief. At issue here are Plaintiff's claims of negligence and negligent misrepresentation against Acordia. In general, Plaintiff claims that Acordia rendered bad advice regarding coverage. Plaintiff also believes that Acordia should have undertaken its own review of the

2006 U.S. Dist. LEXIS 41491, *4

Seville complaint and informed Acuity that the Seville action was pending.

Acordia has moved for judgment on the pleadings.

## STANDARD OF REVIEW

Courts apply the same analysis to motions for judgment on the pleadings under *Rule 12(c)* as they apply to motions to dismiss under *Federal Rule of Civil Procedure 12(b)(6)*. *E.E.O.C. v. J.H. Routh Packing Co., 246 F.3d 850, 851 (6th Cir. 2001)*. When considering a motion to dismiss pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, the allegations of the complaint must be taken as true and construed liberally in favor of the plaintiff. *Lawrence v. Chancery Court of Tenn., 188 F.3d 687, 691 (6th Cir. 1999)*. A claim is not to be dismissed "unless [*4] it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957); see also Hammond v. Baldwin*, 866 F.2d 172, 175 (6th Cir. 1989). Notice pleading requires only that the defendant be given "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley, 355 U.S. at 47*. However, the complaint must set forth "more than the bare assertion of legal conclusions." *Allard v. Weitzman (In Re DeLorean Motor Co.), 991 F.2d 1236, 1240 (6th Cir. 1993)*.

"In practice, a . . . complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988)* (quoting *Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101 (7th Cir. 1984)*). Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief. *Craighead v. E.F. Hutton & Co., 899 F.2d 485, 489-490 (6th Cir. 1990)*. [*5]

## DISCUSSION

The threshold question presented by this case is whether Plaintiff's claims of negligence and negligent misrepresentation are barred by Ohio's economic loss doctrine.[1] The parties agree that Plaintiff's settlement and legal expenses are economic losses and that both of Plaintiff's claims against Acordia sound in tort.

The economic loss doctrine holds that absent tangible physical harm to persons or tangible things there is generally no duty to exercise reasonable care to avoid economic losses to others. *Queen City Terminals, Inc. v. Gen. Am. Transp. Corp., 73 Ohio St. 3d 609, 1995 Ohio 285, 653 N.E.2d 661, 667-68 (Ohio 1995)*. These economic losses may be recovered in contract only. *Id.* Plaintiff acknowledges this general rule, but argues that it does not apply to its claims, relying in large part on *Haddon View Investment Co. v. Coopers & Lybrand, 70 Ohio St. 2d 154, 436 N.E.2d 212 (Ohio 1982)*. That case held that "[a]n [*6] accountant may be held liable by a third party for professional negligence when that third party is a member of a limited class whose reliance on the accountant's representation is specifically foreseen." *Id.* at Paragraph 1 of the Syllabus. The plaintiffs in *Haddon View* were limited partners who sued an accountant who rendered faulty services pursuant to a contract with the limited partnership. *Id. at 213*. Because they were not in privity of contract with the accountant, the limited partners had to rely on claims sounding in tort. The Ohio Supreme Court concluded that such an action was proper, and in doing so, cited *Section 552 of the Restatement (Second) of Torts* with approval:

(1) One who * * * supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) * * * [T]he liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited [*7] group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

*Haddon View, 436 N.E.2d at 214 n.3*. The parties dispute whether *Haddon View* is still good law, and if it is, whether the duties announced in *Haddon View* attach to an insured and its broker.

Much of Ohio's development of the economic loss rule occurred after *Haddon View* was decided. *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.* involved a

---

[1]  The parties agree that Ohio law applies to Plaintiff's claims against Acordia.

Case: 1:08-cv-02755-DCN  Doc #: 341-1  Filed:  06/12/15  50 of 70.  PageID #: 17413

Page 3 of 6
2006 U.S. Dist. LEXIS 41491, *7

commercial buyer and seller of an arch dryer system. *42 Ohio St. 3d 40, 537 N.E.2d 624, 624 (Ohio 1989)*. The arch dryer eventually malfunctioned, damaging the product itself and costing the buyer significant additional expenses. *Id. at 628*. Even though the parties had a contract with explicit limitations on the seller's liability, the buyer's subrogee sought to recover against the seller under theories of negligence and strict liability. *Id. at 627*.

The Ohio Supreme [*8]  Court first recognized the "general rule . . . that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable." *Id. at 630*. However, its ultimate decision did not have such a broad sweep. It recognized that previous decisions had allowed recovery of purely economic losses when the parties were not in privity of contract. *Id. at 634*. However, those cases did not address "whether economic loss may be recovered in strict liability where the parties *are* in privity of contract." *Id.* (emphasis in original). The court concluded that they could not. Commercial buyers are relegated to claims under the Uniform Commercial Code, and "in the absence of injury to persons or damage to other property the commercial buyer may not recover for economic losses premised on theories of strict liability or negligence." *Id. at 635*.

The Ohio Supreme Court discussed the interplay between the cause of action recognized in *Haddon View* and the economic loss doctrine in *Floor Craft Floor Covering, Inc. v. Parma Cmty. Gen. Hosp. Ass'n, 54 Ohio St. 3d 1, 560 N.E.2d 206 (Ohio 1990)*. [*9]  The *Floor Craft* plaintiff was a flooring contractor that entered into a contract to install flooring as part of a hospital renovation project. *Id. at 206*. Its portion of the project went awry as a result of the architect's specification of incompatible flooring and sealant. *Id.* The contractor and the architect each had contracts with the hospital, but not with each other. *Id.* When the flooring contractor brought claims for negligence against the architect, the architect countered that the claims were barred by the economic loss doctrine. *Id. at 208*.

The flooring contractor asked the Ohio Supreme Court to apply *Haddon View* and *Section 552 of the Restatement to* the contractor-architect relationship. *Id. at 211*. The Ohio Supreme Court declined the invitation. The court's survey of other jurisdictions found little support for expanding these duties to contractors and architects. *Id. at 209-11*. Unlike the accountant in *Haddon View*, "the architects' services are generally extended to an unresolved class of persons unfixed in number." *Id. at 211*. Absent project management responsibilities, [*10]  the parties' relationship

could not justify liability under the cause of action recognized in *Haddon View*. *Id.* Because the flooring contractor could not recover under *Haddon View*, its claims were barred by the economic loss doctrine. *Id. at 212*.

It is notable that the flooring contractor's contract with the hospital clearly addressed the relationship between the contractor, architect and hospital. *Id. at 212 n.4*. The contract explicitly disclaimed any special relationship between the contractor and architect. The architect did not have any control over how the contractor performed its work. Moreover, the contract also addressed liability. If the work was performed as required by the contract, but faulty as the result of the architect's specifications (as the flooring contractor claimed), the contractor was not responsible to the hospital for the excess cost. *Id.*

A recent Ohio Supreme Court case further clarified the interplay between *Haddon View* and the economic loss rule. In *Corporex Dev. & Constr. Mgmt. Inc. v. Shook, Inc.*, the plaintiff DSI contracted with Corporex for the construction of a hotel. *106 Ohio St. 3d 412, 2005 Ohio 5409, 835 N.E.2d 701, 703 (Ohio 2005)*. [*11]  Corporex then hired Shook as a subcontractor to perform concrete work. Upon discovery that the work was faulty, both Corporex and DSI sued Shook. Because it had no contract with Shook, DSI's claims were based only in negligence and implied warranty. DSI argued, and the lower court held, that there was a sufficient "nexus" under *Haddon View* to allow its claims despite the economic loss rule. *Id.*

The Ohio Supreme Court reversed. *Haddon View* did not create a blanket "nexus" exception to the economic loss rule. *Id. at 705*. Rather, "[l]iability in *Haddon View* was based exclusively upon [a] discrete, preexisting duty in tort. . . ." *Haddon View* recognized only the following:

> professional liability, and thus a duty in tort, [exists] only in those limited circumstances in which a person, in the course of business, negligently supplies false information, knowing that the recipient either intends to rely on it in business, or knowing that the recipient intends to pass the information on to a foreseen third party or limited class of third persons who intend to rely on it in business.

*Id.* (citing *Restatement (Second) of Torts § 552* [*12]  ). *Corporex* thus makes clear that although tort claims are generally barred by the economic loss doctrine, the discrete tort generally referred to as negligent misrepresentation is not. *Id; see also Laurent v. Flood Data Servs., Inc., 146 Ohio App. 3d 392, 2001 Ohio 1660, 766 N.E.2d 221, 227-28*

2006 U.S. Dist. LEXIS 41491, *12

*(Ohio App. 2001)* (holding that a negligence claim is barred by the economic loss doctrine while a negligent misrepresentation claim is not).

Applying these holdings to the case at bar, it is clear that Plaintiff cannot maintain its negligence claim against Acordia. Numerous courts have held that negligence claims for economic loss do not survive the economic loss doctrine. *See Chemtrol, 537 N.E.2d at 630* (explaining that "a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable"); *All Erection & Crane Rental Corp.,* 1:01-cv-1282, at 7 (N.D. Ohio Apr. 9, 2004) (holding that the economic loss doctrine barred a negligence claim without regard to whether the parties were in privity of contract). These decisions are confirmed by the Ohio Supreme Court's holding in *Corporex,* which recognized the [*13] *Haddon View* claim of negligent misrepresentation, while rejecting an attempt to bring a negligence claim. *Corporex, 835 N.E.2d at 705.*

Although Plaintiff attempts to recast its negligence claim as one of "professional negligence" akin to attorney malpractice, the Court finds it highly unlikely that the Ohio Supreme Court would recognize an independent insurance broker malpractice claim in light of its recent economic loss decisions. [2] The Court recognizes that the Ohio Supreme Court has stated that an action against an insurer was "roughly analogous to a malpractice action" in determining the appropriate statute of limitations. *Kunz v. Buckeye Union Ins. Co.,* 1 Ohio St. 3d 79, 1 Ohio B. 117, 437 N.E.2d 1194, 1196 (Ohio 1982). However, this was prior to Ohio's wholesale adoption of the economic loss doctrine.

Some Ohio Courts have held that insurance [*14] agents or brokers have a duty to exercise reasonable care in procuring the requested insurance. However, the economic loss doctrine was not asserted in those cases. *E.g., The Island House Inn, Inc. v. State Auto Ins. Cos.,* 150 Ohio App. 3d 522, 2002

*Ohio 7107, 782 N.E.2d 156, 158-59 (Ohio App. 2002).* Moreover, this duty is fairly limited and could arguably be read as a contract claim, since the broker failed to procure the coverage the insured wanted to purchase. *See Fiorentino v. Lightning Rod Mut. Ins. Co.,* 114 Ohio App. 3d 188, 682 N.E.2d 1099, 1104-05 (Ohio App. 1996) (discussing whether a claim against an insurance agent for failing to obtain coverage sounds in contract or tort for statute of limitations purposes); *Craggett v. Adell Ins. Agency,* 92 Ohio App. 3d 443, 635 N.E.2d 1326, 1332 (Ohio App. 1993) (explaining that "an insurance sales agency has a duty to exercise good faith in obtaining only those policies of insurance which its customer requests."). Finally, while some cases have suggested a negligence duty to advise on coverage terms, [3] that duty is better confined to the negligent misrepresentation tort adopted in *Haddon View* and reaffirmed in *Corporex.*

[*15] Thus, if Plaintiff is to avoid the economic loss doctrine, it must state a claim for negligent misrepresentation as set out in *Corporex* and *Haddon View.* Acordia first argues that Plaintiff cannot do so because all of the parties are commercial entities. Acordia points out that courts within the Sixth Circuit have made broad pronouncements that the economic loss doctrine bars tort claims in commercial transactions. *See HDM Flugservice GmbH v. Parker Hannifin Corp.,* 332 F.3d 1025, 1029-30 (6th Cir. 2003) (explaining that "commercial parties lacking privity, as opposed to non-commercial parties, [are] foreclosed from recovering economic losses"); *Trgo v. Chrysler Corp.,* 34 F. Supp. 2d 581, 594 (N.D. Ohio 1998) (holding that "whether privity exists or not, commercial parties cannot recover for solely economic loss in tort under Ohio law"); *All Erection & Crane Rental Corp. v. Acordia Northwest, Inc.,* 162 Fed. Appx. 554, 04-3862, 11 (6th Cir. Jan. 18, 2006) (holding that commercial parties are limited to claims for breach of contract or claims under the Uniform Commercial Code).

