1    IN THE DISTRICT COURT OF THE UNITED STATES
     FOR THE NORTHERN DISTRICT OF OHIO
2              EASTERN DIVISION

3

HODELL-NATCO INDUSTRIES, INC.,
4                                    08CV2755
          Plaintiff,
5
      vs.                            June 16, 2015
6                                    8:30 A.M.

7  SAP AMERICA, INC., ET AL.,
                                     Volume 2
8          Defendants.

9


10
          TRANSCRIPT OF JURY TRIAL PROCEEDINGS
11    BEFORE THE HONORABLE DONALD C. NUGENT
          UNITED STATES DISTRICT JUDGE
12              AND A JURY

13

14

15

16

17

18

19

20

21

22

23

24

25

1    APPEARANCES:

2

3    For the Plaintiff:          Christopher J. Carney, Esq.
                                 Sharon A. Luarde, Esq.
                                 P. Wesley Lambert, Esq.
4                                Brouse McDowell
                                 600 Superior Avenue East
5                                Suite 1600
                                 Cleveland, Ohio    44114
6                                216-830-6830

7

8    For the Defendants:         Gregory J. Star, Esq.
                                 Michael John Miller, Esq.
                                 Joseph M. Kelleher, Esq.
9                                Alex H. Hayden, Esq.
                                 Drinker Biddle & Reath
10                               One Logan Square
                                 18th & Cherry Streets
11                               Philadelphia, PA    19103
                                 215-988-2734

12

13

14

     Official Court Reporter:    Susan K. Trischan, RMR,CRR,FCRR
15                               7-189 U.S. Court House
                                 801 West Superior Avenue
16                               Cleveland, Ohio  44113
                                 216-357-7087

17

18   Proceedings recorded by mechanical stenography;
     transcript produced by computer-aided transcription.
19

20

21

22

23

24

25

```
 1                    TUESDAY, JUNE 16, 2015,  8:30 A.M.

 2                         (Proceedings resumed in presence of the

 3         jury as follows:)

 4                         THE COURT:  Good morning, ladies and

08:33:52  5     gentlemen.

 6                         THE JURORS:  Good morning.

 7                         THE COURT:  Have a seat.

 8                         Nice beautiful day out so you're better off

 9         being in here, right?

08:34:02 10                    Okay.  Mr. Reidl, you may continue.

11                         MR. CARNEY:  Kim, thank you.

12                         THE COURT:  That's why she gets paid the

13         big bucks.

14                         MR. CARNEY:  I was going to say, Kim, are

08:34:55 15     we ready?  There's a button to be pushed.  Who would have

16         thunk it?

17                         MS. ANDERS:  Yes, I'm ready.

18                         MR. CARNEY:  Thank you.

19                         Kim, could you turn to Exhibit 92, please?

08:35:20 20                    MS. LUARDE:  We're having some technical

21         difficulties here.

22                         THE COURT:  I had the technicians, they

23         were here at 7:30 this morning saying "Everything is

24         perfect."

08:35:44 25                    Can you see it on your screens?  Okay.
```

| | |
|---|---|
| 1 | MS. ANDERS:  What exhibit? |
| 2 | MR. CARNEY:  Exhibit 92, please. |
| 3 | DIRECT EXAMINATION OF KEVIN REIDL (RESUMED) |
| 4 | BY MR. CARNEY: |
| 08:36:01 5 | Q.    Mr. Reidl, you have in front of you Exhibit 92. |
| 6 | Can you please identify the document? |
| 7 | A.    Sure.  This is an e-mail from Jon Woodrum of LSi to |
| 8 | myself and Dan Lowery and Joe Guagenti from LSi.  It's |
| 9 | dated Saturday, July 14th, 2007. |
| 08:36:20 10 | Q.    And this is approximately four months after you've |
| 11 | gone live on Business One? |
| 12 | A.    Yes. |
| 13 | Q.    And what's Mr. Woodrum conveying to you in this |
| 14 | e-mail? |
| 08:36:36 15 | A.    That they're working with SAP on performance |
| 16 | improvements.  It says, "We're working closely with SAP |
| 17 | on performance areas and where and how we see potential |
| 18 | enhancements from SAP basic, SAP DI API and the LSi |
| 19 | In-Flight add-on." |
| 08:36:54 20 | Q.    I see a reference later in the e-mail to a PL29. |
| 21 | A.    Yes. |
| 22 | Q.    What is that referring to? |
| 23 | A.    A patch level.  Those were, patches were released |
| 24 | to -- by SAP and LSi to fix bugs and improve performance |
| 08:37:15 25 | and so forth. |

```
 1    Q.    And my understanding is that there were numerous

 2    patches that were -- that were put on Hodell's system to

 3    try and improve Business One, is that correct?

 4    A.    Correct.  Yes.  There were a number of them over

 5    the course of four or five months.

 6    Q.    And did you experience a significant upgrade with

 7    Patch Level 29?

 8    A.    No, I don't believe so.

 9          We -- there was a number of these patch

10    levels, and they -- they may have fixed a thing here or

11    there, but the performance of the system overall

12    continued to be slow and continued with its lockups.

13    Q.    Now, during SAP's opening statement, it was -- it

14    was stated that Hodell's performance had improved

15    significantly on Business One by November of 2007.

16          Do you recall that?

17    A.    Yes, I recall that.

18    Q.    Did the Business One performance improve

19    significantly by November of 2007?

20    A.    No.  No.  It still had slow -- it still wasn't

21    working performance-wise.  It was slow and it had

22    lockups, bugs, and so forth.

23    Q.    It was stated that by May of 2007 there was a 50%

24    improvement in performance.

25          Is that accurate?
```

1    A.    I don't believe so.

2              50 percent improvement on what?  50%

3    improvement on 20% functionality would have been another

4    10%, so, no, the performance continued to be slow and

08:39:04  5    problematic.

6    Q.    By September it was stated that performance had

7    improved by 500%.

8              Is that true?

9    A.    No.  It hadn't improved by 500%, I don't believe

08:39:37 10   so.

11   Q.    Do you know who Edward Neveux is?

12   A.    Yes.  He was a development employee for SAP.

13   Q.    It was stated that in October of 2007, he came to

14   your workplace for a day to observe performance of the

08:39:38 15   system.

16             Do you recall that?

17   A.    Yes, I do.

18   Q.    Did he, in fact, come to your workplace to observe

19   the performance of the system?

08:39:47 20   A.    Yes, he was at our office.

21   Q.    In November of 2007 were you still performing -- or

22   excuse me, was Hodell still having performance issues

23   with Business One?

24   A.    What date was that again?  Can you repeat that?

08:40:13 25   Q.    October of 2007.

1    A.    Yes, we were still having performance issues.

2    Q.    Just again, what time of performance issues were

3    they?

4    A.    The biggest issues were system, the speed of the

08:40:25  5    system.  It was slow, unresponsive.  It locked up

6    frequently.  It froze up.

7              Our users couldn't complete their tasks.

8    When it froze up, we would have to reboot it, restart it.

9    We are having functionality issues that continued.

08:40:44  10             So those issues that we had early on, they

11   continued.  I mean, they -- the bug, the patch levels

12   might fix a bug or two here or there, but they continued.

13             MR. CARNEY:  Kim, can you please turn to

14   Exhibit 109?

08:41:10  15   Q.    Now, did anybody at SAP ultimately tell you that

16   Business One was not an appropriate solution for Hodell?

17   A.    Yes, they did.  In November of 2007.

18   Q.    I'd ask you to identify Exhibit 109.

19   A.    This is an e-mail from Michael Sotnick of SAP to my

08:41:34  20   father, Otto, myself, Dan Lowery, Jon Woodrum, Dan Kraus,

21   and Paul Killingsworth, dated 11/16/2007.

22   Q.    Now, Michael Sotnick was the boss of Dan Kraus, is

23   that correct?

24   A.    That's my understanding, yes.

08:41:51  25   Q.    Okay.  And what, you know, what did he convey to

1    you in this e-mail?

2    A.    Well, he told us that it wasn't going to work for

3    us.

4              He said, "We have evaluated the processes

08:42:05 5    and approach and have come to the conclusion that there

6    is no change we can make on our side that would result in

7    a material improvement."  So that indicated really for

8    the first time definitively that the system wasn't going

9    to work for us.

08:42:23 10    Q.    And this is a month after Mr. Neveux visited your

11    facility in Valley View?

12    A.    Yes.

13    Q.    How many months was this after Hodell had started

14    operating the Business One software?

08:42:38 15    A.    About eight months.

16    Q.    During this eight-month period, did anybody at SAP

17    tell you that you should move away from Business One?

18    A.    No, they didn't.

19    Q.    Did anyone tell you that there was no go-forward

08:42:56 20    path with Business One?

21    A.    No, sir.

22    Q.    Upon receiving this information from Mr. Sotnick,

23    what steps did you take?

24    A.    Well, when we knew that it wasn't going to work for

08:43:19 25    us, we went out, and after we received this, we hired a

1    consultant that would help us evaluate replacement

2    software because we had decided that we obviously would

3    have to replace the software if it wasn't going to work

4    for us.

08:43:33  5    Q.    Okay.  During the eight-month period that you were

6    operating under Business One, did you suffer loss in

7    productivity?

8    A.    Yes.

9              MR. STAR:  Objection.  Leading.

08:43:47 10              THE COURT:  Overruled.

11    A.    Yes, we had productivity losses.

12              Our people, as I mentioned earlier, our

13    people were scrambling.  We had to bring in extra people

14    to handle the workload, and so, yes, we suffered from

08:44:02 15    productivity issues.

16    Q.    What -- what other -- what other economic harm did

17    Hodell suffer?

18    A.    We couldn't fulfill our customers' obligations

19    sometimes and had to do so in a delayed fashion, so our

08:44:20 20    reputation, our service reputation -- in the opening

21    statements, you heard that we rely heavily on our service

22    reputation as a differentiator, and that's always been

23    very important to us, and we weren't able to sustain that

24    level of service so our reputation took a big hit in the

08:44:38 25    marketplace.

1          Our customers were frustrated with us, and,

2     you know, we struggled to meet their obligations and to

3     fulfill their requirements.

4     Q.    What about -- what about employees, was there an

08:44:53 5     impact with respect to employees?

6     A.    We had always distributed 20% of our pre-tax

7     profits, so we had profit sharing with every employee in

8     the company, every full-time employee in the company, and

9     we had to stop doing that in 2009.

08:45:15 10    Q.    Have you begun sharing -- the profit-sharing plan

11    again with employees?

12    A.    No, we haven't.

13    Q.    Why not?

14    A.    Because we're still digging out from the mess that

08:45:27 15    this created for us.

16    Q.    So I take it the economic impact on Hodell

17    continued even after it decided to move away from

18    Business One?

19              MR. STAR:  Objection.  Leading.

08:45:38 20              THE COURT:  Overruled.

21    A.    Yes, it continued.

22          We -- we had traditionally grown through

23    acquisitions and organically, and we weren't able to do

24    an acquisition that we would have liked to do, so it

08:45:53 25    continued and we had continued productivity issues.

1          And it was a struggle and continues to be a

2    struggle still digging out of some of that.

3    Q.    Who was your lender at the time?

4    A.    PNC.

08:46:09 5    Q.    And were they concerned with your economic

6    performance?

7    A.    Yes.  They indicated that they did not want us to

8    do the acquisition and wouldn't fund it, and they even

9    threatened liquidation.

08:46:31 10         And so we had to -- we had to deal with a

11   lender that was unhappy with our performance, and that,

12   that brought significant hardship to us.

13         We had to navigate through that, and it

14   was -- it was a tough time.

08:46:45 15   Q.    Okay.  Is there anything specific that your lender

16   did other than threaten liquidation?

17   A.    They shut down the acquisition that we tried to do.

18         We had an acquisition on the west coast

19   that we were working with and had negotiated a deal, and

08:47:07 20   the lender shut down the deal and said, "We're not going

21   to --"

22              MR. STAR:  Objection, Your Honor.

23              THE COURT:  Objection sustained.

24              MR. STAR:  This is all hearsay.

08:47:15 25              THE COURT:  Objection sustained.

|       |                                                              |
|-------|--------------------------------------------------------------|
| 1     | MR. STAR:  The last several questions as                     |
| 2     | well.                                                        |
| 3     | THE COURT:  Too late for that.                               |
| 4     | BY MR. CARNEY:                                               |
| 08:47:24 5 | Q.    You previously mentioned that in 2007, Hodell     |
| 6     | employed close to 180 employees?                            |
| 7     | A.    Correct.                                              |
| 8     | Q.    And currently Hodell employs 130 employees?          |
| 9     | A.    Correct.                                              |
| 08:47:41 10 | Q.    Why the drop in head count?                     |
| 11    | A.    In early 2009, we had to do our first ever layoff,   |
| 12    | and so we had to lay off about 10 or 12 people, and        |
| 13    | since, we haven't replaced people that have left or        |
| 14    | retired.                                                    |
| 08:48:02 15 | Q.    What do you attribute that to?                  |
| 16    | A.    The continuing difficulty that we've had with the    |
| 17    | system; that the challenges that this presented to us.     |
| 18    | I mean, this really hit us hard as an                      |
| 19    | organization, and we had to dig ourselves out.             |
| 08:48:24 20 | Q.    How did Hodell go about looking for replacement |
| 21    | software?                                                   |
| 22    | MR. STAR:  Objection.  Asked and answered.                 |
| 23    | THE COURT:  Overruled.                                      |
| 24    | A.    We hired a consulting firm and paid them about 35    |
| 08:48:36 25 | or $37,000 to help us evaluate all the various        |

1    replacement software packages that were out there.

2              And we did that because we needed to do it

3    quickly.  We needed it -- once we -- once they told us

4    that it wasn't going to work for us, we determined that

08:48:53  5    we need to quickly get off the system as quickly as we

6    could, and the consulting firm helped us do that.

7              They evaluated 10 or 11 different software

8    packages in conjunction with us, and they originally

9    said --

08:49:10 10              MR. STAR:  Objection.  Your Honor, I'm

11    sorry to interrupt.

12              This is all hearsay.

13              THE COURT:  Yes.  Objection sustained.

14    BY MR. CARNEY:

08:49:17 15    Q.    Who did you ultimately choose to replace the

16    Business One software?

17    A.    Profit 21.

18    Q.    And when was Profit 21 installed at Hodell?

19    A.    In April of 2009.

08:49:32 20    Q.    Okay.  Well, you were told in November of 2007 that

21    Business One would not work for you.

22              Why did it take so long to get on a new

23    software system?

24              MR. STAR:  Objection.  Hearsay.

08:49:47 25    Mischaracterizes the testimony and the evidence.

        1              THE COURT:  Overruled.

        2              You can answer if you understand the

        3    question.

        4              THE WITNESS:  Yes, sir.

08:49:57 5   A.    Well, it took from the time that we decided to move

        6    and the time we went live on a system, it took over a

        7    year, and that's an accelerated process.

        8              The Profit 21 originally told us it would

        9    take 18 months to two years, and we negotiated with them

08:50:12 10  to shorten that time period down to 12 months because we

        11   really needed to get off of SAP quickly.

        12             And they worked with us on that and agreed

        13   to that.

        14   Q.    How much did you expend, how much did Hodell expend

08:50:30 15  on Profit 21?

        16   A.    We spent a million dollars, approximately.

        17   Q.    Was that budgeted for?

        18   A.    No.  No.  We wouldn't budget a million dollars for

        19   a software system when we had just installed one two

08:50:46 20  years prior.

        21   Q.    And is Hodell running Profit 21 today?

        22   A.    Yes, we are.

        23   Q.    How is Hodell's -- how's the performance of

        24   Profit 21 at Hodell?

08:51:05 25             MR. STAR:  Objection.  Relevance.

1           THE COURT:  Overruled.

2    A.    The performance works well.

3           It handles the transactions, it handles the

4    number of users, it handles the database size, it handles

08:51:17 5    that all well, and our employees can focus on serving our

6    customers and not the difficulties of the computer

7    system.

8           So it works well for us.

9    Q.    It was stated in SAP's opening that Hodell's

08:51:38 10   performance actually increased while -- financial

11   performance increased while Hodell was on Business One.

12          Do you recall that statement?

13   A.    Yes, I recall that.

14   Q.    Why would you purchase and install a new software

08:51:54 15   system if Business One was improving your financial

16   performance?

17   A.    I'm sorry.  Can you say that again?

18   Q.    Why would you purchase and install a new software

19   system if Business One was improving Hodell's financial

08:52:08 20   performance?

21   A.    The answer is we -- we wouldn't do that if the

22   software system was working well.

23          We desperately needed to get off of that

24   system, and we had to spend the money, the extra million

08:52:23 25   dollars, to go out there and replace it.

1         And our employees applauded that decision.

2    In fact, one of my branch managers told me that his team

3    was cheering when they heard that.

4              MR. STAR:  Objection.  Hearsay.

08:52:38  5              THE COURT:  Objection sustained.

6    BY MR. CARNEY:

7    Q.    In SAP's opening, you recall that there was a

8    discussion about a number of SAP documents in 2005 and

9    2006 that lowered the target market for Business One to

08:53:08 10  companies with 10 to 100 employees and 50 concurrent

11   users.

12             Do you recall that statement?

13   A.    Yes, I do.

14   Q.    When did you first learn that these documents

08:53:16 15  existed?

16   A.    We learned that these documents existed when we

17   were preparing for the lawsuit, which would have been in

18   late 2008, and when, during the discovery process with

19   LSi and SAP had to turn over their documents.

08:53:33 20             So that's, that's the first time we saw

21   this information.

22   Q.    Is there a reason you didn't search the Internet

23   for them in 2004 or 2005 prior to going live with

24   Business One?

08:53:46 25  A.    We felt there was no need to.

1          We had -- it had been represented to us by

2      their channel partner, LSi, that the system could handle

3      our needs.  Their literature was consistent with that.

4      Another business partner had indicated that it could

08:54:18  5      handle our needs, so we didn't feel that we needed to do

6      any further research.

7      Q.    In SAP's opening, it was suggested that Hodell did

8      not have the appropriate hardware to support Business

9      One.

08:54:24 10          Do you recall that statement?

11     A.    Yes.

12     Q.    As part of the Business One implementation, did

13     Hodell upgrade its then existing hardware?

14     A.    Yes, we did.

08:54:34 15     Q.    Explain.

16     A.    We followed the advice of SAP's business partner

17     LSi, and they made recommendations to us on the type of

18     server to buy, and so we went out and bought a new

19     server, a big, new server for -- to run SAP on per their

08:55:00 20     recommendations.

21          We installed that server.

22          We also purchased a couple of new Citrix

23     servers, and those are network servers, so we went out

24     and spent I want to say in the neighborhood of $50,000 on

08:55:11 25     hardware, and so our understanding was that we had the

1    horsepower, if you will, we had the pickup truck that was

2    required to pull the trailer.

3              So we bought that hardware that they

4    recommended, and brand new hardware.

08:55:28  5    Q.    After Business One went live, did you continue to

6    upgrade your computer hardware?

7    A.    Yes, we did an upgrade in, I believe, in early

8    2008.

9              We had hired a full-time IT director in the

08:55:41 10    fall of 2007, his name was Joe Vislocky, and one of the

11    things he did when he came on, he wanted to help out

12    where he could with improving the performance, and so he

13    brought in a consultant and they did some evaluation and

14    analysis of our network, made some recommendations, and

08:56:01 15    Joe went out or he asked me for authorization to buy a

16    couple of servers.  I authorized that.

17              And I believe he did that in early 2008.

18    Q.    Did you implement all of the recommendations of the

19    consultant that was engaged?

08:56:18 20    A.    Yes.  I believe we bought the servers and equipment

21    that they had recommended, and Joe and his team installed

22    it.

23    Q.    Did those recommendations improve the performance

24    of Business One?

08:56:29 25    A.    No.  There were no material improvements.

1          I mean, there may have been some minor

2    improvements, but overall the system's slowness was still

3    there.

4    Q.    Now, Mr. Star made reference to the fact that

08:56:44  5    Hodell's, during the operation of Business One, Hodell

6    recorded record gross profits while operating under

7    Business One.

8                Do you recall that?

9    A.    Yes, I do.

08:56:54 10    Q.    How is it that Hodell could have had record gross

11    profits while on Business One if the software was not

12    functioning properly?

13    A.    Well, the record gross profits would have been

14    related to sales, and we were able to generate those to

08:57:15 15    meet those sales obligations by scrambling.

16                Every -- by every person in the

17    organization doing whatever they could to enter orders

18    and fulfill our customers' requirements.

19                But what's important to note is that the

08:57:27 20    net profit is what counts, the net profit is the company

21    that -- the money that the company actually earns.

22                The net profit had reduced, had been

23    reduced significantly in 2007 and 2008 versus previous

24    levels, and that's because our expenses were higher, so

08:57:47 25    it cost us more money to serve our customers.

```
 1    Q.    What type of expenses increased?

 2    A.    Payroll expenses increased, interest costs

 3    increased, depreciation increased because we were

 4    spending money on software, and in 2008 we were already

 5    spending money on replacement software for Profit 21.

 6                 MR. STAR:  Your Honor, objection.  Move to

 7    strike all this.  It lacks foundation.  There's no

 8    business records to support any of this testimony.

 9                 MR. CARNEY:  He's the president.

10                 THE COURT:  Yeah, he can go ahead and

11    answer.

12                 You can cross-examine on it.

13                 MR. STAR:  Thank you.

14                 MR. CARNEY:  Just bear with me.

15    BY MR. CARNEY:

16    Q.    Yesterday we talked about the development agreement

17    between LSi and Hodell.

18                 I just want to ask you a couple more

19    questions about it, okay?

20    A.    Okay.

21                 MR. CARNEY:  Kim, can you get to Exhibit

22    291?

23    Q.    When you signed the development agreement in 2004,

24    did Hodell consider it to be contractually obligated to

25    buy 80 Business One licenses referred to in this
```

253

1    document?

2    A.    Yes, we did.

3    Q.    At that time did LSi present you with any other

4    documentation to sign?

09:00:05 5    A.    No, they did not.

6    Q.    Were you provided with a license agreement in

7    December of 2004?

8    A.    No, we weren't.

9    Q.    Is there anything in the development agreement

09:00:25 10   saying that LSi or IBIS is not an agent of SAP?

11   A.    No, there isn't.

12   Q.    I just want to ask you a couple questions about the

13   license agreement.

14              MR. CARNEY:  I believe that's Exhibit 252,

09:00:50 15   Kim.

16   Q.    The license agreement itself was between Hodell and

17   SAP America, correct?

18   A.    Correct.

19   Q.    And this was signed one year after the development

09:01:12 20   agreement we were just referring to between LSi and

21   Hodell, correct?

22   A.    Correct.

23   Q.    During this one-year period, how much money had

24   Hodell spent on the development of -- or how much money

09:01:31 25   had Hodell spent pursuant to the development agreement

1    with LSi?

2    A.    Just shy of $300,000.  At that point I believe it

3    was $275,000 that we had spent.

4    Q.    And the license agreement itself, who presented

09:01:57  5    that to you?

6    A.    LSi.

7    Q.    Was anyone from SAP present when that was presented

8    to you?

9    A.    No, sir.

09:02:06  10    Q.    Do you blame SAP for the damage done to Hodell?

11    A.    Yes, I do.

12    Q.    Why?

13    A.    Well, they -- they misled us on the capabilities of

14    the system in terms of number of users, their

09:02:56  15    performance, the database and transactions.

16          It was known back in 2004, 2005, we would

17    have a large number of users, and we were never notified

18    that we were outside the Sweet Spot of their number of

19    users.

09:03:13  20          We were never notified that we didn't meet

21    the criteria or that we were outside the criteria for

22    their -- for their number of users and the functionality

23    of their system.

24          And after we -- we went live, they became

09:03:41  25    engaged with us directly around April of 2007, and they

             1    never told us what they were hearing from their

             2    developers.

             3                  We did not hear directly from them that the

             4    system was never going to work for us until November of

09:03:54     5    that year.

             6                  And it was well-known by many people in

             7    their organization, as we've seen in e-mails, that their

             8    heads of development, their heads of sales, their heads

             9    of SAP Business One, their CEO, which I went to directly,

09:04:12    10    Bill McDermott, they knew about this.

            11                  MR. STAR:  Your Honor, I'm sorry to

            12    interrupt.

            13                  This is just rambling testimony.

            14                  THE COURT:  Yes.  Ask him -- put a question

09:04:21    15    to him.

            16    BY MR. CARNEY:

            17    Q.    Do you believe there's any culpability on the part

            18    of LSi for the damage to Hodell?

            19    A.    Yes, I do.

09:04:33    20    Q.    How so?

            21    A.    Well, I -- I don't blame them for selling the

            22    product to us.

            23                  I believe that they were representing the

            24    product to us as they understand it, as it was

09:04:48    25    represented to them, so -- and what we were hearing from

1   them was consistent with what we had heard from another

2   channel partner, American Express, and what we had seen

3   in the literature.

4            So it was all consistent, so I believe that

09:05:01 5   they sold it in a good faith effort.

6            However, I do believe that as a channel

7   partner, they had access to documents after the fact that

8   showed otherwise in terms of number of users.

9            MR. STAR:  Your Honor, I'm sorry again.

09:05:18 10            THE COURT:  Yes, put another question to

11   him.

12            MR. CARNEY:  I have no further questions,

13   Your Honor.

14            THE COURT:  Thank you.

09:05:25 15            You may cross-examine.

16            MR. STAR:  Thank you, Your Honor.

17       CROSS-EXAMINATION OF KEVIN REIDL

18   BY MR. STAR:

19   Q.   How are you, Mr. Reidl?

09:06:10 20   A.   I'm fine.  How about you, Mr. Star?

21   Q.   I'm doing well, thanks.

22            Sir, yesterday and today you've repeatedly

23   referred to the solution, the software that Hodell went

24   live on, as just Business One, but it wasn't just

09:06:35 25   Business One, was it?

1    A.    It was Business One, In-Flight and Radio Beacon.

2    Q.    Right.  And In-Flight was a customized product for

3    Hodell, correct?

4    A.    It was a customized product for Hodell and the

09:06:40  5    fasteners industry.

6    Q.    That's a product that you knew didn't exist before

7    you developed it along with IBIS/LSi, right?

8    A.    It existed in FACTS, as I represented yesterday, so

9    they were --

09:06:51  10    Q.    Let's break that down.

11          As you testified yesterday, before SAP and

12    Business One were ever involved, you were using a FACTS

13    software solution that you got through Dale Van Leeuwen

14    and IBIS?

09:07:06  15    A.    Correct.

16    Q.    Okay.  And on that FACTS solution, Van Leeuwen and

17    IBIS had built an add-on that they called In-Flight?

18    A.    Correct.

19    Q.    And when you eventually decided that you'd go to a

09:07:19  20    Business One platform to replace FACTS, you decided that

21    you would recreate In-Flight to work with SAP?

22    A.    They were going to recreate In-Flight to work with

23    SAP.

24    Q.    And it was going to be re-created from scratch,

09:07:34  25    correct?

1    A.    It was going to be built on the new platform, the

2    SAP platform with their development kits.

3    Q.    Thank you.  And the code, the software code for

4    In-Flight on Business One didn't exist back in 2003 or

09:07:48  5    2004?

6    A.    My understanding is that they were going to build

7    it that, that code, build that software on the SAP

8    platform and create that code, yes, on the SAP platform.

9    Q.    Thank you.

09:08:02  10              So when you went live, you went live in

11    March, 2007 on a custom software solution, a three-part

12    solution, right?

13    A.    Three -- yes, as I mentioned, SAP, In-Flight, and

14    Radio Beacon.

09:08:14  15    Q.    And the SAP piece of that was the base SAP software

16    that all SAP customers get, correct?

17    A.    Yes.  It was the foundation for the solution.

18    Q.    And on top of that, you had Radio Beacon as an

19    add-on product?

09:08:40  20    A.    Yes, Radio Beacon was our warehouse management

21    software.

22    Q.    And then on top of both of those things, you were

23    going to put your custom In-Flight add-on that was being

24    developed to work with Business One?

09:08:42  25    A.    Yes.  This was -- understand, this In-Flight was

1    not just our custom.  That was being developed for the

2    fastener industry.

3                        You refer to it being ours.  It was for the

4    fastener industry.

09:08:53  5    Q.    Thank you.  Because you were going to resell it to

6    other companies in the fastener industry, yes?

7    A.    We were not going to resell it.

8    Q.    You were going to share in the commissions of

9    reselling that custom In-Flight product throughout the

09:09:06 10    fastener industry, yes?

11    A.    As I testified yesterday, we were going to

12    be -- receive a thousand dollars commission per user up

13    to a hundred thousand users, and that was to -- because

14    we were the first on the software and we were going to

09:09:21 15    act as a reference account.

16    Q.    Great.  We're going to get into some of that in

17    more detail, but you were going to earn commissions on

18    the resale of In-Flight to other companies in the

19    fastener industry, we agree on that?

09:09:35 20    A.    Up to -- up to the first 100 users on the software.

21    Q.    You were the project lead at Hodell for this

22    project, right?

23    A.    Correct.

24    Q.    You always understood that Business One, the base

09:09:53 25    platform by itself, didn't have the functionality Hodell

1    actually needed to run its business?

2    A.    Correct.  It would -- it would be -- it would work

3    in conjunction with the add-on of In-Flight and Radio

4    Beacon.

09:10:07  5    Q.    So you needed In-Flight and you needed Radio Beacon

6    to make Business One even a viable solution for you to

7    consider?

8    A.    Yes, and that's how it was sold and marketed to us,

9    that it would be the solution.

09:10:20 10    Q.    Sir, sir, I'm sorry.

11              You understood that for Business One to be

12    a viable solution for you, you needed not just the base

13    software but you needed the two add-ons, Radio Beacon and

14    the custom In-Flight add-on that was going to be

09:10:35 15    developed, correct?

16    A.    Yes, we needed all three.

17    Q.    Thank you.

18              So the jury understands this, when you

19    actually went live in March, 2007, you didn't just go

09:10:49 20    live with the base SAP software; you went live with the

21    whole three-part custom solution?

22    A.    Correct.

23    Q.    That's a three-part custom solution, no one else in

24    the world had ever gone live on?

09:11:02 25    A.    Correct.  We were the first.

1    Q.    And yesterday you talked about the testing that was

2    done at Hodell on this three-part custom solution, do you

3    remember that?

4    A.    Yes.

09:11:13   5    Q.    Okay.  And you recognize that only Hodell in its

6    actual environment with the software loaded on its

7    machines could do the stress testing of this custom

8    solution?

9    A.    Yes.  As well as LSi.

09:11:30  10    Q.    You worked with IBIS/LSi to do the stress testing

11    at your offices on your machines?

12    A.    Correct.

13    Q.    Let's take a look --

14              MR. STAR:  Bob, could you please pull up

09:12:07  15    Exhibit 145, please?

16              Your Honor, for whatever reason we're not

17    able to make the switch from their presentation to ours

18    if I may have just a moment.

19              THE COURT:  I may be able to do it for you.

09:12:32  20              Are you on the rear table computer?

21              MR. ADELMAN:  Yes, Your Honor.

22              THE COURT:  Well, you should be -- it

23    should be working.

24              Let me try that.

09:13:03  25              MR. STAR:  I think we're going to need a

1    couple minutes, if Your Honor doesn't mind.

2                    THE COURT:  Let me -- I'll see if I can get

3    our -- one of our systems people up here.

4                    MR. STAR:  Thank you.

09:13:17 5              THE COURT:  I'll tell you a funny story

6    about the telephone in a minute.

7                    (Pause).

8                    THE COURT:  You're probably wondering why a

9    Judge has a telephone on the bench, right?

09:13:44 10             When I first got -- you know I was in the

11   State Court of Appeals before this and the state Common

12   Pleas Court.  Of course we didn't have a telephone.  We

13   didn't even have an answering machine.  My mother used to

14   call and say what goes on over there, I can never get

09:13:57 15  ahold of you.  We didn't have an answering machine.

16   That's how primitive we were.

17                   So I come here and I see telephones, pretty

18   nice.  Who can I call?  You know, we were in trial.

19                   And I learned, the Judge will remain

09:14:12 20  nameless, but there was a Judge here some time ago that

21   had -- he was the one that ordered phones to be on one

22   Judge's desk.  So if one Judge got it, everybody wanted

23   it.  So every Judge had a phone on their desk.  He would

24   have somebody call in the back when he wanted a

09:14:38 25  break -- wait a minute, that's not the best.

```
 1        He would answer the phone and say "I've got
 2   to go, the President is on the phone," and hang up.  And
 3   people believed him for years.
 4        And he went in the back and smoked a
 5   cigarette.
 6        That was always in the old days, too, as a
 7   lawyer, you always wanted a Judge that smoked cigarettes.
 8   You would say why would that be?  Because they couldn't
 9   go more than an hour without taking a break.  As a
10   lawyer, you like that.
11        But nobody smokes anymore, right?  Do we
12   have any smokers on the jury?  Two, or three, all right.
13   So you go down to the nice patio down there?
14        A JUROR:  Yep.  Outside.
15        THE COURT:  All right.  When I was a
16   prosecutor, we had -- in the old days, you could, you
17   know, there were Judges that smoked right on the bench.
18   I couldn't believe it, so -- yeah, right.
19        Now, a Judge decided, see how nice your
20   jury room is with the windows and everything.  There's a
21   long story about that but in Common Pleas Court the
22   jurors are locked up in a room with no windows, nothing,
23   and one Judge --
24        A JUROR:  I was there.
25        THE COURT:  You were there?  Okay.
```

1          One Judge decided I'm not going to let the

2     jury smoke because it bothers the nonsmokers.

3          Well in those days you didn't even think

4     about that.  And I'm the prosecutor going you can't do

09:16:05  5     that, because if a guy can't have a cigarette after he's

6     deliberating, they'll be crazed and there will be fights

7     in the jury room.  Judge didn't care.  He said no smoking

8     in the jury room, and that was the beginning of where we

9     are now.

09:16:18 10          Can't even smoke on the street out there, I

11     don't think, can you?

12               (Discussion had off the record).

13               THE COURT:  Well, I think we're all set.

14               Is it working?

09:26:42 15          (Pause)

16               THE COURT:  Success.  Good work, men.

17     Thanks.

18               MR. STAR:  Thank you, guys.  Thank you.

19     BY MR. STAR:

09:27:14 20     Q.   Now, Mr. Reidl, we were talking about the

21     pre-go-live testing that you did at your location on your

22     custom solution.

