1      IN THE DISTRICT COURT OF THE UNITED STATES
          FOR THE NORTHERN DISTRICT OF OHIO
2                  EASTERN DIVISION

3

HODELL—NATCO INDUSTRIES, INC.,
4                                      08CV2755

            Plaintiff,
5

       vs.                          June 17, 2015
6                                    8:30 a.m.

7   SAP AMERICA, INC., ET AL.,
                                     Volume 3
8           Defendants.             Pages 491—766

9


10
         TRANSCRIPT OF JURY TRIAL PROCEEDINGS
11    BEFORE THE HONORABLE DONALD C. NUGENT
           UNITED STATES DISTRICT JUDGE
12                 AND A JURY

13

14

15

16

17

18

19

20

21

22

23

24

25

APPEARANCES:


For the Plaintiff:          Christopher J. Carney, Esq.
                            Sharon A. Luarde, Esq.
                            P. Wesley Lambert, Esq.
                            Brouse McDowell
                            600 Superior Avenue East
                            Suite 1600
                            Cleveland, Ohio    44114
                            216-830-6830


For the Defendants:         Gregory J. Star, Esq.
                            Michael John Miller, Esq.
                            Joseph M. Kelleher, Esq.
                            Alex H. Hayden, Esq.
                            Drinker Biddle & Reath
                            One Logan Square
                            18th & Cherry Streets
                            Philadelphia, PA    19103
                            215-988-2734




Official Court Reporter:    Judith A. Gage, RMR-CRR
                            7-189 U.S. Court House
                            801 West Superior Avenue
                            Cleveland, Ohio  44113
                            216-357-7238








Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

|   |   |
|---|---|
| 1 | <u>WEDNESDAY, JUNE 17, 2015, 9:16 A.M.</u> |
| 2 | (Proceedings in presence of jury:) |
| 3 | THE COURT:  We are missing Sean.  He had to |
| 4 | have surgery today.  I hope we don't lose anybody else. |
| 09:16:10 5 | Mr. Lowery, you may continue. |
| 6 | MS. LUARDE:  Your Honor, we noticed there |
| 7 | are two witnesses in the back of the room. |
| 8 | Under Rule 615, we would like them -- |
| 9 | THE COURT:  Are you making a motion for |
| 09:16:10 10 | separation of witnesses? |
| 11 | MS. LUARDE:  Yes, please. |
| 12 | MR. MILLER:  Your Honor, I'm not sure -- |
| 13 | THE COURT:  Who are you? |
| 14 | A SPEAKER:  We are observers, Your Honor. |
| 09:16:10 15 | THE COURT:  You are not witnesses? |
| 16 | MR. MILLER:  Thank you, Your Honor. |
| 17 | I didn't recognize them. |
| 18 | THE COURT:  Do you want to be witnesses? |
| 19 | A SPEAKER:  No, thank you. |
| 09:16:10 20 | THE COURT:  Do you want to make a speech or |
| 21 | anything?  No. |
| 22 | Remember, I told you how the lawyers talk |
| 23 | to the witnesses before they call them? |
| 24 | Sorry, Sharon. |
| 09:16:10 25 | MR. MILLER:  They didn't look familiar to |

 1    me, Your Honor.

 2              Thank you.

 3              THE COURT:  I have to tell you a story.

 4              When I was a Prosecutor, I tried all kinds

 5    of murder, death cases, and all these tough cases and

 6    stuff, never ever thought, had a concern about the jury,

 7    what they thought about people coming in the courtroom.

 8              My first case as a Judge in Common Pleas

 9    Court, I go back to the jury, the first they ask is "who

10    are all these people coming in and out of the courtroom?"

11    I said they had nothing to do with the cases.  You always

12    have other cases going on and stuff like that.

13              It was interesting to me.  I probably

14    should have mentioned it at the beginning because, you

15    know, you observe everything that happens here, and not

16    in a case like this, necessarily, but if you had a —

17    probably a hard-fought murder case or something like

18    that, you may be like, "oh, are the people in the back

19    following me around?  Do they know anything about me?"

20              The answer is no, they don't.  The people

21    coming in and out of the courtroom usually are on another

22    case.  It is rare they are on the case that is presently

23    being heard, especially in state court.  Just so you

24    know.  All right?

25              Okay.  You may proceed.

1          DIRECT EXAMINATION OF DANIEL LOWERY (RESUMED)

2     BY MR. LAMBERT:

3     Q.    Mr. Lowery, I have a few questions to ask you and I

4     think we'll be done.

5                   You testified that Hodell had problems with

6     the implementation after it went live.

7                   Do you recall that testimony?

8     A.    Yes.

9     Q.    Did you contact anybody at SAP with regard to these

10    problems?

11    A.    Yes.  From go-live on, my job primarily was getting

12    more and more people from SAP involved to help solve the

13    problem.

14    Q.    And who in particular did you get involved?

15    A.    We started with Dan Kraus and Ken Lorenzo, moved up

16    to Sotnick.  I was sending e-mails to Bill McDermott, the

17    president of North America.  I drafted an e-mail written

18    in German by my office manager to the CEO of SAP AG, I

19    believe the name is Hagemann, and Udi Ziv, et cetera.

20    That did successfully start to get people involved.

21    Q.    You mentioned Udi Ziv.

22                  Can you tell the jury who Udi Ziv is.

23    A.    He was the product manager of the SAP business

24    product over in Israel.

25    Q.    Can you turn to Exhibit 78 in your binder.

1    A.    I'm going to try to listen better for the jury

2    today.

3                78?

4    Q.    Yes, sir.

09:16:11 5    A.    Okay.

6    Q.    Can you turn to the last page of the document,

7    Mr. Lowery.

8    A.    I'm there.

9    Q.    There is an e-mail reflected on Exhibit 78.4.

09:16:11 10                Do you see that?

11   A.    Yes.

12   Q.    Can you identify that for the jury.

13   A.    That was an e-mail from me to Udi Ziv, copy to Dan

14   Kraus, Sontick, Seligmann.  I forget what Rodney

09:16:11 15   Seligmann's title was.  But it was to Udi Ziv, the

16   product manager in Israel.

17   Q.    And what's the date of that e-mail?

18   A.    That was April 2007.  Shortly after go-live.

19   Q.    Can you read your e-mail to Mr. Ziv for the jury.

09:16:11 20   A.    "Udi, I have a customer that needs you to call him

21   with me.  He is red hot at the performance of SAP

22   Business One and wants to know two things:  Why is it

23   taking so long for SAP to fix the problem?  And two, when

24   will he receive his fix?  It takes two hours to key in a

09:16:11 25   large order and scales down from there.  He is bleeding

1    money and is threatening to throw out the system,

2    Hodell-Natco, Incorporated, in Cleveland."

3    Q.    And was that accurate at the time you wrote it?

4    A.    Yes.

09:16:11  5    Q.    Did Mr. Ziv respond to you?

6    A.    He did.

7    Q.    Can you identify his response to you on Exhibit 78?

8    A.    Let me find it.

9            78.2 is an e-mail from Udi Ziv to me,

09:16:11 10    carbon copy many people at SAP.

11            "Dan, as you know, this customer's

12    environment is far outside the Sweet Spot of Business

13    One, with 120 users, and therefore, we anticipate that

14    such performance issues will come up."

09:16:12 15            "Having said that, we believe we have

16    identified the issue that may be causing this specific

17    performance problem, but there is no real way to verify

18    this until we use it for real in the customer's

19    environment.  The fix will be included in the April

09:16:12 20    patch, scheduled for the end of the month.  I know it is

21    late for the customer, but presenting a hotfix for such

22    an issue is too risky and may make the situation even

23    worse, as we cannot perform the same amount of testing on

24    a hotfix."

09:16:12 25            "Best regards, Udi."

Lowery – Direct (Resumed)                    498

1    Q.    The first sentence of that e-mail says "as you

2    know, the customer's environment is far outside the Sweet

3    Spot."

4              You just read that, correct?

09:16:12 5    A.    Yes.

6    Q.    Prior to receiving this e-mail, did you -- had you

7    heard of a Sweet Spot for SAP Business One?

8    A.    No.

9    Q.    Is this the first time you had heard of such a

09:16:12 10   term?

11   A.    Yes.

12   Q.    Did you respond to Mr. Ziv's e-mail?

13   A.    Did I respond to this e-mail?

14   Q.    Yes.

09:16:12 15   A.    Yes.

16   Q.    Can you direct the jury to where on Exhibit 78.

17   A.    It is Exhibit 78.  It is from me to Udi Ziv, dated

18   Sunday, April 15.

19   Q.    Is it on the first page of that exhibit?

09:16:12 20   A.    It is.

21   Q.    Down at the bottom?

22   A.    It is, yes.

23   Q.    What's the date of that e-mail?

24   A.    April 15th, 2007.

09:16:12 25   Q.    And who is included on that e-mail?

1    A.    Jon Woodrum, Dan Kraus, Michael Sotnick, Rodney

2    Seligmann, and Niels Stenfeldt.

3    Q.    Can you identify for the jury who was an SAP

4    employee on that e-mail.

09:16:12 5    A.    Jon Woodrum was mine.  Dan Kraus, SAP.  Michael

6    Sotnick, of course, was the senior VP.  Rodney Seligmann,

7    I don't know his title, but he was SAP.  And Niels

8    Stenfeldt had to be SAP, he didn't work for me.

9    Q.    Can you read your response to Mr. Ziv for the jury.

09:16:12 10    A.    "Udi, thank you for the quick response, but hope I

11    don't sound stupid, but I don't understand, 'as you know,

12    this customer's environment is far outside the Sweet Spot

13    of Business One, with 120 users, and therefore, we

14    anticipate that such performance issues will come up.'  I

08:40:45 15    don't understand that at all and never heard that

16    before."

17            "The whole reason they bought SAP was

18    because it was supposed to scale to their growth.

19    They're planning more acquisitions, adding more users,

08:40:57 20    and this was their known objective since day one,

21    two-plus years ago by everyone, SAP included."

22            "Why did SAP let us go this long before

23    telling us this was not the product for Hodell?  I just

24    spent $1 million developing the product to SAP

08:41:14 25    specifications.  What am I supposed to do now?  More

1    importantly, what am I supposed to tell Hodell?  This is

2    unbelievable."

3    Q.    And were the statements made in that e-mail

4    accurate when you made them?

09:16:13 5    A.    Yes.

6    Q.    Did anyone from SAP respond to your April 15, 2007

7    e-mail?

8              Can I direct your attention to the top of

9    page 78.

09:16:13 10   A.    The very first one?

11   Q.    Yes.

12   A.    It is to Dan Lowery from Dan Kraus.

13   Q.    Is that Dan Kraus' response to your e-mail that you

14   just read?

09:16:13 15   A.    Let's see.  Second S.O.S. from partner for help.

16             Right.  He responded to my e-mail.

17   Q.    And can you read Mr. Kraus' response for the jury.

18   A.    "Dan, your development team and others have been

19   told that this is outside the Sweet Spot a number of

08:42:20 20   times.  When Hodell purchased, there was no such

21   definition, but in the two years since, we have shared

22   this information both directly with your team around

23   Hodell-Natco and in general at FKOM summer sales meetings

24   and through the use of the online qualification tool.

08:42:38 25   This is also why Geoff Ashley, Ralf's team, the solution

Lowery – Direct (Resumed)                    501

1   architects, and I have all been so forthright about full

2   testing before go-live."

3   Q.    Do you agree with Mr. Kraus' statements in that

4   e-mail?

09:16:13 5   A.    No.

6   Q.    What in particular do you disagree with?

7   A.    That we were told that we were way outside the

8   Sweet Spot of SAP Business One.

9   Q.    Can you turn to Exhibit 247 in your binder.

09:16:13 10   A.    247?

11   Q.    Yes, sir.

12              Can you turn to the last e-mail in that

13   chain.  It begins on the first page and spills over into

14   the second.

09:16:13 15   A.    Okay.  The big one?

16   Q.    Yes.

17   A.    Okay.

18   Q.    Can you identify that e-mail for the jury.

19   A.    It's from me to Kevin Reidl and Otto Reidl.  The

09:16:13 20   subject is titled "personal update."

21   Q.    Do you see the e-mail starting in the middle of the

22   first page of Exhibit 247?

23   A.    Oh, from Dan Lowery to Dirk Boessmann and Udi Ziv

24   dated April 2007.

09:16:13 25   Q.    I'm sorry.  The one from Otto Reidl to yourself,

Lowery – Direct (Resumed)                    502

 1    April 25, 2007, do you see that?

 2                    Maybe you can pull it up.

 3    A.    It is from Otto to me?

 4    Q.    Yes, sir.

09:16:13  5    A.    I see it.

 6    Q.    And what is Mr. Reidl telling you in that e-mail?

 7    A.    Can you give me a second?

 8                    MR. MILLER:  Your Honor, objection.

 9                    Hearsay.

09:16:13 10                    THE COURT:  Let the witness do the

11    summarizing.

12                    MR. MILLER:  Thank you.

13                    THE WITNESS:  What do I do?

14    BY MR. LAMBERT:

09:16:13 15    Q.    Did you forward this e-mail on to anyone at SAP?

16    A.    Possibly.  I don't know.

17    Q.    Can you look at the first page of Exhibit 247.

18    A.    Okay.

19    Q.    There is an e-mail from Dan Lowery to Dirk

09:16:13 20    Boessmann and some other folks.

21                    Do you see that?

22    A.    Udi Ziv.  Yes.  It is a personal update from Otto.

23    Q.    Okay.

24    A.    It was, "Dirk and Udi, just so you know what I'm

08:45:32 25    hearing from the customer, Dan."

1    Q.    So you are passing along Mr. Reidl's comments to

2    SAP?

3    A.    I did.

4    Q.    You were not copied on the last e-mail of that

09:16:14  5    chain at the top of 247, are you?

6    A.    No.  This was an internal --

7    Q.    Can you identify the senders and recipients of the

8    e-mail?

9    A.    It was from Udi Ziv, the product manager, to Dan

09:16:14 10    Kraus and Niels Stenfeldt, and carbon copy Dirk

11    Boessmann.

12    Q.    Are those all SAP employees, to your knowledge?

13    A.    Yes.  Those are all SAP employees.

14    Q.    Were you made aware of that information

09:16:14 15    -- information reflected in that e-mail?

16    A.    Can I read it?

17    Q.    Sure.

18    A.    "Guys, there is not much that we can do here.  We

19    will supply what may be a fix for the current problem,

08:46:26 20    but we know that there will be others.  There is no doubt

21    that this is not a B1 customer and we somehow need to get

22    away from this.  Udi."

23              I was not copied on that, no.

24    Q.    Were you made aware of that information on or about

09:16:14 25    April 25, 2007?

Lowery – Direct (Resumed)                504

1    A.    No.

2    Q.    Did LSi try to figure out what was causing the

3    problems that Hodell was experiencing with the Business

4    One implementation?

09:16:14  5    A.    We did.

6    Q.    What did LSi do?

7    A.    Well, I think I mentioned to the jury yesterday, I

8    was proud of my team.  And again, my job as the owner,

9    every morning I touch base with the managers and ask

08:47:14 10    them, "how is Hodell going?"  And to that, they -- they

11    dug in and got their hands around almost everything in

12    the -- that was causing the slowness, and uncovered other

13    problems.  Like Kevin Reidl --

14                MR. MILLER:  Objection, Your Honor.

09:16:14 15                Hearsay.

16                THE COURT:  Overruled.

17                Go ahead.

18                THE WITNESS:  Kevin Reidl mentioned -- I'll

19    try to do this quickly.

08:47:38 20                Kevin Reidl mentioned yesterday that the

21    original goal had slipped.  That was due to these memory

22    freezes, which we all had on our PCs.  It was a huge

23    problem.  And we identified that and sent the information

24    to SAP and then they eventually fixed that.  So that

08:47:58 25    -- we lost three months of time trying to get the product

Lowery – Direct (Resumed)                505

1    out the door and go-live.  But that is the quality of my

2    team.

3                    But then we found out the DI API -- I take

4    my hat off to the jury because they have to listen to

08:48:17  5    these technical names -- but the DI API is part of --

6                    MR. MILLER:  Objection, Your Honor.

7                    There is no foundation he has the expertise

8    to testify --

9                    THE COURT:  You can cross-examine him on

08:48:26 10    it.

11                    THE WITNESS:  The DI API is part of the

12    software development toolkit of SAP and it basically is

13    the garden hose between our code and SAP Business One.

14                    And it was explained to me, because I'm not

08:48:42 15    the brightest guy in the world, it is like somebody had

16    their heel on the garden hose, it just couldn't get the

17    data --

18                    MR. MILLER:  Your Honor, it was explained

19    to him.

08:48:52 20                    THE COURT:  Put another question.

21                    THE WITNESS:  It is my people.  It is my

22    technical team.

23                    THE COURT:  All right.  But you're not the

24    expert.

08:48:57 25                    MR. MILLER:  Move to strike.

          1              THE WITNESS:  No.  You would have to get

          2     those guys if you want the detail.

          3              There is no doubt in my mind that the --

          4              MR. MILLER:  Your Honor, move to strike.

09:16:15  5     BY MR. LAMBERT:

          6     Q.    Mr. Lowery, specifically with regard to what LSi

          7     attempted to do to address Hodell's problems, what

          8     specific aspects of the implementation did LSi look at?

          9     A.    What specific aspects of the implementation to help

08:49:26 10     resolve the problem?  Well, it started off, we initially

         11     -- because people were getting involved in SAP, they

         12     asked us to send pieces of our code, the area of the code

         13     that were suspects of the problem.

         14     Q.    What code?

08:49:40 15     A.    In-Flight Enterprise.

         16     Q.    Okay.

         17     A.    To the labs in Germany I believe.  And they were

         18     taking a look at the problem.  I know that there is an

         19     exhibit of this somewhere.

08:50:02 20              That was the first time I knew that this

         21     was a bigger problem than it was going to be, because

         22     that lab wrote back they would have to rewrite the

         23     product, which is something they could not do quickly.

         24     Q.    Rewrite In-Flight?

08:50:14 25     A.    Right.  No.  Rewrite SAP Business One, the DI API

Lowery – Direct (Resumed)                    507

1    product.

2    Q.    Did anybody identify to you a problem with the

3    In-Flight code?

4    A.    No.

08:50:26  5    Q.    Did LSi send the In-Flight code to anyone else

6    besides SAP?

7    A.    Yes.

8    Q.    And who was that?

9    A.    Dan Kraus asked us to send the code to another

08:50:39 10    partner called Apollo.  With much angst, we sent some of

11    the code, because our code is our asset.  That is our

12    most precious product.

13    Q.    Can you identify who Apollo is?

14    A.    It is an SAP Business One business partner.

08:51:00 15    Q.    Okay.  So you were asked to send the In-Flight code

16    to another SAP business partner?

17    A.    Right.  So that they could take a look at our code.

18    Q.    Did you in fact do that?

19    A.    We did do that.

08:51:12 20    Q.    And did Apollo respond to you?

21                MR. MILLER:  Your Honor, more hearsay.

22                THE COURT:  Overruled.

23                THE WITNESS:  Did Apollo respond?  Yes.

24    They responded through our people that they found nothing

08:51:26 25    wrong.

Lowery – Direct (Resumed)                    508

1    BY MR. LAMBERT:

2    Q.    They found nothing wrong with the In-Flight code?

3    A.    No.  Gave our guys compliments on how they

4    approached it as a matter of fact, if I remember

08:51:34  5    correctly.

6    Q.    Did LSi evaluate whether Radio Beacon was causing

7    any of the problems that Hodell experienced?

8    A.    Radio Beacon was involved in that early-on memory

9    freezing, but again, that was resolved.  It was an SAP

08:51:49  10    issue.

11    Q.    So you determined that -- LSi determined that

12    In-Flight was not causing the problems, correct?

13    A.    Correct.

14    Q.    Nor was Radio Beacon, correct?

08:52:00  15    A.    Nor Radio Beacon.

16    Q.    So what do you believe was causing the problem?

17              MR. MILLER:  Objection, Your Honor.

18              THE COURT:  Objection sustained.

19              MR. MILLER:  Thank you.

08:52:06  20              Move to strike.

21              MR. LAMBERT:  Your Honor, we don't have

22    anything further.

23              THE COURT:  Thank you.

24              You may cross-examine.

09:16:16  25              MR. MILLER:  Thank you, Your Honor.

                    CROSS—EXAMINATION OF DANIEL LOWERY

1   BY MR. MILLER:

2   Q.    Good morning, Mr. Lowery.

3   A.    Good morning.

4   Q.    We met two days ago.  My name is Michael Miller.

5   A.    We did.

6   Q.    Thank you for being here.  I have a series of
    questions.

7            I'm going to start about something you
    testified about yesterday, basically, your own personal
    involvement with Hodell.

8            And I want to be clear, you were not
    involved with Hodell until literally years after Dale Van
    Leeuwen was involved with them?

9   A.    You mean since —

10  Q.    Very simple question.

11           You were not involved with Hodell —

12  A.    I'm just trying to understand it.  You mean since
    he — when he first sold him FACTS way back when?

13  Q.    That's my point.

14           You were not involved with Hodell until
    literally years after Dale was working with them?

15  A.    Correct.

16  Q.    And I want to understand.

17           You owned the company and you started a

```
         1    company called LSi?

         2    A.    Correct.

         3    Q.    Right.  That was in 1989?

         4    A.    '89.  Correct.

08:54:01 5    Q.    You were the president, the majority owner of LSi?

         6    A.    I was.

         7    Q.    And IBIS was a separate company that was started by

         8    Dale Van Leeuwen, right?

         9    A.    Correct.

08:54:10 10   Q.    And IBIS had this pre-existing relationship with

         11   Hodell that went back many years, we heard about that

         12   over the course of the last couple days, right?

         13   A.    Correct.

         14   Q.    And you knew Dale from the software industry?

08:54:24 15   A.    Correct.

         16   Q.    And in May of 2004, your company LSi acquired

         17   Dale's company IBIS?

         18   A.    April 28th, 2004.

         19   Q.    April or May 2004, is that correct?

08:54:35 20   A.    Correct.

         21   Q.    Okay.  And you were not -- again, just to be clear,

         22   prior to that acquisition by LSi of IBIS, you were not

         23   involved with Hodell?

         24   A.    No.

08:54:42 25   Q.    You would not even have ever heard their name
```

1    before that?

2    A.    Oh, no, I would have.  Part of the reason we bought

3    the company was Hodell.

4    Q.    And Dale, as you testified yesterday, he was the

08:54:52  5    one, he was the salesman for the Hodell transaction,

6    right?

7    A.    Yes.

8    Q.    He was the one who reviewed, for example, Hodell's

9    business requirements, he is the one that knew Hodell's

08:55:05 10    business requirements, right?

11    A.    Correct.

12    Q.    And he is the one that would have reviewed them and

13    evaluated whether B1 was a proper fit?

14    A.    B1 was -- say that again.

08:55:16 15    Q.    Dale is the one that would have evaluated the

16    requirements of Hodell and whether it would have been a

17    fit -- B1 would have been a fit for Hodell?

18    A.    Correct.

19    Q.    And he is the one that would have, for example,

08:55:26 20    evaluated Hodell's IT structure, its hardware, and

21    whether it had the right hardware for B1 and all that?

22    A.    Yes.

23    Q.    Dale was involved in that?

24    A.    That's right.

08:55:38 25    Q.    You were not involved in that at all?

Lowery - Cross                    512

1    A.    That's right.

2    Q.    You would agree Dale was the architect on the

3    project?

4    A.    Yes.

08:55:43  5    Q.    Okay.  He also had Hodell's confidence and he had

6    Hodell's trust?

7    A.    Yes.

8    Q.    Right.  I think you described him in your

9    deposition as the technical eyes and ears on the project.

08:55:55 10          Does that sound right?

11    A.    Yes.

12    Q.    Okay.

13    A.    Up to a certain point.

14    Q.    Okay.  And let's talk for a minute about your

08:56:02 15    technical expertise.

16          You're not a technical -- you're not a tech

17    guy, right?

18    A.    I am not.

19    Q.    Your entire career, you talked about this

08:56:11 20    yesterday, going back 43 years --

21    A.    You had to bring that up.

22    Q.    -- it's all -- is all in sales?

23    A.    Sales.

24    Q.    Okay.  You don't have any training on the technical

08:56:22 25    side of the software industry, is that right?

1    A.    Well, unless you count three months of programming

2    school at IBM.

3    Q.    Say that again, please.

4    A.    When you go through IBM sales training, they also

08:56:37  5    teach you the fundamentals of programming.

6    Q.    IBM sales training.

7              But you would agree, you don't have any

8    training in the technical side of the software industry?

9    A.    That's correct.

08:56:49 10    Q.    Okay.  You don't know how to write code?

11    A.    I do not.

12    Q.    You have zero professional certifications?

13    A.    No.

14    Q.    And except for things like sales meetings and

08:57:00 15    product direction meetings, you've never had any training

16    on any SAP product, including B1?

17    A.    That's correct.

18    Q.    For example --

19              THE COURT:  That wasn't the president.

08:57:19 20              MR. MILLER:  I was trying to think of

21    something funny, Your Honor, and decided to curb it.

22    BY MR. MILLER:

23    Q.    You know there was training given by SAP on the

24    technical aspects of B1, right?

08:57:33 25    A.    Correct.

Lowery – Cross                    514

1    Q.    And people at your company, IBIS/LSi, they went to

2    that training, right?

3    A.    That's right.

4    Q.    And this training was very serious, right, it was

08:57:44  5    going on for days, it wasn't a 15 minute PowerPoint, it

6    was three or four or five days of intense technical

7    training on B1, correct?

8    A.    Yes.

9    Q.    Let's talk about DI API for a second.

08:57:54 10             You testified just a couple minutes ago

11    that you were pretty certain that that was what the

12    problem was with B1, right?

13    A.    Yes.

14    Q.    And you're aware here that SAP's position is that

08:58:07 15    the problem isn't the DI API type that transmits

16    information from In-Flight Enterprise to B1, but the

17    problem is In-Flight Enterprise itself is pushing too

18    much information through the pipe too often, isn't that

19    right?

09:16:18 20             MR. LAMBERT:  Objection.

21             THE COURT:  Overruled.

22    BY MR. MILLER:

23    Q.    You're aware that that's SAP's position?

24    A.    No.  But I -- okay.

08:58:30 25    Q.    Okay.  I just want to be clear.  Your view -- let's

Lowery – Cross                    515

1    make sure the jury understands.

2                    The DI API, as you explain it, is the pipe

3    that transmits information from In-Flight Enterprise,

4    which is the customized software piece that your company

08:58:46  5    has developed, right?

6    A.    Correct.

7    Q.    And the DI API is the pipe that transmits

8    information from that In-Flight Enterprise to B1?

9    A.    Correct.

08:58:54 10    Q.    We all agree on that, right?

11    A.    Yes.

12    Q.    And your testimony earlier today is that you think

13    that the DI API pipe which is associated with B1, you

14    think that's the problem, right?

08:59:07 15    A.    I do.

16    Q.    But when you testified in your deposition and you

17    were asked what a DI -- what the DI API was, you were not

18    able to give a description beyond two sentences, isn't

19    that right?

08:59:20 20    A.    Can I see my deposition?

21    Q.    Sure.  Do you still have a copy of it from

22    yesterday?

23    A.    It was in that big book.

24                    When you say I don't understand it, what --

08:59:32 25    Q.    I can help.

Lowery - Cross                    516

```
         1              MR. MILLER:  May I approach, Your Honor?

         2              THE WITNESS:  -- is the technical part of

         3    it or what it did or what?

         4    BY MR. MILLER:

08:59:38 5    Q.    We'll go right to your deposition.

         6              Okay.  Now, had you a large binder

         7    yesterday.

         8    A.    I don't know where that is.

         9    Q.    Do you still have that?

08:59:48 10   A.    No.

        11    Q.    Okay.  Do you know where it is?  Your binder is

        12    small.  What I have handed you is a copy of what you had

        13    yesterday.  There are fewer exhibits and attachments, so

        14    it is a little less dense.

09:00:08 15             But you recall having your deposition taken

        16    in this case, right?

        17    A.    I do.  Sure.

        18    Q.    It was over four days?

        19    A.    Sure.

09:00:12 20   Q.    Two sets of two days, I think there were 837 pages,

        21    right?

        22    A.    Yes.

        23    Q.    You testified under oath?

        24    A.    Yes.

09:00:20 25   Q.    You were in your lawyer's office?
```

Lowery - Cross                    517

1    A.    Yes.

2    Q.    You were represented by a lawyer at the time?

3    A.    I did.

4    Q.    Please turn to Page 88.

09:00:29  5    A.    88?

6    Q.    Page 88, Line 1.

7    A.    Okay.

8    Q.    I'll follow along with you.

9              Just give me a moment, please.  If you go

09:00:47 10   to 87 --

11   A.    87?

12   Q.    Right at the end on line 25, there is a question,

13   right, and it says, "Okay."

14             And your answer is:  "And then all the

09:00:57 15   -- this is -- as I understood it, this is what STK is, is

16   the only way they could guarantee the integrity of

17   talking to and from the SAP Business One.  So you had to

18   use their toolkit, you had to use their programming

19   protocol, you had to do it like they said so that SAP

09:01:16 20   Business One could talk you through the DI API, which

21   we'll get into I'm sure?"

22             Do you see that there?

23   A.    Yes.

24   Q.    Data interchange and application program interface.

09:01:35 25             So that's the pipe that In-Flight talked to

Lowery – Cross                    518

1    Business One, right?

2    A.    Correct.

3    Q.    Okay.  This guy here told you the –– this is your

4    answer, right?

09:01:42  5            "This guy here, he told you the rules how

6    to do that, but for sure, if you need a more technical

7    description, get someone smarter than me."

8    A.    Okay.

9    Q.    Right?

09:01:50 10            So I didn't do a particularly great job of

11   reading that, but other than what you testified to at

12   Page 88, which is that DI API is the pipe that transmits

13   information from In–Flight Enterprise to Business One,

14   which we've all agreed is a very basic principle, other

09:02:10 15   than that, if anyone needs a more technical description

16   of what the DI API is, they've got to ask someone smarter

17   than you?

18   A.    Yes.

19   Q.    Because that's all you know about DI API?

09:02:22 20   A.    Yes.

21   Q.    Thank you.

22            Let's talk about IBIS and LSi and Hodell's

23   roles here.

24            You talked yesterday about SAP did not

09:02:37 25   engage in direct B1 sales, right?

1    A.    As far as -- you mean do they have a direct sales

2    force?

3    Q.    That's right.

4    A.    Not to my knowledge, they did not.

09:16:19 5    Q.    So just to be clear, SAP did not engage in direct

6    sales of B1 to customers, correct?

7    A.    Correct.

8    Q.    The dealers did that?

9    A.    Correct.

09:02:58 10    Q.    Dealers like IBIS/LSi?

11    A.    Correct.

12    Q.    All right.  And that would mean, unless there was

13    some special circumstance, there would be no direct

14    communication between SAP on the one hand and the

09:03:14 15    customers on the other hand, correct, in connection with

16    the sale of a B1 product?

17    A.    I think that's too broad a statement.  But in

18    general, yes.

19    Q.    Well, let's take a look at your deposition again.

09:03:24 20          Will you turn to Page 51.

21    A.    31?

22    Q.    51.  I just want to be clear.  I'll start at

23    Page 50.

24          But you would agree the question posed to

09:04:01 25    you in your deposition in your lawyer's office:  "Did

Lowery - Cross                    520

1    they ever explain to you why they were doing it that

2    way?"

3              Answer:  "Well, the least expensive way to

4    get a sales force is through channels.  You don't have to

5    hire a rep.  You don't have to pay them a salary.  You

6    get a partner channel going and that -- that used to be

7    the least expensive path to getting your product out.  I

8    guess similar Hodell I mean."

9              Question:  "It insulates SAP from having

10   direct communication with the customer."

11             There is an objection.

12             Question:  "If it's only being offered

13   through channel partners, then employees, direct

14   employees of SAP are not communicating with the end

15   user?"

16             Answer:  "Well, unless we bring them in you

17   mean, unless the partner would bring them in, yeah.  I

18   don't think I'm understanding where you went on that."

19             So unless you would bring in SAP to the

20   partner, unless there was some sort of special

21   circumstances, which is what I was asking you about

22   before, unless there was some sort of special

23   circumstance like that, SAP on the one hand would never

24   be in direct contact with the customer on the other hand,

25   right?

1    A.    Yes.

2    Q.    Okay.  And in this case, just to be clear, that's

3    exactly how it played out, there was no direct

4    communication between SAP on the one hand and Hodell on

09:05:15  5    the other hand until after go-live?

6    A.    I'm not sure of that.

7    Q.    Well, let's make it simpler for you.

8              You're not aware of any direct

9    communication between SAP on the one hand and Hodell on

09:05:30 10    the other hand prior to the license agreement in December

11    of 2005?

12              Let's start there.

13    A.    Well, unless we bring them in, and what that means

14    is you can have them help you on a demo or you can have

09:05:44 15    them help you explain paperwork, contracts, I just don't

16    know what was -- I mean, we constantly talked to SAP.

17    Q.    And that's my point though.

18              You're not aware that SAP was ever brought

19    in to do a demo or have one of these meetings, which are

09:05:59 20    some of these special circumstances that you're talking

21    about in other cases?

22              When it came to Hodell, you're not aware of

23    any direct communication or contact between SAP on the

24    one hand and Hodell on the other?

09:06:11 25              And let's, for starters, take it up to the

Lowery - Cross                                                522

1   time of this --

2   A.   From my perspective, that's correct.  You would

3   have to ask Dale what he did when he was selling to them.

4   Q.   I understand.

09:06:22  5          Just to be clear, you're certainly not

6   aware of it up to the time of the license agreement in

7   December of '05?

8   A.   December '05, the development agreement?

9   Q.   Well, the development agreement was in December of

09:06:32  10   '04, right?

11   A.   December '04.  Right.

12   Q.   And then the license agreement was in December of

13   '05?

14   A.   You're correct.

09:06:37  15   Q.   And I'm sorry we're going back and forth on this,

16   but I think this is an important point.  It is very

17   basic.  It should be clear.

18          You're not aware of any direct contact

19   between SAP on the one hand and Hodell on the other prior

09:06:52  20   to the December 2005 license agreement?

21   A.   Correct.

22   Q.   And you're likewise not aware of any direct contact

23   between SAP on the one hand and Hodell on the other hand

24   prior to go-live, which was in March of 2007?  You're not

09:07:03  25   aware?

Lowery - Cross                                      523

1   A.    I personally am not aware of it.

2   Q.    Thank you.

3               Now, LSi had what's known as a distribution

4   agreement with SAP, isn't that right?

09:07:15 5   A.    What was that again?

6   Q.    Your company, LSi --

7   A.    Right.

8   Q.    -- had what's known as a distribution agreement

9   with SAP, right?

09:07:27 10   A.    Is that the partner agreement?  Is that the same

11   thing?

12   Q.    I think you might call it the partner agreement.

13               Let's take a look at it.  Okay.  Can you

14   call up Exhibit 30, please.

09:07:49 15               Can you show the whole document just so we

16   can kind of orient Mr. Lowery.

17               When you show the whole document, it is

18   harder to read, but I think you probably recognize this

19   as what you call a channel partner agreement?

09:08:04 20   A.    Yes.

21   Q.    The title of it -- we'll call up the top of it,

22   Bob, please.

23   A.    Do you want me to read it?

24   Q.    That's okay.  I will once we call it up.  This

09:08:23 25   screen is delaying.  Thank you.

1          The title is SAP Business One Software

2     Marketing and Distribution Agreement, right?

3     A.     Correct.

4     Q.     And this was a contract between your company, LSi,

09:08:33 5     and SAP, and you can see right at the top, this agreement

6     was made the 19th of December --

7     A.     Correct.

8     Q.     My screen is blank, so I will try and -- thank you.

9     There we go.

09:08:49 10          This agreement is made effective the 19th

11     day of December, by and between SAP America, et cetera,

12     et cetera, and LSi Lowery.

13               That is your company, right?

14     A.     That is correct.

09:08:58 15     Q.     If I look at the end of this document, right, I

16     would see that you signed it?

17     A.     There is no signature, but --

18     Q.     Why don't we go, Bob, all the way --

19     A.     Okay.

09:09:09 20     Q.     -- to the page that is Bates labeled LSi 42, also

21     has section 17.8 in it.

22               It is a minor point, but I want the jury to

23     understand, this is a contract between your company, LSi,

24     and SAP and you signed it?

09:09:33 25     A.     Did I?  Is that the one I signed?

Lowery - Cross                    525

1          Because I don't have that up here.  I'm not

2     doubting you.  I just don't see it.

3     Q.    I understand.  We're having some -- this screen --

4     A.    My screen is blank.

09:09:50  5          THE COURT:  They are all blank now.

6                Let's see here.

7     BY MR. MILLER:

8     Q.    Maybe -- how about this.  If I told you that I'm

9     staring at the signature page --

09:10:08 10   A.    I believe you.

11    Q.    -- and there is a bunch of pen and is right over

12    your name and says "Dan Lowery," do you believe that you

13    signed that contract?

14    A.    Lawyers do not lie.  I believe you.

09:10:18 15   Q.    Thank you.

16                All right.  Well, then let's try and move

17    on.

18                This distribution agreement that --

19                THE COURT:  Excuse me.

09:10:24 20                Are you on the front table computer or the

21    rear?  It's on.  Let me try the rear.

22                MR. MILLER:  Mine is blank, Your Honor.

23                THE COURT:  They are all blank.

24                THE WITNESS:  Mine just flashed "no signal

09:10:44 25   detected."

         1                    MR. MILLER:  It is like back in the 1700s.

         2      That was an attempt at humor.

         3                    THE COURT:  We'll see if we can get Dave up

         4      here.

09:16:22 5                    THE JURY:  Can we stand up?

         6                    THE COURT:  Absolutely.  It will take a

         7      while.

         8                    Why don't we question on other stuff in the

         9      interim.  I was thinking, too, you can bring your coffee

09:11:25 10     in here if you want in the morning.

