1           IN THE DISTRICT COURT OF THE UNITED STATES
                FOR THE NORTHERN DISTRICT OF OHIO
2                       EASTERN DIVISION

3

HODELL-NATCO INDUSTRIES, INC.,
4                                       08CV2755

            Plaintiff,
5

        vs.                             June 18, 2015
6                                       8:30 a.m.

7   SAP AMERICA, INC., ET AL.,

                                        Volume 4
8           Defendants.                 Pages 767 - 1036

9

10

            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
11      BEFORE THE HONORABLE DONALD C. NUGENT
            UNITED STATES DISTRICT JUDGE
12                  AND A JURY

13

14

15

16

17

18

19

20

21

22

23

24

25

1    APPEARANCES:

2

3    For the Plaintiff:          Christopher J. Carney, Esq.
                                  Sharon A. Luarde, Esq.
                                  P. Wesley Lambert, Esq.
4                                 Brouse McDowell
                                  600 Superior Avenue East
5                                 Suite 1600
                                  Cleveland, Ohio    44114
6                                 216-830-6830

7

     For the Defendants:         Gregory J. Star, Esq.
8                                 Michael John Miller, Esq.
                                  Joseph M. Kelleher, Esq.
9                                 Alex H. Hayden, Esq.
                                  Drinker Biddle & Reath
10                                One Logan Square
                                  18th & Cherry Streets
11                                Philadelphia, PA    19103
                                  215-988-2734

12

13

14

     Official Court Reporter:    Susan K. Trischan, RMR,CRR,FCRR
15                                7-189 U.S. Court House
                                  801 West Superior Avenue
16                                Cleveland, Ohio  44113
                                  216-357-7087

17

18

19

20

21

22

23

24   Proceedings recorded by mechanical stenography;
     transcript produced by computer-aided transcription.
25

<u>THURSDAY, JUNE 18, 2015,  8:35 A.M.</u>

THE COURT:  Good morning, ladies and
gentlemen.

THE JURORS:  Good morning.

THE COURT:  You may continue.

CROSS-EXAMINATION OF PAUL KILLINGSWORTH (RESUMED)

BY MR. KELLEHER:

Q.    Good morning, Mr. Killingsworth.

A.    Good morning.

Q.    Can you hear me all right?

A.    I can.

Q.    Sir, yesterday Mr. Carney asked you a few
questions -- oh, there we go.  Thanks.

Sir, yesterday Mr. Carney asked you some
questions about a document called an online qualification
tool.

Do you remember that, sir?

A.    Yes, sir, I do.

Q.    Let's take a look at document.  It's Exhibit 435.

Mr. Killingsworth, I believe it's at Tab
10-B of your binder.  It should be handwritten there.

A.    I'm there.

Q.    We're just going to wait for Bob to get it up on
the screen.

A.    And you can wait for me to get my glasses.

Q.   Very good.

MR. KELLEHER:  John, can we turn this monitor so I can see, because this one doesn't work?

Q.   Ready when you are?

A.   Okay.  I'm ready.

Q.   Is this the document Mr. Carney asked you about yesterday?

A.   Yes, it is.

Q.   Sir, can you take a look at the very first sentence of the document?

A.   I see it.

Q.   Can you read that sentence to the jury?

A.   "The purpose of this document is to present the questions, logic and text presented to the users of the online quote tool."

Q.   And, sir, what does it mean by "Text presented"?

A.   So when you use the tool, you put in a bunch of information, and then it will kick back some information to you.

So it kicks back a little -- I don't even know what you'd call it, but just a little box or text, but then below it it also gives you a paragraph explanation, and the paragraph explanation is very important.

Q.   All right.  Very good, sir.

1          Can we move to the second page of this

2     document?  Specifically at Number 2 where it says "Number

3     of employees at prospect."

4     A.    I'm there.

08:37:36  5     Q.    Sir, you were asked questions about number two,

6     right?

7     A.    Yes.

8     Q.    And it sounded like you wanted to give a further

9     explanation, is that correct?

08:37:46 10     A.    Thank you.  Yes, I did.

11          So even though it says that the little

12     block of text kickback says "no fit," it also comes back

13     with this paragraph below and this is important.  May I

14     read it, the paragraph?

08:38:02 15     Q.    Absolutely.

16     A.    Okay.  It says, "You have indicated your prospect's

17     employee count exceeds the range of the recommended

18     Business One target market.  We are aware that in various

19     organizations, countries, and cost structures, the number

08:38:15 20     of employees has a varying effect on the usage of the

21     system.  Therefore, we recommend that you thoroughly

22     review your prospect's requirements and, if necessary,

23     consult with your SAP channel manager."

24     Q.    Sir, do you have an understanding of what that text

08:38:32 25     means?

1    A.    I do.  What it's saying is even though the little

2    text box says no fit, it's not saying for sure rule it

3    out.  It's saying this is an area you just need to

4    explore further.  It's outside of the normal target

08:38:45  5    range, but it doesn't mean it can't work.  It just means

6    that you, as a reseller, need to dig a little deeper.

7    Q.    Thank you, sir.  Could you look at number three?

8    It's on the third page.

9    A.    Yes.

08:38:58  10   Q.    The heading is "Number of SAP Business One users

11   planned."

12              Do you see that, sir?

13   A.    Yes, I do.

14   Q.    And you were asked questions about this yesterday,

08:39:07  15   weren't you?

16   A.    Yes, I was.

17   Q.    And what is the text that gets returned to partners

18   when they enter 76 or greater users?

19   A.    It kicks back the words "No fit" and then the

08:39:20  20   paragraph below.  It's very similar to the other

21   paragraph I read that said, "You have indicated" --

22              THE COURT:  You can't read so fast.

23              THE WITNESS:  I apologize.

24   A.    "You have indicated that your prospect is planning

08:39:35  25   on a large number of SAP Business One users.  SAP

 1    Business One is optimized to work within an environment

 2    defined by both users and transactions -- the potential

 3    number of users at this prospect indicates this

 4    implementation may result in suboptimal performance.  We

08:39:55  5    recommend you carefully analyze the number of

 6    transactions and type of usage planned and consult with

 7    your SAP channel manager."

 8    Q.    Thank you, sir.  What is your understanding, if

 9    any, of what that text means?

08:40:08 10    A.    There's actually a lot embedded in that text so I

11    won't go into it too much, but there's two, two key

12    things.

13                One is just dig deeper.  You need to ask

14    the customer, potential customer exactly how many users,

08:40:22 15    how many are going to be on the system at one time, and

16    transaction volume is a key putting those two components

17    together.  It doesn't rule it out.  It just simply says

18    dig deeper and analyze more carefully.

19    Q.    Thank you, sir.  Are there also considerations that

08:40:39 20    the reseller ought to look into with respect to the

21    potential customer's hardware and network infrastructure?

22    A.    Absolutely.  That's a key component.  If they have

23    a high number of users and a high transaction volume,

24    then you've got to make sure that they've got the

08:40:55 25    hardware that's necessary to be able to handle it.

1    Q.    Thank you, sir.  Could you turn back to the first

2    page just very quickly?

3    A.    I'm there.

4    Q.    Do you know what the date of this document is?

08:41:08 5    A.    It is February the 21st, 2006.

6    Q.    Do you have an understanding of whether that is

7    before or after Hodell signed the license agreement?

8    A.    It is my understanding that it is after.

9    Q.    Sir, are you familiar with the sorts of companies

08:41:26 10   that are running Business One?

11   A.    Yes, I am.

12   Q.    Sir, how did you acquire that familiarity?

13   A.    Well, as a reseller -- as a reseller for 12 years,

14   obviously very keenly aware of the types of companies

08:41:41 15   that Business One fits in, as well as my experience with

16   SAP, dealing with customers all day, every day.

17   Q.    Sir, how long has SAP been selling Business One?

18   A.    For a little over 12 years now.

19   Q.    Sir, how many countries does SAP sell Business One

08:41:58 20   in?

21   A.    150.

22   Q.    Sir, are you able to estimate how many businesses

23   run Business One on a global basis?

24   A.    I have a very accurate understanding.  It's nearly

08:42:10 25   50,000 businesses running Business One.

1    Q.    Sir, I'd like to show you what I've marked as

2    Exhibit 700.

3              Can you flip to that in your binder?

4    A.    I'm there.

08:42:22 5    Q.    Sir, do you recognize this document?

6    A.    I do.

7    Q.    Can you please tell the jury what it is?

8    A.    Yeah.  This is -- this is a report.  It's --

9    actually, we ran it to an Excel spreadsheet, but this is

08:42:34 10   a report that I had someone on my team run for me, and

11   it's from an SAP internal database of customer

12   information.

13   Q.    And, sir, at a very high level, what does it show?

14   A.    This report, at a high level, is showing all of the

08:42:50 15   customers globally, all over the world, that have 50 or

16   more users, Business One customers.

17   Q.    Sir, where did the data reflected in this report

18   come from?

19   A.    It was one of our internal databases.

08:43:05 20   Q.    And when you say "Internal databases," you mean SAP

21   database?

22   A.    Yes.  I'm sorry.

23   Q.    Sir, is the information that is kept in that

24   database, does SAP keep that in the database in the

08:43:17 25   ordinary course of its business?

A.    Yes, sir, we do.

Q.    Is the data reflected on this exhibit a true and accurate reflection of the data that's in that database?

A.    Yes, sir, it is.

Q.    Are reports such as these ones that you direct your subordinates to generate in the ordinary course of your business?

A.    Very frequently, yes, sir.

Q.    Sir, are reports such as these ones that you yourself analyze and review in the ordinary course of your business?

A.    Frequently.  Yes, sir.

Q.    I'd like to actually spend some time and look through this exhibit with you.

I know the print is very small.  I've printed the exhibit on oversized paper.  Would that be helpful to you?

A.    That's very helpful.  Thank you.

MR. KELLEHER:  Your Honor, may I approach the witness?

THE COURT:  Sure.

THE WITNESS:  Much better.

MR. CARNEY:  Your Honor, can we get a copy of that?

THE COURT:  I think you have it on your

1    screen, don't you?

2              MR. CARNEY:  We can't see it.

3              MR. KELLEHER:  Your Honor, I can address

4    that.  It's an identical copy of Exhibit 700.  They have

08:44:18  5    that.  This is just a larger -- it's blown up on bigger

6    paper.  I mean, they could have printed it on bigger

7    paper.  I only have one copy on bigger paper.

8              MR. MILLER:  On the screen I think we will

9    all be able to see it.

08:44:33 10              MR. CARNEY:  We cannot see the --

11              MR. MILLER:  We will blow it up.  We want

12    everyone to see.

13              MR. CARNEY:  That's fine.  Thank you.

14              MR. KELLEHER:  May I proceed, Your Honor?

08:44:56 15    BY MR. KELLEHER:

16    Q.    So, sir, I'd like to start with the -- looking at

17    the first three columns --

18    A.    Yes.

19    Q.    I think I want to have -- Bob, can you blow up the

08:45:06 20    heading of the first three columns?

21              Sir, can you explain to the jury what these

22    first three columns show?

23    A.    Certainly.  The region is the region classification

24    where the customer purchased the licenses.  EMEA stands

08:45:29 25    for Europe, Middle East and Africa, for example.

1   Q.   Okay.  What does, if you know, LATAM stand for?

2   A.   Latin America.

3   Q.   Okay.  NA?

4   A.   North America.

08:45:39 5   Q.   The second column, sir, what does that reflect?

6   A.   Is the country within that region where the

7   licenses were acquired.

8   Q.   And the CUST ID in the third column?

9   A.   That's one of the customer IDs that we keep in the

08:45:52 10   system.

11   Q.   Thank you.  Can you look at the fourth column?

12        Bob, can you just blow the header up on

13   that so we can show the jury?

14        Do you see that, sir?

08:46:01 15   A.   Yes, sir.

16   Q.   And can you explain very briefly what this column

17   reflects?

18   A.   As it indicates, it's the name of the customer.

19   Q.   How about the next column?

08:46:10 20   A.   The next column is the partner ID or the reseller

21   ID.  And next to that is the partner name.

22   Q.   And that would be the name of the reseller that

23   resold the product?

24   A.   Yes, sir.

08:46:24 25   Q.   To that particular customer?

1    A.    That is correct.

2    Q.    Okay.  How about the next column, it says

3    "Industry."  Can you take a look at that?

4    A.    It is the industry that we classify the particular

08:46:35  5    customer in.

6    Q.    And how about the next column, it looks like it

7    says ERP ID?

8    A.    That is a link to another database, and this is the

9    ID of that customer in the other database.

08:46:45  10    Q.    Thank you, sir.  The next column it says

11    "Terminated."

12    A.    Yeah.  That means that if there is a one in that

13    column, it means that for whatever reason, they

14    terminated their contract with SAP.

08:46:58  15    Q.    Sir, if the company has terminated their contract

16    with SAP, does that, if you know, necessarily mean that

17    the solution was a failure for them?

18    A.    No.  It doesn't mean that at all.

19          It could also mean that they terminated the

08:47:12  20    contract and moved on to one of our other products.

21    Q.    Sir, then we have a couple of columns here, one

22    says "Prof," P-R-O-F.  The next says "Limited."  Then

23    there's something called "Starter Package" and then

24    there's a column called "Total."

08:47:30  25          Could you please explain to the jury what

1    those columns mean?

2    A.    Sure.  "Terminated, Prof," stands for -- I'm sorry,

3    starting with professional.  Professional, limited, and

4    starter package are all three different types of Business

08:47:44 5    One licenses.

6                    And then the total is, obviously, a summary

7    of those different types.

8    Q.    So I see some numbers underneath, for example, the

9    total column.

08:47:54 10                    Can you give me just at a very high level

11    what those numbers reflect?

12    A.    Yeah.  This is the total number of Business One

13    licenses that were licensed to this particular customer.

14    Q.    Sir, the next column, it says -- the next three

08:48:08 15    columns, postal code, city and street.  Can you, just so

16    the jury understands the fullness of the document, can

17    you say what that means?

18    A.    Yeah.  That's the address where the customer has

19    registered.

08:48:18 20    Q.    Thank you so much.

21                    Sir, how many pages long is this document?

22    A.    Over 30, I think.  No, not quite 30.  26 pages.

23    Q.    Sir, based on this chart, how many customers have

24    purchased over 50 Business One licenses?

08:48:43 25    A.    More than 2,000.

1    Q.    Sir, how many companies have purchased more than

2    100 Business One licenses?

3    A.    More than 500.

4    Q.    Sir, what company has SAP sold the most Business

08:49:00  5    One licenses to?

6    A.    It's the company at the top, Oryx Computer Systems

7    Limited.

8    Q.    Bob, can you pull up on the screen?  How many

9    licenses did Oryx Computer Systems buy?

08:49:14 10    A.    5,766.

11    Q.    Of those, how many were professional licenses?

12    A.    1,446.

13    Q.    Is that company still running Business One?

14    A.    To the best of my knowledge, yes.

08:49:29 15    Q.    Sir, are there any other companies on this list

16    that stand out to you as companies that the jury might

17    recognize?

18    A.    Yeah.  Absolutely.

19          I mean, Loreal there at the top is on this

08:49:41 20    list.  Chevron I know I've seen.  Hanes Brands is on

21    here.  Coca-Cola Company is on here.  Many, many, very

22    familiar names.

23    Q.    Sir, when you say Loreal, that's the company that

24    makes the makeup that a lot of people wear?

08:49:59 25    A.    Yes, sir.

1    Q.    And Coca-Cola makes the soft drink pop that

2    everybody drinks?

3    A.    That's the one.

4    Q.    And Hanes makes the underwear that many people

08:50:08 5   wear?

6    A.    That's the one.

7    Q.    Sir, is Hodell-Natco anywhere on this list?

8    A.    Yes, sir, they are.

9    Q.    Can you please take a look and let me know where on

08:50:16 10  this list they are.

11   A.    They're on Page 4, about a quarter of the way down.

12   Q.    Sir, we're actually going to give Bob a chance

13   to -- okay.  So, sir, as a general matter, on this list,

14   is this list ranked from, at the top, the company with

08:50:40 15  the most amount of licenses and at the bottom the company

16   with the fewest?

17   A.    Yes, sir.  That's how we sorted this.

18   Q.    And you said that -- what page is Hodell on?

19   A.    According to my report, Page 4.

08:50:53 20  Q.    Roughly how many companies bought more licenses

21   than Hodell?

22   A.    More than 250.

23   Q.    Sir, what industry does SAP classify Hodell as

24   being in?

08:51:08 25  A.    They're in the wholesale industry.

1    Q.    And we looked at this chart, and it shows you the

2    industry of all the customers that are listed on here,

3    correct?

4    A.    That is correct.

08:51:17  5    Q.    Sir, if you know, are there any companies in the

6    wholesale industry that bought more licenses than Hodell?

7    A.    Yes, there are.

8    Q.    Sir, if you know, roughly how many companies in the

9    wholesale industry bought more licenses than Hodell?

08:51:34 10    A.    Somewhere around 30.

11    Q.    Sir, do you have an understanding of whether those

12    companies or how those companies compare to Hodell?

13    A.    I do.

14    Q.    How do you know that, sir?

08:51:47 15    A.    From my vast experience working with Business One

16    customers.  I mean, no two customers are exactly alike,

17    but generally speaking within the wholesale industry they

18    are usually very similar.

19    Q.    Sir, are you able to give an example of a wholesale

08:52:05 20    company on the list that's similar to Hodell in your

21    view?

22    A.    Yeah, sure.  Fairview Fittings, for example.  They

23    are here on, I think -- yep.

24         Well, let me see.  I thought I saw them on

08:52:29 25    Page 3.  Just a moment.

1   Q.    I think Bob's a little faster.  If you check your

2   screen you might see it?

3   A.    Yeah, here they are.  Fairview Fittings, for

4   example.  They're in the wholesale industry.  Generally

08:52:43  5   speaking, wholesalers either buy supplies, hold them in

6   their warehouse and then sell them to somebody else, kind

7   of a buy/hold/sell business model.

8          Sometimes they also make, hold, sell, they

9   make the items, then hold them in their warehouse and

08:53:01 10   then sell them to somebody else. So generally speaking,

11   that would fall under the wholesale industry.

12          Fairview Fittings does that for, like,

13   hoses and valves and connecters for the automotive

14   industry and that kind of thing.  They're primarily a

08:53:17 15   buy/hold/sell type customer.

16   Q.    Sir, how many Business One licenses did Fairview

17   Fittings purchase?

18   A.    153.

19   Q.    You got that on the screen, Bob?

08:53:29 20          It's difficult for Bob to navigate through

21   this, it's so small.  I apologize.

22   A.    It helps me take my water break.  It's good.

23   Q.    I'm just going to move on, sir.  We have your

24   testimony.

08:54:19 25   A.    I'm sorry?

```
 1    Q.    I'm just going to move on.

 2    A.    That's fine.

 3    Q.    Are there additional companies in the wholesale

 4    industry other than Fairview Fittings that are similar to

 5    Hodell?

 6    A.    Yes, sir.

 7          I saw another one, for example, Tech

 8    Equipment or just a little farther up.  They're similar.

 9    They both buy and distribute technical products and

10    testing equipment but they also manufacture as well.

11          But they're in the wholesale industry, and

12    they have 158 licenses.

13    Q.    Thank you, sir.

14          I want to switch gears a little bit to a

15    different topic.

16          Mr. Carney yesterday asked you some

17    questions about Business One marketing materials.

18          Do you remember that line of questioning,

19    sir?

20    A.    Yes, sir.  Yes, sir, I do.

21    Q.    Sir, are you familiar with how SAP marketed

22    Business One in and around the time of 2003 and 2004?

23    A.    Yes, sir, I am.

24    Q.    And how do you have that familiarity?

25    A.    I was a reseller during that time.
```

1    Q.    A reseller of which product, sir?

2    A.    Business One, among others.

3    Q.    Does your current role at SAP also give you a

4    familiarity with that, sir?

08:55:38  5    A.    Yes, it does.

6    Q.    Sir, I'd like to show you what I've marked as

7    Exhibit 314.  It should be the next tab in your binder.

8                   This is a document that Mr. Carney showed

9    you yesterday, is that right?

08:55:45 10    A.    It is.

11    Q.    Are you there?

12    A.    I am.

13    Q.    I think you testified -- well, do you have any idea

14    of the rough date of this document?

08:55:59 15    A.    This document is dated -- I'm sorry, I don't see a

16    date on this one.

17    Q.    Sir, is this consistent with the marketing

18    materials that you're aware of from the 2003 and 2004

19    time period?

08:56:17 20    A.    Yes, sir, it is.

21    Q.    And if we looked at the copyright date, would you

22    be surprised to find that in very small print it says

23    something to that effect?

24    A.    No, that would not surprise me.

08:56:27 25    Q.    All right, sir.

1          I'd like to draw your attention to the

2     second page, the first paragraph.

3     A.     Yes, sir.

4     Q.     Mr. Carney asked you about this paragraph

08:56:36  5   yesterday.

6                Do you remember that?

7     A.     Yes, sir, I do.

8     Q.     Can you read that paragraph for the jury?

9     A.     Starting at the top left corner?

08:56:47 10   Q.     Yeah, starting at "SAP Business One provides."

11    A.     Okay.  "SAP Business One provides robust and fully

12    integrated financial and sales management capabilities

13    and gives managers on-demand access to critical real-time

14    information for better decision-making.  The solution

08:57:04 15   helps emerging businesses, from those with 10 to several

16    hundred employees, to streamline their operational and

17    managerial processes.  Using one complete source of

18    customer data, companies can use management control tools

19    to improve efficiency and gain visibility into the sales

08:57:23 20   process.  Moreover, these management controls -- combined

21    with the solution's easy access to information -- enable

22    managers to retain profitable customers, identify new

23    growth opportunities, and focus on resources on the

24    business' most important issues."

08:57:40 25   Q.     Sir, I'd like -- thank you.  I'd like you to direct

1    your attention to the sentence that says, "The solution

2    helps emerging businesses, from those with ten to several

3    hundred employees, to streamline their operational and

4    managerial processes."

08:57:58  5                    Do you see that, sir?

6    A.    Yes, sir, I do.

7    Q.    There's been a lot of talk in this case about that

8    sentence.

9                    Are they talking about users in that

08:58:09  10    sentence?

11    A.    No, sir.

12    Q.    And can you, if you know, explain for the jury the

13    difference between users and employees?

14    A.    Absolutely.

08:58:20  15                    Typically speaking, when we go into a sales

16    cycle, we know -- and when I say "we," I'm talking both

17    as an SAP person as well as a reseller.  You know that

18    the number of users that are going to be consumed by a

19    particular customer is never going to be -- not

08:58:46  20    never -- almost never the same as the number of

21    employees.

22                    In fact, most customers -- think about it.

23    If you're a customer and you're looking at buying the

24    software and you're paying per user, if you buy one

08:58:59  25    license for everybody in the company, whether they need

1    it or not, it's going to be way more expensive, so most

2    customers are actually looking for ways to cut down on

3    the number of users to reduce their cost.

4             So we know as a reseller, we know as a

08:59:10  5    company, we know as a publisher that when we say that

6    it's ten to a few hundred employees, we know that the

7    users are going to be a subset of that number; that we're

8    rarely, very rarely going to sell a system that has the

9    exact same number of users as they have employees.

08:59:30 10             The number of employees is just an

11    indicator, just a demographic that gives us an idea of

12    about where Business One is going to do really well.

13    Q.    Sir, does it say anywhere in this exhibit that

14    Business One is going to work for companies with 300 or

08:59:51 15    500 users?

16    A.    No, sir, it does not.

17    Q.    Sir, are you aware -- pardon me.

18             Sir, are you aware of any SAP marketing

19    material that says Business One will work for companies

09:00:04 20    with 300 or 500 users?

21    A.    No, sir.  Excuse me.  No, sir, I am not.

22    Q.    Sir, that paragraph that we have on the screen that

23    you're talking about, at a high level, can you just tell

24    the jury what this means?

09:00:17 25    A.    Sure.  When we make statements like this, whether

1    it's SAP or anybody else, what we're saying is, "Look, if

2    you're a company that fits this demographic, chances are

3    that Business One could be a good fit for you; you need

4    to come take a look at us."

5            It's a general marketing statement, just

6    kind of like, you know, if you see a Chevy truck ad

7    during the Superbowl, you know that generally speaking

8    there are going to be guys who might be interested in

9    buying a Chevy truck.

10           It's the same thing.  If you're a company

11   that's ten to a few hundred users -- I'm sorry, ten to a

12   few hundred employees, we know you might be the type of

13   company where Business One will be suitable for you.

14   Q.    And, sir, in your testimony right there, you said

15   take a look.

16           Can you take a look at the third paragraph

17   here?

18   A.    Yes, sir.

19   Q.    Specifically, the last sentence there.

20   A.    Yes, sir.

21   Q.    And can you read that to the jury?

22   A.    The last sentence says, "Take a look at the

23   powerful new SMB solution from the largest business

24   software vendor in the world -- SAP Business One."

25   Q.    Sir, is this marketing material making any promises

1   to any customer about any specific number of users?

2   A.   No, sir.  On the contrary, it's saying come take a

3   look and see if it's a good fit for you.

4   Q.   Sir, I'd like you to direct your attention to

09:01:38  5   Page 5.  This is the second piece of marketing literature

6   in this exhibit.  You were asked questions about it

7   yesterday.

8   A.   Yes, sir.

9   Q.   Let me know when you're there.

09:01:49 10   A.   I am.

11   Q.   I'd like to direct your attention to the bottom

12   paragraph there.

13   A.   I see it.

14   Q.   Thank you.  Specifically, the sentence that says,

09:01:58 15   "Whether you have five employees or 500, the solution

16   helps emerging businesses streamline their operational

17   and managerial processes."

18           Sir, do you see that sentence?

19   A.   Yes, sir, I do.

09:02:13 20   Q.   And do you have an understanding, sir, of what that

21   sentence means?

22   A.   Again it's very similar to what I just talked

23   about.  It's saying that if you are a company that has

24   five employees or 500 employees, you might want to come

09:02:26 25   take a look at Business One.  It might be a good fit for

1    you.

2    Q.    Sir, does this document say anything about the

3    suitability of Business One for companies with 500 users?

4    A.    No, sir, it does not.

5    Q.    Sir, I'd like to ask you some questions about these

6    statements.

7              Are you aware of whether SAP had data

8    supporting the statements that we've just talked about?

9    A.    Absolutely.

10   Q.    And did SAP, in fact, have that data?

11   A.    Yes, sir, we did.

12   Q.    And at a very general level, sir, what sort of data

13   did SAP have that supported and that supports the

14   statements that we just looked at?

15   A.    We have two different types of data.

16              One type of data is what we just looked at,

17   this report, that demonstrates that there are customers

18   that fit this criteria, and Business One is wildly

19   successful for them.

20              We also have testing data.  We have

21   information that we tested the product, we have different

22   test results that demonstrate that if you fit within this

23   range, it can work.

24   Q.    Sir, I'd like to direct your attention to what

25   we've marked as Exhibit 453.

```
 1    A.    I'm there.

 2    Q.    Sir, do you recognize this document?

 3    A.    Yes, sir, I do.

 4    Q.    Can you please tell the jury what it is?

 5    A.    It's called an SAP Business One sizing guide.

 6    Q.    Sir, how do you know what this document is?

 7    A.    I'm very familiar with it.  Both we used it when I

 8    was a reseller, and we also still use documents just like

 9    this today at SAP.

10    Q.    Sir, what's the date of this document?

11    A.    This is July, 2004.

12    Q.    Sir, let's take a step back.

13               Can you just very briefly explain for the

14    jury what is a hardware sizing guide?

15    A.    A sizing guide is what we use to provide

16    recommended hardware configurations for different

17    software sizes or the number of users.

18               Essentially, what we do is we try the

19    hardware on certain hardware configurations, we test it,

20    see how it works, and then provide recommendations.  If

21    you're going to put ten users on a system, you need this

22    type of hardware.  If you need, you know, 50 users on the

23    system, you need this type of hardware.

24               It's -- like I said, it helps you size the

25    right hardware for the number of users.
```

1    Q.    Thank you, sir.  Can you turn to Page 5 of this

2    document?

3    A.    I'm there.

4    Q.    Sir, this Page 5 is called "Executive Summary."

09:05:14  5              Do you see that?

6    A.    Yes, sir, I do.

7    Q.    Do you have an understanding of what this means?

8    A.    Yes, sir, I do.

9    Q.    Can you please tell the jury?

09:05:20 10    A.    What it is, it is saying we tested -- in this

11    particular test, we tested three configurations.  And

12    this gives us a summary of what the recommended hardware

13    is for each of the three different configurations.

14    Q.    Sir, the first configuration, sir, how many users

09:05:37 15    were tested on that?

16    A.    Up to 20.

17    Q.    And then if you look to the right of that, there's

18    a box with four rows in it.  It says, "CPU Pentium 4."

19              Do you see that?

09:05:49 20    A.    Yes, sir, I do.

21    Q.    Is that a type of hardware?

22    A.    It is.  It's a processor.

23    Q.    Sir, then you see the next medium configuration.

24    How many users were tested with the medium configuration?

09:06:02 25    A.    Up to 60.

1    Q.    And again, if you look to the right there's a box.

2    Is that a hardware recommendation?

3    A.    Yes, sir.

4    Q.    Is that hardware different from the hardware that's

09:06:10  5    mentioned above it?

6    A.    It is.

7    Q.    And is there any relationship between -- that's a

8    bad question.  Strike that.

9              The hardware that's being recommended for

09:06:24  10    the medium, that's Intel Xeon X2?

11    A.    That is correct.

12    Q.    And the hardware that's recommended for the small,

13    that's a Pentium 4?

14    A.    Correct.

09:06:33  15    Q.    How does the Intel Xeon X2, if you know, compare to

16    the Pentium at a very high level?

17    A.    At a very high level, that processor that is being

18    recommended is a much more powerful processor.

19              It also, the memory and the servers are

09:06:50  20    also twice the amount of memory, and as it goes up it's

21    recommending more powerful hardware.

22    Q.    Thank you, sir.  Let's take a look at the large

23    configuration.  How many users were tested with that?

24    A.    Up to 150.

09:07:02  25    Q.    And if we look to the right, do we again see a

1    hardware recommendation?

2    A.    I do.

3    Q.    And this is an Intel Xeon X4?

4    A.    That is correct.

09:07:09  5    Q.    And is that more powerful than the Intel Xeon X2?

6    A.    I believe what this is indicating, to be specific,

7    is you need -- in the medium configuration you need the

8    Intel Xeon processor times two.  You need two processors.

9             The CPU for the large configuration is the

09:07:26 10   same processor.  You just need four of them, if I

11   understand this correctly.

12   Q.    Thank you, sir.  Can you turn to Page 7?

13   A.    I'm there.

14   Q.    I'm going to walk you through this slide in a

09:07:58 15   little more detail, but can you just tell the jury at a

16   very high level what we're looking at here?

17   A.    We are looking at the -- some high-level test

18   results on the particular hardware configuration.

19   Q.    And how many users were tested during this test?

09:07:59 20   A.    20.  20 users.

21   Q.    And if we look at the right, we see the CPU,

22   Pentium number 4?

23   A.    I see that.

24   Q.    That's the -- that's the hardware that's being

09:08:10 25   recommended?

```
 1    A.    That is correct.

 2    Q.    Underneath that box there's another box that says

 3    number of users, number of balance sheets, and things

 4    like that.

 5                Do you see that?

 6    A.    I do.

 7    Q.    Can you tell the jury what that is?

 8    A.    These are the number of users that were on the

 9    system, the number of balance sheet transactions, the

10    number of customers that were in the system.  It just

11    identifies the quantity of these particular items that

12    were used for the test.

13    Q.    Thank you, sir.  On the left, there's some bullet

14    points.  The first one says -- the first one I'm looking

15    at says, "Performance test results."

16                Do you see that?

17    A.    Yes, sir, I do.

18    Q.    And the bullet after that, it says "Time-wise, all

19    actions took less than one second."

20                Do you see that, sir?

21    A.    Yes, sir, I do.

22    Q.    Do you have an understanding of what that's saying?

23    A.    Every transaction, based on time, every transaction

24    that we ran through the system when we tested it took

25    less than a second.
```

1    Q.    And that's with 20 users?

2    A.    That's correct.

3    Q.    Sir, I'd like you to flip the page to the medium

4    configuration.

09:09:07  5    A.    I'm there.

6    Q.    How many users were tested here?

7    A.    Up to 60.

8                Actually, to be clear, in the box at the

9    bottom right it says the number of users is 60.

09:09:18 10    Q.    Sir, in the performance results bullet, do you see

11    that on the left?

12    A.    Yes, sir, I do.

13    Q.    What were the performance results when SAP tested

14    Business One with 60 users?

09:09:30 15    A.    Most actions took less than one second.  However,

16    there was an invoice based on a quotation-type

17    transaction that took three seconds.

18    Q.    Sir, in your experience over the course of your

19    career with business software, is three seconds

09:09:47 20    acceptable performance for the particular action that's

21    listed here?

22    A.    It's perfectly acceptable.

23    Q.    Sir, I'd like you to flip the page twice and go to

24    Page 10.

09:10:00 25    A.    Yes, sir.  I'm there.

1    Q.    Just waiting for the screen.

2              Is that the -- is this the test results for

3    the test with 150 users, sir?

4    A.    Yes, sir, it is.

09:10:11 5    Q.    And how do you know that?

6    A.    It says that right there in the box on the bottom

7    right-hand corner.

8    Q.    It says -- on the left there's the same bullet.  It

9    says, "Performance Test Results."

09:10:22 10    A.    I see it.

11    Q.    Can you read the first two bullets there?

12    A.    "Again most actions took less than one second.

13    However, that same transaction that we saw on the other

14    page, the invoice based on a quotation-type transaction,

09:10:35 15    took 17 seconds."

16    Q.    Sir, based on your experience in this industry, is

17    17 seconds for the timeline for the invoice based on a

18    quotation action, is that acceptable performance?

19    A.    It is.

09:10:48 20    Q.    Sir, based on your experience in this industry, is

21    most actions taking less than one second, is that

22    acceptable performance?

23    A.    That's very good performance.

24    Q.    Sir, I'd like to draw your attention -- please give

09:11:08 25    me a moment -- to Exhibit 122.  It should be at the next

1    tab of your binder.

2    A.    Yes, sir.  I'm there.

3    Q.    Can we move to the next page, Bob?  The cover page

4    of the actual document.

5          Sir, do you recognize this document?

6    A.    Yes, sir, I do.

7    Q.    Can you please tell the jury what it is?

8    A.    It's very similar to the other document we saw.

9    It's an SAP Business One sizing guide.

10   Q.    Is this a testing document, sir?

11   A.    Yes, sir, it is.

12   Q.    What's the date on this document?

13   A.    August of 2004.

14   Q.    I'd like to draw your attention to Page 6, sir.

15   A.    I'm there.

16   Q.    Sir, at the top it says "Results -- test set one."

17          Do you see that?

18   A.    I do.

19   Q.    Sir, at a very general level, without getting into

20   specifics yet, what are we looking at here?

21   A.    So these are the results of the first round of

22   testing that we did with different configurations of

23   hardware and users.

24   Q.    This is testing Business One?

25   A.    Yes, sir, that is.  Correct.

1    Q.    Sir, I'd like to direct your attention to the first

2    row.  It says, "Number of users."

3                   Do you see that?

4    A.    I do.

09:12:41  5    Q.    And then I see the number 20 there.

6                   Do you see that?

7    A.    I do.

8    Q.    And then there are -- there's another column that

9    says "Time per action."

09:12:53 10                   Can you tell the jury what that means?

11    A.    This is how long each of the individual

12    transactions actually took.

13    Q.    And, sir, with the 20-user tests, how long did

14    these actions take?

09:13:04 15    A.    Generally speaking, they're all less than a second,

16    except for that one transaction labeled "Quotation."

17                   Oh, "Number of quotations," it took a

18    second and a little over a half.

19    Q.    Sir, the next two columns, medium business, do you

09:13:22 20    see that?

21    A.    I do.

22    Q.    How many users were tested there?

23    A.    Sixty.

24    Q.    What were the response times for that test?

09:13:28 25    A.    Again, most transactions took less than a second,

1      but a couple of transactions took around three seconds.

2      Q.    Sir, the next two columns, it says 150 users.  Do

3      you see that?

4      A.    Yes, sir.

09:13:40   5   Q.    What were the test results with 150 users?

6      A.    Again, most transactions took less than a second,

7      with two transactions taking 16 and 17 seconds.

