1           IN THE DISTRICT COURT OF THE UNITED STATES
             FOR THE NORTHERN DISTRICT OF OHIO
2                       EASTERN DIVISION

3

    HODELL-NATCO INDUSTRIES, INC.,
4                                        08CV2755

               Plaintiff,
5
          vs.                            June 22, 2015
6                                        10:00 A.M.

7   SAP AMERICA, INC., ET AL.,
                                         Volume 6
8               Defendants.

9

10
              TRANSCRIPT OF JURY TRIAL PROCEEDINGS
11        BEFORE THE HONORABLE DONALD C. NUGENT
               UNITED STATES DISTRICT JUDGE
12                      AND A JURY

13

14

15

16

17

18

19

20

21

22

23

24

25

1   APPEARANCES:

2

3   For the Plaintiff:        Christopher J. Carney, Esq.
                              Sharon A. Luarde, Esq.
                              P. Wesley Lambert, Esq.
4                             Brouse McDowell
                              600 Superior Avenue East
5                             Suite 1600
                              Cleveland, Ohio   44114
6                             216-830-6830

7

8   For the Defendants:       Gregory J. Star, Esq.
                              Michael John Miller, Esq.
                              Joseph M. Kelleher, Esq.
9                             Alex H. Hayden, Esq.
                              Drinker Biddle & Reath
10                            One Logan Square
                              18th & Cherry Streets
11                            Philadelphia, PA   19103
                              215-988-2734

12

13

14

    Official Court Reporter:  Susan K. Trischan, RMR,CRR,FCRR
15                            7-189 U.S. Court House
                              801 West Superior Avenue
16                            Cleveland, Ohio  44113
                              216-357-7087

17

18  Proceedings recorded by mechanical stenography;
    transcript produced by computer-aided transcription.
19

20

21

22

23

24

25

<u>MONDAY, JUNE 22, 2015,  10:09 A.M.</u>

1        MR. MILLER:  Good morning, Your Honor.

2        THE COURT:  Good morning.

3        MR. MILLER:  Next up is Dale Van Leeuwen.

4  He'll be by video.  He's being called by Hodell.  Your

5  Honor, I want to talk to you in advance.  We have the

6  same issue we had with Mr. Lowery.  His deposition was

7  taken and repeatedly he offered personal opinions on

8  matters he has no personal knowledge of and I just want

9  to caution counsel, mention to the Court that in advance

10  we're going to be looking for those foundations to be

11  laid or there will be a lot of objections.  We will waste

12  a lot of time.

13        THE COURT:  Okay.

14        MR. MILLER:  Thank you.

15        Number two, we asked counsel for, last week

16  for a list of exhibits they planned on using with

17  Mr. Van Leeuwen.  We were provided with that list just a

18  couple of minutes ago.

19        The very first exhibit that's on the list

20  is Exhibit 33.  That was the subject of an objection in

21  front of Judge Wells.  We objected to the use of Exhibit

22  33, and she sustained that.  And it's not an exhibit in

23  the case.

24        THE COURT:  What is Exhibit 33?

1  MR. MILLER: It's a set of notes that were

2  taken from a field kick-off meeting, and there's some

3  handwriting on there and there's a reference to no

4  theoretical -- no upper size limit, and

10:10:54 5  there's -- Mr. Van Leeuwen was asked about these notes at

6  his deposition. He wasn't able to properly authenticate

7  the document, wasn't able to properly attribute the

8  statement to any particular speaker and the exhibit was

9  stricken.

10:11:06 10  THE COURT: Whose notes are they?

11  MR. MILLER: They're his notes, but he

12  doesn't -- he was unable to otherwise automate it. It's

13  got hearsay statements in it from people, but it's

14  unclear who they were. It's from a meeting in Las Vegas

10:11:21 15  early in 2004 that he barely remembers to begin with.

16  He also testified, Your Honor, that the

17  reference to no upper size limit wasn't a reference to

18  users in the case. It was instead a reference to there's

19  no rule when you sell B1 about not competing with

10:11:34 20  All-In-One.

21  So it doesn't have to do with the

22  capabilities of B1; it has to do with the internal sales

23  rules about whether somebody who was selling B1 has kind

24  of a hard stop where they have to stop selling B1 and let

10:11:46 25  the All-In-One people take over.

1        Judge Wells considered all of these

2    arguments.  They were laid out in writing and our

3    objection was sustained.  The exhibit was stricken.  I

4    don't even have a copy of it with me.

10:12:01  5        MS. LUARDE:  Your Honor, we're happy to

6    withdraw it.  That's fine.

7        THE COURT:  Okay.

8        MR. MILLER:  That was easy.

9        THE COURT:  I think we have our guy there.

10:12:11 10        MR. MILLER:  Looks like.

11        THE COURT:  Okay.

12        MR. MILLER:  We also filed a motion, Your

13    Honor, yesterday with respect to Mr. Ashley, and there

14    are a couple of exhibits that are at issue there.

10:12:22 15        I'll let Mr. Star, he's prepared to address

16    the Ashley motion.

17        THE COURT:  Let's do that after this is

18    over.

19        MR. MILLER:  That's fine.

10:12:29 20        MR. STAR:  Fine.

21        THE COURT:  We have to break at 11:30.

22    Unfortunately, I have something else I have to do at

23    lunch time so.

24        MS. LUARDE:  Okay.

10:12:41 25        THE COURT:  Do you think that's ready,

1    Sharon?

2                    MS. LUARDE:  I think we're all set to go.

3                    THE COURT:  Do we need Dave up here while

4    we're doing this?

10:12:51 5              THE CLERK:  I'll call him.

6                    THE COURT:  All right.

7                    (Jury in)

8                    (Proceedings resumed in presence of the

9    jury as follows:)

10:15:00 10            THE COURT:  Good morning, ladies and

11   gentlemen.

12                   THE JURORS:  Good morning.

13                   THE COURT:  All right.  Well, we're

14   starting and we have this remote, we talked about last

10:15:28 15  week I think, and the remote is from the gentleman who is

16   in Chicago.

17                   And so it's sort of the modern way.  He

18   didn't have to come here.  So with that in mind, you may

19   call your next witness.

10:15:42 20            Let me say one thing, we have to stop at

21   11:30 this morning until about 1:45.  That's the plan.

22   All right?  Just so you know you have a little bit longer

23   lunch.  We will still leave at 4:30.

24                   A JUROR:  Thank you.

10:16:04 25            MR. LAMBERT:  Your Honor, the Plaintiff

1       calls Dale Van Leeuwen.

2                        THE COURT:  Thank you.

3                        MR. LAMBERT:  We're going to pass out the

4       exhibits that we will be using.

10:16:18 5                        The witness is going to be sworn in.

6                        THE COURT:  Who does it?

7                        MR. LAMBERT:  I think you do it.

8                        THE COURT:  Okay.  Mr. Van Leeuwen, can you

9       hear me?

10:16:26 10                       THE WITNESS:  Yes, I can.

11                       THE COURT:  Would you raise your right hand

12      for me?

13                            DALE VAN LEEUWEN

14         of lawful age, a witness called by the PLAINTIFFS,

15               being first duly sworn, was examined

16                   and testified as follows:

17                       THE COURT:  Could you tell us your full

18      name and spell your last name?

19                       THE WITNESS:  My full name is Dale

10:16:42 20      Van Leeuwen, it's spelled V as in Victor, A-N, space,

21      capital L-E-E-U-W-E-N.

22                       THE COURT:  Thank you.  You can put your

23      hand down.

24                       Go ahead.  We have about a two-second delay

10:17:01 25      here.

1          MR. LAMBERT:  Right.

2          DIRECT EXAMINATION OF DALE VAN LEEUWEN

3     BY MR. LAMBERT:

4     Q.    Mr. Van Leeuwen, just so you know there's a

5     few-second delay between your feed and my feed so we'll

6     try not to talk over each other.  Is that fair?

7     A.    Absolutely, yes.

8     Q.    Okay.  And just so you know, there's a court

9     reporter present with you in the room?

10    A.    Yes.

11    Q.    Okay.  And just before we move forward, I'm Wes

12    Lambert, I represent the Plaintiff, Hodell-Natco.  I took

13    your deposition several years ago.  I'm not sure if you

14    recall or not.

15          Do you recall that?

16    A.    I -- I do remember the deposition, yes.

17    Q.    Okay.

18          And the court reporter has a stack of

19    exhibits that she might show you or ask you to reference

20    as well as your deposition?

21    A.    Okay.

22    Q.    As well as your deposition transcript if you -- if

23    that becomes needed.

24    A.    Okay.

25    Q.    Now, sir, you currently work for a company by the

1    name of Dickenson & Associates in Chicago, is that

2    correct?

3    A.    That is correct.

4    Q.    And Dickenson & Associates is an SAP partner?

10:18:03   5    A.    That is correct as well, yes.

6    Q.    Dickenson assists in sales and implementation of

7    SAP products?

8    A.    Yes.

9    Q.    And you're also a former owner and employee of

10:18:17  10    LSi-Lowery Systems, Inc., correct?

11    A.    That is correct.

12    Q.    And you were involved in the sale of SAP Business

13    One to Hodell-Natco?

14    A.    Yes, I was.

10:18:28  15    Q.    And you left LSi some time in 2006, correct?

16    A.    Yes.  That is correct.

17    Q.    And after you left LSi, you spoke with at least two

18    SAP employees about the Hodell-Natco implementation, is

19    that correct?

10:18:48  20    A.    Yes.  That's correct.

21    Q.    And those conversations occurred some time in 2009

22    with regard to your work at Fast Rite?

23    A.    That's correct.

24    Q.    One of the employees that spoke --

10:19:00  25              MR. MILLER:  Objection, Your Honor.  That's

1    hearsay.

2                    THE COURT:  The answer may stand.

3                    MR. MILLER:  I think we're heading to the

4    important part.

5                    THE COURT:  Well, then you can raise an

6    objection.

7    BY MR. LAMBERT:

8    Q.    One of the employees you spoke with was Paul

9    Killingsworth, is that correct?

10   A.    That's correct.

11   Q.    And the other employee you spoke with was Dan

12   Kraus, is that correct?

13   A.    That is also correct, yes.

14   Q.    And just to be clear, they were SAP employees at

15   the time you spoke with them?

16   A.    I know Paul Killingsworth was.  I'm not 100% about

17   Dan Kraus' -- I know he left SAP.  I'm not sure exactly

18   what date it was, but I believe he was still employed at

19   SAP.

20   Q.    At the time of your conversation in 2009, Dan Kraus

21   to your understanding was still an SAP employee?

22   A.    I believe so, yes.

23   Q.    Okay.

24                    And your conversation with Paul

25   Killingsworth, do you recall -- first of all, Paul

1    Killingsworth and Dan Kraus, do you recall their job

2    titles?

3    A.    At that moment, no.

4                I know that Dan Kraus ran the SAP practice

10:20:11 5    for the Business One product line for SAP in -- in North

6    America.

7                Paul Killingsworth was in sales associated

8    with Business One software.

9    Q.    Okay.  And you spoke to Paul Killingsworth in the

10:20:25 10    context of possibly moving Hodell to All-In-One or A1, is

11    that correct?

12    A.    That is correct.

13    Q.    And in your conversation with Dan Kraus, Dan Kraus

14    conveyed to you that the SAP Business One installation at

10:20:43 15    Hodell was a failure, correct?

16                MR. MILLER:  Objection.

17                THE COURT:  Objection sustained.

18                MR. MILLER:  Thank you, Your Honor.

19                MR. LAMBERT:  Your Honor, may I approach?

10:20:48 20                THE COURT:  Say again.

21                MR. LAMBERT:  May I approach real quick?

22                THE COURT:  Tell me here.

23                MR. LAMBERT:  He just testified that Dan

24    Kraus was an SAP employee so it's a statement of a party

10:20:58 25    opponent, an employee of a party opponent.

1264

```
         1              THE COURT:  Objection sustained.
         2     BY MR. LAMBERT:
         3     Q.    Mr. Van Leeuwen, prior to joining LSi, you were the
         4     sole owner of The IBIS Group, correct?
10:21:17 5     A.    That's correct.
         6     Q.    And for how long were you the owner of The IBIS
         7     Group?
         8     A.    Approximately 10 years.
         9     Q.    And IBIS was an SAP channel partner, is that
10:21:30 10    correct?
        11     A.    Yes.  That is correct as well, um-hmm.
        12     Q.    And to become a channel partner, you had to have
        13     certain -- meet certain qualifications such as competency
        14     and -- competency from a technical perspective, correct?
10:21:47 15    A.    Correct.
        16     Q.    And when you became an SAP channel partner, you
        17     were given access to marketing material, is that correct?
        18     A.    That is correct.
        19     Q.    And you were given access to an internal
10:22:00 20    partner -- internal portal for partners, is that correct?
        21     A.    Correct.
        22     Q.    And technical resources supplied by SAP?
        23              MR. MILLER:  Your Honor, this is a series
        24     of leading questions.
10:22:12 25              THE COURT:  Overruled.
```

```
 1                    MR. MILLER:  He's basically testifying.

 2       A.    Correct.  Yes.

 3       Q.    And technical resources supplied by SAP were given

 4       to you at that time?

 5       A.    Correct.  Yes.

 6       Q.    And as an SAP partner, you were expected to

 7       leverage a relationship with SAP to sell its product,

 8       were you not?

 9       A.    Yes, I was.

10       Q.    And you did, in fact, do that, correct?

11       A.    Yes.  Correct.

12       Q.    And as an SAP partner, you had to report to

13       somebody at SAP?

14       A.    Sales activities, et cetera, yes.  That's correct.

15       Q.    And one of the people you reported to was named Ken

16       Lorenz?

17       A.    Correct.

18       Q.    And you also had ongoing conversations with Dan

19       Kraus as part of your sales activities, is that correct?

20       A.    Correct.

21       Q.    And at some point, IBIS was acquired by LSi?

22       A.    Correct.

23       Q.    And when did that happen?

24       A.    I believe it was May, 2004.

25       Q.    And LSi was also an SAP partner at the time,
```

```
 1            correct?

 2            A.    Correct.

 3                       MR. MILLER:  Objection, Your Honor.

 4                       THE COURT:  Overruled.

10:23:36 5    Q.    And when LSi acquired IBIS, LSi and IBIS became one

 6            and the same to your understanding, correct?

 7                       MR. MILLER:  Objection, Your Honor.

 8            Legal --

 9            A.    Correct.

10:23:46 10                THE COURT:  Objection sustained.

11                       MR. MILLER:  Thank you.

12            BY MR. LAMBERT:

13            Q.    What happened when LSi acquired IBIS, can you

14            explain that for the jury?

10:23:55 15   A.    So I assigned 100% ownership of IBIS to Dan Kraus

16            of -- I'm sorry, Dan Lowery of LSi.

17                       I received a sum of money and I also

18            received five percent shares of the joint companies.

19            Q.    And just backing up for a minute, you were -- you

10:24:22 20   testified you were personally involved in selling

21            Business One to Hodell, is that correct?

22            A.    That is correct.

23            Q.    And at the time that you were representing Business

24            One and selling Business One to Hodell, it was your

10:24:38 25   understanding that you were making those representations
```

1    and undertaking that activity on behalf of both LSi and

2    IBIS, is that correct?

3                    MR. MILLER:  Objection, Your Honor.

4                    THE COURT:  Objection sustained.

5                    MR. MILLER:  Thank you.

6    BY MR. LAMBERT:

7    Q.    When you were selling Business One to Hodell, who

8    is it your understanding that you were selling it on

9    behalf of?

10   A.    So being a channel partner, we were representing

11   SAP, and I was employed at LSi, so I was -- I was selling

12   for LSi.

13   Q.    Prior to working for LSi, you had worked with

14   Hodell-Natco, is that correct?

15   A.    That's correct, for many years.

16   Q.    You worked with Hodell with regard to its FACTS

17   system?

18   A.    That is correct.

19   Q.    In fact, you were -- you worked with the company

20   that installed FACTS at Hodell?

21   A.    That is correct.

22   Q.    And you were the project manager for that

23   implementation?

24   A.    Yes, I was.

25   Q.    That was some time in the 1990s?

A.    I did not get that audio.

Q.    That was some time in the 1990s that you performed
that installation at Hodell?

A.    Yes.  Yes, it was.

10:26:03  Q.    And then you continued to work with Hodell for
several years after that, correct?

A.    Yeah.  I worked -- the company that I worked for
that ultimately sold Hodell-Natco was a company by the
name of Soft Tech.  They went out of business 2004 -- I'm
10:26:25 sorry -- '94, and I continued a relationship with Hodell
from '94 through the acquisition of Business One.

Q.    And was that -- after your employer went out of
business, you formed IBIS, correct?

A.    That's correct.

10:26:50  Q.    And you continued --

A.    And just for the -- just for the record, IBIS was a
d/b/a.  It was actually the Integrated Business Solutions
Group, just so you're -- it's on record.

        That was actually the corporate name was
10:27:05 the Integrated Business Solutions Group.

Q.    Prior to it being acquired by LSi, correct?

A.    That's correct.  Yes.

Q.    And in your work with IBIS, you became familiar
with Hodell's software needs and its expectations with
10:27:28 regard to that software, correct?

1    A.    That is correct.

2    Q.    And in particular with regard to its ERP software

3    system?

4    A.    Yes.  That's correct.

10:27:37  5          The -- The IBIS Group or the Integrated

6    Business Solution Group, we focused on companies

7    specifically in the fastener industry and had -- had very

8    deep knowledge in regards to the industry as well as

9    Hodell-Natco.  That is correct.

10:27:56  10   Q.    You knew how Hodell's orders were processed and

11   shipped?

12   A.    Yes.

13   Q.    And you knew Hodell's future growth plans,

14   particularly through acquisitions, is that correct?

10:28:10  15   A.    That is correct.

16   Q.    And these things were communicated to you by Otto

17   Reidl?

18   A.    That is also correct, yes.

19   Q.    Going to the sale of SAP Business One to Hodell,

10:28:34  20   again you sold Business One to Hodell as a channel

21   partner for SAP, is that correct?

22          MR. MILLER:  Objection, Your Honor.

23          THE COURT:  Objection sustained.

24   BY MR. LAMBERT:

10:28:43  25   Q.    Again, would you state for the jury when you sold

| | |
|---|---|
| 1 | Business One to Hodell, in what capacity were you acting |
| 2 | and who were you working for? |
| 3 | MR. MILLER:  We're retreading the same |
| 4 | area. |
| 10:28:54 5 | THE COURT:  Objection sustained. |
| 6 | BY MR. LAMBERT: |
| 7 | Q.    Do you recall when the sale of Business One to |
| 8 | Hodell occurred? |
| 9 | A.    I want to say it was 2000 -- 2005. |
| 10:29:12 10 | Q.    Did the sale involve the execution of a development |
| 11 | agreement? |
| 12 | A.    Yes, it did. |
| 13 | Q.    And you acknowledge that Hodell was relying upon |
| 14 | LSi's assessment of the Business One product in |
| 10:29:35 15 | determining whether to buy it? |
| 16 | MR. MILLER:  Objection, Your Honor. |
| 17 | THE COURT:  Objection sustained. |
| 18 | MR. MILLER:  It would be much easier if |
| 19 | counsel just asked him what happened. |
| 10:29:43 20 | THE COURT:  It would be. |
| 21 | BY MR. LAMBERT: |
| 22 | Q.    Can you -- can you describe the process by which |
| 23 | Hodell purchased Business One for the jury? |
| 24 | A.    Certainly. |
| 10:29:55 25 | So again, I was -- I was supporting the |

1    FACTS application, which was developed by a company by

2    the name of Software Solutions, ultimately changed their

3    name to Aperum.  They were acquired by INFOR as an

4    organization, and that application exists today.

10:30:17    5             Hodell-Natco, because of their acquisition

6    and growth plans and conversations I had with Otto, it

7    became very clear that they needed to expand past the

8    current FACTS application.  I was looking at other INFOR

9    products such as Take Stock, et cetera.

10:30:41    10             Hodell-Natco was actually approached by

11   American Express and introduced to the business -- the

12   SAP Business One application through American Express.

13             Otto called me up and said, you know, "This

14   is a product you should look at as an organization."

10:31:04    15             I set up a series of appointments with SAP,

16   flew down to, I believe Atlanta, met with Dan Kraus, Ralf

17   Mehnert, Ken Lorenz.  We went through a series of

18   conversations in regards to capability of the

19   application.  We talked about Hodell-Natco specifically,

10:31:33    20   their requirements, et cetera.

21             We decided as an organization to take on

22   the product line, SAP Business One.  We -- at that point,

23   American Express was still engaged with Hodell-Natco in

24   regards to an acquisition, but it became clear that the

10:31:59    25   Business One application was going to require some

1    intellectual product or knowledge applied to it to make

2    it fastener-industry specific, and American Express did

3    not have the capacity to do that.

4              So at that point, the sale cycle shifted to

10:32:22  5    The IBIS Group engaging with Hodell-Natco to sell them

6    the Business One product.

7    Q.    Were you aware of -- did you become aware of

8    Hodell's needs with respect to its current user count and

9    anticipated user count for the SAP Business One software,

10:32:44 10   if it were to purchase it?

11   A.    Oh, yeah.  Well in advance of, you know, while I

12   was still focused on FACTS, Hodell-Natco, through

13   acquisition, continued to grow its user counts and really

14   had taken the FACTS application to its capacity.

10:33:07 15             So Otto and I had many strategy

16   conversations in regards to where Hodell-Natco was going

17   with the application, so forth, and so I knew that their

18   expectation was well over, you know, 300, 400 users.

19             And it was part of the conversation that I

10:33:28 20   had with Dan Kraus, Ralf Mehnert and Ken Lorenz when I

21   met them down in Atlanta.

22   Q.    And did you do anything to investigate or determine

23   whether the SAP Business One product could support

24   Hodell's anticipated user count?

10:33:46 25   A.    Yeah, we wouldn't have moved forward without a

1    clear understanding and some due diligence around whether

2    or not it could support it.  So there was, again,

3    conversations with those three gentlemen in particular.

4                    They all agreed that the application could

5    support, you know, that user count, the three to 400-user

6    range; that it was running in Europe with over 300 users.

7                    And they also provided a marketing, piece

8    of marketing material which showed that the application

9    would support that.

10   Q.    And who was the publisher of that marketing

11   material you referenced?

12   A.    SAP.

13   Q.    And what did the marketing material that you just

14   referenced say about the capacity, the user capacity?

15   A.    That it could --

16                    MR. MILLER:  Objection, Your Honor.

17   A.    That it could support over 300 users.

18                    THE COURT:  Do we know what we're talking

19   about?

20                    MR. LAMBERT:  I'm sorry, Your Honor.

21                    THE COURT:  Do we know what we're talking

22   about?  Is there some document or something?

23                    MR. LAMBERT:  I'm going to show it to him

24   in a minute.  He just said he saw marketing material by

25   SAP.

```
 1              THE COURT:  Show it to him and see if he
 2    can identify it.
 3    BY MR. LAMBERT:
 4    Q.    We'll get to the marketing material in a minute,
 5    but it's your testimony that you did see marketing
 6    material discussing the capacity of the system?
 7    A.    That is correct.  Yes.
 8    Q.    Did you become aware of whether SAP was interested
 9    in getting into certain vertical markets with respect to
10    the Business One software?
11    A.    Absolutely.  Yes.  They were very, very focused on
12    what we were doing in vertical markets.  We actually
13    co-sponsored a trade show out in Las Vegas, the National
14    Fastener Distributor Association.
15    Q.    And who is "we," when you say "we co-sponsored"?
16    A.    SAP, and I believe at that point it was Lowery
17    Systems.
18    Q.    Co-sponsored a trade show relating to the fastener
19    industry?
20    A.    Yeah, it was a matter of attending a trade show,
21    you know, so there was, you know, booth space, you know,
22    typical costs and expenses associated with attending and
23    presenting at a trade show.
24    Q.    Do you recall attending an SAP meeting in Las Vegas
25    about the Business One product?
```

1    A.    Yes.

2    Q.    Can you tell the jury about that meeting?

3    A.    Specifics about it?  Yeah.

4          It was SAP, I believe it was a field

10:36:49  5    kick-off meeting, you know, promoting SAP Business One.

