1      IN THE DISTRICT COURT OF THE UNITED STATES
           FOR THE NORTHERN DISTRICT OF OHIO
2                     EASTERN DIVISION

3

HODELL-NATCO INDUSTRIES, INC.,
4                                    08CV2755
           Plaintiff,
5
      vs.                          June 23, 2015
6                                  8:30 A.M.

7   SAP AMERICA, INC., ET AL.,
                                   Volume 7
8           Defendants.

9


10
           TRANSCRIPT OF JURY TRIAL PROCEEDINGS
11      BEFORE THE HONORABLE DONALD C. NUGENT
           UNITED STATES DISTRICT JUDGE
12                   AND A JURY

13

14

15

16

17

18

19

20

21

22

23

24

25

1430

1   APPEARANCES:

2

3   For the Plaintiff:         Christopher J. Carney, Esq.
                               Sharon A. Luarde, Esq.
                               P. Wesley Lambert, Esq.
4                              Brouse McDowell
                               600 Superior Avenue East
5                              Suite 1600
                               Cleveland, Ohio    44114
6                              216-830-6830

7

8   For the Defendants:        Gregory J. Star, Esq.
                               Michael John Miller, Esq.
                               Joseph M. Kelleher, Esq.
9                              Alex H. Hayden, Esq.
                               Drinker Biddle & Reath
10                             One Logan Square
                               18th & Cherry Streets
11                             Philadelphia, PA    19103
                               215-988-2734

12

13

14

15  Official Court Reporter:   Susan K. Trischan, RMR,CRR,FCRR
                               7-189 U.S. Court House
                               801 West Superior Avenue
16                             Cleveland, Ohio  44113
                               216-357-7087

17

18  Proceedings recorded by mechanical stenography;
    transcript produced by computer-aided transcription.
19

20

21

22

23

24

25

```
 1
 2                    TUESDAY, JUNE 23, 2015,  8:35 A.M.
 3                         THE COURT:  Good morning, ladies and
 4        gentlemen.
08:35:17 5               THE JURORS:  Good morning.
 6                         THE COURT:  No problem with all that rain,
 7        huh?
 8                         A JUROR:  Yeah.
 9                         THE COURT:  Have a seat.
08:35:23 10              At least nobody slept all night, did they?
11        I didn't think so.
12                         Okay.  You may call your next witness.
13                         MR. STAR:  Your Honor, we had a brief
14        preliminary matter.  May we approach?
08:35:33 15              THE COURT:  Okay.
16                         (Side-bar conference had off the record).
17                         THE COURT:  All right.  David, we're ready.
18                         Sir, can you hear me?  Apparently not.
19                         A MALE SPEAKER:  Yes, we can.  We do not
08:37:26 20      have video.
21                         THE COURT:  Say that again.
22                         A MALE SPEAKER:  I said yes, we can hear
23        you, but we do not see video from you.
24                         There it is.
08:37:35 25              THE COURT:  There it is?  All right.
```

 1          Can the witness raise his right hand?

 2                        GEOFFREY ASHLEY

 3      of lawful age, a witness called by the PLAINTIFFS,

 4             being first duly sworn, was examined

08:37:49  5                and testified as follows:

 6                THE COURT:  Thank you.

 7                Could you tell us your full name and spell

 8   your last name for us?

 9                THE WITNESS:  Geoffrey Paul Ashley,

08:37:59 10   A-S-H-L-E-Y.

11                THE COURT:  Thank you.

12            DIRECT EXAMINATION OF GEOFFREY ASHLEY

13   BY MS. LUARDE:

14   Q.    Good morning, Mr. Ashley.

08:38:06 15                Can you hear me okay?

16   A.    Yes.

17   Q.    My name is Sharon Luarde, and I represent

18   Hodell-Natco.

19                I don't think we've met before.  Have we?

08:38:15 20   A.    We have not, to my knowledge.

21   Q.    Mr. Ashley, you are a former SAP employee, is that

22   correct?

23   A.    That is correct.

24   Q.    And you are currently represented by SAP's counsel

08:38:29 25   in this matter, is that correct?

```
 1            A.    That's correct.
 2            Q.    And could you tell me, Mr. Ashley, who is in the
 3       room with you today?
 4            A.    There --
08:38:52 5                 A MALE SPEAKER:  Paul Guest.  I'm an
 6       employee with the United States District Court, Western
 7       District.
 8            Q.    Thank you.  Mr. Ashley, are any of your attorneys
 9       in the room with you today?
08:39:03 10           A.    No.
11            Q.    Mr. Ashley, could you tell me where you reside?
12            A.    I reside in Bedford, New Hampshire.
13            Q.    And how long have you lived there?
14            A.    About nine years, I guess.  Nine, going on ten.
08:39:22 15           Q.    Okay.  Thank you.
16                 And where do you currently work,
17       Mr. Ashley?
18            A.    Self-employed.
19            Q.    I'm sorry?  I couldn't hear that.
08:39:32 20           A.    Self-employed, sole proprietor.
21            Q.    Thank you.  And what do you do?
22            A.    I consult with mostly computer publishers,
23       partners, technology-related software firms.
24            Q.    And do you currently consult with SAP?
08:39:51 25           A.    No, not currently.
```

1    Q.    Have you in the last nine years?

2    A.    No.

3    Q.    And when did you begin your employment with SAP?

4    A.    About, if I remember correctly now, about 2004, I

08:40:14  5    think.

6    Q.    And you left in 2011, is that correct?

7    A.    That's correct.

8    Q.    And could you tell me what your title was when you

9    were hired by SAP?

08:40:26 10    A.    Director of sales for North America Business One.

11    Q.    And Business One, in fact, was the product that you

12    were responsible for, correct?

13    A.    That is correct.

14    Q.    And in that role, you were required to manage all

08:40:42 15    of SAP's channel partners, correct?

16    A.    From the standpoint of sales and marketing and

17    pre-sales, that's correct.

18    Q.    Okay.  And we refer to them as channel partners.

19            Does that sound right to you?

08:41:00 20    A.    That's fine.  Yes.

21    Q.    Okay.  And you mean companies like LSi, is that

22    right?

23    A.    That's correct.

24    Q.    And you held that role until 2008, is that correct?

08:41:15 25    A.    Yes, I think.

1       Q.    Okay.  And you moved to a different position at

2       SAP, right?

3       A.    That is correct.  I was still with SAP after I left

4       the Business One role.

08:41:25  5     Q.    And what role did you move to after you left the

6       Business One role?

7       A.    I was the director of business development for the

8       All-In-One product for North America.

9       Q.    Okay.  Thank you.

08:41:41 10           Mr. Ashley, I'd like to talk to you a

11      little bit about events that occurred after you left SAP

12      and after you left your employment.

13            Do you recall having communications with

14      Mr. Killingsworth via e-mail?

08:41:57 15           MR. STAR:  Objection.  Relevance.

16            THE COURT:  What is the relevance?

17      A.    Sure.  Yes.

18            MS. LUARDE:  Yes.  Your Honor, they had

19      discussions regarding the failure of the Hodell-Natco

08:42:09 20     implementation.  That's directly relevant to the material

21      issues in this case, including SAP's representations or

22      lack of representations to Hodell-Natco.

23            THE COURT:  Okay.  Objection sustained.

24            Ask him about what he did during the time

08:42:23 25     in question.

```
 1    BY MS. LUARDE:

 2    Q.    Mr. Ashley, you are aware of what's called an SAP

 3    partner portal, is that correct?

 4    A.    I'm sorry.  You broke up.  SAP?

 5    Q.    Partner portal.

 6    A.    Yes.  Yes, I am.

 7    Q.    And this portal contains different sections for

 8    marketing information, is that right?

 9    A.    It does.

10    Q.    And could you tell me, does that contain templates

11    to be used by channel partners?

12    A.    Sure.  There are some templates.

13    Q.    Okay.  Mr. Ashley, I'd like to put in front of you

14    Exhibit 134.  And I'd like the court reporter there to

15    hand you Exhibit 134.

16    A.    Okay.

17    Q.    And you're familiar with this document, Mr. Ashley,

18    is that correct?

19    A.    Well, I was at the time, yes.

20    Q.    And could you tell me what this document is?

21    A.    This one is, we had something called an MDF,

22    marketing development fund.  It was -- it was actually

23    administered by the SAP marketing department, and this

24    was the guide that gave the partners the rules,

25    regulations, what was eligible, what was not, how to
```

1    submit for funding and reimbursement, things like that.

2    Q.    Okay.  So this would have been used by LSi, for

3    example, correct?

4                    MR. STAR:  Objection.

08:44:40 5    A.    Yes.

6                    THE COURT:  Overruled.

7    Q.    And if you could turn to Page 134.4 of that

8    document, and I think you'll see the numbers at the

9    bottom right-hand of the page.

08:44:53 10                   Do you see that?

11   A.    Okay.  134.4.  Okay.

12   Q.    And under the top of this page, you'll see

13   introduction, and it states, "The SAP business partner

14   program was created to ensure maximum market penetration

08:45:08 15   for SAP and our partners."

16                   Do you see that?

17   A.    Yes.

18   Q.    And you agree that that's correct, right?

19   A.    Yes.  That's what it says.

08:45:21 20   Q.    And the partners, Mr. Ashley, in fact, are the

21   Business One sales force for SAP, is that right?

22   A.    The part -- well, that would be one of the

23   audiences for it, correct.

24   Q.    One of the audiences for this document, is that

08:45:43 25   what you mean?

1438

1    A.    Yes.

2    Q.    But the channel partners themselves are the only

3    sales force for SAP Business One, is that correct?

4    A.    That was correct -- is correct.

08:46:03  5    Q.    And you would agree that this program was designed

6    to provide partners with the tools for generating market

7    awareness and leads for SAP Business One, correct?

8    A.    Correct.

9    Q.    And this program also provides financial support to

08:46:21  10    channel partners, correct?

11    A.    You'd have to further define what you mean by

12    "Financial support."

13    Q.    Sure.  If you'd look at Page 134.4.

14    A.    Okay.

08:46:35  15    Q.    And it talks about co-op marketing funds and you'll

16    see it states underneath that, "Co-op marketing funds are

17    monies designated for use by SAP Business One partners."

18         Do you see that?

19    A.    Correct.  Yes.

08:46:51  20    Q.    So that's a form of financial support for Business

21    One partners, correct?

22    A.    That's correct.  It was a reimbursement based on

23    monies already spent.

24    Q.    Okay.  And you would agree that partners are

08:47:08  25    encouraged to leverage the SAP brand, is that correct?

         1    A.    That was correct.

         2    Q.    And if you'd look at Page 134.4 underneath the

         3    heading, "Leveraging the SAP brand," there's an SAP

         4    business partner logo that channel partners were, in

08:47:29 5    fact, encouraged to use, is that correct?

         6    A.    They were authorized to use, that is correct.

         7    Q.    In fact, they were encouraged.  Right above that

         8    states "We encourage you to leverage that brand for name

         9    recognition, quality standards, and general market

08:47:46 10   awareness."

         11               Right?

         12   A.    Yes.

         13   Q.    So you wanted channel partners to use SAP logos,

         14   correct?

08:48:00 15   A.    Yes.

         16   Q.    And you wanted them, in fact, to leverage the SAP

         17   brand for the mutual benefit of both the channel partners

         18   and SAP, correct?

         19   A.    Correct.

08:48:19 20   Q.    And you would agree that partners were encouraged

         21   to use the SAP Business One templates for press releases

         22   to announce their partnership with SAP, is that right?

         23   A.    That's correct.

         24   Q.    And if you'd turn to Page 8 of this same document.

08:48:53 25   A.    Okay.

1  Q.    You'll note that the partner must have this

2  activity, certain activities approved by SAP, is that

3  correct?

4  A.    That is correct.

08:49:11  5  Q.    Would you agree that channel partners were

6  encouraged by SAP to attend trade shows?

7  A.    Yes.

8  Q.    And that was done because trade shows allowed

9  channel partners to actually demonstrate the Business One

08:49:31  10  solution, is that right?

11  A.    That would be one of the reasons, sure.

12  Q.    What would be another reason?

13  A.    Well, you have to think about if you are going to a

14  trade show as a person attending that trade show, you're

08:49:52  15  already pre-selecting yourself for a certain type of a

16  solution.

17              So in other words, more qualified prospects

18  would be at a trade show than just randomly sending out

19  e-mails asking "Are you interested."

08:50:08  20  Q.    Because in theory, you would only go to a trade

21  show if you were interested in what was at the trade

22  show, is that what you're stating?

23  A.    At least -- correct.  At least that industry.

24  They're usually industry-specific.

08:50:21  25  Q.    Okay.  And are -- when channel partners telemarket

1  and they use SAP Business One as part of their script,

2  does SAP have to approve that script?

3  A.   If they want to be reimbursed for any of the

4  expenses incurred, then SAP had to pre-approve it.

08:50:50  5        They weren't -- theoretically, SAP had to

6  pre-approve anything that was being said, but that wasn't

7  always done.

8  Q.   Okay.  And, in fact, if you'd turn to Page 134.14

9  of the document in front of you.

08:51:14 10  A.   Yes.

11  Q.   It states that, "Telemarketing to a targeted

12  audience can be an excellent method of follow-up or

13  promotion to potential or existing customers."

14        Correct?

08:51:23 15  A.   Correct.

16  Q.   And below, I think it talks about the telemarketing

17  script must include SAP Business One as part of the

18  overall solution, right?

19  A.   To get reimbursed, correct.

08:51:35 20  Q.   Correct.  And that SAP has to approve the script,

21  which we just discussed, correct?

22  A.   Yes.

23  Q.   And you would agree with me that SAP did not

24  communicate directly with customers or end users, and

08:51:54 25  instead it was the partners' responsibility to handle

1    those communications?

2    A.    That is correct.

3    Q.    And you would agree that SAP, from a marketing

4    standpoint, marketed Business One to growing companies,

08:52:10 5    is that correct?

6    A.    That is correct.

7    Q.    In fact, you would agree that SAP marketed to

8    growing companies and represented that they can grow with

9    Business One, is that correct?

08:52:28 10   A.    That is correct.

11   Q.    And you would agree that SAP marketed the Business

12   One product whether there were five employees or 500, and

13   SAP Business One helps emerging businesses streamline

14   their operational and managerial processes, is that

08:52:50 15   right?

16   A.    I don't know if that was an SAP -- I don't remember

17   if that was an SAP actual line or not.

18   Q.    The five or 500 employees?

19   A.    That whole, that whole sentence, that whole

08:53:07 20   sentence I don't remember.

21   Q.    Okay.  Do you recall that your deposition was taken

22   in this case, Mr. Ashley?

23   A.    Do I recall when?

24   Q.    No, do you recall that your deposition was taken?

08:53:18 25   A.    Yes.  Yes.

```
 1    Q.    And that was March 16th, 2012.  Do you recall --

 2    A.    Yes.

 3    Q.    -- about that time frame?

 4    A.    Yes.

 5    Q.    And I would ask the court reporter to put a copy of

 6    your deposition in front of you.

 7                 If you could turn to Page 239, Mr. Ashley.

 8    I don't know if she put the deposition in front of you

 9    yet.

10                 A FEMALE SPEAKER:  The deposition -- the

11    deposition is in a binder, and the binder includes

12    exhibits.

13                 MS. LUARDE:  Yes, it's in the binder.  Oh,

14    it's in the box, I think, actually.

15                 A FEMALE SPEAKER:  Right.  It includes

16    Exhibits 172 to 181 at the back of it.

17                 Is that all right to go ahead and give him

18    the inclusive binder?

19                 MS. LUARDE:  That's fine.

20                 A FEMALE SPEAKER:  With all the exhibits in

21    there.  Okay.  I just wanted to make sure that was right.

22                 There you go.

23                 THE WITNESS:  Okay.

24    A.    And I forgot.  What page?

25    Q.    Sure.  239.
```

08:53:29  (line 5)
08:53:53  (line 10)
08:54:06  (line 15)
08:54:16  (line 20)
08:54:25  (line 25)

1444

1   A.     Okay.

2   Q.     And you'll see, if you look at -- and just to

3   refresh your recollection, Mr. Ashley, you were asked on

4   239, 19, the question was, "Would you agree that SAP

08:54:56 5   marketed the Business One product whether you had five

6   employees or 500, SAP Business One helps emerging

7   businesses streamline their operational and managerial

8   processes"?

9              And you see beneath that, Mr. Ashley, what

08:55:11 10   is it that you state?

11             MR. STAR:  Just objection.  She's going to

12   refresh.  She doesn't need to --

13   A.     "Yes, that's how it's marketed."

14             THE COURT:  Overruled.

08:55:19 15   Q.     Thank you, Mr. Ashley.

16             Mr. Ashley, you were involved with Hodell

17   while you were the director of channel sales for SAP, is

18   that correct?

19   A.     Yes, it depends on what you mean by involved, but

08:55:40 20   yes.

21   Q.     Sure.  You had some involvement with the sale of

22   Business One to Hodell by LSi, is that correct?

23   A.     That is not correct.

24   Q.     You were not involved at all with the sale of

08:55:52 25   Business One to Hodell, is that your testimony?

```
         1    A.     Not that I -- that is correct, not that I remember.

         2                  I don't -- I don't remember having a single

         3    conversation with Hodell-Natco prior to their purchase of

         4    the software.

08:56:04 5    Q.     Well, that's because SAP relies on the channel

         6    partners to do that work, is that correct?

         7    A.     That is correct.

         8    Q.     But, you were, in fact, updated by LSi on the

         9    status of the sale to Hodell, is that correct?

08:56:24 10   A.     At the very end, that would be correct.

         11   Q.     When you say, "At the very end," what time period

         12   are you referring to?

         13   A.     Probably within, give or take, sixty days of when

         14   they decided to purchase.

08:56:42 15   Q.     How long -- you were only employed a couple of

         16   months before Hodell decided to purchase, is that

         17   correct?

         18                  MR. STAR:  Objection.  Leading.

         19                  THE COURT:  Overruled.

08:56:50 20   A.     No, actually I was --

         21   Q.     You can answer.

         22   A.     We were able to determine later that I had dates

         23   wrong during my deposition.  I was actually there for

         24   just about a year before they bought.

08:57:10 25   Q.     Mr. Ashley, was it your routine to be updated
```

1446

1    weekly by partners about forecasts, their sales

2    forecasts?

3    A.    Yes.

4    Q.    And at the time, prior to Hodell being sold, they

08:57:22 5    represented a very large opportunity for SAP, is that

6    correct?

7    A.    That is correct.

8    Q.    I'd like you to turn to Exhibit 176.

9    A.    Is that in here?  Okay.

08:57:50 10   Q.    And you would agree, Mr. Ashley, this is a document

11   from you, dated December 22nd, 2005, to various people

12   internally at SAP, is that -- is that an accurate

13   representation?

14   A.    That's correct.

08:58:09 15   Q.    And the subject line of this, you would agree, is

16   "December 23rd goal, more than an idea," is that right?

17   A.    Yes.

18   Q.    And, in fact, you were encouraging sales in this

19   document, is that right?

08:58:25 20   A.    That's correct.

21   Q.    And you had sales goals, in fact, for Business One,

22   correct?

23   A.    Correct.

24   Q.    And you would agree with me that in Paragraph 1 of

08:58:37 25   this document, you're actually, you know, pushing your

1    team when you write, "While we still have time to reach

2    the goal, it will take a very concerted effort by each

3    member of the team and a decision to drive each of the

4    partners to meet their commitments."

08:58:54 5                    Is that correct?

6    A.    That is correct.

7    Q.    And the partners you're referring to are partners

8    like LSi, correct?

9    A.    Yes.

08:59:04 10   Q.    So you internally at SAP are pushing channel

11   partners to make sales, correct?

12   A.    I'm pushing channel managers to work with their

13   channel partners to get sales, that's correct.

14   Q.    Okay.  And you'll see further down in the second

08:59:28 15   paragraph, you state, "We have kept our eyes focused on

16   the goal through product-related issues that could have

17   distracted us and derailed our plans."

18                    Do you see that?

19   A.    Not in the second paragraph.

08:59:43 20   Q.    It's about four lines down in actually the

21   paragraph underneath John Luther's quote?

22   A.    Oh, okay.  Sorry.  I was looking at the wrong

23   paragraph.

24                    Yes.

09:00:01 25   Q.    And the product-related issues you're referring to

1    would be issues related to Business One, is that correct?

2    A.    Yes.

3    Q.    And further down in this paragraph, you write, "We

4    have overcome all of these obstacles and we enter this

09:00:19 5    final phase with even greater visibility to our partner's

6    business," and you're referring to overcoming obstacles,

7    personal obstacles as well as obstacles related to the

8    product, is that right?

9    A.    Yes.

09:00:34 10   Q.    And again down in the last paragraph, you have in

11   bold, "We want and need to have each and every partner

12   produce something in the fourth quarter."

13          And you're again referring to channel

14   partners like LSi producing something in the fourth

09:00:50 15   quarter, is that correct?

16   A.    Yes.

17   Q.    And you again are encouraging sales, "It is a time

18   to remind every partner of this goal and to work with

19   every partner to meet this goal," is that correct?

09:01:07 20   A.    Yes.

21   Q.    And on the second page of this document, you'll see

22   at the bottom of the second paragraph, you state, "LSi

23   should be sending in the Hodell-Natco order today which

24   will be the largest deal closed this quarter and possibly

09:01:30 25   this year.  Way to go, Ted, and way to go, LSi."

1449

 1              Do you see that?

 2    A.    Yes.

 3    Q.    And that was accurate, right, that LSi was the

 4    largest deal that quarter and possibly of the year?

09:01:45  5    A.    Yeah, as far as I know at the time.

 6    Q.    Okay.  And further down -- skip that.

 7              If we could turn to Exhibit 177.

 8    A.    Okay.

 9    Q.    And you would agree, Mr. Ashley, this is an e-mail

09:02:24 10    from you to Michael Sotnick.

11              And who is Michael Sotnick?

12    A.    Michael Sotnick was my boss' boss, so he was in

13    charge of all channel-related sales in North America for

14    the Business One and the business All-In-One products.

09:02:44 15    Q.    And the date of this is January 2nd, 2006, correct?

16    A.    That's correct.

17    Q.    And just so we're clear on the hierarchy, you

18    actually reported to Dan Kraus, is that correct?

19    A.    That's correct.

09:02:56 20    Q.    Okay.  Under the first heading, "Q4 Wins," this is

21    in reference to Hodell-Natco, is that right?

22    A.    That's correct.

23    Q.    And it was the first point, and you're talking

24    about closing the first six-figure opportunity, is that

09:03:18 25    correct?

1    A.    Yes.

2    Q.    And you're referring to the first six-figure sale

3    of Business One for the quarter or in the United States?

4    A.    It doesn't say here.

09:03:34    5          It's probably for the quarter, because it

6    says "Q4 Summary" as part of the summary, so at least for

7    the quarter ending December 31st, 2005.

8    Q.    And this was a big deal for SAP, and, in fact, you

9    write, "This was an important win not only for its size,

09:03:52  10    but also for the fact that this is the first of what we

11    hope will be many new customers in the fastener

12    microvertical."

13          Is that right?

14    A.    Yes.

09:04:03  15    Q.    So this was important to SAP, correct?

16    A.    Yes.

17    Q.    And, in fact, you state in the next line, could you

18    read the next sentence for us, please, starting with

19    "LSi"?

09:04:22  20    A.    "LSi has created a Business One vertical solution

21    specific to this industry and we are looking to

22    Hodell-Natco to be our first happy referenceable customer

23    within this space."

24    Q.    And, in fact, you wanted to use Hodell-Natco as a

09:04:36  25    reference in order to encourage others within the

```
          1    fastener industry to purchase SAP Business One as well as

          2    the In-Flight program, correct?

          3    A.     Yes.

          4    Q.     And under challenges, the first bullet point, you

09:05:03  5    state, "Q4 Challenges."  The very first sentence under

          6    challenges, "The first and most obvious challenge we

          7    faced in Q4 was the issue surrounding the product."

          8           And again you're referring to issues

          9    surrounding Business One, correct?

09:05:23 10    A.     That's correct.

         11    Q.     And you go on to state, "We were forced to deliver

         12    a series of conference calls to our entire channel in

         13    which we notified our partners of significant issues with

         14    the product."

09:05:36 15           Correct?

         16    A.     Yes.

         17    Q.     And then you go on to write, "This could have been

         18    disastrous for the team if the business partners were

         19    allowed to get distracted with the negative noise

09:05:52 20    surrounding some failed B1 implementations."

         21           Do you see that?

         22    A.     Yes.

         23    Q.     So at this point in time, you're referencing some

         24    failed Business One implementations, correct?

09:06:01 25           MR. STAR:  Objection.  Relevance.
```

```
 1              THE COURT:  Overruled.

 2     Q.    You can answer.

 3     A.    Okay.

 4     Q.    It was yes or no.  You're referencing failed

 5     Business One implementations in this sentence?

 6     A.    I'm distracted by the negative noise

 7     surrounding -- yeah, I don't remember if it's about a

 8     specific failed implementation or the fact we could have

 9     and it would distract people and we didn't want them

10     getting distracted from selling.

11     Q.    Right, because you wanted to sell Business One and

12     make money for SAP as well as the channel partners,

13     correct?

14     A.    Yes.

15     Q.    Okay.  And again, on the next page, under Q4

16     successes on Page 177.2.

17     A.    Okay.

18     Q.    You write, "The most significant success in Q4 was

19     the amazing way in which the entire Business One team

20     responded to the product quality issues."

21              And again, you are referring to product

22     quality issues with regard to Business One, is that

23     right?

24     A.    Yes.

25     Q.    So you agree with me at least a couple of times in
```

1    this document you're referring to product quality issues

2    with Business One, correct?

3    A.    Yes.

4    Q.    And this is January 2nd, 2006 is the date of

09:07:37 5    this --

6    A.    Yes.

7    Q.    -- memo?

8    A.    Yes.

9    Q.    Could you turn to Exhibit 178, Mr. Ashley?

09:07:56 10    A.    Okay.

11    Q.    And you would agree that this is an e-mail from you

12    to Volney Spaulding, and you're copying Michael Sotnick,

13    is that correct?

14    A.    Um-hmm.  That's correct.

09:08:11 15    Q.    And in this e-mail, would you agree that you're

16    referencing Hodell-Natco as being a high profile account?

17    A.    I don't know whether it says it here so I don't

18    know that I can say that specifically about them.

19    Q.    Well, you know what might help you out,

09:08:35 20    Mr. Ashley --

21    A.    No, it says Lowery.  It is, yes.

22    Q.    So this just confirms that Hodell-Natco was in fact

23    a high profile account for SAP, correct?

24    A.    Yes.

09:08:46 25    Q.    And if you'd turn to the next page, you'll see an

1454

1     attachment, 178.2.

2                      And have you seen this before?

3     A.    Maybe.  I don't know.  It's so long ago.

4     Q.    Yeah, no, I understand.

09:09:05  5                      This was attached to this particular

6     e-mail, Mr. Ashley, that you forwarded on?

7     A.    Yes.

8     Q.    And this, in fact, represents -- could you tell me

9     what this is, Mr. Ashley?

09:09:27 10    A.    We did a, I don't know what you call it, we did a

11    debrief, I guess, at the end of quarters where we would

12    take organizations where we had significant wins and we

13    would document what were the challenges we overcame, what

14    was the competitive nature of the sale, et cetera.

09:09:44 15                     Basically we used this information to help

16    our sales team and our partners become better at selling

17    within certain industries, certain challenges, things

18    like that.

19    Q.    Okay.

09:09:57 20    A.    So we called it, we called it win-loss analysis.

21    Q.    And Hodell-Natco, based on this, would be

22    classified as a win, is that what you're stating?

23    A.    That is correct.

24    Q.    And you'll see in this document it references,

09:10:13 25    underneath organization size and industry information,

1455

1    that there would be 120 SAP Business One users, do you

2    see that?

3    A.    Yes.

4    Q.    And you would also see "Why SAP" further down?

5    "It's written the reputation and financial resources of

6    SAP combined with the industry-specific expertise of

7    LSi/IBIS and its In-Flight add-on made the solution a

8    strategic fit."

9             Do you see that?

10   A.    I do.

11   Q.    And that would be part of why Hodell-Natco would

12   have chosen SAP, is that correct?

13   A.    That's correct.

14   Q.    Was the fact that Hodell was a 120 SAP Business One

15   user a concern to you?

16   A.    Not necessarily.

17   Q.    Did anyone at SAP at this point in time -- and

18   we're talking February 10th, 2006 -- express any concern

19   about the 120 business users referenced in this document?

20   A.    No.  Not to my knowledge.

21   Q.    Could you turn to Exhibit 52, Mr. Ashley?

22   A.    I don't think I have it.

23             A FEMALE SPEAKER:  I think I have it here.

24             THE WITNESS:  Thank you.

25   Q.    Do you have Exhibit 52 in front of you, Mr. Ashley?

```
 1    A.    Yes.

 2    Q.    And you would agree that this is an e-mail from Dan

 3    Lowery at LSi dated October 25th, 2006, to you, among

 4    other people, at SAP, is that correct?

 5    A.    Yes.

 6    Q.    And in this document, LSi announces the In-Flight

 7    product, is that correct?

 8    A.    Yes.

 9    Q.    In fact, could you read the first paragraph for the

10    jury, please?

11    A.    "On November 16th in Las Vegas, LSi Lowery Systems

12    is announcing to the fastener industry our new In-Flight

13    Enterprise product for SAP Business One.  It is the

14    result of two years of development written in SAP SDK for

15    business -- for B1 and will go live at Hodell-Natco in

16    Cleveland December 11th.  Followed shortly after Fast

17    Rite in Chicago."

18    Q.    And again this just emphasizes that this In-Flight

19    program was going to be used for multiple potential

20    fastener companies, correct?

21                    MR. STAR:  Objection.  Foundation.

22                    THE COURT:  Overruled.

23    A.    Yes.

24    Q.    And you see in the second paragraph it states,

25    "Hodell-Natco is a 150-seat SAP B1 user."
```

1                    Is that correct?

2    A.    Yes.

3    Q.    And was the fact that Hodell-Natco was being

4    identified as a 150 Business One user a concern to you at

09:13:56 5    this time?

6    A.    I can't recall if it was at this -- I don't

7    remember it being an issue at that time.

8    Q.    Did it raise any -- and it didn't raise any red

9    flags to you, is that correct?

09:14:13 10   A.    Not that I recall.

11   Q.    Okay.  And there came a point in time in 2007 that

12   Hodell actually went live with Business One, correct?

13   A.    That's what I think, yes.

14   Q.    Okay.  I know it's been a period of time.

09:14:32 15              Could you turn to Exhibit 158, Mr. Ashley?

16   A.    I don't have that one either, I don't think.

17              A FEMALE SPEAKER:  What number?

18              THE WITNESS:  158.

19              A FEMALE SPEAKER:  (Handing).

09:15:03 20              THE WITNESS:  Thank you.

21   Q.    And I'll give you just a second to read through

22   this, okay?

23   A.    Okay.  Yes.

24   Q.    Okay.  And you would agree that this is an e-mail

09:16:15 25   exchange dated April 17th, 2007, between various internal

1      people at SAP, is that correct?

2      A.    Yes.

3      Q.    And, in fact, you initiated this communication on

4      April 17th, is that correct?

09:16:37  5      A.    I don't know if I was the first or not, but I, on

6      this particular exhibit, yes.

