1          IN THE DISTRICT COURT OF THE UNITED STATES
          FOR THE NORTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION

3

HODELL-NATCO INDUSTRIES, INC.,
4                                        08CV2755

          Plaintiff,
5

      vs.                              June 24, 2015
6                                      8:30 A.M.

7    SAP AMERICA, INC., ET AL.,

                                       Volume 8
8          Defendants.

9

10

          TRANSCRIPT OF JURY TRIAL PROCEEDINGS
11    BEFORE THE HONORABLE DONALD C. NUGENT
          UNITED STATES DISTRICT JUDGE
12                 AND A JURY

13

14

15

16

17

18

19

20

21

22

23

24

25

1    APPEARANCES:

2

3    For the Plaintiff:          Christopher J. Carney, Esq.
                                  Sharon A. Luarde, Esq.
                                  P. Wesley Lambert, Esq.
4                                 Brouse McDowell
                                  600 Superior Avenue East
5                                 Suite 1600
                                  Cleveland, Ohio    44114
6                                 216-830-6830

7

8    For the Defendants:         Gregory J. Star, Esq.
                                  Michael John Miller, Esq.
                                  Joseph M. Kelleher, Esq.
9                                 Alex H. Hayden, Esq.
                                  Drinker Biddle & Reath
10                                One Logan Square
                                  18th & Cherry Streets
11                                Philadelphia, PA    19103
                                  215-988-2734

12

13

14

15   Official Court Reporter:    Susan K. Trischan, RMR,CRR,FCRR
                                  7-189 U.S. Court House
16                                801 West Superior Avenue
                                  Cleveland, Ohio  44113
17                                216-357-7087

18   Proceedings recorded by mechanical stenography;
     transcript produced by computer-aided transcription.
19

20

21

22

23

24

25

1

2                    WEDNESDAY, JUNE 24, 2015,  8:31 A.M.

3       (Proceedings resumed in presence of the jury as follows:)

4                    THE COURT:  Good morning, ladies and

08:32:21 5       gentlemen.

6                         You may continue.

7                    MR. STAR:  Your Honor, just one brief

8       issue.

9                    THE COURT:  Mr. Reidl, you can go ahead and

08:32:29 10      take the witness stand.

11                        (Side-bar conference had off the record).

12            DIRECT EXAMINATION OF OTTO REIDL (RESUMED)

13      BY MS. LUARDE:

14      Q.   Good morning, Mr. Reidl.

08:33:34 15      A.   Good morning.

16      Q.   Can you hear me okay?

17      A.   Yes.

18      Q.   Okay.  So, Mr. Reidl, when we left off yesterday,

19      you'll recall that we were getting into the point where

08:33:50 20      we were talking about some independent contractors for

21      the company.

22                        Do you recall that?

23      A.   Yes.

24      Q.   Okay.  And, Mr. Reidl, can you tell me, does Hodell

08:34:01 25      actually have contracts with some of these independent

```
 1    sales representatives?

 2    A.    Yes, we do.

 3    Q.    Okay.

 4              MS. LUARDE:  Your Honor, may I approach?

 5              THE COURT:  Sure.

 6              MS. LUARDE:  Thank you.

 7    BY MS. LUARDE:

 8    Q.    And, Mr. Reidl, I've handed you a copy of what's

 9    called a domestic sales representation agreement.

10              Do you see that?

11    A.    Yes, I do.

12              MR. STAR:  Your Honor, I'm going to object

13    to this.

14              They did not have this on their exhibit

15    list.  We did not offer this as an exhibit.

16              THE COURT:  Didn't you cross-examine the

17    witness on this?

18              MR. STAR:  We did not introduce the

19    document.

20              THE COURT:  Okay.  Overruled.

21              MS. LUARDE:  Thank you, Your Honor.

22    BY MS. LUARDE:

23    Q.    Mr. Reidl, could you tell me the purpose of these

24    agreements?

25    A.    This defines the relationship between our company
```

1    and the sales representative.

2    Q.    And are all of the agreements with, I think you

3    said you had five or six --

4    A.    Five.

5    Q.    -- five independent sales representatives.  Are all

6    of these agreements the same?

7    A.    Yes.

8    Q.    Okay.  And who at the company is responsible for

9    having these signed?

10   A.    The president or the sales manager.

11   Q.    Okay.  So your son, Kevin Reidl, or the sales

12   manager in charge?

13   A.    For the particular warehouse.

14   Q.    Okay.  And this agreement -- bear with me just one

15   moment, please.

16              If you'd turn to Paragraph 13 of this

17   contract.

18   A.    Okay.

19   Q.    How is the relationship described or defined

20   between Hodell and these independent sales

21   representatives?

22   A.    It states that the rep agrees that in all matters

23   relating to this agreement, he shall be acting as an

24   independent contractor; that neither rep nor employees of

25   rep are employees of Hodell-Natco within the meaning or

1    application of any federal or state law.

2                      And the rep hereby agrees to assume all

3    liabilities or obligations imposed by one or more of such

4    laws with respect to employees of the rep in the

08:36:46  5    performance of this agreement.

6    Q.    And what is the general purpose of that paragraph?

7    A.    To indicate that the rep does not have the

8    authority to state that he is an employee of

9    Hodell-Natco.

08:37:08 10    Q.    And, in fact, if you'd turn to Paragraph 14 of this

11    document, this paragraph actually talks about the use of

12    Hodell-Natco's name, is that correct?

13    A.    That is correct.

14    Q.    And could you read the first --

08:37:29 15                      MR. STAR:  Objection, Your Honor.  This

16    is -- again, this is not --

17                      THE COURT:  Overruled.

18    Q.    And could you read the first sentence for me,

19    please?

08:37:37 20    A.    Yes.  "A rep shall not use the name of Hodell-Natco

21    or any abbreviation or variation of it on his stationery,

22    business cards, advertisements, telephone directory

23    listings, or any other written or printed material except

24    with the prior written approval of Hodell-Natco."

08:37:57 25    Q.    And why do you have that particular provision in

1    this agreement?

2    A.    That, first of all, that he is not an employee of

3    the company.

4              Second, he is not authorized to make any

08:38:15  5    representations other than what he has in the documents.

6    Q.    And he's not allowed to say on his stationery that

7    he's Hodell, is that correct?

8    A.    That is correct.

9    Q.    And, Mr. Reidl, in your tenure with Hodell-Natco,

08:38:32 10    have you ever had an instance where an outside sales

11    representative made a representation to a customer --

12              MR. STAR:  Objection.  Relevance.

13              THE COURT:  Objection sustained.

14              MS. LUARDE:  Okay.

08:38:47 15              THE COURT:  Let's stick to this case.

16    BY MS. LUARDE:

17    Q.    Mr. Reidl, I want to shift gears now and talk about

18    the computer software, the ERP system at Hodell.

19              Could you tell the jury how the computer

08:39:04 20    ERP systems are used at Hodell?

21    A.    We use our computer system to handle all office and

22    warehouse functions that have been automated by the

23    system.

24              We enter orders via EDI, electronic data

08:39:31 25    interchange, or manually type into the system.

1          We automatically print sales order -- sales

2     orders or load them down to the warehouse.  The automated

3     warehouse management system directs the order picker to

4     pick the product for that order.  And he prepares it for

08:39:53 5     shipment.

6     Q.    So we've heard --

7     A.    We invoice automatically.

8     Q.    Okay.

9     A.    And download information from our bank to update

08:40:03 10     our cash receipts, invoice records.

11     Q.    So we've heard the ERP system's being described as

12     sort of the backbone for the company.

13               Is that a fair assessment?

14     A.    The ERP system is vital to our operations, the

08:40:28 15     efficient operation of our --

16     Q.    So what happens if it doesn't work?

17     A.    Currently it would be very difficult to do

18     everything manually, but that would have to be the

19     fallback position until the system comes back up.

08:40:46 20     Q.    Okay.  And, in fact, we've heard testimony that

21     Hodell-Natco replaced its old system, the FACTS system,

22     with the Business One system, is that correct?

23     A.    That is correct.

24     Q.    Can you tell the jury a little bit about the FACTS

08:41:07 25     system?

1    A.    The FACTS system is a software package that we had

2    been using about 14 years.

3              It is what is called a character-based

4    system or also labeled a Legacy System.  Basically you

08:41:29  5    didn't use a mouse with it.  It wasn't Windows-friendly,

6    and the warehouse management system had to be integrated

7    with that.  That was a separate package.

8    Q.    And your experience using FACTS, can you tell us

9    the vendor that you used to purchase that system?

08:41:53 10    A.    Yes.  We purchased the software package from a

11    company called Soft Tech in Chicago.  About nine or

12    twelve months after we purchased the software or we

13    implemented the software, Soft Tech went out of business.

14              At that time, there was another gentleman

08:42:22 15    whose name I don't recall at the moment, I think his

16    first name was Art, who assisted us for approximately a

17    year; at which point, Dale Van Leeuwen made contact with

18    us, and from that point on, we worked with Dale

19    Van Leeuwen for the next 12, 13 years.

08:42:53 20    Q.    And --

21    A.    But he was familiar with us.  He worked for Soft

22    Tech.

23    Q.    And Dale Van Leeuwen actually owned IBIS, is that

24    correct?

08:43:05 25    A.    I'm sorry.  Could you ask that again?

1    Q.    Yes.  Dale Van Leeuwen owned IBIS?

2    A.    That is correct.

3    Q.    And could you, since we're talking about

4    Mr. Van Leeuwen, could you describe Hodell's relationship

08:43:23 5    with IBIS and Mr. Van Leeuwen?

6    A.    Mr. Van Leeuwen assisted us in the customization of

7    the FACTS package over time to provide a vertical

8    integration for our market.

9            He worked with us to adapt Radio Beacon,

08:43:57 10   which is a warehouse management system using scanners,

11   handhelds.  And he worked with us through

12   the -- basically when we left the system.

13   Q.    And did you trust Mr. Van Leeuwen?

14   A.    I had an extremely close working relationship with

08:44:28 15   him.

16            In my experience with him, he never once

17   lied to me.

18   Q.    And there were times, though, and you had, I think

19   you described, at least a 15-year relationship, is that

08:44:41 20   correct?

21   A.    I'm sorry?

22   Q.    You had at least a 15-year relationship with

23   Mr. Van Leeuwen?

24   A.    That's fairly close.

08:44:48 25   Q.    Okay.  And during that period of time, you had a

1676

```
          1   couple of disagreements with him, is that correct?
          2   A.   That is correct.
          3   Q.   And during the course of this trial, you've seen
          4   e-mail traffic presented to Mr. Van Leeuwen stating that
08:45:08  5   you threatened to sue IBIS.
          6            Do you recall that?
          7   A.   Yes, I do.
          8   Q.   Could you tell the jury what that was all about?
          9   A.   That was -- reflected our complaints concerning the
08:45:24 10   progress on the Radio Beacon integration and the speed of
         11   progress involved, the lack of speed of progress.
         12   Q.   And, in fact, did that cause you or that
         13   disagreement, did that cause you or Hodell to lose faith
         14   in Mr. Van Leeuwen?
08:45:49 15   A.   No.
         16   Q.   And, in fact, you never did sue Mr. Van Leeuwen
         17   over the FACTS or Radio Beacon system, did you?
         18   A.   That is correct.
         19   Q.   And, in fact, is this the first lawsuit that you
08:46:00 20   filed?
         21   A.   Correct.
         22   Q.   And this is the first time you've testified then in
         23   Federal Court, correct?
         24   A.   That is correct.
08:46:12 25   Q.   And at some point in time, you made the decision to
```

1677

1    switch from the FACTS system, correct?

2    A.    Correct.

3    Q.    Why is that?

4    A.    We needed a more user-friendly package that could

08:46:30 5    enable us to grow the company.

6          We were starting to maximize the

7    capabilities of FACTS for our company.  As I stated

8    earlier, there was no interaction with modern software,

9    such as Microsoft Office or Excel.  If you wanted to

08:46:53 10   download data, you had to ask the IT person to extract

11   that data from the system and upload it into a

12   spreadsheet or a printout.

13         Furthermore, we wanted to fully automate

14   our warehouses, and we needed a package that could assist

08:47:15 15   our growth plans.

16         Prior to the implementation of SAP, we had

17   been growing at a -- just short of 14% per year

18   compounded over 10 years, so we needed a system that

19   could adapt to that number of users that it would

08:47:36 20   involve.

21   Q.    Okay.  And, Mr. Reidl, could you tell me then how

22   you became familiar with SAP's Business One software?

23   A.    Yes.  About mid year 2003, I don't remember the

24   precise month, I attended an IT or Information Technology

08:48:03 25   trade show in Cleveland, where I learned about a

1    competing product called Navision or Navision, I'm not

2    sure of the pronunciation, and I learned about SAP

3    Business One.

4            I provided my business card to a number of

08:48:29 5    vendors.  I don't know if AmEx got a card from me, but

6    shortly after that trade show, I received a mailing from

7    AmEx, and I may have filled out that card to send back to

8    AmEx.

9    Q.    Okay.  And just going back a little bit to the

08:48:52 10   trade show, you actually looked at a variety of different

11   potential ERP systems during that process, correct?

12   A.    Correct.

13   Q.    And what were a couple of the other systems you had

14   looked at at that time?

08:49:06 15   A.    We had looked at Profit 21, which is what we are

16   currently running on.

17            We looked at Computer Insights.

18   Q.    And --

19   A.    We looked at, as part of this process, SAP Business

08:49:34 20   One.

21            We had a couple of others.

22   Q.    Okay.  Mr. Reidl, I'd like to direct you to Exhibit

23   314.  And I have your binder here?

24            MS. LUARDE:  Your Honor, if I may approach.

08:49:52 25            THE COURT:  You may.

1679

| | |
|---|---|
| 1 | MS. LUARDE:  Thank you. |
| 2 | BY MS. LUARDE: |
| 3 | Q.    Mr. Reidl, I know the jury has seen this exhibit |
| 4 | before, but could you identify this document for us? |
| 08:50:20 5 | A.    Yes.  It's a document describing SAP Business One, |
| 6 | entitled "SAP Business One Brief." |
| 7 | Q.    And, in fact, when did you receive this document, |
| 8 | Mr. Reidl? |
| 9 | A.    In 2003. |
| 08:50:46 10 | MS. LUARDE:  And, Kim, could you turn to |
| 11 | Page 4, please? |
| 12 | Q.    And you'll see, Mr. Reidl, on Page 4 of this |
| 13 | document, could you tell me who published this document? |
| 14 | A.    SAP AG. |
| 08:51:06 15 | Q.    Okay.  Mr. Reidl, when you received this document, |
| 16 | the Business One Brief, did you read this document? |
| 17 | A.    Yes, I did. |
| 18 | Q.    And, in fact, does this document say anything that |
| 19 | you relied on in selecting Business One? |
| 08:51:26 20 | A.    Yes, it does. |
| 21 | First of all, we were looking at a system |
| 22 | that could support growth, and the document states it |
| 23 | supports dynamic growth.  It is easy to customize, to |
| 24 | adapt to the industry, and it promised productivity |
| 08:51:53 25 | improvement, efficiency in the use of resources, people |

1    and capital resources, and it had the backing of the

2    world's largest ERP provider or one of the world's

3    largest.  It stated that.

4    Q.    And, Mr. Reidl, in fact, if you'd turn to Page 2 of

08:52:21 5   this document.  That would be 314.2, Kim.

6          Some of these statements that you just

7    described, the first one on 314.2, the first paragraph,

8    do you see that, Mr. Reidl?

9    A.    Yes, I do.

08:52:40 10  Q.    Is that one of the statements that you relied upon?

11   A.    Yes.

12   Q.    And, in fact, this states, "The solution helps

13   emerging businesses, from those with 10 to several

14   hundred employees, to streamline their operational and

08:52:55 15  managerial processes."

16          That, was that important to Hodell?

17   A.    Absolutely.

18   Q.    And why?  Why was that important?

19   A.    Because we had plans to continue our growth path,

08:53:09 20  which meant we would be expanding our number of users

21   significantly over the expected 10-year life.  When we

22   started to investigate alternatives, that was our target.

23   It should handle, be able to handle our requirements for

24   the next 10 years.

08:53:33 25  Q.    And, in fact, Hodell historically had grown through

1681

1    acquisition, is that correct?

2    A.    That is correct.  We historically, a little over

3    two-thirds, close to three-quarters of our growth was

4    from the addition of market share through acquisition.

08:53:49 5                   The balance was the core business growth,

6    the underlying business.

7    Q.    And, in fact, this states that Business One --

8                   MR. STAR:  Objection.  Leading.

9                   THE COURT:  Overruled.

08:54:03 10   Q.    -- that Business One helps emerging businesses from

11   10 to several hundred employees.

12                  Did you take the several hundred employees

13   to mean users or employees or what did you think that

14   meant?

08:54:16 15   A.    First of all, several hundred, the definition of

16   several in the dictionary I looked up is more than two or

17   three.  So I picture this to be 300.

18                  And since employees, who do not use a

19   system, have no bearing on describing the capacity of the

08:54:37 20   system, I assumed that was users.

21   Q.    And when you read this document, any -- any other

22   page in this document, does it say "Users," like 10

23   users?

24   A.    Not to my recollection.

08:54:58 25   Q.    Thank you.

1682

1      Did Hodell actually -- did SAP Business One

2   actually help Hodell grow and streamline your operational

3   and managerial processes?

4   A.   No.  Quite the contrary.

08:55:14  5   Q.   Mr. Reidl, I'd like to direct your attention to

6   Page 3 of this document.  And I believe in the bottom

7   left-hand corner you had earlier referenced Business

8   One's expertise, correct?

9   A.   Correct.

08:55:40 10   Q.   And why was that important to Hodell?

11   A.   First of all, it's delivered through a network of

12   highly qualified channel partners who understand the

13   specific challenges facing small and midsize businesses.

14   Q.   And it was important to you to have SAP's backing,

08:56:07 15   and why was that?

16      MR. STAR:  Your Honor, objection.

17      THE COURT:  Overruled.

18   A.   In the implementation of software, there are often

19   a time frame where not everything runs smoothly, and this

08:56:23 20   document further stated that it had -- when you buy this,

21   you're dealing with an organization that has, I think, 30

22   years of experience in this area.

23   Q.   And, in fact, Kim, if you're on 314.3, the second

24   column, the second full paragraph.  There you go.

08:57:01 25      And, Mr. Reidl, is that the portion you're

1    referring to?

2    A.    Pardon me?  Could you repeat that, please?

3    Q.    Yes.  You just mentioned 30 years experience.

4    A.    Yes.

08:57:12  5    Q.    Is this the portion of the document you were

6    referring to?

7    A.    Yes.

8    Q.    And there were also other portions of this document

9    that were important to Hodell, including -- Kim, on

08:57:32 10    314.3, the first paragraph in the left-hand column.

11                    MR. STAR:  Objection.  Counsel is

12    testifying.

13                    THE COURT:  Overruled.

14    Q.    And I believe you also mentioned this when we asked

08:57:45 15    about why this was important to you.

16    A.    Yes.  And this talks about growth and improved

17    profitability, better bottom line; short implementation

18    cycle, which did not happen.

19    Q.    And did you rely on all of this information in

08:58:13 20    making your selection?

21    A.    Yes.

22    Q.    And, Mr. Reidl, if I could direct you to Page 5 of

23    Exhibit 314, I believe it's actually -- it's a separate

24    document, although it has the same exhibit number.

08:58:37 25    A.    Yes.  Okay.

1  Q.    And could you tell the jury what this document is?

2  A.    This is a document, it's labeled "SAP Solution

3  Brief," and it deals with SAP Business One.

4  Q.    And did you rely on the content of this document in

08:58:57  5  deciding whether to purchase SAP Business One?

6  A.    Yes.

7  Q.    And what on this first page was important to you in

8  making your decision?

9  A.    As I mentioned before, first, ability to grow, to

08:59:19  10  have an easily customizable system to provide vertical

11  add-ons for our industry; five to 500 employee

12  capability; the backing of the world's largest or one of

13  the world's largest ERP providers; real-time access to

14  information; improved employee productivity.

08:59:50  15            A lot of the things that were discussed in

16  the earlier document, also.

17  Q.    And, in fact, did any of these things actually

18  occur at Hodell?

19  A.    No.

09:00:07  20  Q.    Kim, if you could turn to the next page, please.

21            And, Mr. Reidl, you relied on information

22  contained on this page as well, correct?

23  A.    Correct.

24  Q.    And, in fact, one of the headings is "Support for

09:00:22  25  Growth," and you just testified growth is important for

1    Hodell?

2    A.    Correct.

3    Q.    And, Kim, if you could turn to Page 7 of this

4    document, please.

09:00:35    5              And you also relied on portions of Page 7,

6    correct?

7    A.    Correct.  Again, the highly -- it's delivered

8    through a network of highly qualified channel partners

9    and supported by SAP's global resources.

09:01:03  10    Q.    And it states there, "You receive first-class

11    service and support," correct?

12    A.    Correct.

13    Q.    Did Hodell actually receive first-class service and

14    support from SAP?

09:01:16  15    A.    No.

16    Q.    And the channel partners referred to here, the

17    channel partner you worked with was actually LSi and

18    IBIS, correct?

19    A.    Correct.

09:01:29  20    Q.    And to your knowledge, could you have actually

21    purchased SAP Business One directly from SAP?

22    A.    It's my understanding that this product was

23    marketed exclusively through channel partners.

24    Q.    And, Kim, if you could turn to Page 8 of this

09:01:52  25    document, please.

1686

```
 1              And at the bottom, Mr. Reidl, I know the

 2      print's really small, but I think it states that it's a

 3      2003 SAP AG document.  Do you see that?

 4      A.    That's correct.

 5      Q.    And when did you -- you received these materials at

 6      the trade show, is that correct?

 7      A.    No.  I -- this one came from Dale Van Leeuwen.

 8      Q.    And that came before you actually made the decision

 9      to purchase Business One?

10      A.    That's correct.  It was part of the documentation

11      prior to further investigation.

12      Q.    Okay.  So, Mr. Reidl, we discussed the trade show

13      that was in Cleveland in 2003, and I believe you

14      testified you received some information from AmEx, is

15      that correct?

16      A.    Yes.

17      Q.    Mr. Reidl, could I turn you to Exhibit 617?

18      A.    Okay.

19      Q.    And could you identify this document for the jury?

20      A.    Yes.  This is an e-mail I received from Heather

21      Devereaux with the subject being SAP Business One -- the

22      American Express edition, and it had three attached

23      documents, and she was sending this to me on behalf of a

24      Christina Alagna, I'm not sure I can pronounce that

25      correctly, from the American Express tax and business
```

1    services.

2                    I never met her or talked to her,

3    Christina.

4    Q.    And Christina's name is at the bottom here, right?

09:04:10  5    A.    Correct.

6    Q.    And if you could turn to Page 2, Kim.

7                    And, I'm sorry, Kim, could you flip back to

8    the first page?

9                    And the date of this document, Mr. Reidl,

09:04:32  10    what is the date of the document?

11    A.    October 1st, 2003.

12    Q.    And on Page 2, Kim, is this one of the attachments

13    that was sent in that e-mail?

14    A.    Yes, it was.

09:04:58  15    Q.    And did you read these documents when you received

16    them?

17    A.    Yes.

18    Q.    And did you rely on these documents when making a

19    decision on whether to use SAP Business One at Hodell?

09:05:14  20    A.    Yes, it caused me to proceed further in the

21    investigation.

22    Q.    Okay.  And, in fact, on Page 2 of this document, it

23    states, "The American Express Edition," but in the

24    right-hand, there's actually an SAP logo.

09:05:35  25                    Do you see that?

1    A.    Yes.

2    Q.    And, Mr. Reidl, in relying on this, if you'd turn

3    to Page 617.6, did you rely on information on Page 6 of

4    this document in making your decision?

09:05:54 5    A.    Yes, I did.

6    Q.    And could you tell us what that is?

7    A.    Yes.  "Among others, the SAP Business One solution

8    effectively supports companies with as low as 10 and as

9    many as several hundred employees."

09:06:15 10    Q.    And again, scalability was important for Hodell,

11    correct?

12    A.    Correct.

13    Q.    Kim, could you give us Exhibit 618, please?

14          And could you identify Exhibit 618 for us,

09:06:39 15    Mr. Reidl?

16    A.    Yes.  It is entitled SAP Business One Whitepaper.

17    Q.    And what is the date of that document?  It's in the

18    upper left-hand corner.

19    A.    August, 2002.

09:06:57 20    Q.    And at the bottom, it states -- it has an SAP logo.

21    Do you see that?

22    A.    Yes, I do.

23    Q.    SAP America?

24    A.    Correct.

09:07:07 25    Q.    Kim, could you turn to Page 2, please?

1689

```
 1                    And, Mr. Reidl, the front page states SAP

 2    America, but do you see at the bottom?

 3    A.    It says "2002 SAP AG."

 4    Q.    Okay.  And where did you receive this document or

 5    who did you receive this document from?

 6    A.    From American Express.

 7    Q.    Was there a specific person, do you recall?

 8    A.    I received the document on several occasions.  The

 9    first one was from Heather Devereaux and the second time,

10    it was in an e-mail attachment from a Penny Vitantonio of

11    American -- AmEx.

12    Q.    And again, you read this document when you received

13    it, correct?

14    A.    Yes, I did.

15    Q.    And, Kim, could you go to 618.4, please?

16                    And this Whitepaper, actually this is

17    Page 618.4, at the bottom I think it states it's Page 4

18    of 30.

19                    Do you see that?

20    A.    Correct.

21    Q.    So this is a 30-page document, right?

22    A.    Yes, it is.

23    Q.    And on the first paragraph, did you rely on

24    information contained in the first -- under the first

25    heading?
```

1    A.    Yes.  30-year -- SAP -- "30 years in the business

2    of helping businesses grow."

3    Q.    And it talks there, could you read the second line,

4    Mr. Reidl?

09:09:10 5    A.    Yes.  "12 million users, over 60,000 installations,

6    1,500 partners, 23 industry solutions."

7    Q.    And under "Experience, Knowledge, and Technology

8    For Maximizing Business," do you see that, Mr. Reidl?

9    A.    Yes.

09:09:31 10    Q.    And what are they saying there?

11    A.    Yes.  First of all, the technology to maximize a

12    business means improving the efficiency of the business.

13              They've leveraged their extensive

14    experience to deliver mySAP Business Suite, one other SAP

09:10:03 15    product.  It allows employees and customers to work

16    together successfully anywhere, anytime.  Flexible.

17    Supporting databases.

18    Q.    And you relied on these statements in making your

19    decision, correct?

09:10:22 20    A.    Yes.

21    Q.    Kim, could you turn to the next page, please?  And

22    here it states "Fast implementation," correct?

23    A.    Correct.

24    Q.    And that would be important to Hodell as well,

09:10:53 25    correct?

1   A.    Yes.  We wanted to minimize the period of

2   implementation to get the benefits of the purported

3   productivity and improved efficiency.

4   Q.    And, Mr. Reidl, I'm going to have Kim flip

5   to -- bear with me one second -- Page 618.7, please, Kim.

6            And down at 2.8, could you tell us what

7   that states, Mr. Reidl?

8   A.    Yes.  It says, "To secure critical business and

9   system processes, a robust MS-SQL 2000 database is used.

10  It supports an unlimited number of simultaneous user

11  transactions."

12  Q.    If you could continue.  Mr. Reidl, if you could

13  read the remainder of that.

14  A.    Okay.  "In addition, its scalability provides for

15  expansion of business activities while simultaneously

16  securing and controlling all business processes."

17  Q.    And, Mr. Reidl, you relied on this statement in

18  making your decision to purchase Business One, correct?

19  A.    Yes.  Scalability, which I define as growth

20  capability, is vital to this decision.  It's one of the

21  major reasons we decided to leave FACTS.

22  Q.    Because your business was growing, correct?

23  A.    Correct.

24  Q.    And when you see the phrase, "Unlimited number of

25  simultaneous user transactions," is that what you were

1692

1    referring to with regards to growth?

2    A.    Correct.

3    Q.    And, Kim, if you could turn to Page 18 of this

4    document, under technology, the heading "Technology,"

09:13:54 5    Mr. Reidl.

6    A.    Okay.  You want me to read that?

7    Q.    Sure.

8    A.    Okay.  Again, "To secure critical business and

9    system processes, a robust MS-SQL 2000 database is used.

09:14:16 10    It supports an unlimited number of simultaneous user

11    transactions."

