1880

1           IN THE DISTRICT COURT OF THE UNITED STATES
              FOR THE NORTHERN DISTRICT OF OHIO
2                      EASTERN DIVISION

3

HODELL-NATCO INDUSTRIES, INC.,
4                                      08CV2755
          Plaintiff,
5
       vs.                          June 25, 2015
6                                   8:30 A.M.

7   SAP AMERICA, INC., ET AL.,
                                     Volume 9
8          Defendants.

9


10
          TRANSCRIPT OF JURY TRIAL PROCEEDINGS
11      BEFORE THE HONORABLE DONALD C. NUGENT
             UNITED STATES DISTRICT JUDGE
12                  AND A JURY

13

14

15

16

17

18

19

20

21

22

23

24

25

1881

1  APPEARANCES:

2

3  For the Plaintiff:        Christopher J. Carney, Esq.
                             Sharon A. Luarde, Esq.
                             P. Wesley Lambert, Esq.
4                            Brouse McDowell
                             600 Superior Avenue East
5                            Suite 1600
                             Cleveland, Ohio   44114
6                            216-830-6830

7

8  For the Defendants:       Gregory J. Star, Esq.
                             Michael John Miller, Esq.
9                            Joseph M. Kelleher, Esq.
                             Alex H. Hayden, Esq.
10                           Drinker Biddle & Reath
                             One Logan Square
11                           18th & Cherry Streets
                             Philadelphia, PA   19103
                             215-988-2734
12

13

14

15  Official Court Reporter:  Susan K. Trischan, RMR,CRR,FCRR
                              7-189 U.S. Court House
16                            801 West Superior Avenue
                              Cleveland, Ohio  44113
17                            216-357-7087

18  Proceedings recorded by mechanical stenography;
    transcript produced by computer-aided transcription.
19

20

21

22

23

24

25

1

2                       THURSDAY, JUNE 25, 2015,  8:34 A.M.

3                       THE COURT:  Good morning, ladies and

4      gentlemen.

08:35:40  5                  Okay.  You may continue.

6                       MR. STAR:  Thank you, Your Honor.

7           CROSS-EXAMINATION OF OTTO REIDL (RESUMED)

8      BY MR. STAR:

9      Q.    Good morning, Mr. Reidl.

08:36:28 10    A.    Good morning.

11     Q.    Let's go to Exhibit 844, please.  I'll talk to you

12     a little bit about Dale Van Leeuwen.

13                      There came a point in time, sir, that you

14     learned that Mr. Van Leeuwen was quitting IBIS/LSi and he

08:36:43 15    was going to be leaving this project, right?

16     A.    Correct.

17     Q.    And that came as a surprise to you when you found

18     out that information, right?

19     A.    Correct.

08:36:55 20    Q.    Let's just take a look at Exhibit 844, and if we

21     can go to the second page of that at the bottom, you see

22     there's an e-mail from your son to Dan Lowery and you're

23     copied on that, and that's March 17th, 2006.

24                      Kevin writes, "I was recently made aware of

08:37:17 25    Dale's decision to leave IBIS.  This comes as a shock as

1    we move toward the biggest transition in our company's

2    history."

3              That was around the same time that you were

4    told Mr. Van Leeuwen was quitting, correct?

08:37:34  5    A.    Correct.

6    Q.    All right.  And then you were told that

7    Mr. Van Leeuwen was going to be replaced by a gentleman

8    named John Bilas, right?

9    A.    Can you highlight?

08:37:48  10   Q.    Yeah, I'll take you to a different document.  Let's

11   show you Exhibit 318.

12              We'll just start at the top and work our

13   way through it quickly.  The last e-mail in this chain in

14   318 is an e-mail from Jon Woodrum to your son, dated

08:38:09  15   April 25th, 2006.

16              Bob, if we can jump to the next page,

17   halfway through there's an e-mail that begins there.  I

18   just want to show -- right there.

19              This is an e-mail from Jon Woodrum to

08:38:28  20   Kevin, April 21st, 2006, right?

21   A.    Correct.

22   Q.    Okay.  And let's just go to the next page just so

23   we all understand and it's the third full paragraph.

24              This is Jon Woodrum's e-mail to Kevin.  And

08:38:46  25   you see there in the third paragraph Jon's writing, "I

1    was at the IBIS office again this week for John Bilas'

2    starting days.  Jon is Dale's replacement as the

3    In-Flight product manager and the account executive for

4    existing accounts."

08:39:01  5             It was your understanding, sir, according

6    to what you were being told by IBIS/LSi that Mr. Bilas

7    was going to be replacing Mr. Van Leeuwen, correct?

8    A.   That's what it says.

9    Q.   Okay.  And you learned that around this time in

08:39:16 10   late April of 2006, right?

11   A.   That's what this document chain indicates.

12   Q.   Okay.  And let's just look at one more document on

13   this subject.

14             Pull up 848, please.

08:39:42 15             Sir, can you identify these as your own

16   handwritten notes?

17   A.   I'm sorry.  Could you --

18   Q.   Sure.  Are you able to identify this as your open

19   handwritten notes?

08:39:51 20   A.   This is my handwritten note.

21   Q.   Okay.  So on -- pardon me -- on May 8th of 2006, is

22   it true that you were notified by Dan Lowery that John

23   Bilas was fired?

24   A.   That is correct.

08:40:06 25   Q.   Okay.  All right.  Let's move to a different

1    subject.

2                        Bob, can you pull up Exhibit 618, please?

3                        Sir, you were shown Exhibit 618 yesterday

4    morning when you were answering questions from your

08:40:27 5    counsel, and let's go to Page -- and this was just so

6    everybody's on the same -- on the same spot, this was a

7    Business One Whitepaper, and you were shown a -- some

8    language on Page 7 at the bottom there, I believe it is,

9    Bob, under the heading "Client/server architecture."

08:40:50 10                   Sir, you remember testifying about this

11   language yesterday?

12   A.    Yes.

13   Q.    Okay.  I just want to make sure that we understand

14   your position on this.

08:41:01 15                   You agree with me that this says, "To

16   secure critical business and systems processes, a robust

17   MS-SQL 2000 database is used"?

18                   Sir, you understand the MS-SQL 2000

19   database to be a Microsoft product, correct?

08:41:19 20   A.    That is correct.

21   Q.    Okay.  The next sentence says, "It supports an

22   unlimited number of simultaneous user transactions."

23                   You'd agree with me that the "It" in that

24   sentence refers to Microsoft's database product, correct?

08:41:34 25   A.    This document is about SAP Business One.

1   Q.    So you're telling us that when you read this, the

2   word "It" in your view doesn't refer to the prior

3   sentence, and the "Robust MS-SQL database," is that your

4   testimony?

08:41:57 5   A.    This document refers to the combination of SAP

6   Business One and the SQL server database, which discusses

7   the volume of transactions that could be handled by this

8   combination.

9   Q.    Okay.  So just so we understand your position, when

08:42:14 10   you read a document like this, these simple two sentences

11   here where the first sentence refers specifically to a

12   Microsoft product, as you've just admitted, and the next

13   sentence starts with the word "It," you don't believe the

14   subject of that next sentence is in fact the Microsoft

08:42:33 15   product referred to in the prior sentence?  Yes or no?

16   A.    No.

17   Q.    Thank you.  Bob, let's go to Exhibit 247, please.

18         Scroll down a little bit, please, Bob.

19   There's an e-mail from Mr. Reidl there.  I'm sorry, go up

08:43:04 20   a little bit.  We'll see.  Okay.  Stop right there.

21         Sir, you were shown Exhibit 247 yesterday

22   by your counsel.  You recall this to be an April 25th,

23   2007 e-mail that you sent to Dan Lowery and others?  We

24   can scroll down and see your text --

08:43:25 25   A.    Can we see the from and to?

1  Q.    Yeah.  Sometimes these e-mails print out in a weird

2  way.  This does show that you were the sender, and the

3  recipients are the folks highlighted in green there.

4           Do you see that?

08:43:39  5  A.    I'm sorry, could you repeat that?

6  Q.    Yes.  You see your name at the top, what we've

7  highlighted in green?

8  A.    Right.  Right.  Yes.

9  Q.    That shows you were the sender of this e-mail?

08:43:48  10  A.    Okay.

11  Q.    Okay.  Let's scroll down and see your actual

12  e-mail.

13           Okay.  This is an e-mail you were shown

14  yesterday.  You remember that?

08:43:58  15  A.    Correct.

16  Q.    This is an e-mail where you were saying things like

17  you were losing $55,000 a year in interest penalties and

18  that you were losing customers and sales and those sorts

19  of things.

08:44:11  20           Do you remember testifying about that?

21  A.    Correct.

22  Q.    Okay.  Scroll back up, Bob.  Pause right there.

23           The first recipient of that e-mail is a

24  person named Eugene Kratus, and he has an e-mail address

08:44:27  25  at a place called Spieth Bell.  Mr. Kratus was your

1  lawyer, correct?

2  A.    Correct.

3  Q.    And the Spieth Bell law firm was the same law firm

4  that actually filed this lawsuit on your behalf in

08:44:38  5  November of 2008, right?

6  A.    Correct.

7  Q.    So as of April 25th of 2007, just about six weeks

8  after go-live, you were already involving the very

9  lawyers who originally filed this lawsuit for you, right?

08:45:03 10  A.    Could you restate that question?

11  Q.    Sure.

12        As of about six weeks after go-live, you

13  were already involving the very lawyers who eventually

14  filed this lawsuit on your behalf, right?

08:45:20 15  A.    At that point I was only involved with Gene Kratus.

16  Q.    Okay.  It was his law firm that filed the lawsuit

17  on behalf of Hodell, was it not?

18  A.    Much later.

19  Q.    Thank you.  And we can agree that you involved

08:45:37 20  Mr. Kratus and his law firm some six weeks after go-live,

21  right?

22  A.    Correct.

23  Q.    So you were getting legal advice even that early

24  from the very lawyers who later filed the lawsuit for

08:45:52 25  you?

1    A.    Could you restate that, please?

2    Q.    You can agree with me you were getting advice from

3    the very law firm that later filed the lawsuit on your

4    behalf, correct?

08:46:06  5    A.    There was no advice involved.  I simply notified

6    him that we were experiencing problems.

7    Q.    Okay.  And you were telling everybody else who you

8    sent your e-mail to that you were involving lawyers,

9    because you copied a lawyer on your e-mail, right?

08:46:25  10   A.    That's correct.

11   Q.    Okay.  Yesterday you testified, excuse me.

12   Yesterday you testified to the effect that you felt after

13   go-live, you were being lied to by SAP, do you remember

14   saying that?

08:46:36  15   A.    Correct.

16   Q.    And then your attorney showed you a bunch of

17   e-mails and asked you if you would have liked to have

18   known some of the information in those e-mails, and you

19   said you would have liked to have known it.

08:46:49  20             Do you remember saying that?

21   A.    Absolutely.

22   Q.    And then you testified to the effect that had you

23   known that earlier, you would have saved something like

24   eight months and switched off to a new system sooner.

08:47:02  25             Do you remember that?

1    A.    Yes.

2    Q.    Okay.  But we know you had your lawyers involved

3    from the very start after go-live, right?

4    A.    They had been notified of our difficulties.

08:47:13  5    Q.    Okay.  So you weren't just notifying LSi or IBIS,

6    right?

7    A.    Correct.

8    Q.    Okay.  One more topic, sir.

9             Let's just make sure we understand your

08:47:32 10    testimony.

11             Am I correct that in your view, at no time

12    after go-live and throughout the two years that Hodell

13    ran Business One and In-Flight and Radio Beacon, your

14    view is at no time did the performance of that system

08:47:49 15    significantly improve?

16             That's what you believe?

17    A.    I never said that.

18    Q.    So you do believe that performance significantly

19    improved?

08:47:58 20    A.    No, I didn't say it significantly improved.

21             There was some improvement.

22    Q.    There was some.  So you at least concede there was

23    some improvement?

24    A.    Yes, it was marginal.

08:48:09 25    Q.    Okay.  There we go.  Your position is the

1    improvement was marginal?

2    A.    That's correct.

3    Q.    And your position is the improvements never got to

4    a spot where the performance was reasonable for you;

08:48:22  5    that's your position?

6    A.    Under no circumstances would I have gone to the

7    expense --

8    Q.    Sir, yes or no?  Yes or no; your position -- I'm

9    simply just trying to confirm it so this jury

08:48:34 10    understands.

11           Your position is there were merely marginal

12    improvements, and in your view, the system never got to a

13    spot that you felt was reasonable?  Yes or no?

14    A.    Not anywhere near close.

08:48:45 15    Q.    Thank you.

16           Now, you testified yesterday to the effect

17    that part of why you think SAP lied to you after go-live

18    is because SAP was mentioning that patches would be

19    installed on the system.

08:48:59 20           Do you remember saying that?

21    A.    Correct.

22    Q.    And, of course, you're aware that patches were, in

23    fact, installed on the system by SAP?

24    A.    Correct.

08:49:09 25    Q.    And you've been here for all the testimony, and

1892

1        rather than belabor the point, let's just try to get

2        right to it.  You're aware that there was something

3        called Patch Level 25 that was implemented by SAP?

4        A.    I remember that number.

08:49:23  5        Q.    Okay.  You also heard testimony about something

6        called Patch Level 29 that was implemented by SAP, right?

7        A.    I -- no, I'm not a hundred percent sure of that

8        number, but I believe it went that high.

9        Q.    All right.  And you were here for Mr. Edward

08:49:41 10        Neveux's testimony, right?

11        A.    I'm sorry?

12        Q.    You were here for Eddy Neveux's testimony?

13        A.    Correct.

14        Q.    Okay.  In fact, you even traveled, as I recall,

08:49:50 15        years ago to New Hampshire to be there for Mr. Neveux's

16        deposition, didn't you?

17        A.    No.  I didn't travel to --

18        Q.    Maybe it was your son.  Maybe I have that wrong.

19        It's been so long.

08:50:01 20        A.    Okay.

21        Q.    But you heard Mr. Neveux's testimony about Patch

22        Level 25 and 29, correct?

23        A.    Yes, I heard that.

24        Q.    Okay.  Let's pull up Exhibit 24, please -- I'm

08:50:14 25        sorry, wrong exhibit -- 166.  We will look at the details

1893

1    of the exhibit in a moment, sir, but I want to ask you a

2    couple questions.

3    A.    Okay.

4    Q.    You are aware that Mr. Neveux, along with

08:50:31  5    Mr. Killingsworth from SAP, actually came out and visited

6    with Hodell and spent a day at Hodell's offices in

7    Cleveland in October of 2007, correct?

8    A.    That was his testimony.

9    Q.    No, I'm not asking you whether you're aware of it

08:50:48  10    just through his testimony, sir.

11              I'm trying to make sure that we limit what

12    we're talking about here to the things you actually knew

13    at the time.  So let me try a different question so you

14    understand.

08:50:58  15              You were aware back in October of 2007 that

16    Mr. Neveux and Mr. Killingsworth actually came to your

17    offices for a day?

18    A.    That is my recollection.

19    Q.    Okay.  And you knew that was going to be happening;

08:51:12  20    it had been planned for a while, correct?

21    A.    I don't know how long it was planned for, but I

22    knew it was going to happen.

23    Q.    Okay.  And they came out midweek during October of

24    2007, right?

08:51:33  25    A.    This e-mail was sent about then, so --

1894

1    Q.    Okay.

2    A.    -- that would be -- I don't recall exactly what day

3    they were out there.

4    Q.    You were there when Mr. Neveux and

08:51:42 5    Mr. Killingsworth came to your offices, right?

6    A.    I was at the office.

7    Q.    Okay.  So you're aware of the things and the

8    activities that they were doing while they were at your

9    office in October of '07, right?

08:51:54 10    A.    I was aware they were there.

11    Q.    Okay.

12    A.    And --

13    Q.    And you're aware that Mr. Neveux, for instance, as

14    he testified, actually sat with users of the computer

08:52:04 15    system, observed what they were doing, right?

16    A.    Correct.

17    Q.    In fact, that's what you wanted him to be doing,

18    correct?

19    A.    Correct.

08:52:14 20    Q.    You're also aware that Mr. Neveux, as he testified,

21    installed certain software tools onto Hodell's computers

22    to measure performance and response times, right?

23    A.    That's what he said.

24    Q.    Okay.  And you don't doubt that he actually did

08:52:29 25    that?

1   A.    I have no reason to doubt it.

2   Q.    Okay.  And you don't have any reason to doubt the

3   actual performance measurements that Mr. Neveux took and

4   he testified to already in this case, right?

08:52:41  5   A.    I don't have any way to judge that.

6   Q.    Okay.  And we can agree that October, 2007, when

7   Mr. Neveux and Mr. Killingsworth actually came out,

8   turned out to be a pretty busy month for Hodell in 2007,

9   right?

08:53:04 10   A.    I suspect so.  Really October is one of our peak

11   months.

12   Q.    I'm sorry, I didn't hear the last part.

13   A.    October is normally one of our peak months.

14   Q.    Okay.  So he actually did these performance

08:53:18 15   measurements during one of Hodell's peak usage times,

16   correct?

17   A.    Peak users time is not just the month or the day,

18   but also the time of day and how many people are on the

19   system.

08:53:31 20   Q.    Okay.  I understand that, but you, we can agree,

21   Mr. Neveux and Mr. Killingsworth spent the entire day at

22   Hodell, right?

23   A.    That's what he indicated.

24          I was not involved all day long.

08:53:44 25   Q.    Okay.  Let's just make sure that we all understand

1896

1    how busy October of 2007 actually was.

2              Let's go to Exhibit 24, Bob, and the page

3    for calendar year -- calendar year 2007, please.  If we

4    can zoom in a little bit so everybody can see, we've

08:54:13  5    highlighted some columns here so we can move through this

6    pretty easy.

7              So you would agree this is your

8    consolidated financial information from 2007, right?

9    A.    Correct.

08:54:24 10    Q.    All right.  And just to move quickly, if we look at

11    gross sales, we've highlighted in green October.  You can

12    agree with me that October had the third-most gross sales

13    of any month that year, right?

14    A.    If you're referring to gross sales, correct.

08:54:39 15    Q.    Okay.  And if we go down, the next thing we have

16    highlighted on the left is "Total hours worked hourly,"

17    and for October, that was 14,246 hours?

18    A.    Correct.

19    Q.    Okay.  And if you compared that to the other 11

08:55:02 20    months, you'd agree with me that October was the

21    second-most hours worked of any month that year, right?

22    A.    Correct.

23    Q.    It was second only to August, which had about 700

24    more hours worked, right?

08:55:32 25    A.    August was the highest month.

1897

1    Q.    Okay.  By just over -- just less than 700 hours

2    more, right?

3    A.    I'm sorry?

4    Q.    By just less than 700 hours more?

08:55:48  5    A.    August had about 700 hours more, correct.

6    Q.    And just by comparison, in September there were

7    2000 hours worked less than in October, right?

8    Difference between 14,246 and 12,158?

9    A.    Correct.

08:56:07 10    Q.    All right.  And if we look at the total number of

11    pounds shipped, we'd see that October was again the

12    second busiest month, second only to May, correct?

13    A.    Correct.

14    Q.    And in October, you shipped almost 2 million

08:56:34 15    pounds?

16    A.    That's correct.

17    Q.    Okay.  And if we look at incoming orders, we see

18    that October also had the second highest number of

19    incoming orders, correct?

08:56:49 20    A.    That's correct, but that's when we get the blanket

21    orders for the following year for our Reno branch, which

22    represents half of our open sales order base.

23    Q.    Okay.  I'm not sure what you're trying to get at

24    there, but we can agree very simply that October was the

08:57:09 25    second busiest month for Hodell in 2007, right?

1    A.     In terms of pounds shipped, yes.

2    Q.     Okay.  And that's when Mr. Neveux and

3  Mr. Killingsworth came out and Mr. Neveux did his

4  measurements, yes?

08:57:29  5    A.     They came out there during October.

6    Q.     Okay.  And you never asked Mr. Neveux or

7  Mr. Killingsworth to come back on a different day, did

8  you?

9    A.     No, I did not.

08:57:40 10    Q.     Okay.

11               MR. STAR:  Thank you.  That's all I have.

12               THE COURT:  Thank you.

13               Any redirect?

14               MS. LUARDE:  Yes, Your Honor.

08:58:00 15    REDIRECT EXAMINATION OF OTTO REIDL

16  BY MS. LUARDE:

17    Q.     Good morning, Mr. Reidl.

18    A.     Good morning.

19    Q.     Mr. Reidl, you recall yesterday that at the end of

08:58:18 20  the day, you were asked whether you stood behind your

21  testimony about your relationship with SAP.

22               Do you recall that testimony by -- that you

23  had given yesterday?

24    A.     Yes.

08:58:30 25    Q.     And Mr. Star actually pointed you to portions of

1          your deposition.

2                         Do you recall that?

3          A.    Yes, he did.

4          Q.    And, Mr. Reidl, you seemed a little tired

08:58:39 5         yesterday, and can you tell the jury, do you actually

6          stand behind that portion of your deposition testimony?

7          A.    Yes, I do.

8          Q.    And, Mr. Reidl, there's also testimony yesterday

9          about your deposition and whether you knew before signing

08:58:58 10        the license agreement that SAP was only suitable for 10

11         to 100 users.

12                         Do you recall that?

13         A.    Yes.

14         Q.    And I think I need to give Kim just a second, if we

08:59:13 15        could pull up Exhibit 5.

16                         And, Mr. Reidl, we're putting in front of

17         you Exhibit 5, and if you actually would like a hard

18         copy, I can get that to you, if you can read it a little

19         easier.

08:59:36 20                        Kim, we need the entire document up.

21                         Do you recall seeing Exhibit 5, Mr. Reidl?

22         A.    Yes.

23         Q.    And can you explain to the jury why you testified

24         in your deposition that you had this information in 2005

09:00:02 25        and why that testimony is inaccurate?

```
 1              MR. STAR:  Objection.  That wasn't the

 2    question asked yesterday.

 3              THE COURT:  Overruled.

 4    BY MS. LUARDE:

 5    Q.   You can answer, Mr. Reidl.

 6    A.   At the top of the document, it indicated a date of

 7    November 1st, 2005, so in my deposition, I agonized over

 8    that date and came to the conclusion I must have known

 9    about it.

10    Q.   But in fact, you learned later that that was not

11    correct, is that right?

12    A.   That's correct.

13    Q.   And why is that, Mr. Reidl?

14    A.   Because when I examined the document further, it

15    indicated that we could not have had this document before

16    November 27th, 2005 -- 2007, because that's the date at

17    which the last notation on this document was made.

18    Q.   And, Kim, could you please highlight that portion

19    for the jury?

20    A.   So this was after we were notified that the system

21    would not work for us.

22    Q.   And, Mr. Reidl, you were also asked yesterday a lot

23    of questions about Hodell's website and whether Hodell

24    refers to certain entities as partners.

25              Do you recall that?
```

```
 1    A.    Yes.
 2    Q.    And, but those entities don't use Hodell's logo or
 3    trademark, do they?
 4    A.    They do not.
 5    Q.    And they don't actually sell Hodell's products, is
 6    that correct?
 7    A.    No, they do not.
 8    Q.    And they're vendors of yours, right?
 9    A.    Correct.
10    Q.    So --
11    A.    They supply products to us.
12    Q.    Thank you.
13              Mr. Reidl, you recall yesterday Mr. Star
14    asked you a series of questions about your handwritten
15    notes.
16              Do you recall that?
17    A.    Yes.
18    Q.    And, Kim, could you put Exhibit 826 up, please?
19              Mr. Reidl, do you recall the questioning on
20    this particular document, 826?
21    A.    Correct.
22    Q.    And your testimony yesterday was that related to
23    whether your notes referenced the number of users you
24    were told Business One could handle.
25              Do you recall that?
```

```
          1   A.    Yes, I do.
          2   Q.    And your testimony was that the notes themselves
          3   don't state that you were told 300 users, do you recall
          4   that?
09:03:23  5   A.    Yes.
          6   Q.    Does the presence or absence of that information in
          7   your notes make you any less certain that those
          8   statements were made to you?
          9   A.    No.
09:03:33 10               MR. STAR:  Objection.
         11               THE COURT:  Overruled.
         12   A.    If I had not been told that it could handle 300
         13   users over that ten-year time period, there would be no
         14   further need to have a meeting or any further
09:03:48 15   discussions.
         16   Q.    And, in fact, these notes contain some statements
         17   here about a demo, is that correct?
         18   A.    Correct.
         19   Q.    And about scheduling a demo?
09:04:04 20   A.    Pardon me?
         21   Q.    And about scheduling a demonstration?
         22   A.    Yes.
         23   Q.    And you would not have gone through that process if
         24   Business One could not support your users, correct?
09:04:12 25   A.    Absolutely not.
```

1    Q.    And, in fact, did American Express actually make a
2    proposal to you?
3    A.    Yes, they did.
4    Q.    And was this the only time that you received
5    representations from SAP's channel partners about
6    Business One's user capacity?
7    A.    No.
8    Q.    What other representations did you receive?
9    A.    I received representations from Dale Van Leeuwen of
10   IBIS.  I received, a few months later, representations by
11   Dan Lowery.  And during the entire process up through
12   2005, that continually was reinforced between 300 and 500
13   users.
14   Q.    So just to confirm, you didn't have just one
15   conversation about user capability, correct?
16   A.    No.  There were many.
17   Q.    So repeatedly in 2003, 2004, and 2005, correct?
18   A.    Correct.
19   Q.    And, Mr. Reidl, I'd like to put in front of you
20   Exhibit 12.
21         And do you recall questioning by Mr. Star
22   on this exhibit?
23   A.    Yes, I do.
24   Q.    And during your testimony, Mr. Star had cut you off
25   when you wanted to make a statement.

1          Can you tell the jury what you wanted to

2      say?

3      A.     Right.  The concern expressed there was on the SKUs

4      of greater than 120,000, but I was advised that most of

09:06:02 5      the problem in the demo was for demo software server

6      load.  Therefore, that concern was not an issue.

7      Q.     Because it had nothing to do with Hodell or your

8      servers?

9      A.     It has nothing to do with our servers.

09:06:21 10          MS. LUARDE:  Your Honor, may I approach on

11      just one issue?

12               THE COURT:  Um-hmm.

13               MS. LUARDE:  Thank you.

14               (Side-bar conference had off the record).

09:09:53 15               MS. LUARDE:  May I use one of your

16      demonstratives from yesterday?

17               MR. MILLER:  Sure.

18               MS. LUARDE:  Thank you.

19               MR. MILLER:  They are right here next to

09:10:17 20      the stand.  The ones we used yesterday, that's where we

21      left them.

22      BY MS. LUARDE:

23      Q.     Mr. Reidl, you recall that you were shown this

24      demonstrative yesterday.

09:11:04 25               Do you recall seeing this?

```
            1    A.    Yes.

            2    Q.    And on this demonstrative, you see employee head

            3    count.

            4              Do you see that?

09:11:12    5    A.    Correct.

            6    Q.    And you agree with Mr. Star that your head count

            7    did not go up at all when you switched from FACTS to

            8    Business One, is that correct?

            9    A.    That's correct.

09:11:21   10    Q.    So is it your testimony that you were harmed

           11    because you had to employ more people than in 2006?

           12    A.    No.

           13    Q.    Then how are you claiming that Hodell was harmed

           14    due to decreased productivity?

09:11:37   15              MR. STAR:  Objection.  Calls for an expert

           16    opinion.

           17              THE COURT:  Objection is overruled.

           18    BY MS. LUARDE:

           19    Q.    I'll restate it again.

09:11:44   20              How are you claiming that Hodell was harmed

           21    due to decreased productivity?

           22    A.    During this period, 2007 and 2008, we had at least

           23    27 people leave the employ of the company, and during

           24    that time our pound volume declined and we would not have

09:12:13   25    replaced those people if we -- if SAP Business One had
```

1906

1   performed as it should have, and we would not have had

2   those employees because our pound volume declined.

3          And the number of people that we had to

4   replace, times the cost of those people for a 25-month

09:12:41 5   period, amounted to a $2.6 million cost increase.

6   Q.   Okay.  And, Mr. Reidl, and that 2.6 million, over

7   what period of time was that?

8   A.   That was over the 25-month period.

9   Q.   Otto, are you telling the jury that you would have

09:13:06 10   laid off 27 people?

11   A.   No.  We would have not replaced them, as I pointed

12   out, because had SAP Business One given us the ability to

13   perform business as we should have, we wouldn't have

14   replaced the people that left.

09:13:26 15   Q.   Okay.  And Mr. Star yesterday spent a lot of time

16   with this -- these type of demonstratives related to

17   gross profit and gross sales.

18          Do you recall that?

19   A.   Correct.

09:13:43 20   Q.   And on all of these demonstratives, how do you

21   explain the high gross sales and gross profits per

22   employee in 2008?

23   A.   Those were inflation on the selling price of the

24   product per pound.

09:14:00 25   Q.   And so even though, just so I understand you, you

1  sold less product, but because the cost was more, you

2  made more money?

3  A.    We had a higher gross margin.  We did not make more

4  money.

09:14:15  5  Q.    Thank you for correcting me on that.

6              And so the demonstratives do not show that

7  2008 was your best year, do they?

8  A.    Correct.  They merely show the interim guideline of

9  gross sales and gross profit that is only part of the

09:14:32 10  picture.

11  Q.    And give me just one moment, Mr. Reidl.

12  A.    Sure.

13  Q.    And, Mr. Reidl, you recall your testimony from

14  yesterday where you marked certain items on this

09:15:12 15  demonstrative for the jury.

16              What is the true measure of profitability

17  for Hodell?

18  A.    The profit before tax.

19              MR. STAR:  Objection.  Calls for expert

09:15:25 20  opinion.

21              THE COURT:  Overruled.

22  Q.    And what is the profit before tax?

23  A.    Profit before tax is what the company makes before

24  it pays its tax, the taxes.

09:15:39 25  Q.    And so do you think SAP is accurately portraying

1    2008 as your purported best year?

2    A.    No.  Absolutely not.

3    Q.    And, Mr. Reidl, I'd like to refer you to a document

4    that we saw this morning, Exhibit 166.

09:16:23 5                    And, Mr. Reidl, you recall the testimony

6    related to whether or not October was a peak month, do

7    you recall that?

8    A.    Correct.

9    Q.    And Mr. Neveux came to Hodell in October, 2007,

09:16:40 10   correct?

11   A.    Correct.

12   Q.    And, Kim, if you could highlight for me, in the

13   fourth paragraph, there's a sentence where at the end it

14   says, "Yesterday was a slow day."  And if you could blow

09:17:06 15   that up a little bit, that would be really helpful.

16                    Mr. Reidl, do you see in this document that

17   Mr. Neveux reports that "Yesterday was a slow day as far

18   as an order entry day"?

19   A.    Absolutely.

09:17:21 20   Q.    And do you recall Mr. Neveux confirming that in his

21   testimony here during the trial?

22   A.    I'm sorry, could you repeat that?

23   Q.    Do you recall Mr. Neveux confirming that during

24   trial in his testimony?

09:17:31 25   A.    Correct.

1    Q.    And, Mr. Reidl, even though it may be a peak month,

2    you have slow days, is that right?

3    A.    Correct.

4          The peak days are near the end of the

09:17:42  5    month.

6    Q.    Thank you.

7          MS. LUARDE:  May I confer, Your Honor?

8          THE COURT:  Sure.

9    BY MS. LUARDE:

09:18:05 10    Q.    And, Mr. Reidl, one additional question.

11          Kim has just highlighted a portion for us.

12          Could you tell us what that states, what

13    Mr. Neveux reports there?

14    A.    The last highlighted section?

09:18:22 15    Q.    Yes, please.

16    A.    Okay.  It says, "I did see what looked like a

17    longer delay, but that could be due to an add-on code or

18    Citrix and the network latency issues."

19    Q.    And before that, he's referring to, "I did see what

09:18:37 20    looked like a longer than a nine-second delay," is that

21    your understanding of this highlighted portion?

22    A.    Correct.

23          MS. LUARDE:  Thank you, Mr. Reidl.

24          THE COURT:  Any recross?

09:18:50 25          MR. STAR:  Yes.  Thank you.

1          RECROSS-EXAMINATION OF OTTO REIDL

2     BY MR. STAR:

3     Q.    Sir, as I understood your testimony here a moment

4     ago concerning -- strike that.

09:19:25  5               Ms. Luarde asked you some questions about

6     the notes that you had taken and the subject we had been

7     talking about yesterday where you believed you were

8     promised 300 users.  Do you remember that?

9     A.    Correct.

09:19:36 10   Q.    Okay.  What I heard you say to her is that

11    throughout 2003, 2004, and 2005, you believe that this

12    supposed promise of 300 users for Hodell on its custom

13    software was, in your words, continually reinforced.

14               That's what you said, correct?

09:19:58 15   A.    Correct.

16    Q.    But even though you thought it was continually

17    reinforced, we can all agree never once did you write

18    that down, confirm it in an e-mail, confirm it in any

19    kind of a memo, right?  Yes or no?

09:20:09 20   A.    I didn't need to.

21    Q.    Thank you.

22               You were asked questions about testimony

23    yesterday that we went through where you had said, during

24    your deposition, that prior to signing the license

09:20:23 25   agreement, Hodell actually was aware of a distinction

1    between users and employees?

2                  Do you remember that?

3    A.    Can you refresh my memory?

4    Q.    Sure.  Ms. Luarde a few moments ago showed you

09:20:38 5    Exhibit Number 5, which was a November 1st, 2005 e-mail,

6    right?

7    A.    Correct.

8    Q.    And you told the jury that --

9                  MS. LUARDE:  Objection.  Your Honor, it

09:20:48 10   wasn't an e-mail.

11                 MR. STAR:  Sorry.

12   A.    No, it wasn't an e-mail.

13                 MR. STAR:  Article.

14                 THE WITNESS:  Thank you.

09:20:55 15   BY MR. STAR:

16   Q.    Your testimony a moment ago was that it was because

17   of the date at the bottom of that document that you

18   believe you were confused three years ago when you

19   testified, right?

09:21:05 20   A.    No.  No.  I said the top of the document date is

21   what confused me about when we learned of that.

22   Q.    I understand.

23                 Bob, pull up Exhibit 5 real quick.  Okay.

24   This is in fact the document, right?

09:21:28 25   A.    Pardon?

1912

```
              1    Q.    This is the document?

              2    A.    I need to look at the whole document --

              3    Q.    Scroll down, please.

              4    A.    -- to see.

09:21:40      5                    This is the document.

              6    Q.    Okay.  And it was marked as Exhibit 5 at your

              7    deposition three years ago?

              8    A.    Correct.

              9    Q.    You have your transcript up there in front of you,

09:21:49     10    sir?

             11    A.    Do I have my transcript?

             12    Q.    Your deposition transcript, is that still in front

             13    of you?

             14    A.    Yes.

09:22:00     15    Q.    All right.  Flip to Page 125 for me.

             16    A.    Okay.

             17    Q.    All right.  Top of Page 125, I asked you.

             18     -- pardon me, right in the middle, Line 8, I said can

             19    you mark -- I said to the court reporter --

09:22:33     20    A.    Wait, could you slow down a bit?

             21    Q.    Sure.  Page 125, I said to the court reporter, "Can

             22    you mark this as the next exhibit, please?"

             23    A.    I'm sorry, I can't make out what you're saying.

             24    Q.    You're having trouble hearing me?

09:22:45     25    A.    Yeah -- no, it was either too fast or too close to
```

1    the microphone.  I'm not sure which.

2    Q.    I'm trying to be loud enough so you can hear me.

3    A.    It was loud enough.  I can't make out the words.  I

4    apologize.

09:22:58  5    Q.    No worries.  I'll try again.

6               You agree with me that at Page 125 of your

7    transcript we actually marked this document as Exhibit 5,

8    right?

9    A.    Correct.

09:23:08  10    Q.    Okay.  Go back to Page 110 of your transcript.

11    A.    Okay.

12    Q.    All right.  Now, we can agree that this is some 15

13    pages of testimony prior to us marking Exhibit 5 during

14    your deposition, right?

09:23:37  15    A.    Okay.

