2154

1                IN THE DISTRICT COURT OF THE UNITED STATES
                 FOR THE NORTHERN DISTRICT OF OHIO
2                          EASTERN DIVISION

3

   HODELL-NATCO INDUSTRIES, INC.,
4                                        08CV2755

              Plaintiff,
5
         vs.                             June 26, 2015
6                                        8:00 a.m.

7  SAP AMERICA, INC., ET AL.,
                                         Volume 10
8             Defendants.

9


10               TRANSCRIPT OF JURY TRIAL PROCEEDINGS
11           BEFORE THE HONORABLE DONALD C. NUGENT
                 UNITED STATES DISTRICT JUDGE
12                      AND A JURY

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES:

 2

 3   For the Plaintiff:          Christopher J. Carney, Esq.
                                 Sharon A. Luarde, Esq.
 4                               P. Wesley Lambert, Esq.
                                 Brouse McDowell
 5                               600 Superior Avenue East
                                 Suite 1600
 6                               Cleveland, Ohio   44114
                                 216-830-6830

 7

 8   For the Defendants:         Gregory J. Star, Esq.
                                 Michael John Miller, Esq.
 9                               Joseph M. Kelleher, Esq.
                                 Alex H. Hayden, Esq.
10                               Drinker Biddle & Reath
                                 One Logan Square
11                               18th & Cherry Streets
                                 Philadelphia, PA   19103
12                               215-988-2734

13

14

15   Official Court Reporter:    Susan K. Trischan, RMR,CRR,FCRR
                                 7-189 U.S. Court House
16                               801 West Superior Avenue
                                 Cleveland, Ohio  44113
17                               216-357-7087

18

19   Proceedings recorded by mechanical stenography;
     transcript produced by computer-aided transcription.

20

21

22

23

24

25
```

1

2          THE COURT:  Be seated, please.  Okay.  Are

3    we ready to roll?

4          MR. STAR:  We are, innuendo, Your Honor.

08:03:25  5    Thank you.

6          Your Honor.  Thank you.

7          Obviously we have a number of motions that

8    we've submitted, some which are still pending.  I wasn't

9    planning this morning on, you know, throwing everything

08:03:37 10   at the Court's feet right now and our idea was that we

11   would perhaps leave some items for later, if necessary.

12          I really wanted to focus on the damages

13   piece of this case right now.  After we've heard the

14   testimony of Mr. Reidl, and I'll just make this point.

08:03:58 15   There's no other testimony or evidence that's going to

16   come in during this trial that's going to impact in any

17   way their damages claim.  They've put on all the proof

18   that they could put on.

19          And to walk through what they've actually

08:04:10 20   claimed, I'll just take them in the pieces that they put

21   up.

22          First off, Your Honor correctly held that

23   the Pacific Coast Bolt piece of this is out.

24          Hodell then, through Mr. Reidl, claimed

08:04:25 25   that they had out-of-pocket costs of $842,000.

1          I'm not going to address that right now,

2     but we don't agree with the calculation.

3          The next item was what they called

4     training, testing, and travel.  And Mr. Reidl claimed

08:04:45  5     without any support that that was between 35 and $55,000,

6     and then he called it a conservative estimate.  That was

7     his testimony, and we'd find that at Page 1771 of the

8     transcript.

9          There's nothing behind that calculation.

08:05:02 10     There's no documentation.  It's only Mr. Reidl's say so.

11          We don't think that they can proceed to the

12     jury on that particular element of the damages.

13          Next was a so-called calculation for return

14     on investment, and you'd find that at Pages 1771 through

08:05:21 15     77 of the transcript.  They tried to put that calculation

16     and that amount in through an Exhibit Number 625, which

17     was not permitted.

18          Mr. Reidl then, without any support,

19     claimed that his return on investment loss was $1.2

08:05:41 20     million.  There was no proof at all given to support that

21     figure.

22          There was some mention of some kind of a

23     calculation, but, remember, this is a

24     return-on-investment claim.  There was no testimony or

08:06:01 25     evidence given as to a rate of return or how they

1    established the particular rate of return.  At best, what

2    we heard was Mr. Reidl calculated that he'd have to have

3    earned back a certain amount of money to break even after

4    five years, but there's nothing behind that calculation.

08:06:22  5          On top of that, it's not really the kind of

6    calculation without any support at all that a lay witness

7    ought to be able to put in front of a jury.  We don't

8    think that one goes.

9          I'm going to come to the big one after

08:06:37 10   this, leaving that for last.

11         The next piece of their damages claim you'd

12   see at Page 1784 of the transcript, and it's what they

13   call increased interest expense on debt.  And Mr. Reidl

14   said that was somewhere between $498,000 and $550,000.

08:07:00 15         He pointed to Exhibit 607, which doesn't

16   support a claim.  It's his consolidated financial

17   statements.  This is -- this is it.  (Indicating)

18         We don't have a bank record.  We don't have

19   anything that connects this supposed -- there's not even

08:07:24 20   a calculation that was offered, let alone a connection to

21   SAP or Business One.

22         That kind of calculation, to the extent

23   there was a calculation, would require an expert to come

24   in and say what kind of factors there were that might

08:07:44 25   have led to an increased interest expense.

1                You have to disaggregate other causes,

2      right?  Increased interest is going to be affected by all

3      of the money that a company like Hodell borrows, and to

4      just throw out a number without any support would leave

08:08:00  5      the jury to throw a dart against the wall.

6                So to summarize, the only thing that we

7      think they could put up of those categories I went

8      through is some amount of out-of-pocket costs.

9                And let me take you to the last damages

08:08:15 10      category, the first one they tried to present actually,

11      and it's what they call lost productivity.

12                You could see my frustration.  This, this

13      piece of this case has been like chasing a ghost for

14      years, for years.  And they've tried it in many different

08:08:33 15      ways.  They've called this different things at different

16      times.  They've started by calling it a lost productivity

17      claim, and what we found out yesterday was, you could see

18      my frustration there, for the first time we found out

19      yesterday how Mr. Reidl's actually calculating what he

08:08:54 20      believes to be the damage, and it boils down to him

21      claiming they had increased overhead costs because of

22      extra employees.

23                Let's just take it from the top.

24                The first piece of it they tried to tell us

08:09:09 25      they had a productivity drop because they shipped less

1  pounds of product when they ran Business One.  Like

2  Dr. Kennedy before him and like Judge Wells saw with

3  Dr. Kennedy, there is no connection at all between a drop

4  in the number of pounds shipped and actual financial harm

08:09:33  5  because Hodell's business records show the opposite

6  happened.

7           That's what Judge Wells recognized when

8  Dr. Kennedy tried to do the same thing.  Dr. Kennedy,

9  like Mr. Reidl, tried to take this drop in number of

08:09:48 10  pounds shipped and then connect that as a cause to some

11  harm.

12           That's where Dr. Kennedy and Mr. Reidl

13  departed with their ultimate calculation.  Just so Your

14  Honor is aware, what Dr. Kennedy tried to do is to say,

08:10:08 15  "Well, they had a workforce that could have shipped more

16  and, therefore, I believe they would have made more

17  money," but of course, that dropped away because you have

18  to have a customer that wants to order your goods for you

19  to ship it and do more work.

08:10:28 20           What Mr. Reidl tried was a different way,

21  what he said was I paid more people than I should have.

22  And what we finally found out yesterday, after rounds and

23  rounds of questions, of course, was what their own

24  records show.

08:10:40 25           They had the head count they had prior to

1    Business One, unrelated to Business One.  What Mr. Reidl
2    finally explained yesterday is that in his view, 27
3    people left.  He said then he was not going to replace
4    those people, but that he had to replace them because of
08:11:01 5    Business One.
6            But who are those people?  Who are those
7    people?  They don't exist.  If they existed, we would
8    have a personnel record for each of them.  We would know
9    when -- we'd know their names, we'd know when they were
08:11:19 10   hired, when they left the company, who replaced them, how
11   much they had been paid, how much the replacements had
12   been paid.
13           And in general, of course, an overhead
14   claim is permissible, right?  But you have to offer the
08:11:34 15   right proof.  If I had to hire an extra guy, I can
16   explain who that person was, how much I paid him, and why
17   I hired him, and then my overhead cost increase is his
18   head.
19           But that's not at all what Hodell has tried
08:11:51 20   to do, and the reason they haven't done that is because
21   these people didn't exist.  Mr. Reidl gets to this
22   calculation of 27 additional people by calculating that
23   his productivity dropped and then he extrapolates that
24   had he been at prior productivity levels based on just
08:12:06 25   the number of pounds shipped, he would have had 27 -- he

1    would have needed 27 fewer people.

2            Well, the problem doesn't end there,

3    though, right, with his failure to identify any of these

4    folks because then what he's done, to come out to his

08:12:23  5    ultimate number is to take that number of fictional

6    employees, 27, and multiply it by what he claims to be

7    some average cost per employee.  But that couldn't be how

8    you could do it, right?

9            I mean, if you hired Joe to work in the

08:12:38  10    warehouse, you'd know how much you paid Joe.  But

11    instead, what Mr. Reidl has done, he admitted this during

12    cross-examination, is he took the pay for the entire

13    organization, including himself, divided that by the

14    total number of employees, and came up with an average

08:12:53  15    salary.  And then he said, "I'm going to multiply that

16    average cost," which obviously would be higher, "By this

17    fictional 27 people and I come out to an annual figure."

18    And then he extrapolated that over the two-year period

19    they ran Business One.

08:13:10  20            So when you consider all of this, it's

21    purely speculative.  What would the jury do with that?

22    They'd just have to again throw a dart at the wall.

23    There's nothing, no evidence besides pure guesswork and

24    speculation on which they could come up with a number.

08:13:29  25            That leaves us where?  Hodell has simply

1   out-of-pocket costs.  Hodell simply has breach of

2   contract damages.

3                    They've pled all these different tort

4   claims, and this is a point we've been arguing for a long

08:13:47 5   time.  When it comes down to its essence, there are no

6   distinct damages between what they've requested on the

7   breach of contract versus what they've requested on their

8   tort claims.  And when you look at Ohio law, we have it

9   in our briefing, for instance, the *Textron* case that has

08:14:08 10   been relied upon by this Court and others, there are two

11   pieces to the analysis on when you can proceed with a

12   tort claim in the face of a contract.

13                    One, and both of these things have to be

14   satisfied.  One, you must have a duty in tort that's

08:14:26 15   arising independent of the contract.  I'll get back to

16   that in a moment.

17                    Two, your damages have to be separate and

18   distinct.  You can't just repeat breach of contract

19   damages and then build this into a tort claim.  That is

08:14:43 20   what the Plaintiffs have done, however.

21                    There was no effort, no effort whatsoever

22   to identify damages that were distinct for breach of

23   contract versus tort.  None.  None.

24                    And under *Textron* and other cases that

08:15:05 25   follow that thinking, they can't have a tort claim.  They

1    can't proceed.  They have simply economic losses.

2              All of the relationship between SAP and

3    Hodell is subject to the license agreement.  Right?  We

4    have a valid, binding commercial contract controlled by

08:15:28  5    the UCC.  There's been this attempt for years to try to

6    argue that somehow in some way some amount of the

7    licenses that Hodell acquired from SAP were acquired

8    outside of the context of the license agreement and prior

9    to it.  But what evidence have we seen on that?  None.

08:15:48 10              Everybody agrees that Hodell had to sign

11    the December 23rd, 2005 license agreement; that they did

12    not receive any software from SAP until they signed that

13    license agreement.  The agreement itself is very clear,

14    I'm happy to go through it if you'd like, it requires an

08:16:05 15    order to be submitted.  The software, as defined, is

16    defined by the order for the software that comes in.

17              All of the licenses that Hodell received

18    are controlled by that contract.  So when we step back,

19    what do we see?  They have no -- they have no tort

08:16:24 20    damages.  All of the damages that they've tried to put up

21    on the board here duplicate their breach of contract

22    claims, and when we analyze each of their particular

23    damages claims, we find they're left with nothing but

24    out-of-pocket costs.

08:16:43 25              And this has been our point for a long

2165

1    time.  This case is about a contract.  It's a breach of

2    contract.  So for those reasons, we think that the jury

3    should not even be presented with any of these damages

4    categories besides their out-of-pocket costs.  And we'll

08:17:01 5   respond to those with evidence later.

6                    We also believe that tort claims should be

7    dismissed under *Textron* or the economic loss rule.

8                    THE COURT:  Let me ask one question.

9                    MR. STAR:  Sure.

08:17:10 10              THE COURT:  If, in fact, there was evidence

11   that they had to hire 27 additional people to make up for

12   the slowdown in the use of the software, would that be

13   compensable under the contract?

14                   MR. STAR:  In general, I believe it would.

08:17:33 15              Now, we have in this case to deal with the

16   damages limitations provisions, right?  But if we're

17   talking in general under Ohio law --

18                   THE COURT:  No, I'm talking about in this

19   case.

08:17:44 20              MR. STAR:  Well, in this case, ultimately

21   we'd run up the against the damages limitations, we'd

22   have to take a look at that.

23                   But I think your question is hey, if we

24   actually hired Bob and Joe and Jane to work because we

08:17:59 25   couldn't get our work done and they came in with the

2166

1    payroll records and the exact amounts they paid for those

2    folks, I mean, in general that is the kind of claim that

3    a Plaintiff can put up, but the problem here is --

4              THE COURT:  And if that happened, then you

08:18:13 5    would argue against that saying the license agreement

6    limits the amount of contractual damages.

7              MR. STAR:  We would, we would be arguing

8    that the license agreement does control.

9              But the analysis under Ohio law is not --

08:18:25 10             MR. MILLER:  May I just add one point, Your

11    Honor, to clarify?  We've talked about this before.

12             If, if the damages limitation provision is

13    deemed to modify our contract, the contract damage claim,

14    then a Plaintiff can get around a damages limitation

08:18:42 15    provision and can bring fraud and tort claims in a

16    contract context any time there's a limitation of damages

17    provision.

18             In other words, if there's a damages

19    limitations provision and that makes the contract damages

08:18:54 20    different than the tort claim, then in any contract ever,

21    right, that has a damages limitation provision, then that

22    Plaintiff doesn't have to worry about the economic loss

23    rule or any of the other, you know --

24             THE COURT:  That's kind of their point,

08:19:07 25    isn't it?

```
 1              MR. MILLER:  I understand, but it can't be

 2    that all of that jurisprudence from the 50 states over

 3    however many decades this has been developing gets tossed

 4    out the window any time a commercial party includes a

 5    damages limitation provision.

 6              There's no case law supporting that.  It's

 7    an idea, but the point is as Mr. Star has reminded us,

 8    under Ohio law, what would their contract damages be if

 9    they ever did put in proper evidence of the 27 employees,

10    that would be part of the breach of contract claim and

11    they can't argue that their damages claim is different

12    because of the damages limitation provision, because if

13    they were permitted to do that, then every single

14    contract in a commercial setting that has a damages

15    limitation provision would be a get-out-of-jail-free card

16    for Plaintiffs and they could bring all the tort claims

17    they want and all the case law would go out the window.

18              And that can't be.

19              THE COURT:  But your argument is that under

20    Textron, that any tort claim would have to be different,

21    that the damages would have to be different than you

22    could obtain under a breach of contract claim.

23              MR. STAR:  Right.

24              THE COURT:  And --

25              MR. STAR:  Yes.  Certainly.
```

                          1          THE COURT:  And the thought, and that's why

                          2     I asked you the question about if they had -- could

                          3     properly prove that they had out-of-pocket expenses that

                          4     were in addition to paying for the license agreements,

      08:20:27            5     but something, they had to hire more employees or do

                          6     something in addition, and would that be permissible in

                          7     this case under the breach of contract claim, or is your

                          8     argument that you're limited, you have a damage

                          9     limitation in the license agreement so you couldn't get

      08:20:46           10     that; you would be arguing the same thing.

                         11          You say you couldn't make that argument

                         12     because there's a limitation in the license agreement.

                         13          MR. STAR:  I understand exactly what you're

                         14     asking.  Mr. Miller and I see this exactly the same way.

      08:20:59           15          And the analysis goes like this, right?

                         16     The *Textron* and annual the line of cases off of *Textron*

                         17     are dealing, first off, with general Ohio law, right?

                         18     Not looking at the actual contract yet.

                         19          And when you take it at the highest level,

      08:21:13           20     you have to have different damages.  And we don't have

                         21     different damages here.

                         22          The *Textron* ruling doesn't fall apart

                         23     simply because in a commercial contract controlled by the

                         24     UCC where the UCC specifically allows the parties to

      08:21:30           25     agree on damages limitation provision, it doesn't,

1    putting a damages limitation provision in your contract

2    then doesn't do away with *Textron*'s general holding.

3    That would make no sense.  Right?

4                    That would be saying that Ohio law says on

08:21:46  5    the one hand that you must have separate and distinct

6    damages, but if you're a party to a contract who decides

7    to agree with the other party to limit damages, now

8    you've opened yourself up to whatever tort claims and

9    whatever damages in tort a Plaintiff wants to seek simply

08:22:05  10    because you then agreed to limit the damages.  No.

11                    It actually goes the way that we're

12    suggesting it goes.  The general principle is the same.

13    You have to have distinct damages.  They don't.

14                    And then we look to the contract itself,

08:22:19  15    because we end up when you view the general analysis is

16    the tort claims fall away.  They fall away.  And then

17    we're left with the contract which is exactly what the

18    UCC contemplates in the first place.  We ought to be left

19    with the contract.

08:22:34  20                    And when we're left with the contract, then

21    we deal with the contract claim.  And the contract limits

22    the kinds of damages that they can recover.

23                    Now, Your Honor asked me if in general a

24    Plaintiff can come in with an overhead cost claim and the

08:22:47  25    answer is yes.  But then you're always going to have to

2170

1    deal with whatever limitations you agreed to in the first

2    place.

3              So --

4              THE COURT:  But according to the Plaintiff,

08:22:56  5    that's why they filed the fraud claim, so they can go

6    outside the limitation of the contract.

7              MR. STAR:  Exactly.  Exactly.  Because

8    they've been trying to get away with the -- get out from

9    under the contract on all kinds of theories for years,

08:23:11 10    but this, this argument -- and that is the one that they

11    raise in their brief in response to our *Textron*

12    argument -- is simply that, oh, because of the damages

13    limitation, whatever they're asking for in tort is

14    distinct.  It doesn't make any sense.  It doesn't make

08:23:30 15    any sense.

16              They have only their argument on it.

17    There's no case law to support that.  So the tort claims

18    fall away, they fall away and we're left with the

19    contract and that's what the jury ought to be presented

08:23:40 20    with.

21              THE COURT:  Right.  If I accepted your

22    argument, then there would never be contract damage and a

23    parallel tort.

24              MR. STAR:  No, I don't think that's right.

08:23:51 25              What *Textron* says is you need to have

1    separate and distinct damages, and what are the separate

2    and distinct damages?  Well, that's up to the Plaintiff

3    to prove, right?  And we're dealing with what's in this

4    case.

08:24:03  5         In certain cases, and we've all seen them

6    if we do the research, there's cases where Courts have

7    allowed claims to proceed.  But when we look at the

8    damages that this Plaintiff has put up --

9         THE COURT:  Okay.  It was kind of like a

08:24:19  10    hypothetical, but we're saying the same thing but coming

11    to a different conclusion, I think, and that is that

12    your -- the license agreement limits the damages, and

13    that was my question, would that then be contemplated in

14    the license agreement if there was evidence that would

08:24:37  15    support additional expenses that were incurred because of

16    the alleged slowdown?

17         MR. STAR:  Yeah.  And I also think that

18    that question -- and it puts the cart before the horse

19    because it sort of assumes that they have actually put in

08:24:53  20    that evidence.

21         THE COURT:  I'm just saying assume that.

22         MR. STAR:  If we assume that.

23         THE COURT:  Right.

24         MR. STAR:  Then it would eventually run up

08:25:00  25    the damages limitation provision and we'd be arguing over

1    whether, for instance, the damages limitation provision's

2    enforceable, right?  They've made that argument before.

3               There are ways around the damages

4    limitation provision for a Plaintiff, right?  Provision

08:25:14  5    is unconscionable, failed its essential purpose, right?

6               The contract itself holds that particular

7    provisions can be stricken out, right?  Because a

8    Plaintiff can show that, oh, for instance, although you

9    gave me a warranty, the warranty failed its essential

08:25:34 10    purpose.  Because you limited my damages, that also

11    failed its essential purpose.  But we're still within the

12    confines of the contract and we're not dealing with a

13    tort claim.

14               And it all presupposes in this case that

08:25:45 15    they have even put up those damages, and they haven't.

16               THE COURT:  Can you think of an example

17    where you can have a contract, somebody suing for breach

18    of contract and also sue for -- in tort?

19               MR. STAR:  Sure.  I mean, there's cases out

08:26:02 20    there.  You put me on the spot to actually come up with a

21    hypothetical scenario.

22               MR. MILLER:  Can I propose one, Your Honor?

23               MR. STAR:  Sure.

24               MR. MILLER:  In a contract context, you

08:26:15 25    have foreseeable damages, right?  In a typical fraud

1    claim, you can make a benefit of the bargain argument in

2    a classic software implementation case, okay?  The

3    Plaintiff's fraud damages are different than the breach

4    of contract damages because they typically put in

08:26:34  5    evidence of how their expectations were built up during

6    the sales cycle.  They were told they would make this

7    much of a rate of return over a period of time.  They

8    were promised this by blankety-blank salesperson.  They

9    are not seeking their foreseeable contract damages.

08:26:53 10    They're seeking their benefit of the bargain damages.

11            They're saying, "Wait a second, after you

12    had a board meeting, we ended up buying the software

13    because of what you said.  The sky's the limit."

14            Here comes the expert, we get more

08:27:07 15    efficient, our employment costs go down, our real estate

16    costs go down, and if you look down in the bottom

17    right-hand corner, our damages number is huge.

18            And they haven't done that here, as

19    Mr. Star pointed out.  Their damages claim is identical

08:27:20 20    to their tort claim.  And to go to a point when you look

21    at the cases --

22            THE COURT:  I know what you're saying, but

23    I guess I'm not making my question clear.

24            I'm trying to figure out in your world if

08:27:33 25    you could ever have both.  I mean --

1          MR. MILLER:  You couldn't collect the same

2     dollar twice.

3               THE COURT:  No, I understand that.

4               MR. MILLER:  But it's definitely true --

08:27:42  5          THE COURT:  If you're telling the Plaintiff

6     in this case you can't get under the license agreement,

7     the contract, you can't get damages if they expended

8     extra funds to hire more people because the software

9     didn't work like they had claimed that it would --

08:27:55 10          MR. MILLER:  Right.

11               THE COURT:  -- or you claimed it was going

12     to work, and you say they're limited in their license

13     agreement, you can't get those damages.

14               MR. MILLER:  I understand, Your Honor, and

08:28:05 15     my response to that, and I was going right to that, is

16     twofold.

17               The inquiry that Courts are driving at when

18     they say, hey, is there a separate duty and say, hey, are

19     you seeking separate damages on your contract claim and

08:28:18 20     your tort claim is an inquiry driven towards is this some

21     sort of different -- is this some sort of different

22     claim?  Is there something different about the tort claim

23     from the contract claim?

24               The inquiry isn't, oh, at the end of the

08:28:33 25     day, will you be limited by your damages limitation

1    provision.  They're trying to figure out, wait a minute,

2    these are parties in a contractual relationship.  This

3    one Plaintiff wants to bring a tort claim.  And the

4    cases, all of them, all across the country when you

08:28:47  5    consolidate them are basically saying is this tort claim

6    distinct from the contract claim, and a big line of

7    inquiry is, is there a separate duty?  And here we don't

8    think there is and there's a whole line of case law on

9    it.

08:28:59  10    Another part of the analysis is is what

11    they're seeking in damages different, and the reason the

12    Courts are asking that isn't to decide how at the end of

13    the day are they going to get what they want; they're

14    trying to decide if they should get outside of the

08:29:11  15    contract in the first place by conducting an analysis to

16    see, "Hey, is this something different?"

17    So when you look at it that way, what

18    actually matters is the complaint.  And when you read the

19    complaint, you can see right from the day one in this

08:29:24  20    case, all the way until day now in this case, what

21    they've been seeking in damages is the same.  And the

22    reason that matters is Courts want to know are your tort

23    claims different from your contract claims?

24    And the answer here is no.

08:29:38  25    And when you go to Your Honor's point that,

1     well, wait a second, if at the end of the day, the

2     Defendant is going to argue that there's a damages

3     limitation provision and they're not going to be able to

4     get their contract damages, is that unfair somehow to the

08:29:50   5     Plaintiff?  I would say two things.  One, that this is a

6     sophisticated commercial contract between an arm's length

7     business and these were the terms that were agreed upon.

8     If we weren't going to have damages limitations

9     provisions in these contracts, Your Honor, this software

08:30:05  10     would be a lot more expensive.

11          But to go right to the point, this idea

12     that, oh, if there's a damages limitation provision,

13     that's a get-out-of-jail-free card, and now they can

14     bring tort claims whenever they want because their

08:30:19  15     damages are different under breach of contract than they

16     are in tort, that would fly in the face of the -- all of

17     those cases, okay, and there are no cases that say that

18     they can do that.

19          And if that was permitted, there'd be a

08:30:35  20     long line of cases that, "Oh, my gosh, sure, here is how

21     you get out of -- you get stuck in a contract and you

22     want to bring a tort claim.  That's not a problem.  Just

23     find where in all these contracts there's a damages

24     limitation provision and argue your damages are going to

08:30:51  25     be different.  It's over.  Then go and bring a tort

1    claim."

2                    That's not how it works.  That's why there

3    are no cases.  And if ultimately they were permitted to

4    proceed here, if we acknowledge that your damages have to

08:31:05  5    be different and they're permitted to proceed because

6    their damages are different because the damages

7    limitation provision, that case will stand alone against

8    all those other cases and it won't, it won't hold water,

9    and the reason is all the way back to the beginning, the

08:31:24 10    inquiry was different.

11                    The inquiry was, hey, this tort claim is,

12    is it different than a contract claim?  Let's look at the

13    duty, blah, blah, blah.  Let's look at the damages.  What

14    are they seeking?  They're the same.

08:31:36 15                    And that's been our point.

16                    THE COURT:  Okay.

17                    MR. MILLER:  I have one other point to

18    make.

19                    THE COURT:  You do?

08:31:42 20                    MR. MILLER:  I do.  Do you mind?

21                    It relates -- just a second.  It relates to

22    the damages.  In addition to everything that Mr. Star

23    said, even if Mr. Reidl was permitted to testify about

24    phantom employees without putting in the evidence, and

08:32:00 25    he's not, and I think Your Honor recognizes that, we've

```
         1    briefed this, but it's really important and I think Your
         2    Honor picked up on it when you asked Mr. Reidl the
         3    question, when you look at the numbers in 2000 --
         4                 THE COURT:  I can't see.
08:32:16 5                 MR. MILLER:  Forgive me.
         6                 THE COURT:  Here, put it up on the -- you
         7    can hold it, right?
         8                 MR. MILLER:  I can do even better.
         9                 When you look at the numbers for 2006,
08:32:26 10   these are the gross sales, this was the number Mr. Reidl
        11    acknowledged was accurate.  That was the productivity
        12    number dollars per employee, right?  And Your Honor
        13    recognized that, wait a second, that was the year on
        14    FACTS.  When you shifted to the first full year on B1,
08:32:45 15   your productivity measured by the rest of the world,
        16    dollars, how much -- how many sales can you -- sales is
        17    how many orders can you take, how many shipments can you
        18    make, how much money can you collect.  It's the process.
        19    Productivity increased.  Okay.
08:33:01 20                And if, again, leaving aside the whole
        21    problem that they have that these employees are phantom,
        22    and they can't put that evidence in, even if they somehow
        23    got over that hurdle, if they're going to bring someone
        24    in to say oh, we're in Alice in Wonderland, dollars isn't
08:33:20 25   what matter, it's pounds, in Alice in Wonderland, we
```

                1   weigh everything, we don't actually use dollars, if
                2   you're going to bring a layperson in and say oh, we're in
                3   Alice in Wonderland and you have to ignore dollars, the
                4   way the whole rest of the world measures productivity,
    08:33:37    5   the whole corporate world all the way around the globe,
                6   that person can't do that.  It has to be an expert.  This
                7   is the point I made at side-bar, Your Honor.  If you want
                8   to bring a witness in to say where we are up is down,
                9   it's really strange.  Where we are up is down.  You need
    08:33:55   10   to bring in a physics professor.  And they tried it with
               11   Dr. Kennedy and Judge Wells saw through that.  And you
               12   can't bring in someone and say "Look, in Alice in
               13   Wonderland, pounds is what matters, not dollars."

               14          You need an expert.  It's the reason
    08:34:08   15   everyone in this courtroom had their hands on their heads
               16   trying to follow what Mr. Reidl was suggesting, and it's
               17   two reasons:  One, he's wrong, he's trying to say up is
               18   down, this is what matters, this is more productive.  But
               19   besides that, if Hodell wants to try this, they need to
    08:34:27   20   bring in someone with an economics or accounting or some
               21   sort of serious financial credentials to say, yeah, it's
               22   legit; pounds is what matters.

               23          But you can't -- you can't toss this to the
               24   jury and say, oh, if you guys feel like sending them some
    08:34:43   25   money on this pounds theory, it's okay.  And I think Your

1    Honor was appreciating that, and it's a huge problem.

2                   THE COURT:  I have one final inquiry on

3    this.  I kind of did my best to get up to speed with all

4    of the briefing that was filed in this case over seven

08:35:00  5    years and what not and Judge Wells' decisions and

6    certainly Magistrate Judge White's

7    Reports & Recommendations on this, and I concurred with

8    Judge Wells based on the information that I had before me

9    that Dr. Kennedy's purported opinion was way too

08:35:22 10   speculative on this pounds shipped theory, and then

11   allowed Mr. Reidl to testify as a business owner and give

12   a lay opinion as to that and tried to understand the

13   pounds per -- or pounds, number of pounds shipped versus

14   the other.

08:35:39 15               And then today is, what, Friday?  Wednesday

16   heard, I thought for the first time, and maybe I'm

17   missing something if I didn't read something in the

18   briefing or the papers or anything, that the damage

19   calculation was done on the basis of having to have 27

08:35:59 20   point some additional employees to take up the slack

21   caused by Business One's slowdown of this operation.

22               And then yesterday heard, because of that

23   chart that shows 2006, 186.2 employees, 2008, 184.3

24   employees, and that kind of makes you scratch your head

08:36:24 25   as to what -- where did we get those 27 people.  And I

1  know Greg was trying to get this inquiry out and trying

2  to ask where these people were from.  And then we got an

3  explanation yesterday morning.

4         And I guess my question is much more

08:36:43  5  fundamental.  Was that ever disclosed in discovery?

6         MR. STAR:  This is how it went.  Mr. Reidl,

7  at his deposition three years ago, did tell us that he

8  somehow calculated extra employees and he did admit

9  during his deposition that he didn't know who any of

08:37:07  10  those folks were.

11         We scratched our heads three years ago as

12  to how he came up with extra employees because we've

13  known all of these numbers.  So the testimony that

14  Mr. Reidl gave on Wednesday about, you know, so-called

08:37:21  15  extra employees, that, that piece of it at least wasn't

16  that big of a surprise to us.

17         His testimony yesterday morning, that was

18  never disclosed before.  And what he said yesterday

19  morning was for the first time that they lost 27 people

08:37:42  20  and that they somehow weren't going to replace those

21  folks, in other words attrition he said, but that he

22  rehired 27 replacements to fill those jobs because he

23  still needed those 27 people.

24         That was brand new.  Never disclosed.  And

08:37:59  25  that's why I had said to him yesterday, "You understand,

1       sir, you've got an obligation in this case and you've had

2       it for years to produce to us everything that supports

3       your damages calculation."

4                    And if we go way back, Your Honor, to

08:38:13  5     Hodell's initial disclosures, you could never find

6       anything like this in that initial disclosure.  They had

7       a line item for lost productivity, they called it, and it

8       came out to this kind of number.

9                    But it wasn't until yesterday that we heard

08:38:29 10    for the first time that they had attrition of 27 people

11      and they replaced them because of Business One.

12      Therefore, my frustration, obviously.

13                   If they wanted to proceed with that claim,

14      they obviously had obligations.  We don't think those

08:38:43 15    people actually exist, or if they existed it would have

16      been very easy, go to your HR department and pull out the

17      records and show us who those people are and what you

18      paid those particular people.

19                   And that gets right down to the meat and

08:38:56 20    potatoes of this particular claim.  They never really

21      disclosed it.  They didn't support it with any documents,

22      even though they had an obligation to do it.  They still

23      don't have any documents, nor could they put them in now.

24      That would be tremendously prejudice.  And on top of

08:39:16 25    that, when they try to calculate the per person cost,

 1    they make zero effort, zero, to try to attach it to the

 2    particular person or 27 people.  They do this broad

 3    average.

 4              And so if that answers Your Honor's

 5    question on that, obviously there's other issues that we

 6    have and we'll reserve those for later, for instance, the

 7    agency issues and so on.

 8                   THE COURT:  Okay.

 9                   MR. STAR:  Thank you.

10                   THE COURT:  Mr. Lambert.

11                   MR. LAMBERT:  Good morning, Judge.

12                   THE COURT:  Good morning.

13                   MR. LAMBERT:  Is there anything fresh in

14    your mind that you want me to address first or do you

15    just want me to get going?

16                   THE COURT:  It's up to you.

17                   MR. LAMBERT:  Well, I want to start, and

18    SAP never really -- never really talks about what the

19    actual standard for recovery of damages in a case like

20    this is.  They don't want to actually focus on what the

21    actual standard for recovering damages in a civil case

22    is.

23              And you heard Mr. Miller and Mr. Star talk

24    about "These cases."  I don't know what "These cases"

25    are.  I know what Ohio law case, *TJX Companies versus*

1    *Hall*, 183 Ohio App. 3d, 286, the general rule regarding

2    damages in civil cases is that they must be proven with

3    certainty, Your Honor, but the amount may be reasonably

4    estimated.

08:40:50   5         The fact that Hodell was harmed must be

6    proven, I acknowledge that, but when you want to talk

7    about the numbers themselves, they may be reasonably

8    estimated.  That's what Ohio law is.

9         And that's what -- you know, Your Honor, I

08:41:08  10    submit that we've done much more.  We've gone over and

11    above what Ohio law requires us to do with damages.

12         We didn't reasonably estimate damages.

13    Otto Reidl put together a very, very specific calculation

14    of what his view of the damages are.  And Mr. Star is

08:41:33  15    free to cross-examine Mr. Reidl about Mr. Reidl's view of

16    the damages, and the jury can consider both sides' view

17    of the evidence.

18         But just because one side disagrees with

19    the factual record doesn't mean that the damages

08:41:52  20    calculation gets knocked out altogether.  That's just

21    simply not the law in Ohio.

22         The law in Ohio is that the amount may be

23    reasonably estimated.  And we've gone over and above that

24    with each of the components that Mr. Star went over.

08:42:09  25

```
 1              THE COURT:  Reasonably estimated is a

 2    little bit different than speculation, isn't it?

 3              MR. LAMBERT:  I agree.  And I submit to

 4    Your Honor that the testimony hasn't been speculation.

08:42:25  5    It's been based upon business records that SAP themselves

 6    relied upon in cross-examination.  Exhibit 24 forms the

 7    basis for Mr. Reidl's calculation.  Exhibit 24 was

 8    produced in discovery.

 9              His calculation of damages -- and I'm just

08:42:43 10    talking about the productivity component.  When we're

11    talking about what was disclosed during discovery, his

12    calculation of damages is based upon Exhibit 24, which

13    everybody acknowledges was produced and SAP themselves is

14    relying upon it up here.

08:43:01 15              THE COURT:  Okay.  Let's just look at this.

16              If you're on the pounds, number of pounds

17    shipped as the basis of that calculation, correct?

18              MR. LAMBERT:  Right.

19              THE COURT:  Okay.  And but that really

08:43:13 20    isn't what Mr. Reidl testified about.

21              He said that even though the number of

22    pounds shipped was less, then he added in that net that

23    we needed to have more people do less.

24              MR. LAMBERT:  We needed --

08:43:31 25              THE COURT:  Right?
```

2186

```
 1                    MR. LAMBERT:  Yes.  And what he's --

 2                    THE COURT:  Hear me out.

 3                    And so the basis of the calculation is the

 4         27 additional employees, he said, that it cost to ship

 5         less product.

 6                    MR. LAMBERT:  The 27 -- I'm sorry.  I'm

 7         sorry.

 8                    THE COURT:  I think that, if I understand

 9         it, that was the testimony.  Then you just extrapolate

10         the 27 employees' cost out.

11                    MR. LAMBERT:  Yes.

12                    So what he's saying is we had a given

13         volume of business under SAP, right?  Here's the pounds

14         we were shipping.

15                    And for -- I'm a little bit troubled for

16         somebody to get up and argue that it's Alice in

17         Wonderland to calculate productivity on man hours used to

18         produce a given level output but the United States

19         Department of Labor does the same thing, right?  And

20         Judge Wells even though she kicked Dr. Kennedy, she found

21         the productivity analysis was spot on.

