IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HODELL-NATCO INDUSTRIES, INC., | ) | CASE NO. 1:08-CV-2755 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | **BENCH BRIEF RELATING TO HODELL'S** |
| | ) | **LOST PRODUCTIVITY DAMAGES CLAIM** |
| SAP AMERICA, INC., et al. | ) | **AND MOTION FOR RECONSIDERATION** |
| | ) | **OF THE COURT'S EXCLUSION OF** |
| Defendants. | ) | **HODELL'S LOST ACQUISITION** |
| | ) | **DAMAGES** |

Plaintiff Hodell-Natco Industries Inc. ("Hodell") submits the following Bench Brief addressing its lost productivity damages claim. Hodell further requests that the Court reconsider its decision precluding Otto Reidl from testifying as to Hodell's damages incurred from the lost acquisition of PCBC.

## I.     STANDARD FOR RECOVERY OF DAMAGES UNDER OHIO LAW

The standard SAP seeks to impose in this case relating to Hodell's damage claim is contrary to Ohio law. It has never been the law in Ohio that a plaintiff – particularly a plaintiff that has been victimized by fraud – be required to prove its damages with mathematical certainty. "The general rule regarding damages in civil cases is that they must be proven with certainty, but the amount may be reasonably estimated." *TJX Cos. v. Hall*, 183 Ohio App.3d 236, 2009-Ohio-3372, ¶ 32, 916 N.E.2d 862 (8th Dist. 2009) (internal citation omitted). Further, "[d]amages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate." *Id*. (quoting *Palmer v. Connecticut Ry. & Lighting Co*., 311 U.S. 544, 559-560 (1941), citing *Eastman Kodak Co. v. Southern Photo Materials Co*., 273 U.S. 359 (1927)). In *TJX*, because the

plaintiff's loss was spread out over several years, many transactions, and because of the large volumes that the company transacted, the court found that the trial court's grant of summary judgment in TJX's favor on the issue of liability and damages was sufficiently supported by TJX's reasonable estimate of the loss.  *Id.*  at ¶ 34.

In *Accurate Die Casting Co. v. Cleveland*, 2 Ohio App.3d 386, 442 N.E.2d 459 (8th Dist. 1981), the City of Cleveland challenged a company's damages calculation for its injuries related to flooding of the company's property from the City's sewer system.  The plaintiff presented evidence that it sustained flood damages in the form of compensating employees for flood clean-up, reduced plant use as a result of employee time spent cleaning up, reduced property value as a result of its newly identified tendency to flood, and lost value of fixtures because the property was no longer useful for its intended purpose.  *Id.*  at 389.

The City argued that the trial court erred in awarding the plaintiff clean-up expense because the plaintiff did not submit any evidence of actual expense and only presented conjecture.  *Id.*  at 390.  The City also argued that the trial court erred in granting the plaintiff damages for loss of use of the plant.  *Id.*  The court rejected these arguments.  *Id.* at 391.  In doing so, the court reasoned that it is uncertainty as to the existence, not the amount, of damages that precludes recovery.  *Id.*  In a footnote, the court detailed the basis of the plaintiff's damages calculations as follows: "Plaintiff's vice-president testified that the plant was cleaned up by the supervisors, who devoted the full two weeks to the task, and by the indirect labor, i.e., employees engaged in packing, inspection, etc., who divided the two weeks between the cleanup and the production, which resumed as cleanup progressed and as the direct production labor was gradually recalled to work. Plaintiff calculated the ratio of indirect labor's wages to direct labor's wages for an ordinary week and for the two weeks following the flood. Plaintiff contended that

2

the increased percentage of indirect-labor's wages for those two weeks, together with the supervisor's wages for those weeks, comprised a conservative estimate of cleanup expenses." *Accurate Die Casting* at 391, fn. 8.

