IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HODELL-NATCO INDUSTRIES, INC. | ) | CASE NO. 1:08 CV 2755 |
| | ) | |
| Plaintiff, | ) | JUDGE NUGENT |
| | ) | |
| v. | ) | |
| | ) | |
| SAP AMERICA, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

**SAP AMERICA, INC. AND SAP AG'S MOTION FOR JUDGMENT AS A MATTER OF
LAW WITH RESPECT TO PLAINTIFF'S DAMAGES CLAIM AND WITH RESPECT TO
PLAINTIFF'S TORT CLAIMS**

---

Defendants, SAP America, Inc. and SAP AG (collectively "SAP"), hereby request that the

Court enter an order, in the form of the proposed order attached hereto, granting their Motion for

Judgment as a Matter of Law.[1]

The reasons supporting this motion are set forth in SAP's Memorandum of Law, which is

incorporated herein by reference.

Respectfully submitted,

/s/ Gregory J. Star
Michael J. Miller (admitted *pro hac vice*)
Gregory J. Star (admitted *pro hac vice*)
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone:  (215) 988-2700
Facsimile:  (215) 988-2757
*Attorneys for SAP America, Inc. and SAP AG*

---

[1] There remain additional grounds on which SAP is entitled to judgment as a matter of law which SAP will raise, if
necessary, at the appropriate time.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HODELL-NATCO INDUSTRIES, INC. | ) | CASE NO. 1:08 CV 2755 |
| | ) | |
| Plaintiff, | ) | JUDGE NUGENT |
| | ) | |
| v. | ) | |
| | ) | |
| SAP AMERICA, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

**MEMORANDUM OF LAW OF SAP AMERICA, INC. AND SAP AG IN SUPPORT OF MOTION FOR JUDGMENT AS A MATTER OF LAW WITH RESPECT TO PLAINTIFF'S DAMAGES CLAIM AND WITH RESPECT TO PLAINTIFF'S TORT CLAIMS**

---

## **TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................................... 1

II.    ARGUMENT ................................................................................................................. 2

    A.    Hodell's Lost Productivity/Increased Overhead Claim Fails ............................... 2

    B.    Hodell's Return on Investment Claim Fails........................................................... 6

    C.    Hodell's Purported "Excess Debt Expense" Claim Fails ..................................... 7

    D.    Hodell's Purported Training, Testing, and Travel Claim Fails ............................ 7

    E.    In Addition To Failing To Prove The Existence Or Amount Of Damages,
        Hodell's Tort Claims Otherwise Fail Under Controlling Ohio ............................ 8

    F.    Hodell's Request for Punitive Damages Fails ..................................................... 14

III.    CONCLUSION............................................................................................................ 16

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Airlink Commuc'ns, Inc. v. Owl Wireless, LLC*,
  2011 U.S. Dist. LEXIS 106673 (N.D. Ohio Sept. 20, 2011) .....................................1, 2, 10, 11

*B&P Co. v. TLK Fusion Entm't, LLC*,
  No. 3:11-cv-276, 2013 U.S. Dist. LEXIS 26131 (S.D. Ohio Feb. 26, 2013) .........................10

*Battista v. Leb. Trotting Ass'n*,
  538 F.2d 111 (6th Cir. 1976) ...............................................................................................8

*Central States Stamping Co. v. Terminal Equip. Co.*,
  727 F.2d 1405 (6th Cir. 1984) ............................................................................................15

*Cincinnati Gas & Elec. Co. v. Brock*,
  No. C-830137, 1983 WL 2375 (Ohio Ct. App. Dec. 21, 1983)..............................................5

*Cincinnati Gas & Elec. Co. v. Gen. Elec. Co.*,
  656 F. Supp. 49 (S.D. Ohio 1986) .........................................................................................9

*Columbus Finance, Inc. v. Howard*,
  327 N.E.2d 654 (Ohio 1975) ...............................................................................................15

*Cuyahoga Metro. Hous. Auth. v. 10-8 Sys.*,
  No. 1:05-cv-0980, 2006 U.S. Dist. LEXIS 8340 (N.D. Ohio Mar. 2, 2006).........................12

*Dawes v. BAC Home Loans Servicing LP*,
  No. 1:10-cv-02637, 2011 U.S. Dist. LEXIS 66507 (N.D. Ohio Apr. 27, 2011) ....................12

*Digital & Analog Design Corp. v. N. Supply Co.*,
  540 N.E.2d 1358 (Ohio 1989) .............................................................................................14

*Infocision Mgmt. Corp. v. Found. for Moral Law Inc.*,
  No. 5:08-cv-1342, 2009 U.S. Dist. LEXIS 65867 (N.D. Ohio July 27, 2009).......................10

*Kinetico, Inc. v. Indep. Ohio Nail*,
  482 N.E.2d 1345 (Ohio Ct. App. 1984)..............................................................................5, 8

