2693

1              IN THE DISTRICT COURT OF THE UNITED STATES
              FOR THE NORTHERN DISTRICT OF OHIO
2                        EASTERN DIVISION

3

    HODELL-NATCO INDUSTRIES, INC.,
4                                        08CV2755
              Plaintiff,
5
         vs.                             June 30, 2015
6                                        8:30 A.M.

7   SAP AMERICA, INC., ET AL.,
                                         Volume 12
8              Defendants.

9

10
              TRANSCRIPT OF JURY TRIAL PROCEEDINGS
11         BEFORE THE HONORABLE DONALD C. NUGENT
              UNITED STATES DISTRICT JUDGE
12                      AND A JURY

13

14

15

16

17

18

19

20

21

22

23

24

25

2694

APPEARANCES:


For the Plaintiff:          Christopher J. Carney, Esq.
                            Sharon A. Luarde, Esq.
                            P. Wesley Lambert, Esq.
                            Brouse McDowell
                            600 Superior Avenue East
                            Suite 1600
                            Cleveland, Ohio    44114
                            216-830-6830


For the Defendants:         Gregory J. Star, Esq.
                            Michael John Miller, Esq.
                            Joseph M. Kelleher, Esq.
                            Alex H. Hayden, Esq.
                            Drinker Biddle & Reath
                            One Logan Square
                            18th & Cherry Streets
                            Philadelphia, PA    19103
                            215-988-2734




Official Court Reporter:    Susan K. Trischan, RMR,CRR,FCRR
                            7-189 U.S. Court House
                            801 West Superior Avenue
                            Cleveland, Ohio  44113
                            216-357-7087


Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

1

2          <u>TUESDAY, JUNE 30, 2015,  8:33 A.M.</u>

3               THE COURT:  Good morning, ladies and

4    gentlemen.

08:33:36  5          THE JURORS:  Good morning.

6               THE COURT:  Have a seat.

7               I probably shouldn't say this but I was

8    thinking, you know, this has been the worst stretch of

9    weather we've had in recent memory, right, rain?  So you

08:33:49 10  can't feel too bad by being cooped up.

11              So but I think maybe you're the cause of

12   this global change?

13              A JUROR:  Maybe.

14              THE COURT:  Maybe?  You didn't do it?

08:34:05 15  Okay.

16              All right.  You may proceed.

17              MR. LAMBERT:  Thank you, Your Honor.

18        CROSS-EXAMINATION OF GEOFFREY OSBORNE

19   BY MR. LAMBERT:

08:34:14 20  Q.   Good morning, Mr. Osborne.  I'm Wes Lambert.  I

21   represent Hodell-Natco.

22              We've met before via video conference

23   before, right?

24   A.   Good morning, counsel.  Yes, by video, that's

08:34:25 25  right.

1    Q.    Okay.  Nice to meet you in person.  I just want to

2    go over of few background facts on you before we get

3    started.

4              You testified yesterday you're a former

08:34:32 5    partner at Pricewaterhouse, right?

6    A.    PricewaterhouseCoopers, yes.

7    Q.    And last time we spoke, PWC was still engaged in

8    this matter, is that still the case?

9    A.    I assume that they are.  I have spoken to them

08:34:48 10   several times over the last several months, so I assume

11   that they're still engaged, yes.

12   Q.    Okay.

13             And there's some folks at Pricewaterhouse

14   that helped you prepare your analysis and your opinions

08:35:02 15   that you've given in this case, correct?

16   A.    They have sat, provided some assistance, that's

17   correct.

18   Q.    Okay.  You touched upon this on direct examination,

19   but PWC has a large SAP consulting practice, is that

08:35:21 20   correct?

21   A.    They have an SAP consulting practice.  I don't know

22   what you mean by large.  It's --

23   Q.    They have a dedicated SAP consulting practice,

24   correct?

08:35:29 25   A.    Yes, they do have a dedicated SAP consulting

1    practice.  They do.

2    Q.    And PWC is, in fact, an SAP partner, correct?

3    A.    Not correct.  No, they're not.

4    Q.    PWC has received SAP partner awards, has it not?

08:35:45 5    A.    There are awards that they receive for their

6    knowledge of their -- the software and the work they do

7    with their clients.

8              They may call them partners, but they're

9    not in a partnership with SAP, no.

08:35:56 10    Q.    They are in what you call -- I believe you called

11    it an alliance, correct?

12    A.    They are in an alliance with SAP and with all the

13    major software vendors, yes.

14    Q.    And PWC was in an alliance with SAP at the time

08:36:12 15    that you formed your opinions on this case, correct?

16    A.    They were an alliance partner back in 2012, and as

17    I understand it from my conversation with someone this

18    past week, they are still an alliance, in an alliance

19    arrangement with SAP and the other software vendors, yes.

08:36:30 20    Q.    Okay.  And, in fact, they've just, PWC just won an

21    SAP partner award, didn't they?

22    A.    I -- I wouldn't know.

23    Q.    You'd agree with me that PWC promotes that it

24    collaborates with SAP in order to help its clients align

08:36:47 25    their technological resources and applications?

1    A.    I would agree to that.  Yes, it's very important

2    for that practice to know the software very, very well as

3    in any of the software so they can serve their clients,

4    yes.

08:36:58  5    Q.    And you would agree with me that PWC offers

6    integration services for its clients that are

7    implementing SAP software products, correct?

8    A.    I believe that they do offer some integration

9    services.  I don't think that's the major part of their

08:37:14  10    practice, but they do some of that work.

11    Q.    And PWC publishes what it calls thought leadership

12    articles on SAP products on its website, isn't that

13    correct?

14    A.    Yes, they do, because their clients want to know

08:37:30  15    that they know that software very well so we can go help

16    them.  They will hire us to do that work.

17    Q.    And again, and again PWC gets hired by clients

18    based upon your client, PWC's client's purchase of SAP

19    software, is that correct?

08:37:52  20    A.    It could be that.  It could be a lot of work's done

21    after the SAP platform has already been installed,

22    installed or installed for years.

23                As I understand it, SAP, as in any of the

24    other software platforms, requires updates and changes

08:38:10  25    and the companies change.  So that practice, as I am

1    aware, would go in to help their clients well after

2    installations are done or well after purchases are done

3    but to help their clients maximize the use and the tools

4    that are included in the SAP software.

08:38:25  5    Q.    The short answer to my question, sir, though, is

6    yes, right?

7    A.    Well, your question was whether they go in only to,

8    after they purchase the software, and I was clarifying

9    it.  They do it there and they do it at other times.

08:38:37  10    Q.    So PWC doesn't just get paid when its clients

11    purchase SAP software; it also gets paid by clients that

12    remain on SAP software?

13    A.    Certainly.

14    Q.    Okay.

08:38:50  15    A.    If they have SAP software, they need help.  Complex

16    systems, and they need help from consultants and maybe

17    PWC can be any one of the other major consulting firms

18    that would offer services to companies that are on SAP,

19    but PWC does help them make sure that they maximize the

08:39:05  20    use of that tool, right.

21    Q.    Well, there aren't other consulting firms in here

22    providing purported expert testimony in this case.  It's

23    PWC that's in here providing alleged expert testimony, is

24    that correct?

08:39:16  25    A.    No, that's not correct.  I'm not with PWC anymore.

1    Q.    You were at the time your opinions were formed and

2    your investigation was made in this case, correct?

3    A.    Well, it's a bit of a split.

4          I -- my initial work was when I was with

08:39:27  5    PWC, and for the last year, I have not been with PWC.

6    I'm retired.

7    Q.    And the people that are supporting your opinion,

8    the backroom folks, are still with PWC, is that correct?

9    A.    That is correct.

08:39:39 10    Q.    Okay.  Kim, can you pull up 77?

11          I want to highlight just this top e-mail.

12    You may have never seen it before, but were you provided

13    documents produced by SAP in this case?

14    A.    Yes, I was.

08:39:57 15    Q.    I'll represent to you this document was produced by

16    SAP.  And I want to note an individual's name here.  This

17    is an e-mail from Udi Ziv to Dan Kraus and others at SAP

18    relating to Hodell-Natco.

19          Are you familiar with any of these names?

08:40:19 20    A.    Well, I've read their names on various e-mails.

21    Q.    I want to direct your attention to Rodney

22    Seligmann.

23          Do you see that here?

24    A.    Yes.

08:40:26 25    Q.    Are you aware that Rodney Seligmann now currently

1    leads part of PWC's SAP consulting practice?

2    A.    I'm not aware of what his position is in that

3    practice.  I think you pointed out to me in my deposition

4    that he is with the firm, but I don't know Rodney.

08:40:47 5    Q.    You don't disagree, though, you don't have any

6    reason to disagree that Rodney Seligmann leads the part

7    of -- part of PWC's SAP consulting practice?

8                    MR. KELLEHER:  Objection.  Foundation, this

9    witness --

08:41:00 10                    THE COURT:  Overruled.

11    A.    As I said to you in my deposition and as I recall

12    now, I don't -- I'm not aware that Rodney Seligmann runs

13    the practice.  The people that I knew that were involved

14    in the practice, he wasn't one of them, so I don't know

08:41:13 15    that.

16    Q.    But you acknowledge that he is at least part of the

17    SAP consulting practice at PWC now?

18    A.    I can only --

19                    MR. KELLEHER:  Objection.

08:41:20 20                    THE COURT:  Overruled.

21    A.    I can only acknowledge it to the fact that you

22    showed me something in my deposition of that.  Other than

23    that, I know nothing about it.

24    Q.    Okay.  And we can see here that Rodney Seligmann,

08:41:29 25    at the time of the events giving rise to this lawsuit,

```
        1   was actually an SAP employee involved in the underlying

        2   facts of this case, correct?

        3                  MR. KELLEHER:  Objection.

        4                  THE COURT:  Overruled.

08:41:39 5   A.    He had an SAP e-mail address so I assume he was.

        6   Q.    You gave some background testimony on what you

        7   would do to prove lost sales in a lost profit case.

        8                  Do you recall that?

        9   A.    I do.

08:41:58 10  Q.    Okay.  I think we ultimately agreed on one thing.

       11   In a lost profit analysis, you agree that it's not

       12   incumbent upon the person doing the analysis to prove

       13   each and every lost sale that is being calculated,

       14   correct?

08:42:19 15  A.    I would agree that depending on the volume of the

       16   claimed lost sales or the sales you're trying to

       17   quantify, depending on that volume, it normally would not

       18   be necessary to prove every single sale, but it really

       19   depends on the volume of sales you're looking to quantify

08:42:37 20  and getting a reasonable feel for -- that they represent

       21   the ones that you do prove out represent the whole.

       22   Q.    And I just want to be sure we're clear on one

       23   thing.

       24                  In your review of the underlying facts of

08:42:55 25  this case in preparation for forming your opinion, you
```

1    did see some evidence of lost sales, is that correct?

2    A.    No.  I saw no evidence of lost sales.

3              I saw claims or assertions that problems

4    with the system or with orders or with a customer were

08:43:15 5    happening early on in the implementation, but I never saw

6    evidence of lost sales.

7              As a matter of fact, contrary to that, I

8    believe Kevin Reidl testified that all the orders that

9    were received were processed so that kind of confirmed to

08:43:31 10   me that, in fact, although there may have been some

11   delays in processing sales, that they all were actually

12   processed.

13   Q.    You don't recall testifying in your deposition that

14   you saw evidence of lost sales?

08:43:43 15   A.    We talked in my deposition -- well, the answer

16   would be no.

17              What we talked about in my deposition, that

18   there were some -- some inferences discussed in the

19   depositions of Kevin Reidl and with Otto Reidl where they

08:44:01 20   talked about some customers that they potentially lost

21   sales on, but there was never any documents put forth to

22   quantify or identify any specifics about those customers

23   or those alleged lost sales.

24   Q.    But you would at least agree that there was

08:44:15 25   testimonial evidence that you had in forming your

```
 1   opinions that there were, indeed, lost sales and lost

 2   customers, correct?

 3   A.    No.  Not correct.

 4   Q.    Okay.  You recall me taking your deposition, right?

 5   A.    I do recall that.

 6   Q.    And you recall that you were under oath at the time

 7   that your deposition was taken?  You're familiar with

 8   that process?

 9   A.    Yes.

10   Q.    And you're familiar with the fact that you had the

11   opportunity to review your deposition after it was taken,

12   correct?

13   A.    I did.

14              MR. LAMBERT:  Your Honor, may I approach?

15              THE COURT:  You may.

16   BY MR. LAMBERT:

17   Q.    Could you turn to Page 103 of that, sir?

18   A.    103?

19   Q.    Yes.

20   A.    Sure.  Okay.

21   Q.    There was a question that you see, beginning on 102

22   and then it goes over to 103.  You and I were discussing

23   evidence of lost sales, and if you see beginning on 103,

24   Page 14, you stated:  "There's very -- it's not the

25   clearest and best evidence, but there certainly is
```

08:44:29  5
08:44:37 10
08:44:51 15
08:45:07 20
08:45:46 25

1    evidence by the two executives of the company who gave

2    their testimony about what the value or the volume of the

3    lost sales were.  So there is evidence, they're very

4    small sales and that's all we have."

08:46:01  5              Do you see that?

6    A.    I do.

7    Q.    That's the testimony you gave?

8    A.    Yes, but it was in the context, you have to put it

9    in the right context.

08:46:06  10   Q.    Okay.  But that's the testimony, you gave the

11   testimony, referred to it as evidence of lost sales,

12   correct?

13   A.    Yes.

14   Q.    I read that correctly?

08:46:14  15   A.    Yes, but the context of this questioning was is it

16   related to the testing of the magnitude that was claimed

17   at that time of lost sales, and I went -- we did an

18   analysis to look through the entire record.

19   Q.    I agree.  I agree with that.

08:46:30  20              That wasn't my question.  I want you to

21   answer my question.

22   A.    That was --

23   Q.    I read that correctly, did I not?

24   A.    You read this correctly, but you didn't put it in

08:46:38  25   the context of what we were talking about, yeah.

Q.    Are you a statistician?

A.    I've taken statistics courses, but I don't consider myself a statistician, no.

Q.    You don't perform statistical analyses as part of your day-to-day business activities?

A.    There are statistical tools that I've utilized in my analysis day-to-day and I've utilized statisticians when I was with PWC, I utilized their services, but I don't consider myself a statistician.

Q.    That's not something you personally do, you rely either on some tool or some other person to do it, correct?

A.    No.  I'd say that there are times that I will use statistics as a tool.  I will sometimes use actual tools to do that, or I will actually get some folks that are very schooled in that area to assist.

So it happens in different ways.

Q.    Okay.  And just so I'm clear, you've never published any books on labor productivity, is that correct?

A.    I have not.

Q.    As a CPA, you're certainly familiar with the Bureau of Labor Statistics?

A.    Yes.  I know what it is, yes.

Q.    And are you familiar with the way that the Bureau

1    of Labor Statistics measures labor productivity?

2    A.    Not sitting here, no, I don't.

3    Q.    Would you disagree that productivity is measured by

4    comparing the amount of goods and services produced with

5    the inputs which were used in production?

6    A.    I don't -- if you could show me something that

7    defines that.  It's the way you said that, I don't quite

8    understand what you're asking.

9    Q.    Well, do you disagree that that's an appropriate

10   measure of labor productivity?

11   A.    I can't agree or disagree on the way you posed the

12   question.  If you could give me the context in which

13   that's laid out, then I can answer your question.

14   Q.    Do you agree labor productivity is the ratio of the

15   output of goods and services to the labor hours devoted

16   to the production of that output.

17   A.    I would say that I would -- I would not be

18   surprised that the Bureau of Labor Statistics uses some

19   of those metrics in some of their analyses that they

20   publish.  It wouldn't surprise me.

21   Q.    Would you agree that a damages expert that

22   testified as to the measure of lost profits in -- as

23   a -- based upon gross sales, did not -- would not be

24   doing so following accepted lost profit methodologies?

25                    MR. KELLEHER:  Objection to the form of the

1    question.

2                    THE COURT:  Do you understand that

3    question?

4                    THE WITNESS:  No, I don't.  If you could

08:49:26  5    restate the question, please, I'll do my best to answer

6    it.

7                    MR. LAMBERT:  I'll move on.

8    BY MR. LAMBERT:

9    Q.    I want to focus on some testimony you gave

08:49:37 10    regarding Otto Reidl's productivity calculation.

11                    And you took issue with his analysis of the

12    average number of employees needed to ship product while

13    on the FACTS software and the average number of employees

14    required to ship product on Business One.

08:50:01 15                    Is that correct?

16    A.    That's correct.  I took issue with his theory and

17    his application of that theory to make that calculation,

18    yes.

19    Q.    And one of the, I guess, criticisms you had was

08:50:16 20    that in calculating the average employees under FACTS, he

21    used an average of 2002 to 2006 rather than just 2006,

22    which you think he should have done, is that correct?

23    A.    I believe if you were to accept his calculation,

24    the best way to do it would be to look at the last year

08:50:40 25    in which they operated FACTS when the company was most

1    like it was when it was operating Business One; that is,

2    the size of the company, number of employees and

3    operations, and make that comparison.

4         It was much more relevant than making a

08:50:54  5    calculation of five-year average when the company was not

6    like it was at all when it was running Business One.

7    Q.    So --

8    A.    That was my issue I took.

9    Q.    Yes or no, your testimony is that one data point,

08:51:06 10    2006, is a better comparison than multiple data points

11    from 2002 through 2006, is that your testimony?

12    A.    That is my testimony.

13    Q.    Okay.

14    A.    In this situation, looking at these facts, that's

08:51:20 15    absolutely the way you would do it.

16    Q.    And then I was a little surprised, though, when you

17    looked at one of Hodell's demonstratives and said that

18    you didn't think it went back far enough.

19         Do you recall that?

08:51:31 20    A.    Yeah.  That's right.

21    Q.    So when you want to criticize Otto Reidl's

22    calculation of average employees, he went back too far,

23    but when you want to criticize the demonstrative we

24    looked at it, it didn't go back far enough, is that your

08:51:48 25    testimony?

1    A.    It is.

2    Q.    Okay.

3    A.    I mean, the graph that was being shown was a

4    demonstrative of a trend.  That's one thing.

08:51:53  5         Mr. Reidl's calculation, as I understand

6    it, was his underlying calculation that calculated

7    damages.  A much different thing, and --

8    Q.    He was calculating, wouldn't you agree, the average

9    number of employees used over a certain period of time

08:52:11 10    versus the average number of employees used under

11    Business One, right?

12    A.    Yes.  He was using an irrelevant comparison of a

13    time frame to a much shorter, specific time frame.

14    Q.    But --

08:52:27 15    A.    And the comparison leads that, leads the answer to

16    be irrelevant.

17    Q.    But in your opinion, when you're criticizing other

18    aspects of the opinion, you need to take into

19    consideration facts going way further back, that's your

08:52:40 20    testimony here today?

21    A.    My testimony is that that graph is misleading

22    because it doesn't show the full time frame, which you

23    can see the full trend, and it also includes the time

24    frame for one quarter which is totally inappropriate.

08:52:51 25    Q.    So when it suits your analysis, you want to just

1       look at one particular point in time, and then when it

2       suits your analysis, you want to look at the whole time

3       frame, is that what you're telling the jury?

4       A.    No, not at all.

08:53:02  5    Q.    Okay.  You testified that you agreed -- or you

6       disagreed with Mr. Reidl's increased interest expense

7       calculation, is that correct?

8       A.    I didn't disagree with -- well, first of all, there

9       isn't a calculation so I can't disagree with the actual

08:53:18  10   calculation.  I've never seen one.  I don't know

11      precisely what it is.  He didn't describe it.

12      Q.    Okay.

13      A.    What I disagreed with is there's no evidence in the

14      record, either in testimony or in any documents, which

08:53:29  15   details any facts about an increase of interest expense

16      due to Business One.

17      Q.    We can agree on a basic concept, though, okay?  We

18      can agree that -- with the concept that as a borrower's

19      debt level increases, the amount of dollars the borrower

08:53:53  20   has to pay in interest charges would likely also

21      increase, correct?

22      A.    In a general statement, that would be the case,

23      unless there's a change in the interest rate or change in

24      the payment terms.

08:54:02  25   Q.    And it's similar to a credit card, right?  Someone

2712

1    has a credit card with a fixed interest rate and that

2    person racks up debt on the credit card, they end up

3    paying more interest, right?

4              That's just a natural consequence of

08:54:22  5    things, right?

6    A.    I don't understand your question.  You said they

7    rack up debt and that's more interest.

8              Are you comparing it to another time frame?

9    I don't understand what your question is.

08:54:28 10    Q.    I thought it was a pretty clear.  If someone has a

11    credit card with a zero dollar balance --

12    A.    Oh, okay.

13    Q.    -- and then they incur a substantial amount of

14    debt, they are paying more interest in dollars than they

15    were before they had zero, right?

16    A.    Well, that question is different.  So you're saying

17    they had no debt and now they have debt?

18    Q.    Right.

19    A.    There's more interest because they have debt.

08:54:47 20    Obviously, yes.

21    Q.    Okay.

22              And if someone has a credit card with

23    $5,000 debt on it and has to use that credit card and max

24    it out, they're paying more interest in dollars on that

08:54:58 25    credit card, correct?

1    A.    Again, your question's not clear.  When you say max

2    it out, you mean over $5,000?  They would go higher than

3    $5,000?

4    Q.    You're confused by that question?

08:55:08  5    A.    Yeah, it didn't make sense.

6    Q.    Okay.  If someone has a $5,000 balance on their

7    credit card --

8    A.    Right.

9    Q.    -- and has to use it and incur $10,000 more in

08:55:20  10    charges on that card, now we can agree that they're

11    paying more interest in dollars on that card, correct?

12    A.    If the balance increases and they pay their

13    interest on the balance, yes, the interest would

14    increase.

08:55:30  15    Q.    Did you look at the documents that were given to

16    Mr. Reidl as Exhibit 607 as part of his interest

17    calculation?

18    A.    I don't recall the specific exhibit number.  If you

19    can show it to me, I can tell you whether I remember

08:55:46  20    seeing it.

21    Q.    Well, you testified you reviewed his testimony.

22          I'm asking if you reviewed the documents

23    that were part of that testimony.

24    A.    I did review the documents.  I just don't recall

08:55:55  25    what specific document 607 is.

1    Q.    Okay.

2    A.    If you can show it to me.

3    Q.    You testified a little bit yesterday about

4    out-of-pocket expenses.

08:56:04  5              Do you recall that?

6    A.    I do.

7    Q.    And you testified about an Exhibit 602 -- or 622

8    which was a printed ledger itemizing the out of pockets.

9              Do you recall that?

08:56:15 10   A.    Was that the -- let me see if I can find it here,

11   if I can recall.

12              602 or 622?

13   Q.    622.

14   A.    Yes, I do recall 622.

08:56:28 15   Q.    Okay.  And you compared checks and invoices that

16   had been submitted into evidence in this case as backup

17   of that ledger, correct?

18   A.    I did, yes.

19   Q.    And you agree that the amounts have been accurately

08:56:43 20   tabulated, correct?

21   A.    The amounts on the invoices and copies of invoices

22   and checks have been correctly put onto this schedule.

23   Q.    And you're not disputing in any way that that money

24   was actually paid by Hodell-Natco, correct?

08:57:01 25   A.    I'm not disputing it was paid to LSi, yes.

1      Q.     You testified that it's a standard practice when a

2   company makes a capital investment, for the company to

3   evaluate whether the return on that investment that would

4   be -- to calculate the return on that investment, that

08:57:27  5   would be necessary to justify making the investment,

6   correct?

7      A.     Yeah, I would think that that would be a sound

8   business procedure, yes.

9      Q.     So it's not something that's completely out of left

08:57:38 10   field for a company making a significant capital

11   investment to expect a return on that investment

12   commensurate with the amount they're going to be paying?

13   It's not a novel concept, is it?

14      A.     It's not a novel concept that companies would

08:57:57 15   normally expect that they're going to take on a large

16   project, to get some return, at least something that

17   would make sense, give them satisfaction or confidence

18   that entering into the project would be useful to the

19   company, either in benefits or in increased sales, lower

08:58:11 20   costs, yes.

21               That would be the normal course of a

22   business.

23      Q.     Mr. Kelleher showed you several charts, and I don't

24   want to rehash all of them, but there were several charts

08:58:36 25   put up yesterday where somebody -- and I don't think it

1    was you -- but divided gross sales into the number of

2    employees to come up with gross sale per employee, gross

3    sale per employee hour worked, and things like that.

4              Do you recall those charts?

08:58:46  5    A.    It wasn't per hour worked.  It was gross sales

6    divided by different levels of employees, both total

7    employees, which included full-time and temporaries, and

8    then just full-time.  Are those the schedules you're

9    talking about?

08:58:59 10    Q.    Yeah.

11    A.    Okay.

12    Q.    For any of those charts, did you perform any kind

13    of statistical analysis of the data that's on those

14    charts?

08:59:06 15    A.    Can you describe what you mean by statistical

16    analysis?

17    Q.    Did you do any kind of regression analysis or any

18    other kind of analysis of that data?

19    A.    No.

08:59:16 20    Q.    That's reflected on the chart?

21    A.    No, I did not do a regression analysis on that

22    chart, no.

23    Q.    Can we agree with the simple proposition that a

24    decline in employee productivity can have an effect on

08:59:29 25    the profitability of a business?

1    A.    I would agree that it could.

2    Q.    Okay.

3    A.    Depending on facts and circumstances.

4              MR. LAMBERT:  Your Honor, may I approach?

08:59:51 5          THE COURT:  The witness?

6              MR. LAMBERT:  Yes.

7              THE COURT:  Sure.

8    BY MR. LAMBERT:

9    Q.    Mr. Osborne, I've handed you a hard copy of one of

09:00:35 10   the demonstratives we were looking at yesterday.

11              You're welcome to confirm it, but it's a

12   copy of the large demonstrative that you were

13   demonstrating to the jury yesterday.

14              Do you recall this, this data?

09:00:50 15  A.    Yes, I do.

16   Q.    And you were talking about comparing the total head

17   count at Hodell-Natco between the year 2006 and then the

18   years 2007 and 2008.

19              Do you recall that testimony?

09:01:07 20  A.    Excuse me.  Could you say the question again?

21   Q.    You were testifying yesterday about the total head

22   count at Hodell-Natco in the year 2006, and then

23   comparing it to the total head count of Hodell in 2007

24   and 2008, correct?

09:01:24 25  A.    That was one of the comparisons I made, yes.

2718

Q.    Okay.  And you didn't take into account, when you were looking at that total head count, the amount of product that Hodell shipped using that total head count, did you?

09:01:36 A.    Well, yeah.  I mean, I have kept that into account because I know the sales of the company during those same time periods.

Q.    I'm talking about the product shipped out by Hodell; not the gross sales, which I understand that you

09:01:47 want to focus on.  The product that Hodell actually shipped out the door.

A.    Well, the product shipped out the door is represented by the sales dollars the company gets.  So, yes, I have considered that.

09:01:59 Q.    Let's take a look at that.

A.    Okay.

Q.    I want you to look at 2007, and let's get that demonstrative that you were looking at yesterday out.

Sir, we can agree that in, based upon the

09:02:55 demonstrative that your counsel prepared, in 2007, Hodell had 186.8 employees, correct?

A.    Are you speaking to Exhibit 911?

Q.    I believe so, yes.

A.    Okay.

09:03:14 MS. LUARDE:  909.

2719

1          MR. LAMBERT:  What is it?

2          MS. LUARDE:  909.

3    BY MR. LAMBERT:

4    Q.    909.  Do you have that in front of you?

09:03:21 5    A.    Okay.  I don't know whether I do.  I have 910, 911.

6    Yes, I do.  I'm sorry.  Here it is.

7    Q.    You have 909?

8    A.    I do.  Sorry.

9          Your question was?

09:03:38 10   Q.    How many employees, total employees in 2004 did

11   Hodell-Natco have?

12   A.    2004 was 160.

13   Q.    How many total employees did Hodell-Natco have in

14   2007?

09:03:51 15   A.    For the full year 2007, 186.8.

16   Q.    And how many did Hodell-Natco have in 2008?

17   A.    184.3.

18   Q.    And then if you look back at the demonstrative

19   exhibit that I showed you, in 2004, using 160 employees,

09:04:15 20   Hodell shipped 21,532,388 pounds, correct?

21   A.    That's what the document shows, yes.

22   Q.    And in 2007, using almost 187 employees, Hodell

23   shipped slightly less pounds, you agree with that?

24   A.    I would agree with that.

09:04:36 25   Q.    And in 2008, using almost -- using 24 more

1  employees, Hodell shipped actually 1.5 million less

2  pounds, do you agree with that?

3  A.    1.5?  I'm not sure how you get 1.5.  How did you

4  calculate the 1.5?

