1          IN THE DISTRICT COURT OF THE UNITED STATES
              FOR THE NORTHERN DISTRICT OF OHIO

2                   EASTERN DIVISION

3

HODELL-NATCO INDUSTRIES, INC.,

4                           08CV2755

         Plaintiff,

5

      vs.                   July 1, 2015

6                        7:45 A.M.

7   SAP AMERICA, INC., ET AL.,

                      Volume 13

8        Defendants.

9

10

        TRANSCRIPT OF JURY TRIAL PROCEEDINGS

11      BEFORE THE HONORABLE DONALD C. NUGENT
          UNITED STATES DISTRICT JUDGE

12             AND A JURY

13

14

15

16

17

18

19

20

21

22

23

24

25

1    APPEARANCES:

2

3    For the Plaintiff:          Christopher J. Carney, Esq.
                                  Sharon A. Luarde, Esq.
                                  P. Wesley Lambert, Esq.
4                                 Brouse McDowell
                                  600 Superior Avenue East
5                                 Suite 1600
                                  Cleveland, Ohio    44114
6                                 216-830-6830

7

8    For the Defendants:         Gregory J. Star, Esq.
                                  Michael John Miller, Esq.
                                  Joseph M. Kelleher, Esq.
9                                 Alex H. Hayden, Esq.
                                  Drinker Biddle & Reath
10                                One Logan Square
                                  18th & Cherry Streets
11                                Philadelphia, PA    19103
                                  215-988-2734

12

13

14

15   Official Court Reporter:    Susan K. Trischan, RMR,CRR,FCRR
                                  7-189 U.S. Court House
16                                801 West Superior Avenue
                                  Cleveland, Ohio  44113
                                  216-357-7087
17

18   Proceedings recorded by mechanical stenography;
     transcript produced by computer-aided transcription.
19

20

21

22

23

24

25

1

2          <u>WEDNESDAY, JULY 1, 2015,  7:55 A.M.</u>

3                    THE COURT:  Be seated, please.

4                    All right.  Thanks, everybody, for being so

07:55:38  5   prompt.  We've got a few things to go over.

6                    The first is what the claims are going to

7   be, and we had this discussion yesterday, and I think I

8   looked back, as best I could -- you never filed a summary

9   judgment on the contract claim with SAP, I don't believe.

07:56:00  10                   MR. STAR:  We -- oh, there's so much

11   briefing.  We --

12                   THE COURT:  Doesn't make any difference,

13   but --

14                   MR. STAR:  We did argue at one point about

07:56:10  15   that claim.  I can't remember.

16                   THE COURT:  You did.  You filed a motion to

17   dismiss on it, but --

18                   MR. STAR:  Filed a motion to dismiss, and I

19   believe we did move for summary judgment on the contract

07:56:20  20   claim arguing that they hadn't shown an actual breach of

21   the documentation -- departure from the documentation.

22                   THE COURT:  Okay.  I couldn't find it, but

23   that doesn't make any difference.

24                   MR. STAR:  Okay.

07:56:31  25                   THE COURT:  Ms. Luarde yesterday argued or

1    gave up the argument on the breach of warranty claim, and

2    because the documentation, there's no evidence of what

3    was contained in the documentation, that prompted me

4    again to look at the briefs that you filed the day

07:56:48  5    before, and to look at the -- not only the complaint, but

6    the license agreement, and there's -- the Plaintiff is

7    bound by the license agreement, and there's no other

8    independent breach claim other than the breach of

9    warranty.

07:57:04  10           So the motion pursuant to Rule 50 is

11    granted as to the contract claim.

12           The issue that will go before the jury,

13    issues that will go before the jury is the fraudulent

14    inducement claim against both SAP America and SAP AG.

07:57:25  15    And because SAP America had a relationship with the

16    sellers, we look to the license agreement again to

17    determine whether any of the oral statements can be used

18    in furtherance of that claim by either Mr. Lowery

19    or -- Mr. Lowery or Mr. Van Leeuwen.

07:57:45  20           And the license agreement again completely

21    contradicts the ability, saying that there can't be no

22    warranties and there's no dispute that either Mr. Otto

23    Reidl or Mr. Kevin Reidl had any misunderstanding about

24    what the terms and conditions of the license agreement

07:58:02  25    were.  So those oral representations can't be used

1    against SAP America.

2              Now, as to SAP AG, there was no

3    relationship, so there's no agency relationship between

4    Lowery, Van Leeuwen, or SAP AG so those statements can't

07:58:26 5    be used.

6              So there's going to be a couple of, like, I

7    think three written advertising situations that can

8    be -- I'm going to put them in the instructions, but

9    under -- in Exhibit 618, that it is correct that what the

07:58:43 10   Plaintiff wanted to offer, the statement, it supports an

11   unlimited number of simultaneous user transactions, was

12   referring to the MS-SQL 2000 database, not Business One,

13   so that's out.

14             And the other thing is, and this is a

07:59:01 15   little bit different because when the American Express,

16   through Ms. Vitantonio, was trying to present a package

17   to Hodell, she did have some conversation, and generally,

18   that would have been barred, too, but you called her as a

19   witness so that information, her statements can be used

07:59:21 20   in the Plaintiffs' pursuit of their claim for fraudulent

21   inducement.

22             Other than that, I think we're ready to go.

23             The practice has been that I do the

24   instructions, the general instructions first before the

07:59:39 25   argument, and then the parties argue, and then I give the

1    concluding instructions.

2                   But if you would like it in the

3    old-fashioned way where you argue first and I give the

4    instructions later, that's fine with me, too.

07:59:50  5                   MR. MILLER:  We defer to you, Your Honor.

6                   MS. LUARDE:  We'll defer to you on that,

7    Your Honor.

8                   THE COURT:  Okay.  All right.  Then we'll

9    give you a copy of the instructions.  We'll give you a

08:00:02 10   chance to review them.

11                   And if you have any objections to it or any

12   modifications, let me know before we start.  Okay?

13                   MR. STAR:  Thank you.

14                   Your Honor, may I just make a couple points

08:00:13 15   to have them on the record very briefly?

16                   First off, with respect to election of

17   remedies on out-of-pocket costs, there was some testimony

18   by Kevin Reidl --

19                   THE COURT:  I'm sorry, let me say this.  I

08:00:24 20   did -- you'll see in the instructions I put in that if

21   they consider the subject of the damages, they can

22   consider the evidence, if any, of out-of-pocket costs,

23   training costs, and training, travel, I think maybe I

24   said -- and what was the third?  I can't remember.  The

08:00:47 25   business with the 27 employees.

1          MR. STAR:  Okay.

2          THE COURT:  So I put that in.

3    Those -- those are the three issues that were the subject

4    of damages.

08:00:55  5          MR. STAR:  Fine.  I'll take a look and --

6          MR. MILLER:  Can I clarify since I'm

7    probably doing -- I'm doing the closing?

8          The three items of damages that are out --

9          THE COURT:  No, in.

08:01:06 10          MR. MILLER:  Okay.

11          THE COURT:  You can look at it.  You'll

12    see.

13          MR. MILLER:  The Profit 21?

14          THE COURT:  No.

08:01:15 15          MR. MILLER:  Okay.

16          MR. STAR:  And one other point, Your Honor.

17          We did discuss the issue yesterday of SAP

18    AG and whether it's subject to the protections of the

19    license agreement.  We filed a supplemental brief last

08:01:29 20    night, and just very quickly, as I thought about this

21    more, the question of whether they were third-party

22    beneficiary or an incidental beneficiary is sort of

23    beside the point.

24          The issue here is whether Hodell is bound

08:01:43 25    by the promise it made as part of its bargain for

1       exchange when it entered into the license agreement with

2       SAP America.

3                       And this is the same sort of thing that all

4       of us are used to every day.  For instance, if you have a

08:01:58  5       settlement agreement, all right, the release or

6       indemnification provisions in those settlement agreements

7       almost always flow to people who are not actually

8       signatories to the contract.  They don't even need to

9       know that they're signing the contract, right?

08:02:10 10                       If I were sued, I could -- I could agree to

11      settle a claim and have my wife and my children released,

12      and they might not even have known I was sued.  And that

13      release against those individuals who might not have even

14      known about the release would be fully enforceable so

08:02:28 15      that if the other party to the lawsuit had come back then

16      and tried to sue my wife or children, they wouldn't be

17      able to do it.  The release and the indemnification

18      provision would hold up.

19                       And that's where we are with this.  The

08:02:40 20      beneficiary, third-party beneficiary question, goes to an

21      unrelated point as to whether a party who is named in a

22      release or indemnification provision can actually just be

23      sued in their own right on the contract, or whether they

24      could sue on the contract.

08:02:53 25                       What we're dealing here, though, with is a

1    defense, right, a defense of release and indemnification.

2    And to go around the license agreement with respect to

3    SAP AG in the way that Hodell is suggesting, I would say

4    would undo all of the jurisprudence that we're all used

08:03:16  5    to and that everybody in this country relies on all the

6    time when we settle claims.

7                THE COURT:  How is it relevant at this

8    juncture?

9                MR. STAR:  How is it relevant at this

08:03:28 10    juncture?

11                Well, I'm not quite sure where Your Honor

12    has come out with respect to what protections SAP AG

13    itself gets under of the license agreement.

14                I do understand you to say the Plaintiffs

08:03:38 15    are bound by the contract they signed.  That contract

16    they signed includes damages limitations provisions that

17    clearly apply to claims and remedies against SAP AG.

18                THE COURT:  All right.  But you asked

19    pursuant to Rule 50 to dismiss the breach of contract

08:03:53 20    claim, and that was done based on the evidence in the

21    case, so that damages limitation is out.

22                MR. STAR:  Yes, but what that means is that

23    the contract stands, right?  There is no claim that the

24    contract was breached.

08:04:04 25                THE COURT:  Right.

```
    1              MR. MILLER:  We didn't waive the contract,

    2     Your Honor.  We just said --

    3              THE COURT:  Yes, I know.  This is an

    4     argument that could be made afterwards.

08:04:12 5              We don't have to do it now.  I mean, I

    6     think that --

    7              MR. MILLER:  We have the rights under the

    8     contract still.  We didn't say tear up the contract.

    9              THE COURT:  Well, they have an independent

08:04:23 10     tort.  Don't worry.

   11              MR. MILLER:  I understand it.

   12              MR. LAMBERT:  The fraudulent inducement

   13     claim is that you can't stand behind a contract that has

   14     been fraudulently induced.  That's the whole point.

   15              THE COURT:  You're preaching to the choir.

   16              MR. LAMBERT:  Thank you, Your Honor.

   17              THE COURT:  Okay.

   18              MR. MILLER:  It's on the marketing

   19     documents and there's not an agency with SAP AG.

08:04:40 20              Yesterday there was a discussion about, and

   21     I contributed to some of the confusion, about what

   22     exactly is Hodell saying was misleading in the marketing

   23     materials, and we had three documents.  One of them was

   24     618.

08:04:52 25              THE COURT:  You'll see it right in the
```

1    charge.

2              MR. MILLER:  Okay.  Thank you.

3              THE COURT:  We have that.

4              Okay.  We'll see you in a bit.  Tell me

08:04:58 5    when you're ready.  Okay?

6              MS. LUARDE:  Thank you, Your Honor.

7              THE COURT:  I'm supposing that you got all

8    the documents in order.

9              MR. STAR:  Well, we --

08:05:08 10            MR. CARNEY:  I wouldn't say that, Your

11   Honor.

12             THE COURT:  You know, I've been doing this

13   for 31 years, and never once have lawyers the next day

14   said, "Okay, we got all the exhibits in order" according

08:05:21 15   to what I had said the day before.

16             So this is nothing new.

17             MR. CARNEY:  We have a couple of

18   objections.

19             THE COURT:  All right.  We can do it later.

08:05:28 20             All right.

21             (Recess taken).

22             THE COURT:  Be seated, please.

23             Okay.  Somebody has some objections on the

24   charge?

08:49:54 25             MS. LUARDE:  Yes, Your Honor.

1          THE COURT:  Okay.  Fire away.

2          MS. LUARDE:  Thank you.  It might be better

3    for me to go to the podium so Sue can hear me okay.

4          THE COURT:  Okay.

08:50:11  5          MS. LUARDE:  A couple of things, Your

6    Honor.

7          Before I go into the objections, I would

8    like some clarification with regard to the oral

9    representations that were made by Mr. Van Leeuwen and

08:50:27 10   Mr. Lowery and Ms. Vitantonio with regard to the number

11   of users that Business One would support.

12          In particular, I understand, based on the

13   instructions, that the agency argument is out and that

14   the oral misrepresentations are no longer in play, but

08:50:49 15   these misrepresentations go to reliance and my clients'

16   reliance on the marketing materials.

17          Based on the materials that he received

18   from SAP, the materials made a statement and the oral

19   representations back that up, and he --

08:51:12 20          THE COURT:  I'm going to cut you off

21   because I know what the evidence is, but the license

22   agreement bars that for SAP America.  And there was no

23   agency relationship between Van Leeuwen or Lowery and SAP

24   AG.  So you can use the written material, but not the

08:51:34 25   oral representations, other than Ms. Vitantonio, because

1    the Defense called her as a witness, and her testimony is

2    here.  You can discuss that.

3              MS. LUARDE:  Okay.  All right.  Your Honor,

4    a couple things.

08:51:46  5              We have a lot of objections, I think you

6    could imagine, with regard to the agency component here,

7    and I'd like to address that if I may.

8              THE COURT:  You can just do a general

9    objection.  You don't have to rehash everything.

08:51:59 10              MS. LUARDE:  Okay.  Your Honor, we would

11   request and object to the lack of agency instructions

12   because we believe that LSi was acting with apparent

13   authority for both SAP AG and SAP America.

14              THE COURT:  Okay.  I'm sorry, Sharon, but

08:52:21 15   you're making the same argument.  We've had this.

16              MS. LUARDE:  Okay.  I just want to make

17   sure it is clear.

18              THE COURT:  It is.  It's very clear.

19              MS. LUARDE:  Okay.  I apologize if it's too

08:52:31 20   much.

21              The other objection we have to the

22   instructions, the OJI actually states for essential

23   elements of fraud that it's not clear and convincing

24   evidence but preponderance of the evidence, and so I

08:52:48 25   think the clear and convincing is not correct in the

2918

1    instructions.

2              THE COURT:  Well, we got that right out of

3    *Glazer versus Lehman Brothers* here in the Sixth Circuit.

4              MS. LUARDE:  Yeah, we pulled ours from OJI

08:53:03 5    so I think the standard --

6              THE COURT:  Jennifer, get that.  It's in my

7    office.  You know where it is.

8              MS. LUARDE:  And the other instruction

9    would relate to punitive damages.  We notice that there's

08:53:14 10    no punitive damage charge.  We believe that with an

11    intentional tort claim such as fraud, that we're entitled

12    to such a charge.

13              THE COURT:  Okay.

14              MS. LUARDE:  And, Your Honor, I believe

08:53:42 15    that's, you know, since I have to keep this general,

16    those are the objections that we have.

17              THE COURT:  Thank you.

18              MR. STAR:  Your Honor, very briefly.  No

19    objections to the charge whatsoever.

08:53:55 20              I just thought with respect to the verdict

21    sheets, that there was a potential for some confusion to

22    the jury just because in openings and then throughout the

23    last couple of weeks, they have heard about all of these

24    supposed oral representations.  And it's very clear from

08:54:10 25    the instructions that we're down to simply the question

1    of whether there were false statements in writing in

2    those two exhibits, 314 and 617.

3                My suggestion, if I can be so bold as to

4    make a suggestion, would be on the two verdict sheets,

08:54:29   5    simply to add a phrase at the end of the sentence where

6    presently the sentence reads, "We, the jury, being duly

7    impaneled and sworn, find by clear and convincing

8    evidence in favor of blank on Plaintiff's claim of fraud

9    in the inducement," and I would ask "based on the written

08:54:45  10    representations made in Exhibits 314 or 617."

11                THE COURT:  I think the instructions cover

12    that.

13                MR. STAR:  Thank you, Your Honor.

14                THE COURT:  Do you agree with the Plaintiff

08:55:34  15    in its preponderance of the evidence?

16                MR. STAR:  Not at all.  In fact, we had a

17    proposed jury instruction number 15, evidence required

18    for fraudulent misrepresentation especially where you're

19    alleging, as they are here, a fraud in the inducement to

08:55:50  20    set aside a contract, "That fraud must be proven with

21    clear and convincing evidence."

22                That's taken from the Federal Jury Practice

23    and Procedure Instructions.  It's also taken from OJI,

24    OJI Instruction 303.07.  It also comes from the Sixth

08:56:11  25    Circuit case of *Micrel versus TRW*, Your Honor.  I can

1    hand this to you, if Your Honor would like.

2              THE COURT:  I had the *Glazer* case out here

3    somewhere.

4              MR. STAR:  Okay.  The *Micrel* case is from

08:56:26  5    the Sixth Circuit.  The citation is 486 F. 3d 866, Sixth

6    Circuit, 2007.  Here's a quote.  "When a Plaintiff seeks

7    to set aside a written document, clear and convincing

8    evidence of fraud is required."

9              That's also been the holding of the Ohio

08:56:43 10    Supreme Court in a case called *Household Financial*

11    *Corporation versus Altenberg*, A-L-T-E-N-B-E-R-G.  That's

12    5 Ohio 2d. 190.  It's a 1966 Ohio Supreme Court case.

13    "In an action to set aside a contract, clear and

14    convincing evidence of fraud is required."

08:57:06 15              MS. LUARDE:  Your Honor, the citation that

16    we have is OJI 449.03.

17              And one other thing that I forgot to raise

18    at the podium, Your Honor, is the law of the case in this

19    particular case with regards to the fraudulent

08:57:29 20    inducement.

21              It's been clear that Judge Wells and

22    Magistrate Judge White concluded that SAP America and SAP

23    AG could also have been found to

24    fraudulently -- fraudulently induce the development

08:57:51 25    agreement itself, which pre-dates the license agreement

1    by one year.  And so that claim also would remain.

2              And --

3              MR. LAMBERT:  Just for the record, also, I

4    don't believe that -- there is a duty to mitigate

08:58:09  5    instruction.  I don't think there's a duty to mitigate in

6    a fraud case so I don't think that instruction should be

7    given.  I just note that for the record.

8              THE COURT:  All right.  As to the punitive

9    damages, in the event there's an award in favor of the

08:58:32 10    Plaintiff, we will discuss that afterwards, sever that

11    claim.

12              MS. LUARDE:  Thank you.

13              MR. LAMBERT:  Your Honor, can I just note

14    one final thing with regard to the oral representation

08:59:05 15    argument?

16              THE COURT:  Yes.

17              MR. LAMBERT:  We've argued in the case that

18    SAP AG and SAP America could still be responsible for the

19    oral misrepresentations if LSi and/or IBIS and/or

08:59:20 20    American Express were acting as conduits through which

21    the misrepresentations were made.  In other words,

22    regardless of whether there was agency, if SAP told

23    Van Leeuwen and IBIS that 500 users is appropriate for

24    Business One and allowed them to pass it through to

08:59:41 25    Hodell, we believe under the case law, and I think this

1    was in Judge White's Report & Recommendation, that as

2    long as they made the statement to Van Leeuwen and

3    allowed it to be passed through to Hodell, they could

4    still be responsible for it regardless of whether there's

08:59:55  5    an agency relationship.

6                    THE COURT:  Well --

7                    MR. LAMBERT:  I believe Your Honor might

8    see it the other way, but I wanted to make that for the

9    record.

09:00:08  10                    THE COURT:  I do.  I mean I'm basing it not

11    only on the law but on the license agreement, which is

12    pretty clear that they understood that they weren't

13    disclaiming anybody and wouldn't have had any ability,

14    outside or otherwise, to make any representations.

09:00:19  15                    All right.  I'm reading from *Glazer versus*

16    *Lehman Brothers*.  That's a Sixth Circuit appellate case,

17    2005.  "Under Ohio law, a Plaintiff must prove six

18    elements in order to prove fraudulent inducement.  He

19    must prove those six elements by clear and convincing

09:00:46  20    evidence."

21                    And they cite *Davis versus Sun Refining and*

22    *Marketing Company*, 109 Appellate 3d. 42, and that's a

23    1996 case, and also in the OJI instructions.  It says

24    that "The degree of proof on contracts or to set aside a

09:01:11  25    document for fraud is clear and convincing evidence."

2923

1    That's *Cross versus Ledford*, a 1954 case from the Ohio

2    Supreme Court.

3              So I think I've correctly stated the burden

4    of proof and the legal standard for that, that's clear

09:01:28  5    and convincing evidence.

6              All righty.  Then we're ready to go.

7              (Proceedings resumed in presence of the

8    jury as follows:)

9              THE COURT:  Good morning, ladies and

09:04:00  10   gentlemen.

11             THE JURORS:  Good morning.

12             THE COURT:  Get your sleep last night?

13             All right.  Have a seat.

14             As you probably know, the parties have

09:04:10  15   rested their cases, and we've gone over all the necessary

16   legal issues that we have to go over, and now it becomes

17   that part of the trial where I instruct you on the law

18   that applies in the case, and the lawyers have an

19   opportunity to argue their cases to you.

09:04:29  20             What I'm going to do is give some general

21   instructions first about the nature of your duties and

22   responsibilities, the law of the specific claims in this

23   case, and then the lawyers will argue their case, after

24   which, I will give you your final or concluding

09:04:51  25   instructions.

1          And then you will retire in your

2     deliberations.

3               Now, it's important that -- and I have to

4     say, forgive me for reading the instructions, but I do so

09:05:03  5     out of an abundance of caution to ensure that I don't

6     misstate the law to you.

7               And so kind of special day for you because

8     Jayden wanted to come today and he went down and met you,

9     didn't he?

09:05:18 10          THE JURORS:  Yes.

11          THE COURT:  He was excited about that.  He

12     was here at, like, 7:15.  I think you may be the subject

13     of a book report or something when he goes back to school

14     this fall.

09:05:33 15               Anyway, all right, ladies and gentlemen of

16     the jury, we now come to the part of the trial where the

17     Court gives the jury the law in the case.

18               Before I start, I want to tell you

19     something about the charge to the jury.  As I've told you

09:05:45 20     several times, the jury, you, are the trier of the facts,

21     and the Court makes all of the determinations of law.

22               To help you understand the charge and to

23     simplify it, I've divided it into three parts.

24               The first portion of the charge deals with

09:05:59 25     the general law that is applicable in almost every civil

1    case.  It defines what evidence is, the burden of proof,

2    the credibility of the witnesses, and the function of the

3    Court and the jury, and other similar matters.

4                The second area discusses the law that

09:06:16  5    applies in this specific case.  I will review with you

6    the law that applies in this case and the various

7    elements of that law.  I will also define for you terms

8    that may require definition.  As I told you when we

9    began, some of the terms are common and generally

09:06:34  10   understood and do not require definition or explanation.

11   I will then instruct you as to your duties in regards to

12   your findings and any potential verdict.

13                And after I tell you about the law that

14   applies in this case, I will give you instructions

09:06:49  15   concerning your deliberation.  This will include the

16   interrogatory or question I'll send back to you and the

17   election of a foreperson and how you'll conduct yourself

18   during your deliberations.

19                Following that, the case will be turned

09:07:02  20   over to you for your consideration.

21                Now, I ask you to follow what I say because

22   every aspect of the law and everything is of equal

23   importance.

24                Now, you have heard the evidence, but you

09:07:16  25   have not yet heard the arguments of counsel.  It is now

1    the duty then of the Court to instruct you on the law

2    that applies in this case.

3                As I told you, the Court and the jury have

4    separate functions.  You decide the disputed facts, and

09:07:29  5    the Court provides you with instructions of law.

6                It is your sworn duty to accept these

7    instructions and to apply the law as it is given to you

8    by me.  Then that means that you are not permitted to

9    change the law, nor to apply your own conception of what

09:07:48 10    you think the law ought to be.

11                In keeping with your oath then, you will

12    not be swayed or influenced by considerations extraneous

13    to the law and the evidence, such as sympathy for, or

14    bias or prejudice against, either party to this lawsuit.

09:08:04 15                Now, while it is your duty to follow and

16    apply to this case the law that the Court now gives you,

17    remember that you, and you alone, are the judges of the

18    facts.  And in this respect, you are to exercise your own

19    judgment without regard to anything which the Court may

09:08:20 20    have said or done during the course of the trial.

21                Now, during the trial, as you know, the

22    Court has been requested to rule upon objections made by

23    both counsel for the Plaintiff and for the Defendant.

24    These objections presented legal questions, and the

09:08:35 25    Court, in deciding each one of them, has endeavored to

1    follow the law.  So you will draw no inference of any

2    kind from the manner in which the Court has ruled upon

3    any question of law, nor will you, because of any

4    expression of the Court or other act of the Court, infer

09:08:52 5    that the Court entertains any notion whatsoever as to the

6    facts in this case.

7              The Court must not, and therefore, does

8    not, seek to invade the province of the jury in

9    determining the issues which you are called upon to

09:09:05 10   decide.  Insofar as you are concerned, the Court has no

11   opinion on the matters which it is your responsibility to

12   decide.

13             Now, in this case what you have before

14   you -- I'm just giving you a general overview, you know

09:09:19 15   what it's about, but when you go through a case and you

16   hear a lot of things, some things may be relevant to your

17   consideration, and some things may not be, depending on

18   what the final claim or claims in the case are.

19             In this case, the claims are the Plaintiff,

09:09:35 20   Hodell-Natco, has filed a lawsuit against two entities.

21   It's SAP America and SAP AG.  And in those claims, they

22   say they were fraudulently induced to enter into the

23   license agreement, and as a result of that fraudulent

24   inducement, they have suffered some damage.  And that's

09:10:01 25   what you're here to decide.  But I'll get into that as we

1    go along.  Okay.  That's just generally what the claim

2    is, and you know that, you've heard that throughout the

3    trial.

4                Now, at the commencement of trial, counsel

09:10:13  5    for the Plaintiff and counsel for the Defendant addressed

6    to you in what we have referred to as opening statements.

7    In those opening statements, they sought to outline for

8    you what they expected the evidence to show.  In short

9    order, they'll be presenting final arguments, and I'll

09:10:28  10    give you a comment about how to consider final arguments

11    when we come to that time.

12                Now, opening statements, though, and

13    closing arguments are proper in an effort to assist you,

14    but you are instructed that they do not constitute

09:10:44  15    evidence and, therefore, will not be so considered by

16    you.  Nor will you consider as evidence any testimony

17    which the Court may have withdrawn from your

18    consideration or has instructed you to disregard.

19                So whenever reference is made to evidence

09:10:59  20    upon which this case is to be decided, the jury will

21    understand that the evidence includes all the testimony

22    that you heard from the mouths of the several witnesses

23    who testified here during the course of the trial,

24    together with any exhibits that have been offered and

09:11:13  25    received into evidence during the course of the trial and

1    will go with you in your jury room, and any stipulations

2    or admissions like we talked about back on the first day.

3                    Now, evidence may be either direct or

4    circumstantial.  I mean, I'm sure you've all heard those

09:11:29  5    terms, right?  Direct evidence is a recital of facts by

6    witnesses who have actual knowledge as to what

7    transpired.  It is the testimony given by a witness who

8    has actually seen or heard the things concerning which

9    that witness has testified.

09:11:44 10                    Now, circumstantial evidence, on the other

11    hand, is proof of facts or circumstances from which the

12    jury may infer other connected facts or related facts

13    which naturally and logically follow according to the

14    common experience of mankind.

09:11:59 15                    Now, back in the days when I was a lawyer,

16    and I heard Judges give these instructions about direct

17    and circumstantial evidence, sometimes I was confused and

18    I thought I knew what I was talking about as a lawyer.

19    And so I try to give a little example about this so you

09:12:18 20    can understand.

21                    Now, direct evidence is something perceived

22    by the senses.  Okay?  So right now, if I gave you an

23    example, you're all looking at me, I hope, and then I

24    take my left index finger and I say that and I touch it

09:12:32 25    here on this piece of wood.  You could all come and

1       testify that you saw me put my left index finger on that

2       piece of wood on July 1st, 2015 at about 9:10 a.m. in the

3       morning.  All right?  Because you saw me do it.  That

4       would be direct evidence of it.

09:12:48  5              Now, if we all left the courtroom, and I

6       did the same thing, I still put my left index finger on

7       that piece of wood, right?  So if somebody wanted to be

8       able to prove that I did that, how would they go about

9       it?  Because no one saw me do it.  No one smelled me do

09:13:05 10      it, heard me do it, felt me do it, right?  Nothing

11      perceived by the five senses.

12              So when you watch NCI Los Angeles or

13      whatever those shows are, Law & Order I guess is the

14      better one, you've all seen fingerprint evidence

09:13:23 15      testimony or things in the media, that's a legit art.  So

16      what happens is a fingerprint technician would come in or

17      police officer and would testify that, yeah, listen,

18      we've proved that no two fingerprints are alike,

19      everybody's fingerprint is unique.  And so you could say

09:13:45 20      okay, I believe that.

21              And then the technician could come in and

22      say that we are able to lift fingerprints and then

23      compare them with known prints to make a positive

24      identification.  So if they, a technician came in here

09:14:01 25      and went to that piece of wood, what they would do,

2931

1    you've all seen it, it's a dark piece of wood, they would

2    put white powder and if it's a light piece of wood, they

3    would put black powder, and they put it on there and you

4    could actually, from the sweat and ridges in your skin,

09:14:18  5    it may leave an imprint.  So they could dust that, and

6    put the powder on and dust it with a little brush and

7    then they look at it and then they take a piece of latex

8    tape and put it on it and lift that.

9         That's called a latent fingerprint, okay.

09:14:35  10   And you've heard that term.  So the technician could look

11   at that and take it back to the lab and they have a

12   comparison microscope and they have, believe it or not, a

13   system where all our fingerprints are in, they can just

14   push a button, and if there's a match, it does it

09:14:48  15   automatically and then pulls up, would pull up my left

16   index finger and then the technician would look at it and

17   compare the ridges and then, as an expert, could come in

18   and say, "Yep, the left index finger latent print I

19   lifted from that piece of wood on July 1st matches

09:15:05  20   perfectly my known left index finger."

21        All right.  So all that I told you, direct

22   evidence, that's what the technician testifies to.  But

23   now where is the circumstantial evidence?  The

24   circumstantial evidence is you could draw an inference

09:15:19  25   from that direct evidence that some day, at some point, I

1    put my left index finger on that piece of wood.  Okay?

2    That's the reasonable inference you could draw from that.

3                And sometimes circumstantial evidence is

4    even more powerful than direct evidence.  Why?  Because

09:15:36  5    sometimes people say that circumstantial evidence doesn't

6    lie because if you believe that, that means I actually

7    did put my left index finger on that piece of wood

8    ;whereas, you might not believe somebody who said I saw

9    him do it.  It's a question.

09:15:49 10                So when I give that example, it's kind of a

11    long-winded example, but it shows there are two types of

12    evidence, direct and circumstantial.  The law says

13    neither one is any greater or any lesser of evidence.

14    Then it's up to the jury to decide which evidence you

09:16:06 15    want to believe and how much weight you put on it.  And

16    every case, believe it or not, has both circumstantial

17    and direct evidence.

18                Now, I talked about an inference.  And an

19    inference is a reasonable deduction of fact.  Remember

09:16:19 20    how I explained that?  Which logically follows from other

21    facts established by the evidence which you may, but are

22    not required, to make.  But you may not build one

23    inference upon another inference.

24                What does that mean?  That means you could

09:16:34 25    infer that I put my left index finger on that piece of

1    wood, right, from the evidence, but you couldn't

2    make -- draw another inference in saying when I did it.

3    That's building one inference upon another inference

4    because the fingerprint wouldn't tell you when I did it.

09:16:47  5    It just would say I did it, okay?

6              Although you may not build one inference

7    upon another inference but you may make more than one

8    inference from the same set of facts or circumstances.

9    Those are decisions for the jury to decide.

09:17:01  10             Now, it is the law which you shall consider

11    in your deliberations in this case that a party who

12    asserts the affirmative of a proposition, that is, a

13    person who claims that certain facts exist, must prove it

14    or them by the greater weight of the evidence.

09:17:16  15             Now, there are two different types of

16    burdens of proof in this case:  Clear and convincing

17    evidence and preponderance.  I'll explain it as we go

18    along, and I think you'll understand when I finish with

19    all this.

09:17:31  20             Now, having considered all the evidence,

21    what you must do is determine whether the parties have

22    met their respective obligations of proving their claims.

23             Now, I said generally the party asserting a

24    proposition to be true has the burden of proof as to that

09:17:45  25    proposition.  Burden of proof means the duty of producing

1    evidence to lead you to believe that the facts are as

2    that claimant contends.

3          So when a particular party has the burden

4    of proof on a particular issue, that party must prove the

09:18:00  5    facts material to that issue by the greater weight of the

6    evidence.

7          The burden of proof, then, rests upon the

8    Plaintiff in this case to prove their claim by clear and

9    convincing evidence the essential and material allegation

09:18:16 10   of the complaint which are denied by the Defendant.

