3132

1          IN THE DISTRICT COURT OF THE UNITED STATES
               FOR THE NORTHERN DISTRICT OF OHIO
2                     EASTERN DIVISION

3

   HODELL-NATCO INDUSTRIES, INC.,
4                                    08CV2755

             Plaintiff,
5
        vs.                          July 2, 2015
6                                    8:30 A.M.

7  SAP AMERICA, INC., ET AL.,

                                     Volume 14
8             Defendants.

9

10

               TRANSCRIPT OF JURY TRIAL PROCEEDINGS
11          BEFORE THE HONORABLE DONALD C. NUGENT
                UNITED STATES DISTRICT JUDGE
12                     AND A JURY

13

14

15

16

17

18

19

20

21

22

23

24

25

1    APPEARANCES:

2

3    For the Plaintiff:        Christopher J. Carney, Esq.
                               Sharon A. Luarde, Esq.
                               P. Wesley Lambert, Esq.
4                              Brouse McDowell
                               600 Superior Avenue East
5                              Suite 1600
                               Cleveland, Ohio    44114
6                              216-830-6830

7

8    For the Defendants:       Gregory J. Star, Esq.
                               Michael John Miller, Esq.
                               Joseph M. Kelleher, Esq.
9                              Alex H. Hayden, Esq.
                               Drinker Biddle & Reath
10                             One Logan Square
                               18th & Cherry Streets
11                             Philadelphia, PA    19103
                               215-988-2734

12

13

14

15   Official Court Reporter:  Susan K. Trischan, RMR,CRR,FCRR
                               7-189 U.S. Court House
                               801 West Superior Avenue
16                             Cleveland, Ohio  44113
                               216-357-7087

17

18   Proceedings recorded by mechanical stenography;
     transcript produced by computer-aided transcription.
19

20

21

22

23

24

25

1          THURSDAY, JULY 2, 2015,  8:35 A.M.

2              THE COURT:  Good morning, ladies and

3     gentlemen.

4              You saved Jayden from the zoo again.

08:36:31  5              MR. MILLER:  Your Honor, shall I continue?

6              THE COURT:  You may continue.

7              MR. MILLER:  Thank you.

8              Good morning.

9              THE JURORS:  Good morning.

08:36:38 10              MR. MILLER:  I'm going to pick up right

11     with the slide that I left off.  Okay?  SAP never told

12     Hodell to abandon Business One.  What we covered

13     yesterday, SAP worked very hard after go-live to help

14     Hodell, right?  And the solution objectively, you can't

08:36:55 15     look at this any other way.  It got better.

16              Okay.  Now, In-Flight was always a problem

17     and still is a problem, and ultimately is what did this

18     solution in, but there can be no dispute in this case,

19     they went live, they had some issues.  I think the phrase

08:37:15 20     I used yesterday was SAP pounced on this, thousands of

21     hours.  There was improvement.

22              I was moving fast towards the end of

23     yesterday, but showing you objective indicia of actual

24     improvement, Patch Level 25, Patch Level 29, the test

08:37:32 25     that Eddy Neveux did in October, and then again, the

1    point that IFE was the real problem and we looked at the

2    different charts.

3              When Hodell presented their case and in

4    their closing argument, they took the position that

08:37:50  5  notwithstanding of everything that I just said, that on

6    November, I think it's 16th or 17-th, we'll look at it in

7    a second -- we told them abandon Business One.  That they

8    got like a notice from us that if you held it up, it said

9    abandon Business One.  Okay.

08:38:07 10            And the document that they referred to as

11    the, you know, notice to abandon Business One is Exhibit

12    109.  Okay.  Can we call that up, please?

13              Now, this is a little bit complicated.

14    There's a sentence -- here's -- this is highlighted

08:38:29 15  because we're going to walk through it.  Let me show you

16    the sentence that they referred to and they did it in

17    closing argument, and they did it throughout this trial.

18              Look at the second paragraph.  Okay?  They

19    say, "From the SAP side," could you maybe go in green,

08:38:45 20  Bob, with the first sentence of the second paragraph?

21              Go ahead.  The whole first sentence of the

22    second paragraph.  "From the SAP side, as it relates to

23    the integration points, the acronyms you listed below, we

24    have evaluated the processes and approach," and just to

08:39:03 25  be clear, right, this is from Michael Sotnick, a senior

1    SAP person, to the Reidls.  And again, this is what they
2    point to and they say this is what told us to abandon
3    Business One.
4              "From the SAP side as it relates to the
08:39:18  5    integration points, the acronyms you listed below, we
6    have evaluated the processes and approach and have come
7    to the conclusion that there is no change that we can
8    make on our side that would result in a material
9    improvement."
08:39:29  10             And they say, "See, they told us to abandon
11    this."  Let's break it down.  "The integration points,
12    the acronyms you list below," let's scroll down and see
13    what that is, just to the e-mail below.
14             Otto Reidl.
08:39:42  15             Keep going, right there, go up.  You have
16    to go up more.  There's a reference -- hold on, guys.
17    Let me show you where it is.  You got it?  Yes.  Exactly.
18             "I've been staying on the side lines," et
19    cetera, "since our meeting.  Are the problems so" -- et
08:40:12  20    cetera, et cetera, "resolve the problems relating to SAP
21    software and the DI API interface."
22             Okay.  So scroll back up.  So just in that
23    one sentence, okay, all we're saying -- go up to the
24    green part -- right.  From the SAP side, all we're saying
08:40:28  25    is the DI API, right, there's Business One and it has

1    that pipe that's the DI API, okay, we're saying we've

2    worked to improve our pipe, even though we think the

3    problem is In-Flight, you guys are pumping too much

4    information through the pipe, we've worked to improve the

08:40:43 5    pipe, and it's gotten better, but we don't expect the

6    pipe to get much better.

7              And why are we saying that?  We don't think

8    the pipe is broken in the first place.  We worked to

9    improve it, but the problem is In-Flight pumping too much

08:40:57 10   information in the pipe.

11             So this sentence is not what they suggest

12   that it is.  It's just us saying, look, we worked on the

13   pipe, we made it better, don't expect it to get much

14   better.  It's as good as it's going to get.  And we don't

08:41:11 15   have any problem with making that statement.  We don't

16   think there's anything wrong with the pipe.  The problem

17   is In-Flight.

18             But it's much, much more than that.  Look

19   at the rest of this.  Look at the whole thing.  Again

08:41:21 20   Michael Sotnick, Senior, writing to Otto.  Scroll up just

21   to get the date so I know I had it right.  Right.

22             November 16th.  "Our team's worked with

23   yours and LSi and have systematically eliminated some

24   issues and brought others to the forefront."

08:41:36 25             Good.  Then there's the sentence we went

1      over about DI API.  Look at the rest.  They don't focus

2      on this, Hodell.  "That being said, we've also worked

3      with LSi on the architecture of their integration to

4      identify areas that would help speed the communication

08:41:51 5      between applications."

6                       What's he talking about there?  He's saying

7      we went back to LSi to work on In-Flight so they can stop

8      shoving so much information in the pipe.  Okay?

9                       And then it says, "In this case, speed is

08:42:05 10     related to having the applications talk to each other

11     less often.  Some of those recommendations have been

12     implemented by LSi."

13                      What's the implication?  There's more work

14     to be done there, right?  LSi should keep doing this,

08:42:18 15     keep fixing the amount of information that's getting

16     pumped through the pipe.  Okay?

17                      It's not saying let's all walk away, but it

18     gets -- there's more.  "We're working with LSi on an

19     independent evaluation of In-Flight.  They have provided

08:42:32 20     assistance by providing some of their code," it's right

21     here, "For evaluation, but they've not delivered the full

22     application set.  SAP has offered to pay for this and has

23     requested that LSi participate."

24                      So now we're not only pointing out that

08:42:50 25     we've worked to improve -- get them to improve In-Flight

1    and we expect them to keep going, we're willing to

2    evaluate their code.  We're going to keep working is what

3    that sentence says.

4                Then you go down here, more, right?  "We

08:43:05  5    spent significant time evaluating your hardware

6    environment and have identified some quick fixes.  But

7    we're doing more.  We're proceeding with a direct

8    engagement with Citrix on your behalf for a more expert

9    evaluation."

08:43:18 10                We believe there are material gains to be

11    made in this area.  So they're not saying, quick, abandon

12    Business One.  They're saying a lot different than that.

13    This is very -- this is a very forward-looking

14    progressive e-mail talking about let's keep working, get

08:43:36 15    LSi to fix In-Flight more, we'll take a look at their

16    code, we'll spend the money.  Oh, your hardware wasn't

17    right.  You got to keep working on that.  There are

18    material gains to be made.

19                This is all the stuff that Hodell doesn't

08:43:50 20    show you when they show 109.  They go right to that one

21    sentence and say, "See, they told us to abandon Business

22    One."  It's not true.

23                Down here, "As you can see from the above,

24    a great deal has occurred in the past two months.  We

08:44:04 25    talked about taking both a short-term and long-term

1    approach and working both simultaneously.  This has and

2    continues to happen.  I look forward to discussing our

3    long-term approach with you in more detail the week after

4    Thanksgiving and appreciate your patience as we work

08:44:23   5    through these actions."

6                Where in this document does it say, like

7    Hodell says, that we're telling them on November 16th

8    they've got to abandon Business One?  And you see, they

9    need that in this case, right?  Because what I've been

08:44:38  10    saying is true.  SAP worked really hard.  B1 got a lot

11    better.  They ditched it and went to Profit 21, and they

12    need some explanation for why the heck did they do that.

13    And they don't really have one.  So they point to 109 and

14    they point to that one sentence, and that's all they keep

08:44:57  15    refraining to you, but it's not accurate, right?

16                This is actually a very progressive e-mail

17    that reflect the hard work we did, the improvements that

18    have been made, and how much more work we expect to do

19    with them in the future to make B1 work for them, which

08:45:10  20    if they stayed with it, it would have been great.  But

21    that's that.

22                I mentioned Profit 21.  Hodell says that B1

23    was bad, right?  But if B1 was as -- how could B1 be as

24    bad as they say when the solution that they picked after

08:45:38  25    two years of supposed evaluation was so much worse?

3141

1    Right.  There's a pattern here, okay, and we're going to

2    talk about that and we're going to talk about it right

3    now.

4                    Take a look at 277, please.  They had

08:45:53  5    FACTS, right, and they had Radio Beacon with that.  We

6    remember the litigation letters, 195, 311, 312, Otto's

7    letters and Kevin's e-mails about litigation.

8                    Then they move from FACTS to B1.  Here we

9    are on B1, right?  And then they go to Profit 21, again

08:46:13 10    after -- the one that's supposed, like how could B1 be

11    bad if Profit 21 is what they say it is here?

12                    Look at the date, okay?  May 22nd, 2009.

13    Okay.  They're live with Profit 21.  This is Kevin Reidl

14    writing to people that were associated with Profit 21.

08:46:33 15                    He's talking in the first sentence, "I'd

16    like to update you on the status of our Profit 21

17    implementation."  And, you know, we could read this whole

18    thing and you all will have access to the whole thing,

19    but I'm going to go right to the end.  "To put things in

08:46:50 20    perspective," because I've read it and I think this is

21    what you want to see, "We were sold a system that will

22    streamline our operations and make us more profitable.

23    Our sales, like most other companies in the current

24    economic climate, are down significantly, both

08:47:06 25    year-to-date and in comparison to '08."

3142

1        Can you go to the next page?  "However, we

2   recently needed to hire three more employees to manage

3   the new work load.  Not a good indication of efficiencies

4   gained, particularly since our product mix and customer

5   base has not changed."

6        Next, "I'm most disappointed because we

7   have lost customers through this."

8        There's a credibility issue here.  Okay.

9   When they buy software, this is what you see, okay?  Look

10  at the next one, 325.

11       Again, yes, thank you.  Kevin Reidl to the

12  folks who implemented and were associated with Profit 21,

13  right to the heart of it.  "Our business is off 25%, but

14  our head count is up."  Boy, that sounds awfully

15  familiar.  "Since the day we went live on P21, any

16  efficiency we had vanished with the implementation of

17  this software."

18       Okay.  This goes to the heart of their

19  credibility.  You'll have those with you if you'd like to

20  look at them in more detail.

21       And, look, we shouldn't even be talking

22  about damages.  I'm going to wrap up in a couple of

23  minutes and I'm going to summarize all the reasons I told

24  you yesterday why.  Okay.

25       This case has gotten very tiny.  It's very

1    easy.  But just like Hodell likes to pay attention to all

2    the facts after go-live because it doesn't really have a

3    case, doesn't have a case, just like they like to pay

4    attention to all those facts after go-live, they like to

08:48:48  5    pay attention to damages, and damages would like -- was a

6    huge piece of this case, way more than it should have

7    been.  That's another sign, by the way, of a party that

8    doesn't really have a case.  They're shifting, right?

9    They don't have a case.

08:49:02 10              It also goes to credibility.  Hodell came

11    in here in their opening and they said that

12    they -- running B1 for two years from '07 to '09, almost

13    put them out of business.  And I was taking notes as they

14    went.  They said that they even faced liquidation in

08:49:21 15    2009.  And mind you, basically the worst economic climate

16    that our country has experienced since the Great

17    Depression, the whole country was on the brink of

18    financial collapse or depression.  They blamed all their

19    problems on Business One.

08:49:38 20              Well, the Court and the law has stepped in

21    on their damage claim, okay, and notwithstanding all the

22    stuff that you heard in the opening, the Hodell damage

23    claim has now been shrunk like lots of the other parts of

24    this case.  And just to be clear, this is not me saying

08:49:57 25    this.  Okay?  Judge Nugent read you the, what's called

3144

1    the jury charge, that document that he was reading

2    yesterday.  If you remember, there were only three parts

3    to their damage claims that were left, and that's as a

4    matter of law in this case.  That's not me saying that.

08:50:14  5         There's three things left, and Hodell won't

6    challenge this, and that's why when they did their little

7    math thing yesterday, they only had three components, and

8    it was the increased overhead, that was the 2.6 million,

9    it was the training and travel -- they guessed at that at

08:50:31 10   50,000 -- and it was their supposed out-of-pockets, which

11   are 830.  Okay?

12        None of those are valid.  I'm going to talk

13   about all three, but I want to start with the overhead

14   one.  Okay?

08:50:42 15        Let's go here.  You've heard this -- I'll

16   bring this a little closer.  You've heard this before.

17   I'll try not to trip, but it matters.  2008, okay, was

18   the best year in sales that Hodell ever had.  This was up

19   earlier in the trial.  Excuse me.

08:51:18 20        I don't want to knock this over, either.

21   That's fine.  If you can put it on the screen if you

22   don't mind, that's great.

23        And sales matter.  B1 affects all parts of

24   their business, their ability to take orders, all the ERP

08:51:37 25   systems, software, affects and that's their point, all

3145

1    aspects of their business, their ability to take orders,

2    their ability to process orders, their ability to ship

3    goods, their ability to pay for it, their ability to

4    track all that.

08:51:48  5              What's that?  That's a sale, when you take

6    an order, process it, and get it out the door.  The

7    first -- the only full year that they ran Business One,

8    they had the highest sales that they ever had.  You can

9    stop right there.  Okay?

08:52:06  10             It was in one of the worst -- the beginning

11   of one of the worst economic climates again our country

12   has seen in almost a hundred years, and they had their

13   best year ever.  And remember they were saying, it was

14   really hard, we couldn't do this.  All the things they're

08:52:23  15   talking about are associated with orders.  It's hard to

16   process the sales orders, how to get the orders out the

17   door, all those things.  If it was true, it couldn't be

18   the best sales year they ever had -- look at these

19   numbers, FACTS, FACTS, FACTS, FACTS, some FACTS, B1,

08:52:41  20   still goes up -- pardon me, that goes down but that was

21   some FACTS, B1, and look at this, the one year they ran

22   at 43 million, okay?  That's just part of this.

23             Because even this, right, and Mr. Reidl

24   came in here and he talked about productivity, right, and

08:53:04  25   I'm going to look at that and what he did was he said

1      forget this, okay, the way you measure corporate success

2      is you figure out how many employees it took to ship a

3      given number of pounds of product.  Okay?