However, the Sixth Circuit did not apply this language to negligent misrepresentation [*16] claims [4] [*17] and the

[2] Unlike an attorney-client relationship, it is not entirely clear who the broker represents. Here, Plaintiff alleges that Acordia was Acuity's agent.

[3] *E.g., Island House,* 782 N.E.2d at 159 (Ohio App. 2002); *First Catholic Slovak Union v. Buckeye Union Ins. Co.,* 27 Ohio App. 3d 169, 27 Ohio B. 202, 499 N.E.2d 1303, 1305 (Ohio App. 1986).

[4]

*See Flugservice,* 332 F.3d at 1030 (applying the economic loss doctrine to claims of strict liability, implied warranty and negligence, while deciding that "the economic loss rule does not apply to claims of negligent misrepresentation"). Some district courts have decided that negligent misrepresentation claims are barred by the economic loss doctrine. *Trgo,* 34 F. Supp. 2d at 595; *Picker Int'l v. Mayo Found.,* 6 F. Supp. 2d 685, 688-89 (N.D. Ohio 1998). The Court declines to follow *Picker* or *Trgo* for a number of reasons. First, these holdings were decided before and are directly contrary to the Ohio Supreme Court's decision in *Corporex* and the Sixth Circuit's decision in *Flugservice,* both of which reaffirmed the validity of a negligent misrepresentation claim in spite of the economic loss doctrine. Both

2006 U.S. Dist. LEXIS 41491, *17

Ohio Supreme Court has not done so either. [5] *See Chemtrol, 537 N.E.2d at 629-30* (addressing claims of products liability and negligence); *Queen City, 653 N.E.2d at 665* (addressing a negligence claim). In fact, *Flugservice* explicitly held that "the economic loss rule does not apply to claims for negligent misrepresentation." *Flugservice, 332 F.3d at 1032*.

Acordia's argument that commercial entities are barred from bringing negligent misrepresentation claims simply cannot be reconciled with *Corporex, Flugservice* and the negligent misrepresentation tort recognized in those decisions. The negligent representation cause of action contemplates that "a person, *in the course of business,* negligently supplies false information, knowing that the recipient . . . intends *to rely on it in business." Corporex, 835 N.E.2d at 705* (emphasis added); *Flugservice, 332 F.3d at 1033*.

Moreover, the cases cited by Acordia involved traditional commercial transactions, not the giving of business advice. As Acordia notes, in this case Plaintiff did not seek its advice while attempting to procure insurance. Plaintiff already had insurance. It treated Acordia as a trusted advisor with expertise [*18] in insurance. This is the sort of situation that the negligent misrepresentation tort was meant to deal with. Indeed, a number of Ohio courts have considered negligent misrepresentation claims against insurance brokers. *Merrill v. William E. Ward Ins., 87 Ohio App. 3d 583, 622 N.E.2d 743 (Ohio App. 1993)* (affirming a negligent misrepresentation verdict against an insurance agent); *Lu-An-Do, Inc. v. Kloots, 131 Ohio App. 3d 71, 721 N.E.2d 507 (Ohio App. 1999)* (considering and rejecting a negligent misrepresentation claim against an insurance agency because no false information was supplied and the plaintiff's reliance was unjustified).

The Court also notes that the plaintiffs in the cases cited by Acordia were attempting to avoid express contractual limitations on the claims they were asserting. *Chemtrol, 537 N.E.2d at 629; Trgo, 34 F. Supp. 2d at 587; Picker, 6 F. Supp. 2d at 689; All Erection & Crane Rental Corp. v. Acordia Northeast, Inc.,* 1:01-cv-1282, at 5 (N.D. Ohio Nov. 4, 2002). Here, Acordia has not identified any contract provision governing Acordia's responsibility for rendering insurance advice. If such a provision did exist, [*19] the

parties would be best left to their bargain. *See, e.g., Foster Wheeler Envirespose v. Franklin County Convention Facilities Auth., 78 Ohio St. 3d 353, 1997 Ohio 202, 678 N.E.2d 519, 529 (Ohio 1997)* (holding that one contractor could not justifiably rely on another contractor's estimate of waste when the master contract stated that "the quantities listed . . . are to be used as approximate and are to be used for the comparison of bids only"). In this case, there is no bargain.

The critical issue, then, is whether Plaintiff has properly stated a claim of negligent misrepresentation. Plaintiff alleges that it was involved in a business transaction of reporting a lawsuit to its insurer, that Acordia was in the business of procuring and placing insurance coverage and that Acordia negligently provided false information by advising Plaintiff that the Seville lawsuit was not a covered advertising injury. Unlike a number of cases where courts have rejected negligent misrepresentation claims, Plaintiff alleges that Acordia provided advice to a limited group or class (Plaintiff) at Plaintiff's behest. *Compare Haddon View, 436 N.E.2d at 215* ("[W]e conclude that the limited partners in the [*20] Car Wash partnerships constitute a limited class of investors whose reliance on the accountant's certified audits for purposes of investment strategy was specifically foreseen by defendant."), *with Laurent, 766 N.E.2d at 228* (explaining that the flood determination was requested by a third party and that there was no evidence that the defendants knew it was intended to be used by the plaintiff).

Acordia principally challenges the reliance aspect of Plaintiff's negligent misrepresentation claim. Plaintiff alleges that Acordia provided the information knowing that Plaintiff would rely on the information in its business, and even offered to sell Plaintiff a policy that would cover such claims in the future. Plaintiff continues that it in fact did rely on the information provided by Acordia when it failed to report its claim.

Acordia counters that an insured cannot justifiably rely on a broker's representations regarding the contents of an insurance policy in light of the insured's countervailing duty to read and understand its policy. *Island House, 782 N.E.2d at 158-59; Fry v. Walters & Peck Agency, Inc., 141 Ohio App. 3d 303, 750 N.E.2d 1194, 1200 (Ohio App. 2001);* [*21] *Craggett, 635 N.E.2d at 1332*. Plaintiff concedes such

---

cases also involved parties attempting to avoid the terms of a contract. *Trgo, 34 F. Supp. 2d at 587; Picker, 6 F. Supp. 2d at 689*. The holding in *Picker* is also dicta, since the defendant did not provide business advice, and plaintiff could not support its negligent misrepresentation claim in any event. *Id. at 689*.

[5] Ohio courts have stated that there is "no basis for distinguishing between so-called commercial and noncommercial buyers." *Ohio Dep't of Admin. Servs. v. Robert P. Madison Int'l, 138 Ohio App. 3d 388, 741 N.E.2d 551, 557 (Ohio App. 2000)*.

2006 U.S. Dist. LEXIS 41491, *21

a duty, but responds that it is a matter of comparative negligence that cannot be resolved in a motion to dismiss.

Two aspects of the policy are at issue. The first is the provision covering advertising injuries. Plaintiff alleges that Acordia advised that trade dress claims were not covered under this provision, when in fact they were. The second is the notice provision that Acuity invoked to decline coverage. That provision provides as follows:

**2. Duties in the Event of Occurrence, Offense, Claim or Suit**

* * *

b. If a claim is made or *suit* is brought against any insured, you must:

(1) Immediately record the specifics of the claim or *suit* and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or *suit* as soon as practicable.

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or *suit*.

It is not readily apparent that the advertising injury provision includes [*22] claims of trade dress infringement. *See, e.g., Westfield Cos. v. O.K.L. Can Line, 155 Ohio App. 3d 747, 2003 Ohio 7151, 804 N.E.2d 45, 48 (Ohio App. 2003)* ("Courts, insurers, and insureds have struggled with the interpretation of 'advertising injury' coverage provisions in commercial insurance policies."). The Court thus finds that the cases cited by Acordia are distinguishable. In each cited case, the policy provision at issue unambiguously precluded the coverage sought by the insured. *Island House, 782 N.E.2d at 157; Fry, 750 N.E.2d at 1201; La-An-Do, 721 N.E.2d at 511-12; see also Brown v. Woodmen Accident & Life Co., 84 Ohio App. 3d 52, 616 N.E.2d 278 (Ohio App. 1992)* (noting that "the insurance policy was 'clear and unambiguous'" and granting summary judgment that reliance on a contrary representation was not justified). Where coverage is unclear, Ohio courts require a comparative

negligence analysis. *Wanner Metal Worx v. Hylant-Maclean, Inc., 2003 Ohio 1814, 2003 WL 186558, *8 (Ohio App. 5th Dist. 2003); Gerace-Flick v. Westfield Nat'l Ins. Co., 2002 Ohio 5222, 2002 WL 31168883, *9 (Ohio App. 7th Dist. 2002);* [*23] *Nichols v. Progressive Ins. Co., 2002 Ohio 3058, 2002 WL 1311859, *8 (Ohio App. 10th Dist. 2002); Bedillion v. Tri-County Ins. Agency, 1993 Ohio App. LEXIS 648, No. 15722, 1993 WL 27381, *3 (Ohio App. 9th Dist. 1993).* Accordingly, dismissal is not appropriate. [6]

The contractual notice provision does not justify dismissal either. Plaintiff's Complaint alleges that "early discussions and negotiations with Seville led Meskill to understand that Seville did not intend to formally pursue the litigation. That circumstance changed in 2005." Plaintiff then "telephoned Acordia and spoke with several Acordia representatives to report the fact [*24] of the law suit and to request a defense from Meskill's insurer." "[O]n the advice and encouragement of Acordia, Meskill did not pursue its insurance claim with Acuity at that time."

These allegations must be taken as true. In light of these allegations, Plaintiff's failure to provide the necessary written notice can be attributed to the advice of Acordia. Although Plaintiff may be charged with knowledge of the written notice requirement, there is little reason to submit written notice when there is no claim. Plaintiff's failure to provide written notice is a subject more appropriate for a comparative negligence analysis or a summary judgment motion.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Judgment on the Pleadings is GRANTED as to Plaintiff's negligence count and DENIED as to Plaintiff's negligent misrepresentation count.

IT IS SO ORDERED.

PATRICIA A. GAUGHAN

United States District Judge

Dated: 4/7/06

---

[6] Acordia also contends that a statement regarding coverage cannot be the basis of a negligent misrepresentation claim because it is a statement of law. However, the only cited authority arose in the context of a fraud claim. *Lynch v. Dial Finance Co., 101 Ohio App. 3d 742, 656 N.E.2d 714, 720 (Ohio App. 1995); Yendes v. Shaw, 83 Ohio App. 300, 52 Ohio Law Abs. 154, 79 N.E.2d 181, 182 (Ohio App. 1948).*

**❶** Cited

As of: June 12, 2015 5:02 PM EDT

## *Lee v. Dublin Manor Corp.*

United States District Court for the Southern District of Ohio, Eastern Division

August 3, 2007, Decided; August 3, 2007, Filed

Case No. 2:06-cv-0533

**Reporter**

2007 U.S. Dist. LEXIS 56703; 2007 WL 2259190

Frank Lee, et al., Plaintiffs, v. Dublin Manor Corp., et al., Defendants.

## Core Terms

misrepresentation, allegations, motion to dismiss, inducement, fraud claim, fraudulent, negligent misrepresentation, certificate of occupancy, economic loss rule, amended complaint, contends, title insurance, requirements, merger clause, asserting, permanent, falsely

**Counsel:** [*1] For Frank Lee, Twila Lee formerly known as Twila Gardner, Plaintiffs: Steve J. Edwards, LEAD ATTORNEY, Grove City, OH.

For Dublin Manor Corp., S/A John C. Lucas doing business as Manor Homes, Dublin Manor LLC S/A John C. Lucas, Defendants: Marc J Kessler, LEAD ATTORNEY, Jeffrey A Yeager, Hahn Loeser & Parks - 2, Columbus, OH; Douglas J Schockman, Joseph Anthony Gerling, Lane Alton & Horst - 2, Columbus, OH; Jeffrey A Yeager, Hahn Loeser & Parks LLP, Columbus, OH.

For Commonwealth Land Title Company, Defendant: Steven E Elder, LEAD ATTORNEY, Wilmington, OH; Michelle L Polly-Murphy, Steven E Elder Co LPA, Wilmington, OH.

For Central Ohio Agency, Kara Tinkler, Defendants: Robert Elmer Albright, LEAD ATTORNEY, Lucas Prendergast Albright Gibson & Newman - 2, Columbus, OH; Brian K Duncan, Lucas, Prendergast, Albright, Gibson & Newman, Columbus, OH.