23               Let's take a look at what's been marked

24     already as Exhibit 145.

09:27:24 25               Can you first identify this document for

1   us, please?

2   A.    Sure.  Can you --

3   Q.    You --

4   A.    As we identify, can you zoom in so I can see?

09:27:54  5              This is an e-mail from Jon Woodrum to

6   myself, Dan Lowery, Marcia Weissman, Joe Guagenti, Avery

7   Myrick at LSi, dated Tuesday, November 14th, 2006.

8   Q.    Thank you.  Do you recall receiving this e-mail

9   back at that time?

09:28:10  10  A.    Yes.

11              MR. STAR:  Your Honor, I'd like to move

12  Defendant's Exhibit 145 into evidence.

13              THE COURT:  Sorry, we'll do that

14  after -- at the appropriate time.

09:28:18  15             MR. STAR:  Thank you, Your Honor.

16              THE COURT:  We don't have to do it after

17  each exhibit.

18              MR. STAR:  Terrific.  Thank you.

19  BY MR. STAR:

09:28:24  20  Q.    Sir, I notice your SAP is not copied on this

21  e-mail, is that right?

22  A.    Correct.

23  Q.    All the people that are on the e-mail chain,

24  they're all from either Hodell or IBIS/LSi?

09:28:36  25  A.    Yes.

1    Q.    And look down at the paragraph, second paragraph.

2    Jon Woodrum's telling you here, "We know there is a

3    performance issue to be satisfied before go-live and we

4    know that lies in/with the In-Flight add-on."

09:28:54   5              So you knew back in November of 2006 that

6    there were problems with the In-Flight add-on,

7    performance problems, right?

8    A.    Based on this e-mail, yes.

9    Q.    Well, it wasn't just based on this e-mail.  It was

09:29:07  10   based on the testing that you yourself were doing?

11   A.    I don't recall that we were doing testing yet at

12   this time.

13              It was shortly thereafter.  Most of the

14   testing happened in early 2007, to my recollection.

09:29:20  15   Q.    Great.  Let's look at the testing that was going

16   on.

17              MR. STAR:  Bob, let's go to 226, please.

18   And can you blow that up a little bit so we can see it?

19              That part is fine.  There we go.

09:30:23  20   BY MR. STAR:

21   Q.    Can you identify this document, sir?

22   A.    Sure.  This is an e-mail from Jon Woodrum to

23   myself, copying several people at LSi on Sunday, November

24   26th of 2006.

09:30:32  25   Q.    And you would agree with me at this point in time,

1      November 26th of 2006, you're having conversations with

2      the folks at IBIS/LSi about performance issues, correct?

3      A.    Yes.

4      Q.    You're actually discussing with them, as it says in

09:30:54  5      the first paragraph, the primary purpose of what you're

6      doing here is to discuss what you're seeing as

7      performance.  You're talking about performance issues

8      with your custom software?

9      A.    I don't know that it's with custom software or with

09:31:12 10      SAP, but it says performance, what we're seeing is

11      performance and what various areas has been.

12      Q.    And what you were seeing as performance was through

13      your testing of this overall custom solution, right?

14      A.    I believe this was testing that they were doing on

09:31:31 15      their side.  This was likely before we started doing

16      testing.  I can't tell you for certain, but this is

17      probably testing they were doing themselves.

18      Q.    When is it you believe you actually started doing

19      testing at your location?

09:31:47 20      A.    Probably shortly thereafter.  I venture to say

21      December of 2006.

22      Q.    And when you started doing the testing in December

23      of 2006, you saw problems with the performance of the

24      solution, right?

09:32:03 25      A.    Yes.

268

| | |
|---|---|
| 1 | Q.    You already said that yesterday? |
| 2 | A.    Yes, we did. |
| 3 | Q.    Okay. |
| 4 | MR. STAR:  Bob, jump to 786, please. |
| 09:32:17 5 | Q.    Sir, you told us yesterday that in the months |
| 6 | leading up to go-live, you had actually planned and then |
| 7 | canceled go-live on at least four or five occasions. |
| 8 | Do you remember that? |
| 9 | A.    Yes. |
| 09:32:27 10 | Q.    And the reasons you were canceling go-live four or |
| 11 | five times is because you were seeing poor performance on |
| 12 | the solution? |
| 13 | A.    Yes. |
| 14 | MR. CARNEY:  Objection, Your Honor. |
| 09:32:37 15 | THE COURT:  Overruled.  Overruled. |
| 16 | BY MR. STAR: |
| 17 | Q.    Sir, will you please take a look at what we've put |
| 18 | up here, which is marked as 786? |
| 19 | Can you identify this document for us? |
| 09:32:53 20 | A.    An e-mail from Jon Woodrum to myself with a copy to |
| 21 | Dan Lowery on Monday, December 11th, 2006. |
| 22 | Q.    All right. |
| 23 | MR. STAR:  Bob, let's take Mr. Reidl to the |
| 24 | second page of that e-mail chain.  Page 2, Bob. |
| 09:33:29 25 | MR. CARNEY:  Your Honor, I just want to |

1    make a record.  This is one of the documents -- this is a

2    document that was never identified as an exhibit that was

3    excluded by Judge Wells.

4                    THE COURT:  Okay.  Go ahead.

09:33:42  5         MR. STAR:  Thanks, Your Honor.  Just to

6    respond to that.

7                    THE COURT:  You don't have to respond.

8                    MR. STAR:  Thank you.

9    BY MR. STAR:

09:33:48 10   Q.    Mr. Reidl, identify what we're looking at here,

11   sir.

12   A.    This is an e-mail from, looks like from myself to

13   Jon Woodrum and Dan Lowery, dated 12/11/2006.

14   Q.    And the subject line is Go Live Check Point and

09:34:02 15  Planning, right?

16   A.    Yes, it is.

17   Q.    And what you write to Mr. Woodrum and Mr. Lowery is

18   the following:  "We'd like to have a commitment from LSi

19   that everything will be working and functional, including

09:34:14 20  the known issues, especially those below, prior to

21   January 8th."

22                   Sir, you had known performance issues with

23   your solution as of January -- pardon me -- as of

24   December of 2006, correct?

09:34:26 25  A.    Yes, there were issues with the --

1     Q.    You went on to say, "Additionally, we'd like a
2     commitment that all functions processes will be fully
3     tested and verified by LSi, using our data on our system
4     as working and fully functional as designed prior to
09:34:49 5     January 8th."
6                        Do you see that?
7     A.    Yes.
8     Q.    You recognize, sir, that performance testing and
9     function testing was vital before going live on this
09:34:59 10    somewhere?
11    A.    Performance testing was an important piece of the
12    implementation process, yes.
13    Q.    Right.  Because you didn't want to go live if you
14    saw bad performance?
09:35:08 15    A.    Right.
16    Q.    Makes sense.
17                        You tell Jon Woodrum and Dan Lowery that
18    you'll delay the go-live until January 8th of '07 but you
19    won't extend it any further.
09:35:21 20                        You wanted to go live, right?
21    A.    Can you maybe zoom in, tell me where we're looking
22    at?
23    Q.    Second paragraph, "We will delay."
24    A.    Correct.
09:35:35 25    Q.    Okay.  But you didn't actually go live for another

1    couple months?

2    A.    Right.  We went live in March of 2007.

3    Q.    Right.  And the reason you had further delay was

4    because you continued to see poor performance?

09:35:47  5    A.    Yes.  We delayed it because of issues that came up

6    during testing.

7              MR. STAR:  Bob, go to 508, please.

8              MR. CARNEY:  Objection, Your Honor.  This

9    is another document that was excluded.

09:36:18  10             THE COURT:  Overruled.

11    BY MR. STAR:

12    Q.    Sir, can you identify this document, please?

13    A.    This is an e-mail from myself to various members of

14    our organization, Hodell-Natco, dated Wednesday, December

09:36:35  15    20th, 2006.

16    Q.    And no one from SAP was given this e-mail, right?

17    You didn't send it to them?

18    A.    Correct.

19    Q.    And the folks that you CC in the recipient list,

09:36:51  20    people like Chiming Wong and Mark Betts, they were part

21    of your IT team that was working on the project with you,

22    correct?

23    A.    Correct.  They were part of our IT team, and

24    they -- it's important to note that we had no direct

09:37:07  25    conversation with SAP at this point because they were

1    working exclusively through their channel partners so

2    everything we were doing was through them.

3    Q.    Sir, thank you.  We'll get to that.  We're going to

4    cover it.  I appreciate that.

09:37:22   5           My question was simple.  The folks that are

6    cc'd on this e-mail are the people who are part of your

7    internal IT staff, they're your team for this project,

8    right?

9    A.    Not all.  You want me to go through them?

09:37:34  10   Q.    No, I'll go through them.  Terry Phillips is on

11   there.  He was part of your IT team, correct?

12   A.    He was working with the Radio Beacon product.

13   Q.    He was part of your IT team running this project,

14   correct?

09:37:45  15   A.    Part of the IT team running this project?

16   Q.    Yes, sir.

17   A.    He was -- he was working on the Radio Beacon

18   component of it.  He later ran a project for us with

19   Profit 21.

09:37:55  20   Q.    Let's just be clear.  You've already told this jury

21   that the solution you were going to go live on was a

22   three-part solution, it was In-Flight, Radio Beacon, and

23   Business One.

24           Mr. Phillips was working on this project,

09:38:09  25   sir, correct?

1    A.    With the Radio Beacon implementation part of it.

2    Q.    Thank you.  Let's look at your e-mail, the subject

3    of this is SAP Project Update, and it's as of December

4    20th, 2006.

09:38:31  5          Middle way down, go back, please, starts

6    with Paragraph -- keep going.  That's fine.

7          The paragraph there that begins with

8    "Performance and speed," do you see that?

9    A.    Yes.

09:38:50  10   Q.    It says, "Performance and speed -- this continues

11   to be an issue."

12         You knew you were having performance and

13   speed issues.  This is as of December 20th of '06, right?

14   A.    Right.

09:39:02  15   Q.    Goes further, "LSi installed an improved/faster

16   version of In-Flight on Sunday night."

17         Sir, you were having performance problems

18   with In-Flight back in December of 2006?

19   A.    Is that a question?

09:39:19  20   Q.    Yes.

21   A.    Yes, based on this, we were having performance

22   issues on the solution at the time.

23   Q.    And you wrote, "In doing transactions in SAP,

24   particularly sales orders, I've found the speed and

09:39:33  25   performance to be slow and frustrating."

1          You were having performance problems

2     specifically with your sales order process months before

3     you went live, correct?

4     A.    Correct.

09:39:44 5     Q.    Okay.  Those are the same performance problems you

6     told us about yesterday that you experienced after

7     go-live; you had, according to you, poor performance

8     after go-live with entering sales orders?

9     A.    Correct.

09:40:07 10          MR. STAR:  Let's go to 299, Bob.

11     Q.    Mr. Reidl, will you identify this document, please.

12     A.    It's an e-mail from myself to various members of

13     our organization dated Tuesday, January 2nd, 2007.

14     Q.    Okay.

09:40:39 15     A.    Regarding an SAP stress test.

16     Q.    And you were the primary person at Hodell

17     responsible for running the stress test of this solution,

18     correct?

19     A.    Yes.  I was overseeing it with LSi's assistance.

09:40:53 20     Q.    No assistance, though, from SAP?  They weren't

21     involved?

22     A.    LSi was their channel partner.

23     Q.    Sir, let's just get something straight.

24          You understand LSi and IBIS were separate

09:41:08 25     companies from SAP?

```
1    A.    Correct.
2    Q.    Okay.  So let's go back to my question.
3          You'd agree with me that SAP itself was not
4    involved in any way, shape, or form with any of your
5    pre-go-live testing?
6    A.    Not on our system.
7          I don't know about if they were with LSi on
8    their systems.
9    Q.    So no one from SAP was out at your location prior
10   to going live helping you test this solution?
11   A.    No.
12   Q.    And you weren't telling anybody at SAP what you
13   were seeing when you were testing this solution?
14   A.    No, we were working through LSi.
15   Q.    You weren't telling SAP what you were seeing when
16   you were testing this solution?
17   A.    No.  Because we were working with LSi.
18   Q.    You weren't sending e-mails to SAP to report to SAP
19   on what you were seeing when you were stress testing this
20   solution?
21   A.    No.  Again, we were working with LSi.
22   Q.    Thank you.  I understand, but my questions are
23   simple.
24          You weren't sending information, reports,
25   updates, directly to SAP, were you?
```

```
 1      A.    No, we relied on LSi to do that.

 2      Q.    Let's go back to your e-mail, January 2nd, 2007.

 3                  You're still a few months before go-live.

 4      And you're writing about stress testing and here's what

 5      you write, the second paragraph, "The intent of this test

 6      is to make sure that both the hardware and software can

 7      handle the load of all users doing their daily activities

 8      at the same time."

 9                  You understood what it meant to stress test

10      a software system, right?

11      A.    Yes.

12      Q.    And you knew this stress testing had to be done at

13      your location using your computers with your employees

14      and users doing their jobs as they would normally do it?

15      A.    Yes.

16                  MR. STAR:  Jump ahead to 301, please.

17      BY MR. STAR:

18      Q.    Sir, can you identify this document for us?

19      A.    This is an e-mail from Keith Winn to all, all users

20      and an SAP group that was internal to our company.

21      Q.    Mr. Winn was part of your internal IT project team?

22      A.    Yes.  I believe he was our network administrator.

23      Q.    And you would have been copied on this e-mail?  You

24      were one of the recipients?

25      A.    Yes.
```

```
 1    Q.    And here's what Mr. Winn writes on January 5th,
 2    2007, just three days after your e-mail about stress
 3    testing.
 4              "As we are all aware, the stress tests
 5    have shown that there are still issues with how the
 6    software is operating."
 7              Do you see that?
 8    A.    Yes.
 9    Q.    You agree with Mr. Winn's assessment as of January
10    5th of 2007 that there were issues with the software?
11    A.    Yes.  And I believe that's why we postponed the
12    go-live.
13    Q.    And the software he's referring to, that's all the
14    software; it's Business One, plus Radio Beacon, plus
15    In-Flight, that's what you were testing?
16    A.    Yes.  The solution.
17    Q.    Yeah.  You actually wanted to see more stress
18    testing done after this, correct?
19    A.    Yes.  We had to do more testing.
20              MR. STAR:  Go to 798, please, Bob.
21              MR. CARNEY:  Objection, Your Honor.  This
22    is another document that was excluded by Judge Wells in
23    her February 9th, 2015 order.
24              THE COURT:  Yes, the objection is
25    overruled.
```

```
 1    BY MR. STAR:
 2    Q.    Sir, will you identify what's been marked as 798,
 3    please?
 4    A.    This is an e-mail from myself to Jon Woodrum, dated
 5    January 5th of 2007.
 6    Q.    Look at the -- it's the paragraph beginning, "I'm
 7    no expert."
 8                Do you see that there?
 9    A.    Yes.
10    Q.    Okay.  The sentence on the second line begins as
11    follows:  "We will continue to be available for stress
12    tests.  However, I want to limit it to one per day at
13    3:00 p.m."
14                Do you see that?
15    A.    Yes.
16    Q.    And you went on to write, "I'd like to keep our
17    operations running as smoothly as possible, and a half
18    hour interruption times 70 people adds up to a big
19    operational and economic sacrifice."
20                Right?
21    A.    Right.
22    Q.    You were trying to limit the amount of stress tests
23    you were actually going to do before you went live?
24    A.    Yes.  One per day was actually a significant amount
25    of stress testing.
```

```
          1    Q.     And you were trying to limit those tests to no more
          2    than a half hour, correct?
          3    A.     Correct.
          4    Q.     But you told us yesterday that you only actually
09:46:20  5    did four or five stress tests.
          6                 You stand by that, right?
          7    A.     I believe so.
          8    Q.     Okay.  You were saying here you were willing to do
          9    one per day, but that didn't even happen, did it?
09:46:34 10                 You only did four or five of them over the
         11    course of weeks?
         12    A.     I believe -- yeah, I believe we did them when
         13    instructed by LSi, when they were prepared to work with
         14    us on the stress test.
09:46:44 15                 So four or five.  May have been more.
         16                 MR. STAR:  Bob, let's go to 57, and I want
         17    to focus on the e-mail chain that begins at the bottom of
         18    the first page.  If you can zoom in there so we can see
         19    it.  No, no.  Just the header so we can see that, Bob.
09:47:24 20    BY MR. STAR:
         21    Q.     All right.  We're going to walk through this chain.
         22    Sometimes e-mails are a little bit different because
         23    they're broken up over pages, but these are as the
         24    documents originally appeared.
09:47:41 25                 Sir, can you identify what's been marked as
```

1    Exhibit 57, please?

2    A.    This is an e-mail from myself to Jon Woodrum, Dan

3    Lowery, and Dan Reidl, my brother.

4    Q.    And it's January 12th, 2007?

09:48:01  5    A.    Correct.

6    Q.    Still a couple months before you actually go live?

7    A.    Yes.

8              MR. STAR:  All right.  Bob, go to the

9    second page, please, and blow that up, if you would.

09:48:19 10    Q.    Sir, is it your testimony that Hodell required

11    IBIS/LSi to be with you on your premises in order for you

12    to run stress tests?  Could you do that alone?

13    A.    I believe they were working with us remotely

14    through their office so they would remote into our

09:48:38 15    system.

16    Q.    And here's what you report to Mr. Woodrum on

17    January 12th of 2007.

18              You say to him, "As I've stated earlier,

19    when you can show me that the system is working,

09:48:48 20    including all of the major components, I will commit to a

21    go-live date."

22              Sir, you knew as of January, 2007, that the

23    entire system wasn't working in the way you wanted it to,

24    correct?

09:49:01 25    A.    Correct.  It wasn't ready for go-live.

 1    Q.    And you point out problems.  In fact, you call them

 2    in the next paragraph issues with three critical

 3    components that need to be satisfied before going live.

 4              And then you list them.  First one's data

09:49:19  5    conversion.

 6              The next one is stress test.  Do you see

 7    that?

 8    A.    Yes.

 9    Q.    You write this:  "To our disappointment, this one

09:49:27 10    failed."

11              Your stress testing was failing, wasn't it,

12    sir?

13    A.    This one had failed, and I believe the previous one

14    had as well.

09:49:36 15    Q.    You were seeing lockups, correct?

16    A.    Yes.  Here it says, "I believe the original lockup

17    issue has been addressed."

18    Q.    Go to the -- pardon me.  You say in the second

19    item, "Remaining issues are the display refresh pseudo

09:49:57 20    lockup situation and substantial delays in processing.

21    System is very slow, almost to the point of lockup, in

22    certain parts of the application."

23              Then you write, "Mostly In-Flight apps."

24              Sir, you knew as of January of 2007 that

09:50:13 25    the In-Flight program was causing most of your lockup

1    issues?

2    A.    Most of them?  That's what I say there.

3    Q.    Okay.  And you don't mention Business One itself

4    when you mentioned your stress tests and the stress tests

09:50:29 5    having failed, do you?

6    A.    No, not here.

7    Q.    Okay.  And you didn't send this e-mail along to

8    SAP?

9    A.    No, I didn't.

09:50:35 10   Q.    Then you go on and you talk in your Item Number 3

11   about process testing.

12                   Do you see that?

13   A.    Yes, I do.

14   Q.    You write, "Based on our findings over the past

09:50:48 15   week, this one also failed."

16                   Right?

17   A.    Right.

18   Q.    Then you write, "The base SAPBO," that's Business

19   One?

09:50:58 20   A.    Right.

21   Q.    You write, "The base Business One applications work

22   fine.  However, the major components of the In-Flight

23   program do not."

24                   Do you see that?

09:51:06 25   A.    Yes, I do.

1    Q.    Then you go on to say, "i.e., IPs," what's that?

2    A.    Inventory processing.

3    Q.    And it was In-Flight that processed your inventory,

4    correct?

09:51:17 5    A.    No.

6    Q.    In-Flight with Radio Beacon was processing your

7    inventory?

8    A.    No.  In-Flight with Radio Beacon and SAP Business

9    One was --

09:51:24 10    Q.    You needed -- pardon me, go ahead.

11    A.    These three components were processing our

12    inventory.

13    Q.    Fine.  You needed all three of those to process

14    your inventory?

09:51:33 15    A.    Correct.

16    Q.    You talk about warehouse transfers being a problem?

17    A.    Correct.

18    Q.    And these are components, as you write, major

19    components of the In-Flight program that weren't working

09:51:43 20    as of January of 2007, right?

21    A.    Right.

22    Q.    It goes on, you write, "In-Flight portions of the

23    item master record," they weren't working either, were

24    they?

09:51:55 25    A.    Based on this e-mail, apparently not.

284

1    Q.    Well, it's not just based on this e-mail.  You

2    remember they weren't working, don't you?

3    A.    I remember lots of different things, so I have to

4    rely on documentation for some of it.

5                    This one says that the item master record

6    wasn't working.

7    Q.    Okay.  This is your own e-mail, you wrote it?

8    A.    Yes.

9    Q.    Okay.

10                   MR. STAR:  Let's go to Exhibit 202, please.

11   Q.    Sir, this is a several-page e-mail chain.  I'm

12   going to focus on the first page for a moment.

13                   Can you identify this document for us?

14   A.    Can you zoom in a little bit more?  What part are

15   we looking at?

16   Q.    Yes.  We can hand you a paper copy if you need it,

17   as well.

18   A.    This is an e-mail from Dan Lowery to myself and Jon

19   Woodrum and Ross Elliott.

20   Q.    Okay.  It's back on February 16th of 2007?

21   A.    I believe so.  I didn't see the date there.

22                   MR. STAR:  All right.  Bob, focus in on the

23   bottom half of the e-mail, please.

24   Q.    This is you writing to Jon Woodrum and Dan Lowery,

25   correct?

```
 1    A.    Correct.

 2    Q.    And you're not writing to anybody at SAP?

 3    A.    No.

 4    Q.    Okay.  Sir, yesterday you were asked some questions

 5    about Terry Phillips, and I mentioned his name already

 6    today.

 7              You considered Terry Phillips to be one of

 8    your best IT guys, didn't you?

 9    A.    Yes.  He was a -- working with the Radio Beacon

10    product and had some development experience I think with

11    the website development.

12    Q.    Yes.  He actually started with your company working

13    in the warehouse but then was going to college to get a

14    computer degree, wasn't he?

15    A.    Yes, I believe so.

16    Q.    Okay.  And during my opening, I referred to

17    Mr. Phillips, we had it up on a demonstrative, as

18    Hodell's IT project manager.

19              Do you remember me saying that?

20    A.    I remember you saying that, yes.

21    Q.    Okay.  And you agree, Mr. Phillips was, in fact, an

22    IT project manager for Hodell, wasn't he?

23    A.    He was an IT project manager, not for this project.

24    I was the project manager for this product.

25              He was managing the Radio Beacon component
```

1    of this project.  And later, IT project manager was

2    specifically assigned to him because he took over the

3    role of project manager for the Profit 21 implementation.

4    Q.    Thank you for clarifying, but on this project,

09:54:46  5    which included integrating Radio Beacon and custom -- the

6    custom In-Flight application, Mr. Phillips was an IT

7    project manager on a significant part of the project,

8    correct?

9    A.    On the Radio Beacon part of it, yes.

09:55:00 10    Q.    Thank you.  And you're writing here to Jon Woodrum

11    and Dan Lowery about comments from Terry on February

12    16th, 2007.

13               Do you see that?

14    A.    Yes.

09:55:10 15    Q.    And, in fact, you write in the third paragraph of

16    your e-mail that Terry is one of your best IT guys.

17               That's what you thought of him?

18    A.    Um-hmm.

19    Q.    Yes?

09:55:26 20    A.    Yes.  He was very good with the Radio Beacon

21    integration part of it, yes.

22    Q.    And you trusted his advice, of course?

23    A.    Yes.  Certainly when it came to Radio Beacon.

24    Q.    Okay.

09:55:38 25               MR. STAR:  And, Bob, can you put that back

1    up?  Same one.  202.  Blow that bottom part up, please.

2    Q.    You go on to write in the paragraph that begins, "I

3    do understand," halfway through that you write, "Terry

4    has played the role of project manager and has helped to

09:56:20  5    develop the integration.  I'd like for the integration to

6    be working as soon as possible."

7                   Do you see that?

8    A.    Yes.

9    Q.    And Mr. Phillips, earlier in this e-mail chain,

09:56:33  10   gave you his thoughts and his comments about what was

11   happening on this solution, didn't he?

12   A.    I don't know, I don't have it.

13   Q.    Hold on.  We're not there yet.

14                  MR. STAR:  Bob, go to Page 2, halfway down.

09:57:04  15   Q.    This is an e-mail from Mr. Phillips to you.

16   Subject is RB/SAP, that's Radio Beacon/SAP, right?

17   A.    Right.

18   Q.    And it gives you an update list of pending issues

19   for the Radio Beacon/SAP integration, correct?

09:57:16  20   A.    Correct.

21   Q.    Okay.  I'm going to go to the last part of his

22   e-mail, which is on Page 4 at the bottom.

23                  MR. STAR:  Blow that whole thing up,

24   please.

09:57:45  25

```
 1    BY MR. STAR:
 2    Q.    Sir, on February 16th, 2007 as part of Mr.
 3    Phillips' e-mails to you, he gives you further comments,
 4    and he writes at the bottom of the first paragraph there,
 5    under further comments, "I feel that I will need a full
 6    week to test and confirm that we are ready to go live
 7    given the state of the integration between Radio Beacon
 8    and SAP."
 9                Do you see that?
10    A.    Yes.
11    Q.    He goes on in the next paragraph, about two-thirds
12    of the way through, "I have also been very frustrated
13    with the lack of testing and documentation on the part of
14    LSi."
15                Did you agree with Mr. Phillips at this
16    time?
17    A.    Did I agree with him?
18    Q.    Yeah.
19    A.    I'm not -- I don't recall.
20                That's what he wrote, that he was
21    frustrated with the lack of testing on the part of LSi,
22    so I --
23    Q.    This is --
24    A.    I had no reason to disagree.
25    Q.    This is just a couple of weeks before you actually
```

1    go live, right?

2    A.    Roughly three weeks.

3    Q.    Okay.  And he signs off at the bottom of that

4    e-mail as project manager.  That was his title, wasn't

09:58:54  5    it?

6    A.    Yes.  Again for the Radio Beacon integration.

7    Q.    Thank you.  Flip ahead, please, to Exhibit 899,

8    Bob.  You can blow the whole thing up, if you don't mind?

9    A.    Do you guys have some spots on the screen?  I've

09:59:28 10    got a couple of, I don't know, yellow or green spots.

11    Just my monitor.

12            THE COURT:  You can click on either the

13    bottom right or left, I forget, and erase those.

14            THE WITNESS:  I can?  I just made it worse.

09:59:44 15            THE COURT:  Did you?  That's like Jon

16    Madden, you can do the --

17            THE WITNESS:  I'll work around it.

18    BY MR. STAR:

19    Q.    Sir, can you identify this document, please?

09:59:54 20    A.    This is an e-mail from me to Jon Woodrum, Marcia

21    Weissman, Terry Phillips, Eric Johnson, Floyd Lesti

22    regarding inventory.

23    Q.    The date is March 8th, 2007, that's the day after

24    you went live?

10:00:09 25    A.    Right.

1    Q.    You weren't copying anybody from SAP, right?

2    A.    Right.

3    Q.    And the subject of your e-mail is inventory.

4          Do you see that?

10:00:20  5    A.    Yes.

6    Q.    And basically you're talking about problems with

7    synching up your inventory, correct?

8    A.    Can I read through the document?

9    Q.    Yeah, go right ahead.

10:01:08 10    A.    Okay.  What was your question again?

11    Q.    Sure.  I'll ask a different one.

12              MR. STAR:  What happened to the document?

13              THE COURT:  That was me.  I must have

14    messed it up.  Trying to get those green -- can you get

10:01:30 15    them off when it goes back on?

16              THE WITNESS:  You fixed it.  I don't see

17    any green spots.

18              THE COURT:  Fixed it?  I see nothing on

19    there.

10:01:38 20              THE WITNESS:  Fixed the green spots.

21              THE COURT:  I sure did.  You're on the

22    front table computer now.  Okay.

23              THE WITNESS:  All fixed.  Thank you.

24    BY MR. STAR:

10:02:05 25    Q.    All right.  You've had a chance to look at what

1    we've marked as Exhibit 899.

2              This is an e-mail from March 8th, 2007 from

3    you to some folks at IBIS/LSi?

4    A.    Yes.

10:02:15  5    Q.    And internally at Hodell, right?

6    A.    Yes.

7    Q.    Including Terry Phillips?

8    A.    Yes.

9    Q.    Okay.  And you're talking about inventory, that's

10:02:24 10    the subject?

11    A.    Yes.

12    Q.    All right.  And you're finding at this point in

13    time right after go-live that you're having to manage, in

14    your words, two different inventories.

10:02:35 15              Do you see that under Item 1, two-thirds of

16    the way down?

17    A.    Yes.

18    Q.    The line says "It appears"?

19    A.     "It appears that we are faced with the same

10:02:48 20    problem we had with Radio Beacon and FACTS.  We will have

21    to manage two different inventories."

22    Q.    Right.  One of the things you told us yesterday was

23    that after go-live you were having inventory problems,

24    you couldn't track your inventory you said, you remember

10:02:59 25    that?

```
 1    A.    Yes.
 2    Q.    You said sometimes you couldn't even find inventory
 3    items and you had to just write them off.
 4                 Do you remember that?
 5    A.    Correct.
 6    Q.    Sometimes you said you were buying extra inventory
 7    because you couldn't figure out what you had in stock, do
 8    you remember that?
 9    A.    Yes.
10    Q.    And here you're writing that, "It appears we are
11    faced with the same problems we have had with Radio
12    Beacon and FACTS.  We will have to manage two different
13    inventories."
14                 Sir, you knew of the inventory issues
15    before you went live, correct (beginning quotes)?
16    A.    This is a document after we went live.
17    Q.    I understand.  You're talking about here, sir, the
18    same problems.
19                 Of course you're referring to problems that
20    existed before you went live, right?
21    A.    This is -- what I say is between Radio Beacon and
22    FACTS.  Different, different solution.
23    Q.    Let's just go back to this.
24                 You went live on a three-part solution?
25    A.    Right.
```

```
          1    Q.    Radio Beacon, custom In-Flight, and base Business
          2  One, right?
          3    A.    Right.
          4    Q.    And you tested that three-part solution.
10:04:07  5                You just told us --
          6    A.    Right.
          7    Q.    -- you tested that three-part solution before you
          8  went live?
          9    A.    Yes.
10:04:12 10    Q.    And you told the jury yesterday that after go-live,
         11  you were having inventory issues, you couldn't track your
         12  inventory, right?
         13    A.    Right.
         14    Q.    And here you're writing the day after go-live that
10:04:25 15  you're faced with the same problems "We have had with
         16  Radio Beacon and FACTS."
         17                So you're not telling this jury that you
         18  just found out the day after go-live about the inventory
         19  problems that were being caused by Radio Beacon and
10:04:40 20  FACTS, are you?
         21                MR. CARNEY:  Objection, Your Honor.
         22                THE COURT:  Overruled.
         23    A.    Can you -- can you restate that question?  Because
         24  we're talking about two different systems here.
10:04:50 25    Q.    It's all one system, isn't it?  It's all integrated
```

1    together, sir?

2    A.    What I mentioned specifically is having had with

3    Radio Beacon and FACTS.

4    Q.    Sir, I had a question.  It's all one system?

10:05:01 5                MR. CARNEY:  Objection, Your Honor.

6                THE COURT:  Overruled.

7    BY MR. STAR:

8    Q.    And it's all integrated together?

9    A.    FACTS was not part of this solution.  No.  This

10:05:09 10   says Radio Beacon and FACTS.  FACTS was not part of the

11    solution that we're talking about.

12    Q.    But you're having the same old problems you were

13    having with Radio Beacon all along, right, sir?

14    A.    What I identify is, yes, we had problems that were

10:05:21 15   similar to the problems that we had with Radio Beacon and

16    FACTS.

17    Q.    So for years, for years, you've been having

18    inventory problems with Radio Beacon, correct?

19    A.    With Radio Beacon and FACTS.

10:05:33 20   Q.    And you tested that same Radio Beacon software when

21    you tried to add it on to Business One, and you saw

22    inventory problems before you went live on your new

23    solution, correct?

24    A.    Yes, we had inventory problems.

10:05:46 25   Q.    Thank you.

1          During your direct testimony yesterday and

2    again today, you told us a lot, and you explained to the

3    jury, that Hodell had slow computer performance after

4    go-live.  That's your view of what happened, right?

10:06:18  5    A.    Yes.

6    Q.    Sometimes you had lockups, you said?

7    A.    Yes, on the solution.

8    Q.    I noticed you didn't go through any documents which

9    memorialized exactly how long it was taking for Hodell to

10:06:28 10    process any particular transactions, did you?

11    A.    No.

12    Q.    The attorneys didn't show you any documents like

13    that?

14    A.    I don't believe so.

10:06:36 15    Q.    And you and I have talked about that subject

16    before.

17          You agree Hodell never sat down and did a

18    study and wrote down how long it was taking to complete

19    any particular transaction.

10:06:49 20          You didn't keep a log of anything like

21    that, did you?

22    A.    We didn't keep a log of how long it took to enter a

23    sales order.

24          Our salespeople knew how long it took it to

10:07:00 25    enter a sales order, and they knew and it took extra

1    long.  They knew the difference.

2    Q.    Mr. Lambert, in his opening yesterday, told the

3    jury that even on your old FACTS system, it would

4    sometimes take hours to enter a very long sales order.

10:07:19  5                  Do you remember him saying that?

6    A.    I believe so.  I'm not a hundred percent certain.

7    Q.    And that was true, wasn't it?

8                  On your old system, sometimes your sales

9    orders would take hours to enter, they were very long on

10:07:36 10   some occasions?

11   A.    Very long ones might take an hour, maybe two hours.

12   But we're talking probably 500 or a thousand line orders

13   on FACTS, but not typically.

14   Q.    And Hodell doesn't have a single document that

10:07:55 15   actually measures the speed at which it was taking your

16   sales team to enter sales orders, you just don't have

17   anything like that to show the jury, do you?

18   A.    I don't believe we do.  LSi might.

19   Q.    Now, it's been established that Hodell ran on

10:08:15 20   Business One plus In-Flight and Radio Beacon from March

21   of 2007 through until April 1st of 2009, so a period of

22   two years, right?