         11                   THE JURY:  They told us no.

         12                   THE COURT:  Who is they?

         13                   THE JURY:  The young lady.

         14                   THE COURT:  I better check.  It probably

09:11:36 15     depends on what is going on.

         16                   THE WITNESS:  Okay.  My screen is up.

         17                   THE COURT:  We are becoming familiar now.

         18                   Maybe if you want to do it.

         19     BY MR. MILLER:

09:12:05 20     Q.    All right.  So this agreement, this distribution

         21     agreement basically permitted --

         22     A.    I do want to note, it is not signed by SAP.  Does

         23     that matter?

         24     Q.    If I asked you to look at the next page, I know

09:12:19 25     there is a copy of that same signature page and it was

Lowery - Cross                                              527

1    signed by SAP --

2    A.    Okay.

3    Q.    -- would you believe me?

4    A.    I would believe you.

09:12:26  5    Q.    Should I save us the time of going there?

6    A.    Save the time.

7    Q.    Trust me -- thank you -- SAP signed the contract.

8    This was the distribution agreement that allowed LSi to

9    go out in the world figure out what customer's business

09:16:22  10    requirements were and sell B1 to them, right?

11    A.    Yes.

12    Q.    And the idea -- and this is I think the point you

13    were making yesterday -- SAP didn't just let anybody go

14    out in the world and sell their B1 product right?  I

09:16:22  15    mean, there were requirements to qualify as having a

16    right to sign this agreement.  SAP just didn't pick

17    people up off the street and ask them to sign these

18    distribution agreements and send them out there, right?

19    A.    I would hope not.

09:16:22  20    Q.    Well, you testified yesterday that it was a badge

21    of honor --

22    A.    It was.  I just don't know the requirements they

23    had.  They never said you have to do these four things.

24    Q.    I want the jury to understand the setting and

09:16:22  25    context of the comment you made yesterday.  You said it

Lowery – Cross                                    528

1    was a badge of honor --

2    A.    It was.

3    Q.    To be recruited by SAP and asked to sign one of

4    these distribution agreements, right?

09:16:22  5    A.    Right.  I just don't know what the requirements

6    were.

7    Q.    I understand and I have not asked you if you knew

8    what the requirements were.  I just wanted to be clear--

9    A.    I thought you were.

09:16:22  10    Q.    I'm sorry.  It was a badge of honor to be recruited

11    by SAP and asked to sign one of these agreements right?

12    A.    It was.

13    Q.    And you have been on the sales side of the computer

14    business for 43 years, right?

09:16:22  15    A.    Yes, sir.

16    Q.    And regardless of exactly what SAP stand cards were

17    and we're going to hear about that at these trials, you

18    believed that LSi certainly met those standards because

19    you testified yesterday that LSi was a high quality

09:16:23  20    partner.  Right?

21    A.    Yes.

22    Q.    In fact, you said that the -- I don't want to

23    -- I'm going to try and remember exactly what you said,

24    but see how close I get.

09:16:23  25              You said that the hotel team that you ^

1    Hodell team that you had was the best team you had ever

2    had in the 40 some odd years you had in the software

3    business?

4    A.    It was.

09:16:23 5    Q.    And then yesterday, Mr. Lambert took you through a

6    bunch of sections of this distribution agreement, right?

7    Do you remember that?  You were kind of reading section

8    after section.  You read section 4.7, 4.10, 9.1 on

9    training, correct?

09:16:23 10    A.    I remember that, yes.

11    Q.    And these were a series of paragraphs, we all

12    remember from yesterday, about actual obligations that

13    companies like LSi, who were acting as dealers, would

14    have under this distribution agreement.

09:16:23 15    A.    I remember that.

16    Q.    Right?  Things that they had to do, right?

17    A.    Yes.

18    Q.    And Mr. Lambert of course was very impressed with

19    the fact that the agreement also permitted dealers like

09:16:23 20    LSi to use the SAP logo, right?

21    A.    Yes.

22    Q.    But you're aware that this agreement consistent

23    with a lot of the sections you were reading yesterday had

24    significant restrictions, not just on how you could use

09:16:24 25    the logo, were you on how you acted and operated out in

1   the world selling the B1 product.  Right?

2   A.    Do I -- where is that at?

3   Q.    Well, let's start with the fact that this contract

4   permitted you only to sell SAP Business One at your own

09:16:43  5   risk and for your own account.  Correct?

6   A.    Does it say that.

7   Q.    Well, I'll show you where it says that.  Why don't

8   we go to Section 2.6.

9   A.    In this?

09:16:57 10   Q.    Yes.  It would be called up on the screen for you.

11   A.    216?

12   Q.    It is 2.6.  Mr. Lowery, I --

13   A.    I'm sorry.

14   Q.    We're going to mostly use the electronic screen.  I

09:17:09 15   have a couple of papers here, but there are so many of

16   them, we would be back and forth flipping tab to tab, so

17   we're going to try to work just off the computer.  Okay?

18   A.    Okay.  2.6 is up on my screen.

19   Q.    Okay.  And Section 2.6, in the contract that LSi

09:17:25 20   signed with SAP about selling Business One says, under

21   best efforts, resellers shall use its best efforts to

22   market and license the software and market and provide

23   maintenance and support services, period.  All caps.

24   Reseller, that's LSi right?

09:17:42 25   A.    Correct.

Lowery – Cross                    531

```
         1    Q.    Reseller does so at its own risk and for its own
         2    account except as otherwise set forth herein.  Correct?
         3    A.    Correct.
         4    Q.    Let's take a look at a note, that is language that
09:17:54 5    was not just in the contract, but it is a contract that
         6    you signed and you agreed to.
         7    A.    Correct.
         8    Q.    On behalf of LSi, right?
         9    A.    Correct.
09:18:01 10   Q.    Let's take a look, Bob, at Section 12.3.
         11             Section 12.3, sir, again, in the contract
         12   that LSi through you signed with SAP to sell Business One
         13   at 12.3 under "no representations or warranties" said
         14   "reseller shall not make any representations or
09:18:42 15   warranties as to the performance of the software
         16   maintenance or other services on behalf of SAP or SAP AG
         17   -- did everyone lose the screen there or is it just me?
         18   Just me.
         19   A.    You're reading it correctly.
09:18:58 20   Q.    Yes.  And the final sentence, "SAP's warranty
         21   obligations limitations and liabilities related to the
         22   SAP end user license agreement with the reseller shall be
         23   solely as stated herein."  That was language in the
         24   contract and language that you agreed to correct?
09:19:13 25   A.    Correct.
```

Lowery – Cross                              532

Q.    Okay.  Take a look at Section 17.8, please.

There is your signature at the bottom.

A.    I saw that.

Q.    Section 17.8, sir, you would agree that in the
contract that your company, LSi, had with SAP to sell
Business One stated under republic, reseller, that's LSi
is an independent contractor and is not an agent employee
or legal representative of SAP.  Reseller -- mine just
disappeared again.  I can continue.  Do you have it up on
the screen?

A.    I do.  Do you want me to read it?

Q.    No.  It came back.  Reseller expressly acknowledges
that it has no power or authority to accept any order for
SAP, or to make guarantees or warranties concerning the
software or the delivery thereof, or to make any
commitment for SAP or to obligate SAP in any respect
whatsoever, reseller agrees to indemnify SAP and to hold
SAP harmless from and against any loss claims damages
fees, including attorney's fees or award arising from any
breach of this agreement, including but not limited to
any violation of actions in excess of resellers's
authority hereunder and arising out of any claims by any
reseller licensees.  This agreement shall not be
construed as creating a partnership, joint venture,
agency relationship, or granting a franchise under any

Lowery – Cross                                          533

```
        1    applicable laws.

        2                   Do you see that there?

        3    A.    I do.

        4    Q.    I read it correctly?

09:20:54 5    A.    I did.

        6    Q.    And you agreed to that when you signed the contract

        7    with SAP, right?

        8    A.    I did.

        9    Q.    Okay.  Take a look -- you would agree that the

09:21:04 10   license -- when you sell Business One to customers,

       11    right, they execute license agreements with SAP?

       12    A.    Correct.

       13    Q.    So the way this works is you have a contract with

       14    SAP that allows you to distribute Business One, correct?

09:21:20 15   A.    Correct.

       16    Q.    And when you find a customer that decides to buy

       17    the Business One product they actually execute a license

       18    agreement between them and SAP, right?

       19    A.    Correct.

09:21:27 20   Q.    And the license agreements are a pretty standard

       21    form, the language is typically the same from one

       22    customer to another, except they are buying different

       23    numbers of users, users of B1, correct?

       24    A.    Correct.

09:21:39 25   Q.    Can we please take a look at Exhibit 316?
```

Lowery - Cross                                        534

1            Exhibit 316 is the license agreement

2      between SAP and Hodell?  Do you see at the top there?

3      A.    Yes.

4      Q.    I want the jury to be following every part of this.

09:22:00  5  Of course my screen is blank.  Thank you.

6            The top of it says "this agreement is made

7      effective as of the 23rdrd of December, '05, by and

8      between SAP -- right -- and Hodell?

9      A.    Correct.

09:22:12 10           MR. LAMBERT:  Your Honor, I object.  He

11     doesn't established he has any personal knowledge of this

12     agreement.

13           THE COURT:  Ask him if he knows anything

14     about it.

09:22:18 15  BY MR. MILLER:

16     Q.    Do you know anything about the license agreement

17     between SAP and Hodell?

18     A.    I know it was executed.

19     Q.    Right.  I mean, you were selling the B1 -- IBIS/Lsi

09:22:32 20  was selling the B1 product to Hodell, they would have

21     seen the license agreement right?

22     A.    Yes.

23     Q.    And you are the majority owner of LSi and the

24     president of IBIS?

09:22:43 25  A.    Yes.

1    Q.    So you are familiar with this license agreement?

2    A.    Yes.

3    Q.    And I'm just pointing out to make sure the jury

4    understands that this is a contract between SAP and

09:22:53  5    Hodell, right, signed or filled out here December 23,

6    2005?

7                    MR. LAMBERT:  Objection.

8                    THE COURT:  Overruled.

9    A.    Yes.

09:22:59 10    Q.    Thank you.  Take a look at Section 4.1, please.

11                    Just so the jury understands, we've

12    explained these license agreements are executed when

13    customers buy B1 and the language in them --

14                    MR. LAMBERT:  Objection.

09:23:22 15                    MR. MILLER:  Your Honor, we just covered

16    this.

17                    MS. LUARDE:  He is testifying for the jury.

18                    MR. LAMBERT:  He is testifying, Your Honor.

19                    THE COURT:  He took a page from your book,

09:23:31 20    I think, ask a straightforward question if you would.

21    BY MR. MILLER:

22    Q.    We already covered this.  The language that is in

23    this license agreement that Hodell signed is just like

24    the language that you see in license agreements that lots

09:23:43 25    of customers sign.  The license agreement forms, you just

Lowery - Cross                        536

1    admitted, are basically the same --

2                THE COURT:  All right.  You just asked four

3    questions.

4                MR. MILLER:  Forgive me.

09:23:52  5                THE COURT:  Ask one.  One at a time.

6                MR. MILLER:  Thank you, Your Honor.

7    BY MR. MILLER:

8    Q.    The license agreement is a form document, right?

9    A.    Correct.

09:23:58  10   Q.    It is basically a template.  Correct?

11   A.    Okay.

12   Q.    And customers who buy B1, they are all required to

13   execute license agreements?

14   A.    They are.

09:24:10  15   Q.    And they all pretty much look like this one.

16   A.    All the B1 customers.

17   Q.    Yes?

18   A.    Yes.

19   Q.    And they all pretty much look like this one, 316?

09:24:19  20   A.    Unless somebody legals it up or something.

21   Q.    But that rarely occurs, correct?

22   A.    Rare occurrence.

23   Q.    That's all I'm trying to establish.  Now I want to

24   look at Section 4.1.

09:24:32  25                You would agree, sir, that in this license

Lowery – Cross                          537

1     agreement that Hodell signed, that just like the license

2     agreement that all customers sign, under Section 4, it

3     says SAP reseller relationship/price and payment,

4     licensee acknowledges and agrees that the SAP reseller

09:24:51  5     through which licensee has arranged for the procurement

6     of this agreement -- from which licensee receives any

7     services related to the software, is not the agent of

8     SAP.  The SAP reseller is an independent company, person,

9     or entity with no authority to bind SAP or make

09:25:14 10     representations or warranty on behalf of SAP.

11                      You see that there, right?

12     A.     I do.

13     Q.     And that was in all of the sales that IBIS/Lsi ever

14     made of B1 to -- to B1 customers?

09:25:30 15     A.     To the best of my knowledge.

16     Q.     Thank you.  Your team at IBIS/Lsi, they had through

17     the training and the things we talked about had

18     specialized skill and knowledge to implement software.

19     Right?

09:25:46 20     A.     Correct.

21     Q.     And you would agree that implementing software at a

22     corporation, that's a complicated undertaking and it

23     requires specialized skill.

24     A.     Yes.

09:26:27 25     Q.     And IBIS/Lsi, they owned the services that the team

1    used, or they –– they may have been leasing them, but

2    IBIS/Lsi's office, the IBIS/Lsi people were working from,

3    who worked on the hotel project?

4    Q.    Did they work at offices of mine?

09:27:01    5    A.    I want to be clear.  When people on your team were

6    working on the hotel project, they worked out of your

7    offices?

8    A.    They did.

9    Q.    They were not working out of SAP's offices?

09:27:26    10    A.    Yes.

11    Q.    So when they were using computers and desks and

12    chairs and pens and pencils, they were not using SAP's

13    computers and desks and chairs and pens and pencils,

14    right?

09:27:26    15    A.    That's correct.

16    Q.    They were using IBIS/Lsi's basically assets to

17    perform this implementation, correct?

18    A.    That's correct.

19    Q.    And the team that you had on the Hodell project,

09:27:26    20    they were IBIS/Lsi employees.

21    A.    They were what?

22    Q.    IBIS/Lsi.  Right?

23    A.    Yes.

24    Q.    IBIS/Lsi hired those people?

09:27:26    25    A.    Yes.

1    Q.    And IBIS/Lsi could fire those people.

2    A.    Did you say that we fired them?

3    Q.    No.  I just want to be clear that the Hodell team,

4    your Hodell team, they were IBIS/Lsi employees --

5    A.    Yes.

6    Q.    And it was IBIS/Lsi that hired these people and

7    could fire these people if they want to.

8    A.    Oh, yes.

9    Q.    IBIS/Lsi paid them benefits --

10   A.    Yes.

11   Q.    IBIS/Lsi controlled their hours, whether they went

12   on vacation or not.  All of that was controlled by

13   IBIS/Lsi.

14   A.    Correct.

15   Q.    Not controlled by SAP?

16   A.    Correct.

17   Q.    Because IBIS/Lsi was an independent company and

18   entity from SAP?

19   A.    Correct.

20   Q.    And IBIS/Lsi was in charge of the project.

21   A.    Yes.

22   Q.    Now, you read yesterday from Exhibit 32 -- can we

23   call that up, please?

24              I'll represent for the record, Exhibit 32,

25   that you read from yesterday, that is a contract between

Lowery - Cross                    540

1    IBIS and SAP known as a software development kit, but

2    let's look at it?

3    A.    Okay.

4    Q.    Go up to the top of it, please.

09:28:32  5              Do you see the title, right "limited term,

6    SAP Business One software development kit license."  Do

7    you see that there?

8    A.    I do.

9    Q.    And you know that's where people get SDK, software

09:28:46 10   development kit?

11   A.    I do.

12   Q.    You would understand what I meant if I called this

13   an SDK contract?

14   A.    I do.

09:28:52 15   Q.    And this one here, effective, I think it reads 31st

16   day of December, '03, this one is actually between IBIS

17   on the one hand and SAP on the other.  Right?

18   A.    Correct.

19   Q.    And what these SDKs do is they permit dealers like

09:29:11 20   IBIS or like LSi to develop add-ons to go on top of

21   Business One to provide functionality to customers that

22   Business One doesn't provide.  Right?

23   A.    Yes.

24   Q.    Okay.  Take a look, please, at Section 8 -- uh-oh?

09:29:38 25              And just to be clear, looking at the title

Lowery – Cross                                      541

1    of this, this is the IBIS SDK.

2    A.    Yes.  This document was before I acquired IBIS.

3    Q.    I understand.  And I want the jury to understand.

4    So we talked about LSi's distribution agreement.  And you

5    just testified LSi also had one of these SDKs?

6    A.    We had one too.

7    Q.    And all we're talking about now is the IBIS SDK?

8    A.    Right.

9    Q.    And it is likely the same as the one you executed,

10   right?

11   A.    Best of my knowledge.

12   Q.    Let's look at Section 8?

13   A.    Okay.

14   Q.    You would agree, sir, that IBIS and LSi agreed to

15   this language up on everybody's screen except for mine

16   that says disclaimer of warranty.  "SAP disclaims all

17   warranties, express or implied at law or in equity

18   related to the SAP Business One software, software

19   development kit, documentation, SAP proprietary

20   information, licensee extensions, and any third party

21   software."  Do you see that there?

22   A.    I do.

23   Q.    And if you look at the front of this agreement

24   there is a definition section.  Right?

25   A.    Okay.

1    Q.    Go to the first page, please.

2              This will just take a second but it is

3    worth doing.

4              All the way down at the bottom where it

09:31:13 5    says -- highlight the very final line.  It says

6    "extension means."

7              And now we go to the next page and see the

8    definition, right?

9    A.    Okay.

09:31:23 10   Q.    Can you go to the next page, please?  Up top.

11              Can you highlight the two top paragraphs,

12   the ones that are indented?

13              I want to be clear, in the SDK there is a

14   definition of an extension.  This is the extension and it

09:31:47 15   looks technical, but what we are basically talking about

16   are add-ons, right?

17   A.    We're talking about what?

18   Q.    This definition of an extension that's on the

19   screen in front of you --

09:31:57 20   A.    Yes.

21   Q.    Looks pretty technical but is basically a

22   description of an add-on?

23   A.    An add-on, okay?  Do you want me to read it and

24   make sure.

09:32:06 25   Q.    Take your time.  You don't have to read it out

Lowery - Cross                                    543

1    loud?

2    A.    You're correct.  No, no.  You're correct.  I just

3    didn't -- I didn't know what you were trying to ask for.

4    Q.    Okay.  I just want everyone in this courtroom to

09:32:16  5    understand in this contract, when it uses the word

6    extension it is talking about an add-on.

7    A.    That's correct.

8    Q.    So very quickly, let's go back to Section 8.  We

9    had this disclaimer of warranty piece.  Can you blow up

09:32:41 10    Section 8, please?

11          The one I read a moment ago.  It starts

12    "SAP disclaims all warranties," et cetera, et cetera,

13    and in the fourth line says -- well, disclaims all

14    warranties related to the SAP Business One software,

09:32:59 15    software development kit, documentation, SAP proprietary

16    information, licensee extensions, and any third party

17    software.

18          So SAP in the SDK is disclaiming all

19    responsibility and liability for the add-ons.  Correct?

09:33:14 20    A.    Yes.

21    Q.    And you agreed to that when LSi signed its SDK?

22    A.    I did.

23    Q.    And IBIS agreed to that when they signed their SDK.

24    Correct?

09:33:26 25    A.    Correct.

1    Q.    Take a quick look again, please, at 316.

2          Go to 7.1, please.

3          Just to be clear, Exhibit 316 is the Hodell

4    license agreement, right?  We looked at that just a

09:33:52  5    couple minutes ago?

6    A.    Correct.

7    Q.    If you go to Section 7.1, you would agree that

8    under the heading "performance warranty maintenance,"

9    7.1 reads "SAP warrants that the software will

09:34:15 10    substantially conform to the functional specifications

11    contained in the documentation for six months following

12    delivery.  The warranty shall not apply, one, if the

13    software is not used in accordance with the

14    documentation, or, two, if the defect is caused by a

09:34:29 15    modification, integration add-on, licensee, third party

16    software, or third party database."  Do you see that

17    there?

18    A.    I do.

19    Q.    And when it refers to, in that last piece of the

09:34:42 20    sentence, "an integration add-on,"  that's basically

21    something like In-Flight Enterprise.  Correct?

22    A.    It is.

23    Q.    So not only is it true that SAP disclaims liability

24    and responsibility for add-ons in the SDK but SAP in its

09:34:59 25    license agreement with Hodell and with its other

Lowery - Cross                    545

1     customers disclaims liability and responsibility for

2     add-ons there to.  Correct?

3     A.    Correct.

4     Q.    Okay.  Yesterday, by the way, I want to shift gears

09:35:14  5     just a little bit.

6                 You said repeatedly that IBIS was a

7     reseller, as if they had a distribution contract with

8     SAP, just like LSi did.  That's what you said yesterday,

9     right?

09:35:29  10     A.    I apologize.  IBIS was a what?

11     Q.    I just want to be clear?

12     A.    I just didn't hear.

13     Q.    No problem.  Yesterday, you testified repeatedly

14     that IBIS had a channel partner or distribution agreement

09:35:47  15     with SAP, right?

16     A.    Correct.

17     Q.    So your testimony from yesterday was -- well, just

18     so everyone is following, you have testified today and we

19     just walked through this quite a bit that LSi had a

09:36:00  20     distribution agreement and an SDK --

21     A.    Correct.

22     Q.    Right?  And we talked about IBIS, they have an SDK.

23     We just looked at it, right?

24                 And yesterday you were testifying, oh,

09:36:12  25     yeah, not only does IBIS have an SDK, they have one of

Lowery – Cross                    546

```
        1    these distribution agreements too.  Correct?

        2    A.    Correct.

        3    Q.    Okay.  And you're the president of IBIS, so, I

        4    mean, that's not without any foundation that you say

09:36:27 5    that.  You would know, right?

        6    A.    Yes.

        7    Q.    And you have been involved in this lawsuit since it

        8    started, right, in November of 2008?

        9    A.    Yes.

09:36:37 10   Q.    I'm sorry.  You have to answer, because they are

       11    taking down all the words, so I know when you are nodding

       12    your head, everybody knows you mean yes?

       13    A.    Yes.  The answer is yes.

       14    Q.    Thank you.  But you're aware that neither IBIS nor

09:36:52 15   LSi nor SAP nor Hodell have been able to find or produce

       16    a draft, original, final, any version whatsoever of any

       17    IBIS distribution agreement.  Nobody has found one.

       18               MR. LAMBERT:  Objection.

       19    BY MR. MILLER:

09:37:15 20   Q.    Correct?

       21               THE COURT:  Overruled.

       22    A.    I don't know that.

       23    Q.    You have been in this case since November, 2008.

       24    Right?

09:37:20 25   A.    Correct.
```

Lowery – Cross                                    547

1    Q.    You can't tell this jury that you have seen an IBIS

2    distribution agreement, can you?  Because I certainly

3    haven't and no one else at counsel table has seen it.

4    Correct?

09:37:33  5                    MR. LAMBERT:  Objection.

6                    THE COURT:  But you're asking multiple

7    questions.

8                    MR. MILLER:  That's fine.  I'll slowdown.

9    BY MR. MILLER:

09:37:42 10   Q.    You have been in the lawsuit since November of

11   2008.  Right?

12   A.    Correct.

13   Q.    Just -- and I realize that it may have been that

14   you had an understanding that IBIS had a distribution

09:37:55 15   agreement, but you can't tell us that you have actually

16   seen an IBIS distribution agreement.

17   A.    No.

18   Q.    Meaning you can't tell us that you have seen

19   -- that I'm correct.  You can't tell us that you have

09:38:08 20   seen one.

21   A.    That's correct.

22   Q.    Okay.  And if I told you that IBIS didn't have a

23   distribution agreement, you couldn't point to any

24   evidence that I was wrong?

09:38:21 25   A.    No.

Lowery – Cross                                    548

1    Q.    Okay.  And an SDK contract, that's a different

2    thing from a distribution agreement.  Right?

3    A.    Yes.

4    Q.    Because the distribution agreement is what permits

09:38:39 5    the reseller to go out and sell the B1 product to the

6    customer.  Right?

7    A.    Yes.

8    Q.    And the SDK is what permits that dealer, reseller,

9    channel partner, whatever we are calling them, the SDK is

09:38:53 10    what permits that entity to develop add-ons.  Right?

11    A.    Correct.

12    Q.    Take a look at Exhibit 32.

13                Again, this is the IBIS SDK.  Right?  The

14    only contract we've seen between IBIS on the one hand and

09:39:18 15    SAP on the other hand.  Right?

16    A.    Correct.

17    Q.    Okay.  Look at Section 5.2, please.

18                5.2, sir, in the SDK contract that IBIS had

19    with SAP, under termination it says "this agreement and

09:39:46 20    the license granted hereunder shall terminate upon the

21    earliest to occur of the following,"  and number one, 180

22    days from the date of this agreement in the event there

23    is no written agreement between SAP and licensee

24    establishing licensee as an authorized SAP Business One

09:40:06 25    software partner, partner agreement, by the end of such

1    180 day period.

2              Do you see that there?

3    A.    I do.

4    Q.    So if IBIS had this SDK executed in December of

09:40:22  5    2003 and we've established that, right?

6    A.    Correct.

7    Q.    They had an SDK, it is this one right here, and it

8    was executed in December of 2003.  Right?

9    A.    Correct.

09:40:30 10    Q.    If IBIS didn't go ahead and get a distribution

11    agreement, then according to the language we just

12    reviewed at 5.2, IBIS's SDK terminates after 180 days.

13    Right?

14    A.    Yes.

09:40:49 15              MR. LAMBERT:  Objection.

16              THE COURT:  Overruled.

17    BY MR. MILLER:

18    Q.    So by June of 2004, if IBIS doesn't have a

19    distribution agreement, IBIS has zero contracts with SAP.

09:41:02 20    Right?

21    A.    Correct.

22    Q.    Shifting gears just a little bit more, after this

23    SDK agreement was executed, that's when LSi came in and

24    acquired IBIS, right, in April/May 2004.  Right?

09:41:29 25    A.    Correct.

Lowery - Cross                                    550

1    Q.    But IBIS after it was acquired by LSi continued to

2    conduct business.  Right?

3    A.    As IBIS?

4    Q.    Correct.

09:41:38  5    A.    I'm not sure what that means.  We bought all assets

6    of IBIS.

7    Q.    Well, let's break it down a little bit.  LSi --

8    A.    Help me out here.

9    Q.    We'll work together.

09:41:51 10    A.    Hmm?

11    Q.    We'll work together?

12    A.    Okay.

13    Q.    LSi you testified yesterday, it still exists.

14    A.    It still exists.

09:41:58 15    Q.    Right.  And when LSi acquired IBIS, it wasn't some

16    fancy corporate transaction.  LSi just bought the stock

17    of IBIS and IBIS became a subsidiary of LSi, right?

18    A.    Okay.

19    Q.    You tell me.

09:42:13 20    A.    I think so.

21    Q.    Okay.

22    A.    Remember, I'm the dumb salesman.

23    Q.    But you're the owner of these companies, right?

24    A.    I am the owner of the companies.

09:42:21 25    Q.    Thank you, sir.  And IBIS continued to conduct

          1    business as IBIS after LSi acquired IBIS.  Right?

          2    A.    I don't know how to answer that, because --

          3    Q.    Okay, then let's look at some documents.

          4    A.    The switch to LSi was all marketing materials.

09:42:38  5    Q.    Would you disagree with Dale Van Leeuwen said that

          6    IBIS continued to conduct business after the acquisition

          7    of LSi by IBIS?

          8                    MR. LAMBERT:  Objection.

          9                    THE COURT:  Objection sustained.

09:42:48 10    A.    I have no idea what Dale says.

         11                    THE COURT:  You don't have to answer.

         12    BY MR. MILLER:

         13    Q.    No problem.  Let's look at Exhibit 9, please.

         14                    Exhibit 9, I'll represent for the record,

09:43:04 15    it is an October 14, 2004 IBIS letter to Hodell.

         16                    Can you isolate that?  It is on IBIS

         17    letterhead.

         18    A.    The letterhead of IBIS, right.

         19    Q.    Can you isolate, Bob, down on the bottom who signed

09:43:21 20    it?

         21    A.    No one signed it but it has my name and Dale's

         22    name.

         23    Q.    Thank you, sir, and you're correct, but I didn't

         24    have appending question.

09:43:28 25                    Bob, can you please isolate at the

1    bottom—-

2    A.    He did.

3    Q.    The names of the senders of this letter.  And you

4    see that down there, at the bottom of the document that

09:43:42 5    has IBIS at the top, it has the name of two people.

6    Right?

7    A.    Correct.

8    Q.    One of them is Dale Van Leeuwen, correct?

9    A.    Correct.

09:43:51 10    Q.    And he is described as the COO of The IBIS Group.

11    Right?

12    A.    Correct.

13    Q.    And below that, that is your name, Dan Lowery,

14    president of The IBIS Group, correct?

09:44:02 15    A.    Yes.

16    Q.    And the date of this is October 14, 2004?

17    A.    Okay.

18    Q.    Can we show the date?  It's in the upper right-hand

19    corner.  Okay.

09:44:10 20          So LSi acquires IBIS in April or May of

21    2004.  This is five or six months later, correct?

22    A.    Correct.

23    Q.    And clearly IBIS is continuing to conduct business

24    because here you are sending a letter to Hodell on IBIS

09:44:28 25    letterhead with your name on the bottom described as the

1    president of IBIS, right?

2    A.    Yes, correct.

3    Q.    Take a look at Exhibit 11.  This, by the way,

4    appears to be the attachment to Exhibit 9, and it

09:44:48 5    likewise has the IBIS letterhead.  Correct?

6    A.    Correct.

7    Q.    And this was basically the first proposal that

8    IBIS/LSi was making to Hodell for this entire project.

9    A.    Okay.

09:45:07 10    Q.    Take a look.  I'll make it even easier.  Why don't

11    we take a look at Exhibit 291, please.

12                   Sir, this is the development agreement,

13    correct?

14    A.    Correct.

09:45:27 15    Q.    This is the December, 2004 development agreement.

16    Right?

17    A.    Correct.

18    Q.    Let's look at who it is between, we'll start with

19    some really, really simple stuff.  It is right there at

09:45:38 20    the top.

21                   Development agreement between Hodell-Natco,

22    The IBIS Group, a wholly-owned company of LSi Lowery

23    Systems and LSi Lowery Systems?

24    A.    Right.

09:45:53 25    Q.    And that's who this contract that you signed on

Lowery - Cross                          554

1    behalf of IBIS and LSi was between?

2    A.    Correct.

3    Q.    And it can be a little complicated, that kind of

4    language at the top.

09:46:02  5              It is Hodell, correct, is one party?

6    A.    Yes.

7    Q.    The second better is The IBIS Group?

8    A.    Correct.

9    Q.    And they are described there.  What is IBIS, it is

09:46:12 10   a wholly owned company of LSi?

11   A.    Right.

12   Q.    And the third party to the contract is LSi.  Right?

13   A.    Okay.

14   Q.    And this, again, is December, 2004.  Five, six

09:46:25 15   months after LSi acquired IBIS.

16   A.    Correct.

17   Q.    And this, again, if it is December, 2004, is six

18   months after the only remaining contract that existed

19   between IBIS and SAP expired.

09:46:43 20   A.    In your opinion.

21   Q.    Based on the language that we read in IBIS's SDK.

22   Correct?

23   A.    In my opinion, he had a contract.  We just have not

24   found it.  Where is it?

09:46:55 25   Q.    Seven years in, no party has produced it.  You're

Lowery - Cross                          555

          1    still not sure if that existed or not?

          2    A.    I'm not sure that is true.

          3    Q.    If there was no distribution agreement --

          4    A.    I have already answered that.

09:47:08  5    Q.    If there was no distribution contract between IBIS

          6    and SAP you would agree at the time this development

          7    agreement was signed in December of 2004, IBIS didn't

          8    have any contract with SAP.  Correct?

          9                 MR. LAMBERT:  Objection.

09:47:20 10                 THE COURT:  Overruled.

         11    A.    Well, I don't know what I'm allowed to say or not.

         12                 When we bought IBIS, SAP was ecstatic about

         13    it, they all loved it.  So I don't know --

         14    Q.    Sir, you are going to get a chance, perhaps Hodell

09:47:38 15    will want to ask you some questions like that.

         16                 I just want to be clear.  If IBIS didn't

         17    have a distribution agreement, and I realize that you are

         18    not prepared to say they didn't have one --

         19    A.    Right.

09:47:49 20    Q.    But if they didn't have a distribution agreement,

         21    you would agree based on the language we saw on their SDK

         22    --

         23    A.    I agree.

         24    Q.    Let me finish please.  That their SDK expired in

09:47:58 25    June of 2004.  Correct?

1    A.    Correct.

2    Q.    And this development agreement is dated December,

3    2004.  Correct?

4    A.    Correct.

09:48:05   5    Q.    And that would have been six months after the only

6    contract, if there is no distribution agreement, that

7    IBIS ever had with SAP expired.

8    A.    If all that was true, correct.

9    Q.    Thank you.  Let's talk about some of the risks

09:48:20  10    associated with this project.

11          The solution, right, was going to involve

12    three major components, correct?

13    A.    Correct.

14    Q.    B1, Radio Beacon -- correct?

09:48:35  15    A.    Correct.

16    Q.    And In-Flight Enterprise.  Correct?

17    A.    Correct.

18    Q.    Let's start with B1.  In 2003, when you were first

19    getting going with SAP, B1 was a brand new product in the

09:48:51  20    United States.  Right?

21    A.    Correct.

22    Q.    It was a fresh product, and your company was aware

23    of that.  Right?

24    A.    Correct.

09:48:59  25    Q.    And IBIS and LSi, in your view, recognizing

Lowery - Cross                                557

1    -- taking for the moment the idea that IBIS had a

2    distribution agreement, IBIS and LSi were some of the

3    first companies signed up with SAP to sell this product.

4    A.    Probably.

09:49:21  5    Q.    And you knew that SAP had bought this product in

6    Israel and they were going to roll it out in the United

7    States.

8    A.    Correct.

9    Q.    And you knew that the B1 product had been in the

09:49:34  10   United States for less than a year.

11   A.    Correct.

12   Q.    And you knew that there were very few, so far U.S.

13   customers, because most of the customers were in Europe

14   and Israel.

09:49:46  15   A.    Correct.

16   Q.    Elsewhere in the world at least, correct?

17   A.    Elsewhere in the world?  Is that what you said?

18   Q.    Yes?

19   A.    Yes.

09:49:55  20   Q.    I asked a bad question.  You knew that there were

21   relatively few U.S. customers and the bulk of the

22   customers for B1 were up until now throughout the rest of

23   the world including Europe and Israel?

24   A.    Correct.

09:50:10  25   Q.    And you even testified yesterday that it was your

Lowery - Cross                                558

1    understanding that the Hodell deal was going to be one of

2    the largest B1 deals that had occurred thus far?

3    A.    That's what I was told.

4    Q.    But that would have just been in the United States.

5    Correct?

6    A.    I don't know.

7    Q.    You didn't know?  But Hodell knew what you knew?

8    Right?  Hodell would have known -- if it was your

9    understanding that this Hodell transaction was going to

10   be one of the largest B1 sales in the United States,

11   Hodell would have known that too.

12   A.    I don't know.

13   Q.    You would have told Hodell that.

14   A.    Why would I tell them that?

15   Q.    Do you think that that -- do you think that is

16   something that is important for you to know when you are

17   selling a product, that it has never -- I'll let you

18   answer.

19   A.    I don't know.

20   Q.    How about all the things we just talked about?

21   A.    You just asked me did I tell them.  I can't answer

22   I did.  I don't know if I did.

23   Q.    You don't remember?

24   A.    I don't remember I was told that by Dan Kraus.

25   Q.    Would it be fair to say the basics of what we just

Lowery – Cross                    559

1    covered, which is that B1 was relatively new in the

2    United States, and that Hodell was possibly one of the

3    largest U.S. B1 sales thus far?  That's something that

4    you knew for sure.

09:51:29  5    A.    I knew.

6    Q.    And you would agree that that is something that

7    Hodell would want to know.  I mean, you have been in the

8    sales business for 43 years.  Do you think that a

9    customer might want to know that?

09:51:42  10    A.    That they are a large customer?

11    Q.    No.  The things you knew about B1 that we just

12    reviewed, that it was relatively new in the United States

13    and this sale might have been one of the biggest ones in

14    the United States yet, don't you think a customer, in

09:51:54  15    your 43 years of experience, would want to know that?

16    A.    Possibly.

17    Q.    And you don't remember if you told Hodell that or

18    not?

19    A.    I'm sure I told them that it was a new product.

09:52:06  20    They knew that.  What was the other thing?  As far as

21    being the largest customer, I don't know that I mentioned

22    that to them.

23    Q.    Let's talk about In-Flight.

24              By itself, right, B1 didn't have all of the

09:52:24  25    functionality that Hodell needed?

Lowery – Cross                           560

1    A.    Correct.

2    Q.    So B1 is accounting software, basically, correct?

3    A.    ERP system they call it.

4    Q.    Let's back it up then.  B1 is an ERP system

09:52:39  5    correct?

6    A.    Accounting, back office the part of that.

7    Q.    It is a significant part of what B1 offers,

8    correct?

9    A.    Accounting.

09:52:45  10    Q.    Well, accounting and back office functions like you

11    just mentioned.

12    A.    Yes.

13    Q.    Okay.  And B1 doesn't offer a customer, not just

14    like Hodell, but customers generally, all the

09:52:57  15    functionality they need to run their business.  B1 does

16    certain things and that's it.

17    A.    I apologize if I don't understand.  Are you saying

18    it was never sold vanilla, just as–is?

19    Q.    No.  No.  I'm not saying that.  I'll try to ask it

09:53:15  20    in an even simpler way.

21           You would agree that by itself, B1 didn't

22    have all the functionality that Hodell needed.

23    A.    Correct.

24    Q.    Okay.  And just so we're clear, when we're talking

09:53:26  25    about functionality, we're talking about the different

Lowery - Cross                                    561

1    types of tasks a piece of software can perform.  Right?