8      Q.    Sir, are those test results acceptable in the

9      context of business software?

09:13:58  10   A.    Yes, sir, it is.

11     Q.    I'd like you to turn to Page 7.

12     A.    I'm there.

13     Q.    Thank you.  I'm just waiting for it -- oh, there it

14     is on the screen.

09:14:11  15           Sir, this says "Results -- test set two."

16           Do you see that?

17     A.    I do.

18     Q.    And, sir, how many users were involved in these

19     tests?

09:14:19  20   A.    300 in one and 500 in another.

21     Q.    Sir, just so we're clear, the 300 user, the test

22     results from the 300-user test, that's in those two

23     columns where it says 300 and then time per action,

24     right?

09:14:37  25   A.    That is correct.

1    Q.    And can you please tell the jury what the response

2    times were for the Business One tests with 300 users?

3    A.    Less than a second for most, and then about a

4    little over a second for one.

09:14:49 5    Q.    And how about the next two columns, sir, the tests

6    with the 500 users?  Do you see that?

7    A.    I do.

8    Q.    What were the test results with the 500 users?

9    A.    Again, less than a second, and, you know, one

09:15:04 10   second and two seconds for a couple of transactions.

11   Q.    Sir, I'd like to draw your attention to Exhibit

12   126.  Bob, can we go to the first actual page?  Which

13   will be the next page on your actual document.

14              Thank you.  Do you see this document, sir?

09:15:24 15   A.    Yes, sir.

16   Q.    Do you recognize it?

17   A.    Yes, sir, I do.

18   Q.    Can you please tell the jury what it is?

19   A.    This is a similar document to the sizing guides.

09:15:35 20   It's a testing document, and it's recommended hardware

21   from IBM.

22   Q.    What's the date of the document, sir?

23   A.    The date of the document is April the 2nd, 2004.

24   Q.    Sir, let me ask you, and I apologize in advance

09:15:52 25   what may be a silly question.  Who is IBM?

1           MR. CARNEY:  Objection, Your Honor.

2           THE COURT:  Overruled.

3    A.    It is the IBM that we are very familiar with.  It's

4    a common household name.  They manufacture hardware.

09:16:03  5    They also do a lot of software, but they're

6    primarily -- well, they're a hardware and software

7    manufacturer.

8    Q.    So IBM is different from SAP?

9    A.    Yes, sir.

09:16:17  10    Q.    So this document reflects recommendations based on

11    third party testing?

12    A.    That is correct.

13    Q.    I'd like to draw your attention to Page 9, sir.

14    A.    I'm sorry.  Do you want Page 9 as labeled by IBM

09:16:39  15    orthopedic the 9 that's in the far right-hand corner?

16    Q.    That's a very good question.  Page 8 as labeled by

17    IBM or Page 9 as labeled by me.

18    A.    I am there.

19    Q.    So, Bob, it looks like this.  Bob, we're in Exhibit

09:17:11  20    126.  That's the correct page.  Thanks, Bob.

21           So, Paul, look at your screen.  Are we all

22    on the same page?

23    A.    Yes, sir, we are.

24    Q.    Very good.  Sir, can you please tell the jury at a

09:17:37  25    high level what we're looking at here on this page?

1    A.    This is very similar to the sizing guide we just

2    looked at.  It's testing using the small, medium, large

3    configuration on different hardware by IBM.

4    Q.    And how many users are reflected in this testing

09:17:51  5    document?

6    A.    Twenty.

7    Q.    And for the medium?

8    A.    Sixty -- I'm sorry -- 75.

9    Q.    And for the large?

09:17:58 10    A.    A hundred and twenty.

11    Q.    And if we look at the fourth column there, it

12    says -- I'm not going to read what the caption is because

13    it's a bunch of letters, but can you just tell the jury

14    what that fourth column there is talking about?

09:18:14 15    A.    That represents different server configurations,

16    hardware configurations.

17    Q.    That IBM is recommending for a given set of users?

18    A.    That is correct.

19    Q.    Based on tests that IBM conducted?

09:18:24 20    A.    That is correct.

21    Q.    Sir, at the bottom there's remarks and disclaimer.

22    Do you see that?

23    A.    I do.

24    Q.    Sir, it says, "There is more than one configuration

09:18:34 25    possible for a specific set of requirements.  The above

1    configurations should be considered as examples and not

2    as the only valid solutions.  Basis for the above

3    configurations are not only SAP requirements, but also

4    performance, price and system features that are necessary

09:18:54  5    for typical customer needs corresponding to that number

6    of users."

7              Sir, do you see that language?

8    A.    I do.

9    Q.    Do you have an understanding of what that language

09:19:03  10    means?

11    A.    It means a couple of things to me.

12              What it means is that this isn't the only

13    possible configuration.  You could do other

14    configurations that could be successful, but they're also

09:19:17  15    saying essentially that they had tested this and this is

16    the results that they came up with.

17    Q.    Thank you, sir.

18              Sir, a few moments ago -- or more like five

19    or ten minutes ago at this point -- I asked you what

09:19:29  20    basis SAP had for the statements in that marketing

21    literature that we looked at.

22              Do you recall that question from me?

23    A.    Yes, sir, I do.

24    Q.    And your answer, can you remind the jury of your

09:19:41  25    answer?  I think there were two things you were talking

1    about.

2    A.    That's correct.

3    Q.    What were those two things, sir?

4    A.    Our experience.  We did have customers that, you

09:19:49 5    know, met that criteria, but we also had testing

6    information that backed up our target market.

7    Q.    Okay.  I'd like to talk a little more about the

8    first one you mentioned, which is experience with

9    customers.

09:20:04 10    A.    Okay.

11    Q.    I'd like to draw your attention to Exhibit 834.

12    A.    Yes, sir.  I'm there.

13    Q.    Do you see that document?

14    A.    I do.

09:20:21 15    Q.    Do you recognize it?

16    A.    I do.

17    Q.    Can you please tell the jury what it is?

18    A.    This is a report I ran.  I did this one myself.

19    And I ran this report off of one of our internal

09:20:34 20    databases.  It was an SAP database that had customer

21    information.

22    Q.    And, sir, at a very high level, because we're going

23    to get into it, but at a very high level, can you tell

24    the jury what this shows?

09:20:47 25    A.    What this shows is all the customers that we had on

1    record at this time that were running Business One in the

2    2003 and 2004 time frame.

3    Q.    And --

4    A.    And they had -- I'm sorry, I forgot an important

5    criteria.  That had more than 50 users.

6    Q.    And, sir, where did the data from this report come

7    from?

8    A.    An SAP database that we own that contained customer

9    information.

10   Q.    And is the information reflected in this document a

11   true and accurate reflection of the information in that

12   database, to the best of your knowledge?

13   A.    Yes, sir, it is.

14   Q.    Sir, in 2003 and 2004, were there any customers of

15   SAP that would have had over 500 employees?

16   A.    Certainly, yes.

17   Q.    From this document, are you able to give the jury a

18   sense of what you mean by that?

19   A.    Well, just by looking at this, I don't know Chevron

20   U.S.A.'s employee count, but I would be pretty safe in

21   guessing that they had more than 500.

22            I would say the same thing about Loreal,

23   for example.  I, again, don't know how many they actually

24   had, but surely it's more than 500.

25   Q.    And let's take a look at Loreal on this document.

```
         1    A.    I'm there.

         2    Q.    I'm waiting for Bob to get there.  Bob, can you get

         3    there?  Sir, can we go to that -- Bob, shift back to

         4    where you were just a touch to the left.  Thank you.

09:22:56 5                  So you see Loreal there, sir?

         6    A.    I do.

         7    Q.    And the "Customer since" column, what's that mean?

         8    A.    Customer since, that's the -- they've been a

         9    customer with SAP since this date.

09:23:08 10   Q.    And what is that date, sir?

        11    A.    For Loreal, it is Q1, 2004.

        12    Q.    Q1, what does that mean?

        13    A.    Quarter one.  I'm sorry.

        14    Q.    At the beginning of the year?

09:23:21 15   A.    Correct.

        16    Q.    Sir, how many professional user licenses did Loreal

        17    purchase?

        18    A.    1,826.

        19    Q.    Sir, are there any companies on this list from the

09:23:36 20   United States?

        21    A.    There are.

        22    Q.    Can you tell the jury a little bit about that?

        23    A.    Well, there's one here, Chevron, I mentioned them,

        24    and they have 300 professional users.

09:23:48 25                 The Koehler Company, for example, they have
```

```
 1    110 users.  Respironics -- let me make sure I get that,
 2    they have 82 users.  So, yeah, there are several
 3    customers from the United States.
 4    Q.    Sir, when you said Chevron, is that the gas
 5    company?
 6    A.    Yes, sir.
 7    Q.    Sir, what company purchased the most licenses?
 8    A.    According to this report -- I didn't sort this one
 9    in order, I don't believe, but it looks like it is
10    Loreal.
11    Q.    Can you take a look at a company known as Compagnie
12    Financiere et de?
13    A.    There.  I think I found it.  Yes.
14    Q.    How many licenses did they purchase, sir?
15    A.    Oh, thank you.
16             So their total number is 3,104.
17    Q.    How many professional licenses, sir?
18    A.    1,742.
19    Q.    And in what time period were they running Business
20    One?
21    A.    They were running in quarter two of 2004.
22    Q.    Quarter two, that's -- well, what is quarter two?
23    A.    April, May, June.
24    Q.    Thank you, sir?
25    A.    No problem.
```

1    Q.    Sir, in total, how many Business One customers did

2    SAP have in 2004 that would have had several hundred

3    employees?

4    A.    This looks to be about 30 or more.

09:25:18  5    Q.    Sir, to your knowledge, do all of those companies

6    successfully run Business One?

7    A.    To the best of my knowledge, yes.

8    Q.    Sir, I want to take a step back and understand some

9    of your testimony in context.

09:25:36  10              Earlier today, we talked about marketing

11    literature.

12              Do you recall that line of questioning?

13    A.    Yes, sir, I do.

14    Q.    Did SAP ever market or advertise this product for

09:25:50  15    companies with 300 or 500 users?

16    A.    No, sir.  Never.

17    Q.    However, does Business One work for companies with

18    300 or 500 users?

19    A.    Absolutely does.

09:26:05  20    Q.    Sir, so on the one hand we have marketing

21    literature that does not market the product for 300 or

22    500 users, but on the other hand you just told me that

23    Business One does work for companies with that many

24    users.

09:26:24  25              And so my question for you, sir, is how do

1    you reconcile that dichotomy?

2    A.    Well, when we are -- we're keenly -- a couple

3    things.

4                One thing is we have multiple products.  We

5    know that Business One can work for a large company.  We

6    know it can work for a company that has a lot of users.

7    It's possible.  We see that.  We've got the evidence.

8    We've got the data.  We get it.

9                But we also have other products, and we

10   have other products that fit different markets.  So when

11   we go to our marketing, what we're saying is, look,

12   Business One, generally speaking, is most appealing and

13   is easiest for customers in this range, in the, you know,

14   range up to 300 to 500.  That's where Business One,

15   generally speaking, fits very, very well.  It doesn't

16   mean it can't work a little higher up, but it does mean

17   that, generally speaking, that's where you fit.

18                Then if you are in another market, let's

19   say you're a company of 500 to a thousand, we have other

20   products that probably are going to suit you better.

21                So when we do our marketing materials, what

22   we're saying is, you know, there's going to be some

23   overlap, and if you're a customer looking at an SAP

24   product, it can get really, really confusing if there's

25   too much overlap.  I'm a 500-employee company.  Which one

1    should I be looking at, Business One or your other

2    products?

3              So what we try to do in marketing is we

4    will, generally speaking, try to segment our target

09:27:59 5    market so it's easier for the consumer to start the

6    process with the right product.

7    Q.    Thank you, sir.  And from SAP's perspective, is

8    there a business reason why they might want to sell

9    bigger companies on bigger software?

09:28:14 10   A.    Well, sure.

11             Our other -- I mean, Business One is our

12   least expensive product.  It's very, very, relatively

13   speaking, very much -- it's much less expensive than all

14   of our other products.

09:28:27 15             So, generally speaking, the other products

16   are going to generate more revenue for us.

17   Q.    So if a bigger company is buying Business One, then

18   SAP gets less money for that?

19   A.    That is correct.

09:28:41 20   Q.    So it's in SAP's interest to sell a bigger company,

21   a bigger product?

22   A.    If it works for them, yes.

23   Q.    Sir, I'd like to switch gears.

24             Yesterday Mr. Carney asked you some

09:28:52 25   questions about resellers, and are you familiar with the

1    agreements that SAP has with its resellers?

2    A.    Yes, sir, I am.

3    Q.    What is the basis of that knowledge?

4    A.    Twofold.

09:29:12  5           I had to sign an agreement when I was a

6    reseller, so I have that knowledge.

7           But also in working with -- even though my

8    title is customer relations, we do a lot of work with our

9    existing channel partners, our resellers, so I'm very

09:29:30  10    familiar with the contract through working with them.

11    Q.    So you're familiar with these agreements through

12    your work back when you were actually working at a

13    reseller?

14    A.    That is correct.

09:29:39  15    Q.    Sir, I'd like to show you what we've marked as

16    Exhibit 30.

17    A.    I'm there.

18    Q.    Can you explain, just can you say what this is?

19    A.    This is the SAP Business One software marketing and

09:29:55  20    distribution agreement.

21    Q.    Is this the primary contract that a reseller of

22    Business One has with SAP?

23    A.    Yes, sir, it is.

24    Q.    Is this substantially similar to the agreement that

09:30:08  25    your company signed with SAP when you were a reseller?

1    A.    Yes, sir, it is.

2    Q.    Sir, I'd like to draw your attention to Page 27.

3    I'm at Section 17.8, Bob.

4    A.    I'm there.

09:30:34  5    Q.    Sir, this says 17.8, relationship.  "Reseller is an

6    independent contractor and is not an agent, employee, or

7    legal representative of SAP."

8                   Do you see that, sir?

9    A.    Yes, sir, I do.

09:30:50 10    Q.    It continues to say, "Reseller expressly

11    acknowledges that it has no power or authority to accept

12    any order for SAP, or to make guarantees or warranties

13    concerning the software or the delivery thereof, or to

14    make any commitment to SAP" -- excuse me -- "for SAP or

09:31:16 15    to obligate SAP in any respect whatsoever."

16                   Do you see that language, sir?

17    A.    Yes, I do.

18    Q.    Is that language substantially similar to the

19    reseller agreement that you signed when you worked for a

09:31:29 20    reseller?

21    A.    Yes, sir, it is.

22    Q.    Of Business One?

23    A.    Yes, sir.

24    Q.    Sir, when you were a reseller of Business One, did

09:31:37 25    you understand yourself to be an agent of SAP?

```
 1    A.    Absolutely not.

 2    Q.    Sir, did you understand yourself to be an

 3    independent contractor of SAP?

 4    A.    Yes, sir.  And, in fact, if I may, this is true not

 5    only with SAP.  We were a reseller of other products.

 6            The other agreements say the same thing,

 7    and as a reseller -- I was a reseller for 10 years, since

 8    1994.  I -- we go to reseller conventions all the time.

 9            Generally speaking, I don't think any

10    reseller thinks of themselves as an agent.

11                  MR. CARNEY:  Objection.

12                  THE COURT:  Objection sustained.

13    A.    I understood we were not an agent.

14    BY MR. KELLEHER:

15    Q.    Thank you, sir.  Sir, as a reseller, did you

16    understand that you had any power or any authority to

17    make guarantees about the software on behalf of SAP?

18    A.    Can you please ask -- I'm sorry.  I lost you at the

19    very beginning of that sentence.  I want to make sure I

20    answer it correctly.

21    Q.    No problem.  Let me try and rephrase it.

22            Sir, you were a reseller of Business One at

23    one point in time?

24    A.    Yes, sir.

25    Q.    And you signed an agreement with SAP?
```

1    A.    Yes, sir.

2    Q.    It was substantially similar to this agreement?

3    A.    Yes, sir.

4    Q.    The language that we're looking at at 17.8, that

09:32:51 5   language or substantially similar language was in the

6    reseller contract that you and your company, in fact,

7    signed?

8    A.    Yes, sir.

9    Q.    And I'm asking you, sir, when you were a reseller

09:32:59 10  of Business One, not when you worked for SAP, but when

11   you were a reseller of Business One, did you understand

12   that you as a reseller had any power or authority to make

13   representations or guarantees or warranties on behalf of

14   SAP?

09:33:17 15  A.    I understood that perfectly.

16   Q.    Were you authorized to do that, sir?

17   A.    No, sir, we were not.

18   Q.    Sir, did you understand that you were authorized to

19   obligate SAP in any respect whatsoever?

09:33:29 20  A.    I understood we were not authorized to do so.

21   Q.    Sir, are you familiar with the license agreement

22   that SAP has with its customers?

23   A.    Very familiar, yes, sir.

24   Q.    How have you gained that familiarity?

09:33:46 25  A.    Primarily through my work at SAP, dealing with

1    customers and customer situations.  We do refer to the

2    end user license agreement frequently.

3    Q.    I'd like to show you that document, sir.  It's

4    Exhibit 316.

09:34:00  5    A.    I'm there.

6    Q.    Sir, is this the license agreement that you were

7    just talking about?

8    A.    Yes, sir, it is.

9    Q.    Can you turn to the second page?

09:34:20 10    A.    I'm there.

11    Q.    Actually, let's actually turn to the last page.

12              Do you see the signature block there?

13    A.    I do.

14    Q.    Who is this contract between?

09:34:28 15    A.    Hodell-Natco and SAP.

16    Q.    Who signed for Hodell?

17    A.    Mr. Kevin Reidl, executive VP.

18    Q.    Do you know Mr. Reidl?

19    A.    I do.

09:34:41 20    Q.    Is that Mr. Reidl sitting at the table right there?

21    A.    It is.

22    Q.    I'd like you to look at Page 2, sir.  Section 4.1.

23    A.    I'm there.

24    Q.    It says, "Licensee acknowledges."

09:34:51 25              Sir, who is the licensee?

```
 1    A.      That would be Hodell-Natco.

 2    Q.       "Hodell acknowledges and agrees that the SAP

 3    reseller."

 4                    Who is the reseller in this case, sir?

 5    A.      That would be IBIS/LSi.

 6    Q.       "Hodell acknowledges and agrees that IBIS/LSi,

 7    which Hodell has arranged for the procurement of this

 8    agreement or from which Hodell receives any services

 9    related to the software is not the agent of SAP.

10    IBIS/LSi is an independent company, person, or entity,

11    with no authority to bind SAP or to make representations

12    or warranties on behalf of SAP."

13                    Do you see that language, sir?

14    A.      Yes, sir, I do.

15    Q.      Do you have an understanding of what that language

16    means?

17    A.      It's very clear to me.

18                    My understanding is that the licensee,

19    Hodell-Natco, the customer, is acknowledging that the

20    reseller is not an agent and has none of the powers

21    listed here.

22    Q.      Sir, you mentioned that you work with this document

23    in your job at SAP today, is that true?

24    A.      That's correct.

25    Q.      Do you ever have conversations with customers about
```

          1    this document?

          2    A.    Yes, we do.

          3    Q.    What do you tell them about it?

          4          MR. CARNEY:  Objection, Your Honor.

09:36:15  5          THE COURT:  Overruled.

          6    A.    Well, the conversation -- you know, we have lots of

          7    different conversations, but one of the conversations

          8    that we have is when a customer might come to us and say,

          9    "Well, your reseller told me" --

09:36:30 10          MR. CARNEY:  Objection, Your Honor.

         11          THE COURT:  Objection sustained.

         12    BY MR. KELLEHER:

         13    Q.    Sir, are you familiar with the process by which SAP

         14    licenses are acquired?

09:36:40 15    A.    I do.

         16    Q.    And just so I'm clear, I'm talking about Business

         17    One licenses.

         18          Are you aware of the process by which

         19    Business One licenses are acquired?

09:36:48 20    A.    I -- I am, yes.

         21    Q.    Sir, can you very briefly tell the jury what that

         22    process is?

         23    A.    Very, very high level, we get an order for the

         24    licenses and we, in turn, give the customer an end user

09:37:04 25    license agreement to execute.

1    Q.    And then do they get the software after that?

2    A.    Yes.  Yes.  I'm sorry, I left that step out.

3    Q.    Sir, is it possible for a customer to purchase

4    licenses without first signing a license agreement with

09:37:22 5    SAP?

6    A.    No, sir.  We always require an end user license

7    agreement.

8    Q.    Sir, I'd like to turn your attention to Exhibit

9    618.

09:37:32 10    A.    I'm there.

11    Q.    Sir, I think you were asked some questions about

12    this document yesterday.

13              Do you remember that?

14    A.    I do.

09:37:47 15    Q.    And specifically, sir, I think the questions that

16    you were asked yesterday were about Page 18.

17              Can you turn there?  I'm at the second

18    paragraph, Bob.

19              Are you there, Mr. Killingsworth?  Exhibit

09:38:21 20    618, in the bottom right-hand corner.

21    A.    I am.  I'm there.

22    Q.    You look a little confused.  We can square it away.

23    A.    Okay.  I'm there.

24    Q.    Sir, you see at the top it says "4, Technology."

09:38:38 25    A.    I'm sorry, I just want to be clear on something.

         1               Mr. Kelleher, it might have happened, but I

         2   don't remember seeing this yesterday.

         3   Q.    Fair enough.  Do you have -- have you ever seen

         4   this document before?

09:38:52 5   A.    Yes, I have.

         6   Q.    I'd like to direct your attention to the second

         7   paragraph.

         8   A.    I'm there.

         9   Q.    It says, "To secure critical business and system

09:39:05 10  processes, a robust MS-SQL 2000 database is used.  It

         11  supports an unlimited number of simultaneous user

         12  transactions."

         13               Do you see those two sentences, sir?

         14  A.    Yes, sir, I do.

09:39:22 15  Q.    What is MS-SQL 2000 database?

         16  A.    That stands for Microsoft SQL 2000.  It's the

         17  database upon which Business One is built.

         18  Q.    Sir, does SAP make the MS-SQL 2000 database?

         19  A.    No, sir, we do not.

09:39:45 20  Q.    Who makes that?

         21  A.    Microsoft.

         22  Q.    Are they a separate company?

         23  A.    Yes, sir.

         24  Q.    Sir, the second sentence, it says, "It supports an

09:39:54 25  unlimited number of simultaneous user transactions."

1          Do you have an understanding of what "It"

2     is referring to?

3     A.    Yes, sir.  It seems clear to me that "It" is

4     referring to the Microsoft SQL-2000 database.

09:40:08  5     Q.    Not Business One?

6     A.    That is correct.

7     Q.    Sir, I'd like to draw your attention to Exhibit

8     267.  Now, I'm pretty sure you were shown this yesterday,

9     but you let me know if you weren't.

09:40:20 10     A.    Okay.  Yes, I was shown this yesterday.

11     Q.    And you remember you were asked questioned about

12     the e-mail on the center of the page?

13     A.    Yes, sir, I do.

14     Q.    Bob, can you blow that up?

09:40:38 15          What are we looking at here, sir?

16     A.    This is the e-mail that we talked about yesterday

17     where I wrote a -- actually Mr. Kraus, my vice president

18     at the time, asked me to get information from Mr. Reidl

19     about the costs that they have spent on software and

09:40:57 20     services thus far on his Business One project.

21     Q.    And looks like you wrote some bullet points down

22     there, sir?

23     A.    That is correct.

24     Q.    And am I correct in understanding that that is what

09:41:07 25     Mr. Reidl told you?

1    A.    That is exactly correct.

2    Q.    Do you have any personal knowledge of whether any

3    of that information is actually correct?

4    A.    No, sir.  All I know is that this is what Mr. Reidl

09:41:21  5    conveyed to me.

6    Q.    So you didn't do any independent analysis or

7    computation or anything, investigation, to determine

8    whether there was any veracity or truth to these numbers,

9    right?

09:41:33 10    A.    That is correct.

11    Q.    You just wrote down what you were told?

12    A.    That's correct.

13    Q.    Sir, I'd like you to turn to Exhibit 263.

14              I'd like to go to the second e-mail on the

09:41:51 15    page.  It's from Dipan Shah.

16    A.    That is correct.

17    Q.    Do you remember being shown this document yesterday

18    by Mr. Carney?

19    A.    I do.

09:41:57 20    Q.    Do you remember you were asked questions about it?

21    A.    I do.

22    Q.    Sir, it seemed to me like there was something else

23    you were trying to say about this document yesterday, is

24    that true?

09:42:10 25    A.    That's true.

1    Q.    Would you like to say that now?

2    A.    I would.  We worked feverishly not only on the

3    Business One side to try and help the customer, but we

4    also, like I mentioned yesterday, were exploring lots of

09:42:25  5    options and we were willing to make financial

6    consideration to help them move if that would be a good

7    thing.

8          In fact, in this conversation we thought it

9    would be a good idea for them to move to All-In-One if

09:42:37 10    possible.  That didn't mean they had to.  That just meant

11    if we could make this work, All-In-One might, if they're

12    going to grow to the size that we were hearing them say,

13    then maybe we need to start now the process of evaluating

14    All-In-One.

09:42:51 15          So when we were doing this conversation, it

16    was with the understanding that let's see what we can do

17    to help, let's see if we can move them to another product

18    that might help them -- might help alleviate some of

19    their problems.

09:43:03 20    Q.    Sir, you mentioned that SAP was willing to make

21    significant financial considerations?

22    A.    That is correct.

23    Q.    You mean that SAP was willing to take care of them

24    and do the right thing?

09:43:14 25    A.    That is correct.

1    Q.   Sir, this is my final question.

2              Did SAP ever quit on Hodell?

3    A.   No, sir.  Never.  We stayed with the customer

4    throughout the entire process and did everything we

09:43:29  5    possibly could to find a remedy, whether it was our

6    software or somebody else's, we genuinely tried and we

7    genuinely cared.

8              MR. KELLEHER:  Thank you, sir.

9              No further questions at this time, Your

09:43:41  10   Honor.

11             THE COURT:  Thank you.

12             Mr. Carney.

13        REDIRECT EXAMINATION OF PAUL KILLINGSWORTH

14   BY MR. CARNEY:

09:44:32  15   Q.   Mr. Killingsworth, you testified yesterday on a

16   number of occasions that you were not a technical guy,

17   correct?

18   A.   Not currently, no, that's correct.

19   Q.   Okay.  And you're not a software developer for SAP,

09:44:48  20   correct?

21   A.   That is correct.

22   Q.   And you don't write code for SAP?

23   A.   That is correct.

24   Q.   And you don't write code for Business One?

09:44:58  25   A.   Yes, sir, that's correct.

1    Q.    And you never have?

2    A.    No, sir, I have not.

3    Q.    And prior to joining SAP, when you worked as a

4    reseller, you were involved in a total of four SAP

09:45:16 5    Business One implementations, correct?

6    A.    That is correct.

7    Q.    And none of those implementations involved a number

8    exceeding 30, correct?

9    A.    I'm sorry, I didn't hear you.

09:45:25 10    Q.    I'll speak up.

11    A.    Thank you.

12    Q.    And none of those implementations involved a number

13    of users exceeding 30?

14    A.    That is correct.

09:45:34 15    Q.    You would agree that Hodell was a notable deal

16    during the sales process, correct?

17    A.    I'm sorry, I'm having a little bit of difficulty.

18              Did you say a notable deal?

19    Q.    I'm sorry.  Yes, I did.

09:45:52 20    A.    Yes.

21              MR. KELLEHER:  Objection.  Your Honor, can

22    we get a foundation laid for this line of question?

23              THE COURT:  If he knows the answer, he can

24    answer it.

09:46:00 25    A.    I would agree it was notable, yes.

1    Q.    And it was viewed as a large deal for SAP at the

2    time, correct?

3    A.    Yes, sir, relatively large.

4    Q.    You testified yesterday that Udi Ziv worked for the

09:46:20  5    company that developed SAP Business One is Israel that

6    was ultimately purchased by SAP, correct?

7    A.    To the -- to the best of my understanding, sir,

8    that is correct.

9    Q.    Okay.

09:46:30 10    A.    I may not be a hundred percent sure there.

11    Q.    And Mr. Ziv was in a leadership role in the

12    development of SAP Business One?

13    A.    Yes, sir, that is correct.

14    Q.    And he had two titles at the time, general manager

09:46:45 15    of the SAP labs in Israel?

16    A.    Okay.

17    Q.    And general manager of small business solutions for

18    SAP, correct?

19    A.    I'll take your word for it.  I'm not sure off the

09:46:55 20    top of my head.

21    Q.    And he reported directly to the Board of Directors

22    of SAP in Germany, correct?

23    A.    I do not know that.

24    Q.    But we could at least agree he had a significant

09:47:09 25    leadership role in Business One development?

1    A.    I can agree he had a leadership role.

2              MR. CARNEY:  Your Honor, I need to get

3    something from the desk.

4    Q.    You testified yesterday that SAP did not conceal

09:47:59 5    anything from Hodell as part of the -- as part of this

6    overall deal, correct?

7    A.    That is correct.

8    Q.    You'd agree that SAP knew that Hodell was

9    purchasing 120 user licenses for Business One, correct?

09:48:16 10    A.    I wasn't -- I wasn't part of the sales process.  I

11    wasn't around during that time.

12    Q.    You came to learn that, though, correct?

13    A.    I did come to learn that, yes.

14    Q.    Thank you.

09:48:33 15              MR. CARNEY:  Kim, could you pull up Exhibit

16    119.

17    Q.    And this is a document that we talked about

18    yesterday, correct?

19    A.    Correct.

09:48:52 20    Q.    Sizing transaction volumes for Business One,

21    correct?

22    A.    That is correct.

23    Q.    And the date on the document is July 17th of 2006,

24    correct?

09:49:03 25    A.    That is correct.

1    Q.    And we talked about some information on Page 24.

2                Do you recall that?  Why don't you turn

3    there, Kim?

4    A.    I see that.

09:49:17  5    Q.    And this identifies a red flag as being if a

6    customer exceeds 30 users, correct?

7    A.    I see that.

8    Q.    Once you got involved with Hodell, you did not tell

9    them this information, correct?

09:49:33 10    A.    Did I tell them this information?

11    Q.    That's my question.

12    A.    No, sir, I did not tell them this.

13    Q.    And to your knowledge, you're not aware of anybody

14    at SAP that ever did, correct?

09:49:43 15    A.    I am unaware, that's correct.

16                May I comment about that?

17    Q.    No.  But your counsel will have the opportunity to

18    ask you follow-up questions.

19    A.    Okay.  Thank you.

09:49:56 20    Q.    If SAP didn't provide this information to Hodell as

21    part of the sales process, who should have provided this

22    information to Hodell during the sales process?

23    A.    SAP is not very frequently involved in the sales

24    process.

09:50:19 25    Q.    Okay.  Then who should have provided that

1    information during the sales process?

2    A.    We expect our reseller channel to carefully

3    investigate each and every sale to see if it's a good fit

4    and make sure that they have all of the elements in place

09:50:34  5    for it to be a successful implementation, both in

6    software, services, hardware.

7    Q.    So you would expect the reseller to provide that

8    type of information to the customer?

9    A.    I would expect the reseller not necessarily to

09:50:49  10    provide information, but rather to, as I believe this

11    document is indicating, to investigate further.

12             MR. CARNEY:  Kim, do you have on your

13    computer Mr. Killingsworth's deposition?

14             A FEMALE SPEAKER:  You have two copies.

09:51:19  15             MR. CARNEY:  Excuse me.

16             A FEMALE SPEAKER:  Volume one and volume

17    two.

18             MR. CARNEY:  You have volume one and two?

19             A FEMALE SPEAKER:  Yes.

09:51:45  20    BY MR. CARNEY:

21    Q.    Can you turn to Page 187?

22             MR. KELLEHER:  Your Honor, objection.  Are

23    we talking about putting the deposition on the screen?

24    Because I don't know that that's proper.

09:51:55  25             THE COURT:  I don't know what we're doing.

1           MR. CARNEY:  I think that's what we're

2   planning on doing, correct?

3           MR. KELLEHER:  We object to that, Judge.

4   It's not evidence in the case.  If he wants to use it for

09:52:05  5   a prior inconsistent statement --

6           THE COURT:  Hang on.

7           What are you trying to do?

8           MR. CARNEY:  Pull up his deposition.

9           THE COURT:  Why don't you ask him the right

09:52:12  10   questions about it?

11   BY MR. CARNEY:

12   Q.    Mr. Killingsworth, you gave your deposition in this

13   case as a corporate designee for SAP, correct?

14   A.    That is correct.

09:52:27  15   Q.    And, in fact, you sat on two occasions for your

16   deposition.

17           The first deposition being July 13th, 2012.

18   Does that ring a bell?

19   A.    Sure.

09:52:36  20   Q.    And the second day of the deposition was October

21   3rd, 2012, correct?

22   A.    Sounds about right.

23   Q.    Okay.  And the depositions were under oath?

24   A.    I'm sorry?

09:52:48  25   Q.    The depositions were both under oath, correct?

1  A.    That is correct.

2  Q.    And you swore to tell the truth?

3  A.    That is correct.

4  Q.    Thank you.

09:52:59 5           MR. CARNEY:  Kim, could you pull up

6  Volume 1 of the deposition.

7           THE COURT:  Would the lawyers come up here

8  for a minute?  You can stand and stretch if you want.

9           (Side-bar conference had off the record).

09:55:52 10          THE COURT:  Okay.  I guess we're ready to

11  go.

12  BY MR. CARNEY:

13  Q.    Now, just to recap what we just discussed, you

14  personally never told anybody from Hodell that a red flag

09:56:41 15  would have been 30, 30 users, right?

16  A.    No, sir, I did not.

17  Q.    And to your knowledge -- and to your knowledge,

18  nobody at SAP did as well, correct?

19  A.    To the best of my knowledge, that's correct.

09:57:01 20  Q.    Any communication to that effect would have come

21  from the partner, correct?

22  A.    Typically, yes.

23  Q.    Okay.  And in this case it wouldn't have been

24  inappropriate for LSi to provide that information to

09:57:18 25  them, correct?

1    A.    By "That information," can you be more specific for

2    me, please?

3    Q.    The 30-user limitation.

4    A.    I wouldn't consider it a limitation at all.

09:57:28  5    Q.    A red flag.

6    A.    It's a flag saying that the reseller needs to

7    investigate further, and this is one person's analysis.

8    Q.    "That person" being an employee of SAP?

9    A.    That is correct.

09:57:42 10    Q.    Okay.  Now, turn to Exhibit 129, please.  Can you

11    turn to Page 8, Kim?

12               And we talked about this document

13    yesterday, and the second paragraph of the first column,

14    it says that SAP Business One is for companies with 100

09:58:44 15    employees, and optimized for performance with up to 50

16    concurrent users, correct?

17    A.    That is correct.

18    Q.    And this is a March, 2006 publication, correct?

19    A.    Correct.

09:58:56 20    Q.    And once you got involved with Hodell-Natco and you

21    realized that they had 120 users, you didn't tell them

22    that -- you didn't tell them any of this information,

23    correct?

24    A.    No.  But the 50 concurrent users is talking

09:59:11 25    specifically about 50 users on the system all at the same

 1   time and it's optimized.  It doesn't mean that it can't

 2   work with more.

 3   Q.    You didn't tell Hodell-Natco that Business One was

 4   optimized for 50 concurrent users, did you?

 5   A.    No, sir.

 6   Q.    And you don't know if anybody at SAP ever did,

 7   correct?

 8   A.    I do not know that.

 9   Q.    And it would have been the channel partner who

10   would have provided that information to them, if anybody,

11   correct?

12   A.    Typically speaking, that's correct.

13   Q.    Now, you testified yesterday that -- well, I asked

14   you, I asked you, "In order for a channel partner to sell

15   Business One, you would agree with me that a channel

16   partner would have to make representations about the

17   capabilities of the product, wouldn't you?"

18              And I said, "It would stand to reason,

19   correct?"

20              MR. KELLEHER:  Objection, Judge.  This is a

21   compound question.  I don't understand.

22   BY MR. CARNEY:

23   Q.    And you testified --

24              THE COURT:  You can ask him a question.  I

25   mean --

1    Q.    You testified in your -- you testified yesterday

2    that they may not make representations to customers,

3    correct?

4    A.    They can do what it says in the license agreement.

10:00:38  5    I can't quote that back to you verbatim, but the license

6    agreement is clear what they can and cannot represent.