6          Again further, you know, just conversations

7    with -- with the Business One leadership team, Dan Kraus,

8    Ralf was there, Chris Robinson was there.  He was

9    our -- our PAM, Partner Account Manager.  Luke -- Ken

10:37:16 10    Lorenz was there as well.

11    Q.    And were any discussions had at that meeting about

12    the capacity of the Business One product?

13    A.    Yeah, it was -- it was further discussed, you know,

14    just that these are counts and so forth, and that they

10:37:33 15    made sense for Hodell-Natco.

16    Q.    And specifically, Hodell's planned growth to 300

17    users?

18          MR. MILLER:  Objection, Your Honor.

19          THE COURT:  Overruled.

10:37:45 20          MR. MILLER:  Trying to get some clarity.

21    BY MR. LAMBERT:

22    Q.    Did you hear my question?

23    A.    Could you ask it again?  I'm sorry.

24    Q.    Those conversations specifically included or

10:38:00 25    regarded Hodell's planned growth to 300 users?

1276

1        MR. MILLER:  Your Honor, which

2   conversations, with which people?

3        THE COURT:  The objection is overruled.

4   A.    Yes.  Yes, it did.  It included that.

10:38:10  5   Q.    And were you assured that the Business One product

6   could handle that capacity?

7   A.    Yes.  Absolutely.

8        Well, and that existed well through the

9   point of sale.  You know, Dan Kraus was involved.

10:38:31 10   Everybody knew the users that were being sold.  Everybody

11   knew the growth pattern and where they were going with

12   their business.

13   Q.    Is it your testimony that Dan Kraus was involved in

14   the sale of Business One to Hodell-Natco?

10:38:44 15   A.    Absolutely.  Yes.

16   Q.    In what way?

17   A.    He was directly involved in negotiating the

18   contracts between IBIS/LSi and SAP putting together the

19   necessary end user paperwork for licensing of the

10:39:07 20   product.

21   Q.    Was Mr. Kraus involved in helping determine that

22   this was the right solution to fill or to fit Hodell's

23   needs?

24   A.    So from that perspective, The IBIS Group, LSi, had

10:39:28 25   historically with the FACTS application taken a core ERP

1       application and utilizing our intellectual knowledge, we

2       developed functionality that was specific to a vertical

3       market.

4                        So as it relates to the core foundation and

10:39:49  5     its ability to support the user counts, I would have to

6       say absolutely.  Dan Kraus was aware of that.  He

7       couldn't have been intimate about the application of

8       industry-specific processes from a matching standpoint.

9       Q.    But just --

10:40:11 10    A.    That really required LSi and IBIS's intellectual

11      property.

12      Q.    But just so everybody is clear, separating

13      In-Flight from Business One, it's your testimony that you

14      were relying upon Dan Kraus and SAP to determine that

10:40:26 15    Business One itself was a fit for Hodell and that it

16      could handle Hodell's capacity, is that correct?

17                       MR. MILLER:  Objection.  Leading.

18      A.    That is correct.  Yes.

19                       THE COURT:  Overruled.

10:40:37 20    Q.    And based upon everything that you've just

21      testified about and your conversations, you acknowledge

22      that you turned around --

23      A.    We lost audio.

24      Q.    Can you hear me?

10:40:52 25    A.    I can now.  Yes.  Thanks.

1278

1    Q.    So based upon the conversations that we were just

2    discussing, you acknowledge that you turned around and

3    told Hodell and Otto Reidl that Business One could

4    support at least its growth to 300 users, is that

5    correct?

6    A.    We -- we confirmed it.  Otto was, again, he was

7    already aware of this based on American Express and the

8    conversations that were being had there.

9              I mean, that same marketing material that

10   I'm talking about was presented by American Express as

11   well, so everybody was on board that the application

12   could support the user count.

13   Q.    But just so we're clear, you specifically also told

14   Hodell that Business One could support that user count,

15   is that correct?

16   A.    That I had confirmed that with SAP, that is

17   correct.

18   Q.    And the user count and the capacity of Business One

19   to handle Hodell's user count wasn't just important to

20   Hodell; it was important to you personally, correct?

21   A.    That is correct.

22   Q.    Can you explain to the jury why that is?

23   A.    Well, there's a significant investment that goes

24   into taking a core application and developing it for a

25   specific vertical market.

                          Our intention was -- was to continue to

sell the FACTS application for those companies that were

smaller, those companies up to, let's say, 75 users, and

we were going to take the SAP Business One application

for users that were, let's say, 50, so there was some

overlap, up to, you know, the 3-to-400-user range.

Q.    Was it made clear to you by SAP and Mr. Kraus that

SAP was looking for as many users on the Business One

system as possible?

                    MR. MILLER:  Objection, Your Honor.

                    THE COURT:  Objection sustained.

                    MR. MILLER:  Thank you.

BY MR. LAMBERT:

Q.    Did you go through a discovery period with regard

to the potential sale of Business One to Hodell?

A.    Yes, we did.

Q.    Can you describe for the jury what a discovery

period is?

A.    A discovery period is where you sit down with the

organization, in this case it was Hodell-Natco, talk

about processes, talk about requirements, both current

and future state.

                    There is a constant balance you have to

maintain, in that the current Legacy System may have

certain restriction that causes a workaround.  You don't

1    bring those things forward.  So you spend time working

2    through the to-be state, if you will, and you determine

3    whether or not -- you determine all the company's

4    requirements and current state processes.

5                    And then you identify whether or not

6    there's a match with the application that you're looking

7    to deploy.

8    Q.    Were there any alarms during this discovery period

9    with regard to whether Business One could support

10   Hodell's user count?

11   A.    User count, no.  Not at all.

12   Q.    Did you attend any SAP training classes with regard

13   to the Business One product?

14   A.    I did, yes.

15   Q.    Can you describe for the jury what those training

16   classes entailed?

17   A.    The training classes were in regards to the

18   application.  There was a, what's referred to as an SDK,

19   or software development kit.  So we learned the

20   utilization of the software development kit, we learned

21   the application, we learned how to develop queries, et

22   cetera, utilizing the tools of the application.

23   Q.    And before I forget, did Hodell make it clear to

24   you that they would not purchase Business One unless it

25   could support their anticipated growth to 300 users?

1    A.    Yes.  That was very clear.

2    Q.    Was that always consistent throughout the sales

3    process of Business One to Hodell?

4    A.    Yes.

10:45:43 5    Q.    Was Dan Lowery involved at all in the sale effort,

6    in the sales efforts of Business One to Hodell-Natco?

7    A.    I believe he may have met with them one time.  I

8    mean, the ongoing sales process itself, no.

9              Ultimately, I believe Dan signed the

10:46:09 10   contracts, the ultimate sales contracts that -- just

11   given his title.  But actually, I don't even remember

12   that a hundred percent or if I had signed those.

13   Q.    Okay.

14   A.    But, yeah, I mean, Dan was aware of it.  He was not

10:46:23 15   actively involved, but I -- you know, he knew, Dan knew

16   how important this particular opportunity was.

17   Q.    I want to get to some of that literature that you

18   were talking about.

19             Can you look at Exhibit 35 in your binder?

10:46:44 20   A.    Okay.

21   Q.    Is Exhibit 35 the type of document that you were

22   talking about that you reviewed as part of your discovery

23   process with Business One?

24   A.    Yes.  That's a partner brief, yes.

10:47:08 25   Q.    And this is the kind of information you were

1  relying upon when determining whether Business One would

2  be a fit for Hodell?

3  A.   This was one of those elements, that is correct.

4  Q.   And at the top of that first page, it indicates

5  it's a copyright by SAP AG.

6           Is that accurate?

7  A.   That's correct.  Yes.

8  Q.   If you would turn to, Mr. Van Leeuwen, if you see

9  on the bottom right-hand corner, there's page numbers.

10  It goes 35, 35.2, 35.3.

11           Do you see that?

12  A.   Yes.  Yes, I do.

13  Q.   Can you turn to the 35.4?

14  A.   Okay.

15  Q.   There's a discussion of scalability.

16           Do you see the word "scalability" there as

17  one of the bullet points?  There's enhanced productivity

18  and control and then management.

19  A.   Yeah.

20  Q.   Inside and scalability.  Do you see that?

21  A.   Oh, okay.  Yes.

22  Q.   Can you describe for the jury --

23  A.   Sorry, it's a --

24  Q.   Can you describe for the jury what scalability

25  means?

1    A.    Scalability means it provides the ability to grow.

2    Q.    Could you turn to Exhibit 36 in your binder?

3                Exhibit 36 is another type of document

4    that -- another document that you received and relied

10:48:51 5    upon in marketing Business One to Hodell?

6    A.    Yes.

7    Q.    Is this also an SAP document?

8    A.    Yes, it is, a copy of one.

9    Q.    Sorry about the copy quality, but if you look down

10:49:11 10    in that, that last paragraph of the document, there's a

11    statement, "Whether you have five employees or 500, this

12    solution helps emerging businesses streamline their

13    operational and managerial processes."

14                Do you see that?

10:49:26 15    A.    Yes, I do.

16    Q.    Is that statement one of the things you relied upon

17    to determine that Business One could support 500 users?

18    A.    Yes, it was, and was consistent with the

19    conversations that I had with -- with people like Dan

10:49:44 20    Kraus and Ralf Mehnert, et cetera, yes.

21    Q.    And in your opinion, would it be appropriate to now

22    claim that "employees" is not synonymous with "users" in

23    that statement?

24                MR. MILLER:  Objection, Your Honor.

10:49:57 25                THE COURT:  Objection sustained.

|   |   |
|---|---|
| 1 | MR. MILLER:  Thank you. |
| 2 | THE COURT:  Objection sustained. |
| 3 | BY MR. LAMBERT: |
| 4 | Q.   Can you turn to Exhibit 38 in your binder? |
| 10:50:16 5 | A.   Okay. |
| 6 | Q.   Exhibit 38 is another document provided to you by |
| 7 | SAP, is that correct? |
| 8 | A.   Yeah.  I'm not -- I'm not sure if this was a |
| 9 | document or screenshot. |
| 10:50:33 10 | MR. MILLER:  Objection. |
| 11 | A.   Looks like it says it's a calculator -- oh, report, |
| 12 | yeah, so this would have been a document but it is from |
| 13 | SAP, yes. |
| 14 | Q.   It's one of the documents again that you relied |
| 10:50:44 15 | upon in assessing the Business One product? |
| 16 | MR. MILLER:  Your Honor, objection.  Can he |
| 17 | ask him what it is? |
| 18 | THE COURT:  Yeah, he should be able to |
| 19 | identify what it is first. |
| 10:50:54 20 | BY MR. LAMBERT: |
| 21 | Q.   Can you identify what the document is, |
| 22 | Mr. Van Leeuwen? |
| 23 | A.   This looks like a lead-in page to a document that |
| 24 | would have talked about the return on investment by |
| 10:51:08 25 | acquiring the SAP Business One application for a company. |

1    Q.    And did you rely upon any information in this

2    document in assessing the Business One product for

3    Hodell?

4    A.    Yes.  This, this would have been supporting

10:51:25  5    material to support the purchase of SAP Business One.

6    Q.    And is there anything in this document that

7    supports your understanding of the capacity, the

8    user-count capacity for the Business One software?

9    A.    Again, it talks about in the first section whether

10:51:49  10    you have five or 500 employees, Business One helps

11    emerging businesses streamline their operation and

12    managerial processes.

13    Q.    Again, this document's called an ROI calculator, is

14    that correct?

10:52:05  15    A.    That's correct.

16    Q.    Okay.

17    A.    Stands for "return on investment."

18    Q.    Can you describe return on investment as it

19    pertains to the Business One software based upon your

10:52:16  20    review of this document?

21    A.    Return on investment would be, you know, you're

22    going to have an acquisition, a purchase associated with

23    the licenses of Business One.  You'll have implementation

24    costs, et cetera, and this type of document would support

10:52:37  25    how you're going to obtain a return on investment through

1    efficiencies, for example, through, you know, the

2    potential savings of employee head counts, et cetera.

3              I mean, there's several things that can go

4    into return on investment.

10:53:01  5    Q.    And did you market Business One to Hodell on that

6    basis?

7    A.    Yes, I would say so.  Yes.

8    Q.    Did you ever see any marketing literature from SAP

9    where it started to modify the target market for the

10:53:29  10   product?

11   A.    I have to be careful.  I mean, over the years, yes,

12   I have.

13             During, during the point of time where we

14   were working on the sale to Hodell-Natco, no.

10:53:49  15   Q.    But you subsequently did come to learn that the

16   target market for Business One had been reduced?

17   A.    Yes.  Absolutely.

18             And if -- if I might add, the core

19   application, because I wanted to verify, too, that, you

10:54:10  20   know, it could support this user count, that it wasn't

21   just, you know, somebody's idea.

22             It was my understanding in conversations

23   that I had with people at SAP, Dan Kraus being one of

24   them, that there were -- there were companies in Europe

10:54:27  25   that were operating with this, this type of user count.

1   What did become quite clear is that the application, once

2   we engaged and we started working on it, once we

3   understood really what was the core application, that the

4   system was really built to support a company that is in

5   Europe.

6           And the processes in Europe, even simple

7   things like order-to-cash, are very different, right?  So

8   in Europe, they traditionally don't have a warehouse with

9   inventory.  They use 3PL, it's a third-party logistics

10  company.

11          So a lot of the processes that need to be

12  there from a U.S. perspective weren't necessarily there.

13  You couldn't even write a check in the application

14  because in Europe, you deal with wire transfer.  That's

15  pretty much how people do all their payments, et cetera.

16          So I think the -- I think the application

17  was able to support the users that they were talking

18  about, but not -- not in the U.S. with the processes that

19  are associated with what we deal with here in North

20  America.

21          MR. MILLER:  Your Honor, this is the

22  witness's personal opinion.  He's not an expert.

23          THE COURT:  Yeah, ask him a question,

24  please.

25

BY MR. LAMBERT:

Q.    Did you attend any SAP training classes where the
transaction volume Business One could support was
discussed?

10:56:28  A.    I would say yes.

Q.    Is transaction volume something that could
influence the performance of an ERP system?

A.    Absolutely.

Q.    Did you do anything to determine whether SAP

10:56:39  Business One could support Hodell's transaction volume?

A.    We did internally as we started the development
effort and after it was sold to Hodell-Natco.

I think leading to that, we relied on
information that was provided by SAP.

10:57:06  Q.    Did you do anything --

A.    I mentioned --

Q.    Go ahead.

A.    I mentioned a software development kit.  You know,
there -- there was --

10:57:17  MR. MILLER:  Your Honor, this is not
responsive to the question.  It really isn't.

THE COURT:  Yeah, put a question.

A.    Sorry.

Q.    Did you do anything to investigate the capacity

10:57:31  testing that SAP had done on the Business One product?

1        A.    I mean, I don't remember.

2                    I would say no.  I relied on what was being

3        reported by SAP.

4        Q.    You testified --

10:57:54 5     A.    At least through the point of sale.

6        Q.    You testified that there were gaps in functionality

7        between what SAP Business One could do and what Hodell

8        needed, is that correct?

9        A.    That's correct.  Yes.

10:58:05 10    Q.    And is that why the In-Flight Enterprise software

11       was developed?

12       A.    That is correct.

13       Q.    Was In-Flight developed or intended to be used just

14       for Hodell, or was that going to be an industry -- a

10:58:22 15    solution for the industry as a whole?

16       A.    Our intention was to develop it, and the

17       development work that was done was done in such a way to

18       not only support Hodell-Natco, but to support other

19       people within the industry.

10:58:42 20    Q.    But did SAP indicate to you that they were

21       interested in the In-Flight development?

22       A.    Yes.

23       Q.    In what way?

24       A.    That was really part of their strategy was to have

10:59:00 25    organizations like IBIS/LSi develop, further develop the

1290

| | |
|---|---|
| 1 | application specific to vertical markets and become, you |
| 2 | know, their -- their lead-in to those industries. |
| 3 | Q.    Can you turn to Exhibit 71 in your binder? |
| 4 | A.    Okay.  I have it. |
| 10:59:34 5 | Q.    Exhibit 71 is a series of e-mails that you're |
| 6 | copied on, is that correct? |
| 7 | A.    Yes. |
| 8 | Q.    Do you recall sending and receiving the e-mails |
| 9 | that are reflected on Exhibit 71? |
| 10:59:49 10 | A.    I'll -- I'll have to read through them real quick |
| 11 | to verify. |
| 12 | Q.    Please do.  I want to make sure that we're clear on |
| 13 | that. |
| 14 | (Pause)? |
| 11:01:01 15 | A.    Yes, I was -- I was definitely part -- I was |
| 16 | definitely copied on these e-mails, yes. |
| 17 | Q.    Can you explain to the jury what -- the e-mail on |
| 18 | Page 71.2, looks like it was the last e-mail in the |
| 19 | chain, is that correct? |
| 11:01:20 20 | A.    I believe -- |
| 21 | Q.    In other words, the e-mail chain starts at the back |
| 22 | and works it's way toward the front, right? |
| 23 | A.    Just based on the time that's on here, I can't say |
| 24 | that that's true or not. |
| 11:01:43 25 | Q.    Well, can you explain to the jury what the e-mail, |

1    the first e-mail is on Page 71.2?

2    A.    71.2.  So this was an internal e-mail sent to

3    discuss with Dan Lowery and Jon Woodrum just our

4    relationship with American Express that we had been

11:02:16  5    working in good faith on the Hodell-Natco.

6              It talked about the fees associated with

7    signing up as a -- as a Business One reseller.  You know,

8    some of the marketing that would take place, et cetera.

9    Q.    And going back to the e-mails further back, you

11:02:40 10    were involved in or copied on e-mails between Mr. Lowery

11    and some folks at SAP, is that correct?

12    A.    Yes.  Yes, it is.

13    Q.    And looks like the e-mail, the first e-mail towards

14    the back, it starts on 71.3 and then spills over on to

11:03:12 15    71.4.

16              Do you see that communication?

17    A.    Yes.

18    Q.    An e-mail from Dan Lowery to Daniel Kraus, July

19    21st, 2004, at 7:01?

11:03:29 20    A.    Yes.

21    Q.    And then on the next page there's several

22    paragraphs and there's one that starts, "Dale and I have

23    been talking about."

24              Do you see that?

11:03:40 25    A.    Starts with, "Dale and I have been talking about."

1          On which page?

2     Q.    71.4.

3     A.    Okay.  Yes.  "Dale and I have been talking."

4     Q.    Can you read that paragraph for the jury?

11:03:59 5     A.    "Dale and I have been" -- and this is -- this is

6     Dan Lowery writing to Dan Kraus.

7               "Dale and I have been talking about two

8     large close prospects who want us to write our equipment

9     rental and our fastener functionality into SAP.  One is

11:04:18 10    currently installed on FACTS and the other is waiting for

11    us to propose the cost and the timeline for ER, equipment

12    rental, on Business One.  They are both 150-user deep

13    deals, which would give us two verticals for the SAP

14    Business One product.  Personally I feel the verticals

11:04:42 15    are the quickest routes to continue SPO sales."

16    Q.    Is one of the 150-user deals referenced in that

17    paragraph Hodell-Natco?

18    A.    Yes, it is.

19    Q.    And this e-mail is July, 2004, correct?

11:05:05 20    A.    That is correct.

21    Q.    Prior to Hodell signing the development agreement

22    or any other agreement to purchase Business One?

23               MR. MILLER:  Your Honor, objection.  The

24    word "Hodell," we've already had this, is not in the

11:05:17 25    document.

```
 1              THE COURT:  All right.  But you can
 2   cross-examine on that.
 3   BY MR. LAMBERT:
 4   Q.    My question was this e-mail was sent prior to
 5   Hodell signing any contract with LSi or with SAP, to your
 6   knowledge?
 7   A.    Yes.
 8   Q.    And the gentleman that that e-mail was sent to, Dan
 9   Kraus, he's one of the individuals that you had spoken
10   with about the capacity of the SAP Business One system?
11   A.    Yes.  That is true.
12   Q.    Ultimately, if you look on 71.3, Dan Kraus responds
13   to Mr. Lowery and copies you?
14   A.    Okay.  Yes.
15   Q.    And he's forwarding on an e-mail from Ralf
16   Mehnert-Meland, correct?
17   A.    Yes.  Yes.
18   Q.    Is there anything significant in
19   Mr. Mehnert-Meland's e-mail that you noticed at the time?
20   A.    So his e-mail states that we could ultimately take
21   the application into large accounts, such as Caterpillar
22   and John Deere, which are certainly large enterprise
23   accounts.
24   Q.    And was that something that was important to you?
25   A.    Yes.  Yeah.
```

1294

1        I mean, to me that reflects very well.  I

2   mean, SAP's thought process that the application could

3   scale, using that word "scale," into large enterprise

4   accounts.

11:07:07 5   Q.    And then Dan Kraus ultimately replied, "I think we

6   can help you land your current prospects with a promise

7   of a larger SAP relationship for the product."

8        Do you see that statement?

9   A.    What page is that on?

11:07:30 10  Q.    Same page, the e-mail right above

11  Mr. Mehnert-Meland's e-mail.

12  A.    Oh, yeah, okay.  Yes.

13  Q.    And what did that statement mean to you when you

14  received it?

11:07:41 15  A.    All right.  You know, it was our intention to -- we

16  were excited with the ability for the application to

17  scale, and if we were to develop on it, to open up new

18  markets for us.

19  Q.    And based upon your involvement as an SAP channel

11:08:01 20  partner, did you come to understand that the potential

21  sale of Business One to Hodell was a high profile sale

22  within SAP?

23  A.    Yeah.

24       To my knowledge, it was the largest one at

11:08:19 25  the time that was sold.  I was even invited to visit

|     |     |
| --- | --- |
| 1 | Yardley, Pennsylvania at the SAP headquarters and stay, |
| 2 | stay on site at some private rooms that they have |
| 3 | available, um-hmm. |
| 4 | Q.    Because of the -- because of the SAP Hodell sale? |
| 11:08:42 5 | A.    That is correct.  Um-hmm. |
| 6 | Q.    Could you turn to Exhibit 178? |
| 7 | MR. MILLER:  Your Honor, the |
| 8 | witness -- there was an objection with regard to this. |
| 9 | MR. LAMBERT:  I'm going to ask |
| 11:09:11 10 | Mr. Van Leeuwen about -- I acknowledge that he wasn't |
| 11 | copied on the e-mail.  I'm asking him about the |
| 12 | attachment for the e-mail. |
| 13 | I'll lay a foundation for it. |
| 14 | THE COURT:  Go ahead. |
| 11:09:21 15 | BY MR. LAMBERT: |
| 16 | Q.    If you would look at the page in the bottom |
| 17 | right-hand corner, it says 178.2. |
| 18 | A.    Yes. |
| 19 | Q.    Is this information that you communicated to SAP? |
| 11:09:52 20 | I'll ask a better question while you're reading it. |
| 21 | Did you participate in the preparation of |
| 22 | the document that's reflected on Page 178.2? |
| 23 | A.    Yes. |
| 24 | Q.    And did you provide the information that's |
| 11:10:05 25 | reflected on 178.2? |

1    A.    I believe I did send it to SAP.

2                MR. LAMBERT:  Your Honor, may I proceed to

3    ask the witness about this document?