7      Q.    Okay.  Fair enough.

8            And on this date, you and other people from

9      SAP participated in a conference call with Kevin and Otto

09:16:55 10      Reidl of Hodell and Dan Lowery of LSi, is that correct?

11      A.    As far as I remember, yes.

12      Q.    Okay.  And do you recall who from SAP was on that

13      call?

14      A.    No.  I mean, not that I can say for certainty.

09:17:18 15            I know Ralf was on it and I was on it.

16      I -- maybe Manfred, but I can't remember.

17      Q.    Okay.  And would you agree with me that this is a

18      summary, and, in fact, you call it a summary of the

19      Hodell call; this is your summary of what transpired

09:17:39 20      during the call?

21      A.    Yes.

22      Q.    Is that right?

23      A.    Yes.

24      Q.    I'd like to go through a few of these points with

09:17:53 25      you.

             1          Under point one, you state -- could you

             2     read point one for us, actually, Mr. Ashley?

             3     A.     "LSi commented that they originally sold the

             4     solution to Hodell as something that was designed for

09:18:08     5     companies of 250 million in revenue with up to 500 users.

             6     There was stunned silence on the phone from the SAP team

             7     as Hodell confirmed that this was their understanding of

             8     what was purchased."

             9     Q.     And you would agree with that, what happened on

09:18:31    10     that particular call?

            11     A.     Yes.

            12     Q.     In the second point, you note that Hodell currently

            13     has 120 users, is that correct?

            14     A.     That's what it says, correct.

09:18:43    15     Q.     And the next line is, "They expect to grow at 17%

            16     compounded growth per year and they expect to be a

            17     300-user in the short-term."

            18                 Is that correct?

            19     A.     That's correct.

09:18:54    20     Q.     So on April 17th, SAP was advised that they had 120

            21     users, expected 17% compounded growth --

            22     A.     I lost audio.

            23     Q.     Sure.  So on April 17th, SAP was aware that Hodell

            24     had 120 users, correct?

09:19:15    25     A.     Correct.

1460

1    Q.    And that they expected to be at 300 users in the

2    short-term, correct?

3    A.    Correct.

4    Q.    In the next sentence, could you read point number

09:19:38 5    three for me, please, Mr. Ashley?

6    A.    "They mentioned that the solution has already cost

7    them their profit for the year.  They are throwing out

8    numbers like 750,000 in losses already.  They are losing

9    customers and employees."

09:19:51 10    Q.    And you would agree that the "They" referenced in

11    point number three is Hodell, correct?

12    A.    Yes.

13    Q.    So Hodell has already lost their profit for the

14    year, is that what you're stating here?

09:20:05 15                    MR. STAR:  Objection.

16                    THE COURT:  Overruled.

17    A.    I'm stating that they stated that, correct.

18    Q.    And you have no reason to doubt that this document

19    reflects the content of that call, is that correct?

09:20:19 20    A.    This is my summary of that call, correct.

21    Q.    Okay.  And this was written the same day as the

22    call, correct?

23    A.    I have no idea.  I'll say yes, but I don't know.  I

24    don't remember.

09:20:31 25    Q.    Well, you state in the first paragraph, you said

1    "We had a call with Hodell this morning."

2    A.    Oh.  Well, then, yes.

3    Q.    Okay.  And you also notice in Paragraph Number

4    three, "Hodell was throwing out numbers like $750,000 in

5    losses already."

6                      Do you see that?

7    A.    I do.

8    Q.    So on April 17th, you're being advised by Hodell

9    that they are already losing money to the tune of

10   $750,000, correct?

11   A.    Yes.

12   Q.    And Hodell is also losing customers and employees

13   at that same time, correct?

14                    MR. STAR:  Objection.

15                    THE COURT:  Overruled.

16   A.    They said that they are losing customers and

17   employees, correct.  I have no way to confirm it.

18   Q.    Okay.  But that's what you were advised on the

19   call?

20   A.    That is correct.

21   Q.    And if you could turn to the next page, Mr. Ashley.

22   A.    Okay.

23   Q.    Could you read point number eight for us, please?

24   A.     "The call was left with SAP going back to

25   executive management to determine if we have a solution

1  or not.  We committed to overcommunicating where we are

2  in order to keep Hodell in the loop.  There are no

3  specific next steps with time frames defined."

4  Q.    And so at this point in time, you're writing that

09:22:08  5  SAP was going to try to figure out if there was a

6  solution for Hodell, is that correct?

7  A.    Correct.

8  Q.    If you'd flip back to Page 158.

9  A.    Page 158 of what?  I'm sorry.

09:22:31 10  Q.    The very first page, Mr. Ashley.

11  A.    Yes.  Yes.

12  Q.    There's an e-mail from Ralf Mehnert-Meland, is that

13  correct?

14  A.    Right.

09:22:46 15  Q.    And he's addressing this to you.  He says, "Geoff,

16  thanks.  Right on."

17          Do you see that?

18  A.    I do.

19  Q.    And then he states, "All:  One item from my end,

09:23:00 20  there is no way SAP Business One will work for this

21  customer."

22          Do you see that?

23  A.    Yes.

24  Q.    So you would agree that on April 17th, 2007, Ralf

09:23:13 25  Mehnert-Meland concluded Business One would not work for

1463

 1    that customer, is that correct?

 2                   MR. STAR:  Objection.  Foundation.

 3                   THE COURT:  Objection sustained.

 4    A.    That's correct.

09:23:21 5    Q.    You then see that he writes, "We need to find a way

 6    to move them on."

 7                   Do you see that?

 8    A.    Yes.

 9    Q.    And is he stating that you need to figure out a way

09:23:35 10    to get Hodell off of Business One?  Is that what he

11    means?

12                   MR. STAR:  Objection.

13                   THE COURT:  Sustained.

14    A.    I don't know what he meant for sure, no.

09:23:42 15    Q.    Okay.  And then he writes, "Lowery needs to take

16    responsibility for this mis-sell."

17                   And Lowery would be the channel partner, is

18    that correct?

19    A.    Yes.

09:23:53 20    Q.    And he calls this a mis-sell, is that correct?

21                   MR. STAR:  Objection.  Leading.  She keeps

22    doing the same thing.

23    A.    That's what he calls it, correct.

24                   THE COURT:  He's answered the question.

09:24:03 25                   Go ahead.

1    BY MS. LUARDE:

2    Q.    Could you turn to Exhibit 159, Mr. Ashley?

3    A.    Not on this.  This only goes to 172.

4          Okay.

09:25:04  5    Q.    And before we get to that, could you tell me what

6    Ralf Mehnert-Meland's role was at SAP?

7    A.    Well, I had responsibility for revenues from what

8    we would call a value added reseller, which are what

9    you're calling channel partners.

09:25:23  10         There was another class of partners called

11    systems innovators or ISVs, and they were partners that

12    created their own intellectual property that went on top

13    of the Business One product so it extended the

14    capabilities of the product.

09:25:42  15         So Lowery happened to be a partner that was

16    both a reselling partner and an ISV partner, so Ralf had

17    him for the ISV side of his business, and I had him for

18    the sales, marketing, pre-sales, that stuff.

19    Q.    And so Ralf Mehnert-Meland was, if you looked at an

09:26:01  20    organizational chart, he was equivalent to you on the

21    organizational chart but just for a different -- for the

22    ISV component, is that correct?

23    A.    Yes.  We were peers.

24    Q.    Okay.  Thank you.

09:26:13  25         So back to Exhibit 159, you would agree

          1    that this is an e-mail chain, Mr. Ashley, involving you

          2    and other folks internal at SAP, is that correct?

          3    A.    That is correct.

          4    Q.    And if you'd turn to Page 159.2, you would agree

09:26:34  5    that this is the e-mail that we had just discussed that

          6    you had sent on April the 17th, 2007 summarizing the

          7    Hodell call, correct?

          8    A.    Yes.

          9    Q.    Okay.  And Dan Kraus writes back, and Dan Kraus is

09:26:55 10    who you reported to, correct, Mr. Ashley?

         11    A.    That is correct.

         12    Q.    And he writes to you and others within SAP,

         13    including Udi Ziv.

         14              Do you see that?

09:27:11 15    A.    Well, I do, but it's kind of --

         16    Q.    At the bottom of the page.

         17    A.    At the bottom of the page.  Oh, okay, I'm sorry.

         18              Yes.

         19    Q.    And he states, "We very simply need to figure out

09:27:21 20    if there is a solution in A1 for this customer or if we

         21    just refund our license fees."

         22              That's what Mr. Kraus writes here, correct?

         23    A.    That is correct.

         24    Q.    And A1 is a different product within SAP's

09:27:38 25    portfolio of products, correct?

1    A.    Yes.  Correct.

2    Q.    And A1 is for larger customers than Business One

3    customers, correct?

4    A.    Yes.

09:27:50  5    Q.    And then Mr. Kraus writes, "There is no go-forward

6    path here with Business One."

7                   Do you see that?

8    A.    I do.

9    Q.    And Mr. Kraus, who is your boss, also writes, "The

09:28:02 10    partner," and he's referring to LSi, is that correct?

11    A.    Correct.

12    Q.    "Clearly has misrepresented the solution."

13                  Do you see that?

14    A.    I do.

09:28:13 15    Q.    And Udi Ziv, this e-mail was sent to Udi Ziv, and

16    Udi Ziv, you would agree, was the team lead in the

17    development of Business One, is that correct?

18                  MR. STAR:  Objection.  Foundation.

19    A.    Yes.

09:28:31 20                  THE COURT:  Overruled.

21                  THE WITNESS:  Sorry.

22                  Can I ask a question?  Am I supposed to

23    hear when they do an objection?  Because I don't hear it

24    until after it's done so I don't know to not respond.

09:28:46 25

1    BY MS. LUARDE:

2    Q.    It's our hope, Mr. Ashley, that you can hear what's

3    going on.

4                    I realize it's difficult being remote.

09:28:55 5   A.    All right.  I'm letting the SAP attorneys know I

6    can't hear them when they make any comments.

7    Q.    Okay.  Thank you, Mr. Ashley.

8                    And you would agree, and I believe in your

9    deposition you testified, that Udi Ziv is an authority on

09:29:14 10  the product because he was one of those most specifically

11   involved in the creation, development, and maintenance of

12   the product.

13                   Do you agree with that?

14                   MR. STAR:  Objection.

09:29:21 15                   THE COURT:  Overruled.

16   Q.    You can answer, Mr. Ashley.

17   A.    Are you saying I said this?

18   Q.    I'm asking you, you agree that Mr. Ziv is an

19   authority on the Business One product because he was one

09:29:35 20  of those most specifically involved in the creation,

21   development, and maintenance of the product, is that

22   correct?

23   A.    I would agree that Udi Ziv was one of the most

24   knowledgeable person on the code of the SAP Business One

09:29:49 25  product.

1468

1       There is a difference.

2    Q.    Okay.  If you could turn to -- actually let me just

3    ask you this question.

4       Would you agree that Udi Ziv was a

5    significant authority on the Business One product, in

6    your opinion?

7    A.    I would agree that Udi Ziv was an authority on the

8    code of the Business One product.

9       I don't know if Udi Ziv had ever worked in

10   a business environment in his -- I'm not saying anything

11   negative about Udi.  I don't know that he ever worked in

12   a business.  He was also from Israel so I don't know if

13   he was familiar with American business and business

14   practices.

15      So he was absolutely the authority on

16   writing code.

17   Q.    Okay.

18   A.    For Business One.

19   Q.    Could you turn to Page 155 of your deposition,

20   Mr. Ashley?

21   A.    Okay.

22   Q.    And we may be saying the same thing.  I just want

23   to make sure that the record is clear.

24      You were asked in 155 about Mr. Ziv.

25      Do you see that line of questioning,

1   starting on Line Number 5?

2   A.   Yes.

3   Q.   And the question was:  "Do you know who Udi Ziv

4   is"?

09:31:42  5            MR. STAR:  Objection, Your Honor.

6   Q.   And you go forward?

7            THE COURT:  Hold on.

8            Does he have some inconsistent statement in

9   there?

09:31:48 10            MS. LUARDE:  He does, Your Honor.

11            THE COURT:  Why don't you read it to him

12   then?

13            MS. LUARDE:  Sure.

14   BY MS. LUARDE:

09:31:53 15  Q.   The question was, "Okay, was he a pretty

16   significant authority on the Business One product in your

17   opinion?"   And the answer was, "Yes."

18            Do you see that?

19   A.   Yes.

09:32:02 20  Q.   On Line -- and the question is "Why is that?"

21            And the answer is, "Why is he an

22   authority?"

23            And the question is "Yes.  In your opinion,

24   why is he an authority on the product?

09:32:15 25            "Answer:  Because he was one of the most

1470

```
         1    specifically involved in the development, the creation,

         2    and development and ongoing maintenance of the product."

         3                 That was your answer, correct?

         4    A.    That's correct.

09:32:25 5    Q.    And you didn't just limit it to writing code in

         6    that response, is that correct?

         7    A.    That's pretty much what that says.

         8                 Everything that that says is specific to

         9    the code or the product itself, correct.

09:32:39 10   Q.    Okay.  Thank you for clarifying that, Mr. Ashley.

         11                And back to Exhibit 159.

         12   A.    Okay.

         13   Q.    Again we have Mr. Kraus here stating, "There is no

         14   go-forward path here with Business One."

09:33:23 15                That is what this document states, correct?

         16   A.    That's what the document states, correct.

         17   Q.    And you would agree by April, 2007, Udi Ziv, Ralf

         18   Mehnert-Meland, and Dan Kraus concluded that Business One

         19   would not work for Hodell, is that correct?

09:33:39 20                MR. STAR:  Objection.

         21                THE COURT:  Overruled.

         22   A.    I would say --

         23                THE COURT:  Go ahead.

         24   A.    Okay.  I would say that that's what he said, that's

09:33:51 25   correct.
```

|     |    |                                                              |
| --- | -- | ------------------------------------------------------------ |
| 1   | Q. | "He" being Dan Kraus said that, correct?                     |
| 2   | A. | Yes.                                                         |
| 3   | Q. | And Ralf Mehnert-Meland stated that, correct?                |
| 4   | A. | Yes.                                                         |

09:34:01  5    Q.    And Udi Ziv also agreed with that, is that correct?

6                   MR. STAR:  Objection.

7                   THE COURT:  Overruled.

8    A.    Yes.

9    Q.    And you would agree that by 2007, SAP had figured

09:34:12 10    out that Business One used in the type of environment at

11    Hodell, given its configuration, was not going to work?

12    A.    I would agree that some people within SAP had said

13    that, correct.

14                   I'm not saying SAP said that.

09:34:29 15    Q.    But certain people within SAP had concluded that,

16    is that your testimony?

17    A.    Yes.

18    Q.    And you would agree that the Business One team in

19    Israel, including Udi Ziv, concluded somewhere by April

09:34:52 20    or May, 2007, that Hodell was not an appropriate

21    environment for Business One, correct?

22                   MR. STAR:  Objection.

23                   THE COURT:  Overruled.

24    A.    No.  I don't -- I can't answer that.

09:35:03 25                   I know Udi did.

1472

1    Q.    Okay.  But Udi was the lead of that team in Israel,

2    correct?

3    A.    I don't -- if -- maybe.  I mean, it was so long

4    ago.

09:35:17  5    Q.    Okay.  Could you turn to Exhibit 160, Mr. Ashley?

6    And just let me know when you're done reviewing this

7    document, okay?

8    A.    Okay.

9    Q.    And, Mr. Ashley, you'll agree that the first e-mail

09:36:47 10    on 160.3 is again your summary of the Hodell call,

11    correct?

12    A.    Yes.

13    Q.    And then we have the e-mail from your boss,

14    Mr. Kraus, correct, that we just discussed?

09:37:02 15    A.    Yes.  Yes.

16    Q.    And then there's an e-mail in the middle of the

17    page from you, is that correct?

18    A.    Yes.

19    Q.    And you write in the first line, "There will not be

09:37:15 20    a solution in All-In-One without some very substantial

21    customizations to incorporate the In-Flight solution that

22    drove this initial purchase."

23          Do you see that sentence?

24    A.    I do.

09:37:27 25    Q.    And All-In-One is another SAP product, correct?

1    A.    Correct.

2    Q.    And you're stating here, and if I get this wrong

3    just let me know, that All-In-One, there would be a lot

4    of customizations or changes that need to be made for

09:37:47  5    In-Flight to work with that, is that correct?

6    A.    No.  That is not correct.

7    Q.    Okay.

8    A.    It -- the All-In-One is a different code base, so

9    to get All-In-One to act like SAP Business One with

09:38:01  10    In-Flight, you'd have to do a lot of customization to

11    All-In-One.

12    Q.    Okay.  Thank you.

13    A.    That's why in the next paragraph I say the ideal

14    would be to get In-Flight to somehow work with

09:38:13  15    All-In-One.

16    Q.    Okay.  And then on Page 1 of this document, there's

17    an e-mail from Ralf Mehnert-Meland.

18               Do you see that?

19    A.    Yes.

09:38:31  20    Q.    And he's stating here, "Dirk and I had some

21    follow-up discussions."

22               And he's referring to Dirk Boessmann, who's

23    on this e-mail chain, is that correct?

24    A.    Yes.

09:38:42  25    Q.    And he writes -- and Dirk Boessmann was in

1    development, too, is that correct?

2    A.    I -- I don't remember if he was technically

3    development or support.  I don't actually remember now.

4    Q.    Okay.

09:38:58 5    A.    But he had a technical development background.

6    Q.    Thank you.

7              And he writes, "A multiple SAP Business One

8    scenario or an A1 SAP Business One scenario are really

9    not feasible."

09:39:12 10             Do you see that?

11    A.    Yes.

12    Q.    "They likely would be too complex and not resolve

13    the issue anyway."

14             Do you see that?

09:39:19 15    A.    Yes.

16    Q.    And then Mr. Mehnert-Meland writes, "Unless there

17    is something we can do on the A1 or ERP side, SAP may not

18    have a solution for Hodell."

19             Do you see that?

09:39:34 20    A.    Yes.

21    Q.    And so Ralf Mehnert-Meland is concluding that SAP

22    may not have a solution for Hodell, is that right?

23                   MR. STAR:  Objection.

24                   THE COURT:  Sustained.

09:39:42 25    Q.    Do you agree with me that there was a problem

1    within the architecture of Business One?

2                        MR. STAR:  Objection.

3                        THE COURT:  Overruled.  If he knows the

4    answer.

09:40:04 5    A.    No.  I can't agree with the statement that way.

6    BY MS. LUARDE:

7    Q.    Bear with me just one second, Mr. Ashley.

8    A.    Um-hmm.

9    Q.    Let me try to restate.

09:40:38 10                      The issue within Business One has to do not

11   only with the number of transactions or the size of the

12   database, it literally has to do with the way the product

13   is architected.

14                        Would you agree with that?

09:41:01 15   A.    Taken in that context, sure.

16   Q.    Okay.  And you would also agree that some users,

17   some customers, even with small numbers of users, might

18   have the following issue.  "Depending on how they did

19   things in their business, how many fields they had to

09:41:19 20   view at any point in time, because the product did

21   lookups."  And you know what lookups are, correct,

22   Mr. Ashley?

23   A.    Correct.

24   Q.    And that's -- and could you tell me what a lookup

09:41:31 25   is, Mr. Ashley?

1476

A.    One of the -- one of the advantages and primary
features of SAP Business One, which was one of the things
that Hodell was most excited about, was the idea that
regardless of what field you were in, by simply clicking
in the field, it would go down into the database and do
lookup.

So, for example, if you couldn't remember
the name of an inventory item or number, whatever, by
simply clicking on it, it would automatically bring up
the inventory file and you could quickly, by typing in
just a couple letters or numbers or names, find that
item.

So you didn't have to remember everything
all the time.

So it was one of the primary architectural
components of the product.  It wasn't a defect; it's the
way the product was architected.

Q.    Okay.  And would you agree the reason it would take
an hour to place an order hypothetically is because it
had to do a lookup through a huge database every time you
hit the tab key?

A.    Again, depending on how it was implemented, yes.

Q.    Okay.

Do you agree that the implementation at
Hodell-Natco was not successful?

1    A.    Yes.

2    Q.    And do you recall anyone at SAP disagreeing with

3    Hodell's conclusion that Business One performance was

4    unacceptable?

09:42:58 5    A.    At what period of time?

6    Q.    At any point in time prior to litigation,

7    obviously.

8    A.    At any point in time, yes, I would agree that we

9    did not agree with them.  That was not a correct

09:43:10 10    statement at all points in time.

11    Q.    Prior to litigation, do you recall anyone at SAP

12    disagreeing with Hodell's conclusion that Business One

13    performance was unacceptable?

14    A.    Yes.

09:43:25 15    Q.    Mr. Ashley, I'd like you to turn to Page 254 of

16    your deposition.

17    A.    Okay.

18    Q.    And, Mr. Ashley, this deposition was taken in 2012,

19    which is several years before today, correct?

09:43:55 20    A.    That's correct.

21    Q.    And this is a little bit closer in time to when

22    this incident actually occurred or this transaction

23    actually occurred, would you agree with that?

24    A.    Well, yeah, a little bit closer.

09:44:08 25    Q.    Okay.  And if you look at Page 254, Line 13, the

1    question that is asked, "Do you ever recall anyone at

2    SAP" -- it says just agreeing.  I think it means

3    disagreeing -- "with Hodell's conclusion that Business

4    One performance was unacceptable?"  And your answer,

09:44:28  5    Mr. Ashley on March 16th, 2012, was, "No, I don't recall

6    anybody disagreeing that it was unacceptable."

7                    Do you see that?

8    A.    I do.

9    Q.    Okay.  Mr. Ashley, did you ever tell anyone that

09:44:52  10   Business One was not ready for prime time?

11                   MR. STAR:  Objection.

12                   THE COURT:  Overruled.

13   A.    Again, depending on context, probably.

14   Q.    Do you recall -- do you know -- you obviously know

09:45:08  15   Dan Lowery, correct?

16   A.    Yes, I do.

17   Q.    And Dan Lowery was the owner of LSi, is that

18   correct?

19   A.    That's correct.

09:45:26  20   Q.    And you know that Dan Lowery and LSi were a party

21   to this lawsuit, correct?

22   A.    Yes.

23   Q.    And did you tell Dan Lowery that LSi -- that SAP

24   Business One was not ready for prime time?

09:45:47  25                   MR. STAR:  Objection.  Relevance.

1          THE COURT:  Overruled.

2     Q.   You can answer.

3     A.   Again depending on the time and the context,

4     probably.

09:46:09 5     Q.   Do you recall ever sending Mr. Lowery an e-mail

6     advising him that Business One was a product not ready

7     for prime time?

8          MR. STAR:  Objection.

9          THE COURT:  Yeah, we've asked that

09:46:19 10   questions four times now.

11         MS. LUARDE:  He wanted to know the context,

12    Your Honor.

13         THE COURT:  That's all right.

14         MS. LUARDE:  Okay.

09:46:33 15   Q.   And do you recall making a statement like that as

16    recently as January, 2012?

17         MR. STAR:  Objection.  401 and 403.

18         THE COURT:  Sustained.

19    BY MS. LUARDE:

09:46:47 20   Q.   Do you recall discussing with Mr. Lowery that LSi

21    had relied on documentation that SAP put together in the

22    sale of Business One?

23         MR. STAR:  Same objection.

24         THE COURT:  Sustained.

09:47:13 25   Q.   Do you recall telling Mr. Lowery that Hodell relied

|     |     |
| --- | --- |
| 1 | on SAP to back their commitments? |
| 2 | MR. STAR:  Same objection. |
| 3 | THE COURT:  Overruled. |
| 4 | Q.   You can answer. |
| 09:47:22  5 | A.   I actually don't -- |
| 6 | THE COURT:  Can you get a little bit away |
| 7 | from the microphone when you speak?  Thanks. |
| 8 | A.   Sure. |
| 9 | Q.   Do you recall telling Mr. Lowery that Hodell relied |
| 09:47:39 10 | on SAP to back their commitments? |
| 11 | A.   I don't recall. |
| 12 | Q.   Do you recall having e-mail exchanges with |
| 13 | Mr. Lowery to that effect? |
| 14 | MR. STAR:  Objection. |
| 09:47:59 15 | THE COURT:  Why don't you just ask him what |
| 16 | he said to him rather than beating around a bush? |
| 17 | MS. LUARDE:  Okay. |
| 18 | BY MS. LUARDE: |
| 19 | Q.   Mr. Ashley, did you say to Mr. Lowery, "I have |
| 09:48:09 20 | always told SAP" -- |
| 21 | MR. STAR:  Objection. |
| 22 | THE COURT:  Hang on a second.  Why don't |
| 23 | you ask him a question what he thinks rather than what he |
| 24 | told somebody else? |
| 09:48:21 25 | |

BY MS. LUARDE:

Q.   Do you think that Hodell relied on SAP to back their commitments?

A.   What commitment?

Q.   Commitments related to Business One.

A.   They had every right to expect --

            THE COURT:  We can't understand you because I think you're too close to the microphone.  I know, it's hard.  Just --

            THE WITNESS:  I'm actually back quite a ways.

            THE COURT:  We'll try it that way and see.

            THE WITNESS:  Okay.

A.   I agree Hodell should have expected SAP to meet their license agreement commitments.

            By the way, I also believe SAP did meet their commitments.

Q.   Mr. Ashley, do you recall -- actually, did you ever tell Dan Lowery that SAP does not want you as a witness because you would tell the truth, SAP screwed this up?

            MR. STAR:  Objection, Your Honor.

            THE COURT:  Yeah, the objection is sustained.

            MR. STAR:  She should move off of this.

           1   BY MS. LUARDE:

           2   Q.    Do you agree that there were numerous cries for

           3   help for the partner, and SAP either blew them off, gave

           4   wrong information, or took sides?

09:50:02   5                 MR. STAR:  Same objection.

           6                 THE COURT:  Overruled.

           7                 Do you understand that question?

           8   A.    No.

           9   Q.    I'll restate it.

09:50:10  10                 Do you agree that there were numerous cries

          11   for help from the partner, and SAP either blew them off,

          12   gave wrong information, or took sides?

          13   A.    I will stipulate that I wrote that to Dan, yes.

          14   Q.    Do you agree with that; yes or no?

09:50:28  15   A.    Not in the context that you're using it.

          16   Q.    And you wrote this to Dan December 29th, 2011, is

          17   that correct?

          18                 MR. STAR:  Objection, Your Honor.

          19                 THE COURT:  Overruled.

09:50:40  20   A.    Yes.

          21                 MS. LUARDE:  I have no further questions at

          22   this point, Your Honor.

          23                 THE COURT:  Thank you.

          24                 You may cross-examine.

09:50:52  25                 MR. STAR:  Thank you, Your Honor.

```
 1              CROSS-EXAMINATION OF GEOFFREY ASHLEY
 2      BY MR. STAR:
 3      Q.    Good morning, Mr. Ashley.  How are you?
 4      A.    Good.
 5      Q.    Sir, would you please go to Exhibit 840?
 6      A.    Sorry?
 7                   A FEMALE SPEAKER:  One moment.
 8      Q.    Sir, are you able to identify this document for us?
 9      Oh, pardon me.  We're going to hand out binders and we
10      haven't done that yet.
11                   I'm moving too fast.
12                   THE COURT:  Why don't we take a quick break
13      then?
14                   MR. STAR:  That's great, Your Honor.
15                   THE COURT:  We'll do that to take out the
16      other binders.
17                   And the, okay, folks.  I have a couple
18      things to attend to during this 10:00 o'clock hour so it
19      may be a little longer than that, but keep in mind the
20      admonition, and hopefully somebody will be opening the
21      door.
22                   And then, Josh, you can take our smokers
23      down if you want.
24                   Okay.  We'll see you in about 15 or 20
25      minutes.
```

1484

| | |
|---|---|
| 1 | (Jury out) |
| 2 | (Recess taken) |
| 3 | (Proceedings resumed in presence of the |
| 4 | jury as follows:) |
| 10:21:31 5 | THE COURT:  All right.  Have a seat, |
| 6 | please. |
| 7 | MR. STAR:  Thank you, Your Honor. |
| 8 | BY MR. STAR: |
| 9 | Q.    Mr. Ashley, can you hear me okay? |
| 10:21:58 10 | A.    Yes. |
| 11 | Q.    All right, sir.  We were about to talk about |
| 12 | Exhibit 840. |
| 13 | Do you have that in front of you, please? |
| 14 | A.    I do. |
| 10:22:06 15 | Q.    Would you be able to tell us what that document is, |
| 16 | sir? |
| 17 | A.    This is an e-mail from Dan Lowery announcing his |
| 18 | add-on for the SAP Business One product, In-Flight. |
| 19 | Q.    The date of that is October 31st, 2005? |
| 10:22:26 20 | A.    Yes. |
| 21 | Q.    Sir, do you have a recollection of when Hodell |
| 22 | signed a license agreement with SAP? |
| 23 | A.    I'm sure it's in all this stuff, but I don't |
| 24 | actually remember. |
| 10:22:37 25 | Q.    All right.  Let's go through this and then we'll |

1       get to that.

2                   The subject line of the e-mail is

3       "Fasteners In-Flight."

4                   Do you see that?

10:22:45  5     A.    Yes.

6       Q.    Mr. Lowery writes to you, "Some good news for a

7       change.  After nine months of development, we had the

8       first showing of our In-Flight Enterprise for SAP today

9       to Hodell-Natco."

10:23:00 10                 Do you see that?

11      A.    I do.

12      Q.    Sir, to your recollection, prior to receiving this

13      e-mail on October 31st of 2005, had you ever heard of

14      Hodell-Natco?

10:23:14 15     A.    Not to my knowledge.

16      Q.    Prior to this date, did you know any of the details

17      about Hodell-Natco's business?

18      A.    No.

19      Q.    Mr. Lowery goes on to write here -- and by the way,

10:23:30 20     you see in the CC line, he copies, among other people, an

21      e-mail address that says MDVL.

22                  Do you know who that person is?

23      A.    I don't actually.

24      Q.    You don't know whether that was Dale Van Leeuwen,

10:23:46 25     for instance?

1        A.    Oh, could be.  I mean, it makes sense.

2        Q.    In the first -- pardon me -- the next sentence,

3   Mr. Lowery goes on to write, "After a three-hour demo

4   running live with their data, the customer was

10:24:04 5   impressed."

6              Sir, through your recollection, what do you

7   recall your reaction back in October of 2005 when you

8   received this e-mail and read that information that

9   Mr. Lowery provided?

10:24:16 10   A.    We would have been excited.

11       Q.    He mentions a three-hour demo.

12             To your recollection, were you a part of

13  that demonstration to Hodell?

14       A.    No.  No.  Not at all.

10:24:28 15   Q.    To the best of your knowledge, was there anybody

16  else that was actually an SAP employee that was part of

17  that demonstration to Hodell?

18       A.    Not to my knowledge.

19       Q.    Okay.  Mr. Lowery goes on to write in the next

10:24:42 20  paragraph, "Dale Van Leeuwen and his team made the

21  presentation to five members of Hodell" -- he writes

22  Nowco -- obviously "Hodell-Natco's management and

23  steering committee."

24             And then he writes, "Included was Otto and

10:24:58 25  Kevin Reidl, the owners."