12                    Excuse me.

13                    "In addition, its scalability provides for

14    expansion of business activities while simultaneously

09:14:31 15    securing and controlling all business processes."

16                    That's again addressing scalability as

17    growth.

18    Q.    So this statement actually appears twice in this

19    Whitepaper?

09:14:47 20    A.    That's correct.

21    Q.    And was it your opinion that Business One could

22    support a company the size of Hodell which had immediate

23    needs for 120 user licenses?

24                    MR. STAR:  Objection.

09:15:00 25                    THE COURT:  Overruled.

1693

| | | |
|---|---|---|
| 1 | A. | When we were making this -- the decision to enter? |
| 2 | Q. | Yes. |
| 3 | A. | Yes. |
| 4 | Q. | And was this true? |
| 09:15:10 5 | A. | No. |
| 6 | Q. | When you received these documents in 2003, did you |
| 7 | | speak with anyone at SAP at that point in time? |
| 8 | A. | I -- I spoke with the channel partner. |
| 9 | Q. | And which channel partner was that at that time? |
| 09:15:34 10 | A. | At that time, it was AmEx. |
| 11 | Q. | And why didn't you speak with SAP? |
| 12 | A. | Because the product is marketed exclusively through |
| 13 | | channel partners. |
| 14 | Q. | And did you believe AmEx was speaking on behalf of |
| 09:15:58 15 | | SAP? |
| 16 | A. | I didn't have anybody else to talk to. |
| 17 | Q. | Did AmEx lead you to believe that they were able to |
| 18 | | speak on behalf of SAP? |
| 19 | A. | Yes. |
| 09:16:20 20 | Q. | How so? |
| 21 | A. | They represented the product and its capabilities |
| 22 | | to us. |
| 23 | Q. | Okay.  And you recall that you had a webinar with |
| 24 | | AmEx, is that correct? |
| 09:16:44 25 | A. | Correct. |

```
 1    Q.    And when was that?

 2    A.    Either late 2003 or early 2004.

 3    Q.    And can you tell us, tell the jury, what happened

 4    during that webinar with AmEx?

 5    A.    We had a demonstration of the basic American

 6    Express SAP Business One product.

 7    Q.    How does a webinar work?

 8              Do you just log into your computer and

 9    watch it?  Do they come in?

10              Can you tell us a little bit more?

11    A.    No, the webinar, I believe, also involved IBM.  I'm

12    not positive of that.  But it was basically we logged

13    into a -- through a connection over the Internet to a

14    demo package.

15    Q.    Okay.

16    A.    You know, we were basically seeing the product on

17    the screen.

18    Q.    And in addition to the webinar, you also met with

19    AmEx, is that correct?

20    A.    That is correct.

21    Q.    And can you tell us and tell the jury about meeting

22    with AmEx?

23    A.    Yes.  In -- in December of '03, if I have the date

24    correct, I met with Penny Vitantonio and another person,

25    I believe his first name was Eric, worth was his last
```

1    name, that's my spelling.  I don't recall the correct

2    last name.

3                    And we talked about the -- a host of items,

4    including scalability.

09:18:50  5    Q.    Where did this meeting occur, Mr. Reidl?

6    A.    At our offices.

7    Q.    And so Ms. Vitantonio and another AmEx

8    representative showed up, and you had a conversation,

9    right?

09:19:03 10    A.    Correct.

11    Q.    And one of the items was related to scalability,

12    you just testified?

13    A.    Yes.

14    Q.    And did you explain to AmEx Hodell's needs and

09:19:20 15    requirements about the number of users initially and an

16    increase in number?  Is that what you were referring to

17    was scalability?

18    A.    Yes.  I spoke to them about our growth history and

19    our plans for future growth, and I received assurance

09:19:34 20    that it could handle our planned growth in number of

21    users over a 10-year period at 300.

22    Q.    And did you talk to them about the size of your

23    inventory?

24    A.    I'm sorry?

09:19:51 25    Q.    Did you discuss with AmEx the size of your

1    inventory?

2    A.    Yes.

3    Q.    And did you also discuss with them your database

4    size?

09:20:07  5    A.    We filled out, I think they wrote down information

6    that we discussed, the inventory size, number of orders,

7    number of customers, and so forth.

8    Q.    Okay.

9    A.    The facts that they needed to provide a quote.

09:20:34  10    Q.    Did AmEx express any concern at that time about

11    your user size?

12    A.    No.

13    Q.    Did AmEx ever express any concern about your user

14    size?

09:20:51  15    A.    No.

16    Q.    In fact, did they express any concern about the

17    other information that you discussed?

18    A.    No.  They actually ended up giving us a quote.

19    Q.    So they never told you that Hodell was too big for

09:21:16  20    Business One?

21    A.    No, they did not.

22    Q.    So AmEx made a proposal to Business One, is that

23    correct?  They provided you with a quote?

24    A.    Correct.

09:21:24  25    Q.    And can you tell me, if you recall, what that quote

1  was?

2  A.    It was $582,000, as I recall.

3  Q.    And what was your response to that, Mr. Reidl?

4  A.    That pretty much was outside our range.

09:21:51 5  Q.    So it was outside your budget, correct?

6  A.    Yes.  It -- I said it would have to be somewhere

7  near half that number.

8  Q.    Okay.  And after that, after you declined this

9  proposal, did you have any further conversations with

09:22:05 10  AmEx?

11  A.    Yes.

12  Q.    And what were those?

13  A.    At the -- just prior to receiving the quote,

14  because of my years of experience with Dale Van Leeuwen,

09:22:28 15  I wanted to get his opinion on a number of the products

16  that we were looking at, including SAP Business One.

17         I specifically mentioned to him Navision

18  and Profit 21, that the Computer Insights and I had

19  learned about SAP Business One.  And I asked him to give

09:22:53 20  me an assessment.

21         And at that point he reviewed with me very

22  quickly, on Navision he indicated that Microsoft was

23  buying Navision from, I believe it was a British company,

24  and they were going to change the support arrangement,

09:23:23 25  but he didn't discourage me from looking at Navision

1    further, but he was not very positive.

2              And he agreed that he would take a look at

3    SAP Business One to give us a better sense of the

4    remaining choices.

09:23:43  5    Q.    And just so I understand, so you had -- these

6    conversations with Dale and AmEx were going on at the

7    same time, correct?

8    A.    Correct.

9    Q.    And you had previously made Dale aware that you

09:23:57 10    were looking for a replacement ERP system, is that right?

11    A.    Yes.  As a matter of fact, we were -- three or four

12    of our executives, myself included, met at Dale's offices

13    to review a product called Take Stock, which was a

14    product by a company called Software Solutions.  At that

09:24:29 15    time I believe they were called Aperum, and they were

16    the -- also provided our FACTS package, so this was a

17    movement from the Legacy System to Take Stock, and we

18    evaluated that for almost a week.  We actually attended

19    classes and demo, so forth, at the IBIS offices in

09:24:50 20    Chicago.

21    Q.    So you conducted, you know, some pretty serious due

22    diligence in selecting your ERP system?

23    A.    Yes.

24              MR. STAR:  Objection.  Leading.

09:25:00 25              THE COURT:  Overruled.

```
 1    A.    I spent several days in Yardley, PA at the Profit
 2    21 headquarters.
 3                I also went to Atlanta at the Software
 4    Solutions headquarters to review the Take Stock at their
 5    facility.
 6                We spent two days along with one of their
 7    IT people in Chicago, Illinois at Computer Insights to
 8    review their product.
 9                And at the end, the products that survived
10    were P21, Computer Insights, in that order, but we were
11    still trying to learn more about SAP Business One before
12    making a final decision.
13    Q.    And Mr. Van Leeuwen helped you obtain additional
14    information on Business One?
15    A.    Correct.
16    Q.    And eventually -- and could you just explain for
17    me, did Mr. Van Leeuwen then became your -- he became
18    your contact person then on Business One instead of AmEx?
19    A.    Actually there was a joint conference call with
20    AmEx, and gradually AmEx decided that after discussing
21    our requirements with Dale Van Leeuwen, that they would
22    have him work on the vertical integration and come up
23    with a joint proposal, but they actually then stepped out
24    of the picture and IBIS was the one that then basically
25    did the rest of the investigation.
```

Q.    Okay.  And so from a chronological period of time,
are we -- where are we?  Are we in the late 2003, early
2004 time period?

A.    We're early in 2004.

09:27:29    Q.    Okay.  And so Mr. Van Leeuwen is working with you
on Business One, correct?

A.    Correct.

Q.    And at some point, though, IBIS and LSi merged, is
that your understanding?

09:27:52    A.    I'm sorry.  Could you repeat that?

Q.    IBIS and LSi merged, is that your understanding?

A.    They merged sometime after that in April or May of
2004.

Q.    And did you have an understanding of LSi's

09:28:14    relationship with SAP?

A.    Yes.  They were a channel partner.

             Prior to that merger, Dale Van Leeuwen
confirmed the user number to me.

Q.    And when did that occur?

09:28:40    A.    That was still in '03, and I think it tied to the
document that's five to 500 employees.

Q.    And did you have ongoing discussions with
Mr. Van Leeuwen in the '03, '04 time period, about
Business One and whether it would work for Hodell?

09:29:03    A.    Yes.

1    Q.    And in addition to the one where you said he just

2    confirmed the user size, what were some of the other

3    things that you discussed?

4    A.    Could you repeat that, please?

09:29:15 5    Q.    Sure.  Other than just the user count and the user

6    size, what were some of the other things that you

7    discussed with Mr. Van Leeuwen?

8    A.    The ability for vertical integration into our

9    industry.

09:29:36 10              The availability of a warehouse management

11    system, and again scalability was always on the front

12    burner.

13              And in the case of Dale Van Leeuwen, he

14    knew our entire database requirements.  He knew our

09:30:03 15    growth path from 14 years of working with us.

16    Q.    And did he confirm that Hodell would be a good fit

17    with Business One?

18              MR. STAR:  Objection.  Leading.

19              THE COURT:  Overruled.

09:30:16 20    A.    Yes.

21    Q.    And that wasn't just in one discussion but it

22    was --

23    A.    No.

24    Q.    -- many discussions?

09:30:26 25    A.    Many.

1    Q.    So what happened then when LSi and IBIS merged?

2    A.    Shortly after they merged, Dan Lowery contacted me,

3    and Dale Van Leeuwen confirmed the transaction that he

4    basically sold IBIS to LSi, and that he would be, I

09:31:12 5    think, Chief Operating Officer at LSi/IBIS.

6    Q.    Okay.

7    A.    And Dan Lowery, in conversations, confirmed his

8    understanding that our user requirements were going to

9    dramatically increase and he assured me that this would

09:31:37 10    suit our needs.

11    Q.    And were these conversations with Mr. Lowery and

12    Mr. Van Leeuwen consistent with what you had been told by

13    AmEx?

14    A.    Yes.

09:31:55 15    Q.    And was it consistent with the literature that you

16    had been provided?

17    A.    Yes, it was.

18    Q.    And so you had no reason to believe that Business

19    One would not work for you and Hodell, correct?

09:32:14 20    A.    Correct.  Quite the contrary, it was going to

21    supply all our requirements.

22    Q.    Could you tell me how many items does Hodell

23    actually have in its inventory?

24    A.    We have in the range of 40,000 base product

09:32:50 25    numbers, which then are extended to a term called SKUs

1    for different pack sizes and configurations.

2              That, that number then is in the range of

3    between 140 and 160,000.

4    Q.   So even though you may have 40,000 pieces, because

09:33:14 5   of different packaging you have a larger number of SKUs?

6    A.   That is correct.

7    Q.   And did Mr. Lowery or Mr. Van Leeuwen ever express

8    any concern about Business One's ability to support

9    Hodell's inventory size while you were evaluating

09:33:35 10  Business One?

11   A.   No.

12   Q.   Did they ever express concern during the

13   implementation process?

14   A.   Implementation, you're referring to when we

09:33:53 15  actually started to operate it?

16   Q.   Actually prior to starting to operate it.

17   A.   In the testing phase, we started experiencing

18   system problems.

19   Q.   Thank you.  And we'll get to that in just a few

09:34:11 20  minutes, okay?

21   A.   Okay.

22   Q.   So ultimately, did you decide that Business One

23   would be a good solution for Hodell?

24   A.   Yes.

09:34:29 25  Q.   Mr. Reidl, I'd like you to flip to Exhibit 291.

1704

| | |
|---|---|
| 1 | A.    All right.  I don't locate it in this file. |
| 2 | Q.    You may just have to look at the screen, but if |
| 3 | you'd like a hard copy, I can give one to you. |
| 4 | A.    No, I can read this. |
| 09:35:19  5 | Q.    Okay.  And, Mr. Reidl, you're familiar with this |
| 6 | document, correct? |
| 7 | A.    Pardon me? |
| 8 | Q.    You're familiar with this document? |
| 9 | A.    Yes. |
| 09:35:27 10 | Q.    And could you tell me what this document is? |
| 11 | A.    This is a development agreement between |
| 12 | Hodell-Natco Industries, Inc. and The IBIS Group and |
| 13 | LSi-Lowery Systems. |
| 14 | Q.    And, in fact, I think on Page 2 of this document, |
| 09:35:59 15 | is that your signature on the bottom? |
| 16 | A.    Yes, it is. |
| 17 | Q.    And in this document -- Kim, if you could turn back |
| 18 | to Page 1.  And you see in this document, what were you |
| 19 | agreeing to do in Paragraph 1? |
| 09:36:29 20 | Kim, bullet point one. |
| 21 | A.    We are basically agreeing to acquire 80 user |
| 22 | licenses and enable, by the downpayments and progress |
| 23 | payments on their development, to help them fund the |
| 24 | development process. |
| 09:37:03 25 | Q.    So just so I'm clear, you were agreeing to purchase |

1705

1    80 Business One user licenses?

2    A.    That is correct.

3    Q.    And then IBIS and LSi were using those funds to

4    develop In-Flight?

09:37:18 5    A.    In addition to their own, yes.

6    Q.    Okay.  And did you believe you were bound to

7    purchase 80 user licenses through this deal?

8    A.    Absolutely.  We issued a purchase order and they

9    invoiced us for those licenses with the terms for payment

09:37:39 10    for those outlined on that document.

11    Q.    And, Kim, could you turn to Page 2 of this

12    document, Paragraph 4?

13          And could you read that paragraph?

14    A.    "In case of default by The IBIS Group or LSi, due

09:38:11 15    to bankruptcy or insolvency, SAP has agreed Hodell-Natco

16    will receive 80 user licenses of SAP Business One from

17    SAP for the balance of payment to SAP of 120,000 users."

18    Q.    What does that mean to you, Mr. Reidl?

19    A.    That means SAP was aware of the purchase of these

09:38:37 20    80 user licenses, and they had specified the balance,

21    price we would have to pay to receive them.

22    Q.    And was that important to you?

23    A.    Yes.

24    Q.    Why?

09:38:53 25    A.    In the event that LSi got into insolvency or could

1706

```
 1    not continue to operate.
 2    Q.    And we've heard some questioning by Mr. Star to
 3    indicate that Hodell was going into business with IBIS
 4    and LSi as a developer.
 5              Are you in the business of developing
 6    software?
 7    A.    No.  This document, IBIS/LSi have the intellectual
 8    property for this product.  We have zero intellectual
 9    property share.
10    Q.    Thank you.  Mr. Reidl, I'd like to turn you to
11    Exhibit 252, which is a copy of the license agreement.
12    A.    252?
13    Q.    Yeah.  Kim is going to pull that up for you.
14    A.    Okay.
15    Q.    I'm not certain that's in your binder.
16              And, Mr. Reidl, you've seen this document
17    before, correct?
18    A.    Correct.
19    Q.    And could you tell me, how many licenses on
20    December 23rd, 2005, were you purchasing?
21    A.    Forty.
22    Q.    And that was in addition to the 80 from the earlier
23    document, is that correct?
24    A.    Correct.
25    Q.    And there's no doubt in your mind you had 120 user
```

1    licenses when you went live, is that correct?

2    A.    Correct.

3    Q.    And, Mr. Reidl, I would like to direct your

4    attention to Paragraph 7 of this document.

09:40:55 5               Kim, it's actually on 252.4.

6               Do you see -- do you see that warranty

7    language, Mr. Reidl?

8    A.    Yes.

9               Do you want me to read it?

09:41:19 10    Q.    Yes, please.

11    A.    Okay.  "Performance warranty/maintenance.

12    Warranty.  SAP warrants that the software will

13    substantially conform to the functional specifications

14    contained in the documentation for six months following

09:41:38 15    delivery."

16    Q.    That's sufficient, Mr. Reidl.

17               This sentence refers to documentation for

18    up to 60 months following delivery.

19               Did you receive documentation when you

09:41:54 20    signed this license agreement?

21    A.    I did not.

22    Q.    Okay.  Did the SAP product conform to the

23    representations that were made about the product?

24               MR. STAR:  Objection.  Calls for an expert

09:42:15 25    opinion.

```
 1                    THE COURT:  Overruled.

 2     A.    No, they did not.

 3     Q.    Okay.  Thank you.

 4                    Mr. Reidl, I'd like to turn now to the

 5     go-live process on Business One.

 6                    You recall that Hodell actually went live

 7     on SAP Business One, correct?

 8     A.    Correct.

 9     Q.    And let me back up just one second.

10                    Earlier you referenced having some issues

11     during testing.

12                    Why did you decide to go live if you were

13     having some issues with regards to testing?

14     A.    The LSi had been working with SAP on the problems

15     we experienced.

16                    MR. STAR:  Objection.

17                    THE COURT:  Yeah, objection sustained.

18     Q.    Could you just tell us about your knowledge with

19     regards to the testing and your decision to go live, why

20     you decided to go live?

21     A.    Yes.

22                    LSi assured us that the issues that were

23     remaining can be addressed over the -- during the

24     implementation phase; that they are being narrowed down.

25     Q.    Okay.  And you relied on LSi, correct?
```

1     A.    Correct.

2     Q.    And up to this point in time, you have not had any

3     conversations with anyone from SAP, correct?

4     A.    No.  We were talking to their channel partners.

09:44:18  5     Q.    And when did Hodell-Natco go live on Business One?

6     A.    March 7th, I believe, in 2007.  It was the

7     beginning of March.

8     Q.    And what happened?

9     A.    We experienced serious problems, systems locking

09:44:58 10     up, difficulty entering orders, difficulty inquiring on

11     availability of stock, slow response to order entry, and

12     just a myriad of problems.

13     Q.    And did that have an impact on employee morale?

14              MR. STAR:  Objection.  Relevance.

09:45:22 15              THE COURT:  Overruled.

16     A.    It certainly did.

17     Q.    And did it have an impact on your business itself?

18     A.    Yes.  Our -- our company prides itself on service.

19     Our service deteriorated.

09:45:48 20     Q.    How so, how did it deteriorate?

21     A.    Pardon me?

22     Q.    How did it deteriorate?

23     A.    Okay.  Part of service is providing a quality

24     product at a competitive price in a timely fashion based

09:46:08 25     upon the expectations that we have trained the customer

1710

1      to expect from us.

2                      Our -- we had difficulty delivering on

3      time.  We didn't know what inventory we had.  We often

4      had to purchase on a short-term basis to try and get the

09:46:38 5      service back up, and then do cycle counts to track down

6      where the problem was.

7                      And it increased our cost for service, but

8      we're still behind in terms of our normal level of

9      service.

09:46:55 10    Q.    And did that impact your company's reputation?

11    A.    Yes, it did.

12                      MR. STAR:  Objection.

13                      THE COURT:  Overruled.

14    Q.    So did you notify anyone of these problems?

09:47:16 15    A.    I personally, yes.

16    Q.    Who?

17    A.    LSi/IBIS.

18    Q.    And were efforts made to resolve the problems that

19    were being experienced?

09:47:32 20    A.    I believe they were trying to.

21    Q.    So LSi and IBIS were trying to resolve the issues?

22    A.    Yes.

23    Q.    Can you tell us a little bit about some of the

24    efforts they were undertaking?

09:47:51 25    A.    Well, they got SAP involved, and we were hearing

1    about potential patch levels.

2    Q.    Okay.  And, Mr. Reidl, could you tell us

3    who -- actually, when did you speak with someone from SAP

4    directly?

09:48:22 5              Do you recall the first time?

6    A.    I believe the very first time that I spoke with

7    someone at SAP was on April 17th, 2007.

8    Q.    Okay.  And was that a -- that was a telephone

9    conference?

09:48:43 10   A.    Correct.

11   Q.    And could you tell us who was on that call?

12   A.    On the SAP side, a Dirk Boessmann, Geoff Ashley.

13   From our -- and several other people.

14              From our side, myself and Kevin.

09:49:16 15   Q.    Okay.

16   A.    And from LSi, Dan Lowery.

17   Q.    And, Mr. Reidl, you took notes contemporaneous with

18   that call, correct?

19   A.    Yes.

09:49:33 20   Q.    Kim, could you put up Exhibit 18, please?

21              And, Mr. Reidl, could you identify this

22   document for me, please?

23   A.    Yes.  These are handwritten notes that I took

24   during the conference call with Dirk Boessmann in

09:50:07 25   Germany.

```
         1    Q.    And the Geoff there, is that Geoff Ashley?

         2    A.    Yeah, I didn't know it's G-E-O-F, okay, but it's

         3    Geoff Ashley.

         4    Q.    Okay.  And what did they tell you, "They being

09:50:36 5    SAP" -- tell you about the problems Hodell was

         6    experiencing?

         7    A.    They indicated that they were working on a patch

         8    level that would be released sometime near the end of the

         9    month, and further, they would be addressing the locking

09:50:57 10   issues that we were experiencing.

         11   Q.    And what else did they tell you on this call?

         12   A.    I asked did we buy the wrong system.  That's a yes

         13   or no question.

         14              Mr. Lowery, prior to asking that question,

09:51:25 15   stated to everyone on the conference call that we were

         16   going to -- he listed our data volume, customer base, so

         17   forth, and our expectation that we would grow to three to

         18   500 users.  I don't know if he said three to 500 or just

         19   500, and so my question came after that.

09:52:00 20              And Mr. Boessmann said "That is a question

         21   you need to address to SAP America, but you're probably

         22   near the high end of the system capability."

         23              When I hear that, and he just heard that

         24   we're going to have 500 users, I'm -- he's referring to

09:52:26 25   at that point.
```

1    Q.    So the next paragraph where you talk about Dirk,

2    that's Dirk Boessmann?  This is referring to his comment

3    that he thinks we are at the high end of the system

4    capability?

09:52:41  5    A.    Correct.

6    Q.    But he didn't say -- he didn't respond to your

7    question directly?

8    A.    No.  I asked did we buy the wrong system.  That

9    clearly is a yes or no question.

09:52:54 10    Q.    And the following paragraph discusses a patch,

11    correct?

12    A.    Yes.

13    Q.    And so this is SAP describing what they intend to

14    do?

09:53:12 15    A.    I'm sorry.  Could you repeat that?

16    Q.    Sure.  In that paragraph, is this what SAP stated

17    that it would be doing?

18    A.    That's my summation of the understanding of what

19    they would be doing.

09:53:25 20    Q.    And what was your -- what was your understanding?

21    A.    Well, that they were going to urgently work to the

22    best of their ability on a patch to eliminate the lock,

23    locking problem and the performance issues.

24    Q.    At --

09:53:50 25    A.    And they would also analyze the bigger question of

1714

1    our system choice.

2    Q.    Okay.  And in the next paragraph, could you tell us

3    what that means?

4    A.    Yeah.  My recollection of this is we don't have a

09:54:12  5    system capacity issue in terms of servers, "Although Dirk

6    hinted at dispersed servers as an enhancement."

7    Q.    But they didn't tell you that your servers were a

8    problem, correct?

9    A.    No.

09:54:27 10    Q.    And they didn't tell you point blank that Business

11    One would not work?

12    A.    No.

13    Q.    For Hodell?

14    A.    They did not.

09:54:35 15    Q.    And at the very bottom, you write, "SAP is aware

16    that urgency is critical in terms of problem/issue

17    resolution and communication."

18          Do you see that?

19    A.    Yes.

09:54:53 20    Q.    Is that something you advised SAP about, that it

21    was urgent and critical to get this resolved?

22    A.    Yes.  And they recognized that during the

23    conversation.

24    Q.    Okay.  Mr. Reidl, during the course of this trial,

09:55:15 25    you've seen a lot of internal SAP e-mail traffic about

1       this phone call.

2                    Do you recall those documents?

3       A.     Yes.

4       Q.     And, in fact, some of those e-mails pre-date the

09:55:36  5   call.  Do you recall that?

6       A.     Yes.  I think the 15th of April.

7       Q.     And, in fact, I think there was some from April

8       12th?

9       A.     Or even earlier, yes.

09:55:52 10   Q.     I'm not going to put them up in front of you, but I

11      just want to ask you a few questions.  Okay?

12                   Do you recall seeing the e-mail from Udi

13      Ziv to Dan Kraus dated April 12th, 2007, Exhibit 69,

14      throughout the course of this trial?

09:56:08 15   A.     Yes.  As part of the discovery.

16      Q.     Yes.  And in that document, Mr. Ziv states,

17      "Someone had sold to the wrong customer which is way

18      above any sane B1 Sweet Spot, 120 users."

19                   Do you recall that statement?

09:56:29 20   A.     Yes.

21      Q.     Did anyone on April 15th tell you that someone had

22      sold to the wrong customer which is way above any sane B1

23      Sweet Spot, 120 users?

24      A.     No.

09:56:43 25   Q.     And you would have liked to have known that on that

1   date, correct?

2   A.    Pardon me?

3   Q.    Would you have liked to have known that on -- on

4   this call?

09:56:51 5   A.    Absolutely.  It would have given us a heads-up

6   about what we need to do.

7   Q.    In fact, you would have taken some corrective

8   action, is that right?

9   A.    Yes.

09:57:05 10   Q.    And what would you have done?

11   A.    Well, we would have started rapidly evaluating the

12   next alternative to replace SAP Business One.

13   Q.    And so in other words, you wouldn't have gone

14   through the next, you know, eight months, correct?

09:57:24 15   A.    Yes.  Yes.

16   Q.    And also in that e-mail, do you recall

17   communications involving Dan Kraus?

18   A.    Yes.

19   Q.    And Mr. Kraus -- I apologize, give me one second.

09:57:58 20          He writes in this e-mail, "Udi, this

21   customer was sold in 2004 before there was any announced

22   or understood issue."

23          Would you have liked to have known that

24   there was an understood issue on April 15th, 2007?

09:58:19 25          MR. STAR:  Objection.

```
 1                    THE COURT:  Overruled.
 2    A.    I would have liked to have known that.
 3                    I'm sorry.
 4                    THE COURT:  That's all right.
 5                    THE WITNESS:  Am I not allowed to answer?
 6                    THE COURT:  It's okay.
 7    BY MS. LUARDE:
 8    Q.    And there were additional e-mails other than
 9    Exhibit 69.
10                    Do you recall that?
11    A.    Yes.
12    Q.    And there was a later Udi Ziv e-mail where Mr. Ziv
13    writes, "Someone needs to tell the partner about the
14    Business One Sweet Spot and that an environment of 120
15    users and growing is nowhere near it."
16                    Did anyone tell that you on April 15th,
17    2007?
18    A.    No, they did not.
19    Q.    And again, you would have liked to have known that,
20    correct?
21    A.    Absolutely.
22    Q.    And again, there is another exhibit, 255, that was
23    dated April 16th, 2007.
24                    Do you recall that particular e-mail?
25    A.    Who is it from?
```

1   Q.   Yes.  This one is actually from Dan Kraus to Rodney

2   Seligmann and Michael Sotnick?

3   A.   Yes.

4   Q.   And that particular e-mail -- bear with me just one

10:00:20  5   second.  I apologize.

6        References known performance issues with

7   SAP Business One.

8        Would you have liked to have known that

9   there were known performance issues with SAP Business

10:00:39  10   One?

11   A.   Yes.  Preferably before we decided to go with it.

12   Q.   And are you familiar with the name Ralf

13   Mehnert-Meland?

14   A.   Correct.

10:01:02  15   Q.   And are you -- you're also familiar with Paul

16   Killingsworth, correct?

17   A.   Yes.

18   Q.   And Geoff Ashley, is that correct?

19   A.   Yes.

10:01:14  20   Q.   And do you recall the e-mail dated April 16th,

21   2007, from Ralf Mehnert-Meland to Michael Sotnick, Daniel

22   Kraus, Geoff Ashley, Paul Killingsworth, Manfred Weiss

23   and Eddy Neveux relating to performance issues at

24   Hodell-Natco?

10:01:34  25   A.   Yes.