16    Q.    All right.  Bottom of Page 110, Line 18, you said:

17    "We had gone on the Internet and seen -- and seen some

18    indication that the number of users, the limit on the

19    number of users was declining, the number of users."

09:23:57  20               Do you see that?

21    A.    Correct.

22    Q.    I said:  "When was this?"

23               You answered:  "Sometime during '05 or '04.

24               "Question:  Prior to December 23rd of 2005?

09:24:10  25               "Answer:  Correct."

1914

1        Then go to Page 117, Line 11.  We can also

2   agree that this testimony at Page 117 was prior to you

3   being shown Exhibit 5, correct?

4   A.    Correct.

5   Q.    Okay.  At Line 11 of Page 117, I asked you:  "Now,

6   you said that prior to December 23rd, 2005, Hodell had

7   gone onto the Internet and seen information suggesting

8   that the number of users for possible on Business One had

9   been decreased, right?"

10       Your answer:  "I believe so.

11       "Question:  When did that happen and what

12  did you find?

13       "Answer:  I would have to refresh my memory

14  from the documents.  I would have to dig them out.

15       "Question:  Fair to say, though, that prior

16  to signing the license agreement on December 23rd, 2005,

17  Hodell was aware that there was information publicly

18  available indicating that the number of users possible on

19  Business One might be less than 300?"

20       Your answer, one word:  "Yes."

21       Do you see that?

22  A.    Correct.

23  Q.    Okay.  Look at Page 120, Line 13.  We went through

24  this yesterday.

25       "Question:  Do you know if Hodell had found

1915

           1    the information that you're referring to on the Internet

           2    about the decreased number of users for Business One

           3    before it made the third $60,000 payment under the

           4    development agreement?

09:25:58   5                        "Answer:  I believe so."

           6                        See that?

           7    A.    I don't, no.

           8    Q.    You don't see that testimony?

           9    A.    Correct.

09:26:10  10    Q.    Page 120, Line 13 through 19.

          11    A.    Okay.

          12    Q.    You agree that I read that testimony correct?

          13    Quickly?

          14    A.    You're looking at what line number now?

09:26:34  15    Q.    Page 120, Lines 13 through 19, ending with your

          16    answer, "I believe so."

          17    A.    You're looking at what page number, sir?

          18                        MR. STAR:  May I approach, Your Honor?

          19                        THE COURT:  Sure.

09:26:57  20                        THE WITNESS:  Yeah.

          21    BY MR. STAR:

          22    Q.    I'm down here.

          23    A.    Okay.

          24    Q.    120 right there.

09:27:05  25    A.    Okay.

1916

1    Q.    All right.  You're at the spot now.

2              Let's just do it again.  Page 120, Line 13,

3    "Question:  Do you know if Hodell had found the

4    information that you're referring to on the Internet

09:27:22 5    about the decreased number of users for Business One

6    before it made the third $60,000 payment under the

7    development agreement?

8              "Answer:  I believe so."

9              That is your testimony?

09:27:34 10   A.    That was my testimony, yes.

11   Q.    Okay.

12   A.    Correct.

13   Q.    Then, of course, if we go to Page 125, that's when

14   Exhibit 5 was entered as an exhibit during your

09:27:48 15   deposition, right?

16   A.    Okay.

17   Q.    Go to the bottom of Page 126, Line 21.

18              "Question:  You believe that Hodell did

19   actually have this November 1st, 2000 document in its

09:28:09 20   possession prior to signing the license agreement in

21   December, 2005?"

22              Your answer:  "I don't know.  I don't know.

23   I don't recall.

24              "Question:  Okay.  But you do believe that

09:28:23 25   Hodell had information in its possession prior to signing

1917

1     the license agreement that indicated that the number of

2     users possible on Business One had decreased to something

3     less than 300, right?"

4                    Your answer.  Can you read that for the

09:28:40  5     jury, your answer?

6     A.     "Correct."

7     Q.     Thank you.

8     A.     In all these cases, I asked --

9     Q.     Sir, sir, I just asked you to confirm the answer.

09:28:51  10    A.     Okay.

11    Q.     Your testimony was what we just read, wasn't it? I

12    got that right?

13    A.     That's what it was.

14    Q.     Thank you.

09:28:59  15    A.     I also said I needed to take another look at the

16    document.

17    Q.     Fine.  Let's just go back through it because you

18    said on at least three occasions before you were even

19    shown that exhibit, that you were certain that Hodell had

09:29:11  20    seen the kind of information that those questions

21    referred to.

22                    That was your testimony, wasn't it?

23    A.     That's what the document says.

24    Q.     Thank you.

09:29:26  25                    Now, you admitted when Ms. Luarde asked you

             1    some questions that Hodell did not actually have more

             2    employees when it was running Business One than it did

             3    when it was running FACTS in 2006, that's what you

             4    confirmed, right?

09:29:43     5    A.    The total number on board were not more.

             6    Q.    Okay.  Then you said something that I think we've

             7    never heard in the seven years we've been litigating this

             8    case.

             9          You said 27 people quit on their own and

09:30:04    10    you had to replace them just because the number of

            11    pounds -- strike that.

            12          What you said was 27 people quit Hodell,

            13    and you had to replace them because of Business One, that

            14    was your testimony, right?

09:30:18    15    A.    I said 27 people left, I believe.

            16    Q.    Fine.

            17    A.    Okay.

            18    Q.    We can agree that never before in the seven years

            19    we've been litigating this case have you ever, ever

09:30:33    20    indicated that that's the theory behind your damages

            21    claim, have you?  Never once.

            22    A.    It's because you are confusing head count

            23    with -- when a company starts a given year with a head

            24    count, by the end of the year, there have been some

09:30:52    25    people who have left and some people have been added or

1919

1    not added.

2    Q.    Thank you.

3    A.    And to handle the business --

4    Q.    So we can agree -- sir, we can agree that until

09:31:01  5    this morning, you've never actually articulated this as

6    your damages theory, have you?

7    A.    The fact that we needed --

8    Q.    Yes or no?

9    A.    -- more people --

09:31:17 10    Q.    Yes or no?  Today was the first time?

11    A.    That's not a yes or no answer -- yes or no

12    question.

13    Q.    And still as of today, you've never even brought in

14    a single record of any of these people you say left,

09:31:29 15    right?

16    A.    I was not asked for that record.

17    Q.    Well, sir, let's understand.  You had lawyers

18    involved, we've already established that, since the month

19    after go-live in 2007, right?

09:31:45 20    A.    Could you repeat that, please?

21    Q.    You had lawyers involved in the month after go-live

22    back in April of 2007, correct?

23    A.    We had contact with the attorneys.

24    Q.    Thank you.  The very attorneys that then filed the

09:31:58 25    lawsuit for you in November of 2008?

```
          1    A.      Yes.  Much later than that.

          2    Q.      Thank you.  And you understood, of course, that

          3    Hodell had obligations to provide all of the documents it

          4    might use to support any claim for damages; you

09:32:15  5    understood that, right?

          6    A.      Yeah.

          7    Q.      Yes or no?

          8    A.      That's my understanding.

          9    Q.      Okay.

09:32:22 10    A.      I --

         11    Q.      And you're now telling us, you're now telling us,

         12    sir, that your damages theory is that 27 people left the

         13    company and you had to hire 27 new people, that's what

         14    you're telling us right now, right?

09:32:37 15    A.      Correct.

         16    Q.      Yet even though you acknowledge that you and your

         17    company had an obligation in this case to actually

         18    provide documentation that would support such a claim,

         19    you can agree with me that you never provided anything

09:32:52 20    like that, right?

         21    A.      You are not allowing me to answer how a corporation

         22    operates.

         23    Q.      Sir, have you given us a single record showing the

         24    name of even a single one of these supposed 27 people who

09:33:05 25    left your company; yes or no?
```

```
 1    A.    I have not provided that information.

 2    Q.    You can agree with me that you've also not given

 3    any information about these supposed 27 replacement

 4    workers that you hired to fill those spots, right?

 5    A.    Employment levels in a company do not stay

 6    stagnant.

 7    Q.    Sir, yes or no?  Yes or no?

 8    A.    No.

 9    Q.    And, of course, besides not giving us a single name

10    of any of the people who left or the people you say were

11    replaced, you've never told us what you were paying those

12    old workers who left or what you might have been paying

13    the new workers who you hired to replace them, right?

14              You've never given us specific information?

15    A.    Correct.

16              MR. STAR:  That's all I have, Your Honor.

17              One second to confer.

18              (Pause)

19    BY MR. STAR:

20    Q.    One more series of questions.

21              Sir, I'll be brief.  We can agree that even

22    if, as you say, people left and you replaced those

23    people, nonetheless, in 2008 you were still more

24    profitable, you made more money per employee, you were

25    more efficient, right?
```

1922

1        A.     No.  That's gross profit.  That does not reflect

2        the profit of a company.

3        Q.     You brought in more money, more money came in the

4        door per hour worked in 2008 than in any other year,

09:35:37 5      correct?

6        A.     We --

7        Q.     Yes or no?

8        A.     Incorrect.

9        Q.     You're telling us that more money came in per hour

09:35:45 10     worked in some other year?  Look at those numbers.

11       A.     The dollars came in more, but there was inflation

12       and the cost of product also inflated.

13       Q.     The amount of money brought in the door per hour

14       worked, regardless of whether you hired people to replace

09:36:00 15     the 27 folks you say left, was still more, wasn't it,

16       sir?

17       A.     But it doesn't reflect the cost of operating a

18       company.

19                      MR. MILLER:  Forgive me, Your Honor.

09:36:23 20     Q.     And even if we look at it this way, sir, the total

21       amount of money you brought in the door was more in 2008

22       than in any other year, correct?

23       A.     The way you define it, that's what it says.

24       Q.     All right.  So even though you say you had to have

09:36:44 25     more workers, you still brought more money in the door in

1923

1   2008, right?

2   A.    I said we had to have more workers for the pounds

3   shipped.

4   Q.    And still, we don't know who those workers are,

5   right?

6   A.    I'm sorry?

7   Q.    And still, we don't know who those workers are,

8   correct?

9   A.    Correct.

10                  MR. STAR:  Thank you.

11                  THE COURT:  Mr. Reidl, you're excused, sir.

12  Thank you.

13                  (Witness excused)

14                  THE COURT:  You may call your next witness.

15                  MS. LUARDE:  Your Honor, we would like to

16  renew our request to proffer Dr. Kennedy's testimony.

17                  THE COURT:  All right.  But that doesn't

18  have anything to do with what we're doing here.

19                  MS. LUARDE:  Subject to the admission of

20  exhibits and we need to discuss with counsel two of their

21  witnesses we are allowed to take as if in our case in

22  chief, and that would be --

23                  MR. MILLER:  Can we approach?

24                  MR. STAR:  We can approach.

25                  MS. LUARDE:  Yes.

1924

1            (Side-bar conference had off the record)

2            THE COURT:  All right.  Folks, the

3    Plaintiff has rested its case.  That means you've heard

4    all the testimony the Plaintiff intends to offer in its

09:39:37  5    case in chief.

6            Generally we take a recess at this time, go

7    through all the exhibits and things like that, legal

8    issues.  The parties have agreed that we don't have to do

9    that now, we can do it at a time when your time is not

09:39:49 10    being inconvenienced.

11            And so that means neither party waives any

12    of its rights at this time.  They're still reserved to

13    the appropriate time, so legal issues can be addressed to

14    me, and they can have an opportunity to go through the

09:40:02 15    exhibits.

16            But that does mean that the Plaintiff has

17    offered the evidence that it wants in its case in chief,

18    and the Defense now has an opportunity if they wish to go

19    forward with any testimony.

09:40:13 20            So will there be any testimony on behalf of

21    the Defense?

22            MR. STAR:  Yes, Your Honor.

23            THE COURT:  Call your first witness.

24            MR. STAR:  Thank you.  We are calling

09:40:26 25    Penelope Vitantonio, Your Honor.

1      THE COURT:  We have a couple things at

2   10:00.  An arraignment, you probably don't care about.

3   That's when people come in the first time after they are

4   charged, after an indictment has been returned.  You may

09:40:39  5   have read something about this, it's a pretty big

6   Medicaid, Medicare fraud going on.  It's the first

7   installment of people charged with that.  And then I have

8   a sentencing of somebody who was involved in drugs.

9      And when you go on your break, you can come

09:40:56 10   back out if you want, if you're interested at all,

11   because I'm going to give the court reporters a break

12   first, and then when they come back, we will go.  If you

13   want to come back in and watch, you can.  You don't have

14   to.  It just shows you sometimes what we do during

09:41:12 15   criminal cases.

16      A JUROR:  Sit in the back?

17      THE COURT:  No, right there.  Are you

18   afraid of something?

19      A JUROR:  No.  Just --

09:41:29 20      THE COURT:  Okay.  We'll educate you a

21   little bit about what happens in the criminal arena.

22      Ma'am, would you raise your right hand for

23   me?

24

25

1926

| | |
|---|---|
| 1 | PENELOPE VITANTONIO |
| 2 | of lawful age, a witness called by the DEFENSE, |
| 3 | being first duly sworn, was examined |
| 4 | and testified as follows: |
| 09:42:01 5 | THE COURT:  Please have a seat up there. |
| 6 | Could you tell us your full name and spell |
| 7 | your last name? |
| 8 | THE WITNESS:  Yes.  Penelope A. Vitantonio, |
| 9 | V-I-T-A-N-T-O-N-I-O. |
| 09:42:20 10 | THE COURT:  Thank you. |
| 11 | MR. STAR:  Thank you, your Honor. |
| 12 | DIRECT EXAMINATION OF PENELOPE VITANTONIO |
| 13 | BY MR. STAR: |
| 14 | Q.   Good morning, Ms. Vitantonio. |
| 09:42:27 15 | A.   Good morning. |
| 16 | Q.   Ma'am, just tell the jury a little bit about |
| 17 | yourself, where you presently work. |
| 18 | A.   Sure.  I work for SAP.  I'm in North America field |
| 19 | marketing. |
| 09:42:37 20 | Q.   And let's just go through your background and your |
| 21 | experience. |
| 22 | You're obviously in the software industry? |
| 23 | A.   Yes. |
| 24 | Q.   Okay.  When did you start in the software industry? |
| 09:42:46 25 | A.   1990. |

1927

1    Q.    And in 1990, who were you working with?

2    A.    I worked for Sterling Software here in -- actually

3    out of Beachwood, Ohio.

4    Q.    And --

09:42:56  5    A.    Or a retail software company.

6    Q.    Thank you.  By the way, where do you live?

7    A.    I live in Independence, so --

8    Q.    And you presently work for SAP here in Ohio?

9    A.    Yes.

09:43:05 10    Q.    Okay.  Do you know how many people are employed by

11    SAP in Ohio?

12    A.    In Ohio, there's between a hundred and 120.

13    Q.    Okay.  All right.  So you started working in the

14    software industry back in the nineties.

09:43:17 15          What was your next employment in that

16    industry?

17    A.    I worked for Sterling Software until 1998, and then

18    I was interviewing with SAP.  I went to SAP in 1998 and

19    worked in a field marketing role covering the midwest

09:43:31 20    here.

21          I did that for about two years until 2000.

22          And then I left and worked for a company

23    out of California, an application hosting company, and

24    worked there a couple of years.

09:43:44 25          And then worked for -- went to American

```
 1    Express.  I was laid off from that company in California,
 2    and I went to work for American Express then in a sales
 3    role.
 4    Q.    And when did you go to American Express?
 5    A.    It was July of 2004.
 6    Q.    And how long were you there?
 7    A.    About two years.
 8    Q.    All right.  So approximately July of 2002 through
 9    sometime in 2004?
10    A.    Yes.
11    Q.    Okay.  And at some point during your time at
12    American Express, were you working in any capacity with
13    the Business One software?
14    A.    Yes, I was.
15    Q.    Can you explain that?
16    A.    Because of my SAP background, our New York office
17    of American Express was starting a new relationship with
18    SAP to sell SAP Business One.  We were already a reseller
19    of Microsoft Business Solutions.
20    Q.    Okay.  And American Express, were they -- they were
21    selling multiple or reselling multiple vendor software
22    products?
23    A.    Yes.
24    Q.    You mentioned Microsoft products?
25    A.    Yes, Microsoft products first, yeah.
```

1    Q.    Those Microsoft products, did they compete with SAP

2    products in some way?

3    A.    Yes.

4    Q.    And tell us a little bit about what you did at

09:45:00  5    American Express with respect to Business One?

6    A.    I was a sales rep for them.  I was asked to go to

7    training for the first training that was happening, and I

8    was asked to also sell Business One in addition to

9    Microsoft Business Solutions.

09:45:19  10    Q.    Okay.  And when you were asked, you were asked by

11    American Express?

12    A.    I was asked by American Express management.

13    Q.    And you were employed by American Express at that

14    time?

09:45:27  15    A.    Yes.

16    Q.    Okay.  You weren't employed by SAP?

17    A.    No.

18    Q.    Let's, we're going to come back to some of those

19    events in that time frame, but let's just go through the

09:45:37  20    rest of your employment history and up to how you got

21    back to SAP now.

22    A.    Sure.

23    Q.    After American Express, where did you go next?

24    A.    I was recruited away to a company up out of New

09:45:49  25    York, Corning, New York, who also sold multiple software

1      products.

2                      I was in a business development role, so I

3      was both a sales rep and a sales manager.

4      Q.    What products were you dealing with at that time?

09:46:04  5      A.    Microsoft Business Solutions and also SAP Business

6      One and SAP All-In-One.

7      Q.    Was that Microsoft product something that competed

8      in some way with the SAP products?

9      A.    Yes.

09:46:14 10      Q.    Okay.  And you returned to SAP in some capacity in

11      what year?

12      A.    In late 2004.

13      Q.    Okay.  And you've been with SAP since late 2004?

14      A.    Yes.

09:46:27 15      Q.    And just quickly go through what you've been doing

16      at SAP since you came back in 2004.

17      A.    I came back as a -- in a marketing role, actually

18      as a contractor first for about six months, and then in a

19      marketing role for our ERP and HR products solutions.

09:46:45 20      Q.    Okay.  Just so we understand -- sorry.

21      A.    Sorry.  It's for the larger enterprise companies so

22      companies a billion and above in sales.

23      Q.    Okay.

24      A.    So I focused on that since late 2004.

09:46:57 25      Q.    And since you returned to SAP in 2004, have you

1931

1    worked at all with Business One or marketing with

2    Business One or anything about that product?

3    A.    No.  No.

4    Q.    Okay.  Let's go back to the time that you were with

09:47:11  5    American Express.

6                My colleague tells me maybe we had some

7    confusion there, that perhaps that you said -- let's just

8    get your start -- your employment dates at American

9    Express.

09:47:32 10    A.    Yeah.

11    Q.    Was it July, 2002 through sometime in 2004?

12    A.    Yes.  I think it was early 2004, though.  I'm a

13    little fuzzy on the dates.

14    Q.    Okay.  So about a two-year period?

09:47:43 15    A.    Yes.

16    Q.    Great.  All right.  Let's talk about what you were

17    doing at American Express.

18                There came a time when you met folks from

19    Hodell and Otto Reidl, correct?

09:47:52 20    A.    Yes.

21    Q.    Okay.  Tell us about how that happened.

22    A.    I received a lead from, I guess it was SAP.  It was

23    a Business One opportunity or a lead, some interest.

24    Mr. Reidl was interested in our Business One Solution so

09:48:12 25    I called and followed up on the lead and left a phone

1932

1    call.  I sent him some information.

2    Q.    And when you say "Our Business One Solution," what

3    exactly are you referring to?

4    A.    The SAP Business One Solution, the American Express

09:48:29  5    Business One, the American Express Edition.

6    Q.    What does that mean the American Express Edition?

7    Explain to the jury how that worked.

8    A.    American Express was working with a partner of

9    SAP's, and we created an American Express Edition that

09:48:41 10    had additional functionality for companies like

11    Hodell-Natco, for distributors and warehouses.

12              It was more for the warehouse management

13    and EDI solutions.

14    Q.    So the jury's heard testimony about add-on

09:48:57 15    products.

16              Is it correct that what American Express

17    had was their own add-on product?

18    A.    Yes.

19    Q.    To the base Business One software?

09:49:06 20    A.    Yes.

21    Q.    And when you went out to market that product, it

22    had a name?

23    A.    Yes.

24    Q.    It was called the American Express Edition?

09:49:11 25    A.    Yes.

1933

```
         1    Q.    And it's that product that you were discussing with
         2    Mr. Reidl and folks at Hodell?
         3    A.    Yes.
         4    Q.    All right.  Let's walk through what happened.
09:49:25 5          You had a series of conversations with
         6    Mr. Reidl, right?
         7    A.    Yes.
         8    Q.    You met with him face-to-face on occasion?
         9    A.    Yes.
09:50:14 10   Q.    All right.  Bob, let's go to Exhibit 816, please.
        11          Ma'am, we'll show you the whole thing here
        12    and I'm wondering if you can just identify for the jury
        13    what we're looking at.
        14    A.    Sure.  These are my notes from a meeting with
09:50:14 15   Mr. Reidl and a couple of people from American Express on
        16    my side, Mike Neuendorff and Dale, and --
        17    Q.    And what's the date of that meeting?
        18    A.    November 7th of 2003.
        19    Q.    All right.  It looks like you took a lot of notes
09:50:14 20   and we're going to try to walk through it.
        21          We've highlighted some spots to focus
        22    attention on.
        23          On the left-hand side, it's a little bit
        24    difficult to read, but can you tell the jury what you
09:50:27 25   were noting there and what was being discussed at the
```

1934

1    time?

2    A.    We were talking about the -- you want me to read

3    what's highlighted?

4    Q.    Well, you can explain what was going on.

5    A.    Or just explain.

6    Q.    That would be very helpful.

7    A.    Okay.  So this was a discovery meeting where I was

8    trying to understand the business and what the needs

9    were, and so we talked about what Hodell-Natco currently

09:50:55 10   has in as a software system.

11                    They currently have 130 users.  They don't

12   use them.  They have a profile company, very strong,

13   largest distributor, they're technology bound, they deal

14   with package sizes.

09:51:11 15   Q.    Let's pause you right there.  What do you mean that

16   they were technology bound?  What did that mean to you?

17   A.    They were kind of stuck by their current

18   technology.  They couldn't do what they wanted to do so

19   they were looking for a new solution.

09:51:26 20   Q.    Okay.  In the left-hand side -- on the left-hand

21   side there, there's some highlighting of some text.  It

22   looks like it says -- well, maybe you can tell us.  Those

23   are your notes, so.

24   A.    Yes.  My chicken scratch.  A hundred users software

09:51:41 25   and services.

1935

1    Q.    Okay.  Why did you write "a hundred users software

2    and services"?

3    A.    Because we were talking about a hundred users.

4    Q.    Okay.

09:51:48  5    A.    And that was the -- the number we were talking

6    about.

7    Q.    Okay.

8          There's been testimony in this case that

9    you were part of conversations during which promises were

09:52:02 10    made to Mr. Reidl and Hodell that they could have 300

11    users on the Business One system that they were

12    discussing.

13          Do you recall ever being involved in a

14    conversation like that?

09:52:18 15    A.    No.

16    Q.    Okay.  Let's keep going through some of your other

17    notes.

18          Bob, let's go to Exhibit 818, please.  Are

19    you able to identify this document for us?

09:52:40 20    A.    Yes.  This was an internal conversation with Eric

21    Worth, who is out of our New York office, and we were

22    talking about the Hodell estimate and what we could come

23    back to them with, and we said we could cap it at

24    $400,000, for a hundred users, software and services, but

09:53:03 25    it has to close, this is no equipment, no handhelds, no

1   access points to the warehouse, and they have to be a

2   reference for us.

3   Q.    Okay.  And these are your own notes, right?

4   A.    These are my notes, yes.

09:53:14  5   Q.    And why did you write down a hundred users?  Why

6   was that something you would make a note of?

7   A.    Because that's the number we were talking about.

8   Q.    Okay.  If you had been talking about 300 users,

9   would you have written that down?

09:53:26  10   A.    Yes.

11   Q.    Why would you have written down 300 users if that's

12   something you had been talking about?

13   A.    Because I'm a sales rep and it would have been a

14   bigger commission check for me.

09:53:35  15   Q.    Okay.

16   A.    Because it was priced per user.

17   Q.    What was the price per user, if you can recall?

18   A.    3750, $3,750 per user.

19   Q.    Okay.  Let's go to Exhibit 820, please.  Are you

09:53:58  20   able to identify this for us?

21   A.    Yes.  My notes.

22   Q.    And what date did you take those notes?

23   A.    December 3rd of 2003.

24   Q.    And tell us, what do these notes reflect?  What was

09:54:13  25   going on on December 3rd of 2003 that you took these

1    notes about?

2    A.    This was a meeting at Hodell, at their office, with

3    some members of the Hodell team, including Otto, Kevin,

4    Mark, Bill, Rex, Kevin Ebinowski.

09:54:33 5    Q.    Okay.  Down in the left margin, it's a little bit

6    difficult to read.  You write something that looks like

7    "Dale EXT."

8              What does that mean?

9    A.    Next to the master counts.

09:54:48 10    Q.    Let me ask you a better question.  I'm just trying

11    to establish who was part of this meeting.

12              Do you recall if Mr. Van Leeuwen, Dale

13    Van Leeuwen, was part of this meeting at all?

14    A.    If you go up a little bit, "not there, late."

09:55:05 15    Somebody was late.  Kevin -- Dale -- I don't -- I don't

16    recall.  He may have been on the phone.  I don't recall.

17    Q.    Okay.  And do you recall if you were on the phone

18    with the folks at Hodell or were you at their offices?

19    A.    No, we were at their office.

09:55:18 20    Q.    And you say we, it was you and somebody else from

21    American --

22    A.    Yes.

23    Q.    We're going a little fast.  You just need to let me

24    finish and then you can answer.

09:55:28 25    A.    Okay.

1938

1  Q.    Yeah, the court reporter can't take it down.

2        So just to be clear, you went with somebody

3  else from American Express?

4  A.    Yes.

09:55:34  5  Q.    And who was that person?

6  A.    I went with Dan Gobbelet.

7  Q.    Okay.

8  A.    Mike Neuendorff, and Eric Worth, and I don't recall

9  the others.  There may have been a couple of others.

09:55:56  10  Q.    Okay.  There's been testimony in this case that it

11  was during this particular meeting on December 3rd of

12  2003 that Mr. Reidl asked for a specific assurance that

13  Business One would support his particular need for 300

14  users.

09:56:18  15        Do you recall that being discussed or

16  mentioned in any way during the December 3rd, 2003

17  meeting?

18  A.    No.  I don't.

19  Q.    Do you see anywhere in your notes --

09:56:30  20  A.    I don't have --

21  Q.    -- where you wrote down anything like that?

22  A.    No, I don't have it in my notes.

23  Q.    And if that would have been discussed, is that

24  something you would have written down?

09:56:39  25  A.    Yes.

1939

1    Q.    Why?

2    A.    Because we were only talking about a hundred users,

3    and that was three times the number.

4    Q.    And you would have written that down for purposes

09:56:50  5    of pricing or for another reason?

6    A.    For pricing.

7    Q.    Okay.

8    A.    Sure.

9    Q.    Before we move off of this, just down at the very

09:56:59 10    bottom, Bob, if you can highlight or focus in on that

11    highlighting at the bottom.

12    A.    "Ninety-day testing, implementation, run parallel."

13    Q.    What did you mean "run parallel"?  What was being

14    discussed?

09:57:11 15    A.    We were talking about Hodell did not want to cut

16    over immediately to the American Express Edition.  They

17    wanted -- we wanted to run parallel to do testing, to

18    make sure it worked, to make sure that it was sized

19    correctly.

09:57:26 20    Q.    And just help us understand, you're not a technical

21    person, right?

22    A.    No.

23    Q.    You don't know the details of how Business One or

24    any of the add-ons are coded?

09:57:36 25    A.    No.

1940

1    Q.    Right?  You were in a sales role for American

2    Express?

3    A.    Sales, yes.

4    Q.    Okay.  And in that role, you're gathering

09:57:45 5    information, right?

6    A.    Yes.

7    Q.    Okay.  And what was your understanding of -- strike

8    that.

9            There's been testimony here about parallel

09:57:53 10    systems.

11            Is that also something that's referred to

12    as running a Legacy System?

13    A.    If you're running them together, yes.

14    Q.    Right.  And you understand that to mean that when

09:58:04 15    you switch from your old system, your Legacy System, to

16    your new system --

17            MR. CARNEY:  Objection.

18            THE COURT:  Overruled.

19    BY MR. STAR:

09:58:11 20    Q.    -- you continue to run the old system for a period

21    of time?

22    A.    Yes.

23    Q.    And what's the reason -- what do you understand the

24    reason to be as you indicated in your notes that you were

09:58:21 25    discussing running parallel?

1  A.    To make sure the new system is doing what it's

2  supposed to as compared to the old system.

3  Q.    Okay.  And in case the new system doesn't do what

4  you wanted it to do --

09:58:38 5  A.    Yes.

6  Q.    -- what happens in that scenario?

7  A.    You have the old system as your backup and it's

8  still running your business.

9  Q.    And based on your notes from December 3rd, 2003, is

09:58:50 10  it your testimony that running parallel was something

11  that was actually discussed with Hodell?

12  A.    Yes.

13  Q.    Let's go to Exhibit 821, please.  This is also a

14  little bit difficult to read, but can you identify it for

09:59:20 15  us?

16  A.    Yes.  These were my notes from a December 19th call

17  with Eric Worth and Jais, who was one of our technical

18  people at American Express.

19  Q.    Okay.  Do you see anything in these notes where you

09:59:41 20  wrote down that you had been discussing with anybody the

21  number of users and Hodell wanting supposedly to have 300

22  users?

23  A.    No.  Not in these notes.

24  Q.    Let's go to your -- let's go to 822.  Yes, we'll be

10:00:28 25  there.  Bob, are you able to blow that one up a little

1942

1    bit?  Let's just focus on the top for a minute.

2                    Ma'am, are you able to identify

3    these -- this document for us?

4    A.    Yes.  These are my notes.

5    Q.    And from what date?

6    A.    From -- from February 2nd of 2004.

7    Q.    February 7th or 2nd?

8    A.    I'm sorry, February 2nd.

9    Q.    Okay of 2004?

10   A.    2004.

11   Q.    So you'd been having at this point a series of

12   discussions with Mr. Reidl?

13   A.    Yes.

14   Q.    Is that right?

15   A.    Yes.

16   Q.    And there came a time when Hodell -- pardon

17   me -- there came a time when American Express actually

18   made a proposal and quoted a price to Hodell, right?

19   A.    Yes.

20   Q.    And do these notes reflect the proposal that you

21   were making to Hodell?

22   A.    Yes.

23   Q.    Let's walk through some of this.

24                    At the top there, you have -- we don't have

25   it highlighted but it says "Total, 385K," do you see

```
          1    that?
          2    A.    Yes.
          3    Q.    Hold on, we've just --
          4    A.    You need to go back.
10:01:58  5    Q.    Let's stay with 822, Bob.
          6             Okay.  At the top there it says in brackets
          7    "Total, 385K."
          8             What did that refer to, ma'am?
          9    A.    This was for the package we were putting together
10:02:48 10    for the American Express Edition for Hodell.
         11    Q.    Okay.  Is that reflecting the kind of pricing that
         12    you were discussing?
         13    A.    Yes.
         14    Q.    Let's move down the document and look at the
10:03:00 15    left-hand margin.
         16             You write something that looks like -- Bob,
         17    can you blow that up?
         18             MR. MILLER:  Your Honor, Bob is telling us
         19    that the system has frozen up on him.
10:03:16 20             THE COURT:  Okay.  We'll take our morning
         21    recess at this time.
         22             Okay.  Keep in mind the admonition, and
         23    then Jeanie will let you know when we're ready for the
         24    other stuff, if you're interested.
10:03:29 25             I'm not trying to force you.  You can do
```

1    what you want.

2                          (Jury out)

3                          (Recess taken)

4                          (Proceedings resumed in presence of the

5    jury as follows:)

6                          THE COURT:  Okay.  Be seated, folks.

7                          You may continue.

8                          MR. STAR:  Thank you, Your Honor.

9    BY MR. STAR:

10:36:35 10   Q.    Ms. Vitantonio, we were looking at Exhibit 822,

11   which are your handwritten notes from a conversation you

12   had on February 2nd of 2004.

13                          We've got some highlighted text.  Tell the

14   jury what you recall happening, what you were taking

10:36:53 15   notes on on February 2nd of 2004.

16   A.    Starting at the highlighted part?

17   Q.    Sure.

18   A.    Mr. Reidl said he doesn't want to be a pioneer

19   again.  He's not interested in development costs.  75

10:37:06 20   users currently in FACTS.

21   Q.    Okay.  Bob, are you able to zoom in on the bottom

22   half of that page?

23                          When you write down that Mr. Reidl told you

24   he doesn't want to be a pioneer again, what did you

10:37:17 25   understand that to mean?

```
 1    A.    He didn't want to struggle with software solution

 2    for his business.

 3    Q.    Okay.  You write "Not interested in development

 4    cost."

 5              What did that mean?

 6    A.    He -- he wanted something out of the box that

 7    worked.

 8    Q.    Okay.  So he didn't want to go through a

 9    development phase of new software?

10    A.    Yes.

11    Q.    Then you write "75 users currently in FACTS."

12              What did that mean?

13    A.    He currently -- or he had 75 users currently in the

14    FACTS system they were running.

15    Q.    Below that, we don't have that highlighted but it

16    says "Number of PCs" and it looks like "135"?

17    A.    "Employees."

18    Q.    Okay.  And is that what they told you, they had 135

19    employees?

20    A.    Yes.

21    Q.    And then it says "155 with additional location."

22              What did that mean?

23    A.    There would be another 155 employees.

24    Q.    Or a total of 155 employees if they added a

25    location?
```

1946

```
         1   A.    Yes.

         2   Q.    Okay.  And then on the left-hand side, you write

         3   what looks like "90 to 100 with additional location."

         4              What was that a reference to?  Was that

10:38:36 5   referring to the number of users they wanted?

         6   A.    "Ninety to a hundred with additional location."

         7              Yes.

         8   Q.    Okay.  And then it's kind of vertical, you write

         9   "100 B1, 25 WM."

10:39:03 10             What did that mean?

        11   A.    They were looking at 100 Business One and American

        12   Express users and 25 warehouse users.

        13   Q.    Okay.

        14              Looking at these notes, do you have any

10:39:19 15  recollection of ever having a discussion about Hodell

        16   wanting or needing 300 users or 500 users on its system?

        17   A.    No.

        18   Q.    Let's go to -- let's go through just a couple more

        19   documents and we'll be done.

10:39:34 20             Bob, Exhibit 824, please.

        21              Are you able to identify this exhibit?

        22   A.    Yes.  These are my notes from February 3rd.

        23   Q.    Of 2004?

        24   A.    Of 2004, yes.

10:39:52 25  Q.    Okay.  And this is in reference to Hodell again?
```

1947

```
             1    A.    Yes.

             2    Q.    And on the left-hand side at the top, you have some

             3    names.  It looks like Dan G., Karl, and Dale V.

             4                Was that Dale Van Leeuwen?

10:40:06     5    A.    Yes.

             6    Q.    So this is referring to a conversation that you had

             7    with Mr. Van Leeuwen and others?

             8    A.    Yes.

             9    Q.    On February 3rd, 2004?

10:40:13    10    A.    Yes.

            11    Q.    Okay.  And you write here "Two years past due."

            12                What is that a reference to?

            13    A.    This conversation was with Karl from Radio Beacon,

            14    and it was about their Radio Beacon warehouse

10:40:32    15    installation, and they were two years past due on the

            16    maintenance payment.

            17    Q.    And you say "They."

            18                Do you mean Hodell?

            19    A.    Hodell.  Sorry.

10:40:43    20    Q.    Okay.  So Hodell was two years past due on

            21    maintenance payments to Radio Beacon?

            22    A.    Yes.

            23    Q.    What impact, if any, would that have?

            24    A.    On support.

10:40:50    25                They were on an old release, and
```

1948

1    weren't -- hadn't paid support in two years.