22                    THE COURT:  Well, it could be.

23                    MR. LAMBERT:  She said it was -- that part

24         was spot --

25                    THE COURT:  Well, it depends what the
```

1    evidence is.

2                      MR. LAMBERT:  Right.

3                      But getting back to the calculation itself,

4    okay, the calculation is how much -- what was their

08:44:58  5    output under SAP as measured in pounds shipped, what was

6    their output during that time period and what workforce

7    level did we have to maintain to generate that output,

8    okay?

9                      Under FACTS, historic numbers, real

08:45:14 10   numbers, not made-up numbers, real numbers, under FACTS

11   for that same level of output, how many people would we

12   have needed to generate that same level of output under

13   FACTS, right?

14                      And the numbers bear out that under FACTS,

08:45:31 15   we could have done that same level of output, shipped

16   that same level of product using 27 less people.  In

17   fact, we had done that historically.

18                      That's the testimony.  That's the

19   calculation.

08:45:46 20                      And so the 27 people, we're not saying that

21   we had to hire Bob and Jim and --

22                      THE COURT:  Wait.  Where's the calculation

23   that says you could have done -- because you did that in

24   2006, right?

08:46:03 25                      MR. LAMBERT:  Yes.

1          THE COURT:  Let's say you shipped a hundred

2     pounds in 2006 and eighty pounds in 2008, you used the

3     same number of people, that's what you're saying the

4     pounds shipped analysis is?

08:46:14   5          MR. LAMBERT:  But it would be -- it would

6     be an improper -- just from a mathematics standpoint and

7     not expert, just basic math, to average -- to say what

8     did we do under FACTS, right?  What did we do under

9     FACTS?  Let me just pick two years.  Right?

08:46:32  10          You want to get a feel, a realistic data

11     set, what did we do under FACTS from 2002 up and through

12     when we went on Business One, right?  You want to get a

13     feel for a reasonable time period.  Right?  The same time

14     period that Dr. Kennedy used, which nobody disputes is a

08:46:51  15     reasonable amount of time to calculate.

16          What did we do for these years?  Let's get

17     a feel for a decent amount of time over these years.

18     What did we do, right?  And that came out to here's what

19     we shipped and here's our workforce that we needed to do

08:47:05  20     that.

21          And then under SAP Business One, what did

22     we need to ship out less?  To ship out less, we needed

23     more.

24          MS. LUARDE:  And, Your Honor, if you look

08:47:17  25     at the numbers, and I apologize for interjecting, but you

1    see the employees, but if you look at this document, you

2    can see that the pounds shipped decreased.  It went from

3    23,312,000 to 21 million to 20 million, and it took the

4    same number of employees.

08:47:38  5              MR. LAMBERT:  And, in fact -- so we were

6    less, the company was less productive because of SAP

7    Business One.  It took -- it took more -- look, if you

8    look, it took more employees, 2004, they shipped 21,000

9    pounds.  2007, under Business One, they stipulated

08:48:01 10    21,000.

11              MS. LUARDE:  21 million.

12              MR. LAMBERT:  21 million in 2004.

13              2007 they shipped 21 million.  2008 they

14    shipped 20 million.

08:48:10 15              Well, in 2004 how many employees did they

16    have?  160.

17              2007 to ship --

18              MS. LUARDE:  The same amount.

19              MR. LAMBERT:  -- pretty much the same.  We

08:48:22 20    had 26 and 24 more employees just to get the product out

21    the door.

22              And the causation of that, Mr. Reidl

23    testified there was nothing else introduced into our

24    business that can account for the difference in those

08:48:36 25    numbers.

1          THE COURT:  How do you account for his

2     testimony that we had the attrition though of 27 people?

3     We don't know when they left during 2008, we don't know

4     who replaced them, we don't know what time during the

08:48:51 5     year, we don't know what their salary was, we don't know

6     where they worked or whether they had anything to do with

7     production.

8          MR. LAMBERT:  That's -- I submit to Your

9     Honor that is a straw man argument that's been concocted

08:49:05 10     by SAP.

11          THE COURT:  Well, it wasn't concocted.

12     That was the testimony.

13          MR. LAMBERT:  Well, the testimony was put

14     in as a way to explain to the jury, we weren't just going

08:49:15 15     to fire 27 people, right?  To explain why we didn't just

16     fire 27 people to get us down to here, right?

17          We had to keep people on --

18          THE COURT:  That's not what he said,

19     though.  He said people left.

08:49:32 20          MR. LAMBERT:  People did leave and he has

21     personal knowledge of people leaving.

22          He works with the company.  He's the CEO.

23          THE COURT:  He can't just say that.  You

24     can't just say people left, and if you do, then you say

08:49:43 25     when did they leave during the year and who did you

2191

1    replace them with.  I didn't hear any testimony about

2    that, other than the bald statement.

3                    MR. LAMBERT:  That's not the basis for the

4    calculation.

08:49:55   5                    THE COURT:  I thought that was the basis

6    for the calculation.

7                    MR. LAMBERT:  The basis for the calculation

8    is we had to use -- the entire -- not just particular

9    employees that come and go --

08:50:06  10                    THE COURT:  Wait.  And I'm not going to

11    belabor this point, but that's why I asked in the

12    beginning, isn't your claim that you needed more people

13    to ship less product?

14                    MR. LAMBERT:  We needed more people

08:50:21  15    company-wide to ship less product; not, we didn't need 27

16    particular people to ship less product.  That's --

17                    THE COURT:  That doesn't make -- but then

18    the point is we don't know, and I'm just going from the

19    testimony.  The testimony was that people left.  The

08:50:38  20    first time we heard that as far as -- and I looked last

21    night at all these papers that have been filed.  I don't

22    see that anywhere in the record that people by

23    attrition -- nobody was laid off or anything, people just

24    left apparently to get another job during the period of

08:50:57  25    2008, and then 27-point-some people left and then they

1    were replaced because they needed that to make up for the

2    slowness of Business One.

3                    MR. LAMBERT:  Mr. Star just acknowledged

4    that Mr. Reidl testified to that fact in deposition.

08:51:15  5           THE COURT:  No.  No.  That's not what he

6    said.  He didn't say that.

7                    So, listen, what I'm going to suggest that

8    you do, because I'm troubled by this, if you want to

9    brief it and both guys give your -- I'm saying the same

08:51:31 10   thing about the difference, what are your different

11   damages in tort damages versus contract damages.  I mean,

12   that seems like a pretty substantial issue as well.

13                   MR. LAMBERT:  Well, if I could address

14   that.

08:51:41 15           I think that argument is actually very

16   simple because on this tort, contract, duty outside of

17   contract argument that SAP is making, even assuming

18   everything that Mr. Star said is true legally -- which it

19   isn't -- but assuming if he's right, that would only

08:52:07 20   apply to SAP America because SAP AG filed a motion to

21   dismiss Hodell's contract claims against it, argued that

22   it wasn't a party to the license agreement and argued

23   that it wasn't even a third-party beneficiary of the

24   license agreement, and prevailed on that argument.

08:52:30 25           It doesn't get to come into this court now

```
 1        and hide behind the license agreement.  That ship has

 2        sailed.

 3                    THE COURT:  I do not understand that at

 4        all.

 5                    MS. LUARDE:  SAP AG is trying to benefit

 6        from a contract, and that contract is only between SAP

 7        America and Hodell.

 8                    THE COURT:  Who is the Defendant here?

 9                    MS. LUARDE:  SAP AG and SAP America are

10        both Defendants in this case.  Both of them are

11        Defendants in this case.

12                    And so even if, even if everything they say

13        is true, which legally, which it's not, SAP America

14        cannot benefit to a contract when they successfully

15        argued at the motion phase that that should be dismissed

16        because they were not third-party beneficiaries.

17                    MR. LAMBERT:  That's the law of the case.

18                    MS. LUARDE:  That is the law of the case.

19                    THE COURT:  If you want, you can file

20        something and we'll see.

21                    MR. STAR:  Thank you.  Your Honor, if I can

22        point one thing out.  I think we may have briefed these

23        issues.

24                    THE COURT:  Now we've got some testimony.

25                    MR. STAR:  Right.  Okay.  Let me -- may I
```

1   point out one thing?  Your Honor asked about discovery,

2   and I'm just looking back here at a set of

3   interrogatories that we had sent years ago.  We asked, it

4   was our interrogatory number seven to Hodell, identify

08:53:57 5   and describe the methods used to determine your alleged

6   damages sought in your amended complaint and as

7   identified in your initial disclosures.

8              Their answer, the categories and methods of

9   calculating the damages was determined by reference to

08:54:11 10   documents, including financial records and other data in

11   Hodell's possession.  They then never, of course,

12   produced anything to support what we heard from Mr. Reidl

13   yesterday.

14              Such records are being produced herewith

08:54:23 15   and will be forthcoming.  But they weren't.  Then they

16   did this.  "Hodell expects that it will retain an expert

17   to more precisely calculate certain aspects of Hodell's

18   damages."  And they went on to say an expert report and

19   opinion would be provided.

08:54:36 20              And that is what they did, right?  They

21   pursued this entire lost productivity claim through

22   Dr. Kennedy.  To just see the mathematical gymnastics

23   that counsel had to go through here, no disrespect, how

24   would a jury, how would a jury take this information and

08:55:00 25   get to leap to where they get to, to come up with some

1    number?

2              And Mr. Lambert suggests, I don't want to

3    belabor the point too much, that we don't dispute his

4    productivity calculation.  We do.  When we filed a motion

08:55:14  5    concerning Dr. Kennedy, we didn't do a kitchen sink

6    approach.  We attacked what was so obviously

7    fundamentally the problem, which is you can't have a

8    productivity drop based on the amount of goods that you

9    sell without proof that you had a customer at the other

08:55:33  10    end calling you, wanting to call you to demand your

11    product.

12              And fundamentally, that was the initial

13    failure, among others, that Judge Wells saw with

14    Dr. Kennedy's report.  Right?  That this theoretical --

08:55:49  15              THE COURT:  We haven't even touched on that

16    issue.

17              MR. STAR:  Right.  And so the idea of

18    demand is absolutely fundamental, right?  They could say

19    all they want to, just like Dr. Kennedy did, that, oh,

08:56:03  20    his theory was we -- our workforce should have been able

21    to ship more product and the average cost would have been

22    X and we believe it was Y, but it made no sense because

23    they had no evidence that any customers were willing to

24    place additional orders.

08:56:18  25              The same thing happens when you get down to

1    this theoretical claim of additional people.  What

2    they're saying is, oh, our people shipped less.  Well,

3    their people shipped a hundred percent of the orders that

4    they got.  They haven't -- they haven't shown that if

08:56:34  5    they got an extra order, they wouldn't have been able to

6    fulfill it or if they got a hundred extra orders or a

7    thousand extra orders, that they wouldn't be able to

8    fulfill it.

9              It all falls apart because you have to have

08:56:46 10    a customer there willing to buy your stuff.  It's like

11    saying, "Hey, I lost out on the room I wanted to rent,

12    but if there was no one willing to rent your room you

13    didn't lose anything.

14             THE COURT:  I think if you decide to brief

08:56:58 15    something, you should brief that because I haven't heard

16    any evidence that any order went unfilled at all.

17             So --

18             MR. LAMBERT:  Just while we're on the

19    record if I could clear something up regarding

08:57:11 20    Dr. Kennedy.

21             Obviously we had the motion to proffer his

22    testimony to the Court.  Is that going to be denied or

23    how do we --

24             THE COURT:  You have all -- you have his

08:57:20 25    transcript as part of the record.  You have his report.

2197

1    You have the opinion of Judge Wells.  You have -- what

2    else do you want to put on?

3                   MR. LAMBERT:  I would like to put on his

4    direct examination.  That's what we don't have.  And we

08:57:33 5    never had a *Daubert* hearing.  We never had the

6    opportunity to --

7                   THE COURT:  Okay.  You didn't answer my

8    question, though, about the -- is there any evidence in

9    the record that anybody placed an order that couldn't be

08:57:43 10   filled because of the Business One?

11                  MR. LAMBERT:  That's not our claim.  That's

12   not the basis of his -- Your Honor --

13                  THE COURT:  Well, now, that's kind of an

14   interesting point.  That's not your claim that you were

08:57:55 15   not able to fulfill any orders?

16                  MR. LAMBERT:  Our claim is that we had to

17   spend more money in employee costs to fill the orders

18   that we did fill and ship.  That's always been the claim.

19                  We're not claiming that we lost a

08:58:12 20   particular customer, that we couldn't ship a particular

21   order.  And this theory that is very novel --

22                  THE COURT:  Wait.  Wait.  Let me understand

23   you correctly.

24                  Your claim is that it cost you more money

08:58:29 25   under Business One to ship the orders that you received?

```
 1                    MR. LAMBERT:  It cost -- yes.

 2                    MS. LUARDE:  Yes.

 3                    MR. LAMBERT:  So a company can make money,

 4      right?  A company can have gross sales or whatever, which

08:58:40  5      really isn't a metric that anybody would rely upon.  A

 6      company could have record gross sales, right, but if, but

 7      if your expenses are sky rocketing and it's costing you

 8      more money and whatever, then you've lost that money

 9      regardless of what your gross sales are, you've lost that

08:58:57 10      money.  It's gone.

11                    MS. LUARDE:  And, Your Honor --

12                    MR. LAMBERT:  Right?  Isn't that just a

13      basic economic principle that if you lost --

14                    THE COURT:  Okay.  I think you now have

08:59:07 15      flushed a few things out, so if you want to brief that.

16                    MR. STAR:  Just answer the last question

17      you asked, which is is there evidence in the record of

18      them being able to fulfill customer orders?  To the

19      contrary, Mr. Reidl, Kevin Reidl in his deposition years

08:59:21 20      ago admitted that they were able to fill 100 percent of

21      the --

22                    THE COURT:  They just said that's not part

23      of their claim.

24                    MR. STAR:  They want to ignore demand.

08:59:30 25                    MR. LAMBERT:  Lost sales has never been a
```

```
          1    part of the claim.  They have known it.
          2                    THE COURT:  Okay.  Okay.
          3                    MR. LAMBERT:  It's lost efficiency, and it
          4    doesn't matter --
08:59:37  5                    THE COURT:  Okay.
          6                    MR. LAMBERT:  And, Your Honor --
          7                    THE COURT:  We're ready.
          8                    (Proceedings resumed in presence of the
          9    jury as follows:)
09:01:33 10                    THE COURT:  Good morning, ladies and
         11    gentlemen.  Sorry for the little delay.  That was me.
         12                    Are you missing somebody?
         13                    THE JURORS:  Yes.
         14                    THE COURT:  You can move down one, I guess.
09:02:56 15    All right.  Juror Number 7, we knew this might be coming.
         16    She had an exam at school and they said she couldn't miss
         17    it.
         18                    She was balancing as best as she could as
         19    you know with school and trying to do everything and
09:03:25 20    wanted in the worst way to stay, but they finally told
         21    her she would be tossed out if she wasn't there today.
         22    So she's gone.
         23                    MR. KELLEHER:  Your Honor, SAP would like
         24    to call Ralf Mehnert-Meland.
09:03:40 25                    THE COURT:  Okay.
```

             1              Good news and bad news for you.  The good

             2      news is we have to break at 11:30.  The bad news is you

             3      have to come back at 1:15.

             4              THE JURORS:  We can do that.

09:03:55     5              THE COURT:  You can do that.  As long as it

             6      doesn't rain, you can walk outside or do something for a

             7      bit.

             8              A JUROR:  The rain is coming tonight.

             9              THE COURT:  Say that again.

09:04:05    10              A JUROR:  The rain is coming tonight.  It's

            11      in St. Louis right now.

            12              (Discussion had off the record).

            13                  RALF MEHNERT-MELAND,

            14        of lawful age, a witness called by the Defendants,

            15            being first duly sworn, was examined

            16              and testified as follows:

            17              THE COURT:  Please have a seat.

            18              And if you would, would you tell us your

            19      full name and spell your last name?

09:04:55    20              THE WITNESS:  It's Ralf Mehnert-Meland, and

            21      it's M-E-H-N-E-R-T hyphen M-E-L-A-N-D.

            22              THE COURT:  Thank you very much.

            23              Now, it's with the microphone, try to speak

            24      slowly.  You probably heard that already.

09:05:10    25              THE WITNESS:  Yes.

```
 1                         THE COURT:  We have been going through that
 2            with people.  Everybody has a tendency, either it's
 3            nerves or to try to get information out, both lawyers,
 4            Judge, sometimes jurors, and witnesses, they figure the
09:05:22  5  faster they speak, the better it is.  But it doesn't work
 6            that way because these ladies --
 7                         THE WITNESS:  I skipped the coffee this
 8            morning.
 9                         THE COURT:  Okay.
09:05:30 10                  MR. KELLEHER:  May I proceed, Judge?
11                 DIRECT EXAMINATION OF RALF MEHNERT-MELAND
12            BY MR. KELLEHER:
13            Q.    Good morning.
14            A.    Good morning.
09:05:35 15   Q.    Sir, before we begin, I've got a binder of some
16            documents I'm going to bring up to you.
17            A.    Thank you.
18            Q.    Sir, could you please introduce yourself to the
19            jury?
09:06:02 20   A.    My name is Ralf Mehnert-Meland, and I'm from Fargo,
21            North Dakota.
22            Q.    You said you're from Fargo, North Dakota, sir?
23            A.    Yes.
24            Q.    And are you originally from Fargo, North Dakota?
09:06:15 25   A.    No.  I was born in Germany and I moved to the
```

1    United States about 30 years ago.

2    Q.   And, sir, are you a -- you're a former SAP

3    employee?

4    A.   Yes, I am.

09:06:23 5   Q.   And were you issued a subpoena to come here and

6    testify?

7    A.   No, I was not.

8    Q.   So are you here -- are you here voluntarily?

9    A.   Absolutely.

09:06:33 10  Q.   And did we ask you to come to testify?

11   A.   Yes, you did.

12   Q.   And in connection with that request, did we agree

13   to cover certain of your expenses such as air fare and

14   hotel and things of that nature?

09:06:44 15  A.   Yes, you did.

16   Q.   And, sir, does any of that affect your ability to

17   give full and accurate testimony here today?

18   A.   No, it does not.

19   Q.   And, in fact, that's what you're planning on doing?

09:06:54 20  A.   Yes, sir.  That's what I'm planning.

21   Q.   Thank you.  I'd like to just start a little bit

22   with your background, if you don't mind.

23              Where did you go to school?

24   A.   I went to, when I moved to the United States I went

09:07:08 25  to a small school, a college in Kenosha, Wisconsin and

2203

1     then after that I went to law school in Washington, D.C.

2     Q.    And what did you study in Wisconsin?

3     A.    My majors were business and international

4     marketing.

09:07:21   5     Q.    You said business and marketing?

6     A.    Yes.

7     Q.    What did you do after, after you went to law

8     school?

9     A.    I worked for a law firm for three years.  I was

09:07:31  10     a -- on the corporate side so I would negotiate

11     agreements and learn how to negotiate agreements.

12     Q.    And how long did you do that for?

13     A.    For three years.

14     Q.    And after, after you did that, then what did you

09:07:42  15     do?

16     A.    I joined a company, a software company in Fargo,

17     North Dakota called Great Plains Software.

18                    THE JURORS:  Judge, we can't hear.

19                    THE COURT:  Yes.  Keep the

09:07:55  20     microphone -- you can move it around to the right if you

21     want, too.

22                    MR. MILLER:  There you go.

23                    THE WITNESS:  Is this better?  Sorry, my

24     apologies.

09:08:04  25

BY MR. KELLEHER:

Q.   Very good.  So maybe we'll take a few steps back.

You mentioned that you went to school and that was in Wisconsin?

A.   Yeah, I went to a college, a small college in Wisconsin and my major there was international business and marketing.

And then I went to law school in Washington, D.C.

Q.   And after law school, you practiced law for a few years?

A.   Yep.  I joined a law firm for three years in Minneapolis, and I was on the corporate side so I would learn how to negotiate agreements and write agreements.

Q.   And then after you did that, sir, then what did you do?

A.   I joined a software company in Fargo, North Dakota called Great Plains Software and I stayed there until 2000 -- about 2000, and I did business there as well.

Q.   And while you were with -- you mentioned Great Plains Software, that's a kind of software?

A.   Yep, it is.

Q.   Was that later acquired by anyone?

A.   It was acquired by Microsoft later on.  It actually was a competitor to SAP.

1    Q.    And when you were with Great Plains, your role was

2    a business role?

3    A.    Yeah.  It was mainly business.  I had a small role

4    to be the corporate attorney, but my main role was on the

09:09:12 5    business side.

6    Q.    Sir, are you able to write software code?

7    A.    No.  No, I am not.

8    Q.    Was that ever part of your formal education?

9    A.    No.  No.

09:09:21 10    Q.    Is that something that you did when you were with

11    Great Plains Software?

12    A.    No.

13    Q.    So when you say you were on the business side, what

14    does that mean?

09:09:27 15    A.    My role was to -- to recruit other companies to

16    work with us, basically.

17              Either they were reselling our software or

18    they were building additional products for us, but had

19    nothing to do with the software side itself.

09:09:40 20    Q.    And what did you do after Great Plains, sir?

21    A.    I had a short stint in a small start-up company

22    also in Fargo, North Dakota for about a year and a half

23    called Be At Home, and then I joined SAP.

24    Q.    And around when did you join SAP?

09:09:56 25    A.    It was in late 2002.

1    Q.    And what was your role at SAP when you joined?

2    A.    It was a very similar role that I had at Great

3    Plains from the business side.  My role was to recruit

4    what we called ISV partners, companies that would have

5    products or build products that would work with our

6    products.

7    Q.    So you mentioned that was similar to your role at

8    Great Plains?

9    A.    Yes.

10   Q.    Do you remember your specific business title when

11   you were at SAP?

12   A.    I think it was called director of business

13   development.

14   Q.    So you said director of business development, is

15   that right?

16   A.    That is correct.

17   Q.    So the word "Development" is in that title?

18   A.    Yes, it is.

19   Q.    Does that have -- does that refer to the

20   development of software?

21   A.    No.  It did not.

22   Q.    What does it refer to?

23   A.    It refers to developing business, to growing

24   business and recruiting more partners.  It has nothing to

25   do with software.

```
 1    Q.    Did you ever develop software while you were with

 2    SAP?

 3    A.    Nope.

 4    Q.    Is that something you're able to do?

 5    A.    Not at all.

 6    Q.    So is that outside your expertise?

 7    A.    Nope.

 8    Q.    It is?

 9    A.    It is not my expertise.

10    Q.    It is not your expertise?

11    A.    It is not my expertise.

12    Q.    So, sir, can you just tell the jury what you did at

13    SAP?

14    A.    So my role at SAP, I believe I was one of the first

15    employees in the -- in the Business One group, was to

16    first, on my own and then with a team, to go out and

17    recruit additional companies that would have products, so

18    for example if we knew we needed a product that would

19    work for hospitals, we would go out and recruit partners

20    who had that software that would then integrate and work

21    with our software.

22                  So that was my role.

23    Q.    So you were working on the business side with

24    resellers?

25    A.    Marginally.
```

1            Some of the partners that we recruited were

2       also able to sell our software, but most of them were

3       stand-alone and we really didn't do much on the reselling

4       side.

09:11:47 5   Q.    So let me see if I understand this.

6            There's basically two kinds of resellers.

7       On the one hand, you've got resellers who just sell the

8       licenses and on the other hand, you've got resellers who

9       develop add-on applications, and sometimes there's an

09:12:02 10  overlap in there.  Sometimes some of them do both?

11      A.    You're almost right.

12           You have the resellers who resell, and then

13      the others we don't call resellers.  We call them ISVs or

14      independent software vendors.

09:12:13 15          But you are right, some of them overlap.

16      So I have resellers that only sell.  I have ISVs that

17      build product.  Sometimes I have an overlap.  Some of the

18      resellers have product and some of the ISVs can sell, but

19      they are pretty distinct.

09:12:26 20  Q.    And so you just mentioned those two groups that you

21      just said are pretty distinct.

22           Which of those two groups did you work

23      with?

24      A.    I worked with the ISVs, the ones that didn't sell.

09:12:36 25  Q.    The ones that developed the products?

A.    Developed the products or had a product and

integrated with us, correct.

Q.    And when you were in your role with those companies

that developed add-on applications, were you personally

involved in any of the software coding for that?

A.    No.  No.  Again I have no knowledge.  I mean, I

wouldn't know code if it bit me.  I mean, I can tell you

it looks funny, but other than that, I'm not smart enough

for that.

Q.    Are you familiar with a group within SAP, are you

generally familiar with a group called Install Base

Development?

A.    Yes.

Q.    You know it exists, right?

A.    Yep, I do.

Q.    Is that -- are you part of that group?

A.    No.  No.

Q.    Do the folks that work in the development group, do

they report to you?

A.    No.

Q.    So we heard the name Dirk Boessmann.

            Are you familiar at all with who he is?

A.    Absolutely.  Yeah.  I know who Dirk is.

Q.    And which group within SAP does he work for?

A.    He was on the development group that was located in

```
 1    Germany.

 2    Q.    Software development?

 3    A.    Software development, yes.

 4    Q.    Does Dirk work for you?

 5    A.    No.

 6    Q.    Has he ever worked for you?

 7    A.    No.

 8    Q.    Sir, I'd like to direct your attention to Exhibit

 9    788.  It should be the first one in your binder.

10                  Do you see that, sir?

11    A.    Yes, I do.

12    Q.    I'm looking at the e-mail at the very bottom of the

13    page.

14                  Do you recognize that e-mail?

15    A.    Yes, I do.

16    Q.    And what is that e-mail?

17    A.    That is an e-mail that was sent to me from

18    Mr. Lowery, and he asked me at that point whether I was

19    aware of their In-Flight development effort.

20    Q.    So he mentions the In-Flight development, he asks

21    you whether you are aware of it?

22    A.    That is correct.

23    Q.    And if you look above that, it says -- it's an

24    e-mail from you back to Mr. Lowery, is that correct?

25    A.    No.  I think I'm looking at --
```

2211

1    Q.    Right in the middle.

2    A.    Okay.  I may be looking at different.

3            So right in the middle, right in the

4    middle, I responded back to Dan and I told him in very

5    general terms I was aware that there was something going

6    on and that I thought it was for the fasteners industry.

7    Q.    We're going to wait for it to get up on the screen.

8            Is that what you're talking about right

9    there?

10   A.    Yes.

11   Q.    So what did you mean by this response to

12   Mr. Lowery?

13   A.    That I had heard there was -- that they may be

14   working on a product that would work for the fasteners

15   industry, and again, we were looking for partners who had

16   these specialized products but that's all I had heard.

17   Q.    So you knew it existed and you knew that it was

18   generally for the fastener industry.

19           Did you know anything else about it at this

20   time?

21   A.    I did not.

22   Q.    Did you ever learn anything else about it?

23   A.    Not really.  I mean, we learned more about it after

24   the -- after the discussions on the go-live, but until

25   that time, no.

1    Q.    So this e-mail, just to orient us in time, this
2    e-mail is September of 2005?
3    A.    That is correct.
4    Q.    And you didn't know anything about In-Flight
09:15:36 5    besides the very general things you say here at that
6    time?
7    A.    That is correct.
8    Q.    And you're saying that eventually you did learn
9    something more about it but that wasn't for many, many
09:15:44 10    years later?
11    A.    That is correct.
12    Q.    And I think you mentioned after go-live, is that
13    right?
14    A.    Yeah.
09:15:54 15    Q.    Sir, I'd like to direct your attention to Exhibit
16    294, and just so you know, sir, these are documents that
17    we've -- that I think the jury has seen before so I'm
18    going to try to move somewhat quickly with you through
19    these documents so we don't --
09:16:13 20    A.    You said 294?
21    Q.    Yes, sir.
22    A.    Okay.
23    Q.    I think it might be behind Tab 3.
24    A.    Yep.  I got it.
09:16:19 25    Q.    Are you with me?

2213

1    A.    I got it.

2    Q.    Very good.  Can you turn to the last page of that

3    document?  It's Page Number 4.  Just let me know when

4    you're there.

09:16:32  5    A.    Yep, I got it.

6    Q.    And you see there's an e-mail from Dan there to

7    you?

8    A.    Yes, I do.

9    Q.    Do you recognize that e-mail?

09:16:39 10    A.    I do recognize the e-mail.

11    Q.    And can you tell the jury what it is?

12    A.    That's an e-mail again from Dan to me informing me

13    that I would be receiving a call from Dale on this team

14    to ask direction on a Business One performance issue.

09:16:54 15    Q.    And this is -- what's the date on this e-mail?

16    A.    This is from February 27th, 2006.

17    Q.    So is this before Hodell went live?

18    A.    No.  I think -- I believe they went live in 2007.

19    Q.    So this is --

09:17:10 20    A.    They went live in 2007.  This is about a year

21    earlier.

22    Q.    A year earlier?

23    A.    A year earlier, yes.

24    Q.    Thank you.  So then did you respond to Mr. Lowery?

09:17:20 25    A.    Yes, I did.

1    Q.    And is that what we're looking at at the very top

2    of this page there?

3    A.    Yes.   That is correct.

4    Q.    And what did you say to Mr. Lowery?

09:17:27  5    A.    I responded back to him saying I've copied Eddy,

6    Eddy Neveux, and wanted to know what the issues were.

7    Q.    And who is Eddy Neveux?

8    A.    Eddy Neveux is, he's a solution architect.  And so

9    I had my team of -- I had my team of people involved in

09:17:47 10    recruiting these partners, these ISVs and none of us

11    really had technical knowledge.  What we would need if we

12    were talking to a new partner, we would have a team of

13    solution architects and those were our very smart people

14    who understand the product, who understand the code, who

09:18:02 15    understand how it works, and they would work with my team

16    but mainly with the partner to make the connection

17    between the products.

18              And so whenever I had a technical question,

19    Eddy, Eddy is my fallback guy because I don't know

09:18:17 20    technical stuff.

21              So when somebody comes to me, whether it's

22    a partner or somebody else has a technical question or

23    something looks like a technical question, I am not going

24    to answer because I am clueless.  So I would have Eddy

09:18:29 25    actually help me out.

1    Q.    And is that what you did here, sir?

2    A.    Yes, it is.

3    Q.    That's why you brought Mr. Neveux in?

4    A.    Absolutely.

09:18:34  5    Q.    Because as you said, you're kind of clueless as far

6    as technical things are concerned?

7    A.    Right.

8    Q.    But Eddy is not, right?

9    A.    No.  Eddy is very, very good.

09:18:44 10    Q.    And you said he's a solution architect for SAP?

11    A.    Yeah, at least he was at that point.

12    Q.    And do you have a sense of how many Business One

13    Solution architects there are in the world?

14    A.    I don't know now, but I think at the time when we

09:18:53 15    built the team, by the time I left, we had about seven.

16    Q.    So he's one of seven in the world?

17    A.    Yes.

18    Q.    And that's why you would, when you got technical

19    questions about performance and things like that, is that

09:19:03 20    why you copied Mr. Neveux?

21    A.    Absolutely.

22    Q.    Because he had knowledge, technical knowledge that

23    you didn't have?

24    A.    Correct.

09:19:09 25    Q.    Sir, why don't you flip the page?  If you would

2216

1    actually go to Page 2, the e-mail that starts at the very

2    bottom.

3    A.    At the very bottom?

4    Q.    Um-hmm.  Do you see it?

09:19:30  5    A.    Yep.  I see it.

6    Q.    So do you recognize this e-mail?

7    A.    Yes, I do.

8    Q.    Can you tell me what it is?

9    A.    This is a response from Dale back to me about, let

09:19:41  10    me see the second page here, giving me some additional

11    information.  And this is dated February 27th of 2006,

12    giving me additional information on the issue that he had

13    raised in his initial e-mail.

14    Q.    So let's turn to Page 3 where we can see what he

09:19:57  15    actually wrote to you.

16              In the very first paragraph is where I am.

17    He says, "I called and left you a message for your phone.

18    As I really need to take the issue of performance up with

19    you directly.  We have been working with Eddy and he has

09:20:13  20    been very helpful on many fronts so I do not wish to

21    disturb his involvement or effort.  He continues to

22    really help us out, but we feel we have exhausted the

23    issue of performance with Eddy, the SDN and even other

24    partners and we need your involvement."

09:20:27  25              Do you see that?

1    A.    I do.

2    Q.    The Eddy he's talking about, that's the Eddy Neveux

3    you mentioned?

4    A.    Yes, ifs.

09:20:32 5    Q.    So if you skip down to the next paragraph, he gives

6    you some technical specifications it looks like,

7    particularly the last sentence, he says, "Databases

8    150,000 SKUs, 20,000 customers, 7500 vendors."

9              Do you see that?

09:20:49 10   A.    I do.  Yes, I do.

11   Q.    And then in the next paragraph, he says, "Running

12   base SBO," is that Business One?

13   A.    That is Business One.

14   Q.    "We are seeing 25 seconds before we can scroll or

09:20:58 15   select data."

16              So did you understand that to be the

17   performance issue he was talking about?

18   A.    Yes, I did.

19   Q.    Can you turn to the first page of this exhibit?

09:21:18 20              So this is an e-mail from -- well, first of

21   all, do you recognize this e-mail here?

22   A.    Yes, I do.

23   Q.    This is from Ed Neveux to you, and he copies some

24   other individuals, including Dan Lowery.

09:21:29 25              Do you see that?

1    A.    I do see that.

2    Q.    Can you read for me the first paragraph of Eddy

3    Neveux's response?

4              MR. MILLER:  Joe, sorry.  Could you wait,

09:21:42  5    please?

6              MR. KELLEHER:  Can we take a second?

7    A.    Are we okay?

8    Q.    I think we are.  Just read the first paragraph.

9    A.    "SAP -- Dale, SAP is looking into the issue.  We

09:22:07 10    have had some reports of issues in performance with large

11    data sets in the SAP Business One product.  Development

12    is aware of this issue and we are waiting to hear back on

13    what is to be done to resolve the issue.  The bad news is

14    that we do not have a time frame as to when these issues

09:22:20 15    will be resolved.  I will keep you informed of progress

16    as we are updated from SAP development."

17    Q.    What was the date of this e-mail, sir?

18    A.    It looks like the 3rd of March.  March the 3rd,

19    2006.

09:22:38 20    Q.    Right.  That's the -- at the very top, there's an

21    e-mail that somebody forwarded on, but the e-mail that

22    I'm looking at --

23    A.    I'm sorry.  It's the 1st, March the 1st of 2006.

24    Q.    March the 1st?

09:22:48 25    A.    March the 1st of 2006, yes.

1    Q.    Okay.  And again, is that over a full year before

2    Hodell went live on the system?

3    A.    Yes.

4    Q.    Sir, when you read -- you did read this e-mail at

09:22:57  5    the time you received it?

6    A.    I did.

7    Q.    And when you read that paragraph that you just read

8    to the jury, what was your understanding of what was

9    being said?

09:23:05 10    A.    Well, basically exactly what it said, that I mean

11    Eddy was telling us and I didn't know at that point that

12    we had some reports of issues in performance with large

13    data sets.

14              And that development was aware of the issue

09:23:17 15    and we didn't have a timeline.

16    Q.    So he says there were some reports?

17    A.    Yes.

18    Q.    And what was the bad news that he was -- he uses

19    the word bad news, right?

09:23:28 20    A.    Let's see here.  The bad news is that we do not

21    have a time frame, that's correct, when these issues will

22    be resolved.

23    Q.    What did you understand him to be saying to you and

24    others?

09:23:36 25    A.    Literally what it said, there was no time frame.

1    There was reports of some issues.  Again, first time I

2    had heard about it.  And the bad news was development had

3    not given us a timeline so.

4    Q.    Is Mr. Neveux telling them that Business One would

09:23:51 5    definitely not work?

6    A.    No.  Not at all.

7          It just said we had some reports of large

8    data sets, and, you know, at this point we didn't realize

9    or we didn't know what was a large data set but he

09:24:04 10   informed them that, you know, we had had some reports of

11   large data set issues so, you know, development knew

12   about the issue, didn't have a time frame to fix it, and

13   that was the warning.

14   Q.    So it might work, it might not work?

09:24:17 15   A.    Might work.  Might not work.

16   Q.    And the Dale that you wrote this to, that's Dale

17   Van Leeuwen?

18   A.    Yep.

19   Q.    From IBIS?

09:24:23 20   A.    Yes.

21   Q.    Sir, I'd like to direct your attention to Exhibit

22   785.  Just let me know when you're there.  I think it's

23   behind Tab 4.

24   A.    785.

09:24:48 25   Q.    Should be towards the front.  Should be, like, the

1    next e-mail, I think.

2    A.    Did you say 75 or --

3    Q.    Sir, in the bottom corner it's going to say 4034.

4    Do you see that?  SAP 0004034.

09:25:19  5    A.    I do not.

6                   MR. KELLEHER:  Your Honor, may I approach

7    and get us on the same page?

8                   THE COURT:  Yeah.

9                   THE WITNESS:  785.  Okay.  Sorry.

09:25:43  10    BY MR. KELLEHER:

11    Q.    All right, sir.  Are you looking at Exhibit 785?

12    A.    Yes, I am.

13    Q.    Okay.  Do you recognize this document?

14    A.    Yes, I do.

09:25:54  15    Q.    Can you turn to the second page, please?

16    A.    Yep.

17    Q.    I'd like to direct your attention to the e-mail at

18    the top.

19                   Do you see that e-mail from you to a bunch

09:26:08  20    of people there?  Do you see that?

21    A.    Yes, I do.

22    Q.    Do you recognize that document?

23    A.    I do recognize the document.

24    Q.    Can you tell the jury what it is?

09:26:15  25    A.    So this is an e-mail that I sent to Joe at IBIS and

1    copied Eddy Neveux on it as well and some other people,

2    Dale, for example.

3    Q.    When you say Joe at IBIS, do you know his last

4    name?

09:26:27  5    A.    I do know and I don't want to slaughter it.  We

6    called him Joe G.

7    Q.    Joe G?

8    A.    Yeah.

9    Q.    Would that be Joe Guagenti?

09:26:37  10    A.    It would be.

11    Q.    And you also copied Dale Van Leeuwen?

12    A.    I did.

13    Q.    And you say "Joe, Eddy and I will participate."

14            First of all, who is the Eddy you're

09:26:50  15    talking about?

16    A.    Again, it's Eddy Neveux.

17    Q.    And you will participate in what?

18    A.    In the phone call.  There was a request to have a

19    phone call to discuss the issue of performance that they

09:26:59  20    had raised earlier.

21    Q.    The same issue that we were just talking about in

22    the other e-mail we looked at?

23    A.    Yes, the same issue.

24    Q.    And when you say "they" requested the call, are you

09:27:09  25    talking about IBIS/LSi?

1    A.    That is correct.

2    Q.    And is there a reason why you were bringing Eddy on

3    to participate?

4    A.    Yes, because Eddy is my technical guy.  When we

09:27:19 5    talk about anything on the product, I cannot talk to it,

6    so I need Eddy in there or somebody like Eddy but Eddy

7    was my go-to guy to actually help me out and answer

8    correctly.

9    Q.    Thank you, sir.

09:27:30 10          You continue to say "Are you aware of the

11    previous e-mail exchanges between SAP and LSi on this

12    issue?"

13          Do you see that sentence?

14    A.    Yes, I do.

09:27:38 15    Q.    Do you remember writing that?

16    A.    I do remember writing that.

17    Q.    What were you talking about, the previous e-mail

18    exchanges?

19    A.    It goes back to the -- excuse me.  It goes back to

09:27:47 20    the e-mail exchange we had about two weeks earlier at the

21    beginning of March talking about the fact that we had had

22    some reports on the issues with large data sets.

23    Q.    The e-mails we just talked about?

24    A.    Yes.

09:27:59 25    Q.    Sir, can you turn to the next page?  I'm looking at

1    Mr. Neveux's response to you.  It's at the bottom.  Do

2    you see that?

3    A.    I think the system is not there yet.

4    Q.    Bob, it's the first page.  There you go.  At the

09:28:19 5    bottom, there's an e-mail.

6    A.    Yep.  It's an e-mail in response to my e-mail just

7    from Eddy, Eddy to me asking me what the plan is.

8    Q.    So he says to you "What's the plan here?  I am

9    happy to speak with them, but based on the configuration

09:28:35 10    they have, in other words, the volume of data."

11          Let me stop right there.  When he says the

12    "volume of data," is he referring to the SKUs and the

13    database size?

14    A.    Yeah.  He's referring to the size of the database.

09:28:47 15    Q.    He says, "This has nothing to do with the SDK, and

16    I do not have an answer or a solution that's magically

17    going to correct the problem for them, or correct the

18    problem.  I just want to get some understanding before we

19    get on the phone and get yelled at for something there is

09:29:00 20    no resolution for."

21          Do you see that?

22    A.    Yes, I do.

23    Q.    And did you understand him to be referring to the

24    e-mail that he had sent IBIS/LSi roughly two weeks

09:29:09 25    before?

1    A.    Yes, I did.

2    Q.    So then if we look just very briefly at the e-mail

3    that you responded back to him, just the next one up,

4    Bob.

09:29:27  5    A.    Yep.

6    Q.    So you say "I want to know what the volume is they

7    are working on.  Then we tell them what we need to.  I

8    will do that.  I need you to be there to give me

9    technical backing."

09:29:37  10                 Do you see that?

11    A.    I do.

12    Q.    So again, what were you saying to Mr. Neveux here?

13    A.    Number one, I want to know more information on what

14    they're actually working on just to get some more

09:29:46  15    information because I didn't think we had enough, and

16    basically I was going to be the spokesperson delivering

17    the same message.

18    Q.    And you needed him there for -- to support that?

19    A.    Absolutely.

09:29:56  20    Q.    From a technical basis?

21    A.    Absolutely.

22    Q.    Okay.  And then at the very top, he writes in the

23    e-mail, he being Mr. Neveux, Eddy, to you, same day, he

24    says, "They gave us what the volume of data they are

09:30:11  25    using is," and he lists it in the next sentence.

2226

```
 1              Then he goes on to say, "This is from Dale
 2   as of a week and a half ago."
 3              So he's talking about the February 27th
 4   e-mail we just looked at?
 5   A.    Yep.
 6   Q.    "Based on the numbers that we received from the
 7   September, 2005 testing from Israel, the, quote, unquote,
 8   high end database testing was with 60,000 items and
 9   16,000 business partners.  As you can see, they're using
10   150,000 items and 27,500 business partners."
11              Do you see that?
12   A.    I do.
13   Q.    And was this -- when he says "The high end," do you
14   have an understanding of what he means?
15   A.    Yeah, he was saying we had tested different
16   configurations and that was the highest we had tested.
17   Q.    Does that mean, sir, that the numbers they're
18   talking about here is a hard ceiling on what Business One
19   can do?
20   A.    No.  It just -- that's just as far as we had gone
21   with the testing.
22              Maybe if we had gone farther, we would have
23   had a different test result, but we just decided to end
24   it there.
25              And so it doesn't mean it wouldn't have
```

1      worked.  I mean, it's like, you know, if you have a car,

2      you go 20 miles an hour and it works, you go 40 miles an

3      hour and it works, and you go 60 miles an hour and it

4      works, well, if you stop there, you can never figure out

09:31:30  5    whether it can go 80 or 90 or a hundred miles an hour.

6                      So we did -- we for some reason tested it,

7      and this was the high end of the testing we had done.  We

8      had never gone beyond that for some reason.

9      Q.     So you're saying if you test the car at 60 miles an

09:31:46 10   hour, then you know it can go 60, and if you don't test

11     it at 80, it doesn't mean the car can't do 80, it just

12     means you haven't actually done a test for that?

13     A.     Exactly.

14     Q.     And is that your understanding of what Mr. Neveux

09:31:54 15   was talking about when he said the high end testing?

16     A.     Yep.  I mean, that's exactly what he said, the high

17     end database testing meaning that's as far as we had gone

18     on the database testing.

19     Q.     Okay, sir.  We have been talking about a phone call

09:32:08 20   that's in this e-mail chain, that you were trying to set

21     up a phone call.

22                      Do you remember that?

23     A.     Yes.

24     Q.     And you had brought on Eddy to help you with that

09:32:14 25   phone call?