The court of appeals stated that the trial court correctly determined that the plaintiff's damages calculations, which were presented by the company's vice-president, were premised on "established experience and direct inference from known circumstances, which, though not exact, are fairly definite standards, not mere speculation or conjecture." *Id.*

Thus, it is the law in Ohio that a plaintiff may recover damages even in the event that its proof of damages is imprecise. *See Modic v. Modic*, 91 Ohio App.3d 775, 783, 633 N.E.2d 1151 (8th Dist. 1993) ("once the *fact of* damage is established with reasonable certainty the plaintiff is given considerable latitude in proving the *amount* of the loss lest the wrongdoer escape his obligation to make restitution")(emphasis in original) (citing concurring opinion in *Kinetico, Inc. v. Independent Ohio Nat'l Co.*, 19 Ohio App.3d 26, 33, 482 N.E.2d 1345 (8th Dist. 1984) ("[t]he 'reasonable certainty' requirement applies only to the cause of the damages and not the amount of the damages . . . [m]athematical precision, therefore, is not required") (breach of contract case)). When an amount of damages cannot be proven with certainty, the jury may review "all the facts and circumstances of the case, having any tendency to show damages, or their probable amount; so as to enable [the jury] to make the most intelligible and probable estimate which the nature of the case will permit." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 564 (1931) (antitrust case).

As detailed below, Hodell has gone over and above the standard imposed by the above-cited cases. It has put into evidence business records substantiating the numbers used to calculate its lost productivity damages. Hodell has also established the *fact* of damage, as

Hodell's CEO presented testimony that Hodell's *net profit* declined substantially after the implementation of Business One (diverging substantially from the gross sales figure speciously relied upon by SAP).  Mr. Reidl further testified that the only change in his business that occurred during this time that could account for the dramatic change in productivity – and corresponding decline in net income – was the introduction of SAP Business One into Hodell's business.

SAP claims it was unaware of Mr. Reidl's calculations and method used prior to his trial testimony.  However, as evidenced by the attached deposition pages of Mr. Reidl, SAP was aware of the calculations and method used as early as February 8, 2012 and had ample time to conduct discovery related to these calculations.  [Deposition of Otto Reidl, February 8, 2012 ("Reidl Depo.") pp. 339-390, attached hereto as Exhibit 1].  Clearly SAP was satisfied with the information it received because it chose not to conduct further discovery on the issue.

## II.  HODELL'S MEASURE OF WORKER PRODUCTIVITY IS ACCEPTED BY THE BUREAU OF LABOR STATISTICS

If Hodell is living in "Wonderland" by measuring worker productivity by pounds shipped per employee, then the U.S. Government and every investment analyst and economist that relies upon the Bureau of Labor Statistics ("BLS") must be living in "Wonderland" as well.  The BLS devotes an entire section of its website to labor productivity, and provides the following information particularly applicable to this case:

**How is productivity defined?**
Productivity is a measure of economic efficiency which shows how effectively economic inputs are converted into output.

**Why is productivity measurement important?**
Advances in productivity, that is the ability to produce more with the same or less input, are a significant source of increased potential national income. The U.S. economy has been able to produce more goods and services over time, not by requiring a proportional increase of labor time, but by making production more

efficient.

**How is productivity measured by BLS?**
Productivity is measured by comparing the amount of goods and services produced with the inputs which were used in production. Labor productivity is the ratio of the output of goods and services to the labor hours devoted to the production of that output.[1]

Hodell has not pulled some metric out of thin air to calculate damages in this case.  Hodell's productivity is properly measured in terms of product shipped (output) in relation to the total labor force (input) required to generate that output.

Moreover, the BLS supports Hodell's use of total population compensation to calculate the cost of productivity decreases:

**What is included in compensation?**
Compensation is a measure of the cost to the employer of securing the services of labor. It includes wages and salaries, supplements (like shift differentials, all kinds of paid leave, bonus and incentive payments, and employee discounts), and employer contributions to employee-benefit plans (like medical and life insurance, workmen's compensation, and unemployment insurance).[2]

Finally, Hodell has never contended that it had to add or replace a specific employee or set of employees as a result of the failing Business One implementation.  Rather, as the testimony of Otto Reidl, Kevin Reidl and Jaime Clarke demonstrates, Hodell's ERP system touches every aspect of Hodell's business.  And the failing Business One implementation affected every aspect of Hodell's business – from the office staff to the warehouse workers.  In the same regard, the BLS dictates that worker productivity must be measured in terms of the entire workforce, not particular sectors of the workforce:

---

[1] Source: http://www.bls.gov/lpc/faqs.htm#P01

[2] Source: http://www.bls.gov/lpc/faqs.htm#Q05.