*Lawyers Title Co., LLC v. Kingdom Title Solutions, Inc.*,
  592 F. App'x 345 (6th Cir. 2014) ........................................................................................16

*LifeWise Master Funding v. Telebank*,
  374 F.3d 917 (10th Cir. 2004) ...............................................................................................4

*Logsdon v. Graham Ford Co.*,
  376 N.E.2d 1333 (Ohio 1978) .............................................................................................15

*Loyd v. Huntington Nat'l Bank*,
No. 1:08-cv-2301, 2009 U.S. Dist. LEXIS 51858 (N.D. Ohio June 18, 2009) ......................11

*Malone v. Courtyard by Marriott P'ship*,
659 N.E.2d 1242 (Ohio 1996) .....................................................................................14, 15

*Miller's Bottled Gas, Inc. v. Borg-Warner Corp.*,
56 F.3d 726 (6th Cir. 1995) ................................................................................................16

*Northpoint Props. v. Charter One Bank*,
No. 94020, 2011 WL 2112666 (Ohio Ct. App. May 26, 2011)................................................7

*Parma Cmty. Gen. Hosp. v. Premier Anesthesia of Parma*,
No. 1:09-cv-325, 2011 U.S. Dist. LEXIS 11035 (N.D. Ohio Feb. 4, 2011)............................9

*Phelps v. MacConnell*,
No. 3:12-cv-344, 2014 U.S. Dist. LEXIS 105472 (S.D. Ohio Aug. 1, 2014) ...................9, 10

*Preston v. Murty*,
512 N.E.2d 1174 (Ohio 1987) ...........................................................................................15

*Rhodes v. Rhodes Indus.*,
595 N.E.2d 441 (Ohio Ct. App. 1991)...............................................................................5, 8

*Sherrod v. Enigma Software Grp. USA, LLC*,
No. 2:13-cv-36, 2014 U.S. Dist. LEXIS 137329 (S.D. Ohio Sept. 29, 2014) .........................9

*Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*,
684 N.E.2d 1261 (Ohio Ct. App. 1996)......................................................................8, 9, 11

*Wells Fargo Bank, N.A. v. Fifth Third Bank*,
931 F. Supp. 2d 834 (S.D. Ohio 2013) ...............................................................................10

*Wolfe v. Cont'l Cas. Co.*,
647 F.2d 705 (6th Cir. 1981) ...............................................................................................8

*World Metals v. AGA Gas*,
755 N.E.2d 434 (Ohio Ct. App. 2001)...................................................................................5

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
395 F.3d 416 (7th Cir. 2005) ...............................................................................................4

## STATUTES, RULES & REGULATIONS

Fed. R. Civ. P. 50(a) ...........................................................................................................2

Fed. R. Evid. 701(c)..............................................................................................................4

I.    **INTRODUCTION**

Hodell attempted – but failed – to establish the following alleged categories of damages:

- Lost productivity/increased overhead of $2,598,173 (Trial Tr. at 1754-68);

- Return on investment of $1,200,000 (Trial Tr. at 1771-73; 1776-77);

- Increase interest expense on debt of between $498,000 and $550,000 (Trial Tr. at 1784-85); and

- Training, testing, and travel expenses of between $35,000 and $50,000 (Trial Tr. at 1771)[2].

Regardless of the legal theory underlying these damages categories, and with the exception of its out of pocket costs (the amount of which SAP challenges), each element of Hodell's damages computation is highly speculative, lacks sufficient proof, lacks a causal connection to any conduct by the defendants, and is supported only by improper lay opinion testimony from Hodell's CEO, Otto Reidl.[3]

In addition, to the extent the jury is permitted to consider any amounts beyond Hodell's out of pocket costs, Hodell's tort claims must be dismissed because Hodell has failed to establish that (a) its tort claims are based on a duty independent of its License Agreement or (b) that its tort claims seek damages independent and distinct from those sought for breach of contract. *See Airlink Commuc'ns, Inc. v. Owl Wireless, LLC*, 2011 U.S. Dist. LEXIS 106673, 15-16 (N.D. Ohio Sept. 20, 2011) (dismissing tort claims where the plaintiff sought consequential damages for lost profits, sales, and customers because the plaintiff failed to establish any damages

---

[2] Prior to trial, Hodell suggested that it would also offer alleged inventory control cost damages. No such evidence was presented at trial, and this damages theory has been waived.

[3] Hodell claimed out of pocket costs related to Inflight, Radio Beacon, and Business One of $842,992.62. Trial Tr. at 1769-71. Hodell also attempted to offer evidence of costs associated with its replacement ERP system, Prophet 21. Trial Tr. 392-95. However, Hodell failed to produce during discovery or offer into evidence at trial any underlying business records supporting these costs, and instead attempted to prove this amount through a high-level summary of costs that was prepared for litigation. Beyond the utter lack of evidence, Hodell of course cannot recover both it costs for InFlight, Radio Beacon, and SAP plus its alleged cover damages for its replacement ERP system.

independent and distinct from those sought for breach of contract, and holding that contractual damages limitations provision applied to remaining breach of contract claim).  Therefore, any recovery Hodell might seek against the SAP defendants is subject to the damages limitations provisions of the License Agreement, and the existence of these limitations provisions does *not* operate to make Hodell's alleged tort damages distinct from those it seeks for breach of contract.[4]  *Id*.