09:04:57 5  Q.    1.2?

6  A.    How do you come up with that?

7  Q.    In 2004 they shipped 21,532,388.

8  A.    Okay.

9  Q.    2008 they shipped 20,334,692?

09:05:11 10  A.    There's approximately 1.2 million difference, yes.

11  Q.    Okay.  Thank you.

12          So you agree that in 2008, Hodell had to

13  use at least 24 more employees to ship 1.5 -- 1.2 million

14  pounds less product, correct?

09:05:39 15          That's what the numbers reflect on this

16  chart?

17  A.    You're making a comparison between 160 and 184.3?

18  Is that what you're making a comparison on?

19  Q.    Yeah.  Basic math, that's 24 more, right?

09:05:51 20  A.    That is 24 more employees, yes.

21  Q.    And basic math is that roughly 21.5 million and

22  20.3 million is 1.2 million less, correct?

23  A.    Yes.

24  Q.    Okay.

09:06:11 25  A.    On pounds.  And of course, we all recognize from

1    the document that the sales increased significantly

2    during that time period.

3    Q.    I'm talking about the output of pounds shipped by

4    Hodell-Natco.  We're agreeing on those numbers?

09:06:17  5    A.    Yes.  And they -- as the document will show as

6    well, the one with the documents, that pounds changed on

7    every year, but sales dollars changed as well so you have

8    to kind of look at the broader picture than just the

9    pounds, but, yes, the pounds decreased.

09:06:41  10    Q.    I'm just asking a basic question.  Trying to move

11    this along.

12                    You agree that Hodell used 24 more

13    employees in 2008 to ship 1.2 million less pounds?

14    A.    In comparison 2004 to 2008, yes.

09:06:50  15    Q.    And in 2007, Hodell used roughly 27 more employees

16    to ship about the same amount of pounds of product,

17    correct?

18    A.    They are similar pounds, yes.

19    Q.    You are not disputing that basic comparison, right?

09:07:03  20    A.    Not disputing that basic comparison.

21    Q.    I want you to look at a couple other things on that

22    demonstrative I gave you.

23                    Do you see incoming orders there along the

24    bottom?

09:07:13  25    A.    Yes, I do.

1    Q.    Incoming orders in 2008?

2    A.    Yes.

3    Q.    Were 76,756?

4    A.    Yes, they were.

09:07:24  5    Q.    And that's the lowest amount of incoming orders of

6    any time at Hodell-Natco since 2003, wouldn't you agree?

7    A.    It is the lowest amount since 2003, yes.

8    Q.    And I want you to look at the pounds shipped for

9    2008.

09:07:42 10                Do you see that?

11    A.    I do.

12    Q.    You agree with me that the pounds that Hodell

13    shipped in 2008 are the lowest at any time since 2003?

14    A.    They were the lowest since 2003, yes.  Pounds

09:07:59 15    shipped were, um-hmm.

16    Q.    So in Hodell's purported best year ever, Hodell had

17    the least amount of incoming orders since 2003 and the

18    lowest amount of product shipped since 2003, right?

19    That's what the data reflects?

09:08:41 20    A.    The data reflects that, and it reflects that it had

21    the highest sales ever.

22    Q.    I'm asking you -- I didn't ask you about the gross

23    sales.

24    A.    Okay.

09:09:09 25    Q.    I'm asking you about the product that shipped and

1    the orders it received.

2    A.    I concur with your statement, yes.

3    Q.    Okay.

4    A.    That's correct.

09:09:09  5    Q.    I want to talk about this profit before tax line.

6              Do you see that?

7    A.    I do.

8    Q.    Do you see that in the purported best year ever,

9    Hodell's gross -- Hodell's profit before tax was 869,393?

09:09:27 10    A.    Yes.

11    Q.    And you see that in 2007, when Hodell was primarily

12    using Business One, its profit before tax was 424,603, do

13    you see that?

14    A.    I do.

09:09:27 15    Q.    For 2007, Hodell's profit before tax was the lowest

16    of anytime after 2003, correct?

17    A.    That's correct.

18    Q.    And for 2008, its profit before tax was the

19    second-lowest time of any time since 2003?

09:19:40 20    A.    For the presentation you're showing me, 2002

21    through the first quarter of 2009, yes.

22    Q.    And even if you were to combine both 2007 and 2008

23    profit before tax, it wouldn't even equal the same number

24    for 2006 alone, correct?

09:19:40 25    A.    I guess, yes, I would say that, yes.

1    Q.    And if you combine Hodell's profit before tax for

2    2007 and 2008 when it was using Business One, you'd agree

3    that it barely equals 2005 alone, correct?

4    A.    Can you state that question again?  I don't

09:19:40  5    understand your question.

6    Q.    If you combine the profit before tax of 2007 and

7    2008 while Hodell was using Business One, it barely

8    equals 2005 alone, isn't that correct?

9    A.    It's very close to what 2005 was, yeah.

09:19:40 10    Q.    So those two years are close to just 2005?

11    A.    Yes.

12    Q.    Okay.  And if you combine the profit before tax for

13    '07 and '08 while Hodell was using Business One, it's

14    barely more than 2004 alone, correct?

09:19:40 15    A.    It is more than 2004.

16    Q.    Slightly?

17    A.    I don't know what you mean by barely, but it's more

18    than 2004.

19    Q.    Okay.  It's a little over 2004, right?

09:19:40 20    A.    It's more than 2004.

21    Q.    Okay.  I want you to look at the percent of profit

22    before tax as a percentage to net sales.  Do you see that

23    next line down?

24    A.    I do.

09:19:40 25    Q.    For 2007, which is the year Hodell went live on

1    Business One, its profit before tax as a percent of its

2    net sales was 1.1%, do you see that?

3    A.    I do.

4    Q.    And we can agree that that's the lowest of any time

5    since 2003?

6    A.    Since 2003, yes.  Because 2002 and 2003 were

7    negative, right.

8    Q.    And you would agree that in 2008, Hodell's profit

9    before tax as a percent to net sales was 2%?

10   A.    Yes, it was.

11   Q.    And we can agree that that's the second-lowest of

12   any time since 2003, correct?

13   A.    Yes, if I don't include 2002 and 2003, that's the

14   second lowest.

15   Q.    And even if you were to combine 2007 and 2008,

16   again, that's less than 2006 alone, correct?

17   A.    It would be less than 2006 by combining those two

18   years.

19   Q.    And it would be less than 2005 by combining both

20   those years?

21   A.    Yes, it would be.

22   Q.    You would agree with me with this basic concept,

23   that a company can turn a profit but still have suffered

24   financial harm?

25   A.    What kind of profit are we talking about?

1    Q.    A company can make money but still have suffered

2    financial harm in a business case, correct?

3    A.    Well, I'm guessing, I'm going to assume when you

4    say make money, that's a cash return.

09:19:40 5            I would say yes, I think companies can earn

6    a return on their sales and still suffer harm, yes.

7    Q.    Because in those situations, even though a company

8    made money, it's possible to show that the company should

9    have made more than it actually did, correct?

09:19:41 10   A.    Well, that, I mean, that's -- that's the issue,

11   right?

12   Q.    That's the basic concepts of damage calculations,

13   correct?

14   A.    No, I won't answer that question.  Just ask me.

09:19:41 15           The issue is you can demonstrate -- you

16   have to be able to demonstrate what they lost.  It's not

17   merely that they had a loss while they made money.  Okay.

18   You have to go and demonstrate the loss.

19   Q.    I understand --

09:19:41 20   A.    Okay.

21   Q.    -- how you feel it should be demonstrated, and

22   we'll get to that in a second.

23   A.    Okay.

24   Q.    The concept, though, is accurately stated by me, a

09:19:41 25   company -- it's possible to find that a company made

```
 1    money or turned a profit in a given year but still
 2    suffered financial harm.
 3              Those aren't mutually exclusive?
 4    A.   I don't think they're mutually exclusive, no.
 5              MR. LAMBERT:  Your Honor, may I confer real
 6    quickly?
 7              THE COURT:  Yes.
 8    Q.   I'm going to wrap this up, but I just have a couple
 9    final questions.
10              I just want to clear one thing.  You're not
11    a lawyer, correct?
12    A.   No, I am not a lawyer.
13    Q.   Okay.  And you're not here to offer testimony to
14    this jury as to the legal standard for recovery of
15    damages in a business case, is that correct?
16    A.   No, I'm not here to define or state any kind of
17    legal theory.
18              MR. LAMBERT:  No further questions.
19              THE COURT:  Thank you.
20              Any redirect?
21              MR. KELLEHER:  Just a few questions, Your
22    Honor.
23         REDIRECT EXAMINATION OF GEOFFREY OSBORNE
24    BY MR. KELLEHER:
25    Q.   Good morning, Mr. Osborne.
```

1    A.    Good morning, counsel.

2    Q.    Mr. Lambert asked you some questions about what he

3    referred to as your criticism of the five-year average

4    head count.

09:19:41  5         Do you remember that?

6    A.    I do.

7    Q.    And did anything Mr. Lambert asked you change the

8    opinions you expressed yesterday about that?

9    A.    Absolutely not.

09:19:41 10   Q.    And what is the problem with using a five-year

11   average head count the way Mr. Reidl has done?

12   A.    It's kind of smoke and mirrors.

13        You can make calculations to come to an

14   answer you really want, but really what you need to do is

09:19:41 15   step back and do the right calculation.  And the right

16   calculation would be to pick some time periods that were

17   most comparative where you're going to make a comparison

18   like that.

19        And the only way to do that is to look at

09:19:41 20   the last full year as Hodell was ramping up their

21   business, was at higher sales, higher employees, right

22   before they switched over to Business One, and you make

23   the comparison for that year to the time period when

24   Hodell was running Business One.

09:19:41 25        That's a fair and appropriate comparison.

2729

```
 1            Taking five years with lower numbers,
 2    different business, lower sales, it's just not
 3    comparable.
 4    Q.    Hey, Bob, can you put up Exhibit 909?
 5            MR. MILLER:  You want it up on the easel?
 6            MR. KELLEHER:  Yeah, that's not it, Bob.
 7    Thanks, Mike.
 8            I think it's right there.  There you go,
 9    Bob.  Thank you.
10            MR. MILLER:  You want me to put it here?
11            MR. KELLEHER:  Sounds good to me.
12    A.    I've got it right here, so I'm good.  Thank you.
13            MR. MILLER:  We're almost there.  We'll
14    take down the billboard.
15            MR. KELLEHER:  I think we're good.  We got
16    it on the screen.
17            MR. MILLER:  Okay.
18    BY MR. KELLEHER:
19    Q.    Mr. Osborne, does this demonstrative help you
20    explain the testimony you just gave in response to my
21    last question?
22    A.    Yes.  I mean, to talk about comparability, if you
23    include years like 2002, 2003, when the sales and the
24    operations of that business, the kind of guts of the
25    business was at 24 million in sales and 141 employees,
```

1  and include that in an average, then you really are

2  comparing that year of a business that was much smaller

3  to a time period when the business was operating at

4  43,877,000 in sales and 144 employees.

09:19:42  5  You can see that including those numbers in

6  the average lowers the average, obviously.  It kind of

7  drives, again, you're going to get an answer of -- that

8  you hired employees, where in fact, when you look at the

9  last year FACTS was operated, 2006, the full year, the

09:19:42 10  sales are within $1 million and the number of employees

11  is within two.

12  That comparison is the appropriate and the

13  relevant comparison; not looking back at years that the

14  business was very different.

09:19:42 15  Q.  Sir, you just said "hired additional employees,"

16  and I saw you use your hands like making a quotation

17  mark, is that right?

18  A.  Yes.  Yes, I did.

19  Q.  And is that because in your review of every single

09:19:42 20  document that you reviewed that Hodell produced, that

21  there's not any evidence of any actual people that were

22  added?

23  A.  I have not seen any evidence of any names, employee

24  rolls, salaries or anything, no, never seen anything.

09:19:42 25  Q.  And again, at a very basic level, to conduct an

1    expert damages analysis or an expert accounting analysis,

2    if you want to validate a claim that there was additional

3    people, what you look to are the documents that have

4    their names on them, what they did, how much they were

09:19:52  5    paid, when they worked, is that right?

6    A.    That's exactly right.

7    Q.    And you didn't see any of those documents in this

8    case?

9    A.    I did not.

09:19:59 10    Q.    Are you able to say whether or not Hodell added 27

11    additional employees to run Business One?

12    A.    There is no evidence that they added any employees

13    because of Business One.

14    Q.    Let's shift gears a little bit.

09:20:21 15          Mr. Lambert asked you some very general

16    questions about productivity declines, and one of the

17    questions he asked you was whether hypothetically, a

18    productivity decline could in a given case have an effect

19    on profitability.

09:20:43 20          Do you recall that question?

21    A.    I do.

22    Q.    And do you remember what your answer was?

23    A.    I said in certain circumstances, facts or

24    circumstances, it could.

09:20:52 25    Q.    Sir, in this case, based upon everything that

1    you've reviewed, in this case, and assume that there was

2    a productivity decline, did that have any effect on

3    profitability that you could see?

4    A.    No, I saw no evidence of its effect on

09:21:07 5    profitability.

6    Q.    Okay.  Sir, let's talk about what I just asked you

7    to assume, okay, which was that there was a productivity

8    decline.

9              Counsel asked you some questions about a

09:21:19 10   particular productivity metric.  Do you remember that?

11   A.    Yes.

12   Q.    And the metric that counsel asked you about had to

13   do with pounds of product shipped per employee.

14              Do you remember that?

09:21:30 15   A.    Yes.

16   Q.    And we looked at that, that demonstrative that's

17   now on the floor over there that summarizes Hodell's

18   financial documents.

19              And you were shown that the pounds of

09:21:46 20   product shipped per employee went down in certain years,

21   do you remember that?

22   A.    Yes, it did.

23   Q.    Sir, as a professional damages expert and a

24   professional accountant, are you able to tell the jury

09:22:00 25   whether or not pounds of product shipped is an

1    appropriate metric to measure productivity?

2    A.    Well, not in the case of Hodell because as you can

3    see, as those pounds decline, sales are increasing.

4              So what was considered to be a useful

5    measure of what the business was doing, that is if I

6    shipped more pounds, I'm going to get more sales dollars

7    in, which, you know, rationally someone could think that

8    might be a good measure, while in actuality, that measure

9    does not work because in fact as they were shipping less

10   pounds, they were getting more sales dollars.

11             And what that means is that the mix of the

12   products was changing.  Simply, they were shipping

13   lighter products that got more sales dollars.

14             So if you're going to try to measure

15   productivity solely by pounds shipped by employee, you're

16   not going to get the right answer because as they were

17   shipping more and more pounds, they were shipping -- I

18   mean, they were shipping less pounds, they were getting

19   more sales dollars.

20             So the comparison or the analysis doesn't

21   really work.

22   Q.    Thank you, sir.  And Mr. -- and counsel walked you

23   through some mathematics.

24             Do you remember that with respect to this

25   issue?

```
 1    A.    Which ones?
 2    Q.    You talked about pounds of product per employee and
 3    he showed you that they went down, and you don't dispute
 4    that they went down, right?
 5    A.    No, I don't dispute it at all.
 6    Q.    Does the fact that pounds of product per employee
 7    went down, did that have any effect on Hodell's
 8    profitability in this case?
 9    A.    Well, actually the pounds shipped went down.  The
10    pounds per employee went up -- no, the pounds for
11    employee went down as well.  Both of them went down, and
12    that would -- does not affect my opinion as to whether
13    there are financial damages here.
14              A productivity change, whatever it is,
15    positive or negative, doesn't tell me there's damages.
16    It's a nice measure you might look at or try to analyze
17    to see whether it tells you something about the business,
18    but I can learn what I need to know about this business
19    by looking at the financial statements of this business.
20              What Business One has been -- it's been
21    asserted that Business One hurt the business because it
22    couldn't get orders done and it couldn't make sales.
23    Well, the facts are black and white about this, they show
24    you that during Business One, they had the highest sales
25    in their history.
```

2735

```
 1              So if that assertion is right, I
 2   don't -- it doesn't really matter to me about
 3   productivity.  What matters to me is that they were able
 4   to make the sales that they were getting placed and those
 5   sales increased under Business One.
 6   Q.    Hey, Mike, can you put up 911?  You've got this in
 7   your binder, Mr. Osborne.
 8   A.    Okay.  Yes, I have it.
 9   Q.    I'm just going to wait until Bob gets it up on the
10   screen.
11              Okay.  It's up on the screen.  Well, it was
12   up on the screen.
13              Sir, does this exhibit that we're looking
14   at here, does this show an appropriate measure of
15   productivity for Hodell?
16   A.    In the facts and circumstances of this case, they
17   do, because I don't think the pounds shipped really tell
18   you the story of what went on.
19   Q.    And, sir, what story does this demonstrative tell
20   you of what went on?
21   A.    This shows you as employees increased in number,
22   the sales and the business increased.
23   Q.    So regardless of how many pounds of product they
24   shipped, they brought in more money per employee?
25   A.    Yes, that is the case.
```

Q.    Just a few more questions.

Hey, Bob, can you go back to the last one you were, the summary exhibit, Hodell's demonstrative? Nope.  Yep, that's it.

Sir, do you remember counsel asked you some questions about that --

A.    Yes.

Q.    -- document?

And he drew your attention to the profits before tax line, do you remember that?

A.    Yes, he did.

Q.    Is that a metric that you would look at in this case to determine damages?

A.    No, it would not be.

Q.    And can you please just tell the jury why?

A.    Well, because profit before taxes is after expenses that don't really involve the operations of the business. It certainly wouldn't involve anything to do with Business One's usage as a software platform.

The operating profit line is the one that practitioners like myself and analysts really look to to try to understand the health and the success of a business.

And that's after all operating expenses of the business.

1    Q.    And what does the operating profit line show?

2    A.    Well, it shows during these years, that it

3    increased up through 2006, it dipped, and then came back

4    up again in 2008.

5          When you look at it, it's not shown on this

6    demonstrative, but normally practitioners like myself

7    will look at a percentage relationship; that is, you'll

8    take that number and divide it by gross sales, and you

9    get a percentage relationship.  They call it the

10   operating margin.

11         As you see in this, there's a product

12   margin about five lines down, and then there's a gross

13   profit percentage there about midway on the page.

14   Normally, people analyzing financial statements will do

15   the same thing for operating income -- operating profit.

16   They will take that number and divide it by sales to see

17   what that percentage is and try to manage that

18   percentage.

19         And during the years that Hodell was

20   operating here, it was a relatively consistent

21   percentage.  It did go up and down, but not drastically

22   go up and down.

23   Q.    Sir, at the very end of counsel's questions, he

24   asked you a hypothetical that as a general matter is it

25   possible to show that a company made some money in a

```
 1    given year but still suffered financial harm.

 2                Do you remember that?

 3    A.    I do.

 4    Q.    And your answer, I think, hypothetically was yes,

 5    that's possible?

 6    A.    Yes, it is.

 7    Q.    Sir, in this particular case, did Hodell show any

 8    damages as a result of this alleged productivity decline?

 9    A.    No, they did not.

10                MR. KELLEHER:  Judge, may I confer for a

11    moment?

12                THE COURT:  Yes.

13                MR. KELLEHER:  No further questions at this

14    time, Judge.

15                THE COURT:  Any recross?

16                MR. LAMBERT:  Just a couple.

17         RECROSS-EXAMINATION OF GEOFFREY OSBORNE

18    BY MR. LAMBERT:

19    Q.    Sir, if we could pull up the chart you were just

20    on, the sheet I gave you.

21    A.    Yes, I have it right here.

22    Q.    This fun thing.  Gross sales, you were talking a

23    lot about, you've been talking a lot about gross sales in

24    this case, right?

25    A.    We have referred to it a lot, yes.
```

1    Q.    That's that top line?

2    A.    It is.

3    Q.    And conceptually, right, to get to gross sales,

4    it's essentially multiplying the product sold by the

09:29:49  5    price of that product, right?

6              That's conceptually how you reach gross

7    sales?

8    A.    The product sold?  Well, it's however you monetize

9    the actual products.

09:29:59  10    Q.    Whatever you're selling --

11    A.    Whether it's pounds --

12    Q.    -- it's by the selling price of that product,

13    correct?

14    A.    By selling price to derive gross sales, yes.

09:30:06  15    Q.    Okay.  And so in Hodell's case, what it's selling

16    is fasteners, chains, bolts, down the line, right?

17    A.    That's what they sell, yes.

18    Q.    And then you multiply the price of those various

19    things to get to what their gross sales were, right?

09:30:20  20    A.    Right.  And I understand they basically bill by

21    weight, by pound.

22    Q.    So you agree with me that gross sales, everything

23    else being equal, will rise just based upon a price

24    increase in what you're selling; that's fundamental

09:30:41  25    economics, right?

1    A.    God, if you run a business, you would hope so.

2    Q.    All right.

3    A.    That's what you want to do is raise your prices so

4    you get more sales, yeah.

09:30:50 5    Q.    So fundamentally speaking, a rise in gross sales

6    can be attributed to nothing else but a rise in the price

7    of what you're selling, right?  That's just basic?

8    A.    Are you asking me hypothetically can that happen?

9    Q.    Yes.

09:31:06 10    A.    Yes, you can sell the goods at a higher price and

11    get higher sales.

12    Q.    All right.  And I want to direct you to 2008.

13                The average selling price per pound in 2008

14    was the highest of any time reflected on this chart other

09:31:22 15    than 2009, correct?

16    A.    That is correct.

17    Q.    And that will have, by itself, a direct impact on

18    the gross sales of the company, right?

19    A.    A higher sales price will benefit the gross sales

09:31:34 20    of the company, yes.

21    Q.    And if you look at 2007, the average selling price

22    per pound was the second-highest of any time other than

23    2009, correct?

24    A.    That's correct.  It was the second highest.

09:31:51 25    Q.    And that change by itself would necessarily impact

1    that gross sale number, right?

2    A.    It would -- that change?  Which change are you

3    talking about?

4    Q.    The rise in price you just admitted occurred.

5    A.    The increase in average sales price would increase

6    the gross sales line, yes.

7    Q.    And you're familiar with the concept of inflation,

8    right?

9    A.    Generally, yes.

10   Q.    And inflation can impact gross sales numbers,

11   correct?

12   A.    Inflation can affect gross sales numbers.

13   Q.    And if you can't answer the question just let me

14   know.

15   A.    I don't necessarily know what you mean by that.

16   Q.    Okay.  And you agree that even accepting your

17   premise that in terms of gross sales, 2008 was

18   Hodell-Natco's best year ever because its gross sales

19   were $43,877,103, you agree that it could still be found

20   to have suffered economic harm because conceptually, its

21   gross sales should have been higher, right?

22             That's something we agreed on earlier?

23   A.    I don't know whether we agreed on that earlier.

24             If you're asking me hypothetically even at

25   $43 million in sales, in gross sales, could

1    hypothetically the company have been harmed?  In what

2    way?  I'm not sure.  Harmed in what way?

3    Q.    By not making as many sales as it could have,

4    correct?

09:33:19 5    A.    That's hypothetically true, sure.  If they could

6    have made more sales, then they would have had a higher

7    number.

8    Q.    So just looking at gross sales alone doesn't tell

9    you whether, in fact, there was economic harm to a

09:33:33 10    company, correct?  You'd have to do further analysis?

11    A.    Yes.  A good part of my testimony yesterday was

12    what the analysis had to be.  You really have to kind of

13    get in there and find out who are those sales that you

14    didn't make, what customers they were, what was the time

09:33:47 15    frame of them, what was the dollar value of the sales.

16    I mean, you need to see the details of

17    those sales.

18    Q.    Gross sales, though --

19    A.    And then you would be able to quantify, identify

09:33:56 20    appropriately and quantify that damage.

21    Q.    Just so we're all clear here, gross sales by itself

22    does not tell you whether a business has been

23    economically harmed, correct?

24    A.    Oh, I absolutely agree that's the case.  No, I

09:34:12 25    never said that it did.

```
 1              MR. LAMBERT:  Okay.  No further questions,
 2   Your Honor.
 3              THE COURT:  Thank you, Mr. Osborne.
 4              THE WITNESS:  Thank you, Your Honor.
 5              MR. KELLEHER:  May I ask a few questions.
 6              THE COURT:  What?
 7              MR. KELLEHER:  May I ask a few questions?
 8              THE COURT:  If you want.
 9         FURTHER REDIRECT EXAMINATION OF GEOFFREY OSBORNE
10   BY MR. KELLEHER:
11   Q.    Mr. Osborne, counsel just asked you a series of
12   hypothetical questions about productivity.
13              Do you remember that?
14   A.    Yes.
15   Q.    Sir, with respect to productivity for Hodell, what
16   matters; money or pounds?
17   A.    Money.  Money talks.
18              MR. KELLEHER:  No further questions.
19              THE COURT:  Anything based on that?
20              MR. LAMBERT:  No.
21              THE COURT:  Thank you, Mr. Osborne.  Watch
22   your step going down.
23              THE WITNESS:  Thank you, Your Honor.
24              (Witness excused)
25              THE COURT:  You may call your next witness.
```

2744

1              MR. STAR:  Your Honor, we rest.

2              THE COURT:  Is there any rebuttal?

3              MR. CARNEY:  We do, Your Honor.

4              MR. STAR:  Your Honor, could we approach

09:35:15  5    and hear what they plan to offer?

6              THE COURT:  Who is your rebuttal witness?

7              MR. CARNEY:  We have two rebuttal

8    witnesses, Your Honor.

9              We have Mr. Joseph Vislocky, former IT

09:35:25 10   director at Hodell-Natco, and we'll also be calling

11   Mr. Otto Reidl.

12             THE COURT:  Okay.  Go ahead.

13             MR. MILLER:  Your Honor.

14             MR. STAR:  Your Honor, may we approach?

09:35:37 15            THE COURT:  You can.

16             MR. STAR:  Thank you.

17             THE COURT:  Stand and stretch if you want.

18             Somebody take that poster down, too.

19             (Side-bar conference had off the record)

09:39:00 20            THE COURT:  Sir, could you raise your right

21   hand for me?

22                  JOSEPH VISLOCKY,

23        of lawful age, a witness called by the DEFENSE,

24           being first duly sworn, was examined

09:39:07 25              and testified as follows:

```
 1                    THE COURT:  Please have a seat.

 2                    Would you tell us your full name and spell

 3       your last name?

 4                    THE WITNESS:  Joseph Steven Vislocky, it's

 5       V as in Victor, I-S-L-O-C-K-Y.

 6                    THE COURT:  Thank you.

 7            DIRECT EXAMINATION OF JOSEPH VISLOCKY(REBUTTAL)

 8       BY MR. CARNEY:

 9       Q.   Mr. Vislocky, my name is Chris Carney.  We met the

10       other day, correct?

11       A.   Yes, sir.

12       Q.   Have you ever testified in open court before?

13       A.   I have not.

14       Q.   A little nervous?

15       A.   A little bit.

16       Q.   Okay.  Can you describe your Information Technology

17       background to the jury?

18       A.   My career in IT began while I was in college.  I

19       worked for a private country club as a computer system

20       operator and administrator.

21                    I later went on to work at University

22       Hospitals of Cleveland.  I had four titles during my

23       tenure there.  My duties ranged everything from help desk

24       support to consultation services as a consultant

25       internally, an analyst, as well as project management and
```

1    support.

2                          After I left University Hospitals, I went

3    to State Industrial Products as their manager of IT.

4    There, I oversaw the personnel and systems relative to

09:40:39 5    operating that business.

6                          And following that, I went to Hodell-Natco.

7    Q.    And when was that?

8    A.    That was in November of 2007.

9    Q.    Okay.  And what did you do for Hodell-Natco?

09:40:55 10   A.    I was their director of IT.

11   Q.    And what were your responsibilities?

12   A.    I oversaw the personnel and systems, IT technology

13   that operated that business.

14   Q.    Did you oversee the IT infrastructure?

09:41:11 15   A.    Yes.

16   Q.    And the systems that were in place?

17   A.    Yes, the infrastructure and the systems, correct.

18   Q.    As part of your position, did you recommend

19   necessary upgrades?

09:41:18 20   A.    Yes.  Where appropriate, yes.

21   Q.    How long did you work for Hodell?

22   A.    A little more than five years.

23   Q.    So were you in the position of director of IT the

24   entire time?

09:41:30 25   A.    The entire time, yes.

1    Q.    Why did you leave?

2    A.    I had a better opportunity came my way.

3    Q.    Okay.  Now, when you started at Hodell-Natco in

4    November of 2007, did part of your duties include

09:41:49  5    evaluating the IT hardware and related systems that were

6    currently in place?

7    A.    Yes.

8                MR. STAR:  Objection.  This should have

9    been part of their case in chief.

09:41:58 10                THE COURT:  Overruled.