11          Now, these affirmative allegations denied

12   by the Defendants constitute the issue or issues of fact

13   which the Plaintiff has the burden of proof by clear and

14   convincing evidence.

09:18:28 15          What do we mean by that?  To be clear and

16   convincing, the evidence must have more than simply a

17   greater weight than the evidence opposed to it and must

18   produce in your minds a firm belief or conviction about

19   the truth of the matter.

09:18:46 20          Now, as the sole Judges of the facts, you

21   are also the sole Judges of the credibility of the

22   witnesses and the weight to be given to each person's

23   testimony.

24          To weigh the evidence, you must consider

09:18:57 25   the credibility or believability of each person who

1    testified, so you will apply the tests of truthfulness

2    which you apply in your own daily lives.

3              And in determining the credibility of any

4    witness, you should consider the witness's interests or

5    bias in the outcome of the verdict, if any; the witness'

6    appearance, manner, and demeanor while testifying before

7    you; the witness' candor and frankness or lack of candor

8    and frankness; the consistency of that witness' testimony

9    with the other known facts in the case; the witness'

10   memory or lack of memory; the witness' intelligence or

11   lack of it; and the reasonableness or unreasonableness of

12   the witness' testimony, and the probability of that

13   witness knowing the truth of the facts and circumstances

14   established by the evidence which, in your good judgment,

15   would add to or detract from that person's credibility

16   and the weight you give to that witness' testimony, and

17   which will enable you to determine the degree of

18   credibility which you assign to each witness.

19             Now, you are instructed that one way of

20   impeaching any witness is by showing that that same

21   witness has made a different or contradictory statement

22   or statements on the same point on a former occasion.  If

23   you find from the evidence that any witness has been

24   impeached in this manner, you may take that into

25   consideration in determining that person's credibility

1    and the weight you give to that witness' testimony.  And

2    you are instructed that you are not bound to believe

3    something to be a fact simply because a witness has

4    stated it to be a fact.

5           If you believe from all the evidence that

6    that witness was mistaken or has testified falsely

7    concerning such alleged fact, you may believe or

8    disbelieve that witness as you see fit.

9           You are not required, then, to believe what

10   a witness has testified to merely because the statement

11   was made on the witness stand or under oath.  You may

12   believe all, or part, or none of what any witness has

13   said in accordance with the credit to which you feel that

14   witness is entitled to in the exercise of your honest and

15   impartial judgment.

16          As a matter of law, then, you may believe a

17   portion of the testimony of a particular witness and

18   disbelieve the rest of that witness' testimony, or you

19   are privileged to believe all the testimony of a

20   particular witness, or you may disbelieve all the

21   testimony of any witness.  Those are judgments for the

22   jury to make.

23          Now, if statements in a deposition differ

24   from the testimony given by the same witness in the

25   courtroom, you may consider them to test the credibility

1    or the believability of that witness.

2            Evidence has been introduced consisting of

3    transcript questions and answers that were previously

4    asked to various witnesses.  Such evidence is also to be

5    considered according to the usual test, normal test, that

6    are applied to all witnesses.

7            Also, you did hear in this case certain

8    expert testimony that has been given.  Now, men and women

9    learned in special sciences or, I always have a hard time

10   with this word, peculiarly, I got it, adapted to explain

11   and elucidate a given set of facts in a case are called

12   expert witnesses.

13           The purpose of such expert witness

14   testimony is to assist the jury in judging the facts in

15   order to bring such facts within the better understanding

16   of the jury, if they can.  Certain questions may have

17   been asked or propounded in this case and answers given

18   to them by those so-called expert witnesses.  In some

19   questions, the facts embodied have been assumed by the

20   witness to be true.

21           If you find that the assumed facts forming

22   the basis of an expert opinion are not true, or -- and/or

23   whether the assumed facts forming the basis of any

24   expert's opinions are unreliable and/or are not worthy of

25   belief in your good judgment, then you may use such

2938

1    information to determine what credit, if any, you are to

2    give to the testimony of any such expert.

3            In other words, just like with all other

4    witnesses, you should weigh and evaluate the testimony of

09:23:07  5    any expert witnesses by considering their background,

6    knowledge, skill, and experience in the subject on which

7    they have rendered an opinion, and considering whether

8    the facts upon which that opinion was based were

9    established to your satisfaction.

09:23:24  10            Now, this case also should be decided or

11    considered and decided by you as an action between

12    persons of equal standing in the community, of equal

13    worth, and holding the same or similar situations in

14    life.

09:23:39  15            A corporation is entitled to the same fair

16    trial at your hands as any private individual.  All

17    persons, including corporations, partnerships,

18    unincorporated associations, and other organizations

19    stand equal before the law and are to be dealt with as

09:23:56  20    equals in a Court of justice.

21            When a corporation is involved, of course,

22    is may act only through natural persons as its agents or

23    employees, and in general, any agent or employee of a

24    corporation may bind the corporation by his or her acts

09:24:13  25    and declarations made while acting within the scope of

1    his or her authority that was delegated to him or her by

2    the corporation or within the scope of his or her duties

3    as an employee of that particular corporation.

4              And as I have mentioned to you, a number of

09:24:30  5    exhibits and testimony related to them have been

6    introduced.

7              First, ladies and gentlemen, the numbering

8    or the lettering of the exhibits that you take to the

9    jury room may or may not follow consecutively.  A couple

09:24:42 10    reasons for this.  First, the party that marked the

11    exhibit may not have offered it into evidence or, second,

12    for some legal reason or procedural ruling, the Court may

13    not have permitted that exhibit into evidence.

14              Rest assured that you will have all the

09:24:58 15    evidence or exhibits that were properly marked and

16    properly received into evidence, and you will not have

17    any others.

18              And we talked about the demonstrative

19    boards that they had.  Some were marked, some were not.

09:25:12 20    It's up to the lawyers.  They decide which ones they want

21    to go.  Some of them are just copies of other documents

22    that you'll have with you when you retire to begin your

23    deliberations.

24              One final comment about exhibits.  A lot of

09:25:26 25    times people ask if you can get testimony read back to

1    you.  The answer generally is no, even though the ladies

2    are taking everything down.  We frown on giving or

3    reading back portions of any testimony because it may

4    highlight that certain portion when you're supposed to

09:25:47  5    take all the evidence together to come to your decision.

6          On the other hand, if you come to an

7    impasse where you say, "I just can't, we can't reach a

8    decision without it," you can always make a request to

9    the Court, and I'll take that into consideration.  So I'm

09:26:01 10    not completely foreclosing that possibility.

11          Now, as to exhibits, it's just like

12    testimony; it's up to the jury to decide what weight, if

13    any, that you give to any exhibit.

14          I'm now going to instruct you on the law as

09:26:15 15    to the specific claims in this case.  And when I say in

16    these instructions that a party has the burden of proof

17    on any proposition or use the suppression "if you find or

18    if you decide," that means you must be persuaded

19    considering all the evidence in the case as to the claim,

09:26:33 20    first, that the Plaintiff has proved that by clear and

21    convincing evidence.  And then when you get to damages,

22    I'll talk about what preponderance of the evidence is.

23          Now, in this case Hodell asserts that it

24    received certain false representations upon which it

09:26:49 25    relied in deciding to enter into the license agreement.

1    Hodell does not allege that it received any direct,

2    verbal, false representation from SAP, but Hodell does

3    allege that it received false written representations

4    from SAP AG and SAP America in the form of marketing

09:27:13  5    literature concerning Business One.

6              Specifically, Hodell asserts that it relied

7    on the representations made by SAP AG and/or SAP America

8    in Exhibits 314 and 617, including the following

9    statements:  "SAP Business One brief.  Quote, the

09:27:36  10    solution helps emerging businesses from those with 10 to

11    several hundred employees to streamline their operational

12    and managerial processes."

13              That's Exhibit 314.2.

14              "SAP solution brief.  Quote, whether you

09:27:54  15    have 5 employees or 500, the solution helps emerging

16    businesses streamline their operational and managerial

17    processes."  That's Exhibit 314.5.

18              "SAP Business One Solution effectively

19    supports companies with as low as 10 and as many as

09:28:13  20    several hundred employees."  That's in Exhibit 617.6.

21              SAP AG and SAP America deny that any

22    misrepresentation was made to Hodell and assert that the

23    statements in their marketing literature were true.

24              A claim of fraud in the inducement arises

09:28:35  25    when a party is induced to enter into an agreement

1    through fraud or misrepresentation.  A claim of

2    fraudulent inducement asserts that a misrepresentation of

3    facts outside the agreement or other wrongful conduct

4    induced a party to enter into the agreement.

09:28:54  5         There can be no recovery for fraud in the

6    inducement when the allegedly fraudulent statement

7    contradicts the unambiguous terms of the final written

8    contract.  As a matter of law, then, a party cannot

9    justifiably rely on a prior statement that contradicts

09:29:12 10   the unambiguous terms in a written contract.

11         To prove fraudulent inducement, then,

12   Hodell must demonstrate the same elements necessary to

13   prove an action for fraud.  So Hodell must prove by clear

14   and convincing evidence each of the following elements:

09:29:30 15         1.  A false representation of fact was made

16   with knowledge of its falsity or with utter disregard and

17   recklessness about its falsity that knowledge may be

18   concluded and found.

19         And, two, the representation was material

09:29:51 20   to the transaction.

21         3.  The representation was made with the

22   intent of misleading Hodell into relying upon it.

23         And, four, Hodell was justified in relying

24   on the representation and did, in fact, so rely.

09:30:08 25         And, five, Hodell was injured, and the

1    injury was proximately caused by its reliance on the

2    representation.

3              The representation must be material; that

4    is, it must be important, necessary, or having influence

09:30:27  5    in the transaction.  It must also be so substantial and

6    important that it influenced the person to whom it was

7    made or from whom -- that's not it -- to whom it was

8    made.

9              A representation is false when it is not

09:30:50  10   substantially true.  The truth or falsity of a

11   representation depends on the natural and obvious

12   meanings of the words, taking into consideration all of

13   the surrounding circumstances.

14             A person knows a representation is false

09:31:07  15   when he is aware that it is not substantially true.

16             A representation is made with utter

17   disregard and recklessness when the person who makes the

18   representation is completely careless or indifferent to

19   the consequences or the risk that the representation will

09:31:25  20   cause the person to whom it is made to do or not to do

21   certain things.

22             Recklessly means wantonly, with

23   indifference to consequences.  If a person makes a

24   representation without knowing whether it is true or not,

09:31:42  25   or makes it without regard to its truth or falsity, or to

1    its possible consequences, he may be found to have made

2    the representation recklessly.

3         If a person has no knowledge of a fact but

4    asserted it as true when it was false, you may find that

09:32:00  5    he made the representation with utter disregard and

6    recklessness.

7         A representation recklessly made without

8    knowledge of the truth is the same as a false

9    representation knowingly made.

09:32:14 10         A person intends to mislead another to rely

11    on a representation when it is his purpose to mislead.  A

12    person's intent is known only to himself, unless he

13    expresses it to others or indicates it by his conduct.

14         Intent is determined from the way in which

09:32:33 15    the representation is made, the means used, and all the

16    facts and circumstances in evidence.

17         Rarely is the subjective intent of any

18    party alleged to have committed fraud provable by direct

19    evidence.  Fraud must be measured by objective standards.

09:32:51 20    The existence of intent to mislead or defraud must be

21    considered under the totality of all the circumstances

22    before you.

23         There is a justifiable reliance in a

24    representation when a person of ordinary care would rely

09:33:06 25    on it under the same or similar circumstances.

1          Hodell must be directly damaged by the

2    reliance on the representation.  This means that the

3    damage was caused by the representations in a natural and

4    continuous sequence and without which the damage would

5    not have occurred.

6          Where an original act is wrongful and in a

7    natural and continuous sequence produces a result which

8    would not have taken place without the act, proximate

9    cause is established.  And the fact that some other act

10   unites with the original act does not relieve the initial

11   offender from liability.  Even where an act is not the

12   sole cause of the injury, that act can still be

13   sufficient to satisfy the element of proximate cause so

14   long as it put in motion the sequence of events that lead

15   to the injury.

16          Remote cause or condition, a person is not

17   responsible for damage to another if his or her act is a

18   remote cause and not a proximate cause.  A cause is

19   remote when the result could not have been reasonably

20   foreseen or anticipated as being the likely cause of any

21   damage.

22          Under Ohio law, certain types of

23   representations cannot constitute a misrepresentation.

24          Future act.  A misrepresentation must also

25   relate to an existing fact.  Ordinarily, a statement

2946

1    about a future act and what a person intends to do in the

2    future does not relate to an existing fact and cannot be

3    the basis of a claim for misrepresentation unless the

4    person who made the statement did so with a present

09:34:47  5    intent to act contrary to the statement.

6            Opinions.  Expressions of opinions, even

7    though false, are not a basis for misrepresentation.

8            Puffing.  Boastful assertions or highly

9    exaggerated descriptions or claims are puffing or

09:35:06  10   bragging and are not false representations.  Sometimes it

11   is called dealer's talk or trade talk.

12           So if you find that Hodell has proved by

13   clear and convincing evidence all of the elements of

14   fraud against one or both of the Defendants, your verdict

09:35:22  15   would then be in favor of Hodell and you would then

16   consider the subject or the issue of damages.

17           However, if you find that Hodell has failed

18   to prove by clear and convincing evidence any one or more

19   of the elements of fraud against one or both of the

09:35:38  20   Defendants, your verdict must be for that Defendant or

21   those Defendants against whom one or more of the elements

22   was not proven and you would enter the verdict

23   accordingly, and you would not consider the subject of

24   damages.

09:35:51  25           Now, if you find in favor of Hodell on its

 1    claim of fraudulent inducement as to either/or both of

 2    the Defendants, Hodell is entitled to recover, as

 3    compensatory damages, such damages as will fairly

 4    compensate Hodell for the wrong suffered; that is, the

09:36:09 5    damages sustained by reasons of the fraud or deceit and

 6    which have naturally and proximately resulted therefrom.

 7             If you do find for Hodell, you will decide

 8    from a preponderance of the evidence what amount of money

 9    will reasonably compensate Hodell for the damages

09:36:27 10   directly caused by the fraudulent inducement.

 11            In the event that you are deliberating on

 12   the subject of damages, you may consider the evidence, if

 13   any, related to the subject of Hodell's increased

 14   overhead expense, out-of-pocket expenses, and/or training

09:36:44 15   expenses.

 16            You are not to consider any other damages,

 17   including potential attorney fees, costs, or punitive

 18   damages.  And then punitive damages are really those

 19   damages awarded to punish a party, but you're not to

09:36:58 20   consider either potential attorneys' fees, costs, or

 21   punitive damages.

 22            The issue of attorney fees, costs, and/or

 23   punitive damages are not subjects for the jury to

 24   consider.

09:37:10 25            Now, the general rule regarding damages in

1    a civil case is that they must be proven with certainty,

2    but the amount may be reasonably estimated.

3              Damages are not rendered uncertain because

4    they cannot be calculated with exact -- with absolute

09:37:26  5    exactness.

6              It is sufficient if a reasonable basis of

7    computation is afforded, although the result may only be

8    an approximate.

9              In other words, damages need not be

09:37:37  10    calculated to a mathematical certainty.

11              Now, SAP claims that Hodell failed to

12    mitigate its damages.  If SAP proves by a preponderance

13    of the evidence that Hodell did not make reasonable

14    efforts under the facts and circumstances in evidence to

09:37:51  15    avoid loss or lessen damages caused by SAP's

16    misrepresentation, you should not allow damages that

17    could have been avoided by reasonable efforts to avoid

18    any loss.

19              Hodell, however, is not required to take

09:38:05  20    measures that would involve undue risk, burden, or

21    humiliation.

22              Now, what is a preponderance of the

23    evidence in comparison to clear and convincing evidence?

24    Preponderance of the evidence is the greater weight of

09:38:19  25    the evidence; that is, the evidence that you believe

1    because it outweighs or overbalances in your minds the

2    evidence that's opposed to it.

3                Preponderance means evidence that is more

4    probable, more persuasive, or of a greater probative

09:38:32    5    value.  Remember, it is the quality of the evidence that

6    must be weighed, and quality is not necessarily identical

7    to quantity or the greater number of witnesses or

8    exhibits presented during the trial.

9                In determining whether any issue has been

09:38:47   10    proved by a preponderance of the evidence, you should

11    consider all of the evidence, regardless of who produced

12    it.  If the weight of the evidence on any issue is

13    equally balanced or if you are unable to determine which

14    side of the issue has -- which side of an issue has the

09:39:04   15    preponderance, the party who has the burden of proof has

16    not then established that issue by a preponderance of the

17    evidence.

18                Now, I do know that evidence in lawsuits is

19    not always clear and unquestionable, so I don't expect

09:39:17   20    you to decide the issues' uncertainties.  On the other

21    hand, you must not be satisfied with mere possibilities.

22    Injustice could easily result if you awarded a verdict or

23    a decision to a party who's only possibly entitled to it.

24                Your answers to the issues on damages must

09:39:34   25    be based on probability, what is probably the truth, what

1    is more likely the truth than not.  Another way of

2    expressing that function is that you are to decide those

3    issues according to the preponderance of the evidence,

4    regardless of who produced it.

09:39:51  5         Now, the fact that I have instructed you on

6    the proper measure of damages should not be considered as

7    indicating any view of mine as to which party is entitled

8    to a verdict in the case.

9         The instructions as to the measure of

09:40:04 10   damages are given for your guidance only in the event you

11   should find in favor of the Plaintiff from clear and

12   convincing evidence in the case in accordance with all

13   the other instructions.

14        Okay.  Now, that concludes my general

09:40:17 15   instructions, and I'm going to turn the case over to the

16   lawyers at this point, and then when they're finished,

17   I'll give my concluding comments about how to conduct

18   yourself in the jury room and other such procedural

19   matters.

09:40:30 20        Now, final arguments.  I mentioned to you

21   in opening statements, the lawyers stood before you and

22   gave you an outline or an overview of what that lawyer or

23   those lawyers thought the evidence was going to show

24   during the course of the trial.

09:40:47 25        Now in final arguments you've heard all the

1    evidence.  They get to stand before you and go over what

2    they think the evidence was as it was presented during

3    the course of the trial.

4                  Now, sometimes, though, none of these

09:41:02  5    lawyers, let me tell you honestly, none of them would

6    ever intentionally try to mislead you.  So if they say

7    something that they claim is in the evidence, and you

8    don't remember it, you call on your good judgment as to

9    what the testimony and other evidence actually was.

09:41:20 10                  You know this, these lawyers have been with

11    this case for a long time.  They've talked to witnesses

12    outside the courtroom, they've read depositions, they've

13    read documents, and so if they say something that you

14    don't recall from the evidence, it may be just a

09:41:32 15    misstatement based on something that they may have heard

16    or thought outside the courtroom.  Or on the other hand,

17    your memory may be short on it.  So you just, at the end

18    of the day, you have to decide what you heard in court.

19    Don't necessarily rely on what any lawyer says.

09:41:47 20                  Second thing is is in final arguments, the

21    lawyers are permitted to, in an effort to persuade you to

22    their position, draw what they think are reasonable

23    inferences that can be drawn from the evidence.

24                  Now, you can accept what the lawyer says as

09:42:06 25    a reasonable inference or reject them.  That's a decision

1    you have to make.  Ultimately, any reasonable inference

2    to be drawn from the evidence has to be drawn by you, the

3    jury.

4            The lawyers are permitted to argue before

09:42:19 5    you, the jury, in an effort to assist you on

6    understanding the evidence and obviously in an effort to

7    persuade you to their position.

8            What any lawyer says simply is not

9    evidence.  All right?  So don't substitute what a lawyer

09:42:32 10    says for the evidence for what you found to be the

11    testimony or other evidence during the course of the

12    trial.

13            Because the Plaintiff has the burden of

14    proof, the law says the Plaintiff must proceed first and

09:42:43 15    give their opening argument.  Then when they're

16    concluded, the Defense has a chance to give their

17    argument.  And then when they're finished, because the

18    Plaintiff has the burden of proof, they get a chance to

19    finish and give the final argument to you, after which, I

09:42:58 20    will give you your final instructions and the case will

21    be given to you for your consideration.

22            So I'll let the Plaintiff take a couple

23    minutes to get set and fixed up if they want to do that.

24    You can stand up and stretch and when they're ready,

09:43:12 25    we'll get going.

```
 1              Who is going first for you?  All right.
 2     Sharon, how long do you think?
 3                    MS. LUARDE:  About an hour and a half.
 4                    THE COURT:  Could you tell me during your
 5     presentation a good time to break if you want, or if you
 6     don't want to break, we'll go the whole time.
 7                    MS. LUARDE:  That's fine.  I'll be happy to
 8     do that.
 9                    THE COURT:  It's your judgment.
10                    MS. LUARDE:  Okay.  Is it okay if I run to
11     the restroom real quick?
12                    THE COURT:  Sure -- no.
13                    (Laughter)
14                    MS. LUARDE:  Good morning.
15                    THE JURORS:  Good morning.
16                    MS. LUARDE:  I want to thank all of you for
17     your time the last couple of weeks.  I know learning
18     about DI API and two-tier architecture is just a really
19     interesting topic.  So thank you for that.
20              We're here today, you've heard a lot of
21     evidence during this trial, and we're here today for one
22     clear reason, and that reason is was Hodell lied to about
23     Business One's capabilities?  And based on everything
24     you've seen, the answer to that is yes.  They were
25     absolutely lied to during the sales process and even
```

1    after the sales process.

2    And, in fact, there really can't be much of

3    a dispute about this.  We know Dan Kraus, and you saw Dan

4    Kraus.  He was their vice president in charge of sales,

09:49:48   5    and he came in to testify.  And during his testimony, Dan

6    Kraus actually said that he didn't know about any

7    limitations with regard to Business One and its user

8    size.  He wasn't aware of any whatsoever.

9    And Dan Kraus, as the vice president of

09:50:07  10    sales, you can draw an inference from that that he wasn't

11    telling anyone that sold Business One, knew of any

12    limitations.  He wasn't telling people that they knew of

13    any limitations because he didn't know of any

14    limitations.

09:50:21  15    We also know that Ralf Mehnert-Meland said

16    that the product was oversold.  We also know that Dirk

17    Boessmann, who was the developer at SAP, said that

18    Business One would fail due to overselling.  We also know

19    that Udi Ziv, you've all seen Exhibit 69 and you get to

09:50:47  20    see it again, Udi Ziv, let's talk for just a minute about

21    Udi Ziv.

22    Udi Ziv was the head of development for

23    Business One in Israel.  Udi Ziv didn't report to the

24    president of the company.  His testimony was that he

09:51:05  25    reported directly to the Board of Directors.  Udi Ziv was

1    identified by Geoff Ashley as the guy who knew about

2    Business One.  Udi Ziv was in charge of the development

3    team.  He knew exactly what Business One's capabilities

4    were and were not.

09:51:23  5         And Udi Ziv -- Kim, if you could pull up

6    Exhibit 69, and if you could scroll down, Kim.  And

7    again, Kim.  Blow up this portion.  Udi Ziv wrote, "I

8    honestly do not know what to tell you.  Someone has sold

9    to the wrong customer, which is way above any sane B1

09:52:11 10   Sweet Spot.  120 users."

11         This is what the head of the development

12   team for Business One is writing, and he uses "WAY" in

13   all caps, and he has three exclamation points, and he's

14   very clear that 120 users is way above what Business One

09:52:34 15   can handle.

16         And I submit to you, based on what we've

17   heard, SAP knew this way back in 2004 and 2003 when

18   Hodell-Natco was actually looking at purchasing this

19   product.

09:52:48 20        The development team knew it.  Udi Ziv knew

21   the minute he saw the user count, he knew it.  And that's

22   why he sent this e-mail.

23         We also have another document going to this

24   exact point, and that's from Geoff Ashley.  And Geoff

09:53:08 25   Ashley, you recall, he was on this screen and appeared by

2956

1    remote video, and Geoff Ashley actually authored an

2    e-mail -- and, Kim, if you can pull it up, it's Exhibit

3    180.

4                    If you look at this document, dated April

09:53:34  5    16th, 2007, Geoff Ashley, he's writing to Michael

6    Sotnick, and Michael Sotnick is pretty high up in the

7    corporation, and Ralf Mehnert-Meland, who you met here

8    during the trial.

9                    Geoff Ashley writes, down here, "There were

09:53:53 10    many discussions with Dan Lowery and others within his

11    organization stressing that this, quote, unquote,

12    opportunity was suspect from day one."

13                    What does he mean by that?  It's pretty

14    clear to me.  They knew from the get-go, they knew from

09:54:12 15    the very moment that Hodell-Natco identified their needs,

16    that Business One would never support Hodell-Natco and

17    their ERP needs.  It never would work.  And they knew it.

18    SAP knew it.

19                    You know, part of why we're here today is

09:54:47 20    due to the overselling of the product, and I wanted to

21    put these documents right in front of you before I talked

22    a little bit about Hodell-Natco.  And I want to spend

23    just a second talking about Hodell and talking about Otto

24    and Kevin Reidl and Hodell-Natco itself.

09:55:02 25                    As you learned during the testimony,

1    Hodell-Natco is a small, family-owned business, located

2    here in Cleveland, Ohio.  And they're a warehouse

3    distribution facility.  You know all this.  They ship

4    fasteners and parts.

09:55:19  5              And you saw Otto and Kevin on the stand.

6    Otto and Kevin, in my opinion, are intelligent,

7    articulate, savvy businessmen.  They're sincere and

8    they're honest and they're hard-working, and there is no

9    way Otto Reidl or Kevin Reidl would invest close to a

09:55:40 10   million dollars in a computer system that would never

11   work.

12              They wouldn't do it.

13              And to believe what SAP is telling you,

14   that Otto Reidl didn't conduct enough of an

09:55:57 15   investigation, that they just were making things up --

16   you have to discount everything that these two gentlemen

17   have told you.

18              Instead, you have to believe current SAP

19   employees who were trotted up here one after another on

09:56:22 20   the stand.  And I'll get to this later about some of the

21   inconsistencies during their own testimony here at trial.

22              Kim, if you could, I'd like to put up

23   Exhibit 314, please.  So Hodell-Natco, back in 2003,

24   decided that they needed a new ERP system.  And why did

09:57:00 25   they need it?  Well, they had been using the FACTS system

1    for almost 14 years, which is a really long time for a

2    computer system.  And they needed a system that would

3    grow with their company.  And I think you've heard the

4    testimony, I thought it came out fairly clear that

09:57:17  5    Hodell-Natco grew through acquisition, that they would

6    actually buy their competitors.  They would absorb them

7    into their family, and they would continue to have a

8    growth rate of 13 or 14% annually per year.

9          And so the FACTS system was out-of-date and

09:57:35 10    it simply didn't work for them anymore, and so Otto Reidl

11    actually undertook a search to find a new ERP system.

12    And so Otto and Kevin got together and put their heads

13    together, agreed that they needed a new system, and they

14    came up with certain parameters for that system.

09:57:55 15          You know, before we invest this money, what

16    does the system have to do?  What do we need it to do?

17          Number one, scalability.  And we've heard a

18    lot about scalability.  They needed a system that would

19    grow.  They knew that they needed 120 licenses initially.

09:58:15 20    They knew that they needed to grow up to three to 500

21    users, and they knew this because they had plans to grow

22    through acquisition.

23          Historically they have done that, and that

24    was their future plan.  They were very clear on this

09:58:31 25    need.

1        They also needed a system that could be

2    customized.  They needed a system that could support the

3    fastener industry.  They needed a system that could

4    handle a large number of SKUs, a large number of

09:58:47  5    inventory parts.

6        And we heard testimony about the inventory

7    parts.  There are about 40,000 inventory parts, but then

8    when you take a bulk package of bolts or nuts and you put

9    it into different size packages, it creates another SKU.

09:59:04 10        So they had about 40,000 inventory parts,

11    and about 150,000 SKUs.  And the computer system had to

12    be large enough to handle that.

13        The system also had to be able to be

14    efficient and more efficient than what they had under

09:59:22 15    FACTS because otherwise, why would you switch?  Why would

16    you move from a system that was working to a system that

17    didn't work?  You wanted to build an efficiency.  And

18    that was really important to them.  They wanted to

19    increase their productivity, increase their efficiency

09:59:40 20    rate, and have a better bottom line.  I mean, that's what

21    companies do.

22        They were also really interested in SAP

23    because SAP holds itself out as one of the world leaders

24    in ERP software systems.  That's what they say.  "We're

10:00:02 25    the best."  That's their claim.

2960

1          And, in fact, if you look at some of their

2     recent annual statements, they have about 16,000

3     employees worldwide.  SAP is a really big company, and

4     with all that personnel, you would believe that you would

10:00:20   5     have great support.  And that was important to Hodell.

6     That was important to Kevin.  That was important to Otto.

7     They wanted to have a system that would work for them.

8     That was key for them.

9          What they didn't know is even though they

10:00:43  10     had all of this criteria and ultimately selected Business

11     One, what they didn't know -- and these are Geoff

12     Ashley's words, Geoff Ashley's testimony -- Business One

13     was not ready for prime time.  It just wasn't.

14          They knew it.  Geoff Ashley knew it.  We

10:01:01  15     saw his last e-mail.  Udi Ziv knew it.  Dan Kraus knew

16     it.  They knew it.

17          So Otto and Kevin determined the parameters

18     they needed for the purchase of a new system.  And Otto

19     actually conducted due diligence.  You heard his

10:01:23  20     testimony.  He didn't just latch on to the first thing he

21     came across.  He took a trip to Chicago, and he looked at

22     Profit 21.  He also looked at a program called Take

23     Stock, and he looked at a variety of different ERP

24     systems before he landed on Business One.

10:01:41  25          And, in fact, he came across Business One

 1    when he was here in Cleveland.  He went to the trade

 2    show, and he, you know, walked around, looked at

 3    different booths, met with different people, gave them

 4    some information, and lo and behold, they reached out to

 5    him.

 6              And who reached out to him?  It was

 7    American Express.  And AmEx has their own Business One

 8    Edition.  And that was his first contact with a channel

 9    partner about Business One.

10              And actually, Kim, we'll switch to Exhibit

11    617.  And let's take a close look at this document.  Here

12    we are on Page 1, October 1st, 2003, and it's from

13    Heather Devereaux, and she's sending documents to Otto.

14    The AmEx Edition.  And, Kim, if you could flip to the

15    next page.

16              And here we are, the second page, the first

17    page of the American Express Edition document, and this

18    document down here in the corner -- Kim, if you can blow

19    that up for me -- is an SAP channel partner logo.  Otto

20    read every bit of this information.  Kim, if you could

21    scroll to the next page.

22              He read everything on this page.  And the

23    next page, Kim.  He read about the financing program, and

24    he read this about, "New solutions for small and midsize

25    businesses."

2962

1                    And, Kim, if you could, I believe on the

2       next page.  And all of this information was incredibly

3       important to Mr. Reidl in making his decision.  And what

4       really caught his eye was this:  "The SAP Business One

10:04:09    5   Solution effectively supports companies with as few as

6       ten and as many as several hundred employees."

7                    That was critical for Hodell.  Why?

8       Because they were growing.  They needed a system that

9       could grow.

10:04:33   10                   They also met with Ms. Vitantonio, and you

11      saw Ms. Vitantonio testify.  She actually is currently

12      working for SAP, but at the time, she worked at AmEx, and

13      she was the channel partner for SAP for the AmEx Edition.

14      And she testified that she met with Otto Reidl and had a

10:04:57   15   couple phone calls with Otto Reidl, and you'll recall,

16      she had very detailed notes where they had what was

17      called a discovery meeting, and during that meeting, she

18      took down a lot of information about the database size,

19      the number of SKUs, and other information that was

10:05:14   20   relevant to the decision to put together a proposal for

21      Business One.

22                   Ms. Vitantonio, because Business One was

23      new to the United States, she actually had to work pretty

24      closely with SAP in order to make sure that the product

10:05:35   25   would work for Hodell.  So she worked with her technical

1   people who talked to SAP's technical people, and in fact

2   they concluded, based on the information they had, that

3   Business One would be a fit.

4              You also recall, again, because of the

10:05:55  5   importance of scalability, that Otto Reidl testified that

6   he specifically asked about whether this system was

7   scalable and whether it would accommodate the number of

8   users that Hodell would require.  That was important to

9   him.  That was important to their company.  He wasn't

10:06:19 10   going to throw money away on something that wouldn't

11  work.  That's not going to happen.

12             Ms. Vitantonio, her notes didn't reflect

13  300, but what she did say in her testimony is that she

14  was sure she probably did talk about scalability with

10:06:37 15  Otto, "Yeah, I talked to him about scalability.  I talked

16  to him about growth."

17             What we do know then is that a proposal was

18  submitted, and the proposal was eventually turned down

19  because of the cost factor.

10:07:04 20             What SAP is claiming with this

21  document -- and, Kim, if you could go back to 314.  In

22  314, we have the SAP Business One brief.  And again, this

23  is another piece of documentation that Mr. Reidl

24  received, and both Kevin and Otto reviewed this material.