4                    In other words, very simple, count up the

08:53:22  5      people, weigh the product, and divide them and see how

6      many pounds does each employee in our company ship.

7      Okay?

8                    We brought Geoff Osborne in here to tell

9      you something that you really already know, and it's you

08:53:38 10      don't measure corporate success in pounds.  Okay?  You

11      just don't measure corporate success in pounds.  People

12      measure corporate success in dollars, okay?

13                    And you can start here, and I think that

14      you can end here, but if you're going to do an analysis

08:53:56 15      like what Mr. Reidl wanted to do, and you want to measure

16      how much work can get done by each employee, okay, then

17      look at dollars.  Don't weigh it.  Don't weigh it.

18                    Product -- diamonds are light.  They're

19      expensive.  Some really heavy things, lead, might be

08:54:23 20      cheap.  You don't weigh corporate success; you measure it

21      in dollars.  And that's why you've seen this repeatedly

22      in this case.

23                    And this exhibit, if you're going to look

24      at productivity at all, likewise completely eliminates

08:54:34 25      this idea of an increased overhead productivity loss.

1    And here's why:  Okay.  This is -- these were the same

2    numbers that was on the other chart, right, because you

3    got the 43 million in 2008, the same exact gross sales.

4                 And then Mr. Reidl totaled his employees.

08:54:53  5    And this was the all-in one, right?  This is the one that

6    included the temps also, okay?  So if you're going to

7    measure productivity by, hey, how much can each employee

8    do, and I can understand how that might make some sense,

9    okay, but they got the same problem.

08:55:12 10                 In 2008, the only year that they ran B1 the

11    whole time, they had the most productive year ever, not

12    just in total sales, but in sales per employee.

13                 So now we're not just talking about gross

14    sales, we're talking about efficiency, how much does each

08:55:32 15    employee do.  And we're not weighing it, okay?  Which is

16    ridiculous.  We are looking at dollars and it was the

17    most efficient year they ever had.

18                 Okay.  One more step.  If you're going to

19    ignore the total sales and you're going to ignore the

08:55:53 20    dollars and you're still going to weigh it, which is what

21    they insist on doing, right -- do you mind if I borrow

22    this exhibit -- - then you got to give us the detail.

23                 If you were going to go there, which is

24    where you should never go in the first place, but if

08:56:10 25    you're going to go there and you're going to ignore the

 1    43 million, the best year ever, you're going to ignore

 2    that this document kills what they're saying, but if

 3    you're going to ignore them both and you're going to go

 4    here -- I'll try to remember to take that away so you

 08:56:27  5    have the timeline -- and you're going to go here, you

 6    have to give us -- actually, no.  Can we put it on the

 7    screen, Bob?  Maybe that's best.

 8         This is the exhibit that they routinely

 9    came back to, to measure how, like, the pounds per

 08:56:42 10    employee sometimes showed something, right?

 11         You can talk about this thing for a long

 12    time, and some of the witnesses did, probably longer than

 13    they need to, but I want to show you something that I

 14    think I can show you pretty efficiently that just takes

 08:56:56 15    the air out of this.  Okay?

 16         Take gross sales -- and just go all the way

 17    across, Bob.  You guys will be familiar with those

 18    numbers, it's those numbers and the numbers we looked at

 19    before.  And go down to sales and admin expense.  Okay?

 08:57:16 20    Sales and admin expense is a big part of this supposedly

 21    productivity loss that they suffered that involves

 22    employees and weighing stuff, okay?

 23         And what they're really saying is that

 24    those costs went up, and it was because of B1, and that

 08:57:39 25    reflects that they had to hire more people and somehow we

3149

1    need to pay them money.

2              Geoff Osborne walked in and he told us all,

3    look, you don't weigh stuff, corporate success is dollars

4    and we went to this and proved that, but then he, Geoff

08:57:52  5    Osborne, remember him, he was the guy, the CPA who we

6    brought in here, he said "Ladies and gentlemen, look at

7    sales and Admin.  Starting in 2003, way before Business

8    One, it starts going up," right?  And his point was "That

9    shouldn't happen.  That's weird.  Sales and Admin is

08:58:10 10    supposed to be kind of steady, okay?  Cost of goods sold

11    and cost of product sold, and other costs of sale, they

12    might vary.  This one, Sales and Admin, is supposed to

13    stay the same, but Hodell is saying it went up because of

14    Business One, but Geoff is saying no, no, it's going up

08:58:27 15    in 2004 and 2005,  in 2006 and then it goes up in 2007.

16              He said that's weird.  And he's right.  But

17    here's where it gets really weird.  Look at the sales

18    from 2006 to 2007.  Okay?  They go from almost 43

19    million, 42,9, down to 40, right?  Well if you have less

08:58:50 20    sales, right, then your Admin, sales and administrative

21    expenses, should go down, right?  And see how they went

22    up, actually?  They went 7 million to 7.4.  And that's

23    why I'm saying this is part of their equation.  They're

24    saying, "Oh, see that?  That's B1.  Give us some money."

08:59:08 25              And my point is it's been going up for

3150

1    years, and Geoff Osborne is all over this saying someone

2    needs to explain that.  And then Geoff tried to unpack

3    it, right?  So he explained, and we got Otto's testimony

4    on this, what's in that Sales Admin?  What's in there?

08:59:46 5    Is that all just B1 if you look in there?  No.  No.  No.

6    No.

7            Mr. Reidl testified and it does include

8    salespeople, but it includes a whole lot else.  It

9    includes office people, travel, advertisements,

08:59:46 10   insurance, right from the transcript, bad debt, telephone

11   and telegraph, we'll remember that, it includes the

12   independent sales reps, their pay is in there.  It

13   includes their auditor expenses, and it includes

14   executive salaries.

09:00:00 15          Okay?  And Geoff Osborne said "Yeah, I know

16   all that stuff's in there.  I need to see that.  I need

17   to see the breakdown in order to determine what the

18   heck's been going on with you guys and why have your

19   sales and Admin been going up, and I'll show you this

09:00:17 20   isn't associated with Business One."

21          They never gave us those records.  You

22   can't get -- you can't unpack that.  That was Geoff's

23   point at the end of his testimony.  That's weird that it

24   was going up.  It was going up before they even had B1 so

09:00:30 25   I don't see how it could be associated with B1.  The only

1    way you could even begin to understand whether this was

2    even remotely associated with B1 would be to unpack this

3    because, hey, maybe it's executive salary increases,

4    maybe the independent sales reps are getting paid more,

09:00:48  5    maybe, whatever, the advertisement, travel, office, bad

6    debt, telephone and telegraph, maybe it's all that stuff.

7    We can't tell.  They have never given us the records.

8    Okay?  The claim's got to die.

9              But there's more.  Remember, Mr. Star

09:01:06  10    pressured Otto Reidl, "Did you or didn't you" it was late

11    in one of the afternoons, "Hire these supposedly 27

12    additional people that make up this 2.6 million that you

13    want" because ultimately that's what they're saying.

14    They're dodging and moving and slipping and sliding, but

09:01:25  15    ultimately, they're saying, "Hey, we had to hire 27 more

16    people" and Greg point blank asked Otto Reidl at the end

17    of the day, did you or didn't you, and we couldn't get a

18    straight answer out of him.  Right?

19              And then he came in the next morning and he

09:01:40  20    testified, "Yeah, that's what we did.  I've thought it

21    over.  We hired 27 additional people."

22              Can you put that up, Bob, please?

23              This is his testimony fresh in the morning,

24    "Because I thought it over.

09:01:57  25              "How are you claiming that Hodell was

1    harmed?  During this period, 2007 and 2008, we had at

2    least 27 people leave the employ.  During that time our

3    pound volume declined.  We wouldn't have replaced those

4    people if Business One" keep going, is there another way

09:02:16  5    to do this?  Okay.

6              "And the number of people that we had to

7    replace, the number of people we had to replace times the

8    cost of those people for a 25-month period, amounted to a

9    $2.6 million cost increase."

09:02:31 10              So he's saying, "I hired 27 more people,"

11    and I think, just bear with me for a second.  Go to the

12    next one, Bob.  And he was even more clear because Mr.

13    Star -- that was on direct, that was through his own

14    lawyers.  He was even more clear when Mr. Star, whatever

09:02:52 15    1920 is, go to the next one.  So that was him on direct,

16    and then Mr. Star comes back to him and says, "I want to

17    be clear.  You're now --"  it's just the beginning of

18    this -- "And you're now telling us, you're now telling

19    us, sir, that your damages theory is that 27 people left

09:03:10 20    the company and you had to hire 27 new people?  That's

21    what you're telling us right now, sir, right?  Correct."

22              Okay.  But if that's the position that

23    they're going to take, and this has been our position

24    since the beginning of this case, they need to produce

09:03:28 25    proof about the 27 additional people.  Who were they?

1      Where are they?  It's easy to do.  They have a $40

2      million company.  If they hired 27 additional people,

3      tell us who they are.  Tell us how they were associated

4      in some way with Business One.  Tell us how much you paid

09:03:45  5      them.

6              And Mr. Star, if you go back to this

7      text -- just blow up the whole bottom of it, Bob.

8      Actually, go back to the page, please.  Just scoop it.

9      After "Correct."  There you go, right there.

09:03:59 10             Mr. Star took him through this.  And look

11     at the question at the bottom.  "Sir, have you given us a

12     single record showing the name of even a single one of

13     these supposed 27 people who left your employ; yes or no?

14             "I've not provided that information.

09:04:17 15             "Can you agree with me that you've also not

16     given any information about these people?"

17             So he's not even -- we're not getting any

18     information "That you supposedly hired to fill those

19     spots?

09:04:29 20             "Employment levels don't stay stagnant."

21             Go all the way to the bottom.  No.  No.

22     There you go.  Can you scroll down for the rest of the

23     text?  There we go.

24             I'll cut right to the bottom.  Bob, go to

09:04:44 25     the bottom, please.  Right where you were, Bob.  Sorry.

1    Right there.  That's better.  Perfect.

2                   "Besides not giving us a single name of

3    any of the people, you say were replaced, you never told

4    us what you were paying them, paying those older workers

09:05:05  5    who left or what you might have been paying the new

6    workers who you hired to replace them, right?  You've

7    never given us specific information?  No."

8                   So when it got down to it, he couldn't

9    decide what to say the one afternoon.  He comes in the

09:05:18 10    next day and said, "I've thought it over.  Yeah, we

11    hired."  And we said we've been after this the whole

12    case.  Who are they?  Give us the records.  They don't

13    have it.  He admits it.

14                   And then what happens?  Yesterday Hodell's

09:05:33 15    counsel comes in and they changed it again.  Now they're

16    saying, "No, no.  We didn't hire 27 additional people.

17    That's why you don't have the records, it's just that the

18    people who were here worked harder."

19                   So they've shifted and they shifted again.

09:05:48 20    We proved that they didn't have the records, and then

21    they shifted again.  And now they're saying "Oh, these

22    ghosts," they are ghosts, there weren't actually 27

23    additional people -- "we just worked harder and we don't

24    have any proof of that."

09:06:02 25                   Well, that's not a damages claim.  So you

1    can take this whole productivity business and kick it,

2    okay?  It's a false analysis.  There was no loss.  This

3    number, I believe -- well, you believe, that once you

4    understand this, says it all.  Okay?

09:06:18  5              Just a couple of other things on damages.

6                Do you have your chart with the arrows?

7    Can you call it up on the screen, Bob?  I don't know

8    where it is.

9                Do you remember this chart?  Okay.  This

09:06:42 10   chart is an outrage.  Okay?  This chart should not have

11   come into this courtroom, and it should not have been

12   presented to you.

13               Mr. Osborne pointed something out that is

14   dramatically important about this chart.  There's an X

09:06:59 15   axis and a Y axis.  The X goes across the bottom, right?

16   The Y axis goes over here on the left, right?

17               And if you look on the left, gross profit,

18   right, and it's in million dollar increments, right, and

19   gross profits, the blue, and they have this kind of

09:07:18 20   hairbrained scheme that somehow the difference between

21   these things suggest that, oh, my gosh, B1 was a problem,

22   except the red line doesn't track on the same parameters

23   as the blue line.

24               We've all seen charts, right?  You have

09:07:33 25   something on the bottom, usually time.  Something on the

3156

1    top.  And here it's dollars.  Except the red line isn't

2    following the increments on the left.  Look at this.  On

3    the right side, it says, "Net profit," the red line is

4    following a different set of increments that are in

09:07:50    5    different sizes.

6              It's not -- it's warped.  If you made the

7    lines on the right the same as the lines on the left, or

8    if you ran both lines from the left, those lines come

9    together.  If you warp it and have the red line track,

09:08:09    10    what do you want to call it, a Z axis, it's going to

11    create that.  That's what they did.  I don't know who did

12    it, but that's what someone did.

13              So when you get to increased overhead, we

14    can be done with that.  SAP received $150,000

09:08:25    15    approximately for this software.  They got the licenses,

16    they had the software.  They can use it forever.  They

17    only used it for two years.  That was up to them.  It was

18    their mistake, but we're even.  Okay?

19              The overhead expenses that they say that

09:08:41    20    they incurred, you know, to spend on Business One, that's

21    money that they expected to spend in the first place.

22    There are no damages.

23              Okay?  I need to make a couple things

24    clear, and I mentioned this yesterday but I'm not sure I

09:09:03    25    made it as clear as I should.

1          This case has shrunk, and it's not just me

2     saying this.  The Court, the law shrank this case.

3     Remember, Judge Nugent was reading you the jury charge,

4     right, and he had the -- he was reading it right off of

09:09:28 5    there and explaining look, that's how it's done; we want

6     to get this exactly right.

7          In that charge, he was explaining to you

8     that this case is now down to very, very little.  It's

9     the two marketing documents and the Penny Vitantonio

09:09:43 10   conversations.  That's it.  Okay?

11         This Court has found, as a matter of law,

12    that there is no breach of contract.  No breach of

13    warranty.  Found as a matter of law.  They're gone, okay?

14         This Court has found, as a matter of law,

09:10:00 15   that neither IBIS and Dale, or LSi and Dan, are the

16    agents of SAP.  That's gone.  Okay.  That's not me saying

17    this.  The law is they're gone.  They're not the agents.

18    Okay?

19         Likewise, it has been determined by the

09:10:19 20   Court, as a matter of law, and this is what was read to

21    you, not in exactly these words, but this won't be

22    challenged by Hodell because it's true.  This isn't

23    argument; it's reality, the statements of Dale and IBIS

24    and Dan and LSi, if they ever existed in the first place,

09:10:38 25   they're not associated with SAP.  Those are not our

1    statements.  They're gone.  Okay?

2                And again, as a matter of law, the only

3    basis for them to proceed are the two marketing documents

4    and the statements of Penny Vitantonio.  There's

09:11:00  5    basically nothing left of the case, except for that.

6                And I want to talk about that briefly, and

7    I want to get this wrapped up.

8                First, the standard.  We talked about clear

9    and convincing.  There's preponderance, right?  That's

09:11:15 10    like 51%, 49%, okay.  Clear and convincing is a higher

11    standard.  You need to have a firm belief and a

12    conviction.  Okay?  It's not beyond a reasonable doubt,

13    which is a criminal standard, all you'll ever hear.  But

14    it's not preponderance.  This is different, okay.

09:11:33 15    Substantially different.  You have to have a firm belief,

16    a firm conviction.  Boom, I got a firm belief.  Okay.

17                That's not going to happen.  That's for

18    each element of a fraud claim, and I'm not going to go

19    all through all of them, but one is you have to have

09:11:46 20    clear and convincing evidence, a firm conviction, that

21    there was a false statement, that there was an intention

22    to mislead, and that there was justifiable reliance.

23                They can't get any of these for any of

24    what's little bit left in the case.  Penny Vitantonio,

09:12:00 25    right, she did not promise Otto that B1 was good for 300

1    or 400 or 500 users.  She came in here, she was credible.

2    She said, "I don't do that.  I wouldn't have done that.

3    If I ever did do that, I would have written it down

4    because I'm a salesperson and, gee whiz, that would be

09:12:24  5    fantastic."

6                    And we know from her notes that she didn't

7    do that, and we had them up there yesterday.  Four times

8    on four different occasions, four different conversations

9    with Otto, she wrote down 100 users.  And then Otto,

09:12:41 10    remember, he had no notes -- he had notes of these

11    conversations, but no notes that said 300 or 400 or 500.