For Dublin Manor Corp., S/A John C. Lucas, Dublin Manor LLC, S/A John C. Lucas, ThirdParty Plaintiffs: Marc J Kessler, LEAD ATTORNEY, Jeffrey A Yeager, Hahn Loeser & Parks - 2, Columbus, OH; Douglas J Schockman, Joseph Anthony Gerling, Lane Alton & Horst - 2, Columbus, OH.

For Dig Right Excavating, L.L.C., Dig Right Excavating, L.L.C., ThirdParty Defendants: [*2] Michael Hrabcak,

LEAD ATTORNEY, Selig & Hrabcak - 2, Worthington, OH; Heidi A Smith, Hrabcak & Co LPA, Worthington, OH.

For Site & Pipe, Inc., Site & Pipe, Inc., ThirdParty Defendants: Bryan L Jeffries, The Law Firm of Bryan L Jeffries, Westerville, OH.

For Village of Plain City, Ohio, ThirdParty Defendant: James Alan Climer, LEAD ATTORNEY, Mazanec Raskin & Ryder Co LPA, Cleveland, OH; Michael S Loughry, Mazanec Raskin Ryder & Keller Co LPA, Columbus, OH.

For Dublin Manor Corp., S/A John C. Lucas, Dublin Manor LLC, S/A John C. Lucas, Counter Claimants: Joseph Anthony Gerling, LEAD ATTORNEY, Douglas J Schockman, Lane Alton & Horst - 2, Columbus, OH; Jeffrey A Yeager, Hahn Loeser & Parks - 2, Columbus, OH; Marc J Kessler, Hahn Loeser & Parks - 2, Columbus, OH.

**Judges:** James L. Graham, Senior United States District Judge.

**Opinion by:** James L. Graham

## Opinion

### *OPINION AND ORDER*

This matter is before the Court on the motion of Defendant Commonwealth Land Title Insurance Company ("Commonwealth") to dismiss the claims of Plaintiffs Frank and Twila Lee(collectively the "Lees") against it for failure to state a claim upon which relief can be granted pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*. The Lees, husband [*3] and wife, have brought this lawsuit against several defendants for claims arising out of their purchase of a new home. The Lees allege that Defendants Dublin Manor Corporation and Dublin Manor LLC (collectively "Dublin Manor") violated their rights under the Real Estate Settlement Procedures Act, *12 U.S.C. § 2608,*

2007 U.S. Dist. LEXIS 56703. *4

The Lees also have asserted various state law claims against Dublin Manor, as well as state law claims against Defendants Central Ohio Agency, Kara Tinkler, and Commonwealth pursuant to this Court's supplemental jurisdiction. The relevant claims, for the purposes of Commonwealth's motion to dismiss, are the Lees' claims for fraud and negligence against Commonwealth.

The Lees contend that, at the closing, an agent of Commonwealth, Kara Tinkler, falsely provided information to them regarding the existence of a permanent certificate of occupancy for the property. The Lees allege that they relied upon this misrepresentation in closing on the property and that, consequently, Commonwealth is liable to them for the damages they have sustained under either a theory of fraud or negligence. In response to the Lees' allegations, Commonwealth filed its motion to dismiss for failure to [*4] state a claim upon which relief can be granted. Commonwealth asserts various theories which it contends serve as a complete bar to the Lees' claims against it. The Court has considered each of Commonwealth's arguments and, for the reasons set forth below, grants Commonwealth's motion to dismiss Frank Lee's claims, but denies the motion to dismiss Twila Lee's claims.

**I. Background**

On December 4, 2004, Twila Lee contracted with Dublin Manor to construct a single-family home at 175 Lantern Lane in Plain City, Ohio. The Lees contend that, as a condition of their contract for the sale of the new home, they were required to purchase title insurance from Commonwealth and to close at a title company selected by Dublin Manor. The Lees allege further that Dublin Manor chose Defendant Central Ohio Agency as the title company at which the closing would occur. The Lees contend that Dublin Manor's performance under the contract in building the home was, *inter alia*, negligent and of substandard quality. The Lees specifically allege that the home contained various deficiencies, errors, mistakes, and omissions which serve, in part, as the basis for their claims against Dublin Manor.

In addition to their [*5] claims against Dublin Manor, the Lees have set forth claims against Commonwealth. The Lees assert that, during the closing, they asked Defendant Kara Tinkler whether a valid and permanent certificate of occupancy existed for the property. The Lees allege that Kara Tinkler, as an employee and agent of Commonwealth and an agent for Central Ohio Agency, responded and informed them that the certificate was contained in the papers the Lees would receive at the closing. The Lees

contend that a permanent certificate of occupancy had not been granted and that Commonwealth, through its agent Kara Tinkler, falsely misrepresented this fact to them, thereby causing them to rely upon the statement and close on the property. The Lees have sued Commonwealth on the basis of this misrepresentation under theories of fraud and negligence.

**II. Standard of Review**

In ruling on a motion to dismiss under *Rule 12(b)(6)*, the court must construe the complaint in a light most favorable to the plaintiff and accept all well-pleaded allegations in the complaint as true. *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)* (A district court weighing a motion to dismiss asks "not whether a plaintiff will ultimately prevail but [*6] whether the claimant is entitled to offer evidence to support the claims.").

A complaint must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory. *Weiner v. Klais & Co., Inc., 108 F.3d 86, 88 (6th Cir. 1997)*. While the complaint need not contain detailed factual allegations, the factual allegations must be enough to raise the claimed right to relief above the speculative level and to create a reasonable expectation that discovery will reveal evidence to support the claim. *Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007)*; *Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 526, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)* ("It is not . . . proper to assume that [the plaintiff] can prove facts that it has not alleged[.]"). The plaintiff must provide more than labels and conclusions, or a formulaic recitation of the elements of a cause of action. *Twombly, 127 S. Ct. at 1965*, and the court is not "bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)*; *see also Morgan v. Church's Fried Chicken, 829 F.2d 10 (6th Cir. 1987)* (noting [*7] that the court is not required to accept as true unwarranted legal conclusions or factual inferences). A motion to dismiss under *Rule 12(b)(6)* will be granted if the complaint is without merit due to an absence of law to support a claim of the type made or of facts sufficient to make a valid claim, or where the face of the complaint reveals that there is an insurmountable bar to relief. *Rauch v. Day & Night Mfg. Corp., 576 F.2d 697 (6th Cir. 1978)*.

As a general rule, matters outside the pleadings may not be considered in ruling on a 12(b)(6) motion to dismiss unless the motion is converted to one for summary judgment under *Rule 56*. *Jackson v. City of Columbus, 194 F.3d 737, 745*

2007 U.S. Dist. LEXIS 56703, *7

*(6th Cir. 1999)*; *Weiner, 108 F.3d at 88*. The court, however, may consider extrinsic materials, without converting the motion to one for summary judgment, if the materials merely "fill in the contours and details" of a complaint. *Yeary v. Goodwill Indus.-Knoxville, Inc., 107 F.3d 443, 445 (6th Cir. 1997)*. The court may also consider a document or instrument which is attached to the complaint, or which is referred to in the complaint and is central to the plaintiff's claim. *See Fed. R. Civ. P. 10(c)* ("[a] copy [*8] of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *Weiner, 108 F.3d at 89*.

## III. Analysis

### A. Frank Lee's Claims Against Commonwealth

As an initial matter, the Court finds that Plaintiff Frank Lee has failed to state a claim against Commonwealth upon which relief can be granted. The Lees contend in their claims against Commonwealth that they relied upon the misrepresentation by Commonwealth's agent, Ms. Tinkler, in closing on the property. The Court has reviewed the amended complaint and the contract to purchase the property, as well as the policy for title insurance which the Lees contend they were required to purchase from Commonwealth. Frank Lee was neither a party to the Dublin Manor contract, nor an insured under the Commonwealth policy. As discussed more fully, *infra*, justifiable reliance is an element of the claims of fraud and negligent misrepresentation which the Lees attempt to allege against Commonwealth. Because Frank Lee was not a party to the contract with Dublin Manor or the insured under the policy with Commonwealth, and has not otherwise alleged any reliance upon the purported misrepresentation of Commonwealth, he has failed [*9] to state a claim upon which relief may be granted. Commonwealth's motion to dismiss Plaintiff Frank Lee's claims against it is granted.

### B. Twila Lee's Claims Against Commonwealth

#### 1. Fraud

While state law governs the burden of proving fraud at trial, the procedure for pleading fraud is governed by the pleading requirements of *Rule 9(b) of the Federal Rules of Civil Procedure*. Under *Rule 9(b)*, averments of fraud and the circumstances constituting the fraud must be stated with "particularity." *Fed. R. Civ. P. 9(b)*. To comply with *Rule 9(b)*, the Sixth Circuit requires a plaintiff to, at a minimum, "'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the

injury resulting from the fraud.'" *Walburn v. Lockheed Martin Corp., 431 F.3d 966, 972 (6th Cir. 2005)* (quoting *Coffey v. Foamex L.P., 2 F.3d 157, 161-62 (6th Cir. 1993)*). Allegations of fraudulent misrepresentations must be made with sufficient particularity and with a sufficient factual basis to support an inference that they were knowingly made. *Coffey, 2 F.3d at 162*. *Rule 9(b)* provides that "[m]alice, intent, knowledge, and [*10] other condition of mind of a person may be averred generally." *Minger v. Green, 239 F.3d 793, 800 (6th Cir. 2001)*.

When deciding a motion to dismiss which alleges that a party has failed to comply with *Rule 9(b)*, this Court must also consider the policy favoring simplicity in pleading codified in *Rule 8*, which requires a "short and plain statement of the claim." *Fed. R. Civ. P. 8(a)*; *see also Sanderson v. HCA-The Healthcare Co., 447 F.3d 873, 876 (6th Cir. 2006)* (stating that the particularity requirement of *Rule 9(b)* must be read in harmony with the requirements of *Rule 8*). The threshold test is whether the complaint places the defendant on sufficient notice of the misrepresentation, thus allowing the defendant to answer and address the plaintiff's claim of fraud in an informed manner. *Coffey, 2 F.3d at 162*; *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc., 342 F.3d 634, 643 (6th Cir. 2003)* (stating that the complaint should provide fair notice to defendant and enable it to prepare an informed pleading responsive to the specific allegations of fraud).

Under Ohio law, the elements of a fraud claim are: (1) a representation or, where there is a duty to disclose, concealment of [*11] a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance. *Russ v. TRW, Inc., 59 Ohio St. 3d 42, 49, 570 N.E.2d 1076 (Ohio 1991)*.

A specific claim of fraud in the inducement arises when a party is induced to enter into an agreement through fraud or misrepresentation. *ABM Farms, Inc. v. Woods, 81 Ohio St. 3d 498, 502, 1998 Ohio 612, 692 N.E.2d 574 (Ohio 1998)*. "The fraud relates not to the nature or purport of the [contract], but to the facts inducing its execution . . . ." *Id.* (quoting *Haller v. Borror Corp., 50 Ohio St. 3d 10, 14, 552 N.E.2d 207 (Ohio 1990)*). A fraudulent inducement claim often alleges that "a misrepresentation of facts outside the contract or other wrongful conduct induced a party to enter into the contract." *ABM Farms, 81 Ohio St. 3d at 503*. To

2007 U.S. Dist. LEXIS 56703, *11

prove fraud in the inducement, a plaintiff must demonstrate that the defendant made a knowing, material misrepresentation with the intent [*12] of inducing the plaintiff's reliance, and that the plaintiff relied upon that misrepresentation to his detriment. *Id.; see also Beer v. Griffith, 61 Ohio St. 2d 119, 123, 399 N.E.2d 1227 (1980)*. A plaintiff may assert a specific claim for fraud in the inducement by pleading the same elements as generally required for fraud. *See Medical Billing, Inc. v. Medical Mgmt., 212 F.3d 332, 338 (6th Cir. 2000)* (applying Ohio law).