23   A.    We were on the system two years.

24   Q.    Okay.  You filed the complaint and started the

10:08:30 25   lawsuit in this case in November, 2008.

1          Do you remember that?

2    A.    Yes.

3    Q.    So when you filed the complaint in this case, you

4    were actually running Business One plus In-Flight plus

10:08:42  5    Radio Beacon?

6    A.    Yes, but not effectively.

7    Q.    You prepared for months in advance of filing that

8    complaint, correct?  It didn't just happen out of the

9    blue?

10:08:55 10    A.    It would have been a couple of months.

11    Q.    Yeah.  For a couple of months.

12              And you never took the time to sit down and

13    document while you were running our system what actual

14    performance you were seeing?  You didn't do that, did

10:09:14 15    you?

16    A.    Such as?

17    Q.    Such as sitting down and tracking with a log how

18    long it was taking to enter a sales order, how long it

19    was taking to update a sales order; you didn't do

10:09:24 20    anything like that?

21    A.    I don't believe we did, no.

22    Q.    You never took the time to stand over somebody's

23    shoulder with a video camera and video their screen and

24    show --

10:09:31 25              MR. CARNEY:  Objection, Your Honor.

1                    THE COURT:  Overruled.

2                    MR. STAR:  Thank you.

3       BY MR. STAR:

4       Q.    You never took the time in the months leading up to

10:09:36 5      filing your complaint while you were running Business One

6       plus Radio Beacon plus In-Flight, to stand with a user

7       and video and record what was actually happening on their

8       screen, did you?

9       A.    We relied on --

10:09:48 10     Q.    Sir, you never did that, did you?

11      A.    Can I explain?  We --

12      Q.    The answer calls for a -- the question calls for a

13      yes or no.

14      A.    We didn't measure that.  We relied on our

10:09:58 15     salespeople and our employees and the experiences that

16      they had and observing them, but we didn't stand over

17      them with a video camera and record the screen, if that's

18      what you're asking.

19      Q.    It is.  And you never ran a transaction log report

10:10:14 20     out of your custom software solution to figure out how

21      long it was taking to do anything in the process,

22      correct?

23      A.    We -- we would have relied on LSi to do that.

24      Q.    So you never ran a transaction log report, did you?

10:10:27 25     A.    We didn't.  I don't know if LSi did.

1    Q.    Now, Mr. Carney, when he was questioning you,

2    talked about patches that were installed on the system,

3    and as I understood your testimony, let's just make sure

4    we've got this right, your view is the patches that were

10:10:46    5    put on really made only marginal improvements in

6    performance?

7                That's your view?

8    A.    Yes.  There were a number of patches that were

9    released over time.  They improved things here and there,

10:10:58    10    but overall the system's slowness and lockups were always

11    an issue.

12    Q.    Let's go to Exhibit 320, please.

13                Bob, if you can maybe blow up all the text

14    on that page so he can see it.  I'm going to zoom in on

10:11:23    15    some spots.  I just want to see if you remember this

16    document, sir.

17                Can you identify it for us, please?

18    A.    Are we looking at the top or the bottom?

19    Q.    Well, we're going to work at the bottom.  I just

10:11:35    20    want to see, first off, if you recall this e-mail.

21    A.    This is an e-mail from myself to Jon Woodrum and

22    Dan Lowery, dated 5/22 of 2007.

23    Q.    All right.  So you're a couple months after go-live

24    at this point, right?

10:11:51    25    A.    Right.

1    Q.    All right.

2                MR. STAR:  Bob, let's focus in on the

3    bottom e-mail there from Jon Woodrum to Kevin, please.

4    Q.    Jon's reporting that he made a visit out to your

10:12:11  5    St. Louis location.

6                Do you recall him doing that?

7    A.    Yes.

8    Q.    And he says, "The visit to the St. Louis store," he

9    was talking about your operation in St. Louis, "was a

10:12:21 10    really good one," right?

11    A.    Yes.

12    Q.    Okay.  Go to the next page, Bob, and zoom in on the

13    top.

14                This is the continuation of Mr. Woodrum's

10:12:47 15    e-mail.  He writes, "Cain and I" -- Cain was his son,

16    correct?

17    A.    Yes.

18    Q.    He writes, "Cain and I" -- oops.  Here we go.

19                "Cain and I were there from about 7:15 to

10:13:15 20    until near noon."

21                Right, so about five hours he was at the

22    St. Louis store.

23                Do you remember that happening?

24    A.    Yes.

10:13:21 25    Q.    And here is what he writes.  "Mostly observed

1    deliveries and orders (the areas reported as previously

2    the most difficult due to performance).  But we did

3    observe and visit with Melissa in accounting as well.

4    Cain helped her on some specific questions while there.

10:13:39  5    Marty entered a 91 line order."

6              He goes on to write, "It never slowed down

7    throughout the order and took 2-3 seconds to update when

8    finished."

9              Do you see that?

10:13:52  10   A.    Yes.

11   Q.    You weren't there, were you?

12   A.    No, I was not.

13   Q.    You didn't have any reason to dispute that

14   Mr. Woodrum and his son, Cain, actually sat with a user

10:14:04  15   name Marty and observed him entering a 91-line sales

16   order, you didn't dispute that, do you?

17   A.    I had no reason to dispute it.

18   Q.    And you'd agree that if a 91-line order for Hodell

19   was entered and never slowed down through the process and

10:14:22  20   took only two to three seconds to update, that was

21   perfectly acceptable performance in your mind, right?

22   A.    That was -- you have to observe the time they were

23   there.  They were there 7:15 until noon when not all of

24   our users were on.

10:14:38  25   Q.    Sir, that's not my question.

A.   All of our users were on in the afternoon.

Q.   You're not answering the question that I've put to
you.

A.   Okay.

Q.   You can explain it later when your counsel wants to
question you.

My question was different.

Your contention in this case is that Hodell
had slow software performance, correct?

A.   Correct.

Q.   This is a report to you from Jon Woodrum and his
son, Cain, after they went to your store in St. Louis a
couple months after go-live, right?

A.   Right.

Q.   And we went through it.  He says they observed
Marty entering a 91-line order.

My question to you, sir, in your business,
if Marty was able to enter a 91-line order with no
slowdown and it took only two to three seconds to update,
that would be perfectly acceptable performance for
Hodell, correct?

A.   If that performance was sustainable, yes.

MR. STAR:  Stay on that e-mail, Bob.  Go
back to the first part of it.

Go back to the first page, the top.

1    Q.    So you respond to Mr. Woodrum, here's your e-mail.

2    You say you're going to forward an e-mail with a summary

3    of comments from your branch managers and then you write

4    this:  "In short, while there were marginal improvements

10:16:11  5    in certain areas (large orders particularly) overall the

6    system is still far too slow."

7                    So you wouldn't accept what Mr. Woodrum was

8    saying, even though you weren't there to observe what he

9    saw, right?

10:16:24 10   A.    I was disputing because I had gathered, it shows

11   that I had gathered information from all of our branch

12   managers.

13   Q.    But, you personally weren't there and you

14   personally can't dispute what Mr. Woodrum actually

10:16:37 15   observed, can you?

16   A.    I can't dispute what he observed.

17   Q.    Thank you.

18                    THE COURT:  Can we break for our morning

19   recess?

10:16:43 20                    MR. STAR:  Certainly, Your Honor.  Thank

21   you.

22                    THE COURT:  Okay, folks.  We'll take 15 or

23   20 minutes.  Keep in mind the admonition and we'll be

24   back in about 20 minutes.

10:16:52 25                    THE CLERK:  All rise.

1           (Jury out).

2           (Recess taken).

3           (Proceedings resumed in presence of the

4      jury as follows:)

10:38:24  5           THE COURT:  You may continue.

6      BY MR. STAR:

7      Q.   Mr. Reidl, yesterday when you testified and again

8      this morning, as I understood your testimony, you contend

9      that after you went live and you were having discussions

10:38:46 10    at that point with folks from SAP, you believe SAP wasn't

11     telling you everything.

12           That's your view, right?

13     A.   Correct.

14     Q.   You told us yesterday, though, that there was a

10:38:56 15    conference call on April 17th, 2007 that included a bunch

16     of people from SAP.

17           Do you remember that?

18     A.   Yes.

19     Q.   And you were on that call?

10:39:05 20    A.   Yes.

21     Q.   And you remember being told by Dirk Boessmann of

22     SAP during that call that SAP believes you at Hodell were

23     pushing the upper limits in terms of users and your

24     database size at Hodell, right?

10:39:21 25    A.   Right.

```
 1            Q.      Okay.  You were told that during the call by SAP?

 2            A.      Yes, and I subsequently questioned that.

 3            Q.      Today you offered some testimony about what you

 4     think happened to your company after go-live, and

10:39:42  5     Mr. Lambert during his opening yesterday told the jury

 6     that Hodell nearly went out of business.

 7                        And let's just be sure we have your

 8     position clear.  You're telling the jury that you blame

 9     whatever you think happened just on Business One,

10:39:54 10     correct?

11            A.      This, this, yes, this software system failed

12     miserably and impacted our company in a big way.

13            Q.      Thank you for clarifying.

14                        You're saying the software system.  So what

10:40:07 15     you're actually telling the jury is you think whatever

16     problems you had and whatever harm you might have

17     suffered came from the multi-component solution Radio

18     Beacon, the custom In-Flight application, and in your

19     view the base Business One program, right?

10:40:23 20            A.      No.  Business One.

21                        MR. CARNEY:  Objection.

22                        THE COURT:  Overruled.

23     BY MR. STAR:

24            Q.      Pardon?

10:40:26 25            A.      Business One.
```

1    Q.    So you're laying the blame completely at the feet

2    of the core Business One application, that's your view?

3    A.    The core Business One application could not handle

4    our user, number of users.

10:40:37  5    Q.    Sir?

6    A.    Number of users.

7    Q.    Sir, I asked you a question that required a yes or

8    no answer, I think.  You can clarify it later on if your

9    attorney wants to ask you about.

10:40:48 10              Your position, what you're telling this

11   jury, is that you believe whatever problems or harm you

12   might have suffered after go-live were solely because of

13   the core Business One piece of this solution, that's your

14   view?

10:40:58 15   A.    Business One and, as I said this morning LSi, they

16   did not represent some of the literature that was out

17   there at the time.

18   Q.    But as far as the three pieces of the software,

19   you're blaming just the core Business One piece, correct?

10:41:13 20   A.    The core Business One piece was the major component

21   that contributed to the performance issues.

22   Q.    Sir, you have no technical background, do you?

23   A.    Only through work experience.

24   Q.    Okay.  You've never written software code?

10:41:25 25   A.    No, I haven't.

```
 1    Q.    You're not a software expert?
 2    A.    No.  I don't want to be.
 3    Q.    Okay.  You don't have any experience or training
 4    that allows you to offer an opinion as to what might have
 5    caused a performance problem in a multi-component
 6    Software Solution, do you?
 7    A.    No.  Again my experience is through work
 8    experience.
 9    Q.    Thank you.  Today you said you had, in your view,
10    productivity losses.
11               You didn't show the jury any documents
12    about that, did you?
13    A.    I don't believe so.
14    Q.    You said you had to hire extra people.  You didn't
15    tell the jury the names of any of those people, did you?
16    A.    No.
17    Q.    You told the jury that you somehow had reputation
18    damages, but you didn't show the jury any documents about
19    that either, right?
20    A.    No documents.
21    Q.    Now, it's been established that you went off of
22    Business One at the end of March of '09, and switched on
23    to Profit 21, the next Software Solution, at that point,
24    correct?
25    A.    Correct.
```

Q.    And what you've said to this jury concerning the
time you were on Business One is you've contended, and
you told them today, that you lost customer orders and
you couldn't fulfill orders that came in, right?

        That's your view?

A.    Yes.

Q.    But again, you don't have a single document, a
single piece of paper, a memo, an e-mail, anything that
actually records or memorialized that Hodell lost any
customer or any order at all, right?

A.    Losing orders, you don't -- you know --

Q.    Sir --

A.    Can I explain?

        When --

Q.    You can explain when your attorney wants to ask you
the question.

        My question's simple?

A.    Can you repeat that?

Q.    Yeah.  I'm correct that you don't have, and Hodell
does not have, a single piece of paper, an e-mail, a
memo, a note, a record from its business system, showing
that you lost a single customer, a single sale, or a
single order while you used Business One, Radio Beacon,
and In-Flight, correct?

A.    No.  Our business system wouldn't -- wouldn't track

1    that.

2    Q.    You don't have a single piece of paper, do you?

3    A.    Not that I know of.

4    Q.    Thank you.  And you're the president of the

10:43:46  5    company, yes?

6    A.    Yes.

7    Q.    You told us yesterday when you introduced yourself

8    to the jury that you're in charge of the sales operation,

9    right?

10:43:55  10   A.    Yes.  And the most important --

11   Q.    You're in charge of the sales operation, yes?

12              And as the person at Hodell in charge of

13   the sales operation, there would be nobody in the company

14   better than you to know if you actually lost a customer

10:44:11  15   or lost a sale, right?

16   A.    Right.

17   Q.    Okay.

18   A.    And the sales organization reported to me, so the

19   feedback I was gathering throughout our --

10:44:21  20   Q.    I'm going to stop you right there.

21              MR. STAR:  Your Honor, he's about to try to

22   get some hearsay.  I asked him a simple question.  I

23   would like an answer.

24              THE COURT:  Try to answer the question

10:44:31  25   that's asked.

1    BY MR. STAR:

2    Q.    We talked about this when you and I were together

3    before some years back.

4              You agree with me that Hodell, during the

10:44:54   5    period it ran its custom Software Solution, was actually

6    able to fulfill and take every single order that came in

7    the door while you ran that software for two years,

8    right?

9    A.    Every single order that came through the door?  Not

10:45:12  10    every single order.  That builds into backlog.  But the

11    way we were able to do that is by working long hours,

12    having every person dedicated to entering those orders,

13    managing those orders, and doing whatever we could.

14              And we had many -- we had workarounds.

10:45:29  15    People would come in early and work late.

16    Q.    Sir, you fulfilled the orders that came in the door

17    while you ran the custom software for two years, correct?

18    A.    Yes.

19    Q.    Thank you.

10:45:37  20    A.    With significant more effort and expense.

21    Q.    We'll get into that.  We'll get into the time it

22    took you.  In fact, let's do it right now.

23              I'm going to hand you a hard copy, just so

24    you have it --

10:45:48  25              MR. STAR:  Your Honor, do you mind if I

        1    approach?

        2              THE COURT:  Go ahead.

        3              MR. STAR:  Bob, put this up on the screen.

        4    It's going to be Exhibit 24, please.

10:46:07 5    BY MR. STAR:

        6    Q.   Sir, can you tell us what -- we'll wait until it

        7    comes up on the screen.

        8              Mr. Reidl, can you identify what's been

        9    marked as Exhibit 24, please?

10:46:54 10   A.   Yes.  These are summary financial statements for

       11    our organization.

       12    Q.   These are Hodell business records showing your

       13    financials over the course of a period of years?

       14    A.   Yes.

10:47:06 15   Q.   Okay.  It shows things like gross sales, net sales,

       16    total hours worked, those sorts of things?

       17    A.   Correct.

       18    Q.   And it goes from the period of 2002 up through the

       19    end of the period you used Business One, In-Flight, and

10:47:24 20   Radio Beacon, March, 2009, correct?

       21    A.   Correct.

       22    Q.   Sir, we've gone through this, you and I, before?

       23    A.   I recall.

       24    Q.   Okay.  And if we went through each of the gross

10:47:40 25   sales figures, we'd find that 2008, the year, the only

1   full calendar year you ran Business One, plus In-Flight

2   and Radio Beacon, Hodell earned its most gross sales

3   ever, right?

4   A.    Yes.  Gross sales; not net profit.

10:48:00  5   Q.    Gross sales.  Thank you, sir.

6   A.    Gross sales.

7   Q.    In fact, let's try to do it this way.  We've got a

8   demonstrative.  Let's walk through it and let's see if

9   you agree with what we've got on there.  We will iron out

10:48:54 10   our easel issues.

11              Sir, you can track with me --

12              MR. STAR:  Joe, can you move it back a

13   little bit so I can see it also, please?

14   Q.    Can you see all the numbers on there?  Is that

10:49:28 15   close enough for you?

16   A.    I can see the big ones.

17   Q.    Great.  And if you go on your document, your

18   Exhibit 24 there, sir, that's your financial record.

19   A.    Yes.

10:49:36 20   Q.    You can confirm for me by going through each of the

21   years 2002 through 2008 which are in the document that

22   the annual gross sales figures we have listed here in

23   this column are correct, right?

24              Will you do that for us?

10:49:48 25   A.    Sure.  Yeah, they look to be correct.

1    Q.    Okay.  And you agree that the only full year you

2    used Business One, you had the most gross sales, correct?

3    A.    Correct.

4    Q.    43.8, almost 43.9 million?

10:50:06 5    A.    Correct.

6    Q.    It's the most gross sales your company has ever

7    made?

8    A.    Correct.

9    Q.    It happened while using Business One, plus

10:50:12 10    In-Flight, plus Radio Beacon?

11    A.    With great difficulty, yes.

12    Q.    Thank you.

13                And by the way, if we did that same

14    exercise with Hodell's net sales out of your business

10:50:47 15    record, we'd also find that in 2008, you had the highest

16    net sales in company history, right?

17    A.    Yes.  Net sales is gross sales minus various

18    returns, allowances.

19    Q.    Your net sales and your gross sales were highest in

10:51:04 20    2008 when you ran Business One?

21    A.    Yes.

22    Q.    In-Flight, and Radio Beacon?

23    A.    Yes.  Again, with great difficulty.

24    Q.    Sir, you agree with everything we have on this

10:51:18 25    demonstrative, correct?

1    A.    Yes.

2              MR. STAR:  Your Honor, I would like to add

3    this as another exhibit.  I don't know what our next

4    exhibit number is, Alex.

10:51:27 5              MR. HAYDEN:  907.

6              MR. STAR:  For Defendant's 907.  We'll mark

7    that later.

8              THE COURT:  Okay.

9    BY MR. STAR:

10:51:47 10   Q.    Let's break down some of the numbers a little bit,

11   sir.

12              MR. STAR:  Bob, go to in Document 24,

13   Exhibit 24.  It's going to be the consolidated calendar

14   year statement for 2008, please.  Yeah, keep going, sir.

10:52:38 15             Bob, can you focus on the column that has

16   October -- oops, I touched it.  Here we go.  Focus on the

17   column that has October, please.

18              MR. MILLER:  Just to be clear, 2006?

19              MR. STAR:  2008.  Thank you.

10:53:00 20             Sorry, you've got 2006 up.  We need to go

21   2008, pull out October, 2008.

22              Keep going.  Next page.

23   BY MR. STAR:

24   Q.    Okay.  And, sir, you've got a paper copy there so

10:53:36 25   you can work through it with me.

```
 1              You agree what we've blown up here is the
 2   column for October of 2008, right?
 3   A.    Yes.
 4   Q.    And you and I talked about this before.  Gross
 5   sales in October, 2008 were $4,157,000, and that was the
 6   highest month of gross sales Hodell ever had?
 7   A.    Yes.
 8   Q.    And if we go down about halfway through the page,
 9   in the left-hand column, under the gray break, there's an
10   entry on the left for warehouse employees.
11              Do you see that?
12   A.    I'm sorry, where?
13   Q.    Warehouse employees, do you see the column on the
14   far left?
15   A.    Yes.
16   Q.    Warehouse employees are folks that are actually
17   working in your warehouse and picking and processing
18   orders as they come in and shipping them out, right?
19   A.    Right.
20   Q.    And if you track over to October, the column for
21   October, 2003, you had 83 warehouse workers, right?
22   A.    Yes.
23   Q.    So you were able to fulfill the highest gross sales
24   in company history with 83 warehouse workers in October,
25   2008 while running Business One, plus In-Flight, plus
```

```
         1    Radio Beacon, right?
         2    A.    Yes.
         3    Q.    For comparison purposes --
         4                MR. STAR:  Bob, go back to 2007.
10:55:21 5    Q.    -- and let's look at the column for October of
         6    2007.  Pardon me, I'm sorry, look at the column for
         7    February of 2007, just before you started on Business
         8    One, plus In-Flight and Radio Beacon.
         9    A.    February?
10:55:47 10   Q.    Yes, sir.
        11    A.    2007?
        12    Q.    February, 2007, was the last month you were on your
        13    old software system, correct?
        14    A.    Correct.
10:55:59 15   Q.    And that month you had gross sales of 3.29 million?
        16    A.    Correct.
        17    Q.    So nearly a full million less in gross sales than
        18    you did in October, 2008, while you ran Business One and
        19    In-Flight and Radio Beacon?
10:56:16 20   A.    Correct.
        21    Q.    And in February of 2008, if we look at how many
        22    warehouse employees you had, I'm sorry, February, 2007.
        23    I misspoke.  If you look at how many warehouse employees
        24    you had, it was 91, correct?
10:56:32 25   A.    Correct.
```

1    Q.    So in February, 2007 while you were on your old

2    FACTS system, you needed 91 people in the warehouse to

3    put out 3.29 million in gross sales, correct?

4    A.    Correct.

10:56:47 5    Q.    But in October of 2008, while you were on Business

6    One and Radio Beacon and In-Flight, you had eight less

7    warehouse workers, yet you put out nearly a million

8    dollars more in gross sales, correct?

9    A.    Correct.

10:57:04 10    Q.    Thank you.  So you had less people shipping

11    product, but you were making more money, correct?

12    A.    We also -- we also had temporary workers to help

13    bridge that gap.

14    Q.    Temporary workers are not shown on this record, are

10:57:24 15    they?

16    A.    I don't believe so.  They would have been under

17    operating costs somewhere.

18    Q.    In fact, there's no document that you've produced

19    to SAP in this case that actually lists out your number

10:57:38 20    of temporary workers or the number of hours they worked?

21    A.    No, we don't track that.  We just know that there's

22    cost involved.

23    Q.    So you don't have a record to suggest -- that would

24    support what you're actually suggesting, that you, as I

10:58:06 25    understand it, you needed more temp workers while you

1    were running Business One?

2              You don't have any documents to support

3    that, do you?

4    A.    I don't believe so.

10:58:13  5    Q.    You can put that one away.

6              Now, after you left Business One and Radio

7    Beacon and FACTS and you went to your next solution, you

8    told the jury that was called Profit 21 or P 21, right?

9    A.    Correct.

10:58:39 10    Q.    And you started on Profit 21 in April, 2007?

11    A.    Yes.  That sounds correct.

12    Q.    And when Mr. Carney was questioning you, you told

13    the jury that you spent lots of money, it cost you I

14    think you said something like a million dollars to get

10:58:56 15    Profit 21, to buy their software and to implement it, but

16    you don't have a single document or record that supports

17    those costs, do you?

18    A.    I believe we do.

19    Q.    You've not shown it to the jury, have you?

10:59:10 20    A.    I don't know that we have, no.

21    Q.    Okay.  Well, I'll tell you, we haven't seen your

22    actual invoices or canceled checks.  They weren't

23    produced to us, were they?

24              MR. CARNEY:  Objection, Your Honor.  Is he

10:59:21 25    testifying?

```
 1                    THE COURT:  Ask a question.
 2    BY MR. STAR:
 3    Q.    Your actual checks, canceled checks, records of
 4    payment for costs related to Profit 21, they weren't
10:59:29 5    produced in this case, were they?
 6    A.    I'm not sure if they were or weren't.
 7                    I believe the agreement was, the contract
 8    was, that showed the price, showed the price that we
 9    paid.
10:59:39 10   Q.    Let's look at what you were telling Profit 21 after
11    you went live on their software and left your custom
12    solution.  Let's take a look at Exhibit 320, please.
13                    MR. STAR:  Can you blow that up so
14    Mr. Reidl can see it better?
11:00:11 15   BY MR. STAR:
16    Q.    Mr. Reidl, can you identify this document, please?
17    A.    Sure.  It's an e-mail from myself to Jon Woodrum
18    and Dan Lowery, dated 5/22/07.
19    Q.    Oh, pardon me.  I've got the wrong exhibit in front
11:00:25 20   of me.  My mistake.  My mistake.
21    A.    I think we went through this one already.
22    Q.    I lost my spot.  I meant to go to Exhibit 277.  My
23    apologies.
24                    MR. CARNEY:  Objection, Your Honor.  This
11:00:39 25   again was excluded pursuant to Judge Wells' February --
```

1          THE COURT:  Objection's overruled.

2     BY MR. STAR:

3     Q.    Sir, can you identify this document?

4     A.    This is an e-mail from Jon Snow to himself, myself,

11:01:00  5     and other people at Activant.

6     Q.    Act -- sorry, go ahead.

7     A.    And Joe Vislocky from our company.

8     Q.    And Activant is the company from whom you purchased

9     Profit 21, correct?

11:01:13 10     A.    Yes.  And I said later -- yesterday I said Epicor

11     but Epicor bought them later, yes.

12     Q.    We'll just call it Profit 21 if that's okay.  It

13     will be less confusing for everybody.

14     A.    Right.

11:01:25 15     Q.    And below the e-mail from Mr. Snow is an e-mail

16     from you, and you're writing to people at Profit 21,

17     right?

18     A.    Right.

19     Q.    This is May 22nd, 2009, about seven weeks after

11:01:39 20     you've gone live on the Profit 21 system, correct?

21     A.    Right.

22          MR. STAR:  Bob, go down to Mr. Reidl's

23     e-mail, please, first page.  Blow that bottom part up.

24     Q.    This is your e-mail, sir, to the folks at Profit 21

11:02:08 25     after you've gone live on their software.  Second

1   paragraph you write, "Our current status is as follows:

2   We are seven weeks into this implementation and yet we

3   continue to struggle with numerous issues that absolutely

4   should not exist at this point."

11:02:25 5              You were having issues even with Profit 21,

6   weren't you?

7   A.     Functionality issues.  Not performance.

8   Q.     Go to the top of the next page, please.  I'm sorry,

9   I meant to go to the bottom of that, of that last page.

11:02:47 10             You also say this.

11             MR. STAR:  Go up a little bit, Bob.  Bottom

12   of Page 1, please.  There you go.

13   Q.     "While I will stop short of calling this

14   implementation a failure, I will say that it has not gone

11:03:08 15  well.  My patience, and those of my counterparts on our

16   executive team are quickly running out.  To put things in

17   perspective, we were sold a system that will streamline

18   our operations and make us more profitable."

19             And you go on, you're saying your sales are

11:03:28 20  down, right?

21   A.     Yes.

22   Q.     Go to the top of the next page.  You just told

23   Profit 21 that your sales are down but here's what you

24   say next.  "However," although your sales are down,

11:03:45 25  "We've recently needed to hire three employees to manage

322

1     the new work load."

2              Sir, you're telling Profit 21 that they

3     were ruining your productivity, weren't you?

4     A.    We're telling them we had to add three employees to

11:03:59   5   manage the new work load because there were functionality

6     issues that existed at this time.

7     Q.    You're blaming Profit 21 and its software to cause

8     you to hire more people to get even less work done,

9     right, because you had a downturn in sales?

11:04:14  10   A.    Yes.

11     Q.    And you write, "Not a good indication of

12     efficiencies gained, particularly since our product mix

13     and customer base hasn't changed."

14              Do you see that?

11:04:23  15   A.    Yes.

16     Q.    You're telling Profit 21 you were doing the same

17     work but less of it than you had been doing on Business

18     One, Radio Beacon, and In-Flight; yet you were less

19     efficient, right?

11:04:39  20   A.    Yes, because we were still working through the

21     functional issues that overlap from go-live.

22     Q.    You go on two paragraphs later and you write,

23     "Aside from the above, I am most disappointed because we

24     have lost customers through this."

11:04:58  25              Same complaint you made of SAP, right?

1    A.    Right.

2    Q.    Let's go to Exhibit 325, please.  Now, the last

3    thing we worked through was you to Profit 21, May 22nd,

4    2009, seven weeks after you implemented that solution.

5                      Identify this document for me, please, sir.

6    A.    This is an e-mail from myself to Kathy Crusco,

7    copying Joe Vislocky and another individual, Friday,

8    September 25th, 2009.

9    Q.    By September 25th, 2009, you're almost a full six

10   months after going live on Profit 21, right?

11   A.    Right.

12   Q.    And we'll move through this a little bit quicker.

13                     The discussion you're having with

14   Ms. Crusco at Profit 21, she's asking you for payment on

15   the software, right?

16   A.    A maintenance payment, yeah.

17   Q.    And here's what you write to her, telling her you

18   agree to pay the balance of the 48,000 installment,

19   maintenance payments, but you go on to say, "I agreed to

20   make payments and pay maintenance on a system that does

21   not currently work for us."

22                     Six months into this implementation of

23   Profit 21, you're telling them the same thing you told

24   SAP and LSi and IBIS, the system didn't work for you,

25   right?

1    A.    We still had some functional issues that were being

2    worked out, yes.

3    Q.    And then you go on to say this:  "Our business is

4    off 25%."

11:06:52  5              You mean to say you're 25% down in your

6    sales, correct?

7    A.    Correct.

8    Q.    Yet you go on to say, "But our head count is up

9    since the day we went live on Profit 21."

11:07:05 10              You were doing less sales, but you were

11   employing more people on Profit 21, correct?

12   A.    That's my understanding, yeah.

13   Q.    Then you go on to write -- well, these are your

14   words, right?  You wrote this?

11:07:16 15   A.    Right.

16   Q.    You go on to write to Ms. Crusco at Profit 21, "Any

17   efficiency we had" -- and you're referring to the

18   efficiencies you had using Business One, Radio Beacon and

19   In-Flight, right?

11:07:27 20   A.    Any we had -- any we had had prior, yes.

21   Q.    Yeah.  And prior, you were on our -- you were on

22   the system that was Business One, Radio Beacon and

23   In-Flight?

24   A.    Right.

11:07:37 25   Q.     "Any efficiency we had has vanished with the

1    implementation of this software," being Profit 21,

2    correct?

3    A.    Correct.

4    Q.    Let's switch gears, sir.  Let's step back to when

11:08:02 5    you first met Dale Van Leeuwen.

6              We talked about this as well when we were

7    together a couple years ago.

8              You, as I recall, told me you first met

9    Van Leeuwen back in the late 1990s, around 1999, does

11:08:19 10    that sound right?

11    A.    That sounds about right.

12    Q.    And when you met Van Leeuwen, you knew him to be

13    the owner and the principal of a company called The IBIS

14    Group?

11:08:28 15    A.    Yes.

16    Q.    And you understood, Mr. Van Leeuwen at that point

17    in time, was representing a product called FACTS and you

18    were working with him on the FACTS software at Hodell,

19    correct?

11:08:39 20    A.    Correct.

21    Q.    He had, to your understanding, no relationship with

22    SAP at that time?

23    A.    That's my understanding, correct.

24              At what time?

11:08:52 25    Q.    We're talking back when you first met him, back in

1    the late 1990s?

2    A.    Back in 1999, yeah, that's correct.

3    Q.    Okay.  Just so we've got this clear, FACTS itself

4    is not an SAP product?

11:09:06 5    A.    Correct.

6    Q.    You've testified a couple times about In-Flight,

7    right?  And I just want to make sure we get on the same

8    page here so the jury understands.

9              When you had your old FACTS system,

11:09:21 10   Mr. Van Leeuwen and IBIS were creating some custom

11   functionality to go on top of FACTS as an add-on, and

12   they called that In-Flight?

13   A.    They did.

14   Q.    Okay.  Later on, years later when you eventually

11:09:35 15   look at Business One, the idea is to rebuild the product

16   that had been called In-Flight and keep the same name,

17   but it was going to be rebuild it to work with Business

18   One, correct?

19   A.    Correct.

11:09:50 20   Q.    So although the name was the same back on the FACTS

21   system, the product was going to be materially different,

22   it was going to be different software code, you

23   understood that?

24   A.    Same functionality or similar functionality but

11:10:01 25   different -- it was going to be built on the SAP

1    platform, right.

2    Q.    Just so the jury understands, the In-Flight program

3    was going to complete the same kinds of functions but it

4    was going to be completely different software because it

5    needed to be rewritten to work on Business One?

6    A.    Right, using the Business One code.

7    Q.    I'd like to show you Exhibit 195, please.  Sir,

8    this is a letter -- and I'll just tell you right now that

9    is from -- it shows that it's from your father dated

10   January 24th, 2001.

11             Before I ask you any questions, I just want

12   to have an understanding.  Is this a letter you would

13   have seen back at that time?

14   A.    I believe so.  I can't say with certainty.

15   Q.    All right.  Let's walk through it and if it's not

16   something that you recall seeing, then I'll ask your dad

17   about it later.

18             In his letter, he's writing to Dale

19   Van Leeuwen at the IBIS Group.

20   A.    Was this part of an e-mail that I was copied on or

21   something?

22   Q.    So far as I understand it was not.  It's a separate

23   letter.

24   A.    Okay.

25   Q.    That's how it was produced.

```
 1    A.    Okay.  Thank you.

 2    Q.    But again, if you find you don't remember this,

 3    just tell me and I'll ask your dad about it.

 4    A.    We may have talked about this in my deposition,

 5    right?

 6    Q.    I think we did.

 7    A.    Okay.

 8    Q.    Your father writes to Dale Van Leeuwen, "Before we

 9    decided to become a beta site."

10               Do you understand what a beta site is?

11    A.    Yes.

12    Q.    What is that, sir?

13    A.    It's being the first on a product.  In this case,

14    it's eWMS, which is the rebranding of Radio Beacon.

15    Q.    And a beta site customer is going to take on a lot

16    of risk, you'd agree?

17    A.    They're going to -- they're going to take on the

18    responsibility of being first on a product.

19    Q.    Yeah.  And being first on a product like this is

20    always risky, correct?

21    A.    I don't know if you would say risky, but

22    it's -- it's going to take some time.

23    Q.    Okay.

24    A.    And got to work through the kinks.

25    Q.    Your father in this letter to Dale Van Leeuwen is
```

                1    complaining about what's been going on with your

                2    implementation of software through Mr. Van Leeuwen and

                3    IBIS, right?

                4    A.    Do you mind if I read through the document?

  11:12:42     5    Q.    Go right ahead.  No, take your time.

                6    A.    Okay.  I've read the part that's on the screen.

                7    Q.    Okay.  Go to the next page and then you can read

                8    that one, too, before I ask you about it.