2    A.    Correct.

3    Q.    I mean, if there is a universe of things the

4    company needs to get done in its operations, when it came

5    to Hodell it was clear B1 didn't do all of that, it only

6    provided certain functions, they were going to need the

7    rest of them done some other way.  Right?

8    A.    Correct.

9    Q.    And In-Flight Enterprise is what is known as an

10   add-on or an extension.  We've talked about that?

11   A.    Correct.

12   Q.    And In-Flight was designed to provide the

13   functionality to Hodell that B1 did not provide.

14   A.    Correct.

15   Q.    Okay.  It was basically supposed to fill gaps in

16   the functionality that the other software, B1, didn't

17   fill.

18   A.    Correct.

19   Q.    And everybody knew that.  Everybody knew that there

20   was -- everybody in the Hodell transaction, including

21   everyone at IBIS/Lsi and everyone at Hodell, that

22   In-Flight was going to provide functionality that B1

23   didn't.

24   A.    Correct.

25   Q.    And this new In-Flight Enterprise for B1, it was

1    distinct, a different thing than the In-Flight

2    application that Hodell was using back when they were on

3    FACTS.  Right?

4    A.    I'm sorry.  Could you repeat that?

09:54:45  5    Q.    Not a problem.  I will slow it down.

6          Hodell used to be on a different computer

7    system before they got B1, right?

8    A.    Correct.

9    Q.    And that was called FACTS, right?

09:54:56 10    A.    Yes.

11    Q.    And FACTS had an add-on also.  Correct?

12    A.    Yes.

13    Q.    It was developed by IBIS?

14    A.    Correct.

09:55:02 15    Q.    And it was called In-Flight?

16    A.    Correct.

17    Q.    Okay.  The In-Flight that worked with FACTS for

18    Hodell back in the old days is different than the

19    In-Flight Enterprise that was supposed to work with B1

09:55:18 20    going forward for Hodell.  Correct?

21    A.    What do you mean by different?

22    Q.    Well, you would agree that it was going to require

23    code to be written from scratch.

24    A.    Correct.

09:55:34 25    Q.    And Hodell was aware of that?

Lowery – Cross                          563

1    A.    Yes.

2    Q.    And Hodell knew that when you write code from

3    scratch, that means risk.

4                MR. LAMBERT:  Objection, Your Honor.

09:55:45  5                THE COURT:  Objection sustained.

6    BY MR. MILLER:

7    Q.    You worked with Hodell to help sell this product,

8    correct?

9    A.    Yes.

09:55:53 10   Q.    And you have interacted with Hodell during the

11   course of this sale.  Correct?

12   A.    Yes.

13   Q.    And you just testified that the In-Flight

14   Enterprise code was going to have to be written from

09:56:41 15   scratch.

16   A.    Correct.

17   Q.    And you know from your interactions with Hodell

18   that they were aware that the In-Flight code, In-Flight

19   Enterprise code was going to have to be written from

09:56:53 20   scratch.  Correct?

21   A.    Yes.

22   Q.    And you also knew from your interactions with

23   Hodell that they knew that having the In-Flight

24   Enterprise code written from scratch involved risk?

09:57:05 25                MR. LAMBERT:  Objection.

```
 1              THE COURT:  Objection sustained.
 2    BY MR. MILLER:
 3    Q.    You knew that this In-Flight Enterprise add-on was
 4    untested, right?  It was brand new?
 5    A.    Yes.
 6    Q.    Yes to both questions?
 7    A.    In that context, yes.
 8    Q.    Pardon?
 9    A.    In that context, yes.
10    Q.    This In-Flight Enterprise add-on was a customized
11    piece of software that was going to fit on top of B1.
12    Correct?
13    A.    Correct.
14    Q.    And that was untested; that had never happened
15    before.  No one had ever taken this code that was getting
16    written from scratch --
17    A.    Right.  I'm not sure I understood the context.
18    Yes, that's correct.
19    Q.    So just to be FLEER --
20    A.    I just didn't want to get it so where we're saying
21    we didn't test it.
22    Q.    We're talking over each other.  I'll try to
23    slowdown.
24              The In-Flight Enterprise code that was
25    written from scratch was going to be basically developed
```

| | |
|---|---|
| 1 | into this In-Flight Enterprise somewhere, piece of |
| 2 | customized software that would fit on top of B1, correct? |
| 3 | A.    Correct. |
| 4 | Q.    Okay.  And this code that was written from scratch |
| 09:58:27  5 | was untested because no one had ever done this before. |
| 6 | That's what we mean when we say it was written from |
| 7 | scratch? |
| 8 | A.    Okay.  Correct. |
| 9 | Q.    And you know from your interactions with Hodell |
| 09:58:40 10 | that Hodell knew this had never been tested? |
| 11 | MR. LAMBERT:  Objection. |
| 12 | THE COURT:  Why don't you ask him if he |
| 13 | ever told Hodell that. |
| 14 | BY MR. MILLER: |
| 09:58:46 15 | Q.    Did you ever tell Hodell that this In-Flight |
| 16 | Enterprise code that was being written from scratch was |
| 17 | being written from scratch? |
| 18 | A.    I think it's intuitive. |
| 19 | Q.    Right?  And would it be intuitive then that it was |
| 09:59:01 20 | untested?  Would you have told them that it was untested? |
| 21 | A.    What does that mean to you? |
| 22 | Q.    Well, by its very nature it was brand new and it |
| 23 | had not been used in the field, correct? |
| 24 | A.    Is that what you mean when you say untested? |
| 09:59:14 25 | Q.    Sure? |

```
 1    A.    Yes.
 2    Q.    And Hodell was aware of that?
 3    A.    They knew that.
 4    Q.    And would it have been intuitive if SWER?
 5          Software is being written from scratch and
 6    never been used before in the field that it entailed
 7    risk.
 8                MR. LAMBERT:  Objection.
 9                THE COURT:  Objection sustained.
10                MR. MILLER:  Thank you, Your Honor.  I will
11    move on.
12                THE COURT:  You keep asking what somebody
13    else knows.
14                MR. MILLER:  That's fine.
15    BY MR. MILLER:
16    Q.    In any event this In-Flight Enterprise customized
17    software was a major part of the Hodell project, correct?
18    A.    It was.
19    Q.    It was going to involve literally thousands of
20    hours of hardworking coding by IBIS and LSi.  Correct?
21    A.    Correct.
22    Q.    Let's take a look at Exhibit 11.
23          We looked at Exhibit 11 a couple minutes
24    ago, correct?
25    A.    Correct.
```

1    Q.    This was the IBIS/Lsi proposal to Hodell for this

2    project.  Correct?

3    A.    Correct.

4    Q.    Take a look, please, about midway down, where it

10:00:29  5    says the purchase of In-Flight Enterprise.  It is the

6    kind of second thing below "costs."

7    A.    Yes.  I see it.

8    Q.    The purchase of In-Flight Enterprise, and below

9    that it says 3816 hours.  Do you see that there?

10:00:45 10   A.    I do.

11   Q.    So this was IBIS' estimate to Hodell of how much

12   effort would be associated with writing this customized

13   code from scratch that would become In-Flight Enterprise.

14   Correct?

10:00:59 15   A.    Correct.

16   Q.    Okay.  And the In-Flight coding, by the way, just

17   to be clear, this is getting done by IBIS/Lsi, not SAP.

18   Right?

19   A.    Yes.

10:01:10 20   Q.    So we have B1, we had In-Flight, and then the third

21   component was Radio Beacon.  Right?

22   A.    Correct.

23   Q.    And Radio Beacon is another add-on, right?

24   A.    Yes.

10:01:31 25   Q.    And SAP, they were not involved with Radio Beacon

Lowery - Cross                    568

1   either, were they?

2   A.   I can't answer that.

3   Q.   Let me ask it to you this way --

4   A.   Because Radio Beacon -- Ross Elliott, the president

10:01:57  5   of Acellos, which is Radio Beacon, worked with SAP.  He

6   was on their council, software council.  When you say

7   they didn't work with him, I don't know if that is true.

8   Q.   Thank you.  SAP is a big company.  It has a lot of

9   employees.  I'm not surprised to hear that somebody from

10:02:15  10  SAP knows somebody at Radio Beacon.  You are not

11  surprised either right?

12               MR. LAMBERT:  Objection, Your Honor.

13               THE COURT:  Objection sustained.

14  BY MR. MILLER:

10:02:21  15  Q.   But when we talk about this project and the three

16  components in this project that were B1, In-Flight, and

17  Radio Beacon, you would agree with me that SAP wasn't

18  involved with the Radio Beacon work that was being done

19  by IBIS/Lsi for Hodell.  Correct?

10:02:40  20               MR. LAMBERT:  Objection.

21               MR. MILLER:  I'm asking if he is aware.

22               THE COURT:  Overruled.

23  BY MR. MILLER:

24  Q.   Was it too long of a question?

10:02:52  25  A.   Possibly.  But let me think.  This is for the

Lowery – Cross                              569

1    conversion of data for both the SBO and RB application.

2    Correct.  I would say yes.  That's correct.

3    Q.     Thank you.  And Radio Beacon, you have been here

4    the last couple of days, that was at the heart of the

10:03:15   5    dispute that was about to lead the litigation or appeared

6    to be about to lead the litigation between IBIS and

7    Hodell ––

8                    MR. LAMBERT:  Objection.

9    BY MR. MILLER:

10:03:26  10    Q.     –– in late 2003.  Isn't that right?

11                   THE COURT:  Objection sustained.

12    BY MR. MILLER:

13    Q.     Are you aware –– do you remember, you have been

14    here for the last couple days.  Right?

10:03:36  15    A.     I have.

16    Q.     I'm sorry.  And you heard the testimony about the

17    letters that were written and the e-mails that came from

18    Hodell to IBIS about problems with the e-WMS component

19    and Radio Beacon.  Correct?

10:03:53  20    A.     I did.  I saw those.

21    Q.     Okay.  And you weren't copied on those, right,

22    because that would have been way before LSi took over

23    IBIS.

24    A.     Correct.

10:04:04  25    Q.     Okay.  You heard that sitting here in the

Lowery – Cross                        570

1    courtroom.  Correct?

2    A.    Correct.

3    Q.    Okay.

4              MR. MILLER:  Your Honor, I have plenty more

10:04:14 5   to go but now might be a good time to break.

6              THE COURT:  When you say plenty more, what

7    does that mean?

8              MR. MILLER:  I have more cross-examination

9    to go.  I know we normally take a morning break.  This

10:04:29 10  might be an okay time to take a break or we can keep

11   going.

12             THE COURT:  Do you want to vote on that?

13   Okay, we'll take a 15 or 20 minute break folks.  Keep in

14   mind the admonition.  Should be should come to the door.

10:04:41 15  We had a mistake yesterday because they didn't hear my

16   signal.  And there she is.

17             (Recess had.)

18             (Proceedings in presence of jury:)

19             THE COURT:  You may continue.

10:28:16 20            MR. MILLER:  Thank you, Your Honor.

21   BY MR. MILLER:

22   Q.    Mr. Lowery, let's go back to some of the contracts.

23   A.    Okay.

24   Q.    Dealers that have a distribution agreement and an

10:28:29 25  SDK, right, are permitted to sell B1 and develop these

Lowery - Cross                                    571

1    add-ones, correct?

2    A.    Correct.

3    Q.    And you could combine if you had a distribution

4    agreement and an SDK, B1 with an add-on and you could

10:28:43  5    create something that you described before and others

6    have described before as an industry vertical.  Right?

7    A.    Yes.

8    Q.    And you know what an industry vertical means.

9    Right?

10:28:54 10    A.    Well, you mean like, it's an extension, it's an

11    add-on?

12    Q.    Just to be clear, it means developing, in this

13    context, it means taking the B1 product, putting the

14    add-on on top of it, and selling it not just to one

10:29:14 15    customer, but selling it to multiple customers in the

16    industry and in the world.

17    A.    Correct.  That was our goal.

18    Q.    Okay.  In other words, when you are developing an

19    industry vertical in this context, you are taking B1 and

10:29:32 20    putting customized software on top of it that is

21    customized for that particular industry and then selling

22    the product to the whole industry if you can.

23    A.    If you can.

24    Q.    And you liked industry verticals.

10:29:46 25    A.    Do I like industry verticals?  Yes.

Lowery - Cross                          572

1     Q.    You testified that you liked industry verticals?

2     A.    Yes, I did.  I do.

3     Q.    And you developed one before for the equipment

4     rental industry.  Isn't that right?

10:29:58  5     A.    We did.

6     Q.    That wasn't with B1?

7     A.    No.

8     Q.    But, it was the same idea.  You took a software

9     product, it was customized for the equipment rental

10:30:06 10    industry, and then you sold it.

11    A.    Correct.

12    Q.    To lots of companies in the equipment rental

13    industry?

14    A.    Correct.

10:30:11 15    Q.    And you wanted to do the same thing here with B1,

16    Radio Beacon, and In-Flight on top.  Correct?

17    A.    Correct.

18    Q.    And your view was we'll sell it to these other

19    companies and take over the world?

10:30:22 20    A.    Okay.  Yes.

21    Q.    You testified to that at your deposition.

22    A.    Okay.

23    Q.    Okay.  Let's take a look at 291, please.

24          We've looked at this a couple times.

10:30:47 25    Hodell on the one hand and IBIS and LSi on the other hand

1    executed this development agreement in December of 2004.

2    Right?

3    A.    Correct.

4    Q.    Take a look at the project description, please.  It

10:30:59 5    is right there at the top.  Can you blow that up?  It is

6    right below the date.

7                    Project description.  This will be the

8    development of The IBIS Group's IBIS In-Flight Enterprise

9    application and its integration into SAP Business One

10:31:22 10   software for Hodell-Natco.  That was the project.  Right?

11   A.    Yes.

12   Q.    And you would agree this is the only contract that

13   existed between IBIS on the one hand and Hodell on the

14   other hand?

10:31:40 15                   MR. LAMBERT:  Objection.

16                   THE COURT:  Overruled.

17   BY MR. MILLER:

18   Q.    You're not aware of another contract that existed

19   between these parties, right?

10:31:46 20   A.    Let me think a second. I believe there was

21   something if we didn't meet certain milestones, we would

22   have to pay it back, this and that.  That may have been

23   in this contract, I don't know.  Hold that open, I'm just

24   saying.  There might have been another contract on

10:32:11 25   performance.

1    Q.    Just to be clear, this contract goes on for

2    multiple pages, correct?

3    A.    Yes.

4    Q.    With all sorts of issues, right?

10:32:19 5    A.    Yes.

6    Q.    And sitting here right now, for lack of a better

7    way of approaching this, you can't point to or describe

8    for the jury some other contract that existed between --

9    A.    Not as I sit here right now.

10:32:33 10    Q.    -- Hodell and these parties?  Okay.

11                And you would agree that IBIS/Lsi and

12    Hodell, they were partners in this project?

13    A.    Correct.

14    Q.    And you testified also that IBIS/LSi and Hodell on

10:32:49 15    the other hand, they were in this development agreement

16    that we're looking at, they were in this together.

17    A.    Yes.

18    Q.    Right?  Because part of this contract was that

19    Hodell was funding the development of In-Flight

10:33:04 20    Enterprise.  Right?

21    A.    I'm not a lawyer.  They prepaid and we used that

22    money to fund the development.  So I don't know legally

23    if that answers your question.

24    Q.    Fair enough.  So they paid money --

10:33:23 25    A.    They paid money for the licenses --

1    Q.    Forgive me.  Can I just take it a step at a time?

2    A.    Um-hmm.

3    Q.    Okay?  They paid money, correct?

4    A.    Correct.

10:33:31 5    Q.    And you just testified they used that money to fund

6    the development, right?

7    A.    They paid money for licenses and we used our profit

8    from that, yes.

9    Q.    Let's take a look -- you know, I'm going to keep

10:33:56 10   moving.  Let's try it this way.

11              Take a look at Exhibit 9.

12   A.    Okay.

13   Q.    We've had this up a couple times also.  This is the

14   October 14th proposal?

10:34:12 15   A.    I've seen it, yes.

16   Q.    From IBIS?

17   A.    Um-hmm.

18   Q.    To Hodell.  Take a look, please, at the second

19   paragraph, the second sentence.

10:34:32 20   A.    Okay.

21   Q.    Can you blow that whole second paragraph up, Bob?

22              I'm sorry.  The whole second paragraph, not

23   just the items.  That's better.

24              The second sentence of this document reads

10:34:50 25   "it should also be noted that as much as we are asking

Lowery – Cross                                576

```
            1    you to participate in assisting in the funding of the

            2    development, the benefits are there."

            3                   You see that there, right?

            4    A.    I do.

10:35:00    5    Q.    Would you agree with me now that they were

            6    assisting in the funding of the development?

            7    A.    Yes.

            8    Q.    Okay.  Take a look at 740, please.

            9                   That one will need to be blown up.  It is

10:35:23   10    really faint on my screen.

           11                   I shouldn't have complained.  Now it is

           12    gone.

           13                   740 -- is it on everyone else's screen?

           14    Okay.  Great.

10:35:35   15                   This is a November 11th e-mail from Otto

           16    Reidl to you and Dale, right?

           17    A.    Correct.

           18    Q.    And Bill Rex and Kevin Reidl are copied.  Right?

           19    A.    Correct.

10:35:48   20    Q.    This is leading up -- this is prior to the

           21    execution of the development agreement.  Right?

           22    A.    Um-hmm.  Yes.

           23    Q.    Five, six weeks before that.  Right?

           24    A.    Yes.

10:35:58   25    Q.    And Mr. Reidl says to you in the second sentence,
```

1       "Although we are unhappy about playing a developer, open

2       paren, pioneer, the guys with the arrows in their back,

3       role, the attached agreement reflects what we are willing

4       to proceed with," a page and it continues, correct?

10:36:22  5     A.    Yes.

6       Q.    And this likewise supports the testimony you just

7       gave that one of the roles of Hodell in the development

8       agreement was funding the development of In-Flight

9       Enterprise.

10:36:32  10    A.    Okay.  Yes.

11      Q.    Do you agree?

12      A.    Yes.

13      Q.    Thank you.  So go back to the development

14      agreement, please.  291.

10:36:44  15          Do you remember that the total price under

16      the development agreement, after all the back and forth

17      with Hodell and IBIS, was $300,000?

18      A.    Yes.

19      Q.    And it was paid –– it was to be paid in five equal

10:36:56  20    installments of $60,000 each.  Right?

21      A.    Correct.

22      Q.    Take a look at page two of the development

23      agreement, please.  It will come right up on your screen.

24          And by the way, if you want to work off of

10:37:10  25    hard copies, I can get you one.  I just?

Lowery – Cross                                  578

1          It just seems easier --

2     A.    This is fine.

3     Q.    Okay.

4     A.    As long as you zoom.

10:37:19  5     Q.    That's the key, isn't it?

6                Take a look at page two, up top.  The first

7     three paragraphs there.

8                "In exchange for the appointment, The IBIS

9     Group will, one, provide Hodell-Natco with the unlimited

10:37:36 10    user licenses for In-Flight Enterprise and its

11    integration into SAP Business One, and it goes on to

12    describe how it is defined.  For Hodell, for Hodell-Natco

13    use at no charge."  You see that there, right?

14    A.    I do.

10:37:56 15    Q.    So one of the things that Hodell would get in

16    exchange for the $300,000 that it was paying in the five

17    equal installments of $60,000 is this paragraph one here,

18    right?

19    A.    Yes.

10:38:06 20    Q.    And this paragraph one here is unlimited In-Flight

21    Enterprise licenses, no charge.

22    A.    Correct.

23    Q.    Go back to Exhibit 11 real quick, Bob.

24               We looked at this before, but I want to

10:38:25 25    make sure the jury understands.

1                    The In-Flight Enterprise application and

2       the In-Flight Enterprise work that IBIS was going to do

3       for Hodell was a big undertaking with thousands of hours

4       of work.  Correct?

10:38:39  5     A.    Correct.

6       Q.    So those In-Flight Enterprise licenses that Hodell

7       was going to get for free that we were just looking at,

8       they had a tremendous amount of value because of how much

9       work was going to go into creating In-Flight Enterprise

10:38:55 10     in the first place.  Right?

11      A.    Correct.

12      Q.    And if you look at Exhibit 11, right there the

13      middle of the page, the same thing we looked at before,

14      the middle of other people's pages, the same thing we

10:39:06 15     looked at before, the estimate in October of 2014 from

16      IBIS for how long it would take them to develop the

17      In-Flight Enterprise application was 3816 hours.

18      Correct?

19      A.    Correct.

10:39:21 20     Q.    And then you can see over in the margin it is

21      indicated that there would be no charge?

22      A.    Correct.

23      Q.    Which is effectively what ended up happening?

24      A.    Correct.

10:39:29 25     Q.    So then go back to 291, please.

1          Second page, please.

2              And, Bob, can you blow up that same part we

3      were looking at, the in exchange part?

4              There we go.

10:39:50  5          First three paragraphs.

6              We looked at number one.  Number two is

7      deliver the product in a timetable agreed upon.  I want

8      to focus on item three.

9              In the contract that IBIS and LSi signed

10:40:06 10   with Hodell in exchange for that $300,000 paid over those

11     five equal $60,000 installments, in addition to number

12     one, in exchange, Hodell was getting number three.

13     Correct?

14     A.    Correct.

10:40:18 15   Q.    So let's look at three.  Upon successful completion

16     of the development of In-Flight to SAP Business One, in

17     consideration for assisting in the initial funding of

18     In-Flight Enterprise development -- right?

19     A.    Correct.

10:40:31 20   Q.    Hodell-Natco will receive a $100 per user license

21     fee for the first one thousand users of In-Flight,

22     excluding Hodell-Natco users.  Right?

23     A.    Correct.

24     Q.    So, if the industry vertical is successful, and

10:40:54 25   IBIS/Lsi are able to go out into the world and sell more

1    of these In-Flight Enterprise licenses, Hodell stands to

2    make money as a result of that.

3    A.    Correct.

4    Q.    They stand to make up to a hundred thousand

10:41:07  5    dollars?

6    A.    Correct.

7    Q.    So effectively, Hodell and LSi and IBIS, by way of

8    the development agreement, they just went into business

9    together?

10:41:18 10                 MR. LAMBERT:  Objection.

11                 THE COURT:  Overruled.

12    A.    Correct.

13    Q.    Let's review how that works, right?

14                 Hodell is going to pay the $300,000.

10:41:27 15    Right?

16    A.    Correct.

17    Q.    And IBIS/LSi is going to do all this work,

18    including the estimated 3816 hours of work for the

19    In-Flight Enterprise application, right?

10:41:38 20    A.    Correct.

21    Q.    And that would have obviously lots of value?

22    A.    Correct.

23    Q.    And Hodell would get all that value and only pay

24    $300,000 and might get a hundred thousand dollars later.

10:41:56 25    Correct?

Lowery - Cross                              582

1    A.    Correct.

2    Q.    All in exchange for Hodell agreeing to be a

3    pioneer.

4    A.    Correct.

10:42:05  5    Q.    Right?  And just to be clear, go back to 11,

6    please.

7                    That 3816 hours, if you can highlight

8    that --

9    A.    Thank you.

10:42:27  10    Q.    If you look down below the 3816 --

11    A.    Correct.

12    Q.    Do you see references to $150 per hour?

13    A.    Okay.

14    Q.    That's a reference to IBIS/LSi labor rates.  Right?

10:42:39  15    A.    Correct.

16    Q.    And you would agree with my math, if you applied

17    those IBIS/LSi labor rates of $150 to the 3816 estimated

18    hours for the In-Flight Enterprise application, the kind

19    of result of that math is $572,000?

10:42:53  20    A.    Okay.  Right.  I agree.

21    Q.    Now, let's talk about some of what you covered

22    yesterday, including the knowledge of SAP.

23                    Let's take a look, Bob, please at Exhibit

24    40.

10:43:20  25                    This is an e-mail.  Can you blow up the top

Lowery – Cross                                    583

1    of it, please?

2                    This is an e-mail from you to Dan Kraus,

3    dated November 3, 2004.  Right?

4    A.    Correct.

10:43:41  5    Q.    And you agreed yesterday that this would have been

6    the first notice to SAP of the Hodell name.

7    A.    Yes.

8    Q.    Okay?  Go to the second page, which is the

9    attachment.

10:43:57 10                    If you look at Line 13 --  thank you.

11                    It says, "customer prepays 60 percent to

12    IBIS/LSi for fastener development."  Right?

13    A.    Correct.

14    Q.    And then look down at 16.  Can you highlight that

10:44:20 15    please?

16                    It says LSi/IBIS would acquire the licenses

17    in the fourth quarter of 2005.  Correct?

18    A.    Correct.

19    Q.    So you would agree with me that leading up to the

10:44:38 20    development agreement, it was contemplated that the

21    licenses that Hodell would eventually have with SAP, that

22    wasn't going to happen until the end of the quarter in

23    2005.

24    A.    I didn't get the question.

10:44:53 25    Q.    Okay.  You would agree with me --  let's unpack it.

1           Hodell, if it wanted to be a customer that

2    used B1, would have to execute a license agreement with

3    SAP?

4    A.    Correct.

10:45:09 5   Q.    And you would agree with me that as of November 3,

6    2004, when this document was created, it was estimated

7    that that license agreement between Hodell on the one

8    hand and SAP on the other hand, that wouldn't happen

9    until the end of the quarter, 2005.

10:45:26 10  A.    Okay.  Correct.

11   Q.    So let's --  and that's when it actually happened.

12   Correct?

13   A.    I believe so.

14   Q.    Well, let's take a look at 316.

10:45:44 15          Let's unpack it this way.  Let's look at

16   291 first.

17          Back to the development agreement.  Go to

18   paragraph three.  You can see there, again, this is the

19   contract between IBIS and LSi and Hodell.  Right?

10:46:14 20  A.    Correct.

21   Q.    This was executed in December, 2004.  Right?

22   A.    Correct.

23   Q.    Okay.  And here in Paragraph 3 they are talking

24   about Hodell paying some of the sixty thousand dollar

10:46:26 25  installment payments, right?

Lowery – Cross                                585

1    A.    Correct.

2    Q.    Let's read the whole thing.  "Hodell-Natco will pay

3    $60,000 of the purchase price of 120" --  and that's part

4    of the 320, right?

10:46:37  5    A.    Correct.

6    Q.    "When IBIS orders the software from SAP."  You see

7    that there, right?

8    A.    Correct.

9    Q.    So it was clear that IBIS had not ordered the

10:46:44 10    software yet from SAP?

11    A.    Correct.

12    Q.    Okay.  And then it continues, "this should occur on

13    the date mutually agreed upon and listed in the In-Flight

14    Enterprise development project plan, which is attached."

10:46:56 15    Right?

16    A.    Okay.

17    Q.    So now go to 319.

18          Or is it 316?  316.  And there you have it,

19    right?  In December of 2005, that's when Hodell executed

10:47:16 20    a license agreement with SAP.

21    A.    Correct.

22    Q.    And that's when they got their licenses.

23    A.    Correct.

24    Q.    Thank you.  You said yesterday, I'm switching

10:47:31 25    gears --

Lowery – Cross                                    586

1    A.    What did I just say yes to?  They had the license

2    agreement.

3    Q.    You can put it back up.  I want to make sure he is

4    comfortable.

10:47:39  5              I'm just pointing out that the license

6    agreement, it is dated December, 2005?

7    A.    2005, correct.

8    Q.    December, 2005?

9    A.    Correct.

10:47:46 10   Q.    Which is what was contemplated in Exhibit 40 on the

11   second page, and it says the licenses will be fourth

12   quarter 2005.  Right?

13   A.    Correct.

14   Q.    And this is the actual agreement, December, 2005,

10:48:01 15   is the fourth quarter of 2005, correct?

16   A.    Yes.

17   Q.    And this is dated the 23rd of December, 2005,

18   correct?

19   A.    Correct.

10:48:08 20   Q.    And again, that's when Hodell got their licenses

21   from SAP?

22   A.    You mean physical delivery of them?

23   Q.    They acquired their license rights?

24   A.    They acquired their license rights.

10:48:19 25   Q.    Correct?

1          I just want to pick up the answer so the

2     court reporter hears it.

3     A.    Yes.

4     Q.    Now we'll switch gears.

10:48:30 5          You said yesterday that you're not sure you

6     told anyone at Hodell that B1 could support up to 500

7     users.  You weren't sure.

8     A.    Okay.

9     Q.    Correct?  And you realize not only are you not sure

10:48:47 10    of whether you ever said it, but you can't point to any

11    documents anywhere suggesting that anyone ever told

12    Hodell that B1 was good for up to 500 users.

13    A.    You mean other than the SAP marketing material?

14    Q.    Well, let's be clear.  Let me ask it to you this

10:49:16 15    way.

16          I don't want to limit it to anything.

17    You're not aware of any document in the universe that

18    stated to Hodell or to anyone that B1 was good for up to

19    500 users.

10:49:34 20    A.    Again, I -- I don't know how to answer that.

21    Q.    Maybe with a yes or no question.  You're not aware

22    of any -- a yes or no answer -- you're not aware of any

23    document in the universe that ever informed Hodell or

24    anyone else that B1 was good for up to 500 users?

10:49:56 25    A.    My confusion is did I give them those documents or

Lowery – Cross                              588

1    did they see them?  I know they saw them because they

2    produced them.

3    Q.    Let me try and approach this in a different way.  I

4    know you have 43 years of sales experience, right?

10:50:09   5    A.    I have what?

6    Q.    You have 43 years of computer software sales

7    experience.

8    A.    Maybe 44 by now.

9    Q.    Right.  And you –– we're all aging.

10:50:23  10           And LSi had a distribution agreement and an

11    SDK, right?

12    A.    Correct.

13    Q.    And you were involved in the same of B1 not just to

14    Hodell but to other customers, you had some understanding

10:50:33  15    of B1, correct?

16    A.    Correct.

17    Q.    And you're not aware of any document in the

18    universe that told Hodell or anyone else that B1 was good

19    for up to 500 users?

10:50:48  20                    MR. LAMBERT:  I'm going to object, Your

21    Honor.

22    BY MR. MILLER:

23    Q.    Can you answer that with a yes or no?  Is that

24    possible?  Are you aware of a document of that type in

10:50:58  25    the universe?  Yes or no?

1    A.    By answering that, I would be saying that my people

2    didn't send them stuff.

3    Q.    I'm just asking what -- what you're aware of, sir.

4    Are you aware of any document in the universe that

10:51:12  5    informed Hodell or anyone else that B1 was good for up to

6    500 users.  Yes or no?

7    A.    The SAP -- yes.

8    Q.    What document?

9    A.    The SAP marketing brochures.

10:51:22 10    Q.    And when you reference the SAP marketing brochures,

11   you reference them because they reference employees.

12   Correct?

13   A.    Yes.

14   Q.    You're aware that there is no SAP marketing

10:51:32 15   literature that says B1 is good for Hodell or good for

16   anyone else for up to 500 users.  Correct?

17   A.    It said employees.

18   Q.    Right.  And you draw -- you treat employees

19   exactly like users?

10:51:47 20   A.    I do.

21   Q.    But, just to be clear, so the jury understands,

22   you're not aware of any SAP marketing literature that

23   says B1 is good for up to 500 users there.  There is no

24   such thing, right?

10:52:00 25   A.    As far as I know.

Lowery – Cross                                   590

1    Q.    And you're not aware of any document in the

2    universe that says B1 is good for 500 users?

3    A.    Users, no.

4    Q.    But, you're aware of literature that says it is

10:52:13    5    good for 500 employees?

6    A.    Yes.

7    Q.    And the same is true, for the whole range from 300

8    to 500.  We don't have to go through this thing again, do

9    we?  There wouldn't be documents that you're aware of

10:52:26   10    that said B1 is good for 300 to 500 users, correct?

11    A.    Correct.

12    Q.    Just some marketing literature that refers to

13    employees, correct?

14    A.    Correct.

10:52:33   15    Q.    Okay.  B1 is ERP software, right?

16    A.    Yes.

17    Q.    We covered that.  Not all employees are users of

18    ERP software.  Correct?

19    A.    Correct.

10:52:57   20    Q.    Because as you explained to the jury earlier today,

21    ERP software for the most part is an accounting program

22    and serves back office functions.  Right?

23    A.    Accounting, inventory, foreclosing, sales analysis,

24    receivables, payables.  It runs the company.

10:53:21   25    Q.    And the reality, though, is that typically with an

Lowery – Cross                           591

1    ERP software product like B1, not all of the company's

2    employees are users of that ERP software.  Correct?

3    A.    Substantially they are.  Does the janitor have a

4    user, no.  But does every other office administrator have

10:53:47  5    them?  Sure.

6    Q.    Office administrators are users, right?

7    A.    Sure.

8    Q.    But you're aware that employees, just because a

9    person is an employee of a company that happens to have

10:53:56  10    an ERP software product, that doesn't mean that they are

11    a user of that ERP software product?

12    A.    Does not mean, no.

13    Q.    Thank you.  Let's talk about the project, okay?

14           The project started right after the

10:54:15  15    development agreement was signed in December of 2004,

16    right?

17    A.    Correct.

18    Q.    And your team worked on that project all the way up

19    to when the license agreement was signed in December of

10:54:27  20    2005, but then even after that, all the way up to go-ive

21    and even after that in 2007.  Right?

22    A.    Correct.

23    Q.    Let's take a look at Exhibit 139.  Can you go, Bob,

24    to the bottom --  really, go to the bottom of the second

10:54:53  25    page is probably the place to start.

1        Can you blow that up?  Oh, boy.  You can

2   see at the bottom an e-mail from you to Dale Van Leeuwen

3   and Jon Woodrum.  Do you see that there?

4   A.    I see one from Dale to me.

10:55:19  5   Q.    No, no.  All the way at the bottom.

6   A.    I'm sorry, I'm sorry.  Yes.  Correct.

7   Q.    If we need to get the exhibit out, we will.

8   A.    You're correct.  I was misreading.

9   Q.    The one we are looking at hat's on the screen is

10:55:34 10   from you to Dale Van Leeuwen and Jon Woodrum, who is also

11   at LSi, correct?

12   A.    Correct.

13   Q.    And it is dated May 10, 2005.  Right?

14   A.    Correct.

10:55:42 15   Q.    And May 10, 2005, would have been during the heart

16   of this project, right?  You guys had been working on it

17   since December, 2004.  You are five months into the

18   project, right?

19   A.    We were five months into the project.

10:55:56 20   Q.    Okay. And down at the bottom, you're writing to

21   your two people, Dale and Jon, thinking through how I

22   approach Otto for the second payment, optimally, I think

23   we should --  and can you go to the next page, Bob?

24        And if you would blow that up, "prepare a

10:56:22 25   document that he signs?  Leaving it open-ended would seem

1    to expose us and not protect us.  What are your thoughts

2    on this?  Dan."  Right.

3    A.    That's what it says.

4    Q.    When you talk about that second payment, just so

10:56:35  5    everybody is following, it is the second $60,000 payment

6    towards the $300,000 that Hodell was going to owe under

7    the development agreement.  Right?

8    A.    Correct.

9    Q.    Okay.  So look next at the first page, all the way

10:56:55 10    at the top.  And about midway down, you can see a

11    response from Jon Woodrum?

12    A.    Okay.

13    Q.    And just to place this into time, you're five

14    months into the project, right?  Again?

10:57:12 15    A.    Correct.

16    Q.    But, you're still seven months away from Hodell

17    executing the license agreement with SAP, right?  That

18    didn't happen until December, 2005.  Right?

19    A.    Correct.

10:57:21 20    Q.    Okay.  And then what you have here in the upper

21    left-hand corner is Jon Woodrum responding to you.

22    Right?

23    A.    Correct.

24    Q.    Okay.  Now, I don't know if you can see this, and

10:57:34 25    you tell me if you need to see more, but when Jon Woodrum

1    responds, he doesn't copy Dale?

2    A.    Okay.  That's correct.

3    Q.    That's correct?  You're aware of it.  It is kind of

4    hard with the screen, I want to make sure you're

10:57:48  5    comfortable and understand that when Jon Woodrum

6    responds, Dale is not copied, right?

7    A.    It appears not.

8    Q.    And Jon Woodrum, he was the vice president of

9    software support at IBIS/LSi, right?

10:58:02 10    A.    Correct.

11    Q.    In fact, I think if you go --  well, let's just

12    keep moving.  Go to the next page.

13                End of the first full paragraph.

14                It starts with, "somehow."

10:58:18 15                Just to place this in context, you asked

16    Jon and Dale, "hey, I think I'm approaching Otto for the

17    second $60,000 payment, what do you guys, think," right?

18    That's what you had asked?

19    A.    That's correct.

10:58:33 20    Q.    Here is Jon responding to you, not copying Dale,

21    right?  Here is what he says.  Look at the second to the

22    last sentence of the paragraph that begins with the word

23    "somehow."  I will not go through the whole e-mail.  We

24    can if you would like.  I want to focus on a couple of

10:58:47 25    sentences and I want to start with this one "we have been

1    unrealistic thinking Dale could have this ready in the

2    timeline originally envisioned."  Do you see that there?

3    A.    Yes.

4    Q.    Can you highlight the whole sentence so Mr. Lowery

10:59:05  5    can see that?

6    A.    I can see that.

7    Q.    This is Mr. Woodrum reporting to you, blind to

8    Dale, that IBIS/LSi is unrealistic thinking that Dale

9    could have it ready in the timeline originally

10:59:18  10   envisioned, correct?

11   A.    Yes.

12   Q.    He is talking about the Hodell project, right?

13   A.    Yes.

14   Q.    And then go to the paragraph down below that starts

10:59:27  15   with "I'm serious."  He reports to you "I'm serious when

16   I say that HN" –-  that is Hodell-Natco, right?

17   A.    HN is Hodell-Natco, correct.

18   Q.    I'm serious when I say if Hodell's enhancements are

19   somewhat described in the list of IBIS solutions.  We are

10:59:44  20   looking at 10,000 hours and five years, not 2800 hours

21   this year.  That's what he reported to you, correct?