7    Q.    Can a -- so is it your testimony that a reseller

8    like LSi can make representations about the number of

9    users that SAP Business One can handle at their business?

10:01:03 10    A.    No.   That's -- they can't do that.

11    Q.    They can't do that.

12         They can't talk to the reseller about the

13    volume of data they have and tell them -- tell them if

14    Business One is a good fit or not a good fit?

10:01:18 15    A.    That they very much can do.

16    Q.    They can do that?

17    A.    They can absolutely pursue how much volume the

18    customer might be pushing through.  They would also talk

19    about where they're going to be pushing the data.

10:01:30 20    They'll ask them what kind of hardware they're going to

21    use.  They can ask that question, sure.

22    Q.    And all that information that you just described

23    would come from SAP, correct?

24    A.    Some of it does.

10:01:38 25    Q.    And they would have to pass that information along

1    to the customer?

2    A.    Not necessarily.

3    Q.    Okay.  If that's your testimony.  Fine.

4          Is it the -- should the customer get on the

10:01:50  5    Internet and search this on his own?  Is that your

6    testimony?

7          MR. KELLEHER:  Objection, Your Honor.

8          THE COURT:  Overruled.

9    A.    Most customers these days do just that.

10:02:01 10    Q.    I'm talking about in 2003, during the course of a

11    sale --

12    A.    Okay.

13    Q.    -- and an SAP Business One channel partner is

14    making a sale to -- making a sale to a customer like

10:02:15 15    Hodell.

16    A.    Um-hmm.

17    Q.    And they're showing them the product, they're

18    showing them how it works, they're asking -- Hodell's

19    asking questions about users, transaction volume.

10:02:32 20          The channel partner's got to provide them

21    with information on that.  They've got to answer their

22    questions, do they not?

23    A.    They do.

24    Q.    And the information that they answer their

10:02:43 25    questions with is information that's been provided to the

1    channel partners by SAP.

2    A.    In part, yes.  But also based on their experience

3    in the field.  We rely very, very heavily on that.

4    Q.    You talked about the opportunity qualification tool

10:03:18  5    yesterday and you were asked some questions about it

6    again today, correct?

7    A.    Yes, sir.

8    Q.    And that's Exhibit 435.

9          Before we get there, I have one more

10:03:35 10    question with respect to 129.  Again, Page 8, Kim.  You

11    having difficulty?

12                    A FEMALE SPEAKER:  Page 8?

13                    MR. CARNEY:  Page 8.

14    BY MR. CARNEY:

10:04:44 15    Q.    I just want to ask you one other question with

16    respect to the second paragraph on the first page.

17          It states that Business One is ideally

18    suited for companies with 10 to 100 employees, correct?

19    A.    That is correct.

10:05:00 20    Q.    And in 2003, 2004, 2005, and 2006 and 2007 and

21    2008, you were aware of the fact that Hodell had in

22    excess of 100 employees that whole period of time,

23    correct?

24    A.    That is correct.

10:05:20 25    Q.    Okay.  With regard to Exhibit 435, the opportunity

1    qualification tool, this was published in February of

2    2006, correct?

3    A.    That is correct.

4    Q.    The Hodell sale was consummated in 2004, correct?

10:05:54  5    A.    Two -- yes.  Correct.

6    Q.    Okay.  So this document didn't exist then, correct?

7    A.    That is correct.

8    Q.    This is the first version of it, correct?

9    A.    It says Version 1.0 so I would assume so, but I

10:06:11 10   don't know for sure.

11   Q.    Okay.  And the third -- Kim, could you highlight

12   the third paragraph of the first page, starting with

13   "Overall"?

14             It states that "Overall, the OQT tool only

10:06:30 15   produces two outputs:  Any given opportunity is either a

16   good fit for Business One (a fit or a go) or is not a

17   good fit (no fit or no go)."

18             Did I read that correctly?

19   A.    You did.  And one of the reasons why we quit using

10:06:51 20   it --

21   Q.    You answered the question.  I appreciate it.

22             MR. KELLEHER:  Judge, the witness was

23   literally answering the question.

24             THE COURT:  Overruled.

10:07:01 25

1    BY MR. CARNEY:

2    Q.    Now, turning to the second page, number of

3    employees, 150 employees is no fit, correct?

4    A.    That's simply -- I can't answer that with a yes or

10:07:20 5    no.

6                  MR. CARNEY:  Your Honor, can you direct the

7    witness to answer the question?  It's a direct question.

8                  THE COURT:  You're asking the questions;

9    not me.

10:07:27 10   BY MR. CARNEY:

11   Q.    Answer the question, sir.  It's number of

12   employees, 150 plus employees, this document states no

13   fit?

14   A.    We discussed --

10:07:37 15   Q.    Yes or no?

16   A.    I can't answer it with a yes or no.

17   Q.    Underneath it, the logic, it says "Both no fit, 150

18   plus employees, and marginal fit, 101 employees to 150

19   employees, produce partner text output and are a no fit,

10:07:58 20   no go."

21                  I read that correctly, did I not?

22   A.    You did read it correctly.

23   Q.    Okay.  Now, when you became involved with Hodell,

24   you didn't share any of this information with them, did

10:08:09 25   you?

1 A. No, sir.

2 Q. And this is a confidential document to SAP,

3 correct?

4 A. Well, this is a document that was -- in fact, it's

10:08:22 5 a tool that was available to partners.  The partners were

6 to use this tool.

7 Q. But partners weren't -- had no ability to use this

8 tool in 2004 because it didn't exist, correct?

9 A. That is correct.

10:08:35 10 Q. Okay.  And in 2006, when it did exist, it was a

11 confidential document of SAP, correct?

12 A. That's what it says on this right here.

13 Q. Thank you.

14   MR. CARNEY:  Kim, could you turn to Page 3

10:08:58 15 of the document?

16 BY MR. CARNEY:

17 Q. Number three says "Number of SAP Business One users

18 planned.  Answers:  76 plus, no fit."

19   Hodell had more than 76 employees using

10:09:20 20 Business One, correct?

21 A. They did have more than that.

22 Q. Thank you.  And if you read further, the logic,

23 "Both no fit, 76 plus, and marginal fit, 51 to 76,

24 produce partner text output and are a no fit (no go),"

10:09:42 25 correct?  That's what it says, right?

1    A.    No, sir.  To be accurate it's "51 to 75 produce

2    partner text output" and --

3    Q.    It says "No go"?

4    A.    Right.

10:09:55  5    Q.    Okay.  And this information you did not provide to

6    Hodell when you became involved?

7    A.    That is correct.

8    Q.    And as you sit here you know of no other SAP

9    employee who did, correct?

10:10:08  10    A.    To the best of my knowledge, that is correct.

11              MR. CARNEY:  Kim, could you pull up Exhibit

12    69?

13    Q.    This is the -- a document that I asked you about

14    yesterday and so did your counsel.

10:10:43  15              Do you recall?

16    A.    Yes, I -- yes, I do.

17    Q.    Okay.  And let's turn to Page 3 of this exhibit.

18    Directly in the middle of the page.  Kim, could you blow

19    up that e-mail?

10:11:08  20              This is the e-mail from Udi Ziv dated April

21    12th, 2007 to Dan Kraus, which you were copied on,

22    correct?

23    A.    That is correct.

24    Q.    And Mr. Ziv states, "I honestly do not know what to

10:11:23  25    tell you.  Someone has sold to the wrong customer, which

1     is way above any seen Business One Sweet Spot, 120

2     users!!!  And obviously they are going to be experiencing

3     severe performance issues."

4                    Did I read that correctly?

10:11:45  5     A.    You did read it correctly.

6     Q.    Okay.  And you didn't communicate that to Hodell,

7     did you?

8     A.    I didn't agree with it.

9     Q.    You didn't communicate that information to Hodell,

10:11:59 10    information that was provided to you by one of the

11    developers of -- on the team that developed the software.

12    You didn't provide that information?

13    A.    Mr. Carney, this is just one person's assessment

14    from 6,000 miles away.  I had other people performing

10:12:19 15    assessments and we were providing that information to the

16    customer on a regular basis.

17    Q.    I'm sorry, you must not have understood my

18    question.

19    A.    Please try again.

10:12:27 20    Q.    You did not provide the conclusions of Mr. Ziv to

21    Hodell-Natco?

22    A.    Absolutely not.

23    Q.    Okay.  And at the time that he provided you and

24    others with that information, you'd only been working

10:12:44 25    with the company for five months, correct?

844

1    A.    But I had been working with Business One --

2    Q.    You'd only been working with the company for five

3    months, correct?

4    A.    That's correct.

10:12:52 5    Q.    Okay.  You're not involved in development, you're

6    not involved in coding and writing the software, correct?

7    A.    Oh, that's correct.

8    Q.    Okay.  He goes on to say, "Bottom line, I recommend

9    that we go for a reimbursement and we debrief the whole

10:13:18 10    process that got us to having this customer in the first

11    place."

12              And you didn't provide this information to

13    Hodell either, correct?

14    A.    I didn't agree with it.  That is correct.

10:13:31 15    Q.    And so you didn't provide it to them?

16    A.    That is correct.

17    Q.    Okay.  And to your knowledge, nobody at SAP around

18    this time period provided this information and the

19    conclusions of Mr. Ziv to Hodell, correct?

10:13:48 20    A.    I have no knowledge of anyone doing that.

21    Q.    Thank you.

22              THE COURT:  Mr. Carney, I'll interrupt you

23    now.

24              We'll take our morning recess.  Keep in

10:13:56 25    mind the admonition, about 15 minutes, refresh

1    yourselves.

2                    THE CLERK:  All rise.

3                    (Jury out).

4                    (Recess taken)

10:34:02  5    BY MR. CARNEY:

6    Q.    Before we broke -- I'm sorry.  Before we broke, we

7    were discussing Exhibit 69, and that was the Ziv e-mail

8    that you did not communicate to -- the conclusions of

9    which you did not communicate to Hodell-Natco, correct?

10:34:30 10    A.    Correct.

11    Q.    Okay.  Let's go to Exhibit 247.  Do you have it in

12    front of you?

13    A.    Yes, sir, I do.

14    Q.    Thank you.  I just want to highlight the first

10:35:00 15    e-mail on the first page.

16                    This is another e-mail from Mr. Ziv about

17    two weeks later, correct?

18    A.    Correct.

19    Q.    And he said "There's not much we can do here.  We

10:35:23 20    will supply what may be a fix for the current problem,

21    but we know that there will be others.  There is no doubt

22    that this is not a Business One customer, and we somehow

23    need to get away from this."

24                    Correct?

10:35:35 25    A.    That is what he writes.

1    Q.   And you are familiar with this e-mail, correct?

2    A.   Yes, sir, I am.

3    Q.   And you were familiar with it at the time, correct?

4    A.   You mean on the date of the e-mail?

10:35:48  5    Q.   You learned about it, right?

6    A.   Yes, I have learned about it, correct.

7    Q.   And to your knowledge, none of this information,

8    none of these conclusions were ever provided to SAP at or

9    around the time of the date of the e-mail, certainly by

10:36:05 10   you, correct?

11   A.   Well, this specific e-mail, no, that's correct.

12   Q.   Okay.  You'd agree with me, in both of the e-mails

13   that we just discussed from Mr. Ziv, he doesn't even

14   address the issue of add-ons, correct?

10:36:56 15   A.   In this one, no.  I'd have to reread the other one

16   carefully to be able to agree with you.

17   Q.   Okay.  Well, then why don't we turn back to 69?

18   A.   Okay.

19   Q.   69.3, Kim.  Specifically, I don't see the word

10:37:13 20   "Add-on" or "Add-ons" in Mr. Ziv's e-mail of April 12th,

21   2007.

22   A.   Mr. Carney, I might be mistaken, but it may be

23   earlier in the context that it is mentioned.

24            I know in some communication, Mr. Ziv

10:37:27 25   became aware of add-ons.

1    Q.    I'm only asking you about the April 12th, 2007

2    e-mail.

3    A.    He doesn't state anywhere -- let me --

4    Q.    There's no reference to add-ons.

10:37:43  5    A.    In this one e-mail that's highlighted -- I can't

6    speak to the rest of the chain because I can't see it,

7    but in this one e-mail the word "Add-on" is not on the

8    page that I can see.

9    Q.    Okay.  Well, then let's turn back to the fourth

10:38:03 10    page of Exhibit 4, the e-mail that started this e-mail

11    chain.

12              It was an April 11th, 2007 e-mail from Dan

13    Lowery to Udi Ziv which you were copied on, correct?

14    A.    That is correct.

10:38:20 15    Q.    Okay.

16    A.    And I see the word "Add-on" in bullet number two.

17    Q.    That's right.  Mr. Lowery advises Mr. Ziv in this

18    e-mail "We've installed a 120 user B1 deal at

19    Hodell-Natco in Cleveland with an add-on we developed

10:38:39 20    called In-Flight Enterprise," correct?

21    A.    Correct.

22    Q.    Okay.  And when Ziv -- so Ziv is aware of that

23    information as of April 11th, 2007, correct?

24              MR. KELLEHER:  Objection, Your Honor.  He's

10:38:54 25    asking about someone else's awareness.

|  |  |
|---|---|
| 1 | THE COURT:  Overruled. |
| 2 | A.    According to this e-mail chain, that is correct. |
| 3 | Q.    Okay.  And when Mr. Ziv circulated his internal |
| 4 | response to the e-mail to Mr. Kraus and you and others |
| 10:39:11 5 | within SAP, he focuses on the user count, correct? |
| 6 | A.    Which is one of the reasons why I disagreed with |
| 7 | him. |
| 8 | Q.    He focuses on the user count, correct? |
| 9 | A.    He does. |
| 10:39:24 10 | Q.    And he makes no reference to In-Flight being an |
| 11 | issue or any other add-on. |
| 12 | The word "add-on" isn't even in the April |
| 13 | 12th, 2007 e-mail, correct? |
| 14 | A.    That's precisely my point. |
| 10:39:38 15 | Q.    There's no reference to add-ons, correct? |
| 16 | A.    In this one e-mail, correct. |
| 17 | Q.    And he was definitive in this e-mail.  Three |
| 18 | exclamation points, correct? |
| 19 | A.    No, sir, I would not call him definitive by the |
| 10:39:52 20 | definition of that word at all. |
| 21 | Q.    120 users with three exclamation points is not |
| 22 | definitive in your mind? |
| 23 | A.    No, sir, that is not definitive. |
| 24 | Q.    Thank you.  Thank you.  Can we move on to Exhibit |
| 10:40:27 25 | 157, Kim? |

1          I want to focus, Mr. Killingsworth, on the

2     e-mail at the bottom of Page -- that begins on the first

3     page of this Exhibit 157 and spills over into the second

4     page.

10:40:46  5          It's an e-mail that's authored by Ralf

6     Mehnert-Meland April 16th, 2007, and you were copied on

7     it.

8     A.    That is correct.

9     Q.    Right?

10:40:55 10    A.    That is correct.

11    Q.    And its summary is that Hodell just had too much

12    data, SAP Business One cannot handle it, and there is no

13    fix in sight.  "I believe we need to find a way to get

14    the customer off of SAP Business One."

10:41:09 15          Did I read that correctly?

16    A.    You did read it correctly.

17    Q.    And Mr. Meland was the director of business

18    development for SAP Business One, correct?

19    A.    For the --

10:41:21 20    Q.    At the time he authored this e-mail?

21    A.    That word "Development" is not the same thing as

22    programming and development that we have been referring

23    to.

24    Q.    I just asked you about his title.  It's --

10:41:33 25    A.    That's what his title says, correct.

850

1    Q.    It's right there in the e-mail?

2    A.    Yeah, but he's not talking about programming.

3    Q.    He's the director of Business One development?

4    A.    Yeah, but not programming.

10:41:41 5    Q.    According to his title?

6    A.    Yeah, but he wasn't a programmer.

7    Q.    That's fine.  And I didn't mean to imply that he

8    was.

9    A.    Okay.

10:41:46 10    Q.    Okay.  But he's concluded, a nonprogrammer, as

11   opposed to Ziv who was a programmer, he's concluded that

12   there's too much data and there's no fix in sight and we

13   got to get -- we've got to get this customer off SAP

14   Business One.

10:42:05 15    A.    That was his opinion at the time.

16   Q.    That was his opinion?

17   A.    At the time.

18   Q.    At the time.  And you never communicated Mr.

19   Meland's opinion to Hodell, correct?

10:42:17 20    A.    Correct.

21   Q.    And you're aware -- or are you aware if anybody

22   else at SAP around the time of this e-mail communicated

23   that to SAP or, excuse me, Hodell-Natco?

24   A.    I am not aware that anybody at SAP communicated

10:42:39 25   Mr. Mehnert-Meland's opinion to Hodell at that time.

1    Q.    Thank you.  Would you agree with me that a customer

2    that is experiencing severe performance problems, like

3    Hodell said they were at the time, would have liked to

4    have known this type of information at that time?

10:43:10 5    A.    No, sir, I do not agree with that.

6    Q.    Thank you.  Turn to Exhibit 158, and this -- is the

7    first e-mail in this chain is an e-mail by Mr. Ashley

8    dated April 17th, 2007, correct?

9    A.    That is what I see, yes.

10:43:52 10   Q.    And after the conference call on 2/17 -- or, excuse

11   me -- April 17th, 2007, once again Mr. Meland says we

12   need to find a way to move them on.

13              Do you see that?

14   A.    No, sir, I don't.  Can you help me?  I'm sorry.

10:44:17 15   Q.    At the top.  I'm sorry.  "All:  One item from my

16   hand.  There is no way Business One will work with this

17   customer.  We need to find a way to move them on.  Plus,

18   Lowery needs to take responsibility for the mis-sell."

19   He's acknowledging here that there was a mis-sell.

10:44:35 20              MR. KELLEHER:  Objection.

21   Q.    Was any of this communicated by you to

22   Hodell-Natco?

23              MR. KELLEHER:  Objection.  Compound

24   question and --

10:44:40 25              THE COURT:  Yeah.  One question at a time,

1    if we could.

2    BY MR. CARNEY:

3    Q.    Mr. Meland is stating in this e-mail that there's

4    no way SAP Business One will work for this customer, and

10:44:58 5    this is an e-mail dated April 17th, 2007, and this

6    information was not communicated to Hodell on that date,

7    correct?

8                    MR. KELLEHER:  Same objection, Judge.

9                    THE COURT:  Overruled.

10:45:09 10    A.    I wasn't on this e-mail.

11    Q.    Okay.

12    A.    And I don't know who, if anybody, communicated

13    anything at that time.

14    Q.    Do you agree with -- do you agree with Mr. Meland's

10:45:26 15    statement here, "Plus, Lowery needs to take

16    responsibility for the mis-sell"?

17    A.    No, sir, I do not agree with that.

18    Q.    So Lowery shouldn't take responsibility for the

19    mis-sell?  Is that your --

10:45:37 20    A.    What I believe is this could have been a very

21    successful implementation if everything had been done

22    correctly.

23    Q.    Thank you.  Turn to Exhibit 159.  Do you have it in

24    front of you?

10:46:35 25    A.    Yes, sir, I do.

1    Q.    I'd like to direct your attention to the e-mail at

2    the bottom of the page, the Dan Kraus e-mail of April

3    17th, 2007.

4              Do you see that?

10:46:46 5    A.    I do.

6    Q.    And he states in that -- he states in that e-mail

7    that there's no go-forward path here with Business One.

8              That's as of April 17th, 2007.

9              I take it you disagree with that

10:47:04 10   conclusion?

11   A.    You're correct.

12   Q.    Okay.

13   A.    It was one month after the sale -- I'm sorry; after

14   we found out about it.

10:47:11 15   Q.    You disagree with it, correct?

16   A.    I do, yes.

17   Q.    And he goes on to say that "The partner clearly has

18   misrepresented the solution."

19              I take it you disagree with that statement

10:47:34 20   as well?

21   A.    You're correct, sir.

22   Q.    You'd agree with me on this, though:  Nothing in

23   this e-mail makes reference to Hodell's hardware

24   infrastructure, correct?

10:47:48 25   A.    In this one paragraph, that's what I see, but I

854

1        cannot speak to the rest of the e-mail chain.

2        Q.    Okay.  And there's no reference to In-Flight or any

3        other add-on, correct?

4        A.    On this screen in front of me, that is correct.

10:48:09  5   Q.    Moving to Exhibit 160, it's a -- and I'd like to

6        focus on the e-mail that starts in the middle of the page

7        of 160.  This is another e-mail from Meland, this one

8        dated April 18th, 2007, the day after the first e-mail

9        that we talked about with Meland, right?

10:48:44 10   A.    I'm sorry, will you rephrase your question?

11       Q.    I'll withdraw it.

12       A.    Okay.

13       Q.    Kim, could you blow up the third paragraph?

14       "Hodell asked the right question today:  Did we buy the

10:49:06 15   wrong solution with SAP Business One?  Based on what we

16       know now, the answer is 'yes,' as Lowery completely

17       oversold SAP Business One."

18                   I read that correctly?

19       A.    You did read it correctly.

10:49:21 20   Q.    Thank you.  You disagree with Meland's conclusion

21       that the solution would not work for Hodell, correct?

22       A.    Here he's referring to 500 users, and that did

23       throw some --

24       Q.    Let me -- let me rephrase the question.

10:49:44 25   A.    Okay.

1    Q.    Mr. Meland is stating that SAP purchased the wrong

2    solution, correct; yes or no?

3    A.    No, you said SAP purchased the wrong solution.

4    Q.    I did.  Hodell-Natco purchased the wrong solution.

10:50:12 5    That's what he's saying, correct?  Yes or no.

6    A.    That's what his summary is in the first part of the

7    paragraph, yes.

8    Q.    Okay.  And he goes on to state that Lowery

9    completely oversold SAP Business One?

10:50:26 10   A.    If 500 users is true, then that could be another

11   flag to consider, but that's what he's saying.

12   Q.    Well, another flag to consider is in SAP's own

13   documentation that 30 users is a red flag, correct?  We

14   talked about that?

10:50:44 15   A.    We did, indeed.

16   Q.    Thank you.

17   A.    And we were talking about --

18   Q.    Thank you.

19           MR. KELLEHER:  Objection, Your Honor.  The

10:50:50 20   witness was in mid sentence.

21           THE COURT:  Overruled.

22   Q.    Now, yesterday under questioning from your counsel

23   you testified -- oh, excuse me.  I apologize.

24           You testified yesterday that you believed

10:51:16 25   that Business One 2007 could improve the performance

856

1    of -- at Hodell-Natco, correct?

2    A.    There was certainly potential for that, yes.

3    Q.    There was potential for that?

4    A.    Yes.

10:51:30 5    Q.    Hodell-Natco never got on Business One 2007,

6    correct?

7    A.    To the best of my knowledge, as I testified

8    yesterday, that is correct.

9    Q.    Were you involved in the development of Business

10:51:55 10    One 2007A software?

11    A.    No, sir.

12    Q.    And you didn't write the code for it and you had no

13    involvement whatsoever, right?

14    A.    Not on the development side, no, sir.

10:52:04 15    Q.    Okay.  Can you turn to 162?

16            Kim, can you blow up the third -- the

17    second paragraph?

18            And I'm going to read to you starting mid,

19    the middle of the paragraph.

10:52:33 20            "Unless the performance issues with large

21    data sets of this magnitude are handled in Business One

22    2007A, there is nothing we can currently recommend to

23    make better as this core issue is a Business One issue in

24    its own base code."

10:52:57 25            Did I read that correctly?

1    A.    You did read that correctly.

2    Q.    Okay.

3    A.    I don't agree with it.

4    Q.    You don't agree with it.  And this was authored by

10:53:11  5    Edward Neveux on July 18th, 2007, and he's a Software

6    Solution architect, correct?

7    A.    Correct.

8    Q.    Thank you.  Kim, could you turn to Exhibit 259?

9    Tell me when you have it in front of you.

10:53:59 10    A.    I'm there.

11    Q.    Okay.  This is an internal -- it's an eight-page

12    internal e-mail that was produced by SAP in discovery.

13             MR. KELLEHER:  Objection.  Foundation.

14             THE COURT:  Overruled.  I mean, just ask

10:54:18 15    him a question about it; don't explain where you got it

16    or if he got it that way.

17    BY MR. CARNEY:

18    Q.    And if you look at the subject matter of the first

19    e-mail on the first page, it says "Urgent forward:

10:54:35 20    Hodell-Natco."

21             Correct?

22    A.    Correct.

23    Q.    Okay.  And somewhere on Page 4 of -- can you turn

24    to Page 4?  Can you blow up the first e-mail at the top,

10:54:53 25    or in the middle of the page, the September 20th e-mail

1     from Dan Kraus?

2                    Now, this is when you were ultimately

3     included on this e-mail chain, correct?

4     A.    That is correct.

10:55:09  5     Q.    Okay.  And it's the same subject matter throughout

6     the whole e-mail, Hodell-Natco, correct?

7     A.    I'm always cautious to agree to something when I

8     haven't read everything, but I doubt --

9                    MR. KELLEHER:  As a point of order, can we

10:55:43 10     provide the witness with a hard copy --

11                    THE COURT:  Overruled.

12                    MR. KELLEHER:  -- so he can look at it?  He

13     is showing him what other people said and asking him

14     about it without him reading the document.

10:55:43 15                    THE COURT:  Excuse me.  If he can answer

16     the question, he'll answer it.  If he can't, he'll say he

17     can't.

18                    MR. KELLEHER:  Thank you.

19     A.    Can you ask me the question again, please?

10:55:56 20     Q.    I'm so distracted I think I forgot.

21                    The subject matter throughout the e-mail is

22     Hodell-Natco, correct?

23     A.    I can't answer that question.

24     Q.    Okay.  Kim, can you turn to Page 7 of the e-mail?

10:56:19 25     A.    Sir, is it possible for me to get a hard copy of

859

1     this easily?  If it's too much trouble, we can go

2     through --

3     Q.    No.  No.  I'll see.

4     A.    Okay.  Sorry for the trouble.

10:57:46  5     Q.    No.  No.

6     A.    So, sir, your question was does this entire

7     document relate to the Hodell issue ongoing at the time?

8     Q.    Yes.

9     A.    That is correct.

10:58:26 10     Q.    And you became involved in this discussion starting

11     on the fourth page of this e-mail, correct?  Under

12     "Urgent forward:  Hodell-Natco"?

13     A.    According to what I have here, and again I'm not

14     trying to be difficult, I'm -- I think I'm the original

10:59:02 15     e-mailer.  I'm the first e-mail, and it's from Paul to

16     Dan, dated September 18th.

17     Q.    Oh, perfect.  Perfect.  I apologize.

18     A.    Perhaps that helps you.

19     Q.    It does.  Well, let's turn to -- let's turn to the

10:59:21 20     sixth page of the e-mail.

21     A.    Okay.

22     Q.    Let's talk about the Dusan Lacko e-mail of

23     September 19th, 2007.

24                    Do you have that in front of you?

10:59:48 25     A.    Okay.  Is it here on the screen?

1    Q.    Yes, it is.

2    A.    Okay.

3    Q.    Kim, could you blow up where it starts with "I was

4    told"?

11:00:15    5         It states that, "I was told that it always

6    was the last, quote unquote, small thing we need to do

7    for them.  So that SAP shows some goodwill and SAP

8    America can talk to them about moving them away from

9    Business One."  And in parens it says, "A/O."

11:00:25    10         Do you know what that refers to?

11   A.    I do.  I assume he's referring to AIO which would

12   be All-In-One, another one of our products.

13   Q.    Okay.  So "Now we are going to spend resources that

14   could be reducing the backlog and risk regressions.  The

11:00:43    15   change will be in DI API for a fix that will probably not

16   mean much in the big picture.  This customer will run

17   into another problem sooner or later.  His DB" --  that's

18   database, correct?

19   A.    That is correct.

11:00:58    20   Q.    "His database is growing and we don't have any

21   archiving solution in Business One.  As I see it, this

22   customer has a very small chance to be a satisfied

23   Business One customer."

24         Now, you never communicated Mr. Dusan

11:01:18    25   Lacko's conclusions to Hodell-Natco either, did you?

```
 1    A.    I didn't agree with it.  No, sir.

 2    Q.    Okay.  You didn't agree with it.

 3                 Who is Dusan Lacko?

 4    A.    I don't remember his specific role but I believe he

 5    was in either support or development.

 6    Q.    Okay.  And turning to the next e-mail that starts

 7    at the bottom of Page 5, and goes on to Page 6, this

 8    e-mail was authored by Shang-Ling Jui on September 19th,

 9    2007.

10                 She, too, is an employee of SAP, correct?

11    A.    I -- it appears so.  Yes.  I don't know her.

12    Q.    You don't know who she is?

13    A.    No, I don't.

14    Q.    Do you know what department she is in?

15    A.    I don't, I'm sorry.

16    Q.    She states that, "Again, though we put much in this

17    case, it's little chance to have this customer satisfied

18    because of the improper use case.  For Business One, 120

19    clients and 400 concurrent database connections overloads

20    the Business One product.  Never expect a tiger to fly.

21    I urge the migration plan for this customer."

22                 And you never communicated this to

23    Hodell-Natco either?

24    A.    Again, no, sir.  I didn't agree with it.

25    Q.    So you didn't communicate it?
```

```
 1    A.    I didn't, no.

 2    Q.    Okay.  And you know of nobody else who communicated

 3    this conclusion within SAP to Hodell-Natco?

 4    A.    It was one person's assessment from far away.  I

 5    assume it was --

 6    Q.    So the answer is no?

 7    A.    That is correct.

 8    Q.    So you disagreed with Ziv's conclusions,

 9    Mehnert-Meland's conclusions, Kraus's conclusions,

10    Neveux's conclusions, Lacko's conclusions and

11    Shang-Ling's conclusions, correct?

12               MR. KELLEHER:  Objection.

13    A.    Correct.  You're absolutely correct.

14    Q.    All of whom concluded that Business One was not

15    going to work for Hodell?

16               MR. KELLEHER:  Objection.

17    A.    That was their -- that was their opinion.

18    Q.    And in none of the e-mails where they expressed

19    their conclusions, there was never any -- anything with

20    respect to In-Flight or Hodell-Natco's IT infrastructure,

21    correct?

22    A.    I can't say -- I'm sorry, ask that question again.

23    Q.    We went through -- I asked you questions about a

24    series of e-mails.

25    A.    Right.
```

1    Q.    Correct?

2    A.    Right.

3    Q.    From Ziv, from Kraus, from Meland, from Neveux,

4    from Lacko and Shang-Ling, correct?

11:04:23 5    A.    Correct.

6    Q.    And in none of the e-mails that we discussed was

7    there a reference to In-Flight, correct?

8    A.    No, sir, that's not correct.

9    Q.    The --

11:04:34 10    A.    The very first one that we talked from Udi Ziv, we

11    talked about that was in a previous e-mail string.

12    Q.    You're talking about the Lowery e-mail informing

13    Udi Ziv that there was an add-on called In-Flight,

14    correct?

11:04:51 15    A.    Correct.

16    Q.    And when he expressed his conclusion that it's

17    outside any -- it's outside any sane Sweet Spot for

18    Business One, he -- Mr. Ziv never mentioned In-Flight as

19    being an issue, correct?

11:05:09 20    A.    He doesn't say that in one e-mail, but, no, and he

21    also didn't have the full assessment.  He wasn't there.

22              He wouldn't know it was.

23    Q.    Did Mr. Ziv's e-mail make any reference to

24    In-Flight?

11:05:37 25    A.    That e-mail did not.

1    Q.    Thank you.  Now, you testified yesterday that SAP

2    installed a number of patches on Business One -- at

3    Hodell and Business One -- and Business One at Hodell,

4    the performance improved significantly.

5              Do you recall that?

6    A.    I do.

7    Q.    Okay.  And that testimony was based on several

8    e-mails that were provided to you by your counsel.

9              Do you recall?

10    A.    Well, I knew that information based on my own

11    assessment and my own involvement in the project.

12              I'm the one that actually wrote the e-mail

13    that provided that summary.

14    Q.    There were a number of e-mails that you testified

15    about yesterday, correct?

16    A.    Too many to remember.

17    Q.    Turn to 809, Kim.

18              This is a five-page e-mail that you

19    testified about yesterday, correct?

20    A.    Correct.

21    Q.    And starting on the second page of the document,

22    it's an October -- the second page is an e-mail from

23    Mr. Neveux to you dated October 17th, 2007, correct?

24    A.    Correct.

25    Q.    And the first sentence of his e-mail is "As

1    requested, here is a summary from my perspective with

2    respect to the on site visit that we had with

3    Hodell-Natco yesterday at their Cleveland office."

4    A.    That's --

11:07:29  5    Q.    So I gather from that that you and Mr. Neveux were

6    in the Hodell-Natco Cleveland office on October 16th of

7    2007?

8    A.    That --

9    Q.    Does that comport with your --

11:07:42 10    A.    I don't remember the exact date, but yes.

11    Q.    But that comports with your understanding?

12    A.    Yes.  Yes.

13    Q.    Okay.  And the sum and substance of your testimony

14    with respect to this e-mail, this entire document, is

11:07:57 15    that performance was improving at Hodell-Natco, right?

16    A.    That was one of the things from this e-mail, yes.

17    Q.    Okay.  But it was your conclusion, based on your

18    visit on October 16th, that Hodell's Business One

19    environment was improving, correct?

11:08:15 20    A.    It was my conclusion based on what I was being told

21    by the customer and the experts that performance was

22    improving.

23    Q.    Okay.  And Exhibit 307 was another document that

24    you testified about, correct?

11:08:37 25    A.    It's coming, I'm sure.

1    Q.    Okay.  I'm sorry.

2              MR. CARNEY:  Kim, can you blow that up?

3    A.    I'm there.

4    Q.    Okay.  And this is an e-mail to you from Joe

11:09:01 5   Guagenti at -- he worked for LSi, correct?

6    A.    That is correct.

7    Q.    Okay.  And this was an e-mail dated September 14th

8    of 2007, correct?

9    A.    That is correct.

11:09:16 10  Q.    And based on this e-mail, this was further -- a

11   further indication to you that performance was improving

12   at -- or had improved substantially at Hodell-Natco,

13   correct?

14   A.    That is correct.

11:09:32 15  Q.    Now let's turn to Exhibit 426.  This is an e-mail

16   that you weren't shown by your counsel yesterday.

17              Do you have that up in front of you?

18   A.    I do.

19   Q.    Okay.  Let's turn to -- let's turn to the bottom of

11:10:59 20  Page 2 of the document, okay?

21              It starts -- it's the start of an e-mail

22   from you to Matt Lull?

23   A.    I see it.

24   Q.    Okay.  And Matt Lull, who is he?

11:11:16 25  A.    May I see the bottom before -- I believe he was

1    someone at Citrix.

2    Q.    Okay.  Citrix is not affiliated with SAP, correct?

3    A.    That's correct.

4    Q.    Okay.  And the e-mail continues on to Page 3 of

5    this document, correct?

6    A.    That is correct.

7    Q.    And this is your e-mail and you're saying hello to

8    Matt, and I'm going to start with the second paragraph

9    starting with "This customer."

10            "This customer, Hodell-Natco, is a small

11   family-owned business in the fastener and chain industry.

12   They have eight locations, headquarters in Cleveland,

13   Ohio.

14            "They have a 120-user SAP Business One

15   installation with a custom add-on written by their

16   current SAP VAR" -- and that would have been LSi,

17   correct?

18   A.    Correct.

19   Q.    "That provides additional functionality specific

20   to the fastener industry.  Most all of these users

21   connect to the ERP system via Citrix, including the

22   remote offices.

23            "They are experiencing terrible

24   performance in the ERP system and we believe there are

25   four primary reasons:

1          "SAP Business One is not designed to

2     handle this amount of transaction volume.

3          "The add-on is creating some additional

4     overhead."

11:12:51  5          You go on to talk about the

6     hardware/network and then you conclude with the Citrix

7     environment, correct?

8     A.    That is correct.

9     Q.    So this is an e-mail dated October 19th, 2007,

11:13:18 10     after your visit to Hodell-Natco that's completely

11     inconsistent with what you told the jury yesterday?

12          You're telling -- you're saying in this

13     e-mail that they are having terrible performance at

14     SAP -- at Hodell-Natco, correct?

11:13:26 15          MR. KELLEHER:  Objection.  This is a

16     compound question, Judge.  Can we get the question one at

17     a time?

18          THE COURT:  He can answer it.

19     A.    I can answer this question.  So --

11:13:33 20     Q.    Well, let me rephrase it because --

21          THE COURT:  You asked him the question.  He

22     says can answer it so let him answer it.