4                THE COURT:  Go ahead.

11:10:20 5    BY MR. LAMBERT:

6    Q.    You reference, there's some various bullet points

7    on this document, is that correct?

8    A.    Yes, there are.

9    Q.    In fact, there's several categories, business

11:10:36 10   challenge, competition information, organization and

11   size.  Do you see those various categories?

12   A.    Yes.

13   Q.    The second bullet point is under business

14   challenge.  It states, "Managing the migration of data

11:10:51 15   from multiple operations during an acquisition."

16                Did I read that correctly?

17   A.    That is correct, yes.

18   Q.    And you communicated that to SAP?

19   A.    Yes.

11:11:04 20   Q.    And what's that -- what's your -- what does that

21   mean?  Can you explain that for the jury?

22                MR. MILLER:  Your Honor, could I have him

23   to lay a foundation?

24                THE COURT:  Overruled.

11:11:19 25   A.    Do you want me to proceed?

1    Q.    Well, let's back up.

2              Do you recall when this document was

3    prepared?

4    A.    Exact dates, no.  This would have been put together

5    really as kind of a business case, if you will, for

6    Hodell-Natco.

7              It's a -- it's an account profile.  That

8    would have been shared with SAP as part of just the, you

9    know, the sales correspondence, et cetera, back and forth

10   between us.

11   Q.    Okay.  And can you explain for the jury what

12   managing the migration of data for multiple operations

13   during an acquisition means?

14   A.    Yeah, so Hodell-Natco had historically had

15   continuous aspirations of acquisition.

16              They -- they had grown their current user

17   count, both holistically and through acquisition, and

18   their intention was to continue to grow through

19   acquisition.

20              As you acquire a company, the application

21   that they're currently running on supports the database

22   and ultimately the data that they've been operating their

23   company on, and as an acquisition takes place, you need

24   to take that, that data, extract it, ultimately transform

25   it and load it up into the new ERP.

1    Q.    Under the bullet point, "Industry

2    size -- organization size and industry information," do

3    you see that section?

4    A.    Yes.

11:13:02 5    Q.    It says, the last bullet point, "Undisclosed but

6    120 SAP Business One users."

7              Those are your words?

8    A.    Yes.  Yes, they are.

9    Q.    And that was accurate when you wrote it?

11:13:16 10   A.    I believe it was, yes.

11   Q.    And under the --

12   A.    I believe that's what they were -- I believe that's

13   what they were licensed for on their FACTS application as

14   well.

11:13:28 15   Q.    Under the bullet point, "Why SAP," can you read

16   that for the jury?

17   A.    "Why SAP?  The reputation and financial resources

18   of SAP, combined with the industry-specific expertise of

19   LSi/IBIS and its In-Flight add-on, made the solution a

11:13:54 20   strategic fit."

21   Q.    Thank you.

22              Did you have communications with a

23   gentleman by the name of Geoff Ashley?

24   A.    Yes.

11:14:01 25   Q.    With regard to the Hodell-Natco sale in particular?

1   A.   Yes.

2   Q.   What was Mr. Ashley's title?

3            MR. MILLER:  Your Honor, when did Mr.

4   Ashley's title change?

5            THE COURT:  You can talk about that.

6            Go ahead, he can answer.

7   Q.   When you were communicating with Mr. Ashley, what

8   was his role with SAP?

9   A.   So he was -- he was heading up -- he worked under

10  Dan Kraus, but he was -- he was operating really as a VP

11  in sales.

12           I think that's about it.

13  Q.   VP of sales?

14  A.   And I believe that is correct.  I can't remember

15  off the top of my head.

16  Q.   And just so we're clear, this is for the Business

17  One product, correct?

18  A.   That is correct.  Yes.

19           At that point in time, that is correct.

20  Q.   Was he high up in the Business One channel, to your

21  understanding?

22           MR. MILLER:  Objection, Your Honor.

23  Confusing.

24           THE COURT:  Objection sustained.

25           MR. MILLER:  He just led him.

1        THE COURT:  Objection was sustained.

2   Q.   Had you known Geoff Ashley prior to becoming

3   involved with SAP?

4   A.   Yes, I did.

11:15:30  5   Q.   Can you explain that?

6   A.   I knew -- yes.

7        He worked at Aperum, which was, as I

8   mentioned earlier, Software Solutions was the original

9   developer of the FACTS application.

11:15:48  10        As they changed their name from Software

11   Solutions to Aperum, Geoff Ashley was on board in part of

12   that.  And then ultimately as FACTS was sold to INFOR, I

13   believe at that point, he transitioned away from INFOR

14   and to SAP.

11:16:06  15   Q.   To your knowledge, was Mr. Ashley aware of Hodell

16   before becoming involved with SAP?

17   A.   Yes.

18   Q.   And how would he have been aware of Hodell prior to

19   being involved with SAP?

11:16:19  20        MR. MILLER:  Your Honor, Mr. Ashley will be

21   a witness.

22        THE COURT:  Overruled.

23   A.   That would have been through -- through the

24   relationship with INFOR.  I had -- I had mentioned that

11:16:31  25   we were looking at different solutions for Hodell-Natco.

1        One of those included the Take Stock application.

2                         Geoff Ashley was certainly part of the team

3        that was looking for solutions for Hodell-Natco at the

4        time.

11:16:47 5        Q.    And would he have become aware of Hodell's user

6        count, size, volume, and business processes as part of

7        that?

8                         MR. MILLER:  Objection.

9        A.    Yes.

11:16:57 10                        THE COURT:  Objection sustained.

11        Q.    I want to move on a little further and try to speed

12        this up.

13                         After Business One was sold to Hodell, it

14        had to -- Business One and In-Flight had to be tested, is

11:17:13 15        that correct?

16        A.    Well, the -- so after the point of sale and -- the

17        first thing that had to happen were designs needed to be

18        built out associated with the intellectual property of

19        In-Flight Enterprise.

11:17:34 20                        As that was taking place, we were, you

21        know, establishing our own internal systems for Business

22        One.

23                         We ultimately, utilizing the software

24        development kit, started exercising the developed designs

11:17:56 25        into -- into applications.  So we started doing the

1    actual development in our in-house systems utilizing the

2    SDK based on the designs that I was producing for

3    In-Flight Enterprise.

4    Q.    Did LSi experience any problems with the Business

11:18:18 5   One software during the pre-live testing process?

6    A.    There -- there were -- there were definitely

7    performance issues surrounding the utilization of

8    matrixes and tables which was integral to our design.

9    Q.    Well, did you attempt to isolate Business One from

11:18:40 10  the In-Flight product to determine where the slowness was

11   coming from?

12   A.    We determined that the lack of performance was

13   coming from the pipe.  And when I say that, I mean the

14   communication between --

11:19:01 15          MR. MILLER:  Objection.  No foundation.

16          THE COURT:  Objection sustained.

17          MR. MILLER:  Thank you, Your Honor.

18   BY MR. LAMBERT:

19   Q.    What did you do to investigate what was causing the

11:19:10 20  slowness that you experienced during the testing?

21   A.    Initially we worked on it internally.  We would

22   enable components through the SDK, then we would turn

23   them off.  We would see significant performance hit when

24   we had the software development kit turned on with the

11:19:30 25  developed applications.

1        We then notified SAP.  SAP worked with our

2   development team to try to optimize any of the

3   development that was undertaken.

4   Q.    Did you try to isolate the In-Flight product from

5   the SAP product as part of this process?

6   A.    Yeah.  When I talk about --

7               MR. MILLER:  Objection.

8   A.    -- turning on and off the SDK, that's exactly what

9   it does.  It would shut off the In-Flight-developed

10  application because all the development was done

11  utilizing the SDKs.

12              So when we would turn off the developed

13  application, the SDK then performance was as anticipated.

14  When we turned on the SDK, then performance would drop.

15  Q.    Is the SDK the same thing as the DI API?

16              MR. MILLER:  Objection, Your Honor.

17              THE COURT:  Overruled.

18              MR. MILLER:  It's leading.

19              THE COURT:  Overruled.

20  Q.    Do you understand my question?

21  A.    Yes.

22              So the DI API is the communication between

23  the SDK, the software development kit, and the core

24  application.

25  Q.    If you would turn to 294 in your binder.

A.    So it is a component of the software development

kit, but it is just that, a component.  It is not the

software development kit in its entirety.

Q.    Okay.  Thank you.

Can you turn to 294, Exhibit 294?

A.    Okay.

Q.    The e-mails in Exhibit 294, are those e-mails you

sent and received?

A.    Yes, they are.

Q.    And I want to direct your attention to Page 294.2.

There's an e-mail from yourself to Mr. Mehnert-Meland

down at the very bottom, and then it spills over on to

24.3.

A.    Okay.  Yes.

Q.    Do you recall sending that e-mail?

A.    I do.

Q.    And what's being discussed in that e-mail

communication?

A.    We were providing our current working environment,

both from a software perspective as well as from a

hardware perspective.  We were communicating the size of

the database, number of customers and vendors or master

data records is what they're referred to, and the

performance or the lack thereof that we were seeing.

Q.    The second paragraph on 294.3, that starts, "To

1    assist you in understanding the environment we are

2    deploying in," do you see that?

3    A.    Um-hmm.  Yes.

4    Q.    Is that in reference to the Hodell-Natco

11:23:07 5    environment?

6    A.    No.  I believe this is our internal development

7    system.

8    Q.    Okay.  The database size, though, down in the last

9    section, is that Hodell's database size?

11:23:25 10    A.    Yes.  Yes, it is.

11    Q.    And 150,000 SKUs, that was Hodell's inventory

12    items?

13                MR. MILLER:  Objection, Your Honor.

14    A.    Number of --

11:23:37 15                THE COURT:  Overruled.

16    Q.    You can answer.

17    A.    Yeah, that was approximately the number of material

18    records in the master data file.

19    Q.    And that was accurate?

11:23:47 20    A.    The items.

21    Q.    And that was accurate?

22    A.    Yes.  Yes, it was.

23    Q.    You said you experienced --

24                MR. MILLER:  Your Honor, just to be clear,

11:23:58 25    he doesn't know if it's accurate.  You can't ask if

1    somebody else's information is accurate.

2                THE COURT:  The objection was overruled.

3    BY MR. LAMBERT:

4    Q.    You testified that you experienced slowness or

11:24:11 5    latency issues with the software when it was being

6    tested?

7    A.    Yes.  That is correct.

8    Q.    Did you continue to proceed with the development of

9    In-Flight and the integration of Business One anyway?

11:24:24 10   A.    Yes, we did.

11   Q.    Why is that?

12   A.    Communications with SAP were that they were going

13   to continue to support resolving the issues, and I

14   believe at the time they were working on an upgrade to

11:24:41 15   the software development kit to increase the volume of

16   information that could pass through on the DI API.

17   Q.    I just want to be clear on one thing.

18                During -- during the sale process of

19   Business One to Hodell, did anyone at SAP ever

11:25:03 20   communicate to you that Hodell was outside any particular

21   Sweet Spot for the Business One software?

22   A.    No.

23   Q.    At any point during the sales process of Business

24   One to Hodell, did anyone at SAP ever express any concern

11:25:24 25   or raise a red flag regarding the size of the Hodell

1       deal?

2       A.    At which point in time, before or after the sale?

3       Q.    Before the sale.

4       A.    No.  No one did.

11:25:41  5   Q.    In fact, it was quite the opposite reaction, wasn't

6       it?

7                      MR. MILLER:  Objection, Your Honor.

8                      THE COURT:  Objection sustained.

9                      MR. MILLER:  Thank you.

11:25:50 10   BY MR. LAMBERT:

11      Q.    And during your time and your personal involvement

12      with IBIS and LSi as an SAP partner, was it clearly

13      advertised to you that the Business One software was for

14      customers with 3 to 500 users?

11:26:13 15                 MR. MILLER:  Objection, Your Honor.

16                      THE COURT:  Overruled.

17      A.    The -- yes, I would say that the application

18      through the entire process and well through after selling

19      Hodell-Natco, it was our intention to develop this for

11:26:37 20   larger companies up to 300, 300 or 500 users.

21                      And as stated, you know, you can go after

22      larger enterprise accounts like Caterpillar or John

23      Deere.

24      Q.    And based upon your personal involvement with the

11:26:55 25   software, is it your understanding or belief that SAP

            1    overrepresented the scalability of this software?

            2                    MR. MILLER:  Objection, Your Honor.

            3                    THE COURT:  Objection sustained.

            4                    MR. MILLER:  Thank you.

11:27:03    5                    MR. LAMBERT:  Your Honor, I don't have

            6    anything further at this time.

            7                    THE COURT:  Say that again.

            8                    MR. LAMBERT:  I don't have anything

            9    further.

11:27:10   10                    THE COURT:  Okay.  Thank you.

           11                    Sorry, Mr. Van Leeuwen, but we're going to

           12    have to break now because we have some other matters to

           13    attend to.

           14                    1:30, does that sound okay?  Mr. Panigutti,

11:27:22   15    where are you going to meet?

           16                    A JUROR:  L-1.

           17                    THE COURT:  All right.  Keep in mind the

           18    admonition and appreciate your patience.

           19                    MR. MILLER:  Your Honor, could you instruct

11:27:32   20    the witness 12:30 his time.

           21                    THE COURT:  12:30 you time,

           22    Mr. Van Leeuwen.  Is that okay?

           23                    THE WITNESS:  I have appointments at 12:00

           24    o'clock.  I didn't anticipate this running past this

11:27:44   25    morning.

1    I'll have to make changes.

2    THE COURT:  Thank you.  Thank you.

3    Okay.  We'll see you then.

4    THE WITNESS:  You're welcome.

11:27:50  5    THE CLERK:  All rise.

6    (Jury out).

7    (Luncheon recess taken).

8    - - - - -

1310

```
           1              MONDAY, JUNE 22, 2015,  1:25 P.M.

           2                   THE COURT:  Good afternoon, ladies and

           3       gentlemen.

           4                   You may cross-examine.

13:41:54   5                   MR. MILLER:  Thank you, Your Honor.

           6                   We have a preliminary matter.  We'd like to

           7       approach.

           8                   MR. STAR:  May we approach real quick?

           9                   THE COURT:  Okay.

13:42:03  10                   (Side-bar conference had off the record).

          11                   MR. MILLER:  Your Honor, we've handed to

          12       the jury the exhibits that we plan on using during this

          13       cross-examination.

          14                   THE COURT:  Thank you.

13:46:38  15                   MR. MILLER:  There may be others, but this

          16       is a set --

          17                   THE COURT:  Okay.

          18                   MR. MILLER:  -- that hopefully will save us

          19       some back and forth.

13:46:45  20                   THE COURT:  Thank you.

          21                   MR. MILLER:  May I proceed?

          22                   THE COURT:  Sure.

          23                   MR. MILLER:  Thank you.

          24

          25
```

```
            1              CROSS-EXAMINATION OF DALE VAN LEEUWEN

            2       BY MR. MILLER:

            3       Q.     Good afternoon, Mr. Van Leeuwen.  How are you?

            4       A.     Fine.  How are you?

13:46:52    5       Q.     Okay.  I'm a lawyer.  My name is Michael Miller,

            6       I'm a lawyer for SAP.  I have a series of questions for

            7       you today.

            8                      Can you hear me well?

            9       A.     I can hear you, yes.

13:47:04   10       Q.     Looks like there's just a little bit of a lag.  So

           11       I'll try to let you finish your answer.

           12       A.     Okay.

           13       Q.     You let me finish my question.  Okay.

           14                      Let's start with your relationship with

13:47:15   15       Hodell which you covered a little bit on direct

           16       examination, but I want to unpack that A little bit to

           17       make sure the jury has a full flavor of how far back you

           18       go with Hodell and the texture of your relationship.

           19                      Okay?

13:47:27   20       A.     Okay.

           21       Q.     You used to be at a company called Soft Tech,

           22       right?

           23       A.     That is correct.

           24       Q.     And Soft Tech sold FACTS software?

13:47:35   25       A.     That is correct.
```

1312

1    Q.    All right.  And FACTS software is ERP software,

2    right, business management software?

3    A.    Before the phrase was coined, yes.

4    Q.    So in other words, ERP is a relatively new term,

13:47:50 5    but the nature of the FACTS software was that it was ERP

6    software?

7    A.    That is correct.

8    Q.    And that's business management software?

9    A.    Yes.

13:48:00 10    Q.    And one of your FACTS customers back when you were

11    at Soft Tech was Hodell?

12    A.    That is correct.

13    Q.    And you were, and I think you testified to this on

14    direct, you were the implementation manager for the

13:48:13 15    Hodell implementation of FACTS?

16    A.    That is correct.

17    Q.    Okay.  And this goes all the way back, I didn't

18    quite catch your answer, either to the late 1980s or the

19    early 1990s, right?

13:48:26 20    A.    Early 1990s.

21    Q.    Okay.  And you worked directly with multiple Hodell

22    employees in connection with your role as this

23    implementation manager for the implementation of FACTS,

24    right?

13:48:38 25    A.    That's correct.

1    Q.    And in particular, you and Otto Reidl worked

2    together on many, many nights on this implementation; you

3    worked very closely with Mr. Otto Reidl, right?

4    A.    That is correct.

13:48:51  5    Q.    I mean, you had occasions, you testified at your

6    deposition, where the two of you would work through the

7    night, right?

8    A.    Yes, we did.

9    Q.    Okay.  And implementation, of course, is just the

13:49:02 10    beginning of what's a much longer and deeper relationship

11    in connection with someone who had your role and a

12    customer like Hodell, right?

13    A.    That's correct.

14    Q.    And at the time, you considered yourself to be a

13:49:16 15    partner of Hodell?

16    A.    Yes.

17    Q.    And you've even called this relationship that was

18    getting started with this implementation going back to

19    the early 1990s, you called it a marriage, right?

13:49:29 20    A.    Yes.  It very much is.

21    Q.    Okay.  Because, and let's make sure the jury

22    understands, because once an ERP solution gets installed,

23    once you get married, then you have to support and

24    maintain that solution, right?

13:49:43 25    A.    That's correct.

1    Q.    All right.

2              And there, of course, it's not just

3    supporting and maintaining the solution; there are also

4    new releases of the software?

13:49:53  5    A.    Correct.

6    Q.    Right.  And then there's just a little bit of a

7    lag, and also the needs sometimes of the company might

8    change over time, and you're involved in that, also?

9    A.    That's correct.  In the case of Hodell, for

13:50:10  10    example, when they did an acquisition.

11    Q.    Exactly.  That's what I was going to go to next.

12              Everything I just talked about was true

13    with respect to Hodell; they needed support and

14    maintenance, right?

13:50:21  15    A.    Correct.

16    Q.    All right.  And they had -- and there were new

17    releases of FACTS?

18    A.    That's correct.

19    Q.    All right.

13:50:28  20              And Hodell, as you mentioned, was acquiring

21    other companies.  So their needs changed and you had to

22    deal with that, also?

23    A.    That is correct.

24    Q.    And you personally were involved in basically all

13:50:39  25    of that?

1   A.    Yes, I would say for the most part, yes.  Yes.

2   Q.    Right.  And first, just so we're clear, it started

3   through your employer Soft Tech, right?

4   A.    That's correct.

13:50:53  5   Q.    And then Soft Tech went out of business?

6   A.    That's right.

7   Q.    Okay.  And then you started IBIS in 1994?

8   A.    Correct.

9   Q.    And then IBIS kind of picked up where Soft Tech

13:51:06  10   left off.  You were kind of picking up stranded Soft Tech

11   customers and Hodell was one of them?

12   A.    Yes.  That's correct.

13         I think for a short period of time, Hodell

14   was being supported by another company called Ultra Tech

13:51:22  15   in the middle of that, but, yes, ultimately, in fairly

16   short order, I started supporting Hodell-Natco.  That's

17   correct.

18   Q.    And we can talk about Ultra Tech if you want, but

19   it doesn't change the story that we're talking about,

13:51:35  20   right, which goes back to the early 1990s, you were the

21   implementation manager for FACTS, and then it was an

22   ongoing relationship because of the support and

23   maintenance and all that.  Then Soft Tech went out of

24   business and then you eventually took over through IBIS

13:51:51  25   around 1994?

```
 1              A.    That's correct.

 2              Q.    Okay.  And during this period of time, obviously

 3         you would have become very aware of Hodell's specific

 4         business requirements, right?

13:52:03 5      A.    Correct.

 6              Q.    And, in fact, at the time, going back, years back,

 7         you know, to 1994 and after that, IBIS was interested in

 8         creating what's known as a microvertical, right?

 9              A.    That is correct.

13:52:19 10     Q.    And my microvertical, what you meant to do through

11         IBIS was to serve not just Hodell, but the entire

12         wholesale fastener distribution industry, right?

13              A.    That is correct.

14              Q.    And just to be clear, we're not just talking about

13:52:37 15     the wholesale distribution industry; we're talking about

16         the wholesale fastener distribution industry, right?

17              A.    That's correct.

18              Q.    Right.  And that's --

19              A.    Yes.

13:52:46 20     Q.    Just so the jury follows -- sorry, but the fastener

21         industry is things like chains and clips and bolts and

22         nuts and fasteners, right?

23              A.    That's correct.

24              Q.    Serving not just Hodell but their competitors in

13:53:03 25     that industry, correct?
```

1    A.    Right.

2    Q.    So it's clear that leading up to the facts of this

3    case, say starting in 2003 and '4 and '5, you and IBIS

4    were very, very familiar with Hodell and its requirements

13:53:17  5    and the requirements of the wholesale fastener

6    distribution industry, right?

7    A.    That is correct.

8    Q.    Okay.  So let's switch gears a little bit.

9          At some point in 2001, IBIS took on a

13:53:32  10    project for Hodell called eWMS, right?

11    A.    Correct.

12    Q.    And that stood for electronic, that was kind of the

13    little E, and then it was WMS, warehouse management

14    system?

13:53:46  15    A.    Correct.

16    Q.    Right.  And that involved basically software known

17    as Radio Beacon?

18    A.    Well, it was -- it was sold through Software

19    Solution/INFOR, but, yeah, the core application, I

13:54:07  20    believe, came from Radio Beacon.  That is correct.

21    Q.    And the idea was to take the FACTS ERP software and

22    supplement some of its functionality with Radio Beacon?

23    A.    No, not -- it would have been additional

24    functionality that never existed.

13:54:24  25    Q.    Yeah, and I didn't mean to suggest that it

1    was -- that it did used to exist.  I'm just making sure

2    the jury understands FACTS provides certain

3    functionalities, obviously, right?

4    A.    Correct.

13:54:34   5    Q.    And the idea was Radio Beacon provides some

6    different functionalities, right?

7    A.    That is correct.

8    Q.    And the idea back in 2001 was to merge FACTS and

9    Radio Beacon so that Hodell would get the benefit of all

13:54:49  10    the functions from FACTS and all the functions from Radio

11    Beacon all in one package?

12    A.    That's correct.

13    Q.    Okay.

14            But you had big problems merging those

13:55:00  15    products together, didn't you?

16    A.    We were -- we were a very early adopter of eWMS

17    that was sold by Software Solutions and without a doubt,

18    there were interface issues that were -- when the

19    application was provided by Software Solutions, the full

13:55:21  20    integration did not exist.

21    Q.    Just to be clear, this project where you were

22    merging the functionalities of FACTS together with the

23    functionalities from Radio Beacon, that was a project

24    that IBIS was responsible for?

13:55:36  25    A.    I just sold the application.  That is 100% correct.

1    Q.    And you were the lead contact, your role at IBIS

2    and you started it in 1994, right?

3    A.    Correct.  Yes.

4    Q.    And you were the sole owner?

13:55:50  5    A.    That is correct.

6    Q.    And what was your title, say, circa 2001?

7    A.    CEO.

8    Q.    Okay.  So you were the founder, sole owner, and CEO

9    in 2001 in connection with IBIS?