1    Sir, prior to receiving that information

2    from Mr. Lowery on October 31st of 2005, had you ever

3    heard of Otto or Kevin Reidl?

4    A.    No.  Not at all.

5    Q.    After receiving this e-mail in October -- on

6    October 31st of 2005, what was your understanding of

7    where LSi and Hodell were with their project?

8    A.    To me, it was they had done some joint development

9    of a fastener-specific add-on for the Business One

10   product.  They had gone through the alpha, which is the

11   designing of it, the beta stage, which is the testing of

12   it, and they were now ready to run the software.

13   Q.    Was there any information provided to you in this

14   e-mail that would cause you any concern for what they

15   were doing at that time in October of 2005?

16   A.    No.  Actually the opposite.

17   Q.    Why do you say it was the opposite, sir?

18   A.    The customer was impressed.

19   Q.    Rather than go through a bunch of background, it's

20   been stipulated in this case that the license agreement

21   between SAP and Hodell was signed on December 23rd of

22   2005.

23        With that understanding, did you ever

24   receive any information between this October 31st, 2005,

25   e-mail and the signing of the license agreement on

1    December 23rd, 2005, that would have given you any cause

2    for concern about this deal with Hodell?

3    A.    None whatsoever.

4    Q.    Flip to Exhibit 177, please.

10:27:05  5    A.    I actually have it here, yeah, in this.

6                Okay.

7    Q.    You were asked a bunch of questions about this

8    particular exhibit.  I'm going to move through it pretty

9    quickly, but on the first numbered item on the first page

10:27:28  10   there, beginning with, "We were able to close," that

11   paragraph finishes off with a sentence about Hodell-Natco

12   being the first happy referenceable customer within this

13   space.

14                Sir, you wrote this document, right?

10:27:42  15   A.    I did.

16   Q.    Okay.  Explain to us what you meant and what your

17   expectations were with respect to Hodell being a happy

18   referenceable customer.  What did that mean to you?

19   A.    At this point in time, what I understood was that

10:27:59  20   Hodell-Natco and LSi had worked together to create this

21   add-on.  It was specific to the fastener industry, which

22   is a vertical industry, and the idea was that

23   Hodell-Natco would work with Lowery to actually market

24   into that industry so that we could get more customers

10:28:21  25   within the fastener industry, with Hodell being a very

1    known and referenceable name.

2    Q.    You --

3    A.    So we were excited.

4    Q.    Sorry, I didn't mean to cut you off there.

10:28:32  5    A.    That's all right.

6    Q.    When you write "Happy referenceable customer," what

7    were your expectations and hopes and desires with respect

8    to Hodell back in January of 2006?

9    A.    Our expectations were that we would have a very

10:28:47 10    long-term publisher/partner/customer relationship.

11    Q.    You expected them to be successful?

12    A.    Yes.

13    Q.    You had no -- strike that.

14            Did you have any information that would

10:29:03 15    have led you to have any concern that Hodell would be

16    anything but a happy reference customer in the future?

17    A.    We had nothing that would indicate that they would

18    not be happy.  As a matter of fact, we had everything to

19    indicate the opposite, that they were happy.

10:29:20 20    Q.    And you say everything to indicate that they were

21    happy.

22            What do you base that on?

23    A.    There was, as they already stated in earlier

24    e-mails, there was approximately nine months, seven to

10:29:34 25    nine months of joint development in which the software

1   was, as far as we knew, developed, tested, and,

2   therefore, found to be what they wanted.  They were

3   happy.

4           You have to remember, they did all of that

10:29:50 5   testing and all of that work before they bought the

6   software, so if they were unhappy, they wouldn't have

7   bought the software.

8   Q.   And are you --

9   A.   That was our expectation.  Sorry.

10:30:00 10   Q.   Okay.  And are you referring back to Exhibit 840,

11   sir?  Is that what you're basing that on?

12   A.   Let's see.  Well, that on other exhibits and

13   things, discussions that have been going on, yes.

14   Q.   All right.  Just sticking with Exhibit 177 for a

10:30:15 15   moment, down at the bottom under the heading, "Q4

16   Challenges," in the first line there's a mention of

17   issues surrounding the product.

18           And you were asked some questions about

19   that.

10:30:26 20           Do you recall any particular specific issue

21   that might have existed with the product back around the

22   time you wrote this document in early 2006?

23   A.   Yeah.  I can remember some of the issues.

24   Q.   You don't have any recollection, though, of any

10:30:45 25   particular issue that later on became problematic for

1    Hodell, do you?

2    A.    No.  They were -- they -- the issues were more

3    related to a product being localized for the United

4    States or the American or North American marketplace.

10:30:59  5    Q.    All right.

6    A.    So, for example, we couldn't do a check register,

7    you know, silly things like that.

8    Q.    Okay.  Just so the jury understands what you mean

9    by "Localizing the software," can you just explain that

10:31:12 10    at a high level, please?

11    A.    Yes.  The product was written in Israel and it was

12    originally marketed in Europe, and then it was brought

13    over to the United States.

14                And when you take a software product from

10:31:28 15    one region or one area of the world to another, you do

16    something called localization, because they use Euros, we

17    use dollars.  They have different form sizes.  We have

18    eight-and-a-half-by-11.  They have what's called A7.

19    There's a lot of things that have to happen within the

10:31:45 20    software that is very specific to our market.

21                In the U.S. we have sales tax.  They have

22    value added taxes.  It was things like that.

23                And so the problems we were talking about,

24    the problems I was talking about, were really fit and

10:31:56 25    finish kind of things.  It was getting it to print out a

1492

| | |
|---|---|
| 1 | check register.  It was getting it to have a dollar sign, |
| 2 | you know, because it didn't have a dollar sign on some of |
| 3 | the reports.  It didn't have reports.  You know, the U.S. |
| 4 | Generally Accepted Accounting Principles have very |
| 10:32:13 5 | specific things, trial balances and things like that, |
| 6 | that we have to be able to produce. |
| 7 | And when the product was first released and |
| 8 | brought into the marketplace, we didn't produce a lot of |
| 9 | reports. |
| 10:32:21 10 | So these weren't problems with the |
| 11 | architecture or the way the product functioned.  They |
| 12 | were product, they were the reports and the little things |
| 13 | that had to be tweaked. |
| 14 | Q.   Thank you for that. |
| 10:32:34 15 | If you could please flip to Exhibit 52. |
| 16 | A.   I'm sorry? |
| 17 | Q.   Exhibit 52. |
| 18 | A.   Oh, 52.  Yes, sir. |
| 19 | Q.   Sir, can you identify this document for us? |
| 10:32:59 20 | A.   Yes.  I'm sorry? |
| 21 | Q.   Would you identify this document for us, please. |
| 22 | A.   This is an e-mail to Dan Kraus and others from Dan |
| 23 | Lowery announcing the In-Flight fastener -- the release |
| 24 | of the In-Flight fastener software. |
| 10:33:17 25 | Q.   And you see up at the top that you were one of the |

1493

```
 1    recipients of this e-mail, sir?

 2    A.    Yes.

 3    Q.    And this is from October 25th of 2006, correct?

 4    A.    That is -- that is correct.

 5    Q.    Just for reference point, the first document we

 6    looked at was Exhibit 840.

 7              That was from October 31st of 2005, so

 8    now --

 9    A.    Right.

10    Q.    -- we're one year removed from that e-mail,

11    correct?

12    A.    One year and nine months because there was also the

13    development that occurred before all of that other stuff

14    happened.

15    Q.    All right.  But -- well, thank you.

16              But from the e-mail that is Exhibit 840,

17    we're about exactly one year removed, correct?

18    A.    That -- that is correct.

19    Q.    All right.  To your recollection, at any point over

20    that one-year period between October 31st of 2005 and the

21    date of this e-mail, which is Exhibit 52, October 25th,

22    2006, were you personally ever given any information or

23    indication that there were problems with Business One or

24    any of the software that was being implemented for

25    Hodell?
```

A.    No.  None.

Q.    This e-mail that's Exhibit 52 on October 25th,
2006, is from Dan Lowery, correct?

A.    That is correct.

Q.    And he writes to you and others and he says in the
first paragraph, "On November 16th in Las Vegas,
LSi-Lowery Systems is announcing to the fastener industry
our new In-Flight Enterprise product for SAP Business
One.  It is the result of two years of development
written in SAP SDK for B1 and will go live at
Hodell-Natco in Cleveland December 11th, followed shortly
after at Fast Rite in Chicago."

            Sir, what I'd like to know is what was your
understanding, your reaction back in October of 2006 when
you received this e-mail from Mr. Lowery?

            What did you understand to be the state of
their project?

A.    Well, obviously the product was tested, the product
was working, the customer was happy.

            They're announcing a product to an
industry.  Fast Rite is, if not the largest, one of the
largest fastener shows in the industry, so they're happy
enough that Hodell-Natco was working with Lowery to
announce the product at a show for companies just like
them.

1          So we would have assumed, and rightly so,

2    that everything was fine.

3    Q.    Is there anything that you see in this e-mail that

4    at the time gave you any cause for concern at all with

10:36:07 5    respect to Business One and Hodell or what was going on

6    between LSi and Hodell with respect to their

7    implementation of software?

8    A.    No.

9    Q.    Let's go to -- you can put that one away.

10:36:26 10          Let's go to Exhibit 151, please.

11          Just so everybody here is following along,

12   this gets a little confusing because sometimes the same

13   chain of e-mails is marked multiple times as an exhibit.

14          This is very similar to Exhibit 158 that

10:36:48 15   you discussed earlier today.

16          151, sir, you'd agree, includes an e-mail

17   that you wrote on April 17th, 2007, following a call you

18   had that morning with Hodell?

19   A.    That is correct.

10:37:05 20   Q.    Let's walk through this e-mail.

21          What was the reason you were having a call

22   with Hodell on April 17th, 2007?

23   A.    We had been made aware that there were issues with

24   the software.  We had a very unhappy customer, and we

10:37:23 25   were trying to work with our partner and our customer to

1496

1    figure out how we can all -- we can get the solution,

2    make it make sense, and move forward.

3    Q.    The evidence in this case, it's been stipulated

4    that Hodell went live on Business One plus In-Flight and

10:37:39  5    Radio Beacon on March 7th of 2007.

6              You said you had been made aware of some

7    issues at Hodell.

8              Were you made aware of those issues prior

9    to March 7th, 2007, or did you learn about those issues

10:37:56 10    afterwards, sir?

11    A.    March -- sorry?

12    Q.    March 7th, 2007 is -- it's been stipulated that

13    that was the date that Hodell went live on the software.

14    A.    Oh, okay.

10:38:13 15    Q.    I'm just trying to get --

16    A.    I'm sorry, I didn't hear.

17    Q.    Yes.

18              With that understanding, do you recall

19    whether you were made aware of issues at Hodell prior to

10:38:24 20    the go-live on March 7th, 2007, or did you learn of those

21    issues only afterwards, sir?

22    A.    To my knowledge and recollection, we would not have

23    known or I would not have known of anything prior to the

24    go-live.

10:38:37 25    Q.    Okay.  Let's walk through Exhibit 151, your April

1    17th, 2007 e-mail.

2              You were asked about the first numbered

3    point where you wrote "LSi commented that they originally

4    sold this solution to Hodell as something that was

10:38:55  5    designed for companies of 250 million in revenue with up

6    to 500 users."

7              And in the next sentence you wrote "There

8    was stunned silence."

9              What did you mean when you wrote there was

10:39:07  10    stunned silence?  Tell us what was happening.

11    A.    At this -- at this point in time, this was the

12    first time we had ever heard anything with those kind of

13    numbers associated with them.

14              So up until that point, we were thinking

10:39:21  15    120, and actually I can't remember if we knew users or

16    employees, but 120 was the largest number, to my

17    knowledge, that we had heard up to that point and to hear

18    250 million revenue, 500 users, and as I say later the

19    growth numbers that they were experiencing, that's the

10:39:40  20    first time we ever heard anything that.

21    Q.    Sir --

22    A.    So we were stunned because we had no knowledge.

23    Q.    Thank you.

24              And, sir, you testified earlier that you

10:39:48  25    were knowledgeable of some of the marketing literature,

1    you were in a sales role with Hodell -- pardon me -- a

2    sales role with SAP where you were managing the resellers

3    and the relationship with the resellers, right?

4    A.    That is correct.

10:40:02 5    Q.    To your recollection, did SAP ever market or

6    authorize anybody to market Business One to companies of

7    up to $250 million in revenue, needing up to 500 users?

8                    Was that how SAP positioned the product,

9    sir?

10:40:21 10    A.    I don't think we ever positioned the product to

11    500 -- I know we didn't position the product to 500

12    users.

13                    I honestly can't remember what revenue

14    number might have been in any written point from SAP

10:40:35 15    marketing, but I know we never said 500 users.

16    Q.    In Item Number 2, you write, "Hodell currently has

17    120 users.  They expect to grow at 17% compounded growth

18    per year.  They expect to be a 300 -- to be at 300 users

19    in the short-term (next couple of years)."

10:40:57 20                    Why, sir, were you writing that information

21    in your summary on April 17th, 2007?  Why was that

22    important?

23    A.    This was -- this was further data to support my

24    fact that we were sitting in stunned silence, meaning

10:41:12 25    this is all information that we were hearing for the

1499

1    first time, this amount of growth.

2              I didn't put it in here, but they also

3    started telling us about numbers of inventory items,

4    numbers of transactions per invoice, things like that,

10:41:24  5    and we were hearing all this for the first time, and it

6    was well outside of anything that we had understood up to

7    that point.

8    Q.    So one of the things I'm understanding you to say

9    that you heard for the first time on April 17th of 2007

10:41:37 10    was that Hodell was expecting to be a 300 -- have a

11    300-user system, is that right?

12    A.    That's correct.

13    Q.    You had never heard that before?

14    A.    Not to my knowledge.

10:41:51 15              That's why I put it in here for everybody

16    to see.

17    Q.    Okay.

18              Item Number 3, you write down here, "They

19    mentioned that this solution already cost them their

10:42:02 20    profit for the year."

21              Who is "They"?  Who are you referring to,

22    sir?

23    A.    Hodell-Natco had said that.

24    Q.    They said that to you during this phone call?

10:42:13 25    A.    That's what this is indicating, yes.

1500

1    Q.    You go on, "They are throwing out numbers like

2    $750,000 in losses already.  They are losing customers

3    and employees."

4          Who gave you that information, sir?

10:42:27  5    A.    I couldn't tell you exactly the name of who told

6    me, but it would have been somebody from Hodell-Natco,

7    probably one of the owners, but that, I can't say for

8    certainty.

9    Q.    Sir, did you do anything to confirm that

10:42:41 10    information that you wrote in Item Number 3?

11    A.    No.  This is simply their statement.

12          To my knowledge -- well, all I can say is I

13    did not personally do anything to confirm this.

14    Q.    Okay.

10:42:53 15          At any point in time, sir, do you recall

16    anybody ever demonstrating to you that any of the

17    information that you wrote down in Item Number 3 was

18    actually true or whether it was just being exaggerated or

19    anything like that?

10:43:08 20    A.    No.  That was the first and only time the notice

21    had ever come up to my knowledge.

22    Q.    Okay.  Go down to Item Number 7.  It's hard to see

23    on the -- some of the printouts, but that appears, would

24    you agree with me, to have been an item that you put in

10:43:28 25    bolded text, Item Number 7?

1  A.    That is correct.

2  Q.    And you talk there, you report, "LSi stated that

3  they in effect did not," all caps, "Test this environment

4  with anything approaching the number of users or the load

10:43:47  5  being placed on the system.  Jon."

6           Who is Jon?

7  A.    Jon was Lowery Systems, I think.  I don't remember

8  his exact title, but he was basically their top technical

9  guy.  Might have been Chief Operating Officer but I

10:44:03  10  honestly don't remember the title.

11  Q.    Okay.  Was it Jon Woodrum, do you think?

12  A.    Oh, Jon Woodrum.  I'm sorry.  Yes.

13  Q.    Okay.

14           Jon Woodrum stated, "They used around 20

10:44:13  15  users to test most of it and the most they ever had to

16  try and log on was 80, but he also stated that the 80

17  user number did not stress the system as they were not

18  processing orders, making payments, et cetera."

19           Why did you write this information in your

10:44:27  20  summary on April 17th and why did you bold it?

21  A.    I -- again this was -- we were led to believe that

22  they had two years essentially worth of joint development

23  and testing before they went live, and this is the first

24  time that we're hearing that they never did anything to

10:44:47  25  test or simulate a live environment.

1502

```
            1              So you can't -- well, obviously you

            2   can -- most people would not go live without testing the

            3   product in a top, live environment, and they certainly

            4   wouldn't only test 20 users if they're planning to put

10:45:02    5   150 on.

            6              It just didn't make sense.

            7              So it's bolded because I'm trying to

            8   emphasize to everybody the discrepancy between what they

            9   did and what we're now hearing, that they're asking of

10:45:14   10   the software.

           11   Q.    Is that part of the reason that you wrote that you

           12   were in stunned silence during this call?

           13   A.    Absolutely.  That's -- this is -- this is all

           14   basically confirmation of that comment.

10:45:29   15   Q.    Sir, you were shown a series of documents, some of

           16   them are in the binder that I hand -- that you have and

           17   that the jury has in the black binder.  Others are going

           18   to be in the white binder.  So forgive me if we're going

           19   to hop around here a little bit.

10:45:43   20              And I'm going to move quickly through this.

           21              You were shown a series of exhibits, 158,

           22   159, and 160.  I just generally want to ask some quick

           23   questions about those.

           24   A.    Okay.

10:46:12   25   Q.    Let's do 158 first.
```

1503

```
           1              Do you have that, sir?

           2    A.    I do.

           3    Q.    Okay.  The last e-mail in the chain is, of course,

           4    the first thing that we see, right?  And that is an

10:46:23   5    e-mail you were asked about from Mr. Mehnert-Meland to

           6    you, April 17th at 11:29 a.m.

           7              Sir, how long after your e-mail of that

           8    same day summarizing the phone call did Mr. Meland,

           9    Mehnert-Meland write back to you?

10:46:44  10    A.    About 20 minutes.

          11    Q.    Okay.

          12    A.    It looks like.

          13    Q.    Look at Exhibit 159, if you would, please.  I think

          14    that might be in your other binder.

10:46:53  15    A.    I have it right here.

          16    Q.    Okay.  And the last e-mail in that chain, that's

          17    from you back to Dan Kraus and others.

          18              What time did you -- what day and time did

          19    you write that e-mail, sir?

10:47:12  20    A.    And you're talking about the first one, correct?

          21    Q.    That's correct.

          22    A.    The same date at 11:30 a.m.

          23    Q.    So we're talking about 21 minutes after you had

          24    circulated your summary of the call that you had earlier

10:47:26  25    that morning, right?
```

 1    A.    That is correct.

 2    Q.    And let's look at one last document that you were

 3    shown.

 4                That was Exhibit 160.  And if you look at

10:47:40  5    the first e-mail on the page, which is the last in the

 6    chain, that is from Manfred Weiss to Ralf Mehnert and a

 7    bunch of other people, including you.

 8                Tell us the date and time of that e-mail.

 9    A.    That's the next morning at 7:42 in the morning.

10:48:02 10    Q.    And so how long after you circulated your summary

11    did this e-mail get sent back to you and the rest of the

12    group, sir?

13    A.    Less than 24 hours.

14    Q.    Okay.  And you were asked a bunch of questions

10:48:13 15    about the things that people like Mr. Weiss and

16    Mr. Mehnert-Meland wrote in those e-mails.

17                Those were not your statements, were they,

18    sir?

19    A.    No, they were not my statements.

10:48:26 20    Q.    And, sir, since these were within the 24 hours

21    after you had that call on April 17th of 2007, tell us,

22    did you consider any of what you were hearing from your

23    colleagues to be final conclusions, or did you consider

24    these to be simply initial reactions?

10:48:47 25    A.    I didn't consider them.

1505

```
            1              They were initial reactions, and they were

            2      in some cases just pure emotion.

            3      Q.    All right.

            4      A.    I mean, obviously knew they would end up being

10:48:58    5      evidence in a trial.  It was just communication back and

            6      forth.

            7      Q.    At the tail end of your testimony, you were asked

            8      by Hodell's counsel some questions about the term

            9      "Unacceptable performance at Hodell," and whether

10:49:20   10      you -- I'm paraphrasing, but something to the extent that

           11      whether you agreed or disagreed that the performance

           12      there was always unacceptable.

           13              And you were shown Page 254 of your

           14      deposition.

10:49:34   15              If you can go back, sir, and look actually

           16      at Page 253 of your deposition and read through 254, just

           17      read it to yourself.  You don't have to read it aloud.

           18              And then I'd like to ask you a couple

           19      questions.  And if you'd start at 253 at Line 20.

10:50:09   20      A.    I remember this.

           21      Q.    All right.  Does that refresh your recollection,

           22      sir, that your testimony at Page 254 of your deposition

           23      actually related to the performance that was being

           24      reported to you at or around April of 2007?

10:50:25   25      A.    That's correct.
```

1    Q.    Okay.  As you read this testimony here, were you

2    answering questions back at the time of your deposition

3    at this section of your deposition about what you thought

4    of the performance at Hodell later on in time?

10:50:42  5    A.    Yes.

6    Q.    What did you believe ultimately, what was your

7    understanding, rather, ultimately of whether the

8    performance at Hodell improved or didn't improve or

9    whether it was acceptable or unacceptable?

10:50:58 10    A.    After we learned of the issues with -- at Hodell,

11    we spent enormous amounts of time and energy trying to

12    work to improve the software.  We brought them numerous

13    version updates and enhancements.

14              We created actually custom code specific to

10:51:13 15    them and their environment.

16              Once all of that was done and implemented

17    and then tested, by the way, with a full load, they got

18    what I -- what I and others considered to be very

19    reasonable performance.  And it was -- and that was what

10:51:29 20    I was actually stating earlier today, which is why I said

21    no, I don't agree, because we had, I believe,

22    demonstrated that SAP Business One could, in fact, give

23    them decent performance right then and there and over

24    time, because of the nature of the software, it would get

10:51:44 25    better and their performance would get better, and this

1507

        1   solution could potentially work.

        2   Q.    Thank you, sir.

        3               MR. STAR:  I have no other questions.

        4               THE COURT:  Any redirect?

10:51:53 5               MS. LUARDE:  Yes, Your Honor.

        6               May I approach, Your Honor, about an issue?

        7               THE COURT:  What issue is this?

        8               MS. LUARDE:  It's relating to some earlier

        9   exhibits and Mr. Ashley's testimony that opens the door

10:52:10 10  to use those to --

       11               THE COURT:  Okay.  Come over here.  We'll

       12   talk for a minute.

       13               You can stand up and stretch if you wish.

       14               (Side-bar conference had off the record).

10:56:25 15      REDIRECT EXAMINATION OF GEOFFREY ASHLEY

       16   BY MS. LUARDE:

       17   Q.    Mr. Ashley.

       18   A.    Yes.

       19   Q.    I have a few questions for you.

10:56:30 20               I would like you to turn back to your

       21   deposition, Page 254, if you could, please.

       22   A.    Actually, I'm still there.  Okay.

       23   Q.    Okay.  Great.  Thank you.

       24               The question, your counsel had you look up

10:56:49 25  above at Page 253 to reference a time frame of April,

1    2007.

                         You recall that, correct?

3    A.    I do.

4    Q.    But if you look at the question on Page 254,

10:57:01  5    starting on Line 13, I'm going to -- I'm going to read

6    this to make sure we're clear.  The question doesn't

7    relate --

8                     MR. STAR:  Objection, Your Honor.  In

9    fairness, if we're going to do this, then counsel needs

10:57:12 10    to present the jury with all of the context.

11                     THE COURT:  Well, you can do that.

12                     Again, we've gone through this, I think,

13    three times, maybe four.

14                     MR. STAR:  Right.

10:57:22 15    BY MS. LUARDE:

16    Q.    Your testimony was that this related to 2007,

17    correct?  That --

18    A.    Yes.  After, after August of 2007.

19    Q.    Great.  The question, though, was do you ever

10:57:34 20    recall, and my question to you is do you ever recall

21    anyone at SAP disagreeing with Hodell's conclusion that

22    Business One performance was unacceptable?

23                     Do you see that?

24    A.    Yes.  And I -- my answer remains the same.

10:57:50 25                     If you're asking the word "Ever," remember

1   then I say yes, I remember people disagreeing, including

2   me.

3   Q.   But on Page 254, the question is "Do you ever

4   recall" and it's not limited to 2007, is that correct?

10:58:06  5   A.   Yes.

6   Q.   Thank you.

7            Mr. Ashley, you referenced joint

8   development and testing.  Do you recall that?

9   A.   I do.

10:58:28 10   Q.   And when you're referring to joint development and

11   testing, are you referring to joint development and

12   testing by LSi and Hodell-Natco?

13   A.   I do.

14   Q.   Did you see copies of a development agreement?

10:58:44 15   A.   No.

16   Q.   Did you see any documentation referring to joint

17   development by Hodell-Natco and LSi?

18   A.   Other than some of the e-mails where Dan Lowery

19   referred to them.

10:59:04 20   Q.   But none of those are in front of you here today,

21   correct?

22   A.   No, yeah, where he announced it, he talked about

23   co-development or joint development.

24   Q.   What was that exhibit number, Mr. Ashley?

10:59:14 25   A.   Oh, I don't know.

```
 1    Q.    Was it Exhibit 52?

 2    A.    It -- it might have been.

 3    Q.    Could you put 52 in front of you, Mr. Ashley?

 4          MR. MILLER:  What number is that?

 5          MS. LUARDE:  52.

 6    A.    Yes.

 7    Q.    And, in fact, if I read this, it states, "On

 8    November 16th in Las Vegas, LSi is announcing to the

 9    fastener industry our new In-Flight Enterprise product

10    for SAP Business One is the result of two years

11    development and will go-live at Hodell-Natco."

12          I don't see anywhere in this document where

13    it says "Joint development."  Do you?

14    A.    There's nothing in the document that says joint

15    development.

16    Q.    Thank you.

17          MS. LUARDE:  Your Honor, could I confer

18    with my counsel?

19          THE COURT:  Of course.

20          MS. LUARDE:  Thank you.

21          (Pause)

22    BY MS. LUARDE:

23    Q.    Mr. Ashley, do you recall ever telling Mr. Lowery

24    that Business One --

25          MR. STAR:  Objection.
```

1     THE COURT:  You can ask the question.

2  Q.    -- that Business One could have worked if anyone at

3  SAP would have wanted to take the time to help you get

4  there?

11:01:39  5  A.    Yes.

6  Q.    And did you further write -- strike that.

7           MS. LUARDE:  I would ask the court reporter

8  if they received Exhibit 246 yet.  We were trying to

9  e-mail that to them.

11:02:20 10           A FEMALE SPEAKER:  I have Exhibit 180 that

11  was brought in.

12  BY MS. LUARDE:

13  Q.    Great.  If you could turn to Exhibit 246,

14  Mr. Ashley, that is in the black binder.

11:02:39 15  A.    I don't have a black binder.

16  Q.    Oh, well, it's from the -- from your counsel.

17  A.    This goes to 181.  Okay.

18  Q.    And if you could look at Exhibit 246 and let me

19  know when you're done.

11:03:47 20  A.    Okay.

21  Q.    And you'll see at the bottom of the first page of

22  Exhibit 246 there's an e-mail from Ralf Mehnert-Meland,

23  dated April 16th, 2007.

24           Do you see that?

11:03:58 25  A.    I do.

1512

1       Q.    And I'll flip -- I'd like you to flip to the next

2       page, Mr. Ashley.  He has a summary line there on 246.2

3       which states, "Summary:  Hodell just has too much data.

4       SAP Business One cannot handle it and there is no fix in

11:04:19 5      sight.  I believe we need to find a way to get the

6       customer off SAP Business One."

7                     Do you see that?

8       A.    I do.

9       Q.    Turning back to the first page of Exhibit 246,

11:04:33 10     Mr. Ashley, you respond.

11                    And could you read your first sentence for

12      me?

13      A.    "I concur with what --"  sorry -- "I concur with

14      what Ralf has said."

11:04:48 15     Q.    Thank you.  So in that e-mail you agreed with what

16      Mr. Mehnert-Meland had written below, correct?  Yes or

17      no?

18      A.    I can't say yes or no.

19                    Some of it.

11:05:02 20     Q.    Okay.  But in this e-mail, you say you concur with

21      what Ralf has said, correct?

22      A.    I do concur with what, some of what Ralf said.

23      Q.    Thank you.  Going back to Exhibit 159.

24      A.    Yes.

11:05:35 25     Q.    I believe your testimony was that this was the

first time you had learned those numbers, meaning 120 users, is that correct?

A. No, meaning 500 users.

Q. Were you aware at that time or prior to that time that Hodell had 120 users?

11:05:57

A. Yes.

Q. Okay. In fact, you were aware of that quite some time before that, is that correct?

A. Sure. I mean, I don't remember exact time frames, but I did know, yes.

11:06:15

We knew, yes.

Q. If you could look at Exhibit 180, the court reporter will have to give that to you.

A. Thank you. I have it. Okay. Okay.

11:06:55

Q. Mr. Ashley, this is an e-mail from you to Michael Sotnick and Ralf Mehnert-Meland, correct?

A. That's correct.

Q. And if you could look one, two, three, four -- five paragraphs down, could you read that first sentence for me?

11:07:16

A. "There were many discussions as well as e-mails with Dan Lowery and others within his organization stressing that this opportunity was suspect from day one."

11:07:29

Q. So you would agree, you're writing here that this

1514

1    opportunity -- and you have that in quotes, correct?

2    A.    I had what in quotes?  Oh, "Opportunity," yes.

3    Q.    The word "Opportunity"?

4    A.    Yes.

5    Q.    Was suspect from day one?

6              So you would agree as of April 16th, 2007,

7    you believed that the Hodell-Natco opportunity was

8    suspect from the very beginning, correct?

9    A.    That's what I wrote.

10   Q.    Thank you.

11              MS. LUARDE:  I have no further questions.

12              THE COURT:  Any recross?

13              MR. STAR:  Very quickly, Your Honor.

14       RECROSS-EXAMINATION OF GEOFFREY ASHLEY

15   BY MR. STAR:

16   Q.    Mr. Ashley, to be very brief, you were just shown

17   again Exhibit 246 and then Exhibit 180.

18              Could you tell the jury, sir, the date of

19   the e-mails that make up Exhibits 246 and 180?

20   A.    This is 246, right?

21              A FEMALE SPEAKER:  Yes.

22   A.    Okay.  246 was on 4/16/2007, and 180 is same day.

23   Q.    That's the day before you have the conference

24   call -- pardon me -- the same day of the conference call

25   you had with Hodell, April 16th, 2007?

1515

1   A.    Either that day or the day before.

2           MS. LUARDE:  Objection.

3   A.    I can't remember.

4           But yes.

11:09:01 5          MS. LUARDE:  Objection.  The conference

6   call was April 17th.

7           MR. STAR:  Do I have the date wrong?  Maybe

8   I do.  Pardon me.

9   BY MR. STAR:

11:09:08 10  Q.    Go to 151.  You're correct.  Let me do that again.