1719

```
           1    Q.    And in particular -- and this is before the

           2    call -- Ralf Mehnert-Meland writes, "There are basically

           3    two issues relating to performance with SAP Business One.

           4    One, performance degrades with SSP add-on products

10:01:58   5    accessing SAP Business One and, two, performance degrades

           6    with large data sets.  Two, Hodell has both issues."

           7                Do you recall that?

           8    A.    Yes.

           9    Q.    Would you have liked to have been told that on

10:02:11  10    April 17th, the very next day?

          11    A.    Yes, I would have.

          12    Q.    And, in fact, Geoff Ashley was on that phone call,

          13    correct?

          14    A.    Yes, he was.

10:02:20  15    Q.    And Mr. Ashley didn't tell you that?

          16    A.    No, he did not.

          17    Q.    And, in fact, do you recall the summary e-mail that

          18    was prepared by Mr. Ashley?  We saw a lot of that

          19    yesterday.

10:02:51  20    A.    Yes.

          21    Q.    And do you recall seeing Mr. Ralf Mehnert-Meland's

          22    response to that summary e-mail from Mr. Ashley, Exhibit

          23    158?

          24                I can read it for you, if you'd like.

10:03:12  25    A.    Okay.
```

1720

1    Q.    He says, "Geoff, thanks.  Right on.  All:  One item

2    from my end.  There is no way SAP Business One will work

3    for this customer."

4              Do you recall that?

10:03:23  5    A.    Yes.

6    Q.    And did Geoff Ashley call you later that day and

7    tell you there's no way SAP Business One will work for

8    this customer?

9    A.    No, he did not, nor did anybody else from SAP.

10:03:42 10    Q.    And you would have liked to have known that, right?

11    A.    Yes, ma'am.

12    Q.    During this period of time, this April time frame,

13    we've seen a lot of e-mail traffic that's internal to

14    SAP, but SAP, what were they telling you at this same

10:04:17 15    period of time?

16    A.    That they're working on patches to improve the

17    performance of the system.

18    Q.    And when you asked that question on the April 17th

19    call about whether Hodell had purchased the right system,

10:04:39 20    no one called you directly and said "No, you did not"?

21    A.    No.

22    Q.    Mr. Reidl, I'd like to turn you to Exhibit 247.

23              THE COURT:  We'll take our morning recess

24    at this time.

10:04:58 25              MS. LUARDE:  Thank you.

         1              THE COURT:  Okay, folks, we'll take about
         2     15 minutes.
         3                   Keep in mind the admonition.
         4                   (Jury out)
10:05:06 5                   (Recess taken).
         6                   (Proceedings resumed in presence of the
         7     jury as follows:)
         8                   THE COURT:  Okay.  Be seated, folks.
         9     BY MS. LUARDE:
10:26:30 10    Q.    Mr. Reidl, before we broke, we had gone through
         11    some questioning about the April 17th, 2007 call.
         12                   Do you recall that?
         13    A.    Yes.
         14    Q.    And I just had a couple of quick follow-up
10:26:47 15    questions on that.
         16                   You recall there was an e-mail written by
         17    Geoff Ashley summarizing the call, and there were
         18    multiple responses on that day, correct?
         19    A.    Correct.
10:27:00 20    Q.    And one of the responses that I failed to mention
         21    was from Dan Kraus, where he writes, "There is no
         22    go-forward path here with Business One."
         23                   Do you recall that e-mail?
         24    A.    Yes, I do.
10:27:14 25                   While I answer, I want to apologize to

1    everybody.  I'm wearing hearing aids.  So when I'm asking

2    you to repeat a question, it's because I do have some

3    hearing loss.

4    Q.    And I will try to speak more loudly.

10:27:29    5           And so, Mr. Reidl, when Dan Kraus wrote on

6    that same date, "There is no go-forward path here with

7    Business One," and that was April 17th, 2007, Dan Kraus

8    did not call Hodell and tell you that, did he?

9    A.    No, he did not.

10:27:47    10    Q.    And let me ask you this question, Mr. Reidl:  On

11    that call on April 17th, 2007, do you believe that SAP

12    was being honest with Hodell?

13    A.    No, I do not because we kept being advised of

14    patches, and I would have liked to have had an answer to

10:28:16    15    my question.  I could have taken action eight months

16    sooner.

17    Q.    Thank you.

18           And, Mr. Reidl, I'd like to turn you to

19    Exhibit 247.  And Page 2 of this document, Mr. Reidl, is

10:28:44    20    actually an e-mail that you had written, and I'll

21    represent to you that the first page, the date on it is

22    April 25th, 2007, which is just a week later, right?

23    A.    Correct.

24    Q.    So, Mr. Reidl, what are you expressing to Dan

10:29:03    25    Lowery in this e-mail?

1    A.    The difficulty we're experiencing as a result of

2    the deteriorating financial performance of the company

3    and the impact it has on our borrowing rate and --

4    Q.    Just --

10:29:26  5    A.    -- and just generally our operations.

6    Q.    So already this is becoming a problem for Hodell,

7    correct?

8    A.    Yes.

9    Q.    And you're explaining to him in this e-mail all of

10:29:37 10    the issues that you're already seeing with Business One,

11    correct?

12    A.    Correct.

13    Q.    And this is the impact on Hodell?

14    A.    That is correct.

10:29:44 15    Q.    And I just want to refer you to a couple of

16    sentences in this document.

17          About five or six lines down, you write,

18    "We are now at the top premium differential."

19          Kim, I don't know if you can find that.

10:30:09 20    It's four lines down.

21          MR. STAR:  Your Honor, we would object.

22    This lacks foundation.

23          THE COURT:  Overruled.

24    A.    In our bank relationship, we have what is called a

10:30:23 25    covenant that expresses the performance we have to

1    achieve to get a certain level of interest charged, and

2    when our performance deteriorates, the interest rate goes

3    up.

4    Q.    And of course, you know this because you're the CEO

10:30:42 5    of the company, right?

6    A.    Correct.

7    Q.    And this is part of your responsibility, correct?

8    A.    Yes, it is.

9    Q.    And you then write "On interest cost alone, this

10:30:54 10   amounts to a $55,000 a year penalty."

11              Do you see that?

12   A.    Correct.

13   Q.    And you go on then to talk about your loan officer.

14              What was going on with National City Bank?

10:31:07 15   A.    I had to start reporting monthly on my estimate of

16   the impact on the performance of the company of the

17   software implementation, and requirement to spell out

18   what we think the progress was going to be, how long this

19   was going to take.

10:31:34 20   Q.    And a few lines down, Mr. Reidl, you then go on to

21   write -- and, Kim, it's just three lines down -- "I

22   cannot determine."

23              Could you read that for the jury,

24   Mr. Reidl?  Do you see that?

10:31:49 25   A.    "I cannot determine how much more of our customer

1    base has been permanently lost, and how much of the sales

2    loss can be recouped, since I cannot assure our customers

3    of the resolution of our implementation problems."

4    Q.    What do you mean by that?

10:32:06  5    A.    Our service had deteriorated to the point where

6    customers were getting very concerned about our

7    operations, and of course we were concerned because our

8    employees are having difficulty quoting.  A big portion

9    of our business is quote over the phone.  And they could

10:32:33 10    not get the information necessary to quote.

11              So we were so busy trying to keep our

12    company going that we didn't have time to keep a log of

13    all the things that were deteriorating around us.

14    Q.    Right.  And, in fact, the next sentence, you talk

10:32:51 15    about your warehouse productivity.  Do you see that?

16    A.    Yes.

17    Q.    And so can you read that for the jury as well,

18    please?

19    A.    Okay.  "Our warehouse productivity has dropped off

10:33:06 20    more than 30%, billing and shipping errors abound -- not

21    all the problems of Hodell-Natco.  Office overtime is sky

22    rocketing and employee drop-out is hard to forecast,

23    based on current stress level."

24    Q.    Could you explain what you mean here for the jury?

10:33:29 25    A.    We were spending a lot of time after-hours to do

1    things that we should be doing during the day such as

2    entering orders when not as many people were on the

3    system in the evening, or early in the morning.

4                     We lost a number of employees.  Our

10:33:51    5    turnover was probably a little higher than normal because

6    of that.

7                     And we had difficulties, we would have

8    dropped invoices.  We didn't know if it was being

9    e-mailed.  It might print locally and nobody could follow

10:34:13   10    up to see where -- whether the customer was billed.

11    Q.    So again, if you go a little further down in this

12    e-mail, in addition to talking about, you know, the

13    financial implications and, you know, some of the

14    implications with the warehouse, further down you talk

10:34:33   15    about, "As for the number of user issue, I don't buy it."

16                     Do you see that, Mr. Reidl.

17    A.    Yes.

18    Q.    And then you talk about the system, right; updating

19    a customer profile takes three and a half minutes?

10:34:46   20    A.    Correct.

21    Q.    Can you tell us a little bit about that, please?

22    A.    When we set up or modify a customer profile,

23    meaning information, either address or contact person or

24    just basically the customer information in the system, it

10:35:11   25    would take three and a half minutes to update that.

1    Q.    And why are you referring to, "As the number of

2    user issue"?

3                    What does that mean to you in this e-mail?

4    A.    I was not being told the truth about the

10:35:33  5    capabilities of the system in terms of the number of

6    users.

7    Q.    And down at the bottom, you talk about fixing the

8    problem now.

9                    Do you see that?

10:35:48 10    A.    Yes.

11    Q.    And you also state, "We explained the urgency in

12    our conference call last week," and that was the April

13    17th, 2007 call, correct?

14    A.    Correct.

10:35:59 15    Q.    And if you'd flip to the first page of this

16    document, at the very top, Mr. Reidl, there's an internal

17    e-mail -- do you see that -- between Dan Kraus, Niels

18    Stenfeldt, Dirk Boessmann, and it's from Udi Ziv?

19    A.    Correct.

10:36:29 20    Q.    And what is Mr. Ziv stating here?

21    A.    "There is not much we can do here.  We will supply

22    what may be a fix for the current problem, but we know

23    that there will be others.  There is no doubt that this

24    is not a B1 customer, and we somehow need to get away

10:36:48 25    from this."

1    Q.    Mr. Reidl, on April 25th, 2007, did Udi Ziv call

2    you to tell you that Business One would not work?

3    A.    No, he did not.

4    Q.    Did Dan Kraus make that call?

10:37:07  5    A.    No, he did not.

6    Q.    Did Niels Stenfeldt make that call?

7    A.    No, he did not.

8    Q.    Did Dirk Boessmann make that call?

9    A.    No.

10:37:16 10    Q.    Did they e-mail you?

11    A.    No.

12    Q.    Would you have liked to have known on April 25th,

13    2007, that there is not much SAP can do for you and there

14    is no doubt that this is not a B1 customer?

10:37:36 15           Would you have liked to have known that?

16    A.    Absolutely.  Once you know you have a problem, you

17    can start taking alternate action.

18    Q.    And this is in response to your earlier e-mail

19    where you're expressing that your company is in dire

10:37:55 20    straits, correct?

21    A.    Correct.

22    Q.    And this e-mail that you sent was forwarded by Dan

23    Lowery to this group of individuals, correct?

24    A.    Correct.

10:38:14 25    Q.    I'd like to turn you, Mr. Reidl, to Exhibit 19,

1729

1    please.

2                     Could you identify this document for me,

3    Mr. Reidl?

4    A.    This is -- these are handwritten notes, my

10:38:43  5    handwritten notes on a telephone conference between LSi,

6    Radio Beacon, SAP, and I list the individuals.

7                     It was dated May 11th, '07.

8    Q.    And so on this call, Mr. Reidl, just so we're

9    clear, under the heading "SAP," Dirk Boessmann was on

10:39:09 10    this call, correct?

11    A.    Yes, he was.

12    Q.    And Paul Killingsworth was on this call?

13    A.    Correct.

14    Q.    And could you tell us, based on these notes -- and

10:39:20 15    these notes were taken at the same time of this call or

16    shortly thereafter, correct?

17    A.    They were taken during the call.

18    Q.    During the call itself?

19    A.    Yes.

10:39:27 20    Q.    And this is your handwriting?

21    A.    Yes, it is.

22    Q.    And could you tell me what you asked SAP on this

23    call and what their responses were?

24    A.    I asked to obtain an answer on the system

10:39:49 25    capability to handle our growth projection of 13% per

1730

1    year.

2    Q.    And that's reflected in the bottom paragraph, is

3    that right?

4    A.    Correct.

10:40:04 5    Q.    And the next line, it says, "Paul to try and get

6    back to us on Monday."

7                   Is that Paul Killingsworth?

8    A.    Yes.

9    Q.    And what else is SAP telling you on this call?

10:40:16 10   A.    That middle of next week, following the date

11   hereon, there would be a -- or near the end of the week,

12   there would be a Patch Level 24 that would address some

13   of the issues that we're experiencing.

14   Q.    And --

10:40:43 15   A.    And prior to that, they had discussed earlier in

16   the conversation, they discussed a Patch Level 23 that

17   was released and is ready to be downloaded into our

18   system.

19   Q.    So despite all the -- all the e-mails that we've

10:41:01 20   just covered, SAP on this call is telling you "We're

21   going to give you a couple of patches"?

22   A.    Correct.

23   Q.    And Dirk Boessmann, on that call, he did not tell

24   you that Business One would not work for Hodell, did he?

10:41:17 25   A.    Absolutely not.

1731

```
         1    Q.    And did Paul Killingsworth tell you Business One
         2    would not work?
         3    A.    No, he did not.
         4    Q.    I'd like to turn to Exhibit 437, please.
10:42:11 5                And, Mr. Reidl, can you identify this
         6    document for me, please?
         7    A.    Yes.  This is an e-mail from Paul Killingsworth to
         8    Kevin Reidl and myself with CC to Dan Lowery and himself
         9    also, Paul Killingsworth.
10:42:37 10   Q.    And this e-mail is dated a few days after the May
        11    11th, 2007 call, correct?
        12    A.    Correct.
        13    Q.    And you actually received this at the time, is that
        14    correct?
10:42:53 15   A.    Correct.
        16    Q.    And on Line 1 of the document, what is
        17    Mr. Killingsworth telling you?
        18    A.    That that afternoon they had an internal meeting
        19    "With our team regarding" the Hodell-Natco situation.
10:43:18 20   Q.    And then I think you see in the second paragraph,
        21    he references Dirk.
        22                Would that be Dirk Boessmann?
        23    A.    Yes.
        24    Q.    And so did you assume that he was talking to Dirk
10:43:32 25   Boessmann and others at SAP about Hodell-Natco?
```

1    A.    That is what he was stating here.

2    Q.    And in the second sentence of the second paragraph,

3    what is Mr. Killingsworth telling you?

4    A.    As a result of the work that the development team

10:44:07 5    was performing, it was their belief that the results of

6    these efforts will substantially realize in the PL 23

7    release.

8              That implies to me there will be some

9    improvement and substantial improvement.

10:44:31 10    Q.    Um-hmm.  And, in fact, in the third paragraph, the

11    first couple of lines, that just underscores what you

12    stated, correct?

13    A.    Correct.

14    Q.    Because he's indicating to you here that Patch

10:44:55 15    Level 23 is going to help, right?

16    A.    That is correct.

17    Q.    And, in fact, he states, "As you well understand

18    and have stated yourselves, the future of Business One

19    with your company lies heavily with success of this patch

10:45:16 20    level."

21              Do you see that?

22    A.    Yes, I do.

23    Q.    And then if you go down a little further in this

24    paragraph, starting with the word "Functionally."

10:45:27 25    A.    Yes.

1733

1    Q.    Could you read that sentence for the jury, please?

2    A.    "Functionally, the product -- with the additions of

3    In-Flight and Radio Beacon -- is an outstanding business

4    solution for you and your company."

5    Q.    And the product he's referring to there is Business

6    One, correct?

7    A.    Correct, and the add-ons.

8    Q.    And based on what you now know from the e-mails

9    that we've covered, on May 14th, 2007, was SAP lying to

10   you in this e-mail?

11                   MR. STAR:  Objection.

12                   THE COURT:  Overruled.

13   A.    Yes.

14   Q.    And, in fact, was Business One an outstanding

15   business solution for you and your company?

16   A.    Not by any stretch of the imagination.

17   Q.    And did you rely on what Mr. Killingsworth from SAP

18   in customer service was telling you about patch levels

19   and how they would work for Hodell, were you relying on

20   that information?

21   A.    Yes.  They're holding out hope that things will get

22   better.

23   Q.    And this is almost a month after that initial phone

24   call, correct?

25   A.    Correct.

1734

1    Q.    And this is after you've e-mailed them and talked

2    to them about the dire straits your company is in,

3    correct?

4    A.    That is correct.

10:47:13  5    Q.    Could you turn to Exhibit 439, Kim?

6          And I'd like to refer you to the second

7    e-mail in this chain, Mr. Reidl.

8    A.    Yes.

9    Q.    And you see this e-mail is from Dirk Boessmann to

10:47:49 10   Dan Kraus dated May 22nd, is that correct?

11   A.    That is correct.

12   Q.    And could you read for the jury the last three

13   sentences here, starting with the word "But"?

14   A.    "But that is in the case -- in this case not the

10:48:12 15   key question Hodell needs to get answered.  You have to

16   tell them that with a target of 300 users they do not

17   have the right product out of the SAP portfolio.  If they

18   continue to discuss with me, they are just losing time

19   and money.  From my perspective it is now time to be

10:48:33 20   honest to the customer."

21          MR. STAR:  Your Honor, I object.  This

22   exhibit wasn't put before --

23          THE COURT:  The objection is sustained.

24   BY MS. LUARDE:

10:48:48 25   Q.    Did anyone call you on May 22nd and tell you that

1735

```
         1    you need to move off of Business One?
         2    A.    No, they did not.
         3              MR. STAR:  Your Honor, could she take the
         4    exhibit down?
10:49:03 5              THE COURT:  Yeah.
         6    BY MS. LUARDE:
         7    Q.    Mr. Reidl, I'd like to turn you to Exhibit 89,
         8    please.
         9              And could you identify this document for
10:49:30 10   us, Mr. Reidl?
         11   A.    This is an e-mail from Paul Killingsworth of SAP
         12   America to Kevin Reidl and myself with copies to a number
         13   of individuals, Jon Woodrum, Elliott Ross, Dan Kraus,
         14   Geoff Ashley, Dan Lowery, Manfred Weiss, Reggie Paquin,
10:50:03 15   Paul Killingsworth.
         16   Q.    Okay.  And the date of this e-mail is actually June
         17   6th, 2007, correct?
         18   A.    That is correct.
         19   Q.    And so Mr. Killingsworth, who is -- actually his
10:50:22 20   title here on this document is senior manager, customer
         21   relations.
         22              Do you see that down at the bottom?
         23   A.    Correct.
         24   Q.    He's telling you in the first paragraph, can you
10:50:41 25   read that last sentence?
```

1736

1    A.    "We know this time has been very difficult for you

2    and your employees.

3    Q.    So he's acknowledging the difficulties that you're

4    experiencing, right?

10:50:56 5    A.    That is correct.

6    Q.    And then in the second paragraph, could you read

7    the first sentence for the jury, please?

8    A.    "Regarding the performance improvements in SAP

9    Business One 2007A, as Dirk Boessmann mentioned in our

10:51:15 10    last call together, performance improvements were a high

11    priority in this release."

12    Q.    So earlier they were talking about new patch levels

13    and now SAP is telling you that you're going to have more

14    improvements with SAP Business One 2007A, correct?

10:51:35 15    A.    Correct.

16    Q.    Did you believe that they were giving you hope that

17    Business One could work?

18                MR. STAR:  Objection.  Leading.

19                THE COURT:  Objection sustained.

10:51:55 20    Q.    In the third paragraph, the last sentence,

21    Mr. Reidl, could you read that, please?

22    A.    "Nonetheless, it is reasonable to believe that you

23    will experience significant performance improvements in

24    many areas with SAP Business One 2007A when it is

10:52:17 25    implemented at Hodell-Natco."

1    Q.    So what is SAP telling you in this e-mail?

2    A.    We're going to have significant improvements.

3    Q.    Based on all the e-mails that we just covered, do

4    you believe that SAP was being honest with you in this

10:52:40  5    e-mail?

6    A.    Quite the contrary.

7              MR. STAR:  Your Honor, he needs to stick to

8    the facts that he knew at the time.  He's being asked to

9    give opinions.

10:52:53 10              THE COURT:  Did you object to that

11    question?

12              MR. STAR:  I objected to a bunch of them on

13    this line.

14              THE COURT:  Yeah.  Go ahead, ask another

10:53:02 15    one.

16    BY MS. LUARDE:

17    Q.    Could we turn to Exhibit 109, please?

18              Mr. Reidl, could you identify this

19    document, please?

10:53:27 20    A.    Yes.  This is an e-mail from Michael Sotnick at SAP

21    America to myself, Kevin Reidl, Dan Lowery, with copies

22    to Jon Woodrum at LSi, Dan Kraus, Paul Killingsworth.

23    Q.    And what is the date of this document, Mr. Reidl?

24    A.    This is November 16th, 2007.

10:54:06 25    Q.    And about how many months was this after Hodell had

1    started operating with the Business One software?

2    A.    Eight and a half months.

3    Q.    And what is being conveyed to you in this e-mail,

4    Mr. Reidl?

10:54:27 5    A.    In essence, there's nothing much more that can be

6    done with SAP Business One.

7    Q.    And is this the first time that anyone at SAP told

8    you that Business One would not work for Hodell?

9    A.    That is correct.

10:55:06 10    Q.    Mr. Reidl, I'd like to turn now to a different

11    topic, and, you know, throughout the course of the trial,

12    and I think you may recall during opening, that Mr. Star

13    implied that Business One didn't impact Hodell because

14    the financials show that 2008 was Hodell's best year or a

10:55:42 15    great year.

16                Do you recall that?

17    A.    Yes.

18    Q.    Do you agree with Mr. Star?

19    A.    No.

10:55:52 20    Q.    In fact, could you tell me a little bit about your

21    role as CEO, how intimate are you with the company's

22    financials?

23    A.    On a daily basis, I track sales orders in, invoice

24    levels, fill rights that is actually tracked right on our

10:56:14 25    system, and I look at the gross margin on the orders.

1    That's on a daily basis, and month-to-date, and look at

2    the invoicing and the margins for that.

3                And at the end of the month, I spend

4    several days with our controller to go over the final

10:56:41  5    financial statements for the company before they are

6    published.  And I go over it with her line item by line

7    item.

8    Q.   And again, if you could refresh my recollection,

9    how long have you been president or CEO of Hodell or its

10:57:01  10    predecessor?

11   A.   Almost 35 years.

12   Q.   So you've been working with financials --

13   A.   When you count the predecessors.  We started with

14   Hodell in 1983, so it's 32 years.

10:57:16  15   Q.   32 years?

16   A.   Yes.

17   Q.   And you worked with financial information while you

18   were at BFGoodrich as well, correct?

19   A.   Correct.

10:57:23  20   Q.   So you have a lot of experience dealing with

21   financial information?

22                MR. STAR:  Objection, Your Honor.  They're

23   trying to proffer him as an expert.

24                THE COURT:  Yeah.

10:57:31  25                MS. LUARDE:  Okay.  I'll move along.

1740

BY MS. LUARDE:

Q.   And so, Mr. Reidl, could you tell the jury what
year was your record year at Hodell?

A.   2006.

Q.   And could you tell me a couple of the critical
factors that made 2006 a record year?

A.   Yes.

          First, high sales level, high gross margin,
and net profit before tax, that is the profit of the
corporation.

          In addition, we shipped record pounds.  And
let me explain why I look at record pound volumes.

          MR. STAR:  Sorry to interrupt, but I'm
going to object.

          THE COURT:  Yeah, put another question to
him.

BY MS. LUARDE:

Q.   Okay.

          Just so I'm clear, Mr. Reidl, 2006, there
was an event that occurred in 2006 that made it a great
year, and that was an acquisition, correct?

A.   Correct.

          MR. STAR:  Objection.  Leading.

          THE COURT:  Overruled.

Q.   Mr. Reidl, I'd like to put in front of you portions

1    of Exhibit 607.

2              And bear with me just one moment, please.

3    A.    Okay.

4              MS. LUARDE:  May I approach, Your Honor?

10:59:10    5              THE COURT:  You may.

6              MS. LUARDE:  Thank you.

7    BY MS. LUARDE:

8    Q.    And, Mr. Reidl, could you tell the jury, I handed

9    you a pretty thick stack of documents.

10:59:33    10              Could you tell us what those documents

11   represent?

12   A.    They are the audited financial statements for our

13   performance for Hodell-Natco Industries, both balance

14   sheet and income, 2007, 2006.  They're all -- all three

11:00:03    15   are for the period 2006 and 2007.

16   Q.    If you could look back --

17   A.    I'm sorry, there are more pages.

18   Q.    -- I think I gave you three copies of --

19   A.    They are a full stack, okay.

11:00:17    20              At the back, the last statement in the

21   stack, the last one is 2000 -- December 31st, 2010 and

22   2009, December 31st, 2009 and 2008, December 31st;

23   December 31st, 2008 and 2007, and the top one is December

24   31st, 2007; and December 31st, 2006.

11:01:18    25              So it goes from 2006 through 2010.

1742

1    Q.    And those are accurate copies of Hodell's financial

2    statements, correct?

3    A.    Correct.

4    Q.    Kim, could you please pull up Exhibit 24?

11:01:42  5          And just so we're clear, you're involved in

6    the preparation and review of your company's financial

7    statements, correct?

8    A.    That is correct.

9    Q.    And that's part of your responsibility as CEO?

11:01:53  10   A.    Correct.

11   Q.    And, Mr. Reidl, I've put up on this screen the

12   first page of Exhibit 24.

13          Could you identify this document for the

14   jury?

11:02:10  15   A.    This exhibit is a summary of the financial

16   performance month-by-month for calendar year 2002 through

17   and then an annual figure at the far right column.

18   Q.    Okay.  And this page is actually just 2002, and

19   just so we're clear, the far right column, where it says,

11:02:34  20   "Annual," that's the annual figures for 2002?

21   A.    Correct.

22   Q.    And are you familiar with this document, Mr. Reidl?

23   A.    Yes, I am.

24   Q.    And is this a document that you rely on in your

11:02:55  25   role as CEO?

        1    A.    Yes, I do.

        2    Q.    And do you have personal knowledge about the

        3    content of this document?

        4    A.    Yes.  This is a document that we have prepared

11:03:11 5    since 1984, and the predecessor company that owned it

        6    during our due diligence, produced three years prior to

        7    that.

        8    Q.    And is this document prepared in the normal course

        9    of your business?

11:03:28 10   A.    Correct.  It is prepared every month.

        11   Q.    And you personally review this document, right?

        12   A.    Yes, I do.

        13   Q.    And you would consider this a business record?

        14   A.    I'm sorry, could you repeat that?

11:03:45 15   Q.    Sure.  You would consider this to be a business

        16   record, correct?

        17   A.    Yes.

        18   Q.    Mr. Reidl, I'm going to --

        19              MS. LUARDE:  If I may approach, Your Honor,

11:04:02 20   and put up a demonstrative for the jury.

        21              THE COURT:  Go ahead.

        22              MS. LUARDE:  Thank you.

        23              MR. STAR:  May I see that before it goes

        24   up?

11:04:19 25              THE COURT:  Yes.

1744

1    MS. LUARDE:  And, Your Honor, I'm going to

2    be asking Mr. Reidl to point to different numbers on this

3    demonstrative.

4    Would it be okay if he attached a

5    microphone and assisted the jury?

6    THE COURT:  Sure.

7    MS. LUARDE:  Thank you.

8    MR. MILLER:  Your Honor, if we can just

9    have a minute, we're trying to get an electronic copy.

10   MR. STAR:  It's right there.

11   MR. MILLER:  Okay.  That's very helpful.

12   THE WITNESS:  Excuse me.

13   BY MS. LUARDE:

14   Q.   Okay.  Mr. Reidl, we had just looked at Exhibit 24

15   that contained month-to-month and then year-end.

16   Could you tell us what this demonstrative

17   actually represents?

18   A.   This demonstrative represents data extracted from

19   each of the summary statements that are -- we saw year

20   2002 on the screen, the same document is prepared for

21   '03, '04, '05, '06, '07, '08 and the first quarter of

22   2009 on this demonstrative.

23   Q.   And, Mr. Reidl, we've heard a lot about gross sales

24   and gross profits and how 2008 was your best year.