2    Q.    Okay.  And what impact did that have with respect

3    to your discussions?  Why were you writing that down?

4    A.    Well, we were putting together a proposal for them,

10:41:06  5    and we had to catch them up to get them on the latest

6    release to get them current.

7              And they had to pay the past due support

8    fees.

9    Q.    So that would be part of the pricing to get a new

10:41:18 10    system for Hodell?

11    A.    Yes.

12    Q.    Down at the bottom, let's blow that up, Bob.  It

13    looks like you write there "100 users B1."

14              Is that correct?

10:41:35 15    A.    Yes.

16    Q.    Why did you write "100 users B1"?

17    A.    We were talking about 100 users for the Business

18    One, for this proposal we were putting together.

19    Q.    Now, to the left of that, you have some numbers.

10:41:51 20    Oops, I touched the screen.

21              You have some numbers that say "154.

22    A.    Yes.  For RB, Radio Beacon.

23    Q.    Okay.  What do all those numbers refer to?

24    A.    This, I was starting to put together all of the

10:42:07 25    line items for the proposal for each of the components

1949

```
         1    that were needed for this deal.
         2    Q.    Okay.
         3    A.    With Hodell.
         4               So it was 154,000 for Radio Beacon, 180,000
10:42:21 5    for IBIS, 250,000 for SAP, meaning the Business One.
         6    Q.    And the 250,000, would that be for the purchase of
         7    Business One licenses?
         8    A.    Yes.
         9    Q.    Okay.  And the pricing that you were talking about
10:42:37 10   per license, remind us of that.
        11    A.    It was $3,750 per user.
        12    Q.    I can give you a calculator but do you have an
        13    understanding of how many licenses Hodell could acquire
        14    if $250,000 was going to be going toward the purchase of
10:42:55 15   Business One licenses?
        16    A.    3750 divided into 250,000, it's less than, what was
        17    it, 60 to 80.
        18    Q.    Okay.  Let's go to one more exhibit.  825, Bob.
        19               You recall at some point having a
10:43:17 20   conversation with Mr. Reidl where you gave him an actual
        21    proposal with pricing, right?
        22    A.    Yes.
        23    Q.    Is that reflected in the document that we've marked
        24    as 825?
10:43:25 25   A.    Yes.  Here on February 6th.
```

1950

```
 1    Q.    And are these your notes?

 2    A.    Yes, they are.

 3    Q.    Okay.  Let's walk through it so we understand.

 4          At the top, you have some numbers.  What

 5    are you referring to?

 6    A.    This was the estimate I put together, and I called

 7    Mr. Reidl with these numbers.

 8    Q.    And you have a breakdown at the top, you say "SAP

 9    225K" and then to the side you say "275K."

10          Do you see that?

11    A.    Yes.

12    Q.    And below that chain of numbers you have $582,000?

13    A.    Yes.

14    Q.    Okay.  Was that the proposed price you gave to

15    Mr. Reidl, the 582?

16    A.    Yes.

17    Q.    And the breakdown of that price is shown above it

18    with 275,000 going toward Business One licenses?

19    A.    Yes.

20    Q.    And the remainder going toward Radio Beacon, EDI,

21    AmEx's add-on, is that right?

22    A.    Yes.

23    Q.    And then you have something, "IBIS."

24    A.    "Conservative."

25    Q.    So was that for services from IBIS?
```

A.    Yes.

Q.    For work to be performed?

A.    For development.

Q.    For development work from IBIS?

10:44:35    A.    Development work, yes.

Q.    Okay.  So of the total package, the total package price was $582,000 that you proposed?

A.    Yes.

Q.    And 275,000 was for Business One licenses and that 10:44:49 was somewhere less than 80 licenses if you do the math, right?

A.    Yes.

Q.    And what do you recall Mr. Reidl's response being to your proposal?

10:45:03    A.    He said it was too high, so I asked him where we needed to be, and he said about half that number.

And I said something to the effect of "I'm sorry, we can't do that."  And he said "Well, then, we're done."

10:45:16    Q.    Now, we've gone through these notes and you would agree that none of them, in none of them did you write down 300 or 500 users, right?

A.    Correct.

Q.    And would that have been something that you would 10:45:30 have written down if it were something that was

1    discussed?

2    A.    Yes.

3    Q.    Tell us, what would have been the price just for

4    Business One licenses if Hodell was telling you they

10:45:41  5    wanted to acquire 300 licenses?

6    A.    Somewhere close to a million dollars just for the

7    Business One at 3750 per user.

8    Q.    Okay.  And as a salesperson who stood to make a

9    commission for what you were selling on behalf of

10:45:59 10    American Express, is that the kind of information you

11    would have absolutely written down in your notes if it

12    would have been discussed?

13    A.    Yeah.  I would have been spending my commission

14    check.

10:46:08 15    Q.    All right.

16              MR. STAR:  I have no further questions.

17              THE COURT:  Thank you.

18              Cross-examination.

19              MR. LAMBERT:  Your Honor, can I use the

10:46:41 20    projector?

21              THE COURT:  The Elmo?

22              MR. LAMBERT:  I don't need it quite yet so

23    if you want me to just get started and then we can --

24              THE COURT:  It's on.

10:47:06 25              MR. LAMBERT:  Oh, it is?  User error, sorry

1953

1    about that.

1954

```
         1          CROSS-EXAMINATION OF PENELOPE VITANTONIO
         2     BY MR. LAMBERT:
         3     Q.    Okay.  Good afternoon or good morning,
         4     Ms. Vitantonio, how are you doing?
10:47:35 5     A.    Okay.  How are you?
         6     Q.    Okay.  We've never met before, have we?
         7     A.    No, not that I recall.
         8     Q.    My name's Wes Lambert, I represent Hodell-Natco in
         9     this litigation, and you weren't deposed in this matter?
10:47:47 10    A.    No.
         11    Q.    Were you?
         12    A.    No.
         13    Q.    Okay.  So please forgive me, I'm doing this a
         14    little bit on the fly, but I just want to confirm a few
10:47:57 15    things for you that -- my understanding of your testimony
         16    and your involvement with Hodell in this case.  Okay?
         17    A.    Sure.
         18    Q.    You agree with me that you personally had
         19    involvement in attempting to sell Business One to Hodell
10:48:15 20    in late 2003, early 2004 time frame, is that -- was my
         21    understanding correct?
         22    A.    Yes.  We were talking to them, proposing the
         23    American Express Edition.
         24    Q.    And just so everybody is clear, the American
10:48:32 25    Express Edition is built off of business -- SAP Business
```

1    One, is that correct?

2    A.    Yes.

3    Q.    So Business One's the foundation for the solution,

4    correct?

10:48:43 5    A.    Yes.

6    Q.    And then American Express tweaked it a little bit?

7    A.    We added on additional -- American Express added on

8    additional functionality.

9    Q.    Okay.  And that was the point of Business One,

10:48:58 10    right?  So companies like AmEx could add on functionality

11    and customize it for particular markets, correct?

12    A.    Um-hmm.

13    Q.    And --

14    A.    Yes.

10:49:09 15    Q.    Sorry.  And Hodell's was one of those, the fastener

16    industry; that was what we call a vertical market that

17    you could customize Business One and market it to a

18    vertical market like the fastener industry, correct?

19    A.    It wasn't customization per se.

10:49:27 20            It was an American Express Edition that was

21    built specifically for distributors and wholesale

22    manufacturers.

23    Q.    Okay.

24    A.    For that industry.

10:49:36 25    Q.    And you agree, there's nothing wrong with that;

1956

1    that's what the point of Business One is, right?

2    A.    Yes.

3    Q.    It's highly customizable, right?

4    A.    Highly customizable?

10:49:46  5    Q.    We can agree it's customizable.

6          I'll take out the adjective.

7    A.    Yes.

8    Q.    Okay.  So we've confirmed that you were involved

9    with talking to Hodell, right?

10:49:57 10   A.    Um-hmm.

11   Q.    And I think we also confirmed from looking at the

12   notes that Dale Van Leeuwen was also on those calls,

13   correct?

14   A.    Yes.

10:50:05 15   Q.    And you understood that Mr. Van Leeuwen was either

16   in the process of becoming an SAP partner or would become

17   an SAP partner, is that correct?

18   A.    Yes.

19   Q.    Okay.  And we can also agree that on the

10:50:23 20   discussions with Hodell, that Mr. Van Leeuwen was

21   participating in, that pricing was -- pricing for the

22   Business One AmEx solution was discussed, correct?

23   A.    The American Express Edition, yes.

24   Q.    The American Express Edition built off the base

10:50:41 25   Business One package, correct?

1    A.    Yes.

2    Q.    Okay.  And we can also agree, I think we walked

3    through a lot of your notes, you were involved in

4    discussions about Hodell's requirements, right?

10:50:54 5    A.    Yes.

6    Q.    Okay.  And that's reflected in the notes about what

7    they were looking for and what they were looking to do

8    and things like that, right?

9    A.    Yes.

10:51:02 10    Q.    Okay.  And then the final thing I just want to go

11    over, we can agree that either you yourself personally or

12    people at your direction provided marketing literature on

13    Business One to Hodell, is that correct?

14    A.    The American Express Edition of Business One, yes.

10:51:19 15    Q.    So you provided -- and I think, and we can pull it

16    up, there was a document called I think it's 618, I don't

17    have it up here, a document called the American Express

18    Edition for SAP Business One, right?

19    A.    Yes.

10:51:34 20    Q.    And it talked about SAP Business One in there,

21    right?

22    A.    Yes.

23    Q.    And then what American Express had done to

24    customize it?

10:51:40 25    A.    Yes.

1958

1    Q.    Okay.  And it talked about the capabilities of the

2    software, right?

3    A.    Of the American Express Edition?

4    Q.    Of the American Express Edition that was built off

10:51:53 5    of SAP Business One?

6    A.    Yes.  Yes.

7    Q.    Okay.  And you were allowed to give that out,

8    right?

9    A.    This isn't it.  This isn't the right document.

10:52:00 10    Q.    Yeah, I don't want to pull up the document.  I just

11    want to talk about.

12    A.    Yes.

13    Q.    You were allowed to give that out, right?

14    A.    Yes, I sent it to Mr. Reidl.

10:52:09 15            MR. STAR:  Objection.  Foundation.  She is

16    not even sure what he's talking about.

17            THE COURT:  What are we talking about?

18            MR. LAMBERT:  We're talking about the

19    American Express document that Ms. Vitantonio --

10:52:18 20            THE COURT:  Well, what is it?

21            MR. LAMBERT:  Let's pull it up then.  Okay.

22    617.

23    BY MR. LAMBERT:

24    Q.    That's an e-mail from Heather Devereaux, is that a

10:52:39 25    woman you worked with?

1959

1    A.    I didn't personally work with her.  She was a

2    marketing person from this business-to-business

3    marketing.

4    Q.    Okay.  Sorry.  Down at the bottom, Christina

10:52:56 5    Alagna, does that name look familiar to you?

6    A.    No.

7    Q.    Okay.  We can agree there's an attachment, American

8    Express Edition, is that the -- Kim, if you'd cycle over

9    to the next page.

10:53:06 10   A.    Yes.  Yes.

11   Q.    My screen's out, but the that's the document we

12   were just talking about, right?

13   A.    Yes.

14   Q.    And you agree with me that it was -- you were

10:53:14 15   permitted by SAP to give this to companies like Hodell,

16   right?

17   A.    Yes.

18   Q.    Okay.  And there's an SAP -- we see an SAP logo on

19   that document?

10:53:26 20   A.    Yes.

21   Q.    Is that correct.

22            And you were allowed to put SAP's logo on

23   that document, correct?

24   A.    We had to get it approved, yes.

10:53:33 25   Q.    So you got it approved?

         1    A.     American Express.

         2    Q.     And it was placed on there, right?

         3    A.     Yes.  Yes.

         4    Q.     Okay.  And that was known to SAP, right, because

10:53:40 5    you got it approved?  You didn't just put it on there on

         6    your own, right?

         7    A.     No.

         8    Q.     Okay.  And then this document was e-mailed to

         9    Hodell, we can agree on that?

10:53:49 10   A.     Yes.

         11   Q.     Do you recall sending any other marketing

         12   literature or literature related to Business One or the

         13   American Express Edition to Hodell?

         14   A.     Yes.  The previous one you showed on the screen,

10:54:09 15   the Whitepaper.

         16   Q.     The Whitepaper?

         17   A.     Yes.

         18   Q.     So that was something that was sent by American

         19   Express to Hodell, right?

10:54:16 20   A.     Yes.

         21   Q.     Now, correct me if I'm wrong, but American Express

         22   didn't write that document, did they?

         23   A.     No.

         24   Q.     That was written by SAP?

10:54:25 25   A.     Yes.

1    Q.    And then given to you to give to companies like

2    Hodell?

3    A.    Yes.

4    Q.    And you, in fact, did give it to Hodell?

10:54:34  5    A.    Yes.

6    Q.    Okay.  Thank you.

7                And just so I'm clear, you're

8    working -- during the times relevant to what we're here

9    today on, you were working for American Express; not SAP,

10:54:50 10   is that right?

11   A.    Yes.

12   Q.    Okay.

13   A.    American Express.  I was a sales rep.

14   Q.    You were a sales rep for American Express?

10:54:55 15   A.    Yes.

16   Q.    Okay.

17   A.    For the Ohio territory.

18   Q.    Okay.  And you work for SAP now?

19   A.    Yes.

10:55:01 20   Q.    Okay.  And they're -- they pay your salary now,

21   right?

22   A.    Yes.

23   Q.    Okay.  But back, back to the time frame relevant to

24   this lawsuit, you agree with me that you were selling

10:55:16 25   SAP's software to customers, correct?

1962

1    A.    Yes.  SAP Business One, but I was also selling

2    Microsoft Great Plains and Microsoft Business Solutions.

3    Q.    And SAP had authorized you to sell Business One,

4    correct?

5    A.    Yes.

6    Q.    And you were in fact doing that?

7    A.    Yes.

8    Q.    As we've gone over, correct?

9    A.    Yes.

10    Q.    And Hodell was one of those customers you were --

11    A.    Potential customer.

12    Q.    -- selling to?

13    A.    Prospects, yes.

14    Q.    American Express didn't develop the Business One

15    software, they were just selling it to companies, right?

16    A.    We developed -- American Express developed the

17    American Express Edition of Business One.

18    Q.    They developed the add-on?

19    A.    Yes.

20    Q.    But the --

21    A.    But not --

22    Q.    The Business One software that you were going

23    to --

24    A.    No.

25    Q.    -- base it on was sold by SAP, I think we can agree

1963

1    on, right?

2    A.    Yes.

3    Q.    Do you know who the actual developer of the

4    software was?  Is it SAP America, SAP AG?  Who was

10:56:09  5    developing the software?

6    A.    The developer of the Business One?

7    Q.    Yeah.

8    A.    -- software?

9    Q.    Yeah, Business One.

10:56:15 10    A.    It was a company TopManage, I think, acquired.  We

11    acquired a company, I think their name was TopManage out

12    of Israel.

13    Q.    Before -- before SAP started selling it, it was

14    acquired by -- it was developed, originally developed by

10:56:30 15    TopManage, is that correct?

16    A.    Yes.  I think that was their name.

17    Q.    And then when you were selling the SAP software,

18    what was the corporate entity that was developing the

19    software, to your knowledge?

10:56:41 20                Was it SAP AG in Germany, was it SAP

21    America in the United States?

22                MR. STAR:  Objection.  Relevance.

23                THE COURT:  Did you object?

24                MR. STAR:  Yeah.  Relevance.

10:56:50 25                THE COURT:  The objection is sustained.

1964

BY MR. LAMBERT:

1  BY MR. LAMBERT:

2  Q.    Okay.  I just want to be clear, is it your

3  testimony here today that there was no discussion about

4  the user count that Hodell would need for the Business

10:57:08  5  One software if it were to purchase it through your

6  organization?

7  A.    No.

8  Q.    We can agree that at a minimum, Hodell was told

9  that the software could support 100 users?  We saw that

10:57:24 10  in the notes.

11  A.    Yes, I had a hundred users in my notes for almost

12  every discussion.

13  Q.    Okay.  Is it your testimony that not once was

14  Hodell's growth over the life span of -- the usable life

10:57:39 15  span of the product discussed in terms of where it wanted

16  to go with the number of users?

17  A.    Not more than 100 users.

18  Q.    So you --

19  A.    In my discussions.

10:57:51 20  Q.    Okay.  So you don't recall, is it your testimony

21  you don't recall that growth pattern being discussed?

22  A.    That's correct.  I don't.

23  Q.    Okay.  And I just want to be clear between what you

24  recall and what you're certain happened.

10:58:08 25              Is it your testimony that you just don't

1    recall it because you don't see it in your notes?  And I

2    know it happened a long time ago and you probably dealt

3    with a lot of potential customers, is that correct?

4            MR. STAR:  Objection.  Compound question.

5            THE COURT:  Yeah.  Ask one question.

6    BY MR. LAMBERT:

7    Q.    In the course of marketing Business One, you

8    probably dealt with a lot of customers and customers came

9    and went and some bought and some didn't.

10            Is that an accurate summation?

11   A.    Yes.

12   Q.    Okay.  And so we're talking about things that

13   happened --

14   A.    Twelve years ago.

15   Q.    -- twelve, eleven years ago, right?

16   A.    Yes.

17   Q.    And so you went back to your notes and you looked

18   at them to see kind of what was being discussed at the

19   time, right?

20   A.    Yes.

21   Q.    And you didn't see anything about 300 users in

22   there, right?

23   A.    No.

24   Q.    But and you said, "I don't recall that being

25   discussed."

1966

1    A.    I would have written it down.

2    Q.    You're certain you would have?

3    A.    300 users, yes.

4    Q.    Because you would have gotten a commission off of

10:59:01 5    it?

6    A.    Yes.  Because we were paid -- I was a sales rep.  I

7    was paid by, you know, commission.  The higher the sale,

8    the higher my commission.

9    Q.    But we can agree that if Hodell's growth over time,

10:59:15 10   they expected to grow to need 300 users, that wasn't

11   something you were going to get a commission on during

12   the initial sale, right?

13              You were going to get a commission on the

14   initial sale on the 100, right?

10:59:26 15   A.    Yes.

16   Q.    And then if they grew to 300 at some later point in

17   time, that's a different, different subject, right?

18   A.    Yes.

19   Q.    Okay.  So you wrote down what you thought you were

10:59:36 20   going to get a commission on; not necessarily what Hodell

21   wanted to do over time later down the road, right?

22   A.    Yes.

23   Q.    Okay.  So if other people have testified that they

24   heard on that conversation Hodell express that need to

10:59:52 25   grow to 300 users, you can't say here today with 100%

1    certainty that that wasn't discussed, is that true?

2              MR. STAR:  Objection.

3              THE COURT:  Objection sustained.

4    Q.    You talked a little bit about your participation

11:00:10  5    with the Business One program and the marketing of the

6    software.

7                   Did you have to go to training or

8    anything --

9    A.    Yes.

11:00:23 10   Q.    -- about Business One before you went out and sold

11   it?

12   A.    Yes.

13   Q.    Is that -- and who conducted the training?

14   A.    SAP.

11:00:29 15   Q.    Where was that?  Where was that held?

16   A.    The first one was in Newton Square in the

17   headquarters office that I went to.

18   Q.    In Pennsylvania?

19   A.    Yes, in Pennsylvania.

11:00:41 20   Q.    Okay.  Where were the others?

21   A.    In Pennsylvania.  We also had them at our field

22   kick-off meetings in January at different locations.

23                   It was basically a big sales meeting, bring

24   everyone together.

11:00:58 25   Q.    Okay.

1968

```
 1          A.    Either Las Vegas or I forget where all the

 2     locations were.

 3          Q.    But we can agree, I think, that since AmEx wasn't

 4     the developer of the Business One software, in order for

 5     you to know how it worked and what it could do, you had

 6     to go to these SAP training classes, right?

 7          A.    Yes.

 8          Q.    And SAP had to tell you, "Here's what it can do,

 9     here's who you should be targeting," things like that,

10     right?

11          A.    Yes.

12          Q.    Okay.  I want to look at Exhibit 816 and I'm going

13     to have to put that up here.

14                     I don't have it.

15                     We will have to switch over to this.

16                     Exhibit 816 is some of the notes that you

17     were talking about with Mr. Star, right?

18          A.    Yes.

19          Q.    And we see up in the right-hand corner "November

20     7th of '03," I presume, correct?

21          A.    Yes.

22          Q.    And I've highlighted some things and I don't know

23     if it's clear.  Hopefully shows better on your screen,

24     but "Always technology progressive."

25                     Do you see that?
```

```
 1   A.    Yes.
 2   Q.    What was your understanding of what that meant when
 3   you wrote it?
 4   A.    Mr. Reidl told me in the meeting they've always
 5   been technology progressive.
 6   Q.    And you agree that this was, I think you referred
 7   to it as a discovery meeting, is that correct?
 8   A.    Yes.
 9   Q.    What's a discovery meeting, if you could
10   just -- we've heard some testimony about it, but --
11   A.    Sure.
12   Q.    -- I'd like to know your understanding of it.
13   A.    So when we talk to a potential customer or a
14   prospect, we go in and we do what's called a discovery
15   meeting.  We ask them what their needs are, what their
16   current challenges are, where do they want to -- what are
17   they -- where do they want to go to meet their needs for
18   their business needs.
19   Q.    And you need to get that information in order to
20   determine whether this is a customer that can be
21   satisfied by Business One, correct?
22               You don't want to sell it to somebody that
23   it's not going to work for, right?
24   A.    Yes.
25   Q.    Okay.
```

1  A.    We also talk about budget in those meetings just to

2  make sure we're all on the same page with is this in

3  your, you know, is this in your ballpark budget-wise.

4              We give them a price starting off with, and

11:03:28  5  this is the technology that you can expect for that

6  price.

7  Q.    Okay.  And Business One at the time, I believe, and

8  correct me if I'm wrong, was the lowest, cheapest

9  offering SAP had in its portfolio, is that correct?

11:03:40 10  A.    For?

11  Q.    For ERP systems?

12  A.    Yes.

13  Q.    Okay.

14  A.    That's correct.

11:03:45 15  Q.    So we can agree that you had this conversation,

16  this is a reflection of the conversation you had with

17  Otto Reidl in November of 2003, correct?

18  A.    Yes.

19  Q.    And you're learning some information about Hodell

11:04:07 20  and there's some notes where you write down some pretty

21  particular things about what Hodell does and how it does

22  business, is that right?

23  A.    Yes.

24  Q.    And if you look down at the bottom, it's so

11:04:23 25  specific that you talked about the number of orders they

1    do a day, is that accurate?

2    A.    Yes.

3    Q.    And line items, there's orders with five line

4    items, there's orders with 250 line items.

11:04:34  5                    Is that accurate?

6    A.    Yes.

7    Q.    Okay.  And multiple pack sizes, do you see that

8    item?  "One item has multiple pack sizes," do you see

9    that?

11:04:44 10   A.    Yes.

11   Q.    What's that mean?

12   A.    "One item has multiple pack sizes, five sizes per

13   item."

14                    So there were multiple packs within the

11:04:59 15   item.

16   Q.    So if you have, in other words, and correct me if

17   I'm wrong, if you have one item in your inventory, one

18   inventory item, it might actually have five different

19   SKUs associated with it?

11:05:14 20   A.    I guess.  I wrote that down, but I had brought one

21   of my technical guys with me.

22   Q.    Okay.

23   A.    To this discovery meeting.

24   Q.    Okay.

11:05:24 25   A.    Because I'm not that deep in the distribution

1    industry.

2    Q.    Okay.

3    A.    So I'm sorry, I don't know.

4    Q.    Well, we'll keep it at a high level to use the

11:05:32  5    term.

6            I want to direct your attention to the

7    margins of these notes, and I don't want to put all the

8    notes up, but a lot of notes are cut off in the margin.

9            Do you see that?

11:05:45 10    A.    Yes.

11    Q.    And there's some things that you really can't read

12    in there, is that right?

13    A.    Well, I know my writing's bad.  I can -- I can read

14    it.

11:05:55 15    Q.    Well, there's some things in --

16    A.    Yeah.

17    Q.    -- if you look right here, right, you can't read

18    what that says just because it wasn't copied, right?

19    A.    Where the red is?

11:06:04 20    Q.    Right.

21    A.    There's nothing there.

22    Q.    Right.  There's nothing?

23    A.    Right.

24    Q.    There's some things right here that just weren't

11:06:11 25    copied when these notes were duplicated, is that correct?

1    A.    Yes.

2    Q.    Okay.  So there's -- we can agree that there's

3    things written in the margin here that we don't know what

4    was written because it wasn't copied when these documents

11:06:22  5    were duplicated?

6    A.    From this copy, correct.

7    Q.    From this particular copy, okay.

8              Now, I want to direct your attention back

9    to the top of that document.

11:06:47  10            We agree that this document is one of the

11   ones where you wrote down a hundred users, is that

12   correct?

13   A.    Yes.

14   Q.    Okay.  And we also have a notation here to -- who

11:07:00  15   are those individuals, if you could read that?  It's hard

16   to read on my screen.

17   A.    I see Dan Kraus on the bottom.

18   Q.    Is that Chris Robinson above him?

19   A.    Chris Robinson, yes.

11:07:15  20   Q.    And can you tell the jury who those two individuals

21   were?

22   A.    Chris Robinson was my trainer for my first and

23   second, I think, training, boot camp training I went to.

24              And Dan Kraus was there as well.

11:07:37  25   Q.    And I just want to be clear about something.

1            At the time that you were selling Business

2    One to Hodell, the Business One software itself was

3    relatively new in the United States, is that -- is my

4    recollection accurate?

11:07:58 5    A.    Yes.

6    Q.    Do you recall how many installations of Business

7    One you personally had been involved with at the time

8    that you took these notes?

9    A.    That I had personally sold?

11:08:13 10   Q.    Well, let's start with how many had you sold at the

11   time that you took these notes?

12   A.    I don't think we had sold any yet.

13   Q.    So this was one of the first potential sales of

14   Business One in your entire organization at the time?

11:08:28 15   A.    I was talking to multiple prospects at the time,

16   but yes.

17   Q.    Okay.  So you would agree with me, I think, that

18   having received this information from Hodell about how

19   they were going to use the Business One package that you

11:08:50 20   would then customize, you needed to speak with someone at

21   SAP to make sure that that was an appropriate fit for the

22   software, right?

23   A.    Yeah.  I mean, the whole point of the discovery

24   meeting was to understand their needs, what -- what all

11:09:06 25   their needs were, and take that back to my technical

1    team.

2                  And I did bring a technical person with me.

3    And then we went back to American Express, our

4    technical -- we had more technical people, consultants,

11:09:21  5    implementers out of our New York office, and to

6    understand the complexity of the business.

7    Q.   Okay.  And I just want to be clear, did those

8    technical people then interface with people at SAP as

9    part of the discovery process to make sure, hey, this is

11:09:43 10   a customer that can be satisfied by Business One?

11                 MR. STAR:  Objection.  Foundation.

12                 THE COURT:  Overruled.

13   A.   Yes.

14   Q.   They did take that information to SAP, is that

11:09:51 15   accurate?

16   A.   Sizing, to size it properly.

17   Q.   Okay.  Thank you.

18                  There's information on the document about

19   the Sweet Spot for Business One or, I'm sorry, there's

11:10:06 20   not information on the document about the Sweet Spot for

21   Business One.

22                  There's information on the number of users,

23   is that correct?

24   A.   Yes.

11:10:12 25   Q.   And as part of getting the number of users that

1    Hodell was going to need, you needed to know how they

2    were going to actually deploy those user licenses into

3    their system, is that correct?

4    A.    Yes.

11:10:26  5    Q.    Because that's how you size a deal?

6    A.    Yes.

7    Q.    Right?

8              At the time you were selling Business One

9    to Hodell, I'm just wondering if you knew what SAP

11:10:41  10   considered to be the Sweet Spot for Business One?

11   A.    In terms of what?

12   Q.    In terms of number of users.

13   A.    Number of users?  A hundred users.

14   Q.    It's your understanding that the Sweet Spot for

11:10:56  15   Business One at the time these notes were taken was a

16   hundred users?

17   A.    Up to a hundred users.

18   Q.    Up to a hundred?

19             Not aware of anybody saying that 120 users

11:11:11  20   was above any sane Business One Sweet Spot?

21             MR. STAR:  Objection.

22             THE COURT:  Sustained.

23   Q.    Are you aware of any documentation provided by SAP

24   stating the number of users that Business One was

11:11:25  25   optimized for?

```
         1              MR. STAR:  Objection.  Foundation.  Time
         2     frame.
         3              THE COURT:  Overruled.
         4     A.    Optimized for?
11:11:32 5     Q.    Yes.
         6     A.    During my time with SAP Business One, it was a
         7     hundred users.
         8     Q.    Okay.  Kim, can you pull up Exhibit 129?
         9              I think it's on 129.  I think we know what
11:12:10 10    page by now.  It's 129.3 or 4, something like that.
         11             MR. STAR:  Your Honor, I object to the
         12    relevance of this.  This witness was not even with the
         13    company at that point.  This is a document in 2006.
         14             MR. LAMBERT:  I'm going to ask her a
11:12:38 15    question that's relevant to her.
         16             THE COURT:  From something?  2006?
         17             MR. LAMBERT:  This was a document given to
         18    partners.  I want to ask her if she has seen it.
         19             THE COURT:  Okay.
11:12:45 20    BY MR. LAMBERT:
         21    Q.    Have you seen a document called an SAP
         22    partner -- I'm sorry -- SAP Business One Statement of
         23    Direction before?
         24    A.    No.  This is from 2006.  I wasn't with American
11:12:58 25    Express then or with Business One.
```

1    Q.    And I just want to be clear, you're not aware of

2    any documentation at the time that you were selling

3    Business One to Hodell that stated that Business One was

4    optimized for 50 concurrent users, is that correct?

11:13:13  5    A.    No.

6    Q.    And I'm correct that I didn't see anything -- well,

7    we walked through a lot of notes.  I didn't see anything

8    that actually discussed Hodell being in or out of any

9    Sweet Spot for Business One, is that correct?

11:13:33 10    A.    From an industry perspective, they were our target

11    industry.

12    Q.    Okay.  And based upon what you had been provided by

13    SAP, you thought their need for 100 users in the

14    environment they were going to be using those users with,

11:13:54 15    was perfectly appropriate for Hodell, is that accurate?

16    A.    Yes.

17    Q.    Otherwise you wouldn't have continued the

18    discussion, correct?

19    A.    Correct.

11:14:02 20    Q.    And you ultimately made them a proposal, right?

21    A.    Right.

22    Q.    Okay.  And based upon everything SAP had told you,

23    you thought that was okay?

24    A.    Okay with the proposal?

11:14:12 25    Q.    Okay to move forward with the potential deal,

1  right?

2  A.    Yes.

3  Q.    Kim, can we switch back over?

4        And this was another document that we were

11:14:43  5  just looking at a little bit earlier, is that correct?

6  A.    Yes.

7  Q.    These are your notes.  I think these pre-date the

8  ones we were just looking at, right?

9  A.    November 3rd, 2003.

11:14:56  10  Q.    So that was a few days before, maybe?

11        Are these notes of a call with anyone at

12  Hodell-Natco or are they notes of a call with another

13  entity or individual?

14  A.    It looks like they were notes from, I don't know if

11:15:14  15  it was a call -- I think it was a call with Dale from

16  IBIS.

17  Q.    Okay.  And the reference is "Met at Atlanta

18  business"?

19  A.    "Forum."

11:15:29  20  Q.    "Forum."

21        What's that mean?

22  A.    I must have met him at an Atlanta business forum.

23  Q.    Do you remember Mr. Van Leeuwen coming down to

24  Atlanta and meeting with you as reflected in your notes?

11:15:41  25  A.    I don't remember now.  I -- I starred there for

1    some reason.  I must have met him.  I don't remember now,

2    though.

3    Q.    Okay.

4          And "Hodell-Natco tech lock," what's your

11:15:57  5    recollection of what that meant?

6    A.    They were technology locked.  They were, I think,

7    similar to my other notes that said they were technology

8    bound, they were stuck in their current system.

9    Q.    "And they needed to grow out of it," is that an

11:16:12 10    accurate portrayal?

11              MR. STAR:  Objection.  Foundation.

12              THE COURT:  Overruled.

13    A.    They need -- they needed a new system that could

14    work for them.

11:16:19 15    Q.    That could -- I think the word is -- scale to their

16    growth, is that accurate?

17              MR. STAR:  Objection.  Foundation.

18              THE COURT:  Overruled.

19              MR. STAR:  Assumes testimony.

11:16:30 20    A.    It wasn't working so they needed a new technology

21    system that would work for them.

22    Q.    Are you -- and just so I'm clear, and I don't

23    recall seeing it in the notes, but are you familiar with

24    the term "Scale"?

11:16:45 25    A.    Yes.

```
  1   Q.   "Scalability"?

  2   A.   Yes.

  3   Q.   Do you recall that being discussed at all with

  4   Hodell?

  5   A.   With Hodell?

  6   Q.   Or with Mr. Van Leeuwen?

  7   A.   I don't know if I talked about it with

  8   Mr. Van Leeuwen here.

  9   Q.   But it's probably something that you would discuss

 10   with Hodell?

 11   A.   Probably.

 12   Q.   And I've highlighted something, "One of the most

 13   complex in industry."

 14            What do you take -- what's your

 15   recollection of what that meant?

 16   A.   That Hodell-Natco is one of the most complex

 17   distributors in their industry.

 18   Q.   Okay.  So we can agree --

 19   A.   From my conversation with Dale.

 20   Q.   Okay.  So we can agree that during the discovery

 21   process, SAP or, I'm sorry, your organization knew the

 22   information we just went over in the previous notes,

 23   right?

 24            And now we see that this information was

 25   also discussed?
```

```
      1    A.    Yes.

      2    Q.    The complexity, correct?

      3    A.    Yes.

      4    Q.    Okay.  This is Exhibit 817.  These were some more

11:18:20  5    of the notes that you were talking about with Mr. Star,

      6    is that correct?

      7    A.    With Mr. Star?  Oh, yes.

      8    Q.    With Mr. Star.

      9               And these were notes from a Hodell WebEx.

11:18:34 10               Can you describe again -- I don't know if

     11    you described it the first time, but what's a WebEx?

     12    A.    A WebEx is an online webinar that we do where we

     13    would basically demo, demonstrate the software online.

     14               So rather than go to an in-person meeting

11:18:53 15    or just have a phone call, while we're on the phone, we

     16    can visually show them on the computer what we're doing.

     17    We're walking through a demo.

     18    Q.    And we agree that these notes are after the

     19    previous two documents we were discussing, is that

11:19:07 20    accurate?

     21    A.    Yes, they're November 14th so the next week.

     22    Q.    So you had the information on the line items and

     23    the complexity and the, I think, inventory and things

     24    like that?

11:19:19 25    A.    Yes.
```

1    Q.    And went ahead and proceeded to demo the product,

2    correct?

3    A.    Yes.

4    Q.    And on this document we have even more information,

11:19:29 5    right?  "Warehouse data, single SKU, patches."

6    A.    That's "Eaches."

7    Q.    I can't pretend to read all of it, but --

8    A.    Sorry.  Bad notetaking.

9    Q.    No.

11:19:48 10    A.    That's "Eaches."

11    Q.    I'm just happy it's not my notes up here.  We'd

12    have a big problem.

13          But "boxes, master," what's that?

14    A.    "Carton."

15    Q.    "Carton."

16    A.    I think.

17    Q.    "Warehouse, different pack sizes."  We have a lot

18    of information about how Hodell does business on these

19    notes, don't we?

11:20:02 20    A.    Yes.

21    Q.    These are some more notes, we went over Exhibit

22    820.  I want to be clear, these are notes of a

23    conversation with Hodell this time, right?

24    A.    Yes.

11:20:32 25    Q.    And we can see, are these the individuals you

1    believe participated on the call or just they were

2    identified as the project team to you on that call?

3    A.    I don't recall whether this was a call or a

4    meeting, in-person meeting.