```
 1    A.    Correct.

 2    Q.    Did that phone call ever take place?

 3    A.    Yes.  Yes, it did.

 4    Q.    Do you remember the date of that phone call?

 5    A.    No, I don't.

 6    Q.    You wrote this e-mail on March the 13th?

 7    A.    Yeah, we gave him a number of days.  I think it was

 8    the 2nd, was the 2nd of May, the second day that we had.

 9    Q.    Sir, take a look at this e-mail, and if you would

10    look at the second page, this is where we were before,

11    your e-mail at the top just to refresh your recollection.

12    A.    Sorry.  Because we had told him March 15th would

13    work for us, yes.

14    Q.    So did you actually have the call on March 15th?

15    A.    Yes, we did.

16    Q.    Did you say yes?

17    A.    Yes.

18    Q.    And, sir, what did -- who was on the call?

19    A.    It would have been Eddy and myself from our side

20    and I don't recall who was on from the other, from IBIS's

21    side, but it would have been Eddy and myself from our

22    end.

23    Q.    So Eddy and you from SAP and on the other end,

24    there were people from IBIS/LSi?

25    A.    Yes.
```

1    Q.    So in this e-mail you mentioned Joe G, the guy

2    whose name you couldn't pronounce, might he have been on

3    the call?

4    A.    Yes, he might have been on the call.

09:33:19  5    Q.    And Dale Van Leeuwen?

6    A.    Dale, maybe even Dan Lowery at that point because

7    it was again an issue, the e-mail exchange was

8    between -- among us and from SAP side would have been

9    just Eddy and myself.

09:33:29 10    Q.    And Eddy and yourself and it was definitely people

11    from IBIS/LSi?

12    A.    Yes.

13    Q.    On the other end?

14    A.    Yes.

09:33:34 15    Q.    Okay.  And, sir, can you just tell the jury what

16    was discussed on that phone call?

17    A.    Again we basically reiterated what we had put in

18    the e-mail to them saying, hey, there have been some

19    reports on performance issue with large data sets, and

09:33:49 20    then we went into potential ways of resolving it and

21    setting up a system so that, you know, that the system

22    would work.

23    Q.    And did you tell them that they needed to do

24    anything in particular?

09:34:02 25    A.    Yeah, we talked about some technical items to do.

2230

1    Eddy talked about things like filtering and hardware

2    changes and we insisted on it, it needed to be tested

3    because we had never tested it to that -- the databases

4    to that, to that -- to that size.

09:34:16  5    Q.    So when you said we insisted that it needed to be

6    tested, were you referring to specific tests of the

7    specific software system with all of the add-ons

8    specifically on Hodell's specific hardware, is that what

9    you're talking about?

09:34:31 10    A.    Yes.  Yes.  And we talked -- we even gave them

11    instructions on and I think there's some other e-mails as

12    well, on what to do on the hardware side to actually

13    improve performance, put bigger, basically put bigger

14    computers in and do certain things on the filtering side

09:34:46 15    and other things that we definitely delivered that

16    message.

17    Q.    Was that recommendation about testing, was that

18    important to you?

19    A.    Yes.  It always is important.

09:34:55 20          I mean, that's -- if you have a software

21    like ours that runs businesses, you cannot just put it

22    in, you know, and say, okay, now run with it.  I mean

23    you're running business processes and you want to make

24    sure that before you go live, what we call go-live, which

09:35:11 25    is actually using the software, that you make sure it

2231

1    works.

2              And it has to work in the client's

3    environment.  It has to work on their machines.  It has

4    to work in their environment.  And it also has to be I've

09:35:25  5    heard the word pressure-tested, meaning you actually have

6    to do transactions before you go live because if you

7    don't do that and the system is not right for you, your

8    work is not -- your business is not going to work.

9              So absolutely, testing is a crucial part of

09:35:41  10    any installation.

11    Q.    And on this March 15th, 2006 phone call with

12    IBIS/LSi, are those the sorts of things that you and

13    Mr. Neveux told them?

14    A.    Yes.

09:35:51  15    Q.    Sir, I'd like to direct your attention to Exhibit

16    889.

17              It should be the next -- the next tab.  And

18    it, just so we're clear, at the very bottom, it will say

19    SAP 0004029.

09:36:04  20    A.    I got it.

21    Q.    You're there?

22    A.    Yes.

23    Q.    And I'm going to spin us all the way to the last

24    page of the document.  That would be Page Number 5.

09:36:26  25    A.    Yes.

1    Q.    Sir, do you recognize this document?

2    A.    I do recognize the document.

3    Q.    This is an e-mail from Mr. Van Leeuwen to Ed Neveux

4    and he copies some other people?

09:36:37   5    A.    That's correct.

6    Q.    And just so we're clear about it, if you can flip

7    to the first page.  Bob, you don't have to go there.

8    Just go to the first page of the document, sir.

9              The e-mail at the very top, it's to

09:36:53  10    Mr. Neveux and Ralf Mehnert-Meland, do you see that?

11    A.    Yes, I do.

12    Q.    And so when you received that e-mail, you would

13    have received all the e-mails that were -- occurred prior

14    to it in this chain?

09:37:02  15    A.    Yes, I would have.

16    Q.    And you would have read those at the time?

17    A.    Yes, I would have read them.

18    Q.    And did you, in fact, read them at the time?

19    A.    Yes, I did.

09:37:07  20    Q.    Okay, great.  So let's flip back to the last

21    earlier e-mail we were talking about on Page 5.

22              Are you there?

23    A.    Yeah, I'm here.

24    Q.    So this is an e-mail from Mr. Van Leeuwen to Ed

09:37:25  25    Neveux March 29th, 2006.

1           Do you see that?

2    A.    I do.

3    Q.    So is this roughly two weeks after that phone call

4    that you and Mr. Neveux had with IBIS/LSi when you told

09:37:35 5    them that they needed to test?

6    A.    Yes.  That is correct.

7    Q.    And what is Mr. Van Leeuwen saying here?

8    A.    He reached out to Eddy, telling he left a voicemail

9    as well, but he was talking about setting up the test

09:37:51 10    cell environment, the testing environment, and then they

11    talk about being -- wanting to be as efficient as

12    possible, and asked for recommendation on the SQL, SQL

13    shorter version, which is a Microsoft product.

14    Q.    So he mentions the word test cell environment, he

09:38:08 15    says, "We are going to be setting up our test cell

16    environment."

17           Do you see that?

18    A.    I do.

19    Q.    What was your understanding, if any, about what he

09:38:15 20    was talking about when you read this document?

21    A.    That they were going to do what we told them or,

22    you know, told them to do, which is set up a testing

23    environment for the customer.

24    Q.    Test the whole thing with In-Flight and everything

09:38:26 25    else?

```
 1   A.    Yes.

 2   Q.    On Hodell's actual machines?

 3   A.    Yes.

 4   Q.    To make sure that it worked?

 5   A.    Yes.

 6   Q.    Can we go to the first page of this document?  This

 7   would be a later e-mail, up at the very top.

 8   A.    Yep.

 9   Q.    So this is to -- do you recognize this document?

10   A.    I do.

11   Q.    This is an e-mail to Eddy Neveux and yourself from

12   Dale Van Leeuwen, right?

13   A.    That's correct.

14   Q.    This is on March the 30th, 2006?

15   A.    Yep.

16   Q.    This is one day after the e-mail that we just

17   looked at where Mr. Van Leeuwen told you he was setting

18   up the test cell environment?

19   A.    That is correct.

20   Q.    Can you read what Mr. Van Leeuwen wrote to you and

21   Eddy?

22   A.    "Eddy and Ralf, thank you both for your help and

23   guidance in this matter.  We will proceed with the

24   information presented and let you know how the install

25   and testing results come out.  Thank you, again, Dale."
```

1   Q.    And so, pardon me, what did you understand

2   Mr. Van Leeuwen to be telling you when you read this

3   e-mail back in 2006?

4   A.    That they were going to set up the testing

5   environment, do the testing as we had instructed them to

6   do, and then they would let us know how it went.

7   Q.    Did they ever get back to you and let you know how

8   it went?

9   A.    They did not.

10   Q.    And what did you understand from that silence?

11   A.    Good news is bad news -- no.  No news is good news,

12   I'm sorry.

13   Q.    Up is down, right?

14   A.    My apologies.

15   Q.    So you said --

16   A.    No news, no news is good news.  That's what we

17   understood.

18   Q.    And that was your understanding of what had

19   happened with the testing based on what you had been

20   told?

21   A.    Yes.

22   Q.    I think somebody's phone is by the microphone.

23   Thank you.

24         Sir, I'd like to shift gears a little bit.

25   You mentioned that you -- well, let me ask you this:  Did

1    you hear from them after the end of March, 2006?  When is

2    the next time you remember hearing from them?

3    A.    The next time I remember hearing from them was

4    in -- was in April of 2007 when we got an e-mail or when

09:40:45 5    I got an e-mail saying the sky is falling, we have an

6    issue with the customer.

7    Q.    And you said you got an e-mail that said the sky

8    was falling.

9            Is that your paraphrasing?

09:40:54 10    A.    That's my paraphrasing, yes.

11    Q.    And from whom -- who wrote that e-mail that you're

12    talking about?

13    A.    I believe it was Dan Lowery who sent me the e-mail.

14    Q.    And he sent it to a lot of people at SAP?

09:41:07 15    A.    I don't know who was on the distribution list.

16            I would have to -- I would have to look it

17    up, but he definitely reached out to myself.  He may have

18    even had copied Eddy on it at that point.

19    Q.    Okay.  And we may get to that or we may not, but

09:41:23 20    you just said that he said the sky was falling.

21            What do you mean by that?

22    A.    Well, there was an e-mail.  I'm not sure it was

23    copied, but it was talked about, there was a customer and

24    we got the name Hodell-Natco at that point who had issue

09:41:41 25    with an implementation, was losing hundreds of thousands

 1    of dollars, and Dale -- I'm sorry -- Dan was worried

 2    about losing his company.

 3                And then he sent me an e-mail saying that

 4    there's a customer issue, it has to do with Business One

 5    and performance.

 6    Q.    Thank you, sir.  Can you take a look at what we've

 7    marked as Exhibit 246?

 8    A.    I have it.

 9    Q.    Do you recognize this document?

10    A.    I do.

11    Q.    Sir, I'd like to take you to the last page, and

12    we'll just work from the back to the front so we can

13    figure out the context here.

14                I'm on the last page of the e-mail, at the

15    very bottom, it looks like it's to you from Jon Woodrum?

16    A.    That is correct.

17    Q.    And it says the date of this is April 16th, 2007,

18    is that correct?

19    A.    That is correct.

20    Q.    So Mr. Woodrum says, "Re:"  That means regarding?

21    A.    Yes.

22    Q.    "Regarding from Udi Ziv, having said that we

23    believe we have identified the issue that may be causing

24    the specific problem but there is no real way to verify

25    this until we use it in the customer's environment" and

1    goes on and on.

2                 Did you read that e-mail at the time?

3    A.    Yes, I did.

4    Q.    And is that one of the e-mails that you're talking

09:43:04 5    about between and among Mr. Lowery and others at SAP?

6    A.    Yes.

7    Q.    So let's flip to the second page in the middle.

8                 This is an e-mail from -- it says "Von."

9    Do you see that, "Von"?

09:43:25 10                 MR. MILLER:  One second.

11                 MR. KELLEHER:  Okay.

12                 MR. MILLER:  The second page or the second

13    e-mail from Von?

14                 MR. KELLEHER:  I'd like the second page.

09:43:42 15    Very good.  This is it.

16    BY MR. KELLEHER:

17    Q.    Sir, do you see on the screen?

18    A.    Yes, I do.

19    Q.    And so it says Von Dan Lowery, do you see that?

09:43:51 20    A.    Yes.

21    Q.    Do you know what that means?

22    A.    Yes, it means from.

23    Q.    Is "Von" German?

24    A.    Yes.

09:43:58 25    Q.    So that's right in your wheelhouse?

```
 1    A.    Yep.  Yep.  Right there.

 2    Q.    "On," what does "on" mean?

 3    A.    To.

 4    Q.    And to Udi Ziv?

 5    A.    Yep.

 6    Q.    And the date of this is again April 16th, 2007?

 7    A.    That's correct.

 8    Q.    So Dan says, "Thank you for this information.  This

 9    helps.  Udi, I need someone at SAP to make a call to

10    Hodell with me Tuesday, April 17th.  The message being,"

11    and then you list two items.

12              Do you see that?

13    A.    I do.

14    Q.    And for the second item he says, "What have we

15    found out about Hodell and Business One, namely, the

16    transaction volumes of Hodell are pushing the upper

17    limits of Business One, which were not thought to be a

18    problem when Hodell purchased Business One.  However,

19    SAP is working to fix them and will keep working until

20    Hodell is satisfied."

21              Do you see that?

22    A.    I do.

23    Q.    And did you read that e-mail at the time you

24    received these e-mails?

25    A.    Yes.
```

2240

```
 1        Q.    Okay.  So let's flip to the first page.
 2              The e-mail at the bottom -- I'm going to
 3        wait until the screen gets there.  That's it, Bob.
 4        A.    Yes.
 5        Q.    Do you see it, sir?  It's from you to Mr. Sotnick
 6        and Mr. Kraus.  Do you see that?
 7        A.    I do.
 8        Q.    And you copy a bunch of other people at SAP?
 9        A.    Yep.
10        Q.    What's the date on this e-mail, sir?
11        A.    This is April 16th as well.
12        Q.    And you say, "Michael and Dan, here's an update.
13        Geoff, Paul, Eddy, Manfred, please correct and add as
14        needed."
15              Do you see that?
16        A.    I do.
17        Q.    And you list, it looks like, three points and
18        there's some words after that?
19        A.    Yep.
20        Q.    Let's just sort of walk through what you said here.
21              Number one, you say "There are basically
22        two issues relating to the performance with SAP Business
23        One.  Number one, performance degrades with SSP add-on
24        products accessing SAP Business One and, two, performance
25        degrades with large data sets."
```

09:44:57  5
09:45:08 10
09:45:23 15
09:45:28 20
09:45:48 25

1              Do you see that?

2    A.    I do.

3    Q.    What were you talking about here, sir?

4    A.    I was talking about the issue that we had uncovered

09:45:56 5   the year earlier about potential issues -- those reports

6    or some reports of issues with large data sets, and

7    that's what I was referring to.

8    Q.    So when you look right here at point number one,

9    talking about some issues with large data sets, is this

09:46:09 10  the same issue that you talked about with IBIS/LSi over a

11   year before?

12   A.    Yes, it is.

13   Q.    Let's look at point number two.

14              You say, "Hodell has both issues.  They

09:46:21 15  experienced performance issues when Lowery tested the

16   data set against the Hodell data on SAP's Business One

17   standalone a year ago.  With the addition of the Lowery

18   add-on and the now even increased data, performance is

19   seriously degraded."

09:46:35 20              Do you see that?

21   A.    Yes.  Yes.

22   Q.    Sir, what was the basis of your statements there?

23   A.    The basis of my statement was the information I had

24   gotten from IBIS, from IBIS at that point right

09:46:49 25  beforehand saying there's an issue.

1    Q.    So did you do any independent investigation to
2    evaluate whether the things that you wrote there at point
3    number two were correct?
4    A.    I did not.  I didn't have the time to do it.
09:47:04  5                   I went purely by what I had heard
6    from -- from the reseller.
7    Q.    And when you say the reseller, you mean from
8    IBIS/LSi?
9    A.    From IBIS.  From IBIS/LSi, my apologies.
09:47:15 10   Q.    Sir, when you were saying performance is seriously
11   degraded, you didn't actually know that to be true
12   yourself?
13   A.    That is correct.
14   Q.    You were just taking what the partner said?
09:47:24 15   A.    I did.
16   Q.    You had no reason to disbelieve him, right?
17   A.    No, not at all.
18   Q.    Let's look at point number three.
19                   You say, "The upcoming April fix may
09:47:36 20  resolve the add-on performance issue.  We're getting more
21   details on that.  Eddy has been in communication with
22   Dirk Boessmann on Udi's team."
23                   There's that Dirk Boessmann name again?
24                   Did he work for you?
09:47:47 25   A.    No.

```
 1    Q.    He worked for somebody else, right?

 2    A.    Yeah.  He was over in Germany.

 3    Q.    He was in development?

 4    A.    Yep.

 5    Q.    And you're not in development?

 6    A.    No.

 7    Q.    So he says, he continues, "It likely does not

 8    resolve the data set issue.  Resolving the data set issue

 9    is not an easy fix so even if development started today,

10    we are likely talking about -- we are likely talking

11    months.  This is an issue that has been known for years."

12              Do you see that?

13    A.    I do.

14    Q.    What did you mean when you wrote that, sir?

15    A.    Well, again, I took the information in this case I

16    had from the SAP team that a fix was -- that the fix may

17    resolve the issue.  We weren't quite sure whether it

18    would or not.  More detail was going to come.  But it may

19    not even resolve the data set issue and that was an issue

20    that had been known because again we had had, in the

21    past, had had some reports of issues with large data

22    sets.

23    Q.    So the issues that you're talking about at

24    Paragraph Number three, specifically that sentence that

25    says, "This is an issue that has been known," is that the
```

1     issue that you told IBIS and LSi about over a year ago in

2     March of 2006?

3     A.    Yeah.  That's where we warned them.  That's where

4     we warned them about the potential for an issue.

09:49:02 5    Q.    So flip to the second page because your e-mail

6     bleeds over onto the next page.

7               You see there it says "Summary:  Hodell

8     just has too much data.  SAP Business One cannot handle

9     it and there is no fix in sight.  I believe we need to

09:49:21 10   find a way to get the customer off SAP Business One."

11              Do you see that?

12    A.    I do.

13    Q.    Sir, first of all, is this the same issue that you

14    had been talking to IBIS/LSi about back in 2006?

09:49:35 15   A.    Yes.

16    Q.    And specifically, let's look at specifically what

17    you said.

18              You said Hodell just has too much data.

19    You wrote that, right?

09:49:46 20   A.    I did.

21    Q.    Sir, are you -- do you believe you're qualified to

22    make an assessment like that?

23    A.    Probably not.  I based my -- I based my response on

24    what I had heard from -- from LSi that there was too much

09:50:02 25   data.

2245

1    Q.    And you say, "SAP cannot handle it and there is no

2    fix in sight."

3                    Again, are you qualified to make that

4    statement?

09:50:11  5    A.    No.  I mean, at that point, what I did is, this was

6    basically the first time that I had ever been in a

7    situation where I had a customer that I was told had

8    issues, and that is a big deal.

9                    And when you have a situation like this,

09:50:38 10    there was no time, there were no months to think about

11    what the fix needed to be.  We needed to act, in my

12    opinion, we needed to act.

13                    I took the information I had, put it in the

14    words that I thought were correct, and I said, "Hey, we

09:50:53 15    need to get on this."

16                    And that's what we did.  I mean,

17    that's -- it's going to sound corny but that's what SAP

18    does.  If there is an issue, you step up and you do what

19    you can to fix it, and this was my way to say, guys,

09:51:09 20    here's a big issue.

21                    You know, there's too much data, we can't

22    handle it, we may even have to think about moving the

23    customer off of the product, because the number one thing

24    at this point was that we -- we realized for the first

09:51:21 25    time that we have a customer who had an issue, and that

1    is a very, very big deal for SAP.

2              It was then and it is now.  I mean,

3    that's -- and for me personally, I remember writing this.

4    It was -- I'm not going to swear in court, but it was,

09:51:36 5    man, we need to do something right now, and that was my

6    way to express that.

7    Q.    Says there in the next paragraph, you say, "As we

8    said before, and can prove by e-mails, Lowery knew about

9    this a year ago but that's a different discussion.

09:51:52 10   Customer issue needs to be addressed first."

11             Do you see that?

12   A.    I do.

13   Q.    And is that basically what you're just talking

14   about right now?

09:51:58 15   A.    Yes.

16   Q.    So your purpose in writing this e-mail was to

17   galvanize SAP?

18   A.    Yeah, we need -- we need to resolve the issue.

19             At that point in my mind, it didn't make a

09:52:08 20   difference how and why it happened and who was

21   responsible.  That was not important.

22             The important thing was there was an issue

23   and it needed to be fixed, and we would deal with the,

24   you know, again that paragraph that I wrote saying we

09:52:20 25   told Lowery about the issue, we'll deal with that later.

1    Customer needs to be taken care of first.

2                    That was exactly what I tried to say.

3    Q.    Thank you, sir.  I'd like to direct your

4    attention -- well, actually before we do, you had

09:52:35 5   mentioned a few moments ago -- strike that.

6                    Can you go to Exhibit 151?  This one is

7    further in the binder.

8    A.    Yeah.

9    Q.    Do you see it?

09:52:55 10  A.    Yes, I do.

11   Q.    Do you recognize this e-mail?

12   A.    I do.

13   Q.    It's an e-mail from Geoff Ashley to a bunch of

14   people, Dirk Boessmann and yourself, Ralf Mehnert-Meland.

09:53:11 15  Do you see that?

16   A.    Yes, I do.

17   Q.    And he also copies Eddy Neveux?

18   A.    Yep.

19   Q.    What's the subject of the e-mail?

09:53:16 20  A.    This was the summary of the call we had, excuse me,

21   on the 17th.  We referred to this as "the stunned

22   silence" call.

23   Q.    So, sir, is this one day after the e-mail that we

24   just discussed?

09:53:31 25  A.    Yes, it is.

```
 1    Q.    And was there a -- did a phone call happen on this

 2    day?

 3    A.    On the 17th, yes.

 4    Q.    And were you on that phone call?

 5    A.    Yes, I was.

 6    Q.    And was -- were representatives from IBIS/LSi on

 7    that phone call?

 8    A.    Yes.

 9    Q.    Were representatives from Hodell on that phone

10    call?

11    A.    Absolutely.

12    Q.    Do you remember specifically who from Hodell was on

13    there?

14    A.    I remember Otto Reidl speaking.

15    Q.    I'm sorry, I didn't hear you, sir.

16    A.    I remember Otto speaking at the call.

17    Q.    Mr. Otto Reidl?

18    A.    Yes.

19    Q.    The gentleman you see before you?

20    A.    I have never met him.

21    Q.    Oh, very good, sir.  But you remember that Otto

22    Reidl identified himself as being on the phone call?

23    A.    Yes.

24    Q.    And, sir, tell the jury, what happened on that

25    call.
```

1    A.    It was a call that we set up in response, again we

2    had received now an e-mail or several e-mails saying

3    there is an issue, and so we assembled a telephone call

4    at the request of IBIS/LSi to have the customer speak.

5            That was the first time I think we'd ever

6    actually spoken with a customer.  Again, it was an urgent

7    situation.  We were able to assemble people literally

8    around the world to be on the call to talk about the

9    issue that was identified at that point as the

10   performance issue.

11           I believe Dirk from our end did most of the

12   talking.  Frankly, I don't even remember whether I spoke

13   or not personally.

14   Q.    So you said Dirk, that's Dirk Boessmann?

15   A.    Dirk Boessmann, yeah.

16   Q.    He would have done most of the talking in your

17   recollection on this phone call?

18   A.    Yes.

19   Q.    So let's take a look at Mr. Ashley's e-mail that he

20   sent you.

21           Do you see that there?

22   A.    Yes, I do.

23   Q.    Point number one, and this is a summary of what

24   happened on the call that Mr. Ashley prepared and sent to

25   you?

1      A.    Yes.

2      Q.    So let's look at point number one.

3            He says, "LSi commented that they had

4      originally sold this solution to Hodell as something that

09:55:24  5  was designed for companies of 250 million in revenue with

6      up to 500 users.  There was stunned silence on the phone

7      from the SAP team as Hodell confirmed that this was their

8      understanding of what was purchased."

9            Do you see that?

09:55:38 10  A.    Yes, I do.

11     Q.    Do you remember that happening on the call?

12     A.    Very much so.

13     Q.    And what was your reaction when you heard Hodell

14     say that they wanted to go to 500 users?

09:55:52 15  A.    My first reaction was this is not right, I mean we

16     literally, there was stunned silence on the call from the

17     SAP side.  We all went what?  This didn't fit.  This

18     didn't make any sense and we had never known about it and

19     we were looking at these numbers and we're like, yeah,

09:56:10 20  this was all news to us at that point.

21            And so it literally was -- it was for the

22     first time we realized -- again, that's where the stunned

23     silence came in, is we have a customer here who's already

24     telling us there's issues and now we're learning that

09:56:25 25  they want to go even bigger and we didn't know what to

1    say.

2    Q.    Sir, at point number two, Mr. Ashley writes,

3    "Hodell currently has 120 users.  They expect to grow at

4    a 17% compounded growth per year.  They expect to be at

09:56:40  5    300 users in short-term."

6              Do you see that?

7    A.    Yes.

8    Q.    Do you remember hearing Hodell say that on this

9    phone call?

09:56:47 10   A.    I do not remember whether they confirmed the 300.

11   I do remember they confirmed the 500.

12   Q.    And is this consistent with your reaction to this

13   consistent with the 500?

14   A.    Yes.

09:56:59 15   Q.    Sir, I'd like to direct you to Paragraph 4.  It's

16   written "Dirk did an excellent job under stressful

17   conditions.  He has set the expectations that this

18   environment is, all caps, much, larger than we were led

19   to believe and that we cannot make any statements as to

09:57:17 20   performance without some extensive additional testing

21   and/or analysis."

22              Do you see that?

23   A.    I do.

24   Q.    Do you remember Dirk saying that on the phone call?

09:57:24 25   A.    Yes, I do.

2252

Q.    And what was your -- what was your understanding of what was being said there?

A.    Well, exactly that.  In that size of an environment with that kind of data set, we needed to do more testing.

As I mentioned earlier, we had done testing to a certain degree, but we had never gone beyond that, and now we understand that -- I mean, we understood very clearly that if Hodell wanted to go to that degree even now with this much larger data set than we thought, we needed to do some testing to see what was going to work.

Q.    And it says there "We cannot make any statements as to performance."

Do you see that?

A.    Yes.

Q.    What did you understand that to mean?

A.    Exactly what it means.  We couldn't, we couldn't -- we couldn't tell the customer at that point how it would or would not perform because we just didn't know.

We didn't have the data.  We didn't know how much there really was.  We didn't know the setup of the system itself so there was no way we could have made or could make any, any statements as to how the system would perform.

We were just lacking all the data.

1    Q.    And those things that you just said, sir, those

2    were told to Hodell on April 17th, 2007?

3    A.    Yes.

4    Q.    That's about a month or six weeks or so after

09:58:43  5    go-live?

6    A.    I don't know exactly when they went go-live, but

7    yeah.

8    Q.    And, sir, also on that paragraph it says "Dirk has

9    set the expectations that this environment is much larger

09:58:53  10    than we were led to believe."

11         Do you have an understanding of

12    what -- what was told to them about that?

13    A.    I'm sorry, what was what?

14    Q.    What was Dirk talking about when he made those

09:59:03  15    statements to Hodell?

16    A.    Remember we had -- we had had some initial e-mails

17    a year earlier about number of SKUs and business

18    partners, and I think what he's saying, that it was even

19    larger than we were led to believe at that point.

09:59:37  20         So again, it comes back to the data we

21    didn't have, we didn't know how much there was really on

22    data.

23    Q.    And, sir, let's look at Paragraph Number 6.  He

24    writes, "Geoff tried to mention the constant" -- excuse

09:59:37  25    me, that's not the word -- "Geoff tried to mention the

1    concept of dispersing the solution across multiple

2    platforms.  The idea being that we might be able to save

3    the solution by using Business One and In-Flight as a

4    user interface for All-In-One."

09:59:50  5              Do you see that?

6    A.    Yes, I do.

7    Q.    Do you remember that being discussed on a call?

8    A.    Yes.

9    Q.    With Hodell?

09:59:54 10   A.    Yes.

11   Q.    And what do you remember being discussed about

12   All-In-One?

13   A.    Well, we were thinking about maybe we can move

14   Hodell to a different solution.

10:00:01 15            You know, SAP has different solutions for

16   different size of companies, and depending on needs of

17   company, and we were dealing with the solution for small

18   and mid size companies.

19            SAP has solutions for larger companies that

10:00:14 20   can do different things so one of the thoughts we had is

21   is there maybe a way to move from Business One to a

22   different SAP solution or a dispersed solution using

23   different parts.

24            And we proposed that at that point.

10:00:30 25   Q.    To Hodell?

1    A.    Well, during the call.  Hodell was on the call,

2    yes.

3    Q.    Sir, I'd like to take you now to Paragraph Number

4    8.  He writes, "The call was left with SAP going back to

10:00:40  5    executive management to determine if we have a solution

6    or not.  We committed to overcommunicating where we are

7    in order to keep Hodell in the loop.  There are no

8    specific next steps with time frames defined."

9          Do you see that?

10:00:55 10    A.    Yes, I do.

11    Q.    Do you remember that being discussed with Hodell on

12    this call?

13    A.    Yes.

14    Q.    And what were -- what was discussed with them

10:01:01 15    specifically?

16    A.    Well, we said listen, we're going to look into the

17    issue.  We're going to see -- we're going to see what we

18    can do.  We're going to communicate and let you know what

19    we're going to do.  But we can't, we can't give you any

10:01:14 20    steps or time frames.  We cannot tell you when we can get

21    to all these points and when it will be done.

22    Q.    Thank you, sir.

23          I'd like to take a step back and just look

24    at this April 17th call in context with the e-mail that

10:01:30 25    we discussed a few minutes ago that you sent on April

1      16th internally at SAP.

2                  Do you understand what I'm talking about?

3      A.    Yes, I do.

4      Q.    And before we get there, I'll just tell you that

10:01:41  5   there's been some discussion in this case that people at

6      SAP, including yourself, concealed information and kept

7      things hidden from Hodell.

8                  Before we get to the specifics, do you have

9      any response to that?

10:02:02 10   A.    It's not the case at all.

11                 The first time, the first time that we knew

12     about an issue at Hodell was in early April of 2007.

13                 There was no hiding of anything.  We were

14     on the call.  That was the first time we got the

10:02:20 15   information.  We were up front with the information we

16     gave them, based on information we had at that point,

17     because between we hadn't -- we had never -- we had never

18     met the customer until that point.  We had never talked

19     to the customer until that point.

10:02:35 20                It was all done through IBIS/LSi as the

21     reseller, as the value added reseller to the customer.

22                 No, we didn't hide anything.  We told them

23     there was an issue when they told us where they were

24     going to go.  We told them there was an issue.  We told

10:02:56 25   them there was no -- we didn't know how to resolve the

1    issue at that point.  We told them that we don't have a

2    timeline because we don't know how to resolve the issue

3    yet.  But we'll communicate with you.

4              We didn't hide a thing, nothing at all.

10:03:12    5    Q.    Thank you, sir.  What I'd like to do now is look

6    back at the e-mail the day before the call, April 16th,

7    and just so you know what I'm going to be doing, I'm

8    going to be flipping back and forth between your April

9    16th e-mail internally at SAP and then the notes from the

10:03:26   10    April 17th call.  Okay?

11              So maybe if you just want to put a marker,

12    your finger or something on the e-mail that we're at

13    because we're going to flip back to Exhibit 246.  So let

14    me know when you're there.

10:03:43   15    A.    Yep.  I'm here.

16    Q.    So I'm going to wait until it's up on the screen.

17    Can we put them both up like side by side, Bob?  Are we

18    up?

19    A.    Yes.

10:04:40   20    Q.    Excellent.

21              So on the left, sir, just so we can orient

22    everyone, on the left it looks like we've got your e-mail

23    on April 16th, is that right?

24    A.    That is correct.

10:04:50   25    Q.    And just so we're all clear, this was an internal

1    e-mail only to people at SAP, correct?

2    A.   That is correct.

3    Q.   My screen just went out.

4         And then the document on the right, that's

10:05:04  5    the summary of the phone call that happened the very next

6    day, right?

7    A.   That is correct.

8    Q.   Now, that phone call wasn't internal, right?

9         That phone call also included people from

10:05:14 10    Hodell like Otto Reidl?

11    A.   That is correct.  And people from IBIS/LSi.

12    Q.   And SAP?

13    A.   And SAP.

14    Q.   So on the left, we've got an internal e-mail and on

10:05:25 15    the right we've got notes from a call that included

16    Hodell, IBIS, and SAP?

17    A.   Yes.

18    Q.   Sir, on the left, on your internal e-mail at point

19    number one, you say, "There are basically two issues

10:05:36 20    relating to performance.  One has to do with add-ons and

21    one has to do with performance degrades with large data

22    sets."

23         Do you see that?

24    A.   I do.

10:05:45 25    Q.   Did you ever tell Hodell that?

1     A.    Yes, we did.

2     Q.    When?

3     A.    On -- on the call on the 17th, the day later.

4     Q.    The very next day?

10:05:54  5     A.    Yeah.

6     Q.    And if we look at that call, the notes from that

7     call, do you see that reflected in the notes anywhere?

8     A.    Yes.  It is in -- let me read this -- it is in

9     point four when we talk about Dirk doing an excellent job

10:06:12 10    and he said, "The expectation that this environment is

11    much larger than we were led to believe," et cetera, so

12    yes, we did.

13    Q.    And those are the same issues with performance and

14    data sets that you've been telling IBIS/LSi about for

10:06:27 15    over a year, right?

16    A.    Yes.

17    Q.    But here on April 17th, 2007, about six weeks after

18    go-live, Dirk Boessmann and SAP actually told that to

19    Hodell, correct?

10:06:38 20    A.    That is correct.

21    Q.    So let's look at some more things you said the day

22    before internally.

23              Let's look at Paragraph 3.  Well, let's

24    look at Paragraph 2.  You say Hodell has both issues.

10:06:59 25    You're talking about the issues you mentioned in

1     Paragraph 1?

2     A.    That is correct.

3     Q.    Did you tell Hodell that ever?

4     A.    Yes.  In that -- I mean in the summary it talks

10:07:06  5     about in Section 4.

6     Q.    But, sir, I'm looking at this e-mail you sent

7     internally at Paragraph 2.  You said Hodell has both

8     issues with the data sets and with the add-on with

9     respect to performance.

10:07:17  10              That was an internal e-mail, right?

11     A.    That is correct.

12     Q.    Did you ever tell Hodell that they had those

13     problems?

14     A.    Yes.  The next day.

10:07:25  15     Q.    The next day?

16     A.    Yes.

17     Q.    Let's look at point number three.  It says "The

18     upcoming April fix may resolve the add-on performance

19     issue.  We're getting more detail.  It likely does not

10:07:36  20     resolve the data set issue.  Resolving the data set issue

21     is not an easy fix so even if development started today,

22     we're likely talking months.  This is an issue that has

23     been known for years."

24              Do you see that?

10:07:46  25     A.    Yes, I do.

1    Q.    And you said that internally at SAP, right?

2    A.    Correct.

3    Q.    Did you ever tell Hodell that?

4    A.    That it could take time, you mean?

10:07:57 5    Q.    Yeah.  And that it might not work?

6    A.    Yes.  Absolutely.

7    Q.    When?

8    A.    The next day.  In the same call.

9    Q.    Okay.  So let's look at the notes from the call,

10:08:07 10    the very next day.

11              Did those notes reflect that SAP told

12    Hodell that the patches might not fix the problem?

13    A.    Yes, we did.

14    Q.    Where?

10:08:22 15    A.    In the last, if you go to the bottom there in

16    number eight, where we talk about no time -- no next

17    steps or time frames.  There was, again, we couldn't give

18    them any steps or time frames because we didn't know what

19    we were going to do.

10:08:38 20    Q.    How about if you look at Paragraph 4, and thank you

21    for that, but Paragraph 4, he writes, "Dirk did an

22    excellent job.  He set the expectations, but I'm on the

23    second line.  We cannot make any statements as to

24    performance."

10:08:53 25              Do you see that?

1    A.    Yes.

2    Q.    Do you remember that being discussed with Hodell?

3    A.    Absolutely.

4    Q.    What did you tell them?  What did SAP tell them?

10:09:02  5    A.    Again, we couldn't make any statements as to how

6    the system would perform because we didn't have the data.

7    We knew we had a lot of data in the database, but we

8    didn't even understand what else was running so we

9    couldn't make any, any statements at all on how the

10:09:16 10    system would perform.  We just couldn't.  It was

11    impossible and we told them that.

12    Q.    Is that basically the same thing you were saying

13    internally at SAP the day before?

14    A.    Yes.

10:09:25 15    Q.    So let's look one more time at that April 16th

16    e-mail.  This is the internal SAP e-mail from the day

17    before.  I'm on the second page now.

18                I'll wait for Bob to get there.  It says

19    "Summary," Bob.

10:09:50 20                It says "Summary:  Hodell just has too much

21    data.  SAP Business One cannot handle it.  And there is

22    no fix in sight.  I believe we need to find a way to get

23    this customer off SAP Business One."

24                Do you see that?

10:10:03 25    A.    Yes, I do.

1    Q.    You wrote that internally at SAP on April 16th,

2    right?

3    A.    That is correct.

4    Q.    Did SAP ever tell that to Hodell?

10:10:11  5    A.    Yes.

6    Q.    When?

7    A.    The next day.

8    Q.    So let's look at the notes from the call the next

9    day, sir.  It's on the right.

10:10:17  10              Where in there do you see the notes of that

11    discussion?

12    A.    If you look into -- my glasses must be bad, sorry.

13    Q.    Take your time.

14    A.    If you look in item number -- number six, when

10:10:32  15    Geoff, Geoff Ashley, talked about dispersing the solution

16    across multiple platforms, that was the discussion about

17    maybe moving, moving Hodell into a different system or

18    adding -- well, doing a combination of the two systems.

19              But, yes, that's when we told -- the

10:10:49  20    summary talked about the fact that we told Hodell about

21    that.

22    Q.    And the summary mentions All-In-One, right?

23    A.    Correct.

24    Q.    That's another SAP product?

10:10:57  25    A.    Yes, that would be the next product up.  We have

2264

```
         1    Business One, All-In-One, and then the big SAP on top.