5

**Why don't we measure productivity for particular groups, such as white-collar workers?**
BLS productivity measures are based on aggregate national measures of outputs and inputs. These data sources do not provide the information BLS would need to construct occupational measures. There are also conceptual obstacles to disaggregating these national measures. <u>For example, the output of a factory may require both white-collar and blue-collar inputs, and it is therefore unclear how to allocate the output to the two groups separately.</u>[3]

Hodell had to pay the equivalent of 27 additional employees for the 25 months it used Business One because its workforce was unproductive and inefficient due to the failing software. Instead of workers efficiently taking orders, issuing quotes, sending those orders/quotes to the warehouse, and shipping the orders out on a timely basis, its entire workforce was gridlocked by SAP's malfunctioning software.  The testimony of Jaime Clarke alone supports this.

Thus, Otto Reidl's calculation is clear and precise.  He measured Hodell's pounds shipped per employee under the previous system, FACTS, and Hodell's pounds shipped per employee under Business One.  While using SAP Business One, Hodell shipped an average of 19,985,215 pounds of product per year but had to utilize an average of 184.36 total workers to generate this output.  To generate this same amount of output under FACTS, Hodell would have used an average of 27 less workers.  The average cost of Hodell's workforce at this time was around $45,000/employee – meaning Hodell paid the equivalent of $2.5 million in worker costs during the 25 months it ran Business One.

It is particularly disingenuous for SAP to argue that it is "Wonderland" economics for Hodell to equate worker productivity with cost increases or cost savings when SAP's own marketing literature introduced at trial touts the increased productivity and resultant cost savings Hodell could expect if it purchased Business One.  Plaintiff's Exhibit 314.3 and 314.7 both state: "Enhanced productivity and control.  Increased employer productivity, enhanced communication

---

[3] Source: http://www.bls.gov/lpc/faqs.htm#Q02.

with suppliers, and improved efficiency of all operations add up to unsurpassed cost control." Plaintiff's Exhibit 38 contains similar representations.  To the extent SAP now claims that worker productivity has no bearing on business cost, it is now admitting that its own marketing literature on this same subject is misleading.

In 2004 under FACTS, Hodell employed an average of 160 employees and, during that time, shipped 21,532,388 pounds of product. [*See*, Plaintiff's Exhibit 25, SAPB1 Effect on Productivity; *See*, Gross Profit Demonstrative Annual based on Exhibit 24].  However, in 2007 when Hodell switched to SAP Business One, Hodell had increased the number of employees to an average of 187.8, but was only able to ship 21,103,982 pounds of product.  [*Id.*] Similarly in 2008, Hodell employed an average of 184.3 employees and, during that time, was only able to ship 20,344,692 pounds of product. [*Id.*]

Hodell's calculation of worker productivity is based solely upon Joint Exhibit 24 – a business record that shows both the monthly and annual pounds shipped and the annual total workforce population for the 5 years before Business One and the 25 months using Business One.  Further, Mr. Reidl's ability to present his damage testimony was substantially hampered by the exclusion of Plaintiff's Exhibit 25.  Judge Wells ruled in February 2015 that this document was admissible [ECF #279 at 1, overruling SAP's objection to former Trial Exhibit 116, renumbered as Trial Exhibit 25], and Hodell prepared its case for months in reliance upon the Court's ruling that Hodell could use this document at trial.