## II.     **<u>ARGUMENT</u>**

Pursuant to Federal Rule of Civil Procedure 50, which authorizes a court to grant judgment as a matter of law when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue," SAP is entitled to judgment as a matter of law with respect to Hodell's damages claims and with respect to Hodell's tort claims.  Fed. R. Civ. P. 50(a).

### A.     **<u>Hodell's Lost Productivity/Increased Overhead Claim Fails</u>**

At trial, Mr. Reidl testified that Hodell allegedly suffered $2.6 million of damages for what he described as increased overhead costs incurred by Hodell due to decreased productivity caused by the Business One software.  Trial Tr. 1754-68.  At bottom he claimed that: (a) Business One caused a productivity decline because Hodell shipped fewer pounds of product per employee hour worked while running Business One than while running its legacy software system, FACTS; (b) because of this alleged productivity decline, Hodell supposedly needed to employ 27 additional workers while running Business One than Hodell employed prior to this time; and (c) Hodell paid these 27 additional workers an annual average of $45,914, which purportedly cost Hodell $2.6 million over the two years it used Business One.  Trial Tr. 1754-68.

---

[4] Hodell has two breach of contract claims.  First, as to SAP America, Hodell alleges a breach of the License Agreement.  Hodell's second breach of contract claim is against IBIS and LSi for breach of the Development Agreement between those entities and Hodell.

The evidence, however, proved the opposite – Hodell did *not* hire additional employees to run Business One.  To be sure, Hodell's own business records prove that Hodell had fewer employees while running Business One than Hodell had in 2006, its last year on FACTS. Exhibit 909, 910, and 911 (proving that Hodell had 186.2 employees in 2006, 186.8 employees in 2007, and 184.3 employees in 2008); Trial Tr. 1917-18 (O. Reidl admitting "[t]he total number [of employees] on board were not more").

During trial, Mr. Reidl nonetheless attempted to explain that he *computed* the existence of additional employees by looking at historic data over the five years before Business One and by extrapolating that Hodell somehow needed to utilize 27 additional employees while running Business One.  But when pressed to actually respond to the operative question of whether Hodell hired additional employees because of the defendants, Mr. Reidl finally conceded the obvious – Hodell's headcount had grown for other reasons prior to Hodell's use of the software at issue, and Hodell's headcount in 2006 (its last full year on FACTS), was greater than Hodell's headcount in 2007, when it went live on Business One.  *See* Trial Tr. 1917-18; (*see also* Exhibits 909, 910, and 911).

Hodell and Mr. Reidl further failed to offer any evidence of the supposed 27 additional employees, and Mr. Reidl admitted he could not name a single additional person that Hodell actually had to employ while using Business One, let alone any employee who was added specifically as a result of so-called productivity declines allegedly caused by Business One. Trial Tr. 1920-21.  Remarkably, during the final moments of his testimony, Mr. Reidl presented a brand-new theory, claiming that 27 people resigned, that Hodell was not planning to replace these individuals, but that because of the defendants Hodell had to hire 27 replacement workers. Trial Tr. 1905-06.  Beyond the obvious disclosure problems with this new theory, Hodell still

3

failed to present any evidence that any particular workers left or were replaced, let alone any evidence of when these individuals left, when their replacements were hired, or the costs associated with these individuals.[5]  Trial Tr. 1920-21.

If Hodell had actually hired additional employees (or replaced workers who had resigned) because of something to do with the software at issue, the initial proof should have been easy to offer – Hodell would merely have needed to collect and produce its human resources records and tally the specific costs attributable to the particular additional workers (and, of course, then establish causation).  Instead, because there were no additional/replacement employees, Mr. Reidl created his own complex computation driven by Hodell's historic number of pounds shipped per hour worked to support his hypothetical *opinion* that additional workers existed.

Besides the lack of factual support, specialized knowledge is obviously needed to show that, rather than simply comparing the *actual* number of employees year-to-year, it is economically acceptable and reliable to *compute* the number of employees by reference to the number of pounds of product shipped.  *See* Fed. R. Evid. 701(c).  This is especially clear given the undisputed fact that Hodell enjoyed all-time high gross sales (and gross profits) per employee hour worked, while running Business One.  *See* Exhibits 909, 910, 911, 912, and 913.  *See Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005) (lay opinion should be limited to raw data not inferences taken from raw data); *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 929 (10th Cir. 2004) (lay opinion should be limited to simple calculations).