11    Q.    And what did your evaluation entail?

12    A.    I evaluated the overall systems and server hardware

13    and network infrastructure to ensure that everything was

14    appropriate for the systems that Hodell was operating at

09:42:15 15    the time.

16    Q.    How long did this evaluation take you?

17    A.    I began that when I first started with Hodell, and

18    the process took approximately three to four months.

19    Q.    Okay.  Did your evaluation include an examination

09:42:34 20    of the servers that were in place?

21    A.    Yes.

22    Q.    Did it include an evaluation of the Citrix

23    environment?

24    A.    Citrix environment was evaluated as well, yes.

09:42:44 25    Q.    What is -- what is Citrix?

1    A.    Citrix is a brand name for a virtualization

2    platform that presents computer systems to, what they

3    call, thin clients.  One could kind of liken that to a

4    dumb terminal instead of using actual computers at the

09:43:03  5    work stations.

6    Q.    Okay.  Did your evaluation include an examination

7    of the PCs that the employees were using?

8    A.    Yes, it did.

9    Q.    Okay.  What conclusions did you reach after your

09:43:17 10    evaluation of Hodell's IT hardware and servers?

11              MR. STAR:  Objection.

12              THE COURT:  Overruled.

13    A.    The infrastructure was quite good and more than

14    sufficient for the systems that Hodell was operating at

09:43:31 15    the time.

16    Q.    Now, have you ever heard of the term "Silver satin

17    cabling"?

18    A.    Yes, I have.

19    Q.    What is it?

09:43:38 20    A.    Silver satin cabling is a flat version of a cable

21    that looks very much like a telephone cord.  The cord

22    that would run from your wall to the back of your

23    telephone.  It's a flat code of that nature.  It's silver

24    in color, typically; hence the name.  And there are

09:43:57 25    different versions of that type of cabling, some of which

2749

1    is made for networking applications.

2    Q.    Now, there's been testimony in this trial that

3    Hodell-Natco used silver satin cabling from the 1980s

4    with its IT hardware and PCs.

09:44:12  5              Do you recall that being the case?

6              MR. STAR:  Objection.

7    Q.    In November of 2007?

8              THE COURT:  Overruled.

9    A.    I would remember seeing silver satin and would have

09:44:25 10   had it immediately replaced, but I did not see any silver

11   satin in use.

12   Q.    What type of -- what type of cabling did Hodell

13   employ for its computer hardware and servers back in

14   November of 2007?

09:44:40 15   A.    The cabling that was used at the time was the

16   standard of category five or it's frequently called Cat

17   5.

18   Q.    Okay.  Would that have been -- would Cat 5 have

19   been state of the art back in 2007?

09:44:56 20   A.    Yes, that would have been the standard at that

21   time.

22   Q.    Now, as part of your employment with Hodell-Natco

23   during that period of time, did you have occasion to

24   observe the performance of Business One?

09:45:12 25   A.    I did, yes.

```
        1    Q.    And how would you describe the performance of

        2    Business One that you saw?

        3                  MR. STAR:  Objection.

        4                  THE COURT:  Overruled.

09:45:20 5   A.    What I observed while watching certain individuals

        6    in the company perform their tasks, such as --

        7    Q.    What -- what type -- I'm sorry, you were -- okay.

        8    A.    -- such as sales entry people and purchasing

        9    personnel, as they were performing their jobs, I saw slow

09:45:40 10  performance as they moved from field-to-field on the

       11    screen, and especially a lot of lag, a lot of delay

       12    whenever they performed a task that required a database

       13    lookup, such as clicking on a dropdown to choose a

       14    customer from a list of customers.

09:45:56 15               There would be a lengthy delay in that type

       16    of process, whether they're looking up customers'

       17    addresses that were in the database, part numbers when

       18    placing orders, things of that nature.

       19    Q.    When you say "Lengthy delays," can you give us

09:46:12 20  examples?

       21                  MR. STAR:  Objection.  Your Honor, this is

       22    outside the scope of the trial.

       23                  THE COURT:  Overruled.

       24    A.    I saw everything from 15-second to 45-second

09:46:26 25  delays, sometimes longer.
```

```
             1    Q.    And would that have been in simple tasks like

             2    dropdown menus?

             3    A.    Yes.

             4    Q.    Now, the speed -- you're familiar with Radio Beacon

09:46:42     5    and In-Flight, correct?

             6    A.    I am, yes.

             7    Q.    Did the speed issues that you just testified to,

             8    did those issues have anything to do with Radio Beacon or

             9    In-Flight?

09:46:53    10              MR. STAR:  Objection, Your Honor.  There's

            11    been no foundation.

            12              THE COURT:  Yeah, objection sustained.

            13              MR. STAR:  Thank you.

            14    BY MR. CARNEY:

09:46:59    15    Q.    The speed issues that you just testified to, were

            16    those speed issues related to the operation of Business

            17    One?

            18              MR. STAR:  Same objection.

            19              THE COURT:  Objection sustained.

09:47:11    20              How does he know?

            21              MR. CARNEY:  He's the IT director.

            22              THE COURT:  I know, but just because he is,

            23    you have to lay some foundation how he would know.

            24    BY MR. CARNEY:

09:47:24    25    Q.    During your tenure in 2007, were there regular
```

1    reports of slow response time?

2                    MR. STAR:  Objection.  Hearsay.

3                    THE COURT:  Overruled.

4    A.    Yes, sir.  Many reports of slow performance.

09:47:36 5    Q.    Was slow performance the norm?

6                    MR. STAR:  Objection.

7                    THE COURT:  Overruled.

8    A.    It did become the norm.  It was expected every day

9    that it would be slow.

09:47:45 10    Q.    Now, did you undertake projects to try and improve

11    the performance of Business One at Hodell?

12    A.    I did, yes.

13    Q.    What types of things did you do?

14    A.    I had an assessment of the network infrastructure

09:47:57 15    performed by an outside third-party.

16    Q.    Who was that?

17    A.    That was Pomeroy.

18    Q.    And give me the time frame.

19    A.    They performed that within the first year of my

09:48:15 20    tenure at the company.

21    Q.    When Business One was still operating?

22    A.    Oh, yes, while Business One was still operating.

23    Q.    And did they offer any recommendations regarding

24    the hardware?

09:48:27 25                    MR. STAR:  Objection.  Hearsay.

```
 1                    THE COURT:  Objection sustained.
 2      BY MR. CARNEY:
 3      Q.    What did you do as a result of their, Pomeroy's,
 4      evaluation of your systems?
 5                    MR. STAR:  Objection.  Hearsay.
 6                    THE COURT:  Overruled.
 7      A.    They found no problems that needed action.
 8                    MR. STAR:  Objection.  Your Honor, I --
 9                    THE COURT:  I know.  You're supposed to
10      answer what did you do, if anything.
11      A.    We did nothing because nothing was required.
12      Q.    Now, did you hire any consultants to look at the
13      servers?
14      A.    I brought in a consultant to take a look at the SQL
15      database upon which Business One was operating.
16      Q.    And did Hodell implement any recommendations from
17      that consultant?
18                    MR. STAR:  Objection.  Lacks foundation.
19                    THE COURT:  Objection sustained.
20      Q.    Were there any recommendations made by the
21      consultant with respect to the SQL database?
22                    MR. STAR:  Objection.  Hearsay.
23                    THE COURT:  Sustained.
24                    MR. CARNEY:  Just one moment, Your Honor.
25      I'm almost done.  I just want to confer.
```

```
 1              (Pause)
 2    BY MR. CARNEY:
 3    Q.    As part -- as part of your duties, were you
 4    responsible for evaluating recommendations made by third
 5    parties?
 6    A.    I was.
 7    Q.    And the person that you identified, Karen Murphy,
 8    is that her name?
 9    A.    That's correct.
10    Q.    Did you evaluate the recommendations that she made?
11              MR. STAR:  Objection.  It's getting into
12    hearsay again.
13              THE COURT:  You can say whether you
14    evaluated it.
15    A.    I did, yes.
16    Q.    Did you implement any recommendations that were
17    made?
18    A.    Yes.
19    Q.    Did you do everything in your power to improve the
20    performance of Business One at Hodell while Business One
21    was in operation there?
22              MR. STAR:  Objection.  Lacks foundation.
23              THE COURT:  Overruled.
24    A.    Yes, I did.
25    Q.    And were you able to improve the performance?
```

1    A.    I was not.

2              MR. CARNEY:  No further questions.

3              THE COURT:  Any cross?

4              MR. STAR:  Yes.

09:51:18  5    CROSS-EXAMINATION OF JOSEPH VISLOCKY

6    BY MR. STAR:

7    Q.    How are you?

8    A.    I'm well.  Yourself?

9    Q.    I'm all right.

09:51:44 10              Good morning, Mr. Vislocky.

11   A.    Good morning, sir.

12   Q.    I've left a binder there.  We'll refer to some

13   documents.

14              Let's just go through your background real

09:51:52 15   quick.  You said you didn't join Hodell until November,

16   2007, correct?

17   A.    That's correct.

18   Q.    So you have no knowledge of anything that happened

19   with respect to Business One or In-Flight or Radio Beacon

09:52:03 20   prior to November, 2007, right?

21   A.    No direct knowledge, no.

22   Q.    You weren't involved in the sales process?

23   A.    No, sir.

24   Q.    You weren't involved in developing In-Flight?

09:52:13 25   A.    No, sir.

2756

1    Q.    You weren't involved in implementing any of the

2    software?

3    A.    No, sir.

4    Q.    You weren't there at go-live?

09:52:19 5    A.    That's correct.  I was not.

6    Q.    Your knowledge starts from November, 2007 and goes

7    forward, right?

8    A.    That is correct.

9    Q.    So you have no personal knowledge of what, for

09:52:32 10    instance, Hodell had in the way of hardware or network

11    between the time of go-live and up to the time that you

12    started, right?

13    A.    That's correct.

14    Q.    Okay.  So you have no knowledge of what changes, if

09:52:44 15    any, might have been made on that hardware or network

16    environment prior to you starting, right?

17    A.    That's correct, sir.

18    Q.    All right.  So you were asked questions about your

19    knowledge of the cabling that Hodell had as of November,

09:52:57 20    2007, when you started, and you said you didn't see any

21    silver satin cable at that point in time?

22    A.    That's correct.

23    Q.    And what you saw was Cat 5 cable by November?

24    A.    Correct.

09:53:08 25    Q.    All right.

1           But you have no knowledge as to whether

2      silver satin cable was being used during the time

3      Business One was running prior to your start in November,

4      2007, right?

09:53:17 5     A.    That's correct.

6      Q.    All right.  In fact, you have no knowledge, and

7      you're not even qualified to offer any opinion as to what

8      causes there might have been for the so-called

9      performance problems that Hodell was complaining about,

09:53:39 10    right?

11     A.    That's correct.

12     Q.    And you personally didn't do an analysis, even

13     though you're the IT director, you didn't do an analysis

14     of whether Business One or In-Flight or Radio Beacon

09:53:53 15    might have been the cause of the performance problems

16     that Hodell has alleged, right?

17     A.    I don't know if I could take it as you stated it.

18           Many things were attempted to improve the

19     overall environment.

09:54:09 20    Q.    You have no -- strike that.

21           You don't even consider yourself qualified

22     or consider that you have the capability to have done an

23     investigation or analysis to determine whether the

24     performance problems that Hodell's alleged were caused by

09:54:27 25    Business One, by In-Flight, by Radio Beacon, or by

1   something else, right?

2   A.   That's correct.

3   Q.   Let's talk about the hardware.  The hardware was

4   actually a mess when you started, wasn't it?

09:54:40  5   A.   It wasn't a mess.

6   Q.   Well, it was not optimal, we can agree on that,

7   right?

8   A.   I don't know where you're drawing that conclusion

9   from.

09:54:53  10   Q.   Well, let's just make sure we're clear.  What you

11   told this jury, I wrote it down, you said when you

12   started, the infrastructure was quite good and more than

13   sufficient.

14             That's your position today, right?

09:55:03  15   A.   Yes.

16   Q.   Okay.  Let's go to Exhibit -- pardon me for one

17   second.

18             You agree with me that with your own

19   analysis, as of December of 2007, Hodell's servers were

09:55:59  20   critical, they were being overloaded, right?

21   A.   Some servers were showing that they were being

22   overloaded.

23   Q.   Okay.  Let's take a look at Exhibit 330.  I've

24   given you a binder, and I'm going to put this up on the

09:56:15  25   screen.

1           In your binder, sir, it's Tab 2 if you'd

2      like to refer to the paper copy.

3           Before we do this, let's just step back.

4      You can agree with me that the environment, the

09:56:30  5      infrastructure that Hodell would use to run a system like

6      this includes not just servers which are hardware but it

7      includes the network cables and switches and those sorts

8      of things, right?

9      A.   Oh, yes, sir.

09:56:42 10      Q.   And we've been through this before, after you

11      started, Hodell had to even increase such basic things as

12      its network switches, right?  They were underpowered?

13      A.   We did upgrade the switches over time.

14      Q.   Yeah.  Right.  When you started, some of those

09:57:00 15      switches were a ten-megabyte switch, correct?

16      A.   That's correct.

17      Q.   And you -- the standard at that time was a hundred

18      megabyte switch, right?

19      A.   Hundred megabyte switch was very common.

09:57:12 20      Q.   And you in fact made those changes even to

21      something as basic as the switches, right?

22      A.   Yes.  That's correct.

23      Q.   And just so the jury understands, that's akin to

24      having like a modem in your house where you're plugging

09:57:24 25      the computer in the Internet, right?

2760

1    A.    That's a fair analogy, yes.

2    Q.    Okay.  And what you guys did was make a ten-fold

3    increase in the power of those switches, right?

4    A.    We did.

09:57:33 5    Q.    And that's a pretty cheap investment, isn't it?

6    A.    Relatively so, yes.

7    Q.    Okay.  But that investment hadn't been made before

8    you started, had it?

9    A.    No, sir.

09:57:42 10    Q.    So let's make sure we all understand.

11              You started in November of 2007, and

12    Business One at Hodell went live in the beginning of

13    March, 2007?

14    A.    Okay.  Yes.

09:57:54 15    Q.    Okay.  So prior to your start, Hodell had been

16    running Business One for some seven or eight months,

17    right?

18    A.    That's correct.

19    Q.    And during that seven or eight-month time, we can

09:58:04 20    agree, even with respect to something as simple as their

21    network switches, Hodell had outdated, underpowered

22    equipment, right?

23    A.    Just because a hundred megabyte was the standard

24    doesn't necessarily mean that an upgrade was required or

09:58:20 25    necessary.

1    Q.    They were running old hardware, ten megabyte

2    switches weren't the standard at that point, were they?

3    A.    That's correct.

4    Q.    Thank you.  Let's take a look at Exhibit 330.

5                 This goes back to the question about

6    servers that you were asked, and just to recall, your

7    testimony this morning was that when you started in

8    November, you believed that the infrastructure was quite

9    good and more than sufficient.

10                Sir, we can agree that this is a series of

11   e-mails between yourself and a woman named Karen Murphy?

12   A.    That's correct.

13   Q.    Correct?

14   A.    Yes.

15   Q.    Look at the middle page -- middle of the first page

16   there, Bob.

17                You see your e-mail, sir, from December

18   10th of 2007?

19   A.    I do.

20   Q.    Okay.  You're writing to Ms. Murphy?

21   A.    Yes.

22   Q.    And December of '07 is some nine months after

23   Hodell went live on Business One?

24   A.    Yes.

25   Q.    All right.  After your introduction, you go to the

2762

1   third paragraph, starting with the "The diagnostic tool,"

2   you right this, right?  "The diagnostic tool you

3   recommended was installed today.  It has revealed many

4   things."

09:59:33   5           Bob, for some reason we're cut off on the

6   screen.

7           All right.  There we go.

8           "The diagnostic tool you recommended was

9   installed today.  It has revealed many things, mostly

10:00:01  10   bad!"

11          This is what you wrote to Ms. Murphy in

12  December of 2007, right?

13  A.   Yes.

14  Q.   You go on to say, "We are, quote, critical on all

10:00:10  15  servers."

16          Do you see that?

17  A.   I do.

18  Q.   That means the servers were being overloaded,

19  right?

10:00:16  20  A.   Correct.

21  Q.   This is over a month after you start, right?

22  A.   Just about a month, yes.

23  Q.   Okay.  And a month after you start, you've run a

24  tool and you're telling Ms. Murphy that Hodell was

10:00:31  25  critical on its servers, meaning its servers were

```
 1    overloaded?

 2    A.    Correct.

 3    Q.    Let's look at -- in fact, we won't even show an

 4    exhibit.  We'll just move.

 5               You started also to look at the Citrix

 6    servers, right?

 7    A.    Yes.

 8    Q.    And you were seeing big problems with the Citrix

 9    servers, too?

10    A.    What problems are you referring to?

11    Q.    Well, let me step back.

12               You eventually approved a, what you called,

13    a revamp project for the entire Citrix environment,

14    right?

15    A.    That's correct.

16    Q.    And that was going to be an investment of some

17    $30,000 for Hodell to revamp its Citrix servers?

18    A.    Correct.

19    Q.    And the Citrix servers were part of what was

20    running Business One and In-Flight and Radio Beacon,

21    correct?

22    A.    That is correct.

23    Q.    In fact, at around the end of December of 2007,

24    you, on behalf of Hodell, bought what you called a

25    four-way server to use in this -- in this overall
```

| | |
|---|---|
| 1 | environment, correct? |
| 2 | A.    That is correct. |
| 3 | Q.    And what you told Ms. Murphy was, "This new server |
| 4 | will be robust enough for SAP now," right? |
| 10:01:46 5 | A.    Yes. |
| 6 | Q.    So we can agree that even as the -- as of the end |
| 7 | of December, 2007, whatever server you were using to run |
| 8 | Business One, wasn't robust enough for Business One, |
| 9 | correct? |
| 10:01:57 10 | A.    No.  I cannot draw that conclusion. |
| 11 | Q.    Sir, let's refresh your recollection. |
| 12 |             In your binder, look at Tab 5 and take a |
| 13 | moment to refresh yourself.  Look at the e-mail halfway |
| 14 | down the page. |
| 10:02:34 15 | A.    Yes, sir.  I've read it. |
| 16 | Q.    And you agree with me that you told Ms. Murphy that |
| 17 | you were buying a new server which would now be robust |
| 18 | enough for SAP? |
| 19 | A.    My context is different than what you're stating. |
| 10:02:46 20 | Q.    You said to Ms. Murphy in your own e-mail you're |
| 21 | buying a new server and, "This will be robust enough for |
| 22 | SAP." |
| 23 |             Right? |
| 24 | A.    Correct. |
| 10:02:54 25 | Q.    Okay.  Thank you. |

1          And you were making a $30,000 investment in

2   new hardware?

3   A.    Correct.

4   Q.    At the end of December, 2007?

10:03:04  5   A.    That's correct.

6   Q.    And that's because you needed new hardware, right?

7   A.    That's because we were preparing to upgrade the

8   overall infrastructure for all systems.

9   Q.    Right.  Because the infrastructure needed an

10:03:16 10   upgrade, didn't it?  You wouldn't go out and make that

11   investment unless you needed to upgrade it?

12   A.    That was planning for the future, yes, we would

13   make upgrades.

14   Q.    Thank you.  Well, it wasn't just for the future,

10:03:27 15   right?  When you made those upgrades, you were going to

16   move Business One over to those new servers, correct?

17   A.    Yes, sir.  I was going to leverage every

18   performance increase we could have.

19   Q.    Thank you.

10:03:36 20   A.    And use that for anything that was in operation at

21   the time as well.

22   Q.    Thank you.

23          Now, even back as of December, the end of

24   December, 2007, you were part of planning Hodell's

10:03:49 25   lawsuit against SAP, weren't you?

         1    A.    No, sir.

         2    Q.    Well, take another look at your -- at the next

         3    paragraph of that e-mail that I've given you, which is

         4    Tab 5 of your binder.

10:04:02 5          You agree with me that you wrote to

         6    Ms. Murphy at the end of December, 2007, that Hodell's

         7    lawsuit against SAP was going to be filed?

         8    A.    I was aware of the lawsuit, yes.

         9    Q.    And you were the IT director at that point, right?

10:04:26 10   A.    That's correct.

        11    Q.    At no time during your tenure with Hodell, even

        12    though you were aware Hodell was going to file a lawsuit,

        13    did you ever perform any measured study to see how fast

        14    the system was responding?

10:04:46 15         You didn't do that, did you?

        16    A.    A formal study, no.

        17    Q.    No.  And today you got up and you told the

        18    jury -- I wrote it down, make sure I've got this

        19    right -- you told the jury that you were seeing,

10:04:58 20   personally observing delays of 15 to 45 seconds, that's

        21    what you said?

        22    A.    Yes, sir.

        23    Q.    But even as the IT director, knowledgeable that

        24    Hodell was planning to file a lawsuit, you didn't even

10:05:10 25   bother to actually formally document anything you saw,

2767

```
            1    right?
            2    A.    That's correct.
            3    Q.    And you never did an analysis, of course, of what
            4    was causing what you saw with respect to the so-called
10:05:27    5    slowness or the delays, right?
            6    A.    I don't understand the question.
            7    Q.    You never did an analysis or evaluation or study or
            8    an investigation to actually pinpoint what the source of
            9    the problem was with the so-called delays; you didn't do
10:05:43   10    that?
           11    A.    There is no formal study, no.
           12    Q.    You agree that the hardware and network environment
           13    at Hodell was Hodell's responsibility, correct?
           14    A.    Yes.
10:05:56   15    Q.    It's always the customer's responsibility, right?
           16    A.    Unless it's outsourced, yes.
           17    Q.    Okay.  And that wasn't outsourced, was it?
           18    A.    No, it was not.
           19    Q.    Okay.  So it was up to Hodell to make sure it had
10:06:09   20    the right networking and the right hardware and the right
           21    environment, correct?
           22    A.    That's correct.
           23    Q.    And that's part of why they hired you?
           24    A.    Yes.
10:06:15   25    Q.    Even as of March of 2008, some five or six months
```

1     after you were hired, you'd agree with me that Hodell's

2     server and its SQL server were struggling, right?

3     A.     They were.

4     Q.     They were.  Those were the servers that Hodell was

10:06:39  5     trying to use to run Business One, correct?

6     A.     That is correct.

7     Q.     In March of 2008, that's a year after go-live,

8     right?

9     A.     Yes.

10:06:48 10     Q.     Okay.  So even a year after go-live, Hodell's

11     servers are struggling?

12     A.     Yes.

13     Q.     And you needed to improve those servers, right?

14     A.     If the servers were the problem, yes.

10:07:10 15     Q.     Well, struggling servers need to be improved, don't

16     they?

17     A.     Unless the problem was the application itself.

18     Q.     Um-hmm.  And you did make the investment to improve

19     the servers eventually, right?

10:07:21 20     A.     We did.

21     Q.     Okay.  More than a year after Business One had gone

22     live at Hodell, right?

23     A.     Correct.

24     Q.     And, in fact, you've described what you've done at

10:07:41 25     Hodell, your work there over the years, as a complete

1     data center revitalization, correct?

2     A.    That's correct.

3     Q.    So let's just frame our reference here.

4           You started in November of 2007, some nine

5     months after Business One was running?

6     A.    Correct.

7     Q.    Okay.  You're obviously aware that Hodell has

8     complained in this case that from the time it went live

9     in March of 2007, it was having slow performance?

10    A.    That's correct.

11    Q.    Okay.  And when you came in, you felt the need to

12    actually go through a complete data center revitalization

13    project for Hodell to improve their hardware and their

14    network, correct?

15    A.    Their overall infrastructure, yes.

16    Q.    You were part of moving -- let me stay with one

17    other topic first.

18           We can agree that the -- while Hodell was

19    running Business One, Hodell was actually able to ship

20    product out in one or two days, right, from the time it

21    took an order to the time it made a shipment, that

22    happened in one or two days?

23    A.    That was the typical turnaround time, yes.

24    Q.    And you've told us before that that was considered

25    good performance for a business like Hodell?

1    A.    Yes.

2    Q.    But when you switched off of Business One, you went

3    to a product called Profit 21, correct?

4    A.    That is correct.

10:09:00  5    Q.    You were part of the selection process for Profit

6    21?

7    A.    I was.

8    Q.    And Profit 21 went live at Hodell in April of 2009,

9    correct?

10:09:10 10   A.    That's correct.

11   Q.    Let's talk about what happened on Profit 21.  You'd

12   agree with me that Hodell's productivity plummeted

13   because of Profit 21, right?

14   A.    At one point it did, yes.

10:09:23 15   Q.    Well, let's go through it.

16             Bob, pull up Exhibit 325, please.  And,

17   sir, this is at Tab 3 of the binder.  Bob, blow up the

18   top part, please.

19             We see here, sir, an e-mail from Mr. Kevin

10:09:52 20   Reidl to a woman named Kathy Crusco.

21             Who was Ms.  Crusco?

22   A.    I believe she was the person we coordinated our

23   payments to at Activant.

24   Q.    Okay.  So she was a person involved with Profit 21?

10:10:11 25   A.    Correct.

1    Q.    Activant, just so everybody understands, was the

2    company from which you purchased the Profit 21 software?

3    A.    That is correct, sir.

4    Q.    All right.  So this is an e-mail to Profit 21,

10:10:18 5    basically?

6    A.    Yes.

7    Q.    And you were copied on this?

8    A.    Yes.

9    Q.    And it's September 25th, 2009, so what are we

10:10:24 10   talking, some four months after, five months after you

11   guys went live on Profit 21, correct?

12   A.    Thereabouts, yes.

13   Q.    All right.

14         And what Mr. Reidl wrote was, "I agreed to

10:10:39 15   pay the balance" and he goes on, "Of the $48,000

16   installment payment."  And I'll skip down.  "Our

17   business" -- do you see in the middle of this paragraph

18   -- "our business is off 25% but our head count is up

19   since the day we went live on Profit 21."

10:11:00 20         Do you see that?

21   A.    I do.

22   Q.    Do you agree with Mr. Reidl?

23   A.    I was not personally involved with what the head

24   count was, and I didn't see the actual books to make this

10:11:10 25   determination.  I would just trust this as given.

1    Q.    Okay.

2              Mr. Reidl goes on to write, "Any efficiency

3    we had" and you understood he was talking about

4    efficiencies over the last couple years using other

10:11:20  5    software, right?

6    A.    That may be how you could interpret this.

7    Q.    And the other software for the last couple years

8    was Business One and In-Flight and Radio Beacon, right?

9    A.    Yes.

10:11:32 10    Q.    Okay.  He writes, "Any efficiency we had using

11    Business One and In-Flight and Radio Beacon has vanished

12    with the implementation of this software," referring to

13    Profit 21, right?

14    A.    Yes.

10:11:44 15    Q.    Okay.  And he's telling them in the sentence above,

16    "The Profit 21 system does not currently work."

17              Do you see that?

18    A.    I do see that.

19    Q.    Okay.  And you actually agreed with what Mr. Reidl

10:12:00 20    was saying to Profit 21, right?

21    A.    At the time, there were problems with the way that

22    the warehouse component of the software was working, so

23    yes.

24    Q.    And then --

10:12:11 25    A.    It impacted them greatly.

1    Q.    And in the view of you and Mr. Reidl, because of

2    Profit 21, you had lost the efficiencies that you had on

3    Business One, correct?

4    A.    We had lost efficiencies, yes.

10:12:20 5    Q.    And you had increased head count on Profit 21?

6    A.    That's what's stated here.

7    Q.    And your business dropped off by 25%, right?

8    A.    That is what's stated here.

9    Q.    And you actually made very similar statements in

10:12:34 10    writing to other folks at Profit 21, didn't you, sir?

11    A.    I did.

12    Q.    All right.  Let's look at that.  Exhibit 327, Bob.

13    Let's blow up the top part so we can just understand what

14    we're looking at.

10:12:57 15           Sir, this is Tab 1 in your binder.

16    A.    Tab 1.  Thank you.

17    Q.    This is an e-mail chain between yourself and a

18    person named Jay Sheldon in January of 2010, correct?

19    A.    That is correct.

10:13:16 20    Q.    Who is Jay Sheldon?

21    A.    Jay Sheldon was the project manager at Activant in

22    charge of our project.

23    Q.    All right.

24           Let's go to the very bottom of the first

10:13:28 25    page, and I just want you to see the e-mail header and

2774

1    then we'll work into the next page where your actual

2    e-mail exists?

3                    Do you see right there?

4    A.    I do, sir.

10:13:36 5    Q.    Okay.  E-mail from you, and if we scroll down, we

6    see it's to Mr. Sheldon on January 15th, 2010, right?

7    A.    That is correct.

8    Q.    Now, this is nine or ten months after Hodell went

9    live on Profit 21, correct?

10:13:53 10    A.    Approximately.