10:07:42 25  And they reviewed every single page in the document.

 1    And, Kim, if you could flip.

 2              And here, on Page 2, we see, "SAP Business

 3    One provides robust and fully integrated financial and

 4    sales management capabilities, and it gives managers

 5    on-demand access to critical real-time information for

 6    better decision-making.  The solution helps emerging

 7    businesses, from those with 10 to several hundred

 8    employees, to streamline their operational and managerial

 9    processes."

10              Again, another document, similar to the

11    AmEx document, the content of which Otto testified, was

12    supported by Ms. Vitantonio, stating that Business One

13    could support and accommodate their growth needs.

14              SAP's going to tell you these documents are

15    just puffery, they're meaningless, they don't mean

16    anything, but that's not the case.  This document is

17    extremely specific about the number of employees.  Even

18    if you buy into their argument that employees doesn't

19    mean users, it says "10 to several hundred employees."

20    Several hundred in my book is at least 300.  Hodell-Natco

21    was below 300 employees at the time they purchased

22    Business One.

23              And you'll recall the testimony of Brooks

24    Hilliard.  Brooks Hilliard was up on the stand, and he

25    was the rebuttal witness to Helmuth Guembel.  And Brooks

1    Hilliard testified that he would expect 70% of employees

2    to be users on a system for a warehouse, a warehousing

3    company, distribution facility, like Hodell.

4              So 70% of 300, if my math is right, is 210

10:09:49 5    users.  So their own witness, based on this document and

6    based on 300 employees, would anticipate Business One

7    would accommodate at least 210 users.  We only wanted 120

8    initially.

9              In addition to this, we know these

10:10:23 10   statements aren't true for a lot of reasons.  I want to

11   take just one second before I go on to that to talk about

12   this user/employee distinction.  The early documents

13   prepared by SAP refer only to employees.  They don't

14   refer to number of users.

10:10:46 15             And I scratched my head.  That doesn't make

16   any sense to me, and it doesn't make sense because if

17   you're buying user licenses for a software system, it

18   really doesn't matter how many employees you have.  What

19   matters, how many users can that system accommodate, how

10:11:06 20   many users can get on, log on on a day-to-day basis?

21             It doesn't make sense to talk about it in

22   the context of number of employees.  What matters are the

23   number of users.  And guess what?  You, when these

24   documents go back with you to the jury room, not one of

10:11:23 25   them mentions the number of users.  They just say

1    "Employees."  And it's pretty -- a pretty natural

2    assumption that when you're buying and purchasing

3    computer software for users, that you would think that

4    must be what that means because the number of employees

10:11:48  5    really, it's kind of irrelevant to the decision.  It's

6    the number of users that really matters.

7              And here's a question, why did SAP

8    advertise things in this way?  Honestly, I think it's

9    because they didn't know what they were doing when they

10:12:22 10    brought the product to the U.S. market.  This product was

11    new in 2003.  It had only been sold in Europe, it was

12    developed in Israel, and we heard testimony that the

13    product had issues shifting and being localized from

14    Europe to the United States.

10:12:43 15              It's pretty clear that SAP, their

16    literature at least, was all over the board at this point

17    in time.  And I'm going to show you some examples of

18    that.

19              Kim, if you could put up Exhibit -- we have

10:13:04 20    Exhibit 316.  If you could pull up to Page 5 as another

21    example.  Here we have, "Whether you have 5 employees or

22    500."  Well, that's different than what was in the

23    earlier document.  Now they're saying up to 500 users.

24              So under Brooks Hilliard's, you know, 70%

10:13:32 25    theory, stretching my mind on math here, I think that

1    equates to 350 users.  So there's inconsistencies in the

2    literature.  Why?  Because SAP didn't know what they were

3    doing.  In the United States, they didn't know what they

4    were doing.

10:13:53  5              Udi Ziv knew.  Udi Ziv, the head of

6    development for SAP in Israel, he knew.  The development

7    team knew this would never work.  Dirk Boessmann knew.

8    They knew this system could never accommodate the number

9    of users that Hodell needed.

10:14:10  10              Interestingly, Penny Vitantonio,

11   inconsistent with these documents, testified that

12   Business One could support 100 users.  Dan Kraus, the VP

13   of sales for SAP who sat up there, said he didn't know of

14   any limitations.  He didn't know of any.  Ralf

10:14:42  15   Mehnert-Meland, he also came in and testified, he sat up

16   on that stand, "Oh, 50, 50 was the number of concurrent

17   users.  It was always 50."

18              They didn't know what they were doing.  The

19   sales force didn't know what they were doing.  What they

10:14:59  20   did know is they wanted to sell the product.  They wanted

21   to get the product out in the market.  They wanted to

22   make money.  That's what they wanted to do.

23              But these salespeople here in the United

24   States, they were just wrong.  And here's how we know.

10:15:21  25   Internally, SAP documents that pre-date the go-live date

1      tell a different story than what we just looked at.

2                   Kim, if we could put 119.24 up, please.

3      Here we have an SAP document, and, Kim, I believe this is

4      an SAP AG document dated 2006.  SAP AG, this is an

5      internal document, not shared with consumers, not shared

6      with Hodell.  They never saw this document, they never

7      received this document.  Here's what they say:  "When

8      might an opportunity be too large for Business One?"

9      Here are the red flags.  A red flag.  "Will the number of

10     users exceed 30?"   Thirty.  That's what they're saying.

11                  So here we have the salespeople all over

12     the board, we have internal documents in 2006, well

13     before the go-live date, saying that number is 30.  SAP

14     knew this.  They just didn't tell Hodell.

15                  Let's look at another document, 129.8.

16     Here we go.  "While SAP Business One has many satisfied

17     larger customers, it is ideally suited for companies with

18     10 to 100 employees.  SAP Business One serves companies

19     in many industries, but fits best for companies in

20     retail, wholesale, basic manufacturing, and professional

21     services.  SAP Business One is optimized for performance

22     with up to 50 concurrent users."

23                  50.  Far less than 120.  Far less than 300.

24                  SAP knew this.  But they didn't tell

25     Hodell.  They just wanted to make the sale.  They just

1     wanted to make the sale.  And why was Hodell important?

2     Hodell was important to SAP because Hodell is one of the

3     leaders in the fastener distribution industry.  They were

4     developing an In-Flight program -- actually, IBIS was

10:18:15   5     developing an In-Flight program that was going to be used

6     in conjunction with Business One, and that program would

7     give SAP the ability to sell the combination of Business

8     One and In-Flight to other companies like Hodell.

9             And they were going to use Hodell as a

10:18:35  10     recommendation.  That's why Hodell was important, and

11     that's why this sale was pushed.

12             Kim, if we could just look at, I just want

13     to look at the 435.2.  This is also a 2006 document used

14     by SAP.  This is an internal document.  Again, actually,

10:19:09  15     I think this represents a program that people can plug

16     information in on their system, and it will generate some

17     information.  What we do know is the program, number two,

18     question number two, "Number of employees at prospect."

19     150 plus, no fit.

10:19:30  20             The logic down at the bottom, no fit, no

21     go.  SAP knew this.

22             And at the same time, on Page -- Kim,

23     there's a page for users planned.  They're also saying

24     "Number of users planned, 76 plus, no fit."  These are

10:20:13  25     SAP's own documents, sizing Business One for customers.

1    If these are the numbers you come up with, Business One

2    does not fit, it does not work.  And no one told Hodell.

3                 At the same time in Exhibit 428, and we

4    just saw "76 plus users, no fit."  But at the same time

5    in 2006, marketing literature that they're giving to

6    their channel partners -- and if you could turn to the

7    next page, Kim -- says, "You can have up to 200 employees

8    and 100 users."  That's completely different from their

9    own online qualification tool and they're both 2006

10   documents.

11                They didn't know what they were doing.  But

12   Udi Ziv knew.  The development team knew.  And, in fact,

13   multiple SAP employees knew that the sale to Hodell was a

14   mistake, and that they made a mistake, and they knew that

15   the product was oversold.

16                One of the people I want to talk about now,

17   how do we know this is just completely wrong?  We know

18   because Helmuth Guembel, who was our expert, got up on

19   the stand and he testified that the architecture of

20   Business One would never accommodate the number of users

21   Hodell needed, and that SAP knew this very early on.

22   They knew it well before the product was oversold to

23   Hodell-Natco.

24                And Helmuth Guembel is a really interesting

25   man.  Helmuth Guembel, you'll recall, testified that he

1    had consulted with SAP over a period of years, and, in

2    fact, SAP had paid him over that time period almost a

3    million dollars for consulting work.  He also testified

4    that in order to serve as an expert in this case, he had

10:22:42  5    to stop taking consulting work from SAP.

6         He also, unlike some of the other experts

7    in this case, had authored a paper in 2006, before the

8    go-live date at Hodell.  He authored a paper in 2006 that

9    was published in a technical paper, a technical magazine,

10:23:10  10    setting forth the limitations of Business One that he

11    explained here today.  It was well-known to Business One

12    that there were problems with the architecture and that

13    it would never accommodate the number of users that

14    Hodell needed.

10:23:25  15         One of the interesting parts of the

16    testimony, I thought, was when Helmuth actually looked at

17    the IBM paper that SAP was kind of waving around as the

18    testing for the system.  "This paper shows the testing

19    for our system.  We test it.  We know it can accommodate

10:23:47  20    the users."

21         But there was a mathematical calculation in

22    that paper and Helmuth looked at that calculation and he

23    performed that math, he did the math, and his testimony

24    up on the stand was based on IBM's paper, Business One

10:24:02  25    could only accommodate 58 concurrent users.  That was his

1    testimony.  We didn't see that paper after that.

2                    Brooks Hilliard, he didn't say anything

3    about that IBM paper because he couldn't, because Helmuth

4    was right.  That IBM paper, doing that math?  58

10:24:24 5   concurrent users.  That was Helmuth's testimony.

6                    You'll also recall Eddy Neveux and Eddy's

7    testimony, and I want to put up a chart.

8                    And you'll recall that when Mr. Neveux was

9    up on the stand, I put this chart up and asked him to

10:25:03 10  confirm for me the testing that was done by SAP in

11   Israel.  And this is the testing that related to the

12   capacity of Business One and what Business One could

13   actually handle.

14                   And Eddy confirmed for me that the testing

10:25:18 15  in Israel for the number of users at the high end was 30.

16   The number of items, 60,000.  The number of business

17   partners, customers, 16,000.  And you can see what

18   they're testing on this chart.

19                   Over here, here's what Hodell-Natco had in

10:25:51 20  place.  They were starting out with 120 users, growing to

21   three.  That's ten times this number.

22                   The number of items, almost three times.

23   Many, many more business partners.  They knew, SAP knew

24   Hodell-Natco would never work on Business One based on

10:26:25 25  their own testing, based on their IBM testing.  They knew

1    this.

2              So what else has SAP done?  SAP brought

3    Brooks Hilliard in here to defeat our argument based on

4    their own testing, based on the IBM tests, based on

10:26:57  5    Helmuth Guembel, all of whom say Business One is never

6    going to work.  SAP ran a list of companies, and I

7    printed it off here.  This is Defendant's Exhibit 700.

8    And this document shows, well, I think what's telling is

9    what it doesn't show.  It may show on here, the testimony

10:27:33 10    was and Helmuth Guembel was on the stand and Paul

11    Killingsworth was on the stand, this document does not

12    show how many add-ons there were, how many installations

13    there were at each company, did they just have one

14    system, did they have multiple systems?  It doesn't show

10:27:52 15    if they had one add-on, no add-ons, multiple add-ons.  It

16    doesn't show if they're using this for anything more than

17    accounting back-office functions.  It doesn't show

18    anything on this document, other than number of user

19    licenses.

10:28:08 20              That's it.  That's all this document shows.

21    But it doesn't tell you that they are operating it for

22    anything -- it doesn't even tell you if all the users are

23    using it.  This document doesn't tell you anything.  It's

24    completely meaningless.  And this is what Brooks Hilliard

10:28:24 25    says proves that Business One could work for more

1    customers.  That's what SAP is saying.  This proves that

2    Business One can work for bigger customers.  But if

3    that's the case, and you'll recall -- Kim, if you could

4    pull up Geoff Ashley's summary e-mail, the "stunned

10:28:43  5    silence" e-mail.  Pardon me.

6              And if you could look at this, here we go.

7    Point one, this is dated April 17th, 2007.  "LSi

8    commented that they originally sold this solution to

9    Hodell as something that was designed for companies of

10:29:19 10    250 million in revenue with up to 500 users.  There was

11    stunned silence on the phone."

12              If SAP Business One could support Loreal as

13    it claimed, why is there stunned silence on the phone?

14    It doesn't make sense.  And it's because this document is

10:29:48 15    incredibly misleading.  It doesn't give you all the

16    information you need in order to see if this is true.

17    And SAP could have produced that information.  They could

18    have told you, I'm sure, running their system, how many

19    add-ons there were, how the program was installed.  They

10:30:07 20    could have given you that information, but they didn't.

21    They just said how many user licenses are there.  That's

22    it.  They don't provide any more detail or information.

23              And again, if they could support Loreal as

24    they're claiming, why can't it support Hodell?  It's

10:30:30 25    because this document is misleading.

 1              SAP also claims that there was testing done

 2     at Hodell showing that the system actually worked, and

 3     they're relying on that testing to say Business One, in

 4     fact, worked for Hodell.  And we'll talk a little bit

 5     about the testimony of Hodell's employees in a minute,

 6     but I want to talk about those documents for a second.

 7              And, Kim, if you could pull up Exhibit 901.

 8     And this testing occurred on two separate days, Gadi

 9     Barnea conducted one test, and Gadi Barnea, Gadi Barnea

10     didn't come in to testify, but Gadi Barnea did testing on

11     one day, and states in this e-mail -- no, has a

12     breakdown, and on the next page -- Kim, I think there's a

13     chart attached.  There we go.  You know, we went through

14     this chart and this testing and these are the results of

15     testing on one given day.  And the date of this was in

16     July of 2007.

17              I want you to remember that date.  The

18     second test was performed by Eddy Neveux, and that was

19     Exhibit 809.  And Eddy Neveux went in and performed some

20     testing, and this is a -- and he went there with Paul

21     Killingsworth.  And this was in October of 2007.  And,

22     Kim, if you could go to the next page, I believe.  Right

23     here.

24              And Eddy Neveux writes down at the bottom,

25     he says, "The persons that typically enter sales orders

1    at the Hodell/Natco headquarters in Cleveland stated

2    about 4:00 p.m. that yesterday was a slow day as far as

3    an order entry day.  Also to note, the worst performance

4    that I saw with respect to the logs was a nine-second

10:33:34 5    delay with respect to a function, entering a sales

6    order."

7             And then underneath there, he says, "There

8    were a few times visually I did see what looked like a

9    longer delay."

10:33:59 10             So SAP is basing their entire argument, or

11    part of their argument on the fact that testing was done

12    on two separate days and everything was just fine.  But

13    what we do know was after these tests were performed, and

14    remember, Paul Killingsworth was there for that October

10:34:13 15    test.  And if you could go to 423.6, Kim.

16             After this test was performed, Paul

17    Killingsworth writes, "They are experiencing terrible

18    performance."  And he also says, "SAP Business One is not

19    designed to handle this amount of transaction volume."

10:34:46 20    That's what Paul Killingsworth is saying.

21             He's not saying "Eddy Neveux reports

22    everything's just fine.  There are no issues."  No, he's

23    saying they had terrible performance and Business One

24    doesn't work.  That's what he's writing.

10:35:00 25             But Paul Killingsworth backed away from

1    that e-mail during his testimony.  He said he was just

2    trying to get the Citrix person involved.  So he had to

3    exaggerate, you know, what the performance level was

4    because he just wanted to prompt them to do what needed

10:35:19  5    to be done.

6              So Paul Killingsworth, he's like a puppet

7    on a string, and why do I say that?  You'll recall when

8    my colleague, Mr. Carney, was examining

9    Mr. Killingsworth, one of his first questions was related

10:35:34 10    to representations made by channel partners.  And he

11    said, "You would agree with me, wouldn't you, that your

12    channel partners have to make representations about

13    Business One and the sale of products?"   Seems natural.

14              In fact, many, many of the employees

10:35:54 15    testified that in fact they did have to do that.

16    Ms. Vitantonio testified that she had to make

17    representations about Business One.

18              But Paul Killingsworth -- Kim, can you pull

19    that up -- but Paul Killingsworth, here he said, here's

10:36:17 20    the exact question and answer.  He said "Well, what I

21    would suggest is that they can demonstrate what the

22    product is able to do.

23              "Question:  So it's your testimony that a

24    channel partner that sells Business One cannot make any

10:36:31 25    representations about it?

1          "Answer:  Yes, sir, that is my testimony.

2     They may not make a representation.  Correct."

3               So SAP, who has -- who does not have its

4     own sales force and relies on channel partners to make

10:36:47 5     the sales, is saying that channel partners cannot make

6     representations about their products.

7               It just isn't believable.  SAP's lawyers

8     knew it wasn't believable, and Paul Killingsworth came

9     back in and changed his testimony.

10:37:03 10               Here's the question for Mr. Kelleher.  "Are

11     you telling this jury, sir, that SAP expects the

12     resellers or channel partners to be mutes?

13               "Answer:  Absolutely not.

14               "Question:  So you do expect that they're

10:37:19 15     going to say things about the product, right, sir?

16               "Answer:  Absolutely."  Puppet on a string.

17     He'll say whatever, whatever he needs to say as an SAP

18     employee.

19               We also know after this testing was done by

10:37:42 20     Gadi Barnea and Eddy Neveux that Michael Sotnick went to

21     Hodell.  And Michael Sotnick is pretty high up in the

22     company, and he wrote an e-mail where he described the

23     pain that Hodell was experiencing with Business One.

24               If you bear with me one minute, I'll pull

10:38:04 25     that up for you.  Exhibit 264, Kim.

2979

```
  1              And if you could blow that up for me.  And,

  2    Kim, if you could go back to the first page so we can see

  3    the date.

  4              THE COURT:  Sharon, do you want to break

10:38:35 5    after this exhibit?

  6              MS. LUARDE:  Yeah, that's fine, Your Honor.

  7              THE COURT:  Whatever is convenient for you.

  8              MS. LUARDE:  This was sent November 29th,

  9    2007 from Michael Sotnick to Dan Kraus after Gadi Barnea

10:38:47 10    was out there, after Eddy Neveux was out there, and this

 11    is what Michael Sotnick, who's very high in the company,

 12    this is what he writes.  "I have been to their facility

 13    and have seen firsthand the pain that they are in."

 14              You're not going to write an e-mail like

10:39:09 15    that if everything is going just fine.  That's not what

 16    you're going to say.  You're not going to say that

 17    someone's in pain, that he can see the pain they are in.

 18    That's because they were having severe performance issues

 19    at Hodell.

10:39:30 20              THE COURT:  Good?  Okay.

 21              All right, folks.  I hate to do that, hate

 22    to interrupt anybody's argument.  When I was a lawyer, I

 23    would struggle when they wanted to break it up but

 24    there's only so much patience.  What's that saying about

10:39:48 25    the mind can only bear what your seat can take?
```

1    Something like that?  You don't know that?  All right.

2                    Anyways, are we ready there, young man?

3                    (Jury out)

4                    (Recess taken)

10:59:10  5                    (Proceedings resumed in presence of the

6    jury as follows:)

7                    THE COURT:  All right.  Be seated, folks.

8                    MS. LUARDE:  A couple things I just wanted

9    to fill out that we talked about before the break, one of

10:59:53 10    which related to Paul Killingsworth, who I described as,

11    you know, the puppet on the string and what Paul

12    Killingsworth is willing to do, and I want to show you a

13    couple other exhibits.

14                    Could you pull out 266 for me, please?

11:00:18 15    Paul Killingsworth testified that they were trying to

16    help Hodell for willing to do what they needed to do for

17    Hodell, and they offered to thank Hodell and give them

18    some money to help them out.  But in fact, if you look at

19    this document, this is a document dated May of 2009.

11:00:47 20    Paul writes to Dan Kraus, "Did SAP offer to cover the

21    costs of the development of the custom functionality?"

22                    And, Kim, if you can go back a page just so

23    the jury can see what we're talking about here.  266.4,

24    probably?

11:01:10 25                    And they're talking about a price tag of

1    about -- implementation for around $700,000 for a

2    different system.  Kim, again go back to 266.3.  And here

3    we have Paul checking with Dan about who's going to pay

4    for this, and scroll up, Kim, to the top of that page.

11:01:35  5           And you'll see "We haven't agreed with

6    Hodell on anything.  My understanding of the program that

7    was in place with Global, and no longer is, was that we

8    would cover equivalent functionality."

9           They didn't agree to pay for anything.

11:01:56  10    Then they go on to write, "I think the best thing to do

11   with these guys is to just refund their money after they

12   have decided where they are going."

13          Paul Killingsworth, they didn't agree to

14   pay for anything.  It was kind of a surprise.  And again,

11:02:10  15   SAP employee, he'll say what needs to be said.

16          You know, one of the things we've talked

17   about is, you know, SAP knowing that Business One

18   wouldn't work for Hodell-Natco, but not only did they

19   know and should have told their marketing people, the

11:02:27  20   people in Israel, the people on the development side,

21   should have communicated with the marketing team in the

22   United States, you know, what size will work.

23          In addition to that -- excuse me.  In

24   addition to that, we know that SAP actually knew of

11:02:55  25   Hodell prior to the go-live date.  And they knew of its

1    database size prior to the date they went live.

2                 And, Kim, if you could put up Eddy Neveux's

3    e-mail, Exhibit 79, Kim.  And I want to put in front of

4    you Exhibit 79.  Exhibit 79, if you'd scroll back, Kim,

11:03:41  5    to Page; 7 and 8, go to Page 8.

6                 And here we are, March 13th -- I apologize.

7    Actually it's shortly after go-live, March 13th.  A year

8    before go-live, March 13th, 2006.  Go-live was March 7th,

9    2007.  So a year before, Eddy Neveux is -- Kim, go down

11:04:22 10    to the next document.  No, you had it right.  I

11    apologize.  It's hard to read these e-mails on this

12    screen.

13                 March 13th, 2006, one year before go-live,

14    Eddy Neveux writes, "I am happy to speak with them, but

11:04:41 15    based on the configuration they have, i.e., the volume of

16    data, this has nothing to do with the SDK.  I don't have

17    an answer.  I just want to get some understanding of what

18    to do."

19                 Kim, can you go to Page 79.7?  Down here at

11:04:57 20    the bottom.  And he talks about the database size, and he

21    notes, "Based on the numbers that we received from

22    Israel," and these are the numbers I had up earlier on

23    this chart, "They're at the high end."  And he's

24    recognizing that this is a problem.

11:05:24 25                 And, Kim, if you could scroll up, please.

2983

1      Actually, Kim, that's okay.  Let's just switch over from

2      there, where Eddy Neveux knows the database size one year

3      before the go-live date.

4              SAP knew the database size one year before

11:05:50  5      the go-live date.  And then you fast-forward one year to

6      go-live.  And right after that, Udi Ziv's e-mail comes

7      out, recognizing that this database size was too high.

8      120 users is simply too much.  And that's because they

9      knew Hodell-Natco's database size, the number of users

11:06:15 10      that they had, was simply too much for Business One.

11      Business One could not handle Hodell-Natco and its needs.

12              We also know, and we talked a little bit

13      about this, why SAP was so interested in Hodell-Natco,

14      and I just wanted to pull up a document to talk about

11:06:39 15      that.  And that's a document involving Geoff Ashley.  And

16      Geoff Ashley, as you recall, he was in charge of sales

17      here in the United States for SAP.  And there are actual

18      reporting requirements to SAP on sales.  And bear with me

19      just one second.  I apologize for this.  I'm going a

11:07:13 20      little out of order here.

21              All right.  If you could pull up Exhibit

22      177.  And here we have Exhibit 177.  And in this

23      document, this is dated January 2nd, 2006, again SAP knew

24      all about Hodell-Natco.  They knew about Hodell for a

11:07:59 25      long time.  And this, again, is one year before go-live

1    date.

2              Geoff Ashley writes to Michael Sotnick.

3    He's very -- he's very proud in this e-mail.  You can

4    tell that these are big wins for SAP.  He's reporting

5    success stories to his boss and he says "We're able to

6    close our first six-figure opportunity.  LSi was able to

7    close Hodell-Natco Industries for $105,000 to SAP.  This

8    was important, not only for its size, but also for the

9    fact that it was the first of what we hope will be many

10   new customers in the fastener microvertical.  LSi created

11   a Business One vertical solution specific to this

12   industry, and we are looking to Hodell-Natco to be our

13   first happy, referenceable customer within this space."

14             Hodell-Natco was a big deal for SAP sales.

15   They wanted this deal because they wanted to expand on

16   this and sell In-Flight and Business One to other people

17   in the same industry as Hodell-Natco.

18             So again, we have this dichotomy.  The

19   developers knowing it's never going to work, Eddy Neveux

20   questioning the size, questioning the testing, the

21   testing in Israel.  You saw that.  The testing in Israel,

22   simply not high enough, nowhere near Hodell's needs.  Udi

23   Ziv, Eddy Neveux knew Hodell is outside the parameters.

24             Salespeople, though, this was sweet.  They

25   wanted this.  They wanted this deal.

1          Prior to go-live, though, SAP's going to

2     argue and one of their arguments in this case has been

3     that Hodell-Natco shouldn't have gone live.  They didn't

4     perform enough stress testing on the system.  And the

11:10:07  5     testing that was done, it was insufficient.  And they

6     made a mistake when they pulled the trigger to go-live.

7          And they want to place blame on Hodell,

8     they want to place blame on LSi, and they want to push

9     the blame off on other people.  But don't, don't buy into

11:10:22 10     these arguments.  We know, Kevin Reidl was very clear on

11     this in his testimony.  They did a lot of testing before

12     they went live.  They did everything they were asked to

13     do.  They performed load testing.  They performed stress

14     testing.  They put their users on the system and they did

11:10:40 15     what they were told to do.

16          And you recall Kevin Reidl in his testimony

17     was shown a couple of documents about where he delayed

18     the go-live date because he was concerned.  He delayed

19     it.  He's like, "I'm really concerned about this, but

11:10:57 20     you're the experts, LSi, you tell me what to do."

21          He delayed it.  But based on

22     recommendations, he decided to go ahead and go live.  He

23     pulled the trigger.  He did what he was asked to do.

24          Jon Woodrum, he worked at LSi, and you saw

11:11:15 25     him on video.  He was a soft-spoken man and he was very

2986

1    heavily involved with the stress testing and the testing

2    prior to go-live.  And you'll recall that he actually

3    testified in his deposition, which is what we showed you

4    here, that stress testing was actually performed.

11:11:33  5              And I want to show you a portion of his

6    deposition on the screen right now.

7              And we're going to show you a couple clips.

8    One relates to go-live and the other relates to stress

9    testing.

11:11:52 10              (Video played as follows:)

11    A.    March 7th, I'm going to say, '07.

12    Q.    Do you recall when Hodell did go live on Business

13    One?

14    A.    Yes.

11:12:09 15    Q.    And when was that?

16    A.    March 7th, I'm going to say, '07.  Really.

17    Q.    Okay.  At that time was it your personal opinion

18    that Hodell should go live at that time?

19    A.    Yes.

11:12:36 20    Q.    At the time, did you have any concerns or

21    reservations about Hodell going live at that time?

22    A.    Manageable, yes.

23    Q.    And when you say "manageable," what does that mean?

24    A.    You didn't -- I didn't see the performance that we

11:13:04 25    would have liked to have seen, but with their agreement,

1    agreed it was acceptable and with all my other friends,

2    authors, and so on, if you wait until you have a hundred

3    percent, you never go live so eventually you have to pull

4    the trigger and go live.  You wouldn't do it foolishly

11:13:30  5    but if you think the controls are in place, the testing,

6    the stress testing and so on, you do.  But there was

7    -- you would rather see nano seconds than several seconds

8    in response time, and that's what we were seeing.

9    Q.    You mentioned your experience.  In your prior

11:13:52  10   experience, were there other occasions when a customer

11   went to live with an implementation that had, quote,

12   manageable issues or concerns?

13   A.    I have experienced very successful implementations

14   with those I've been involved in.  They work hard at

11:14:19  15   making sure everybody's in agreement and the definition

16   of what it is we're going ahead with, and what the

17   controls, primarily that the controls are in place

18   because for several years, people didn't parallel them

19   and so you want to make sure your controls are in place

11:14:38  20   when you go live."

21             (End of video).

22             MS. LUARDE:  So I just wanted to break here

23   for one second with Jon Woodrum, but you can see he's

24   very clear.  He thought all the concerns were manageable

11:14:50  25   concerns and he agreed with the decision to go live.

1       We were relying on LSi for that.  Kevin

2   Reidl testified to that.  We relied on the channel

3   partner, the highly qualified channel partner, who

4   assisted in making the decision on when to go live.

11:15:07  5   They're the experts.  We relied on them.

6       One of the other issues brought up by SAP

7   is this notion of parallel testing where you actually

8   have to run your Legacy System, your old system,

9   alongside the new system.  And that's something that

11:15:25  10   hasn't been done in the industry for a long time.  And,

11   in fact, Jon Woodrum, I have a very short clip where he

12   testifies to that, that people just don't parallel test

13   during the implementation phase any more.

14       (Video played as follows:)

11:15:36  15   Q.   And what do you mean by parallel?

16   A.   Trying to run both your old system and the new

17   system a hundred percent on same documents, same cash

18   receipts, all those things.  Something's got to give, and

19   usually the new system gives, and you revert to the one

11:15:57  20   you know best.  So for many years, 15 or more years, I

21   have not seen a parallel system run in sophisticated

22   implementations.

23   Q.   So when you say 15 years, does that mean starting

24   in the late nineties?

11:16:15  25   A.   My first implementation with LSi, there was no

2989

1   parallel.  Going clear back to EBS, when online was first

2   cutting edge, we paralleled.  But once it became no

3   longer cutting edge, it wasn't cost effective or

4   necessary to parallel.  If you do the right checks and

11:16:42  5   balances and do your controls, you know how to balance

6   your receivables, inventory, and how documents are

7   processed, so no, a number of years.

8   Q.    And just so I understand, after that point, did you

9   say that you never saw implementations where there's a

11:17:03  10   parallel system run?

11   A.    Correct.

12   Q.    Okay.  In your opinion is that common in the

13   industry?

14   A.    Yes.

11:17:15  15                    (End of video)

16                    MS. LUARDE:  So again, we have a situation

17   where stress testing was done, load testing was

18   performed.  People just don't parallel.  It hasn't been

19   done, I think he said, for 15 years.  That's a long time.

11:17:29  20                    What we do know again, this testing was

21   performed well before signing the license agreement.  We

22   know that Eddy Neveux knew the load size.  We know that

23   SAP was very excited about the sale, and they were very

24   happy to have entered into this agreement in 2005.  And

11:17:54  25   they were happy about that because it opened up this

1    entire new market to SAP.

2              SAP did all the right things and now we're

3    at the go-live date and what happens?  Things go crazy.

4    The system doesn't work.  You heard the testimony of

11:18:13  5    Kevin Reidl, Otto Reidl, Jaime Clarke, all of whom

6    testified that they could not work, they couldn't do the

7    work they needed to do, things were extremely slow, the

8    system would lock up, it would take employee time after

9    hours to input orders.

11:18:32 10              You heard Jaime Clarke testify how on the

11    FACTS system, one of the big customers were Amish

12    customers.  They would get on a phone and they would be

13    able to type the order in while the customer was on the

14    phone.  But under SAP Business One, they couldn't do that

11:18:48 15    anymore.  They had to resort to writing things down,

16    staying late, and typing the orders in.

17              But we do know at this point in time, the

18    company reached out to SAP, and the first e-mail that I'm

19    going to show you again is Exhibit 69 with Udi Ziv.  And,

11:19:19 20    Kim, if you could go back to the very start of this

21    e-mail, the first page which is -- scroll back up.  And

22    blow up the bottom portion.

23              We had Dan Lowery at LSi writing to Udi,

24    and he wants to know why is it taking SAP so long to fix

11:19:37 25    the performance problem?  When can he expect a fix to be

1    delivered to his company?  He's losing hundreds of

2    thousands of dollars a month from lost orders, lost

3    customers, and extra employees to get workload out.  "If

4    they throw the system out they will surely get legal with

11:19:53  5    us all."

6              Kim, can you please scroll up?  And here we

7    go, if you could blow this up.  Dan Kraus then writes,

8    "Udi, any help you can provide to Lowery is appreciated.

9    Dirk's team is working with both Lowery and Accellos to

11:20:14 10    try to find a solution.  The customer is at the large end

11    of the B1 target and was sold with the understanding that

12    complete testing would be done prior to go-live."

13              And that testing was in fact done.  You

14    heard Jon Woodrum.  They did the testing.  If you could

11:20:27 15    scroll back up, Kim.