12                    And we actually missed a quote yesterday

13    that's worth spending a second on because it goes to

14    credibility.  And I realize he wishes the record was

09:13:05 15    different and -- I don't know what he wishes.

16                    But this really goes right to the heart of

17    credibility on this issue, because he testified that the

18    reason he didn't write it down, 300, 400 or 500, is

19    because it was so important.  Remember, he explained, "We

09:13:24 20    wouldn't have proceeded unless I got that assurance."

21    Mr. Star says, "So this jury understands, that's all I'm

22    trying to get to, you contend that during that meeting

23    you were told 300 users?

24                    "That's my contention.

09:13:39 25                    "And we can agree your notes say nothing

1    about that at all, right?

2          "Because that's such an important point, I

3    don't need to write that down when I'm told.  That's an

4    assurance."

5          So in the history of notetaking, it turns

6    out Otto keeps notes on stuff that's not important, but

7    if it's really important, he doesn't take those notes,

8    and that's what he says to you under oath in court.

9          We know that that's not right.  We know.

10   If you're trying to find out the truth on this issue, you

11   think about Penny, you look at Penny's notes, you think

12   about the record, it's easy.  There's no clear and

13   convincing evidence.  Somebody has to have a firm

14   conviction that she made that promise.  She didn't make

15   it.  There's definitely not a firm conviction of it.  And

16   that's why they don't focus on this.  Remember I told you

17   yesterday they hardly mentioned it.

18         Then we get to the marketing materials.

19   The statements at issue are in Exhibit 317, and I have

20   copies of them here.  Sorry, I said 317.  It's 314.

21   These are high-level marketing pieces.  I got my own

22   personal copy here, but this is a high-level marketing

23   piece.  We went through it yesterday, and then this other

24   one, you'll remember this on the screen, I have to get to

25   the first page, likewise.

1          They're ad pieces, right?  Here they are.

2     Okay.  And you can read them.  You can take them back,

3     314 and 617, and you can read the first couple sentences.

4     You can read the whole thing.  These are ad pieces, okay.

09:15:26 5     And remember, the American Express one is about a

6     different product, Business One American Express Edition.

7     Okay?

8          But Judge Nugent read to you the parts of

9     these documents that the Plaintiffs are focused on.

09:15:42 10     Okay?  It's just three sentences, and it's -- I'm reading

11     from what the Judge read to you yesterday.  Okay?

12          And in 314, which is the Business One

13     Brief, the supposed statement is, "The solution helps

14     emerging businesses from those with 10 to several hundred

09:16:00 15     employees to streamline their operational and managerial

16     processes."

17          And then there's two documents in 314.

18     They're both kind of stapled together, which is a mistake

19     by Hodell, but whatever.  There's two documents.

09:16:15 20          The second one says, "Whether you have 5

21     employees or 500, the solution helps emerging businesses

22     streamline their operational and managerial processes."

23          And the third one is, "Business One

24     effectively supports companies with as low as ten and as

09:16:28 25     many as several hundred employees."

1          Okay?  That's it.  That's what's in this

2     case.  They're true statements.  Business One is a great

3     product.  We have sold 40 or 50,000 copies of it.  That's

4     40 or 50,000 customers.

09:16:45  5          We had Dan Kraus, Paul Killingsworth, other

6     SAP witnesses come in here and explain it's a dynamite

7     product.  We've sold it to lots of companies with

8     success.  This is a 26 -- 26 pages.  A number of them

9     have several hundred employees.  A number of them have

09:17:06 10     more than 500 employees.

11          Okay.  And here's what they didn't do.

12     They didn't come in and prove that Business One can't do

13     these things.  Right?

14          Remember, the statement says, and you can

09:17:21 15     look at them, that Business One can help companies with

16     one to several hundred employees.  Business One can help

17     companies with one to 500 employees.  If you're going to

18     challenge that statement, you need to come in and prove

19     that it's false.  You need to bring someone in who says,

09:17:35 20     "Oh, it can't do that," okay?  They didn't even try and

21     prove that.  Probably because they thought other parts of

22     their case were going to survive.  It was never a focus

23     of the case.

24          What they did is they came in and said, "It

09:17:49 25     doesn't work for us."  Stop right there.  These marketing

1    materials are marketing materials.  They're not directed

2    to Hodell.  I talked about that yesterday.  It's not a

3    proposal or a letter to Hodell.  It's not specific to

4    them.  And it's not specific to their complex solution.

09:18:06  5    B1, Radio Beacon and In-Flight.

6            Okay.  So if they're going to try and prove

7    that these are false, they need to put that proof on,

8    which they never did, and they're trying now to backfill,

9    but it was never directed specifically to Hodell.  And

09:18:25  10    they had a unique solution to begin with.

11            There's no way you can make this get a firm

12    conviction that that's a false statement, okay?

13            But then there's intent to mislead.  You

14    got to have a firm conviction of that, too, which is

09:18:44  15    impossible.  SAP wanted this to succeed.  We don't -- we

16    haven't built the business that we built, and we haven't

17    built the successful Business One product that we built,

18    by hitting and running. We want things to work.  We

19    expected this to work.

09:19:02  20            There's been no proof that these statements

21    were somehow created with an intention to mislead people.

22    There's zero proof of that.  And then I talked about this

23    yesterday, justifiable reliance.  There's no way -- their

24    case is that you need to find -- you can find clear and

09:19:22  25    convincing evidence that a reasonable person would look

1       at those three sentences, buried in those marketing

2       documents from 2003, and say, "I'm good to go on Business

3       One.  I'm just going to -- I'm just going to do it."

4       Okay?

09:19:37  5                     We know that it's dealer talk.  Trade talk.

6       The Judge explained to you, you need to take that into

7       consideration.  And look who the reader is.  It's Hodell.

8       Remember the e-mail I showed you yesterday?  They have

9       been around the barn.  They know ERP.  Okay?  They've had

09:19:53 10     FACTS.  They almost got in litigation about FACTS.  They

11      know there are issues.  They know that "Users" isn't the

12      same as "Employees."

13                     They had 160 employees with FACTS and they

14      only had a hundred users.  They know that doesn't mean

09:20:08 15     the same thing.

16                     They know that they have a complex

17      three-part solution with B1, Radio Beacon, and IFE on the

18      top.  And they know these documents are from 2003, those

19      are the dates on them.  They didn't buy our

09:20:24 20     software -- I'll try not to trip -- they didn't buy our

21      software until 2005.

22                     Okay?

23                     And we looked at the documents that their

24      guys, Dale and Dan, had from 2005 that showed the lower

09:20:40 25     numbers.  Remember those from yesterday?  The Sweet Spot

1    and all of that?  You can't say, "Oh, yeah, here's what

2    I'm going to do.  I'm just going to make this decision

3    based on these couple of sentences buried in these

4    marketing documents from a two years ago, even though all

09:20:58  5    of these other things in the universe exist."

6                You can't do it.

7                A couple things, and then I'm wrapping it

8    up.  This point is on credibility.  Give me a second to

9    get organized.  Counsel for Hodell came in here yesterday

09:21:34 10   and said that Paul Killingsworth was a puppet on a

11   string.  And she repeated that over and over.  Right?

12               You saw Paul Killingsworth.  He's not a

13   puppet on a string.  But I want to talk about something.

14   The basis of the suggestion that Paul Killingsworth was a

09:21:53 15   puppet on a string was that he falsely testified that

16   dealers don't have the authority to make representations

17   on behalf of Business One.  Remember that?  If you up his

18   testimony, he testified at one point these dealers, they

19   don't have the authority to make representations on

09:22:14 20   behalf of SAP.

21               And Hodell thought, "Well, that's a lie and

22   this guy's just selling the SAP story" and her point was

23   that they later got him to back off of that.  And I want

24   to show you, take a look at 316, please.  It's right in

09:22:36 25   the agency paragraph.  Scroll down.  What is it, 4.1?  I

1    can't see it.  Hang on.  You got a copy of 316?

2              Okay.  I was right.  It's Section 4.1.

3    Blow it up, please.  Look at the second sentence.  "The

4    SAP reseller is an independent company, person, or entity

09:23:36  5    with no authority to bind SAP or to make representations

6    or warranties on behalf of SAP."

7              So this whole story that you were told

8    about this guy's a puppet on a string, he says -- he'll

9    say anything for SAP.  He even says, "dealers can't make

09:23:56 10    representations."  Paul was right.  Paul knows his job.

11    Paul knows how this works.  These people aren't our

12    agents.  They're not allowed to make representations that

13    bind SAP.

14              And he later said they are allowed to speak

09:24:15 15    about the product.  Of course, they are.  His point was

16    he knows his contract.  The whole point of trying to rip

17    him and calling this man a puppet on a string when

18    actually he actually knows his job and this case better

19    than you do.  Just takes that whole idea and just tears

09:24:31 20    it away.

21              And I'll show you another example very

22    quickly.  That next exhibit, Bob.  I think it's 437.  And

23    it's related, because this is Paul writing.  Okay?  We've

24    seen this exhibit repeatedly from Hodell.  Look at the

09:24:54 25    last two sentences, last two sentences.

1           Take the second-to-last sentence of the

2      third-party paragraph.  Hodell likes to repeat in this

3      case that Paul wrote in May of '07 that the

4      product -- no, no, the next sentence, please -- that the

09:25:11  5      product with the additions of In-Flight and Radio Beacon

6      is an outstanding business solution for you and your

7      company.

8           And this is back to, hey, you know, did we

9      keep secrets and were we reporting to them what was going

09:25:23  10      on, et cetera, et cetera.  One of the things they like to

11      say is not only did we not tell them what we thought, but

12      we lied to them in the early days and told them, "Oh,

13      Business One is awesome.  There are no issues with it."

14           And they refer to this sentence and it's

09:25:38  15      come up a couple times, and I want to just dispel this.

16      Okay?  Look at this sentence and look at the one after

17      it.  "Functionally, the product with the additions of

18      In-Flight and Radio Beacon is an outstanding business

19      solution for you and your company."

09:25:55  20           Business One is a great product, okay, but

21      even in March, '07, when they were having go-live

22      problems, there's no question that functionally Business

23      One was a totally solid product even for Hodell.

24           Functionality is just does it do the right

09:26:10  25      things?  Does it do all of the things that you want it to

1    do?  Hodell's never had a beef with functionality.

2    Hodell's beef has been with performance.  And that's the

3    point that Mr. Killingsworth makes in the next sentence.

4              "The issue we face today is solely the

5    performance problem we are experiencing with your

6    installation."

7              Yes.  Functionally, it's a solid product.

8    Hodell, you seem to be having some problems.  They cite

9    to this as oh, here's SAP lying again.  Here's SAP saying

10   right after the Udi Ziv e-mail that B1 is great, they're

11   feeding a different story to Hodell than they have

12   internally.  It's just not true.  Paul is making two very

13   honest and open statements.

14             Functionally, everything is fine.  We have

15   to deal with performance.  Which again, we did and it

16   improved.  They should have stuck with it.

17             So I'm wrapping up.  Counsel for Hodell,

18   they're going to get a last chance to speak.  That's how

19   this works.  They go, I go, then they go again.

20             Here's something that they cannot change,

21   and it's what I told you in the beginning.  There are no

22   SAP misrepresentations in this case.  Even when you

23   shrink it down to these three little things, in fact

24   especially when you shrink it down to these three things,

25   we have the whole history of this case has boiled down to

 1    those couple little things; there are no SAP

 2    representations.

 3                 If anybody -- and this is right from what I

 4    told you at the start of this argument yesterday -- if

09:27:52  5    anybody made a mistake, if anybody did something that

 6    they shouldn't have -- did something they shouldn't have

 7    or could have done something more but didn't, it was

 8    Hodell or their guys, Dale or Dan.  And Business One, at

 9    the end of the day, was a good product for them and it

09:28:10 10   improved and they should have stuck with it.

11                And they don't have any damages, and I

12    don't have any problem looking you right in the eye and

13    telling you when you get back in the jury room, this is

14    not hard.  It's not hard.  There was no fraud.  However

09:28:28 15   that verdict sheet is set up, you're going to indicate

16    that there was no fraud because we know there wasn't, and

17    no way in a million years is there clear and convincing

18    evidence of it.  Check the box.  We're done.  And we

19    could all go back to our lives.

09:28:42 20                Thank you very much.

21                THE COURT:  Thank you, Mr. Miller.

22                You may conclude the argument.

23                MS. LUARDE:  Well, I think

24    Mr. -- Mr. Miller and I can agree on one thing and one

09:29:14 25   thing only, and that is how much I appreciate you being

1    here for the past few weeks and listening to all this

2    testimony.

3              I can say other than that, we agree on

4    absolutely nothing.  There's a lot to address given the

09:29:59  5    last, I don't know, almost four hours of argument that

6    you've heard.  I promise to you I'm just going to hit the

7    highlights.  I promise to keep this as short as I can and

8    aisle ask my colleagues over here to cut me off if they

9    think I'm going too long.

09:30:14 10              The first thing I want to talk about is

11    this:  SAP has come in here, and Mr. Miller has said that

12    they had no idea about Hodell-Natco until 2004.  And

13    that's a lie.  And we know that's a lie because

14    Ms. Vitantonio got up on that stand and she told you she

09:30:34 15    met with Otto Reidl.  And in the fall of 2003, her

16    technical people took down information, took down

17    details, and they called SAP to help her size that

18    product.

19              And why did they do that?  Because this was

09:30:48 20    the first sale for her of Business One in the United

21    States.

22              The technical people at SAP knew all about

23    Hodell-Natco in the fall of 2003.  They knew the details

24    of the sale.

09:31:05 25              Mr. Miller was absolutely wrong when he

1    made that statement to you.  And I want to pull up her

2    testimony on that.

3              Kim has got that up for us.  Here we have

4    Ms. Vitantonio talking about the discovery meeting that

5    she had.  The questioning by my colleague.  "Do those

6    technical people then interface with people at SAP as

7    part of the discovery process to make sure, hey, this is

8    a customer that could be satisfied by Business One?"

9              Her answer, "Yes."  Clear, unequivocal,

10   "Answer:  Yes."

11             They told SAP all about Hodell-Natco in the

12   fall of 2003.

13             And I just want to be clear, did those

14   technical people then interface -- go to the next

15   page -- for sizing, sizing, to size it properly?  They

16   called SAP to size the product properly.

17             SAP knew about Hodell-Natco in the fall of

18   2003.  Mr. Miller is not being truthful.

19             If you could go to the next page, Kim.  Do

20   you have all of it?  Okay.

21             SAP knew about Hodell-Natco in 2003.  We

22   didn't sign the license agreement until 2005, two years

23   later.  They knew about Hodell-Natco, and in 2005, they

24   accepted and provided 120 user licenses to Hodell-Natco.

25             And guess what?  They knew.  At that point

3172

1  in time, they knew Business One would never, ever work

2  with 120 user licenses.  How do we know that?  Let me

3  show you.

4           In 2005, in September, 2005, this testing

5  was performed in Israel.  Israel, where Business One was

6  developed.  Udi Ziv, in charge of that development team,

7  they did this testing.  They knew before they accepted

8  payment for 120 licenses, they knew 30 was the highest.

9  That's what they knew.  Yet, they turn around and they

10  give us 120 licenses?

11           They buried their head in the sand, and

12  they did it because they wanted to make the sale.  That's

13  what this is all about.  They knew this.  They knew we

14  had too many items.  They knew this.  Penny Vitantonio

15  told them.  She told them in 2003 we had 150,000 SKUs.

16  They knew that.

17           They knew how many customers we had.

18  Ms. Vitantonio told them that in 2003.  Her testimony was

19  clear.  It was clear on that point.  And you know what?

20  Right now, she even works for SAP, but she was clear on

21  this.  She picked up the phone, her technical people

22  picked up the phone and called.

23           And my client believed and had every reason

24  to believe that Business One would work for them based on

25  the representations, the marketing literature, and based

1    on conversations with Penny Vitantonio.

2                    The Judge is going to instruct you on the

3    law, but I have to tell you, if you don't know the

4    parameters of what you're selling, and it's very clear

09:35:25 5   throughout everything we've seen in this case, if you

6    don't know what you're selling, and it turns out that you

7    mis-sold something because you didn't gather all the

8    information you needed in order to properly make the

9    sale, that's fraud.  And that's what happened here.