Commonwealth argues that the fraud claim has not been alleged with sufficient particularity to withstand this motion to dismiss. However, the Court finds that the fraud claim complies with the requirements of *Rule 9(b)*. Twila Lee contends that, at the closing for the home, Commonwealth, through its agent Ms. Tinkler, [1] falsely informed the Lees that a permanent certificate of occupancy had been granted for the home. Twila Lee alleges further that the representation was made by Commonwealth with knowledge of its falsity and that she and her husband, in reliance on Commonwealth's representation, closed on the property. She contends that as a direct and proximate result of this fraudulent misrepresentation, she sustained damages. The amended complaint sufficiently alleges the nature, time, [*13] and place of the misrepresentation which formed the basis for Twila Lee's fraud claim.

While the amended complaint does not specifically allege fraudulent intent, it does include sufficient allegations to support an inference of this element. Twila Lee alleges that she was required to purchase title insurance from Commonwealth as a condition of the contract with Dublin Manor. She alleges that, at the closing, Commonwealth's agent falsely informed the Lees, in response to their inquiry, that a permanent certificate of occupancy had been granted for the property and would be contained in the papers they received during the closing. Twila Lee alleges further that no certificate of occupancy had been obtained prior to the closing or even within thirty (30) days thereafter. For the purposes of this 12(b)(6) motion to dismiss, the Court may properly infer from the allegations that the intent of the alleged misrepresentation [*14] was to induce her to close on the property and, in so doing, to purchase title insurance from Commonwealth.

The amended complaint places Commonwealth on sufficient notice of the misrepresentation to allow it to answer and

address Twila Lee's claim of fraud in an informed manner. The Court observes, however, that even if the allegations of the amended complaint failed to satisfy those requirements, dismissal on this basis alone would not be appropriate in the absence of a motion for a more definite statement under *Federal Rule of Civil Procedure 12(e)*. *See Coffey, 2 F.3d at 162*. No such motion has been filed in this case.

## 2. Negligence

While the Tenth Claim of the amended complaint is denominated as a claim for negligence, a close reading of the allegations reveals that Twila Lee has sufficiently pled a claim for negligent misrepresentation to withstand Commonwealth's motion to dismiss. Ohio recognizes the tort of negligent misrepresentation which provides that:

> One who, in the course of his business profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject [*15] to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Delman v. City of Cleveland Heights, 41 Ohio St. 3d 1, 4, 534 N.E.2d 835 (Ohio 1989)*. Liability for negligent misrepresentation is based on the negligence of the actor in failing to exercise reasonable care or competence in supplying correct information. *Moffitt v. Auberle, 167 Ohio App. 3d 120, 2006 Ohio 3064, 854 N.E.2d 222 (Ohio Ct. App. 2006)*. A representation made with an honest belief in its truth may still be negligent because of a lack of reasonable care in ascertaining the facts, or in the manner or expression, or absence of skill and competence required by a particular business or profession. *Martin v. Ohio State Univ. Found., 139 Ohio App. 3d 89, 103-04, 742 N.E.2d 1198 (Ohio Ct. App. 2000)*.

Here, Twila Lee contends that Commonwealth breached its duty to exercise reasonable care in providing her with accurate information regarding the certificate of occupancy. This misrepresentation occurred at the closing for the property for which Commonwealth had been retained to provide title insurance coverage. She further alleges that she relied upon [*16] the false information which was provided to the Lees by Commonwealth's agent in closing on the

---

[1]  Commonwealth disputes that Ms. Tinkler was, in fact, its agent. As Commonwealth observes in its motion, however, for the purpose of its 12(b)(6) motion to dismiss, the Court must accept the factual allegations of the Lees' amended complaint as true. *See Scheuer, 416 U.S. at 236*.

2007 U.S. Dist. LEXIS 56703, *16

property. As a result, Twila Lee contends that she incurred damages. The alleged facts indicate that Twila Lee may be able to prove that Commonwealth either was operating in the course of its business profession or had a sufficient pecuniary interest in this transaction to support a claim for negligent misrepresentation. The Court, therefore, finds that Twila Lee has alleged sufficient facts to enable her to proceed with her claim of negligent misrepresentation.

## C. Commonwealth's Arguments That Twila Lee's Claims Are Barred

The Court has considered each of Commonwealth's arguments that Twila Lee's claims against it are barred and finds them all to be without merit. The Court, however, will specifically address the two principal arguments Commonwealth makes in support of its motion to dismiss. First, Commonwealth contends that various provisions in the title insurance policy bar the claims asserted against it. As support, Commonwealth relies upon the Ohio Supreme Court's holding in *Chicago Title Ins. Co. v. Huntington Nat'l Bank, 87 Ohio St. 3d 270, 277, 1999 Ohio 62, 719 N.E.2d 955 (Ohio 1999)*. Commonwealth's reliance is [*17] misplaced. In *Chicago Title*, the court held that a merger clause included in the title insurance policy excluded the negligence claim which Huntington sought to bring based upon Chicago Title's failure to discover a superior mortgage. The court determined that Huntington was limited to the contractual remedies available in the policy because the language "explicitly preclude[d] an independent tort action by [Huntington] for negligence arising out of the status of its lien or of title to the secured property." *Id.*

Here, however, the merger clause in the contract does not bar the type of claims Twila Lee seeks to bring. The merger clause in Twila Lee's policy with Commonwealth provides:

> Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the title to the estate or interest covered hereby or by any action asserting such claim, shall be restricted to this policy.

Def.'s Mot. to Dismiss, Exh. B. The merger clause expressly limits Commonwealth's liability to the policy for three categories of claims: 1) claims arising out of the status of the title; 2) claims arising out of an interest covered by the policy; and 3) claims arising out of any [*18] action asserting such claim. As Twila Lee's claims arise out of an alleged misrepresentation as to the existence of a certificate of occupancy, upon which Twila Lee relied in entering into the contract for title insurance and in closing on the property, these claims against Commonwealth are not covered by the merger clause. The alleged misrepresentation did not arise out of the status of the title or an interest covered by the policy and Twila Lee's claims did not arise out of an action asserting any such claims.

Similarly, Commonwealth's argument that additional language contained in the policy bars Twila Lee's claims is also unavailing. Commonwealth contends that Twila Lee's tort claims are barred by the exclusion provision in the policy which states that:

> The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:
>
> 1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land;
>
> * * *
>
> 3. Defects, [*19] liens, encumbrances, adverse claims or other matters:
>
> a. Created, suffered, assumed or agreed to by the insured claimant . . . .

*Id.* The exclusions of the policy do not bar Twila Lee's claims because she does not assert any claims under the policy.

Second, Commonwealth argues that the economic loss rule bars Twila Lee's claims. Under Ohio law, the economic loss rule generally prevents recovery in tort for purely economic loss. *Corporex Dev. & Constr. Mgmt., Inc. v. Shook, Inc. 106 Ohio St. 3d 412, 2005 Ohio 5409, 835 N.E.2d 701 (Ohio 2005)*. The Court observes, however, that Ohio courts have held that, as a general matter, the economic loss rule does not apply to bar claims for negligent misrepresentation. *See McCarthy, Lebit, Crystal & Haiman Co. v. First Union Mgmt., Inc., 87 Ohio App. 3d 613, 631-32, 622 N.E.2d 1093 (Ohio Ct. App. 1993); HDM Flagservice GMBH v. Parker Hannifin Corp., 332 F.3d 1025, 1032 (6th Cir. 2003)* (applying Ohio law and addressing inapplicability of economic loss rule to negligent misrepresentation claims).

Because Ohio courts generally do not apply the economic loss rule to preclude negligent misrepresentation claims, this Court will not, at this stage, preclude Twila Lee from proceeding with her claim of fraudulent [*20] inducement, which by its very terms, includes an intentional or reckless

2007 U.S. Dist. LEXIS 56703, *20

fraudulent misrepresentation. Additionally, the Court notes that Commonwealth has not directed this Court to any case in which the economic loss rule has been applied to bar recovery on a fraud claim. Commonwealth's argument that the economic loss rule bars Twila Lee from asserting her tort claims of fraudulent inducement and negligent misrepresentation is not well taken.

## IV. Conclusion

For the foregoing reasons, the Court grants Commonwealth's motion to dismiss Frank Lee's claims, but denies the motion to dismiss Twila Lee's claims.

It is so ORDERED.

/s/ James L. Graham

Senior United States District Judge

DATE: August 3, 2007

No *Shepard's Signal*™
As of: June 12, 2015 5:03 PM EDT

## MV Circuit Design, Inc. v. Omnicell, Inc.

United States District Court for the Northern District of Ohio, Eastern Division

March 24, 2015, Decided; March 24, 2015, Filed

CASE NO. 1:14 CV 2028

**Reporter**
2015 U.S. Dist. LEXIS 37688

## Core Terms

Cart, alleges, patent application, patent, email, motion to dismiss, technology, conspiracy, intellectual property, fraudulent concealment, parties, fraud claim, negligent misrepresentation, asserts, inventions, disclose, negligent misrepresentation claim, duty to disclose, representations, attorneys, citations, business transaction, aiding and abetting, limitations period, misrepresentations, infer, statute of limitations, elements of fraud, disclosures, misleading

**Counsel:** [*1] For MV Circuit Design, Inc., Plaintiff: James A. Fussell, III, Janet L. Goetz, Peter J. Toren, Sean J. Williams, LEAD ATTORNEYS, Weisbrod Matteis & Copley, Washington, DC; Luis A. Carrion, Renner, Otto, Boisselle & Sklar, Cleveland, OH.

For Omnicell, Inc., Rioux Vision, Inc., Defendants: Laura J. Cunningham, Stephen R. Smith, LEAD ATTORNEYS, Cooley - Washington, Washington, DC; Michael G. Rhodes, LEAD ATTORNEY, Cooley - San Francisco, San Francisco, CA; Stephen C. Crenshaw, LEAD ATTORNEY, Cooley - Reston, Reston, VA; Anthony J. O'Malley, Vorys, Sater, Seymour & Pease - Cleveland, Cleveland, OH; George M. Moscarino, Moscarino & Treu, Cleveland, OH.

For Kilpatrick Townsend & Stockton, LLP, Defendant: Brian P. O'Donnell, LEAD ATTORNEY, Kilpatrick Townsend & Stockton - Denver, Denver, CO; Frederick L. Whitmer, LEAD ATTORNEY, Kilpatrick Townsend & Stockton - New York, New York, NY; Susan A. Cahoon, LEAD ATTORNEY, Kilpatrick Townsend & Stockton - Atlanta, Atlanta, GA; Aaron M. Williams, Anthony J. O'Malley, Vorys, Sater, Seymour & Pease - Cleveland, Cleveland, OH.

**Judges:** Dan Aaron Polster, United States District Judge.

**Opinion by:** Dan Aaron Polster

## Opinion

### ORDER

Currently pending before the Court are two motions to dismiss. [*2] On November 14, 2014, Omnicell, Inc. ("Omnicell") and Rioux Vision, Inc. ("Rioux") jointly filed a Motion to Dismiss all of the declaratory judgment and tort claims that MV Circuit asserts against them (Doc. # 25)[1] and, on the same day, Kilpatrick Townsend & Stockton LLP ("Kilpatrick") filed a Motion to Dismiss all of the tort claims that MV Circuit asserts against it (Doc. # 24). For the reasons discussed below, the Court grants in part and denies in part Omnicell, Rioux and Kilpatrick's respective Motions to Dismiss.

### I. Factual Background

This case arises out of MV Circuit's allegation that Omnicell, Rioux and Kilpatrick (together, "Defendants"), "through a pattern of deception and fraudulent concealment...stripped [MV Circuit] of its patent rights ... in a medication-dispensing cart that became known as the RIO Cart." (Doc. # 1, Complaint ("Comp."), ¶ 1). Although medical carts had been used in the healthcare industry for years, the carts lacked adequate systems to ensure that the correct medication would be dispensed at the prescribed dose. The medication-dispensing cart that MV Circuit and Rioux [*3] developed, eventually called the RIO Cart, addresses these problems. Specifically, the RIO Cart includes a computer-monitored drawer system for keeping track of who dispensed what type of medication, when it was dispensed, and that corroborated dispensing information automatically.

MV Circuit, an engineering and design company, began developing medical-cart technology in 2001 when one of Rioux's former employees, Ray Reckelhoff, approached MV Circuit to discuss developing a new medical cart and

---

[1] Omnicell and Rioux have not moved to dismiss MV Circuit's patent infringement claims.