                9          In the middle paragraph, you agree your

  11:13:45    10    father is complaining to Van Leeuwen that very little

               11    preparatory work was done on the project that you had

               12    going with him?

               13    A.    Yes.  It says the implementation was taken with

               14    very little preparatory work.

  11:13:58    15    Q.    And he's referring here to Radio Beacon, right?

               16    It's the Radio Beacon add-on which at that time you were

               17    using with your FACTS software, correct?

               18    A.    Correct.

               19    Q.    Correct, sir?

  11:14:06    20    A.    Correct.

               21    Q.    Bottom paragraph on that first page, your father

               22    writes to Van Leeuwen, "We have invested close to

               23    $300,000, plus at least $60,000 in implementation costs

               24    to get where we were with CrossDock."

  11:14:22    25          CrossDock was one of the software programs

1    that Van Leeuwen and IBIS had sold you, right?

2    A.    I'm not sure if they did or not.  I think by the

3    time I came on to the company, it had already been

4    purchased and I can't tell you with certainty that it was

11:14:37  5    purchased with --

6    Q.    Your father goes on to write, "Unfortunately, we

7    are incurring at least a thousand dollars a day higher

8    costs to maintain the status quo while picking packaged

9    orders manually and writing out packing slips, in essence

11:14:55  10    doubling our workload."

11            You understood what your father was saying

12    to Mr. Van Leeuwen is that this prior software was

13    ruining your productivity, right?

14    A.    Yes.  There were higher costs.

11:15:11  15    Q.    And those higher costs, according to your dad, were

16    more labor costs because you were having to take more

17    time to do the same work?

18    A.    Right.  That's my understanding.

19    Q.    Let's go to the second page, please.  Take a moment

11:15:34  20    if you need to read that and refresh yourself with it.

21    A.    Okay.

22    Q.    The first paragraph your father writes, "If the

23    product could not provide the capabilities required, all

24    of the parties selling Radio Beacon as a FACTS-integrated

11:16:23  25    warehouse management system had an obligation to say so.

1    They did not!"

2                 Now, let's just break this down.  SAP

3    wasn't involved back then, right?

4    A.    Right.

11:16:34  5    Q.    This didn't involve any SAP software at all, did

6    it?

7    A.    This did not involve SAP.

8    Q.    What you understood that your father was saying

9    here was that the software that you were on at that time,

11:16:46 10    its capabilities, he believed, had been misrepresented to

11    you, right?

12    A.    Right.

13    Q.    And when he writes, "All of the parties selling

14    Radio Beacon as a FACTS-integrated warehouse management

11:17:00 15    system," those parties included Dale Van Leeuwen and

16    IBIS, right?

17    A.    Yes, he was one of the parties.

18    Q.    Thank you.

19                 Look at the fourth paragraph on the second

11:17:12 20    page of this letter from your father.  He writes, "I am

21    not going to belabor the point of the drop in customer

22    service and lost business in this letter.  That issue is

23    reserved in the event I need to seek legal advice."

24                 Sir, you understood your father to be

11:17:30 25    telling Mr. Van Leeuwen and IBIS back in 2001 that his

1    old software system was causing a drop in Hodell's

2    customer service and a loss of business to Hodell, right?

3    A.    Right.

4    Q.    Same kinds of things you're complaining about with

11:17:44  5    SAP and In-Flight and Radio Beacon now?

6    A.    Yes.

7    Q.    Look at the bottom of the last paragraph, last

8    sentence.  He writes, "We cannot possibly have a glimmer

9    of hope for a payback on our investment if there is not a

11:18:04 10    quick resolution to these implementation problems."

11                Do you see that?

12    A.    Yes.

13    Q.    And that also was the same kind of claim that

14    you're now making against SAP and Business One and

11:18:15 15    In-Flight and Radio Beacon, that you're not going to get

16    a payback on your investment, right?

17    A.    That's part of the claim, yes.

18    Q.    Let's move on.  Let's go to Exhibit 311, please.

19                MR. STAR:  Can you blow that up so we can

11:18:46 20    see it, please, Bob?

21    Q.    We're going to review this whole chain, sir, but

22    I'm just wondering if you can identify the document for

23    us, first.

24    A.    This is an e-mail from Dale Van Leeuwen to myself

11:19:00 25    on Friday, July 11th, 2003.

1    Q.    All right.

2                MR. STAR:  Bob, let's go to the bottom half

3    of that first page.

4    Q.    Sir, you write to Mr. Van Leeuwen on July 11th of

11:19:31 5    2003, and this is before you've ever had any discussion

6    about SAP or Business One, right?

7    A.    I believe so, yes.

8    Q.    And this e-mail has nothing at all to do with SAP

9    or Business One, right?

11:19:45 10    A.    Right.

11    Q.    And let's look what you write to Mr. Van Leeuwen.

12    You're talking about at that point in time the software

13    that he had been selling to you and had been working with

14    you -- with on -- with you on for several years at that

11:19:57 15    point, correct?

16    A.    Correct.

17    Q.    You write, "Dale, I'm writing this message to you

18    in an effort to clearly communicate my concerns with you

19    regarding eWMS," that was Radio Beacon?

11:20:11 20    A.    Right.

21    Q.    "And The IBIS Group in general."

22                You had concerns with The IBIS Group,

23    didn't you?

24    A.    Yes.  As I testified yesterday, we had concerns

11:20:23 25    that they had adequate resources, and in his e-mail he

```
          1    notes that, that he has resource allocation issues.
          2    Q.    And you go on to write, "I find it disheartening to
          3    be in this position with your organization."
          4                 That's the way you felt back then, right?
11:20:39  5    A.    Yes.
          6    Q.    Second paragraph, last sentence you write,
          7    "However, based on the level of attention we received
          8    from your organization, how are we to rely on you in the
          9    future when we need to keep a larger, more complex
11:20:55 10    software package running smoothly?"
         11                 Those were your feelings back in July of
         12    2003, right?
         13    A.    Right.
         14    Q.    You were questioning how you could even rely on
11:21:04 15    Mr. Van Leeuwen and IBIS back in 2003?
         16    A.    Yes, because of the level of attention from his
         17    organization, the resources required to handle our load.
         18    Q.    And this is before you're even discussing Business
         19    One?
11:21:20 20    A.    Correct.
         21    Q.    And you go on here, you write this:  "In May,"
         22    you're talking about May of 2003, right?
         23    A.    Yes.
         24    Q.     "In May of 2003 I went to bat for you before my
11:21:34 25    father.  He was ready to take legal action."
```

1          Your father was going to sue Van Leeuwen

2     and IBIS in 2003, wasn't he?

3     A.    I believe he threatened it.  I don't think he was

4     ready to.

11:21:47  5     Q.    You had to convince your dad that the project would

6     be completed by June 3rd.  What you're telling

7     Van Leeuwen is you went to bat for him so your dad

8     wouldn't actually sue him back in 2003, right?

9     A.    That's my understanding, yes.

11:22:03  10    Q.    And part of what you told your father was, with

11    Dale's help, that the project would actually be completed

12    by June 30th, but that didn't happen, did it?

13    A.    No, it doesn't look like it did.

14    Q.    Right.  Because you're saying to him, the project's

11:22:18  15    not complete.  That was six-plus weeks ago.

16    A.    Right.

17    Q.    And in the last paragraph on that first page, you

18    write, "We paid for a working system and it is not yet

19    fully functional."

11:22:34  20          Then you write, "Due diligence was never

21    conducted at the start of the project."

22          Those are your feelings about

23    Mr. Van Leeuwen and IBIS as of July, 2003, right?

24    A.    And Aperum, the parent company that was involved as

11:22:51  25    well.

```
 1    Q.    And Aperum was the Radio Beacon company, right?

 2    A.    No, it wasn't.  Radio Beacon had their product

 3    called Radio Beacon.  They were selling it through

 4    Aperum, and rebranding it called eWMS.

 5    Q.    Okay.  So as of July, 2003, you had concerns with

 6    Dale Van Leeuwen, right?  You felt he didn't do due

 7    diligence.

 8    A.    Right.

 9    Q.    Your father had been ready to sue him back then and

10    you went to bat for Van Leeuwen to convince your dad not

11    to do that, correct?

12    A.    Right.

13    Q.    You were also dissatisfied with Radio Beacon, eWMS,

14    right?

15    A.    Yes.  Specifically the integration.

16    Q.    And felt that they hadn't done the proper due

17    diligence on integrating Radio Beacon with your old FACTS

18    system, right?

19    A.    Right.

20    Q.    Same Radio Beacon product you later tried to lay on

21    top of Business One, plus In-Flight?

22    A.    Right.  I don't know if you'd call it lay on top,

23    but it was part of the three-prong solution that we've

24    been talking about, yes.

25    Q.    Now, these e-mails and letters, they were never
```

1    sent to SAP, were they?

2    A.    No.

3    Q.    You were dealing with IBIS and Van Leeuwen at the

4    time, right?

11:24:10  5    A.    Right.

6    Q.    You never even had spoken with SAP?

7    A.    I had never spoken with SAP?

8    Q.    Back at this time.

9    A.    Correct.

11:24:19 10    Q.    You didn't actually speak with anybody at SAP until

11    after you went live in March of 2007?

12    A.    Right.

13    Q.    Let's look at Exhibit 312, please.

14              You're copied on this.  Can you identify

11:24:48 15    the document for us, please?

16    A.    It's an e-mail from my father to Dale Van Leeuwen

17    copying me on Thursday, July 24th, 2003.

18    Q.    Let's look what your father writes to Van Leeuwen

19    and copied you on back in July of 2003.

11:25:11 20              He says, "Our labor cost is up 1.5 cents

21    for every sales dollar in Cleveland."

22              Do you see that?

23    A.    Yes.

24    Q.    You agree with me he's telling Van Leeuwen and IBIS

11:25:23 25    back in 2003 that you're less efficient because of IBIS's

1    and Van Leeuwen's software, right?

2    A.    Yes.

3    Q.    He's telling them basically for every dollar you

4    guys generate in sales, you're losing one and a half

11:25:47  5    percent?

6    A.    No, he's saying there's additional cost of one and

7    a half cents.  Doesn't necessarily mean --

8    Q.    So to your bottom line, it's a

9    one-and-a-half-percent reduction in the amount of money

11:26:04 10    you're actually bringing in, the net amount of money

11    you're bringing in?

12    A.    For our Cleveland operation which was one of all of

13    our warehouses.  It had only been installed in Cleveland.

14    Q.    And you understand your father to be saying, and to

11:26:16 15    be blaming this only on the software back in 2003, right?

16    That's what he's saying?

17    A.    Yes.

18    Q.    The software is causing you to be less efficient

19    back in 2003?

11:26:32 20    A.    Yes.  That's my understanding.

21    Q.    And it had nothing to do with Business One or SAP,

22    right?

23    A.    Right.

24    Q.    Go to the second paragraph.  Your father writes,

11:26:45 25    "I'm personally convinced that eWMS, Radio Beacon, was

1    promoted well beyond its capabilities and Hodell-Natco

2    has paid a very dear and costly price for believing in

3    this product and the support promised by Radio Beacon and

4    Aperum's precursor."

11:27:05  5              Do you see that?

6    A.    Yes.

7    Q.    You agreed with your dad, right?

8    A.    Right.

9    Q.    He goes on to write, "Who knows how far behind our

11:27:20 10   competition may have fallen because we are in irons, an

11   old sailor term, with a five-year-old version of FACTS.

12   I cannot begin to measure the cost of this lack of

13   progress and I'm worried that we do not have a realistic

14   fall-back-upon option."

11:27:37 15            You and your dad both felt as of July of

16   2003 that you were stuck in an old version of FACTS that

17   Van Leeuwen and IBIS had failed to update and could not

18   properly support, correct?

19   A.    Correct.

11:27:51 20   Q.    That's the reason you started looking for new

21   software, because you were dissatisfied with the old

22   software Van Leeuwen had given you over the course of

23   some years?

24   A.    That was only one of the reasons.

11:28:06 25            As I testified yesterday, we were looking

1    for a product that was more scaleable, customizable,

2    could grow with us.

3    Q.    Because you couldn't get any of that with the

4    solution Van Leeuwen had given you?

11:28:18  5    A.    With -- right, with the -- with the FACTS and

6    In-Flight, Radio Beacon solution, we needed to grow.

7    Q.    And at no time in your search for new software and

8    your conversations about the Business One product did you

9    ever inform SAP itself of anything that had been going on

11:28:54 10    back in 2003 between Hodell and IBIS and Van Leeuwen,

11    right?

12          You never told SAP you had been considering

13    suing Van Leeuwen and IBIS, did you?

14    A.    No.  We were working through IBIS and LSi.

11:29:09 15    Q.    Okay.  And you never told SAP anything about what

16    had been happening?

17    A.    I never had direct contact with SAP because it was

18    crystal clear that they marketed and sold their product

19    through their certified business partners.

11:29:24 20    Q.    And you, as I understand it, believe that that

21    certified business partner was Van Leeuwen and his

22    companies IBIS/LSi, right?

23    A.    LSi.

24    Q.    Um-hmm.  But you told us IBIS/LSi, they became one

11:29:38 25    and the same, that was your testimony yesterday?

1    A.    LSi purchased IBIS.

2    Q.    Um-hmm.

3    A.    I believe that was in May of 2004.

4    Q.    Yeah, at that point you considered them one and the

11:29:48  5    same?

6    A.    Correct.

7    Q.    And when you first started having conversations

8    with anybody about Business One outside of your father

9    and people within Hodell, the person you were talking to

11:29:59 10    was Dale Van Leeuwen?

11    A.    Right.

12    Q.    Dale Van Leeuwen you knew for years?

13    A.    Right.

14    Q.    And when you knew him for all those years, he had

11:30:12 15    no relationship with Business One or SAP at all?

16    A.    I don't believe so.  You can ask him that.

17    Q.    He never told you he did over all those years,

18    right?

19    A.    No, he -- he indicated that he had been forming a

11:30:27 20    relationship with them.

21    Q.    It was late in your relationship with him, wasn't

22    it?  It was late in 2003, right?

23    A.    It would have been in the second half of 2003,

24    right.

11:30:36 25    Q.    So when you first knew Mr. Van Leeuwen and knew him

1    for all those years, you knew him to be running his own

2    completely separate and independent company that had

3    nothing to do with SAP, right?

4    A.    Correct.

11:31:12  5    Q.    There's been mention in this case of conversations

6    between people at Hodell and folks at American Express.

7                    As I understood our discussions on that

8    topic before, you personally weren't involved in speaking

9    with anybody at American Express, right?

11:31:39 10    A.    That's correct.

11    Q.    That was mainly your father on behalf of Hodell?

12    A.    Right.

13    Q.    You really only became involved with Business One

14    discussions sometime in, I think you said yesterday, late

11:31:53 15    2003 or early 2004?

16    A.    Right.

17    Q.    And at that point in time you're dealing with

18    Van Leeuwen and IBIS, right?

19    A.    Yes.

11:32:03 20    Q.    And Van Leeuwen and IBIS, they're the ones you

21    actually have a relationship with; they're the guys that

22    you trust, yeah?

23    A.    Van Leeuwen and IBIS?

24    Q.    Yeah.

11:32:13 25    A.    Yeah.  He was the one that we were working with,

1    and as he represented the solution, it would be a

2    solution, that three-part solution that we were talking

3    about, bringing SAP into the mix.

4    Q.    Okay.  Let's talk about Dan Lowery.

11:32:35  5              He wasn't involved in your early

6    discussions about Business One back in late '03 or early

7    2004, right?

8    A.    No, I don't believe so.

9    Q.    You only met Mr. Lowery after LSi and IBIS merged,

11:32:52 10    correct?

11   A.    Correct.

12   Q.    That merger happened in May of 2004?

13   A.    April or May of 2004, yeah.

14   Q.    And the first time Mr. Lowery and you ever met

11:33:03 15    face-to-face in person was in September of 2004, correct?

16   A.    I'm not certain about that.

17              He came out with Dale, I thought it was

18   shortly after the acquisition, but I'm not certain.

19   Q.    Let's just try to refresh your recollection real

11:33:21 20    quick on that so we can -- we can nail this down.

21              Let's go to Exhibit 830, please.

22              Sir, you recall this is an e-mail from

23   Mr. Lowery to your father and yourself on September 12th,

24   2004?

11:33:49 25    A.    Yes.

1    Q.    And the subject line is "Thank You."  And what

2    Mr. Lowery writes to you there is "Thank you for your

3    time and opportunity to discuss your business.  I enjoyed

4    meeting you both and the tour of your operation."

11:34:05  5              Does that refresh your recollection as

6    September, 2004 being the first time you actually met

7    face-to-face with Dan Lowery?

8    A.    Yes.

9    Q.    Okay.  And so up until that point in time,

11:34:17 10   September of 2004, the only person outside of people

11   internal at Hodell that you'd had any face-to-face

12   discussions with concerning Business One, the only person

13   was Mr. Van Leeuwen, right?

14   A.    I believe so, yes.

11:34:32 15   Q.    But by September of 2004, you were pretty far along

16   with your plan to go forward with Van Leeuwen and IBIS

17   and develop a three-part custom solution, correct?

18   A.    Yes.  We had had some discussions, but nothing had

19   been formalized yet.

11:34:53 20   Q.    Right.  Because by December of 2004, we've

21   established this yesterday, you actually signed a

22   development agreement with IBIS/LSi?

23   A.    Yes.

24   Q.    And the development agreement is for the

11:35:05 25   development of In-Flight and integration of In-Flight and

1    Radio Beacon on top of Business One?

2    A.    It's for the purchase of 80 Business One user

3    licenses and the development of those additional

4    components, yes.

11:35:18 5    Q.    All right.  Let's take a look quickly at Exhibit 9,

6    please.

7                This is a letter you were shown yesterday.

8    It's dated October 14th, 2004 and it's signed by Dale

9    Van Leeuwen at the bottom as COO, The IBIS Group and Dan

11:35:45 10   Lowery, president, The IBIS Group.

11                Do you remember this letter?

12   A.    I believe so.

13   Q.    Okay.

14   A.    I may have to read it again but --

11:35:51 15   Q.    Sure.  You can take your time.

16                Let me just establish the background here.

17                You had just met Lowery for the first time

18   face-to-face in September.

19   A.    Okay.

11:36:00 20   Q.    Of '04, right?

21   A.    Right.

22   Q.    So this is just a month or so after you first met

23   Dan Lowery face-to-face?

24   A.    Yeah, we looked at this yesterday as well.

11:36:09 25   Q.    Okay.  It's defining the project that you're going

```
 1    to undertake with IBIS and LSi, correct?

 2    A.    Correct.

 3    Q.    And in the second paragraph, they're talking about

 4    this project taking over 5,000 man hours of work.

 5                    Do you see that?

 6    A.    Correct.

 7    Q.    And yesterday you told us that you thought that

 8    this development project of In-Flight and integrating it

 9    on top of Business One with Radio Beacon would take 18

10    months.

11                    That was your understanding through this

12    letter, correct?

13    A.    Correct.

14    Q.    And you understood this was going to be a big

15    project, an 18-month project is a big project, right?

16    A.    Correct.

17    Q.    And in the last paragraph there, it talks about

18    what you just said, it was going to be an 80-user

19    Business One system at a price of $3,750 per user, right?

20    A.    Right.

21    Q.    It didn't talk about three hundred users on a

22    Business One system, did it?

23    A.    This letter did not.  Our conversations did.

24    Q.    This letter doesn't say, "Hey, Kevin or Otto, we

25    understand you're on a growth path and that you want to
```

1    go from 80 to 300 pretty quickly."

2             It doesn't say anything like that?

3    A.    No.  Our conversations covered that.

4    Q.    Okay.  You keep coming back to conversations

11:37:34  5    because you'll admit you don't have a single piece of

6    paper, whether it's a note, an e-mail, a memo, anything

7    where you ever memorialized that anybody ever told you

8    you could have a 300-user system on Business One, right?

9             MR. CARNEY:  Objection, Your Honor.  That's

11:37:56  10   out of character.

11            THE COURT:  Overruled.

12   A.    We had documents from SAP, copyrighted by SAP, that

13   indicated that it was scaleable to 3 to 500 users.

14   Q.    You're referring to the marketing literature.

11:38:10  15   We're going to go there.  You don't have a single note, a

16   memo, anything that you exchanged with anybody that told

17   you or memorialized for you that Hodell had been promised

18   it could have a 300-user system; you don't have any such

19   thing do you?

11:38:26  20   A.    I don't.  I believe my father has notes.

21   Q.    We'll go through your father's notes when he

22   testifies, we'll see what they say.

23            You can't point us to a single document

24   that contains such a promise, can you?

11:38:38  25   A.    I don't have that document.

```
          1    Q.    Thank you.
          2              Yet, let's be clear for the jury.  What
          3    you're saying in this case is that this promise, this
          4    so-called promise about 300 users was vitally important
11:38:55  5    to you, right?  You wouldn't have moved forward, you
          6    think, without that promise?
          7    A.    It was important to us, yes.
          8    Q.    Yet you never wrote it down, did you?
          9    A.    We had communicated it many times.  We had
11:39:06 10    discussed it many times in face-to-face meetings.
         11    Q.    You never wrote it down?
         12    A.    I believe it's in notes, but I never wrote it down,
         13    no.  I made sure that we communicated it to Dale
         14    Van Leeuwen and Dan Lowery.
11:39:18 15    Q.    Let's go to Exhibit 11, please.
         16              MR. STAR:  Bob, blow that up so we can see
         17    all the text, please.
         18    Q.    So you recall receiving this as part of your
         19    communications with IBIS and LSi back in around October
11:39:49 20    of 2004?
         21    A.    Yes.  We identified this yesterday with the
         22    Business One logo.
         23    Q.    And it talks about you're going to purchase
         24    Business One licenses, you see that at the top?
11:40:03 25    A.    Yes.
```

1    Q.    And then in the middle there it breaks down the

2    costs, do you see that?

3    A.    Yes.

4    Q.    80 users of Business One at 3750 a user for

11:40:14  5    $300,000, right?

6    A.    Right.

7    Q.    And then it says "The purchase of In-Flight

8    Enterprise," and it says that's going to be a 3800-hour

9    development project, do you see that?

11:40:23  10    A.    Yes.

11    Q.    But you're getting that at no charge, right?

12    A.    Right.

13    Q.    And you'd agree with me if you do the math and you

14    take IBIS/LSi's normal hourly rate that we see there of

11:40:34  15    150 bucks an hour and you multiply that by 3800 hours,

16    it's over 570,000 of free software development you're

17    going to get, right?

18    A.    Right.

19    Q.    And the reason you were going to get that free

11:40:47  20    software development is because that was the restitution

21    you were getting from IBIS due to the prior software

22    failures that you had on the old FACTS system, right?

23    A.    In part.

24        It was also because we were going to be the

11:41:01  25    first working with them on this system.

1    Q.    So you're going to be the beta site for this brand

2    new, untested, unknown system, right?

3    A.    We were going to be the first user in our industry

4    on it.

11:41:12  5    Q.    The first user in any industry?

6    A.    Yes.  And specifically we were talking about the

7    fastener industry.

8    Q.    Yeah, but so the jury understands, the software

9    hadn't been used by any company, whether they are in

11:41:22  10    fasteners or whatever else, right?

11    A.    My understanding is that Business One had.  Radio

12    Beacon had.

13    Q.    Business One, but Radio -- let's just be clear.

14    The combination that you were going to run, Business

11:41:32  15    One --

16    A.    Yes.

17    Q.    -- plus Radio Beacon and In-Flight wasn't used

18    anywhere by any company in any industry?

19    A.    Correct.

11:41:37  20    Q.    And you had concerns because you were going to be

21    the first company ever using this, right?

22    A.    Right.

23    Q.    It was risky?

24    A.    Well, as I mentioned before, you can say risky, but

11:41:54  25    I would say it requires more effort and more testing and

1       more problem-solving and work to get it there.

2       Q.    Let's go to Exhibit 8.  Recognize these as your

3       dad's handwritten notes?

4       A.    Yes.

11:42:18  5    Q.    Okay.  He indicates that this was a conference --

6                     MR. CARNEY:  Objection, Your Honor.

7                     THE COURT:  Overruled.

8       Q.    He indicates here it was a conference call on

9       October 14th of 2004 and he lists you as having been one

11:42:32 10   of the participants on that call.

11                    Do you remember being part of that?

12      A.    Yes.

13      Q.    And what your father writes here is Hodell

14      concerns, do you see that?

11:42:44 15   A.    Yes.

16      Q.    This is a couple months before you actually sign

17      your development agreement with IBIS/LSi, right?

18      A.    Right.

19      Q.    Look at this first concern.  IBIS/LSi already

11:42:58 20   missed the first estimate for the start of the

21      implementation, correct?

22      A.    Correct.  That's my understanding.

23      Q.    You didn't pick up the phone or send an e-mail to

24      anybody at SAP and say, "Hey, SAP, we're concerned.

11:43:10 25   IBIS/LSi has missed the start of your -- of the

```
       1    implementation."
       2                You never said that, right?
       3    A.    No.  We were working through their business
       4    partner.
11:43:19  5    Q.    The next thing he writes as a concern is it's a
       6    custom development of major components.
       7                Do you see that?
       8    A.    Yes.
       9    Q.    You understood, you understood the project to be
11:43:28 10    exactly that, a major custom development project; it was
      11    going to take 18 months to complete?
      12    A.    Right.
      13    Q.    Let's keep going.  Yesterday Mr. Carney was
      14    questioning you and he asked you, "Kevin, you think that
11:43:52 15    you were in business together with IBIS/LSi," and you
      16    said you didn't think you were.
      17                And you said something to the effect that,
      18    hey, you guys are in the chain and fastener business;
      19    you're not software developers.
11:44:04 20                Right?  That's your view?
      21    A.    Right.
      22    Q.    But you actually, you and your father both
      23    recognized that you were actually going to play the role
      24    of a developer working with IBIS/LSi, correct?
11:44:15 25    A.    We were going to be the first to use it.
```

1          We don't do software development.  They do

2    that.

3    Q.    Let's look at Exhibit 740.

4    A.    They and SAP do that.

11:44:44  5    Q.    Sir, you recognize Exhibit 740 as an e-mail from

6    your father, copying you, back on November 11th of 2004,

7    a month before your development agreement is signed with

8    IBIS/LSi?

9    A.    Yes.

11:44:58 10   Q.    And the subject is "Revisions to the draft

11   In-Flight development agreement," right?

12   A.    Right.

13   Q.    I notice no one from SAP is copied on this,

14   correct?

11:45:07 15   A.    Right.  Again, we were working through their

16   business partner.

17   Q.    Thank you.

18          MR. STAR:  Bob, focus in on the language

19   there, if you don't mind.

11:45:21 20   Q.    Here's what your father writes and copies you.

21   "The attached document is a revision to the draft you

22   sent us."

23          Look at this sentence for me.  "Although we

24   are unhappy about playing a developer (pioneer-the guys

11:45:37 25   with the arrows in their back) role, the attached

1    agreement reflects what we are willing to proceed with."

2           Mr. Reidl, you agree with your father,

3    Hodell was going to play a developer role in this custom

4    project with IBIS/LSi, right?

11:45:53 5    A.    Right.  Indeed, he defines that by saying pioneer.

6    The guys that are going to be the first to use the

7    product; not -- but I want to be clear, we weren't

8    developing any software in-house.

9           LSi was doing that.

11:46:06 10    Q.    I understand you weren't writing software code.  No

11    one debates that.

12    A.    Okay.

13    Q.    But you do agree you were part of this joint

14    development project, you were providing the funding and

11:46:16 15    you were taking the risk as the pioneer, the guys with

16    the arrows in your back, right?

17    A.    Because we were going to be the first with this

18    software, yes.

19    Q.    And what you were doing in this joint venture is

11:46:28 20    you were providing the funding for IBIS/LSi to then go

21    out and build its custom application, correct?

22    A.    We were providing some of the funding is my

23    understanding.  I don't know about all of the funding

24    but, yes, we were going to be paying them for the initial

11:46:51 25    purchase of Business One licenses and helping them with

1    the upfront funding.

2    Q.    And in addition, Hodell also considered itself in

3    its own words to be a development partner with IBIS/LSi

4    on this custom software development project, correct?

11:47:13  5    A.    Is there a piece of paper we should look at or

6    exhibit?

7    Q.    Yes, sir.  Exhibit 755, please.

8         MR. STAR:  Bob, just come out of that for a

9    moment.  I want to see the Bates label at the bottom.

11:47:40 10    Q.    Sir, you see at the bottom it has the

11    numbers -- letters H-O-D-L followed by some numbers, 107?

12    A.    Right.

13    Q.    You recognize that means this is a document that

14    was produced in this case out of Hodell's business

11:47:53 15    records, right?

16    A.    Right.

17    Q.    So this is a Hodell document?

18    A.    Right.

19    Q.    And in this document, someone on behalf of Hodell

11:48:02 20    acknowledges, "If they want us to be a development

21    partner, we should see rewards from the success of the

22    product; i.e., commissions on future sales."

23         Do you see that?

24    A.    Right.

11:48:16 25    Q.    You don't dispute what this document says, Hodell

1    was going to be a development partner with IBIS/LSi,

2    right?

3    A.    We were -- we were going to work with them in

4    collaboration.  This says development partner.  Yes.  And

11:48:31  5    we would earn a commission on future sales.

6                And I think, like I mentioned, that was the

7    first 100 users on the system.

8    Q.    Thank you, sir.

9                MR. STAR:  Your Honor, I'm not sure what

11:48:41 10    you want to do.

11                I see we're coming up toward noon.  I have

12    awhile to go.  I can start on another topic or --

13                THE COURT:  Yes, we'll go until 12:00,

14    12:15 if that's all right.

11:48:52 15                MR. STAR:  That sounds fine.

16                THE COURT:  We will wait until it's

17    completely sunny outside so you can go out.

18    BY MR. STAR:

19    Q.    All right.  So we all know you eventually sign a

11:49:05 20    contract with IBIS/LSi and this is a development

21    agreement, you sign it in December of 2004?

22    A.    Right.

23    Q.    All right.  Let's get you a copy of that.  I think

24    it probably would be easier to give you also a hard copy

11:49:15 25    if you'd like to have it.  It's Exhibit 291.  Spend some

1    time with it.

2    A.    I've seen it before.

3              MR. STAR:  Can you give him a copy?

4    Q.    Sir, the parties to this agreement are Hodell-Natco

11:50:07  5    Industries, The IBIS Group that you have listed here as a

6    wholly-owned company of LSi-Lowery Systems, and

7    LSi-Lowery Systems, Inc., itself, right?

8    A.    Right.

9    Q.    And if we flip to the signature block on the bottom

11:50:23 10    of the second page, you agree it's signed by the actual

11    parties, Hodell on the one hand, your father signs,

12    right?

13    A.    Right.

14    Q.    And Dan Lowery signs on behalf of both LSi and

11:50:38 15    IBIS, correct?

16    A.    Correct.

17    Q.    All right.  Let's walk through some of the details

18    of this.

19              First off, the project description on the

11:50:46 20    first page --

21              MR. STAR:  If you can blow that up, Bob.

22    Q.    The project's described as the development of the

23    IBIS Group's In-Flight Enterprise application and its

24    integration into SAP Business One software for

11:51:10 25    Hodell-Natco Industries, Inc., right?

```
     1   A.    Right.

     2   Q.    That's what you understood this project to be?

     3   A.    Right.

     4   Q.    And under general terms, it breaks out how

11:51:18  5   the -- it breaks out the finances of this, of this

     6   engagement, right?

     7   A.    Right.

     8   Q.    It says Hodell's going to advance LSi $180,000 of

     9   the 300,000 purchase price in three stages -- pardon

11:51:34 10   me -- in three $60,000 stages as downpayment for, A, the

    11   purchase of 80 user licenses of Business One.

    12                Do you see that?

    13   A.    Yes.

    14   Q.    B, the purchase of unlimited user licenses of IBIS

11:51:50 15   In-Flight Enterprise software for Hodell-Natco use.  Do

    16   you see that?

    17   A.    Yes.

    18   Q.    And, C, the purchase of the programs to integrate

    19   the In-Flight Enterprise application to SAP's Business

11:52:03 20   One software.  Right?

    21   A.    Right.

    22   Q.    So your total price was going to be $300,000, yes?

    23   A.    Right.

    24   Q.    And $300,000 was not all going toward Business One

11:52:17 25   software, was it?
```

1 A. No. It was going towards three different

2 components.

3 Q. And in the italicized paragraph under general

4 terms, if you can blow that up, Bob, it talks about how

11:52:37 5 you're going to fund this, right?  You're going to make a

6 first $60,000 installment payment at the signing of the

7 contract, yes?

8 A. Yes.

9 Q. Another $60,000 at 150 days after signing?

11:52:51 10 A. Yes.

11 Q. And the final 60,000 of the downpayment at 300 days

12 after signing, right?

13 A. Right.

14 Q. So let's just break this down and see if we

11:53:02 15 understand.

16    The total price was going to be 300,000?

17 A. Yes.

18 Q. You were going to pay that in five installments of

19 60,000?

11:53:15 20 A. Yes.

21 Q. The first three installments were to be spread out

22 over the first 300 days after you signed the development

23 agreement, right?

24 A. Yes.

11:53:29 25 Q. 60,000 at signing, 60,000 150 days later, and the

1    next 60,000 for a total of 180,000, 300 days after you

2    sign the contract, right?

3    A.    Right.

4    Q.    And the remainder would be 120,000, correct?

11:53:46  5    A.    Correct.

6    Q.    And you weren't going to pay that remaining balance

7    until software was actually purchased from SAP, right?

8    A.    Yes.  It says when ordered -- when IBIS orders the

9    software from SAP.

11:54:01 10    Q.    And you understood IBIS was not going to order

11    software from SAP until at least 300 days after you

12    signed the development agreement, right?

13    A.    Can you say that again?

14    Q.    Sure.

11:54:16 15    A.    Can I have a minute?

16    Q.    Please.

17    A.    I want to read through the rest of that paragraph.

18    Q.    Take your time.

19    A.    Thank you.

11:54:22 20              (Pause).  Okay.

21    Q.    So now that you've refreshed yourself with the

22    document, just to go back, you're going to make a total

23    of $180,000 worth of payments in three installments and

24    that was going to be paid by 300 days after you signed

11:55:05 25    the contract, right?

1    A.    Right.

2    Q.    You then have a remaining balance of 120,000 that

3    you were going to pay over two additional $60,000

4    installment payments, right?

11:55:14  5    A.    Right.