22   A.    That is what?

23   Q.    That is what he reported to you, correct?

24   A.    That's correct.

10:59:54  25   Q.    And then if you look down further, right at the

Lowery – Cross                               596

1    lower left-hand corner, first sentence of the last

2    paragraph on the page, "I would not sign off without

3    specs if I were Hodell."  Correct?

4    A.    Correct.

11:00:08  5    Q.    Can you scroll down a little more, because I want

6    to make sure we're clear on this?  And show Mr. Woodrum's

7    signature line.

8              Right there.  Vice president of software

9    support.  Okay.

11:00:24 10              So now let's look at Exhibit 41.  Exhibit

11    41 is another letter on IBIS letterhead.  Right?

12    A.    Correct.

13    Q.    Okay.  And if you go to the end of it --  well,

14    actually, let's cover the date first.  This is May 17,

11:00:57 15    2005.  Right?

16    A.    Correct.

17    Q.    And just to be clear, the one we were just looking

18    at started out as a May 10, 2005 e-mail and then Mr.

19    Woodrum got back to you on the 11th.  Right?

11:01:13 20    A.    Correct.

21    Q.    So there was May 10th, you are asking Dale and Jon

22    about payment.  May 11th.  Jon gets back to you with what

23    we just covered, right?

24    A.    Correct.

11:01:23 25    Q.    And here you are, May 17, writing to Hodell.

1    Right?

2    A.    I can't read it.

3    Q.    That's fine.  Let's go --  that helps.  Thank you.

4    This is IBIS letterhead.  Right?

11:01:34  5    A.    IBIS letterhead, May 17, 2005.  Dear Otto.

6    Correct.

7    Q.    And go to the end, please.

8              It is only two pages.  I just want Mr.

9    Lowery to understand.

11:01:46  10              And this came from you, correct?

11    A.    Correct.

12    Q.    Okay.  And let's go back to the first page, please?

13    Go to the second paragraph.

14              So after that exchange, where you ask Dale

11:02:02  15    and Jon what to do and Jon told you the things we just

16    reviewed, you report to Mr. Reidl at Hodell, "as a result

17    of our last meeting and progress review, I hope you feel

18    as I do that we demonstrated a thorough execution of our

19    game plan and a dedication to the project that shows us

11:02:22  20    to be on target to our projections."

21              That's what you reported to Mr. Reidl?

22    A.    Correct.

23    Q.    Can you go down, please, to the last paragraph of

24    this page?

11:02:37  25              And you continued, reporting to Mr. Reidl,

1    "as the programers work through the development effort

2    and we see the strength of the tools that will be made

3    available to Hodell through this effort, we've become

4    even more excited over the solution."  Correct?

11:02:57  5    A.    Correct.

6    Q.    And again, this is five months into the work you

7    were doing under the development agreement, but seven

8    months before Hodell executed the license agreement with

9    SAP.  Correct?

11:03:06  10   A.    Correct.

11   Q.    Let's look at Exhibit --  excuse me.  Oh, it's

12   clear.  Mr. Reidl paid the $60,000 after he got that,

13   right?

14   A.    He did.

11:03:34  15   Q.    So we don't have to go through that?

16   A.    He paid the second payment.

17   Q.    Let's keep moving.  Look at 215, please.  And by

18   the way, speaking of being on schedule, go-live was late

19   on this project, right?

11:04:02  20   A.    Say that one more time.

21   Q.    I say, by the way, speaking of schedule, the

22   go-live on this project was later than it had originally

23   anticipated to be.

24   A.    You mean at this point in time?

11:04:14  25   Q.    Well, at some point --  say for example at the time

Lowery - Cross                          599

1    of this exchange with Mr. Reidl, you would agree that

2    go-live was currently then scheduled for somewhere

3    midpoint 2006.  Right?

4    A.    I mean, I don't have any paperwork in front of me,

11:04:32  5    but I believe the original go-live was December, '06.

6    December of '06.  Then it slipped to January and then to

7    March 07.  As I testified earlier today in testimony,

8    that was the memory freezes.  December 15, '06 was the

9    original go-ive as I understand it.  My notes.

11:05:00 10    Q.    There is no pending questions.  You have notes?

11    A.    That I made last night.  Yeah.

12    Q.    Thank you.

13    A.    You can have a copy if you want.

14    Q.    I may ask you for one when we are on break.  Thank

11:05:14 15    you.

16    A.    Okay.

17    Q.    But I think it is probably better that you just

18    testify from your recollection.  Is that fair?

19    A.    That's fine.

11:05:19 20    Q.    And if you can't remember, just let us know?

21    A.    I will.

22    Q.    And if you need to look at the notes, then we'll

23    deal with that.  Okay?

24    A.    Okay.

11:05:30 25    Q.    Fair enough?

Lowery – Cross

600

1    A.    Fair enough.

2    Q.    And we were just talking about when was the go-ive

3    date originally supposed to be, right?

4    A.    Correct.

11:05:38  5    Q.    Just give me a moment, please.

6              Can you go to page 604, please, of your

7    deposition?

8    A.    Page 604?

9    Q.    Correct.

11:06:06  10   A.    Okay.

11   Q.    Now, we talked a little bit about this deposition,

12   and you remembering it, and it going on over four

13   sessions.  Right?

14   A.    The what was?

11:06:18  15   Q.    This deposition went on for a long time?

16   A.    Yes.

17   Q.    It was in four separate sessions, right?

18   A.    Yes.

19   Q.    This deposition was also years ago.  Right?

11:06:27  20   A.    It was.

21   Q.    I think the date of the first of the sessions was

22   in February of 2012 and then the second of the sessions

23   was in July of 2012.  Right?

24   A.    I'll take your word for it.

11:06:40  25   Q.    Okay.  Well, you would also agree that 2012 is a

1    lot closer in time to the facts of this case than today,

2    June of 2015.  Right?

3    A.    Yes.

4    Q.    And you were having some trouble remembering when

11:06:54  5    was the original go-ive on this project.  Right?  Just a

6    minute ago you were having trouble remembering that,

7    right?

8    A.    Correct.

9    Q.    Okay.  So if you look at Page 604, you would agree

11:07:07 10    that on Line 7, Mr. Star asked you, "When  you signed the

11    development agreement with, between LSi and Hodell, when

12    did you expect, at that point in time, when did you

13    expect to go live on the --

14                    "Answer:  '06 sometime."

11:07:22 15                    End of the question.  "Full system."

16                    And there is some back and forth but then

17    you answer, on Page 604, line 18, "I'm sorry, sometime in

18    2006 I think, I believe it was June of 2006.

19                    "Question:  June, 2006?

11:07:40 20                    "Answer:  Was the first one?

21                    "Question:  But you didn't actually go live

22    until March, '07, correct?

23                    Answer:  March, 07."

24                    Do you see that there?

11:07:50 25    A.    Yes.

1    Q.    Does that accurately reflect your testimony?

2    A.    Yes.

3    Q.    And that was three years ago, right?

4    A.    Yes.

11:07:56 5    Q.    Will you agree that the go-live was originally

6    supposed to be June of 2006, but it ended up not

7    happening until March of 2007?

8    A.    I don't know.  These conflict.

9    Q.    Okay.  Take a look, please, at Exhibit 215.

11:08:17 10    A.    Again -- oh.

11    Q.    Actually -- yeah.  Take a look at Exhibit 215.

12    A.    Okay.

13              MR. MILLER:  Your Honor, Exhibit 215 is

14    almost exactly the same as Exhibit 120.  Exhibit 215 was

11:08:42 15    originally, as I understand it, a Hodell exhibit, but it

16    was withdrawn.  And the first page that is off of 215 and

17    is not on 120 is the cover e-mail, and I don't think

18    we'll have an objection, I would like to walk the witness

19    through Exhibit 120.  It is just going to be cleaner and

11:09:02 20    easier than going back to his deposition.  I just want to

21    make sure no one has objections.

22              THE COURT:  Go ahead.

23    BY MR. MILLER:

24    Q.    Take a look at Exhibit 215.  You can see this is an

11:09:12 25    e-mail -- this is tough to read -- but the sender is

1    Jon Woodrum again, right?  Can you see that on the second

2    line?

3    A.    Yes.

4    Q.    Can you highlight that, Bob, please?

11:09:23 5          Can you read that?

6    A.    Can I read it?  Yes, I can.

7    Q.    There we go.  The sender was Jon Woodrum and the

8    recipient was basically you, Dan Lowery, right?

9    A.    That's correct.

11:09:42 10   Q.    And you can see the date of it was March 24, '05.

11   A.    Correct.

12   Q.    Right?  And again, Jon Woodrum is the vice

13   president of software support.  Right?

14   A.    Correct.

11:10:00 15   Q.    And he is basically writing a report for you about

16   the Hodell project later in May, 2005.  This is really

17   only a couple days after your prior exchange, right?

18   A.    Okay.

19   Q.    And this is seven months before the December 2005

11:10:17 20   Hodell SAP license agreement?

21   A.    Correct.

22   Q.    This document that is attached, this report --  can

23   you go to that, Bob?

24          It is pretty dense.  More dense even than

11:10:29 25   the e-mail exchanges from before.

1        Can you go to the next page, please?

2            I've got it in my hand here.  It is one,

3    two, three, four, five single space pages, and I'm not

4    going to go through it all.  You can see Mr. Woodrum

5    starts with background, he talks about the project and he

6    talks about his experience.  I want to go to Roman III,

7    which is on the fourth page of the exhibit, fifth

8    paragraph down.  Stop.  Thank you.

9            Right there.  The paragraph that starts

10   with "my concern."  Oh, wait.  No.  The second full

11   paragraph from the top.  "My concern."

12           Mr. Woodrum reports to you, on May 21,

13   2005, "My concern for the project, regardless of

14   scheduling timeline, is that we do not have an agreed

15   upon scope definitive enough to commit to the timeline

16   agreed upon, open paren, as originally intended with

17   project item number one."  Do you see that there?

18   A.    Yes.

19   Q.    And you actually recall having that exchange with

20   Mr. Woodrum, correct?

21   A.    Yes.

22   Q.    This exchange, where Mr. Woodrum e-mailed you on

23   May 24, 2005 --

24   A.    Yes.

25   Q.    -- and attached this five-page single space report,

1   you remember that, don't you?

2   A.    Yes, I do.

3   Q.    And none of these concerns that Mr. Woodrum is

4   expressing here and elsewhere in this report were passed

11:12:22  5   along to Hodell, right?

6   A.    Say that again.

7   Q.    Sure.  Mr. Woodrum is writing to you, right?

8   A.    Correct.

9   Q.    Five months into the project and seven months

11:12:31 10   before the license agreement.  Right?

11   A.    Correct.

12   Q.    And one of the things he is telling you is about

13   this concern that is up on the screen.  Right?

14   A.    Correct.

11:12:40 15   Q.    And then let's look at some more.  Go to the next

16   page where it says recommendation.

17            Under paragraph 3, scroll down, right

18   there.  The paragraph, in my opinion, can you highlight

19   that?  He is also reporting to you, "in my opinion, I

11:13:09 20   feel we need to tell the customer that we think it is not

21   possible that we are setting the 2005 project

22   expectations too high.  This concern makes it more

23   important than before to clarify the project

24   functionality scope as originally planned.  We should

11:13:25 25   take the lead in doing the right thing."

1          That is another thing that Mr. Woodrum

2    reported to you, correct?

3    A.    Yes.

4    Q.    So kind of back to my original question.  You

11:13:34  5    didn't report Mr. Woodrum's concerns and recommendations

6    to Hodell.

7    A.    We did not report this to Hodell?

8    Q.    I'm asking you if it is true that you did not pass

9    this along to Hodell.

11:13:46 10    A.    Well, that takes some thinking here.

11          What Jon was asking for is where are the

12    detailed design specs.  Dale was supposed to deliver

13    those, and I don't know exact dates here, but Dale in '05

14    somewhere was battling stage five lymphoma cancer.  We

11:14:11 15    were trying to work around Dale's, the limitations that

16    that does.

17    Q.    Sir, it is a simple question.

18    A.    I know, I'm thinking out loud.  I'm sorry, I have

19    to recollect here.

11:14:28 20          These concerns for detailed design specs by

21    Jon, because Jon was not the project manager of the

22    Hodell product --

23    Q.    Sir, you're going to have a chance to testify later

24    if Hodell wants to ask you questions.

11:14:45 25          My question is were the concerns and

1    recommendations in this report and in particular the ones

2    I just reviewed passed along by IBIS/LSi to Hodell?

3    A.    In a way.

4    Q.    Take a look at your deposition again, okay?

11:14:59 5    A.    Let me just finish.

6    Q.    Sir, thank you for your answer.  Let's look at your

7    deposition.  Page 452, please.

8    A.    Oh, I'm sorry.  What page?

9    Q.    Page 452.  At the top, do you see that there?  Line

11:15:38 10    2.

11            "Question:  Referencing this report.  Okay.

12    Were any of the concerns expressed by Mr. Woodrum in this

13    project status update passed along to Hodell to your

14    knowledge?

11:15:48 15            "Answer:  This is your answer.  You're

16    asking me if Jon's, if the internal concerns between Jon

17    and Dale were passed on to Hodell?

18            "Question:  Correct.

19            "Answer:  No.  Why would they be?"

11:16:03 20            That was your testimony, correct?

21    A.    I'm still catching up.  We're not on 452.

22    Q.    Let's slow down.  I am on Page 452.  In the upper

23    right-hand corner.

24    A.    Upper right?  Okay.  Passed along to Hodell.

11:16:18 25    Q.    And you would agree, sir, that your testimony

1    referencing this report --

2    A.    Right.

3    Q.    Were any of the concerns expressed by Mr. Woodrum

4    in this project status update including the one we just

11:16:31 5    reviewed passed along to Hodell to your knowledge.

6              "Answer:  You're asking me if Jon's, if the

7    internal concerns between Jon and Dale were passed on to

8    Jon and Hodell:

9              "Question:  Correct.

11:16:42 10              "Answer:  No, why would they be?"

11              That is your testimony, right?

12    A.    That is my testimony.

13    Q.    Let's take a look at Exhibit 128, please.

14    A.    Okay.

11:16:50 15    Q.    Here is another report from Jon Woodrum to you.

16    This one is dated later, August 1, 2005.  Can you go to

17    the first page, please, the first kind of substantive

18    page?

19              You agree -- I have that part, right?

11:17:36 20    Right?

21    A.    That what?

22    Q.    That this is a report from Jon Woodrum to you dated

23    August 1, 2005.  We don't have to go through those

24    details.

11:17:45 25    A.    Yes.

Lowery – Cross                    609

1    Q.    Look at the end of the third paragraph, please.

2    A.    Okay.

3    Q.    I'm going to read -- I guess I will read the whole

4    paragraph.

11:17:59  5              "Monday evening, 6:30 p.m. hours, before

6    you, Dale, and I are able to meet with one of our largest

7    prospects in a two day presentation, Dale sends me an

8    e-mail to let me know that he thinks I'm a back stabber,

9    I'm a liar, I am not to assume he is my friend and we

11:18:15 10   should not expect that he will be staying with the

11   company a day beyond his May, 2006 commitment to you."

12              Do you see that there?

13   A.    I do.

14   Q.    Okay.  LSi acquired IBIS in April or May of 2004.

11:18:31 15   Correct?

16   A.    Correct.

17   Q.    And Dale had an employment agreement in connection

18   with that acquisition.  Right?

19   A.    Correct.

11:18:37 20   Q.    And the deal was, Dale, you have to stay here at

21   least two years.  Correct?

22   A.    Correct.

23   Q.    So when Jon reports to you on August 1st that Dale

24   won't be staying with the company a day beyond his May,

11:18:50 25   2006 commitment to you, that is a reference to Dale's

Lowery – Cross                                    610

1    employment agreement.  Right?

2    A.    Correct.

3    Q.    And the idea is the first date Dale can walk, he is

4    going to take off.  Right?

11:19:01  5    A.    That's what he is saying.

6    Q.    And again, this is eight months into the

7    development agreement project that IBIS/LSi had with

8    Hodell.  Right?

9    A.    Correct.

11:19:10  10    Q.    And four months before Hodell had a license

11    agreement with SAP.

12    A.    Correct.

13    Q.    Okay?  Take a look, please.  You didn't tell Hodell

14    when you got this report that there was a chance that

11:19:41  15    Dale was going to leave soon, did you?

16    A.    I don't know.

17    Q.    Take a look at Exhibit 844, please.

18          Would you agree that you waited eight

19    months, until March of 2006, so from August of 2005, you

11:20:06  20    waited eight months, until March of 2006 to tell Hodell

21    that Dale might be leaving?

22    A.    Is that what this e-mail is?  Can I read it?

23    Q.    It's fine.  Let's look at 844.

24          The way to look at 844 would be to start at

11:20:31  25    the bottom, okay.

```
         1              So can you, Bob, go to the second page?
         2    A.    Okay.  What is the question?
         3    Q.    There is no pending question yet.  I'm going to
         4    orient you on the document and then we'll walk it through
11:20:47 5    because we're trying to figure out when did you tell
         6    Hodell what you knew in August of 2005 about Dale
         7    leaving.  Okay?  Fair enough?
         8    A.    Fair enough.
         9    Q.    Okay.  So we go to the second page.  That's the
11:21:06 10   first page, I think.  We're looking at 844, right?  Okay.
        11    Something is not right.
        12              Okay.  There we go.  Thank you.  The screen
        13    looked so clear, I thought it must be a different
        14    document.
11:21:24 15             The date of this -- I'm going to highlight
        16    the date, Bob, please, and the "to" and "from."  You have
        17    Kevin Reidl, who is here in the courtroom and testified
        18    the other day, right --
        19    A.    Okay.
11:21:39 20   Q.    He is writing to you, you can see that in the upper
        21    right-hand corner there, Dan Lowery, right?
        22    A.    Yes.
        23    Q.    And he copies his father, Otto, right?  And then
        24    let's go to the text, just the first paragraph.  You can
11:21:55 25   emphasize that, please, the text.
```

Lowery - Cross                    612

1          "Good morning, Dan.  I was recently made

2    aware of Dale's decision to leave IBIS.  This comes as a

3    shock as we move towards the biggest transition in our

4    company's history.  As you know, having Dale involved in

11:22:10  5    the SAP project was a major deciding factor for us."

6    Correct?

7    A.    Correct.

8    Q.    So here you have Kevin writing to you in March of

9    2006 about him learning from somebody else that Dale is

11:22:24 10    leaving the project.  Right?

11    A.    Yes.

12    Q.    So would you --

13    A.    I don't know, I don't know who he is referencing.

14    Q.    Well, clearly he is writing to you --

11:22:38 15    A.    Right.

16    Q.    In March of 2006, indicating that he just found out

17    Dale is leaving, right?

18    A.    Okay.

19    Q.    So that must mean you didn't tell him between

11:22:48 20    August of 2005 and when he wrote to you in March of 2006,

21    right?

22    A.    I didn't tell Kevin, obviously.

23    Q.    You're not aware of telling anyone else at Hodell

24    that news, are you?

11:22:58 25    A.    I have -- I have no idea.  I can't recollect.

Lowery – Cross                    613

1      Q.    So let's look at your response, and that's the

2      front of the document.

3                   This is you responding to Kevin, March 17,

4      11:26 a.m., correct?

11:23:26  5    A.    Right.

6      Q.    So basically --

7      A.    The day after his e-mail.

8      Q.    It is actually the same day.  He wrote to you on

9      March 17th at 8:42 a.m. --

11:23:36 10                 And you are writing back three hours later.

11                 Kevin and Otto, first, I know we've not had

12     the length of experience that you have had with Dale, but

13     I hope I have shown you the openness and honesty I try

14     and run my business on."

11:23:50 15                 And you continue.  "When I first heard Dale

16     was leaving two weeks ago, it was a surprise, but not

17     totally unexpected.  A month ago, he mentioned to me he

18     purchased seven commercial real estate buildings and my

19     brain immediately thought of the complexity and time

11:24:09 20    commitment that it takes.  I then started the plan for

21     the eventual notification of his leaving.  Two weeks ago

22     he informed me May 18th would be his last day."

23                 You see that there, right?

24     A.    Yes.

11:24:20 25    Q.    Okay.  So even to this day, in March of 2006, March

Lowery – Cross

614

1    17, when you provided an explanation to Kevin and Otto,

2    you are still not telling them what Jon Woodrum told you

3    back in August of 2005, right?

4    A.    There is no need.

11:24:36  5    Q.    You have a different story --

6    A.    Well, it was an internal document from Woodrum.

7    Q.    Right.  So there is an internal document from

8    Woodrum, correct?

9    A.    Yes.

11:24:44  10    Q.    And that is not a falsified document.  He reported

11    those things to you, correct?

12    A.    Correct.

13    Q.    And in this report, when Kevin asks you, hey, what

14    is going on, I heard Dale is leaving, you have this

11:24:57  15    explanation in the second paragraph.  But that

16    explanation still doesn't include what you heard from

17    Jon.  Correct?

18    A.    Let me read the e-mail here.

19              Can you scroll down a little bit?

11:25:25  20    Q.    Sure.  Maybe we should give the witness a hard

21    copy.  It is 844.

22    A.    Can I just scroll down?

23              We're notifying him, we're agreeing with

24    him, Dale's leaving, putting together the conversion

11:26:17  25    plan, the transition plan.  Dale is available to be a

Lowery - Cross                           615

1    consultant."  What's the question?

2    Q.    What you told Kevin and Otto in March of 2006 was

3    different from what Jon Woodrum told you back in August

4    of 2005.  Correct?

11:26:31  5    A.    Yes.

6    Q.    Thank you.

7    A.    I don't understand.  I mean --

8    Q.    That's fine.

9    A.    -- what that means.  What Jon is saying was his

11:26:40  10   concern.  Jon was not in charge of the product.  Dale

11   was.  And it was a complicated personnel mess for me to

12   deal with but we made plans to get Jon involved and take

13   over the project when Dale was leaving.

14   Q.    I don't want to go back and forth all day, but you

11:26:55  15   never reported what Jon reported to you, you reported

16   this version in paragraph two.  Correct?  That's the one

17   you reported?

18   A.    Because Jon was expressing thoughts --

19   Q.    Jon, just to be clear, paragraph two, you didn't

11:27:12  20   even report you knew in August of 2005 that Dale might be

21   leaving.  Correct?  Correct?

22   A.    He was expressing concerns about we don't have

23   detailed design specs.  Because of his note we got the

24   detailed design specs.

11:27:27  25   Q.    One of the concerns that Jon had was that Dale

Lowery – Cross                                          616

1    might leave.  Correct?

2    A.    Correct.

3    Q.    And you didn't report either then or at any time up

4    to and including this e-mail that Jon expressed a concern

11:27:41  5    in August of 2005 that Dale might leave?

6    A.    Dale had not told me he was leaving.  Why would I

7    believe Jon?

8    Q.    And instead, what you reported, among other things,

9    to Kevin and Otto, was that you first heard Dale was

11:27:56 10    leaving two weeks ago, correct?

11    A.    Okay.

12    Q.    Okay.  And Dale did leave?

13    A.    Dale did leave.

14    Q.    On March 18, 2006?

11:28:02 15    A.    April 28th.

16    Q.    Excuse me.

17    A.    April 28th.

18    Q.    I used the wrong date.  I have May 18, 2006.  Could

19    it have been that?

11:28:11 20    A.    April 28th was the last day.  That's the

21    acquisition of the company date.

22    Q.    That's the point, he left the first day he could?

23    A.    Yes.

24    Q.    Okay.  You are in litigation with Dale, correct?

11:28:34 25    A.    Correct.

Lowery – Cross                        617

1    Q.    Dale accused you of fraudulently using LSi money

2    for your own personal use?

3                    MR. LAMBERT:  Objection.

4                    THE COURT:  Objection sustained.

11:28:45  5    A.    You guys are lawyers.  You know you can't talk

6    about litigation.

7                    MR. MILLER:  Your Honor, move to strike.

8    There is a whole line of questioning we can get into if

9    the witness would like.

11:28:56  10                    THE COURT:  No, no.  That is not necessary.

11                    MR. MILLER:  Thank you.  I'll move on.

12    BY MR. MILLER:

13    Q.    Let's look at Exhibit 142.  Go all the way to the

14    bottom, please.

11:29:29  15                    Second page, actually, is probably the best

16    way to do it.

17                    Can you scroll up, Bob, so we can see who

18    it is from?  Right there.

19                    So this is an e-mail from Jon Woodrum to

11:29:45  20    you, dated February 26, 2006.  Do you see that?

21    A.    Yes.

22    Q.    And if you scroll down to the paragraph that begins

23    with "so if you concur."

24    A.    Yes.

11:30:02  25    Q.    He reports to you, "So if you concur, I will plan

1    accordingly.  Perhaps you know Dale's schedule.  I don't

2    want to take ownership of this project in the customer's

3    eyes, because, for one, I could not look them in the eye

4    or even talk to them on the phone about this project so

11:30:23   5    we will need to decide how that goes."  You see that

6    there, right?

7    A.    I do.

8    Q.    You never shared that with Hodell.

9    A.    No need to.

11:30:30  10    Q.    And you're in litigation with Mr. Woodrum also,

11    aren't you?

12              MR. LAMBERT:  Objection.

13              THE COURT:  Objection sustained.

14    BY MR. MILLER:

11:30:41  15    Q.    Take a look at Exhibit 121.  I'm going to skip

16    that.  Let's move forward.  Let's talk about the B1

17    product for a couple minutes.

18              Go to Exhibit 130, please.

19              You testified earlier today that prior to

11:31:37  20    hearing the phrase Sweet Spot, from Udi Ziv in April of

21    2007, after the go-live, that you had never heard the

22    phrase "Sweet Spot" in the context of B1.  Correct?

23    A.    And Hodell.

24    Q.    B1 and Hodell.  Correct?

11:31:57  25    A.    Right.

1    Q.    You had never heard the phrase "Sweet Spot" having

2    to do with B1 or Hodell.  Correct?  I just want to be

3    clear.

4    A.    If I understand your question, yes.

11:32:08  5    Q.    Okay.  So we've got Exhibit 130 up here.  Not a

6    particularly good copy.  But I think if you look at --

7    if you go in three, four --  go to the end.  That is

8    probably the best way to do it.  The very final pages.

9              We'll come back to that.  The last page,

11:32:31 10    please.

11              We're going to come to the Sweet Spot spot.

12    Trust me.

13              Can we please go to the last page, Bob?

14    Okay.  I just want to orient us.

11:32:56 15              I'm not doing a particularly good job of

16    this.

17              How about if we do this?  Let's go to the

18    front.  All the way to the front, to the blank white

19    page.  Do you see that on the screen?

11:33:10 20    A.    Do I?

21    Q.    Is your screen working right?  It is like a white

22    page?

23    A.    Yes.

24    Q.    And you had some exchanges yesterday with Mr.

11:33:18 25    Lambert about the origin of documents and one of the

1    things I think we established was that if there is a,

2    what's known as a Bates label, which is that LSi number

3    towards the top third of the page, if that is on there

4    and there is a cover sheet like this that this document

11:33:34  5    came from LSi, right?

6    A.    Okay.

7    Q.    Fair enough?

8    A.    Fair enough.

9    Q.    Now, we'll try to establish the date of this

11:33:40 10    document.  Can you try to go to the last page of the

11    document?  It is a long document.  It is like 30 pages

12    long.

13                    This will work.  This page is good enough.

14                    Can you blow up what's in the lower

11:34:11 15    left-hand corner?  There is a date, all the way down at

16    the bottom, with a copyright.  This is when it is boring

17    to be a lawyer.

18                    SAP AG 2005.  Do you see that there?

19    A.    I do.

11:34:30 20    Q.    And it says SAP, small business product strategy,

21    Gadi Shamia?  You see that there?

22    A.    I do.

23    Q.    Now, Bob, can we go to the page of this exhibit

24    that is in the lower left-hand corner, page twelve?  It

11:34:51 25    looks like this.  In the lower left-hand corner, there is

Lowery – Cross                    621

1    a 12.

2                      There you go.  Okay.

3                      So if you look at what is on the screen,

4    you can see a timeline at the bottom.  Okay?  And then

11:35:18 5   you see there is Q4, '05 over on the left.  Right?

6    A.    Yes.

7    Q.    So we know this is an '05 document from the

8    copyright, correct?

9    A.    Yes.

11:35:31 10  Q.    Do you think it is fair to say that this report

11   from Gadi Shamia, and we'll talk about this in a moment,

12   is from the latter part of 2005, judging by the timeline

13   that's here.  Correct?

14   A.    Yes.

11:35:44 15  Q.    And Gadi Shamia, he is knowledgeable about B1,

16   right?

17   A.    He what?

18   Q.    He is very knowledgeable about B1?

19                    MR. LAMBERT:  Objection.

11:35:59 20  A.    How would I know that?

21   Q.    You are familiar with Gadi Shamia, are you not?

22   A.    He was one of the owners of the products in Israel.

23   Q.    If he was one of the owners of the B1 product in

24   Israel, he would be pretty knowledgeable about B1,

11:36:13 25  correct?

Lowery – Cross                                    622

1     A.    Unless he was a salesman like me, per your words.

2     Q.    Let's take a look at what Gadi Shamia said.  Take a

3     look at the slide we had up earlier, Slide 7.

4                Do you see in the upper left-hand

5     corner -- go back to where we were?

6     A.    Small business report card?

7     Q.    No.  Back to the slide we had before.  Sorry.

8                It says small businesses, 1 to 100

9     employees.  Do you see that there?

10    A.    I do.

11    Q.    Some are subsidiaries that are within the Ven

12    diagram, right?

13    A.    Yes.

14    Q.    And some of them, part of the Ven diagram, are

15    small businesses right?

16    A.    Yes.

17    Q.    And Gadi Shamia is reporting that the circle drawn

18    that is beneath the heading, 1 to 100 employees, that's

19    the Business One Sweet Spot.  Correct?

20    A.    That's what it says.

21    Q.    And this was prior to the license agreement that

22    was executed between Hodell and SAP.  Correct?

23    A.    Okay.

24    Q.    And this was a couple of years after LSi signed a

25    distribution agreement and an SDK with SAP to go out into

1    the world to sell B1, correct?

2    A.    And several months before SAP accepted the order

3    for 120 users, why did they accept the order if they

4    didn't --

11:37:51  5    Q.    Sir, my question to you, and we may go there --

6    A.    Okay.

7    Q.    But, my question to you is that in 2005, Gadi

8    Shamia is referencing a Sweet Spot in connection with B1,

9    right?

11:38:05 10    A.    That's what this piece of paper says.

11    Q.    Okay.  And go to the front of this document,

12    please.

13              And we also know that this document came

14    from your files.  Correct?

11:38:15 15    A.    It did.

16    Q.    And we know that Gadi Shamia was a respected,

17    knowledgeable B1 person because he was one of the owners

18    of the B1 product when it was back in Israel.  Right?

19    A.    Well, he must not speak for the Americas

11:38:31 20    because --

21    Q.    I'm asking you if he is who I asked you that he

22    was.  Correct?  He is?

23    A.    What was the question again.

24    Q.    That he was one of the owners of the company that

11:38:38 25    developed B1 over in Israel?

Lowery – Cross                                    624

```
        1    A.    Correct.

        2    Q.    And if you go to the cover sheet of this, this

        3    document that came from the LSi files --  next page,

        4    please.

11:38:54 5                   That can't be right.  There we go.

        6                   Notwithstanding your testimony that you

        7    never heard of the Business One --  you never heard of

        8    the phrase Sweet Spot in the context of Business One

        9    until you saw Udi Ziv's April 2007 e-mails, in contrast

11:39:10 10  to that there was a document in LSi's files from 2005

       11    that used the phrase "Sweet Spot" in connection with B1

       12    very prominently, correct?

       13    A.    Yes.  But, I said that in relation to Hodell.

       14    Q.    It will speak for itself.

11:39:27 15  A.    Have I seen numbers, yes, but in terms of Hodell,

       16    the first time I saw --

       17    Q.    So now your testimony is, oh, it's not that you

       18    never heard the phrase Business One --  pardon me.

       19                   Now, your testimony is not that you never

11:39:43 20  heard of the phrase Sweet Spot in the context of Business

       21    One.  Now your testimony is, oh, no, I just never heard

       22    of the phrase Sweet Spot in the context of Hodell --

       23    A.    You just said that earlier.

       24                   MR. LAMBERT:  Objection.

11:39:55 25                 THE COURT:  Overruled.
```

Lowery - Cross                    625

1    A.    Unless you are talking apples and I'm talking

2    oranges, but we just addressed that.

3    Q.    We want to make sure the jury understands.

4    A.    Then ask it again, because I don't understand.

11:40:04  5    Q.    I understood your testimony to be earlier today,

6    and when I was asking you questions on cross-examination,

7    that flat out, you had never heard the phrase Sweet Spot

8    in the context of B1, whether it related to Hodell or any

9    company in the history of mankind.  That's what I

11:40:21 10    understood.  Okay?  You understand that?

11    A.    Understood.

12    Q.    So now, your testimony is it is not that you never

13    heard the phrase Sweet Spot in the context of Business

14    One.  Your testimony is oh, I never heard the phrase

11:40:34 15    Sweet Spot in the context of Hodell using Business One?

16    A.    And I think I stated that clearly earlier.

17    Q.    We'll look at the transcript and see because now,

18    we understand your testimony.

19    A.    Okay.

11:40:42 20    Q.    Okay.  Take a look at Exhibit 123.

21    A.    Okay.

22          MR. MILLER:  Your Honor, if I may approach

23    for one moment.

24    BY MR. MILLER:

11:41:31 25    Q.    So we're back to 123.  By the way, on Exhibit 130,

1    the one that had Sweet Spot kind of front and center in

2    that circle, you know what I mean?

3    A.    Yes.

4    Q.    You never passed that along to Hodell.  Correct?

11:42:04  5    A.    I don't know.

6    Q.    You don't know?

7    A.    I don't know.

8    Q.    Back to 123.  These are --  if I can find my

9    place --  these are January 30, '06 notes from a field

11:42:12 10    kickoff meeting.  And just to place this, right --

11    A.    I'm sorry?

12    Q.    Just to place this in time, this is more than a

13    year after the development agreement was executed.

14    Correct?

11:42:30 15    A.    Okay.

16    Q.    And it's a month or so after the license agreement.

17    Right?

18    A.    Correct.

19    Q.    And you admitted in your deposition you have seen

11:42:39 20    these notes before.  Right?

21    A.    I have.  I'm sorry.  I have.

22    Q.    And if you look at the second --  sorry --  third

23    page of this --

24              MR. LAMBERT:  I object, Your Honor.  Seeing

11:42:54 25    the documents doesn't mean --

1              THE COURT:  Give us a little context.

2    BY MR. MILLER:

3    Q.   Okay.  123, from the top, these are field kickoff

4    meeting notes.  Do you see that in the upper left-hand

11:43:07  5    corner?

6    A.   Yes.

7    Q.   Okay.  And they are dated Monday, January 30, 2006.

8    Right?

9    A.   Correct.

11:43:14 10    Q.   And these are notes that were prepared by IBIS/LSi

11    personnel -- well, let me go even slower.

12              A field kickoff meeting is a meeting that

13    SAP conducts where dealers and resellers like IBIS/LSi

14    come to the meeting and interact with various people and

11:43:49 15    learn about B1.  Correct?

16    A.   Correct.

17    Q.   And IBIS/LSi, they would send people to field

18    kickoff meetings?

19    A.   We did.

11:43:49 20    Q.   They had them annually?

21    A.   Pardon me?

22    Q.   Field kickoff meetings were at least annually?

23    A.   Yes.

24    Q.   And this is one of them, right?

11:43:50 25    A.   Yes.

1    Q.    And IBIS/LSi people went to this?

2    A.    Yes.

3    Q.    And here is someone from IBIS/LSi reporting back to

4    you what happened at the field kickoff meeting, right?

11:43:59  5              MR. LAMBERT:  Objection.

6                        THE COURT:  Overruled.

7    BY MR. MILLER:

8    Q.    And if you go to the third page, at the top, third

9    page, it says day two at the bottom.  That is fine.

11:44:24  10             This is Gadi Shamia, vice president of

11   solution management.  He is the one they are describing.

12                        If you scroll to the paragraph that starts

13   with "they explained."  Keep going.  Scroll up, please.

14                        Thank you.

11:44:43  15             "They explained our spot in the market, the

16   Sweet Spot for SAP Business One,"  and then it says,

17   double asterisk, right "look at this, 10 to 100

18   employees."  Do you see that there?

19   A.    Yes.

11:44:59  20   Q.    Correct?

21   A.    Correct.

22   Q.    And then two lines down, three lines down, 50

23   concurrent users.  Do you see that there?

24   A.    Correct.

11:45:07  25   Q.    And I'm hitting some of these in the upper right.

1    Up to 500 -- 5,000 transactions per month.  Do you see

2    that there?

3    A.    Correct.

4    Q.    And up to 50,000 items.  Do you see that there?

11:45:19 5    A.    Yes.

6    Q.    And moderate customization.  Right?

7    A.    Correct.

8    Q.    So the Sweet Spot for SAP Business One was

9    described at this field kickoff meeting to IBIS/LSi as

11:45:29 10    including what we just reviewed.

11    A.    Yes.

12    Q.    And these numbers, the ones I just reviewed, they

13    are actually smaller numbers than their corresponding

14    Hodell numbers.  Right?

11:45:43 15    A.    What are smaller numbers?

16    Q.    I tried to save us a little bit of time.  We can

17    talk through it.

18          Go to the employee reference, there is 10

19    to 100 employees.  Hodell had more employees than that,

11:45:56 20    right?

21    A.    Yes.

22    Q.    And three lines down, Hodell might have had more

23    than 50 concurrent users, right?

24    A.    Yes.

11:46:02 25    Q.    And if you shift to the other ones I was looking

1    at, the 5000 transactions a month and up to 50,000 items,

2    Hodell's corresponding numbers with respect to those

3    items were higher.  Right?

4    A.    Correct.

11:46:15 5    Q.    And your project was going to involve massive

6    customization because of In-Flight Enterprise.  Right?

7    A.    Correct.

8    Q.    And when you saw these notes, you testified that

9    you were concerned.