23     A.    What I was communicating to this individual was

24     that since the beginning, we had been dealing with

11:13:45 25     performance problems.

1      Now, by my saying that they were

2   experiencing terrible performance wasn't necessarily a

3   direct result of something that I saw the day before.

4      I was kind of recapping the entire

5   situation, because one of the things that was identified

6   was that the Citrix environment could be suspect.  So SAP

7   reached out to Citrix and we asked "Hey, guys, would you

8   be interested in coming and helping us do an assessment?"

9   And we were even talking later in this e-mail chain about

10  paying for it.

11      So I was just telling this guy, "Hey, we

12  got some problems over here.  We need some help."

13  Q.    And the problems were terrible performance in

14  the --

15  A.    According to the customer it had been, but

16  perhaps --

17  Q.    And according to your e-mail, correct?

18  A.    I am restating what had been told to me.  I'm also

19  restating over the course of time.

20      We also have other e-mails with the

21  customer prior to this that said it greatly improved.

22  Q.    Your e-mail says "Terrible performance," and it

23  isn't couched in terms of the customer's telling me they

24  have terrible performance.

25      You're communicating to Matt Lull that

1    there was terrible performance, correct?  Yes or no?

2                    MR. KELLEHER:  That's a compound question.

3                    THE COURT:  It is more than a compound

4    question.

5    BY MR. CARNEY:

6    Q.    Okay.  Let's move on.  Let's move on to Page 5 of

7    the e-mail, correct?

8    A.    Okay.

9    Q.    Mr. Meland actually started this e-mail chain,

10   correct?

11   A.    I can't tell from here.  I'm sorry.

12   Q.    Last page, 426.5.

13                   Do you have it, Kim?  Can you blow it up,

14   please?

15   A.    I assume this is the last page, and if that's the

16   case, then it is correct, Mr. Ralf Mehnert-Meland started

17   it.

18   Q.    Your co-worker?

19   A.    I'm sorry?

20   Q.    He's your co-worker?

21   A.    Yes.

22   Q.    And he's asking Michel Koopman -- I believe he was

23   a Citrix employee as well, correct?

24   A.    I can't say for sure, but based on the context,

25   that's a reasonable conclusion.

1    Q.    And he's asking for help, right?

2    A.    Yes.

3    Q.    And he states, "I have a huge request.  We have an

4    escalation with a SAP Business One customer running in a

11:16:19  5    Citrix environment.  They have abysmal performance, which

6    is essentially an issue of the number of

7    user/transactions they run with SAP Business One -- not a

8    Citrix issue."

9              Did I read that correctly?

11:16:33 10    A.    You did read it correctly.

11    Q.    And that --

12    A.    I don't agree with it, obviously, but you read it

13    correctly.

14    Q.    I know you don't agree with it.

11:16:41 15    A.    Okay.

16    Q.    I was going to ask you that.

17    A.    All right.

18    Q.    Thank you for --

19    A.    Sorry.

11:16:45 20    Q.    Okay.  So he characterizes, you know, Mr. Meland

21    characterizes the performance of SAP Business One in this

22    e-mail at a time that was after your on site visit as

23    abysmal, but again, you disagree with that

24    characterization?

11:17:01 25              MR. KELLEHER:  Objection, Your Honor, to

1    the form of the question.

2                    THE COURT:  The answer may stand.

3                    He disagrees with it.

4    Q.   Turn to 901, please, Kim.

11:17:58  5               This is another e-mail that you reviewed

6    with your counsel yesterday, correct?

7    A.   That is correct.

8    Q.   And the subject is Hodell-Natco visit.  It's a July

9    8th, 2007 e-mail, correct?

11:18:14 10  A.   That is correct.

11   Q.   And the sender is Gadi Barnea?

12   A.   Correct.

13   Q.   And you were one of the recipients?

14   A.   Correct.

11:18:23 15  Q.   And let's take a quick look at the document, okay?

16   Third line, again 120 user in various locations,

17   Cleveland, St. Louis, Houston, Reno.

18                    That accurately reflects Hodell's user

19   count in July of 2007, yes?

11:18:58 20  A.   I don't know that.  That's what he's saying here,

21   but I can't say for sure.

22   Q.   This person, Mr. Barnea, went to -- you testified,

23   went to a site visit at Hodell at your direction,

24   correct?

11:19:14 25  A.   That is correct.

1    Q.    He's part of your team?

2    A.    That is correct.

3    Q.    And you rely on what your team members tell you,

4    correct?

11:19:20 5    A.    That is correct.

6    Q.    And you have no reason to doubt the veracity of

7    that statement, do you?

8    A.    I'm not saying it's right or wrong.  I'm just

9    saying I don't have data to confirm or deny; I'm sorry.

11:19:51 10    Q.    Okay.  Let's go focus in, Kim, on the portion of

11    the e-mail that begins with "To give you the underline

12    result first."

13              "I can break down the cause of the

14    performance into three different categories.  80% of the

11:19:58 15    issues result -- results of the In-Flight add-on or a DI

16    API issue."

17              Do you see that?

18    A.    I do.

19    Q.    It's either the add-on or a DI API issue.  That's

11:20:14 20    what Mr. Barnea's communicating to you in that sentence,

21    correct?

22    A.    That's correct.  Eighty percent of the problems

23    were somewhere within there.

24    Q.    Okay.  And the DI API is part of the core Business

11:20:32 25    One software package?

1    A.    Again, I'm not super technical, but I'm reluctant

2    to say core.

3            It is part of SAP Business One suite, but

4    I'm not willing to say it's part of the core.

11:20:56  5    Q.    It's not anything that was developed or coded by

6    LSi, is it?

7    A.    That is correct.

8            It's our pipe as we talked about yesterday.

9    Q.    And there's software and coding that was developed

11:20:57 10    by SAP that is part of that, quote, unquote, pipe, right?

11    A.    Absolutely correct.

12    Q.    Okay.  Then it goes on to say, "Ten percent from

13    SAP core product."

14            So at least Mr. -- is it Mr. Barnea?

11:21:18 15    A.    It is Mr. Barnea.

16    Q.    Okay.  You know, he's saying it could be as much as

17    90% an SAP issue, correct?

18    A.    I don't agree with that statement.

19    Q.    I didn't think you would.

11:22:47 20            Let's go to Exhibit 173, please.  Now,

21    during the course -- during the course of the ongoing

22    litigation, you contacted Geoff Ashley, correct?

23    A.    That is correct.

24    Q.    Let's turn to the second page of the document --

11:23:12 25            MR. KELLEHER:  Objection, Your Honor.

1       THE COURT:  Overruled.

2   Q.    173.2.

3   A.    Yes.

4       MR. KELLEHER:  Your Honor, may we approach

11:23:24  5   on this issue just very briefly?

6       MR. MILLER:  This is hotly contested.  This

7   was an exhibit that we objected to in advance.

8       THE COURT:  Okay.  Come on up.

9       You can stand and stretch if you want.

11:23:38 10       MR. KELLEHER:  Can they take it down,

11   please?  Judge, can they take it down while we talk?

12       (Side-bar conference had off the record).

13       THE COURT:  The objection is sustained.

14  BY MR. CARNEY:

11:28:39 15  Q.    Kim, could you please pull up Exhibit 700?

16  Defendant's Exhibit 700.

17       Now, you testified about this this morning,

18  on examination by your counsel, correct?

19  A.    That is correct.

11:29:05 20  Q.    And on Exhibit 700, there's a number of categories

21  that you went -- that you went through that describe the

22  particular customers, correct?

23  A.    That is correct.

24  Q.    Are these fields that you created or had -- or were

11:29:27 25  these fields created at your direction?

1    A.    No, sir.

2    Q.    How were they --

3    A.    May I ask you for a clarification on the question?

4    Q.    Sure.  There's all kinds of categories and columns

5    on the document.

6    A.    Okay.

7    Q.    And I consider each category to be a field.

8    A.    Okay.

9    Q.    Did you -- did you ask someone to create me a

10   document with these fields?

11   A.    No, sir, I did not.

12   Q.    Okay.  How was the document created?

13   A.    On this one, because it's a global document, I

14   asked a colleague -- essentially, I needed a customer

15   report that had all Business One customers in all of the

16   world with 50 or more licenses.

17              I believe that's all the instructions that

18   I gave him.

19   Q.    Okay.  And this was the report that was generated

20   for you?

21   A.    That is correct.

22   Q.    Okay.  And there's no information on this report

23   with respect to any of the customers listed on the

24   report, of how many add-ons the customers are using at

25   their specific locations?

1    A.    No, sir.  This report does not address add-ons.

2    Q.    Okay.  And there's no information on the number of

3    inventory items that these customers are using, correct?

4    A.    Absolutely correct.

11:30:47 5    Q.    And there is no information on the number of

6    customers that any of these entities service, correct?

7    A.    Absolutely correct.

8    Q.    There's no information on the number of suppliers

9    that any of these customers deal with, correct?

11:31:04 10    A.    Again, correct.

11    Q.    And there's no information on that spreadsheet as

12    to how any of these customers of SAP are actually using

13    the system, correct?

14    A.    Absolutely correct.

11:31:19 15    Q.    For example, this report doesn't even tell you how

16    many SAP Business One systems a particular customer has,

17    correct?

18    A.    That is correct.

19    Q.    So, for example, Chevron, they have a lot of

11:31:37 20    subsidiaries and a lot of offices and things of that

21    nature, correct?

22    A.    That is correct.

23    Q.    They could have multiple Business One systems in

24    their organization, correct?

11:31:50 25    A.    Absolutely correct.

1    Q.    And this wouldn't reflect that?

2    A.    That is correct.

3    Q.    And we could go down, and you'd have to say the

4    same -- give the same answer with respect to any of the

11:32:01  5    customers on the list?

6    A.    Absolutely correct.

7    Q.    The report doesn't tell you if all the users are

8    operating on the same system, does it?

9    A.    No, it does not.

11:32:16  10    Q.    Hodell operated on one system, correct?

11    A.    Correct.

12    Q.    Chevron could, for all we know, could be operating

13    on a hundred systems, correct?

14    A.    They could be operating on one system.  We don't

11:32:31  15    know.

16    Q.    But we don't know that?

17    A.    This report does not give us any of that

18    information.

19    Q.    It doesn't give that information for any of the

11:32:40  20    customers?

21    A.    Correct.

22    Q.    Do you know how many systems, Business One systems

23    Chevron is operating under?

24    A.    No, sir, I do not.

11:32:55  25    Q.    Do you know how many Business One systems any of

1   the customers that are listed in Exhibit 700 are

2   operating on?

3   A.   I could probably find -- yes.  Okay.  The answer to

4   your question is yes.

11:33:09 5   Q.   Okay.

6   A.   Two of the customers that I referred to, Tech

7   Equipment and Fairview Fittings that I referred to

8   earlier, both of them are operating on one system.  One

9   has 153 licenses and the other one has 158.

11:33:22 10   Q.   And we'll get to them.

11   A.   Okay.

12   Q.   Okay.  One was Fairview Fittings, right?

13   A.   Correct.

14   Q.   You don't know what Fairview -- the size of

11:33:36 15   Fairview Fittings' inventory is, do you?

16   A.   I do not.

17   Q.   Okay.  You don't know how many customers Fairview

18   has?

19   A.   No, sir.

11:33:45 20   Q.   You don't know how many suppliers they have and you

21   don't know how many -- you don't know how much data

22   pushes through their Business One system, do you?

23   A.   Absolutely correct.

24   Q.   Okay.  And if I asked you the same questions with

11:33:59 25   respect to -- what was the other entity, Tech Equipment?

1    A.    Tech Equipment.

2    Q.    Would you provide me with the same answers?

3    A.    What I can tell you is that according to the

4    partner from a very, very high level as he considers them

11:34:13 5    an extremely high volume user.

6              MR. CARNEY:  Move to strike, Your Honor.

7              THE COURT:  You asked him the question.

8              MR. CARNEY:  It's hearsay.

9              THE COURT:  But you asked the question.

11:34:21 10             MR. CARNEY:  Fair enough.

11    BY MR. CARNEY:

12    Q.    You have no personal knowledge of the amount of

13    volume that Tech Equipment runs through their system?

14    A.    That is correct.

11:34:36 15    Q.    Okay.  No information on the number of customers?

16    A.    That, too, is correct.

17    Q.    No information on the number of suppliers?

18    A.    That is correct.

19    Q.    No information if they are, all of the employees of

11:34:51 20    Tech's systems are using the system concurrently,

21    correct?

22    A.    That is correct.

23    Q.    The test data that you discussed in your testimony,

24    I believe Exhibit 453 was one of them -- you don't have

11:35:48 25    to pull it up.  I don't want to get too deep into the

1    test data.

2                    But that's confidential information that's

3    proprietary to SAP, correct?

4    A.    I'm not sure what you mean by that.

11:36:09  5    Q.    It's confidential information.

6    A.    There were some -- sizing documents, for example,

7    were specifically for use by our resellers.

8    Q.    Okay.  So if the -- so the resellers had access to

9    some of that sizing documentation?

11:36:12 10    A.    Oh, absolutely.  That's why we publish it.

11    Q.    Okay.  And the reseller is supposed to use that to

12    evaluate the customer's needs, correct?

13    A.    That's one of the very important elements, yes.

14    Q.    So the reseller is going to have to speak with the

11:36:30 15    customer, ask them about their needs, roll up their

16    sleeves, get the information, and provide

17    recommendations, correct?

18    A.    That is correct.

19    Q.    Okay.  And if a channel partner, we've also

11:36:49 20    referred to them as resellers, tells a customer to

21    proceed and that the product will work for them in their

22    business environment, with or without add-ons, the

23    customer should be able to rely upon that, correct?

24    A.    I can't answer that, but I mean, it's a

11:37:10 25    complicated --

1    Q.    Well, sir --

2    A.    Here's what I would say --

3    Q.    Well, no, let me --

4    A.    Okay.

11:37:14  5    Q.    Let me ask you another question.

6    A.    Okay.

7    Q.    Your channel partners, the channel partners of SAP,

8    they're qualified, they're vetted by SAP, correct?

9    A.    That's correct.

11:37:31 10    Q.    Okay.  SAP promotes their channel partners as

11    having industry-specific expertise, correct?

12    A.    Not always, no.  But, I mean, some do, yes.  Some

13    have industry-specific.  Some are just generalists.

14    Q.    I'm not asking about -- I'm not asking about the

11:37:51 15    channel partner themselves.

16              I'm asking you about marketing literature

17    of SAP.  Marketing literature of SAP.  We've gone over it

18    in this litigation.

19    A.    I remember that phrase, but I think it's saying

11:38:06 20    that some partners have industry-specific expertise.

21    That's a reasonable conclusion.

22    Q.    Well, pull up 314, please, Kim.

23              Sorry about that, I had to get my binder

24    because I know when you blow it up, it's going to

11:39:03 25    disappear on me.

1          Do you have Exhibit 314 in front of you?

2     A.    I do.

3     Q.    Can you turn to Page 3 of the document, last bullet

4     point, "Unmatched expertise."

5               "Because SAP Business One is delivered

6     through a network of highly qualified channel partners

7     who understand the specific challenges facing small and

8     mid size businesses, customers receive world-class

9     service and support."

10              I don't see anywhere in that statement that

11    some of the channel partners have expertise.

12    A.    This is a general statement.

13              MR. KELLEHER:  Objection.

14              THE COURT:  Overruled.

15    A.    This is a general marketing statement.

16    Q.    And the marketing statement that certainly in this

17    case Hodell relied upon doesn't -- it doesn't say

18    anything about some of our channel partners have

19    industry-specific expertise or some of our channel

20    partners are highly qualified, does it?

21    A.    Mr. Carney, at the end of the day, we do everything

22    we can --

23    Q.    Does it?

24    A.    -- to bring in the best partners we can find.

25              But we don't manage their businesses, we

1    don't run things for them.  What we do do is bring in the

2    best partners we can find.

3    Q.    And SAP brings in highly-qualified channel

4    partners?

11:40:41  5    A.    To the best of our ability, we sure do.

6    Q.    Kim, could you please  pull up Exhibit 316?

7          Actually, Kim, pull up -- blow up the first

8    paragraph of the first page of the document.

9          And it states that this is an

11:41:44 10    agreement -- this is the license agreement, correct?

11    A.    That is correct.

12    Q.    You testified about this in your examination by

13    your counsel, correct?

14    A.    That is correct.

11:41:52 15    Q.    And it states that this is an agreement between SAP

16    America and Hodell-Natco, correct?

17    A.    Correct.

18    Q.    Doesn't say "This is an agreement between SAP AG

19    and Hodell-Natco," does it?

11:42:04 20    A.    You are correct.

21    Q.    Okay.  Now, turn to the last page, the signature

22    page.

23          Can you blow up the signature lines?  The

24    signatories to the agreement are Hodell-Natco and SAP

11:42:28 25    America, correct?

1    A.    That is correct.

2    Q.    Not SAP AG, correct?

3    A.    Correct.

4    Q.    And not the holding company of SAP AG and SAP

11:42:40 5    America, SAP.  SAP is the holding company?

6    A.    I'm not trained in the law.  All I can tell you is

7    what it says.  It says SAP America.

8    Q.    Right, it does say that, but when you were asked by

9    your counsel, your answer was SAP.

11:42:55 10    A.    Okay.

11    Q.    It's not SAP.  It's SAP America, correct?

12    A.    According to what I read here, this is -- it says

13    SAP America, sir.  That's all I can tell you.

14    Q.    And it doesn't say SAP AG?

11:43:12 15    A.    It does not say that.

16    Q.    Thank you.

17          Kim, could you pull up Exhibit 263?

18    Specifically I want to talk to you just briefly about Mr.

19    Shah's e-mail of Saturday, November 3rd -- thank you,

11:43:54 20    Kim -- 2007.

21          And we've had discussion about this,

22    correct?

23    A.    Correct.

24    Q.    And you were asked some questions concerning this

11:44:08 25    document by your counsel, and the whole point of this

1    e-mail was it was simply a recap of the Hodell-Natco

2    situation, they need to come off Business One and let's

3    try to move them into the A1 product, correct?

4    A.    That was the general, general idea, yes.

11:44:29 5    Q.    Okay.  And you stated that "And we'll offer" -- and

6    SAP was prepared to offer financial concessions to SAP to

7    get them into A1?

8    A.    Yeah.  We very much wanted to do the right thing

9    and help them.

11:44:50 10    Q.    Is that reflected in this e-mail?  Because I don't

11    see it.

12    A.    The paragraph that states, "Please note that should

13    any funds be required at any stage from global support,

14    we would need to approve them in advance."  That was one

11:45:05 15    reference to our financial considerations.

16    Q.    Okay.  So no decision had been made, at least at

17    the time of this e-mail, whether or not SAP was going to

18    provide financial relief to SAP, correct?

19    A.    No, sir.  This was where we were going to engage

11:45:24 20    with the customer and offer them as a possible go-forward

21    solution.

22    Q.    Do you know if anybody at SAP engaged with the

23    customer to try to get them to go to the A1 solution?

24    A.    I believe we did, but I --

11:45:41 25    Q.    I just want to know what you know.

                1   A.    I believe we did.

                2   Q.    Do you know if they did?

                3   A.    With a hundred percent certainty, no, but I am

                4   pretty sure --

    11:45:52    5   Q.    Thank you.

                6   A.    -- we did offer that as an option.

                7   Q.    Okay.  Thank you.

                8             MR. CARNEY:  I have no further questions.

                9             THE COURT:  Thank you.

    11:45:59   10             Mr. Kelleher.

               11        RECROSS-EXAMINATION OF PAUL KILLINGSWORTH

               12   BY MR. KELLEHER:

               13   Q.    Let me know when you're ready, Bob.

               14             And, Bob, could you pull up Exhibit 700,

    11:46:34   15   please?

               16             Is it on the screen?  Because mine is

               17   blank.

               18   A.    I can -- I'm seeing it.

               19   Q.    Very good.  I want to make sure I can see it, too,

    11:46:56   20   sir.

               21             You remember Mr. Carney asked you some

               22   questions about this, sir?

               23   A.    Yes, sir, I do.

               24   Q.    And as a general matter, some of the questions he

    11:47:05   25   asked you were about the volume of some of these

888

1    customers?

2    A.    That is correct.

3    Q.    Sir, is Loreal Cosmetics on this list?

4    A.    They are.

11:47:12 5    Q.    Bob, maybe you can blow that up.

6              How many licenses does Loreal have?

7    A.    Oh, I don't remember.  It was, I believe 17 or

8    1800.

9    Q.    Sir, are you generally familiar with the company

11:47:32 10   Loreal?

11   A.    Very generally.  Oh, there they are.  They're

12   number three.

13              Yes, generally familiar.

14   Q.    Sir, Loreal had a lot of products?

11:47:41 15   A.    They do.

16   Q.    A lot of different shades of lipstick?

17   A.    They do.

18   Q.    A lot of different shades of mascara?

19   A.    They do.

11:47:48 20   Q.    Blush?

21   A.    Yes.

22   Q.    Other cosmetic products?

23   A.    Lots.

24   Q.    Loreal have a lot of customers?

11:47:54 25   A.    I would assume.

|   |   |
|---|---|
| 1 | MR. CARNEY:  Objection. |
| 2 | THE COURT:  What's this all about? |
| 3 | MR. KELLEHER:  Your Honor, the questions |
| 4 | from opposing counsel were about the volumes, the number |
| 11:48:05 5 | of items that the company sells, and the insinuation was |
| 6 | that this witness didn't know whether or not the volumes, |
| 7 | the number of items that these companies sold were |
| 8 | similar. |
| 9 | THE COURT:  I don't think that was the |
| 11:48:17 10 | point of the questions. |
| 11 | BY MR. KELLEHER: |
| 12 | Q.   Sir, you mentioned Tech Equipment and Fairview. |
| 13 | A.   I did. |
| 14 | Q.   What industry are they in? |
| 11:48:31 15 | A.   They're in the wholesale industry. |
| 16 | Q.   What industry is Hodell in? |
| 17 | A.   The wholesale industry. |
| 18 | Q.   Did both of those companies have more users than |
| 19 | Hodell? |
| 11:48:39 20 | A.   Yes. |
| 21 | Q.   Were both of those companies on the same system? |
| 22 | A.   Yes. |
| 23 | Q.   Sir, you were shown a series of e-mails where |
| 24 | various SAP employees expressed their views on whether |
| 11:48:55 25 | Business One would work for Hodell. |

1           Do you remember that?

2      A.    I do.

3      Q.    Sir, at the time of those e-mails -- and I

4      understand that you were shown a lot of them -- but

11:49:05  5   generally speaking, they started in April of 2007, do you

6      recall that?

7      A.    I do.

8      Q.    And they sort of went on from there.

9      A.    I do.

11:49:12 10   Q.    At the time, sir, what was, if you know and if you

11     can remember, what was SAP's understanding of the number

12     of users that Hodell was going to go to?

13     A.    Based on my recollection, it was nowhere near three

14     or 500.

11:49:32 15          I thought, I believed 140 was the original

16     number that we were told, but I'm pulling that off the

17     top of my head.

18     Q.    So my question, sir, is not how many they bought,

19     but how many they were saying they were going to go to?

11:49:47 20   A.    There was -- I'm sorry.

21          So there were -- we later learned from

22     comments with the customer and being on calls with the

23     customer, they had talked about three or 500 in these

24     calls later.

11:49:59 25   Q.    Alex, do you have that document?  The call that

891

1    Paul's referencing, April 17th of 2007.

2                    MR. HAYDEN:  (Handing).

3                    MR. KELLEHER:  Hey, Bob, can you pull up

4    Exhibit, looks like, 160.  Thanks.  Can you go to the

11:50:46 5   third page.

6    BY MR. KELLEHER:

7    Q.    Sir, you remember being asked about this e-mail by

8    Mr. Carney?

9    A.    Yes, sir, I do.

11:50:51 10  Q.    Sir, I'd like you to take a look at point number

11   four.  Can you read that, please?

12   A.     "Dirk did an excellent job under stressful

13   conditions.  He set the expectations that this

14   environment is much" -- I'm sorry.

11:51:06 15  Q.    I'll tell you what, sir.  Why don't you actually

16   read paragraph number one, first?

17   A.    Okay.

18   Q.    We'll get the technical stuff ironed out.

19                    It's on Page -- on my version it's on the

11:51:32 20  third page and it's point number one.  There's a series

21   of points one through eight.  It's right there.  Point

22   number one.

23                    I think we're ready for you, sir.  Can you

24   read point number one that's on the screen?

11:51:56 25  A.    Okay.  More slowly this time.

1    Q.    Thank you.

2    A.    "LSi commented that they originally sold this

3    solution, in quotes, to Hodell as something that was

4    designed for companies of 250 million in revenue with up

11:52:10  5    to 500 users.  There was stunned silence on the phone

6    from the SAP team as Hodell confirmed that this was their

7    understanding of what was purchased."

8    Q.    Sir, what's the date of this e-mail?

9    A.    The date of this e-mail is April 17th, 2007.

11:52:29 10    Q.    Sir, does this refresh your recollection as to what

11    SAP's understanding was as to the number of users that

12    Hodell was telling SAP at this time that they were going

13    to have?

14    A.    The second paragraph is clearer on that statement

11:52:49 15    to me, because the way the first paragraph reads, it

16    talks about how it was positioned to the customer by LSi.

17              The second paragraph, however, if I may

18    read on --

19    Q.    Please do.

11:53:02 20    A.    "Hodell currently has 120 users.  They expect to

21    grow at 17% compounded growth per year.  They expect to

22    be a 300 users in the short-term (next couple of years)."

23    Q.    So it was your understanding, sir, that Hodell was

24    going to move to 300 users, and that's what they were

11:53:25 25    telling SAP at least?

```
 1              A.    That's correct.

 2              Q.    But at the time Hodell had only purchased 80 or 120

 3        users?

 4              A.    That is correct.

 5              Q.    And, so, sir, all of these e-mails you were shown

 6        about what various other people said at SAP, they were

 7        all after this e-mail, right?

 8              A.    That is correct.

 9              Q.    And so they would have been written with the

10        understanding that Hodell was saying we're going to go to

11        300, maybe 500 users?

12                           MR. CARNEY:  Objection, Your Honor.

13                           THE COURT:  Objection sustained.

14              Q.    Sir, those e-mails that Mr. Carney showed you, do

15        you have an understanding as to what SAP's understanding

16        was about what Hodell wanted to go to in terms of number

17        of users when those e-mails were written?

18                           MR. CARNEY:  Objection.

19                           THE COURT:  Objection sustained.

20              Q.    Sir, I mentioned a lot of e-mails that Mr. Carney

21        showed you, other people's e-mails.  Let's take a look at

22        some of them.

23              A.    Okay.

24              Q.    Because I think you were trying to give an answer

25        and I don't know that you actually got the full answer
```

1    out.

2    A.    Thank you.

3    Q.    Can you take a look at Exhibit 69?

4          Can you go to the Udi Ziv e-mail that he

11:54:41  5    was showing?  Greg, can you tell him where it is?

6          I'm good.  Here it is.

7          Sir, this is the e-mail that Mr. Carney

8    asked you a bunch of questions about.

9    A.    Correct.

11:55:10  10    Q.    Did you write this e-mail, sir?

11    A.    I did not write this e-mail.

12    Q.    Did you agree with -- do you agree with the

13    contents of this e-mail?

14    A.    No.  And I don't know if this is appropriate, but

11:55:22  15    perhaps I can deal with all of the e-mails as a whole

16    with a statement that pertains to this e-mail and the

17    others.

18    Q.    That's fine.

19    A.    Okay.

11:55:30  20          MR. CARNEY:  Objection, Your Honor.

21          THE COURT:  Overruled.

22    A.    Generally speaking, the individuals with whom I

23    disagreed were not very close to the situation.  They

24    certainly weren't as close to the situation as I was.

11:55:43  25          Especially Mr. Ziv only had a tiny fraction

1    of the data.  He only knew a couple of pieces of -- they

2    had an add-on and they had 120 users and they had

3    problems.  That's all he knew.

4              I was very close to this and I got experts

5    involved, I deployed them on the ground.  We wanted to

6    see for real what was really going on.

7              We had reason to believe -- and again, I go

8    back to my 22 years of experience.  We had reason to

9    believe that ultimately we could figure out what was

10   going on, find the problem, and address it.  We have a

11   huge history of success with these things.

12             These other people, nowhere near -- I don't

13   know how many of them have actually handled a single

14   escalation.  Maybe some of them have, but I've got 22

15   years of experience doing this sort of thing, both as a

16   reseller and at SAP, and when I bring in the smart people

17   and I say assess this and tell me what's going on, assess

18   this, tell me what's going on, and I'm learning about the

19   hardware environment --

20             MR. CARNEY:  Objection.

21             THE COURT:  Overruled.

22   A.    -- and when I'm learning about the hardware

23   environment, I'm getting very good, timely information.

24             And I felt compelled throughout

25   this -- yeah, there may have been moments of

1    exasperation, but we had every reason to believe that we

2    could find the problem and fix it.

3              And, quite frankly, we -- after the

4    patches, patch level 25 and patch level 29, when we saw

11:57:12  5    performance improvement, we proved Mr. Ziv wrong.  We can

6    see improvement.  We were getting real data that nine

7    seconds was the worst we saw.

8              So I had every reason to disagree with

9    those people making assessments from afar.  But we still

11:57:28 10    wanted to consider all options for the right thing for

11    the customer.

12    Q.    Thank you, sir.

13              Mr. Carney asked you a bunch of times why

14    didn't you pass along this e-mail.  He also asked you why

11:57:40 15    didn't you pass along the other e-mails that you were

16    just referencing.

17              Would you like to tell Mr. Carney and the

18    jury why you didn't pass it along?

19    A.    These were internal communications, and for one,

11:57:54 20    I'm not going to pass along something with which I don't

21    agree.

22              Secondly, as I just said, I didn't believe

23    that these people had all of the information.  What we

24    were doing is staying in very, very close communication

11:58:08 25    with this customer.  Like I mentioned before, we answered

1    every e-mail, every phone call.  We arranged calls.  We

2    gave them updates.  We weren't hiding anything but, yes,

3    we were working feverishly behind the scenes and there

4    was no reason for us to share all of the information

11:58:25  5    while we're still making what we believe to be the best

6    decision possible.

7    Q.    Sir, look at Exhibit 69 again, the e-mail from

8    Mr. Ziv.  What's the date on that?

9    A.    It's April 11th, 2007.

11:58:38  10   Q.    I'd like to show you Exhibit 70.  Bob, can you pull

11   that up?

12              Bob, blow up that middle e-mail.

13              Do you recognize this e-mail, sir?

14   A.    Yes, sir, I do.

11:58:59  15   Q.    It's an e-mail from Mr. Ziv to Mr. Lowery, do you

16   see that?

17   A.    I do.

18   Q.    Who is Mr. Lowery?

19   A.    Mr. Lowery was with LSi, IBIS/LSi.

11:59:10  20   Q.    Mr. Lowery -- or Mr. Ziv says to Mr. Lowery, "As as

21   you know, this customer's environment is far outside the

22   Sweet Spot of Business One (with 120 users, et cetera)

23   and therefore we anticipate that such performance issues

24   will come up."

11:59:28  25              Do you see that, sir?

1    A.    I do.

2    Q.    What's the date that Mr. Ziv said this to

3    Mr. Lowery?

4    A.    That would be April the 13th.

11:59:35  5    Q.    Sir, is that literally two days after Mr. Ziv

6    circulated the internal e-mail referencing the Sweet Spot

7    and 120 users?

8    A.    Yes, sir, it is.

9    Q.    Let's take a look at Exhibit 158.  At the very top.

12:00:03 10    Can you blow up the e-mail at the very top?

11                    Do you remember getting questions about

12    this from Mr. Carney?

13    A.    I do.

14    Q.    This is an e-mail.  Did you write this e-mail?

12:00:18 15    A.    No, sir, I did not.

16    Q.    Who wrote it?

17    A.    Mr. Ralf Mehnert-Meland.

18    Q.    Do you know Mr. Mehnert-Meland?

19    A.    I do.

12:00:26 20    Q.    Is Mr. Mehnert-Meland a technical person?

21    A.    No, sir, he is not.

22    Q.    He says, "Lowery needs to take responsibility for

23    the mis-sell."

24                    Do you see that?

12:00:37 25    A.    I do.

1    Q.    My question to you, sir, do you agree that this was

2    a mis-sell?

3    A.    I do not.

4    Q.    Why do you not agree with that?

12:00:44  5    A.    I've said it before and I'll say it again.  This

6    could fit this situation.  If all of the issues had been

7    addressed, if the hardware issue, the Citrix issue and

8    the In-Flight issue had been addressed properly, this

9    could be a successful implementation.

12:01:15 10    Q.    Turn to 259, please.

11              Sir, just as a general matter, do you

12    remember Mr. Carney asked you some questions about this

13    document?

14    A.    I do.

12:01:28 15    Q.    This is an e-mail chain that has a number of

16    e-mails on it?

17    A.    I do.

18    Q.    Sir, I want to take you to an e-mail Mr. Carney

19    didn't show you.  It's on Page 4 at the bottom.  Can you

12:01:44 20    take a look at that?

21    A.    Thank you.

22    Q.    Just let me know when you're there, sir.

23              Do you recognize this e-mail, sir?

24    A.    Yes, sir, I do.

12:02:09 25    Q.    From Mr. Kraus to a bunch of other people, looks

1    like, at SAP?

2    A.    That is correct.

3    Q.    I'm looking at the text.  He says -- and Bob you're

4    going to have to skip to the next page but follow along

12:02:24 5    with me, okay?  Because we're not there yet.  We're going

6    there.

7              "We know that the performance will not get

8    substantially better."

9              Can we go to the next page, Bob?

12:02:36 10              "And have told the customer as much."

11              Do you see that, sir?

12    A.    I do.

13    Q.    Do you have any understanding of what this is in

14    reference to?

12:02:46 15    A.    Yeah.  Mr. Kraus is making it clear that we did

16    talk to the customer about this.

17    Q.    I'd like to take you to Exhibit 158 -- excuse

18    me -- 160.

19              MR. ADELMAN:  160?

12:03:16 20              MR. KELLEHER:  Yes, 160, this is it, this

21    is correct.  We're on the third page.

22              We're at point number four.

23    Q.    Sir, point number four says -- so they're talking

24    about an April 17th, 2007 conference call here?

12:03:38 25    A.    Okay.

1    Q.    So this conference call involved SAP, Hodell, IBIS

2    and LSi, correct?

3    A.    Correct.

4    Q.    Number four says, "Dirk did an excellent job under

12:03:50 5    stressful conditions.  He has set the expectations that

6    this environment is much larger than we were lead to

7    believe and we cannot make any statements as to the

8    performance without some extensive, additional testing

9    and/or analysis."

12:04:02 10              Do you see that, sir?

11   A.    Yes, sir.

12   Q.    So do you have any response to the suggestion that

13   this information was not being passed along to Hodell?

14   A.    I totally disagree with that statement.

12:04:12 15   Q.    To be clear, the information was being passed along

16   to Hodell?

17   A.    Absolutely.

18   Q.    In this conference call?

19   A.    Yes.

12:04:18 20   Q.    On April 17th?

21   A.    Yes.

22   Q.    And subsequently as well?

23   A.    That's correct.

24   Q.    You have personal knowledge of that?

12:04:24 25   A.    Yes.

1    Q.    I'd like to switch gears a little bit, go to

2    Exhibit 901.

3              You remember Mr. Carney showed you this

4    exhibit, sir?

12:04:50 5    A.    I do.

6    Q.    Bob, can you focus in on the stuff that Mr. Carney

7    was talking about, the 80%, but bring it down an extra

8    couple of sentences to the stuff he didn't show him?

9              Sir, do you see where it says "To give you

12:05:19 10   the underline result first, I can break down the cause of

11   the performance issues into three different categories."

12             Do you see that?

13   A.    Yes, sir.

14   Q.    It says, "80% of the issues results of the

12:05:20 15   In-Flight add-on or a DI API issue."

16             Do you see that?

17   A.    I do.

18   Q.    Mr. Carney asked you whether, according to that,

19   90% of the issue could be with respect to SAP and SAP

12:05:33 20   alone.  Do you remember that question, sir?

21   A.    I do, and I disagreed with hmm.

22   Q.    Sir, the sentence below, where it says, "It is not

23   only that the majority of the issues are driven by the

24   add-on, they are also the items with the highest

12:05:46 25   priority."  Do you see that, sir?