13:56:05 10    A.    That is correct.

11    Q.    Okay.  And IBIS had this agreement with Hodell to

12    merge FACTS and Radio Beacon and there were problems in

13    connection with that project, right?

14    A.    That -- that is correct.  Those problems,

13:56:21 15    however --

16    Q.    Well, and you were the lead contact between IBIS on

17    the one hand and Hodell on the other hand, right?

18    A.    Correct.

19    Q.    Okay.  Take a look, please, at Exhibit 195.  I have

13:56:31 20    a colleague there with you in Chicago or at least I

21    certainly hope I do, and she's got a binder of documents.

22    I'd like to go over several of these.

23              For ease of reference, there's some

24    highlighting on the documents because otherwise we'd be

13:56:45 25    spending half the afternoon kind of going from

1    page-to-page, but I want to start with, let me just be

2    clear, the highlights is not in the originals.  It's for

3    emphasis today.  To 195, do you see that there?

4    A.    Yep.

13:56:58 5    Q.    Okay.  You would agree, this is a January 24th,

6    2001, letter to you from Otto Reidl?

7                 Do you see his signature on the second page

8    there?

9    A.    Yes.

13:57:13 10    Q.    And --

11    A.    Actually there is no signature.  There is no

12    signature on the second page.

13    Q.    Thank you.  But you see his name on the second page

14    above the word "President, Hodell-Natco Industries"?

13:57:24 15    A.    I do.  Yes.

16    Q.    Okay.  And you would agree with me this letter, the

17    subject matter of it, is the fact, is the eWMS project

18    where FACTS and Radio Beacon were being merged together,

19    right?

13:57:35 20    A.    That's correct.

21    Q.    And he reports to you in the highlighted section

22    about midway down the first page, "The implementation was

23    undertaken with very little preparatory work but instead

24    was on a modify-as-you-go basis."

13:57:49 25                 Do you see that there?

```
 1              A.    I do.

 2              Q.    And that's what Mr. Reidl reported to you on

 3         January 24th, 2001 in connection with this project?

 4              A.    Yes.

13:57:58  5      Q.    And then if you turn to the second page, he further

 6         reported to you, "If the product could not provide the

 7         capabilities required, all of the parties selling Radio

 8         Beacon as a FACTS integrated warehouse management system

 9         had an obligation to say so.  They did not!"

13:58:13 10                    Do you see that there?

11              A.    Yes, I do.

12              Q.    And likewise, Mr. Otto Reidl was reporting this to

13         you in connection with this project on this date, January

14         24th, 2001?

13:58:26 15      A.    Yes.

16              Q.    And then further down highlighted it reads, "I'm

17         not going to belabor the point of the drop in customer

18         service and lost business in this letter.  That issue is

19         reserved in the event I need to seek legal advice."

13:58:39 20                    Do you see that there?

21              A.    I do.

22              Q.    And again this is what Mr. Otto Reidl, the

23         president of Hodell, was reporting to you all the way

24         back in January of 2001 in connection with this eWMS

13:58:47 25      project, right?
```

1    A.    That's correct.

2    Q.    Hodell was not happy with IBIS, was it, at that

3    point in time?

4    A.    I don't think that Hodell-Natco had any issue with

13:58:59  5    IBIS directly.

6    Q.    Okay.  Well, then let's look at 311.  311, sir.  Do

7    you see that there?

8    A.    Yep.

9    Q.    311, if you go to the second e-mail, in other words

13:59:18 10    skipping the top e-mail and going to the earlier one in

11    the chronology, is a July 11th, 2003 letter, this time

12    from Kevin Reidl to you.

13          Do you see that there at the top?  It's

14    highlighted?

13:59:30 15    A.    I do.

16    Q.    Okay.  And this again is in connection with this

17    FACTS/Radio Beacon project, right?

18    A.    I would assume so, yes.

19    Q.    Okay.  Well, you can see right there in the first

13:59:44 20    sentence, right, "In an effort to clearly communicate my

21    concerns with you regarding eWMS and The IBIS Group in

22    general," correct?

23    A.    Yes.

24    Q.    So if there was any doubt about the prior letter,

13:59:54 25    it's now clear the complaints of Hodell are about IBIS,

```
  1    correct?

  2    A.    No.

  3    Q.    Okay.  Well, then look at the next highlighted

  4    section, sir.

  5              About midway down the page.

  6    A.    I will absolutely -- I will absolutely state --

  7    Q.    Forgive me, sir.

  8              MR. MILLER:  Your Honor.

  9    A.    We are taking responsibility.

 10    Q.    Sir, I have no pending question.

 11    A.    We took responsibility.

 12    Q.    You're going to get -- forgive me, and I know it's

 13    even harder with the electronics.

 14              Here's the process.  I ask you questions

 15    and you provide me with answers.

 16              You had a direct examination where you

 17    worked with the Hodell lawyers to tell your story, and

 18    other than a series of objections, you just got to tell

 19    your story.

 20    A.    That's --

 21              MR. MILLER:  Your Honor, I just need an

 22    answer to my questions.  That's all.  I'm just trying to

 23    make it clear.

 24              THE COURT:  Go ahead.

 25    Q.    You will have an opportunity to explain if you
```

1     think it necessary, and some of it may be during our

2     exchange.

3     A.     Okay.

4     Q.     But this is all my turn to ask you questions and

14:00:50 5     get direct answers.

6             Is that fair enough?

7     A.     So you let me know when I can tell my side of the

8     story, okay?

9     Q.     You had one chance, sir, and you're going to have

14:00:59 10     another.  Fair enough?

11     A.     Great.

12     Q.     Let's go halfway down the highlighted page, okay?

13             Mr. Kevin Reidl is reporting to you here,

14     "Based on the level of attention we received from your

14:01:07 15     organization, how are we to rely on you in the future

16     when we need to keep a larger, more complex software

17     package running smoothly?"

18             Do you see that there?

19     A.     Yes.

14:01:19 20     Q.     And that's what Mr. Kevin Reidl was reporting to

21     you in July of '03 in connection with this project,

22     right?

23     A.     That's correct.

24     Q.     And then he continues, literally in the next

14:01:27 25     sentence, "In May, I went to bat for you before my

1325

1    father.  He was ready to take legal action, but I

2    proceeded to convince him, with your help, that the

3    project would be completed by June 30th.  In the event

4    you couldn't finish everything on your first visit, you

14:01:42  5    were to return within a couple of weeks to complete any

6    open items.  That was six plus weeks ago."

7                   Do you see that there?

8    A.    I do.

9    Q.    And if you look a little further down, he says,

14:01:51  10    "Due diligence was never conducted at the start of the

11    project."

12                   Do you see that there?

13    A.    I do.

14    Q.    Fair to say that Kevin Reidl, on behalf of Hodell,

14:02:03  15    was complaining about the level of attention that IBIS

16    gave the project, correct?

17    A.    Okay.  Yes.

18    Q.    And Kevin Reidl was referring to the fact that

19    Hodell or that his father, Otto Reidl, was ready to take

14:02:16  20    legal action back in July of 2003, right?

21    A.    Yep.

22    Q.    And, of course, it's clear from the last reference

23    that Hodell's complaining to you, complaining to IBIS,

24    about due diligence in connection with the software

14:02:32  25    project, right?

1326

1   A.    Correct.

2   Q.    Okay.  Let's look at 312.  It's the next exhibit.

3   If you go to the back of this, it's probably the easiest

4   way to track this, the last page.

14:02:57 5              There's a July 15th, 2003 e-mail from Otto

6   Reidl to you, do you see that there?

7   A.    Yep.

8   Q.    And if you juggle with the exhibits a little bit,

9   the exchange from 311 was circa July 11th, so this is a

14:03:14 10  couple days after that.

11             Sounds right?

12  A.    Yes, it does.

13  Q.    Okay.

14             And Otto Reidl reports to you, "Dale, it's

14:03:20 15  been 32 months and counting.  The same old story.  No

16  eWMS, no FACTS upgraded -- no FACTS upgrade for which we

17  have now waited three years, or other technology in

18  view."

19             Do you see that there?

14:03:36 20  A.    I do.

21  Q.    And that's what Mr. Otto Reidl was reporting to you

22  in July of '03 in connection with this project, right?

23  A.    That is correct.

24  Q.    The FACTS/Radio Beacon project?

14:03:45 25  A.    Yes.

```
          1    Q.    Okay.

          2                And if you go to the top of this document,

          3    at the bottom of the first page, you can see that you

          4    sent a lengthy response and then at the very top, you see

14:04:06  5    there's Otto Reidl kind of replying to your response?

          6                Do you see that?

          7    A.    Are you referring to what we just went over?

          8    Q.    No.  I'm just walking us through the chronology, so

          9    again all, the way in the back was Mr. --

14:04:21 10    A.    Yes.

         11    Q.    -- Otto Reidl's initial note to you.  And then if

         12    you go to the front, at the bottom is your response to

         13    Otto, correct?

         14    A.    Yes.  That is correct.

14:04:31 15    Q.    And then if you go to the top of the first page,

         16    you can see that Otto Reidl replied to your response.

         17    A.    Yes.  That is correct.

         18    Q.    Okay.  And Mr. Otto Reidl, in reply to your

         19    response, says to you, and this isn't highlighted so

14:04:45 20    we'll just have to slow down a little bit.  In the second

         21    sentence, "Our labor cost is up approximately 1.5 cents

         22    for every sales dollar in Cleveland over the old, quote,

         23    inefficient, quote, paper method for the last two and a

         24    half years.  That doesn't count the capital and

14:05:03 25    management time costs, nor does it measure the loss of
```

1    employee confidence in our management technology push."

2              Do you see that there?

3    A.    Yes, I do.

4    Q.    And again that's what Otto Reidl was reporting to

14:05:14 5    you in connection with this FACTS/Radio Beacon project in

6    July, 2003?

7    A.    That's correct.

8    Q.    I just want to look at one or two more parts of

9    this.

14:05:22 10              If you look further down in the beginning

11   of the highlighted text, he reported to you, did he not,

12   "A lot of this has to be defined as a lack of presenter,

13   quote, promoter or salesmen, quote, observance of

14   customer requirements versus capabilities of the

14:05:36 15   software."

16              Do you see that there?

17   A.    I do.

18   Q.    Okay.  And finally, he reported to you, "I'm

19   personally convinced that eWMS was promoted well beyond

14:05:44 20   its capabilities and Hodell-Natco has been -- has paid a

21   very dear and costly price for believing in this product

22   and the support promised by Radio Beacon and Aperum's

23   precursor."

24              Do you see that there?

14:06:00 25   A.    I do.

1    Q.    Okay.  Now, we've looked at these three documents,

2    not in every line of them by any stretch, although

3    they'll ultimately be available to the jury, but wouldn't

4    you agree, sir, that it's fair to say at this point in

14:06:12    5    time, in July of 2003, the marriage that existed between

6    Hodell on the one hand and IBIS on the other hand was in

7    trouble?

8    A.    No, I would not say that at all.

9    Q.    Okay.

14:06:23   10    A.    And the reason I'm going to say that, and you've

11    left the opportunity for me to now speak, is that The

12    IBIS Group was a VAR, a value added reseller of this

13    software, this Radio Beacon software and Software

14    Solutions.

14:06:37   15         We relied heavily on both Software

16    Solutions and Radio Beacon to do the discovery process,

17    to support whether or not the application could provide

18    the necessary functionality, and do the implementation.

19         We facilitated, and we will -- The IBIS

14:07:02   20    Group took responsibility to the very best of its

21    ability.  We stood beside the customer throughout the

22    entire process.  There is no doubt in my mind that

23    Hodell-Natco had a fairly extensive cost associated with

24    the implementation.  When he talks about, when he talks

14:07:25   25    about legal action and so forth, at no point is this

1330

1   saying it's directed to The IBIS Group.

2   Q.    That's what I thought you might be saying, sir.

3   A.    He --

4   Q.    Hold on.  Your point is, "Oh, all this back and

14:07:38  5   forth, Hodell is not mad at IBIS; they're mad at somebody

6   else," right?

7   A.    They were extremely frustrated over the situation

8   at hand.  Absolutely.

9   Q.    And that frustration, sir, included frustration

14:07:48  10   with IBIS, correct?

11   A.    I -- I think -- he relied, Otto relied very

12   heavily --

13   Q.    Hold on, sir.  If you can't answer that -- sir, if

14   you can't answer that, let's quickly go back to 195,

14:08:03  15   okay?  And 195 it says, "The implementation was

16   undertaken with very little preparatory work but instead

17   on a modified-as-you-go basis," right?

18   A.    That's correct.  And I explained --

19   Q.    Excuse me, sir.

14:08:15  20   A.    -- who did --

21   Q.    Sir, Your Honor, I'd like to ask him a question.

22         You were the implementation manager for

23   this project, correct?

24   A.    I oversaw the project.  I was not on the ground --

14:08:25  25   Q.    Sir.

```
 1    A.     -- doing the implementation.

 2    Q.     Sir, are you changing your testimony?

 3                  Earlier today I asked you if you were the

 4    implementation manager for this FACTS/Radio Beacon

 5    project, and you testified that the answer was yes.

 6    Correct?

 7    A.     As an organization --

 8    Q.     Sir.

 9    A.     -- that is a hundred percent correct.

10    Q.     Sir.

11    A.     We took responsibility.

12    Q.     I want to be clear.  Earlier today, not ten minutes

13    ago, I asked you if you were the implementation --

14    A.     I apologize.  I misunderstood.  I misunderstood

15    your question.  I apologize for that.

16    Q.     Sir, are you or were you or were you not the

17    implementation manager for the FACTS/Radio Beacon project

18    on behalf of IBIS?

19    A.     For IBIS's participation in the project, yes.

20    Q.     Okay.  Thank you.

21                  And when Hodell complains about preparatory

22    work in connection with the implementation in Exhibit

23    195, they're talking about you, right?

24    A.     No, they're not.

25    Q.     Okay.
```

14:08:33  5
14:08:41 10
14:08:52 15
14:09:08 20
14:09:22 25

1332

1    A.    They're talking about --

2    Q.    Let's move on.

3    A.    You asked me the question.  I'm going to give you

4    the answer.

14:09:29  5    Q.    You can deny.  So you think the marriage that

6    existed between Hodell and IBIS, notwithstanding some of

7    the snippets that we just reviewed and the threats of

8    litigation, was fine?

9    A.    It was so fine that it continued on for many years

14:09:45 10   after that.

11   Q.    Let's talk about how much it continued, sir.

12   A.    It --

13   Q.    Do you think, do you think there was a threat of

14   litigation, right, against you in July of 2003, right?

14:09:55 15   A.    We would have absolutely been called into, into the

16   litigation, but I -- I don't believe that the litigation

17   would have been against IBIS directly.

18   Q.    You don't?  Because if you look at 311, in the

19   second highlighted section from the bottom, doesn't Kevin

14:10:13 20   Reidl report to you, "In May, I went to bat for you

21   before my father"?

22   A.    We --

23   Q.    Excuse me, sir.  I get to ask this question.  "You"

24   meant you, right?

14:10:26 25   A.    It did.

```
 1    Q.    And then it continues --

 2    A.    At that point, he's not talking about litigation.

 3    He is talking about --

 4    Q.    Sir, the very next sentence, does it not read, "He

 5    was ready to take legal action."

 6                Isn't that what it says?  Isn't that what

 7    it says?

 8    A.    It does not say legal action against IBIS.

 9    Q.    I understand your point.  All right.  Let's move

10    on.

11                Let's talk about what happened next after

12    these threats of litigation in July of 2003.

13                Your first involvement, I think you

14    testified to this in fact today, with the SAP B1 product

15    was when you received a telephone call from Otto Reidl,

16    correct?

17    A.    That is correct.

18    Q.    And you say that Otto Reidl had been approached

19    about B1, not by IBIS, but by American Express, right?

20    A.    That's correct.

21    Q.    And you also agree, you didn't even know about B1

22    until Otto called you to talk about B1?

23    A.    That's correct.

24    Q.    And AmEx, just to be clear, or just to be clear

25    that AmEx was the first entity to mention B1 to Hodell,
```

1   AmEx was what's known as the partner of record, isn't

2   that right?

3   A.    Yeah, that would be correct.

4   Q.    And a partner of record is pretty much in the B1

14:12:00 5   reseller context, an SAP term meant to designate

6   what -- who is the reseller who made the first contact

7   with the customer?

8   A.    That's correct.

9   Q.    And again, here, just so the record's clear, the

14:12:14 10   partner of record was AmEx, right?

11   A.    I think we've established that, yes.

12   Q.    Right.  And in SAP world, that means they were the

13   first seller to contact Hodell about B1?

14   A.    That's correct.

14:12:28 15   Q.    Now, this call that you testified about that came

16   in from Otto Reidl, that would have been sometime in

17   2003, right?

18   A.    I can't recall a specific date.

19   Q.    Well, let's -- let's try this.  Can you take a look

14:12:45 20   at Exhibit 32?

21               I'll represent for the record, the exhibit

22   was marked for the purposes of this case, this exhibit

23   was marked for the purposes of this case as Number 32.

24   It's the software development kit contract between IBIS

14:13:15 25   and SAP, and I think if you look at the top of it, you'll

1335

1    see SAP's name and your name, and you'll agree with me

2    that that's what this is?

3    A.    That's correct.  Yep.

4    Q.    Okay.  And just so we're following, because I think

14:13:30  5    this will refresh your recollection and we want the jury

6    to understand the chronology here, the title of this is

7    "Limited term SAP Business One Software Development Kit

8    License."

9              Do you see that at the top and then it says

14:13:43 10    Version 2.0?

11    A.    I do, yes.

12    Q.    Right.  And some people refer to these as SDK

13    agreements?

14    A.    Correct.

14:13:51 15    Q.    Okay.  And this says "This agreement's made

16    effective as of," and it's hard to read but I think it

17    says, "31 day of December, 2003."

18              Do you see that there?

19    A.    I do.

14:14:02 20    Q.    Okay.  By and between SAP America, et cetera, et

21    cetera.

22              And then it's handwritten in there "The

23    IBIS Group," right?

24    A.    Correct.

14:14:13 25    Q.    So if you first heard about B1 from Otto from this

1   telephone conversation -- from a telephone conversation

2   from Otto, then that conversation must have occurred

3   prior to the SDK agreement when you executed an actual

4   contract with SAP relating to B1, right?

14:14:35  5   A.    That's correct.  Yes.

6   Q.    It's not a trick question by any stretch of the

7   imagination.  I just want to be clear if you had a SDK at

8   the end of December, 2003, it must have been that the

9   call from Otto came in some earlier time in 2003, is that

14:14:56  10   right?

11   A.    Yes, we already said we established that.  Yes.

12   Q.    Thank you.  Thank you.

13                A lot of dates and a lot of documents and I

14   realize you know the history of this maybe fairly well

14:15:06  15   but some of the jurors -- all the jurors, they're new to

16   this, okay?

17                So this call that came in from Otto in 2003

18   would have been sometime after the exchanges that we just

19   looked at in Exhibits 195 and 311 and 312, right?

14:15:24  20   A.    That's correct.

21   Q.    Okay.  And they finished, we just saw, in July of

22   2003, right?  The exchanges that we just reviewed?

23   A.    Yes.

24   Q.    The last one was July 15th.

14:15:35  25                And if the SDK is dated December, 2003,

1337

1    then this call that came in to you from Otto Reidl where

2    you first heard about B1 was sometime between July, 2003

3    and December, 2003?

4    A.    That's correct.

14:15:47  5    Q.    And Otto, when he called, was very excited about

6    B1, right?

7    A.    He was, yes.

8    Q.    All right.  And you testified today that he told

9    you that this was a product, something like, and I don't

14:16:05 10    want to get your words wrong, but I think I'm pretty

11    close and you can tell me if I'm not, he told you, "Hey,

12    Dale, this is a product that you should look into for

13    your organization"?

14    A.    Yes, he did.

14:16:15 15    Q.    Would you agree with me that that is a gross

16    understatement of what he actually told you?

17    A.    No.

18    Q.    Would you agree with me that he actually directed,

19    your word, you as his partner, your word, to drill down

14:16:37 20    on Business One?

21    A.    I would say that, yes, he felt that this was a

22    product that we should review and we should consider as

23    part of our portfolio.

24    Q.    So in other words, it's not just that he said,

14:16:57 25    "Hey, Dale this is a product you ought to look at," you

1  agree with me that he directed you as his partner to

2  drill down on this product both for yourself and for

3  Hodell?

4  A.    That's correct.

14:17:07  5  Q.    Okay.  And, of course, you went out and did that,

6  right?  You went out into the world and followed up on

7  Otto Reidl's request to determine, to investigate

8  Business One, fair enough?

9  A.    Yes.  I met with SAP people who told me whether the

14:17:26 10  application could perform the specific functions or not.

11  Q.    And we're going to unpack that and talk about it in

12  some detail, but I just want to be clear after he

13  directed you as his partner to drill down on B1 and

14  whether it was suitable both for yourself and Hodell, you

14:17:42 15  went out into the world and did that investigation,

16  right?

17  A.    Yes, and that was being done along with

18  other investigations.

19  Q.    Thank you.  I'm going to proceed.

20  A.    We were investigating the software as well.

21          MR. MILLER:  Your Honor, he answered yes.

22          THE COURT:  Please just answer the question

23  he asked you.

24  Q.    And you knew that Hodell was relying on your

14:17:57 25  assessment of B1 when it was making its decision on

1   whether to buy B1 or not, right?

2   A.    They, there was a parallel effort in place.  AmEx

3   was working with them.  We were working with AmEx at the

4   time.

14:18:14 5   Q.    But you know that Hodell, after directing you as

6   its partner to drill down on B1, and notwithstanding the

7   litigation exchanges or whatever you want to call those

8   that occurred in 2001 and 2003, Hodell was relying on

9   you, right?

14:18:31 10  A.    Sure.  Yes.

11  Q.    And again, notwithstanding what had happened in

12  2011 and -- pardon me -- 2001 and 2003, your point was

13  they still trusted you?

14  A.    Yes.

14:18:44 15  Q.    And when you did this investigation, just to be

16  clear, you weren't just doing it for Hodell; you were

17  also doing it for yourself, right?  IBIS?

18  A.    That -- that is correct.

19  Q.    Because you were focused on this idea of a

14:19:00 20  microvertical and creating a solution for the wholesale

21  distribution -- wholesale fastener distribution industry,

22  right?

23  A.    That is correct.

24  Q.    Okay.  So let's talk about the project for a

14:19:12 25  moment.

1          You would agree that the solution that was

2    being developed here and that's at issue in this case,

3    it's a complicated multi-component solution?

4    A.    That is correct.

14:19:43  5    Q.    Right?  Just so we're clear, it doesn't just

6    involve B1, right?

7    A.    Correct.

8    Q.    It also involves an add-on application called Radio

9    Beacon and an add-on application called In-Flight

14:19:43 10   Enterprise, right?

11   A.    That's correct.

12          MR. MILLER:  Just pause for one second.

13   I'm not sure what that is.  There was a noise with the

14   microphone and it was a little bit distracting.

14:19:54 15   BY MR. MILLER:

16   Q.    Let's talk about In-Flight.

17   A.    Sure.

18   Q.    Another word for add-on is extension, right?  I

19   think you used that term earlier today, all right?

14:20:05 20   A.    Correct.

21   Q.    So In-Flight was an add-on or extension depending

22   on what word you want to use, right?

23   A.    Correct.

24   Q.    And it fills gaps in functionality that it or the

14:20:15 25   other software, B1, wouldn't have, right?

1    A.    That is correct.

2              THE COURT:  Mr. Miller, are you touching

3    anything there?