11          Sir, Exhibit 246 and 180, they're from

12  April 16th, 2007, yes?

13  A.    That's correct.

14  Q.    And you have a conference call with Hodell on April

11:09:24 15  17th where you find out for the first time that Hodell

16  believes they could have 300 users or 500 users and all

17  those things that you told the jury you learned for the

18  first time on April 17th, 2007, right?

19  A.    Yes.

11:09:39 20  Q.    And that's the call where you were in stunned

21  silence, right?

22  A.    Yes.

23  Q.    So the communications in Exhibit 246 and Exhibit

24  180 tell us, in your view, were those preliminary

11:09:54 25  assessments or were those final conclusions?

1   MS. LUARDE:  Objection.  They contacted

2   Hodell.

3   THE COURT:  Overruled.  Overruled.

4   A.   The --

11:10:03 5   THE COURT:  Go ahead.

6   THE WITNESS:  Sorry.  Thank you.

7   A.   They were -- obviously they were preliminary

8   assessments.  They were internal conversations, and they

9   were talking, in my case, talking more about a

11:10:15 10   personality than they were about the actual situation.

11   Q.   Okay.

12   MR. STAR:  Thank you very much, sir.

13   I have nothing further.

14   THE COURT:  Thank you, Mr. Ashley.  You're

11:10:25 15   finally finished.

16   THE WITNESS:  Thank you.

17   THE COURT:  Have a good day.

18   THE WITNESS:  Thank you.

19   (Witness excused)

11:10:32 20   THE COURT:  You may call your next witness

21   then.

22   MS. LUARDE:  Your Honor, we would like to

23   call Helmuth Guembel.

24   Your Honor, if I may go to the hall.

11:11:02 25   THE COURT:  Yes.  Sir, could you raise your

1517

1    right hand for me?

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
1                        HELMUTH GUEMBEL,

2          of lawful age, a witness called by the PLAINTIFFS,

3               being first duly sworn, was examined

4                    and testified as follows:

11:12:42  5          THE COURT:  Could you tell us your full

6    name and spell your last name.

7    A.    My name is Helmuth Guembel, and my last name

8    spelled GUEMBEL.

9               THE COURT:  Thank you.

11:13:01 10       DIRECT EXAMINATION OF HELMUTH GUEMBEL

11   BY MS. LUARDE:

12   Q.    Good morning, Mr. Guembel.

13               THE COURT:  You can start.  Try to speak up

14   if you can, Helmuth.

11:17:01 15               THE WITNESS:  Okay.  I try.

16               THE COURT:  Sounds like it's working.

17               THE WITNESS:  I woke it up.

18               THE COURT:  Yeah, you did.

19               THE WITNESS:  Yeah.

11:17:08 20               THE COURT:  It's voice-activated, maybe.

21               MS. LUARDE:  Maybe.

22   BY MS. LUARDE:

23   Q.    Mr. Guembel, could you tell yourself -- I'm

24   sorry -- could you introduce yourself to the jury,

11:17:20 25   please?
</pre>

1    A.    Yes.  As I said, my name is Helmuth Guembel, and

2    I'm the sole proprietor of a consultancy called Strategy

3    Partners International.

4              I've been with Strategy Partners

11:17:34  5    International since its inception in 1996, and providing

6    consulting and advisory services to the IT industry, in

7    particular, the ERP industry, and users internationally

8    in Europe for the most part.

9    Q.    Thank you.  And, Mr. Guembel, you're not from the

11:17:59 10    United States, correct?

11    A.    I'm not -- pardon?

12    Q.    You're not originally from the United States?

13    A.    I'm not originally from the United States.  I was

14    born in Germany, raised in Germany, and I'm living

11:18:11 15    currently in Switzerland.

16    Q.    And is that where strategy partners is located?

17    A.    Yes, that is true.

18    Q.    And could you tell me what is your position with

19    strategy partners?

11:18:27 20    A.    My position with strategy partners is I'm a

21    managing partner, and together with freelancers that I

22    have occasionally, I'm providing advisory services.

23    Q.    And when did you open Strategy Partners, what year?

24    A.    I opened it in 1996.

11:18:50 25    Q.    And in your role as the managing partner of

1    Strategy Partners, could you explain for the jury what

2    your day-to-day responsibilities are?

3    A.    My day-to-day responsibilities are to run the

4    advisory projects that we are doing, monitor the market,

11:19:15  5    doing research, liaise with the press if necessary and

6    advisable, and perform speaking engagements and also

7    moderating engagements.

8    Q.    And you also do what we've discussed before as

9    intelligence gathering, is that correct?

11:19:36  10    A.    Yes.  That is monitoring the market.  Intelligence

11    gathering, which means I read the press, I have several

12    sources in the market, and in particular with vendors and

13    partners of vendors and customers that give me input and

14    that allow me to do my work.

11:19:59  15    Q.    And what market are we talking about exactly?

16    A.    It is for -- for the main, it is the ERP market,

17    the market of enterprise backbone applications.

18    Q.    Mr. Guembel, have you ever consulted with SAP

19    America or SAP AG?

11:20:25  20    A.    I've consulted with SAP AG for a number of times,

21    yes.

22    Q.    And SAP AG, are they located in Germany?

23    A.    They're located in Germany, a stone throw away from

24    my hometown.

11:20:41  25                THE COURT:  Dave, false alarm.  It worked.

```
  1              Thank you.

  2     BY MS. LUARDE:

  3     Q.    And what type of engagements have you handled for

  4     SAP AG?

  5     A.    A vast number of engagements.  Altogether about 50,

  6     running from consulting with the board of executives,

  7     Hasso Plattner for instance, Gerd Oswald, Dietmar Hopp,

  8     doing competitive analysis for SAP, speaking at user

  9     events, consulting on behalf of SAP with SAP customers,

 10     motivating SAP employees at internal events, and also

 11     analyzing SAP products, helping SAP with go-to-market

 12     events and also announcement endeavors.

 13     Q.    And I believe you said that you've been retained by

 14     SAP AG over -- over 50 different times, is that correct?

 15     A.    That is correct.

 16     Q.    And how did you go about determining it was that

 17     number of times?

 18     A.    I just -- I just scanned the invoices that I sent

 19     to SAP over -- well, starting in 1998 actually.

 20              1996 I wasn't able to look at my records

 21     because I don't have them any more on my PC, and I

 22     arrived at that number.

 23     Q.    And do you know the time frame for which you worked

 24     for SAP AG?

 25     A.    Yes.  The time frame started -- well, actually
```

1522

1    during my time with the previous employer, and but I

2    don't have obviously any records because I did not charge

3    SAP myself.  And right in 1996, I started to get

4    consulting jobs for SAP and the time frame ends with 2012

11:22:58 5    when I informed SAP that I couldn't make myself available

6    for some time because I saw a conflict of interest while

7    working in conjunction with this case.

8    Q.   Do you know, and if you don't know the answer to

9    this, that's okay, but do you know about how much SAP has

11:23:22 10    paid you for consulting work?

11    A.   Yes, I know about how much that is.

12         It's a little tricky because some of this

13    was invoiced in Swiss francs and some of this was

14    invoiced in Euros, but the number might be well around

11:23:38 15    one million U.S. dollars.

16    Q.   Thank you.  And, Mr. Guembel, in addition to your

17    work at Strategy Partners, do you also hold any teaching

18    positions?

19    A.   Yes, I do.

11:23:54 20         I'm a teacher with the University for

21    Applied Sciences in Munich and have been so for five

22    winter semesters.  And next winter semester will be my

23    sixth.

24    Q.   And what, what do you teach at the University for

11:24:15 25    Applied Sciences?

1523

1    A.    It's a course on alternative ERP systems.  The main

2    education that the students receive at that university is

3    on SAP's Business Suite and the Dean felt that this

4    education should be complemented so that they have a

11:24:37  5    broader view of what is around on the market.

6               The last course, by the way, included also

7    Business One, although that is an alternative that comes

8    from SAP itself.

9    Q.    And that was a course that you taught was also on

11:24:52  10    Business One?

11    A.    Well, in this, the portfolio of that, in the

12    syllabus for that course, we cover a number of systems.

13    Not all, of course, that are around on the market, but

14    every winter semester, we put a different portfolio

11:25:10  15    together and, yes, Business One was one of the systems

16    that we looked at.

17    Q.    Could you tell the jury a little bit about the ERP

18    System of the Year Award and your involvement?

19    A.    Yeah.  Since, I believe, 2007, there is the award

11:25:42  20    for the ERP system of the year.  That award is -- for

21    this award there is a jury, and I have been on that jury

22    from day one of the existence of that award.

23               The origin of this endeavor is the

24    University of Potsdam, which is university that is very

11:26:05  25    near to Berlin, and also on the campus there is Hasso

1    Plattner Institute which is funded and owned by one of

2    the SAP founders.

3    Q.    And that's the Hasso Plattner Institute?

4    A.    Yes.

11:26:22  5    Q.    And was that initiated by, I think you said, the

6    SAP co-founder?

7    A.    It was.

8    Q.    Hasso Plattner, correct?

9    A.    It was.  And he's still deeply involved.

11:26:36 10    Q.    And what do you do in your role on this jury for

11    the selection of the ERP system of the year?

12    A.    The jury's composed of a number of people that have

13    different backgrounds, and there are two professors,

14    university professors, there are two members of the jury

11:26:59 15    that are involved in the selection of ERP systems for

16    customers.  There are two journalists, and I'm the only

17    industry watcher/analyst that is currently on the jury.

18              So the jury looks at the applications of

19    various vendors.  Vendors get an invitation to apply, and

11:27:27 20    if they want, they can do this, and we also have

21    presentations from the vendors and their partners.  And

22    from that, we judge whether any of these systems is a

23    candidate for the title of ERP system of the year.

24    Q.    Have you published articles over the course of your

11:28:01 25    professional experience?

```
 1    A.    Yes, I've published a number of articles in my

 2    professional career, about 40, I believe, since 2002.

 3                    Included in the number of articles are also

 4    a number of studies that we marketed, some of which were

 5    also bought by SAP.

 6    Q.    So, just so I understand, you've actually written

 7    articles about SAP, correct?

 8    A.    I've -- I've written -- some of the articles are on

 9    SAP.

10    Q.    And have you written any articles about SAP

11    Business One, in particular?

12    A.    Yes.  I wrote an article about Business One that

13    was published in 2006.

14    Q.    And could you briefly tell us what that article was

15    about?

16                    MR. STAR:  Objection.  The article is

17    hearsay.

18                    THE COURT:  Overruled.

19                    Go ahead.

20    Q.    You can answer.

21    A.    Okay.

22                    The article was due to the fact that two

23    things had happened.  Number one, one of my clients had

24    looked into potentially getting SAP Business One for its

25    subsidiaries of which there were a few in countries like
```

1    Italy and Switzerland, and had discarded this idea for

2    reasons that I don't want to elaborate here right now.

3              And the other reason was really that SAP

4    with Business One departed very strongly from its

11:29:47  5    previous architectural view, namely that a scalable

6    system should be a so-called three-tier client server

7    system.

8              The article's role was to discuss what the

9    limitations of Business One as they existed at that time

11:30:07 10    were, and what it would mean potentially to get outside

11    of the scope of the limitations of Business One.

12    Basically, what would happen if you outgrow the system.

13    Q.    Okay.

14              And, in fact, you analyzed this and

11:30:26 15    prepared this article before you became involved with

16    Hodell-Natco, correct?

17    A.    Definitely.

18              I had no knowledge at all at that time of

19    Hodell-Natco at all.

11:30:39 20    Q.    And, Mr. Guembel, in fact, your work has been

21    recognized as influential by industry publications, is

22    that correct?

23    A.    Yes.   That is true.

24    Q.    And you told me something about *Computer Week*.

11:30:53 25              What was that?

1    A.    That was, I believe, in 2002, and *Computer Week*

2    annually publishes the list of the 100 most influential

3    persons in the IT market in Germany, and actually I was

4    on the first publication that did that, and I, if I

11:31:19  5    recall it correctly, I was placed number 37 or something

6    like that.

7    Q.    Congratulations.

8    A.    Thank you.

9    Q.    Can you tell me a little bit about your educational

11:31:34 10    background, Mr. Guembel?

11    A.    Yes.  I hold a degree as a Master of Arts in

12    political economics that I acquired at the University of

13    Heidelberg, Germany, in 1972.

14              And that's my academic degree.

11:31:57 15    Q.    But you also have some training from Siemens AG, is

16    that correct?

17    A.    That is correct.  Before that I received -- and

18    actually during my university education, I received

19    education as a business administration trainee by Siemens

11:32:17 20    AG, which is a very large, international electrical

21    conglomerate, similar to General Electric perhaps.

22    Q.    And did you also obtain some certifications from

23    Software AG?

24    A.    Yes, I did.  I worked for Software AG for six

11:32:43 25    months, and during that time, I received a comprehensive

1    education on their products; in particular, their

2    database products.

3    Q.    Okay.  Now, before you started working at Strategy

4    Partners, you worked for Gartner, is that correct?

11:33:07  5    A.    That is correct.

6    Q.    Could you explain to the jury what Gartner is?

7    A.    Gartner is the lead, by far the leading and most

8    influential IT consulting and analyst company.  It's a

9    market-watching company, and it's also a company that

11:33:31 10    follows industry trends.

11               Gartner is a public company and has today,

12    I believe, several thousand of analysts.

13               When I started to work with Gartner in

14    1989, I was one of the three first industry analysts in

11:33:53 15    Europe.

16    Q.    And, in fact, Gartner touts itself as a partner to

17    clients in over 9,000 distinct enterprises worldwide.

18               Does that sound about right to you?

19    A.    That is correct.  I would dare to say that no large

11:34:23 20    enterprise in the industrialized world is without the

21    advice of Gartner.

22    Q.    And how long did you work at Gartner?

23    A.    I worked from '89, 1989, that is, until the end of

24    1995.

11:34:42 25    Q.    And you're familiar with Bill McDermott, is that

1    correct?

2    A.    Yes.  Bill McDermott was at, during my time with

3    Gartner, also the CEO of Gartner.

4    Q.    And now where is Mr. McDermott?

11:34:59  5    A.    Pardon?

6    Q.    Now where does Mr. McDermott --

7    A.    Mr. McDermott now is the CEO of SAP.

8    Q.    I'd like to say it's a small, small world.

9    A.    Sure is.

11:35:14  10    Q.    And what did you do when you were at Gartner?

11    A.    My first assignment at Gartner was as a program

12    director in the software management service.

13              That was at that time the only service that

14    looked at software, and the main focus of that service

11:35:35  15    was software for large enterprises and large computers

16    called mainframes.

17              Mainly, IBM products like MVS and DB2 and

18    the like were part of my work.

19              My specialty were European vendors that

11:35:59  20    were still around at that time in that market, and in

21    1991, I started to work on what we called the ERP

22    vendors, co-authoring the first research note that

23    Gartner ever produced on SAP.

24              And the following years, my focus shifted

11:36:19  25    from system software to ERP software.

1    Q.    And, in fact, while you were at Gartner, did you do

2    consulting work -- Gartner was retained by SAP for

3    consulting work while you were at Gartner?

4    A.    Yes.

11:36:38  5    Q.    Correct?

6    A.    Yes.

7          SAP was a Gartner customer even before I

8    joined Gartner.  I would estimate that they became a

9    customer maybe three or four years before that, and the

11:36:54 10    engagement between SAP and Gartner became much bigger

11    over that time.  And I was part of this.

12    Q.    And you were also, if I recall correctly,

13    consulting unit manager for Digital Equipment.

14          Could you tell me about that?

11:37:26 15    A.    Yes.  Before -- before I joined Gartner, I worked

16    with Digital Equipment, and my role at Digital Equipment

17    was twofold:  One, I was the manager of a consulting unit

18    that provided large systems, IBM-oriented mainframe

19    consulting, to customers that wanted to add to their IBM

11:37:48 20    portfolio, also Digital products.

21          And the second role was I oversaw the

22    development of some IBM-oriented telecommunications

23    software that digital -- aimed to provide for the banking

24    industry.

11:38:07 25    Q.    And before that, you also worked for Software AG,

1    correct?

2    A.    Yes.  Before that I worked at Software AG, and my

3    role there was as a senior systems architect, which

4    involved developing ways and means how to put the various

11:38:26  5    Software AG products together and have them work

6    optimally with data -- with operating systems that were

7    run on the various target systems.

8    Q.    And you worked at Software AG in or around 1987,

9    correct?

11:38:45  10    A.    Yes.

11    Q.    And prior to that, you worked at Nixdorf Computer

12    AG, is that correct?

13    A.    That is -- that is true.  I worked at Nixdorf

14    Computer AG from 1980 to '87, and at that time Nixdorf

11:39:10  15    Computer AG was a strongly growing computer vendor

16    internationally operating, headquartered in Germany.

17    Q.    Nixdorf was eventually acquired by Siemens, is that

18    correct?

19    A.    Nixdorf was eventually acquired by Siemens.

11:39:38  20            That happened later during actually my time

21    at Gartner, and the person I worked closely together at

22    Nixdorf was also a Gartner group analyst later on, and we

23    advised IBM on that purchase.

24            Not IBM, I'm sorry, Siemens on the

11:40:02  25    purchase.

1    Q.    Siemens on the purchase.

2              And for a period of time, you worked

3    Siemens AG as well, correct?

4    A.    I worked Siemens AG from '72 until I joined Nixdorf

11:40:14  5    Computer AG right after finishing university, and I -- my

6    first years were in the development department for

7    operating systems.

8              I was involved in several large projects.

9    One of them was an international one that involved the

11:40:35  10   rest of the European computer industry, mainly Phillips,

11   and then I was assigned a task in a group that defined

12   the architecture for a new computer series that Siemens

13   was developing.

14             Finally it ended up in a cooperation with

11:40:57  15   Fujitsu, and I was sent to Japan to do some architectural

16   work there in conjunction of this project.  And after

17   that, I became a manager in the marketing organization of

18   Siemens.  My roles there was -- were defining new

19   products, tracking the economic feasibility, and also

11:41:23  20   interacting with users and user organizations such as the

21   German FBI or Dresdner Bank, Deutsche Bank, some of

22   the -- Daimler Benz, those customers were customers that

23   I had regular interaction with.

24   Q.    And, Mr. Guembel, you've -- in all of this

11:41:45  25   experience that we discussed, clearly you've had a lot of

1    consulting experience on the selection of ERP systems,

2    correct?

3    A.    Yes.

4    Q.    And that would be both at Gartner, Strategy

5    Partners, and other positions that you've held, correct?

6    A.    Was at Gartner and Strategy Partners.

7    Q.    Okay.  And about how many such consultations have

8    you worked on?

9    A.    It's hard to track that, because at Gartner I -- I

10   was having something like 800 inquiries a year, which

11   gives you maybe an idea how broad this load was.

12            At Strategy Partners, this was much more

13   focused because I enjoyed the luxury of having longer

14   running engagements, but I would estimate that it is well

15   over 100 cases.

16   Q.    And you've actually also consulted on the

17   implementation of ERP systems, correct?

18   A.    Yes, I did.

19   Q.    And that would be both at Gartner and Strategy

20   Partners?

21   A.    Yes.

22   Q.    And about how many implementations of ERP systems

23   have you consulted on?

24   A.    The -- these cases were fewer than the selection

25   cases because I wasn't always involved in giving advice

1    on the implementation, but I would think it would be

2    between 60 and 100.

3    Q.    And has your work experience also enabled you to

4    study the architecture of software programs?

11:43:26 5    A.    Yes.  Having been involved in architectural work

6    very early in my career, in various environments, of

7    course I developed an interest and a capability in

8    judging architectures, also, within the application

9    space, namely -- predominantly within the frame of ERP

11:43:51 10   products.

11   Q.    And just to summarize, you started working at

12   Gartner in 1989.  So from 1989 to present, you've been

13   involved with consultation on selection and

14   implementation of ERP systems?

11:44:16 15   A.    Yes.  Yes.

16   Q.    And could you also tell the jury the sorts of

17   programs that you've studied throughout your career?

18   A.    Initially I studied, apart from my first program

19   that I wrote myself, which was an application program for

11:44:49 20   a cable manufacturer while I was a student and employed

21   as a programmer by Siemens, I studied parts of operating

22   systems, databases, and also application programs later

23   on while at Gartner and Strategy Partners.

24            And today, I'm engaged in a project

11:45:17 25   architecturally that aims at providing knowledge

1    management and knowledge distribution portal in the

2    Internet.  So the architectural work goes on.

3    Q.    And just for my understanding and the jury's

4    understanding, what do you mean by architecture?

11:45:43  5    A.    Architecture in this context is defining the

6    building blocks of a system and defining the ways, how

7    these building blocks are being interconnected so that

8    they can be created economically, maintained in a

9    sustainable fashion, and perform according to the specs

11:46:05 10    that were created to meet the demand of the market.

11    Q.    And we're here about an ERP system, and I think we

12    all know what an ERP system is, but could you just give

13    us a quick explanation of what an ERP system actually is?

14    A.    ERP stands for enterprise resource planning, and

11:46:32 15    while there is no firm and hard description on what it

16    really encompasses, for practical purposes, I would say

17    it is the IT backbone, it is the programming backbone for

18    everything an enterprise does.

19    Q.    Okay.

11:46:55 20    A.    So without -- when it doesn't work, the business

21    will come to a grinding halt.

22    Q.    And, Mr. Guembel, have you testified as an expert

23    before?

24    A.    Yes, I did.

11:47:09 25    Q.    And could you -- and that was on one case, correct?

1    A.    That was in a case that involved one of the

2    distributors that SAP had as the Plaintiff, and SAP as

3    the Defendant.

4    Q.    Was that SAP AG was the Defendant?

11:47:32  5    A.    That was SAP AG.

6    Q.    And that case was not located in the United States,

7    correct?

8    A.    It was not located in the United States.

9          It was SAP and the distributor had agreed

11:47:48 10    in the distribution agreement that they struck that any

11    conflicts should be settled before the International

12    Chamber of Commerce, which is located in Paris, but the

13    actual trial was not held there; it was held in -- near

14    Frankfurt, Germany.

11:48:08 15    Q.    Okay.  And were you retained as an expert in any

16    other cases?

17    A.    I was retained as an expert in some other cases,

18    but they settled out-of-court and I helped to prepare

19    usually the Plaintiff to create materials that helped him

11:48:38 20    to resolve the case.

21    Q.    Okay.  And what percentage of your time is actually

22    devoted to being an expert in litigation matters?

23    A.    It is a very small percentage, and I would think

24    that it is less than two percent of my time.

11:48:59 25    Q.    And before this engagement, have you ever consulted

1    with Hodell-Natco before?

2    A.    No.  Not at all.

3    Q.    And how long have you been in the technical field

4    in general?

11:49:16   5    A.    I started in 1968 to develop an interest in

6    computers, and immediately I was sent to computer classes

7    by Siemens because Siemens at that time paid for a large

8    part of my university education.

9              And in that role, they could also

11:49:42  10    complement my education with anything they deemed to be

11    essential.

12    Q.    Okay.  So since 1968, you've been in the

13    technical --

14    A.    Yeah.

11:49:51  15    Q.    -- technical field and I'd like to say my math is

16    great, but that's 40-some years, correct, almost 50

17    years?

18    A.    It's almost -- I think it's almost 50, yes.

19    Q.    Almost 50 years?

11:50:03  20    A.    Yes.

21    Q.    I'm glad to say it's not 43 years?

22              MS. LUARDE:  At this point, Your Honor, we

23    would like to tender Mr. Guembel as an expert in the

24    fields of ERP system analysis, deployment strategy, and

11:50:25  25    in the ERP market.

1538

         1              THE COURT:  You may proceed.

         2              MS. LUARDE:  Thank you.

         3    BY MS. LUARDE:

         4    Q.    Mr. Guembel, have you been retained to provide

11:50:34 5    expert testimony in this matter?

         6    A.    Yes, I was.

         7    Q.    And, in fact, like any expert, you're being

         8    compensated for your testimony, correct?

         9    A.    Yes.

11:50:44 10   Q.    And could you tell me your hourly rate?

        11    A.    My hourly rate is 750 Euros, which today translates

        12    to a little over 800 U.S. dollars.

        13    Q.    And that's on an hourly basis, correct?

        14    A.    That's on an hourly basis.

11:51:04 15   Q.    And how much have you been paid by Hodell to this

        16    point?

        17    A.    To this point, I've been paid by Hodell a little

        18    less than $100,000.

        19    Q.    Okay.  And that's for your time from 2012 through

11:51:19 20   today?

        21    A.    Yes.

        22    Q.    Or approximately today?

        23    A.    Approximately today.

        24    Q.    And have you provided Hodell with some discounts?

11:51:29 25   A.    Yes.  But they were not very significant.

1    Q.    And is your hourly rate consistent with other

2    engagements that you've undertaken?

3    A.    Yes, it is.

4          My hourly rate has stayed the same from day

11:51:53  5    one until today of my time with Strategy Partners.

6    Q.    So at Gartner, your rate was the same?

7    A.    No.  My rate was much higher.  As an independent

8    consultant and advisor, you don't have the same economic

9    clout as such a giant company like Gartner, so it's very

11:52:21 10    common to arrive at something that is about half of the

11    rate that Gartner would charge.

12    Q.    Okay.  I apologize, I'm just a little confused.

13          So at Gartner your rate was higher?

14    A.    It was much higher.

11:52:37 15    Q.    Than what you're charging now?

16    A.    It was much higher.

17    Q.    And we talked earlier about SAP engagements.

18          Is your rate the same for SAP engagements?

19    A.    My rate is the same for SAP engagements, except

11:52:53 20    that most of the engagements that I did for SAP were on a

21    fixed price base.

22    Q.    Okay.

23    A.    But the basic rate that is used to calculate the

24    fixed price is exactly the same.

11:53:07 25    Q.    Great.  And your fee in this case doesn't depend in

1540

1    any way on the outcome of the case, correct?

2    A.    It does not depend.

3    Q.    And what was the nature of your assignment?

4    A.    The nature of the assignment was based on the

11:53:25  5    publication that I independently of this case issued in

6    2006, to check whether the demands that Hodell had

7    defined could be handled in any way by Business One.

8    Q.    In other words, would Business One work or fulfill

9    Hodell-Natco's needs?

11:53:55 10   A.    Yes.

11   Q.    Okay.  And did you actually author a report in this

12   matter?

13   A.    I did.

14              MS. LUARDE:  Your Honor, may I approach?

11:54:03 15             THE COURT:  Sure.

16              MS. LUARDE:  Thank you.

17              I grabbed the wrong binder.  I apologize.

18   Bear with us just one second.

19   BY MS. LUARDE:

11:55:12 20   Q.    Mr. Guembel.

21   A.    Okay.

22   Q.    I'm going to hand that to you.

23              And, Mr. Guembel, I've handed you a copy of

24   the report.  I apologize, it doesn't have the attachments

11:55:32 25   on it, but we will make sure to get those for you during

1       the lunch break.

2       A.    Um-hmm.

3       Q.    Could you tell me, Mr. Guembel, is this an accurate

4       copy of just the written portion of your report without

11:55:44  5   the attachments?

6       A.    It is.

7       Q.    Okay.  And how much time did you spend preparing

8       and authoring your report?

9       A.    For the report itself, I spent about 35 hours.

11:56:02 10   Q.    And, Mr. Guembel, your opinions are actually

11      summarized in this report, is that correct?

12      A.    That is correct.

13      Q.    And could you tell me, in preparing the report,

14      what underlying facts were you provided?

11:56:48 15          And if you need to refer to your report,

16      you can do so.

17      A.    Well, in preparing this report, I relied on a

18      number of e-mails and documents from -- also documents

19      from SAP, also relied on publicly-available articles and

11:57:07 20   books.  And also, I was briefed in a telephone

21      conversation by Otto Reidl, Kevin Reidl, and Bill Rex.

22      Q.    And could you summarize for the jury your knowledge

23      of Hodell's installation environment?

24      A.    Yeah.  The summary is that Hodell started out with

11:57:38 25   acquiring 80 licenses.

1       MR. STAR:  Your Honor, I object to this.

2       If he's going to be shown a document, he's

3   just going off his memory, it's hearsay.

4       MS. LUARDE:  Your Honor --

11:57:52  5       THE COURT:  Overruled.

6       MS. LUARDE:  Thank you, Your Honor.

7   BY MS. LUARDE:

8   Q.   You can continue, Mr. Guembel.

9   A.   Okay.  Started off with purchasing 80 licenses.

11:58:07 10   Added to that another 40, had at the time of the purchase

11   40,000 items on inventory, translating into 150,000 SKUs

12   because these items were available in several packing

13   forms, packaging forms, and each of them had a SKU.

14       They had five warehouses distributed.  They

11:58:36 15   wanted to have all of this on a centralized installation

16   that was commonly usable by all of the users.

17       They had a very large database of over 40

18   gigabytes, and they wanted to grow the 120 concurrent

19   users that they had meant to implement over the time to

11:59:04 20   something like 300 and potentially even 500 users, due to

21   plans for mergers, acquisitions, and organic growth of

22   the business.

23   Q.   And --

24   A.   They had also many business partners, 20,000

11:59:22 25   customers, if I'm correctly informed, and 7,5 00 vendors

1    or suppliers that they were buying the fastener articles,

2    the fastener items that they were distributing.

3    Q.    And, Mr. Guembel, you're also aware that they would

4    have had a large amount of transactions, is that correct?

11:59:47   5              MR. STAR:  Objection.

6              THE COURT:  Overruled.

7    A.    They -- I mean, judging from the numbers that I

8    just explained, it is clear that a large number of

9    transactions would be the consequence.

12:00:02  10         If you take the 80 users, for instance,

11   that they had defined and you determined the number of

12   work days they have in a year, then that would be 1600

13   work days.  And if you take the 100,000 transactions

14   ceiling that SAP was talking about in their statements of

12:00:27  15   direction, and then divide that by the 1600, then that

16   would mean that whatever transaction is, six of them

17   could be done on the average by each of these users.

18   Q.    And that's six per day?

19   A.    Six per day.

12:00:40  20         Now, a transaction in this context could be

21   processing a purchase order that was coming in.  It could

22   be booking an invoice that was -- that was paid.  It

23   could be issuing an order to a supplier to replenish

24   inventory, any of these.  And some of these, these

12:01:07  25   activities, would result even in multiple transactions

1  inside of the system.

2          So it is very, very likely that each of the

3  users would issue more than just six of these activities,

4  six of these transactions a day.  In actual fact, my

5  suspicion is that you would have been done with the six

6  in less than two hours of his work.

7  Q.    And I believe you mentioned that the more than

8  100,000 transactions was important to you, is that

9  correct?

10 A.    It was not only important to me, it was also

11 important to SAP because they kept reiterating it in

12 their statements of directions, and they, as I have

13 quoted in this paper.

14 Q.    And what did they say in their statement of

15 direction, that --

16 A.    Statement of direction, let me just look it up

17 here.

18          MR. STAR:  Objection.

19          THE COURT:  Overruled.

20 BY MS. LUARDE:

21 Q.    Is that one of the attachments I don't have on

22 your --

23 A.    No, it -- well, it is in the section starting

24 Page 11 that deals with the analysis of SAP Business One

25 and its suitability for Hodell.

 1              And in 2009, SAP, in their Statement of

 2    Direction for the 8.8 set of releases, which was way

 3    after Hodell had stopped implementing this project, SAP

 4    said, "Broadly speaking, SAP Business One customers

 5    usually have up to 50 Euro, 50 Euro million in annual

 6    revenue turnover and 100,000 transactions per year."