25   Could you circle gross sales and gross

1       profits for 2008?

2       A.      I'm not sure.  Can you see the circle?

3                       MR. LAMBERT:  2006.

4       A.      2006, 2008 gross sales.

11:08:18 5                      MS. LUARDE:  Otto, I think your mic may be

6       off.

7                       THE WITNESS:  Pardon?

8                       MS. LUARDE:  I think your mic is off.

9       Technology.  There.

11:08:34 10                     Is it working now?

11                      THE WITNESS:  Is it working?  Can you hear

12      me?  Sorry.

13      BY MS. LUARDE:

14      Q.      And, Mr. Reidl, could you tell us and the jury what

11:08:49 15     the gross sales were for 2008?

16      A.      $43,877,103.

17      Q.      And what were they for 2006?

18      A.      $42,965,574.

19      Q.      So if you just look at those numbers, you would

11:09:12 20     agree that 2008 is bigger than 2006, correct?

21      A.      That's what it would imply.

22      Q.      But can you tell the jury what is meant by "Gross

23      sales"?

24      A.      That's the total value of the invoices before any

11:09:34 25     adjustments, returns, so forth.

1746

1    Q.    Does that -- does that tell you, Mr. Reidl, what

2    your best year is if you just look at that figure?

3                MR. STAR:  Objection.  Calls for an expert

4    opinion.

5                THE COURT:  Overruled.

6    A.    No.

7    Q.    What --

8    A.    Gross sales alone do not tell you what your overall

9    performance is.

10                There are interim steps, such as gross

11    profit.  Should I circle that?

12    Q.    Yes, please.

13                MR. STAR:  Your Honor, objection.  He's

14    testifying as an expert.

15                THE COURT:  Overruled.

16    A.    Gross sales and gross profit are intermediate steps

17    in determining the profitability of the company.

18                They are --

19                MR. STAR:  There's no question pending,

20    Your Honor.

21    BY MS. LUARDE:

22    Q.    Could you tell us what is meant by "Gross profits,"

23    Mr. Reidl?

24    A.    Yes.  It's the gross sales minus various sales

25    deductions and adjustments and the warehouse operating

1       costs.

2       Q.    And could you tell the jury which number Hodell

3       relies upon to measure its profitability?

4       A.    The line called "Profit before tax."

11:11:10  5                   And for 2006, a million-five; 2008, 860 or

6       870,000 rounded.  So approximately half of the

7       profitability of 2006, a little more than half, and not a

8       record profit year as was stated by Mr. Star.

9       Q.    And just so the jury understands, what does it mean

11:11:45 10     when you have up on this document "Profit before taxes"?

11      A.    That is the number that is reported on our tax

12      return with perhaps minor adjustments for -- that the

13      auditors make.

14      Q.    And that number is actually -- all overhead

11:12:12 15     expenses are taken out prior to that, correct?

16      A.    Correct.  It -- before gross -- after gross profit,

17      we still have to pay the entire office staff, our bank

18      debt, our interest payment.  We have to pay our outside

19      auditors, our sales reps.

11:12:36 20     Q.    And so this is one indicator to you that 2006 was

21      much better than 2008, correct?

22                   MR. STAR:  Objection.  Leading.

23                   THE COURT:  Overruled.

24      Q.    You may answer.

11:12:48 25     A.    Absolutely.

1748

1    Q.    And are there some other indicators as well,

2    Mr. Reidl?

3    A.    Yes.

4                One thing we track is pounds shipped, and

11:13:00  5    we track the selling price of the pounds and we track the

6    cost to us for the purchases for that, and the difference

7    is our cents or dollar per pound that we have left over.

8                We don't have that on here, but what we see

9    is our record of pounds shipment was --

11:13:28 10                    MR. STAR:  Objection.

11                    THE COURT:  Overruled.

12                    Go ahead.

13    A.    -- 23,312,148.

14    Q.    And what year was that, Mr. Reidl?

11:13:38 15    A.    2006.

16    Q.    And how many pounds were shipped then in 2008?

17    A.    20 -- I'm sorry -- 20,334,692.

18    Q.    And so there's a difference there between '06 and

19    '08.

11:14:01 20                    What is that difference, Mr. Reidl?

21    A.    That's about three million pound difference, about

22    a two percent drop in the pounds shipped.

23    Q.    Just so I understand, if the number of pounds

24    shipped decreased by three million pounds from 2006 to

11:14:22 25    2008, how is it possible to have increased gross sales?

1749

1    A.    If I direct your attention to the third line from

2    the bottom, you see that the average selling price

3    between 2006 on a per pound basis, it went from

4    one -- $1.80 to $2.12 per pound, so that's an inflation

11:14:50  5    of 32, almost 17% inflation in selling price.

6    Q.    So the cost of the product went up in 2008?

7    A.    Correct.

8               The cost of the product from -- the selling

9    price of the product went up.

11:15:16  10    Q.    So would you agree with me that if you

11    multiplied --

12               MR. STAR:  Objection.  Leading.

13               MS. LUARDE:  I'm asking a question.

14               THE COURT:  Finish the question.

11:15:27  15    BY MS. LUARDE:

16    Q.    If you multiplied the two -- what would happen if

17    you multiplied the pounds shipped in 2008 by the selling

18    price in 2006?  What would happen to the gross sales?

19               MR. STAR:  Objection.  Relevance.

11:15:43  20               THE COURT:  Objection sustained.

21    Q.    Mr. Reidl, I'd like to put a different

22    demonstrative in front of you.

23               Mr. Reidl, could you -- this demonstrative

24    that I placed in front of you, could you tell me or

11:17:26  25    explain to the jury what this demonstrative means?

1       A.    Yes.   In this demonstrative, we have plotted

2       the -- from the charts that you just saw for the years

3       involved from December, '04 up through, actually

4       December, '08, and actually beyond on an annualized

11:17:57  5   basis, but we plotted the gross profit and that's the

6       blue line for those respective time periods.

7                   The gross profit scale is over here.  The

8       net profit scale is over here.

9                   The red line reflects the gross profit over

11:18:18 10   that same time frame, and you can see here that the gross

11      profit and net profit track almost parallel, but on this

12      side, the profit before tax -- I'm sorry, this is profit

13      before tax and gross profit on the back side, this is

14      gross profit and profit before tax while we were

11:18:52 15   operating on SAP.

16      Q.    And Mr. --

17      A.    They run fairly parallel.  Here they diverge.

18      Q.    And, Mr. Reidl, is that telling you in part that

19      during the period of time you were on SAP Business One,

11:19:07 20   that you had increased overhead?

21                  MR. STAR:  Objection.

22      A.    That is correct.

23                  THE COURT:  Overruled.

24      Q.    And prior to going on SAP Business One, could you

11:19:19 25   tell us a little bit about the trend line while on the

```
 1        FACTS system?
 2        A.    This trend line here?
 3        Q.    Yes.
 4        A.    They tended to track each other.
 5        Q.    And it was increasing as well, is that correct?
 6        A.    That is correct.
 7        Q.    And in addition to the divergence between gross and
 8        net after being on Business One, what else do you see
 9        from this chart?
10        A.    Could you repeat that question?
11        Q.    Sure.  It was a horrible question.
12                    What other -- when you look at this chart
13        as the CEO, what do you conclude with regard to the
14        implementation of Business One?
15                    MR. STAR:  Objection.
16                    THE COURT:  The objection's overruled.
17        A.    It was an abysmal failure.
18        Q.    And so it's your -- is it your conclusion that
19        Business One was the cause of financial harm to Hodell?
20                    MR. STAR:  Objection.
21                    THE COURT:  Overruled.
22        A.    That is correct.
23        Q.    Thank you.  You can return to your seat.
24                    In your role as CEO, Mr. Reidl, did you
25        personally calculate the amount of damages suffered as a
```

1752

| | |
|---|---|
| 1 | result of the failure of SAP Business One? |
| 2 | MR. STAR:  Objection. |
| 3 | THE COURT:  Objection sustained. |
| 4 | Q.    Mr. Reidl, did Hodell suffer from increased |
| 11:21:41 5 | overhead expenses while running Business One? |
| 6 | A.    Yes, we did. |
| 7 | Q.    And what do you mean by the phrase "Increased |
| 8 | overhead expenses"? |
| 9 | A.    It's the cost of the increase in employment |
| 11:22:02 10 | required under SAP for the -- if we had operated under |
| 11 | FACTS to ship out the same pound volume of product. |
| 12 | Q.    Okay.  And so just so I understand, it took more |
| 13 | people and cost more money to ship product under SAP than |
| 14 | it would have taken to ship that same number of pounds |
| 11:22:39 15 | using FACTS, is that correct? |
| 16 | A.    That is correct. |
| 17 | MR. STAR:  Objection. |
| 18 | THE COURT:  Yeah, how about laying us a |
| 19 | foundation for that? |
| 11:22:51 20 | BY MS. LUARDE: |
| 21 | Q.    Okay.  Mr. Reidl, I'd like to put in front of you, |
| 22 | if you go back to Exhibit 24.  And, Mr. Reidl, we |
| 23 | discussed how this is a document maintained in the |
| 24 | ordinary course of your business at Hodell, correct? |
| 11:23:06 25 | A.    That is correct. |

1    Q.    And this document is based on the financial

2    documents, 607, that you have in front of you, correct?

3    A.    Correct.

4    Q.    And all of these documents are financial records

11:23:22 5    that are maintained in the ordinary course of business at

6    Hodell, correct?

7    A.    That is correct.

8    Q.    And you as CEO of the company are personally

9    familiar with the financials at Hodell?

11:23:36 10    A.    Correct.

11    Q.    And, in fact, that's one of your major

12    responsibilities, right?

13    A.    That's my primary responsibility.

14    Q.    And, in fact, as CEO, you are concerned about the

11:23:54 15    impact Business One was having at Hodell, correct?

16                    MR. STAR:  Objection.  Leading.

17                    THE COURT:  Overruled.

18    A.    That is correct.

19    Q.    And so you actually looked at the financials to see

11:24:06 20    what was occurring, is that correct?

21    A.    Yes, I do, on a monthly basis.

22    Q.    Kim, could we have Exhibit 25, please?

23                    MR. STAR:  Before that goes up, we object

24    to Exhibit 25.

11:24:18 25                    THE COURT:  Can we talk about it?

1754

                        MR. STAR:  Yes.

                        THE COURT:  You can stand and stretch if

you want.

                        (Side-bar conference had off the record).

11:29:52  5            THE COURT:  Okay.

                        MS. LUARDE:  I apologize.  Could I get a

document, Your Honor?

                        THE COURT:  Yes.

                        MS. LUARDE:  Thank you.

11:30:52 10  BY MS. LUARDE:

Q.    Mr. Reidl, we had just looked at a demonstrative

that demonstrates that there was, in your testimony, an

increase in overhead expense with the implementation of

Business One.

11:31:10 15            Do you recall that demonstrative?

A.    Yes.

Q.    And what I'd like to talk about now is one of the

components of overhead at your company, and that relates

to employee cost, is that right?

11:31:25 20  A.    Correct.

Q.    And, Mr. Reidl, at one point in time you took a

look at employee costs and the impact on productivity.

                        Do you recall doing that?

A.    Yes.

11:31:46 25  Q.    And, Mr. Reidl, I'd like you to explain to me one

1    component of that calculation, and that first component,

2    could you explain to me how you track employee

3    productivity?

4              MR. STAR:  Objection.  Calls for expert

11:32:05  5    opinion.

6              THE COURT:  Overruled.

7    A.    Okay.  I can give a basic example.

8              We sell steel products.  Over 95% of our

9    products are made from steel.  If you -- everybody

11:32:26  10    recognizes what a bolt is.  If we have -- excuse me -- an

11    order for a hundred pieces of a bolt out of standard low

12    carbon steel, and we have another order for a hundred

13    pieces of a similar -- the identical size bolt in

14    stainless steel, they weigh the same, all activity in our

11:33:00  15    organization takes the same amount of effort and time to

16    accomplish.

17              The steel, low carbon steel product sells

18    in the range of $1.80 a pound.  A 3/16 stainless part in

19    that same size, has the same weight per part, but the

11:33:27  20    selling price would be in the range of $3.60 a pound.

21              So the one order is half of the dollar

22    value of the other order, but they took exactly the same

23    amount of effort, throughout our organization, all

24    efforts, office and warehouse.

11:33:50  25              So the measure of our performance is based

1    on how many people we need to handle a given amount of

2    pounds shipped.

3    Q.    And so --

4    A.    And that's something we've been tracking since

11:34:09  5    1984.  And we track the number of people on a monthly

6    basis that we have on board at the end of the month, and

7    we come up with an average number for the year for the

8    number of employees that we have on staff for the pounds

9    that we ship that year.

11:34:29 10                    And that gives us a pounds per employee

11    shipped per year.

12    Q.    And so, Mr. Reidl, so I understand, you -- your

13    business, you're in the business of distributing steel

14    products that have different weights and actually steel

11:34:59 15    products, and the steel products will have consistent

16    weights, correct?

17    A.    Correct.

18    Q.    And they've had consistent weight ever since you've

19    been in this industry, right?

11:35:09 20    A.    As far as specific products, yes.

21    Q.    Okay.  And again, just so I understand, in order to

22    ship those steel products, it takes the same amount of

23    effort, whether the price is $5 per part or $20 per part,

24    correct?

11:35:34 25    A.    Correct.

1  Q.   Okay.  And that's why you have this metric of

2  pounds shipped per employee?

3  A.   That is correct.

4  Q.   And you track this on a regular basis at your

11:35:45  5  company?

6  A.   Correct.

7  Q.   Kim, could I see Exhibit 24 for just a minute?

8           And, Mr. Reidl, on Exhibit 24 -- this is

9  the 2002 year as an example -- this document actually

11:36:21  10  shows the number of pounds shipped per month, is that

11  correct?

12  A.   Correct.

13  Q.   And then it also establishes total hours worked,

14  correct?

11:36:33  15  A.   Correct.

16  Q.   And it has --

17  A.   But that is hours for the warehouse.

18  Q.   Okay.  And up above, though -- thank you for

19  correcting me -- are the number of employees, right?

11:36:45  20  A.   Correct.

21  Q.   So how do you -- how do you do this calculation,

22  then, this pounds shipped per employee?

23  A.   You divide the line that says "Pounds shipped," the

24  number in that line, by the total population, which is in

11:37:07  25  three lines above.

1       Q.    Okay.  And so for this, the Business One effect on

2       productivity, did you perform a similar calculation to

3       determine employee productivity?

4                      MR. STAR:  Objection.

11:37:35  5                      THE COURT:  Sustained.

6       Q.    Mr. Reidl --

7                      THE COURT:  You can ask him to do the

8       calculation, if you want.

9                      MS. LUARDE:  Okay.  I will do that.

11:38:00 10     BY MS. LUARDE:

11      Q.    Mr. Reidl, if I gave you the entire Exhibit 24,

12      would you be able to calculate Business One's effect on

13      productivity and including the calculation we just

14      covered, which is the pounds shipped per employee?

11:38:21 15                     MR. STAR:  Object to the question, Judge.

16                      THE COURT:  Objection sustained.

17                      Again, he can do the mathematical.

18      Attributing to what caused it is another issue.

19                      MS. LUARDE:  Okay.  Thank you, Your Honor.

11:38:34 20     BY MS. LUARDE:

21      Q.    Were you able to calculate -- are you able to

22      calculate from Exhibit 24 the number of pounds shipped

23      per employee while on Business One?

24      A.    Correct.

11:38:52 25     Q.    And did you at one point undertake that

1       calculation?

2       A.     Yes, I do.  I calculate the pounds shipped per

3       employee every year, every month.

4       Q.     And while on Business One, do you recall -- you

11:39:20 5   recall performing that calculation.  Do you recall the

6       number that you reached?

7       A.     I would have to have my documents in front of me or

8       get a calculator and I can do it right here.

9                       MS. LUARDE:  Your Honor, may I put a

11:39:45 10  document in front of the witness so --

11                      THE COURT:  You may.

12                      MS. LUARDE:  -- he can answer the question?

13                      Thank you, Your Honor.

14                      MR. STAR:  Your Honor, I just object.  If

11:40:05 15  she wants to refresh his recollection, but --

16                      THE COURT:  I think that's what she's going

17      to do.

18                      MR. STAR:  Okay.  I don't want him to be

19      testifying from a document that's not before this jury.

11:40:15 20  BY MS. LUARDE:

21      Q.     Mr. Reidl, I believe you just testified that you

22      couldn't recall off the -- at your fingertips what the

23      number was that you calculated that represented the

24      number of pounds shipped per employee while on SAP

11:40:30 25  Business One.

                              And looking at this document, does that
refresh your recollection?

A.    Yes.

Q.    And what was that number?

11:40:39  A.    108,406 on an annualized basis per employee.

Q.    And that covers what time period?

A.    Twenty-five months.

Q.    And did you perform that same calculation,
Mr. Reidl, for the period of time that you used the FACTS
11:41:03  system?

A.    Yes.  I did that on this chart from 2002 to
February, 2007.

Q.    And could you tell me what the number of pounds
shipped per employee while using FACTS, what that number
11:41:21  would be?

A.    The average for that time period that I just stated
was 127,138 pounds per employee per year.

Q.    And so there was a -- and what conclusion do you
reach from that difference?

11:41:43  A.    That there was a significant drop.

                  MR. STAR:  Objection.

                  THE COURT:  He can just do the math.

BY MS. LUARDE:

Q.    Okay.  What is the difference between -- all right.
11:41:53  On FACTS, more pounds were shipped per employee of

1761

1    127,138, and if you deduct what the SAP average 25-month

2    time period was, what number does that give you?

3    A.    Can you ask that question again, please?

4    Q.    I will try.  If you do the math, what is the

11:42:17  5    difference between the number of pounds shipped per

6    employee on FACTS and SAP?

7    A.    Yeah.  If I look at the pounds shipped for SAP for

8    the 25-month period, it averages 19,985,215 on an annual

9    basis.

11:42:38 10              The average employees that we used was

11    184.36.

12              Had we shipped the same pounds --

13              MR. STAR:  Objection.  He's answering a

14    different question.

11:42:52 15              THE COURT:  You asked a different question.

16              I think the question is simple and that was

17    what was it when you had SAP and what was it before, the

18    number of employees and the number of pounds shipped.

19              MS. LUARDE:  Right.

11:43:04 20              THE COURT:  Those two things.

21    BY MS. LUARDE:

22    Q.    Mr. Reidl, I guess just to make it easy, so based

23    on this calculation, the FACTS average was 127,138,

24    correct?

11:43:21 25    A.    Correct.

1762

```
 1    Q.    And the SAP average was 108,406, correct?

 2    A.    Correct.

 3    Q.    And the number of pounds, that's the number of

 4    pounds per employee, is that correct, annualized on FACTS

 5    and Business One?

 6    A.    Read that number again.

 7    Q.    Sure.  On the FACTS -- we'll try.  On the FACTS --

 8              THE COURT:  Wait a minute.  Wait a minute.

 9    Sharon, this is a little painful.

10              MS. LUARDE:  It is painful.  That's why --

11              THE COURT:  As I hear your testimony,

12    there's 19,000 pounds less during the SAP time.

13              THE WITNESS:  Correct.

14              THE COURT:  Okay.  And what are the number

15    of employees for both times?

16              THE WITNESS:  The number of employees that

17    we used to support the SAP business, if I understand your

18    question correctly --

19              THE COURT:  Correct.  Yes.

20              THE WITNESS:  -- was an average of 184.36.

21              THE COURT:  And how about with FACTS?

22              THE WITNESS:  If we --

23              THE COURT:  How many employees to support

24    FACTS?

25              THE WITNESS:  The employees to support
```

1    FACTS for the pounds shipped under FACTS?

2              THE COURT:  Correct.

3              THE WITNESS:  Was 163.7.

4              THE COURT:  Thank you.

11:44:43  5    THE WITNESS:  For 20.8 million pounds.

6              THE COURT:  Thank you.

7    BY MS. LUARDE:

8    Q.    And so there were how many more employees required

9    while using Business One?

11:44:54 10    MR. STAR:  Objection.  They haven't set the

11   time frame period.

12             THE COURT:  I thought he did.

13             You can -- excuse me, you can cross-examine

14   on that issue.

11:45:01 15    MR. STAR:  Fine.

16   BY MS. LUARDE:

17   Q.    During -- while you used Business One, you have a

18   calculation of the number of extra employees required.

19             What is that number?

11:45:15 20   A.    That is the number of employees that -- that is the

21   drop in number of employees that we would experience if

22   we shipped 19,985,000 pounds with the FACTS productivity

23   level.

24   Q.    So what you're stating is that you would have used

11:45:50 25   27 less employees if you were shipping under FACTS than

1764

1    Business One?

2    A.    That's correct.

3              MR. STAR:  Objection, Your Honor.

4              THE COURT:  Objection is sustained.

11:45:56  5          The question is how many employees were

6    there in 2007, 2008, and 2006.

7              Do you have that figure there?

8              MS. LUARDE:  Your Honor, if I -- if I could

9    explain.

11:46:09 10            THE COURT:  You don't need to explain

11   anything.

12             Do you understand my question, Mr. Reidl?

13             THE WITNESS:  I'm not certain because we

14   have people leaving and people being hired.

11:46:18 15            THE COURT:  Okay.

16             THE WITNESS:  So are you -- you're asking

17   me the exact number that were employed or --

18             THE COURT:  You're giving testimony about

19   the number of pounds shipped per employee so you must

11:46:29 20  know how many pounds were shipped and how many employees.

21             THE WITNESS:  Yes.  And that information is

22   under SAP, the average employment for the year on an

23   annualized basis.  We were on it for 25 months.

24             THE COURT:  Right.

11:46:49 25            THE WITNESS:  Was 184.36.

            1              THE COURT:  Okay.  Then how about what was
            2       the --
            3              THE WITNESS:  Under FACTS, we had an
            4       average of 163.7 employees that shipped 5% more pounds.
11:47:06    5              THE COURT:  Got you.
            6              MR. MILLER:  Your Honor, to be clear, you
            7       asked about 2006 and the average the witness is
            8       testifying to is over a five-year period.  So I'm not
            9       sure --
11:47:15   10              THE COURT:  I did ask 2006.
           11              Do you have that figure for 2006?
           12              THE WITNESS:  The 2006 average was 125,202
           13       pounds.
           14              THE COURT:  No, I'm sorry, the number of
11:47:29   15       employees.
           16              THE WITNESS:  The number of employees?  I'm
           17       answering including the equivalent temporaries?
           18              THE COURT:  I guess.
           19              THE WITNESS:  Was 186.2.
11:47:41   20              THE COURT:  Thank you.
           21       BY MS. LUARDE:
           22       Q.    But, Mr. Reidl, just so we're clear, your
           23       calculation of pounds shipped per employee, you're
           24       looking at the average number of pounds each employee
11:47:59   25       could ship per year, correct?

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
|          | 1  | A.    Correct.                                         |
|          | 2  |              MR. STAR:  Objection.  Relevance.         |
|          | 3  |              THE COURT:  Overruled.                    |
|          | 4  | BY MS. LUARDE:                                         |
| 11:48:05 | 5  | Q.    And you compared that average number of pounds   |
|          | 6  | shipped per employee on FACTS to the average number of |
|          | 7  | pounds shipped per employee on Business One, correct?  |
|          | 8  | A.    Correct.                                         |
|          | 9  | Q.    And what you determined, comparing those two     |
| 11:48:28 | 10 | separate time periods, was that it required an additional |
|          | 11 | 27 people while operating under Business One, correct? |
|          | 12 |              MR. STAR:  Objection.                     |
|          | 13 |              THE COURT:  Overruled.                    |
|          | 14 | A.    That's correct.                                  |
| 11:48:45 | 15 | Q.    Okay.  Let's move on to the second half of this  |
|          | 16 | calculation.                                           |
|          | 17 |              You also determined the annualized cost for |
|          | 18 | each employee over a period of time, correct?          |
|          | 19 | A.    Correct.                                         |
| 11:49:02 | 20 | Q.    And you came up with a number of what it cost per |
|          | 21 | employee, correct?                                     |
|          | 22 | A.    Correct.                                         |
|          | 23 | Q.    And you base this number off of figures in your  |
|          | 24 | financial records, is that accurate?                   |
| 11:49:15 | 25 | A.    That is accurate.                                |

```
 1    Q.    And what is the number that -- the annualized cost
 2    for each employee, what is that number?
 3                  MR. STAR:  Objection.  Foundation.
 4                  THE COURT:  Overruled.
 5    A.    That's a combination of the cost for employees in
 6    the warehouse, the cost for all the employees in the
 7    office, plus the cost of the temporary employees.
 8    Q.    What is that number?
 9    A.    For which year or for the average period?
10    Q.    The annualized costs per employee, you came up with
11    a number.
12    A.    Okay.  For the time period, or for a given year?
13    Q.    Mr. Reidl, you -- while on SAP Business One.
14    A.    The average cost -- annualized cost per employee
15    for all our employees while we were using SAP Business
16    One was $45,914.
17    Q.    And so to calculate the impact on your overhead and
18    to explain that gap between gross and net on this chart,
19    what is the dollar amount of the -- what is the dollar
20    amount and the effect on productivity?  What dollar
21    amount does that equate to?
22                  MR. STAR:  Objection.
23                  THE COURT:  Overruled.
24    A.    $2,598,000 for that period.
25                  MR. STAR:  Objection.
```

```
 1              THE COURT:  Overruled.

 2              MR. STAR:  Move to strike that.  There's no

 3    foundation to the actual cost --

 4              THE COURT:  Again, we can go into all of

 5    this.

 6              MR. STAR:  Thank you.

 7    BY MS. LUARDE:

 8    Q.    So it's your testimony that Hodell-Natco suffered

 9    losses of $2,598,173 as a result of an impact on its

10    productivity because of the use of Business One, is that

11    correct?

12    A.    That is correct.

13              MR. STAR:  Object and move to strike that.

14              THE COURT:  Overruled.

15    BY MS. LUARDE:

16    Q.    Mr. Reidl, there are also other components that you

17    looked at in analyzing the financials for Hodell, and one

18    of those actually included calculating the out-of-pocket

19    expenses that you incurred in licensing Business One, is

20    that right?

21    A.    That is correct.

22    Q.    And could you give me the categories that make up

23    your out-of-pocket expenses?

24    A.    They're the licensing expenses for SAP Business

25    One, the licensing for the Radio Beacon licenses,
```

1    maintenance contract for the Radio Beacon license, the

2    maintenance contract for the SAP Business One license,

3    licenses, and the implementation and maintenance expenses

4    from LSi.

11:52:58  5    Q.    And, Mr. Reidl, if you'd flip to your binder,

6    Exhibit 606.

7    A.    606?

8    Q.    Yes.  And if you don't have that in front of you, I

9    can get a copy for you, Mr. Reidl.

11:53:49  10    A.    Yeah, I don't have it in front of me.

11              MS. LUARDE:  May I approach, Your Honor?

12              THE COURT:  You may.

13              MS. LUARDE:  Thank you.

14    A.    Yeah.  Okay.

11:54:30  15    Q.    And, Mr. Reidl, could you take a minute and look

16    through that document and then tell the jury what

17    this -- what this is?

18    A.    This is a stack of copies of invoices and checks

19    that support the items I discussed earlier on the

11:55:29  20    out-of-pocket costs.

21    Q.    And are these documents maintained in the ordinary

22    course of your business?

23    A.    Yes, they are.

24    Q.    And, Mr. Reidl, if you could turn to Exhibit 622,

11:55:43  25    please.

1       A.    Okay.

2       Q.    And could you identify what this document is?

3       A.    This is -- this is a document prepared by our

4       accounting department at my request to list all of the

11:56:35 5   items related to those out-of-pocket costs, the dates of

6       the posting, and the amount of the transaction, and who

7       was the recipient.

8       Q.    And this is a document that comes directly off of

9       your system at Hodell?

11:57:01 10  A.    I'm sorry?  I could not hear that.

11      Q.    And this is a document that came off of your system

12      at Hodell?

13      A.    That is correct.

14      Q.    And this is just a, if I'm correct, this is a

11:57:14 15  summary of the invoices that are in front of you, is that

16      correct?

17      A.    That is correct.

18      Q.    And what are the total amount of damages that are

19      direct out-of-pocket expenses related to the Business One

11:57:28 20  failed implementation?

21                  MR. STAR:  Objection.

22                  THE COURT:  Well, the characterization of

23      the question?  Yes.

24                  What does that total?

11:57:38 25                  MR. STAR:  Thank you.