11:20:44  5    Q.    So do you recall having an in-person meeting with

6    Hodell?

7    A.    Yes.

8    Q.    And this is in December of 2003?

9    A.    December of 2003, yes.

11:20:53 10    Q.    Okay.  After all of the data we just went over and

11    the previous notes had been provided to you, right?

12    A.    Yes.

13    Q.    And you went ahead and proceeded with the WebEx,

14    right?

11:21:03 15    A.    The week before, yes.

16    Q.    Okay.  And then the face-to-face meeting?

17    A.    Yes.  Or if it's a call, I can't tell.  I

18    honestly -- I'm sorry, I don't remember if it was a call

19    or a meeting --

11:21:14 20    Q.    I understand.

21    A.    -- in person.

22    Q.    So this is the project team that your notes reflect

23    was identified to you, is that accurate?

24    A.    Yes.

11:21:22 25    Q.    Otto Reidl?

1    A.    Um-hmm.

2    Q.    Correct?

3    A.    Yes.

4    Q.    Mark, I believe, Betts, right, or you probably

5    don't remember?  There's not a last name in there.

6    A.    Right.

7    Q.    Okay.  Bill Rex, Kevin Reidl, Kevin Ebinowski?

8    A.    Yes.

9    Q.    That's the project team that you were aware of?

10   A.    Yes.

11   Q.    Do you recall interacting with an individual by the

12   name of Terry Phillips at all as part of the project

13   team?

14   A.    No, I don't.

15   Q.    I've highlighted a section, "A lot of warehouse

16   users, does it impact licensing?"

17              What's your recollection of that statement?

18   A.    Well, I was asking if the warehouse users would

19   impact licensing.

20   Q.    And there are a lot of them, is that a fair reading

21   of that?

22   A.    That's what my notes say.

23   Q.    The word "Lot"?

24              This was something that was discussed a

25   little bit with Mr. Star about parallel, running parallel

1  and we had a discussion about what that means, right?

2  A.    Yes.

3  Q.    Okay.  And what that says is "Ninety-day testing,

4  implementation."  Right?

11:22:43 5  A.    Yes.

6  Q.    And when a software -- before a customer like

7  Hodell goes live on a software, it's supposed to be

8  tested; there's an implementation period, and it looks

9  like you were anticipating it to be maybe ninety days?

11:22:59 10  A.    Well, I wrote down "Question:  Implementation time

11  frame.  Mike and Dale need to get together.  Six months

12  development.  Ninety-day testing, implementation, run

13  parallel."

14  Q.    And I do see a fair amount of references to Dale.

11:23:15 15  That's Dale Van Leeuwen in these notes, right?

16  A.    Yes.

17  Q.    Do you know whether he was an SAP partner at the

18  time, or was he still in the process of becoming one?

19              MR. STAR:  Objection.  Foundation.

11:23:24 20              THE COURT:  Overruled.

21              MR. STAR:  Assumes facts not in evidence.

22  A.    I don't know his status.  I didn't know his status

23  at the time.

24  Q.    Okay.  Is it fair -- is it a fair reading of that,

11:23:35 25  what we've highlighted and what was discussed earlier,

1       that running parallel was running parallel during the

2       testing phase and the implementation phase, right?

3       A.    Not necessarily.  We had --

4       Q.    Well, okay, go ahead.

11:23:51  5     A.    -- customers that ran parallel after they went

6       live, too, to make sure nothing would happen.

7       Q.    I understand that.  I want to talk about just

8       Hodell and what your notes reflect your conversation with

9       Hodell was.

11:24:05  10          And "ninety-day testing and implementation,

11      run parallel," is what that says, right?

12      A.    Yes.

13      Q.    So that was discussed with Hodell, running parallel

14      during the testing and implementation?

11:24:18  15    A.    In, in this meeting, yes.

16      Q.    Okay.  Exhibit 821, you discussed with Mr. Star,

17      this is a few days after the document we were just

18      looking at.

19            Is that correct?

11:24:46  20    A.    Yes.

21      Q.    And we're about over a month into the sales cycle

22      to Hodell for Business One, is that correct?

23      A.    Yes.

24      Q.    Okay.

11:24:56  25          And, you know, we have some things here

1   about servers and Radio Beacon and that wasn't a secret,

2   that's what Hodell wanted to do, they wanted to use Radio

3   Beacon, too, right?

4   A.   They were already using it, yes.

11:25:11  5   Q.   They were already using it, right?

6   A.   Yes.

7   Q.   Okay.  "All remotes tie into Cleveland for orders."

8          Correct me if I'm wrong, but that's in

9   reference to all the different remote locations Hodell

11:25:27  10   had, would need to be tied into the Cleveland office,

11   right?

12   A.   Yes, the remote warehouses.

13   Q.   Okay.  This was 822.  These again are notes.  I

14   believe -- I don't believe it identifies who you were

11:26:00  15   talking to when you wrote these notes.

16          Do you have a recollection of who the

17   conversation was with?

18   A.   No, I don't.

19   Q.   Okay.  So you're not actually sure if these reflect

11:26:26  20   notes of a conversation with anyone at Hodell-Natco?

21   A.   No.  It looks like it was an internal discussion.

22   Q.   And who would you commonly meet with internally to

23   discuss things like what are reflected in these notes?

24   A.   Eric Worth or Dan Gobbelet or Mike Neuendorff.

11:26:58  25   Q.   Who was Mike Neuendorff?

```
 1    A.    He was my technical guy.

 2    Q.    Who did he work for?

 3    A.    American Express.

 4    Q.    Okay.  And who were the other two folks?

 5    A.    Dan Gobbelet and Eric Worth, both of American

 6    Express.

 7    Q.    Okay.  Thank you.

 8                We can -- we can agree that this is

 9    discussing Hodell-Natco, though, correct?

10    A.    Yes.

11    Q.    In February of 2014, I assume?

12    A.    Yes.  2014.

13    Q.    We see there's some discussion of users here,

14    correct?

15    A.    Yes.

16    Q.    And then we see "SDK training for Dale's group."

17                Do you see that?

18    A.    Yes.

19    Q.    That's discussing the fact that Mr. Van Leeuwen had

20    this In-Flight application that he was going to work with

21    as part of the solution, is that correct?

22                MR. STAR:  Objection.  Foundation.

23                THE COURT:  Overruled:

24    A.    "SDK training for Dale's group," yes.

25    Q.    So during these initial discussions, it's not a
```

1    secret that In-Flight was going to be part of the

2    ultimate solution, is that correct?

3    A.    With Hodell?

4    Q.    Yeah.

11:28:06  5    A.    No.

6    Q.    Not a secret?

7    A.    Not a secret.

8    Q.    Okay.  And, Dale, to do SDK training, isn't it fair

9    he would have to have some kind of signed agreement with

11:28:20 10    one of the SAP entities in order to access the SDK,

11    right?  That's how you got it?

12                    MR. STAR:  Objection.

13                    THE COURT:  Objection sustained.

14                    You can ask Dale these questions.

11:28:31 15    BY MR. LAMBERT:

16    Q.    Do you see the statement, "Could be additional

17    location with additional 12 to 15 users"?

18    A.    Yes.

19    Q.    What's your understanding of what that meant?

11:28:42 20    A.    Maybe this was a meeting with Hodell.  I don't know

21    because I don't have the attendees down.

22                    Could be an additional location of Hodell's

23    with additional 12 to 15 users, maybe a warehouse.

24    Q.    Is that possibly they could have been adding in

11:28:59 25    another or acquiring another company that would give them

1991

1    an additional location?

2    A.    Possibly.

3    Q.    Okay.  Do you see the statement "75 users currently

4    in FACTS"?

11:29:15  5    A.    Yes.

6    Q.    And then there's a statement right blow that.  Is

7    that, "155 with additional location"?

8    A.    Yes.

9    Q.    Okay.  So there's some discussion certainly

11:29:27 10    internally that Hodell could go at least 55 users above

11    the initial 100, is that fair?

12                MR. STAR:  Objection.

13    A.    I think that's employees.

14                THE COURT:  Overruled.

11:29:38 15    A.    Sorry.

16                I think that's employees, though, 155.

17    Q.    Okay.

18    A.    If you look at my notes.

19    Q.    That's what I'm trying to get a handle on.

11:29:46 20                It says "75 users currently in FACTS,"

21    right?

22    A.    Um-hmm.

23    Q.    And then "155 with additional location."

24    A.    But then next to that, it stays "135 EEs."

11:30:02 25                That's short for employees.

```
 1   Q.    Okay.
 2   A.    Not every employee is a user.
 3   Q.    Fair enough.  "Dale should have all development
 4   time done pretty soon."
 5               Is that again a reference to the
 6   development of the In-Flight application?
 7   A.    Yes.
 8   Q.    Correct?
 9   A.    Yes.
10   Q.    And just so we're all aware and we can frame your
11   involvement in the case, your involvement in this sales
12   cycle to Hodell ended in 2004, correct?
13   A.    Yes.
14   Q.    Is it February, 2004?
15   A.    February, after they didn't decide to go with us,
16   yes.
17   Q.    Okay.
18               And are you able to offer testimony here
19   today about what was said to Hodell or done with Hodell
20   after February, 2004?
21   A.    No.  I walked away.
22   Q.    Okay.
23   A.    We were done.
24   Q.    So you don't know -- you don't have any testimony
25   for us today about what happened with the sale of
```

1    Business One to Hodell after --

2    A.    No.

3    Q.    -- February, 2004?

4    A.    No.

11:31:09  5              MR. LAMBERT:  Okay.  Thank you.

6                    That's all I have.

7                    THE COURT:  Any redirect?

8                    MR. STAR:  A quick follow-up, a couple

9    questions, Your Honor.

11:31:22 10         REDIRECT EXAMINATION OF PENELOPE VITANTONIO

11   BY MR. STAR:

12   Q.    Ms. Vitantonio, there was a question asked to you

13   about the commission that you would earn, and it was

14   suggested that you'd only be writing down in your notes

11:31:40 15   the number of licenses that would be initially purchased

16   because you'd only care about an initial commission.

17                    Am I correct, though, that if you sold the

18   deal initially and Hodell, like any other customer, might

19   have bought licenses, additional licenses later, you also

11:31:59 20   would have earned commission on that, right?

21   A.    Yes.

22   Q.    So if they had been discussing with you that they

23   initially wanted some number of users but then wanted to

24   acquire licenses later, is that something you would have

11:32:09 25   written down?

1    A.    Yes.

2    Q.    Okay.  You were asked some questions about Exhibit

3    820 where you had made the note about running parallel.

4               Let's just flip to that document real quick

11:32:32 5    so we all know what we're talking about.

6               And it was suggested that -- Bob, if you

7    can blow up the bottom part -- it was suggested that you

8    were only referencing running parallel during a testing

9    phase.

11:32:48 10               I just want to make sure we all understand.

11   During a testing phase of software, wouldn't a customer

12   always be running parallel?  They'd be running their old

13   system to run their business and testing the new system?

14   A.    Yes, they should be.

11:33:04 15               MR. LAMBERT:  Objection.

16               THE COURT:  Overruled.

17   A.    Yes, they should be.

18   Q.    Okay.  And so that always happens?

19   A.    Yes.

11:33:11 20   Q.    What you were referring to, though, was something

21   different, wasn't it?

22               You were referring to running parallel

23   after they went live on the system that they wanted,

24   correct?

11:33:27 25   A.    Yes.

1          MR. STAR:  Okay.  Those are all the

2     questions I have.

3               THE COURT:  Thank you.

4               Any recross on that?

11:33:34 5          MR. LAMBERT:  No, Your Honor.

6               THE COURT:  Thank you, ma'am.  You're

7     excused.  Watch your step, please.

8               (Witness excused)

9               THE COURT:  You may call your next witness.

11:33:48 10          MR. MILLER:  Your Honor, SAP calls Dan

11     Kraus, if we may step out.

12               THE COURT:  Sure.

13                    DANIEL KRAUS

14       of lawful age, a witness called by the DEFENSE,

15            being first duly sworn, was examined

16               and testified as follows:

17               THE COURT:  Please have a seat.

18               Would you tell us your full name and spell

19     your last name.

11:35:17 20          THE WITNESS:  Daniel Francis Kraus,

21     K-R-A-U-S.

22               THE COURT:  Thank you.

23          DIRECT EXAMINATION OF DANIEL KRAUS

24     BY MR. MILLER:

11:35:23 25     Q.    Good morning, Mr. Kraus.

1    A.    Good morning.

2    Q.    Thank you for coming.

3    A.    You're welcome.

4    Q.    And apologies for the delay.  It's the nature of

11:35:30  5    the process.

6              Could you tell the jury, please, just at a

7    high level, your educational background, and just again

8    at a high level, your work history?

9    A.    Sure.  I graduated from the University of

11:35:42 10    Massachusetts in 1986 with a degree in marketing.

11              From there, I spent about three years

12    selling, advertising, and then payroll systems.  And in

13    1989, I went to work for Great Plains Software, which is

14    now part of Microsoft.

11:35:58 15              I was with Great Plains until 1997, so just

16    about eight years, a little bit over eight years, and

17    while I was there, I had roles that involved working with

18    a dealer network, so the dealer channel and working with

19    partners and what we called partners at the time, helping

11:36:18 20    them evaluate opportunities and market the product.

21              I spent about five years of my career there

22    recruiting new dealers to sell the product, and then I

23    managed the product line that we developed.

24    Q.    And when did you leave Great Plains?

11:36:32 25    A.    I left Great Plains in 1997.

1        I had a number of different jobs between

2   1997 and 2003.  I worked for a couple of different

3   companies, working with either dealers doing marketing.

4   I actually ran a consulting company for about a year,

11:36:51 5   about a year at that point, year and a half at that

6   point.

7        I started with SAP in 2003.  I was hired

8   there to be the channel director so I was in charge of

9   the sales.

11:37:05 10   Q.    And before we go into any detail about your

11   responsibilities at SAP, why don't you just tell the

12   jury, so we have an overview of your work history, how

13   long you were at SAP and where you are now just so we

14   know what you do now?

11:37:17 15   A.    Yep.

16        So I was at SAP from 2003 until 2009.

17        I left in 2009, started my -- my company

18   back up.  It was actually a company I had that I shut

19   down when I went to work for SAP.  Started the company

11:37:33 20   back up.  The name of the company is Leading Results.  We

21   are a marketing agency.  We have six employees and we

22   help small businesses do marketing and do lead

23   generation.

24   Q.    Does Leading Results, does it work with SAP now?

11:37:45 25   A.    In the six years that I've been running the

1    company, we did one project for SAP.  We took some

2    registrations for a set of conferences that they did.

3              I don't work directly with SAP.  Some of my

4    clients are actually SAP dealers, but that's my only

11:37:59  5    involvement with SAP.

6    Q.    What portion of the Leading Results work that you

7    do relates to SAP, if you can estimate?

8    A.    All totalled, I think things that are related to

9    SAP in some way, shape, or form probably account for 15%

11:38:14  10    of my revenue, maybe 20.

11    Q.    Okay.  Let's talk about SAP.

12              Why don't you walk us through

13    chronologically at, again it can be a relatively high

14    level and we can go into more detail later if necessary,

11:38:26  15    when you started at SAP and what your, kind of, different

16    positions were and your responsibilities.

17    A.    Sure.  So I had three primary roles at SAP over the

18    time I was there.

19              So I was hired in -- I was hired in 2003 to

11:38:39  20    run the channel, and I was brought in because I

21    understood how the software that Business One represented

22    really got sold.  So my experience at Great Plains was

23    all about selling products through a dealer channel.

24              And so when I joined SAP, it was really to

11:38:58  25    run the sales for Business One.  And that involved both

1    building the dealer channel as well as the sales of the

2    product.

3            I had that role for about a year and a

4    half.  In 2004, September, 2004, my boss left for a

11:39:17    5    different position, and I was promoted to the vice

6    president of Business One.

7            And in that role, I had responsibility for

8    sales, service, and business development, which is what

9    we generally called anything else that was involved in

11:39:31  10    getting revenue.

11            So I had a small services team for client

12    escalations OR if we had things that needed to be done

13    locally, I had the sales team.  And then I had the

14    business development team which went out there and found

11:39:45  15    the different developers and third-party add-ons.

16    Q.    Okay -- sorry, I didn't mean to stop you.

17    A.    No.  And then I had that role until early 2009.  In

18    2009, I moved from being responsible for Business One in

19    the U.S. to taking a role on -- in global marketing.  And

11:40:02  20    so I was responsible for trying to coordinate the global,

21    marketing the global lead generation for Business One and

22    I did that role for about four or five months, at which

23    point, it really wasn't what I was hired to do.  It's not

24    what I wanted to be doing.

11:40:17  25            And SAP at the time was trying to shift

1      head count around and asking people to leave and laying

2      people off, and I had the opportunity to ask them to give

3      me an exit package and lay me off, and I took advantage

4      of that and got laid off in June of 2009, started my

11:40:34  5      company right at that point.

6      Q.    Got it.  Let's talk about B1.  Why don't you start

7      by telling the jury how B1 was sold.

8      A.    So Business One was sold, was sold through dealers.

9      It's still sold through dealers.

11:40:47  10           The dealer network ARE the folks that have

11     the relationship with the customer.  And that's, that's

12     really typical for software in this space.  When you talk

13     about small businesses, there's a couple of segments of

14     small business.  The very small ones, you know, they'll

11:41:02  15     go into a Staples or an Office Depot and might buy a

16     product off the shelf that they use to run their books.

17     And the next segment up, you start to get customers that

18     are a little more complicated in terms of what their

19     businesses are and they need to work with a consultant,

11:41:16  20     they need someone to help them understand what products

21     can and can't do for them.  And Business One, like Great

22     Plains before it, is one of those products that is sold

23     through a dealer channel.

24     Q.    And how is the sale of Business One through dealer

11:41:28  25     channels distinct from the sale of other SAP products,

| | |
|---|---|
| 1 | like their ECC product? |
| 2 | A.   So SAP had, at the time had three primary products. |
| 3 | At the time, it was called mySAP or SAP R3. |
| 4 | It's now ECC6.  And that product was sold by direct sales |
| 11:41:45  5 | reps to the largest customer. |
| 6 | So you know the customers that actually buy |
| 7 | ECC6.  They are people like Procter & Gambel or Ford or |
| 8 | really big name companies. |
| 9 | The next level down are we talked about the |
| 11:41:59 10 | market segment is SME, small and medium sized enterprise. |
| 11 | So in the medium -- |
| 12 | Q.   Sorry.  The court reporter has to take down |
| 13 | everything both of us say. |
| 14 | A.   You can't take down as fast as I talk?  I'll slow |
| 11:42:12 15 | down.  Sorry. |
| 16 | Q.   A lot of us have a tendency to talk fast.  So I'll |
| 17 | try to slow down, also. |
| 18 | Go ahead.  You were describing the other |
| 19 | segments. |
| 11:42:22 20 | A.   So there is SME, which is small and medium |
| 21 | enterprise. |
| 22 | So in the medium space, SAP had a product |
| 23 | called All-In-One, and then Business One was the product |
| 24 | that SAP had for the small space. |
| 11:42:33 25 | And so we were very focused on how do we |

1    get that very large segment of businesses in the U.S. as

2    SAP customers, and Business One was a product that we

3    used for that segment.

4    Q.    Okay.  Thank you.  Let's focus on Business One.

11:42:46  5              In connection with the sale of Business One

6    to customers, what role do these dealers who you've

7    mentioned play?

8    A.    So the dealer plays all the roles.  The dealer is

9    the face to the customer.  They're responsible for

11:43:02 10   finding the customer, qualifying him, making sure that

11   the product has a functional fit, qualifying that the

12   customer's environment is going to be there.  If there

13   isn't a functional fit for the product, Business One was

14   developed as a general business management package so it

11:43:20 15   wasn't designed for a specific type of business.

16              So we had developers who would create

17   add-ons or third-party products that enhanced the

18   functionality of Business One.

19   Q.    Just a little bit slower.

11:43:30 20              Go ahead.

21   A.    So the dealer was responsible for looking and

22   seeing did Business One fit, and if it didn't fit, how do

23   you close that functional gap.

24              So that gap, it might be closed by finding

11:43:42 25   a third-party product that was already out there, or it

1    might be closed by the dealer saying "I'm going to go and

2    develop the add-on or develop additional functionality."

3              So the dealer made sure there was a

4    functional fit.

11:43:54  5    Q.    Who collects -- sorry, but who collects the

6    customer's requirements to see what they need and how

7    heavy of a load they're going to put on B1 and what their

8    other needs and requirements are going to be?

9    A.    So the dealer has full responsibility for the sale

11:44:08 10    all the way through.  So in addition to the functional

11    requirements, we'd look at -- the dealer needed to look

12    at what's the volume, how many users were going to be

13    there, how big was the database of the different items

14    because it could be an inventory database, it could be

11:44:21 15    employees, it could be vendors.

16              There's lots of different factors that come

17    into play.

18              And then in all of this, it was, you know,

19    does the customer's, you know, are the customer's

11:45:25 20    employees technologically savvy enough to run the product

21    or how much training would they need once the product

22    went live.

23              The dealer also was responsible for pricing

24    the product and collecting the money and making that sale

11:45:25 25    happen.  They'd --

1    Q.    If I could interrupt.  When you say making the sale

2    happen, does that include getting the license agreement

3    signed?

4    A.    Yeah, that was part of the responsibility for the

11:45:25  5    dealer was to present the license agreement and have that

6    signed.

7    Q.    Okay.  Thank you.

8               And how about like the actual installation

9    and implementation of the software and whatever training

11:45:25 10    at the customer's location is done after that, who's got

11    that responsibility?

12    A.    So once a dealer understood all the requirements

13    and they had purchased the software, you know, on behalf

14    of the customer, sold it to the customer, the dealer

11:45:25 15    would install it, they would do the training and the

16    testing and any of the go-live processes.

17               Once the customer was live, the dealer was

18    responsible for the support.  So because customer -- you

19    know, the customers would have new employees come in.

11:45:33 20    Well, those employees needed to get trained on the

21    software.  A lot of times --

22               THE COURT:  Slow down.

23               THE WITNESS:  I'm sorry.  I'm trying.

24               THE COURT:  Really.  I can't even follow

11:45:43 25    you listening let alone the poor ladies here.

1          THE WITNESS:  Yeah, you know I live in

2     Charlotte, but I'm from the northeast, and I have this

3     problem in Charlotte, too, so I'll try.

4     BY MR. MILLER:

11:45:55 5     Q.    We'll keep moving in a moment, but just to be clear

6     you were talking about the dealer owns the sale from

7     beginning to end?

8     A.    Yes.

9     Q.    And that includes the installation and

11:46:03 10    implementation of the software and whatever follow-up

11    needs to get done, is that fair to say?

12    A.    Yeah, the dealer is responsible for the customer

13    satisfaction.

14    Q.    Okay.

11:46:09 15    A.    They have the face-to-face relationship with the

16    customer.

17    Q.    Okay.  Thank you.

18          Let's talk about SAP.

19          What role does SAP play in a B1 sale?

11:46:21 20    A.    Very little.

21    Q.    Tell me what, if anything, they do?

22    A.    We provide the software.  We provided the license

23    agreement that the customer needed to sign.  On occasion,

24    we may have a dealer that is looking for a price

11:46:39 25    concession, so we might get involved at that standpoint.

1    Q.    Okay.

2    A.    Occasionally a dealer would say I have a customer

3    that would like to talk to somebody from SAP and

4    understand -- you know, talk to somebody from the company

5    and make sure that this product is real or that, you

6    know, that SAP is actually committed to this product and

7    we might have a conversation with a customer.

8    Q.    So if a customer wants to talk to SAP, SAP will

9    make that happen?

10   A.    Absolutely.

11   Q.    Let's talk about, let me ask you point blank, how

12   do dealers collect information they have about B1, how do

13   they learn about this product that they're selling?

14   A.    So when a dealer goes through a process, they want

15   to evaluate, first, is this a product that I want to

16   sell.

17            So they'll start to learn about the product

18   from looking at a website, from attending a conference,

19   maybe talking to another dealer or a customer that's out

20   there.

21            So they'll get that information.

22            Then they'll talk to somebody who would

23   have been on my staff to recruit partners, and so they'd

24   get the information about the product.  They might even

25   ask for a copy of the product to evaluate in-house.  So

1     they'd start to learn about it that way.

2                    Once they sign a distribution agreement --

3     Q.    Just to be clear, what you were just talking about

4     is the kind of information a prospective dealer might

11:47:58  5     collect before they actually sign either an SDK -- not a

6     SDK, but a distribution agreement, right?

7     A.    Correct.

8     Q.    Okay.  Go ahead.

9     A.    Once they sign the distribution agreement, we would

11:48:06 10     have training classes that were available and that we

11     required them to go through so they'd go through

12     technical training, they'd go through sales training.

13                    We had conferences that we did a couple of

14     times a year.

11:48:17 15     Q.    Slow down.

16     A.    Where we'd have -- where we'd have the dealers come

17     in.  We rotated them around, around the country, so we

18     generally did one in early in the year, January, February

19     time frame, and generally one in the middle of the

11:48:31 20     summer.

21                    So the dealers would come into the

22     conferences.

23     Q.    Can I interrupt you just for a moment?

24     A.    Sure.

11:48:37 25     Q.    You mentioned that there was technical training and

1    sales training.

2                    Can you explain to the jury the difference

3    between those two references?

4    A.    Sure.

5                    So a typical dealer is going to have people

6    that are responsible for doing the consulting.  They're

7    going to be the people that are also part of the whole

8    pre-sales process, understanding what the customer's

9    needs are.

10                   Those consultants would go through a

11   technical training.  They'd understand how the software

12   operates, the features, the functions, how it works.

13                   Most dealers also had somebody that was

14   focused on sales, finding new customers.  So they would

15   understand where the product is positioned, who the best

16   fit for is, what are our marketing and our sales messages

17   around that.

18   Q.    And just to be clear, in order to be a dealer, a

19   dealer had to have both technical and sales training?

20   A.    Correct.

21   Q.    And these training sessions that we're talking

22   about, just to be clear, we're not talking about a couple

23   of hours over a webinar, right?  We're talking about in

24   person over a period of time?

25   A.    Yeah.

1    Q.    Tell me about that.

2    A.    In the beginning, the only way that we had to do

3    training was actually classroom training, and it was

4    probably one of the things that we got the most

11:49:47  5    resistance from with new dealers was the fact that we

6    asked them to go and spend a week in a classroom setting

7    so.

8    Q.    Did you test them?

9    A.    We tested them at the end of it and they needed to

11:49:59 10    pass the test.

11    Q.    How about -- what other sources of information were

12    there for dealers about B1 after they signed their

13    distribution agreements?  I mean you covered --

14    A.    Right, so --

11:50:11 15    Q.    -- a number of meetings and conferences and

16    training, but the jury needs to understand all of it.

17    A.    So we had -- we had the conferences, we had the

18    training classes.  We did -- we had an online portal so

19    they could get the information off the Internet.

11:50:26 20            We communicated with them outbound or

21    proactively through newsletters or conference calls that

22    we would invite them to.

23            And then I had a staff of people that were

24    out in the field meeting with dealers face-to-face on

11:50:40 25    occasion, and those people were also conveying our

1    messages and could get information for the dealers.

2                   When it came to things like technical

3    support, so if a customer was installed and there was an

4    issue, the normal route was, first, a dealer would log a

11:50:58  5    ticket into our support system.  We'd respond to that

6    ticket.  And if it was something that needed to actually

7    be clarified through a conversation, they'd actually get

8    on the phone and talk to a support rep either in our

9    support center or one of my local people, depending on

11:51:14 10    the situation.

11    Q.    So your point is in addition to everything else

12    that you mentioned, if a dealer had a question

13    technically about B1, they could access an SAP technical

14    person?

11:51:22 15    A.    Yes.

16    Q.    Okay.  Let's talk about the factors that a dealer

17    should consider in determining whether B1 was a suitable

18    fit for a customer.  Can you walk us through that?

19    A.    So since the dealer owns that relationship with the

11:51:35 20    customer, there's a lot of things that they should be

21    looking at.

22                   First and foremost, I think, is does the

23    product do what the customer needs it to do?  Software's

24    malleable, you can make it do a lot of different things.

11:51:50 25                   Business One shipped with a lot of features

1    in the product, and the first line was does Business One

2    do what the customer needs it to do.  And if it doesn't

3    do all of what a customer needs it to do, how do you

4    close that gap?  Do you go and get a third-party product,

11:52:07  5    do you write something, or does the customer change the

6    business process?  Those are all ways of dealing with a

7    functional gap.

8                Once you understood whether the customer

9    could use the product from a functional standpoint, you

11:52:23 10    then needed to evaluate it from the size and transaction

11    volume.  So how many transactions were going on, how

12    frequently were they, were there multiple shifts?  You

13    know, how big was the database?  So how many items did I

14    have in here, how many vendors did I have, how many

11:52:38 15    customers did I have?

16                And then you've got to look at all of that

17    and look at the technical environment.  So what's the

18    hardware we're going to run this on?  Does that hardware

19    exist at the customer?  Do they have the servers?  Do

11:52:52 20    they have all those work stations?  Is the network there,

21    or is the customer going to need to enhance their network

22    and their hardware environment and expand on that?

23  Q.    Got it.

24                When you were talking about sizing issues

11:53:03 25    and transaction volumes, et cetera, would that also

2012

1    include the number of users?

2    A.    It would include the number of users, absolutely.

3    Q.    Okay.  And you'd consider those altogether like

4    users, transaction volumes, database sizes, is that all

11:53:17  5    within this sizing reference that you made?

6    A.    Yeah, I -- a piece of ERP software, a business

7    management software, is probably one of the most complex

8    things to sell and to implement because of all the

9    factors that come into play because it's not any one

11:53:31 10    factor that would say yes or no as to whether the

11    software will work or not.

12              You've got to look at all of those pieces

13    and understand if there's any trade-offs and what they

14    are.

11:53:42 15    Q.    Understood.

16              Now, you mentioned also a dealer would

17    evaluate the functionality of B1 and determine whether a

18    customer might need other types of software to supplement

19    the functionality of B1.  Is that a fair characterization

11:53:54 20    of what you were saying?

21    A.    Yes.

22    Q.    And is that pretty common?

23    A.    It's common in probably 90% of the situations where

24    a customer needs something that the product may or may

11:54:03 25    not do right out of the box.

2013

1    Q.    Got it.

2            So B1's designed to do certain things, and

3    one of the things the dealer needs to evaluate is what

4    other functionalities might a customer need?

11:54:14  5    A.    Correct.

6    Q.    And if there are other functionalities that a

7    customer needs and they acquire it from other software,

8    is that -- is there a phrase for that?  Is that an add-on

9    or an extension?  I just want to make sure that the jury

11:54:25 10    understands and we're all talking about the same thing?

11    A.    Yeah, and we would call them alternately add-ons or

12    an add-on, a third-party product.  We use kind of both of

13    those terms interchangeably.

14    Q.    Got it.

11:54:38 15            So whose job ultimately was it to determine

16    whether B1 was suitable for the customer?

17    A.    The dealer.

18    Q.    And just to be clear, why does that make sense?

19    A.    Well, the dealer's the one who is eyeball to

11:54:50 20    eyeball with the customer.  You know, if I'm going to

21    sell a package to somebody who's a distributor, I need to

22    be able to walk through their warehouse and understand

23    how many items they have, how is it set up.

24            And if I'm selling it to a manufacturer, I

11:55:03 25    need to look at the manufacturing line and understand,

1    you know, what are their processes and how are they set

2    up?

3              The dealers are local and they own that

4    relationship with the customer over a long period of

11:55:15  5    time.

6    Q.    Tell me about that part.  You say a long period of

7    time.

8              Is the suggestion that dealers have

9    histories with their customers, is that common?

11:55:21 10   A.    That's very common.  A lot of times you'll find a

11   dealer who is selling a customer their second or their

12   third package.  You know, they've worked with them over a

13   period of time.  They've developed a trust -- we actually

14   talked about it.  It is a trusted advisor relationship,

11:55:37 15   and the customer would rely on the dealer to make the

16   right recommendations for their business.

17   Q.    When B1 dealers sold -- when dealers sold the SAP

18   B1 product, were they required to exclusively sell B1 as

19   an ERP solution, or were they permitted to sell other ERP

11:55:56 20   solutions from SAP competitors?

21   A.    The license that we grant in the distribution

22   agreement was nonexclusive, which meant they could sell

23   other products if they wanted to.  Many dealers sold

24   multiple products, and, you know, I believe LSi

11:56:11 25   sold -- they were a FACTS reseller when they signed up

1    and I believe that they kept selling it.

2              I know that they still had customers that

3    they had to support.

4    Q.    Thank you.  And we're going to come to LSi in a

11:56:20 5    couple minutes.

6              I want to cover a couple more kind of

7    overall issues.

8              Were dealers permitted to commit or bind

9    SAP in any way?

11:56:31 10   A.    No.  Actually the distribution agreement

11   specifically says that they can't do that.

12   Q.    What role, if any, did you play in connection with

13   the preparation of those distribution agreements?

14   A.    So when I started with SAP, we really didn't -- we

11:56:45 15   didn't have a distribution agreement.

16             I was part -- part of the team that worked

17   with the legal team inside of SAP to help construct those

18   agreements based on past experience I had had working

19   with dealer channels so I guess you could say I consulted

11:57:01 20   on them but that would be about the extent of the role.

21   Q.    Okay.  Thank you.

22             Can you tell us what market segment was B1

23   aimed at and did that change over time?

24   A.    So Business One -- so again, SAP had three products

11:57:15 25   in their portfolio.

1    They had mySAP, ECC6, SAP All-In-One, and

2    then Business One aimed at the smallest market.  So

3    Business One was really focused on the small segment of

4    the business and even to this day that's where Business

11:57:29  5    One is still focused, it's on the small segment so that

6    hasn't changed at all.

7    Q.    And how has -- let's talk then now that it's clear

8    that there were these three segments and Business One was

9    in the smallest segment, what -- how was B1 aimed within

11:57:46  10    that segment and did that change over time?

11    A.    So when I started with SAP we talked about Business

12    One being a great fit for companies with one to 500

13    employees and over, I think, probably about six months

14    in, we started changing the way that we talked about it

11:58:01  15    because what we found is Business One was competing with

16    All-In-One.  And we really didn't want that internal

17    family competition.

18    Q.    Just slower so that the court reporter doesn't --

19    A.    I'll breathe.

11:58:12  20    Q.    -- get mad at me.

21    Maybe she already is.  I have to put my

22    glasses on to see.  Are we good?

23    Go ahead.  Sorry.

24    A.    So we originally talked about it as one to 500 but

11:58:28  25    that was bumping into the All-In-One space a lot, so we

1    shifted that and began talking about Business One as a

2    great fit with companies with one to 250 employees.

3    Q.    Got it.

4            And were there any other reasons why the

11:58:42  5    market segment aim of B1 changed over time?

6    A.    Over time eventually it became clear that there

7    were some issues around really large data sets that we,

8    you know, that we wanted to understand and we wanted to

9    be more careful about of those large data sets.

11:59:00  10           So by, you know, talking to customers or

11    talking to partners about the different customer sizes,

12    it allowed us a little bit more flexibility if there was

13    a sale that might have been not a perfect fit.

14    Q.    What's a localization?

11:59:16  15    A.    The easiest way to describe this is that accounting

16    is accounting.  Debits have to equal credits.  The rules

17    are pretty well established.

18           But every country has its own unique tax

19    and reporting requirements.  The way we do accounting and

11:59:33  20    reporting in the U.S. is different than what they do in

21    Canada, which is different than what they do in Germany,

22    et cetera.

23           So a localization is how the product was

24    adapted for the use in a specific country.

11:59:45  25    Q.    This was an issue in connection with B1 because, of

1      course, it was used in Europe for a period of time and

2      elsewhere in the world and then was going to be used in

3      the United States?

4      A.    Right.  So when we first started shipping Business

11:59:58  5   One in the U.S., we had a couple of localization issues.

6            In Europe they don't do a lot of checks.

7      They do a lot of bank transfers and a lot of electronic

8      transfers so we had an issue with the way the checks got

9      printed out of Business One in the U.S.