         2    Q.    So here you were discussing with Hodell the

         3    potential for possibly moving them to a bigger SAP

         4    product?

10:11:09 5    A.    That is correct.

         6    Q.    That's the day after you talked about that

         7    internally at SAP?

         8    A.    That is correct.

         9    Q.    This is about six weeks after they went live?

10:11:18 10   A.    I -- I assume.  I don't know the exact go-live date

         11   so.

         12   Q.    But that's roughly true?

         13   A.    Okay.  Yeah.  Yes.

         14   Q.    Sir, I'd like to show you another e-mail that you

10:11:31 15   wrote.

         16         This one you wrote a day later so let's

         17   flip to Exhibit 160.

         18   A.    Yes, I got it.

         19   Q.    Sir, I'm looking at your e-mail at the bottom.  I'm

10:11:53 20   just going to wait until we're all there.

         21         Looks like we are.

         22         Looks like we are not.  Now it looks like

         23   we are.

         24         Sir, this is an e-mail from you to a number

10:12:05 25   of people at SAP, correct?
```

1    A.    That is correct.

2    Q.    This is April 18th, 2007?

3    A.    That is correct.

4    Q.    So this is the day after, right, that phone call

5    that we just talked about?

6    A.    Right.

7    Q.    And this is an internal e-mail, right?

8    A.    That is correct.

9    Q.    You say here -- look, why don't you just tell me

10   what you were saying here in this e-mail?

11   A.    Again, after, after the call on the 17th, again we

12   called it the stunned silence call because it was -- it

13   was literally a -- it was quite a call from our

14   perspective because we for the first time realized that

15   there may be an issue.

16            And so what we did -- and also realize, we

17   were all dispersed so we were not all in the same spot so

18   we were shooting e-mails with ideas and what could be

19   done, and what I basically did is I had talked to Dirk

20   Boessmann and we talked about potential solutions to the

21   issue.  Again, it was my business side and Dirk may be

22   coming up with something.

23            And I say in the e-mail that, you know,

24   unless we can do something with All-In-One, again that

25   next product up, that I believe we may not have a

1    solution for Hodell based on the information that we had

2    received the day before, which still was pretty limited,

3    but gave us a general idea.

4            I also talked about a question that Hodell

5    had asked the day before during that call, which is they

6    asked a question "Did we buy the wrong solution," and in

7    my e-mail I say -- I said to the group here internally

8    based on information that we had at that moment, that I

9    believed the answer may be yes, that they bought the

10   wrong solution.

11           And that was the gist of the e-mail.

12   Q.    So, sir, thank you for that.

13           The gist of the e-mail that you just

14   described, I'm not talking about the exact words there,

15   I'm saying the gist, the sum and the substance of the

16   e-mail that you just talked about that we're looking at

17   on the screen, is that what was told to Hodell the day

18   before?

19   A.    Yes.  Yes.  I mean, we talked about the fact

20   that -- we even talked about the fact of moving them to a

21   different product in that call, and again that

22   was -- that was from a business, from a business

23   perspective, from my knowledge of the products, may have

24   been a solution to the problem.

25           But that was the first reaction of the

1    call.

2    Q.    And, sir, you mentioned earlier, just so we can

3    clarify, you didn't do much of the speaking on that

4    April 17th call?

10:14:43  5    A.    I did not.

6    Q.    That was Dirk Boessmann, correct?

7    A.    Correct.

8    Q.    He's a different person than you?

9    A.    Yes, he is.

10:14:48 10    Q.    Might be he used different words to express the

11    same concept?

12    A.    Probably.  He probably did, yes.

13    Q.    In fact, you're almost certain he didn't use the

14    exact words that you used, right?

10:14:58 15    A.    I'm quite sure he didn't read my e-mail verbatim,

16    absolutely.

17    Q.    Hadn't happened yet, right?

18    A.    Yes.

19    Q.    So, sir, during this time -- and when I say "this

10:15:14 20    time," let me put you at a place -- after go-live, okay,

21    we're in April.  They went live in March, right?

22    A.    Yep.

23    Q.    We're in April.  You received and you learned about

24    the e-mail from Mr. Lowery to Udi Ziv that you mentioned,

10:15:31 25    you described it as the sky is falling.

```
 1                    Was that sometime in the first or second
 2    week of April?
 3    A.    Yeah, it was very close to that, to the call.
 4    Q.    And so within a few days of that call?
 5    A.    Um-hmm.
 6    Q.    You wrote a bunch of e-mails during that time,
 7    right?
 8    A.    Yep.
 9    Q.    We just talked about two of them, right?
10    A.    Correct.
11    Q.    But you wrote more than just those two, right?
12    A.    Yeah.  There's a couple more, yes.
13    Q.    And were you saying basically the same thing in all
14    those e-mails?
15    A.    Yes, I basically was.
16    Q.    The same things that we just talked about?
17    A.    Correct.
18    Q.    And, sir, the sum and substance of those e-mails,
19    was that relayed to Hodell during the April 17th phone
20    call?
21    A.    That is correct.
22                    THE COURT:  Could I interrupt you here?
23                    MR. KELLEHER:  Yes.
24                    THE COURT:  Is this a good time to break?
25                    MR. KELLEHER:  Actually I don't have much
```

1    longer, Judge.  I have maybe another -- yeah, let's break

2    now.

3                   (Laughter).

4                   THE COURT:  There you go.

5                   About 15 minutes.  I think I have another

6    matter.  I'm not sure.  I haven't seen anybody wander in

7    yet, so keep in mind.

8                   (Jury out)

9                   (Recess taken).

10                  (Proceedings resumed in presence of the

11   jury as follows:)

12                  THE COURT:  We just did a little sentencing

13   on food stamp trafficking.  A lot of times what

14   happens -- you may or may not know this -- food stamps

15   started, you have a food stamp, you go somewhere and you

16   buy certain things with it.  Now, there's a card, a WIC

17   card, all these different things.

18                  But sometimes people buy those or pay

19   money, pay like 50 cents on the dollar and then a

20   merchant can do that and then they turn it into the

21   government and they get full value and the person with

22   the assistance only gets half of that.

23                  So there's always a constant review and

24   look for that and trying to find people, and that's what

25   this involved.  And at the end of the day, he had like

1    $800,000.

2                        THE JURORS:  Wow.

3                        THE COURT:  Not a bad business, huh?  Until

4    they knock on your door.

10:50:08  5              (Discussion had off the record)

6                        THE COURT:  Okay.  You can continue.  11:30

7    I told you, right, and then 1:15 we'll start again.

8    BY MR. KELLEHER:

9    Q.    So, sir, when we left off, I think we were looking

10:50:35 10  at Exhibit 160.  Are you there in the book?

11   A.    Yes, I am.

12   Q.    We have that on the screen?

13   A.    Yes.

14   Q.    And, sir, I think what I asked you before, right

10:50:46 15  before we broke, was whether you wrote other e-mails

16   internally at SAP within this time frame, and by this

17   time frame, I mean in the middle of April of 2007?

18   A.    Yes, I believe there's a couple more.

19   Q.    Okay.  And I'm not going to necessarily show them

10:51:06 20  all to you.

21                       You may see them later.

22                       But what were you generally saying in those

23   e-mails?

24   A.    Well, from what I have learned before the call and

10:51:18 25  from what I learned at the call, I was -- I was of the

1    opinion, I mean it was my opinion was that Business One

2    may not be the right fit for the customer.

3                   Again, the reseller IBIS had told us

4    information that it was our issue.  We learned at the

10:51:32  5    call they were going to go even larger on user count.

6    And where I was sitting was like if they have problems

7    already, and if they now grow, in my opinion it couldn't

8    work.  There was no way that it could work.  Again these

9    were all very short time frame e-mails.

10:51:52 10                   And I don't think we were in a panic mode,

11    but again we had a customer that couldn't do their

12    business, and that is a big deal.  And at that point, we

13    just tried to do what we could to come up with a

14    solution, and again I had -- my proposal and my thoughts

10:52:08 15    which were, hey, this may not be the right fit.

16                   And frankly, others disagreed with it

17    because they said, no, we can make this work, and it will

18    work now that we have the information that we did.

19                   So again, this was before the information

10:52:21 20    that I learned much later on that I wrote those e-mails,

21    and like I said, it was the first time in my career and

22    first time since that I'd ever had a customer that had

23    issues like this.

24    Q.   So, sir, let's just slow down and unpack some of

10:52:35 25    the things you said, and thank you for that.

1                    You mentioned that this customer early on,

2     I think you said was having trouble running their

3     business.

4                    Did you ever personally see that or know

10:52:46  5     that to be the case?

6     A.    No.  No.  Again, I based my -- my reaction was

7     based on what we had heard from IBIS, the reseller,

8     because they were, until we had the call, they were the

9     only face to the customer.

10:52:59 10                    And they told in the e-mail to me, they

11     said, "Hey, customer is down, customer is not working,

12     it's Business One and performance issue."

13     Q.    So in April of 2007 when you're writing these

14     e-mails, you had never been to Hodell, right?

10:53:14 15     A.    No.  I've never been to Hodell.

16     Q.    You had never been to Hodell, period?

17     A.    No.

18     Q.    But certainly you hadn't been there when you're

19     writing these e-mails in April?

10:53:24 20     A.    No.

21     Q.    And so when you say they were having problems, that

22     was based exclusively on what you were being told by the

23     reseller IBIS/LSi?

24     A.    That is correct.

10:53:32 25     Q.    But what you were being told by them, I think you

1    testified earlier, it was sort of like the sky is falling

2    situation?

3    A.    Yeah.  There was an e-mail talking about -- I think

4    it was from Dan Lowery at LSi, I'm going to lose my

10:53:45  5    business, the customer is losing hundreds of thousands of

6    dollars.

7            Again then we had Hodell-Natco on a call

8    and I think they at that point mentioned they had lost

9    $750,000.

10:53:54  10            So, yeah, the information that we got at

11    that point was very, very dramatic, and I reacted, maybe,

12    maybe in a knee jerk fashion, but I reacted to what I

13    knew at that point, which was not very much but --

14    Q.    And, sir, I'm having a little hard time hearing

10:54:12  15    you.

16            Did you say it was a knee jerk fashion?

17    A.    May be a knee jerk reaction.  Things moved fast, I

18    had a reaction but I reacted how I thought to react at

19    that point.  Maybe it was a little bit knee jerk, maybe a

10:54:27  20    little emotional on my end, but again, it all comes back

21    to having a customer who needed to be taken care of.

22    Q.    And why were you making these, in your words, knee

23    jerk reactions?

24    A.    I was trying to find a way -- again, we as a group

10:54:42  25    were all trying to resolve the issue.  Again now we had

1      information on the 17th what can be done, and we were all

2      distributed.  So we weren't sitting as a group huddling

3      and getting together and talking about things, so we did

4      stuff by e-mail, and part of my contribution to that, if

10:54:58  5      you will, was hey, I don't think this is going to work

6      for this customer based on the information we have.  They

7      have a big data set and maybe we should move them to a

8      different product.

9      Q.    Sir, you just mentioned a conclusion that you

10:55:11 10      reached in April that this wasn't going to work for

11      Hodell.

12            Do you remember just saying that?

13      A.    Yes.

14      Q.    Sir, did you ever come to reconsider that

10:55:18 15      conclusion?

16      A.    Oh, absolutely.  Absolutely.

17            Later that year, you know, as we started to

18      get involved, as SAP started to get involved directly

19      with Hodell, you know, we sent people out, we looked at

10:55:31 20      the way the system was set up, we looked at the hardware.

21            We had, I think it was in late -- somewhere

22      in October, Eddy Neveux had gone out as one of the people

23      and had written a report and came back and said here is

24      what we found.  And in the end, it turned out that yes, a

10:55:51 25      piece of the issue was us, was Business One, was the

         1    software, but a much larger piece was with the add-on

         2    solution that we didn't know about that had been

         3    developed by -- I'm sorry -- we didn't have much detail.

         4    We knew about an add-on solution.  We knew In-Flight was

10:56:06 5    in place, but we didn't know, didn't have any detail.

         6              So the report comes back and says yeah,

         7    there were issues with Business One, but the much larger

         8    issues were with this add-on product that had been

         9    developed that we didn't know about.  And then there was

10:56:22 10   an issue on the hardware side and the other thing we had

        11    learned, and we learned that in the call on the 17th

        12    already, that the testing that we had said needed to be

        13    done, when we talked to IBIS a year earlier and had told

        14    them, Eddy and I had told them "You got to do the

10:56:39 15   testing, you have to do the testing" because we had never

        16    test to do that degree.  That testing

        17    apparently -- excuse me -- apparently never was done to

        18    the degree it should have been done.

        19              There was some testing going on, but it was

10:56:52 20   never really fully loaded.  And at that point in October

        21    when we saw the final data, I'm like, I was wrong, my

        22    initial reaction was wrong.  My initial reaction to say

        23    "Guys, this cannot work, we need to move them on to a

        24    different product," was wrong.

10:57:06 25             And, you know, I -- again, knee jerk

```
 1          reaction at that point and in retrospect, that was wrong.

 2          Q.    Thank you, sir.

 3                     And you mentioned that, I think you're

 4          talking about the visit that Eddy Neveux did at Hodell?

10:57:23  5  A.    Yes.

 6          Q.    So let me turn you to a document, this is Exhibit

 7          809.  It's towards the end of your binder.

 8          A.    I have it.

 9          Q.    It's the same thing that's on the screen here?

10:57:40 10  A.    Yes.

11          Q.    Okay.

12                     So, sir, the e-mail at the very top, this

13          is to Paul Killingsworth.  Do you see that?

14          A.    Yes, I do.

10:57:51 15  Q.    And it's from a Michael Sotnick?

16          A.    Correct.

17          Q.    And it's carbon copied to yourself and Dan Kraus?

18          A.    Yes.

19          Q.    And do you recognize this document?

10:58:01 20  A.    I do.

21          Q.    Is this an e-mail that you received?

22          A.    Yes.

23          Q.    And when you received this e-mail, did you read it?

24          A.    Oh, yes.

10:58:08 25  Q.    And did you also read the prior e-mails in the
```

1    chain that were on -- attached to this e-mail?

2    A.    Yes.

3    Q.    Sir, I'd like to take you to look to one of those

4    prior e-mails that you read.  It's from Mr. Killingsworth

5    to Mr. Neveux, to Mr. Kraus, do you see that, on October

6    17th?

7    A.    I do.

8    Q.    So Mr. Killingsworth says, "I believe there are

9    several areas where improvements could be obtained

10   including," he talks about Citrix servers, additional

11   ram, replace, quote, unquote, lesser machines, better

12   load balancing.

13              Did you have an understanding of what was

14   being said to you when you read that?

15   A.    I had a general understanding that these items were

16   related to the way that the computer network was set up

17   at the customer.

18   Q.    When you say a general understanding, because

19   you're not a technical person?

20   A.    I'm not a technical guy, no.

21   Q.    But, you do understand, you worked with computers

22   for a long time, right?

23   A.    Yes.

24   Q.    So you have a high level understanding?

25   A.    Yes, I do.

2278

```
 1    Q.    And what was your high level understanding of what
 2    Mr. Killingsworth was saying in this e-mail?
 3    A.    Well, if you look at the item, for example where he
 4    talks about replacing a couple lesser machines, that was
 5    an indication maybe there was old hardware running that
 6    didn't have the power that was needed to run our software
 7    properly.
 8    Q.    And --
 9    A.    Go ahead.
10    Q.    And in your understanding, what is the effect of a
11    lesser or underpowered machine on performance?
12                MR. LAMBERT:  Objection.
13                THE COURT:  Overruled.
14    BY MR. KELLEHER:
15    Q.    You may continue.
16    A.    As a general rule, the more powerful the machine,
17    the better and the faster your software will run.
18                If you have a machine that's old and it
19    doesn't have as much power, from a processing
20    perspective, the software will run slower.  That's a
21    general rule.
22    Q.    Thank you, sir.  Let's look at the next bullet.
23    Mr. Killingsworth writes, "Network assessment, cabling,
24    routing/switching, server capacity and configurations,
25    and database servers."
```

1                         Do you see that?

2    A.    Yes, I do.

3    Q.    Do you have a general or high level understanding

4    of what Mr. Killingsworth was telling you when he wrote

11:00:23 5   that?

6    A.    Yes, I do.

7    Q.    Can you please tell the jury what that

8    understanding was?

9    A.    Again, it's very -- it's very similar to the

11:00:31 10  computer itself.

11              The way that the computers are set up in a

12   facility, the way that they're connected literally by

13   cables, when one computer needs to talk to the other

14   computer, if the cable, if the physical cable between the

11:00:42 15  two computers, for example, is of a type that doesn't

16   allow fast traffic, then the traffic cannot go fast, even

17   though the computers are fast.

18              And so as he was talking about routing and

19   switching and cabling and he gives a little bit more

11:00:55 20  detail, what had had happened or what he had found, they

21   had found when they were looking at the infrastructure,

22   the infrastructure was set up in such a way that even

23   though the software worked or could, could have worked,

24   the computers were either too slow or even the connection

11:01:10 25  among all these boxes were too slow and sometimes too

1    old.

2                    And so I have a general understanding of

3    that, yes.

4    Q.    Sir, is that basically like if you have an Internet

11:01:19  5    connection through a wire and you use a small wire,

6    you're going to see slower performance than if you use,

7    like, a cat three or a cat five, a wider wire, is that

8    basically what you're talking about?

9                    MR. LAMBERT:  Objection, Your Honor.

11:01:34  10                    THE COURT:  Overruled.

11   A.    Yes, basically it is.

12                    I don't know, in the old days if you ever

13   dialed up a modem, that went through a phone cable,

14   that's not done anymore.  Now, we have these cat 5

11:01:47  15   cables, they are a little thicker, and they are built to

16   allow lots of data to go from one place to another, and

17   there's even different versions and grades of that.

18                    So yes, that's basically what it is.

19   Q.    And so your high level understanding is that having

11:02:01  20   these smaller or lesser cables, that can effect the

21   performance of a solution?

22   A.    And that's -- yes.  And that was confirmed in this

23   report where he talks about -- excuse me -- when he talks

24   about old cabling or old switch boxes or router boxes,

11:02:18  25   yes.

1    Q.    And Mr. Killingsworth, he actually went with

2    Mr. Neveux to Hodell on October 17th, he was with

3    Mr. Neveux at Hodell, correct?

4    A.    Yes.  I don't know whether it was on October 17th,

11:02:32  5    but they were out there, I believe they were out there

6    together, and again those were our experts.

7              Eddy from a purely technical side, and then

8    Paul from setting things up and, you know, when they come

9    back and tell us, hey, this is what the issue is, then

11:02:48  10    you take that.  That is the issue.

11              They're very smart.  They know what they're

12    doing and they put it together for us then.

13    Q.    Sir, the part over the bottom, Mr. Killingsworth

14    says, "It is my humble opinion that if this software ERP

11:03:02  15    system were installed and implemented in a new

16    well-architect network environment, we would see an

17    immediate improvement in performance on the order of 25

18    to 50%."

19              Do you see that?

11:03:13  20    A.    Yes, I do.

21    Q.    And did you read that at the time?

22    A.    Yes.

23    Q.    What was your understanding of what

24    Mr. Killingsworth was telling you when you read that?

11:03:18  25    A.    Well, that's from my, again back to my initial

1    reaction.  That's when I started to learn that it

2    wasn't -- it wasn't the software that could have been the

3    issue.  At this point, I realized, hey, there's a

4    hardware issue from a pure setting it up that could

11:03:34 5    improve the performance even more to what, beyond what

6    they had already done.

7    Q.    So when you read this e-mail, you began to

8    reconsider the conclusions and the statements that you

9    had made in April that we talked about this morning?

11:03:47 10    A.    That is correct.

11    Q.    Sir, can you flip to the next page of the document.

12             Do you recognize this e-mail, sir?

13    A.    Yes, I do.

14    Q.    Is this the e-mail that you read when it was

11:03:59 15    included in the e-mail that was sent to you?

16    A.    Yes.

17    Q.    This is from Eddy Neveux to Paul Killingsworth?

18    A.    Correct.

19    Q.    Dated -- what's the date?

11:04:06 20    A.    October 17th.

21    Q.    So the first sentence, he says, "As requested, here

22    is a summary from my perspective with respect to the on

23    site visit that we had with Hodell-Natco yesterday at

24    their Cleveland headquarters."

11:04:22 25             Do you see that?

1    A.    Yes, I do.

2    Q.    So does that refresh your recollection as to when

3    the visit was?

4    A.    Yes, it does.  October 16th.

11:04:30  5    Q.    I said the 17th.  So you're actually right.

6    A.    October 16th.

7    Q.    Very good.

8                So these e-mails we are looking at, these

9    were summaries from Mr. Neveux and Mr. Killingsworth of

11:04:39 10    what they actually saw when they were actually at Hodell

11    on October 16th, 2007, is that correct?

12    A.    That is correct.

13    Q.    Sir, let's look at what Mr. Neveux wrote.

14                I'm in the third paragraph.  He says, "My

11:04:56 15    role was to look at the day-to-day processes of what they

16    do with SAP Business One and the In-Flight add-on from

17    LSi."

18                Do you see that?

19    A.    Yes, I do.

11:05:05 20    Q.    And then the next paragraph, I'm partially like

21    maybe a third of the way down, the fourth line.  He says,

22    "There is no doubt that the In-Flight add-on does

23    overhead with respect to memory consumption as in the

24    correct -- as in the current version Hodell-Natco is

11:05:30 25    running, using SAP Business One 2005 SP01, an add-on per

1    connection will consume 50 to 60 megabytes of ram."

2                Do you see that?

3    A.    Yes, I do.

4                MR. LAMBERT:  Your Honor, I'm going to

11:05:46   5    object.

6                THE COURT:  Overruled.

7                MR. LAMBERT:  There's no indication he's

8    even on this e-mail.

9                THE COURT:  Overruled.

11:05:51  10                MR. LAMBERT:  Okay.

11    BY MR. KELLEHER:

12    Q.    Sir, can you turn back to the first page?

13    A.    Yes.

14    Q.    The e-mail at the very top, do you see that?

11:05:58  15    A.    Yes, I do.

16    Q.    To Paul Killingsworth?

17    A.    Yep.

18    Q.    From Michael Sotnick?

19    A.    Yep.

11:06:03  20    Q.    Who is on the carbon copy line?

21    A.    Myself and Dan Kraus.

22    Q.    Ralf Mehnert-Meland?

23    A.    Yes.

24    Q.    That's you?

11:06:09  25    A.    Yes.

1    Q.    When you received this e-mail, did it include all

2    of the prior e-mails on the chain?

3    A.    It would have.

4    Q.    And would you have read them at the time?

11:06:17 5    A.    Yes.

6    Q.    And did you, in fact, read them at the time?

7    A.    Yes, I did.

8    Q.    Thank you, sir.  Let's go back to the second page.

9              MR. CARNEY:  Then I'll object because he

11:06:24 10    has no firsthand knowledge of the information in the

11    e-mail.

12              THE COURT:  Overruled.  Overruled.

13    BY MR. KELLEHER:

14    Q.    Sir, we're on the second page.

11:06:31 15    A.    Yes.

16    Q.    You're back with me?  And we were talking about the

17    last paragraph there.

18              He says to you, "There's no doubt that the

19    In-Flight add-on does overhead."

11:06:48 20              What was your understanding of what was

21    being said to you?

22    A.    Again, I don't have the technical understanding

23    when he talks about how many megs of ram.  But what this

24    part told me is that the In-Flight -- the In-Flight

11:07:02 25    addition may have had to do with the performance of the

1    system overall.

2    Q.    And he goes on below, sir, to say, "Also to note,

3    the, quote, unquote, worst performance that I saw with

4    respect to the logs generated by the Business One -- by

5    the SAP Business One Dot Net Profiler tool, when doing

6    order entry at Hodell-Natco, was a nine-second delay with

7    respect to a function entering a sales order using SAP

8    Business One and In-Flight."

9              Do you see that?

10   A.    Yes, I do.

11   Q.    What was your understanding when you read that?

12   A.    I didn't -- I thought this was great, great news,

13   because nine seconds, I did not consider to be an issue.

14              Especially after that, I believe it was in

15   the April 17th call, when we had heard about -- no, I'm

16   sorry, it was an e-mail beforehand, but we had heard from

17   IBIS orders would take an hour or two to enter.  And when

18   I heard nine seconds, I'm like this is great, this is

19   good.  Performance is way up.

20   Q.    Can you turn to the second page, sir?  Sir, I'm

21   starting with the phrase "With respect to."

22              Do you see that?

23   A.    Yes, I do.

24   Q.    It says, "With respect to using the SAP Business

25   One Dot Net Profiler against the In-Flight add-on and

1    without being able to see the source code, it was found

2    that there is still an excessive amount of talk or

3    communication between the In-Flight add-on and SAP

4    Business One.  And to note, the communication is

11:09:03    5    specifically with respect to marketing documents, such as

6    sales orders and sales quotes, but other areas were also

7    mentioned were purchase orders."

8               Do you see that?

9    A.   Yes, I do.

11:09:14    10    Q.   I want to focus on the first part.

11               He wrote to you, "There is still an

12    excessive amount of talk or communication between the

13    In-Flight add-on and Business One."

14               Do you see that?

11:09:23    15    A.   Yes, I do.

16    Q.   What did you understand when you read that?

17    A.   Now, even though -- this is more of a technical

18    issue.  This was actually what my team was responsible

19    for.

11:09:32    20               Remember, we had these ISV partners who

21    develop products, and one of the things that we always

22    were on the lookout for, if I have these additional

23    products that work with my product, when they're

24    connected, I need to make sure that they're connected

11:09:46    25    properly basically.

1        And that's one of the things that Eddy

2    Neveux, for example, was responsible for, to make sure

3    that the connection was done properly.

4        When the connection is not done properly,

11:09:57 5    what can happen is that something that happens here, it

6    has to talk to our product, may actually slow things

7    down.  It does happen, and there's processes then to

8    resolve that.

9        What this told me in very general terms is

11:10:12 10    that there was an issue in this connection.  That

11    something was going on in this add-on piece that affected

12    the way that we were functioning.

13        So that's the short, short answer.

14        I could not tell you how this magic

11:10:26 15    happens, but I do know that, you know, when these things

16    connect, that there could be an issue.  And that's

17    something I know because I've worked with these kind of

18    partners for many years.  And I may not know the

19    technical side of things, but I do know that sometimes

11:10:42 20    there can be connection issues.  I have the same issue

21    right now with partners of mine in my current employment

22    where we need to make sure that this connection works

23    properly.  If it doesn't work properly, there may be

24    issues.

11:10:56 25        And that's what he told me, when you talked

1    about excessive amount of communication, that in that

2    connection, something was going on.  There was lots of

3    data going from one to the other maybe that had an impact

4    on our system.

11:11:06  5    Q.    Thank you, sir.  And just so we're clear, what was

6    doing the excessive amount of communication?

7    A.    It was the add-on.  It was the In-Flight add-on

8    from IBIS that communicated, that communicated a lot with

9    us, and slowed us down, because we had to communicate

11:11:20 10    back and send data back and forth.

11              And when you do that, the software, my

12    software is busy sending stuff over here and doing stuff

13    over here and may have to slow down what it is supposed

14    to do on its own.

11:11:32 15    Q.    And, sir, you mentioned that you see some of these

16    issues in your current work, like the work you do today,

17    right?

18    A.    Yes.  Yes.

19    Q.    You don't work for SAP, right?

11:11:41 20    A.    No.  I do not no.

21    Q.    Do you work for Business One?

22    A.    No.

23    Q.    Have you worked with Business One since you left

24    SAP?

11:11:47 25    A.    I have not.

1    Q.    So the performance, the connectivity, the

2    performance issues you just testified to, those have

3    nothing to do with Business One?

4    A.    Nothing to do.  I'm sorry, I was giving an example.

11:11:55  5    Q.    That's just a general software problem you're

6    experiencing with different software?

7    A.    Different software, sir.

8    Q.    Sir, let's take a step back.  In October after you

9    read these e-mails from Eddy Neveux and Paul

11:12:09 10   Killingsworth, after you read these e-mails about their

11   site visits, did you ever come to a conclusion as to what

12   was causing the performance issues that were happening at

13   Hodell?

14   A.    Yes.  And I think somewhere, and I don't know where

11:12:20 15   this is, somebody came up with a percentage and said

16   yeah, we had a -- we had -- we were cause of some of the

17   issues, but the hardware was a big issue, the fact that

18   it had never been tested was a big issue, and then the

19   In-Flight add-on was really the main reason that we found

11:12:37 20   for the slowdown.

21                   And that really came out of that report

22   from Eddy and Paul in October.

23   Q.    And so did that cause you to change prior

24   conclusions that you may have come to back in April or

11:12:52 25   other times?

```
 1   A.    Yes.  Absolutely.

 2              In April, again, I was told in a short time

 3   frame, it's our problem.  I believe that and I went into

 4   fix mode.  Customer has to be taken care of.

 5              And then the report comes out and I'm

 6   looking at the report going nine seconds, that's not bad

 7   at all.  That's actually very good.  We have found other

 8   issues and the customer is now running.  And for me, that

 9   was, yeah, I was wrong in April and that's fine with me.

10              I mean, the important thing was not that I

11   was right in April.  The important thing was that the

12   customer is up and running, and that's what we did.

13   Q.    Sir, I'd like to just change gears a little bit.

14              There's been some testimony in this

15   case -- well, let's take a step back.

16              Do you know Mr. Dale Van Leeuwen?

17   A.    Yes.  I mean, it's -- we've had a couple of

18   interactions.

19   Q.    You know who he is, right?

20   A.    I know who he is, yes.

21   Q.    That's all I wanted.

22   A.    Yes, I do.  Sorry.

23   Q.    Sir, there's been some testimony in this case that

24   you told Dale Van Leeuwen early in 2004 that Business One

25   was good for Hodell at 300, 400, or 500 users and that
```

2292

1    you may have done that in Vegas at a meeting or in

2    Atlanta at a meeting.

3              Sir, do you recall ever meeting

4    Mr. Van Leeuwen in Vegas or Atlanta?

11:14:23  5    A.    I don't recall meeting him and I don't recall at

6    all talking to him about Hodell.

7              I believe the first time I learned about

8    Hodell -- well, maybe I saw the name Hodell in a sales

9    report, but the first time as a customer when we talked

11:14:38 10    about it was when in March of 2006 when Eddy and I were

11    on the phone with IBIS and we started, I think, hearing

12    the Hodell name.

13              But, no, I don't recall that at all.

14    Q.    Sir, in 2004, you don't even recall that you even

11:14:55 15    knew about Hodell?

16    A.    Correct.

17    Q.    Sir, would you have told Mr. Dale Van Leeuwen that

18    Business One was a good fit for Hodell or any company

19    with 300, 400 or 500 users?

11:15:10 20    A.    No, I wouldn't have.

21              We weren't -- we weren't marketing to that

22    kind of company.  Remember, we had three products.  We

23    had Business One, All-In-One, and the big SAP.

24              We ran marketing, we were not marketing to

11:15:24 25    companies of that size because we had a different product

1    for it.  So, no, I -- I doubt it.

2              I mean, I think the numbers we had at that

3    point were probably in the -- no, those are testing

4    numbers but they were not at 300 users.  300, 400, 500

11:15:44  5    users, those were -- I mean, you know, those would have

6    triggered a bigger SAP question.

7              And to be honest, if we had sold -- so you

8    have Business One, All-In-One, the big SAP.  And as they

9    go up, they get more expensive.  Right?  It's very

11:16:02 10   simple.  They are bigger software solutions, they get

11   more expensive.

12             If we had sold a system that would have fit

13   in the middle, we would have had our heads ripped off by

14   the rest of SAP saying no, no, no, that's our market

11:16:14 15   here.  We marketed -- we marketed our product to the

16   lower end of the market.  It was a less expensive product

17   for a reason, because these smaller companies, you know,

18   can't afford big price tags.

19             No.  I -- I don't know why I would have

11:16:31 20   said that because that's not where we were marketing.  We

21   were marketing down here and --

22   Q.   Sir -- I'm sorry.

23   A.   And 500 users up here?  No.

24   Q.   Sir, your main -- what you do at SAP and what you

11:16:43 25   did at the time was a marketing and business development

1    role, right?

2    A.    That's correct.

3    Q.    So you would have been focused on the marketing,

4    right?

5    A.    Yes.

6    Q.    And any statements that you would have made to

7    anyone who asked about the product would have been

8    consistent with the marketing, right?

9    A.    Yes.  Yep.

10   Q.    And SAP wasn't marketing Business One for companies

11   with 300 or 400 or 500 users, right?

12   A.    That's correct.

13          MR. KELLEHER:  Your Honor, may I have a

14   moment to confer?

15          THE COURT:  Yes.

16          MR. KELLEHER:  Just a couple more

17   questions, sir.

18   BY MR. KELLEHER:

19   Q.    And just to clarify, you testified earlier that

20   your job at SAP was a business -- a business development

21   job with respect to resellers or ISVs who were making

22   add-on products, right?

23   A.    That is correct.  And again, a reseller is somebody

24   who sells, and I was not working with them.  I was

25   working only with the ISVs.

1    Q.    Got it.  So you're making a distinction between

2    resellers and ISVs.  You only worked with the ISVs.  They

3    are the people who did the -- who did add-ons?

4    A.    That is correct.

11:18:43  5    Q.    Okay.  Sir, were you involved in any way in the

6    sales process, the license sales process to Hodell?

7    A.    No.

8                   MR. KELLEHER:  That's all I have at this

9    time, Judge.

11:18:52  10                   THE COURT:  Folks, okay, we will break now

11    and come back at 1:00 o'clock, how is that?

12                   Keep in mind the admonition.  You have

13    heard a lot of evidence.  You haven't heard it all.  And

14    enjoy lunch, and we'll call for you at 1:00 o'clock,

11:19:06  15    where Mr. Panigutti?

16                   A JUROR:  We'll be on L-1.

17                   THE COURT:  You'll be there.  Okay.

18                   (Jury out)

19                   (Luncheon recess taken).

20                         - - - - -

21

22

23

24

25

1          FRIDAY, JUNE 26, 2015, 1:00 P.M.

2               (Proceedings resumed in presence of the

3    jury as follows:)

4               THE COURT:  Be seated, folks.  Good

13:03:04  5    afternoon.

6               THE JURORS:  Good afternoon.

7               THE COURT:  You may cross-examine.

8               MR. LAMBERT:  Your Honor, may I approach

9    and provide the witness with some documents?

13:03:12 10              THE COURT:  Sure.

11              MR. LAMBERT:  Thank you.

12         CROSS-EXAMINATION OF RALF MEHNERT-MELAND

13   BY MR. LAMBERT:

14   Q.   Good afternoon.  How are you doing,

13:03:44 15   Mr. Mehnert-Meland?

16   A.   Good.  Thank you.

17   Q.   I'm Wes Lambert.  I represent Hodell-Natco.  We

18   have not met before today, have we?

19   A.   We have not.

13:03:50 20   Q.   Okay.  I don't know if you recall, but I sat in on

21   your deposition that was taken a few years ago but it

22   wasn't actually me that took it.

23               I just want to jump into a few background

24   things real quick.

13:04:00 25               You testified, and I don't know if I caught

1    it, that you were -- you're an attorney, is that correct?

2    A.    That is correct.

3    Q.    Do you actually have an active law license

4    currently?

13:04:08  5    A.    I do.

6    Q.    Okay.

7              You testified this morning about there's a

8    lot of testimony about the April 17th call, right?  That

9    was the focus of a lot of your testimony?

13:04:27 10             Do you recall that?

11    A.    I do.

12    Q.    Okay.  And you were a participant in that phone

13    conference, correct?

14    A.    That is correct.

13:04:33 15    Q.    But you weren't the driver of the call; that was

16    Dirk Boessmann, right?

17    A.    That is correct.

18    Q.    Okay.  Why was he the one interfacing with the

19    customer?

13:04:44 20    A.    I think it was decided at that point that he was

21    the most likely to answer questions about coming up,

22    because the questions we expected were more of a

23    technical nature.

24    Q.    Okay.  Could you pull your mic up a little bit?

13:04:55 25    A.    Sorry.

2298

1    Q.    So he was -- there might be technical issues that
2    came up and that's the guy to answer them, right, Dirk
3    Boessmann?
4    A.    That is correct.
13:05:02  5    Q.    Okay.  And it's his statements or -- to Hodell that
6    you were testifying about this morning, right, what Dirk
7    Boessmann said to Hodell; not what you said, right?
8    A.    He was the lead in the call, but there were a
9    number of other people that actually spoke.
13:05:21 10              So leading doesn't mean that he was the
11    only one speaking, but that is correct.
12    Q.    Okay.  Well, you testified this morning, and I
13    spent some time looking at your testimony, that Dirk
14    Boessmann came clean to Hodell, was that your testimony?
13:05:38 15    A.    I believe I said something along those lines, that
16    we gave them the information, yes.
17    Q.    Okay.  Whatever information SAP had up to that
18    date, is that your testimony here today?
19    A.    That is my testimony.
13:05:51 20    Q.    Okay.  I'd like to ask you, sir, how you explain
21    Mr. Boessmann's e-mail here on Exhibit 439 where he's
22    telling Mr. Kraus a month later that now's the time to be
23    honest with the customer.
24              Isn't that inconsistent with what you just
13:06:13 25    said?

1    A.    I do not believe so because we shared with the

2    customer the information we had at that point, and I do

3    believe we shared that information on the -- on the April

4    17th call.

13:06:23  5    Q.    Well, here's what Mr. Boessmann said.

6                "If I am forced to answer" -- this is a

7    month later.

8                "If I am forced to answer the question on

9    performance, so on and so forth, I have always to tell

13:06:35  10   them that SAP is doing its very best to improve the

11   product in all aspects and continuous process, but that

12   in this case is not the key question Hodell needs to get

13   answered.  You have to tell them that with a target of

14   300 users, they do not have the right product out of the

13:06:52  15   SAP portfolio.  If they continue to discuss with me, they

16   are just losing time and money.  From my perspective, it

17   is now time to be honest with the customer."

18                That's what Mr. Boessmann is saying over a

19   month later to Dan Kraus, isn't it?

13:07:07  20   A.    No.  He's referring, and again I don't -- was I on

21   this e-mail?  I don't believe I was on this e-mail

22   exchange so I can't totally explain to you what Dirk may

23   or may not have thought, but he is referring to the 300

24   users.

13:07:22  25                When we had the call, the question at that

1    point was 120 users.  We learned on that call that they

2    were going to go to 300 users, which we had never known

3    before.  So I don't know, I cannot tell you whether Dirk

4    referred to the 120 user or 300.  In his e-mail he seems

13:07:38 5    to be talking to the 300 users, a level at which Hodell

6    was not at, and the call was really about the system as

7    it was implemented at that time, which was 120 users.

8    Q.    Well, it was "the stunned silence" call because it

9    was expressly said on that call that they were going to

13:07:58 10    go up to 300 users and that they had been sold on the

11    basis of 500 users, right?

12              That was said on the call?

13    A.    It was said by Hodell but we did not respond to

14    that at that point because we didn't know what to say.

13:08:09 15    Q.    Okay.  So you -- you agree with me that Udi Ziv

16    had, prior to that call, weighed in on the Hodell

17    implementation, right?

18    A.    Udi had sent an e-mail out, yes, that is correct.

19    Q.    And he had said Hodell was way above any sane

13:08:29 20    Business One Sweet Spot, is that correct?

21    A.    Yes, he did say that.

22    Q.    And I think we all agree that was not said to

23    Hodell in that call, right?

24    A.    We shared with Hodell that the system they were

13:08:40 25    running was much larger than we expected.

1    Did we use the word "This is outside,

2    outside any sane Sweet Spot" I do not recall but we got

3    the gist across that the system that they had was larger

4    than we expected.

13:08:55  5  Q.   Okay.  So that's -- I'm glad we've cleared that up

6    now.

7    So what was said to Hodell on that call was

8    just that the system was larger than you expected.

9    That's what you're saying was disclosed to Hodell on that

13:09:06  10  call, is that --

11  A.   That was one of the items we disclosed, yes.

12  Q.   Well, I just want to be clear that the day before,

13  right, you had sent an e-mail saying something to the

14  effect that there's no fix in sight, right?

13:09:20  15  A.   That was -- yes.  That was my opinion at that time.

16  Q.   And we need to get this customer, Hodell, off

17  Business One, right?

18  A.   With the information I had at that time, that was

19  my opinion, yes.

13:09:29  20  Q.   Okay.  And you didn't tell Hodell, "There's no fix

21  in sight.  We need to get you off Business One" the next

22  day, did you?

23  A.   Yes, we did, because we talked about alternative

24  solutions, we talked about All-In-One, and we also talked

13:09:44  25  about the fact that we could not give them a timeline or

1    any time where we could deliver a fix.

2              So -- and this is, I mean, you can even see

3    this in the summary.  We did share that with Hodell that

4    we may have to look at different products and there's no

13:09:58  5    timeline, we cannot guarantee performance and there's no

6    timeline that we can give you.

7    Q.    But, sir, we agree, that's a lot different than

8    "way outside any sane Business One Sweet Spot," right?

9    A.    It is phrased differently, but the message, the

13:10:14 10    gist is the same.

11    Q.    The gist is the same.  "We may need to look at

12    combining Business One with All-In-One" is the same as

13    "There's no way this is going to work for you"?

14    A.    I'm sorry, I was referring to the notes.

13:10:26 15              The notes talk about the notes, but there

16    was a whole call where we very clearly stated that there

17    was an issue, and whether we used the words may -- we did

18    not, I'm sure we did not use the word "sane," but this

19    was not -- this was not sugar-coated at that point.

13:10:44 20    Q.    Let's look at, can you flip to Exhibit 402 in your

21    binder?  Kim, could you pull that up?

22    A.    Yes.

23    Q.    This is Mr. Boessmann e-mailing you a week after

24    that call, correct?

13:11:17 25    A.    That is -- that is correct.