The exclusion of Exhibit 25 while Mr. Reidl was on the witness stand hampered Mr. Reidl's ability to explain his calculations to the jury. Hodell submits that Plaintiff's Exhibit 25 should have been admitted over SAP's objection pursuant to established precedent.  *See United States v. Kerley*, 2015 U.S. App. LEXIS 6723, 3, 2015 FED App. 0077P (6th Cir. Apr. 23,

2015); *State Office Sys., Inc. v. Olivetti Corp. of Am.*, 762 F.2d 843, 845-46 (10th Cir. 1985) (damages calculation exhibit properly admitted into evidence as part of layperson opinion testimony under Rule 701); *Malloy v. Monahan*, 73 F.3d 1012, 1015-16 (10th Cir. 1996), (district court did not err in admitting exhibit showing layperson's damages computation regarding lost future profits); *Neponset Landing Corp. v. Northwestern Mut. Life Ins. Co.*, 902 F. Supp. 2d 166, 173 (D. Mass. 2012) (damages exhibit admissible in evidence to show the basis for layperson damages testimony).  Hodell requests that the Court reconsider its exclusion of this relevant and probative exhibit.

## III.    HODELL REQUESTS RECONSIDERATION OF THE COURT'S EXCLUSION OF HODELL'S LOST ACQUISITION DAMAGES

While Mr. Reidl was on the witness stand, the Court ruled that Mr. Reidl could not testify regarding Hodell's damages incurred as a result of the lost PCBC acquisition.  The Court ruled at sidebar that the testimony was too speculative.  It was unclear from the Court's ruling whether the item of damages itself was to speculative, or whether it was Mr. Reidl's proposed testimony supporting this damage component that was speculative in the Court's view.

Hodell submits that Mr. Reidl's testimony is no different – and even more supported – than the testimony admitted in *Malloy v. Monahan*, 73 F.3d 1012 (10th Cir. 1996), wherein the Tenth Circuit held that testimony from the plaintiff as to his lost profits resulting from his inability to acquire additional investment properties was admissible because he "had sufficient expertise and personal knowledge to render an opinion as to lost future profits of his own real estate ventures." *Id.* at 1016. The court held that the opinion was "based upon more than mere guesswork" because the plaintiff "had substantial experience" in real estate ventures and his *estimates* "were based upon his knowledge of the Denver housing market." *Id.* at 1016-1017. The *Malloy* Court emphasized that the defendant "had the opportunity to cross-examine Malloy

8

regarding the basis of his figures," his experience, and other matters. *Id.* at 1016. *See also*, *In re Merritt Logan, Inc*., 901 F.2d 349, 360 (3d Cir. 1990)(business owner testimony based upon third-party's sales forecast for new store location admissible under Rule 701).

Hodell submits that Mr. Reidl's testimony is admissible for the same reasons set forth in *Malloy* and *In re Merritt Logan*. Furthermore, because Mr. Reidl laid the foundation for Hodell's inability to acquire PCBC at trial, Dr. Kennedy's valuation opinion is admissible to prove the value lost from the inability to acquire PCBC. Judge Wells did not find any flaw in Dr. Kennedy's valuation analysis. Judge Wells merely found that Dr. Kennedy's opinion was inadmissible because she believed that some foundational evidence as to why Hodell was unable to acquire PCBC would be lacking. That foundation has been established, and Dr. Kennedy's opinion is therefore admissible.

As to the remaining components of Hodell's damages, SAP has not identified any particular flaw in Mr. Reidl's analysis, and has had the opportunity to cross-examine Mr. Reidl extensively as to the basis and calculation of these damages. It is ultimately up to the jury as to which side it found more convincing.

Dated: June 28, 2015

Respectfully submitted,

/s/ *P. Wesley Lambert*
Christopher J. Carney (0037597)
Sharon A. Luarde (0071625)
P. Wesley Lambert (0076961)
BROUSE MCDOWELL
600 Superior Ave. E., Suite 1600
Cleveland, Ohio 44114
(216) 830-6830 phone
(216) 830-6807 fax
CCarney@brouse.com
SLuarde@brouse.com
WLambert@brouse.com
*Attorneys for Plaintiff Hodell-Natco Industries, Inc.*

9

## CERTIFICATE OF SERVICE

The undersigned certifies that on June 28, 2015, the foregoing was filed electronically.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access the document through the Court's electronic filing system.

/s/ *P. Wesley Lambert*

P. Wesley Lambert, Esq. (0076961)
*Attorney for Plaintiff Hodell-Natco*
*Industries, Inc.*

938127