And to make matters worse, to reach his final damages figure, Mr. Reidl multiplied the non-existent additional/replacement employees by $45,914 per year, which he claimed is the annualized cost per employee.  Trial Tr. at 1767.  But, as Mr. Reidl admitted, this figure is not

---

[5] Hodell never supplemented its initial disclosures or discovery responses with this information.

4

based on the amounts that were paid to particular additional employees, but instead is an average figure for Hodell's entire staff – including Mr. Reidl himself and Hodell's other executives. *Id.* at 1808-10.

While Ohio law does, in certain cases, allow for the recovery of overhead costs, a plaintiff can only recover specific additional costs incurred because of a breach. *See Cincinnati Gas & Elec. Co. v. Brock*, App. No. C-830137, 1983 WL 2375 (Ohio Ct. App. Dec. 21, 1983) ("The law of damages provides that only those damages proximately or directly caused by the defendant's negligence are compensable. Thus, as to this one aspect of the judgment, the damage caused by the defendant can be and should have been directly traced to the cost of a particular employee's labor, rather than the cost of some mythical "average" employee. The plaintiff failed to prove that all the elements of damage presented to the court were proximately caused by the defendant's negligence."); *World Metals v. AGA Gas*, 755 N.E.2d 434, 437-39 (Ohio Ct. App. 2001) (rejecting claim for overhead and remanding for new trial where costs were "all inclusive" and many had been incurred prior to any alleged breach; "lump sum overhead figures . . . gave the jury no reasonable basis on which it could calculate [alleged overhead damages]."); *Kinetico, Inc. v. Indep. Ohio Nail*, 482 N.E.2d 1345, 1352 (Ohio Ct. App. 1984) (rejecting claim for increased office expenses, including labor, and remanding for new trial where plaintiff provided only lump sum figure with no individual cost breakdown); *see also Rhodes v. Rhodes Indus.*, 595 N.E.2d 441, 448 (Ohio Ct. App. 1991) (Damages "must be substantiated by calculations based on facts available or in evidence, otherwise they are speculative and uncertain.").

For these reasons (and as further discussed in SAP's Motion to Preclude Inadmissible Lay Opinion Testimony, ECF No. 304, which is incorporated herein), Hodell's lost productivity/increased overhead damages claim fails as a matter of law.

**B.        Hodell's Return on Investment Claim Fails**

Mr. Reidl next testified that Hodell lost roughly $1.2 million due to what he called lost return on investment. Trial Tr. 1771-72.  He describes this as the "cost savings [that] would have to be achieved to provide a return on investment based on the company's cost of capital over [a] five-year period.  Trial Tr. 1776-77.  No further details were provided, and Mr. Reidl simply told the jury that this amounted to "$1.2 million, if it took five years to achieve the return on investment." *Id.* at 1777.  Hodell did attempt to offer Mr. Reidl's analysis through proposed Trial Exhibit 625, but the Court properly excluded Exhibit 625.  Accordingly, the jury has no basis on which to assess this figure, and would have to simply rely on Mr. Reidl's say so that this number is reasonable or reliable.[6]  But it is not.

Indeed, as SAP explained in advance of trial, what Mr. Reidl attempted to do was to subtract the amount of money he allegedly spent implementing Business One (adjusted for depreciation) from the productivity savings he says Hodell would have been "required" to make in those years to break even on its investment by the end of 2011 (adjusted for taxes and time value of money).  *See* ECF No. 304 at 23-25.  In other words, Hodell's lost payback calculation does not show the estimated payback Hodell actually *would have received*, it shows the payback Hodell now says it *needed to receive* to break even after five years.  *Id.*

Hodell's hope or need be paid back on its investment in five years is not a proper basis for an award of damages.  Indeed, damages are generally intended to put a plaintiff in the

---

[6] Hodell also tried to rely on Exhibit 38, which is a single-page from an otherwise unidentified document.  The document itself is difficult to read, and Mr. Reidl did not even testify that he used this document to form the basis of any part of his supposed calculation.  Trial Tr. 1776-77.

position it would have been in absent the alleged wrongdoing – not the position the plaintiff wanted or "self-required" to be in.  *See Northpoint Props. v. Charter One Bank*, No. 94020, 2011 WL 2112666, at *7 (Ohio Ct. App. May 26, 2011) (noting that fraudulent misrepresentation damages are measured by the benefit of the bargain rule).

Regardless, the Court properly precluded Exhibit 625, and Hodell otherwise failed to offer any evidentiary support for its return on investment claim.  As such, this portion of Mr. Reidl's testimony amounts to an unsupported and improper lay opinion that Hodell lost a roughly $1.2 million return on investment simply because Mr. Reidl says so.  This claim is highly speculative and unsupported by record evidence, and it should be dismissed.[7]

### C.    Hodell's Purported "Excess Debt Expense" Claim Fails

Mr. Reidl also testified about an alleged loss of $498,000 to $550,000 due to alleged "increase[d] interest expense on debt."  Trial Tr. 1784.  Mr. Reidl provided nothing more than a high-level explanation and failed to actually show how he calculated this component of Hodell's damages claim.  Trial Tr. 1785.  Hodell then failed to identify any exhibit that actually supports Mr. Reidl's testimony, and at best pointed the jury to Exhibit 607, which is nothing but Hodell's consolidated financial statements.