11    Q.    Okay.  So about the equivalent time that Hodell had

12    been live on Business One when you joined Hodell in

13    November of 2007, right?

14    A.    That's correct.

10:14:08 15    Q.    Okay.

16                    And so your e-mail to Mr. Sheldon

17    concerning Profit 21 comes about nine or ten months after

18    you went live on that software?

19    A.    That is correct.

10:14:18 20    Q.    Okay.  Let's look at what you wrote to Mr. Sheldon

21    in January of 2010.

22                    And just, let's back up so that everybody

23    understands without having to go through everything in

24    the e-mail, you were having a dialogue with Mr. Sheldon

10:14:32 25    where he was soliciting your feedback as to whether you

```
           1    were happy with Profit 21, right?

           2    A.    That's correct.

           3    Q.    Okay.  And your e-mail that we're about to look at

           4    is your response to Mr. Sheldon's solicitation of

10:14:44   5    feedback about Profit 21?

           6    A.    Yes, sir.

           7    Q.    All right.  Let's look at what you write.

           8                You write, in the second line, "The product

           9    has potential."  You're talking about Profit 21?

10:14:56  10    A.    Yes.

          11    Q.    Okay.  "The product has potential but is ruining

          12    our business."

          13                That's what you wrote?

          14    A.    Yes.

10:15:04  15    Q.    "Especially WWMS."

          16    A.    Correct.

          17    Q.    And that refers to the warehouse management piece

          18    of this?

          19    A.    That is correct.

10:15:13  20    Q.    And just like on Business One plus In-Flight plus

          21    Radio Beacon, with Profit 21, you were going to have

          22    software as part of this that would manage functions in

          23    the warehouse?

          24    A.    That's correct.  The WWMS is equivalent to the

10:15:24  25    Radio Beacon component.
```

1   Q.    You helped me out there.

2   A.    Of the Business One.

3   Q.    That saves us a little bit of time.

4         So here in January of 2010, you're

10:15:34 5   complaining to Mr. Sheldon about the warehouse management

6   functions within Profit 21?

7   A.    Yes, sir.

8   Q.    Let's go on.

9         You write, "I hope the product grows up

10:15:44 10   soon.  I'd love to recommend Profit 21 to my friends, but

11   how do I show them the reduced productivity?"   And then

12   in parens you gave them some figures.  "50% lower than

13   our all-time lowest levels."

14         Do you see that?

10:16:03 15   A.    I do.

16   Q.    And you wouldn't have written that to Mr. Sheldon

17   in an e-mail like this if this wasn't true, would you?

18   A.    No, sir.

19   Q.    So we can agree that some nine or ten months into

10:16:16 20   the Profit 21 implementation, you and Mr. Reidl are both

21   writing to Profit 21 and telling Profit 21 things like

22   your head count has gone up, right?

23   A.    Yes.

24   Q.    Productivity levels have dropped?

10:16:29 25   A.    Yes.

1    Q.    And your business is suffering, it is off because

2    of Profit 21, right?

3    A.    That's true as well, yes.

4    Q.    Okay.  And those were drops after you went off of

5    Business One, correct?

6    A.    Correct.

7    Q.    And, in fact, as you told Mr. Sheldon, Profit 21

8    caused you to go 50% lower than your all-time lowest

9    productivity levels, right?

10   A.    That's what it says, yes.

11                   MR. STAR:  I have no other questions.

12                   THE COURT:  Any redirect?

13                   MR. CARNEY:  Briefly, Your Honor.

14           REDIRECT EXAMINATION OF JOSEPH VISLOCKY

15   BY MR. CARNEY:

16   Q.    Mr. Vislocky, you testified on cross-examination

17   that you exchanged out some switches from ten to a

18   hundred.

19                   What was that all about?

20   A.    Network switches are devices where all of the

21   various computers in an environment come together and

22   then are relayed to the servers.

23   Q.    And did switching out the servers, as you testified

24   to, improve the performance of Business One?

25   A.    Are you asking about the servers or the switches,

1    sir?

2    Q.    I'm sorry, the switches.

3    A.    Could you repeat the question then?

4    Q.    I'm sorry.  Did exchanging the switches improve the

5    performance of Business One?

6    A.    It did not.

7    Q.    You testified about the purchase of a new four-way

8    server as part of upgrading the overall system.

9                Do you recall that testimony?

10   A.    Yes, sir.

11   Q.    And you did that, correct?

12   A.    I did.

13   Q.    And was that upgraded when -- upgraded when

14   Business One was still operating at Hodell?

15   A.    It was, yes.

16   Q.    And did this four-way server improve the

17   performance of Business One?

18   A.    It did not.

19   Q.    You testified -- well, strike that.

20                You testified that Hodell's server and SQL

21   were struggling, SQL server were struggling in March of

22   2008, and as a result, Hodell made the investment to

23   improve those servers.

24                Do you recall that testimony?

25   A.    That's correct.  Yes.

2779

1      Q.    And was that the four-way server that you testified

2      to?

3      A.    Yes.

4      Q.    Okay.

10:19:21    5            And again, that investment didn't improve

6      the performance of Business One, correct?

7      A.    It did not.

8      Q.    You had some discussion about Profit 21, the

9      software system that replaced Business One, correct?

10:19:43   10    A.    I'm sorry, could you repeat the question?

11     Q.    Sure.  Mr. Star was asking you about Profit 21.

12            Do you recall that?

13     A.    Yes.

14     Q.    Profit 21 was the software system that replaced

10:19:56   15    Business One at Hodell-Natco, correct?

16     A.    That is correct.  Yes.

17     Q.    And when Profit 21 was implemented, you just

18     testified about certain performance issues, particularly

19     in the warehouse area, correct?

10:20:14   20    A.    That's correct.

21     Q.    Could you explain briefly what those issues were?

22     A.    A great deal of what Hodell-Natco does as part of

23     their processing in the warehouse is what is known as

24     secondary processing in the terminology of Profit 21.

10:20:34   25            And that process is taking raw materials

         1    that are in bulk from stock, from inventory, and then

         2    converting them to other package types.  So I could take

         3    bulk product and repackage it as packs of fifties or

         4    packages, boxes of 100.

10:20:55 5                    And then those would be a different SKU, a

         6    different part number, than the actual bulk product from

         7    which it was taken.

         8                    So the secondary process is taking one

         9    particular SKU and converting it into another SKU through

10:21:10 10   some process.

        11    Q.    Now, is what you're describing a functionality,

        12    functionality component of the software?

        13    A.    Of Profit 21, yes.

        14    Q.    Was that eventually corrected?

10:21:22 15   A.    It was, yes.

        16    Q.    So it's your testimony that those issues were

        17    resolved?

        18    A.    They were.

        19    Q.    When you departed from your employment at

10:21:43 20   Hodell-Natco, was Hodell still operating Profit 21?

        21    A.    Yes, they were.

        22    Q.    And when was that?

        23    A.    That was in April of 2013.

        24    Q.    And how was it operating at the time of your

10:21:58 25   departure?

```
 1    A.    It was operating --

 2                    MR. STAR:  Objection.  Foundation.

 3                    THE COURT:  Overruled.

 4    A.    It was operating quite well.  It was fine.

 5                    MR. CARNEY:  Okay.  No further questions,

 6    Your Honor.

 7                    THE COURT:  Anything?

 8                    MR. STAR:  Let me confer a moment.

 9                    (Pause)

10                    MR. STAR:  No other questions.

11                    THE COURT:  Thank you.  Thank you.  You're

12    excused, sir.

13                    THE WITNESS:  Thank you.

14                    (Witness excused)

15                    THE COURT:  Okay, folks, we'll take a short

16    recess at this time.  We're getting there.  And keep in

17    mind the admonition.

18                    (Jury out)

19                    (Recess taken)

20                    (Proceedings resumed in presence of the

21    jury as follows:)

22                    THE COURT:  You may be seated, folks.

23                    You may call your next witness.

24                    MR. CARNEY:  The Plaintiff calls Mr. Otto

25    Reidl.
```

1          THE COURT:  Mr. Reidl, you may have a seat.

2                    OTTO REIDL,

3      of lawful age, a witness called by the PLAINTIFFS,

4           being previously duly sworn, was examined

10:40:33  5                and testified as follows:

6        DIRECT EXAMINATION OF OTTO REIDL (REBUTTAL)

7   BY MR. CARNEY:

8   Q.    Mr. Reidl, you heard Mr. Osborne testify that he

9   found no evidence of lost profits because he found no

10:41:06 10  evidence of lost sales, lost customers, or lost orders.

11                Do you recall that testimony?

12  A.    Yes, I do.

13  Q.    Is your calculation for lost production seeking

14  damages for lost profits in this case?

10:41:21 15  A.    No, we did not.

16  Q.    Thank you.

17                You heard Mr. Osborne testify that

18  Hodell-Natco did not consider other factors, such as the

19  state of the economy or competition that may have had an

10:41:38 20  effect on your company's performance?

21                Do you recall that testimony?

22  A.    Yes, I do.

23  Q.    Why didn't you take into account your competition

24  as being a factor in your company's performance?

10:41:49 25  A.    We did not make any claims for lost sales, lost

1    customers, or lost orders.

2              We looked at the business that we had,

3    which has taken into account the competition, and looked

4    at what it would take to provide that product to our

10:42:13  5    customers, to operate our business.

6    Q.    So the business you had, it's because you beat out

7    your customers, correct?

8    A.    That is correct.  That's business we had.

9    Q.    Why didn't you take into account the economy as

10:42:28 10    being a factor in your company's performance?

11    A.    Again, we looked at the business we had.  We did

12    not look at claims for lost sales, lost customers, or

13    lost orders.

14              We looked at the business we had in hand

10:42:46 15    and the effort it took to provide that service to our

16    customers.

17    Q.    Thank you.

18              MR. CARNEY:  Your Honor, may I approach the

19    witness.

10:42:59 20              THE COURT:  Oh, sure.

21              MR. CARNEY:  Your Honor, I'm going to be

22    asking Mr. Reidl about Exhibit 1001, which is the poster

23    board that is to your left in front of the jury, and I

24    know it's going to be on the screen for the jury and

10:43:33 25    others, but I do have hard copies of it that I would

1    prefer giving to the jury simply because it's easier to

2    read.

3                    THE COURT:  Go ahead.

4                    MR. CARNEY:  Thank you.

10:43:51 5            MR. STAR:  Your Honor, I object to this.

6    This was part of their case in chief.  He's going to

7    recalculate the same things.

8                    THE COURT:  This is rebuttal now.  What are

9    you going to do with it?

10:44:00 10           MR. CARNEY:  I'm going to address some of

11   the contentions that were made by Mr. Osborne in his

12   testimony.

13                   THE COURT:  Okay.  Go ahead.

14   BY MR. CARNEY:

10:44:23 15   Q.    Mr. Reidl, you heard Mr. Osborne's testimony that

16   sales and administrative or office expenses were

17   increasing sharply since 2002, and he insinuated that

18   this was an indication of mismanagement.

19                   Do you recall that testimony?

10:44:38 20   A.    Yes, I do.

21   Q.    Is that accurate?

22   A.    No, it is not.

23   Q.    Why not?

24   A.    Because if you look at the sales and administrative

10:44:50 25   expense --

1    Q.    Now, let me stop you.

2                That's in the -- that's in the middle of

3    the -- sales and admin expense is in the middle of the

4    left column of Exhibit 1001?

10:45:03 5    A.    Correct.

6    Q.    Okay.  Go on.

7                Mr. Reidl, why, why was his statement

8    inaccurate?

9    A.    Because you need to look at sales and

10:45:23 10   administrative expense as a percent of gross sales.

11   Q.    And what happens if you do that?

12   A.    The expense, we can demonstrate by doing the

13   calculation, declined from 2002 to 2006, and then

14   increased as a percent of sales for the period 2007,

10:45:47 15   2008, and first quarter of 2009.

16   Q.    So, for example, if you take the sales and

17   administrative expense figure for 2002, which was

18   $5,106,878, and divide it by the gross sales for 2002,

19   what would be the percentage?

10:46:14 20               MR. CARNEY:  And, Your Honor, I provided

21   him with a calculator to do that.

22   A.    Comes out 20.5%.

23   Q.    Can you do the same calculation for 2003?

24   A.    It comes out 19.2.

10:46:48 25   Q.    Can you do the same calculation for 2004?

```
          1    A.   17.4.

          2    Q.   Can you do the same calculation for 2005?

          3    A.   16.2.

          4    Q.   Can you do the same calculation for 2006?

10:47:42  5    A.   16.5.

          6    Q.   So there was a little increase from 2005 to 2006?

          7    A.   Correct.

          8    Q.   What was that attributed to?

          9    A.   The --

10:48:00 10              MR. STAR:  Objection.  Foundation.

         11    A.   -- training activities --

         12              THE COURT:  Overruled.

         13    A.   -- related to implementation of SAP Business One.

         14    Q.   Thank you.

10:48:07 15              Can you go on to 2007?

         16              Can you do the same calculation?

         17    A.   Yes.  18.1.

         18    Q.   How about 2008?

         19    A.   I'm not the world's fastest typist.  17.5.

10:49:11 20    Q.   And how about the first quarter of 2009?

         21              MR. STAR:  Objection.  Relevance.

         22              THE COURT:  Overruled.

         23    A.   All right.  That's wrong.

         24              18.3.

10:49:53 25    Q.   And what do you attribute the increased percentage
```

```
 1    for 2007, 2008, and first quarter of 2009 to?
 2                    MR. STAR:  Objection.  There's no
 3    foundation.  He's talking about a one-line high-level
 4    item on an overall document.
 5                    THE COURT:  I know.  I think you can
 6    cross-examine on that.
 7                    Go ahead.
 8                    MR. CARNEY:  You can answer.
 9    A.    That is due to the implementation of SAP Business
10    One and the impact it had on the efficiency of operating
11    our company.
12    Q.    Thank you.
13                    What's the metric by which Hodell-Natco
14    measures performance?
15    A.    Profit before tax.
16                    MR. STAR:  Objection.  Relevance.  Calls
17    for expert opinion.
18                    THE COURT:  Yeah, overruled.
19                    Go ahead.
20    Q.    Is this the same metric the U.S. Government uses to
21    measure profitability?
22                    MR. STAR:  Objection, Your Honor.
23                    THE COURT:  The objection's sustained.
24    Q.    Do you sign the tax returns for Hodell-Natco?
25    A.    Yes, I do.
```

2788

```
         1    Q.    And what do you report to the federal government?

         2    A.    The line that's listed as profit before tax.

         3    Q.    Thank you.  Now, if you look at profit before tax

         4    for 2006, how much money did Hodell-Natco earn?

10:51:15 5    A.    The profit before tax was $1,506,952.

         6    Q.    And what did it earn in 2007 under Business One?

         7    A.    $424,603.

         8    Q.    And what did it earn in 2008 under Business One?

         9    A.    $869,393.

10:51:37 10   Q.    So am I correct in saying that your profit before

         11   taxes in 2007 and 2008 combined was over $200,000 less

         12   than in 2006?

         13               MR. STAR:  Objection.  This was covered.

         14   A.    That's correct.

10:51:50 15               THE COURT:  Yeah, this is not rebuttal.

         16               MR. STAR:  This is not at all.

         17   BY MR. CARNEY:

         18   Q.    What do you attribute that to?

         19               MR. STAR:  Objection.

10:51:59 20               THE COURT:  Put a different subject.  This

         21   is all repetitive.

         22   BY MR. CARNEY:

         23   Q.    Okay.  We'll move down.

         24               Pounds shipped in 2007, do you see that?

10:52:16 25   A.    Yes.
```

1    Q.    What was it?

2                    MR. STAR:  Objection.  This was covered.

3                    THE COURT:  Again, why are we doing this?

4                    MR. CARNEY:  To show --

10:52:25  5          THE COURT:  It was already covered, wasn't

6    it, in his --

7                    MR. CARNEY:  I don't think what I was about

8    to do was covered by Mr. --

9                    THE COURT:  I think dollars was covered.

10:52:36 10          MR. CARNEY:  Then I'll move on.

11   BY MR. CARNEY:

12   Q.    You heard Mr. Osborne testify that he saw no

13   information on increased interest expense.

14                   Do you recall that testimony?

10:52:51 15   A.    Yes, I do.

16   Q.    Does Exhibit 1001 address the issue of interest

17   expense?

18   A.    Yes, it does.

19   Q.    And is interest expense listed in the left-hand

10:53:04 20   column?

21   A.    Yes, it is.  The fourth line -- actually eight

22   lines from the bottom.

23   Q.    What was Hodell-Natco's interest expense for 2008?

24   A.    $774,082.

10:53:28 25   Q.    And that was when it was operating Business One?

1    A.    Correct.

2    Q.    What was the interest expense for 2007?

3    A.    $838,671.

4    Q.    Now, let's take a look at the interest expense for

5    2004, 2005, and 2006.

6                See that?

7    A.    Yes.

8    Q.    What was the interest expense for 2004?

9    A.    $486,328.

10   Q.    What was the interest expense for 2005?

11   A.    $561,840.

12   Q.    And what was the interest expense for 2006?

13   A.    $667,181.

14   Q.    The interest expense for 2004, 2005, and 2006 is

15   much lower than 2007 and 2008.

16                Do you see that?

17   A.    Yes, I do.

18   Q.    And what do you attribute that to?

19                MR. STAR:  Objection.  Lacks foundation.

20                THE COURT:  Objection sustained.

21   BY MR. CARNEY:

22   Q.    Mr. Osborne testified on his examination that the

23   business must have -- Hodell's business must have changed

24   between 2002 and 2009.

25                Do you recall that?

1   A.    Yes.

2   Q.    Was the product mix for the products you buy and

3   ship different in 2007 than 2002, 2003, 2004, 2005, 2006?

4                MR. STAR:  Objection.  Calls for

10:55:24  5   speculation.

6                MR. CARNEY:  I think he knows his business,

7   Your Honor.

8                THE COURT:  All right.  Go ahead.

9                THE WITNESS:  Can I answer?

10:55:33 10                MR. CARNEY:  Yes, you can.

11   A.    We buy and sell commodity product which is steel.

12   That has not changed.

13                MR. CARNEY:  No further questions, Your

14   Honor.

10:55:46 15                THE COURT:  Anything?

16                MR. STAR:  May we confer for a moment?

17                THE COURT:  Yes.

18                MR. STAR:  Just a few questions, Your

19   Honor.

10:57:02 20                CROSS-EXAMINATION OF OTTO REIDL

21   BY MR. STAR:

22   Q.    Mr. Reidl, how are you?

23   A.    I'm fine.  Thank you.

24   Q.    All right.  It's still morning, so I'll say good

10:57:57 25   morning.

2792

1            Let's just go through quickly a couple

2     things that you talked about here.  This is the same

3     exhibit that your counsel just took you through.

4            He spent some time with you going through

10:58:05  5     the line item here that is called "Sales and Admin

6     Expense."

7            Do you see that?

8     A.    Yes.

9     Q.    And you've taken that line item from your

10:58:14 10     consolidated financial statements, right?

11     A.    Those are taken from the financial statements.

12     Q.    We can agree that there are a number of components

13     that make up what you've indicated here as sales and

14     Admin expenses, correct?

10:58:34 15     A.    Certainly.

16     Q.    Tell us what all the components are of Hodell's

17     sales and Admin expenses?

18     A.    Yes.  The sales and administrative expenses include

19     all of the office salaries, their benefits and

10:58:55 20     incentives.  That's the salary component.

21            And then below that line are corporate,

22     other corporate charges that include bad debt,

23     advertising, computer maintenance expenses and expenses

24     related thereto; travel, telephone and telegraph data

10:59:28 25     expenses that are related to the office; the independent

1    rep commissions; our auditor expenses; other professional

2    fees; legal expenses.

3    Q.    So like your legal fees in this case?

4    A.    Pardon?

10:59:51  5    Q.    Like legal fees that you have for your lawyers?

6    A.    You bet.

7    Q.    Yeah.

8    A.    Yeah.

9    Q.    Okay.  So you gave us -- you give us one line

10:59:59 10    item --

11    A.    Yes.

12    Q.    -- that you call sales and administrative expenses?

13    A.    Let's make something clear.  There aren't a lot of

14    legal expenses in these figures.

11:00:07 15    Q.    Sir, I didn't ask you that question.

16    A.    Right.

17    Q.    I didn't ask you that question.

18           You gave us one line item called sales and

19    Admin expense?

11:00:14 20    A.    That's correct.

21    Q.    Okay.  And what you just told us, that within that

22    number, it includes things like office salaries,

23    benefits, compensation for your workforce, right?

24    A.    Correct.

11:00:26 25    Q.    What you called corporate charges, including travel

1    expenses, telephone and data charges and those sorts of

2    things?

3    A.    That's correct.

4    Q.    Independent representative commissions, those,

11:00:41 5    those are those third-party sales agents that we talked

6    about last week, right?

7    A.    They're independent reps.

8    Q.    When they make a sale, you pay them a commission

9    and then you throw that on your books?

11:00:53 10    A.    When they bring an order.

11    Q.    Sir -- fine.  When they bring in an order, you pay

12    them a commission?

13    A.    When it's invoiced.

14    Q.    You pay them a commission, right?

11:01:03 15    A.    Correct.

16    Q.    Thank you.  And in your books, you show the

17    commission to these third-parties under your sales and

18    Admin expenses?

19    A.    Correct.

11:01:12 20    Q.    What other expenses fall within your one-line item

21    of sales and Admin expenses?

22    A.    I thought I enumerated them good in my --

23    Q.    Was that exhaustive?  Were you done with your list?

24                You said auditors on top of it and legal

11:01:30 25    fees?

1    A.    Travel, the telephone and telegraph, there's some

2    insurance expense.

3    Q.    All right.

4    A.    Those are the major ones.

11:01:46 5    Q.    Fine.  There might even be others, right?  You just

6    can't recall them off the top of your head?

7    A.    Well, there's depreciation, but that's not a cash

8    item.

9    Q.    But all that stuff is in your sales and Admin line

11:01:57 10    item?

11    A.    Yes.

12    Q.    Okay.  And you've not given us a breakdown of what

13    any of those costs were in any particular year.  You've

14    just given us a single line item, correct?

11:02:07 15    A.    I didn't prepare this item here.

16                We provided financial statements that

17    provide that detail.

18    Q.    I'll tell you, you didn't.

19                You're not sitting up here on this -- let's

11:02:18 20    just step back, right?

21                We've been through this before.  You've

22    been front and center in this litigation since it started

23    in November of 2008.  You gave a deposition years ago

24    concerning your personal damages calculation, and you

11:02:34 25    even testified in front of this jury last week about how

1    you tried to calculate damages, but still here today, you

2    go back and have reloaded and point to this one line item

3    of sales and administrative expenses but you don't give

4    us or the jury any of the breakdown of what those

11:02:50  5    expenses are, do you?

6    A.    Not in this chart.

7    Q.    Okay.  And you haven't shown them documents that

8    have that breakdown, have you?

9    A.    I'm sorry?

11:03:00 10    Q.    You have not shown the jury documents that have

11    that breakdown, have you?

12    A.    I haven't personally, no.

13    Q.    Let's just talk about one of the categories that

14    you say is included within your sales and Admin expenses.

11:03:12 15          You told us it's office salaries, benefits,

16    those sorts of things.

17          That includes people like you, right?

18    A.    That is correct.

19    Q.    Your salary?

11:03:21 20          It includes Kevin's salary?

21    A.    Absolutely.

22    Q.    It includes Mr. Rex's salary?

23    A.    Yes, it does.

24    Q.    Okay.  And you've not given us a breakdown of the

11:03:29 25    various salaries or increases or decreases for any

1    particular employee within the company over the years

2    that you just reviewed with your counsel, have you?

3    A.    No, I have not.

4    Q.    And you said, this is an interesting one, you said

11:03:44 5    it includes benefits.  That would be health care, right?

6    A.    Absolutely.

7    Q.    Okay.  So when you just went through with your

8    attorney the ratio or percentage of your sales and admin

9    expenses over your gross sales between the period of 2003

11:04:01 10    through the end of the first quarter of 2009, you didn't

11    break out for the jury what kind of increases, for

12    instance, in healthcare costs, Hodell had over those

13    years, did you?

14    A.    No, I did not.  They're required for hiring

11:04:16 15    employees.

16    Q.    Right.  So those kinds of -- let's just pause for a

17    second.

18              You and I can agree, I mean everybody knows

19    it, that over the years that you're looking at here, 2002

11:04:26 20    through 2008, healthcare costs in this country have sky

21    rocketed, right?

22              MR. CARNEY:  Objection.

23              THE COURT:  Overruled.

24    A.    That's your term.

11:04:37 25    Q.    They've sky rocketed, haven't they, sir?

```
          1    A.    They've increased.

          2    Q.    And you know that because you're dealing with the

          3    benefits that you give to your employees?

          4    A.    That is correct.

11:04:44  5    Q.    You're working with the Blue Crosses, Blue Shields

          6    of the world to go out and get a benefits plan and

          7    negotiate the terms of those plans, right?

          8    A.    That's correct.

          9    Q.    And like every other person and company in America,

11:04:59 10    Hodell's healthcare costs and benefit costs have gone up

         11    every year from 2002 through 2008, right?

         12    A.    I believe that's correct.

         13    Q.    And that has zero to do with your software, right?

         14    A.    It has everything to do with our software.

11:05:19 15    Q.    These --

         16    A.    We need to employ --

         17    Q.    Your costs, your costs for healthcare premiums are

         18    impacted by the software you run, is that -- you're going

         19    to look at this jury and tell them that?

11:05:30 20    A.    All our costs in operating our business are

         21    required to operate it.  We wouldn't have them otherwise.

         22    Q.    I won't even go into it any further.

         23          And you've not given us, of course, a

         24    breakdown here of what your benefits, even your benefits

11:05:57 25    payments were for any particular employee for each of
```

1    these years in question, have you?

2    A.    No, we have not.

3    Q.    Thank you.  You looked at another line item which

4    was your interest expense, which is two down from the

11:06:21 5    highlighted one on the page there, Bob.

6                Sir, we can agree that like your sales and

7    admin expense line item, you've just given us a single

8    line item entry here with no breakout and no detail of

9    what your interest expenses were, correct?

11:06:43 10    A.    Those interest expenses come right out of our

11    general ledger.

12    Q.    You've given us the top line number without any

13    detail, correct?

14    A.    Correct.

11:06:56 15    Q.    And let's just go through and see if we can agree

16    on some basic things.

17                Even if we look back in 2002, Hodell was

18    paying interest expenses of over half a million dollars a

19    year, correct?

11:07:09 20    A.    Correct.

21    Q.    So we can agree that back in 2002, that interest

22    expense had absolutely nothing to do with SAP or Business

23    One?

24    A.    That's correct.

11:07:20 25    Q.    Okay.  So even then, Hodell had a history of

1    borrowing money and in carrying interest expenses, right?

2    A.    That's how the business operates.

3    Q.    Very good.  And, in fact, you've always borrowed

4    money and incurred interest expense, right?

11:07:38 5    A.    That needs to be expanded.

6                When we have an after-tax profit --

7    Q.    Sir, sir, let's just go through it.

8                In every year on this chart, 2002, '3, '4,

9    et cetera, you've got listed there an interest expense

11:07:55 10    item, correct?

11    A.    Correct.

12    Q.    That means, very simply, that you were always

13    carrying debt and having to pay interest on that debt?

14    A.    That's correct.

11:08:01 15    Q.    And you were borrowing historically for things that

16    had nothing to do with SAP or Business One, correct?

17    A.    No, that's not correct.

18    Q.    In 2002 --

19    A.    Before --

11:08:14 20    Q.    -- you're telling me you were borrowing money?

21    A.    No, you didn't ask me 2002.

22    Q.    I asked you historically.

23    A.    Okay.  All right.

24    Q.    Let's just establish, let's try not to argue here.

11:08:25 25    I'm trying to establish a very simple point.

1          We can agree that historically Hodell has

2    borrowed money for things that have nothing to do with

3    SAP or Business One, right?

4    A.    Up through 2003, that's correct.

11:08:38  5    Q.    And you're not telling this jury that the borrowing

6    and the interest expenses that you were charged from 2004

7    onward relate simply to SAP or Business One, are you?

8    A.    No, but part does.

9    Q.    Part.  Okay.  Thank you.

11:08:51  10          And you've not tried to give this jury any

11    breakdown of what so-called part you even try to

12    attribute to SAP or Business One, correct?  Yes or no,

13    have you given a breakdown?

14    A.    I -- yes, I did.

11:09:06  15          I gave a listing of the amount we spent

16    over the four years before we implemented it, three

17    years.

18    Q.    Somebody has their phone right up on a microphone

19    if we can move that, please.

11:09:18  20          No?  You said you gave a breakdown?  I mean

21    we're sitting here right now.  Where is that breakdown?