16              Right here.  This.

17              So this information, Udi Ziv writes to Dan

18    Kraus, Paul Killingsworth, Michael Sotnick, Dirk

19    Boessmann and Niels Stenfeldt.  No one from Hodell-Natco

11:20:51 20    is on this e-mail, and they write, Udi writes, "I don't

21    know what to tell you.  Someone has sold to the wrong

22    customer which is way above any sane B1 Sweet Spot, 120

23    users.  And obviously they are experiencing severe

24    performance issues."

11:21:06 25              Udi knew, and he knew that based on this

1    testing that was done years earlier.  Udi knew.

2              "The only thing we can say is that the

3    situation is beyond the normal B1 conditions.  I

4    recommend that we go for a reimbursement.  We debrief the

11:21:27 5    whole process that got us to having this customer in the

6    first place."

7              So what sort of testimony did you hear

8    about this from SAP?  They said it was an emotional

9    response.  And I'm going to play a clip from Udi Ziv, and

11:21:45 10   I want you to take a look at his demeanor and tell me

11   what you think.  You can't tell me what you think, but

12   think about it.

13                   (Video played as follows:)

14   Q.    Okay.  69, I'm looking at your response to what you

11:22:02 15   sent to Dan Kraus, April 12th at 2:51 p.m.   Were the

16   statements you made in that e-mail to Dan Kraus obvious

17   to you based upon the information that had been indicated

18   to you by Dan Kraus and Dan Lowery?

19   A.    You're asking if it was obvious?  I don't know

11:22:31 20   what -- I don't know what was obvious or not.  I mean, I

21   can read what I wrote, but I don't know what was obvious

22   and what wasn't.

23   Q.    Well, more likely than not, did you do any

24   independent investigation or research in preparation of

11:22:45 25   writing this e-mail?

A.    I don't remember.  I -- I doubt I wrote it without

addressing some other people in the organization because

these are usually things I wouldn't be dealing with

directly, but I don't know.

Q.    More likely than not, who would you have talked to?

A.    Most probably, at least Dirk Boessmann, who's

copied on this e-mail.

                    (End of video)

               MS. LUARDE:  So Udi testified first that he

consulted with Dirk Boessmann and, secondly, Udi doesn't

strike me as a very emotional guy.  He seems pretty

serious and somebody that would take an e-mail like that

pretty seriously.

               And, Kim, I want to put 69 back up for the

jury.  And, Kim, could you go back to the e-mail portion

we were just looking at, 69.3, I think, Kim.

               So this is dated April 12th from Udi Ziv,

and he writes this e-mail to the following people.  And,

Kim, on 69.2, down here at the bottom, we have Dan Kraus'

response.

               "Udi, this customer was sold in 2004 before

there was any announced or understood issue.  We need a

commitment to figure out a way to get this issue solved.

If that doesn't work, you have my commitment to then look

at reimbursement."

2994

1          What is Dan Kraus stating here?  It was

2   sold before the salespeople in the United States knew

3   what they were doing, before there was any announced or

4   understood issue.

5          If you could go up to the next e-mail, Kim.

6   Udi asks a question, "I'll get back to you.  By the way,

7   did it take the customer two and a half years to get

8   implemented or did they start late?"

9          Go back up, Kim, to the e-mail.  Blow the

10  whole top portion up.  Dan Kraus writes back, again

11  talking about the vertical fastener distribution work,

12  and at the top Udi responds to Dan Kraus:  "Too bad we

13  didn't stop the implementation of Business One before it

14  started."

15          That's because the development team for SAP

16  knew Business One would never work for Hodell.  They knew

17  this well before the go-live date.  They knew it before

18  the signing of the license agreement.  They knew it with

19  regards to this testing.

20          Eddy Neveux knew it back in 2006.  They all

21  knew this.  This testing was from 2005.  They knew this.

22  SAP knew this would never work for Hodell.

23          But the e-mail traffic doesn't stop then.

24  If we could go to Exhibit 77, this is also an April 12th,

25  2007 e-mail.  Dan Lowery had written to Udi Ziv and he

1    says "Thank you for responding.  As you can tell, we are

2    in a bad spot, so any expediency is greatly appreciated."

3             The next page, Kim.  On April 13th, a day

4    later, "As you know, this customer's environment is far

5    outside the Sweet Spot of Business One with 120 users,

6    and therefore, we anticipate that such performance issues

7    will come up."

8             And then he goes on and he references to

9    Dan Lowery, he references a patch, a hot fix.  And, Kim,

10   if you could go up to the top part.  Dan Lowery writes

11   back, "Hope I don't sound stupid, but I don't understand.

12   'As you know, this customer's environment is far outside

13   the Sweet Spot of Business One with 120 users.'  And,

14   therefore, we anticipate such performance issues will

15   come up.

16            "The whole reason they bought SAP was

17   because it was supposed to scale to their growth.  They

18   are planning more acquisitions, adding more users, and

19   this was their known objective since day one, two plus

20   years ago by everyone, SAP included.

21             "Why did SAP let this go on so long?  What

22   am I supposed to tell Hodell?  This is unbelievable."

23            Kim, if you can go back to 77.1.  Udi

24   responds internally.  He doesn't respond to Hodell.  He

25   doesn't respond to Dan Lowery.  He writes to Dan Kraus,

1    copying Michael Sotnick, Rodney Seligmann, Niels

2    Stenfeldt, and he says, "Dan, someone needs to tell the

3    partner about the Business One Sweet Spot and that an

4    environment of 120 users and growing is nowhere near it."

11:28:50  5         Udi knew, based on this size, that 120

6    users would never work on Business One.

7         He goes on to say, "Due to the size of the

8    customer, I expect this not to be the last performance

9    issue they encounter."

11:29:10 10         This is the head of the development team

11    for Business One, and he's saying Business One is not

12    going to work.

13         Kim, if we could go to Exhibit 78.  If you

14    could go down further, Kim, up to the next page, 78.3,

11:30:02 15    78.2.  Let's try it one more time.  78.1.

16         Here at the bottom we have the e-mail that

17    we just saw from Dan Lowery to Udi Ziv.  Dan Kraus writes

18    to Lowery and says, "Your development team and others

19    have been told that this is outside the Sweet Spot a

11:30:30 20    number of times.  When Hodell purchased, there was no

21    such definition, but in the two years since we have

22    shared this information both directly and with your team

23    around Hodell-Natco and in general at the field kick-off

24    meetings."

11:30:45 25         Dan Kraus on April 15th, 2007 recognizes

1      that Business One is not going to work for Hodell-Natco.

2      He also recognizes that the sales team didn't know what

3      they were doing a couple years earlier when they sold

4      this because Business One's capabilities didn't change.

11:31:04    5      The testing was the testing.

6                    And so we fast forward to one day before

7      the April 17th phone call.  If you could put 157 up, Kim.

8      I'm sorry, Exhibit 77.  Here we are again, one day before

9      the phone call, Udi Ziv is writing to Dan Kraus, and this

11:32:12   10      is the one that we just saw about the last performance

11      issue.

12                    Then we fast forward to the phone call

13      itself on April 17th, and it's the day of the call.

14      Exhibit -- and we've seen a lot of e-mail traffic about

11:32:52   15      the date of the phone call and the e-mail prepared by

16      Geoff Ashley.  Kim, I'm more interested in the response

17      to this on the first page.  Here we have down at the

18      bottom Dan Kraus.  Dan Kraus, who did not participate in

19      the phone call.  You saw his testimony.  He wasn't there,

11:33:08   20      but he writes, "There's no go-forward path here with

21      Business One."

22                    The date of this phone call he knows this.

23      Geoff Ashley, Dirk Boessmann, Ralf Mehnert-Meland, all

24      these individuals are copied on this e-mail chain, but

11:33:23   25      Dan Kraus admits on that day that Business One isn't

1      going to work for Hodell, but no one told Hodell on that

2      call that Business One was not going to work.  They like

3      to say that Dirk Boessmann, I think you recall the

4      testimony that Dirk Boessmann, Ralf Mehnert-Meland said

11:33:42  5  Dirk Boessmann was the guy who did all of the talking on

6      that phone call.

7                And Dirk Boessmann, and if you go back,

8      Kim, to the next page, is recorded as having said that

9      he, "Dirk, did an excellent job.  He has set expectations

11:34:12 10  that this is an environment much larger than what we were

11     lead to believe."

12                And you recall that the testimony that Dirk

13     told them on the call that it was never going to work.

14     Dirk said it was never going to work.  But Dirk Boessmann

11:34:28 15  didn't say that because if Dirk Boessmann had actually

16     said that on that call, why would he later write -- let

17     me find this e-mail for you -- 439.  And this is May

18     22nd, well after the date of the earlier e-mail where

19     Dirk Boessmann allegedly told Hodell that the system

11:35:07 20  wasn't going to work.

21                He writes, "From my perspective, it is now

22     time to be honest to the customer."

23                If Dirk Boessmann was honest to the

24     customer on that call, why is he later writing this down?

11:35:22 25  Why is he making that statement?  That's because no one

1    told Hodell on that call that the system wasn't going to

2    work.  No one said that to Hodell.

3                In fact, Otto asked on that call "Did we

4    buy the right system," and he never received a response.

11:35:42  5    And you recall that testimony when Otto was up on the

6    stand.  I mean, this was very difficult for him.

7                What he was told is what's recorded on

8    Exhibit 159, that they were on the high end.  That's a

9    little bit different than being told the system's not

11:36:02 10    going to work.

11                Can we have Exhibit 160?  Ralf

12    Mehnert-Meland on that same day writes, "Hodell asked the

13    right question today:  Did we buy the wrong solution with

14    SAP Business One?  Based on what we now know, the answer

11:36:27 15    is yes, as Lowery completely oversold SAP Business One."

16                Again, SAP is admitting that the product

17    was not properly sold, and they also are admitting that

18    they know Business One isn't going to work, but they

19    didn't tell Hodell on that call that the system wasn't

11:36:44 20    going to work.

21                Kim, if we could put up Exhibit 19.  I'm

22    sorry, Exhibit 247.  We also have Exhibit 247, yet

23    another e-mail from Udi Ziv, "Guys, there's not much that

24    we can do here.  We will supply what may be a fix for the

11:37:18 25    current problem, but we know there will be others.  There

1    is no doubt that this is not a B1 customer, and we

2    somehow need to get away from this."

3              Udi Ziv, again, he knows this isn't going

4    to work, but what are they telling Hodell?  They're

5    telling Hodell at the same time, Exhibit 19, they're

6    telling Otto -- these are Otto Reidl's notes -- that

7    Patch Level 23 is ready to go.

8              They're telling Hodell, when they know all

9    along that this isn't going to work, they're telling

10   Hodell, "We're going to put a patch on.  That's what

11   we're going to do."

12             Kim, if we could have 437.  Paul

13   Killingsworth, Exhibit 437, writes to Kevin Reidl and

14   Otto Reidl, well after this April 17th call, and talks

15   about how the product and the additions are an

16   outstanding business solution for you and your company.

17   But Paul Killingsworth knows it is not an outstanding

18   business solution.  You saw him testify.  What did he

19   say?  He said "Oh, I thought Udi Ziv was wrong."  Udi

20   Ziv, who's the head of the Business One development team,

21   he was wrong.

22             Paul Killingsworth, who was basically a

23   customer service representative is saying that the head

24   of the development team for Business One is wrong?

25             In fact, on Exhibit 161, we have yet

1    another person saying Business One isn't going to work.

2    Here we have Gianluigi Bagnoli, June 13th, 2007, another

3    person involved in development.  "From the numbers I see,

4    the customer is simply outside of the area B1 is supposed

11:39:34    5    to cover."

6                    Killingsworth disagreed with Gianluigi as

7    well.

8                    Exhibit 439.  And we saw this e-mail

9    already, but Dirk Boessmann, recognizing May 22nd, 2007,

11:40:00   10    B1 is not going to work.

11                    And here we are on Exhibit 259, yet another

12    e-mail from Dusan Lacko.  Scroll down to the bottom of

13    the page.  Is there another e-mail?

14                    Dan Kraus is writing that they need an

11:41:13   15    update on the status for this customer.  And, Kim, if you

16    could go back to 259.6.  Blow this up.  Dusan Lacko

17    writes in this e-mail to colleagues, "I was told all the

18    time it was always the last small thing we needed to do

19    for them," being Hodell-Natco, "So that SAP shows some

11:41:45   20    good will and SAP America can talk to them about moving

21    away from Business One."

22                    Let's just string them along so we can move

23    them away from Business One.

24                    He also recognizes the problems within

11:41:58   25    Business One.  "The database is growing and we do not

1    have any archiving solution in Business One."

2              Again, the people overseas seem to know

3    Business One would never support this type of customer.

4    Kim, if you could go back up, please.

11:42:13  5              I think this bottom line kind of says it

6    all.  "Never expect a tiger to fly.  Never expect a tiger

7    to fly."  That was the comment about Business One.

8              Now, Dan Kraus knows about how bad things

9    are going at Hodell, but yet during all of this time,

11:42:50  10   nobody is calling Hodell.  And at the same time, you

11   heard Otto Reidl testify, you heard Kevin Reidl testify,

12   Jaime Clarke, how bad things are at the company, how

13   difficult things are for them to process orders.  They're

14   not able to provide quotes.  They're having a hard time

11:43:08  15   doing their day-to-day work activities.

16             Finally, we have people go out and perform

17   the testing which we saw, but on November 9th, Michael

18   Sotnick finally sends an e-mail -- 109.  Michael Sotnick

19   writes, "From the SAP side, we've evaluated the processes

11:43:54  20   and approach and have come to the conclusion that there

21   is no change we can make on our side that would result in

22   a material improvement."

23             This is finally someone telling SAP,

24   someone from SAP finally telling Hodell-Natco that

11:44:10  25   there's nothing they can do.

1           But I submit to you all along, well before

2   the license agreement is signed, the testing never

3   supported the user size needed and required by

4   Hodell-Natco.  Helmuth Guembel testified there's no way

11:44:33  5   Business One would ever work.  This was a known fact to

6   the developers at SAP in Israel who knew the limitations

7   of Business One, and the moment they saw 120 users, they

8   knew Business One would never work for this company.

9           We've spent a lot of time talking about SAP

11:45:03  10   witnesses, and I wanted to talk just a little bit about

11   Ralf Mehnert-Meland.  Kim, if you could put up Exhibit

12   157.

13           And I think you may recall this e-mail

14   dated April 16th, 2007.  Again, this is the day before

11:45:28  15   the April 17th phone call.  The next page, please.

16           He writes that, "Hodell just has too much

17   data.  SAP Business One cannot handle it and there is no

18   fix in sight.  I believe we need to find a way to get the

19   customer off SAP Business One."

11:45:48  20           Ralf Mehnert-Meland said that was a

21   knee-jerk reaction.  He didn't really mean it; it was

22   just a knee-jerk reaction.  Sort of like Paul

23   Killingsworth, you know, changing his testimony, Ralf

24   Mehnert-Meland is running away from the content of this

11:46:01  25   e-mail.  It was just an emotional reaction, a knee-jerk

3004

1    reaction.

2                 So this is dated, if you could go back to

3    the date, April 16th, 2007.

4                 Here we have another e-mail from Ralf

11:46:34  5    Mehnert-Meland where he's responding to Geoff saying "One

6    item from my mind.  There is no way SAP Business One will

7    work for this customer.  We need to find a way to move

8    them on.  Plus, Lowery needs to take responsibility for

9    the mis-sell."  That's yet another knee-jerk reaction for

11:46:54 10    Ralf Mehnert-Meland.

11                 Dan Kraus, "No go-forward path here with

12    Business One."  Kim, if you could just move up.  That's

13    okay.  But again, Dan Kraus, I guess his was also, you

14    know, a knee-jerk reaction, an emotional response to the

11:47:27 15    situation.

16                 Ralf Mehnert-Meland came into this Court

17    and testified that SAP Business One was working just

18    fine, but after the visits that were made, he writes

19    that, "They have an abysmal performance, which is

11:48:01 20    essentially an issue of the number of users and

21    transactions."

22                 He ran away from that e-mail as well.  Ralf

23    Mehnert-Meland claimed during his examination that he

24    changed his opinion because he conferred with other SAP

11:48:24 25    employees and they changed his mind about his opinion

1        that Business One wouldn't work.

2                    But on cross-examination, I think you'll

3        recall, he was asked to identify one of those employees,

4        and he couldn't name a single person.  Ralf

11:48:37  5      Mehnert-Meland is running away from his earlier written

6        documentation, just like Paul Killingsworth; you know,

7        puppet on a string.

8                    Geoff Ashley testified here that Business

9        One actually got better, but his earlier testimony,

11:49:08 10      you'll recall during his deposition, was different than

11       that, and he doesn't recall -- he didn't recall anyone

12       disagreeing with Hodell's conclusion.

13                   In fact, when you put up Geoff Ashley's

14       e-mail, Exhibit 180, Geoff Ashley knew that this deal was

11:49:22 15      suspect from day one.  So we have an awful lot of SAP

16       employees and former SAP employees doing their best to

17       run away from written e-mail documentation and earlier

18       testimony that they had given, and I submit to you that

19       the earlier e-mails are closer in time to what's going

11:49:41 20      on.  This is when all the events are unfolding.  This is

21       when people's memories are fresh.  And things always

22       change after litigation.

23                   In fact, if SAP's software ran as quickly

24       as their employees are running from their e-mails, we

11:50:01 25      wouldn't even be here today.  We wouldn't have had the

1    performance issues that we had.

2              One thing I want to make sure we dismiss is

3    the notion that the problem wasn't with SAP's product,

4    that it was with In-Flight or with Radio Beacon.  I go

11:50:19  5    back to Helmuth Guembel for his testimony on that fact.

6    He was very clear that there were three problems with

7    Radio Beacon.  One, it was a two-tier architecture which

8    caused problems, and I think you remember, too, he talked

9    about the 32 byte versus 64 byte, how the memory for 32

11:50:40  10   byte is the equivalent of one DVD and 64 byte is like 64

11   billion DVDs, and how that was a big problem for Business

12   One and he also talked about the DI API.  And the DI API,

13   he likened it to the security gate at the airport where

14   you walk through the airport and you have to get in a

11:50:57  15   line and you have to go in a queue and go through one by

16   one every time you want to get through.

17             And he likened the DI API to that where he

18   said any time you send something from the computer, from

19   your computer to Business One, you go through the DI API

11:51:12  20   and you have to go through security checks.  And the

21   developer did that on purpose because they wanted the

22   Business One program to be secure, but that made the

23   system very, very slow.

24             And the DI API, which is part of Business

11:51:29  25   One, part of their package, is part of the problem.

1           And he was very clear that the problem was

2      with the Business One itself, with the architecture, the

3      DI API, and the 32 versus 64 byte notion.

4           As for hardware, Joe Vislocky came in and

5      he testified that the hardware was fine, the hardware

6      worked great for Hodell.  When he arrived in 2007, the

7      hardware worked, and he didn't see any of those silver

8      slinky connector cables.  You saw him testify.  You can

9      judge his credibility.  But Joe Vislocky was very clear

10     that there was no problem with the hardware at

11     Hodell-Natco.

12          So now we get to the part where I get to

13     talk about damages and financial harm to the company.

14          SAP put up a witness, Geoffrey Osborne, who

15     testified that despite all of these problems, despite the

16     fact that the system never worked for Hodell, that they

17     have zero financial harm across the board.  I think you

18     can remember every category, zero, zero, zero, zero,

19     zero.

20          The only category he was willing to concede

21     on was some out-of-pocket costs but he even disagreed

22     with that calculation.

23          Well, what I'm here to tell you is, you

24     know what, that's simply not credible, it's simply not

25     possible given all the performance issues that they had.

1    I mean, you heard Jaime Clarke, you heard how difficult

2    his job was.  And, in fact, what I have to show you is

3    some numbers and I want to put some charts up on the

4    board that we talked about before, and one of the things

5    I want to mention before I put those up is the Judge will

6    instruct you on damages.  And the thing with Geoffrey

7    Osborne, he kept talking about what a forensic accountant

8    would do.  That's not the standard.  That's not the test.

9         You don't have to be a forensic accountant

10   to present testimony on damages and recover.  That's not

11   the standard that's applied here.  And what Geoffrey

12   Osborne does as a forensic accountant is different from

13   what Otto Reidl did as the owner of the company.  And

14   Otto Reidl is the CEO of the company, and he's been in

15   this business for over 30 years.  There isn't anyone in

16   this courtroom, including Geoffrey Osborne, who is better

17   able to talk about how Hodell was damaged and the

18   financial harm that was caused to that company.  He knows

19   this better than anybody else.

20        And I want to put up for you a couple of

21   things.  The first thing I want to talk about is how the

22   company was harmed and how we know that the company was

23   harmed.

24        I'm just going to put this up, first, to

25   show this to you.  This chart shows two trend lines.  It

1    shows the gross profit for the company, and it shows the

2    profit before tax for the company.  And it shows the

3    divergence between the two.

4              And that separation is the equivalent of

5    overhead.  Overhead for the company, what it costs them

6    to run their business.

7              Geoffrey Osborne took -- went to great

8    lengths to attack this particular demonstrative, and I

9    submit to you that's because he just didn't like what it

10   showed.  But he did not testify, he did not say at any

11   point that he disagreed with the conclusion that there

12   was increased overhead.  He never said that.  He just

13   said he didn't like the way it was graphed.

14             But the fact that there was increased

15   overhead costs is shown on this document, and it's shown

16   in the financials.  And you can see the timing of this,

17   and here's why the timing is important:  It occurs right

18   before the go-live date.  You can see, and right before

19   the go-live date, that's where Hodell-Natco started

20   paying for implementation costs and that's one of the

21   components of our damage claim.

22             The travel expenses to send employees to

23   Chicago for train-the-trainer sessions where you have to

24   send someone to learn about the system, that includes air

25   fare, that includes hotel costs, that includes, you know,

1    car rentals and expenses.  That was incurred in this time

2    period.

3              Otto estimated that to be about $50,000,

4    and that's one item of damages that we're seeking

11:56:53  5    recovery on.

6              Kim, if you could just type them on the

7    screen for the jurors so they can see what we're asking,

8    on a blank piece of paper.

9              But SAP has argued throughout this case

11:57:25 10   that, in fact, when we went on Business One, 2008 was the

11   company's best year, and they say that because the gross

12   sales were $43,877,103, which if you look across, that is

13   in fact the highest number for gross sales.

14             However, Otto Reidl testified the correct

11:57:49 15   number to look at for your profitability is actually

16   profit before tax, and this is how Hodell measures how

17   well the company performed.  And you can see the numbers

18   drop dramatically when Business One was implemented.  It

19   went from $1,506,000 down to 424 and to 869.  And Otto,

11:58:16 20   in fact, testified that 2006 was in fact the company's

21   best year.

22             Now, here's what's interesting about the

23   difference between gross sales and profit before tax.  We

24   all get a paycheck, and that top number on your paycheck,

11:58:35 25   your gross, that can be a pretty big number, but after

1   that, taxes are taken out, healthcare is taken out,

2   401(k) is taken out, and then you have some money that

3   you bring home.  But even after you bring money home, you

4   still have to pay for your rent, you have to pay for your

5   mortgage, you have to pay for your groceries, you have to

6   pay for all kinds of expenses, normal living expenses.

7   What you have left at the end of the day, well, that's

8   your profit, that's what you get to put in the bank.

9            That's the same here.  Gross sales, that's

10  like your gross pay.  That's what's coming in the door.

11  And after you take everything out, you're left with

12  profit before tax.  That's the money they made.

13           In 2008, they only made 869,000.  You can

14  add 2007 and 2008 together when Business One was in use,

15  and it still doesn't equal 2006.  2006 was their best

16  year.

17           And Otto explained why their gross sales

18  went up.  They didn't ship more pounds.  Due to

19  inflation, it was sold for a higher price.  They got more

20  money for the product.  That's why the number is so high.

21           You can see on here the impact this had on

22  the company.  Incoming orders went down.  Pounds shipped

23  went down.  Profit before tax went down.  Percent to net

24  sales decreased.  Sales and administrative expenses.  I

25  mean, across the board, you can see 2007, 2008, that

1    there was a huge impact at Hodell-Natco.  And one of the

2    items that we're seeking recovery for is actually the

3    increased overhead costs due to loss in productivity.

4              And I think the way to think about that is

12:01:13   5    like this:  Suppose hypothetically you live, you know, on

6    a big farm and you have a huge plot of land that you need

7    to mow, and you have about five or six people who

8    actually come out to mow your lawn, and one day, every

9    lawnmower runs much slower.  And it takes them a lot

12:01:34  10    longer to do the same work.  That's why they're less

11    efficient, they're less productive, because the equipment

12    didn't work.  And it takes them longer to do the same

13    job.  That's what happened at Hodell-Natco.  Because

14    Business One didn't work, it took them a lot longer to do

12:01:56  15    their job.

16              In fact, you heard Jaime Clarke testify

17    that FACTS worked a lot better than Business One.

18    Business One simply didn't work.  It took them longer to

19    do their job.  And that drove up the costs.

12:02:09  20              Otto performed a calculation, and in that

21    calculation, he determined company-wide that it took them

22    27, the equivalent of 27 additional people to ship the

23    same amount of pounds between FACTS and Business One.

24              And I want to borrow a demonstrative from

12:02:31  25    you if I may.

1          So I'm borrowing this chart because this

2     actually shows the number of employees at the company,

3     and I just want to provide you an additional item to look

4     at when considering this damage component.

12:03:07  5          So here you'll see in 2004, 2004, the

6     company shipped 21,532,388 pounds.  Do you see that on

7     here?  That's pretty close to 2007 where there were

8     21,103,982.  Somewhat the closest comparisons that I see

9     on this chart.

12:03:39 10          But if you look at the difference in the

11     number of employees, you'll see that in 2004 -- it's hard

12     to read upside down -- there were 160 employees, but yet

13     in 2007 for the same amount of pounds, right here, there

14     are almost 27 more employees.

12:04:16 15          I mean, that supports Otto's calculation

16     that it took him the equivalent of 27 additional

17     employees company-wide to ship the same amount of

18     product.

19          So because Business One had an impact

12:04:34 20     company-wide, Otto averaged the average employee cost and

21     that was $45,000 per employee.  SAP Business One didn't

22     just impact the people in the warehouse.  It impacted the

23     salespeople, it impacted upper management, it impacted

24     everyone.

12:04:54 25          So he averaged the costs.  And when you

1    multiply the 27 times the average cost of employee, for

2    the period of time that Business One was actually at the

3    company and operating -- Kim, will you put that up for

4    me -- it's $2,598,173.  That's the financial impact that

12:05:22  5    Business One had on the company.

6              And Otto Reidl, to reach that opinion,

7    relied on documents that we produced in this case,

8    Exhibit 607 and 624.

9              And for our last damage component, those

12:05:49 10    are the out-of-pocket expenses, and Otto produced and we

11    produced in this case, all of the invoices and we

12    produced a summary sheet.  And these are Exhibits 606 and

13    622.  And you'll see that we didn't pay SAP directly on

14    these invoices.  That's because our agreement was with

12:06:11 15    LSi.  And how LSi distributed those funds to SAP, we

16    don't know.

17              But what we do know is that we've had

18    out-of-pocket expenses of $830,440.12, and there's no

19    dispute and there's been no dispute in this case that

12:06:31 20    these payments were made in connection with this failed

21    software implementation.

22              And so these three components, lost

23    productivity of $2,598,173, training and travel of

24    50,000, and out-of-pocket expenses of 830,440.12 -- Chris

12:07:09 25    is helping me with some quick math here -- equal

1    $3,478,613.

2                        I know it's a lot of money, but that was

3    the impact of Business One at Hodell-Natco.

4                        Again, what I can say to you is that when

12:08:09  5    you consider all of the evidence and you look at the

6    facts in this case, I think it's pretty clear what

7    happened, and that is that SAP developed a product in

8    Europe.  They knew what the product was about in Europe.

9    The developers knew the limitations of the product.  They

12:08:30 10    had the testing done well before the license agreement

11    was signed showing the limitations of the product.

12                        Helmuth Guembel talked about the

13    limitations of the product.  This is all known to the

14    developers at SAP.

12:08:45 15                        But what happened in this case, in 2003

16    when it first came over to the United States, the sales

17    team, for whatever reason, didn't get the message.  They

18    didn't know who to market the product to.  The marketing

19    literature is all over the board.  Their internal

12:09:03 20    documentation is all over the board.  And even the

21    testimony that we've heard during this trial is all over

22    the board about what size Business One could handle.

23                        What we do know is that SAP wanted to make

24    sales in the United States.  They wanted to sell the

12:09:20 25    product.  They rushed the product to market.  They made

1       the sale.  They were excited about Hodell.  They wanted

2       them because of their industry, because of their

3       business.  They wanted to be in the vertical fastener

4       market.  That's what they wanted to do.  They were very

12:09:35  5     excited about that.

6               But all along, the product was not

7       appropriate for Business One, and SAP knew that.  Then

8       when things started going south, you saw all the e-mail

9       traffic throughout the trial and the documents I've shown

12:09:51 10     you here; they didn't do anything about it.  They strung

11      Hodell-Natco along for months, and as Hodell-Natco

12      continued, continued to lose money.

13              So it's our request that when you go back

14      and consider the facts, that you enter an award in favor

12:10:15 15     of Hodell-Natco.

16              Thank you.

17              THE COURT:  Thank you, Ms. Luarde.

18              Okay, folks.  That will conclude this

19      morning's presentation.  1:30, does that sound good?

12:10:26 20     It's about ten after 12:00 right now, so that will give

21      you enough time to refresh yourself.

22              Keep in mind the admonition and we'll

23      conclude and see you at 1:30.

24              (Jury out)

12:11:27 25             (Proceedings adjourned at 12:11 p.m.).

|   |   |
|---|---|
|  | 1 |

                    WEDNESDAY, JULY 1, 2015,  1:29 P.M.

 1          WEDNESDAY, JULY 1, 2015,  1:29 P.M.

 2                  THE COURT:  Good afternoon, folks.  Have a

 3      seat.

 4                  You may proceed.

13:35:25   5                  MR. MILLER:  Thank you.

 6                  Good afternoon, ladies and gentlemen.

 7                  THE JURORS:  Good afternoon.

 8                  MR. MILLER:  It's been awhile since June

 9      15th, I know that.

13:35:35  10                  A couple of things on that.  I feel like a

 11     reintroduction is in order.  I'm Mike, Mike Miller.

 12     That's my team.  I think you heard and met most of them.

 13     Greg and I worked together on this case for a long time,

 14     and we talked before this case even got started that he

13:35:52  15     would do the opening and I'd do the closing.  So here I

 16     am.

 17                  Number two, on the note that June 15th was

 18     awhile ago, I want to thank you guys for your service.  I

 19     know this is hard.  It's hard on the lawyers but I know

13:36:08  20     it's also hard on the jurors.  I know that firsthand.

 21                  My wife was a juror last winter.  She got a

 22     call out of the blue.  The trial was even shorter than

 23     this one.  We've got three kids.  It turned our life

 24     upside down.  So I get it, and thank you for everything

13:36:21  25     that you're doing.  We know you're paying attention and I

1    know this is hard work.  We're almost done.  Okay?

2                A couple of things.  Greg, when he did his

3    opening, had some demonstratives that I thought were

4    good, and they were helpful so I'm going to put these

13:36:41  5    back out.  Now, I know you guys have learned a lot about

6    the case since then so maybe you don't need all this but

7    this is the one that has the key people.  I tend to talk

8    fast so if I'm flying around from name-to-name, maybe

9    this will help you track it.

13:36:55  10               This one you've seen before.  It's a really

11   simple timeline.  Obviously, there are way more dates in

12   this case than on here but again I find it to be a pretty

13   helpful guide.  And I don't know if you can see this, but

14   this is just a description of the four contracts.  Right?

13:37:11  15   The ones we've heard about repeatedly.

16               They've got key people, that's who's who.

17   Key facts.  Very quickly, the contracts, the distribution

18   agreement, the software development agreement that would

19   go with the distribution agreement.  This was LSi and

13:37:28  20   SAP.  The SDK was IBIS and SAP.  The development

21   agreement, which was LSi and IBIS and Hodell.  SAP wasn't

22   a party.  And then the license agreement.

23               Can you see?  Okay.  And then the license

24   agreement, which was SAP and Hodell.

13:37:41  25               Okay?

1          So here's what I've done.

2     Obviously -- oops.

3               A JUROR:  Sorry, can you move that one

4     over?

13:37:50  5          MR. MILLER:  Sure.  This way?

6               A JUROR:  Yes.

7               A JUROR:  Move that one.

8               MR. MILLER:  Move that one this way?  Ooh,

9     we were worried about that.  I thought if I only went

10    over there once.

11              How about if I do this?  I know that these

12    are worth it.

13              That would have been an epic start, right?

14              THE COURT:  They wouldn't forget you.

13:38:14 15          MR. MILLER:  No.  Very, very memorable,

16    that lawyer.