09:35:44 10                  Israel knew exactly what's going on.  The

11   United States, brand new to the market, they just wanted

12   to get out there, they wanted to make sales, they wanted

13   to get their commission.  That's what this is about.

14                   SAP knew the product would never work

09:36:02 15  before those license agreements were ever delivered.

16                   Now, we talked a bit about credibility

17   issues and, you know, Paul Killingsworth.  Paul

18   Killingsworth got up on that stand and initially said

19   "Hey, guess what?  Our channel partners aren't allowed to

09:36:26 20  make representations.  That's what our agreement says."

21                   SAP is great at hiding behind their

22   agreements.  They're hiding behind their agreement with

23   the developers.  They're hiding behind their license

24   agreement with the end users.  They rely solely -- the

09:36:42 25  testimony was they rely solely on channel partners to

1    make representations.

2              And Paul Killingsworth got up there and

3    said, "Oh, they're not allowed to make representations."

4    And he backed off that testimony.  You saw that yesterday

09:36:56 5    when we pulled that up.

6              He backed off that.  In fact, his early

7    testimony is, "All they were able to do is go to trade

8    shows and demonstrate the product."

9              You don't make any sales just by

09:37:09 10    demonstrating the product.  And Ms. Vitantonio, she

11    was -- she said, "Yeah, we had to make representations."

12    Geoff Ashley, "Yep, got to make representations."

13              But Paul Killingsworth?  Puppet.  He

14    changed his testimony up there on that stand.  He changed

09:37:27 15    his testimony.

16              I want to talk a little bit about Otto

17    Reidl, and Otto Reidl is an honest man.  And opposing

18    counsel has done their best to eviscerate his

19    credibility.  And one of the things they did is they took

09:37:50 20    this document from November, 2005 and they waved it in

21    front of you and said, "Hodell-Natco knew back in 2005,

22    based on this document, that Business One could not

23    support them.  Otto Reidl testified to that fact in his

24    deposition."

09:38:12 25              Kim, if you could pull up Exhibit Number 5.

3175

1    Here's the document we're talking about, and, Kim, go to

2    the bottom.  November 1st, 2005.  This is the only

3    document like this in the case, by the way.

4                    Down here at the bottom, you see the Bates

09:38:31  5    label, Kim?  Could you do the whole bottom, please?

6    HODL00494.  What that means, that's a document Hodell had

7    in its records that it produced in this case.

8                    During the course of the litigation, Otto

9    and his team had gone on the Internet to see what was

09:38:55 10    going on with Business One, and they found this document,

11    well after November 1st, 2005.  And how do we know it was

12    after November 1st, 2005?  Because the comments at the

13    bottom, you'll see the last postdate, November 27th,

14    2007.

09:39:18 15                    Otto Reidl could not have had that

16    document.  He could not have seen that document November,

17    2005, because of that comment on there that says

18    "November 27th, 2007."

19                    So what happened?  Otto gathered his

09:39:36 20    materials.  He looked at the materials because that's the

21    kind of person that he is.  He looks at what he's doing.

22    He pays attention to what he's doing.

23                    He gives these documents to counsel.  They

24    go to SAP.

09:39:49 25                    Fast forward to the deposition.

1          He's asked a question:  "Did you ever see

2     in 2005 anything about Business One?  You know, maybe I

3     did see something."

4          They pull this article out, and he was like

09:40:04 5     "Yes, I did see that then."

6          He went back and took a closer look at the

7     document and he realized, "I couldn't possibly have seen

8     it then."

9          And he came in here and he tried to clarify

09:40:15 10     his testimony on the stand, but Mr. Miller and Mr. Star

11     just want to beat him up over this document saying that

12     he saw this in November, 2005.  And there is no way, no

13     way he could have seen that in November, 2005.

14          But that's the kind of people we're dealing

09:40:31 15     with.  That's what SAP is about.  They manipulate their

16     documents.

17          And let's talk about another document that

18     they have manipulated.  Exhibit 700.

19          They have waved this up in this case and

09:40:47 20     they're saying look at how many users -- customers we

21     have with over 500 users.

22          And I remember very vividly the questioning

23     about L'Oreal.  L'Oreal, wow, they must have a lot of

24     product.  They must have a lot of different shades of

09:41:06 25     lipstick, a lot of different colors of blush.  They have

1    a huge inventory.  If this is one, you know, they're on

2    the list, they're using Business One.  Don't be fooled.

3    They're misleading you.  This document doesn't say

4    anything at all about the number of Business One ERP

09:41:26  5    installations at L'Oreal.  It doesn't.

6            They could be running dozens of separate

7    independent ERP systems that total up to this number of

8    users.  And make no mistake, SAP, this is from their

9    database.  They selected the fields they wanted to

09:41:48  10   include on this document.  They could have included a

11   field to show the number of ERP installations, but they

12   didn't.  Why?  Because it doesn't help them and they know

13   it.  They know that.  This document tells you absolutely

14   nothing.

09:42:05  15           In fact, I have to say if that document is

16   true and you can have 1600 people on one Business One

17   installation, one Business One ERP system, why was there

18   "stunned silence" on that April 17th call?  Why would

19   Dirk Boessmann say, "You're at the high end of the users

09:42:37  20   with 120"?  Does that make any sense to you?  It doesn't

21   to me.

22           They want it both ways.  There is no way

23   that list is accurate.  It's just not.

24           In fact, in addition to the "stunned

09:43:01  25   silence" phone call, why would Udi Ziv, the developer of

1    Business One, the guy who reports to the Board of

2    Directors, say it's beyond any sane B1 Sweet Spot, 120

3    users?  Why would he ever write that if that list is true

4    and can support 1600 users on one ERP system?  It's

09:43:34 5    because that list is a lie, and don't believe that.

6              In fact, during the life of this case,

7    we've seen e-mail after e-mail after e-mail where

8    Business One was mis-sold, multiple SAP employees wrote

9    that.  Multiple.  And multiple SAP employees have written

09:43:57 10   how the system didn't work at Hodell, and SAP is running

11   away from all of that.

12             And they want you to believe a whole new

13   story here, a whole new story about how Business One is

14   so great and can support this number of users.  Why?

09:44:12 15   Because the marketing literature that they put out, the

16   statements made by Penny Vitantonio to my client, were a

17   lie.  And they're trying to get out from under this case.

18             And I have to tell you the fact that SAP is

19   now claiming that the system worked is absolutely

09:44:40 20   stunning to me.  Absolutely stunning.  I want you to

21   think about this.  So you remember in October, you know,

22   Eddy Neveux did a test and he said it was nine seconds,

23   right?  Nine seconds was the lag time.  And I heard a lot

24   about well, you know, you go on to Amazon, you order a

09:45:00 25   book or a record or movie or whatever you're going to

1  order, you know, that's not very long.

2           Let's think about it in the business

3  context.  So pretend I'm at Hodell, phone rings, I pick

4  it up.  "Hello, Hodell-Natco.  Hey, Sharon, we need to

09:45:16  5  order some parts.  Okay, Mr. Miller, let me pull that up

6  on the system.  Let me find you on my computer.  Click,

7  one, two, three, four, five, six, seven, eight, nine.

8  Oh, there you are.  Okay.  Which address would you like

9  that shipped to?  Oh, I'd like it shipped to, you know,

09:45:46 10  the St. Louis address.  Okay.  Let me enter that.  Click,

11  one, two, three, four, five, six, seven, eight, nine.

12  Okay.  What would you like?  Oh, I'd like 50, 50 bolts.

13  Okay.  Click, one, two, three, four, five, six, seven,

14  eight, nine.  Okay.  Would you like something else?

09:46:23 15  Yeah, I think I need, you know, I need some chain, too.

16  Okay.  Click, one, two, three, four, five, six, seven,

17  eight, nine.  Would you like something else?  Yes, I

18  would.  I'd also like some fasteners.  Okay.  Click."

19           MR. MILLER:  Your Honor, I object.

09:46:53 20           MS. LUARDE:  On and on and on.

21           THE COURT:  Objection sustained.

22           MR. MILLER:  There's no testimony --

23           THE COURT:  Objection sustained.

24           MR. MILLER:  Thank you.

09:47:00 25           MS. LUARDE:  Actually, Joe Vislocky

1    testified every time you had to go to a dropdown, that

2    there was lag time.  And that's what I was describing was

3    the amount of lag time every single time they had to move

4    through their system and go through a dropdown.

09:47:15  5                    MR. MILLER:  Objection.  Same objection,

6    Your Honor.

7                    THE COURT:  Objection sustained.

8                    MR. MILLER:  That's not the testimony.

9                    MS. LUARDE:  That was the testimony.

09:47:19 10                    THE COURT:  Excuse me.  I don't want you

11   two arguing.

12                    You remember what the evidence was.

13                    MR. MILLER:  Thank you, Your Honor.

14                    MS. LUARDE:  In fact, Jaime Clarke

09:47:31 15   testified, Joe Vislocky testified about all of the

16   problems with Business One.

17                    You recall Jaime Clarke talking about the

18   hour glass circling?  How that hourglass continued to

19   circle?

09:47:52 20                    You heard Joe Vislocky talk about problems

21   with the dropdown situation.  That's all evidence in the

22   record.

23                    You heard Kevin Reidl talk about problems

24   with the system.  I mean, there were serious performance

09:48:04 25   issues at the company.

1          What does SAP do?  SAP is blaming In-Flight

2     and Radio Beacon for the problems, in particular

3     In-Flight.  And who do they rely on for that?  They rely

4     on Joe Guagenti.  Joe Guagenti came in here and he got on

5     the stand, and he testified on direct, and it wasn't

6     until cross-examination that you actually learned that

7     Joe Guagenti is still in a working relationship with SAP.

8          SAP paid for him to come in here, paid for

9     him to testify.  And during the course of his testimony,

10    he admitted on the stand that in an e-mail to Eddy Neveux

11    that he was not being honest to Eddy Neveux.  He admitted

12    on the stand that he was lying in an e-mail to Eddy

13    Neveux.

14          He also admitted that he went to

15    Hodell-Natco, he sat there, he knew there were all these

16    problems with In-Flight, but he never told anyone at

17    Hodell-Natco.  He's not believable.  He's not

18    trustworthy.

19          Who is trustworthy?  Helmuth Guembel.  You

20    know, Joe Guagenti wants to say it was all In-Flight; it

21    wasn't Business One.  I'm here to tell you Helmuth

22    Guembel, the man who has turned down SAP and said, "I

23    can't work for you right now because I'm working on this

24    case with Hodell-Natco and there is a conflict," the man

25    who has worked for years with SAP, the man who was paid

1    close to a million dollars for consulting with SAP, he

2    came in here and he was unequivocal that the problem

3    Hodell experienced was with Business One performance.

4    Business One was the problem.  And he went through all of

09:50:04 5    his testimony about the architecture, the DI API, the 32

6    byte versus 64 byte.  That's the person to believe.

7    And look at Helmuth's credentials compared

8    to Joe Guagenti.  Based on that alone, who really knows

9    what they're talking about?  Helmuth Guembel, the man

09:50:25 10   with all this experience on ERP systems?  Yeah, he's the

11   guy.  He's the person to believe; not Joe Guagenti, the

12   guy who lied to Eddy Neveux.

13   One thing that also is really interesting

14   about that is that, you know, we've talked a lot about

09:50:45 15   the testing, and in the almost four hours of closing

16   argument, Mr. Miller didn't say a single word about the

17   IBM study.  The IBM study that they relied on to support

18   their position, they ran away from it after Helmuth

19   Guembel testified that by performing that mathematical

09:51:09 20   calculation, the number of concurrent users Business One

21   could support was 58.

22   They didn't say a single word about that

23   after -- that document disappeared.  It was gone.  Not a

24   single word after that.  And in closing, almost four

09:51:27 25   hours of closing, not a word because Helmuth is right.

1    That document, when you do the math, it's 58.  And that

2    proves what they're saying in their marketing literature

3    is a lie.

4              What Penny Vitantonio told my client that

09:51:49  5    it could support -- she was going to sell a hundred

6    licenses -- it's a lie.  And SAP knew it.  They knew it

7    from their own internal testing.  They knew this.

8              You know, it's interesting, Mr. Miller says

9    that we don't have a case.  "Oh, the case has shrunk," we

09:52:20 10   don't have a case.  I submit to you after seven years, my

11   client has pursued this case to be here today for seven

12   years, and if Judge Nugent believed we didn't have a

13   case, we wouldn't be standing here in front of you.

14             We have a case, and we have a good case

09:52:37 15  because SAP, in their marketing literature and through

16   Ms. Vitantonio, told my client that Business One will

17   work for them.

18             And it was a lie.

19             And SAP Israel with the testing and the

09:52:53 20  information they had, they knew it was -- they knew it

21   was a lie.  They rushed to market in the United States.

22   They were making sales.  They were selling anything they

23   possibly could with utter disregard for who was buying

24   the product.

09:53:08 25             I want to talk -- mention one more thing

1    about this April 17th phone call where SAP claims that

2    they were straight with Hodell, that they told them, you

3    know, Business One -- I'm not sure now what they're

4    claiming they told them.  I thought it was that Business

09:53:47  5    One wasn't going to work, but I'm not sure at this point

6    what they claim they're actually telling them.

7              But here's my point.  If they were straight

8    with Hodell on that call, why would Dirk Boessmann write

9    an e-mail later?  Dirk Boessmann, who was the guy on the

09:54:03  10    phone, the guy doing the talking for SAP, why would he

11    later send an e-mail saying "It's now time to be honest

12    with the customer"?

13              If Dirk Boessmann thought they were honest

14    on that April 17th call, why would he later send that

09:54:16  15    e-mail?  It doesn't make any sense.  And, in fact, why

16    would Kevin Reidl -- and if you could pull up Exhibit

17    84.2, Kim -- and this is an e-mail to Dan Lowery.

18              He said, "We never heard back from you or

19    SAP regarding the large number of users we have in SAP

09:54:52  20    Business One and whether that could be a factor in the

21    performance problems we're experiencing.  In the

22    conference call we had last week, we were to hear back on

23    this."

24              He goes on, "What exactly is the range in

09:55:05  25    number of users that Business One is designed for?  We

1    were told up to 500 users when we bought the package, but

2    we heard in the conference call that we were pushing the

3    high end of the package with approximately 115 users

4    currently."

09:55:19  5         If he had told the truth on that call, why

6    would he be sending that e-mail?  Why would Dirk

7    Boessmann later write, "It's now time to be honest with

8    the customer"?  It's because that information was never

9    conveyed on that call, and it wasn't conveyed until

09:55:34  10   November of that year.

11        I want to talk for a minute about the

12   instructions you're going to receive on fraud, and I'm

13   grabbing my notes because I want to make sure I get this

14   right.  The Judge has prepared these instructions and

09:56:09  15   he's read them to you on specific elements of fraud, and

16   I want to tell you how we've satisfied every one of these

17   elements.

18        The first thing we need to show is a false

19   representation.  And what we have are a couple of

09:56:55  20   Exhibits 314, 617, and we have Ms. Vitantonio.

21        I want to look at the documents first.  You

22   can go back and I'm sure you're going to look at these

23   materials, but I want to point out a few things to you.

24        First of all, they want to say, SAP wants

09:57:12  25   to say this is all puffery.  All nonsense.  It's like

3186

1    saying we have the world's best pizza.  I think that was

2    the analogy that was given.

3              This is nothing like saying we're the

4    world's best pizza.  In this marketing literature and in

09:57:31  5    these documents and in the comments made by

6    Ms. Vitantonio, they were very, very clear about the

7    number of users, and they were also very clear about a

8    lot of different things, but it's not just the number of

9    users.  The instructions actually say we relied on the

09:57:48  10    entire content of these documents, but in particular the

11    user count.

12              MR. MILLER:  Objection, Your Honor.

13              THE COURT:  Overruled.

14              MR. MILLER:  The word user count is out --

09:57:55  15              THE COURT:  Excuse me.  Excuse me.  The

16    jury will remember the evidence and look at the

17    documents.