Case: 1:08-cv-02755-DCN Doc #: 341-1 Filed: 06/12/15 61 of 70. PageID #: 17424

Page 2 of 11
2015 U.S. Dist. LEXIS 37688, *4

computer station. MV Circuit agreed to work with Mr. Reckelhoff and Rioux, and in the ensuing six years MV Circuit worked almost exclusively on developing the hardware, software, and firmware that were eventually incorporated in the RIO Cart. MV Circuit hired engineers and spent hundreds of thousands of dollars of its own money on developing and conceiving of a number of components that were incorporated in the RIO Cart, including the drawer system; height actuator and weight sensor; wireless linking system; power system controller and; the computer controller. During the course of working with Rioux, MV Circuit charged Rioux only for certain hardware expenses and it sold Rioux prototypes it [*4] developed for various components to be used in the RIO Cart.

On February 14, 2007, Rioux sent MV Circuit a "Master Development Agreement," which provided, among other things, that, in the future, Rioux would be the exclusive owner of any intellectual property either party developed in connection with the RIO Cart. MV Circuit rejected Rioux's proposal and over the next few months the parties exchanged proposed draft agreements, but did not reach an agreement. While the parties were in negotiations, MV Circuit continued working closely with Rioux on developing the cart.

Then, on November 29, 2007, Omnicell purchased Rioux for $26 million. After learning of Omnicell's acquisition, on December 17, 2007, MV Circuit's CEO and founder, Markos Paradissis, met with Omnicell executives in California. During the meeting, MV Circuit proposed negotiating an agreement with Omnicell pursuant to which Omnicell would purchase MV Circuit's intellectual property rights in the RIO Cart. Omnicell told Mr. Paradissis that its attorneys would contact him to continue discussions and on January 22, 2008, Bob Schmid, Omnicell's Associate General Counsel, telephoned Mr. Paradissis. The next day, Mr. Schmid sent [*5] Mr. Paradissis an email summarizing their telephone discussion ("Schmid email"). Mr. Schmid wrote, in part:

> I have identified patent counsel with the Townsend and Townsend and Crew[2] law firm to whom you can disclose information relating to the IP that you believe relates to the Rioux Vision carts. This counsel would review this information and possibly discuss it further with you and/or your people. The purpose of the review and discussion is to enable him to provide to Omnicell his assessment of the patentability of these features as well as the overall value of the technology behind these features. He would not share with Omnicell the underlying technological descriptions that you would disclose to him but would provide the assessment mentioned above. For your information, although this counsel is solely Omnicell's counsel not the counsel of MV Circuit, this individual is not our regular patent counsel and would not be involved in developing any patent applications on behalf of Omnicell with respect to any technologies similar to those that are disclosed to him by MV Circuit. Omnicell remains free to develop rights with respect to any similar technologies through patents or otherwise. [*6] [3] (Comp. ¶ 50).

Mr. Schmid sent a copy of the above email to Omnicell's outside counsel, William J. Daley, at the Denver office of Kilpatrick Townsend. In reliance on Mr. Schmid's representations, on January 28, 2008, MV Circuit disclosed its confidential intellectual property to Mr. Daley. Following their initial conversations, Mr. Paradissis sent Mr. Daley a "summary/outline" that summarized some of MV Circuit's inventive contributions to the RIO Cart's development. Mr. Daley and Mr. Paradissis continued to exchange emails, including an email in which Mr. Daley requested that Mr. Paradissis provide him with "conception dates" for the technology that MV Circuit invented. Then, about a month later, Omnicell employees with engineering and [*7] technical expertise visited MV Circuit's Ohio office to learn about MV Circuit's intellectual property.

As was the case when MV Circuit was negotiating with Rioux, Omnicell and MV Circuit failed to reach an agreement on the purchase price of MV Circuit's intellectual property. Despite this, between 2008 and 2011, MV Circuit continued to work closely with Omnicell developing technology for the medical cart, and it continued to sell the circuitry used in the RIO Cart to Omnicell. Then, in 2011, Omnicell stopped purchasing products from MV Circuit, and MV Circuit began exploring other opportunities to license or sell its intellectual property related to the mediation-dispensing cart technology. While doing so, in May 2013, MV Circuit discovered that on February 11,

---

[2] Kilpatrick Townsend is the result of the merger between two law firms, one of which was formerly known as Townsend and Towsend and Crew.

[3] In the Complaint, MV Circuit does not include the portion of the Schmid email that reads "Omnicell remains free to develop rights with respect to any similar technologies through patents or otherwise." However, in its brief opposing the Defendants' Motions to Dismiss, it acknowledges that this was included in the email.

2015 U.S. Dist. LEXIS 37688, *7

2006, Rioux filed a provisional patent application related to the RIO Cart, U.S. Provisional Application No. 60/772, 416 ("the '416 Application"), claiming that its employee, Ray Recklehoff, was the sole inventor. The '416 Application ultimately issued as U.S. Patent No. 8, 180, 485 ("the '485 Patent"). MV Circuit also learned that between 2006-2011, either Omnicell or Rioux had filed other patent applications related to the RIO Cart. [*8] Two of these applications ultimately issued as U.S. Patent No. 8,773, 270 ('270 Patent) and U.S. Patent No. 8,812.153 ('153 Patent).

On September 12, 2014, MV Circuit filed a Complaint in this Court against Defendants Omnicell, Rioux and Kilpatrick (collectively, "Defendants"). MV Circuit asserts correction of inventorship claims against Omnicell under 35 U.S.C. § 256 (Counts 1, 2 and 3); and seeks declaratory judgment compelling Omnicell to correct inventorship designation on certain international patent applications (Counts, 4, 5, and 6). MV Circuit also asserts various state tort claims against both Omnicell and Kilpatrick, including, fraudulent concealment, negligent misrepresentation, fraud and conspiracy, as well a claim against only Kilpatrick for aiding and abetting Omnicell.

As noted above, on November 14, 2014, Omnicell and Rioux jointly filed a Motion to Dismiss all of the declaratory judgment claims and tort claims that MV Circuit asserts against them (Doc. # 25), and, on the same day, Kilpatrick filed a Motion to Dismiss all of the tort claims that MV Circuit asserts against it (Doc. 24). On January 29, 2015, MV Circuit filed a consolidated Opposition Brief (Doc. # 27), consenting to the Court's dismissal of the declaratory judgment claims (Counts 4, 5 and [*9] 6) and opposing the Defendants' Motions to Dismiss the state tort law claims, and, on February 17, 2014, the Defendants filed a Reply Brief (Doc. # 29 and Doc. # 30, respectively). Because MV Circuit consents to the Court's dismissal of the declaratory judgment claims, the Court grants Omnicell and Rioux's Motion to Dismiss as to these claims. Furthermore, for the reasons discussed below, the Court grants in part and denies in part Omnicell, Rioux and Kilpatrick's respective Motions to Dismiss as to MV Circuit's state law tort claims.

## II. Legal Standard

Omnicell and Kilpatrick bring their respective Motions to Dismiss under *Federal Rule of Civil procedure 12(b)(6)* for failure to state a claim. To survive a motion to dismiss under *Rule 12(b) (6)*, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Fed. R. Civ. P. 12(b) (6)*; *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868*

*(2009)* (quoting *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. "[A] formulaic recitation of the elements of a cause of action will not do," and a plaintiff must include factual allegations sufficient to "raise a right to relief above the speculative level." *Id.* A claim has facial plausibility only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is [*10] liable for the misconduct alleged." *Id.* (citing *Twombly, 550 U.S. at 556*). Merely reciting "labels and conclusions" is not enough. *Twombly, 550 U.S. at 555*.

In addition, for fraud claims, a complaint must state "with particularity" the circumstances constituting an alleged fraud or conspiracy. See *Fed. R. Civ. P. 9(b)*. "*Rule 9(b)* does not require omniscience; rather, the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." *Hale v. Enerco Grp., Inc., 2011 U.S. Dist. LEXIS 781, 2011 WL 49545, at * 5 (N.D. Ohio Jan 5, 2011)* (internal quotation marks omitted) (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A., 848 F.2d 674, 679 (6th Cir.1988)*.

## III. Analysis

### A. Fraud and Fraudulent Concealment

The elements of fraud and fraudulent concealment are: "(1) a representation, or where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance." *Hale, 2011 U.S. Dist. LEXIS 781, 2011 WL 49545, at *5* (citing *Gaines v. Preterm—Cleveland, Inc., 33 Ohio St. 3d 54, 514 N.E.2d 709, 712 (Ohio 1987)*).

MV Circuit's tort claims, including its fraud and fraudulent concealment [*11] claims, arise out of the January 23, 2008 email that Omnicell's Associate General Counsel, Bob Schmid, sent to MV Circuit's CEO, Markos Paradissis. MV Circuit's fraud claims are based on the following statements from the Schmid email:

- "[Mr. Daley] is not our regular patent counsel"

- "[Mr. Daley] would not be involved in developing any patent applications on behalf of Omnicell with respect to any technologies similar to those that are disclosed to him by MV Circuit."

2015 U.S. Dist. LEXIS 37688, *11

- "[Mr. Daley] would not share with Omnicell the underlying technological descriptions that you disclose to him . . ."
- "[I]f MV Circuit disclosed its intellectual property and inventions related to the RIO Cart, Omnicell would assess its value and patentability . . ."

The Complaint alleges that the above statements were false because 1) Mr. Daley's law firm, Kilpatrick Townsend, was Omnicell's regular patent counsel; 2) Kilpatrick Townsend was prosecuting Omnicell's patent application related to the technology in the RIO Cart; 3) Kilpatrick Townsend was actively working on additional patent applications based on identical technology that MV Circuit had disclosed to Mr. Daley; and 4) Omnicell had already determined that MV Circuit's [*12] inventions were patentable because it was prosecuting patent applications that claimed MV Circuit's inventions. The Complaint further alleges that Defendants made these statements to 1) induce MV Circuit to disclose its intellectual property to Mr. Daley; 2) to mislead MV Circuit into believing that Omnicell had not filed a patent application on the Rio Cart; and 3) to induce MV Circuit into continuing to work with Omnicell on the Rio Cart. MV Circuit asserts that, in reliance on these statements, it disclosed its intellectual property to Mr. Daley and continued to work with Omnicell on the Rio Cart; the Complaint alleges that Mr. Paradissis sent Mr. Daley a "summary/ outline" that summarized some of MV Circuit's inventive contribution to the RIO Cart's development, including the Drawyer System, Wireless Linkying System, HIPPA switch, Guide Lights and Power System Controller. Finally, MV Circuit asserts that it was injured as a result of disclosing its intellectual property to Mr. Daley because the intellectual property that MV Circuit disclosed to Kilpatrick was included in subsequent patent applications that Kilpatrick prepared and prosecuted on behalf of Omnicell. For instance, the [*13] "summary/outline" disclosed a "so-called HIPPA or privacy switch that permits a user to hit a button to cause personal patient information to be replaced by a screen saver." After Mr. Paradissis sent Mr. Daley the "summary/ outline," Kilpatrick Townsend, on behalf of Omnicell, subsequently drafted U.S. Application No. 61/420,262 ("the '262 Application") which claims, in part, that Omnicell's employees invented a "HIPPA...button" that performs the identical function that MV Circuit disclosed to Mr. Daley. The '262 Application ultimately issued as Patent '270. (Comp., ¶ 58).

As to MV Circuit's fraudulent concealment claims, the Complaint alleges, in addition to the above allegations, that the Defendants had a duty to disclose certain information to

MV Circuit because of the "continuing relationship of trust" between MV Circuit and Omnicell, and between MV Circuit and Rioux. Specifically, the Complaint alleges that Defendants had a duty to disclose the "true facts" concerning Kilpatrick Townsend's representation of Omnicell and that Omnicell and Rioux were filing patent applications that were based on MV Circuit's intellectual property.

Defendants argue that MV Circuit has failed to adequately plead [*14] a claim for fraud and fraudulent concealment and that, even if it has, these claims are time barred.