6    Q.    And you understood that that balance of $120,000

7    was not going to be paid until after IBIS/LSi actually

8    ordered software from SAP, correct?

9    A.    Right.

11:55:31  10    Q.    And that order of software from SAP, you

11    understood, was not going to happen until at least 300

12    days after you signed this development agreement, right?

13    A.    That's what I understood.

14    Q.    And, in fact, in Paragraph 3, it broke that out a

11:55:52  15    little bit, right?  It's talking in Paragraph 2 about

16    what IBIS is going to do with the $180,000 downpayment,

17    that's the first three installments over the first 300

18    days, right?

19    A.    Right.

11:56:05  20    Q.    And then it talks about what's going to happen with

21    the remaining balance of 120,000, correct?

22    A.    Correct.

23    Q.    And it says Hodell will pay 60,000 of the purchase

24    price balance of 120,000 when IBIS orders the software

11:56:21  25    from SAP, right?

1    A.    Yeah, I believe I just confirmed that.

2    Q.    Yep.  And you even go further, this should occur on

3    a date mutually agreed upon and listed in the In-Flight

4    Enterprise development project plan, do you see that?

11:56:34  5    A.    Yes.

6    Q.    And then it breaks out what the money is going to

7    go to.

8              This $60,000 payment will be for 40

9    licenses of Business One, right?

11:56:45 10    A.    Right.

11    Q.    The remaining $60,000 purchase price balance for

12    the 41st through 80th license will be due on successful

13    implementation, do you see that?

14    A.    Yes.

11:57:01 15    Q.    Okay.  Now, when Mr. Lambert gave his opening and

16    then throughout your testimony when Mr. Carney questioned

17    you, I understood Hodell's position to be that you

18    believe that at the time you signed this development

19    agreement in December, 2004, you had actually purchased

11:57:41 20    from SAP 80 Business One user licenses.

21              Is that actually your position, sir?

22    A.    My position is that when we signed this agreement,

23    we obligated ourselves and we were purchasing 80 Business

24    One user licenses from their channel partner through LSi,

11:58:00 25    from LSi.

1    Q.    Let's break it down.  I just -- this is something

2    we've been at for years on this issue.

3    A.    Right.

4    Q.    You would agree with me right now that Hodell did

11:58:09 5    not actually purchase software from SAP until at least

6    300 days after you signed the development agreement,

7    right?

8    A.    We purchased the software from LSi.  That's where

9    we purchased the software.  We did not purchase the

11:58:26 10   software from SAP.  We purchased it from their channel

11   partner.

12   Q.    Is it your position and you're telling this jury

13   that when you signed this development agreement in

14   December of 2004, you actually purchased software from

11:58:39 15   SAP?

16   A.    We purchased and obligated ourselves to purchase 80

17   user licenses from their channel partner.  It was sold

18   and marketed through their channel partner.

19   Q.    Sir --

11:58:51 20   A.    LSi was their channel partner.

21   Q.    We've gone through this before when you and I

22   talked.

23         You agree you eventually sign a license

24   agreement with SAP directly, right?

11:59:02 25   A.    No.  LSi presented that license agreement to us.

1    Q.    You signed a contract with SAP.  The other party to

2    that license agreement is SAP, correct?

3    A.    Correct.

4    Q.    And you signed that, you personally signed it, on

5    December 23rd of 2005, a year after this development

6    agreement?

7    A.    Yes.  Right after we had purchased 40 additional

8    licenses.

9    Q.    You keep coming back to that.  We'll break that

10   down for the jury, too.

11              Let's be clear, though.  You've told me

12   this before.  The first time Hodell ever received

13   Business One software from SAP, it didn't happen until

14   after December, 2005, after you signed the license

15   agreement, correct?

16   A.    Correct.  LSi installed it on our servers much

17   later.

18              THE COURT:  You look like you want a break.

19              MR. STAR:  We can take a break now.

20              THE COURT:  All right, folks, lunch time.

21   How does that sound?

22              It's close to 12:00 o'clock.  1:15, where

23   do we meet, Mr. Panigutti?

24              A JUROR:  L-1.

25              THE COURT:  All right.  You guys have been

1   good.   Sometimes we have jurors wandering around up here.

2               Keep in mind the admonition.  We'll see you

3   at 1:15.

4               (Jury out)

5               (Luncheon recess taken).

6                    - - - - -

1      <u>TUESDAY, JUNE 16, 2015,  1:22 P.M.</u>

2            THE COURT:  Be seated, folks.

3      CROSS-EXAMINATION OF KEVIN REIDL (RESUMED)

4      BY MR. STAR:

13:23:34  5   Q.    All right.  Mr. Reidl, let's go through a few more

6      subjects and get you down from there.

7            Let's stay with your development agreement.

8      You have a copy there, that's Exhibit 291.

9            MR. STAR:  Bob, can you bring that back up?

13:23:45 10   Q.    Sir, you'll agree with me there's nowhere in this

11     contract between Hodell and IBIS/LSi that mentions Hodell

12     is going to grow to needing 300 users of Business One,

13     right?

14     A.    Right.

13:24:00 15   Q.    Doesn't say anything about Hodell being on any

16     particular growth path, correct?

17     A.    Correct.

18     Q.    And it doesn't provide you a price for 300 users,

19     correct?

13:24:10 20   A.    Correct.

21     Q.    We talked before a couple years back, we talked

22     about the total number of employees in Hodell's

23     workforce.

24            You agree with me that it's always been the

13:24:26 25   case that Hodell has had less users on its computer

1    system than it has total employees, right?

2    A.    To -- to some levels.

3    Q.    Back in 2004, for example, when you were running on

4    the FACTS software system, you had about 160 employees,

13:24:50  5    right, at the end of 2004?

6    A.    That sounds about right.

7    Q.    And you had about 100 users on your FACTS system?

8    A.    That's about right.

9    Q.    So roughly two-thirds of your employees were

13:25:00  10    actually users of your computer system?

11    A.    Yes.  And I'm not sure how many Radio Beacon users,

12    so that would have been additional users.

13    Q.    But it's always been the case that not all of your

14    employees are actual users of the computer system?

13:25:17  15    A.    Correct.  Typically it would be about 80 or 90%.

16    Q.    You could put the development agreement down.  I'm

17    done with that one.

18              As I understand your position, and you can

19    confirm for me or tell me if I'm wrong, your position is

13:25:44  20    that at no time before December, 2005 when you signed the

21    license agreement with SAP, were you aware that SAP was

22    marketing Business One to companies looking for up to 100

23    users, correct?

24    A.    Can you restate that again?  There was a lot in the

13:26:05  25    sentence.

1    Q.    Sure.

2    A.    Go ahead.

3    Q.    Sure.  Your position in this case is that at no

4    time prior to December of 2005 when you signed the

13:26:13 5    license agreement with SAP was Hodell aware that SAP was

6    marketing Business One toward target companies wanting up

7    to a hundred users?

8    A.    Right.

9    Q.    Okay.

13:26:26 10    A.    The literature that we had seen was three and 500.

11    Q.    And what you told Mr. Carney when he questioned you

12    is that at no time prior to signing the license agreement

13    had you yourself gone out on to the Internet or

14    investigated or done your own due diligence with respect

13:26:41 15    to the Business One product, right?

16    A.    Right.  I'm pretty sure I wouldn't have done that.

17    Q.    All right.  And you didn't go out and meet with

18    another company who was already using Business One,

19    correct?

13:26:54 20    A.    Right.

21             MR. STAR:  Bob, let's put up Exhibit 789,

22    please.

23    Q.    Sir, this is a lengthy document, we can hand and

24    you hard copy if you'd like.  It's 41 pages long.  Let's

13:27:21 25    just focus on the first page.

1          You see about midway down, there's a series

2     of letters and numbers that say HODL 39955, do you see

3     that?

4     A.    Yes.

13:27:36  5     Q.    You'd agree with me that means this was a document

6     that was in Hodell's files and was produced by Hodell

7     during the course of this litigation, correct?

8     A.    Correct.

9     Q.    All right.

13:27:57 10          MR. STAR:   Bob, let's go to Page 4, please.

11     Q.    And by the way, I'm sorry, stay right there, the

12     document is titled "SAP Business One Overview" and it

13     shows it's by somebody named Volker Anders, SAP Business

14     One Solution Management, SAP AG.

13:28:16 15          And go to Page 4 if you're there.

16          MR. STAR:   Bob, blow up the page, if you

17     can.

18     Q.    See down in the bottom left-hand corner it says SAP

19     AG 2005?

13:28:35 20     A.    Yes.

21     Q.    Next to that it says "SAP Skills, November, 2005

22     Conference"?

23     A.    Right.

24     Q.    And if you go over to the right you see those same

13:28:45 25     letters and numbers, HODL, this time 39958?

1    A.    Right.

2    Q.    That means you had this and produced this document

3    in this case?

4    A.    Yes.

13:28:55  5    Q.    And if you go above that, here's what it says.

6                    "SAP Business One is an affordable,

7    integrated business management solution that helps you

8    increase profitability and gain better control of your

9    business."

13:29:09 10                    Below that, "SAP Business One Facts:  For

11    companies with 10 to 100 employees."

12                    This document was in your possession,

13    wasn't it, sir?

14    A.    No.

13:29:20 15    Q.    You produced it in this case, didn't you?

16    A.    It was found as we were preparing for the

17    litigation.  We didn't have this in our possession in

18    2005 like you're trying to portray.

19    Q.    I'm not trying to portray anything, sir.

13:29:32 20    A.    Okay.

21    Q.    You produced this document from your files in this

22    case, correct?

23    A.    Correct.

24    Q.    Okay.  When you looked for this information, you

13:29:40 25    found it, right?

1    A.    Yes.  I believe we found it in 2008 or '9.

2    Q.    When you also took the time to look, you found the

3    document that's Exhibit 5.

4                  MR. STAR:  Bob, can you pull that up,

13:29:53  5    please?

6    Q.    Exhibit 5 is an article off the Internet, isn't it?

7    A.    Yes.

8    Q.    And Hodell found that when it ran its own Internet

9    search, correct?

13:30:11 10    A.    Yes, it was found in late 2007.

11    Q.    Right.  When you bothered to go on the Internet and

12    take a look.

13    A.    Actually it was -- I think it was -- couldn't have

14    been found earlier than late 2007, and we found it in, it

13:30:23 15    would have been 2008 as we were preparing for this

16    lawsuit.

17    Q.    That is when you found it, but the article, let's

18    zoom in, Bob, zoom in on the top.  Can you blow that up?

19                  The article's from November 1st, 2005,

13:30:46 20    right?

21    A.    Right.

22    Q.    This is something you found on the Internet and it

23    says the following:  "With regard to SAP Business One

24    2005," which by the way, that's the version of Business

13:30:59 25    One that Hodell was running, correct?

```
 1    A.    Correct.  But we were not running it in 2005.

 2    Q.    I understand.  You didn't go live with any of the

 3    software that's at issue here until 2007?

 4    A.    Right.

 5    Q.    But this article in November, 2005 is referring to

 6    the version of Business One you ultimately used, correct?

 7    A.    Correct.

 8    Q.    And here's what it says:  "SAP has just released

 9    new functionality for their starter ERP package aimed at

10    companies who are looking for 10-100 users."

11              That's the kind of information you found

12    when you looked on the Internet, correct?

13    A.    Yes, at a later time.

14    Q.    Okay.  Bob, you can take that one down.  Thanks.

15              As we established earlier on, you never

16    spoke with anybody actually employed by SAP until after

17    you went live in 2000 -- March of 2007, correct?

18    A.    Again, we didn't speak with anyone because we were

19    working through their channel partner.  I --

20    Q.    Just trying to confirm the facts.

21              You didn't speak with anybody from SAP?

22    A.    That's correct.

23    Q.    Okay.  Thank you.

24              But you were working with people from

25    IBIS/LSi, they were at your site all the time, right?
```

```
 1    A.    Right.
 2    Q.    People like Marcia Weissman, you got to know her?
 3    A.    Right.
 4    Q.    People like Jon Woodrum, you got to know him?
 5    A.    Right.
 6    Q.    Right.  There's a bunch of other people you were in
 7    communication with and meeting face-to-face with from
 8    IBIS/LSi, right?
 9    A.    Right.
10    Q.    And this was going on for a period of a couple
11    years, you were working on this project since you signed
12    that development agreement in December of 2004, right?
13    A.    They would have been on site to prepare for
14    implementation, not during the -- when they were
15    developing the software.
16    Q.    But people were on site from IBIS/LSi for months on
17    and off, were they not?
18    A.    When we were preparing to go live.
19    Q.    Yes.  And at no time did you personally observe
20    anybody from SAP actually controlling anything the people
21    from IBIS/LSi were doing, correct?
22    A.    Can you say that again?
23    Q.    Sure.  At no time did you personally observe or
24    witness anybody from SAP actually controlling or
25    directing or supervising the work that the people from
```

13:32:30 (line 5)
13:32:37 (line 10)
13:32:52 (line 15)
13:33:06 (line 20)
13:33:23 (line 25)

1    IBIS/LSi were doing when they were on site at Hodell,

2    right?

3    A.    Correct.

4    Q.    Last topic.  We will go over the license agreement.

13:33:43  5         MR. STAR:  Bob, can you bring that one up?

6    It's 316, please.  Why don't we give him a copy of it as

7    well, hard copy.

8    BY MR. STAR:

9    Q.    Sir, you're the one who signed this license

13:34:42 10    agreement on behalf of Hodell, correct?

11    A.    Yes.

12    Q.    And when we talked about this a couple years back,

13    you told me you read this entire thing along with your

14    father very carefully, right?

13:34:53 15    A.    Right.

16    Q.    And that, in fact, happened?

17    A.    Right.

18    Q.    You took this very seriously?

19    A.    We reviewed it and signed it, yes.

13:35:02 20    Q.    And you understood everything that was written in

21    this document, right?

22    A.    Yes.  It was pretty boilerplate.

23    Q.    Nothing was confusing to you?

24    A.    No.  I indicated that there was something that was

13:35:17 25    confusing to me, that I don't know what section it was

1    in.  I testified to it yesterday, that in the agency, the

2    agency clause, it said about -- it talked about the

3    resellers, not their agent, yet LSi presented this

4    document to me; not SAP.

13:35:42  5              So I thought that was strange.

6    Q.   So you found that confusing, but you never picked

7    up the phone or sent an e-mail or got in touch with

8    anybody at SAP about that, right?

9    A.   No.  They were presenting it through LSi.

13:35:55  10   Q.   But you never spoke with anybody at SAP and told

11   SAP that you were confused in any way, shape, or form

12   about what was in this contract, did you?

13   A.   No.

14   Q.   Let's walk through it.

13:36:10  15              Hodell's called the licensee, right?

16   A.   Are we at the top here?

17   Q.   Yes.

18   A.   Yes.

19   Q.   Look at Paragraph 1.6, if we can blow that up, Bob.

13:36:40  20   Maybe just blow up the whole -- maybe just blow up the

21   whole section there, Bob.

22              It's a little difficult to see on the

23   screen.  The document's been copied so many times but you

24   have a hard copy there.

13:37:02  25              You see in Paragraph 1.6 it defines the

1    term, "Named users," right?

2    A.    Yes.

3    Q.    It says, "It means, named users means any

4    combination of users listed by permitted functionality

13:37:15  5    and any other SAP required information and licensed by

6    SAP to licensee."  That's Hodell.  "Under this agreement

7    pursuant to the order for the software placed by licensee

8    Hodell or on its behalf by an SAP reseller," which would

9    have been IBIS/LSi.

13:37:35 10            Do you see that?

11    A.    Yes.

12    Q.    So named users, you would agree, was defined

13    pursuant to an order for software that would be placed

14    with SAP, right?

13:37:43 15    A.    Right.

16    Q.    Put that one down for a second.  We're going to

17    come back to it?

18            MR. STAR:  Bob, can you pull up Exhibit

19    138, please?  Blow up the top of that, if you could, Bob.

13:38:11 20    Q.    Sir, you would agree with me this is an order form

21    for 80 user licenses that was placed with SAP on December

22    22nd, 2005, the day before the license agreement,

23    correct?

24    A.    I don't know what this is.  I haven't seen this.

13:38:25 25    Q.    You're claiming you're not aware of this document?

1    A.    I think it was produced, wasn't it produced by SAP?

2    Q.    It was.

3    A.    Okay.

4    Q.    But you've seen this document before, haven't you?

13:38:36  5    A.    It may have been in the -- I mean, I don't recall

6    specifically going through it, but if it was produced

7    then it was produced.

8    Q.    But you're not disputing that on December 22nd,

9    2005, an order form for 80 Business One user licenses was

13:38:52 10    sent to SAP, are you?

11    A.    That's what it appears to be.

12    Q.    Thank you.  Let's go back to the license agreement.

13          Yesterday you were asked some questions as

14    to whether the license agreement mentions SAP AG or

13:39:09 15    applies to SAP AG at all.

16          Take a look at Paragraph 1.7.

17          MR. STAR:  Bob, maybe just blow up that

18    whole thing, 1.7.

19    BY MR. STAR:

13:39:23 20    Q.    Talks about proprietary information, right?

21    A.    Right.

22    Q.    And it says that means with respect to SAP and SAP

23    AG, in parens defined as the licensor of the SAP

24    proprietary information to SAP, and it goes on.

13:39:38 25          You see SAP AG being mentioned in this

1    contract, right, sir?

2    A.    Right.

3    Q.    Let's go down to Paragraph 1.10 on the first page.

4              MR. STAR:  Blow that whole thing up.  No,

13:40:11  5    the first, first page of the license agreement, Bob.  Not

6    the main schedule; the license agreement.  There we go.

7    BY MR. STAR:

8    Q.    We see here on the first page of the license

9    agreement, Paragraph 1.10, it defines the term

13:40:39  10    "Software," right, in quotes?  Capital S software, right?

11    A.    Right.

12    Q.     "Software means the SAP Business One software

13    product developed by or for SAP and/or SAP AG and

14    delivered to licensee Hodell hereunder pursuant to the

13:41:01  15    order for the software, including without limitation

16    present and future orders placed by licensee Hodell or on

17    its behalf by an SAP reseller."

18              Do you see that?

19    A.    Yes.

13:41:14  20    Q.    Again it mentions SAP AG, right?

21    A.    Yes.

22    Q.    And again it mentions the software is that software

23    pursuant to orders actually placed with SAP, right?

24    A.    Right.

13:41:27  25              And as I testified yesterday, this was

1    presented when we had purchased 40 additional licenses

2    from LSi.

3    Q.    You can explain that when your counsel asks you

4    questions.  I don't have a question pending.

13:41:41  5                    Move to strike that.

6                    THE COURT:  Okay.

7    BY MR. STAR:

8    Q.    No one forced you to sign this license agreement,

9    right?

13:41:49 10   A.    I'm sorry?

11   Q.    No one forced you to sign this license agreement?

12   A.    No.

13   Q.    Let's walk through some of its other provisions.

14   Let's go to Page 3, Article 7.

13:42:17 15                   MR. STAR:  Why don't you blow up the whole

16   Section 7.1 through 7.3, Bob.

17   Q.    You agree with me that Article 7 is headed

18   "PERFORMANCE WARRANTY/MAINTENANCE" in all caps, do you

19   see that?

13:42:32 20   A.    Yes.

21   Q.    And it provides in 7.1, the warranty that Hodell's

22   going to receive, correct?

23   A.    Correct.

24   Q.    That's the warranty you're actually going to get on

13:42:40 25   the Business One software you order and receive from SAP,

1    right?

2    A.    That LSi orders and we receive.

3    Q.    You receive the software.  This is the warranty?

4    A.    Right.

13:42:51 5    Q.    On the software you received from SAP, right?

6    A.    Correct.  Correct.

7    Q.    Let's walk through it.

8            SAP warrants that the software, which is

9    Business One, correct?

13:43:01 10    A.    Correct.

11    Q.    "SAP warrants that Business One will substantially

12    conform to the functional specifications contained in the

13    documentation for six months following delivery."

14            Goes on to say, "The warranty shall not

13:43:16 15    apply, one, if the software is not used in accordance

16    with the documentation or, two, if the defect is caused

17    by a modification, integration add-on, the licensee,

18    third party software, or third party database."

19            So you understand -- you understood SAP was

13:43:39 20    providing no warranty for any of the add-on products that

21    you were purchasing as part of your overall customized

22    solution, correct?

23    A.    Correct.

24    Q.    The only warranty SAP provided was this warranty

13:43:52 25    that we just read related to Business One, correct?

```
        1   A.      Correct.
        2               MR. STAR:  I have no further questions.
        3               THE COURT:  Thank you.
        4               You may redirect.
13:44:38 5      REDIRECT EXAMINATION OF KEVIN REIDL
        6   BY MR. CARNEY:
        7   Q.    Mr. Reidl, you were asked a number of questions on
        8   cross-examination.  I'm going to try and cover some
        9   ground here, but my hope is I'll be fairly brief.
13:45:33 10               You were asked about the add-ons, Radio
       11   Beacon and the In-Flight program.
       12               Do you recall questions regarding that?
       13   A.    Yes, I do.
       14   Q.    What was your -- what was your understanding of the
13:45:49 15   customability of Business One at the time you agreed to
       16   purchase Business One?
       17   A.    As I said, that was an important factor in our
       18   purchase, that it could, in fact, be customizable.
       19               And In-Flight was that feature that could
13:46:14 20   provide that customizability that would represent some of
       21   the functionality that we needed.
       22   Q.    And, in fact, your FACTS system, your LEGACY system
       23   that you operated for over 15 years, that had a
       24   customability component to it as well, correct?
13:46:33 25   A.    Yes, it did.
```

1    Q.    Now, you recall Mr. Star showing you a series of

2    e-mails between you and your father, and in particular

3    you and representatives of LSi relating to performance

4    issues prior to going live on Business One.

13:47:05 5                    Do you recall that?

6    A.    Yes, I do.

7    Q.    Now, had all of the performance issues you saw

8    during testing, had they all been fixed?

9    A.    No, not all of them.

13:47:19 10   Q.    Why did you decide to go live?

11   A.    Because they had improved quite a bit

12   since -- dramatically, and I think I testified yesterday

13   that there is no perfect go-live, there is no hundred

14   percent perfect go-live and LSi represented to us, Dan

13:47:42 15   Lowery and Jon Woodrum represented to us that the

16   remaining bugs and issues and performance issues were

17   going to be fixed and addressed by them in conjunction

18   with SAP.

19   Q.    Were the remaining bugs and issues that you just

13:47:54 20   described, were they, at the time you went live, were

21   those manageable for your business that you saw in the

22   testing?

23   A.    In the testing?

24   Q.    Yes.

13:48:03 25   A.    To our understanding, they were -- they were

1    manageable and LSi felt the same.

2    Q.    You were asked a series of questions regarding why

3    you didn't involve or report the issues that were seen

4    during testing directly to SAP prior to going live.

13:48:28  5                    Do you recall that?

6    A.    Yes.

7    Q.    Why didn't you report testing issues to SAP prior

8    to going live?

9    A.    This, this solution was entirely sold, marketed,

13:48:48 10   and represented to us by LSi, their channel partner.

11                    And every step of the way that was the

12   case.  There, if I went to pick up a phone and call SAP,

13   I don't even know how I could get that number, but it was

14   always represented by LSi, their business partner.

13:49:06 15   Q.    Do you know if LSi was having communications with

16   SAP during the testing phase?

17                    MR. STAR:  Objection, foundation.

18                    THE COURT:  You can answer that yes or no.

19   A.    My understanding is they were.

13:49:19 20   Q.    Thank you.  There was also a series of questions

21   about transaction logs, and Mr. Ashley -- excuse me,

22   Mr. Ashley?  Mr. Star, in his cross-examination of you,

23   took you to task for not developing a transaction log to

24   document all of the issues such as the delays that

13:49:59 25   Hodell-Natco was experiencing after it went live.

1          Do you recall that testimony?

2     A.    Yeah, we were talking about video recording people.

3     Q.    Why didn't you prepare a transaction log to

4     document all of the speed issues that Hodell experienced

13:50:20  5     post-go-live?

6     A.    We were entirely focused on trying to run our

7     business, trying to serve our customers.

8                We didn't have time to videotape people

9     that were taking orders.  We were all working towards

13:50:34 10     serving our customers.

11                I said that yesterday.  I said it again

12     today.  We had all 175 people working tirelessly, early

13     in the morning, late at night, on weekends to serve our

14     customers.

13:50:48 15                We were not focused -- I'm sorry, we were

16     not focused on videotaping people taking orders or

17     creating that log.

18                MR. CARNEY:  Kim, could you pull up Exhibit

19     320?  Can you blow that up, please?

13:51:51 20     Q.    This is an e-mail exchange that you had with Dan

21     Lowery.  The first e-mail in that exchange was an e-mail

22     you had with Dan Lowery, but I'd ask Kim to go to the

23     next page.  I believe it was an e-mail between Mr. Reidl

24     and Mr. Woodrum.

13:52:45 25                MR. CARNEY:  It's not showing up on my

```
          1    screen.
          2                    Your Honor, if you don't mind, could
          3    I -- I'm going to go back to counsel table and get a hard
          4    copy of the exhibit.
13:52:53  5                    THE COURT:  Sure.  Sure.
          6    BY MR. CARNEY:
          7    Q.    Mr. Reidl --
          8    A.    Yes.
          9    Q.    -- I'll come back to that.
13:53:54 10                    Now, you were asked about an e-mail,
         11    Mr. Reidl, concerning there was an e-mail exchange
         12    between you and Joe Woodrum in May of 2007 when he
         13    visited the St. Louis warehouse location of Hodell-Natco.
         14    A.    Yes.
13:54:16 15    Q.    Do you recall that testimony?
         16    A.    Yes.
         17    Q.    And his e-mail conveyed, you know, he observed a
         18    91-line transaction being completed in two or three
         19    seconds.
13:54:34 20                    Do you recall that testimony?
         21    A.    Yes.  Two --
         22    Q.    In that e-mail?
         23    A.    Two to three seconds per line I think is what
         24    the --
13:54:40 25    Q.    Okay.  Two to three seconds per line.
```

1      Do you recall the time of day Mr. Woodrum

2 was at your facility?

3 A.    Yes.  He indicated that he was there from 7:00 in

4 the morning until about noon.

13:55:02 5 Q.    What is peak use?  What would be peak use time on

6 the Hodell-Natco ERP system when you were working with

7 Business One?

8 A.    Peak use is typically from about noon to 4:30 or

9 5:00 o'clock, because we have people in different time

13:55:27 10 zones and east coast, they're logging in earliest and

11 then midwest and then working west.

12      So the people on the west coast aren't

13 logging in until 11:00 or 11:30 east coast time.

14      So the reason why the afternoon is the peak

13:55:44 15 is that's when the most, the highest number of users are

16 on the system.  So early in the morning there were fewer

17 users on the system because it was east coast, and then

18 by 12:00 or 1:00 o'clock, everyone from all time zones

19 was on the system using it at the same time.

13:56:06 20 Q.    Now, you mentioned -- well, let me ask you, did

21 your employees take steps such as workarounds to help

22 with the productivity of the Business One system?

23      MR. STAR:  Objection.  Leading and

24 foundation.

13:56:20 25      THE COURT:  Overruled.

1          MR. STAR:  Outside the scope.

2     A.    Yes, we did.

3               I mentioned a few times we were all, all in

4     it together, all working hard, late and early, so, yes,

13:56:31  5     we developed workarounds, and as an example, we've been

6     talking about order entry.  One of the workarounds that

7     salespeople would take is they would write down the order

8     or, you know, have a copy of the order maybe that the

9     customer sent them, and they would work around by using,

13:56:50 10     entering it particularly if it was a large order with

11     three or 500 items, they would enter it either early in

12     the morning when there are fewer people on the system and

13     it was performing slightly faster, or later in the day or

14     on the weekend.

13:57:06 15               So that was an example of the kind of

16     workarounds that we would have.

17     Q.    You recall in your cross-examination you were asked

18     a series of questions by Mr. Star where he took issue

19     with the fact that you didn't have any documentation with

13:57:38 20     regard to lost customers and lost sales and lost orders.

21               Do you recall that testimony?

22     A.    Yes, I do.

23     Q.    Why is it that your company didn't have those types

24     of documents?

13:57:52 25               I think Mr. Star cut you off from answering

1    that question.

2    A.    Yes.

3              I asked to explain.

4              Yeah, we -- we didn't -- we weren't

13:58:02 5    receiving orders because our customer was placing them

6    with our competitors.  We couldn't -- we couldn't, for

7    example, we couldn't quote, provide a quote to them fast

8    enough, and they would place that order with our customer

9    because it took too long to enter the quote, it took too

13:58:17 10   long to get through the line items, look up the

11   inventory, look up the pricing, and our salespeople were

12   struggling to try to keep up to enter the orders that

13   they had.

14             So that slowness was pervasive throughout

13:58:30 15   the organization and we were doing everything that we

16   could to hold on to the business.

17   Q.    This chart that you were asked to testify about, I

18   believe it was marked as Exhibit 907.

19   A.    Yes.

13:58:51 20   Q.    Just a couple questions.

21             Is gross sales an indicator of

22   profitability?

23             MR. STAR:  Objection.  Calls for an expert

24   opinion.

13:59:01 25             THE COURT:  Objection sustained.

1    BY MR. CARNEY:

2    Q.    Now, how long has Hodell been on Profit 21?

3    A.    Since April of 2009, so about six years now.

4    Q.    Are the functional issues that you experienced with

13:59:38  5    Profit 21 when you first implemented that software

6    system, do they still exist?

7    A.    No.

8    Q.    You were asked in your cross-examination a series

9    of questions regarding documents between Hodell-Natco and

14:00:15 10    IBIS about the FACTS -- about the FACTS system and the

11    integration issues that you were experiencing with Radio

12    Beacon.

13             Do you recall that?

14    A.    Yes.

14:00:28 15    Q.    And those -- and the time frame of the e-mails that

16    you were looking at were in the July, 2003 time frame,

17    correct?

18    A.    Correct.

19    Q.    And you were specifically asked why you didn't

14:00:44 20    contact or copy anyone at SAP regarding these issues.

21             Do you recall that?

22    A.    Correct, I do.

23             MR. STAR:  Objection.  Misstates the prior

24    question.

14:00:53 25             THE COURT:  You can clear it up.

1    BY MR. CARNEY:

2    Q.    Why didn't you contact SAP when you were having

3    issues with FACTS and the integration with Radio Beacon

4    in 2003?

14:01:08  5    A.    They weren't a party to any of that.  Why would I?

6    Q.    You were also asked about a number of e-mails where

7    you were disheartened and upset with Dale Van Leeuwen

8    during the same time frame.

9              Do you recall that?

14:01:29 10    A.    Yes.

11    Q.    Why did you continue working with Mr. Van Leeuwen

12    when his company became affiliated with LSi?

13    A.    Because he had intimate knowledge on the functional

14    requirements that would be used for In-Flight and our

14:01:53 15    industry, and so that was important to us.

16              He knew the functional requirements of our

17    industry as well as anyone, and so when he joined

18    with -- when his company joined with LSi, LSi had

19    significantly more resources to complete the product and

14:02:13 20    so it made very good sense for us to continue.

21    Q.    Did LSi have the resources that IBIS lacked?

22              MR. STAR:  Objection.  Foundation.

23    A.    Yes, it did.

24              THE COURT:  Well, overruled.

14:02:31 25    A.    Yes.  In one of the e-mails put in front of me

1    where I was complaining to Dale, he answered by saying he

2    didn't have the resources; too many of his people were on

3    vacation and working other projects, and he didn't have

4    the resources, so we knew that was the case.

14:02:52  5              And when LSi purchased them, they did have

6    significantly more resources.

7    Q.    Now, you were also asked on your cross-examination

8    whether or not Hodell had any records of the expenditure

9    with respect to the new software system, that being

14:03:19 10    Profit 21, do you recall that?

11    A.    Yes.

12              MR. CARNEY:  Kim, can you turn to Exhibit

13    621?  That's Defendant's Exhibit 621.  Excuse me,

14    Plaintiff's Exhibit 621.

14:04:01 15              MR. STAR:  Your Honor, before he questions

16    or this is published to the jury, we object to this

17    document.  This was prepared for litigation; it's not an

18    actual business record.  It's hearsay.

19              THE COURT:  Well, who prepared this?

14:04:13 20              MR. STAR:  Mr. Reidl prepared it after

21    litigation was filed, in connection with filing

22    litigation.  It's not an actual business record and it's

23    not supported at all by any backup documentation

24    whatsoever, none at all.

14:04:25 25              THE COURT:  Well, you can -- let's hear

```
 1    about it first then we'll see.
 2    BY MR. CARNEY:
 3    Q.    Mr. Reidl, you have in front of you Exhibit 621.
 4              Do you have that in front of you on the
 5    screen?
 6    A.    Yes.
 7    Q.    I'm asking you because my screen isn't working.
 8    A.    Oh, yes, it's in front of me.
 9    Q.    Okay.  Thank you.
10              What is the title of the document?
11    A.    It's titled "Hodell-Natco P21 expenditures while on
12    SAP Business One."
13    Q.    Okay.  And this document appears to be a ledger of
14    payments that you made to Profit 21, is that correct?
15    A.    That's correct.
16              MR. STAR:  Objection.  Foundation.
17              THE COURT:  Objection sustained.  Let him
18    tell us if he knows what it is.
19    A.    Yes, this is a general ledger --
20    BY MR. CARNEY:
21    Q.    Kevin, let me ask a question.
22              THE COURT:  Okay.
23    Q.    Can you please identify the document?
24    A.    This is a business record of Profit 21 expenditures
25    while we were on SAP Business One.  It is a business
```

1    record.

2    Q.    And the first column there, there is a posting date

3    column that has -- what is that, what is that column

4    reflecting?

5    A.    Those are posting dates indicating dates where

6    certain payments were made.

7    Q.    And what was the total amount of payments made to

8    Profit 21 while Hodell-Natco was still operating Business

9    One?

10   A.    $506,000.

11   Q.    And change, correct?

12   A.    And change, yes.

13   Q.    The next document I'd like to ask you about is

14   Exhibit 623.

15              MR. CARNEY:  Kim, could you pull that up?

16              MR. STAR:  Your Honor, same objection.  No

17   foundation for this.  This is hearsay.  It's not actually

18   supported by backup documentation.  It's not a business

19   record.

20              THE COURT:  Well, I suppose we'll find that

21   out.