11:46:33 10   A.    When I saw these notes, I called Dan Kraus and

11   shortly after that, Jeff Ashley, and asked them why they

12   accepted our order less than 30 days prior to these

13   numbers coming out, and they told me the same question,

14   don't worry, there is no theoretical maximum, you are

11:46:48 15   good to go.

16   Q.    And you have no notes of that?

17   A.    Just phone calls.

18   Q.    In the history of this project and of this case,

19   you have no notes of anyone at SAP, including Dan Kraus,

11:47:04 20   saying to you there is no theoretical maximum with

21   respect to B1, correct?

22   A.    I don't know that.

23   Q.    Can you point to one of those notes now?

24   A.    As I sit here, no.

11:47:17 25   Q.    Because we have been litigating this case since

Lowery – Cross                          631

1   November of 2008, right?

2   A.    Yes.

3   Q.    And you were a defendant and you actively defended

4   yourself for a period of time in this case.  Correct?

11:47:27   5   A.    Correct.

6   Q.    And the parties exchanged massive numbers of

7   documents, hundreds of thousands of documents, right?

8   A.    Correct.

9   Q.    And there were multiple depositions, including

11:47:36  10   yours.  Right?

11   A.    Correct.

12   Q.    And right now, in court, you can't point to a

13   single note that you ever took indicating that Dan Kraus

14   or anybody else at SAP ever told you that for B1 there is

11:47:49  15   no theoretical maximum.  Correct?

16   A.    Well, except one small -- sir.

17   Q.    Sir, that is a yes or no --

18   A.    That's a no.  If these numbers were true why did

19   they take the order less than 30 days before that.

11:48:04  20                 MR. MILLER:  Your Honor, move to strike.

21                 THE COURT:  You just have to answer the

22   question asked if you can.

23   BY MR. MILLER:

24   Q.    You're not aware of any notes where Dan Kraus or

11:48:12  25   anybody else at SAP said there is no theoretical maximum

1   when it comes to B1?

2   A.    As I sit here this instant, no.  Do you want me to

3   go find some?

4   Q.    And you haven't pointed at any of those -- are you

11:48:24  5   suggesting that you could go find them if we took a

6   break?

7   A.    Not if we took a break.  Give me a month.

8   Q.    We've given you seven years and you have not

9   produced it yet.  Isn't that true?

11:53:23  10  A.    I don't know.

11  Q.    Correct?

12  A.    It could be out there.

13  Q.    Well, you testified yesterday that Dan Kraus and

14  others constantly --

11:53:23  15  A.    Constantly?

16  Q.    Constantly.  You testified today consistent with

17  that, that Dan Kraus and others constantly told you oh,

18  there is no theoretical maximum when it comes to B1,

19  right?

11:53:24  20  A.    That's correct.

21  Q.    But, you can't point, even though you say they told

22  you this constantly, to a single note that reflects that.

23  Correct?

24  A.    Not as I sit here today.

11:53:24  25  Q.    And just to be clear, I'm not just talking about

1    notes.  You can't point to a single communication in the

2    form of a proposal, an e-mail, a contract, a note, a

3    napkin with notes on the side, nothing that has the word

4    theoretical next to the word maximum.  Correct?

11:53:25  5    A.    I don't know if I can produce that.

6    Q.    All right.  And those concerns that you had, that

7    you discussed with Dan Kraus, you never passed them along

8    to Hodell.  Correct?

9    A.    He said don't worry about it.

11:53:25  10    Q.    Sir, yes or no.  Simple question.

11    A.    No.

12    Q.    Meaning correct, you didn't pass the concerns along

13    to Hodell?

14    A.    That's correct.

11:53:25  15    Q.    Thank you.

16                Look at Exhibit 129.  Well, just leave it

17    right like that.  I'm not sure we're going to go there or

18    not.

19    A.    I see it.

11:53:25  20    Q.    I understand.  We looked at Exhibit 130, right?  A

21    couple minutes ago.  That was the one that had the big

22    circle and Sweet Spot and had the reference 10 to 100

23    employees, right?

24    A.    Correct.

11:53:25  25    Q.    And we looked at the field kickoff notes, right,

1    and they had the numbers that I just looked at with you,

2    right?  Or we reviewed together, correct?

3    A.    Correct.

4    Q.    Okay.  You would agree that over time, the numbers

11:53:25 5    that were referenced in the SAP materials with respect to

6    the suitability of B1 for use by customers and how many

7    users they would have or how big of a company B1 could

8    handle were going down, correct?

9    A.    Correct.

11:53:26 10    Q.    Okay.  Let's switch gears.

11              We talked earlier, you're not a technical

12    person, right?  You don't write software code, right?

13    A.    I don't.

14    Q.    Okay.  And you can't say that the installation of

11:53:26 15    B1 at Hodell was a failure.  You don't agree that it was

16    a failure?

17    A.    State that over again.

18    Q.    It had too many negatives?  You would agree that

19    the installation of B1 at Hodell was not a failure?

11:53:26 20    A.    I would agree that the installation was not a

21    failure?

22    Q.    Correct.  That's what you testified to at your

23    deposition, right?

24    A.    I'm just trying to understand what you're saying.

11:53:26 25    Q.    Okay.  Was the installation of B1 at Hodell a

Lowery – Cross                              635

1   failure?

2   A.    The code was developed, the code did what it was

3   supposed to do.  It was slow.

4   Q.    Right.  So again, you would agree --  it wasn't a

5   failure.

6   A.    From a perspective of what?

7   Q.    From the perspective of your testimony when you

8   were deposed in this case?  Well, let's do it again.

9   A.    What is it, what are you saying?  From a

10  perspective of what?

11  Q.    You have been understanding the common definition

12  of the word failure?

13  A.    I'm asking you what you are asking.

14  Q.    It goes the other way.  I'm sorry, I'm not trying

15  to be difficult.  But the way this process works, there

16  is discovery and all the defense parts you were involved

17  in and then we get to today and then it is my turn to

18  finally ask you some questions.  And the question I'm

19  asking you is based on your common understanding of the

20  word failure, was the installation of B1 at Hodell a

21  failure?

22  A.    I don't know how to answer that because I think

23  you're trying to lead into something.

24  Q.    I'm not.  I'm not trying to lead you.  I want to

25  get your understanding -- I think we actually agree on

1    this.  But I just want to get your understanding.

2    A.    We developed software that ran for 18 months at a

3    company.  It ran slow.  It was thrown out and here we are

4    in court.

11:53:28  5    Q.    Okay.

6    A.    Tell me what that means.

7    Q.    Thank you.  Maybe it will be easier if we look at

8    your deposition.  You have been asked this before.  Look

9    at Page 266, please.

11:53:28 10    A.    What was the number?

11    Q.    266.

12              "Question:  So your testimony, or would you

13    agree with me that the installation and operation of the

14    SAP Business One software at Hodell was a failure,

11:53:52 15    correct?

16              "Answer:  No.  I mean, they ran it --  they

17    ran their business on it for two years."

18              Correct?

19    A.    Okay.

11:54:00 20    Q.    That was your testimony?

21    A.    That's my testimony.

22    Q.    So when you were deposed three years ago, you

23    agreed that it was not a failure.  Right?

24    A.    I think I'm saying the same thing I said two years

11:54:11 25    ago.  They ran their business on it for two years.

Lowery – Cross                                637

1    Q.   I think you might be.  It wasn't a failure, right?

2    A.   What?

3    Q.   I think you are saying the same thing.  It was not

4    a failure.

11:54:21  5    A.   I'm confused.

6    Q.   Agreed?

7    A.   I'm confused.

8    Q.   All right.  We're going to move on?

9    A.   I feel like you are going for something that I

11:54:46  10   don't know what you're trying to get to.

11   Q.   Well, if you look at 266 --

12   A.   It says no.  They ran it on their business for two

13   years.

14   Q.   So the question was, when you were under oath, so

11:54:59  15   your testimony or would you agree with me that the

16   installation and operation of the SAP Business One at

17   Hodell was a failure.  That's the question.

18              And your answer is "no."

19   A.   No.  Then I will say no.

11:55:09  20   Q.   So at your deposition, it is clear now you

21   testified that the installation and operation of B1 was

22   not a failure.  Right?

23   A.   Correct.

24   Q.   And you're basically saying the same thing today?

11:55:22  25   A.   Correct.

Lowery – Cross                                    638

1    Q.    Because they ran it for two years?

2    A.    Correct.

3    Q.    And you actually pursued Hodell for the final

4    $60,000 payment because you think you delivered what you

11:55:33  5    were supposed to deliver, which was a working B1

6    solution?

7                    MR. LAMBERT:  Objection.

8                    THE COURT:  Overruled.

9    BY MR. MILLER:

11:55:40  10   Q.    Correct?

11   A.    Pursued means what, a phone call?

12   Q.    You brought a counterclaim against Hodell seeking

13   the $60,000, right?

14   A.    Yes.

11:55:45  15   Q.    So you wanted the full $300,000.  You had gotten

16   240 and you wanted the final 60?

17   A.    Correct.

18   Q.    And that was the nature of the counterclaim?

19   A.    Correct.

11:56:28  20                   MR. MILLER:  Your Honor, just a minute.

21   I'm coming close to being done.

22   BY MR. MILLER:

23   Q.    Take look at Exhibit 311 and 312.  I don't have

24   copies of these with me, so I'm just going to have to

11:58:12  25   work off the screen, but it's okay.

1           You were here for the last couple days,

2    right?

3    A.    I have been.

4    Q.    And you were present when Mr. Reidl, Kevin Reidl

11:58:29 5    was examined with respect to letters and e-mail

6    communications that Hodell was sending in 2001 and 2003

7    about the FACTS software solution that Dale had

8    previously installed, right?

9    A.    I did.

11:58:46 10    Q.    In fact, this was one of them, 311, right?

11           MR. LAMBERT:  Objection.  He is not a party

12    to the e-mail.

13           THE COURT:  Objection sustained.

14    BY MR. MILLER:

11:58:55 15    Q.    Did Dale Van Leeuwen tell you when --  at any time

16    prior to when LSi acquired IBIS that IBIS had come close

17    to litigation with Hodell?

18    A.    No.

19    Q.    And did Dale tell you that at any time prior to

11:59:14 20    when IBIS/LSi signed the contract with Hodell?

21    A.    No.

22    Q.    And did Dale tell you that any time ever?

23    A.    No.

24    Q.    And you found out in this litigation, correct?

11:59:28 25    A.    I did.

Lowery – Cross                                    640

1    Q.    So you found out about this almost being litigation

2    back in '01 and '03.  You didn't find that out until you

3    were in litigation with Hodell?

4    A.    That's correct.

11:59:37  5    Q.    Take a look at your --  grab your deposition

6    transcript, please.

7              We had an exchange earlier.  We actually

8    had multiple exchanges.

9    A.    Who, you and me?

11:59:52  10    Q.    Yes, about whether you had ever heard the phrase

11    "Sweet Spot" in the context of B1.

12    A.    Okay.

13    Q.    And your testimony was --  and there was a

14    distinction drawn between whether you heard of the phrase

12:00:12  15    Sweet Spot in connection with B1 on the other hand that

16    was a possibility -- I just want to be clear.  Your point

17    was you had never heard of the phrase Sweet Spot in the

18    context of Hodell and B1.  Correct?

19    A.    Right.  Let me say this one more time for the

12:00:28  20    record.

21    Q.    Okay.

22    A.    I never heard SAP ever say Hodell exceeds the Sweet

23    Spot of SAP Business One.  Ever.

24    Q.    And your point was in fact you had never even heard

12:00:39  25    the phrase Sweet Spot in the context of Hodell and B1.

1   Right?  Correct?

2   A.    In the text I just said.

3   Q.    Okay.  And you --  so let's look at Page 337 of

4   your deposition.

12:01:05  5              Let me know when you have it handy.

6              So this takes a little bit of back and

7   forth before we get to the part that is relevant to Sweet

8   Spot, but on Page 14.

9              Question:  "Have you seen Exhibit 77

12:01:31  10  before?

11             Answer:  "Most of it.

12             Question:  "I want to ask you about some of

13  the e-mails in Exhibit 77 we already talked about.

14             Answer:  "Yes.

12:01:40  15             Question:  "In an e-mail to Udi Ziv dated

16  April 15, 2007.  Do you see that?

17             Answer:  "Yes.

18             Question:  "Do you recall sending that

19  e-mail?

12:01:51  20             Answer:  "Yes."

21             Do you see that there?

22             We get to the next page.  You are replying

23  to information Udi provided you, yes?

24             Answer:  Correct.

12:02:02  25             In response to an earlier email, correct?

1    And then you say yeah, correct.  Right.  You follow that?

2    A.    Kind of.

3    Q.    Let's get to Line 7.  "He is letting you know that

4    Hodell's environment is far outside the Sweet Spot for

12:02:22  5    Business One."  Correct?

6    A.    Correct.

7    Q.    So that's a reference to the e-mail you talked

8    about earlier where Udi Ziv used the phrase "Sweet Spot"

9    in connection with Hodell, correct?  That's a reference

12:02:37  10    to that?

11    A.    Okay.

12    Q.    "Question.  Is this the first you've heard of a

13    Sweet Spot for SAP Business One?

14              "Answer:  Correct.

12:02:47  15              "Question:  You never heard of the term

16    "Sweet Spot" used in relation to Business One before this

17    date?

18              "Answer:  No."

19              Do you see that there?

12:02:58  20    A.    Yes.

21    Q.    And that was your testimony, under oath, three

22    years closer to the time the events of this case.

23    Correct?

24    A.    What e-mail are we talking about here?

12:03:06  25    Q.    Exhibit 77.  Do you want to call it up?

Lowery – Cross                              643

1    A.    Yes.  Can you zoom it?

2    Q.    Go to the bottom.  That's one way to do it.

3    A.    Okay.  I got it.  Now go up to his.

4    Q.    I will scroll down.

12:03:40  5    A.    Go down.

6    Q.    Keep going.  Right here.  Scroll up, just to be

7    clear.

8              On April 13, 2007, Udi Ziv is writing to

9    you, right?

12:03:54  10    A.    Yes.

11    Q.    Do you see that e-mail?

12    A.    Yes.

13    Q.    And he says "Dan, as you know, this customer's

14    environment is far outside the Sweet Spot of Business

12:04:02  15    One, with 120 users, et cetera, and therefore, we

16    anticipate that such performance issues will come up."

17    You see that there, right?

18    A.    Yes.

19    Q.    If you go back to your deposition, on Page 377, you

12:04:15  20    would agree, right there on Line 5, it says, "Review

21    Exhibit 377 and let me know when you are finished,"

22    right?  That's the question.  Do you see it there on

23    Line 5?

24    A.    Slow down a little bit.

12:04:27  25    Q.    Page 337, Line 5.

1    A.    All right.

2    Q.    My question is "Review Exhibit 77 and let me know

3    when you are finished."  Right?

4    A.    Yes.

12:04:39  5    Q.    So the exhibit that you are reviewing in your

6    deposition back in 2012 is the same one we just pulled up

7    on the screen, Exhibit 77.  Fair enough?

8    A.    Yes.

9    Q.    And then there is the back and forth and you go to

12:04:51 10    Page 338, at Line 7, and the question is "He is letting

11    you know that Hodell's environment is far outside the

12    Sweet Spot for Business One, correct?"

13              And your answer is correct, right?

14    A.    So this is after we went go-live?

12:05:07 15    Q.    Yes.  After you went go-live, you wrote to Udi Ziv,

16    right?

17    A.    Correct.

18    Q.    And Udi Ziv sent you back Exhibit 77 --

19    A.    Saying it was outside --  okay.

12:05:20 20    Q.    And you were asked about that at your deposition

21    here, correct?

22    A.    Correct.

23    Q.    And then the question was, "He is letting you know

24    that Hodell's environment is far outside the Sweet Spot

12:05:28 25    for Business One, correct?"  And your answer is

Lowery – Cross                                645

1     "correct"?

2     A.    Right.

3     Q.    And the next question is "Is this the first you

4     heard of a Sweet Spot for SAP Business One?

12:05:39  5             "Answer:  Correct?"

6                That's your testimony, right?

7     A.    Correct.

8     Q.    And then the next question is, "You never heard of

9     the term 'Sweet Spot' used in relation to Business One

12:05:48 10   before that date,"  and your testimony was, "no."  Right?

11    A.    Okay.

12             MR. MILLER:  No further questions.

13             THE COURT:  We'll break for lunch.  About

14    1:25?

12:06:38 15            THE JUROR:   Downstairs.

16             THE COURT:  Keep in mind the admonition.

17             (Luncheon recess had.)

18

19

20

21

22

23

24

25

WEDNESDAY, JUNE 17, 2015,  1:31 P.M.

(Proceedings outside the presence of the jury:)

THE COURT:  You wanted to talk to me?

MS. LUARDE:  Yes, Your Honor.  We have a few issues.  The first one relates to Mr. Lowery and Mr. Van Leeuwen and the conduct of the examination.  Both of these individuals are actually defendants in the case, although there was a default against them.  They are still, we can still get a judgment against them as a defendant, and we want to make sure we are able to take their examination as if on cross exam.

THE COURT:  You don't think that Lambert was cross-examining him the whole time?

MS. LUARDE:  He was.  He was trying.  But I want to make sure for the orderly conduct of the rest of the day --

THE COURT:  Is Van Leeuwen coming in person?

MS. LUARDE:  We served him and will have him through the remote transmission process.  Along with that, we were asked a question.  Apparently you have to decide how you want this to proceed, whether the court reporter would be here or in the remote location to take down his testimony or both.

(Discussion off the record.)

1           MS. LUARDE:  I'll make sure they know that.

2      The last question relates to the video deposition clips

3      that we intend to play.  There has been some back and

4      forth between us and opposing counsel over how that will

13:31:37 5      be performed.  We went through and we designated our

6      selections.  They did the same.  We exchanged the

7      selections early on.  We've since modified some of ours,

8      let opposing counsel know.  But, what we want to do is

9      just play our selections in our case in chief.  Opposing

13:31:37 10     counsel, as I understand it, wants us to just play the

11     deposition straight through with the designations.  You

12     know, you are --

13           THE COURT:  What do you mean?

14           MS. LUARDE:  So for example, we selected a

13:31:37 15     handful of questions --

16           THE COURT:  Yes.

17           MS. LUARDE:  And we'll skip forward about

18     20 pages and have another handful of questions and we

19     just want to play what we selected and obviously items

13:31:37 20     that support our case.  Opposing counsel wants us to just

21     play everything.  But --

22           THE COURT:  When you say everything, the

23     whole deposition?

24           MS. LUARDE:  No.  Our selections and

13:31:37 25     then --

1              MR. MILLER:  The counter designations.

2              MS. LUARDE:  They have something on page 15

3    and we have something on page 20.  They want us to

4    include their selection in there.

13:31:37  5              THE COURT:  I guess what you have to do,

6    you can play yours and you can just -- as if on cross,

7    play yours.

8              MR. MILLER:  Your Honor, if I may, on both

9    points, first, with respect to Mr. Van Leeuwen, I

13:31:37 10   understand a subpoena has been served.  It is our

11   understanding he testified on Tuesday.

12             MR. LAMBERT:  I think it was Monday.

13             MR. MILLER:  Fine.  With respect to the

14   counterdesignations, Your Honor, all we want to do is

13:31:38 15   what the Rule calls for, which is fair.  This is supposed

16   to be done fairly.  If they designate a piece of people

17   and --

18             Testimony and leave out -- we have

19   designations where they designate a piece of testimony

13:31:38 20   but leave out the thing he says after that or designate a

21   piece of testimony, leave out the middle part that

22   matters, and then go back --

23             THE COURT:  I'm totally with you.  This is

24   not my first rodeo.  I don't -- one at a time.  If you

13:31:38 25   feel that way, they can designate it and you can play the

1    whole thing.  It may take longer, but if that's what you

2    want to do, that's what you want to do.

3             MR. MILLER:  We discussed this with counsel

4    and prepared the tapes.  At the pretrial, counsel said

13:31:38 5    they will do it however they like.  We want to do it in

6    accordance with the rules.  There is two pieces to it.

7    When a piece needs to be included in order for the

8    testimony to be fairly understood, we ought to play it at

9    once --

13:31:38 10             THE COURT:  You are repeating yourself.  I

11    know exactly what you are saying.

12             MR. MILLER:  Okay.  When there is another

13    designation we make that is five pages before that is on

14    a different topic, I agree that should be played later.

13:31:38 15    That's not really a counterdesignation.  That is our own

16    designation.  We can deal with that in our case, but when

17    they are playing testimony the rule says they are not

18    allowed to unfairly take things out and play it like out

19    of context, the jurors are entitled to hear it in

13:31:38 20    context.

21             My point is we should review the transcript

22    and when we run into situations where leaving out

23    snippets would be unfair because it would mislead the

24    jury, we should not let them get away with that and play

13:31:38 25    that whole section.

1          THE COURT:  I get your point.

2          MR. MILLER:  Thank you.

3          MS. LUARDE:  Your Honor, again --

4          THE COURT:  You already won.

13:31:38  5          MS. LUARDE:  Thank you.  I will shut up,

6    then.  Thank you.

7          MR. MILLER:  Now I'm confused, Your Honor.

8          THE COURT:  You should not be.  It is what

9    I said at the beginning.  They can do their designation.

13:31:38 10    At the time of cross, you can play the whole thing and

11    put it in context if you want.

12          MS. LUARDE:  That's all I have.

13          THE COURT:  You may redirect.

14                REDIRECT EXAMINATION

15    BY MR. LAMBERT:

16    Q.    Good afternoon.  Mr. Miller was asking you some

17    questions about the SDK agreement with IBIS.  Do you

18    recall that line of questioning?

19    A.    I do.

13:33:15 20    Q.    And can you pull up the SDK agreement, Exhibit 32?

21          When did LSi acquire IBIS?

22    A.    April 2004.  April 28.

23    Q.    Can you look at the SDK agreement and tell me the

24    date of the SDK agreement, when it was signed?

13:33:40 25    A.    It was completed in December, 2003.  I can't make

Lowery – Redirect                                    651

1    out the date.  Looks like the 31st day of December.

2    Q.    December 31, 2003?  Can you turn to Section 5.2 of

3    this agreement, the section Mr. Miller was asking you

4    about.

13:34:05 5    A.    Okay.

6    Q.    I'm sorry, Kim, 5.2.  The termination section.  Do

7    you recall that?

8    A.    I do.

9    Q.    And he was asking you some questions implying that

13:34:34 10   this agreement had terminated after 180 days or it

11   terminated after 180 days?

12   A.    Correct.

13   Q.    Now, you testified that LSi acquired IBIS in April

14   of 2004.

13:34:46 15   A.    Correct.

16   Q.    And that this agreement was signed in December of

17   2004.

18                  THE COURT:  2003.

19   Q.    December, 2003.  Correct?

13:34:55 20   A.    Correct.

21   Q.    180 days is about six months.  Correct?

22   A.    Correct.

23   Q.    How many months are in between December and April?

24   A.    Four.

13:35:02 25   Q.    So within the time frame of this 180-day clause.

Lowery - Redirect                           652

1    Correct?

2    A.    Yes.

3    Q.    Mr. Miller asked you some questions about whether

4    there was any document in the universe that you were

13:35:19  5    aware of that talked about Business One being appropriate

6    for 500 users, do you recall that?

7    A.    I do.

8    Q.    Can you turn to Exhibit 36?  It should be in your

9    binder or you can look at it on the screen if you want.

13:35:33 10    A.    Should be on my monitor?

11    Q.    It should be in your binder --

12    A.    Oh, in my binder.

13    Q.    Or you can look at it on the screen, whichever you

14    prefer.

13:35:42 15    A.    Which section?

16    Q.    Exhibit 36, please.

17    A.    Okay.

18    Q.    This is a document in the universe that you believe

19    says 500 users is appropriate for Business One?

13:35:58 20    A.    Yes, this document I'm looking at says that.

21    Q.    Can you pull up Exhibit 618?

22                  MR. MILLER:  Your Honor, can the jury see

23    what he is referring to instead of hit-and-run on the

24    exhibit?

13:36:17 25                  THE COURT:  You can, can't they?  Is it on

1    the screen?

2                    MR. LAMBERT:  I'm trying to be brief, Your

3    Honor.  If you want to zoom in.

4                    MR. MILLER:  If it says that, see where it

13:36:25  5    says that.

6    BY MR. LAMBERT:

7    Q.    Mr. Lowery, can you point to that place?

8    A.    Whether you have 5 employees or 500.  Is that what

9    you are saying?

13:36:43  10   Q.    Yes.  Thank you.

11                   Can we pull up Exhibit 618?  Exhibit 618 is

12   an SAP Business One Whitepaper.  Do you see that?

13   A.    Yes.

14   Q.    It says SAP's logo on it.  Correct?

13:37:07  15   A.    I'm sorry?

16   Q.    It has SAP's logo on it.  Correct?

17   A.    It does.

18   Q.    And it's published by SAP?

19   A.    It is.

13:37:14  20   Q.    Can you turn to Page 7 of that document?

21   A.    Okay.

22   Q.    Is this another document that supports your

23   contention that Business One would be appropriate for 500

24   users?

13:37:29  25   A.    Let's see.  Section 2.8.  It supports an unlimited

1    number of simultaneous user transactions.  Yes.

2    Q.    Is that consistent with your testimony with regard

3    to what you heard from Mr. Kraus?

4    A.    Yes.

13:37:45  5    Q.    Mr. Miller asked you some questions about your

6    knowledge regarding the DI-API, correct?

7    A.    Yes.

8    Q.    The DI-API is part of the core Business One

9    software.  Correct?

13:38:04 10    A.    Yes.

11    Q.    And based on your experience with the Hodell

12    implementation, it was your understanding that the DI-API

13    was causing the problems Hodell experienced.  Correct?

14    A.    I'm sorry for asking you to repeat that.

13:38:16 15    Q.    Based upon your experience with the Hodell

16    implementation, it was your understanding or belief that

17    the DI-API was causing the problems Hodell was

18    experiencing?

19    A.    Yes.

13:38:29 20    Q.    Now, you testified when Mr. Miller was questioning

21    you about SAP not having its own sales force to sell

22    Business One.  Do you remember that?

23    A.    I do.

24    Q.    And you said something to the effect of it was the

13:38:44 25    cheapest way for SAP to get a sales force out there

Lowery – Redirect                          655

1    selling Business One.

2    A.    Correct.

3    Q.    LSi and the other channel partners were SAP's sales

4    force.  Correct?

13:38:56  5    A.    That's correct.

6    Q.    You have been in the computer software business for

7    more than 40 years; that was your testimony?

8    A.    You keep bringing that up.  Yes.  Can we count in

9    celsius or something.

13:39:16  10    Q.    43 years is that what it was?

11    A.    43.

12    Q.    As a computer salesperson do you have to make

13    representations to software that you are selling to

14    customers?

13:39:24  15    A.    Yes.

16    Q.    When Mr. Miller was walking you through the

17    marketing and distribution agreement that LSi signed with

18    SAP, he took you to a section that said something to the

19    effect of you agree not to make representations about the

13:39:43  20    software.  Do you remember that?

21    A.    I do.

22    Q.    How are you supposed to sell the software if you

23    cannot make representations to the customers about it?

24    A.    That's a great question.  I don't know.

13:39:50  25    Q.    You don't know?

Lowery - Redirect                          656

1    A.    How would you --  you have to make some

2    representations.

3    Q.    Let's look at Exhibit 30 real briefly to go over a

4    couple things you were asked by Mr. Miller.

13:40:06  5    A.    30?

6    Q.    Yes.

7    A.    Okay.

8    Q.    Mr. Miller kept referring to this as a distribution

9    agreement.  Do you recall that?

13:40:16 10    A.    He did, yes.

11    Q.    What's the actual title of that document?

12    A.    SAP Business One Software Marketing and

13    Distribution Agreement.

14    Q.    So it is a marketing and distribution agreement.

13:40:24 15    Is that accurate?

16    A.    Correct.

17    Q.    Not just a distribution agreement?

18    A.    Correct.

19    Q.    And it concerns the marketing of the SAP software.

13:40:30 20    Correct?

21    A.    Correct.

22    Q.    Marketing by LSi.  Correct?

23    A.    Marketing by LSi.

24    Q.    And this agreement was never given to Hodell.  Is

13:40:45 25    that accurate?

Lowery – Redirect                    657

1    A.    No.

2    Q.    And the SDK agreement that Mr. Miller went over

3    with you that IBIS signed, that wasn't given to Hodell

4    either, was it?

13:40:55 5    A.    I can't imagine it, no.

6    Q.    Looking at the top of that agreement, the agreement

7    identifies the parties to the marketing and distribution

8    agreement.  Do you see that?

9    A.    The --

13:41:14 10   Q.    This agreement is made effective this --

11   A.    Yes, I see it.

12   Q.    By and between who?

13   A.    Between SAP America, Inc., a Delaware corporation,

14   and LSi Lowery Systems.

13:41:30 15   Q.    It is between SAP America and LSi, correct?

16   A.    Correct.

17   Q.    Can you turn to the end, the document that Mr.

18   Miller directed you to during this examination, 30.28?

19   It is a signature page.

13:41:51 20   A.    Okay.

21   Q.    The signatories to this agreement are yourself on

22   behalf of LSi Lowery Systems, correct?

23   A.    Correct.

24   Q.    And a gentleman by the game of Gary Fromer on

13:42:04 25   behalf of SAP America Inc.?

Lowery - Redirect                           658

1    A.    Correct.

2    Q.    There is no signature line for SAP AG, is there?

3    A.    No.

4    Q.    You don't recall signing a similar document with

5    SAP AG, do you?

6    A.    Correct.

7    Q.    You were asked about the license agreement that

8    Hodell signed.  Do you recall that?

9    A.    Yes, I do.

10   Q.    Mr. Miller described that as a template or a form

11   agreement.  Do you recall that line of testimony?

12   A.    I do.

13   Q.    Do you recall anyone during your time selling SAP

14   Business One being able to alter or change the terms of

15   that template or form agreement?

16   A.    Possibly, but I can't say for sure.

17   Q.    You can't recall any particular instance where an

18   end user customer was able to change the terms of that

19   license agreement?

20   A.    Correct.  Like terms of payment or something like

21   that?

22   Q.    And you weren't -- you weren't the LSi employee

23   that actually presented that agreement to Hodell,

24   correct?

25   A.    No.

| | |
|---|---|
| 1 | Q.    You weren't there when it was signed? |
| 2 | A.    No. |
| 3 | Q.    And you don't know what was said to Hodell as part |
| 4 | of that signing process.  Correct? |
| 13:43:18  5 | A.    No. |
| 6 | Q.    When did the development agreement --  can you pull |
| 7 | up 291? |
| 8 | Mr. Miller asked you a series of questions |
| 9 | about the development agreement and identified, you know, |
| 13:43:43 10 | what parties are identified under the development |
| 11 | agreement.  Do you recall that? |
| 12 | A.    I do. |
| 13 | Q.    Was that agreement drawn up by an attorney? |
| 14 | A.    I don't think so. |
| 13:44:00 15 | Q.    You don't recall an attorney being involved in |
| 16 | putting that together? |
| 17 | A.    I don't recall an attorney, no. |
| 18 | Q.    At the time LSi acquired IBIS, did you consider LSi |
| 19 | and IBIS to be one and the same company? |
| 13:44:15 20 | A.    Yes. |
| 21 | MR. MILLER:  Objection, Your Honor, some |
| 22 | sort of corporate legal conclusion. |
| 23 | THE COURT:  Overruled. |
| 24 | BY MR. LAMBERT: |
| 13:44:21 25 | Q.    You can answer. |

Lowery – Redirect                              660

1    A.    Oh.  Yes.

2    Q.    Did you believe ––  was it your understanding that

3    after LSi acquired IBIS, LSi and IBIS could continue

4    marketing and selling Business One to customers?

13:44:35  5    A.    Yes.

6    Q.    Did anyone at SAP ever tell you that IBIS couldn't

7    market and sell Business One to customers?

8    A.    No.

9    Q.    Can you pull up Exhibits 9 and 11, please?

13:44:48  10          Exhibits 9 and 11 are documents that you

11    sent to Hodell as part of the sales and marketing process

12    of Business One.  Correct?

13    A.    Yes.

14    Q.    And it indicates that they are on IBIS Group

13:45:13  15    letterhead.  Correct?

16    A.    Correct.

17    Q.    And it has the SAP logo on there?

18    A.    It did.

19    Q.    Was that put there with SAP's authorization?

13:45:21  20          MR. MILLER:  Objection, Your Honor.  Can he

21    testify as to how it got there instead of ––  it's a

22    leading question.

23    BY MR. LAMBERT:

24    Q.    Who put the logo there?

13:45:28  25    A.    Our administrator up in our Chicago office.

1      Q.    Where did they get it from?

2      A.    The SAP partner website.

3      Q.    Did SAP ever tell you -- did SAP ever tell you,

4      hey, stop -- IBIS, stop putting our logo on your

13:45:49  5      letterhead?

6      A.    No.

7            MR. MILLER:  Objection, Your Honor.  There

8      is no foundation that SAP knew it was being used in this

9      document.

13:45:55 10            THE COURT:  You can explore that.

11      BY MR. LAMBERT:

12      Q.    I'll restate the question, or state it again.

13            Did anyone from SAP ever say, "Hey, IBIS,

14      stop putting your logo on your letterhead"?

13:46:09 15      A.    No.  Everyone at SAP knew IBIS was LSi.

16            MR. MILLER:  Objection, Your Honor.

17            THE COURT:  Same.

18            MR. MILLER:  Move to strike.

19      BY MR. LAMBERT:

13:46:18 20      Q.    The development agreement we were just looking at

21      was signed in December of 2004.  Correct?

22      A.    Correct.

23      Q.    And it concerned the purchase of Business One

24      licenses.  Correct?

13:46:29 25      A.    Correct.

Lowery – Redirect                    662

1    Q.    And at the time Hodell signed that agreement, LSi

2    considered Hodell obligated to buy those Business One

3    licenses.  Correct?

4    A.    We did.

13:46:42  5              MR. MILLER:  Objection.

6                THE COURT:  Overruled.

7    Q.    What was your answer?

8    A.    Yes, we did.

9    Q.    And Hodell was going to be paying $300,000 towards

13:46:50 10   those licenses?

11   A.    Yes.

12   Q.    And Hodell did not sign a license agreement when it

13   signed the development agreement.  Correct?

14   A.    No, it did not.

13:47:00 15   Q.    The license agreement that Mr. Miller showed you

16   was a full year later.  Correct?

17   A.    Correct.

18   Q.    A year after Hodell had become obligated to

19   purchase 80 Business One licenses?

13:47:12 20              MR. MILLER:  Objection, Your Honor.  He

21   just testified as to what LSi thought, not whether they

22   were actually obligated.

23                THE COURT:  You're right.

24                MR. MILLER:  Thank you.

13:47:18 25

Lowery – Redirect                     663

BY MR. LAMBERT:

Q.    A year after, in LSi's mind, Hodell was obligated

to buy 80 Business One licenses, correct?

A.    Correct.

13:47:27  Q.    Do you know how much money Hodell paid in between

the time it signed the development agreement and the

license agreement?

A.    To who?

Q.    To LSi.

13:47:39  A.    I would have to add it up.

Q.    Would you disagree with me if I told you it was at

least $277,000?

A.    No.

          MR. MILLER:  Objection, Your Honor.

13:47:53          THE COURT:  Sustained.

A.    Because this --  these would include --

          THE COURT:  That's all right, Mr. Lowery.

You don't have to answer.

          THE WITNESS:  I'm sorry.

13:48:01  BY MR. LAMBERT:

Q.    Mr. Miller, during his questioning of you, admitted

that Business One was a fresh product.  Do you recall

that?

A.    Yes.

13:48:09  Q.    And he said it was a new product.  Do you recall

1    that?

2    A.    Yes.

3    Q.    Can you turn to --  can you pull up 314?

4    A.    Section 14?

13:48:22 5    Q.    I'm going to pull up 314.  I don't think it is in

6    the binder.

7                    MR. MILLER:  Your Honor, I want to be

8    clear.  There was a question I asked the witness --

9                    THE COURT:  I don't even know what this

13:48:31 10    exhibit is.

11                    MR. MILLER:  The question was, "Mr. Miller

12    admitted blank."

13                    THE COURT:  That is a completely improper

14    question.  You're right.

13:48:38 15                    MR. MILLER:  Thank you.

16    BY MR. LAMBERT:

17    Q.    Do you recall the line of questioning about being

18    asked whether Business One was a fresh product?

19    A.    I do.

13:48:44 20    Q.    And whether it was a new product?

21    A.    I do.

22    Q.    Okay.  Exhibit 314 is a document --  does that look

23    familiar to you?

24    A.    If you could zoom it up a little bit.

13:48:58 25    Q.    You might need to scroll through it for my

Lowery – Redirect                                665

1    questioning, but do you recall seeing Exhibit 314 before?

2    A.    Yes.

3    Q.    This is one of the documents Kevin testified that

4    he saw as part of the marketing of Business One to

13:49:14  5    Hodell.

6    A.    All right.

7    Q.    Is there anything in this marketing literature

8    published by SAP that mentions Business One being a fresh

9    product?

13:49:25  10    A.    I don't see anything.

11    Q.    There is nothing in the marketing literature

12    telling Hodell that Business One is a fresh product, is

13    there?

14    A.    No.

13:49:43  15    Q.    There is nothing in there telling Hodell that

16    Business One is a new product, is there?

17    A.    No.

18    Q.    In fact, Kim, can you cycle through a couple pages?

19          Can you zoom in there?  I'm sorry.  Go to

13:50:14  20    the next page, Kim.

21          Isn't it true that this document says

22    hundreds of businesses around the world are already using

23    SAP Business One?  Correct?

24    A.    Yes.

13:50:32  25    Q.    During the development of In-Flight, do you

Lowery - Redirect                    666

1  remember being asked about the development of In-Flight,

2  correct?

3  A.    I'm sorry.  Could you ask that?

4  Q.    Do you remember being asked by Mr. Miller about the

13:50:48  5  development of the In-Flight software?