1    A.    I do.

2    Q.    What was your understanding when you received this

3    report from Mr. Barnea about specifically what he was

4    saying as what the cause of the performance issues were?

12:05:57  5    A.    I interpreted that to mean that the add-on was the

6    biggest part of the problem.

7    Q.    And that's because he used the word "Majority,"

8    right?

9    A.    That is correct.

12:06:07  10    Q.    That was his conclusion, sir?

11    A.    That is correct.

12    Q.    Mr. Barnea, can you give us a sense of his

13    qualifications to make that conclusion, sir?

14    A.    He was a solution expert.  He'd been working with

12:06:21  15    the software for many, many years and was technical in

16    nature.

17    Q.    This is the sort of stuff he does on a daily basis,

18    right?

19    A.    Every day.

12:06:27  20    Q.    I want to switch gears a little bit, sir.

21              Mr. Carney asked you when Hodell

22    consummated the sale of Business One.

23              Do you remember him asking you that?

24    A.    I do.

12:06:53  25    Q.    Sir, is it possible to acquire Business One

1    licenses before signing a license agreement?

2    A.    No, sir.

3    Q.    Sir, I'd like to show you Exhibit 316.

4          Do you recognize this document, sir?

12:07:11 5    A.    I do.

6    Q.    This is the license agreement between Hodell and

7    SAP, correct?

8    A.    That is correct.

9    Q.    Let's go to the last page -- actually that will do

12:07:21 10    right there.

11          When was this agreement made, sir?

12    A.    The 23rd day of December, 2005.

13    Q.    Is it possible for Hodell-Natco to have received

14    Business One licenses before this day?

12:07:38 15    A.    No, sir.

16    Q.    Sir, I'd like to switch gears again.

17          You were asked a number of questions by

18    Mr. Carney about what resellers are allowed to say and

19    what they're not allowed to say?

12:07:51 20    A.    Yes.

21    Q.    Do you remember those questions, sir?

22    A.    I do.

23    Q.    I want to ask you a question.

24          Are you telling this jury, sir, that SAP

12:08:00 25    expects the resellers to be mutes?

```
 1   A.    Absolutely not.

 2   Q.    So you do expect that they're going to say things

 3   about the product, right, sir?

 4   A.    Absolutely.

 5   Q.    Can you pull up the license agreement -- or the

 6   reseller agreement?  It's 30.  It's Exhibit 30.

 7               Can we go to the section that's like

 8   18-something we looked at this morning?  You know what

 9   I'm talking about, Greg?

10               THE COURT:  Mr. Kelleher, do you have much

11   more?

12               MR. KELLEHER:  Maybe about five minutes,

13   Judge.

14               THE COURT:  Okay.  We'll let you finish.

15               MR. KELLEHER:  Thank you, sir.

16   BY MR. KELLEHER:

17   Q.    Mr. Killingsworth, do you see this paragraph here?

18   A.    I do.

19   Q.    And because we were just interrupted, and the

20   interruption was my fault for not having my binder.  I

21   apologize.

22   A.    No problem.

23   Q.    Sir, Mr. Carney asked you questions about what

24   resellers were allowed to say to customers.

25               Do you remember that?
```

12:08:12 (line 5)
12:08:59 (line 10)
12:09:05 (line 15)
12:09:12 (line 20)
12:09:23 (line 25)

```
 1            A.    I do.

 2            Q.    And you're not telling this jury that resellers

 3       aren't allowed to talk to customers, right?

 4            A.    That is correct.

 5            Q.    Sir, if you'd look at this paragraph,

 6       "relationship," it says "Reseller is an independent

 7       contractor."  It's not the agent.  "Reseller expressly

 8       acknowledges it has no power or authority to accept an

 9       order or to make guarantees or warranties concerning the

10       software."

11                       I want you to focus on this next part.

12            A.    Okay.

13            Q.     "Or to make any commitment for SAP or to obligate

14       SAP in any respect whatsoever."

15                       Do you see that, sir?

16            A.    Yes, sir, I do.

17            Q.    And my question for you is resellers are allowed to

18       talk about the product, right?

19            A.    That is correct.

20            Q.    And when they talk about the product, they don't

21       have the authority to bind SAP, right?

22            A.    That's absolutely correct.

23            Q.    And every customer who signs a license agreement

24       knows that, right?

25            A.    That is correct.
```

1          If I may add, we counsel salespeople on

2     this subject.  As a reseller, you tell your salespeople,

3     you know, go out, demonstrate the product, talk about the

4     product, but you must be accurate with what you say the

12:10:42  5     product will do.

6          Salespeople get eager sometimes -- no

7     offense to the salespeople in the room, I've been one --

8     but they get eager sometimes and might say something that

9     the product may or may not be able to do.

12:10:54 10          So we counsel them make sure you know what

11    the product is able to do.  We provide training, even.

12          If the salesperson says "Hey, this product

13    is great and it washes your car, too," well, just because

14    the salesperson says that doesn't mean SAP has to go

12:11:10 15    change the software to make it wash your car.  We can't

16    make those kinds of binding statements.

17    Q.    Thank you, sir.  And that's because the reseller

18    doesn't have the power or the authority to bind SAP,

19    correct?

12:11:20 20    A.    Correct.

21    Q.    And customers who sign license agreements, they

22    know that?

23    A.    That is correct.

24    Q.    Sir, why don't you look at Section 2.6?  It's on

12:11:37 25    Page 7, Bob.  I want Exhibit 30.

1            There it is.  Can you blow that up, Bob?

2    Thank you.

3            You see that, sir?

4    A.    I do.

12:11:55  5    Q.    It says "Reseller" -- that's IBIS/LSi, right?

6    A.    That is correct.

7    Q.     "Shall use its best efforts to market and license

8    the software."  In all caps, do you see that, sir?

9    A.    I do.

12:12:09 10    Q.     "Reseller does so at its own risk and for its own

11    account."

12            Do you see that, sir?

13    A.    Yes, sir, I do.

14    Q.    Do you have a sense of what that means?

12:12:17 15    A.    Pretty straightforward.

16    Q.    Could you please tell the jury?

17    A.    Sure.  That when they market and provide

18    maintenance and support services, market and license the

19    software, that the reseller does so at its own risk, and

12:12:33 20    it's not obligating SAP in any way.

21            MR. KELLEHER:  Judge, may I have ten

22    seconds to confer with my colleagues?

23            THE COURT:  Yes.

24            (Pause).

12:13:00 25            MR. KELLEHER:  Thank you, Your Honor.  We

1    have no further questions at this time.

2                    THE COURT:  Thank you.

3                    Okay.  Ladies and gentlemen, that will

4    conclude the testimony for this morning.

12:13:13  5              We'll take our luncheon recess.  It's about

6    12:15.  How about if we meet downstairs at 1:30, is that

7    good?

8                    A JUROR:  1:30 is good.

9                    THE COURT:  Is it good?  Where do you want

12:13:24 10   to meet.

11                    A JUROR:  L-1.

12                    THE COURT:  Okay.  L-1 it is.  We'll see

13   you then.  Thanks.

14                    THE CLERK:  All rise for the jury.

12:13:33 15              (Jury out).

16                    (Luncheon recess taken).

17                    (Proceedings adjourned at 12:13 p.m.)

18                          - - - - -

19

20

21

22

23

24

25

1      <u>THURSDAY, JUNE 18, 2015,  1:30 P.M.</u>

2      (Proceedings resumed in presence of the jury as follows:)

3                    THE COURT:  Good afternoon, ladies and

4      gentlemen.

13:33:46  5                    Okay.  You may call your next witness.

6                    MS. LUARDE:  Thank you, Your Honor.  We'd

7      like to call Mr. Neveux.

8                    THE COURT:  Sir, could you raise your right

9      hand for me?

13:37:09 10                    EDWARD NEVEUX,

11         of lawful age, a witness called by the PLAINTIFFS,

12              being first duly sworn, was examined

13                 and testified as follows:

14                    THE COURT:  Please have a seat.

13:37:12 15                    Could you tell us your full name and spell

16     your last name?

17                    THE WITNESS:  Edward Neveux, N-E-V-E-U-X.

18                    THE COURT:  N-E-V --

19                    THE WITNESS:  N as in Nancy, E as in

13:37:31 20     Edward, V as in Victor, E as in Edward, U as in uncle, X

21     as in x-ray.

22                    THE COURT:  Thanks.

23        DIRECT EXAMINATION OF EDWARD NEVEUX

24     BY MS. LUARDE:

13:37:44 25     Q.   Good afternoon, Mr. Neveux.

```
 1    A.    Hi.

 2    Q.    My name is Sharon Luarde and I'm representing

 3    Hodell in this matter, and I don't think you and I have

 4    ever met before, is that correct?

 5    A.    That's correct.

 6    Q.    Okay.  Mr. Neveux, do you currently work for SAP?

 7    A.    I do.

 8    Q.    And what do you do for them?

 9    A.    I'm a solution architect for SAP Business One.

10    Q.    And you've been in that position since 2004, is

11    that correct?

12    A.    Yes.

13    Q.    And in that role, do you work with business

14    partners, such as LSi, that use the software development

15    kit?

16    A.    Yes.

17    Q.    And just for my purposes, is the software

18    development kit frequently referred to as an SDK?

19    A.    Yes.

20    Q.    And what is the SDK used for?

21    A.    It's used by resellers who want to build small,

22    large integrations or add-ons to integrate with SAP

23    Business One.

24    Q.    And you have to use the SDK in order to add on to

25    Business One, is that correct?
```

1    A.    Yes.

2    Q.    And that's because your channel partners or other

3    developers cannot access Business One code directly, is

4    that correct?

13:39:03  5    A.    That's correct.

6    Q.    And, Mr. Neveux, you're familiar with Hodell-Natco?

7    A.    Yes.

8    Q.    And did you become involved with Hodell-Natco back

9    in, gosh, 2006?

13:39:23 10    A.    It's some time in 2006, yes.

11    Q.    And was that because they raised performance issues

12    about Business One?

13    A.    Actually they didn't.  I never actually spoke to

14    Hodell-Natco.

13:39:35 15          It was through the reseller, IBIS/LSi.

16    Q.    Thank you.  And that was while they were actually

17    developing In-Flight, is that correct?

18    A.    I'm sorry.  I don't understand your question.

19    Q.    Sure.  You became involved with LSi while they were

13:39:57 20    developing the add-on for the SDK called In-Flight?

21    A.    Yes.

22    Q.    Is that correct?

23    A.    Yes.

24    Q.    And that was before In-Flight was actually

13:40:07 25    implemented at Hodell-Natco, correct?

1    A.    Yes.

2    Q.    Okay.  And could you tell me the names of some of

3    the people that you were in contact with at LSi?

4    A.    Mainly that would have been Joe Guagenti, if I'm

13:40:25  5    pronouncing that correctly, Dale Van Leeuwen, and the

6    gentleman, I can't remember his last -- his first name.

7    He owns the company.  I can't think of his name.  Sorry.

8             THE COURT:  Ed, you have a very soft voice.

9             THE WITNESS:  Oh, sorry.

13:40:40  10             THE COURT:  Do you want to lean a little

11    bit closer to the mic?

12             THE WITNESS:  Sure.

13    BY MS. LUARDE:

14    Q.    Would that be Dan Lowery?

13:40:46  15    A.    Yes, I'm sorry.  Dan Lowery.

16    Q.    Okay.  And do you recall that Hodell went live in

17    March of 2007?

18    A.    I do.

19    Q.    Okay.  Kim, could I have Exhibit 294, please?

13:41:04  20             And, Mr. Neveux, I'm going to actually give

21    to you -- I'm sorry, Your Honor, may I approach?

22             THE COURT:  Sure.

23    BY MS. LUARDE:

24    Q.    A copy, a hard copy of the exhibits to use.

13:41:20  25    A.    Okay.

1    Q.    And, Mr. Neveux, you'll see that you have a screen

2    with the exhibit that we're talking about, but I've given

3    you a hard copy in case that's --

4    A.    Okay.

13:41:33 5    Q.    -- easier for you.

6    A.    It is.  Thank you.

7    Q.    Okay.  Mr. Neveux, could you find Exhibit 294 in

8    the binder that I just gave to you?

9    A.    I have it, yes.

13:41:46 10   Q.    Excellent.  And could you tell me, have you seen

11   this document before?

12   A.    Yes, I have.

13   Q.    Okay.  Kim, could you put up 294.2, please?

14             And could you highlight the bottom of the

13:42:06 15   page for me?

16             And, Mr. Neveux, I would direct you to the

17   bottom of Page 294.2.  And do you see that you're copied

18   on an e-mail from Dale Van Leeuwen?

19   A.    Yes.

13:42:22 20   Q.    And the date of that e-mail is February 27th, 2006,

21   correct?

22   A.    Yes.

23   Q.    And the subject line is "Re: Dan Lowery-SAP

24   performance."

13:42:33 25             Do you see that?

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
|          | 1  | A.    I do.                                                   |
|          | 2  | Q.    Okay.  Could you turn to the next page, which is        |
|          | 3  | Page 3?                                                       |
|          | 4  | A.    Okay.                                                   |
| 13:42:44 | 5  | Q.    And at the end of the second paragraph, you'll see      |
|          | 6  | a reference to the database.  It says "The database has       |
|          | 7  | approximately 150,000 SKUs, 20,000 customers and 7500         |
|          | 8  | vendors."                                                     |
|          | 9  |              Do you see that?                                 |
| 13:43:01 | 10 | A.    I do.  Excuse me.  I do.                                |
|          | 11 | Q.    And they're referring to Hodell-Natco at this          |
|          | 12 | point, is that correct?                                       |
|          | 13 | A.    Yes.                                                    |
|          | 14 | Q.    Okay.  Mr. Neveux, I'm going to put up a               |
| 13:43:11 | 15 | demonstrative that I just want to check a few things off      |
|          | 16 | on.  Okay?                                                    |
|          | 17 | A.    Okay.                                                   |
|          | 18 | Q.    I'm trying to turn this so you can see this a          |
|          | 19 | little bit better.                                            |
| 13:43:38 | 20 |              And you see here, Mr. Neveux, I have            |
|          | 21 | Hodell-Natco in the last column?                              |
|          | 22 | A.    Um-hmm.                                                 |
|          | 23 | Q.    And I believe I just read off to you 150,000 items,    |
|          | 24 | is that correct?                                              |
| 13:43:46 | 25 | A.    Yes.                                                    |

1    Q.    And you would agree with me that that is the size

2    or the number of items in Hodell-Natco's database, is

3    that correct?

4    A.    That's correct.

13:44:02  5    Q.    And I believe if you add up the other number, it

6    would be 27,500 customers based on that e-mail, is that

7    correct?

8    A.    Customers or vendors but, yes, 27,000, yes.

9    Q.    And you would agree that's an accurate

13:44:20  10    representation on this chart, correct?

11    A.    Yes.

12    Q.    27,5?

13              Kim, could you please put up Exhibit 119

14    for me?  And I would like -- Kim, can you take those

13:44:54  15    marks off the screen?

16              THE COURT:  Yes, do that, Kim, if you

17    would.

18              MS. ANDERS:  Yes.

19    BY MS. LUARDE:

13:45:13  20    Q.    Page 10 of that document.

21    A.    Okay.

22    Q.    And, Mr. Neveux, you saw this document during your

23    deposition.

24              Do you recall that?

13:45:27  25    A.    Yes, I do.

1   Q.    Okay.  And this document is actually an SAP

2   document, is that correct?

3   A.    Correct.

4   Q.    And this is a document that relates to SAP testing,

13:45:37  5   is that correct?

6   A.    Correct.

7   Q.    And you'll agree with me that this is also a

8   document that relates to Business One?

9   A.    Correct.

13:45:48  10   Q.    Okay.  And on Page 10 of that document, there's a

11   table, and the table describes two customer profiles, is

12   that correct?

13   A.    Correct.

14   Q.    And does that define the number of users on the

13:46:07  15   high end as being 30?

16   A.    Yes.

17   Q.    And the typical being 10?

18   A.    Yes.

19   Q.    And you would agree on this chart, Mr. Neveux, that

13:46:27  20   typical being defined as 10 is accurate?

21   A.    Yes.

22   Q.    And the high end being 30 is accurate as well?

23   A.    Yes.

24   Q.    And the warehouse size under typical, there's a

13:46:43  25   number five for five warehouses, is that correct?

1    A.    Yes.

2    Q.    And on the high end, there would be 10 warehouses,

3    correct?

4    A.    Yes.

13:46:53  5              MR. KELLEHER:  Your Honor, not to object,

6    but when he says correct, is she saying as reflected in

7    this document or is the question different?  Could we

8    have the clarification?

9              THE COURT:  I don't know the answer to

13:47:04 10    that.

11              MR. KELLEHER:  I need it.  That's why I'm

12    asking.

13              MS. LUARDE:  Sure.  Let me clarify.

14    BY MS. LUARDE:

13:47:10 15    Q.    As reflected in the testing that was done by SAP

16    and shown in Exhibit 119, the number five and number ten

17    accurately depict the testing performed by SAP and shown

18    in this document?

19    A.    Yes.

13:47:24 20    Q.    Is that correct?

21    A.    Yes.

22    Q.    Okay.  And the same is true with the number of

23    items.  The typical number of items would be 20,000 as

24    reflected on this chart, is that correct?

13:47:33 25    A.    In this testing, yes.

919

1    Q.    And the high end was 60,000?

2    A.    Yes.

3    Q.    The same with price lists, we had 20 and 20?

4    A.    Yes.

13:47:46  5    Q.    And for the number of accounts, there are 1,000 and

6    3,000?

7    A.    Yes.

8    Q.    And for the number of business partners or

9    customers, you would agree that the typical number would

13:48:02 10    be for 2000?

11    A.    Yes.

12    Q.    And the high end was 16,000?

13    A.    Yes.

14    Q.    And we have one box that's not checked.

13:48:25 15          Are you aware that Hodell-Natco had 120

16    user licenses?

17    A.    I don't -- I believe as of -- yes.

18    Q.    And are you also aware that they wanted to expand

19    up to 300 users potentially?

13:48:27 20    A.    I don't -- at some point, yes.

21    Q.    Thank you.

22          MS. LUARDE:  And, Your Honor, I'd like to

23    mark this as an exhibit.  Wes, do you have any idea what

24    our next exhibit number might be?  No.  10,000?  1,000?

13:48:58 25    10,000 sounds a little more right.  If we could mark that

1    as Exhibit 1000.

2                  THE COURT:  Go ahead.

3    BY MS. LUARDE:

4    Q.    Mr. Neveux, would you agree that based upon the

13:49:17  5    September, 2005 testing that was performed in Israel by

6    SAP, that the high end database testing was with 60,000

7    items?

8    A.    Yes.

9    Q.    And 16,000 business partners, is that correct?

13:49:39 10    A.    16,000?  I'm sorry, can you repeat the question?

11    I'm sorry.

12    Q.    I may have misread the number.  I apologize.

13                  Yes, 16,000 business partners on the high

14    end?

13:49:57 15    A.    Oh, yes.  I'm sorry.  Yes.

16    Q.    And the testing performed in Israel, Udi Ziv, was

17    he involved with that testing?

18    A.    I know Udi Ziv's in Israel.  I don't know if he was

19    involved in the testing of it.

13:50:16 20    Q.    Okay.  But, you know who Udi Ziv is, correct?

21    A.    He's in development in Israel, that's correct.

22    Q.    And he was the head of the Business One development

23    team, is that correct?

24    A.    I know he was in development, ma'am.  I actually

13:50:32 25    don't know if he was the head of it.

1    Q.    Okay.

2                Kim, could I have Exhibit 294 up, please?

3                And before we turn to Exhibit 294,

4    Mr. Neveux, if you had known these numbers that are

13:50:56 5    reflected on this chart in 2004, would you have advised

6    against Hodell purchasing Business One?

7    A.    No.

8    Q.    No?  Do you recall your deposition being taken

9    March 15th, 2012?

13:51:16 10    A.    No, ma'am.

11    Q.    No?

12    A.    No.

13    Q.    Do you recall Mr. Lambert asking you a series of

14    questions at some point in time?

13:51:24 15    A.    I know I had a deposition.  I don't remember the

16    person.

17                MS. LUARDE:  Your Honor, may I approach the

18    witness?

19                THE COURT:  Yes.

13:51:55 20    Q.    Mr. Neveux, I've just handed you a copy of your

21    deposition, dated March 15th, 2012, and it was taken in

22    this particular case.

23                Do you see that on the first page?

24    A.    I do.

13:52:08 25    Q.    Okay.  Mr. Neveux, I would ask you to turn to

1    Page 50 of this transcript.

2    A.    Okay.

3    Q.    And I'd have you read starting on the bottom of

4    Page 50 -- actually in the middle of Page 50, Line 6,

13:52:39 5    there's a question.

6              And the question that's asked is:  "How

7    about from your personal perspective, if you would have

8    known the number of --"  and then it says "Strike that.

9    If you had been contacted in 2004 and had known the

13:52:55 10   number of users Hodell was planning on going live with,

11   its database size, transaction volume and that

12   information, would you have advised against Hodell

13   purchasing Business One?"

14             Could you please read your answer,

13:53:10 15   Mr. Neveux?

16   A.    At that time I said, "I would have.  Well, so

17   again in my position, I don't ever really talk to the end

18   customer unless somebody higher up asks me to like when I

19   came to your site."

13:53:25 20   Q.    But, your answer, does that refresh your

21   recollection that at that point in time, your response

22   was that you would have, you would have advised against

23   Hodell purchasing Business One?

24   A.    I'll say yes.

13:53:36 25   Q.    Okay.  Thank you, Mr. Neveux.

1          Kim, could you turn to 294.3, please?

2    Actually, all right, Kim, you may need to go back to

3    294.2.

4          Mr. Neveux, at the bottom of this page, you

13:54:08 5   see there's an e-mail from Dale Van Leeuwen to Ralf

6    Mehnert-Meland.

7    A.    Yes.

8    Q.    And you're copied on this e-mail, correct?

9    A.    Yes.

13:54:20 10   Q.    And 294.3, Kim.  And this is the e-mail we actually

11   were just talking about, but I want to refer you to the

12   third paragraph of this document.

13          Do you see the third paragraph on 294.3?

14   A.    I do.

13:54:43 15   Q.    And this states:  "Running base SBO," and that's

16   Business One, correct?

17   A.    Correct.

18   Q.    "With no add-ons."

19          Correct?

13:54:55 20   A.    Yes.

21   Q.    "At current, we are seeing 25 plus seconds before

22   we can scroll or select data if we invoke an item search

23   anywhere in the system."

24          Is that correct?

13:55:06 25   A.    Yes.

1    Q.    "As I mentioned, we have really worked to identify

2    the bottleneck and have determined that it is not SQL,

3    the extraction of data, but is the rendering of the data

4    in SBO to the client."

5                    Do you see that?

6    A.    I do.

7    Q.    Are you stating here that the problem is with

8    Business One?

9    A.    No.  This is what the partner is stating the

10   problem is with Business One.

11   Q.    You're correct, that is what Dale Van Leeuwen is

12   stating.

13                   If you could turn back to Page 294, which

14   is the first page of the document.

15   A.    Okay.

16   Q.    And this is, in fact, your response on March 1st,

17   2006, is that correct?

18   A.    Yes.

19   Q.    And could you read the first two sentences for the

20   jury?

21   A.    "SAP is looking into this issue.  We have had some

22   reports of issues in performance with large data sets in

23   the SAP Business One product."

24   Q.    Thank you.  So you would agree that on March 1st,

25   2006, SAP was aware of performance issues with large data

1    sets, correct?

2    A.    They were aware of some, some performance issues;

3    not all.  I mean, across our customer database, the

4    number of commerce we have, it was some reports.  It

13:56:48 5    wasn't everybody that had it.  It was just some.

6    Q.    Thank you.  Kim, could we have Exhibit 156, please?

7              Do you have the document in front of you,

8    Mr. Neveux?

9    A.    Yes, I do.

13:57:22 10    Q.    Thank you.  Mr. Neveux, you see in the bottom half

11    of the first page of this document, there's an e-mail

12    from you to Dirk Boessmann, I believe.

13              Is that correct?

14    A.    Is that -- that's in the middle of the page?

13:57:43 15    Q.    Yes.

16    A.    Okay.

17    Q.    It starts out --

18    A.    Yes, I see it.

19    Q.    Thank you.  And you're asking Mr. Boessmann a

13:57:52 20    couple of questions here, is that correct?

21    A.    Yes.

22    Q.    And up above, Mr. Boessmann is responding to you,

23    correct?

24    A.    That is true.

13:58:06 25    Q.    Okay.  Could you tell me, could you read for the

1   jury what your question was, the first question that you

2   have listed?

3   A.    So back in the middle of the page?

4   Q.    That would be fine.

13:58:18  5   A.    Okay.  "A couple of questions.  What do you mean

6   when you say we'll resolve a dedicated performance

7   issue?"  That's in quotes.  "What is the issue

8   specifically?"

9   Q.    And what does Mr. Boessmann state in response?

13:58:32  10   A.    He says "The issue as described in the

11   corresponding note to the fix."

12   Q.    Okay.  And what is your second question to

13   Mr. Boessmann?

14   A.    "Second, when you say -- when you say specifically

13:58:49  15   or specially in an environment which is already at the

16   edge, what does this mean?  Does it mean a data set that

17   is on the high end of the data that was tested for SAP

18   Business One?"

19   Q.    And how does Mr. Boessmann respond?

13:59:02  20   A.    He says, "To my knowledge, the environment has

21   120-user using add-ons which also produce a significant

22   traffic."

23   Q.    And you're referring to Hodell-Natco in this

24   e-mail, is that correct?

13:59:17  25   A.    Yes.

```
 1              MR. KELLEHER:  Objection, Your Honor.  He
 2   didn't write it.
 3              THE COURT:  Overruled.
 4              Go ahead.
 5   BY MS. LUARDE:
 6   Q.   And Dirk Boessmann is on the development team, is
 7   that right?
 8   A.   I don't know what he did to be honest with you,
 9   ma'am, at that time.
10   Q.   If I told you he was on the development team, would
11   that surprise you?
12   A.   Would it surprise me?  Not necessarily.  I mean,
13   this gentleman is in Germany.  I'm based in the United
14   States so I don't know what his role was.
15   Q.   Kim, could I have Exhibit 157, please?
16              Mr. Neveux, you would agree that at the
17   bottom of Exhibit 157, you're copied on an e-mail sent by
18   Ralf Mehnert-Meland to Michael Sotnick, Daniel Kraus, and
19   I believe other internal people at SAP, is that correct?
20   A.   Yes.
21   Q.   And the date of this e-mail is April 16th, 2007, is
22   that right?
23   A.   Yes.
24   Q.   And could you read the first sentence on the bottom
25   of Page 157 for the jury, please?
```

1    A.    "There are basically two issues relating to

2    performance with SAP Business One."

3    Q.    Continue.

4    A.    Okay.

14:01:00  5    Q.    And if you could continue to the next page.

6    A.    Okay.  "One, performance degrades with SSP add-on

7    products accessing SAP Business One and, two, performance

8    degrades with large data sets."

9    Q.    And you agree with that statement, correct?

14:01:15 10    A.    I don't.

11    Q.    You don't agree with that statement?

12    A.    No.

13          This is the information that we were

14    getting from the partner.  I had no hard information

14:01:23 15    beyond what the partner was telling me at that time as

16    far as the system being slow or degradation.

17    Q.    Thank you.  You know, we'll let your counsel clean

18    up the rest of you for you, okay?

19          And Ralf Mehnert-Meland also states that

14:01:39 20    Hodell has both issues in point two, is that correct?

21    A.    Yes.

22    Q.    And he also states that Lowery tested the data set

23    against the Hodell data on SAP B1 stand alone a year ago,

24    correct?

14:01:51 25    A.    Correct.

1    Q.    And you were involved in that testing, is that

2    correct?

3    A.    I was not involved in this testing, no.

4    Q.    Okay.  Could you read the summary line for the

14:02:05  5    jury, please?

6    A.    The summary line?  "Hodell just has too much data.

7    SAP Business One cannot handle it and there is no fix in

8    sight.  I believe we need to find a way to get the

9    customer off SAP Business One."

14:02:24  10   Q.    And you never corrected the content of this e-mail

11   or added to this e-mail, is that correct?

12   A.    I --

13   Q.    I mean, there's no response from you to anyone

14   correcting this information, is that correct?

14:02:50  15   A.    Correct.

16   Q.    Thank you.  And you were aware before this e-mail

17   that the size of the data set was outside the Business

18   One parameters, is that right?

19   A.    It was outside of the testing that had been done,

14:03:03  20   yes.

21   Q.    And you were aware at the time of this e-mail that

22   customers with large data sets ran into performance

23   issues, whether it was simply Business One alone like

24   vanilla with no add-ons, is that correct?

14:03:17  25   A.    I was aware -- I was aware of some customers; not

1     all.

2     Q.    And it was actually a yes or no question, but thank

3     you for your clarification.

4              Could we flip to Exhibit 158, please?  And

14:03:49  5   the first e-mail at the bottom is an e-mail from Geoff

6     Ashley and you're copied on that e-mail, is that correct?

7     A.    Yes.

8     Q.    And it's dated April 17th, 2007?

9     A.    Yes.

14:04:03 10   Q.    And this e-mail was sent to you, and you were

11    actually a participant in the call, is that right?

12    A.    The e-mail was sent to me.  I was not a participant

13    on this call.

14    Q.    And the e-mail above that is actually a response

14:04:17 15   from Ralf Mehnert-Meland who was on the call, is that

16    right?

17    A.    I believe so.

18    Q.    And could you read for the jury what he states?

19    A.    This is at the very top?

14:04:27 20   Q.    Yes, please.

21    A.    "Geoff, thanks.  Right on.  All:  One item from my

22    end -- there is no way SAP Business One will work for

23    this customer.  We need to find a way to move them on.

24    Plus Lowery needs to take responsibility for the

14:04:41 25   mis-sell."

1    Q.    Thank you.  Could you flip to Exhibit 159, please?

2    And you see at the bottom of this e-mail that you're also

3    copied on an April 17th, 2007 e-mail from Dan Kraus, is

4    that correct?

14:05:05 5    A.    Yes.

6    Q.    And if you go to the next page you'll see that same

7    Geoff Ashley summary about the call, do you see that?

8    A.    Yes.

9    Q.    And back on the first page, could you tell me what

14:05:21 10    Dan Kraus states at the bottom of the e-mail?

11    A.    Do you want me to read that?

12    Q.    Yes, please.

13    A.    Okay.  "We very simply need to figure out if there

14    is a solution in A1 for the customer or if we just refund

14:05:37 15    our license fees.  There is no go-forward path here with

16    Business One.  The partner clearly has misrepresented the

17    solution."

18    Q.    And he doesn't refer to the 2007 version of

19    Business One in this e-mail, is that right?

14:05:55 20    A.    Not in this e-mail, no.

21    Q.    Okay.  Could you turn to Exhibit 160, please?  And

22    on the first page of that e-mail, you'll see that you

23    were copied on an e-mail, another e-mail from Ralf

24    Mehnert-Meland, dated April 18th, 2007?

14:06:25 25    A.    Yes.

1    Q.    And you see your name on the CC line, correct?

2    A.    The --

3    Q.    Or "To" line actually.

4    A.    This is the e-mail at the top, correct?

14:06:38 5    Q.    The e-mail at the bottom.

6    A.    Yes.

7    Q.    And the third paragraph of that e-mail, could you

8    read the first sentence for the jury?

9    A.    Where it says, "Hodell asked"?

14:06:55 10    Q.    Yes, please.

11    A.    "Hodell asked the right question today:  Did we buy

12    the wrong solution with SAP Business One?"

13    Q.    Could you read the second sentence as well, please?

14    A.     "Based on what we know, the answer is yes, as

14:07:08 15    Lowery completely oversold SAP Business One."

16    Q.    And could you turn to Exhibit 161, Mr. Neveux?  And

17    I'd like you to look at the very bottom.  You'll see

18    there's a message from you, dated June 13th, 2007 to Dan

19    Kraus, Ralf Mehnert-Meland, Gianluigi Bagnoli, is that

14:07:50 20    correct?

21    A.    Yes, ma'am.

22    Q.    And could you turn to the next page of the

23    document, 161.2?  And you reported to or did you report

24    to Gianluigi?

14:08:04 25    A.    I still do, yes.  Did and still do.

1    Q.    Okay.  And the subject matter of this document is

2    "Hodell-Natco In-Flight interface."

3              Is that correct?

4    A.    Yes.

14:08:23 5    Q.    If you could go to the second line of your e-mail

6    to Gianluigi, starting with the word "What."

7    A.    Yes.

8    Q.    Could you read that for me, please?

9    A.    "What we know is that the data set used by Hodell

14:08:40 10    for business partners and items alone is in the 100,000

11    plus area of records and will only continue to grow."

12    Q.    And could you read the next sentence as well?

13    A.    Excuse me.  "There are performance issues with this

14    data set without any add-on installed as stated by the

14:08:55 15    partner and the customer."

16    Q.    And so they're reporting to you at this point in

17    time that there are performance issues without the

18    In-Flight add-on, is that correct?

19    A.    Yes.  The partner and the customer are, yes.

14:09:15 20    Q.    And if you flip back to the first page, and, I'm

21    sorry, could you go back to the second page again?  I

22    apologize.

23              Could you read your last sentence beginning

24    with the word "Since"?

14:09:38 25    A.    I'm sorry, where are we here?  I apologize.  Oh,

934

1    yes, I'm sorry.

2    Q.    Since the performance issues manifested themselves?

3    A.    Yes.  It says, "Since the performance issues

4    manifested themselves in Business One by itself, no

5    add-ons, I do not see how we will get any better

6    performance using the API without possibly involving

7    development."

8    Q.    And on the first page of 161, I believe Gianluigi

9    is responding to you, is that right?

10   A.    Yes.

11   Q.    Could you read Gianluigi's response, the first

12   paragraph of that response?

13   A.    Starting "I think you are right.  If the

14   performance issues are in B1 business logic, then the

15   same issues will be in the DI API, as it is built on top

16   of the same logic."

17   Q.    And the second paragraph, the first sentence,

18   please.

19   A.    "From the numbers I see, the customer is simply

20   outside of the area B1 is supposed to cover."

21   Q.    Thank you.  And you wrote, in fact -- I'm sorry,

22   Kim, did you put -- my screen is out -- 161.2.  And the

23   first page of that 161, do you agree with Gianluigi that

24   the customer is simply outside the area B1 is supposed to

25   cover?

1    A.    No.

2                 I'm sorry, this is on the first page or the

3    second page, ma'am?

4    Q.    This is on the first page.

14:11:46  5    A.    Okay.

6    Q.    That's okay.  We'll move on to 162.  And here we

7    have a June 18th, 2007 e-mail from you, right?

8    A.    Yes, ma'am.

9    Q.    And here you're saying, "The issue with this

14:12:08 10    particular customer is that they started with a data set

11    that was well outside/greater than the high end data set

12    tested for Business One 2005A SPO1 in Israel."

13                 You write that, correct?

14    A.    Yes.

14:12:24 15    Q.    And that was a correct statement, is that right?

16    A.    No.

17    Q.    So what you wrote here in 2007, what you're telling

18    me is what you wrote here in 2007 to Volker Anders,

19    Torsten Budesheim, Paul Killingsworth, and your boss at

14:12:43 20    SAP, you're just wrong when you say that this customer

21    started with a data set that was well outside or greater

22    than the high end data tested for B1 in 2005?

23    A.    Yes, ma'am.

24    Q.    That's what you're saying, that's wrong?

14:12:57 25    A.    All I was saying was that this was outside of what

 1   SAP had tested.  Doesn't mean it won't work.  Just means

 2   it's outside --

 3   Q.    You can clear that up with your counsel.

 4         What I'm asking you is is this statement

 5   accurate that the customer started with a data set that

 6   was well outside or greater than the high end data set

 7   tested for Business One 2005, is that correct?

 8   A.    It was outside --

 9   Q.    Is that correct, yes or no?

10   A.    Yes.

11         MR. KELLEHER:  Your Honor.

12   Q.    Thank you.

13         THE COURT:  He answered.

14   Q.    If you go further down in this e-mail, you'll see a

15   statement, "Performance issues exist in Business One by

16   itself as stated by development with this magnitude of

17   data (no add-ons running)."