4              MR. MILLER:  No.  I'm not touching it.  It

5    almost seems like maybe there's a microphone remotely.  I

6    don't know where Mr. Van Leeuwen's microphone is, but I

7    think we can see all these microphones.

8              THE WITNESS:  My microphone is about three

9    feet away from me.

10             MR. MILLER:  Okay.  I'll just keep going.

11   BY MR. MILLER:

12   Q.    Again, In-Flight Enterprise, the idea was it would

13   provide functionality that B1 didn't have?

14   A.    That is correct.

15   Q.    All right.  And you had also done an add-on where

16   you were working on FACTS -- I'm sorry, Your Honor.

17   Seems like it's getting worse.

18             THE COURT:  Would you call Dave and see if

19   he can fix this noise that's going on here?

20             MR. MILLER:  Judge, I'll try and keep

21   going.  Okay.

22   BY MR. MILLER:

23   Q.    You had done an add-on also for FACTS, correct, and

24   it was called In-Flight?

25   A.    That is correct.

1342

1    Q.    Okay.

2              But this new In-Flight that was going to be

3    used with Business One was different, correct?

4    A.    It was different in that it was on a different

14:21:54 5    technology platform.

6    Q.    Well, number one, it had a different name, right?

7    It was called In-Flight Enterprise?

8    A.    As I explained earlier --

9    Q.    Sir, did it have a different name?  Was the new

14:22:05 10    In-Flight called In-Flight Enterprise?

11    A.    That is correct.  Yes.

12    Q.    Okay.  And if I call it In-Flight Enterprise, you

13    understand I'm talking about the one associated with B1,

14    correct?

14:22:17 15    A.    Yes.

16    Q.    Okay.  And it required code, software code to be

17    written from scratch, correct?

18    A.    That is correct.

19    Q.    And it was an untested, complex piece of software

14:22:35 20    that was going to be merged with B1, correct, with this

21    code that's written from scratch?

22    A.    If -- if you want to call the SDK provided by SAP a

23    merging, yes.

24              We developed it, utilizing the SAP SDK.

14:22:54 25    Q.    Understood.  But the code was written by IBIS,

1    correct?

2    A.    The code --

3    Q.    The code wasn't written by SAP?

4    A.    That's correct.  It was just audited and performed

5    by -- tested by SAP.

6    Q.    Okay.  So we want to go slow here.  I just want to

7    make sure the jury understands.

8    A.    Okay.

9    Q.    The code for IFE which stands for In-Flight

10   Enterprise, that was written not by SAP, but instead by

11   IBIS, isn't that right?

12   A.    Correct.

13   Q.    Okay.  I just wanted to be clear.

14               And it was an untested add-on, right, this

15   code being drafted from scratch, so it was obviously

16   untested, correct?

17   A.    That's correct.

18   Q.    And you, both you and Hodell, were aware that it

19   was untested, correct?

20   A.    Correct.

21   Q.    And this coding that IBIS was doing for Hodell in

22   connection with IFE, was a huge part of this overall

23   project that involved B1, Radio Beacon and In-Flight,

24   correct?

25   A.    So Radio Beacon had their -- had they used the same

1344

1  SDK to do the interface between Radio Beacon and Business

2  One?  IBIS had nothing to do with that interface.

3  Q.    My question -- and thank you.  And I'm not trying

4  to suggest that you did.

5  I'm focusing just on IFE, and my point to

6  you --

7  A.    I --

8  Q.    Is that the In-Flight Enterprise coding that IBIS

9  did for IFE, right, that was a major part of this

10  project?  It's a big piece of work?

11  A.    We -- again, we were filling in gaps where Business

12  One couldn't provide functionality.

13  Q.    Let's take a look at Exhibit 9, okay?  And Exhibit

14  11, we'll look at them together.

15  Exhibit 9 is an October 14th, 2004 letter

16  from you and Dan Lowery to Otto and Kevin.

17  Do you see that there?

18  A.    Yes, I do.

19  Q.    Okay.  And this is basically the cover letter, if

20  you look at Exhibit 11 which is on the next tab, to this

21  attached kind of data sheet, do you see that there?  Fair

22  enough?

23  A.    Is this the one you're referring to has the date on

24  it or not?

25  Q.    I'm going to refer both to Exhibits 9 and 11.

1    A.    Okay.

2    Q.    I'm just pointing out that Exhibit 9 is an IBIS

3    letter from you and Dan Lowery at IBIS, and it's a

4    proposal?

14:26:02 5   A.    That's correct.

6    Q.    For this project that we're talking about, right?

7    A.    Yes.

8    Q.    A Hodell project that will have B1, In-Flight and

9    Radio Beacon, right?

14:26:12 10  A.    Correct.

11   Q.    And Exhibit 11 is the attachment to Exhibit 9 and

12   it provides additional details in connection with the

13   project?

14   A.    Correct.

14:26:23 15  Q.    Okay.  And it's likewise on IBIS letterhead?

16   A.    Yes.

17   Q.    And if you look at the second paragraph of Exhibit

18   9, actually why don't we just go right to it, look at the

19   second paragraph of 9, that's fine, and we'll go to 11.

14:26:42 20               THE COURT:  Excuse me for a minute.

21               Dave, this was making noise.  I don't -- of

22   course, as soon as you come in, it stops.

23               (Discussion had off the record)

24   BY MR. MILLER:

14:27:18 25  Q.    You see in the first sentence of the second

1346

1     paragraph, sir, it says "As such, this project timeline

2     defines over 5,000 man hours of work."  That's a lot of

3     work, right?

4     A.    Yes.

14:27:29 5     Q.    Okay.  And if you look at 11, it's not the same

6     reference, but it's broken down a little bit.

7                 Do you see the highlighted part?

8     A.    Yes.

9     Q.    Okay.  And it says there the purchase of In-Flight

14:27:44 10     Enterprise, and then beneath that, there's a reference to

11     3816 hours.  Do you see that there?

12     A.    Yes.

13     Q.    So you would agree with me back to my original

14     question, that the In-Flight Enterprise component of this

14:27:58 15     solution that you were developing for Hodell, that was a

16     major piece of the solution, the In-Flight Enterprise

17     part?

18     A.    Again 5,000 man hours of development is not a lot

19     of time.  It's considerable.  But I would say there's

14:28:16 20     probably hundreds of thousands of man hours in business

21     All-In-One -- or Business One by comparison, so you get

22     some idea of the volume of programming involved.

23     Q.    Got it.  So let's make sure the jury understands.

24                 Business One, at the time you're sending

14:28:31 25     this note on behalf of IBIS to Hodell, is a product

```
        1    that's already had a lot of time devoted to it, right?

        2    A.    I assumed that at the time.

        3    Q.    That's all I mean.

        4    A.    I assumed that at the time.

14:28:50 5    Q.    And I think that's what you were suggesting.  SAP

        6    had dumped thousands and thousands of hours already in B1

        7    at the time you're sending this October 14th letter,

        8    correct?

        9    A.    Sure.  Yes.  Absolutely.

14:29:00 10   Q.    Because B1 is a product in December of -- pardon

       11    me -- October of 2014 that was on the proverbial shelf

       12    and customers could go and buy it, correct?

       13    A.    In Europe, that is true.

       14    Q.    In October of 2004, it was also available in the

14:29:18 15   United States, isn't that right?

       16    A.    It became available in the United States, that is

       17    correct.

       18    Q.    But this letter is dated October of 2014.  I just

       19    want to be clear, B1 is available?

14:29:30 20   A.    2000 --

       21    Q.    2004.

       22    A.    2014?  You said 2014.

       23    Q.    I'm sorry.  My mistake.  October 14th, 2004, you

       24    could buy B1, that was a finished product, correct?

14:29:45 25   A.    No, I would not say it was a finished product.
```

1348

1    Q.    But it was a product that was available for sale?

2    A.    It was a marketable -- it was a marketable product,

3    yes.

4    Q.    Okay.  And your point is that so in connection with

14:29:56 5    this project, the hours that you're talking about that

6    needed to be devoted to the project that are listed here

7    on Exhibit 11, you would agree with me that the vast

8    majority of them weren't with respect to B1, which is a

9    product that's out in the market, but instead they were

14:30:12 10   with respect to In-Flight Enterprise?

11   A.    These hours were a hundred percent related to

12   In-Flight Enterprise.

13   Q.    Thank you.

14   A.    That is correct.

14:30:21 15             What I was -- what I was saying was

16   comparatively as far as effort goes, 5,000 hours is a

17   very small amount of time compared to developing Business

18   One.

19   Q.    But in terms of percentages going forward,

14:30:35 20   virtually all of the hours that were to be devoted to the

21   project going forward were going to be devoted to the

22   In-Flight Enterprise part of it?

23   A.    Were going to be, but that absolutely did not come

24   to play.  SAP had in place hundreds of hours --

14:30:51 25   Q.    We're going to talk about the effort that SAP

1  expended to assist here, but the plan here in October of

2  2004, going forward, was that the vast majority of the

3  work to be done in the future was going to be done by

4  IBIS in connection with In-Flight Enterprise, that's the

14:31:05 5  only point I'm trying to make?

6  A.    Yes.

7  Q.    Thank you.

8  A.    We assumed we had a viable product when we started.

9  Q.    Thank you.

14:31:16 10        Take a look at Exhibit -- well, and just to

11  be clear, Hodell was aware, not just that the In-Flight

12  Enterprise code was from scratch and was untested --

13  A.    Um-hmm.

14  Q.    -- but they would effectively be a pioneer in

14:31:32 15  connection with the implementation of this new product in

16  the wholesale fastener distribution industry, right?

17  A.    Yes, they were -- they were one -- yes.  Correct.

18  Q.    Take a look, please, at Exhibit 740.

19        Just to be clear, this is a November 11th,

14:32:04 20  2004 e-mail.

21        Do you see that there?

22  A.    Okay.

23  Q.    From Otto Reidl to you and Dan Lowery.

24        Do you see that there?

14:32:16 25  A.    Yes, I see it.

1    Q.    And he reports to you that, "The attached document

2    is a revision to the draft you sent us, although we are

3    unhappy about playing a developer (pioneer, the guys with

4    the arrows in the back)."

14:32:29  5             Do you see that there?

6    A.    Yep.

7    Q.    And that's consistent with your point which is that

8    Hodell understood they were a pioneer in connection with

9    this solution, right?

14:32:37 10    A.    Yes.

11    Q.    And we were talking about the different components

12    of the solution.  We talked about B1 and In-Flight.

13             The third component was Radio Beacon,

14    right?

14:32:45 15    A.    That's correct.

16    Q.    And that was, of course, at the heart of the

17    dispute that we went over in connection with Exhibits

18    195, 311, and 312, right?

19    A.    Correct.

14:32:54 20    Q.    Okay.  So let's talk about transaction volume a

21    little bit in connection with Hodell and this project.

22             You would agree with me that there were a

23    number of factors that affect software performance?

24    A.    Correct.

14:33:07 25    Q.    Right.  And one of them is obviously the number of

1     users on the system?

2     A.    That's correct.

3     Q.    And likewise, transaction volume is one of the

4     factors that affects software performance, right?  Things

14:33:19  5     like the number of products, the number of customers, the

6     number of vendors that a customer has?

7     A.    That's correct.

8     Q.    And just focusing on the number of transactions,

9     you would agree that the Hodell transaction environment

14:33:35 10     was relatively high?  In other words, they had a lot of

11     transactions?

12     A.    They have -- they have a large number of SKUs.

13     They have a lot of master data.

14     Q.    Okay.  You would agree that they have a complex

14:33:50 15     environment?

16     A.    For a distributor, yes.

17     Q.    Okay.  And you know that from your years of working

18     with Hodell?

19     A.    Yes.

14:34:01 20     Q.    Right?

21              So after you talked to Otto and he told you

22     to drill down, okay, you testified that you had two

23     out-of-town trips in connection with B1, and that one of

24     them was Las Vegas and one of them was Atlanta, that was

14:34:17 25     earlier today?

```
 1            A.     That is correct.

 2            Q.     Okay.  I'm going to try to talk through these and

 3     unpack some of your testimony.  All right?

 4                   I'm going to start with the Vegas trip.

14:34:27  5     That was in early 2004, fair enough?

 6            A.     If you say so.  I don't -- I don't remember.

 7            Q.     Okay.  You testified today that you talked with Dan

 8     Kraus, Ralf Mehnert-Meland, and Chris Robinson and Ken

 9     Lorenz when you went on your trip to Vegas.

14:34:50 10                   Does that sound right from earlier today?

11            A.     I believe that is correct.

12            Q.     But at your deposition three years ago, isn't it

13     right that you were pretty clear that the only person you

14     spoke to about the capabilities of B1, when you went to

14:35:06 15     Las Vegas, was Dan Kraus?

16            A.     I -- I must have been mistaken because I remember

17     standing with Ralf Mehnert very specifically going over a

18     list, a litany of questions that I had.

19            Q.     Well, you took two trips, right?

14:35:26 20            A.     Um-hmm.

21            Q.     One was to Vegas and one was to Atlanta, right?

22            A.     Correct.

23            Q.     And maybe you talked to Ralf Mehnert in Atlanta,

24     right?

14:35:41 25            A.     Did I -- I'm sure I talked to Ralf Mehnert in
```

1       Atlanta as well.

2       Q.    And you just don't remember, I think your testimony

3       now appears to be, whether you talked to just Dan Kraus

4       in Vegas or whether you talked to Dan and all those other

14:35:57 5   guys you listed when you were in Vegas, right?

6       A.    I -- I know that I spoke to Dan in pretty much

7       every conversation, every instance when we were together,

8       and for the most part, Ralf Mehnert was there and so was

9       Chris Robinson.

14:36:16 10  Q.    For the most part.  We're trying to be a little

11      more specific.  Why don't we take a look at your

12      deposition, okay?  Do you have that transcript there with

13      you?

14      A.    I do not.

14:36:26 15  Q.    Can someone please hand the witness the deposition

16      transcript?

17                  Now, you remember being deposed, right?

18      A.    I do.

19      Q.    You testified under oath for a period of hours,

14:36:40 20  right?

21      A.    Yes, I did.

22      Q.    Okay.  And this was coming up now on three years

23      ago, right?

24      A.    Yes.

14:36:51 25  Q.    Your deposition would have been three years closer

          1    to the facts in this case which took place way back in

          2    '03, '04 and '5, et cetera, correct?

          3    A.    That's correct.

          4    Q.    Okay.  Take a look at Page 197, 12, would you

14:35:46  5    please?

          6              You were asked by counsel the following

          7    question:

          8              "You were asked a series of questions about

          9    your comment that you believe that Business One was

14:35:54 10    suitable for any -- for anyone from a company anywhere

         11    from three up to 500 users?  I was a little bit unclear

         12    as to a portion of your testimony, I'll tell you, and I'm

         13    just going to try and clarify it.

         14              "Answer:  Sure.

14:36:09 15              "Question:  Is it your contention that

         16    somebody from SAP and -- is it your contention that

         17    somebody from SAP --"

         18              THE COURT:  Hang on for a second.

         19              Try it again now.

14:37:35 20              MR. MILLER:  Thank you, Your Honor.

         21    BY MR. MILLER:

         22    Q.    Let's look at your deposition testimony

         23    starting -- we'll start over, Page 197, Line 12.

         24              "Question:  You were asked a series of

14:37:53 25    questions about your comment that you believe that

1    Business One was suitable for anyone -- anywhere from a

2    company anywhere from three up to 500 users.  I was a

3    little bit unclear as to a portion of your testimony,

4    I'll tell you, and I'm just going to try and clarify it

14:38:06  5    in this way.

6                "Answer:  Sure.

7                "Question:  Is it your contention that

8    somebody from SAP, an SAP employee, actually told you

9    that Business One was suitable for a company with three

14:38:16 10    to up to 500 users?

11                "Answer:  Yes.

12                "Question:  Is that your contention?

13                "Answer:  Yes.

14                "Question:  Who do you believe told you

14:38:26 15    that?

16                "Answer:  Dan Carr and Ralf Mehnert, both

17    at independent times.

18                "Question:  Dan Carr?

19                "Oh, I'm sorry, not Dan Carr; Dan Kraus.

14:38:36 20                "Question:  Dan Kraus told you it and you

21    also believe Ralf Mehnert-Meland told you that?

22                "Answer:  Correct.

23                "Question:  Did they tell you at the same

24    time?

14:38:44 25                "Answer:  No.

1356

1        "Question:  When did Dan Kraus tell you

2   that?

3        "Answer:  I believe that it was at the FKOM

4   meeting that I attended.

14:38:54 5        "Question:  When was that?

6        "Answer:  I don't remember.

7        "Question:  How many FKOM meetings have you

8   attended?

9        "Answer:  Just one for Business One during

14:39:03 10   that period of time.  I've attended many since then.

11        "Question:  So there would be one meeting

12   that you'd be thinking of specifically, right?

13        "Answer:  Yeah.  But Dan communicated that

14   to me.

14:39:15 15        "Question:  How did he communicate it to

16   you?

17        "Answer:  Just in a conversation as it

18   related to the market we were trying to penetrate with

19   our development and with our product specific to the

14:39:24 20   industry that we were going after.

21        "Question:  Is this a one-on-one

22   conversation between just yourself and Dan Kraus?

23        "Answer:  I don't know if Tim Lowe was

24   there or not."

14:39:37 25        That was your testimony at your deposition,

1  isn't that right?

2  A.    Yes.

3  Q.    And you don't talk about Ralf Mehnert-Meland or

4  Chris Robinson or Ken Lorenz being part of your

14:39:50 5  conversation with Dan Kraus in Las Vegas, right?

6  A.    That specific conversation?  No.

7  Q.    Well, that's the -- you took two trips before you

8  reported back to Otto Reidl on B1, right, the trips we

9  discussed, Las Vegas and Atlanta, correct?

14:40:06 10  A.    Correct.  That --

11  Q.    Forgive me, sir.  And you testified this morning

12  about both of those trips, right?

13  A.    Yes.

14  Q.    And I'm focused on the Vegas one, okay?

14:40:18 15  A.    Okay.

16  Q.    And --

17              THE COURT:  I'm going to have to interrupt

18  you, Mr. Miller, because we're going to have to turn the

19  connections off and turn them back on again.

14:40:33 20              MR. MILLER:  Okay.

21              THE COURT:  Do you want to take about ten

22  minutes?

23              (Jury out).

24              (Recess taken).

15:00:28 25              (Proceedings resumed in presence of the

1    jury as follows:)

2              THE COURT:  Well, we think we got

3    everything set.

4              We'll see.

15:00:45  5              Mr. Miller, you may continue.

6              MR. MILLER:  Thank you, Your Honor.

7    BY MR. MILLER:

8    Q.    Mr. Van Leeuwen, I'm going to try and somewhat pick

9    up where we left off so we don't have to go through much

15:00:54 10   of that testimony.

11             Do you recall we were just reading through

12   your deposition testimony, right?

13   A.    Yes.

14   Q.    And it was about the trip you took to Las Vegas and

15:01:01 15   the conversation that you had about the capabilities of

16   B1 when you were there in Vegas, correct?

17   A.    Correct.

18   Q.    And you would agree with me that your deposition

19   clarifies that the conversation that you had in Las Vegas

15:01:13 20   wasn't with Ralf Mehnert, Chris Robinson, Ken Lorenz and

21   Dan Kraus as you testified earlier, but instead it was

22   just with Dan Kraus, right?

23   A.    No.  That's not correct.

24   Q.    You would agree with me that your deposition

15:01:28 25   testimony makes a reference just to a conversation with

1    Dan Kraus, right?

2    A.    That's -- that's a reference to one of many

3    conversations that I had on that trip.

4    Q.    Okay.

15:01:42 5    A.    So when you talk about capability, there were

6    multiple conversations that were had.

7    Q.    And in your deposition --

8    A.    You're pointing to one specific one with Dan Kraus.

9    Q.    Well, your deposition, I'll flip to the end of it,

15:01:54 10    it's 303 pages long, does that sound about right to you?

11    A.    Yes.

12    Q.    Would you agree with me that there's nowhere in

13    that deposition where you discuss any conversation in Las

14    Vegas in 2003 with anyone but Dan Kraus?

15:02:10 15    A.    That's because nobody asked me.

16    Q.    Okay.  Let's look back at just at the piece of the

17    testimony that starts at 198, okay?  With respect to the

18    Vegas trip and your conversations starting on Line 16.

19              Do you see that there?

15:02:25 20    A.    Of which page?  I'm sorry.

21    Q.    198.

22    A.    Okay.

23    Q.    Actually we should start on Line 13.

24              "When did Dan Kraus tell that you?  I

15:02:36 25    believe that was at the FKOM meeting that I attended.

1       "Question:  When was that?

2           "Answer:  I don't remember.

3           "Question:  How many FKOM meetings have you

4   attended?

15:02:46  5           "Answer:  Just one for Business One during

6   that period of time.  I've attended many since then.

7           "Question:  So there will be one meeting

8   that you'd be thinking of specifically, right?

9           "Answer:  Yeah.  Where Dan communicated

15:02:59 10   that to me.

11           "Question:  How did he communicate it to

12   you?

13           "Answer:  Just in a conversation as it

14   related to the market we were trying to penetrate with

15:03:10 15   our development and with our product specific to the

16   industries that we were going after.

17           "Question:  Is this a one-on-one

18   conversation, just yourself and Dan Kraus?

19           "Answer:  I don't know if Tim Lowe was

15:03:22 20   there or not."

21           Do you see that there?

22   A.    Yes.

23   Q.    That was your testimony, right?

24   A.    Yes.  Absolutely.

15:03:29 25   Q.    And just to be clear --

1    A.    Understand --

2    Q.    Sir, just to be clear, when you testified on direct

3    examination, this guy, Tim Lowe, who you are referencing

4    in your deposition, you didn't talk about Tim Lowe at all

15:03:41 5    earlier today, right?

6    A.    Correct.

7    Q.    Okay.  You talked about --

8    A.    He's not an employee.  He's not --

9    Q.    Forgive me, sir.  You asked about Dan Kraus, Ralf

15:03:51 10    Mehnert, and Chris Robinson and Ken -- you testified

11    about Dan Kraus, Ralf Mehnert, Chris Robinson and Ken

12    Lorenz at; this Vegas meeting, right?

13    A.    Correct.

14    Q.    And you would agree with me if I gave you as much

15:04:04 15    time as you wanted to look through this 303-page

16    deposition, you'd not be able to find any suggestion that

17    your conversation in Las Vegas about the capabilities of

18    B1 was with anyone other than Dan Kraus?

19    A.    Let me be clear.

15:04:20 20    Q.    Sir, can you -- before we move on, can you answer

21    that question?  You wouldn't be able to find -- you

22    reviewed your deposition before today, right?

23    A.    No.

24    Q.    Okay.  But if I gave you all the time in the world,

15:04:33 25    you couldn't find anywhere in that deposition where you

1    explained after those many, many hours under oath where

2    you testified about the capabilities of B1 in your

3    meetings, no testimony other than what I just read that

4    suggests that you had a conversation in Vegas about the

15:04:48  5    capabilities of B1 with anyone but Dan Kraus?

6    A.    Listen, the question is very specific on Page 198.

7    You are asking about the user count.  That is one

8    component of the performance of the system.

9                I had one conversation with Dan Kraus at

15:05:04 10    this meeting where we talked about that.

11                I had multiple meetings.  FKOM is a

12    multiple-day event.  I had other conversations in regards

13    to other aspects of performance with other SAP people

14    while I was at that show.

15:05:18 15    Q.    Got it.

16                So your point is notwithstanding the

17    testimony that I just read, and the references therein to

18    a single communication, your point is there were other

19    communications; you just didn't talk about them when you

15:05:32 20    got deposed, right?

21    A.    I was --

22    Q.    Correct?

23    A.    -- asked a very specific question.

24    Q.    Yes or no, please.  Sir, it's a very simple

15:05:37 25    question.  Thank you.