 7              And in 2007, they also said that the

 8    Business One would be a product that was well useful for

 9    a number of users that was in the bracket of ten to 100

10    employees.

11              So the 100,000 transaction limit is not a

12    hard-coated limit, I must say, but it is, I would think,

13    the fair estimate of the vendor as to how far the product

14    would in all probability carry the user when stressed.

15              MR. STAR:  Objection.

16    Q.    Thank you.

17              MR. STAR:  Move to strike this.

18              THE COURT:  Overruled.

19              MS. LUARDE:  Now, Your Honor, this might be

20    a good time for a lunch break.

21              THE COURT:  Okay.  If it's a good time for

22    you, too?

23              MS. LUARDE:  Yes.

24              THE COURT:  Okay.  Great.

25              It's just about 12:00 o'clock.  I don't

1     know, is the cafeteria open?  Okay.  Well, then we

2     can -- how about if we meet on L-1 at 1:15.

3                    Does that sound like a reasonable time

4     frame?

12:04:36  5           Okay.  Enjoy your lunch.  Keep in mind the

6     admonition.

7                    We'll call for you at 1:15.

8                    (Jury out)

9                    (Luncheon recess taken).

10                    - - - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    TUESDAY, JUNE 23, 2015,  1:13 P.M.

2  (Proceedings resumed in presence of the jury as follows:)

3              THE COURT:  You can be seated.

4         DIRECT EXAMINATION OF HELMUTH GUEMBEL (RESUMED)

5  BY MS. LUARDE:

6  Q.    Good afternoon, Mr. Guembel.

7              Before we left for break, we had gone

8  through a lot of facts or information that you relied

9  upon in forming your opinion.

10             Do you recall that?

11  A.    Yes, I do.

12  Q.    And in your experience, in evaluating and

13  implementing ERP systems, should this background

14  information on Hodell have been known by the channel

15  partner?

16  A.    Yes, it should.

17  Q.    And should it have been known by SAP?

18  A.    It also should.

19  Q.    And one of the items we didn't cover early on

20  related to your report, and now we have a complete report

21  in front of you.

22             Could you tell me and summarize the

23  materials that you relied upon in preparing your report?

24  A.    Yes, I can provide you with a summary.

25             The materials that I used to provide that

1548

1    report were relying on books and university articles that

2    were generally available.

3                    Also, presentations and marketing materials

4    as they were made public by SAP and available on the web.

13:27:41  5                    Also, release notes.  Also, information on

6    road maps, et cetera, that routinely puts it out, and

7    there was also made some use of several e-mails as they

8    were created in the context of this -- of this project.

9    Q.    Okay.  And those materials are all identified in an

13:28:06 10    appendix to your report, correct?

11   A.    The appendix to the report tabulates all of these

12   materials and relates them to the footnotes in the

13   report.

14   Q.    Okay.  But you actually reviewed much more than

13:28:21 15   that, and also are relying on your education and

16   experience, correct?

17   A.    Yes.  That is correct.

18   Q.    Okay.

19                   Mr. Guembel, based upon your knowledge of

13:28:40 20   Hodell and of Business One, did you form opinions in this

21   matter?

22   A.    Yes, I did.

23   Q.    And, Mr. Guembel, I believe those opinions are

24   reflected in your report.

13:28:52 25                   Could you tell me if you'd turn to Page 16,

1    and you could do it from memory if you can do it from

2    memory, or if you prefer to read it, but your first

3    opinion in this matter, could you tell me what that is?

4    A.    My first opinion here on Page 16 is that SAP

13:29:11  5    Business One is inherently limited as to the number of

6    concurrent users it can support.

7              That limitation is based on the

8    architectural qualities that Business One exhibits.

9    Q.    Thank you.

13:29:27  10             And could you tell me what you mean by, or

11   what are the architectural qualities of Business One that

12   limit its capabilities?

13   A.    Business One uses an architecture blueprint that is

14   known as fat client or two-tier client server.

13:29:50  15   Q.    Okay.  And there are a couple of other things that

16   are within Business One that are also problematic, is

17   that correct?

18   A.    That is correct.

19   Q.    Could you tell me what they are?

13:30:01  20   A.    The next limitation is the addressability of

21   memory.  Also, termed the 32-bit address limitation

22   versus 64-bit address availability as it is available in

23   your software.

24   Q.    And the third thing that's a problem?

13:30:24  25   A.    The third thing that is a problem, when, in

1    particular, when creating extensions as they were

2    required here in the context of this project is the way

3    the architecture was done for the SDK, in particular for

4    the DI API, but also for the UI API, but in this context,

13:30:50  5    it's more the DI API that matters.

6    Q.    Okay.

7                    Mr. Guembel, I'd like to explain to the

8    jury what you mean by two-tier architecture, and we've

9    actually created a graphic for that.

13:31:03  10                    MS. LUARDE:  Your Honor, if I may put that

11    on the easel.

12                    THE COURT:  Go ahead.

13                    MS. LUARDE:  Thank you.

14                    And, Your Honor, it might be easier if

13:31:32  15    Mr. Guembel can put on a mic and stand by this to

16    explain.

17                    Would that be all right?

18                    THE COURT:  That's fine.

19                    MS. LUARDE:  Thank you, Your Honor.

13:31:51  20                    THE WITNESS:  I don't have it.

21    A.    Okay.  Now it should work.

22    Q.    Okay.

23                    THE COURT:  Just put it on your lapel, and

24    it works, believe it or not.  Lapel, really.

13:33:03  25                    MS. LUARDE:  This is like a prom date.

1                    THE COURT:  Prom date did you say?

2                    MS. LUARDE:  I guess.  It's been a long

3      time.  Feel like that's what I'm doing here.

4                    THE WITNESS:  Okay?  It's on?

13:33:14  5                    MS. LUARDE:  It's on.

6                    THE WITNESS:  Okay.  Thank you.

7      BY MS. LUARDE:

8      Q.    Mr. Guembel.

9      A.    Okay.  I just want to run through this real

13:33:21 10     quickly.

11                    What you have here --

12                    THE COURT:  You can stand there if you

13     want.

14                    MR. STAR:  I can see it, but there's just

13:33:31 15     no question.

16                    MS. LUARDE:  I will ask a question.  I

17     apologize.

18     BY MS. LUARDE:

19     Q.    Mr. Guembel, I've put up here a graphic that I

13:33:38 20     think explains the fat client architecture that we were

21     discussing.

22                    Could you briefly explain to the jury what

23     this is all about?

24     A.    I will.  What you see here is four boxes on the

13:33:54 25     top, which is representing the clients.

1          Clients in this context are the PCs that

2     are on the desktop of the user.

3          Here in this box you see the database

4     server.  That is the place for all of the records stored,

5     everything that a enterprise needs to keep on file;

6     invoices, general ledger, inventory records, et cetera.

7          You see some arrows on here, and these

8     arrows show the paths along which information can be

9     exchanged.

10          You don't see arrows between these clients,

11    and that means that the clients between themselves cannot

12    really exchange anything.  They cannot help each other

13    out if there is a shortage of resources.

14    Q.   So, Mr. Guembel, what does that mean from a user

15    perspective if they can't share resources?

16    A.   I'll try to explain it the following way.

17          Let's assume a time when there were no

18    computers around, and that would -- the rise and fall of

19    the enterprise with all of the records, and this would be

20    equivalent to the offices where all the clocks were

21    sitting that were processing incoming orders and

22    shipments and the like.

23          So if you have them sitting all in one

24    room, if one of the clocks would have been overloaded and

25    would have a stack that high and the next one would be

1    idling because there's nothing in his or her in basket,

2    that person could come to help and talk to the colleague

3    and say, "Okay, I'll take over some of the work so that

4    it gets done."  That is called resource sharing.

5              If you think of a situation where you put

6    cubicles between these clocks, and you couldn't see them,

7    you know, they could not come to a rescue for their

8    colleague that is inundated with work, and that's the

9    situation that you have here, you know, so there's no

10   resource sharing.

11             Also, there is no resource sharing here

12   between the clients and the database server.  The

13   database server is too busy, you know, storing

14   information, storing records.  The clients have to wait,

15   and if the clients have extra capacity, it doesn't help.

16   They cannot hand it over to the database server and say,

17   "Okay, here, I'm idling.  Here, you have some of my

18   memory or my processor power."

19             That's very fixed.

20             So what that means is if you start to

21   increase the number of clients, then you are more likely

22   to run into a situation where you need more resources.

23   Q.    And so, Mr. Guembel, when we talk about needing

24   more resources or a client being overloaded or someone

25   being overloaded, if you're the person who is overloaded,

1    does that -- what does that do; does that show up as the

2    hour glass spinning on the screen or what does that

3    reflect?

4    A.    I'm the person -- if I'm the machine in this case,

13:37:11  5    and I don't want to be the machine, if that machine gets

6    overloaded, the user of that machine will see that there

7    is the hour glass, he's experiencing -- he or she's

8    experiencing extended wait times, and also there is the

9    phenomenon that is called the sticky keyboard.  That

13:37:32 10    means when you start keying in something, the machine

11    really doesn't respond because there's no echo from the

12    other side.

13    Q.    Thank you, Mr. Guembel.

14    A.    Okay.

13:37:47 15    Q.    And you can take the microphone off.

16    A.    Okay.

17    Q.    And just so I understand this phenomena of that

18    sticky keyboard or, you know, nonresource sharing,

19    that's -- that's an inherent limitation in the Business

13:38:27 20    One architecture, correct?

21    A.    That's a limitation that can happen and will

22    reliably happen if the system gets overloaded.

23    Q.    Okay.  But that has nothing to do with an add-on

24    like In-Flight, right?

13:38:40 25    A.    That is due to the basic architecture

1    considerations and has nothing itself -- in itself to do

2    with the extension.

3    Q.    The second limitation that we discussed,

4    Mr. Guembel, is this 32-bit versus 64-bit limitation, is

13:39:02 5    that correct?

6    A.    That is correct.

7    Q.    What does that mean?

8    A.    32-bit in this context means the width of the

9    address that can be used to address the memory, which

13:39:17 10    basically boils down to how much memory can be used on

11    such a machine by the application.

12                    And with 32 bits, you can address

13    the -- you can address four gigabytes.  Four gigabytes is

14    roughly the equivalent of a DVD.  A DVD actually is a

13:39:36 15    little bit more.  And in this context, it would be a

16    little less than 10% of the data that Hodell had on its

17    database.

18    Q.    And so what you're saying is that Business One is a

19    32-bit machine, is that correct, or program?

13:39:59 20    A.    Business One, until very recently, has been subject

21    to this 32-bit limitation.

22    Q.    And when was that changed?

23    A.    That was changed, I believe, in 2012.

24    Q.    So it couldn't have been on the 2007 Business One?

13:40:19 25    A.    Not at all.

1   Q.   Okay.  So what does it mean then with the change to

2   the 64-bit?

3   A.   The change to 64-bit is not a change to just

4   doubling the amount of bytes that you can have on the

13:40:43 5   system, but it means that you can have four billion times

6   the amount.

7            So think of a stack of DVDs that is four

8   billion DVDs high.  I did some math.  That stack would be

9   2,500 miles high, so basically you can forget about the

13:40:58 10  limitations; whereas before, with 32 bits, it is a

11  consideration.

12  Q.   And so, Mr. Guembel, with this limitation of the

13  equivalent of one DVD worth of memory, how did this

14  impact Hodell?

13:41:18 15  A.   It impacts a user with a large number of concurrent

16  users on the system in the way that the database system

17  does not enough -- does not have enough space to handle

18  all of these requests in a short time.

19            So bottom line is it is likely to result,

13:41:42 20  very likely to result in extended response times and is,

21  as I have seen here, they did occur.

22  Q.   So in other words, just to process things, it's

23  going to take you longer to do that, right?

24  A.   Yes.  At some point in time, actually, if you go

13:42:02 25  even beyond that point, the system will be so tied up by

1    itself and by managing itself that it cannot perform any

2    reasonable work any more.

3    Q.    Okay.  And, Mr. Guembel, you've reviewed the

4    testimony given by Eddy Neveux here in this case,

13:42:24  5    correct?

6    A.    Yes, I did.

7    Q.    And he testified that some testing that was

8    performed at Hodell, the longest wait time they had was

9    nine seconds.

13:42:38 10    A.    Yes.

11    Q.    Do you recall that?

12    A.    He said that.  I do recall that.

13    Q.    And I just -- I just want you to assume just for

14    the purposes of this question that that's true.

13:42:50 15              Is this acceptable performance?

16    A.    In the context of a professional environment where

17    orders are coming in over the telephone and clocks are

18    working as fast as they can to service these orders, it

19    is not acceptable.

13:43:07 20              It's acceptable if somebody buys a book for

21    himself on Amazon or so, then having an extra sip of

22    coffee is okay.

23    Q.    So in other words, if you're entering orders, line

24    items on an order and it takes nine seconds after each

13:43:25 25    entry, that would not be acceptable?

1    A.    That would not be acceptable.

2              MR. STAR:  Objection to foundation.  That

3    wasn't the testimony.

4              THE COURT:  Overruled.

13:43:33  5   BY MS. LUARDE:

6    Q.    And, Mr. Guembel, you and I have discussed and

7    you've seen a copy of an IBM study that was used during

8    the course of this trial, correct?

9    A.    Yes.

13:43:42 10   Q.    And when you reviewed that document, you analyzed

11   the recommended configuration prepared by IBM, is that

12   correct?

13   A.    Yes, I did.

14   Q.    And could you tell me what you concluded after

13:43:56 15   reviewing the IBM study?

16   A.    Yes, I can.  I can tell.

17              The IBM study that came out in 2004 by the

18   IBM Competence Center in Waldorf that was analyzing the

19   resource requirements of Business One at that time, used

13:44:17 20   the formula to determine the amount of memory required to

21   accommodate users.

22              And the result of that formula was that to

23   accommodate ten concurrent users, it would take one

24   gigabyte, which is okay.  We can configure one gigabyte.

13:44:34 25              It also went on to say that for any user

1       beyond the ten, for each of the users, user, you would

2       have to add 64 megabytes.  And if I use that formula and

3       use the information that I just laid out to you before,

4       that the maximum address for memory would be four

13:45:00  5   gigabytes, then using that formula, the formula says that

6       you can accommodate 58 concurrent users.

7       Q.    So just so I'm clear, what you're saying is the IBM

8       study concludes that you can only have 58 concurrent

9       users on the B1 system?

13:45:20 10   A.    With the four gigabyte address limitation, yes.

11      Q.    And that four-gigabyte address limitation relates

12      back to this 32-bit concept we just discussed?

13      A.    Correct.

14      Q.    And could you tell the jury about the third

13:45:41 15   limitation?  And we've heard quite a bit about DI API in

16      this case.

17      A.    Yes, I can.

18      Q.    And just to do a quick refresh, what is DI API?

19      A.    DI API is one of the two sets of interfaces that

13:46:00 20   SAP supplies in the context of something that is called

21      the SDK.  That's the software development or system

22      development kit.

23            The idea of these interfaces is to give

24      partners, or anybody else who wants to make an extension,

13:46:16 25   a clear cut interface similar to an electricity plug in

1    the wall, you know, to safely interface with the system.

2                Experience before with other system

3    environments has shown that making these extensions that

4    are very frequent in the field, because no ERP system can

5    be installed out of the box as it is, can result in

6    severe reliability and upgradeability issues with

7    customers.

8                So the architectural consideration here

9    that was the foremost consideration was to make it safe

10   to create such extensions.

11               Safety and reliability were the over -- the

12   most important considerations.

13   Q.    And so this DI API is -- has been described as a

14   hose, not literally but figuratively, between an add-on

15   and Business One.

16               I don't know if you agree with that analogy

17   or not, but does that sound about right?

18   A.    Yes.  It sounds about right.

19               You can use all kind of analogy like a

20   conveyor belt, a pipe, a hose, or so, but it's a -- it's

21   a conduct in which information, in particular data here,

22   is exchanged between the add-on and the database server.

23   Q.    And part of that goal was so that the Business One

24   program itself could not be corrupted by any extension

25   the partner would provide, is that accurate?

1    A.    That is -- that is correct.

2          The design goal here is to make sure that

3    the extension, in the worst case, can corrupt itself or

4    make itself fall over, but the rest of the system will be

13:48:26  5    left intact and, most importantly, the customer's data

6    will not be corrupted and the system data won't be

7    corrupted either, which is, I think, a very good design

8    decision from that point of view.

9    Q.    And do you have an analogy --

13:48:46  10   A.    Yes, it is.  Obviously the trade-off here is speed.

11   If you want to do extra scrutiny and if you want to make

12   sure that nothing happens, then you have to apply some

13   effort on the side of this interface, which of course

14   takes away some of the speed.

13:49:02  15         And the analogy is one where travelers are

16   using -- air travelers are using the airport, and when we

17   go to the airport, we have to go through security.

18   Security creates an overhead and makes us wait for some

19   time, but it buys us, at least we think it does, security

13:49:27  20   and safety.

21         So if you bypass all of this, it may be

22   okay for yourself because you think that you are a safe

23   traveler, but if everybody does, you know, it will

24   corrupt the system.

13:49:43  25         And here we have the same situation.

1    Q.    And so how does the security, how did this security

2    impact Hodell?

3    A.    Now, each time an extension makes a request for

4    data, either reading or writing the data, then it has to

5    go through that conduct, through this interface.

6              And each time, the system makes sure that

7    nothing detrimental happens.  And in the case of Hodell's

8    extension, that extension was used a lot of times.  It

9    was essential for order processing, and Hodell could not

10   operate without it.

11             So each time an order from a customer was

12   processed, then for each line item, it had to go through

13   this extension.  Consequently, through the API.

14   Consequently, through security, which means always cue

15   again, you know, stand in line for the checks, and that

16   is a little costly.

17   Q.    So in other words, if you have a 100-line item

18   order, if I understand what you're saying, you enter the

19   first line item, that goes through security, and then you

20   have to wait and go through the second line item goes

21   through security, and the third.  They don't all go

22   through together, is that right?

23   A.    That is true.  Some other systems that -- of

24   course, any system that wants to be on the safe side when

25   accommodating extensions has to come up with the same

1    design considerations.

2                    And there have been other systems where

3    this has been an issue, and the answer that was invented

4    was to create groups that you can get through security.

13:51:37  5                    It may be, compared to some extent with

6    what you have with TSA pre, that is something that allows

7    you to skip some of the detailed checks while going

8    through security at the airport because some scrutiny has

9    been applied before.

13:52:00 10   Q.    And because of the security checks and with the DI

11   API, what is the impact on the, you know, the sales clerk

12   at Hodell or the user of the system at Hodell?

13   A.    The impact here is that it slows down the

14   processing, and there is wait time on the side of the

13:52:22 15   client.  Hence, the clock sitting at the client trying to

16   process, for example, incoming orders is slowed down and

17   he cannot get as many orders processed during a workday

18   as he used to.

19                    Consequently, the revenue and --

13:52:43 20                    MR. STAR:  Objection.

21                    THE COURT:  Overruled.

22                    MR. STAR:  He's going way outside the scope

23   of his report.

24                    THE COURT:  Overruled.

13:52:49 25                    MS. LUARDE:  You can answer.  Finish.

1    A.    Okay.  Consequently the revenue and also the number

2    of shipments that an enterprise can make is reduced.

3    BY MS. LUARDE:

4    Q.    And so we heard Jaime Clarke talk about looking at

13:53:03 5    an hour glass spinning on the screen.

6    A.    Yes.

7    Q.    And that is caused in part by this DI API issue,

8    correct?

9    A.    It's caused by a combination of two issues.

13:53:15 10              One is inadequate scalability of the base

11   system, and of course, if the base system doesn't render

12   the required performance, then it can get only worse when

13   you put up extensions.

14   Q.    Okay.  And the three limitations that we just

13:53:36 15   discussed, these are all related to the design and

16   architecture of Business One?

17   A.    Related to the design and architecture, yes.

18   Q.    And these three limitations, just so we're clear,

19   have nothing to do with an add-on such as In-Flight,

13:53:51 20   correct?

21   A.    Well, two of the three limitations don't have to do

22   anything with the add-on.

23              The third limitation, of course, is not a

24   limitation if you don't have any add-on.  So it comes

13:54:04 25   only into effect if you add to the system using these

1    interfaces.

2    Q.    So in other words, the DI API, there would be no DI

3    API problem if there's no add-on, correct?

4    A.    That is correct.

5            I also might add that, different from other

6    systems, including SAP's R3 or Business Suite, there is

7    no way around DI API.  It is the prescribed interface

8    that the vendor gives to its partners.

9    Q.    So there's no way for someone like LSi to use

10   something else other than the DI API?

11   A.    Yes, there's no way.

12           The partner has no access to the source

13   code of the system.  That is done purposely because SAP

14   wants to make sure that it doesn't get corrupted, and so

15   he has to rely on the SDK and the APIs that are in there.

16   Q.    And we've heard a little bit in this case that

17   these limitations could be corrected with different

18   hardware.

19           Is that true?

20   A.    Well, it -- let's go through the limitations.

21           The two-tier client server limitation

22   cannot be corrected by extra hardware.  It requires a

23   different architectural layout.

24           The 60 -- the 32-bit limitation can be

25   corrected with hardware that is capable of 64-bit

1    addressing, but it requires suitable software, and

2    Business One hasn't been upgraded to support this kind of

3    hardware until Version 9.

4    Q.    So just so I'm clear, that could not have been

13:56:03  5    corrected back in 2007?

6    A.    By just going out and buying more hardware or more

7    strongly configured hardware, it could not be corrected.

8    Q.    And -- thank you.

9             Mr. Guembel, we heard some testimony in

13:56:39  10   this case that Business One is supporting very large

11   customers like Loreal, and would you be surprised to

12   learn that a large customer with, I want to say about

13   1600-user licenses, would be supported by Business One?

14   A.    I would be surprised.

13:57:02  15            First of all, we must make a distinction

16   between a customer and installation, and we must make

17   also another distinction between a named user and a

18   concurrent user.

19            The way SAP records the number of users is

13:57:21  20   per customer, so SAP does not have any -- any

21   information, at least in the table that I was given, that

22   says how many installations the customer is using for

23   this amount of users.

24            It could be in theory one.  It could be

13:57:43  25   100.  It could be 1,000.  There is no information in

1    there.

2                    It also does not say how many of these

3    users are concurrently on the system.  So these users

4    that are in this, in this table, could be switching on

13:57:59 5    the system in the morning and work all day long

6    diligently, or do nothing, or not even switch it on ever.

7                    It only means that the customer paid for

8    the right to use that many users.

9    Q.    And, Mr. Guembel, just so we're clear.

13:58:22 10                    MS. LUARDE:  And may I approach, Your

11    Honor?

12                    THE COURT:  You may.

13    BY MS. LUARDE:

14    Q.    And I've handed you what's been marked as

13:58:39 15    Defendant's Exhibit 700, and that's -- that's the list

16    that you were discussing, correct?

17    A.    Yes, it is.

18    Q.    And just so I'm clear, you talked about this list

19    not showing anything distinguishing between the number of

13:59:02 20    user licenses and how it's installed, so what you're

21    saying is this just shows the number of user licenses

22    that were purchased, correct?

23    A.    Yes.

24    Q.    And with regards to Loreal, Mr. Guembel, did you

13:59:17 25    take a quick look on the Internet to see what was going

```
            1    on with Loreal?

            2    A.    Yes, I did.

            3                 MR. STAR:  Objection.

            4                 THE COURT:  Objection sustained.

13:59:25    5    A.    Loreal --

            6                 MR. STAR:  No.

            7                 MS. LUARDE:  Mr. Guembel --

            8                 THE COURT:  You don't have to answer.

            9    BY MS. LUARDE:

13:59:33   10    Q.    Is it possible that Loreal actually only uses

           11    Business One for its subsidiaries?

           12                 MR. STAR:  Objection.  Called for

           13    speculation.

           14                 THE COURT:  Objection sustained.

13:59:41   15    BY MS. LUARDE:

           16    Q.    Of the entities on this list, is it possible that

           17    some of these -- strike that.

           18                 When you discussed installation, were you

           19    referring to customers installing separate Business One

13:59:58   20    systems at different locations such as different

           21    subsidiaries?

           22    A.    Yes, I was.

           23    Q.    Mr. Guembel, I'd like to refer you back to your

           24    report, and again you can tell me from memory if you can,

14:00:21   25    but what is your second opinion in this case?
```

1    A.    My second opinion in this case is based upon my

2    experience and training at the time Hodell signed the

3    development agreement in December, 2004, SAP and its

4    business partners had sufficient information to

14:00:40  5    determine --

6                    MR. STAR:  Objection.

7                    THE COURT:  Objection sustained.

8    BY MS. LUARDE:

9    Q.    Mr. Guembel, did you conclude that in 2004, based

14:00:49 10   on your experience, the information that you reviewed,

11   and the documentation you relied upon, that SAP and LSi

12   had enough information to conclude that

13   Hodell-Natco's --

14                    MR. STAR:  Objection.

14:01:05 15   Q.    -- user requirements exceeded --

16                    THE COURT:  Go ahead, finish the question.

17   Q.    -- this software's inherent limitations or at a

18   minimum, were a red flag as to whether Business One

19   should be sold to or implemented at Hodell-Natco?

14:01:19 20                   MR. STAR:  Objection.

21                    THE COURT:  Overruled.

22   A.    Yes.  I think that for all of the parameters that

23   were on the table at that time, the number of users, the

24   size of the database, the number of items on the

14:01:34 25   inventory, the SKUs, the five warehouses that the

1    customer was operating, the growth path that the customer

2    has divulged to both the vendor and the partner, all of

3    this should have alerted both the partner and the vendor

4    to apply more scrutiny to try and find out whether this

14:02:03  5    would work.

6               The indicators were showing that it was

7    borderline or maybe outside of the scope.  And to my

8    mind, it was really outside of the scope.

9    Q.    Okay.

14:02:16 10              And as part of your analysis in reaching

11   your conclusion, in this December, 2004 time frame, the

12   fact that LSi was a new channel partner also played a

13   role in that, correct?

14              MR. STAR:  Objection.  Leading.

14:02:35 15              THE COURT:  Overruled.

16   A.    Yes, it played a huge role.

17              LSi had the experience with another system

18   and with a few, to my knowledge, with a few Business One

19   implementations that were much, much, much smaller.

14:02:53 20              Now, this is like giving somebody who just

21   has obtained a driver's license the key to a Formula One

22   car, you know?  So I think that SAP did not apply the

23   guidance that would have been necessary to make this a

24   success.

14:03:16 25   Q.    And you reached a third opinion in this case, and

1    it's similar to the other two, that in 2005, SAP and LSi

2    also had enough information to determine that

3    Hodell-Natco's user requirements exceeded the software's

4    limitations or, at a minimum, were a red flag as to

14:03:39  5    whether B1 should be sold to or implemented at Hodell.

6                 Is that accurate?

7                 MR. STAR:  Objection.  Objection.

8                 THE COURT:  You didn't -- you don't know

9    what SAP knew about this in 2003, do you?

14:03:53  10                THE WITNESS:  I -- from the e-mails that I

11   looked into, SAP had knowledge that this was going to be

12   the largest installation that they had sold by that time.

13                So SAP, if you're making such a big sale,

14   then you routinely try as a vendor to get to know more

14:04:23  15   about it because you would like to make similar sales

16   somewhere else.

17                THE COURT:  Okay.  But what did you -- what

18   knowledge did you attribute to SAP?

19                THE WITNESS:  SAP, at the minimum, knew

14:04:37  20   that they had sold 80 licenses; that they sold another

21   40, which was going to be 120.  That by itself would

22   have -- should have started to get them interested

23   whether they would be on one machine or several machines.

24                Several machines, they could handle safely.

14:04:56  25   One machine, no way.

1          THE COURT:  What year did they know this?

2          THE WITNESS:  That was the -- 80 licenses

3     were sold in 2004, and I think in 2000 -- it was in 2005,

4     a little later, very shortly later, another 40 licenses

5     were sold.

6          THE COURT:  Okay.  Well, first of all, they

7     didn't sell 80 licenses in 2004, but the question was

8     characterized in 2003, I thought.

9          MS. LUARDE:  Actually it was 2005, Your

10    Honor.

11         THE COURT:  All right.

12    BY MS. LUARDE:

13    Q.   And the development agreement, you got the 80

14    license number from the development agreement, is that

15    correct?

16    A.   Yes.

17    Q.   And then the 40 additional licenses, it's been our

18    position that the 40 additional licenses were 2005?

19    A.   This -- yes.

20         This list, by the way, shows Hodell still

21    as an active customer with 140 licenses.

22         THE COURT:  I guess I'm confused.

23         MR. STAR:  Yeah.

24         THE COURT:  You may be able to

25    cross-examine, but if you're saying 120 licenses was too

1    much --

2                        THE WITNESS:  At 120 concurrent users was

3    too much.

4                        120 named users could have been handled,

14:06:12  5    but then you need to know how often they log on and what

6    kind of workload they create, et cetera.

7                        THE COURT:  I don't mean to be interjecting

8    all the time, but the question was when did SAP know

9    that.

14:06:27 10                        THE WITNESS:  At the time the sale was

11    booked.

12                        THE COURT:  In 2005?

13                        THE WITNESS:  That was done in 2005?  Yes,

14    then it was done in 2005.

14:06:38 15                        THE COURT:  Okay.

16                        THE WITNESS:  The customer cannot start at

17    all the using the license before it is booked.

18                        THE COURT:  Right.  Okay.

19    BY MS. LUARDE:

14:06:47 20    Q.    And just so we're clear, Mr. Guembel, all of the

21    architectural limitations that we discussed with regard

22    to the Business One product at Hodell, those, there were

23    no changes between 2005 and 2007 that would change your

24    opinion that you would believe 2007 would have worked,

14:07:08 25    correct?

1574

1    A.    Correct.  In those years, SAP filled functional

2    gaps in the system to make the system more viable

3    internationally and to meet customer demands.

4              There were a few bug fixes, of course, but

14:07:24  5    there was nothing in the way of rearchitecting the system

6    to increase the performance dramatically.

7    Q.    And are you aware -- strike that.

8              And one last question, Mr. Guembel, and

9    this is with regard to parallel systems.

14:08:10  10              You understand what I mean by parallel

11    systems, correct?

12    A.    Yes.

13    Q.    And can you tell me, I guess number one, what is a

14    parallel system?

14:08:18  15    A.    A parallel system in this context is just splitting

16    up the load that Hodell had in mind between a couple of

17    systems, and let them run independently.

18    Q.    And in practice, in your experience --

19    A.    Oh, yes, and -- I'm sorry, I take that back.

14:08:42  20              I think your question was to whether a

21    system should be run in parallel when you migrate from an

22    old to a new system?

23    Q.    Yes.  That's correct.

24    A.    Okay.  Okay.  I'll answer that one.

14:08:59  25              Okay.  When -- Hodell before did use

1        another system called FACTS also with this In-Flight

2        extension, implemented very differently, but there was

3        this system.

4                        When Hodell switched or attempted to switch

14:09:17  5    to Business One, they could have run Business One in

6        theory in parallel to the old system.