1   A.     The total is $842,992.62.

2   Q.     Thank you.

3              And, Mr. Reidl, as part of the Business One

4   implementation, you also incurred costs with regard to

11:57:59 5   training, testing, and travel?

6              Do you recall that?

7   A.     Correct.

8   Q.     And what do you mean by "Training, testing, and

9   travel" expenses?

11:58:12 10   A.     This is the expense for the people who traveled to

11   Chicago to become trainers.  This is basically the

12   train-the-trainers expense.

13              We sent at least two people from every

14   location out of the seven warehouses, plus one person

11:58:34 15   from Milwaukee.  And from the Cleveland office we

16   actually sent three or four.  So it's a total of about 15

17   people for a one-week period to Chicago, and the cost of

18   their travel, food, lodging, and the salaries for those

19   people during that time.

11:58:56 20              It's a very conservative estimate.

21   Q.     And what is that estimate?

22   A.     Between 35 and $50,000.  50,000 is closer to the

23   actual.

24   Q.     Okay.  And, Mr. Reidl, in addition to the items

11:59:16 25   that we just discussed, Hodell also is looking for the

1772

1    damages suffered for the lost return on investment, is

2    that correct?

3                    MR. STAR:  Objection.

4                    THE COURT:  Overruled.

11:59:36  5    Q.    You may answer.

6    A.    Yes.  When a business makes an investment, a

7    capital investment, it expects a return of that

8    investment.

9                    Typically, if you get a return on

11:59:51 10   investment in three to four years, it may be feasible to

11   do the project.  If it takes longer than that, you

12   typically don't make the investment.

13                    MR. STAR:  Your Honor, I object.  Can we

14   approach?

12:00:04 15                    THE COURT:  No.  You don't need to.

16                    Go ahead.

17   BY MS. LUARDE:

18   Q.    And, Mr. Reidl, in fact, SAP advertised that you

19   would receive a return on investment by using SAP

12:00:15 20   Business One, is that correct?

21   A.    Correct.

22   Q.    And did you actually calculate the lost return on

23   your investment?

24                    MR. STAR:  Objection.

12:00:25 25   A.    Yes, I did.

1773

1                        THE COURT:  Overruled.

2   Q.    Mr. Reidl, I'm putting in front of you Exhibit 625.

3                        MR. STAR:  We object before that even goes

4   up.

12:00:35  5                        THE COURT:  Because?

6                        MR. STAR:  May we approach?

7                        THE COURT:  Yeah.

8                        You know what?  It's 12:00 o'clock.  We

9   probably should go to lunch.

12:00:44 10                        What do you think?  1:15, is that okay

11   again?  Gives you -- did you try the cafeteria yet,

12   anybody?  How was it?  Tower City is better?  Yes.

13                        Does 1:15 give you enough time?  Okay.

14   Keep in mind the admonition.  Somebody should be opening

12:01:06 15   the door momentarily.

16                        See you at 1:15.

17                        (Jury out)

18                        (Side-bar conference had off the record).

19                        (Proceedings adjourned at 12:01 p.m.)

20                              - - - - -

21

22

23

24

25

1       WEDNESDAY, JUNE 24, 2015, 1:16 P.M.

2                   THE COURT:  Okay.  Be seated, folks.

3               Good afternoon.

4                   THE JURORS:  Good afternoon.

13:27:30  5         THE COURT:  You may continue.

6           DIRECT EXAMINATION OF OTTO REIDL (RESUMED)

7   BY MS. LUARDE:

8   Q.    Good afternoon, Mr. Reidl.

9   A.    Good afternoon.

13:27:37 10  Q.    Before we go on to the next damage component, I

11  just wanted to clean up one issue on this demonstrative.

12                  MS. LUARDE:  Your Honor, may I approach?

13                  Thank you.

14  Q.    Mr. Reidl, can you see on this demonstrative how we

13:28:20 15  have the red and the blue lines coming up and declining

16  shortly before the implementation of SAP Business One.

17  Do you see that?

18  A.    Correct.

19  Q.    Can you explain that for me?

13:28:32 20  A.    Yes.  We started experiencing expenses related to

21  the SAP implementation before we actually started or

22  turned the, you know, turned on the power to say.

23                  We had to make an investment.  The carrying

24  cost for that investment, we had substantial amount of

13:28:58 25  training in 2006.  We did testing.  And then we did more

1    training.

2    Q.    Thank you.  And I just want to make sure, I believe

3    this is clear, but this dotted line reflects the actual

4    go-live date on Business One, correct?

13:29:26  5    A.    Correct.

6    Q.    Thank you.

7              Mr. Reidl, before we broke for lunch, we

8    were just getting started on lost return on investment.

9              Do you recall that?

13:30:03  10    A.    Yes.

11    Q.    And could you tell me, Mr. Reidl, do you typically

12    calculate your return on investment when you purchase

13    something like an ERP system?

14    A.    Yes.

13:30:16  15    Q.    And that's something you do in your role as CEO of

16    the company?

17    A.    Correct.

18    Q.    And I believe you explained prior to lunch, but

19    just so you could refresh for us, what do you mean by

13:30:29  20    "Return on investment"?

21    A.    That's the present value of the improvement in

22    after-tax profit measured against the return on the

23    investment itself.

24    Q.    And, in fact, did SAP advertise that you would

13:30:58  25    receive a return on investment by using SAP Business One?

1    A.    Yes, they did.

2    Q.    And, Kim, could you put up Exhibit 38 for me,

3    please?

4              And, Mr. Reidl, we saw this document

13:31:21 5    throughout the course of this trial.

6              Do you recall that?

7    A.    Yes.

8    Q.    And could you tell me what this -- what this is?

9    A.    This is a document by SAP for SAP Business One, and

13:31:40 10   it shows a graph of investment cost and return, improved

11   product -- profitability and it shows a less than a

12   couple years' return; actually a few months.

13   Q.    And at the bottom of the page, you see it states,

14   at the very bottom, "The ROI calculator is a tool to help

13:32:11 15   you gauge the cost savings and revenue increases that

16   you'll gain with SAP Business One."

17              Do you see that?

18   A.    Yes, I do.

19   Q.    And that's what you mean by return on investment,

13:32:22 20   correct?

21   A.    Correct.

22   Q.    And, Mr. Reidl, did you prepare a calculation for

23   your return on investment?

24   A.    I did after-the-fact.

13:32:56 25   Q.    And could you describe generally how you performed

1        that calculation?

2        A.    I took a look at what the return on investment

3        would be, what kind of cost savings would have to be

4        achieved to provide a return on investment based on the

13:33:15  5   company's cost of capital over that five-year period.

6        Q.    And how much did you calculate Hodell lost as a

7        result of the failed implementation of Business One?

8                      MR. STAR:  Objection on multiple levels.

9                      THE COURT:  Overruled.

13:33:34 10   A.    $1.2 million, if it took five years to achieve the

11       return on investment.

12       Q.    Mr. Reidl, I'd like to move to the next damage

13       component.

14                      You're familiar with a company called PCBC,

13:33:58 15   correct?

16       A.    Correct.

17       Q.    What does that stand for, PCBC?

18       A.    Pacific Coast Bolt Corporation.

19       Q.    And could you tell me a little bit about who, who

13:34:13 20   is Pacific Coast Bolt Corporation, PCBC?

21       A.    That's a company located near Los Angeles,

22       California that is in the fastener distribution business.

23       They serve a number of markets, both geographically and

24       strategically of interest to our company, particularly

13:34:38 25   Waterworks, which is a growth industry in California, and

1    wind power.

2                    They do have some manufacturing

3    capabilities to produce stainless fasteners that are used

4    in the wind power industry.

13:34:55  5    Q.    And Hodell, could you tell us, are those part of

6    the reasons why you really wanted to acquire PCBC?

7    A.    Yes.  Among others, it was a very profitable

8    company.

9                    MR. STAR:  Objection.

13:35:11 10                   THE COURT:  You really didn't ask him that

11   question yet.

12   Q.    I'm sorry.  Could you repeat that answer?

13   A.    I said strategic --

14                   THE COURT:  Ask him a question.

13:35:21 15   Q.    Okay.  You had strategic reasons for acquiring

16   PCBC, is that correct?

17                   MR. STAR:  Objection.

18                   THE COURT:  Overruled.

19   A.    That is correct.

13:35:27 20   Q.    Could you tell me what they were?

21   A.    Market expansion into California, expansion into

22   several end-user markets, the wind power and waterworks

23   area, and an expansion in higher grade fasteners.  And it

24   would have enabled us to provide sales management

13:35:51 25   coverage for all of California.

1           We currently serve the northern California

2       market from our Reno facility.

3       Q.    And historically, could you describe how Hodell has

4       actually grown over time?

13:36:14 5   A.    Yes.  We've done 13 acquisitions through the year

6       2006 from our inception.  That's approximately 1.7

7       acquisitions -- one acquisition every 1.7 years.

8           Approximately a little over two-thirds of

9       our profitability and sales growth comes from the

13:36:43 10  acquisition segments side of our activity.

11      Q.    And, Mr. Reidl, you've just described 13 different

12      acquisitions.

13          Were you personally involved in those

14      acquisitions?

13:36:56 15  A.    I played the key role in each one of those.

16      Q.    And could you tell me what you do in that process?

17                MR. STAR:  Objection.  Relevancy.

18                THE COURT:  Overruled.

19                MR. STAR:  He's not here as an expert.

13:37:11 20  A.    I played a lead role in the due diligence, which is

21      gathering all information we can on the profitability, on

22      the products, the customers, the markets served, the

23      actual facilities, their -- the condition of their

24      inventory, the health of their customer base.

13:37:34 25          Basically what I'm talking about there is

1    the, first of all, the growth rate that the company

2    experienced over the previous five years; the -- any

3    large customers lost during the last couple of years; any

4    large customers added during the last couple of years to

13:37:52  5    get a feel for how they're doing.

6    Q.    So you take a pretty hard look at each of these

7    acquisitions, correct?

8    A.    Yes, we do.  We look at all their financial

9    records, including their tax returns.

13:38:04 10    Q.    And since you started using SAP Business One, how

11    many acquisitions have you had at Hodell?

12    A.    Zero.

13    Q.    And with regard to PCBC, where were you in the

14    process when you started using Business One?

13:38:38 15                    MR. STAR:  Objection.  Foundation.

16                    THE COURT:  Overruled.

17    A.    After the signing of the letter of intent, we

18    started after the due diligence work, we worked on the

19    development of the purchase agreement, and that was to

13:38:59 20    close already set up for April 30th, 2009.  We had agreed

21    to the seller's redline changes to the final purchase

22    agreement.  We were ready to sign.

23    Q.    And, Mr. Reidl, if I direct your attention to

24    Exhibit 601.  And, Kim, that would be Page 2 of that

13:39:28 25    document.

1    A.    Okay.

2    Q.    And, Mr. Reidl, you just discussed the asset

3    purchase agreement in your comments.

4              Is this what you were referring to?

13:39:55  5    A.    This is the e-mail from the owner, Mr. Leroy

6    Gardner, on his final comments, and attached was the

7    asset purchase agreement with their redline markups.

8    Q.    Okay.  And just so it's a little easier,

9    Mr. Reidl --

13:40:22 10              MS. LUARDE:  May I approach the witness?

11   Thank you.

12   Q.    And, Mr. Reidl, is that the asset purchase

13   agreement that you were discussing?

14   A.    Correct.

13:40:48 15   Q.    And how long is that document?

16   A.    53 pages.

17   Q.    Okay.

18   A.    That's with the red-lining.

19   Q.    Okay.  So what was left after this red-lining

13:41:12 20   process, Mr. Reidl?

21   A.    I'm sorry?

22   Q.    After this red-lining process, what was left to do

23   with PCBC to finalize the deal?

24   A.    Sign, have it -- well, we had to have our attorney

13:41:26 25   print the final document with the red lines accepted, and

1782

1     we were then going to schedule a signing in Los Angeles

2     for April 30th.

3     Q.    But this transaction did not go through, is that

4     correct?

13:41:51  5   A.    That is correct.

6     Q.    What happened?

7     A.    With the loss in productivity, the extra investment

8     in a new replacement software package, and the increased

9     carrying cost of our debt, we ran out of cash.

13:42:16  10  Q.    And so you were not able to finalize the deal?

11    A.    That is correct.

12    Q.    And as part of the due diligence, you reviewed

13    multiple documents from PCBC, is that correct?

14                  MR. STAR:  Objection.  Hearsay.

13:42:42  15                  THE COURT:  You can answer that yes or no.

16                  THE WITNESS:  I can answer?

17    A.    Yes.  We reviewed four years of tax returns,

18    internal financial statements.  We did a week's worth of

19    due diligence at their facilities.  In -- as I enumerated

13:43:08  20  before, we looked at their inventory, the facility, the

21    lease arrangements, the ability to extend the lease.  We

22    looked at the employees, their capabilities, the talents

23    involved.

24                  We analyzed their customer base, the turns

13:43:27  25  on inventory, the condition of their equipment.  I played

1   a lead role.  There were five of us there for a week.

2   Q.   And, Mr. Reidl, if I could direct your attention to

3   Exhibit 628.  And you'll see up on the screen will be the

4   first page.

13:43:45 5            MR. STAR:  Object.  We object to this, Your

6   Honor.  It's hearsay.

7            THE COURT:  Objection sustained.

8   BY MS. LUARDE:

9   Q.   Mr. Reidl, did you prepare a calculation of losses

13:44:00 10   sustained by Hodell as a result of the failure to acquire

11   PCBC?

12   A.   I did.

13            MR. STAR:  Objection.  Calls for an expert

14   opinion.

13:44:13 15            THE COURT:  Objection sustained.

16   BY MS. LUARDE:

17   Q.   And, Mr. Reidl, with regard to the 13 acquisitions

18   that you handled, was it your practice to determine how

19   profitable that acquisition would be for Hodell?

13:44:23 20   A.   We did that with every single acquisition, looking

21   at their history and then the projection under our own

22   operation.

23   Q.   All right.  And, Mr. Reidl, in your role as CEO at

24   Hodell, did you do that same calculation for PCBC?

13:44:49 25   A.   I did.

1          MR. STAR:  Objection.  Calls for a legal

2     opinion.

3          THE COURT:  Objection sustained.

4     Q.   Mr. Reidl, I'd like you to turn to the next damage

13:45:07  5     calculation, which is increase interest expense on debt.

6          Could you tell me what you mean by that?

7     A.   That's the increase in interest as a result of the

8     SAP Business One implementation, looking at what our

9     interest cost was relative to sales level before and what

13:45:35 10     it was afterwards.

11     Q.   And could you tell me why -- why did you have these

12     increased costs?

13          MR. STAR:  Objection.  Foundation.

14          THE COURT:  Overruled.

13:45:55 15     A.   We had increased debt resulting from the

16     productivity effect.  We had increased debt from the

17     replacement software cost.

18     Q.   And --

19     A.   And we had an increase in our borrowing -- the

13:46:21 20     premium over the base borrowing rate, based on the fact

21     that we were at the low end of our covenant compliance.

22     Q.   And, Mr. Reidl, I'm going to put in front of you

23     Exhibit 607, which are -- we looked at before.  Those are

24     your audited financial statements, is that correct?

13:46:45 25     A.   That's correct.

```
 1              MS. LUARDE:  May I approach, Your Honor.

 2              THE COURT:  You may.

 3              MS. LUARDE:  Thank you.

 4      BY MS. LUARDE:

 5      Q.    And, Mr. Reidl, did you perform a calculation to

 6      determine your increased cost due to interest on debt?

 7              MR. STAR:  Objection.

 8              THE COURT:  Overruled.

 9      A.    Yes, I did.

10              I -- I compared interest cost at a given

11      level of sales for the period before, three years before

12      SAP implementation, and the first full year not on SAP.

13      And the interest cost as a percent of sales for the

14      three-year period before and the immediate one year

15      after, when applied to the sales numbers, indicated the

16      excess interest we had to carry under the SAP use.

17      Q.    And what was that number?

18              MR. STAR:  Objection.

19              THE COURT:  Overruled.

20      A.    Five -- it was between 498 and 574,000, $550,000.

21      Q.    And you relied on the financial documents before

22      you in preparing that calculation, is that correct?

23      A.    That is correct.

24      Q.    Is the failed Business One implementation still

25      affecting Hodell-Natco today?
```

1           MR. STAR:  Objection.

2           THE COURT:  Objection sustained.

3    Q.    Mr. Reidl, you testified earlier that there was a

4    decrease in productivity at Hodell from the 2002-2006

13:49:02  5    time period as compared to '07 to '08.

6              Do you recall that testimony?

7    A.    Yes, I do.

8    Q.    What changed at Hodell between those two time

9    periods?

13:49:11 10    A.    SAP Business One.

11    Q.    And are you aware of anything else that would have

12    impacted Hodell's productivity during this time?

13    A.    No.

14    Q.    Well, what about the economy?  Wouldn't that have

13:49:26 15    an effect on productivity?

16    A.    No, because I was looking at the pounds we actually

17    shipped.

18    Q.    And so are you saying that the economy doesn't have

19    anything to do with your efficiency?

13:49:41 20    A.    It has nothing to do with the productivity.

21    Q.    And, Mr. Reidl, we also looked at a big stack of

22    invoices.

23              Do you recall that?

24    A.    Yes.

13:49:54 25    Q.    And I'm -- that was Exhibit 606.

1       And, Mr. Reidl, some of these invoices were

2   not paid to SAP, and could you explain to the jury why

3   some of these invoices are not SAP payments?

4   A.    Because we purchased SAP Business One through LSi,

13:50:27 5   a channel partner.

6           MS. LUARDE:  Your Honor, may I approach on

7   an issue?

8           THE COURT:  You may.

9           MS. LUARDE:  Thank you.

13:50:50 10          (Side-bar conference had off the record).

11          MS. LUARDE:  Okay.  Mr. Reidl, that's all I

12   have for you at the moment.

13          Thank you.

14          THE COURT:  Thank you.

13:51:53 15          You may cross-examine.

16          MR. STAR:  Thank you, Your Honor.

17           CROSS-EXAMINATION OF OTTO REIDL

18   BY MR. STAR:

19   Q.    Good afternoon, Mr. Reidl.

13:53:36 20   A.    Good afternoon.

21   Q.    Sir, let's begin talking about some of the supposed

22   damages numbers that you were talking about, and then

23   we'll later get through some of the other topics that you

24   started with.

13:53:49 25          The first thing that you talked about was

1    what you, as I understood, you said was an increased

2    overhead cost you said you had during the time you ran

3    Business One, is that correct?

4    A.    Correct.

13:54:06  5    Q.    And as I understood you, you offered a calculation

6    where you suggested that prior to running Business One,

7    you had something like 163.7 employees, but during the

8    time you ran Business One for two years, you had 184

9    employees, is that what you said?

13:54:29 10    A.    I don't have that slide in front of me, but --

11    Q.    Let's make sure you've got the documents?

12          MR. STAR:  Do you mind if I approach, Your

13    Honor?

14          THE COURT:  Go ahead.

13:54:41 15          THE WITNESS:  Those are from our --

16          MR. STAR:  Yeah, you were referring to one

17    of them, right, for your numbers?  Do you have Exhibit 25

18    up here?

19          MS. LUARDE:  Greg, do you need it?

13:54:51 20          MR. STAR:  Yes, please.

21    BY MR. STAR:

22    Q.    This was the one you were referring to for your

23    numbers?

24    A.    Correct.

13:55:02 25    Q.    So your calculation was that you had 163.7 people

1    during the period you ran FACTS, but while you ran

2    Business One for two years, you had 184.36, is that what

3    you said?

4    A.    Correct.

13:55:25  5    Q.    Now, Judge Nugent asked you some questions about

6    how many actual employees you had each year where you

7    were running FACTS or Business One.  Do you remember

8    that?

9    A.    Can you refresh my memory?

13:55:40 10    Q.    Sure.  Let's just make sure we all understand.

11             When you say you had 163.7 people while you

12    were running FACTS before Business One, to get to that

13    number, you've actually done an averaging over a period

14    of five years, right?

13:55:58 15    A.    That is correct.

16    Q.    Okay.  The last full year that you ran FACTS was

17    what year, sir?

18    A.    I averaged it through February of 2007.

19    Q.    Sir, sorry, just to be clear, what was the last

13:56:14 20    full year that Hodell ran the FACTS system before you

21    went to Business One?

22    A.    2006.

23    Q.    Okay.  Tell us, sir, how many employees did Hodell

24    have in 2006?

13:56:28 25    A.    186.2.

1    Q.    Okay.  And how many employees did Hodell have in

2    2007?

3    A.    184.3.

4    Q.    And in 2007, you switched from FACTS to Business

13:56:44  5    One, correct?

6    A.    Correct.

7    Q.    So you'd agree with me from the last full year that

8    you ran FACTS in 2006 to the first year you began running

9    Business One in 2007, you actually decreased by almost

13:57:03 10    two full people over the course of the year, right?

11    A.    That is correct.

12    Q.    Okay.  And how many employees did you have in 2008?

13    A.    184.3.

14    Q.    In 2008 was the number?

13:57:23 15    A.    Pardon?  2008 you asked me?

16    Q.    Yes, sir.

17    A.    Correct.

18    Q.    Okay.  So again, well, 2008, that was the only

19    calendar year you actually ran -- the full calendar year

13:57:36 20    you actually ran Business One, correct?

21    A.    Correct.

22    Q.    I'd like to put a demonstrative up and have you go

23    through it with me if you don't mind.

24             I'm happy for you guys to see it first if

13:57:58 25    you'd like to.

1791

```
 1              MS. LUARDE:  Sure.
 2              THE COURT:  Are you folks marking any of
 3    these demonstrative exhibits?
 4              MR. STAR:  I may.  I may well mark these as
 5    exhibits, Your Honor.
 6              THE COURT:  Okay.  Because sometimes we say
 7    at the end of the case, you see a lot of these
 8    demonstrative exhibits, you don't get them in the back
 9    because they just mark them for the purpose of the
10    witness.
11              Sometimes you get them; sometimes you
12    don't.  Sometimes it's up to the lawyers; sometimes it's
13    up to me.
14    BY MR. STAR:
15    Q.    Mr. Reidl, are you able to see this, sir?
16    A.    Yes, I am.
17    Q.    It's on the screen as well?  Okay, great.
18              Sir, you'd agree with me that in the year
19    2002, you ran the FACTS software, correct?
20    A.    In 2002, correct.
21    Q.    And from your own business records, you had gross
22    sales of $24.8 million?
23    A.    Correct.
24    Q.    And you had a total labor force, including both
25    full-time and temporary employees, of 141.3 people,
```

1    right?

2    A.    Correct.

3    Q.    Okay.  And if you look at the numbers we have for

4    2003, 2004, 2005, 2006, those are years that you ran the

13:59:52  5    FACTS software, correct?

6    A.    2002 through 2006, we were in FACTS.

7    Q.    Okay.  And between the period of 2002 through the

8    end of 2006, Hodell actually increased its labor force by

9    over 40 total people, right?

14:00:12 10    A.    Correct.

11    Q.    In fact, from 2002 you went from having 141.3

12    people to having 186.2 at the end of 2006, correct?

13    A.    Correct.

14    Q.    And you'd agree with me that those increases in

14:00:32 15    employees happened irrespective of Business One; you were

16    not running Business One, right?

17    A.    Correct.

18    Q.    So Business One, we can agree --

19    A.    With one minor exception.

14:00:44 20    Q.    Go ahead.

21    A.    Okay?  In 2006, we did extensive training and

22    testing, okay, which means that we were adding work to

23    the existing force.

24    Q.    I'm only asking about the number of people, okay?

14:01:02 25    We'll get into --

1     A.    Correct.

2     Q.    -- some of the other details later.

3                   We can agree, though, that the number of

4     people, the change from 2002 to the end of 2006, was due

14:01:13  5     to factors that had nothing to do with Business One or

6     SAP, correct?

7     A.    Could you repeat that question, please?

8     Q.    Sure.  Let's just break it down, okay?

9                   We agree that in 2002, for instance, you

14:01:27 10     had 141.3 people?

11     A.    That I agree with.

12     Q.    And then each year you moved up; you went to 142.4

13     in 2003?  Do you see that?

14     A.    I -- yes.  Okay.

14:01:43 15     Q.    And that change had nothing to do with Business

16     One, of course?

17     A.    Correct.

18     Q.    And then you went from 142.4 to 160 people?

19     A.    Correct.

14:01:51 20     Q.    In 2004?

21     A.    Correct.

22     Q.    That change had nothing to do with Business One?

23     A.    Correct.

24     Q.    And then from '04 to '05, you added 8.8 more

14:02:02 25     people; that also had nothing to do with Business One,

1    right?

2    A.    A certain amount of our time was already devoted to

3    the implementation.

4    Q.    I --

14:02:13    5    A.    In '05.

6    Q.    Are you saying --

7    A.    They were already --

8    Q.    Sorry, go ahead.

9    A.    LSi was doing development, and we were being asked

14:02:20   10    to answer some questions and update, being updated on

11    their progress.

12    Q.    Okay.  I understand what you're saying is that you

13    spent some of your time perhaps interacting with the

14    folks at LSi and IBIS.

14:02:34   15              My question's different, though.  We're

16    talking about actually bringing, physically bringing a

17    new person on board.

18              You went from 160 people in '04 to 168.8 in

19    2005.  That increase of 8.8 people had nothing to do with

14:02:50   20    SAP or Business One, we can agree on that, right?

21    A.    That's close.

22    Q.    Well, can you identify a person that you hired

23    because of Business One?

24    A.    No.  We have a certain amount of work to do.  When

14:03:03   25    you add some tasks that don't have to do with the sales

1795

```
           1    currently for some future implementation of software,
           2    that takes time that's not being devoted to the sales
           3    that are occurring.
           4    Q.    We're going to talk about -- we're going to talk
14:03:20   5    about the amount of time that Hodell's workforce actually
           6    spent working.
           7    A.    Sure.
           8    Q.    What I'm asking you here is simply, you'd agree
           9    that your total employees, those are the actual people
14:03:29  10    that work for you, that show up and work in your
          11    warehouse or in your office, yes?
          12    A.    Yes.
          13    Q.    And we can agree that this change of adding 8.8
          14    people from '04 to '05, you didn't add anybody because of
14:03:44  15    Business One, right?
          16    A.    That is correct.
          17    Q.    Thank you.
          18                And the same is true from '05 to '06, you
          19    didn't add anybody because of Business One?
14:03:53  20    A.    No, that's not -- no longer correct.
          21    Q.    Well, identify for me right now even one particular
          22    person that you hired during the period of '05 to '06
          23    because of Business One.
          24    A.    Okay.  We didn't provide any exhibits.  We hired 33
14:04:08  25    people during that year.
```

1    Q.    You had an acquisition that you made that year,

2    right?

3    A.    Yeah.  Yeah.  In --

4    Q.    Correct?

14:04:13  5    A.    In '07 we hired 33 people during the time of

6    this --

7    Q.    Sir, let's stick with where we are, okay?

8    A.    Okay.

9    Q.    Can you see this well enough?

14:04:23 10    A.    I can see it, yes.

11    Q.    Okay.  And we have it on the screen in front of

12    you?

13    A.    Yes.

14    Q.    You testified earlier that in 2006, you had an

14:04:37 15    acquisition, brought in more people through an

16    acquisition.

17              That had nothing to do with Business One,

18    correct?

19    A.    Correct.

14:04:42 20    Q.    Okay.  Thank you.

21              So an increase in your head count between

22    '05 and '06 happened, but it didn't have anything to do

23    with Business One; you weren't even running that

24    software, yes or no?

14:04:56 25    A.    That's not correct.

1    Q.    Identify for us right now even one person by name

2    that you hired between '05 and '06 because of Business

3    One.

4    A.    We have a workload.  If work needs to get done, or

14:05:13 5   if it's in the warehouse or in the office, you then add

6    people.

7              I don't say it's we hired you because we

8    have to devote some of our time to the implementation or

9    training of SAP Business One.

14:05:28 10             That's not how you function.

11   Q.    In 2006, sir, you were not running SAP Business

12   One, were you?

13   A.    In 2006, we weren't running it, but we were

14   testing.

14:05:36 15  Q.    You were testing?

16   A.    And training, lots of training.

17   Q.    Sir, we've been through this.

18             You don't have a single exhibit, a

19   document, a payroll stub, a list of employees, anything

14:05:47 20  like that where you can identify for us even a single

21   person by name that you hired because of Business One,

22   can you?