12:00:10 10   Q.    And just to be clear, so the jury understands, it's

11     not -- you're not suggesting that no localization was

12     worked -- was done -- no localization work was done when

13     B1 was brought to the United States?

14            I think your point is work was done but

12:00:23 15   there was still some kind of layover issues?

16            MR. CARNEY:  Objection, Your Honor.

17            THE COURT:  Overruled.

18     BY MR. MILLER:

19     Q.    Thank you.  I want to be clear and I want the jury

12:00:30 20   to understand.

21     A.    Yeah, so when we brought Business One to the U.S.,

22     it was localized for the U.S. accounting rules and the

23     U.S. business practices.  The team that did that

24     localization was unfamiliar with a few of the constructs

12:00:42 25   of the way we do business in the U.S. so the whole idea

 1    of printing checks as a regular part of doing business

 2    was something that we needed to refine.

 3              The concept of a 1099, having a contract

 4    employee that you have to issue a 1099 to, was something

12:01:00  5    that wasn't in the product at all.  The way we do bank

 6    reconciliation in the U.S. is different than the way they

 7    do bank reconciliation in Europe.  In Europe it's

 8    typically done electronically.  In the U.S. we get a bank

 9    statement, look at it, we reconcile it that way.

12:01:15 10   Q.    Were those issues ironed out relatively early on?

11   A.    Right.  And that's what new versions or patches

12   were for is when we identified one of those, that

13   development would be done to address that issue and solve

14   the localization issue.

12:01:27 15   Q.    Okay.  Thank you.

16              MR. MILLER:  I don't have a watch on me,

17   Your Honor, but I'm sensing we're close to noon.  This is

18   not a bad time to break.

19              THE COURT:  All right.  If you want to

12:01:34 20   break now, we can.

21              MR. MILLER:  What time is it?

22              THE COURT:  Any objections?

23              Okay.  It's high noon.  He didn't have a

24   watch on.  He had a pretty good call on that, 12:00

12:01:45 25   o'clock exactly.

2020

1          MR. MILLER:  I have some help.

2          THE COURT:  So 1:15 or thereabouts on L-1

3    we'll call for you.

4          Keep in mind the admonition.  We'll see you

12:01:54   5    in a bit.

6          (Jury out)

7          (Luncheon recess taken)

8          (Proceedings adjourned at 12:02 p.m.)

9                - - - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
  1                  THURSDAY, JUNE 25, 2015,  1:14 P.M.
  2                  THE COURT:  Okay.  Be seated, folks.
  3                  Now, Mr. Kraus, you had a chance to relax
  4       over the lunch hour, so did the court reporters but --
13:23:01 5          THE WITNESS:  Try to slow down.
  6                  THE COURT:  Okay.
  7                  MR. MILLER:  Thank you, Your Honor.
  8       BY MR. MILLER:
  9       Q.   Mr. Kraus, let's try and pick up, roughly speaking,
13:23:08 10      where we left off.
 11                  You were talking about a shift in the
 12       target market for B1.
 13                  Can you tell the jury whether there was
 14       also -- there were also changes in the marketing
13:23:19 15      materials themselves, and can you kind of walk us through
 16       that?
 17       A.   Sure.
 18                  So when we -- excuse me -- when we first
 19       started working with -- when I first started working with
13:23:31 20      Business One as I said earlier, we -- the marketing
 21       materials talked about it as being for companies that
 22       were from one to 500, and those materials started to
 23       change.
 24                  I think the next version talked about it as
13:23:44 25      being good for companies that were up to 250 employees.
```

```
 1              And there was a further -- a further

 2     conversation, I don't remember exactly when it occurred,

 3     but we would talk about it as being a good fit for

 4     companies that had 10 to a hundred employees.

 5              So it shifted over a period of time.

 6     Q.   Let's take a look at a few exhibits, okay?

 7     A.   Um-hmm.

 8     Q.   You have a binder with you?

 9     A.   No.

10     Q.   I think we have a binder of exhibits for the

11     witness.

12              MR. MILLER:  One moment, Your Honor.  Just

13     one moment, Your Honor.

14              We want to slow down.  We don't want to go

15     too fast.

16              Bob, can you call up on the screen Exhibit

17     428?  I'm going to get started and try to work off the

18     electronic copies.

19     A.   Sure.

20     Q.   Alex will bring you a hard copy, it might be a

21     little easier for you to look at.

22              Is the screen populated for you there?

23     A.   It is.

24     Q.   Okay.  Can you tell us -- forgive me.  With

25     something like this, the paper copies are a little bit
```

1   easier.

2   A.    Great.

3   Q.    They're numbered, if you look, there's a 428.

4   A.    I have it.

13:25:17 5   Q.    It should be in the front.

6   A.    Um-hmm.

7   Q.    Okay.  It's a three-page document, the front page

8   of which is populating the computer screens.

9              Can you tell us what that is?

13:25:27 10   A.    So this is a public-facing presentation that talks

11   about what I had said earlier as far as the various

12   different market sizes that SAP had products for.

13              At the -- at the large end for 500-plus

14   employees we had mySAP Business Suite or --

13:25:46 15   Q.    I'm going to slow you down a little bit already,

16   although your cadence is fine, but forgive me for

17   interrupting.

18              You mentioned it was a public-facing

19   document?

13:25:55 20   A.    Yes.

21   Q.    How do you know that this document is what you

22   refer to as public-facing?

23   A.    Two pieces.  Nowhere on it does it say SAP

24   confidential or internal use only, and on the back page

13:26:07 25   there's a very big copyright notice.

                        So in a presentation deck that we would use

 1      at a conference or that we would make available to our

 2      resellers to use or for customers to look at, this is

 3      pretty typically how the copyright was set up.

 4 Q.    Got it.  Is this something that you'd be familiar

 5      with in the course and scope of your employment at SAP

 6      and the work you did with Business One?

 7 A.    It is.

 8 Q.    Okay.  And who would something like this go to and

 9      how would it be used?

10 A.    These slides may have been part of a larger

11      presentation.  They might have been used by themselves,

12      made available, might have been used in a sales training

13      class, could have been presented to the partners at a

14      conference; would have been available to the partners to

15      use and even market Business One to their customers.

16 Q.    You just said "Would be available to the dealers."

17 A.    Absolutely.

18 Q.    Right?

19 A.    Yes.

20 Q.    When you said partners, you mean partners, dealers,

21      resellers?

22 A.    Yeah, partners, dealers, resellers are terms I use

23      interchangeably.  Sorry.

24 Q.    Is there any doubt in your mind this would be

```
          1    available to the dealers?
          2    A.    No, there's no doubt in my mind at all.
          3    Q.    You said this is public.  Is this something you
          4    could find on the Internet?
13:27:19  5    A.    I would guess there are probably --
          6              MR. CARNEY:  Objection.
          7              THE COURT:  Objection sustained.
          8    Q.    You can't guess.
          9    A.    I would suppose that dealers would put this on
13:27:25 10    their website.
         11    Q.    Forgive me.  Would you be wildly speculating or
         12    guessing if you explain to us whether or not this was
         13    available on the Internet?
         14    A.    No.
13:27:34 15    Q.    Okay.  Can you explain whether this would be
         16    available on the Internet?
         17    A.    Dealers would likely use this on their website,
         18    which means it would be available on the Internet.
         19    Q.    Okay.  Now, you started to explain I guess what's
13:27:48 20    the second page?
         21    A.    Yes.
         22    Q.    It's SAP portfolio.
         23              Thank you, Bob.
         24              Can you walk us through this, the basics of
13:27:57 25    this slide?
```

```
 1    A.    Sure.

 2                As I was talking about earlier, there were

 3    three primary products that SAP went to market with and

 4    addressed different market segments.

 5                This slide talks about all three of those

 6    market segments.

 7                So at the large company size, 500-plus

 8    employees, is mySAP Business Suite.

 9                In the mid market, so up to 500 employees,

10    would be mySAP All-In-One.

11                And then in the one to 200 or the 10 to 200

12    space on here would be SAP Business One.

13    Q.    Okay.  Now, the technology that computer screens

14    have some resolution issues.  In my hard copy, I can see

15    the names of these three different SAP products above the

16    employee numbers that are referenced there.

17                For the jury's edification, can you confirm

18    that that's right and just explain what they can't see?

19    A.    Sure.  So this one would be for --

20    Q.    Thank you.

21    A.    -- for SAP Business One with 10 to 200 employees

22    and 3 to 100 users.

23    Q.    Okay.  That's fine.  That's fine.  And the point is

24    that that's above the numbers on the far left, and then

25    All-In-One is above the numbers in the middle, and ECC is
```

1    in front of the numbers on the far right?

2    A.    Correct.

3    Q.    All right.

4    A.    This goes from left to right, small to large, in

13:29:18 5    terms of the market.

6    Q.    Okay.  Let's take a look next at Exhibit 124.

7    A.    Excuse me, which number?

8    Q.    124.

9    A.    124.

13:29:26 10    Q.    Hopefully everything I ask you about is in the

11    binder.  If it's not, it's my fault.

12               Now, Exhibit 124, it's understood in this

13    case that this was produced by LSi in this case.

14               Will you tell us what Exhibit 124 is?

13:29:44 15    A.    Yes.

16               So Exhibit 124 is a Business One Statement

17    of Direction, and this was a document that was for

18    internal use of the SAP employees as well as for

19    partners.

13:29:59 20    Q.    Is there a date in here that gives you any idea of

21    when this was produced?

22    A.    Yeah, there's a version history and the initial

23    draft would have been January 6th, 2005, and then for

24    partner release, which means we would share it with

13:30:17 25    partners, would be March 22nd, 2005.

2028

1    Q.    Okay.  And then it looks like there's another date.

2    A.    Yeah.  A few minor changes made on April 25th,

3    2006.

4    Q.    Okay.

13:30:27  5    A.    No, 2005, sorry.

6    Q.    Is there also a date in the lower right-hand

7    corner?

8    A.    There is.  April 25th, 2005.

9    Q.    Okay.  And just to be clear, the first document

13:30:36 10    that we looked at, 428, when you flip to the third page

11    and we were explaining how it was public-facing, the

12    copyright date on that was 2005, right?

13    A.    That's correct.

14    Q.    And the date we're looking at here is really a

13:30:50 15    range, but it's from January, 2005 to April, 2005, right?

16    A.    Yes.

17    Q.    And just to orient the jury, the license agreement

18    in this case that was signed by Hodell with SAP, that was

19    December of 2005?

13:30:58 20    A.    That's correct.

21    Q.    So both of these documents are substantially in

22    advance of that license agreement?

23    A.    Yes.

24    Q.    Okay.  Take a look, please, at Section 3.1.  You

13:31:09 25    got to flip through a couple pages.  It's the fifth page.

1    A.    Um-hmm.

2    Q.    It's not only the fifth page but described as

3    Page 5 of 22 at the bottom.

4              Bob, can you highlight the second full

13:31:24  5    paragraph below -- actually, why don't we take it from

6    3.1, the whole -- all of 3.1, please?

7              Can you explain to the jury what was being

8    communicated to dealers and others in Section -- in the

9    summary portion of this Statement of Direction?

13:31:40 10    A.    So the Statement of Direction is explaining to

11    dealers and employees in terms of where, where the

12    planned direction of the product was going to be, what

13    would new features be, what was the market that it was

14    planned to address, and what it says in here is it talks

13:31:57 15    about the number of countries that the product's now

16    available in, which was 37 countries, and that there were

17    800 partners.

18              It talks about the testing that was being

19    done in 2004 for Version, let's see, 2004A.  It talks

13:32:18 20    about the testing that was done on 2004A, which is the

21    version that was shipping at the time.

22              And then it talks about the future releases

23    and the future direction of the product in the second

24    paragraph.

13:32:29 25    Q.    Yeah, will you please read for the jury and into

1    the record the paragraph that begins with "In future

2    releases"?

3    A.    Sure.  "In future releases, SAP Business One will

4    focus on the needs of businesses with 10 to 100

13:32:44  5    employees.  While SAP Business One continues to meet the

6    needs of many larger businesses of up to 250 employees,

7    by concentrating on companies with 10 to 100 employees,

8    we will be able to more rapidly increase the penetration

9    of the small and midsize market by focusing on SAP

13:33:02 10    Business One's core strengths; true integration."

11    Q.    Got it.  What's your understanding of what was

12    meant to be communicated there?

13    A.    What's being communicated here is that the future

14    direction of the product, while it will continue to

13:33:17 15    be -- it can continue to be used for larger companies,

16    the future development, the features that are going to

17    get added to the product in the future are going to be

18    focused on companies that are more in the 10 to 100

19    employee range.

13:33:29 20    Q.    Does this mean that you can only sell Business One

21    to companies with 10 to 100 employees or Business One

22    will only work for companies with 10 to 100 employees?

23    A.    Absolutely not.  We say right in here that you'll

24    be able to continue to meet the needs of larger

13:33:44 25    businesses.

1                What we're saying is simply that the new

2       features, the new releases, are going to focus more on

3       the needs of that smaller segment of the market, and

4       that's -- that's the goal of enhancing the product going

13:33:55  5     forward.

6       Q.    Okay.  Let's take a look next at Exhibit 130.  This

7       is a little bit out of order.  I think 130 is probably at

8       the back of your binder, but it's got a side tab like the

9       rest of them, so hopefully you can find it pretty easily.

13:34:16 10               And this is another document that's

11      understood to have been produced from the files of LSi.

12               Can you tell us what Exhibit 130 is?  With

13      the cover sheet, it's actually the second page of the

14      exhibit.

13:34:30 15     A.    Right.

16      Q.    The first page is the LSi cover sheet, but can you

17      tell us what this document is?

18      A.    So this is a presentation that would have been done

19      by Gadi Shamia, who, as his title is on here the VP for

13:34:47 20     the Solution Management for Small Business Solutions, and

21      it's talking about Business One and where it's been and

22      where it's going.

23      Q.    And is there a date on the document?  Are you able

24      to orient us date-wise?

13:35:04 25     A.    So this was presented, it has the partner Tech

1    Summit logo on it.  The Tech Summits were usually done in

2    a late spring or early summer, so I don't know the exact

3    date but it would have been sometime in the middle of

4    '05?

13:35:17  5    Q.    Okay.  Is that an '05 to the right of the tech

6    partner?

7    A.    Yes.

8    Q.    A SAP partner, Tech Summit?

9    A.    Yes, it says Tech Summit '05.

13:35:27 10   Q.    Who would this presentation have been made to?

11   A.    This would have been made to the partners.

12   Q.    And how would LSi have gotten this presentation in

13   its files?

14   A.    They would have been at the Tech Summit and either

13:35:37 15   received a copy of it there or downloaded it from the

16   PowerPoints we made available after the conference.

17   Q.    I see.

18         Can you please take a look at what's the

19   fourth paper page of the presentation, it's probably the

13:35:50 20   third page of the presentation itself?

21   A.    Um-hmm.

22   Q.    It says, "Small business report card" there.

23         Do you see that?

24   A.    Yes.

13:35:57 25   Q.    Now, you've been testifying how the target for B1

1  changed somewhat over time.

2        Is this consistent with that, and can you

3  explain?

4  A.    Sure.

13:36:07  5        This -- this is consistent, and from a

6  marketing standpoint, we wanted to have the dealers focus

7  where the biggest opportunity was.

8        And if you look at this, this pyramid, it

9  shows the number of businesses.  And I believe this is

13:36:22 10  the number of businesses in the U.S.  And it talks about

11  the fact that, you know, there's a very small number,

12  45,000 large businesses.

13        There's more, 613,700 medium-sized

14  businesses with 100 to 999 employees, but then when you

13:36:43 15  look at one to 99 employees, there's 78 million firms or

16  78 million businesses in that space.

17  Q.    And when you say "one to 99 employees" by

18  referencing the 78.3 million, is that because of the

19  language that's at the top of the pyramid that SAP is an

13:36:57 20  affordable integrated business management solution

21  designed specifically for small and medium-sized

22  companies?

23  A.    Right.

24  Q.    10 to 100 employees?

13:37:06 25  A.    Right.  So the goal of this slide and this pyramid

1    would have been to show the dealers that we're focusing

2    in ten to 100 employees because that's where the biggest

3    opportunity is in terms of the number of businesses.

4    Q.    Thank you.  I had forgotten there was a reference

13:37:22  5    to one to 99 in the lower right-hand corner so it's

6    really in two places on this page, right?

7    A.    Yes.

8    Q.    Take a look, would you please, at what I guess is

9    the two pages after this.

13:37:40  10              Can you tell us, Mr. Kraus, what this is

11    communicating?

12    A.    So what this is doing is really talking about where

13    the Sweet Spot is for SAP Business One.

14              And it's that spot between the very

13:37:56  15    smallest of businesses and the subsidiaries for large

16    companies, and when we talked about the Sweet Spot, and I

17    think this analogy might have actually been used when we

18    were -- when this slide was presented, you know, the

19    Sweet Spot is describing much like on a tennis racquet,

13:38:15  20    if you're playing tennis, there's a Sweet Spot on the

21    racquet that you're going to get the most power from

22    hitting the ball.

23              And that's where we were encouraging our

24    dealers to focus, was kind of in that spot.

13:38:26  25              But that doesn't mean that if you hit

1    somewhere else on that racquet, you wouldn't get a ball

2    over the net.  And so that's what we were trying to say,

3    not that there's an absolute place but here's the Sweet

4    Spot, here's the best place to focus on, and that's what

13:38:42 5    was being communicated through this slide.

6    Q.    Is Sweet Spot also a marketing term?

7    A.    Not in the general vernacular but SAP was using it

8    that way to talk about and help partners have a shortcut

9    to think about --

13:38:54 10   Q.    Let's slow down a little bit as I think your speed

11   is coming back up to northeast standards.

12                  Are you from New York?

13   A.    Originally.

14   Q.    Okay.  I think you told me you're upstate New York

13:39:07 15  so maybe that is what it is.

16                  Forgive me, I'm just kidding.

17                  This marketing -- the notion that the Sweet

18   Spot has a marketing component, can you explain to the

19   jury what you mean by that?

13:39:16 20  A.    Sure.

21                  So when a dealer is looking for where

22   they're going to find prospects to sell to, the idea of

23   the Sweet Spot was to give them a shortcut, a heuristic

24   to think in their head this is where I want to focus my

13:39:33 25  marketing efforts, my sales efforts, is in this Sweet

1      Spot of the ten to 99 or one to a hundred, both are used.

2      Q.    And we're going to talk about this more in a little

3      bit, but just to be clear, could a dealer sell outside of

4      a Sweet Spot?

13:39:49  5      A.    There was -- there was no limitations put in terms

6      of where they could sell the product.

7      Q.    Understand.

8            And was Business One -- we'll come to this,

9      but was Business One used successfully outside of the

13:40:00 10     Sweet Spot?

11     A.    Sure.  There were a lot of customers that have

12     bought the product.

13     Q.    Okay.  I want to come back to that.

14     A.    Okay.

13:40:06 15     Q.    Because we could get off target and it could end up

16     taking us longer I think to get through these materials.

17            I just want to be clear.  These figures

18     that we've looked at, 428 and 124 and 130, these were all

19     prior to the December, 2005 license agreement?

13:40:22 20     A.    Yes.

21     Q.    And would dealers like LSi have been generally

22     aware of these figures?

23     A.    Yes.  They should have been.

24     Q.    Okay.

13:40:37 25            You mentioned earlier there were some

1    earlier marketing materials that had higher numbers in

2    them like one to 500 employees.  Do you recall that?

3    A.    Yes.

4    Q.    And just to be clear, was there a reference to one

13:40:47 5    to 500 employees or was it something else?

6    A.    It was one to 500 employees.

7    Q.    Okay.

8          Do you believe these materials that you're

9    referencing that referred to Business One working with

13:40:57 10   companies that had up to 500 employees, were they

11   accurate?

12   A.    Sure.

13   Q.    And why is it that you're comfortable saying that's

14   accurate?

13:41:06 15   A.    Because every business is a little different in

16   terms of how they're structured.

17          I think the best example I could give you

18   is let's say I run a painting company and I've got 20

19   crews of ten painters on each crew.  Well, I have 200

13:41:23 20   employees right there that are out in the field working

21   every day that are never going to be in any kind of

22   accounting system.

23          You know, there's a lot of different types

24   of companies that you have employees that would never be

13:41:34 25   involved in the system in any way, shape or form.

2038

1              So being able to give people a range to

2      think about, it would fit in this realm is a helpful way

3      to do it.

4      Q.     In other words, not all employees are ERP users,

13:41:50 5      correct?

6      A.     Correct.

7      Q.     Okay.  Separate and apart from that, is it true or

8      is it not that SAP B1 has worked well for companies that

9      actually do have up to 500 employees or more?

13:42:00 10      A.     Yes.

11      Q.     Tell us about that.

12      A.     We -- we had -- we had a number of customers before

13      Hodell-Natco ever bought Business One that were large,

14      and we've had -- well, since I've left and even before,

13:42:15 15      there were a number of customers that have bought the

16      product that used it successfully that are very large.

17      Q.     Thank you.  Thank you.  And we'll come back to that

18      probably, also.

19              In fact, let's talk about it right now.

13:42:34 20      A.     Okay.

21      Q.     Tell the jury, has B1 been a successful product?

22      A.     Absolutely.  Business One has more than 40,000

23      customers that are using it around the world, and

24      generally, you would look at a product, whether it's

13:42:49 25      successful or not, based on the adoption, and 40,000

1    companies running a product is a lot of companies running

2    a product.

3                So yes, it's been a successful product.

4    Q.    What range of size company -- what company size

13:43:00  5    ranges have been successful with Business One?  The jury

6    wants to know.

7    A.    All.

8    Q.    Explain, please.

9    A.    There's --

13:43:08 10    Q.    Take your time.

11    A.    There are companies that -- there are companies

12    that have one or two employees, one or two users and

13    everybody's in the system obviously if there's only two

14    people that have run the product, and there's companies

13:43:21 15    that have -- that have had hundreds of people that are in

16    the system.

17                So it's really covered a broad range.

18    Q.    Let's talk about this case.

19                Were you involved in the B1 sale to Hodell?

13:43:36 20    A.    Very peripherally.

21    Q.    Why don't you tell us what your peripheral

22    involvement was.

23    A.    Dan Lowery and the folks at LSi approached me with

24    a proposal for pricing in 2004, the end of 2004, asking

13:43:58 25    me if this is something we would support.

             1                We traded some e-mails back and forth and

             2        negotiated a price that we would hold, providing that the

             3        order was put in, you know, sometime in the next year.  I

             4        told them I'd hold the price for a year.

13:44:14     5                And that was pretty much what I heard of it

             6        until it came back and Dan was ready to order the license

             7        agreement, and then I signed the license agreement.  That

             8        was about my involvement.

             9        Q.    Okay.  Let's walk through that just a little bit.

13:44:26    10                Can you go back to pretty much the front of

            11        your binder?

            12        A.    Um-hmm.

            13        Q.    Look at Exhibit 40 and can you call that up,

            14        please, Bob?

13:44:38    15                Exhibit 40, I'll give you a moment while

            16        you kind of find it, it's up on the screen, is a November

            17        3rd, 2004 e-mail from Dan Lowery to you.

            18                Do you see that there at the top?

            19        A.    Yes.

13:44:52    20        Q.    Can you tell us what Exhibit 40 is?

            21        A.    So this is Dan Lowery introducing -- excuse

            22        me -- introducing Hodell-Natco to me where he's saying

            23        this is an existing customer that we have, and they've

            24        given him an agreement to pay part of the SAP license as

13:45:12    25        a way to pay for his cost in redeveloping his fastener

1    product from FACTS over to SAP Business One.

2                     He gives me the reasons why they're willing

3    to do that, and then he gives me the reasons in terms of

4    how we're going to benefit from that.

13:45:30  5              And then he attached a spreadsheet that

6    laid out --

7    Q.    Can you go to that?

8    A.    -- financial arrangements that he was looking for.

9    Q.    Sorry.  I cut you off, Dan.  Can you please go to

13:45:42 10   that second page, Bob, so we can track what Dan was

11   telling us about.

12                     Go ahead, you were telling us something

13   about the second page?

14   A.    So he attached a spreadsheet that said here's the

13:45:53 15   80 licenses that they would like to buy, what the price

16   was, what the cost is he was asking us for, which was, it

17   was a greater margin or bigger discount than he would

18   have normally gotten, and explaining that this is how the

19   deal would work in his -- in his eyes.

13:46:10 20   Q.    Do you -- so this is November 3rd, 2004?

21   A.    Yes.

22   Q.    Okay.  Do you recall hearing the Hodell name from

23   anybody before you got this e-mail from Dan Lowery?

24   A.    No.  This is the first I recall hearing the name.

13:46:24 25   Q.    Okay.  What happened, just so the jury is following

1    the chronology, I think you explained a couple of minutes

2    ago, what happened after the November 4th e-mail?

3    A.    So Dan and I probably traded e-mails a couple of

4    times back and forth through the end of the year.

13:46:41  5              We came to an agreed-upon price, and then I

6    didn't hear anything else on this deal until towards the

7    end of 2005 when they were ready to start to get serious

8    about the license agreement.

9    Q.    Okay.  So you get this first e-mail in November of

13:46:57 10   2004?

11   A.    Yes.

12   Q.    And there's some back and forth between you and

13   Lowery establishing a price for the 80 licenses, right?

14   A.    Correct.

13:47:03 15   Q.    And then your testimony is you heard very little

16   for pretty much the next year?

17   A.    I don't think I heard anything.

18   Q.    Okay.  Well, let's take a look at Exhibit 748,

19   please.

13:47:21 20              Exhibit 748, you can see at the top, is an

21   October 26th e-mail from you to Ted Steffner and Ken

22   Lorenz.  Who were they?

23   A.    So Ted Steffner would have been the channel

24   manager, the person who was responsible for working with

13:47:37 25   LSi on a regular basis, on a day-to-day basis.

```
 1              Ken Lorenz actually preceded Ted in that
 2    role, so I would have copied him as well because Ken was
 3    managing or was the partner manager for LSi at the time
 4    of the original e-mail.
13:47:55 5    Q.    You've got a really good memory.  Just to be clear,
 6    though, they're both SAP employees?
 7    A.    Yes, they're both SAP employees.
 8    Q.    Okay.
 9              Now, I can see from the bottom two-thirds
13:48:05 10   of this cover page that there's a copy of the November
11    3rd e-mail that Dan Lowery sent you that we were just
12    talking about that was Exhibit 40, right?
13    A.    Correct.
14    Q.    And then above that, you're explaining apparently
13:48:20 15   information to Ted and Ken, right?
16    A.    Yes.
17    Q.    Can you -- can you emphasize and read to the jury
18    what you say there in the second paragraph?
19    A.    "The challenge on this -- the challenge on this is
13:48:31 20   that this e-mail is from a year ago and I've gotten no
21    update on this in a year."
22    Q.    Okay.  And that's consistent then with your
23    testimony, right, that you went back and forth with
24    Lowery for a month or so after the November 3rd e-mail,
13:48:43 25   and then you pretty much didn't hear anything for almost
```

1    a year?

2    A.    Correct.

3    Q.    Okay.  And what then happened?  Did you reach an

4    agreement on price and a license agreement was ultimately

13:48:53  5    executed?

6    A.    Right.  So Dan had -- I believe what happened is

7    Dan had went to -- gone to Ted and said "We have this,

8    this license we want to do, this license we want to

9    execute."

13:49:07  10           I would have been probably forwarding this

11   e-mail to Ted because he asked me, you know, is this

12   real?  You know, is this deal something that you actually

13   committed to?  And --

14   Q.    When you say that, what are you referring to; the

13:49:22  15   price or --

16   A.    The pricing and the terms for the Hodell-Natco deal

17   that Dan and I had negotiated earlier.

18   Q.    Was --

19   A.    Ten months ago.

13:49:29  20   Q.    Was there anything else that was being discussed by

21   you or any other involvement of yours other than price?

22   A.    No.

23   Q.    Okay.  So take a look at 316, please.

24           Can you blow up the top, please, Bob?

13:50:01  25           This is an easy one.  I'm really just doing

1    this to orient you and everyone else timing-wise, but you

2    would agree with me this is the December 23rd, 2005

3    license agreement contract between Hodell and SAP?

4    A.    Correct.

13:50:17  5    Q.    Okay.  So that kind of completes the sequence,

6    right?

7    A.    Right.  So we negotiated the price, we came back

8    and confirmed it, we honored the commitment we made, and

9    then the license agreement was executed at the end of the

13:50:27 10    year with Hodell-Natco and SAP.

11    Q.    Thank you.  So while we're looking at this, if I

12    can find it, Bob, can you please go to Section 7.1?  And

13    I'm not going to get into a lot of detail on the license

14    agreement, but this has come up so let's spend a second

13:50:50 15    on it.

16         You have to blow up 7.1, please, Bob.  It's

17    tiny.

18         It says here, "Performance

19    warranty/maintenance, 7.1, warranty.  SAP warrants that

13:51:05 20    the software" and that's a defined term, right?

21    A.    Um-hmm.

22    Q.    "Will substantially conform to the functional

23    specifications contained in the documentation for six

24    months following delivery."

13:51:19 25         Do you see that there?

1    A.    Yes.

2    Q.    How do customers get the documentation?

3    A.    So SAP Business One was shipped on a CD originally

4    and then a DVD.  When the software is installed, one of

13:51:29 5    the choices to install are the help files, and the help

6    files are the documentation.

7    Q.    So a customer who got the CDs, they have the

8    documentation?

9    A.    They have the documentation.

13:51:38 10    Q.    Thank you.

11            By the way, just one other item while we're

12    doing some minor housekeeping.  Take a look at the

13    definition of "Software."

14            The warranty that we were just looking at

13:52:00 15    had the word "Software" in it.

16            Do you remember that?

17    A.    Yes.

18    Q.    And it was capitalized, right?  Do you remember

19    that?

13:52:08 20    A.    Yes.

21    Q.    Okay.  So when we looked at 7.1, it had the word

22    "Software" in it and it was capitalized?

23    A.    Correct.  Um-hmm.

24    Q.    Would it be fair to say, in accordance with this

13:52:19 25    definition at 1.10 -- sorry.  Bob, go to software,

```
 1    please.
 2                   There's two 1.10s.  There's actually a
 3    typographical error in this document.
 4                   Would it be fair to say that the definition
 5    of software reads, "The SAP Business One software product
 6    developed by or for SAP and/or SAP AG and delivered to
 7    licensee," that would be Hodell, right?
 8    A.    That would be correct.
 9    Q.    "Hereunder pursuant to the order for the software,
10    including without limitation present and future orders."
11                   Do you see that there?
12    A.    Yes.
13    Q.    So if Hodell ended up with 120 licenses because it
14    got 80 at one point and 40 later, those 120 licenses
15    would be within the definition of software?
16    A.    Yes, it would.
17    Q.    Okay.  And just to be clear, other than what you've
18    already discussed, do you recall any other involvement or
19    communications you had prior to the December, 2005
20    license agreement about Hodell?
21    A.    No.  There's nothing else I recall.
22    Q.    Okay.  By the way, at the time of the license
23    agreement, were you aware of Hodell's database size and
24    their transaction volumes?
25    A.    No, the only thing I was aware of was the number of
```

1    users being ordered.

2    Q.    Okay.  Do you remember when the go-live was?

3    A.    The go-live was early March of 2007.

4    Q.    Okay.  So we've kind of gotten up to the date of

5    the license agreement.

6              Can you explain to the jury the involvement

7    you had with the Hodell B1 project after the date,

8    December, 2005 date of the license agreement, up to the

9    March, 2007 go-live, which is basically -- it sounds like

10   a longer time, but it's 15 months, right?

11   A.    Right.

12             So in that time frame, I was aware of some

13   early performance issues, and I don't know whether it was

14   Business One or In-Flight, and I was aware of it only

15   because my team kept me in the loop as to the customers

16   that we had and where they were at in implementation.

17             You know, in our regular monthly meetings,

18   I would have gotten that update.

19             It never escalated into anything that we

20   needed to put resources to or anything that I paid

21   attention to beyond that.

22             And then there was some back and forth with

23   LSi originally and then with LSi and Hodell for

24   maintenance fees.  When we did the original license

25   agreement or when we did the original deal, I had said to

1    Dan that he needed to have the maintenance payments for

2    the software start at the same time the license was

3    executed.

4    Q.    Is that customary?

13:55:09  5    A.    Yeah.  That was actually a requirement, that

6    license -- that maintenance fees start on the date that

7    the license is executed.

8                   Dan wanted to delay that.  We had said no.

9                   He came back and asked for us to delay them

13:55:23 10    and to give them a credit on those payments.  I had said

11    no to that.

12                   And then a few months later, we got a

13    letter from Hodell-Natco via -- via Dan asking for a

14    credit for those license fees.

13:55:36 15    Q.    They wanted the same thing?

16    A.    They wanted the same thing.  And at that point, it

17    had been a year, a year-plus I think at that point, and

18    it wasn't worth arguing over.  So we gave them the

19    credit.

13:55:47 20    Q.    Was there some sort of argument that either the

21    dealer was making or the customer was making about why

22    they were entitled to the credit?

23    A.    The customer was asking for the credit because we

24    had had delays getting one of the service packs, a

13:56:03 25    Business One 2005 service pack out the door.

```
         1    Q.    Did that issue get resolved?

         2    A.    The service pack got shipped.

         3    Q.    Right.

         4    A.    I don't remember as to why it was delayed.

13:56:11 5    Q.    Okay.  And the delay in the shipment of the service

         6    pack, did -- does that have anything at all to do with

         7    the B1 performance issues that Hodell's raised in this

         8    case?

         9    A.    No, because this would have all happened before,

13:56:24 10   before they actually went live.  So we're talking about a

        11    service pack before they were ever live.

        12    Q.    Okay.  So anything else?

        13                So we're talking about your involvement

        14    from, right, license agreement, December, '05, up to

13:56:38 15   go-live, March, 2007.  Any other interaction that you're

        16    remembering?

        17    A.    Not that I recall, no.

        18    Q.    Okay.  Then you talked about the performance issues

        19    that you heard -- I think you said early, early on, would

13:56:50 20   that be early 2006?