```
 1    Q.    Okay.  And the first e-mail in that chain --
 2              MS. ANDERS:  We don't have it yet.
 3    BY MR. LAMBERT:
 4    Q.    The first e-mail in that chain you see is an e-mail
 5    from yourself to several individuals inquiring as to what
 6    the next steps are, right?
 7    A.    That is correct.
 8    Q.    And Mr. Boessmann replies to you, "But as the
 9    customer is shortly targeting 300 user, field should take
10    action as the system will fail due to the overselling."
11              Correct?
12    A.    I see that, yes.
13    Q.    Okay.  Thank you.  And just before we move on, you
14    testified this morning that some people had disagreed
15    with your conclusion in April that Business One was never
16    going to work for Hodell?
17    A.    That is correct.
18    Q.    Who?  Who were those people?
19    A.    I cannot give you names.
20              I can only tell you that the sign of people
21    disagreeing was the fact that we did go out to Hodell, we
22    did send people out, and we did make massive
23    improvements.
24              And to your point here, the field, which
25    was -- which was sales and marketing and related
```

1      organizations, did go out and work with the customer.  So

2      I cannot give you names, but I can tell you that people

3      were out there and that's why SAP actually kept involved

4      and made sure that the system in the end actually worked.

13:12:45 5     Q.    Well, I'd like to know the name of a single

6      individual that disagreed with all the e-mail traffic

7      we've seen during this case that this product wasn't

8      going to work for Hodell?

9      A.    To be honest, I mean, I -- I cannot give you the

13:13:01 10    name because I was, after, after -- shortly after the

11     call, I was basically out of the loop.

12                     I can tell you, though, that somebody must

13     have made the decision.  Otherwise, people wouldn't have

14     gone to Hodell for months and tried to solve the issue.

13:13:14 15                    I don't know who, who the person was.  I

16     mean, Eddy Neveux's manager, for example, is Gianluigi

17     Bagnoli out of Italy.  He would have had to sign off on

18     Eddy going over.

19                     I don't remember who Paul Killingsworth's

13:13:41 20    manager was at that time, but he would have had to permit

21     him to go over as well.

22                     So the fact that SAP continued to work on

23     it should be a clear indication that we were involved in

24     this process.  Otherwise, we wouldn't have done all these

13:13:53 25    things.

2305

Q.    So you think maybe Gianluigi Bagnoli was the one,
he was the one?

A.    I doubt it, but he would have been in the chain of
approval saying, "Yes, Eddy can go."

13:14:06         Frankly, I don't know who would have -- it
may have been Dan Kraus, it may have been Michael
Sotnick, it may have gone all the way to Rodney
Seligmann, who was the head of sales at that point.

         I cannot remember who was the head of our
13:14:18 service organization at that point, but it would have all
gone through a process there to say, yep, let's go out
and see what's going on.

Q.    Okay.  Let's look at 161, Kim.

         Let's look at what Gianluigi Bagnoli said
13:14:34 two months after that call.

         Do you see that e-mail?

A.    Yes, I do.

Q.    And you're copied on it, correct?

A.    Yes, I am.

13:14:44 Q.    And he says, "From the numbers I see, the customer
is simply outside of the area B1 is supposed to cover."

         Is that correct?

A.    He does say that.

Q.    That's two months later, correct?

13:14:53 A.    Yes.  And he, as I, were proven wrong.

1    Q.    When did your involvement in the Hodell

2    implementation and trouble shooting issues cease?

3    A.    I was, as you can see, I was probably copied on a

4    couple of e-mails, but actively I was not involved at

13:15:14  5    all.

6               It was really not my business to begin

7    with, because I was on the ISV partner side.

8    Q.    Well, you testified this morning about a bunch of

9    site visits and stuff that people took, right?

13:15:27 10    A.    Yes, ma'am.

11    Q.    And you were able to give pretty detailed testimony

12    on what you thought those people meant, is that correct?

13    A.    That is correct.

14    Q.    But you weren't involved at all at that time?

13:15:36 15    A.    I was not involved in the site visits but I did get

16    the final report.

17    Q.    Okay.  But you're just now looking at those e-mails

18    now and trying to interpret what people meant many years

19    ago.

13:15:45 20               Is that what your testimony is?

21    A.    No, that is not.

22               I had read the e-mails at that point and

23    had come to my conclusions at that point, which was in

24    October of 2007.

13:15:53 25    Q.    Just based upon the hearsay statements of other

 1      people and what other people actually did, right?

 2                        MR. KELLEHER:  Objection, Your Honor.

 3                        THE COURT:  Overruled.

 4      A.     These were statements by our experts.  I mean, we

13:16:04  5     had Paul Killingsworth and Eddy Neveux out there who were

 6      absolute experts on these kind of issues, so I relied on

 7      those statements, absolutely.

 8                        But they weren't just people who didn't

 9      know what they were talking about.  Those were -- those

13:16:16 10    were -- those were the experts.

11      Q.     Okay.  So we'll establish now Paul Killingsworth

12      and Eddy Neveux are the people that you rely upon for

13      your information, right?

14      A.     For this purpose, yes.

13:16:24 15    Q.     Okay.  By the way, just before I forget, in your

16      role as the director of business development for SAP,

17      were you familiar with an SAP partner by the name of

18      American Express Business & Tax Services?

19      A.     Yes, I was.

13:16:47 20    Q.     Did they report back to SAP as a channel partner?

21      A.     Yes, they did.

22      Q.     Okay.  Thank you.

23                        Now, you were one of the first employees

24      for the SAP Business One division in the United States

13:17:04 25    when you first got hired, correct?

1    A.    That is correct.

2    Q.    And that was sometime in 2002 or 2003?

3    A.    Late 2002.

4    Q.    Late 2002.  How many other people were working

5    there at the time?

6    A.    Oh, I think it was probably a dozen, but I -- I

7    couldn't give you all the names anymore.

8          We were led at that point by a person

9    called Gadi Shamia.

10   Q.    Okay.

11   A.    But it was -- it was a small group at that point.

12   Q.    How many people were in the United States working

13   on Business One at the time?

14   A.    That was the group.

15   Q.    A dozen?

16   A.    Yeah.  I would say a dozen, but again, I don't know

17   the -- I don't remember the exact number.

18   Q.    Okay.  Obviously in order to get the group up and

19   running, right, because you came in on the ground floor,

20   you were going to have to get up to speed on what

21   Business One could do, is that right?

22   A.    That is correct.

23   Q.    And how did you go about doing that?

24   A.    I had some basic training on the product.  I never

25   really was -- I wouldn't have been able to demo the

1    product itself, and I would have been involved in the

2    sales and marketing side of things with documentation and

3    then, of course, my role was to build that part of the

4    channel, the ISVs.

13:18:07  5    Q.    Okay.  And based upon all the e-mail traffic that

6    you went over this morning, part of your job entailed

7    relaying some relatively technical information to people

8    outside of the SAP organization, is that correct?

9    A.    Not quite.

13:18:26  10                When I would get a technical question, I

11    would involve Eddy, usually, to help me out relay that

12    information because I was not technical enough by any

13    means to make technical commentary of any sort.

14    Q.    But you did ultimately -- you were ultimately on

13:18:42  15    occasion the one that passed it along to the partner, for

16    instance, right?

17                I mean, we saw Exhibit, what, 294 where you

18    were interfacing with Dale Van Leeuwen and things like

19    that?

13:18:52  20    A.    I would have an e-mail -- yes, so I would have an

21    e-mail, but when it came to the actual content of the

22    e-mail or if we were scheduling a call, I would always

23    have Eddy or somebody like Eddy with me, but usually it

24    was Eddy.

13:19:06  25    Q.    Okay.  And just so I'm clear, your job was to go

2310

1    out and recruit partners that developed add-on products,

2    right?

3    A.    That is correct.

4    Q.    And you -- these add-ons then got integrated into

13:19:20  5    Business One through the SDK?

6    A.    Yeah.  And the partners integrated them through the

7    SDK, yes.

8    Q.    Okay.  And really Business One was marketed, that's

9    one of the -- that's one of the selling points of

13:19:33 10    Business One, right, that you could do that?

11    A.    Yes.  That was one of the selling points.

12    Q.    Okay.  And sometimes you would target specific

13    partners because of your awareness of an add-on that they

14    were developing, is that accurate?

13:19:52 15    A.    That is accurate.

16    Q.    And you would look for where there were gaps in

17    certain industries that SAP wasn't servicing at the time

18    and go and make a strategy target to those kinds of

19    add-on products, correct?

13:20:06 20    A.    That is correct.

21    Q.    And then after you got the partners in, you managed

22    them, right?

23    A.    That is correct.

24    Q.    And you helped them get their add-on products

13:20:15 25    built?

1    A.    No.  We helped them -- we helped them get the

2    add-on products marketed and sold to other companies, to

3    other customers or potential customers.

4    Q.    Okay.

13:20:26  5         Do you remember talking about in your

6    deposition -- I don't want to read your deposition right

7    now, but do you remember talking about in your deposition

8    about helping them get it built as well?

9    A.    No, I don't.  I don't recall saying that.

13:20:38 10        What we would do is we would -- we had the

11   SDK, which is a software tool that helps you to

12   integrate, and we had people like Eddy, for example, who

13   would sometimes work with the partners.  If the partners

14   had issues with integrations or if we had questions about

13:20:56 15  a partner's integration, he would go out and then help

16   us.

17        He was responsible for asking the right

18   question and investigating the integration that had been

19   built by the partner.  We didn't build any integrations

13:21:09 20  ourselves.  That was the partner's responsibility because

21   we didn't know the partner's product, we only knew ours.

22   So we gave them the tool and said you build it.  And Eddy

23   and the other solution architects, if there were issues,

24   they would go in and try to figure out with the partner

13:21:25 25  what the issues were.

1          Sometimes they would go in before the

2     partner starts building to help them build the

3     integration the right way, but the product, the

4     integration itself was always built by the partner.

13:21:35 5     Q.    Okay.  And I think we agree on that, the partner

6     did the development but they weren't just hung out to dry

7     by your team, right?

8          Your team was involved, right?

9     A.    Those partners who were signed up with us, who were

13:21:45 10     ISVs, yeah, absolutely.  We have the solution architects

11     working with them.

12     Q.    And then, then your team would help them take those

13     products out into the market and help them market them to

14     customers, right?

13:21:56 15     A.    That is correct.

16     Q.    Okay.  And we agree and you're aware that these

17     partners were -- had the SAP logo on their literature and

18     things like that, right?

19     A.    Yes.  Those that were signed up.

13:22:06 20          IBIS, for example, was not.  IBIS was a

21     reseller that also has a -- had a product, but the

22     partners that were actually that we recruited and signed

23     up formally as an ISV, they would, they would go through

24     that process, that is correct.

13:22:20 25     Q.    Okay.

1            Now, you had knowledge of what LSi was

2    planning to do with their add-on into the fastener

3    industry before they even became a partner, right?

4    A.    I had very basic knowledge, and I think we went

13:22:40  5    through the e-mail this morning.

6            There was an e-mail where they reached out

7    to me, said, hey, do you know what we're doing with

8    In-Flight, and I had a general idea it was an add-on for

9    the fastener industry, but that was it.

13:22:51 10    Q.    But I'm talking before that even happened, you

11    recruited LSi to become an ISV partner, right, before

12    they even became a partner because of the In-Flight

13    application?

14    A.    I do not recall that.

13:23:06 15            I believe we recruited LSi as a -- as a

16    reseller of our product.  I don't think the focus was

17    initially on the product itself -- I'm sorry.  I don't

18    believe the focus was initially on the add-on product.

19    Q.    Right.  LSi was in the process of becoming or

13:23:25 20    investigating whether to become a reseller, right?

21    A.    Correct.

22    Q.    And you at that time learned of the potential for

23    In-Flight, right?

24    A.    Yes.  Yes.

13:23:35 25    Q.    And you recruited them on both bases, right?

1    A.    I didn't recruit them at all.

2          The reseller group recruited them; not my

3    group.

4    Q.    SAP recruited them?

13:23:47  5    A.    SAP did, yeah, but not I.

6    Q.    Okay.

7    A.    So we never, just to be clear, they were recruited

8    as a reseller of product, and I believe they were given

9    the SDK to build an integration to their product but they

13:24:00  10   never went over to my side of the business which would

11   have basically taken that product, that add-on product,

12   and sold it to other people.

13         To that point, we never got.

14   Q.    Okay.  But just so we're clear, when they were

13:24:15  15   being recruited as a partner by SAP, it was with

16   knowledge of In-Flight, correct?

17         MR. KELLEHER:  Objection.  Foundation.

18         THE COURT:  Overruled.

19   A.    I -- I cannot answer the question because I was not

13:24:24  20   involved in the recruitment process itself.

21         I found out about the In-Flight product

22   when the -- when I got the e-mail, and I cannot even tell

23   you at what stage that was in the recruitment process of

24   them as a reseller partner.

13:24:39  25   Q.    Okay.  I was hoping to not have to do this but can

1    you turn to Page 16 of your deposition?  Are you there?

2    A.    Yes.

3    Q.    Can you -- I'm looking at the question on Page 16,

4    Line 11.

13:25:05 5              "Do you know how LSi was first recruited to

6    be a partner at SAP?"

7              And you initially said "I do not."  But you

8    did answer, right?  You answered the question?

9    A.    I did answer the question, and the way I answered

13:25:21 10   is that I believed they were first recruited as a

11   reseller for Business One product, and then as part of

12   engagement I believe there was a second line where we

13   found out they had the product.

14              Again, we found out about the product

13:25:31 15   through the e-mail that they had sent to me.  But I don't

16   think we ever recruited them as a reseller.  If we had

17   recruited them -- well, first of all, there should be an

18   agreement with them in the first place, but I don't think

19   we ever did because --

13:25:45 20   Q.    Just read what you -- I don't want to paraphrase

21   what you said in your testimony.

22              Let's read what you actually said.

23              "I do believe they were first recruited as

24   a reseller of the Business One product."

13:25:54 25              MR. MILLER:  Whoa.  Whoa.  Objection.

1          He just misquoted.

2               MR. KELLEHER:  Objection, Your Honor.

3               THE COURT:  Did you just misread it?

4               MR. LAMBERT:  No, I'm reading it verbatim.

13:26:04  5          MR. KELLEHER:  You left a word out.

6               MR. LAMBERT:  Where?

7               MR. KELLEHER:  In the first part.

8               MR. MILLER:  Page 16, Line 13 you're

9    reading from, aren't you?

13:26:12 10              MR. KELLEHER:  Why don't you just read it

11   again?

12   BY MR. LAMBERT:

13   Q.     "Do you know how LSi was first recruited to be a

14   partner at SAP," do you see that question?

13:26:22 15   A.     Yes.

16   Q.     And you initially answered "I do not."  Right?  "I

17   acknowledge that"?

18   A.     "I acknowledge that," yeah.

19   Q.     But then you went ahead and answered the question

13:26:37 20   and said, "I do not believe they were first recruited.

21   Well, I'm sorry.  I do believe they were first recruited

22   as a reseller of the Business One product and then as

23   part of the engagement, I believe there was a second line

24   where we found out that they had a product that may be of

13:26:47 25   interest to us and so we recruited them or we expanded

1    their relationship with us to include an ISV or solution

2    partnership -- partner relationship."

3                    Do you see that testimony?

4    A.    I do.  I do.

13:27:01 5    Q.    And then on the next page, Line 2, "Why were they

6    recruited as an ISV partner?"

7                    And your answer was:  "What we found out

8    after they had again being recruited as a reseller is

9    that they had some knowledge in the fastener industry and

13:27:18 10   that they were interested in building an add-on product

11   on the fastener side.  And that was of interest to us

12   because we had no solution in that market."

13                   That was your testimony, correct?

14   A.    That was my testimony.

13:27:27 15   Q.    Thank you.

16   A.    And if I may make a comment on that, we did expand

17   the relationship because we did give them the SDK to

18   build the product, but we never got to making them a

19   formal ISV partner.

13:27:43 20   Q.    Is your testimony you gave them the SDK without any

21   kind of agreement with them?

22   A.    I believe there was a SDK license agreement of some

23   sort.

24   Q.    Okay.

13:27:54 25   A.    We always had a license agreement.

1    Q.    We can agree that, and I think this is from your

2    testimony earlier, that there was a particular market

3    segment for Business One, is that correct?

4    A.    Yes.  We -- we marketed it that way, yeah.

13:28:15 5    Q.    Well, there's a particular area where you wanted to

6    be.  You didn't want to be up here or even right here.

7    You wanted to be down here, right?

8    A.    That is correct.

9    Q.    Okay.  And one of the reasons for that is that a

13:28:29 10   lot of Business One customers can't afford the bigger

11   guys, right?

12   A.    Yep.

13   Q.    Business One's cheaper, right?

14   A.    It's cheaper and it's easier to implement, et

13:28:41 15   cetera, yes.

16   Q.    And at the time of the Hodell sale, Business One

17   was relatively new in the United States, isn't that true?

18   A.    Sale was -- sale was 2006, right?

19   Q.    The sale started in 2003 and --

13:28:58 20   A.    Yeah.

21   Q.    I'll represent to you --

22   A.    Yeah, it was relatively new to the United States.

23   Q.    Okay.

24          Now, a lot of customers, because of the

13:29:07 25   price point, could either buy Business One or nothing at

1    all, right, because they could either afford -- they

2    could afford Business One but not the stuff that was

3    above it, right?

4              MR. KELLEHER:  Objection, Judge, calls for

13:29:20  5    speculation.

6              THE COURT:  Overruled.

7    A.    I cannot answer, I cannot cleanly answer that.

8              It depends on the customer.  I mean,

9    sometimes you have a large customer size-wise who has a

13:29:31 10    lot of money who has a small need from the ERP side.

11    Wouldn't be an issue.  So I can't cleanly answer that.

12              Sometimes it's the other way around.

13              On the SAP side, if they didn't find

14    another product on SAP, they could have found products

13:29:45 15    from other -- from other vendors.  I mean, there's many

16    other vendors.  As a matter of fact, many of our

17    customers came from other vendors and were replaced.

18    Q.    That's my point.  There's a particular market

19    you're going after with Business One, right?  People that

13:30:01 20    can't necessarily afford R/3 or --

21    A.    Yes.  That is correct.

22    Q.    So they're either going to get, if SAP wants to do

23    business with them, it's got to be through Business One

24    or else they're going to Aperum or one of the other

13:30:16 25    vendors, right?

2320

1      A.      They could.  They could do that or maybe negotiate

2      a very good deal from SAP for a high end product, but I

3      was not involved in that prong at all so I couldn't

4      answer that.

13:30:36  5      Q.      SAP, you had some awareness of the channel partner

6      program, right?  You've testified a little bit about that

7      today?

8      A.      Yes, I do.

9      Q.      And I think it's been covered a lot here that SAP

13:30:50 10      sold Business One just through channel partners, right?

11      That's your understanding?

12      A.      That is my understanding, yes.

13      Q.      And I think you used the term "Reseller" several

14      times, and we've heard it through the case.  Is that a

13:31:05 15      term you've used with regard to companies like LSi?

16      A.      Yep.  Reseller or value added reseller or dealer,

17      but those are the terms we would use.

18      Q.      Okay.  Now, I just want to clear something up.

19              Are they really reselling it?  I mean,

13:31:19 20      they're not really taking title to the licenses and

21      reselling it, are they?  They're just passing it through

22      to the customer, am I correct?

23              MR. KELLEHER:  Objection, Your Honor.

24      Compound question.

13:31:28 25              THE COURT:  Overruled.

1            MR. KELLEHER:  Calls for a legal

2    conclusion.

3            THE COURT:  Overruled.

4    A.    The engagement, the engagement between the reseller

13:31:35 5    and the customer has multiple pieces.

6                There is, again, they are the face to the

7    customer and they would know who the customer is so first

8    of all, there usually is a services agreement engagement

9    between the reseller and the customer.

13:31:48 10   Q.    I understand the relationship in general.  I don't

11   want to be here all day beating this into the ground, but

12   they don't -- the sales process of Business One, the

13   partner doesn't buy Business One from SAP and then resell

14   it to the customer?

13:32:04 15   A.    That's okay.  That is correct.

16   Q.    Okay.

17   A.    The license goes from SAP to the customer.

18   Q.    The license and the software goes directly to the

19   customer; that's not a resale, right?  That's not bought

13:32:18 20   and then resold, we can agree on that?

21   A.    I, to be honest, I do not know whether the software

22   was shipped to the -- the software was shipped -- I'm

23   sorry.  The software was always shipped to the reseller

24   who then delivered it to the -- to the environment to the

13:32:35 25   customer.

1    Q.    But the software itself was sold to the customer.

2    Title didn't pass to the reseller and then to the

3    customer, do you understand what I'm talking about?

4    A.    No.  Because you're selling a license so you didn't

13:32:46 5    deal with title anyway.

6    Q.    Okay.

7    A.    I -- I do not understand your question.

8    Q.    I think you answered it earlier but we'll just move

9    on.

13:32:56 10             We talked a little bit about your technical

11    background, do you recall that?

12    A.    Yes.

13    Q.    You have a little bit of knowledge and you had to

14    be trained on the product, right?

13:33:11 15    A.    Yes.

16    Q.    And I was reading -- well, you agree that there's

17    some architectural limitations that Business One has,

18    right?  We talked about that in your deposition?

19    A.    Yes.  There's architectural limitations with regard

13:33:28 20    to on how many machines it will run, et cetera, et

21    cetera, yes.

22    Q.    Okay.  And that, that's in terms of what kind of

23    customer Business One will be appropriate for; it's

24    architected for a certain type of customer, we can agree

13:33:44 25    on that?

1    A.    Yes, we can.

2    Q.    Okay.  And I was trying to get my head around

3    something you said in your deposition, and maybe just to

4    short circuit it, but there was a limitation on the

13:33:57  5    database for Business One, do you recall that?

6                   MR. KELLEHER:  Objection, Your Honor.  This

7    is hearsay.

8                   THE COURT:  Overruled.

9    A.    I do not.

13:34:03 10                   Could you let me know where, where you

11    found that?

12    Q.    Page 61 of your deposition.  It wasn't me that

13    asked you this but, "Why exactly would the combination of

14    high volume and high number of users not be a good fit

13:34:23 15    for Business One," and you responded "There was a

16    limitation," further down on 16, "There was a limitation

17    on the database which is a Microsoft limitation."  And

18    you didn't mean that in a negative way.

19                   But Microsoft SQL server had limitations on

13:34:40 20    their performance, depending on the number of users,

21    right?

22    A.    That's what I recalled.

23    Q.    And that's your -- is that your understanding of

24    the product now?

13:34:47 25    A.    That -- now you mean?

1    Q.    Now is not really relevant, right?

2    A.    Okay.  Yeah.

3    Q.    Back when Hodell was buying it.

4    A.    That was my understanding then, yes.

13:34:58  5    Q.    Is your understanding of -- is your understanding

6    different now than what you testified in your deposition?

7    A.    No.  And my understanding when I testified in

8    deposition was based on basically stuff that I had heard,

9    and that's why I said I believe there was limitation from

13:35:15 10    Microsoft environment.

11    Q.    Okay.  And that, you're not taking that back; you

12    agree with that, right?

13    A.    That's what I believed at that time, yes.  I'm not

14    taking it back because that's what I believed and have

13:35:24 15    not done any more research on figuring out whether that

16    was true or whether it was just a -- or whether it was a

17    wrong belief.

18          But that's what I believed.

19    Q.    So we were talking earlier about database issues

13:35:35 20    with Business One, and your understanding is part of that

21    has to do with the use of the Microsoft SQL server and

22    the limitations on performance derived from the number of

23    users it can handle, right?

24    A.    That's what I believed at that point, yes.

13:35:50 25    Q.    Okay.  So if a customer had been given the

1    impression that Business One, using -- that this

2    Microsoft SQL server could support an unlimited number of

3    simultaneous user transactions, that customer was -- had

4    been given inaccurate information to your knowledge?

13:36:10  5          MR. KELLEHER:  Objection, Your Honor.

6                THE COURT:  Objection sustained.

7                MR. LAMBERT:  Well, Kim, can you pull up

8    618.7?

9    BY MR. LAMBERT:

13:36:28 10   Q.    I'm going to focus down here at the bottom.

11          This document says, "A robust MS-SQL

12   database is used," that's SQL, is that correct?

13   A.    That is true.

14   Q.    And it says it supports an unlimited number of

13:36:48 15   simultaneous user transactions.

16          Do you see that?

17   A.    I do.  Is this one of our documents or --

18   Q.    Yeah, it is.

19   A.    Okay.  I've not seen the document.  Would you be

13:36:56 20   able to --

21   Q.    Sure.  Kim, can you go to the first page?

22          This is a document that actually American

23   Express and Penelope Vitantonio testified yesterday she

24   was given by SAP to give to Hodell.

13:37:18 25          Do we agree on that, it's an SAP document?

2326

            1           MR. KELLEHER:  Objection.  The witness

            2    wasn't here.

            3                 THE COURT:  Overruled.

            4    A.    The --

13:37:28    5                 THE COURT:  Go ahead, if you know what

            6    they're talking about you can answer.

            7    A.    Actually I don't.  This document pre-dates my time

            8    at SAP so I don't -- I don't know whether I've seen it or

            9    not.  I don't recall this document.

13:37:38   10    Q.    Okay.  We agree it says SAP on the front, right?

           11    A.    We do agree it says SAP on the front.

           12    Q.    And it says SAP Business One Whitepaper on the

           13    front?

           14    A.    Yes.

13:37:52   15    Q.    Okay.  And the section we had highlighted earlier,

           16    you agree based upon your understanding of the SQL server

           17    that is inaccurate -- that's not an accurate statement,

           18    correct?

           19                 MR. KELLEHER:  Objection.

13:38:04   20                 THE COURT:  Objection sustained.

           21    Q.    We can agree that Business One was optimized for

           22    performance with up to 50 concurrent users, correct?

           23    A.    I don't know.  I don't think we can agree because

           24    we had -- we had varying levels of optimizations and

13:38:34   25    testing done at varying levels so I don't know whether it

2327

1    was 50, 50 users and at which time we would have made a

2    statement.

3                So I can't, just like that, I cannot agree

4    because I don't know.  I don't recall what we optimized

13:38:48  5    it to.  Again, we had customers with, many customers with

6    more than 50 users so I don't know whether the

7    optimization statement is correct.  I just don't recall.

8    Q.    We can agree that during the entire time you were

9    with SAP, the Sweet Spot for Business One was 50

13:39:10 10    concurrent users, can we not agree on that?

11    A.    No.  We had ranges.  We had ranges of users.  We

12    looked at a customer and the usage with regard to what

13    does the customer -- no, no, we cannot.

14                I'm sorry.  We looked at users with regard

13:39:28 15    to what the customer needed, what industry they were in.

16    So I cannot agree with the statement that during my

17    entire time, it was 50 users.

18    Q.    Can you turn to Page 58 of your deposition, sir?

19    A.    Yes, I'm here.

13:39:55 20    Q.    And we're looking at Line 11.  The question was

21    posed to you:  "Do you know what was considered the

22    Business One Sweet Spot when you first became involved

23    with Hodell and it sounds like approximately 2006" and

24    I'll read the answer that you gave:  "Yeah, I believe at

13:40:12 25    that point and I shouldn't say at that point, I mean the

1    Sweet Spot really didn't change.  I mean, it was always

2    the smaller, the smaller end of the business, not the

3    very small ones but the smaller end.  And if I recall

4    correctly, just as a general guideline, if somebody was

13:40:26  5    in about a hundred million dollars of revenue and lower

6    and didn't need more than 50 concurrent full users,

7    roughly speaking, that was a good fit.  I mean, we also

8    looked at employee size and it could have been a hundred

9    or 200 employees, but that was really used as a gauge for

13:40:41 10    complexity.  So at that point it would have been, you

11    know, probably around a hundred million in revenue and

12    lower, probably 50, 50 to 70 or so concurrent users and

13    I'm thinking it was probably 50."

14                  Do you recall that testimony?

13:40:55 15    A.    I do.

16    Q.    And your testimony was that it never really changed

17    the whole time you were there, right?

18    A.    No.  Let me -- let me go back.

19    Q.    Well, that was your testimony, correct?

13:41:04 20    A.    My testimony with the Sweet Spot didn't change.  It

21    was always the small end of the market.

22    Q.    And you ended it, "I'm thinking it was probably

23    50," right?

24    A.    And then I said it was a general guideline if

13:41:18 25    somebody had a hundred million dollars in revenue and 50

1    users, you were always fine.  It was like, yep, you're

2    good.

3    Q.    Okay.  So that was the 50, right?  We agree that

4    was the number that you gave, 50?

13:41:28 5    A.    Yep we agree.  But again, that wasn't a quick way

6    for us to say 50 users, no issue at all.  Hundred million

7    dollars, no issue at all.  But that doesn't mean it's

8    only 50 users or that the Sweet Spot was 50 users.  The

9    Sweet Spot was the lower end of the market.

13:41:47 10   Q.    Okay.  We'll come back to that.

11                You testified that you knew what the Sweet

12   Spot was for Business One the whole time you were there,

13   correct?

14   A.    Yes.

13:42:00 15   Q.    And would you agree with me that Dan Kraus, who was

16   the VP of the Business One division, should have also

17   known the Sweet Spot the whole time he was there?

18                MR. KELLEHER:  Objection.

19                THE COURT:  Objection sustained.

13:42:15 20   BY MR. LAMBERT:

21   Q.    You did have some communication with Dan Lowery

22   surrounding the Hodell sale before it was made, correct?

23                MR. KELLEHER:  Objection.  Compound

24   question.

13:42:38 25                THE COURT:  Do you understand the question?

2330

1           THE WITNESS:  I understand the question.

2    A.    Yeah, I did not.  I do not recall any conversation

3    about Hodell specifically.

4    Q.    Would you turn to Exhibit 71 in your binder?  Kim,

13:42:59  5    I'm actually going to go to the last page in that

6    document.

7    A.    I'm sorry, you said the last page?

8    Q.    Yeah, well, you'll want to start at 71.3 with the

9    e-mail at the bottom and then turn over to the next page.

13:43:19 10    A.    So you said on Page 3 at the very bottom of the

11    e-mail?

12    Q.    Yes.  From Dan Lowery to Dan Kraus, do you see that

13    e-mail?  And then it spills over.

14    A.    Yep.

13:43:28 15    Q.    And if you look on 71.4, in the middle, he

16    references that he and Dale have been talking to two

17    large close prospects who want to write equipment rental

18    and fastener functionality to SAP.  Further on, they are

19    both 150 user deals, right?

13:43:45 20    A.    Yes, I see that.

21    Q.    Okay.  And that e-mail gets forwarded on to you,

22    right, on 71.3?

23    A.    Yes, it does.

24    Q.    And then you responded "Dan, if they can build an

13:44:05 25    equipment rental module that I can take into large

```
 1   accounts, Caterpillar and John Deere, we may be able to

 2   get some funding."

 3                  Right?

 4   A.    Yes.

 5   Q.    And then Dan Kraus forwarded your e-mail on to

 6   folks at LSi and IBIS, correct?

 7   A.    That is correct.

 8   Q.    And states, "I think we can help you land your

 9   current prospects with the promise of a larger SAP

10   relationship for the product.  And we can make some

11   commitments on helping you market the solution once it is

12   done, or close."

13                  Correct?

14   A.    That is correct, that's what he says.

15   Q.    And we can agree that that is discussing -- one of

16   those deals that was being discussed in that first e-mail

17   was Hodell, correct?

18                  MR. STAR:  Objection.

19                  THE COURT:  Overruled.

20   A.    I'm sorry, where do you see Hodell being discussed

21   here?

22   Q.    Well, it was your understanding that that was

23   Hodell that was being discussed, correct?

24   A.    Why would that have been my understanding?

25   Q.    Well, is it --
```

1    A.    I -- I'm sorry, I -- I remember the e-mail, but all

2    that was discussed was they had a customer they were

3    building a module, but Hodell was not mentioned here.  So

4    I don't -- I don't think -- again, I was not involved in

13:45:16  5    the Hodell sale.

6    Q.    Well, would you turn to Page 63 and 64 of your

7    deposition, sir.

8              Down at the bottom of Page 63, it was asked

9    "Starting with Page 3" and we're talking about Exhibit

13:45:39 10    71.  "Starting with Page 3 of that e-mail, which is

11    actually the first e-mail in the string, e-mail from Dan

12    Lowery to Dan Kraus, it is in review, is that fair to say

13    that Mr. Lowery had conveyed to SAP and then as we see

14    throughout this e-mail string further on, other people at

13:45:55 15    SAP that they were looking at 150 user setup for Hodell?"

16              Your answer:  "Yes, it says that in the

17    e-mail.  They are both 150-user deals.  Yes."

18              Do you recall that saying that?

19    A.    Yes, I recall saying that.

13:46:10 20    Q.    Okay.  Thank you.

21    A.    But, again, I didn't say Hodell.  They were talking

22    about two 150-user deals, but Hodell was not mentioned.

23    Q.    Can you turn to Exhibit 294 in your binder?  And we

24    can agree that this e-mail was sent, this e-mail exchange

13:46:31 25    involving you occurred more than a year before "the

2333

1  stunned silence" e-mail that you were talking about this

2  morning?

3  A.    Yes, we can.

4  Q.    This is one of the ones -- this is one of the

13:46:44 5  e-mail communications I think you went over this morning

6  on direct examination, correct?

7  A.    That is correct.

8  Q.    And we can agree that both yourself and Mr. Neveux

9  were provided with the information on 294.3, right?

13:46:59 10               That's -- that's accepted at this point?

11  A.    Yes.  Yes.

12  Q.    And in there, you've got the database size, right?

13  A.    That is correct.

14  Q.    And you've got the 150,000 SKUs, that was given to

13:47:13 15  you, right?

16  A.    Yes.

17  Q.    And the 20,000 customers?

18  A.    Correct.

19  Q.    And the 7500 vendors?

13:47:21 20  A.    Correct.

21  Q.    And again, in the next paragraph, they're talking

22  about the problems that LSi is having testing the

23  solution, correct?

24  A.    That is correct, yes.

13:47:32 25  Q.    And the last sentence of that paragraph, "Again

```
         1    these results are base system without our add-ons as to

         2    ensure our programming has not impacted performance."

         3                 Do you see that?

         4    A.   I see that.

13:47:46 5    Q.   And then even further down, "Client will be running

         6    with 120 users," correct?

         7    A.   That is correct.

         8    Q.   That's all out in the open at this point, right?

         9    A.   It is.

13:47:57 10   Q.   Okay.

        11                 And then right after this e-mail, you did

        12    correspond with Mr. Neveux who you've said is very

        13    knowledgeable on Business One, correct?

        14    A.   That is correct.

13:48:14 15   Q.   And let's go to, Kim, 79.2.  This document's a

        16    little lacking, but you forwarded a bunch of e-mails to

        17    Dan Kraus on April 15th, 2007, right?

        18    A.   Yes.  That is correct.

        19    Q.   And he was looking for you to dig up information on

13:48:47 20   what had been said to LSi prior to the go-live date?

        21    A.   That is correct.

        22    Q.   Okay.  And then if we go to 79.8, Kim, and there's

        23    an e-mail --

        24    A.   I'm sorry, I'm sorry, you said which one?

13:49:07 25   Q.   79.8, I'm sorry.
```

```
 1   A.   Oh, I don't have that.  Sorry.

 2   Q.   All right.

 3   A.   Would you mind?  Do you have a paper copy?

 4   Q.   I don't have it in there?  I'm sorry.

 5   A.   I don't have the last two pages, and it must be my

 6   glasses.  I can't read the screen properly.

 7   Q.   Okay.

 8   A.   79.6, I don't have anything beyond 6.

 9   Q.   Okay.  Sorry about that?

10             MR. LAMBERT:  May I approach, Your Honor?

11             THE COURT:  Sure.

12             THE WITNESS:  Thank you.

13   BY MR. LAMBERT:

14   Q.   Lost my train of thought.  Where were we?  79.8,

15   right?

16   A.   Yes.

17   Q.   In the middle, there's an e-mail from Ed Neveux to

18   yourself?

19   A.   Dated March 13th, yes.

20   Q.   Yeah.  And he says, he  wants to know what the plan

21   is here.  He's happy to talk with LSi.  Then he says,

22   "But based on the volume of data, this has nothing to do

23   with the SDK."