Simply put, Hodell failed to prove this portion of its damages claim and failed to establish that Mr. Reidl was competent to calculate the figure he stated to the jury.  There is no evidence on which the jury could award any particular amount for alleged increased interest expense attributable to the defendants without resorting to pure guesswork.

### D.    Hodell's Purported Training, Testing, and Travel Claim Fails

Mr. Reidl further testified that Hodell suffered between $35,000 and $55,000 of other losses he called training, testing, and travel expenses.  Trial Tr. 1771.  However, as with Hodell's

---

[7] For example, beyond failing to offer a calculation, Mr. Reidl failed to explain the rate of return he used.

alleged overhead claim, Hodell failed to offer any specific evidence or documentary support for these alleged costs.  Instead, Mr. Reidl merely testified to his own personal "estimate" of the costs of "travel, food, lodging, and the salaries" of "about 15 people [who were allegedly sent] for a one-week period to Chicago" to train on the new system.  *Id*.

Of course, Hodell actually used the system for two full years, and thus received value for any expenses it may have incurred in connection with training its staff.  Moreover, Hodell utterly failed to provide any actual evidence in support of this component of its damages claim.  Accordingly, other than Mr. Reidl's estimate, the jury (like SAP) has no business record to consult to determine if Mr. Reidl's calculation is accurate.  As such, Hodell has failed to offer sufficient proof of this damages category, and its claim for training, testing, and travel expenses should be dismissed.  *See*, *e.g.*, *Kinetico, Inc.*, 482 N.E.2d at 1352; *Rhodes*, 595 N.E.2d at 448.

### E.    In Addition To Failing To Prove The Existence Or Amount Of Damages, Hodell's Tort Claims Otherwise Fail Under Controlling Ohio

Ohio law provides that "'the existence of a contract action excludes the opportunity to present the same case as a tort claim.'"  *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1270 (Ohio Ct. App. 1996) (quoting *Wolfe v. Cont'l Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981)).  Thus, Ohio law includes ***two rules*** that must each be met in order to pursue tort claims in the face of a contract.

***First***, a tort claim must be based on a breach of "a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed."  *Textron Fin. Corp.*, 684 N.E.2d at 1270 (citing *Battista v. Leb. Trotting Ass'n*, 538 F.2d 111, 117 (6th Cir. 1976)).  ***Second***, "[i]n addition to containing a duty independent of that created by contract, an action arising out of contract which is also based upon tortious conduct must include actual damages attributable to the wrongful acts of the alleged tortfeasor which are in addition to those attributable to the

8

breach of the contract." *Textron Fin. Corp.*, 684 N.E.2d at 1271 (citing *Cincinnati Gas & Elec. Co. v. Gen. Elec. Co.*, 656 F. Supp. 49, 63 (S.D. Ohio 1986)); *see also Parma Cmty. Gen. Hosp. v. Premier Anesthesia of Parma*, No. 1:09-cv-325, 2011 U.S. Dist. LEXIS 11035, at *9-13 (N.D. Ohio Feb. 4, 2011) (Nugent, J.) ("[C]laims for fraud are not permitted when the damages resulting from the alleged fraud are not distinct from the damages available under a breach of contract claim.").

These two rules apply to all tort claims – including claims for fraud, fraudulent inducement, and negligent misrepresentation. *See Textron Fin. Corp.*, 684 N.E.2d at 1270-72 (applying rules to hold that fraud and negligent misrepresentation claims should have been dismissed by trial court); *Phelps v. MacConnell*, No. 3:12-cv-344, 2014 U.S. Dist. LEXIS 105472, at *20-28 (S.D. Ohio Aug. 1, 2014) (applying rules to dismiss a variety of tort claims including fraudulent inducement and negligent misrepresentation).

Setting aside for the moment whether Hodell's tort claims are based on a duty independent from the License Agreement, the Court must dismiss all of Hodell's tort claims because Hodell has failed to come forth with any actual tort-based damages that are in addition to those attributable to Hodell's alleged breach of contract claims.