22    A.    You have the chart which shows our investment in

23    SAP Business One.

24    Q.    Okay.  Let's just step back?

11:09:35  25    A.    Now, let me explain something.

```
 1    Q.    Let's step back.

 2                When your attorney was examining

 3    Mr. Osborne, they analogized interest expenses to having

 4    a credit card, okay?  You heard that?

 5    A.    Yes.

 6    Q.    And you'd agree that like having a credit card --

 7                MR. CARNEY:  Objection, Your Honor.  This

 8    is improper on rebuttal.  Well outside of what I --

 9                THE COURT:  You asked about the interest,

10    did you?

11                MR. CARNEY:  I did not ask him about credit

12    cards or anything like that.

13                THE COURT:  Well, go ahead.

14                MR. STAR:  Thank you.

15    BY MR. STAR:

16    Q.    Let's go back.

17                Like a person who would use a credit card,

18    you've run up the amount on your credit card by

19    purchasing various things, borrowing for different items,

20    correct?

21    A.    Correct.

22    Q.    Okay.  And if you don't pay off your monthly credit

23    card statement, your credit card company charges you

24    interest, right?

25    A.    That's correct.
```

2803

Q.    And they charge you interest on the whole amount
that you didn't pay, right?

A.    That's correct.

Q.    And just like on a credit card statement, you'd
have business records at Hodell that lists out the
different things that you purchased and borrowed for over
each calendar year and you could have given that
information to the jury, right?

A.    We have that information.

Q.    Thank you.

A.    We do not carry a cash account.  Every penny that
is left after tax is to reduce the bank debt.  If we
expend money today, we borrow money that day.  If we have
cash coming in, more than we need to cover all of the
checks that are written, that reduces debt.

          That's an ongoing cycle.

Q.    Okay.  I'm not sure what that last part was
responsive to, but we can agree that like a consumer that
would have a credit card statement showing all the things
you purchased and, therefore, borrowed money for, Hodell
would have records that would show each thing you
purchased and borrowed money for, right?

A.    No, that's not how it works.

Q.    You don't have those records?  You don't know what
you actually bought?

1    A.    We have records.  I just mentioned, we write a

2    check.  When we get an invoice, we print a check on the

3    system.  It goes against our bank account.  Our money

4    coming in goes to reduce the debt, and then that item is

11:11:55 5    drawn on the loan, but we don't actually tie it back to

6    that item.

7    Q.    Sir, a business like Hodell knows what it buys over

8    the course of a year, correct?

9    A.    I'm sorry?

11:12:08 10    Q.    A business like Hodell knows through its own

11    records what it spends money on over the course of a

12    year?

13    A.    That is correct.

14    Q.    Right.  And you can tell us and give us a breakdown

11:12:20 15    of what those things were over the course of each of

16    these years, correct?

17    A.    Correct.

18    Q.    But you didn't do that, did you?

19    A.    We gave you the total.

11:12:30 20    Q.    Thank you.

21                MR. STAR:  That's all I have.

22                THE COURT:  Any redirect?

23                MR. CARNEY:  No, Your Honor.

24                THE COURT:  Thank you, Mr. Reidl.  You're

11:12:36 25    excused.

```
 1                      (Witness excused)
 2                      THE COURT:  Anything further?
 3                      MS. LUARDE:  Just one moment, Your Honor.
 4                      (Pause)
11:12:56  5            MS. LUARDE:  May we approach, Your Honor?
 6                      THE COURT:  Yes.
 7                      (Side-bar conference had off the record)
 8                      THE COURT:  One more.  Okay.  You rest
 9      subject to our discussions?  Ms. Luarde, you're resting
11:14:38 10     subject to our discussions?
11                      MS. LUARDE:  Yes, Your Honor.
12                      THE COURT:  Okay.  Surrebuttal?  It's
13      called getting the last word in.
14                      (Laughter)
11:14:53 15            THE COURT:  That's a legal term I invented
16      that you all understand.
17                           GEOFFREY OSBORNE
18         of lawful age, a witness called by the DEFENSE,
19            being previously duly sworn, was examined
20                     and testified as follows:
21       DIRECT EXAMINATION OF GEOFFREY OSBORNE (SURREBUTTAL)
22      BY MR. KELLEHER:
23      Q.    Hello again, Mr. Osborne.
24      A.    Good morning.
11:15:09 25     Q.    Mr. Osborne, you were sitting just a few rows back
```

1    there in this courtroom when Mr. Reidl just testified?

2    A.    Yes, I was.

3    Q.    And you heard him testify about the sales and

4    administrative line on the summary exhibit that is in

11:15:25 5    front of the jury and that we're looking at on the

6    screens.

7              Did you hear him testify about that?

8    A.    Yes.  Yes, I did.

9    Q.    So this is -- this is a single line on this summary

11:15:38 10    document, right?

11    A.    It is a single line.

12    Q.    And if we look, starting in 2003, just at the

13    numbers, it looks like they go up over time, is that

14    right?

11:15:49 15    A.    Yes.  The trend is upward over time.

16    Q.    And you heard Mr. Reidl testify that within this

17    one summary line, there are multiple, multiple components

18    that aren't shown on this summary, right?

19    A.    Yes, there are multiple components.

11:16:34 20    Q.    So you heard Mr. Reidl testify that this line, this

21    single line here that's highlighted, includes things like

22    office salaries, benefits, incentives, bad debt,

23    advertising, maintenance, travel, telephone, I heard

24    telegraph charges, commissions, auditors fees, expenses,

11:16:35 25    legal fees, insurance expenses, and the compensation of

1       all of their executives.

2                   Did you hear that the same way I did?

3       A.    Yes, I did.

4       Q.    But again, nothing on the line that we're looking

11:16:51  5     at and nothing on the line that Mr. Reidl testified

6       about, which is the line that we're looking at, contains

7       the breakdown of all of those things I just mentioned,

8       right?

9       A.    No.  It's one single line.

11:17:02  10    Q.    Sir, have you had an opportunity -- let's take a

11      step back.

12                  This is a sum -- this is a summary of,

13      like, summary financial statements, right?

14      A.    Yes, it is.

11:17:11  15    Q.    But a company would have detailed backup to support

16      the summary that we're looking at on that line, right?

17      A.    Yes, there are detailed financial statements by

18      month for the company that gives you the details of all

19      those line items.

11:17:24  20    Q.    And, sir, you were able to review whatever Hodell

21      produced in terms of the backup documentation, right?

22      A.    Yes.

23                  MR. KELLEHER:  Your Honor, may I approach

24      the witness with that?

11:17:35  25                 THE COURT:  You may.

           1    BY MR. KELLEHER:

           2    Q.    I've got what they've marked as Exhibit 607.  I'll

           3    bring it up to you.

           4    A.    Thanks.

11:17:49   5    Q.    I'll give you a moment to familiarize yourself with

           6    that or refamiliarize yourself, as the case may be.

           7    A.    Yes, I recall this document.

           8    Q.    And just so we're clear, these are all the backup

           9    documentation -- well, strike that.

11:18:10  10                 Let me ask it a different way.

          11                 That stack, those papers that I just gave

          12    you, that detailed breakdown, does that contain the

          13    breakdown you'd need to link the increased expenses that

          14    we looked at on the sales and administrative line to

11:18:33  15    something that Business One caused?

          16    A.    Absolutely not.

          17    Q.    Can you -- I know it's a big document, but can you

          18    tell us why?

          19    A.    These, these are just listings of accounts.  Us

11:18:48  20    accountants like to record things in detail on the

          21    general ledger, I think Mr. Reidl talked about the

          22    general ledger, the basic books and records of the

          23    business.  Used to be in the old days, it was an actual

          24    ledger that you wrote in, but nowadays, it's an

11:19:01  25    electronic document, and all these various accounts would

1    be listed in there and the transactions are posted in

2    that account to accumulate costs to those details.

3                 But those are just accumulating costs that

4    are spent by the company with no earmarking or

11:19:15  5    identification as to the source or the reason of the

6    cost.  It's just the cost.

7                 So when you look at a line item, whatever

8    expense you're looking at, it just says that's what the

9    expense -- that's what the company incurred.  They may

11:19:28 10    pay it in a later month, but that's what they recorded

11    for that month, but there's nowhere in this document that

12    I would expect to or will you see anything that tells

13    you, well, what caused that expense for that month was

14    this cause or that cause.

11:19:41 15                 It's not in these documents.

16    Q.    So that breakdown that we're talking about that you

17    would need to determine whether all those things that

18    Mr. Reidl said are included in that one sales and

19    administrative line, it doesn't include the information

11:19:54 20    that you'd need to say what caused what, right?

21    A.    No.  It's -- as I explained in my testimony, it's a

22    study that has to be done.  You have to actually sit

23    down, get these documents and then do a good bit more to

24    come up with anything that would relate to a correlation

11:20:10 25    between a cost and a reason for the cost.

1    Q.    So the first part of that document, are those

2    Profit & Loss statements?

3    A.    Yes.

4    Q.    And for what years do you have Profit & Loss

11:20:24  5    statements?

6    A.    It starts for the year ended 12/31/02 and I believe

7    they're consecutive, although sometimes in different

8    formats, but they go up to through March, 2010.

9              Yes.  March 31st, 2010.

11:20:43 10   Q.    And those are all the Profit & Loss statements all

11   throughout there?

12   A.    They look to be Profit & Loss statements for all of

13   them, '6.  Trying to see if they're the whole year for

14   2007.

11:21:10 15             Yes, they seem to be the Profit & Loss

16   statements.

17   Q.    And in none of them does it contain the information

18   you would need to link any increase in sales and

19   administrative costs to Business One?

11:21:23 20   A.    No, there's no linkage or ability to do that off

21   these financial statements.

22   Q.    Sir, having heard all of the testimony of Mr. Reidl

23   and everything that you've heard up to this point, does

24   anything you've heard change your opinion as a

11:21:38 25   professional accountant and damages expert, as to the

1    amount of damages that Hodell suffered due to loss of

2    productivity?

3    A.    No.  My opinion is still there's no evidence of any

4    damages caused by Business One due to lost productivity.

5                MR. KELLEHER:  Thank you.  No further

6    questions.

7                THE COURT:  Any cross?

8                MR. LAMBERT:  No, Your Honor.

9                THE COURT:  Thank you, Mr. Osborne.

10               THE WITNESS:  Thank you, Your Honor.

11               (Witness excused)

12               THE COURT:  Betsy, don't leave.

13               THE CLERK:  All rise.

14               THE COURT:  In a minute.  Hang on.  Hang

15   on.

16               THE CLERK:  Sorry.

17               THE COURT:  I can see you.  I think you

18   have heard all the testimony you have heard in the case.

19   We have a lot of things to go over, the legal issues, all

20   the exhibits and everything else and rather than waste

21   your time, what we'll do is excuse you for the day.  I'll

22   have you back here, I have to check, I'm doing this.  I'm

23   sorry, but I'm picking up one of my children at the

24   airport tomorrow morning.

25               5:45 a.m. so we can do it.  Okay.

1    It is important that you probably, may or

2    may not have heard all the testimony.  You probably have.

3    But it's still important to keep an open mind not to form

4    or express any opinion about any aspect of the case, and

11:23:12  5    keep -- continue your open mind until tomorrow when you

6    hear the arguments of the lawyers and my instructions on

7    the law.

8    So pardon me, have a good afternoon and too

9    bad it's not sunny, you can be outside.  But we can't

11:23:27 10    give you everything.  Right, Mr. Panigutti?

11    A JUROR:  Right.

12    THE COURT:  We're trying.  And 8:15 on L-1

13    and you'll be in for a long day.

14    Have a good night.

11:23:39 15    THE CLERK:  All rise for the jury.

16    (Jury out)

17    THE COURT:  Okay.  Have a seat.

18    We can talk about Dr. Kennedy's testimony

19    if you want now, but if you want to tell us why you think

11:24:08 20    there's something different than what Judge Wells has

21    found and why that would be appropriate in rebuttal or

22    what he would testify in rebuttal, I'm happy to hear it.

23    MR. LAMBERT:  Sure, Your Honor.

24    Well, first of all --

11:24:26 25    THE COURT:  Speak into the microphone so

1    she can get it.

2                    MR. LAMBERT:  I'm sorry.

3                    The purpose of the proffer that we would

4    intend to make with Dr. Kennedy is twofold.

11:24:45  5                    At the out -- before the commencement of

6    the presentation of evidence, we had filed a motion to

7    reconsider Judge Wells' order, and as stated in that

8    motion, we think it was a clear error of law to exclude

9    Dr. Kennedy from testifying.

11:25:05 10                    And I understand that Your Honor has

11   expressed some opinions on that, and isn't inclined to

12   reconsider it, but just in the scintilla of opportunity

13   there and since he's here anyway, you know, we initially

14   would be proffering his testimony for that basis.

11:25:27 15                    So and I guess, in my opinion, it wouldn't

16   be truly rebuttal testimony in that regard because we

17   believe he should have testified in our case, and that

18   decision to exclude him which was made without the

19   benefit of a *Daubert* hearing was error.

11:25:51 20                    So that's the first aspect of that.

21                    The second aspect of it, though, as far as

22   rebuttal testimony, is Mr. Osborne got up and testified

23   about productivity and what the appropriate measures of

24   productivity are, and he testified about charts on gross

11:26:14 25   sales as being a proper measure of productivity, and that

1    Hodell's productivity was in decline before Business One;

2    that there's no evidence that Business One was the cause

3    of any productivity decline.

4              And Dr. Kennedy has a clearly contrary

11:26:39  5    opinion on that, and separating out the step in

6    Dr. Kennedy's opinion, which I believe was proper and I

7    think the law supports was proper, as to how he got to

8    the damages component, the first thing Dr. Kennedy did

9    was conduct a rigorous statistical analysis which

11:27:03 10   Mr. Osborne did not do; a rigorous statistical analysis

11   of Hodell's productivity for the time period leading up

12   to the implementation of Business One and then its

13   productivity while operating Business One.

14              And he found a very statistical relevant

11:27:23 15   correlation between -- a deviation in productivity

16   between those two time periods using what's called a

17   but-for analysis which is a universally accepted --

18              THE COURT:  All right.  But you're just

19   repeating what you argued to Judge Wells.

11:27:42 20              MR. LAMBERT:  What I just stated, I did

21   argue to Judge Wells and she found was appropriate.  She

22   found that the productivity analysis that Dr. Kennedy did

23   was reliable and accurate.

24              THE COURT:  Okay.  Here, let me just cut

11:27:59 25   you off.

1        I'm going to read part of Judge Wells'

2    opinion, and then if there's something different, I want

3    you to let me know.

4        MR. LAMBERT:  Okay.

11:28:07  5        THE COURT:  This is what she says, and I'm

6    reading in part from Page 6.

7        "Based on Dr. Kennedy's report, Hodell

8    experienced a productivity decline while using Business

9    One, since, on average, Hodell shipped fewer pounds of

11:28:23 10    product per hour over that period than it did in the five

11    years prior.  This conclusion seems reasonable enough,

12    and SAP does not actively dispute it.  The problem,

13    however, is that Hodell does not make a convincing case

14    that productivity levels, i.e. pounds of product shipped

11:28:41 15    per hour, bear a direct relationship to revenue and

16    profit.  That is to say, Dr. Kennedy cites no accepted

17    economic principle whereby an increase or decrease in

18    productivity necessarily causes a corresponding change in

19    revenue and profit.  Even if there were such a principle,

11:29:00 20    it appears that precisely the opposite happened here.

21        "As SAP points out, in 2008 while Business

22    One was running live, Hodell's productivity may have been

23    in decline, but it experienced a record year in gross

24    sales:  $43.8 million to be exact.  Moreover, Hodell's

11:29:19 25    gross profits for 2008, $8.6 million, significantly

1    exceeded the average for the previous five years, 7.16

2    million.

3              "Instead of attempting to explain these

4    facts, Dr. Kennedy divines a connection between

5    productivity decline and lost profits, based on the idea

6    that Hodell's unused productivity, had it been put to

7    use, could have resulted in more sales, which could have

8    meant more revenue, which could have meant more profit.

9              "This analysis, while interesting, says

10   nothing about sales and profit that would have occurred.

11   The missing piece, as SAP vigorously argues, is evidence

12   that there was a demand for Hodell's product commensurate

13   to the amount of product that could have been shipped."

14             And I'm going to skip the first sentence

15   because we didn't hear about that.

16              "Even Hodell's own expert conceded that

17   his report was built on the assumptions that Hodell had

18   customer demand for its product equivalent to the amount

19   of product that could have been shipped and that, but-for

20   the problems with Business One, those customers would

21   have bought additional product from Hodell.  Dr. Kennedy

22   conceded that he was unaware of any actual evidence

23   showing that there was additional demand for 4.2 million

24   pounds of Hodell's product.  So in the Court's view,

25   Dr. Kennedy's assumptions and the lack of evidence of

1    demand are fatal to the reliability of his opinion."

2              And then she quotes a couple cases that

3    talk about that.  And then near the end, it says, "To say

4    that Hodell had lost profits totaling $3,239,555

11:31:08  5    attributable to SAP simply because it had the capacity to

6    ship an additional 4.2 million pounds of product is pure

7    speculation."

8              On the next page, she says in the first

9    paragraph, "To make the connection between productivity

11:31:35 10    decline and lost profits, Hodell must provide evidence of

11    demands for its product."

12             And she says, "The Court also rejects the

13    proposition that Hodell should be allowed to establish

14    the factual predicates for Dr. Kennedy's testimony at

11:31:48 15    trial."

16             And these are her words.  Apparently this

17    is before her.  "Hodell maintains that its sales staff

18    will testify to lost sales and canceled orders, which

19    would purportedly demonstrate to the jury that a demand

11:32:02 20    for 4.2 million pounds of its product did exist, thus

21    substantiating Kennedy's opinion."

22             Of course, then she says that turns the

23    Rule on its head.

24             She talks about the but-for.  "The

11:32:26 25    reliability of an expert opinion may turn on whether the

1    expert properly accounts for causal factors other than

2    the Defendant's unlawful behavior.  In the present case,

3    Dr. Kennedy's but-for analysis fails to account for any

4    number of factors which may have caused or contributed to

11:32:42  5    Hodell's decline in productivity, most notably, the

6    absence of demand for Hodell's product."

7            And finally she says, "The Court rejects

8    Hodell's claim that Dr. Kennedy's analysis is consistent

9    with the 'before and after' method of determining lost

11:32:56 10    profits.  It is undisputed that the 'before and after'

11    method is a widely accepted method, and a treatise cited

12    by Hodell describes it as follows:

13            "The method compares the Plaintiff's

14    performance before the event or action causing lost

11:33:11 15    profits to the Plaintiff's performance after that event

16    or action.  The underlying theory is that, but-for the

17    Defendant's action, the Plaintiff would have experienced

18    the same level of revenues and profits after the event or

19    action as the Plaintiff did before that event or action."

11:33:28 20            Then she cites a bunch of cases.  And then

21    she says, "What these cases and nearly every 'before and

22    after' case the Court has reviewed have in common is the

23    sort of parameter used to measure loss.  Each case looks

24    to either sales or profit during the damages period as

11:33:45 25    compared to sales or profit during a benchmark period.

1    The difference between the two provides a measure of lost

2    profits or lost sales.

3              "Thus, hypothetically, if a Plaintiff

4    averaged $500 profit per month during the damages period,

11:34:00  5    and 1,000 per month during the benchmark period, the

6    Plaintiff has suffered an average profit loss of $500 per

7    month.  This loss, after adjustments for any applicable

8    causal factors, may then be attributed to the Defendant,

9    provided liability is established.

11:34:17 10              "And while Dr. Kennedy claims to use the

11    'before and after' method to ascertain Hodell's damages,

12    Dr. Kennedy's analysis does not resemble the 'before and

13    after' method as it is commonly described in the case law

14    and treatises.

11:34:30 15              "Instead of looking directly at sales or

16    profit, the financial parameters with which Hodell is

17    actually concerned, Dr. Kennedy considers productivity, a

18    parameter whose connection to sales and profit is not

19    entirely clear.  Dr. Kennedy may characterize his

11:34:45 20    analysis as a 'before and after' analysis, but after

21    several opportunities to do so, Hodell has failed to

22    provide any authority supporting the idea that

23    productivity is an accepted and reliable parameter for

24    determining lost profits in the 'before and after'

11:35:02 25    analysis.

1           "Therefore, the Court rejects the idea that

2      his methodology is sound, simply because he calls it a

3      'before and after' analysis."

4           So I haven't heard -- you haven't said

11:35:12  5      anything that's any different than that.

6           MR. LAMBERT:  Well, Your Honor, let's start

7      off with the comment that there's nothing tying

8      productivity to a decline in the profits of the business.

9           That's been -- that's been clearly

11:35:28 10      established in this case that even by Mr. Osborne

11      acknowledges, that productivity can tie into the profits

12      of a business.

13           THE COURT:  Of course, it's possible but so

14      here's the thing, and I've been pretty patient all along,

11:35:47 15      I've been trying to follow this, but according to the

16      information that you presented to Judge Wells was that

17      you asked, well, even if you didn't show that you lost

18      sales or had orders that went unfulfilled because of

19      Business One, that give you time and you would do that

11:36:05 20      during the trial.  Well, we haven't had any testimony to

21      that.

22           MR. LAMBERT:  The argument that was made to

23      Judge Wells was in the analysis that Dr. Kennedy does, he

24      is not calculating particular lost sales and particular

11:36:18 25      lost customers; he's calculating what happened before.

            1              THE COURT:  Okay.  We're repeating

            2    ourselves.  I read that part in the but-for analysis.

            3              MR. LAMBERT:  Right.

            4              THE COURT:  And that doesn't apply here.

11:36:32    5    I'm following Judge Wells.

            6              So unless you have something different, you

            7    can put something on the record if you want, the Defense

            8    can, because I haven't seen anything different that would

            9    change my mind about Dr. Kennedy.

11:36:41   10              MR. LAMBERT:  That's fair.

           11              The only thing that I would ask, though,

           12    then, is if the Court would potentially allow us to

           13    present the first part of his analysis, that is the

           14    productivity calculation, independent of the actual

11:36:56   15    damage component, but the productivity calculation as

           16    rebuttal to what Mr. Osborne testified to.

           17              THE COURT:  No.  I don't see it.  I don't.

           18              All right.  Here, I'll meet you guys here

           19    at 1:30 and then I want to talk over what the

11:37:11   20    instructions are going to be and what the claims are, and

           21    the damage issue.

           22              Now, the Plaintiff did submit this morning

           23    what he believes are the oral representations that were

           24    made by SAP to Hodell that would induce them.

11:37:32   25              MR. STAR:  Sorry, Your Honor, we're -- I

1      don't think we --

2                    THE COURT:  I don't mean oral.  I mean the

3      documents.

4                    MR. STAR:  Yes.  Okay.  Thank you.

5                    THE COURT:  I don't think you disagree with

6      what they put in their brief but you can look at it.

7                    MR. STAR:  Okay.  We will take a look at

8      it.

9                    THE COURT:  Because whatever, if we get to

10     that point, whatever the actual -- whatever you're

11     relying on, the documents you're relying on have to be

12     part of the charge so the jury knows exactly what we're

13     talking about.

14                   MR. LAMBERT:  I guess I tried to make it

15     clear in the brief, Your Honor.

16                   THE COURT:  I think you did, yes.

17                   MR. LAMBERT:  It's not just the written

18     representations, though.

19                   THE COURT:  We'll get to that because you

20     signed the license agreement, too.

21                   MR. LAMBERT:  Okay.  The client signed the

22     license agreement, yes.

23                   THE COURT:  Well, that's what I meant,

24     right.

25                   I know you didn't.

2823

1              MR. STAR:  And just to be clear, we

2    obviously take the position that those three documents

3    that they cite as the, you know, marketing literature

4    that they claim was false isn't false and doesn't support

11:38:28  5    the claim.

6              THE COURT:  I know you say that.

7              MR. STAR:  Very good.

8              THE COURT:  All right.  We'll see you at

9    1:30 or thereabouts.

11:38:42 10              (Proceedings adjourned at 11:38 a.m.)

11                    - - - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>TUESDAY, JUNE 30, 2015,  1:49 P.M.</u>

1

2          THE COURT:  All righty.  We have rested.

3          I will trust that all counsel will go over

4     all of the exhibits, including the demonstratives if

13:50:05  5     they've been marked or if you want to offer them into

6     evidence, and collect them, gather them, and then have

7     them ready to go with the jury when they retire.

8          In the event that there's a document or an

9     exhibit that's objected to, I can address that in the

13:50:21 10     morning first thing, but otherwise, tomorrow morning

11     first thing, we'll just have the Plaintiff and then the

12     Defendant describe for the record the numbers of the

13     exhibits that are offered into evidence without

14     objection.

13:50:39 15          So that means that if there are objections

16     to either side's, those I will address, not the others.

17          That being said, both sides having rested,

18     or all sides having rested, I guess the onus is on you.

19          MR. STAR:  Thank you, Your Honor.

13:51:00 20          Would you like me at the lectern?

21          THE COURT:  Um-hmm.  It makes it easier for

22     Shirle and Sue.

23          MR. STAR:  Very good.

24          THE COURT:  I'd like you to start out, if

13:51:19 25     you would, as to what claims you think are now

1    viable -- I mean, that we have before us right now.  Not

2    viable necessarily.

3                    MR. STAR:  Well, what was left when we

4    started the trial were two fraud claims which, from all

13:51:40 5    accounts, seem to be completely duplicative.  One was

6    captioned just as a fraud claim.  The other one is

7    fraudulent inducement. But there was never any

8    distinguishment between those two claims.

9                    We had actually filed a motion about that,

13:51:56 10   which I think was still pending before we started trial.

11                   THE COURT:  But you did file -- that was

12   part of your summary judgment, too, wasn't it?

13                   MR. STAR:  No.  This was raised --

14                   THE COURT:  I mean it was raised in the

13:52:09 15   summary judgment motion?

16                   MR. STAR:  You know, now that you say it,

17   you're right.  I apologize.  There was a lot that was

18   raised.

19                   But nonetheless, we've never seen any, any

13:52:20 20   distinguishment between those two claims, the one for

21   fraud and the one for fraudulent inducement.

22                   In any event, those claims were all based

23   on, they were both based on the same allegations of

24   either an affirmative verbal misrepresentation prior to

13:52:40 25   the signing of the license agreement at the end of

1    December, 2005, or affirmative false statements in

2    marketing literature prior to the signing of the license

3    agreement.

4              So our view has been that regardless of

13:52:54  5    whether they've couched these as two separate fraud

6    claims, they're the same thing, and essentially, it's a

7    claim that they were fraudulently induced into the

8    license agreement through either affirmative verbal

9    misrepresentations or affirmative written

13:53:09  10    misrepresentations in marketing literature.

11              Hodell has tried, and this is the subject

12    of a motion that was still pending before we began these

13    proceedings, Hodell has tried, Your Honor, to

14    recharacterize their claims to also include a claim for

13:53:27  15    concealment, both prior to the license agreement and then

16    post-contractually.  We're reasserting through a Rule 50

17    motion that I think we've just recently filed that that

18    claim is not viable for a number of reasons.  It was

19    never pled in their complaint, and on top of that,

13:53:50  20    there's been no proof of the requisite elements for a

21    concealment claim which would, of course, require a duty

22    of disclosure.

23              And this is in our papers, but at a bare

24    minimum, to have a duty to disclose and, therefore, be

13:54:09  25    subject to a concealment claim, you have to have some

1    relationship between the parties.  And the testimony that

2    we heard at trial from Mr. Reidl, Otto Reidl, was that

3    there was no relationship between Hodell and SAP.  Zero

4    contact until over a year after the license agreement.

13:54:25  5          In his own terms, tracking Ohio law with

6    respect to the kind of relationship that you'd need,

7    there was no special relationship; none.

8          So we don't believe that Hodell has ever

9    been able to proceed or, number one, they never pled a

13:54:45 10   concealment-based fraud claim and they shouldn't be able

11   to sort of convert their claims into one now.

12          So to summarize that with respect to their

13   fraud claims, it's an affirmative claim of fraud; that

14   is, affirmative misrepresentation based on verbal

13:55:01 15   statements or statements within marketing literature.

16          Next, they had a negligent

17   misrepresentation claim, which is completely duplicative

18   of their fraud-based claim with respect to the factual

19   predicate of that, right?  It's the same alleged

13:55:18 20   misrepresentations.  Of course, for a negligent

21   misrepresentation claim, that can only, under Ohio law,

22   be based on affirmative misrepresentations.  It could not

23   be ever based on a concealment.  And factually, it tracks

24   identically with Hodell's fraud claims.

13:55:37 25          And then as to the SAP Defendants, the only

1    other claim that Hodell had leading into trial was for

2    breach of the warranty within the license agreement,

3    which was a claim as to SAP America.