17              Here's what we've got.  We've got a lot of

18    testimony.  And we've got a lot of exhibits.  It is not

19    possible for me to cover all that testimony or all those

13:38:25 20    exhibits.  It's just too much.  It would take, like, the

21    length of time that we've already spent.

22              My job is to summarize it, and I've decided

23    that the best way to present it to you is in chapters,

24    like chapters in a book.

13:38:37 25          I've worked very hard on this case and

1   identified what I believe to be the key issues, and I've

2   organized them in a logical order.  It's kind of roughly

3   chronological.  It's not perfectly chronological.  And

4   what I've done is I've collected what I believe to be the

13:38:52  5   key evidence on all of these key issues.

6                  And please, don't be intimidated by this.

7   I'm not going to go through all of it, and some of it I'm

8   going to move through it very quickly, but I will tell

9   you this:  I don't cherry pick, okay?  These conclusions

13:39:07 10   I'm going to ask you to draw in connection with these

11   issues that are in these chapters are supported by real

12   evidence.  It's not a grab this here, grab this there.

13   It's what this case has shown, and these conclusions I'm

14   going to ask you to draw, the evidence compels you to

13:39:22 15   draw them.  Okay?

16                  A couple of other things though before we

17   get started.  This case has changed a lot.  You'll

18   remember Judge Nugent told us at the start, you're going

19   to hear one thing in opening statements.  Then you're

13:39:36 20   going to hear something else during the trial.  And then

21   you're going to hear something else during the closing

22   arguments.  Well, we're at the closing arguments.  This

23   case has changed a lot.  Okay?  It shrank.

24                  The only thing that's at issue right now

13:39:50 25   fundamentally, there's still a big story to tell, but the

1    only thing that's at issue fundamentally are whether two

2    SAP marketing documents are misrepresentations,

3    fraudulent misrepresentations they'd have to be in order

4    for you to find against SAP.

13:40:06   5         We'll talk about them.  One is Exhibit 314.

6    One is Exhibit 617.  There are a couple of sentences in

7    each one.  I'm going to look specifically at those.  But

8    after three weeks, or whatever it's been, two weeks and a

9    half, this case has boiled down to a couple -- all that's

13:40:22  10    left of it, a couple sentences in a couple of documents,

11    and Penny Vitantonio, right, the woman from American

12    Express, whose notes said a hundred users.  We're going

13    to talk about her, too.  That's all that's left in this

14    case.

13:40:37  15         And here's what I will tell you:  The

16    evidence, there's no SAP misrepresentation whatsoever.

17    You're just not going to find it.  And if there's anyone

18    here who maybe could have done something different or

19    should have done something slightly differently, it's not

13:40:55  20    going to be SAP.

21         It's going to be either Hodell or their

22    guy, Dale, Dale Van Leeuwen, who was very active in the

23    sales cycle and was the captain of the ship and who left,

24    or Dan Lowery, who was not active in the sale cycle but

13:41:09  25    was active in the project, and you've already seen from

1    the evidence, but I'll highlight some of it.  He did a

2    terrible job of informing Hodell of what's going on.

3              And you're also going to see that B1 was

4    actually fine.  It started out as there were some issues,

13:41:25 5    but it improved and ultimately was fine.  They ran it for

6    two years.  It's improved since then and they should have

7    stayed on it.

8              The problem here was In-Flight Enterprise.

9    And we'll talk about that, too.  And then ultimately I'll

13:41:40 10   get to damages and walk you through what has been way

11   overly focused on in this trial, but at this point, I

12   don't think we can ignore it.  So we're going to talk

13   about damages.  And I'll show you my version of why the

14   damages are zero and in particular the productivity,

13:41:55 15   extra overhead damages are zero.

16             So Chapter 1.  There is -- oh, by the way.

17   We have a PowerPoint, okay.  You're welcome to, you know,

18   observe that as much as you'd like.  I'm mostly going to

19   work off of documents, okay?  And I'll try and hopefully

13:42:14 20   keep you kind of guided.

21             Chapter 1.  There is a long history here

22   between IBIS and Dale on the one hand and Hodell on the

23   other.  It goes back to the 1980s.  We were thinking the

24   other night, maybe we can actually reference Ronald

13:42:28 25   Reagan.  We only miss him by a year.  Okay?  This goes

1    back a long way.

2                Dale Van Leeuwen, first at his prior

3    employer and then at IBIS, worked with Hodell on another

4    ERP solution, right?  We've heard about this.  This is

13:42:43 5    that FACTS solution.  Right?  FACTS has got nothing to do

6    with SAP.  FACTS is a totally separate company selling a

7    totally separate ERP solution, and it got installed, it

8    got implemented by Dale and his companies going all the

9    way back to the 1980s.  And then into the 1990s when he

13:43:02 10    started out, Dale was the implementation manager.

11                This is not a dispute in the case.  Okay?

12    Hodell doesn't like to talk about it, but they've never

13    said oh, that's not true.  They know it's true.  Goes

14    back -- they don't like to talk about it but it goes back

13:43:16 15    that far.  He was the implementation manager.  The

16    testimony is uniform.  They had a partnership.  They

17    worked together very hard.

18                Otto and Dale used to work through the

19    night on this.  And Dale even testified, it wasn't just a

13:43:27 20    partnership.  He testified that it was a marriage.

21                Can you call up that -- Bob's going to help

22    us with some quotes.  You might have to blow that up,

23    Bob, because the resolution is terrible.

24                And this is me asking Dale on

13:43:41 25    cross-examination, "And you've even called this

1    relationship that was getting started with this

2    implementation going back to the early 1900s, you called

3    it a marriage, right?

4              "Answer:  Yes.  It very much is.

13:43:51  5              "Question:  Okay.  Because, and let's make

6    sure the jury understands, because once an ERP

7    solution" -- I almost laughed when I was asking this

8    question -- "once an ERP solution gets installed, once

9    you get married, then you have to support and maintain

13:44:05  10    that solution, right?

11              "Answer:  That's correct."

12              Okay.  Then what else do we know?  We know

13    that after about ten years of marriage, ten, twelve years

14    of marriage, there was trouble.  And they were on the

13:44:17  15    rocks.  Right?  And we've seen those exhibits.  Now, Dale

16    tried to deny this.  Ultimately, that just goes to his

17    credibility.  You can't deny this.  It's undeniable.

18              Look at 195.  Bob, if you can call that up.

19    SAP has been showing you this and Hodell hasn't.  It's a

13:44:34  20    January 24th, 2001 letter from Otto Reidl to Dale having

21    to do with the FACTS program and having to do in

22    particular with the eWMS part of it.  Okay.

23              That's a reference to Radio Beacon, which

24    you know is relevant in this case, too.  But this is back

13:44:52  25    when Radio Beacon, then called eWMS, was linked up with

1    FACTS, and Otto is not happy and he's writing to Dale in

2    a formal letter, "Our company spent a great deal of time,

3    effort and money to evaluate products, to communicate our

4    needs, and to prepare our warehouses for implementation.

13:45:09 5    Why?  Because we've been around the barn several times."

6              I'm going to come back to that phrase.

7    "We've been around the barn several times."  What does he

8    mean?  He means they understand what's going on.  They

9    have been on ERP before.  They've implemented ERP before,

13:45:26 10    they know what the issues are and they are saying, "Don't

11    jerk me around.  I know what I'm talking about," okay?

12              Later in our case, they tried to act like

13    they didn't know what they were talking about.  And we'll

14    talk about that.

13:45:33 15              The implementation was undertaken with very

16    little preparatory work, sounds familiar, but instead was

17    on a modified-as-you-go basis.  And then, Bob, I think

18    there's some more.  At least I think there is.  The next

19    page.

13:45:50 20              There you go.  "If the product could

21    not" -- can you skip that, please?  There you go.  "If

22    the product could not provide the capabilities required,

23    all of the parties selling Radio Beacon as a

24    FACTS-integrated warehouse management system, had an

13:46:05 25    obligation to say so.  They did not."

1            Sounds familiar, also.

2            Last point.  "I'm not going to belabor the

3   point of the drop in customer service and lost business

4   in this letter."  Sounds familiar again.  "That issue is

13:46:18  5   reserved in the event I need to seal legal advice."  This

6   is a very serious letter.  That marriage was in trouble.

7            Go please to 311.  Remember when I was

8   cross-examining Dale and I was asking him, hey, this

9   311 -- go all the way to the bottom.  No, actually you're

13:46:31 10   right.  Stop right there.  Just scoop the whole thing,

11   Bob.

12            I was asking Dale, "Doesn't this suggest

13   that there was a likelihood of litigation of Hodell

14   against you?"  And he denied that.  Remember?  And I had

13:46:43 15   to kind of walk him through this.

16            This is Kevin Reidl, two years later, but

17   the same system.  July 11th, 2003.  "In an effort to

18   clearly communicate my concerns with you," right,

19   "regarding eWMS," same thing as Radio Beacon thing, "and

13:47:02 20   The IBIS Group in general, however based on the level of

21   attention we received from your organization, how are we

22   to rely on you in the future when we need to keep a

23   larger computer software package running smoothly," et

24   cetera?

13:47:17 25            "In May, I went to bat for you before my

1      father.  He was ready to take legal action."

2                  It was right around then that Dale stopped

3      fighting me a little bit on whether this litigation

4      threat was directed to him, okay.  And then there's

13:47:30  5      another one, and I'm not going to go through all this,

6      but just the last line on 311.

7                  "Due diligence was never conducted at the

8      start of this project."

9                  Dale didn't do due diligence in connection

13:47:42 10      with the Radio Beacon piece of the whole thing, and this

11      is very clear about that.

12                  If you look at 312, I'm not going to

13      belabor this, but Otto complains to Dale, very quickly,

14      32 months and counting.  Dale gives a response.

13:48:05 15                  And just go to the top, Bob.  That's

16      probably the easiest thing.

17                  It's more of the same.  I'm not even going

18      to quote this.  You guys will have access to the

19      exhibits.  If you want to look at 312, please do so.  No

13:48:19 20      different than 195 and 311.  Hodell is ticked off at Dale

21      and they're threatening litigation.

22                  So why does this matter, right?  Well, it's

23      a couple reasons.  One is context.  You need to

24      understand the history, okay?  This case is not like, oh,

13:48:36 25      Dale Van Leeuwen, he's a lifetime B1 guy.  He goes

         1    door-to-door-to-door hoping to find a B1 customer, and he

         2    finally knocked on the door and somebody answered and it

         3    was Otto and he sold him some B1 software.

         4              It's not that at all.  It's the opposite.

13:48:50 5    Dale's not an SAP guy.  Dale is a Hodell guy.  And you

         6    know this from this, going all the way back, like I said,

         7    to the 1980s.  But there's more.  Remember, Otto admitted

         8    that Dale didn't introduce B1 to Hodell.  Hodell

         9    introduced B1 to Dale.

13:49:12 10             So they knew each other on FACTS.  They're

        11    driving each other crazy and about to get in suits

        12    together.  And go to the next quote that we have, Bob,

        13    please.  This is Otto's testimony in this courtroom under

        14    oath.

13:49:26 15             Can you just scoop that?  Scoop is my word

        16    for enlarging it.  All right?  "Okay.  Mr. Reidl, could

        17    you tell me when you became familiar with SAP's Business

        18    One software?"  That's a really good question.  "Yes.

        19    Around mid year 2003, I don't remember the precise,

13:49:46 20   month, et cetera, et cetera, that's June, '03, I attended

        21    this trade show, et cetera, learned about these competing

        22    products, et cetera, and I learned about SAP Business

        23    One.  I gave my card to the vendors.  I don't know if

        24    American Express got one from me, but then I got a card

13:49:59 25   from AmEx."

1          So there's no dispute.  Hodell, they're the

2     ones that found out about B1.  They went to Dale.  Okay.

3     So look at the next snippet I've got.  Same day.  Otto

4     Reidl again, as if there's any doubt that he sent Dale

13:50:17 5     out in the world as Hodell's guy to figure out what you

6     would do.

7          "Just prior to receiving the quote, because

8     of my years of experience with Dale, I wanted to get his

9     opinion on a number of the products that we were looking

13:50:29 10     at, including Business One.  I specifically mentioned to

11     him blank and blank and blank, and I had learned about

12     Business One.  And I asked him to give me an assessment."

13          Now, Dale agrees, right?  Go to Dale,

14     please, on this point.  This is an undisputed point.

13:50:48 15     This is Dale.  You remember this on direct?  "Hey, can

16     you describe for me the process by which Hodell purchased

17     Business One?"  And he tells you everything I just told

18     you.  "I was supporting FACTS.  They were having some

19     issues."

13:51:04 20          And then it says down here, in the bottom

21     third, "Hodell-Natco was actually approached by American

22     Express and introduced to the business -- the SAP

23     Business One application through American Express.  Otto

24     called me up and said, you know, this is a product you

13:51:20 25     should look at as an organization."

1         And I stopped Dale on cross-examination,

2    you might remember this, and I said, "Dale isn't that an

3    understatement?"  Because we had taken his deposition.  I

4    knew what actually happened.

13:51:30    5         So go to the next line, please.  So I asked

6    him, "Dale," scoop the whole thing, please, "would you

7    agree with me," we're talking Otto, "he actually directed

8    you, your word, as his partner, your word, to drill down

9    on Business One?"

13:51:50    10         "Answer:  I would say that, yes.  He felt

11   that this was a product that we should review and we

12   should consider as part of our portfolio."

13         In other words, it's not just that he said,

14   hey, Dale this is a product you ought to look at, "You

13:52:03    15   agree with me that he directed you as his partner to

16   drill down on the product both for yourself and for

17   Hodell?"  And he said, "Yes, that's correct."

18         I realize this is a lot of detail.

19   Remember Star, Greg Star, as soon as he got started, he

13:52:17    20   said there was another part of the story.  Hodell tries

21   to hide this part of the story from you.  These guys go

22   way back.  Dale Van Leeuwen was Hodell's guy.  It ended

23   up mattering, and we'll talk about some of that.  Go to

24   the next chapter.

13:52:33    25         This was a project, a big project, and it

1    had real risk, right?  I know you've all heard this but

2    it's three components.  It's B1 itself, it's Radio

3    Beacon, which had just about gotten IBIS and Dale and

4    Hodell in litigation, and this project, remember, it kind

13:52:50  5    of gets going months after that July letter.  So it's

6    right on the heels of almost them being in litigation.

7              And number three, it's In-Flight

8    Enterprise.  What's In-Flight Enterprise?  We didn't hear

9    about In-Flight Enterprise much in that closing argument,

13:53:03  10    did we?  We went like, I don't know, say it was two hours

11    long, I think it was, I'm not sure, might have been a

12    little bit longer.  I think we went two whole full hours

13    before we even heard the word In-Flight Enterprise.

14              In-Flight Enterprise was a highly

13:53:18  15    customized piece of business software that had never

16    before existed that was being written from scratch by

17    IBIS and it was going to get stacked on top of B1 and

18    Radio Beacon, and it was going to be tried out for the

19    first time at Hodell, and we'll talk in a minute, and

13:53:35  20    then they were going to go sell it all over the country,

21    right?

22              Let's get an idea of how big of a deal

23    In-Flight was because if you are going to evaluate B1 and

24    somebody is going to stack In-Flight on top of it, you

13:53:51  25    better look at In-Flight or you really can't evaluate B1,

1    right?

2              Take a look, please, at Exhibit 11.  I

3    think you probably all remember Exhibit 11.  We've used

4    it for a couple different purposes but right now there's

13:54:05  5    the purchase of In-Flight Enterprise.  This is a pitch

6    piece from IBIS to Hodell in October of 2014, and they're

7    saying hey, we think this In-Flight Enterprise is going

8    to take 3800 hours.  Think about that.  That's a lot of

9    hours.  Okay?

13:54:21  10              Now, they're going to give it to them for

11    free, right?  And we'll come back to that.

12              But let's talk about how big In-Flight is a

13    little bit more.  Okay.  Because remember on

14    cross-examination, me and Dale again, I tried to get him

13:54:36  15    to admit, look, let's make sure you guys understand this

16    product B1; it's done.  It's for sale.  People can go buy

17    it, like you could go buy something in Staples.  This way

18    with SAP, you buy it from a dealer, but the product is

19    done, the market is open.  If somebody wants it, they can

13:54:56  20    get it.  Now, he fought me on it a little bit, but then I

21    got him to concede.

22              And go to the next slide, please.  Scoop

23    that whole thing, please.

24              And we had just been looking at Exhibit 11,

13:55:09  25    so it's kind of easier to follow this.  "And your point

1    is that so in connection with this project, the hours

2    that you're talking about that needed to be devoted that

3    are listed here on 11, right, that's the 3816, you would

4    agree with me that the vast majority of them weren't with

13:55:24 5    respect to B1, which is a product that's out in the

6    market, but instead they were with respect to In-Flight

7    Enterprise?

8            "Answer" -- he couldn't have been more

9    clear -- "These hours were a hundred percent related to

13:55:35 10   In-Flight Enterprise.  Thank you."  He couldn't stop

11   himself.  "That is correct.  Okay, thanks, Dale.  Okay.

12   Now, we got it," but there's more.

13           Take a look at -- remember Joe Guagenti?

14   Joe Guagenti came in here.  He's not an SAP employee.  He

13:55:49 15   wrote In-Flight Enterprise, okay?  He was the head code

16   writer for In-Flight Enterprise.

17           Look what he said.  Remember his block,

18   block and a half analogy.  His point was, yeah,

19   In-Flight's big.  It's bigger than B1.  So the thing

13:56:07 20   that's stacking on top of B1, it's bigger and also on top

21   of Radio Beacon, bigger than B1.

22           "Are you familiar with the size?  Yes.  Is

23   that because you wrote the whole thing?  Yes.  Give us a

24   sense of how big it is?  Sure.  If SAP was one city

13:56:24 25   block, that's B1.  In-Flight, the size of In-Flight was

1    like one city block, maybe more.  Maybe one and a

2    half" -- sorry, I read it wrong -- "maybe one and a half

3    city blocks.  So it was quite a bit larger or equal to

4    the size of SAP, that's Business One, itself.  I mean

13:56:42  5    that's how big this application was."

6                And no one disputes in this whole case SAP

7    didn't write a line of IFE code.  I say "IFE" sometimes.

8    That's In-Flight Enterprise, same thing.

9                And the contracts, just to be clear, SAP

13:56:58 10    wants nothing to do with these add-ons that are built by

11    these people who sign distributor agreements and

12    distribution agreements and SDKs.

13                And we're clear about that.  Our

14    relationship was different.  We created and we sell B1.

13:57:12 15    If somebody wants to have a distribution agreement and

16    they want to go sell B1 out in the world, they can do

17    that.  If they want to build add-ons, then they execute

18    one of those SDKs, and they can do that.  And if a

19    company like Hodell wants the software, then, fine,

13:57:26 20    they've got to sign a license agreement with us.

21                And all that kind of happened here,

22    although it's all screwed up with IBIS and LSi because

23    IBIS doesn't have a distribution agreement, and I'll talk

24    about all that stuff.

13:57:38 25                But all three of those contracts, the

1    distribution agreement and the software development

2    agreement, we weren't a party to this one, skipping, and

3    the license agreement, they all say, hey, SAP wants no

4    responsibility for these add-ons, which makes perfect

13:57:51  5    sense.  We don't write them.  We can't control what

6    people are going to decide to stack on top of our

7    product.

8             And just this part may be a little bit

9    boring, but can you call up 32?  I just wanted to see,

13:58:03 10    the contracts do say this.

11             I think it's -- all right, fine.  This is

12    the SDK, right?  This is IBIS's contract that is signed

13    in December of 2003 with SAP, and this is the contract

14    that expired because they never had a distribution

13:58:22 15    agreement.  Okay.  And I'll come back to that, too.

16             It expired six months after it was

17    executed.  IBIS was out there acting like they still had

18    a contract with us.  It's a whole other story, but go to

19    8.8 -- just 8.  Can you blow that up?

13:58:39 20             It's legal language, and it's in all caps,

21    though, for emphasis.  And the people who are entering

22    into these contracts know exactly what it means.  I had

23    underlined the key part.  "Licensee extensions and any

24    third-party software."  So SAP disclaims everything, the

13:58:57 25    short version of that, having to do with licensee

3036

```
 1    extensions and any third-party software.  That's add-ons,
 2    okay?
 3                   So go quick to 30.  I just want you guys to
 4    see.
 5                   We put this in every contract, and it's in
 6    every contract that's in this case.  This is the
 7    distribution agreement that LSi signed.  Likewise, in
 8    December of '03.  And for this one, it's Section 12.2.
 9    This one's even thicker, but look, it's right up top,
10    same idea.  They disclaim all responsibility for
11    third-party software.
12                   I'm not going to bore everybody.  So go to
13    316, please.
14                   This is the contract that Hodell signed,
15    okay?  They got IBIS saying, fine, you guys are going to
16    step away from add-ons, makes sense.  LSi is saying fine,
17    step away from that.  Hodell says fine.  This is their
18    contract with us.  I think it's 7.1.
19                   Okay.  "SAP warrants that the software will
20    substantially conform to the specifications," et cetera,
21    et cetera.  "The warranty shall not apply."
22                   Romanette 1, and it kind of continues over
23    here.  "If the defect is caused by a modification,
24    integration add-on."
25                   You can spend all the time you want looking
```

1    at 316, that's our license agreement.  Hodell signed it

2    with us.  It's in perfect English.  Those are defined

3    terms.  That's In-Flight Enterprise.  We don't have any

4    responsibility for it.

14:00:33  5              Okay.  Very quickly go to 8 because I'm

6    talking about making the point in Chapter 2 that this is

7    a big, risky project.  Hodell knew that.  These are Otto

8    Reidl's own notes.  This is right around the time of that

9    Exhibit 11.  "Hodell-Natco concerns."  They have

14:00:53 10   concerns?

11              Look at item two.  Oh, they're concerned

12   that this is a custom development.  That's In-Flight

13   Enterprise.  They're concerned about that.  And what

14   else?  They're concerned about SAP's commitment.  That's

14:01:05 15   what I was just telling you.  Otto knows they're doing

16   something here that's big and risky, and SAP is not

17   committing to it, and they've got concerns.

18              So look, please, at 740.  Just more of the

19   same.  This one's a little tough to read, but just scoop

14:01:25 20   that whole thing.

21              This is Otto to Lowery and Van Leeuwen,

22   November of '04, second sentence, "Although I'm unhappy

23   about playing a developer, a pioneer, the guys with the

24   arrows in their back, role," the attached agreement, and

14:01:41 25   it basically says, "Okay, we'll do it."  He doesn't

1    exactly love that he's a developer, but he wants to get

2    the benefits of it, and I'll talk about that in a second.

3                   But he definitely knows those are the guys

4    that get -- the pioneers that get the ideas and are going

14:01:52  5    west and whatever, but they get the arrows in the back.

6                   Okay.  So Chapter 3.  It's not just that

7    it's a big, risky project.  This is a joint venture.

8    This is another thing Hodell doesn't like to talk about.

9    I'm going to get right into it.  Let's get into how it

14:02:10 10    works.

11                  Not only is Dale Hodell's guy out in the

12    world, throwing down, finding out for them, they go into

13    business together.  And there's no dispute, by the way,

14    in this case that that was true.

14:02:22 15                  Like this is another one of the things

16    where they don't like to talk about it, but these facts

17    are not contested facts.  The idea was let's get Business

18    One, stack Radio Beacon on top of it, get this giant

19    In-Flight thing that's even bigger than B1, stack that on

14:02:37 20    top of it.  We'll be the first ones to use it, but we'll

21    sell it all over the country.

22                  There's nothing wrong with that, as a

23    principle, but that's not us doing that.  That's them

24    doing that, and let's look at how they had that set up.

14:02:50 25                  Look at 291, Bob.

1           Very quickly.  This is the development

2    agreement, right?

3                So contract number three.  Who is a party?

4    Not us.  This is IBIS -- well, sorry, missed the most

14:03:05  5    important one.  Hodell and IBIS and LSi, right?  And what

6    is the project description?  And you got the timeline,

7    right, so it's right here.  Right?  They're signing the

8    development agreement, signing this agreement right here.

9                What are they doing?  It's the development

14:03:21 10    of IBIS's In-Flight Enterprise application and its

11    integration into SAP Business One.  The development

12    agreement is building In-Flight.  That's what it really

13    is.

14                There's a little bit more to it, but here's

14:03:34 15    how it works.  Hodell pays 300,000, right?  See that

16    300,000 purchase price in the lower right.  Go to the

17    next page.  I've highlighted this to make it easy for

18    you.  There you go.  And here's what they get in exchange

19    for their 300,000.  Thank you, Bob.

14:03:50 20                One, they get unlimited user licenses for

21    In-Flight Enterprise, okay?  And then upon -- this is

22    down to three, on successful completion of In-Flight,

23    once it's done, IBIS and Hodell are going to go out into

24    the world and try to sell it to other companies, and

14:04:11 25    Hodell gets a hundred dollars for each of the first 1,000

1     licenses that they sell to somebody else.

2            Now, you know, other fastener companies,

3     because they're trying to create -- remember the

4     testimony about the microvertical, they're trying to

5     create -- they're trying to sell it to all the fastener

6     companies they can, and Hodell can make $100,000 from

7     that.

8            Okay.  So go back, please, to 11.  I just

9     want you to see the math.  Scoop right -- just a piece of

10    that.  There you go.  That's fine.

11           It's the -- this is rough math, but it's

12    sound.  It's 3816 hours that were estimated at the

13    beginning.  The going rate for labor for IBIS is 150

14    bucks an hour.  If you times 3816 times 150 bucks an

15    hour, that's $572,000 of free In-Flight Enterprise, plus

16    if they succeed with this business venture and their

17    joint venture works out and they sell a thousand licenses

18    to someone else, Hodell gets another hundred thousand.

19           So remember Greg Star was kind of walking

20    Otto through, "Hey, how come you walked away from

21    American Express?"  Greg's point was, "Look, you're not

22    the type of company that you'd like to come off as.  You

23    guys have 40-some-odd-million-dollars in sales.  How come

24    you were so cheap when it came to American Express and

25    you said you had to beat this by at least half?"

1              And this gives you a flavor for what's

2      going on.  They weren't just being cheap with American

3      Express; they were going into business and they were

4      going to spend $300,000, and they were going to try to

14:05:38  5      double their money and make 672,000.  Think about that.

6      They're not out there trying to find, hey, what's the

7      best software for our company and all the people that

8      work here.  If they were really thinking about that, they

9      probably would have bought from American Express.  Okay?

14:05:52  10              They had this other idea with someone they

11      were about to a couple months before that to get into

12      litigation where they cut their price in half, pay

13      $300,000, and maybe double their money getting 672,000

14      back, which obviously didn't happen.

14:06:08  15              Very quickly, I think this is uncontested,

16      but I can't resist.  Look at 755.  Otto admits that this

17      was to make money.  Notes.  "If they want us to be a

18      development partner, we should see rewards from the

19      success of the product.  Commissions on future sales."

14:06:24  20              That's the hundred bucks times the

21      thousand, right?

22              Look at this next piece which is great.  It

23      totally proves one thing, that -- go to 10, please, Bob.

24      The In-Flight pass was IBIS's restitution.  So they're

14:06:43  25      doing two things.  They're going out into business and

1    they want to make some money, 672,000 in value, and they

2    want to settle this whole Radio Beacon dispute that

3    almost resulted in litigation.

4                    These guys were trying to do a lot, okay?

14:06:56  5        And look at the next exhibit.  You

6    can -- well, fine.  Go ahead, put it up there.

7                    Jon Woodrum from IBIS, he called this a

8    joint venture.  I mean, those are his words, not mine.

9    You can barely read it, it's at that third arrow.  I

14:07:14  10    thought that was funny.

11                    Anyway, Hodell, there were -- you could

12    tell from some of the questions that they asked during --

13    might have been in the opening statement but it really

14    came out in the questions.  They were trying to suggest

14:07:27  15    "We're not really involved in this.  If there is a joint

16    venture, we're not really involved."

17                    Well, they're the investor.  You can be a

18    joint venturer and be the cash guy.  Right?  Cash, cash

19    is what drives ventures like that.  They're the ones that

14:07:42  20    came up with the 300.  Remember, only about $150,000 ever

21    came to SAP in this whole case.  That other 150 or

22    whatever it turns out to be, that's the funding for this

23    joint venture to build this In-Flight Enterprise.

24                    And, Bob, if you go just -- I think we --

14:07:56  25    go to the next quote.  I think this point is made, but

1    this is Kevin, I think, "You'd agree that you were part

2    of this joint development project, you were providing the

3    funding, and you were taking the risk as the pioneer, the

4    guys with the arrows in your back?

14:08:11  5    "Answer:  Yeah, because we were going to be

6    the first with this software."  They were going to rush

7    to market and be first.

8    So just skip the next one, Bob.  That's

9    planning for Chapter -- what we're calling Chapter 3.

14:08:27  10    So it used to be that part of this case was

11    that Dale and Dan were acting on behalf of SAP.  That's

12    gone.  Okay?  That's not in this case.  So some of this

13    doesn't exactly match up because this case changed and it

14    shrank, and I have to kind of conform what I'm talking to

14:08:46  15    you guys about on the fly, but I want to make this point

16    because the contract, all right, this one, 316, it

17    doesn't just say that Dale and Dan or whoever is out

18    there selling our software is not our agent.  It does a

19    lot more than that, and it matters.

14:09:01  20    Can you call up 316, please?  Now, this

21    thing's got a lot of stuff in it, but I'm going to try

22    and move quickly.  Yeah, 7.1 and 7.2.  Well, that's just

23    that they're not an agent.  Go to 7.1 so I can avoid

24    dropping my papers.

14:09:29  25    Sorry.  I meant Section 7.1 of 316.  It's

 1    on 316.3.  The next page.  Yeah, you're going to have to

 2    blow that up.  My eyes are getting tired.  Can you blow

 3    it up more or just stretch it?  Okay.

 4              SAP warrants what?  Warrants what the

14:09:56  5    software will do.  It will conform to the functional

 6    specs contained in the documentation, and that's it,

 7    period.

 8              Here's what it doesn't apply to, and we've

 9    walked through some of that.  I'm not going to spend a

14:10:07 10    lot of time on that.  You're welcome to go back.  It's

11    7.2.

12              SAP and its licensors.  All right.  This

13    contract is between SAP America and Hodell.  Okay?  But

14    if you read this contract, the licensor, that's SAP AG.

14:10:23 15    That's the German parent that Hodell is desperately

16    trying to drag into this case because they don't have a

17    case to begin with that's left.  Now, they're just

18    reaching and lurching.

19              But I want to be clear, when Hodell signed

14:10:37 20    this contract, they agreed that SAP America and SAP AG

21    were disclaiming liability.  "SAP and SAP AG disclaim all

22    other warranties express or implied including without

23    limitation" -- (Pause)

24              I told them I'd talk fast, but I hear you,

14:11:12 25    I'll try to slow down.  How is that?

1        "Limitation and implied warranties and

2    merchantability or fitness for a particular purpose,

3    except to the extent that any warranties implied by law

4    cannot be validly waived."

14:11:36    5        Okay?  And just very briefly, there's 9.3,

6    that's further down.  That's a limitation of liability

7    provision.  Okay.  Same deal.  It inures to the benefit

8    of SAP America, and its desperate attempt to bring in SAP

9    AG doesn't work because they have protection under that,

14:11:52   10    too.

11        I'm not going to spend time -- go to the

12    last one.  The last one is an entire agreement.

13    Everything that everybody has talked about, including the

14    writings -- and I'll talk about the writings in this

14:12:05   15    case -- they're out the window.  It's only what's in this

16    contract that counts, okay?

17        And Hodell signed this contract, and let's

18    be clear, they -- Kevin Reidl and Otto Reidl, they

19    admitted that they got the license agreement, it was in

14:12:25   20    plain English, they read it, they understood it.  I mean,

21    I know right now it would be a drag to go through every

22    word there, but if you were Hodell and you're buying this

23    software, you're going to read that thing.

24        And we took their depositions and asked

14:12:37   25    them, "Hey, did you read this?"  And they said, "Oh,

1    heck, yeah, we read it and understood it.  We agreed with

2    it.  And then we signed it."

3                    Right.  And I've got a couple of reminders

4    for us all.  Can you go to the next transcript clip?

14:12:52  5    This one's Otto.  "And you understood everything in the

6    license agreement?  Correct."

7                    Go to the next one.  Otto again:  "Your

8    view of the license agreement when you read this thing at

9    the end of December of 2005, you actually agonized over

14:13:15 10   signing it, right?

11                   "I'm sorry?

12                   "Question:  You actually agonized over

13   signing the license agreement, correct?

14                   "Answer:  Correct."

14:13:25 15                   But he signed it.

16                   Kevin Reidl, one more.  This is Kevin.

17   He's the guy that actually put the pen to paper.  "You're

18   the one who signed the agreement?  Yes.  When we talked

19   about" -- this is Court testimony, right?  We all heard

14:13:38 20   this.  Sometimes it doesn't seem -- this isn't a

21   deposition.  This is what happened in front of us.  It

22   may not be every word, but this transcript came from

23   Shirle and Sue, and that's what they said.

24                   "And when we talked about this, is it true?