18              MS. LUARDE:  This is an SAP AG publication,

19    and, in fact, it says, "The solution helps emerging

09:58:11  20    businesses from those with 10 to several hundred

21    employees to streamline their operational and managerial

22    processes."

23              I submit to you even if it says 10 to

24    several hundred employees, that's a false statement

09:58:25  25    because Hodell-Natco fit within that parameter, and

1     Business One did not work.

2            But the reality is, there's no other

3     comment in this document about users.  And it's

4     reasonable to assume, if you're looking at purchasing

09:58:42 5    software, when you read a statement like that, that it

6     means users.

7            There's also information in here

8     about -- very specific statements, very specific things

9     about the benefits that you receive.  This isn't just

09:58:59 10   marketing literature.  This isn't just saying, "We have

11    the world's best pizza."  This is very specific.  It has

12    very detailed points in here about comprehensive

13    financial expertise, management control, intuitive user

14    interfaces, enhanced productivity and control,

09:59:19 15   unparalleled ease of use, new opportunities for success,

16    global reach, unmatched expertise.

17            This isn't "This is the world's greatest

18    pizza."

19            The next document, the SAP solution brief,

09:59:36 20   the same thing.  "Whether you have five employees or 500,

21    the solution helps emerging businesses streamline their

22    operational and managerial processes."

23            This is very specific about the number of

24    employees, which we took to mean the number of users.

09:59:53 25   But again, even if it's the number of employees, it

3188

1    doesn't work.  It's a lie.  This document, again, very

2    specific.  "Operational support, intuitive user

3    interface, scalability for dynamic businesses.  Supported

4    by SAP's global resources."

10:00:15  5              All of these documents were prepared by SAP

6    AG and distributed by SAP America.

7              We also have Ms. Vitantonio, and the AmEx

8    materials.  It's the same thing.  Very detailed

9    information about the product.  It talks about support,

10:00:43 10    easy solutions, financing program.  You put financing

11    information in marketing materials.  New solutions for

12    small and midsize businesses.  Importantly here, "The SAP

13    Business One Solution effectively supports companies with

14    as few as 10 and as many as several hundred employees."

10:01:09 15              Again, you know what?  We didn't just rely

16    on this information.  We had meetings and calls with

17    Ms. Vitantonio, and Ms. Vitantonio admitted in her

18    testimony that she discussed scalability with Otto Reidl.

19              And we've heard Mr. Miller say there's not

10:01:32 20    a single written note saying the number of users, but

21    guess what?  We have written notes from Otto Reidl in a

22    meeting with Ms. Vitantonio where scalability was

23    discussed.

24              And Kim, if you could put that up.  827.

10:01:59 25              December 19th, 2003.  Don't blow that up

1    yet.  Penny Vitantonio, telephone call.  Down here, could

2    you highlight that, please?

3              "Scalability."  We know what that meant to

4    Otto Reidl.  He was very clear that SAP Business One had

5    to be able to accommodate Hodell-Natco's growth.  It had

6    to scale to their growth.  And Hodell-Natco, for the last

7    13 years, grew through acquisition and added users.

8              And Otto Reidl, in his notes, in his

9    handwriting, states "I discussed scalability with Penny

10   Vitantonio on December 19th, 2003."

11             She admitted it.  And yet, despite that

12   conversation, knowing that it is scalability, scalability

13   was important, a proposal was submitted by AmEx to

14   Hodell-Natco, and that's because everyone was on board.

15   Otto Reidl and Hodell-Natco believed the system would

16   work.  Penny Vitantonio, after discussing the needs with

17   SAP, believed it would work.  Scalability was discussed.

18             Mr. Miller, that wasn't true.

19             So these are the false representations that

20   were made.  It was represented to my client in marketing

21   literature, in that literature that I just showed you.

22   That's very specific.  It's not puffery.  It's not "The

23   world's greatest pizza."  It's very specific on details

24   as to what Business One can do.

25             They also discussed this with

1    Ms. Vitantonio, who took that information back to SAP,

2    and SAP said it would work.  And we have these notes from

3    Otto Reidl where he discussed scalability.

4              There were false representations made in

10:04:33  5    this case that led my client into entering an agreement

6    to purchase Business One.

7              The next element is was this material to

8    the transaction at hand?  Absolutely.  I don't think

9    anyone can really dispute the criticality of scalability

10:05:01 10    for Hodell-Natco.  That was key for them.  That testimony

11    hasn't even been disputed.  That was key for

12    Hodell-Natco.  They had to have a system that could

13    accommodate their growth.  It was material to their

14    decision-making.

10:05:14 15              Intent.  Intent can be inferred from all

16    the surrounding circumstances.  And I want to submit to

17    you that again, there's documentation, and you'll have

18    all these documents with you, but Business One, this sale

19    to Hodell-Natco, was a big deal.  It was a big deal for

10:05:40 20    SAP.  It was, I think the notes were by Geoff Ashley,

21    where "This was the largest sale in Business One

22    history."

23              We also know that SAP wanted to get into

24    the vertical market industry; that they wanted to have

10:05:59 25    this add-on developed so they could go out and sell to

1    other companies like Hodell.

2              This was important for their sales team.

3    Hodell-Natco was a big deal for their sales team.  They

4    wanted this sale.

10:06:18  5    SAP says, "You know what?  If we wanted to

6    quit Hodell, why didn't we just sell them a bigger

7    product, a more expensive product?  Why didn't we just

8    put them in A1?"  They knew Hodell-Natco would not go

9    forward with an A1.  They didn't have the budget for it.

10:06:42 10              So they needed to sell Business One.

11             Justifiable reliance.  That's the next

12   component.  Yeah, we had Penny Vitantonio saying, "This

13   is going to work for you."  And she gave them a proposal

14   because she was told by SAP this is going to work for

10:07:08 15   them.  That's what happened.

16             We're allowed to rely -- aren't we allowed

17   to rely on their channel partners?  Because SAP doesn't

18   sell directly.  There's no one else to rely on.  And AmEx

19   was a Business One channel partner.  We're allowed to

10:07:26 20   rely on the statements that they made.

21             And she said this is going to work, and she

22   gave them a proposal.

23             We're also allowed to rely on these

24   detailed documents they provided.  I mean, if we're not

10:07:38 25   allowed to rely on them, why are they sending them out?

1    Again, detailed statements about the benefits of Business

2    One.  It's not "The world's greatest pizza."  These are

3    detailed documents.

4                    Injury.  Yeah, Business One, the base

10:08:02  5    product, was the problem.  Helmuth Guembel was clear on

6    that front.  They want to say it was the infrastructure,

7    that the hardware was bad.  And you heard Joe Vislocky on

8    the stand.  Joe Vislocky came in and testified, "I didn't

9    see any of that silver slinky stuff.  I didn't see any of

10:08:24 10    that."

11                   SAP's counsel tried to beat him up saying,

12    "Well, you went in and you upgraded things.  Yeah, I did.

13    I mean, that's what you do.  I mean, you're constantly

14    upgrading, you know, servers.  You're upgrading things."

10:08:39 15                   But here's what he also said.  "It did not

16    change the performance of the system."  It didn't.  That

17    was his testimony.  That's what he said.

18                   As for In-Flight being the cause, well,

19    again, you know, Joe Guagenti, Helmuth Guembel,

10:09:04 20    (indicating).  I think Helmuth wins.  It wasn't

21    In-Flight.  It was core B1 product.

22                   And even if In-Flight contributed to the

23    slowness, In-Flight was an add-on built on top of the B1

24    product.  And you heard Helmuth testify that, you know,

10:09:29 25    it's an add-on, it sits on top of it, but the core

1    problem was Business One.  And even if --

2                    MR. STAR:  Objection, Your Honor.

3                    That was not Mr. Guembel's testimony.

4                    THE COURT:  Again, the jury is going to

10:09:39  5    have to remember their testimony.  I told you what the

6    lawyers say isn't evidence.

7                    MS. LUARDE:  Well, again, I think I'm

8    disagreeing with opposing counsel.

9                    In-Flight.  Even if you decide In-Flight

10:09:57 10   added to the problem, there's no dispute that Helmuth

11   Guembel said Business One was the problem.  That's what

12   Helmuth Guembel said.  That was his testimony.

13                   And, in fact, Udi Ziv, in his e-mail

14   correspondence, when he said, "Way above any sane B1

10:10:34 15   Sweet Spot," he didn't say anything about In-Flight

16   add-on.  He said it was a problem with B1.

17                   Testing.  Udi Ziv.  Udi Ziv knew.  This

18   whole time, Udi Ziv, the development team, they knew.

19                   I want to talk just for one quick minute

10:11:01 20   about damages, and I'm not going to belabor the point.

21   SAP has come in here with all these charts about gross

22   profit and gross sales per employee.

23                   MR. MILLER:  Objection.

24                   MS. LUARDE:  And here we have gross annual

10:11:28 25   sales, gross sales.  I would love to bring home my gross

3194

1    pay.  I'm sure you would, too.  But that's not the true

2    metric of profitability.  It just isn't.

3              And they can multiply and divide gross

4    numbers all the they want, but they're still gross

10:11:51  5    numbers.  That's not the true measure of profitability.

6    It just isn't.  It's smoke and mirrors.  That's what this

7    is.  It's smoke and mirrors.

8              As for productivity, and our productivity

9    numbers, all you have to do is look at this and you can

10:12:35 10    see the number of pounds that shipped dropped.  We were

11    less productive using Business One.  And again, I go back

12    to the analogy yesterday.  You know, the big old house

13    with the big yard, and you have a lot of people who need

14    to get that lawn cut, and if there's a problem with the

10:13:02 15    lawnmower, it's going to take an awful lot longer, and

16    it's going to take more people during that same period of

17    time to get the job done.

18              And SAP wants to beat us up over not

19    producing a payroll record for a specific employee?  This

10:13:21 20    is one that had an impact on the entire company, everyone

21    from Otto and Kevin down to the person in the warehouse.

22    It wasn't just about one employee not being able to do

23    their job.  It was about the entire company being ground

24    to a standstill because Business One did not work.

10:13:38 25              That's the issue.  Don't be fooled by, "Oh,

1    I have to point to a specific person."  All you have to

2    do is look at this chart again, and these numbers are not

3    made up.  These are real numbers.

4                In 2004, we shipped 21,532,000 pounds.

10:14:00  5    That's the closest year to 2007.  21,103,000.  And when

6    you compare that to the number of employees -- 2004, the

7    number of employees on FACTS, 160; 2007, 186 -- you can

8    see it took more people to ship the same amount of

9    product.

10:14:45 10                I just want to wrap up really quickly and

11    say, you know, you heard all the testimony in this -- in

12    this case, and it's very clear that SAP knew about

13    Hodell-Natco through Penny Vitantonio back in 2003.  They

14    knew the parameters.  SAP wanted to make this sale, and

10:15:23 15    after -- despite this testing that was done before the

16    sale of the licenses in 2005, SAP took an order for 120

17    users, despite knowing it wouldn't work.

18                SAP buried its head in the sand and allowed

19    this sale to go forward.  And SAP is coming in here and

10:15:44 20    hiding behind their contracts and saying they don't have

21    any obligation, they don't have any responsibility.  Yes,

22    they do.  They lied to my client.  My client relied on

23    that to great expense, great cost.

24                And now they're saying to give us nothing.

10:16:09 25    The reality is SAP committed fraud, and my client is

1    entitled to the damages that we discussed yesterday.

2                    And I just want you to go back and use your

3    common sense on this.

4                    Thank you.

5    10:16:27         THE COURT:  Thank you, Ms. Luarde.

6                    Could you remove those, whoever is

7    responsible for the demonstratives?  Thank you.

8                    Okay, folks.  Now, remember what I said to

9    you yesterday, right, as to the instructions that I gave.

10   10:17:00 I'm going to give some final instructions now, and then

11   the case will be in your hands for your consideration.

12                   Now, the verdict in this case must

13   represent the considered judgment of each member of the

14   jury.  In order to return a verdict or to answer the

15   10:17:18 interrogatory, if you get there, each juror has to agree.

16   That means that your verdict or your verdicts or your

17   answer to the interrogatory must be unanimous.

18                   Now, it's your duty as jurors to consult

19   with one another during your deliberations and to

20   10:17:35 deliberate with a view to reaching an agreement, if you

21   can do so without doing violence to your individual

22   conscience and good judgment.

23                   You must each decide the case for yourself,

24   but do that only after a fair and impartial consideration

25   10:17:50 of the evidence with your fellow jurors.

1          Now, in the course of your deliberations,

2    do not hesitate to reexamine your own views, if you're

3    convinced that you may have been wrong.  But do not

4    surrender your honest conviction as to the weight or

10:18:06  5    effect of any evidence solely because of the opinion of a

6    fellow juror or for the mere purpose of returning a

7    verdict.

8          Remember that each one of you is equal in

9    the jury room, and each one of you should be given an

10:18:19 10    equal opportunity to present your views as to what you

11    think the state of the evidence is, and then each one

12    should consider the views of your fellow jurors as well.

13          Remember at all times that you are not

14    partisans.  You are Judges; Judges of the facts as

10:18:35 15    presented by the evidence in this case.

16          And so your sole interest should be to seek

17    the truth based on the evidence that was presented during

18    the course of this trial.

19          Now, for your convenience and in order to

10:18:46 20    assist you in reaching a proper verdict, I'm submitting

21    to you one interrogatory and two verdict forms.  I'm

22    going to display them to you at this point, and I think

23    if I just show them to you, they will be

24    self-explanatory.

10:18:59 25          Now, I have a verdict.  The form is just

1    like it is.  You'll see it when you go back, but it

2    says -- has the caption here, says "We, the jury, being

3    duly impaneled and sworn, find by clear and convincing

4    evidence in favor of" and then I have a blank space here,

10:19:16  5    and I say next to it "Insert in ink, either Plaintiff or

6    SAP AG, on Plaintiff's claim of fraud in the inducement."

7             You see nine signature bars, and here under

8    the first signature bar I have foreperson and

9    that's -- your foreperson will sign on that signature

10:19:33  10    bar, and the other eight remaining concurring jurors will

11    sign in whatever order you want.

12             And then down at the bottom it says

13    "Dated," of course, the date you sign this document will

14    be inserted there.

10:19:44  15             Below that I have a sentence that says, "If

16    you find in favor of the Plaintiff, answer the

17    interrogatory."  And again that will make sense when we

18    get there.

19             Now, the second verdict form, I have,

10:19:56  20    "Verdict as to SAP America," same caption, same thing.

21             It says, "We, the jury, being duly

22    impaneled and sworn, find by clear and convincing

23    evidence," blank space, "insert either Plaintiff or SAP

24    America on Plaintiff's claim of fraud in the inducement."

10:20:12  25             Again, the nine signature bars with the

1       foreperson under the first one, dated at the bottom.

2       Same sentence that says, "If you find in favor of the

3       Plaintiff, answer the interrogatory."  Obviously if you

4       find in favor of the Defendant on both, then you don't

10:20:26  5     have to answer the interrogatory, and this will be

6       self-explanatory.

7                    Here's the interrogatory.  "If you found in

8       favor of the Plaintiff on its claim of fraud in the

9       inducement against either Defendant, what damages has the

10:20:41 10    Plaintiff proven by a preponderance of the evidence?"

11      And then you'll see I have a blank space here and then I

12      have next to it in parentheses, "Insert in ink an amount

13      from zero dollars to whatever you think the evidence

14      requires."  Same format, nine signature bars, foreperson

10:20:58 15    signs on the first line and then the other eight

16      concurring jurors sign in whatever order you want.

17                   One kind of comment about that, and that is

18      that sometimes jurors will get confused.  The foreperson

19      signs on the first line.  It doesn't make any difference

10:21:14 20    what order you sign, the rest of you sign, so you don't

21      all have to sign in the same order after that.  I kind of

22      make a point of that because we did that one time and the

23      poor jurors were back there going crazy.  They kept on

24      asking for different verdict forms because they didn't do

10:21:28 25    it all the same, and we must have had 15 verdict forms in

1    that case.  So now I'm kind of clear about that; you can

2    sign in whatever order that you want.

3                Now, it is proper to add the caution that

4    nothing that I have said in these instructions and

5    nothing in any form of interrogatory or verdict form

6    prepared for your convenience is meant to suggest or

7    convey in any way or manner any intimation as to what

8    verdict I think you should find.