### 1. Sufficiency of the Allegations—Omnicell

First, Omnicell and Rioux argue that MV Circuit does not allege any facts that plausibly suggest that the statements from the 2008 Schmid email were false. In doing so, they point to facts that MV Circuit has not alleged. For instance, as to the statement that Daley was not Omnicell's regular patent counsel and would not be involved in prosecuting patent applications, Omnicell and Rioux note that the Complaint does not allege that Mr. Daley consulted with or spoke to the Kilpatrick attorneys who prosecuted Omnicell's patents. Similarly, as to the statement that Mr. Daley would not share with Omnicell the underlying technological descriptions that MV Circuit would disclose, they note that MV Circuit has not alleged that Mr. Daley actually disclosed MV's proprietary information to any specific person at Kilpatrick or Omnicell. Thus, Omnicell and Rioux essentially argue that MV Circuit has not alleged all the facts that are necessary for MV Circuit to prove its case. The difficulty that MV Circuit may have proving its case is not relevant when analyzing [*15] a 12(b)(6) motion to dismiss. Rather, the appropriate inquiry is whether MV Circuit has alleged sufficient facts from which the Court can infer that the statements in 2008 Schmid email were false. *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (citing *Twombly, 550 U.S. at 556*) ("A claim has facial plausibility only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." ). That requirement is met here.

As noted above, MV Circuit alleges that after it disclosed its intellectual property to Mr. TDaley, a lawyer at Kilpatrick, the firm, on behalf of Omnicell, filed patent applications that included, at least in part, the information that MV Circuit had disclosed to Mr. Daley. For instance, after Mr. Paradissis sent Mr. Daley the "summary/outline," which disclosed, among other things, a "so-called HIPPA or privacy switch." Kilpatrick, on behalf of Omnicell, drafted the '262 Application which claims a "HIPPA ... button" that

2015 U.S. Dist. LEXIS 37688, *15

performs the identical function that MV Circuit disclosed to Mr. Daley. Contrary to Schmid's representation to Paradissis, Daley's law firm was developing patent applications for Omnicell based on technology similar to that disclosed by [*16] MV Circuit. Thus, based on these factual allegations, it is plausible to infer that Daley shared MV Circuit's information with other lawyers at his firm.

Second, Omnicell and Rioux argue that MV Circuit alleges no relationship sufficient to give rise to a duty to disclose and, as such, any omission by Omnicell is not actionable. "Ohio law requires that a plaintiff establish a duty to disclose if a concealment of fact is alleged as a basis for fraud." *Cedar View, Ltd. v. Colpetzer, 2006 U.S. Dist. LEXIS 7018, 2006 WL 456482, * 3(N.D. Ohio Feb. 24, 2006)* (citation omitted). Under Ohio law, the "duty to speak does not depend on the existence of a fiduciary relationship between the parties. It may arise in any situation where one party imposes confidence in the other because of that person's position, and the other party knows of this confidence." *Cent. States Stamping Co. v. Term. Equip. Co., 727 F.2d 1405, 1409 (6th Cir. 1984)* (citing *Smith v. Patterson, 33 Ohio St. 70, 75-76 (1877)*. Here, the Complaint alleges facts from which the Court can infer that MV Circuit imposed confidence in Omnicell and Rioux because of their long-standing business relationship: (1) MV Circuit and Rioux developed a close relationship of trust during six years of developing the RIO Cart technology; (2) MV Circuit and Rioux each invested their own resources researching and developing the RIO Cart technology; (3) Rioux indicated to MV Circuit [*17] that they would share in the commercial success of the RIO Cart; (4) MV Circuit and Rioux collaborated on the entire development process for the RIO Cart, exchanging ideas, designs, and prototypes; and (5) MV Circuit continued working closely with Omnicell after it purchased Rioux to further develop the RIO Cart technology.

Finally, Omnicell and Rioux argue that MV Circuit has failed to sufficiently allege the requisite intent[4] reliance, and harm elements of fraud and fraudulent concealment. However, as noted above, MV Circuit alleges that the Defendants made misleading and false statements to MV

Circuit in order to induce MV Circuit to 1) continue to work with Omnicell and 2) disclose its confidential intellectual property to Mr. Daley. The Complaint alleges that MV Circuit worked closely with Omnicell and Rioux on developing the technology for the RIO Cart and that Omnicell knew that MV Circuit, rather than Rioux, had the expertise required to develop the technology in the RIO Cart. The Complaint further alleges that MV Circuit continued to work with Omnicell, the specific propriety information that MV Circuit disclosed to Omnicell, and how this information was used by Omnicell. For [*18] instance, as noted above, the Complaint alleges that the "summary/ outline" that Mr. Paradissis sent Mr. Daley disclosed MV Circuit's inventive contributions to the RIO Cart, including Guide Lights (also referred to as "the visual indicator). (Comp. ¶ 92). The Complaint further alleges that Mr. Paradissis conceived of and developed the visual indicator, and that claim 9 of the '270 Patent discloses the visual indicator that Mr. Paradiss developed. (Id). Thus, MV Circuit has sufficiently alleged the remaining elements of fraud.

Omnicell and Rioux also argue that "several key facts" undermine MV's statements regarding these elements of fraud. Some of the "key facts" that Omnicell and Rioux point to are contentions outside of the Complaint. Specifically, they assert that after MV Circuit made the disclosures to Mr. Daley, it began filing its own patent applications related to the RIO Cart, and, as a result, "any claims of injury based on the alleged disclosures in 2008 are illogical." They also argue that because Omnicell filed patent applications prior to the 2008 Schmid email, it had no reason to hide its inventions from Plaintiff. What MV Circuit will or will not be able to ultimately prove is not relevant when ruling on a 12(b)(6) motion to dismiss. *Perry v. United Parcel Service, 90 Fed. Appx. 860, 860-861 (6th Cir. 2004)* ("The court's function is not to weigh the evidence... but rather to examine the complaint and determine whether the plaintiff has pleaded a cognizable claim." (citations omitted). [*20] The Court must determine whether the Complaint contains enough facts to state a claim to relief that is plausible on its face. Even with the heightened pleading requirements mandated by *Federal Rule of Civil*

---

[4]   In their Reply Brief, Omnicell and Rioux raise an additional argument concerning the sufficiency of the allegations that they did not raise in their Motion to Dismiss. They assert that Plaintiff fails to adequately plead the "material transaction" element of fraud. Specifically, they argue that MV Circuit does not allege how Defendants' patent applications were material to the transaction it proposed, i.e., that Omnicell purchase MV Circuit's technology. The Complaint is replete with allegations that MV Circuit would not have disclosed its confidential property to the Defendants or devoted its time and resources to developing the RIO cart had it known not only about the patent [*19] applications but that Kilpatrick was Omnicell's patent counsel. While MV Circuit will ultimately have to prove how its disclosures were material to the transaction it proposed to MV Circuit, the Court finds that these allegations sufficiently plead the "materiality" element of fraud.

*Procedure 9(b)*, MV Circuit has sufficiently alleged a claim for fraud. As discussed above, MV Circuit has alleged the content and date of the misrepresentations that it relied on, Defendants' fraudulent scheme and intent, and the injury that it sustained as a result of relying on these misrepresentations. *See Hale v. Enerco Grp., Inc., 2011 U.S. Dist. LEXIS 781, 2011 WL 49545, at * 5 (N.D. Ohio Jan 5, 2011)*( "In complying with *Rule 9(b)*, a plaintiff, at a minimum, must allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." (quoting *U.S. ex. rel Bledsoe v. Cmty. Health Sys., Inc., 342 F.3d 634, 642 (6th Cir.2003)* (internal quotation marks omitted)).

Accordingly, the Court denies Omnicell and Rioux's Motion to Dismiss the fraudulent concealment and fraud claims (Counts 7 and 9, respectively).

## 2. Sufficiency of the Allegations-Kilpatrick

Kilpatrick argues that MV Circuit has not adequately plead a claim for fraud and fraudulent concealment. First, Kilpatrick argues that it is not responsible for any misrepresentations in the 2008 Schmid email because Mr. Daley [*21] simply received a copy of the email and, therefore, any misrepresentations in the email were made solely by Omnicell. The Court disagrees. The Complaint alleges that Kilpatrick, along with Omnicell, made the statements contained in the Schmid email. The Complaint further alleges that Kilpatrick was Omnicell's regular patent counsel at the time that the email was sent, Mr. Schmid sent a copy of the email to Mr. Daley, and that Mr. Daley, in accordance with the terms of the email, engaged in discussions with MV Circuit regarding MV Circuit's "inventive contributions" related to the RIO Cart. Furthermore, the email makes specific representations about what Mr. Daley would and would not do. For instance, the email provides that Mr. Daley would review any disclosures that MV Circuit made to him so that he could provide Omnicell with "his assessment of the patentability of these features as well as the overall value of the technology behind these features" but that he would not share the "underlying technological descriptions with Omnicell." (Comp., ¶ 50). It is unlikely that Omnicell would have made such specific representations about what Mr. Daley would or would not do without Mr. Daley [*22] having communicated this information to Omnicell. Thus, it is reasonable to infer from these facts that Mr. Daley was

somehow involved in the creation of this e-mail, i.e., that he drafted, discussed, or otherwise contributed to the substance of the email[5]. At a very minimum, Mr. Daley was aware of the representation that Schmid made to Paradissis, and Daley received the proprietary information from Omnicell because of these representations.

Second, Kilpatrick claims that because it was Omnicell's attorney, the attorney immunity doctrine shields it from liability. "Under Ohio law, attorneys enjoy immunity from liability to third persons arising from acts performed in good faith on behalf of, and with knowledge of, their clients. There is no immunity, however, where attorneys act maliciously. *Vector Research, Inc. v. Howard & Howard Attorneys P.C., 76 F.3d 692, 700 (6th Cir. 1996)* (citing *Scholler v. Scholler, 10 Ohio St.3d 98, 10 Ohio B. 426, 462 N.E. 2d 158, 163 (1984)*. Under, *Fed. R. Civ. P. 9 (b)*, "malice may be averred generally," because malice is "difficult to demonstrate at the pleading stage of litigation." *Vector Research, Inc., 76 F.3d at 700* (citations [*23] omitted). In *Vector*, the Sixth Circuit held that the plaintiffs' allegations that the "attorney defendants acted maliciously," "shared the malicious motives of their client," and "improperly handled personal and confidential information" were sufficient to defeat an attorney immunity challenge on a preliminary motion to dismiss. *Id.* Similarly, in *LeRoy*, the Supreme Court of Ohio affirmed reversal of the granting of the defendant attorneys' motion to dismiss on immunity grounds, concluding that the plaintiffs' "allegations of collusion and conflict of interest fall within the ambit of malice based on the sum total of the underlying facts alleged" and could be pleaded generally. *LeRoy v. Allen, Yurasek & Merklin, 114 Ohio St. 3d 323, 2007 Ohio 3608, 872 N.E. 2d 254, 260 (Ohio 2007)*. Here, the Complaint is replete with allegations that Omnicell and Kilpatrick "embarked on a scheme" to "mislead and deceive" MV Circuit. Thus, because the Defendants have sufficiently alleged malice, the Court finds that, at this stage of the litigation, it is inappropriate to apply the attorney immunity doctrine to shield Kilpatrick from liability from MV Circuit's fraud claim.

Next, Kilpatrick asserts that MV Circuit failed to plead facts showing that Kilpatrick had a "duty to disclose." The Court agrees. [*24] As noted above, "Ohio law requires that a plaintiff establish a duty to disclose if a concealment of fact is alleged as a basis for fraud." *Cedar View, Ltd. v. Colpetzer, 2006 U.S. Dist. LEXIS 7018, 2006 WL 456482, * 4 (N.D. Ohio Feb. 24, 2006)*. Under Ohio law, the duty to

---

[5]  Kilpatrick also sets forth arguments concerning the remaining elements of fraud (i.e., false statement, justifiable reliance, intent, and harm). For the same reason that the Court rejects Omnicell's arguments as to these elements, it rejects Kilpatrick's.

2015 U.S. Dist. LEXIS 37688, *24

disclose may be required of a party to a business transaction where (1) the parties are in a fiduciary relationship; (2) both parties to the transaction understand that a special trust or confidence has been reposed; or (3) full disclosure is necessary to dispel misleading impressions that are or might have been created by partial revelation of the facts. *Blon v. Bank One, Akron, N.A., 35 Ohio St. 3d 98, 101, 519 N.E.2d 363, 367 (1988); see also Stuckey v. Online Resources Corp., 819 F.Supp. 2d 673, 686-87 (S.D. Ohio July 12, 2011)("[F]ull disclosure may be required of a party to a business transaction where such disclosure is necessary to dispel misleading impressions that are or might have been created by partial revelation of the facts."*). The Complaint alleges that Kilpatrick "had a duty to disclose to MV Circuit the true nature of the law firm's work for Omnicell and the existence of the pending patent applications in order to dispel or correct their misleading statements." (Comp. ¶ 159). However, the Complaint does not allege any facts from which the Court can infer that MV Circuit and Kilpatrick [*25] were parties to a business transaction. The business transaction that is the basis of MV Circuit's Complaint involves MV Circuit's proposal to Omnicell to enter into an agreement in which Omnicell would purchase or license MV Circuit's intellectual property rights in the RIO Cart. The Complaint does not allege that Kilpatrick was a party to this transaction, nor does it allege any other facts from which the Court can infer that Kilpatrick and Omnicell were parties to a business transaction. Rather, the Complaint alleges that when Omnicell and MV Circuit were parties to a business transaction, Kilpatrick assisted Omnicell in defrauding MV Circuit.