22   BY MR. CARNEY:

23   Q.    It's a four-page document, correct, Mr. Reidl?

24   A.    Correct.

25   Q.    And what's the -- what's the title of the document?

1    A.    "Hodell-Natco expenditures for P21 from P21 system

2    operation."

3    Q.    And the last column on the right is identified as

4    check date?

14:07:38 5    A.    That's correct.

6    Q.    What does this column reflect?

7    A.    That reflects the date that checks were cut and

8    issued.

9    Q.    To whom?

14:07:51 10    A.    To Profit 21, to Activant, their parent company.

11    Q.    Can you turn to Page 4 of the document?

12    A.    Okay.

13    Q.    Okay, thank you.  I'm just going to ask you about

14    the column second from the right captioned "Amount Paid."

14:08:19 15            What does that column reflect?

16    A.    That's the amount of the checks that were paid.

17    Q.    To Profit 21?

18    A.    To Profit 21.

19    Q.    After the system went operational at Hodell?

14:08:32 20    A.    Yes.

21    Q.    What's the total?

22    A.    $501,892.

23    Q.    When you add them up, when you add those two

24    figures up on the two exhibits we just talked about,

14:08:46 25    where does that get you?

1  A.     A little over a million dollars.  A million and

2  9,000 dollars or 8,000 dollars.

3  Q.     When Hodell-Natco went live on Business One, how

4  many licenses from SAP did it have?

14:09:13  5  A.     120.

6  Q.     You were asked a lot of questions on

7  cross-examination about the development of the In-Flight

8  program, and Mr. Star characterized Hodell-Natco as a

9  developer of the In-Flight program.

14:09:44  10            Do you recall that line of questioning?

11  A.     Yes.

12  Q.     What was Hodell's role in the development of the

13  In-Flight program?

14  A.     Our role was that we were going to be the first on

14:09:59  15  it, as I explained earlier today.  We were going to be

16  the first on it; not developing it.  We are not a

17  development company, not in the business of developing

18  software.

19            We're in the business of distribution, and

14:10:12  20  so our role was going to be that we would work with them

21  and be the first one live on this product.

22  Q.     Thank you.

23            MR. CARNEY:  Kim, could you pull up Exhibit

24  789?  That should be one of the Defendant's Exhibits that

14:10:49  25  Mr. Reidl was asked about.

```
              1    Q.    Kevin, tell me when you have it in front of you.

              2    A.    I can see it.

              3    Q.    Okay.  It's back.

              4          And this is a -- what is this document?

14:11:14      5    A.    SAP Business One overview.

              6    Q.    And it bears a Hodell Bates label somewhere on the

              7    document, correct?

              8    A.    Correct.

              9    Q.    This is a document that Hodell-Natco produced in

14:11:29     10    discovery, correct?

             11    A.    Correct.

             12    Q.    Just to clear up the record here, when did

             13    Hodell-Natco first become aware of this document?

             14    A.    In -- it would have been 2008 at the earliest when

14:11:43     15    we were preparing for this litigation.

             16          MR. CARNEY:  Kim, can you please go to

             17    Exhibit 5 of Defendant's Exhibits?

             18    Q.    This is another document that Hodell-Natco produced

             19    in this litigation, correct?

14:12:12     20    A.    Correct.

             21          MR. CARNEY:  Kim, can you blow up the

             22    second-to-last line on the document, "Posted by"?

             23    A.    Okay.

             24    Q.    Okay.  My computer screen's not working again.

14:12:36     25          What does that line state?
```

1    A.    It says, "Posted by Clinton Boyd, November 27th,

2    2007 at 3:14 p.m."

3    Q.    Does that post date give you any type of indication

4    as to when you came across this particular document?

14:12:58  5    A.    It would have been no earlier than November 27th,

6    2007, which is after they told us that the system wasn't

7    going to work for us.

8    Q.    Thank you.

9              MR. CARNEY:  I have no further questions.

14:13:12 10              THE COURT:  Thank you.

11              Any recross?

12              MR. STAR:  Yes, Your Honor, briefly.

13         RECROSS-EXAMINATION OF KEVIN REIDL

14    BY MR. STAR:

14:13:42 15    Q.    Mr. Reidl, let's stay with Exhibit 5.

16              MR. STAR:  Bob, if you could put that up.

17    Q.    Sir, we went over this.  Mr. Carney just asked you

18    a couple questions.

19              You agree with me this is an article from

14:14:03 20    November 1st, 2005, right?

21    A.    Yes.

22    Q.    Okay.  You go down to the bottom of the article

23    above where it says "Comments" and it says there, "SAP

24    posted 10:59 p.m." and something called SAP ERP

14:14:23 25    Permalink, do you see that?

1    A.    Yes.

2    Q.    And then what Mr. Carney showed you were a series

3    of comments posted by other people after the article was

4    initially published on this Permalink site, correct?

14:14:36 5    A.    Yes, it appears to be.

6    Q.    Right.  So the date he focuses on, November of

7    2007, that's just somebody adding a comment on top of a

8    document that had already been posted back in 2005,

9    right?

14:14:46 10    A.    Right.

11    Q.    Thanks.  Mr. Carney asked you about your

12    communications, the letters your father and you were

13    having with Dale Van Leeuwen and IBIS back in 2003, July,

14    2003, when you were threatening to sue him, you were

14:15:03 15    telling him you were disheartened, you were questioning

16    how you could rely on him.

17              You remember those letters?

18    A.    Yes.

19    Q.    Mr. Carney suggested that my question to you was

14:15:11 20    something to the effect that why didn't you call SAP at

21    that time, but what we actually established was that all

22    of that predated SAP and Business One, correct?

23    A.    That's correct.

24    Q.    And so what I asked you wasn't whether you should

14:15:26 25    have called SAP at that time.  You didn't have a

1    relationship with them, right?

2    A.    That's correct.

3    Q.    What I asked you is simply whether at any point in

4    the future you ever bothered to tell SAP what had been

14:15:37 5    going on between you and Van Leeuwen and IBIS years

6    earlier, and your answer was you hadn't, correct?

7    A.    Correct.

8    Q.    You were shown Exhibit 621 and 623.  Let's look at

9    621.  It's a single-page document, right?

14:16:00 10    A.    Yes.

11    Q.    That's the whole thing?  Yes?

12    A.    Yes.

13    Q.    You're not aware of any actual supporting invoices

14    that go and would establish these actual numbers in this

14:16:15 15    document; they just haven't been produced to SAP in this

16    case, have they?

17    A.    I don't know.  I don't know.  There's been many

18    pages produced.

19    Q.    Okay.  And what about with 623?  Mr. Carney --

14:16:30 20              MR. STAR:  If you could put that up, Bob.

21    Q.    Here it is.  It's coming up sideways, but

22    Mr. Carney, I think said this is a four-page document,

23    but this is the whole thing, right?  One piece of paper?

24              That's what you're aware of that is

14:16:49 25    actually marked as 623?

1    A.    I'm not sure.  We looked through four pages, I

2    believe.

3    Q.    In 623?  We have one page from you.  You believe

4    there are actually four pages?

14:17:02  5    A.    I believe we flipped through four pages earlier.

6    Q.    Sir, the same thing is true, though, with 623 as it

7    is with 621, you don't have any of the backup

8    documentations, you don't have actual invoices, you don't

9    have canceled checks, nothing like that, right?

14:17:15 10          You just have this?

11   A.    I don't know if it's been produced or not in this

12   discovery.  I can't tell you for sure.

13   Q.    Sir, you prepared to testify today, didn't you?

14   A.    Yes.

14:17:26 15   Q.    You're the president of the company.  You're

16   claiming that you suffered damages, right?

17          MR. CARNEY:  Objection, Your Honor.

18          THE COURT:  Overruled.

19   Q.    You're claiming you suffered damages?

14:17:35 20   A.    Correct.

21   Q.    You've been preparing since you filed this lawsuit

22   in November of 2008 to be here today to testify on these

23   subjects, right?

24   A.    Right.

14:17:43 25   Q.    Yet you don't know if you've actually produced any

1    canceled checks or invoices or anything that would

2    support these figures, you just don't know?

3    A.    I don't know.

4    Q.    Thank you.

14:17:52  5    A.    There was a lot of documentation that's been

6    produced.

7                    MR. STAR:  That's all I have.

8                    THE COURT:  Thank you, Mr. Reidl.  You're

9    excused.

14:17:58 10                    Watch your step going down.

11                    THE WITNESS:  Thank you.

12                    (Witness excused)

13                    THE COURT:  You may call your next witness.

14                    MR. LAMBERT:  Your Honor, if it please the

14:18:08 15    Court, the Plaintiff calls Dan Lowery to the stand.

16                    MR. MILLER:  Your Honor, may I approach

17    with counsel?  I have a point to make about Mr. Lowery's

18    testimony.

19                    THE COURT:  Sure.  Stand up and relax if

14:18:19 20    you want and stretch.

21                    (Side-bar conference had off the record).

22                    THE COURT:  Mr. Lowery, step forward, sir.

23    Raise your right hand for me.

24

25

                                    DANIEL LOWERY,

         of lawful age, a witness called by the Plaintiffs,

                    being first duly sworn, was examined

                        and testified as follows:

14:20:14          THE COURT:  Please have a seat.

                  MR. LAMBERT:  Your Honor, before we get

started I'd like to do the exhibits the old-fashioned way

so may I approach the witness and give him a binder?

                  THE COURT:  Of course.

14:20:34          Sir, would you tell us your full name and

spell your last name?

                  THE WITNESS:  Daniel Lowery.  And where I'm

employed?

                  THE COURT:  No, spell your last name for

14:20:41 me.

                  THE WITNESS:  Oh, L-O-W-E-R-Y.

                  THE COURT:  Thank you.

                  MR. LAMBERT:  And also, Your Honor, as

notice to the Court and to opposing counsel, given

14:20:53 Mr. Lowery's affiliation with the Defendant LSi-Lowery

Systems, Inc. And The IBIS Group, Inc., we intend to

treat Mr. Lowery as if on cross-examination here.

                  THE COURT:  I don't see any reason for

that.

14:21:07          MR. LAMBERT:  He's an affiliate of a party

```
         1    opponent in the case, Your Honor.
         2                THE COURT:  No, he's not.  Just go ahead.
         3          DIRECT EXAMINATION OF DANIEL LOWERY
         4    BY MR. LAMBERT:
14:21:18 5    Q.    Mr. Lowery, where do you reside?
         6    A.    St. Louis, Missouri.
         7    Q.    Who's your current employer?
         8                THE WITNESS:  And could I mention something
         9    here, Judge?
14:21:24 10               THE COURT:  Nope, sorry.
        11               THE WITNESS:  I'm a little hard of
        12    hearing --
        13               THE COURT:  You can mention that.
        14               THE WITNESS:  -- so if I ask you to repeat
14:21:30 15   something, I apologize.
        16               MR. LAMBERT:  My pleasure.
        17               THE WITNESS:  I apologize to the jury.
        18               THE COURT:  All right.  I'm sorry about
        19    that, yeah.  Just make sure the lawyers don't mumble.  If
14:21:39 20   you don't understand the question, just tell them.
        21               THE WITNESS:  I will ask them again.
        22               MR. CARNEY:  Your Honor, just a point to
        23    make, I don't believe the witness was sworn in.
        24               THE COURT:  Yeah, he was.
14:21:50 25               MR. CARNEY:  I apologize.  I didn't hear.
```

```
 1              THE COURT:  They are all trying to trick
 2     me.  I got Panigutti watching my back.
 3     BY MR. LAMBERT:
 4     Q.    Mr. Lowery, I'm sorry.  Who is your current
 5     employer?
 6     A.    Lowery Systems, Inc. is where I work.
 7     Q.    And what's your title with Lowery Systems, Inc.?
 8     A.    President, owner.
 9     Q.    Okay.  And is the Lowery Systems, Inc., is that the
10     same thing as LSi?
11     A.    It is.
12     Q.    Okay.  And LSi owns The IBIS Group, Inc., correct?
13     A.    Yes.
14     Q.    Okay.  To your knowledge, LSi -- can I refer to
15     IBIS as -- IBIS Group as IBIS, is that all right?
16     A.    Yes.
17     Q.    Can I refer to LSi and IBIS jointly as LSi, is that
18     fair?
19     A.    Absolutely.
20     Q.    Okay.  Was LSi named as a Defendant in this case?
21     A.    It was.  I'm here without counsel.  I'm a salesman,
22     not a lawyer, so help me out here.  I was a Defendant.
23     Q.    Hodell sued LSi, correct?
24     A.    Who did?
25     Q.    Hodell sued LSi?
```

```
 1    A.    Yes.
 2    Q.    Okay.  And to your knowledge is LSi still a party
 3    to the case?
 4                 THE COURT:  Well, they're not so --
 5    A.    I don't know.
 6                 THE COURT:  Mr. Lowery, you don't have to
 7    answer those questions.  They're not a party to the case.
 8                 THE WITNESS:  -- okay.
 9    BY MR. LAMBERT:
10    Q.    Mr. Lowery, you and I have spoken before today, is
11    that correct?
12    A.    Yes.
13    Q.    And we've spoken since your deposition was taken,
14    is that correct?
15    A.    Yes.
16    Q.    Okay.  And your deposition was taken several years
17    ago?
18    A.    Yes.
19    Q.    And we agree that I requested that you come testify
20    here today, is that correct?
21    A.    Correct.
22    Q.    Okay.  And I asked you to fly from St. Louis to
23    Cleveland to be here to testify?
24    A.    Correct.
25    Q.    And we even offered to help defray some of your
```

1    costs that you incurred to do that, right?

2    A.    Correct.

3    Q.    It's expensive to come from St. Louis to Cleveland?

4    A.    Correct.

14:23:56 5    Q.    But we agree that no one has told you how to

6    testify here today?

7    A.    No.

8    Q.    And you intend to testify truthfully and honestly

9    here today, is that correct?

14:24:06 10    A.    Yes.

11    Q.    Can you tell me the nature of LSi's business?

12    A.    It's exclusively a software company now.

13    Q.    How long has LSi been in operation?

14    A.    1989.

14:24:24 15    Q.    Since 1989?

16    A.    Um-hmm.

17    Q.    And you've been involved with LSi since 1989?

18    A.    Yes.

19    Q.    What do you mean by, I think you referred to it as

14:24:32 20    a software operation, is that what you said?

21    A.    Well, over the years, it's had other pieces to it.

22    It sold -- it was an IBM business partner.  That's

23    closed.

24              It was an SAP reseller.  That's closed.

14:24:50 25              It was a Lotus Notes company.  That's

1    closed.

2                         Now we're down to where we sell and support

3    FACTS with a couple of industry verticals or add-ons as

4    you guys --

14:25:05 5    Q.    Okay.  How long have you been in the software

6    business, for lack of a better term?

7    A.    Well, really since 1973.  I started with IBM.  I

8    was a salesman there, selling software, hardware, and

9    basically have been in it since then.

14:25:24 10                         So 43 years.

11    Q.    Over 40 years, right?

12    A.    Unfortunately, yes.

13    Q.    Let's just cut to the chase.

14                         LSi is a former channel partner of SAP,

14:25:41 15    right?

16    A.    Correct.

17    Q.    And LSi sold Business One to Hodell as a channel

18    partner of SAP?

19    A.    It did.

14:25:49 20    Q.    And the sale of Business One to Hodell occurred in

21    2004 and 2005?

22    A.    Correct.

23    Q.    Is that accurate?

24    A.    That's correct.

14:25:59 25    Q.    And the sale involved the execution of a

1    development agreement, is that correct?

2    A.    Correct.

3    Q.    Can you tell the jury a little bit about IBIS?

4    A.    It's a company I bought in April of '04, April

14:26:19 5    28th, '04, from Dale Van Leeuwen.

6               And he also was a FACTS reseller, as LSi

7    was, and then we jointly started, when SAP was recruiting

8    partners to become channel partners for SAP Business One,

9    he and I talked closer and closer and he decided to

14:26:44 10   become a Business One partner, and we did, too, and then

11   we said, well, we should -- I should buy you because that

12   would -- we'd sell more, we'd have more customers, et

13   cetera.

14               So that's how that all rolled out.

14:26:58 15   Q.    Okay.  And just so I'm correct and so we're all

16   clear here, IBIS became an SAP Business One channel

17   partner at some point?

18   A.    Yeah.  It -- '03.

19   Q.    2003?

14:27:08 20   A.    I believe, yeah.

21   Q.    And --

22               MR. MILLER:  Objection.  Foundation.

23               THE COURT:  Overruled.

24   Q.    And LSi separately became a channel partner?

14:27:17 25   A.    Correct.

409

```
       1    Q.    Also in 2003?

       2    A.    I think.

       3    Q.    Okay.

       4    A.    I'm not sure.

14:27:22 5    Q.    And this was before LSi bought IBIS, correct?

       6    A.    Correct.

       7    Q.    Okay.  And when did LSi buy IBIS?

       8    A.    April 28th, '04.

       9    Q.    And I think you covered it briefly, but why, why

14:27:40 10   the acquisition?  Why did you buy IBIS?

      11    A.    Well, several reasons.

      12                Dale wanted out, and we were in acquisition

      13   mode at the time.

      14    Q.    "We" meaning LSi?

14:27:58 15   A.    LSi.

      16    Q.    LSi was growing?

      17    A.    Yes.

      18    Q.    Okay.

      19    A.    Those were the good days.

14:28:03 20   Q.    LSi is no longer an SAP channel partner, correct?

      21    A.    It is not.

      22    Q.    Can you describe for the jury the SAP channel

      23   partner program as it existed when LSi was a channel

      24   partner?

14:28:20 25   A.    Sure.
```

            1              Well, they were recruiting software
            2    businesses that were already established and successful,
            3    so when SAP approached us, we took it as kind of a badge
            4    of honor or something because SAP was a prestigious name,
14:28:47    5    still is.
            6              So to be a part of the SAP family was quite
            7    a deal, so the offer was made.  We sign up to become a
            8    partner, and we had to give them $10,000, send your
            9    people to school, and start selling.
14:29:09   10              But we were excited to sell Business One.
           11    Dale had already told me he was all excited about
           12    Business One, had been down to I believe Atlanta and met
           13    with Dan Kraus.
           14              MR. MILLER:  Objection, Your Honor.
14:29:21   15    Hearsay.
           16              THE COURT:  Objection sustained.
           17              MR. MILLER:  Move to strike.
           18              THE COURT:  Move on.  Ask a question.
           19              Excuse me, have him ask a question.
14:29:29   20              MR. LAMBERT:  I'm sorry, I didn't hear the
           21    objection just so I know not to --
           22              THE COURT:  Ask him another question.
           23              MR. LAMBERT:  Okay.
           24              THE COURT:  We don't need to know what
14:29:35   25    other people told him.

```
          1              MR. LAMBERT:  I wanted to make sure I obey
          2    the objection so I'm going to move on.
          3    BY MR. LAMBERT:
          4    Q.    Mr. Lowery, you agree with me that it was your job,
14:29:46  5    LSi's job, to sell Business One on behalf of SAP?
          6    A.    Yes.
          7    Q.    And LSi did that with SAP's expressed
          8    authorization, is that correct?
          9    A.    Yes.
14:29:58 10    Q.    And at the direction of SAP?
         11    A.    Yes.
         12              MR. MILLER:  Objection, Your Honor.
         13              THE COURT:  Let him answer the questions.
         14              MR. MILLER:  A leading question.
14:30:06 15              THE COURT:  Right.
         16    A.    I could --
         17    Q.    Let me ask you a question.
         18    A.    Okay.
         19    Q.    Did LSi sell Business One under the direction of
14:30:16 20    SAP?
         21    A.    Yes.
         22    Q.    And what do you mean by under the direction of SAP?
         23    A.    We had a quota to sell.
         24    Q.    Anything else?
14:30:29 25    A.    And we -- the plan for the business partner channel
```

1    was to build third-party add-ons; in this case, fastener

2    vertical we named In-Flight Enterprise.

3                So these were all -- we had another one

4    teed up, ready to be developed when we closed the

14:30:52  5    practice for equipment rental but that was never

6    developed.  But we were excited because when we bought

7    IBIS we bought his intellectual property and his brain

8    power.  He was very well respected in the fastener

9    industry.  So we were excited about building our

14:31:05 10    fastener vertical and taking that to market.  We thought

11    we could do some good there.

12    Q.    And you said "He had a very good reputation."

13                I'm just, who are you referring to?

14    A.    Dale, Dale Van Leeuwen.

14:31:15 15                Yeah, he was -- gave speeches at

16    conferences for fastener trade shows and things like

17    that.  He was very well respected as a fastener expert.

18    Q.    And do you know whether Mr. Van Leeuwen was also

19    recruited by SAP?

14:31:32 20    A.    He was.

21    Q.    Was LSi authorized by SAP to refer to itself as a

22    business partner?

23    A.    Yes.

24    Q.    Was LSi encouraged to do this?

14:31:44 25    A.    Yes.

1    Q.    Did SAP's name carry weight with potential

2    customers?

3    A.    My ears.  Did it carry weight?  Yes.

4    Q.    Did the SAP name --

14:32:01  5    A.    Oh, yes.

6    Q.    -- carry weight with potential customers in your

7    experience?

8    A.    Opened the doors.

9    Q.    It opened the door?

14:32:06  10    A.    You bet.

11    Q.    Okay.  And was being an authorized channel partner

12    for SAP a prestigious thing?

13    A.    Yes.

14    Q.    Did SAP authorize LSi to use the SAP logo?

14:32:21  15    A.    Yes.

16    Q.    To your knowledge, was Business One only sold

17    through channel partners?

18    A.    It was.

19    Q.    SAP didn't have its own sales force?

14:32:38  20    A.    No.

21    Q.    To go sell Business One to customers?

22    A.    Not to my knowledge.  No, that was the nice part of

23    it.  There was no direct channel as far as I know.

24    Q.    So correct me if I'm wrong, but SAP used business

14:32:53  25    partners like LSi to sell Business One --

414

```
 1    A.    Correct.
 2    Q.    -- on its behalf?
 3    A.    Correct.
 4    Q.    And just so the record's clear, Mr. Lowery, can you
 5    wait until I finish my question so the court reporter can
 6    take it down and it will be clear in that way?
 7    A.    I will.
 8    Q.    I appreciate it.
 9              Is it your belief that your position as a
10    channel partner of SAP -- is it your belief -- strike
11    that.  Is your position that LSi's position as a channel
12    partner of SAP made LSi SAP's agent?
13    A.    Yes.
14              MR. MILLER:  Your Honor, objection.
15              THE COURT:  Objection sustained.
16    Q.    Mr. Lowery, can you turn to Exhibit 27 in your
17    binder?
18    A.    Okay.
19    Q.    Have you seen Exhibit 27 before?
20    A.    Yes.
21    Q.    Can you identify that document for the jury?
22    A.    It's -- I don't know what they're called, but it's
23    Hodell suing SAP in the Northern District of Ohio,
24    Eastern Division, so it's a claim I guess.
25    Q.    Well, is this the answer that LSi --
```

```
          1    A.    Oh, I'm sorry, answer to first amended complaint,

          2    yes.

          3    Q.    And who was it filed on behalf of?

          4    A.    LSi.

14:34:23  5    Q.    Was it also filed on behalf of the IBIS Group?

          6    A.    And The IBIS Group.

          7    Q.    Am I correct this is what your lawyer filed on

          8    behalf of LSi and IBIS in response to the allegations in

          9    Hodell's complaint?

14:34:39 10    A.    Yes, when I had a lawyer.  Yes.

         11    Q.    If you would turn to Page 2 of that document.

         12    A.    Page 2, I'm there.

         13    Q.    Yes.

         14              MR. MILLER:  Objection, Your Honor.  We're

14:34:53 15    heading toward --

         16              THE COURT:  Objection sustained.

         17              MR. MILLER:  Thank you, Your Honor.

         18              MR. LAMBERT:  I'm sorry, what was the

         19    objection?

14:35:00 20              THE COURT:  It was sustained.

         21              MR. LAMBERT:  To the document in general?

         22              THE COURT:  Right.

         23    BY MR. LAMBERT:

         24    Q.    Okay.  Mr. Lowery, can you turn to Exhibit 28 in

14:35:05 25    your binder?
```

```
 1    A.    I'm there.

 2    Q.    Can you identify the document that's been marked as

 3    Exhibit 28?

 4    A.    Responses, Defendant SAP and SAP AG's first set of

 5    interrogatories to co-Defendants LSi and IBIS Group.

 6    Q.    Can you flip through the document and see if those

 7    are your responses to the document?

 8                   MR. MILLER:  Your Honor, same objection.

 9                   THE COURT:  Objection sustained.

10                   MR. MILLER:  These are lawyer prepared.

11                   THE COURT:  Objection sustained.

12                   MR. LAMBERT:  Okay.  We'll move on.

13    BY MR. LAMBERT:

14    Q.    Mr. Lowery, isn't it true that LSi made

15    representations to Hodell about the Business One

16    software?

17    A.    To make sure I understood, we made the

18    representations to Business One -- about Business One

19    software to Hodell?

20    Q.    Yes.

21    A.    Yes.

22    Q.    LSi, did LSi countersue SAP for damages in this

23    case?

24    A.    I don't know.

25    Q.    You don't recall?
```

```
 1    A.   I don't recall.
 2    Q.   Can you turn to Exhibit 30 in your binder?
 3    A.   One more time?  I'm sorry.
 4    Q.   Can you turn to Exhibit 30 in your binder?
 5    A.   Okay.  Okay.
 6    Q.   Can you identify that document for me?
 7    A.   That's an SAP Business One software marketing and
 8    distribution agreement.
 9    Q.   Is this a document that LSi was required to execute
10    as part of becoming a channel partner with SAP?
11    A.   Yes.
12    Q.   If you'd turn to Page 28, if you see on the bottom
13    right-hand corner there's 30.28 in the bottom right-hand
14    corner.  It will also pop up on your screen if you want
15    to look at it.
16    A.   I'm there.
17    Q.   Okay.  Is that your signature?
18    A.   That's my signature.
19    Q.   Where it says LSi-Lowery Systems, Inc.?
20    A.   That's me.
21    Q.   And identifies yourself as president?
22    A.   Yes, sir.
23    Q.   And who is the counterparty to the agreement?
24    A.   Gary Fromer.
25    Q.   On behalf of?
```

1   A.   Oh, on behalf of SAP America.

2   Q.   The parties to the agreement are SAP America, Inc.

3   and LSi, correct?

4   A.   Correct.

14:37:56  5   Q.   Is this the document that gave LSi the right to

6   market Business One?

7   A.   Yes.

8   Q.   Can you turn back to the first page of that

9   document, Mr. Lowery?

14:38:12  10   A.   Could you repeat that?

11   Q.   Could you turn back to the first page of that

12   exhibit?

13   A.   Yes, I'm sorry.

14   Q.   All right.  There's several whereas clauses on the

14:38:25  15   first page, do you see that?

16   A.   I do.

17   Q.   Can you read the third whereas clause for the jury?

18   A.   "Whereas, SAP and reseller desire to successfully

19   partner via this agreement in order to pervasively

14:38:38  20   penetrate the small and medium enterprise U.S. market."

21   Q.   And is the reseller referred to in that phrase you

22   just read for the jury, is that LSi?

23   A.   Yes.

24   Q.   To your knowledge, had IBIS executed a similar

14:38:54  25   document?

             1    A.    Yes.

             2    Q.    Could you turn to Page 9?  It will say 30.9 in the

             3    bottom right-hand corner.

             4    A.    Okay.

14:39:05     5    Q.    Are you there?

             6    A.    I am.

             7    Q.    Okay.  Thank you.

             8              There's a section called, "Business

             9    opportunity management," Section 4.3.

14:39:16    10              Do you see that?

            11    A.    I do.

            12    Q.    Can you read that section for the jury, Mr. Lowery?

            13    A.    4.3, business opportunity management.  "Reseller

            14    shall use and maintain all customer leads in the sales

14:39:28    15    opportunity management system maintained by SAP, and

            16    shall comply with all sales opportunity management

            17    requirements as established by SAP from time to time."

            18    Q.    And did LSi, in fact, maintain its sales leads in

            19    an SAP database that was maintained by SAP?

14:39:47    20    A.    We did.

            21    Q.    Can you turn to the next page of that document,

            22    sir?  Are you there?

            23    A.    I am.

            24    Q.    Thank you.

14:39:57    25    A.    I'm sorry.

```
            1    Q.    Thank you.

            2                There's a Section 4.7?

            3    A.    Um-hmm.

            4    Q.    Called "Performance Targets."

14:40:04    5    A.    Correct.

            6    Q.    Can you read that for the jury?

            7    A.    4.7A, Performance Targets.  "Reseller shall meet

            8    the sales and other performance targets set forth in the

            9    SAP partner program or as otherwise mutually agreed upon

14:40:19   10    by the parties in writing from time to time."

           11    Q.    Did LSi intend to do that?

           12    A.    Yes, I believe we did, some years very well.

           13    Q.    Can you direct your attention to Section 4.7C down

           14    at the bottom page of that document?

14:40:41   15    A.    Okay.

           16    Q.    Can you read -- what's the title of that section,

           17    sir?

           18    A.    "Customer Satisfaction Targets."

           19    Q.    Can you read that for the jury?

14:40:52   20    A.    "Reseller shall obtain and maintain customer

           21    satisfaction ratings, as set forth in the SAP partner

           22    program or as mutually agreed upon by the parties in

           23    writing from time to time.  Customer satisfaction target.

           24    Customer satisfaction shall be measured by SAP in

14:41:09   25    substantially the same manner as SAP measures customer
```

```
 1    satisfaction for its directly licensed customers."

 2    Q.    Thank you, sir.  There's a section right under the

 3    one you just read, 4.8, third-party products.

 4                    Do you see that?

 5    A.    Yes.

 6    Q.    And it discusses third party products, is that

 7    correct?

 8    A.    Yes.

 9    Q.    Can you read the first sentence of that section for

10    the jury?

11    A.    "Third-party products.  Due to the unusual

12    complexity of the software, some third-party software and

13    hardware may not be compatible with the software, may

14    impose special support obligations or may hinder the

15    software's use, thereby causing damage to SAP and/or the

16    reseller."

17    Q.    And then there's a -- the next sentence begins with

18    "Therefore."

19                    Do you see that?

20    A.    I do.

21    Q.    Can you read that sentence for the jury?

22    A.    "Therefore, the reseller agrees to not distribute,

23    support, promote, or recommend any third party product

24    for purposes of interoperating with the software which

25    has not been previously approved in writing by SAP or
```

 1   otherwise has been made known to the public officially as

 2   appropriate for use or interoperation with the software."

 3   Q.   And when the section's discussing the software, is

 4   that SAP Business One, to your knowledge?

14:42:39  5   A.   Correct.

 6   Q.   And when it's discussing third-party products, is

 7   that referring to pieces of software that were developed

 8   as add-ons for Business One?

 9   A.   Yes.

14:42:50 10   Q.   And did LSi comply with this section of the

11   agreement?

12   A.   I don't really know how to answer that because this

13   wording is complex.

14   Q.   It's legalese in your opinion?

14:43:09 15   A.   We -- we complied with everything SAP requested of

16   us, but this one says in writing and things like that.

17              I can't -- I can't say we had anything in

18   writing.

19   Q.   Well, let's discuss it and let's back off of the

14:43:26 20   legal jargon in this section and talk about it like

21   regular people.

22              Did LSi make SAP aware of In-Flight?

23   A.   Oh, my, yes.  Yes.

24              We -- first you have to tell SAP you want

14:43:45 25   to develop a third-party add-on.  To do that, you have to

1    go to a software development school called a software

2    development tool kit, I believe is the name of the class.

3    And then you have to buy that software development tool

4    kit for, I believe it was, $10,000.

14:44:03  5    And that software development tool kit is a

6    set of software that helps you write the code for your

7    third party, so that it works with Business One.

8    Q.    Who develops the software development kit?

9    A.    SAP.

14:44:21 10    Q.    That's an SAP product?

11    A.    Um-hmm.

12    Q.    Okay.  Is that part of Business One?

13    A.    No.  I mean, it's a -- it's a tool kit to develop

14    third party add-ons for Business One.

14:44:32 15    Q.    Okay.  Can you turn to Section 4.9 of that

16    document?  It's on the same page as the paragraph we just

17    read.

18    A.    Okay.  I'm there.

19    Q.    Can you look at Subsection B under marketing and

14:44:49 20    advertising, and if you would, would you read that for

21    the jury?

22    A.    D as in dog?

23    Q.    B as in boy.

24    A.    B as in boy?

14:44:57 25    "Reseller will be expected to participate

1    actively in trade shows and events suitable for promoting

2    the software and support services.  All advertising,

3    promotions, and participation in the trade shows and

4    events shall be at reseller's expense, except as

14:45:15  5    otherwise agreed in writing between SAP and the

6    reseller."

7    Q.    So SAP expected LSi to participate in trade shows

8    for SAP's products?

9    A.    We did.  Yes, they did.

14:45:32 10    Q.    I want to direct your attention to the section you

11    thought I directed your attention to before, 4.9D.

12    A.    Okay.

13    Q.    Can you read that for the jury?

14    A.    4.9D, "All marketing and promotional materials

14:45:47 15    developed by or for the reseller, including but not

16    limited to, print advertisement, broadcast or telecast

17    commercials, product brochures, sales aids, manuals,

18    displays, and publicity concerning the software and

19    services shall be of first quality and graphically shall

14:46:04 20    be designed to meet the buying characteristics of the

21    target market.  All such materials shall be submitted to

22    the SAP SMB business development manager to ensure

23    consistency with SAP and industry standards for review at

24    least 10 business days prior to publication,

14:46:23 25    distribution, or broadcast."

1    Q.    So marketing materials that LSi intended to use for

2    SAP products needed to be submitted to SAP for approval?

3    A.    Yes.

4    Q.    Can you turn to the next page of that document,

14:46:40  5    sir?

6    A.    Okay.

7    Q.    There's a Section 4.10, information duties of

8    reseller.

9    A.    I'm there.

14:46:47 10    Q.    And it -- reseller again is LSi, is that accurate?

11    A.    Correct.

12    Q.    Can you read that section, the first section of

13    that 4.10 for the jury?

14    A.    4.10, information duties of reseller, the A, you

14:47:02 15    mean?

16    Q.    Just A, yes, thank you.

17    A.    "Reseller will regularly inform SAP about its

18    market, the marketing activities, and the results of its

19    sales efforts as related to the software.  Such

14:47:13 20    information shall be considered reseller proprietary

21    information so long as the exclusions in Section 1.12 do

22    not apply to the information."