6  A.    Yes.

7  Q.    And marrying it with Business One I think was one

8  of the terms that was used?  In-Flight was going to be

9  integrated in the Business One product, right?

13:51:03 10  A.    Yes.

11  Q.    Did anyone from LSi work with SAP during that

12  process?

13  A.    The integration?

14  Q.    Yes.

13:51:09 15  A.    Yes.

16  Q.    Were they in contact with SAP personnel?

17  A.    Yes.

18  Q.    Do you know anyone in particular at SAP?

19  A.    Eddie Neveux was front and center to the technical

13:51:19 20  people.  They had people they talked to when they had

21  questions on top of him.  Manfred Weis or something like

22  that comes to mind.

23  Q.    And Mr. Miller asked you some questions about

24  Business One, or the In-Flight being a customization to

13:51:39 25  Business One.  Correct?

Lowery - Redirect                    667

1    A.    Yes.

2    Q.    And, in fact, that was how Business One was

3    marketed.  Correct?

4    A.    Correct.

13:51:45  5    Q.    As being highly customizable.  Correct?

6    A.    Yes.

7    Q.    That was one of the main selling points for

8    Business One?

9    A.    Yes, it was.

13:51:53 10    Q.    And Mr. Miller asked you some questions about the

11    testing of In-Flight and whether it had been tested.  Do

12    you recall that line of questioning?

13              MR. MILLER:  Objection, Your Honor.  I

14    don't think I did ask those questions.

13:52:08 15              THE COURT:  Overruled.

16    A.    I do remember that.

17    Q.    And he wouldn't let you answer whether he thought

18    that In-Flight was tested?

19    A.    Correct.

13:52:15 20    Q.    Did LSi, in fact, test In-Flight before it was

21    installed at Hodell?

22    A.    Yes.

23    Q.    And did -- did LSi test In-Flight before Hodell

24    went live using the software?

13:52:32 25    A.    Yes.

Lowery - Redirect                                      668

1    Q.    How so?  How did you do the testing?

2    A.    It was a continual test, as each piece of code was

3    written by Joe Guagenti and his staff, they would go

4    through a systems assurance process, try to break it.

13:52:52  5    Q.    Mr. Miller asked you whether you thought that

6    Business One implementation was a failure.  Do you recall

7    that line of questioning?

8    A.    I do.

9    Q.    You testified that Hodell only ran Business One for

13:53:04 10    two years?

11    A.    Correct.

12    Q.    You have been in the computer --  the last time I'm

13    going to bring this up.  You have been in the software

14    business for 43 years.  Correct?

13:53:15 15    A.    Correct.

16    Q.    And in your experience, how much of that experience

17    has been selling ERP systems?

18    A.    90 percent.

19    Q.    Back in 2007, would two years be the amount of time

13:53:30 20    you would have expected Hodell to run Business One?

21    A.    I was expecting them to run it forever, but I'm not

22    sure I understand the question.

23    Q.    Well, prior to installing Business One at Hodell,

24    how long did you expect Hodell would continue using

13:53:54 25    Business One after it went live?

Lowery – Redirect                    669

1          MR. MILLER:  Objection, relevance.

2          THE COURT:  Overruled.

3     A.    Forever.  I mean, you know, for the life of the

4     system.

13:54:00 5     Q.    Not two years, correct?

6     A.    Not two years, no.

7     Q.    Mr. Miller asked you some questions about some

8     deposition testimony you gave.  Do you recall that?

9     A.    I do.

13:54:09 10    Q.    And he pointed to one question and one answer from

11    your deposition.  Do you recall that line of testimony?

12    A.    I do.

13    Q.    He didn't ask you to read the whole line of

14    questioning, did he?

13:54:23 15    A.    No.

16    Q.    Can you turn to Page 266 in your deposition?

17    A.    256?

18    Q.    266.

19    A.    266?

13:55:03 20    Q.    Yes, sir.

21    A.    I'm there.

22    Q.    On 266, Line 15 is the question that Mr. Miller

23    read you, correct?  So your testimony would be that the

24    installation and operation of Business One at Hodell was

13:55:18 25    a failure.  Correct?

Lowery – Redirect                                          670

1    A.    Correct.

2    Q.    And he read your answer, "No, I mean they ran their

3    business on it for two years"?

4    A.    Right.

13:55:24  5    Q.    He didn't read you the rest of that line of

6    questioning, did he?

7    A.    No.

8    Q.    Let's go back.  Let's read the rest of that

9    questioning, shall we?

13:55:32 10    A.    Okay.

11    Q.    There is a follow-up question on Line 23.  Do you

12    see that?

13    A.    Yes.

14    Q.    "You would agree with me it did not work as it was

13:55:40 15    supposed to work, correct?"

16                And there are intervening objections, and

17    you asked me a question on Page 267.  What did you ask

18    me?

19    A.    "Are you talking about SBO or In-Flight."

13:55:57 20    Q.    I said, "I'm talking about Business One."  What was

21    your answer?

22    A.    "I believe that the SAP Business One DI-API

23    problems were unacceptable."

24    Q.    And I asked you, "And they were never fixed,"

13:56:10 25    right?

1    A.    "No."

2    Q.    They were never fixed, correct?

3    A.    Correct.

4    Q.    He didn't ask you about Page 835 of your

13:56:16  5  deposition, did he?

6    A.    835?

7    Q.    835.

8    A.    I'm there.

9    Q.    There is a question I asked you on Page 835, Line

13:56:44  10  16.  This is the line of questioning Mr. Miller didn't

11   show you, correct?  "Question:  Do you agree with me it

12   was unacceptable at Hodell—Natco?"

13             THE COURT:  Are you going to read the whole

14   transcript?

13:57:01  15             MR. MILLER:  Objection.

16   BY MR. LAMBERT:

17   Q.    I asked you on line 16, "Do you agree with me that

18   the performance of Business One was unacceptable at

19   Hodell—Natco?"  And what was your answer?

13:57:09  20  A.    I do.

21   Q.    And do you agree with me that Hodell—Natco had

22   every right to abandon Business One and move to a

23   different software package?  What your answer?

24   A.    Sure.

13:57:19  25  Q.    Mr. Miller asked you about Exhibit 130.  Kim, can

Lowery - Redirect                672

1      you pull up Exhibit 130?

2                   It might be Defendant's Exhibit 130.  I'm

3      not sure.

4                   This was a document, the Gada Shamia

13:57:43 5      document?

6      A.    Yes.

7      Q.    Discussing the Sweet Spot.

8      A.    Yes.

9      Q.    Do you know when you had this in your possession?

13:57:49 10      A.    I don't.

11      Q.    But we see that at least in 2005, SAP knew this

12      information.  Correct?

13      A.    Correct.

14      Q.    And this was before Hodell signed the license

13:58:02 15      agreement?

16      A.    Correct.

17      Q.    And SAP in this document is acknowledging that the

18      Sweet Spot for Business One is 10 to 100 employees.

19      Correct?

13:58:10 20      A.    Correct.

21      Q.    So we know that SAP knew in 2005 that Hodell was

22      outside the Business One Sweet Spot.  Correct?

23      A.    Yes.

24      Q.    And do you consider 10 to 100 employees to be the

13:58:22 25      same as 10 to 100 users?

Lowery - Redirect                    673

1    A.    Yes.

2    Q.    And how many users did Hodell go live with in

3    March, 2007?

4    A.    80, plus another 40, so 120.

13:58:33 5    Q.    120 users.  And again, just so I'm clear, this

6    document is a 2005 SAP document.  Correct?

7    A.    Correct.

8    Q.    Kim, can you pull up Defendant's Exhibit 123?

9          This is the field kickoff meeting notes you

13:59:01 10    were asked about.  Correct?

11    A.    Yes.

12    Q.    Do you remember being asked about some notes you

13    took, or someone took where they --  were they your

14    notes?  I forget.

13:59:13 15    A.    Were they mine?  Did I make these?

16    Q.    Yes.

17    A.    No, these were made by somebody that worked for me.

18    Q.    Can you flip to the page where it has --  that Mr.

19    Miller was asking about?

13:59:24 20          There we go.

21    A.    Okay.

22    Q.    The section, "look at this."  Do you see that?

23    A.    Yes.

24    Q.    And he asked you, you knew in, at least at the time

13:59:42 25    these notes were taken, that Business One was not

Lowery – Redirect                           674

1    appropriate for Hodell?

2    A.    Yes.  He asked me that.

3              MR. MILLER:  Your Honor, can you read that

4    back?  I object, Your Honor.  I don't think that's the

14:00:02  5    question.

6              MR. LAMBERT:  I'll restate it.

7    BY MR. LAMBERT:

8    Q.    Do you remember being asked about these notes,

9    correct?

14:00:12 10    A.    I do.

11    Q.    And whether you saw that someone had said at a

12    field kickoff meeting that Business One was appropriate

13    for 50 concurrent users.  Do you recall that?

14    A.    I do.

14:00:22 15    Q.    And you acknowledge you did not communicate that to

16    Hodell.  Correct?

17    A.    I did not.

18    Q.    And why isn't that?

19    A.    Well, because I called SAP, Dan Kraus, Jeff Ashley,

14:00:42 20    because these are concerning numbers, and I told you what

21    they mentioned, they said there is just --  don't worry

22    about it, there is no theoretical maximum, continue with

23    the program.

24    Q.    The Hodell program?

14:00:54 25    A.    The Hodell program.

Lowery - Redirect                    675

1    Q.    And did an order for SAP licenses ultimately get

2    placed?  An order for SAP ultimately got placed, correct?

3    A.    Yes.

4    Q.    And it was for 80 and 40, correct?

14:01:12  5    A.    Yes.

6    Q.    And well outside the 50 concurrent users in these

7    notes.  Correct?

8    A.    Correct.

9              MR. MILLER:  Objection, Your Honor.

14:01:18 10              THE COURT:  Overruled.

11              MR. MILLER:  50 concurrent is different

12    than 80 plus 40.

13    BY MR. LAMBERT:

14    Q.    Mr. Miller asked you a line of questioning about

14:01:30 15    whether you communicated this to Hodell, and again you

16    said you didn't.  Correct?

17    A.    I said I did?

18    Q.    Didn't?

19    A.    Yes.

14:01:36 20    Q.    Did not.

21    A.    Oh, wait a minute.  I'm sorry.  I thought you said

22    SAP.  No.  I did not communicate that to Hodell.

23    Q.    And at the time you --  LSi was an authorized SAP

24    channel partner.  Correct?

14:01:51 25    A.    Correct.

Lowery – Recross                              676

```
         1              MR. LAMBERT:  Nothing further, Your Honor.

         2              THE COURT:  Thank you.  Any recross?

         3              MR. MILLER:  Yes, Your Honor.  I expect to

         4    be brief.

14:02:03 5                    RECROSS-EXAMINATION

         6    BY MR. MILLER:

         7    Q.    Can you call up Exhibit 618, please?

         8              Mr. Lowery, we have on the screen Exhibit

         9    618, do you see that there?

14:02:50 10   A.    I do.

        11    Q.    That's the exhibit Mr. Lambert just reviewed with

        12    you a couple moments ago?

        13    A.    Okay.

        14    Q.    Correct?

14:02:56 15   A.    Correct.  Well, yes.

        16    Q.    SAP Business One Whitepaper.

        17    A.    Yes.

        18    Q.    Okay.  It is from August of 2002.

        19    A.    Yes.

14:03:03 20   Q.    Okay.  Can you please, Bob, go to page seven?

        21              Down at the bottom, 2.3, can you highlight

        22    that, please?

        23              Actually, it would be the next page of that

        24    that has 2.8 on it.  I think that is 2.8.  The print is

14:03:31 25   so difficult to read.
```

Lowery – Recross                          677

1          Can you scroll down, please, and try to get

2     a photograph of 2.8 so we can all see it?  Thank you.

3          Actually –– right.  2.8.  This is the

4     phrase that you reviewed when Mr. Lambert was asking you

14:03:46 5     questions?

6     A.    It is.

7     Q.    And the first sentence says to secure critical

8     business and system processes, a robust MS–SQL 2000

9     database is used.  Do you see that sentence there?

14:03:58 10    A.    Yes.

11    Q.    MS stands for Microsoft?

12    A.    It does.

13    Q.    It is a Microsoft product?

14    A.    Yes.

14:04:05 15    Q.    A piece of Microsoft software?

16    A.    Yes.

17    Q.    Thank you.  Next question about fresh and new.  We

18    talked about whether the product, B1, was fresh and new,

19    right?

14:04:18 20    A.    We did.

21    Q.    And the point, isn't it true, that B1 existed in

22    other parts of the world before it was offered for sale

23    in the United States?

24    A.    It did.

14:04:29 25    Q.    So in the 2003 and 2004 time frame, B1, to the

Lowery – Recross                         678

1    extent it was fresh and new, was fresh and new in the

2    United States.  Right?

3    A.    Yes.

4    Q.    Okay.

14:04:41  5            MR. MILLER:  No further questions, Your

6    Honor.

7            THE COURT:  Thank you, Mr. Lowery.  You are

8    excused.  Watch your step.

9            THE WITNESS:  I'm done?

14:04:47 10            THE COURT:  You are finished.

11            THE WITNESS:  Thank you to the jury.  That

12    had to be tough sledding.  Am I free to go?

13            THE COURT:  Do whatever you please.

14            MS. LUARDE:  Your Honor, at this time, we

14:05:06 15    would like to call Udi Ziv.  He is actually one of our

16    witnesses whose video clips we intend to play.

17            MR. STAR:  Your Honor, can we approach?  We

18    discussed the order of witnesses and this is out of the

19    order we were going to do this.

14:05:25 20            MR. MILLER:  We flew a witness in from out

21    of town to go in the sequence the witnesses were told to

22    us they would come in.  According to the sequence, the

23    next witness is Paul Killingsworth that has been waiting

24    all morning in the conference room.

14:05:39 25            MS. LUARDE:  Your Honor, we made a last

1    minute decision.  We were told that Mr. Killingsworth was

2    here for the duration.  We were under the impression it

3    would be okay.  The video selection is short.  The timing

4    seems appropriate to put him in.  It also lays the

14:05:53  5    foundation for the testimony --

6                    THE COURT:  Did you ask that

7    Mr. Killingsworth be brought here?

8                    MS. LUARDE:  We did.  And if we need to go

9    forward with Mr. Killingsworth, we will.

14:06:07 10                    THE COURT:  We should do that.  He has been

11   here all day.

12                    MR. STAR:  So you want him called?

13                    MS. LUARDE:  Yes.  We call

14   Mr. Killingsworth.

14:06:31 15                    (The witness is sworn.)

16                    THE COURT:  Please tell us your full name

17   and spell your last name.

18                    THE WITNESS:  My name is Paul Anthony

19   Killingsworth.  It is spelled K-i-l-l-i-n-g-s-w-o-r-t-h.

14:07:35 20                    THE COURT:  Thank you.

21                    PAUL KILLINGSWORTH, being first duly sworn,

22   was examined and testified as follows:

23              DIRECT EXAMINATION OF PAUL KILLINGWORTH

24   BY MR. CARNEY:

14:07:38 25   Q.    Hello, Mr. Killingsworth.  My name is Chris Carney

1    and I'm a lawyer for Hodell—Natco.  We've never met

2    before, have we?

3    A.    No, we have not.

4    Q.    Who is your current employer?

14:07:50 5    A.    SAP America.

6    Q.    And how long have you worked for SAP?

7    A.    I have been there since November of 2006.

8    Q.    And when you were hired at SAP, you were hired to

9    be an escalation manager.  Correct?

14:08:06 10    A.    That's correct.

11    Q.    And that would have been an escalation manager for

12    the Business One group.  Correct?

13    A.    Correct.

14    Q.    And are you still an escalation manager for the

14:08:14 15    Business One group?

16    A.    No, sir, I am not.

17    Q.    Okay.  How long were you an escalation manager for

18    the Business One group?

19    A.    In approximately 2009, I believe, I was promoted to

14:08:24 20    senior director for customer relations and solution

21    experts for Business One North America.

22    Q.    Well, congratulations.  Now, in your role as an

23    escalation manager, do you recall testifying in your --

24    you were deposed in this case, correct?

14:08:46 25    A.    Yes, sir.

1    Q.    And you were asked a series of questions under

2    oath.  Correct?

3    A.    That is correct.

4    Q.    Okay.  Do you recall your testimony back in your

14:08:56  5    deposition that in your role as an escalation manager,

6    you dealt with customer complaint situations that had

7    escalated to the point that they were being --  they

8    weren't being appropriately addressed through usual

9    channels or were urgent in nature.

14:09:13 10              Is that an accurate description of your

11    role as an escalation manager?

12    A.    It sounds accurate to me, yes.

13    Q.    Okay.  Now, when you were deposed in this case, you

14    were identified by SAP as its corporate designee, as the

14:09:37 15    person most knowledgeable on a number of topics.

16    Correct?

17    A.    Yes, sir.

18    Q.    Okay.  Now and one of those topics was how SAP was

19    marketed --  SAP marketed and sold Business One.

14:09:51 20    Correct?

21    A.    That is correct.

22    Q.    And it's fair to say that SAP relied upon its

23    channel partners to make those sales because it didn't

24    have a direct sales force.  Isn't that correct?

14:10:04 25    A.    For Business One, yes, sir, that is correct.

Killingsworth - Direct                    682

1    Q.    And that's -- and I thank you for clarifying.

2    We'll be talking about Business One today, okay?

3    A.    Okay.

4    Q.    Thank you.  And you recall testifying in your

14:10:22 5   deposition that channel partners were responsible for

6    qualifying the sales of Business One customers and were

7    managed by an SAP regional channel manager who reported

8    to an SAP sales manager.  Is that correct?

9    A.    That is correct.

14:10:37 10  Q.    Now, at the time of the Hodell sale, Jeff Ashley

11   was the Business One sales manager.  Correct?

12   A.    I believe so, yes.

13   Q.    You testified to that effect on Page 52 of your

14   deposition.  Do we need to pull it out?

14:10:56 15  A.    No, sir.  That will be fine.

16   Q.    And Mr. Ashley reported to Dan Kraus.  Correct?

17   A.    That is correct.

18   Q.    Do you recall what Dan Kraus' title was at the

19   time?

14:11:06 20  A.    Not precisely, but it was something -- it was vice

21   president of Business One, something along that line.

22   Q.    Now, back in the 2006 -- of course after you

23   became employed by SAP, end of 2007 time frame, you

24   became familiar with a company by the name of LSi.

14:11:29 25  Correct?

1    A.    Yes, sir, that's correct.

2    Q.    And LSi was a channel partner of SAP.  Correct?

3    A.    That is correct.

4    Q.    And you recall testifying in your deposition that

14:11:43 5  SAP publicly represented this fact, the fact --  excuse

6    me.

7              You testified in your deposition that SAP

8    publicly represented this fact to potential customers?

9    A.    I'm sorry.  I'm not understanding your question.

14:11:58 10  Can you say that again?

11   Q.    That was a poor question.  I apologize.

12             SAP publicly represented to potential

13   customers that Business One sales were made through their

14   channel partners.  Correct?

14:12:13 15  A.    That is correct.

16   Q.    And channel partners were encouraged to use the SAP

17   logos on their marketing literature and to leverage the

18   SAP brand.  Correct?

19   A.    Sure, yes.

14:12:33 20  Q.    Okay.  And it is true that to become a channel

21   partner of SAP, potential channel partner had to have

22   demonstrated sales success and quality work product.

23   Correct?

24   A.    In general, yes, that was the criteria that the

14:12:56 25  recruiters would use to select channel partners, yes.

1    Q.    And that's what you testified to at pages 65 and 66

2    of Volume 1 of your deposition?

3    A.    Okay.

4    Q.    Do we need to pull it out or do you accept that?

14:13:09 5    A.    No, sir.  I'm fine.  Thank you.

6    Q.    And in fact, SAP emphasized the experience and

7    qualifications of its channel partners in its marketing

8    literature.  Correct?

9    A.    If you can show me some documentation to that

14:13:28 10    effect, I might be able to validate that, but I don't

11    know any marketing material specifically that says that.

12    Q.    Could you pull up Exhibits -- excuse me, Exhibit

13    314, please?

14            May I approach?  It may be easier to you,

14:14:07 15    the exhibits that I would potentially talk to you are in

16    this binder, but we can pull them up on the screen as

17    well.

18    A.    Thank you.  It is hard to read on the screen.

19    Q.    Tell me when you are ready.  Oh.  You are doing

14:14:23 20    like I am?

21    A.    Just this year I had to start wearing reading

22    glasses, and I'm having a hard time getting used to that.

23    Here we go.

24    Q.    It's okay.  Take your time.  I'm going to ask you

14:14:32 25    some questions about Exhibit 314.

Killingsworth – Direct                    685

1     A.    Okay.  I'm ready.

2     Q.    If you leaf through the document, before I start

3     asking you questions, you can see it is an eight-page

4     document.  Correct?

14:14:48  5     A.    That is correct.

6     Q.    And, in fact, if you just go to the fifth page

7     the document --  and when I say the fifth page, why don't

8     you go to --  it is 314.5.

9     A.    I have it.

14:15:13  10     Q.    That is actually a second document.  These were two

11     pieces of marketing literature that were combined into

12     one document.  I was just going to ask you a couple

13     questions about both.  Okay?

14     A.    Okay.

14:15:26  15     Q.    Turning back to the first document --  or excuse

16     me, the first page of the document, the title of that

17     document is "SAP Business One brief."  Correct?

18     A.    That is correct.

19     Q.    And it's fair to say this is a piece of marketing

14:15:48  20     literature, correct?

21     A.    That is correct.

22     Q.    Okay.  Could you please turn to the fourth --

23     excuse me, the third page of the document?

24     A.    I'm there.

14:16:05  25     Q.    Okay.  I'm going to --  direct your attention to

Killingsworth - Direct                    686

1   the last bullet point in the first column of the

2   document.  Do you see that?

3   A.    I do.

4   Q.    And can you please read that?

14:16:22  5   A.    Sure.  "Unmatched expertise—because SAP Business

6   One is delivered through a network of highly qualified

7   channel partners who understand the specific challenges

8   facing small and mid size businesses customers receive

9   world class service and support."

14:16:40  10   Q.    So then this is a piece of marketing literature

11   that emphasized the experience and qualifications of

12   channel partners.  Correct?

13   A.    That is correct, yes.

14   Q.    And since we're on the document, why don't we turn

14:16:52  15   to the second piece of marketing literature in this

16   exhibit.

17   A.    Can you give me a page?

18   Q.    Page 7.

19   A.    314.7?  Is that what you are referring to?

14:17:15  20   Q.    Yes.  Thank you.

21   A.    I'm there.

22   Q.    And the second paragraph in the second column.

23   A.    I see it.

24   Q.    This paragraph is substantially identical to the

14:17:28  25   paragraph you just read.  Correct?

1    A.    Yes.  Substantially the same.

2    Q.    And so this is another piece of marketing

3    literature that SAP used to emphasize the experience and

4    qualifications of its channel partners.  Correct?

14:17:46  5    A.    That is correct.

6    Q.    Okay.  Can you turn to Exhibit 129, please?

7    A.    I'm there.

8    Q.    And I would ask you to turn to Exhibit 129, Page 2.

9    A.    I don't appear to have 129.2.  I have 129.3, table

14:18:30 10    of contents.  But I can see it on the screen.  That's

11    fine.

12    Q.    Thank you.  And that is an SAP Business One 2006

13    document.  Correct?

14    A.    That is correct.  March, 2006.

14:18:45 15    Q.    And it's a statement of direction for SAP Business

16    One?

17    A.    That is correct.

18    Q.    And it is a confidential document to SAP, correct?

19    A.    Yes.  It says right there, "confidential for SAP

14:19:04 20    and Business One partners."

21    Q.    Thank you.  Bear with me.  I'm just checking my

22    notes.

23              Kim, could you please turn to Page 7 of the

24    document?

14:19:56 25              I'm going to direct your attention to the

1    second paragraph, the first column.

2    A.    I see it.

3    Q.    Could you please read the first sentence?

4    A.    Sure.  "Please note.  As a rule, this document

14:20:19  5    should not be shared with customers."

6    Q.    Thank you.  Let's turn to the next page, 129.8.

7    A.    I'm there.

8    Q.    I would like to direct your attention to the second

9    paragraph in the first column.

14:20:46  10    A.    I'm there.

11    Q.    The first sentence states that "While SAP Business

12    One has many satisfied larger customers, it's ideally

13    suited for companies with 10 to 100 employees."  Do you

14    see that?

14:21:08  15    A.    Yes, I do.

16    Q.    In 2006 when this document was published, the

17    target market for Business One customers was customers

18    with 10 to 100 employees.  Correct?

19    A.    This is saying here that it is just ideally suited.

14:21:26  20    I wouldn't necessarily say that's where it was marketed.

21    Q.    Okay.  Let's turn to -- let's go to the last

22    sentence of that paragraph.

23    A.    Okay.

24    Q.    What does it say?

14:21:40  25    A.    SAP Business One is optimized for performance with

1    up to 50 concurrent users.

2    Q.    Okay.  Thank you.

3    A.    Sure.

4    Q.    Now, let's turn to the same page, the second

14:21:56 5    column, last paragraph.

6              Can you read the last paragraph, and end

7    after the first bullet point?

8    A.    Sure.  "Our experience shows us that SAP Business

9    One implementations are significantly more successful

14:22:16 10   when we target prospects that fit the profile we used

11   while designing the product as follows:  10 to 100

12   employees approximately half of them using SAP Business

13   One concurrently."

14   Q.    Thank you.  Now, in order for a channel partner to

14:22:39 15   sell Business One, you would agree with me that a channel

16   partner would have to make representations about the

17   capabilities of the product, wouldn't you?  It would

18   stand to reason, right?

19   A.    Well, what I would suggest is that they can

14:22:54 20   demonstrate what the product is able to do.

21   Q.    So it's your testimony that a channel partner that

22   sells Business One cannot make any representations

23   about --

24   A.    Yes, sir, that is my testimony.  They may not make

14:23:14 25   a representation.  Correct.

1    Q.    So when they go to a trade show, what do they do?

2    A.    They can show the software, they can provide

3    marketing documents that we provided them.  They can

4    demonstrate it.

14:23:27  5    Q.    And how many years of sales experience do you have?

6    A.    Well, prior to joining SAP, I was a reseller

7    myself, and I spent 12 years as a reseller.

8               During those 12 years, I did pretty much

9    everything, from consulting to sales to project

14:23:46 10    management and eventually owned the company, so I have

11    quite a bit of experience.

12    Q.    Okay.  Thank you.  Now, you're aware of the fact

13    that in July of 2004, LSi approached SAP about two 150

14    SAP Business One deals with one of them being

14:24:06 15    Hodell-Natco, correct?

16    A.    Well, I wasn't at SAP at the time but I became

17    aware of that later yes.

18    Q.    And you testified to that effect at your deposition

19    at Pages 219 and 220, Volume 1?

14:24:21 20    A.    Okay.

21    Q.    Okay?  We can pull it out --

22               MR. KELLEHER:  Objection.

23               THE COURT:  Just ask him questions.

24    BY MR. CARNEY:

14:24:37 25    Q.    You would agree with me that a 150-user license

| | |
|---|---|
| 1 | deal would have raised some eyebrows and gotten the |
| 2 | attention of SAP because it was a big sale in terms of |
| 3 | dollar amount and number of users, correct? |
| 4 | A.    Generally speaking when there was a big sale like |
| 14:24:57 5 | this, what we consider a large sale, when we became aware |
| 6 | of it, it was of interest, sure. |
| 7 | Q.    So let me ask the question again.  I'm sorry.  I |
| 8 | thought it called for a yes or no answer.  You're aware |
| 9 | of the fact that –– you would agree that a 150-user |
| 14:25:17 10 | license deal would have raised some eyebrows and gotten |
| 11 | the attention of SAP because it was a big sale in terms |
| 12 | of dollar amount and number of users, correct?  Yes or |
| 13 | no.  And if you can't answer it yes or no, then just tell |
| 14 | me that. |
| 14:25:31 15 | A.    I'm uncomfortable with the way you phrased that |
| 16 | question to answer it yes or no. |
| 17 |                   MR. CARNEY:  May I approach, Your Honor? |
| 18 |                   THE COURT:  Sure. |
| 19 | BY MR. CARNEY: |
| 14:26:48 20 | Q.    Mr. Killingsworth, I just handed you Volume 1 of |
| 21 | your deposition in this case as the company designee. |
| 22 | A.    Yes. |
| 23 | Q.    And that deposition was taken on July 13, 2012. |
| 24 | Correct? |
| 14:27:05 25 | A.    That's correct. |

1    Q.    And you were represented by counsel?

2    A.    That is correct.

3    Q.    And you gave testimony in front of a court

4    reporter?

14:27:15   5    A.    That is correct.

6    Q.    And you were sworn just like you were today to tell

7    the truth.  Correct?

8    A.    That is correct.

9    Q.    And you were asked a series of questions, starting

14:27:27  10    on page, the bottom of Page 219, Line 24.

11    A.    I'm there.

12    Q.    And I'll read the question.  And I'll ask you to

13    read the answers, okay?

14    A.    Okay.

14:27:43  15    Q.    "Okay.  But we can agree that at that point, Dan

16    Lowery was communicating to Dan Kraus that he was

17    discussing a potential sale of 150-user licenses to

18    Hodell."  Is that fair?

19    A.    "That I can agree to, he was discussing a potential

14:28:00  20    sale."

21    Q.    "Question.  At the time that this e-mail was sent,

22    would a 150-user license deal have raised a red flag at

23    SAP"?

24    A.    "It would raise a lot of eyebrows.  I wouldn't say

14:28:17  25    a red flag.  I would say it would get attention."

1    Q.    "And why is that?"

2    A.    "That is a big sale."

3    Q.    "In terms of dollar amount and in terms of users.

4    Is that correct?"

14:28:30  5    A.    "Yes, yes."

6    Q.    Now, the document that you were being questioned

7    about was Exhibit 71, and I'll ask you to turn to

8    Page 217 of your -- excuse me.

9    A.    I assume I can close this?

14:28:50  10    Q.    No.  I'm going to ask you to turn to 216 of your

11    deposition, just so you can confirm that.  And Kim, can

12    you pull up Exhibit 71, please?

13              Excuse me.  I apologize.  I may have the

14    wrong exhibit.

14:29:50  15              MR. CARNEY:  May I confer?

16              THE COURT:  Sure.

17              (Discussion off the record.)

18              MR. CARNEY:  I apologize.

19    BY MR. CARNEY:

14:30:49  20    Q.    Kim, is there any way to blow up the last,

21    Paragraph 4 -- excuse me, Page 4?  Thank you.

22              Now, this is Exhibit 71 and you testified

23    to it at your deposition, correct?

24    A.    I don't recall if I read that document, to be

14:31:11  25    honest with you.

1    Q.    Well, let's take a look at Page 216 of your

2    deposition?

3    A.    Okay.  All right.

4          THE COURT:  Why don't you just ask him

14:31:19 5   questions that you want him to answer.  Don't be talking

6    about the deposition all the time.

7          MR. CARNEY:  Thank you, Your Honor.

8    BY MR. CARNEY:

9    Q.    Kim, could you blow up the fourth paragraph,

14:31:31 10  beginning with "Dale and I"?

11         "Dale and I have been talking about two

12   large close prospects who want to write our equipment

13   rental and fastener functionality to SAP.  One is

14   currently installed on FACTS and the other is waiting for

14:31:53 15  us to propose the cost and timeline for ER on SAP

16   Business One.  They are both 150-user deals which would

17   give us two verticals for the SAP product.  Personally, I

18   feel verticals are the quickest route to continuing SBO

19   sales."

14:32:13 20         This was part of an e-mail to Dan Kraus,

21   and you testified to it, about it at your deposition.

22   Correct?

23         MR. KELLEHER:  Objection.

24         THE COURT:  Ask him if recognizes the

14:32:35 25  document.

Killingsworth - Direct                695

```
            1    A.    No, sir, I don't recognize the document.

            2    Q.    But you stand by your testimony that a --

            3                MR. KELLEHER:  Objection, Your Honor.

            4                THE COURT:  It's the same thing.

14:32:47    5                MR. CARNEY:  I'm wrapping up the line of

            6    questioning.

            7                THE COURT:  You may have been asking

            8    improper questions at the deposition.  I don't know.  The

            9    issue before is the testimony here.

14:32:54   10                MR. CARNEY:  I'll move on.

           11                MR. KELLEHER:  We would move to strike --

           12                THE COURT:  Stop.

           13    Q.    In 2004, in July of 2004, would a 150-user sale be

           14    outside the Sweet Spot for SAP Business One?

14:33:17   15    A.    Yes.  It could be considered outside the Sweet

           16    Spot, yes.

           17    Q.    Thank you.

           18    A.    It doesn't necessarily mean it is a bad sale.

           19    Q.    Thank you.  Your answer -- I appreciate it, but you

14:33:35   20    answered the question.

           21                Please turn to 435.  Exhibit 435.

           22                Can you identify this document?

           23    A.    I can.  It is a document that describes the

           24    opportunity qualification tool, otherwise known as the

14:34:04   25    OQT.
```

1    Q.    And its date of publication is the 21st of

2    February, 2006?

3    A.    That is correct.

4    Q.    And this, too, is an SAP confidential document.

14:34:21  5    Correct?

6    A.    That is correct.

7    Q.    Please turn to Page 2 of the document.

8    A.    I'm there.

9    Q.    Now, this is a document that helps channel partners

14:34:41 10    qualify a sale.  Correct?

11    A.    That is correct.

12    Q.    And it sets forth criteria that they should

13    consider in terms of qualifying a sale.  Correct?

14    A.    That's correct.

14:34:52 15    Q.    Now, in the middle of page two, number two, it says

16    "the number of employees at a prospect."  Do you see

17    that?

18    A.    Yes, sir, I do.

19    Q.    And in the answers, it states 150 plus employees is

14:35:12 20    no fit.  Correct?

21    A.    The text there says that, but if you read the

22    paragraph just below that, it explains it further.

23    Q.    Thank you.  150 plus employees states no fit.  Yes

24    or no?

14:35:27 25    A.    I'm uncomfortable --  it says that on the paper --

1    Q.    Thank you.

2    A.    But that is not all the information.  There is

3    additional information here that you have to take into

4    consideration.

14:35:36  5    Q.    Thank you.  And your counsel can clear that up?

6    A.    Thank you.

7    Q.    Number 3.  Number of SAP Business One users

8    planned.  That's on page 3 of the same document.

9    A.    I see it.

14:35:51 10    Q.    And under the column answers, 76 plus users, no

11    fit.  Correct?  I read that correctly, didn't I?

12    A.    You read it correctly.

13    Q.    Thank you.  Can you turn to Exhibit 119.

14    A.    I'm there.

14:36:31 15    Q.    Let's start with page two of that, which is the

16    cover page.  Correct?

17    A.    Yes, sir.  According to this.

18    Q.    And can you identify the document?

19    A.    It's described as a sizing transaction volumes.

14:36:49 20    Q.    And it relates to SAP Business One.  Correct?

21    A.    That is correct, yes.

22    Q.    Okay.  Can you please turn to page four of the

23    document?

24    A.    119.4, I presume?

14:37:06 25    Q.    Yes.  Thank you.

1    A.    Yes, I'm there.

2    Q.    And the title on the top of that page is "History

3    of Business One Deal Sizes."  Do you see that?

4    A.    I do.

14:37:15 5    Q.    And in the first line after it, it states "average

6    deal size," number of users.  Do you see that?

7    A.    It does say the average, yes.

8    Q.    And the average was 15, correct?

9    A.    That is correct.

14:37:27 10    Q.    Okay.  Now, let's turn to Page 24 of the same

11    document.

12    A.    I'm sorry.  Did you say 24?

13    Q.    I did.

14    A.    Okay.  I'm there.

14:37:43 15    Q.    And the title of this page is, "When might an

16    opportunity be too large for Business One?"  Correct?

17    A.    I see that.

18    Q.    And it goes on to say, right underneath the title,

19    "here are the red flags that the experts suggest to me

14:38:07 20    are reasons for fully reviewing the fit carefully,"

21    correct?

22    A.    Mostly correct.  I think you added the word "fully"

23    but for reviewing the fit carefully.  Correct.

24    Q.    Sorry about that.

14:38:22 25    A.    No problem.

1    Q.    And under the --  under the heading "size,"  the

2    last line says "will the number of users exceed 30"?

3    Correct?

4    A.    Yes, sir.

14:38:34  5    Q.    Do you know who Udi Ziv is?

6    A.    I know the name.  I don't know him personally.

7    Q.    He was an employee of SAP?

8    A.    Yes.  Correct.  SAP Israel.

9    Q.    And he was involved in the development of Business

14:39:00 10   One?

11   A.    I know he worked in the development group, and I

12   believe he also was with the company that SAP acquired

13   when we acquired Business One, but that's all I know, I'm

14   afraid.

14:39:11 15   Q.    Okay.  You don't know if he --  is it your

16   testimony that you're unaware of whether or not he had a

17   leadership role --

18   A.    I do believe he had a leadership role, yes.

19   Q.    With SAP Business One development?

14:39:30 20   A.    Correct.

21   Q.    Thank you.  Can you turn to Exhibit 69?

22   A.    I'm there.

23   Q.    And this is a five-page e-mail exchange, and we're

24   going to go to page 5.  We'll start --  well, actually,

14:39:51 25   page four, because page five is just the end of a

Killingsworth - Direct                    700

1     signature line.

2     A.    Okay.

3     Q.    The first e-mail in this series is an e-mail sent

4     from Dan Lowery to Udi Ziv on April 11, 2007.  Correct?

14:40:12  5     A.    That is correct.

6     Q.    And you are one of the individuals that was copied

7     on this document --  or on this e-mail.  Correct?

8     A.    That is correct.

9     Q.    The other individuals were Dan Kraus, Michael

14:40:26 10    Sotnick, and Bill McDermott, who I believe at the time

11    was the CEO of SAP America?

12    A.    At the time, yes.  He had a high leadership

13    position, yes.