18         Do you see that?

19   A.    This is still in the first paragraph?

20   Q.    Yes, please.

21   A.    Yes.

22   Q.    And I read that correctly?

23   A.    I'm sorry, I'm just trying to find it.

24         Oh.  Yes, I do see that, ma'am.

25   Q.    You next state, "Unless we know that SAP Business

1    One 2007A has addressed this issue with large data sets;

2    i.e., we have known benchmarks, any add on using the DI

3    API as both RB," which is Radio Beacon, is that correct?

4    A.    Yes, ma'am.

14:14:47 5    Q.    "And In-Flight will have the same performance

6    issues with this volume of data which is only going to

7    increase."

8              Did I read that correctly?

9    A.    Yes, ma'am.

14:14:58 10    Q.    And these are things you are telling Paul

11    Killingsworth, correct?

12    A.    Yes.

13    Q.    Your boss, Gianluigi Bagnoli, correct?

14    A.    Yes.

14:15:08 15    Q.    And other internal folks at SAP on June 18th, 2007?

16    A.    Yes.

17    Q.    And you agree that unless there was a guarantee

18    2007A, which is the new Business One version, is that

19    right, at that time?

14:15:36 20    A.    Yes.

21    Q.    Was able to handle larger data sets, 2007A would

22    not be a solution for Hodell, is that correct?

23    A.    That's what I said, yeah.

24              MS. LUARDE:  Give me just one second,

14:16:10 25    please.

|    |    |
|----|----|
| 1  | (Pause) |
| 2  | Q.   Kim, could we have Exhibit 79, specifically 79.8? |
| 3  | And, Mr. Neveux, I'm not certain that document is in |
| 4  | your -- |
| 14:16:48  5 | A.   Yeah, it's not. |
| 6  | Q.   -- binder.  If you'd like a hard copy, I can get |
| 7  | one for you. |
| 8  | A.   Yes, I would, please. |
| 9  |            MS. LUARDE:  May I approach, Your Honor? |
| 14:17:35 10 |            THE COURT:  Sure. |
| 11 |            THE WITNESS:  Thank you. |
| 12 | BY MS. LUARDE: |
| 13 | Q.   Mr. Neveux, would you please turn to 79.8. |
| 14 | A.   Okay. |
| 14:18:13 15 | Q.   And you'll see in the middle of this document, |
| 16 | there's an e-mail from you, dated March 13th, 2006. |
| 17 |            Do you see that? |
| 18 | A.   I do. |
| 19 | Q.   And that's to Ralf Mehnert-Meland, is that correct? |
| 14:18:25 20 | A.   Correct. |
| 21 | Q.   And March 13th, 2006 is about one year before |
| 22 | Hodell-Natco went live, is that correct? |
| 23 | A.   About that, yes. |
| 24 | Q.   And the subject line states, "Need to set up |
| 14:18:44 25 | meeting about SAP performance issues this week!" |

```
 1              Is that correct?
 2    A.    Yes.
 3    Q.    And this document actually relates to Hodell-Natco,
 4    is that right?
 5    A.    Yes.
 6    Q.    And could you read for the jury what you're stating
 7    to Ralf in this e-mail?
 8    A.    The whole -- the whole e-mail?
 9    Q.    Yes, please.
10    A.    It says, "Ralf, what is the plan here?  I am happy
11    to speak with them but based on the configuration they
12    have, i.e., the volume of data, this has nothing to do
13    with the SDK, and I do not have an answer or a solution
14    that magically going to correct the problem.  I just want
15    to get some understanding before we get on the phone and
16    get yelled at for something there is not a resolution
17    for."
18    Q.    And, in fact, at this point in time, you recognized
19    Hodell's volume was outside of what had been tested for
20    SAP Business One, is that correct?
21    A.    That's correct.
22    Q.    And in this e-mail, you're concluding that the
23    problems had nothing to do with the add-ons, is that
24    correct?
25    A.    I'm concluding there's a problem, yes.
```

```
 1    Q.    But not with the add-ons, not with In-Flight, or
 2    Radio Beacon, is that correct?
 3    A.    Correct.
 4    Q.    The problem was with Business One itself, is that
 5    right?
 6    A.    Well, I actually didn't know so I don't have a yes
 7    or no to that, unfortunately.  I didn't know at this
 8    point.  This was hearsay information from the customer
 9    and partner.
10    Q.    Mr. Neveux, you can clean that up.
11               Again --
12               MR. KELLEHER:  Judge, objection.  She asked
13    him an open-ended question.  The witness --
14               THE COURT:  I thought you did, too.
15               MR. KELLEHER:  Mid sentence, Judge.
16               THE COURT:  You can answer it.
17               THE WITNESS:  Sorry?
18               THE COURT:  You can answer.
19               MS. LUARDE:  I apologize, Your Honor, I
20    thought I had a yes or no question, but I might have gone
21    off script a little bit.
22    A.    In this case, when I was saying this to Ralf, we
23    had some information from the partner but not a lot of
24    information, so basically all we're saying is yes, it's
25    outside of what SAP Business One has been tested with,
```

1   but I didn't know any more at that.

2            So this was just what the customer and the

3   partner were telling us.  I had done no testing myself.

4   No testing had been done with their -- Hodell's data,

14:21:12 5   other than by the partner themselves.

6   Q.    Okay.  But, it was outside of -- it was larger than

7   the testing that had been performed in Israel, correct?

8   A.    Correct.

9   Q.    Okay.  Do you recall your -- again, we'll go back

14:21:27 10   to your deposition, if you don't mind.

11   A.    Okay.

12   Q.    Mr. Neveux.

13            And if you would turn to Page 69.

14            MR. KELLEHER:  Objection.  Objection.  I

14:21:57 15   think this talks about the same malady we discussed

16   before.

17            MS. LUARDE:  Actually it refers to the

18   question I asked before I got the very lengthy answer,

19   but if I need to reask, I'm happy to do so, your Honor.

14:22:07 20            MR. KELLEHER:  If the witness agreed, I

21   don't see why --

22            THE COURT:  All right.  Go ahead.

23            MS. LUARDE:  I'll just --

24   BY MS. LUARDE:

14:22:13 25   Q.    Let me ask the question one more time.

1          When you were referring to 79.8, your

2     statement says, "This has nothing to do with the SDK."

3          Does that mean that it is a problem with

4     Business One itself unrelated to whatever add-ons would

14:22:39 5   be integrated into the software; yes or no?

6     A.    I can't answer that yes or no.

7     Q.    If you could turn to Page 69 of your deposition,

8     Mr. Neveux.

9     A.    Um-hmm.

14:22:56 10  Q.    The question that was asked:  "Okay.  Your

11     statement says this has nothing to do with the SDK.  Does

12     that mean that it is a problem with Business One itself

13     unrelated to whatever add-on would be integrated into the

14     software?"

14:23:08 15         And could you read your answer, please?

16     A.    My answer was "Yes."

17     Q.    Thank you.

18          MS. LUARDE:  Give me just one second,

19     please.

14:23:54 20         I have nothing more at this point.

21          THE COURT:  Thank you.

22          MR. KELLEHER:  Your Honor, I have a binder

23     for the witness.  May I approach and give it to him?

24          THE COURT:  You may.

14:24:47 25         THE WITNESS:  Thank you.

|    |    |
|----|----|
| 1 | CROSS-EXAMINATION OF EDWARD NEVEUX |
| 2 | BY MR. KELLEHER: |
| 3 | Q.   Good afternoon, Mr. Neveux. |
| 4 | A.   Good afternoon. |
| 14:25:21 5 | Q.   Sir, you were shown a lot of exhibits that you |
| 6 | didn't write. |
| 7 |         Do you remember that? |
| 8 | A.   Yes. |
| 9 | Q.   I might come back to those and ask you questions; I |
| 14:25:33 10 | might not. |
| 11 |         Sir, you were also asked questions about |
| 12 | the testing environment and Hodell's transaction volumes. |
| 13 |         Do you remember that? |
| 14 | A.   Yes. |
| 14:25:55 15 | Q.   And you were asked questions about whether or not |
| 16 | you ever told that information to anybody. |
| 17 |         Do you remember that? |
| 18 | A.   Yes. |
| 19 | Q.   Sir, do you remember the first time that you came |
| 14:26:10 20 | to know about IBIS/LSi or Hodell? |
| 21 | A.   Both or individually?  I'm sorry, I don't |
| 22 | understand. |
| 23 | Q.   Sir, when was the first time -- you understand that |
| 24 | Hodell's the Plaintiff in this case? |
| 14:26:26 25 | A.   Yes. |

944

```
          1    Q.    And you understand that IBIS/LSi is the reseller

          2    that's at issue in this case?

          3    A.    Yes.

          4    Q.    And my question is:  When is the first time that

14:26:34  5    you came to know of IBIS/LSi?

          6    A.    In December of 2005.

          7    Q.    You say December of 2005, sir?

          8    A.    Yes.

          9    Q.    Sir, can I ask you to turn to Exhibit 306?  Just

14:26:50 10    let me know when you're there, sir.  Should be the first

         11    tab of your document.

         12    A.    Okay.  Yes.

         13    Q.    It will say 306 in the bottom right.

         14    A.    Yes, I got it.

14:26:59 15    Q.    Do you see that?

         16    A.    I do.

         17    Q.    Do you recognize this document, sir?

         18    A.    I do.

         19    Q.    Is this an e-mail -- oh, can you tell me what it

14:27:11 20    is?

         21    A.    It's simply an e-mail between -- from Joe Guagenti

         22    from IBIS to myself.

         23    Q.    And you said Joe Guagenti's from IBIS/LSi?

         24    A.    Yes.

14:27:24 25    Q.    And he's -- he's writing you an e-mail here?
```

1    A.    Yes.

2    Q.    And is he asking you some questions?

3    A.    He is.

4    Q.    Sir, before we get into it, what's the date of this

14:27:33 5    e-mail?

6    A.    December 19th, 2005.

7    Q.    Sir, is that before Hodell signed the license

8    agreement with SAP?

9    A.    Yes.

14:27:42 10    Q.    Sir, I'd like to take a look at the e-mail.  And

11    it's a little difficult to understand, but I think we can

12    work through it slowly.

13              At the very bottom of the first page, it

14    says, "From Joe Guagenti to Eddy Neveux, December 19th,

14:28:03 15    2005."

16              Do you see that?

17    A.    Yes, I do.

18    Q.    And then if you flip to the second page, you'll

19    see, it says "Dear, Mr. Edward Neveux."

14:28:12 20    A.    Um-hmm.

21    Q.    Is there a reason, do you have an understanding of

22    why he's using your full name, Mr. Edward Neveux?

23    A.    Probably because it's the first time I had ever

24    spoken to this person or IBIS.

14:28:23 25    Q.    You go by Eddy, right?

1    A.    Um-hmm.

2    Q.    Sir, as I said, it's kind of hard to follow.  We've

3    got Joe's questions.  Do you see where it says that?

4    A.    Yes, sir.

14:28:35 5    Q.    Then there's one, and then there's some words, and

6    then there's two, and then there's some words, and

7    there's three and some words.

8              Do you see that?

9    A.    I do.

14:28:43 10   Q.    And then below that, there's Eric's questions and

11   the same thing, one and two?

12   A.    Um-hmm.

13   Q.    I'd like to direct your attention to Joe's question

14   number two.  And, sir, just so we're clear, Joe is

14:29:03 15   Mr. Guagenti?

16   A.    Yes.

17   Q.    And did he work for IBIS/LSi?

18   A.    Yes.

19   Q.    Do you have an understanding of what he did at

14:29:08 20   IBIS/LSi?

21   A.    He was a programmer.

22   Q.    Is that a software programmer?

23   A.    Yes.

24   Q.    And just at a very high level, is that a software

14:29:17 25   programmer or is that somebody who knows how to write and

1    analyze software code?

2    A.    Yes.

3    Q.    And let's look at question number two.  He says to

4    you quote, "SAP B1 is slow.  We have a client with

14:29:34  5    100,000 plus items and entering a sales order can be a

6    slow task."

7                    Do you see that, sir?

8    A.    I do.

9    Q.    He continues, "If you tab off a blank item code on

14:29:48 10    the sale/quote form, it can take ten plus seconds to

11    display the full item list."  Do you see that, sir?

12    A.    I do.

13    Q.    He continues, "I have tried the new data table

14    class, and it is faster but still slow at eight seconds.

14:30:02 15    I have set up tracers to find where the application is

16    running slow and found getting the data from the DB,"

17    that's database, right?

18    A.    Yes.

19    Q.    And he's talking about that hundred thousand item

14:30:13 20    database, right?

21    A.    Yes.

22    Q.    He's talking about that thing that's on the chart

23    right there, right?

24    A.    Yes.

14:30:18 25    Q.    "From the database is fast.  SAP rendering to the

1      data to the screen is slow."

2                    Then he says "What can we do to speed this

3      up?"

4      A.    Um-hmm.

14:30:32  5      Q.    Do you see that?

6      A.    I do.

7      Q.    Is he asking for your advice here, sir?

8      A.    Yes, he is.

9      Q.    Sir, right on the next line it says "Bracket" and

14:30:40 10      then there's a less than sign.  And it says, "Eddy

11      Neveux," and then there's a greater than sign and another

12      bracket.

13                    Do you see that?

14      A.    I do.

14:30:47 15      Q.    Sir, is the text that follows, is that your

16      response to him?

17      A.    It is.

18      Q.    He basically just wrote your response right in

19      there next to the question?

14:30:54 20      A.    Yes, which I do very often.  Yes.

21      Q.    That's a common practice of yours?

22      A.    For myself, yes.

23      Q.    And that's what you did here for Mr. Guagenti?

24      A.    Yes.

14:31:03 25      Q.    You say, "When you say the quote new data table

1    class, are you talking about the grid item and data table

2    objects in Business One 2005 A?"

3                Do you see that, sir?

4    A.    I do.

14:31:16 5    Q.    I'm going to read you this next sentence that you

6    wrote, okay?  I think this is kind of important.

7                "If so, there is not much more you can do

8    to speed this up based on the number of records it has to

9    check."

14:31:30 10                Do you see that?

11    A.    I do.

12    Q.    That's what you wrote to him, right, sir?

13    A.    Correct.

14    Q.    And when you said, "There's not much more you can

14:31:40 15    do to speed this up based on the number of records," what

16    were you referring to, the number of records?

17    A.    The hundred thousand plus items.

18    Q.    And this is in December 19th of 2005?

19    A.    Correct.

14:31:52 20    Q.    And this is before Hodell signed the license

21    agreement with SAP?

22    A.    Yes.

23    Q.    Sir, I'd like to direct you right back where we

24    left off.

14:32:01 25                You say, and right after that line we just

1    talked about on the second page, okay, "Are you filtering

2    your search or are you searching the whole table, all

3    columns for 100,000 items?"  That's the question you ask

4    him, right?

14:32:16  5    A.    Yes.

6    Q.    You go on to say, "We found that by increasing

7    ram," ram is memory?

8    A.    Yes.

9    Q.    "On the work station, in other words 128K to 512K

14:32:26 10    or more, for memory intensive operations can help

11    sometimes.  I see that you have 760 K.  You may even want

12    to try a gig if that's possible on one of the machines to

13    see if that helps."

14           Do you see that, sir?

14:32:41 15    A.    I do.

16    Q.    What are you basically telling him there?

17    A.    Well, this is a very generic question that I would

18    get all the time so he's basically saying building some

19    sort of add-on for SAP Business One and I'm having an

14:32:52 20    issue with a hundred thousand items and it seems slow to

21    them.

22           And I'm recommending to them first and

23    foremost, based on my experience with the software

24    development kit and being the North American solution

14:33:06 25    person for all of North America, I work with a lot of

1    these people, I was just suggesting one of the things he

2    could try, which is in our best practices, so we have a

3    best practices document that tells people that build

4    add-ons that work with Business One basically how they

14:33:21  5    should build their add-ons, you know the way we've showed

6    them to do and so forth, I was just saying hey, did you

7    try filtering because in this case filtering is one of

8    those things that could possibly, even though eight

9    seconds for business software is not bad in the least,

14:33:35  10    but I was telling hey, did you try this because you may

11    be able to cut that down.

12    Q.    Are you telling Mr. Guagenti that Business One is

13    definitely going to work for Hodell?

14    A.    No.

14:33:48  15    Q.    Are you telling him that it definitely won't work

16    for Hodell?

17    A.    Well, no, because I didn't know about Hodell at

18    this time.  This was just a generic question.

19    Q.    Thank you, for that, sir.  And whatever customer

14:34:00  20    he's talking about here?

21    A.    Right.

22    Q.    You didn't tell him whether this would or would not

23    work for the customer, right?

24    A.    That's correct.

14:34:05  25    Q.    All you said to him was there might not be much

1   more you can do to speed this up based on the hundred

2   thousand records, items, it has to check, that's all you

3   said, right?

4   A.    That's correct.

14:34:16 5   Q.    And then you go on to give him some

6   recommendations, things he might try, right?

7   A.    This is correct.

8   Q.    You basically said to him, and pardon me for

9   dumbing down the technical stuff, but I want to try to

14:34:28 10   make sure everyone in the room understands us, you

11   basically say to him hey, you might want to try some good

12   hardware, some strong hardware?

13              MS. LUARDE:  Objection, Your Honor.  We

14   have leading questions.

14:34:38 15              THE COURT:  Overruled.

16   BY MR. KELLEHER:

17   Q.    Is that basically what you said to him, sir?

18   A.    Yes.

19   Q.    And you also go on to mention some more things.

14:34:47 20   You talk about filtering and I'm going to ask you to

21   explain to the jury what that means, but I'm going to ask

22   you at least at first to try to stay pretty high level so

23   we could follow with you.

24              Sir, when you recommend that Mr. Guagenti

14:35:02 25   of IBIS/LSi back in December 19th of 2005 do some

1    filtering, what were you talking about?

2    A.    So when an add-on works with SAP Business One, all

3    the information gets passed back and forth in a pipe.

4    Think of a pipe, if you will.

14:35:18    5         And what I'm asking him here is he's saying

6    that they feel the information being passed back and

7    forth to Business One and their add-on is slow, so a very

8    common thing that could cause slowness is SAP Business

9    One, because it's a very generic solution, we have

14:35:36  10    add-ons, people -- resellers that build add-ons for very

11    specialized things.  In this case, the fastener industry.

12         So SAP Business One, for everything that

13    you do in SAP Business One, it basically sends out

14    information, just kind of throws it out there.  And this

14:35:53  15    pipe listens to that information.

16         So basically all I was saying is hey, you

17    want to make sure that you don't listen to everything

18    that's coming from Business One.  You want to make sure

19    that you're only listening to those things that your

14:36:04  20    add-on needs, and that will cut down possibly the

21    performance issues that you're saying you have.

22    Q.    And, sir, when you say -- thank you for that.

23         Let me just make sure I'm following you.

24    When you say that you have to be selective or you have to

14:36:18  25    filter what you're listening to, when you say you, are

 1    you basically referring to the add-on?

 2    A.    I'm -- at this point in time, I didn't specifically

 3    know about an add-on.  It was just -- or I didn't know

 4    anything about In-Flight so, yeah, whatever you're

14:36:35  5    programming to integrate with Business One, yes.  I'm

 6    saying you need to look at your code, verify that you're

 7    using filters based on the best practices from SAP, and

 8    that may help your performance.

 9    Q.    Got it.  So, sir, let's take an even further step

14:36:47 10    back because I remember my opposing counsel asked you a

11    question about, you know, what was your job, but we

12    didn't really get into like what is it so maybe we ought

13    to take some time now to figure out who you are.

14                   What exactly is it that you do at SAP?

14:37:02 15    A.    For the past 11 and a half years, I've been a

16    solution architect with SAP in the same capacity.  So

17    it's always been for Business One.

18    Q.    And what specifically do you focus on with respect

19    to Business One?

14:37:14 20    A.    Anything, anything that deals with integration.  So

21    add-ons as an example, any integration with SAP Business

22    One, that's all I do.

23    Q.    Is it fair to say you have a lot of experience with

24    add-ons, sir?

14:37:26 25    A.    I do.

1      Q.     And that's kind of what you focus on?

2      A.     Yes.

3      Q.     And you often get questions and concerns and

4      questions from clients about the add-ons?

14:37:35  5      A.     That's my everyday job, yes.

6      Q.     And you, sir, are someone who is able to write

7      software code?

8      A.     Yes.

9      Q.     You're someone who's able to analyze software code?

14:37:48 10      A.     Yes.

11      Q.     You are what we might call, for lack of a better

12      term, a technical person?

13      A.     Yes.

14      Q.     And you focus on the add-ons?

14:37:56 15      A.     Yes.

16      Q.     I want to focus your attention back to your

17      response here at Paragraph 2.  I'm actually on the last

18      sentence.  You tell Mr. Guagenti, "You can also download

19      the SDN with the new SDK tools called Business One

14:38:21 20      testing environment or B1TE and use the SQL profiler to

21      see if there are and where there may be performance

22      issues dot, dot, dot, if any."

23             Do you see that, sir?

24      A.     I do.

14:38:34 25      Q.     And that's what you wrote to Mr. Guagenti, right?

1    A.    Yes.

2    Q.    You wrote that to him back in December 19th of

3    2005?

4    A.    Yes.

14:38:42    5    Q.    Sir, again, please at least at the beginning stay

6    high level for us.  What is the Business One testing

7    environment or the B1TE that you're telling him he can

8    download and use?

9    A.    So B1TE, or the Business One test environment, are

14:39:04    10    just the collection of tools that my group wrote.  So

11    it's just a tool that was written to allow us to be able

12    to analyze add-on codes, specifically add-on code.  So if

13    a reseller were to come to me and say I'm having an

14    issue, you know, with my add-on, one of the tools that I

14:39:34    15    would use is the Business One test environment.  I would

16    have them download it, put it on their system, and

17    there's some tools they could run that would analyze

18    their code.  Number one, for correctness, so it analyzes

19    if it's being done correctly based on our best practices,

14:39:47    20    but it also gives information in this case about time,

21    how long different things take and what those different

22    things are.

23          I was asking him as part of this, again it

24    was just a generic question, one of the things you might

14:39:57    25    do is go to an SAP site, download this tool, put it on

1  your system, please run it.

2  Q.   So this tool you're talking about, sir, you and

3  your team actually developed this tool?

4  A.   Yes, sir.

5  Q.   It's a software tool?

6  A.   Yes, sir.

7  Q.   And what do you actually do?  Do you actually stick

8  it onto computer hardware and it conducts some sort of

9  analysis?

10  A.   Yes.  So basically wherever SAP Business One and

11  the add-on is installed, I can install this tool on that

12  environment, I can turn it on, and let it run, and it

13  just sits and collects all information that happens in

14  the add-on.

15  Q.   So you're asking Mr. Guagenti, you're recommending

16  to him that he download and install and use this tool

17  that your team developed?

18  A.   That's correct.

19  Q.   Do you know if he ever did that prior to go-live?

20  A.   Prior to go-live?  He did not.

21  Q.   I'd like to take your attention, sir, to Exhibit

22  293.  This is a document that you were shown a few

23  minutes ago.

24  A.   Yes.

25  Q.   Just let me know when you're there?

```
         1    A.    I am, sir.

         2    Q.    And I'd like you to just go to the second page, the

         3    last e-mail on the page.

         4    A.    Yes.

14:41:17 5    Q.    Sir, at the bottom there regarding an e-mail from

         6    Dan Lowery to Ralf Mehnert, February 27th, 2006.  Do you

         7    see that?

         8    A.    I do.

         9    Q.    And you're not copied on that e-mail, right?

14:41:28 10   A.    No, sir.

         11   Q.    And Mr. Lowery says, "Hey, Ralf, you'll be

         12   receiving a call from Dan Van Leeuwen this week to ask

         13   for direction on SAP B1 performance issues."

         14                Do you see that?

14:41:42 15   A.    I do.

         16   Q.    Why don't you look at the next e-mail up in the

         17   chain?  It starts at the bottom of the first page.

         18                Do you see that?

         19   A.    Yes.

14:41:51 20   Q.    It's from Mehnert, Ralf Mehnert-Meland to Dan

         21   Lowery.

         22                Do you see that?

         23   A.    I do.

         24   Q.    It's on the same day, February 27th, 2006?

14:41:59 25   A.    Yes.
```

```
 1   Q.    He says "Dan, thanks.  Dale have copied Eddy Neveux

 2   as well.  What are the issues?"

 3              Do you see that?

 4   A.    I do.

 5   Q.    You're Eddy Neveux, right?

 6   A.    Yes.

 7   Q.    Okay.  So let's look at the first page.

 8              Are you there, sir?

 9   A.    I am.

10   Q.    So we're looking at here, do you recognize this

11   document?

12   A.    I do.

13   Q.    Can you tell the jury just very generally what it

14   is?

15   A.    Yeah.  So this e-mail's a few months after that I

16   would have talked to IBIS/LSi, so all I was saying was in

17   response to Mr. Dan Lowery's e-mail, that I wasn't sure,

18   you know, where their performance issues were that he

19   mentioned, and then I just talked about there were some

20   areas that they could see some performance around and

21   basically that's it.

22   Q.    Sir, this is an e-mail you wrote to

23   Mr. Mehnert-Meland?

24   A.    Yes.

25   Q.    Did you say yes, sir?
```

1    A.    Yes.

2    Q.    And this is February 27th, 2006?

3    A.    Yes.

4    Q.    Do you have an understanding of whether this was

14:43:06 5   over a year before go-live?

6    A.    Yes, it was a year or more, yes.

7    Q.    Sir, the first sentence, you say, "I am not exactly

8    sure where the," you use quotation marks here, "quote,

9    unquote, performance issues you mention in the e-mail are

14:43:22 10  that you are talking about."

11              Do you see that?

12   A.    I do.

13   Q.    Sir, do you have an understanding of why you put

14   the word performance in quotation marks?

14:43:31 15  A.    It's in quotation marks because that's what the

16   partner told us.

17              I had no, no information or no hard metrics

18   that there was a performance issue so it's in quotations

19   because that's what the partner was telling me.

14:43:42 20  Q.    So you personally didn't have any knowledge at this

21   point in time whether there were or there were not

22   performance issues?

23   A.    Correct.

24   Q.    And as of the date of this e-mail, the only thing

14:43:52 25  you had heard in terms of actual measurements was that it

1    was taking maybe eight or ten seconds, right?

2    A.    That's correct.

3    Q.    You heard that back in December?

4    A.    Yeah, December of 2005, yes.

14:44:02   5    Q.    Sir, how many years' experience do you have in

6    business software?

7    A.    In business software?

8    Q.    Yeah, not SAP but just business software in

9    general.

14:44:10   10    A.    25 plus.

11    Q.    25 years?  Is eight to ten seconds good performance

12    with business software?

13    A.    Yeah.  It's not bad at all.  I mean, for any

14    business software, for all the stuff that goes on behind

14:44:23   15    the scenes, it's not like a Word document, as an example.

16    Microsoft word, you type in a document, you hit enter.

17    If that was eight seconds telling you it's saving, that

18    would be something.

19            There's so many different things going on

14:44:35   20    behind the scenes that even in that first e-mail, I

21    didn't look at eight seconds as any huge deal.

22    Q.    Thank you, sir.

23            Now, I want to get in and ask you some

24    questions about, like, what exactly we mean, because

14:44:54   25    we've been talking a lot in this trial about response

1    times and actions, and I do want to ask you some

2    questions about, like, what do you actually mean, like

3    what does a user actually do?  I think I want to save

4    that for later.

5                        Is that okay with you?

6    A.    Sure.

7    Q.    I'd like to direct your attention back to the

8    second paragraph here on Exhibit 293.

9                        Are you with me?

10   A.    I am.

11   Q.    I'm looking at the last sentence.  You say, "Please

12   include as much detailed information in the message as

13   possible and even sample code if you can."

14                       Do you see that?

15   A.    I do.

16   Q.    When you said, "Sample code," can you please tell

17   us what you were asking for?

18   A.    Yeah.  As part of what I do in my day-to-day job,

19   in this particular case, this reseller was saying there

20   was a problem in the add-on, so one of the first things I

21   want to see is I want to get the code that they wrote

22   from them, I want to see it.

23                       That gives me a chance to analyze it and

24   basically tell them if I feel they're doing it correctly

25   or not, especially at this stage, it's really early.  So

1    I was asking them for their code.

2    Q.    Sir, before go-live, did IBIS/LSi ever give you any

3    sample code?

4    A.    No.  I never received any code from IBIS/LSi.

14:46:05 5    Q.    Is that something you would have been interested in

6    seeing?

7    A.    Definitely.

8    Q.    Sir, I'd like to direct your attention to Exhibit

9    294.

14:46:19 10    A.    Yes.

11    Q.    I think you were also shown this e-mail earlier?

12    A.    Yes.

13    Q.    Do you remember that?

14    A.    I do.

14:46:24 15    Q.    I'd like to direct your attention to the last page

16    on the e-mail there on the last page, that's Page 4.

17    A.    Yes.

18    Q.    Excuse me.  I had to take a drink.

19                This is an e-mail we already saw, right?

14:46:50 20    This is, "Ralf, you'll be receiving a call from Dale

21    Van Leeuwen"?

22    A.    Yes.

23    Q.    Talked about -- we just looked at this e-mail,

24    right?

14:46:56 25    A.    Yes.

1    Q.    And the next one up on the line, we also looked at

2    this e-mail, too.  This is where Ralf Mehnert says,

3    "Thanks.  I've copied Eddy," right?

4    A.    Um-hmm.

14:47:06    5    Q.    That's you, Eddy Neveux?

6    A.    Yes.

7    Q.    So what I want to focus really on is the e-mail on

8    the third page, but to do that we're going to have to

9    start on the bottom of the second page and that's got the

14:47:17  10    header?

11    A.    Yes.

12    Q.    So is this an e-mail from Dale Van Leeuwen to Ralf

13    Mehnert-Meland?

14    A.    Yes.

14:47:23  15    Q.    On February 27th, 2006?

16    A.    Yes.

17    Q.    This is before go-live, right?

18    A.    Yes.

19    Q.    Over a year before go-live?

14:47:32  20    A.    Yes.

21    Q.    And you were copied on this e-mail?

22    A.    Yes.

23    Q.    Would you have read this e-mail in the ordinary

24    course of your business?

14:47:45  25    A.    Yes.

1    Q.    So let's look on Page 3.  Dale writes, "I called

2    and left a message for you on your phone.  As I really

3    need to take the issue of performance up with you

4    directly.  We have been working with Eddy," that's you,

14:48:02    5    right?

6    A.    Yes.

7    Q.    "And he has been very helpful on many fronts so I

8    do not wish to diminish his involvement or efforts.  He

9    continues to really help us out.  But we feel we have

14:48:12  10    exhausted the issue of performance with Eddy, the SDN,

11    and even the other partners' suggestions and need your

12    involvement or at least direction as to whom we should

13    talk to."

14                Do you see that?

14:48:21  15    A.    I do.

16    Q.    Sir, what was your understanding when you read this

17    of what he was saying to you?

18    A.    He's basically saying that they're having

19    performance issues.  I've worked with him and his team at

14:48:32  20    IBIS and he feels that the information that I had given

21    them, they've exhausted and they need further help.

22    Q.    I'd like to direct your attention to what you were

23    shown earlier today, it's that last sentence of the next

24    paragraph.

14:49:01  25    A.    Yes.

1    Q.    Says the database has approximately 150,000 SKUs,

2    20,000 customers, 7500 vendors.

3              Do you see that?

4    A.    I do.

14:49:01  5    Q.    Was this the first time that you saw all that

6    information?

7    A.    This information?  Yes.

8    Q.    The only thing you had seen before was what?

9    A.    That they had a hundred thousand plus items.

14:49:12  10    Q.    Now, just looking at the information that's in this

11    e-mail, 150,000 SKUs, 20,000 customers, 7500 vendors,

12    that's some of the stuff that's on this chart, right?

13    A.    Yes.

14    Q.    Is that enough information for a person to

14:49:33  15    determine whether or not a piece of software will work

16    for a particular client?

17    A.    No, not at all.

18    Q.    It's not enough information?

19    A.    No.  I mean, all we know right now, so the

14:49:47  20    information here is just master records.  We don't know

21    its transaction volume.  You know, we don't know other

22    master record information like warehouses, ship to

23    addresses, so it's some of the information but, no, I

24    mean I wouldn't be able to make a determination here that

14:50:02  25    this would or would not work for Hodell.

1    Q.    Thank you, sir.  I'd like to direct your attention

2    to the first page.

3    A.    Yes.

4    Q.    This is the e-mail that we discussed earlier,

14:50:16 5    right?

6    A.    Yes.

7    Q.    This is an e-mail from you to Ralf Mehnert-Meland,

8    copy to Dan Lowery, Dan Lowery, he's the owner of

9    IBIS/LSi?

14:50:27 10   A.    Yes.

11   Q.    Also you copy, it says Joe at IBIS Group.

12              Do you know who that is?

13   A.    Yes.

14   Q.    Can you tell the jury?

14:50:35 15   A.    Joe, that's Joe Guagenti?  I'm sorry?

16   Q.    Yeah, the guy's name is Joe Guagenti.

17   A.    Yeah.  Yes.

18   Q.    It's the same guy you were talking to earlier.

19   A.    Right now -- I was just looking for that.  My

14:50:52 20   apologies.

21   Q.    No worry.  Let's look at what you wrote.  You say,

22   "Dale, SAP is looking into this issue.  We had some

23   reports of issues and performance with large data sets in

24   the SAP Business One product.  Development is aware of

14:51:04 25   the issue and we're waiting to hear back on what is to be

1        done to resolve it."

2                   Let's just stop right there.  What are you

3        telling him there, sir?

4        A.    I'm simply telling them that again, out of all the

14:51:14  5        customers we had running SAP Business One, even then we

6        had very large customers running it with large data sets.

7        We had heard in a couple instances where they had run

8        into some performance issues, so I was just telling him

9        development is aware that some customers have experienced

14:51:31 10        this, and that was it.

11                   And that I didn't have a time frame

12        to -- that I would hear -- I couldn't give him a time

13        frame that I would hear back from development on what the

14        resolution may or may not be to that.

14:51:43 15        Q.    And you wrote this e-mail on March 1st, 2006, sir?

16        A.    Yes.

17        Q.    Is that about a year before Hodell went live?

18        A.    Yes.

19        Q.    And is this information that you're telling

14:51:54 20        Mr. Lowery and Joe Guagenti from IBIS/LSi, is this

21        consistent with the information that you told Joe

22        Guagenti of IBIS/LSi back on December 19th of 2005?

23        A.    Yeah.  It's basically -- it is the same.  I mean I

24        was kind of giving them caution at that point in time to

14:52:12 25        say, you know, while I don't know it will or will not

1    work, it's outside of what we tested and I was asking

2    them to be cautious and test it at that time.

3    Q.    Thank you, sir.  And you brought up it's outside of

4    what was tested.

14:52:26  5               So I'd like to -- and you were asked some

6    questions about that earlier, do you remember that?

7    A.    I do.

8    Q.    So I'd like to spend some time unpacking that and

9    understanding what that means because I don't know that

14:52:35 10   everyone in the room has the same experience with testing

11   software and writing software that you do.

12   A.    Okay.

13   Q.    What does it mean --

14               MR. KELLEHER:  Your Honor, may I actually

14:52:48 15   approach the demonstrative that's here?

16               THE COURT:  Sure.

17               MR. KELLEHER:  I don't have a stand-off

18   mic.  Can you hear me?

19               THE COURT:  Ask Sue.

14:53:02 20               MR. KELLEHER:  Can you hear me?

21               THE COURT:  You can grab one of these mics

22   here.

23               MR. KELLEHER:  I'm happy to.

24               THE COURT:  That works.

14:53:26 25               MR. KELLEHER:  How about now?  Good?

1    BY MR. KELLEHER:

2    Q.    We are about to talk about testing, particularly

3    software testing, and these numbers that are up here,

4    20,000 items, 60,000 items, it says typical, 20,000

14:53:51  5    items, high end 60,000 items.  That's what it says,

6    right?

7    A.    Yes.

8    Q.    So were these the parameters of what was -- of how

9    they tested the software?

14:54:01 10    A.    Not necessarily.  I mean, again, these were the

11    parameters for those two particular instances, but it

12    doesn't mean it is not going to work outside or inside

13    those parameters.

14    Q.    So these are just two tests?

14:54:12 15    A.    Yeah, definitely.

16    Q.    Were there more than two tests?

17    A.    There may have been.

18    Q.    And I want to focus on this idea of high end.

19                   Do you have an understanding of what it

14:54:24 20    means to be high end?