1    A.    Yes.  I was asked a very specific question on the

2    deposition about user count.

3    Q.    Fine.  Let's talk about the user count.  Let's talk

4    about that.

15:05:44  5          You testified today, did you not, that

6    during the Vegas trip, when you discussed the

7    capabilities of B1, you were told by these many people at

8    SAP that B1 was good for up to 300 users, right?

9    A.    And -- yes.  That's correct.

15:06:04  10   Q.    And that's the number you used.  In fact, you

11   testified today repeatedly that the B1 number that was

12   communicated to you by SAP was 300, right?

13   A.    300 plus, that is correct.

14   Q.    When you --

15:06:19  15   A.    300 plus.

16   Q.    Excuse me, sir.  When you testified earlier today,

17   you didn't say 300 plus, did you?  You said it was 300,

18   correct?  Yes or no.

19   A.    I believe I said -- I believe -- no.

15:06:30  20   Q.    Okay.  We'll go back and read your transcript.

21          You don't think today with these ten jurors

22   listening that when you testified about your conversation

23   in Las Vegas, you don't think that you testified that you

24   were told that B1 was good for up to 300 users?  You

15:06:47  25   don't think that's what you said?

1    A.    I think I said three, 300 to 400 users is what I

2    believe I said.

3    Q.    You didn't say 500 users, though, did you?

4    A.    No, but the --

15:06:59  5    Q.    Fine.  Thank you.  Let's -- you want to talk user

6    counts.  Let's look at your deposition because when you

7    testified at your deposition, sir, about this

8    conversation in Las Vegas where you were supposedly told

9    by SAP that B1 was good for some number of users, when

15:07:18 10    you testified this at your deposition -- about this at

11    your deposition, you didn't say 300; you said 500, right?

12    A.    Both are accurately portrayed in the SAP document.

13    Q.    Sir, yes or no, do you remember what you testified

14    to at your deposition with respect to the Vegas

15:07:35 15    conversation and the number of users you were supposedly

16    told that B1 was good for?

17            Do you remember?

18    A.    Three, three years ago?  No, I'm going to have to

19    go back through the deposition.

15:07:46 20    Q.    Fine.  I'll help you out.

21            Turn to Page 197, please, Line 12.

22    A.    Okay.

23    Q.    This testimony is going to be familiar because we

24    looked at this just a minute ago.

15:07:55 25            "Question:  You were asked a series of

1  questions?"

2  A.    I --

3  Q.    Excuse me, sir.  We're going to review the

4  testimony.

15:08:03  5          "Question:  You were asked a series of

6  questions about your comment that you believe that

7  Business One was suitable for anywhere, for a company

8  anywhere from three to 500 users.  I was a little bit

9  unclear as to a portion of your testimony, I will tell

15:08:16 10  you, and I'm just going to try and clarify it this way.

11          "Answer:  Sure.

12          "Question:  Is it your contention that

13  somebody from SAP, an SAP employee, actually told you

14  that Business One was suitable for a company with three

15:08:29 15  up to 500 users?

16          "Answer:  Yes.

17          "Question:  Is that your contention?

18          "Answer:  Yes."

19          That was your testimony, right?

15:08:37 20  A.    Yes.

21  Q.    So at your deposition --

22  A.    Right.

23  Q.    -- contrary to your testimony today, your story was

24  that someone at SAP told you that B1 was good for up to

15:08:49 25  500 users, correct?

1    A.    Again, I did not have an opportunity to review my

2    deposition.

3    Q.    Sir, sir, do you agree with me your deposition

4    testimony is inconsistent with what you testified about

15:09:01  5    today because today you talked about 300 or you're saying

6    now 400, but in your deposition, you talked about 500?

7              MR. LAMBERT:  I'm going to object, Your

8    Honor.

9    A.    Between three to 500 users, three to 400 is

15:09:14 10   accurate.

11             THE COURT:  Excuse me, Mr. Miller.  We've

12   gone over this enough.

13             MR. MILLER:  Thank you.  I'm going to keep

14   moving, Your Honor.

15:09:20 15            THE WITNESS:  Absolutely.

16   BY MR. MILLER:

17   Q.    There are no notes, sir, of any conversations that

18   you had with anyone at SAP when you were in Vegas that

19   say any of these numbers, either 300 or 400 or 500,

15:09:37 20   right?

21   A.    Just the marketing material.

22   Q.    Right.  Leaving the marketing material aside, you

23   have no notes that corroborate that you were told by SAP

24   in Vegas in early 2004 that B1 was good for 300 users,

15:09:55 25   400 users, or 500 users, right, the three numbers you've

1   now used?  Fair enough?

2   A.    Fair enough.

3   Q.    And you realize that Dan Kraus denies that he told

4   you that B1 was good for any particular number of users?

15:10:11  5                MR. LAMBERT:  Objection, Your Honor.

6                THE COURT:  The objection is sustained.

7   A.    I am not aware of that.

8   Q.    And this conversation that you had, or these

9   conversations that you had, in Las Vegas, you would agree

15:10:23 10   with me now these were generally with respect to your

11   interest and IBIS's interest in developing the vertical

12   solution, an integrated microvertical; they were

13   generally in connection with that initiative and not

14   specific to Hodell?

15:10:41 15   A.    I would not say that that's the case at all.

16                I would say that it was a joint -- it was

17   combined.

18   Q.    You would agree with me that at your deposition,

19   you testified that these conversations related generally

15:10:55 20   to the market you were trying to penetrate and the

21   industries you were going after and you never testified

22   at your deposition when you were asked extensively about

23   the Vegas meeting that it had anything to do specifically

24   with Hodell?

15:11:09 25   A.    That is correct in my deposition.

1    Q.    Thank you.

2    A.    Although you have e-mails that showed me talking

3    about that.

4    Q.    Thank you.  Let's talk about Atlanta, okay?

15:11:17 5          And if there are e-mails you want me to

6    look at, feel -- we'll get into those, but for now, I

7    want to shift to Atlanta, but I'm happy to look at any

8    document you want to show me that you say is inconsistent

9    with where we are, fair enough?

15:11:31 10   A.    Okay.

11   Q.    This trip to Atlanta, this would have been later in

12   the spring of 2004, right?

13   A.    I believe that's correct, yes.

14   Q.    Okay.  And in connection with the Atlanta trip,

15:11:45 15   again earlier today when you were testifying about what

16   you were told, your position was that you spoke with

17   multiple SAP people about B1's capabilities, right?

18   A.    That's correct.

19   Q.    Okay.  In your testimony today, and we moved

15:12:04 20   through it pretty quickly, but I took pretty good notes,

21   was that when you went to Atlanta and talked about the

22   capabilities of B1, the SAP people who reported to you

23   that B1 was good for up to 300 users were Ralf Mehnert,

24   Dan Kraus, and Ken Lorenz, right?

15:12:21 25   A.    I would say that is correct.

1    Q.    Okay.  But again, sir, in your deposition, you were

2    clear, were you not, that when you went to Atlanta and

3    had a conversation about the capabilities of B1, you

4    talked to one person about that and one person only, and

15:12:37  5    it was Ralf Mehnert-Meland, isn't that right?

6    A.    I -- again, I do not remember that.

7    Q.    You don't remember whether it was multiple people

8    like you testified earlier today, or if it was Ralf

9    Mehnert-Meland, right?

15:12:51 10    A.    No.  I don't remember my testimony from three years

11    ago.

12    Q.    Okay.

13    A.    In detail.

14    Q.    Let's look at it.  Please turn to Page 197, Line

15:13:01 15    20.

16                "Question:  Is it your contention that

17    somebody FROM SAP, an SAP employee" -- oh, strike that.

18                Move to Page 204, please.  Line 14.  We've

19    already looked at 197.  We can come back to it if

15:13:28 20    necessary.

21                But, 204, Line 14, in connection with the

22    Atlanta trip.

23                "Question:  When I asked you who at SAP

24    told you 500 users, you identified Kraus and

15:13:40 25    Mehnert-Meland?

1370

1          "Answer:  Yes."

2               Strike that, the question is general.

3    "When I asked you at SAP who told you 500 users, you

4    identified Kraus and Mehnert-Meland?

15:13:49 5          "Answer:  Yes.

6               "Question:  Let's talk about

7    Mehnert-Meland.  When you believe -- strike that.  How

8    did Mehnert-Meland convey to you that Business One was

9    good for up to 500 users?

15:14:01 10              "Answer:  That conversation was a bit

11   different.  That conversation, I mean, I mean, I can -- I

12   don't remember the building.  I remember where we were

13   standing.  We were standing at the top of a set of

14   elevators and we had approximately a 45-minute

15:14:14 15  conversation in regards to addressing those questions

16   that I'd written down as far as feature functionality to

17   try and identify how much effort would have to go into

18   developing that solution that we had talked about, the

19   American Express relationship.

15:14:32 20              "And I specifically asked the question of

21   scalability, I specifically asked the question of

22   scalability."

23              Do you see that there?

24   A.   Yes.

15:14:44 25  Q.   Does that help refresh your recollection that when

1    you were in Atlanta, you talked only with Ralf

2    Mehnert-Meland?

3    A.    No.  It even says Dan Kraus before that.

4    Q.    Okay.  Well, let's go back, just to be clear, sir.

15:14:58  5    At 197-20, okay?

6    A.    No, go to 11.

7    Q.    Sir, okay, 197-20?

8    A.    104, 11.

9    Q.    "Is it your contention that somebody from SAP, an

15:15:14  10    SAP employee, actually told you that Business One was

11    suitable for a company with three up to 500 users?

12                    "Answer:  Yes.

13                    "Question:  Is that your contention?

14                    "Answer:  Yes.

15:15:22  15                    "Question," and this is the interesting

16    part, "Who do you believe told you that?

17                    "Answer:  Dan Carr and Ralf Mehnert, both

18    at independent times."

19                    Now we're talking about two conversations

15:15:32  20    and then you continued:  "Dan Carr?

21                    "Oh, I'm sorry, not Dan Carr, Dan Kraus.

22                    "Question:  Dan Kraus told you it, and you

23    also believe Ralf Mehnert-Meland told you that?

24                    "Answer:  That is correct.

15:15:45  25                    "Question:  Did they tell you that at the

1  same time?

2                    "No.

3                    "When did Dan Kraus tell you that?

4                    "Answer:  I believe that that was at the

15:15:52  5  field kick-off meeting that I attended."

6                    Do you see that there?

7  A.    Yes.

8                    THE COURT:  I'm going to have to interrupt.

9                    MR. MILLER:  Just one question, Your Honor,

15:16:03 10  just so we don't have to go back over that.

11  Q.    The field kick-off meeting was in Vegas, right?

12  A.    Correct.

13                    MR. MILLER:  Thank you.

14                    Forgive me, we're having technical

15:16:17 15  difficulties.  You might not be able to hear it, but the

16  sound that caused us to take a break earlier has come

17  back worse than ever.

18                    THE COURT:  Looks like his testimony might

19  be over.

15:17:00 20                    I think it's coming from Chicago.

21                    Give me ten minutes.  If the smokers want a

22  cigarette, they can go, okay?  You go back and we'll try

23  to get this fixed.

24                    (Recess taken)

15:26:27 25                    (Proceedings resumed in presence of the

          1    jury as follows:)

          2                    THE COURT:  We are going to try again.

          3    BY MR. MILLER:

          4    Q.    Okay.  Mr. Van Leeuwen, I'll try and pick up where

15:26:41  5    we left off.

          6                    You testified --

          7    A.    Okay.

          8    Q.    -- with respect to the Atlanta trip earlier today

          9    you testified that the number --

15:26:48 10                    THE COURT:  You have to speak into the mic.

         11                    MR. MILLER:  Forgive me, Your Honor.  I was

         12    trying not to have feedback.

         13    BY MR. MILLER:

         14    Q.    Back to the Atlanta trip, correct?  You following?

15:26:57 15    A.    Okay.

         16    Q.    You testified earlier today that the user number

         17    that was communicated to you as being good for Business

         18    One was communicated to you by people at SAP was 300,

         19    right?  This is Atlanta.

15:27:13 20    A.    Correct.

         21    Q.    Okay.  And you would agree with me that at your

         22    deposition, the user number that you testified under oath

         23    that was communicated to you during the Atlanta trip was

         24    up to 500, correct?

15:27:25 25    A.    Correct.

1  Q.    It was a different number?

2  A.    In the same, same range, but yes.  I didn't include

3  the top end of the range.

4  Q.    And you don't have any notes at all that have

15:27:38  5  either 300 or 500 users referenced in connection with

6  this Atlanta meeting, right?

7  A.    That is correct.  When I sold the business, all of

8  that paperwork went with LSi.

9  Q.    You don't have any -- you're not aware, though, of

15:27:54  10  any documents that exist that with respect to this

11  Atlanta meeting and these supposed conversations, you can

12  see the number 300 and then the word users, right?

13  A.    I can't recall.  Again I don't have access to those

14  documents other than the marketing material that I'm

15:28:14  15  looking at, which says it.

16  Q.    Right.  Leaving the marketing materials aside which

17  refer to employees, you're not aware of any documents

18  that corroborate that you had a conversation with someone

19  in Atlanta where the phrase "300 users" came up, correct?

15:28:27  20  A.    Yes, you're right.  I don't have that because I'm

21  not an employee of LSi.

22  Q.    Yes or no, sir?

23  A.    I don't know.

24  Q.    And likewise, it would be true that you don't have

15:28:35  25  a document that has the phrase 500 users in it, either?

```
          1    A.    Correct.

          2    Q.    You don't have either?

          3    A.    Correct.

          4    Q.    Okay.  And again, you testified today that when you
15:28:48  5    were in Atlanta -- you okay?

          6    A.    I'm perfectly fine.

          7    Q.    You testified today that the conversations you had

          8    about the capabilities of B1, they were specific to

          9    Hodell, right?

15:29:05 10    A.    In Atlanta?

         11    Q.    Correct.

         12    A.    They would have included both.  They would have

         13    included Hodell as well as what we were doing from an

         14    industry perspective.

15:29:13 15    Q.    Okay.

         16                And once again, in your deposition, you

         17    were clear your conversations in Atlanta, regardless of

         18    who they were with, were not specific to Hodell, isn't

         19    that right?

15:29:28 20    A.    Did I communicate that I was asking the questions

         21    specifically on Hodell's behalf?  No.

         22    Q.    No, I'm --

         23    A.    In my mind, absolutely I was looking at

         24    Hodell-Natco, I was looking at a number of customers that

15:29:42 25    had that kind of user count.
```

```
 1   Q.    Sir, I think you testified differently today than
 2   you did in your deposition.
 3              Let's see if that's true, okay?  Fair
 4   enough?
 5   A.    Fair enough.
 6   Q.    Today you told this jury that when you had meetings
 7   in Atlanta to discuss the capabilities of B1, you told
 8   this jury that those conversations were specifically with
 9   respect to Hodell, right?  That's what you told us today?
10   A.    Okay.  Yes.
11   Q.    Okay.
12   A.    Look --
13   Q.    And in your deposition, sir, Page 54, 19, okay?
14   A.    Okay.
15   Q.    Page 54, Line 19.
16              Let me know when you're there.
17   A.    I'm there.
18   Q.    "Question" at Line 19.  "Well you mentioned
19   something about a trip to Atlanta where you -- where you
20   were told the software would be appropriate for 300 to
21   500 users.  Do you recall that conversation?
22              "Answer:  Um-hmm.  Nodding.
23              "Question:  Do you?
24              "Answer:  Three, three users to 500 users.
25              "Question:  Three users to 500?
```

1       "Answer:  Three to 500.

2              "Question:  Did that conversation also --

3   did you ask any questions during that trip about other

4   aspects --

15:31:04 5   A.    I lost audio.

6   Q.    Can you hear me now?

7   A.    I can, yes.

8   Q.    Okay.

9              "Question:  Did that conversation also, did

15:31:13 10  you ask any questions during that trip about other

11  aspects of Hodell's business as far as transaction

12  volume, database size, or anything else of that nature?

13             "Answer:  No.  It was more functional.

14  Other than users, it was more -- the questions that I

15:31:31 15  asked at that point in time were more functional."

16             Do you see that there?

17  A.    Yes.

18  Q.    Does that help confirm for you that when you had

19  meetings with people at SAP like you say in Atlanta, they

15:31:42 20  were not with respect to Hodell's specifics?

21  A.    Sir, I would have to say that --

22  Q.    Can you answer that question with a yes or no?

23  A.    Our organization -- I would say no.

24  Q.    Okay.  Would you agree with me that --

15:32:04 25  A.    You did not make it clear.  No.

1378

1    Q.    Let me try this.  Would you agree that you would be

2    speculating if you said that you talked about Hodell when

3    you met with SAP in Atlanta?

4    A.    Absolutely not.

15:32:12 5    Q.    Okay.  Let's take a look at Page 193.

6    A.    We --

7    Q.    Line 9, please.

8          "Question:  When you went to this meeting

9    in Atlanta, did you mention to SAP that Hodell-Natco was

15:32:34 10    a prospect for Business One?

11          "Answer:  No response.

12          "Question:  If you will?

13          "Answer:  It would be speculation on my

14    part.  We certainly talked about the fastener vertical

15:32:45 15    market.  I believe that Chris Robinson already knew about

16    the call that took place from Hodell-Natco to me in

17    regards to American Express, et cetera, et cetera."

18          Do you see that there?

19    A.    I do, yes.

15:32:56 20    Q.    Okay.

21          Does that help confirm for you that when

22    you were in Atlanta, it would have -- does that help

23    confirm for you that you would be speculating if you said

24    you talked about Hodell when you were in Atlanta?

15:33:07 25    A.    Okay.

1    Q.    Yes or no?

2    A.    The original question is --

3    Q.    The original question was:  "Would you be

4    speculating if you said that you talked about Hodell when

15:33:16 5    you met with SAP in Atlanta?"  Your answer was,

6    "Absolutely not."

7              Now we've looked at your deposition

8    testimony.  Do you agree that you would be speculating if

9    you said you talked about Hodell when you were with SAP

15:33:27 10    in Atlanta?

11    A.    So --

12    Q.    Yes or no?

13    A.    Can I explain or no?

14    Q.    Can you answer yes or no?

15:33:34 15    A.    No.

16    Q.    Fine.  Let's move on.  Let's move on.  I have a lot

17    more to cover.

18              "Question:  Your testimony earlier today,

19    was it after these meetings in Vegas and Atlanta, you

15:33:51 20    turned around and reported to Otto Reidl that the B1

21    product was good for Hodell up to whatever the number you

22    want to say," is 300 users, right?

23    A.    Sir, you are mixing users only with -- with a

24    conversations about functionality, about performance,

15:34:09 25    about a lot of things.

1    Q.    I'm asking a question about what you said?

2    A.    And that's why I'm having a hard time because

3    you're saying I had a conversation about Hodell

4    specifically.  I don't think that I mentioned their name.

15:34:21  5    That would be a speculation.

6              Did I in my mind include Hodell-Natco in

7    the questions that I was asking?  Absolutely.

8    Q.    Let's talk about what happened after Vegas and

9    after Atlanta, right?  You went back and reported to

15:34:37 10    Otto, because he had directed you to drill down and

11    investigate B1, right?

12    A.    Yes.

13    Q.    And you turned around and reported to Otto that the

14    B1 product was good for Hodell for up to 300 users,

15:34:50 15    right?

16    A.    I -- I don't think that I said 300 users or not.  I

17    don't -- I don't remember that.

18              I do remember reporting to him that, yes, I

19    felt that the B1 solution was going to be viable for them

15:35:03 20    based on the information I received from the

21    conversations I had with SAP employees.

22    Q.    And now your testimony, contrary to what you said

23    earlier, is you don't remember if you gave him a specific

24    user number, right?  That's what you just said?

15:35:19 25    A.    I don't know that I gave them a specific user

1    number in those two meetings.

2    Q.    That's fine.

3              Well, we're not talking about those two

4    meetings.  I'm talking about when you reported back to

15:35:28 5    Otto after those two meetings.  That's what we're talking

6    about, right?

7    A.    You're going to have to explain that to me.  I'm

8    sorry.

9    Q.    Okay.  I'm just --

15:35:38 10    A.    I'm not following.

11    Q.    I understand.  I'm just keying off of your

12    testimony from earlier today.

13              You talked about a meeting in Vegas and you

14    talked about a meeting in Atlanta, and then you told this

15:35:48 15    jury that after that, you quote, unquote, turned around

16    and reported to Otto on the capabilities of B1 and that

17    it was good for up to 300 users.

18              Do you remember that testimony today?

19    A.    Okay.  Yes.

15:36:05 20    Q.    Okay.  And now you've just told us that you're not

21    actually sure if you reported a specific user number to

22    Mr. Reidl, right?  You said that about 30 seconds ago.

23    A.    Okay.  Yep.

24    Q.    Okay.  So let's kind of recap here, right?

15:36:24 25              You agree that this was a complicated

1      project, it was B1, Radio Beacon, and In-Flight, right?

2      A.    Yes.

3      Q.    And you had these conversations with SAP in Atlanta

4      and in Vegas, I'll switch the order, Vegas and Atlanta,

15:36:44 5    right?

6      A.    Right.

7      Q.    Okay.  And you say that SAP told you that B1 was

8      good for up to some number of users, 300 or 400 or 500,

9      right?

15:36:56 10   A.    Yes.

11     Q.    And you just took that, and this is your phrase,

12     not mine, at face value, right?

13     A.    Again I also relied on the marketing material that

14     I was provided.

15:37:10 15   Q.    Okay.  So you were relying on the conversations

16     that we've discussed and marketing material, right?

17     A.    That is correct.

18     Q.    And you took that, and this is your phrase, not

19     mine, at face value, right?

15:37:26 20   A.    That is correct.  I had no reason to believe that

21     SAP was going to lie to me.

22     Q.    In fact --

23                MR. MILLER:  Move to strike, Your Honor.

24     BY MR. MILLER:

15:37:35 25   Q.    You testified three times in your deposition that

1     you took what was supposedly said to you by one person or

2     more about 300 or 400 or 500 users that may or may not

3     have included Hodell in the conversation, whatever it was

4     that SAP told you, you testified three times in your

15:37:53  5     deposition you just took that at face value, right?

6     A.     I -- I had no way of measuring it, other than the

7     information that I had at the time.

8     Q.     Because you didn't -- well, you could have -- you

9     didn't, for example, conduct any further discovery or due

15:38:11 10     diligence, right?

11     A.     Around the user count?  No, I did not.

12     Q.     Okay.  Because you felt like you don't need to

13     spend any real effort on that, right?

14     A.     Correct.  I had an SAP document that said it could

15:38:27 15     do that, and I had conversations that I had with people

16     that were in charge of the product line at that point in

17     time and told me that that was the capability.

18     Q.     So you had the conversations we discussed and the

19     marketing material, right?

15:38:39 20     A.     Correct.

21     Q.     And the marketing material refers to employees,

22     right?  Not users?

23     A.     Correct.

24     Q.     And you took what SAP said in these conversations

15:38:49 25     we've been talking about, and these marketing materials,

```
        1    and notwithstanding the fact that Otto Reidl told you as

        2    his partner to drill down, you just took what SAP said at

        3    face value?  And that's your version of the SAP

        4    conversations, right?  True?

15:39:07 5    A.    That's correct.  That's correct.

        6    Q.    Okay.  You didn't feel like you needed to drill

        7    down, notwithstanding the fact that Otto Reidl told you

        8    to drill down?

        9    A.    Sir, I would ask you how was I to drill down beyond

15:39:18 10   what I did?

        11   Q.    You didn't feel like --

        12   A.    No, I'm not going to answer the question unless you

        13   give me the opportunity to ask you how was I to change

        14   that?

15:39:25 15   Q.    Sir --

        16   A.    What more would I have been expected to do?

        17   Q.    Notwithstanding Otto Reidl's direction to you to

        18   drill down, you agree that you did not drill down?

        19   A.    I drilled down to the extent that I could.

15:39:35 20   Q.    Let's take a look at your deposition and see what

        21   you testified to under oath about whether you drilled

        22   down.  Okay?

        23   A.    Okay.

        24   Q.    Let's look at Page 46.

15:39:54 25             THE COURT:  Just so you know, we're
```

1    finishing at 4:30 and this witness is finished at 4:30

2    whether you're finished or not.