7                        In practice, there are some problems doing

8        so.  Initially, you can do that just for testing

9        purposes, but the moment you blow up the new system to an

14:09:42 10    operational level required to accommodate the 80 users,

11       then you run into some additional problems.

12                       Number one is a space problem, because you

13       have to use two systems at the same -- at the same time,

14       you know, so it can be up to twice the space.

14:10:03 15                      The second problem is a more nasty problem,

16       because if you use the old -- the new system to do your

17       daily work, then you are changing the data that is in the

18       system.  These data changes need to be applied to the old

19       system again, so because they need to be kept on the same

14:10:27 20    level.

21                       Since both systems usually do have very

22       different structures, this reverse porting of all of the

23       changes that are accumulated in the new system to the old

24       system is not openly laborious, but it's also

14:10:44 25    error-prone.  And in theory, you would have even to test

1576

1  these changes to make sure that you are on the same page

2  with both systems.

3          So in reality, it isn't done.  It's

4  theoretically a nice and wonderful concept.  In practice,

14:11:01  5  there are just too many obstacles and customers usually

6  are switching user groups, by user groups, to the new

7  system.  And sometimes there is even no other choice than

8  doing what is called the big bang, that is migrate stock,

9  lock, and barrel in one move.

14:11:21  10  Q.    And so, Mr. Guembel, the reality is running a

11  parallel system just doesn't occur in your experience?

12  A.    It doesn't occur.

13          MS. LUARDE:  Thank you.

14          I have no questions at this time.

14:11:34  15          THE COURT:  Thank you.

16          You may cross-examine.

17          MR. STAR:  Thank you.

18      CROSS-EXAMINATION OF HELMUTH GUEMBEL

19  BY MR. STAR:

14:12:10  20  Q.    Good afternoon, Mr. Guembel.  How are you?

21  A.    Fine.

22  Q.    Let's pick up right where you left off and then

23  we'll get into some other topics.

24          As I understood the end of your testimony

14:12:20  25  there, you're telling this jury that it just doesn't make

1    sense, it's not common practice, to run a parallel or

2    what we'd also call a Legacy System at the time a

3    customer goes live.

4                    That's your testimony?

14:12:34 5    A.    My testimony is that it is not practical to run the

6    old system and the new system in full swing and parallel.

7    Q.    Regardless of whether it's practical, when you were

8    asked about that in this case, it was your opinion that

9    that is what you would have recommended Hodell and LSi to

14:12:51 10   do when they went live on this system, correct?

11   A.    Initially when they would have gone live in the

12   system, running in parallel for a couple of users, to

13   test it would have been my recommendation but not for

14   full production.

14:13:05 15   Q.    In fact, your testimony was you would have been

16   embarrassed to find out that Hodell and LSi didn't

17   actually run a parallel Legacy System.

18                    That was your testimony on the issue

19   before, wasn't it?

14:13:18 20   A.    But it was limited -- it was limited, and it did

21   not include full-swing production usage.

22   Q.    That's your limitation today, but you didn't give

23   that limitation when you were deposed a couple years

24   back, did you?

14:13:31 25   A.    I have no recollection.

```
 1              You know, I wasn't asked probably.
 2    Q.    Pardon?
 3    A.    I probably wasn't asked.
 4    Q.    You don't recall being asked about parallel Legacy
 5    Systems?
 6    A.    I -- I recall being asked, but I do not recall
 7    being asked whether it would be for the full operation.
 8    Q.    Well, let's go to your deposition.
 9              Do you have it there in front of you?  Can
10    we give you a copy?
11    A.    I don't have my deposition.
12    Q.    Great.  Let's give you a copy, then.
13              Sir, go to Page 161, Line 21.
14    A.    Yes.
15    Q.    You there?
16              "Question:  Is it your view that the best
17    practices in an ERP implementation is to keep a Legacy
18    System running to revert to in case there are issues with
19    the new solution?"
20              Read your answer back to the jury, please.
21    A.      "Is it -- is it your view that the best -- that
22    the best practices is -- in an ERP implementation is to
23    keep a Legacy System running to revert to in case there
24    are issues with the new solution?
25              "Answer:  I would recommend to have, how do
```

1    you say, a belt and suspenders."

2    Q.    Right.  And go to Page 1 -- and right there, you

3    didn't limit that to just a parallel Legacy System for a

4    couple of users; you were referring to a full parallel

14:15:19  5    Legacy System in case there were problems, right?

6    A.    I don't see that.

7    Q.    Go to Page 163, Line 12.  I'll read the question,

8    you read your answer.

9              "Question:  If the evidence in this case

14:15:39 10    was that the legacy system was turned off and it was not

11    kept as a system to which Hodell could revert, would that

12    cause you to opine that the decisions made by either

13    Hodell or LSi were poor decisions in that regard?"

14              Your answer's at Line 19.  Read that,

14:15:57 15    please.

16    A.    "I -- it would cause me to deep dive into this

17    because I would be, let's say I would be embarrassed."

18              But this is a different --

19    Q.    Sir, I just asked you to read back your testimony.

14:16:11 20              Your testimony was you'd be embarrassed if

21    you found out that the legacy system was turned off and

22    that it couldn't be reverted to; that was your testimony,

23    wasn't it?

24    A.    It was my testimony.

14:16:20 25    Q.    Thank you.

1           Your rate in this case, you said 750 Euros

2     an hour?

3     A.    Yes.

4     Q.    Okay.  And you told the jury that converts to,

14:16:31  5     what, around 800 bucks?

6     A.    A little over, yes.

7     Q.    A little over.  It's about $850 actually, isn't it?

8     A.    I'm not aware of today's exchange rate.

9     Q.    You --

14:16:43 10     A.    It's okay.

11     Q.    You just traveled here from Europe, didn't you?

12     A.    Yes.

13     Q.    Okay.  So you would know the exchange rate, I would

14     assume, right?

14:16:52 15     A.    I -- I keep -- I keep my money in Swiss francs, you

16     know, so --

17     Q.    I see.  Swiss bank accounts.

18           So let's talk about --

19           MS. LUARDE:  Objection.

14:17:03 20     Q.    Let's talk about what you did in this case.

21           You were hired by Hodell's lawyers at 750

22     Euros an hour to provide specific opinions, correct?

23     A.    Not to provide specific opinions, but to provide

24     opinions.

14:17:19 25     Q.    Well, Hodell's attorneys actually drafted up a list

```
            1    of questions and told you to answer those specific

            2    questions and only those specific questions, correct?

            3    A.    Correct.

            4    Q.    And you weren't the one who drafted the questions

14:17:34    5    you were directed to answer in this case, were you?

            6    A.    I did not draft the questions.

            7    Q.    Okay.  That was Hodell's lawyers; they told you

            8    specifically what they wanted you to look at and what the

            9    scope of your assignment was going to be?

14:17:47   10    A.    Yes.

           11    Q.    And, of course, you're aware you've testified here

           12    that the ultimate Software Solution that Hodell went live

           13    on included the base Business One program, plus a program

           14    called Radio Beacon, which was an extension or an add-on,

14:18:06   15    right?

           16    A.    Yes.

           17    Q.    Plus In-Flight, which was also an extension or

           18    add-on?

           19    A.    Yes.

14:18:11   20    Q.    Okay.

           21               Hodell's attorneys, when they drafted up

           22    the list of questions for you to answer, they didn't ask

           23    you to answer a single question about In-Flight, correct?

           24    A.    Correct.

14:18:23   25    Q.    Nor did they ask you to answer a single question
```

```
 1   about Radio Beacon?

 2   A.    Correct.

 3   Q.    They didn't even ask you to give an opinion on any

 4   of the work that was done to build the custom In-Flight

 5   application for this solution?

 6   A.    Correct.

 7   Q.    But you actually, you feel you're personally

 8   qualified to have done a full analysis of those

 9   extensions, those add-ons, to see if they were causing

10   problems, right?

11   A.    No.

12   Q.    You don't feel that you were qualified to do that?

13   A.    I'm qualified to do it, but I did not provide that

14   analysis.

15   Q.    Thank you.  That was my point.

16               You're fully qualified to have analyzed not

17   just Business One but Radio Beacon and In-Flight, right?

18   A.    Right.

19   Q.    But you were only asked to look at one of those

20   three pieces in this case, correct?

21   A.    Correct.

22   Q.    And that was, in fact, you were directed to only

23   look at one of the three pieces, right?

24   A.    Correct.

25   Q.    Given your experience, you went over it in some
```

1    detail and you've been an analyst now for some years, and

2    you testified that you've gone out and you've worked on

3    different implementations and consulted on

4    implementations and so on.

14:19:38  5              You would agree that in order to come into

6    a project like this that entailed a multi-part custom ERP

7    solution, in order to determine the actual cause of any

8    particular performance problem, you need to look at the

9    thing holistically, at all parts of it, right?

14:20:02  10   A.    No.

11   Q.    No?  Your answer is no?

12   A.    My answer is no.

13   Q.    You don't agree that you'd need to actually, in

14   order to establish the root cause of a problem that a

14:20:11  15   customer's having, your testimony right now is you don't

16   think you'd need to also look at, for instance, In-Flight

17   and Radio Beacon?

18   A.    My testimony --

19   Q.    Just answer the question yes or no.  Yes or no?

14:20:22  20   A.    No.

21   Q.    Sir, go to Page 23 of your deposition, please.

22   Pardon me, start at the bottom of Page 22, Line 17.  Just

23   read that to yourself for a moment.

24   A.    17?

14:21:08  25   Q.    17.  You know what?  I'll move it along.

1584

```
 1    A.    I'm not following it completely.

 2    Q.    Right.  I'll do it for us so we can all follow it.

 3                Question on Line 17:  "When you say this

 4    would have been the same for Business One itself, do you

 5    mean that in order for you to analyze exactly what took

 6    place for Hodell, you would need to drill down very deep

 7    into the Business One software or are you saying

 8    something different?"

 9                And your answer is this:  "In order to find

10    out exactly on a byte-by-byte level, you need to drill

11    down on both products because a perfectly implemented

12    In-Flight product could go fatally wrong."

13                Do you see that?

14    A.    Yes.

15    Q.    "If it were based on a sick Business One and

16    vice-versa, you know."

17                That was your testimony?

18    A.    Yep.

19    Q.    Right?

20                So you agree that at your deposition, you

21    said in order to find out exactly what happened here,

22    you'd not just need to look at Business One, you'd need

23    to look at In-Flight as well, correct?

24    A.    Correct.

25    Q.    Thank you.
```

1  A.   And may I add something to this?

2  Q.   No.

3  A.   No.

4  Q.   I just asked you yes or no.

14:22:16  5  A.   Okay.

6  Q.   You'd also agree with me that in order to fully

7  analyze what other problems Hodell might have actually

8  had, in addition to looking at the software that was

9  running, you'd also need to look at the hardware and

14:22:43  10  overall environment at Hodell, correct?

11  A.   Correct.

12  Q.   You didn't do that either, did you?

13  A.   I did not.

14  Q.   That was not part of the assignment that was given

14:22:51  15  to you, the directions that were given to you from

16  Hodell's counsel, was it?

17  A.   It wasn't part.

18  Q.   You were just told "Forget about everything else,

19  forget about the hardware, forget about their

14:23:04  20  environment, forget about Radio Beacon, forget about

21  In-Flight, and tell the jury ultimately why you think

22  there's a problem with just Business One."

23       That's what you were told to do?

24  A.   I was -- I was told to answer the questions that I

14:23:18  25  was given.

1    Q.    And as you told us before, you didn't even

2    determine if the problems that Hodell alleges it

3    experienced were actually caused by Business One, did

4    you?

14:23:39 5    A.    The -- I did determine from the point of view of

6    architecture and the architecture limitations whether

7    Business One could serve as a base for anything that

8    Hodell wanted to perform with this base.

9    Q.    Well, let's go back to your deposition again.

14:23:58 10    We're still at Page 23, Line 18.

11              "Question:  And what analysis did you do

12    specifically with respect to Business One to determine if

13    Business One at Hodell was healthy?

14              "Answer:  I did not determine whether

14:24:20 15    Business One at Hodell was healthy.  That wasn't the

16    question asked.  The question asked -- that was asked was

17    whether the basic architecture at the time of the

18    acquisition was such that I could safely speculate it

19    would be scalable enough to go up to the levels of users

14:24:36 20    that Hodell was requesting."

21              That's all you did?  You didn't figure out

22    how Business One even operated at Hodell.  You just

23    speculated based on an old report that you wrote years

24    before.  Right?

14:24:48 25    A.    But that -- yes, but that report was current at the

 1    time Hodell made the decision.

 2    Q.    You wrote your report in 2006?

 3    A.    Yes.

 4    Q.    And separate and apart from Hodell?

14:24:58  5    A.    Yes.

 6    Q.    To come to the conclusion that you could safely

 7    speculate, your words, safely speculate if Business One

 8    could scale to the number of users Hodell was requesting,

 9    right?

14:25:13 10          Those were your words?

11    A.    Yes.

12    Q.    So your opinions here in this case are just

13    speculation, right?

14    A.    No.

14:25:20 15          MS. LUARDE:  Objection.

16          THE COURT:  Overruled.

17    Q.    No?  Now you're changing your testimony?

18          You just said you were going to safely

19    speculate?

14:25:29 20          MS. LUARDE:  Objection.

21          THE COURT:  Overruled.

22    Q.    Are you changing your testimony or not?

23    A.    Yes, I do, because --

24    Q.    Thank you.  That's all I wanted to know.

14:25:36 25    A.    Yes.

1        Q.    That's all I wanted to know.

2              Besides the paper that you wrote back in

3        2006 and the report that you put together in this case,

4        all you said in your testimony today, the only other time

14:25:57  5    you've kind of looked at Business One was in connection

6        with a class that you teach, is that what you said?

7        A.    I said that I looked at it most recently in that

8        conjunction.  I looked at it also in conjunction with

9        some customer-driven analysis, customers that looked into

14:26:20  10   employing Business One in distributed solutions.

11       Q.    You personally have never implemented Business One,

12       you've never been on the front lines of an implementation

13       or deployment of Business One, correct?

14       A.    That is correct.

14:26:33  15   Q.    Okay.

16             And you didn't actually observe how

17       Business One or In-Flight or Radio Beacon actually

18       operated at Hodell, correct?

19       A.    That is correct.

14:26:44  20   Q.    Okay.  And so you agree, you didn't conduct even

21       what you personally consider any sort of scientific

22       experiment to determine the cause of any of the problems

23       that Hodell alleges that it suffered?

24             You just didn't do that, right?

14:27:01  25   A.    I did not do that.

1    Q.    Because a scientific experiment would require you

2    to actually deal with measurements of performance and

3    response times in a computer system, correct?

4    A.    That is correct.

14:27:11  5    Q.    You wouldn't, in your normal course of business as

6    an analyst, you wouldn't just rely on anecdotal stories

7    of people claiming they saw from time to time an

8    hourglass or they had slow performance.

9              You'd want hard, fast data, wouldn't you?

14:27:27 10    A.    As an analyst, it is impossible to go out and

11    measure everything.

12    Q.    I understand.  My question's different.

13              I'm asking you as an analyst, as an

14    experienced individual in this field, when you're

14:27:39 15    determining the root cause of a problem, you don't do it

16    based on anecdotal stories; you base your analysis on

17    actual data, measurements of response time at a customer

18    location, correct?

19    A.    I will measure response times at the customer

14:27:55 20    locations if I'm required to, to fix the situation there.

21    Q.    Okay.  So if you're called in -- let's just break

22    this down for the jury.

23              What you're saying, sir, is if you're

24    called in to consult on a project, that you'd personally

14:28:14 25    measure the response times to figure out what's going on,

1   where are the problems, and how long is the problem,

2   right?  That makes sense, right?

3   A.    It does make sense, but it's not the role of an

4   analyst.  It is the role of a technical person that is

14:28:29  5   assigned to fix a customer situation, a system engineer.

6   Q.    Okay.

7   A.    Somebody like Eddy Neveux would do that.

8   Q.    So maybe you personally wouldn't go out and take

9   the measurements, but you'd have somebody do that and

14:28:44  10   give you the actual data so you can make an analysis

11   based on actual facts, correct?

12   A.    If my task would be to fix that situation or at

13   least to determine how far we are away from fixing it.

14           But that wasn't the task and I think it is

14:29:00  15   not routinely the task of an analyst.

16   Q.    So maybe I just don't understand.

17           Are you saying you personally don't, in

18   your regular operations, in whatever you've been doing

19   for the last decade or so, you personally don't get

14:29:17  20   called out on to projects to help fix problems or analyze

21   problems, is that what you're saying?

22   A.    Not all problems in a project can be determined

23   with exact measurements.

24           Some or many, many, many problems --

14:29:29  25   Q.    My question's different.  I asked you very

1    specifically are you telling this jury that you don't

2    have experience going out to customers that are having

3    performance problems with an ERP system and analyzing the

4    root cause of those problems, is that what you're saying?

14:29:44 5    A.    I have experience, but I haven't done it here.

6    Q.    I -- thank you.  This is what we're trying to get

7    down to.

8              You do have that experience, and in your

9    experience doing that for a customer, you would agree

14:29:57 10    that you don't just rely on anecdotal stories of people

11    complaining that from time to time, things were slow.

12              You want to get hard, fast data, don't you?

13              MS. LUARDE:  Objection.

14              THE COURT:  Overruled.

14:30:10 15    A.    If my role is to fix that situation, yes.

16    Q.    Thank you.

17              And here you didn't go out and personally

18    gather any data on how long any of the response times

19    were taking at Hodell when it was running Business One,

14:30:23 20    did you?

21    A.    That wouldn't have even been possible.

22    Q.    Sir, you have to let me finish.  You have to let me

23    finish.

24              You personally didn't gather any data as to

14:30:32 25    the response times Hodell was actually experiencing when

1  it was running this solution, did you?

2  A.    I did not gather that information.

3  Q.    Okay.  And no one from Hodell actually provided you

4  with any of that information, right?

14:30:44  5  A.    Nobody provided me with that information.

6  Q.    All that you had from Hodell about their

7  performance problems was what we've been talking about,

8  anecdotes, stories, people telling you the system was

9  slow, right?

14:30:59  10  A.    That is true.

11  Q.    That's the kind of information that you've just

12  said isn't good enough to analyze a problem, is it?

13  A.    It's not good enough to fix the problem.

14  Q.    Well, to fix a problem, you got to figure out what

14:31:11  15  the problem is first.  Can we agree on that?

16  A.    I can -- well, normally if you fix a problem, you

17  are trying to narrow it down.

18  Q.    Yeah, and you narrow it down by figuring out what

19  the problem is.  And to figure out the problem with

14:31:25  20  performance on an ERP system, we can agree you do that by

21  getting hard data; you go get response times and you

22  figure out where you're having a problem, right?

23  A.    Right.

24  Q.    Thank you.

14:31:38  25            You are aware, though, that individuals

1       from LSi and from SAP, while Hodell was using Business

2       One, actually did document response times for pieces of

3       this solution, correct?

4       A.    Correct.

14:31:58  5     Q.    Let's take a look at some of that.

6                     MR. STAR:  I'm having microphone issues

7       here.  I think this thing's falling apart.

8                     I don't know.  I may have broken the

9       equipment, Your Honor.

14:32:11 10                     THE COURT:  That's all right.  It's yours

11      anyway.

12                     MR. STAR:  I don't know what that means,

13      but I'm not paying for it.

14      BY MR. STAR:

14:32:25 15     Q.    Before we look at that, sir, let's -- do you have

16      your opinion -- your report up in front of you?

17                     Sir, go to Page 9 of your report.  I just

18      want to make sure you and I are on the same page, not

19      page of the report, but metaphorically?

14:33:01 20     A.    Page 9, yes.

21      Q.    This is where Ms. Luarde asked you some questions

22      about information you were given about Hodell's

23      environment, and you told her what you understood, that

24      they were going to have 80 users and their plans for the

14:33:12 25     software.

1        You remember that testimony?

2   A.    Yes, I do.

3   Q.    Okay.

4             One of the things that you indicated that

14:33:18 5   you understand was that Hodell had requirements for quick

6   order processing and that although they didn't tell you

7   what they meant by quick, you assumed that anything that

8   exceeds one minute is not acceptable; that's what you

9   based your opinions on?

14:33:35 10  A.    Yes.

11  Q.    Okay.  So one minute wouldn't be acceptable, that

12  was your view?  That was your view, one minute wouldn't

13  be acceptable?  Yes?  Page 9 of your report.

14  A.    Page 9 of my report.  But in some other -- at some

14:33:54 15  other --

16  Q.    Sir, yes or no, based on Page 9 of your report --

17  A.    Based on Page 9, yes.

18  Q.    Thank you.

19            Can you pull up, let's go to Exhibit 165.

14:34:18 20  Sir, we're going to use the screens.  We can give you a

21  hard copy if you'd like to have a hard copy?

22            Sir, this is -- what happened?  Oh, it's my

23  screen.  Sorry.

24            Bob, just go back to the beginning of that,

14:34:38 25  please.

                          Sir, this is an e-mail between Gadi Barnea

2    and Ed Neveux of SAP.  This is actually one you did

3    review in connection with your report, correct?

4    A.    I would have to check that.

14:34:52 5    Q.    All right.  Well, let's do it just to make sure you

6    don't get confused.

7    A.    I have an e-mail from Gadi Barnea July 8th.  That's

8    not this.

9    Q.    Right.  You reviewed an e-mail from Gadi Barnea on

14:35:30 10    July 8th which attached -- just go to the back.  We have

11    multiple versions of the same document.

12                     The penultimate information is in the back.

13    Can you go to the chart, Bob?

14                     This chart is something you're familiar

14:35:41 15    with.  You reviewed that in connection with preparing

16    your report, right?

17    A.    I did see that chart.

18    Q.    Okay.

19                     And you have no reason to doubt -- let me

14:35:52 20    just step back.  This, you agree, was measurements taken

21    of response times listed in seconds of different

22    processes at Hodell in different scenarios, sometimes

23    running Business One by itself, sometimes running with

24    the In-Flight add-on, right?

14:36:09 25    A.    Um-hmm.

1    Q.    Yes?

2    A.    Yes.  I --

3    Q.    Okay.  And you reviewed this information in

4    connection with your report, correct?

14:36:18  5    A.    I'm not sure.  I -- I have seen that table, but I

6    am hesitant to put it into context.

7    Q.    Well, let's make sure you don't get confused.

8              Go to the -- go to the bottom of Page 12

9    and top of Page 13 of your report.  Just read that real

14:36:46 10    quick.  Actually just the top of Page 13.  And you have a

11    footnote.  I just want to make sure that you're

12    comfortable that you've seen this before.

13    A.    Okay.  I'm on Page 12.

14    Q.    Yeah, just read to yourself that first, the top

14:37:01 15    line, and then your footnote and you cite to an e-mail.

16    A.    "Normally software vendors tend to" --

17    Q.    Sir, you don't have to read it out loud.  The top

18    of Page 13 of your report.  Should I show you?

19    A.    Yes, please.

14:37:18 20    Q.    Just right there.  (Indicating).

21    A.    Okay.  "Business One" --

22    Q.    Sir, you don't need to read it out loud.  I just

23    want you to refresh yourself.

24    A.    Okay.

14:37:30 25    Q.    Thank you.  And you, just so we're on the same

1       page, you were citing to an e-mail from Gadi Barnea which

2       showed performance both with and without the add-on

3       running, correct?

4       A.    Um-hmm.

14:38:09  5    Q.    Do you see that cite, sir?  You rely on an e-mail

6       from Gadi Barnea with response times?

7       A.    I do.

8       Q.    And I'm only trying to establish that when you look

9       at the chart that I have up on your screen, that is the

14:38:20 10    chart that you recall using and referring to here when

11      you wrote your report?

12      A.    Um-hmm.

13              MS. LUARDE:  Objection, Your Honor.

14      Q.    Right?

14:38:28 15              THE COURT:  Overruled.

16      Q.    I'm not trying to -- I'm not trying to trick you.

17      I'm just trying to make sure that we're on the same page.

18              This is a chart of response times that you

19      actually reviewed prior to writing your report; you even

14:38:42 20    talked about it in your report, correct?

21      A.    I talked about measurements that were done without

22      the extensions, and they were in this e-mail from Gadi

23      Barnea, and I would need to see that this is exactly that

24      table.

14:39:02 25    Q.    All right.  Let's do it.

1    A.    And in the one that --

2    Q.    Sir, I have no question.  I'm going to try to find

3    the place so there's no question.  Okay?

4    A.    Okay.

14:40:12  5    Q.    Sir, let me help you out.  Sir, this is your entire

6    report with all the stuff you attached to it.

7    A.    Okay.

8    Q.    Do you want me to show you?

9    A.    Yeah.

14:40:24  10    Q.    Okay.  This is the chart?

11    A.    Um-hmm.

12    Q.    Same one that's up on your screen right now?

13    A.    Um-hmm.

14    Q.    Okay.  And so this originally came from this

14:40:36  15    e-mail, Exhibit 165?

16    A.    Um-hmm.

17    Q.    Right?

18    A.    Um-hmm.

19    Q.    Yes?  You have to answer with a yes or no?

14:40:41  20    A.    Yes.

21    Q.    Okay.  Okay.

22          So we're all on the same page here, you had

23    Exhibit 165 and this chart that's now up on the screen is

24    the one you were referring to when you wrote your report,

14:40:54  25    right?

```
 1    A.    I'm -- I'm not comfortable.

 2    Q.    Well --

 3    A.    The --

 4    Q.    Here, you can have it right here, sir.  You can

 5    flip through it yourself.

 6              Can I get a tab?  Here's an actual copy.

 7    Flip through that.

 8              All I want to know is did you rely on that

 9    chart?

10    A.    I'm lost.

11    Q.    What can we do to help you?  You're not sure if

12    that's a document that was attached to your report?

13    A.    Okay.  Here is my problem.

14              In the footnote that I attached here, I

15    refer to an e-mail from Gadi Barnea, dated July 8th,

16    2007.

17              And in the materials that I have here that

18    relate to my -- to these footnotes, I find -- I do not

19    find that table.

20              In the handout that I was given, to me by

21    you, I of course find that table.

22    Q.    Okay.  I think I can help and we can move past

23    this.

24              The testimony has been that Gadi Barnea

25    originally prepared this chart after a visit to Hodell in
```

1    July of 2007.  It was then attached again to an e-mail

2    that is the one that you then attached to your report.

3    A.    Okay.

4    Q.    Okay?

14:44:10  5              So with that understanding, you had this

6    chart and you relied on this chart when you prepared your

7    report, correct?

8    A.    The chart was somewhere in this report, yes.

9    Q.    Okay.  Let's talk about the chart.  You can put

14:44:26 10   that stuff off to the side.  We'll keep it up on the

11   screen for you.

12   A.    Okay.

13   Q.    You agree that it measures response time in

14   seconds?

14:44:32 15   A.    Yes.

16   Q.    That's the kind of data that somebody like yourself

17   would want to have when analyzing a so-called performance

18   problem in an ERP system; you'd want to have measurements

19   of response times in seconds?

14:44:46 20   A.    Yes.

21   Q.    And it talks about doing different functions,

22   that's what the column in the left indicates; for

23   instance, tab out of a line item with 295 lines, that's a

24   particular function that a user at Hodell might do,

14:45:00 25   correct?

1    A.    Um-hmm.  Yes.

2    Q.    Yes.  And if you go to the far right, just on that

3    top line item, for instance, it -- the second to the last

4    column on the right talks about running that through a

14:45:12  5    particular server with In-Flight running, and then the

6    column past that is without In-Flight running?

7    A.    Yes.

8    Q.    And you see the difference there, correct?

9    A.    Yes.

14:45:22 10    Q.    So with In-Flight running for that particular

11    function, it was nine seconds, and without, it was two

12    seconds, correct?

13    A.    That is correct.

14    Q.    Go down to the -- if you look at your screen, you

14:45:35 15    can follow.  We have it highlighted in green.  "Update a

16    sales order with 296 lines."

17              Do you see that?

18    A.    Yes.

19    Q.    And updating a sales order, you understand that to

14:45:43 20    mean you get to the end of entering all your data, and

21    you hit "Submit."

22              Correct?

23    A.    Yes.

24    Q.    And there with In-Flight running, that process took

14:45:56 25    766 seconds but only 100 seconds with just Business One,

1602

1    right?

2    A.    Right.  But a hundred seconds is too long.

3    Q.    I didn't ask you that.  We'll get there.  We're

4    going to get through that.

14:46:10  5              You'll agree there was a significant

6    difference when In-Flight was shut off and just Business

7    One was running, correct?

8    A.    Yes.

9    Q.    That in your view, your professional opinion, is

14:46:21 10   that's a very wide variance, right?

11   A.    It is.

12   Q.    And a wide variance like that, that would lead you

13   to want to investigate what's going on with In-Flight

14   that when you turn In-Flight on, it takes so much longer;

14:46:39 15   you'd want to know?

16   A.    Yes.

17   Q.    But you didn't investigate that?

18   A.    I did not investigate.

19   Q.    Because you were just investigating and answering

14:46:46 20   the specific questions Hodell's counsel told you you

21   should answer, right?

22   A.    Yes.

23   Q.    And everything else in your view, even if you

24   professionally believed it was significant, everything

14:47:00 25   else in your view was out of the scope of your assignment

1    from Hodell's counsel, right?

2    A.    No.

3    Q.    That was out of the scope of your assignment from

4    Hodell's counsel, sir, wasn't it?

14:47:12 5    A.    It was, but I did look at the DI API which was --

6    Q.    But you did not look at In-Flight itself, did you?

7    A.    Not at In-Flight itself.

8    Q.    Thank you.  And go to the last -- the last -- let's

9    just go through a couple others that are on the screen.

14:47:28 10              "Adding a 100-line order," that was 60

11    seconds with In-Flight, right?  So that's within your

12    threshold of 60 seconds, yes?

13    A.    Yes.

14    Q.    And then when you turned In-Flight off and just did

14:47:47 15    Business One, it was 8.5 seconds, so well under your

16    threshold of 60 seconds, correct?

17    A.    Yes.

18    Q.    And go to the last item, "Adding a delivery with

19    100 lines," 900 seconds when In-Flight's running but only

14:48:05 20    28 seconds without In-Flight, so well within your

21    threshold without In-Flight running, correct?

22    A.    Correct.

23    Q.    Yet, even when you saw this data prior to actually

24    writing your report, you didn't go and investigate

14:48:22 25    In-Flight and see what part of In-Flight perhaps is

1604

1    causing problems with this performance; you just didn't

2    do that?

3    A.    I did not do that.

4    Q.    Thank you.

14:48:38 5            MR. STAR:  Bob, put up Exhibit 307, please.

6    Q.    Sir, if you're more comfortable having a hard copy

7    of this, I'm happy to give it to you, but if you want to

8    follow along on the screen, that's where you have it.

9            Sir, the evidence has been that this is an

14:48:57 10    e-mail dated September 14th, 2007 from Joe Guagenti, who

11    was with LSi, to Paul Killingsworth and others at SAP.

12            Sir, this is not an e-mail that you cited

13    as a document in your report that you relied upon in

14    reaching your opinions, is it?

14:49:20 15    A.    It -- I don't think so.

16    Q.    Okay.  Well, just to be sure, your report, you told

17    counsel on your direct examination, has an appendix at

18    the back where you actually list out the documents you

19    did rely on and that you did cite to.