23   A.    Because of Business One?  For what period?

24   Q.    Any period.

14:06:03 25  A.    Any period?

1     Q.     You're not able to identify even a single person by
2     name, are you?
3     A.     We didn't submit those exhibits, but we --
4     Q.     Thank you.
14:06:12 5     A.     -- hired 33 people in '07, from March to the end of
6     the year, and we hired 36 people in '08.
7     Q.     Well, let's look at your numbers.  It's right there
8     on the chart.
9     A.     We had turnover -- okay.
14:06:24 10     Q.     Sir, let's look at the numbers.  Let's look at the
11     numbers.
12            You've told this jury today that to get to
13     your increased overhead number, which I think you told
14     them was something like $2.6 million, you had two
14:06:38 15     variables, right?
16            They -- well, let me break it down for you.
17     A.     Yeah.
18     Q.     You told this jury that you had 27.6 additional
19     people and then you multiplied that by, I think what you
14:06:51 20     said was $45,913 per person to come out to 2.6 million?
21     A.     No, I didn't say that.  What I said was I found out
22     the monthly cost for that 45,000, so you get the one
23     month cost times the number of extra employees, times the
24     25 months.
14:07:11 25     Q.     Okay.

```
          1              In any event, we'll break that down
          2     further.  To come out to any number, you have to tell
          3     this jury that you actually had extra employees, don't
          4     you?  That's part of your formula?
14:07:26  5     A.    We had the same, almost the same number of people
          6     to ship a lot fewer pounds.  Productivity on our
          7     operation.
          8     Q.    Sir --
          9     A.    -- is measured by pounds per employee per year.
14:07:40 10     We've done that forever.
         11     Q.    Let me go back.  I am trying to find out.
         12              Are you telling this jury right now as you
         13     sit there that Hodell actually hired 27.6 additional
         14     people, or are you willing to concede that you did not
14:07:54 15     hire anybody additionally?  It's right there in your
         16     records.
         17     A.    Let me restate what I said.
         18     Q.    Sir.  I just need an answer to my question.
         19              Which is it?  Did Hodell actually hire
14:08:09 20     people or did you not actually hire people?
         21     A.    We hired people.
         22     Q.    Who are they?
         23     A.    I don't have them on top of my head.  We hired 33
         24     people during the period March 1st to the end of 2007,
14:08:25 25     and we hired 36 people January 1st to December 31st,
```

1800

1    2008.  And we hired four people in the first three months

2    of '09.

3    Q.    Sir, do you remember we discussed this at your

4    deposition back in February of 2012?

14:08:50 5    A.    Yeah.

6    Q.    Okay.

7              MR. STAR:  Do we have a copy of his

8    transcript?

9    A.    Okay.

14:09:23 10   Q.    Sir, go to Page 423, please.  Actually, I'm sorry,

11   start on Page 422, Line 15?

12   A.    423?

13   Q.    422 first, Line 15.

14   A.    Okay.

14:09:49 15   Q.    I asked you the question:  "Now, can you pinpoint

16   any human beings that you added because of the SAP

17   implementation and problems?"

18              Your answer:  "I just look at the total

19   employment for a given pound of sales.

14:10:04 20             "Question:  Okay.  So do you have a list

21   someplace of, well, this person we had to hire because of

22   bad productivity?"

23              Your answer was no.

24              Do you see that?

14:10:16 25   A.    Can you point me to the line number?

1    Q.    Sure.  I'm between Lines 15 and 23 on Page 422.

2    A.    Okay.

3    Q.    I read that correctly, didn't I?

4    A.    Could you read it again?

14:10:32  5    Q.    Sure.  I asked you:  "Can you pinpoint any human

6    beings that you added because of the SAP implementation

7    and problems?"

8              Your answer:  "I just look at the total

9    employment for a given pound of sales.

14:10:48  10              "Question:  Do you have a list someplace of

11    well, this person we had to hire because of bad

12    productivity?

13              "Answer:  No."

14              Do you see that?

14:10:57  15    A.    That is correct, I don't have the list, but we

16    hired --

17    Q.    Sir, and I asked you those questions over three

18    years ago in 2012, right?  February, 2012 we went over

19    that?

14:11:09  20    A.    Correct.

21    Q.    And in the last three years, you've never come up

22    with a list, you've never come up with a single name, a

23    payroll stub or anything of any person that you believe

24    you hired, true?

14:11:26  25    A.    We have not submitted it to you.  I have such a

1    list.

2    Q.    And then I asked you -- go to Page 423.  Go to

3    Page 423, please.  I'm sorry.  Did I just hear you say

4    that you do have a list?

14:11:43  5    A.    Yes.  I don't have it with me.

6    Q.    Well, I --

7    A.    But --

8    Q.    Sir, go back to the question on 422.

9              "Question:  Do you have a list someplace?

14:11:54  10              "Answer:  No."

11   A.    At that time I did not.

12   Q.    So you've since created a list, but you didn't

13   bother to give it to us?

14   A.    I asked our HR department, because you asked this

14:12:05  15   question, to see --

16   Q.    Sir, my question -- my question is a yes or no.

17              You were asked about a list, but you

18   haven't given us a list, have you?

19   A.    That is correct.

14:12:17  20   Q.    Go to Page 423, Line 6.

21              "Question:  Okay.  But no specific person

22   or position that you can point to and say we had to hire

23   this person because of SAP, is that correct?"

24              Your answer:  "Not from this information.

14:12:40  25              "Question:  I'm talking about from any

1    information?

2              "Answer:  Okay."

3    A.    Sir, you're going too fast.

4    Q.    I'm sorry.

14:12:48  5    A.    I don't even know what line you're on.

6    Q.    423, Line 6 I started at.  Shall I do it again?

7    A.    Yes.

8    Q.    "Question:  Okay.  But no specific person or

9    position that you can point to and say we had to hire

14:13:02  10   this person because of SAP, is that correct?"

11             Your answer:  "Not from this information.

12             "Question:  Well, I'm talking about from

13   any information now."

14             Your answer:  "Okay.  We may have somewhere

14:13:19  15   said we've got to add a couple people in the warehouse,

16   we're not keeping up."

17             That was your answer back then, wasn't it,

18   sir?

19   A.    That's what it says here.

14:13:28  20   Q.    And you haven't even given us the names of the

21   couple of people that you think you may have had to add

22   in the warehouse because of Business One, have you?

23   A.    Could you ask that question again?

24   Q.    You've not even given us the names or payment

14:13:46  25   information or dates of hire or any personnel information

1    for even the couple of people that you think may have

2    been added in the warehouse because of Business One; yes

3    or no?

4    A.    That's an answer, a net number of people we hired.

14:14:05  5    We always have some people terminating.

6    Q.    Sir, yes or no, have you produced a single record

7    in the eight years, seven, eight years we've been

8    litigating this case, that identifies in any way, shape,

9    or form even these couple of people that you believe may

14:14:26 10    have been hired in the warehouse because of Business One?

11    A.    We have not submitted it.

12    Q.    Okay.  And you came to a total figure of increased

13    overhead costs because of so-called extra employees who

14    you can't identify, and you came out to a number of 2.6

14:14:47 15    million, right?

16    A.    You -- that's -- you're making a statement and a

17    question.

18    Q.    Is that what you came out to?  Was that what the

19    number was that you told the jury, 2.6 million?

14:14:59 20    A.    I said the productivity --

21    Q.    Sir, did you tell the jury $2.6 million because of

22    what you called increased overhead due to extra

23    employees, yes or no?

24    A.    Yes.

14:15:08 25    Q.    And from all that we've gone through, the most

           1    specific that you've ever been able to get was back at

           2    your deposition in February, 2012, where you said you

           3    might have had to add a couple people in the warehouse.

           4                You didn't pay those couple people a total

14:15:25   5    of $2.6 million, did you; yes or no?

           6    A.    We're talking about the number --

           7    Q.    Yes or no?

           8    A.    That is an absurd question.

           9    Q.    Because it didn't happen, did it?  Did it?

14:15:43  10    A.    We hired --

          11    Q.    Did it happen or did it not happen?

          12    A.    What?

          13    Q.    Did you actually hire anybody in your warehouse?

          14    A.    Yes, we did hire people in the warehouse.

14:15:52  15    Q.    And you agreed with the numbers we've got there on

          16    the demonstrative, right?  Those are accurate employment

          17    statistics for Hodell for the period of 2002 through

          18    2008?

          19    A.    Correct.

14:16:09  20    Q.    Okay.  Sir, we've gone through this a bunch of

          21    times, and you've just said again you actually hired

          22    people, but let's just be clear.

          23                I'll just do it again.  You can't even give

          24    us a single name, even though you've been litigating this

14:16:33  25    case since 2008, you can't even tell us the name of a

1        single person that you hired?

2        A.    No, I didn't say that.

3        Q.    You've never given us a record, you've never given

4        us a name, you've never given us a date of hire, have

14:16:46 5    you?

6        A.    I haven't given you the record.  You asked another

7        question.  I can't name a single person.

8        Q.    You've never identified a single person before,

9        have you?

14:16:54 10   A.    That is correct.

11       Q.    Okay.  Let alone 26, 27.6 additional people, you've

12       not identified them, have you?

13       A.    I'm sorry, I couldn't make out what you said.

14       Q.    You've not identified the 27.6 additional people

14:17:12 15   you claim you had to hire, have you?

16       A.    We're talking about extra people we had to ship

17       fewer pounds.

18       Q.    Sir, my question was simple.

19             I think we can agree you have never

14:17:34 20   identified the names, dates of hire, payment information,

21       or anything about any of these so-called 27.6 additional

22       people; it just hasn't happened, has it?

23       A.    It has happened.

24       Q.    You've produced to us that information?

14:17:54 25   A.    No.  No.  But you said you can't prove any --

```
 1    Q.    That is not what I said.
 2    A.    Okay.
 3    Q.    I need you to -- I asked you if you have identified
 4    that information.  I think it's established that you
 5    haven't.
 6                    We can agree on that, right?
 7    A.    Say that again, please.
 8    Q.    We can agree that you have never, even throughout
 9    your testimony this morning, identified any information
10    at all about even a single one of the supposed 27.6
11    additional people you say you had to hire, right?
12    A.    I said we had them employed to ship fewer pounds.
13    Q.    You're just refusing to answer my question?  I'm
14    asking you very specifically.  This is very simple, sir.
15    I'll try it just one more time and see if we can get an
16    answer.
17                    You can agree with me that you have never,
18    even today, identified a single bit of information about
19    any one of the supposed 27.6 additional people you claim
20    you hired because of Business One?  We can agree on that,
21    right?
22    A.    Not in the way you're asking it.
23    Q.    Okay.  You talked about your supposed annual cost
24    per employee.  Do you remember that?
25    A.    Yes.
```

1808

1    Q.    And I think the number you came out with was

2    $45,914 per employee, is that what you came out to, sir?

3    A.    Correct.

4    Q.    And to get to the ultimate figure of 2.6 million

14:20:09  5    that you provided to the jury, you did a calculation,

6    right?

7    A.    Correct.

8    Q.    And let's just establish something, you're not a

9    damages expert, right?

14:20:22 10    A.    That is correct.

11    Q.    You're not an economist?

12    A.    I'm not an economist.

13    Q.    Your training, education, does not include training

14    as an accountant or anything like that, right?

14:20:41 15    A.    No, I never said that.  I had accounting training.

16    Q.    I didn't say you said it.  I'm just asking you to

17    confirm it, sir.

18          Am I right that you have no formal

19    education as an accountant?

14:20:59 20    A.    I'm not a formal accountant.

21    Q.    Thank you.

22          I'd like to find out how exactly you came

23    out to the number of 45,000.

24          Am I correct that what you did was you took

14:21:53 25    your total labor and staff cost and divided it, simply

1809

1   divided it by the total number of people that you had?

2   A.   I'm sorry, could you say that more slowly?

3   Q.   Sure.  I'm trying to figure out, so the jury

4   understands, how you came to the number of $45,000 as

14:22:18 5   being your average cost per employee, okay?

6   A.   Correct.

7   Q.   What I understand, and you tell me if I've got this

8   right or if I have it wrong, what I understand you to

9   have done was to take your total cost for employees and

14:22:33 10   everybody else, yourself and your son Kevin and Mr. Rex

11   and so on, you took all of those costs, that total, and

12   you simply divided it by the total number of people, is

13   that right?

14   A.   Averaged over the time period.

14:22:47 15   Q.   Averaged over the time period?

16   A.   Yes.

17   Q.   So the $45,000 figure that you came out with was

18   not even an average cost for the supposed 27.6 additional

19   people, it was an average cost for everybody who works at

14:23:07 20   Hodell, including you?

21   A.   Correct.

22   Q.   Okay.  And how much do you make a year, sir?

23   A.   Am I required to say that?

24          MS. LUARDE:  Objection.

14:23:19 25          THE COURT:  Overruled.

1810

1    A.    Okay.  120,000 approximately.

2    Q.    Is that salary or total compensation?

3              MS. LUARDE:  Objection.

4              THE COURT:  Overruled.

14:23:29  5    A.    That's my salary, total compensation.

6    Q.    Okay.  And was that the same number in 2007 and

7    2008, sir?

8    A.    Boy, probably, but I -- I don't remember exactly

9    how much I made then.

14:23:46 10              I took a pay cut in '09 of 20%, I believe,

11    so it would have been a little more.

12    Q.    Back in 2007 and 2008, how much on average did you

13    pay a person who worked in your warehouse, for instance?

14    A.    I'd have to -- the backup sheets for this document,

14:24:08 15    the Schedule 24, provide the warehouse employment and the

16    warehouse cost is on here.  I could calculate it.

17    Q.    Well, your Exhibit 24, do you have it in front of

18    you, sir?

19    A.    I don't have it in front of me.

14:24:24 20              MR. STAR:  Can we give him another copy?

21    Q.    Instead of trying to do a calculation which is

22    going to take us too much time, let me just try to cut to

23    the chase.

24    A.    Can you?

14:24:46 25    Q.    Yeah.  Let me try to cut to the chase.

1                    We can agree that you, when you made the

2        salary that you indicated, were making more than what you

3        paid people who worked in the warehouse, correct?

4        A.    Correct.

14:24:56  5    Q.    Okay.  Yet, when you gave the calculation to the

6        jury here of $2.6 million, you took the supposed 27.6

7        additional employees who you haven't identified and you

8        multiplied them by your total average costs, including

9        what you and other executives were paid, right?

14:25:17 10    A.    Correct.

11       Q.    So you've made no effort whatsoever to even

12       identify the 27.6 people, right?  We've been through

13       that?

14       A.    I looked at the --

14:25:33 15    Q.    Sir?

16       A.    I don't have specific names.

17       Q.    Thank you.  Nor did you pull out specific pay

18       information for those people to tell us actually what

19       amount you may have even paid those people who you're now

14:25:43 20    telling the jury were hired because of Business One,

21       right?

22       A.    I used the average cost per employee.  They're all

23       required to run the company.

24       Q.    I'll keep at it then.

14:26:04 25                    Let's be clear on what you're telling this

1812

1    jury.  You're telling this jury you hired additional

2    people, right?

3    A.    Correct and --

4    Q.    Sir, I'm about to --

14:26:21  5    A.    We had to hire people to replace people that left

6    during this period.

7    Q.    You're saying -- sir --

8    A.    And the net result was --

9    Q.    Sir, that's not responsive to any question I asked.

14:26:29  10            You're saying you hired additional people

11    but you're not telling us who they were or what you paid

12    those additional people, correct?

13    A.    I had not presented that document to you.

14            MR. STAR:  Your Honor, may I approach?

14:26:47  15    Your Honor?

16            THE COURT:  The witness or up here?

17            MR. STAR:  You.

18            (Side-bar conference had off the record)

19            THE COURT:  Remember the O.J. Simpson case?

20    You all remember.  Yeah, who remembers the case?  Oh,

21    really?

22            Well, okay, you're showing your age.  Yeah,

23    I know.

24            See, it happens all the time, they're at

25    the side, and the Judge steps out, that was a very bad

1    exposition for the justice system, in particular the

2    judiciary, demonstrating the Judge was clueless.  And

3    that was bad.  That is bad for the system.

4                But we do have side-bars for a reason.  We

14:31:52  5    talk about legal issues, and rather than adjourn Court

6    and do it in open Court, we do it at the side.  So we're

7    talking about legal things and not factual things, so

8    it's not for your concern.

9                So if you overhear something or people get

14:32:05  10    animated, that's natural how that happens.

11                So when I was a lawyer, I always used to

12    get a kick out of this so that's why I like saying it as

13    a Judge because the Judge used to always tell the jurors,

14    "Now, we're not trying to hide anything from you."  And

14:32:18  15    as a lawyer, I used to kind of scratch my head, that's

16    exactly what we're doing.

17                So we are hiding the law from you, but so

18    don't be concerned about it.  All right?

19                You may continue your questioning.

14:32:30  20                MR. STAR:  Thank you, Your Honor.

21    BY MR. STAR:

22    Q.    Mr. Reidl, just to round out this exhibit, you

23    agree with me that the numbers up on this exhibit are

24    accurate, correct?

14:32:41  25    A.    The gross sales are correct and the total

1814

1    employment is correct.

2    Q.    Okay.

3              MR. STAR:  We'd like to mark this as the

4    next Defendant's exhibit.  I think it's 909.  Do you mind

14:32:58 5    writing on that, Alex, Joe?

6    BY MR. STAR:

7    Q.    Sir, back to some of your testimony from earlier,

8    you testified that in your view, your records show that

9    Hodell shipped fewer pounds per hour worked or total

14:33:29 10    pounds over the course of the time you ran Business One

11    than in prior years, right?

12    A.    No, I didn't state that.

13    Q.    Okay.

14    A.    I said per employee.

14:33:38 15    Q.    Per employee.

16    A.    The -- the hours that are on the Exhibit 24 are

17    just for the warehouse hours.

18              The total number of employees is listed on

19    here.

14:33:52 20    Q.    Okay.

21    A.    Other than the temps.

22    Q.    So your view is you shipped fewer, fewer pounds of

23    product per total employee hours worked while you ran

24    Business One than you had in the prior years?

14:34:06 25    A.    That is correct, pounds.

1815

1    Q.    But, you agree you actually brought more money in

2    the door in 2008 than in any other year; your gross sales

3    were the highest, correct?

4    A.    The gross sales in 2008 were higher.

14:34:21 5    Q.    Okay.  You'd agree with me that Hodell, like any

6    other company of its kind, will only actually ship a

7    pound of product if a customer places an order for a

8    particular product, right?

9    A.    Correct.

14:34:38 10    Q.    I mean, it's very basic.  You're not just shipping

11    product out hoping somebody's there at the other end.

12    You only ship product out when a customer demands that

13    product, right?

14    A.    Correct.

14:34:48 15    Q.    So we can then agree that the total number of

16    pounds of product that you ship depends on customers'

17    demand for your products, right?

18    A.    Correct.

19    Q.    And the pounds of products, let me just step back.

14:35:10 20           You've testified that Hodell has 40,000

21    different products, right?

22    A.    Correct.

23    Q.    And then you -- some of those you repackage in

24    various ways so that at the end of the day, you have

14:35:23 25    something like 150,000 different items in your -- on your

1816

1    shelves in your warehouse, right?

2    A.    That's correct.

3    Q.    Okay.  And we can agree that different items might

4    weigh the same, but one product could cost a customer

14:35:47  5    more than the other, right?

6    A.    That is correct.

7    Q.    Okay.  We can also agree that depending on the

8    material, the kind of steel, for instance, that is in a

9    particular fastener, one of your inventory items may

14:36:04  10   weigh less than another but be more expensive to the

11   customer, correct?

12   A.    If it's a steel product, it's going to be very

13   closely the same weight per the physical dimensions.

14   Q.    Okay.  But, you do have products in your huge

14:36:18  15   inventory that sometimes weigh less than another product

16   but cost more, correct?

17   A.    Yes.

18   Q.    Okay.  And let's just break it down even further.

19        If an order comes in for a product like

14:36:37  20   that that weighs less but costs more, the process through

21   which you take that order and fulfill that order is

22   basically the same, correct?

23   A.    Could you repeat that, please?

24   Q.    Sure.  We can agree that in a situation where

14:36:55  25   Hodell is being asked to fulfill an order for a product

1817

1    that weighs less than some others but costs more per

2    pound, the process through which you take the order, pick

3    the order off your shelf, package it up, and ship it out

4    to the customer is basically the same, right?

14:37:13  5    A.    Correct.

6    Q.    So we can agree that a particular worker being

7    asked to do a particular job might spend exactly the same

8    amount of time picking off the shelf a product that

9    weighs less but costs more than another, right?

14:37:35 10    A.    That could be.

11    Q.    Okay.  So the -- let me show you another

12    demonstrative here.  Maybe we can move through some of

13    this a little bit faster.

14              Sir, I can keep it here so you can see.

14:38:43 15              Sir, I know that you want to talk about net

16    sales, and we'll get to that.  Here I have a chart that's

17    taken from your business records, your Exhibit 24, and

18    I'd like to go through that with you.

19              MR. STAR:  Am I being heard okay?  Should I

14:38:59 20    have a mic?

21    Q.    Sir, we've taken here Hodell's annual gross sales.

22    The total number of full-time employees taken off of your

23    Exhibit 24, and we've simply divided those numbers to

24    come up with the gross sales per total population, what

14:39:24 25    you've called your full-time employees.

1818

1    A.    Um-hmm.

2    Q.    Do you have Exhibit 24 there in front of you?

3    A.    Yes, I do.

4    Q.    Okay.  Let's just confirm that these numbers are

14:39:35  5    accurate.

6               Is this working?  Thanks.

7               So you see here we have annual gross sales,

8    you agree, 24.8 million in 2002?

9    A.    Yes.

14:40:10 10    Q.    And those numbers are accurate up through 2008,

11    right?

12    A.    The gross sales numbers are correct.

13    Q.    Okay.  And so the highest gross sales we've already

14    established is 43.8 million in 2008 when you ran Business

14:40:57 15    One, yes?  That's correct?

16    A.    Correct.

17    Q.    Now, let's look at your, what you've called your

18    Exhibit 24, "Total population," which is your full-time

19    employees, right?

14:41:08 20    A.    Right.

21    Q.    Okay.  Let's just confirm we have those numbers

22    accurate.  137 people in 2002?

23    A.    Correct.

24    Q.    138 in 2003?

14:41:21 25    A.    Correct.

1819

```
 1    Q.    156 in 2004?

 2    A.    Correct.

 3    Q.    162 in 2005?

 4    A.    Correct.

 5    Q.    And you jumped up to 177 in 2006?

 6    A.    Correct.

 7    Q.    And that was before Business One?

 8    A.    Correct.

 9    Q.    Then in 2007, you used FACTS for the first two

10    months and then in March, early March of '07 you switched

11    to Business One?

12    A.    Correct.

13    Q.    And you had 176 full-time employees in 2007?

14    A.    Correct.

15    Q.    So one less full-time employee in 2007 than in

16    2008 -- pardon me -- one less full-time employee in 2007

17    than in 2006, correct?

18    A.    Correct.

19    Q.    And then in 2008, you added one full-time employee

20    to come up again to 177, right?

21    A.    Correct.

22    Q.    And we've done a little math, and I'm happy to give

23    you a calculator if you'd like to confirm or check our

24    numbers, but we've simply divided your annual gross sales

25    by your total number of employees, and you'd agree with
```

1820

1    me that the best year ever that you had for gross sales

2    per full-time employee was in 2008 when you ran Business

3    One for the full calendar year?

4    A.    That's based on sales dollars; not pounds.

5    Q.    We'll -- of course it's not based on pounds.  We're

6    basing it on money.

7                    Based on dollars, right?  That's how people

8    get paid, right?  They get paid in dollars?

9    A.    Right, and so does the supplier of the product.

10   Q.    Right.  Everybody gets paid in dollars, not in

11   pounds, right?

12   A.    Correct.

13   Q.    Yes.  So when we look at dollars, the things

14   everybody gets paid in, you had gross sales of $247,893

15   per full-time employee in 2008.  Do you see that?

16   A.    You did the division.

17   Q.    Okay.  So you agree with this?

18   A.    If you did the math correctly.

19   Q.    Well, feel free to check it, but --

20   A.    I don't have a calculator with me.

21   Q.    We put one right up there for you.  You can check

22   these numbers if you'd like.

23   A.    Oh, I didn't see that.  Sorry.

24                    Okay.  The '08 number is correct.

25                    And I checked 2006.  That number is also

1    correct, when you're looking at dollars.

2    Q.    Okay.  And we'd like to mark that as the next

3    Defendant's exhibit.  Is that 910?

4              Sir, just sticking with that for a couple

5    more questions, you can agree with me, sir, that when we

6    look at the total dollars brought in the door by Hodell,

7    which is represented through your annual gross sales,

8    when you divide that by your total number of full-time

9    employees, your best year for gross sales per full-time

10   employee was 2008 when you ran Business One?

11   A.    Correct.

12   Q.    Okay.  Let's go to another demonstrative and see if

13   you'll confirm that.

14              Sir, we've now taken the same gross sales

15   figures from your business records, and you had also

16   given us some information about not only your full-time

17   employees but with the additional temporary workers for

18   what you've called your total employees, and you can

19   confirm that these numbers are correct, right?

20   A.    That total employee number including temps is

21   correct for the years.

22   Q.    Very good.  And so when we did the same basic math

23   and we divide annual gross sales, that's the money in the

24   door, by your total number of workers, your full-time

25   employees plus your temps, we again find that the highest

1    gross sales per employee happened in 2008 when you ran

2    Business One, right?

3    A.    Based on that calculation, yes.

4    Q.    All right.

14:47:26  5             And you can feel free to confirm these

6    numbers again, but you can check -- check them with your

7    calculator, but if you agree with them, we'll mark this

8    as the next exhibit, Defendant's 911.

9    A.    I'll check two of them.

14:47:39 10   Q.    Thank you.

11   A.    Okay.

12   Q.    Can we mark that one, put the next one up?  Oh.

13   A.    '06 and '08 are correct.

14   Q.    You agree that that's correct?

14:49:02 15   A.    '06 and '08 are correct.

16   Q.    All right.  We'll mark that as Defendant's 911,

17   please.

18             Joe, would you mind putting the next one

19   up?

14:49:56 20             Sir, the next chart that we've made here

21   again takes your gross sales figures, but this time off

22   of your business records takes your total hours worked

23   hourly, and if you go to your Exhibit 24, you can confirm

24   for me that these numbers represent the total number of

14:50:16 25   hours worked by Hodell's overall labor force for these

1    years, right?

2    A.    No, that's not correct.

3    Q.    That's not correct?  That's not --

4    A.    The temps are almost a hundred percent warehouse

14:50:27 5    employees.

6    Q.    Okay.  But all that you've actually given us in

7    this case so far as total hours worked comes off your

8    Exhibit 24, correct?

9    A.    Correct.  Those are direct full-time employees.

14:50:38 10    Q.    Okay.  So let's just make sure everybody

11    understands.

12                We don't have numbers from you as to the

13    total number of hours worked by temporary workers in any

14    of these years?

14:50:48 15    A.    You have the equivalent number of full-time, which

16    is times 2080 hours per year.

17    Q.    I don't understand what you're saying.  Let's break

18    this down.

19                We've got your Exhibit 24, yes?

14:51:00 20    A.    Yes.

21    Q.    On there it has a line item for total hours worked

22    hourly, right?

23    A.    Correct.

24    Q.    And you've now told us that's just for your

14:51:12 25    full-time employees?

```
 1    A.    That is correct.
 2    Q.    All right.  So at least we have those numbers
 3    correct, right, 120,816 hours in 2002 is your total
 4    full-time employee hours?
 5    A.    May I take a moment just to check?
 6    Q.    Please.  Go right ahead.
 7    A.    Correct.
 8    Q.    Okay.
 9    A.    I'm sorry, I went through '07.  I have one more.
10          Correct.
11    Q.    Okay.  So we've correctly listed here the total
12    number of full-time hours worked from 2002 to 2008, yes?
13    A.    Correct.
14    Q.    Now, you said that this, these figures don't
15    include temporary worker hours that may have been put in
16    over any of these calendar years, but you can't point me
17    to a record that you've produced in this case that would
18    actually include that information, right?
19    A.    I provided the equivalent full-time employees, and
20    that's 2080 hours a year for a full-time employee.
21    Q.    I'm just asking you very simply, you've not given
22    us a record in this case of actual temporary worker hours
23    that were put in in any of these calendar years; yes or
24    no?
25    A.    Not on Exhibit 24.
```

1    Q.    Not just Exhibit 24.  Not on any other document,

2    right?