        21    A.    It was somewhere in the first half of 2006.  The

        22    exact dates I --

        23    Q.    And I just want to make sure everybody understands.

        24    You used the phrase, and forgive me if I don't get it

13:57:02 25   right, but not anything you needed to pay attention to.
```

2051

1       And I want to be clear.

2       A.    Yeah.

3       Q.    Was somebody paying attention to that stuff?

4       A.    Yeah, so in the -- the way -- In-Flight Enterprise

13:57:14  5   was part of this deal, and so it would have been Ralf's

6       team that was interacting with the folks at LSi on the

7       development of In-Flight Enterprise.  If there were

8       specific issues on Business One, those would have been

9       logged as a ticket within the support system.

13:57:33 10             So the appropriate channels would have

11      known what was going on.

12      Q.    Got it.  And you weren't part of that, those

13      channels, you weren't in direct interaction there?

14      A.    No, that's why I heard about it peripherally.  If

13:57:45 15  something got escalated, if it was a customer that was

16      asking for somebody to be on site, if we were going to be

17      asked to put resources into it, I would have gotten more

18      involved because that would have been somebody asking me

19      to have my team go out there and visit with the customer.

13:57:59 20  Q.    Thank you.  You just used the word escalated.  I

21      just want to be clear, when you say escalate, what do you

22      mean, if something had escalated?

23      A.    An escalation might occur because a customer is no

24      longer in production, so, you know, our biggest concern

13:58:14 25  was to make sure that a customer was successful.

1           So if a customer is running the software

2    and then something has happened so that they can no

3    longer actually run their business, they aren't in

4    production any longer, that would be an escalation.  At

13:58:28 5    that point, we get people involved.

6    Q.    Is an escalation when something becomes more

7    serious?

8    A.    Yes.

9    Q.    But it hadn't become more serious because, you knew

13:58:35 10    that because you didn't get notified, is that your point?

11    A.    Um-hmm.

12    Q.    Okay.

13           Do you recall having any direct contact

14    with Hodell prior to this March, 2007 go-live?

13:58:45 15    A.    No, I don't recall ever having direct contact.

16    Q.    How about volumes?  You testified you weren't aware

17    of the transaction volumes and database sizes prior to

18    the license agreement.

19           Were you aware of that information prior to

13:58:56 20    the go-live?

21    A.    I think prior to the go-live I had seen a couple of

22    e-mails that talked about either the database size.  I

23    don't remember them in detail.

24    Q.    Okay.  What involvement did you have in connection

13:59:11 25    with this Hodell project after go-live?

1    A.    So after go-live, I got involved in it pretty

2    quickly.

3              Dan Lowery wrote a number of e-mails to

4    folks in Europe, part of the development team, anybody he

13:59:28 5    could try and get -- get their attention to say that

6    there were some problems.

7              So when those e-mails started going around,

8    that, that came back to me very quickly, and meant that I

9    was getting involved in it.

13:59:40 10    Q.    Did there come to be a point in time when people at

11    SAP, including yourself, became concerned that for

12    whatever reason, B1 might not be a good fit for Hodell in

13    this context where IFE was involved, et cetera?

14    A.    So I think the first time that we would have had

14:00:05 15    any concern was in the phone call that occurred between

16    Hodell and members of my team and Lowery where we -- I

17    think that's the first time that we really started to

18    understand the scope of where they were trying to go with

19    the product at that point.

14:00:20 20    Q.    And let's work towards that phone call.

21              But why don't we start with Exhibit 69?

22    And that's next.  That's next in your binder, I hope.

23    A.    Yes.  So this is all about around the same time.

24    Q.    Sure.  So let's -- and the jury's seen this

14:00:44 25    document, but there are lots of documents and I think

1    it's good to orient.

2    A.    Yes, there are.

3    Q.    So go all the way to the back.  Down to the bottom,

4    Bob.

14:00:58  5              From Dan Lowery.

6    A.    Right.  So this would have been -- this would have

7    been the e-mail that -- one of the e-mails that Dan sent

8    to try and get somebody involved and to get involved and

9    try to improve the customer experience.

14:01:12  10  Q.    And just so the jury's following, your testimony

11   was they went live in March of 2007, correct?

12   A.    Correct.

13   Q.    And you began to hear about go-live problems soon

14   after that, right?

14:01:24  15  A.    Yeah, and the exact time frame, I can't tell you.

16   Q.    Understood.  And I'm not trying to pin that down by

17   any stretch.

18              But then comes this, right?

19   A.    Right.

14:01:35  20  Q.    Was this -- tell me about this Dan Lowery e-mail

21   and what you see Dan communicating here and how that may

22   have made an impression or not on you?

23   A.    So this, this e-mail to Udi Ziv from Dan is giving

24   Udi a little bit of background, so Udi wouldn't have had

14:01:55  25  the full background on Hodell-Natco or on In-Flight

1    Enterprise, IFE, and so Dan's giving him a little bit of

2    background, talking about who he is, we're a Business One

3    reseller in St. Louis.  We've installed the 120 users at

4    Hodell-Natco, along with that add-on that they've

14:02:14  5    developed called In-Flight Enterprise.

6                The customer went live March 1st and

7    they're experiencing extreme system performance issues.

8    He talks about the fact that it takes two hours to enter

9    a large customer order but he doesn't really define what

14:02:29 10    a large order is.

11    Q.    And skip to the end.  He has a paragraph there

12    where he talks about them being close to throwing out the

13    system.  Do you see that there?

14    A.    Right.

14:02:37 15                So Dan's trying to get a reaction from Udi

16    here.  He's talking about the fact that the customer's

17    losing hundreds of thousands of dollars a month, and then

18    that they're close to throwing out the system and they

19    want to talk to an executive to ensure that they know how

14:02:51 20    serious they are.  I'm assuming he means how serious that

21    SAP will know how serious they are.

22    Q.    Got it.  You just used a phrase, "Dan's trying to

23    get a reaction"?

24    A.    Um-hmm.

14:03:02 25    Q.    Take a look at who he's sending this e-mail to and

1    tell us what you may mean by trying to get a reaction in

2    that context.

3    A.    So Dan sent this directly to Udi, and then he

4    copied myself and Paul Killingsworth, and then he

14:03:16  5    copied --

6    Q.    And can I stop you there?

7    A.    Um-hmm.

8    Q.    Who are these people?  And I want you to explain to

9    the jury kind of your understanding of their roles at

14:03:23 10   SAP.

11   A.    All right.

12              So Paul works for my team and Paul was in

13   charge of customer satisfaction.  So if there was a

14   customer that was in escalation where as I said earlier,

14:03:36 15   an escalation is the customer is at a production stop,

16   they can't keep running their business, Paul's job was

17   really to quarterback the customer service, to make sure

18   we got the right resources on site with the customer to

19   improve the situation so that they could keep working.

14:03:53 20             Then he's copying Michael Sotnick, who is

21   my boss.  So Michael was in charge of Business One and

22   SAP All-In-One.

23   Q.    So did Paul report to you?

24   A.    Yeah, well, not directly.

14:04:04 25   Q.    So you two, we'll consider you lateral?

1    A.    Paul, Paul was on my team.  He reported to Manfred

2    Weiss, who did report to me.  So Paul was two layers

3    down.

4    Q.    Understand.

14:04:14  5          So now this e-mail is not just going to you

6    and Paul, but it's going a level above you, correct?

7    A.    It's going a couple levels above me.

8    Q.    Well, let's take it one step at a time.

9    A.    And so Michael Sotnick is my boss, and so he's

14:04:27 10   copying my direct manager.  And then he actually, it

11   might have been two or three levels in copying Bill

12   McDermott because Bill McDermott was the CEO or the

13   president, I'm not sure of the exact title, of the

14   Americas.

14:04:39 15          So Bill owned all of the sales related to

16   SAP in North America.

17   Q.    Got it.

18          How would you characterize Lowery's tone in

19   this e-mail based on your experience at SAP and

14:04:59 20   elsewhere?

21   A.    It was alarmist.  He's talking about the situation.

22   He's bringing out details.  From a negative standpoint,

23   he's putting a lot of flavor around it, but in terms of

24   the detail in terms of how we got to that problem, he's

14:05:13 25   putting very little information in there.

1    Q.    Got it.  That reminds me, you said a minute ago

2    that you're not sure, something like Udi Ziv didn't have

3    the full background on Hodell.

4              Do you remember saying that?

14:05:25 5    A.    Yes.

6    Q.    Other than what's in this e-mail, are you aware of

7    Udi Ziv having any background about Hodell?

8    A.    No, I would think that this is probably the first

9    time Udi has heard about it.

14:05:33 10    Q.    Okay.  So let's then move forward, one page to

11    69.3.

12              And you see there's a note, kind of right

13    there in the middle, it's Udi Ziv to you, right?  He's

14    copied Paul, Michael, Dirk Boessmann, and Niels

14:05:50 15    Stenfeldt?

16              They're both SAP employees?

17    A.    Yes, they are.

18    Q.    We've seen this e-mail before, correct?

19    A.    Yes.

14:05:57 20    Q.    What effect did this e-mail have, what do you think

21    generated this tone and reaction and what effect did this

22    e-mail have on you?

23    A.    Well, Udi -- Udi is kind of matching Dan's tone.

24    He's somewhat alarmist in his response back, and he's

14:06:14 25    saying, you know, look, this is outside the Business One

1    Sweet Spot, and that's where the performance issues are

2    coming from.

3    Q.    Okay.  Sorry.

4    A.    No.

5    Q.    All right.  Let's do this:  Look at Exhibit 70.

6    A.    Exhibit 7?

7    Q.    Well, let me ask you this.  This message on 69

8    about the Sweet Spot, did SAP keep that a secret?

9    A.    No.  This was Udi communicating internally.

10   Q.    Right.

11   A.    I think it was the next day he responded back

12   probably in a much more business-like tone, but

13   essentially saying the same thing to Dan Lowery.

14   Q.    All right.  Well, let's go to that, and that's

15   Exhibit 70.

16   A.    Right.  The April 13th message.

17   Q.    Right on the front of it?

18   A.    Yes.

19   Q.    Do you see that there?  Can you highlight that

20   there, Bob?

21          The message from before on 69 from Udi Ziv

22   where he uses the phrase "Sweet Spot," would I be right

23   if I told you that was dated April 12th, that would then

24   mean that this is the next day, right?

25   A.    Correct.

1    Q.    So a day after responding about a Sweet Spot

2    internally to SAP, Udi Ziv is responding with the Sweet

3    Spot reference, this time to Dan Lowery, the dealer who

4    had been working with Hodell, right?

14:07:42  5    A.    Exactly.

6    Q.    And would you have expected the dealer to have

7    passed that along to the customer?

8    A.    The dealer had the relationship with the customer.

9    They had been communicating on their behalf.  I would

14:07:50 10    have expected that it was communicated back.

11    Q.    Okay.

12              In fact, you're aware in this case that the

13    dealer LSi, they had a contract with Hodell, right; a

14    development agreement?

14:08:06 15    A.    Yeah.

16    Q.    Okay.  IBIS was also a party to that development

17    agreement as far as you know?

18    A.    I don't know how IBIS fit into that overall

19    agreement.

14:08:18 20    Q.    Okay.  That's fine.  That's fine.  You mentioned

21    that there was a conference call that had an impact on

22    the view you had and that of your colleagues about

23    Business One and the whole Hodell situation.

24              Let's take a look at Exhibit 151, please.

14:08:37 25    A.    Um-hmm.

1    Q.    That's next in the binder.

2              This is a two-page exhibit, that's what you

3    have, right?

4    A.    Yes.

14:08:53  5    Q.    And if you'd go to the, kind of, one-third down I

6    guess I'd say on the first page, you see Geoff Ashley

7    writing to Dirk Boessmann, Ralf Mehnert-Meland, Manfred

8    Weiss you had mentioned a moment ago, yourself, and Ed

9    Neveux.

14:09:14  10              Do you see that there?

11    A.    Yes.

12    Q.    Okay.  Can you walk through for us what Geoff was

13    reporting to you guys on?

14    A.    All right.

14:09:21  15              So this was the conference call that was

16    coming about as a result of Dan's request a few days

17    earlier to say they want to have an executive talk to

18    them.

19    Q.    And let's go slowly for our court reporter.

14:09:31  20    A.    I will go slowly for Sue.

21              So this is Geoff summarizing what he had

22    heard on the call.  A couple of points kind of jump out

23    at me on this, in that it's in point one where LSi

24    committed they originally sold the solution to Hodell as

14:09:49  25    something that was designed for companies of 250 million

1    revenue up to 500 users.

2              And Hodell confirmed that that's what they

3    had heard.

4    Q.    What does the -- what does the e-mail in point

14:10:05 5    one -- and, Bob, can you highlight that?  -- what does

6    the e-mail from Geoff Ashley at point one say about this

7    idea of 500 users?

8              Can you read that, please, the two

9    sentences there?

14:10:15 10    A.    You want me to read point one?

11    Q.    Please.

12    A.    All right.  So "LSi committed commented they

13    originally sold this solution to Hodell as something that

14    was designed for companies of 250 million in revenue with

14:10:30 15    up to 500 users.  There was stunned silence on the phone

16    from the SAP team as Hodell confirmed that this was their

17    understanding of what was purchased."

18    Q.    And how about the next point.

19    A.    So "Hodell currently has 120 users.  They expect to

14:10:45 20    grow at 17% compounded growth per year.  They expect to

21    be a 300 users in the short-term, next couple of years."

22    Q.    Do you think 17% is a high growth rate?

23    A.    Seventeen percent is --

24              MR. CARNEY:  Objection.

14:11:01 25              THE COURT:  Objection sustained.

1    Q.    We'll do the math later.  Thank you.

2                At this point in time, at this point in

3    time, what was your understanding, given that we're now a

4    month and change after go-live, what was your

14:11:22  5    understanding of the transaction volumes and database

6    sizes and the extent significance of any add-ons that

7    Hodell was going to use with any Business One product?

8    A.    I think I had limited understanding at this point

9    in time.  We knew there was a high transaction volume.

14:11:40 10    We knew the database was big.  I don't think I had a lot

11    of the specifics.

12                This was very early on in trying to

13    understand what was going on.

14    Q.    But I think you were just clear.  You understood at

14:11:53 15    this point that Hodell had a high transaction volume?

16    A.    Right.

17    Q.    Let's go through point by point.  You had an

18    understanding at this time they were talking about 500

19    users, correct?

14:12:02 20    A.    Yeah, so --

21    Q.    Potentially 500 users?

22    A.    They -- at this point, we understand what they're

23    anticipating the system to grow to, so we knew that they

24    had a high transaction volume, we knew that they had 120

14:12:15 25    users, we knew that they had a large database, and in

1    this --

2    Q.    And were you also aware of the add-on?

3    A.    We're aware of In-Flight Enterprise.

4    Q.    And I don't want to skip over that too quickly.

14:12:27  5         What were you aware of with respect to

6    In-Flight Enterprise when you see this e-mail come in

7    about this conference call?

8    A.    So --

9    Q.    Were you aware it existed?

14:12:44 10   A.    Yeah, I'm aware that it existed and that it was

11   supposed to provide functionality that Hodell-Natco

12   needed.

13   Q.    Okay.

14        And is it your point that as a result of

14:12:52 15   this e-mail, did this e-mail and the knowledge regarding

16   the transaction volumes and the add-on and the idea that

17   it might go up to 500 users have an impact on your view

18   of whether B1 was the right way to go here?

19   A.    Yeah.  The initial gut reaction to this e-mail

14:13:09 20   coming in is there's -- there's a lot of things here that

21   we weren't aware of at that point.

22        The -- what was committed to them in terms

23   of the size of what the product would support, we didn't

24   realize that that had been committed.

14:13:23 25        The growth rate and where they were

           1    expecting to be in users was something that we hadn't

           2    been communicated to.  We weren't aware of.

           3    Q.    If you look at point four, can you explain whether

           4    in your view SAP was keeping secret its reaction to what

14:13:43   5    it had learned on the conference call?

           6    A.    I wasn't on the call.  As I -- as I read this, you

           7    know, it says he -- they're talking about Dirk, "Dirk did

           8    an excellent job under stressful conditions.  He set the

           9    expectation that this environment is much larger than we

14:14:00  10    were led to believe and we can't make any statement as to

          11    performance without some extensive additional testing

          12    and/or analysis."

          13    Q.    Okay.  And what were your views about the use of B1

          14    after this conference call?  Were you concerned?

14:14:13  15    A.    When I read this e-mail, I was initially very

          16    concerned.  The emotional gut reaction to this was this

          17    isn't -- you know, this isn't where we should be.

          18    Q.    Did SAP work with IBIS/LSi to improve the situation

          19    at Hodell?

14:14:27  20    A.    Yeah.  Once we were aware of the issues and, you

          21    know, even Dirk said it in here that we need to make

          22    extensive additional testing and analysis, we had people

          23    that went on site, we offered and had applets installed

          24    so we could see what was actually going on in the

14:14:46  25    software.

1    Q.    Can I just stop you there for a second?

2              I just -- this is your chance to tell the

3    jury, after this conference call, notwithstanding your

4    concern, did SAP work hard to help Hodell?  And if they

14:15:01 5   did, can you tell the jury what you know about that?

6    A.    So during this process, after we were aware that we

7    had a customer that had a severe problem, we did, we took

8    all the steps that we needed to take to, first,

9    understand the problem, so that was where we went out on

14:15:17 10  site, we did testing, we provided different tools that

11   would allow our technical team to understand what was

12   happening in the product and in the -- in between the

13   add-on and Business One.

14             In addition to that, we took a lot of those

14:15:35 15  test results and I believe the development team used some

16   of that to create patches, and there were a number of

17   patches that were done to try and improve performance.

18             We went on site and looked at the network

19   environment, the hardware that the software was actually

14:15:52 20  running in, and made recommendations there as well in

21   terms of how that could be improved.

22             So we did -- we used --

23   Q.    Slower.

24   A.    We used people and technology to the best we could

14:16:05 25  to understand the situation and start to improve it.

1    Q.    Okay.  Thank you.

2                Were you involved in any determination as

3    to what role In-Flight Enterprise may have played in

4    connection with the problems at Hodell?

14:16:16 5    A.    No, I was not directly involved in making that

6    determination.

7    Q.    Right.  But were people in the course and scope of

8    your employment at SAP, were people who were doing that

9    reporting to you?

14:16:28 10    A.    Yes, there were people on my team who would go on

11    site and evaluate what was happening.

12    Q.    And what was reported to you with respect to the

13    role that In-Flight Enterprise played in connection with

14    these problems that Hodell and IBIS/LSi were reporting?

14:16:44 15    A.    I don't think we had exact numbers, but the general

16    sense was that In-Flight Enterprise was causing a lot of

17    the slowdown in the performance overall.

18    Q.    Were IBIS/LSi and Hodell fully cooperative during

19    this SAP effort after go-live to try and help them?

14:17:04 20    A.    Hodell -- Hodell-Natco I think was as cooperative

21    as they could be in the process.

22                LSi, not so much.  We would ask them

23    for -- to install an applet and they would eventually get

24    to it.  They gave us a lot of resistance to do that, so

14:17:23 25    we could see what was happening.

```
 1              We asked them for their source code, the

 2     code the product is actually written in, so that we could

 3     analyze that and try to make recommendations.  They gave

 4     us the source code a little bit at a time.  They never

 5     gave us all of it to work with.  So they were fairly

 6     resistant and created a lot of delays in that process.

 7     Q.    Can you please take a look at Exhibit 262?

 8     A.    Um-hmm.

 9     Q.    Which I'm skipping over a couple of exhibits to try

10     and keep us moving here, but 262, it's probably two or

11     three exhibits further on in what we've given you.

12              Do you see that there?

13     A.    Um-hmm.

14     Q.    Okay.

15              This is a series of e-mails.  Probably the

16     best place to start is from the back, and it looks like

17     the last of the e-mails starts on the second of the

18     pages.

19              You can tell me if I've got that wrong,

20     but, yeah, so if you go to the second page,

21     Bob -- right -- highlight at the top.

22     A.    Yep.

23     Q.    This is what started the e-mail chain.  This is

24     Paul writing to Michael Sotnick and there's a copy to

25     you, correct?
```

1     A.     Correct.

2     Q.     And then flip to the next page.  That's 262.3.

3                    And, Bob, can you move the evaluation of

4     IFE code up to kind of the middle of the screen, all

14:18:54 5     right?  And highlight the second paragraph.

6                    Do you see that there?

7     A.     Yes.

8     Q.     Is that consistent with your testimony that, among

9     other things, IBIS/LSi wasn't fully cooperative because

14:19:10 10     they wouldn't turn over their In-Flight Enterprise code

11     in its entirety?

12     A.     Correct.  The reports that we had gotten from

13     Apollo, who was the firm that was evaluating the source

14     code, was that they had not turned it over and they were

14:19:25 15     only giving them bits and pieces of it.

16     Q.     Okay.  We're not planning for the moment to go

17     through the nitty-gritty details, but can you tell the

18     jury as a result of all this effort, after go-live and

19     this conference call, whether B1 improved --

20     A.     It did.

21     Q.     -- at Hodell?

22     A.     It did.  There were a number of places where there

23     was significant performance improvement.  All this

24     attention in trying to analyze where the slowdowns were

14:19:56 25     allowed us to have some answers and start to try and make

1    some changes for them.

2    Q.    Did you or anybody else at SAP ever tell Hodell to

3    abandon B1?

4    A.    No, we never said to abandon it.

14:20:08  5    Q.    Did B1 work for Hodell?

6    A.    B1 was working for Hodell at the time.

7    Q.    How do you think B1 would work for Hodell today?

8                     MR. CARNEY:  Objection.

9                     THE COURT:  Overruled.

14:20:18 10    Q.    You can answer.

11                     MR. CARNEY:  Your Honor, he --

12                     THE COURT:  Overruled.  I said overruled.

13    Q.    Go ahead.

14    A.    So Business One today is at, I think, Version 9.1

14:20:28 15    is the most recent release, and the product works well

16    and Hodell would be running on it if they had continued

17    to pay their maintenance and update the software.

18    Q.    Thank you.  I want to shift gears and kind of back

19    way, way up.

14:20:46 20                     When did you first meet Dan Lowery?

21    A.    I don't know the exact date.  I was introduced to

22    him by Chris Robinson who was working for me at the time.

23    Q.    And this was at SAP?

24    A.    Yeah.

14:20:56 25    Q.    So Chris Robinson's an SAP guy?

1    A.    Chris Robinson was the person who was out there

2    recruiting new resellers, and he knew Dan from a previous

3    relationship so he introduced him to me.

4    Q.    And who was the person who got Lowery and his

5    company LSi signed up as a distributor, a dealer?

6    A.    That would have been Chris as well.

7    Q.    Okay.  And what about Dale Van Leeuwen, do you

8    remember him?

9    A.    I remember Dale.

10   Q.    When did you meet him?

11   A.    I --

12   Q.    If you remember.

13   A.    I don't remember when I met him.

14         I believe that I was introduced to him

15   through Dan Lowery so it would have been afterwards, but

16   I don't remember when.

17   Q.    Okay.  There's been -- Dale Van Leeuwen had a

18   company called IBIS.

19         You've heard of IBIS, right?

20   A.    Yes.

21   Q.    Did IBIS have a distribution contract with SAP?

22   A.    No, they did not.

23   Q.    There's been testimony about a conversation

24   supposedly between you and Dale Van Leeuwen in Las Vegas

25   where he says you said that B1 would be suitable for

1    companies with 300 or 400 or 500 users.

2                    Do you recall a conversation like that?

3    A.    I would have never said that.

4    Q.    Well, let's be -- let's just --

14:22:11 5    A.    Yeah.  So I don't recall the conversation.

6    Q.    Okay.

7    A.    And it's not something I would have said because we

8    talked about Business One as being suitable for companies

9    based on the number of employees.

14:22:20 10                    We never talked about it in terms of users.

11    Q.    And why do you talk about it in terms of employees

12    as opposed to users?

13    A.    Because employees is a common terminology.  It's

14    something that you can understand.

14:22:32 15                    I can look at a company and know that it

16    has 25 employees or 250 employees or 500 employees.

17                    I could never know how many users that

18    company's going to have.  If you were selling a product

19    like Microsoft Office where everybody needed a copy of

14:22:48 20    Word or Excel, then you might be able to say, you know, a

21    company of 500 employees would have 500 users, but with

22    ERP accounting software, you never talk about users and

23    employees as the same thing.

24    Q.    Did you -- did you discuss the use of B1 in context

14:23:10 25    or outside of whatever it is that SAP's marketing

1    material said?

2    A.    No.  Because when we talked about it, we needed to

3    have the documentation that would support what we were

4    saying.

5    Our market -- if our marketing material

6    said one to 500, that's what we were talking about.  When

7    it changed to 250, that's what we talked about.

8    Q.    And if you were going to have a discussion about

9    users, you testified earlier about our components, how

10   would that go?  If you were going to have a conversation

11   about whether B1 was suitable for a company, would you

12   have that conversation in the sole context of users?

13   A.    No, because users is only one factor in terms of

14   whether the software is going to fit or not.

15   Q.    And remind us, what are the others?

16   A.    So as we talked about earlier, it could be, you

17   know, is there a functional fit for the software, is

18   there an add-on that needs to be there, how many people

19   are going to use the software, how are they actually

20   going to use the software, so what types of things are

21   they doing with the product; how big is the database; how

22   many transactions are going on; what's the hardware that

23   it's running on?

24   I mean, those are all the factors that come

25   into play.

1    Q.    Okay.  Now, you testified you don't remember having

2    a conversation with Dale in Las Vegas.

3              Would that likewise be true that you don't

4    remember having a conversation with Dale in Atlanta about

14:24:23 5    these issues?

6    A.    I don't recall talking to Dale in Atlanta at all.

7    Q.    But your point is if you ended up in a conversation

8    with Dale or someone else who -- not that Dale was a

9    dealer but someone else who may have been acting as a

14:24:36 10   dealer, your point is you wouldn't have told them that B1

11   was good for up to 300 or 400 or 500 users, right?

12   A.    No.  That's a conversation we'd never have.

13   Q.    Okay.  And do you recall ever having a conversation

14   around these times about B1 being good, not just in

14:24:53 15   general for 300 or 400 or 500 users, but B1 being good

16   for Hodell for 300 or 400 or 500 users?

17   A.    I hadn't heard of Hodell so I would have never had

18   that conversation.

19              MR. MILLER:  Okay.  No further questions.

14:25:09 20             THE COURT:  Cross-examination.

21        CROSS-EXAMINATION OF DANIEL KRAUS

22   BY MR. CARNEY:

23   Q.    Mr. Kraus, my name is Chris Carney.  I'm an

24   attorney for Hodell-Natco.

14:26:04 25             I'm going to be asking you some questions,

1    okay?

2    A.    Sure.

3                MR. CARNEY:  Your Honor, may I approach the

4    witness?

14:26:10  5                THE COURT:  Sure.

6    Q.    Mr. Kraus, I gave you a binder that has some

7    exhibits that I may be talking to you about, and behind

8    the exhibits is a copy of your deposition.

9                I may also have occasion to talk to you

14:26:41 10    about that as well.

11                Excuse me.  It ran away from me.  Are we

12    good, Sue?

13                So when you started with SAP in March of

14    2003, at that time SAP had three employees devoted to

14:27:09 15    Business One, correct?

16    A.    Three employees in the U.S. that were devoted.

17    Q.    Thank you.  And were you the fourth?

18    A.    I believe so.

19    Q.    Okay.  And your responsibility, at least at the

14:27:26 20    inception of your employment and for about a year and a

21    half, was responsibility for finding partners and

22    developing a strategy to take Business One to market in

23    the U.S., correct?

24    A.    That's correct.

14:27:37 25    Q.    Now, you were aware, were you not, that prior

1    to -- prior to Business One going to market in the United

2    States, there was testing performed on the capabilities

3    of Business One, correct?  Internal testing by SAP?

4    A.    Yeah, when you put a product to market, yes, you

5    test it.

6    Q.    And that testing would have been done overseas,

7    either in Germany or Israel, correct?

8    A.    Yes, that's usually where it would be done.

9    Q.    Okay.  And those testing results were made

10   available to you, correct?

11   A.    I'm sure they were.  I don't recall them.

12   Q.    Do you ever recall reviewing the testing materials?

13   A.    As I said, I might have looked at them.  You're

14   going back right now 13 years so.

15   Q.    Or did you simply rely on SAP's development team to

16   tell you that the product, that the product worked, and

17   as long as it worked, your responsibility was to market

18   and sell the software?

19   A.    That's what I was hired to do was to market and

20   sell the software.

21   Q.    So you didn't really -- you just relied on SAP's

22   development team to make sure that they did their tests

23   and as long as they told you the product was okay to

24   sell, you would sell it?

25   A.    Correct.

2077

1    Q.    Okay.  And I believe you testified that SAP relied

2    upon its channel partners to make the sales because they

3    had the direct relationship with the end customer,

4    correct?

14:29:23  5    A.    That's correct.

6    Q.    Okay.  And I know you discussed that partners were

7    required to have training in SAP Business One and it was

8    classroom training and it was fairly intensive, correct?

9    A.    Correct.

14:29:48  10    Q.    And you're familiar with the marketing and

11    development agreement that SAP has with its channel

12    partners, correct?  You testified to it in your direct

13    examination, do you recall that?

14    A.    Yes.  I'm familiar with it.

14:30:06  15    Q.    And you'd agree with me that channel partners were

16    required to market the product and sell to -- sell to end

17    users?

18    A.    Yeah.  That's actually in the development agreement

19    or in the license agreement.

14:30:21  20    Q.    And -- and a consequence of doing that is they

21    would have to make representations about the capabilities

22    of B1, correct?

23    A.    That's correct.

24    Q.    And as part of the development agreement, there

14:30:38  25    were other guidelines that were established with respect

1    to things like marketing, correct?

2                  MR. MILLER:  Could I just get

3    clarification, Your Honor?  You've said development

4    agreement and then the witness said license agreement and

14:30:53 5   I think we're actually talking about the distribution

6    agreement.

7                  MR. CARNEY:  You know what?  I apologize.

8                  MR. MILLER:  Okay.

9                  MR. CARNEY:  I was talking about the

14:31:02 10  marketing and distribution agreement.

11                  THE WITNESS:  Yes.

12   A.    And there are statements in there that the dealers

13   are expected to market the product.

14   Q.    Okay.  And there were -- and they had sales quotas,

14:31:14 15  correct?

16   A.    No, they do not have quotas.

17   Q.    They do not have quotas?

18   A.    They do not have quotas.  There were

19   different -- there were different levels that a partner

14:31:24 20  could obtain in terms of recognition based on their

21   sales, but there was no sales quota.

22   Q.    Okay.  Thank you for that clarification.

23                  And there was a mechanism by which

24   marketing dollars could flow and would flow from SAP to

14:31:38 25  the channel partners in order to promote SAP Business

1    One, correct?

2    A.    Yes.

3    Q.    And channel partners were, if not required, they

4    were encouraged to use SAP logos and things of that

14:31:58  5    nature on their marketing literature?

6    A.    Yes.  There were guidelines in terms of how they

7    should use them.

8    Q.    And I believe you said this, but I just want

9    to -- I just want it to be clear.

14:32:17 10                    There were performance targets for channel

11    partners, not necessarily quotas, but performance

12    targets?

13    A.    There were -- there were different levels that a

14    partner could achieve, and they're not necessarily

14:32:31 15    targets.  So if they've sold a certain amount or did a

16    certain thing, they would get a higher discount and be

17    able to earn more money on each sale.

18    Q.    Now, I think we're all in agreement with this:  SAP

19    Business One was a general ERP system, correct?

14:33:00 20    A.    Correct.

21    Q.    Out of the box, it was not designed for any

22    specific industry, right?

23    A.    That would be correct.

24    Q.    And SAP relied upon its channel partners to develop

14:33:11 25    add-ons to the functionality of the product, correct?

```
            1    A.    Yes.

            2    Q.    And that would have included LSi, right?

            3    A.    Right.

            4    Q.    And their In-Flight Enterprise add-on?

14:33:22    5    A.    Correct.

            6    Q.    And there's also been testimony throughout of

            7    another -- of another add-on by the name of Radio Beacon,

            8    correct?

            9    A.    That was another add-on, yes.

14:33:36   10    Q.    And by the time LSi was involved with Hodell-Natco,

           11    Radio Beacon had already been approved as an add-on for

           12    SAP Business One, correct?

           13    A.    I'm not sure of the exact timing on that.

           14    Q.    But at some point in time, Radio Beacon became an

14:33:56   15    approved add-on for SAP Business One?

           16    A.    It was an add-on that we sold so, yes.  I think it

           17    was approved.  I'm not sure of the exact term but --

           18    Q.    Yes.  You mentioned that -- you mentioned that your

           19    first -- your first specific communications with Dan

14:34:24   20    Lowery at LSi about Hodell-Natco occurred sometime in

           21    November of 2004, correct?

           22    A.    That's correct.

           23    Q.    You knew at that time or around that time that he

           24    was going to have to develop an add-on to marry with

14:34:44   25    Business One, correct?
```

1   A.   Dan had originally talked to us about two different

2   markets.  One of them was the equipment rental market.

3   The other one was the fastener market.

4   Q.   Um-hmm.

14:34:54 5   A.   And frankly, when Dan talked to me about it, I

6   didn't even know what the fastener market was.

7   Q.   Sure.

8   A.   So rental was what we at the time were most

9   interested in.

14:35:03 10   Q.   But when it got to the point where November of 2004

11   rolled around and he presented you with information on

12   Hodell-Natco, he also told you that he, LSi, was going to

13   have to develop an add-on to marry with SAP Business One,

14   correct?

14:35:21 15   A.   Correct.

16   Q.   Okay.  And we talked about, or you talked about

17   this in your direct examination, but I want to ask you a

18   couple more questions about it, okay?  It's Exhibit 40 in

19   that binder in front of you.

14:35:42 20   A.   Um-hmm.

21   Q.   Thanks.

22        And this was -- and this was the November

23   3rd, 2004, e-mail you received from Dan Lowery where he

24   identified Hodell, correct?

14:35:59 25   A.   Correct.

1    Q.    Okay.  And the spreadsheet on the second page

2    identifies some of the -- some of what he, you know, some

3    of the deal terms?

4    A.    Correct.

14:36:15 5    Q.    Correct?

6    A.    Correct.

7    Q.    And one of those deal terms was the fact that

8    ultimately, he was going to need 80 SAP licenses,

9    correct?

14:36:26 10   A.    That's correct.

11   Q.    So that's November of 2004.

12               He does mention in that, in his cover

13   e-mail, that they could double within a year.

14               Kim, could you get back to Page 1?  And

14:36:54 15   you've read that, I assume, correct?

16   A.    Yes.

17   Q.    I'm sorry?

18   A.    Yes, I read that.

19   Q.    And that, that wouldn't have given you any concern,

14:37:04 20   I take it from your testimony, right?

21   A.    No, it wouldn't have given me any concern, and a

22   lot of times, a dealer is going to tell you what they

23   think you want to hear to try to negotiate the best price

24   as well, so it could have been Dan positioning that to

14:37:19 25   try and get a better deal in terms of pricing.

1    Q.    Now, after you received Exhibit 40, you spoke with

2    others within SAP about this, about this deal, correct?

3    A.    Likely.

4    Q.    One of the people that you spoke with was Ralf

14:37:44  5    Mehnert-Meland, correct, because the deal was describing

6    an add-on?

7    A.    I may have talked to Ralf.  I may not.  I don't

8    recall.  You're going back a lot of years on me right

9    now.

14:37:56 10    Q.    Would you have spoken to your boss at the time,

11    Gadi Shamia?

12    A.    Was he my boss at this point?

13          My boss at this point would have been

14    Michael Sotnick.  Actually, I'm not sure who it was

14:38:13 15    because this is shortly after I took over the role, but I

16    would have talked to somebody about the terms to say is

17    this something I can do, can I approve it?

18    Q.    And one of them would have been your boss?

19    A.    Yes.

14:38:24 20    Q.    So it's not like you received this proposal from

21    Mr. Lowery and slid it in a file and never had any

22    discussion with anybody else at SAP about it, correct?

23    A.    Correct.

24    Q.    Let's turn to Exhibit 34, okay?

14:39:04 25    A.    Okay.

1    Q.    Tell me when you have it.

2    A.    I have it.

3    Q.    And this is a press fact sheet from October of

4    2003, correct?

14:39:18  5    A.    Correct.

6    Q.    And is this one of the marketing materials that you

7    were referring to in your direct examination?

8    A.    This would have been a type of marketing material

9    that we talked about Business One in.

14:39:37 10    Q.    And if I direct your attention to -- if I direct

11    your attention to the third paragraph on the first page.

12    A.    Um-hmm.

13    Q.    And specifically the second line, it states that,

14    "It is the starting point for small and midsize

14:39:57 15    businesses, from ten to several hundred employees."

16                Do you see that?

17    A.    Yes.

18    Q.    So at least in October of 2003, that was, at least

19    according to this marketing material, that was the target

14:40:20 20    market for SAP Business One, correct?

21    A.    Yeah.

22    Q.    And did you know how many employees that

23    Hodell-Natco had in 2003?

24    A.    No, that wasn't communicated.  All that was

14:40:38 25    communicated to me was the number of users that they

1    needed.

2    Q.   Okay.

3              MR. MILLER:  Can we be clear you said 2003,

4    notwithstanding Exhibit 40 states November of 2004,

14:40:49 5    right?

6              THE WITNESS:  Right.

7              MR. MILLER:  I don't want there to be

8    confusion.

9              MR. CARNEY:  I'm talking about October of

14:40:55 10   2004.

11             THE WITNESS:  Right.

12             MR. MILLER:  Okay.

13             THE WITNESS:  Actually it's December of

14   2004 or November of 2004, and, no, it's not communicated

14:41:01 15   to me in here how many employees.

16   BY MR. CARNEY:

17   Q.   Where are you seeing -- I'm just curious, where do

18   you see November of 2003?  I'm on Exhibit 34.

19             MR. MILLER:  Yes.  It says October --

14:41:15 20            THE COURT:  One at a time, guys.  Come on,

21   if you're going to object, object.

22             MR. MILLER:  Well, objection, Your Honor.

23   It's confusing.

24             THE COURT:  If it's confusing to the

14:41:24 25   witness, he can tell us he's confused.