24             Right?

25   A.   That's what he says, yes.
```

1    Q.    And the SDK was the thing that interacted with

2    In-Flight, right?

3    A.    That's -- yeah, that's the solution development

4    kit, the tools, yes.

13:50:40  5    Q.    And then at the top, you respond and ask for the

6    volume they're working on, right?

7    A.    Yes, I do.

8    Q.    And then he says, "They already gave it to us," and

9    then he goes through the particulars all over again,

13:50:59 10    right?

11    A.    Yes, he does.

12    Q.    Okay.  And again, Mr. Neveux, who you've said that

13    you relied upon, said he doesn't have any solution to

14    this issue at this point, right?

13:51:16 15    A.    That is correct.

16    Q.    Okay.

17    A.    Or any solution past what he had told them already

18    which was there was an earlier exchange beforehand.

19    That's why he wrote that e-mail saying I have nothing

13:51:30 20    other than I can tell, so he already told them, IBIS/LSi,

21    he told them things that then we retold them on, I

22    believe, the 15th of March.

23    Q.    You make it a point, you told them, I think my

24    notes say that you told them that there were some

13:51:48 25    performance issues with the data set thing that was going

1    on?

2    A.    Yeah, we have -- we had had some reports on

3    performance issues related to large data sets.

4    Q.    Did you -- and just so I'm clear, did you tell LSi

5    at this point that Hodell's database was well above the

6    high end testing that LSi -- that SAP had done?  Did you

7    relay that information?

8    A.    Yes.  We relayed that -- well, we definitely

9    relayed it in the call that I was on.

10   Q.    That Hodell was well outside what had been tested

11   on the high end?  That was relayed --

12   A.    Was well outside the testing, yes.

13   Q.    Okay.  And did you give them the testing numbers?

14   A.    I do not recall.

15   Q.    Okay.

16                And you testified, I believe, that it was

17   as far as SAP had gone in the testing.  I had that in my

18   notes.  Is that accurate?

19   A.    With regard to the database size, yes.

20   Q.    Okay.  And that doesn't mean it wasn't going to

21   work, is that your testimony?

22   A.    That is correct.

23   Q.    It just means that you don't know one way or the

24   other, right?

25   A.    Correct.  Past, past that point, we didn't know and

 1    that's why we told LSi to make sure that they tested the

 2    system in the environment.

 3    Q.    Okay.  And then Mr. Neveux even chimes in, "Even in

 4    the best case with the customer in Germany they were only

 5    using a hundred thousand items."

 6                Do you recall him telling you that?

 7    A.    Yes, I do.

 8    Q.    All right.  And you went over -- Kim, if you could

 9    pull up Defendant's 889.

10                MS. ANDERS:  889?

11                MR. LAMBERT:  889, thanks.

12    BY MR. LAMBERT:

13    Q.    This was an e-mail that you were talking about on

14    direct examination, right?

15    A.    Yes, it is.

16    Q.    Okay.

17                And we can agree that Mr. Van Leeuwen's

18    not -- Mr. Van Leeuwen's keeping in touch with your team,

19    correct?  He's not just out there on his own?

20    A.    He definitely kept in touch on the 30th, about two

21    weeks after we had the call, yes.

22    Q.    All right.  I want to talk real briefly about Radio

23    Beacon.

24                You were the -- you were the third-party

25    add-on development manager, is that --

1    A.    That's -- that's correct.

2    Q.    That's a short way of saying that.

3    A.    That's good.

4    Q.    And Radio Beacon is one of those third-party add-on

5    products?

6    A.    That is correct.

7    Q.    Okay.  And Radio Beacon was an approved add-on for

8    Business One, right?  That was one of the --

9    A.    Yep.  They had gone through that whole process

10   with -- yeah, they had gone through the whole process

11   with part of my team, and we were actually actively

12   co-marketing with Radio Beacon.

13   Q.    Okay.  So they were certified and good to go,

14   right?

15   A.    Um-hmm.  Yep.

16   Q.    We can agree there was nothing wrong with using

17   Radio Beacon and integrating it into your Business One

18   application, right?

19   A.    I do not know when they were actually certified.

20             The process we use being that we recruit a

21   partner, they build the integration, and then there's a

22   process of certification.  So at some point, they were

23   certified.

24             I do not know when that point was.

25   Q.    Okay.  You'll agree Radio Beacon is a good product,

           1     it's fine, SAP co-markets it, right?

           2     A.    We had some issues, especially in the beginning,

           3     but it turned into, yes, it turned into a very good

           4     partner after awhile.

13:55:14   5     Q.    Do you know a gentleman by the name of Ross

           6     Elliott?

           7     A.    Yes.

           8     Q.    Is he on the SAP partner council, too, isn't he?

           9     A.    At some point he was.  I don't know whether he was

13:55:26  10     at that time but, yes, yes, I believe he was on the

          11     council.

          12     Q.    And I believe he's one of the senior people at the

          13     company that owns Radio Beacon software, right?

          14     A.    Yes.  Yes.  And I believe he was on the council,

13:55:36  15     yes.  He was moving, the council moved memberships, but I

          16     believe he was on.

          17     Q.    Okay.

          18               Turn to 157 in your binder.

          19               This is the -- one of the e-mails we were

13:56:05  20     talking about this morning, right?

          21     A.    Yes.

          22     Q.    Is this one of the ones that you said was a

          23     knee-jerk reaction?

          24     A.    From my end, yes.

13:56:14  25     Q.    Okay.  You never wrote to anybody that I've seen

1    and took any of this back, did you?

2    A.    No.

3    Q.    You never said "Hold up, I was -- this was just a

4    knee-jerk reaction, never mind."

13:56:32  5              I haven't seen any communication like that.

6    A.    Yeah, I -- I didn't send that out.  I mean, we were

7    happy in October that things -- yeah, I didn't send that

8    out, no, I did not.

9    Q.    So between April and October, by October you

13:56:44  10   thought everything was fine, you didn't need to do

11   anything further?

12   A.    Yes.

13   Q.    Okay.  Can you turn to -- well, turn to the second

14   page of that document.

13:57:10  15             And I want to focus on point two, "Hodell

16   has both issues.  They experienced performance issues

17   when Lowery tested the data set against the Hodell data

18   on SAP's Business One standalone a year ago."

19             Do you see that?

13:57:30  20   A.    Yes.

21   Q.    And that's --

22   A.    Yes.

23   Q.    -- in reference to Exhibits 294 and 79 that we just

24   went over that you're referencing that exchange?

13:57:43  25   A.    The March exchange, yes.

1   Q.   Okay.  And then number three, you talk about an

2   April fix that might resolve the add-on performance

3   issue, right?

4   A.   Yes.

13:57:51 5   Q.   "But it doesn't likely resolve the data set issue.

6   Resolving the data set issue was not an easy fix so even

7   if development started today, we are likely talking

8   months.  This is an issue that has been known for years,"

9   plural, correct?

13:58:06 10   A.   That is correct.

11   Q.   Not just last year when you were talking to LSi,

12   but for years, right?

13   A.   Yes, it would have been two years at that point

14   because we had the reports in March of 2006 when we had

13:58:19 15   discussion with LSi that we had had some, some reports of

16   issues.

17              So it would have been -- it would have been

18   more than one year, yes.

19   Q.   More than one year.  Okay.

13:58:28 20   A.   Yes.

21   Q.   And but the data set issue again is in reference

22   to, I think, the Microsoft SQL server thing we were

23   talking about earlier, right?

24   A.   No, I don't believe it is.

13:58:43 25   Q.   Okay.

1   A.    It is with regard to the size of the -- the amount

2   of data that's in the database.

3   Q.    Okay.  Can you turn to -- well, staying on 157, you

4   termed this e-mail as a knee-jerk reaction.

13:59:08  5         What was it a knee-jerk reaction to?

6   A.    We had a customer that had had problems.

7   Q.    Okay.

8   A.    And we found out about it from a partner.  We

9   didn't realize there were problems.  We found out, we get

13:59:21  10   an e-mail from the partner saying, "I'm going to lose my

11   business, the customer is losing hundreds of thousands of

12   dollars," and first reaction is we have an issue.

13         And the first thing that we do and I do is

14   customer first, so what do we need to do to resolve the

13:59:36  15   customer.  I based my response on the information that I

16   had at that point, which was the e-mail from the partner,

17   from the reseller.

18         Mainly the e-mail from the reseller.

19         Maybe even Udi's initial reaction as,

13:59:51  20   saying, "Hey, you know, we may have an issue here and we

21   may have to do something, you know, we will have to do

22   something about it."

23         I didn't have any time to verify anything.

24   I mean as I mentioned earlier, we hadn't even had any

14:00:08  25   complication, at least I had not had ever any

          1    complication with Hodell.  The first call, the first

          2    contact was the day after, and so my reaction was we have

          3    an issue.  Reseller tells us the customer is down.  We're

          4    going to do something right now.  And that's where I say,

14:00:22  5    "Hey, if we look at all these things, they have both

          6    issues," based on that little information that I had at

          7    that point.  That was the knee jerk.

          8    Q.    Well, you had -- you had all that information in

          9    March of 2006, didn't you?

14:00:33 10    A.    No, I did not.

         11    Q.    You had all the database information, we just went

         12    over those e-mails?

         13    A.    Yeah.  But --

         14    Q.    That's not new in April.

14:00:44 15    A.    We had the database information but we didn't know

         16    there was an issue.

         17              We had the database information --

         18    Q.    They were just talking about the issue and we just

         19    went over all the e-mails with the issue.

14:00:53 20    A.    We told them that we had a -- that we had some

         21    reports of large database issues.

         22              We went back and said listen, you know,

         23    here's what you need to do.  We don't know whether it

         24    affects you or not in the environment you're setting up.

14:01:06 25    We're not saying it won't work.  What we're saying is if

1    you want to run this large date base, IBIS, here's what

2    you need to do so --

3    Q.    Are you saying it was a knee-jerk reaction to Dan

4    Lowery's initial e-mail to Udi Ziv a week earlier

14:01:23  5    identifying the problems?

6    A.    I don't think -- I don't think I was copied on

7    that.

8              My knee-jerk reaction was to his e-mail.

9    There was an e-mail that he sent to me.  It may have

14:01:32 10    been, yeah, I think it was Dan, that Dan sent to me

11    saying, "I have an issue with Business One performance at

12    Hodell."

13    Q.    And your very first reaction, right --

14              MR. STAR:  Your Honor, he asked him an open

14:01:45 15    ended question.  He was still answering.

16              THE COURT:  Yeah, he was trying to, but we

17    have gone over this many, many, many, many, many times.

18              MR. LAMBERT:  I'll move on.

19    BY MR. LAMBERT:

14:01:55 20    Q.    Let's go to 158.

21              Right.  Again, this is on the next day,

22    this is the next day, a day's gone by from your knee-jerk

23    reaction, right?

24    A.    Um-hmm.

14:02:20 25    Q.    And got again the same, the same conclusion, right?

1    "There is no way SAP Business One will work for this

2    customer.  We need to find a way to move them on."

3              Do you see that?

4    A.    Yes.  And what had happened in the call is we -- I

14:02:34  5    got some more information and the main part of the

6    information was going to 300 or 500 users.

7              And my -- my thinking at that point was if

8    the system, for whatever reason, doesn't work with 120

9    users, what the heck is it going to do at 300 and 500

14:02:51 10    users?  So my reaction again after that call

11    was -- again, this is my, my reaction with the

12    information I have is this can't work.

13    Q.    I'm trying to get some specific answers to some

14    specific questions, and I just -- I want to try to move

14:03:05 15    it along.

16              So the question was that was what you said

17    in this e-mail, right?

18    A.    That is what I said in this e-mail.

19    Q.    Okay.  And then you ended this particular e-mail

14:03:15 20    with the statement, "Lowery needs to take responsibility

21    for the mis-sell."

22              Right?

23    A.    Yes, I do.

24    Q.    And you agree that if Lowery had told Hodell that

14:03:24 25    Business One would work with up to 50, hundred users, in

1    your opinion that's a mis-sell, right?

2    A.    I'm sorry, I miss -- can you just say it again,

3    please?

4    Q.    Yeah.  If Lowery had told Hodell, which you're

14:03:37 5    saying you learned on this call, that Business One would

6    work for up to 500 users, you agree that that was a

7    mis-sell, right?  That's what you said here?

8    A.    Not quite.

9    Q.    What do you say that I'm not reading correctly?

14:03:58 10    A.    In this environment, when you have a system that

11    already doesn't work for whatever reason with 120 users,

12    if you move that to 500, in my opinion, that can't work,

13    and that is the mis-sell.

14          I'm not saying 500 users is the mis-sell.

14:04:11 15    I'm saying in this environment here, having a system

16    already that 120 users for some reason doesn't work, if

17    they promised 500 users, it couldn't work.

18    Q.    Let's look at -- let's look at 160.  Can we turn to

19    Exhibit 160?  This is another one of your e-mails.  This

14:04:29 20    is even another day removed from your initial knee-jerk

21    reaction, right?

22    A.    Yep.

23    Q.    And you e-mailed all the same folks, this is all

24    the same e-mail chain, right?

14:04:40 25    A.    Yep.

2348

1    Q.    And you say, "Hodell asked the right question, did

2    we buy the wrong solution with SAP Business One?  Based

3    on what we know now, the answer is yes, as Lowery

4    completely oversold SAP Business One.  We made it clear

14:04:55  5    that SAP Business One was never advertised for companies

6    with up to 250 million in revenue and 500 users."

7              That's what you said in this e-mail, isn't

8    it, sir?

9    A.    It is.

14:05:07 10    Q.    Okay.  Thank you.

11              So you agree with me that Lowery oversold

12    business -- or your position is that Lowery oversold

13    Business One, right?

14    A.    At that point with the information that I had, that

14:05:21 15    was my decision.  Then that's at that point I would

16    agree.

17              I changed my opinion later when we found

18    out what the issues really were, but at that point, yes.

19    Q.    I haven't seen anywhere where you changed your

14:05:33 20    opinion, sir.  Did you send another e-mail I'm not aware

21    of where you said, "Never mind, I'm sorry I said this

22    about LSi"?

23    A.    I did not send such an e-mail, but I think I

24    changed my opinion probably in my head.

14:05:49 25    Q.    In your head, okay.

```
 1              Do you agree that Dan Kraus also reached
 2    the same conclusion?  If you'd turn to 159.
 3              MR. STAR:  Objection, Judge.  Foundation
 4    and relevance.
 5    Q.    You were copied on Exhibit 159?
 6              THE COURT:  Overruled.
 7    A.    Yes, I was copied.
 8    Q.    Okay.  And do you know at the bottom, Dan Kraus
 9    also takes the same position, "The partner clearly has
10    misrepresented the solution."
11              Do you see that?
12    A.    That is what he says, yes.
13    Q.    Okay.  So you weren't the only one that reached
14    that conclusion?
15    A.    I was not, no.
16    Q.    Okay.  And so we can agree -- strike that.  We're
17    not going to agree.
18              Trying to move this along, if you'd give me
19    a little bit of patience there.
20              We can agree that, if you'd turn back to
21    402, Dirk Boessmann, who was the driver of that call a
22    week earlier, right?
23    A.    Yes.
24    Q.    So this is a week after your initial knee-jerk
25    reaction, right?
```

```
 1    A.    That is correct.

 2    Q.    And then all the subsequent e-mails that followed,

 3    right?

 4    A.    I'm sorry, what about the subsequent e-mails?

 5    Q.    There was other e-mails that were days after your

 6    initial knee-jerk reaction that said the same thing,

 7    right?

 8    A.    Yes.  There were e-mails, yes.

 9    Q.    Okay.  And, but Mr. Boessmann again is saying that

10    the system will fail due to the overselling.

11                 Is it your contention that's also a

12    knee-jerk reaction a week later?

13    A.    Well, I think we were also reeling from the stuff

14    we had heard a week earlier, so I mean I don't know how

15    he took that call but, I mean, he clearly said a week

16    later that he thought it was failure due to overselling.

17    Q.    And he is, we've established, very knowledgeable on

18    Business One.  He's the guy that you looked to, right?

19    A.    Absolutely.  And this is where it says 300 users,

20    you and I talked about this earlier, 300 users was a big

21    issue for him.

22    Q.    He unequivocally says the system is going to fail,

23    right, he says it on April 24th?

24    A.    Yes, he says that in the e-mail, yes.

25    Q.    Thank you.  Can you turn to 180?
```

```
 1              I'm going to focus -- yeah, I want to focus

 2    on the e-mail in the first page.  It's from Geoff Ashley

 3    to Michael Sotnick and yourself the day before that, that

 4    call?

 5    A.    I'm sorry, you said the first page?

 6    Q.    Yeah.  On 180.

 7    A.    Yes.

 8    Q.    Okay.  And this is the day before the stunned

 9    silence call?

10    A.    That is correct.

11    Q.    Okay.

12              And Mr. Ashley says to you, "There were

13    many discussions as well as written e-mails with Dan

14    Lowery and others within his organization stressing that

15    this, quote, unquote, opportunity was suspect from day

16    one."

17              Do you see what he says there?

18    A.    I do.

19    Q.    Do you have any knowledge of what he's talking

20    about?

21    A.    None at all.

22    Q.    Okay.

23              Then he concludes:  "Hodell is a huge

24    influencer in this industry and failure would have a

25    significant negative impact on our ability to drive
```

1    success in the future."

2              That is what he said to you, correct?

3    A.    That is what he did say.

4    Q.    And then can you turn to 163?  163 is an e-mail

14:09:58 5    from, again, Ed Neveux to yourself and others, right?

6    A.    I'm sorry, did you say 163?

7    Q.    163, on the first page.

8    A.    Yeah.

9    Q.    Do you see Mr. Neveux's e-mail?  This is in

14:10:14 10   September of '07, right?

11   A.    That is correct.

12   Q.    And they're still trying to figure out

13   what's -- what the problem is?

14   A.    Yep.

14:10:21 15   Q.    And he -- and he states down at the bottom, "Not to

16   beat a dead horse, blah, blah, blah, but according to

17   Gadi Barnea, there are performance issues, although not

18   as bad, with no add-ons running at Hodell just using

19   vanilla Business One."

14:10:41 20             Do you see that?

21   A.    I do.

22   Q.    And you have every reason to believe Mr. Neveux

23   because he's very knowledgeable on this subject, correct?

24   A.    Yes.

14:10:47 25   Q.    Okay.  Now, you testified about Mr. Neveux's visit

```
 1    to SAP or to Hodell in October, right?

 2    A.    Yes.

 3    Q.    And based upon what was reported back to you from

 4    what you saw on that one day, you thought everything was

 5    fine now, right?

 6    A.    Yes.

 7    Q.    Okay.  Just on that one day that he was there?

 8    A.    That's what the report said, yes.

 9    Q.    Okay.  If you would turn to 426 in your binder, and

10    I want to go specifically to 426.5, Kim.

11                Now, this is an e-mail you sent a day after

12    Eddy Neveux had reported to you, correct?  This is

13    October 18th?

14    A.    That is correct.  Yes.

15    Q.    Yeah.  He had already been out there and reported

16    back to you, correct?

17    A.    That is correct.

18    Q.    Okay.  And you're e-mailing Michel Koopman.

19                Who is Michel Koopman?

20    A.    Michel Koopman.

21    Q.    Yeah.  Is he a Citrix consultant?

22                Actually if you look up, I can speed it

23    along, if you look up, he has a signature block up there,

24    director of business development, Citrix Systems, Inc.?

25    A.    Okay, yes.
```

| | |
|---|---|
| 1 | Q.    Okay. |
| 2 | A.    I'm sorry, he used to be -- yeah.  Yes, he is with |
| 3 | Citrix. |
| 4 | Q.    Okay. |
| 14:12:45 5 | So you were interpreting, I believe in |
| 6 | Exhibit 809 what Eddy Neveux had said, and I want to look |
| 7 | at what you actually said.  Okay? |
| 8 | A.    Yes. |
| 9 | Q.    You actually said the next day, "they," meaning |
| 14:12:55 10 | Hodell, "have abysmal performance," right? |
| 11 | A.    Yep. |
| 12 | Q.    "Which is essentially an issue of the number of |
| 13 | users/transactions they run with Business One," right? |
| 14 | Those were your words? |
| 14:13:09 15 | A.    Those are my words. |
| 16 | Q.    Okay.  I don't see anything in there about |
| 17 | In-Flight, right?  You don't mention In-Flight? |
| 18 | A.    No.  I was -- I mean, to be honest, I mean, this |
| 19 | was -- this was an e-mail to request help because one of |
| 14:13:20 20 | the issues that Eddy had identified in October 17th was |
| 21 | that there needed to be an improvement on the Citrix |
| 22 | environment. |
| 23 | So this was basically a way for me to say, |
| 24 | listen, I know somebody at Citrix, I'm going to ask you |
| 14:13:33 25 | for help.  And there was no reason for me to say, hey, |

2355

1    you know, the real issue is In-Flight and the real issue

2    is that the hardware isn't working, and the real issue is

3    that, whatever, the system wasn't tested.

4              This was, hey, Michel, I have an issue, we

14:13:50  5    have a performance issue with Business One.  I'm not

6    going to throw anybody else on the thing.  This was not

7    the --

8    Q.    You've identified the issue, sir.  You've

9    identified the issue in your own words as

14:14:02 10   "users/transactions, they run with SAP Business One,

11   dash, not a Citrix issue."

12             That's what you wrote, isn't it?

13   A.    It is.  The important part here is it was not a

14   Citrix issue.  I didn't want him to feel that I was going

14:14:16 15   after him for Citrix.  Yes, I said that here but --

16   Q.    Again, we could -- I'm not going to harp on it.

17   You wrote what you wrote, correct?

18   A.    I wrote what I wrote.

19   Q.    Okay.

14:14:26 20             And then Paul Killingsworth gets brought

21   in, right, and he copies you on another e-mail on the

22   same topic.  If you'd look at 462.2.  426.2, I'm sorry.

23             Again a day after, two days after the

24   visit, a day after your e-mail, and he says again, "They

14:14:55 25   are experiencing terrible performance in the ERP system."

2356

1                    Correct?

2      A.    I'm sorry, I don't see that yet here.

3                    MS. LUARDE:  We're finding it, Wes.

4                    MR. LAMBERT:  426.3.

14:15:11 5    BY MR. LAMBERT:

6      Q.    We see right here, "They are experiencing terrible

7      performance in the ERP system."

8      A.    And this is an e-mail from Paul?

9      Q.    Paul to you.

14:15:20 10   A.    Okay.

11     Q.    And others.

12     A.    I see that, yes.

13     Q.    Okay.  And this is later in October than the e-mail

14     that you were discussing from Mr. Neveux, correct?

14:15:35 15   A.    That is correct.

16                   MR. LAMBERT:  Okay.  Your Honor, may I

17     confer real briefly?

18                   THE COURT:  Sure.

19                   MR. LAMBERT:  Nothing further, Your Honor.

14:16:12 20                  THE COURT:  Thank you.

21                   Any redirect?

22                   MR. KELLEHER:  Very briefly, Your Honor.

23                   Let me know when you're ready, Bob.

24                   MR. ADELMAN:  I'm ready.

25

         1           REDIRECT EXAMINATION OF RALF MEHNERT-MELAND

         2    BY MR. KELLEHER:

         3    Q.    Can you pull up the exhibit that was just shown to

         4    the witness?  I think it was 426.

14:17:02 5                   And can we scroll to the part that the

         6    witness was asked questions about?  Can you flip that

         7    monitor around, please?

         8                   Sir, are you with me?

         9    A.    Yes.

14:17:34 10   Q.    I'm at the paragraph in the middle there, "I have a

         11   huge request."

         12                  What were you -- what's the context?  What

         13   were you trying to do here?

         14   A.    I was trying to get help as quickly as possible.

14:17:49 15                  Again, we had Eddy's, one of Eddy's

         16   conclusions was that if we improve the Citrix

         17   environment, we may have -- we may see significant

         18   performance enhancements.  So I basically said, "Hey, you

         19   know, I need your help Michael.  Citrix, I need your

14:18:10 20   help."

         21   Q.    And does he work for SAP?

         22   A.    He does not.

         23   Q.    So would it take some convincing to get Michel

         24   Koopman to help?

14:18:18 25   A.    Yes.

1    Q.    Sir, when you said they had abysmal performance,

2    were you basically telling him what people had told you

3    over the course of many months?

4    A.    I was probably overstating it a little bit to get

14:18:30  5    his help.  I mean again I had to report from Eddy that

6    said performance had improved.

7                  There was problems in April obviously when

8    we had the call with Hodell, but they had improved since

9    then.

14:18:44 10    Q.    And you're talking about help from Citrix, I mean,

11    that would have involved some expenditure of resources

12    and money on Citrix's part?

13    A.    Oh, yes.  Yes.

14    Q.    So this was your -- your attempt to advocate for

14:18:58 15    Hodell?

16    A.    Yep.

17    Q.    Because even notwithstanding what you had read the

18    day before about the nine seconds being the worst thing,

19    were you still committed to helping Hodell?

14:19:06 20    A.    Absolutely because one of his -- one of Eddy's

21    conclusions was if we improve Citrix, that will make a

22    difference.

23    Q.    And so you reached out to Mr. Koopman to help

24    Hodell?

14:19:16 25    A.    Yes.

1               MR. KELLEHER:  I have nothing further,

2       Judge.

3               THE COURT:  Thank you.

4               Anything based on that?

14:19:21  5               MR. LAMBERT:  No, Your Honor.

6               THE COURT:  Thank you.

7               Thank you, you're excused.  Watch your step

8       going down, please.

9               (Witness excused)

14:19:29 10               THE COURT:  Take about ten minutes to

11       refresh yourselves because the next witness is not too

12       long, is that what I understand?

13               MR. KELLEHER:  That's correct, Judge.

14               THE COURT:  Because when the next witness

14:19:40 15       is finished, guess where you're going?  Home.

16               Okay.  So about ten minutes.

17               (Jury out)

18               (Recess taken)

19               THE COURT:  Be seated, folks.

14:35:13 20               You may call your next witness.

21               MR. KELLEHER:  Thank you, Your Honor.  SAP

22       calls Joe Guagenti.

23                    JOSEPH GUAGENTI

24          of lawful age, a witness called by the DEFENSE,

25               being first duly sworn, was examined

          1                   and testified as follows:

          2                   THE COURT:  Please have a seat if you

          3        would, would you tell us your full name and then spell

          4        your last name?

14:35:31  5                   THE WITNESS:  My name is Joe Guagenti,

          6        G-U-A-G-E-N-T-I.

          7                   THE COURT:  Thank you.

          8            DIRECT EXAMINATION OF JOSEPH GUAGENTI

          9        BY MR. KELLEHER:

14:35:47 10        Q.   Good afternoon, Mr. Guagenti.

         11        A.   Good afternoon.

         12        Q.   Now, I'd like to ask you a little bit about your

         13        background, but before I do, some preliminary matters.

         14                   You and I have spoken before?

14:35:55 15        A.   Yes, we have.

         16        Q.   And did anyone ever issue you a subpoena to come

         17        here and testify?

         18        A.   No, they have not.

         19        Q.   So are you here freely and voluntarily?

14:36:09 20        A.   Yes, I am.

         21        Q.   But you and I have spoken before?

         22        A.   Correct.

         23        Q.   On a number of occasions?

         24        A.   Correct.

14:36:14 25        Q.   And during that time, you asked me to see certain

1    documents and I gave them to you?

2    A.    Correct.

3    Q.    And you're from Chicago, is that correct?

4    A.    Yes, I am.

14:36:23  5    Q.    And so as part of your agreement to come here and

6    participate, we've agreed to cover some of your expenses,

7    like hotels and air fare, is that correct?

8    A.    Correct.

9    Q.    Sir, is any of that affecting in any way your

14:36:39 10    ability to testify truthfully here?

11    A.    Absolutely not.

12    Q.    The whole truth, nothing bug the truth?

13    A.    The whole truth, nothing but.

14    Q.    And that's what you're going to do, right?

14:36:48 15    A.    It is.

16    Q.    Thank you, sir.

17          Now, look, why don't we start with where

18    you live.

19    A.    I live in St. Charles, Illinois.  It's just outside

14:36:57 20    of Chicago, probably about 40 miles.

21    Q.    And have you always lived in the Chicago area?

22    A.    Most of my life, yes.

23    Q.    Where did you go to high school?

24    A.    I went to Fenton high school, it's in Bensenville,

14:37:10 25    right outside of O'Hare airport.

1    Q.    And what did you do after high school?

2    A.    I did a -- I went into the military for a short

3    period of time.  I went there to jump school and become a

4    rigger.  A rigger is someone who packs parachutes and

14:37:29  5    stuff like that.

6                And then I was assigned to the 12th special

7    forces group out of Arlington Heights.  That's in

8    Illinois as well.

9    Q.    And what did you do with that?

14:37:42  10    A.    I just did my reserve status for six years or so,

11    and that was -- that was my stint in the military.

12    Q.    What did you do afterwards?

13    A.    Well, while I was still on reserved status, I

14    worked -- I went to school to do electronics, and then I

14:38:01  15    got offered a job at a company called Konami.

16                And they produce video games.

17    Q.    And what were you doing for Konami?

18    A.    I was programming video games for them, and this

19    was in, like, '85 so there was no real computers or, you

14:38:21  20    know, at-home computers or consoles like your saying

21    Genesis or anything like that.  This was all for arcade.

22                So it was hardware and

23    programming-intensive.

24    Q.    So help me understand this.  You're talking about

14:38:37  25    like the arcade machines?

1    A.    Correct.

2    Q.    You could actually walk into a video arcade and put

3    a quarter in it?

4    A.    Yes.  Those are it.

14:38:44  5    Q.    So is there software that runs those machines?

6    A.    It's all custom designed software because they are

7    all custom chips, so there's hardware involved as well as

8    programming, all in assembly language, which is machine

9    language.

14:38:58  10    Q.    Thank you, sir.

11           And you're saying you developed or you

12    wrote some of that software code?

13    A.    Correct.

14    Q.    And you worked with the hardware to make these

14:39:05  15    video game machines?

16    A.    Correct.

17    Q.    What were some of the machines you made?

18    A.    While I was at Konami, I worked on a game called

19    Roller Games.  I worked on Bottom of the Ninth, Teenage

14:39:18  20    Mutant Ninja Turtles, and The Simpsons.

21    Q.    And these are the arcade games that you might have

22    played in the nineties with The Simpsons and --

23    A.    Correct.

24    Q.    Okay.  Sir, has your whole career been focused on

14:39:30  25    writing software for video games?

1  A.    It was up until like 2002, 2003, where I finished

2  up my last bit with EA Sports doing, like, NBA Live, PGA

3  Tour, video games like that.  I'm kind of a nonviolent

4  kind of video game guy, so those are the types of games I

14:39:52 5  like to work on.

6  Q.    Sir, isn't it true there were some violence in The

7  Simpsons?

8  A.    No, there was not.  There was not.

9  Q.    Sir, so after you -- when was it that you left the

14:40:04 10  video game industry?

11  A.    It was like 2002, 2003.

12  Q.    And what did you do next?

13  A.    At that point in time, I really wanted to try

14  something new in my life.  I just wanted to do something

14:40:15 15  different so I left the video game world to go into the

16  business world, so corporate.

17       You know, so my first job after I got done

18  doing, working with video games was working with

19  companies like Blue Cross and Blue Shield to -- at the

14:40:37 20  time HIPAA was coming into play and they really wanted to

21  move from a paper-type of society where they're passing

22  claims back and forth by paper, to electronic, you know,

23  saving, like, instead of, like, 2.50 to $5 to process a

24  claim by Blue Cross and Blue Shield, they would get away

14:40:58 25  with, like, 25 cents because they could shove it right

1    into the machine.

2              What ended up happening was a lot of these

3    big companies like Blue Cross, they couldn't handle the

4    format in which the government was dictating had to be

5    the format of the electronic data that was being

6    transferred, and they called it X12.  They couldn't

7    handle it because they had these old systems, Legacy

8    Systems that couldn't handle it.

9              So they wanted to have what they call like

10   a clearinghouse where one type of format would come in,

11   you know, like, let's say Chinese, it would come in and

12   it would be converted to English, and then Blue Cross can

13   kind of handle maybe, like, Italian.

14             So at some point in time, the transaction

15   becomes the standard like English, but then when it moves

16   on, it moves on to the language that's appropriate for

17   that insurance carrier.

18   Q.   Okay.  So all that stuff you just said, does that

19   mean you wrote software code for the healthcare industry?

20   A.   Yes.  I'm sorry.  Yes, it does.

21   Q.   All right.  Thank you.

22             And what was the company's name that you

23   worked for?

24   A.   I actually worked for my own company.  It was

25   called TCB Healthcare.

2366

1   Q.    Okay.  And now when did you leave TCB Healthcare?

2   A.    I left TCB Healthcare in order to take a position

3   at LSi/IBIS Group at that point in time.

4   Q.    Okay.  And which -- where did you physically work

14:42:30 5   when you were hired by IBIS/LSi?

6   A.    It was in West Chicago.  It was the Lagrue

7   Building.  It was basically the old IBIS office space.

8   Q.    And when you were hired, were there other employees

9   that worked with you that were already there?

14:42:49 10   A.    Correct.  Yes.

11   Q.    Were they mostly the old IBIS employees?

12   A.    I believe they were all but maybe one of them.

13   Yeah, because I don't know, I wasn't part of human

14   resources so I don't think I could answer that.

14:43:04 15         But it seemed that most of them were all

16   old IBIS.

17   Q.    When you're in the office, sir, were you able to

18   look around?  Was there stationery with letterhead lying

19   around?

14:43:16 20   A.    Oh, yes, there was Ibon stationery.  There was

21   actually an Ibon picture up on the wall.  It's a bird, I

22   guess.  So there was this Ibon bird up on the wall.

23   Q.    Sir, you're saying "Ibon."

24         Do you mean IBIS?

14:43:33 25   A.    IBIS, right.  Yes, exactly.  But it was this bird.

1    It was an Ibon, I believe they called it.

2    Q.    Sir, what were you hired to do at LSi/IBIS?

3    A.    I was hired to come in and create a software

4    package for the fastener market space, so on this new

14:43:56 5    platform that they had SAP Business One.

6    Q.    So, sir, was that the application that you were

7    hired to develop, did that ultimately become called

8    In-Flight?

9    A.    Yes, it was.

14:44:08 10    Q.    So just to be clear, you were the developer of the

11    In-Flight application?

12    A.    Yes, I was one of the developers.

13    Q.    How many developers were there?

14    A.    Two of us.

14:44:17 15    Q.    And what was the other gentleman's name?

16    A.    His name was Eric Johnson.

17    Q.    And he also worked for IBIS/LSi?

18    A.    Yes, he did.

19    Q.    And the two of you together actually wrote the

14:44:27 20    software code for the In-Flight application?

21    A.    Correct.

22    Q.    And just so that we're all clear, before, before

23    you did that, IBIS/LSi had another product that was

24    called In-Flight, is that right?

14:44:43 25    A.    That is correct.

1    Q.    And that was for the FACTS, F-A-C-T-S, computer

2    system?

3    A.    Correct.  It's just a completely different computer

4    system altogether, like the difference between Apple and,

14:44:58  5    you know, Windows.

6    Q.    So you couldn't just take that thing and use it

7    with Business One, right?

8    A.    No, you could not.

9    Q.    So you literally, you and Mr. Johnson literally had

14:45:07  10    to develop In-Flight from scratch?

11    A.    Correct.

12    Q.    And you did that by writing code?

13    A.    Correct.

14    Q.    Sir, I'm just going to cut right to the chase.

14:45:17  15              There's been a lot of discussion in this

16    case about the In-Flight application and whether or not

17    it caused performance issues at Hodell.

18              Do you have a view as to whether the

19    In-Flight application that you and Mr. Johnson developed

14:45:37  20    was developed improperly?

21    A.    I believe it could have been so much better and,

22    yes, it was improperly put together.

23              It was rushed.  It was -- it didn't take

24    into account the structure that was already in place for

14:45:54  25    SAP Business One because the knowledge that was coming

1    from In-Flight FACTS, the old system, the knowledge was

2    in Eric's head and not really in good paper form.

3              So everything that was taken from Eric's

4    head, he just coded it really quickly into SAP Business

14:46:26  5    One and really not taking the tool set that I spent a

6    whole lot of time putting together and using that tool

7    set.

8              So like, when you find a problem, like you

9    find a word search, you find that you spelled, you know,

14:46:35 10   "The" T-H-A, or whatever you spelled it, T-H-A and you

11   wanted it T-H-E, and you find and replace.  Well, it

12   wasn't that way because everything was so custom.

13   Everything he did was so customized and it was hard for

14   me to start breaking that all apart.

14:46:54 15   Q.    And I think you mentioned that Mr. Johnson started

16   coding very quickly?

17   A.    Yes.

18   Q.    Did that have an affect on performance of the

19   ultimate application?

14:47:02 20   A.    Yes.  Oh, yes, it did.

21   Q.    Thank you, sir.

22              I'm just going to ask you to let me finish

23   because the court reporter is trying to take it down and

24   it's hard.

14:47:10 25   A.    Oh, I'm sorry.

1    Q.    So I'll start over if you don't mind.

2          Did the quick coding that you mentioned,

3    did that have any effect on the performance of the

4    overall In-Flight application?

14:47:19 5    A.    Yes, it did.

6    Q.    And can you explain at a very high level that we

7    can all understand, if you can, why that is?

8    A.    Maybe a good analogy may be, you know, SAP, SAP

9    Business One is like a switch board where, you know, you

14:47:54 10   can make phone calls to, and In-Flight was one of those

11   applications that would call up the switch board so that

12   it can be directed to, you know, a certain department,

13   sales or whatever.

14          So it's kind of like a switchboard.  So it

14:48:06 15   comes into this company and then it gets directed to, you

16   know, one of the departments, you know, sales, support,

17   whatever it may be.

18          And what In-Flight was doing was it wasn't

19   making calls like it wanted to call just sales, the sales

14:48:21 20   department, you know, Extension 101.  It was making calls

21   to everybody and it was telling everybody, it was ringing

22   everybody's phone, and everybody's picking up their phone

23   and they're saying hello and what do you want, and

24   they're like I want to buy.  Well, you're in support or

14:48:50 25   you're not in sales, or you're in bill collections or

1    wherever you may be.  So everybody has to keep hanging up

2    on that.

3                    So what ends up happening is the

4    switchboard gets flooded.

14:48:50 5    Q.    And the switch board in this analogy -- that was an

6    analogy, right?

7    A.    Yes, this was an analogy.

8    Q.    And the switch board that you were talking about,

9    that would be?

14:48:57 10   A.    SAP Business One.

11   Q.    And the whatever it is making all the phone

12   calls --

13   A.    Are the customers or In-Flight.

14   Q.    So, but the thing that's making all the phone calls

14:49:06 15   in this analogy, that's In-Flight?

16   A.    Correct.

17   Q.    And when it was making all those phone calls and

18   sending all that data, was that necessary?

19   A.    No, not at all.

14:49:17 20   Q.    And did that have any effect on performance?

21   A.    Yes, it did.

22   Q.    So we've been here a few weeks now.  We've heard

23   about a DI API.

24   A.    Okay.

14:49:27 25   Q.    Do you know what that is?

```
          1    A.    Oh, yes, I do.

          2    Q.    And, sir, we've heard it described here, obviously

          3    again another metaphor or analogy, but we've heard it

          4    described as a pipe in between that connects SAP Business

14:49:42  5    One and all of the add-on applications that have been

          6    developed.