As explained above, the only tenable damages component that could be presented to the jury is Hodell's out of pocket costs.  But even assuming the jury is permitted to consider other elements of Hodell's alleged damages, Hodell failed to articulate any difference between its contract and tort damages, and those claims must now be dismissed.  *See Textron Fin. Corp.*, 684 N.E.2d at 1270-72; *see also Sherrod v. Enigma Software Grp. USA, LLC*, No. 2:13-cv-36, 2014 U.S. Dist. LEXIS 137329, at *21-22 (S.D. Ohio Sept. 29, 2014) (in the context of a software license agreement, dismissing plaintiff's fraud and misrepresentation claims because the plaintiff

did "not identify any evidence of 'actual damages attributable to the wrongful acts of the [Defendant] which are in addition to those attributable to the breach of contract.'" (citation omitted)); *Phelps*, 2014 U.S. Dist. LEXIS 105472, at *20-28 (dismissing variety of tort claims including fraudulent inducement and negligent misrepresentation because there was no "plausible conclusion that [plaintiff] suffered actual damages beyond the financial harm arising from Defendants' alleged breach of contract."); *Wells Fargo Bank, N.A. v. Fifth Third Bank*, 931 F. Supp. 2d 834 (S.D. Ohio 2013) (dismissing gross negligence claim because it fails to allege actual damages beyond the loss attributable to defendant's alleged breach of contract, and holding that request for punitive damages does not cure this failure); *B&P Co. v. TLK Fusion Entm't, LLC*, No. 3:11-cv-276, 2013 U.S. Dist. LEXIS 26131, at *29 (S.D. Ohio Feb. 26, 2013) (dismissing fraudulent misrepresentation and negligent misrepresentation claims where damages sought were "virtually identical" to alleged breach of contract damages); *Infocision Mgmt. Corp. v. Found. for Moral Law Inc.*, No. 5:08-cv-1342, 2009 U.S. Dist. LEXIS 65867 (N.D. Ohio July 27, 2009) (granting summary judgment on fraudulent inducement claim because plaintiff failed to establish a genuine issue with respect to damages existing in addition to those attributable to a breach of contract).

At best, Hodell will argue that its contract and tort damages are distinct because its contract damages (if any) would be limited by the terms of its License Agreement.  Hodell has this wrong.  Specifically, in *Airlink*, the parties were subject to a detailed written agreement which, like the License Agreement, contained an express limitation on warranties and on damages.  2011 U.S. Dist. LEXIS 106673, at *15-16.  The plaintiff asserted both contract and tort claims, and sought to recover damages for lost profits, lost customers, and lost sales.  The defendant argued, *inter alia*, that the plaintiff had failed to establish any tort damages distinct

10

from or in addition to those being sought for breach of contract.  The defendant thus argued that the plaintiff was limited to a breach of contract claim, and further that the parties' damages limitation provision precluded recovery of the damages being sought.  The court agreed with the defendant and held that the damages limitations provision controlled, that plaintiff's lost profits claim was a request for consequential damages that was indistinct from plaintiff's contract claim, and therefore that the plaintiff could only proceed in contract and recover those damages permitted by the parties' agreement.

The holding in *Airlink* not only refutes Hodell's argument, but it is the only logical outcome.  To be sure, under the general rule of *Textron*, a plaintiff cannot pursue tort claims that duplicate the relief being sought for breach of contract.  Ohio law (and the law generally in other states) seeks to uphold the division between contract and tort actions so that parties may rely upon the bargain they struck.  Here, the License Agreement is controlled by the UCC, which permits sophisticated parties to agree in advance on the scope of their obligations and liabilities to one another.  *See Loyd v. Huntington Nat'l Bank*, No. 1:08-cv-2301, 2009 U.S. Dist. LEXIS 51858, at *19 (N.D. Ohio June 18, 2009) ("The UCC has created a statutory scheme to assess liability and otherwise allocate losses arising in the commercial context.").

Hodell's argument – that the existence of a permissible damages limitation provision somehow opens the door to an array of tort damages – would eviscerate the very rule created by *Textron* and followed by courts for years.  Indeed, by Hodell's argument, if the parties were wise enough to have contractually limited recoverable damages, a tort claim would *always* survive just because of the damages limitations provision.  Such a result would dramatically depart from Ohio law and would render this case an outlier.

11

On top of this, Hodell's tort claims simply recast purely contractual promises and obligations into tort claims, which is an independent reason why those claims must be dismissed. Hodell has admitted that it had no interaction with SAP prior to signing the License Agreement in December 2005.  In short, there was no relationship between SAP and Hodell, and Hodell has admitted that whatever relationship did exist, it was purely a business-to-business, arm's length relationship that did *not* involve any special trust or confidence.  Trial Tr. 1876.[8]

Moreover, in the License Agreement, SAP and Hodell agreed on an express limited warranty, and further agreed that SAP had disclaimed all other warranties, express or implied, including any implied warranties of merchantability or fitness for a particular purpose.[9]  License Agreement, Exhibit 316, §§ 7.1, 7.2.  Hodell also agreed to an express limitation of liability provision which, among other things, disclaimed damages for lost profits and other special, incidental, or consequential damages.  *Id*. § 9.3.  And Hodell agreed that the License Agreement constituted its entire agreement with SAP and that "all previous representations, discussions, and writings are merged in, and superseded by, this Agreement."  *Id*. § 11.9.