4                 What remains?  We think the

13:56:00  5    misrepresentation claims haven't been proven.  Right?

6    We, if we could start with the marketing literature,

7    Hodell has told us that there were three pieces of

8    marketing literature.  Pardon me.  Mike, do you have

9    the -- Your Honor, if it's okay with you, we have kind of

13:56:20 10    divided the labor up on some of the pieces so Mr. Miller

11    and I, and even Mr. Kelleher, might jump around a little

12    bit if that's okay.

13                 THE COURT:  Yeah, you can, but we might be

14    able to short circuit this.

13:56:31 15                 MR. STAR:  Sure.

16                 THE COURT:  Because Hodell filed a brief on

17    this, and then there was testimony about the different

18    written representations, I think that that's what they're

19    confined to.

13:56:41 20                 MR. STAR:  That is what they're confined

21    to, but as far as the viability of those pieces of

22    information to form a misrepresentation claim, we'd like

23    to respond to that.

24                 MR. MILLER:  Thank you, Your Honor.

13:56:53 25                 And just to be clear and to follow up

2829

1    Mr. Star's comment about us not believing that there's a

2    misrepresentation claim, that goes all the way back to

3    the license agreement, which is clear, and it precludes

4    all of these tort claims, and that would be with respect

13:57:07  5    to SAP America and SAP AG, and we can revisit that if

6    Your Honor would like.

7                But on the marketing materials, we read

8    their brief, and they've effectively referenced, after

9    all this back and forth over whatever it's been, seven

13:57:22 10    years, they've referenced three documents.  They're all

11    high level.  They're all of an advertising, marketing

12    nature.  None of them are specific with respect to Hodell

13    or this solution.  And when you look at them, and you

14    look at the specific sections that Hodell has pointed to,

13:57:42 15    Your Honor, these statements are either obviously

16    puffery, high-level marketing materials, or the

17    statements are true, and they're just obviously accurate,

18    or a couple of them didn't even come up in this case.

19                And just in the short bit of time we had in

13:58:02 20    between the break and now, and I did lots of other

21    things, too, I went through these three exhibits.  I

22    guess it's 314, 617, and 618.  And I'm not sure what

23    order to take them in, but 617 is probably the easiest

24    place to start.

13:58:23 25                617, Your Honor, is the American Express

1    advertisement, and if I may approach just briefly --

2              THE COURT:  I've got it in front of me.

3              MR. MILLER:  I've highlighted it for ease

4    of reference.  It makes quite a bit of reference.  It can

13:58:41 5   save you time.  That's what I highlighted.

6              Do you mind, Your Honor?

7              THE COURT:  Yeah, go ahead.  Thank you.

8              MR. MILLER:  If you flip to the first page,

9    it couldn't be more obvious that they're talking about a

13:58:54 10  product different than the one that's at issue in this

11   case.  Right?

12             Our case has B1, Radio Beacon, and

13   In-Flight Enterprise, which is this massive 3,000-hour

14   customized piece of software.  This advertisement, 617,

13:59:08 15  is about SAP Business One, the American Express Edition.

16             And if you look at it, you can see

17   highlighted, American Express Edition, American Express

18   Edition, American Express Edition, throughout the entire

19   document.

13:59:26 20             And if you -- it's interesting, if you look

21   at the first page on the right column, there are two

22   paragraphs on the right.  Those are the two paragraphs

23   that don't relate specifically to Business One, the

24   American Express Edition, and they're like I just said,

13:59:47 25  they're high level, they're not inaccurate, they're not

1    at issue in this case.  I mean, it's just a couple

2    sentences.

3              At our core, and so American

4    Express -- the, Business One edition, American Express

14:00:01 5    Edition is going on and on and then it says "At our core

6    is SAP Business One specifically designed to address the

7    needs of small and mid size businesses.  SAP Business One

8    streamlines operational and managerial processes by

9    providing fully integrated financial distribution and

14:00:17 10   sales management capabilities."

11             And then if you keep going, there's like a

12   bigger paragraph below, and the bigger paragraph below is

13   likewise about Business One itself, not necessarily the

14   American Express Edition, but all it does is list the

14:00:33 15   functionalities that it provides, and nobody disputes

16   that it provides those functionalities.  That hasn't even

17   been an issue in this case.

18             So you end up back to that first paragraph

19   and staring at it and saying are we going to have a fraud

14:00:46 20   trial about a statement like this?  And I think you

21   cannot.  It's high level.  It's not specific to Hodell.

22   It's not specific to this totally different solution that

23   had this 3,000-hour customized piece of software on top.

24   It's not inaccurate.  And there hasn't been any, any

14:01:08 25   evidence in the case that these things don't happen.

1    They do happen.

2                    Hodell wants to read that, right, as some

3    sort of guarantee that if this sentence exists, then that

4    means that Business One, when installed with Radio Beacon

14:01:21  5    and this massive IFE program, is guaranteed to work for

6    Hodell and they get to present this to a jury in a fraud

7    trial.

8                    And you just can't do that.

9                    If you go, Your Honor --

14:01:38 10                    THE COURT:  I think I'm missing --

11                    MR. MILLER:  I'm sorry?

12                    THE COURT:  I'm not missing anything on

13    yours, but the sentence that the Plaintiff is relying on,

14    they say they're relying on, says, "SAP Business One

14:01:50 15    Solution effectively supports companies with as low as 10

16    and as many as several hundred employees."

17                    MR. MILLER:  Well, that's, where that

18    really shows up is in 314.

19                    THE COURT:  Oh, they had it marked as 617.

14:02:02 20                    MR. MILLER:  Oh, it's possible that that

21    sentence is in there, but I didn't see it.

22                    THE COURT:  I didn't either.

23                    MR. MILLER:  Okay.  It doesn't matter.

24                    THE COURT:  Well, that's what they're

14:02:11 25    relying on.

1          MR. MILLER:  All right.  Well --

2          MR. STAR:  It's at Page 6 of 617.  Page 6.

3          MR. MILLER:  I'm getting there.  On Page 6,

4     Your Honor, is that where they cite to it in their brief?

14:02:36  5          THE COURT:  Yeah.

6          MR. MILLER:  Okay.  Do you see?

7          Okay.  The SAP Business One Solution, I

8     still don't see it.  Okay.  All right.  There we go.

9     "The SAP Business One Solution effectively supports

14:03:02 10    companies with as few as 10 and as many as several

11    hundred employees."

12          THE COURT:  Okay.  That's what the

13    Plaintiff says they're relying on.

14          MR. MILLER:  And that's similar to what's

14:03:10 15    in 314.  In its support, we've heard testimony in the

16    case, Your Honor, that's not a lie.  You can't have a

17    fraud case about its advertisement statement like that.

18    It's high level.  It's not specific to Hodell.  It's got

19    nothing to do with this solution that we have here, which

14:03:25 20    has this massive In-Flight Enterprise add-on.

21          And forgive me.  I didn't pay attention to

22    that because I mostly paid attention to the same

23    statement that's in 314, but the arguments are identical,

24    right?

14:03:36 25          You can't have a fraud trial.  We know, we

2834

 1    saw Exhibit 700, and Your Honor will remember that.

 2    That's the -- that's the list of SAP Business One

 3    customers worldwide with more than 50 users.  There are

 4    hundreds of companies on that list with more users than

14:03:53 5    Hodell.  And this reference here isn't even to users.  It

 6    just says, "This solution effectively supports companies

 7    with as few as 10 and as many as several hundred

 8    employees."

 9              There's been no testimony in the case that

14:04:08 10    that's an untrue statement.  There's been some testimony

11    in the case that Hodell thinks that it hasn't worked well

12    for them, but this sentence doesn't guarantee, and that's

13    my point.  And they want to take these statements and

14    read them not as high-level marketing statements but as

14:04:24 15    guarantees that this Business One Solution will work for

16    them in this unique situation that they have where they

17    coupled it with Radio Beacon and In-Flight Enterprise.

18              So you have this context where Business One

19    has 40 to 50,000 customers, many of them have many more

14:04:42 20    users than Hodell.  They obviously have many, many more

21    employees than Hodell.  And it's been a success all

22    around the world.

23              Mr. Kraus testified -- well, I asked him,

24    is this product a success, and he said well, if you sell

14:05:02 25    40 or 50,000 of something, it's a success necessarily.

1      And we talked about the size.  And this sentence,

2      "effectively supports companies with as few as 10 and as

3      many as several hundred," yes, it does.

4                  And there's been no evidence in the case to

14:05:17  5      contradict that.  "Effectively supports company with as

6      few as 10 and as many as several hundred employees."  Of

7      course, it does.

8                  Does that say, "And it's guaranteed to work

9      for you"? It doesn't.  And it doesn't say, "And it's

14:05:32 10      guaranteed to work for you even if you put a 3,000 hour

11      In-Flight Enterprise on the top of it."

12                  And, Your Honor, if you look at 314, which

13      I think Your Honor has, which has the same statement in

14      it and has the others --

14:05:47 15                  THE COURT:  I think I'm looking at 617,

16      aren't I?

17                  MR. MILLER:  Agreed.  And this statement is

18      in 617, so 617 is the American Express document that has

19      American Express listed in it 15 times.  The description

14:06:00 20      about Business One that I started with was in the right

21      column.  Right?  It's very high level.  And it's correct

22      that on Page 6, buried in this, there's another statement

23      that says 10 to several hundred employees.  I see that.

24                  And all I'm pointing out to Your Honor, in

14:06:16 25      addition to what I've already explained, which is that

1    this is high level, not specific to Hodell and definitely

2    not specific to this solution, and it's not a guarantee,

3    and it's not the kind of thing that you can have a fraud

4    trial about.

14:06:30 5              If you look, Your Honor, at 314, which is

6    the Business One brief --

7              THE COURT:  Do you have that?  Do I have

8    that?

9              MR. MILLER:  I think I can bring you a

14:06:42 10   copy.

11             Can we bring a copy of 314 to the Judge?

12   Can you call that up, Bob?  It will show up on your

13   screen, Your Honor.

14             THE COURT:  Yeah, I have it in here.

14:06:53 15            MR. MILLER:  I think I did a better job of

16   going through this one to isolate the statements that

17   they say are untrue, because I only had the brief for a

18   short period of time, but I'd want to start, Your Honor,

19   with the first statement, and I realize this may be not

14:07:12 20  something they're focused on, but you've got to put this

21   in context, right?

22             This is a piece of marketing literature.

23   Again, high level; not specific to Hodell, and not

24   specific to their highly-customized solution.  And the

14:07:27 25  gist of this is high level, and it's clear from the first

1       sentence, right?

2                       I mean, this is -- this is the -- it's

3       high-level marketing.  "Running a successful small or

4       midsize business is more challenging than ever.  With

14:07:44  5   buyers spending down and the market at large playing wait

6       and see, many small businesses have hit a plateau."  You

7       know what you're about to read when you get this, Your

8       Honor.  It's a promotional document.

9                       And if you'd go to the next page, Bob.  No,

14:08:02 10   left column.  It's circled in pen.  There you go.

11                      This is the one we see the most, Your

12      Honor.  Are you oriented?

13                      THE COURT:  No, I'm not.  Sorry.

14                      MR. MILLER:  314.

14:08:17 15                     THE COURT:  I'm on that.

16                      MR. MILLER:  Second page, upper left-hand

17      corner.

18                      THE COURT:  Got you.

19                      MR. MILLER:  Okay?  This is, this is one of

14:08:23 20   those sentences that they're so focused on.

21                      "Provides robust and fully integrated

22      financial and sales management capabilities and gives

23      managers on-demand access to critical real-time

24      information for better decision-making."

14:08:39 25                     That's okay.

1                    THE COURT:  They only have two sentences --

2    I shouldn't say only, but they were talking about two

3    sentences in 614.  It says, "The solution helps emerging

4    businesses and those with 10 to several hundred employees

5    to streamline their operational and managerial

6    processes."

7                  That's the one sentence.

8                  And the second sentence is, "Whether you

9    have five employees or 500, the solution helps emerging

10    businesses streamline their operational and managerial

11    processes."

12                  MR. MILLER:  Well, they -- I think they

13    have referred to a couple of others.

14                  THE COURT:  That's all they have indicated

15    that they're relying on.

16                  MR. MILLER:  Fine.

17                  These are very much like what we just went

18    over in 617.  Does this solution help emerging

19    businesses, some of whom may have ten or some of which

20    may have several hundred employees, streamline their

21    operational and managerial processes?  Is it okay for

22    SAP, in a piece of promotional material, to say that?

23    And the answer is, shoot, yeah.

24                  I mean, this is, first off, again, it's

25    obviously a marketing document.  It's a promotional piece

1    of material, not for just, you know, totally

2    unsophisticated consumers who are walking down the aisle

3    at Staples.  This is an ERP solution.  People who buy it

4    have some idea of what they're getting into.

14:09:59  5                But more to the point, Your Honor, it does

6    help businesses with 10 to several hundred employees do

7    these things.  That's been the testimony in this case.

8    They haven't brought in, Your Honor, witnesses to testify

9    that that's false.

14:10:15  10                What they've done, and this, I guess, is

11    the ultimate point, right?  They've tried to put on a

12    case that it didn't work for them.  But this sentence

13    doesn't say, "And it's guaranteed to work for you."

14                And that's the whole point.  You can't have

14:10:36  15    a fraud trial about a high-level promotional statement

16    like this in this context when we know it's true that the

17    product does do these things, and there's been no

18    evidence in the case that a product doesn't do those

19    things, right?

14:10:55  20                Like, this, and, Your Honor, if I may, back

21    way up and look at this case kind of from the beginning.

22    This case was presented and litigated largely based on

23    the supposed verbal representations, and I think that's

24    falling apart for Hodell, and they're back now focused on

14:11:19  25    the marketing literature, and they're isolating it down

1    to these couple of sentences.

2                    And you can't put -- we're down to nine

3    jurors I guess in a box and say, based on this evidence,

4    that they're allowed to conclude that that's fraud

5    because, again, if you're going to have a real trial

6    about whether that's false, they have to put on evidence

7    to prove that it's false; not that it didn't work for

8    them.  They would need to bring in engineers to say, "Oh,

9    this product doesn't help emerging businesses from 10 to

10   several hundred employees streamline their operational or

11   managerial processes."

12                   This product can't help emerging businesses

13   from 10 to several hundred streamline their processes,

14   and they didn't do, they didn't try to do that.  They

15   just came in and said "We're doing Business One, Radio

16   Beacon, and In-Flight.  It's going to be this big and it

17   didn't work for us."

18                   And that's a big, big difference.

19   Effectively they want to read this as a guarantee.

20                   And if you go to the 500 statement -- which

21   is in the second document, Bob.  It's 314.5 -- it's the

22   same idea.  It's down at the bottom, second sentence,

23   third paragraph.  You know, "Whether you have five

24   employees or 500, the solution helps emerging businesses

25   streamline their operational and managerial processes."

1           That's what it does.  It's business

2   management software that helps businesses streamline

3   their processes, and there's been no testimony that, oh,

4   this product, it don't work.  The testimony's been, no,

14:13:12  5   no, we have 50,000 customers worldwide, it works.  It

6   didn't work for you maybe, you say.  We think it did.

7   But it didn't work for you maybe because of what you did;

8   you stacked it with this other stuff, you did a lot of

9   things wrong, et cetera, et cetera.

14:13:28 10           But again, Your Honor, if we take away the

11   verbal representations -- and I think I know we're

12   working towards that and maybe that's what is happening

13   in this case -- and then you're back to just these couple

14   of marketing pieces, and we're then down to, in these

14:13:43 15   marketing pieces, these couple sentences, you can't have

16   a two and a half week jury trial and then tell the jury

17   that they get a shot at tagging SAP on these sentences

18   because if this was a motion for summary judgment, they

19   would lose right now.  They would have to lose right now.

14:14:02 20           And I realize that there was some prior

21   litigation on this, but the point I think was they get a

22   chance to prove that it's wrong and they had their

23   chance.  It was a two and a half week jury trial, and

24   they never put on any evidence that Business One doesn't

14:14:18 25   help emerging businesses in the way these statements say.

2842

1          THE COURT:  I got you.

2               How about the contract issue?

3          MR. MILLER:  Could I mention just the third

4     one, 618?

14:14:29 5          THE COURT:  Yeah.

6          MR. MILLER:  Because I think that's

7     different, and it's worth mentioning separately.

8               This is the MS-SQL database.  This comes up

9     twice in 618.  First, Bob, at 618.7, down at the bottom.

14:14:47 10    And it's kind of the same exact statement that gets made

11    at 618.18.  Right?  All the way down to the bottom, Bob,

12    2.8.

13              This is a trick.  This MS-SQL 2000 database

14    is not our product and there's been uncontroverted

14:15:19 15    testimony in this case.  It's been uniform.  MS stands

16    for Microsoft.  This is a very powerful server and

17    database, and it's used in B1.  So when you read this, to

18    secure critical business and system processes, a robust

19    MS-SQL 2000 database is used."  It is.  That's not our

14:15:44 20    product.  "And it supports an unlimited number of

21    simultaneous user transactions."

22              A.  They're not talking about B1.  They're

23    talking about a Microsoft product.

24              B.  There's been -- and this is

14:15:57 25    important -- there's been no evidence in the case that

1    the MS-SQL doesn't support an unlimited number of

2    simultaneous user transactions.

3              So if Hodell, after eight years of

4    litigation or whatever it's been, wants to have the jury

14:16:12  5    go back on these two sentences out of the gobs and gobs

6    of testimony and exhibits, you would think that during

7    the trial, they'd call a witness who gets up there and

8    says "Let me tell you about this MS-SQL database issue,

9    this thing's a disaster, doesn't work, definitely doesn't

14:16:31 10    support an unlimited number of user transactions."

11              They never did that.  They just said what

12    they repeat over and over, that B1 didn't work for them,

13    and this thing was in there.  We went out of our way and

14    actually countered what they should have been trying to

14:16:48 15    prove, right?  We brought a number of witnesses in here

16    who said MS stands for Microsoft and, yes, that's -- can

17    you call -- that database is very powerful, and I think

18    Professor Brooks Hilliard testified, "Look, it might not

19    be an unlimited number of users transactions, but that is

14:17:10 20    an extremely powerful database and it will -- there's no

21    way it will be a limitation in the context of B1."

22              That's got to come out of the case, Your

23    Honor.  I mean, so what I think about this, you've got

24    617, it's got the one sentence in it and it's really

14:17:29 25    about American Express, then you've got 618, which is

2844

1    about Microsoft, and they haven't proven anything, and

2    we've actually -- the evidence in the case is the

3    opposite, which is that it's really powerful, and then

4    you're back to 314, and I pointed to the high level

14:17:49  5    statements.  There's only the two that apparently they

6    are now focused on, you can't go to a jury on this.

7              So you want to talk about the contract?

8              THE COURT:  Not necessarily.

9              MR. MILLER:  Do you mean the breach of

14:18:03  10    contract claim or you mean the license agreement itself?

11             THE COURT:  Wasn't that the breach of

12    contract claim?

13             MR. MILLER:  Well, it's hard to say, right?

14             You asked -- you asked counsel the other

14:18:11  15    day, tell me about your breach of warranty claim, and I

16    was shocked.

17             THE COURT:  Maybe I misspoke, but --

18             MR. MILLER:  Well, we might as well cover

19    this.  It will only take a minute.

14:18:21  20             But you asked them about, hey, what's your

21    breach of warranty claim, and I was -- I was floored.  I

22    mean, counsel --

23             THE COURT:  You were what?

24             MR. MILLER:  Floored.  I couldn't believe

14:18:31  25    what they were saying.

1          THE COURT:  Oh, I thought you were floored

2     at my question.

3               MR. MILLER:  No.  It was a good question.

4               THE COURT:  Oh, of course.

14:18:38  5          MR. MILLER:  The answer that you got was

6     that SAP admitted -- the answer that you got was that the

7     warranty goes to the documentation, and that SAP admitted

8     that it had breached the warranty by way of admitting

9     that there were issues in connection with a service pack,

14:19:01 10    and that SAP had admitted that the document -- that the

11    software didn't conform to the documentation because SAP

12    admitted that there was a defect or some sort of issue in

13    connection with the service pack and had given Hodell a

14    maintenance credit back prior to when they went live.

14:19:18 15         And the reason I was so floored, Your

16    Honor, is, first, I never heard that expressed before,

17    but more to the point, that service pack issue doesn't

18    have anything to do with this case.  And the only

19    testimony in the case on it came from Dan Kraus.  And Dan

14:19:39 20    Kraus testified, yes, prior to when they went live, Dan

21    Lowery was hitting me up for trying to get a free

22    maintenance credit, and then him and Hodell came after me

23    basically saying that the documentation failed to, you

24    know, conform to the specifications and it related to the

14:19:56 25    service pack issue.

1          And we gave them the credit.

2          And then I asked him, "Dan, did that -- did

3     that service pack issue get resolved?"

4          And his answer was:  "Yes."

14:20:09  5          And then I asked him:  "Dan, did that have

6     anything to do with anything in this case?"

7          And his answer was "No."

8          So their whole breach of warranty claim, if

9     their answer is to be believed from the other day, is

14:20:22 10    based not on the fact that the solution didn't work for

11    them; it's based on the fact that SAP supposedly admitted

12    that the solution was defective by way of this service

13    pack issue.  But that's a total nonissue.  It was

14    resolved, it's got nothing to do with this case.  So I

14:20:43 15    don't know why -- I can't believe that it came up but, if

16    that's all they're raising, then I think it's easily

17    disposed of.  There's no breach of warranty claim, unless

18    there's something else they're going to tell us, that

19    they're going to assert.  But they answered your

14:20:57 20    question.  I thought they were clear.

21          There was a brief we filed on that, Your

22    Honor.  It's three or four pages long.  We filed it on

23    the 29th.  I guess that was last night.  It's titled

24    "Rule 50 Motion of SAP America and SAP AG as to Hodell's

14:21:15 25    claim that SAP breached the SAP Business One Software

1    License Agreement."  And this addresses those issues, and

2    then the final point on it is that this documentation, if

3    you kind of broaden the warranty claim and you look at

4    the license agreement, leave aside for the moment this

5    new and strange and, I think, ridiculous theory that the

6    service pack was a breach of the warranty, if you read

7    the warranty at 7.3, right, and I won't read the whole

8    thing, just the first phrase, "SAP warrants that the

9    software will substantially conform to the functional

10   specifications contained in the Documentation."  And it's

11   capital D.

12             Right?

13             In that Rule 50 motion that we filed last

14   night that deals with this whole service pack can't be a

15   breach of warranty issue.  We also point out that this

16   documentation that's referenced in the warranty, we gave

17   that to them.  It comes in -- it's in the help files.

18   When you buy Business One, you get a CD, and in the help

19   files, there's this documentation that was referenced.

20   So there's no suggestion to be made in the case that,

21   like, they didn't get the documentation or anything like

22   that.  Dan Kraus dealt with that, and I think we quote

23   him right in the briefs so Your Honor can see.

24             THE COURT:  You do.

25             MR. MILLER:  Right.

1          So I'm going to turn this over.  Mr. Star

2     is going to pick up some of these other issues.

3               MR. STAR:  So, Your Honor, just turning

4     back to the tort claims, the license agreement obviously

14:33:05   5     has an extreme effect on the tort claims Hodell has tried

6     to plead here on a number of levels.

7               For example, the claim has been regardless

8     of the source of the misrepresentation, whether it's

9     through those three pieces of marketing literature that

14:33:05  10     Mr. Miller just went through, or whether it's through

11     some supposed verbal representation, the claim has been

12     that Hodell was promised it could have some higher number

13     of users later on.  And what has come out in this case is

14     that the license agreement itself very clearly covers the

14:33:05  15     number of users Hodell acquired.

16               And it is the entire agreement between the

17     parties, and I'm happy to go through the provisions of

18     the license agreement if Your Honor would like me to, but

19     it becomes very simple.

14:33:05  20               What we heard and was undisputed is that

21     under Section 1.6 of the license agreement, each user had

22     to be a, quote, named user, and that named user

23     definition was pursuant to the order for the software

24     that came into SAP.

14:33:05  25               Under Section 1.10 defining the term

1    "Software," capital S, the software is the Business One

2    software product developed by or for SAP America or SAP

3    AG, and delivered, delivered to Hodell pursuant to the

4    order for the software.

14:33:06  5           Let me pause right there because it's been

6    undisputed -- I'll step back right there.  We know from

7    the openings that Hodell has tried to perpetuate this

8    idea that it actually ordered and acquired software from

9    SAP back in 2004 when it signed the license agreement.

14:33:06 10          I think that has been flatly rejected,

11   right?

12           THE COURT:  Would you say that again.

13           MR. STAR:  Sure.  Hodell has contended from

14   the beginning of this case that somehow it actually

14:33:06 15  ordered and acquired Business One software from SAP back

16   in December of 2004 when it signed the development

17   agreement.  That idea has been -- there's just no factual

18   support for it.  The contracts don't support it.  It's

19   not even, I think, an issue in the case anymore, and it's

14:33:06 20  got to be undisputed at this point that they purchased,

21   acquired the licenses for the software through the

22   license agreement pursuant to the orders that were

23   placed.

24           The first order that was placed came the

14:33:06 25  day before they actually signed the license agreement,

1    December 22nd of 2005, and it was for 80 licenses.  And

2    it's been undisputed that they later on acquired 40

3    additional licenses.

4              And so when we look at the license

14:33:06  5    agreement, it actually defines the software as named

6    users pursuant to the order or future orders for the

7    software.  And when we then look further into the

8    contract, Your Honor, there's a, at Section 7.8, in bold,

9    companies, performance warranty, right, and it talks

14:33:06 10    about the warranty for the software as defined.

11              So the idea that promises outside of the

12    contract with respect to the number of users would have

13    been made is contradicted by the very terms of the

14    contract because when we go to the final provision of it,

14:33:06 15    we have a fully -- a full integration clause, right, that

16    all prior representations, discussions and writings are

17    merged in and superseded by this agreement.

18              So that right there precludes them from

19    coming in with any claim of a misrepresentation prior to

14:33:06 20    the license agreement about the number of users.

21              But that's not the end of the implications

22    created by the license agreement itself.  I'll just move

23    through some of these issues.

24              We've had the claim, of course, that IBIS

14:33:06 25    and LSi, which were two separate companies and always

1    remained two separate companies, although LSi purchased

2    IBIS, the claim has been that they were SAP's agents.

3    Well, let's break those two companies down.

4            The proof in the case has been that with

14:33:06  5    respect to IBIS, it had no relationship with SAP.  It had

6    at one time signed up on what was called a SDK contract,

7    a software development contract, which expired by its own

8    terms in six months.  It did not give them the right to

9    market or promote or distribute Business One.

14:33:06 10            IBIS never signed a distributor agreement

11    with SAP.  Outside of that SDK agreement, IBIS was

12    basically a stranger to SAP.  It had no authority at all

13    to do anything.  There can't really be any claim that

14    IBIS was SAP's agent or that anybody acting for IBIS was

14:33:06 15    acting for SAP.

16            Then as to LSi, the evidence was also

17    undisputed, LSi actually did sign up as an SAP reseller

18    and had limited authority to distribute Business One

19    pursuant to the terms of its contract with SAP.  But when

14:33:06 20    you look at the license agreement, this is what becomes

21    really important, the evidence was through the testimony

22    of both Otto and Kevin Reidl that the license agreement

23    itself was presented to Hodell by LSi.

24            And the very company that they're saying

14:33:06 25    was somehow SAP's agent presented them with a contract

1    that says exactly the opposite, right?  At Section 4, we

2    went over it ad nauseam, "Hodell acknowledged and agreed

3    that LSi was not the agent of SAP and was just an

4    independent company."

5            So the license agreement's dispositive on

6    the issue of agency, and Hodell will continue to dispute

7    that, I'm sure, but what evidence did they put up that

8    they thought the relationship with LSi or IBIS and SAP

9    was something different than what was in this agreement?

10   I think the answer was no evidence.

11           So the license agreement's dispositive on

12   the question of agency.

13           The license agreement's also dispositive on

14   the question of what kind of claims can actually go to

15   the jury in this case when we consider the damages that

16   have been alleged by Hodell.  This goes back, Your Honor,

17   to the issue we were discussing the other morning in the

18   context of the *Textron* case, and what Ohio law says with

19   respect to duplicative contract and tort damages.

20           I think it's settled through the *Textron*

21   decision that a Plaintiff cannot proceed on a tort claim,

22   any kind of tort claim, where their damages are not

23   independent or any different from the breach of contract

24   damages.

25           I won't belabor this too much.  We went

1    through it the other morning.  And Your Honor posed the

2    question to us of, well, what happens in a situation like

3    this where the license agreement has a damages limitation

4    provision?  And Hodell had argued that simply the

14:33:07  5    existence of the damages limitation provision in the

6    license agreement somehow would make their tort damages

7    different than their contract damages.