14:13:50 25                   "Right?

1              "And that, in fact, happened?

2              "Right.

3              "You took this very seriously?

4              "Yeah, we reviewed it and signed it, yes.

5              "Question:  And you understood everything

6       that was written in this document, right?

7              "Answer:  Yes.  It was pretty boilerplate."

8              So everything I was just walking through,

9       and kind of running through, but before you even begin to

10      think about SAP here, you have to look at that contract

11      and they agreed to all that stuff, okay?

12             Here's another point:  Their guy Dale,

13      okay, he was the guy during the sales process -- and I

14      just want to make sure you guys understand kind of the

15      distinction between Dale and Dan, right?  Dale's back in

16      the eighties.  Dan comes way later.

17             And there's some testimony from Dan where

18      he flat out admits he had nothing to do with the sale.

19      The sale problems that Hodell had were the fault of

20      Hodell and their guy Dale.  They shouldn't have hired

21      someone they were getting ready to sue.

22             But go ahead and look at the first clip.

23             I think if you go -- that's it, just go to

24      the trial transcript for Dale.  This looks about right.

25      Yeah.

1            Remember, Judge Nugent kind of stopped Dan

2     Lowery, he wanted to know.

3            "The Court" -- this is Dan Lowery and the

4     Judge is asking him, "When you tried to make the sales

14:15:27  5     pitch to Hodell, who did you talk to?

6            "Well," the witness, says, "the sales pitch

7     was made by Dale.

8            "The Court:  All right.  So that wasn't

9     made by you, right?

14:15:36 10            "Answer:  The what, sir?

11            "It was not made by you, the sales pitch?

12            "Answer:  No."

13            Okay.  I have a couple more of these.  I

14     want to go through them real quick.  I want you to know

14:15:47 15     what happened here.  It must be hard to sit there and not

16     be able to take notes and we're flying by you guys

17     throwing papers left and right.

18            I'm trying simultaneously to move quickly

19     so that I don't waste time and bore you guys, but I want

14:16:01 20     to spend some time because like I said at the start, I'm

21     not cherry picking.  This is what these -- we haven't

22     even gotten close to anything that's contested yet.

23     These are important base facts.  Okay.

24            "Mr. Lowery, did you talk to anybody?

14:16:18 25            "Dale did most of the selling."

           1                There's another one.  I think there's
           2    another one.  Yeah.  "Dale was the one.  He was the
           3    salesman?  Yeah."
           4                And then what about Dan, right?  Dan Lowery
14:16:30   5    admitted he didn't hear about Hodell until after his
           6    company, LSi, bought IBIS.  Remember that?  IBIS existed.
           7    It worked with Hodell.
           8                Dan Lowery and his company, LSi, bought
           9    IBIS, and they basically kept him as a subsidiary.  They
14:16:47  10    purchased them in -- and there was a little bit back and
          11    forth -- we'll call it May of 2004.  That's the first
          12    time Dan Lowery heard of Hodell, and then he admitted
          13    that he didn't meet them until September of 2004.
          14                So at this point it's May.  Dale is the
14:17:04  15    guy, but very quickly, go to 830.  I think it's the next
          16    exhibit.
          17                This is Lowery writing to the Reidls,
          18    September 12th, '04.  Oh, boy.  "Thank you for your time
          19    and the opportunity to discuss your business.  I enjoyed
14:17:22  20    meeting with you."  Pardon me.  "I enjoyed meeting you
          21    both and the tour of your operation."
          22                So that sets something in time.  The guy
          23    just met them the day before.  Okay?
          24                All right.  So where do we want to go next?
14:17:38  25    Let's keep moving.

1           This one's fun.  Next chapter.  B1 is a

2    dynamite product and SAP has lots, has gobs of happy

3    customers who have more users than Hodell.  And some of

4    those sales were before Hodell and some of those sales

14:18:04  5    were after Hodell.

6           Remember Paul Killingsworth came in here

7    and testified?  Customer service.  He's an executive at

8    SAP.  He's in charge of B1.  It's his baby.  He spoke

9    with pride about B1.  It was clear, they have 40 to

14:18:23 10    50,000 customers.  40 to 50,000 companies are running B1.

11    That's a lot of companies.  Okay?

12           And remember Dan Kraus came in?  He was

13    kind of the same.  He doesn't even work for SAP anymore,

14    but he's still in software.  He volunteered to come here,

14:18:43 15    tell us about B1.

16           And look at what he said, if you'd call his

17    transcript up.  This is -- it's one of those things that

18    once you get it, you get it.  "All right.  Separate and

19    apart, is it true or not that B1 has worked well for

14:18:59 20    companies that actually do have up to 500 employees or

21    more?"

22           Which by the way, when you go to the couple

23    of little things that are left in this case, it's, hey,

24    does B1 work for companies with one to several hundred

14:19:12 25    employees or does B1 work for companies with between one

1   and 500 employees?  And I'm going to be talking about

2   this, but you're darn right it does.

3                It totally does, and there's lots of them

4   out there and we have a stack of exhibits that show them.

14:19:27   5                Now, Hodell had some issues, but that was

6   specific to Hodell and it was because of a whole bunch of

7   things Hodell did, and we ultimately think B1 worked for

8   them and they should have stuck with it, et cetera, et

9   cetera.

14:19:39  10                But when you see something like that, stop

11  yourself and say, "Okay, don't forget that," okay,

12  because B1 works for companies with hundreds of

13  employees.

14                But look at what he says here.  And I'm

14:19:49  15  going to come to that in a second.  "We had a number of

16  customers before Hodell ever bought B1 that were large,

17  and we've had -- well, since I've left and even before

18  there were a number of customers that have bought the

19  product that used it successfully that are very large.

14:20:00  20  Okay.  Thank you.  Thank you.  We'll come back to that."

21                And I decided, no, let's talk about it

22  right now, right?

23                "Question:  Tell the jury, has B1 been a

24  successful product?

14:20:10  25                "Absolutely."

1          This is where it gets good.

2              "B1 has more than 40,000 customers that are

3     using it around the world, and generally you would look

4     at a product, whether it's successful or not, based on

5     the adoption.  And 40,000 companies running a product is

6     a lot of companies running a product.  So, yes, it's been

7     a successful product."

8              And he goes on to talk about the range of

9     size, and he talks about how some of them are small and

10     some of them are large.  But the reason, the main

11     reason -- and that's part of the reason, I guess -- but

12     the main reason I wanted you to see that is that's his

13     point.  Hey, is B1 a success?  Of course, it is.

14              They didn't sell 40,000 copies the first

15     day.  They've been selling B1 for a long time, and 40 to

16     50,000 companies over that period of time that decided to

17     buy it, it's self-proving.  It's definitely a successful

18     product.  They sold it to 50,000 companies, right?

19              And look at, can you call up 700?  This is

20     700.  I hope I don't drop this, that would be bad.

21              Mr. Killingsworth testified about this.

22     It's a list of all customers in the history of B1 around

23     the world that have more than 50 users.  Okay.  I'm

24     running out of space.

25              But very briefly -- I'll try not to get too

1  close -- this thing's huge.  Okay?  It's 26 pages long,

2  and over in this column it takes, like, the professional

3  licenses and the limited licenses and it adds them up.

4  And if you look at the top here, that's just kind of a

5  sampling -- no, no, that's the top.  See in the upper

6  right-hand corner, 5766?  And it goes down from there,

7  it's in decreasing order by total number of users.  It's

8  26 pages long.

9  And my friend Joe walked Paul Killingsworth

10  through this.  Thank you for this, Joe; you gave me a

11  little cheat sheet.  There are over 2000 companies on

12  this list with more than 50 B1 licenses.  There are 500

13  companies with more than a hundred user licenses.

14  Notable names:  Loreal, Unilever, Phillips, Coca-Cola,

15  Haines, Chevron, et cetera.  More than 250 of these

16  companies have more users than Hodell.

17  And then if you get -- if you look at it,

18  it's got an industry column, and you can find there

19  industry which is wholesale.  There are 28 companies in

20  the wholesale industry with more users than Hodell.

21  This is a very important exhibit.  So is

22  this one, 834.  834 is like a reduced version of 7.  It's

23  just the '03 and '04 sales worldwide to companies with

24  more than 50 users.  And there's been all this testimony

25  about, oh, well, maybe Hodell was the biggest company

1    that they'd ever sold to, which is totally not true.

2                    And if you look -- thank you, Bob.  Is that

3    about as big as we can make it, I guess?  These

4    are -- this is 834.  The green are U.S. companies that

14:23:28 5    were prior to Hodell because this is '03 and '04.  And

6    remember, Hodell doesn't get our licenses until December,

7    '05, and there are at least four big ones, United States

8    companies, Chevron, Koehler, Respironics, and there's

9    another one at the bottom called Attica, so Hodell wasn't

14:23:48 10    our biggest company at the time.  We had other prior

11    sales.

12                    It's interesting, Hodell at the trial, they

13    hate these lists.  This is a big problem for them.  Okay.

14    So what do they try and do?  They try and say, "Well, you

14:24:02 15    don't tell whether there's an add-on in here and you

16    don't tell, well, maybe they were running it in separate

17    subsidiaries" or something like that, right.  Or they

18    criticized it because it's not broken out some other way.

19                    This report is what it is.  This is a

14:24:17 20    report that can be run at SAP, and we ran it.  If they

21    wanted to investigate that, they had these lists.  Okay.

22    They could do it, but they haven't.  They just brought it

23    up at trial and took a swipe at it.

24                    And remember what happened?  Okay.  They

14:24:29 25    asked Paul Killingsworth, "Hey, wait a minute, aren't

1      these separate installations?"

2                    And he said, "Whoa, whoa, wait a second.

3      I've not conducted that study.  That's

4      definitely nonsense."  He didn't say it.  It was clearly

14:24:39  5      nonsense, you could tell by how he was reacting.

6                    But right off the top of his head he

7      remembered two companies that were not just in the

8      wholesale business, but they were, like, incredibly

9      analogous to Hodell.  And he named them off the top of

14:24:53  10      his head.  One was Fairview Fittings which is on this

11      list and one is Tech Equipment.  Fairview had 153 users.

12      Tech Equipment had 159.  Total single installations.

13                    Okay.  And remember, they didn't have the

14      guts to ask Dan Kraus about that.  They just didn't.

14:25:12  15      They ditched that idea because they felt like maybe they

16      scored a quarter of a point and leave it and argue it

17      later, instead of doing what they should have done which

18      is if this is what they are going to say, then

19      investigate it, which they never did.

14:25:23  20                    And then they tried to ask Brooks Hilliard

21      a question about it.  And remember what he said?  I have

22      a quote from him.  Brooks Hilliard checked with SAP about

23      that issue, and they looked at the range of companies

24      with between 60 and 300 users on this list, and found

14:25:37  25      that the vast majority of them are single installation.

 1              So that's the end of this issue.  We

 2    got -- this is a massively successful product.  It's

 3    not -- it's not ERP ECC.  We're not selling it to Fortune

 4    100 companies.  It's not All-In-One.  But it's massively

14:25:56   5    successful in its space, and it's continued to improve,

 6    and we have lots of happy customers with more users than

 7    Hodell.

 8              I'm going to take a drink.

 9              So let's talk about the marketing

14:26:16  10    materials.  There are two documents that we're talking

11    about.  One is 314 and one is 617.  I'll talk about both

12    of them kind of first.  These are high-level promotional

13    materials and they're both from 2003.  Okay?

14              They're not specific to Hodell.  This

14:26:43  15    wasn't like a Hodell proposal, "Dear Hodell, we've

16    checked you out."  These are out there in the world about

17    B1, high-level promotional material.

18              Do you remember what Your Honor said about

19    the funny legal word -- I don't like saying it because it

14:27:01  20    sounds funny -- puffery.  Okay?  What that means is it's

21    okay for the pizza shop to say world's best pizza.  Okay.

22    If you don't like the pizza, you don't get to sue them

23    the next day and say "That wasn't the world's best pizza,

24    I want my money back, I want more spice" or whatever.

14:27:18  25              Puffery just acknowledges the obvious that

1    out in the world, when products are being promoted and

2    advertised, you can say things like that's the best darn

3    truck, you know, or something like that, and it's called

4    dealer talk.  Right?  And I think you use that phrase.

14:27:34  5    Or trade talk.  That's number one.

6             So these are high-level promotional

7    materials.  They're not specific to Hodell.  They're

8    subject to the dealer talk exception.

9             And here's what they're also not specific

14:27:44 10    to.  When I say they're not specific to Hodell, they're

11    not specific to taking B1 and stacking Radio Beacon on

12    top of it, and then stacking In-Flight Enterprise on top

13    of that.

14             Okay?  But let's get into it.  Let's look,

14:27:57 15    right, let's look at the language.  There are only, like,

16    a couple of sentences.

17             Can you call up 314, please?  Just, all

18    right, fine, let's scoop this for a second.  This is not

19    the language at issue but -- actually back up, Bob.

14:28:14 20    Scoop the whole thing so they can see what this document

21    is.  That's right.  That's right.  Okay.  That's better.

22             See, it says SAP Business One Brief.  Like

23    I said, it's not a letter to Hodell, all right.  First

24    sentence, "Running a successful small or midsize

14:28:31 25    business, SMB, is more challenging than ever.  With

1    buyers spending down and the markets at large playing

2    wait and see, many small businesses have hit a plateau,"

3    et cetera.

4                You can tell if Hodell ever got this thing

14:28:46  5    and if they ever read it like they say that they did that

6    that when you pick it up, it says Business One Brief,

7    read the first couple sentences, you know what you're

8    looking at.  All right?  It's a piece of promotional

9    material.

14:28:56 10                But go to the sentence that they're

11    challenging, the first, it's on the next page, and this

12    sentence is repeated in 617, or something really close.

13                Blow up the highlighted.  And then go to

14    the second sentence.  "The solution helps emerging

14:29:12 15    businesses."  Can you underline that?  That's perfect.

16    The green.

17                "The solution helps emerging businesses

18    from those with 10 to several hundred employees to

19    streamline their operational and managerial processes."

14:29:25 20                That's true.  We know it's true.  This is a

21    very dynamic, successful product.  We got 40 or 50,000

22    customers.  I just read off from Joe's cheat sheet that

23    he gave me how successful that it's been, how many of

24    them have way more users and, likewise, employees than

14:29:47 25    Hodell.

1          The idea that that's a fraud -- and

2     remember.  Every time this comes up, do you ever notice

3     this, that like the Business One Brief is a couple pages

4     long, single-spaced, and it comes up pre-highlighted with

14:30:01  5     the language underlined as if that's how it existed in

6     the world.  It doesn't.

7          But the idea that, oh, yeah, that's a

8     fraud, is ridiculous.  This product works.  It's worked

9     for companies with lots more employees than Hodell.  Some

14:30:16 10     of them, lots of them, have several hundred employees.

11     That statement is accurate.  Okay.

12          What Hodell is really saying is it didn't

13     work for them.  Right?  They had B1 and put Radio Beacon

14     on top and the In-Flight Enterprise.  We don't agree with

14:30:32 15     that.  We think it did work and we think they should have

16     stuck with it.  In-Flight was the problem, et cetera.

17          But their point is "It didn't work for me."

18     And then, fine, go back to the language.  Does it say

19     that this is a guarantee, it's going to work for every

14:30:45 20     single company, it's guaranteed?

21          It totally doesn't say that.

22          And here's another related issue.  There's

23     no evidence that got put in this case that this is

24     untrue.  We had this big case that went two weeks and a

14:31:01 25     couple days.  They were throwing stuff everywhere on the

1     wall.  Right?  This was not the focus of the case.  And

2     even when it was, they were basically suggesting it

3     didn't work for Hodell.

4                But think about this:  They were not

5     putting in evidence that it didn't work for companies

6     from one to several hundred employees.  They didn't do

7     the investigation of several -- like, if you want to

8     prove that this is an untrue statement, it's not just it

9     didn't work for one company that stacked an IFE on top of

10    something, you need to bring in an expert and say it

11    doesn't work, it can't work for companies with one to

12    several hundred employees.

13               Even Mr. Guembel, whose testimony I think

14    should be totally disregarded, he doesn't even say that.

15    He does not deny that this product could work for

16    companies with several hundred employees.  Doesn't deny

17    it.  And the record evidence makes it impossible to deny.

18               Very quickly, look at 617.  There's another

19    statement in here by the way, it says one to 500.  Same

20    deal.  Right?  Lots of companies with 500 employees B1

21    worked for.

22               Hodell's wrong that it didn't work for

23    them, but if they want to say that it didn't work for

24    them, it just didn't work for them, okay.

25               This is from -- this is the second document

1    that they're saying that we defrauded them with.  Okay?

2    This thing's from 2003.  The other one was from 2003,

3    also.  This is someone from biz2bizmarketing writing to

4    Otto in October 1st of 2003 attaching this piece of

14:32:37 5    promotional literature.

6              Go to the next page, please.  Look at the

7    top, this isn't even the same product.  So this case is

8    going down, down, down.

9              We're down to two documents.  We looked at

14:32:55 10   314.  There's, like, two sentences in that, and then they

11   go, "Yeah, put 617 up on the board, we want to say that's

12   fraud, too."  617 was Penelope Vitantonio's company.  She

13   was at American Express.  This was the American Express

14   product.  They weren't going to have Radio Beacon and

14:33:11 15   In-Flight.  They had a totally different add-on that they

16   were selling, okay.

17             And I think, see all these little

18   highlights that we put in here?  You'll get this document

19   and you can look through it.  It says "Business One --

14:33:25 20   American Express Edition," repeatedly, like, I didn't

21   count them.  It's probably ten times that's it's in

22   there.

23             And if you go to Page 6, it does have a

24   statement in it, but it's pretty much the same exact

14:33:38 25   statement that we saw from 314.  I think if you got one

         1    to several hundred employees, Business One is going to

         2    work for you, or let's look at it.  Doesn't guarantee it.

         3    I don't want to overstate it.

         4                 The SAP -- there it is.  "The SAP Business

14:33:56 5    One Solution effectively supports companies with as few

         6    as ten and as many as several hundred employees."

         7                 I'd write that again because it's true.

         8    Business One supports companies with as many as ten and

         9    up to several hundred employees.  That's -- that's

14:34:13 10   uncontroverted evidence in this case.

         11                And just to be clear, now that the case has

         12   kind of boiled down to this, Judge Nugent told -- talked

         13   to you about standards of proof, right, and there's like

         14   preponderance of evidence, and that's like if one side

14:34:32 15   has, like, slightly more evidence than the other, then

         16   they win, even like 51% to 49%, right?

         17                When you evaluate these documents and these

         18   little sentences that are inside these documents that are

         19   totally benign and totally true, in order to decide -- to

14:34:50 20   decide if maybe that's a misrepresentation, you have to

         21   decide that there's been not just preponderance of

         22   evidence, but clear and convincing evidence.  Okay?

         23   That's different.

         24                Not a criminal trial, it's not beyond a

14:35:06 25   reasonable doubt, okay, but it's not a regular civil

1    trial either where it's just going like this

2    (indicating).

3              It's clear and convincing evidence.  You

4    have to have a firm belief or conviction.  And I don't

14:35:19  5    know how else to describe it, those are the exact words

6    that Judge Nugent used.  But the point is, wow, they're

7    definitely going to lose.  They got to prove that it's a

8    false statement, which it is not.  We went through all

9    that.

14:35:35 10              And they have to prove that it was done --

11    they have to prove it was a false statement by clear and

12    convincing evidence.  They have to prove that we made the

13    statement, and they have to prove this by clear and

14    convincing evidence, too, with the intent to mislead

14:35:52 15    them.

16              Where is the proof of that?  We wanted this

17    to work.  They pointed in our promotional stuff after

18    this about Hodell, where we were celebrating the sale.

19    Yeah, we were celebrating.  We thought it would work.  We

14:36:08 20    still think it does, et cetera, et cetera.  But where is

21    the proof in this case that we intended to harm them?  We

22    thought this was going to work.  Okay?

23              Reasonable reliance.  This is a big one,

24    okay.  There's no way that a reasonable person in

14:36:26 25    Hodell's position -- and that's how you should look at

1    it -- can do what they're saying.  When they had 617 up

2    during counsel's close, their argument was this sentence

3    is critical.  It was like six pages of single-spaced

4    text.  That sentence, "ten to several hundred," that's

14:36:46 5    the one that was critical as if that's the only thing

6    that they ever got and that's the only thing they ever

7    did and they made their decision.

8         That's not reasonable.  If you take what

9    they're saying to be true, you can't go out in the world

14:36:57 10   and be a company like Hodell and be blind to everything

11   like this Radio Beacon thing, almost got you in

12   litigation and this massive In-Flight and all sorts of

13   other things and their massive transaction volumes,

14   they're going to talk about that and go, "No, no, I saw

14:37:12 15   that sentence and I'm justifiably relying on that.  I'm

16   settled."

17        They know ERP, right?  They had FACTS

18   before that almost got them in litigation.  They know

19   that "employees" doesn't equal "users."  That issue

14:37:31 20   shouldn't really be alive in the case any more, okay?

21        Kevin Reidl testified that when they had

22   FACTS, right, they had 160 employees.  How many users?

23   I'll show it to you in a second.  They had a hundred.

24   Okay.  So Hodell knew "employees" does not equal "users."

14:37:49 25   And that really matters.

1          Greg did a good job of this in the opening,

2     making sure you understood.  When you buy software, you

3     pay per user.  You pay per license, right?  So if you're

4     a thrifty customer -- and we know that Hodell's, like,

14:38:04  5     ultra thrifty, they don't want to buy any more users than

6     they have to.

7          Remember, Dan Kraus talked about that, he

8     had that painting analogy, like, you run a painting

9     company, you got painters out there painting houses or

14:38:17 10    whatever, they're definitely working but they're not

11    necessarily going to be computers users at all.  They're

12    out in the field doing their work.

13         So it's a pretty big painting company and

14    they have an ERP solution like Business One or one of

14:38:29 15    these other ones, they're not going to buy a user license

16    for every single one of these guys who doesn't need one.

17         And the same was true for Hodell.  Reidl,

18    Kevin admitted on -- can you call that up, actually?  Did

19    I skip over it?

14:38:51 20         "Yeah, back in '04 when they were on FACTS

21    they had about 160 employees.  That's right.  And you had

22    about a hundred users?  That's right.  So two-thirds were

23    actually users?  That's right."

24         So we can stop with the idea that when you

14:39:07 25    see the word "employee" -- first off, it doesn't matter

1    anyway.  You could substitute the word "users" for those

2    couple of sentences, and when you go back to several

3    hundred, sure, works for several hundred users.

4         But it didn't say "users" and they don't

5    have a single document, a single document in this case

6    that says "users."  There's no such thing.

7         One point.  And I'm going to dwell on this

8    later, but Greg will get mad at me if I don't mention

9    this.  Both of those documents, 314 and 617, they're from

10   2003.

11        Okay.  Hodell knew -- and we'll talk about

12   this in a little bit -- that the numbers for B1

13   were -- well, put it this way, those two documents were

14   from '03.  When did they sign the license agreement?

15   '05, okay.  December, '05.  So when you think about how,

16   you know, do we have clear and convincing evidence that

17   it was justifiable for them to rely on those two little

18   teeny, tiny sentences, right, you need to keep in mind

19   before you get a firm conviction -- and you cannot --

20   that that was justifiable, but you need to keep in mind

21   that they're talking about things that are back from '03

22   in connection with a decision they made in '05.

23        Okay.  And we're going to talk about that,

24   there were materials out there in the world by '04 and

25   '05 that had lower numbers in there.  IBIS and LSi knew

1    all about that, and so did Hodell because, remember,

2    Otto, right, there was that Exhibit 5.

3              You remember Exhibit 5?  You probably

4    don't.  Exhibit 5 was a magazine article, okay, and it

5    had lower B1 numbers in it.  And in his deposition Otto

6    admitted, "Hey, I had Exhibit 5 and those lower numbers

7    before this."  Okay.  And then when he came in here in

8    court, he said "I made a mistake.  I did not have Exhibit

9    5 before I signed the license agreement.  I found it

10   afterwards."

11             Okay.  And he said, "Look, if you flip

12   through it and you look at the fine print, at the very

13   end of it there's a 2007 print date."  And his point was

14   "I couldn't have had it in 2005 because this thing got

15   printed in 2007.  I must have looked at this after

16   go-live," right?  That's not illogical, but it's beside

17   the point.

18             And Greg did a really good job of making

19   this clear to you, you might not remember it, but this is

20   exactly what happened.  Otto then admitted that at his

21   deposition, before Greg showed him Exhibit 5, Otto

22   admitted no less than three times in his deposition that

23   Hodell knew before it signed the license agreement that

24   the numbers were coming down somewhat.

25             I'm going to talk in a minute about how

 1    that was happening and why, avoiding competition with

 2    All-In-One and et cetera, but again clear and convincing

 3    evidence.  They got all these elements.  It's got to be

 4    false.  It had to have intent to mislead.  There's got to

 5    be justifiable reliance.

 6                    Whoa.  What are they relying on?  Two

 7    documents from 2003 -- they're coming up on now on three

 8    years old -- when they knew there's obviously lots of

 9    other 2004 documents out there and 2005 documents, and

10    I'll talk about those, and they had lower number in them,

11    but they admitted that they knew.  You can't -- that's

12    the end of that.

13                    Performance tests.  Remember the

14    demonstrative that had the blue on it?  Right?  That's

15    misleading.  Okay.  That document's not complete.

16                    SAP conducted performance tests that

17    support the numbers that are at issue in this case.

18    Okay?  I'm going to go through just a couple of them.

19                    Bob, can you call up 122?  We'll try and

20    show you guys the cover sheet.  You might remember this.

21    No, I'm sorry, that's right, and you got to rotate it.

22    Gives me a break.

23                    This is August, 2004, right?  SAP B1 sizing

24    guide.

25                    Can you go to the highlighted sections,

1    please?  So it's small, medium and large configurations.

2    Notice the large configurations for purposes of this test

3    in, what was it, July, August, 2004?  Do I have these in

4    right order?

5              I'm doing it backwards, sorry.  Can you

6    call up 453?

7              Sorry.  I was tired last night and I had

8    them in the wrong order.

9              So they're very similar, but I think it's

10   important for you to see them chronologically.  This is

11   July, '04, SAP Business One sizing guide.

12             Next page.  Same idea.  They're testing out

13   the software.  Right?  And trying to determine, hey, if

14   you're going to put stress on it, how much hardware do

15   you need, how big should your servers be, and stuff like

16   that.

17             So they split them into three groups,

18   small, medium and large.  So go -- keep going.  I think I

19   have these pages right.  Their large configuration, like

20   I said, was 150 users, and here's all the hardware that

21   you need.  Right.  Which by the way, tells you that we

22   expect it will work for 150 users or we wouldn't tell you

23   what kind of hardware to use with 150 users, but keep

24   going.  There's some data.  There you go.

25             Here's the report.  Time-wise most actions

1    took less than one second.  That's a big success.  There

2    were 150 users, and they ran 20,000 transactions.

3                  Okay.  Now, I think that's the last

4    reference in this.  All right.

14:45:04  5              So go now to the one we were just looking

6    at, 122.  It's kind of interesting.  This is a month

7    later.  Let's scroll through this.  It has the small,

8    medium and large.  Let's go to the first highlighted

9    section, Bob.

14:45:19 10              Right.  So there's 20, 60 and then 150

11    users.  It's the same test, right?  You can see it's

12    20,041 transactions.  Right?  If you get a little bit

13    more detail, there were a couple of them that were

14    longer, but this is a robust test.  I mean, they're

14:45:38 15    testing 150 users and they're doing 20,000 transactions,

16    but go to the next -- fine, stop.

17                  In August, when they ran the test, they ran

18    some bigger ones.  They ran tests with 300 users and then

19    they ran tests with 500 users.  And you can see the

14:45:54 20    transaction times, they're relatively low.  And they

21    ran -- they didn't -- they didn't crank this thing to see

22    if it could go a hundred miles an hour, but they're

23    running thousands of transactions through.

24                  And then look, there's something else I saw

14:46:10 25    the other day I think is interesting.  Then they went out

1    into the field and they're talking to customers, and this

2    is the information they've collected based on their field

3    experience in '04.  And if you look, the items, that's

4    like the SKUs, that's relatively low compared, right, to

5    Hodell.

6                   But we heard the testimony, you look at

7    everything.  It's not all driven by SKUs, it's how many

8    products do you have and how many people do you buy them

9    from and how many customers do you have and how many

10   warehouses do you have.  It's all of those things, so

11   it's kind of almost like add up all those numbers and

12   look at it then.

13                  And when you do that here, this, this is

14   80,000 to 90,000 customers.  The users are there, 70 to a

15   hundred, with a thousand accounts and a hundred

16   warehouses.

17                  And go, look how many transactions they

18   ran.  Annually, these figures exceed Hodell's numbers,

19   400,000, 52, 12 and 380,000.  Those are big numbers.

20                  So when you, you know, when Hodell holds up

21   that demonstrative that they're marking with their little

22   pen, they're not including this stuff.  So I don't know

23   why they're going through that exercise.

24                  A couple of things.  Hodell focuses on the

25   fact that, "Oh, when you did these tests" -- and this is

1    more -- less from argument but more from the questions

2    that they asked witnesses, that "When you did these

3    tests, you didn't test them at our volumes, right, our

4    exact volumes."

5            And you can't do that.  Right?  Every

6    customer is different.  There's not going to be a test

7    where you kind of perfectly match the customer, but I

8    thought the testimony on this -- who was it?  The one who

9    said go 60 miles an hour.

10           MR. STAR:  Guagenti.

11           MR. MILLER:  Joe Guagenti.

12           He said if you test the car and it's tested

13   that it can go 60, that doesn't mean that it can't go 80.

14   But what it also means -- and we're going to talk about

15   this in a couple minutes -- if you're Hodell and you're

16   going to stack Radio Beacon and this giant enterprise on

17   top of that, you need to remember, hey, this thing's only

18   been tested to go 60.

19           And these test results, the testimony is,

20   they went to Hodell's guys, okay, IBIS and LSi and their

21   training and all the stuff they went through, they got

22   all that stuff.  Okay?  That's performance tests.

23           Your Honor, I've got a ways to go.  If we

24   can, I would imagine the jury might want five minutes.

25           THE COURT:  That's fine.

1             MR. MILLER:  I don't need a lot of time.

2             THE COURT:  Okay.

3             MR. MILLER:  Whatever you guys want.

4             THE COURT:  Is ten minutes good for

5      everybody?

6             MR. MILLER:  Works for me.

7             THE COURT:  If so, keep in mind the

8      admonition.

9             We will wait for our little general -- our

10     young general, I should say.  Not little general.  I

11     think that's what we should start calling him, don't you?

12     He'd like that.

13            His mother's not too happy.  He wants to

14     come back tomorrow, too.  Of course, I gave him the go

15     ahead.

16            (Jury out).

17            (Proceedings resumed in presence of the

18     jury as follows:)

19            THE COURT:  Be seated, folks, please.

20            This is getting a little exciting.  One of

21     my daughters is here.  She came from New York, and she's

22     waiting for me to take her home.  And another one of my

23     kids took the red eye last night from Los Angeles and

24     guess who rode on the plane with her?

25            THE JURORS:  Dwayne Wade.

 1              THE COURT:  Oh, you're so far off.  LeBron.

 2              A JUROR:  Oh.

 3              THE COURT:  Wouldn't you think he would

 4    have his own plane or something?  He took the red eye on

 5    Spirit Air or something like that, and then he actually

 6    with his kids picked up his bags at the baggage thing and

 7    everything, but he did have a driver.  Of course, my

 8    daughter did, too.

 9              (Laughter)

10              THE COURT:  5:45 a.m., I'll have you know.

11    Very well paid driver, though.  That was the difference.

12              You may continue.

13              MR. MILLER:  Thank you, Your Honor.

14              Okay.  Next chapter, we'll talk about

15    add-ons and transaction volume a little bit.  They

16    matter.  Okay.

17              Stacking stuff on top of B1.  What you put

18    up there, matters.  And transaction volumes matter.  And

19    Hodell knew that, and so did Dale and Dan.

20              This case, like I said, it's strange.  I'm

21    going to go right to just a couple of points and probably

22    move through these next couple of chapters quickly.

23              But go, please, to 291, Bob.

24              We've seen this.  Right?  That's this.

25    Sorry.  That's this, development agreement between Hodell

1    and IBIS and LSi.  The project description is an add-on.

2    This is what they're doing.  They're going to build this

3    thing that's bigger than B1, okay.  "The development of

4    IBIS's In-Flight Enterprise application."  I know that

15:06:52  5    seems really simple, but it's also really important.

6    It's funny.  You can litigate a case and finally go back

7    and look at the project description and, like, yeah,

8    that's what they're doing, they're taking B1 and stacking

9    this big whopper on top of it.