9                What the verdict shall be is the sole and

10   exclusive duty and responsibility of the jury.

11                Remember what I told you earlier.  The

12   Court has no opinion whatsoever, even despite what the

13   lawyers said during their arguments, on the obligations

14   and the duties which it is your responsibility to

15   determine, which is whether the Plaintiff has proven

16   either one of their claims by clear and convincing

17   evidence; and if they have, whether they have proved any

18   damages by a preponderance of the evidence.  The Court

19   has no opinion whatsoever on those issues on which it is

20   your duty to determine.

21                Now, upon your retirement, you should

22   proceed to select one of your members as foreperson.

23                Now, the foreperson has no greater

24   authority, nor any greater responsibility, than any other

25   member of the jury, except the Court charges the

1      foreperson with the responsibility:  One, of making sure

2      the verdict forms and interrogatory, if you get there,

3      are signed and dated according to the instructions; and,

4      two, in the event that you wish to make any communication

10:22:57   5      to the Court, that your note is signed by your foreperson

6      and dated.

7             So I'll say that again.  And you probably

8      will do this because we may have smokers that want to go

9      out or you may want to go to lunch, so if you communicate

10:23:12  10      with the Court, the note has to be written, could be

11      written by anybody, but it has to be signed and dated by

12      your foreperson.

13             Other than that -- well, and of course, the

14      foreperson, sure, is also charged with the responsibility

10:23:24  15      of confining the discussions in the jury room to the

16      evidence and the law in this case, which makes perfect

17      sense.

18             Otherwise, the foreperson has no greater

19      authority, nor any greater responsibility than any other

10:23:36  20      member of the jury.

21             And as a comment, don't go back and argue

22      for three hours saying nobody wants to be the foreperson

23      because you don't want, like on Law & Order, to walk out

24      and read the verdict because when the verdict is returned

10:23:49  25      here in open court, I will read all the verdicts.  Okay?

1    So you don't have to worry about that.

2              Now, regardless of any opinion you may have

3    as to what the law is or what the law ought to be,

4    remember that it would be a violation of your sworn duty

10:24:04  5    to base a verdict on any view of the law other than what

6    I have given in these instructions, just as it would also

7    be a violation of your sworn duty as Judges of the facts

8    in this case to base a verdict upon anything other than

9    the evidence that was presented during the course of this

10:24:22 10    trial.

11              Now, I do hope that these instructions have

12    been sufficiently clear to enable each one of you to

13    perform your duties.  If you have a question about these

14    instructions, it should be discussed first in the privacy

10:24:34 15    of your jury room.  If you come to a disagreement as to

16    the meaning of an instruction, it may be possible, under

17    certain circumstances, to review those matters by a

18    request to the Court.

19              So if you desire to address any

10:24:47 20    communication to the Court, as I've said, you must reduce

21    your communication to writing, have it signed and dated

22    by your foreperson, and then you can contact the Court by

23    using the push button in the jury room.  And I will

24    endeavor to answer your question.

10:25:01 25              And after you have reached a verdict,

1    you'll contact us by using the push button.  You'll be

2    brought back here in open court and I will read the

3    verdict.

4              Now, after your verdict is returned and you

5    are discharged as jurors, at that time, you'll be free

6    from the admonition I've been giving you about disclosing

7    or discussing the case.  Whether or not you do discuss

8    the case is certainly up to the individual juror because

9    your verdict obviously speaks loudly and clearly to what

10   you think the state of the evidence to have been.

11             Now, I would say this, too, that one more

12   caveat on this from what we see on television.  We have a

13   Court rule, and I say this in every case because it's

14   true, we have a Court rule that says that nobody, that

15   means nobody, shall have any contact with any member of

16   any jury unless the Trial Judge gives his or her

17   permission.

18             And I don't give that permission.

19             So you can commence your deliberations,

20   secure in the knowledge that no one will have any contact

21   with any member of the jury about any aspect of your jury

22   service whatsoever.

23             I need to emphasize that because a lot of

24   times I find from people watching the TV shows or

25   actually seeing on the news in different states and

1    different places, people talking to jurors and say how

2    does that happen.  I don't know.  But in Federal Court,

3    it doesn't happen.  Okay?  Just so you know that.

4                    Now, are there any objections,

10:26:31  5    modifications, additions or deletions that have not

6    already been raised by the Plaintiff?

7                    MS. LUARDE:  No, Your Honor.

8                    THE COURT:  By the Defendant?

9                    MR. STAR:  We have a couple of points to

10:26:40 10    address, Your Honor.

11                    MR. MILLER:  Can we approach?

12                    THE COURT:  I should have known, right?

13                    (Side-bar conference had off the record)

14                    THE COURT:  You know, good thing we have

10:28:54 15    these opportunities because I did make an error in the

16    verdict form because in this case, I'm going to change

17    the verdict form so you'll get them back in a minute.

18                    The verdict form is going to state in

19    essence we, the jury, in this case being duly impaneled

10:29:10 20    and sworn, find by clear and convincing evidence in favor

21    of the Plaintiff on Plaintiff's claim, either they prove

22    it or they don't.  I'll figure it out.  Because the

23    Defendant doesn't have to prove anything.  Okay?  The

24    Plaintiff has to prove their case.  The Defendant doesn't

10:29:30 25    have to prove anything.  And they pointed that out and

1    it's true.

2                    So that's why I said this.  So I'll figure

3    out the right way to word the verdict form because I told

4    you the burden of proof is on the Plaintiff.  The

10:29:44 5    Defendant doesn't have to prove anything.

6                    Okay.  I'll take care of that and then

7    we'll get it back to you.

8                    Now, the last thing I want to say is that

9    the lawyers are going to get all the exhibits together

10:29:59 10   and we'll send those back to you in a minute or two.

11                   First order of business is to elect your

12   foreperson.  The other thing is it's 10:30 in the morning

13   on Thursday.  And I say this in every case, too, so I'm

14   not singling out you in this case to say it.  You take

10:30:21 15   whatever time in your deliberations that you think the

16   evidence and the law requires.  I've had cases that

17   lasted for a day, and the jury deliberated for a week.

18   I've had cases that lasted for two months, and the jury

19   deliberated for five minutes.

10:30:39 20                   So there's no set amount of time that any

21   jury should deliberate on any case.  It's solely up to

22   you to decide what amount of time you think the evidence

23   and law requires you to deliberate.  So don't be bound by

24   any internal time constraints that you think there are.

10:31:01 25   All right?

1          The second thing is you've been very, very

2     prompt and cooperative with us.  And believe me,

3     everybody appreciates that, but the time, your

4     deliberation time is yours now.  And that means that you

10:31:17  5     may deliberate when all nine of you are together in the

6     confines of the jury room.

7          When there's a break for a smoke or you

8     break for lunch or something like that and there are some

9     people in the jury room and some people not, you can't

10:31:27 10     talk about the case.  You may talk about the case only

11     when all nine of you are together in the jury room.

12          If you want to take a break, you contact us

13     by writing a note.  If you want to go to lunch, you can

14     write a note and tell me what time you want to go and

10:31:43 15     when you want to come back, and we'll let you obviously

16     go and then we'll have you back on L-1 whenever you say

17     you want to come back.  All right?

18          If you go to the end of the day and you

19     have not reached a decision, certainly you're permitted

10:31:59 20     to go home.  I think the building is closed tomorrow, to

21     be honest with you, so -- I know.  Believe it or not, I

22     do have the power to open the building, and that would be

23     a decision for you, all right, to make, or you can come

24     back on Monday if that's what you think, or we can work

10:32:21 25     late.

1          Now, Jeanie is not here.  She's on

2     vacation, but she cringes when I say this, but we've

3     actually had juries here up to midnight.  If you want to

4     stay afterwards, you can do that, too.

10:32:34  5          What I'm telling you with all these things

6     is you decide the course of your deliberations, and we

7     will follow whatever you say you want to do.  I want to

8     make all that clear.

9          And so with that, I'll get -- oh, you'll

10:32:46 10    have a copy of the exhibits to go back with you.  I will

11    straighten out my mistake on the verdict forms and get

12    that back to you.

13          We will have the ladies bring in -- maybe

14    the General may carry some of the exhibits back to you,

10:33:01 15    but you may deliberate then only when all nine of you are

16    together in the confines of your jury room.

17          Okay?  You'll have a copy of the

18    instructions as well, so if you want to refer to that,

19    you'll have that.

10:33:14 20          I used to tell people at the beginning, you

21    know -- I saw you go, whew.  And I used to say at the

22    beginning, and then I found that I lost you during it if

23    you know you're going to get a copy of it, so I wait

24    until the end to spring that on you.

10:33:29 25          Think about this.  I'm an old Judge, so

1    when I was a young lawyer and the Judges used to read

2    these charges, I mean, they had papers all over the

3    place.  It wasn't done like this in a book that you give

4    to the jury.  I often wondered how in the world does the

10:33:43 5    jury ever know what the Judge said?  And in those days,

6    half the time they didn't.  But now you do.

7              You will have a copy of this with you.  If

8    you want to review it, you're certainly welcome to do it.

9              And the one last comment, good luck.

10:33:59 10          (Jury out)

11             MR. STAR:  Mr. Reidl finally broke out for

12   us, after he jumped and jived around, saying there were

13   27 extra people, and then they came back and said, "No,

14   really look at the sales and administrative expense

10:35:16 15  line."

16             Here's what Mr. Reidl ended up saying when

17   I asked him just the other day on June 30th.  You can

18   find this at Pages 2792 through 93.  He's explaining the

19   sales and admin line item, and then below that line are

10:35:32 20  corporate and other corporate charges that include bad

21   debt, advertising, computer maintenance expenses and

22   expenses related thereto.  Travel, telephone and

23   telegraph, the independent rep commissions, our auditor

24   expenses, other professional fees and legal expenses.

10:35:51 25            I asked him:  "So like your legal fees in

1    this case?"

2                    His answer:  "Pardon?"

3                    I asked him again:  "Like legal fees that

4    you have for your lawyers?

5                    "Answer:  You bet."

6                    That was his testimony.

7                    THE COURT:  Okay.  Well, didn't I give an

8    instruction saying that they can't consider legal fees?

9                    MS. LUARDE:  Right.

10                   MR. STAR:  Precisely my point.  Precisely

11   my point.

12                   They've been given this huge line item

13   entry without a breakdown at all of what's in there,

14   right?

15                   This is all they've been told, and we find

16   out just on June 30th that among the things that are

17   within the costs that they're asking this jury to award

18   them are their legal fees for their lawyers in this case.

19                   That was his testimony.

20                   MS. LUARDE:  Your Honor, if I could.

21                   THE COURT:  Guys, you don't have to do

22   anything.  It's a little late to shoot that bullet.

23                   MR. MILLER:  Can we go to the verdict

24   sheet?  Because they're deliberating now, right, so we

25   literally -- my sense is we ought to focus on what

```
 1   exactly this is going to say and get it in their hands.

 2                   THE COURT:  Yeah.

 3                   MR. MILLER:  Can I make a suggestion?

 4                   THE COURT:  You may.

 5                   MR. MILLER:  Okay.  Simple question:  "Do

 6   you find by clear and convincing evidence in favor of

 7   Plaintiff on Plaintiff's claim of fraud in the

 8   inducement?"  It just takes out --

 9                   THE COURT:  Okay.  I tried to say that.

10   You said it better.  I'll take care of that.  That's the

11   correct way.

12                   MR. MILLER:  We believe that it ought to

13   continue, "Based on the marketing materials, based only

14   on the marketing materials."

15                   THE COURT:  That's in the charge.

16                   I'll do it the way you said it here.

17                   Okay.  We'll take a short break and then

18   I've got a plea, but I want you to get your exhibits, and

19   then if we have objections, first of all, put all the

20   exhibits that you agreed to in one spot, and then we'll

21   do that first.  And then if there are -- we'll take those

22   back.

23                   And then if there are objections, we'll do

24   that.

25                   MR. MILLER:  Thank you.  Is there any
```

10:36:54 (line 5)
10:37:05 (line 10)
10:37:19 (line 15)
10:37:30 (line 20)
10:37:40 (line 25)

1    assistance we can provide, Your Honor, in expediting the

2    verdict sheet, if you want us to do any typing?

3                    THE COURT:  No.

4                    MR. MILLER:  Okay.  We'll step away.

10:37:49  5          THE COURT:  We're big boys here and big

6    girls.  Right, General?

7                    (Recess taken)

8                    (11:15 a.m.)

9                    THE COURT:  Anyway, all right.  So the

11:15:09 10   Plaintiff is offering Exhibits 1 through 800,000 and

11   there's only one objection?

12                   MR. MILLER:  It's the other way around,

13   Your Honor.  We have objections and Mr. Kelleher can

14   address those to their exhibits.  I think we get through

11:15:23 15   them quickly, and they I think have one objection or two

16   objections to two of our exhibits so.

17                   MR. CARNEY:  Actually three.

18                   MR. MILLER:  You guys can go first.  It

19   doesn't matter.

11:15:36 20          THE COURT:  I guess I'm not making myself

21   clear.

22                   What exhibits are you offering, and

23   then -- that are without objection?  That's the first

24   question.

11:15:45 25          And you just give us the number of the

3212

1    exhibits.  We don't need to know anything else.

2                    MR. CARNEY:  Do you want without objection?

3                    THE COURT:  Correct.

4                    MR. CARNEY:  Okay.  Plaintiff's Exhibit 18,

11:16:08  5    19.

6                    THE COURT:  Listen.

7                    MR. KELLEHER:  I'm not ready to listen.

8    Hold on.  Now I'm ready to listen.

9                    Thank you.

11:16:20 10                    THE COURT:  Okay.

11                    MR. CARNEY:  Plaintiffs are offering the

12    following exhibits, without objection:  18, 19, 40, 41,

13    55, 59, 60, 69, 70, 71, 73, 77, 78, 79, 85, 92, 134, 156,

14    158, 161, 162, 163, 176, 177, 178, 180, 226, 246, 247,

11:17:21 15    259, 262, 266, 314, 316, 402, 426, 435, 436, 437, 439,

16    607, 617, 618, 622, 1000, 1002, Joint Exhibits 9, 11, 24,

17    30, 32, 68, 89, 119, 124, 129, 130, 131, 151, 157, 159,

18    160, 166, 227, 263, 264, 291, 294, 299, 453, Defendant's

19    Exhibits 12, 126, 136, 137, 307, 316, 826, and 840.

11:19:04 20                    THE COURT:  And which ones are being

21    objected to?

22                    MR. CARNEY:  The Defendant has objected to

23    34, 35, 36, 38, 52, 84, 109, 252, 253, 267, 606, 615.

24                    MR. KELLEHER:  There's no objection to 606.

11:19:58 25                    MR. CARNEY:  I apologize.

1              So 606 comes in without objection.

2              615, 621, 623, and then our demonstratives

3      1001, 1003, and 1004.

4              That's it.

11:20:30  5              THE COURT:  Okay.  How about the defense?

6              MR. KELLEHER:  Judge, SAP offers Exhibit

7      Number 4, Exhibit Number 5, Exhibit Number 8, Number 9,

8      Number 10, Number 11, Number 12, Number 17, Number 18,

9      21, 24, 30, 32, 34, 36, 40, 41, 57, 68, 70, 77, 89, 109,

11:21:34 10      119, 121, 122, 123, 124, 126, 128, 129, 130, 131, 136,

11      138, 139, 142, 145, 151, 157, 158, 159, 160, 163, 165,

12      166, 167, 195, 202, 214, 215, 216, 217, 227, 246, 255,

13      258, 262, 263, 264, 277, 291, 293, 294, 299, 301, 306,

14      307, 311, 312, 314, 316, 318, 320, 325, 327, 330, 332,

11:23:23 15      428, 439, 453, 508, 617, 618, 700, 740, 748, 755, 785,

16      786, 788, 789, 798, 809, 816, 817, 818, 820, 821, 822,

17      824, 825, 826, 827, 828, 830, 834, 840.  Excuse me, 834

18      is objected to.  840, 844, 848, 889, 899, 901, 907, 909,

19      910, 911, 912, 913.  Those are the exhibits that SAP

11:24:54 20      enters without objection.

21              There are two exhibits that SAP would like

22      to offer into evidence to which there has been objection.