Accordingly, the Court grants Kilpatrick's Motion to Dismiss the fraudulent concealment claim (Count 10) and denies the Motion to Dismiss the fraud claim (Count 12).

### 3. Statute of Limitations

In addition to their arguments concerning the sufficiency of MV Circuit's allegations, the Defendants also argue that MV Circuit's fraud claims are time barred. Because the Defendants' respective Motions set forth similar statute of limitation arguments, the Court will consider these arguments together.

Under Ohio law, the statute of limitation for fraud [*26] is "four years after the cause therof accrued." *Ohio Rev. Code § 2305.09*. The Defendants assert that the four-year statute of limitation period begins to accrue when the fraud was committed. However, the Ohio Supreme Court has held that "a cause of action for fraud ...accrues either when the fraud is discovered, or when in the exercise of reasonable diligence,

the fraud should have been discovered." *Cundall v. U.S. Bank, 122 Ohio St. 3d 188, 2009 Ohio 2523, 909 N.E.2d 1244, 1250 (2009)* (citations omitted). The court explained that while a cause of action generally accrues when the wrongful act was committed, the discovery rule is an exception to the general rule. *Norgard v. Brush Wellman, Inc., 95 Ohio St. 3d 165, 167, 2002 Ohio 2007, 766 N.E.2d 977 (2002)*. Here, MV Circuit alleges that it discovered that Omnicell had filed a patent relating to the RIO Cart technology in May 2013. Thus, based on this allegation, MV Circuit's fraud claims do not expire until May 2017.

This does not end the Court's inquiry. Defendants also argue that MV Circuit should have discovered the fraud before it did and that the Court should *not* apply the fraudulent concealment doctrine to toll the statute of limitation period.

"Generally, a motion under *Rule 12(b)(6)*, which considers only the allegations in the complaint, is an inappropriate vehicle for dismissing a claim based upon a statute of limitations. However, dismissal [*27] is warranted if the allegations in the complaint affirmatively show that the claim is time-barred." *Lutz v. Chesapeake Appalachia, L.L.C., 717 F.3d 459, 464 (6th Cir. 2013)* (internal quotation marks and citations omitted)." Here, the Court finds that the Complaint does not affirmatively show that MV Circuit's claim is time-barred. As noted above, the statute of limitation for fraud begins to accrue "when the fraud is discovered, or when in the exercise of reasonable diligence, the fraud should have been discovered." *Cundall, 122 Ohio St. 3d 188, 2009 Ohio 2523, 909 N.E.2d 1244, 1250* (citations omitted). When determining whether a plaintiff should have discovered the fraud prior to when it alleges it did, the relevant inquiry is "whether the facts known would lead a fair and prudent man, using ordinary care and thoughtfulness, to make further inquiry." *Id*. The Defendants argue that the following factual allegations demonstrate that MV Circuit should have known, prior to May 2013, that MV Circuit and Rioux could be filing patent applications related to the RIO Cart: 1) some of the patent applications were public information; 2) the Schmid email was sufficient to alert MV Circuit that Omnicell had or would be filing patent applications related to the RIO Cart; 3) in 2007, Rioux "asked MV Circuit to stipulate that Rioux alone [*28] had conceived of the technology in the medical cart" ("the stipulation") (Comp. ¶ 2); and 4) in 2007 Rioux sent MV Circuit a proposed agreement that provided that Rioux would be the exclusive owner of any IP developed in connection with the RIO Cart. The Court disagrees.

First, the Court agrees with other courts that have held that mere publication of a patent or patent application is

2015 U.S. Dist. LEXIS 37688, *28

insufficient to put a claimant on notice of his claims relating to the patent. *compare General Electric Co. v. Wilkins, 2011 U.S. Dist. LEXIS 81479, 2011 WL 3163348, at \* 5 (E.D. Cal. July 26, 2011). with Informatics Applications Group, 836 F.Supp.2d 400, 425 (E.D. Va. 2011)*("[P]ublication of the patent application for the #146 Patent on October 16, 2008 [] was sufficient to place [plaintiff] on constructive notice and trigger the statute of limitations on [its] fraud claim"). As the Court in *General Electric* explained, it is "not reasonable" to impose on a claimant the "onerous burden" of "scour[ing] the substance of each patent to determine whether [the claimant] should have been named as an inventor." *General Electric, 2011 U.S. Dist. LEXIS 81479, 2011 WL 3163348, at \*5*.

Second, as to the stipulation and the 2007 proposal that Rioux sent to MV Circuit, the Court finds that neither of them affirmatively shows that MV Circuit should have known that Omnicell and Rioux were filing patent applications. In doing so, the Court construes the Complaint in the light most favorable [*29] to MV Circuit, as it must on a 12(b)(6) motion to dismiss. The Complaint alleges that after Rioux sent MV Circuit the proposed agreement stating that Rioux would be the exclusive owner of any IP developed in connection with the RIO Cart, MV Circuit rejected Rioux's proposal and sent Rioux a counter-proposal. The parties never reached an agreement, so there is no conclusive proof that MV Circuit knew or should have known that Rioux was filing any patent applications based on the RIO Cart.

Finally, as to the statement in the 2008 Schmid email that Defendants argue should have alerted MV Circuit that Rioux or Omnicell had or would be filing patent applications, the Court finds that this statement, in light of MV Circuit's other factual allegations, does not affirmatively show that MV Circuit's fraud claims are time barred. MV Circuit alleges that it "had no reason to suspect" that Rioux or Omnicell had filed patent applications related to the RIO Cart because, among other things, Rioux had contracts with MV Circuit that explicitly prohibited Rioux from disclosing to any third party the intellectual property that MV Circuit provided to Rioux. (Comp. ¶ 73). The Complaint further alleges [*30] that MV Circuit "had no reason to suspect" Omnicell because Omnicell and Kilpatrick made statements in the Schmid email suggesting that they were assessing the value and patentability of MV Circuit's intellectual property.

Accordingly, for the reasons discussed above, the Court finds that the Complaint does not affirmatively show that MV Circuit's fraud claims are time-barred. Having done so, the Court need not consider whether the fraudulent concealment doctrine tolls the statue of limitations period.

## B. Negligent Misrepresentation

Omnicell, Rioux and Kilpatrick argue that MV Circuit has failed to adequately plead a claim for negligent misrepresentation and that, even if it has, its negligent misrepresentation claim is time barred. Kilpatrick also asserts that the attorney immunity doctrine bars MV Circuit's negligent misrepresentation claim.

## 1. Statute of Limitation

A claim for negligent misrepresentation must be brought within the four years after the action accrued. *Ohio Rev. Code § 2305.09*. Under Ohio law, the discovery rule does not apply to negligent misrepresentation claims. *See Allen v. Andersen Windows, Inc., 913 F.Supp.2d 490, 509 (S.D. Ohio 2012)*. Thus, the limitations period provided for a negligent misrepresentation claim in Ohio "begins to run when the allegedly negligent [*31] act is committed, rather than when its damage is discovered." *Svete v. Wunderlich, No. 2:07-cv-156, 2008 U.S. Dist. LEXIS 75977, 2008 WL 4425509, at \*9 (S.D. Ohio. Sept. 30, 2008)*. Here, the alleged "misrepresentations" in the Complaint occurred in January 2008, and MV Circuit filed the instant action in September 2014, well over four years from the date of the misrepresentations. Nonetheless, MV Circuit contends that the fraudulent concealment doctrine tolls the limitation period. To toll the statute of limitation period under the fraudulent concealment doctrine, a plaintiff must plead "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence." *Lutz, 717 F.3d at 475*. The Court finds that MV Circuit has sufficiently alleged that the fraudulent concealment doctrine tolled the statute of limitation period.

As to the first prong, the Complaint allege that Defendants intentionally deceived MV Circuit into thinking that Omnicell had not filed any patent applications related to the RIO Cart. For instance, the Complaint alleges that in the Schmid email, Omnicell and Kilpatrick told MV Circuit that it was interested in [*32] conducting an assessment of the patentabilty of MV Circuit's intellectual property in the RIO Cart, thereby suggesting that no patent application claiming MV Circuit's intellectual property in the cart had been filed. Clearly the second prong is met; MV Circuit alleges that it discovered the fraud outside of the limitation period. As to the third prong, the Sixth Circuit has recognized that "only information sufficient to alert a reasonable person to the possibility of wrongdoing gives rise to a party's duty to inquire into the matter with due diligence." *Lutz, 717 F.3d at*

2015 U.S. Dist. LEXIS 37688, *32

475-76 (internal quotation marks and citation omitted). As detailed above, MV Circuit alleges that it "had no reason to suspect" that Rioux or Omnicell had filed patent applications related to the RIO Cart. Thus, the Court concludes that MV Circuit's allegations are sufficient to survive a motion to dismiss. Whether or not MV Circuit did in fact have sufficient information to trigger its duty to investigate, are "questions for summary judgment or for trial, and they should not be resolved on a motion to dismiss." *Id.*

## 2. Attorney Immunity

Under Ohio law, "[a]n attorney is immune from liability to third persons arising from his performance as an [*33] attorney in good faith on behalf of, and with the knowledge of his client, unless such third person is in privity with the client or the attorney acts maliciously." *Scholler v. Scholler, 10 Ohio St. 3d 98, 10 Ohio B. 426, 462 N.E.2d 158, 163 (Ohio 1984).* Here, as discussed above, MV Circuit has alleged that the Defendants acted with malice. Thus, the Court finds that at this stage of the litigation it is inappropriate to apply the attorney immunity doctrine to shield Kilpatrick from liability from MV Circuit's negligent misrepresentation claim.[6]

## 3. Sufficiency of the Factual Allegations

The Court now turns to Defendants' argument that MV Circuit has not properly plead a claim for negligent misrepresentation. Under Ohio law, negligent misrepresentation is defined as follows: "A person who, in the course of his business, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary [*34] loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or

communicating the information." *Rheinfrank v. Abbot Labs., 2013 U.S. Dist. LEXIS 113289, 2013 WL 4067826, at *2 (S.D. Ohio Aug. 12, 2013)* (quoting *Gutter v. Dow Jones, Inc., 22 Ohio St. 3d 286, 22 Ohio B. 457, 490 N.E.2d 898, 900 (Ohio 1986)).* As noted above, MV Circuit alleges facts from which the Court can infer that Omnicell and Kilpatrick, in the course of a business transaction, supplied MV Circuit with false information and that MV Circuit relied upon this information.