23    Q.    And did LSi regularly inform SAP about its

24    marketing -- market and marketing activities and the

14:47:28 25    results of its sales efforts?

                1    A.    Yes.

                2    Q.    As it relates to SAP Business One?

                3    A.    Yes.

                4    Q.    Can you turn to, same section, 4.10C, and read the

14:47:49     5    first sentence of that section for the jury, sir?

                6    A.    Okay.  4.10C, "Reseller will provide accurate and

                7    up-to-date marketing and forecasting information to SAP

                8    on a regular basis, in accordance with Section 4.3,

                9    including prompt updates concerning matters that

14:48:07   10    materially affect the current sales forecast.  From time

              11    to time, SAP may make special requests with respect to

              12    marketing and forecasting information.  Upon such

              13    requests, reseller will use its reasonable efforts to

              14    provide such information in an organized, timely, and

14:48:25   15    accurate fashion."

              16    Q.    And LSi complied with that, to your understanding?

              17    A.    We did.

              18    Q.    And all these sections that we're reading off, to

              19    your knowledge, IBIS was subject to as well?

14:48:38   20    A.    Yes.

              21    Q.    By virtue of it having signed a similar document?

              22    A.    Correct.

              23    Q.    Can you read Section 4.10D as in dog for the jury?

              24    A.    "Reseller and SAP will conduct a yearly business

14:48:53   25    review, as directed by SAP."

1   Q.   Do you recall ever being part of a yearly business

2   review with SAP?

3   A.   Yes.

4   Q.   Could you turn to Page 16 of that document?

14:49:24  5   A.   Okay.  I'm there.

6   Q.   Can you look at Section 8, specifically 8.2?

7   A.   Okay.

8   Q.   Can you read that for the jury?

9   A.   "Reports and meetings.  Reseller shall submit those

14:49:47 10   reports and attend those meetings related to the business

11   and marketing and distribution of the software as

12   reasonably requested by SAP from time to time and

13   otherwise in accordance with the SAP partner program."

14   Q.   Can you read Section 9.1 for the jury?

14:50:05 15   A.   "Training obligation.  Reseller and reseller's key

16   sales and marketing personnel and key technical and

17   support personnel shall attend an appropriate number of

18   designated SAP-sponsored software training courses at the

19   rates set forth in SAP's then-current SAP Business One

14:50:25 20   U.S. price list and conditions, or if not applicable,

21   then in accordance with SAP's then-current rates for such

22   services, or as otherwise may be reasonably determined by

23   SAP."

24   Q.   Is that why, as you testified earlier, LSi sent

14:50:44 25   people to SAP training classes?

```
 1    A.    Yes.

 2    Q.    Because this agreement said LSi had to, correct?

 3    A.    Well, you wanted to.  You know, to sell it, install

 4    it, you know, you had to have a quality team of people,

 5    and they had to be trained on Business One.

 6    Q.    And do you believe you had a quality team of

 7    people?

 8    A.    I -- that is the best group I've ever had in 40

 9    years.  I mean --

10              THE COURT:  Mr. Lambert, I may interrupt

11    you now.  We'll take our afternoon recess.

12              Okay, folks, about 15 minutes.  Keep in

13    mind the admonition.

14              THE CLERK:  All rise.

15              (Jury out)

16              (Recess taken)

17              (Proceedings resumed in presence of the

18    jury as follows:)

19              THE COURT:  Have a seat, folks.

20              Go ahead.

21              MR. LAMBERT:  Thank you, Your Honor.

22    BY MR. LAMBERT:

23    Q.    Mr. Lowery, we were going through the LSi SAP

24    America reseller agreement, do you recall that testimony?

25    A.    I do.
```

```
       1    Q.    And we were covering some of the sections that

       2    dealt with maintaining LSi's leads and an SAP database,

       3    correct?

       4    A.    Correct.

15:15:03 5  Q.    That was maintained by SAP?

       6    A.    Correct.

       7    Q.    Correct?

       8                 And the obligation to participate in the

       9    yearly review by SAP?

15:15:09 10 A.    Correct.

      11    Q.    And submitting reports and attending meetings and

      12    trade shows put on by SAP?

      13    A.    Correct.

      14    Q.    Can you turn to Page 17 of that reseller agreement

15:15:23 15 with SAP, please?

      16    A.    What section are we on?  I kind of --

      17    Q.    I'm sorry, Page 17?

      18    A.    Of Section 30?  Tab 30?

      19    Q.    I'm sorry, yes.  Yes, sir.

15:15:34 20 A.    30, 17?

      21    Q.    Yes.  I specifically want to direct your attention

      22    to Section 10.2 of that document.

      23    A.    Okay.  I'm there.

      24    Q.    Could you read the first sentence of that section

15:15:51 25 for the jury?
```

430

1    A.    10.2.  Audit.  During the term of this agreement

2    and during the three-year period immediately following

3    termination, SAP shall have the right to audit the

4    reseller's records concerning reproduction and sub

15:16:06  5    licensing of the software, and any other obligations of

6    reseller to SAP under this agreement.  Such audits shall

7    be conducted at SAP's expense, during normal business

8    hours following written notice, advance notice to

9    reseller not less than ten business days in advance, and

15:16:25 10    in a manner so as to not unreasonably interfere with the

11    reseller's business operations."

12    Q.    And again directing just your attention to just

13    that first paragraph, it was your understanding that SAP

14    had the right to audit your business at any time,

15:16:39 15    correct?

16    A.    Correct.

17    Q.    Can you turn to the next page of that document,

18    Mr. Lowery?

19    A.    All right.  I'm there.

15:16:57 20    Q.    Can you direct your attention to Section 10

21    point -- or, I'm sorry, 11.1B as in boy?

22    A.    Okay.

23    Q.    Can you read just the first sentence of that

24    paragraph for the jury?

15:17:14 25    A.    11.1B.  "Notwithstanding any prior agreements to

1       the contrary, including any SAP end user agreements with

2       reseller, as of the effective date of this agreement, any

3       modifications or unauthorized extensions that are created

4       on behalf of reseller or any third party shall be the

15:17:33  5     exclusive property of SAP."

6       Q.    Can you read the next sentence of that paragraph

7       for the jury?

8       A.    "Reseller expressly assigns any existing rights in

9       such work to SAP and agrees to assign to SAP any such

15:17:49 10     rights that it may subsequently acquire, including but

11      not limited to patent rights."

12      Q.    Thank you, sir.  And can you direct your attention

13      down to the bottom of that page?

14      A.    Okay.

15:18:05 15     Q.    And specifically, Section 11.3.

16      A.    11.3?

17      Q.    Yes, sir.

18      A.    Okay.  Trademarks?

19      Q.    Right.  Can you read 11.3A for the jury?

15:18:24 20     A.    "11.3A.  SAP hereby grants the reseller a

21      nonexclusive, nontransferable, limited license to use the

22      trademarks and service marks used by SAP, SAP AG, or

23      their licensors, in connection with the software

24      collectively the marks."

15:18:44 25     Q.    And can you turn to the next page and read the very

1    last sentence of that paragraph for the jury?

2    A.    "With respect to reseller's use of the marks,

3    reseller shall comply with SAP trademark use guidelines,

4    as same may be amended from time to time, as well as the

15:19:01 5    SAP partner program."

6    Q.    And did LSi, in fact, use the logo of SAP and SAP

7    AG to your knowledge?

8    A.    Yes.

9    Q.    Did SAP or, I'm sorry, did LSi literature relating

15:19:23 10   to Business One and In-Flight -- let's back up.

11              Was there literature or documents relating

12   to Business One and In-Flight prepared by SAP and

13   given -- or prepared by LSi and given to Hodell?

14   A.    Yes.

15:19:38 15   Q.    And --

16   A.    Well, we had plenty of collateral printed.

17              I don't know if we had it printed when we

18   were selling Hodell.

19   Q.    Were there memoranda or other letters to Hodell

15:19:54 20   relating to the Business One and In-Flight program?

21   A.    Well, there was SAP logoing on the developer

22   agreement, wasn't there?

23   Q.    Well, we'll get to that in a minute.

24   A.    Okay.

15:20:07 25   Q.    Did it --

1   A.     Believe me, if we could use it, we put it on there,

2   I guess is how we did it.

3   Q.     Did SAP prepare a press release to announce LSi's

4   introduction as a channel partner?

15:20:21  5   A.     No.  They were supposed to.  That $10,000 sign-up

6   fee, Dan Kraus said five of that would be used for a big

7   event to announce LSi in St. Louis, but that never

8   happened.

9   Q.     Do you recall a template or anything that was given

15:20:39 10   to LSi as --

11   A.     There may have been a template for press releases

12   that we used.  I'm not sure.

13   Q.     Well, can you turn to Exhibit 73 in your binder,

14   please?

15:20:51 15   A.     Okay.

16   Q.     Can you review that document for me?

17   A.     It's a press release, March 15th, 2004.  Okay.

18   It's for LSi as named partner to bring SAP Business One

19   in St. Louis.

15:21:07 20   Q.     And what's the date of that document?

21   A.     March 15th of '04.

22   Q.     And is this on a template that was prepared and

23   provided to LSi by SAP?

24   A.     I don't know.  I mean, I can guess if you want me

15:21:25 25   to read it and see if I wrote it or something, but I

```
          1    don't know.

          2                    MR. MILLER:  Your Honor, I think that's not

          3    necessary for him to be guessing.

          4    A.    It looks like it may have come from SAP.

15:21:37  5    Q.    Well, do you recall having your deposition taken in

          6    this case over the course of several days a few years

          7    ago?

          8    A.    I remember the deposition, yeah.

          9    Q.    And I was there, correct?

15:21:46 10    A.    Yes.

         11    Q.    And Mr. Star was there, correct?

         12    A.    Yes.

         13    Q.    And you were represented by Mr. Hume of the

         14    Reminger firm at the time, is that correct?

15:21:56 15    A.    Correct.

         16    Q.    And, you know, I asked you a bunch of questions and

         17    you provided responses under oath, correct?

         18    A.    Okay.

         19    Q.    And --

15:22:04 20    A.    Yes, I remember that.

         21    Q.    And you were given a chance to review that

         22    deposition after it was taken, correct?

         23    A.    Yes.

         24                    Your question is?

15:22:19 25    Q.    Give me a minute.
```

435

```
 1              MR. LAMBERT:  Your Honor, may I approach

 2     the witness and give him a copy of his deposition?

 3              THE COURT:  You may.

 4     A.   Oh, okay.  Is there a page number?

 5     Q.   I hope your arms are in shape.

 6              Can you turn to Page 325 of your

 7     deposition, Mr. Lowery?  Or, I'm sorry, 352 of your

 8     deposition.

 9     A.   Go to Volume 3 first, I guess.

10              What page?

11     Q.   352, sir.

12     A.   Okay.  I think I'm there.

13     Q.   I'm sorry, 326.  My mistake.

14     A.   Okay.

15     Q.   Actually, it would start on 325.

16     A.   Okay.

17     Q.   You see on Page, or on Line 12 of Page 325, I asked

18     you, "Have you seen Exhibit 73 before?"

19     A.   Yes.

20     Q.   And what was your response?

21     A.   "Okay.  Have you seen Exhibit?  Yes."  I said,

22     "Yes.  What is it?"

23     Q.   And I asked you what is it?

24     A.    "It's a press release that SAP helped us put

25     together and we probably sent it out to local papers in
```

```
  1    St. Louis."

  2    Q.    Thank you, sir.  Let me direct your attention to

  3    the third page of that press release, Mr. Lowery.

  4    A.    I'm sorry?

  5    Q.    The third page.  It will say 73.3 in the bottom

  6    right-hand corner.

  7    A.    Okay.

  8    Q.    Are we there?

  9    A.    I got -- okay.  I think so.  There's no page on the

 10    bottom, but I think I know where you're at.

 11    Q.    It says -- there's a sentence that begins in the

 12    middle "SAP Business One supports."

 13    A.    I'm there.

 14    Q.    Can you read that for the jury?

 15    A.    "SAP Business One supports companies with as few as

 16    ten and as many as several hundred employees, and can be

 17    implemented in as little as one week."

 18    Q.    And do you agree with me that where it says "Ten

 19    and as many as several hundred employees," that means

 20    users for the software?

 21    A.    Yes.

 22                 MR. MILLER:  Objection, Your Honor.

 23                 THE COURT:  Overruled.

 24    Q.    I'm sorry, what was your answer?

 25    A.    Yes.
```

```
 1    Q.    We saw the section of SAP's agreement with LSi that
 2    talked about using the SAP logo.
 3                 Do you recall that a few minutes ago?
 4    A.    Yes.
 5    Q.    And you said that LSi did use SAP's logo, correct?
 6    A.    We did.
 7    Q.    Okay.  Would you turn to Exhibit 134 in your
 8    binder?
 9    A.    Okay.
10    Q.    Can you identify Exhibit 134 for the jury?
11    A.    SAP business partner co-op marketing guide,
12    guideline for application, use and reimbursement.
13    Q.    Is this a document that was produced by LSi in this
14    litigation?
15    A.    Is that a document?
16    Q.    Is this a document that LSi produced as part of its
17    document production in this litigation?
18    A.    I -- I don't know.
19    Q.    You're not sure?
20    A.    How would I know that?
21    Q.    Can you turn to the first page, the very first page
22    of that document?
23    A.    Yes, sir.
24    Q.    It says "Slip sheet" at the top?
25    A.    It says "SAP business partner co-op."
```

438

```
           1    Q.    The very page preceding that, sir?

           2    A.    Oh, introduction?

           3    Q.    No, the very first page.

           4    A.    I'm sorry.  Okay.

15:27:03   5    Q.    It has an exhibit sticker down at the bottom?

           6    A.    Yes.

           7    Q.    And then it has a Bates label up at the top, it

           8    says LSi 9762?

           9    A.    You mean the very first page?

15:27:20  10                MR. MILLER:  Your Honor, we'll stipulate

          11    that this was produced by LSi.

          12    A.    Okay.  LSi 9762 dot PDF, okay.

          13    Q.    That's going to make that pretty simple.

          14                Thank you.

15:27:32  15                Could you turn to -- you've seen this

          16    document before, correct?

          17    A.    Yes.

          18    Q.    And this was given -- was this given to LSi by SAP?

          19    A.    Yes.

15:27:44  20    Q.    And it was given to LSi by SAP as part of LSi being

          21    a channel partner?

          22    A.    Yes.

          23    Q.    For SAP?

          24    A.    Yes.

15:27:52  25    Q.    Turn to the page, bottom right-hand corner, 134.4.
```

1    A.    Okay.  I'm there.

2    Q.    Up at the top, there's an introduction?

3    A.    Um-hmm.

4    Q.    Can you read the first sentence of that

15:28:05  5    introduction for the jury?

6    A.    "SAP business partner program was created to ensure

7    maximum market penetration for SAP and our partners."

8    Q.    Is that your understanding of the purpose of the

9    partner program that LSi was a member of?

15:28:18  10    A.    Yes.

11    Q.    And that, was that your intent as the president of

12    LSi?

13    A.    Yes.

14    Q.    To comply with that first sentence?

15:28:28  15    A.    Yes.

16    Q.    Okay.  There's a section leveraging the SAP brand.

17                 Do you see that?

18    A.    Yes.

19    Q.    Can you read what it says directly under that for

15:28:37  20    the jury?

21    A.    "The SAP brand has significant value.  As a member

22    of our partner program, we encourage you to leverage that

23    brand for name recognition, quality standards and general

24    market awareness."

15:28:50  25    Q.    And there's an SAP logo right below that that says

1    "Business partner," correct?

2    A.    Correct.

3    Q.    Can you read the first sentence right after SAP's

4    logo?

15:29:01  5    A.    "SAP Business One partners may use the SAP business

6    partner logo on all appropriate marketing materials

7    related to Business One product."

8    Q.    And LSi did, in fact, use the SAP logo on its

9    marketing materials, correct?

15:29:15 10    A.    We did.

11    Q.    And did that logo say "SAP America" or "SAP AG" or

12    did it just say "SAP"?

13    A.    Probably on our marketing materials, it said

14    "Business SAP partner" mostly.

15:29:30 15    Q.    But it didn't different between SAP America and SAP

16    AG.  Just said SAP?

17    A.    I don't know.

18    Q.    Is it similar to the one we're looking at on the

19    current page?

15:29:40 20    A.    Did it look like the one on this page?

21    Q.    Right.

22    A.    Yes.

23    Q.    It doesn't mention SAP America or SAP AG, does it?

24    A.    It does not.

15:29:48 25    Q.    Thank you.  I'd like you to flip a few pages

1    further back in that document for me, Mr. Lowery, to the

2    page that has 134.11 down at the bottom.

3    A.    All right.

4    Q.    There's a section called Press Releases and

15:30:09 5    Editorial Coverage.

6    A.    Okay.

7    Q.    Can you read the first sentence under -- under that

8    heading for me?

9    A.    "Public coverage of our joint solution can provide

15:30:20 10    critical market awareness for little or no direct

11    expense."

12    Q.    Joint solution, correct?

13    A.    Correct.

14    Q.    Is that your understanding of what you were

15:30:31 15    engaging in in the sale of Business One and In-Flight to

16    Hodell?

17    A.    It was.

18    Q.    A joint solution with SAP?

19    A.    Yes.

15:30:37 20    Q.    Can you read the first sentence of that second

21    paragraph, "Partners should use"?

22    A.    "Partners should use the SAP Business One PR

23    template for press releases to announce the partnership."

24    Q.    Is that the template that we just reviewed in

15:30:55 25    Exhibit 73?

1    A.    I believe so, yes.

2    Q.    Do you agree that SAP was exercising control over

3    LSi's marketing of the Business One product?

4    A.    Control?

15:31:18  5    Q.    I'm sorry.  Given, given what we've just read, was

6    SAP monitoring how LSi marketed the Business One product?

7    A.    Oh, yes.

8              MR. MILLER:  Your Honor, could we have some

9    questions about what happened instead of just

15:31:32  10    complete --

11              THE COURT:  Really.  I mean --

12              MR. MILLER:  Thank you.

13    BY MR. LAMBERT:

14    Q.    Would you turn to Exhibit 9 in your binder,

15:31:41  15    Mr. Lowery?

16    A.    Okay.

17    Q.    Can you identify Exhibit 9 for the jury?

18    A.    It's IBIS Group letterhead, SAP Business One, is

19    that the one we're talking about?

15:31:57  20    Q.    Yes, sir.

21    A.    SAP Business One for the fastener industry with an

22    SAP business partner logo, dated October, 2004.

23    Q.    Is this a document that Dan Lowery and Dale

24    Van Leeuwen sent to Hodell relating to the Business One

15:32:24  25    product?

          1    A.    It is.

          2    Q.    And I want to direct your attention to the upper

          3    right-hand corner of that document.

          4                 There's an SAP logo on that document,

15:32:35  5    correct?

          6    A.    Correct.

          7    Q.    And it doesn't say SAP America or SAP AG, does it?

          8    A.    I can't see it if it does.  There's some little

          9    tiny print below partner.

15:32:48 10    Q.    You can clearly see it says SAP?

         11    A.    Yes.

         12    Q.    Was that placed on this document with SAP's

         13    authorization?

         14    A.    Yes.

15:32:55 15                 MR. MILLER:  Objection, Your Honor.

         16                 THE COURT:  Overruled.

         17    Q.    Did SAP allow you to put that logo on this

         18    document?

         19    A.    Yes.

15:33:02 20    Q.    And this was given to Hodell-Natco, correct?

         21    A.    This was what?

         22    Q.    This document was given to Hodell-Natco, correct?

         23    A.    Yes.

         24    Q.    In the course of being a channel partner for SAP,

15:33:23 25    did you personally have conversations with SAP employees

1    about the type of customer that Business One should be

2    sold to?

3    A.    Yes.

4    Q.    And what SAP employees specifically do you remember

15:33:37 5    speaking with?

6    A.    Well, if we're talking about Hodell, the first one

7    was Dan Kraus when I told him we were -- when we felt we

8    could bring this deal down, I talked to him about the

9    price guarantees that we were going to need and that sort

15:33:56 10   of thing, and he was super ecstatic.

11            I believe this was the biggest order in the

12   history of Business One channel, I think, unless they've

13   sold a bigger one since we were out of the program.

14   Q.    At the -- well, we'll get into that in a minute.

15:34:15 15   A.    I could understand why they would be excited about

16   this transaction.

17   Q.    I can, but my question is do you recall having

18   conversations with SAP employees about the type of

19   customer that Business One should be sold to in general?

15:34:28 20   A.    Oh, yes.  Sure.

21   Q.    And what SAP -- what SAP employees do you remember

22   having those conversations with?

23   A.    Well, Dan Kraus.  Our primary contacts on the

24   management side were Dan Kraus, Geoff Ashley, Michael

15:34:46 25   Sotnick, although Michael Sotnick was a senior VP, we

             1    didn't talk to him as regularly.  Dan Kraus was the

             2    primary driver.

             3    Q.    What was Dan Kraus's title with SAP to your

             4    knowledge?

15:35:01     5    A.    I think he was director of sales.

             6    Q.    What were --

             7    A.    I'm guessing, but I don't know.

             8    Q.    What, to your knowledge, what did he do as director

             9    of sales?

15:35:10    10    A.    He was the number two guy, clearly the number two

            11    guy, but he ran the channel.

            12              His job was to build the channel and

            13    recruit the partners and get them up and running and he

            14    was -- he was the guy.

15:35:24    15    Q.    Dan Kraus was the gentleman that ran the channel

            16    that LSi was a part of, correct?

            17    A.    Dan Kraus -- could you say that again?

            18    Q.    You said Dan Kraus ran the channel, is that what

            19    you just said?

15:35:38    20    A.    For SAP.

            21    Q.    For SAP?

            22    A.    Um-hmm.

            23    Q.    And that's the channel that LSi was a part of?

            24    A.    Business One channel.

15:35:42    25    Q.    Right.  Okay.  What did Dan Kraus tell you about

1    the type of customer that Business One should be sold to?

2    A.    Well again, early on what -- they sold it for the

3    small-to-medium-sized business sector, and this goes back

4    to when Dale went down there initially, one of the key

15:36:06  5    questions they were asking was because he knew he had

6    Hodell teed up so he asked about --

7              MR. MILLER:  Your Honor, this is someone

8    else's conversation.

9              THE COURT:  Don't tell us -- tell us what

15:36:17 10    you did.  Tell us what you did.

11    Q.    We want to know, Mr. Lowery, I want to know what

12    was said to you.

13    A.    Oh.

14    Q.    To SAP employees about --

15:36:26 15    A.    Right.  They wanted to know the upper limits.  I

16    had conversations with Dan about the upper limits of the

17    package because they knew Hodell was coming, and he

18    assured me that would be no problem.

19              The term they constantly used over and over

15:36:40 20    was there's no theoretical maximum on the number of

21    users.  So we, that's when we full bore started, and then

22    we were told by Dan and, you know, he had a staff

23    underneath him, Eddie Neveux, I can't remember all of

24    them, but, you know, we had to then get our staff

15:36:58 25    trained, we had to get our people up to speed, we had to

```
        1   hire quite a few people to head this project up, what
        2   types of people, they told us what skill sets they
        3   needed, SQL, that type of thing.
        4   Q.    And just so I'm --
15:37:17 5   A.    Constant, constant communications.
        6   Q.    Just so I'm clear, you recall having a conversation
        7   with the head of the SAP Business One channel that you
        8   were a part of in which that person told you there was no
        9   theoretical maximum --
15:37:31 10  A.    Yes.
       11   Q.    -- for the product?
       12   A.    Yes.
       13   Q.    The product being Business One?
       14   A.    Yes.
15:37:36 15  Q.    Did he tell you whether there was any upper size
       16   limit for which the product should be sold to?
       17   A.    No.
       18   Q.    Again, the product being Business One?
       19   A.    No.
15:37:47 20  Q.    Is that one of the first questions that a company
       21   like LSi asks when becoming a partner?
       22   A.    Yes.
       23   Q.    How big can we sell -- how big of companies can we
       24   sell this to?
15:38:02 25  A.    Can it scale -- FACTS had limitations there so we
```

1    all had the same goal, to get a product that didn't have

2    those limitations.

3    Q.    Is that why you were, is that why LSi was

4    interested in becoming a Business One partner?

15:38:13  5    A.    Yes, and the fact of the name.  We saw SAP as a

6    very prestigious name to help us grow.

7    Q.    Okay.  So there were two components, the SAP name,

8    correct?

9    A.    Yes.

15:38:22 10    Q.    And the fact that you could sell to bigger

11    companies?

12    A.    Yes.

13    Q.    Or at least you were told you could, correct?

14    A.    Correct.

15:38:35 15    Q.    Did SAP have a sales methodology that it wanted

16    partners to follow?

17    A.    Yes.

18    Q.    And what was that, sir?

19    A.    It was a very well put together document approach

15:38:56 20    that, you know, my salesman, Tim Lowe, followed to the

21    letter.

22                And it was -- it was quality stuff.  It was

23    from the prospect acquisition all the way to selling.

24    Q.    And just so I'm clear, the questions or the

15:39:14 25    conversations that you had with the head of SAP's

1    channel, as you referred to it, about the size limit for

2    Business One, do you remember that testimony a few

3    minutes ago?

4    A.    Yes.

15:39:24  5    Q.    Was that in regard to Hodell?

6    A.    Specifically Hodell, but in general.  We felt we

7    were going to sell a dozen Hodells.

8    Q.    Okay.  But the conversation that we have here --

9    A.    It was specifically about Hodell, yes.

15:39:41 10    Q.    Okay.  Thank you.

11                You relied upon documentation that

12    SAP -- or did you rely upon documentation that SAP put

13    together in selling Business One to Hodell?

14    A.    Yes.

15:39:58 15    Q.    Do you recall SAP literature that was published by

16    SAP discussing the program?

17    A.    Right.  And presentations.

18    Q.    Literature and presentations?

19    A.    Um-hmm.

15:40:10 20    Q.    Okay.  Can you turn to Exhibit 34 in your binder,

21    sir?

22    A.    Okay.  All right.  I'm there.

23    Q.    Thank you.  Do you -- can you identify this

24    document for the jury?

15:40:30 25    A.    Press fact sheet, press fact sheet, October, 2003.

1    It's an SAP Business One fact sheet.

2    Q.    Is this document part of the information that you

3    relied upon in marketing and selling Business One to

4    Hodell?

15:40:49 5    A.    Yes.

6    Q.    And what in particular in this document did you

7    rely upon in selling Business One to Hodell?

8    A.    Well, obviously the, in the third paragraph, the

9    from 10 to several hundred employees.

15:41:11 10    Q.    And why did you rely upon that section or that

11    statement?

12    A.    Well, because that was the size we felt that Hodell

13    was going to be.

14    Q.    And again, forgive me if I've already covered this,

15:41:26 15    but ten to several hundred employees in this document,

16    did you equate employees with users?

17    A.    I did.

18    Q.    So when it says "Ten to several hundred employees,"

19    you understood that to mean ten to several hundred users?

15:41:38 20    A.    Correct.

21    Q.    Do you recall anyone at SAP ever disagreeing with

22    your interpretation of employees equating to users?

23    A.    Just in the depositions.

24         MR. MILLER:  Objection, foundation.  It's

15:41:55 25    never been established that it's from us.

```
 1                  THE COURT:  Overruled.  Overruled.
 2                  MR. LAMBERT:  I'll restate it again so you
 3      can hear me.
 4      BY MR. LAMBERT:
 5      Q.    Do you recall anyone at SAP ever disagreeing with
 6      your conclusion that ten to several hundred employees
 7      meant ten to several hundred users?
 8                  MR. MILLER:  Your Honor, there's no
 9      foundation.
10                  THE COURT:  Yeah, you have to ask him if he
11      had, you know, the question, what his interpretation was.
12      BY MR. LAMBERT:
13      Q.    Did you make SAP aware that you understood this
14      package to be capable of supporting ten to several
15      hundred users?
16      A.    Yes.  That's -- that's how I interpreted it.
17                  Is that your question?
18      Q.    And was SAP aware that that was your
19      interpretation?
20      A.    One more time?
21      Q.    Was SAP, was any employee of SAP aware that you
22      were under the belief that Business One could support ten
23      to several hundred users?
24      A.    I felt they all were.  They all believed that.
25      Q.    And did any of those people disagree with your
```

1    conclusion?

2    A.    When things started blowing up, we started hearing

3    that you guys made a mistake, you thought users were

4    equal to this, but not when it was being sold and

5    developed, no.

6          Depositions, I heard it in deposition, but

7    that's -- no, not when it was in --

8    Q.    So years after the product was sold was the first

9    time you ever heard that, is that correct?

10    A.    That's correct.

11    Q.    Can you -- I want to direct your attention to the

12    first paragraph of that document, Mr. Lowery.

13          There's a sentence down at the end of that

14    paragraph that starts with "Small businesses."

15          Can you read that for the jury?  It's the

16    very last sentence.

17    A.    "SAP Business One also supports an open migration

18    path to mySAP all-in-one solutions and mySAP business

19    suite offering businesses of all sizes unprecedented

20    levels of integration amongst the parent companies,

21    subsidiaries, vendors, and partners that make up the

22    business ecosystem."

23    Q.    I'm sorry, I must have directed you to the wrong

24    part.

25          Can I direct you to the very first

1    paragraph of that document?

2    A.    Oh.

3    Q.    Up at the top there.

4    A.    Oh, "many smaller businesses"?

15:44:14 5    Q.    No.  Can you read the last sentence of that

6    paragraph for the jury?

7    A.    Okay.  "Small businesses should not have to worry

8    about ripping out an old system because it doesn't scale

9    with them when they achieve their growth goals."

15:44:26 10    Q.    And to your knowledge, was that important to Hodell

11    in selecting an ERP system?

12    A.    Yes.

13    Q.    Why is that?

14    A.    Well, they were on FACTS.  Going to a new system is

15:44:39 15    a very painful migration, regardless of what you do.  You

16    don't want to have to redo it.  That's -- that's a big

17    selling point, as is the thing I read incorrectly.

18    That's a big selling point.

19            I'm sorry.

15:44:56 20    Q.    Companies that -- like Hodell that buy ERP systems,

21    how long do they typically plan to spend on that system

22    when they purchase it?

23            How long do they plan to use it for?

24    A.    That's difficult to answer.

15:45:12 25            I mean, when I was a young IBM guy, if you

1    got five years out of a system, you were -- that was

2    about it.

3              But I think that now today, well, when

4    Hodell bought theirs, I'm sure they were hoping for ten

15:45:27 5    years.

6              Now today people don't even hardly

7    get -- they don't replace them because they can't afford

8    it.

9    Q.    But at the time that Business One was being sold to

15:45:37 10    Hodell, it would be a customer's normal expectation to

11    remain on that system for about 10 years?

12              MR. MILLER:  Objection, Your Honor.

13              THE COURT:  Objection sustained.

14              MR. MILLER:  Thank you.

15:45:47 15    BY MR. LAMBERT:

16    Q.    Can you turn to the next page of that document,

17    Mr. Lowery?

18    A.    Um-hmm.

19    Q.    I want to direct your attention to the paragraph

15:45:58 20    "Technology to support growth."

21    A.    Okay.

22    Q.    Again, this is part of the information you relied

23    upon in marketing Business One to Hodell?

24    A.    I did.

15:46:06 25    Q.    Can you read the first section -- or the first

1    paragraph of that section for me?

2    A.    "Technology to support growth, an integrated sales

3    force automation system includes pipeline tracking,

4    opportunity management, strategic selling, and contact

15:46:23 5    management."

6              Is that what you want me to read?

7    Q.    And did Hodell make it clear to you during the

8    sales process that they were looking for technology to

9    support their growth?

15:46:34 10    A.    Yes.

11    Q.    Was that ever a question in your mind as to why

12    Hodell was looking for a new ERP system?

13    A.    No.

14    Q.    It was always made very clear from day one?

15:46:47 15              MR. MILLER:  Your Honor, this is the third

16    leading question in a row.

17              THE COURT:  Objection sustained.

18              MR. MILLER:  Okay.

19    Q.    Can you direct -- I want to direct your attention

15:46:57 20    to the section titled "SDK," please.

21    A.    Okay.

22    Q.    What does SDK mean, if you know?

23    A.    It means to me "software development kit, the new

24    SAP Business One solution development kit allows SAP

15:47:14 25    partners to extend and change functionality of SAP

1    Business One in order to create industry-specific

2    functionality, complementary capabilities, or interfaces

3    to a third-party tools and systems."

4    Q.    Kim, would you mind highlighting that for me?  I

15:47:33  5    want to spend a little time with this.

6              In laymen's terms, what is this paragraph

7    of this document discussing?

8    A.    In laymen's terms, it eases the partner's ability

9    to develop code that works with Business One and ensures

15:47:57 10    that it works in the proper way with Business One.

11    Q.    In your experience as a channel partner of SAP, was

12    that one of the main selling points for Business One?

13    A.    I would say no, because that just -- that was just

14    one of those things they came and said Dan, we got to go

15:48:21 15    to SDK school, we got to learn to do this, and I said

16    okay, let's go.

17              Was it a selling -- maybe to the technical

18    people, but not to me it wasn't.

19    Q.    No, I think my question was poorly phrased.

15:48:31 20              To -- for LSi, was it important that LSi

21    would be able to develop added functionality to SAP

22    Business One?

23    A.    Oh, yes.  Critical.  I mean, then it became

24    supported, authorized, endorsed, whatever.

15:48:50 25    Q.    What became supported and authorized and endorsed?

1    A.    Third-party code.  If you use the software

2    development tool kit, as I understood it, then that means

3    the code that is produced will work with the base

4    Business One package.

15:49:05  5    Q.    Okay.  And is that one of the reasons that LSi was

6    interested in becoming a Business One partner?

7    A.    I'm not sure how to answer that.

8    Q.    In other words, when --

9    A.    To develop an add-on?

15:49:21 10    Q.    Yes.

11    A.    Oh, yes, it's critical.

12    Q.    Why is that?

13    A.    Well, that's the whole reason.  My whole business

14    strategy was to develop add-ons, whereas some companies

15:49:31 15    don't.  They just will sell the vanilla Business One, and

16    that's fine.

17              But we feel we control our future a lot

18    more by developing our own intellectual property.

19    Q.    Can you read the last sentence of that SDK section

15:49:53 20    for the jury?

21    A.    "The SAP Business One SDK encourages development

22    to provides customers with more choices and applications

23    for managing their business with SAP Business One."