14    Q.    Okay.  What's he doing now?

14:40:40 15    A.    He is now the CEO of SAP.

16    Q.    SAP America?

17    A.    Well, I want to make sure I'm accurate.  I believe

18    it is SAP AG.  I'm sorry.  I'm not totally clear on his

19    official title.

14:40:54 20    Q.    Can you read the first three bullet points

21    beginning with "we are"?

22    A.    "We are an SAP Business One reseller in St. Louis."

23          Next bullet point, "We have installed a

24    120-user B1 deal at Hodell-Natco in Cleveland with an

14:41:19 25    add-on we develop called In-Flight Enterprise.

1        "And we went live March 1, 2007 and are

2    experiencing extreme system performance issues.  Large

3    customer orders take two hours to enter into the system,

4    et cetera."

14:41:32  5    Q.    So he identifies Hodell as a 120-user B1 company.

6    Correct?

7    A.    That is correct.

8    Q.    And turning to page three of the document, I want

9    to direct your attention to an internal e-mail from Udi

14:42:05 10    Ziv to Dan Kraus on Thursday, April 12, 2007.  Do you see

11    that?

12    A.    I do.

13    Q.    And again, Mr. Killingsworth, you were copied on

14    this document?

14:42:19 15    A.    I was.

16    Q.    And could you please read the first sentence of the

17    e-mail?

18    A.    He says, "I honestly do not know what to tell you.

19    Someone had sold to the wrong customer, which is way

14:42:32 20    above any sane B1 Sweet Spot, 120 users, three

21    exclamation points, and obviously they are experiencing

22    severe performance issues."

23    Q.    Okay.  Then I would like to go to the --  to the

24    last paragraph of the e-mail and I would ask you to read

14:42:51 25    the two bullet points that are there.

1    A.    "Bottom line, I recommend that we go for a

2    reimbursement and we debrief the whole process that got

3    us to having this customer in the first place."

4    Q.    Turn to Exhibit 157, please.

14:43:17 5    A.    I think I'm there.

6    Q.    This is another document produced by SAP in

7    discovery.  It's a two page e-mail exchange.  Correct?

8    A.    Correct.

9    Q.    Now, I want to direct your attention to an April

14:43:38 10    16, 2007 e-mail from a gentleman by the name of Ralf

11    Mehnart-Meland.  Did I say that correctly?

12    A.    We call him RMM for short.

13    Q.    I'll call him Ralf Mehnart-Meland.  He sent an

14    e-mail to Michael Sotnick and Dan Kraus, correct?

14:44:04 15    A.    Correct.

16    Q.    And I note that you also were copied on the e-mail.

17    Correct?

18    A.    That is correct.

19    Q.    And Jeff Ashley was copied on the e-mail, Edward

14:44:13 20    Neveux, and Manfred Weis?

21    A.    Correct.

22    Q.    I take it Manfred Weis is another SAP employee?

23    A.    He is, yes.

24    Q.    I would ask you to turn to the second page of the

14:44:30 25    document.  I would like to direct your attention -- oh,

Killingsworth - Direct                    703

1    excuse me.  Before we do that, what's the subject of this

2    e-mail?

3    A.    The subject SAP-BO at Hodell-Natco.  Is that what

4    you are referring to.

14:44:56  5    Q.    The subject of the e-mail we were just discussing,

6    subject, forward, Dan Lowery, performance issues at

7    Hodell-Natco?

8    A.    I'm sure it is on there.  There it is.  I see it.

9    Yes.

14:45:06  10    Q.    Now, I would like to have you turn to the second

11    page of the exhibit.  And I would ask you to go to the

12    summary of Maynard, his summary of the whole situation as

13    of April 16, 2007.

14    A.    I see that.

14:45:29  15    Q.    Can you read the summary, please?

16    A.    He writes "Hodell has just too much data.  SAP

17    Business One cannot handle it and there is no fix in

18    sight.  I believe we need to find a way to get the

19    customer off SAP Business One."

14:45:43  20    Q.    And at the time, Mr. Maynard was the director of

21    business development for SAP Business One, correct?

22    A.    That is correct.

23    Q.    Now, let's turn to Exhibit 162.

24    A.    I'm there.

14:46:11  25    Q.    This is another internal e-mail of SAP, correct?

Killingsworth – Direct                  704

1      A.    Yes, it is.

2      Q.    It's a four-page document.

3      A.    I'm counting six for some reason.

4      Q.    Yes.  And I see that.  And I put this binder

14:46:43  5   together quickly.  But you will see that the last two

6      pages are, again, Exhibit 157.  Do you see that?

7      A.    I do.

8      Q.    Okay.  So are we on the same page here, that

9      Exhibit 162 is a four-page document?

14:46:57 10   A.    Well, the bottom of mine is cut off.  What I'm

11     saying is Exhibit Number 157 in the middle of the page.

12     Oh, I see up here.  Okay.  Hang on.

13     Q.    If you could just turn to the first page.

14     A.    Oh, one more.  I'm there now.  Yes.

14:47:18 15   Q.    Okay.  And I'm only going to ask you about the top

16     e-mail on the first page of this document.

17     A.    Okay.  That's fine.

18     Q.    Okay.  This is an e-mail from Edward Neveux to

19     Volker Anders and Torsten Budeshemim?

14:47:45 20   A.    That's correct.

21     Q.    I notice you are copied on this e-mail with another

22     individual by the name of --

23     A.    You're not going to try it.

24     Q.    Gianluigi Bagnoli?

14:48:08 25   A.    Close.  You have to say it with an Italian accent,

Killingsworth - Direct                    705

1    though.

2    Q.    I cannot.    This is dated June 18, 2007.  Correct?

3    A.    Yes.

4    Q.    And the subject of the e-mail is SAP Business One

14:48:19  5    at Hodell-Natco, correct?

6    A.    That is correct.

7    Q.    I'm going to direct your attention to the second

8    sentence of Mr. Nuveaux's e-mail, beginning with the

9    issue, and I would ask that you read it to the jury.

14:48:36 10    A.    Just that one sentence?

11    Q.    Yes.

12    A.    "The issue with this particular customer is that

13    they started with a dataset that was well outside, slash,

14    greater than the, quote, high end, unquote, dataset

14:48:48 15    tested for Business One 2005 SP 01 in Israel."

16    Q.    Now, Mr. Neveux at the time was a solution

17    architect for Business One, correct?

18    A.    That is correct.

19    Q.    So he is a technical guy.  Right?

14:49:03 20    A.    That is very correct.

21    Q.    Now I would like you to move on to the fourth

22    sentence, and I would ask you to read to the jury the

23    fourth sentence of Mr. Nuveaux's e-mail, starting with

24    the word "performance"?

14:49:24 25    A.    "Performance issues exist in Business One by itself

1    as stated by development with this magnitude of data.  No

2    add-ons running."

3    Q.    And add-ons are things like --  you have heard of

4    Radio Beacon, right?

14:49:39  5    A.    I have.

6    Q.    And that's an add-on, correct?

7    A.    Correct.

8    Q.    And you have heard of In-Flight Enterprises,

9    correct?

14:49:45  10    A.    That is correct.

11    Q.    That's an add-on, right?

12    A.    Correct.

13    Q.    Okay.  Now, can you turn to Exhibit 437?

14    A.    I'm there.

14:50:13  15    Q.    This is an e-mail you sent to Kevin Reidl and Otto

16    Reidl at Hodell-Natco, and it is dated May 14, 2007, at

17    7:25 p.m. correct?

18    A.    Correct.

19    Q.    Why don't you read the second paragraph of your

14:50:36  20    e-mail.

21    A.    "We have also been working with Dirk and the

22    development team to find and address the course of the

23    issues.  We believe that the results of these efforts

24    will be substantially realized in the PL 23 release.

14:50:50  25    Many hours of research and development have culminated in

1    the changes that will be implemented in this patch

2    level."

3    Q.    Now I'd like you to go to the next paragraph and

4    read for the jury your -- the second-last sentence of

14:51:11  5    your e-mail in that paragraph, starting with

6    functionally.

7    A.    I'm sorry?  Functionally?

8              "Functionally, the product with the

9    additions of In-Flight and Radio Beacon is an outstanding

14:51:24  10    business solution for you and your company.  The issue

11    we're faced today is solely the performance problem we're

12    experiencing at your installation."

13    Q.    Thank you.  Please turn to the next document.  That

14    should be 263 in your exhibit binder.

14:51:51  15    A.    What number did you say?

16    Q.    I'm sorry.  263.

17    A.    I'm there.

18    Q.    Okay.  This also is a -- another e-mail chain

19    internal to -- internal to SAP, correct?

14:52:12  20    A.    That is correct.

21    Q.    Okay.  And I want to focus on the e-mail in the

22    middle of the first page of Exhibit 263.  Okay?

23    A.    Okay.

24    Q.    The e-mail was from a gentleman, and I'm just

14:52:28  25    assuming it was a gentleman --

1    A.    You are correct.

2    Q.    Okay.  Dipan Shah, and it is to Michael Sotnick,

3    Dan Kraus, yourself, and a number of other individuals,

4    and those other individuals are also employees of SAP, at

14:52:51 5    least as of the time of the e-mail, correct?

6    A.    I don't recognize all those names as SAP employees

7    but it is safe to assume that.

8    Q.    Thank you.  Who was Mr. Shah at the time?

9    A.    You know, I don't know his role.  It says here,

14:53:13 10    service manager.  I did interact with him, but I don't

11    remember specifically what he did as service manager.

12    I'm sorry.

13    Q.    And the subject matter of the e-mail is

14    Hodell-Natco recap.  Correct?

14:53:26 15    A.    That is correct.

16    Q.    And I would like to focus on the first paragraph.

17    This is November -- well, the date of this e-mail is

18    November 3, 2007, and as I read this e-mail, it outlines

19    the reasons why Hodell must move on from Business One and

14:53:58 20    move to another product.  Is that a fair reading of the

21    e-mail?  Yes or no.

22    A.    Would you kindly ask me the question again then,

23    please?

24    Q.    Sure.  As I read this document, this document is

14:54:12 25    summarizing the Hodell-Natco situation, and it outlines

Killingsworth – Direct                         709

1    reasons why Hodell—Natco must move from Business One.  Is

2    that fair?  If not, then tell me it's not.

3    A.    That is a fair summary of the e-mail, yes.

4    Q.    Okay.

14:54:34   5    A.    Sir.  I'm sorry.  I didn't mean to get casual.

6    Q.    That's okay.  Can I direct your attention to the

7    second paragraph?

8    A.    I'm there.

9    Q.    Can you read --  can you read the first sentence?

14:54:55  10    A.    We agreed on the fact that we need to move this

11    customer to A1, not only based on the fact that the DI is

12    an issue, but also on the fact that there are a large

13    number of documents and users, which makes this customer

14    a non—sweetspot project of Business One.  We've reached

14:55:15  15    the point where any more work will only bring diminutive

16    returns on improving the DI.

17    Q.    Thank you.  The DI -- well, first of all, A1,  A1

18    is another SAP software package, correct?

19    A.    That is correct.

14:55:30  20    Q.    Okay.  DI, the reference to DI in this, in the

21    first paragraph of this e-mail, that's the DI-API?

22    A.    Yes.

23    Q.    And that's part of the base functionality of the

24    SAP Business One.  Correct?

14:55:48  25    A.    I wouldn't characterize it that way, no.

14:56:01

14:56:23

14:56:39

14:56:59

14:57:35

1    Q.    It's not an add-on?

2    A.    No.  But it is a pipe that connects add-ons.

3    Q.    It is not an add-on, correct?

4    A.    It is not an add-on.

5    Q.    Thank you.  It is something that is developed by

6    SAP, correct?

7    A.    That's correct.

8    Q.    Thank you.  And Mr. Shah summarizes that we have to

9    get him off Business One because they are a large number

10   of document --  they have a large number of documents and

11   a large number of users.  Correct?

12   A.    That is correct.

13   Q.    There is no reference in the first paragraph of

14   this e-mail to add-ons, is there?

15   A.    That is correct.

16   Q.    And there is no reference to In-Flight in this

17   e-mail.  Correct?

18               MR. KELLEHER:  Objection.  The document

19   speaks for itself.

20               THE COURT:  Go ahead.

21   A.    Correct.

22   Q.    I would like to ask you about Exhibit 267 if you

23   don't mind.

24   A.    I'm there.

25   Q.    This is a two-page internal SAP e-mail.  Correct?

1    A.    That is correct.

2    Q.    Let's start with the first e-mail in the chain.  It

3    starts on the first page of the document, at the bottom.

4    Do you see that?  It's from Dan Kraus to you, on

14:57:58  5    September 29, 2007.

6    A.    That is correct.

7    Q.    And the subject of the document is Hodell–Natco

8    spend to date.  Right?

9    A.    That is correct.

14:58:09 10    Q.    And he is asking you to reach out to Kevin ––  and

11    I assume that would be Kevin Reidl ––  to find out what

12    their expenses have been to date?

13    A.    That's correct.

14    Q.    And you responded to Mr. Kraus in an e-mail on

14:58:30 15    October 1, 2007, correct?

16    A.    That is correct.

17    Q.    And you talk about direct costs that they have

18    incurred.  Correct?

19    A.    Yes, I do.

14:58:43 20           MR. KELLEHER:  Judge, objection.  This is

21    hearsay.

22           THE COURT:  Overruled.

23    BY MR. CARNEY:

24    Q.    You talk about direct costs of $550,000 that they

14:58:54 25    have incurred up to this date.  Correct?

1    A.    That is correct.

2    Q.    And close to $70,000 in hardware costs.  Correct?

3    A.    Well, I say -- yes, closer to 70K, yes.  That's

4    what I say.

14:59:10  5    Q.    And HW refers to hardware.  Correct?

6    A.    Correct.

7    Q.    And SW refers to software?

8    A.    Yes, sir.

9    Q.    Okay.  And then you list a whole series of indirect

14:59:23 10    costs that they have incurred?

11    A.    That is correct.

12    Q.    Okay.  Meeting time, people, 400,000, and you say

13    "this figure is not a line item, rather it is a delta

14    item versus a shortfall in the sales versus last year and

14:59:42 15    other factors I didn't ask for, correct?

16    A.    That is correct.

17    Q.    And you forwarded this information on to Mr. Kraus.

18    A.    That's correct.

19    Q.    Thank you.

15:00:00 20         MR. CARNEY:  Your Honor, this might be a

21    good time to take a break.

22         THE COURT:  Okay.  We can do that.  Folks,

23    are you ready for your afternoon recess?

24         Okay.  Keep in mind the admonition.  See

15:00:12 25    you in about 15 or 20 minutes.

1          (Recess had.)

2          (Proceedings outside the presence of the

3     jury:)

4          MR. CARNEY:  Let me try it and you can jump

15:03:37  5     in if I say it inaccurately.  The parties are stipulating

6     that Exhibit 615 reflects the 2013 annual report for SAP.

7          MR. MILLER:  And we stipulate that the

8     document you are referencing says what it says.  Period.

9          THE COURT:  But it is the annual report,

15:04:21 10     isn't it?

11          MR. MILLER:  If that's what it says, then

12     that's what it says.

13          THE COURT:  All right.

14          MR. MILLER:  I'm not even familiar with the

15:04:27 15     document.

16          THE COURT:  All right.  We're good.

17          MR. CARNEY:  Thank you, Your Honor.

18          Then I'm done with the witness.

19          (Luncheon recess had.)

15:23:01 20          THE COURT:  You may inquire.

21          MR. KELLEHER:  Thank you, Your Honor.

22          CROSS-EXAMINATION

23     BY MR. KELLEHER:

24     Q.    Good afternoon, Mr. Killingsworth.

15:23:06 25     A.    Good afternoon.

Killingsworth - Cross                714

1    Q.    Mr. Carney asked you some questions about your

2    background.  You remember that right?

3    A.    I do.

4    Q.    I would like to flush that out a little bit.  Could

15:23:18  5    you tell us your current role is at SAP?

6    A.    I will say the mouthful again.  I'm currently

7    senior director for customer relations and solution

8    experts for Business One North America.

9    Q.    In 2007, what was your role at SAP?

15:23:33 10   A.    In 2007 the official title was senior manager for

11   customer relations, but it was fairly characterized as

12   escalation managers, yes.

13   Q.    And, sir, how do those two roles relate to each

14   other?

15:23:44 15   A.    So I now manage the previous role. The senior

16   manager, I'm the senior director, so I manage that

17   individual.

18   Q.    Sir, I'm talking about your role in 2007.

19   A.    I'm sorry.

15:23:58 20   Q.    No, no.  For my next question.

21   A.    Oh, okay.

22   Q.    What did you do in that role?

23   A.    So as we discussed, one of the things that -- I

24   mean generally speaking, you know, customers get all of

15:24:15 25   their issues handled through the usual means, but when

Killingsworth - Cross                    715

1    the customer needs to speak to somebody at SAP, for

2    whatever reason, things are not handled through the

3    proper channels or there is a problem or they need to

4    speak to SAP, they would come to us and that's what our

15:24:34  5    role was.

6    Q.   How long have you worked for SAP?

7    A.   Going on nine years now.

8    Q.   And is that all with a single product?

9    A.   Yes.  Correct.  I only dealt with Business One

15:24:46  10   during that tenure.

11   Q.   Before you were employed by SAP, you had a job?

12   A.   That's correct.

13   Q.   And what was that job, sir?

14   A.   As we mentioned, I was a reseller, since about 1994

15:24:59  15   was a reseller for about 12 years.

16   Q.   When you say a reseller, sir, was one of the

17   products you resold Business One?

18   A.   It is.  We also sold other products as well.

19   Q.   So how many years in total, sir, have you worked

15:25:13  20   with Business One?

21   A.   So I've worked with Business One since around 2002,

22   2003, since it was introduced into the United States.

23   Q.   Sir, Mr. Carney asked you a series of questions

24   about e-mails that you received and things that you may

15:25:30  25   have done while you were on the project at Hodell.  Do

Killingsworth - Cross     716

1    you recall that line of questioning in general?

2    A.    I do.

3    Q.    How did you first -- when did you first become

4    familiar with Hodell?

15:25:40  5    A.    Very first became familiar in March of 2007.

6    Q.    How did you gain that familiarity?

7    A.    So I received an e-mail from our then vice

8    president, Dan Kraus, alerting me that there were

9    problems at this customer and he wanted me to investigate

15:25:56 10   further.

11   Q.    And what, sir, was specifically your assignment or

12   your mission while you were at Hodell?

13   A.    So primarily my job was to get involved, find out

14   what was going on, find out where the problems were, and

15:26:12 15   find out what, if anything, we could do to help.

16   Q.    Sir, was there a team of people from SAP involved

17   in that effort?

18   A.    There were, yes.

19   Q.    And what was your role vis-à-vis that team?

15:26:22 20   A.    So my job was primarily the liaison.  I was the

21   in-between kind of guy.  I was the one coordinating all

22   the resources, making phone calls, connecting with

23   people, coordinating the efforts from our side.

24   Q.    Very good.  So let's talk about what happened.

15:26:37 25   What was the first thing you remember doing on this

1   project?

2   A.    The first thing I remember, it was calling the

3   reseller at the time, LSi, which is usual and standard

4   for us.  The very first call we make is to the reseller

15:26:54 5   to find out what is going on.

6   Q.    Sir, when you reached out to IBIS/LSi, what did

7   they tell you?

8   A.    I believe my first conversation was with Mr.

9   Lowery, and he told me that they were experiencing --

15:27:06 10   they, the customer, Hodell-Natco, were experiencing

11   tremendous performance problems and he told me that they

12   were having a lot of issues and that the issues

13   related --  were related to Business One.

14   Q.    After you spoke to Mr. Lowery, what did you do

15:27:27 15   next?

16   A.    Well, you know, we talked about what --  what the

17   problems were and then we went through the usual process

18   of starting to maybe apply software patches and see if we

19   could find a way in the software to help alleviate some

15:27:43 20   of the problems.

21   Q.    So let me stop you there for a second.  When you

22   say software patches, can you explain to the jury what

23   you mean by that?

24   A.    Sure.  So when you like have your Apple iPhone and

15:27:53 25   gets updated, you get a new release of the operating

Killingsworth - Cross          718

1    system or whether it is Windows or pretty much any other

2    software, you get an update, affix to the release, that's

3    what these patches --  at SAP we call those patches.

4    Q.    Sir, in your role with customer relations at SAP,

15:28:12  5    was that a normal approach for you to take in dealing

6    with customer issues?  I'm talking about the software

7    patches.

8    A.    Absolutely.  Very customary for us, yes.

9    Q.    So, sir, how did the process of applying patches

15:28:25 10   work at Hodell?

11   A.    Well, quite frankly, initially, it was --  we had

12   mixed results.  Some of the first patches weren't as

13   helpful as we had hoped.  But then not long thereafter,

14   we started seeing some significant improvements.

15:28:42 15   Q.    Sir, do you have any sense for why the initial

16   patches --  patches, why you experienced what you call

17   mixed results?

18              MR. CARNEY:  Objection, Your Honor.  I

19   mean, he is a customer relations guy.

15:28:58 20              THE COURT:  Do you know the answer?  Do you

21   know why it didn't work?

22              THE WITNESS:  I do.

23              THE COURT:  Okay.  Tell us.

24              THE WITNESS:  So typically speaking, with a

15:29:05 25   patch, what we are doing is we're going after specific

1    bugs, specific problems.  Well, in a normal situation, we

2    have the luxury of time to diagnose things to figure out,

3    okay, exactly what's the problem, exactly where is the

4    issue, exactly what line of code is causing the problem

15:29:22  5    and then we can address it.

6              This situation was a little different,

7    because we were in a live environment.  The customer had

8    turned the switch, turned the software on and were

9    running their business on the software.

15:29:35 10              We didn't find out that there were these

11    problems, these performance issues until after they had

12    gone live.  Traditionally, we uncover this kind of thing

13    during testing, before they go live.  And that didn't

14    happen here.  We found out in live.  So, to answer the

15:29:52 15    question, we didn't –– we didn't have the luxury to try

16    and diagnose every little thing.  We were just trying to

17    put something out there as quickly as possible that we

18    hoped would actually help and it wasn't until later when

19    we had more time we were able to get specific.

15:30:11 20    Q.    You mentioned you find these things out during

21    testing.  Do you recall saying that?

22    A.    I do.

23    Q.    Specifically, what kind of testing?

24    A.    There is two types of testing.  There is functional

15:30:21 25    testing, or what we call end user testing and it is where

15:30:38

1    a —— where customers will test the product for

2    functionality.  You make sure it is doing what it is

3    supposed to do, make sure that their operations, their

4    daily work is doing —— that the software is performing

5    correctly.

6              The second type of testing is what we call

7    load testing.  Load testing is where you put everybody on

8    the system and you pound away at it to see if it can

9    handle the load.  And it was our understanding that there

15:30:52 10   had been some functional testing but very, very limited

11   if any load testing done.

12              MR. CARNEY:  Objection, Your Honor.

13              THE COURT:  Overruled.

14   BY MR. Kelleher:

15:31:01 15  Q.    Mr. Killingsworth, whose responsibility is it to do

16   the road testing?  Is that SAP or the reseller?

17   A.    It is the reseller and the customer together, not

18   SAP.

19   Q.    Sir, Mr. Carney showed you an e-mail from a man

15:31:16 20  named Udi Ziv.  Do you remember seeing that document?

21   A.    I do.

22   Q.    Let me show you the exhibit.  I have a binder for

23   you.

24   A.    I prefer binders.

15:31:27 25  Q.    I believe it is Exhibit 69.  Sir, it should be at

1    the first tab.  Let me know when you are there?

2    A.    I'm at the tab, but I don't have any glasses.

3    Q.    Very good.  We'll wait for you.

4    A.    I'll get there.  I'm there.

15:32:05  5    Q.    Move to page 3.  There is an e-mail in the middle

6    of the page from Udi Ziv to Dan Kraus?

7    A.    I see it.

8    Q.    Was this the e-mail that Mr. Carney asked you

9    questions about?

15:32:14  10    A.    Yes, it appears so.

11    Q.    And I think he asked you to read a sentence.  Do

12    you remember that?

13    A.    I do.

14    Q.    And the sentence he asked you to read was someone

15:32:22  15    has sold to the wrong customer, which is way above any

16    sane B1 Sweet Spot, 120 users.  Is that the sentence that

17    he asked you to read?

18    A.    That is correct.

19    Q.    Sir, do you --  when you received this e-mail, did

15:32:37  20    you agree with that sentence?

21    A.    I did not agree with that sentence.

22    Q.    Can you tell me why you did not agree with it?

23    A.    I believe that Mr. Ziv was coming to the conclusion

24    that someone had sold to the wrong customer, and I don't

15:32:52  25    think he had enough information to arrive at that

1    decision.  He knew it was 120 users, which yes, we agreed

2    was above the Sweet Spot, but that doesn't mean that it

3    is inappropriate.  It doesn't mean it can't work.  If you

4    think of a Sweet Spot, like a tennis racket, it is, it is

15:33:12  5    only this big.  The spot in the middle of the racket is

6    this big.  But the rest of the racket still can work.  He

7    is saying this information he had, 120 users, and I think

8    he knew at some point there were add-ons, he jumped to

9    the conclusion, like a knee jerk reaction, this can't be

15:33:31  10    right, this is wrong, and I totally disagreed with that.

11    Q.    Sir, Mr. Ziv, where does he work?

12    A.    He worked in --  we mentioned this in SAP labs

13    Israel.

14    Q.    And just to ask a stupid question, he was

15:33:45  15    physically located, to the best of my knowledge, in

16    Israel, the country?

17    A.    That is correct.  He was overseas.

18    Q.    Do you have any understanding of whether Mr. Ziv

19    ever visited Hodell?

15:33:53  20    A.    No.  He did not.  In fact, he was in development,

21    and we were in the field, and that was one of the other

22    reasons why I came to the conclusion that he just is

23    jumping to a conclusion without all the information, we

24    were much, much closer to the situation, and I just

15:34:09  25    didn't agree with his initial assessment here.

1   Q.    Sir, you just drew a distinction between

2   development on the one hand and the field on the other.

3              Can you give the jury, explain what you

4   meant by that to the jury?

15:34:21 5   A.    Yes, sure.  So development is the programers, the

6   guys that are in the office, writing the code.

7              We consider the people that are out in the

8   field like myself dealing with the customers, doing

9   sales, doing implementations, consulting, the people that

15:34:36 10  have their hands on the product, outside with the

11  customers in the field.

12  Q.    Thank you, sir.  I want to shift gears a little

13  bit.

14             Hodell has talked about in this case the

15:34:44 15  issue of screen locking.  Are you generally familiar with

16  what a screen lock is?

17  A.    I am.

18  Q.    Would you mind briefly explaining to the jury what

19  a screen lock is?

15:34:53 20  A.    I bet most of us have probably experienced it

21  recently.

22             On your computer or your device, whatever,

23  you are sitting there tapping, and it is not doing

24  anything.  That's a screen lock.  And that's what they

15:35:07 25  were experiencing at Hodell.

1    Q.    Thank you, sir.  I would like to show you what we

2    marked as Exhibit 258.  Can you turn to that in your

3    binder?  It should be at Tab 3.

4    A.    Yes, sir.  I'm there.

15:35:22  5    Q.    I would like to --  the e-mail on the bottom half

6    of the first page --

7    A.    I see it.

8    Q.    Do you recognize this document, sir?

9    A.    Yes, sir, I do.

15:35:33  10    Q.    Can you please tell the jury what this document is?

11    A.    Yes.  This is a rather lengthy document that I put

12    together late one night for Dan Kraus, who was the VP of

13    Business One.  It is essentially a summary of the events

14    that had happened since the beginning until this point in

15:35:54  15    time.

16    Q.    Sir, at this point in time on the project, was

17    putting together summaries like this part of your, the

18    scope of your responsibilities with SAP?

19    A.    All the time, yes, sir.

15:36:04  20    Q.    Sir, I would like to draw your attention to page

21    three.

22          Can you let me know when you are there?

23    A.    I'm there.

24    Q.    Specifically, I'm interested in the entry that

15:36:17  25    reads April 12, 2007.  I know there are two entries for

1    that date, but I'm going to be focused on the first one.

2    A.    I'm there.

3    Q.    Okay.  Are we there?  Good.  It is on the screen as

4    well.

15:36:29  5              Can you read the first entry for April 12,

6    2007?

7    A.    "April 12, 2007, no noticeable improvements in

8    performance after a few days of running with PL 20 --

9    patch level 20 --  however, locking issue seems to be

15:36:44 10   much better.  IBD, and that" --  can I define what IBD

11   means.

12   Q.    Please do.

13   A.    It means "installed base development."  We talked

14   about development a second ago.  The programers that work

15:36:58 15   on the new product that are coming out, you know, the new

16   version, the update, and there are the programers that

17   work on the product that is already in the field that,

18   is already in the hands of people.  So somebody may be

19   working on a version that has not even been released yet.

15:37:11 20   These guys, the IBD, installed base development, they are

21   the ones working on the product out in the field right

22   now.

23              So IBD --  whereas I --  apparently added

24   code that creates, quote, dumb files, whenever a database

15:37:26 25   lockup occurs, which provides significant information for

Killingsworth - Cross                726

1    future diagnosis.

2    Q.   Sir, with respect to PL 20 is that one of those

3    initial patches that you described that didn't work as

4    well as you might have hoped?

15:37:38  5    A.   Correct.  This is about a month after we got

6    involved.  Yes.

7    Q.   And specifically about the database lockups, what

8    did you mean when you wrote this entry?

9    A.   Well, what we're saying is at this point in time,

15:37:49 10    we don't see much performance improvement but the screen

11    lockups that had been reported to us, we're not seeing

12    that at this time.  It seems to have involved the

13    problem.

14    Q.   Sir, did those screen lockups ever resolve?

15:38:01 15    A.   Yes, eventually they went away completely.

16    Q.   And do you have any sense of when that was, sir?

17    A.   It would be -- I think it was in May, just a

18    few -- yes, it was.  It was in May -- May 22nd, if you

19    look at that entry.  May 22, 2007.  We also see

15:38:20 20    significant performance improvements and there have been

21    no database lockups, significant milestone.  I don't know

22    specifically between those two points if there had been

23    an occurrence or not but we know there had been no

24    reports at this time.

15:38:34 25    Q.   Thank you, sir.

Killingsworth - Cross                727

1        And in terms of your job on the project,

2   you would know, you would be the person that would know

3   whether or not there were reports of those lockups

4   subsequent.

15:38:43  5   A.    Absolutely.  Because we were checking in frequently

6   to find out what the status was, having frequent calls,

7   frequent e-mails, trying to determine where are we, are

8   things working, where are the improvements, so the answer

9   to the question is yes, sir.

15:38:55 10   Q.    Sir, you just mentioned frequent calls and frequent

11   checking in.  With whom were you referring?

12   A.    Primarily --  well, I mean, it's everybody.  In my

13   job, we were speaking with a lot of -- a lot of times we

14   were speaking with the reseller, IBIS/LSi.  Had the

15:39:12 15   occasional update with the customer, Hodell-Natco.  But

16   there was a lot of internal conversations and e-mails

17   working on the project.

18   Q.    Sir, we talked about software patches and you

19   mentioned initially there were mixed resulting.  Did

15:39:32 20   Hodell eventually start seeing good results from the

21   application of software patches?

22   A.    Yes.  In fact, the entry I just read to you -- I

23   wrote, I misspelled it, I'm not sure how I missed that.

24   It was a significant milestone because performance is

15:39:47 25   improved and I put in parentheses by customer assessment

1    50 percent or so.

2    Q.    Sir, when you wrote "customer assessment,"  who

3    were you referring to?

4    A.    Hodell-Natco had reported to us that they were

15:39:58  5    seeing an improvement of 50 percent, yes.

6    Q.    Do you have a recollection of who at Hodell-Natco?

7    A.    I believe it was Mr. Kevin Reidl.

8    Q.    Sir, I would like you to look at the next entry, on

9    May 23, 2007.

15:40:12 10    A.    I see that.

11    Q.    It says "customer states that gains are good, but

12    only another 50 percent improvement will be deemed

13    acceptable." Do you see that, sir?

14    A.    I do.

15:40:21 15    Q.    And you wrote that?

16    A.    I did.

17    Q.    And what did you mean by that, sir?

18    A.    Well, pretty much what it says, that they were

19    pleased that we had this, this improvement, but by their

15:40:34 20    assessment, they wanted to see another 50 percent before

21    they would consider it resolved.

22    Q.    Very good, sir.  I would like to talk a little bit

23    more about this patch level 25.  I would like to show you

24    Exhibit 439.  You can flip to it in your binder.  I'm

15:40:51 25    actually going to look at the third page, the e-mail that

1    is basically on the bottom of that page.  Let me know

2    when you are there, sir?

3    A.    I'm there.

4    Q.    I'm trying to wait for the monitor to catch up.

15:41:05  5    Looks like we are good.

6                Sir, do you recognize this e-mail?

7    A.    I do.

8    Q.    And can you tell me what it is?

9    A.    It is an e-mail from Dan Lowery --  can I make sure

15:41:19 10    we're talking about the same thing?

11    Q.    Sure.

12    A.    Are we at the bottom of page three, counsel?

13    Q.    Yes, we're on the bottom of page three.  The

14    document says from D. Lowery, sent Tuesday, May 27, 2007.

15:41:29 15    A.    Very good.  This is an e-mail from the reseller,

16    Dan Lowery, to some SAP people and he copied some people

17    also in his organization as well.

18    Q.    Sir, were you copied on this e-mail?

19    A.    I was, yes.

15:41:43 20    Q.    So you would have received this e-mail in the

21    ordinary course of your business at SAP?

22    A.    Yes, sir, I would have.

23    Q.    Would you have reviewed this document at that time?

24    A.    Absolutely yes.

15:41:54 25    Q.    And, sir, would you also, because of the way e-mail

1   works, also have received all of the earlier e-mails on

2   this chain?

3   A.    Yes, sir.

4   Q.    And did you review those e-mails?

15:42:05 5   A.    Yes, sir, I did.  I'm sorry, I didn't let you

6   finish.  My bad.

7   Q.    Your answer was yes, you did?

8   A.    That's correct.

9   Q.    I would like to move to the very last page, the

15:42:19 10   e-mail on that page.  It is page number seven.

11   A.    Yes, sir.  I'm there.

12   Q.    And I think just for you, for the monitor, on page

13   six we have the header.

14            Do you recognize this document, sir?

15:42:42 15   A.    I do.

16   Q.    Can you tell the jury what it is?

17   A.    In is an e-mail from Dan Lowery to Kevin Reidl --

18   to Kevin and Otto Reidl and he is copying a couple people

19   on his team.  The subject is Dan Lowery, Monday update,

15:42:58 20   and the date of it is the 21st of May, 2007.

21   Q.    Very good, sir.  Can you flip to the last page?

22   That's the substance of the e-mail, it appears like?

23   A.    I'm there.

24   Q.    Sir, it says -- I'm at the line where it says order

15:43:12 25   entry?

Killingsworth – Cross          731

1    A.    I'm there.

2    Q.    Can you read that paragraph to the jury, please?

3    A.    "Order entry.  Small orders are seeing significant

4    improvement in entry time.  Larger orders are seeing

15:43:23  5    entry per line improvements to one to two seconds, with

6    no degradation after the 43rd line, where previously the

7    system started tanking on speed.  The order process to

8    enter a 91 line order was continuous, one to two seconds

9    per line."

15:43:40  10    Q.    Sir, when you read this, what was your

11    understanding of what was being said there?

12                MR. CARNEY:  I object on hearsay grounds.

13    This is --  he has no first-hand knowledge of any of

14    this.

15:43:50  15                MR. KELLEHER:  Judge, the witness testified

16    he read the e-mails contemporaneous with receiving them

17    and I asked him his understanding.

18                THE COURT:  Right.  Go ahead.

19    A.    So, it was my understanding that there was a

15:43:59  20    significant improvement in the performance and they had

21    started seeing times of one to two seconds for entry and

22    the order process to enter a 91 line item was one to two

23    seconds so this was a significant improvement.

24    Q.    Do you see right below that where it says lockups?

15:44:21  25    A.    I do.

1    Q.    Read that?

2    A.    It appears we have no lockups in Radio Beacon or

3    the SAP application as of 3:40 eastern daylight time.

4    These were two specific areas of attention on patch level

15:44:32 5    25, significant if it –– if it is permanently resolved.

6    We did have two In–Flight lockups in process, in process

7    ticket entree, both of which are being reviewed.

8    Q.    What was your understanding when you read that?

9    A.    The understanding is that the Radio Beacon add–on

15:44:51 10   and the SAP product was not getting any more lockups but

11   they were seeing a couple of lockups in the In–Flight

12   add–on.

13   Q.    And the In–Flight, sir, do you understand who

14   developed the In–Flight add–on?

15:45:03 15   A.    IBIS/LSi.

16   Q.    Did SAP develop that add–on?

17   A.    No, sir, we did not.

18   Q.    Sir, can you move to page 5.  There is an e–mail

19   there.  Let me know when you are there.

15:45:15 20   A.    I'm there.

21   Q.    Do you recognize this e–mail, sir?

22   A.    Yes, sir, I do.

23   Q.    Did you read it when you received it?

24   A.    It was received ––

15:45:25 25   Q.    Sir, my question was whether you read this e–mail

1    when you received it?

2    A.    Oh, I'm sorry.  I didn't understand you.

3                    Yes, I did read this when I received it,

4    yes.

15:45:33  5    Q.    Who wrote the e-mail, sir?

6    A.    It was written by Jon Woodrum from LSi

7    International.

8                    MR. CARNEY:  Objection.

9                    MR. KELLEHER:  He was part of the e-mail

15:45:52 10    chain.

11                    THE COURT:  I thought he said he saw that.

12                    MR. CARNEY:  He may have seen it during the

13    course of this litigation.  He is not a party.

14                    THE COURT:  I thought he said he got it

15:46:01 15    contemporaneous with the issuance of it.  Is that right?