21    A.    Yes.

22    Q.    Can you tell us what that means?

23    A.    Well, high end could be the number of users, it

24    could be -- it could be the number as an example of

14:54:36 25    records that you have in the system.  It could be the

1    type of hardware that you're implementing your software

2    on at that point in time.

3    Q.    So does this mean that it won't work if you have

4    more than 60,000 items?

14:54:51 5    A.    No.

6    Q.    So all it really means is that you hadn't tested

7    above 60,000 items?

8    A.    That's correct.

9    Q.    And the same thing with price lists and accounts

14:54:59 10    and everything else you see on here, right?

11    A.    Yes.

12    Q.    Is high end the ceiling?

13    A.    No.

14    Q.    Do these tests demonstrate or come to the

14:55:09 15    conclusion that high end, quote, unquote, is a ceiling?

16    A.    No.

17    Q.    Thank you.  Sir, focusing in on this 294, you go on

18    to say, "The bad news is that we don't have a time frame

19    as to when these issues will be resolved.  I will keep

14:55:50 20    you informed of progress as we are updated from SAP

21    development."

22    A.    Yes.

23    Q.    You use the word "Bad news," is that right?

24    A.    I did use it, yes.

14:56:01 25    Q.    And what did you mean by this?

1    A.    I just simply meant at that time that, you know,

2    while we were aware of, you know, some reports in regards

3    to this particular issue, I didn't -- I didn't have a

4    time frame where I would be able to give them information

14:56:15  5    from development.  That's all I meant.

6    Q.    And that's what you're telling IBIS/LSi?

7    A.    That's correct.

8    Q.    In March of 2006?

9    A.    Yes.

14:56:21 10    Q.    A year before they went live?

11    A.    Yes.

12    Q.    Sir, can you look at Exhibit 785?

13    A.    Yes.

14    Q.    I think you were shown, you may have been shown

14:56:33 15    this e-mail.  I'm not sure, but I'd like to ask you some

16    questions about it.  Can you turn to the second page?

17    A.    Yes.

18    Q.    The e-mail at the bottom is from Joe Guagenti to

19    Ted Steffner, March 13th, 2006.

14:56:48 20          Do you see that?

21    A.    I do.

22    Q.    Joe says, "Ted, I need to set up a conference call

23    this week in regards to the performance issues we're

24    having."

14:56:56 25          MS. LUARDE:  Objection.  Mr. Neveux is not

 1    copied on this particular e-mail.

 2                  THE COURT:  What is the e-mail?

 3                  MR. KELLEHER:  Judge, this is just a

 4    foundational e-mail.  Mr. Neveux comes in on the very

14:57:07  5    next e-mail in the chain.  I'm not going to ask him any

 6    substantive questions.  I'm just trying to put this in

 7    context for people.

 8                  THE COURT:  Who is on this e-mail?

 9                  MR. KELLEHER:  On this e-mail chain,

14:57:17 10    Mr. Neveux and a number of other people.

11                  THE COURT:  Overruled.

12    BY MR. KELLEHER:

13    Q.    Sir, Mr. Guagenti says, "Ted, I need to set up a

14    conference call in regards to performance issues.  Please

14:57:30 15    arrange for Business One technical people to attend."

16                  Do you see that?

17    A.    I do.

18    Q.    I want you to look at the very next e-mail, sir.

19    That's from Ralf Mehnert-Meland to Joe Guagenti.

14:57:43 20                  Are you copied on that, sir?

21    A.    Yes, I am.

22    Q.    What's the date of that?

23    A.    March 13th, 2006.

24    Q.    Just a couple weeks after the e-mail we just talked

14:57:52 25    about?

1    A.    Yes.

2    Q.    Ralf says, "Joe, Eddy and I will participate."

3              When he says Eddy, is he talking about you?

4    A.    Yes.

14:58:01  5    Q.    And when he says "Will participate," is he talking

6    about that conference call we just looked at?

7    A.    Yes.

8    Q.    He says, "Are you aware of the previous e-mail

9    exchanges between SAP and LSi on this issue?"

14:58:18  10              Do you see that?

11    A.    I do.

12    Q.    Sir, do you have any understanding of what

13    Mr. Mehnert-Meland was talking about when he said, "The

14    previous e-mail exchanges"?

14:58:27  15    A.    He would have been referencing the e-mail exchanges

16    between myself and IBIS going from 2005 and the ones

17    earlier to this in 2006.

18    Q.    Basically the e-mails that we've just been talking

19    about, right?

14:58:41  20    A.    Yes.  That's correct.

21    Q.    The e-mails where you tell Mr. Guagenti that this

22    hasn't been tested and that he needs to proceed with

23    caution.

24    A.    Yes.  That's correct.

14:58:50  25    Q.    So was a call set up, did you guys set up a call?

1    A.    Yes.

2    Q.    And do you remember the date of that call?

3    A.    It would have been, like, the 15th, I believe.

4    Q.    March 15th, 2006?

14:59:03 5    A.    I think so.

6    Q.    Were you on that call, sir?

7    A.    Yes.

8    Q.    Do you remember what was discussed on that call?

9    A.    Basically that they were having performance issues.

14:59:18 10   We talked about, you know, their items, the business

11   partners, the volume, and basically again, I reiterated

12   what I had already put in the e-mails prior to this as

13   far as for the In-Flight add-on, the best practices that

14   they should be looking at.

14:59:36 15            I talked about, again, using the testing

16   tool, and then ultimately we said, you know, where it's

17   just simply outside of what SAP tested, you as the

18   reseller really need to test, you know, the heck out of

19   this to make sure that this is going to work for your

14:59:52 20   customer.

21   Q.    Thank you, sir.  And you just used the word

22   "testing" at least a couple of times.

23   A.    Yes.

24   Q.    And you said that you told IBIS/LSi that this was

15:00:02 25   outside the testing that SAP had done, right?

```
  1    A.    Yes.
  2    Q.    And then you recommended that IBIS/LSi do what?
  3    A.    They as reseller needed to test this for the
  4    customer.
  5    Q.    Are you referring to general Business One testing
  6    or specific testing at Hodell?
  7    A.    Well, ultimately it would have been In-Flight
  8    Business One, but at Hodell using their hardware, their
  9    data, everything.
 10    Q.    And their add-on?
 11    A.    Yes.  I did say that.
 12    Q.    Which you came to learn was called In-Flight?
 13    A.    Yes.
 14    Q.    So you're telling them to test it altogether?
 15    A.    Yeah.
 16    Q.    To find out whether or not it's going to work for
 17    them?
 18    A.    Yes.
 19    Q.    Because it's outside of what SAP tested, so they
 20    need to proceed with caution, right?
 21    A.    Definitely, which is what I had said in the
 22    previous e-mails.  Even with that little bit of
 23    information, I did tell them that, you know, again while
 24    in the initial e-mail it was very generic, and I didn't
 25    really know anything about In-Flight, I didn't think the
```

1    performance was a big deal at that time based on the

2    number of items, but, you know, I was cautioning them and

3    asking them "Are you following our best practices?  Is

4    this in your code?"

15:01:07  5    Q.    And you just mentioned cautions, sir.

6                Your cautions date all the way back to

7    December 19th, 2005, right?

8    A.    Yes.

9    Q.    Same thing you talked about in this conference

15:01:17  10   call?

11   A.    Yes.

12   Q.    I'd like you to turn to Exhibit 889.

13   A.    Yes.

14   Q.    I'm on the last page.  There's an e-mail there.  Do

15:01:35  15   you see the e-mail, sir?

16   A.    I do.

17   Q.    Who wrote the e-mail?

18   A.    Dale Van Leeuwen.

19   Q.    Who did he write it to?

15:01:42  20   A.    Myself.

21   Q.    What's the date, sir?

22   A.    March 29th, 2006.

23   Q.    This is a few weeks after that March 15th

24   conference call that we just talked about?

15:01:52  25   A.    Yes.

1    Q.    He says "Eddy, I left you a voicemail but here is

2    what we need your input on.  For Hodell-Natco, this is

3    the large B1 system that we told you with 135 users and

4    150,000 SKUs, we're going to be setting up our, quote,

15:02:12   5    test cell, unquote, environment and want to be as

6    efficient as possible."

7              Do you see that sentence, sir?

8    A.    I do.

9    Q.    What was your understanding of what Mr. Van Leeuwen

15:02:22  10    was talking about when he said "We are going to set up

11    our test cell environment"?

12    A.    That basically he would be duplicating his testing

13    and duplicating the customer's environment.

14              So the same type of hardware, software,

15:02:38  15    database, In-Flight, exactly the same thing as the

16    customer would use when they went live.

17    Q.    And were those the recommendations that you made to

18    IBIS/LSi?

19    A.    Yes.

15:02:50  20    Q.    On the March 15th, 2006 conference call?

21    A.    Yes.  I wouldn't test any other way, but yes.

22    Q.    Sir, I'd like you to -- there's some e-mails that

23    intervene.

24              THE COURT:  Mr. Kelleher, I'm going to

15:03:03  25    interrupt you here for our afternoon recess.

| | |
|---|---|
| 1 | MR. KELLEHER:  Judge, may I have sixty more |
| 2 | seconds? |
| 3 | THE COURT:  Sure. |
| 4 | MR. KELLEHER:  Thank you. |
| 15:03:09 5 | BY MR. KELLEHER: |
| 6 | Q.    So I'm not going to get into the e-mails that |
| 7 | intervene.  I want to look at the last e-mail on the |
| 8 | first page of 889.  It's at the very top. |
| 9 | A.    Yes. |
| 15:03:17 10 | Q.    Sir, do you see that's to yourself, Edward Neveux? |
| 11 | A.    Yes. |
| 12 | Q.    And you see it's from Dale Van Leeuwen, right? |
| 13 | A.    Yes. |
| 14 | Q.    What's the date of that e-mail? |
| 15:03:29 15 | A.    It is 3/30/2006. |
| 16 | Q.    So one day after the e-mail we just talked about |
| 17 | where Mr. Van Leeuwen told you he was going to set up the |
| 18 | test cell environment? |
| 19 | A.    Yes. |
| 15:03:41 20 | Q.    He says to you and Ralf "Eddy and Ralf, thank you |
| 21 | both for your help and guidance in this matter.  We will |
| 22 | proceed with the information presented and let you know |
| 23 | how the install and testing results come out." |
| 24 | Do you see that? |
| 15:03:54 25 | A.    I do. |

1   Q.    Sir, when you read that back on March 30th, 2006,

2   what was your understanding of what IBIS/LSi was going to

3   be doing?

4   A.    They were going to be testing their In-Flight

15:04:10  5   add-on, SAP Business One, in the exact same environment

6   as the customer had.

7   Q.    And that's what you recommended to them on that

8   March 15th conference call?

9   A.    Yes.

15:04:18 10   Q.    And these are the issues that you had been

11   discussing and making recommendations to IBIS/LSi going

12   all the way back from a number of e-mails all the way

13   back until December 19th, 2005, right?

14   A.    That's correct.

15:04:32 15   Q.    And December 19th, 2005, is before Hodell signed

16   the license agreement, right?

17   A.    Yes.

18                MR. KELLEHER:  Judge, I think now might be

19   a good time.

15:04:39 20                THE COURT:  Yep.  Okay, folks, 15 minutes.

21                THE CLERK:  All rise for the jury.

22                (Jury out)

23                (Recess taken)

24                (Proceedings resumed in presence of the

15:19:54 25   jury as follows:)

1          MR. KELLEHER:  May I proceed, Your Honor?

2          THE COURT:  Sure.

3     BY MR. KELLEHER:

4     Q.    Mr. Neveux, I'd like to direct your attention to

15:20:00  5     the last document you were talking about.

6     A.    Yes.

7     Q.    It's marked 889.

8     A.    Yes.

9     Q.    Now, looking at the first e-mail on the screen

15:20:11 10     there.

11     A.    Yes.

12     Q.    At the top of the page.  You received this e-mail

13     on March 30th, 2006?

14     A.    Yes.

15:20:21 15     Q.    And this is the e-mail where Dale says to you,

16     "Thank you for your help.  We'll proceed with the

17     information presented and let you know how the testing

18     comes out"?

19     A.    Yes.

15:20:32 20     Q.    Sir, when's the next time you heard back from

21     anyone at IBIS/LSi?

22     A.    Like a year later.

23     Q.    What was your understanding from the fact that you

24     hadn't heard from them in that time?

15:20:47 25     A.    That they had taken our recommendations and they

1    were in the process of testing based on what we had told

2    them how they, you know, how they should be testing.

3    They needed to test the In-Flight add-on with Business

4    One in the same environment that Hodell-Natco was using.

15:21:03  5    Q.    And, sir, when you didn't hear from them for a

6    year, did that make you understand that they were having

7    problems?

8    A.    No.  And for what I do, I only hear about bad

9    problems, I only hear about problems.  That's my job.

15:21:19 10    I never hear when things are going well, so

11    to me not hearing anything from them for that period of

12    time, I made the assumption that everything must be fine

13    because if it wasn't, they would have been contacting me.

14    Q.    Sir, I'd like to direct your attention to Exhibit

15:21:33 15    151.

16    A.    Yes.

17    Q.    Do you recognize this document, sir?

18    A.    Excuse me.  Yes, I do.

19    Q.    This is an e-mail that you were asked questions

15:21:43 20    about earlier?

21    A.    Yes.

22    Q.    And just to be clear, I'm at the -- it's the Geoff

23    Ashley e-mail at the bottom there.

24    A.    Yes.

15:21:51 25    Q.    The first line says, "We had a call with Hodell

1    this morning."

2    A.    Yes.

3    Q.    You weren't on that call, right?

4    A.    I was not on the call.

15:21:58  5    Q.    But you are copied on this e-mail?

6    A.    Yes, I am.

7    Q.    And you read this e-mail when you received it?

8    A.    Yes.

9    Q.    Sir, I'd like to direct your attention to Paragraph

15:22:09 10    Number 4.  Actually, let's start with Paragraph Number 1.

11              Can you read that to the jury?

12    A.    Bullet number one?

13    Q.    Yes, please.

14    A.    "LSi commented that they originally sold this

15:22:22 15    solution to Hodell as something that was designed for

16    companies of 250 million in revenue with up to 500 users.

17    There was stunned silence on the phone from the SAP team

18    as Hodell confirmed that this was their understanding of

19    what was purchased."

15:22:40 20    Q.    Sir, is this the first time you're hearing that

21    Hodell might want to go to 500 users?

22    A.    For me, yes.  Yes.

23    Q.    Sir, I'd like you to read Paragraph Number 2.

24    A.    "Hodell currently has 120 users.  They expect to

15:22:57 25    grow at 17% compounded growth per year.  They expect to

984

1     be a 300 -- to be a 300 users in the short-term, next

2     couple of years."

3     Q.    Sir, is this the first time that you ever heard

4     that Hodell expected to be a 300 users?

15:23:14  5     A.    Yes.

6     Q.    And, sir, this e-mail is April 17th, 2007, right?

7     A.    Yes.

8     Q.    This is after the go-live?

9     A.    Yes.

15:23:23  10     Q.    Sir, I'd like you to look at Paragraph 4.

11              Do you see that?

12     A.    I do.

13     Q.    Could you read that to the jury?

14     A.    "Dirk did an excellent job under stressful

15:23:34  15     conditions.  He has set the expectations that the

16     environment is much larger than we were led to believe

17     and that we cannot make any statements as to performance

18     without some extensive, additional testing and/or

19     analysis."

15:23:48  20     Q.    Sir, he refers to setting expectations.

21              Do you see that?

22     A.    I do.

23     Q.    And one of the expectations that it stated that was

24     set is that the environment is much larger than we were

15:24:03  25     led to believe and we can't make any statements as to the

1    performance without some extensive, additional testing.

2    A.    Yes.

3    Q.    Or analysis.

4          Do you see that?

15:24:12 5    A.    I do.

6    Q.    Did you have any sense when you read this, sir,

7    about what he was talking about?

8    A.    Yeah.  He was simply, again I didn't write this,

9    but he was saying that he couldn't make, again, any

15:24:24 10    concrete statements until more testing was done because

11    it simply fell outside of what SAP had done testing on,

12    which we would have expected in that year that went by

13    the partner had been doing this testing.

14    Q.    And, sir, is that statement there at number four,

15:24:41 15    is that consistent with what you were telling Joe

16    Guagenti at IBIS/LSi back on December 19th, 2005?

17    A.    Yes.

18    Q.    Sir, I'd like you to take a look at number 7.

19          Do you see that?

15:24:55 20    A.    I do.

21    Q.    Can you read that, please?

22    A.    "LSi stated that they in effect did not test this

23    environment with anything approaching the number of

24    users, or the load being placed on the system.  Jon

15:25:10 25    stated that they used around 20 users to test most of it,

1    and the most they ever had to try and log on was 80.  But

2    he also stated that the 80-user number did not stress the

3    system as they did not -- as they were not processing

4    orders, making payments, et cetera."

15:25:28  5    Q.    What was your understanding, if any, when you read

6    this paragraph?

7    A.    That they -- they didn't do any testing.  I mean,

8    they definitely did not test this in the capacity that

9    the customer would be using it.  It would be like in this

15:25:45  10   case, having a car and somebody saying I need you to go

11   out and test the car because I need you to test the

12   engine, it makes a funny noise but you need to drive it

13   around.  They went out, started the car, got out of the

14   car and said I didn't hear anything.  That's exactly what

15:25:58  15   it was.

16                  They didn't do the testing based on what

17   Hodell-Natco had.

18   Q.    Sir, how many years experience do you have in the

19   software industry?

15:26:03  20   A.    25 plus, 25.

21   Q.    Do you have any experience with testing software at

22   a customer's environment?

23   A.    I do.

24   Q.    What is your understanding of the proper way to

15:26:14  25   conduct such tests?

1    A.    Again, the tests should be performed based on what

2    the customer's end environment will be.

3              So the test performed by the partner needs

4    to be in this case In-Flight, SAP Business One, whatever

15:26:33  5    other add-ons that they have, but those two, and then the

6    exact same infrastructure or the environment, the same

7    computers.  If they were using remote software like later

8    they talk about Citrix, everything has to be identical

9    apples-to-apples.

15:26:44  10    Q.    Was it apples-to-apples in this case, sir?

11    A.    Not even close.

12    Q.    Sir, you weren't involved in any way with the

13    testing that IBIS/LSi and Hodell did on site at Hodell

14    prior to go-live, correct?

15:26:59  15    A.    No, sir.

16    Q.    And that's not something you would ever be involved

17    in?

18    A.    No, sir.

19    Q.    That's something that the customer is responsible

15:27:09  20    for, correct?

21    A.    Customer and partner.

22    Q.    Together?

23    A.    Yes.

24    Q.    Sir, I'd like to direct your attention to Exhibit

15:27:20  25    161.

1    A.    Yes.

2    Q.    I'm on the second page.

3    A.    Yes.

4    Q.    This is an e-mail that you wrote to a gentleman by

15:27:36  5    the name of Gianluigi?

6    A.    Yes.

7    Q.    This is actually an e-mail that I think you talked

8    a bit about with Ms. Luarde earlier today?

9    A.    Yes.

15:27:52 10    Q.    Sir, you say, "Do you have any thoughts on the

11    e-mail below?  I do not think that we will find too much,

12    if anything, with respect to the DI API.  What we know is

13    that the data set used by Hodell for business partners

14    and items alone is in the 100,000 plus area of records

15:28:14 15    and will only continue to grow.  There are performance

16    issues with this data set without any add-on installed as

17    stated by the partner and the customer."

18              I'd like to stop right there, sir.

19              Can you, it sounded like you wanted to give

15:28:30 20    a more explanation when you were asked this question

21    earlier.  So could you do that now?

22    A.    I did.  So I had not been to Hodell.  I had not

23    been on site yet.  So I had no, like, hard numbers.

24              All of this information as far as slowness

15:28:45 25    and performance, I was getting from the partner and the

1    customer.  I had nothing to back that up, but I had no

2    reason necessarily to not believe the customer or partner

3    so I was simply reiterating that information to my boss.

4    Q.    So the customer and the partner told you that the

15:28:59 5    problem was without In-Flight, right?

6    A.    They did.

7    Q.    And you hadn't been out to Hodell to analyze it for

8    yourself yet, right?

9    A.    That's correct.

15:29:09 10    Q.    And so you were just understanding what the

11    customer told you?

12    A.    Yes.

13    Q.    Sir, in your 20 -- in your time with SAP, how many

14    times -- first of all, where do you work from?

15:29:24 15    A.    I'm actually considered a remote user.  There's not

16    an office close to me, so I don't go into an office.  I

17    work remotely, basically laptop, I connect into SAP, I do

18    my work, conference calls, phone calls, I do it from

19    home.

15:29:41 20    Q.    You work from home?

21    A.    Yes, sir.

22    Q.    And that's been generally consistent for much of

23    your time at SAP?

24    A.    For the whole time for SAP, yes.

15:29:47 25    Q.    And how many years is that with SAP?

1    A.    11 and a half.

2    Q.    Sir, in your 11 and a half years with SAP, how many

3    times have you ever gone out to a customer's location to

4    analyze the situation and try to help?

15:30:01  5    A.    Other than Hodell, I have never, in eleven years,

6    before and now after, ever been asked to go to a customer

7    site, which I think is important only because of that one

8    point.

9                I've never had to go to a customer site and

15:30:15 10    analyze anything.  That's how important SAP felt that

11    this particular issue was.

12    Q.    And, so, sir, is it customary for you to accept

13    statements and conclusions made by the partner and the

14    customer?  Is that a typical and ordinary way that you

15:30:30 15    transact your business?

16    A.    Well, I mean I always listen to the customer and

17    the partner, but like when I went out to Hodell, I mean

18    there's a point where you have to go out and test, in

19    this case testing and get the information for yourself.

15:30:43 20    Q.    Got it.  And we're about to get there.

21                But before we do, I'd like to flip to the

22    first page because you were shown this e-mail, too.

23                This is your boss's response to you.

24    A.    Yes.

15:30:55 25    Q.    So you didn't write this, right?

```
 1    A.    No, sir.

 2    Q.    Your boss wrote this?

 3    A.    Yes.

 4    Q.    You always agree with everything your boss says?

 5    A.    No, sir.

 6    Q.    He says to you, "I think you're right.  If the

 7    performance issues are in Business One logic, then the

 8    same issues will be in the DI API as it is built on top

 9    of the same logic."

10              Sir, what was your understanding of what he

11    was saying to you with those sentences?

12    A.    Very similar to what I was saying in the previous

13    one is that I think in this case he's saying if, so he's

14    basing his information on what he's hearing from me, and

15    I'm basing that information that I'm giving him on the

16    customer and the partner.

17              Again, I don't have any metrics from

18    anybody.  One of the things I mentioned earlier is that I

19    had asked IBIS to use the Business One test tool which

20    would have given hard numbers in that case.

21              I actually could have analyzed a

22    spreadsheet is basically what it pushes out that would

23    have told me about all the talking and listening going

24    back and forth to Business One.  I never got that

25    information.  So at this point in time, it's just what
```

1    the partner and customer is telling me.

2    Q.    That's the B1TE tool, sir?

3    A.    Yes, sir.

4    Q.    That's the tool that you and your team developed

5    yourselves?

6    A.    That's correct, and that's actually used for all

7    certifications of Business One add-ons.

8    Q.    And that's a tool that analyzes what the add-on is

9    doing?

10   A.    Yes, it's made just to analyze the add-on.

11   Q.    And that's the tool you recommended to Mr. Guagenti

12   in December 19th of 2005 that he installed?

13   A.    Twice actually.

14            The first time on December 19th and then

15   later on in 2006.

16   Q.    And why did you want him to install the tool?

17   A.    Because again it would help me from what my job is.

18   I mean my job is to help the partners and ultimately, my

19   job is to help the customer.

20            So I was simply asking him to install this

21   tool which would have given me metrics on how the

22   In-Flight add-on was running.  I could have looked at

23   that and again if there were any issues, like the very

24   first thing I told him in December 19th was to make sure

25   he was using filtering, which is a way to cut down all

1    the unnecessary talking going back and forth between the

2    two systems.

3              It would have told me immediately when they

4    were first working on building In-Flight if that was

15:33:06  5    happening or if it was not.  And if it was, I could have

6    told them how to fix that back then.

7    Q.    Thank you, sir.

8              You mentioned -- you mentioned a number of

9    times actually your visit to Hodell so I'd like to ask

15:33:20  10   you some questions about that now, if you don't mind.

11   A.    Sure.

12   Q.    Do you remember when you went out to Hodell?

13   A.    I do.  It was in October of 2007.

14   Q.    Did you go out by yourself?

15:33:33  15   A.    No, sir.  It was myself and Paul Killingsworth.

16   Q.    I'd like you to take a look at Exhibit 167.

17   A.    Yes, sir.

18   Q.    Do you see that document, sir?

19   A.    I do.

15:33:50  20   Q.    Do you recognize it?

21   A.    I do.

22   Q.    I'd like to direct your attention to Page 3, the

23   e-mail at the very bottom.

24   A.    Yes.

15:34:05  25   Q.    Can you tell the jury what this is?

1    A.    It's an e-mail from myself to Trinidad Martinez.

2    Q.    What's the date of that, sir?

3    A.    Excuse me.  October 16th, 2007.

4    Q.    Thank you.  And what are you -- what are you saying

15:34:21 5    to -- well, first of all, let's take a step back.

6                    Who is -- who is Ms. Martinez?

7    A.    So Trinidad Martinez is a colleague of mine.

8    There's globally six solution architects and we each take

9    care of a region, if you will.  I take care of North

15:34:36 10    America, which is the United States and Canada.  Trinidad

11    in this case takes care of EMEA, which is basically she

12    takes care of all of Europe.

13                    She's been around actually myself and her

14    are the two that have been around the longest, and I sent

15:34:48 15    her information again as a second opinion.  So she's also

16    a solution architect and I wanted her opinion on what I

17    was seeing.

18    Q.    So you're the only Business One solution architect

19    in the United States and Canada?

15:35:00 20    A.    Yes, sir.

21    Q.    There's only six in the whole world?

22    A.    Yes, sir.

23    Q.    Ms. Martinez is one of the other ones?

24    A.    Yes.

15:35:08 25    Q.    And here you're sending her data, like, hard data?

1    A.    Yes.

2    Q.    And you're asking her to take a look at it?

3    A.    Yes, as basically a second opinion.

4    Q.    We can look at the e-mails in a moment, sir, but do

15:35:20  5    you have a recollection as you sit here today what the

6    results of Ms. Martinez's analysis were?

7    A.    Yeah, I mean basically she had come up with the

8    same -- I didn't give her any information up front about

9    what my thoughts were.

15:35:36  10         She took the information which again

11    they're just logs, the tool runs, it produces a very long

12    Excel spreadsheet, has lots of information in it, lots of

13    columns.  While I was at Hodell, I sent this off to her

14    and I just said can you tell me what your opinion is

15:35:50  15    here.

16         Basically what she came back with is again

17    we have a pipe that sits between the In-Flight module and

18    SAP Business One and basically it talks and listens

19    through that pipe.

15:36:02  20         What she came back with in that e-mail is

21    that In-Flight was sending just a massive amount of

22    unnecessary information back and forth to Business One

23    and that's what she was telling me.  She was saying

24    things like 700 lines, 650 lines for certain things in

15:36:20  25    the programming that we would do, when my take on it, and

1    she just confirmed that, is it shouldn't have been 700

2    times or 650 times; it should have been one or two times.

3    And that's what she was saying in that e-mail.

4    Q.    So I want to sort of slow down and unpack what you

15:36:36 5    just said.

6              You mentioned a tool.  What tool are you

7    referring to?

8    A.    Again B1TE or the Business One test environment.

9    Q.    That's the testing tool that you and your team

15:36:46 10    developed?

11    A.    That's correct.

12    Q.    That's the testing tool that you recommended

13    Mr. Guagenti and IBIS/LSi use back in December of 2007?

14    A.    Yes.  That's correct.

15:36:54 15    Q.    Excuse me, December of 2005?

16    A.    Yes.

17    Q.    Sorry.

18              So walk me through this, sir.  And keep it

19    at a nontechnical level if you don't mind and if you can,

15:37:05 20    but what do you do with the tool?  Like, where does it

21    go?

22    A.    So the tool is just this small piece of software.

23    It's a little executable, so basically you take the

24    program, you would install it on -- in the case of

15:37:18 25    Hodell -- the machines where SAP Business One was

1    installed along with the In-Flight mod actual.

2                    And you basically double click on it.  It

3    starts up.  And then you tell it to run and it just sits

4    in the background and it listens to everything that an

15:37:33 5    add-on does.  It doesn't listen to Business One.  It

6    listens to, in this case, the In-Flight add-on.  And it

7    just records everything that goes from the In-Flight

8    module to Business One through our pipe, and then back.

9    Everything that occurs is called a call, so if the mouse

15:37:49 10    moves on a screen or if a piece of -- everything, and it

11    just records that information.

12                    And it gives me information about if --

13    basically it will give me warning information so the tool

14    will tell me if something is being done incorrectly

15:38:01 15    within the code.

16                    It will give me what are called exceptions

17    which are errors, so if there's an error somewhere in the

18    code, it will tell me that, and then it will also give me

19    the time.  Specifically, what I was looking at is the

15:38:15 20    time column.  So between each, each talking and

21    listening, if you will, for every line -- and in this

22    case, the sheet was well over 13,000 lines -- it will

23    tell me the time it takes between every talk, listen,

24    talk, listen, talk, listen, both for the

15:38:31 25    user interface, what you see when you're working on the

1    system, and the data going back and forth.

2    Q.    So, sir, the results of this test, it produced

3    results that were 13,000 lines long?

4    A.    That's when I stopped it.  It would have gone

15:38:44  5    longer.  One of the things that can happen if you let it

6    go, I could have, like, ran their machine out of hard

7    disk space, but that's as far as I let it go.

8    Q.    Did you analyze the 13,000 lines?

9    A.    I did.  When I was on site, there was a point where

15:38:56 10    Paul and I broke and Kevin let us into one of the

11    conference rooms and I sat and I actually took, analyzed

12    the information and then also e-mailed it from Hodell to

13    Trinidad.

14    Q.    And so what were the results that you saw from

15:39:10 15    looking at those 13,000 lines?

16    A.    Again, it was an unnecessary amount of information

17    that the In-Flight module was sending to Business One.

18              So from a standpoint of performance, that's

19    the first place.  And what does that mean?  Well, it

15:39:26 20    means one of the first things that I had mentioned to

21    IBIS/LSi and Joe Guagenti way back in December and then I

22    continued to mention it was he wasn't using what we call

23    filtering.

24              And again filtering is just where if you're

15:39:37 25    in a crowded room and there's a lot of people talking,

1    you want to focus on one people, you filter that out.

2    You listen to that one person.

3              That's what filters do to our software.

4    It's part of the software development kit, and I

15:39:49  5    specifically had asked him to use filtering.

6              What I found out from my tool is even

7    though I had asked him in December of 2005 and later on

8    again I had asked those questions in 2006, when I ran my

9    tool and the data that actually came out of it is that

15:40:02 10    they did not invoke filtering in the In-Flight software.

11              So for them, what they were saying

12    performance, that's a huge area where performance would

13    have come from because they didn't architect it, they

14    didn't build it correctly.

15:40:15 15    Q.    Sir, earlier you mentioned best practices.

16    A.    Yes, sir.

17    Q.    What is that at a very high level, sir?  What is

18    the best practices for SAP?

19    A.    Best practices is a document or documents that SAP

15:40:24 20    publishes with every version of SAP Business One.  And

21    best practices in this case are telling resellers that

22    want to build add-ons the best way of doing that.

23    Filtering is one of those as an example.  So that's like

24    the number one cardinal rule.

15:40:41 25              And when you look at our best practice

1  documentation, it actually says if you do not use

2  filtering, you could have a performance issue, which is

3  the reason we started that.

4  Q.   Sir, those best practices you just talked about,

15:40:52 5  were those available, if you know, to IBIS/LSi?

6  A.   Yeah.  They're in two places actually.  They are

7  part of the software development kit, the online help.

8  So if you think of like Microsoft Word or Excel or

9  something like that, you have the help you can search.

15:41:08 10  Same thing for our software development kit and its help

11  file.  It's online and it's readily available, so best

12  practices are there.

13        Also you can go to what we call the

14  software, it's a website for SAP.  You can download the

15:41:19 15  information there which is more on a Whitepaper a Word

16  format.

17  Q.   So, sir, if you're a reseller and you've got the

18  software development kit, then you also have those best

19  practices manuals?

15:41:29 20  A.   Yes.

21  Q.   You're able to read them?

22  A.   Yes.

23  Q.   And you're able to read the things you just talked

24  about, about filtering?

15:41:36 25  A.   Yes.

1    Q.    Sir, I'd like you to flip to the second page of

2    167.

3    A.    Okay.

4    Q.    This is an e-mail from Trinidad to yourself on

15:41:57 5    October 17th, 2007?

6    A.    Yes.

7    Q.    I want to focus on the middle there where she says

8    she has point number one and point number two.

9                Do you see that?

15:42:06 10    A.    I -- excuse me.  I do.

11    Q.    Point number one, she says, "I think they are

12    listening for the key, underscore, down item event.  This

13    event is fired too often and shouldn't be used unless

14    there's no other way around it.  Are they listening for

15:42:22 15    these events for the forms with matrixes?"

16                And then at point number two, she says

17    "There are some lines repeated too many times.  I don't

18    know why.  Here are some examples of the most repeated.

19    I give the number of lines.  Most of them are while

15:42:38 20    managing UI events."

21                And if you look down at Subparagraph B,

22    there's the numbers 2295-2984, looks like there's a

23    little arrow, it says "650 times for a unique event," and

24    there are then what appear to be five exclamation points.

15:43:00 25                And then there's the number 4867-5566,

1    another arrow, 700 times, four exclamation points.

2                     What are they doing?  What are they doing

3    it, what are they doing it so many times per each menu

4    event?  Five question marks.

15:43:20  5                     Sir, it sounds very technical but could you

6    just explain to the jury in the least technical way you

7    can what your colleague, Ms. Martinez, was telling you

8    here?

9    A.    Again, she was basically just saying that in the

15:43:36 10    case of the pipe, there was a lot of unnecessary

11    information that was being generated and/or listened to

12    by the In-Flight module and she was asking why are they

13    doing this so many times.

14                     So as an example, and I think I mentioned a

15:43:52 15    second ago, if you look at the Section B for this

16    particular class -- again the name of the class is

17    irrelevant.  It's our software or the In-Flight module is

18    doing something and it's sending that information to it.

19                     And she's saying why is this being done 650

15:44:05 20    times, why is this being done 700 times, because for this

21    particular thing, it should have been once, maybe twice.

22    And it was done, again, 650 and 700 times.

23    Q.    How many times, if you know, should they have been

24    doing that?

15:44:20 25    A.    Again typically once, maybe twice, depending on the

1    circumstances, but typically once.

2    Q.    And does that result in too much excessive data

3    being pushed through this pipe?

4    A.    Well, unnecessary information.  I mean it could be

15:44:36  5    data.  It could be so data, but yes, it's unnecessary.

6              So think of it instead of one unnecessary

7    item, it's 700 unnecessary items going across.  And

8    that's just one example because the tool I ran runs

9    across everything In-Flight did at that point in time.

15:44:55  10             So that's just one area.

11   Q.    Sir, does pushing, as you say excessive, or too

12   much data through the pipe, does that have any effect on

13   performance or can it?

14   A.    Definitely.  Definitely.  Again the more

15:45:07  15   unnecessary information you push through a pipe, it's

16   almost like water, right?  It's not going to work

17   correctly.  You can't get the whole thing through.  It is

18   going to slow down the system, and on top of that, there

19   were other factors in there.  However, yes.  It was just

15:45:22  20   a ton.

21             I mean, I can't explain it any other way.

22   It was a ton of information that shouldn't have been

23   going through.  It wasn't built based on SAP's best

24   practices.

15:45:31  25   Q.    Was it built for speed, sir?

A.    No.  Think of it like a big old Winnebago, as an

example, big RV, not that it didn't work.  I mean I don't

know if the In-Flight module worked.  I assume it worked

but like a big -- that thing is great.  It goes down the

15:45:50  road, but it's not built for speed.  That's the Ferrari

or the Corvette or whatever you like.

And following our best practices, it would

have been built like a Ferrari, and it wasn't.  It was

the RV, just kind of slow and lumbered down the highway.

15:46:03  Q.    Sir, I'd like to look at the first page of this

exhibit.  Let me know when you're there.