3                    MR. MILLER:  Do we know what time it is

4    now?

15:40:03    5                    THE COURT:  It's about 20 to 4:00.

6                    MR. MILLER:  Okay.  Thank you, Your Honor.

7    I'll move as fast as I can.

8    BY MR. MILLER:

9    Q.    "Question, Page 46, Line 12:  "Based on your

15:40:20   10    discussions with the folks at SAP in the spring of '04

11    and these training classes, did you assure Mr. Reidl and

12    Hodell-Natco that SAP Business One would be appropriate

13    for not only their immediate needs but their planned

14    growth of up to 300 users?

15:40:33   15                    "Answer:  You know, I'd have to say that,

16    you know, other than having very specific information

17    that this was the expected range of users that the

18    application could support, having asked the question

19    again from a personal perspective in the development that

15:40:47   20    we did and, you know, having asked it for Hodell-Natco,

21    it really wasn't an issue that I needed to drill down on

22    because it was not known to be an issue.  So I didn't, I

23    didn't spend a lot of effort other than taking at face

24    value the information that was being provided at the

15:41:06   25    time."

```
 1                    Do you see that there?

 2     A.    Yes.   That's correct.

 3     Q.    And that was your testimony, right?

 4     A.    That's correct.

 5     Q.    Okay.   Let's move on.

 6     A.    I felt that I had exhausted --

 7     Q.    Sir, forgive me, we have some timing issues.  I

 8     want to keep moving.

 9                    Take a look at 291, please.

10     A.    Was that a page in here?  No.

11     Q.    This is the development agreement.  You've seen

12     that before, right?  Right, you've seen the development

13     agreement before?

14     A.    I'll have to take a minute to review it.  This was

15     signed by Dan Lowery so I have to review it.

16     Q.    Signed by Dan Lowery at the end on behalf of LSi

17     and IBIS, correct?

18     A.    That's correct.

19     Q.    Okay.  Look at general terms on the first page,

20     please.

21     A.    Okay.

22     Q.    See under Item 1, Hodell-Natco will advance, talks

23     about 180,000 of the $300,000 purchase price, you see

24     that there, right?

25     A.    Yes.
```

1    Q.    Okay.  Go to the second page.  See where it says

2    "In exchange for the downpayment, right, IBIS Group will,

3    one, provide Hodell-Natco with the unlimited user license

4    for In-Flight Enterprise," do you see that there?

15:42:42  5    A.    Yes.

6    Q.    Okay.  And then under Item -- and that

7    user -- those IFE licenses, those are what we talked

8    about before that were in Exhibit 11, it was estimated to

9    be 3816 hours, do you remember that, had no charge next

15:42:57 10    to it?

11    A.    Yes.  Yes.

12    Q.    Okay.

13    A.    Yes, I remember that.

14    Q.    Okay.  And yet the rate that Hodell was charging

15:43:02 15    was $150 -- pardon me -- the rate that IBIS was charging

16    was $150 an hour?

17    A.    If you did the math and that's what it came out to,

18    then, yes, that's correct.

19    Q.    Right.  If you do the math and you multiply 3816 by

15:43:19 20    $150 an hour, you get to about 572,000.

21              Can you trust me on that math?

22    A.    Sure.

23    Q.    So in exchange for the $300,000, one of the things

24    that Hodell gets is Item 1, which are the unlimited free

15:43:31 25    IFE licenses which could have a value as much as 572,000,

1    right?

2    A.    Sure.  Okay.

3    Q.    Okay.  And Item 3, they'd also get a hundred

4    dollars for at least the next 1,000 licenses that were

15:43:45 5    sold for IFE, right?

6    A.    I believe that's what it says, yes.

7    Q.    So the deal was Hodell pays 300,000 and in

8    exchange, they get maybe $572,000 worth of IFE work, plus

9    they might make an extra hundred thousand dollars later

15:44:09 10    if IFE takes off and people are able to sell those IFE

11    licenses to other companies in the fastener business,

12    right?

13    A.    That's what this document says, yes.

14    Q.    Okay.  Let's switch gears.

15:44:26 15              Let's talk about how B1 was sold.

16              SAP didn't engage in any direct B1 sales,

17    right?  They used value added resellers.  I just kind of

18    want to set the stage for the jury.

19    A.    Yes, they were -- the sale was through a VAR, that

15:44:48 20    is correct, but they had engagement and involvement.

21    Q.    Say that again.

22    A.    The software was sold through a VAR.

23    Q.    Value added reseller?

24    A.    It was on -- it was on a value added reseller

15:45:02 25    paper, but, for example, Dan Carr was very aware of what

1   was going on, the agreements, the licensing that was put

2   together --

3   Q.   We're going to put -- you say Dan Carr.  It's not

4   actually Dan Carr, right, it's Dan Kraus?

15:45:15 5   A.   I'm sorry, Dan Kraus.

6   Q.   We're going to talk about what he was aware of, but

7   the primary person in contact with Hodell was the value

8   added reseller, right?

9   A.   Correct.

15:45:24 10   Q.   And that was you?  You were the primary contact for

11   the value added reseller with Hodell?

12   A.   It was American Express and IBIS through to a

13   certain point, and then IBIS took over.

14   Q.   And American Express bowed out of this pretty

15:45:38 15   early, right?

16   A.   I can't remember the date.

17   Q.   Fine.

18            At some point, American Express was no

19   longer involved; it was just you on behalf of IBIS

15:45:49 20   communicating with Hodell to sell B1?

21   A.   That's correct.

22   Q.   Okay.  And that stayed the same --

23   A.   And by me, you mean -- you mean LSi/IBIS.

24   Q.   I mean you were the primary -- we're going to talk

15:46:03 25   about whether it was LSi or IBIS, but you were the

1     primary communicator with Hodell?

2     A.     That's correct.  I sold the application.  That is

3     correct.

4     Q.     Okay.  And that stayed the same shifting to LSi and

5     IBIS even after LSi acquired IBIS, right?

6     A.     Correct.

7     Q.     And that also stayed the same after the development

8     agreement was signed, the one we just looked at, in

9     December of 2005?

10    A.     Lost audio.

11    Q.     That also stayed the same after the development

12    agreement was signed in December of 2004, right, that you

13    were the primary contact with Hodell?

14    A.     December of 2004?  That was in December of 2004?

15    Q.     Yes.

16    A.     I -- I remained as the key point for another month

17    after that.

18    Q.     Well, and we're going to talk about that, but you

19    were originally what, in your own words, you were the

20    captain of the ship for this project, right?

21    A.     Up through early 2005, that is correct.

22    Q.     Let's look at Exhibit 32.  We looked at this

23    before.  It's the SDK.

24    A.     Okay.  I have a lot of paper going on here.

25                 Got it.

1    Q.    I'm going to go right to Section 2.1.  This is

2    basically the agreement, sir, don't you agree that

3    permits a company like IBIS, which signed this agreement

4    with SAP, to develop add-ons like In-Flight Enterprise,

5    correct?

6    A.    I'd have to read it.  Hang on.

7    Q.    No, that's fine.  You're reading Section 2.1 under

8    "Grant of license"?

9    A.    Correct.

10   Q.    Okay.

11   A.    Sir, I'm sorry, what was your question again?

12   Q.    My question is very simple.  Wouldn't you agree

13   that this is the SDK agreement that permits -- would

14   permit a company like IBIS to develop add-ons like

15   In-Flight Enterprise?

16   A.    Yes.

17   Q.    Okay.  And the section you just looked at is the

18   grant of the license that would permit IBIS to do that,

19   right?

20   A.    Yes.

21   Q.    Okay.  And if you flip --

22   A.    I believe it's -- it's not an acquisition.  I think

23   we're renting the software is what it says in here.

24   Q.    Well, you're actually developing an add-on.  You're

25   permitted to use the SAP software to develop your add-on

          1    like In-Flight Enterprise, right?

          2    A.    Right.  That is correct.

          3    Q.    So then you look at the front -- well, actually go

          4    to 5.2.  Actually I'll save you a step.  Let's include

15:49:27  5    this step.  Look at the very first page, definition 1.5

          6    at the bottom.  See it says --

          7    A.    Okay.

          8    Q.    -- "Extension means"?

          9    A.    Yes.

15:49:38 10    Q.    And then there's a definition of the extension on

         11    the next page.  It's a bunch of technical stuff.

         12    Highlighted on the top of the next page.

         13    A.    Yep.

         14    Q.    These are the add-ons, right?  That's a description

15:49:50 15    of an add-on in text speak?

         16    A.    That's -- that's the description of an extension.

         17    Q.    Right.  Thank you.

         18              And an extension is an add-on?  I just want

         19    to make sure the jury doesn't get confused?

15:50:02 20              Right?

         21    A.    From a technical perspective, an add-on could be a

         22    completely separate and disparate piece of software that

         23    is being interfaced using the SDK.

         24              In this case, it was software that was

15:50:26 25    developed using the SDK.

1393

1   Q.   The IFE, the In-Flight Enterprise --

2   A.   Yes.

3   Q.   -- was an extension under this agreement, right?

4   A.   That is correct.

15:50:37 5   Q.   All right.  Thank you.

6             And if you go to the end or Page 7, there's

7   a paragraph called "Termination."

8   A.   Okay.

9   Q.   And you would agree with me that if the company

15:50:57 10   signing this contract with SAP doesn't subsequently enter

11   into a partner agreement, otherwise known as a

12   distribution agreement, then this SDK agreement expires

13   in 180 days, right?

14   A.   Based on what is written here, I would have to say

15:51:13 15   that's true.

16   Q.   Okay.  Take a look at Exhibit 9.  Because that SDK

17   that we just looked at, that was dated December, 2003,

18   right?

19   A.   Yes.

15:51:30 20   Q.   And then LSi acquired IBIS in May of 2004?

21   A.   Correct.

22   Q.   Okay.  And if there was no distribution agreement,

23   that SDK agreement would have expired in June of 2004,

24   right?

15:51:47 25   A.   I'd have to say that's true as I'm looking --

1    Q.    And you're not aware of any distribution agreement

2    between IBIS and SAP, are you?

3    A.    No, it would have been LSi.  It wouldn't have been

4    IBIS at that point.

15:52:01  5    Q.    Because IBIS didn't have a distribution agreement

6    with SAP, right?

7    A.    I don't remember that.  I don't remember.  I

8    honestly don't remember.

9    Q.    If I told you that one's never existed in this

15:52:12 10    case, would you disagree with me?

11    A.    I couldn't.  I don't remember.

12    Q.    Okay.

13                  Well, let's look at this Exhibit 9 because

14    Exhibit 9's dated October 14th, 2004, right?  We looked

15:52:22 15    at that before, right?

16    A.    Which one is that?  I'm sorry.

17    Q.    Nine.

18    A.    Okay.

19    Q.    And on October 14th, 2004, which is after when the

15:52:35 20    SDK would have expired, IBIS is still writing to Hodell

21    about this project, right?  It's got IBIS's name at the

22    top, right?

23    A.    Yeah, as a company of LSi.

24    Q.    If you look down the bottom, it's signed by

15:52:59 25    you -- not signed, but the names of you and Dan are

1     there, right?

2     A.    Yes.

3     Q.    And it says for you "COO, The IBIS Group," and for

4     Dan, "President, The IBIS Group," right?

15:53:14 5    A.    That's correct.

6     Q.    So you're writing this October 14th, '04 letter on

7     IBIS letterhead with yours and Dan's names as IBIS

8     representatives at a point in time, October 14th, 2004,

9     when IBIS has zero contractual relationship with SAP

15:53:29 10   whatsoever.

11              Right?

12     A.    SAP --

13     Q.    Yes or no.  It's a simple yes or no.

14     A.    Well, I can't answer that.  I don't know.

15:53:41 15   Q.    Because you're not aware --

16     A.    I don't know if they did.

17     Q.    If you had no distribution -- if IBIS had no

18     distribution agreement, then it would be true that when

19     this letter was written, IBIS had no contract with SAP,

15:53:54 20   right?

21     A.    As a subsidiary of LSi, I don't know.  I don't know

22     how that would work contractually.

23     Q.    Well, let's look at how else IBIS represented

24     itself.

15:54:04 25            Look at Exhibit, look at 291.  IBIS signed

1       the development agreement, right, when they had no

2       contractual relationship with SAP?

3       A.      Again, I don't know how Dan Lowery has The IBIS

4       Group structured in his corporate structure.  I have no

15:54:26 5      idea.

6       Q.      I have a very simple question.  IBIS was a party to

7       the December, 2004 development agreement, correct?

8               It's right at the top, right?  It says,

9       "Development agreement between Hodell, The IBIS Group"?

15:54:39 10     A.      Right.

11      Q.      Do you see that there?

12      A.      Correct.  That was pre-acquisition.  That is

13      correct.

14      Q.      Okay.  And look at Exhibit 41.  And by the way, you

15:54:49 15     say pre-acquisition.  The development agreement was

16      December, 2004, right?

17      A.      32 -- your Exhibit 32 says 2003.

18      Q.      No.  No.  291.  I'm looking at Exhibit 291.

19      A.      Yeah.  Absolutely.  That was after acquisition.

15:55:11 20             I'm saying that the licensing of the SDK

21      was done pre-acquisition.  That was your question.

22      Q.      And then it expired?

23              We've already covered that, right?  If

24      there was no distribution agreement, that expired, right?

15:55:24 25     A.      Again, I don't know that.

|    |    |
|----|----|
| 1 | Q.    Fine. |
| 2 | A.    I don't know that. |
| 3 | Q.    Let me ask you a very simple question.  Exhibit |
| 4 | 291, in December, 2004, IBIS was still operating, |
| 15:55:40 5 | correct? |
| 6 | A.    IBIS was operating, that is correct.  How it was |
| 7 | structured, I have no idea. |
| 8 | Q.    Forgive me, sir.  And they were a party to the |
| 9 | development agreement, right? |
| 15:55:56 10 | A.    I would say yes, that is correct.  Yes. |
| 11 | Q.    Look at Exhibit 41. |
| 12 | A.    I have this. |
| 13 | Q.    This is another IBIS letter to Otto Reidl, right? |
| 14 | A.    Yes. |
| 15:56:21 15 | Q.    Okay.  And this is dated May 17th, 2005, right? |
| 16 | A.    That is correct. |
| 17 | Q.    Thank you.  Let's go up.  Let me switch gears a |
| 18 | little bit. |
| 19 |        You testified on direct examination about |
| 15:56:37 20 | Exhibit 71.  Take a look at Exhibit 71, okay? |
| 21 | A.    One second. |
| 22 | Q.    And if you go to the back of it, this was the |
| 23 | e-mail, if you go I guess to the second page from the |
| 24 | back down at the bottom, it's an e-mail from Dan Lowery |
| 15:57:03 25 | to Dan Kraus. |

```
 1              You see that there, right?

 2    A.    Dan Kraus, starting at the bottom --

 3    Q.    Bottom of the second to the last page, 71.3?

 4    A.    Yep.  Yes.

 5    Q.    Okay.  And if you go to the next page, there's the

 6    text of Dan's e-mail, Dan Lowery's e-mail to Dan Kraus,

 7    right?

 8    A.    Yes.

 9    Q.    And then right in the center, there's a big -- the

10    biggest paragraph there, it says "Dale and I have been

11    talking about two large close prospects who want us to

12    write our equipment rental and fastener functionality to

13    SAP."

14              Do you see that there?

15    A.    Yes.

16    Q.    Okay.  And if you go down a couple lines, it says

17    "They're both 150-user deals."  Correct?

18    A.    Yes.

19    Q.    But other than saying that they're 150-user deals,

20    no additional detail about these deals is provided by Dan

21    Lowery to Dan Kraus at SAP, right?

22    A.    That is correct.  In 2004, that's correct.

23    Q.    It doesn't even have Hodell's name in it, does it?

24    A.    Not that I can see.

25    Q.    And there's nothing in here about transaction
```

1    volumes or anything like that, right?

2    A.    Within this group of e-mails, there's the users and

3    then there's the Caterpillar, John Deere mentioned.

4    Q.    That you talked about before?

15:58:36 5    A.    Yes.

6    Q.    Then go to Exhibit 40.

7    A.    Okay.

8    Q.    Exhibit 40 is a November 3rd e-mail from Dan Lowery

9    to you, right?  Pardon me, from Dan Lowery to Dan Kraus.

15:59:06 10    A.    To Dan Kraus.

11    Q.    Yeah, sorry.  And you're copied on that, right?

12    A.    I am, yes.

13    Q.    Okay.  And Dan Lowery says to Dan Kraus, on

14    November 3rd, 2004, "LSi/IBIS has an opportunity with

15:59:19 15    Hodell-Natco, an existing IBIS fastener customer, using

16    FACTS software."

17              Do you see that there?

18    A.    I do.

19    Q.    And you would agree with me that this is the first

15:59:29 20    time in history that LSi or IBIS communicated the actual

21    name Hodell in any sort of written communication to SAP?

22    A.    I -- I can't say that definitively at all.

23    Q.    You can't point --

24    A.    I don't know.

15:59:44 25    Q.    Isn't it true you're not aware of any written

1    communication of any type prior to this where the word

2    "Hodell" or the name Hodell was communicated to SAP?

3    A.    Again, I cannot suggest that.

4          I would say that that is untrue in that

5    AmEx, if they registered the deal, Hodell-Natco's name

6    would have been on that and that was way earlier than

7    this.

8    Q.    But you're not aware of IBIS/LSi communicating

9    anything about Hodell in writing prior to this day?

10   A.    Again, I can't say.

11   Q.    Okay.

12   A.    I don't have --

13   Q.    That's fine.  It's hard to remember everything in

14   the universe.  I mean, I get that.

15         I just want to know you're not aware of

16   anything ten years ago?

17   A.    Ten years ago.

18   Q.    And on the second page --

19   A.    Ten years ago, yes.

20   Q.    On the second page there's a reference to the

21   number of users, right?

22   A.    Second page of --

23   Q.    Second page of this.

24   A.    Of 40?

25   Q.    Yes, there should be a second page.  It's a

1   spreadsheet.  It's tiny.

2   A.   Okay.

3   Q.   Do you see it?

4   A.   I do see it.

16:00:56 5   Q.   Okay.  And if you look at Line 7, it just says SAP

6   licenses, 80, correct?

7   A.   That's correct.

8   Q.   And just like Exhibit 71, this Exhibit 40 doesn't

9   contain any other references with respect to Hodell's

16:01:14 10   specifics other than a user reference, right?

11   A.   I would have to say that's true.

12   Q.   Okay.  So look at 294.  It's in your binder.  294,

13   sir, if you go to the back, starts out as a note from Dan

14   Lowery to Ralf Mehnert-Meland at SAP, right?

16:01:47 15         Do you see that there?  All the way on the

16   last page.

17   A.   Okay.

18   Q.   And it says "You'll be receiving a call from Dale

19   Van Leeuwen this week to ask direction on SAP B1

16:02:03 20   performance issues."

21         Do you see that there?

22   A.   Okay.  Yeah.

23   Q.   Then it goes on and on.  And if you go ahead,

24   there's a quick thanks e-mail, but if you go to the

16:02:13 25   second page of this document at the bottom, you see

1    there's a Dale Van Leeuwen e-mail to Ralf Mehnert-Meland,

2    dated February 27th, '06?

3                    Second page.

4    A.    Okay.

16:02:26  5    Q.    Okay.  And then if you go to the next page, that's

6    the bulk of your e-mail to Ralf, the one that Lowery was

7    talking about was going to be coming, right?

8    A.    That's correct.

9    Q.    Okay.  So then look at the highlighted part.  You

16:02:40 10   report to Ralf Mehnert-Meland, "To assist you in

11   understanding the environment we are deploying in, I

12   provide the following:"  And there's a number of hardware

13   references, and the last highlighted item says, "The

14   database has approximately 150,000 SKUs, 20,000

16:02:57 15   customers, 7500 vendors."

16                    Do you see that there?

17   A.    That was in my e-mail to Ralf.

18   Q.    And that's my point.  This is the first time in

19   history that you've communicated those transaction

16:03:10 20   specifics to SAP, isn't it right?

21   A.    No.

22   Q.    You can't point to another document in the universe

23   that communicates these specifics from IBIS/LSi to SAP

24   prior to this date, right?

16:03:22 25   A.    That's because I don't have access to those

1       documents, that's correct.

2       Q.    But we've been litigating this case --

3       A.    I can't answer that.

4       Q.    Let's talk about that.  You were a Defendant in

16:03:31  5   this case, isn't that right, or IBIS was a Defendant in

6       this case, right?

7       A.    I believe that is correct.

8       Q.    Well --

9       A.    LSi was.

16:03:41 10   Q.    IBIS was actively defending this case for a period

11      of time, right?

12      A.    Okay.

13      Q.    And Hodell --

14      A.    I was not engaged -- I was not engaged or involved

16:03:51 15   in that so I really -- I really can't speak to that.

16      Q.    Well, you were one of the principals of IBIS,

17      correct?

18      A.    I -- I was not involved at all in any of the

19      litigation or anything to do with IBIS after I departed

16:04:06 20   from the organization.

21      Q.    You're aware that IBIS got sued by Hodell, right?

22      A.    I was -- I was made aware of that, that is correct.

23      Q.    Okay.

24      A.    But I had no part in any of the discovery or

16:04:20 25   anything like that.

| | | |
|---|---|---|
| | 1 | Q.    Well, you participated in a deposition, correct? |
| | 2 | We talked about that extensively, right? |
| | 3 | A.    Yes. |
| | 4 | Q.    Right? |
| 16:04:27 | 5 | A.    Yes. |
| | 6 | Q.    And you're aware IBIS is no longer defending this |
| | 7 | case, right? |
| | 8 | A.    I didn't know that until just now. |
| | 9 | Q.    Okay.  Well, you were aware then that Hodell sued |
| 16:04:36 | 10 | IBIS, right? |
| | 11 | A.    That they were included in the lawsuit, that is |
| | 12 | correct. |
| | 13 | Q.    Right.  So you were adverse to Hodell and its |
| | 14 | lawyers, right? |
| 16:04:46 | 15 | MR. LAMBERT:  Objection, Your Honor. |
| | 16 | THE COURT:  Objection sustained. |
| | 17 | A.    I never had any contact with them at all. |
| | 18 | Q.    Isn't it true -- |
| | 19 | A.    I had no contact. |
| 16:04:53 | 20 | Q.    -- that you've had contact with Hodell's lawyers in |
| | 21 | the last several months? |
| | 22 | A.    Just to -- just to testify. |
| | 23 | Q.    And you discussed with them the testimony that you |
| | 24 | provided earlier today, isn't that true? |
| 16:05:04 | 25 | A.    No. |

1    Q.    And you had a series of e-mails with them about

2    your testimony today, isn't that true?

3    A.    No.

4                MR. LAMBERT:  I'm going to object and ask

16:05:14  5    for the basis --

6    Q.    I don't have time to --

7    A.    Other than to ask me to testify, no.

8    Q.    Let's go back to 294.

9    A.    Okay.

16:05:34 10    Q.    Actually, no, let's keep moving.

11                Let's talk about your role in the project,

12    something you wanted to talk about.