14:49:36 20            Just take a look and confirm for me this

21    was not one of them.

22            That's not in your appendix, is it, sir?

23    A.    I, if it's not in my appendix, I did not refer to

24    it.

14:50:20 25    Q.    Okay.  So let's take a look at this document that

1    you did not rely on in rendering your opinions.

2                    September 14th, 2007, Joe Guagenti of

3    IBIS -- of LSi, pardon me, writes the following:  "The

4    issues we are covering here is" -- some of his language

14:50:41 5    is a little bit off.  "Some of the issues we are covering

6    here is the sales order update taking minutes to update a

7    200-line order at our client Hodell.  A few months back,

8    both SAP's Gadi Barnea and LSi's Joseph Guagenti had a

9    site visit to Hodell to determine what could be done to

14:51:03 10    improve performance for Hodell at PL25 at the time."

11                    Do you see that?

12                    MS. LUARDE:  Objection, Your Honor.  This

13    document has not been admitted into evidence at this

14    point through any witness.

14:51:14 15                    THE COURT:  What is this document?

16                    MR. STAR:  This document has been

17    discussed, I believe, with Ed Neveux already.

18                    This document is an e-mail report from Joe

19    Guagenti at LSi, your Honor, in September of '07 and he's

14:51:26 20    reporting on significant performance improvements on this

21    project.

22                    THE COURT:  Didn't we hear this from

23    somebody else?

24                    MR. STAR:  Yeah, I'm asking him if he

14:51:33 25    relied on it, and he didn't.

1606

```
         1              THE COURT:  Go ahead.

         2              MR. STAR:  We've already established that,

         3    and I want to go further.

         4              THE COURT:  Go ahead.

14:51:37 5              MR. STAR:  Thank you.

         6    BY MR. STAR:

         7    Q.    I won't read the whole sentence again.  We've done

         8    that.

         9              You'll see that they're referring to

14:51:43 10   something called PL25.

        11              Do you understand that to be a patch level?

        12    A.    Um-hmm.

        13    Q.    Patch level 25?  Sir?

        14    A.    Yes, I do.

14:51:54 15   Q.    Okay.  Did you investigate at all as part of your

        16    analysis and your opinions what Patch Level 25 was or

        17    whether or not it made performance improvements for

        18    Hodell?

        19    A.    Vendors routinely apply patches and --

14:52:12 20   Q.    Sir, my question is different.  I simply asked you

        21    you did not look at Patch Level 25?

        22    A.    No.

        23    Q.    You did not look at whether Patch Level 25 made any

        24    performance improvements for Hodell, correct?

14:52:25 25   A.    I did not.
```

1607

Q.    Okay.  I have some highlighted language toward the
bottom there.  It begins, "We then."

              Do you see this?  "We then installed PL29."

              Do you understand that to be something
called Patch Level 29, correct?

A.    Yes.

Q.    And like Patch Level 25, you also didn't analyze
Patch Level 29 to see what performance improvements, if
any, it might have made for Hodell, did you?

A.    I did not.

Q.    Okay.

              And look what Guagenti writes.  "We then
installed Patch Level 25 over the existing Patch Level 29
and have seen a 500% increase in the performance in the
sales order."

              Do you see that?

A.    Um-hmm.

Q.    You have to answer yes or no.  They won't be able
to take it down.

A.    Yes.

Q.    Thank you.

              "Hodell also has seen this performance
increase in their operation."

              This document just wasn't given to you as
part of preparing your report, is that right?

1  A.    I do not recall having seen it.

2  Q.    Okay.  But you don't dispute that Hodell was

3  actually experiencing significant performance

4  improvements with these different patch levels, do you?

14:53:34  5           MS. LUARDE:  Objection.

6           THE COURT:  Overruled.

7  A.    I do not -- I do not dispute that patch levels can

8  yield significant improvements.

9  Q.    Let's go to Exhibit 166, please.  You were asked

14:53:57  10  some questions about this e-mail.  It's from Eddy Neveux

11  of SAP October 17th, 2007.  It's the summary of his visit

12  to Hodell.

13           Do you remember being asked about that?

14  A.    Yes.

14:54:10  15  Q.    And we've -- Bob, if you can just scroll down a

16  little bit, please.

17           You were asked about Mr. Neveux's comment

18  on nine-second response time?

19  A.    Yes.

14:54:25  20  Q.    I just want to see if you understand what he was

21  saying here.

22           He writes, "Also to note, the worst

23  performance that I saw with respect to the logs generated

24  by the SAP Business One Dot Net Profiler tool."

14:54:38  25           Let's pause right there.  You've not

1    offered any opinions as to what the Business One Dot Net

2    Profiler tool is, have you?

3    A.    The Net Profiler tool is a tool that is allowing to

4    track response times.

14:54:53  5    Q.    Exactly.

6              So a person like Ed Neveux could go out to

7    a client like Hodell and he could install this Dot Net

8    Profiler tool and through that tool, he could figure out

9    what all the response times were in the system, right?

14:55:11  10    A.    The response times, the tool gives him the

11    information about the response times between the add-on

12    and the system.

13    Q.    And he measured response times, and I'll tell you

14    he testified -- you said you read his testimony in this

14:55:26  15    case, right?

16    A.    Yes.

17    Q.    His actual testimony, not at a deposition, but that

18    he gave last week when he testified in front of this

19    jury?

14:55:32  20    A.    Yes.

21    Q.    You remember him testifying he saw -- and when he

22    measured, he saw no delay in entering or keying in data

23    on Hodell's system?

24    A.    Yes.

14:55:43  25    Q.    He saw no delay in moving a mouse, right, the arrow

1610

1    and the mouse --

2    A.    Yes.

3    Q.    -- around the field, right?

4    A.    Yes.

14:55:51  5    Q.    He saw no delay in clicking from one field to the

6    next on the screen?

7    A.    Um-hmm.

8    Q.    Right?

9    A.    Yes.

14:55:59 10    Q.    The only thing he saw a delay in was when an order

11    would be entered, and at the end, you'd click "Submit" or

12    "Enter," right?

13    A.    Yes.

14    Q.    And there, the worst performance he reported based

14:56:14 15    on his Dot Net Profiler tool was nine seconds, right?

16    A.    On the system that wasn't fully loaded.

17    Q.    What do you mean that wasn't fully loaded?

18    A.    Did it have 80 concurrent users on it?

19    Q.    How do you know that?

14:56:29 20    A.    The 80 concurrent users were not sustainable by

21    that time.

22    Q.    Hodell by this point in time had 120 users,

23    correct?

24    A.    They had bought them but not operational, to the

14:56:43 25    best of my knowledge.

1611

1    Q.    Sir, you weren't there when Mr. Neveux and

2    Mr. Killingsworth visited Hodell on October 17th of 2007,

3    were you?

4    A.    All I can say --

14:56:53  5    Q.    Sir, you weren't there, were you?

6    A.    I wasn't there.

7    Q.    Now I understand you to be questioning the veracity

8    of Mr. Neveux's report, is that what you're doing?

9    A.    I'm not questioning the veracity.

14:57:06  10         I'm questioning whether Mr. Neveux saw the

11   operational conditions as they would have been at Hodell

12   in operational usage.

13   Q.    So what you're going to say to this jury right now

14   is you just aren't going to accept Mr. Neveux's report

14:57:22  15   here as being good enough, right?

16         You'd want more?  You'd want personally to

17   figure out what performance they were having.  You'd want

18   more data is what you're saying?

19   A.    Yes.

14:57:34  20   Q.    Yes?

21                   MS. LUARDE:  Objection.

22                   THE COURT:  Overruled.

23   Q.    But you don't have any more data, do you?

24   A.    I don't.

14:57:40  25   Q.    Okay.  So the only data you actually have are the

1       three things that I just walked you through, right?

2                   You have Mr. Barnea's chart of response

3       times, yes?  You're aware of that?

4       A.      I'm aware of that chart.

14:57:54 5      Q.      That's the, in your report in reaching your

6       opinions, that chart with response times is the only

7       piece of data with actual measurements of response times

8       that you even used when you reached your opinions, right?

9       A.      Yes.  And that chart is not acceptable in terms of

14:58:11 10     response times.

11      Q.      That chart was prepared in July of '07, correct?

12      Yes?

13      A.      Yes.

14      Q.      And then we had what we just saw was Mr. Guagenti's

14:58:24 15     e-mail indicating the difference in performance when they

16      moved to Patch Level 29, right?

17      A.      Yes.

18      Q.      And that e-mail was from September of 2007?

19      A.      Yes.

14:58:34 20     Q.      And you have no basis to tell this jury that you

21      doubt the veracity of what Mr. Guagenti was reporting in

22      his e-mail, do you?

23                  Sir, yes or no?  You're not telling this

24      jury that you doubt the veracity of Mr. Guagenti's

14:58:54 25     September 14th, 2007 e-mail, are you?

1    A.    I doubt the adequacy of the context.

2              I do not doubt the veracity.

3    Q.    You're just saying it wasn't good enough?

4    A.    I am saying that you would have to see what these

14:59:10 5    improvements do in the context of a fully operational

6    system as Hodell would use it in day-to-day operations.

7    Q.    Sir, look at Mr. Neveux -- look at Mr. Neveux's

8    e-mail, sir, from October 17th of 2007.

9              Look at the third paragraph.  "My role,"

14:59:31 10    according to Ed Neveux, "My role was to look at the

11    day-to-day processes of what they do with SAP Business

12    One and the In-Flight add-on from LSi."

13              Do you see that?

14    A.    Yes.

14:59:41 15    Q.    Mr. Neveux, you're aware, testified that he

16    personally sat with Hodell and its users during its

17    normal business operations and personally observed and

18    measured what was going on; you're aware of that?

19    A.    I'm aware of that.

14:59:57 20    Q.    Yet you're not willing, as I understand it, to

21    accept what he reported as being true, correct?

22    A.    I cannot see here that the 120 concurrent users

23    were on that system, busily using that system.

24    Q.    If you were to accept what Mr. Neveux says that

15:00:17 25    Hodell was actually using its system in the way it used

1614

1        it every day, and that the worst performance Hodell saw

2        was nine seconds, you'd agree this system performed

3        perfectly fine for Hodell, right?

4        A.    No, I would not agree.

15:00:32  5    Q.    You don't agree with that, even though your

6        testimony has been that response times over 60 seconds

7        are unacceptable, but response times under that are

8        within your parameters?

9        A.    If they're under that, then they're automatically

15:00:47 10    within the parameters.

11                        The normal expected performance for systems

12        like that is subsequent response time.

13        Q.    Let's keep going.  We'll go round and round.  Go

14        back to the chart from Barnea.

15:01:03 15                        We went through -- Bob, if we can put that

16        chart back up.

17                        We went through some of these response

18        times.  You said with adding a hundred line order, the 60

19        seconds with In-Flight was in your parameters and

15:01:25 20    certainly the eight and a half seconds was within your

21        parameters; that was your testimony ten minutes ago,

22        right?

23        A.    My testimony --

24        Q.    Yes or no, that was your testimony ten minutes ago?

15:01:35 25    A.    No, it wasn't.

1    Q.    You didn't say it was within parameters?

2    A.    I said that it was within the one-minute, but

3    everything that is below one minute is not automatically

4    acceptable.

15:01:47  5              Outside one minute, totally unacceptable.

6    Q.    I see.  So now, now you're adding some additional

7    flavor to your testimony.

8              You're -- you're not -- strike that.

9              Let's look at, you testified earlier the

15:02:06 10    adding and delivery with 100 line items, 900 seconds with

11    In-Flight was not acceptable, but you told us that 28

12    seconds to do that was within your parameters.

13              That is what you said, right?

14    A.    I do not recall having said that.

15:02:22 15    Q.    You don't recall saying that to this jury ten

16    minutes ago?

17    A.    Have it read out, perhaps.

18    Q.    We'll do that.  Let's move on.

19              Let's talk about your actual main opinion

15:02:40 20    in this case.

21              You've said that it was that the

22    architecture of Business One wasn't suitable for big user

23    counts, that's basically where you come out, right?

24    A.    Yes.

15:02:53 25    Q.    And so we all understand, you actually reached that

1    opinion when you authored a paper back in 2006, right?

2    A.    Yes.

3    Q.    You called that today an article, you've called it

4    a Whitepaper in the past?

15:03:13 5    A.    Um-hmm.

6    Q.    Yes?

7    A.    Yes.

8    Q.    And the actual facts of this case have no bearing

9    on your actual opinions because you just drew your

15:03:21 10   opinions from a report that you prepared without respect

11   to Hodell at all, right?

12   A.    The -- the report was done without having knowledge

13   of the Hodell circumstances, that is true.

14   Q.    And what you essentially did to prepare the report

15:03:41 15   that you submitted in this case was you took your paper

16   that you wrote in 2006 and you basically, on a word

17   processor, literally copied and pasted a huge chunk of

18   your 2006 report and just pasted it over to a report that

19   you gave to Hodell and submitted in this case, right?

15:04:03 20   A.    I pasted those portions that were applicable, even

21   in the context of the Hodell circumstances.

22   Q.    And as you said, you actually made no effort in

23   this case to pinpoint the particular source of any

24   performance problem at Hodell, right?

15:04:27 25   A.    I did not go out and take any measurements at

1    Hodell.

2    Q.    Your Whitepaper, in that document, your article,

3    whatever we want to call it now, that you authored in

4    2006, you made the following statement.  See if you

5    recall it.

6                    Speaking of a two-tier architecture.

7    A.    Yes.

8    Q.    "When the number of users exceeds 100, performance

9    begins to deteriorate."

10                   Do you remember that statement?

11   A.    That is true.

12   Q.    And you cited to a source, a reference source,

13   right?

14   A.    Yes.

15   Q.    You cited to an article published by Carnegie

16   Mellon University in Pittsburgh, right?

17   A.    Yes.

18   Q.    Let's take a look at that article, if you will.

19                   Bob, I think you have that there, right,

20   the Carnegie Mellon article?

21                   No, wrong one.

22                   Sir, I'm happy to give you a hard copy of

23   this if you'd like.

24   A.    It's not necessary.

25                   MR. STAR:  Your Honor, I see the time.

1    Would you like us to take a break right now?

2              THE COURT:  Fine.  We have somebody that's

3    about to open the door, I think.

4              Folks, we'll take our afternoon recess at

15:06:07 5    this time.  There she is.

6              THE CLERK:  All rise.

7              (Jury out)

8              (Recess taken)

9              (Proceedings resumed in presence of the

15:22:29 10   jury as follows:)

11             THE COURT:  Have a seat.

12   BY MR. STAR:

13   Q.    Mr. Guembel, let's reorient ourselves.

14             We were talking about your 2006 paper,

15:22:40 15   article, whatever you're calling it, and one of the

16   statements that you made in your 2006 paper was the

17   following:  "When the number of users exceeds 100,

18   performance begins to deteriorate."

19             And in support of that, you cited to an

15:22:56 20   article published by Carnegie Mellon University, right?

21   A.    Yes, I did.

22   Q.    You also in your 2006 report cited to a second

23   source, an article from a gentleman named George

24   Schussel?

15:23:11 25   A.    Yes.

1    Q.    Do you recall that?

2    A.    Yes.

3    Q.    Take a look at your report in this case

4    which -- take that down for just one second, Bob, if you

15:23:21  5    would.

6                   Sir, if you have your report in this case

7    in front of you.

8    A.    Um-hmm.

9    Q.    Go to Page 3.

15:23:36 10                   And you'll agree with me that in this

11    section of your report, you essentially copied and pasted

12    your 2006 article?

13    A.    Yes.

14    Q.    Citations and all, correct?

15:23:47 15    A.    Again?  Pardon?

16    Q.    You copied and pasted your 2006 article into your

17    2012 report in this case, including the citations, the

18    sources that you relied upon?

19    A.    Adding another citation.

15:23:59 20    Q.    Okay.  And for the notion that when the number of

21    users exceeds 100, performance begins to deteriorate, you

22    again cited the Carnegie Mellon University article,

23    right?

24    A.    Yes.

15:24:14 25    Q.    The same article that you had cited back in 2006?

1620

1    A.    Yes.

2    Q.    All right.  Bob, let's pull up the Carnegie

3    Mellon -- and by the way, just so we're all clear, in

4    your report in this case in 2012, you also cited to

15:24:29 5    George Schussel?

6    A.    Yes.

7    Q.    Okay.  Same citation, same article?

8    A.    Yes.

9    Q.    From 2006.

15:24:35 10          Good.  Let's go ahead and look at the

11   Carnegie Mellon article that you first cited back in

12   2006.  You can leave that up, Bob.

13                Oh, my screen's not working.

14                Bob, go to the very end, please.

15:25:01 15                Sir, you see where we've highlighted there

16   on the screen?

17   A.    Yes.

18   Q.    You agree with me that the original publication

19   date of this Carnegie Mellon article was January 10th of

15:25:10 20   1997?

21   A.    I do.

22   Q.    Thank you.  And right above that, Bob, scroll up a

23   little bit.

24                Highlighted there is the George Schussel

15:25:26 25   article?

1    A.    Yes.

2    Q.    That you relied upon in your 2006 paper and again

3    in your 2012 report in this case?

4    A.    Yes.

15:25:32 5    Q.    And obviously if the Carnegie Mellon article was

6    published in January of 1997, the Schussel article

7    predated that?  That's obvious?

8    A.    Yeah.

9    Q.    Yes.  And according to the footnotes in the

15:25:47 10    Carnegie Mellon article that we have here, the Schussel

11    article was actually published sometime in 1995, right?

12    A.    Yes.

13    Q.    So when you're writing a paper about technology and

14    two-tiered architectures and so on in 2006, you're

15:26:01 15    already relying on information that's nine years old, at

16    least nine years old?

17    A.    Yes.

18    Q.    Okay.  Let's stick with the Carnegie Mellon

19    article.

15:26:10 20              And go to Page 2 of that article, Bob,

21    please.

22              This article from Carnegie Mellon, which

23    you've just established was first published in January of

24    1997, has a section here on two-tier architectures,

15:26:43 25    right?

1    A.    Yes.

2    Q.    And in the highlighted section, it says, "A

3    two-tiered client server architecture is a good solution

4    for distributed computing when work groups are defined as

15:26:55 5    a dozen to a hundred people interacting on an LAN," and

6    it goes on, right?

7    A.    Yes.

8    Q.    Then it has this:  "When the number of users

9    exceeds 100, performance begins to deteriorate."

15:27:10 10            It goes on, right?

11    A.    Yes.

12    Q.    And its citation at the end of that paragraph is to

13    Schussel, right?

14    A.    Yes.

15:27:15 15    Q.    That's the Schussel article from '95?

16    A.    Yes.

17    Q.    Let's take a look at that article.  Just stay at

18    the top there, Bob, real quick.

19            So Schussel starts his article off, and the

15:27:34 20    article you relied on in 2006 and again in 2012, he

21    starts it off with this:  "It's the purpose of this

22    article to explain how the client/server architecture is

23    really a fundamental enabling approach that provides the

24    most flexible framework for using new technologies like

15:27:53 25    the worldwide web."

```
            1                   At that point in time the worldwide web,

            2       the Internet that we're all used to, was brand new,

            3       wasn't it?

            4       A.    It was -- no, not so brand new, but it was new.

15:28:03    5       Q.    Yeah, it was just coming out.  People, most people

            6       didn't have e-mail accounts yet, did they?

            7       A.    I did.

            8       Q.    You did?  You're not most people.

            9                   Right?  Most people didn't have e-mail

15:28:15   10       accounts, did they, sir?

           11       A.    My 78-year-old uncle did.

           12       Q.    Sir, answer the question.

           13       A.    The Internet wasn't anything what it is today.

           14       Q.    Thank you.

15:28:30   15                   In fact, Google actually formed as a

           16       company in 1995 and didn't even start getting its

           17       services to people for years later, right?

           18                   MS. LUARDE:  Objection.

           19                   THE COURT:  Overruled.

15:28:42   20       A.    Right.

           21       Q.    Yeah.  You know that?  You've been in the industry

           22       since the early seventies, right?  Yeah?

           23       A.    Yes.

           24       Q.    Flip forward, Bob, to the second page, please.

15:29:01   25                   Mr. Schussel starts off, he's writing about
```

1       events since 1992 with software.

2                    Do you see that?

3       A.     Um-hmm.

4       Q.     In the world of computers and hardware and

15:29:25 5    software, the delta between 1992 and even 2006 when you

6       wrote your report, that's huge, isn't it?

7       A.     With regard to architecture, it isn't.

8       Q.     Sir, yes or no?

9       A.     No.

15:29:37 10   Q.     You don't think that's a huge difference?  Let's

11      keep going.

12                   He writes, about the two tiered

13      client/server architecture, right?  And there's the

14      quote.  "The two tiered client/server architecture has

15:29:54 15   proven to be very effective in solving work group

16      problems."

17                   It's basically what was then copied into

18      the later Carnegie Mellon article that you relied on,

19      right?

15:30:05 20   A.     Um-hmm.

21      Q.     Yes?

22      A.     Yes.

23      Q.     So Carnegie Mellon's source of this information was

24      Mr. Schussel?

15:30:11 25   A.     Yes.

1    Q.    So your ultimate source of this information was

2    also Mr. Schussel in his 1995 article, right?

3    A.    But it was undisputed by anybody.

4    Q.    Sir, your sole source for this kind of information

15:30:26 5    was Mr. Schussel's 1995 article?

6    A.    No.

7    Q.    That's what you cited to?

8    A.    No.  No.

9    Q.    All right.  Let's keep going.

15:30:32 10          Go back to your -- go back to your paper in

11    2006.  We established you cited two sources.  You cited

12    Carnegie Mellon and you cited Schussel, right?

13    A.    Yes.

14    Q.    And then you copy and pasted that over to your new

15:30:47 15    report in this case?

16    A.    Yes.

17    Q.    Thank you.  Let's go back to the article from

18    Mr. Schussel.  And he writes, "What typically happens

19    with client/server in large enterprise environments is

15:31:02 20    that the performance of a two-tier architecture

21    deteriorates as the number of online users increases."

22          You see that?

23    A.    Yes.

24    Q.    And he finishes that paragraph off with this:

15:31:12 25    "With 50 clients" and you've already told us clients

1    is -- clients are the computers, the PCs that people are

2    actually using on their desk tops, right?

3    A.    Yes.

4    Q.    "So with 50 PCs or computers and today's typical PC

15:31:30  5    hardware, this is no problem."

6              Right?

7    A.    Yes.

8    Q.    So he's saying even back in '95 with the computers

9    that you had back then, you could easily have 50 people

15:31:42 10    pounding away on a two-tiered architecture system, right?

11    A.    No.

12    Q.    You're disagreeing with what he's saying?

13    A.    He says with 50 clients but not pounding away so

14    there's a difference between clients on the system and

15:31:55 15    concurrently using it a hundred percent of the time.

16    Q.    So you got that interpretation of his article, but

17    let's go on.

18              He then goes, he goes from saying "With 50

19    clients in today's typical PC hardware, this is no

15:32:08 20    problem."

21              Look at what he says next.  "When one has

22    2000 clients on a single server, however, the resulting

23    performance isn't likely to be satisfactory."

24              That's what Mr. Schussel was writing in

15:32:19 25    1995 about the hardware that was available at that time,

1    correct?

2    A.    Correct.

3    Q.    And you didn't go out and do any empirical study,

4    scientific study on your own to figure out if there's a

15:32:30 5    difference between 50 users or clients and 51 or a

6    hundred or 200 or 2000; you just relied on this article,

7    correct?

8    A.    No.  SAP publishes --

9    Q.    Sir, you relied on this article when you wrote your

15:32:45 10    paper and when you wrote your report in this case, didn't

11    you?

12    A.    I relied also on my experience.

13    Q.    And you've not, in providing your report in this

14    case, you didn't attach to your report any study or

15:33:02 15    scientific experiment or anything like that that you

16    personally did or were aware of with respect to the

17    number of users on a two-tiered system?

18              The only thing you pointed back to was

19    Schussel's article, right?

15:33:18 20    A.    I could not find anything.

21    Q.    Thank you.  We can agree that the performance of

22    any computer system, any ERP system, is going to be

23    dependent in some way, some degree, on the actual

24    computers that are being used, the servers and the PCs,

15:33:41 25    the hardware, right?

```
 1    A.    Yes.

 2    Q.    That even with the most robust ERP system that you

 3    might find out there today, if you're trying to run it on

 4    computers from 1995, it's not likely to work very well,

 5    is it?

 6    A.    I do not agree.

 7    Q.    You think -- okay.  So let's understand, you think

 8    that computer hardware and PCs, the hardware actually

 9    available to the users, doesn't actually impact the

10    performance that the users are going to get?

11    A.    It does impact.

12    Q.    It does impact?

13    A.    It does impact.  But it does not say that if you

14    run an old hardware, it does not work.

15    Q.    Okay.  But certainly with more powerful hardware,

16    you get better performance, don't you?  That's

17    universally accepted, isn't it?

18    A.    That's not universally accepted.

19              If the architecture permits you.

20    Q.    Yes.

21    A.    If it does not permit you, any hardware that you

22    throw at the problem will not solve it.

23    Q.    And you put up that chart over there.  Guys, can

24    you turn it around?  That's fine, the jury can see.

25              On that chart there, sir, at the bottom, it
```

1    talks about the database server.  That's a piece of

2    hardware, right?

3    A.    That's true.  Plus software.

4    Q.    Plus software.  Thank you.  Software doesn't run

5    without hardware?

6    A.    Yes.

7    Q.    Okay.  And you describe at the top the clients are

8    the computers, the PCs, the actual machines that people

9    are using, right?

10   A.    Yes.

11   Q.    Okay.  So the more powerful the machines, the

12   better the speed of the system, right?

13   A.    No.

14   Q.    Okay.

15   A.    It takes more than that.  It takes an architecture

16   that lets you permit using the power of the machine.

17   Q.    So let's just see if we understand your opinion.

18           You're saying that a two-tiered system, no

19   matter how powerful the machine, is somehow locked back

20   in 1995 world, is that your opinion?

21   A.    It's limited.

22                 MS. LUARDE:  Objection.

23                 THE COURT:  Overruled.

24                 Go ahead.

25   A.    Okay.  It's limited in terms of scalability, yes.

1630

1    Q.    Okay.  You agree, though, that there have been

2    major improvements in hardware and PC technology since

3    1995, right?

4    A.    I do agree, but they need to be put into

15:35:58  5    perspective here.

6              Just putting a strong engine into a small

7    car doesn't make it a race car.

8    Q.    Thank you for that.  And you didn't do any study of

9    your own to determine what impact on performance or what

15:36:17 10    deterioration there would be on performance, even on a

11    hardware environment back in 1995 when you'd go from 50

12    users to 51 or to 100 or 200?

13              You never did that, did you?

14    A.    I did not do it in this context.

15:36:39 15    Q.    Thank you.

16              And your view of Mr. Schussel's number was

17    that his number of 50 clients or 50 users wasn't a hard

18    and fast number in his article back in 1995, right?  That

19    was your view?

15:36:55 20    A.    My view was that it was used to show that there was

21    a scalability problem.  Whether it would start with 49,

22    51, or start with 53, that wasn't the issue.

23    Q.    And the numbers he chose went from 50 to 2000,

24    right?

15:37:12 25    A.    He only said with 2000, it's not going to be

1    satisfactory.

2    Q.    And all you're doing is guessing what would be

3    satisfactory in the middle; you don't have any hard, fast

4    scientific evidence that you can point us to to show us

15:37:25  5    where on the two-tiered system performance would start to

6    deteriorate, do you?

7    A.    I do not have that in this context, but I've seen

8    installations that were going -- that were developing

9    poor performance as the number of users were increased

15:37:45 10    due to the architecture.

11    Q.    So all you can point us to, as you're sitting here

12    today, let's just step back.

13          You wrote your article in 2006, and then

14    you copied big chunks of that into your report that you

15:38:01 15    gave in this case in July of 2012, right?

16    A.    Yes.

17    Q.    So we're almost, by my math, three years since you

18    issued your report.

19          And all that you're able to say to this

15:38:11 20    jury on the stand today is you can maybe point to some

21    other customer installations where you saw some

22    deterioration in performance on a two-tiered system,

23    that's it?

24    A.    All I can say is that the architectural

15:38:30 25    considerations haven't changed, and what Schussel said in

1    '95 is still true to the very day.

2              You will not find any more modern

3    literature to that that comes to a different conclusion.

4    I've checked all resources that I had again, and I am

15:38:47 5    sure you will not arrive at a different conclusion.

6    Q.    Well, the fact is you haven't cited any more modern

7    sources than that?

8    A.    There are no more modern sources.

9    Q.    Thank you.

15:38:59 10    A.    What was true then is true today.

11    Q.    Sir, even after all the testimony that you gave and

12    the things you've said both on your direct and now on

13    your cross-examination, you agree and your opinion is

14    this:  That back in December of 2005, it would have been

15:39:48 15    appropriate to take an order for 80 Business One user

16    licenses, right?

17    A.    Provided that you knew that there were not

18    concurrent users.

19    Q.    That's your testimony today, but your testimony

15:40:05 20    previously was simply that you can do it, right?

21    A.    You can take any order if you know that you can

22    handle the load.

23    Q.    Well, let's go to your deposition.  I just need to

24    find the right page.  Pardon me.

15:41:02 25              It is actually the last page of your

1    deposition, 205.

2                    Are you with me?

3    A.    Page -- okay.  205 that is.

4    Q.    Um-hmm.  The question that was asked was this:  "Do

15:41:30  5    you have an opinion as to whether, as of December of

6    2005, it would have been proper or improper to sell a

7    deal where a customer was requiring a total of 80

8    Business One licenses?"

9                    Your answer:  "As per scrutiny applied, I

15:41:48 10    would have said, and with a positive outcome, I would

11    have said you can do it, you know, but it's in the gray

12    zone."

13                    That was your opinion?

14    A.    Yes.

15:41:56 15    Q.    It was not an on or off?

16    A.    No, it could be done.  If proper scrutiny applied,

17    which means you verify you can handle the load, you can

18    take that order, but did anybody verify that?

19    Q.    That's not my question.  You agree that as of

15:42:12 20    December, 2005, there was nothing wrong on its face with

21    taking an order for 80 Business One licenses, correct?

22    A.    I added a proviso, and I still stand by that.

23    Q.    You added that proviso today.

24    A.    I said, "So this is 80 users with Business One at

15:42:37 25    that time is a prescription drug."

1                    Prescription drug means they are

2    administered only after investigation or examination by a

3    doctor.  They're not an over-the-counter thing like a

4    fisherman's friend.

15:42:55 5    Q.    Right.  Business One is --

6    A.    That's what I said.

7    Q.    Business One is not a system you go get off the

8    shelf.  You go -- no ERP system is, is it?

9    A.    It's a prescription drug.  The meaning that I

15:43:06 10   attached to that is you need to make sure that it's used

11   correctly, and I still stand by that.

12   Q.    Sir, you agree that a customer like Hodell has its

13   own responsibilities and obligations when an ERP

14   implementation project is being run, correct?

15:43:49 15   A.    That is correct.

16   Q.    There are things in an ERP implementation that can

17   only be done by a customer like Hodell, correct?

18   A.    That is correct.

19   Q.    For instance, the system itself must be tested in

15:43:49 20   the customer's actual environment before they go live,

21   that's standard, right?