3    A.    I would then multiply that by 2080.

4    Q.    We're splitting hairs here.

14:53:34 5    A.    Okay.

6    Q.    You can't show me a document right now that gives

7    me a total number of temporary worker hours put in,

8    actual hours put in in any of these eight calendar years,

9    can you?

14:53:44 10    A.    That's correct.

11    Q.    Okay.  Thank you.

12            So going off the information that we do

13    have for actual hours worked, when we divide your annual

14    gross sales by your full-time hours worked, you'd agree

14:53:55 15    we'd find that by far 2008 was the best year with $293 in

16    gross sales per employee hour worked, right?

17            You can check the numbers.

18            Bob, do you have the one up there?

19    A.    Okay.  The division is correct for '06 and '08.

14:54:54 20    Q.    Okay.  Let me just -- I just realized we had the

21    wrong exhibit up there for the jury.  Let me just make

22    sure they see that.

23            Bob, can you put that up?  It's the one,

24    the 293 on the bottom right.  No.

14:55:32 25            All right.  Not able to find it.

1826

| | |
|---|---|
| 1 | We'll -- you agree these numbers are |
| 2 | correct, right, sir? |
| 3 | A.    For '06 and '08. |
| 4 | Q.    You can check any of the years you'd like just to |
| 14:55:43 5 | confirm these numbers are correct. |
| 6 | Joe, do you mind holding this up for the |
| 7 | jury? |
| 8 | A.    You want to tie everybody's time up for that? |
| 9 | Q.    Pardon? |
| 14:55:52 10 | A.    Do you want to tie everybody's time up for that? |
| 11 | Q.    No. |
| 12 | A.    No? |
| 13 | Q.    If you're fine with that, then we won't. |
| 14 | Just because the jury hasn't seen this yet, |
| 14:56:01 15 | I'd like to just confirm -- |
| 16 | THE JURORS:  It came up. |
| 17 | MR. STAR:  There we go.  Murphy's Law. |
| 18 | We're going to mark this Exhibit 912. |
| 19 | BY MR. STAR: |
| 14:56:25 20 | Q.    And very quickly, you agree that when you take your |
| 21 | total hours worked for full-time workers for all of these |
| 22 | years and you divide it by the total number of dollars |
| 23 | that came in the door, by far the best year you had was |
| 24 | 2008 when you ran Business One for the full year? |
| 14:56:42 25 | A.    That's the maximum number of gross sales per hour |

1        worked.  It's not by far the best year.

2        Q.    Based on this metric, on this measurement, that's

3        all I'm asking you, sir, you can -- you can give other

4        testimony later.  When you divide the total number of

14:56:59  5        dollars that came in the door by the total number of

6        full-time hours worked, by far the best year was 2008,

7        right?

8        A.    In dollars per warehouse full-time hours worked.

9        Q.    It's not just warehouse.  This is all full-time

14:57:21 10        employees, right?

11        A.    Pardon?

12        Q.    This is -- this represents all full-time employee

13        hours, doesn't it?

14        A.    In the warehouse.

14:57:27 15        Q.    In the warehouse.  So by far, your best year was

16        $293 per hour worked in the warehouse in 2008?

17        A.    In dollars.

18        Q.    In dollars?

19        A.    Yes.

14:57:40 20        Q.    The way people get paid, right?

21        A.    Yes.

22        Q.    Thank you.  And let's just stick with this one for

23        a minute, by the way, because you say these are just

24        warehouse hours.

14:57:51 25                      2006, your full-time employees put in

1    172,000 hours in the warehouse, right?

2    A.    Correct.

3    Q.    With gross sales of $42.9 million, right?

4    A.    Okay.

14:58:13  5    Q.    Yes?

6    A.    Yes.

7    Q.    But in 2008, your workers put in 149,000 hours but

8    made nearly a million dollars more in gross sales, right?

9    A.    That's sales dollars, yes.

14:58:35 10    Q.    Sales dollars.  And the difference between the

11    total hours worked in the warehouse in 2006, 172,000, and

12    worked in 2008, 149,000, that's over 22,000 less hours,

13    but you brought in nearly a million dollars more money,

14    right?

14:58:56 15    A.    On -- on dollars, yes.

16    Q.    On dollars.  While you ran on Business One, right?

17    A.    Um-hmm.

18    Q.    While you ran Business One, right?

19    A.    Correct.

14:59:39 20    Q.    Last one, I promise.

21              Bob, now you can put up the one that you

22    had.

23              Sir, one final demonstrative.  Instead of

24    taking your gross sales, we've now taken your gross

15:00:01 25    profits off of your Exhibit 24, and that's what you see

1829

1    in that second column.

2              Can you confirm those numbers are accurate,

3    sir?

4    A.    The annual gross profit number and the total

15:01:40  5    warehouse hourly worked for full-time employees is

6    correct.

7    Q.    Very good.  And when we do that same simple

8    calculation by dividing annual gross profit dollars by

9    the total hours worked, we find again that by far the

15:01:56 10    best year by that measure was 2008 when you ran Business

11    One, correct?

12    A.    I didn't check those numbers, the division, but I

13    assume you did it correctly.

14    Q.    Yes.  And if you assume my math is correct and if

15:02:14 15    you compared 2008, the only full calendar year that you

16    ran Business One against 2006, the last full calendar

17    year you ran FACTS, you had a significant improvement in

18    the gross profit for total hours worked for your

19    full-time warehouse workers, correct?

15:02:31 20    A.    Yes.  I just want to make one comment.

21              You did not include the overtime hours in

22    any of these charts so far.

23    Q.    Well, I've included your total hours worked?

24    A.    That's regular hours, and then there's overtime

15:02:47 25    hours on this chart.

1830

1    Q.   Well, we'll go through that because -- well, we'll

2    get into that after -- probably now is the good time for

3    a break?

4                    THE COURT:  Okay.

15:02:55  5                    MR. STAR:  I'd like to mark this as

6    Defendants, what is it, 913?  Okay.

7                    THE COURT:  Okay, folks, we'll take our 15

8    minutes this afternoon.

9                    Keep in mind.

15:03:06 10                    (Recess taken)

11                    (Proceedings resumed in presence of the

12    jury as follows:)

13                    THE COURT:  You may be seated, folks,

14    please.

15:23:59 15                    You may continue.

16                    MR. STAR:  Thank you, Your Honor.

17    BY MR. STAR:

18    Q.   Mr. Reidl, I just want to stick on one point and

19    see if I can get something clarified.

15:24:05 20                    When we were just looking at this

21    demonstrative with the total hours worked hourly, that

22    third column, the 120,816 at the top, I understood you to

23    say that that's just warehouse worker hours, full-time

24    warehouse worker hours for the year?

15:24:21 25    A.   Yes.  Straight time warehouse hours worked.

1    Q.    So it didn't include other workers like yourself or

2    other executives; that's your testimony?

3    A.    It didn't include the overtime hours and it didn't

4    include the temporaries.

15:24:36 5    Q.    Okay.

6    A.    For the warehouse.

7    Q.    For the warehouse.

8              You testified earlier about the number of

9    pounds of product that Hodell was shipping per hour that

15:24:50 10   it worked over the course of the various years 2002

11   through 2008, right?

12             Do you remember speaking about that?

13   A.    Yes.  That's on the Schedule 24.

14   Q.    Okay.  I just want to make sure that we are doing

15:25:04 15   the same -- using the same math so when we look at this

16   later, we understand what you've done, okay?

17             Look at Exhibit 24 for me.

18             For the -- just use the first page as an

19   example, for the calendar year 2002 you came out with an

15:25:27 20   average pounds shipped per hour worked of 147.6, right?

21   A.    Correct.

22   Q.    And to do that, to get to that number, you took

23   your total pounds shipped, which is on the line above it,

24   17.8 million, right?  That was the numerator?

15:25:55 25   A.    Correct.

1    Q.    And the denominator was your total hours worked --

2    A.    Correct.

3    Q.    -- of 120,816, correct?

4    A.    Correct.

15:26:06 5    Q.    So as I understand your testimony now, you're

6    saying that that is your -- the 147.6 is the average

7    pounds per shipped, per hour worked, just by your

8    full-time warehouse workers, is that what you're saying?

9    A.    That is correct.

15:26:26 10    Q.    And it didn't include, for instance, you?

11    A.    That is correct.

12    Q.    All right.  Let's just make sure we've got this

13    clear.  Maybe it's just a misunderstanding.

14          Go to Page 348 to 349 of your deposition.

15:26:43 15    I just want to see if I can refresh your recollection and

16    make sure that we're on the same page.

17          I'll show you where I am, if that's okay.

18    A.    Yeah.  348?

19    Q.    Right.  If you'd start at Line 18 on Page 348 and

15:26:59 20    read through Line 15 of 349, just to refresh yourself.

21    A.    Okay.  How far should I read?

22    Q.    Just halfway through 349.

23          Does that refresh your recollection that

24    when we talked about this topic before, the understanding

15:28:27 25    that you gave me was that the calculation for the average

```
            1    pounds of product shipped per hour worked --

            2    A.   No.  This doesn't say per hour worked.

            3    Q.   I'm sorry, I didn't finish.

            4    A.   Yeah.  Okay.

15:28:40    5    Q.   Let me just finish.

            6              Does this refresh your recollection that

            7    the calculation you did of pounds shipped per hour worked

            8    actually included all of Hodell's employees, including

            9    yourself and everybody else at the organization, and that

15:28:59   10    was the total hourly worked figure that you used in your

           11    calculation, right?

           12    A.   Where do you see that?

           13    Q.   Well, let's go through it.

           14              You see at the bottom of 348 we talked

15:29:13   15    about how you did your productivity calculation?

           16    A.   Okay.

           17    Q.   You said, going to Page 349, Line 7, you said, "I

           18    looked at the pounds shipped in total and the number of

           19    employees, and did a weighted average number of pounds

15:29:34   20    required per pound shipped under FACTS.

           21              "Question:  How many employees were

           22    required per pound shipped in 2002 on average?"

           23              You said, "About 131."

           24              I asked you, "Did that include you?"

15:29:52   25              You said, "Absolutely."
```

1834

```
 1              "Question:  So you're including everybody
 2    at the time in the Hodell organization?
 3              "Answer:  Absolutely."
 4              Do you see that?
15:30:00  5    A.    Yes.
 6    Q.    So when you look at Exhibit 24, for instance, and
 7    the information we have up there as total hours worked,
 8    just so I understand, maybe we just had a
 9    misunderstanding some years ago at your deposition, are
15:30:15 10    you telling me now that that figure, for instance the
11    120,816, does it actually include all full-time hours
12    including, for instance, yourself or is it simply limited
13    to the warehouse workers?
14    A.    No, I stated it correctly in the deposition.
15:30:30 15    Q.    So it includes everybody?
16    A.    The pounds -- the hours are for warehouse hourly
17    people only.
18              My calculation was for all employees
19    against the pounds shipped.  That's what I stated in the
15:30:48 20    deposition.
21              I didn't talk about hours worked.  I talked
22    about the total number of employees.
23    Q.    All right.  Maybe we just don't see that the same
24    way, and I won't waste everybody else's time on it.
15:31:02 25              MR. STAR:  Your Honor, may we quickly
```

1   approach on one issue?

2                    THE COURT:  Yes.

3                    (Side-bar conference had off the record)

4   BY MR. STAR:

15:31:46 5   Q.    Mr. Reidl, one more question about some of your

6   math calculations here.

7                    You gave some testimony about what you call

8   the return on investment.  Do you remember that?

9   A.    Yes.

15:31:56 10   Q.    And you were shown in Exhibit Number 38 -- I don't

11   know if you still have that perhaps in the white binder

12   in front of you.

13                    And, Bob, if we can pull that up, it would

14   be great.

15:32:16 15   A.    Okay.

16   Q.    This was a document that you gave some testimony

17   about, and you said that this -- this gave you some

18   reason to believe that SAP had represented that you would

19   get a return on investment.

15:32:32 20                    Do you remember that?

21   A.    The channel partner represented that.

22   Q.    Okay.

23   A.    Based on what they had in their possession.

24   Q.    So SAP didn't make a representation to you directly

15:32:43 25   about any particular return on investment that you would

1   receive, right?

2   A.    He said you would get a very quick return on

3   investment.

4   Q.    And nobody gave you a specific percentage return or

15:32:53 5   a timeline for return or an amount of return, correct?

6   A.    No.  But, if the experience is --

7   Q.    That's all I asked --

8   A.    Yeah.

9   Q.    -- whether anybody gave you that.

15:33:05 10          We can agree, right, no one gave you any

11   particular numbers?

12   A.    They said you would have a return on investment in

13   a number of months.

14   Q.    Nobody gave you any particular number of months or

15:33:16 15   particular rate or particular amount of return, correct?

16   A.    Nothing more specific than that.

17   Q.    And you agree you signed a license agreement, your

18   son actually signed a license agreement with SAP at the

19   end of December, 2005, right?

15:33:31 20   A.    That's when it was signed.

21   Q.    And at no time prior to signing that license

22   agreement did you ever perform any calculation or explain

23   to anybody that you expected any particular rate of

24   return on your investment in this software, right?

15:33:52 25   A.    When I'm told that it's going to be --

Q.    Sir, yes or no?  You never did a calculation like
that, did you?

A.    I didn't need to do one if it was that fast.

Q.    Okay.  Thank you.

              Let's move on to some other topics.

              You were shown some marketing literature,
sir.  Let's just go back to some of that.

              Bob, can you pull up Exhibit 314?

              Sir, this was one of the documents you were
shown by your counsel when you were testifying.

              Do you remember that?

A.    Yes.

Q.    And you said this was something that you had seen
before you decided to move forward with Business One,
right?

A.    Correct.

Q.    Okay.  We can agree on a couple things.  This was
referring to the base Business One package, correct?

A.    And it refers to -- I'd have to scroll up.  On one
of the pages, it talks about ability to adapt.

Q.    Sir, this didn't talk about any of the particular
custom software that Hodell eventually was going to build
and employ in its solution, correct?

A.    It did not mention Radio Beacon or In-Flight.

Q.    Okay.  In fact, there's no SAP literature that you

1    ever received that mentioned anything at all about the

2    custom software that you ultimately were going to deploy,

3    base Business One plus custom In-Flight plus Radio

4    Beacon, right?  That just didn't exist?

15:35:52  5    A.    No specific document from SAP talked about those

6    two add-ons, but they talked about the easy adaptability

7    for add-ons through the DI API.

8    Q.    Okay.

9    A.    The Whitepaper in particular.

15:36:07 10    Q.    All right.  But none of that literature ever

11    mentioned In-Flight, and you understood that the

12    In-Flight project, this development of a custom software

13    add-on, was going to be at least an 18-month project even

14    from the start, right?

15:36:26 15    A.    That is correct.

16    Q.    All right.  So let's just make sure we have this

17    clear as well.  We covered it with your son when you were

18    here and you heard the testimony.

19              You agree that Hodell never just ran

15:36:47 20    Business One, the base package, you always ran Business

21    One plus In-Flight and Radio Beacon?

22    A.    Business One by itself couldn't run a distribution

23    of fasteners.

24    Q.    Right.  And you knew that all along going back to

15:36:57 25    2003, 2004?

1    A.    2003, yes.

2    Q.    Okay.

3    A.    Yes.

4    Q.    Thank you.

15:37:11   5              Let's talk about the conversations that you

6    gave some testimony on, conversations that had -- that

7    occurred back in 2003.

8              You gave some testimony about meeting with

9    Penelope Vitantonio from American Express.  Do you recall

15:37:31 10  that?

11   A.    Correct.

12   Q.    Your testimony today was that during a

13   conversation, as I understood it, during a conversation

14   with Ms. Vitantonio and others, you received an assurance

15:37:46 15  that Business One would meet Hodell's specific needs for

16   300 or 500 users, is that your testimony?

17   A.    300 users, yes.

18   Q.    Okay.  And you're, just so we have this clear, you

19   believe that actually happened during a conversation with

15:38:04 20  Ms. Vitantonio?

21   A.    That is correct.

22   Q.    Okay.  And Ms. Vitantonio at the time was with

23   American Express, right?

24   A.    Correct.

15:38:12 25  Q.    And she was promoting a product called the American

1840

```
        1    Express Edition of Business One?
        2    A.   Correct.
        3    Q.   Right.  And you took notes, handwritten notes, of
        4    your conversations with Ms. Vitantonio, right?
15:38:34 5    A.   Correct.
        6    Q.   All right.  Let's take a look at some of them.
        7              You recall -- strike that.
        8              Let's just try to pinpoint the time or date
        9    when you believe you had these conversations where you
15:38:50 10   were told what you've testified to.
       11              You said before that you believe that was
       12    during a specific conversation on December 3rd of 2003,
       13    right?
       14    A.   I believe I said on -- my notes indicated I talked
15:39:08 15   about scalability on 12/19/03.
       16    Q.   Can you --
       17    A.   There were a number of conversations but one of
       18    the --
       19    Q.   Sorry.  I don't mean to talk over you.  I'm just
15:39:23 20   trying to move this along fast.
       21              You have your deposition there.  Just
       22    refresh yourself, if you would.  Can you go to Page 112?
       23    It should be in the first volume, and I'll give you the
       24    line.
15:39:35 25   A.   I'm sorry, what page?
```

1    Q.    112.  It's in the first volume.

2    A.    Yeah.

3    Q.    And just read from Page -- just read it to yourself

4    real quick from Page 112, Line 3.

15:40:52  5                   (Pause)

6                   Have you read that, sir?

7    A.    Yes, I read it.

8    Q.    Okay.  Does that refresh your recollection that

9    your previous position had been that it was specifically

15:41:12  10    during a conversation on December 3rd, 2003, where you

11    believe you were told and given an expressed assurance

12    that Business One would be suitable for Hodell's specific

13    needs for 300 or 500 users?

14    A.    That's what it says.

15:41:31  15    Q.    Okay.  Let's take a look at Exhibit 826, please.

16    And I'm happy to give you a hand -- pardon me -- I'm

17    happy to give you a paper copy of this, if you'd like.

18                   Bob, if you can show Mr. Reidl, this is a

19    two-page document.  Just show him both pages, please.

15:42:14  20                   Sir, can you identify these notes?

21    A.    Yes.  They're my handwritten notes.

22    Q.    Notes that you personally prepared during a

23    telephone call or meeting on December 3rd, 2003?

24    A.    Yes.

15:42:27  25    Q.    All right.  Let's go to the first page of that.

1842

         1           Underneath the date, it has, "Penny

         2    V./Mike."

         3           Is that Penny Vitantonio?

         4    A.    Correct.

15:42:39 5    Q.    Okay.  So you had a meeting with Penny Vitantonio

         6    and a gentleman named Mike on December 3rd, 2003, right?

         7    A.    Correct.

         8    Q.    All right.  And just let's confirm your position,

         9    your stance on things here.

15:42:52 10           What you've said before is that it was

        11    during this meeting that you got a specific

        12    representation that Business One could handle 300 or 500

        13    users for you, right?

        14    A.    That's what the deposition says.

15:43:10 15   Q.    Okay.  Was that what you recall happening?

        16    A.    I don't see it in the notes here.

        17    Q.    Right.  There's nothing in your notes that say

        18    anything about anybody promising you anything, right?

        19    A.    I had conversation with them on our growth plans

15:43:30 20   at -- on several meetings, and specifically talked, one

        21    place I did record it, on the 19th of December.

        22    Q.    And we're going to look at those notes just in a

        23    minute.

        24           I'm just going to walk you through these

15:43:43 25   and we'll have a chance to look at all of them, okay?

1   A.    Okay.

2   Q.    Your position has been that you were not willing to

3   proceed any further with any discussions about Business

4   One unless you had actually received a specific assurance

15:44:08  5   that Business One could handle 300 or 500 users for

6   Hodell specifically, right?

7   A.    My statement was 300 users over a 10-year period.

8   Q.    Okay.  Go to Page -- and I just want to confirm

9   that you believe you were told that on this -- during

15:44:35 10   this meeting on December 3rd.

11            Go to Page 133 of your deposition, please.

12   A.    Which page?

13   Q.    133.  And I'll read from Line 15.

14            "Question:  Do you believe that Hodell

15:45:00 15   relied in any way on this particular statement that we've

16   just been talking about here in the SAP Business One

17   Brief?"

18            Your answer:  "We relied on the fact that

19   we were advised that the system would support 300 users

15:45:12 20   at the December 3rd, 2003 conference call meeting with

21   AmEx and IBIS."

22            Does that refresh your recollection that

23   you previously believe that you had been told during this

24   specific conversation on December 3rd, 2003, that you

15:45:28 25   could have 300 users?

1    A.    That's what it says here.

2    Q.    Okay.  And just so we're clear, go to Page 139,

3    Line 6.

4               "Question," there's some background

15:45:49  5    information.  Your answer, Line 9, "We were told at that

6    meeting 300 users, and when we started with 120 users the

7    system would not handle it.

8               "Question:  Okay.  You're referring to the

9    December 3rd, 2003 meeting?

15:46:02  10               "Answer:  Correct."

11               So now you're refreshed, you have no doubt

12    that previously you believed this representation was made

13    on December 3rd, 2003?

14    A.    Sir, you lost me.  I don't know where you were

15:46:15  15    reading.

16    Q.    Page 139, sir, Line 9.

17    A.    Okay.

18    Q.    All right.  So am I to understand you to now be

19    saying today, three years after your deposition, that it

15:47:01  20    wasn't on December 3rd, 2003, but it was on -- it was

21    during a subsequent meeting where you received what you

22    think was a representation about 300 users?

23    A.    No.  I'm saying it -- here I say it occurred here,

24    but there was another time when scalability was talked

15:47:23  25    about, also.

1845

1    Q.    Okay.

2                So this jury understands, that's all I'm

3    trying to get to, you do contend that on -- that during

4    the December 3rd, 2003 meeting you were told 300 users;

15:47:36  5    that's your contention?

6    A.    That's my contention in my deposition.

7    Q.    Okay.  And we can agree that your notes say nothing

8    about that at all, right?

9    A.    Because that's such an important point, I don't

15:47:51  10    need to write that down when I'm told.  That's an

11    assurance.

12    Q.    So you're not in the habit of actually writing down

13    very important points, that's your testimony?

14    A.    A single number like 300, I didn't need to.

15:48:04  15    Q.    But your position has been that unless you got that

16    exact representation, you were done; you weren't going

17    forward with Business One at all, that's your position,

18    right?

19    A.    That's correct.

15:48:18  20    Q.    Okay.  Now, you mentioned another meeting on

21    December 19th.

22                Let's look at your notes from that meeting,

23    sir.

24                It's 828, Bob.  No, got the wrong number.

15:48:41  25    827, sorry.

1           And can you scroll those -- there's two

2       pages here, sir.  I'd like you to see the whole thing.

3               Bob, can you scroll?  There we go.

4               All right.  Sir, these are your handwritten

15:49:21 5     notes from the December 19th, 2003 meeting with

6       Ms. Vitantonio, is that right?

7       A.   Correct.

8       Q.   We can blow it up so you can see it better or give

9       you a paper copy, but you agree with me, you didn't write

15:49:36 10    anywhere in here "300 users," right?

11      A.   No, but that's --

12      Q.   The word "Users" doesn't appear, right?

13      A.   "The low-to-high range" pertained to the users.

14      Q.   Sir, you didn't write down the word users or 300

15:49:51 15    users or anything like that, did you?

16      A.   "Scalability" means number of users.

17      Q.   So you wrote down "Scalability-volume plus

18      complexity," and it's your testimony right now that that

19      is a reference to 300 users?  That's what you're pointing

15:50:08 20    to?

21      A.   That's when it was discussed, when it was

22      discussed.

23      Q.   Okay.  But no numbers in this document, right, sir?

24      A.   Correct.

15:50:17 25    Q.   And, in fact, we could go through all your various

1    notes that you kept about your meetings with

2    Ms. Vitantonio and other people and we'd find first off

3    that you were a pretty prolific notetaker, right?

4    A.    I take brief notes.

15:50:32 5    Q.    Okay.  You took notes of the meetings that you had

6    about Business One, correct?

7    A.    Correct.

8    Q.    And you wrote down things that were important to

9    you, right?

15:50:39 10   A.    Correct.

11   Q.    But nowhere in any of your notes ever did you write

12   down that anybody told you or promised you or said

13   anything about 300 users, correct?

14   A.    At that point, I wouldn't need to continue if I

15:50:57 15   weren't told that.

16   Q.    My question's different, and I think we have your

17   answer.

18            You never wrote it down anywhere, did you?

19   A.    "Never" is the wrong word.  I didn't write it on

15:51:12 20   these notes right here that we've looked at.

21   Q.    Well, wait.  Let's just get it clear for the jury.

22   We'll be here forever if we battle over these points.

23            You've been involved in this case since it

24   was filed in November of 2008, right?

15:51:24 25   A.    Correct.

1    Q.    Part of what you did in this case was to go back in

2    your own personal files and pull out everything that you

3    had, including all your notes that we're seeing here.

4    That's how we got them, right?

15:51:34 5    A.    Correct.

6    Q.    And you've been preparing to be here today, you've

7    been preparing for years to be here?

8    A.    Correct.

9    Q.    And you've gone back, of course, and looked through

15:51:43 10    all of your notes and everything that you have in this

11    case, right?

12    A.    I assume so.

13    Q.    Okay.  And having done that, in preparing yourself

14    for years to be here, you're not able to tell this jury

15:52:03 15    or show this jury a single document, a note, an e-mail, a

16    memo, anything where you ever indicated -- you ever wrote

17    down that somebody told you 300 or somebody communicated

18    it to you in an e-mail, nothing like that actually

19    exists, does it?

15:52:20 20    A.    I can only say on these notes right here.

21    Q.    Okay.  We'll take that answer.

22              Let's fast forward to the end of your

23    dealings with Ms. Vitantonio.  Actually let me just

24    clarify something.

15:52:38 25              You were asked some questions about the

1849

1    actual price and proposal that you got from American

2    Express, and then you were asked a question to the effect

3    of "Did you have any further discussions with American

4    Express after that proposal."

15:52:53  5                Do you remember that?

6    A.    Could you repeat that question from the beginning?

7    Q.    Sure.  I'm just trying to set some background here

8    so we can move along.

9    A.    Yes.

15:53:05 10  Q.    Your counsel asked you some questions about the

11   price that you got from American Express.  You said it

12   was 582,000?

13   A.    That's my recollection.

14   Q.    Okay.  And we're going to see some notes.  We'll go

15:53:15 15  through that.

16               You said to American Express you got to cut

17   the price in half, right?

18   A.    I said the cost would have to be approximately

19   half.

15:53:22 20  Q.    Okay.  And then your counsel asked you, after that

21   event, right, you got the price from American Express and

22   told them no, your counsel asked you did you continue

23   having discussions with American Express, do you remember

24   that?

15:53:38 25  A.    Yes.

1850

1    Q.    Okay.  The answer that you gave, at least as I

2    heard you, was you started then mentioning dealings with

3    Mr. Van Leeuwen and you didn't actually mention anything

4    with American Express, but let's just be clear, after you

15:53:52  5    rejected American Express's proposal, that was the end of

6    your conversations with American Express and

7    Ms. Vitantonio, right?

8    A.    In September, you said, or no?

9    Q.    No, I didn't say September.

15:54:08 10              Maybe I'm speaking too quickly.

11              Let me -- let me try with some documents

12    and we'll see if we can't do it that way.

13              Exhibit 828, please.  We'll move through

14    this, sir.

15:54:33 15              Okay.  Sir, these are your handwritten

16    notes from a conference or a conversation you had with

17    Ms. Vitantonio, that's Penny, on February 2nd, 2004,

18    right?

19    A.    Correct.

15:54:44 20    Q.    Okay.  And you indicate in your notes that the

21    price is going to be $3,500 to $3,750 per user, do you

22    see that?

23    A.    Correct.

24    Q.    And you're referring to the price per user for a

15:55:01 25    Business One license, correct?

1    A.    Correct.

2    Q.    Okay.  And you can do the math with the calculator

3    there or trust me, because I've done it, if you'd

4    multiply 300 licenses by even the lower number, 3500, 300

15:55:20 5    licenses you'd agree would cost you $1,050,000, correct?

6    A.    That's the math that you used.  I wasn't buying

7    that number of licenses at that time.

8    Q.    Right.  We're going to go through that.

9               And on top of the license price, the

15:55:41 10   upfront price for the licenses, you indicate 20% per year

11   of base fee in maintenance.