```
 1              MR. CARNEY:  I'll move on.

 2   BY MR. CARNEY:

 3   Q.    If I told you that Hodell had less than 150

 4   employees in October of 2003, then that employee count

 5   would have fit within the target market of SAP Business

 6   One at the time, correct?

 7   A.    Yes.  That would be correct.

 8   Q.    Okay.  Can you turn to the next document, 36?  Can

 9   you identify this document?

10   A.    It says on it that it's an SAP solution brief.

11   Q.    Okay.  And I don't see a date of publication on

12   this document, but in the third paragraph of this

13   document, the second line, "Whether you have five

14   employees or 500, the solution helps emerging businesses

15   streamline their operational and managerial processes."

16              I read that correctly, right?

17   A.    Yes, you read that correctly.

18   Q.    So at the time of this piece of marketing

19   literature, SAP was defining its target market as

20   anywhere between five and 500 employees?

21   A.    Correct.

22   Q.    And I think we can agree that Hodell fit within

23   those parameters employee-wise?

24   A.    I believe so.

25   Q.    Okay.  There's no limitation in this piece of
```

1    literature on the number of users, correct?

2    A.    That's correct.

3    Q.    Okay.

4          And if we turn back to Exhibit 34, you'd

14:43:39  5    agree with me that there's no limitation placed on the

6    number of users in that document either, correct?

7    A.    You're going to have to let me read the whole

8    document.

9          (Pause)

14:44:51 10          No, there's no limitations that are placed

11    in this document, although it does talk about scalability

12    and it does talk about that a business could use SAP

13    Business One -- a business that uses Business One can

14    migrate to the SAP enterprise application portfolio

14:45:09 15    including mySAP All-In-One or mySAP Business Suite.

16    Q.    Okay.  But you'd agree with me that this fact sheet

17    doesn't place a limitation on the number of users of SAP

18    Business One?

19    A.    No.

14:45:23 20    Q.    And, in fact, in the 2003-2004 time frame when you

21    were working for SAP and marketing and selling SAP

22    Business One, you yourself were not aware of any

23    limitations on the amount of data that Business One could

24    process, correct?

14:45:43 25    A.    That would be correct.

1    Q.    And you yourself were not aware of any limitations

2    on the amount of users that Business One could

3    accommodate, correct?

4    A.    That would be correct, also.

14:45:54   5    Q.    In fact, the only limitation that you were aware of

6    concerning Business One during this period of time is

7    where SAP wanted to position the product, right?

8    A.    Right.  We were talking about it from a marketing

9    standpoint.

14:46:12  10    Q.    You didn't -- from a marketing standpoint.

11                You didn't want to market SAP Business One

12    in such a way that it would encroach upon, for example,

13    the All-In-One product?

14    A.    That would be correct.

14:46:26  15    Q.    Okay.  Because All-In-One is a more expensive

16    product?

17    A.    It's a more expensive product.  It's also a more

18    robust product, too.

19    Q.    And if you go to Exhibit 69, which we talked about

14:46:46  20    or which you testified about in questioning from your

21    counsel, there's further discussion about the fact that

22    there was no announced or understood issue, correct?

23    A.    That's correct.

24    Q.    Okay.  And let's turn to Page 4 of Exhibit 69.

14:47:16  25                This was -- the first e-mail in this chain

1    was the Lowery e-mail to Ziv that you testified to, and

2    where he is telling -- where Lowery's telling Mr. Ziv

3    some information about Hodell and that they're having

4    performance issues, correct?

14:47:36  5    A.    Correct.

6    Q.    Okay.  And I think -- I believe you characterized

7    in your testimony that he provided very limited

8    information, correct?

9    A.    That's correct.

14:47:49 10    Q.    Okay.  The next e-mail in this chain is your

11    e-mail, your e-mail to Udi Ziv with copies to Paul

12    Killingsworth and Michael Sotnick, do you see that?

13    A.    Yes.

14    Q.    And it doesn't appear that you provided with -- you

14:48:11 15    provided Mr. Ziv with any further information with

16    respect to Hodell-Natco's situation, correct?

17    A.    That's correct.

18    Q.    Okay.  Notwithstanding that, in the next e-mail

19    Mr. Ziv states that, "Someone has sold to the wrong

14:48:35 20    customer which is way above any sane Business One Sweet

21    Spot.  120 users!!!  And obviously they are experiencing

22    severe performance issues."

23            Correct?

24    A.    Correct.

14:48:51 25    Q.    Now, when you were asked on direct examination who

1    all of these individuals were within SAP, Mr. Miller

2    didn't ask you who Mr. Ziv was.

3                 He was the head of development for Business

4    One, correct?

14:49:07 5   A.    I don't know what Udi's exact title was.  He

6    was -- I don't know whether it was Install Base

7    Development or new product development.  He was in the

8    development team and he led a development team.  I'm not

9    sure which.  I never quite understood the exact structure

14:49:22 10   of the development team.

11   Q.    You would agree with me that he was an authority on

12   Business One, correct?

13   A.    I would agree, yes, he was an authority on Business

14   One.

14:49:29 15   Q.    And his conclusion that someone sold to the wrong

16   customer was based strictly on user count, correct?

17   A.    That's correct.

18   Q.    And he didn't care about -- he didn't ask any

19   questions about database size or transaction volume or

14:49:52 20   anything of the like, correct?

21   A.    That's correct.

22   Q.    Okay.

23                 In fact, I think you'd agree with me that

24   he was pretty emphatic in his opinion because he's

14:50:06 25   recommending that we go for reimbursement and debrief the

1    whole process that got us to having this customer in the

2    first place, correct?

3    A.    Well, that's what he's recommending, but he

4    also -- he also doesn't have all the information at this

14:50:27 5    point.

6    Q.    And then moving on to Page 2 of Exhibit 69, you

7    respond to this e-mail and you say, "Udi, this customer

8    was sold in 2004 before there was any announced or

9    understood issue."

14:50:46 10   A.    Correct.

11   Q.    So by 2007, you were aware that there were issues

12   with Business One, correct?

13   A.    By 2007, we understood there were performance

14   issues with large data sets or complicated add-ons.

14:51:03 15   Q.    Or users?

16   A.    Or users.  There's a lot of different factors that

17   could have come into play there.

18   Q.    None of which you were aware of in 2004 and in 2003

19   when you were marketing and selling, selling the product

14:51:18 20   in the U.S. market, correct?

21   A.    That's correct.

22   Q.    Okay.  Thank you.

23         And then we continue through this e-mail

24   chain and at the top of it, Mr. Ziv states to you, it can

14:51:34 25   be on Page 2, Mr. Ziv states to you "Too bad we didn't

1    stop the implementation of Business One before it

2    started."

3              Correct?

4    A.    That's correct.

14:51:46  5    Q.    And then on the first page of Exhibit 69, you had

6    some -- you had an e-mail exchange with your boss,

7    Michael Sotnick, correct?

8    A.    That's correct.

9    Q.    And the substance of the two e-mails that are on

14:52:05 10    the first page of 69, you were trying to come up with a

11    way to respond to Mr. Ziv, correct?

12    A.    Correct.  I was looking for a way to -- to have Udi

13    go and actually start to interact with the customer and

14    get more involved.

14:52:21 15    Q.    Got it.  And at the top of Page 69, Mr. Sotnick

16    says to you, "Since Udi is communicating just with you,

17    it is you that should respond."

18              And he goes on to say, "The 'cheeky' part

19    of me wants you to respond as follows: 'Too bad I didn't

14:52:46 20    know the limitations of the product in 2004.'"

21              Did I read that correctly?

22    A.    Yes, you read that correctly.

23    Q.    So your boss is confirming the fact that he didn't

24    even know what the limitations were of Business One back

14:53:00 25    in 2004, correct?

1    A.    He didn't work for SAP in 2004.

2    Q.    Okay.  But he became -- he became your boss,

3    correct?

4    A.    Correct.

14:53:09  5    Q.    And as your boss, I think you'd agree with me that

6    he became familiar with the product, correct?

7    A.    You're asking me to characterize something that I

8    don't -- I don't really know how well Michael got to know

9    the product or not.

14:53:25 10                I mean, he understood its -- he understood

11    what ERP software was, he understood the market sizing

12    for Business One, but beyond that, I -- I'd be

13    uncomfortable characterizing how much he knew or didn't

14    know.

14:53:37 15    Q.    We'll move on.

16                You'd agree with me then that in 2003 and

17    in 2004 when channel partners like Dan Lowery were

18    marketing and selling Business One, they didn't know of

19    any limitations on the product either, correct?

14:54:16 20    A.    If we didn't know of any, we weren't communicating

21    any, so, no, they wouldn't have known of any, unless they

22    experienced them on their own, through their own testing.

23    Q.    So when Mr. Lowery presented you with the deal

24    that -- the outlines of the deal that we just discussed

14:54:38 25    in Exhibit 40 where he was going to have -- where Hodell

2094

1    was going to purchase 80 user licenses and pre-pay it or

2    pre-pay a portion of it to help fund the development of

3    In-Flight Enterprise, he wasn't aware of any limitation

4    on the product, correct?

14:54:59  5    A.    That's correct.

6    Q.    Okay.  And when you took the order in December of

7    2005, you didn't know there were any limitations on the

8    product, correct?

9    A.    When we started talking about Business One

14:55:21  10   being --

11   Q.    Yes or no?

12   A.    It's not a yes or no answer.

13   Q.    Well, then let me direct you to your deposition.

14              Can you turn to Page 107 of your

14:55:42  15   deposition?

16   A.    107?

17   Q.    Please.  Tell me when you're there.

18   A.    I'm there.

19   Q.    I'm going to refer you to Line 2 of your

14:56:14  20   deposition.  Okay?

21              Now, this was a deposition you gave in this

22   case on June 27th of 2012, correct?

23   A.    Sounds about right in terms of the date, yes.

24   Q.    Okay.  And you were under oath, correct?

14:56:31  25   A.    Correct.

1    Q.    And you were asked the following question, starting

2    at Line 2:

3              "Your statement before there was any

4    unannounced or understood issue."

14:56:46 5              Do you see that?

6    A.    Yes.

7    Q.    And your answer is "Um-hmm.

8              "What do you mean by that?

9              "Answer:  So in 2007 when Udi, when they

14:56:58 10   were talking about a Sweet Spot, what they -- what

11   they're talking about is they had recognized that there

12   were places where Business One wasn't a good fit between

13   a combination of number of users, transaction volume,

14   what the users actually did in the system, the topology

14:57:17 15   in terms of how the product was deployed, and they had

16   developed a grid that said here's where it fit, here's

17   where it didn't fit, this is the Sweet Spot, this wasn't

18   a Sweet Spot."

19              Correct or did I read that correctly?

14:57:36 20   A.    Correct.

21   Q.    So it's your testimony that you didn't know until

22   2007 about these issues, correct?

23   A.    Again, you know, you've got a lot of timelines and

24   dates in here, so when we knew and what we didn't know

14:58:09 25   about issues and when we talked about the Sweet Spot, you

1    asked me this in 2012 and we're going back to 2004 to

2    2007, so I can't tell you for sure what I knew when in

3    terms of the exact timeline of it.

4    Q.    Well, then, let's go on to Page 108 and let's see

14:58:31 5    if this refreshes your recollection, okay?

6                    Let's look at Line 2.

7                    "When did those announced or" --

8                    MR. MILLER:  Your Honor, he's refreshing

9    his recollection.  He can do that on his own.

14:58:45 10                    THE COURT:  Okay.

11                    MR. MILLER:  You don't need to publish it

12    to the jury to refresh recollection.

13    BY MR. CARNEY:

14    Q.    Okay.  Very good.

14:58:52 15                    Why don't you read Page 108, Lines 2 to 7

16    to see if that will refresh your recollection when these

17    issues were announced or understood?

18    A.    It actually doesn't, and I say in here that I don't

19    recall the exact dates.

14:59:10 20                    I was asked again in the deposition, "Isn't

21    it true that those issues were understood and announced

22    prior to Hodell going live," and my answer was "They may

23    have been.  They may not have been.  I don't know.  Again

24    I don't have a document with a date on it."

14:59:24 25    Q.    Line 2, you were asked, "When did those announced

1    or understood issues get published?"  And your answer:

2    "I'm guessing it was sometime either late 2006 to 2007.

3    I'm not sure.  I'd need to see a document that has a date

4    on it."

14:59:41  5          We can agree it was in that time frame,

6    though, can we not?

7    A.    No, I can't.  I don't remember what the date was,

8    and that's why I said I need to see a document with a

9    date on it.

14:59:59 10          MR. CARNEY:  Is this a good time to break,

11   Your Honor?

12          THE COURT:  If you wish we can do that.

13          I do have one other matter to attend to

14   while we're on break, so and then after I do that, then

15:00:09 15   of course, the court reporters have to have a little bit

16   of a break, too, so we might be a little bit longer than

17   15 minutes, but keep that in mind.  Okay?

18          (Jury out)

19          (Recess taken).

15:30:55 20          (Proceedings resumed in presence of the

21   jury as follows:)

22          THE COURT:  Go ahead, please.

23

24   BY MR. CARNEY:

15:31:04 25   Q.    When you started with SAP in March, 2003, SAP had

2098

1    no procedures in place to qualify deals prior to issuing

2    licenses to customers, correct?

3    A.    That's correct.

4    Q.    But by the time you left SAP, those procedures were

15:31:18  5    in place, correct?

6    A.    That's correct, also.

7    Q.    Okay.  And in 2004, those procedures weren't in

8    place, correct?

9    A.    I don't believe they were in place.

15:31:26 10    Q.    And they weren't in place in 2005, correct?

11    A.    I don't believe so.  Not positive of the date when

12    it came into play.

13    Q.    Can you turn to Exhibit 130 in your exhibit book?

14    And you testified about that in your direct examination,

15:32:21 15    correct?

16    A.    That's correct.

17    Q.    And this was one of the documents that you

18    testified about where the Sweet Spot for Business One was

19    reduced to anywhere between 10 to 100 employees, correct?

15:32:37 20    A.    That's correct.

21    Q.    Okay.  Just turn to, I just want to ask you a quick

22    question.  Can you turn to the last page of the document?

23    At the bottom left-hand of the document, could you just

24    please confirm for me that this was an SAP AG

15:33:04 25    publication?

```
         1    A.    Yes.  It says SAP AG 2005.

         2    Q.    Thank you.  Let's talk about, let's move on.  Let's

         3    discuss Exhibit 124, please.  You've seen this document

         4    before.  In fact, I believe you testified about it?

15:33:39 5    A.    That's correct.

         6    Q.    Could you turn to Page -- and this is -- this is

         7    another document, just that it's a 2005 document, and it,

         8    too, is identifying the target Sweet Spot between ten and

         9    a hundred employees, correct?

15:34:03 10   A.    That's correct.

         11   Q.    Okay.  Could you turn to Page 23 of the document?

         12   It's the last page.

         13   A.    23?

         14   Q.    Yes.

15:34:18 15   A.    I don't have a Page 23.  I only have Page 22 of 22.

         16   Q.    For Exhibit 124?

         17              MR. MILLER:  There's a Page 22 of 22 and if

         18   you look in the lower right-hand corner, it says 23 of

         19   23.

15:34:40 20   Q.    Dan, I apologize.  I can call you Dan?

         21   A.    Yes.

         22   Q.    The page numbers that I'm going by are on the

         23   bottom right hand of the document where it says EX 24.23?

         24   A.    Yes.

15:34:54 25   Q.    If I refer to any page numbers going forward,
```

1    that's -- that's where I'd ask you to look at, okay?

2    A.    Okay.  Got it.

3    Q.    Okay.  Thank you.

4              And up at the top of this page, can you

15:35:04  5    confirm for me that this is another publication of SAP

6    AG?

7    A.    It is.

8    Q.    Thank you.  I know you have a flight, is that

9    correct?

15:35:16 10    A.    Trying.

11    Q.    I'm trying to help.  Okay?

12    A.    Thank you.  Appreciate it.

13    Q.    Let's turn to Exhibit 131.

14              And this is -- and this is another SAP AG

15:35:39 15    document, correct?

16    A.    Correct.

17    Q.    And we can confirm that by looking at Page 2 of the

18    document, the bottom, the bottom part on the right-hand

19    corner?

15:35:56 20    A.    That's correct.

21    Q.    Okay.  And this is another 2005 document that sets

22    the Sweet Spot at between 10 and 100 employees, right?

23    A.    That's correct.

24    Q.    Let's go to 436.  Tell me when you're ready.

15:36:17 25    A.    Go ahead.

1    Q.    Let's turn to Page 2, okay?  Down at the bottom

2    left, again, please confirm that this is an SAP AG

3    publication, 2006 now, right?

4    A.    That is correct.

15:36:34  5    Q.    And if we go to Page 6 of this document, let's go

6    to Page 5 first.

7                Now, if we look at Page 5, the parameters,

8    do you see that, company profile parameters?

9    A.    Yes.

15:37:19 10    Q.    Number of employees is the second parameter,

11    correct?

12    A.    Correct.

13    Q.    And in 2000 -- at least according to this document

14    that was published in 2006, the number of employees

15:37:37 15    exceeds 150, SAP AG would consider that customer to be a

16    low fit, correct?

17    A.    That's one of the factors on here.

18    Q.    Okay.

19    A.    It's --

15:37:50 20    Q.    But the answer to the question is yes, right?

21    A.    Yes, it's one of the factors on here.

22    Q.    Okay.  And the third parameter is number of users.

23    They identify low fit as being above 75, correct?

24    A.    That's correct.

15:38:06 25    Q.    Okay.  If we move further into the document, if we

1    go to Page 8, 436.8, the last parameter on this page is

2    the number of add-ons, do you see that?

3    A.    Yes.

4    Q.    And it states that "If the implementation requires

15:38:40  5    multiple add-ons, this may indicate a less than optimal

6    fit.  You could be exposing the implementation to undue

7    risk."

8                   Do you see that?

9    A.    Yes.

15:38:50 10   Q.    In the first category, it says one to three, do you

11   see that?

12   A.    Um-hmm.

13   Q.    And that's considered to be a fit under these

14   parameters, correct?

15:39:02 15   A.    That's correct.

16   Q.    And you understood that the Business One

17   application at Hodell was going to have two add-ons?

18   A.    That's correct.

19   Q.    Radio Beacon and In-Flight Enterprise, right?

15:39:16 20   A.    That's correct.

21   Q.    And that would have fit within those parameters,

22   correct?

23   A.    That's correct.

24   Q.    Let's go to 129.  And this is an SAP Business One

15:39:53 25   publication, Statement of Direction, and it's dated March

1    of 2006.

2                          Do you see that?

3    A.    Yes.

4    Q.    And if you'd go to Page 129.3, and if you go to the

15:40:20 5    bottom, this is -- this is an SAP AG publication that

6    was, in fact, published in March of 2006, correct?

7    A.    That's the copyright date on there.  That's when I

8    would assume that was published.

9    Q.    Okay.  And if you'd turn to Page 129.8, are you

15:40:51 10   there yet?

11   A.    Yes.

12   Q.    Thank you.  I want to direct your attention to the

13   second paragraph on the first column, okay?

14   A.    Yes.

15:41:06 15   Q.    Are you with me?

16   A.    Um-hmm.

17   Q.    And again it says, "While SAP Business One has many

18   satisfied larger customers, it is ideally suited for

19   companies with 10 to 100 employees."

15:41:19 20                        Correct?

21   A.    That's correct.

22   Q.    And then it goes on to say in the last sentence of

23   that paragraph, "SAP Business One is optimized for

24   performance with up to 500 -- or 50 current users,"

15:41:36 25   correct?

```
 1    A.    50 concurrent users.

 2    Q.    50 concurrent users.

 3                So now we have a document that's further

 4    limiting the -- limiting the Sweet Spot to a

 5    hundred -- to 10 to 100 employees and 50 concurrent

 6    users, correct?

 7                    MR. MILLER:  Objection.  Foundation.

 8                    THE COURT:  Overruled.

 9    A.    It's not limiting it.

10                It's defining it.

11    Q.    It's defining it.

12    A.    Yes.

13    Q.    Thank you.  But it's defining the Sweet Spot here

14    as 50 concurrent users?

15    A.    Correct.  It's saying that for Business One, the

16    ideal target market, where you want to focus your

17    efforts --

18    Q.    Dan, you can go on, if you'd like, but we're not

19    going to get out of here at quarter to 5:00 if you do.

20    A.    Okay.  I'll shut up.  That's fine.

21    Q.    So let's take a look at the second column?

22                    THE COURT:  Yes, we are going to get out of

23    here at quarter to 5:00 whether he does or not.

24                    THE WITNESS:  I may not get out of here.

25                    MR. CARNEY:  That's what I meant.
```

                        THE COURT:  I thought I'd throw that one

in.

                        MR. CARNEY:  That's what I meant.

BY MR. CARNEY:

Q.    And if we look at the second column of the same

page, in the last paragraph beginning with "Our

experience," and the first bullet point --

A.    Um-hmm.

Q.    -- again it's once again defining the -- defining

and, quite frankly, refining the Sweet Spot to 10 to 100

employees, approximately half of them using SAP Business

One concurrently?

                        MR. MILLER:  Objection.  Foundation.

                        THE COURT:  Overruled.

Q.    Correct?

A.    Yes.  That's what it says.

Q.    Okay.  Let's move on.

            Let's go to 119.

            Are you there?

A.    Yes, I am.

Q.    And this is a sizing transaction volumes document,

and the date on the front of it is July 17th, 2006,

correct?

A.    That's correct.

Q.    And it's an SAP publication, correct?

1    A.    Yeah, this would have been a presentation that Eric

2    Moreau did and then provided the PowerPoints afterwards.

3    Q.    And I should know the page, you would think.

4          How about turning to Page 119.24?  Tell me

15:44:30 5    when you have it in front of you.

6    A.    I have that in front of me.

7    Q.    Okay.  And on this slide, the top of the slide says

8    "When might an opportunity be too large for Business

9    One?"

15:44:51 10          And it goes on to say, "Here are the red

11   flags that experts suggest to me are reasons for

12   reviewing the fit carefully."

13          And if you go down to the bottom of the

14   page, it says, "Will the number of users exceed 30," do

15:45:10 15   you see that?

16   A.    Yes.

17   Q.    So as of at least July 19th or, excuse me, July

18   16th of 2006, there's a further refinement of -- well,

19   I'll strike that.

15:45:22 20          This document is saying above 30 users,

21   it's a red flag.  Do you see -- I read that correctly,

22   right?

23                MR. MILLER:  Objection.

24                THE COURT:  You read it correctly.

15:45:32 25                MR. MILLER:  He read it correctly and then

2107

1    characterized it incorrectly.

2              THE COURT:  Right.

3              MR. MILLER:  Right.

4    BY MR. CARNEY:

15:45:41 5    Q.    If the number -- the number of users exceeds 30,

6    you would agree with me that this document says that

7    would be a red flag?

8              Yes or no?

9    A.    No -- no, I wouldn't agree with that statement as

15:46:06 10   you've made it.  It talks about the complexity and the

11   size and will the number of users exceed 30.

12             It's a combination of all of them.

13   Q.    Okay.  And the number exceeding 30 is a red flag,

14   correct?

15:46:20 15   A.    In conjunction with the other pieces on the slide,

16   yes.

17   Q.    And the size being another one?

18   A.    The revenue size and the growth and the number of

19   ISV add-ons, they're all laying out the complexity here.

15:46:36 20   Q.    And if the -- okay.  And complexity, that means

21   more than three add-ons and other items, correct?

22   A.    Correct.

23   Q.    But we can at least agree that one of the red flags

24   is users?

15:46:51 25   A.    I'm -- yes.  That's one of the components.

1     Q.    And you'll see at the bottom of this page that

2    this, too, is an SAP publication in 2006, correct?

3     A.    Right.  This was a presentation that was done at

4    the summer sales meeting.

15:47:07 5     Q.    Okay.  Let's move on to Exhibit 435.

6            Can you identify this document?

7     A.    The title on it is "SAP Business One -- Opportunity

8    Qualification Tool, Questions, Logics and Text."

9     Q.    And is this what you were referring to earlier in

15:47:49 10    your testimony that later on in your tenure with the

11    organization, some guidelines were established?

12     A.    Yes.  This is the OQT tool.

13     Q.    And if you turn to Page 435.2, number two, it

14    states the number of employees.

15:48:12 15            Do you see that?

16     A.    Correct.

17     Q.    And above 150, it says it's no fit, correct?

18     A.    It says no fit, and, again, it's one of the

19    components of the whole thing.

15:48:23 20     Q.    Well, another component is on Exhibit 435.3, number

21    of SAP Business One users planned.

22            Do you see that at the top?

23     A.    Um-hmm.

24     Q.    And it says 76-plus, no fit, right?

15:48:40 25     A.    That's correct.

1    Q.    Okay.  Thank you.

2          Now, in your direct examination, you

3    characterized your communications with LSi prior to the

4    go-live date as being limited.

15:49:15    5          Is that a fair characterization?

6    A.    Yes.  That's a fair characterization.

7    Q.    Okay.  I just want to go through a couple, a couple

8    of the communications that you did have.

9          And you've already talked about Exhibit 40.

15:49:31  10    That was in November, early November of 2004.  And just

11    to confirm, that communication was November 3rd of 2004?

12    A.    Yes.

13    Q.    Okay.  Exhibit 136 appears to be a follow-up

14    communication between you and Dan Lowery, correct, on

15:50:03  15    November 4th of 2004?

16    A.    That's correct.

17    Q.    And he's talking about pricing, right?

18    A.    In the e-mail on November 4th?

19    Q.    Yeah.  The first e-mail in the chain.

15:50:20  20    A.    Yes.  Yes.  He's talking about pricing.

21    Q.    And that's consistent with what you've previously

22    testified to, correct?

23    A.    That's correct.

24    Q.    And what he's saying here is the $180,000

15:50:43  25    that -- that you understood that the $180,000 that Hodell

2110

1    was going to pre-pay for licenses was going to go towards

2    development, correct?

3    A.    That's correct.

4    Q.    Okay.  And then he goes on to say, "If LSi/IBIS go

15:51:00  5    away, would SAP agree to sell Hodell-Natco 80 users for

6    $120,000 in December of 2005?"

7              And you responded to that e-mail above it,

8    correct?

9    A.    That's correct.

15:51:13 10    Q.    And you state, "That's a little low, and I can't

11    put it in writing, but verbally, sure."

12    A.    Correct.

13    Q.    So what you're saying here is if for some reason

14    LSi is out of the picture, you would be selling -- you

15:51:32 15    would agree at least verbally to sell Hodell-Natco the 80

16    users directly, correct?

17    A.    I didn't say directly in here.  What I said is that

18    we -- that they would be able to buy it, and we didn't

19    sell direct, so I would be finding a partner to do it, a

15:51:48 20    dealer.

21    Q.    Okay.  Very good.

22              Let's move on to 137.  Are you there?

23    A.    Um-hmm.  I am.  Sorry.

24    Q.    And the first, the first e-mail in this chain is

15:52:12 25    another e-mail from Mr. Lowery to you on January 17th of

1   2005, correct?

2   A.    That's correct.

3   Q.    And he's informing you in the middle of the second

4   paragraph that this communication concerns Hodell-Natco

5   and another prospect, Fast Rite, correct?

6   A.    That's correct.

7   Q.    Another fastener industry customer, correct?

8   A.    That's correct.

9   Q.    Okay.  And he goes on to tell you that, "Each are

10  prepaying licenses to fund the development of our

11  fastener In-Flight to SAP Business One," and he's telling

12  you, "We won't acquire -- we will not acquire their 80

13  licenses, the Hodell 80 licenses, until December of

14  2005."

15            Correct?

16  A.    That's correct.

17  Q.    And so you understood that LSi was developing an

18  add-on to be used in a vertical market for SAP Business

19  One, correct?

20  A.    Right.  That was the substance of the e-mail that

21  he had sent back in November as well, yes.

22  Q.    Conceptually, at least, that's a good thing, right?

23  A.    Yes.

24  Q.    You want to get more business not only for SAP,

25  but, you know, your partners?

```
 1    A.     Partners, yeah.

 2    Q.     And he was just concerned about price increases

 3    and, you indicated in your e-mail above that that you

 4    weren't aware of any?

 5    A.     That's correct.

 6    Q.     Okay.  Now, let's go on to Exhibit 840, okay?  Do

 7    you have it?

 8    A.     I do.

 9    Q.     Okay.  This is another e-mail from Dan Lowery.

10    This time you're copied on it.  He's communicating

11    directly with Ralf Mehnert-Meland.

12                You know who he is, don't you?

13    A.     Yes, I do.

14    Q.     Well, why don't you tell the jury who he is?

15    A.     So Ralf, Ralf worked for my team.  He worked for me

16    directly, and Ralf was responsible for the recruitment

17    and management of the third-party developers, people who

18    did add-ons.

19    Q.     Who did, who actually developed the add-ons?

20    A.     Correct.

21    Q.     Okay.  And Mr. Meland had his own team, is that

22    correct?

23    A.     That's correct.

24    Q.     On the development side of things?

25    A.     Yeah, he had solution architects who worked for
```

1      him.

2      Q.    Okay.  Thank you.

3            And he's informing Ralf, and by copy, you,

4      that they did a demo at Hodell today and things went

15:55:06  5  well, and you congratulated him, right?

6      A.    Right.

7      Q.    And this, this e-mail is consistent with your

8      testimony as well, I believe, because it said -- you

9      testified that even though your communications with LSi

15:55:25 10  and Lowery were more limited to pricing issues, there

11     were others within the organization, the development

12     side, who was having more, more communications with him

13     about the development of the add-on, correct?

14     A.    That's correct.

15:55:40 15  Q.    Okay.

16           So this, the development of the add-on

17     and -- and you're not aware of those communications, the

18     substance of them at least, right?

19     A.    No, not at all.  No.

15:55:53 20  Q.    So you don't know if there were further discussions

21     about user counts or data sets or volume of data, or

22     anything like that, correct?

23     A.    No.  Nothing that I'm specifically aware of.

24     Q.    Okay.  Let's move on to Exhibit 253.

15:56:15 25  A.    I'm there.

1    Q.    Okay.  This is a two-page document, and you sort of

2    touched upon this in your direct examination when you

3    testified that -- about maintenance fees for Hodell,

4    correct?

15:56:36  5    A.    Correct.

6    Q.    Okay.  Let's take a look at, on the first page of

7    this document, the e-mail in the middle of the first page

8    from you to Michael Sotnick.

9    A.    Okay.

15:56:54  10    Q.    You there?

11    A.    Um-hmm.

12    Q.    Now, in this e-mail, you're asking Mr. Sotnick, who

13    we've established is your boss, you're asking him if he

14    will approve crediting the maintenance fee paid -- paid

15:57:07  15    by Hodell for 2006 to 2007, correct?

16    A.    That's correct.

17    Q.    Okay.  And the maintenance fee's, what, about 20%

18    of the license fees?

19    A.    I don't remember the exact number.

15:57:20  20    Q.    Okay.

21    A.    The numbers changed.

22    Q.    Okay.  But it's a significant amount of money,

23    correct?

24    A.    Yes.  Somewhere between 10 and 20%.

15:57:28  25          I don't know the exact number.

1    Q.    Okay.  And you go on to say, "As you know, Hodell

2    is a large and prominent customer and their patience in

3    working through the 2005 SP01 issue was notable and

4    appreciated."

15:57:49  5              Do you see that?

6    A.    Yes.

7    Q.    The SP01, what are you referring to there?

8    A.    The SP means service pack.

9    Q.    Okay.

15:57:57 10   A.    So when we did a release on Business One, we had

11   major versions, so 2005, 2007, those would have been

12   major versions.

13              And SP was a service pack and that's

14   something that would have generally added more

15:58:08 15   functionality or was part of a localization, so that

16   was -- that was a service pack.

17   Q.    Okay.  And then you go on to say, "Their original

18   purchase price was over 100,000 to SAP.  If they had

19   requested the return of the software due to inability to

15:58:25 20   conform to the documentation, we likely would have been

21   obligated to honor that request."

22              Do you see that?

23   A.    I do.

24   Q.    Okay.  And what you're saying there is the software

15:58:38 25   that they purchased didn't conform to the documentation

1    that you referred to that came with the -- that came with

2    the software itself, correct?

3    A.    Correct.

4    Q.    Okay.  And above it, your boss approved the

15:59:00  5    switching, you know, crediting the maintenance fees to

6    2007, correct?

7    A.    Right.  Yes.

8    Q.    And this was prior to go-live, correct?

9    A.    The actual -- well, the go-live was early March,

15:59:35 10    2007, so this would have been right around the time of

11    the go-live.

12    Q.    About three weeks before, right?

13    A.    I made the request in February, so that would have

14    been about three weeks before.  We processed the credit

15:59:51 15    after the go-live.

16    Q.    Thanks for that clarification.

17    A.    Yep.

18    Q.    But your e-mail to your boss where you told him

19    that the software, when purchased didn't conform to the

16:00:03 20    documentation, was in February, correct?

21    A.    Yes, and I actually didn't say that the purchase

22    didn't conform to the documentation.

23         I said because of the delays in --

24    Q.    I didn't say -- I didn't say the purchase.  I said

16:00:15 25    the software didn't conform to the documentation and

1    that's what your e-mail says, correct?

2    A.    Yes.

3    Q.    Thank you.

4          Now, you had -- you had involvement with

5    Dan Lowery, you'd had involvement with Dan Lowery on

6    other matters separate and apart from the Hodell-Natco

7    sale, correct?

8    A.    Yeah.  That's correct.

9    Q.    He'd sold other -- he'd sold Business One to other

10   customers, correct?

11   A.    That's correct.

12   Q.    Okay.  And so at the time of the Hodell-Natco sale,

13   you knew that Lowery had made promises to customers of

14   SAP that he wasn't able to fulfill, correct?

15   A.    We had one experience prior to Hodell-Natco where

16   he made a sale to a customer where he was going to do

17   some development around it, and he wasn't able to get

18   that development done the way that he had committed to

19   the customer.

20          So that was the one experience that we had

21   directly.

22   Q.    Okay.  So the answer is yes, correct?

23   A.    Yeah, there had been one experience.

24   Q.    Okay.

25          And, in fact, Lowery had a history and a

1   reputation within SAP over -- about overpromising and

2   underdelivering, correct?

3   A.   Yeah, that was a flip comment I made in my

4   deposition.

16:01:57 5   Q.   Okay.  You read your deposition afterwards,

6   correct?  And you had the ability to make changes to your

7   deposition, correct?

8   A.   I did, I read my deposition, and I didn't even

9   think about it again until three years -- three years

16:02:15 10   later when I was refreshing myself.

11   Q.   There was an errata sheet -- there was an errata

12   sheet on the back of your deposition, correct?

13   A.   A what sheet?

14   Q.   An errata sheet where you could make changes to the

16:02:28 15   deposition if you thought it was appropriate?

16   A.   I don't even know what that is.

17   Q.   Go -- go to the end of the deposition.

18              MR. CARNEY:  May I approach, Your Honor.

19              THE COURT:  Yeah, are you saying he said

16:02:45 20   something different in his deposition?

21              MR. CARNEY:  No.  No.  No.  He said he made

22   a flip comment and if he made a flip comment he could

23   have changed it.

24              THE COURT:  He didn't say flip comment.  He

16:02:57 25   said that's what he said in his deposition.

1          Go ahead.

2               MR. CARNEY:  Okay.  Let's move on.

3     BY MR. CARNEY:

4     Q.    So Hodell went live in March of 2007, that's been

16:03:09 5     established, correct?

6     A.    Correct.

7     Q.    And you testified on direct examination that you

8     participated in or actually I think you testified that

9     you didn't participate in that April 17th, 2007

16:03:41 10    conference call with LSi and Hodell?

11    A.    Correct.  I wasn't on that call.

12    Q.    But you were on all the e-mails surrounding it,

13    right?

14    A.    Yeah, that was my team that copied me on it

16:03:56 15    afterwards.

16    Q.    Thank you.  Now, let's go to Exhibit 77, if you

17    will.

18    A.    I'm there.  Sorry.

19    Q.    Okay.  First page of this e-mail chain, I just want

16:04:26 20    to talk to you about the -- I just want to talk to you

21    about the first e-mail in this chain.  Okay?

22               MR. MILLER:  Just the first or the last?

23    Q.    On the first page, the last e-mail.  Are we there?

24    A.    Yes.

16:04:44 25    Q.    It's an e-mail from Udi Ziv, dated Sunday, April

1     15th, 2007, to you?

2     A.    Correct.

3     Q.    And he's copied your boss, Rodney Seligmann.

4                 Who is he?  Who is Rodney Seligmann?

16:05:03  5     A.    Rodney was Michael's boss.

6     Q.    Okay.  So he's higher up than -- than Sotnick?

7     A.    That's correct.

8     Q.    Who is -- and I'm probably going to butcher this,

9     who is Niels Stenfeldt?

16:05:17  10    A.    So Niels was in charge of Business One at a global

11    level.  So the way SAP is structured, there is a global

12    organization that's responsible for our product and when

13    I said earlier my last job at SAP was to go to work for

14    the global organization doing global marketing, I went to

16:05:33  15    go work for Niels' team and that was -- that was based

16    out of Europe.

17    Q.    So is he at a higher level in the org chart than

18    you?

19    A.    Niels?

16:05:41  20    Q.    Yes.

21    A.    Yes.

22    Q.    Okay.  So when Mr. Ziv sends this e-mail to you on

23    April 15th, two days before the conference call, he's

24    copying a number of people who are further up in the

16:06:01  25    chain of command at SAP than you, correct?

1    A.    That's correct.

2    Q.    Okay.  And he's telling you in this e-mail,

3    "Someone needs to tell the partner about the Business One

4    Sweet Spot, and that an environment of 120 users and

16:06:17  5    growing is nowhere near it.  I'm happy to continue the

6    dialogue with the partner, but I believe there is a

7    serious expectation setting that needs to happen between

8    you and him."

9                 Correct?

16:06:30 10    A.    That's correct.  Although this isn't the full

11    string because I actually replied to that e-mail.

12    Q.    This is -- this is an SAP document, and I can tell

13    you that with certainty because if you see at the bottom

14    of the -- if you see at the bottom of the right, at the

16:06:48 15    bottom portion of the right side of the document, it has

16    SAP 4609?

17    A.    I understand.

18    Q.    Okay.

19    A.    I just --

16:06:57 20    Q.    If there was a response to it, we were never

21    provided it.

22                 MR. MILLER:  Objection, Your Honor.

23    There's been a debate about who is right.  These aren't

24    questions.

16:07:06 25                 THE COURT:  Well, he said he responded and

```
         1    now they're saying they never got a response.