          7                 Is that a fairly accurate analogy in your

          8    view?

          9    A.    That would be correct, yes.

14:49:50 10    Q.    And one of the add-on applications that was

         11    connected to Business One through this pipe was the

         12    In-Flight application that you developed, right?

         13    A.    That is correct.

         14    Q.    And were there any issues, did In-Flight cause any

14:50:05 15    problems with respect to the pipe?

         16    A.    Yes.

         17                 MR. LAMBERT:  Objection.

         18                 THE COURT:  Overruled.

         19    Q.    I can rephrase the question if you'd like.

14:50:14 20    A.    No, I'm okay.  So I can answer the question?

         21                 Yes.  In-Flight flooded the pipe.  I mean,

         22    it -- as I was doing the analogy, I mean, it was just

         23    making so many phone calls all to departments that didn't

         24    need to be, and it just kept flooding the pipe.

14:50:31 25                 Same thing like if we're delivering
```

1      packages into the city and the city is SAP Business One,

2      and the roads coming in, the highways that are coming in,

3      if, you know, if I'm, like, UPS, DHL and Fed Ex, and

4      we're, you know, every time someone calls for a package,

14:50:51  5   you know, when they call DHL, but I'm In-Flight and I'm

6      UPS, I always send a guy out.  Well, thousands and

7      thousands of those calls that don't actually belong to,

8      you know, like UPS or In-Flight in this case are getting

9      sent out and returned with nothing in the truck.

14:51:10 10            So it's just flooding the highway with all

11     these vehicles that don't need to be on it.  And it jams

12     it up just like a traffic jam.

13     Q.    Thank you, sir.  And I think I heard you say that

14     In-Flight was flooding the pipe, is that what you said?

14:51:25 15   A.    Right.  That is correct.

16     Q.    And did that have any effect on performance?

17     A.    Oh, yes, it did.

18     Q.    Can you, just in laymen's terms, explain that?

19     A.    Just as I did just now.  I mean it's a highway

14:51:39 20   that's coming into the city, and you're jamming all these

21     cars on it that, you know, maybe don't even have people

22     in them or don't need to be in the city or picking up a

23     package, but they're just arbitrarily driving on the

24     highway.

14:51:52 25            I mean, and they have no place to go but

1    they keep going.  So it jams it all up just like the

2    highway would.

3    Q.    And was it necessary, sir, to develop In-Flight in

4    such a way that it jammed up the tube?

14:52:06  5    A.    No, it wasn't.

6    Q.    But that is, in fact, what happened?

7    A.    Yes.  It happened by mistake, yes, it did.

8    Q.    Sir, I'd like to talk about the size of In-Flight,

9    just in general.

14:52:19 10                 Are you familiar with the size of

11   In-Flight?

12   A.    Yes, I am.

13   Q.    And that's because you wrote the thing, right?

14   A.    Correct.

14:52:24 15   Q.    Sir, can you give us a sense of how big In-Flight

16   was as a software application?

17   A.    Yes.  If, if SAP was one city block, In-Flight, the

18   size of In-Flight was, like, one city block, maybe one

19   and a half city blocks.

14:52:42 20                 So it was quite a bit larger or equal to

21   the size of SAP itself.  I mean, that's how big this

22   application was.

23   Q.    Sir, how many add-on applications have you

24   developed in your career?

14:52:57 25   A.    I'd say roughly, for SAP, roughly about 40.

1    Q.    You said 4-0?

2    A.    Yeah, 4-0, yes.

3    Q.    Sir, is it normal for the size of the add-on to be

4    equal to or greater than the size of the base Business

14:53:13  5    One application?

6    A.    No.  It's not.  It's not.

7    Q.    Did that, did the size of In-Flight, did that have

8    any effect on performance at Hodell?

9    A.    Yes, it would.

14:53:26 10            I mean, it's -- it's obvious that if, you

11    know, you have one city block or two city blocks to work

12    in, you know, to build your houses and stuff like that,

13    and you're trying to occupy three city blocks, I mean,

14    you can't -- you can build up, but it's still

14:53:47 15    your -- it's redesigning everything from, you know, what

16    you were permitted to do in the first place.

17    Q.    Thank you, sir.  I'd like to talk a little bit

18    about the development process of In-Flight.

19            This will be a dumb question, but you're

14:54:00 20    familiar with that, right?

21    A.    Yes, I am.

22    Q.    And that's because you developed it?

23    A.    Yes, I did.

24    Q.    Sir, can you take a look at what we've marked as

14:54:08 25    Exhibit 217?

1    A.    Could I have a piece of paper on this one?

2    Q.    Yes.

3    A.    It's kind of blurry.

4              MR. KELLEHER:  Is there a white binder?

14:54:26  5              THE WITNESS:  I seem to have marked

6    something, too, because I thought I could stretch it.

7              MR. MILLER:  To remove it from the screen,

8    just hit the bottom.

9              THE WITNESS: Oh, there.  Okay.

14:54:42 10              Thank you.

11   BY MR. KELLEHER:

12   Q.    Just let me know, sir, when you've had a chance to

13   familiarize yourself with what I've just put in front of

14   you.

14:54:55 15   A.    I recall this document.

16   Q.    Thank you, sir.  This document says "Project status

17   meeting, Tuesday, March 14th, 2006."

18              Do you see that?

19   A.    Yes, I do.

14:55:07 20   Q.    And below that it says "Attended by," do you see

21   that?

22   A.    Yes, I do.

23   Q.    There's a list of names under that.

24              Do you see that?

14:55:15 25   A.    Um-hmm.

1    Q.    And then there's Jon Woodrum, Dale -- that's Dale

2    Van Leeuwen?

3    A.    Dale Van Leeuwen, Amy Pointemonte, Diane Phillips,

4    Joe, that would be me, Joe Guagenti, Marcia Weissman, and

14:55:30  5    John Bilas.

6    Q.    Okay.  Sir, so this is the attendance list of that

7    meeting, right?

8    A.    That is correct.

9    Q.    And your name is on the attendance list?

14:55:38  10    A.    Correct.

11    Q.    And so you were at the meeting, right?

12    A.    Correct.

13    Q.    And it was prepared by John Bilas?

14    A.    Um-hmm.

14:55:44  15    Q.    Do you remember John Bilas?

16    A.    Yes, I do.

17    Q.    Could you tell us very briefly who was John Bilas?

18    A.    Well, John Bilas came in the night and showed up

19    and started working on our project, and he put together

14:56:00  20    this document, made some statements.  Next thing I know,

21    he was fired and gone.  So I'm not sure what ended up

22    happening with him.

23          But, yes, I do, I do recall this.

24    Q.    Thank you, sir.

14:56:15  25    A.    I recall this meeting.  One of the reasons why is

         1    because getting this group together all at one time

         2    wasn't -- wasn't something that was obvious.

         3                    Someone like Jon Woodrum, who lives in St.

         4    Louis, same thing with Dale, Dale didn't show up very

14:56:31 5    much at all -- Dale Van Leeuwen, I'm sorry -- he didn't

         6    show up very much at all as well.

         7                    And then, of course, John Bilas was brand

         8    new.

         9    Q.    Very good.  Sir, it's a long document and I don't

14:56:42 10   want to spend too much time, but I would like to show you

        11    a couple of things.

        12                    Can you turn to the second page?  And I'm

        13    on the first numbered paragraph under the "My opinions"

        14    section.

14:56:56 15                   Do you see the first numbered paragraph

        16    there?

        17    A.    Yes, I do.

        18    Q.    It says, "There does not appear to be a defined

        19    scope to this project at the current time."

14:57:06 20                   Do you see that?

        21    A.    Yes, I do.

        22    Q.    And by, "This project," did you understand him to

        23    mean the In-Flight development project?

        24    A.    Correct.  That's what the meeting was about.

14:57:14 25   Q.    The meeting was about that?

1    A.    Um-hmm.

2    Q.    And it goes on to say, "The working document is

3    very old and needs updating to add and delete

4    functionality as necessary.  There is apparently other

14:57:26  5    functionality being added to this release that is not

6    known to all the project team members and it is not

7    contained on this working document."

8              Do you see that?

9    A.    Yes, I do.

14:57:33 10    Q.    Do you agree with Mr. Bilas' statements here?

11    A.    Yes, I definitely agree with his opinion.  There

12    were -- when I started, it was pretty much the same

13    thing.  There was nothing, no real working document to

14    start with.

14:57:49 15              We had some ideas that were thrown

16    together, and they were working off of an older version

17    of SAP Business One, like the very first one, like 6.5 I

18    believe it was.

19              So that, it didn't really match up with

14:58:13 20    what was going on with the project itself.  And that's

21    one of the reasons why Eric was put onto to the project,

22    because he had the knowledge in his head as opposed to it

23    being in black and white for everybody to kind of follow

24    along.

14:58:27 25    Q.    Thank you, sir.  I'd like to direct your attention

2380

1     to Paragraph Number 6.

2                    Do you see that?

3     A.    Yes, I do.

4     Q.    So it says, "This does not appear to be a very well

14:58:38  5   organized or documented project.  There do not appear to

6     be any of the following documents available readily to

7     team member."

8                    Do you see that?

9     A.    Yes, I do.

14:58:49 10   Q.    And he lists a number of documents at A through J,

11    do you see that?

12    A.    Yes, I do.

13    Q.    He's talking about things like a detailed project

14    plan, detailed business requirement definition for each

14:59:01 15   requirement, detailed design specification for each

16    requirement, detailed testing plan, weekly project status

17    report, access to databases for testing, testing

18    schedules and plans, detailed documentation for each

19    requirement, project budget with weekly updates, and

14:59:24 20   project milestones.

21                    Do you see that?

22    A.    Yes, I do.

23    Q.    Did you understand him to be saying that there

24    don't appear to be any of those documents available?

14:59:31 25   A.    Yes.  That those documents just weren't existing.

1    Q.    And, sir, do you agree with those statements?

2    A.    Yes, I do, except for maybe the milestone one.

3              There may have been some milestones put

4    into place, and I believe there was, and it was more like

14:59:46 5    not the milestone, like, you know, get to Point A and

6    we'll call that a milestone, get to Point B and we'll

7    call that a milestone.  It was like "Here's our go-live

8    date.  That's our milestone to, you know, work backwards

9    from there.

15:00:04 10   Q.    So something like that existed in your view?

11   A.    Yeah.  Yeah.  That was the extent of our

12   milestones.

13   Q.    I understand.  So detailed project plans, there

14   were none of them?

15:00:13 15   A.    No.

16   Q.    Detailed design specifications, there was none of

17   them?

18   A.    No.

19   Q.    Detailed testing plan, you didn't have that?

15:00:17 20   A.    Nope.

21   Q.    Access to databases for testing, you didn't have

22   that?

23   A.    No.

24   Q.    Whose database are we talking about there?

15:00:25 25   A.    This, my opinion, they were talking about our

1    internal database at that point in time.  Given the date

2    on this document, I would believe that would be our

3    data -- our data internal matching up with what would be

4    at the client's site.

15:00:45  5    Q.    You didn't have that?

6    A.    No.

7    Q.    Sir, can you flip to the next page where it says

8    "Summary"?

9    A.    Okay.

15:00:52  10    Q.    Are you there, sir?

11    A.    Yes, I am.

12    Q.    I'm going to wait for our computer man to get us

13    there.  Thanks, Bob.

14            So it says here, sir, "There appears to be

15:01:09  15    a lot of unknowns about this project.  When I say

16    unknown, these are unknowns to a majority of the project

17    team.  I believe that Dale and the programmers are more

18    intricately involved and know more than the rest of the

19    team.  Based on what I heard in this meeting, the

15:01:25  20    documents exposed to -- and the documents exposed to, the

21    project is essentially a, quote, unquote, backroom

22    project with very little formal structure."

23            Do you see that, sir?

24    A.    Yes, I do.

15:01:37  25    Q.    It goes on to say, "It is essentially for the most

1    part undocumented, containing few procedural events or

2    controls built into it.  The scope does not appear to be

3    well defined and ongoing communication with the project

4    constituents, a project team, Hodell, et cetera, is poor

15:01:58  5    at best and needs to improve dramatically."

6                    Do you see that?

7    A.    Yes, I do.

8    Q.    Sir, in your experience, was what Mr. Bilas saying

9    here true?

15:02:08 10   A.    I think the things that I can, you know, speak to,

11   because I really don't know, you know, the communication

12   between LSi and some of the other individuals to Hodell.

13   I mean, I know my personal one with the IT guy, but I

14   could not answer whether or not, you know, this statement

15:02:27 15   is true or not.

16                    But I can, you know, attest to the lack of

17   documentation or a lack of direction for the project

18   itself.  That I can speak to.

19   Q.    Thank you.  And he calls it a backroom project.

15:02:44 20                    Would you agree with that assessment?

21   A.    It sounds terrible.  I would just say, you know,

22   not well-formed, not formed very well, the structure of

23   the project or the planning.

24                    Backroom just sounds kind of -- doesn't

15:03:03 25   sound right to me, period.

```
 1    Q.    Very good.

 2    A.    Sound like something illegal.

 3    Q.    And it says "Little formal structure."

 4          Do you agree with that?

 5    A.    I do agree with that.

 6    Q.    "Few procedural events or controls built into it."

 7          Do you agree with that?

 8    A.    I agree with that as well.

 9    Q.    Sir, in your opinion as the developer of the

10    In-Flight application that we're talking about here, do

11    these things, these statements, these conditions, did

12    that in any way affect the performance of the In-Flight

13    application at Hodell?

14    A.    Yes, it did because we had nothing to base off of.

15    Again, when it came to designing and laying out the

16    individual pieces that were needed to fulfill Hodell's

17    needs, we took the old application, which was In-Flight,

18    and just almost kind of like duplicated it, even without

19    taking into account the structure and the format that was

20    already inside of SAP Business One, and then using that

21    as a basis to start building off of, we took the old

22    application that was running on this old antiquated

23    computer system and moved it over and basically copied

24    it.

25    Q.    Sir, is that the right way, in your view, to
```

1    develop software?

2    A.    Oh, no, it's not.  It's not.

3    Q.    And can that have any affect on performance?

4    A.    Oh, yes.

15:04:30  5    Q.    If you develop software that way?

6    A.    Yes, it can.

7    Q.    And specifically with respect to this case with

8    respect to the In-Flight application, did that have an

9    effect on performance?

15:04:38 10    A.    Yes, it did.

11    Q.    And when you say that, do you mean it made the

12    In-Flight application slow?

13    A.    Correct.  That is what I mean.

14    Q.    Sir, the testimony in this case has been that

15:04:47 15    Hodell went live in early March of 2007.

16              Do you have any personal recollection of

17    that?

18    A.    I do recall them going live, but mainly my

19    focus -- I lost --

15:05:02 20    Q.    It's fine.

21    A.    My focus was on still developing and pushing

22    forward.  At that point in time, it was up to the

23    implementation consultants such as, like, Marcia, the

24    ones that would handle the implementation and the going

15:05:19 25    live for the client, outside of my expertise or my

1    ability to assist in that.

2                Where I did get brought in, and I don't

3    know if I'm supposed to, but I'm just going to continue

4    on.

15:05:34  5    Q.    I can ask you another question.

6    A.    No.  I'll continue on.  I think it's kind of

7    important to understand.

8                At that point in time, you know, there was

9    issues that were taking place at Hodell.  I ended up, you

15:05:47  10    know, going out there and, you know, evaluating the

11    software.

12                So from that respect, yes, I did get

13    involved in the go-live and the implementation, which

14    shouldn't have been, you know, on me to do, but because

15:06:04  15    of the issues that were taking place, they needed another

16    set of eyes, maybe someone with a little bit more

17    technical background, and that's when I came in.

18    Q.    So you actually went out to Hodell at one point?

19    A.    Correct, I did.

15:06:19  20    Q.    And I want to get to that in just one moment.

21    A.    Okay.

22    Q.    But something you said struck me.

23                Sir, in March of 2007 when Hodell went

24    live, were you finished developing In-Flight?

15:06:27  25    A.    No.  I wasn't.  I was still working.

1    Q.    So it was an unfinished product?  What does that

2    mean?

3    A.    I wouldn't say it was hard code version 1.0, you

4    know, kind of like your little version.  I wouldn't call

15:06:43  5    it a hard coded 1.0.  I would say it was close, but to

6    me, it wasn't polished, it wasn't finished at that point

7    in time, and again, polishing is a term that, I mean, you

8    can -- you can polish something until it wears down to,

9    you know, the bare metal, but to me this one still needed

15:07:06 10    some polishing before it may have been deployed or put on

11    the system for Hodell.

12    Q.    And that was true as of the time of go-live in

13    March of 2007?

14    A.    I believe so.

15:07:17 15    Q.    So, sir, you mentioned that you actually went out

16    to Hodell.

17            How many times did you go out to Hodell?

18    A.    Once.

19    Q.    And, sir, do you recall, and if you don't I'm happy

15:07:27 20    to refresh your recollection, but do you recall when you

21    went out to Hodell?

22    A.    I believe it was, like, July, '07.

23    Q.    July of '07?

24    A.    Yeah, somewhere around there.

15:07:44 25    Q.    Sir, if you could flip to Exhibit 901.  And before

1    you look at that, do you remember, were you out there by

2    yourself or was anybody else there?

3    A.    I was out there, and I believe SAP had sent some

4    individual out there as well.

15:08:08  5    Q.    Do you remember the guy's name?

6    A.    Gadi.  Gadi.

7    Q.    Sir, take a look at the document I just pointed you

8    to.

9              Does that refresh your rec -- that's not a

15:08:21 10    word.  Can you refresh your recollection of when you went

11    to Hodell?

12    A.    Yeah, it looks like it was in July of '07.

13    Q.    And this is an e-mail from Gadi Barnea to different

14    people at SAP on July 8th of 2007?

15:08:47 15    A.    Yes.  Oh, I'm sorry, yes, it is.

16    Q.    And you were -- so this is the guy you were

17    thinking of, Gadi?

18    A.    Yes, it is.

19    Q.    So this is when you went out there on July 8th of

15:08:57 20    2007?

21    A.    Yes, it is.

22    Q.    And what did you do when you went out there?

23    A.    My -- my role really was to take a look and see

24    what was going on.

15:09:09 25              Several of the ladies were complaining

1    about speed issues or bad connections, things like that.

2    So I was out there to evaluate more like the environment

3    in which the SAP client was running in.  You know, what

4    type of hardware did they have?  How was it connected?

15:09:33  5    Because I have never seen any of the hardware or how it

6    was being used at Hodell, so I went out there to have

7    physical eyes on it.

8    Q.    Thank you, sir.

9          And was the analysis that you conducted,

15:09:51 10    was that a separate analysis from Mr. Gadi Barnea's, or

11    was it the same as his?

12    A.    No, mine was completely separate.

13          He was out there for, I guess I'd have to

14    read through it, but out there for, like, different

15:10:05 15    reasons.

16          I sat with him to discuss some things, but

17    he was out there focusing on maybe the server side more

18    so, the actual place it was running, and I was focused

19    more on the users and their experience at their side.

15:10:22 20    Q.    Got it.  And I just want to ask you this just so

21    we're clear, just about what you personally did and what

22    you personally observed.

23    A.    Okay.

24    Q.    And saw, okay?

15:10:31 25    A.    Um-hmm.

1    Q.    So, sir, when you developed the In-Flight

2    application, and I'm talking about before July of '07,

3    back when you were developing the thing, did you develop

4    a tool, a software tool that sits inside of it?

15:10:44  5    A.    Yes.  I wrote some tools inside of the In-Flight

6    application which then would reside inside of SAP, and I

7    wrote these tools because of the issues that were taking

8    place.

9              And I couldn't find them, because I'm

15:11:01 10    hundreds of miles away.  I can't see them with my eyes so

11    I have to rely on the IT department that's there at

12    Hodell in order to, you know, look for these problems.

13              So what I ended up doing, since I can't

14    have physical eyes on it at that point in time, I wrote

15:11:19 15    software that would test things.  You know, how much

16    memory does this computer have?  What kind of programs

17    are running in the background?  What kind of connection

18    between, you know, this computer and, you know, that

19    computer?  How was the speed?  How was, you know, all of

15:11:38 20    those, that infrastructure, that environment was set up?

21    Q.    And, sir, when you went to Hodell, were you able to

22    analyze the results and the data that came from that

23    tool, that software tool that you developed?

24    A.    Yes, I was.

15:11:54 25    Q.    And did you, in fact, do that?

1     A.    Yes, I did.

2     Q.    And, sir, what did the data that you got back from

3     your tool tell you?

4     A.    I was seeing some issues with network connectivity,

15:12:07  5     meaning, you know, just not being able to connect to

6     something, just like your web browser not being able to

7     connect to the Internet.

8               There was issues like that that were taking

9     place.  You know, it was slow, and again, you know, I

15:12:22  10    hate throwing out the word slow and fast because it's all

11    relative to what, speed of light or a snail, but my

12    experience was that it was not able to operate in a way

13    that would allow me to do my work.  That's what I would

14    consider slow.

15:12:40  15              And it was slow.

16    Q.    Sir, what did you do after you saw those results?

17    Did you talk to anybody, did you do anything?

18    A.    Yes, we started doing an investigation as to what

19    was causing the problems.  Keith Winn, which was the IT

15:12:59  20    manager at Hodell, we started looking for -- oh, I'm

21    sorry, I'll go back because there was some network

22    issues.

23              One of the big things I was noticing was

24    network issues.  I was getting huge amounts of data.  I

15:13:14  25    had, inside of the computer, a card which should travel

1    at a thousand miles an hour, and when I went in and I

2    looked at the speed on this card that's in there, it was

3    only running at 10 miles an hour.

4              I mean, it was really that big of a

15:13:32  5    difference.

6              Only to find out that the wiring that was

7    used to connect the computer, from the computer itself to

8    the wall, was something called like a silver satin cable

9    which was kind of like, you know, trying to use this

15:14:17 10    cable on the microphone to pass network information

11    through.  It's not -- it's not made to handle that.  The

12    old silver satin cables were, if anyone remembers the old

13    green screen monitors, just pure green, that's what those

14    cables were for; not for the new day and age of, you

15:14:17 15    know, networking to take place.

16              So --

17    Q.    Sir, let me just stop you there.  Those cables that

18    you're just describing, the older, slower cables that

19    you're just describing --

15:14:28 20    A.    Correct.

21    Q.    -- that's what Hodell had?

22    A.    Yes.  Um-hmm.

23    Q.    So, sir --

24    A.    Not on all of the computers but a fair majority of

15:14:35 25    them, yes.

1    Q.    Were there any other infrastructure or hardware

2    issues that you were able to identify in this process?

3    A.    Yes.  Keith had said to me that some of the mice

4    had chewed through some of the wires in the ceiling so

15:14:49  5    there was that issue.

6              I don't know how many, so could have been

7    one, it could have been every single one of them for all

8    I know, but he said that the mice had chewed through some

9    cabling.

15:14:59 10             And then inside of the server room, again,

11   there was -- in this day and age, there are cards which

12   would allow the data to travel at, let's say, a thousand

13   miles an hour, but the hardware that they were using was

14   making it at, it was only set to run at a hundred miles

15:15:23 15   an hour so there was no -- you know, so you're missing

16   this, and with all these new users on there surfing the

17   web, playing music, because I seen this, you know,

18   playing music in the background through their computer,

19   they're using up a lot of the bandwidth, and my

15:15:41 20   application had shown they were streaming movies or

21   streaming video.  That's company policy, not my business,

22   but it affects the bandwidth, you know, the amount of

23   data the rest of the computers on the network can take

24   or, you know, share with.

15:15:57 25   Q.    And so the difficulties, the slowness on the

1    network and with respect to the hardware that you're

2    discussing, you were able to objectively verify that

3    through the software tool that you had developed

4    yourself?

15:16:12 5    A.    That and -- I'm sorry.  Yes.  That and physical

6    eyes on the equipment.

7    Q.    Sir, you mentioned some wire issues, some switches,

8    some cards?

9    A.    Um-hmm.

15:16:24 10    Q.    Computers and usage of computers.  All of those

11    things you just mentioned, do those sorts of things have

12    an effect on the performance of software?

13    A.    Yes.

14                MR. CARNEY:  Objection.

15:16:36 15                THE COURT:  Overruled.

16                Go ahead.

17    A.    Oh.  Yes, they do.

18    Q.    And what kind of an effect?

19    A.    Could be speed.  Speed would be the big one.

15:16:46 20    Q.    Does it make it -- does it make it faster or

21    slower?

22    A.    Slower.  Again, I mean, it's another pipe, it's

23    sending data back and forth, and if the pipe is too small

24    like only the size of this as opposed to a water main,

15:17:02 25    you just -- you just can't push that much through.

1    Q.    And, sir, the pipe that you just mentioned, that's

2    not the same DI API?

3    A.    No.

4    Q.    You're talking about Hodell's wires?

15:17:12  5    A.    Yes.

6    Q.    You're talking about their switches, and you're

7    saying that's also kind of like a pipe?

8    A.    Yes, it is.

9    Q.    But it has nothing to do with the DI API?

15:17:20  10    A.    No.

11    Q.    Sir, is it fair to say that based on the data you

12    analyzed and your firsthand observations, that the

13    hardware and networking infrastructure at Hodell was

14    outdated?

15:17:31  15    A.    Oh, yes, it was.

16    Q.    Sir, is it fair to say that the hardware and

17    infrastructure -- excuse me -- and network infrastructure

18    at Hodell was underpowered?

19    A.    It was underpowered and wrongly configured.

15:17:46  20    Q.    So I want to just get a sense of what makes you

21    think you're able to say that.

22                Are you -- are you an expert in hardware or

23    networking infrastructure?

24    A.    I wouldn't say an expert.  I wouldn't put that

15:18:05  25    label on me because that's not what I do.  I write

1        software.

2                        But throughout my career, I mean, I was the

3        first one to implement a network solution at EA -- a

4        branch here in Chicago or, sorry, in Chicago, EA Sports.

15:18:23  5        I was able to implement a network there as well, and it

6        was the old cable like this.  It wasn't like what we have

7        nowadays, a plug-in.  And turned them over from what we

8        used to call Sneaker Net, that means pulling a disk out,

9        running it over, and putting it in another machine.

15:18:43 10                        So yes, I mean, and I wrote applications

11        for Konami which were all hardware-driven and I used

12        oscilloscopes in order to -- and oscilloscope is kind of

13        like that thing on the Outer Limits that you see with the

14        sine wave going through it.

15:19:01 15                        You know, so I used machines like that in

16        order to analyze hardware as well.  So I wouldn't say

17        it's my field of expertise, but I'd be hard-pressed that,

18        you know, I wouldn't be able to manage putting something

19        together like that.

15:19:15 20        Q.    Is it fair to say that the issues you just

21        described for us with respect to Hodell's hardware and

22        network infrastructure were, like, obvious issues?

23        A.    Obvious for, you know, someone in the IT field,

24        yes.  Without a doubt.

15:19:29 25        Q.    Obvious to someone like you based on your

1    experience?

2    A.    Correct.

3    Q.    So I want to change gears a little bit, sir.

4          We talked about your visit to Hodell.  Are

15:19:40 5    you aware of SAP's efforts to install what are called

6    patch levels or software patches?

7    A.    Yes, I am.

8    Q.    And so you understand that SAP did, in fact,

9    install several software patches after Hodell went live?

15:19:58 10    A.    I think you're misspeaking there.

11          SAP doesn't install anything on a client's

12    system.

13          SAP provides you with software updates, and

14    then it's up to the individual or the customer or the SAP

15:20:17 15    business partner like LSi in order to install and

16    maintain those.

17          Just because there's a patch release or an

18    upgrade or an update that comes out, maybe the -- maybe

19    it's not good for the client.  Maybe it may make changes

15:20:34 20    in their system that, you know, doesn't work with the way

21    they had their system currently set up.

22          So it's up to the business partner like LSi

23    to make that decision as to whether or not to install

24    that patch release or that update or upgrade.

15:20:51 25    Q.    Thank you for correcting me, sir.

| | |
|---|---|
| 1 | And you're drawing a distinction between |
| 2 | SAP that develops the patch and then IBIS/LSi, who |
| 3 | actually installs the patch? |
| 4 | A.   Correct, because you said SAP installs, and they |
| 15:21:04  5 | don't. |
| 6 | Q.   And like I said, thank you for keeping me honest. |
| 7 | What -- are you aware of SAP developing |
| 8 | these patches? |
| 9 | A.   Yes. |
| 15:21:13 10 | Q.   And you're aware of them being installed regardless |
| 11 | of who did the installation? |
| 12 | A.   Correct. |
| 13 | Q.   Does Patch Level 25 or Patch Level 29, does that |
| 14 | ring a bell? |
| 15:21:24 15 | A.   Oh, yes.  I believe I looked at a document that was |
| 16 | shown to me at like a deposition or something like that. |
| 17 | Q.   Okay.  And we might get to the document, but I just |
| 18 | want to ask you some questions based on what you |
| 19 | remember. |
| 15:21:37 20 | A.   Okay. |
| 21 | Q.   Did you ever at any point in time do any objective |
| 22 | analysis of performance improvements after the |
| 23 | application of patch levels? |
| 24 | A.   Yes, I have. |
| 15:21:48 25 | Q.   And how did you -- like, how did you do that? |

A.    Basically what I did was I looked at a couple

different types of documents inside of SAP, something

like sales orders, invoices, items, things -- things like

that, and what I did was I wrote an application, once

again, to kind of test or stress test and get some bench

marks.

        I mean, because, again, I don't like the

terms slow and fast when I don't have something to

compare them to.

Q.    When you say "Something," you mean data?

A.    Anything.  Doesn't matter.  This car is slower.

This car is fast.  Compared to what?  A jet engine?

Compared to a snail?  Compared to a turtle?  So what are

you comparing it to?

        So I like to be able to, you know, have

real numbers so I can say, oh, yes, I see an increase in

performance here or I see a decrease in performance here.

Q.    And you were able to make -- I'm sorry.

A.    So I wrote -- I write tools all the time to test my

ideas and my theories so that I can take my theories and

say, "yes, this theory is plausible and here's

the -- this theory is feasible and this is the data I

have, and it shows that it is."

Q.    Sir, did you ever analyze the performance of the

software before and after Patch Level 29?

1    A.    Yes, I believe that is the one that I did was

2    between two different patch releases.

3    Q.    Thank you, sir.

4          Can you take a look at Exhibit 307?  Just

15:23:36 5    take a look at that and just let me know if that

6    refreshes your recollection --

7    A.    Yes.

8    Q.    -- as to --

9    A.    Sorry.  Yes.  This is a document that I produced.

15:23:45 10   Q.    Okay.  So we don't have to look at the document.

11   We can just talk.

12         Is it your recollection, sir, that you used

13   that software tool to analyze the performance of the

14   software system before and after Patch Level 29?

15:24:04 15   A.    Patch Level 25 and 29 are the two that I tested in

16   this document, so I won't say beyond 29 and I won't say

17   before 25.

18         It looks like I tested 25 and 29.  Those

19   are the two that I tested, and these are my results.

15:24:21 20   Q.    And, sir, were you able to come to a conclusion

21   based on the results that you got from the software

22   application tool that you wrote as to whether or not

23   there were, in fact, performance improvements at Hodell

24   after Patch Level 25 and 29?

15:24:41 25   A.    On patch -- on Patch Release 29, there was

1    improvements, yes.

2    Q.    And are you able to quantify that improvement, sir?

3    A.    Yes.  I -- I estimated that it was about 500%.

4    Q.    And, sir, when you say you estimated that it was

15:24:57  5    about 500%, did you just pull that -- did you just make

6    that number up?

7    A.    No, it's actually in the data itself.

8              It looks like this is poorly copied

9    information, but inside of here, I had all of my timings,

15:25:13 10    you know, like something taking 20 point -- 20 seconds

11    and 100 or that's 15 milliseconds, so that's a real

12    number that I pulled out of it.

13              So it took 20 seconds in order to process

14    this type of document with this type of -- this many

15:25:37 15    lines on it.

16              I only did down to milliseconds.

17    Q.    So, sir, when you said that there was a 500%

18    improvement, that was based on actual facts and figures?

19    A.    That is correct.

15:25:50 20    Q.    And that was based on a patch that SAP themselves

21    implemented?

22    A.    Yes.

23    Q.    Sir, I'd like to just take a step back and talk

24    about the performance issues that Hodell experienced over

15:26:12 25    the time they ran the software.  Okay?

1    A.    Okay.

2    Q.    Sir, based on your role as the developer of the

3    In-Flight application and all the tests that we've talked

4    about that you actually conducted, are you able to say

15:26:30  5    what caused a significant amount of the performance

6    problems at Hodell?

7                    MR. LAMBERT:  Objection.

8                    THE COURT:  Overruled.

9    A.    Yes, I am.  Through both -- and again, this

15:26:45 10   is -- this is real world.  Between my visit with Hodell,

11   going through this data, and I believe one of the reasons

12   why -- why I produced this document in particular doesn't

13   mean I wasn't doing testing prior to this, but one of the

14   reasons that I produced this document was because Hodell

15:27:08 15   on that other document from Gadi had said that, you know,

16   there was issues with In-Flight.

17                    Well, again, I don't like just the

18   finger-pointing.  If you don't have, you know, something

19   real to show me, don't -- don't point the finger.  I want

15:27:24 20   to see real information.  I want to see -- I don't want

21   to hear this guy, that guy, that guy.  Show me something.

22                    So this is why I produced this.  And

23   through each one of the patch releases I was testing, and

24   here's one that went through a big jump

15:27:41 25   between -- between the two, which is what I would expect.

1    You know, even from myself as I move forward and I

2    develop an application and I start what I call polishing

3    it up, you know, I'm going to find places, you know,

4    where I can improve, maybe drastically improve the

15:28:00  5    performance in certain areas.

6         And the reasons why I'm going to look at

7    particular areas that are causing problems is when I hear

8    back from the user, the user's going to tell me, "Oh, on

9    sales orders, it's perfectly fine but, you know, on an

15:28:21 10    invoice it's awfully slow."  And again relative.

11         "But when I go to items, it's really good

12    but, you know, when I'm going to produce something, it's

13    really slow."  And then it gives me time to start really

14    honing in and focusing on that particular problem.

15:28:38 15         So when Gadi put together his analysis of

16    what he thought, I backed it up with, you know, real data

17    to show me where the problems are.

18    Q.    And you're talking about Exhibit 307?

19    A.    I'm still talking about -- yes.

15:28:56 20    Q.    Thank you very much.  And I'm actually asking you a

21    more global question.  And so my question is, sir, based

22    on your experience as the developer of the In-Flight

23    application, and maybe it makes sense to step even

24    further back, sir, in this case, there's been a lot of

15:29:10 25    testimony about what caused any performance issues that

1    Hodell may have experienced.

2                Was it the SAP core product?  Was it the

3    In-Flight application?  Was it something else?

4                And I'm asking you, sir, based on your

15:29:27  5    experience as the developer of the In-Flight application

6    and based on the various tests, not just the ones that

7    we're talking about now, but the various tests that you

8    ran over the course of your involvement, are you able to

9    tell the jury what caused the most performance problems

15:29:47 10    at Hodell?

11    A.    Yes.  That would be In-Flight, number one, and the

12    network environment, number two.  The environment in

13    which Hodell had.

14    Q.    So when you say the In-Flight application caused

15:29:58 15    performance problems at Hodell, that's the In-Flight

16    application that you yourself wrote?

17    A.    Correct, along with Eric Johnson.

18    Q.    Sir, are you able to quantify what percentage of

19    the performance problems were caused by the In-Flight

15:30:11 20    application that you wrote?

21    A.    Again without -- I wouldn't make a broad -- I just

22    wouldn't make up numbers.  I'm sorry, I can't do that.

23    Q.    So without making up numbers, was it an

24    overwhelming part of the problems were as a result of

15:30:30 25    In-Flight?

```
 1    A.    I would say, yeah, you know, based on what I do

 2    know and what I have put together, that In-Flight was

 3    significantly higher in issues than any other part of the

 4    system.

 5                    And, you know, if I -- if I had to venture

 6    a percentage, it would be --

 7    Q.    I don't need you to venture a guess.

 8    A.    -- well over 50 percent, but yes.

 9    Q.    I'm sorry.  I just don't want you to do something

10    you're not comfortable with.

11    A.    Yeah.

12    Q.    But you said a significant, the vast majority, is

13    that fair?

14    A.    Yes, that would be fair.

15    Q.    Of the performance problems that Hodell had in your

16    view as the developer of the In-Flight application, the

17    vast majority of those were because of the In-Flight

18    application?