Although Hodell has alleged that SAP made a promise outside of the License Agreement about the number of users Business One could support, the reality is that the License Agreement

---

[8] The admitted lack of any relationship, let alone a special relationship, is also dispositive of Hodell's negligent misrepresentation claim.  *See Cuyahoga Metro. Hous. Auth. v. 10-8 Sys.*, No. 1:05-cv-0980, 2006 U.S. Dist. LEXIS 8340, at *13-14 (N.D. Ohio Mar. 2, 2006) ("[Plaintiff's] Amended Complaint fails to allege that a special relationship existed between it and ETEC.  As such, its claim for negligent misrepresentation must be dismissed." (citing *Picker Int'l, Inc. v. Mayo Found.*, 6 F. Supp. 2d 685, 689 (N.D. Ohio 1998) (noting that a "core requirement" of negligent misrepresentation under Ohio law is that a special relationship exist between the parties))); *see also Dawes v. BAC Home Loans Servicing LP*, No. 1:10-cv-02637, 2011 U.S. Dist. LEXIS 66507, at *19-20 (N.D. Ohio Apr. 27, 2011).

[9] The License Agreement is between Hodell and SAP America, but benefits SAP AG as well.  Specifically, SAP AG is identified as SAP America's "licensor" and, for example, both SAP America and SAP AG expressly disclaimed all implied warranties and SAP AG otherwise benefits from (among other things) the License Agreement's "Limitation of Liability" provision which specifically covers "SAP and its licensors."  *See* License Agreement §§ 1.7, 1.10, 7.2, 8.2, 9.1 (each mentioning SAP's licensor, SAP AG).  And contrary to recent argument by Hodell, SAP AG has never argued that it is not a third-party beneficiary of the License Agreement.  *See* ECF No. 321 (asserting only that SAP AG is not a party that could be sued directly on the License Agreement).

expressly applies to the particular number of user licenses Hodell acquired and thus contains the exclusive obligation SAP owed concerning the number of users.  More specifically, the License Agreement expressly defines the "Software" as follows:

> 1.10    "<u>Software</u>" means (i) the SAP Business One software product, developed by or for SAP and/or SAP AG and delivered to Licensee [i.e., Hodell] hereunder ***pursuant to the <u>order</u> for the Software (including without limitation present and future orders)*** placed by [Hodell] or on its behalf by an SAP Reseller . . . ."

*See* License Agreement § 1.10 (emphasis added); *see also* ECF No. 110-1 at 12.

It is also undisputed that a year prior to the License Agreement, Hodell entered into the December 24, 2004 Development Agreement with "The IBIS Group Inc., a wholly owned company of LSi-Lowery Systems, Inc. and LSi-Lowery Systems Inc. (LSi)."  Exhibit 291.  The Development Agreement expressly provided that Hodell would eventually purchase 80 Business One user licenses and that IBIS/LSi would ***order*** these Business One user licenses from SAP.  *Id.* (providing that Hodell would "purchase . . . 80 user licenses of SAP Business One Software" and that IBIS/LSi will "order[] the software from SAP . . . .")

It is undisputed that a year later, on December 22, 2005, IBIS/LSi submitted an order to SAP for 80 Business One user licenses.  Exhibit 138.  One day later – December 23, 2005 – Hodell and SAP entered into the License Agreement.  And it is undisputed that no prior order had ever been placed with SAP regarding Hodell, and that no Business One user licenses were delivered to Hodell until after SAP received the actual order for these licenses and after the License Agreement was signed.  It is undisputed that Hodell later acquired 40 additional licenses, all of which were covered by the License Agreement.

Accordingly, any promise relating the number of users was actually covered by the License Agreement.[10]  Thus, any duty SAP owed with respect to the number of users arises solely from the License Agreement, and cannot support a separate tort claim.

## F.    Hodell's Request for Punitive Damages Fails

As explained above, Hodell's tort claims fail as a matter of law and should not be submitted to the jury.  As such, the only remaining claim that could be presented to the jury is Hodell's purported breach of contract claim.  The Ohio Supreme Court has expressly upheld the long-standing black letter law that punitive damages are not an available remedy for a breach of contract claim.  *Digital & Analog Design Corp. v. N. Supply Co.*, 540 N.E.2d 1358, 1367 (Ohio 1989).  For this reason alone, Hodell's request for punitive damages fails as a matter of law and should not be submitted to the jury.