8              And we made the point that that didn't make

9    any sense because then if you were wise enough within

14:33:07  10   your commercial contract to include a damages limitation

11   provision, you kind of weren't smart to do that at all

12   because it would be a get out of jail free card.

13             And we went back and we did some research,

14   and as we pointed out in the brief we filed on Sunday,

14:33:07  15   which is Document Entry 362 on the docket, there's a

16   recent case from the Northern District of Ohio called

17   *Airlink Communications versus All Wireless*.  And if you

18   look at that decision which we attached a copy of, it's

19   basically what we have here.  You had two commercial

14:33:07  20   parties.  You had a contract with very similar limitation

21   of liability and damages limitations and warranty

22   disclaimers as we have here, and the Plaintiff made the

23   same kind of claims that the Plaintiff here is making:

24   Lost profits, lost customers, although I know now they're

14:33:07  25   not saying that, and those sorts of damages.

1            The Defendant argued, well, wait a second,

2       *Textron* says you can't get there because you can't get

3       there on a tort claim because you're seeking the same

4       damages.  The Court agreed.  And the Court said not only

14:33:07 5     do your tort claims fall away and you're stuck with your

6       contract, but then once you're within the context of your

7       contract, you're stuck with your damages limitation

8       provision.

9            And that's what we have here in this case.

14:33:07 10    I'll get into some of the details of whatever might be

11      remaining of their so-called lost productivity/overhead

12      damages claim, but when we went through this the other

13      morning, I think it's pretty clear that whatever might be

14      remaining of their damages, they've done nothing to try

14:33:07 15    to explain to us why their so-called tort damages are

16      different than their contract damages.

17           They've not said that they're seeking one

18      set of damages on one claim versus the other.  The only

19      thing that Hodell has articulated here is a difference is

14:33:07 20    that when they get into the contract, they're stuck with

21      the damages limitations provisions, but the case that we

22      cited, *Airlink*, speaks directly to that issue and proves

23      the point that we were making.

24           So where does that leave us with the

14:33:07 25    license agreement?  It's a contract.  It's binding.  No

1    one's proven otherwise.  It's got a damages limitation

2    provision in it.  Because Hodell is seeking the same

3    exact damages for breach of contract that it does for all

4    of its tort claims, its tort claims fall away.  That's

5    *Textron*.

6                        And as the *Airlink* case holds, they're now

7    within the contract.  They're stuck with nothing but a

8    breach of warranty claim, and they've got to live with

9    the damages limitations provisions that they agreed to

10    years ago.

11                        They have not done anything in this case,

12    by the way, to prove or even to argue that those

13    limitations provisions or that the warranty itself was

14    somehow unconscionable or, you know, that it should be

15    set aside.

16                        THE COURT:  What happens if the contract

17    is -- there is no breach?

18                        MR. STAR:  If there is no breach of

19    contract?

20                        THE COURT:  Right.

21                        MR. STAR:  Well, because the tort claims go

22    away and there would be no breach of contract --

23                        THE COURT:  Why would the tort claims go

24    away?

25                        MR. STAR:  The tort claims would go away

2856

1    under *Textron* because they're seeking duplicative

2    damages.

3                    THE COURT:  No, I said what if there is no

4    breach of contract?  What if their case is just the tort?

14:34:07  5                    MR. STAR:  So under that hypothetical,

6    you're saying, the jury would get to decide whether there

7    was fraud, plus whether there was a breach of contract?

8                    THE COURT:  No.  I'm saying what if -- I'm

9    having, to be honest with you, I'm having trouble with

14:34:23 10    where there is any evidence of a breach of contract.

11                    MR. STAR:  I agree.

12                    THE COURT:  And if there is no breach of

13    contract, no evidence of it, based on the license

14    agreement --

14:34:36 15                    MR. STAR:  Yeah.

16                    THE COURT:  -- then there are potential

17    fraud claims left.

18                    MR. STAR:  Well, it's an interesting

19    paradox that we have there because I don't think that the

14:34:44 20    law would suggest that simply because they failed under

21    breach of contract claim, that they can somehow then

22    convert it into tort claims.

23                    They still must live with their contract.

24                    The jury would be finding in that instance

14:34:58 25    that the contract is completely valid and binding and

2857

1    there was no breach.  And so the point, the point of that

2    is, Your Honor, that the contract is there.  I mean, it's

3    rock solid.  Not only have they not proven a breach of

4    contract claim, but in that context, how can they have a

14:35:16    5    fraud claim where the damages that they were seeking for

6    contract and fraud were -- were the same?  It would make

7    no sense.

8              That's why when we look at cases like

9    *Airlink* and others, Courts are dismissing those claims

14:35:30  10    before they go to a jury.  Right?  It would be very

11    confusing, I would agree, for the jury to get instructed

12    on all of those claims when they're duplicative.

13             MR. MILLER:  Your Honor, if I may, we'll

14    minimize this, but I think it's worth mentioning, and I

14:35:47  15    raised this point the other day.  The cases both in Ohio

16    and throughout the country on this idea of whether the

17    damages in, you know, are the same under breach of

18    contract and tort, aren't looking at what they're going

19    to get because of the damages limitation provision or

14:36:06  20    because of some other reason; they're looking at

21    whether -- they're trying to figure out if this tort

22    claim that's being brought is different than the breach

23    of contract claim so they're looking at what they're

24    seeking.  Right?

14:36:19  25             Fundamentally, the analysis that Courts are

 1    faced with when somebody has a commercially contractual

 2    relationship and wants to bring a tort claim is "Wait a

 3    minute.  Is this tort claim that they're trying to bring

 4    that's over here, is it the same as this contract claim?"

 5              And they look at two things.  Are they

 6    alleging a different duty.

 7              THE COURT:  But, see, that's why I asked

 8    the question the other day about this is a breach of

 9    warranty claim.

10              MR. MILLER:  Right, and they explained it

11    was and they explained it was Dan Kraus and the service

12    pack.  I always thought that they were saying -- I always

13    thought they were bringing a breach of warranty claim

14    because this thing didn't work.  That's what they allege

15    in their complaint.

16              And when you look at their complaint and

17    the way this case was litigated, and this is why I was

18    floored, the way this case was pled and the way this case

19    was litigated is that the contract claim which is here is

20    the same as the tort claim.

21              And on the specific issue that Your Honor

22    just asked about, which is damages, it's ultimately not

23    what kind of tort damages they get if they don't have a

24    breach of contract, it's throughout this case from day

25    one until now, have the damages in connection with the

2859

1   tort claim that they're seeking been the same as the

2   damages in connection with the contract claim that

3   they're seeking?

4           And Mr. Star's point is, yeah, they're the

14:37:38 5   same.  They've always been the same.  And that's how you

6   can tell that their tort claim is no different than their

7   breach of contract claim.  There's no separate duty.

8   There's no separate damages that they're seeking.  It's

9   kind of the same thing.

14:37:52 10           THE COURT:  All right.

11           MR. MILLER:  And all with the others -- all

12   with the caveat that, yeah, I agree with you, I always

13   thought their breach of warranty was claim this didn't

14   work and we want --

14:38:01 15           THE COURT:  No, I didn't think that.  I

16   just asked that question based on what I was hearing

17   because what I was hearing throughout the trial was, I

18   thought, that the number of users.  That was the big

19   issue that was being presented was the number of users,

14:38:13 20   and that's why I asked whether they were progressing on

21   the contract breach claim on breach of warranty because

22   the warranty clause has nothing to do with the number of

23   users.

24           MR. STAR:  Well, so, it's a very

14:38:28 25   interesting question because that goes to really the

1    first prong of *Textron*, right, where *Textron* says you

2    have to have two pieces; you have to have a duty that's

3    independent of your contract.

4                  And really what's happened here is they've

14:38:41  5    alleged a breach of a duty within the contract, and we

6    get there because of the definition of the term

7    "Software" within the license agreement itself.  Right?

8                  The software is defined by, in relationship

9    to each person has to be a named user and the software is

14:38:57 10    defined by the actual orders for licenses that are placed

11    with SAP.

12                  So necessarily, the definition of software

13    does involve the definition of the -- the number of users

14    that Hodell actually acquired.

14:39:11 15                  So, number one, promises about number of

16    users are definitely within the license agreement itself.

17    It's within the definition of "Software."

18                  And the warranty is relating to a warranty

19    for each of those licenses; that the licenses, the actual

14:39:27 20    user licenses that Hodell acquires, will perform pursuant

21    to the warranty.

22                  And that is also another fundamental

23    problem with why they cannot proceed both with tort

24    claims and a contract claim.  And it doesn't matter, Your

14:39:43 25    Honor, ultimately if they failed to prove their contract

2861

1      claim.  The initial piece of this right now is, you know,

2      you can't just go to the contract because you didn't

3      prove -- you can't go to tort because you didn't prove

4      contract, right?  Just as a general high-level principle

14:40:02   5      where the contract covers promises about the software and

6      the software is defined by the orders that come in, and

7      that's based on the number of user licenses --

8                    THE COURT:  I get it.  I got you.

9                    MR. STAR:  Very good.

14:40:15  10                    And then beyond these problems with the

11      license agreement itself, how that precludes these

12      claims, just briefly, on their misrep claims, there was

13      no evidence put up in this case of intent to mislead.

14                    Now, look.  Sometimes intent can be

14:40:30  15      inferred, but what did they put up from which any

16      reasonable person could infer that any of the Defendants,

17      any of them, actually intended to mislead or harm Hodell?

18                    I would -- I would suggest that, I mean, I

19      listened very closely to everything.  There was nothing.

14:40:49  20      There was nothing.  Reasonable reliance, what did we hear

21      there?  We heard nothing at all.  We heard Kevin Reidl

22      testify that he relied on, pretty remarkable, he relied

23      on Dale Van Leeuwen who just months before, if you went

24      back to 2003, Van Leeuwen didn't even know about Business

14:41:10  25      One, and in July of 2003, both Reidls were threatening to

1    sue him.

2              And then they told him, hey, go out in the

3    world and investigate Business One for us.  And what did

4    they say they did on their own so far as due diligence

14:41:24  5    concerning Business One?  The answer was nothing, except

6    talk to Van Leeuwen.

7              So what evidence is there of reasonable

8    reliance?  When we also heard that when they later went

9    on to the Internet and did some basic searches about

14:41:38 10    Business One, they found publicly available literature

11    that contradicted what they now claim Mr. Van Leeuwen

12    told them.

13              Proximate causation.  I'm going to get to

14    damages in a moment.  I mean, if we even assume for a

14:41:54 15    second that there were some damages articulated here, how

16    did they prove proximate causation?  I don't see that

17    they put up any evidence at all.

18              It's been undisputed that this was a

19    complicated, never-before-developed three-part solution.

14:42:09 20    Right?  They did their own custom development.  They

21    didn't try at all to explain to this jury what different

22    pieces of this solution might have caused different

23    problems, let alone to point to what parts of this or

24    acts by particular people caused particular harm.

14:42:28 25              They needed to do that.

1        Let's talk about negligent

2    misrepresentation for a moment.  Look, Your Honor has

3    prior decisions that I've seen where you talk about the

4    necessity of a special relationship, one of trust and

14:42:49  5    confidence between a person in the business of giving

6    guidance and advice, which right away, that's not SAP.

7    We're not an accountant or a lawyer.  We're a software

8    firm that sells a product.

9        But there needs to be a special

14:43:00  10    relationship between the party being accused of a

11    negligent misrepresentation, and the recipient of that

12    representation.  What did Mr. Reidl say?  There was no

13    relationship, let alone a special relationship.  That

14    claim falls away.

14:43:14  15        And I already talked about the fraudulent

16    concealment.  I don't think that's a case that

17    they -- that's not a claim that they ever pled, number

18    one, and they've not shown that there was a duty of

19    disclosure.

14:43:24  20        Their damages.  I'll start with the easy

21    ones.  Training, testing, and travel expense, they're

22    claiming that they actually incurred expenses and trying

23    to pin that on SAP.  Forgetting that they've not made any

24    attempt to disaggregate those costs among different

14:43:54  25    recipients or for different reasons, they didn't even put

1    up evidence of the so-called training, testing, and

2    travel expenses.

3                At best, Mr. Reidl said that was an

4    estimate of 35 to $50,000.  There's no backup

14:44:09  5    documentation.  There's nothing for the jury to do with

6    that claim.  They can't check its veracity.  It's not

7    been proven.

8                Interest expense on debt.  We dealt with

9    that one this morning.  I mean, all that they point to is

14:44:24 10    a one-liner on a high-level financial statement; yet,

11    they admit that there are eight or nine different

12    categories of things that would go -- pardon me, I'm

13    confusing that with the return on the -- the -- sales,

14    right.  Pardon me.

14:44:45 15                On interest expense, they say that on that

16    one line, there's eight or nine different things that go

17    into what they call sales and admin expenses, but how can

18    we figure that out?

19                You know, when they borrow money, they're

14:44:58 20    not -- they weren't just borrowing it because of Business

21    One.  Mr. Reidl admitted that this morning.  They've been

22    borrowing money for years, but they didn't give us any

23    records to say, "Hey, we borrowed X for Business One and

24    because of that, we were charged Y in extra interest."

14:45:15 25    They just say "Hey, here's a number."  There's nothing

1    from which a jury -- there's no evidence that a jury

2    could use to actually come to a number without a guess.

3               The return on investment figure,

4    Mr. Osborne, I thought, went through that and proved very

14:45:32 5    conclusively that that was not calculated properly.

6    Mr. Reidl is not an expert, with all due respect, and

7    there's no basis for his calculation.  His testimony on

8    that amounted to a few pages of ultimately just throwing

9    out a number.

14:45:51 10               And then, of course, there's the bigger

11    component of their damages claim which they've called

12    lost productivity for increased overhead, a number of

13    $2,598,000, and this is the one we've been battling over

14    obviously the most.  Where did that come out?  It's not

14:46:10 15    really clear because the theories have shifted and

16    changed almost daily.

17               On last Wednesday when Mr. Reidl testified,

18    he talked about it in terms of one thing, and then when

19    he showed up last Thursday morning, he clarified and he

14:46:24 20    said to us all very clearly, "This is a claim for

21    increased overhead because of some alleged productivity

22    decline."

23               And we said "What is the overhead

24    increase," and he told us, he said "27 people left the

14:46:42 25    company through natural attrition," and they weren't

1    going to replace those 27 people, but because of Business

2    One, he claimed, they had to go out and hire new people.

3              Okay.  If we just stop right there and

4    assume for a moment that there was proof of any of that,

14:47:00  5    which there wasn't, how would you go about proving that

6    claim and putting it to a jury?  Easy.  You'd get the

7    business records, you'd go to your HR department, you'd

8    get the names of the people who left and you'd get the

9    names of the people who replaced them.  We'd have the

14:47:17 10    dates they were hired, we'd have the amounts the old

11    employees were paid, the amounts the new employees were

12    paid, we'd find out how many hours they worked.  We'd

13    find out how many hours they worked over the damages

14    period, we'd find out how much they were paid over the

14:47:30 15    damages period.  We'd then investigate those people, Your

16    Honor, and we'd find out, hey, were you only doing work

17    associated with Business One or were there other things

18    that you were also doing.

19              Ohio law, Your Honor, just doesn't allow an

14:47:44 20    overhead claim like this, right?  This is essentially a

21    claim for lost profits.  As Mr. Reidl said, everything

22    that comes off as an expense hits their bottom line

23    profits.  And in Ohio, you've got to prove your lost

24    profits with some degree of reasonable certainty, both

14:48:01 25    the existence of them and the amount.  I know Hodell

1       likes to say it's -- they only need to prove one piece of

2       that, that they don't really need to establish the

3       amount, but that's not what the law says.

4               And when you come down to a claim for

5       overhead costs, Ohio law says, "Look, you just have to be

6       particular with what you're asking for.  You, if you had

7       specific additional employees, well, let's find out what

8       you paid them."

9               But as I pointed out the other morning,

10      that isn't even the end of the problem with that claim,

11      right?  Because the second part of it, to get to their

12      ultimate number, they have to multiply the 27 nonexistent

13      people by some number, some dollar number, to get to the

14      total.

15              And what did they do?  They came up with

16      some average which included even Mr. Reidl's salary.  He

17      wasn't hired because of Business One.  You know, if you

18      want specific overhead costs, it's easy to prove.  They

19      didn't even try.

20              And this goes back to a discovery issue

21      from years ago, years ago.  Mr. Kelleher could get up

22      here and do it again, I thought he -- I thought he was

23      very clear the other morning of how this has gone.  He

24      and I have lived through this, and years ago we served

25      Hodell with discovery requests, interrogatories, and

1    every time, every time they told us "Don't worry, we're

2    getting an expert."

3         We, nonetheless, took Otto Reidl's

4    deposition.  We put out a 30(b)(6) notice and said, "Hey,

5    do you have a fact witness who is going to talk about

6    your damages?"  And they put up Otto Reidl and we deposed

7    him.  But when I went to ask questions about his -- about

8    their initial disclosures and the amounts listed in their

9    initial disclosures, there were objections and it was

10   said to us then it's ultimately going to come through an

11   expert.  And that's what they did.

12        And even when Dr. Kennedy was precluded

13   last fall and Hodell then, you know, did a 180 and said

14   "Oh, we're just going to have Mr. Reidl come in here,"

15   they made no effort to try to supplement their document

16   production, their disclosures.  They didn't come to us

17   and say, you know what, our claim is for 27 additional

18   people and here are the records for these people.  They

19   just didn't do it.

20        So under Rule 26 and Rule 37, just right

21   there, without getting into the details of the

22   calculation, that's a basis right there as a sanction to

23   strike out that claim for overhead, lost productivity,

24   whatever they're calling it.

25        And but, finally, when you look at what

1    Mr. Reidl's done, even, even if we do look at the

2    substance of it, he's had to go through mathematical

3    gymnastics that really a lay witness can't do.  Because

4    there weren't really 27 people that were hired, he's had

14:50:46 5    to go back and come up with some theory on how to say

6    "Well, I think we had the equivalent of 27 more people."

7    You know, he did that by looking at their pounds shipped

8    and claiming there was a productivity drop and then

9    arguing that they should have been shipping more.

14:51:02 10              It's all very -- it's all very confusing

11   and unclear as to where he ultimately comes out, but at

12   the end of the day, what has he done?  He's done a

13   computation.  Instead of dealing with facts, hard

14   evidence and facts which should have been available if

14:51:17 15   this was true within Hodell's own business records, he's

16   conjured up a damages theory that really is not one that

17   could be accepted ever, let alone through a lay witness.

18              And I think, unless my friends tell me

19   otherwise, that would cover -- one moment.

14:51:51 20              One final point, in the Rule 50 motion that

21   we filed, which is Docket Entry 362, we also point out,

22   and I think correctly, that this is not a punitive

23   damages case.  Right?  Punitive damages requires a

24   showing of malice as a threshold matter, a showing of

14:52:14 25   malice before the claim could even proceed to the jury.

 1              As I mentioned earlier, there's not even a

 2      suggestion of intentional conduct here, not even evidence

 3      from which you could infer intentional conduct.

 4              I don't know how any reasonable person,

14:52:32  5      Your Honor, could look at all the evidence that was

 6      presented in this case and find that SAP in any way,

 7      shape, or form, any of the Defendants for that matter, in

 8      any way, shape, or form, acted with malice, with a

 9      conscious disregard for Hodell's rights.

14:52:50 10              I mean, the evidence that we heard was to

11      the contrary, that when SAP was finally informed of what

12      was going on on this customized project and brought out

13      after go-live, Mr. Killingsworth testified about this,

14      they made an amazing effort and invested time and money,

14:53:08 15      far greater than what they took in, about $150,000, to

16      try to make Hodell a happy customer.

17              That's not the actions taken by a party

18      that intends to harm another.  Those aren't the actions

19      taken by a party who acts with conscious disregard or

14:53:27 20      malice.

21              And for that, for those reasons, just to

22      summarize -- you got something else?  Oh, one other

23      point.  One other point.

24              I'm sorry to bounce around so much.

14:53:40 25      There's just so many issues in this case, and apologies

 1    if it's a little disjointed.

 2              One argument that has been made is by

 3    Hodell that somehow SAP AG is not protected by the

 4    license agreement.  And there's been a suggestion made

14:53:58  5    that early in the case, in the context of motions to

 6    dismiss, that we somehow made an argument that SAP AG was

 7    not a beneficiary of the license agreement.  That's just

 8    not true.

 9              And I'll walk you through it very quickly.

14:54:13 10              Way back in the motion to dismiss stage, we

11    argued that neither SAP Defendant was a party to the

12    development agreement between Hodell and IBIS/LSi.

13    Hodell in response argued that both SAP Defendants were

14    third-party beneficiaries.  In the context of the

14:54:31 15    development agreement, we argued to the contrary, and

16    Judge White agreed with us.

17              We also argued in a motion to dismiss that

18    only SAP America could be subject to a claim for breach

19    of the license agreement.  In response to our argument

14:54:48 20    that SAP AG could not be subject to a breach of contract

21    claim on the license agreement, Hodell, not SAP, Hodell

22    raised the suggestion that somehow SAP AG could be held

23    liable because it's a third-party beneficiary.

24              I went through our briefing on the motion

14:55:05 25    to dismiss, both our initial brief and our reply.  I saw

1    nowhere in there where we ever made the assertion that

2    SAP AG was not a beneficiary of the license agreement,

3    the license agreement.  And I know Judge White, in his

4    decision, his Report & Recommendation on the motion to

14:55:30  5    dismiss, went through an analysis of Hodell's third-party

6    beneficiary argument, and said, "Hey, SAP AG is not

7    subject to a claim here."

8         But he very clearly said SAP AG may very

9    well benefit from the license agreement.  And very

14:55:46 10    clearly they do.

11         If you look at the license agreement, SAP

12    AG is mentioned specifically throughout it.  Section 1.7,

13    with respect to proprietary information, it's indicated

14    that the proprietary information is that of SAP America

14:56:06 15    and SAP AG, which is then defined as the licensor of the

16    proprietary information to SAP America.

17         The definition of "Software" expressly

18    includes SAP AG.  Throughout the contract, for instance,

19    in the warranty provision, it refers of course to the

14:56:24 20    term "Software" which would refer back to SAP AG.

21         If you look at Section 9, limitation of

22    liability, it expressly mentions SAP and its licensor,

23    which is SAP AG.

24         7.2, where there's an expressed disclaimer

14:56:41 25    of warranties, SAP and its licensors, that's SAP AG,

1    disclaim all other warranties.

2            And finally, in the limitation of liability

3    provision at 9.3, it again refers to SAP and its

4    licensor, which is SAP AG.

14:56:58 5          So to sum all this up, Your Honor, in short

6    order, Hodell is left with a breach of contract claim, a

7    breach of warranty claim against SAP America.  If they

8    haven't proven that claim, well, that's on them.  They

9    had years to do it.

14:57:13 10          They make no effort to bring in the

11   documentation.  They claimed they didn't know where it

12   was.  But during discovery, I will tell you, they were

13   told where the documentation was.

14            And I will, I've said a lot.  So I'll leave

14:57:27 15   it, I'll leave it there.

16            THE COURT:  Thank you.

17            MR. LAMBERT:  Good afternoon, Your Honor.

18            THE COURT:  Good afternoon.

19            MR. LAMBERT:  If it's all right, Ms. Luarde

14:57:50 20   and I will probably split some of these arguments.

21            THE COURT:  That's fine.

22            MR. LAMBERT:  Mr. Miller made a very

23   surprising comment to me, and that is I want to start off

24   with the marketing literature.

14:58:00 25          He said we can't have a fraud trial based

2874

1    upon that marketing literature, but we just did have a

2    two-week fraud trial based upon that marketing literature

3    because two Federal Judges on four separate occasions

4    found that marketing literature sufficient to support a

14:58:24 5    claim for intentional misrepresentation.

6                  And that's because this issue has been drug

7    into the ground by SAP repeatedly, and they've lost every

8    time.

9                  And the most recent time they lost, they

14:58:42 10    had the opportunity to present their case, and they did

11    not prevail, and Judge White and Judge Wells were

12    absolutely correct, the issue of whether the marketing

13    literature is -- misrepresents the capacity of SAP's

14    software is an issue of fact that has to be resolved by

14:59:03 15    the jury.

16                  And what Mr. Miller and Mr. Star did just

17    now in large part was perfectly fine for closing

18    argument.  They argued their view of the evidence, and I

19    can appreciate them doing that.  That's what their job

14:59:23 20    is.  But for every evidentiary issue they raised, the

21    factual record that was put into evidence here at trial,

22    there's something on the other side of it.

23                  And I submit to Your Honor that during the

24    course of this case, as the evidence was going in, and as

14:59:46 25    Your Honor is aware, the motion for directed verdict or

1  motion for judgment as a matter of law that's being made

2  here, the standards are substantially similar.  The

3  evidence -- to summary judgment.

4          The evidence needs to be construed in a

5  manner most favorable to Hodell, and with all reasonable

6  inferences drawn in Hodell's favor.  And so given that

7  that's also the summary judgment standard, I was curious

8  to see, as the evidence went in, what evidence was

9  sufficient to get us here.  What evidence was sufficient

10  in two Federal Judges' minds to get the case past summary

11  judgment and in front of a jury, which is what we just

12  did.

13          And so I went through, and I highlighted

14  Judge White's Report & Recommendation where he undertook

15  a very, very thorough analysis, 28 pages long, just

16  applicable to the claims against SAP America and SAP AG.

17  There was a separate opinion equally as long for the

18  claims against LSi.

19          He undertook, after oral argument, very

20  detailed analysis of the claims and the facts supporting

21  those claims.  And if you go through the opinion, I

22  highlighted what came in, Your Honor.

23          Just about every factual issue that Judge

24  White found sufficient to get us to trial has now come

25  into evidence at trial.  Okay?  So in my mind, if the

1    evidence was sufficient to create a material issue of

2    fact at the Rule 56 stage and the standard's the same,

3    then how can a motion for judgment as a matter of law be

4    granted at this point?  There hasn't been any substantial

5    failure of the factual evidence.  There hasn't been an

6    admission that SAP can hang its hat on that's different

7    than what they tried to hang their hat on two and three

8    years ago in this case.

9              It wasn't sufficient then.  It isn't

10   sufficient now.  The issue is whether there is enough

11   evidence on each element of our claim that a reasonable

12   jury could find on each element of our claim that we

13   submitted competent evidence.  And I submit that we did.

14             THE COURT:  Okay.  I think I understand

15   your fraud claims, and you filed the brief.

16             Am I correct that that's -- those sentences

17   that were highlighted are what you are relying on?

18             MR. LAMBERT:  I don't know that we

19   specifically highlighted every sentence.  I think I

20   pointed out in the brief the particular representations

21   that we thought were material to the transaction.

22             THE COURT:  Well, let's do it this way, so

23   I can ask on Exhibit 314, I guess, it says "SAP Business

24   One brief.  The solution helps emerging businesses from

25   those with 10 to several hundred employees to streamline

 1      their operational and managerial processes."

 2                      That is one statement you're relying on?

 3                      MR. LAMBERT:  That's one statement,

 4      correct.

15:03:06   5              THE COURT:  Okay.  And then in their SAP

 6      solution brief, which is a different item, it says,

 7      "Whether you have five employees or 500, the solution

 8      helps emerging businesses streamline their operational

 9      and managerial processes."

15:03:24 10                  That's the second statement you relied on?

11                      MR. LAMBERT:  One of many, but yes.

12                      THE COURT:  Right.  But I'm just going

13      through them.

14                      And then in Exhibit 617, that was the

15:03:38 15      American Express document, I guess, it says, "SAP

16      Business One Solution effectively supports companies with

17      as low as 10 and as many as several hundred employees."

18                      You rely on that, correct.

19                      MR. LAMBERT:  That's one of the

15:03:55 20      representations, yes, Your Honor.

21                      THE COURT:  All right.  And then the last

22      one I have here is in Exhibit 618, "It supports an

23      unlimited number of simultaneous user transactions."

24                      MR. LAMBERT:  Yes.

15:04:05 25                  THE COURT:  All right.  Those are the

1    advertising items that you're relying on for the fraud

2    claims?

3                    MR. LAMBERT:  Those are the exhibits.

4    Those aren't the only statements in those exhibits that

15:04:15 5    we're relying upon.

6                    THE COURT:  Well, that's what I asked you.

7                    MR. LAMBERT:  Right.  In our brief, we

8    identified -- and I can go through each one of them

9    because they're spelled out in the brief, the brief

15:04:27 10    itself, the Business One brief, so that was Exhibit 314,

11    the solution helps emerging businesses from 10 to several

12    hundred employees, that's the one Your Honor just read.