15:07:05  10          And Hodell knows about add-ons, and this is

11    why some of the story I was telling you before becomes

12    important and relevant.  They had FACTS.  They have been

13    on ERP way longer than most companies.  They get this.

14    They know what an add-on is.

15:07:18  15          So then what, right?  Transaction volumes;

16    they matter, too, okay.  Transaction volumes for Hodell

17    were unusual.  Hodell's in the fastener business.  Right?

18    They have, we've heard this over and over, they've got

19    lots of little parts, little twists and bolts and nuts

15:07:38  20    and stuff, lots of those.  They apparently have lots of

21    customers and lots of vendors where they get these

22    things.  They have a very unusual transaction volume.

23    Okay?

24          Who knows best about their transaction

15:07:50  25    volume?  Well, Dale probably knows more than anyone on

1    the face of the earth because he's an IT guy, and he's

2    married to them, or he was until they broke up.  I don't

3    know where they end up.  Maybe they're divorced now.  I

4    don't know.  But they're not together, put it that way.

15:08:12  5         Dale knew the volumes.  He knew -- he

6    worked with their company since the late eighties all the

7    way up until whenever he walked off from LSi in 2006.  He

8    knows their volumes better than anyone on the face of the

9    earth because he knows how they matter.

15:08:29 10        And Hodell knows their volume, and they're

11   second just to Dale, right, because they know how many

12   parts they got and they know what business they're in,

13   and they've been on ERP before.

14        And look at 294 because remember, it was

15:08:41 15  the conversation about, hey, how do you sell this stuff,

16   right, because SAP has -- it's got three basic products.

17   It's got the ECC ERP for the big companies, the Fortune

18   100, Fortune 500 companies, right?  They buy that from

19   SAP direct, right?  And then there's this All-In-One

15:09:00 20  product, which is basically direct, also, and that's for

21   the mid market, and we'll talk about that in a minute.

22   And then, right, there's B1, right?

23        Well, then of course, then there's going to

24   Staples or going to Best Buy and pulling something off

15:09:16 25  the shelf because you're even a smaller company, and as a

1       small company, you're working out of a garage or

2       something.

3                   But B1, the software in that space,

4       remember Dan Kraus explained, a couple witnesses did, but

15:09:28  5   I thought Dan did the best job of it because remember, he

6       outside used to work at Great Plains and they got picked

7       up by Microsoft and he sold products in this space.

8                   Products in this space get sold not by

9       companies direct, like SAP sells its ECC product; not by

15:09:42 10  going to Staples and pulling something off the shelf.

11      They're sold by dealers.  And how come?  And he

12      explained.  The dealers are eyeball-to-eyeball.  They

13      know what the customers' requirements are.  They know how

14      big is this whopper of an add-on that we're going to add?

15:09:56 15  What are your requirements?  How big are your

16      transactions?  How many -- they know everything about the

17      company.

18                  He even explained that in his experience,

19      not uncommonly, a dealer just like we have here, has

15:10:08 20  previously been involved with an implementation of a

21      prior ERP solution.

22                  They're the ones that are responsible for

23      communicating whether something is a good fit for them.

24      The seller, right, the manufacturer, we don't know what's

15:10:22 25  going on out there.  We just, we have our software, and

1    we sell it through the dealers, and we have a recruiting

2    process.

3              And you remember Dan Lowery went through

4    it.  And it was a badge of honor to make it and all that,

5    but when it gets down to brass tacks, and they're trying

6    to decide, hey, what about the add-on, and what about,

7    you know, the volumes of the company, that's the dealer

8    and the customer.

9              So let's look at that.  Look at -- that was

10   all preliminary to this.  Hummina, hummina.

11             So this is Dale.  This is a multi-page

12   document, right, and these are hard, as counsel would say

13   they're hard to kind of navigate, but this is a February

14   27th -- actually you know what, Bob?  Can you go to the

15   bottom of this?  Let's make sure the jury totally

16   understands this.

17             So Dan Lowery writes to Ralf Mehnert-Meland

18   on February 27th, '06.  They're having some performance

19   problems in connection with the implementation, basically

20   of an IFE, but they're using B1 also, at Hodell.

21   February 27th, 2006 is after the license agreement sale,

22   right?  Because the license agreement sale was in

23   December of '05.  This is three months later.  They're

24   having some problems.

25             Lowery writes to SAP, says, "You're going

1   to hear from Dale Van Leeuwen."

2           Scroll up.  Dale's response.  Keep going,

3   keep going.  One more.  Stop.

4           This is the same date.  Dale responds, and

15:11:58  5   he's explaining some of the things, some of the issues

6   that they're having.  And look at this, "To assist you in

7   understanding the environment we're deploying in, I

8   provide the following."  A bunch of things about

9   hardware, and then the last item, "The database has

15:12:13  10   approximately 150,000 SKUs, 20,000 customers, 7500

11   vendors."

12           This is the first time Hodell -- any

13   significant volume information from Hodell was ever given

14   to SAP.  It's three months after the sale.  And agency is

15:12:31  15   out of the case.  Okay?  So Dale is not our agent and Dan

16   is not our agent.  That's done.  It's not in the case.

17           So what is SAP now?  It doesn't know

18   anything about volumes of any significance until it gets

19   this.  Okay.  And there hasn't been -- Hodell knows full

15:12:48  20   well what our position is on this.  They've had seven

21   years to find earlier proof that SAP, not that it would

22   have mattered, but they don't have any earlier proof

23   because there isn't any.  Okay?

24           And just to kind of confirm some of this,

15:13:02  25   take a look at -- oh, you know what?  I'll come back to

1    that.

2                    Look at 167.  This is a little bit out of

3    order.  Like I said, it's not perfect chronologic order.

4    This is after go-live.  This is six months after go-live.

5    This is Eddy Neveux, one of the B1 solution architects.

6    He's writing internally about the solution.  Look at the

7    second line.

8                    The company data file is 43 gig, analog

9    file is 93 gig.  Yes, gig, exclamation point.  So we

10   didn't get anything that was -- with any significance

11   until February 27th, '06.

12                   And then here we are, whatever this is, a

13   year and a half later, six months after go-live, we're

14   still learning.  These guys are out here.  They're doing

15   something not only do we not know about, but the solution

16   architects are using exclamation points in reference to

17   gigs.

18                   I'm going to skip the next part, Bob, but

19   remember on the add-on thing, that was in the contract,

20   right?  We don't have -- I don't want to waste our time

21   going through it again, but all the contracts that we

22   signed, this one, this one and this one say, oh, yeah,

23   when it comes to add-on, we have no responsibility.

24                   So let me try without talking faster, to

25   move faster.

1        There's only one verbal representation

2   issue left in the case.  And it's what -- the allegation

3   is that Penny said something to Otto, and I'll tell you

4   right now Otto says that Penny Vitantonio told him B1's

15:14:51  5   good for Hodell up to 300 to 400 to 500 users.  She

6   didn't say that.  Okay?  And there's definitely not this

7   whole clear and convincing evidence thing where,

8   remember, it's got to be a false statement.  She had to

9   intend to mislead him.  He had to justifiably rely.  And

15:15:12 10   then it kind of keeps going and there's proximate cause

11   and all that.

12        But let's, you know, I'm not asking you to

13   just hear my declaration sentence and go yeah, mine's

14   right.  Let's look at it, all right.  And by the way, we

15:15:29 15   heard a lot of allegations about what other people said.

16   It's not in the case anymore.  Didn't work.  Okay?  We're

17   down to Penny.  Otto and Penny.  Otto says he talked to

18   Penny a bunch of times in 2003 and in early 2004, right?

19        And then we heard two-plus hours of closing

15:15:50 20   argument from counsel, and I had to ask Greg, "Hey, have

21   they even said anything about Penny?"  Because I

22   remembered that they did.  There was a couple references

23   to her notes, but this is a fraud trial.

24        If they're going to step up and say Penny

15:16:05 25   Vitantonio lied to Otto and she intended to mislead him

1    and Otto justifiably relied and all these damages are

2    proximately caused, they got to step up and do it, and

3    they kind of went around it.

4              And the reason is they know this part of

15:16:21  5    their case goes nowhere.

6              We took Otto's deposition, right?  He had

7    very few details about this, when you'd expect him to

8    have more.  But what do we know?  He's a prolific

9    notetaker.  You've seen his notes throughout the trial.

15:16:46  10   This is the guy when he goes to a meeting -- there's

11   different types of people.

12             You can sit around a business meeting,

13   there's six people, some people are just here, some

14   people are asleep, some people are notetakers.  All

15:16:56  15   right.

16             Otto is obviously a notetaker.  So we're

17   all over that.  In this case, give us all your notes.

18   Okay.  If Penny said this, and he had these conversations

19   with her, and it was as important as he says -- because

15:17:07  20   he was very clear they would not move forward unless he

21   was assured this was good for 300 or 400 or 500, I think

22   they move around a little bit on the numbers, but he's

23   clear about that part.

24             So we look at his notes.  Well, there's

15:17:22  25   nothing in there about 300 or 400 or 500.  In fact,

        1   forget his notes.  Right?  Let's go bigger.  Is there an

        2   e-mail?  Or maybe, like, a proposal or some contract or a

        3   napkin or anything in the history of the universe that

        4   corroborates what Mr. Reidl said that Penny said to him?

15:17:49  5   Look for a three with a zero and a zero in the context of

        6   where, hey, if they're going to say this, they need clear

        7   and convincing evidence.  And there is not.  We've

        8   litigated the case, like I said, for years, and we don't

        9   have that.

15:18:03 10             So what do we have?  We have Penny's notes.

       11   Penny's notes.  She's a prolific notetaker, too.  She

       12   might be more prolific than Otto.  So let's take a look

       13   at what her notes say.  She doesn't deny she talked to

       14   Otto.  And remember, by the way, she's not even talking

15:18:22 15   about she's not selling the same product.

       16             This conversation was about Business One,

       17   the American Express Edition.  Otto thought it was too

       18   expensive.  He would only pay for half of that.  He

       19   wanted to pay 300,000 and double his money, et cetera, et

15:18:40 20   cetera.  She's talking about a different product.  Okay.

       21   But we've been through that.

       22             So let's look at her notes.  Let's talk

       23   about users.  Oh, boy.  If you look, just, hold on, right

       24   there, 100 users on the left margin -- go to the next

15:19:02 25   one, please.  That's fine.  I know it says users.

1          Go to the next one, please.  Some of these

2    don't highlight so we have to use an arrow.  Okay?  A

3    hundred users.  I think this is -- you see 11/20 at the

4    top?  Go to the next one.  February 2nd, 100 users.

15:19:33  5    Okay?

6          Go to the next one.  And by the way, I know

7    there was some testimony that there may have been some

8    exchanges between Otto and Penny about volumes, and

9    there's a note.  I mean we saw a reference to that a

15:19:45 10    minute ago, and I can respond to that, but I want to

11    focus on users.

12          Plus, like I said, she's talking about

13    she's an American Express person.  There's no evidence

14    that she's acting on our behalf.  She's selling a

15:19:58 15    different product.  But let's get down to what Otto said

16    she said about users.  She said a hundred -- or he said a

17    hundred and she recorded it.

18          Go to the next one, please.  That's it.  I

19    think it's four.

15:20:13 20          She's got four times in four separate

21    conversations that she wrote down "100."  Okay?

22          So put yourself in the spot you're in,

23    right?  You guys get to decide this and you got to look

24    at everything and figure out, hey, what's the truth.

15:20:32 25          Well, Otto says this is what he remembers.

1    Penny totally remembers it differently.  She says she

2    wouldn't have said that.  She was very credible.  And I

3    think she's more credible -- I think the evidence

4    suggests she's more credible than him, but that's a tough

15:20:48  5    call.  Could go to the notes.  His notes say nothing.

6    And her notes four times say a hundred users.

7             So if you're looking for the truth, the

8    truth is right there.  I don't know what has made Otto

9    think or remember it in the way or testify the way he

15:21:10  10   had, but that's not what happened.

11            What happened, the truth is in these

12   documents.  She didn't write a hundred so that I could

13   make this argument twelve years later.  When they talked,

14   they talked about a hundred.  You can tell.  So that's

15:21:26  15   done.  That issue's out of the case.

16            Oh, one other thing.  She made the point

17   that if there was a bigger number discussed, she would

18   have written it down.  That makes sense to me.  It should

19   make sense to you.

15:21:46  20            She sells software.  She gets paid on

21   commission.  300 users gives her more money.  If he said

22   300 users, she's writing it down and that's how she

23   explained it.  That's totally believable because that's

24   how it would go.

15:22:01  25            One other point.  Otto's notes, right, he

1    doesn't have it.  He doesn't have anything else having to

2    do with the Penny conversations that say 300 or 400 or

3    500.  And I said, you know, that was like when I said,

4    "Go bigger.  Look for contracts," but nothing.

15:22:19  5          But it's not even just with respect to the

6    conversation with Penny.  In this whole case, in the

7    history of the universe with respect to this case, there

8    are no documents, none, that suggest that Hodell ever

9    said it needed 300, 400 or 500 or that SAP ever said

15:22:46 10   "Yeah, B1 is good for you, Hodell, at 300, 400 or 500."

11   None.  Okay?

12          That tells you something.  It didn't

13   happen, and there's no clear and convincing evidence.

14   That's for sure.

15:22:59 15          Bob, I want to skip number ten, which is

16   about Dale doing a terrible job drilling down.  And go on

17   to a little piece -- sorry, I'm going to try and move

18   through this quickly.

19          SAP knew very little about the Hodell deal.

15:23:20 20   I don't think I've made this point yet.  You've heard it

21   before, but it is really important.  There was zero

22   direct contact with SAP and Hodell prior to go-live.

23   Everybody knows that.  It's not contested in this case so

24   I don't want -- and sometimes you can go through a whole

15:23:38 25   trial, and we didn't make an important point to you.

1    There's no direct contact.

2              The first time SAP heard about Hodell,

3    okay, in any formal way was November, 2004, just a month

4    before they signed up here.  Call up Exhibit 40, please.

15:24:01 5   This was an e-mail from Lowery to Dan Kraus.  Look at

6    this.  That's perfect.

7              November 3rd, 2004.  Lowery to Kraus.

8    "Dan, IBIS -- LSi/IBIS has an opportunity with

9    Hodell-Natco, an existing IBIS fastener customer using

15:24:28 10  FACTS software."  And he goes on and on.  This is an

11   introductory note.  You can tell by looking at it.  It's

12   not like following up on our conversations from before

13   about Hodell.  You can tell by looking at it.  "Hey, we

14   got an opportunity with this company called Hodell."  If

15:24:43 15  he already knew it was an existing fastener customer,

16   that would be weird to write that.

17             He's introducing them to him, and Dan came

18   in here and told us, "Yeah.  Yeah.  Here's what happened.

19   I got that e-mail, and I talked to Dan for about a month,

15:24:56 20  and we got settled on a price.  It was tentative.  And he

21   wanted me to hold the price for a year."

22             Remember, I was going through with Dan and

23   I was literally doing this, okay?  So there's the history

24   of the universe.

15:25:09 25            And then November, '04, they agree

1    tentatively on a price, and then this thing goes

2    basically dark for SAP for a year.

3                So go to 748, please.  Here's Dan writing

4    internally to people at SAP.  This thing's gone active

15:25:32 5    again.  The year has gone by.  It's October of 2005.

6                The challenge on this -- by the way, below

7    this is Exhibit 40 in the chain.  So in November, he's

8    forwarding an e-mail from a year ago.  And look at what

9    he says to his internal colleagues.  "I've gotten no

15:25:49 10    update on this in a year."

11                So only reason I'm showing you that is so

12    you get it.  SAP is not like heavily involved.  The

13    dealers do that.  They deal with the add-ons and all that

14    other stuff, the transaction volumes.

15:26:02 15                SAP got the introductory thing, squared

16    away on a price tentatively, then a year later, it gets

17    active.  So what happens?  SAP honors the price that they

18    talked about a year before, and then the license

19    agreement gets signed right here.  Okay?

15:26:20 20                But consistent to what I'm telling you

21    prior to the sale, we were in the dark about In-Flight

22    and the details associated with it.  That's what really

23    matters, and the transaction volumes and the details

24    associated with that.  And there's proof of that in the

15:26:41 25    case.

1          Like I said, we can't do everything, but

2     here's some choice ones.  Look, please, to 788.  This is

3     a three-chain e-mail.  Start at the bottom.  Perfect,

4     Bob.  Perfect.

15:26:56  5          So Lowery writes Meland, September 26th,

6     '05.  So this is -- this is during that kind of quiet

7     period, right, because it's before the October thing

8     where Dan Kraus says, "It's been quiet for a year."  It's

9     a month or so before, and Lowery says, "Hey, are you

15:27:16 10    aware of our In-Flight development effort?"  And go up to

11    the next exchange.

12          And Ralf responds right away, "In very

13    general terms, I understand it is for the fastener

14    industry.  Is that even right?  Can we talk?"

15:27:33 15          And look up top.  Look at what Lowery does.

16    Lowery writes to Dale.  This is Dale in the upper

17    right-hand corner.  See that little tiny DV?  DV is Dale

18    Van Leeuwen, he actually confirmed that in this trial,

19    not that anybody else thinks it's anybody else anyway.

15:27:56 20          See -- "Hey," Dan to Dale, "see, no one

21    knows about it.  If you have time, can you meet with him

22    on the phone?  We're about to sign a license agreement,

23    but we don't know what's going on.  Not that that's

24    unusual, but we don't know what's going on."

15:28:13 25          And we looked at 294, right?  Just very

1    quickly.  If you can call that up.

2              Go right to the volume part, Bob.  I think

3    it's quick.  Next page or whatever it is.  There you go.

4    We already looked at this.  This is three months after

15:28:29  5    the sale when we got the volumes, right?  And then look

6    at 785.  This is -- this is more of just piling it on so

7    you get it.

8              Scoop the top.  Solution architect for B1.

9    He's writing to Ralf, "Hey, Ralf," and remember this is

15:28:55 10    when the performance problems started and they came back

11    to us.  "Hey, we're having some issues."  And Dan Kraus

12    explained we never knew those issues got to be a problem,

13    and I'm going to talk about that in a minute.  But, we

14    gave them some assistance, told them to make sure they

15:29:10 15    did some, like, hard core testing.  They said they would.

16    Then they disappeared, and we didn't hear again from them

17    until after go-live.

18              But the point of this is, "Hey, Ralf, they

19    gave us what the volume of data they're using is."

15:30:45 20    It's -- and this is a quote from that February 27th, '06

21    e-mail, this is from Dale as to a week, a week and a half

22    ago, this is internal SAP.  They're trying to figure out

23    what's going on in their heads, what do they know and not

24    know.

15:30:46 25              There's a story being told here in the way

1    of this e-mail, and they didn't have those transaction

2    volumes.  They're even internally acknowledging that we

3    just got it.  Okay?

4              Very quickly go back to 294.  And I've

15:30:46  5    already made the point that the people who know about the

6    add-ons and the transaction volumes are Hodell and their

7    guy Dale, but I just want you to see this, too.  We were

8    candid.

9              Scoop that whole thing, Bob, so we can pick

15:30:46 10    the date up.

11              Right after they gave us the transaction

12    volumes, we wrote to them, we know they're having some

13    performance issues.  Hey, look, we're looking into this.

14    "We've had some reports of issues in performance with

15:30:46 15    large data sets in the Business One product."

16              So they tell us on February 27th, three

17    months after the sale, they got a very unusual customer,

18    little parts and all this kind of stuff, and we say,

19    "Whoa, just so you know, we've had some issues with large

15:30:46 20    data sets," right to them, right to their guy, okay?

21              And look at 121.  This is all around the

22    same time.

23              Remember I was just saying like this

24    performance issue came up and we told them to test, like,

15:30:54 25    you know, before you go live, do some hard core testing,

1    get a bunch of users pounding away on this thing, see if

2    it can handle it.

3            These are internal IBIS/LSi notes.  They're

4    dated, like, March 16th.  The team had a call on the

15:31:12  5    15th.  They are aware of response issues.  They have some

6    improvements in the works.  That's consistent with what

7    I'm telling you.  SAP is telling them, look, this is

8    something to work on.

9            We also told them, hey, our satisfactory

15:31:31  10   testing results are these.  So we're telling them "The

11   volumes you have are lower than a lot of our test

12   results."  I don't think this is a full summary like we

13   did in this case about going out and finding everything

14   that we could find.  Probably even more out there.  I

15:31:46  15   just found what we could.

16           But the point is when we heard about the

17   volumes on February 27th, passed right along with them,

18   "Hey, if you're having trouble, you need to know.  We've

19   had issues with large data sets."

15:31:59  20           And then in the conference call, when

21   performance testing comes up, we say, "Look, our levels

22   were these.  Your levels are higher.  You're trying to go

23   80 with that thing on the top.  You need to take that

24   into consideration."

15:32:13  25           So let's keep moving.  This one, this one's

1    hysterical.  This project -- okay, when I say "project,"

2    it's In-Flight -- was a disaster.  And IBIS/LSi hid that

3    not just from SAP.  They hid it from Hodell, too.  So

4    this marriage that they had going was a mess.

5    (15:32:37)    What do we know?  Dale, he was the captain

6    of the ship for this gigantic In-Flight thing that was

7    going to be built.  And the project took, what, 27 months

8    because they signed this -- the project went all of '05,

9    all of '06 and went live in '07, so twelve plus twelve

10   (15:33:02) plus three, 27 months, right?

11   Dale, luckily -- everyone is happy that he

12   beat cancer, but he got very sick right after the

13   development agreement was signed and he testified right

14   here in the courtroom for the first eleven months of the

15   (15:33:16) project, he's out.  He's doing a little bit, but he's not

16   the captain of the ship.  He wasn't on the ship.  He was

17   home sick.

18   And then he came back in late '05 and then

19   he quit in May of '06.  So what's that, six months?  So

20   (15:33:36) the captain of the ship for this project, it's super

21   ambitious, and they're trying to double their money and

22   so on.  He was only there for six of the 27 months.

23   So then Dan Lowery steps in and Jon

24   Woodrum, and things get worse, right?  I'm going to try

25   (15:33:54) and move through this quickly.  Look at 214.

 1          These are samples.  There are gobs of these

 2    e-mails out there.  This is Woodrum in May of '05, but

 3    "Dale's not really around.  We got to trim it down to

 4    that which we can realistically accomplish.  I don't want

15:34:17  5    to see us have a train wreck.  Biting off more than we

 6    can chew."

 7          He's reporting to Lowery the project's not

 8    doing well.  So skip to 139, please.

 9          Check this out.  I think you picked this up

15:34:32 10    when I cross-examined Dan Lowery.  Go to the bottom.

11    Yep.  Move up a little so we can see it.

12          So Dan Lowery is going to write to Dale

13    Van Leeuwen and Jon Woodrum.  So Dale's getting e-mails

14    at this point, although he's not on the ship.  "Hey, I

15:34:50 15    got to go get that next 60 grand from Otto because we

16    only got 60 so far," and this is the one, by the way, if

17    you read the development agreement, if Otto didn't like

18    how things were going, actually it was either the second

19    or the third project -- payment.  I'm not even sure, I'm

15:35:05 20    going to leave that to the side, but they're trying to

21    get 60 grand from Otto, okay?

22          Hey, how do I do it?  Let's try to get him

23    to sign a document.  Okay?

24          Look what Jon Woodrum says in response.

15:35:19 25    He's a senior guy.  Okay?  There it is, May 11th.  So a

1    couple days later.  Scroll down.  There's a highlighted

2    part.  Here we go.

3              "We've been unrealistic thinking Dale could

4    have this ready.  Specs will be the success in advance

5    and at sign-off.  I'm serious when I say that the

6    enhancements are somewhat described in the SAP -- if the

7    enhancements are what's described, we're looking at

8    10,000 hours and five years, not 2800 hours this year."

9              But he doesn't copy Dale.  Okay?

10             Go down further.  Scroll up.  Wait, no, no.

11   Sorry, go back to where you were.  I think we have kind

12   of like the wrong thing.  Hang on.  Whoa.  Highlight the

13   whole thing, please.

14             Okay.  We can just -- I'm going to let you

15   guys look at 139.  Okay?  He doesn't copy Dale.  He's

16   critical of Dale.  Okay?  And he's critical of the

17   project.

18             Go to the top.  Okay.  Yeah, that's fine.

19             So you got Lowery says, "How do we get

20   money from Otto?"  Woodrum writes back to Lowery, doesn't

21   copy Dale, tells Lowery that Dale's an issue and says

22   "The project is a big problem and going to take 10,000

23   hours and five years, not 2800 hours and this year."

24             So what does Dan Lowery do?  Go to 41.  He

25   goes and gets the money.  He totally disregards what

1    Woodrum said and goes and gets the money from Otto.

2                    He writes him this letter May 17th.  Look

3    what he says.  I'm going to try and move fast.  The

4    second highlighted section, "We demonstrated a thorough

5    execution and a dedication to the project that shows us

6    to be on target for our projection."

7                    They're not on target for their

8    projections.  Jon Woodrum, just basically taking over for

9    Dale, just told them they're totally behind.

10                   And then scroll down.  There's another one.

11                   "We see the strength of the tools that will

12   be made available to Hodell.  Through this effort, we've

13   become even more excited over the solution."

14                   That's not true.  And then he collects 60

15   grand off the guy.

16                   Look at 128.  Dale and Woodrum, they don't

17   get along, okay?  Woodrum writes to Lowery on August 1st,

18   '05.  Blow up both those pieces.  "Dale thinks I'm a

19   backstabber.  I'm not going to assume he's my friend."

20   It's totally unprofessional stuff, but here's the main

21   point.  "We shouldn't expect that he'll be staying with

22   the company a day beyond May, '06."

23                   So LSi bought the IBIS company in May, '04.

24   Dale had a contract where he said, "I'll work -- I will

25   not leave for two years."  And on August 1st, Woodrum's

3097

1    telling Lowery, "That dude's out of here.  He's leaving

2    the day, as soon as he can."  Okay.  And he says

3    something like it down here.

4                So Lowery is on notice.  So go to the next

15:38:46  5    exhibit, because you would think they'll Hodell knew Dale

6    forever, they would want to know.

7                Look at 844, down at the bottom, first,

8    please.  They don't tell Hodell.  They find out on their

9    own, which must have been embarrassing, and they write to

15:39:13 10    him, "Hey," this is Kevin, "I found out Dale's leaving.

11    We're shocked.  He was a major deciding factor."

12                So look what Dan says in response.

13                Go to the top.  And mind you, to be clear,

14    this whole thing's got nothing to do with us.  This is

15:39:33 15    all the project.  What was the project?  The project was

16    the development agreement.  What's the development

17    agreement?  It was building this massive IFE.

18                So when all this fur is flying and all

19    these lies are being -- all this stuff, it's got nothing

15:39:48 20    to do with us at all.  We're not only blind to it, and we

21    don't know it's happening.  It doesn't have anything to

22    do with us at all.  Okay?

23                Look at this.  "I first heard he was

24    leaving two weeks ago."

15:40:02 25                We first heard that he might leave in

1    August of '05.  And sure he knew more.  It was a

2    surprise, unexpected.  And then he tells like a tall

3    tale.  "He told me he was going to invest in real estate

4    and I started thinking maybe he would leave."  Well,

15:40:16  5    maybe that even happened, but if you're going to start,

6    you know, telling them when it was, maybe you find your

7    way to telling them that you've known since August that

8    he was probably leaving the day he could.

9           And he goes on and tells him more stuff

15:40:29  10    that's obviously not true.

11           There are a series of exhibits.  You guys

12    don't get to take notes.  I'm not going to go through

13    them all.  Woodrum can't look them in the eyes.  Do you

14    remember that one, right?  Oh, we've got to go to this.

15:40:45  15    I can't resist.  217.  Bilas.

16           They bring in Bilas, he's going to replace

17    Dale, right?  And Bilas does this big report.  And

18    remember again, the report on IFE has nothing to do with

19    us and this is all stuff they don't talk about, right?

15:41:02  20    They just say, "Oh, we saw the sentence, we saw the

21    sentence in 314 about -- and we found that to be critical

22    to us."

23           Their people that they signed the

24    development agreement with and who they almost sued from

15:41:17  25    before, they're all mixed up in something that's not

1    going well.  It's got nothing to do with us.

2              Bilas rips the project, okay.  These things

3    here, A to J, like if you bring in a professional, that's

4    the project, like, these are the things.  Here's what you

5    didn't do, A to J is, like, you didn't do anything.

6    Okay.

7              And what happens to Bilas?  Right?  He gets

8    canned.  Lowery fires him.

9              Go to the next, what is it?  848.  He calls

10   Otto and tells him finally we fired that guy.  I don't

11   think he ever shared the Bilas report with him, but he

12   certainly fired him.

13             So now where?  We know that the market was

14   going down, the target market for SAP B1 in '04 and '05.

15   And that was for two reasons.  ECC was the big one,

16   Fortune 100, All-In-One's in the middle, right, and then

17   B1's at the bottom.  B1 was so robust it was running into

18   All-In-One.  Like, All-In-One salespeople at SAP are

19   saying, "Wait a minute, get these B1 people out of our

20   space.  Okay.  They're cutting into our sales."

21             And SAP makes more money selling

22   All-In-One.  That's, like, a bigger thing.  And they

23   began to put pressure and tension on the Business One

24   people to shrink what they were doing.

25             And then there were also, where we saw SAP

1    admit this to Hodell, there were some reports of some

2    issues with large data sets.  Okay.

3                    Ed Neveux admitted that.  Dan Kraus

4    admitted that.  We admitted that the day they told us

15:43:10  5    that they had a giant data set.  Okay?

6                    Hodell walks around like this is some

7    ominous -- that there's something more ominous about this

8    than there is.  We have what we have.  We've produced the

9    documents.  There's some performance issues that had come

15:43:27 10    up in the past with large data sets.  When you evaluate

11    this, how do you evaluate that?  Well, with everything

12    else.

13                    What else do we know?  This is a hugely

14    successful product.  You can't take that piece and go,

15:43:41 15    "Oh, that thing's a piece of junk."  We have 50,000

16    customers.  I don't have to go back to Joe's cheat sheet,

17    but we have lots of them with plenty more users than

18    Hodell.  It's a thriving product.  They should have stuck

19    with it and they'd be happy now.

15:43:54 20                    A couple things.  Remember the exhibits

21    that I shared with Dan Lowery?  Try 428.  This goes to

22    the last page.  Actually went over this with two people,

23    with Lowery and Kraus.

24                    Dan Kraus explained -- do you see that,

15:44:29 25    that 2005 thing?  He called it public facing.  This is a

1     public facing document.

2               "Dan, what did that mean?  Well, it means

3     the dealers have this and they're allowed to do whatever

4     they want with it.  It's on their websites.  You can find

15:44:45 5    it on the Internet.  Well, what is it?"

6               We'll go to the front.  It's 2005, mind

7     you.  It's a presentation on B1.  Go to the next page.

8     And the numbers are lower.  Right?  It's ten to 200

9     employees; not 500.  It's three to a hundred, okay?

15:45:05 10             Go just back out so we can see.  And then

11    you see All-In-One.  It's hard for you guys to read this.

12    Right here where my finger is, it says B1.  And then

13    right here it's like All-In-One or something like that.

14    And this is the ECC project.  This machine's resolution

15:45:23 15   doesn't pick that up.  Okay.  If you look at the hard

16    copy, you'll definitely see it.

17              But this is part of a license agreement.

18    It's available to the dealers and it's available to the

19    public.  The dealers get this from the meetings where

15:45:34 20   they present this.  I mean, you can find it on the

21    Internet.  So look at the next one.  124.

22              Statement of Direction, early '05, the

23    dealers have this.  What does it say about users?  Pardon

24    me, about users or employees.

15:45:56 25             Go ahead.  Open it.  It's employees, not

1    users.  There you go.  Thank you, Bob.

2              Here's what we're going to do.  We're going

3    to focus on the needs of ten to a hundred employees, but

4    they continue to meet the needs of bigger companies up to

5    250 by concentrating on ten to a hundred, we're going to

6    increase our market presence, penetration.  Okay?

7              This came from Lowery.  The dealer had

8    this.  And it was, I think, what's the date of it?  Go to

9    the front.  Oh, yeah, this is the one from early '05.

10   Okay.  Remember, it had all those dates, January, March

11   and then April.  This is early '05.

12             So then look at 130.  Also from Lowery's

13   files.  Remember he denied "I didn't know about the Sweet

14   Spot."  This came from his files.  Okay.  There's plenty

15   of testimony in this case and evidence that of course the

16   dealers knew about the Sweet Spot.  They knew that it was

17   changing.

18             This is a summer meeting.  Kraus.  Tech,

19   '05, do you see that?  Pop ahead, Bob, to the highlighted

20   part.  Same as what we're looking at, okay?  The numbers

21   have gotten to this range, ten to a hundred.  This is

22   where we're aiming, and it is a marketing effort.  Look.

23   That's where the money is.

24             Maybe it's cheaper, each sale's smaller,

25   but look how wide it gets, right?  There's lots of

1    customers out there that are smaller companies.