23              My colleague tells me I may have missed two

24      that were without objection.  913 and 914.  Is that all

11:25:21 25      of them?  Okay.  So there are two that have been objected

1    to.  That's 281 and 834, and we pose them for additional

2    comment.

3              THE COURT:  Okay.  I guess I'm going to

4    have to ask you now, what's 34?

11:25:40 5              MR. MILLER:  834?

6              THE COURT:  No.  No.  Plaintiff's 34.  I'm

7    sorry.

8              MR. LAMBERT:  Plaintiff's 34 is marketing

9    literature that was distributed by SAP that the channel

11:25:53 10   partner, I think at least Dan Lowery, I think

11   Van Leeuwen, testified they looked at and relied upon in

12   marketing Business One.

13             MR. KELLEHER:  Judge, I actually have a

14   volume that has all the exhibits in it for you.  Do you

11:26:09 15   want to take a look at it?

16             THE COURT:  Yes.  Thanks.

17             MR. KELLEHER:  I have a copies for you guys

18   as well.

19             THE COURT:  That was pretty bad.  Tell me

11:26:21 20   he didn't win any points for that.  He's oblivious, but

21   that's okay.

22             MR. KELLEHER:  So, Judge, this is marketing

23   materials that contain -- from October of 2003.  It

24   discusses the product, but it's not one of the documents

11:26:41 25   Hodell claims it actually relied upon.  Remember, Hodell

1   said there were two of them; 314 and 617.

2              So this document, when you look at it, it

3   has the same words in it, right, from ten to several

4   hundred employees, but this isn't a document Hodell said

5   they relied on.

6              THE COURT:  I got you.  Okay.  Thank you.

7              35 is --

8              MR. KELLEHER:  Are you asking me, Judge?

9              THE COURT:  No.  No.  Since they're

10  offering it, I see that it's a -- introducing -- I guess

11  since you were so kind to give us these, what's the basis

12  of getting it in and what's the objection?

13             MR. LAMBERT:  Well, the basis of getting it

14  in, Mr. Lowery testified -- and I know that at least

15  Mr. Lowery testified and perhaps Mr. Van Leeuwen -- that

16  this was information that they received from SAP in order

17  to educate them on the product and that was part of the

18  basis of that, again of marketing the software to Hodell.

19             THE COURT:  Okay.

20             MR. LAMBERT:  Now, again, I know that the

21  Court has said that we can't rely upon -- or the jury

22  can't rely upon the representations by LSi and IBIS, but

23  it forms the basis for our understanding of what was

24  opined.

25             THE COURT:  Okay.  Same objection?

3216

1          MR. KELLEHER:  Yes, Judge.  And actually if

2     it's helpful to you, I have our objections written on a

3     sheet that I've shared with opposing counsel.

4          THE COURT:  Why not?

11:28:11  5          MR. KELLEHER:  If you'd like it, it might

6     expedite it and move it along.  We have the same response

7     to this exhibit, Judge.

8          It wasn't one of the two exhibits they told

9     this Court they relied upon.  It has some of the similar

11:28:23 10     language in there.  It's irrelevant, and to the extent

11     there is any relevance, the jury's substantially likely

12     to be misled into thinking Hodell did actually rely on

13     this when they told this Court they have not.

14          THE COURT:  Okay.  Got you.

11:28:36 15          36, same thing?  Same?

16          MR. LAMBERT:  36 is essentially the same

17     thing as one of the pages of Exhibit 314 that the

18     Judge -- the Court has put in the jury instruction, and

19     if I may, I mean, their objections to these are presuming

11:28:58 20     the jury isn't going to follow the jury instructions.

21          THE CLERK:  Can you guys talk into the mics

22     so Sue can hear?

23          MR. LAMBERT:  Sorry.

24          I think the jurors are perfectly capable of

11:29:13 25     following the jury instructions as to what the charge is.

1    Again, these are documents that have no other objection

2    that they're making as to admissibility other than they

3    don't -- Hodell didn't rely upon them.  That's not why

4    they're being submitted into evidence.

11:29:32  5                    THE COURT:  Okay.  How about 38 and the --

6                    MR. LAMBERT:  Same thing.  I mean,

7    it's -- it's literature that was given out to SAP's

8    channel partners who testified that they had to rely on

9    this in order to market Business One to Hodell.

11:29:50 10                    Obviously, we had to rely at least in part

11   on representations made by -- or statements, whether they

12   were on behalf of SAP, whoever they're speaking on behalf

13   of, as to deciding how to buy this product.  This forms

14   the basis for what we were told.

11:30:07 15                    MR. KELLEHER:  Again, I don't -- Judge, may

16   I speak?

17                    THE COURT:  Yeah.

18                    MR. KELLEHER:  I don't understand the basis

19   of the objection.  The Court asked them very clearly --

11:30:14 20                    THE COURT:  You're the one objecting.

21                    MR. KELLEHER:  That's a good point.

22                    (Laughter).

23                    MR. KELLEHER:  I don't understand the basis

24   of what Mr. Lambert just said.

11:30:20 25                    I do understand our objection, which is

1    they told the Court that they were relying on two

2    documents.  This wasn't one of them.

3                   But this is even worse, Judge, because you

4    struck their return on investment claim, and this

11:30:30  5    document is the ROI, talks about the ROI calculator for

6    SAP Business One.  It's completely irrelevant, and it's

7    likely to mislead the jury into thinking there is a claim

8    for return on investment when there patently is not.

9                   And I keep hearing Mr. Lambert talk about

10    the business partner.

11                   MR. CARNEY:  Your Honor.

12                   MR. KELLEHER:  This Court has held --

13    pardon me.  And this Court has held, as a matter of law,

14    that IBIS/LSi was not SAP's agent.  So I don't think

11:30:54  15    there's anything to say about that.

16                   MR. CARNEY:  Your Honor.

17                   THE COURT:  Interesting what you just said.

18    You said they keep referring to them as a business

19    partner and that I have held they are not the agent.

11:31:04  20                   Those are two different things, aren't

21    they?

22                   MR. KELLEHER:  Yes, Judge.

23                   THE COURT:  Okay.

24                   MR. KELLEHER:  The factual matter of

11:31:07  25    whether they are our business partner is a different

1      thing, but the thing that matters in this case is whether

2      or not they are our agent, and you have held they are

3      not.

4                    THE COURT:  I know, but you were

11:31:16  5      complaining that he was calling them your business

6      partner.

7                    MR. KELLEHER:  That's what he means.

8                    (Laughter).

9                    THE COURT:  Okay.

11:31:20 10                    MR. KELLEHER:  And it's beside the point,

11     Judge.  No, it's not all like that, and you struck the

12     claim.  I don't get it.

13                    THE COURT:  All right.  Got you.

14                    52.

11:31:30 15                    MR. CARNEY:  Your Honor, before we go on,

16     we'll withdraw 38.

17                    THE COURT:  Okay.

18                    MR. LAMBERT:  52 was a -- 52 is an e-mail

19     Dan Lowery sent to several individuals at SAP, including

11:31:57 20     the CEO, came in through Geoff Ashley.  There's no

21     dispute that it was sent and received.  It's not hearsay.

22     And it talks about the In-Flight, the rollout of

23     In-Flight, and Hodell specifically --

24                    THE COURT:  Okay.  What's the objection?

11:32:19 25                    MR. KELLEHER:  Judge, the objection is that

3220

1      the only witness Hodell showed this to was Otto Reidl.

2      He's not anywhere on the address line of the e-mail.  And

3      there's no foundation for this document.

4                     THE COURT:  Well, it is a business record,

11:32:35  5      isn't it?

6                     MR. KELLEHER:  Was a foundation laid for

7      the business record?  I didn't hear.

8                     THE COURT:  Well, I'm talking about as a

9      practical matter.

11:32:44 10                     MR. LAMBERT:  I looked through the record,

11      Your Honor.  It was shown to Geoffrey Ashley.  I looked

12      in the transcript.  I can give you the page.

13                     THE COURT:  Okay.

14                     MR. CARNEY:  1455 and 56.

11:32:56 15                     MR. KELLEHER:  Judge, we also looked and if

16      we're mistaken, we will withdraw it.  If it was shown to

17      Mr. Ashley, we will withdraw that objection.

18                     THE COURT:  All right.  And then 109?

19                     MR. LAMBERT:  109?  I have 84 in here.  Is

11:33:09 20      there no objection to 84?

21                     THE COURT:  That's what we were just

22      talking about, I thought.

23                     MR. LAMBERT:  No, we were talking about

24      Exhibit 52.

11:33:17 25                     THE COURT:  Wait a minute.  I must have

3221

```
 1   gone one too fast.

 2                   52 was the Las Vegas thing.

 3                   MR. LAMBERT:  Yeah.

 4                   THE COURT:  With the ROI, wasn't it?

 5                   MR. LAMBERT:  No, the ROI was 38.

 6                   MR. MILLER:  And that's the one they

 7   withdrew.

 8                   THE COURT:  38 they withdrew.

 9                   MR. MILLER:  Correct.

10                   THE COURT:  Okay.  And then 84, I got that

11   figured out.

12                   109.

13                   MR. LAMBERT:  No, 84 --

14                   THE COURT:  No, you didn't do 84?

15                   MR. LAMBERT:  We haven't figured out 84?

16                   What's the objection to 84?

17                   THE COURT:  There is no 82.

18                   MR. LAMBERT:  52 we were just discussing.

19                   THE COURT:  52.

20                   MR. LAMBERT:  Was the In-Flight.

21                   THE COURT:  I got that.  And 84 seems to be

22   the same thing to me.

23                   MR. LAMBERT:  What's the objection to 84?

24                   MR. CARNEY:  Hearsay.

25                   THE COURT:  Yes.
```

 1              MR. KELLEHER:  Actually, Judge, 84 is a

 2     little different.  If you'll just give me a moment, I'm

 3     happy to --

 4              THE COURT:  I mean, I know it's a different

11:34:17  5     document.

 6              MR. KELLEHER:  Our objection is very

 7     different.

 8              THE COURT:  Is it?  Okay.

 9              MR. KELLEHER:  Can I state the objection,

11:34:20 10     Judge?

11              THE COURT:  Yeah.

12              MR. KELLEHER:  If you look on Page 2 of 84,

13     this is the e-mail that comes below the e-mail on the

14     first page.  It says, "Good afternoon, Dan."  It's

11:34:30 15     written by Otto Reidl, copied to Eugene Krautus.  That's

16     his lawyer.

17              And if you look at -- I'm on Page 2.  If

18     you look at what's highlighted on the third paragraph

19     there, it says, "The progress of the project is painfully

11:34:44 20     slow and continues to have a severe impact on our

21     operations, and thus, our financial performance.  To put

22     things in perspective, our bottom line in March came in

23     $200,000 below where it should have been, and given our

24     recent business trends and our budget income level, while

11:35:00 25     we can't attribute a hundred percent of the shortfall to

1    this project, I'm certain that the majority of it, via

2    lost sales, operational difficulties and overruns," et

3    cetera, et cetera.

4                    Judge, they don't have a claim for lost

11:35:13  5    sales, and they told this Court that over and over again.

6                    THE COURT:  Okay.

7                    MR. KELLEHER:  This is not a relevant

8    document, and to the extent there is any relevance, it's

9    prejudicial.

11:35:25  10                    THE COURT:  I got you.  I got you.

11                    MR. LAMBERT:  That objection is baseless,

12    Your Honor.

13                    THE COURT:  Okay.  Here.  Let's go to 109.

14                    MR. LAMBERT:  109 was actually shown, shown

11:35:36  15    by Mr. Miller in closing argument, put up on the screen.

16                    I don't understand how they could possibly

17    object to 109.

18                    MR. MILLER:  Agreed.  Withdrawn.

19                    THE COURT:  Okay.  252.

11:35:55  20                    MR. LAMBERT:  What's the objection to 252?

21                    MR. CARNEY:  It's a blurry copy.

22                    MR. LAMBERT:  This is the copy that we had,

23    Your Honor.  This is the license agreement.  This is

24    Hodell's copy.  This is the copy we had in our records.

11:36:12  25                    THE COURT:  Why are you objecting to this?

3224

1              MR. KELLEHER:  Because it's a blurry copy,

2       Judge.  316 is the clear copy.  They want them to look at

3       the blurry stuff.  I mean --

4              MR. LAMBERT:  They are going to have them

11:36:23  5       both.

6              MR. MILLER:  Forgive me, but there is some

7       chance of confusion.

8              THE COURT:  I'm with you.  316 is already

9       in, right?

11:36:31 10              MR. MILLER:  Yes.

11              THE COURT:  It's clear?

12              MR. KELLEHER:  And 316 has both signatures

13       on it.

14              MR. LAMBERT:  That's the point.  We didn't

11:36:37 15       receive a countersigned copy, Your Honor.  This is the

16       only copy we had.

17              THE COURT:  But you didn't have to, right,

18       according to the contract.  You know, signature

19       separately was okay.  I think that's what I read sometime

11:36:49 20       in the past.

21              MR. LAMBERT:  That's fine.

22              THE COURT:  253.

23              MR. LAMBERT:  What's the basis for this

24       objection?

11:36:57 25              MR. CARNEY:  Relevance, unfair prejudice

1    and jury confusion.

2                    MR. LAMBERT:  You know, I don't know what

3    to tell you.  This is an admission by the vice president

4    of SAP Business One division in 2007 that at least at

11:37:16  5    that point in time, he knew the software wasn't working

6    before the go-live date.

7                    I assume they're objecting because of the

8    breach of warranty claim.  It's admissible for other

9    purposes.  There's --

11:37:28 10                    THE COURT:  Okay.  I got you.

11                    MR. LAMBERT:  The jury has been adequately

12    instructed on that issue.

13                    THE COURT:  What's the objection on that?

14                    MR. KELLEHER:  Judge, that's exactly right.

11:37:37 15    You have struck the breach of warranty and the breach of

16    contract claim.  That's what this is talking about.

17    That's the only reason they want this in is because it

18    says, "Failure to conform to the documentation."

19                    There is no claim for failure to conform to

11:37:45 20    the documentation.  There's no relevance to this

21    document.  It's highly prejudicial, even if there were.

22                    THE COURT:  Got you.

23                    267.

24                    MR. LAMBERT:  I have 259 in here.  Is there

11:37:56 25    an objection to 259?

```
         1              MR. MILLER:  No.

         2              Can I ask for procedure?  Since these are

         3      our objections, I think we will move more efficiently if

         4      Joe just --

11:38:07 5              THE COURT:  We're almost finished.

         6              MR. LAMBERT:  Is there an objection to 259?

         7              THE COURT:  No.

         8              MR. LAMBERT:  No.  Okay.

         9              THE COURT:  267, what's the objection to

11:38:13 10     this?

        11              MR. KELLEHER:  Judge, the objection to 267

        12      is that this is an e-mail from Mr. Kraus to

        13      Mr. Killingsworth on September 29th.  Mr. Kraus asked him

        14      to have a confidential conversation with Otto Reidl and

11:38:32 15     he does and he lists what Mr. Reidl told him.  It's

        16      hearsay.

        17              They didn't ask -- Mr. Killingsworth had no

        18      personal knowledge -- he testified to that -- as to the

        19      veracity of the figures.  Mr. Killingsworth wasn't asked

11:38:44 20     in questions about where, under what circumstances he

        21      provided these hearsay figures.  He was just asked to

        22      parrot the contents of the e-mail.

        23              They shouldn't be allowed to try to prove

        24      their damages claim through unreliable hearsay as opposed

11:38:58 25     to actual records.  And it's undisputed they don't have
```

1        the records.

2                        One last point, Judge, it says --

3                        THE COURT:  Got you.  Got you.  I got you.

4                        MR. KELLEHER:  -- and it's lost sales and

11:39:10 5    there is no claim for lost sales.

6                        THE COURT:  615 is what?

7                        MR. LAMBERT:  The SAP annual reports

8        compendium.

9                        I think it was actually, correct me if I'm

11:39:18 10   wrong, Chris, but culled down to just a select few pages

11       from one of the annual reports.

12                       MR. CARNEY:  Yes.

13                       MR. LAMBERT:  And maybe I'm incorrect.

14                       MR. CARNEY:  Yeah, you're right.

11:39:32 15                   MR. LAMBERT:  I'll let you handle that.