The crux of Defendants' argument is that a negligent misrepresentation claim requires that the parties have a "special relationship," such that the defendant is a professional who is in the business of rendering opinions to others for use in guiding their business.[7] (Omnicell Motion at 11; ). In support, Defendants cite: *Ziegler v. Findlay Indus., Inc., 464 F. Supp. 2d 733, 738 (N.D. Ohio 2006); Stafford v. Jewelers Mut. Ins. Co., No. 12-cv-050, 2013 U.S. Dist. LEXIS 29011, 2013 WL 796272, at *7 (S.D. Ohio Mar. 4, 2013);Ortega v. Wells Fargo Bank, NA, No. 11-cv-1734, 2012 U.S. Dist. LEXIS 11409, 2012 WL 275055, at *9 (N.D. Ohio Jan. 31, 2012); Palmer-Donavin Mfg. Co. v. Rheem Sales Co., No. 14-cv-91, 2014 U.S. Dist. LEXIS 82993, 2014 WL 2767665, at *8 (S.D. Ohio June 18, 2014),* MV Circuit, in turn, cites cases that have rejected the special relationship requirement. (MV Circuit Op. Br. at 24 )(citing *Nat'l Mulch & Seed, Inc. v. Rexius Forest By-Products, Inc., 2007 U.S. Dist. LEXIS 24904, 2007 WL 894833, at *9 (S.D. Ohio Mar. 22, 2007); Hodell-Natco Indus. v. SAP Am., Inc.,* 13 F. Supp. 3d 786, 797 (N.D. Ohio 2014); *CCB Ohio LLC v. Chemque, Inc., 649 F. Supp. 2d 757, 767 (S.D. Ohio 2009); Nat'l Century Fin. Enterprises, Inc. v. Inv. Litig., 580 F. Supp. 2d 630, 647 (S.D. Ohio 2008); ATM Exch., Inc. v. Visa Int'l Ass'n, 2008 U.S. Dist. LEXIS 93461, 2008 WL 3843530, at *16 (S.D. Ohio Aug. 14, 2008).*

---

[6]  Kilpatrick cites *In re Nat. Century Fin. Enter., Inc. Inv. Lit.,* No. 2:03-md-1565, 2008 U.S. Dist. LEXIS 39931, 2008 WL 1995216, at *7 (S.D. Ohio May 5, 2008) to suggests that even if MV Circuit had alleged malicious conduct, MV Circuit could not overcome the attorney immunity doctrine. (Kilpatrick Motion at 11). To the extent that this case stands for this proposition, the Court declines to adopt this reasoning.

[7]  Omnicell and Rioux also argue that MV Circuit "cannot state a claim for negligent misrepresentation by alleging intentional false statements" and all the Defendants [*35]  argue that MV Circuit has not alleged that the Defendants failed to exercise reasonable care in communicating the information.( Omnicell Mot. at 14; Kilpatrick Mot. at 10). Ohio courts, however, recognize that plaintiffs can bring a fraud and negligent misrepresentation claim based on the same conduct. See *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.,* 115 Ohio App. 3d 137, 684 N.E. 2d 1261, 1269 (Ohio Ct. App. 1996) ("Where fraud and negligent misrepresentation are claimed as the same set of underlying facts, if fraud is proved, then the claim of negligent misrepresentation is necessarily subsumed thereby."). MV Circuit's allegations that Defendants deliberately deceived MV Circuit to induce it to disclose its intellectual property necessitate the inference that Defendants did not exercise sufficient care when making their misrepresentations. As to Kilpatrick's arguments concerning the justifiable reliance and damage elements of negligent misrepresentation (Kilpatrick Mot. at 9), Kilpatrick makes the same arguments that it does with regard to the justifiable reliance and damage elements of MV Circuit's fraud claims. For the same reasons that the Court rejected these arguments as to MV Circuit's fraud claims, the Court rejects them as to MV Circuit's negligent misrepresentation claim.

2015 U.S. Dist. LEXIS 37688, *34

As this [*36] appears to be a very unsettled area in Ohio law, the Court will deny the Motions to Dismiss MV Circuit's negligent misrepresentation claims at this time (Counts 8 and 11), and will wait to see what discovery shows the parties' true relationship was. The Court notes that even if MV Circuit is not required to prove a "special relationship," it will have to prove that Defendants provided false information to guide MV Circuit in its business transactions, and that MV Circuit justifiably relied on this false information.

## C. Aiding & Abetting

The Complaint alleges that Kilpatrick intentionally and substantially aided and abetted Omnicell in defrauding MV Circuit. While Ohio does not recognize a civil tort of aiding and abetting, Colorado and California, the states where Defendants have their offices, do recognize this tort. *compare Devries Dairy, L.L.C. v. White Eagle Coop. Ass'n., Inc., 132 Ohio St.3d 516, 517, 2012 Ohio 3828, 974 N.E.2d 1194, 1194 (Ohio 2012)* (answering in the negative the certified question, "Under the applicable circumstances, does Ohio recognize a cause of action for tortious acts in concert under the *Restatement (2d) of Torts, § 876*.") *with Hunter v. Citibank, N.A., 2010 U.S. Dist. LEXIS 61912, 2010 WL 2509933, at *18-19 (N.D. Cal. Jan. 28, 2013)* (recognizing a claim for aiding and abetting fraud) *and Sender v. Mann, 423 F. Supp. 2d 1155, 1175 (D. Colo. 2008)* (concluding that "aiding and abetting fraud is a cognizable claim in Colorado"). This makes a choice of law determination necessary [*37] for this claim. *Glidden Co v. Lumbermens, 112 Ohio St. 3d 470, 471-75, 2006 Ohio 6553, 861 N.E.2d 109 (2006)* (adopting the rule that "an actual conflict between Ohio law and the law of another jurisdiction must exist for a choice-of-law analysis to be undertake") (citations omitted).

"In federal question cases, a District Court entertaining pendent state claims should follow the choice of law rules of the forum state." *Glennon v. Dean Witter Reynolds, Inc., 83 F.3d 132, 136 (6th Cir. 1996)* (citations omitted). Therefore, Ohio's choice-of-law rules apply. Ohio follows the Restatement (Second) of Conflict of Laws in making choice-of-law determinations in tort actions. *See Morgan v. Biro Mfg. Co., Inc., 15 Ohio St.3d 339, 341—42, 15 Ohio B.*

*463, 474 N.E.2d 286, 288—89 (Ohio 1984)*. Pursuant to Ohio's choice-of-law rules in a tort action, "a presumption is created that the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit." *Id.* To determine the state with the most significant relationship, the Court must apply the following factors[8]: 1) the place of the injury; 2) the place where the conduct causing the injury occurred; 3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and 4) the place where the relationship between the parties, if any, is located. *Morgan, 15 Ohio St. 3d at 342, 474 N.E. 2d at 289* (citing *Restatement (Second) of Conflict of Laws § 14 (1)*).

Applying these factors to the instance case, the Court finds that Ohio has the most significant relationship to the occurrence and parties. First, the Complaint alleges that MV Circuit was injured by Kilpatrick's actions in Ohio. (Comp. ¶ 17) (Kilpatrick "had the communications with Mr. Paradissis of MV Circuit that are at issue in this case while Mr. Paradissis was in Ohio, causing injury to MV [] in Ohio."). Second, MV Circuit received and relied upon the Schmid email, along with other email communications from Kilpatrick, in Ohio. Third, MV Circuit alleges that it developed and invented the disputed technology [*39] in Ohio and that Omnicell employees visited MV Circuit's office in Ohio to learn more about MV Circuit's intellectual property. Fourth, MV Circuit is an Ohio Corporation with its principal place of business in Ohio, whereas Omnicell is a Delaware corporation with its principal place of business in California and Kilpatrick is headquartered in Georgia. While MV Circuit alleges that Defendants made the representations from Colorado and California, this factor, in light of the other factors, does not weigh in favor of applying Colorado or California law. Finally, Ohio is preferred because it is the forum state. *Carder Buick-Olds Co., Inc. V. Reynolds & Reynolds, Inc., 148 Ohio App. 3d 635, 2002 Ohio 2912, 775 N.E.2d 531, 544 (Ohio Ct. App. 2002)* (explaining that if after applying the relevant factors either state would be appropriate, the court should apply the law of the forum state).

Accordingly, because Ohio does not recognize a claim for aiding and abetting, the Court dismisses this claim against Kilpatrick (Count 14).

---

[8]  For fraud based claims, the Court may also consider: (a) the place, or places, [*38] where the plaintiff acted in reliance upon the defendant's representations, (b) the place where the plaintiff received the representations, (c) the place where the defendant made the representations, (d) the domicile, residence, nationality, place of incorporation and place of business of the parties, (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant. *Restatement (Second) of Conflict of Laws § 148(2)*.

2015 U.S. Dist. LEXIS 37688, *39

## D. Conspiracy

The Complaint alleges that Omnicell and Kilpatrick "agreed to engage in a common scheme" to defraud MV Circuit, and committed multiple overt acts in furtherance of the conspiracy. Omnicell and Kilpatrick assert that MV Circuit has not properly plead the elements of conspiracy and that this [*40] claim is barred by the intra-corporate conspiracy doctrine. Because the Court finds that MV Circuit's conspiracy claim is barred by the intra-conspiracy doctrine, it does not consider whether this claim is properly plead.

In Ohio, civil conspiracy is defined as "a malicious combination of two or more persons to injure another person or property, in a way not competent for one alone, resulting in actual damages." *Williams v. Aetna Fin. Co., 83 Ohio St. 3d 464, 475, 1998 Ohio 294, 700 N.E. 2d 859 (1998)* (citations omitted). Under the intra-corporate conspiracy doctrine, if "all of the defendants are members of the same collective entity, there are not two separate 'people' to form a conspiracy." *Amadasu v.The Christ Hosp., 514 F.3d 504, 507 (6th Cir. 2008)* (barring *Section 1985* civil rights claim on intra-corporate conspiracy grounds). This includes employees and agents of a corporation, such as attorneys acting within the scope of the attorney-client relationship. *See Horen v. Board of Educ. of Toledo City Sch. Dist., 594 F.Supp. 2d 833, 842 (N.D. Ohio 2009)* ("An attorney representing a client cannot 'conspire' within the attorney-client relationship" (citations omitted)); *see also Coley vs. Lucas County, 2014 U.S. Dist. LEXIS 8260, 2014 WL 272667, at *9 (N.D. Ohio Jan. 23, 2014)* (applying intra-corporate conspiracy doctrine to bar state law civil conspiracy claim because "[a] corporation cannot conspire with its own agents or employees").

MV Circuit asserts that the intra-corporate conspiracy doctrine should not be applied to bar [*41] its civil conspiracy claim because courts have held that this doctrine is inapplicable where attorneys actively participate in their clients' fraud. In support of this proposition, MV Circuit cites state court decisions from California and Colorado. (MV Circuit Opp. Br. at 37-38). Under Ohio law,[9] however, the only exception to the intra-conspiracy doctrine that courts have recognized is where an employee acts outside the scope of his employment by engaging in the alleged conspiracy. *Coley, 2014 U.S. Dist. LEXIS 8260, 2014 WL 272667, * 10* ("Plaintiffs cannot rely on the one exception to the intra-corporate conspiracy doctrine, namely that Defendants were acting outside the scope of their employment by engaging in an alleged conspiracy." ); *see also Steptoe v. Savings of America, 800 F.Supp. 1542, 1547-48 (N.D. Ohio Aug. 24, 1992)* (noting that the only exception to the intra-conspiracy rule that courts in Ohio have recognized is where a party to a conspiracy acted outside the scope of his employment in performing the alleged unlawful acts).

As noted above, the Complaint asserts that Kilpatrick and Omnicell conspired to defraud MV Circuit. Kilpatrick, as Omnicell's attorney, was unquestionably [*42] an agent of Omnicell. In addition, the allegations against Kilpatrick are based on conduct that Mr. Daley and other attorneys at Kilpatrick engaged in as part of their representation of Omnicell. See e.g., Comp. ¶ 38 (statements in the 2008 Schmid email were false because Kilpatrick was "actively working on patent applications based on identical technology that MV Circuit disclosed to Mr. Daley"). Thus, Kilpatrick was working within the scope of its employment when it engaged in the allegedly unlawful conduct. Accordingly, because MV Circuit has not alleged that there were two separate "people" who participated in the alleged conspiracy, the Court dismisses Omnicell's conspiracy claim as a matter of law (Count 13).

## IV. Conclusion

For the reasons discussed above, the Court grants in part and denies in part Omnicell, Rioux and Kilpatrick's respective Motions to Dismiss. Specifically, as to Omnicell and Rioux, the Court **GRANTS** their Motion to Dismiss (**Doc. # 25**) the declaratory judgment (Counts 4, 5 and 6) and civil conspiracy (Count 13) claims, and **DENIES** their Motion to Dismiss the fraud (Count 9), fraudulent concealment (Count 7) and negligent misrepresentation (Count 8) claims. As to [*43] Kilpatrick, the Court **GRANTS** its Motion to Dismiss (**Doc. # 24**) the fraudulent concealment (Count 10), aiding and abetting (Count 14) and conspiracy (Count 13) claims, and **DENIES** its Motion to Dismiss the fraud (Count 12) and negligent misrepresentation (Count 11) claims.

**IT IS SO ORDERED**.

*/s/ Dan A. Polster March 24, 2015*

Dan Aaron Polster

**United States District Judge**

---

[9]  As noted in the "Aiding and Abetting" section of the Court's analysis, the Court finds that Ohio law applies to MV Circuit's state law claims.