24    Q.    At any time, did anyone at SAP discourage LSi from

15:50:15 25    developing the In-Flight add-on product?

```
 1    A.    Oh, no.  It was a big deal for them.

 2    Q.    A big deal for who?

 3    A.    SAP.

 4    Q.    Why is that?

 5    A.    Well, it's we sell more, we sell more Business One.

 6    If we penetrate a -- like in this case, the fastener

 7    industry and we could grab control of that, there's a big

 8    number of sales right there for Business One.

 9    Q.    And that was LSi's intent?

10    A.    Yes.  It was our intent.

11    Q.    And SAP's intent as well, to your knowledge?

12    A.    And SAP's intent.

13    Q.    And in the course of marketing and selling Business

14    One to Hodell, did you represent to Hodell that Business

15    One could be easily customized to fit the fastener

16    industry?

17             MR. MILLER:  Objection, Your Honor.  Could

18    we ask --

19             THE COURT:  Overruled.

20    A.    I don't know if the word "Easily" because this was

21    a big project.

22    Q.    But the ability of Business One to be customized

23    with add-on products that Hodell needed --

24    A.    Yes.

25    Q.    -- was part of the selling point to Hodell,
```

459

1    correct?

2    A.    Yes.  Yes.

3    Q.    Okay.  Thank you.

4          And they bought Business One with the

15:51:30  5    understanding that it was customizable, correct?

6    A.    Correct.

7                MR. MILLER:  He's testifying as to --

8                THE COURT:  Objection sustained.

9                MR. MILLER:  Thank you.

15:51:45 10    BY MR. LAMBERT:

11    Q.    Can you turn to Page 34.3 of that document, sir?

12    A.    Okay.

13    Q.    Are you there?

14    A.    I -- I am.

15:52:00 15    Q.    There's a section titled "Business Benefits of SAP

16    Business One," correct?

17    A.    Correct.

18    Q.    Are these selling points that SAP made you aware of

19    as part of -- as a channel partner of LSi -- or as a

15:52:15 20    channel partner of SAP?

21    A.    These, these were good selling points.  You're

22    right.

23    Q.    And did you use these selling points when you were

24    marketing and selling Business One to Hodell?

15:52:23 25    A.    Yeah.  You want me to go through every one?

1    Q.    I'm going to ask you about them specifically?

2    A.    The drag and relate was a big deal.  Easy

3    implementation, everybody wants that.

4    Q.    I want to ask you to read enhanced productivity and

15:52:40 5    control.

6              Can you read that first sentence for the

7    jury?

8    A.    Right.  "Enhanced productivity and control.

9    Increased employee productivity, enhanced communication

15:52:49 10    with suppliers, and improved efficiency of all operations

11    add up to unsurpassed cost control."

12    Q.    And that was the selling -- one of the selling

13    points of Business One?

14    A.    Sure.

15:53:00 15    Q.    And that was communicated to Hodell?

16    A.    Sure.  Yes.

17    Q.    By you?

18    A.    By my team, yes.

19    Q.    And can you turn to -- actually on the same page,

15:53:14 20    new opportunities for success.

21    A.    Yes.  Read it?

22    Q.    Can you read that section?

23    A.    "The collaborative workgroup solution provides fast

24    and easy access to real-time information and supports

15:53:28 25    multiple, simultaneous transactions -- enabling companies

```
          1    to identify and manage new sales opportunities and

          2    quickly bring new products to market."

          3    Q.    Multiple simultaneous transactions, correct?

          4    A.    Correct.

15:53:42  5    Q.    And that was one of the selling points you used in

          6    selling Business One to Hodell?

          7    A.    I --

          8                MR. MILLER:  Objection.

          9    A.    I don't know but --

15:53:52 10                MR. MILLER:  He hasn't testified as

         11    to -- he hasn't been asked what he said to Hodell.  He's

         12    just asked a series of leading questions.

         13                THE COURT:  Yeah, really.  How about

         14    letting him testify?

15:54:02 15                MR. LAMBERT:  Okay.

         16                THE WITNESS:  Am I to answer something?

         17                MR. LAMBERT:  No, I'm thinking too slowly.

         18    I'll think faster.

         19                THE WITNESS:  Okay.

15:54:16 20    BY MR. LAMBERT:

         21    Q.    Can you turn down to -- actually look down at the

         22    bottom of the page, there's a section "Unmatched

         23    expertise."

         24    A.    Okay.

15:54:25 25    Q.    Can you read that for the jury?
```

A.      "Unmatched expertise.  Because SAP Business One is
delivered through a network of highly qualified channel
partners who understand the specific challenges facing
small and midsize businesses, customers receive
world-class service and support."

Q.      And to your knowledge, did SAP consider LSi to be
one of those highly qualified channel partners?

A.      Well, my mother said never brag on yourself, but we
were a customer -- we were a company at that point, we
had approximately 80 installed FACTS accounts, so that
was a -- that's a sizable footprint of customers.

        And I think when we left the SAP program,
we had 14 that we sold in those couple, three years,
however long we were a partner.

        I mean, we could sell and install.  And our
customer set was pretty good, so I would say we were a
high quality partner for them.

Q.      Do you recall what you had told Hodell about LSi's
relationship with SAP?

A.      In regards to?

Q.      In regards to the sale channel for SAP Business
One.

A.      You mean that we were the agent to sell that?  I'm
not sure I --

Q.      Well, did you say that?

1          MR. MILLER:  Objection, Your Honor.

2          THE COURT:  Overruled.

3     A.    I'm not sure how to answer that.

4          THE COURT:  Overruled.

15:55:59 5     A.    I'm not sure how I address --

6     Q.    Did you say something similar to that effect to

7     Hodell?

8          THE COURT:  No, ask him what did

9     you -- please.  What did you say?  What was your

15:56:09 10    relationship to SAP?

11    A.    SAP.  Well, we represented ourselves as the

12    developer of the third-party add-on and an authorized

13    reseller of SAP to Hodell.

14         THE COURT:  Thank you.

15:56:24 15    Q.    Can you read the very last bullet point at the

16    bottom of 34.3 for the jury?

17    A.    Okay.  "Sales and support by channel partners.  SAP

18    Business One is sold exclusively through qualified SAP

19    channel partners, who are selected and based on their

15:56:40 20    expertise in managing mission-critical business processes

21    and ability to help customers develop successful,

22    long-term IT strategies."

23    Q.    Was LSi selected by SAP?

24    A.    Yes.

15:56:57 25    Q.    Was LSi selected by SAP based on their expertise,

1    on its expertise?

2    A.    I would say yes.

3    Q.    Directing your attention back up to the enhanced

4    productivity and control section, do you see that?

15:57:21 5    A.    I do.

6    Q.    SAP Business One was -- was SAP Business One

7    eventually installed at Hodell?

8    A.    Yes.

9    Q.    And Hodell went live on Business One?

15:57:33 10    A.    Yes.

11    Q.    Did Hodell, when it was using Business One,

12    experience enhanced productivity and control over its

13    business?

14              MR. MILLER:  Objection, Your Honor.

15:57:44 15              THE COURT:  Objection sustained.

16              MR. MILLER:  Lack of foundation.

17              Thank you.

18    BY MR. LAMBERT:

19    Q.    Are you aware of how SAP Business One functioned at

15:57:52 20    Hodell when it was running?

21    A.    It functioned, the functions were great.  It was

22    slow.

23    Q.    In other words, what do you mean by slow?

24    A.    The response time to the end users.

15:58:11 25    Q.    Okay.  So do you know whether that slowness

         1    inhibited the enhanced productivity and control of

         2    Hodell's business?

         3    A.    Well, I don't see how it could not have.

         4    Q.    And why is that?

15:58:28  5    A.    Well, we spent, from the time they went go-live

         6    which was, again, what, March, '07 through some time in

         7    '08, I mean, we were just nonstop trying to fix problems,

         8    problems, problems, problems.

         9                So I mean, it had to affect their

15:58:54 10    productivity.  They had to duplicate employees in some

        11    instances and allow us to get in there and do the -- you

        12    know, as this was going on, we were -- we had -- right

        13    after go-live, we pretty much devoted most of the

        14    resources of the company, at that time it was 40 people,

15:59:16 15    now we're eight people, to fix Hodell.

        16                So we were involved in data collection and

        17    I think I remember one of the questions earlier, did you

        18    measure the response times or something, all that had to

        19    have been done and documented and sent to SAP Germany.

15:59:35 20    It was huge.

        21                MR. MILLER:  Objection, Your Honor.

        22                THE COURT:  Objection sustained.

        23                MR. MILLER:  Thank you.  And move to

        24    strike.

15:59:39 25                THE COURT:  All right.  We don't need any

```
          1    speeches.

          2                    Ask a question, please.

          3                    MR. LAMBERT:  I will.

          4    BY MR. LAMBERT:

15:59:44  5    Q.    Can you turn to the next page of that document,

          6    34.4?

          7    A.    Okay.

          8    Q.    I'd like to ask you a question about the very first

          9    sentence on that page, starts with "SAP channel partners

15:59:56 10    provide."

         11                    Can you read that first for the jury?

         12    A.      "SAP channel partners provide customers with

         13    committed support and expertise, fully backed by the

         14    resources of SAP."

16:00:06 15    Q.    In your mind, was that a selling point for Business

         16    One?

         17    A.    Sure.

         18    Q.    Was that important -- to your knowledge was that

         19    important to Hodell?

16:00:15 20    A.    Sure.

         21    Q.    Can you turn to the next exhibit in that binder,

         22    Mr. Lowery?  It's Exhibit 35.

         23    A.    Okay.

         24    Q.    Can you identify this document for the jury?

16:00:32 25    A.    You mean Plaintiff X-35?
```

```
           1    Q.    Yes, sir.  X is short for exhibit.

           2    A.    I'm sorry?

           3    Q.    X is short for exhibit, so that's Exhibit 35.

           4    A.    Okay.

16:00:47   5    Q.    Can you identify that exhibit for the jury?

           6    A.    Introducing SAP Business One 2004.

           7    Q.    Can you tell the jury what this document is?

           8    A.    It's a marketing document.

           9    Q.    Is it a marketing --

16:01:05  10    A.    Sales document.

          11    Q.    What product is it discussing?

          12    A.    SAP Business One.

          13    Q.    Does it indicate who the publisher of that document

          14    is?

16:01:13  15    A.    Who the publisher is?

          16    Q.    Yeah, who -- yeah.

          17    A.    Where would I find that?  Oh, SAP AG.

          18    Q.    Did you utilize any of the information in Exhibit

          19    35 in selling Business One to Hodell.

16:01:36  20    A.    I'm sure we passed these out.

          21                Wait a minute, this is a partner brief,

          22    2004, June, a partner brief.  So this is a marketing

          23    document to us, to try to give us to get on board with

          24    them.

16:01:52  25    Q.    Was this a marketing document that was provided to
```

```
 1   LSi by SAP?
 2   A.    Yes.  So this would be distributed from SAP to the
 3   partners, or potential partners.
 4   Q.    And again, what's the date of the document?
 5   A.    June, 2004.
 6   Q.    And turn to 35.4 of Exhibit 35, Mr. Lowery.
 7   A.    Okay.  I'm there.
 8   Q.    Is there anything on this page that you utilized in
 9   marketing Business One to Hodell?
10   A.    I have to read it.  The bullet points are enhanced
11   productivity, management insight, broad functionality,
12   SAP commitment.
13             I don't know how to answer that.
14   Q.    Well, you testified that this was literature given
15   to LSi by SAP, correct?
16   A.    Right.
17   Q.    For use in marketing Business One to end users like
18   Hodell?
19   A.    Right.  I mean, the drag and relate features, we
20   use that all the time.
21             Single, integrated, high performance
22   solution, SAP all over it, big deal.  So in one form or
23   another, yes, these were selling points.
24             I'm sure we used them at Hodell.
25   Q.    Do you recall any of those selling points being
```

```
 1   important to Hodell in deciding whether to purchase
 2   Business One?
 3                   MR. MILLER:  Objection, Your Honor.
 4                   THE COURT:  Sustained.
 5                   MR. MILLER:  Thank you.
 6   A.    Hodell would answer that.
 7   Q.    Okay.  Could you turn to the next exhibit,
 8   Mr. Lowery, 36?
 9   A.    Okay.
10   Q.    Can you identify Plaintiff's Exhibit 36 for the
11   jury?
12   A.    It's an SAP solution brief.
13   Q.    Do you see -- have you seen Exhibit 36 before?
14   A.    Yes.
15   Q.    Can you explain what it is to the jury?
16   A.    It's a sales document, it appears.  Yeah.  It's
17   going to many of these companies --
18   Q.    If it's hard for you to read --
19   A.    Yes.
20   Q.    -- I can have Kim blow it up on your screen for
21   you.
22   A.    No, I can read it.  Just give me a second.
23   Q.    Okay.
24   A.    Well, I mean, it's a marketing or sales document
25   for Business One.  I can't determine if it's to partners
```

1    or customers.  It can go to either, it appears.

2              Whether you have five employees or 500, so

3    it must be to customers.

4    Q.    Do -- can I direct your attention down to the

16:04:49  5    bottom right-hand corner where it says "LSi"?

6    A.    Yes.

7    Q.    To your knowledge, does that indicate it was

8    produced by LSi in this litigation?

9    A.    Okay.

16:04:57 10    Q.    Is that correct?

11    A.    That's correct.

12    Q.    Okay.  Do you see some handwriting on that

13    document?

14    A.    2004-5 on the top, and a star next to part of the

16:05:11 15    paragraph.

16    Q.    Whose handwriting is that?

17    A.    Mine.

18    Q.    That's your handwriting?

19    A.    Um-hmm.

16:05:17 20    Q.    What's the significance of the handwriting?

21    A.    What's the significance of it?

22    Q.    Yeah, why did you write that on there?

23    A.    Let's see here.  Well, I put a star next to things

24    that I think are important.  You want me to read what I

16:05:31 25    thought was important?

471

1    Q.    Well, first of all, why did you think it was

2    important?

3    A.    Well, it mentions five employees to 500 employees.

4    Q.    Why do you think that was important?

16:05:46  5              MR. MILLER:  Your Honor, could we have it

6    somewhat established when this was, whether it was in

7    2003 or '04 or whether it was part of this litigation

8    when he produced this document?

9              THE COURT:  Good point.  He said it was

16:05:58 10   produced in litigation.

11             MR. MILLER:  The document was produced in

12   the litigation, and he's asking questions about this star

13   that's supposedly --

14             THE COURT:  When did you write on the

16:06:05 15   document?  That's a pretty simple way to do it.

16             THE WITNESS:  I don't know.

17             THE COURT:  There you go.

18             MR. MILLER:  Thank you.

19             THE COURT:  Thank you.

16:06:15 20             MR. MILLER:  I'd object to this line of

21   questioning.

22             THE COURT:  Yeah, move on to something

23   else.

24   BY MR. LAMBERT:

16:06:20 25   Q.    Well, can you read --

         1          THE COURT:  He doesn't have to read.  You
         2   can argue it later.
         3          MR. LAMBERT:  Okay.
         4          THE COURT:  You can read it if you want.
16:06:28 5   BY MR. LAMBERT:
         6   Q.    Did you rely upon any of this in marketing Business
         7   One to Hodell?
         8   A.    Sure, the five to 500 employees, it's always there.
         9   Q.    And you understood that to mean five to 500 users,
16:06:39 10  is that correct?
        11   A.    Yes.  At that time, sure.
        12   Q.    And you told Hodell, based upon that, that Business
        13   One would be appropriate for five to 500 users, correct?
        14          MR. MILLER:  Objection, Your Honor.
16:06:52 15         THE COURT:  Objection sustained.
        16          MR. MILLER:  Thank you.
        17          THE COURT:  How about a little direct?
        18   You're doing all the testifying here.
        19   BY MR. LAMBERT:
16:06:59 20  Q.    Mr. Lowery, what did you tell --
        21          THE COURT:  You can ask him did you talk to
        22   somebody at the Plaintiff's, who did you talk to, what
        23   did you tell them.
        24          MR. LAMBERT:  Sure.
16:07:11 25         THE COURT:  That's the easy way to do this.

```
 1              MR. LAMBERT:  Sure.

 2    BY MR. LAMBERT:

 3    Q.    Mr. Lowery, did you talk to anybody at Hodell about

 4    Business One?

 5    A.    Dale did most of the selling and talking on this.

 6    Q.    But did you have any conversations with Hodell as

 7    well?

 8    A.    Yes.  After -- I don't know what specifically time

 9    frame.  I don't know.

10    Q.    But before the development agreement was signed,

11    did you meet with Hodell?

12    A.    Oh, yeah.  Yes.

13    Q.    Did you talk -- who did you talk with at Hodell?

14    A.    Otto, Kevin, I'm sure.  I can't be for sure.

15    Q.    And what did you talk about?

16    A.    You know, the development, the potential of doing

17    business, going through their operation.  Reviewing what

18    Dale and Otto and Kevin, I'm sure, talked about and this

19    and that.

20              And I'm sure the topic of will this grow

21    with us came up, and that's why they're going with SAP,

22    if that's what you're asking.

23    Q.    Did the number of users that the software could

24    support ever come up in your conversations with Hodell?

25    A.    I can't remember, to be honest with you.
```

1          It was just a fact at that point.

2     Q.    What was a fact?

3     A.    That they support up to 500 was the number that was

4     being published by SAP.

16:08:38  5     Q.    Do you remember the number of users the software

6     could support being important to Hodell?

7     A.    Sure.

8     Q.    And why was that?

9     A.    When was that?

16:08:50  10               MR. MILLER:  Objection.

11               THE COURT:  Objection sustained.

12    A.    Well --

13    Q.    How do you -- do you remember the number of users

14    that Business One could support being important to

16:08:59  15    Hodell?

16    A.    The first time I heard that was important is when

17    Dale came back from visiting with SAP, becoming a

18    partner, and he said he asked how many users it would

19    support because that was --

16:09:11  20               MR. MILLER:  Objection, Your Honor.

21               THE COURT:  Objection sustained.

22               MR. MILLER:  They --

23    Q.    I'm not asking what Dale said.  I'm asking about

24    the importance to Hodell.

16:09:20  25               Do you recall the number of users that

```
      1    Business One could support being important to Hodell?
      2                    MR. MILLER:  Your Honor, that's the
      3    problem, he's trying to get the witness to testify as to
      4    what was important to Hodell.
16:09:30  5                    THE COURT:  Yes, right.  You can have them
      6    testify about it.
      7                    He just said before he doesn't remember who
      8    he talked to or what exactly they said, but they
      9    discussed a lot of things.  If you can get more direct
16:09:44 10   than that, then go ahead.
     11    BY MR. LAMBERT:
     12    Q.    Sir, I just want to back up.
     13                    Do you remember when -- who you talked to
     14    at Hodell during the sales process?
16:09:57 15   A.    During the sales process?
     16    Q.    Yes.
     17                    MR. MILLER:  Objection.  Your Honor --
     18                    THE COURT:  Overruled.
     19                    THE WITNESS:  I didn't understand.
16:10:10 20                    THE COURT:  I know.  When you tried to make
     21    the sales pitch to Hodell, who did you talk to?
     22                    THE WITNESS:  The sales pitch was made by
     23    Dale.
     24                    THE COURT:  All right.  So it wasn't made
16:10:21 25   by you, right?
```

1          THE WITNESS:  The what, sir?

2          THE COURT:  It was not made by you, the

3   sales pitch?

4          THE WITNESS:  No.

16:10:26  5          THE COURT:  Thank you.

6   BY MR. LAMBERT:

7   Q.   Sir, is it your testimony here today that you

8   didn't make any representations to Hodell about the

9   capability of the Business One software?

16:11:02  10  A.   Did -- I didn't understand that.

11  Q.   Is it your testimony that you did not have any

12  conversations with Hodell about the number of users that

13  the Business One software could support?

14  A.   I don't -- here's how I'll answer that.

16:11:23  15          I mean, I don't remember specifically

16  telling Otto or Kevin it will support 500.

17          I do remember that it was just a fact at

18  that point that the product -- it had already been

19  discussed that that was the upper limit that this product

16:11:38  20  would handle.

21          Now, could I have said that in addition to

22  Dale?  Yes, but I don't specifically remember it.

23  Q.   So you're not denying that you might have said that

24  to Hodell?

16:11:51  25  A.   No, I'm not denying that at all.

```
 1                    MR. MILLER:  Objection.

 2                    THE COURT:  Objection sustained.

 3                    MR. MILLER:  Thank you.

 4    BY MR. LAMBERT:

 5    Q.    Did you have any knowledge about what was important

 6    to Hodell in selecting an ERP system?

 7    A.    Yes.

 8    Q.    What was the basis for that knowledge?

 9    A.    My people reporting to me, telling me; Dale

10    specifically.

11    Q.    What was your understanding of what was important

12    to Hodell?

13    A.    Scaleability.

14    Q.    What do you mean by that?

15    A.    Number of users.

16                    MR. MILLER:  Objection, Your Honor.

17    Mr. --

18                    THE COURT:  Objection sustained.  We went

19    over this several times.

20                    MR. MILLER:  Thank you.

21    BY MR. LAMBERT:

22    Q.    Did you have any communications with anyone at SAP

23    during the sales cycle of Business One to Hodell?

24    A.    I'm sure, yes.

25    Q.    Do you recall who you spoke with?
```

```
 1   A.    Well, again, my primary contact was --
 2              MR. MILLER:  Your Honor, forgive me, but
 3   this has been gone over.  He already testified --
 4              THE COURT:  He has.  Let's see if he says
 5   something different.
 6   A.    Dan Kraus, Geoff Ashley, primarily.
 7   Q.    Do you recall when you would have first -- did you
 8   ever mention Hodell by name to any SAP employee?
 9   A.    Yes.
10   Q.    Do you recall when you first would have done that?
11   A.    To Dan Kraus it was at dinner in St. Louis at a
12   restaurant called the Crossing when I told him that we
13   were about to sell it.
14   Q.    So Business One had not been sold to Hodell at that
15   point?
16   A.    We did not have a contract, no.
17   Q.    Do you recall what year that was?
18   A.    '04, probably November, '04, December, '04.
19   Q.    Could you turn to Exhibit 71 in your binder,
20   Mr. Lowery?
21   A.    Okay.
22   Q.    Can you identify Exhibit 71 for the jury?
23   A.    It's a letter, it's -- what is this?
24              It's an e-mail from Dale Van Leeuwen to me,
25   copied Jon Woodrum who was my vice president.
```

```
  1   Q.    Can you scroll through the whole thing or flip
  2   through the whole thing and just --
  3   A.    It's titled funding for the development, and I
  4   presume it's Hodell's development.
16:14:27  5   Q.    Could you turn to the last page of it?
  6                  MR. MILLER:  Objection.
  7                  THE COURT:  Overruled.
  8                  MR. MILLER:  It's something not based on
  9   any evidence.
16:14:33 10                  THE COURT:  Is that what it is or --
 11                  MR. MILLER:  No, it's not.  The word
 12   "Hodell" is not in the document.
 13                  THE COURT:  Well, what is it?
 14                  MR. LAMBERT:  I'm asking him to identify
16:14:41 15   it.
 16   BY MR. LAMBERT:
 17   Q.    Can you identify this document for the jury?  How
 18   about rather than the whole document, we can just go to
 19   specific parts of it, would that be better?
16:15:30 20   A.    Yeah.
 21   Q.    Turn to Page 71.3.
 22   A.    Okay.
 23   Q.    There's an e-mail down at the bottom of that, that
 24   page?
16:15:41 25   A.    Okay.
```

1    Q.   At the bottom of 71.3?

2    A.   Okay.

3    Q.   It says from D. Lowery at LSiSTL.com?

4    A.   Okay.

16:16:00  5    Q.   Was that -- was that your e-mail address?

6    A.   Yes.

7    Q.   And do you recall sending that e-mail?

8    A.   Is this the one July 21st?

9    Q.   That's the one I'm discussing, yes.

16:16:11 10    A.   To Dan Kraus?  Well, let me just read it here.  I

11   mean do you want me to read it or just --

12   Q.   I want you to --

13   A.   Did I send it?  Yes.

14   Q.   That's an e-mail you sent?

16:16:37 15    A.   Yes.

16   Q.   And who is it to?

17   A.   To Dan Kraus.

18   Q.   And Dan Kraus is with SAP?

19   A.   Dan Kraus is with SAP.

16:16:47 20    Q.   What's the date of the document, sir?

21   A.   July 21st, 2004.

22   Q.   The date of the e-mail is July 21st, 2004, correct?

23   A.   Correct.

24   Q.   Is this prior to Hodell executing any agreements

16:17:07 25   with LSi?

1    A.    Yeah, that was December, correct, 2004?  I'm

2    asking.  I mean, can somebody help me?  I'm --

3    Q.    If you want, you can turn to Exhibit 291 in your

4    binder if that will help you out.  A lot of this happened

16:17:34  5    a long time ago.

6    A.    It would -- it's -- I'm sorry, did we already look

7    at 291?

8    Q.    Yes.  291, sir.

9    A.    291.  Okay.  This is dated November 30th, 2004.

16:17:52 10    Q.    What is Exhibit 291?

11    A.    Actually it was signed on 12/24/04 so.

12    Q.    What was?

13    A.    The development agreement.

14    Q.    Okay.  So going back to Exhibit 71, does that

16:18:06 15    refresh your recollection as to whether Hodell had signed

16    anything prior to you sending this e-mail?

17    A.    Right, they had not signed anything prior to that

18    e-mail.

19    Q.    What's being discussed in Exhibit 71?

16:18:22 20    A.    What does that e-mail say?

21    Q.    Yeah, what's being discussed, what are you telling

22    Dan Kraus in Exhibit 71?

23    A.    "Dan, hope all is going well," do you mind if I

24    read it, jury?

16:18:36 25                   THE COURT:  Go ahead.

1    A.     "I was happy to see that we have our first SAP

2    Business One sale, Kato," K-A-T-O, "in Virginia, and then

3    hopefully DRI in Kansas City," which we got that as well,

4    "Will happen next week.  Our pipeline continues building

16:18:54  5    which we will forward to Ken Lorenzo, Ken L., early next

6    week."  There's another guy we talked to often.

7                "Dale Van Leeuwen has back surgery

8    scheduled tomorrow and will be recuperating for three

9    weeks.  We plan to have him working, however, from his

16:19:10 10   bed.  Right, Dale?"  So he must have been copied on

11   this.

12                "He has a stack of things that can be done

13   from home.  Dale and I have been talking about two large,

14   close prospects who want us to write our equipment rental

16:19:28 15   and fastener functionality to SAP.  One is currently

16   installed on FACTS, and the other is waiting for us to

17   propose the cost and timeline for our equipment rental on

18   SAP Business One.  They are both 150-user deals which

19   would give us two verticals for the SAP Business One

16:19:46 20   product.  Personally, I feel verticals are the quickest

21   route to continuing SBO sales.

22                "Ken Lorenzo mentioned the possibility of

23   SAP helping on the funding of this development if we

24   delivered a business plan that built a solid case.  I

16:20:02 25   believe we are in that position to do so.  Can you help

1    us understand what SAP is looking for from us, and to

2    what extent they might help?  Let me know when a good

3    time to call and discuss might be."

4    Q.    Thank you.  That e-mail mentioned 150-user deals,

16:20:23 5    do you remember reading that part?

6    A.    Yes.

7    Q.    Was one of those Hodell?

8    A.    Yes.

9    Q.    Had you had any discussions with Dan Kraus about

16:20:32 10   Hodell by the time you sent this e-mail?

11   A.    Well, we don't tell him the name on the e-mail.  I

12   mean, did I talk to him before I sent that e-mail about

13   Hodell?  I'm confused.

14   Q.    Yes, that was my question.

16:20:45 15   A.    Not specifically about Hodell, other than

16   generically right there.

17   Q.    Okay.  Did Dan Kraus reply to you?

18   A.    Well, we never got any money, so I guess he

19   replied.

16:21:04 20   Q.    Is there an e-mail in that chain on Exhibit 71

21   where Dan Kraus replies to you?

22   A.    Well, hang on.  I mean, let me crawl up here.

23        Okay.  Dan Kraus to me.  "Please see note

24   from Ralf below.  I think we can help you land your

16:21:18 25   current prospects with the promise of a larger SAP

1    relationship for the product, and we can make some

2    commitments on helping you market the solution once it is

3    done (or close) but we have not been doing direct

4    development funding."

16:21:36  5    Q.    And what's the solution, to your knowledge, that's

6    being referenced in this e-mail?

7    A.    In-Flight Enterprise.

8    Q.    That would be integrated into Business One?

9    A.    Yes.

16:22:03 10    Q.    Can you turn to Exhibit 40 in your binder?

11    A.    Okay.

12    Q.    Can you identify Exhibit 40 for the jury?

13    A.    E-mail from me to Dan Kraus, carbon copy Dale, Jon

14    Woodrum, and this is dated November, '04.

16:22:26 15    Q.    That's an e-mail you sent to Dan Kraus November of

16    '04?

17    A.    Right.  Okay.  So this may be the first time he

18    heard the words "Hodell."

19          "LSi/IBIS has an opportunity with Hodell,

16:22:40 20    an existing IBIS fastener customer using FACTS.  The

21    owner has given verbal agreement to pre-paying a portion

22    of their SAP licenses, as a way for LSi/IBIS to fund the

23    programming development to convert our fastener specialty

24    to SAP Business One."

16:22:58 25          Do you want me --

1    Q.    What's the fastener specialty you were mentioning

2    in this e-mail?

3    A.    In-Flight Enterprise is what it eventually was

4    named, the one Hodell ran.

16:23:10  5    Q.    There's a statement, "He's willing to do this for

6    four reasons," do you see that?

7    A.    Yes.

8    Q.    Can you read those for the jury?

9    A.    "He is willing to do this for four reasons,"

16:23:20 10    talking about Otto.

11              "He has tremendous confidence and respect

12    for Dale Van Leeuwen and IBIS fastener software.  He is

13    on a growth path, mostly through acquisitions, that his

14    existing software architecture struggles with.  SAP

16:23:36 15    Business One affords him flexibility and growth paths.

16    LSi/IBIS can integrate Radio Beacon successfully into his

17    operation and SAP Business One.  He has seen and feel the

18    functionality of SBO, SAP Business One, is what he

19    needs" -- oh, "he has seen it and feels the functionality

16:23:59 20    of SAP Business One is what he needs from a software

21    package."

22    Q.    And who is the "He" you're referring to there?

23    A.    Otto, Otto Reidl.

24    Q.    Do you see the next part of that e-mail, you list

16:24:18 25    benefits, do you see that?

         1    A.    Benefits.

         2    Q.    What's that?  Can you read that for the jury?

         3    A.    "Benefits to SAP Business One," so this would be

         4    benefits to SAP.

16:24:29 5          "If we develop our vertical for Hodell, a

         6    full function fastener company, we would now have a

         7    vertical solution for the complete industry to use, could

         8    use.

         9          "The market potential is large.  It

16:24:42 10   appears there could be an immediate pool of prospects of

         11   500 companies.

         12         "Hodell is very visible in the industry.

         13         "Hodell is growing and could double in

         14   users within one year or sooner."

16:24:54 15   Q.    Can you turn to the next page of that document?

         16   A.    Okay.

         17   Q.    What's that page?

         18   A.    An Excel spreadsheet.  Let's see, LSi-Lowery

         19   Systems, dated November, 2004.

16:25:16 20   Q.    Was that an attachment to your e-mail?

         21   A.    I don't know.  Let's see.  I don't know.  How would

         22   I know that?  Oh, there's an attachment, proposal XLS,

         23   okay.

         24         Yes.

16:25:28 25   Q.    What's the name of that attachment?

```
 1    A.    Hodell-Natco proposal.

 2    Q.    Thank you.

 3    A.    And do you want --

 4    Q.    Does it reference the number of SAP licenses?

 5    A.    Eighty licenses, total revenue, LSi cost.

 6    Q.    And if Hodell doubled in users, how many would that

 7    bring them up to?

 8    A.    160.

 9    Q.    Was there any concern expressed to you about

10    selling eighty users, potentially selling 80 users to

11    Hodell?

12    A.    Were we concerned about selling 80 users?

13    Q.    No.  Was there any concern expressed by SAP to you

14    about selling 80 users to Hodell?

15    A.    Oh, no.  No.

16    Q.    Was there any concern expressed to you by SAP about

17    selling a customer that might grow to 160 users?

18    A.    No.  As a matter of fact, I mean, at go-live, there

19    was 120 planned, and then double that in a year, so we

20    were looking at 240 was the number that we were always

21    using.

22              THE COURT:  Is this a good time to stop

23    you?

24              MR. LAMBERT:  Good as any.

25              THE COURT:  Okay.  All right, folks.  I
```

1      told you 4:30.  We're right on the dot.

2                  Keep in mind the admonition.  You've heard

3      some evidence.  You certainly haven't heard it all and

4      you don't know the law that applies in the case.

16:26:58  5      Continue, keep an open mind, don't form or express any

6      opinion about any aspect of the case.  Have a good night.

7                  See you same time, 8:15, where,

8      Mr. Panigutti?

9                  A JUROR:  L-1.

16:27:15 10                  THE COURT:  All right.

11                  THE CLERK:  All rise.

12                  (Jury out).

13                  (Proceedings adjourned at 4:27 p.m.)

14                      - - - - -

1          C E R T I F I C A T E

2               I certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.

5

6

7

8    **/s/Susan Trischan**

9    /S/ Susan Trischan, Official Court Reporter

10   Certified Realtime Reporter

11

12   7-189 U.S. Court House

13   801 West Superior Avenue

14   Cleveland, Ohio 44113

15   (216) 357-7087

16

17

18

19

20

21

22

23

24

25

490

1                              **I N D E X**

2

3    <u>**WITNESSES**</u>:                                             <u>**PAGE**</u>

4      DIRECT EXAMINATION OF KEVIN REIDL (RESUMED)          236

5      BY MR. CARNEY

6      CROSS-EXAMINATION OF KEVIN REIDL                     256

7      BY MR. STAR

8      CROSS-EXAMINATION OF KEVIN REIDL (RESUMED)           366

9      BY MR. STAR

10     REDIRECT EXAMINATION OF KEVIN REIDL                  381

11     BY MR. CARNEY

12     RECROSS-EXAMINATION OF KEVIN REIDL                   397

13     BY MR. STAR

14     DIRECT EXAMINATION OF DANIEL LOWERY                  403

15     BY MR. LAMBERT

16

17                          *  *  *  *  *

18

19

20

21

22

23

24

25