16                    THE WITNESS:  That is correct, sir.

17                    THE COURT:  Okay.  Go ahead.

18    BY MR. KELLEHER:

19    Q.    Mr. Killingsworth, I would like to direct your

15:46:09 20    attention to the first sentence.  It says the visit to

21    the STL store was a really good one.  Do you see that?

22    A.    I do.

23    Q.    What's the STL store?

24    A.    I believe that stands for St. Louis.

15:46:20 25    Q.    And whose store?

Killingsworth - Cross                    734

1    A.    The customer's Hodell—Natco.

2    Q.    Sir, the last paragraph on the page, it starts with

3    the words "Cain and I."  Do you see that?

4    A.    Yes.

15:46:30  5    Q.    Do you have an understanding of who Cain is?

6    A.    Cain worked for LSi.

7    Q.    And can you read that paragraph to the jury, sir?

8    A.    Cain and I were there for about 7:15 until near

9    noon.  Mostly observed deliveries and orders, the areas

15:46:45 10   reported as previously the most difficult due to

11   performance.  But we did observe and visit with Melissa

12   in accounting as well.  Cain helped her on some specific

13   questions while there.  Marty entered a 91 line order.

14   It never slowed down throughout the order and took two to

15:47:00 15   three seconds to update when finished.  They say it does

16   get slower as the day unfolds, more users, more

17   activities, but I didn't notice much difference during

18   the hours we were there.

19   Q.    Thank you, sir.  And what was your understanding

15:47:13 20   when you read this?

21   A.    Just additional confirmation that what —  what

22   they were —  what they had been reported they were now

23   seeing.

24   Q.    Thank you, sir.  Mr. Carney when he asked you

15:47:24 25   questions, he asked you questions about Exhibit 89.  Do

Killingsworth - Cross                    735

1    you remember that, sir?

2    A.    You will have to refresh my memory exactly what 89

3    was but I do remember being asked.

4    Q.    Why don't you flip to the next tab, sir, and take a

15:47:38  5    look.

6    A.    Now I remember.

7    Q.    Sir, do you recognize this document?

8    A.    Yes, sir, I do.

9    Q.    Can you explain to the jury what it is?

15:47:49  10   A.    This is an e-mail from me to the Reidl's, Mr. Kevin

11   and Otto Reidl.  I have copied some people both at SAP

12   and LSi and it is dated June 6, 2007.

13   Q.    As a general matter, what are you discussing in

14   this e-mail?

15:48:08  15   A.    Generally speaking, what I am --  well, first off,

16   in the first paragraph, I tell them they are a very

17   important customer to SAP, which was true, but I also

18   told them that there was a new version coming, version

19   2007.  It wasn't a patch.  This is a whole new version of

15:48:29  20   Business One, and it was coming very soon and we were

21   seeing on our side performance improvements anywhere

22   between 20 and 80 percent and I was telling them that

23   maybe they should consider perhaps going to that, that

24   version.  It might give them some additional relief.

15:48:42  25   Q.    Sir, I would like to direct your attention to the

1    fourth paragraph.  It starts with we do believe?

2    A.    I'm there.

3    Q.    I'm waiting for the monitor to catch up with us.

4    Thank you.

15:48:59  5          Can you tell us very briefly what you were

6    telling to Hodell with this paragraph?

7    A.    May I review it just briefly?

8    Q.    Absolutely, sir.  Take your time.

9    A.    Thank you.  I'm stressing the importance of

15:49:14 10   creating a test environment.

11          The first go-live was without a test

12    environment.  We saw what kind of problems that can --

13          MR. CARNEY:  Objection, Your Honor, he has

14    no first-hand knowledge and he mischaracterized the

15:49:27 15   testimony of every other witness who does have first-hand

16    knowledge.  He has no knowledge --

17          THE COURT:  You can examine him on it.  Go

18    ahead.

19          MR. KELLEHER:  Your Honor, might have to

15:49:37 20   strike counsel testimony.

21          THE COURT:  You know what I told you the

22    lawyers say is not evidence anyway.  Sometimes they get

23    feisty and want to say something, so you take it with a

24    grain of salt.  Okay?

15:49:51 25   BY MR. KELLEHER:

Killingsworth – Cross                    737

1    Q.    Please continue your answer.

2    A.    I got distracted.  Can you ask the question again?

3    Q.    I did, too.  The fourth paragraph starts with we do

4    believe.  I asked you what you meant when you wrote that?

15:50:02  5    A.    Oh.  The testing.

6              So we were stressing the importance of a

7    test environment.  We are saying that yes, we're seeing

8    2007 is a big improvement on our side, we built a faster

9    machine.  And we think you can benefit from it.  But

15:50:18 10    before you just upgrade your current system, put it in a

11    test environment and make sure you see the same kind of,

12    you know, improvement we are seeing.  We're telling them

13    to be cautious.

14    Q.    Sir, do you know whether Hodell ever decided to

15:50:33 15    upgrade to version 2007?

16    A.    To the best of my knowledge, they never did.

17    Q.    Sir, how long would it take, if you know, Hodell to

18    upgrade to version 2007?

19    A.    I can't say with specificity, but it would take in

15:50:47 20    the order of hours and days in order to get that done.

21    Q.    And do you know why?  And only if you know, sir.

22    Let me finish.  Do you know why Hodell didn't upgrade to

23    version 2007 like you recommended?

24    A.    To the best of our knowledge it was because the

15:51:06 25    In-Flight add-on wasn't compatible with 2007, so if they

Killingsworth - Cross                     738

1    go to 2007, they would lose the add-on that they needed.

2    Q.    Sir, and forgive me for this question, but were you

3    trying to mislead Hodell when you sent this e-mail?

4    A.    Absolutely not, sir.  We all were trying to do

15:51:29  5    everything possible to help them find some relief.  We

6    looked at every option.  We were exploring different

7    avenues.  We were considering patches.  We were

8    considering what we could do with the add-on.  We were

9    considering all available options to try to get them some

15:51:45 10    relief and this was one option, and in no way were we

11    trying to mislead them.  It is a little confusing.  I

12    don't see how this could be misleading.

13    Q.    Sir, did anyone from your team ever go out to

14    Hodell and analyze the performance results that they were

15:52:00 15    actually experiencing?

16    A.    Yes, sir.  Twice.

17    Q.    Sir, I would like to talk to you about the first

18    one of those two if you don't mind?

19    A.    Okay.

15:52:09 20    Q.    I would like to show you what I marked as Exhibit

21    901.  It is the next tab.

22    A.    I'm there.

23    Q.    Do you recognize this document?

24    A.    Yes, sir, I do.

15:52:18 25    Q.    Can you please tell the jury what it is?

Killingsworth - Cross                    739

1    A.    This is an e-mail from a gentleman on our team

2    named Gadi Barnea.  He was a solution expert, and Manfred

3    Weis, who at the time was his manager.  It is dated July

4    8, 2007.

15:52:41 5    Q.    And you received this e-mail, sir?

6    A.    I did.

7    Q.    And when did --  when did Mr. Barnea send this to

8    you?

9    A.    On July 8th, early in the morning.

15:52:53 10    Q.    And this was after his visit to Hodell-Natco?

11    A.    Yes.  I'm sorry, this was after he had been on

12    site, and the contents of this e-mail is his report based

13    on his assessment when he was on site.  That is correct.

14    Q.    Sir, was it part of your duties at the time to

15:53:08 15    receive and analyze reports like this from members of

16    your team?

17    A.    All the time.

18    Q.    And specifically on this project with Hodell, was

19    that part of your job?

15:53:17 20    A.    Absolutely.  Yes, sir.

21    Q.    Sir, I would like to take a look at some of the

22    things that Mr. Barnea told you in this e-mail.  Can you

23    look down to the line where it says to give you the

24    underlying result first?

15:53:30 25    A.    I see it, yes.

1    Q.    I'm just going to wait until the monitor catches up

2    with us.

3    A.    Okay.

4    Q.    It says "to give you the underlying result first, I

15:53:39  5    can break down the cause of the performance issues into

6    three different categories.  80 percent of the issues

7    results of the In-Flight add-on or DI API issue.  10

8    percent from SAP core product.  10 percent from Hodell

9    network and hardware configuration."

15:53:58 10              Do you see that, sir?

11    A.    Yes, sir.

12    Q.    What was your understanding of what Mr. Barnea was

13    conveying to you when he wrote those words?

14    A.    My understanding was a vast majority of the

15:54:13 15    performance problems they were experiencing was not the

16    Business One core product.  Rather, it was with the

17    In-Flight add-on, the DI API and the Hodell network.

18    Q.    Sir, I would like you to direct your attention to a

19    sentence later.  It says "it is not only" that's where it

15:54:29 20    starts.  Do you see that?

21    A.    Yes.

22    Q.    Can you read that very small paragraph to the jury?

23    A.    It is not only that the majority of the users are

24    driven by the add-on.  These are also the items with the

15:54:40 25    highest priority since it affects each document.

Killingsworth - Cross                741

1    Q.    Sir, what was your understanding, if any, when you

2    read that line?

3    A.    That again, Mr. Barnea is reiterating that the

4    biggest problems he saw were with the add-on, not with

15:54:53 5    the core product.

6    Q.    Sir, the next two sentences, could you read those

7    to the jury?

8    A.    As an example -- is that the sentence?

9    Q.    Yes.

15:55:03 10   A.    As an example, we run a test for adding a delivery

11   with 100 lines.  It took 25 seconds without the add-on

12   but once we started, the processing time jumped to more

13   than 15 minutes.  Updating a sales order with 296 line

14   items took 80 seconds without the add on and almost 13

15:55:21 15   minutes with it.

16   Q.    And, sir, the add-on that we're talking about here,

17   that's the In-Flight add-on, right?

18   A.    Yes, sir, that's correct.

19   Q.    And what was your understanding when you read these

15:55:29 20   two sentences?

21   A.    Well, Mr. Barnea, in order to try to diagnose where

22   the problem was, turned the add-on off.  He said we won't

23   have the software turn on the add-on software.  When he

24   ran the test with the same exact process with the add-on

15:55:45 25   turned on, in one case it was like, what, 30 times

1    longer, and in another case, it was -- I can't do the

2    math that fast, but it was 80 seconds without and 13

3    minutes with, a significantly longer amount of time with

4    it on.

15:56:00   5    Q.    Sir, these statements that we just read, were they

6    based on actual tests that Mr. Barnea did while he was on

7    site at Hodell?

8    A.    Absolutely, yes.

9    Q.    Sir, the third sentence from the bottom, it says "I

15:56:13  10    have attached the spreadsheet with the full test

11    results."  Do you see that?

12    A.    Yes, sir, I do.

13    Q.    Do you remember reviewing that spreadsheet when you

14    received this e-mail, sir?

15:56:22  15    A.    Yes, sir, I do.

16    Q.    Can you flip to the third and final page of this

17    exhibit?

18    A.    I'm there.

19    Q.    I'm waiting for the screen.  901.3.

15:56:48  20              Can you blow that Excel up?

21              Sir, is this the spreadsheet that you were

22    just talking about?

23    A.    Yes, sir, it is.

24    Q.    And can you please tell the jury what we are

15:56:58  25    looking at here?

1    A.    Well, if you look at the far left column, Column A,

2    he says at all times are in seconds here, but what he is

3    looking at down the column are transactions.  These are

4    the types of transactions this customer and other

15:57:13  5    customers might do in their business, so these are the

6    transactions.

7                Then if you go over to the other columns,

8    these are tests in various configurations and using

9    different, like with clients and without the clients,

15:57:24  10    with Citrix, without Citrix, so he is just documenting

11    his test results.

12    Q.    I just want to slow this down just briefly, so that

13    everyone in the room can understand, because my head

14    swims sometimes.

15:57:35  15    A.    Sorry.

16    Q.    The first column, Column A, do you see that?

17    A.    I do.

18    Q.    Am I correct that these are actions that an Hodell

19    employee might take on the computer system?

15:57:48  20    A.    That is correct.

21    Q.    And that these were actually actions that Hodell's

22    employees did take when Mr. Barnea ran his tests?

23    A.    That's correct.

24    Q.    Columns F and G, you mentioned those.  Do you see

15:58:02  25    them?

1    A.    Yes.

2    Q.    Let's start with Column F.

3    A.    I'm there.

4    Q.    The numbers in this column, those are measured in

15:58:09 5    seconds?

6    A.    That is correct.

7    Q.    And they correspond to the item or the action that

8    the Hodell employee would take in Column A.  Correct?

9    A.    That is correct.

15:58:20 10    Q.    So just, for example, where Line 3 -- let's go

11    actually to -- Line 3 is fine.  It is the first one.

12                Tab out of a line, 296 lines.  That is what

13    the employee at Hodell was actually doing when Mr. Barnea

14    got these results.

15:58:36 15    A.    Well, Mr. Kelleher, let me be clear.

16                I don't know for sure at this point if he

17    is doing this transaction himself.  It is possible that

18    Mr. Barnea was executing this transaction, but he may

19    also have been observing someone do it.  Either way it

15:58:53 20    was on the Hodell system.

21    Q.    What matters is the action was taken on the system?

22    A.    That's correct.

23    Q.    And it's representative of an action that a Hodell

24    user would take?

15:59:00 25    A.    That's correct.

Killingsworth – Cross                745

1          MR. CARNEY:  Objection, Your Honor.

2          THE COURT:  Overruled.

3    BY MR. KELLEHER:

4    Q.    Sir, Column F, if you could look at that.

5    A.    I'm there.

6    Q.    These are response times in seconds?

7    A.    I'm there.

8    Q.    Is this with or without the In-Flight add-on

9    running?

10   A.    These times in Column F are with the In-Flight

11   ad-on running.

12   Q.    And in Column G, we are looking at the same

13   actions, but without the In-Flight add-on running?

14   A.    That is correct, sir.

15   Q.    Sir, could you just, in laymen's terms, tell the

16   jury what the significance is, if any, of the comparison

17   between with In-Flight and without In-Flight?

18   A.    In a few cases, there is very, very little

19   difference.  In a whole bunch of other cases, it is a lot

20   slower with In-Flight turned on.

21   Q.    So, for example, sir, can I direct you to Line 7?

22   A.    I'm there.

23   Q.    What was the action that is being analyzed there?

24   A.    Updating a sales order with 296 lines.

25   Q.    How long did it take with In-Flight running?

1    A.   766 seconds.

2    Q.   How long did it take without In-Flight running?

3    A.   100 seconds.

4    Q.   Sir, can I direct you to line 14?

16:00:16 5    A.   I'm there.

6    Q.   What action are you looking at there?

7    A.   Adding a delivery with a hundred lines.

8    Q.   How long did that take with In-Flight running?

9    A.   900 minutes.  I'm sorry.  Seconds.  900 seconds.

16:00:28 10   Q.   Very good.  How long did that take without

11   In-Flight running?

12   A.   28 seconds.

13   Q.   Can you flip back to the e-mail, sir, on page

14   number one?

16:00:44 15   A.   Yes, sir, I'm there.

16   Q.   To orient us, this is the summary of Mr. Barnea's

17   visit to Hodell?

18   A.   Yes, sir, it is.

19   Q.   The paragraph that starts "I can also say that HN

16:00:54 20   network,"  do you see that?

21   A.   I do.

22   Q.   Can you read that to the jury?

23   A.   I can also say that the Hodell-Natco network has an

24   effect on the overall performances.  Out of their 7

16:01:07 25   Citrix servers, four are slower.  An example would be

1    changing drawers on the pick list on one server, 152,

2    that's the server number.  It took 54 seconds.  While the

3    same task over a different server, which is the server ID

4    was 158, took 13 seconds.

16:01:27  5    Q.    So there was some technical talk, sir.  What is

6    Mr. Barnea saying to you here?

7    A.    At a high level, the hardware was also a

8    significant contributor to the performance because, one,

9    when they ran the system or ran the test through one

16:01:44  10   server, they got one time and when they ran the same

11   exact transaction through another Citrix server, it was

12   much slower.

13   Q.    Sir, Citrix server, again, at a very high level,

14   what is that?

16:01:56  15   A.    It is a way for a user to connect to the software.

16   I can say it very simply or I can get a little deeper if

17   you wish.

18   Q.    Actually, I want you to go even higher.  So are we

19   talking about computer hardware?

16:02:10  20   A.    That's what we're talking about, yes, sir.

21   Q.    Thank you.  Sir, a few moments ago we spoke about

22   patch level 25.  Do you remember speaking about that with

23   me?

24   A.    Yes, sir I do.

16:02:24  25   Q.    Was that the last patch SAP provided to Hodell?

Killingsworth - Cross                                    748

1    A.    No, sir, it was not.

2    Q.    I would like to show you what we marked as Exhibit

3    307.

4    A.    I'm there.

16:02:34  5    Q.    And I apologize in advance.  The words are just

6    really small.

7    A.    I have my glasses.

8    Q.    Do you recognize this document, sir?

9    A.    Yes, sir, I do.

16:02:43 10    Q.    Can you please tell the jury what it is?

11    A.    So this is an e-mail to me, and a bunch of people

12    at SAP, and --  let me see.  And some other people are

13    copied, from Mr. Joe Guagenti, dated September 14, 2007.

14    Q.    Sir, who, if you know was Joe Guagenti?

16:03:06 15    A.    He was an employee of LSi, I believe.

16    Q.    Do you know what Joe Guagenti did at LSi?

17    A.    He was a technical person.  I believe he wrote code

18    and did other technical things.

19    Q.    And when you say wrote code, do you have any

16:03:19 20    understanding of which application, if any, he wrote the

21    code for?

22    A.    Yes.  I believe he worked on the In-Flight add-on,

23    yes.

24    Q.    Sir, I would like to direct your attention to about

16:03:29 25    two-thirds of the way down the first paragraph.

Killingsworth - Cross                    749

1    A.    I'm there.

2    Q.    It says "we then installed."  Do you see that, sir?

3    A.    Hang on just a second.  Yes, I'm there.

4              No, hang on.  I just saw something else.

16:03:45  5    Q.    Let me know when you are there.

6    A.    I'll find it.

7    Q.    Check out the screen --

8    A.    I have it now.  Okay.  Sorry about that.

9    Q.    Sir, it says, quote, "we then installed PL-29."

16:04:04 10   Sir, is PL-29, what is that?

11   A.    Patch level 29.  It is a newer version, newer patch

12   after 25.

13   Q.    That's a software patch provided by SAP to Hodell?

14   A.    I'm sorry.  Yes.

16:04:16 15   Q.    We then installed patch level 29 over the existing

16   patch level 25 and seen a 500 percent plus in performance

17   in the sales order.  Hodell also seen this performance

18   increase in their operations.  This performance increase

19   was a direct result of the new set of DLLs provided in

16:04:42 20   patch level 29.

21              Do you see that, sir?

22   A.    Yes, sir, I do.

23   Q.    What, understanding did you have when you read this

24   passage?  At the time?

16:04:55 25   A.    Patch level 25 was good.  It provided a significant

Killingsworth - Cross                    750

1   improvement in what they were seeing.

2   Q.    And how about patch level 29, sir?

3   A.    I'm sorry.  I meant to say 29.  Patch level 29 was

4   a very good improvement over 25, and we had already seen

16:05:14  5   some improvements in 25.

6   Q.    Sir, did you yourself ever go out to Hodell to see

7   what was going on there?

8   A.    Yes, sir, I did.

9   Q.    Do you have a recollection of when that was?

16:05:33 10   A.    That would have been in October of that year.

11   Q.    Did you go by yourself, sir?

12   A.    No, sir, I did not.

13   Q.    Who went with you?

14   A.    I took Eddie Neveux, one of our solution

16:05:44 15   architects.  We talked about him earlier.

16   Q.    What was the purpose of your visit, sir?

17   A.    The purpose of our visit was to --  well, I wanted

18   to meet the Reidl's in person, to begin with.  In my role

19   in customer relations, I wanted to visit with them in

16:06:02 20   person.  We had spoken on the phone but I wanted to visit

21   with them and let them know we were doing everything we

22   could.  But I also wanted to bring Eddie Neveux because

23   we were seeing progress but I wanted Eddie, a technical

24   guy who knows a lot about hardware, he knows a lot about

16:06:19 25   software and development, and I wanted him to be

Killingsworth - Cross          751

1    physically present and see for himself what was going on

2    and see where we could find some additional improvement.

3    Kind of do another assessment like Mr. Barnea did and see

4    what we could do to help.

16:06:32  5    Q.    And Eddie Neveux, was he on your team of people

6    that were helping you at Hodell?

7    A.    Yes, sir, he was.

8    Q.    Sir, I would like to show you Exhibit 809.

9    A.    I'm there.

16:06:44  10    Q.    Do you recognize this document?

11    A.    I do.

12    Q.    Can you tell the jury what it is?

13    A.    Excuse me.  This is an e-mail from --  well, at the

14    top or do you want me to --

16:06:57  15    Q.    That's a great question.  Let me tell you exactly

16    where I want you to look.

17    A.    Okay.  Sorry.

18    Q.    Can you look at the second page?

19    A.    Second page?

16:07:04  20    Q.    There is an e-mail that looks like it runs a couple

21    pages.

22    A.    So this is an e-mail from Eddie Neveux, it is dated

23    October 17, 2007, he is sending it to me, but he is

24    copying several people inside of SAP.  And the subject is

16:07:20  25    Hodell-Natco visit.  This a summary of his findings

1    and his assessment from going on site to Hodell.

2    Q.    And, sir, did you request Mr. Neveux prepare this

3    summary for you in the ordinary course of your duties for

4    SAP on the Hodell project?

16:07:35 5    A.    Absolutely.  Yes.

6    Q.    Sir, I would like to direct your attention to the

7    last paragraph there.

8    A.    I'm there.

9    Q.    It is a pretty long paragraph, so I'm not going to

16:07:48 10   ask you to read it into the record.  But could you let

11   the jury know what you understood when you read that?

12   A.    Let me briefly reread it just to make sure I get a

13   good sense.

14   Q.    Sure, sir.

16:08:02 15   A.    Essentially, he is saying he was there to observe.

16   One of the things he did was not only take visual

17   observations but also he used some tools to assess the

18   performance.

19   Q.    And what, if anything, was your understanding of

16:08:40 20   what results he got from those tools?

21   A.    He states here "also to note, the worst performance

22   that I saw with respect to the logs generated by the

23   Business One .net profiler tool when doing order entry at

24   Hodell-Natco was a nine-second delay with respect to a

16:08:54 25   function entering the sales order using SAP Business One

Killingsworth – Cross                          753

1    and In—Flight."

2    Q.    Sir, what was your understanding when you read

3    that?

4    A.    Well, my understanding was the worst thing he saw

5    was nine seconds.

6    Q.    Sir, you have been working with business software

7    for how long?

8    A.    22 years.

9    Q.    And Business One for how long?

10   A.    That would be now 12 years.

11   Q.    So in the context of your 22 years experience with

12   business software, is a nine second delay, can you tell

13   the jury whether that is good or bad or neither?

14   A.    So if that's the worst delay you see, in other

15   words, you are seeing a whole list of delays, you are

16   seeing a one—second delay —— you know, when you click

17   okay or click enter, there is always going to be a delay.

18   It is a latency.  You have to wait for the second to get

19   pushed and the screen will repaint.  Half a second, two

20   seconds, no big deal.

21              If the worst thing he is seeing in the list

22   of delays is nine seconds, that seems very reasonable to

23   me.

24   Q.    And, sir, so we're clear about this, because I —— I

25   don't know that everyone uses business software.  When we

1    say an action took a couple seconds, we're not talking

2    about striking a key and seeing a character appear on the

3    screen, are we?

4    A.    No.  We're typically --  what we are typically

5    seeing is when you hit the "okay" button or the "accept"

6    button and there is a delay, typically.

7    Q.    So when you enter information into the system and

8    you push enter or submit, right?

9    A.    Correct, yes.

10   Q.    Sir, I would like you to take a look at the second

11   page.

12   A.    I'm there.

13   Q.    Again, I don't want to read all of this, but did

14   you have any understanding when you read this --  these

15   words on this page of whether Mr. Neveux had any

16   conclusions about the In-Flight application?

17   A.    He came to the conclusion, if you look at the top

18   bullet, it summarizes it.  He assessed that there was

19   still an excessive amount of talk or communication

20   between the In-Flight add-on and SAP Business One and to

21   note the communication is specifically with respect to

22   marketing documents --  meaning like sales orders and

23   sales quotes --  but other areas that were mentioned were

24   purchase orders as well.

25   Q.    At the bottom of the paragraph you read from, it

1   says, quote, others on my team.  Do you see that?

2   A.    The paragraph I just read?  I do further down.

3   Yes.

4   Q.    Do you see it?

16:11:36 5   A.    I do.

6   Q.    It says others on my team as well as myself have

7   looked at the logs generated by the In-Flight add-on.

8   Let me stop there.  Do you have an understanding, sir, of

9   what he means by looked at the logs generated by the

16:11:49 10   In-Flight add-on?

11   A.    I'm not a developer.  So this would be very high

12   level, but what he is talking about is when --  you can

13   install software that will generate a log or a document.

14   It is just a document that you can read, it is text, and

16:12:05 15   it will give you information about the transactions that

16   are going on.

17   Q.    Thank you, sir.  It continues, "and believe that

18   there simply may be a need for LSi to" quote, rearchitect

19   their code.

16:12:19 20                    Did you have an understanding of what he

21   meant when he said that to you?

22   A.    Again, I want you to talk to Mr. Neveux

23   specifically.  He is saying the programming in the

24   In-Flight add-on needed to be worked on, needed to be

16:12:35 25   improved.  That's what he was saying.

1    Q.    Sir, I would like you to look at Exhibit 262.

2    A.    I'm there.

3    Q.    And I'm going to direct your attention to the

4    second e-mail --  excuse me, the e-mail on the second

16:12:52  5    page.

6    A.    I'm there.

7    Q.    Do you recognize this document, sir?

8    A.    I do.

9    Q.    Can you tell the jury what it is?

16:13:00  10    A.    So this is an e-mail from me to Michael Sotnick,

11    who at the time was the manager for Mr. Dan Kraus.  He

12    also copies Suzanne Fuerst and a gentleman by the name of

13    Dipin Shah.

14    Q.    Sir, under the summary tab, the second sentence is

16:13:18  15    Eddie Neveux has made recommendations, some implemented

16    by LSi, some not.  Do you see that?

17    A.    Yes, sir, I do.

18    Q.    Do you have any understanding of what you meant

19    when you read it?

16:13:28  20    A.    Yes.  It means that he had given IBIS/LSi a list of

21    recommendations that he suggested they should do to their

22    In-Flight add-on and he is reporting here that they had

23    done some but not all of his recommendations.

24    Q.    Sir, at the bottom of the page, underlined, it says

16:13:44  25    "evaluation of In-Flight code by Eddie Neveux."  Do you

1    see that?

2    A.    Yes, I do.

3    Q.    Flip to the second page.  The bullets continue.

4              I want you to look at the bullet that

16:13:58  5    starts "while the code itself."  Do you see that?

6    A.    I do.

7    Q.    Do you have any understanding of what --  what was

8    your understanding when you read this?

9    A.    Again, I'm going to say I'm not a developer, so

16:14:12 10    I -- I can't speak with developer terms.  However --

11    Q.    Only if you know, sir.

12    A.    Okay.  What I do know is what he is saying here is

13    that the language that was used was fine language, but it

14    was constructed poorly.  It had a bad foundation.  And

16:14:28 15    there was a problem with the way the In-Flight add-on had

16    been --  it is like if you build something on a bad

17    foundation to begin with, no matter what you put on top

18    of it is not going to be stable and that's what I think

19    he was trying to communicate.

16:14:40 20    Q.    Sir, the next underlying topic says "evaluation of

21    IFV" that is In-Flight.  Evaluation of In-Flight code by

22    Apollo Consulting.  Do you know anything about that?

23    A.    Yes, sir, I do.

24    Q.    Can you tell the jury about that?

16:15:01 25    A.    So one of the --  like I said, I want to say this

Killingsworth - Cross                              758

1    again.  We tried everything we could.  We wanted to help

2    in this situation.  We looked at our own software.  We

3    looked at their hardware.  We wanted to look at their

4    software.  We wanted to evaluate the In-Flight add-on.

16:15:18  5    We offered to do this.

6                    We had great difficulty obtaining the

7    In-Flight software from IBIS/LSi.  I can't say why, but

8    we asked numerous times for them to give us the code.

9    We'll look at it for you.  We'll examine it.  We'll see

16:15:35 10    if there are some suggestions that we can make that might

11    help you.

12                    We never got the whole package, so we said

13    look, if you are really concerned about SAP having your

14    product, then how about we hire a third-party company

16:15:49 15    that does this?  They have successful add-ons.  They are

16    what we would call experts.  So why don't we hire them.

17    We offered to pay.  We suggested we would pay for their

18    assessment of the software, and that company was Apollo.

19    Apollo Consulting.

16:16:05 20    Q.    Thank you, sir.  Did IBIS/LSi ever give you all of

21    the In-Flight code?

22    A.    Only a small piece of it.  Apollo never got the

23    entire program.

24    Q.    Sir, how long did you work on the Hodell project?

16:16:18 25    A.    Well over a year.

Killingsworth - Cross                    759

1    Q.    And when --  just around, if you remember, did you

2    stop?

3    A.    I believe it was early --  wait.  Let me think

4    about this.  It was probably about the same time in 2008.

16:16:34  5    March, 2008.  I don't remember specifically.  I'm sorry.

6    Q.    So do you mean 2009?

7    A.    Yes.  March, 2009.  Yes.  I'm sorry.  I'm getting

8    my dates wrong.

9    Q.    Sir, can you take a look at Exhibit 109?

16:16:57  10    A.    Yes, sir.  I'm there.

11    Q.    Do you recognize this document?

12    A.    Yes, sir, I do.

13    Q.    Can you tell the jury what it is?

14    A.    This is an e-mail from, again, Michael Sotnick, who

16:17:18  15    was vice president over Dan Kraus at the time, to Kevin

16    and Otto Reidl, and he is including Dan Kraus as well as

17    Jon Woodrum from LSi.  It is dated November 16, 2007.

18    Q.    Sir, I would like to direct your attention to the

19    penultimate paragraph there.  It starts with "finally as

16:17:42  20    we talked."

21    A.    I see that.

22    Q.    What was your understanding of what was being

23    written here?

24    A.    So what Mr. Sotnick is saying is that he had had

16:17:53  25    conversations with Hodell-Natco and what he is saying

Killingsworth - Cross                760

1     here is that one of the options that they can consider is

2     to look at other SAP solutions.  Business One is, you

3     know, generally our lowest end business management

4     software.  It is a great product.  It does really, really

16:18:17   5     well, but we also have some other products in our

6     portfolio that are designed for even larger companies and

7     what he is suggesting here is that if they want to

8     continue to -- I mean, let me back up.

9               We are still doing everything we can at the

16:18:33  10     time to make sure that Business One can work, and quite

11     frankly, I still believed that it could.  I felt like

12     Business One was still going to be the right solution for

13     these guys and it would work.

14               But Mr. Sotnick is telling them guys, if

16:18:45  15     this is not the direction you want to go, we have other

16     options.  We are more than willing to let you consider

17     our other options and SAP was saying we'll even give

18     significant financial consideration if that's the

19     direction you want to go.

16:19:00  20     Q.    Sir, did you or, to your knowledge, anyone else at

21     SAP ever tell Hodell to abandon Business One?

22     A.    No, never.

23     Q.    Sir, we talked a lot today about performance

24     issues.  Did the performance issues at Hodell ever

16:19:18  25     resolve?

Killingsworth - Cross          761

1    A.    Well, what we saw and this is consistent from the

2    time Mr. Barnea went and the time Mr. Neveux went.  What

3    we observed is that the performance was not that bad.

4    However we were being told by the customer that it was

16:19:38 5    still not acceptable, still too slow, still looking for

6    improvement.  So we continued our effort.  Generally

7    speaking, what we were observing is not as bad as what we

8    were being told.

9    Q.    Sir, do you have an understanding of whether Hodell

16:19:53 10    could have continued on Business One and had success?

11              MR. CARNEY:  Objection.

12              THE COURT:  Overruled.

13    A.    It is my belief we could have absolutely continued

14    on this and been successful, yes.

16:20:04 15    Q.    Sir, did SAP, to your knowledge, ever come to an

16    official conclusion as to the cause of the performance

17    problems?

18    A.    Officially, no.  No, sir, we never did.

19    Q.    And do you have an understanding of why no official

16:20:14 20    conclusion was drawn?

21    A.    I would suggest primarily speaking because we never

22    got our hands on the In-Flight add-on to assess it

23    properly.  And so we couldn't come to the conclusion.  We

24    found some areas where we could improve some things, we

16:20:28 25    could make our, you know --  so forgive me, can I explain

Killingsworth - Cross                          762

1    something to the jury, just briefly?

2    Q.    Yes.

3    A.    Okay.  There is the Business One core product, all

4    right?  It is just a standard business operating

5    software.  Then you have the In-Flight add-on over here.

6    And between the two there is this pipe, called a DI-API.

7    You probably termed that term.  All it is is a pipe.  It

8    is a piece of software that lets the core Business One

9    talk to the other Business One.  Now, again, I'm not

10   technical.  So I'm doing it in very plain terms.

11              That pipe worked for a lot of people.

12   There were a lot of add-ons, that the pipe was fine for a

13   lot of people.  The core Business One product worked.

14              What was happening, we read this, but what

15   was happening was that the In-Flight add-on, while, you

16   know, it may be functionally good, it was just trying to

17   shove too much stuff down the pipe, and it was causing

18   performance problems.  So what did we do?  We said what

19   can we do to improve the pipe, let's see if we can make

20   it a bigger, stronger, better pipe and that's what we

21   did.

22   Q.    Sir, is it your understanding that there is a way

23   to develop In-Flight that doesn't push so much

24   information through the pipe?

25   A.    Based on the experts --  not my assessment but

Killingsworth - Cross          763

1    based on the expert's assessment --

2              MR. CARNEY:  Objection, Your Honor.

3              THE COURT:  Objection sustained.

4    BY MR. KELLEHER:

16:22:03 5    Q.    Sir, in this case, Hodell is saying that SAP --

6    and forgive me.  They are saying that SAP tried to

7    conceal information from Hodell.

8              Do you have any response to that?

9    A.    That is absolutely false.  We did not try to

16:22:21 10   conceal anything from them.

11   Q.    And, sir, specifically, why do you say that?

12   A.    We did everything we could for this customer.

13   There were a lot of people that were very involved in

14   this.  We answered every e-mail, took every phone call.

16:22:37 15   We responded.  We put people on site.  We weren't

16   concealing anything.  Were we working feverishly behind

17   the scenes, sure.  But concealing stuff?  No.  Absolutely

18   not.

19   Q.    Sir, did you have a motive to trick Hodell with

16:22:53 20   Business One?

21   A.    No, sir.

22             MR. CARNEY:  Object.  Objection, Your

23   Honor.

24             THE COURT:  Overruled.

16:22:58 25   A.    No.  We had zero motive to trick Hodell or any

1    other customer for that matter.

2    Q.    Why do you say that, sir?

3    A.    We wanted to be successful.  If you trick a

4    customer, they are never going to be successful with the

16:23:12  5    product.  If you tell them something and it doesn't work

6    and you trick them, the program, the software is not

7    going to work.

8              We want the customer to be successful.  We

9    have a database of success stories.  We use those success

16:23:24  10    stories to sell more software.

11              If you go around tricking customers and

12    misleading them, you are not going to have a database of

13    successful customers and you are not going to be able to

14    market.

16:23:35  15    Q.    Sir, does SAP sell larger software products than

16    Business One?

17    A.    We do.  And if we were tricking one, why wouldn't

18    we trick them to go with one of the more expensive

19    products?

16:23:47  20    Q.    Sir, we talked a lot this afternoon about the

21    efforts that you and your team put into the project at

22    Hodell after go-live to address the issues that they were

23    reporting.  Can you give the jury a sense of how many

24    hours you worked?

16:24:10  25    A.    Forgive my French, but we worked our asses off.  We

Killingsworth - Cross                765

1    really did.  A lot of people did.  I just said we wanted

2    this customer successful, and I myself alone, if you were

3    to tally up all of the hours in the course of this time,

4    from the moment I found out about it, it is in the

16:24:30  5    hundreds if not approaching thousands of hours over the

6    course of time.  This was a time-consuming thing for me.

7    Stayed up late nights creating reports.  Talking to

8    people overseas in different time zones.  And we have

9    dozens of people at SAP that are all -- they all have

16:24:49 10    their hands on this trying to find a remedy.

11    Q.    Sir, the effort that you just described, your

12    effort and the members of your team, did SAP charge

13    Hodell for any of that?

14    A.    No, sir.  This was not -- this was not anything we

16:25:04 15    would bill for, no.

16    Q.    Sir, do you know, and only if you know, how much

17    money SAP made from this sale?

18    A.    I can round it to less than $150,000.

19    Q.    Sir, if you know, did SAP spend more money than

16:25:20 20    that trying to help Hodell?

21    A.    I can't say that quantitatively sir.  I can say

22    that based on my time and my salary alone, absolutely, we

23    spent a whole lot more than that.

24              MR. KELLEHER:  Your Honor, I do have

16:25:35 25    further questions but this is a natural breaking point.

1    I don't know if you would like me to proceed.

2              THE COURT:  I don't know.  Let's ask the

3    people who care.

4              Okay.  Now, tomorrow, you are allowed to

16:25:47  5    bring your coffee in.  I got it approved by the girls.

6    They yelled at me a little bit for interfering in their

7    responsibility, but nonetheless, if you want to bring

8    coffee in in the morning, you can.  Okay?

9              So, thank you for your patience today and

16:26:04  10   your attention.

11              Same time, same station.  What floor?

12              THE JUROR:   We'll be on L1.

13              THE COURT:  Okay.  8:15.  See you then.

14              (Proceedings adjourned at 4:26 p.m.)

15                   -   -   -   -

16

17

18

19              C E R T I F I C A T E

20       I, Judith A. Gage, Federal Official Court Reporter,
     certify that the foregoing is a correct transcript from
21   the record of proceedings in the above entitled matter.

22              Judith Gage              June 17, 2015

23   _____
     Judith A. Gage                          Date

24

25