A.    Yes.

Q.    This is an e-mail from you responding to Ms.

Martinez?

15:46:15  A.    Yes.

Q.    Is that correct?

A.    It is.

Q.    It's the same day, right?

A.    Yes.

15:46:23  Q.    Looks like you copied your boss there?

A.    I did.

Q.    That's Mr. Bagnoli?

A.    Yes.

Q.    Where is he located, sir, in the world?

15:46:31  A.    Italy.

```
 1    Q.    He works from Italy?

 2    A.    Yes.

 3    Q.    That's where he worked at the time?

 4    A.    Yes.

 5    Q.    Sir, could you just tell the jury basically what

 6    you're telling Ms. Martinez and your boss here in this

 7    e-mail?

 8    A.    Yeah.  I was just kind of giving them the

 9    background on when I went to Hodell and kind of what I

10    saw.

11              So, you know, in the first paragraph here I

12    was talking that I did go -- I did go there.  One of the

13    things that was kind of important was we had arranged,

14    the trip had been arranged, I don't know, quite awhile in

15    advance, two, three, four weeks that we were going to go

16    on site to Hodell, myself and Paul Killingsworth.

17              So one of the things that we wanted to do

18    is to have IBIS/LSi come on site with us.  So as opposed

19    to, even though I did run the tool, I actually wanted to

20    see the In-Flight source code, which I had not seen even

21    though we had asked for it many, many times, I hadn't

22    seen it to this point.  So I wanted to see it, that way I

23    could see with Joe Guagenti, Joe Guagenti, who was the

24    programmer who had built this.  I wanted to sit with him

25    and again go through his code, maybe make recommendations
```

1      on how to make it better, how to make it faster and so

2      forth.

3                   I was saying he never showed.  Actually

4      nobody from IBIS/LSi showed that day, even though they

15:47:53  5      knew we were coming out.

6                   And again I talked about different areas in

7      it.  I talked about their environment.  They were using

8      what's called a Citrix environment, which is just a

9      remote environment that you work from.  Instead of like

15:48:04 10      using the PC in front of you, it uses the hardware in a

11      different location, so I talked about that.  I talked

12      about the overall size of their database.  This was

13      important only because I made recommendations later after

14      my visit that they weren't on Microsoft SQL server, which

15:48:20 15      is where the data was being stored.  They weren't running

16      regular maintenance so this database was larger than it

17      needed to be.  That could also cause issues.

18                   I told her that personally the performance

19      I witnessed yesterday wasn't actually that bad, and that

15:48:34 20      was in a later document.  I don't know if you want me to

21      say that now or --

22      Q.    You're there, so let's talk about it.

23      A.    So when I did go --

24      Q.    Let me ask a question so we can do this the way we

15:48:44 25      have to do it.

1    A.    Okay.

2    Q.    So why don't you flip to Exhibit 809, sir.

3    A.    Okay.

4    Q.    Sir, when did you actually visit Hodell-Natco?

15:48:56 5    A.    I don't remember the exact date.  October, 2007,

6    17th.

7    Q.    And, sir, can you just explain to the jury what you

8    did when you were there?

9    A.    So, yeah, so Paul and I arrived early in the

15:49:07 10   morning, maybe around let's say nine.  We flew in from

11   different locations, met with Kevin.  Kind of told him

12   what we were there to do.  So I can't speak for what Paul

13   did.

14            I basically went over that I was there to

15:49:21 15   get an idea, you know, their overall infrastructure,

16   basically go into the computer room, see like what the

17   computers were doing, how they were set up, how they were

18   working.  I was going to set up the Business One test

19   environment, this tool, and I told him what it would do.

15:49:36 20            Basically it would allow me to see what the

21   In-Flight code was doing because the folks from IBIS/LSi

22   didn't show up.  So I had no way of actually looking at

23   their code, but I felt that the tool would give me the

24   information that I needed.

15:49:47 25            I also sat with -- so a lot of the issues

1    they were saying the customer and the partner from a

2    performance standpoint were centered around like entering

3    sale orders and invoices.  So I actually went in and sat

4    with some of the people.

15:50:02  5              But it was like a room and I sat in that

6    room and I watched them key in sale orders and so forth,

7    and I sat there and kind of watched what it looked like,

8    if there was any issues, if there weren't any issues.

9              Then they broke, I don't know, lunch time.

15:50:15  10   I sent this information from what I had captured from the

11   logs, I sent it to my colleague, who's actually based in

12   France, Trinidad, I sent it to her.  Then kind of went

13   back and -- back and watched people, actually did a

14   little more with I think it's Keith from Hodell, I sat

15:50:33  15   with him, he's their IT person.  So he takes care of all

16   the computers and so forth.  Talked with him and found

17   some issues there that we thought might help.

18              Did some other testing at Hodell so they

19   were using what's called Citrix.  I actually had them

15:50:48  20   install it on a PC so the PC that was in front of them,

21   they found some marginal gains by doing it that way.

22              And I think we left there, I don't know, it

23   was after 4:00 p.m. anyways because I mentioned being

24   there until 4:00 and leaving.

15:51:00  25   Q.    Thank you, sir.  I want to spend some time

1    unpacking what you just said there.

2          You mentioned you sat with people in a room

3    while they were keying in sales orders.

4          Do you remember saying that?

15:51:15  5    A.    Yes, I do.

6    Q.    Those people, were they Hodell-Natco actual users

7    of the actual Business One, In-Flight and Radio Beacon

8    solution?

9    A.    Yes, they were.

15:51:26 10    Q.    You were watching them do their jobs?

11    A.    Yes.

12    Q.    You were watching them enter in sales orders?

13    A.    I was.

14    Q.    Sir, there's been a lot of talk in this case about

15:51:36 15    different actions that you take on a computer and clicks

16    and response times.

17          So I think it might be helpful for everyone

18    to hear from you what actually it means to enter a sales

19    order on this business software.  Could you explain that?

15:51:55 20          What's the first thing you do?

21    A.    Well, I guess the easiest way because I'm assuming

22    you've never seen Business One think of it like going to

23    a website like Amazon, right.  So you go to Amazon and

24    you want to buy something.  So you go into Amazon it has

15:52:12 25    your customer information.  After you put your customer

1    information or your log-in, then you order stuff.  Right?

2    You go in and pick out the stuff you want and you pick a

3    nice pair of shoes and order that.  You could do one

4    thing and you could, as an example, go in and say I'm

15:52:26  5    done, you check out and then you get to the screen where

6    it will ask you for your payment information if it

7    doesn't already have it.  And then finally you submit

8    that order.

9            Okay?  And when you submit that order, you

15:52:37 10    see sometimes a little wheel or whatever and you kind of

11    wait until that's done because software is doing

12    something in the background and it comes back and you

13    order more stuff or do something else.

14            So Business One as far as entering what we

15:52:49 15    call marketing documents but in this case sales orders,

16    that's what they're doing.  They're basically pulling up

17    a form on their computer screen.  They pick a customer

18    and they pick a customer and they have what looks like an

19    Excel spreadsheet almost, a bunch of lines and that's

15:53:04 20    where they can put what the customer is ordering.

21            And once they put that information in as an

22    example, when they're done they go to the total section

23    and then they'll click add.  Now, during the actual entry

24    when people are keying information in, I didn't see

15:53:19 25    visually at that point in time really any lag.

1    So what I mean by that is like when the

2    mouse was moving around or they clicked in a cell as an

3    example or clicked in a field or when they used the tab

4    key to move from one cell to the next, all right, I

15:53:34  5    didn't really notice any, any performance or any what we

6    would call latency.  It acted the way it should have

7    acted.

8        The only time I saw performance in that

9    case was later when I was analyzing the logs and that

15:53:50 10    performance only came in -- so again if you think back to

11    Amazon, you order one item, you click check out, then you

12    click submit.  It goes fairly quickly.  But if you order

13    a hundred items or more on that, you might sit there and

14    just kind of watch your computer screen for nine, ten

15:54:06 15    seconds, whatever it is.  It eventually comes back.

16        Business One was acting in the same way.

17    They would key in the information, that seemed to be fine

18    visually, but when they would click the add button, the

19    latest thing that I could get out of our logs is that it

15:54:18 20    took nine seconds before the screen refreshed, came up

21    clean, and they were ready to enter it.

22        Now, that wasn't all the time.  Visually it

23    seemed fairly quick to me.  I did get that information

24    that the worst thing was nine seconds.  So that means

15:54:33 25    everything else they were doing was under nine seconds

1    which is kind of common in my opinion from working with

2    somewhere for 25 years, that's pretty common.

3              I mean nine seconds isn't that bad.

4    Q.    Sir, thank you for that.

5              So you're talking about, you just explained

6    how a user actually goes about entering a sales order.

7    So did you watch users move their mouse across the

8    screen?

9    A.    I did.

10   Q.    Was there any perceptible slowness to you while you

11   were watching that?

12   A.    No.

13   Q.    How about when users were typing words or letters

14   into the software, into a field?

15   A.    No.  I mean every great once in awhile, but, you

16   know, I can't attribute that in any which way necessarily

17   to Business One alone.  It could have been because they

18   were remotely connecting so but nothing, again, if you

19   hit a tab, it might, you know, stutter over to the cell

20   but that was pretty rare.  That was like the only thing I

21   could pick out that I saw.

22             And that happened very inconsistently.  I

23   mean maybe once or twice I happened to catch that.

24   Q.    Once or twice the whole time you were there?

25   A.    Yeah.

1    Q.    Watching the users?

2    A.    Yes.

3    Q.    And you also analyzed the results from your tool?

4    A.    I did.

15:55:45  5    Q.    And that gives you -- let's take a step back.  When

6    you were watching these people, that was just your

7    observational data, right?

8    A.    Right.  I mean I just sat there and watched them.

9    I wasn't timing it or anything.  I was just sitting there

15:55:59 10    and watching what they call their day-to-day activity.  I

11    wanted to kind of see what they saw.

12    Q.    Later you were able to look at the hard data that

13    came from your tool, right?

14    A.    I was, yes.

15:56:08 15    Q.    And that showed you the response times -- you've

16    been mentioning Business One, but do I take it that you

17    mean the whole system?

18    A.    I do in this case because the way In-Flight, as far

19    as an add-on worked is for a sales order, In-Flight takes

15:56:23 20    over that complete area because they want to do some very

21    specialized things that Business One doesn't do.  That's

22    what an add-on does.  An add-on adds functionality to

23    Business One.

24         So the In-Flight add-on, when a user was

15:56:36 25    keying in a sales order, In-Flight takes over a lot of

1    that information because it's very specialized to what

2    Hodell needed.

3    Q.    And so the worst time, the worst response time that

4    you saw the whole day that you were out there on October

15:56:49  5    17th, 2007 was nine seconds?

6    A.    That's what was recorded in the logs, yes.  So I

7    don't -- I couldn't tell you exactly what that is.  I

8    would probably say it was in and around sales orders,

9    which comes from the In-Flight module.  Again the tool

15:57:07 10    only records what an add-on is doing.  It doesn't care

11    about Business One.  It only records In-Flight, so even

12    in the worst case, a sales order that Hodell-Natco would

13    have been typing in, the worst case, my tool said it was

14    like a nine-second delay.

15:57:29 15                And again, that was only a few times in

16    there.  So to that point, back in 2005 when I asked them

17    to use filtering, and I told them the different best

18    practices that could have helped them, if they had

19    implemented that then, I guarantee that nine seconds

15:57:41 20    could have been cut down even more than.

21    Q.    Sir, based on their results, the data that you got

22    from the software tool that you developed, are you able

23    to say what caused any performance problems that Hodell

24    was experiencing?

15:57:56 25    A.    Yeah.  That --

            1          MS. LUARDE:  Objection.

            2          THE COURT:  Overruled.

            3    A.    Does that mean I can answer it?  Sorry.

            4          THE COURT:  You can answer it.  Go ahead.

15:58:05    5    A.    Yeah, in this case again the tool was there to

            6    analyze the add-on, and the add-on was what was producing

            7    the performance issues that I was seeing in that log.

            8    Q.    And when you say the add-on, sir, just so everyone

            9    in the room is very clear on what you mean --

15:58:18   10    A.    The In-Flight add-on.

           11    Q.    That was developed by IBIS/LSi?

           12    A.    Yes, sir.

           13    Q.    Sir, I'm looking at that e-mail 809.  That's the

           14    e-mail you sent to Paul Killingsworth October 17th, 2007.

15:58:34   15    A.    Yes.

           16    Q.    What are you doing here, sir?  Why are you writing

           17    this letter to Mr. Killingsworth?

           18    A.    Excuse me.  I'm giving basically Paul, Dan Kraus,

           19    my boss, basically just some of the people that have been

15:58:53   20    working on this for quite a long time, I was just giving

           21    them a summary of my visit at Hodell-Natco on that day,

           22    what I found.

           23          Again, just basically a summary.  Folks

           24    weren't there that I thought were supposed to be there,

15:59:09   25    and I made some notes again in here in regards to I

1    didn't feel that they had -- they being IBIS/LSi -- in

2    the In-Flight module, they did not utilize the

3    suggestions we had been giving them for well over a year.

4        Kind of at the end of it, I just went on

15:59:29  5    and based on my experience in working, like a systems

6    engineer, although I wasn't really there to do that, I

7    did pick out some other things in regard to

8    Hodell-Natco's network.  Basically when you had server A,

9    server B, we found that if you switched from server A to

15:59:46 10    server B, that the performance was a little bit better.

11        I found other things on the hardware like

12    the hardware on the network has a pipe, too, right, so if

13    you're connected to a network, there's a cable in the

14    back.  That's a network card, and that sends information

15:59:58 15    back and forth.

16        The card on as an example one of the

17    servers, you can have it set to ten or a hundred.  It was

18    set to ten.  So now the pipe is like this instead of

19    this.

16:00:07 20        So some of the things like that.  So those

21    also could have caused performance issues.  So it was

22    just a summary of like everything I had done and seen

23    that day.

24    Q.    Thank you, sir.  And that pipe you just mentioned,

16:00:18 25    that's different from the other pipe we were talking

1    about that connects In-Flight to Business One?

2    A.    It is.  It is.  This is in the case of, it's the

3    network.

4    Q.    And, sir, you mentioned you have experience as, did

16:00:27  5    I catch it right, systems engineer?

6    A.    Yes.  Systems engineer.  In a previous job actually

7    for a competitor of SAP, I used to implement, install

8    their software, much like a reseller for SAP.

9              And I have a systems engineering

16:00:43 10    background.  So what a systems engineer is is just

11    somebody that understands windows, windows server, the

12    hardware, the network, how they all work together, yes.

13    Q.    And so, sir, based on -- how many years did you do

14    that?

16:00:54 15    A.    Probably for six.

16    Q.    And what's the competitor?

17    A.    I'm sorry?

18    Q.    For whom did you do that, sir?

19    A.    Oh, it was Great -- well, now it's Microsoft.  It

16:01:03 20    was Great Plains Microsoft.

21    Q.    And, sir, based on that experience, are you able to

22    evaluate the hardware and infrastructure -- the hardware

23    and network infrastructure of a customer?

24    A.    I am.

16:01:15 25    Q.    And did you conduct such an evaluation when you

1    visited Hodell?

2    A.    I did at a high level.  Again it was when I was

3    visiting with Keith.  He was the head IT person at

4    Hodell-Natco?

16:01:29  5    Q.    Keith was the head IT guy at Hodell?

6    A.    Yes.

7    Q.    He sort of showed you around, showed you some

8    stuff?

9    A.    Yeah, he did.

16:01:34  10    Q.    And you were able to make some conclusions based on

11    what you saw?

12    A.    I did.

13    Q.    At a very, very high level, sir, because I want to

14    make sure people understand without getting lost in the

16:01:44  15    technical details, what were those conclusions?

16    A.    That the hardware, based on what I saw, I did not

17    feel that the hardware was actually even adequate for

18    what they were trying to do with In-Flight and SAP

19    Business One.

16:01:56  20              I also found some inconsistencies.  They

21    were using again another software, nothing to do with

22    SAP, called Citrix software.  There was nobody on staff

23    certified in Citrix.  The partner had no one certified in

24    Citrix, and it's a very specialized software.

16:02:15  25              There's a lot of tuning you have to do and

1      definitely a lot of testing, which kind of goes back to

2      LSi/IBIS when they set up their test cell, they didn't

3      test with Citrix.  So not only did they not test with the

4      current data set that the customer had, not only did they

16:02:31  5  not stress the system, they didn't even test in the same

6      capacity as Hodell had their network set up to use

7      IBIS -- excuse me -- In-Flight and SAP Business One.

8      Q.    And you're talking about the testing that IBIS/LSi

9      and Hodell did prior to going live?

16:03:09  10  A.    Yes.

11     Q.    Sir, I'd like to direct your attention to the

12     bottom of this page.

13     A.    Okay.

14     Q.    You say "Also to note the, quote, unquote, worst

16:03:09  15  performance that I saw with respect to the logs generated

16     by the SAPBusinessOne.net profiler tool, when doing order

17     entry at Hodell-Natco, was a nine-second delay with

18     respect to a function entering a sales order using SAP

19     Business One and In-Flight."

16:03:18  20              Do you see that?

21     A.    I do.

22     Q.    You got the word "Worst" in quotation marks.

23              Do you remember why you wrote it that way?

24     A.    Yeah, because, I mean, to be honest with you, again

16:03:28  25  there's so much -- there's so much information, so much

1    work that goes on behind the scenes when you simply key

2    in an order, I mean, so things like, as an example, once

3    the order, like in Amazon, is entered and you click

4    "submit," in this case it has to look up the customer, it

16:03:42  5    has to see how many shipping addresses they have, then it

6    has to go to the items, it has to figure out if the item

7    as an example is even in stock.

8         If it's in stock, then it can fulfill that

9    item.  If it can fulfill the item, then it needs to know

16:04:00 10   information about discounts, different pricing matrices

11   that they have because based on the customer, they could

12   have a different pricing structure.  Customer A and

13   Customer B can have different pricing structures.

14        Sorry.

16:04:08 15   So there's a lot of information basically

16   that goes on in the background.  So when I saw nine

17   seconds out of In-Flight, I kind of was like I honestly

18   didn't understand why I was necessarily even there based

19   on how it was described at Hodell-Natco with their

16:04:23 20   performance issues like almost like their business was at

21   a standstill, the servers were melted down, nothing was

22   running and they just couldn't go forward.

23        And nine seconds for business software for

24   what it was doing?  I actually left and I said to Paul I

16:04:37 25   don't get it, because I didn't.

1    Q.    What didn't you understand, sir?

2    A.    I didn't understand where Hodell-Natco based on my

3    observations and based on the tool itself, I didn't

4    understand why they were saying they had performance

16:04:50  5    problems.

6                Nine seconds?  Again think about Amazon

7    when you're keying along an order.  It probably takes

8    nine seconds before you get back to that.

9                In the worst case, it was nine seconds so

16:05:02 10    that means there were many other times where it was even

11    less.

12    Q.    And, sir, when you wrote those other e-mails that

13    you were shown earlier --

14    A.    Yes.

16:05:10 15    Q.    -- did you understand at the time you wrote those

16    earlier e-mails that the worst performance Hodell was

17    experiencing was nine seconds?

18    A.    I'm sorry, say that again.  I apologize.

19    Q.    You were shown some e-mails earlier today and we

16:05:36 20    also went over them, you and I.

21    A.    Yes.  Yes.

22    Q.    Where you said things to your boss, do you remember

23    that?

24    A.    Yes.

16:05:36 25    Q.    At the time you wrote that e-mail, sir, and those

1    e-mails, did you understand that the worst response time

2    that Hodell-Natco was experiencing was only nine seconds?

3    A.    No.   Again I would have had, A, no way of knowing

4    because I hadn't been there myself.   We didn't get any

16:05:46  5    hard information from LSi.   Again I typically would deal

6    with the reseller.   I don't directly deal with the

7    customer typically so we had no hard information other

8    than what the partner and the customer were telling us at

9    the time.

16:05:59 10    Q.    Do you think you would have written those e-mails a

11    little differently if you knew that the worst response

12    times they were experiencing were nine seconds?

13                        MS. LUARDE:   Objection.

14                        THE COURT:   Overruled.

16:06:12 15    A.    Yeah.   I definitely would have.   I definitely would

16    have.

17                        MR. KELLEHER:   Your Honor, may I have about

18    ten seconds to confer with my colleagues?

19                        THE COURT:   Yes.

16:06:35 20                        (Pause)

21                        MR. KELLEHER:   Your Honor, no further

22    questions at this time.

23                        THE COURT:   Thank you.

24                        Ms. Luarde, any redirect?

16:07:04 25                        MS. LUARDE:   No, Your Honor.

|   |   |
|---|---|
| 1 | THE COURT:  Thank you. |
| 2 | Thank you, you're excused.  Watch your step |
| 3 | going down, please. |
| 4 | THE WITNESS:  Thank you. |
| 16:07:10 5 | (Witness excused) |
| 6 | THE COURT:  You may call your next witness. |
| 7 | MS. LUARDE:  Your Honor, at this time, we |
| 8 | would like to call Udi Ziv who will be shown through the |
| 9 | video clips. |
| 16:07:22 10 | THE COURT:  Okay. |
| 11 | MS. LUARDE:  It does go about an hour and |
| 12 | nine minutes, Your Honor.  I don't know if you'd like |
| 13 | to -- |
| 14 | THE COURT:  Well, we'll do it until 4:30. |
| 16:07:32 15 | And then pick it up again tomorrow. |
| 16 | MS. LUARDE:  Okay.  All right.  Thank you. |
| 17 | THE COURT:  Thanks. |
| 18 | - - - - - |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |
| 25 |  |

```
 1    (The following proceedings were played to the jury from a
 2              videotaped deposition as follows:)
 3                            UDI ZIV,
 4        of lawful age, a witness called by the Plaintiffs,
 5                being first duly sworn, was examined
 6                      and testified as follows:
 7         DIRECT EXAMINATION OF UDI ZIV
 8    BY MR. LAMBERT:
 9    Q.    Good evening, Mr. Ziv.  My name is Wes Lambert.  We
10    haven't formerly met, but I represent Hodell-Natco
11    Industries.
12              MS. LUARDE:  Your Honor, we also have
13    exhibits that are used during our clips, and I'm assuming
14    that opposing counsel does as well, that we want to give
15    the jury the exhibits so they can follow along with the
16    testimony as it is actually played.
17                    THE COURT:  Sure.
18                    MR. LAMBERT:  Would you like a copy?
19                    THE COURT:  I'm good, thanks.
20                    (Videotape playing as follows:)
21                    A MALE SPEAKER:  Will the court reporter
22    please swear in the witness?
23                            UDI ZIV,
24        of lawful age, a witness called by the Plaintiffs,
25                being first duly sworn, was examined
```

1       and testified as follows:

2    BY MR. LAMBERT:

3    Q.    Good evening, Mr. Ziv.  My name is Wes Lambert.  We

4    haven't formerly met, but I represent Hodell-Natco

16:10:39 5    Industries in its lawsuit against SAP America and SAP AG.

6              Are you familiar with this case?

7    A.    Yes.

8    Q.    Okay.  Can you hear me all right?

9    A.    Yes, I can.

16:10:50 10   Q.    Okay.  Have you ever had your deposition taken

11   before?

12   A.    No.

13   Q.    You have not?

14   A.    No.

16:10:59 15   Q.    Okay.

16             I'm going to ask you a series of questions.

17   It's going to be my questions and your answers are going

18   to be recorded by the stenographer that's sitting to your

19   right and it's also being recorded by videotape.

16:11:12 20   A.    Um-hmm.

21   Q.    You're under oath as you would be in court.

22             Please give me an opportunity to finish my

23   question before you answer so that everything can be

24   taken down clearly.

16:11:22 25             If you don't understand any of my

1    questions, please let me know and I will attempt to make

2    it more clear.  Otherwise I'm going to presume that you

3    understood my question when you answered it.

4              And we'll try to go relatively quickly

16:11:39  5    since I know it's getting late there.  But if you need a

6    break at any time, please let me know and we'll certainly

7    do so.

8              Is that okay?

9    A.    Yes.  Sounds good.

16:11:48 10    Q.    Okay.  Who did you work for prior to Nice?

11    A.    With long history.  Top Tier Software which was

12    acquired by SAP in 2001, and then for SAP until 2007.

13    Was self-employed for about a year and a half and then

14    joined Nice in November of '08.

16:12:21 15    Q.    What part of -- what month in 2007 did you leave

16    SAP?

17    A.    I think my employment ended in October, if I recall

18    correctly.  I left my position a few months before.  I

19    don't recall exactly the date.

16:12:45 20    Q.    What was your position with SAP while you were

21    there?

22    A.    I had two roles basically.  One was the general

23    manager of SAP Labs in Israel, which is a development or

24    R&D lab for SAP, and the other is the general manager of

16:13:13 25    what was called Small Business Solutions for SAP.

1    The latter was, I think, since 2004, if I
2    recall correctly, until 2007.  Not sure about the dates.
3    Q.    I'm sorry.  Who did you work for prior to SAP?
4    A.    All the way from beginning of history?  Top J
16:13:42  5    software from --
6    Q.    No.
7    A.    Just before?
8    Q.    Immediately prior.
9    A.    Prior to SAP?  Top Tier Software.
16:13:49 10    Q.    Yeah.
11    A.    Top Tier Software which was acquired by SAP.  Top
12    Tier was a company SAP acquired I don't recall when.
13    After 2001 for sure, which would -- main product of that
14    company was called Menahel, which is termed to be
16:14:07 15    business -- SAP Business One after the acquisition.
16    Q.    So did you have any participation or involvement in
17    the sale of top managed to SAP business for SAP?
18    A.    No.
19    Q.    Were you employed by SAP when it was -- when
16:14:31 20    TopManage was acquired by SAP?
21    A.    Yes, I was.
22    Q.    Did you have any role in reviewing the -- what was
23    the name -- strike that.  What was the name of the
24    software of SAP Business One prior to its acquisition by
16:14:48 25    SAP?

A.    The Hebrew name was Menahel, I don't know how to
spell it, M-E-N-A, M-E-N-A-H-E-L, I guess.  I think the
English name was TopManage, but I'm not sure.

Q.    Okay.  And did you have any role in reviewing the
16:15:11  TopManage Software when it was being acquired by SAP?

A.    I don't recall that I did.

Q.    Do you know why SAP wanted to buy TopManage?

A.    Basically to get into the small business solutions
business.

16:15:37 Q.    They didn't have a product offering in that -- in
that market segment at the time?

A.    Not that I know of, no.

Q.    In your job duties with SAP, did you have any
responsibility for overseeing marketing?

16:15:52 A.    No.

Q.    How about development efforts?

A.    Yes.

Q.    For what products?

A.    For the first few months of my employment by SAP of
16:16:11 the what was called the SAP Portal, and then from 2004,
some -- sometime in 2004 for the Business One product,
and for another product with code name Cypress, which
never went to -- never went live.

Q.    During which time periods were you -- I guess for
16:16:36 lack of a better word -- involved with SAP Business One?

A.    Sometime in 2004 until I left my role, which was sometime in 2007.

Q.    Before you go further, what do you mean by small business solutions just so we know how you're using that term?

A.    It's -- it's an organization term.  As I said in the beginning, one of my roles was the general manager of the Small Business Solutions for SAP, which had the Business One, and as I said, the code name Cypress under -- from a product perspective under the organization's responsibility.

So when I say SBS, the Small Business Solutions, I mean the organization that I managed.

Q.    Okay.  And Business One was the only live piece of software that was encompassed within Small Business Solutions during your employment?

A.    The only product that was generally available, yes.

Q.    Okay.  So fair to say that most of your job responsibilities centered on the deployment of SAP Business One?

A.    No.  My -- my main responsibility was in development of the product, not deployment of the product, and also as usually is the case with newer products, a significant amount of my time was on the new product code name Cypress.  So it was a mix of the two.

1           But not deployment but rather development.

2   Q.    I'm going to ask you to go back to an earlier

3   point.

4           With regard to your organization at SAP,

16:18:38  5   you were the head of the Small Business Solutions

6   organization, is that correct?

7   A.    Yes.  Correct.

8   Q.    There was no one above you in SAP with respect to

9   that organization?

16:18:52  10  A.    No.  I was the head, the general manager of that

11  organization reporting to -- to the Board which is the

12  executive management of SAP.

13  Q.    Okay.  And with respect to SAP Business One

14  development and testing, was there anyone at SAP that was

16:19:11  15  above you or did you report directly to the Board on

16  that?

17  A.    The latter.  I reported directly to the Board on

18  that.

19  Q.    Okay.  Did you have any involvement with SAP

16:19:26  20  Business One or TopManage or any prior iterations of the

21  software prior to joining SAP?

22  A.    Yeah.  Up until -- I don't recall when it was

23  started, but the same company, Quick Soft that I referred

24  to, I was part of that company as well, and in

16:19:49  25  2000 -- sorry -- in 1996 I think we split it into two

1   companies.  One became Top Tier and the other became

2   Menahel, which was responsible for that product, that

3   later became TopManage or Business One.

4   Q.    Okay.  So just so I'm clear, you were an employee

16:20:08 5   of Quick Soft, which is the entity that originally

6   developed what would later become Business One?

7   A.    Correct.

8   Q.    Is that correct?

9   A.    Correct.  Yes.

16:20:19 10   Q.    Okay.  And Quick Soft then became part of or Quick

11   Soft was split into two companies?

12   A.    Yes.  Into Top Tier and into what was called

13   Menahel, which was the company that took the product,

14   Menahel, later Business One, with it.

16:20:43 15   Q.    Okay.  In the split, did you go with Menahel or did

16   you go with Top Tier?

17   A.    Top Tier.  I stayed with Top Tier, yeah.

18   Q.    Okay.  Prior to the split, did you have any

19   involvement with SAP Business One or what ultimately

16:20:58 20   became SAP Business One?

21   A.    Yeah.  We were a small company.  We shared what is

22   called code base, we shared some code between this

23   product and other products.  So from that perspective,

24   yes.

16:21:11 25   Q.    Are you familiar with the implementation of SAP

1    Business One at Hodell-Natco?

2    A.    No, I'm not.  Other than what I read two weeks ago,

3    no.

4              I wasn't aware.

16:21:25  5    Q.    Well, is it fair to say that in or around 2007, you

6    were aware that Hodell-Natco had implemented SAP Business

7    One and was having some issues with the implementation?

8    A.    I don't remember the dates, but from what I've read

9    in the documents a couple weeks ago, yeah.  I -- it

16:21:47 10    says -- it said there that I was aware.

11    Q.    Do you have any independent recollection of when

12    you first became aware of the installation at

13    Hodell-Natco?

14    A.    No.  Actually when I saw the documents, I didn't

16:22:12 15    recall any of that.

16              So -- so I guess the only thing I can say

17    is what I've read, briefly read two weeks ago.

18    Q.    When did you first learn that a lawsuit had been

19    filed by Hodell-Natco against SAP?

16:22:30 20    A.    I don't remember the date.  A few months ago, I

21    guess.

22    Q.    Okay.  If you would turn to a document that's been

23    previously marked as Exhibit 69.  If you could review

24    Exhibit 69, let me know when you're finished.

16:25:36 25    A.    Okay.  I'm good.

1  Q.    Sir, Exhibit 69 is a series of e-mails in or around

2  April 12th, 2007.

3              Is this one of the documents you reviewed

4  in preparation for your deposition?

16:25:52  5  A.    Not a hundred percent sure, but I think I did.

6  Q.    Okay.  Having reviewed Exhibit 69, does that

7  refresh your memory at all about receiving an e-mail from

8  Dan Lowery on April -- in April, 2007 asking for help

9  with respect to the implementation of Business One at

16:26:13 10  Hodell?

11  A.    No.  It doesn't.  I mean, I remember reading this

12  two weeks ago but it didn't -- it didn't ring a bell when

13  I read it.

14  Q.    Okay.  So your testimony, you have no recollection

16:26:28 15  whatsoever of addressing the problems with the

16  installation of Business One at Hodell in April of 2007?

17  A.    Correct.  Other than what I've read in these

18  e-mails a couple weeks ago.

19  Q.    Well, looking, starting from the back obviously,

16:26:50 20  the initial e-mail is an e-mail from Dan Lowery to

21  yourself April 12th -- April 11th, 2007 at 4:34 p.m.

22              Do you see that?

23  A.    Yes, I do.

24  Q.    And he's asking for your help answering some

16:27:09 25  questions with respect to the installation of Business

```
  1    One at Hodell, correct?

  2    A.    It seems that way, yes.

  3    Q.    Okay.  And then do you know who Dan Lowery is?

  4    A.    No, I don't.

  5               I do now, but -- from reading this, but I

  6    don't other than that.

  7    Q.    Okay.  There's a reply to that e-mail from Dan

  8    Kraus.

  9               Do you see that?

 10    A.    Yes, I do.

 11    Q.    Do you know who Dan Kraus is?

 12    A.    Yes, I know who Dan Kraus is.  I don't remember

 13    exactly what was his role, but he was an employee of, I

 14    think, SAP America at the time.

 15    Q.    How about the other individuals on that e-mail,

 16    Paul Killingsworth and Michael Sotnick?

 17    A.    I don't recall who Paul was.  Michael Sotnick, I

 18    remember.  Again he was part, I think, of SAP America as

 19    far as I recall.

 20    Q.    Did any of those individuals report to you?

 21    A.    No.  They -- well, I don't recall who Paul was so

 22    Paul may have, but I don't think so.

 23               And the others definitely didn't.

 24    Q.    Did you have any authority over those two

 25    individuals?
```

```
              1   A.    No.

              2   Q.    The e-mail in the middle of that page is an e-mail

              3   from yourself to Dan Kraus and some other people replying

              4   to Mr. Kraus's e-mail, correct?

16:28:48      5   A.    Correct.  Yes.

              6   Q.    Okay.  Are all the individuals on your e-mail and

              7   Mr. Kraus's e-mail, SAP employees?

              8   A.    Again other than Paul, which -- Killingsworth,

              9   which I don't recall who he was, the other are SAP

16:29:10     10   employees, yes.

             11   Q.    What was Dirk Boessmann's position with SAP?

             12   A.    Dirk was reporting to me.  If I recall correctly at

             13   the time, he was responsible for what we call IBD,

             14   development -- IBD, IBD, install base development.

16:29:31     15             Basically responsible for the products that

             16   were already released versus other people that were

             17   responsible for the new products that were -- new

             18   versions of the product that was -- that were in

             19   development.

16:29:44     20             THE COURT:  Is this a good time to stop?

             21   Q.    Okay.  How about Niels Stenfeldt?

             22             MS. LUARDE:  Yes.

             23   A.    Niels.  Niels Stenfeldt was --

             24             THE COURT:  All right, ladies and

16:29:56     25   gentlemen.  You could just leave the folders there.  They
```

1    will be there tomorrow morning.

2                    Have a good night.  Keep in mind the

3    admonition.  8:15, Mr. Panigutti, where do we meet?

4                    A JUROR:  I think we'll be on L-1.

16:30:09  5              THE COURT:  All right.  We'll see you

6    there.

7                    Have a good night.  Thanks.

8                    THE CLERK:  All rise.

9                    (Jury out)

16:30:16 10             (Proceedings adjourned at 4:30 p.m.)

11                        - - - - -

12                    C E R T I F I C A T E

13                    I certify that the foregoing is a correct

14    transcript from the record of proceedings in the

15    above-entitled matter.

16

17

18

19    **/s/Susan Trischan**

20    /S/ Susan Trischan, Official Court Reporter

21    Certified Realtime Reporter

22    7-189 U.S. Court House

23    801 West Superior Avenue

24    Cleveland, Ohio 44113

25    (216) 357-7087

1

# **I N D E X**

2

3  **WITNESSES:**                                                    **PAGE**

4  CROSS-EXAMINATION OF PAUL KILLINGSWORTH            769

5  (RESUMED)

6  BY MR. KELLEHER

7  REDIRECT EXAMINATION OF PAUL KILLINGSWORTH         826

8  BY MR. CARNEY

9  RECROSS-EXAMINATION OF PAUL KILLINGSWORTH          887

10  BY MR. KELLEHER

11  DIRECT EXAMINATION OF EDWARD NEVEUX               910

12  BY MS. LUARDE

13  CROSS-EXAMINATION OF EDWARD NEVEUX               943

14  BY MR. KELLEHER

15  DIRECT EXAMINATION OF UDI ZIV                    1024

16  BY MR. LAMBERT

17

18                              * * * * *

19

20

21

22

23

24

25