13                The project started after the development

14    agreement was signed, right?  That was in December of

16:05:45 15    2004?

16    A.    That's correct.

17    Q.    Okay.  I'm going to try and do some quick math.  If

18    I told you that go-live was in March of 2007, would you

19    follow with me that that's 27 months, right?  That's all

16:05:57 20    of -- all of 2005, all of 2006, plus three months in

21    2007, 27 months, okay?

22    A.    Okay.

23    Q.    Fair enough?

24    A.    Yes.

16:06:10 25    Q.    You again were originally understood to be the

1    captain of the ship, right?

2    A.    That's correct.  Yes.

3    Q.    Okay.  And I do understand and I'm glad that this

4    has turned out much better for you, but I understand for

16:06:24 5    a period of time after the acquisition by LSi of IBIS,

6    you were very sick?

7    A.    Yes.  In January of 2005 I was diagnosed with Stage

8    4 cancer.

9    Q.    And I'm glad that you beat cancer, and that's

16:06:42 10   wonderful, but just to set the timeline for this jury,

11   January of '05 would have been right after the

12   development agreement got executed?

13   A.    That's correct.

14   Q.    And you were out after your diagnosis for, like, 11

16:06:56 15   months?

16   A.    That is correct.  Other than I was developing, I

17   was writing the development specs.

18   Q.    Right.  But you testified at your deposition that

19   you were basically down for 11 months, chemotherapy and

16:07:13 20   various other treatments, and you didn't come back until

21   the late fall, 2005, and even then it was in a very

22   limited capacity?

23   A.    That's correct.

24   Q.    Okay.

16:07:27 25   A.    Yeah, I needed to rebuild my body.  Absolutely.

1  Q.    Thank you.  And just a couple of months then after

2  you returned to the project in late 2005, you resigned

3  from IBIS/LSi, right?

4  A.    I resigned in May of 2006.

16:07:45  5  Q.    Right.  So if you returned in late 2005, five

6  months later, you resigned?

7  A.    That's correct.

8  Q.    And the go-live originally on this project was

9  supposed to be something like mid 2006, right?

16:08:06 10  A.    I -- I don't remember.  I'd have to go back to

11  documents.

12              I don't remember.

13  Q.    Well, let me ask you this:  You would agree that at

14  the time you left, the development of the In-Flight

16:08:17 15  Enterprise was still very much a work in progress?

16  A.    I would agree with that.

17  Q.    And that only 40% of the In-Flight Enterprise was

18  actually completed at that point?

19  A.    I don't know that I could give it a percentage.

16:08:35 20              I mean, I just -- I don't know what that

21  percentage would be.

22  Q.    Would you agree with me that if we went back to

23  your deposition that at Page 254 you testified that 40%

24  of In-Flight Enterprise was completed when you left?

16:08:47 25  A.    Okay.  If I said that, that sounds accurate.  Then,

1    yes.

2    Q.    After you left, you don't have any personal

3    knowledge about B1 or Hodell because you were gone?

4    A.    That's correct.

16:08:58 5    Q.    Okay.  And you don't have any knowledge of how B1

6    worked after go-live?

7    A.    That is correct.

8    Q.    And when you left in April of '06 or May of '06,

9    the problems to the extent they existed with the

16:09:13 10    solution, they were improving?

11    A.    I'm sorry?

12    Q.    They were improving?

13    A.    I would -- the IBIS development team was doing all

14    that they could to increase performance.  I know that SAP

16:09:28 15    was also working diligently on trying to improve the DI

16    API.

17              I don't know that the performance issues

18    were resolved at any level, but I know everybody

19    was -- had full effort on it.

16:09:44 20    Q.    Very simple question.  Didn't you testify that you

21    would describe the performance problems as being minor?

22              Actually let me just ask you this.  Go to

23    Page 256, please.  I think we can do this very quickly.

24    It's not a major point of contention.

16:09:58 25              At the bottom --

1    A.    Okay.

2    Q.    -- Line 23, Page 256.

3    A.    Okay.

4    Q.    "Question:  Would you describe the performance

16:10:09  5    problems that you were having at the time you left as

6    being minor?  Were they moderate?  Were they severe?

7            "Answer:  Oh, they were significant, but

8    again, with an ongoing communication with SAP and

9    assurances that releases and patches were -- we're seeing

16:10:24 10    significant improvement."

11            Do you see that there?

12    A.    Yes.

13    Q.    So when you left you were seeing significant

14    improvement?

16:10:30 15    A.    Okay.

16    Q.    I want to talk about these marketing materials from

17    SAP that you referenced.

18    A.    Yes.

19    Q.    Take a look at Exhibit 36.  I'm going to try and

16:10:44 20    move through this quickly.  You were shown a series of

21    marketing exhibits earlier today, right?

22    A.    Yes.

23    Q.    And one of them, it was Exhibits, I think, 35 and

24    36 and 38.  Do those numbers sound kind of familiar?

16:11:04 25    A.    I see -- yes.  Yes.

Q.    This is one of them anyway, right, 36?

A.    Yes.

Q.    Okay.

And if you look at that front page, you see there's a reference there to whether you have five employees or 500, right?

A.    Yes.

Q.    And your testimony today is that marketing materials, like Exhibit 36 and the statement within those marketing materials, were some of the things that convinced you that SAP Business One was good for up to 300 or 400 or 500 users and that SAP was marketing to that range, correct?

A.    That was one of the components, yes.

Q.    Got it.  But you realize that these marketing materials don't have a reference to users, correct?

A.    They're employees, that is correct.

Q.    Okay.  Let's go on, and you also testified that there were no alarms during the discovery period that B1 couldn't support Hodell's user count, right?

A.    There were no alarms, that is correct.

Q.    Okay.  Take a look at Exhibit 130.  Exhibit 130 -- well, go to the back of it first.

A.    Okay.

Q.    You see in the lower left-hand corner there's a

|   | |
|---|---|
| 1 | little piece of highlighting that says "SAP AG 2005"? |
| 2 | A.   What -- I'm sorry.  So which page are you on? |
| 3 | Q.   All the way to the back. |
| 4 | A.   All the way to the back. |
| 16:12:46 5 | Q.   Got a funny-looking complicated slide that says |
| 6 | demonstration on it? |
| 7 | A.   It's a graphic?  Yes. |
| 8 | Q.   Yeah, but if you look in the lower left-hand |
| 9 | corner, there's a copyright date. |
| 16:12:57 10 | Do you see it? |
| 11 | A.   Okay.  Yes. |
| 12 | Q.   Testing your eyes? |
| 13 | A.   2005. |
| 14 | Q.   Right.  Exactly.  And if you go back under the |
| 16:13:04 15 | front, you can see that this is a B1 presentation by Gadi |
| 16 | Shamia? |
| 17 | A.   Okay. |
| 18 | Q.   And I'll represent to you for the record that this |
| 19 | document was produced by LSi. |
| 16:13:23 20 | Fair enough? |
| 21 | Do you understand what I'm saying, that |
| 22 | this document was produced to us, to SAP during the |
| 23 | course of this litigation, by LSi? |
| 24 | Do you understand that? |
| 16:13:33 25 | MR. LAMBERT:  I'll object, Your Honor. |

1412

1    A.    Okay.

2              THE COURT:  Overruled.

3    A.    I mean, I don't know that.

4    Q.    That's fine.  I understand.

5              THE COURT:  That is true, isn't it?

6    Q.    But I'm representing to you that this came from

7    LSi --

8              THE COURT:  Excuse me.  Whoa.  Whoa.

9              That is true, isn't it?

16:13:48 10              MR. LAMBERT:  What?

11              THE COURT:  That is true, that's where the

12   document came from?

13              MR. LAMBERT:  Yes.

14              THE COURT:  All right.  Then why are we

16:13:54 15   fighting about it?

16   BY MR. MILLER:

17   Q.    I'm just trying to make the point, Mr. Van Leeuwen,

18   that this came from LSi.

19   A.    Okay.

16:14:00 20   Q.    I want you to go to Page -- I guess it's Page 3.

21   It's got a little pyramid on it or big pyramid.

22   A.    Page 3, got a pyramid.  Okay.

23   Q.    We see at the top it says, "SAP Business One is an

24   affordable integrated business management solution

16:14:20 25   designed specifically for small and mid size companies

 1    ten to 100 employees."

 2              You see that there, right?  It's up top.

 3    A.    Yes.  Yes.

 4    Q.    Okay.  And if you go two pages further in, there's

 5    a page that's got a title "Small business market."

 6              Do you see that there?

 7    A.    Page 10?

 8    Q.    Yep.  No.  No.  Two more pages in.  Two more pages

 9    past the pyramid.

10    A.    Okay.  Yes.

11    Q.    Says, "Small businesses" and then parenthetically

12    "One to 100 employees," right?

13    A.    Okay.  Yes.

14    Q.    And then it says -- and then it says Business One?

15    A.    Yes.  I see it.  I see that on these documents.

16    Yes, that is true.

17    Q.    You got to let me finish the question.

18              Then it says Business One Sweet Spot,

19    right?

20    A.    Yes.

21    Q.    Okay.

22              And again, if you were understanding that

23    Business One was actually being marketed for a range of

24    users in the 300 to 400 to 500 range --

25    A.    Yep.

1    Q.    -- this document, if you saw it before the B1 sale,

2    would have been a concern to you?

3    A.    It would have, yes.

4    Q.    And if this document was in LSi's files at the time

16:15:37  5    it was created in 2005, you would have had access to it,

6    correct?

7    A.    I -- I don't know that.

8    Q.    Well, you were the captain of the ship of this

9    project, right?

16:15:47  10    A.    Okay.  If it was in LSi's files, their headquarters

11    is down in St. Louis.  I have no idea whether or not this

12    document was up in the Chicago office or even if I was

13    back from being sick when this document came out.

14              I have no idea.

16:16:01  15    Q.    And your point is that LSi's offices are separate

16    from IBIS's offices, right?  That's one of the points you

17    just made?

18    A.    They are.  Yes.

19    Q.    IBIS's offices were in Illinois, right?

16:16:14  20    A.    That is correct.

21    Q.    And you worked out of IBIS's offices, right?

22    A.    In 2005, I was pretty much working outside of the

23    office.

24    Q.    Because of your illness?

16:16:25  25    A.    Because of my illness and then that I was out in

1       the field.

2       Q.   Okay.  You do realize that if Hodell was aware

3       before the license agreement in December of '05 that B1

4       was marketed to companies like this up to a hundred

16:16:42 5      employees, it's your understanding from your interactions

6       with Hodell that they would not have gone through with

7       the deal?

8       A.   I would say that that's true.

9       Q.   And you're not aware of anyone at IBIS or LSi ever

16:16:53 10     discussing this document, Exhibit 130, with Hodell?

11      A.   I am not.

12      Q.   Take a look, please, at 123.  Actually, you know

13      what?  Skip that.  Go to 294.

14                   We looked at that earlier.  This was the

16:17:17 15     document, sir, where you reported on February 27th, 2006,

16      the Hodell transaction volumes, correct, you reported

17      those to SAP?

18      A.   Yes.

19      Q.   Right?

16:17:31 20                   And if you go to the front, you see a

21      response from SAP, right?  It's just a couple days later?

22                   It's highlighted on the very front.  It's

23      March 1st, 2006.  It's from Eddy Neveux to Ralf Mehnert,

24      copy to you.

16:17:51 25     A.   Okay.  Yes.

1    Q.    And that's you right below the "to," line, right?

2    It says "MDVL," that's "@fastener-software.com," that's

3    you, right?

4    A.    Correct.

16:18:02  5    Q.    And he reports to you, "Dale, SAP is looking into

6    this issue.  We've had some reports of issues in

7    performance with large data sets in the SAP Business One

8    product."

9              You see that there, right?

16:18:14 10   A.    Yes.

11   Q.    So within three days of you giving the transaction

12   volumes to SAP on February 27th, '06, they write back to

13   you and make this statement, correct?

14   A.    Yes.

16:18:23 15   Q.    And you never passed this statement on to Hodell?

16   A.    That's because they were looking into the issue.

17   They said they were looking into the issue.  I didn't

18   have a definitive answer.

19   Q.    And it continues "Development is aware of this

16:18:38 20   issue and we are waiting to hear back on what is to be

21   done to resolve the issue.  The bad news is that we do

22   not have a time frame as to when these issues will be

23   resolved."

24             Do you see that there?

16:18:48 25   A.    Yes.

1    Q.    And you never reported any of this to Hodell,

2    correct?

3    A.    That's correct.

4    Q.    Okay.  Look at 121.  You were asked about these

16:19:07 5    notes in your deposition.  They're dated March 16th,

6    2006?

7    A.    Okay.  Yep.

8    Q.    Take a look at this report on the third page under

9    7.

16:19:40 10    A.    Okay.

11    Q.    You would agree that this reports, if you look at

12    the second paragraph, about a conference call that was

13    taken with SAP on March 15th, 2006, correct?

14    A.    I don't know what generated this report at all.  I

16:20:01 15    don't know.

16    Q.    You testified at your -- and forgive me.  I realize

17    it's been a long time, but you testified at your

18    deposition that you've seen these notes before, correct?

19                    Well, you've seen these notes before,

16:20:15 20    right?

21    A.    I'd have to go back and revisit them.

22    Q.    Do you remember a conference call with SAP on March

23    15th, 2006 about some response issues?  It's kind of

24    referenced in this Paragraph 7.

16:20:55 25    A.    Okay.  Yes.

1418

1    Q.    Okay.  Thank you.  And you would agree, this is SAP

2    telling you that Business One was never tested at

3    Hodell's transaction volumes?

4              You see the third paragraph, it says, "SAP

16:21:10  5    has satisfactory testing results using a test environment

6    of 16,000 BPs, 60,000 SKUs, 30 users and ten warehouses."

7              Do you see that there?

8    A.    Okay.  That just tells me that they're successful

9    at that level.  It doesn't tell me they were unsuccessful

16:21:27 10    at a higher level.

11    Q.    Okay.  But you're aware from reading that, those

12    numbers are lower than Hodell's volumes, correct?

13    A.    That is correct.

14    Q.    And that would have concerned you at the time?  In

16:21:36 15    fact you testified at your deposition that that concerned

16    you because SAP was reporting on testing, but the

17    reports -- the testing that SAP had done had been on

18    volumes that were much lower than Hodell?

19    A.    That is correct, but I --

16:21:51 20    Q.    Okay.  And also --

21    A.    I also had to rely on the second paragraph which

22    says that they were working on the solution.

23    Q.    Okay.  And then, therefore, you decided I'm not

24    telling Hodell about this because you never did tell

16:22:03 25    Hodell about this, right?

1419

1      A.     I would say that that is accurate.  We were -- we

2      were working on our development effort.  SAP was working

3      on performance.

4      Q.     Okay.  And you also agreed that Hodell, you also

16:22:20  5   agree that IBIS/LSi agreed that they would test the

6      system?  Look at the paragraph below.

7      A.     I would say that that's probably true, yes.

8      Q.     Let's go quickly through this.  The last paragraph

9      below the three highlighted ones, "IBIS/LSi will be

16:22:40 10   working closely with SAP, et cetera, et cetera."  Next

11     sentence, "At present, we are planning to stage a similar

12     test environment in the near future at Hodell-Natco with

13     the actual configuration that's in place for this

14     system."

16:22:51 15            Right?

16     A.     Correct.

17     Q.     So you're agreeing to test?

18     A.     Yes.

19     Q.     Okay.  And if you go, take a look very quickly at

16:23:01 20   889.

21     A.     889?

22     Q.     It's towards the back.  It's the last exhibit.

23            A FEMALE SPEAKER:  889 or 898?

24     Q.     You know what, I'm going to skip this.  Let's keep

16:23:21 25   moving because I know we're getting short on time.

1    You never -- leaving the exhibits aside,

2    you never forwarded to SAP the results of the tests that

3    were conducted after the March 15th, 2006 conference

4    call, right?

16:23:37 5    A.    I -- I did not personally, no.

6    Q.    Because you left right after that; you were gone by

7    May, '06?

8    A.    That is correct.

9    Q.    Okay.  And you're not a programmer, right?

16:23:49 10   A.    I can program in certain languages.  Not in SQL or

11   the language that Business One was in.

12   Q.    Here, let's be clear.  You've never written one

13   line of code for B1?

14   A.    Personally, no.  That is correct.

16:24:03 15   Q.    And you did not write the IFE code here either, did

16   you?

17   A.    That is correct.

18   Q.    And you testified at your deposition that you're

19   not qualified to analyze code, isn't that right?

16:24:17 20   A.    That is correct.

21   Q.    And you made a reference earlier in your testimony

22   that DI API, remember that?

23   A.    Yes.

24   Q.    And you talked about it, it's a pipe, right?

16:24:25 25   A.    That's correct.

1    Q.    But, really, that's metaphorical.  You're talking

2    about code, right?

3    A.    Nope.  I'm not.  I'm talking about data.

4    Q.    The pipe itself is not the data.  The pipe is what

16:24:36  5    the data transmits through, correct?

6    A.    Data passes through the pipe.

7    Q.    Correct.  And the pipe is created by writing code?

8    A.    The pipe was developed by SAP as part of the SDK.

9    Q.    Are you suggesting that the pipe is a piece of

16:24:52  10    pipe, or are you suggesting that the pipe is --

11    A.    No.

12    Q.    Excuse me.  Or are you suggesting that the pipe is

13    constructed by writing software code?

14    A.    SAP wrote software code and API to communicate data

16:25:14  15    between itself and Business One.

16    Q.    And that code that SAP wrote, that's the pipe?

17    A.    That's what we're referring to as a pipe.  That is

18    correct.

19    Q.    Okay.  And you're not qualified to analyze that

16:25:26  20    code, that pipe, because it's code, right?

21    A.    That is correct.

22    Q.    Thank you.  SAP, you testified already you think

23    SAP's an honest company, right?

24    A.    Yes.

16:25:40  25    Q.    And you testified --

1    A.    I do.

2    Q.    -- and you'd agree now and you would tell the jury,

3    everybody, including SAP on this project, expected it to

4    be a success?

16:25:52  5    A.    When it was sold, absolutely.

6    Q.    Thank you.

7    A.    Yes.

8    Q.    You talked about the Sweet Spot, remember that in

9    your direct testimony?

16:26:06  10    A.    Okay.

11    Q.    That's a marketing term, right?

12    A.    Yes.

13    Q.    Not a software term?

14    A.    Correct.

16:26:14  15    Q.    And you testified about Exhibit 178.  Remember 178?

16    You have to look at the binder that you got from Hodell.

17    A.    I got it.

18    Q.    This is the one that was not directed to you but it

19    had kind of a couple of pages of attachments and kind of

16:26:37  20    like a chart format?

21    A.    Yes.

22    Q.    These are promotional materials, right?

23    A.    That is correct.  This was reported to SAP.

24    Q.    Right.  These were prepared after the Hodell sale,

16:26:50  25    right?

```
            1    A.     That's correct.

            2    Q.     And they were communicating to others things about

            3    this Hodell sale, correct?

            4    A.     That's correct.

16:27:01    5    Q.     And the only thing that they referenced was the 120

            6    users, correct?  They didn't reference the 300 or 400 or

            7    500 users that you talked about today at various points,

            8    right?

            9    A.     That is correct.

16:27:18   10                   MR. MILLER:  Just one moment, Your Honor.

           11                   (Pause).

           12                   Forgive me, Your Honor.  I'm just trying

           13    to --

           14                   THE COURT:  That's all right.

16:28:10   15                   MR. MILLER:  -- move through this.

           16                   THE WITNESS:  Three minutes and I'm done.

           17                   MR. MILLER:  Your Honor, I have no further

           18    questions.

           19                   THE COURT:  Thank you.

16:28:48   20                   Any redirect?

           21                   MR. MILLER:  I had more questions, but I

           22    mean, I'm --

           23                   THE COURT:  You're out of time.

           24                   MR. MILLER:  Pretty much.

16:29:02   25                   THE COURT:  Okay.
```

 1          MR. MILLER:  I mean, I have more questions

 2     right in front of me.  I'm just cutting things short.

 3          THE COURT:  That's all right because you

 4     got about one minute to go.

16:29:11  5          MR. MILLER:  All right.  I'll ask a quick

 6     question.

 7     BY MR. MILLER:

 8     Q.    You testified, sir, that prior to the sale, that

 9     there was a discovery process.

16:29:23 10          Do you remember that?

11     A.    Yes.

12     Q.    And it would be during the discovery process that

13     you would collect the customer's requirements and

14     specifics.  Here that would be Hodell?

16:29:36 15     A.    That is -- that is a traditional discovery, right,

16     where you go in and you do that discovery.

17     Q.    And you would agree that the details you collected

18     during this discovery process about Hodell, you didn't

19     pass those on to SAP because there was no need to drill

16:29:52 20     down like that?

21     A.    At the point where I was communicating with SAP

22     about the sale itself, there were points where we didn't

23     disclose the name because it was an opportunity.  We

24     hadn't solidified certain aspects of the relationship.

16:30:15 25     Ultimately as soon as that was done, it was communicated

1425

1    to them it was Hodell.

2              And as we moved forward through the sales

3    process, SAP was fully aware of Hodell-Natco's working

4    environment.

16:30:28  5    Q.    You say that now, but when you had your deposition

6    taken, you testified differently, didn't you?  And it was

7    that the details collected were not passed along, and in

8    part because there was no need to drill down.

9              Right?

16:30:49 10    A.    Again, initially they were not.  They were

11    ultimately -- all of the detail, I mean that's shown in

12    all these documents we're sharing information as -- as it

13    was appropriate with SAP.

14    Q.    Well, the first document --

16:31:01 15              THE COURT:  Again, this is your last

16    question.

17              MR. MILLER:  Thank you.

18    BY MR. MILLER:

19    Q.    The first document, the only document, that you can

16:31:08 20    refer to where the details of Hodell's specifics and

21    their transaction volumes was communicated to SAP was

22    Exhibit 294, and Exhibit 294 was after the license

23    agreement sale because 294 was dated February 27th, 2006.

24              Isn't that right, yes or no?

16:31:28 25    A.    That's the only -- that's the only document that

1    I've seen in all this.

2    Q.    Thank you.

3    A.    There were conversations that were had, absolutely.

4              MR. MILLER:  Your Honor.

16:31:37 5              THE COURT:  Thank you.

6              MR. MILLER:  Thank you very much.  I think

7    we've heard about all your supposed conversations.

8              MR. LAMBERT:  We move to strike that.

9              THE COURT:  You can.

16:31:48 10              MR. MILLER:  Thank you, Your Honor.

11              THE COURT:  Okay, folks, that will conclude

12    our testimony for today.

13              Thank you so much for your patience.

14              See you bright and early.  We'll start at

16:31:55 15    the normal time.  Meet at 8:15 where, Mr. Panigutti?

16              A JUROR:  L-1.

17              THE COURT:  Okay.  We'll see you then.

18              Keep in mind the admonitions.

19              (Jury out)

16:32:12 20              (Proceedings adjourned at 4:32 p.m.)

21                   - - - - -

22

23

24

25

1427

1    C E R T I F I C A T E

2         I certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.

5

6

7

8    **/s/Susan Trischan**

9    /S/ Susan Trischan, Official Court Reporter

10   Certified Realtime Reporter

11

12   7-189 U.S. Court House

13   801 West Superior Avenue

14   Cleveland, Ohio 44113

15   (216) 357-7087

16

17

18

19

20

21

22

23

24

25

1428

1      **I N D E X**

2

3      <u>**WITNESSES**</u>:                                                  <u>**PAGE**</u>

4        DIRECT EXAMINATION OF DALE VAN LEEUWEN              1260

5        BY MR. LAMBERT

6        CROSS-EXAMINATION OF DALE VAN LEEUWEN              1311

7        BY MR. MILLER

8

9                                    *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25