22   A.    It is standard.

23   Q.    And we can agree that the only place that you can

24   actually test the system in the customer's environment is

15:43:53 25   in the customer's environment, right?

1    A.    True.

2    Q.    And you need the customer to cooperate and do that,

3    correct?

4    A.    True.

15:44:00  5    Q.    So customers always have big responsibilities when

6    it comes to testing a solution before go-live?

7    A.    But they must not be left alone.

8    Q.    My question is different.

9                    Simply put, you agree customers have big

15:44:14 10    responsibilities with respect to testing a solution in

11    their own environment before they go live, correct?

12    A.    They're part of it.

13    Q.    They're part of it.  And a customer is always part

14    of the decision to go live?

15:44:28 15    A.    True.

16    Q.    And you'd agree that testing of a software system

17    in a lab environment by a software provider has

18    limitations; you can only do so much in a lab, right?

19    A.    That is also true.

15:44:43 20    Q.    Real world at the customer location testing is

21    what's really necessary for any ERP implementation to

22    determine whether the software's performing from a speed

23    perspective or a functionality perspective, right?

24    A.    True.

15:44:59 25    Q.    That's because all of the variables at the customer

          1    location have to be taken into account to figure out

          2    whether the software and the whole system is performing,

          3    right?

          4    A.    Yes.

15:45:12  5    Q.    And here for Hodell, that would entail running

          6    Business One with In-Flight and Radio Beacon on Hodell's

          7    own machines?

          8    A.    True.

          9    Q.    With their own users?

15:45:24 10    A.    Yes.

         11    Q.    Doing the jobs they normally do and will do after

         12    they go live, correct?

         13    A.    Yes.

         14          MR. STAR:  Your Honor, just give me one

15:45:44 15    moment, if you will.

         16    Q.    Sir, you were giving some testimony earlier when

         17    you were standing over by that board and you were talking

         18    about system overload.

         19          We can agree that any kind of computer

15:46:26 20    system, regardless of whether it's a two-tier

         21    architecture or something different, any computer system

         22    can experience overload, right?

         23    A.    Yes.

         24    Q.    That's just inherent in the technology, right?

15:46:37 25    A.    Yes.

1    Q.    And so you're not telling this jury that only

2    two-tiered systems have limitations?

3    A.    I did not tell them.

4    Q.    Okay.  You gave some testimony about a comment in

15:46:58 5    your report where you were referring to a Statement of

6    Direction from SAP from January of 2009.

7              If you go to that big stack with the big

8    clip there where we put a tab, there's a yellow tab on

9    there.

15:47:13 10              This is a printout of everything that was

11   attached and referred to in your report.  And are you

12   with me, the page at the top, it says "Target markets"?

13   A.    Okay.  Yes.

14   Q.    And about halfway down, it starts with the phrase

15:47:48 15   "Broadly speaking."

16              That's the information you were referring

17   to?

18   A.    Yes.

19   Q.    Okay.  Let's just look at that.

15:47:55 20              "Broadly speaking," it says "SAP customers

21   usually have" and then it goes on and gives a profile,

22   right?

23   A.    Yes.

24   Q.    So that's a typical customer profile, right?

15:48:09 25   A.    Yes.

1  Q.   Now, part of what it said here was they have

2  usually up to 50 million Euros in annual revenue and

3  100,000 transactions per year, you see that?

4  A.   Yes.

15:48:23  5  Q.   Now, I heard you say first that that's a limit, but

6  then I understood you to say that it's not a hard limit?

7  A.   It's not a hard limit but if a vendor says

8  typically, then it is -- vendors do not tend to have

9  modest statements about what is typical.

15:48:43  10  Q.   Sir, you understand that this is a snip out of a

11  page called Target Markets.

12          You'd agree with me that this is simply

13  discussing in its own words, "broadly speaking," the

14  profile that Business One customers usually have?

15:49:02  15          This doesn't refer to any technical

16  limitation on its face, does it?

17  A.   It's not a technical -- well, there is no hard

18  coated limit in the system with 100,000 transactions, but

19  what this here says is that this is sort of a description

15:49:23  20  of the space that Business One can be used in.

21  Q.   That's your interpretation, but as you just said,

22  in the software itself, there's no technical or

23  hard-coated limit of a 100,000 transactions per year,

24  right?

15:49:39  25  A.   No, there is not.

1  Q.    Thank you.  And how many transactions per year do

2  you understand Hodell was operating with in, say, 2007

3  and 2008?

4  A.    My calculation, not based on in depth analysis of

15:49:55  5  the processes at Hodell, indicate that we would arrive at

6  around 150,000-plus transactions.

7  Q.    So you believe that Hodell -- let me just step

8  back.

9            You've had to calculate how many

15:50:13 10  transactions they would run, or did they tell you how

11  many transactions they run annually?

12  A.    I -- I used my own experience, using, gauging it

13  from the number of concurrent users, and arrived at that

14  number.

15:50:31 15            And I didn't even take 120 concurrent

16  users, but I took only 80.

17  Q.    And you're aware that throughout the period of

18  March, 2007 through the end of March, 2009, Hodell ran

19  that number of transactions, whatever number you've

15:50:46 20  calculated, using Business One and In-Flight and Radio

21  Beacon, right?

22  A.    I -- as I said, I do not have any benchmark

23  information of the actual workload at Hodell.

24  Q.    But we can agree that whatever workload it was, and

15:51:02 25  whatever number of transactions were actually being run

1    at Hodell, it did that for a two-year period using

2    Business One and In-Flight and Radio Beacon, right?

3    A.    It, in all probability, did not, because the

4    Hodell --

15:51:19 5    Q.    Sir, we've got to stick with what you know.

6                You're saying in all probability.  You just

7    don't know?

8    A.    I -- I know that Hodell could not get through the

9    projected number of transactions that they would have

15:51:31 10   been able to do with that number of users.

11    Q.    Sir, I'm going to stop you there.  Let's step back.

12                You've just said you don't even know the

13    number of transactions that they ran, right?

14    A.    Yes.

15:51:42 15   Q.    Now you're going to tell this jury that somehow you

16    know they didn't run the number of transactions they were

17    supposed to run, is that what you're doing?

18    A.    What I'm saying is --

19    Q.    Yes or no, is that what you were doing?

15:51:54 20   A.    The users on the system did not have the

21    possibility to use it without lengthy wait times.

22    Q.    You never went and observed any wait time yourself,

23    right?

24    A.    I did not observe it.

15:52:09 25   Q.    Right.  The only wait times that you're aware of

1    are the ones we went over, the response times that were

2    measured in the documents we saw?

3    A.    Yes.

4    Q.    Okay.  And you are aware that Hodell ran this

15:52:23  5    system for two full years, right?

6    A.    No, I'm not aware of that.

7    Q.    You didn't know that?

8    A.    No.

9              MR. STAR:  Okay.  Thanks.  That's all I

15:52:31 10    have.

11              THE COURT:  Thank you.

12              Any redirect?

13              MS. LUARDE:  Yes, Your Honor.

14         REDIRECT EXAMINATION OF HELMUTH GUEMBEL

15:52:34 15    BY MS. LUARDE:

16    Q.    Mr. Guembel, I'd like to clear up one -- a couple

17    of lines of questioning that occurred, one of which was

18    related to that you didn't actually go in and test the

19    system at Hodell-Natco.

15:53:18 20              Do you recall that line of questioning?

21    A.    Yes, I do.

22    Q.    But, in fact, by the time you were retained and

23    knew about Hodell, that system was no longer in place, is

24    that correct?

15:53:29 25    A.    That is correct.

1642

1    Q.    So you couldn't possibly have gone to Hodell and

2    hooked something up to measure the wait times, is that

3    correct?

4    A.    That is correct.

15:53:38 5    Q.    Thank you.

6              And you could not have gone in to check the

7    hardware as it existed at the time Hodell was using

8    Business One, is that correct?

9    A.    That is also correct.

15:54:07 10    Q.    And just so we're clear, was Hodell's database size

11    beyond the limitations of Business One at the time they

12    purchased Business One?

13              MR. STAR:  Objection.  It's outside the

14    scope of cross.

15:54:21 15              THE COURT:  Overruled.

16              THE WITNESS:  Okay?

17              MS. LUARDE:  You can answer.

18              THE WITNESS:  I can answer?  Okay.

19    A.    It was inasmuch as at that time all SAP had done

15:54:35 20    was to test Business One with the maximum database size

21    of 11 gigabytes, which was far less than the 43 gigabytes

22    that Hodell had.

23    Q.    And would Hodell have experienced unsatisfactory

24    performance even if Business One did not have a single

15:54:56 25    add-on?

1    A.    Yes.

2                    MR. STAR:  Objection.  Calls for

3    speculation.

4                    THE COURT:  Overruled.

15:55:04  5    Q.    And, in fact, the addition of In-Flight does not

6    impact your opinion in this case at all, correct?

7    A.    It does not.

8    Q.    And the same with Radio Beacon, is that true?

9    A.    That's also true.

15:55:24 10    Q.    And if In-Flight, Radio Beacon, and Hodell's

11    hardware were all perfect at the time they were running

12    Business One, Hodell would have still had performance

13    problems with Business One, is that correct?

14    A.    It still would have had, it still would have had

15:55:43 15    performance problems.

16    Q.    And we discussed patch levels.

17                    Do you recall discussing patch levels

18    during your examination?

19    A.    Yes, I do.

15:55:52 20    Q.    And the fact that there was a new patch released

21    does not change the basic architecture of Business One,

22    is that correct?

23    A.    That's also correct.

24    Q.    So if a patch improved poor performance by 500%,

15:56:08 25    you could still have and would still have poor

1644

1    performance, is that correct?

2    A.    That's also correct.

3    Q.    Mr. Guembel, I'd like to show you Defendant's

4    Exhibit 166?

15:56:44  5              MS. LUARDE:  Kim, can you pull that up,

6    please?

7    Q.    And you recall that we discussed Mr. Neveux's

8    testing at Hodell.

9              Do you recall that?

15:56:58 10   A.    Yes, I do.

11   Q.    And I believe that you were concerned about the

12   environment being tested and what the environment was

13   like, and I'd like to direct you to the third paragraph.

14   A.    Yes.

15:57:17 15              MS. LUARDE:  And, Kim, if you can

16   highlight, in the fourth paragraph about five lines down,

17   starting with the word "Also."

18   A.    "Also to note"?

19   Q.    And if you'd go up one more line, Kim, up one more

15:57:38 20   line.  I apologize.

21              Yeah.  And the next sentence.

22              And, Mr. Guembel, if this was a, as noted

23   here, a slow day --

24   A.    Yeah.

15:57:56 25   Q.    -- do you agree that would not be a good

           1    measurement of the performance at Hodell?

           2    A.    It's not a good measurement.

           3              It should have been repeated on a peak day.

           4    Q.    Okay.

15:58:26   5              Mr. Guembel, you recall during your

           6    testimony that you were pointed to a Carnegie Mellon

           7    article, is that correct?

           8    A.    That is correct.

           9    Q.    And you were pointed to articles and testing done

15:58:45  10    by Mr. Schussel, am I saying that correctly?

          11    A.    Yes.

          12    Q.    And these are older materials --

          13    A.    Yes.

          14    Q.    -- right?

15:58:55  15              And why do you still believe that those

          16    materials are reliable?

          17    A.    An architecture analysis does not change very

          18    quickly.

          19              The -- if -- however, if you would do an

15:59:10  20    ERP system today again, you would architect it in a very

          21    different way because the next generation of systems

          22    would have to be deployed completely in the Internet and

          23    the cloud, but what Schussel said, and the Carnegie

          24    Mellon University came to say in this article, is true to

15:59:33  25    the very day.

 1          It is like some mathematical rules or so.

 2     You know, some things just don't change.

 3     Q.    And the information contained in those articles

 4     simply hasn't changed over time, correct?

15:59:49  5     A.    It hasn't changed over time.

 6              Whether it is 50 users or 52 users, it

 7     remains debatable, but the general bottom line of it,

 8     that two-tiered line server doesn't scale well.  That is

 9     correct.

16:00:08 10     Q.    And, in fact, Business One, their more expensive

11     packages have three-tier architecture, is that correct?

12     A.    That is correct.

13     Q.    And a three-tier architecture would be much better

14     than a two-tier architecture?

16:00:26 15     A.    Also true.

16              MR. STAR:  Objection.

17              THE COURT:  Overruled.

18     Q.    You know, it was implied in the testimony or, I

19     apologize, implied in the questioning that you were told

16:00:41 20     how to answer the questions given to you by Hodell and

21     its counsel.

22              Do you recall that?

23     A.    I do recall that.

24     Q.    And were you actually told how to respond to our

16:00:52 25     questions?

1   A.    No, I wasn't told how to respond to the questions.

2   Q.    And just so we're clear, the performance problems

3   experienced by Hodell, namely slow performance, do you

4   believe that the primary cause was SAP Business One's

16:01:45  5   inherent architectural limitations?

6                 MR. STAR:  Objection.  That's not been his

7   opinion.  It's not in his report.

8                 THE COURT:  Overruled.

9                 MS. LUARDE:  Actually it is in his report.

16:02:00 10   It's on Page 17.

11                 THE COURT:  Overruled.

12                 Go ahead.

13   A.    It is my opinion.

14   Q.    Thank you.  And even if there were issues with

16:02:06 15   regard to In-Flight, those issues were separate and apart

16   from the issues that were just part of Business One's

17   problem with the architecture, correct?

18   A.    Yes.

19   Q.    And this architecture limitation was known in March

16:02:25 20   of 2007 by SAP, is that correct?

21                 MR. STAR:  Objection.

22                 THE COURT:  Overruled.

23   A.    It was known.  It was known.

24   Q.    I'm sorry, is that --

16:02:36 25   A.    It was known, yes.  Sure.

1648

1    Q.    Thank you.

2                MS. LUARDE:  Give me just one second,

3    please.

4                (Pause)

16:03:14 5   BY MS. LUARDE:

6    Q.    And you would agree, Mr. Guembel, that for

7    In-Flight to work properly, Business One actually had to

8    work correctly as well, is that true?

9    A.    True.

16:03:32 10  Q.    And the same would be true for Radio Beacon as

11   well?

12   A.    Also true.

13               MR. STAR:  Objection.

14               MS. LUARDE:  If I may confer quickly, Your

16:03:49 15  Honor.

16               THE COURT:  Sure.

17               (Pause)

18   BY MS. LUARDE:

19   Q.    And, Mr. Guembel, we talked earlier about the IBM

16:04:46 20  study, correct?

21   A.    Yes.

22   Q.    And that study actually supports --

23               MR. STAR:  Objection.  This wasn't brought

24   up on cross.

16:04:54 25               THE COURT:  Yeah, the objection is

```
 1    sustained.
 2                     MS. LUARDE:  I have nothing further.
 3                     THE COURT:  Any recross?
 4                     MR. STAR:  No.  No, thank you.
 5                     THE COURT:  Thank you, sir.  You're
 6    excused.  Watch your step going down, please.
 7                     THE WITNESS:  Thank you.
 8                     (Witness excused)
 9                     THE COURT:  You may call your next witness.
10                     MS. LUARDE:  Your Honor, may we approach?
11                     THE COURT:  Um-hmm.
12                     (Side-bar conference had off the record).
13                     MS. LUARDE:  Your Honor, we'd like to call
14    Mr. Otto Reidl.
15                     THE COURT:  Mr. Reidl, raise your right
16    hand, please.
17                          OTTO REIDL,
18       of lawful age, a witness called by the PLAINTIFFS,
19             being first duly sworn, was examined
20                and testified as follows:
21                     THE COURT:  Please have a seat.
22                     Mr. Reidl, could you just tell us your full
23    name, sir?
24                     THE WITNESS:  Otto Reidl.  The last name is
25    spelled R-E-I-D-L.
```

```
 1              THE COURT:  Thank you.
 2         DIRECT EXAMINATION OF OTTO REIDL
 3    BY MS. LUARDE:
 4    Q.   Good afternoon, Mr. Reidl.
 5              Mr. Reidl, could you tell the jury a little
 6    bit about yourself?
 7    A.   I'm married, have four children.  We reside in
 8    Broadview Heights, Ohio where we've resided for about 35
 9    years.
10    Q.   And could you tell me a little bit about your
11    education, Mr. Reidl?
12    A.   Yes.  I received a BS degree in engineering,
13    chemical engineering from Case Institute of Technology,
14    and a Master's in science, engineering administration,
15    which is comparable to the current MBA program at Case
16    Western Reserve.
17    Q.   So they didn't actually have a, quote, unquote, MBA
18    program at that time?
19    A.   That's my understanding.
20    Q.   Okay.  And, Mr. Reidl, could you tell me where you
21    currently work?
22    A.   I work at Hodell-Natco Industries.
23    Q.   Okay.  And could you tell me just a little bit
24    about Hodell-Natco Industries?
25    A.   That, the company's predecessor was a company
```

1    called Rife Corporation, which started in 1980.

2             I was president of the Rife Corporation.

3    It's a family-owned company owned by the Rex family and

4    the Reidl family.

16:08:43  5             In 1983 we began our acquisition program,

6    and we acquired Hodell chain from Monogram Industries.

7    In 1984, we acquired Natco Fasteners, also from Monogram

8    Industries.

9    Q.    And then did those two, the two companies actually

16:09:14  10   merged, correct?

11   A.    Yes, in 1993.

12   Q.    And is that when Hodell-Natco was actually formed,

13   in '93?

14   A.    Correct.

16:09:26  15   Q.    Okay.  And how many people are employed at Hodell?

16   A.    Currently?

17   Q.    Yes.

18   A.    About 130.

19   Q.    And has that been consistent over time?

16:09:46  20   A.    No.  We hit a peak during the SAP Business One

21   utilization.

22   Q.    And can you tell me what your current position is

23   at Hodell?

24   A.    I'm CEO.

16:10:08  25   Q.    What do you do as the CEO at Hodell?

1652

1    A.    My primary responsibility is to ensure the

2    financial health of the corporation on behalf of our

3    shareholders, our employee/teammates, and our

4    suppliers/customers.

16:10:31  5          I assist in the profitable growth of the

6    company through acquisition to gain market share.  I

7    mentor the top executives based on my experience and

8    background.

9          I play a key role in the budgeting process.

16:10:54 10  I'm the administrator for the company's 401(k) plan for

11   the employees.

12          And I pretty much participate in all of the

13   major decisions that the company undertakes such as

14   policy or strategic direction, banking relations, major

16:11:18 15  leases, insurance, contracts.

16   Q.    And how long have you been the CEO at Hodell?

17   A.    Since 1911.

18   Q.    I'm sorry?

19   A.    I'm sorry, 2011.

16:11:38 20          THE COURT:  That would have been a long

21   time.

22          MS. LUARDE:  I was like wow.

23          (Laughter).

24   Q.    And before you became the CEO, Mr. Reidl, what was

16:11:52 25  your position?

1    A.    I was president of Hodell-Natco Industries.

2    Q.    And when did you become the president?

3    A.    In 1993.

4    Q.    But you were also president to a predecessor

5    corporation, correct?

6    A.    That is correct.

7    Q.    And was that Natco Fasteners?

8    A.    Hodell Corporation and Natco Fasteners, Inc., two

9    separate organizations.

10   Q.    Okay.  And you were president of both?

11   A.    I was president of both, correct.

12   Q.    And when did you start as president with those

13   organizations?

14   A.    In, well, 1983 for Hodell.

15             1984 for Natco Fasteners.

16             I was president of the Rife Corporation

17   before that from its inception until '93.

18   Q.    Okay.  And what was the inception of the Rife

19   Corporation?

20   A.    That was when the Rex family and my family got

21   together to form a company to diversify our investments.

22   Q.    Okay.  And what year was that?

23   A.    Pardon me?

24   Q.    What year was that?

25   A.    I'm sorry.  I can't hear you.

1   Q.    That's okay.  What year was that?

2   A.    That was in 1980.

3   Q.    Okay.  And are you currently on the Board for

4   Hodell-Natco?

16:13:23 5   A.    Yes, I am.

6   Q.    And what is your role on the Board for Hodell?

7   A.    I'm a director.

8   Q.    And how long have you been a director?

9   A.    Since the inception.

16:13:37 10   Q.    Okay.  And, in fact, you're an owner of

11   Hodell-Natco, is that correct?

12   A.    I'm part owner, correct.

13   Q.    And it's -- and who else is a part owner of

14   Hodell-Natco?

16:13:52 15   A.    The Rex family, there are a number of shareholders

16   from the Rex family; myself, my wife, and each of my

17   children.  I have four children.

18   Q.    Well, we've met one of them.

19            Before you worked at Hodell and before you

16:14:20 20   worked at the Rife Corporation, you actually worked for

21   another company, is that correct?

22   A.    That is correct.

23            I worked at BFGoodrich, and I started out

24   in 1963 as a research engineer and went on to become a

16:14:41 25   development engineer, and in 1967, I got my Master's

1    Degree, and I was promoted to the technical council at

2    Avon Lake, Ohio with responsibility of analyzing the

3    technical and financial feasibility of all the

4    development projects annually.

16:15:10  5              After that I moved into the plastic

6    materials marketing department in Cleveland, Ohio where I

7    did financial analysis for the manager of the department

8    for about one year, and then I was assigned a marketing

9    program, cellular vinyl.

16:15:30 10   Q.    Okay.

11   A.    And a year later, I became director of the building

12   products marketing department.

13              And then during project energy

14   independence, I was asked by the chemical company's

16:15:46 15   management committee to go on staff assignment to

16   evaluate the feasibility of BFGoodrich perhaps

17   participating in that project.

18   Q.    Okay.

19   A.    And subsequently, I moved to director of corporate

16:16:03 20   planning of chemicals in Akron, and then I moved to

21   director of planning for the general products division.

22              And my last three years, I was director of

23   development and, planning and development for the

24   engineered products division, which primarily entailed

16:16:28 25   acquisitions and divestments.

1656

1     Q.    Okay.

2     A.    I was involved in two major acquisitions, one of

3     which was accomplished and both corporations were public,

4     so I can talk about that, that was Tremco.

16:16:46  5           Then I worked on another acquisition which

6     did not go forward, so that's under confidentiality

7     agreement.

8     Q.    So you --

9     A.    And I participated in divestments.  I sold off a

16:16:59 10    couple of divisions, but that wasn't my cup of tea.

11          I'm a builder, not a demolisher, so.

12    Q.    I like that.

13    A.    So I left BFGoodrich, I resigned.

14    Q.    And at that point, you went to the predecessor, to

16:17:16 15   Hodell, correct?

16    A.    No.  That's when we formed the Rife Corporation.

17    Q.    Okay.  Thank you.

18          Could you tell for the jury what does

19    Hodell do?

16:17:28 20   A.    Hodell, in 1983, was a manufacturer of chain.  We

21    no longer manufacture chain.  We do some assembly work,

22    but we buy bulk chain.

23    Q.    And are you primarily a distribution company, is

24    that correct?

16:17:51 25   A.    That is correct.

1    Q.    And how does Hodell sell itself to its customers?

2    What distinguishes Hodell?

3    A.    We have -- we use catalogs, direct salespeople.  We

4    have customer service people that deal with customers

16:18:17 5    over the phone.  We have a few reps, independent sales

6    reps.

7    Q.    And customer service is important to you, correct?

8    A.    Absolutely.

9    Q.    Can you explain that to the jury?

16:18:34 10    A.    Customer service is providing the customers'

11    requirements in a timely fashion at an agreed-upon price

12    with quality products.

13    Q.    And you've really tried to instill that within your

14    corporation, correct?

16:18:58 15    A.    Yes.  As Kevin discussed in his testimony, service

16    is a major distinction for our corporation.

17    Q.    And is part of that because you can buy fasteners

18    at a lot of different locations?

19    A.    That's correct.

16:19:23 20    Q.    And you mentioned earlier that Hodell has its own

21    sales force, is that right?

22    A.    Yes.

23    Q.    And could you explain that?

24              I think you have both an inside and outside

16:19:37 25    sales force.  Could you explain that for me?

1    A.    Yes.  The inside sales organization deals with

2    customers over the phone in soliciting orders, taking

3    orders, entering orders in the system, and helping in

4    customer follow-up questions pertaining to orders.

16:20:06  5    Q.    And what about your outside sales representatives?

6    A.    The outside sales representatives can make two

7    kinds of contacts:  One, an existing customer; another, a

8    prospect.

9          With existing customers, with both types of

16:20:26 10    customers, they can ascertain what products they need.

11    With an existing customer, we tend to know that pretty

12    well, but they can provide catalogs and product

13    literature to the prospect and find out what their needs

14    are to see if we can serve them.

16:20:50 15          With an existing customer, if a price

16    arrangement is in place, they can solicit orders subject

17    to credit approval.  If they're paying their bills, then

18    they can accept the sales order.

19          With a prospect, they've got to provide

16:21:10 20    information back to the sales office on, you know,

21    general information on the customer.  We may follow up

22    with a credit request.

23    Q.    But in addition, in addition to your sales force,

24    there are also other types of categories of personnel

16:21:29 25    employed at Hodell, such as people in the warehouse,

1    correct?

2    A.    Pardon me?

3    Q.    You also have warehouse employees, correct?

4    A.    Absolutely.

16:21:35 5    Q.    And could you tell me a little bit about your

6    warehouse structure?

7    A.    We basically -- excuse me.  We basically buy in

8    bulk.  We repackage in some cases as many as ten

9    different packet sizes.  Normal is probably closer to

16:21:58 10   four or five forms of packaging, starting with the

11   decimal pack, a one-pound pack, five-pound, ten-pound,

12   25-pound.

13             Or we package to a customer's requirement,

14   let's say in the waterworks business, they want bolts and

16:22:18 15   gaskets in one container.

16   Q.    And so does that help explain the difference

17   between the number of pieces in the inventories and the

18   number of SKUs that may appear in the database?

19   A.    That's correct.  In the ERP system that we use, and

16:22:39 20   that was the case in SAP Business One, those are each

21   different package form for assembly is a new SKU,

22   different SKU, even though I may have the same base part

23   in it.

24   Q.    In addition to your, you know, we talked a little

16:23:04 25   bit about your sales force, a little bit about, you know,

1    how your warehouse is structured.

2              Could you tell the jury how many different

3    warehouses you have and how many employees within those

4    warehouses?

16:23:16  5    A.    Yes.  We currently have six locations.  Cleveland

6    is our headquarters, St. Louis, Reno, Houston, Orlando,

7    and Blythewood or Columbia, South Carolina.

8              We do have one salesperson in Wauwatosa,

9    Wisconsin.

16:23:40 10    Q.    Where is Wauwatosa, Wisconsin?

11    A.    Madison.

12    Q.    Okay.

13    A.    Actually closer to Milwaukee.

14    Q.    Okay.  Thank you.  And the corporate headquarters

16:23:55 15    you mentioned was in Cleveland, correct?

16    A.    Correct.

17              You asked me before what's the -- basically

18    the people structure in the warehouse and office?

19    Q.    Yes.

16:24:04 20    A.    It's approximately equal quantities in the

21    warehouse and office.

22    Q.    Okay.  And in addition to the sales representatives

23    that Hodell actually employs, both inside and outside,

24    you have had occasion to have independent contractors, is

16:24:33 25    that correct?

1      A.     That is correct.

2      Q.     And about how many independent contractors does

3      Hodell have?

4      A.     Currently five.

16:24:47  5      Q.     Okay.  And could you tell me a little bit about the

6      independent contractor role for Hodell?

7      A.     As I mentioned before, they -- they have two roles.

8              One is if they're prospecting, they're

9      evaluating potential for us to serve a prospect.  They

16:25:14 10    try to gather whatever information they can from the

11     client that they're trying to achieve a sale from to see

12     if we could serve that account.

13             They bring back the information on -- as

14     much information as they can from the account.  If it

16:25:35 15    looks like there's a fit on products, they can hand out

16     the literature that we provide.

17             The literature describes the product, and

18     typically our catalog is the packaged product.  We do

19     have line cards for other products.

16:25:54 20             And then sometimes the customer will ask

21     for certification information on given products.  Those

22     come strictly from our suppliers, and they are -- a

23     fastener is typically manufactured either to the

24     International Fastener Institute specifications which

16:26:15 25    define physical dimensions, physical characteristics,

1    chemical makeup of the product.

2             In the case of chain -- oh, they could also

3    be ASTM, American Society of Testing Materials.

4    Q.    Okay.

16:26:30 5    A.    The chain products are manufactured to the National

6    Association of Chain Manufacturers standards, and the

7    manufacturer provides the certification on the product.

8    Q.    And, Mr. Reidl, you mentioned that you have, I

9    believe, approximately four or five independent sales

16:26:56 10   representatives.

11            Could you tell me why does Hodell have some

12   independent sales representatives who work for you?

13   A.    Well, I can give a couple of examples.

14            We serve northern California, but our

16:27:12 15   closest warehouse is in Reno so we have a sales,

16   independent sales rep that serves that territory.

17            Similarly we have a situation in northeast

18   where we no longer have a warehouse, so there we use a

19   sales rep.

16:27:47 20           THE COURT:  Is this a good spot?

21            MS. LUARDE:  It is, Your Honor.

22            THE COURT:  Okay.

23            MS. LUARDE:  Thank you.

24            THE COURT:  How about if we adjourn for the

16:27:55 25   day, is that agreeable to everybody?

```
 1                    Okay.  We're moving along.  You've heard a
 2        lot of evidence.  You haven't heard it all.  So maintain
 3        an open mind.  Certainly don't form or express an opinion
 4        about anything.
16:28:05  5                   And we'll meet at 8:15, where,
 6        Mr. Panigutti?  Do you remember?
 7                    A JUROR:  L-1.
 8                    THE COURT:  Okay.  See you then.
 9                    (Jury out).
16:29:31 10                   (Proceedings adjourned at 4:29 p.m.)
11                              - - - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1    C E R T I F I C A T E

2         I certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.

5

6

7

8    **/s/Susan Trischan**

9    /S/ Susan Trischan, Official Court Reporter

10   Certified Realtime Reporter

11

12   7-189 U.S. Court House

13   801 West Superior Avenue

14   Cleveland, Ohio 44113

15   (216) 357-7087

16

17

18

19

20

21

22

23

24

25

1665

1          **I N D E X**

2

3     <u>**WITNESSES**</u>**:**                                      <u>**PAGE**</u>

4       DIRECT EXAMINATION OF GEOFFREY ASHLEY           1432

5       BY MS. LUARDE

6       CROSS-EXAMINATION OF GEOFFREY ASHLEY            1483

7       BY MR. STAR

8       REDIRECT EXAMINATION OF GEOFFREY ASHLEY         1507

9       BY MS. LUARDE

10      RECROSS-EXAMINATION OF GEOFFREY ASHLEY          1514

11      BY MR. STAR

12      DIRECT EXAMINATION OF HELMUTH GUEMBEL           1518

13      BY MS. LUARDE

14      DIRECT EXAMINATION OF HELMUTH GUEMBEL (RESUMED) 1547

15      BY MS. LUARDE

16      CROSS-EXAMINATION OF HELMUTH GUEMBEL            1576

17      BY MR. STAR

18      REDIRECT EXAMINATION OF HELMUTH GUEMBEL         1641

19      BY MS. LUARDE

20      DIRECT EXAMINATION OF OTTO REIDL               1650

21      BY MS. LUARDE

22

23                        * * * * *

24

25