12              You understood that to mean that if you

13   spent, say, $100,000 on licenses each year, you'd have

14   $20,000 of maintenance on those licenses, correct?

15:55:58 15   A.    That was my understanding.

16   Q.    Okay.  So if Hodell ultimately were to have

17   purchased a million dollars in licenses, every year on

18   top of that, you'd have a $200,000 maintenance fee,

19   right?

15:56:10 20   A.    That's what it would come out.

21   Q.    Plus to do what you wanted to do, which was to add

22   on to Business One, you'd have to have consulting costs

23   plus development costs, right?

24   A.    Correct.

15:56:28 25   Q.    All right.  Let's take a look at Exhibit 17,

1    please, Bob.

2                    Sir, the last set of your notes we saw was

3    dated February 2nd where Ms. Vitantonio gave you the

4    price per user license, and now, sir, you'd agree what

15:56:56  5    we're looking at is a set of your handwritten notes from

6    February 6th of 2004, right?

7    A.    Correct.

8    Q.    And this is where Ms. Vitantonio gave you a price

9    quote for 582,000?

15:57:11 10    A.    Correct.

11    Q.    And let's just be clear, that 582,000 would include

12    some number of Business One licenses, right?

13    A.    Correct.

14    Q.    It would then include American Express's edition of

15:57:24 15    Business One, which was an add-on for distribution

16    companies, right?

17    A.    But not for fastener distribution.

18    Q.    I understand that.  We're just trying to get this

19    straight away, sir.  I'm not arguing everything with you.

15:57:36 20                    It was base Business One plus American

21    Express's add-on product, right?

22    A.    I don't recall specifically what add-on products

23    were involved here.

24    Q.    That were going to be add-ons, though, we can agree

15:57:54 25    on that, yes?

1    A.    Pardon?

2    Q.    There were going to be add-ons with what

3    Ms. Vitantonio was proposing?

4    A.    Correct.

15:58:00  5    Q.    And it also included the consulting and

6    implementation services, right?

7    A.    Correct.

8    Q.    Okay.  So just to be clear for everybody here, the

9    $582,000, that wasn't just going towards the purchase of

15:58:16 10    Business One licenses at 3500 apiece; it was going toward

11    B1 plus add-ons plus services, right?

12    A.    Partially.  I think it was for 80 user licenses, as

13    I recall.

14    Q.    Okay.  We're dealing with very simple points here.

15:58:40 15    We can agree that the $582,000 included some number of

16    Business One licenses plus other add-ons and plus

17    services, right?

18          It wasn't all going towards Business One

19    licenses, was it?

15:58:53 20    A.    Correct.

21    Q.    Thank you.

22          And you told her it was nice knowing her

23    but we can't afford this package, you'll have to shop

24    alternative software, and this is where you told her the

15:59:05 25    price would have to be chopped at least in half, right?

1854

1    A.    Correct.

2    Q.    Your budget to do the entire project, Business One,

3    plus the add-ons, plus services, was not even over

4    $300,000, right?

15:59:23  5    A.    At that point, I was aware they did not have an

6    adequate add-on for our industry.  That also added to

7    this decision.

8    Q.    Okay.  I simply asked you about your budget, sir.

9          You agree your budget did not even exceed

15:59:38 10    $300,000, yes?

11    A.    For the 80 user licenses.

12    Q.    For the entire thing.  We just went through this.

13    I mean we'll be here forever.

14          Ms. Vitantonio proposed to you a system

15:59:55 15    that had multiple components.  It had Business One, it

16    had add-on products, it had services, right?

17          A JUROR:  Sorry, that was my alarm.

18          THE COURT:  Did you expect to be asleep?

19          (Laughter)

16:00:16 20          THE COURT:  Sorry, Greg.

21          MR. STAR:  No, that's okay.  We needed a

22    break, I think.

23    Q.    Let's just see if we can agree on a very basic

24    point.  I'll try it again.

16:00:27 25          Ms. Vitantonio was proposing you a system

1855

1   that had Business One licenses, plus add-ons, plus

2   services, and your budget for all of that kind of work,

3   the software, plus services, did not even exceed

4   $300,000, we can agree on that, right?

16:00:46  5   A.    It wasn't going to be 582,000 and it was also a

6   negotiating ploy.

7   Q.    Okay.  Fair enough.

8                Now, after this date, February 6th, 2004,

9   you didn't have any more conversations with

16:01:02 10   Ms. Vitantonio or American Express that you can recall,

11   correct?

12   A.    At the moment, I don't have a -- there was

13   conversation with American Express and Dale Van Leeuwen

14   with American Express shunting over the work to Dale

16:01:19 15   Van Leeuwen, and I believe it happened after this.

16   Q.    Okay.  But I'm -- if you can show us a note, we'd

17   be happy to see it, but I've been through them all and

18   this was the last I've ever seen.

19                Are you aware of another conversation you

16:01:31 20   had with American Express after this date?

21   A.    If it came in an e-mail, we supplied it.

22   Q.    Okay.  All right.  Let's move on.

23                We already established that eventually you

24   signed a license agreement at the end of December, 2005,

16:01:59 25   right?

1856

1   A.    Correct.

2   Q.    Okay.  You agree that prior to signing the license

3   agreement in December, 2005, Hodell actually had found on

4   the Internet information that distinguished between the

16:02:17   5   number of employees and the number of users, right?

6   A.    And I was mistaken.

7   Q.    You were mistaken about that?

8   A.    Correct.

9   Q.    Okay.  Go to Page 110 of your deposition.  I'm at

16:03:03  10   Line 18.

11         There's some background and you give an

12   answer.  "We had gone on the Internet and seen some

13   indication that the number of users was being -- the

14   limit on the number of users was declining.  The number

16:03:17  15   of users.

16               "Question:  When was this?

17               "Answer:  Sometime during '05 or '04.

18               "Question:  Prior to December 23rd of 2005?

19               "Answer:  Correct."

16:03:31  20               Do you see that?

21   A.    I didn't follow you, but it was on 112?

22   Q.    I was at the bottom of Page 110.

23   A.    110.

24   Q.    Line 18.  Let's go on to Page 117, sir, Line 11.

16:04:00  25               Are you there?

```
 1              A.     Okay.
 2              Q.     "Question:  Now, you said that prior to December
 3       23rd, 2005, Hodell had gone on to the Internet and seen
 4       information suggesting that the number of users
16:04:19  5    for -- possible on Business One had been decreased,
 6       right?
 7                          "Answer:  I believe so.
 8                          "Question:  When did that happen and what
 9       did you find?
16:04:27 10                 "Answer:  I would have to refresh my memory
11       from the documents.  I would have to dig them out.
12                          "Question:  Fair to say, though, that prior
13       to signing the license agreement on December 23rd, 2005,
14       Hodell was aware that there was information publicly
16:04:45 15    available indicating that the number of users possible on
16       Business One might be less than 300?"
17                          Your answer:  "Yes."
18                          Do you see that?
19              A.     Yes.  This pertains to the same error that I made
16:04:59 20    earlier.
21              Q.     All right.  Well, let's see if you made that error
22       again during your deposition.
23              A.     Yeah.
24              Q.     Page 120, Line 6.  "Do you know if Hodell had found
16:05:15 25    the information that you referenced from the Internet
```

1    concerning the decreased number of users possible on

2    Business One before Hodell made the second $60,000

3    payment under the development agreement?

4              "Answer:  I don't know.

16:05:30  5              "Question:  Do you know if Hodell had found

6    the information that you're referring to on the Internet

7    about the decreased number of users for Business One

8    before it made the third $60,000 payment under the

9    development agreement?

16:05:44  10             "Answer:  I believe so."

11             Are you telling us that you're changing all

12   that testimony today?

13   A.    That was all surrounding the same question, and my

14   recollection at that time was in error.

16:06:01  15             We did not start looking for information

16   until we were seriously in trouble with lockups and we

17   needed to find out what the problem was.

18   Q.    So you're changing all that testimony that we just

19   went through?  You're telling us that three years ago,

16:06:18  20  you had that wrong, but now you have it right?

21   A.    Because I checked with the person who helped do

22   this, sir.

23   Q.    Sir, yes or no, you're changing your testimony, all

24   that testimony we just went through, you're just

16:06:37  25  reversing it?

1    A.    My testimony says what it says.

2    Q.    You were asked the question about whether anybody

3    had ever expressed any concern or information to you

4    about the number of SKUs that Hodell had.

16:06:50 5              Do you remember that?

6    A.    Could you rephrase that question?

7    Q.    Your counsel asked you some questions about whether

8    anybody ever told you about any concerns with the number

9    of SKUs Hodell had.

16:07:05 10             Do you remember being asked about that?

11   A.    Yes.

12   Q.    And you said no, no one told you anything.

13             Do you remember that?

14   A.    I didn't hear that question correctly, sir.

16:07:21 15  Q.    When your counsel asked you that question, you

16   answered, no, no one ever told you anything like that?

17   A.    That's correct.

18   Q.    Okay.  Can we put up Exhibit 12, please?

19             Sir, these are your own personal

16:07:44 20  handwritten notes from October 31st of 2005?

21   A.    Correct.

22   Q.    That's two months before the license agreement is

23   signed with SAP?

24   A.    Correct.

16:07:59 25  Q.    And at the bottom, you had a web demo of Business

1    One at that time?

2    A.    Pardon me?

3    Q.    You had a web demo of Business One at that time?

4    A.    That's what it says, yes.

16:08:11  5    Q.    Okay.  Down at the bottom you write in your own

6    hand, "Some little concern of server size for SQL

7    database greater than 120,000-plus SKUs?"

8              Do you see that?

9    A.    Yes, I see that.

16:08:30  10    Q.    And you wrote that yourself, right?

11    A.    Correct.

12    Q.    Thank you.  Let's talk about the license agreement

13    very quickly.

14    A.    It doesn't say what single --

16:08:42  15    Q.    Sir, I don't have a question.  Your attorney can

16    ask you that.  I'm moving on to a different topic.

17              Let's talk about the license agreement very

18    quickly.

19              Everybody has seen it.  Let's just confirm.

16:08:54  20    You personally read that license agreement stem-to-stern

21    before it was signed by your son at the end of December,

22    2005, right?

23    A.    Correct.

24    Q.    And you understood everything in that license

16:09:06  25    agreement, correct?

1861

1    A.    Correct.

2    Q.    In fact, Hodell had experience signing license

3    agreements for its other software in the past, right?

4    A.    Correct.

16:09:17  5    Q.    FACTS had a license agreement?  You had one with

6    Soft Tech, correct?

7    A.    I believe so.

8    Q.    Okay.  And you were aware that the only way that

9    you can actually acquire the right to use software like

16:09:56 10   Business One is to execute a license agreement with the

11   software provider, correct?

12   A.    Please restate that question.

13   Q.    You had -- let's just step back again.

14              You personally had experience licensing

16:09:56 15   software prior to the December, 2005 license agreement

16   with SAP, right?

17   A.    Correct.

18   Q.    You had done that previously with FACTS?

19   A.    Correct.

16:10:08 20   Q.    Okay.  And you understand, given your experience,

21   that in order for a customer like Hodell to actually

22   acquire licenses from a software provider like SAP, the

23   customer must sign a license agreement, correct?

24   A.    That's what you're saying, right.

16:10:29 25   Q.    I'm not asking you -- I'm asking -- it's not just

1862

1     what I'm saying.

2                    I'm asking you to confirm what you

3     understand, sir.

4                    You understood that, right?

16:10:40  5   A.     Correct.

6     Q.     Thank you.  And you understand that the only way

7     Hodell actually acquired the right to use any Business

8     One licenses was by signing the license agreement in

9     December of 2005, right?

16:10:55 10   A.     We purchased 80 user licenses back in December of

11    '04, and we made a downpayment at that time.

12                    We were not shown a license agreement at

13    that time.

14    Q.     Right, because you didn't actually acquire any

16:11:17 15   licenses then, right?

16    A.     Yes, we did.

17    Q.     Okay, sir.

18    A.     We committed ourselves to the purchase.

19    Q.     Sir, look at Page 224 of your deposition.

16:11:30 20   A.     124?

21    Q.     224.

22    A.     224.

23    Q.     Over three years ago I asked you:  "Sir, you're

24    personally aware that the only way in which Hodell had

16:11:57 25   any right at all to use any SAP software was by signing

1       this license agreement with SAP America?"

2               Your attorney objected and then you said

3       the following:  "I'm not an attorney but I suspect that

4       answer is correct."

16:12:13 5              You see that?

6       A.    Yes.

7       Q.    Okay.  And you'll agree with me that despite your

8       testimony that you somehow purchased Business One in

9       2004, Hodell didn't actually get delivery of any Business

16:12:29 10     One software until after you signed the license agreement

11      at the end of December, 2005, right?

12      A.    That is correct.

13      Q.    Thank you.  Your view of the license agreement when

14      you read this thing at the end of December of 2005, you

16:12:51 15     actually agonized over signing it, right?

16      A.    I'm sorry?

17      Q.    You actually agonized over signing the license

18      agreement, correct?

19      A.    Correct.

16:13:00 20     Q.    But you never got in touch with SAP directly, did

21      you?

22      A.    No.  We were dealing through the channel partner.

23      Q.    And LSi/IBIS were the ones that handed you the

24      license agreement, correct?

16:13:17 25     A.    That's my recollection.

1864

1    Q.    And you never even expressed any concern to LSi or

2    IBIS about the license agreement, did you?

3    A.    I directly, no.  I'm not certain if my son did

4    but --

16:13:36  5    Q.    Thank you.  Stick with what you know, okay?

6              I won't go through all the details,

7    everybody's seen it before, but very quickly, we can

8    agree that when LSi/IBIS handed you the license

9    agreement, it included what we've all seen before as

16:13:54 10    Article 4.1 concerning the relationship between SAP and

11    IBIS/LSi, right?

12              Sir?

13    A.    Yes.

14    Q.    That was in the contract when it was shown to you

16:14:15 15    by LSi/IBIS, right?

16    A.    That appears to be correct.

17    Q.    Okay.  You've contended in this case that IBIS/LSi

18    was acting as SAP's agents and you were led to believe,

19    in your view, that IBIS/LSi was SAP's agent?

16:14:33 20              That's your contention, right?

21    A.    That's my understanding of the channel partner

22    agreement.

23    Q.    Okay.  The channel partner agreement, you say?

24    A.    Correct.

16:14:43 25    Q.    Okay.

1       A.     LSi's --

2       Q.     Let's just be clear.

3                      You previously testified that you had never

4       seen the so-called channel partner agreement?

16:14:53  5     A.     But we were told that they were --

6       Q.     Sir, sir, you never saw the channel partner

7       agreement, did you?

8       A.     Not until discovery.

9       Q.     Not until this litigation.

16:15:02 10                     So at all the times before you bought the

11      software from SAP, you'd never seen that document that

12      you're referring to now, right?

13      A.     That is correct.

14      Q.     Okay.  So just so we are playing on an even field,

16:15:15 15     I'd ask you to keep your testimony here limited to the

16      personal knowledge that you had at the time and not about

17      things that you've learned afterwards.

18                     Is that fair?

19      A.     Correct.

16:15:24 20     Q.     Thank you.

21                     And so let's just be clear:  When LSi

22      presented you with the license agreement, they presented

23      you with a document that said "Licensee," that's Hodell,

24      "Acknowledges and agrees that the SAP reseller," we can

16:15:42 25     agree that's IBIS/LSi, yes?

```
 1    A.    Okay.

 2    Q.    "Through which licensee, Hodell, has arranged for

 3    the procurement of this agreement, or from which

 4    licensee, Hodell, receives any services related to the

 5    software is not the agent of SAP."

 6                Right?

 7    A.    That is what it says.

 8    Q.    And LSi/IBIS, the company that you're now

 9    contending was SAP's agent, they were the ones that

10    handed you this document saying they're not SAP's agent,

11    correct?

12    A.    That's what it says.

13    Q.    And it went on.  It said, "The SAP reseller,"

14    that's IBIS/LSi, "is an independent company, person, or

15    entity with no authority to bind SAP or make

16    representations or warranties."

17                Do you see that?

18    A.    Correct.

19    Q.    That was also in the document IBIS/LSi handed you,

20    and then you signed, right?

21    A.    Correct.

22    Q.    One of the reasons that I understand you've

23    contended that you believe IBIS/LSi was somehow SAP's

24    agent is through the use of the word "Partner," right?

25    A.    Channel partner.
```

```
          1     Q.    Channel partner, okay.

          2     A.    Which the marketing documents say they were -- the

          3     product was sold exclusively through the channel partner.

          4     Q.    Fine.  You can argue that later.

16:17:06  5           I'm asking for your understanding.

          6           Sir, Hodell itself uses that word "Partner"

          7     on its own website to describe other companies, right?

          8     A.    I believe so.

          9     Q.    All right.  Let's take a look so the jury

16:17:21 10     understands.

         11           Go to Exhibit 4, please.

         12           You have to blow that up, Bob.  It's hard

         13     to read.

         14           Go to -- go to the fourth page of this,

16:17:42 15     please.

         16           Sir, you agree with me this is a printout

         17     from your own website that was taken back in February

         18     of -- February of 2012, yes?

         19     A.    I don't know exactly when it was taken, but it's

16:18:01 20     from our website.

         21     Q.    It's from your website, good enough.

         22           And there on your own website you have

         23     companies that you describe and advertise to the world as

         24     manufacturing partner, right?

16:18:13 25     A.    Correct.
```

1    Q.    And you go on to say that "Each partner has been

2    carefully chosen for their uncompromising quality

3    products, their competitive pricing," and so on and so

4    on, right?

16:18:26  5    A.    Correct.

6    Q.    So "Partner" is a term that you yourself use to

7    describe other companies that you have a nonlegal

8    relationship with, correct?  Correct?

9    A.    Correct and --

16:18:39 10    Q.    Thank you.

11    A.    -- they provide us certifications of the products.

12    Q.    All I asked was for you to confirm --

13    A.    Yeah.

14    Q.    -- my question.  Okay?

16:18:52 15              Let's talk about Dale Van Leeuwen a little

16    bit.

17              You were here for Mr. Van Leeuwen's

18    testimony yesterday?

19    A.    Correct.

16:19:11 20    Q.    You have seen and heard the testimony about the

21    letters, you were asked about those earlier today, the

22    letters that you and your son had been sending to

23    Mr. Van Leeuwen from 2001 up through July of 2003 where

24    there were threats of litigation and so on.

16:19:29 25              Do you remember those documents?

1869

```
           1    A.    Yes, I do.

           2    Q.    Okay.  Let's just pull one of them up.

           3             Bob, pull up 312, please.  We'll go through

           4    that quickly.

16:19:39   5             Mr. Van Leeuwen testified yesterday to the

           6    effect that he didn't really believe your threats were

           7    directed at him, but you and I can agree your threats

           8    were definitely directed at Mr. Van Leeuwen and IBIS,

           9    right?

16:19:55  10    A.    You were speaking too rapidly, sir.

          11    Q.    I have a habit of that.

          12             Mr. Van Leeuwen testified yesterday to the

          13    effect that he did not believe that your threats of

          14    litigation back in 2001 and 2003 were actually directed

16:20:13  15    at him.

          16             Do you remember that?

          17    A.    That's what I believe he said.

          18    Q.    Okay.  But you and I can agree that there's no

          19    doubt you were directing your threats at Mr. Van Leeuwen

16:20:22  20    and IBIS, right?

          21    A.    That's what the letter says.

          22    Q.    Okay.  You were actually threatening to sue

          23    Van Leeuwen and IBIS back in '03, yes?  Is that right?

          24    A.    That was a strategy to get them going on correcting

16:20:43  25    the problem.
```

```
 1              We never filed a suit.  This is the first
 2    one we've ever filed in 34 years.
 3    Q.    So you're just saying, hey, you write letters to
 4    people making exaggerated claims and threatening lawsuits
 5    when you're not serious, is that what you're saying?
 6              MS. LUARDE:  Objection.
 7              THE COURT:  Overruled.
 8    A.    You're calling it an exaggeration.
 9    Q.    Well, let's make sure we all understand.
10              Let's just break it down.
11              When your attorneys asked you questions
12    about these documents today, you said you believe
13    Mr. Van Leeuwen never once lied to you; that was your
14    testimony earlier today, right?
15    A.    That's my recollection.
16    Q.    All right.  Look at Exhibit 312.  That's your own
17    e-mail to Dale Van Leeuwen copying your son Kevin July
18    24th, 2003, right?
19    A.    Correct.
20    Q.    And you're writing only to Dale; nobody else,
21    right?  It says, "Dale," do you see that?
22    A.    To Dale and a copy to Kevin.
23    Q.    A copy to Kevin, but you're directing this to Dale,
24    right?  We can agree on that?
25    A.    Yes.
```

1    Q.    And look at what you write, second paragraph, "I am

2    personally convinced that the eWMS was promoted well

3    beyond its capabilities."

4          We can agree you're telling him he has

16:22:16  5    promoted software beyond its capabilities, he's

6    misrepresented the capabilities of software.  That's what

7    you're telling him, right?

8    A.    Yeah, this represents Radio Beacon and Aperum.

9    Q.    Which was software that you acquired through

16:22:29  10   Mr. Van Leeuwen, right?  He was working on that with you?

11   A.    Correct, but it's not -- it doesn't say that he

12   necessarily represented it.

13         I have no reason to believe that he did.

14   Q.    But you were threatening him with a suit, weren't

16:22:43  15   you?

16   A.    To get some action.

17   Q.    I see.  And you say you never actually sued

18   Van Leeuwen over what you were writing about in these

19   e-mails, right?

16:22:58  20   A.    We've never sued anybody other than --

21   Q.    But you actually got restitution from Van Leeuwen,

22   didn't you?

23   A.    Explain that again.

24   Q.    You actually received restitution from Dale

16:23:13  25   Van Leeuwen; that's why you didn't sue him, correct?

1872

```
        1   A.    No.  That's not -- he took action to start
        2   correcting the problem.
        3              It took quite awhile, but he worked on it
        4   and things improved by '06 --
16:23:31 5   Q.    Could you put up Exhibit 10, Bob?  Sir, Exhibit 10
        6   is an e-mail that you received and you put your own
        7   handwritten notes on the bottom, correct?
        8   A.    Top or bottom?
        9   Q.    Pardon?
16:23:53 10  A.    On the bottom.
       11   Q.    On the bottom.  Those are your notes, right, sir?
       12   A.    Correct.
       13   Q.    And you write here, "The In-Flight pass was IBIS's
       14   restitution for our implementation penalty of Radio
16:24:05 15  Beacon."
       16              We can agree you eventually got restitution
       17   from Van Leeuwen, right?
       18   A.    That is to help us recover some of the
       19   implementation losses we suffered.
16:24:25 20  Q.    From the prior implementation, the one you were
       21   writing to him about in your letter, your e-mail on July
       22   24th, 2003, that's Exhibit 312, right?
       23   A.    Right.  That's -- that's my impression.  Okay?
       24   Q.    Well, let's just be clear.
16:24:41 25              You never told SAP about any of these
```

1      disputes you were having with Van Leeuwen and IBIS, did

2      you?

3      A.     I'm sorry?

4      Q.     You never told SAP about any of these disputes you

16:24:56  5    had -- you had been having with Mr. Van Leeuwen and IBIS,

6      did you?

7      A.     I never talked to SAP until after implementation.

8      Q.     Right.  And in your personal view, you and the

9      others at Hodell, you simply had no obligation or duty in

16:25:18 10    your mind to disclose to SAP anything at all about this

11     prior dispute with Mr. Van Leeuwen and IBIS, correct?

12     A.     That was between us and LSi and Radio Beacon.

13     Q.     So you felt like you'd never need to tell SAP a

14     thing about it, right?

16:25:40 15    A.     They didn't have anything to do with this.

16     Q.     Right.  So they, in your view, had no right to know

17     it; you had no obligation to tell them, right?

18     A.     That's correct.

19     Q.     Yet, what we just saw on Exhibit 10 was that in

16:25:58 20    connection with your next project where you were going to

21     use SAP's Business One software as your base platform and

22     build In-Flight, you were actually getting restitution

23     from Van Leeuwen from that prior dispute; yet you still

24     never told SAP anything about it, did you?

16:26:18 25    A.     Pardon?

1     Q.    Yet you still never told SAP anything about it, did

2     you?

3     A.    It didn't concern them.

4     Q.    Right.  They just didn't have any right to know in

16:26:29 5     your view, right?

6     A.    I didn't talk to them until after we were starting.

7     Q.    Right.  Because you had no relationship at all with

8     SAP, did you?

9     A.    I had relationship through LSi, the channel

16:26:44 10     partner.

11     Q.    You had no relationship with SAP directly, did you,

12     sir?

13     A.    We purchased 80 user licenses.

14     Q.    Just through a contract and you never talked to

16:26:56 15     anybody, right?

16     A.    Pardon?

17     Q.    Through a contract that you signed, without ever

18     talking with anybody at SAP, right?

19     A.    That is correct.

16:27:03 20     Q.    And you believe you had nothing akin to any kind of

21     special relationship or you had any kind of trust or

22     confidence between yourself and SAP, right?

23     A.    I -- I don't understand that question.

24     Q.    You don't believe you had any kind of special

16:27:24 25     relationship with SAP, right?

```
 1    A.    I'm not certain what you mean by that.

 2    Q.    Well, we went through this at your deposition

 3    before.

 4                  Remember testifying at your deposition that

 5    you didn't -- that you believed you merely had a

 6    business-to-business or arm's length relationship with

 7    SAP?

 8                  Do you remember that?

 9    A.    Can we read that?

10    Q.    Sure.

11    A.    Where was that?

12    Q.    Sir, Page 236 of your deposition.  It's at the end

13    of the first volume.

14    A.    236, sir?

15    Q.    Yes, sir.

16    A.    Okay.

17    Q.    On Line 8, I asked you back in February of 2012,

18    the following:  "At the time that you signed the license

19    agreement in December of 2005, did Hodell believe that it

20    had any special relationship with SAP America or SAP AG,

21    such that it was in a position of trust or confidence

22    with SAP?"

23                  Your attorney objected.  Then you answered:

24    "I don't believe it was a special relationship.  I

25    believe a company of SAP's stature requires an up and up
```

 1    relationship with all their clients.

 2                "Question:  So you'd agree that when you

 3    signed the license agreement, you had nothing more than a

 4    business-to-business or arm's length relationship between

 5    Hodell and SAP, correct?

 6                "Answer:  Correct."

 7                That testimony you stand by today, don't

 8    you, sir?

 9    A.    That's what it says.

10    Q.    And you stand by that testimony right now, don't

11    you?

12    A.    I don't know how to interpret that question.

13    Q.    Do you stand by your testimony from 2012 or not?

14    A.    I believe that there should be trust between --

15    Q.    Sir, that's not the question.

16                It calls for a yes or no.

17                Do you stand by your testimony as to what

18    you believed the relationship to be, or are you changing

19    that testimony, yes or no?

20    A.    I don't know how to answer that question.

21    Q.    Okay.  We'll move on?

22                MR. STAR:  Oh, I see the time.

23                THE COURT:  Is this a good time?  You have

24    a lot more?

25                MR. STAR:  No.  I'll finish up pretty

1    quickly tomorrow, unless you want me to go for another 15

2    minutes right now, I can probably get it done.

3                    THE COURT:  Well, we still have redirect so

4    what we'll probably do is break for the evening.

16:31:01  5            We made that promise to you 4:30.  So we'll

6    resume tomorrow morning 8:15, Mr. Panigutti, same place?

7    Sounds good.

8                    Keep in mind the admonition.  Have a good

9    night.

16:31:14 10                    (Jury out)

11                    (Proceedings adjourned at 4:31 p.m.)

12                         - - - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

1878

1        C E R T I F I C A T E

2              I certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.

5

6

7

8    **/s/Susan Trischan**

9    /S/ Susan Trischan, Official Court Reporter

10   Certified Realtime Reporter

11

12   7-189 U.S. Court House

13   801 West Superior Avenue

14   Cleveland, Ohio 44113

15   (216) 357-7087

16

17

18

19

20

21

22

23

24

25

1879

1                      **I N D E X**

2

3   **WITNESSES:**                                                   **PAGE**

4   DIRECT EXAMINATION OF OTTO REIDL (RESUMED)       1668

5   BY MS. LUARDE

6   DIRECT EXAMINATION OF OTTO REIDL (RESUMED)       1774

7   BY MS. LUARDE

8   CROSS-EXAMINATION OF OTTO REIDL                 1787

9   BY MR. STAR

10

11                        * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25