         2              MR. MILLER:  Counsel represented something

         3    with certainty and I'm not certain.

         4              THE COURT:  Was there a response?

16:07:18 5              MR. MILLER:  There's a split in the chain

         6    and there's effectively a response so --

         7              THE COURT:  Let me ask you, sir, did you

         8    respond to that e-mail?

         9              THE WITNESS:  I did.

16:07:28 10             THE COURT:  Okay.

        11    BY MR. CARNEY:

        12    Q.    Then I'll just, do you know where that e-mail is?

        13    A.    I don't, but I know I've seen it.

        14    Q.    Okay.

16:07:38 15   A.    I'll refer to my counsel on that, ask them to find

        16    it.

        17    Q.    Now, when you testified about Exhibit 69, Exhibit

        18    69 was the first e-mail from Dan Lowery to Udi Ziv where

        19    he alerted him to the situation with Hodell-Natco, the

16:08:03 20   120 users, and gave him limited information about Hodell,

        21    correct?

        22    A.    Right.

        23    Q.    You recall that?

        24    A.    Yes, I do.

16:08:13 25   Q.    Okay.  And one of your issues, one of your issues
```

1    with Mr. Ziv's response, the internal response to you

2    about 120 users is outside any sane Business One Sweet

3    Spot, one of your critiques of Mr. Ziv was he didn't have

4    all the information about Hodell to make that type of a

16:08:40  5    statement, correct?

6    A.    Correct.

7    Q.    And we established that you didn't -- you responded

8    to -- you responded to Dan Lowery's e-mail to Ziv before

9    Ziv responded internally to you, and we've established

16:09:00 10    you provided him no further information about Hodell?

11    A.    I responded to Udi.  I did not respond to Dan.

12    Q.    To Dan?

13    A.    Right.

14    Q.    And you didn't provide any further information to

16:09:14 15    Udi on the Hodell installation than what was provided by

16    Mr. Lowery, correct?

17    A.    Other than asking Udi to go and talk to the

18    customer, no, I did not.

19    Q.    Yet he's -- and two days elapsed or three days

16:09:37 20    elapsed before he wrote this second e-mail to you about

21    120 users.

22    A.    Which e-mail are you talking about?

23    Q.    Exhibit 77.  Exhibit 77.

24    A.    Right.

16:09:57 25    Q.    Top of the first page dated Sunday, April 15th,

1    2007.

2              That was three days after Mr. Lowery

3    alerted Udi Ziv to the Hodell situation, which prompted

4    Ziv's e-mail to you that it's outside of any sane

16:10:19 5    Business One Sweet Spot.

6    A.    Right.  Well, Udi had also responded to Dan Lowery

7    on it as well, on 4/13.

8    Q.    I understand that.

9    A.    Okay.

16:10:28 10   Q.    Now, you didn't communicate the content of either

11   of these two e-mails to Kevin or Otto Reidl, either in

12   advance of the April 17th meeting, conference call, or at

13   that conference call, correct?

14   A.    That's correct.

16:11:13 15   Q.    Okay.

16   A.    If I had done that, I would have had Dan Lowery

17   trying to rip my head off, and I actually think I said

18   that at some point in my deposition as well.

19   Q.    Let's move to 157.  I just want to ask you about

16:11:53 20   the e-mail that appears at the bottom of the first page

21   of this document that spills over into the second page.

22              Tell me when you're there.

23   A.    I have it.

24   Q.    This is an April 16th, 2007 e-mail from Ralf

16:12:07 25   Mehnert-Meland to Sotnick and you, correct?

```
 1    A.    That's correct.
 2    Q.    And he's relating what he views are the issues with
 3    the performance of SAP Business One at Hodell.
 4                That's a fair characterization, correct?
 5    A.    Yes.
 6    Q.    And his summary on the second page, are you there,
 7    Kim?  Okay.  It's just not showing up here.  No.  No.
 8    That's good.
 9                "Hodell just has too much data.  SAP
10    Business One can't handle it and there's no fix in sight.
11    I believe we need to find a way to get the customer off
12    of SAP Business One."
13                Do you see that?
14    A.    I do.
15    Q.    Meland worked in development, correct?
16    A.    No.  Ralf, Ralf was in charge of the third-party
17    developer channel so Ralf was business development.
18                His role was essentially a sales role.  He
19    had technical people working for him.
20    Q.    And he was the director of business development,
21    correct?
22    A.    Correct.
23    Q.    At least that's what he says on his e-mail,
24    correct?
25    A.    Yes.
```

1    Q.    Okay.  He was qualified to make that statement,

2    correct?

3    A.    Depending on what information he had at the time,

4    maybe, maybe not.

5                I don't know what information he had to

6    make that statement.

7    Q.    You didn't challenge him on that statement, did

8    you?

9    A.    No, I didn't.

10   Q.    Let's go to 158.  Tell me when you're ready.

11   A.    Go ahead.

12   Q.    You testified about the Geoff Ashley summary of the

13   April 17th, 2007 telephone conference with SAP reps,

14   Otto, Kevin -- Otto and Kevin Reidl, and representatives

15   of LSi, correct?

16   A.    That's correct.

17   Q.    A call that you weren't on, correct?

18   A.    Correct.

19   Q.    Although you were copied on, on this e-mail,

20   correct?

21   A.    That is correct.

22   Q.    And you see the follow-up e-mail to Geoff Ashley

23   from Ralf Mehnert-Meland, correct?

24   A.    Yes.

25   Q.    And I mean, he didn't -- he didn't take more than

1    20 minutes to respond to this one, and he says, "All:

2    One item from my end -- there is no way SAP Business One

3    will work for this customer.  We need to find a way to

4    move them on."

16:14:46  5              Do you see that?

6    A.    I do.

7    Q.    And then he goes on to say, "Plus Lowery needs to

8    take responsibility for the mis-sell."

9              Your channel partner, right?

16:14:55 10   A.    Yes.

11   Q.    Okay.  Now, same question:  Was

12   Mehnert-Meland -- was Mehnert-Meland qualified to make

13   that statement?

14   A.    So Ralf was making this statement --

16:15:13 15   Q.    Yes or no?

16   A.    I'm -- based on my previous answer, no, because I

17   don't know how much detail he had.

18              I don't know whether he does or not -- he

19   is or not.

16:15:21 20   Q.    And did you respond to Meland and challenge him on

21   that conclusion?

22   A.    No, I think my initial emotional response to this

23   whole summary was to agree with him.

24   Q.    We'll get to that.  Let's go to Exhibit 159.

16:15:52 25              You there?

1    A.    I am.

2    Q.    You'd agree with me that the first e-mail in this

3    chain, going from back to front, is the same Ashley

4    summary, correct?

16:16:07 5    A.    Yes.

6    Q.    Okay.  And you respond to -- you respond to

7    Ashley's e-mail as well?

8    A.    I do.

9    Q.    And if I -- if I look at -- if I compare Meland's

16:16:27 10    response to your response, you actually respond quicker

11    than Meland, right?

12    A.    Yeah, I think it was about nine minutes.

13    Q.    Okay.  And, "We simply need to figure out if there

14    is an A1 solution for this customer."

16:16:42 15             A1 being another SAP product, right?

16    A.    That's right.

17    Q.    "Or if we just simply refund our license fees.

18    There is no go-forward path here with Business One.  The

19    partner clearly has misrepresented the solution."

16:16:54 20             That, that was your conclusion as of April

21    17th, 2007, correct?

22    A.    In nine minutes after I read the summary, yes, that

23    was my conclusion, that was my initial emotional response

24    to, hey, there's a lot of stuff going on here.

16:17:16 25    Q.    Well, I've never seen -- I've never seen an e-mail

1    from you in connection with this case that was less

2    emotional than this that says, "I was wrong when I

3    reached that conclusion on April 17th, 2007," correct?

4                    MR. MILLER:  Objection to form.

16:17:39  5          THE COURT:  Overruled.

6    Q.    No such e-mail exists, right?

7    A.    I don't think I ever wrote one that said "No, I was

8    wrong."

9    Q.    Okay.  Go to 160, okay?

16:18:01 10          You there?

11   A.    I am.

12   Q.    Okay.

13   A.    I keep forgetting to tell you, sorry.

14   Q.    No, I'm looking down.  I'm trying to orient myself

16:18:10 15   and believe it or not I am trying to move this along.

16                   This e-mail chain, once again, starts with

17   Ashley -- with the Ashley summary e-mail on April 17th,

18   correct?

19   A.    That's correct.

16:18:33 20   Q.    Now let's go to the first page of Exhibit 160.

21   Let's go to the third paragraph in the e-mail that is the

22   first e-mail on that page.  It's from Ralf Mehnert-Meland

23   April 18th, 2007 to Ashley and others, including you, all

24   within SAP, correct?

16:19:05 25   A.    Correct.

1    Q.    And Mr. Meland said in the third paragraph, "Hodell

2    asked the right question today:  Did we buy the wrong

3    solution with SAP Business One?  Based on what we know

4    now, the answer is yes and Lowery completely oversold SAP

16:19:26  5    Business One."

6                    Do you see that?

7    A.    Yes.

8    Q.    Okay.  Now, this is less than a day after that

9    conference call, and he reiterates, Meland reiterates

16:19:38 10    that SAP Business One will not work for Hodell, correct?

11    A.    That's correct.

12    Q.    And you didn't, at least in an e-mail, you didn't

13    respond to this and say, "Ralf, you're wrong," correct?

14    A.    That's correct.

16:19:57 15    Q.    Let's turn to 247.  Two-page e-mail exchange,

16    correct?

17    A.    That's correct.

18    Q.    And the first e-mail is an e-mail from Otto Reidl

19    on April 25th, 2007, to Dan Lowery, among others,

16:20:57 20    correct?

21    A.    That's correct.

22    Q.    Okay.  And Lowery forwards this e-mail to Udi Ziv

23    and Dirk.

24                    That would have been Dirk Boessmann,

16:21:13 25    correct?

```
 1    A.    Correct.
 2    Q.    And Mr. Boessmann, he reported to Udi Ziv, correct?
 3    A.    I'm not sure.
 4    Q.    What was his role, if you know?
 5    A.    Dirk was part of the -- I think he was part of the
 6    IBD team, the Install Base Development team.  He might
 7    have run the team.
 8              I don't recall exactly what his title was.
 9    Q.    And he was -- and Lowery forwards this to Dirk and
10    Udi, and you can see at the top of the page Udi Ziv
11    doesn't respond to Mr. Lowery; he responds to you and
12    Niels Stenfeldt, correct?
13    A.    That's correct.
14    Q.    And so as of April 25th, 2007, once again, Mr. Ziv
15    is saying, "There's not much we can do here.  We will
16    supply what may be a fix for the current problem, but we
17    know that there will be others.  There is no doubt that
18    this is not a Business One customer, and we somehow need
19    to get away from this."
20              I read that correctly, right?
21    A.    You read that correctly.
22    Q.    Okay.  So here's a third time within two weeks
23    where one of the developers of Business One said, "We got
24    to move them off this, we got to move them off, we got to
25    move Hodell off of SAP Business One," correct?
```

1    A.    That's what the developer is saying, yes.

2    Q.    Okay.  And did you pick up the phone at that point

3    and contact Kevin or Otto Reidl and let them know that?

4    A.    Again, that's the dealer's responsibility to be

16:23:05  5    communicating.  Dan's doing a perfectly good job of

6    communicating here.

7    Q.    So the answer to my question is no, you didn't?

8    A.    No.  I've yet to talk to Kevin or Otto at this

9    point.

16:23:14 10    Q.    Because you didn't think it was important enough to

11    be on that April 17th, 2007, conference call, right?

12    A.    I never said that.

13    Q.    Let's go to 439.  This is another e-mail exchange

14    internal to SAP, correct?

16:23:49 15    A.    Give me a moment to orient myself, please.

16    Q.    Sure.  Well, let me -- let me rephrase that

17    question so you don't have to go through the whole e-mail

18    exchange.

19    A.    Okay.

16:24:00 20    Q.    Let's just focus on Page 439, the first page.

21          You there?

22    A.    I am.

23    Q.    I want to focus on the e-mail in the middle of the

24    page from Dirk Boessmann to you on May 22nd, 2007.

16:24:25 25          Are you there?  Are you with me?

```
 1    A.    I am.

 2    Q.    Are you with me?

 3    A.    I am.

 4    Q.    Okay.  And I want to focus in the middle of that

 5    e-mail starting with "But."

 6              "But that is in this case not the key

 7    question Hodell needs to get answered.  You have to tell

 8    them that with a target of 300 users, they do not have

 9    the right product out of the SAP portfolio.  If they

10    continue to discuss this with me, they are losing time

11    and money.  From my perspective, it's now time to be

12    honest to the customer."

13              Do you see that?

14    A.    I do.

15    Q.    And after you received this e-mail, did you contact

16    the customer, Hodell-Natco, and communicate to them what

17    Dirk Boessmann's conclusions were?

18    A.    No, I didn't because earlier in this string --

19    Q.    Thank you.  Let's turn to 262.  Exhibit 262.

20    A.    I'm there.

21    Q.    Okay.  I just want to ask you a couple questions

22    about this document, and specifically I want to talk to

23    you about Michael Sotnick's e-mail to you on

24    October 30th, 2007 at the bottom of the page.

25              Do you see that?
```

2134

1    A.    I do.

2    Q.    And the subject matter is "Hodell-Natco," and I'm

3    going to -- I'm going to pick it up in the middle of the

4    e-mail.

16:26:16  5              "My sense is that after the Citrix

6    evaluation is complete, we will understand the price tag

7    to up the infrastructure and can put responsibility back

8    on Hodell-Natco and LSi to act."  The Citrix evaluation

9    has something to do with a hardware evaluation, correct?

16:26:37 10   A.    That's correct.

11   Q.    Okay.  "No matter what solution they use long-term,

12   they will benefit by a better network.  After that, we

13   need to see if they can limp along to a point where we

14   can come to the table with an A1 solution as a permanent

16:26:51 15   fix.  What do you think?"

16              And you agreed with that, correct?

17   A.    That's correct.

18   Q.    So the thought here was that let them limp along

19   until the A1 solution becomes available for them as a

16:27:08 20   permanent fix, correct?

21   A.    That was one of the options that we were talking

22   about, yes.

23   Q.    At the time of this e-mail, the A1 solution wasn't

24   anything that they could be successfully migrated into,

16:27:21 25   correct?

1    A.    That's, as my understanding, yes, I wasn't involved

2    with A1, but that was my understanding.

3    Q.    Okay.  Let's move on to Exhibit 263.  And I'm just

4    going to ask you a couple questions about the e-mail in

16:27:40  5    the middle of the first page from Dipan Shah.

6                   He sends it to Mr. Sotnick, to you,

7    Killingsworth, and would it be fair to say that the other

8    people in the distribution list are SAP employees?

9                   And if you don't know, that's fine.

16:28:04  10    A.    There's a few in here I'm not sure of.

11    Q.    Okay.  Now, let's focus on the second paragraph,

12    okay?

13    A.    Um-hmm.

14    Q.    "We agreed on the fact that we need to move this

16:28:16  15    customer to A1 not only based on the fact that the DI is

16    an issue," and the DI is the DI API, correct?

17    A.    That's what it's referring to, yes.

18    Q.    And the DI API is part of the core Business One

19    product, correct?

16:28:31  20    A.    The DI API was the interface between any

21    third-party add-on and how you actually put data into

22    Business One.

23    Q.    Okay.  Thank you.

24                   And that was part of the core Business One

16:28:41  25    product, something that was developed by SAP, correct?

         1    A.    That's correct.

         2    Q.    Okay.  "But also the fact that there are a large

         3    number of documents and users which makes this customer a

         4    non-Sweet Spot project of B1."

16:29:01 5                    Now, you'd agree with me that -- well, who

         6    is Dipan Shah?

         7    A.    I think he was part of the Install Base Development

         8    team.  He was one of the people who was working on trying

         9    to find out what we could do and how we could improve the

16:29:16 10   speed.

        11                    I don't know his exact role.  Well, service

        12    manager, SAP, you know, it's on his signature line.

        13    Q.    So the focus in this paragraph prepared by Mr. Shah

        14    is he's focusing on a large number of documents and

16:29:31 15   users, correct?

        16    A.    That's correct.

        17    Q.    As well as the DI API, correct?

        18    A.    That's correct.

        19    Q.    Let's go to 264.  Excuse me.  109, I apologize.

16:29:49 20                   First page, this is an e-mail from

        21    Mr. Sotnick to Kevin and Otto Reidl on November 16th,

        22    2007, correct?

        23    A.    That's correct.

        24    Q.    And you and Mr. Killingsworth, among others, are

16:30:10 25   copied on it, correct?

```
 1    A.    That's correct.

 2    Q.    And Mr. Sotnick, I just want to focus on the first

 3    sentence of the second paragraph, okay?

 4                Are you with me?

 5    A.    Yes.

 6    Q.    "From the SAP side, as it relates to the

 7    integration points, the acronym you listed below," and if

 8    you -- and the acronym that he's referring to is the DI

 9    API, correct?

10    A.    That's correct.

11    Q.    Okay.  "We have evaluated the processes and

12    approach and have come to the conclusion that there's no

13    change we can make on our side that would result in a

14    material improvement."

15                Correct?

16    A.    That's correct.

17    Q.    And he goes on to say in the second-to-last

18    paragraph, "Finally," you know, finally, he talks about

19    "let's see if we can put you into another SAP solution,"

20    correct?

21    A.    He said we're looking at alternative SAP solutions

22    that would fit their scale and growth plans.

23    Q.    Okay.

24                Now, moving on to 264.  Are you with me?

25    A.    I am.
```

1    Q.    Okay.  Now, this is a two-page -- this is a

2    two-page e-mail, and I want to ask you a few questions

3    about it, okay.

4              Let's go to the second page of the

16:31:39  5    document.

6              The first e-mail is your e-mail to Robert

7    Woodson, who is he?

8    A.    He was part of the All-In-One team.

9    Q.    Okay.  For SAP?

16:31:54 10    A.    Correct.

11    Q.    Okay.  And you've copied Sotnick, Killingsworth,

12    and some other people at SAP, right?

13    A.    Correct.

14    Q.    And you state that Michael and I met with

16:32:08 15    Hodell-Natco today, the very unhappy, very large Business

16    One customer, and have agreed to work with them to

17    present an A1 solution for their fastener distribution

18    business."

19              Moving further, "Hodell is going to," they

16:32:24 20    say, "do a broad search and include A1 as one of their

21    possibilities."

22              So at this point in time, Hodell-Natco had

23    decided they had to migrate off of Business One, correct?

24    A.    I don't know what they had decided.

16:32:39 25              I know that they had told us they were

1    going to look at alternatives.

2    Q.    Okay.  Going on into the third paragraph, you

3    state, "This has a bit of hair on it, including a partner

4    that is likely not going to help."

16:32:54  5              That would have been LSi, right?

6    A.    That would be correct.

7    Q.    "To help us make the move and the need for a Radio

8    Beacon interface to A1 for the client, but I do know we

9    will get the support from both Radio Beacon and from the

16:33:08  10   consultant that originally designed the system for

11   Hodell-Natco."

12              That consultant was Dale Van Leeuwen,

13   correct?

14   A.    I honestly don't remember who I'm referring to when

16:33:20  15   I talk about the consultant on that.

16   Q.    Okay.  Well, we'll get back to that, okay?

17   A.    Could have been Dale.

18   Q.    Let's talk about the next e-mail in that chain that

19   begins on the bottom of the first page and bleeds on to

16:33:33  20   the second page.

21              This is a response from your boss,

22   Mr. Sotnick, to you and Robert Woodson, and he states

23   "Team, this has my personal attention and is on the radar

24   of our executive board due to direct escalation.  I have

16:33:53  25   been to their facility and have seen firsthand the pain

1    that they are in."

2             Did I read that correctly?

3    A.    You did.

4    Q.    Okay.  So at least according to Mr. Sotnick,

16:34:07 5    Hodell-Natco's business was experiencing a lot of pain

6    related to Business One, correct?

7    A.    I know that he said they experienced pain.  I don't

8    know exactly what pain he's referring to.

9    Q.    Okay.  And then when we go to the -- then when we

16:34:27 10   go to the last e-mail in this chain, the first one on

11   Page 264, are you with me?

12   A.    Yes.

13   Q.    This is an e-mail on December 4th, 2007 from Robert

14   Woodson who you just identified, correct?

16:34:43 15   A.    Right.

16   Q.    And he's sending it to you and Dan Kraus, and he's

17   telling you, "I just got off the phone with Itelligence,"

18   and that is a business partner on the A1 side, correct?

19   A.    That's correct.

16:34:58 20   Q.    "And Dale Van Leeuwen."

21             Do you see that?

22   A.    So the consultant was referring to Dale.

23   Q.    Okay.  So thank you.

24   A.    Yep.

16:35:05 25   Q.    And then he goes on to say at the end of the

```
            1   e-mail, "We have a ballpark estimate of between 500,000

            2   and a million, plus 20% for expenses" for that

            3   installation, correct?

            4   A.   That's correct.

16:35:34    5   Q.   Let's go to 266.  Can you take a moment to look at

            6   this?

            7   A.   I can.

            8   Q.   Tell me when you're ready.

            9            Are we ready?

16:36:22   10   A.   Not yet.

           11   Q.   I can start asking questions about it and we can go

           12   faster if you'd like.

           13   A.   I'd like to read the string.

           14            Okay.

16:36:53   15   Q.   You're ready?

           16   A.   I'm ready.

           17   Q.   Okay.  The first e-mail in this chain is from Kevin

           18   Reidl to Paul Killingsworth, and it's dated May 8th,

           19   2008, correct?

16:37:09   20   A.   The first e-mail?

           21   Q.   Yeah.  On 266.3.

           22   A.   Is this going -- this is in reverse order.

           23            No, the first e-mail on here is from Paul

           24   to Kevin Reidl on April 17th.

16:37:29   25   Q.   Are we on 266?
```

1    A.    266.5, that's the first e-mail is April 17th.

2    Q.    Then let's go to the third -- the third page of it.

3    I'd like you to go to the Kevin Reidl e-mail of May 8th,

4    2008, beginning with, "A brief update for you"?

16:37:50  5    A.    Yes.

6    Q.    And Mr. Reidl's letting Mr. Killingsworth know that

7    Hodell-Natco is -- has cut its potential candidates for a

8    new ERP system to two, do you see that?

9    A.    Yes.

16:38:08  10    Q.    And going on to the next page -- well, let's just

11    pick it up on the next one.

12          Paul sends Robert Woodson an e-mail saying

13    "Interesting coincidence that we were discussing it this

14    very morning."

16:38:26  15          And then there's some dialogue between the

16    two of them.  And if we'd go to the second page of the

17    document, Paul Killingsworth sends you an e-mail copying

18    Woodson and asking, "Did SAP offer to cover the costs of

19    the development -- the development of the custom

16:38:53  20    functionality?  And see string below"?

21          Do you see that?

22    A.    Are you -- which page are you on?

23    Q.    On the second page of 266.

24    A.    So 266.2?

16:39:09  25    Q.    Yes.  Do you see the e-mail that says, "Did SAP

1   offer to cover the costs of the development of the custom

2   functionality?"

3                   MS. LUARDE:  I think it's Page 3.

4                   THE WITNESS:  It is Page 3.

16:39:27 5   A.    Yes.  Now, I see it.

6   Q.    You know, I apologize.  There must have been

7   a -- mine says 2.  I apologize.

8                   And you're pulled into this e-mail string,

9   correct?

16:39:38 10   A.    That's correct.

11   Q.    Okay.  And then the next -- then the next e-mail is

12   your response to Killingsworth, and you tell -- and you

13   tell Paul, "We haven't formally agreed with Hodell on

14   anything.  My understanding of the program was

16:39:53 15   that -- that the program in place with global" and in

16   parens, "(it no longer is) is that we would cover

17   equivalent functionality.  I think the best thing to do

18   with these guys, least painful for us, is just refund

19   their money for a release after they decide where they

16:40:10 20   are going."

21                   Do you see that?

22   A.    That's correct.

23   Q.    Okay.  And then on the next page is Paul

24   Killingsworth's e-mail of May 20th to you, okay, correct?

16:40:22 25   A.    Correct.

1      Q.    And Paul reported to you, right?

2      A.    Paul reported to Manfred.

3      Q.    He was in your team, though?

4      A.    Yes, he was on my team.

16:40:32  5      Q.    And he reports to you that he just had a long

6      conversation with Kevin Reidl, and we discussed the

7      possibility of a refund with a waiver and he was

8      noncommittal.

9                  Do you see that?

16:40:47 10      A.    Yes.

11      Q.    And then I want to direct your attention to

12      additional call notes.

13                  Do you see that?

14      A.    Yes.

16:40:59 15      Q.    The second to the last additional call note

16      beginning with "Agreed."

17      A.    Yes.

18      Q.    He states that, "Agreed that A1 would almost

19      certainly overwhelm them in many respects and is thus not

16:41:12 20      a viable option."

21                  Do you see that?

22      A.    Yes.

23      Q.    So the conclusion of SAP was that A1 would not be a

24      good Software Solution for Hodell-Natco, correct?

16:41:27 25      A.    I'm not sure who the agreed part of that is.  So

          1    was that Kevin Reidl agreeing on the call that he had

          2    with Paul that it wouldn't be a solution?  Was it SAP

          3    people agreeing that A1 wouldn't be a solution?

          4             I'm -- it's not specific, and the way it's

16:41:44  5    written, I honestly don't know who was agreeing to what.

          6    Q.   So that's your testimony on that subject?

          7    A.   Yeah.

          8    Q.   Okay.  Almost done.

          9             Now, did you reach the conclusion

16:42:07 10    ultimately that Business One was inappropriate for a

         11    company with a profile, the profile of Hodell-Natco?

         12    A.   Business One wasn't inappropriate for the company.

         13             The way that Business One was constructed

         14    with the add-on and the performance issues that it

16:42:23 15    created, that created the problem for Hodell.  That would

         16    be the conclusion that I came to after all, going through

         17    all of this.

         18    Q.   Turn to Page 187 of your deposition, please, and

         19    tell me when you're there.

16:43:04 20    A.   Okay.

         21    Q.   I want to direct you to Line 18.  Tell me when

         22    you're there.

         23    A.   I did.

         24    Q.   "Question:  Did you reach the conclusion ultimately

16:43:14 25    that Business One was inappropriate for a company with

1     the profile of Hodell-Natco?

2                "Answer:  I think by 2007, 2008, yeah, we

3     had reached that conclusion that based on the current

4     state of Business One, that's not a place that we would

16:43:31  5     have sold it at that point in time."

6                I read that correctly, didn't I?

7     A.    Yeah.

8     Q.    And that was your testimony back in 2012 when you

9     gave your deposition, correct?

16:43:41  10    A.    Yes.

11    Q.    Thank you.

12                And you'd agree with me that the primary

13    problem with Business One at Hodell was that the product

14    itself wasn't designed to handle the volume that

16:44:04  15    Hodell-Natco was going to use it for, is that a fair

16    statement?

17    A.    No, I don't -- I don't think it is.

18                We had clients that were bigger that were,

19    that were using it.

16:44:14  20                I think it was the combination of Business

21    One and the construction of the add-on that created the

22    issue.

23    Q.    Well, let's go to your deposition at Page 217.

24    Tell me when you're there.

16:44:31  25                MR. CARNEY:  And just to inform the Court,

```
 1        Your Honor, this is my last line of inquiry.
 2                    THE COURT:  Okay.
 3        BY MR. CARNEY:
 4        Q.    Are you there?
16:44:42  5        A.    I am.
 6        Q.    Okay.  Let's pick it up at Line 11.
 7                    "Question:  Yeah, all right.  And so that
 8        was the primary problem with this application at Hodell,
 9        would you agree with that?
16:44:55 10                   "Answer:  The primary problem with Business
11        One at Hodell would be that the product itself wasn't
12        designed to do everything itself and so --
13                    "Question:  It wasn't designed to handle
14        the volume that Hodell was going to use it for, is that
16:45:12 15        fair?
16                    "Answer:  Yes."
17                    That was your testimony back then, correct?
18        A.    That's correct.
19                    MR. CARNEY:  I have no further questions,
16:45:20 20        Your Honor.
21                    THE COURT:  Thank you.
22                    MR. MILLER:  Your Honor, could I have about
23        two minutes?
24                    THE COURT:  Um-hmm.
16:45:25 25                   MR. MILLER:  Okay.
```

<pre>
  1            REDIRECT EXAMINATION OF DANIEL KRAUS

  2       BY MR. MILLER:

  3       Q.    Mr. Kraus, you were asked a series of questions

  4       about the pessimism expressed by you and by others at SAP

  5       following the Udi Ziv April, 2007 e-mail and the April

  6       17th, 2007 conference call.

  7                    Do you remember that?

  8       A.    Yes.

  9       Q.    Okay.  Based on what you learned in the months and

 10       at this point years after those April, 2007

 11       communications, has the pessimism that you had about B1

 12       changed?

 13       A.    Yeah, Business One got better for Hodell

 14       specifically, but it also got better as a product

 15       overall.

 16       Q.    Did you also learn that some of the problems that

 17       Hodell was seeing had nothing to do with B1 and had to do

 18       with the add-on?

 19       A.    Yeah, as we did more investigation into where the

 20       challenges were and what was causing the problems, it

 21       became clear that the add-on had a lot to do with why the

 22       performance was slow.

 23       Q.    Was it ultimately concluded that the hardware

 24       played a factor?

 25       A.    The way the network was constructed and the
</pre>

1    hardware that was powering this was also a factor was

2    identified by one of the people who was on site.

3    Q.    And at the end of the day, if a customer refuses to

4    be happy with a software product, should they be on it

16:46:32 5    regardless of whether it would actually work for them?

6    A.    My personal opinion is that once a customer gets to

7    a point where they don't believe a product is going to

8    work for them, there's very little you're going to do to

9    make them be happy.

16:46:44 10   Q.    Okay.  But you think B1 would work for Hodell?

11   A.    B1 was working for Hodell.  It wasn't working at

12   the performance levels they wanted, but it was working

13   for them.

14   Q.    And they were on it for how long?

16:46:53 15   A.    They got off of it in 2008.

16   Q.    And SAP has other customers that B1 works for that

17   have more users than Hodell?

18   A.    They do today, and they have some that were

19   earlier.

16:47:02 20   Q.    Some of them were before Hodell?

21   A.    Yes.

22   Q.    And some of them were after Hodell?

23   A.    Yes.

24   Q.    Okay.  Very quickly.

16:47:07 25           You were asked a question about Exhibit

1    253.  I'm shifting gears a little bit.

2              This was that service pack issue.  Counsel

3    was asking you a series -- sorry -- series of questions

4    about 253.  That was the service pack where you granted

16:47:23  5    the maintenance credit?

6    A.    Right.

7    Q.    Okay.  And counsel asked you repeatedly about a

8    concession you made that the software didn't conform to

9    the documentation.

16:47:30 10              Do you remember that?

11   A.    I do.

12   Q.    To the extent the software -- to the extent the

13   software didn't conform to the documentation, okay, was

14   there some nonconformance with the documentation?

16:47:42 15   A.    I wouldn't have written that if there wasn't, but I

16   don't remember what it was.

17   Q.    Was it ultimately resolved?

18   A.    Yes.

19   Q.    And did it have anything at all to do with the

16:47:51 20   issues in this case?

21   A.    No, because that all happened before, before

22   go-live.

23              MR. MILLER:  No further questions.

24              THE COURT:  One question?  No questions?

16:48:09 25              MR. CARNEY:  No.

```
 1                    THE COURT:  Okay.  Thank you.
 2                    (Witness excused).
 3                    THE COURT:  All right.  We did it.  We did
 4         it in time.
 5                    Thanks, folks.  Keep in mind the
 6         admonition.  We'll see you at 8:15, where, Mr. Panigutti?
 7                    A JUROR:  L-1.
 8                    THE COURT:  All right.  Good.
 9                    (Jury out)
10                    (Proceedings adjourned at 4:48 p.m.)
11                         - - - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```
16:48:12 (line 5)
16:48:43 (line 10)

1                     C E R T I F I C A T E

2              I certify that the foregoing is a correct

3       transcript from the record of proceedings in the

4       above-entitled matter.

5

6

7

8       **/s/Susan Trischan**

9       /S/ Susan Trischan, Official Court Reporter

10      Certified Realtime Reporter

11

12      7-189 U.S. Court House

13      801 West Superior Avenue

14      Cleveland, Ohio 44113

15      (216) 357-7087

16

17

18

19

20

21

22

23

24

25

2153

1                          **I N D E X**

2

3   <u>**WITNESSES:**</u>                                                <u>**PAGE**</u>

4     CROSS-EXAMINATION OF OTTO REIDL (RESUMED)              1882

5     BY MR. STAR

6     REDIRECT EXAMINATION OF OTTO REIDL                    1898

7     BY MS. LUARDE

8     RECROSS-EXAMINATION OF OTTO REIDL                     1910

9     BY MR. STAR

10    DIRECT EXAMINATION OF PENELOPE VITANTONIO             1926

11    BY MR. STAR

12    CROSS-EXAMINATION OF PENELOPE VITANTONIO              1954

13    BY MR. LAMBERT

14    REDIRECT EXAMINATION OF PENELOPE VITANTONIO           1993

15    BY MR. STAR

16    DIRECT EXAMINATION OF DANIEL KRAUS                    1995

17    BY MR. MILLER

18    CROSS-EXAMINATION OF DANIEL KRAUS                     2074

19    BY MR. CARNEY

20    REDIRECT EXAMINATION OF DANIEL KRAUS                  2148

21    BY MR. MILLER

22

23                          * * * * *

24

25