19    A.    Correct.

20                    And plus, I know the inner workings of it

21    so that's why I can, you know, say with a great deal more

22    confidence than I can about, you know, the network, even

23    though we found, you know, blatantly obvious things that,

24    you know, caused huge problems, and would, no matter what

25    company you're in, it's hard for me to, you know, because
```

1    I also didn't see all the other rest of the workings.

2                I didn't get a chance to, you know, touch

3    other physical parts of it, so those would be guesses.

4                But knowing what I do know with just the

15:31:53 5   network itself, yes, there was -- that was huge.  I mean,

6    that was, like, that was really big.

7                But from the standpoint of In-Flight, it's

8    just I know In-Flight so well at that point in time that,

9    you know, with confidence I can say, gosh, we did so many

15:32:09 10  things that were probably not -- not the best we could

11   have done.  No, they couldn't have been, they weren't.

12   Q.    And those things that you just mentioned that you

13   and others at IBIS/LSi did with respect to In-Flight that

14   weren't good, they had an effect on performance?

15:32:27 15  A.    Oh, yes.

16   Q.    A significant effect on performance?

17   A.    Significant.

18   Q.    And in your view, the vast majority of the

19   performance issues that Hodell did experience were caused

15:32:35 20  by In-Flight?

21   A.    Yes, they were.

22                And the reason I can make that statement as

23   well is that one of the things that I had done throughout

24   the project was, you know, In-Flight is an add-on that

15:32:50 25  can be attached to SAP Business One, so in order to test

1    what I would say vanilla SAP Business One, meaning no

2    sprinkles, no hot fudge, nothing on it, you disable all

3    of those add-ons.  Now, you have the raw application SAP

4    Business One.

15:33:08  5         And when I would run, you know, just SAP

6    Business One vanilla, it ran.  It ran really nice.  And

7    as soon as I'd turn on In-Flight and there was other

8    add-on modules as well, once I turned those on, you can

9    feel the performance, you know, go down.  You don't even

15:33:32 10   need raw numbers to see that.

11         I mean, you can -- I mean, you hit a key

12   and you're waiting for it to, A, B, you know, C.  I mean,

13   you're just waiting for each one of the key processes.  I

14   mean, it was so obvious that we had made some errors.

15:33:53 15         MR. KELLEHER:  Thank you, sir.

16         THE COURT:  Cross-examination.

17         MR. LAMBERT:  May I approach, Your Honor?

18         THE COURT:  Yes.

19   CROSS-EXAMINATION OF JOSEPH GUAGENTI

15:34:31 20  BY MR. LAMBERT:

21   Q.    Mr. Guagenti, I'm Wes Lambert.  We met several

22   years ago, right, at your deposition?

23   A.    I believe so, Wes.

24   Q.    Great.  Okay.  And I put a copy of your deposition

15:34:40 25  up there for you to reference because I think we're going

1     to need it.

2     A.    Okay.

3     Q.    Not only are you not an expert in evaluating

4     hardware and network infrastructure, you're not even

15:34:54  5     qualified to do it, right?

6               You're not even qualified to give the

7     testimony you just gave about Hodell-Natco's

8     infrastructure.  You'd admit that to me, right?

9     A.    No.  The statement that I gave was my -- was my own

15:35:08 10     personal opinion based on my knowledge of working in the

11     computer industry for 30-something years.

12     Q.    But it's speculation, right, because we've had this

13     discussion before.  You acknowledge you're not qualified

14     to assess Hodell's hardware and network infrastructure,

15:35:27 15     right, that's what you've acknowledged, correct?

16     A.    Yeah, and I guess the same analogy, I'm sorry if I

17     do this, but, you know, I just want to set the record

18     straight, and you can beat me up all you want.

19               If I go look at a car --

15:35:43 20     Q.    I'm going to stay over here.  That's not going to

21     happen.

22               Go ahead?

23     A.    If I go look at a car and it doesn't have wheels on

24     it, I know it's not going to drive.  I mean, I'm not

15:35:51 25     going to be able to get it from Point A to Point B.

1     So just -- it's just reasonable that this

2 can't -- it can't, you know, it can't do what it needs to

3 do.  You can't drive the car without the wheels.  And

4 when you see the raw data with the errors coming back

15:36:07 5 from the network, and you switch out the cable and all of

6 a sudden it starts working, and you don't have those

7 errors anymore, you can say that he's not an expert and

8 that I'm a fortune teller and I was just able to read the

9 wires and know that there was a problem, but it's still,

15:36:26 10 at the end of the day, it fixed those types of issues.

11 Q. I'm not following you.

12     Are we talking about real world things that

13 happened or --

14 A. Yes.

15:36:34 15 Q. -- guesses that you're making on the stand now?

16 A. I don't need to make a guess.

17 Q. Okay.  Because we need to agree on one thing:  You

18 aren't qualified to assess Hodell-Natco's hardware and

19 network infrastructure, right?

15:36:51 20     That's not your area, we can agree on that?

21 A. Then they shouldn't have called me out there to do

22 that.

23 Q. We can --

24 A. Okay.  We'll agree with it.  We'll agree with it,

15:37:00 25 yes.

1    Q.    And, in fact, no one on LSi's staff was qualified

2    to perform that analysis, is that correct?

3    A.    I would not say that because I don't know the

4    complete HR department, but someone like Avery Myrick who

15:37:16  5    has been in hardware for 40-something years running IBM

6    mainframe systems, Mike, and I can't remember his last

7    name, the same thing, I mean, there's just -- at the end

8    of the day when you're working in this type of

9    industry -- and they are actually qualified -- there's

15:37:36 10    just things that are just so blatantly obvious.

11              Is your computer turned on?  Is your mouse

12    plugged in?  You know, those types of things which, you

13    know, I wouldn't be able to help anybody if that was the

14    case.  I wouldn't be able to, you know, help them turn on

15:37:52 15    their computer or find the letter A on their keyboard

16    because I'm not an expert in it.

17    Q.    I really don't want to do this this late in the

18    day, sir, but we're going to have to clean this up just

19    so the record is clear.

15:38:05 20    A.    Okay.  Okay.

21    Q.    Can you turn to Page 173 of your deposition?  I'm

22    sorry, 170 -- bottom of 172.

23    A.    172?

24    Q.    Yeah.  You remember again we started off on this

15:38:19 25    foot, I took your deposition three years ago, right?

```
        1    A.     Um-hmm.  Yes.

        2    Q.     And the court reporter was there taking down your

        3    testimony.  You were under oath just like you are now,

        4    sir, right?

15:38:29 5   A.     Okay.  Yes.

        6    Q.     Correct?

        7    A.     Yes, I was.

        8    Q.     Okay.  And I asked you the question, we were

        9    talking about your trip out to Hodell, right, just to put

15:38:39 10  this in context?

        11   A.     Yes.

        12   Q.     Okay.  And I asked you the question, "You were just

        13   there, you weren't sent for the specific purpose of

        14   undertaking the evaluation of the hardware and network

15:38:51 15  environment, is that accurate?"

        16          And your response was:  "I believe that's

        17   an accurate statement."

        18          And then I said, "And I think you said you

        19   weren't even qualified to do that?"  And then you said

15:39:02 20  "I wouldn't --"  and I said "Is that what you said?"  And

        21   you said, "I wouldn't say that is my forte, and I

        22   wouldn't -- I would say I'm not qualified."

        23          That was your testimony, right?

        24   A.     Are we looking at, like --

15:39:17 25  Q.     173, "I would say that I'm not qualified."  That's
```

1    exactly what it says there?

2    A.    From a standard of, you know, a certification, yes,

3    you are correct.

4    Q.    "I would say that I'm not qualified," right?

15:39:32  5    A.    I will agree.

6    Q.    And then I asked you:  "And you said, but you also

7    said you thought you were the person most qualified at

8    LSi to do it, right?"

9    A.    When it came to SAP Business One.

15:39:43 10    Q.    And you said correct?

11    A.    SAP Business One.

12    Q.    So we can extrapolate from that no one, if you

13    weren't qualified and you were the most qualified, then

14    no one was qualified?

15:39:52 15    A.    Well, I guess you're taking it out of context

16    because there --

17    Q.    What am I taking out of context?

18    A.    Well, okay, for one, we were talking about the trip

19    to Hodell.

15:40:01 20    Q.    Okay.

21    A.    Okay.

22              So who was the only -- who were the people

23    who ended up showing up there?  I was one of the

24    individuals.

15:40:08 25    Q.    Right.

1    A.    Correct?

2    Q.    Right.

3    A.    So we're talking about at Hodell, who is the

4    most -- you know, I was the one from LSi that was the

15:40:16  5    most qualified there at that point in time, but there is

6    a whole hardware division of LSi.

7              So to make the statement, and if I did say

8    that, I am completely off base because LSi had a complete

9    hardware division inside of LSi that installed computers

15:40:41  10   at Chase Banks and banks.

11             I mean, to say that none of them were

12   qualified when they were going around installing this

13   is -- is kind of silly.

14   Q.    Okay.

15:40:56  15   A.    But from the -- from being there, yes, I agree,

16   that's not my forte.  That's not what I do.  I write

17   software, but again it was -- it was -- the changes were

18   made and the changes showed improvement.

19             So either I'm a really good guesser or I

15:41:18  20   have a little bit of ability to, you know, to work on

21   things.

22   Q.    We can agree, though, that -- and this is just I

23   think a logical conclusion -- that if Hodell's IT staff

24   completely revamped the hardware and network environment

15:41:37  25   and they didn't see any noticeable improvement, that

        1    wasn't really what was causing the slow down, was it?

        2                    MR. KELLEHER:  Objection.  This is a

        3    hypothetical question.  There's no factual basis.

        4                    THE COURT:  Objection sustained.

15:41:49  5    BY MR. LAMBERT:

        6    Q.    The cables you testified about?

        7    A.    Um-hmm.

        8    Q.    You don't really have any personal knowledge about

        9    how many users?

15:41:59 10    A.    No, I mentioned that.  I don't.  It could have been

       11    one or it could have been a hundred.

       12    Q.    You were just speculating that there was a certain

       13    amount but you don't really know, right?

       14    A.    I have to base on, you know, what the IT manager,

15:42:13 15    Keith Winn, had said to me.  He just said oh, gosh we had

       16    so many of these cables laying around and I actually

       17    don't think he knew the name of them at that time and I

       18    was like what did they look like and he was like they

       19    were like these silver flat things and I was like oh,

15:42:33 20    that's old school.

       21                    Again, he didn't say Joe, I got a thousand

       22    of these or I had one of these.  He said had some.  So

       23    I'm guessing it was more than one but --

       24    Q.    We're guessing here?

15:42:44 25    A.    Again, again, yes, you are.  I am guessing.

1     Q.    I forgot to ask something.

2                 Where do you work now?

3     A.    I have my own business.

4     Q.    Is that KB Pro?

15:43:00  5     A.    KB1 Pro.

6     Q.    KB1 pro?

7     A.    Um-hmm.

8     Q.    And correct me if I'm wrong, but your business that

9     you work for now is an SAP Business One related business,

15:43:13 10    right?

11    A.    Yes, I do SAP Business One development.

12    Q.    That wasn't asked of you on direct examination that

13    I recall, correct?

14    A.    Yeah, yeah, I think I might have forgot.  Yes, I

15:43:28 15    believe I didn't say that.

16    Q.    And can you just remind me why you left LSi?

17    A.    I didn't leave LSi.  Our whole team was terminated.

18    Q.    Okay.  And you went right to another SAP partner,

19    is that correct?

15:43:44 20    A.    That is correct.  I took -- I -- the whole team had

21    been let go that day, and I made some phone calls and I

22    got everybody a job.

23    Q.    We had some testimony today about -- you had some

24    testimony about what was going on with Hodell after they

15:44:22 25    went live, is that -- do you recall that testimony?

2416

1    A.    You said earlier today?  I'm sorry, can you say

2    that again?

3    Q.    Earlier today is a bad frame of time frame, right?

4    It was a few minutes ago.

15:44:37  5    A.    Oh, okay.  I thought maybe you were talking about

6    somebody else's testimony.  I'm sorry.

7    Q.    You testified there were some things you did after

8    Hodell went live?

9    A.    Correct.  I was continuing to work.

15:44:46  10    Q.    All right.  But isn't it true that you

11    don't -- didn't really even know if Hodell did go-live on

12    Business One?  You didn't even have any knowledge that

13    they had gone live?

14    A.    Again and you are correct, at first I was just -- I

15:45:00  15    was so focused in, I was spending, and it's no excuse,

16    but I was spending like 16 hours a day, 20 days a

17    week -- 20?  -- seven days a week, and I was truly just

18    focusing on, you know, repairing Hodell, making them, you

19    know, run better.

15:45:19  20                It was their business.  And I wasn't going

21    to let that fail.  So I put in everything that I could

22    possibly put into it, and so, yeah, I wasn't part of the

23    implementation.  I was just solely focused in on repair,

24    repair, repair, make this thing work.

15:45:38  25    Q.    And I'm just trying to get a simple answer because

1    it's getting late here.

2    A.    I'm sorry.

3    Q.    And everybody wants to go home.

4    A.    I'm a talker.  Sorry.

15:45:46 5    Q.    But my question is you don't know whether Hodell

6    even went live on Business One?

7    A.    I mean eventually, I did, but, yes, at that moment

8    in time when I was asked, I was just like -- you know,

9    because --

15:45:59 10    Q.    You're talking about at your deposition?

11    A.    At my deposition, because it was so long ago when

12    the deposition, and I was just like, wait, did we even

13    go-live.

14    Q.    Right.  So three years ago, you didn't know if

15:46:10 15    Hodell had gone live, but now here today, you recall it?

16    A.    Yes, I do recall it.

17    Q.    Okay.

18    A.    I'm sorry.

19    Q.    Kim, can you pull up 307?  You were asked some

15:46:30 20    questions about Exhibit 307, and I just want to be clear.

21    A.    Okay.

22    Q.    What really was being discussed in 307.

23          Again, this was the e-mail you sent to Paul

24    Killingsworth and some other folks in September of 2007,

15:46:46 25    right?

1    A.    Yeah, that is correct.

2    Q.    Okay.  And you're acknowledging, again, that

3    there's performance problems that Hodell is having in

4    that first sentence, "Sales orders taking minutes to

15:47:01  5    update," right?  Very first sentence.

6    A.    Yes.  Correct.

7    Q.    And you reference the next sentence, "A few months

8    back, Gadi Barnea's and LSi's Joe Guagenti had a site

9    visit to Hodell," do you see that?

15:47:22  10    A.    Um-hmm.  Yes, I do.

11    Q.    And is that the only time you ever went to Hodell?

12    A.    That is correct.

13    Q.    A couple months before this e-mail?

14    A.    Correct.

15:47:32  15    Q.    Okay.  And then you talked about what you did and

16    to look at what was going on there, right?

17    A.    Correct.

18    Q.    Okay.

19             So and then you say, based upon what you

15:47:43  20    were being told, "LSi started to look at the add-on as

21    being the probable," right?

22    A.    Correct.

23    Q.    And then you talked about how you installed this B1

24    profiler, right?  There's been some testimony in this

15:48:00  25    case about that.  It's something that analyzes

```
 1    interaction between the add-on and Business One?

 2    A.    That is correct.

 3    Q.    Okay.

 4    A.    And it's an application that is developed by SAP.

 5    Q.    Right.

 6                And so you installed it to see what was

 7    going on, and you noticed some things that were going on,

 8    right?  And you took corrective action?

 9                That's what this e-mail's discussing,

10    correct?

11    A.    Correct.

12    Q.    And then you see, "We then installed Patch Level

13    29," and you saw the big increase that you testified

14    about?

15    A.    Correct.

16    Q.    And then you say, "There was no change in our

17    add-on," right?

18    A.    At that point in time, yes, you are correct.

19    Q.    Right?

20    A.    Um-hmm.

21    Q.    So this Patch Level 29 has shown LSi that the 80,

22    10, 10 blaming e-mail is incorrect, right?

23    A.    Yes.

24    Q.    Because you didn't do anything with your add-on,

25    you didn't change it, correct?
```

```
          1    A.    That is correct.

          2    Q.    Business One was changed, and then you saw some

          3    improvement, right?

          4    A.    That is correct.

15:49:05  5    Q.    Okay.  And then can you go to 307.3?  There's

          6    a -- this is a continuation of your e-mail, right?

          7              You have, if we look through the e-mail,

          8    there's a bunch of stuff that I'm not going to pretend to

          9    understand.

15:49:35 10    A.    Okay.

         11    Q.    But I think I can read what's going on on 307.3.

         12    "Again, SAP and LSi are a team.  We need to fix what is

         13    wrong.  I have done just about everything Edward Neveux

         14    has outlined as problems in our add-on."

15:49:54 15              Do you see that?

         16    A.    Yes, I do.

         17    Q.    Was that true?

         18    A.    To an extent, yes, it was.

         19    Q.    To an extent that was true?

15:49:59 20    A.    Yeah.  Correct.

         21    Q.    Okay.

         22    A.    I mean, again, it's like, I made the patches that I

         23    could in the amount of time that I had to put those

         24    patches in, but still the underlying, what I would call

15:50:14 25    structural foundation by which SAP was -- or by In-Flight
```

1    was built was -- was stone as opposed to cement and it

2    was just too shaky.

3    Q.    I just want to be clear.

4         You, were you being accurate when you told

15:50:32 5    SAP in September of 2007 that you had done everything

6    that Ed Neveux had recommended?

7    A.    I wasn't.  I wasn't.

8    Q.    You were not being accurate in that statement?

9    A.    No, I wasn't.

15:50:43 10         MR. KELLEHER:  Objection.  That

11    mischaracterizes the witness's testimony.

12         THE COURT:  Overruled.  He answered.  He

13    answered the question.

14    BY MR. LAMBERT:

15:50:54 15    Q.    You were not being accurate?

16    A.    I was not being accurate.

17         I believe after relooking at this, I mean I

18    was pouring all my blood, sweat and tears into this

19    application, and then to have somebody come in and point

15:51:07 20    the finger at me and my whole entire time team, my ego

21    took a hit.  I'll admit it.

22         I'm -- but also I'll admit that this is

23    true, I mean, I got a performance increase out of an SAP

24    patch release, which is what I would expect from any

15:51:23 25    software application.

 1              Again, if I know where some of the problems

 2    are at and I can start addressing them, I'm going to fix

 3    them.  But this document is true and factual.

 4    Q.    Except for the part that you wrote about doing what

 5    Ed Neveux had said to do, that wasn't?

 6    A.    I did -- I did to some extent, but again I really

 7    needed to do a lot more.

 8    Q.    Okay.

 9    A.    And that onus is completely on me.  Not just my

10    team.

11    Q.    Trying to breeze through some things here.

12              You, sir, were never told

13    that -- whether -- that SAP had not tested Business One

14    at the level that it was going to be installed at at

15    Hodell, right?

16    A.    I don't believe I knew any of the procedures for

17    testing at S -- you're talking about the SAP application

18    itself?

19    Q.    Yeah, let me simplify it.  No one at SAP ever

20    communicated to you -- let's back up.

21              You were on the development team at LSi,

22    right?

23    A.    Yes.  Um-hmm.

24    Q.    And no one at SAP had ever communicated to you that

25    Business One hadn't been tested at the level that it was

```
 1    going to be installed at Hodell, is that fair?

 2    A.    I believe that would be fair.

 3    Q.    Okay.

 4    A.    I think.  I believe that would be fair.  No one at

 5    SAP.

 6    Q.    And you never personally analyzed the Business One

 7    code, I think we can agree on that, right?

 8    A.    Oh, yes.  The Business One code is protected.  You

 9    can't read it whatsoever.

10    Q.    So you don't -- you really don't have much

11    knowledge about the core Business One code --

12    A.    No, I don't.

13    Q.    -- and how that's architected and all that -- well,

14    you would have some knowledge about the architecture.

15    A.    Yes, I do.

16    Q.    That's a poorly worded questioned.

17    A.    But as far as being able to read the code directly,

18    no.  Absolutely not.

19    Q.    No.  Okay.

20    A.    It's a closed book.  I can't look.

21    Q.    I mean, really your knowledge is how add-ons are

22    paired with Business One, right?

23    A.    Right.  It's the passing of information between the

24    two.

25    Q.    A couple just real quick questions on the PC thing.
```

1          You talked about some PCs and applications

2     running in the background, right?

3     A.    Correct.

4     Q.    Okay.  And is it your testimony that Hodell's

15:53:47 5     entire solution was running slow because a few users were

6     running iTunes while they were using Business One?

7     A.    My evaluation was on an individual basis.

8          Like I said, I believe Gadi was there for,

9     you know, examining the server itself.  That's the remote

15:54:06 10    computer that holds all of the information.

11         My focus was more on the end user

12    themselves, the individual using the computer at their

13    work station.

14         So that, that was -- that was mainly my

15:54:20 15    focus.

16         So when Keith Winn took me around, too, and

17    said, "Oh, here's so and so, she's having some problems,"

18    and I said okay let's sit down and run the tool, and we

19    did some of that together as well and this is when we

15:54:36 20    started collecting the data, and again, I'm not looking

21    at, you know, everything else that's going on.  I'm

22    looking at just the data inside the -- what the analyzer

23    had grabbed.

24         What are they running?  Here's some

15:54:49 25    anti-virus software running that's killing the system

1    because it's using, you know, 50% of the CPU or 50% of

2    its total bandwidth.  So I'm looking at that type of

3    information and I can see applications that they have

4    open and running because it's printing them out.

5            So that's how, so I went to each individual

6    and --

7    Q.    Okay.

8    A.    I'm sorry.  You can chop me if you need to hurry

9    here.

10   Q.    No, no, that's perfectly fine, but I guess where I

11   was going with that is one user using iTunes or two users

12   using iTunes isn't going to cause the entire Business One

13   application to slow down; it would just affect just that

14   one person, right?

15   A.    No, it can, and I'll, you know, kind of explain it

16   this way.

17           If everyone that's here had a phone and

18   they were all attached to the same incoming call and

19   we're all trying to talk on it at the same time, it's

20   going to become garbled and it's going to be hard to

21   communicate with the individual on the other end.  So

22   we're occupying time in which, you know, another

23   application or another individual needs to speak.

24           So, yeah, it will.  Will it be terrible?  I

25   don't know because I didn't know how many people were

1    running so --

2    Q.    You don't know, you're guessing, this is

3    another --

4    A.    No, that I'm not guessing on.

5    Q.    But you don't know what the effect would be, right?

6    A.    No, I do know what the effect would be.

7    Q.    You said you don't know how many people were

8    running?

9    A.    Right, but you asked me what the effect was, would

10   be.

11   Q.    And you could easily just close iTunes?

12   A.    Yes, you could.

13   Q.    And that's an easily fixable problem, right?

14   A.    Yes.

15   Q.    We agree that's not something that was --

16   A.    No, it wasn't like it was killing everything, but

17   it would affect the performance because if you're using,

18   you know, like I said, if you're using up all the water

19   in one room, you try to turn the faucet on the other

20   room, there's -- it's barely going to come out.

21            There's only so much, you know, water,

22   that's -- use the analogy of the water pipe -- there's

23   only so much water that goes through it.

24   Q.    Okay.  Did you ever tell Hodell that you hadn't

25   developed In-Flight adequately?

1    A.    I don't believe that would be something that I

2    would convey to them.  That shouldn't have come from me.

3    Q.    Well, you were the developer of the solution,

4    right?  It was on your shoulders to develop the

5    application?

6    A.    But I'm -- but I'm not the owner or the operator.

7              That's -- that's not for me -- I'm not the

8    salesman.  I'm not the one to convey -- I wouldn't say I

9    would be the one to convey at that type of information.

10   Q.    You went out to Hodell and you were on their site

11   with these gentlemen, right?

12   A.    With --

13   Q.    Otto and Kevin?

14   A.    Yeah, and with -- mainly Keith.  I mean, I didn't

15   really see Otto and Kevin.  I saw Keith a lot.  I sat

16   with Keith.

17   Q.    But you were aware they were really having some

18   problems, right?  I mean this wasn't --

19   A.    Oh, yes, that's why I went out there.

20   Q.    And you didn't go, "Hey, by the way, In-Flight's no

21   good."  You didn't tell them that?

22   A.    Again, when I went out for my site visit --

23   Q.    The question is you didn't tell them --

24              MR. KELLEHER:  Judge, he stopped him mid

25   sentence.

1          THE COURT:  Overruled.

2     Q.     The question is you didn't tell them, right?

3     A.     No, I don't believe I personally told them, no.

4     Q.     And I've seen thousands of e-mails in this case.

15:58:21  5   I've never seen an e-mail where you really told anybody

6     that In-Flight was the problem?

7          MR. KELLEHER:  Objection.

8     Q.     Are you aware of any e-mail traffic that says that?

9     A.     This is our internal conversation and I believe

15:58:33 10   also one of the documents I was just shown by John Bilas,

11    just that the whole structure of, you know, what we were

12    doing was, you know, probably not conducive to the way a

13    software application should be developed.

14    Q.     And you kept that to yourself and didn't tell these

15:58:50 15   people, correct?

16    A.     Again that wouldn't be my place.

17          MR. LAMBERT:  Okay.  Thank you.

18          THE WITNESS:  I'm sorry.

19          THE COURT:  Any redirect?

15:58:58 20          MR. KELLEHER:  Could I have a moment,

21    Judge?

22          THE COURT:  Yes.

23          MR. KELLEHER:  Judge, we have no further

24    questions.

15:59:22 25          THE COURT:  Thank you, Mr. Killingsworth,

1    you're excused.  Watch your step going down, please.

2                    THE WITNESS:  Thank you very much.  Thank

3    you.

4                    (Witness excused).

15:59:29  5        THE COURT:  Well, do you want to go home?

6    Yeah.  Sounds like a good idea.

7                    Okay, folks, we've heard a lot of evidence.

8    You may or you may not have heard all the testimony

9    that's going to be presented in the case.

15:59:41  10                   You certainly don't know or haven't heard

11   the arguments of the lawyers, nor do you know what the

12   law is that applies in the case.

13                   It is equally important that you maintain

14   an open mind, that you not form or express any opinion

15:59:53  15   about any aspect of the case, and certainly don't discuss

16   the case with anyone or allow anyone to discuss it with

17   you.  No independent investigations.  You know, we went

18   through all that.

19                   Just keep in mind the admonitions over the

16:00:08  20   weekend and we'll see you Monday morning 8:15 at?

21                   A JUROR:  L-1.

22                   THE COURT:  L-1, good.

23                   (Jury out)

24                   THE COURT:  I have a couple questions for

16:00:38  25   everybody.

2430

1          You may have a seat.

2          How many more witnesses do you have?

3          MR. STAR:  Your Honor, we just have two

4    experts.

16:00:46  5          THE COURT:  All right.

6          MR. STAR:  They will be called on Monday.

7          THE COURT:  All right.  Actually I'm trying

8    to figure some things out here.

9          On -- you asked to have Dr. Kennedy testify

16:00:58 10   or proffer Dr. Kennedy's testimony and again I reviewed

11   all that stuff again, and Kennedy's testimony is or was

12   supposed to be, as I read it, that because he looked at

13   the five years prior to 2007 and looked at the pounds

14   shipped and the number of employees used for those pounds

16:01:32 15   shipped, compared that to the 25 months that Business One

16   was in operation, that he could somehow say that there

17   could have been additional sales and that there was lost

18   profits, am I right?

19          MS. LUARDE:  Yes, Your Honor.

16:01:50 20          THE COURT:  Okay.  Then we, before or this

21   morning I guess it was, we had a discussion that

22   Mr. Reidl's damage claims, which was completely different

23   about the pounds shipped, it was that he had to keep

24   extra people working because of the slowness so that's a

16:02:11 25   completely different measure of damages.

 1                    MS. LUARDE:  That's correct.

 2                    THE COURT:  On the same thing with the

 3     pounds shipped, right?

 4                    MS. LUARDE:  That's correct, Your Honor.

16:02:20 5            THE COURT:  Or not shipped.

 6                    MS. LUARDE:  Mr. Reidl's calculation is

 7     based on increased overhead expense, and Dr. Kennedy's

 8     is -- relates to lost profits.

 9                    THE COURT:  Okay.  Now, I'm going to ask a

16:02:35 10    couple questions because we're trying to figure out if

11     we're going to do a jury charge here.  I'm kind

12     of -- what is the exact breach of contract and what

13     contract are we talking about that you're alleging?

14                    MS. LUARDE:  The contract at issue would be

16:02:54 15    the license agreement with SAP America, and SAP AG is not

16     a party to that agreement.

17                    THE COURT:  Okay.  Now, and what was the

18     defect or what was the breach in that license agreement

19     that you're alleging?

16:03:15 20           MS. LUARDE:  Yeah, I mean, the breach of

21     contract, Your Honor, relates to the product failed in

22     its essential purpose which is to -- it was not a

23     workable ERP system for Hodell.

24                    THE COURT:  I mean, is there someplace in

16:03:33 25    the license agreement that -- like a functional

         1    specification or something, that you say that didn't

         2    comport with what you understood it to be?

         3                 MS. LUARDE:  Yeah, Mr. Lambert is more

         4    familiar with the terms of the license agreement, Your

16:03:48 5    Honor.

         6                 THE COURT:  Okay.

         7                 MR. LAMBERT:  The contract claim and the

         8    warranty relates I think -- not I think -- to the

         9    functionality of the product.  The warranty says it will

16:03:56 10   conform to the documentation.  Nobody in the case has

        11    really identified the documentation, not even SAP.

        12                 MR. MILLER:  That's not true.

        13                 THE COURT:  Hang on.  Hang on.

        14                 I'm saying, I'm asking you what is -- what

16:04:10 15   are you -- I've got to say what the breach is.  What are

        16    you saying the breach is?

        17                 MR. LAMBERT:  That they couldn't deliver

        18    the functionality that the software -- the specific

        19    functions the software was supposed to do.

16:04:23 20                THE COURT:  What?

        21                 MR. LAMBERT:  The things Kevin Reidl

        22    testified to like the faxing and lookups and things like

        23    that.  It couldn't do that.

        24                 THE COURT:  All right.  So -- all right.

16:04:40 25                MR. LAMBERT:  And then we had the admission

1    from Dan Kraus, and this is -- these are the same facts,

2    by the way, that Judge White found sufficient to -- I'm

3    just --

4              THE COURT:  Please, I'm trying to get a

16:04:53  5    straight answer to a question.

6              MR. LAMBERT:  Right.  And we have the Dan

7    Kraus e-mail acknowledging that the software doesn't

8    conform to the documentation when it was delivered to

9    Hodell, so that's -- that's the basis for our claim.

16:05:04 10              THE COURT:  All right.  So you're saying

11    that the -- run that by me one more time.

12              You're --

13              MR. LAMBERT:  The --

14              THE COURT:  Their software doesn't conform

16:05:17 15    to what specific, some clause in the license agreement?

16              MR. LAMBERT:  Yes.

17              THE COURT:  And can you identify that?

18              MR. LAMBERT:  It's the -- I think it's 7.1.

19    The software will substantially perform to the functional

16:05:32 20    specifications.

21              THE COURT:  Of the documentation, correct.

22              And has anybody offered any evidence as to

23    the documentation, what it said?

24              MS. LUARDE:  No, Your Honor.  We have

16:05:45 25    never --

1          MR. MILLER:  Go ahead.

2          MR. LAMBERT:  There is a fact dispute as to

3    what it is but there is no fact dispute that it don't

4    conform to the documentation.

16:05:56 5          THE COURT:  Okay.

6          MR. MILLER:  Your Honor, if I may clarify,

7    Dan Kraus testified that the documentation, Capital D, in

8    the warranty clause that they are referring to and

9    apparently basing their contract claim, the documentation

16:06:11 10   comes with the software.  I covered that with him very

11   carefully.

12         THE COURT:  Right.  I understand.

13         MR. MILLER:  And his testimony about the

14   software not complying to the documentation was in

16:06:21 15   connection with a very not minor issue that I ended with

16   that has nothing to do with this case.  Something came up

17   with the service pack early on.

18         THE COURT:  All right.  That may be a

19   defense.

16:06:30 20         What I'm trying to do is find out what the

21   allegations, what the breach claim is.

22         MR. MILLER:  I understand.

23         THE COURT:  That's all I'm trying --

24         MR. MILLER:  That's the only reason I'm

16:06:39 25   making this point.

1        If their breach of contract claim is based

2   on Dan Kraus' admission about the service pack, we all

3   need to stop right now and look at that very carefully.

4        THE COURT:  Bear with me.  That's why I'm

16:06:52  5   asking these questions.  You have two days to stop and

6   think about what we're talking about.

7        All right.

8        MR. STAR:  Your Honor, we can put the

9   language up if you need it.

16:07:01 10        THE COURT:  I don't need to see it now.

11        I'm asking, and so now I know what the

12   alleged breach is.

13        And then what, fraudulent

14   representation -- first of all, can you have fraud in the

16:07:17 15   inducement by a party that's not a party to the contract?

16        MR. LAMBERT:  Absolutely, Your Honor.

17        In fact, that's -- that's something that

18   hasn't even really been disputed.

19        Going back to the motion to dismiss, this

16:07:36 20   was briefed, and after oral argument, and I take it the

21   Court would stay with the prior holdings, but Judge White

22   found that there could be a fraud, a fraudulent

23   inducement based just on the development agreement

24   transaction to which SAP claims it wasn't a party.

16:07:52 25        So that was a specific holding of Judge

1    White's that wasn't objected to by SAP.

2            THE COURT:  Of course, that was when LSi

3    and IBIS were in the case, right?

4            MR. LAMBERT:  They've always been in the

16:08:04  5    case.

6            THE COURT:  Well, they're not in the case

7    now.

8            MR. CARNEY:  They're still in the case,

9    Your Honor.

16:08:09 10            THE COURT:  Well, they're not in this case

11    before this jury.

12            MR. CARNEY:  But still parties.

13            THE COURT:  I know, but we're talking about

14    these parties here before the jury.

16:08:18 15            Anyway, all right, what specific

16    representation outside of the contract that was made that

17    was fraud that Hodell relied on?

18            MR. LAMBERT:  Well, just to name a few, and

19    again this is something that really is -- that we claim

16:08:42 20    has been decided four times now by Judge White and Judge

21    Wells, is that the statement about the number of users

22    the software can support is outside the terms of any

23    contract with anybody to this case, whether it's the

24    development agreement or the license agreement itself.

16:09:03 25            Judge White correctly held that the license

1    agreement is silent as to the number of users the

2    software can support; that it's -- there's nothing, no

3    allegation we're making it's inconsistent with the terms

4    of the license agreement or the development agreement for

16:09:19  5    that matter, and therefore, that allegation alone is

6    outside the terms of any contract that is sufficient to

7    form the basis.

8                    THE COURT:  So is it your position that the

9    license agreement makes no -- and binds neither party to

16:09:35 10    the number of users?

11                    MR. LAMBERT:  Yeah.  Exactly.  There's

12    no --

13                    THE COURT:  Okay.

14                    MR. LAMBERT:  There's no even mention

16:09:44 15    regarding number of users in the licenses.

16                    THE COURT:  Okay.

17                    THE CLERK:  Who made the representation

18    about the number of users?  Which party?

19                    MR. LAMBERT:  Well, it was SAP's own

16:09:55 20    literature which we've introduced.

21                    THE CLERK:  America or AG?

22                    MR. LAMBERT:  Both.

23                    MS. LUARDE:  I have -- yes, every document

24    was -- that's why we pointed out during the testimony

16:10:18 25    that the copyright dates and the author was SAP AG.  And

| | |
|---|---|
| 1 | SAP AG, again our claim is that the representations that |
| 2 | were made in the marketing materials, in the Whitepaper, |
| 3 | and also the channel partners, the representations made |
| 4 | by, you know, we had Dale Van Leeuwen testify that he |
| 16:10:39 5 | told Otto that the user size could support, you know, up |
| 6 | to 300, 500 users, and Otto Reidl testified what American |
| 7 | Express told him, and we also have Dan Lowery. |
| 8 | And all of that information and the |
| 9 | information from Dale Van Leeuwen, he said he was told |
| 16:11:00 10 | that by SAP, and he was told that by -- down in Atlanta |
| 11 | and in Las Vegas. |
| 12 | THE COURT:  Yeah.  I -- |
| 13 | MS. LUARDE:  So we have multiple |
| 14 | representations that were made. |
| 16:11:11 15 | THE COURT:  Okay. |
| 16 | MR. STAR:  May I just respond to the |
| 17 | question you posed, Your Honor? |
| 18 | THE COURT:  I'm not quite finished yet. |
| 19 | MR. STAR:  Okay. |
| 16:11:18 20 | THE COURT:  Do you -- how many -- I suppose |
| 21 | we should look at, I should look at by Monday morning |
| 22 | anyway, get them to me, the specific documents outside |
| 23 | the license agreement that you're relying on that either |
| 24 | SAP or SAP America, AG, published that you relied on that |
| 16:11:39 25 | you claim were fraudulent that induced you to enter a |

 1    license agreement.

 2              Okay?

 3              MS. LUARDE:  Okay.

 4              THE COURT:  And, okay, I guess that's all

16:11:47  5    the questions I have on that.

 6              MR. STAR:  May I respond very quickly?

 7    Because the answer to the question ultimately that you

 8    posed there was what promises outside of the license

 9    agreement with respect to users or does the license

16:12:00 10   agreement cover users and the answer is very simple and

11    it's in the license agreement itself.

12              THE COURT:  Yeah, I haven't gotten to that.

13              MR. STAR:  Okay.  Fine.

14              THE COURT:  I know what you're talking

16:12:10 15   about.

16              MR. STAR:  Okay.

17              THE COURT:  And the other thing is on the

18    damage issue, I keep going back and I'm asking you guys

19    to do something over the weekend because I'm kind of

16:12:20 20   unclear, but the testimony I heard that there was a

21    business slowdown in 2007 to 2008 unrelated to Business

22    One.

23              MS. LUARDE:  No.  No.  No, Your Honor.

24              THE COURT:  All right.  Then, what evidence

16:12:39 25   that there was a business slowdown related to Business

1    One?

2              MS. LUARDE:  Well, it was related to

3    Business One, and, in fact, the testimony we have is that

4    there were a lot of performance issues with the product,

16:12:52  5    and in the financials, and numbers frankly don't lie, I

6    mean math is math, and so if you look on FACTS, when we

7    were in the implementation phase, you see the trend line

8    here, Your Honor, of gross profit and profit before tax,

9    the two were aligned.

16:13:08  10             And here you see gross profit continues,

11   profit before tax drops, and that difference is overhead.

12   And that's the loss in productivity that Mr. Reidl was

13   explaining.

14             And you can see clearly, based on the

16:13:26  15   timing, that Business One had a huge impact on our

16   ability to efficiently ship product.

17             So that's --

18             THE COURT:  We may be talking about two

19   different things.

16:13:37  20             MS. LUARDE:  Okay.  If I misunderstood your

21   question.

22             THE COURT:  No, no, maybe I didn't state it

23   correctly.

24             When I listened to Mr. Reidl's testimony

16:13:45  25   was that you shipped every order that you had.

2441

1          MS. LUARDE:  We did, but it took more

2     people.

3          THE COURT:  Okay.  That's a different

4     issue.  Then you satisfied every order, and but there

16:13:59  5     were less orders, right?

6          MS. LUARDE:  We satisfied every order that

7     came in, but it took --

8          THE COURT:  Took longer.

9          MS. LUARDE:  -- it took longer to do that.

16:14:13 10          THE COURT:  Correct.

11          MS. LUARDE:  So it was lag, it was more

12     difficult to process, and there was lag time.

13          THE COURT:  I'm walking into Wonderland.

14     I'm sorry, Sharon, but --

16:14:22 15          MS. LUARDE:  No, there's no Wonderland.

16          I'm not sure I understand.

17          THE COURT:  But business was less in 2007

18     and 2008, right, because you shipped less?

19          MR. CARNEY:  We shipped less pounds.

16:14:33 20          MS. LUARDE:  We did ship less pounds.

21          THE COURT:  So business was not as good as

22     it was in 2006.

23          MS. LUARDE:  Based on the number of pounds

24     shipped, that's correct.

16:14:41 25          THE COURT:  Correct.

2442

                    1          And that was based on --

                    2              MS. LUARDE:  I'm following your

                    3      questioning.  I apologize.

                    4              THE COURT:  All right.  I guess that was

16:14:49  5      based on a downturn in business because you say you

                    6      shipped or satisfied every order that you received.

                    7              MS. LUARDE:  That's -- that's correct.

                    8              THE COURT:  Okay.  All right.  I got it, I

                    9      think.

16:15:05 10              See you bright and early.  Thanks.

                   11              MR. STAR:  Thank you, Your Honor.

                   12              MS. LUARDE:  One thought, Your Honor.  The

                   13      testimony is also because of the inability, the problems

                   14      with the program.  We don't know what we lost.  I mean,

16:15:42 15      we don't know because of our inability to ship things

                   16      timely how many customers may not have picked up the

                   17      phone and called.

                   18              MR. CARNEY:  But we're not seeking damages

                   19      for that, Your Honor.

16:15:54 20              MS. LUARDE:  Right.

                   21              (Proceedings concluded)

                   22              (Proceedings adjourned at 4:16 p.m.)

                   23                      - - - - -

                   24

                   25

2443

1            C E R T I F I C A T E

2                 I certify that the foregoing is a correct

3      transcript from the record of proceedings in the

4      above-entitled matter.

5

6

7

8      **/s/Susan Trischan**

9      /S/ Susan Trischan, Official Court Reporter

10     Certified Realtime Reporter

11

12     7-189 U.S. Court House

13     801 West Superior Avenue

14     Cleveland, Ohio 44113

15     (216) 357-7087

16

17

18

19

20

21

22

23

24

25

2444

1                              **I N D E X**

2

3    <u>**WITNESSES**</u>:                                              <u>**PAGE**</u>

4      DIRECT EXAMINATION OF RALF MEHNERT-MELAND              2201

5      BY MR. KELLEHER

6      CROSS-EXAMINATION OF RALF MEHNERT-MELAND               2296

7      BY MR. LAMBERT

8      REDIRECT EXAMINATION OF RALF MEHNERT-MELAND            2357

9      BY MR. KELLEHER

10     DIRECT EXAMINATION OF JOSEPH GUAGENTI                  2360

11     BY MR. KELLEHER

12     CROSS-EXAMINATION OF JOSEPH GUAGENTI                   2407

13     BY MR. LAMBERT

14

15                          *  *  *  *  *

16

17

18

19

20

21

22

23

24

25