But even assuming *arguendo* that Hodell's purported fraud claim is submitted to the jury, Hodell's request for punitive damages still fails as a matter of law because, "as a threshold matter, [Hodell was] obligated to present evidence of malice on the part of [SAP and the other defendants] before [Hodell's] claim for punitive damages could proceed to the jury."  *Malone v. Courtyard by Marriott P'ship*, 659 N.E.2d 1242, 1247 (Ohio 1996).  The Ohio Supreme Court

---

[10] Indeed, in addition to the definition of "Software" which incorporates the number of users actually licensed pursuant to the order SAP received on December 22, 2005, the License Agreement expressly defines "Named Users" as "any combination of users listed by permitted functionality and any other SAP-required information and licensed by SAP to [Hodell] under this Agreement pursuant to the order for the Software placed by [Hodell] or on its behalf by an SAP Reseller," and throughout the License Agreement, the Software is consistently described in terms of the number of actual "Named User" licenses Hodell acquired "pursuant to the order for the Software (including without limitation present and future orders)" placed with SAP.  License Agreement, §§ 1.6, 1.10 (emphasis added). For example, the License Agreement provides that "[e]ach user accessing the Software must be a Named User and must limit access to those functions for which SAP has granted the specific user license pursuant to the official order form for the Software."  License Agreement § 2.1(a) (emphasis added).  Delivery of the Software was even defined by specific reference to the "order form" submitted to SAP.  § 3 ("DELIVERY.  So long as licensee makes payment in accordance with Section 4, the licensed Software in machine-readable formal, and the Documentation, shall be delivered as specified in the authorized order form submitted by Licensee to SAP or the SAP Reseller ("Delivery")). And, of course, the warranty to which SAP and Hodell agreed was that the "Software [as already defined in terms of the actual order placed with SAP] will substantially conform to the functional specifications contained in the Documentation for six months following delivery [which was also defined in terms of the actual order placed with SAP]."  License Agreement § 7.1.

defines "malice" as "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Malone*, 659 N.E.2d at 1247 (quoting *Preston v. Murty*, 512 N.E.2d 1174 (Ohio 1987)).  In *Malone*, the Ohio Supreme Court determined that the trial court properly directed a verdict in favor of defendant on plaintiff's punitive damages claim because plaintiff failed to show that defendant acted with malice.  659 N.E.2d at 1248.

Similar to the plaintiff in *Malone*, Hodell introduced absolutely no evidence at trial to support an award of punitive damages.  Indeed, the record is devoid of any evidence of malice. Consequently, because no reasonable fact finder could conclude that SAP or any of the other defendants acted with malice, the jury should not be given an instruction on punitive damages. *See Logsdon v. Graham Ford Co.*, 376 N.E.2d 1333, 1336 (Ohio 1978) (finding that it was an error for the trial court to instruct the jury on punitive damages because there was insufficient evidence of malice or wanton misconduct even though defendant knowingly concealed a material fact); *see also Columbus Finance, Inc. v. Howard*, 327 N.E.2d 654, 658 (Ohio 1975) (affirming appellate court's reversal of an award of punitive damages because there was "absolutely no evidence" from which actual malice could be inferred).

The Sixth Circuit has expressly stated that "[w]hen there is no evidence that the defendant's actions were motivated by actual malice, it is error to submit the question of punitive damages to the jury." *Central States Stamping Co. v. Terminal Equip. Co.*, 727 F.2d 1405, 1411 (6th Cir. 1984).  The Sixth Circuit has routinely affirmed district courts that have followed this established precedent.  *See, e.g.*, *id.* at 1411 (finding that the district court did not err in refusing to submit the issue of punitive damages to the jury because there was no evidence of actual

15

malice even though material information was withheld) (applying Ohio law); *Lawyers Title Co., LLC v. Kingdom Title Solutions, Inc.*, 592 F. App'x 345, 352-53 (6th Cir. 2014) (finding that the district court did not err by refusing to instruct jury on punitive damages where plaintiff failed to show conduct that demonstrated actual malice) (applying Ohio law); *Miller's Bottled Gas, Inc. v. Borg-Warner Corp.*, 56 F.3d 726, 733-34 (6th Cir. 1995) (finding that the district court did not err in directing a verdict in favor of defendant on plaintiff's punitive damages claim because defendant's conduct was not "outrageous" nor did defendant act with "evil motive" or "reckless indifference" even though defendant knowingly made false representations (applying Kentucky law)).

Accordingly, Hodell's request for punitive damages fails as a matter of law and should not be presented to the jury.

## III.  <u>CONCLUSION</u>

For the reasons stated above, SAP respectfully requests that, with the exception of Hodell's purported out of pocket costs associated with InFlight, Radio Beacon, and Business One, the Court dismiss the remaining components of Hodell's damages claim.  Further, SAP respectfully requests that the Court dismiss Hodell's tort claims, enforce the License Agreement's damages limitations provisions, and dismiss Hodell's request for punitive damages.

Respectfully submitted,

/s/ Gregory J. Star
Michael J. Miller (admitted *pro hac vice*)
Gregory J. Star (admitted *pro hac vice*)
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone:  (215) 988-2700
Facsimile:  (215) 988-2757
*Attorneys for SAP America, Inc. and SAP AG*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this fourteenth day of June 28, 2015, a copy of the foregoing

Motion For Judgment As A Matter Of Law With Respect To Plaintiff's Damages Claim And

With Respect To Plaintiff's Tort Claims, along with the Memorandum of Law in support, was

filed and served via ECF and via email.


/s/ Gregory J. Star
Gregory J. Star (admitted *pro hac vice*)