13                    THE COURT:  Right.

14                    MR. LAMBERT:  That's on 314.2.

15:04:42 15                    It also discusses support for growth.

16    That's also on 314.2.

17                    It discusses enhanced productivity and

18    control.  That's on 314.3.

19                    And then --

15:04:59 20                    THE COURT:  So, wait, let me ask.

21                    So I'm just asking you, the things you

22    wrote in your brief here, those are the things when you

23    say, "It discusses support for growth, trouble-free

24    customization, unmatched expertise," you're saying that's

15:05:17 25    fraud?

1          MR. LAMBERT:  I'm not saying those are

2     necessarily fraudulent.  I'm saying that's what we relied

3     upon in purchasing the software and it ties into some of

4     the other claims we're going to be making here as to why

15:05:27 5     we were told and relied upon the statements that were

6     made to us.

7          I will submit to you with regard to fraud,

8     the solution helps 10 to several hundred employees,"

9     Judge White has already held that's an issue of fact as

15:05:46 10    to whether employees means users and there's been

11    evidence --

12          THE COURT:  I don't want to get into all of

13    that.

14          MR. LAMBERT:  Okay.

15:05:52 15          THE COURT:  I'm trying to ask you, because

16    if I have to instruct on all this, I want to know what

17    you say the fraud is.

18          MR. LAMBERT:  Right.  And, you know, Your

19    Honor, primarily, I agree that the claim has been based

15:06:01 20    upon the number of users that were represented to us that

21    the software could support.  The software was represented

22    as being highly customizable, and easily customizable.

23          I think Mr. Lowery and Mr. Van Leeuwen both

24    acknowledge that that's how the software was sold to

15:06:22 25    Hodell.

1              And then, oh, we come in here at trial and

2      half of SAP's defense has been that In-Flight, you know,

3      we're to blame for buying highly customizable software

4      and implementing and integrating In-Flight into it.

15:06:38  5      Well, it's either highly customizable and it's perfectly

6      acceptable or you told us something that wasn't true,

7      right?

8              THE COURT:  We could be here forever going

9      through these, all those documents.

15:06:48 10              I asked specifically, are you saying that

11      trouble-free customization is a fraudulent inducement to

12      sign the contract?

13              MR. LAMBERT:  I'm saying that it was, if

14      SAP's defense is to be believed, then that's not true, we

15:07:05 15      did not -- we did not receive trouble-free customization.

16      If what they're saying in their defense is that we were

17      undertaking some extreme risk by integrating In-Flight

18      into Business One, then that's a misrepresentation.

19      Because I don't see anything in that marketing literature

15:07:24 20      that tells us we're undertaking extreme risk by

21      implementing or integrating add-on software.

22              In fact, it says quite the opposite.

23              THE COURT:  Well, look at your license

24      agreement.

15:07:35 25              MR. LAMBERT:  I don't see any -- I don't

1    see any warning in the license agreement that says that

2    there's an issue with integrating add-on products into

3    the software.

4                    THE COURT:  All right.  So you --

15:07:50  5                    MR. LAMBERT:  But --

6                    THE COURT:  I will -- I can't decide for

7    you what you're saying the fraud is.  That's why I've

8    asked for days on end to --

9                    MR. LAMBERT:  I know.

15:07:58 10                    THE COURT:  -- to tell me the exact

11   verbiage because if I'm going to give the instruction I

12   have to tell the jury what the words are that you say are

13   fraud that induced you to enter this agreement.

14                    MS. LUARDE:  Your Honor.  I apologize, Wes,

15:08:14 15   if I may.

16                    MR. LAMBERT:  Go ahead.

17                    MS. LUARDE:  Your Honor, if I could address

18   this, first, the brief that we provided to you, you had

19   requested the marketing literature that we relied upon.

15:08:26 20                    The statements that are identified in that

21   literature are, in fact, statements that we believe to be

22   fraudulent.

23                    In addition to that, however --

24                    THE COURT:  All right.  Stop.

15:08:33 25                    MS. LUARDE:  Yes.

1          THE COURT:  All right.  I'm agreeing with

2     you, that that's what you say.

3          The whole document?  Is that what you're

4     saying?

15:08:42  5          MS. LUARDE:  In particular, Your Honor, the

6     points that you reference with regard to users, that's

7     our primary fraudulent claim, yes.

8          THE COURT:  Okay.  All right.

9          MS. LUARDE:  Yes.  So I agree with you, it

15:08:51 10   relates to the number of users that the system can

11    accommodate.

12          THE COURT:  Got you.

13          MS. LUARDE:  Okay?

14          THE COURT:  Thank you.

15:09:00 15         MS. LUARDE:  Secondly, Your Honor, those

16    representations in the marketing literature are not the

17    only basis for fraud.

18          The oral statements that were made that

19    we've heard about throughout the life of this case,

15:09:13 20   including those made by Ms. Vitantonio, Mr. Lowery, and

21    Mr. Van Leeuwen, to our client, who were acting as agents

22    of SAP, were fraudulent as well.

23          THE COURT:  Okay.

24          MS. LUARDE:  And those related to, again,

15:09:32 25   that the system, that Business One could accommodate the

1    number of users, the database size, the number of SKUs

2    and it could accommodate Hodell.

3                THE COURT:  All right.  We can resolve that

4    issue quickly because on the license agreement you

15:09:46  5    disclaim all that.

6                MS. LUARDE:  Your Honor, the license

7    agreement, first of all, the license agreement does

8    not -- SAP AG is not a party to that license agreement.

9                And, in fact, in the motion to dismiss

15:09:57 10    phase, the law of the case is SAP AG is not a party to

11    that license agreement, and if you look at that

12    contract --

13                THE COURT:  All right, so --

14                MS. LUARDE:  -- it is only between SAP

15:10:09 15    America and Hodell.

16                Not SAP AG.

17                And, in fact, the documentation that we

18    provided was written by and copyrighted by SAP AG.  So

19    even if, even if the license agreement somehow applies,

15:10:24 20    SAP AG is not a party to that.

21                Secondly, Your Honor, agency, the law of

22    agency, the terms of a license agreement with regard to

23    disclaiming someone's an agent is only one factor to be

24    considered in determining whether an agency relationship

15:10:43 25    exists.  Just one factor.

 1                It is not dispositive, and that's the law.

 2                And I know you get to decide the law, but

 3      that's the case law that we've seen, it's just one of

 4      many factors.

15:10:54  5                So with SAP AG, there's no contract.  With

 6      SAP America, the license agreement exists, but it's only

 7      one factor for the jury to consider in determining

 8      whether an agency relationship existed between SAP and

 9      LSi and AmEx.

15:11:13 10

 11                THE COURT:  Okay.  So your suit against SAP

 12     AG on the fraud claims, you're saying that they

 13     were -- that they -- people that made these various

 14     statements were agents of SAP AG.

15:11:27 15                MS. LUARDE:  Yes, Your Honor.  They were

 16     agents.  Yes.

 17                THE COURT:  All right.  I'm with you.  All

 18     right.

 19                And then you have a separate claim, I

15:11:36 20     guess, against -- that's going to be a novel approach

 21     because if you can't use those statements against SAP

 22     America, but you can use them against SAP AG?

 23                MS. LUARDE:  We can use them against both,

 24     Your Honor, because, look, it's unclear to Hodell -- and

15:11:53 25     you have to look at it from the perspective of

 1    Hodell -- who these agents are representing.

 2              They held themselves out as representing

 3    SAP.  Documentation shows SAP AG, but you know what?  In

 4    the course of this litigation, we finally see for the

15:12:10  5    first time a contract between LSi and SAP and I believe

 6    it was SAP America.

 7              I mean, we don't know, from the perspective

 8    of Hodell, we know that these people are holding

 9    themselves out as agents of SAP.

15:12:29 10              THE COURT:  Well, you know when you signed

11    the license agreement.

12              MS. LUARDE:  We only knew when we signed

13    the license agreement that we were signing the license

14    agreement with regard to the software.  We had no idea

15:12:38 15    about the relationship between SAP, be it SAP AG, SAP

16    America, and LSi or AmEx.

17              I mean, I don't -- we didn't know at the

18    time.

19              THE COURT:  Well, AmEx has nothing to do

15:12:53 20    with this case, does it?

21              MS. LUARDE:  They do in that they made

22    Ms. Vitantonio, there is a factual dispute as to what she

23    told Mr. Reidl.

24              It is our testimony, and Mr. Reidl's

15:13:06 25    testimony on the record, that she told him that Business

1      One could accommodate the number of users they needed,

2      the growth that they needed, and the customization that

3      they needed.

4                 Those were the representations that she

5      made to him.

6                 THE COURT:  She made to him in the context

7      of the AmEx program.

8                 MS. LUARDE:  She made them in the context

9      of Business One, what Business One could handle.

10                 AmEx --

11                 THE COURT:  With the AmEx add-on.

12                 MS. LUARDE:  You're correct, Your Honor.

13     However, the core Business One product as we've heard

14     throughout the life of this case is the same.  In fact,

15     you can't even get into that code.  You have to interface

16     with it, and the AmEx add-on was a different type of

17     add-on than In-Flight.

18                 But the representations were about the core

19     Business One product.  Don't be fooled.

20                 THE COURT:  Okay.  All right.  I'm not

21     fooled.

22                 But what is your contract claim here?

23                 MS. LUARDE:  Our contract claim, Your

24     Honor, we have a breach of warranty claim under 7.1 of

25     the agreement, and we also have what are -- and I said

1      this early the other day when you raised it -- a failure

2      of its essential purpose.  A warranty claim for the

3      failure of its essential purpose.  The product just

4      doesn't work.

15:14:22  5            THE COURT:  Well, the product does work,

6      though.

7                 MS. LUARDE:  No, it does not.

8                 THE COURT:  It worked for two years.

9                 MS. LUARDE:  Actually it does not, Your

15:14:29 10     Honor.  That's a factual dispute.

11                Our testimony has been --

12                THE COURT:  It may not have met your

13     expectations but it worked for two years.

14                MS. LUARDE:  Your Honor, actually, I

15:14:37 15     disagree with that.  It did not work for two years.  I

16     mean, it did not perform as anyone would anticipate a

17     software program to perform.

18                I mean, the testimony in the record has

19     been that even today with Joe Vislocky, you know, you

15:14:54 20     click on it and you have a dropdown menu, and it takes

21     seconds before it moves, before it works.  We've had

22     Kevin Reidl testify to that effect.  We had Jaime Clarke

23     testify to that effect.  We've had Otto Reidl testify to

24     that effect.  Joe Vislocky testified to that effect.

15:15:16 25                We've also had our expert, Helmuth Guembel,

1    who got up on the stand, and Helmuth is probably one of

2    the most believable people here for the simple reason

3    that he historically has done tremendous amounts of work

4    for SAP, and over time, SAP paid him almost a million

15:15:33  5    dollars for consulting.  He had to turn down consulting

6    work in order to help us out.  He testified there is no

7    way, based on the basic architecture of the system, that

8    Business One could ever work for a company like Hodell.

9         And if you look at the documentation and

15:15:48  10    the e-mail traffic in this case, it's glaring, it's

11    stunning.  I actually was kind of floored when they came

12    in and said Business One worked for Hodell.  It never

13    worked for Hodell.

14         All you got to do is look at their own

15:16:01  15    documentation.  Udi Ziv, who was the head of the

16    development team for Business One in Israel, the first

17    thing he said is, "You have 120 users.  There is no way

18    this is going to work.  They're going to have continued

19    performance problems."

15:16:14  20         We have document after document after

21    document after document where they knew this was a

22    problem.  They knew it was a problem.  And yet they're on

23    the phone with Hodell and they are telling them, "Oh,

24    we'll give you another patch.  How about Patch 25?  How

15:16:31  25    about Patch 29?  Oh, wait a minute, we'll upgrade you to

2889

1    2007."

2                    THE COURT:  All right.  I appreciate you

3    want to argue the case, but my question is what is your

4    contract claim and you're saying breach of warranty

15:16:42 5    and --

6                    MS. LUARDE:  It's under 7.1, a breach of

7    warranty based on failure to conform to the

8    specifications, but also failure of essential purpose.

9                    THE COURT:  Okay.  Is there any evidence on

15:17:00 10   what the documentation is?

11                   MS. LUARDE:  Well, honestly, the first time

12   we heard documentation was delivered with the product --

13   throughout the life of this case, Your Honor, my

14   understanding is -- and, Your Honor, and I have not lived

15:17:11 15   this case like these gentlemen have, but there's

16   deposition testimony where people couldn't point to the

17   documentation.

18                   So the documentation, we didn't know what

19   the documentation was.  We've never been, in this

15:17:23 20   litigation, and, Wes, please correct me if I'm wrong, not

21   been given a copy of it.

22                   THE COURT:  Well, your client got a copy

23   when the software was delivered.

24                   MS. LUARDE:  Your Honor, if it came, we

15:17:32 25   never knew it was there.

1           THE COURT:  Well, then, how do you bring a

2      claim that it's a violation of what's in the

3      documentation?

4           MS. LUARDE:  Because, Your Honor, frankly,

15:17:42 5    Your Honor, the warranty language is more of the failure

6      of essential purpose because we don't know what the

7      documentation says, and they've not presented the

8      documentation at this case, in this trial.

9           In addition, we also have the e-mail

15:17:56 10   traffic where their own representative said we're in

11     breach of the warranty.  They say it means one thing.  We

12     say it's another.  That's a factual dispute.

13          THE COURT:  Well, it's not a factual

14     dispute because you've got to show what the documentation

15:18:12 15   says.

16          MS. LUARDE:  Your Honor, to our knowledge,

17     we've never been given the documentation.

18          THE COURT:  I know.  I can't help that.

19          MS. LUARDE:  So I can't point to

15:18:24 20   documentation we've never been given and, I mean, our

21     client --

22          THE COURT:  Hold it.  Hold it.  Hold it.

23          MS. LUARDE:  Yes, Your Honor.

24          THE COURT:  But you could bring a lawsuit

15:18:33 25   based on the violation of the terms in the documentation

1       and saying you never have seen it?

2                   MS. LUARDE:  Your Honor, we pled in the

3       alternative with regard to the clear language of 7.1

4       about the documentation but also failure of essential

5       purpose.

6                   THE COURT:  You know what?  We're arguing

7       but I don't want to argue with you.  If you don't know

8       what the documentation says, then you can't bring a

9       lawsuit to say that they are in breach of the

10      documentation.

11                  That's all I'm saying.

12                  MS. LUARDE:  Okay.

13                  THE COURT:  So then that's out as far as

14      your breach of contract claim is.

15                  And then what you're saying is your -- it

16      failed in the essential purpose of the software?

17                  MS. LUARDE:  Correct.

18                  THE COURT:  That's your, under the UCC,

19      that's your claim?

20                  MS. LUARDE:  Yes, Your Honor.

21                  THE COURT:  Okay.  Thank you.  That's all I

22      needed to know.

23                  Now, another question is what are the

24      difference in damages between the tort claim, the fraud

25      claim, and the contract claim?

1              MS. LUARDE:  The -- the fraud claim,

2       obviously the damages are much broader than they would be

3       under the contract claim.  The contract claim with SAP

4       America contains a limitation of liability provision that

15:19:39  5       limits the damages.  Of course, if there's a failure of

6       the essential purpose, under case law, we don't have to

7       be party to that.

8              But I believe it limits us to actual

9       damages.

15:19:52 10              Is that correct, Wes?

11              MR. LAMBERT:  It limits, the limitation

12       remedy limits Hodell to a refund of the license fees,

13       which I think SAP claims is some nominal amount.

14              THE COURT:  But isn't that the whole point?

15:20:06 15       You can't file a fraud claim because you have a damage

16       limitation in the -- otherwise in the contract?

17              MS. LUARDE:  No, Your Honor.

18              And, in fact, I believe that was addressed

19       earlier in the summary judgment phase, that you can't

15:20:20 20       hide behind a contract that you fraudulently induced

21       someone to enter into.

22              You know, you can't say, "Oh, here we're

23       going to give you all these great things, sign this

24       contract," and have a limitation of liability provision

15:20:33 25       in there and hide behind that.

 1          And that was already decided in this case

 2     in the summary judgment phase.  So, no, in fact, the

 3     fraud claim remains.

 4               THE COURT:  Okay.

15:20:42  5          So the difference in the damages you see

 6     between the contract claim and the fraud claim is the

 7     amount that you were limited to in the license agreement

 8     because it's not limited when you have a fraud claim.

 9               MR. LAMBERT:  Well, also, Your Honor, the

15:20:58 10    law, especially as stated here by Judge Wells very early

11     on, because this was raised as a basis to dismiss the

12     claim at the motion to dismiss phase, what Judge Wells

13     held, which is in accord with the law, is that the

14     damage, duplicative damages issue in this context means

15:21:21 15    that you can't get a double recovery.

16               And we acknowledge that.  We are not

17     entitled to the same damages -- we are not entitled to

18     damages for breach of contract and then entitled to the

19     same damages on fraud.

15:21:35 20               You get one recovery.  That's what Judge

21     Wells held.  And that's what this, this concept of

22     duplicative damages is.  It's not that -- it's not an

23     element of the case.  It's not -- and frankly, the

24     *Airlink* case that SAP cited, it doesn't even address this

15:21:55 25    issue.

```
 1              The only thing that has to do with -- the
 2   only thing Airlink has to do with this case is that it
 3   was a fraud claim that was dismissed.  If you look at the
 4   cases that we cited, the Karmaloop case and the Furmanite
 5   case, it's factually right on point.  The Court held,
 6   "Where damages are potentially distinct by virtue of a
 7   limitation of liability clause, then as a matter of fact,
 8   there is distinct damages."
 9              And that's what both of those cases held.
10              THE COURT:  That's -- my only question is,
11   is it your position that the damages are not duplicative
12   in the fraud claim and the contract claim only because
13   there's a damage limitation in the license agreement?
14              MR. LAMBERT:  Not only that, but there are
15   no contract remedies available against SAP AG because --
16              THE COURT:  That's a different question.
17              MR. LAMBERT:  Right.
18              I would submit that the remedies for fraud
19   in this case, in other words the remedy for fraud is to
20   put us back in the position that we would have been
21   but-for the fraud.
22              The damages for breach of contract in this
23   particular case are, by virtue of the license agreement,
24   maxed out at a return of the license fees.
25              But contract damages, thereafter, is
```

1    benefit of the bargain rule.  It's different than what we

2    would get for fraud.

3            THE COURT:  Okay.

4            MR. LAMBERT:  But again, the case law says

15:23:41 5    that a party doesn't get to have it both ways.  You don't

6    get to expand the contract, and this is the *Furmanite*

7    case that was just decided, I think, you know, six or

8    seven months ago in Ohio, you don't get to expand the

9    contract and then contract it to suit your needs, and

15:24:02 10    that's what they're trying to do here.

11            MS. LUARDE:  And, Your Honor, I mean, just

12    a point of clarification or addition.

13            You know, the jury instructions from OJI

14    are instructive on the damages for fraud, and they state,

15:24:19 15    "A Plaintiff is entitled to recover as compensatory

16    damages such damages as will fairly compensate him for

17    the wrong suffered; that is, the damages sustained by

18    reasons of the fraud or deceit and which have naturally

19    and proximately resulted therefrom."

15:24:38 20            It goes on to say, "If you find for the

21    Plaintiff, you will decide from the greater weight of the

22    evidence what amount of money will reasonably compensate

23    the Plaintiff for the actual damage directly caused by

24    the fraud ."

15:24:53 25            So we're entitled to actual damages as a

2896

1   result of the fraud, which would include all the damage

2   components that we had Mr. Reidl testify to during the

3   course of the trial.

4           So the fraud damages are, in fact, broader

5   than simply contract damages.

6           THE COURT:  That would be in every case,

7   then, right?

8           MS. LUARDE:  I apologize?

9           THE COURT:  I said if you're correct, that

10  would be in every -- every single contract case, you

11  could file a fraud claim, too, and then the damages, just

12  because by the nature of filing the claim, the damages

13  are different according to you?

14          MS. LUARDE:  Not just according to me, but

15  according to, you know, the damage instructions from OJI.

16  Yeah.

17          Yeah, they are different.  And so, you

18  know, so again, and in this instance, you know, based on

19  all the evidence and based on, you know, the summary

20  judgment, we did go back through and make sure that

21  everything that we put into the summary judgment motion

22  was put into evidence here because the standard for

23  directed verdict is virtually identical to that for the

24  summary judgment.  And everything is there.  Everything

25  is present.  And the fraud claim against both SAP America

2897

1    and SAP AG should go to the jury.

2              And I don't know, there were lots of things

3    thrown around by opposing counsel so I'm not sure what

4    issues you would like me to specifically address.

15:26:36  5              THE COURT:  That's okay.  Go ahead.  I'm

6    sorry.

7              MS. LUARDE:  No, I just -- I'm not quite

8    sure what else you would like me to specifically address,

9    Your Honor.

15:26:49  10              THE COURT:  I think we're good.

11              MS. LUARDE:  Are we good?

12              THE COURT:  I think so.

13              MR. MILLER:  Your Honor, just a few --

14              THE COURT:  Just answer one question for

15:26:56  15    me.

16              If in fact there is evidence, if I believe

17    the advertising material that SAP AG is a separate

18    entity, right?

19              MR. MILLER:  SAP AG and SAP America are

15:27:13  20    separate entities, but that was the point I was going to

21    go to initially, Your Honor.

22              THE COURT:  Well, hear me out.

23              In the flyers that were put out, SAP AG

24    were the author, right?

15:27:30  25              MR. MILLER:  They are the author of some of

1    them.  When you went to the back, it said SAP AG.  I

2    don't think that's in dispute.

3                    THE COURT:  Okay.  And then how about the

4    development agreement with IBIS or LSi?

15:27:39  5                    MR. MILLER:  No.  No.  No.

6                    THE COURT:  That's with SAP America, right?

7                    MR. MILLER:  Neither.  The development

8    agreement is only between Hodell and IBIS and LSi.

9                    The license agreement --

15:27:50  10                    THE COURT:  I'm talking about the agreement

11   that you have with LSi.

12                    MR. MILLER:  Okay.  Right.  The -- well --

13                    MS. LUARDE:  The marketing agreement.

14                    THE COURT:  The marketing agreement.

15:27:57  15                    MR. MILLER:  Right.  That's SAP America and

16   LSi, and then there's a SDK that exists between SAP and

17   LSi.

18                    And then there was a SDK between SAP and

19   IBIS, but that expired.  And there's no SAP distribution

15:28:14  20   agreement with either.

21                    THE COURT:  It's kind of interesting

22   because the Plaintiff is bound by the license agreement,

23   by the parol evidence rule and by their signing of the,

24   understanding of the nature of the agreement that says

15:28:32  25   that LSi is not an agent of anybody or they can't have

1    any representations.  SAP AG's not bound by that.

2              MR. MILLER:  SAP AG has the benefit,

3    third-party beneficiary of the license agreement.

4              Forgive me, if you look at the license

15:28:49 5    agreement, Your Honor, it's Exhibit 316, that's the best

6    copy of it, SAP AG is mentioned repeatedly in the

7    document, and it's defined as the licensor.  It's --

8              THE COURT:  No, I understand that.

9              But didn't, correct me, didn't Judge White

15:29:05 10   and then Judge Wells find that that wasn't true?

11             MR. MILLER:  No.  No.  That's not true.

12             MR. LAMBERT:  Yes, they did.

13             MR. MILLER:  I don't think so.

14             MR. LAMBERT:  It's expressly stated in the

15:29:14 15   Report & Recommendation and in the order.

16             THE COURT:  I thought it was, too.

17             MS. LUARDE:  I have it right here.

18             MR. MILLER:  Your Honor, if I may, this got

19   very twisted early in the case because of arguments that

15:29:26 20   Mr. Star was reciting earlier in connection with the

21   development agreement when it was alleged that

22   potentially the SAP entities could be liable under the

23   development agreement between LSi and IBIS and Hodell,

24   and SAP wasn't a party to that.

15:29:40 25             And then they tried to bring a claim

1    against SAP AG as a -- as some sort of third-party -- SAP

2    America and SAP AG as some sort of third-party

3    beneficiary to the development agreement.  Okay?

4                 The issue that's never been litigated, that

15:30:01  5    can't be legitimately disputed, is that if you look at

6    the license agreement, Exhibit 316, it's a contract

7    between Hodell and SAP America.

8                 THE COURT:  Yeah, but didn't you argue in

9    the summary judgment that SAP AG should be out because

15:30:14  10   they weren't signatories to the agreement?

11                MS. LUARDE:  Yes.

12                MR. STAR:  That they are not subject to a

13   breach.  So there's obviously a difference between a

14   party that can be subject to an affirmative claim of

15:30:24  15   breach of contract and a party that can be a third-party

16   beneficiary who has rights and protections under that

17   contract.

18                MR. MILLER:  And if I may, Your Honor.

19                THE COURT:  I get the argument.

15:30:34  20                MR. MILLER:  No.  No.  But, Your Honor,

21   they are very distinct.

22                THE COURT:  I know.

23                MR. MILLER:  The point is they can't sue us

24   for breach of the license agreement, but I'm right, I

15:30:41  25   just was uncertain for a second, there's never been a

1    conclusion about whether or not they're a third-party

2    beneficiary of this agreement.

3            THE COURT:  I think that Judge Wells and

4    Judge White both said, you argued that, and they rejected

15:30:52  5    it.

6            MR. MILLER:  Well, I'm not sure but --

7            THE COURT:  Ms. Luarde can straighten that

8    out.

9            MS. LUARDE:  Yes.

15:30:58 10            MR. MILLER:  I would say this, Your Honor.

11    If you look at the agreement itself, it can't -- I don't

12    know how it could be disputed.  I mean, the most

13    important section of the license agreement references SAP

14    AG under the warranty section, 7.1.  There's two pieces,

15:31:13 15    right, there's 7.1 and 7.2.  And at 7.2 it says, "SAP and

16    its licensors," that's SAP AG, "disclaim all other

17    warranties, express or implied."

18            THE COURT:  Okay.  I'm going to go to work

19    and get some of this stuff done.

15:31:31 20            A couple things I can tell you.  One is

21    that the negligent misrepresentation, your motion is

22    granted as to that claim.

23            I'm going to look at the contract claims.

24    I'm going to look at the fraudulent inducement -- fraud

15:31:44 25    and fraudulent inducement, I say are basically the same

2902

1    claim.

2                    And then as to damages at this point, the

3    lack of return on investment and the interest increase on

4    the bank debt, those calculations are out.

15:31:56  5                    The others are in, and we'll meet tomorrow

6    morning 7:45 if that's all right and we'll -- I'll give

7    you my final decisions and hopefully the final

8    instructions.

9                    MR. LAMBERT:  Could I have one second on

15:32:10 10   the disclaimer of agency?

11                    I would ask the Court to look at

12   two -- they disclaim, I think it's just SAP, and SAP is a

13   defined party in their initial recital to the license

14   agreement has SAP America.  So they disclaim they're not

15:32:28 15   agents of SAP.  SAP is a defined party.

16                    THE COURT:  I'm with you.

17                    Okay.  Thank you.

18                    (Proceedings adjourned at 3:32 p.m.)

19                           - - - - -

20

21

22

23

24

25

2903

C E R T I F I C A T E

      I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

**/s/Susan Trischan**

/S/ Susan Trischan, Official Court Reporter

Certified Realtime Reporter

7-189 U.S. Court House

801 West Superior Avenue

Cleveland, Ohio 44113

(216) 357-7087

2904

1                              **I N D E X**

2

3    <u>**WITNESSES**</u>**:**                                              <u>**PAGE**</u>

4     CROSS-EXAMINATION OF GEOFFREY OSBORNE                    2695

5     BY MR. LAMBERT

6     REDIRECT EXAMINATION OF GEOFFREY OSBORNE                 2727

7     BY MR. KELLEHER

8     RECROSS-EXAMINATION OF GEOFFREY OSBORNE                  2738

9     BY MR. LAMBERT

10    FURTHER REDIRECT EXAMINATION OF GEOFFREY OSBORNE         2743

11    BY MR. KELLEHER

12    DIRECT EXAMINATION OF JOSEPH VISLOCKY(REBUTTAL)          2745

13    BY MR. CARNEY

14    CROSS-EXAMINATION OF JOSEPH VISLOCKY                     2755

15    BY MR. STAR

16    REDIRECT EXAMINATION OF JOSEPH VISLOCKY                  2777

17    BY MR. CARNEY

18    DIRECT EXAMINATION OF OTTO REIDL (REBUTTAL)             2782

19    BY MR. CARNEY

20    CROSS-EXAMINATION OF OTTO REIDL                          2791

21    BY MR. STAR

22    DIRECT EXAMINATION OF GEOFFREY OSBORNE                   2805

23    (SURREBUTTAL)

24    BY MR. KELLEHER

25