2              And then go to the next highlighted

3    section.  Lowery likes to say "I didn't know about the

4    Sweet Spot."  Well, of course he did.  Right in this

15:47:47  5    document, these are '05, available to the dealers,

6    available to the customers in the way exactly that I've

7    explained it to you.

8              And why does it matter, why do I keep

9    saying '05?  The only two documents that Hodell is saying

15:48:03 10    were fraud are 314, which is that Business One brief, and

11    617, which is the American Express piece.

12             And they're only talking about those little

13    sentences in there.  And they're from 2003, right?  And

14    here we are belting out to dealers, including their guy,

15:48:30 15    all this information about the numbers are lower, and you

16    can find it on the Internet.  And Otto admits that they

17    knew before the license agreement that the numbers are

18    going down, but they're saying, "No, no, ignore all that

19    and just find for me that that true statement in those

15:48:49 20    '03 documents somehow was false," when it's not, "and was

21    intended to mislead, and I justifiably relied because I

22    shut my eyes and stuck my head in the sand and looked at

23    nothing else, including my highly customized solution

24    that had this giant IFE thing and ignored all this stuff

15:49:11 25    and just relied on that sentence."

1           You can't do that.  You can't do it.

2           So we're getting close.  I'm going to

3    skip -- oh, on the Sweet Spot point, remember, Dan Kraus

4    explained, think about a tennis racquet, right.  We had

5    that 130 up there and it was the Sweet Spot?  The Sweet

6    Spot's where it really cranks there, and that's a

7    marketing term and it's got a performance side to it,

8    okay?

9           But just because the number of users that

10   Hodell had was above -- was 80 plus 40, ended up 120,

11   just because it was outside of the Sweet Spot, doesn't

12   mean that it's not in our reasonable range, right.

13          We've sold to lots of customers in that

14   range, right.  The 26-page list and all, we have lots,

15   lots of customers outside of the, quote, unquote, Sweet

16   Spot.  You can still hit the tennis ball outside of the

17   Sweet Spot, and you can win the U.S. Open even if you

18   don't hit it in the Sweet Spot.  Just get it over the

19   net, and you're in the U.S. Open, you're in the finals,

20   you've won.  Okay.

21          We've won.  There are a lot of great

22   success stories and a whole 26-page list of them and they

23   don't all have to be in the perfect Sweet Spot.

24          Next, very quickly, they promised a test

25   prior to go-live.  Remember that?  We looked at 121.

1          Just call it up real quick, Bob.  Go to the

2     7 I think, I guess it is.

3          Yeah.  Look down.  Can you blow that up,

4     please?  This is the -- remember, there were the early

15:50:53  5     performance issues, Dan Kraus testified he wasn't

6     involved, he heard that some stuff had come up, his

7     people were looking into it.  Then they went away and we

8     didn't hear anything until after go-live.

9          But we did have this call, it was the March

15:51:09 10     15th call, and these are IBIS/LSi's records about the

11     call.  Look what they tell us.  They're going to work

12     closely to determine -- with us to determine expectations

13     and needs for the project, which they didn't do.  All

14     right.  The evidence on that never appears in this case

15:51:24 15     because it didn't happen.

16          "At present, we're planning to stage a

17     similar test environment in the near future at Hodell

18     with the actual configuration that's in place for the

19     system."

15:51:37 20          To develop, software people, like people

21     that work in this, this is a big statement.  We're going

22     to do the hard core testing that we talked about, get a

23     bunch of users pounding away on the keys.  It's going to

24     be a similar test environment with the actual

15:51:50 25     configuration.

1     They didn't do that. They admit that.

2 They talk about how, "Oh, well, we think we did enough."

3 They didn't do what they said they were going to do. And

4 they had problems when they went live.

15:52:07 5     But we don't even know. We just get this

6 and we figure, good, let us know if you have any problem.

7 We don't hear anything until after go-live.

8     Next, sorry, these guys shouldn't have gone

9 live the way they did and they shouldn't have gone live

15:52:30 10 without a net, okay? I'm not going to go through this.

11 You'll see this is a skinny chapter.

12     There's a lot of evidence. Greg led a lot

13 of this. Go-live was delayed, delayed, delayed, delayed.

14 Witnesses arguing really theoretically about should they

15:52:48 15 or shouldn't they have gone live. They obviously didn't

16 do the testing that they said they were going to do, and

17 they obviously shouldn't have gone live because if it was

18 half as bad as they say that it was, then they weren't

19 ready, but the one that jumps out to me that's the best

15:53:07 20 is this idea that they went live without a net. Right?

21     They had FACTS and they're running FACTS,

22 and you can go live and keep what people call the Legacy

23 System, which is your old system, running at the same

24 time.

15:53:25 25     Now, it can be annoying and it can chew up

1       a lot of work, but when you're seeing the kinds of things

2       that they were seeing, when there's a reasonable

3       debate -- and I think we have a better side of it -- but

4       at least a reasonable debate that maybe you shouldn't

15:53:42  5       have gone live at all, you're crazy if you go live

6       without the parallel system.

7                    And Mr. Guembel comes in here, and Mr. Star

8       got him to admit in five minutes that Mr. Guembel would

9       be embarrassed if he was associated with an

15:53:58 10      implementation like this that went live without a, quote,

11      unquote, net, meaning keeping the parallel system because

12      you can just stop.  If it didn't work, turn off, oh,

13      shoot, wow, worse than -- we should have known because we

14      know from all the records now that we shouldn't have gone

15:54:16 15      live, they would realize, yeah, everything is the way we

16      kind of thought or should have known it would be.  Go

17      back with FACTS and recheck.

18                    They didn't do it.  They went bing, bang,

19      boom.  Right?  Not smart.

15:54:32 20                    So after go-live, right, what happens?

21      They go live, and they have a problem.  They're back and

22      forth.  They make a quick study of finding our phone

23      numbers and e-mails and all of that after keeping us in

24      the dark, which was normal prior to the sale, but then

15:54:47 25      after the sale when they were having the problems like

1    they really botched that part of it, but gee whiz, when

2    go-live happened and they had problems, you know, they

3    pounced.

4              Most of Hodell's case in the two and a half

5    weeks that we've been here is obsessively focused on what

6    happened after go-live.  Okay?

7              And Exhibit 69, Udi Ziv, they have that

8    e-mail, and they are pounding away at it.  It literally

9    was the majority of their opening, their case in chief,

10    and their closing, okay?  And that tells you something.

11              This case isn't about what happened after

12    go-live.  This case is about what happened before

13    go-live, and if you're them, and all you got is a couple

14    sentences that are totally true and this idea that Penny

15    said something that she didn't say, you better dig.  And

16    they're out there digging trying to make an issue of

17    something that's actually way afterwards and not part of

18    this case.

19              But we're going to talk about the records

20    because they don't say or -- they don't say or suggest

21    what Hodell says that they say or suggest, so let's start

22    with number one, Exhibit 69.

23              Okay?  But let's back up.  Let's do it

24    right.  Go to the bottom, okay?  All of them -- sorry,

25    not just that page.  I should have said all the way to

1    the bottom -- right.  Scroll up a little bit so we can

2    see.  Right there.  Scoop.

3                So Dan Lowery, on April 11th, writes his

4    famous e-mail, or sends off what Hodell thinks is a

15:56:32  5    famous e-mail -- that's better -- to Udi Ziv, and he

6    copies the most senior executives at SAP whose e-mails he

7    can find.  Right?  He's got Dan Kraus, Paul

8    Killingsworth, we heard from him.  He's very senior,

9    okay?  Michael Sotnick, and Bill McDermott, who was the

15:56:51 10    CEO at the time of SAP America.  Dan is going over

11    people's heads and other people's heads and just

12    screaming.

13                Okay.  And what does he say?

14                Reseller, St. Louis, 120 users.  But this

15:57:06 15    is the part that gets me, look at the bottom.  "He's

16    losing hundreds of thousands of dollars a month from lost

17    orders, lost customers, and extra employees."

18                We know that's not true.  They didn't lose

19    any sales.  They didn't lose any customers.  Okay.  And

15:57:22 20    they weren't losing hundreds of thousands of dollars a

21    month.  We know that that's not true.

22                "They're close to tossing this thing out."

23    We know that's not true.  They kept it for two years.

24    "And if they toss it out, they're getting legal."

15:57:37 25                So this is an extreme e-mail sent to

3110

1    super-senior executives where he's saying it's a

2    towering -- I call it the towering inferno.  He's saying

3    "There's a building on fire."  I remember the Towering

4    Inferno movie when I was younger, and "The building's on

15:57:53  5    fire.  Oh, my gosh; oh, my gosh; oh, my gosh."

6                    And then what happens?  Right?  Scroll up.

7    Udi Ziv reacts.  Go up.  Right there.

8                    This is the language that we've seen,

9    right?  What does Udi Ziv know?  Udi Ziv knows it's a

15:58:19  10    towering inferno and they have 120 users, so he reacts.

11    It's an emotional e-mail copied to senior people and he

12    says, "Whoa, I know that it's 120 users.  It's not

13    working.  That must be a problem," because it's like

14    self-proving it must be a problem because the building's

15:58:37  15    on fire.  "It's way outside of any sane Sweet Spot."

16                    So what Hodell likes to say is, "Oh, yeah,

17    so here's the thing.  SAP kept this a secret, and SAP's

18    wrong that this was an emotional exchange, and that it

19    had and other things had an effect on SAP afterwards."

15:58:58  20                    And our point is no, no, no, no.  This was

21    an emotional reaction, and then there were subsequent

22    events that further kind of raised our emotions, and we

23    had some initial comments that we made that people later

24    corrected because the product actually improved after we

15:59:15  25    did a lot of work on it.

1          And I want to walk you through, without too

2     much detail, and show you that's what happened.  We

3     didn't keep any secrets, and we emotionally reacted

4     early.  We dug in and worked hard and then the thing

15:59:33  5     improved and, of course, we found out what we found out,

6     which was the big problem was In-Flight.

7          Look, for example, at 70.  That's the place

8     to go.  Wait a minute, go back, please.

9          Check date, all right?  April 12th, Udi Ziv

15:59:54 10   to Kraus.  Go to 70 now.  This is on the page.  They like

11    to say SAP kept this a secret.  They don't talk about 70.

12    We do.  The next day, Udi writes to Lowery, "As you know,

13    this customer's environment is far outside the Sweet

14    Spot."

16:00:13 15        So number one, they didn't try and conceal

16    what Udi Ziv thought.  The most prominent statement that

17    he made in his e-mail and that Hodell is so focused on

18    now, we passed along to Lowery, Hodell's guy, right away,

19    the next day, here you go.  And then look at what happens

16:00:38 20   next, right?

21         We learned more from Hodell.  And as far as

22    this kind of, "Hey, we keep secret stuff," we tell them

23    more, and the best proof of that is this big call that

24    took place on April 17th, 2007.

16:00:56 25        And go to that, please, 151, and see if you

1    can scoop, like, I don't know, what is it, one to three?

2    That's probably a good -- there's a very tense and high

3    emotion call on the 17th of April.

4                    Hodell is on the call.  Otto Reidl is on

5    there.  IBIS/LSi is on there.  And senior SAP executives

6    are on there.  Okay.  And we learn a lot on this call.

7                    Remember, we haven't known much from these

8    guys.

9                    "We had a call this morning."

10                   "One, LSi commented that they originally

11   sold this solution" -- that's code for got something on

12   top of it, right; it's not just B1 -- "as something that

13   was designed for companies of 250 million in revenue with

14   up to 500 users.  There was a stunned silence on the

15   phone from the SAP team as Hodell confirmed that this was

16   their understanding of what was purchased."

17                   This is the first time people at SAP are

18   going, whoa, they got this big In-Flight Enterprise on

19   top of our product, they've told us now, you know, we've

20   known for a month or so that they've had these issues.

21   We've investigated and we realized what we didn't know at

22   the time of the sale, which is their transaction volume

23   is off the charts or they're high; but not just that,

24   they want 500 users.

25                   So they want, like, they want to just

1    pivot, right, and it's going to be -- and it's a towering

2    inferno, at least that's what Lowery says.  We know

3    that's not true, but that's what everybody on the call

4    thinks.

16:02:39 5              And then they go on, "Hey, we got 120.  And

6    it's not working."  The building's on fire.  It's a

7    towering inferno.  "We grow at 17%."

8              Okay.  17% growth rate, if you divide the

9    number 72 by 17, you can tell how many years it takes to

16:02:58 10   double it.  It takes four and a half, something like

11   that.

12             So they're saying, "Hey, we're going to

13   grow fast.  We're going to be at 300 in no time.  We've

14   lost our profit, and we have 750,000 in losses already."

16:03:08 15   They're one month in.

16             And we know that's not true, all right,

17   because if it was 25 months, and it was 750 a month, it

18   would be a totally different -- we know that's not true.

19   They haven't lost any customers.  We know also -- but,

16:03:20 20   this is more towering inferno, okay.

21             But, then look what happens next.  This is

22   what we hear.  That's the "stunned silence."  Go down,

23   Bob, to some other paragraphs.  Right.

24             Fine.  Four, Dirk Boessmann, he did an

16:03:35 25   excellent job.  He set expectations that, "This

1    environment is much" -- that's everything.  That's the,

2    this, all right, with the big In-Flight on top, that's

3    the transaction volume, "This environment" all caps,

4    "Larger than we were led to believe and that we cannot

16:03:53  5    make any statements as to performance" and he goes on

6    "Without some testing."

7                 So they're having this big call.  The

8    customer is on the phone.  The dealer is on the phone.

9    Senior SAP people are on the phone.  These are the notes

16:04:06 10    from the call.  Right.  SAP's -- you know, this is an

11    internal set of notes.  Everyone who was on the call and

12    plus some other people were getting these notes.  This is

13    what happened.  Okay.

14                 And they tell them, "We're not making any

16:04:20 15    statements as to performance."  Is that the word?  Yeah.

16    That's a big deal.  If you're Otto Reidl, and you're on

17    the phone -- oh, or Dan Lowery.  And they are both on the

18    phone, okay.  These guys, when you came to them with your

19    towering inferno, they said, "Hey, your environment is

16:04:37 20    way off the charts.  We can't make any statements," and

21    there's more.

22                 In Paragraph six, we're talking to them

23    about maybe you shouldn't be on B1.  This is all about

24    All-In-One.

16:04:49 25                 And look at eight.  Let's go a little bit

1    lower.  There you go.  Oops, you had it.  "The call was

2    left with SAP going back to executive management to

3    determine if they have a solution or not."

4              So all what we've heard, especially in the

16:05:12  5    opening and there were hints of it during the trial, and

6    there was some of it in the close, too, that we kept

7    stuff secret.  We gave Udi Ziv stuff the day we got it or

8    the day after, and when they told us what they told us,

9    we told them what we told them, which is a lot.

16:05:28 10              And look at 18.  Even Otto's notes.  Otto

11    acknowledged these are his notes of the call, that they

12    were at the high end of the solution capability.

13              When you hear that as a customer, that's no

14    minor thing.  You're telling people you have a towering

16:05:47 15    inferno, you have a big call.  They didn't say,

16    "Everything is cool.  We'll fix it in no time."  They

17    tell him, "Hey, you're out there."  Okay?  So there's no

18    kind of secrecy issue.

19              So what happens?  There is an emotional

16:06:01 20    reaction to this.  After this, there are a series of SAP

21    e-mails, Dan Kraus, Ralf Mehnert-Meland, and others that

22    are pessimistic that B1 is a good fit for these guys.

23    And who couldn't imagine the crowd mentality with the

24    towering inferno and Udi Ziv's comments and everything

16:06:19 25    that happened during the April 17th call.

1                    And I'm not going to bore you through this,

2       but look just to one or two.  Look at 159.  Scroll down.

3       You got to go down to blow this -- all right.  Stop.

4                    This is -- these are the call notes, right?

16:06:47 5      We've seen this.  April 17th at 11:09.  Okay.  Now,

6       scroll up.  Dan Kraus is copied on this.  So he responds,

7       right, and this is one of the e-mails that Hodell likes

8       to point to where SAP, obviously in their view, admitted

9       this is --will never work and et cetera, et cetera.  It's

16:07:09 10     nine minutes after he got the notes.

11                   "Towering inferno.  Holy smokes.  Big

12      volumes.  Big add-on.  They're going to 500 users.  And

13      the building's on fire."

14                   I'm not surprised that he said that.  And

16:07:23 15     there's another one, 158, and there are more.  It's not

16      like this went away in a day.  This extended for a period

17      of time.  But 159's another one that's Ralf Mehnert.

18      He's 20 minutes after, chiming in.  He says something

19      negative.  Yeah, he does.

16:07:37 20                   "Neither of those guys work for us anymore.

21      Dan's not really involved with SAP.  He said it was a

22      small part of his business.  We come in and ask him,

23      what's the deal.  That's what I said, that's how I felt

24      at the time.  Then what did you think?  We worked hard

16:07:50 25     and we improved the solution, and they never should have

 1    left the solution."

 2                So let's talk about that next.  Oh, yeah.

 3    "We worked hard and there are improvements."  Meetings,

 4    calls, e-mails, site visits, SAP when they finally heard

16:08:16  5    what was going on, they pounced on this.  They pounced on

 6    this.  Paul Killingsworth, remember he wrote that little

 7    note.  He had 333 e-mails on this.  He talked about

 8    spending thousands of hours.  I'm not going to call this

 9    up.  Remember we asked him point blank, "Hey, how was

16:08:32 10    it?"  I'm going to try, without talking fast move, to the

11    end.

12                He said, "We worked our blankety-blanks

13    off," okay, and he went on to explain; it was thousands

14    of hours.  They attacked this, and there's the suggestion

16:08:47 15    from Hodell that we like abandoned them and tossed them a

16    couple of patches.

17                That's not true.  Eddy Neveux, he's never

18    made a site visit to a customer before.  He was at this

19    site and he worked very hard on it.  All right.

16:08:59 20                I've got to go through a couple of these.

21    How are we doing?

22                Okay.

23                THE COURT:  Whatever you want.

24                MR. MILLER:  Thank you, Your Honor.  I

16:09:08 25    know.  I'm trying to be respectful of everything, but

3118

1    I'll just be quiet and keep moving at least.  Be quiet

2    about that.

3              Look at 320.  It gets better.  And again,

4    you can't, I can't go through all the evidence, all the

16:09:22 5    testimony and the exhibits, but I could go through some

6    things that matter.

7              Patch Level 25.  The first patch didn't

8    work too well, Patch Level 23, right after the April

9    call, okay.  But, Patch Level 25, which came out in May,

16:09:36 10   it made a big difference.  And this is Lowery reporting.

11   Gee whiz, that's really a bad text.  All right.  Scoop

12   that.  This is Lowery reporting on Patch Level 25.  Just

13   go down to the bottom.  That's what we really want.  See

14   if we can see it.  Holy smokes.

16:09:51 15            "The installation of Patch 25 was over the

16   weekend."  Thank you.  "Shown improvements.  No more

17   lockups."

18             Okay.  If you scroll to the top, Jon

19   Woodrum goes there with his son, and he visits St. Louis.

16:10:06 20   Okay.  Scoop that, the whole thing.  Right.  The visit to

21   the St. Louis store, this is right afterwards, is a

22   really good one.  And look below.  It's just an

23   anecdotal, but they had a 91 line order.  They had no

24   problems with it.

16:10:21 25            Does that mean like oh, my gosh everything

1    is great?  No, but that's the beginning of this thing

2    turning the corner, and it continues to get better.

3           Look at -- skip ahead.  I want to skip some

4    in the interest of time.  You guys have all the exhibits.

16:10:36  5    You can go back.  If you can remember, look at 258.  But,

6    89.  It's skipping 258 and going right to 89.

7           There was another version of B1 that came

8    out 2007.  Okay.  And there have been subsequent versions

9    since then which is why they should have stayed with B1.

16:10:59 10   This is about the 2007 version.  Paul Killingsworth is

11   reporting.  Okay.  "Hey, performance is improved for

12   customers between 20 and 80%."  They should have gotten

13   that version.

14           Look at 307.  Skipping around now.  I'm

16:11:19 15   skipping some of my -- I'm on my fun ones.  307.  Another

16   patch comes out.  A patch is, we're going to improve the

17   product.  Right.  So there's versions.  They come out

18   different years, and patches are like interim

19   improvements.  Hey, they put on Patch Level 29, over 25.

16:11:40 20   They have a 500% performance increase.  This is real.

21   This is starting to matter.

22           And then go to 166.  Paul -- pardon

23   me -- Ed Neveux makes the site visit.  Okay.  Look what

24   he says.  This is when he ran and got that Net Profiler

16:12:01 25   tool.  This guy is a solution architect.  Everybody

1    deferred to Eddy.  I mean, I don't -- I'm not sure

2    whether that came across to you, but this guy knows what

3    he's talking about.  In the e-mails and in conversation

4    and the way he carried himself, this guy, he's one of six

5    solution architects in the world.  The guy is tech savvy

6    and sincere and he went there and hooked up his Net

7    Profiler solution.

8              And these tech guys, they don't care.  Tell

9    them if it doesn't work, he's going to say it doesn't

10   work.  And he says, "I hooked it up, and it runs a lot,"

11   right?  Remember Hodell has never videoed this.  They

12   have never done any of this, which is a whole other

13   story.

14             He runs a lot and the worst he sees, the

15   worst he sees is a nine-second delay.  His comment, "Hey,

16   performance isn't that bad."

17             And this month that he's here, October,

18   '07, he's there all day.  There's none of this morning

19   nonsense where they like to say you were there when we

20   weren't busy.  We don't get busy because our time zone is

21   later.  He's there all day, the second busiest month that

22   they had in 2007, and he says looks good.  I don't want

23   to misstate it.  He says what he says.  "Performance

24   isn't that bad."  It's certainly getting better.

25             Okay.  And remember they ran this for two

1    years, and it continued to get better and it has

2    continued to get better.  And like I said multiple times,

3    it's too bad they didn't stay on it.

4                    Very quickly on a side issue.  Response

5    time.  The testimony is clear.  I want you to understand

6    these delay things.  When you type the keys and you move

7    the mouse, everything happens in real-time.  Just like

8    when you're on Amazon and you're buying a product, click

9    click, click, you're moving all around.  Okay.

10                   When you're buying five things you want to

11   buy from Amazon and you click checkout or whatever the

12   final step is, when you've entered your information to

13   pin, and you get a little icon, that's what's getting

14   measured in these tools when we're talking about delay.

15   And the reason that matters is like some of their sales

16   orders, we've heard.  They're like huge, like somebody

17   orders a bunch of these bolts and that bolts and these

18   nuts and those nuts, they take like two hours to enter.

19                   Okay.  If you enter something for two hours

20   and it takes nine seconds, it would be like boom, and out

21   the door it goes.  Everything was in real-time until you

22   hit enter at the very end.  That's fine.  We've had the

23   experts come in.

24                   Guembel admitted, and Mr. Star took him

25   through it.  And what's unacceptable is above a minute.

 1    He had below, he comes in here and says sub second.

 2    Well, it's not -- this was in 2005, not 2015.  And he's

 3    wrong.  This is business management software.  When you

 4    enter an order -- and the evidence, by the way, in the

16:15:00  5    case is that Hodell's average order line is four lines

 6    long.  Four lines lock, okay.  So not all huge, but I

 7    want you to understand when they are huge and we're

 8    talking about a nine-second delay, it's not like nine

 9    seconds every time you hit a key.  It's at the very end

16:15:16 10    and that's fine.  You've heard from the professionals on

11    that.

12              IFE.  IFE was a big part of the problem

13    here.  Eddy Neveux, in his entire career, never visited a

14    site.  He goes out in October of '07 to test the system,

16:15:33 15    right?  He uses what he called a B1 testing environment.

16    It's basically going to test what they did.  And what did

17    he find?  He told us; they did not follow the best

18    practices because there was -- and it resulted in too

19    much information going back and forth in the DI API pipe.

16:15:58 20              This isn't that complicated once you

21    understand what they're saying.  B1 and then IFE, right?

22    IFE is bigger than B1, and they have to transmit

23    information back and forth.

24              B1 has a pipe, not a real pipe.  It's

16:16:12 25    software code, and we cleared that up.  But, the question

1    is what's wrong here.  Is the pipe too small?  Or when

2    the IBIS and LSi guys wrote IFE, are they pumping too

3    much information through the pipe?  Okay?

4              Eddy Neveux was clear, "Hey, it's not the

16:16:35  5    pipe.  These guys are nuts, they're pumping all sorts of

6    -- overcommunicating back and forth.  And he did a report

7    on it, 809.  And once you kind of understand the

8    principle, it comes alive to you.

9              Skip that one.  This is October, 2007.

16:16:49 10    It's Eddy's report.  He did the DI API, you know, the

11    testing environment thing, B1TE, testing environment.

12    And are his conclusions, and I always skip the first one

13    because the highlighting will give you a headache.  My

14    screen is blank.

16:17:10 15              Okay.  So this is 809.  We can look at

16    this, but it's not even worth it.  Bob, just go to the

17    next one.  Well, okay, fine.

18              There's no doubt that the In-Flight does

19    overhead with spec with memory consumption is the current

16:17:25 20    version.  He has a bunch of numbers.  He's talking about

21    there's too much communicating going on but read down.

22    Go to the next highlighted section.  It's way more clear.

23              He gets into it.  "There is an excessive

24    amount of talk or communication between In-Flight and

16:17:42 25    Business One."  And there are others in here that I think

1        I missed.  And then he goes on to explain how they're not

2        using the filters in the right way, and it's kind of

3        technical, but this guy went here and he's saying wait

4        it's not the DI API pipe; it's the code that these guys

5        wrote.

6                    And look at -- he's not alone, by the way.

7        Everyone who looked at this reached the same conclusion.

8                    Look at 167.  He involved that woman

9        Trinidad, and she was one of the other six solution

10       architects.  I always picture her like in Trinidad or

11       something.  I don't know where she actually was.  But go

12       down -- oh, fine.  There should be highlighted sections.

13       Yeah.  Here we go.  She reports to him.  She was working

14       with him, right.  She's looking at the code.  She's

15       asking him, "Hey, what are your conclusions?"  Because he

16       had done the BITE testing environment thing, and we just

17       saw his conclusions.  So I don't think she had seen them

18       yet.  "Did you have a look at their code?  I'm interested

19       in knowing," and then she's got it, too.  "There are many

20       points that let me think their code is a very big mess or

21       I'm missing something in their development," and she goes

22       on to explain.  She cites this event.  This is a thing,

23       like the program does a step.

24                    "That's far way too often and shouldn't be

25       used."  And then she goes down another example.  "There

1    are some lines repeated too many times, and I don't know

2    why.  Here you have some samples of the most repeated,"

3    and she gives the number of lines.  And it gets kind of

4    technical, but look at the part on the bottom.

16:19:20  5              She's throwing exclamation points out in an

6    internal e-mail between two tech people saying this is

7    crazy; this thing doesn't work right.  It's firing too

8    often, 700 times, you know, 650 times for a unique event.

9    Something that's supposed to happen once is happening 650

16:19:37 10    times.  It's messing up the program because it's clogging

11    the pipe.

12              And now how else do we know?  We brought in

13    Joe Guagenti.  And he doesn't work for us.  He's the guy

14    who wrote IFE and he came in here last Friday and

16:19:53 15    testified.

16              Can you call up -- let's go to his

17    testimony.  I'll get right to it.  I think we're missing

18    one.  Go back.  2372, 21.  Should be the quote right

19    before this.  It's important.  I can tell you what he

16:20:23 20    said.

21              "Hey, what's wrong?  They flooded the pipe.

22    In-Flight flooded the pipe."

23              Is that it?  No.  We'll come back to it if

24    we have to.  Just keep going.  He said, "It flooded the

16:20:35 25    pipe."  And then we asked him, "And in your view, the

1    vast majority of the performance issues were caused by

2    In-Flight?

3                "Answer:  Yes."

4                If you look at 217 -- I'm going to skip

16:20:53  5    217.  Remember the Bilas report, right?  The Bilas report

6    is critical of putting too much information in the pipe,

7    also.  Okay?

8                But I want to go to 901.  That's not the

9    part.  You'd have to read it, but go to 901.  This is a

16:21:11 10    report, right, from Gadi Barnea.  Go down here and just

11    get the highlighted parts.

12                "It's not only that the majority of the

13    issues are driven by the add-on."  That's In-Flight.

14    "They are also the highest priority," et cetera, et

16:21:32 15    cetera.  And then he attaches a report at the end.  They

16    ran some tests.  Go to the end, please.

17                I'm not going to get into any detail, but

18    you'll remember this.  We've seen it.  Great.  Highlight

19    the two columns on the right.  So they ran some steps

16:21:48 20    using In-Flight and then ran some steps not using

21    In-Flight.  And when you used In-Flight, it was a

22    problem.  And when you didn't use In-Flight, it wasn't a

23    problem.

24                These are all seconds, right?  And the far

16:22:02 25    right is without.  And the second one in is with.  So it

1    took nine seconds with it, two without it.  And then some

2    of them are dramatic, right?  766 seconds.  And only 100

3    and then 900 seconds and 28.  Okay.  I'm moving fast now.

4              Then Guembel comes in here.  How dare he

16:22:26   5    come in here or how dare they come in here and criticize

6    B1 on articles that are from 1995 when the Internet was

7    barely existing and not take a look at the In-Flight

8    code?  Because you stack that on top, all software can be

9    stressed.  All computers can be stressed if you ask them

16:22:46  10    to, you know, your iPhone to fly the space shuttle to the

11    moon, it's going to have a problem.  And how dare he come

12    in here and talk about B1?  He was wrong.  I'm not going

13    to get into the details, but how dare he do that without

14    looking at the In-Flight code?

16:23:01  15              The In-Flight code, you can't do it.

16    Hardware?  It was part of the problem.  Eddy

17    Neveux -- Guagenti, remember Joe Guagenti talked about,

18    "Oh, it's like a car without any wheels."  And what did

19    Hodell do?  A little tricky.  They crossed him on, "Oh,

16:23:23  20    you're not an expert."  It was really interesting.  Tried

21    to make it sound like you can't be trusted on anything

22    having to do with IT.

23              And good for him; he held his own, okay,

24    because he is an IT expert.  He does know what he's

16:23:35  25    doing.  And yes, he's not a certified hardware expert.

1    That's the word he used, "I'm not certified, but I can

2    tell if a car doesn't have any wheels on it, that it's

3    not going to drive, and I can tell you or someone where

4    the A key is on the keyboard."  And he had issues with

16:23:51 5    the hardware.

6                And yesterday in rebuttal -- which was kind

7    of strange, I thought the case was over -- they bring in

8    Joe -- remember they put on all their witnesses, then we

9    put on ours.  And then they brought in another witness,

16:24:03 10    that guy, Joe Vislocky, okay.  Thanks.  Okay?

11                Joe admitted that the servers were

12    struggling.  Joe admitted that they had to go get the

13    switches that Greg was asking them about that had a

14    1,000% performance increase in connection with whatever

16:24:23 15    they touched.  He admitted he dropped 30 grand and

16    getting 30 grand out of Hodell really takes something on

17    new hardware, and that they needed the new hardware. So

18    that's enough on hardware.

19                THE COURT:  Let me ask you, Mr. Miller.

16:24:36 20                MR. MILLER:  Yes.

21                THE COURT:  I know there are some subjects

22    you haven't even broached yet.

23                MR. MILLER:  I could finish quickly if

24    that's what you'd like.

16:24:43 25                THE COURT:  No, I'm saying we could break

```
 1    now and you can finish in the morning because their

 2    rebuttal will take some period of time.

 3              MR. MILLER:  Yeah.

 4              THE COURT:  And I'm feeling the pain of

 5    Shirle and Sue enormously because easy for us to sit here

 6    and listen, or sometimes it's not, but I mean and -- but,

 7    for them, it's unbelievable what they're going through in

 8    this case.

 9              MR. MILLER:  Can I -- what time is it,

10    please?

11              THE COURT:  Almost 4:30.

12              MR. MILLER:  Okay.  Sure.  Take a break.

13              THE COURT:  Thank you.  Is the general

14    there?

15              Okay.  Folks, believe me --

16              THE CLERK:  All rise.

17              THE COURT:  Hang on.  You really have heard

18    almost everything, right, but you haven't heard

19    everything.  It's still important that you keep an open

20    mind until everything is given to you.

21              So keep the faith until tomorrow and the

22    case will go to you for your consideration.

23              Have a good night's rest.  Thank you for

24    your promptness and attention, and we'll see you 8:15

25    where, Mr. Panigutti?
```

3130

1          A JUROR:  L-1.

2          THE COURT:  All right.

3          THE CLERK:  All rise for the jury.

4          (Jury out).

5          (Court adjourned at 4:30 p.m.)

6                   - - - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3131

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

**/s/Susan Trischan**
_____

/S/ Susan Trischan, Official Court Reporter

Certified Realtime Reporter

7-189 U.S. Court House

801 West Superior Avenue

Cleveland, Ohio 44113

(216) 357-7087