16       I'm not sure.

17                       THE COURT:  All right.  Let's just go to

18       621.

19                       MR. KELLEHER:  621, Judge.

11:39:40 20                   Judge, 621, I think we can do it together

21       with 623.  These are the Profit 21.  They're summary

22       documents of their expenditures for Profit 21.

23                       THE COURT:  Oh, all right.

24                       MR. KELLEHER:  Remember, there's no backup

11:39:51 25   documentation.  The claim is out.

3228

| | |
|---|---|
| 1 | THE COURT:  Got you. |
| 2 | MR. LAMBERT:  There wasn't -- just real |
| 3 | quickly, there wasn't a claim for the Profit 21 |
| 4 | implementation cost.  They disputed we actually spent |
| 11:40:03  5 | that money to replace Business One and it was put in for |
| 6 | that purpose.  So they are the ones that opened the door |
| 7 | to that.  If we -- you know, obviously proved it up |
| 8 | through those records. |
| 9 | So I don't understand why they would be |
| 11:40:15 10 | objecting to us.  I understand why they would be |
| 11 | objecting, but there's no basis for it. |
| 12 | THE COURT:  Okay.  And then how about 1001? |
| 13 | That -- is that different than some other exhibit that's |
| 14 | been introduced? |
| 11:40:30 15 | MR. KELLEHER:  No, Judge.  We're going to |
| 16 | withdraw our objection to 1001. |
| 17 | THE COURT:  How about 1003? |
| 18 | MR. KELLEHER:  You say 1003, Judge? |
| 19 | THE COURT:  Yeah. |
| 11:40:40 20 | MR. KELLEHER:  We maintain this objection |
| 21 | for sure. |
| 22 | Judge, this is the heartbeat chart, just so |
| 23 | we're looking at the same thing, right? |
| 24 | THE COURT:  Um-hm. |
| 11:40:46 25 | MR. KELLEHER:  Got those two lines.  And we |

1      printed them in black and white because we ran out of

2      color.

3                      But the whole purpose of this demonstrative

4      by the Plaintiffs was to show the difference between

11:40:52  5      these two lines, right, between the red and the blue

6      lines, but this chart is set up in such a way as to be

7      highly misleading.  Look, they have two Y axes here.

8                      THE COURT:  No, no, I understand all about

9      what the testimony was on that.

11:41:06 10                      MR. KELLEHER:  Well, Judge, the

11      testimony --

12                      THE COURT:  Your objection is because it's

13      misleading?

14                      MR. KELLEHER:  It's fundamentally

11:41:11 15      misleading, Judge.

16                      If I handed this to any professor I've ever

17      had in any quantitative course I've ever taken, I would

18      fail.  There's two different axes.  The intervals are

19      different.  It compares apples-to-oranges.  And if you

11:41:23 20      did, as we did last night, actually compare

21      apples-to-apples, in other words the intervals are the

22      same, Judge, that differential, that delta, it shrinks,

23      it vanishes.

24                      MS. LUARDE:  Your Honor, this --

11:41:36 25                      MR. KELLEHER:  How could you put this to

3230

| | |
|---|---|
| 1 | the jury? |
| 2 | THE COURT:  I'm with you.  I'm with you.  I |
| 3 | understand. |
| 4 | MR. CARNEY:  I need to address this. |
| 11:41:43  5 | THE COURT:  No, you don't.  No, you don't. |
| 6 | 1004. |
| 7 | MR. KELLEHER:  Judge, this is simple. |
| 8 | This was part of Mr. Guembel's expert |
| 9 | report.  Expert reports aren't admissible.  That's the |
| 11:41:52 10 | basis of our objection. |
| 11 | THE COURT:  Okay.  Let me go to Defendants, |
| 12 | 281.  What's that? |
| 13 | MR. CARNEY:  281 was that big document, |
| 14 | this Activant document.  It was about a 300-page document |
| 11:42:09 15 | that they asked questions of Jaime Clarke.  You know, |
| 16 | Activant is the -- developed Profit 21, and they did some |
| 17 | survey before they, you know, before they went to -- |
| 18 | THE COURT:  Let me take a look at it. |
| 19 | MR. KELLEHER:  This isn't the whole thing, |
| 11:42:31 20 | Judge.  It's huge. |
| 21 | MR. CARNEY:  The witness testified that he |
| 22 | had no personal knowledge of the document, couldn't |
| 23 | identify it, and -- |
| 24 | THE COURT:  Okay.  I got you. |
| 11:42:40 25 | MR. CARNEY:  -- couldn't testify. |

1          THE COURT:  Why do you think this gets in?

2          MR. KELLEHER:  Judge, this includes survey

3    responses, as it says on the first page -- it's

4    highlighted -- and also on the second page, from Hodell's

11:42:49  5    own employees.  They were copied verbatim into this

6    report.

7          The document actually came in through

8    Mr. Clarke.  His responses to those surveys are contained

9    in this document.  There's no authenticity issue.  It was

11:43:01 10    produced pursuant to a subpoena to Activant.

11          Hodell actually should have produced this

12    document, Your Honor.  It was a report issued to them by

13    their own software provider, but they never did.  So they

14    shouldn't be able to hide behind the fact they never

11:43:14 15    produced it and now say we can't authenticate it.

16          MR. CARNEY:  Your Honor.

17          THE COURT:  How is it relevant?

18          MR. KELLEHER:  Judge, it's relevant for a

19    bunch of reasons.

11:43:27 20          MR. STAR:  One of them, Your Honor, is with

21    respect to the number of line items per sales order.

22          In this survey, one of the things they

23    answered was that their average sales order is four

24    lines.  They told this jury, they made it sound to this

11:43:41 25    jury like they had routinely 100-plus line item orders.

1          And it's relevant on a host of other

2     issues, including with respect to the number of total

3     orders that they take, the way in which they work, all of

4     those sorts of pieces of data that they talked about with

11:43:59  5     this jury.

6               THE COURT:  Well, now, these were answered

7     by Mr. Kevin Reidl, right?

8               MR. STAR:  Some of them, indeed.

9               MR. CARNEY:  Pardon me?  I didn't hear the

11:44:09 10     question, Your Honor.

11               THE COURT:  Some of these were answered by

12     Mr. Kevin Reidl?

13               MR. LAMBERT:  Yes.  The testimony came in,

14     Your Honor.  Mr. Star was allowed to cross-examine

11:44:17 15     Mr. Clarke about the responses, but the document itself

16     is three to 400 pages long, contains all kinds of other

17     statements not made by anybody in this case, and they

18     simply aren't relevant to any issues in the case.

19               THE COURT:  Okay.  Got you.

11:44:33 20               How about 834?

21               MR. CARNEY:  834, 834 was not identified

22     pursuant to Judge Wells' order, and it was -- and for

23     that reason, we don't want it in.  It was not provided in

24     a timely manner.  The Judge didn't allow it.  And we

11:45:03 25     don't think it should go to the jury.

1          MR. KELLEHER:  Judge, this one is pretty

2     easy.  This is a list of Business One customers from '03

3     and '04 with high user counts.  Hodell just doesn't like

4     the document.

5          And let's just be clear, though.  Your

6     Honor issued an order on May the 12th, 2015; you asked

7     for our exhibit list.  This was on that exhibit list.

8          They've had this document for a long time.

9     Paul Killingsworth laid extensive foundation for this

10    document in his testimony.  It's highly relevant and it

11    should come in.

12         MR. CARNEY:  They also never produced it in

13    discovery, Your Honor, and, you know --

14         MR. LAMBERT:  The first time we saw it was

15    when it was included in their exhibit binder.

16         MR. KELLEHER:  That's actually incorrect,

17    Judge.

18         It was produced by e-mail.  I was in Mr.

19    Star's office when it happened.  We didn't find the

20    document until later, but as soon as we found it, we

21    e-mailed it to you, Wes, on January 14th.  Check your

22    e-mails.

23         THE COURT:  Okay.

24         MR. LAMBERT:  January 14th of what year,

25    sir?

3234

1          MR. KELLEHER:  This year.

2          MR. LAMBERT:  Okay.  How many years had

3    discovery closed after you sent that to me?

4          THE COURT:  All right.  Here.

11:46:05  5          The objection is sustained to Exhibit,

6    Defense Exhibit 281.  Plaintiff's Exhibits 34, 35, 36,

7    84, 252, 253, 267.  615 can be reserved because it may be

8    used later, but the objection is sustained to go to the

9    jury now.  621, 623 and 1004.

11:46:34 10          And 52 will be received.  109 will be

11    received.  1001 will be received.  1003 will be received.

12    And 834 will be received over objection.

13          So if you could get those things together

14    on -- because the jury is probably champing at the bit to

11:46:56 15    get the exhibits back there.

16          Now, don't go too far.  I'm sure you can go

17    to lunch, I'm guessing, but --

18          MR. MILLER:  We'll be close.

19          THE COURT:  Yeah.

11:47:29 20          (Proceedings adjourned at 11:47 a.m.)

21                 - - - - -

22

23

24

25

1          <u>THURSDAY, JULY 2, 2015,  3:14 P.M.</u>

2               THE COURT:  Be seated, please, folks.

3               We have a question.  It's dated today's

4      date.  It reads, "The jury requests clarification" -- you

15:14:12  5      don't have them in the hallway, do you?

6               THE CLERK:  No, he's just there.

7               THE COURT:  Oh, okay.  "The jury requests

8      clarification from the Judge to be sure we are

9      understanding Page 21 of the jury instructions correctly,

15:14:27 10      please confirm that this is the proper interpretation.

11               "Our understanding is that the Plaintiff

12      must prove (by clear and convincing evidence) all five of

13      the elements of fraud and that proof of fewer than five

14      is insufficient proof to find for the Plaintiff."

15:14:49 15               And it's signed by the foreperson.

16               I think the answer is your understanding is

17      correct.

18               MR. MILLER:  You have to prove all five.

19               THE COURT:  Yeah.

15:14:59 20               MR. MILLER:  I think that that, rather than

21      just say, "Your understanding is correct," I think you

22      say, "Your understanding is correct, you have to prove

23      all five."

24               THE COURT:  Does somebody have Page 21?  I

15:15:11 25      don't have a copy.

1        MR. STAR:  Yes, Your Honor.  Sorry.  It has

2    a couple notes.

3            THE COURT:  Telling me how wrong I am?

4            MR. STAR:  No, it actually says how -- no.

15:15:23  5        THE COURT:  Okay.  I'll give it back to you

6    in a minute.

7            (Pause)

8            I've done this a couple times where you

9    wait for the jury and then they come out and say "Oh, we

15:16:57 10   have a verdict.  We're not going to wait for the answers

11   to the question."

12           (Jury in)

13           (Proceedings resumed in presence of the

14   jury as follows:)

15:17:22 15       THE COURT:  Please be seated.

16           Ms. LeClaire, I have a question, and I'm

17   going to ask you one question about it and that is have I

18   correctly read your question.

19           And that is, it's dated 7/2/15.  "The jury

15:17:36 20   requests clarification from the Judge to be sure we are

21   understanding Page 21 of the jury instructions correctly.

22   Please confirm if this is the proper interpretation.

23           "Our understanding is that the Plaintiff

24   must prove (by clear and convincing evidence) all five,"

15:17:59 25   underlined, "of the elements of fraud, and that proof of

1   fewer than five is insufficient proof to find for the

2   Plaintiff."

3                    Now, have I correctly read your question?

4                    The answer is yes, they have to prove all

15:18:13  5   five by clear and convincing evidence.

6                    Thank you.

7                    (Jury out)

8                    (Recess taken).

9                    THURSDAY, JULY 2, 2015,  3:50 P.M.

15:50:32  10                   THE COURT:  Okay.  Be seated, folks.

11                   Ms. LeClaire, has the jury reached a

12   decision?

13                   Would you hand the items to the General?

14   Wait, to the General.

15:50:54  15                   None of you are old enough to remember

16   Johnny Carson.  Carmack?  Who?  I know.  Make fun of me.

17   Go ahead.

18                   Okay.  Case Number 08CV2755, Hodell-Natco

19   Industries versus SAP America, Inc. and SAP AG.

15:51:29  20                   Do you find by clear and convincing

21   evidence in favor of Plaintiff on Plaintiff's claim of

22   fraud in the inducement?

23                   "Answer:  No."  And it's signed in ink by

24   all nine jurors and dated today's date.

15:51:41  25                   I'm going to ask you just a single question

3238

| | | |
|---|---|---|
| | 1 | and that is have I correctly read your verdict juror |
| | 2 | number one? |
| | 3 | JUROR NUMBER 1:  Yes. |
| | 4 | THE COURT:  Number 2? |
| 15:51:48 | 5 | JUROR NUMBER 2:  Yeah. |
| | 6 | THE COURT:  Number 3? |
| | 7 | JUROR NUMBER 3:  Yes. |
| | 8 | THE COURT:  Number 4? |
| | 9 | JUROR NUMBER 4:  Yes. |
| 15:51:52 | 10 | THE COURT:  Number 5? |
| | 11 | JUROR NUMBER 7:  7.  Yes. |
| | 12 | THE COURT:  Number 8?  That's how we do it. |
| | 13 | JUROR NUMBER 8:  Yes. |
| | 14 | THE COURT:  9? |
| 15:51:56 | 15 | JUROR NUMBER 9:  Yes. |
| | 16 | THE COURT:  10? |
| | 17 | JUROR NUMBER  10:  Yes. |
| | 18 | THE COURT:  11? |
| | 19 | JUROR NUMBER 11:  Yes. |
| 15:51:59 | 20 | THE COURT:  Okay.  Thank you. |
| | 21 | Your verdict is correct in form and in |
| | 22 | substance, and each of you have answered in the |
| | 23 | affirmative.  And so I will accept your findings. |
| | 24 | That means that your service is no longer |
| 15:52:09 | 25 | needed or your -- or is concluded, I should say, in this |

3239

1    case.

2                    I want to take the opportunity to thank you

3    on behalf of the parties and certainly the Court for the

4    effort that you put forth.

15:52:20  5                    I don't know what you knew about jury

6    service before you came down in this case, but I think at

7    the end of the day, at the end of this process, I think

8    that, I hope you walk away with the idea that if anybody

9    has a dispute, the best way to resolve is to have people

15:52:37 10   from the community who don't know any of the parties,

11   don't know anything about the case, come in here and

12   listen to the disputed testimony, follow the law as given

13   by the Court, and come up with a verdict that's

14   consistent with the evidence and the law, which you've

15:52:48 15   done in this case.

16                    So you have a right to be proud of the

17   service that you've rendered, not only to the parties,

18   but to the community.  And you're released from the

19   admonition I gave you.

15:52:58 20                    I mentioned to you that you may discuss the

21   case if you want with somebody else, but I think really

22   as an admonishment really or comment, that your verdict

23   speaks loudly and clearly for what you believe the state

24   of the evidence to have been.  So there's no need to make

15:53:14 25   any comment to anybody about any aspect of the case, but

3240

1     to your friends and family, you know, feel free.

2            And one danger always that people talk

3     about the case is that, you know, your verdict is a

4     collective verdict so you wouldn't be speaking for

15:53:27 5     anybody else if you did talk to somebody.

6            So with that, anything further on behalf of

7     the Plaintiff?

8            MS. LUARDE:  No, Your Honor.

9            THE COURT:  On behalf of the Defense?

15:53:34 10            MR. STAR:  No.  Thank you, Your Honor.

11            THE COURT:  All right.  You're excused.

12     I'll be back in a minute to answer any questions that you

13     may have.

14            THE CLERK:  All rise for the jury.

15:53:42 15         (Jury out)

16         (Proceedings adjourned at 3:54 p.m.)

17               - - - - -

18

19

20

21

22

23

24

25

3241

1                    C E R T I F I C A T E

2              I certify that the foregoing is a correct

3   transcript from the record of proceedings in the

4   above-entitled matter.

5

6

7   **/s/Susan Trischan**

8   /S/ Susan Trischan, Official Court Reporter

9   Certified Realtime Reporter

10

11  7-189 U.S. Court House

12  801 West Superior Avenue

13  Cleveland, Ohio 44113

14  (216) 357-7087

15

16

17

18

19

20

21

22

23

24

25